J. ASHLEE ALBIES      OSB #051846
E-mail: ashlee@civilrightspdx.com
CREIGHTON & ROSE, PC
500 Yamhill Plaza Building
815 S.W. Second Avenue
Portland, Oregon  97204
Phone:  (503) 221-1792
Fax:      (503) 223-1516

SHAUNA CURPHEY, OSB # 063063
E-mail: scurphey@curpheylaw.com
Curphey & Badger, P.A.
520 SW 6th Avenue, Suite 1040
Portland, OR 97204
Phone: (503) 241-2848

*Of Attorneys for Intervener-Plaintiff AMA Coalition for Justice and Police Reform*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:12-cv-02265-SI |
| Plaintiff, | MEMORANDUM OF LAW IN SUPPORT OF AMA COALITION'S MOTION TO INTERVENE |
| v. | |
| CITY OF PORTLAND | |
| Defendant. | Oral Argument Requested |

## INTRODUCTION

The Albina Ministerial Alliance Coalition for Justice and Police Reform ("AMA Coalition"), a community group with a long history of civic engagement on police accountability in Portland, seeks to intervene as a plaintiff as of right, or alternatively by permissive intervention, in a lawsuit brought by the United States Department of Justice ("DOJ") against the City of Portland ("City"). The lawsuit arises out of the DOJ's investigation into the Portland Police Bureau's use of excessive force. The facts and law supporting the AMA Coalition's motion are set forth below.

## FACTUAL BACKGROUND

**I.      The AMA Coalition Has a Long History of Advocacy for Police Reform in Portland.**

The AMA Coalition is an umbrella group of individuals and community organizations at the forefront of community organizing for police accountability and oversight in Portland. Decl. Dr. LeRoy Haynes ("Haynes Decl."), ¶ 2. The AMA Coalition was founded in 2003 after Kendra James, a young African American woman, was shot during a traffic stop. *Id.* The Albina Ministerial Alliance ("AMA") is a group of 125 Portland-area churches, including many predominantly African-American congregations, has engaged in social justice work since the 1970s and served as a founding member of the AMA Coalition. *Id.* ¶ 4. The AMA's roots run deep in their ministers' civil rights era work -- Doctor LeRoy Haynes, Jr., Senior Pastor of the Allen Temple AME Church in Northeast Portland currently serves as the AMA Coalition's chairperson. *Id.* ¶ 1. The AMA Coalition broadened its reach after the PPB shooting of Aaron Campbell in January 2010. *Id.* ¶2. In addition to faith-based organizations, other community organizations dedicated to bringing justice to the citizens of Portland and reforming the Portland

Police Bureau ("PPB") now participate in the Coalition, including Portland Copwatch, Disability

Rights Oregon, the Mental Health Association of Portland, the Portland Chapter of the National

Lawyers Guild, and Oregon Action, *Id.* ¶ 3.

> In 2010, the AMA Coalition participants coalesced around the following goals:

1. A federal investigation by the Justice Department to include criminal and civil rights violations, as well as a federal audit of patterns and practices of the Portland Police Bureau (PPB);

2. Strengthening the Independent Police Review Division and the Citizen Review Committee with the goal of adding power to compel testimony;

3. A full review of the Bureau's excessive force and deadly force policies and training with diverse citizen participation for the purpose of making recommendations to change policies and training;

4. Lobbying the Oregon State Legislature to narrow the language of the State statute for deadly force used by police officers;

5. Establishing a special prosecutor for police excessive force and deadly force cases.

*Id.* The AMA Coalition pursues these goals with an emphasis on teamwork among its diverse

members and on the principles of non-violent direct action enunciated by Dr. Martin Luther

King, Jr. *Id.* at ¶ 5.

> Since its inception, the AMA Coalition has been at the forefront of public advocacy

regarding police accountability in Portland, regularly meeting with City leaders, offering

comprehensive analysis and critique of PPB policies and practices, and testifying at public

hearings regarding police accountability and oversight. *Id.* at ¶ 6. For example, several of its

members served on the 2010 Police Oversight Stakeholder Committee ("Committee") -- a group

effort tasked by the Portland City Council to review the structure of police oversight in Portland.

