# AMA

Dr. T. Allen Bethel
President

Albina Ministerial
Alliance

4222 NE 12th Ave.
Portland, OR 97211

503.288.7243
Fax: 503.288.1712
AMAAlliance@aol.com

Tom Perez
Assistant Attorney General
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Special Litigation Section
Washington, D.C. 20530

June 8, 2011

RE:   Portland Police Bureau

Dear Assistant General Perez,

I.   Introduction

We write to follow up on our request for an audit of the Portland Police Bureau (PPB)'s pattern and practice of discrimination against Portland's minority populations, including examination and analysis of its use of force and identification of patterns or practices of discriminatory police practices and unconstitutional searches and seizures. We live in a city that is 6.4% Black, 78.8% White, yet 23% of those subjected to deadly force, 13% of those pulled over for traffic stops, and 24% of those stopped as pedestrians are Black People; the percentage of Black People searched is double the rate of their White counterparts.

II.   Use of Force

We include additional information on the PPB's use of force, compiled from public records regarding officer-involved-shootings and in-custody deaths, attached hereto. There are several overarching themes in these incidents: most incidents involve minorities, people with mental health issues, or people experiencing a mental health crisis; the officers involved are rarely, if ever, disciplined for their use of force; the PPB fails to use information gathered on use of force to discourage excessive force by its officers; and some incidents involved failure to provide timely medical treatment. These practices converge to create a landscape where police officers are not held accountable for their use of excessive force by the PPB, and community members do not to feel protected by the police.

In the past 11 years, from 2000 to 2011, PPB had 61 incidents involving PPB members shooting at civilians or civilian in-custody deaths. The City generally does not provide statistics on the race of the victims; however,

*Albina Ministerial Alliance Coalition for Justice & Police Reform*   P a g e | 1

from what we have been able to glean from newspaper reports and public records, it appears that at least 30% of the 61 people shot at or killed were people of color, in a city that is almost 79 % white. This statistic is slightly down from 2008, when it was at 34%, and 2004 when it was nearly 50 %. Of those 61 people shot or killed, 14, or 23% were African American, compared to 6.4% of the population. Twenty-two of the 61 people, or 36 %, were either unarmed (11), in a vehicle with no other weapon (seven), or armed with "weapons" such as an umbrella, a pair of scissors, an aluminum pushbar, or an Xacto knife (four).

Two cases of particular concern involve James Chasse and Aaron Campbell:

Mr. Chasse, a 42-year-old man with schizophrenia, was brutally beaten to death in broad daylight by two PPB officers and one Multnomah County Deputy Sheriff after being chased and tackled for suspicion of urinating in public. The officers concealed the amount of force used on Mr. Chasse to the paramedics, sent the ambulance away, and attempted to take Mr. Chasse to jail for booking despite his severe and obvious injuries. After the nurses at the jail refused to admit Mr. Chasse, the officers attempted to drive him to an area hospital, rather than the closest hospital. Mr. Chasse died en route. The cause of death was blunt force trauma. The officers were not disciplined for the use of force; rather, they were "dinged" for not having allowed Mr. Chasse medical attention after Tasering him.

In the case of Aaron Campbell, a 25-year-old Black man experiencing a mental health crisis, members of the PPB were negotiating with Mr. Campbell to come out of his girlfriend's apartment, where he went after learning of his brother's death that morning. Mr. Campbell was reported to be suicidal and have a gun. During negotiations, Mr. Campbell was in communication with PPB officers, and complied with a request that he let his children and girlfriend out of the apartment. Mr. Campbell then came out of the apartment in response to a request from the PPB. Moments after emerging, Mr. Campbell was shot in the back with a bean-bag gun, a moment later with an AR-15, and also subjected to a police-ordered K-9 attack. Mr. Campbell was left without medical attention, where he died on scene. Although the officers involved in shooting Mr. Campbell were disciplined, including a rare instance of an officer being fired for an on-duty shooting, those disciplinary actions are being arbitrated and there is no way of knowing whether they will be upheld. Officers who have been fired after shooting civilians have been reinstated most of the time, even in cases where wrongdoing or poor judgment by the shooting officer was found to be the case.

Finally, recent data shows that force is used disproportionately against people of color: from 2004 – 2006, out of all use of force statistics as captured/reported by PPB, African Americans were subjected to force 29% of the time; Taser use against African Americans was at 28%, and pointing of guns against/towards African Americans was at 30%. (2007 Use of Force by the Portland Police Bureau, available at www.portlandonline.com/police/index.cfm?a=154384&c=29870). In 2008, the numbers were:

out of all force, 29% was used on African Americans, Taser use against African Americans was at 29%, and pointing of guns at African Americans was at 34% (2009 Use of Force Report, available at http://www.portlandonline.com/auditor/index.cfm?a=254600&c=44653).

Apropos of nothing, not a single officer involved shooting during the aforementioned timeframe had an officer of color firing at a civilian, whether the civilian was armed or not with a firearm, or if brandishing a weapon.

### III.  Racial Profiling

In addition, we include relevant information on racial profiling, based on data gathered and maintained by the Portland Police Bureau.

