

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

SEP 1 2 2012

The Honorable Sam Adams
Mayor
City of Portland
1221 SW 4th Ave # 340
Portland, OR 97204-1900

RE: <u>Investigation of the Portland Police Bureau</u>

Dear Mayor Adams:

This letter reports the findings of the United States Department of Justice Civil Rights Division's and United States Attorney's Office for the District of Oregon's (collectively "DOJ") joint investigation of the Portland (Oregon) Police Bureau ("PPB"). We opened our investigation to consider whether PPB officers engage in a pattern or practice of using excessive force, with a particular focus on the use of force against people with mental illness or in mental health crisis. Our investigation was brought pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"). Section 14141 authorizes the United States to file a legal action when it has reasonable cause to believe that a law enforcement agency is engaging in activities that amount to a pattern or practice of violating the Constitution or laws of the United States.

While most uses of force we reviewed were constitutional, we find reasonable cause to believe that PPB engages in a pattern or practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness. In this letter, we discuss the need for revised policies, training, supervision, and timely, thorough internal review of use of force in this context.

In making these findings, we recognize the challenges that police officers in Portland and elsewhere confront in addressing the needs of people with mental illness. Our findings take place against a backdrop of a mental health infrastructure that has a number of key deficiencies.

The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Despite the critical gaps in the mental health system, police agencies must be equipped to interact with people in mental health crisis without resulting to unnecessary or excessive force. As Oregon's main population center, Portland police officers encounter people with actual or perceived mental illness with increasing frequency. We are working separately with State officials in a constructive, collaborative manner to address the gaps in the mental health infrastructure. We are confident that the state-wide implementation of an improved holistic, effective community-based mental health infrastructure will be of enormous benefit to law enforcement agencies across the State, as well as to people with mental illness. Implementing these reforms will enhance public safety and officer safety.

We thank the City and PPB, in particular you, Mayor Adams, and Police Chief Michael Reese, for their cooperation throughout our investigation, and for initially inviting us into Portland to conduct this investigation. We acknowledge the professionalism of all of the City officials and counsel involved. In particular, we appreciate the openness and flexibility of the City and PPB personnel during our two site visits, as well as their diligence in providing requested information, including voluminous responsive documents in a timely fashion. Further, we are encouraged by PPB's eagerness to improve its processes, as evident by the steps that PPB has already taken to address concerns raised during our investigation. PPB has not waited for our formal findings to begin the process of addressing the deficiencies that are outlined in this letter. We also commend PPB's willingness to seek outside evaluation and consultation in numerous instances before our investigation. This leaves us optimistic that we will continue our collaborative relationship to craft sustainable remedies that address the deficiencies identified in this letter.

## I.   SUMMARY OF FINDINGS

The use of force is an essential part of law enforcement; however, it must be guided by policy and limited by the protections of the United States Constitution. While most force used by officers in Portland is appropriate, we find reasonable cause to believe that PPB is engaging in a pattern or practice of using excessive force in encounters involving people with actual or perceived mental illness. The pattern or practice is manifested in the following ways:

(1)    Encounters between PPB officers and persons with mental illness too frequently result in a use of force when force is unnecessary or in the use of a higher level of force than necessary or appropriate, up to and including deadly force. We found instances that support a pattern of dangerous uses of force against persons who posed little or no threat and who could not, as a result of their mental illness, comply with officers' commands. We also found that PPB employs practices that escalate the use of force where there were clear earlier junctures when the force could have been avoided or minimized. As described in greater detail below, examples of this use of excessive force include a December 2010 incident when

multiple officers resorted to repeated closed-fist punches and repeated shocking of a subject who was to be placed on a mental health hold.

(2)    In particular, we found that PPB officers use electronic control weapons ("ECWs" (commonly referred to as "Tasers")) in circumstances when ECW use is not justified or use ECWs multiple times when only a single use is justified in encounters with people with actual or perceived mental illness. We found instances that support a pattern of officers using multiple cycles of shock without waiting between cycles to allow the suspect to comply, or officers failing to utilize control tactics during ECW cycles to properly affect handcuffing without having to resort to repeated ECW shocks. Examples detailed below include an August 2010 incident when an officer repeatedly shocked an unarmed, naked subject who, as it turned out, was experiencing a diabetic emergency.

(3)    In effectuating an arrest, officers are permitted to use only the level of force reasonably necessary to accomplish a legitimate government objective; however, we found that PPB officers use more force than necessary in effectuating arrests for low level offenses involving people who are or appear to be in mental health crisis. As detailed below, this includes, for instance, a May 2011 incident in which an officer punched an unarmed subject at least seven times in the face when responding to a call to check on the man's well-being.

We conclude that this pattern or practice results from deficiencies in policy, training, and supervision. We recognize that many of the systemic deficiencies discussed in this letter originated prior to the current PPB administration, which has been aggressive in pursuing reform. Notably, throughout the course of this investigation, Chief Reese and his command staff have been proactive in instituting policy reforms to address our concerns and have already begun the process of correcting many of the issues raised in this report. By building on that initiative, and through strengthening of training, reducing the complexity and duration of the review and discipline processes and other measures, PPB can prevent unnecessary or unreasonable uses of force or self-identify incidents or patterns and undertake self-correcting action. We believe strongly that in addition to protecting constitutional rights, addressing this problem will increase officer safety. Officers need to be as prepared as possible for the situations that they face.

Our formal findings address use of force against people with actual or perceived mental illness. In addition, we also examined allegations that there is a failure to provide adequate and timely access to medical care in the aftermath of certain uses of force, and looked carefully at concerns flowing from apparent tensions between PPB and certain communities in Portland. We do not make any formal findings in these areas; however, our examination identified concerns regarding the failure to provide adequate and timely access to medical care and the need to strengthen community policing. These concerns, including issues of significance involving the relationship between PPB and the African American community, are discussed in Section VII of this letter.

Constitutional policing leads to increased public confidence, which in turns leads to greater public safety.  Addressing the deficiencies identified in this letter will help ensure that PPB provides police services in a constitutional manner and increases its efficacy in protecting the community.

## II.    DOJ INVESTIGATION

On June 6, 2011, we notified you by letter that we were opening an investigation of PPB, pursuant to Section 14141, to determine whether PPB was engaged in a pattern or practice of unconstitutionally using excessive force, particularly against people with mental illness.  Our investigation was prompted in part by the high number of officer involved shootings that involved people with mental illness.[1]

Our investigation has been exhaustive.  We reviewed a large volume of documents from PPB, interviewed police and City of Portland officials, and met with diverse members of the Portland community.  We also met with mental health services providers and officials from Multnomah County regarding the public mental health system's role in PPB interventions for people in mental health crisis.

In reaching our findings, we relied on highly respected consultants who have extensive experience in the delivery of police services, including expertise in officer accountability measures and police interactions with people with mental illness.  Accompanied by a veteran police chief, a psychiatrist who was instrumental in developing the Crisis Intervention Team ("CIT") model, and an expert in police internal affairs, DOJ conducted two tours of PPB, as well as in-person and telephonic interviews of witnesses and organizations that work with PPB.  The combined experience and knowledge of these nationally recognized law enforcement professionals have helped inform our findings.  These professionals conducted independent analyses of certain PPB policies, uses of force, and other data.

During our tours, we met with PPB command staff, representatives from both of the officers' unions, leadership from Internal Affairs, the Professional Standards Division, and the Training Department, among others.  In addition to meeting with you, we met with several agencies and organizations outside of PPB that are critical to PPB's mission, including the Bureau of Emergency Communications ("BOEC"), various local mental health providers, the City Auditor, representatives from the Independent Police Review ("IPR"), the Citizens Review Committee ("CRC"), and representatives from Multnomah County.  Additionally, we heard from hundreds of community members through a multitude of platforms including in-person interviews, our toll free hotline and dedicated email address, and at an open-invitation town hall meeting.

---

[1]       In the last three years, PPB officers have used deadly force 12 times, nine of which involved people affected by mental illness.  We do not reach a separate finding regarding PPB uses of deadly force, specifically.  We note, however, that our review of these uses of force contributed to our findings.

4

The City and PPB have provided full and open cooperation in the investigation. They provided us with prompt and complete access to documents, information, and personnel. Consistent with our commitment to conduct the investigation in a transparent manner, we have provided technical assistance and advice to PPB during our investigation. We were gratified that PPB immediately undertook steps to address many of the concerns raised during those meetings. While we recommend additional reform, the efforts of PPB and its Chief thus far provide a solid foundation for sustainable measures that address our findings.

## III.    BACKGROUND

### A.    Portland, Oregon

According to recent Census data, Portland has an estimated population of 583,776, making it the 29th most populous city in the United States.[2] Portland is Oregon's most populous city and the second most populous city in the Pacific Northwest region, after Seattle, Washington. Approximately 9.4% of Portland's population is Hispanic or Latino (of any race), 7.1% is Asian, and 6.3% is African-American.[3]

Oregon has one of the highest rates of homelessness in the United States, with a large percentage of the homeless population concentrated in Portland.[4] According to the U.S. Department of Housing and Urban Development, 34.7% of sheltered homeless adults nationwide have substance abuse disorders, and 26.2 % have serious mental illness.[5]

### B.    Portland Police Bureau

Currently, PPB is a police force of approximately 1,200 employees, with approximately 980 sworn officers and 240 non-sworn staff.[6] PPB currently divides Portland into three precincts (North, East, and Central), with each precinct led by a commander and divided into as many as 20 districts.[7]

For over a decade, the City of Portland has periodically faced accusations that PPB uses excessive force against civilians. Portland has paid out approximately $6 million in the last twenty years to settle lawsuits related to alleged police misconduct. On multiple occasions, the

---

[2]    Profile of General Population and Housing Characteristics: 2010, U.S. CENSUS BUREAU, *available at* http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml (follow "Geographies" hyperlink; then follow "Places within State" and "Portland city, Oregon") (last visited Sep. 7, 2012).

[3]    *Id.*

[4]    Housing and Urban Development, *The 2010 Annual Homeless Assessment Report* at 22, www.hudhre.info/documents/2010HomelessAssessmentReport.pdf (last visited Apr. 2, 2012).

[5]    *Id.* at 18.

[6]    CITY OF PORTLAND, OREGON, FY 2011-2012 Budget in Brief, *available at* http://www.portlandonline.com/omf/index.cfm?c=55389&a=358662.

[7]    *See* Portland Police Bureau Precinct Map, http://www.portlandonline.com/police/index.cfm?c=43598& (last visited Apr. 2, 2012).

City has attempted to study and address these issues. For instance, in 2003, Portland commissioned the Police Assessment Resource Center ("PARC") to conduct an annual review of officer-involved shootings and deaths in police custody. PARC provided recommendations on measures PPB should take to reduce the occurrence of these events, issued an initial report in August 2003, with follow-up reports in December 2006 and February 2009. [8] Portland also convened a Use of Force Task Force ("Task Force") to analyze statistics and trends in the use of force and deadly force, and retained the OIR Group to conduct an analysis of PPB's officer-involved shootings.

PPB has sought partnerships with various entities to improve its response to individuals with mental illness. For example, PPB has a relationship with Cascadia Behavioral Healthcare and can access their mobile mental health crisis response team, Project Respond, to provide PPB officers with assistance in certain mental health crisis situations. Due to resource limitations, Project Respond is unable to respond to many crises in a timely fashion, particularly after regular business hours, when such crises are more likely to occur. PPB also has developed a Mobile Crisis Unit, which helps connect individuals with mental illness with available mental health services. This unit is comprised of one police officer and a Project Respond worker. The program's benefits are limited, however, because the Mobile Crisis Unit is not intended to be called in an actual crisis situation and only works during regular business hours. Despite PPB's efforts to address concerns regarding officers' use of force, the overall record and prevalence of troubling incidents indicate that a problem persists.

**C.      Serious Deficiencies in the Mental Health System**

On November 11, 2010, DOJ began a separate but related investigation to examine the State's compliance with Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, as interpreted in *Olmstead* v. *L.C.*, 527 U.S. 581 (1999), with respect to the services the State provides to individuals with mental illness.[9] Our state-wide investigation focuses on the needs of individuals with serious mental illness who enter high levels of care in acute in-patient psychiatric facilities, emergency rooms, jails, and prisons, largely because there are insufficient options for adequate community-based mental health services. Through our investigation, we assessed gaps in the State's mental health system, which lead to an increase in police encounters with people with mental illness, including people who are in crisis. As one high-level officer told us, over his career, encounters with people in crisis have gone from a couple of times a

---

[8]      *The Portland Police Bureau: Officer-Involved Shootings and In-Custody Deaths*, from the 2003 PARC Report, *available at* www.vera.org/download?file=667/363.209795pa_2.pdf.

