**S. AMANDA MARSHALL, OSB #95347**
United States Attorney
District of Oregon
**ADRIAN L. BROWN, OSB #05020**
adrian.brown@usdoj.gov
**BILLY J. WILLIAMS, OSB # 90136**
bill.williams@usdoj.gov
Assistant United States Attorneys
**DAVID W. KNIGHT**
david.knight@usdoj.gov
Special Assistant United States Attorney
United States Attorney's Office
District of Oregon
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:    (503) 727-1003
Facsimile:    (503) 727-1117


**JOCELYN SAMUELS**
Acting Assistant Attorney General
**JONATHAN M. SMITH**
Chief
**LAURA COON**
Special Counsel
**R. JONAS GEISSLER**
jonas.geissler@usdoj.gov
**MICHELLE JONES**
michelle.jones2@usdoj.gov
Senior Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
50 Pennsylvania Ave., NW
Washington, D.C. 20530
Telephone:  (202) 514-6255
Facsimile:  (202) 514-4883


Attorneys for Plaintiff, United States

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:12-cv-02265-SI** |
| **Plaintiff,** | |
| **v.** | **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT** |
| **CITY OF PORTLAND,** | |
| **Defendant.** | |

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...........................................................................................................1

II.     THE SETTLEMENT AGREEMENT MERITS COURT APPROVAL.......................2

III.    RESPONSES TO THE COURT'S QUESTIONS TO THE PARTIES ........................4

IV.    COMMUNITY CRITIQUES........................................................................................18

V.     CONCLUSION............................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Davis v. City and County of San Francisco*, 890 F.2d 1438 (9th Cir. 1989)...................................4

*Cemex Inc.* v. *L.A. County*, 166 Fed. Appx. 306 (9th Cir. 2006)....................................................3

*Garrity v. New Jersey*, 385 U.S. 493 (1967)...............................................................................13

*Local No. 93, Intern. Association of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
478 U.S. 501 (1986)...........................................................................................................10

*Officers for Justice v. Civil Service Commission*, 688 F.2d 615 (9th Cir. 1982), *cert.
denied*, 459 U.S. 1217 (1983) ............................................................................................3, 4

*United States v. McInnes*, 556 F.2d 436 (9th Cir. 1977) .............................................................4

*United States v. Oregon*, 913 F.2d 576 (9th Cir. 1990)...........................................................3, 18

## FEDERAL STATUTES

Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 (1994) ................2

# I.    <u>INTRODUCTION</u>

The United States, by and through counsel, respectfully submits the following post-hearing memorandum in support of the Court's acceptance of the Parties' proposed Settlement Agreement, and in response to the Court's post-hearing questions. (ECF No. 61).

Before the Court is an Agreement that will fundamentally alter the way in which Portland Police interact with the people who live and work in the City.  It creates a foundation to protect the civil rights of all Portlanders, particularly those who live with mental illness.  While the United States acknowledges that many community members wished this Agreement went further, many of the objections sought reforms that go well beyond the scope of the investigation undertaken by the United States and the Complaint filed in this case.  The goal of this litigation—to ensure that the Portland Police Bureau ("PPB") has adequate policies, procedures, training, and accountability in place so that encounters with people with mental illness are constitutional—will be achieved through the implementation of the Agreement.

Approval of this Agreement will ensure that there is a roadmap for sustainable reform.  It will ensure DOJ monitoring of remedies; public use-of-force audits; increased community-based mental health options; workable solutions to Citizen Review Committee ("CRC") deadlines and meaningful Independent Police Review ("IPR") investigations; negotiating changes to the 48-hour rule with the District Attorney; data gathering; and much more.  And as described herein, the Agreement is a fair, adequate, and reasonable remedy to the allegations in the United States' Complaint.

As the Court acknowledged, the Court must accept or reject the Agreement as a whole.  Tr. p. 18, ln. 13-21.  If the Court rejects the Agreement, the parties would be forced into uncertain terrain.  Trial would not necessarily result.  Nor could the parties guarantee agreement

Page 1 –    **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

in face of collective bargaining disputes already overcome to get here.  Should there be a new settlement or a resolution after trial, any remedy would be delayed, depriving people in crisis in Portland of much needed relief.  There is no assurance that the Agreement's extensive community oversight remedies would survive should the Court reject the Agreement.

To assist the Court in its consideration of the Agreement, the United States addresses the following three issues:  (1) the legal and factual basis supporting the Court's entry of the Agreement as an order of the Court; (2) responses to the Court's questions to the Parties; and (3) a chart of responses to concerns raised by the public during the fairness hearing.

## II.     THE SETTLEMENT AGREEMENT MERITS COURT APPROVAL

On December 17, 2012, the United States filed a Complaint pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 (1994) ("Section 14141") alleging that the PPB engages in a pattern or practice of using excessive force on individuals with actual or perceived mental illness in violation of the Fourth Amendment to the Constitution and other laws of the United States.  ECF No. 1.  Contemporaneously, the United States and the City of Portland filed a Joint Motion to Enter Settlement Agreement and Conditional Dismissal of Action pursuant to Federal Rule of Civil Procedure 41(a)(2).  ECF No. 3.  The motion set forth an often-used method for resolving a civil rights case:  if the defendant successfully completes the terms of a proposed settlement agreement, and after the plaintiff assesses and agrees that substantial compliance is achieved, the matter would then be resolved and the Court should dismiss the case.