*Id.* The Committee, after months of study and deliberation, issued a comprehensive report in

September 2010, which offered 43 recommendations. Haynes Decl. at ¶ 6; Ex. 1[1] (City of

Portland, Oregon, Police Oversight Stakeholder Committee Final Report, September 21, 2010).

Despite the Committee's overwhelming success in reaching consensus on most of its

recommendations, only a few, some relatively minor, were enacted by the Council. *Id.*

The AMA Coalition's police reform work has also addressed issues of race. For example,

several of its members served on the City's Task Force on Racial Profiling. In addition, the

AMA Coalition conducted an analysis of the PPB's release of 2010 pedestrian stop data, which

revealed that the percentage of African Americans and Latinos who are searched after being

stopped continues to be over twice as high as the percentage of whites who are searched. Ex. 2

(AMA Press Release 6/19/12 and chart).  The data further revealed that in 2010, 14.5% of

African Americans stopped were searched, 11.4% of Latinos stopped were searched, while only

6.5% of Whites stopped were searched. *Id.*

The AMA Coalition intensified its efforts in the wake of several high profile police

shootings and in-custody deaths of minority community members and individuals suffering from

mental illness – including Jose Mejia Poot, Kendra James, James Jahar Perez, James Chasse, Jr.,

Aaron Campbell, Jack Dale Collins, and Keaton Otis -- as well as the many independent audits

and reviews of PPB's systems and policies. *Id.* at ¶ 8. As a result of this work, in October of

2010, the AMA Coalition submitted to the  City a list of 49 Community Demands, including

specific recommendations on the following areas: (1) Use of Force Policy, De-escalation

Training, Discipline; (2) Creating a Plan, Chain of Command, Communication; (3) Medical Aid;

(4) Investigation, Inquest and Grand Jury; (5) Racial and Other Profiling; (6) Oversight: Police

---

[1] All exhibits attached to Dr. Haynes' Declaration will hereafter be referred to simply by Exhibit number.

Review Board; (7) Drug Testing; (8) Transparency; (9) Hiring; (10) Other Training and

Equipment Needs. Ex. 3 (Community Demands, updated October 2010). Despite the AMA

Coalition's continual advocacy and engagement, however, the City failed to implement many of

the recommendations, nor did it address why the proposed recommendations could not be

implemented. Haynes Decl. at ¶ 9.

**II.     The AMA Coalition Called for and Participated in the DOJ Investigation That Led
          To the Case Now Before the Court.**

The AMA Coalition was instrumental in the genesis of the Department of Justice

investigation of the PPB. In May 2010, the Coalition issued a letter to the DOJ requesting an

investigation into the PPB's use of excessive force against people of color and people suffering

from mental illness. Ex. 4 (AMA Letter to DOJ, May 5, 2010). The letter sought "an

investigation into what [the AMA Coalition] believe[s] is a pattern and practice of

unconstitutional behavior by the Portland Police Bureau against members of the minority

community in Portland, including those who suffer from mental health issues, pursuant to your

authority under The Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. §

14141 and The Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. 3789d(c)(3)

("Safe Streets Act")." *Id.*

In June 2011, the DOJ commenced an investigation into whether the PPB engaged in a

"pattern or practice" of civil rights violations relating to officers' use of force. Ex. 5, (DOJ Press

Release, 6/8/11). At the press conference announcing the investigation, AMA Coalition Steering

Committee members Jo Ann Hardesty (FKA Bowman) and Joyce Harris urged the DOJ to look

at race and poverty in its investigation. Haynes Decl. at ¶ 11. In addition, the AMA Coalition

gathered information, witnesses, and evidence for the DOJ, and met with DOJ staff on several