African Americans make up 6.4% of the population, yet represent about 13% of the people pulled over in traffic stops; 24% of pedestrians stopped; and 24% of those searched, which is double the search rate of their White counterparts (2004-2009). Moreover, African Americans make up 26% of those shot or shot at by PPB, 29% of those who had force used against them (2004-2006+), and 52% targeted on the "repeat offender" list (April 2008 figures) and excluded from Drug Free Zones (Sept. 2006-July 2007).

### IV.  Independent Police Review Division

The City of Portland Auditor's office has an Independent Police Review Division (IPR), which is authorized to hear and investigate complaints from community members about the PPB. In practice, the IPR does the initial intake on complaints but less than 10% of complaints are subject to full investigations by the IPR; rather the PPB's Internal Affairs division conducts the investigations.

IPR originally had no jurisdiction to investigate shootings and deaths cases. In 2002 IPR was authorized to hire outside experts to review closed cases. The Police Assessment Resource Center (PARC), although prohibited from reviewing cases involved in civil litigation, produced four reports on the PPB. The OIR Group, an independent group, reviewed and issued a report on the James Chasse shooting in 2010. OIR will look at 16-24 more cases covering 2004-2010 in the coming years.

However, the community has always hoped that IPR would take a more direct role in investigating police shootings. Ordinance changes in 2010 gave IPR authority to sit in on interviews and otherwise participate as the IAD investigates deadly force cases. Still, IPR is not exercising its power to conduct fully independent investigations (and is dependent on the PPB to compel officer testimony even if it did).

Meanwhile, in the nine years that IPR has been functioning, it has received 753 allegations of

Disparate Treatment; only one has been sustained, in 2007. During that same time frame, IPR received 1,311 civilian allegations of excessive force. Seven of those, or .5%, have been sustained: 1 in 2003, 1 in 2008, 2 in 2009 and 3 in 2010. In all these years, the IPR and the Auditor have conducted annual surveys in which there has never been 50% or more satisfaction with the complaint system.

V.     Lack of Discipline

As noted above, we see a consistent failure by the PPB to discipline officers for excessive force or discriminatory practices. There have only been a handful of disciplinary actions taken against egregious violations of community members' rights. For example, in the case of Russel Stoneking, Sgt. Bert Nederhiser was demoted in part for not being part of the tactical plan and not being truthful. In the case of Kendra James, Sgt. McCollister was suspended for 900 hours, but later reinstated by an arbitrator. In the case of Dennis Young, Lt. Kaer was fired but later reinstated by an arbitrator. In the case of James Chasse, as mentioned above, Officers Nice and Humphreys were suspended for failure to allow Mr. Chasse medical attention following use of a Taser, rather than their misrepresentations during the investigation or their use of excessive force that led to Mr. Chasse's need for medical attention and ultimately, his death. In the case of Aaron Campbell, Officer Frashour was fired, and Officer Lewton, Sgt. Reyna and Sgt. Birkinbine were each suspended for 80 hours. However, those disciplinary actions are currently being arbitrated, and we, disappointingly, expect that the disciplinary actions will be overturned.

In addition, there have been six instances in which officers have been criminally charged with sexual misconduct. In November 2006, Officer John Wood plead guilty to official misconduct, was placed on probation, and lost his certification for asking women to show him their underwear and/or tattoos during traffic stops. In June 2007, Officer David Howe, arrested in November 2006 in an undercover prostitution sting, resigned and gave up his police certification, but was not prosecuted because the District Attorney could not interview Howe when Howe was on paid leave. In October 2007, Officer Matthew Kohnke plead no contest to official misconduct, resigned and gave up certification for, among other things, sexually violating a woman in a camp for homeless people. In January 2008, Officer Jason Faulk plead guilty to official misconduct, was placed on probation, gave up his certification and resigned for having sex on-duty with an "emotionally challenged" woman. In August 2009, Officer Joseph Wild resigned two months after pleading not guilty to telephonic harassment and official misconduct charges for calling women and claiming he had sex with them, or threatening to rape them. In October 2009, Officer Rodney Murdock resigned and gave up his certification for unspecified contact with prostitutes and other women while on duty; he has not yet been charged with a crime.

/ / /

/ / /

VI.    Conclusion

The above summary represents a few of our gravest concerns about the PPB and its treatment of members of our community. We strongly urge the Department of Justice Civil Rights Division to undertake a searching examination of the pattern and practices of the PPB. As we've said many times, our ultimate goal is to have everyone go home safely. We do not want to wait until yet another member of our community is sacrificed before action is taken to rein in the PPB.

Sincerely,

The Albina Ministerial Alliance Coalition for Justice and Police Reform

**The Albina Ministerial Alliance Coalition for Justice and Police Reform is working toward these five goals:**

1. A federal investigation by the Justice Department to include criminal and civil rights violations, as well as a federal audit of patterns and practices of the Portland Police Bureau.
2. Strengthening the Independent Police Review Division and the Citizen Review Committee with the goal of adding power to compel testimony.

3. A full review of the Bureau's excessive force and deadly force policies and training with diverse citizen participation for the purpose of making recommendations to change policies and training.

4. The Oregon State Legislature narrowing the language of the State Statute for deadly force used by police officers.

5. Establishing a special prosecutor for police excessive force and deadly force cases.

**The Coalition follows these three Principles:**

1. Embrace the five goals outlined above.

2. Accept the principles of non-violent direct action as enunciated by Dr. Martin Luther King, Jr.

3. Work as a team in concert to achieve the goals.