[9]      During this investigation, DOJ met with more than 50 mental health stakeholders across Oregon, including consumers, advocacy groups, providers, and law enforcement. DOJ also met with State mental health leadership, including Governor John Kitzhaber, Oregon Health Authority Director Bruce Goldberg, and former Addictions and Mental Health Director Richard Harris. In addition, DOJ reviewed numerous reports, studies, and documents pertaining to Oregon's mental health system, many of them provided by the State. While we have not made formal findings in our ADA investigation, the State has undertaken a close collaboration with the Civil Rights Division to leverage health care reform to address gaps in services.

6

month to a couple of times a day.  This is an especially significant problem in Portland, the urban center for the State, with its large homeless population.

The State is engaged in a health care transformation process that will be designed to address many of these gaps.  In the meantime, the current system places a large and increasing burden on law enforcement.  Among the most significant issues are:

- A lack of an adequate support system to help people avoid a mental health crisis, including adequate community-based intensive services, supported housing, and early intervention.  Many individuals receive services through only an emergency room or a jail.

- A lack of an adequate crisis response system to provide services to and help stabilize people in crisis.  People in crisis are more likely to encounter the criminal justice system than the mental health system.

The Addictions & Mental Health Division ("AMH") has a longstanding practice of delegating service delivery and decision making.  Consequently, Oregon lacks a coordinated, statewide community mental health system.  Individuals enrolled in the Oregon Health Plan are served through one of nine regional Mental Health Organizations, while non-Medicaid individuals are served through one of Oregon's 36 county mental health programs.  Services vary somewhat across Mental Health Organizations and vary drastically across counties.  Generally, non-Medicaid individuals receive no intensive community-based services at all and, although Medicaid individuals receive some community-based services, the services that they receive fall far short of the necessary array.  A very high number of these individuals live in Portland.

While some crisis services exist in Portland, due to the lack of a comprehensive state-wide crisis system, there is an overreliance on local law enforcement, jails, and emergency rooms.  Accordingly, when individuals experience a mental health crisis, there is inadequate capacity of mobile crisis teams, crisis walk-in/drop-off centers, and crisis apartments to help people remain in integrated, community-based settings.  Instead, law enforcement often is the first responder to a crisis, and the officers have few if any options other than to take the individual in crisis to a jail, emergency room or institution, causing a rotating door in and out of the criminal justice system.

The State also lacks adequate capacity of community-based supports and services to keep individuals out of crisis.  Adequate resources, such as sufficient numbers of Assertive Community Treatment teams, Intensive Case Management, peer support, and supported employment, are limited,[10] while Intensive Case Management is being piloted only in Multnomah County.[11]  Consequently, individuals unnecessarily enter into, are at risk of entering

---

[10]    DHS Community Services Workgroup Report at 15, 18, 27 (March 2007).

[11]    Team listening tour meeting with Karl Brimner, Mental Health Director for Multnomah County (Dec. 16, 2010).

into, and cycle through jails, emergency rooms, hospitals, and institutions to receive treatment for their mental illness.

For a number of months, DOJ has been working collaboratively with State officials to resolve many of these outstanding issues.  The gaps in the mental health system increase the encounters between PPB and persons with mental illness.  PPB is often the first and sometimes the only responder to a crisis.  This places both a burden and a responsibility on the Police Bureau to require that PPB policy, training, and supervision ensure that force be used against persons with mental illness only to the extent permitted by the Constitution.

## IV.    APPLICABLE LEGAL STANDARD

### A.    Pattern or Practice

Pursuant to Section 14141, the Attorney General, acting on behalf of the United States, is authorized to initiate a civil action against a state or local government for equitable and declaratory relief when there is reasonable cause to believe that law enforcement officers are engaged in a pattern or practice of conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or federal law.  A pattern or practice may be found by examples representing typical conduct, as opposed to isolated instances.  *Int'l Bhd. of Teamsters* v. *United States*, 431 U.S. 324, 336 n.16 (1977) (noting that the phrase "pattern or practice" "was not intended as a term of art," but should be interpreted according to its usual meaning "consistent with the understanding of the identical words" used in other federal civil rights statutes); *United States* v. *Big D. Enters.*, 184 F.3d 924, 930 (8th Cir. 1999) (applying Title VII definition of pattern or practice to Fair Housing Act claim).  This understanding is consistent with the usual meaning of the words "pattern or practice."  *See Webster's Third New Int'l Dictionary* 1657, 1780 (Philip Babcock Grove, ed., 2002) (defining "pattern" as "a representative instance:  a typical example" and "practice" as "performance or application habitually engaged in").

Consistent with this definition, courts interpreting the term in similar statutes have established that anecdotal evidence is sufficient; statistical evidence is not required.  *Catlett* v. *Mo. Highway & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987) (interpreting "pattern or practice" in the Title VII context and citing *Hazelwood Sch. Dist.* v. *United States*, 433 U.S. 299, 307-08, 97 S. Ct. 2736, 2741 (1977) (for statistical evidence) and *Briggs* v. *Anderson*, 796 F.2d 1009, 1019 (8th Cir. 1986) (noting that "statistical evidence is not essential in proving" pattern or practice Title VII claim," and anecdotal evidence may be relied upon)).  For a court to find a pattern or practice, it does not need to find a set number of incidents or acts.  *See United States* v. *W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("The number of [violations] . . . is not determinative . . . .  In any event, no mathematical formula is workable, nor was any intended.  Each case must turn on its own facts").

8

## B.      Excessive Force

Excessive force claims in the context of an investigatory stop, arrest, or other "seizure" of a free individual are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham* v. *Connor*, 490 U.S. 386, 394-95 (1989); *see also Davis* v. *City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (considering the "quantum of force" used relative to the availability of less severe alternatives).  To determine whether the force used is reasonable, the nature and quality of the intrusion on the individual's Fourth Amendment interests are balanced against the legitimate governmental interests at stake.  *Graham*, 490 U.S. at 396; *see also Blankenhorn* v. *City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (same).

In making this determination, courts consider the totality of the circumstances, including: (a) the severity of the crime at issue; (b) whether the subject poses an immediate threat to the safety of the officers or others; (c) whether the subject is actively resisting or attempting to evade arrest; and (d) whether law enforcement could have used other methods to accomplish its purpose. [12]  *Graham*, 490 U.S. at 396; *Davis*, 478 F.3d at 1054-56.  The "most important" factor under *Graham* is whether the suspect posed an "immediate threat to the safety of the officers or others."  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).  "A simple statement by an officer that he fears for his safety or the safety others is not enough; there must be objective factors to justify such a concern."  *Deorle* v. *Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). These factors, however, are not exclusive.  Courts also consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*, including "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."  *Glenn* v. *Washington County*, 673 F.3d 864, 872 (9th Cir. 2011). Notably, "[e]ven when an emotionally disturbed individual is 'acting out and inviting officers to use deadly force,' the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."  *Id*. at 876.

---

[12]      PPB's policy on physical force requires that officers "use only the force reasonably necessary under the totality of the circumstances to perform their duties and resolve confrontations effectively and safely."  PPB Manual of Policy and Procedure ("PPB Manual") § 1010.20 (Jan. 2009).  When determining if a member has used only the force reasonably necessary to perform their duties, PPB states that it will consider the totality of circumstances, including:  the severity of the crime; the impact of the persons behavior on the public; the immediate threat to the safety of officers, self, or others; the extent to which the person actively resisted efforts at control; whether the person attempted to avoid control by flight; and the time, tactics, and resources available.  *Id*.  According to the PPB Manual, force is only permissible to prevent or terminate the commission or attempted commission of an offense; lawfully take a person into custody, make an arrest, or prevent an escape; prevent a suicide or serious self-inflicted injury; defend the officer or another person from the use of physical force; and accomplish some official purpose or duty that is authorized by law or judicial decree.  *Id*.  Officers are expected to display, over the course of their career, the ability to regularly resolve confrontations without resorting to the higher levels of allowable force.  *Id*.

9

Using a focused "decision-point" approach (also known as segmentation) to analyze each use of force incident, we considered each point when an officer made a decision that may have an effect on subsequent events, as opposed to focusing solely on the final decision to use force. The decision-point process allows the police supervisor to conduct more intensive and comprehensive reviews of the reasonableness of a particular use of force incident and to identify and address any flawed tactical decisions and training opportunities. According to the Ninth Circuit, "police tactic[s] that needlessly or unreasonably create a dangerous situation necessitating an escalation in the use of force" are "a course of action this circuit has expressly refused to endorse." *Deorle*, 272 F.3d at 1282 n. 20 (citing *Cunningham* v. *Gates*, 229 F.3d 1271, 1291 n.23 (9th Cir. 2000)). Other courts have similarly denounced unnecessary escalation of force and have held that each individual use of force should be evaluated independently for reasonableness. *See, e.g.*, *Plakas* v. *Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994) ("[W]e carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage"); *Livermore* v. *Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (noting that "the proper approach under Sixth Circuit precedent is to view excessive force claims in segments"); *Wiegel* v. *Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) ("There is evidence that for three minutes the troopers subjected [the subject] to force that they knew was unnecessary to restrain him . . .").

## V.    **FINDINGS**

We conducted an exhaustive investigation, in which we reviewed over 700 incident reports over an 18-month period, including Force Data Collection Reports ("FDCRs") and supervisory After Action Reports ("AARs"),[13] PPB's policies and procedures, training materials, internal affairs files, and various other documents related to PPB's use of force, as well as numerous interviews with current and former PPB officers and community members across the range of race, age and socio-economic status. As noted above, most uses of force we reviewed during this investigation were constitutional; however, we find reasonable cause to believe that PPB is engaged in a pattern or practice of unnecessary or unreasonable force against people with actual or perceived mental illness. This pattern or practice is manifest through the excessive and inappropriate use of ECWs and by using more force than necessary to effectuate arrests for low-level offenses. Below, we describe specific incidents which have been culled from a larger group of problematic cases, to illustrate this pattern.

## A.    **Excessive Force against People Experiencing a Mental Health Crisis Generally**

A significant percentage of encounters between individuals and police involve persons with mental illness. These encounters emerge in a range of contexts from responses to calls to

---

[13]    PPB Policy requires officers to fill out a FDCR anytime that they cause a physical injury or take a person to the ground by applying force and requires supervisors to fill out an AAR whenever officers use certain types of force, e.g., ECW deployment and canine use. PPB Manual §§ 940.00, 1010.20. Notably, the documents we reviewed largely reflect only the officer's account of what happened, but nevertheless reveal concerning patterns of excessive force.

check on a person's well-being to arrests for criminal behavior.  We recognize the challenges that people with mental illness, especially people in a mental health crisis, pose to the delivery of police services.  It is critical that PPB's practices adequately take into account the populations that PPB encounters and serves.  PPB must also take into account behaviors that are the product of mental illness in all encounters.

Police encounters with individuals who are mentally ill can quickly escalate.  Practices and strategies to de-escalate these incidents to protect the safety of both the individual and the officer are required.  There are systems law enforcement agencies can put in place to ensure that its officers can effectively de-escalate such encounters; minimize the risk of danger; and reduce the level of force needed to handle interactions with people in mental health crisis.  It is critical that officers are adept at using these non-force policing tools, not only to protect themselves and others, but because individuals who suffer from mental illness are among the most vulnerable in our society, and neither they, nor their families, should be afraid to turn to the police for help.  Properly applied, de-escalation begins long before the officer is faced with the choice of using force and will often make that decision unnecessary.

The law recognizes that police response to persons in mental health crisis requires special consideration.  When dealing with someone with a mental illness, officers must take into account the subject's mental and emotional state before using force.  *Deorle*, 272 F.3d at 1282; *Glenn*, 673 F.3d at 871-80 (reversing a grant of summary judgment for the defendant police department when the police responded to a welfare call and within four minutes of their arrival shot with a beanbag gun a suicidal teenager armed with a pocketknife and then fatally shot him with a rifle).  This is because "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense."  *Deorle*, 272 F.3d at 1282-83.