Almost immediately after filing of the Complaint and proposed Settlement Agreement, the Portland Police Association ("PPA"), the union of PPB's line officers and sergeants, moved to intervene.  ECF No. 7.  The Court granted PPA intervention based primarily upon its asserted

Page 2 –   **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

rights under its collective bargaining agreement.  ECF No. 32.  Likewise, the AMA Coalition for

Justice and Police Reform ("AMA Coalition") moved to intervene.  ECF No. 19.  But, the Court

denied such intervention finding that AMA Coalition's claims of racially discriminatory policing

lay outside of the Complaint, and that AMA could not change the nature of the action.  ECF No.

32.  Instead, the Court granted the AMA Coalition enhanced amicus status.  *Id.*  The Court then

recommended that the Parties resolve PPA's and the AMA Coalition's objections to the

Agreement through formal mediation.  *Id.*  That process ultimately yielded a Memorandum of

Understanding with the PPA, ECF No. 54 ("PPA MOU"), and a Collaborative Agreement with

the AMA Coalition, ECF No. 55 ("Collaborative Agreement").

 At a Fairness Hearing on February 18 and 19, 2014, the Court received testimony to

assist it in determining whether the Agreement is "fair, adequate, and reasonable" to resolve the

allegations in the United States' Complaint.  *Officers for Justice* v. *Civil Service Comm'n,* 688

F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983); *United States* v. *Oregon*, 913

F.2d 576, 586 (9th Cir. 1990); *Cemex Inc.* v. *L.A. County*, 166 Fed. Appx. 306, 307 (9th Cir.

2006).  Chief Charles Gruber provided the Court with his expert opinion that, among other

things, the Agreement reasonably resolves the allegations of the Compliant.  Tr. p. 61, ln. 4-9.

The United States' previously submitted memorandum and declarations also provide ample

bases for the fairness, adequacy, and reasonableness of the Agreement.  *See* ECF No. 4 and Decl.

of Bill Williams and Clay Neal.

 This Court's analysis of whether an agreement is fair, adequate, and reasonable does not

require "the achievement of the optimal outcome for all parties, but rather, "the [c]ourt need only

be satisfied that the decree represents a reasonable factual and legal determination," to resolve

the allegations of the Complaint."  *See Oregon*, 913 F.2d at 580-81.  Further, the Court must

Page 3 –  **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF
ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO
QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No.
3:12-cv-02265-SI

balance several factors, including, but not limited to: "strength of the plaintiffs' case; risk, expense, complexity and possible duration of continued litigation; relief offered in settlement; extent of discovery already completed; stage of proceedings; experience and views of counsel; governmental participation; and reaction of class members." *See, e.g.*, *Davis* v. *City and County of San Francisco*, 890 F.2d 1438, 1445 (9th Cir. 1989) (citing *Officers for Justice*, 688 F.2d at 625).

Also, public policy favors settlement, particularly in complex litigation such as this pattern or practice case investigated by and filed by the United States. *Officers for Justice, 688 F.2d at 625* ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution."); *United States* v. *McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) ("We are committed to the rule that the law favors and encourages compromise settlements."). The Court implicitly recognized the value of voluntary conciliation when it recommended  mediation to the Parties upon granting PPA intervenor status, and providing the AMA Coalition with enhanced amicus status. After nearly a year in mediation, the Parties reached an agreement that successfully resolved both PPA's and AMA's concerns without further litigation. As a result, the Court should consider the arms' length and good-faith negotiations that took place throughout this lengthy mediation process as a factor in its balancing analysis.

### III.  RESPONSES TO THE COURT'S QUESTIONS TO THE PARTIES

Following the Fairness Hearing, the Court posed thirteen (13) questions to the Parties, with responses due by March 11, 2014.  ECF No. 61.  The United States submits the following responses to those questions.

Page 4 –   **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

**QUESTION 1:**

> **If the Agreement were approved and the case conditionally dismissed with the Court expressly retaining jurisdiction to enforce the Agreement, would the Court have jurisdiction to direct all four Parties to appear for periodic hearings to provide the Court with reports on the status of compliance in the absence of an affirmative allegation by the Plaintiff or the Defendant of non-compliance?  If so, what legal authority supports this conclusion?**

**RESPONSE 1:**

Yes, the Court has the jurisdiction to direct parties in matters before it to appear for periodic status hearings.  The Agreement, however, requires mediation before the Parties can seek court enforcement.  The Parties have asked the Court to conditionally dismiss this action, pursuant to Rule 41(a)(2), subject to the Court retaining jurisdiction to enforce the Agreement, followed by final dismissal with prejudice upon performance of the Agreement.  *See* Joint Motion to Enter Settlement Agreement and Conditional Dismissal of Action, ECF No. 3.  The Parties further requested that the Court place this case on its inactive docket subject to recall to the active docket should enforcement of the Agreement become necessary.  *Id*.  The enforcement provisions of this Agreement provide that the parties to the Agreement will first attempt to resolve their concerns regarding compliance amongst themselves (*see* Agreement at ¶ 181-184), then engage in formal mediation (*see id.* at ¶ 185), and only if mediation is unsuccessful may the United States or the City file a Motion in the Federal District Court for the District of Oregon to enforce compliance with the terms of the Agreement, or to seek a Declaration of the meaning of the Agreement (*see id.* at ¶ 186).