occasions. *Id.*at ¶ 12. For example, just one day after the DOJ announced its investigation, the AMA Coalition provided the DOJ with information from public sources regarding PPB officer-involved shootings from the past decade, along with an analysis of that information. *Id.*; Ex. 6 (AMA Letter to DOJ, 6/8/11); Ex. 7 (AMA Chart of Officer-Involved Shootings).[2] This analysis found that at least 30% of the 61 people shot at or killed were people of color, in a city that is almost 79% white. *Id.* at ¶12. Of those 61 people shot or killed, 14, or 23% were African American, compared to 6.4% of the city population, and twenty-two of the 61 people, or 36%, were either unarmed (eleven), in a vehicle with no other weapon (seven), or armed with "weapons" such as an umbrella, a pair of scissors, an aluminum pushbar, or an Xacto knife (four). *Id.* In addition, the AMA Coalition provided its list of 49 Community Demands to the DOJ, and urged the DOJ to address disparaties in use of force based on race. *Id.* at ¶ 13.

In September 2012, the DOJ made public a Letter of Finding ("DOJ Letter") regarding its investigation into the PPB, finding that "PPB engages in a pattern or practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness." Ex. 8 (DOJ Letter, 9/12/12). While the DOJ noted "consistent concerns from members of the community" regarding racial bias in policing, it specifically declined to make a finding of a pattern or practice regarding PPB's interaction with people of color. *Id.* at 37 - 38. Despite both the AMA Coalition's and Mayor Sam Adams' request that the DOJ look at PPB's relationship with communities of color, "the scope of [the DOJ's] investigation did not include an analysis of whether PPB engages in a pattern or practice of biased-based policing [.]" *Id.* at 38. However, the DOJ recognized feedback regarding racial tensions between the PPB and the community was

---

[2] This chart was a draft compilation prepared by the AMA Coalition to the DOJ for reference purposes only.

"similar to comments that were provided to the City during a series of five community listening

sessions in 2006 with community-based organizations and the PPB, and that data demonstrated

PPB disproportionally stops African Americans. *Id.* at 38. The DOJ's sole proposal for

"remedial measures" with regard to the issue of race was to "require PPB to develop a

community engagement and outreach plan with the goal of creating robust community

relationships and sustainable dialogue with Portland's diverse communities." *Id.* at 41.

The same day that the DOJ announced its findings, it also released a "Statement of

Intent" outlining concepts the City had agreed to in principle. Ex 9, (Statement of Intent).  These

included:

1)      revision of the PPB's use of force policies specific to encounters with people with
        or perceived to have mental illness, Electronic Control Weapons, and de-
        escalation techniques;

2)      expansion of the PPB's crisis intervention resources;

3)      use of the City's Early Intervention System to track "individual officers,
        supervisors and units for non-punitive corrective action, and to assess gaps in
        policy, training, supervision and accountability[.]"

4)      taking steps to expedite misconduct investigations; and

5)      creating a community oversight body to assess implementation of the agreement.

*Id.*

## III.    The Proposed Settlement Agreement Fails to Address Many of the Concerns Raised by the AMA Coalition.

After releasing its findings and the Statement of Intent, the DOJ invited the AMA

Coalition, as well as other stakeholders, to a briefing and solicited their commentary on the

content of a potential consent decree or agreement. Haynes Decl. at ¶ 14.  The AMA Coalition

submitted proposals in response to that request on September 27, 2012, which identified several

areas where the Statement of Intent failed to fully address the problems identified in the DOJ's findings. Ex. 10 (AMA Proposals, 9/27/12). Specifically, the AMA Coalition made recommendations concerning police misconduct and use of force investigations, review board hearings, community engagement, and measures to change the culture at the PPB. *Id.*

On October 26, 2012, the DOJ and the City released a draft settlement agreement and announced that it would be presented to City Council just five days later, on November 1, 2012. Haynes Decl. at ¶ 15. The AMA Coalition and other community groups were not privy to the negotiations between the DOJ and the City that led to the draft agreement. *Id.*  Members of the AMA Coalition testified at the November 1 hearing and submitted comments. *Id.*

Shortly after the initial City Council hearing, the AMA Coalition issued a statement entitled "Concerns about DOJ Agreement with the City of Portland" and testified again at the next Council hearing on the Agreement. Haynes Decl. at ¶ 16; Ex. 11. One of the AMA Coalition's repeated concerns was that the DOJ and the City Council for the most part ignored its recommendations for unexplained reasons. *Id.*  Despite meetings with the DOJ and the City, it is not clear whether, or to what extent, the DOJ and City considered the information and feedback provided by the AMA Coalition. *Id.*