Even "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual."  *Id.* at 1283.  The same reasoning applies to intermediate levels of force.  *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010).  As the Ninth Circuit poignantly stated:

A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case – where such an individual is neither a threat to himself nor to anyone else – the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal.  Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him.  The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force

that would be justified against a person who has committed a crime or who poses a threat to the community.

*Id.*

We found that PPB officers often do not adequately consider a person's mental state before using force and that there is instead a pattern of responding inappropriately to persons in mental health crisis, resulting in a practice of excessive use of force, including deadly force, against them. Further, our review of incident reports and interviews with officers and community members shows little or no indication that the officers considered, or were even aware of, the many tools available to them to resolve interactions with individuals in mental health crisis using less force. We recognize that such tools cannot guarantee a positive outcome with minimal use of force in every instance. Moreover, not every encounter we reviewed was mishandled. Many officers handled difficult interactions with mentally ill persons in an exemplary manner. Nevertheless, we found that in many other instances officers escalate conflict despite the opportunity to de-escalate; rush in when they have the option of holding back; and continue to use force once the need for force has dissipated. The following examples illustrate the pattern or practice:

- In May 2011, officers were called to the home of a subject with a history of mental illness who had allegedly assaulted his mother and was reportedly in possession of a sword. When the officers arrived, the subject was in his bedroom and ignored the officers' orders to come downstairs. Several officers approached the subject's bedroom, opened the door, and commanded the subject to stand up and place his hands above his head. The subject stood up, but refused to place his hands on his head and walked towards the door. An officer shot the subject with a beanbag shotgun round to his leg. Another officer deployed his ECW on the subject's back. This occurred despite the fact that the subject's hands were visible, and the officers never observed a sword, or any other weapon, in the subject's possession.

  The intrusion on the individual's Fourth Amendment rights is substantial, i.e., being shot with a bean bag gun and shocked with an ECW in the back. The government interest in using this level of force to execute this arrest is, at best, moderate: (1) The subject had allegedly assaulted his mother, which is a serious offense. (2) While the subject reportedly had a sword, the officers did not report seeing a sword, or any other weapon, nor being threatened with one. The officers did not report any aggressive behavior from the subject. Accordingly, any perceived threat to the officer based on the initial report of a sword was mitigated by the lack of any present threat at the time they applied force. (3) The suspect was neither evading arrest nor actively resisting arrest. Other relevant factors include that the officers were aware the person had a history of mental illness, but did not appear to take that into account. Also, there were less intrusive alternatives available than shooting the suspect with a bean bag gun and using an ECW on him, including keeping him confined to his room while waiting for a crisis intervention specialist to help communicate with him. The

12

totality of the circumstances indicates that the intrusion into the subject's Fourth Amendment rights outweighed the legitimate government interest.

- In December 2010, two officers responded to a call to help Project Respond contact a subject that they wanted to evaluate for mental health purposes.  The subject complied with the officers' requests to come out of his room, place his hands on top of his head, and take a seat in the hallway.  The officers searched him for weapons and did not find anything dangerous in his possession.  Once seated, the subject began making incoherent statements, prompting the Project Respond workers to request that officers detain the subject on a mental health hold.  When the officers went to grab the subject by his arms, he tensed up and began to pull away.  The officers attempted to take the subject to the ground, but the subject rolled forward onto his back.  The officers turned the subject onto his stomach, at which point the subject trapped his arms underneath his body.  One officer drew his ECW and told the subject to "give us your hands or you'll be tased," and then applied it in drive stun mode to the subject's back.[14]  The subject continued to pull away, and the officer applied his ECW "several" more times.  Then one officer hit the subject up to six times with closed fist punches to the rib area.  Another officer delivered a focused blow with his closed fist to the back of the subject's neck/shoulder area.  The officers remained unable to handcuff the subject and deployed another six ECW cycles in probe mode.  The officers then handcuffed and transported the subject to a mental health hospital for evaluation.

The intrusion on the individual's Fourth Amendment rights – being shocked with an ECW multiple times, in both probe and drive stun mode, and hit multiple times – is substantial.  The government interest in using force to detain this individual pursuant to a mental health hold is moderate, at best:  (1) the person was unarmed and did not engage in threatening conduct towards the officers or others at the time of arrest; (2) the officers were there to perform a welfare check, not to arrest someone for committing a crime; and (3) the subject offered passive resistance by pulling away from officers and not allowing himself to be handcuffed.  Also relevant is the fact that the officers knew they were responding to a call to assist Project Respond make contact with a mentally ill subject, and thus should have been aware of the increased likelihood that the subject's ability to understand or follow the officers' commands is impaired.  On balance, the intrusion into the subject's Fourth Amendment rights outweighed the legitimate government interest.

---

[14]      A drive stun is the use of an ECW by direct contact to a subject, rather than by deploying wire probes common to Taser models of ECWs, like those used by PPB.  Use of the wire probes creates a circuit intended to cause neuromuscular incapacitation.  While a subject is incapacitated, an officer can handcuff the subject.  In contrast, drive stun when not used with probes spread across the subject's body, is not intended to cause incapacitation.  It only causes pain to compel compliance.  Drive stun, therefore, is a pain compliance method without the benefit of intended incapacitation.

PPB's current policies do not require officers to take into account the effect that a person's mental illness may have on their ability to understand commands or the consequences of their actions. PPB policies also fall short in specifying how to de-escalate situations involving people in mental health crisis. For example, PPB policy 870.20 currently requires all individuals to be handcuffed prior to entering a custodial, detoxification, or hospital facility. PPB policy provides officers leeway to use alternative means of securing an individual if the individual has "an injury or other condition that would be further exacerbated by handcuffing." PPB Policy 870.20. In practice, though, PPB does not treat mental illness as a condition that would further exacerbate the individual's condition. The PPB officers we interviewed provided a uniform consensus that it is standard PPB policy to handcuff a suicidal individual for transport to the crisis center. As discussed with mental health professionals, this practice may indeed escalate a suicidal individual's mental state, causing a physical and emotional reaction from the individual. *See Deorle*, 272 F.3d at 1282 (finding that when dealing with a disturbed individual escalating force may "exacerbate the situation."). When officer safety is not implicated, officers should have the discretion to consider mental health as a condition permitting alternative means of securing the individual.

**B.    Excessive Use of ECWs Against Persons in, or Perceived to Be in a Mental Health Crisis[15]**

Through our review of use of force reports and interviews with the public, we encountered numerous incidents where PPB officers deployed ECWs in a manner that was contrary to PPB policy and generally acceptable ECW practices. For instance, PPB officers are engaged in a pattern of using ECWs without warning, using multiple ECW discharges on a single subject (sometimes by multiple officers), and failing to reevaluate the appropriateness of the ECW between cycles. These practices engender fear and distrust in the Portland community, which ultimately impacts PPB's ability to police effectively.

Courts recognize that use of an ECW constitutes an "intermediate or medium, though not insignificant, quantum of force," as the pain is intense, is felt throughout the body, and is administered by effectively commandeering the victim's muscles and nerves. *Bryan*, 630 F.3d at 824-25. Beyond the experience of pain, ECWs can result in "immobilization, disorientation, loss of balance, and weakness," even after the electrical current has ended. *Matta–Ballesteros* v. *Henman*, 896 F.2d 255, 256 n.2 (7th Cir.1990); *see also Beaver* v. *City of Federal Way*, 507 F.Supp.2d 1137, 1144 (W.D. Wash. 2007) ("[A]fter being tased, a suspect may be dazed, disoriented, and experience vertigo"). The use of an ECW on a person could result in serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall. *Bryan*, 630 F.3d at 824-25. And, ECW use can result in death.[16]

---

[15]    While we make a finding that the inappropriate use of ECWs is part of a pattern or practice of excessive force against persons with mental illness, we do have concerns about ECW use generally and identified incidents when they were used inappropriately against persons who were not in apparent crisis.

[16]    NATIONAL INSTITUTE OF JUSTICE UNITED STATES, NIJ SPECIAL REPORT: STUDY OF DEATHS FOLLOWING ELECTRO MUSCULAR DISRUPTION (2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/233432.pdf.

Pursuant to the PPB Manual, an officer is authorized to use an ECW when "a person engages in or displays the intent to engage in" physical or aggressive physical resistance to a lawful police action or suicidal behavior.  PPB Manual § 1051.00.  PPB officers are required to provide a warning to the subject, if feasible, before using the ECW.  *Id*.  By policy, PPB officers are also prohibited from using ECWs on people who are engaged in passive resistance, rather than active resistance, and on people who are in handcuffs, except for in limited circumstances, and only after seeking supervisory approval.[17]  *Id*.  The following example, in addition to those above, is illustrative of PPB's inappropriate ECW usage, all of which were approved by the chain of command, despite describing ECW usage that is against policy.

- In August 2010, three officers responded to a complaint about a person screaming inside their apartment.  The officers obtained a key from the front desk and entered the apartment after announcing their entry.  They encountered an unarmed, naked man laying on the floor of his apartment screaming for help.  The person leapt up when he saw the officers and ran towards them.  The officer immediately, without warning, deployed his ECW at the subject's chest.  The subject fell to the ground, but when he attempted to get back up, the officer deployed his ECW for three additional five-second cycles.  It turned out the suspect was diabetic and experiencing a medical emergency.

  The intrusion on the individual's Fourth Amendment rights, being shocked with an ECW four times without warning while experiencing a medical crisis, is substantial.  The government interest in using force to execute this arrest is slight:  (1) though the officers may have felt threatened when the individual ran towards them, this threat is mitigated, at least in part, by the presence of three PPB officers facing a naked, unarmed individual; (2) the officers were present to conduct a check on the man's well-being; there was no suspicion of criminality; and (3) the subject was not under arrest and neither evaded nor resisted arrest.  On balance, the intrusion into the individual's Fourth Amendment rights outweighs the legitimate government interest.  If any ECW usage was necessary, the officers should have approached the subject and attempted to effectuate the arrest using their hands during the first ECW cycle.

Ambiguities within PPB's ECW policy contribute to an excessive use of force with ECWs.  For instance, the directive that officers may use an ECW when a subject "displays the intent to engage in" aggressive or physical resistance, places the officer in the difficult position

---

[17]    Similarly, the joint Police Executive Research Forum's ("PERF") and Community Oriented Policing Services ("COPS") 2011 Electronic Control Weapon Guidelines, states that:  "ECWs should be used only against subjects who are exhibiting active aggression or who are actively resisting in a manner that, in the officer's judgment, is likely to result in injuries to themselves or others.  ECWs should not be used against a passive subject." 2011 ELECTRONIC CONTROL WEAPON GUIDELINES, *available at* www.policeforum.org/library/use-of-force/ECWguidelines2011.pdf.

of determining when such an intent is manifested.  Also, PPB defines "physical resistance" as "actions that prevent or attempt to prevent an officer's attempt to control a subject, but do not involve attempts to harm the officer."  PPB Manual § 635.10.  This definition could easily include incidents where the subject is passively resisting arrest and poses no harm to the officer.  Further, PPB's policy does not provide any guidance regarding the maximum number of ECW cycles an officer may deploy or limit how many officers can deploy their ECW at a single subject, absent exigent circumstances.

The lack of clarity with respect to PPB's ECW policy was apparent at a January 2012 Use of Force Peer Review meeting, where we observed general confusion amongst the officers in attendance regarding the appropriateness of ECW usage in several of the cases up for discussion.  For instance, officers questioned whether PPB's ECW policy permitted the deployment of an ECW against an individual who failed to comply with an officer's relatively simple command, i.e., to stop walking away from the scene of a traffic stop or open a car door, but otherwise did not act in a threatening manner.  Further, the group struggled to reconcile PPB's ECW policy, which allows ECW usage even when the subject is not engaging in threatening conduct, with recent Ninth Circuit case law.  In several instances, the officers noted that the officer in question resorted to the use of an ECW, which is known to "escalate" situations, before attempting any "desescalation techniques."  It is not surprising to us, then, that officers are using ECWs excessively and inappropriately, given the state of confusion amongst those responsible for reviewing uses of force.