**QUESTION 2:**

> **May the Court approve the Agreement without dismissing the complaint with prejudice and then stay the action in anticipation of dismissing the complaint with prejudice after the City has substantially complied with all provisions of the Agreement and maintained substantial compliance with all provisions for one year,**

Page 5 –   **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

as envisioned in PSA, ¶ 178?  In other words, is an amendment to the Agreement necessary for the Court to approve the Agreement without dismissing the complaint with prejudice at this time?

**RESPONSE 2:**

Yes, the Court may approve the Agreement, stay the case without dismissing the Complaint, and then dismiss the Complaint after the terms of the Agreement have been satisfied, without amending the Agreement.  The Court's proposal is consistent with the Agreement, which provides that the Court will "conditionally dismiss" the Complaint at this time, place the case on its inactive docket, and only completely dismiss the case after the terms of the Agreement have been satisfied.  *See* Agreement at ¶ 178; Joint Motion to Enter Settlement Agreement and Conditional Dismissal of Action, ECF No. 3 at 2.

**QUESTION 3:**

If the Court approves the Agreement and stays the litigation without dismissing the complaint with prejudice at this time, and if the Court directs all four Parties to appear for periodic hearings to provide the Court with reports on the status of compliance, may the Court also direct the Compliance Officer Community Liaison ("COCL") to appear before the Court at these periodic hearings and report to the Court on the status of compliance?  Is an amendment to the Agreement necessary for the Court to achieve this result?

**RESPONSE 3:**

The Court may direct the COCL to appear before the Court at a hearing because the COCL is an independent contractor of the City and therefore subject to the jurisdiction of the Court.  The Agreement requires the COCL to:  (i) prepare quarterly, written, public reports detailing PPB's compliance with, and implementation of, each substantive provision of this Agreement (*see* Agreement at ¶ 162); and (ii) hold open town hall meetings on a quarterly basis where he/she will present his/her draft compliance report to the Community Oversight and Advisory Board ("COAB") and receive public comment on his/her assessments of compliance

Page 6 –   **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

and recommendations (*id.* at ¶ 163). The Agreement also provides that the Parties may submit any COCL reports to the Court if questions arise concerning compliance with this Agreement and, that COCL reports may be used to show compliance or non-compliance with this Agreement, subject to the weight afforded to such reports by the Court. *See id.* at ¶ 164. The United States is amenable to providing the Court with courtesy copies of the COCL's quarterly reports as they are prepared, but the Agreement would need to be amended should the Court seek to impose on the COCL any substantive obligations beyond reporting on compliance.

**QUESTION 4:**

> **If the Court were to hold hearings every six months during which all four Parties and the COCL would provide the Court with periodic reports on the status of compliance, even in the absence of an affirmative allegation by the Plaintiff or the Defendant of non-compliance, would that be an appropriate frequency of hearings to promote compliance with the Agreement?**

**RESPONSE 4:**

The Agreement does not contemplate biannual conferences before the Court, but the Agreement does require the COCL to hold open town hall meetings on a quarterly basis where he/she will present his/her draft compliance report to the COAB, and receive public comment on his/her assessments of compliance and recommendations. *Id*. at ¶ 163. The Court should consider the COCL's quarterly reports, as well as the comments to those reports that the COAB and the United States prepare, to determine if holding additional hearings is necessary. Should the Court determine that additional periodic hearings are necessary, the United States suggest that they should occur no more frequently than every six months absent a motion by the United States for Court enforcement.

Page 7 –    **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

**QUESTION 5:**

**In the Agreement, "supported by evidence" is defined as meaning the standard of proof applied in Citizen Review Committee appeals pursuant to Portland City Code Section 3.21.160, which refers to the "reasonable person" standard. PSA, ¶ 61; see also PSA, ¶ 67(d). In light of the comments raised during the Fairness Hearing, is this standard of review, as opposed to, for example, a "preponderance of the evidence" standard, adequate to achieve the objectives of the Agreement?**

**RESPONSE 5:**

Yes, this provision is fair, reasonable, and adequate; but, the United States is amenable to future change once the Agreement becomes effective. During the course of our investigation, CRC members and others remarked that they have different understandings of, or lacked clarity on, the appropriate standard of review that the CRC must employ. Commenters often conflated the standard of review and the burden of proof. In an, albeit imperfect, effort to add clarity, the Agreement sought to memorialize a consistent definition of the standard of review. *See* Agreement at ¶ 135.

The Agreement already requires that every single administrative investigation be supported by a "*preponderance of the evidence*." *See* Agreement at Sec. VIII, Preamble. This is the burden of proof, not a standard of review.

The standard of review in the current code is "*supported by the evidence*." *See* City Code Section 3.21.160. To the extent that any CRC member believes that an investigation is not supported by a preponderance of evidence, that member may find the outcome unreasonable. *See* Agreement at ¶ 135.