In December 2012, the DOJ filed its Complaint against the City of Portland, alleging a pattern and practice of unconstitutionally excessive force by the Portland Police Bureau against people with actual or perceived mental illness, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 USC § 14141. Compl. ¶ 1, Dkt #1. The DOJ and the City have filed a joint motion requesting the court to approve a negotiated settlement agreement (Agreement) and place this case on the court's inactive docket pending implementation of the

Agreement. *See* Joint Motion to Enter the Parties' Settlement Agreement, Dkt. # 3.

The Agreement, as it now stands, fails to address the concerns raised by the AMA Coalition. As an initial matter, despite evidence and community feedback, the DOJ recognized "lack of community trust by minority groups, particularly the African-American community," Decl. Billy J. Williams, Dkt. # 5, ¶ 4, but made no findings as to disparities in use of force related to race.  While the Agreement keeps in place the Community/Police Relations Committee and directs them to continue overseeing implementation of the Racial Profiling Plan and participate in reviewing demographic data collected on police encounters, Dkt. #4, Attachment 1, Agmt at ¶ 146(d), 148, it does not go as far as the recommendations contained in the DOJ letter of findings. Ex. 8, at p.37-38. For example, the Agreement directs the Bureau to "continue to require that officers document appropriate demographic data regarding the subjects of police encounters," but (a) does not say whether that will include "mere conversations" as suggested in the Letter of Findings, and (b) gives the Bureau until December 31, 2013 to report on changes, rather than requiring changes to be made sooner. Dkt. #4-1, Agmt at ¶ 148.

The Agreement also fails to address concerns raised by the AMA Coalition regarding community involvement and officer use of force, among other issues. For example, the AMA called for involvement of people of color and mental health professionals in officer training, enhanced community member involvement in Police Review Board hearings, and enforcement capacity of the Community Oversight Advisory Board (COAB). Ex. 11, p. 4. In addition, the AMA Coalition raised concerns about the extent to which the Agreement adequately restricted the use of Tasers and explained the appropriate use of force. Ex. 11, p. 1.

Moreover, the Agreement provides for no formal public input or Court oversight

regarding outcomes. It provides that the DOJ is to conduct a comprehensive assessment two years after the effective date of the Agreement "to determine whether and to what extent the outcomes intended by the Agreement have been achieved." Dkt. #4-1, Agmt at ¶ 172. The Agreement further provides that when the City agrees with DOJ's recommendations, the Parties shall stipulate to modify it accordingly. *Id.* Such modifications will not be subject to a Fairness Hearing, nor does the Agreement provide any formal process for public input or Court oversight. Thus, it is critical that an intervenor representing the public's interests be part of this process.

## ARGUMENT

### I.      The AMA Coalition Is Entitled to Intervene as of Right.

Federal Rule of Civil Procedure 24(a)(2) governs intervention as of right. It provides, in relevant part, that "the court must permit anyone to intervene" if the applicant-intervenor, on timely motion, "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. Proc. 24(a)(2). In general, courts construe Rule 24(a) liberally in favor of the movant seeking to intervene and take "all well-pleaded, nonconclusory allegations in the motion to intervene . . . and declarations supporting the motion as true absent sham, frivolity or other objections." *Southwest Ctr. for Biological Diversity v. Berg,* 268 F.3d 810, 818, 820 (9th Cir. 2001). Moreover, a court's analysis of a motion to intervene is "guided primarily . . . by practical and equitable considerations." *Id.* at 818 (citations omitted).

Within the general framework described above, an applicant for intervention as of right must demonstrate that (1) it has a "significant protectable interest relating to the property or

transaction" at issue in the action; (2) the disposition of the action may "impair or impede the applicant's ability to protect its interest"; (3) the application is timely; and (4) that the existing parties "may not adequately represent the applicant's interest." *Id.* (citation omitted).[3] Here, the AMA Coalition has filed its motion in accordance with the Court's January 8th, 2012 deadline. Dkt. #18. Therefore, it addresses only the remaining three factors below.