**C.      Unnecessary Escalation of Force Against Persons in Actual or Perceived Mental Health Crisis**

Our review of PPB's use of force reports reveals circumstances in which officers use unnecessary or unreasonable amounts force against persons who are or appear to be in mental health crisis when encounters escalate as a result of behavior that are the product of mental illness.  These encounters are often unrelated to a criminal violation or are for low level violations.  Sometimes these encounters begin as "mere conversations,"[18] but escalate to unnecessary power struggles between the subject and the police officer.  The pattern we observed sometimes includes the unnecessary use of ECWs and beanbag guns, as well as instances where an officer hit a subject with multiple fist strikes to the head, after any threat had abated.  In each case, it appears that a lesser use of force was appropriate, or force could have been avoided altogether, had de-escalation techniques been employed at an earlier stage.  De-escalation techniques are an important tool for officers to employ in order to avoid unnecessary and potentially excessive uses of force.

---

[18]      Oregon courts define "mere conversation" as "noncoercive encounters that are not 'seizures,'" recognizing that the primary distinction between the two is that the latter involves "the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty."  *State* v. *Ashbaugh*, 244 P.3d 360, 366 (Or. 2010).

The Ninth Circuit identifies uses of force as excessive when the underlying offense is low level and/or the subject posed little threat of harm. *See, e.g.*, *Davis*, 478 F.3d at 1055 (holding that repeatedly throwing a handcuffed plaintiff up against a wall and on the ground, ultimately breaking his neck, was unreasonable when the plaintiff was detained for loitering in a nonpublic area of a casino and posed no threat to officers); *Winterrowd* v. *Nelson*, 480 F.3d 1181, 1186 (9th Cir. 2007) (holding that officer's manual manipulation of plaintiff's injured shoulder during pat down was objectively unreasonable for non-threatening suspect detained during ordinary traffic stop); *Blankenhorn*, 485 F.3d at 478 (misdemeanor trespass not sufficiently severe to warrant gang tackling plaintiff); *Drummond* v. *City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) (recognizing that force was excessive, particularly considering that police were there to perform a public safety check and medical transport; noting there was no underlying crime at issue); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (use of force was excessive where evidence of an underlying crime was "minimal and purely speculative" and plaintiff posed no threat).

Both ECWs and beanbag guns are less-lethal weapons that officers are permitted to use *only* when there is a strong government interest at stake. *Glenn*, 673 F.3d at 871-72. Similarly, fist strikes to the face are considered to be a severe degree of force that also require a strong government interest to justify use. *Benas* v. *Baca*, 2005 WL 3397401, at *1 (9th Cir. Dec. 12, 2005) (holding that officer's "use of force in the form of a closed-fist punch to [subject's] face was so severe that it precludes summary judgment" on citizen's 42 U.S.C. § 1983 claim). Our review of FDCRs revealed numerous examples in which officers used ECWs, beanbag guns, and multiple fists strikes beyond what was necessary to effectuate the arrest and a failure to consider less intrusive alternatives.[19]  The following examples are illustrative of the pattern:

- In May 2011, an officer was called to check on an unarmed man who had been standing in the rain for over an hour. The officer was unable to speak to the subject because of a language barrier and returned to his car to call for assistance from a Spanish speaking officer. When the officer stepped out of his car, the subject approached the officer and kicked at the officer, but did not make contact. The officer caught the subject by the leg and threw the subject to the ground. The subject rolled onto his back and the officer proceeded to punch him 7-10 times in the face, while the subject grabbed at the officer's hands to try and stop the blows.

  The intrusion on the individual's Fourth Amendment rights is substantial, i.e., being punched 7-10 times in face. The government interest in using this level of force to

---

[19]    While attending a training session on less-lethal weapons, the Department observed the Training Department showcase as exemplary an FDCR that resulted from the controversial use of a beanbag gun on an unarmed, 12-year-old girl based on the charge of trespassing and resisting arrest. Whether or not the officers' conduct in that situation was ultimately deemed appropriate, few would argue that that the use of a beanbag gun in that circumstance was ideal and worthy of emulation. We informed PPB of our observations at the training and our belief that the Training Department was conveying a callous attitude toward officer violence in using that incident as a positive example. Thereafter, Chief Reese forbade training officers from using that incident as a model of the appropriate use of a less-lethal weapon. We applaud this corrective action.

execute this arrest is moderate: (1) the subject did not display a weapon, but he did unsuccessfully attempt to kick at the officer before being taken to the ground. Whatever threat the officer perceived was largely mitigated once he forced the subject to the ground, before he repeatedly punched the subject in the face. (2) While there was no initial offense – standing in the rain is not a crime – assaulting an officer is a serious offense. (3) The subject did not evade or resist arrest, but attempted to grab the officer's hands in self-defense, while being punched in the face. Other relevant factors include whether the officer considered if the subject had an emotional or mental illness, given that he had been standing in the rain for over an hour and behaved erratically. Also, there were less intrusive alternatives available than punching the subject in the face 7-10 times. The officer made no attempt to explain in his FDCR why so many punches to the head were necessary to control the subject. On balance, considering the totality of the circumstances, the intrusion into the subject's Fourth Amendment rights outweighed the legitimate government interest.

- In May 2010, officers were called to investigate a complaint that someone was spitting on cars. Noting that the subject appeared to be suffering from a mental breakdown, the officer reported that the subject raised his fists to the officer's face in an effort to show the officer his hospital identification bracelet. That officer ordered the subject to back up, but he did not and instead took what the officer described as a "fighting stance." The officer pepper sprayed the subject, who then reacted by walking backwards towards the street. The officer warned the subject that if he did not sit down, the officer would deploy his ECW on him. The subject did not sit down, and the officer deployed his ECW four times in succession before placing the subject in handcuffs. The officer claimed that he deployed his ECW multiple times because the subject had curled into a "turtle position" and would not extend his arms, as ordered, to be handcuffed. Two other officers were on the scene during this incident.

The intrusion on the individual's Fourth Amendment rights, which includes being pepper spayed in the face and then shocked with an ECW four times, is substantial. The government interest in using force to execute this arrest is slight: (1) the subject neither displayed a weapon nor made any aggressive movements towards the officer, and thus it is unlikely a reasonable officer would believe that the subject posed an immediate threat to the safety of the officers or others. The only threatening conduct the officer identified was that the subject raised his fist to the officer's face and took a "fighting stance," but the officer had previously attributed the raising of the fist as the subject's attempt to show the officer his hospital bracelet. (2) Spitting on passing cars is a low-level crime, if an offense at all and does not warrant this degree of force. (3) The suspect made no attempt to evade arrest by flight nor did he actively resist arrest. Also relevant is the officer's initial observation that the person appeared to be experiencing a mental breakdown, but no efforts were made to account for this. On balance, we find that the intrusion on the individual's Fourth Amendment rights outweighs the legitimate governmental interests at stake. Nonetheless, the supervisor who completed the AAR on this incident found the

use of force to be within policy and no attempt to even counsel the officer on better tactics was even offered.

This pattern or practice of excessive force is the result of deficient policy and training, as well as inadequate supervision. Officers are required to consider the severity of the crime, the threat posed, whether there are less intrusive alternatives available, as well as a subject's mental state, before using force, but these examples reflect a failure to properly take these factors into account. *Glenn*, 2011 WL 6760348, at *6. Further, PPB's failure to identify these excessive uses of force as being out of policy, results in a missed opportunity to take corrective action. These incidents, among others we reviewed, raise concerns about PPB's ability to manage uses of force to ensure they are proportionate to the threat posed and the severity of the crime at issue.

## VI.   SYSTEMIC CONTRIBUTING DEFICIENCIES

Systemic deficiencies contribute to PPB's pattern or practice of excessive force, including: (1) deficiencies in responding to persons with mental illness or in mental health crisis; (2) inadequate reviews of officers' use of force; and (3) inadequate investigations of officer misconduct.

### 1.   Deficiencies in Responding to Persons with Mental Illness or in Mental Health Crisis

Our investigation revealed two systemic deficiencies contributing to unconstitutional uses of force against people in mental health crisis: (1) the absence of officers specially trained in and proficient at responding to mental health crisis; and (2) the lack of strategic disengagement protocols involving mental health providers. [20] As Chief Reese has expressed, police officers are often the first responders to an incident involving a person in mental health crisis. There is no doubt DOJ the City suffers from the significant gaps in the statewide mental health system. While DOJ is working with the State in a related statewide investigation to address the gaps in the system for persons in mental health crisis, police involvement will continue to be tethered to the State's mental health service delivery system. PPB therefore needs tools to handle these incidents in a constitutional and safe manner, though we appreciate that no process is an absolute guarantee against all poor outcomes.

#### a.   Lack of Officers Specially Trained in and Proficient at Responding to Mental Health Crisis

PPB provides all of its officers with an initial 40 hours of crisis intervention training and dedicates a portion of its annual in-service training to this topic. PPB does not, however, have a specialized CIT team that consists of officers who have expressed a desire to specialize in crisis

---

[20]   Two other recommendations address agencies outside the scope of our investigation: (1) assist the BOEC to allow referrals of Mental Health Crisis calls within Project Respond's limited infrastructure; and (2) coordinate with State and County on Revision of the Civil Commitment Process.

19

intervention and have demonstrated a proficiency at responding to individuals in mental health crisis.[21]  While we commend PPB for training all officers on crisis matters, this approach assumes incorrectly that all PPB officers are equally capable of safely handling crisis situations and fails to build greater capacity among qualified officers.  Certainly circumstances will arise when a specialized crisis intervention officer is not immediately available, or when despite the training and experience, a specialized crisis intervention officer is unable to de-escalate a situation sufficiently to prevent the need of a significant use of force.  However, there is growing evidence that a crisis team response is likely to result in a better outcome and reinforce public confidence in policing.

First, not every officer is well suited to effectively deal with people with mental illness.  For example, during our investigation a patrol officer stated that his job was "to put people in jail, not to provide social services."  This officer would not be the appropriate officer to conduct a welfare check on person with mental illness.  A team of crisis intervention officers reduces the likelihood of encounters of such officers with people in mental illness crisis.  Crisis intervention training done with experienced patrol officers and the leadership of a dedicated police-based crisis intervention coordinator also creates a culture change among officers, which often then permeates an agency.

Second, departments cannot rely on academy crisis intervention training to develop officer expertise in working with individuals with mental illness.  New recruits in a basic police academy are not generally ready to receive, absorb and implement critical information about how mental illness calls need a different response than the more common police calls.  Trainees at that level are overwhelmed with information and generally lack the maturity that experience brings them on the street.  Although basic mental health training should be provided to all officers as part of the academy, it is not the optimal time to provide extensive crisis intervention training.

In addition, the 40-hour crisis intervention training curriculum is not what makes a specialized crisis intervention officer an expert in handling mental illness calls.  Expertise requires vast field experience developed by CIT officers as they are dispatched to mental illness crisis calls.  If 25% of patrol officers are ultimately trained as CIT officers and those officers are dispatched to as many of the mental illness calls as possible, that translates to those officers handling four times as many calls as would be the case if the calls were evenly distributed across the patrol force.

Although PPB previously had a specialized crisis intervention unit, it was not successful because PPB personnel generally perceived it as low in professional status.  It was staffed only by volunteers; many officers in the weeklong training course did not view the curriculum as relevant; and the officers generally viewed membership negatively.  Crisis intervention officers

---

[21]      PPB does have a dedicated "Crisis Response Unit," which PPB call their "Mobile Crisis Unit," but it consists of only a single Central Precinct patrol car in which one PPB officer is paired with a Cascadia mental health worker four days a week between the hours of noon and 10 PM.

did not receive a special status like PPB's SERT trained officers.  Instead, PPB officers viewed the original crisis intervention officers as just providing transport to people in crisis without extra pay or prestige.  PPB has many officers and leaders who are committed to providing care to people with mental illness and will assure good outcomes in their encounters with people with mental illness.  Just like an officer trained to negotiate a hostage situation or a SERT officer specially trained for tactical situation, officers with skills to negotiate with a person in a mental health crisis are essential for PPB's success in protecting the public.