The United States is amenable to amending the Agreement as necessary should City Council approve a change to City Code that enables the CRC to exercise a standard of review that is less deferential to the outcome of the administrative investigation, *e.g.*, a "*de novo*"

Page 8 – **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

standard. However, the United States would not agree to any change that would require the CRC to exercise a more deferential standard of review, *e.g.*, an "*abuse of discretion*" standard, thereby making CRC review less meaningful. Hence, this Agreement provides as a floor the "*supported by the evidence*" standard of review, but nevertheless permits the Parties to adopt a different standard if City Code Section 3.21.160 is amended. *See id.* at ¶ 187 (permitting stipulated changes, modifications, or amendments). Thus, if the Court approves this Agreement, discussions among the community, CRC, and City Council about the CRC's standard of review may proceed. The United States, however, does not wish to delay the implementation of meaningful remedies in all areas while awaiting the unsure outcome of that lengthy discussion.

**QUESTION 6:**

> **The Agreement provides that the local Community Care Organizations "will establish, *by mid-2013*, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs." PSA, ¶ 89 (emphasis added). This has not yet occurred. Does this portion of the Agreement require amendment in order to avoid being substantially out of compliance the moment the Agreement is approved?**

**RESPONSE 6:**

No, this portion of the Agreement does not require an amendment for the City to avoid being substantially out of compliance the moment the agreement is approved.

It is important to note that the United States *expected* the Community Care Organizations ("CCOs"), not the City, to establish such walk-in and drop-off centers ("centers"). *Id.* at ¶ 89. The State of Oregon established the CCO model to assist in healthcare transformation under the Affordable Care Act, to serve along with the already statutorily mandated, county-based system for providing crisis services. *See* https://cco.health.oregon.gov/Pages/Home.aspx (last visited on March 5, 2014). Tr. p.70, ln. 19-25, pg. 71 ln. 1-17, pg. 77, ln, 8-25, p. 78, ln. 1-2.

Page 9 –    **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

This expectation that CCOs would establish such centers must be read in context with ¶ 88 of the Agreement.  That paragraph makes clear that the United States is engaging the State in a separate process to address the gaps in the State's mental health infrastructure.  Negotiations with the State are ongoing.  In a January 24, 2013 letter to State Officials, the United States specifically addressed not only the State's current plans to address the gaps in the system but also the United States' frustration that the State has not fulfilled this Agreement's aspiration for the centers, despite City leadership attempts to convey the importance of such centers.  *See* Tr. p. 33, Ex. 3, January 24, 2013 letter to State Officials.

Furthermore, the Agreement acknowledges that it may only legally bind the City as the Defendant in this action, and the support for the establishment of such centers must come from the State and County partners.  The Oregon Health Authority ("OHA"), area CCOs, Multnomah County, local hospitals, health insurance provides, commercial health provides, existing non-governmental organizations such as community-based mental health providers, and other stakeholders must all help in remedying the lack of infrastructure for community mental health services for Medicaid-eligible as well as uninsured area residents.

Certainly, a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree.  *Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C.* v. *City of Cleveland*, 478 U.S. 501, 529-530 (1986) (internal citations omitted).  Just as the Court found in that case, the United States did not impose a legal obligation on the State, the CCOs, or other mental health partners, as none of those entities is a party here.  Therefore, the date set forth in the Agreement for such centers to be established was, and will continue to be, aspirational.

Page 10 –  **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

**QUESTION 7:**

> **The Agreement provides that "[a]ppeals to [the Citizen Review Committee] shall be resolved within 21 days."  PSA, ¶ 121.  In light of the comments raised during the Fairness Hearing, is 21 days a reasonable timeframe in light of the objectives of the Agreement?**

**RESPONSE 7:**

Yes, this timeframe is reasonable when read in context with the other changes the Agreement requires the City to implement concerning citizen complaints.  Importantly, the Agreement's current 21-day deadline does *not* create any statute of limitations after which the CRC could not act nor does the deadline limit the imposition of discipline for appeals that are resolved after 21 days.

The Agreement is designed to compel the City to make changes in the CRC process to make it more efficient and easier for volunteers.  During the course of our investigation, stakeholders made clear that the accountability systems took inordinately long to reach resolution, thereby undercutting efficacy and faith in the system.  Moreover, CRC members and others remarked that CRC volunteers are unnecessarily burdened by having to travel to City offices to review Internal Affairs ("IA") files.  Accordingly, the Agreement is designed, in part, to motivate the City to expedite the CRC file review process and provide such other supports as necessary for the CRC to be equipped to act as quickly and reasonably as possible.  The United States expects the City to take the necessary steps to expedite the process, such as providing secure, confidential remote access to CRC review material.  If, despite a good faith effort, the CRC, or any other part of the officer accountability review chain, is still unable to meet the timeframe provided in the Agreement, then the Agreement requires the City to provide the United States a written review of the IA process, which identifies the source of the delays, and

Page 11 –  **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

implement an action plan for reducing the delays. *See* Agreement at ¶ 123. After analyzing this report, the parties could agree to amend the Agreement as necessary. The ability to make such a change is provided for once the Agreement becomes effective.