### A.    The AMA Coalition, as Advocates of Police Reform in Portland, Has a Significant, Protectable Interest in the Outcome of This Suit.

An applicant-intervenor demonstrates a significant protectable interest if: 1) the interest is protected by law and 2) there is a relationship between the legally protected interest and the plaintiff's claims. *Southwest Ctr. for Biological Diversity,* 268 F.3d at 818 (citation omitted). "Rule 24(a)(2) does not require a specific legal or equitable interest," however. *Wilderness Soc'y v. United States Forest Serv.,* 630 F.3d 1173, 1179 (9th Cir. 2011) (citation omitted). Rather, "the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.*

The Ninth Circuit has recognized that public advocacy relating to the particular issue addressed in the suit gives rise to a significant, protectable interest. *United States v. City of Los Angeles*, 288 F.3d 391, 402 n.5 (9th Cir. 2002) (community groups that have worked on police reform in Los Angeles may have a significant protectable interest related to suit by the U.S. government alleging the Los Angeles Police Department engaged in a pattern or practice of

---

[3] The Ninth Circuit has recognized "a circuit split exists whether an intervenor-applicant must also independently satisfy Article III standing to intervene as of right." *Prete v. Bradbury*, 438 F.3d 949, 956 n.8 (9th Cir. 2006). The court, however, has "in the past […] resolved intervention questions without making reference to standing doctrine" and has stated that, until an en banc review of that issue, it will "decline to incorporate an independent standing inquiry into our circuit's intervention test." *Portland Audubon Soc. v. Hodel*, 866 F.2d 302, 308 n.1 (9th Cir. 1989) (citation omitted) *overruled on other grounds by Wilderness Soc'y v. United States Forest Serv.*, 630 F.3d 1173, 1177-78 (9th Cir. 2011).

depriving individuals of their constitutional rights); *see also Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983) (environmental groups that participated in the creation of a bird sanctuary had a significant, protectable interest in the preservation of birds and their habitats, which was related to a suit challenging the designation of the sanctuary); *Idaho v. Freeman*, 625 F.2d 886, 887 (9th Cir. 1980) (National Organization for Women had a significant, protectable interest in the ratification of the proposed Equal Rights Amendment, which was related to a suit challenging procedures for ratification).

Here, the AMA Coalition has a long history of public advocacy related to police reform on behalf of its members in Portland. After each significant officer-involved death, the AMA Coalition has offered extensive analysis and recommendations for improving police practices, as well as oversight and accountability. It has met repeatedly with members of Council, community members, and the leadership of the PPB in ongoing attempts to address excessive force and racial profiling by the PPB.

**B.    The AMA Coalition's Interest in Protecting Its Members from Unlawful Police Practices Is, as a Practical Matter, Impaired by the Present Suit.**

Under Rule 24(a)(2), courts inquire whether "disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. Proc. 24(a)(2). Courts determine whether the suit impairs the movant's interest by considering whether the movant has "other means" to protect its interest, such as an alternative forum. *Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006). Additionally, even where an alternative forum may exist, a court should consider whether the "litigation may impair appellants' ability to obtain effective remedies in later litigation." *United States v. Oregon*, 839 F.2d 635, 638 (9th Cir. 1988) (holding that government suit over conditions in a state mental hospital could impair the practical

ability of hospital residents to affect, in later litigation, the distribution of the state's limited mental health resources).

Here, as in *Lockyer*, the AMA Coalition, as a practical matter, has no other effective means to protect its interest in protecting its members from unlawful police practices. Despite years of data compilation and analysis and committed advocacy, many of the AMA Coalition's proposed changes to PPB practices related to use of force and race relations in Portland have not come to fruition. The AMA Coalition has participated in many of the City's taskforces and oversight committees, only to have many of those recommendations ignored. While the AMA could pursue litigation to address its concerns, the time and cost involved in such a suit are prohibitive as a practical matter.