Crisis intervention training as currently delivered by PPB is a police based training lacking important community collaboration.  It appears that the curriculum is developed by PPB and that the training is opaque to the community at large.[22]  This is problematic for PPB's ability to understand the community it must serve and protect.  There does not appear to be good reason to deny reasonable access to a crisis intervention course to consumers, family members, advocates, or mental health workers.  Also absent from the current PPB crisis intervention training is live exposure to consumers and family members.  One of the most effective ways to address the stigma of mental illness is to increase direct exposure to people with mental illness. The opportunity for officers to now see people, who may have been violent offenders when ill, as stable contributors in a crisis intervention class is a powerful game changer in crisis intervention training programs.  Indeed, our investigation revealed that officers harbor fear around the dangerousness of persons experiencing mental health crisis, or those with mental illness.  While DOJ does not minimize the potential danger involved, the level of concern generally within PPB is higher than our expert has seen within other agencies.  By including persons in recovery in a crisis intervention class, PPB will not only involve the community, but it may also lower the level of fear, and lead to less fear-based unintended consequences.

Furthermore, the current training in the basic and advanced academies involves training modules scattered over multiple days.  The impact of a weeklong crisis intervention training experience is lost.  Our investigation also found that PPB abandoned live role playing, replacing role plays with discussions of scenarios.  Discussions of given scenarios cannot replace role-playing realistic scenarios in front of peers.  Role-playing is generally viewed as a key element to a successful police training in general and a crisis intervention program in particular.

In the training PPB currently provides its officers, there is a clear acceptance of the "crisis cycle," the need to identify people in crisis, and application of the skills, including interpersonal communication skills, to help people through a crisis.  However, many PPB officers fail to recognize that persons with mental illness need to be dealt with *differently*, and may react very differently to police assistance, than an average citizen.  Officers must have the tools to identify when a person in crisis has a mental illness in order to appropriately adjust their approach and response.  The usual command and control approach does not work effectively with people in a mental illness crisis.  For example, a paranoid person may act in a threatening

---

[22]     During our investigation, we spoke with advocates who desired greater inclusion, but were refused access to the curriculum and were not allowed to attend training sessions.

manner because he/she is frightened.  If the response is to reassure the individual of safety, there may be a de-escalation.  But, if the response is "command and control," it may increase the level of fear and result in an escalation.  Additionally, not all police contacts with people with mental illness are with people in "crisis."  Often times, individuals with mental illness may not be in a crisis, but instead will demonstrate signs and symptoms of their illness, which can be perceived as criminal behavior.  Accordingly, training must include police interactions with people who are symptomatic, but not in crisis, to avoid criminalizing mental illness.

> **b.     Lack of Strategic Disengagement Protocols Involving Mental Health Providers**

PPB informed us that they have begun employing strategic disengagement – a practice of withdrawing from a situation to avoid use of force when a subject does not appear in imminent danger of harm to self or others and has not committed an arrestable offense.  We also observed strategic disengagement in practice while on-site.  However, for individuals who are perceived as not being dangerous to others, but are at risk of harm to self, officers should only practice strategic disengagement in consultation with a mental health professional and should attempt to develop a plan for when and how to hand off responsibility.  Due to the existence of Project Respond, Portland, unlike many communities, can make informed decisions based on collaboration between law enforcement and mental health experts in these very challenging and potentially dangerous situations.  Unfortunately, Project Respond's limited availability reduces the opportunity for this type of collaboration to happen consistently and successfully.

Furthermore, PPB and the City should give careful consideration to Project Respond's capacity to handle non-law-enforcement emergency calls diverted from BOEC.  We received comments from the advocacy community for people with mental illness that people with mental illness or in mental health crisis may fear interactions with PPB.[23]  Advocates informed us that people with mental illness and their families would often prefer interactions with mental health professionals, rather than law enforcement, for welfare checks.  Likewise, PPB officers informed us that they spend an inordinate amount of their law enforcement time on calls that are principally related to mental health needs.  The City should consider where resources are best dedicated to address the need for welfare checks.  Although services are limited, the City could better inform mental health care consumers and their families about available resources, including the crisis hotline and Project Respond.  While Project Respond is not currently staffed to handle the large number of calls received by PPB regarding persons with mental health issues, Project Respond could be utilized to address mental health crisis calls that do not involve a risk to community safety.

The City should consider encouraging direct calls to Project Respond and permitting Project Respond to decide which calls to take and which to refer to the police.  Currently, the

---

[23]     We also received comment from the advocacy community that they were offended by PPB's pejorative reference to people with mental illness as "mentals."  In fact, we observed the term "mentals" used as a descriptor during a roll call presentation.  We recommend that PPB immediately stop using this term.

community does not appear to have broad awareness of the use of Project Respond as a resource. Most calls for service appear to originate through BOEC or the crisis line. At this point, BOEC is not equipped in time or expertise to triage mental healthcare calls to make a determination about public safety and which calls should go to Project Respond. While the public should not hesitate to call 911 – i.e., BOEC – in emergent situations, Project Respond may be better equipped to triage mental healthcare calls that go directly to it in non-emergent situations.

Before implementing direct calls to Project Respond and an increased role for Project Respond in welfare checks, the City should carefully consider appropriate protocol and staffing. The City should also have an evaluation plan to test the efficacy of Project Respond's responses to service calls. Lastly, the City should have a backup plan should calls come in that Project Respond does not have the capacity to address.

PPB officers also frequently commented on the lack of a 24/7 drop-off facility for persons in mental health crisis, in lieu of taking the individual to jail or the emergency room. The City previously operated a facility at which PPB officers could drop off individuals placed on temporary mental health holds for assessment and temporary treatment. During the investigation, officers and mental health providers explained that the Crisis Assessment and Treatment Center ("CATC"), a 15-bed, sub-acute, secure facility, does not fill the void of a temporary, accessible acute care facility. At CATC, a nurse practitioner or doctor is only available from 12 PM to 5 PM. Also, CATC does not permit PPB to drop off people unless authorized by Multnomah County. Significantly, while Multnomah County reported that it established a separate phone line for PPB to seek authorized use of CATC, PPB officers reported that they cannot get authorization from Multnomah to use CATC. Accordingly, officers reported that in most instances they do not try to get authorization. Ironically – and tragically – a number of officers told us that they were not even aware of the separate telephone line for CATC authorization.

Additionally, the Cascadia Urgent Walk-in clinic does not fill the gap for a crisis triage center because individuals who are not enrolled in the State's Medicaid plan are not eligible for service unless they have a life threatening condition. Cascadia and others reported to us that the lack of enrollment or eligibility to enroll is a frequent barrier to the provision of mental health services to these individuals. The absence of an accessible crisis triage center make PPBs need for specialized crisis intervention officers more acute. A secure 24/7 crisis triage center within the City would allow officers the ability to hand over an individual in crisis to a mental health professional quickly and without authorization from the county or otherwise.

## 2. Inadequate Supervisory Review of Officers' Use of Force

PPB's current practice concerning supervisory review of incidents in which officers used force is insufficient to identify and correct patterns of excessive force in a timely fashion. We recognize that Portland has a unique Commission-based governing style, which removes certain elements of the police accountability apparatus from PPB's direct control. While acknowledging deficiencies in the existing system of officer accountability, PPB needs to do more to effectively

supervise officers and reduce instances of officer misconduct.

Following a use of force, supervisors should be on the scene to ensure that a full inquiry of the circumstances of the force used by officers is conducted, including:

- Ensuring medical attention is provided;
- Identifying, separating, and interviewing all involved and witness officers;
- Interviewing those subjected to force;
- Canvassing for witnesses and taking statements from all witnesses;
- Collecting evidence (e.g., hospital reports, photos of all injuries to all involved persons, physical evidence, Taser downloads consistent with the incident, diagrams);
- Conducting a documented review of officers' reports of the incident for completeness, accuracy, and quality; and
- Assessing whether further investigation is needed to determine the appropriateness of the use of force and whether the incident creates a need for retraining.

This was not occurring at PPB until recently, when Chief Reese changed the policy.[24] Supervisors are now required to go to the scene of use of force incidents and conduct an investigation. It is essential that supervisors be required to gather evidence necessary to resolve material discrepancies and consider whether the description of the force used is consistent with the sustained injuries or hospital reports. PPB should further revise its policy to require the AAR process to include collecting forensic evidence, taking photographs, or audio and electronic reception of evidence. PPB should also consider whether its current AAR policy, which suggests that a short one or two paragraph narrative is sufficient to describe the significant facts of the event, should be revised to require supervisors to provide more details.

PPB should revise its AAR policy to include a strong and effective monitoring system to ensure AARs are being timely completed and contain sufficient data for supervisors to adequately analyze uses of force. This analysis should include:

- Was the original stop, detention or subsequent arrest lawful?
- Was the type and amount of force used objectively reasonable and proportional to the resistance encountered?
- Was the type and amount of force related to a legitimate law enforcement objective the officer or the department was trying to achieve?
- Were efforts made to deescalate the situation without using force?
- Was the force reasonably decreased as resistance subsided?
- Was the force used consistent with generally accepted police tactics?

---

[24]    Executive Order RE: DIR 940.00 After Action Reports and Operation Orders, *available at* www.portlandonline.com/police/index.cfm?a=380055&c=29867.

• Was the force used consistent with PPB training programs?

Even if the current AAR policy were sufficient, PPB's practice regarding AARs is not. Many of the cases that we reviewed where officers engaged in a substantial amount of force did not have a corresponding AAR. For the cases that did have AARs, these reports did not contain sufficient investigative findings to constitute an adequate review. PPB supervisors nonetheless sign off on FDCRs without ensuring that thorough AARs are completed according to policy. By tolerating supervisors' failures to investigate and complete uses of force investigation and reviews, PPB misses a crucial opportunity to correct officer behavior. Instead, PPB sends the message that there is little institutional oversight or concern about officers' use of force.

Our analysis and review of hundreds of police reports revealed that rarely was the use of force found to be out of policy, even when the force used was clearly excessive. When PPB officers cause physical injury or take someone to the ground using force, they are required to fill out a FDCR, which includes a description of the totality of the circumstances that existed, including the subject's behavior and a justification for why the force used. PPB Manual § 1010.20. Supervisors are required to fill out an AAR, which includes a narrative that describes the police action and an assessment of its effectiveness through critique and evaluation using required criteria, when officers use certain types of force. PPB Manual § 940.00. In addition to force reports, uses of deadly force require direct on-scene investigation, PPB Manual § 1010.10, and a subsequent review by a Force Review Board, PPB Manual § 335.00.

Throughout our investigation, numerous cases that we reviewed lacked even the fundamental elements to collect even basic acceptable force investigative data to allow management to adequately critique force incidents. Some examples of persistent deficiencies in the reports include:

• Use of pattern or conclusive language, such as stating that the subject was "combative," "confrontational," "struggling," "got off the floor aggressively;"
• No statements taken from on-scene independent witnesses;
• Not all officers on scene who used force wrote reports;
• No statement taken from the person against whom force was used;
• A subordinate officer investigates the force used by a supervisor;
• A supervising officer approves his own use of force;
• A sergeant orders force to be used and neither writes a force report of his actions nor an AAR;
• No pictures of injuries taken;
• Force report written weeks after the incident;
• Discrepancies between involved officers' statements and reports not addressed or resolved; and
• No analysis for whether there was reasonable suspicion or probable cause for original stop and detention.

Force investigations and reviews are designed to audit and ensure that those practices are

25

being followed.  Further, they should instill public confidence and faith in those sworn to protect the law and also serve to protect the officers and their agency from frivolous complaints. Supervisors' failure to intercede and actively manage incidents results in a weak and ineffective force management system.  PPB's current policy does not require supervisors to investigate all uses of force on scene.  In practice, supervisors' review of FDCRs has failed to identify uses of force as excessive, as we describe in the examples above.  Further, PPB has not ensured that supervisors always complete AARs when required.  Nor have supervisors rejected the AARs we reviewed that failed to provide sufficient detail to enable supervisors to adequately assess uses of force.  These policy deficiencies and practice failures have a profound impact on PPB and community they serve.  Significantly, these gaps present lost opportunities to ensure accountability and rectify behavior, thereby failing to prevent further unconstitutional uses of force.

PPB also has failed to timely identify use of force trends.  Prior to this investigation, PPB reviewed officers' overall use-of-force trends on six-month intervals during Force Review Board meetings consisting of supervisors at each precinct reviewing force events.  Six months is far too long for PPB to wait before becoming aware of systemic problems related to officers' use of force.  Based on our technical assistance, PPB recently created a new "use of force auditor" position.  This person will be responsible for evaluating FDCRs and other documents on a regular basis to identify trends.  Critical to the use of force auditor's effectiveness will be PPB's ability to develop a responsive training regime that is targeted to address systemic patterns of undesirable conduct.  If this auditor is the day-to-day monitor of individual officers' use-of-force trends, PPB can reduce unacceptably long delays in identifying use of force trends.