**QUESTION 8:**

> **In light of some of the comments raised during the Fairness Hearing, do the Parties believe that the Independent Police Review Division and the Citizen Review Committee provide a fair, reasonable, and adequate process by which citizens can make complaints against Portland police officers and have confidence that complaints will be adequately investigated and resolved?**

**RESPONSE 8:**

Yes, if the IPR and CRC are reformed in the manner prescribed by the Agreement. As Chief Charles Gruber opined, the Agreement incorporates the necessary provisions to hold officers accountable. Tr. p. 54, ln. 24-25, p. 55, ln. 1-2. The concerns raised at the Fairness Hearing regarding the IPR and CRC underscore the need for the remedies set forth in the Agreement that will make the IPR and CRC process more effective, thereby instilling greater confidence in these systems. For example:

- The Agreement's requirements for on-scene investigations of uses of force (Agreement at ¶ 70) and audits of uses of force (*id.* at ¶ 74) provide a factual record for use by IPR that did not exist before the United States' investigation.

- Within 120 days of the Effective Date, the City must develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary. *See id.* at ¶ 128.

- The City and PPB must ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.  *See id.* at ¶ 129.

- The Agreement permits a member of the CRC to sit on the Police Review Board ("PRB"), thereby subjecting the process to outside perspective and scrutiny.  *See id.* at ¶ 130.

- The Agreement allows the CRC to make one request for additional investigation or information to the investigating entity, i.e. Professional Standards Division ("PSD") or IPR at any point during its review, and requires the investigating entity to conduct the additional investigation within 10 business days or explain why additional time is needed.  *See id.* at ¶ 136.

**QUESTION 9:**

**The Agreement provides that within 90 days after the Effective Date, the City and Portland Police Bureau "shall review its protocols for compelled statements to PSD [Professional Standards Division] and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967)."  PSA, ¶ 124.  (1) What revisions to the protocols do the Parties currently anticipate will be made?  (2) Do the Parties anticipate any changes being made either to the "communication restriction order" or to the "48-hour rule" under ¶¶ 124-125 of the Agreement?  (3) How would these changes, or absence of changes, affect the ability of the Agreement to achieve its goals?  (4) Should these revisions become part of the Agreement?**

**RESPONSE 9:**

(1)  The Parties have not reached agreement on what revisions they anticipate.

(2)  Yes, in practice.  At very least, under the current collective bargaining agreement and City Code, the United States expects changes in the practice of using "communication restriction orders" and the " 48-hour rule."  The City must not give the benefit of using the 48-hour rule to

witness officers who are not subject to criminal investigation, as the City has allowed in the past. Moreover, the City must take constitutionally permissible public safety statements from involved officers to ensure the safety of subjects, other officers, and bystanders.

(3) These changes will further an objective of this Agreement to make officers accountable for uses of force and protect individuals from unconstitutional uses of force. Moreover, these changes should preserve the importance of subjecting officers to criminal investigations if an allegation or suspicion of criminal conduct exists.

(4) No, not at this time. Any revisions to the ultimate 48-hour rule and compelled statements cannot become part of the Agreement, now, without delaying or even jeopardizing the entire Agreement, as such revisions will likely trigger collective bargaining. This is a lengthy process that could span over a year. The other remedies in this Agreement should not be delayed while that process occurs. Instead, the Agreement includes a specific methodology for addressing the 48-hour rule. The City and the United States must work with the Multnomah County District Attorney to fashion a resolution that respects the need for a criminal investigative and prosecutorial process while allowing a concurrent administrative investigative and disciplinary process to proceed. *See* Agreement at ¶ 124.

**QUESTION 10:**

> **The Agreement, as it appeared in December 2012, anticipated that the City will have substantially complied with all provisions by October 12, 2017. PSA, ¶ 178. Is that still the expectation of the Parties? If not, does this portion of the Agreement require amendment?**

**RESPONSE 10:**

The Parties filed this Agreement with the Court in December 2012, with the expectation that the Agreement would become effective shortly thereafter, and that the City would come into

Page 14 –  **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

full compliance with the Agreement within five years.  Nevertheless, the Agreement provides

that the "Court shall retain jurisdiction of this action for all purposes until the City has

substantially complied with all provisions of this Agreement and maintain substantial

compliance with all provisions for one year."  Agreement at ¶ 178(b).  Thus, termination of this

Agreement is not linked to the passage of time, but to the City's compliance with the Agreement,

whether that be in two years or ten years.  Although the United States still anticipates that the

City will be in full compliance with this Agreement within five years, no amendment to the

Agreement is necessary because this Agreement does not have a bright line termination date.

Additionally, the United States supports the Court bringing the Parties in for a non-evidentiary

hearing on the status of compliance on or near October 12, 2017.  Agreement at ¶ 178(c).

**QUESTION 11:**

>  **The Agreement anticipates that the Parties may ask the Court to terminate the Agreement after the City has substantially complied with all provisions of the Agreement "and maintained substantial compliance with all provisions for one year. PSA, ¶ 178(c).  Is one year a sufficient period of time to promote the objective of maintaining substantial compliance with the Agreement?  Would a five-year period of maintenance after substantial compliance better satisfy the objectives of the Agreement?  Would extending the period of time for demonstrating maintenance of "substantial compliance" require an amendment to the Agreement?**

**RESPONSE 11:**

Requiring the City to maintain substantial compliance with the Agreement for a period of

one year is sufficient to promote the objectives of this Agreement.  This Agreement requires the

City to engage in systemic reform by changing its policies, training, data collection efforts, and

officer accountability mechanisms, amongst other things.  These changes will not be easy, but in

the Department of Justice's experience, a cultural shift occurs in police departments where these

reforms are successfully implemented.  This Agreement intentionally places agents for change

Page 15 –  **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

within the PPB, including the Inspector and leadership within the Addictions and Behavioral

Health Unit ("ABHU"), to ensure that the changes made pursuant to this Agreement last long

after the case is over.  Chief Charles Gruber testified at the Fairness Hearing about the cultural

change he has witnessed at police departments that embrace reforms championed by the United

States, and Dr. Maggie Bennington Davis, Chief Medical and Operations Officer of Cascadia

Healthcare, testified that this cultural change is already underway within PPB.  Tr. p. 59, ln. 24-

25, p. 60, ln. 1-25, p. 61 ln. 1-3, pg. 76, ln 12-25, pg. 77, ln 1-7.