Moreover, like the situation in *United States v. Oregon*, the relief that the DOJ seeks here could impair the relief available in any future litigation brought by the AMA Coalition to address disparaties in use of force against minorities in Portland. The Agreement includes extensive monitoring and training changes to the PPB's policy and practices. If the AMA were to bring future legal action to address their remaining concerns regarding: 1) the Agreement's effectiveness in addressing the DOJ's excessive force findings and 2) disparaties in use of force against minorities, the PPB would have to implement additional changes, at additional cost. On the other hand, if the AMA intervenes here, that additional training, monitoring, and oversight would be included in the "package" proposed by the Agreement without requiring another separate investigation, legal action, and negotiation.

**C.   The Record Demonstrates That the Government Will Not Adequately Represent the AMA Coalition's Interests.**

Courts consider three factors in evaluating whether current parties adequately represent

an applicant-intervenor's interests: 1) whether the present parties "will undoubtedly make all of the intervenor's arguments;" 2) whether current parties are "capable of and willing to" make such arguments; and 3) whether the intervenor "offers a necessary element to the proceedings that would be neglected." *United States v. Oregon*, 839 F.2d at 638 (citation omitted). An applicant-intervenor satisfies the requirement of inadequacy of representation "if the applicant shows that representation of its interests "may be" inadequate and the burden of making this showing is minimal." *Sagebrush Rebellion, Inc.*, 713 F.2d at 528. Where, however, the applicant-intervenor shares the same interest as a government entity acting on behalf of its constituents, courts presume the government's representation is adequate, absent a compelling showing to the contrary. *Lockyer v. United States*, 450 F.3d at 443.

The applicant-intervenor may nonetheless rebut the presumption that the government's representation is adequate with evidence that "the government's arguments will not include the constitutional deficiencies raised by the applicants." *United States v. Oregon*, 839 F.2d at 638; *see also Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011) ("[T]he government's representation of the public interest may not be 'identical to the individual parochial interest' of a particular group just because 'both entities occupy the same posture in the litigation,'" especially where the government has a fundamentally different point of view on the litigation as a whole). Here, the AMA seeks to intervene to address the inadequacy of the DOJ's representation in two distinct areas, as described in further detail below.

## 1. DOJ Has Refused to Address Use of Force Disparities Based On Race.

The DOJ has not addressed concerns of disparaties in use of force based on race, as raised by the AMA Coalition and community members. In its initial letter to the DOJ, calling for a

pattern and practice investigation pursuant to 42 USC § 14141 (1994), the AMA Coalition specifically requested the DOJ to examine discriminatory policing practices against Portland's minority community. Ex. 4.  Once the DOJ announced it would be conducting an investigation, the AMA Coalition provided information and analysis demonstrating disparities in use of force based on race regarding officer-involved shootings, and repeatedly urged the DOJ to address these disparates. Haynes Decl. at ¶ 13; Ex. 6, Ex. 7. Comments from minority community members directly to the DOJ supported the AMA Coalition's feedback. Ex. 8, p.37-38. Additionally, the AMA Coalition's analysis of the PPB's racial profiling data demonstrates a disproportionate ratio of pedestrian stops and searches on minorities in Portland. Ex. 2. Yet, despite this information, the DOJ recognized, but did not make specific findings, regarding bias policing or disparities in use of force based on race in its investigation.

Although the present case could easily accommodate remedies to address these concerns, the DOJ and the City are unwilling to incorporate such measures. The unreasonable use of force against those with actual or perceived mental illness and the unreasonable use of force against minorities in Portland are closely intertwined, and both should be addressed in this action. Moreover, the monitoring of excessive force contemplated under the proposed Agreement focuses on mental health. Adding training, monitoring, and reporting that would likewise address race would be a small but significant improvement on bringing true reform to the PPB.  Given the parties' refusal to consider race in this case, the AMA Coalition should be granted intervenor status to ensure remedies relating to race are adequately and appropriately considered.