### 3.    Failure to Implement Timely Corrective Action following Investigations of Officer Misconduct

PPB, along with the City, should streamline its investigation and adjudication of complaints of officer misconduct to give greater effect to and faith in the process.  Currently, PPB has a number of fragmented processes for review of uses of force, none of which result in timely individual or systemic corrective action.

An open, fair, and impartial process of receiving and investigating citizen complaints serves several important purposes.  An appropriate citizen complaint procedure ensures officer accountability and supervision, deters misconduct, and helps maintain good community relations by increasing public confidence in and respect for PPB.  Improving the current procedure for handling citizen complaints at PPB would maximize these goals.

PPB and Portland have admirably sought to include civilian and public participation in the complaint intake and review process.  PPB apparently has implemented this participatory process to encourage public faith in PPB's complaint investigation and disciplinary systems. The participatory systems are the outgrowth of responses to high profile incidents and frequent revisions to PPB's accountability systems.  The apparent goal of transparent and "fair" systems has added layers of review, appeal, and re-reviews.  However, the established systems have

become so complex and so time consuming that the objectives – officer accountability and public confidence – have been lost.  The efficacy of the system is undercut by the unreasonable delay in reaching an outcome from a complaint.  Additionally, the layers of review have provided escape valves inappropriately eviscerating full administrative investigation and corrective action for some complaints.

### a.    Self Defeating Accountability System

We met with many citizens who were concerned about their ability to effectively raise concerns regarding PPB officers' uses of force.  As with other cities, there is a close association between the administrative complaint review processes and the force review processes in PPB.  PPB's force review process, however, is so complex that the progress of any given complaint through the stages of review is both difficult to follow and needlessly lengthy.  Like the complaint process, as described below, the force review interactions with the complaint system are so byzantine as to undercut the efficacy of the system.  In this case, PPB's own force review chart speaks volumes about this problem.  *See* Figure 1, PPB's force review flow chart.



*Figure 1.  PPB's force review flow chart*

27

### b.    Complaint Intake

Complaints originate either internally within PPB or from the community. PPB does not receive the initial community complaints. Rather, complainants submit their complaints to an entity within the City's government. Portland separately elects a City Auditor. Within the City Auditor's Office, is the Office of the Independent Police Review ("IPR"), which receives citizen complaints.[25] IPR performs an initial investigation of the complaints. IPR then determines which complaints merit a full Internal Affairs ("I.A.") investigation. IPR may decline to have a complaint fully investigated for multiple reasons, including a determination that: "it is more likely than not that no misconduct occurred and additional investigation would not reach a different conclusion." *See* IPR Annual Report 2010, May 11, 2012. This is a qualitative determination often based on incomplete information. All allegations which, if true, would amount to a violation of policy should be investigated. However, the IPR is asked to opine of the merit of complaint before a full investigation yields determination on the credibility of the complaint. Accordingly, by design, the intake process becomes a qualitative analysis without the benefit of the information necessary to make a valid determination about which complaints deserve a full IA investigation.

IPR's intake process permits the diversion of complaints of officer misconduct without the benefit of full investigation. IPR declined 66% of the complaints it received in 2010. *Id.* IPR may refer some of these declined complaints to the subject officer's chain of command for informal resolution -- avoiding a full IA investigation -- if IPR determines that the complaint does not merit a full IA investigation. IPR refers to IA only those complaints that survive IPR's vetting process.

Currently, IPR has a backlog of complaints awaiting an initial investigation. We recommend that PPB, the City Attorney, and IPR work collaboratively to expedite the handling of this backlog. We also recommend clearer criteria for IPR declination that does not permit judgments based on incomplete information, particularly when IPR does not refer the complaint to any other entity for investigation.

### c.    IA Investigations

After IA receives complaints of officer misconduct, either internally from within PPB or through IPR, IA codes those complaints and makes determinations of whether they believe the complaint merits a full investigation. PPB policy permits IA to decline to investigate complaints where the complaint alleges no misconduct; the complaint involves a minor or de minimis allegations in IA's determination; IA determines it has no jurisdiction; the complaint involves a claim currently under judicial review; IA is unable to identify the subject employee; the complaint previously has been adjudicated; IA determines the complaint lacks merit; or IA's commander determines IA does not have sufficient resources. IA's ability to decline complaints for this broad swath of reasons presents another potential escape valve for meritorious

---

[25]    IPR is comprised of a handful of civilian employees, some of whom are attorneys.

complaints.  In the past five years, IA has declined between 15% and 26% of the complaints IPR has referred to it, i.e., complaints from civilians.  *See* IPR Annual Report 2011, at p. 8, June 27, 2012.  By contrast, IPR reports that with "few exceptions" PPB has completed full administrative investigations of all complaints initiated internally by PPB.  *Ibid.* at p. 10.

If IA does not decline the complaint, a full investigation does not necessarily follow.  IA determines some complaints are minor complaints of poor service.  PPB refers to these complaints as "service improvement opportunities" or "SIOs."  IA assigns to each subject officer's chain of command his or her SIOs for resolution.  PPB considers SIOs non-disciplinary, and they are not subject to a full investigation.  PPB Manual § 330.00.  PPB has resolved between 51% and 60% of its IA complaints through SIOs in each of the past five years.  *See* IPR Annual Report 2011, at p. 8, June 27, 2012.  The large number of complaints resolved through SIOs diverts meritorious complaints from receiving more extensive review.

Significantly, as each SIO goes out to each chain of command, that SIO stops at the email inbox or hard copy mail box at each level of the chains from top down on the way to the subject officer's Sergeant.  After resolution, the record of the SIO reverses course and stops at each level of the chain of command on the way back up to IA.  This is a taxing use of managerial time that PPB could more efficiently use by simultaneous broadcast of the SIOs from IA down the chain of command to the Sergeant, and the Sergeant's concomitant response directly to IA, with copy to the chain of command.

Also, instead of a full complaint, IA may permit some complaints to be resolved by mediation.  PPB policy does not contain objective criteria to determine which complaints are appropriate for mediation.  Rather, policy requires only that IA make a subjective determination that mediation would "meet the needs of" PPB and the community.  If IA so determines, the subject officer and complainant agree, and the officer's chain of command does not object, then the complaint can be resolved through mediation.  Significantly, mediation does not reach a finding nor can discipline be imposed from mediation.  As a general proposition, mediation can be an effective tool for a police department to efficiently resolve minor complaints and engender a sense of participatory justice among aggrieved community members.  However, we note two issues with PPB's current mediation policy and practice.

First, PPB's mediation policy should contain objective criteria to determine which matters are appropriate for mediation.  Complaints of excessive force should always be subject to investigation and a finding.  PPB has an interest in making sure its officers comply with use of force policies and training.  Permitting mediation in those cases would fail to result in a finding to correct any improper uses of force, if any, and compromise Department-wide statistics regarding uses of excessive force.

Second, we note that mediation, as the name suggests, should be used to reach mutual agreement. PPB, IPR, and others report that mediation is not frequently used.[26] Not surprisingly, then, we received few accounts concerning mediation in practice. One community member with whom we spoke, however, recollected that officers threatened to charge her with a crime in the course of mediation if she would not agree to their resolution of her complaint. She reported having been arrested and released without charge. The gravamen of her complaint was an allegation of false arrest and forced handcuffing. She reported that, during the course of mediation, the officers involved threatened to re-arrest her for the same charge if she would not drop her complaint. This account, which appeared credible, speaks to the potential abuse of mediation rather than its use as an effective conciliatory tool. PPB should ensure that mediation is only used based on objective criteria and that the parties fully understand how mediation will be conducted and the potential outcomes.

For those complaints that result in full IA investigations, we found the investigations to be thorough. IA investigations, however, currently span an inordinately long period of time, e.g., several months. Both PPB and IPR are often unable ensure that IA investigations are completed within ten weeks, PPB's goal for a deadline to complete IA investigations.

There is also a conflict in the information Portland provides the public about the possible outcomes of IA complaints. PPB's IA Policy provides for five possible findings: unproven; unproven with a debriefing – i.e., a critique of the complaint with the subject officer; exonerated; exonerated with a debriefing; and sustained. PPB's standard operating procedure ("SOP") contains additional possible findings. The City Auditor's public website lists only two possible findings: not sustained and sustained. We recommend that PPB and IPR adopt uniform standards on the possible outcomes for IA complaints. We also recommend that PPB add one additional finding: unfounded. Unfounded requires an affirmative proof that the allegation presented is false. This is a significantly different finding than unproven or exonerated. When evidence from investigation of an IA complaint proves that the complainant was untruthful, an unfounded finding completely clears the officer of any alleged violation.

### d.    Criminal Investigation of PPB Officers

PPB refers allegations of potentially criminal conduct by PPB officers from IA to PPB's criminal investigations section. *See* PPB Manual §§ 330.00, 344.00. We have been informed that the Multnomah County District Attorney previously requested that PPB not conduct IA investigations of officer-involved shootings until after the completion of the DA's investigation and/or criminal prosecution. This request was based, among other things, on the concern that an officer's compelled statement in an administrative investigation could potentially taint evidence planned to be used in a criminal indictment. *See, e.g.*, *Garrity* v. *New Jersey*, 385 U.S. 493 (1967); *Kalkines* v. *United State*s, 473 F.2d 1391 (1973). The DA has presented certain

---

[26]    In the past five years, PPB has resolved 1% to 4% of community complaints through mediation. IPR Annual Report 2011, at p. 5, June 27, 2012.

allegations of officer misconduct in the use of force to grand jury for consideration, but the grand jury has endorsed a charge on only one such occasion.

IA has informed us that they are now conducting concurrent administrative and criminal investigations. We commend this effort. PPB has an interest in preserving administrative accountability and public safety expeditiously through its IA process. This should not be delayed by a parallel, bifurcated criminal investigation. We note that PPB's policy still permits IA to decline an investigation if the claim is in judicial review, PPB Manual § 330.00, and this policy runs counter to the announced practice of concurrent investigations. PPB should make clear in its policy that administrative and criminal investigation shall run concurrently. PPB should consult with the DA, FBI, and/or United States Attorney's Office at the outset and throughout this bifurcated process and prior to compelling statements.[27] PPB should also clearly set forth in policy that though IA may use criminal investigation material in appropriate circumstances, all administrative interviews compelling statements, if any, of the subject officer and all information flowing from those interviews must be bifurcated from the criminal investigation in order to avoid contamination of the evidentiary record in the criminal case.

PPB informs us that, by contract, officers involved in shootings or in-custody deaths are permitted to wait 48 hours before they are subject to questioning. This delay in questioning the subject officer is a function of PPB's contract with the officers' union. Portland's City Attorney has also informed us that the DA, or his or her designee, is in command of the scene at an officer-involved shooting or in-custody death, pursuant to State law. The DA is a county employee. Provided the DA is not bound by the City's contract and its 48-hour waiting provision, the DA may consider questioning the officer, subject to his or her ability to exercise rights to counsel and remain silent, as soon as the DA sees fit. This should expedite the accurate resolution of the criminal investigation. If a civilian is involved at the scene of a potential crime, it is difficult to conceive of PPB officers permitting that civilian 48 hours before asking him or her questions about the incident. PPB should not hinder investigation of a potentially criminal action with this officer-specific delay.

Additionally, this 48-hour waiting period has enabled officers to refuse to timely provide complete use of force reports, i.e., FDCRs and public safety statements. In a recent PPB officer-involved shooting, not only did the shooting officer decline to give a statement at the scene, but so did two other officers who used less lethal force. Also, like the shooting officer, the other officers did not provide a narrative on the incident reporting forms, as required, but instead referred to interviews they would later give to detectives. As this incident demonstrates, PPB's waiting period for officers' statements concerning uses of force defeats the purposes of contemporary, accurate data collection through FDCRs. In many jurisdictions, standard use of force reports are not considered *Garrity* and officers are expected to fill them out immediately after an incident.

---

[27]     These policy changes should make clear that only compelled statements made in the face of the reasonable prospect of criminal prosecution are entitled to *Garrity* protection.