Extending the period of time for demonstrating maintenance of substantial compliance

would require an amendment to the Agreement, and such an amendment is not necessary.

Further, a one-year period of maintaining substantial compliance is commonly used for USDOJ

Civil Rights Division, Special Litigation Section, agreements.

**QUESTION 12:**

**A number of police departments provide officers with "on-officer recording systems" (also known as "body cameras," "body cams," or "cop cams"), which are small, pager-sized cameras that clip onto an officer's uniform or glasses or are worn as a headset.  These devices record audio and video of the officer's interactions with the public.  Please explain whether requiring these devices would promote the objectives of the Agreement and, if so, why such a requirement was not included.**

**RESPONSE 12:**

The United States has not required that all PPB officers wear body cameras, but the

Agreement does not prohibit the City from using body cameras.  Currently, the City records

many of its interactions through mobile video recorders, handheld radio transmissions, and GPS

locations.  It is our understanding that the City is willing to engage in use of body cameras to the

extent that the technology is dependable and that its use is affordable.  If the City utilizes body

cameras, the City must carefully govern their use to protect the rights of subjects and bystanders,

*e.g.*, providing *Miranda* warnings when appropriate and respecting reasonable expectations of privacy.

The determination to include or exclude body cameras from the Agreement is driven by a number of factors.  While technology limitations, concerns about privacy rights, and appropriateness of remedy may weigh on such considerations, the ultimate compromise reached in this case is the product of negotiation and subject to settlement privilege.

**QUESTION 13:**

> **Do the Parties want additional time to consider amending the PSA in light of any of the comments raised during the Fairness Hearing or in these post-hearing questions from the Court?  If so, how much time do the Parties want?  If not, please discuss how the PSA is fair, reasonable, and adequate in light of the comments raised during the Fairness Hearing and the issues presented in these post-hearing questions from the Court.**

**RESPONSE 13:**

No, the United States does not desire additional time at this point to consider amending the Agreement.  The United States acknowledges that the Agreement is principally designed to address issues in its investigation and the facts plead in the Complaint and that many community members wished that remedies went even further.  However, as acknowledged by the AMA Coalition and others in the community, this Agreement provides a foundation upon which further change can be established.  The Court's entry of the Agreement without further delay will allow reforms provided in the Agreement to move forward with oversight by the United States. Furthermore, the Agreement includes a provision to allow the Parties to amend the Agreement if necessary, once it's entered as an Order.

Moreover, as we provided in our closing comments at the Fairness Hearing, the vast majority of concerns that were raised by the public during the Fairness Hearing are largely

Page 17 –   **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

addressed in the Agreement.  The Court's analysis as to whether the Agreement is "fair, adequate, and reasonable" does not require "the achievement of the optimal outcome for all parties," but rather "[t]he court need only be satisfied that the decree represents a reasonable factual and legal determination" of the allegations in the Complaint.  *Oregon*, 913 F.2d at 580-81.

## IV.    COMMUNITY CRITIQUES

As an aid in demonstrating how the concerns raised throughout the Fairness Hearing are addressed in the Agreement, the United States provides the following chart listing the topic areas of concern and the specific paragraphs in the Agreement that address the concern.  The overwhelming majority of concerns brought forth during the fairness hearing were previously brought to the attention of the United States during our investigation and settlement negotiation process, which included hundreds of individual interviews with community members and organizational stakeholders, a public town hall meeting and two public conference calls.  Many of the ideas that the public provided were incorporated directly into the terms of the Agreement.  And, reforms of PPB policy detailed in the Agreement have the backing of two nationally renowned police practices experts, as well as a mental health expert who helped craft the Memphis model for crisis intervention.

| Topic Area of Concern: | How does the Proposed Settlement Agreement Address this Concern? |
| --- | --- |
| Police are using too much force, in too many encounters with too little justification. | • The Agreement requires the Portland Police Bureau (PPB) to change its use of force policies so that use of force is maintained within constitutional standards, including limits on Electronic Control Weapon ("ECW") use.  ¶¶ 66-68.<br><br>• Specifically regarding ECW use, officers must reevaluate after one ECW cycle to determine if subsequent cycles are |