/ / /

/ / /

2.  **The Proposed Agreement Fails to Incorporate Several AMA Recommendations That Are Essential to Fully Address the DOJ's Excessive Force Findings.**

As explained more fully above, the Agreement proposed by the DOJ fails to address concerns raised by the AMA Coalition regarding community involvement, officer training, and officer use of force, among other issues. Moreover, the AMA Coalition was not part of negotiations leading up to the current proposed Agreement, nor did the DOJ explain why it chose to reject the AMA Coalition's suggestions regarding its terms. In addition, the Agreement's silence regarding public input or Court oversight regarding outcomes is further evidence that the DOJ does not adequately represent the AMA Coalition's interests. Thus, the AMA seeks to intervene to both contribute to the terms of the Agreement and to represent the public's interest during the monitoring process.

II.  **In the Alternative, the Court Should Grant the AMA Coalition's Motion for Permissive Intervention Because the Coalition Will Contribute to the Full Development of Claims and Will Not Unduly Delay the Proceedings.**

Rule 24(b)(1) governs permissive intervention and provides, in relevant part, that "the court may permit anyone to intervene who . . . has a claim . . . that shares with the main action a common question of law or fact." Fed. R. Civ. Proc. 24(b)(1). Additionally, a court must also consider whether intervention "will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. Proc. 24(b)(3). These issues are addressed in the sections below.

A.  **The AMA Coalition Meets the Threshold Requirements for Permissive Intervention.**

An applicant seeking permissive intervention under Rule 24(b)(2) must meet three threshold requirements: "1) an independent ground for jurisdiction; 2) a timely motion; and 3) a common question of law and fact between the movant's claim or defense and the main action."

*See e.g., Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 84 (9th Cir. 2011). "[T]he independent jurisdictional grounds requirement, [however] does not apply to proposed intervenors in federal-question cases when the proposed intervenor is not raising a new claim." *Id.* at 844. Moreover, the AMA Coalition's motion is timely because, as noted above, it has met the Court deadline. Thus, the section that follows addresses the third factor, common question of law or fact, only.

Here, the AMA's proposed Complaint in Intervention shares questions of both law and fact with the main action. To the extent that the AMA Coalition seeks to intervene to address the adequacy of the proposed remedy, that claim is at the core of the issue now before the Court in the main case. Moreover, while the AMA also seeks to intervene to ensure the existing focus on use of excessive force against those with or perceived to have mental illness also addresses disparities of use of force based on race, its claim is based on the Fourth and Fourteenth Amendments, and is well within the purview of 42 USC §14141, which forms the basis of the DOJ's case. Moreover, the AMA Coalition has presented evidence of disparities in use of force, specifically in officer-involved shootings, sufficient for it to intervene in the case to include such considerations in the remedy.

    **B.**    **The AMA's Participation in the Suit Will Contribute to a Full Development of the Claims and Will Not Unduly Delay or Prejudice the Proceedings.**

The district courts have broad discretion to determine whether permissive intervention is appropriate. *Spangler v. Pasadena City Bd. of Education*, 552 F.2d 1326, 1329 (9th Cir. 1977). A court tasked with exercising that discretion may consider the following factors:

> [T]he nature and extent of the intervenors' interest, their standing to raise relevant legal issues, the legal position they seek to advance, and its probable relation to the merits of the case. . . . whether the intervenors' interests are adequately

> represented by other parties, whether intervention will prolong or unduly delay
> the litigation, and whether parties seeking intervention will significantly
> contribute to full development of the underlying factual issues in the suit and to
> the just and equitable adjudication of the legal questions presented.

*Id.* Finally, the court should not seek to "streamline" the litigation "at the risk of marginalizing

those . . . who have some of the strongest interests in the outcome." *United States v. Los Angeles*,

288 F.3d at 405.

### 1. The AMA Coalition Has a Significant Interest in Addressing Unconstitutional Police Practices in Portland.

As described extensively above, the AMA Coalition has been advocating on behalf of

police reform in Portland for many years. It has spent countless hours and persistent efforts

advocating for police oversight and accountability mechanisms that will reduce the amount of

officer-involved shootings, racial profiling and disparate impact on minorities. Indeed, during the

course of the DOJ investigation, the AMA Coalition offered the DOJ many detailed

recommendations, many of which did not make it into the Agreement. The AMA Coalition has

little understanding of how or why those recommendations were considered or ignored.