Separately, we also note that PPB does not have an established policy for handing over to criminal defendants potentially exculpatory evidence contained in IA files.  *See Brady* v. *Maryland*, 373 U.S. 83 (Ct. Cl. 1963).  Whether a criminal defendant is an involved officer or a civilian, PPB should have a policy in place to transmit potentially exculpatory material to criminal defendants.  We recommend that PPB, the City Attorney and the DA work collaboratively to establish a methodology for the handling of exculpatory material, mindful of the bifurcated administrative and criminal investigations in cases involving officers as defendants.  PPB should memorialize in policy or procedures this agreed-upon methodology.

### e.    The Police Review Board

In addition to the internal affairs complaint investigation process, PPB has developed a Police Review Board ("PRB").  *See* PORTLAND CITY CODE§ 3.20.140.  PRB reviews certain PPB incidents with the stated goal of making recommendations to the Chief regarding findings on those incidents and proposed discipline.  *Id.*  It has no ultimate decision making authority.

PRB reviews only certain incidents.  Notably, an aggrieved civilian involved in an incident cannot force a PRB review.  There are only three routes to a PRB review.  (1) PRB presumptively reviews all incidents of a certain severity – i.e., in-custody death, officer involved shootings, and uses of force that result in hospitalization.  (2) PRB reviews all incidents that result in recommended discipline of a day or more.[28]  (3) PRB receives internal referrals from PPB chain of command or the IPR director.  PPB calls some of these referrals a "controverted" finding or "controverted" recommended disciplinary action.  In other words, if an investigation of an officer's conduct yields a finding with which the IPR Director or the subject officer's chain of command disagrees, they have the power to force a PRB review.  If an aggrieved civilian disagrees with the investigative finding or recommended discipline – or disagrees with the declination to investigate his or her complaint at all – the civilian cannot compel a PRB review.

PRB is comprised of five members in non-use-of-force incident reviews:  a citizen,[29] a peer of the subject officer,[30] the PPB Assistant Chief over the subject officer, the PPB Captain or Commander over the subject officer, and the IPR Director (or his/her designee).  A paid civilian facilitator presides over PRB proceedings.  The subject officer and a representative from his or her bargaining unit may attend PPB's presentation of an incident to PRB.  In certain use of force

---

[28]    An alternative disciplinary route exists for certain violations of the City's Human Resources Administrative Rules regarding complaints of discrimination.  For the sake of this letter, however, those are inapposite.

[29]    There is an additional system established for the appointment of these volunteers.  City codes tasks PPB and IPR with developing criteria for selection of the citizen volunteers.  The City Auditor vets the volunteers and submits their names to City Council for approval or disapproval.  City Council appoints the volunteers for three-year terms.  Code limits these volunteers to one full term and one partial term, if they are filling a vacancy.  Code also permits the City Auditor or Chief to recommend that the City Council act to remove of a citizen from the available pool of volunteers.

[30]    Here, too, there is an additional system in place for selection of the potential PRB members.  Peers are of the same rank and classification as the subject officer.  The Chief must have a pool of pre-approved "peer" officers at the ready.

cases, PRB's also includes one more citizen volunteer and one more peer. Accordingly, the composition of PRB aims to include evaluators both internal and external to PPB. However, PRB has a host of non-voting advisory members, taken mainly from PPB, that further complicate the composition of PRB. Curiously, a complaining civilian, if one is involved in the incident being reviewed, is not permitted to attend PPB's presentation.

The PRB process is long. PPB is required to give an involved officer 14 days' notice prior to the presentation of his or her case at a PRB meeting. PRB meets only twice a month and usually can consider only two cases each meeting. PRB's civilian facilitator has 14 days after the completion of PRB's review of a case to produce written proposed findings. At the completion of its process, PRB presents a public proposed finding, but not its record. The subject officer or the aggrieved civilian may appeal PRB's recommendation to Portland's Citizen Review Committee ("CRC"), the next step on the long journey to resolve an officer-accountability incident.

Despite the good intentions of using PRB as an accountability tool, the current process is not comprehensive and, when conducted, has significant delays in the ultimate resolution of an officer accountability incident.

### f.    Citizen Review Committee

CRC is comprised of nine civilian volunteer members.[31] *See* PORTLAND CITY CODE § 3.21.080. CRC has multiple, broadly defined missions that can be distilled to three categories: (1) hearing appeals of officer accountability complaints; (2) community outreach; and (3) recommending policy changes. CRC members with whom we spoke advised us that they spent the majority of their time in community outreach.

CRC meets just once a month, resulting in additional delays. In order for CRC to consider an appeal, the record of appeal must be completed and CRC members must have an opportunity to review the record prior to the appeal. CRC members reported to us that each appeal usually involves two CRC meetings, each a month apart. At the first meeting, CRC conducts a case file review to certify that the matter is ready for appeal. At the second meeting, CRC conducts an open, public appeal hearing. If the record is incomplete, this two-meeting process is further delayed.

At the appeal, CRC considers only the recommended finding on the officer accountability incident. CRC does not consider and does not receive information on the recommended disciplinary action, if any. CRC has limited authority to reach findings. CRC representatives have informed us that they have been counseled that they may only send a complaint back to PPB for further information or to determine whether a prior finding is "irrational." In fact, the

---

[31]    Like PRB, CRC has another layer of involved processes for soliciting volunteers, screening candidates, nomination by the City Auditor, and appointment by City Council.

City Code permits CRC to find that the prior finding is either supported or unsupported by the evidence in the record. *Id.* This support-or-unsupported standard is a lower threshold than a requirement that CRC affirmatively declare the prior finding "irrational." To the extent that Portland retains this current system, Portland should ensure that CRC applies only the proper standard for findings.

CRC can accept testimony and written statements, and consider the record. Paradoxically, even though CRC may consider any new evidence that develops in its hearing, it is prohibited from using this new evidence to find that the prior record does not support the finding from below. *See* PORTLAND CITY CODE § 3.21.160. This policy appears to be an effort to require CRC's remand of those complaints to IA for further development of the evidentiary record for an incident.[32] However, the policy's direction to CRC asks them to opine on the propriety of a prior finding without consideration of all the evidence before them. This is untenable. Evidence developed by CRC – inculpatory or exculpatory – should be included in the record of the incident, even if remand to IA is then required to fully develop the evidence.

There exists no apparent prohibition on CRC's consideration of officer accountability incidents involving in-custody deaths or officer-related deaths. CRC members inform us that, as a practical matter, though, parties pursue those matters through formal judicial means rather than appeal to CRC.

If CRC reaches a finding that the record of the officer accountability incident does not support the prior recommended finding, CRC may present that incident to the City Council for appeal. *Id.* This is yet another step on the long process toward final resolution of an officer accountability incident. At the Council level, too, there may be a hearing with witnesses. The Council, then, will decide the ultimate administrative finding on the complaint. It does not appear that this step has been utilized before.

### g.    Administrative Determination

After the subject officer or complainant exhausts administrative appeals to CRC, if any, and if CRC does not call upon the City Council to make a final finding, the authority to reach an administrative finding returns to PPB. The Chief makes a finding and recommends discipline. However, the Police Commissioner, i.e., usually the Mayor, has the ultimate authority to make the final determination on serious levels of disciplinary action.

### h.    Appeal of Discipline

If PPB and the Police Commissioner determine that the subject officer's actions require disciplinary action, the officer's collective bargaining agreement then starts the next phase on the

---

[32]    We note that IA has not been required to provide information to CRC by further supplementing IA's investigation of a complaint. In a recent use-of-force investigation, IA refused CRC's request that IA interview a witness to the use of force. Thus, Portland's methodology of requiring CRC to only rely upon an IA record is frustrated by PPB's refusal to fill gaps CRC identifies in that record.

34

long road to the imposition of corrective action.  The subject officer may initiate a union grievance.  If an officer's union will not accept a grievance – which reportedly occurred only once – the officer may appeal a disciplinary action to a state labor board.  In most cases, the subject officer's union will grieve the imposition of discipline on his or her behalf.  After the subject officer meets certain procedural requirements, a state employee relations board will name potential arbitrators to arbitrate the grievance.  Counsel for the City and the subject officer may strike proposed arbitrators from the list leaving a selected arbitrator to hear the arbitration of the aggrieved disciplinary action.  As the City Attorney's Office has characterized this process to us, there are no set rules in arbitration and Portland bears the burden of proof to justify its actions.  This cumbersome process – which reportedly cost Portland $500,000.00 for a single recent arbitration – usually results in an arbitration finding 60 to 90 days after the proceeding.

As happened in that recent costly arbitration, the arbitrator may overrule the imposition of discipline.  Portland can refuse to implement an arbitrator's finding if Portland determines the finding is a violation of public policy.  This refusal would force the subject officer's union to file an unfair labor practices complaint.  If this is resolved favorably for PPB or the arbitrator has upheld PPB's action, the imposed discipline stands.

At long last, if a civilian's initial complaint is meritorious, proven, and survives this grueling process without being overturned, then PPB can impose corrective action.  This process is so lengthy and attenuated, however, that the efficacy of corrective action is invariably undermined.

### i.  Lack of Clarity and Timeliness in PPB's Early Intervention System

PPB recently brought on line its Early Intervention System ("EIS").  PPB had a paper-based EIS previously.  PPB began building the current system in 2004-05.  The prototype went on line in July 2011.  EIS became fully operational in December 2011.  Because PPB's EIS has only recently become operational, there is little data on which to assess the efficacy of the system.

PPB's stated goal for its EIS is to keep officers productive by offering officers interventions when PPB identifies behavior, medical issues, or psychological problems that adversely affect PPB's goals.  *See* PPB Manual § 345.00.  An effective EIS is a powerful tool that should enable PPB to identify officers whose at-risk behaviors exceed department guidelines, even if direct supervision of use of force incidents fail or are found to be within policy.

PPB demonstrated its EIS for us and our consultant.  The EIS is a database that records various domains of officer behavior, e.g., uses of force, complaints, tort claims, allegations of domestic violence, etc.  PPB has established various thresholds at which the EIS will identify an officer.  When the EIS identifies an officer, PPB intervenes by referring the triggered information to the subject officer's chain of command.  PPB policy memorializes some EIS triggers.  *Id.*  For example, EIS is triggered by any three IA complaints against an officer within

six months, or two IA complaints of the same category within six months. *Id.* Some triggers about which PPB informed us, however, are not contained in the policy. The EIS reportedly currently triggers with an officer who has used force in 20% of his or her arrests in the past six months, or who uses force three times more than the average number of uses of force compared with other officers on the same shift. Since these triggers are not specifically enumerated in the policy, we recommend that PPB memorialize in its policy the Professional Standards Division's discretion to develop additional EIS triggers. Additionally, while these proportional-use-of-force triggers are helpful, we recommend that PPB add definitive triggers to its EIS for uses of force, e.g., three uses of force in a month. In order to be effective as an early intervention, the EIS needs to be able to identify officers with more sudden changes than a six-month look back would indicate. Accordingly, a sudden uptick in uses of force within a shorter period of time should trigger the EIS.

As reported to us, PPB currently waits for IA to review a complaint against an officer before referring the triggered officer to his chain of command for an EIS intervention. PPB has informed us that this is their practice because they are concerned that the subject officer would argue an issue cannot be handled by IA since it was already addressed through EIS. This defeats the purpose of the EIS. By policy, EIS is non-disciplinary. Accordingly, no officer should reasonably rely on EIS intervention to avoid IA investigation and the imposition of discipline for sustained wrongdoing. If there is any doubt on this point, we recommend that PPB immediately clarify by issuing an informative directive. Given the inordinately long IA process, as described in this letter, waiting for an internal affairs complaint to reach resolution before utilizing an EIS trigger defeats the point of an "early" intervention system.

Currently the EIS tracks individual officers' data. We recommend that as the system matures, PPB revise it EIS to trigger supervisors whose units collectively use force disproportionately more than other units. These are data present in the system but not synthesized for use on the unit level or supervisory level.

We also note that there is a single individual within PPB who runs EIS and is vested with the discretion to decline to send EIS triggered notifications to chains of command. Unless the triggers are redundant, i.e., the EIS returns the same triggered information for the same officer repeatedly, the declination to send the information to the chain of command is a potential escape valve that undermines the effectiveness and credibility of the EIS. We recommend that triggered information, unless redundant, automatically go to the chains of command.