|  | necessary, including waiting for a reasonable amount of time to allow the subject to comply with warnings. ¶ 68(e).  And, only one ECW may be used at a time on a subject intentionally.  ¶ 68(d). |
|  | • All objectively unreasonable uses of force shall result in corrective action.  ¶ 67(d). |
|  | • Training is required to be changed to focus on de-escalation, and using force no greater than necessary to accomplish a lawful objective.  ¶¶ 84, 84(a). All training must conform to policies.  ¶¶ 94-95.  To assist in this requirement, the training division must conduct a needs assessment on an annual basis.  ¶ 79. |
|  | • Patrol officers must be trained to avoid use profanity, and prohibit using derogatory/demeaning labels. ¶84(a)(vi). |
|  | • The Agreement further requires the City to require use of force complaints be investigated on scene.  ¶ 70. |
|  | • PPB must track any trends in use of force, and make changes to address patterns that emerge, including how force is used against persons with mental illness and against persons of color.  ¶¶ 74, 86. |
|  | • Training Advisory Council meetings must be open to the public so that both DOJ and the community can track progress, and the Chief shall assess all recommendations made by the Council.  ¶ 86-87. |
|  | • Any changes to policies involving force require review and approval of DOJ.  ¶ 169. |
| Police involvement with persons with mental illness or in a mental health crisis make matters worse, and they should not be the first responders to such incidents. | • In order to ensure that police help deescalate any situation for which they are the first responders, the Agreement requires the City to create a specially trained Crisis Intervention Team (CI-Team), consisting of officers that have volunteered to be specifically trained to address scenarios with patience and sensitivity, and to only use force when absolutely necessary to avoid harm to themselves or others.  ¶¶ 99-105. |
|  | • The Agreement requires PPB to develop the ABHU and establish an ABHU Advisory Committee, which shall include |

|  | representation from:  PPB command leadership, Crisis Intervention Team, mobile Crisis Prevention Team, and Service Coordination Team; Bureau of Emergency Communications ("BOEC"); civilian leadership of the City government; and shall seek to include representation from:  the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.  ¶¶ 91, 94.<br><br>• The Agreement requires PPB to work with BOEC, the ABHU, and the ABHU Advisory Committee to create protocols for more accurate information sharing between caseworkers and first responders, and to specifically expand the options for BOEC operators to divert calls to civilian mental health providers as first responders.  ¶¶ 90, 90(d), and 113-115.<br><br>• The ABHU Advisory Committee must provide the City and PPB guidance in expanding the C-I Team and other behavioral health related components, as well as analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis.  ¶ 95. |
|---|---|
| Lack of individual officer accountability in officer misconduct cases brought by private citizens against the City. | • The Agreement requires the City to reopen Internal Affairs investigations of officers when the City is found liable in a civil court judgment for officer misconduct. Furthermore, training must include situations in which a force event could lead to potential civil or criminal liability.  ¶¶ 84(a)(v) and 133. |
| Officers who are found to have used excessive force should not serve as trainers or on specialized units, such as CIT. | • The Agreement requires the City to consider an officer's use of force history in its selection process, and prohibits officers involved in recent events from serving in these roles.  ¶¶ 83, 101, 108, and 133. |
| PPB officers engage in racial profiling | • While the Department did not find sufficient evidence to proceed with an investigation of racial profiling, our findings acknowledged the long history of public distrust of the police.<br><br>• In recognition of this history, the Agreement requires PPB to collect appropriate data to further develop an understanding of the current issues, and to work on remedying these issues, |

| | |
|---|---|
| | which is similar to any remedy that would follow a finding of bias-based policing. ¶¶ 146-152. Specifically the Agreement provides the following to ensure constitutional policing and strengthen community-police relations: <br> o Development of and Implementation of a Community Engagement and Outreach Plan (CEO), to include input from the Human Rights Commission's Community Police Relations Committee ("CPRC") and work to implement the 2009 PPB Plant to Address Racial Profiling. ¶ 146. <br> o Collection of demographic data for each precinct and work with the COAB to develop outreach and policing programs specifically tailored to the residents of the precincts. ¶ 147. <br> o Require officers to document demographic data of police encounters and provide such information to the CPRC. ¶ 148. <br> o PPB must consider enhancements of its data collection efforts in consultation with the COAB and CPRC, and report on its efforts to enhance such data collection within a year of the effective date of the agreement. ¶ 148. <br> o The COAB, COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. ¶ 149. <br> o Annually, PPB must issue a publically available report to include a summary of its problem-solving and community policing activities. ¶ 150. <br><br> • The COAB shall meet at least twice a year with the Chief, Police Commissioner, Precinct Commanders, Neighborhood Response Teams, and a representative of the Office of Neighborhood Involvement and Crime Prevention to assess and solicit comments on PPBs activities in regards to community outreach, engagement, and problem-solving policing. ¶ 152. |
| Officers do not solicit medical assistance on the scene when necessary. | • The Agreement requires PPB to revise training to include an officer's duty to call for medical care when a subject is injured in a force event. ¶ 84(a)(iii). <br><br> • The Agreement requires PPB to evaluate whether supervisors consistently ensure that subjects receive medical attention from an appropriate medical provider when necessary. ¶ 70(c). |
| The Independent Police Review Board does not conduct independent | • Upon implementation of the Agreement by the Court, the City is required to develop plans, protocols, and enhanced website capability to address concerns regarding communication with |