### 2. The AMA Coalition Has Standing To Raise the Legal Issues They Seek to Advance.

An association may bring suit on its members' behalf when: "(a) its members would

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane

to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires

the participation of individual members in the lawsuit." *Oklevueha Native Am. Church of Haw.,*

*Inc. v. Holder*, 676 F.3d 829, 839 (9th Cir. 2012) (citations omitted). When an association seeks

declaratory or injunctive relief, its claims do not require the participation of individual members

because "the remedy, if granted, will inure to the benefit of those members of the association

actually injured." *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 515 (1975)).

Here, as explained above, the AMA Coalition seeks to intervene to raise two, distinct legal issues: 1) the failure of the Agreement to address issues of race; and 2) the adequacy of the proposed Agreement to address the DOJ's findings with regard to the PPB's use of excessive force in encounters with people suffering from mental illness. These interests are germane to the AMA Coalition's purpose because, as described above, it formed specifically to address police accountability and reform in Portland, and, since then, has engaged in continual advocacy related to that issue. Additionally, because only injunctive relief is at issue in this case, the AMA Coalition's claim does not require the participation of its individual members. Thus, the discussion that follows focuses on whether the AMA Coalition's members would have standing to sue in their own right.

A plaintiff seeking to redress unconstitutional police practices may establish standing to assert a claim for prospective injunctive relief if the plaintiff demonstrates "that he is realistically threatened by a repetition of [the violation]." *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 997-998 (9th Cir. 2012) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, (1983)). A plaintiff can demonstrate that he or she is threatened by a repetition of unconstitutional police conduct if the plaintiff can show: "that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy" or 2) "that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'" *Id.* (citations omitted).

Here, the evidence is sufficient to establish that an individual member of the AMA Coalition would have standing to seek the injunctive relief the Coalition now seeks. First, to the

extent that the AMA seeks to intervene solely to address the adequacy of the current Agreement, the DOJ has already found a pattern of police use of excessive force against minority community members. Second, to the extent that the AMA also seeks to intervene to address disparaties in use of force based on race, it has presented evidence of concern sufficient to confer standing.

### 3. The AMA's Participation Will Contribute to a Full Development of the Underlying Factual Issues and a Just Adjudication of the Legal Questions Presented.

The AMA Coalition, with its diversity and deep roots in the communities most affected by the Portland Police Bureau's excessive use of force against people with mental illness and persons of color, and long history of police reform advocacy in Portland, is best suited to represent the interests of the community as an intervenor.  It has a long-established and respected role as a leader in the public debate concerning use of force by the PPB, and will be an important community voice on the implementation and oversight of the proposed Agreement, if entered.

The AMA Coalition strongly believes the proposed Settlement Agreement between the DOJ and Portland is inadequate to protect and represent the public interest, based on the recommendations it has made as described above, and in addressing bias-based policing.  The Complaint alleges violations of the Fourth and Fourteenth Amendments to the United States Constitution, but narrows the focus, and thus the remedies, to use of excessive force against those with or perceived to have mental illness. *See* Compl., ¶¶ 19-20.  Broadening the scope of this case to include bias-based policing, expanding the scope of remedies sought to account for race, and allowing the AMA Coalition to be a party to ensure the current mental health concerns are adequately addressed, would not only be the most efficient way to bring true reform to the PPB, but is also the most efficient use of the parties', and the court's, resources.

## CONCLUSION

For the foregoing reasons, the AMA Coalition respectfully requests that this Court grant its Motion to Intervene as of Right, or, in the alternative, grant its Motion for Permissive Intervention, to allow it to intervene to 1) address bias-based policing; and/or 2) address the adequacy of the proposed Agreement's remedial measures with regard to the PPB's use of excessive force against people who are or are perceived to be mentally ill.

DATED: January 8, 2012

Respectfully Submitted,

_____s/ J. Ashlee Albies_____
J. Ashlee Albies, OSB # 051846
ashlee@civilrightspdx.com
Shuana Curphey, OSB # 063063
shauna@curpheylaw.com