Because there is only one PPB member fully conversant in the use of the EIS, we also recommend that PPB train other members to be proficient in the use of EIS. If the one person now charged with operational responsibility leaves, institutional memory invariably will leave with him.

### j.    Performance Evaluations

It is our understanding that PPB plans to implement quarterly performance reviews. We support this effort and encourage PPB to conduct assessments of employee performance at every level of the organization. Direct supervisors should evaluate their subordinates at least annually. Prior to the evaluations, supervisors should explain the evaluation process and the expectations to their subordinates. Supervisors should also utilize EIS data in preparation for evaluations. In conducting evaluations, supervisors should meet with their subordinates to discuss positive aspects of their police work, their complaint history, if any, and to discuss any problems or concerns officers may have concerning the department. The direct supervisors should memorialize evaluations, including any discussions in face-to-face meetings. Supervisor should then pass written evaluations through the chain of command, affording the opportunity for superiors to add comments. The written evaluations should be stored in the employee's training or personnel file. PPB should tie these evaluations into its promotion process, to the extent permitted by law and PPB's collective bargaining agreements.

## VII.    ADDITIONAL COMMUNITY CONCERNS

During the course of our investigation, we heard consistent concerns from members of the community. While we do not make a finding that there is a pattern or practice violation in connection with these issues, they implicate community confidence in PPB and warrant further consideration by City officials. First, there is a deep-seated concern  that PPB does not provide timely access to medical care following the use of deadly force. Second, segments of the community harbor distrust towards PPB and desire more community policing and outreach.

### 1.  Access to Medical Care

There have been numerous incidents over the years that have prompted community outrage regarding whether PPB officers procured medical attention in a timely fashion following a use of force. PARC identified this as a problem in its study of PPB's uses of force. The Due Process Clause of the Fourteenth Amendment guarantees a pretrial detainee the right to receive adequate medical care, and that right is violated if officials are deliberately indifferent to the detainee's serious medical needs. *Clouthier* v. *County of Contra Costa*, 591 F.3d 1232, 1242-43 (9th Cir. 2010). According to PPB policy, officers "will immediately call EMS if they have any concerns or questions regarding a subject's medical status during an incident or custody situation. EMS will respond and evaluate and assess the subject's medical condition." PPB Manual § 630.45. Although we do not currently find reasonable cause to believe that PPB is engaged in a pattern or practice of deliberate indifference to detainees' serious medical needs, we are concerned that PPB's policy leaves too much discretion to officers to determine when medical attention is needed. Instead, there should be a bright line rule that whenever an injury occurs or whenever a subject complains of an injury, EMS is summoned. PPB should review its data to determine if officers are routinely procuring medical care at the earliest opportunity and, if not, revise its policies and training accordingly.

## 2.    Community Policing

Throughout our investigation, we had the opportunity to speak with members of PPB and the community who raised issues that affect the community's confidence in PPB and, in turn, public safety.  We heard concerns from community members in a number of areas, including PPB's response to organized protests and perceived tensions between PPB and communities of color.  Following numerous exchanges with a multitude of community members through various forums, including discussions with retired PPB officers, it became apparent that a trust divide exists between PPB and certain segments of the Portland community that should be bridged.  We do not make any finding of a pattern or practice violation in this area.  However, it is important to discuss the most prevalent concern identified in the course of our investigation – the often tense relationship between PPB and the African American community.

In the beginning of our investigation, Mayor Adams made clear that one of his reasons to call for our investigation of PPB was PPB's relationships with communities of color.  At the conclusion of our investigation, it was clear that PPB could benefit from building additional bridges with minority communities, including but not limited to the African American community.  While the scope of this investigation did not include an analysis of whether PPB engages in a pattern or practice of bias-based policing, we found that some community members perceive this practice.  We are aware that Chief Reese regularly engages community representatives in meetings to discuss their concerns.  We recommend that PPB continue to address this issue directly with the community and seek to expand opportunities for community engagement.  One community activist succinctly stated that "the problem in not addressing the racial profiling is that it's creating an atmosphere of youths distrusting the cops."  Both African American leaders of the community and average citizens told us that they believed they had been victims of racial profiling during traffic stops.  One citizen stated in his community interview that he got his windows tinted, so that officers would no longer know that he was black, in an effort not to be pulled over.  And he exclaimed to us:  "It works!"  Another community member told us his belief that "they protect the white folk and police the black folk."

Unfortunately, these comments provided during our investigation are similar to comments that were provided to the City during a series of five community listening sessions in 2006 with community-based organizations and PPB.  PPB should consider reviewing the implementation of its 2009 PPB Plan to Address Racial Profiling.  One of the recommendations that came out of the listening sessions included more stringent collection of stop data, but PPB had concerns regarding public release of officer names.  Data provided to us by a local watch group indicated that PPB disproportionately stops African Americans.  The data indicate that 12-24% of PPB's traffic and pedestrian stops are of African Americans.  However, only 6.4% of the City's overall percentage is African American.  Continuing to collect and track stop data would give PPB a better sense of whether a perception of biased policing might be a problem that PBB needs to address.  Engaging with the public concerning such data would help assure the public that PPB is committed to ongoing analysis and remedial efforts to address allegations of biased policing.

Portland's own workgroup on biased policing noted in 2010 that disparate treatment complaints are difficult to prove and that among the complaints that they reviewed, the same officers were repeatedly named.[33]  PPB should consider utilizing its EIS system to track complaints that officers and/or units engage in racially discriminatory policing.  Many of the recommendations in this letter focus on actions that PPB and the City of Portland should take.  In addition, for those people who believe they were victims of racial profiling, it is incumbent upon them to file a formal complaint on every occasion and include as much specific information about the interaction as possible.  The data created by these complaints and resulting investigations will better enable PPB to make informed judgments about these serious allegations of biased policing.  Armed with accurate data and comprehensive investigations of complaints, PPB and the City should be able to better address allegations of biased policing.

As noted above, a number of community members expressed their belief that racism exists within the police force, recounting incidents over a 20-year time span which informed their perception.  A respected local civil rights leader recently publicly stated that there are good officers in PPB.  At the same time, however, he questioned whether officers were held to the same standards as citizens, and whether there is an "us against them" mentality among PPB officers.  It is incumbent on PPB officers, not just the executives, to appreciate the far reaching implications of the actions individual officers can have on the organization and the perceived us-against-them mentality.[34]  One precinct commander relayed that part of the problem with the community's lack of trust is PPB's failure to reach out to the general public enough.  PPB has positive stories to share about its individual officers.  And, while PPB has some regular meetings with community groups, we recommend that PPB provide a broader and more frequent opportunity to listen and respond to the community's concerns.

We received comments that community members feel they are "under siege" because officers who frequently do not live in the community are doing the policing.  PPB can cultivate community trust by providing incentives for its officers to maintain residency in the city they police.  Having more officers live in the community they police may help develop trust and rapport with the community, which will strengthen community policing ideals.  Ensuring that PPB reflects the diversity of the communities being served would also help to improve the effectiveness of PPB.  Under Chief Reese's leadership, PPB has undertaken a comprehensive recruiting program designed to ensure that PPB attracts a diverse pool of qualified applicants.

Based on concerns we heard regarding difficulties that a number of people of color face in integrating into PPB at the recruitment and promotion stages, PPB may also consider conducting a department-wide intensive cultural sensitivity and competency training, including members of the community.  We recognize that PPB has established a Community Partner

---

[33]     "Disparate Treatment Complaints, A Complaint Handling and Case File Review Conducted by the Bias-Based Policing Workgroup of the Citizen Review Committee," March 2010, at 6.

[34]     Following a controversial beanbag shooting of an unarmed 12-year old African American girl, many PPB officers donned t-shirts in support of the officer who shot the girl.  To the community, this was a divisive action that affected their perception of the entire PPB police force.

Program for recruits PPB has hired, but who have not yet attended academy training.  It is our understanding that the recruits volunteer at local service juvenile assistance organizations.  Perhaps this can be expanded beyond juvenile assistance organizations.

Another persistent perception among many community members is that "mere conversations" frequently transition into unlawful pretext stops, and this perception breeds distrust.[35]  While it appears PPB has policies prohibiting discrimination (§ 344.00) and bias based policing (§344.05), a policy on how and when an officer initiates contacts with citizens is missing.  Based on our investigation, including talking with citizens as well as patrol officers, we found that officers tend to blend the distinction between initiating a "mere conversation" and a *Terry* stop.[36]  As PPB is aware, a "mere conversation" is contingent upon an individual's consent.  A person may refuse to converse voluntarily with PPB, but this refusal does not, in and of itself, create a basis for performing a *Terry* stop.  In order for a mere conversation to turn into a *Terry* stop, an officer must have "reasonable suspicion" based upon "objective, articulable facts" that the person is involved in a crime.  *Terry*, 392 U.S. 1 (1968).  A *Terry* stop must be based on an officer's analysis for multiple factors which he or she must be able to objectively articulate.  *Id.*  And, even if the officer does determine there are objective, articulable facts that a person is involved in a crime, there is no right to frisk an individual for weapons unless and until the officer has reasons to believe that the individual has weapons upon his or her person, or poses a threat to the safety of the officer.  *Id.*  Revising this practice will go a long way towards increasing rapport and trust with the community and reducing perceptions of bias-based policing.

The aforementioned concerns and tensions expressed by community members appear to date back many years and will require persistent continuing commitment to inclusion and transparency, as well as effective structures to facilitate continuing dialogue.

## VIII.   REMEDIAL MEASURES

Our investigation reveals reasonable cause to believe that PPB engages in a pattern or practice of using excessive force in violation of the Fourteenth Amendment to the United States Constitution and in violation of federal law.  PPB should implement the following remedial measures to correct the constitutional and statutory deficiencies identified above.

1. In addition to exposing all officers to crisis intervention training, have a specialized unit of crisis intervention officers who are selected based on their temperament, experience and desire to interact with individuals with mental illness or in mental health crisis

---

[35]        *See supra*, n.18.

[36]        A *Terry* stop refers to the common police practice of briefly detain a person who police reasonably suspect is involved in criminal activity, but not requiring a showing of probable cause.  *Terry* v. *Ohio*, 392 U.S. 1 (1968).

2.  Revise policies to place greater emphasis on de-escalation techniques and require officers to consider less intrusive alternatives before employing force.

3.  Implement scenario-based training to ensure officers do not use excessive force and only use force justified to meet the government interest.

4.  Train officers to go hands on following the first application of less-lethal force, when feasible, to effectuate the arrest, and to use as few cycles of the ECW as possible.

5.  Train and require officers to avoid using more intrusive forms of force, such as beanbag guns and ECWs, on individuals who do not pose a threat to the safety of officers and others or who are suspected of committing minor offenses.

6.  Train and require officers to give warnings, where feasible, before using force.

7.  Monitor all uses of force to ensure practice consistent with these standards and affirmatively enforce these standards when force is used in an inconsistent manner.

8.  Conduct on-site supervisory investigations of all uses of force, including contemporaneous public safety and investigatory statements subject to constitutional protections against self incrimination.

9.  Require that PPB officers document each citizen contact, including the reason they stopped the subject, whether the subject consented to the conversation, whether the officer informed the subject that he/she had the right to decline consent, whether the mere conversation escalated further, and demographical information about the subject.  Require that supervisors conduct timely reviews of this data.

10. Adopt policies and practices to streamline the investigation of all allegations of officer misconduct to increase efficacy of corrective action.  This should include a mandate to address investigative inadequacies identified by CRC.  PPB should also keep complainants actively informed and involved of the process.

11. Require PPB to develop a community engagement and outreach plan, with the goal of creating robust community relationships and sustainable dialogue with Portland's diverse communities.

41

## IX.    CONCLUSION

We hope to continue working with PPB in an amicable and cooperative fashion to resolve our outstanding concerns, as set forth in this letter. Please note that this findings letter is a public document and will be posted on the Civil Rights Division's website. The DOJ attorneys assigned to this investigation will be contacting the City's attorneys to discuss this matter in further detail. If you have any questions regarding this letter, please contact Jonathan Smith, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-5393.

Sincerely,

Thomas E. Perez
Assistant Attorney General
Civil Rights Division

Amanda Marshall
United States Attorney
District of Oregon

cc:    Chief Michael Reese
       Portland Police Bureau

       Jim Van Dyke
       Portland City Attorney

42