| investigations, does not communicate with complainants, and lacks transparency. | complainants and transparency of the process.  ¶¶ 138-140.  The DOJ as the monitor will ensure such changes provides meaningful reform.  ¶ 167. |
|---|---|
| 21 days is not enough time for the Citizens Review Committee to complete its review process. | • Our investigation found that officer investigations were taking an inordinate amount of time well outside the bounds of best police practices and delaying justice for individuals and family members.  Furthermore, we determined that the process often bottlenecked at the CRC level.<br><br>• While under the current construct of CRC file review, 21 days may be untenable.  However, as a result of the Agreement, the United States expects the City to provide for a more efficient case-file review process, such as provide CRC members with secure remote access, allowing volunteer members to work on files at home and during times that fit their personal or work schedules.<br><br>• Furthermore, nothing in the Agreement contemplates dismissal of the complaint if the CRC does not finish its review in 21 days.<br><br>• If, despite changes to provide better access to case files, the City cannot meet this timeframe, the Agreement provides the flexibility for the parties to reassess and change the time of review as necessary.  ¶¶ 123, 187. |
| The CRC "reasonable person" standard is too deferential to PPB supervisory decisions regarding officer misconduct. | • The Agreement clarifies that the CRC may find that a decision concerning officer misconduct is unreasonable if it is not "supported by the evidence."  The reasonable person standard, however, means that the CRC is required to look at evidence *objectively* to determine if a reasonable person would agree with the decision under review.  ¶ 61 and Section VIII preamble.<br><br>• Also, the Agreement permits the CRC to send a case back to IPR/IA for further investigation, and requires the City to complete that additional investigation with 10 days.  ¶ 136.<br><br>• The CRC may find the outcome of an investigation unreasonable if the findings are not "supported by the evidence."  ¶ 135. |

Page 22 –  **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI

| | |
|---|---|
| The Agreement needs an independent court monitor. | • The Agreement provides that the United States will serve as the independent monitor.  ¶¶ 23,167.  It is not uncommon for the Department of Justice to monitor enforcement of its terms of settlement, utilizing nationally renowned experts to assist in our analysis of a variety of reporting the City is required to provide us.  ¶¶ 82, 85, 124.<br><br>• The COCL will serve as an independent contractor, and must answer to the entire City Council, as well as the United States.  ¶¶ 160, 162-164. |
| The community does not have ongoing involvement in enforcement of the Agreement. | • The Agreement includes an active oversight role of the Community.  As a direct result of community input, the Agreement establishes a Community Oversight Advisory Board (COAB), which includes five representatives elected directly from the community, to have a voice in determining the City's compliance with this agreement.  ¶ 141.<br><br>• Furthermore, other members selected must be from diverse backgrounds.  ¶ 142(b).<br><br>• The COAB, COCL, PPB, and DOJ will jointly develop metrics to evaluate progress on community engagement and outreach.  ¶ 149.<br><br>• A representative of the United States Attorney will be invited to all COAB meetings.  ¶ 153.<br><br>• The COAB shall provide the opportunity for public comment at each of its meetings.  ¶ 152.<br><br>• As a result of mediation with the AMA, the United States and the City entered a Collaborative Agreement to address the concern of the AMA's ongoing role in assisting in development and implementation of the Agreement's reforms regarding both the COAB and the COCL.  *See* ECF No. 55.<br><br>• Furthermore, as part of the Collaborative Agreement, the United States and the City agree to meet with the AMA within a year of the Agreement's effective date to address ongoing concerns of the AMA. |

| The City has not created a drop-off center for first responders, nor a public walk-in center. | • Our Agreement *expected* the Coordinated Care Organizations to work with the City and other partners (State and County) to establish such centers. ¶ 89. However, there is no compliance requirement for the City to establish such centers on its own. ¶ 88. Neither the CCOs, the State, nor the County is a party to this agreement, and therefore the development of such centers is an aspirational goal, which both the United States and the City continue to work towards achieving.  The United States has a separate, but related, investigation regarding the State's obligation to provide integrated community mental health care services, pursuant to Title II of the Americans with Disabilities Act.  That investigation is ongoing. |

## VI.    CONCLUSION

Upon consideration of all the relevant testimony and written submission of the public, as well as the experience and views of the United States, and the arm's length negotiations that have occurred between all four parties, the United States requests that the Court find that the Agreement is fair, adequate, and reasonable in resolving the allegations in the United States Complaint, and that the Court enter the Agreement as proposed as an Order of the Court.

Respectfully submitted this 11th day of March, 2014.

For the United States:

| S. AMANDA MARSHALL<br>United States Attorney<br>District of Oregon<br><br><br>*/s/ Adrian L. Brown*_____<br>ADRIAN L. BROWN<br>BILLY J. WILLIAMS<br>Assistant U.S. Attorneys<br>DAVID KNIGHT<br>Special Assistant U.S. Attorney | JOCELYN F. SAMUELS<br>Acting Assistant Attorney General<br>Civil Rights Division<br><br>JONATHAN M. SMITH<br>Chief, Special Litigation Section<br>*/s/ Laura L. Coon*_____<br>LAURA L. COON<br>Special Counsel<br><br>*/s/ R. Jonas Geissler*_____<br>R. JONAS GEISSLER<br>*/s/ Michelle A. Jones*_____<br>MICHELLE A. JONES<br>Senior Trial Attorneys |

Page 24 –   **UNITED STATES' POST-HEARING MEMORANDUM IN SUPPORT OF ACCEPTANCE OF SETTLEMENT AGREEMENT AND RESPONSE TO QUESTIONS FROM THE COURT**; *United States v. City of Portland*; Case No. 3:12-cv-02265-SI