ANIL S. KARIA, OSB No. 063902
E-mail: anil@miketlaw.com
Tedesco Law Group
3021 NE Broadway
Portland, OR  97232
Telephone:  866-697-6015
Facsimile:  503-210-9847
        Attorneys for Intervener-Defendant
        Portland Police Association

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>v.<br><br>**THE CITY OF PORTLAND,**<br>Defendant.<br><br>_____ | Civil Case No. 3:12-CV-02265-SI<br><br>**INTERVENER-DEFENDANT PORTLAND POLICE ASSOCIATION'S MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED SETTLEMENT AGREEMENT** |

TABLE OF CONTENTS

I. PROCEDURAL BACKGROUND ...........................................................................1

II. ARGUMENT ......................................................................................................2

    A. LEGAL STANDARD.................................................................................3

    B. THE SETTLEMENT AGREEMENT PRESENTS A FAIR, ADEQUATE,
       AND REASONABLE RESOLUTION TO THE UNITED STATES'
       ALLEGATIONS...............................................................................................4

        1. THE CITY IS COMMITTED TO FAIR, ADEQUATE, AND
           REASONABLE MECHANISMS TO ADDRESS THE UNITED
           STATES' CONSTITUTIONAL ALLEGATIONS............................................5

        2. THE SETTLEMENT AGREEMENT INCLUDES A RIGOROUS
           ENFORCEMENT MECHANISM ...................................................................8

        3. RESOLUTION OF THE PPA'S AND AMA'S OBJECTIONS TO
           THE SETTLEMENT AGREEMENT...............................................................9

    C. RESPONSE TO THE COURT'S QUESTIONS ........................................10

III. CONCLUSION.................................................................................................28

Defendant-Intervener Portland Police Association ("PPA") submits this memorandum in support of entry of the Proposed Settlement Agreement ("Settlement Agreement") between Plaintiff United States ("United States") and Defendant City of Portland ("City") (Docket No. 4-1). While the PPA vigorously disagrees that Portland police officers have engaged in unconstitutional policing, the Settlement Agreement—in its current, unaltered form—is a fair, adequate, and reasonable resolution to the allegations in the United States' complaint.

I.      PROCEDURAL BACKGROUND

On December 17, 2012, the United States filed a complaint against the City under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, alleging a pattern and practice of unconstitutional force by the City's police officers against persons with actual or perceived mental illnesses. (Docket No. 1). At the same time the complaint was filed, the United States and the City filed a Joint Motion to Enter Settlement Agreement and Conditional Dismissal of Action, requesting that the Court enter the parties' Settlement Agreement and conditionally dismiss the action pursuant to Fed. R. Civ. P. 41(a)(2), subject to the Court retaining jurisdiction to enforce the Settlement Agreement. (Docket No. 3).

On December 18, 2012, the PPA moved to intervene in the action. (Docket No. 7). On January 8, 2013, the Albina Ministerial Alliance Coalition for Justice and Police Reform ("AMA") also moved to intervene. (Docket No. 19). On February 19, 2013, the Court granted the PPA's motion to intervene as of right for remedy purposes; deferred ruling on the PPA's motion to intervene for liability purposes; denied the AMA's motion to intervene for remedy purposes; deferred ruling on the AMA's motion to intervene for liability purposes; and granted the AMA enhanced amicus status for remedy purposes. (Docket No. 3 at 3).

The PPA is a labor organization that represents a collective bargaining unit of police officers, sergeants, criminalists, and detectives employed by the City. (Decl. of Anil S. Karia ("Karia Decl.") at ¶ 2). After 10 months of challenging and rigorous mediation and collective bargaining negotiations, the PPA and the City resolved the PPA's objections to the Settlement Agreement. The parties memorialized their resolution in a Memorandum of Agreement (Docket No. 54-1; Karia Decl. at ¶ 4). Concurrently, the parties also executed a new collective bargaining agreement effective July 1, 2013 through June 30, 2017 (Karia Decl. at ¶ 3 and Ex. A). On December 23, 2013, the PPA formally withdrew its objections to the entry of the Settlement Agreement with the Court. (Docket No. 54).

The AMA, a coalition of faith based and community organizations, also participated in extensive mediation with the parties over the terms of the Settlement Agreement. After lengthy negotiations, the AMA notified the Court on December 30, 2013 that the AMA did not object to the entry of the Settlement Agreement. (Docket No. 55).

On February 18 and 19, 2014, the Court held a Fairness Hearing at which it received written and oral testimony on whether the Court should approve the Settlement Agreement. (Docket Nos. 59, 60). On February 28, 2014, the Court submitted 13 questions for the parties' consideration in their written, post-Fairness Hearing briefing to the Court. (Docket No. 61).

II.     ARGUMENT

The Court should approve and enter the Settlement Agreement because it is a fair, adequate, and reasonable resolution to the United States' allegations that Portland police officers have engaged in a pattern or practice of unconstitutional policing against persons with actual or perceived mental illnesses.

A.    LEGAL STANDARD

The Settlement Agreement must be fair, adequate, and reasonable. *Officers for Justice v. Civil Service Comm'n, et al*., 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983). The Settlement Agreement need not be perfect, *Lane v. Facebook, Inc*., 696 F.3d 811, 819 (9th Cir. 2012), nor must it achieve the optimal outcome for all parties, *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). Rather, the Court "need only be satisfied that the [Settlement Agreement] represents a reasonable factual and legal determination." *Id.* at 581.

Rather than examining its component parts, the Court must examine the Settlement Agreement as a whole for overall fairness. *Officers for Justice*, 688 F.2d at 628. That is, the Court cannot "delete, modify or substitute certain provisions;" the Settlement Agreement "must stand or fall in its entirety." *Id.* at 630.

In considering whether the Settlement Agreement is fair, adequate, and reasonable, the Court should balance several factors, including the "strength of the plaintiffs' case; risk, expense, complexity and possible duration of continued litigation; relief offered in settlement; extent of discovery already completed; stage of proceedings; experience and views of counsel; governmental participation; and reaction of the class members." *See Davis v. City and County of San Francisco*, 890 F.2d 1438, 1445 (9th Cir. 1989) (citing *Officers for Justice*, 688 F.2d at 625)).

These evaluation factors are non-exclusive; the Court need only consider those factors that are relevant to the case before it. *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 576 n. 7 (9th Cir. 2004). In its consideration of the relevant factors, the Court need not "reach any ultimate conclusions on the contested issues of law and fact which underlie the merits of the dispute, for it is the very uncertainty of the outcome of litigation and avoidance of wasteful and

expensive litigation that induce consensual settlements." *Officers for Justice*, 688 F.2d at 625. Ultimately, the Court's determination is nothing more than "an amalgam of delicate balancing, gross approximations and rough justice." *Id.*

Further, a fair, adequate, and reasonable Settlement Agreement must be free from fraud, collusion, and overreaching. *Officers for Justice*, 688 F.2d at 625. It should be the product of good faith, arm's length negotiations. *See Cemex Inc. v. L.A. County*, 166 Fed. Appx. 306, 307 (9th Cir. 2006).

Finally, the Court must also be mindful of the strong judicial policy that favors settlement, particularly in complex litigation such as that brought by the United States in this action. *See Officers for Justice*, 688 F.2d at 625 ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution."); *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) ("We are committed to the rule that the law favors and encourages compromise settlements. [T]here is an overriding public interest in settling and quieting litigation.").

B.   THE SETTLEMENT AGREEMENT PRESENTS A FAIR, ADEQUATE, AND REASONABLE RESOLUTION TO THE UNITED STATES' ALLEGATIONS.

The centerpiece of the United States' complaint is that Portland police officers have engaged in a pattern and practice of unconstitutional force against persons with actual or perceived mental illnesses. Both the City and the PPA vigorously deny that such a pattern or practice exists. Nonetheless, as with any suit containing allegations of constitutional violations, the United States and the City are free to voluntarily resolve the United States' allegations short of an admission or judicial finding of liability.

The Settlement Agreement embodies the public policy preference for voluntary conciliation. The Settlement Agreement is a culmination of months-long, arm's length

negotiations and community input over changes to the City's policing practices. At its core, the

Settlement Agreement squarely addresses the United States' allegations of constitutional

violations, empowers the City to affirmatively address the United States' allegations through

structured changes in policing practices, and empowers the United States to seek judicial

intervention should the City fail to adhere to its obligations under the Settlement Agreement.

1.    THE CITY IS COMMITTED TO FAIR, ADEQUATE, AND
      REASONABLE MECHANISMS TO ADDRESS THE UNITED
      STATES' CONSTITUTIONAL ALLEGATIONS.

The primary intent of the Settlement Agreement is set forth in its introduction:

> The Parties enter into this Agreement with the goal of ensuring that the Portland
> Police Bureau ("PPB") delivers police services to the people of Portland in a
> manner that effectively supports officer and public safety, and complies with the
> Constitution and laws of the United States. Specifically, this Agreement is
> targeted to strengthen initiatives already begun by PPB to ensure that encounters
> between police and persons with perceived or actual mental illness, or
> experiencing a mental health crisis, do not result in unnecessary or excessive
> force. * * * . The Parties further recognize that the ability of police officers to
> protect themselves and the community they serve is largely dependent on the
> quality of the relationship they have with that community. Public and officer
> safety, constitutional policing, and the community's trust in its police force are,
> thus, interdependent. The full and sustained implementation of this Agreement is
> intended to protect the constitutional rights of all members of the community,
> continuously improve the safety and security of the people of Portland, keep PPB
> employees safe, and increase public confidence in PPB, all in a cost-effective,
> timely, and collaborative manner. The United States commends the City for the
> steps it already has taken to implement measures to effectuate these goals.

(Settlement Agreement at pp. 3-4).

To fully achieve these goals, the Settlement Agreement presents comprehensive changes

to the Police Bureau's policies and practices in seven major areas:

1.    Use of Force. The Police Bureau will revise its force and electronic control

weapons policies; revise its use of force reporting; enhance its use of force supervisory

administrative reviews; and conduct quarterly use of force audits. (Settlement Agreement at pp.

16-28).

2.    <u>Training</u>. The City will provide its police officers with additional training that reflects the Police Bureau's expectations that officers are committed to the constitutional rights of individuals who have or are perceived to have mental illness, and that further reflects the Police Bureau's commitment to officer safety. (Settlement Agreement at pp. 28-32).

3.    <u>Community-Based Mental Health Services</u>. The Settlement Agreement notes that the "absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis." The City has no direct control or authority over third parties who are primarily responsible for community-based addiction and mental health services, such as the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs"). As a result, the United States, under a separate agreement, "is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure." Although the City has no ability to compel these third parties to improve the State's mental health infrastructure, the City and the United States have aspired to work with these third-parties to provide Portland police officers with additional resources to assist persons with actual or perceived mental illnesses and crises. (Settlement Agreement at pp. 32-35).

4.    <u>Crisis Intervention</u>. "Despite the critical gaps in the state and local mental health system," the City will develop an Addictions and Behavioral Health Unit ("ABHU") within its Police Bureau; continue crisis intervention training for its police officers; establish a dedicated Crisis Intervention Team ("CIT"); enhance its Mobile Crisis Prevention team ("MCPT");

continue with its Service Coordination Team ("SCT"); and improve its emergency dispatching policies and protocols for triaging mental health emergency calls. (Settlement Agreement at pp. 35-41).

5.     <u>Employee Information System</u>. The City will enhance its Employee Information System ("EIS") regarding employee performance. (Settlement Agreement at pp. 41-43).

6.     <u>Officer Accountability</u>. The City will ensure that all complaints regarding alleged officer misconduct are investigated and adjudicated in an expeditious manner that is fair and reasonable to both the officer and complainant. The City has also agreed to retain and strengthen citizen input mechanisms regarding officer accountability in a manner that balances the Police Bureau's need to maintain its control over personnel matters and the City's desire for public transparency. (Settlement Agreement at pp. 43-50).

7.     <u>Community Engagement and Creation of Community Oversight Advisory Board</u>. To promote community confidence in the Police Bureau and to facilitate police-community relations, the City will create a Community Oversight Advisory Board ("COAB") that will monitor the implementation of the Settlement Agreement and provide reports documenting the City's compliance with the Settlement Agreement. The COAB will be chaired by the Compliance Officer Community Liaison ("COCL"), who will be independent from the Police Bureau and accountable to the City Council, the public, and the United States. (Settlement Agreement at pp. 50-71).

The City has already begun to implement or has already implemented many of the changes in these seven broad categories. *See* http://www.portlandoregon.gov/police/article/452158. For example, the City has implemented a new use of force policy and a new electronic control weapons policy that meet the Settlement

Agreement requirements. *See* http://www.portlandoregon.gov/police/article/473783. These policies were implemented after lengthy discussions with the PPA, including discussions over the collective bargaining ramifications of the new policies. Clearly, the City is able to affirmatively and proactively satisfy key terms of the Settlement Agreement even before it takes legal effect. And the City is able to collaboratively enact such changes with the PPA's input and support.

Likewise, the City has already taken proactive steps to implement those provisions of the Settlement Agreement that provide for concrete and comprehensive community involvement in the administration of the Settlement Agreement. For example, the City is already seeking a qualified person to fill the role of the COCL, even though the Settlement Agreement has yet to take legal effect. *See* https://www.portlandoregon.gov/mayor/article/479352.

> 2.    THE SETTLEMENT AGREEMENT INCLUDES A RIGOROUS ENFORCEMENT MECHANISM.

The Settlement Agreement is not merely aspirational. It is a comprehensive policing improvement plan that the City is obligated to satisfy. If the City fails to satisfy its obligations, the Settlement Agreement is not toothless. Indeed, the United States may seek compliance through this Court's ancillary jurisdiction over the Settlement Agreement should the City fail to meet its obligations. (Settlement Agreement at ¶¶ 178, 186).

The Settlement Agreement includes detailed enforcement provisions. (Settlement Agreement at pp. 71-75). Importantly, the Settlement Agreement centers on the judicial preference for voluntary conciliation of disagreements over the implementation of the Settlement Agreement's terms. Rather than constantly seeking the intervention of a third party, such as this Court, the Settlement Agreement specifically calls on the City and the United States to confer and attempt to voluntarily resolve disputes over implementation of the Settlement Agreement. If

voluntary conferral fails to resolve the dispute, the parties are then free to seek the assistance of a mediator. If mediation fails, the United States or the City may then trigger this Court's ancillary jurisdiction to resolve the matter. (*See* Settlement Agreement at ¶¶ 178-187).

This enforcement configuration promotes collaborative resolutions to disputes over implementation of the Settlement Agreement. It promotes a system of voluntary implementation that is realistically tailored to the United States' requirements and the City's ability to enact the changes called for in the Settlement Agreement. It also minimizes discord among the parties that may result from an outside party forcing change on the City and its Police Bureau.

For example, the United States may recommend that the City employ a specific, new less lethal tool. However, the City may be unable to procure that particular less lethal tool because it does not meet the Police Bureau's operational needs. In such case, the United States and the City are able to collaborate and discuss viable alternatives that satisfy the United States' desire for constitutional policing and the City's policy and financially driven realities. In contrast, a system where a third-party unilaterally imposes a specific policing tool on the Police Bureau forces the United States and the City to accept a specific tool where a fair, reasonable, and adequate alternative exists. Further, such a system of third-party intervention also interferes with the collective bargaining obligations the City may have with the PPA over the implementation of new policing tools and their derivative effects on officer safety and employment matters. Voluntary advances in policing are far more likely to survive the test of time and garner the support of all affected parties than imposed changes.

3.    RESOLUTION OF THE PPA'S AND AMA'S OBJECTIONS TO THE SETTLEMENT AGREEMENT.

Not to be lost in this discussion are the parties' agreements that resolve the PPA's and AMA's objections to the entry of the Settlement Agreement. Through lengthy and sometimes

tense negotiations, the PPA, the City, and the United States were able to resolve the PPA's collective bargaining objections to the Settlement Agreement. That resolution, as embodied in a Memorandum of Agreement (Docket No. 54-1), is predicated on the Settlement Agreement in its current form. Any material changes to the Settlement Agreement would upset the delicate balance struck by the PPA and the City in resolving the PPA's collective bargaining objections.

Likewise, the AMA, the City, and the United States engaged in lengthy, mediated discussions, resulting in a Collaborative Agreement (Docket No. 55-1) that garnered the AMA's support of the Court's entry of the Settlement Agreement. The AMA's Collaborative Agreement is predicated on the Settlement Agreement, and any material changes to the Settlement Agreement would similarly upset the voluntary resolution between the AMA, the City, and the United States.

The Settlement Agreement does not present perfection, nor must it. The Settlement Agreement presents a fair, adequate, and reasonable structure under which the City may enact changes to its policing practices. Requiring absolute perfection or an optimal outcome is neither the legal standard nor realistic. *See Lane*, 696 F.3d at 819; *Oregon*, 913 F.3d at 580. Rather, requiring the City to comply with a fair, reasonable, and adequate resolution to the United States' constitutional allegations, as embodied in the Settlement Agreement, is an obtainable goal that satisfies the legal requirements for this Court's entry of the Settlement Agreement. *See Officers for Justice*, 688 F.2d at 625.

### C.    RESPONSE TO THE COURT'S QUESTIONS.

The Court has submitted 13 questions for the parties' consideration. (Docket No. 61). The PPA responds to the Court's questions as follows:

1.    General Response To Questions 1 Through 4.

The Settlement Agreement is built upon the judicial policy of voluntary conciliation and settlement of disputes. The Settlement Agreement empowers the City to affirmatively and proactively take steps to improve its already sound policing policies and practices. In circumstances where the United States and the City may disagree over the City's implementation of settlement terms, the Settlement Agreement promotes conferral and mediation as the first and primary dispute resolution steps. (Settlement Agreement at ¶¶ 181-185, 187). In the rare instance that the United States and the City are unable to resolve their disagreement over the implementation of a settlement term, either party may invoke this Court's ancillary jurisdiction to resolve the parties' disagreement. (Settlement Agreement at ¶ 186).

The City and the United States bargained for and agreed to this enforcement mechanism because it closely aligns with their general desire for a collaborative approach to resolving the United States' allegations of unconstitutional policing. (*See* Statement of Intent; United States Fairness Hearing Ex. 1). The ultimate enforcement power over the City's compliance with the Settlement Agreement rests with the United States, the very body that has pursued allegations of unconstitutional policing against the City on behalf of the community. As the United States made clear during the Fairness Hearing, it is fully committed to overseeing the City's implementation and ongoing compliance with the Settlement Agreement. The United States also expressed its commitment to hold the City accountable should the City fail to live up to its obligations.

Given the rigorous structure for continuing oversight by the United States over the Settlement Agreement, the City and the United States agreed to enter the Settlement Agreement under Fed. R. Civ. P. 41(a)(2) and request that the Court "conditionally dismiss the United States' complaint with prejudice, while retaining jurisdiction to enforce the [Settlement]

Agreement." (Settlement Agreement at ¶ 178). In seeking this particular procedural resolution to the United States' complaint, the United States and the City specifically intended for the Settlement Agreement to be "filed with the Court, but the action will be dismissed and the Court will review compliance only upon an assertion by the United States of a material breach that cannot be resolved through good faith negotiations between the parties." (Statement of Intent at 2-3; United States Fairness Hearing Ex. 1).

This Court has the legal authority to retain ancillary jurisdiction over enforcement of the Settlement Agreement where the complaint has been conditionally dismissed with prejudice. In *Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008 (9th Cir. 2007), the Ninth Circuit explained:

> [A] federal court has jurisdiction to enforce a settlement agreement in a dismissed case when the dismissal order incorporates the settlement terms, or the court has retained jurisdiction over the settlement contract. In both instances, the party seeking enforcement of the settlement agreement must allege a violation of the settlement agreement in order to establish ancillary jurisdiction.

*Id.* at 1017 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381-82 (1994), and *O'Connor v. Colvin*, 70 F.3d 530, 532 (9th Cir. 1995)). By affirmatively invoking this Court's enforcement powers under the Settlement Agreement, the United States or the City would be invoking this Court's ongoing, post-dismissal ancillary jurisdiction over the Settlement Agreement.

This fundamental structure of conditionally dismissing the United States' complaint with prejudice and providing the Court with limited enforcement powers through its continued ancillary jurisdiction over the Settlement Agreement is the very form of voluntary conciliation that the Ninth Circuit has encouraged. *See Officers for Justice*, 688 F.2d at 625.

Inserting a third party with direct oversight authority over the City's implementation of the Settlement Agreement, such as through this Court's direct and ongoing involvement, upsets the delicate balance of enforcement powers struck between the United States and the City. Rather than having the role of final adjudicator of disputes between the United States and the City, this Court would take an active monitoring role over the City's implementation of the Settlement Agreement, a role expressly reserved to the United States in the current form of the Settlement Agreement.

Inserting this Court in an active role in the ongoing oversight of the City's implementation of the Settlement Agreement would prove to be a material change in the terms of the Settlement Agreement. Materially changing the Settlement Agreement directly affects the Memorandum of Agreement between the PPA, the City, and the United States. (Docket No. 54-1). The PPA's Memorandum of Agreement settled the PPA's objections over the existing Settlement Agreement. The PPA detrimentally relied on the terms of the existing Settlement Agreement in settling its collective bargaining objections. For instance, the PPA withdrew its grievance and committed to not filing future grievances or unfair labor practice complaints over the City's implementation of the Settlement Agreement under clearly enumerated circumstances. (Docket No. 54-1 at ¶ 7). The PPA also specifically retained its collective bargaining rights and its ability to challenge the City over collective bargaining issues with respect to a handful of current Settlement Agreement terms, to matters unknown to the PPA involving implementation of the Settlement Agreement, and to matters that fall outside the scope of the Settlement Agreement (Docket No. 54-1 at ¶¶ 8-10). It was only upon the parties entering into the Memorandum of Agreement that the PPA agreed to withdraw its objections to the entry of the Settlement Agreement in its current form. (Docket No. 54-1 at ¶¶ 3, 6).

In other words, the Settlement Agreement in its existing form is a condition precedent to the very existence of the PPA's Memorandum of Agreement. Any material change to the Settlement Agreement, such as the insertion of this Court as an ongoing monitor, would nullify the PPA's Memorandum of Agreement, forcing the PPA, the City, and the United States back to the table to negotiate a new resolution to the PPA's collective bargaining objections.

The PPA, the City, and the United States spent nearly 10 months negotiating a fair resolution to the PPA's collective bargaining objections. All three parties had their respective constituents, such as the City Council and the PPA's Executive Board, approve the Memorandum of Agreement. (Karia Decl. at ¶ 4). Any new memorandum of agreement between the PPA, the City, and the United States would require re-approval by their respective constituents. Resetting the clock and forcing the parties back to the negotiating table will only prolong the United States' and the City's efforts to implement the changes called for in the Settlement Agreement. Such a result is not in keeping with judicial efficiency, nor is it in the best interest of the PPA and its members.

2.      PPA Response To Question 1.

The Court asks:

If the Agreement were approved and the case conditionally dismissed with the Court expressly retaining jurisdiction to enforce the Agreement, would the Court have jurisdiction to direct all four Parties to appear for periodic hearings to provide the Court with reports on the status of compliance in the absence of an affirmative allegation by the Plaintiff or the Defendant of non-compliance? If so, what legal authority supports this conclusion?

No, the Court would not have such power. The Court's retained ancillary jurisdiction may only be invoked by either the United States or the City after those parties have exhausted the dispute resolution procedure in the Settlement Agreement and only upon an affirmative allegation by the United States or the City regarding noncompliance. (Settlement Agreement at

¶¶ 178, 181-87). *See Alvarado*, 509 F.3d at 1017. As explained above in the PPA's general

response, that is the structured dispute resolution procedure to which the United States and City

have agreed in the Settlement Agreement.

3.     <u>PPA Response to Question 2.</u>

The Court asks:

> May the Court approve the Agreement without dismissing the complaint with
> prejudice and then stay the action in anticipation of dismissing the complaint with
> prejudice after the City has substantially complied with all provisions of the
> Agreement and maintained substantial compliance with all provisions for one
> year, as envisioned in PSA, ¶ 178? In other words, is an amendment to the
> Agreement necessary for the Court to approve the Agreement without dismissing
> the complaint with prejudice at this time?

As explained above in the PPA's general response, the City and the United States agreed

to enter the Settlement Agreement under Fed. R. Civ. P. 41(a)(2) and request that the Court

"conditionally dismiss the United States' complaint with prejudice, while retaining jurisdiction to

enforce the [Settlement] Agreement." (Settlement Agreement at ¶ 178). In seeking this particular

procedural resolution to the United States' complaint, the United States and the City specifically

intended for the Settlement Agreement to be "filed with the Court, but the action will be

dismissed and the Court will review compliance only upon an assertion by the United States of a

material breach that cannot be resolved through good faith negotiations between the parties."

(Statement of Intent at 2-3; United States Fairness Hearing Ex. 1).

The United States and the City did not intend for the Court to stay the action in

anticipation of dismissing the complaint with prejudice after the City has substantially complied

with all provisions of the Agreement and maintained substantial compliance with all provisions

for one year. An amendment to the Settlement Agreement would be necessary for the Court to

approve the Settlement Agreement without dismissing the complaint with prejudice at this time.

As explained above in the PPA's general response, any such material amendment to the Settlement Agreement would nullify the PPA's Memorandum of Agreement with the City and the United States.

       4.       <u>PPA Response To Question 3.</u>

The Court asks:

> If the Court approves the Agreement and stays the litigation without dismissing the complaint with prejudice at this time, and if the Court directs all four Parties to appear for periodic hearings to provide the Court with reports on the status of compliance, may the Court also direct the Compliance Officer Community Liaison ("COCL") to appear before the Court at these periodic hearings and report to the Court on the status of compliance? Is an amendment to the Agreement necessary for the Court to achieve this result?

The Court does not have the power under the Settlement Agreement to approve the Settlement Agreement and stay the litigation without dismissing the complaint with prejudice. If the Court wished to do so and also direct the four parties and the COCL to appear before it for periodic status reports, an amendment to the Settlement Agreement would be necessary. As explained above in the PPA's general response, any such material amendment to the Settlement Agreement would nullify the PPA's Memorandum of Agreement with the City and the United States.

       5.       <u>PPA Response to Question 4.</u>

The Court asks:

> If the Court were to hold hearings every six months during which all four Parties and the COCL would provide the Court with periodic reports on the status of compliance, even in the absence of an affirmative allegation by the Plaintiff or the Defendant of non-compliance, would that be an appropriate frequency of hearings to promote compliance with the Agreement?

Without an amendment to the Settlement Agreement, the Court does not have the power to hold six-month hearings to provide the Court with a status report on the City's compliance

with the Settlement Agreement. As explained above in the PPA's general response, any such

material amendment to the Settlement Agreement would nullify the PPA's Memorandum of

Agreement with the City and the United States.

In any event, the Settlement Agreement provides for publication and community input

into the City's ongoing compliance with the Settlement Agreement. The COCL's quarterly,

written reports detailing the Police Bureau's compliance with the Settlement Agreement are to be

made publicly available, providing the Court with the ability to periodically review the status of

the City's compliance. (Settlement Agreement at ¶¶ 162-164). Further, the public has the ability

to provide input to the COCL at town hall meetings regarding the Police Bureau's

implementation of the Settlement Agreement before the COCL finalizes his/her quarterly reports.

(Settlement Agreement at ¶ 163).

6.      PPA Response to Question 5.

The Court asks:

> In the Agreement, "supported by evidence" is defined as meaning the standard of
> proof applied in Citizen Review Committee appeals pursuant to Portland City
> Code Section 3.21.160, which refers to the "reasonable person" standard. PSA, ¶
> 61; *see also* PSA, ¶ 67(d). In light of the comments raised during the Fairness
> Hearing, is this standard of review, as opposed to, for example, a "preponderance
> of the evidence" standard, adequate to achieve the objectives of the Agreement?

The "supported by evidence"/"reasonable person" standard of review is adequate to

achieve the objective of citizen input in the Police Bureau's officer accountability decisions. The

CRC standard of review is the product of the City's well-developed public policy decisions. The

CRC does not sit as a trier of fact in disciplinary actions. That responsibility is specifically

vested with the Police Bureau, its Police Chief, and the Police Commissioner (who is currently

the City's Mayor). The Police Chief sits at the pleasure of the Mayor and City Council. *See*

Portland City Code § 3.20.010. The Mayor and City Council sit at the pleasure of the public. *See*

Portland City Charter §§ 2-102, 3-101. Ultimately, all discipline decisions involving Portland police officers are subject to democratic oversight by publicly elected officials.

The City has chosen to balance the Police Bureau's trier-of-fact powers with CRC and City Council audit functions over the Police Bureau's activities, including discipline actions. *See* Portland City Code § 3.21.090. As part of the CRC's audit functions, the City has specifically selected a "supported by evidence"/"reasonable person" standard of review for both the CRC and City Council. *See* Portland City Code §§ 3.21.020(S), 3.21.160. This standard of review provides citizen input in Police Bureau discipline matters, while retaining the Police Bureau's core trier-of-fact responsibility.

Further, a change to the CRC standard of review to the preponderance of evidence standard would implicate mandatorily negotiable collective bargaining matters that would first need to be resolved with the PPA. *See Amalgamated Transit Union, Division 757 v. Tri-Met of Oregon,* ERB Case No. UP-062-05, 22 PECBR 911, 951–953 (2009), *aff'd,* 250 Or. App. 681 (2012) (employer violates ORS 243.673(1)(e) by implementing changes that impact mandatory bargaining subjects without first bargaining with labor union). The CRC has disciplinary audit review powers that influence the Police Bureau's disciplinary decisions. *See* Portland City Code § 3.21.160. Thus, any changes to the CRC standard of review would necessarily change discipline standards and procedures for PPA members, further implicating their job security. Job security and discipline standards and procedures are mandatory bargaining subjects under Oregon's Public Employee Collective Bargaining Act ("PECBA"). *See Springfield Police Ass'n v. City of Springfield*, 16 PECBR 712, 721 (1996), *aff'd without opinion*, 147 Or App 729 (1997); *Portland Fire Fighters Ass'n, Local 43, IAFF v. City of Portland*, 16 PECBR 245, 251-52 (1995).

7.    PPA Response to Question 6.

The Court asks:

> The Agreement provides that the local Community Care Organizations "will establish, *by mid-2013*, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs." PSA, ¶ 89 (emphasis added). This has not yet occurred. Does this portion of the Agreement require amendment in order to avoid being substantially out of compliance the moment the Agreement is approved?

No. Paragraph 89 of the Settlement Agreement does not require amendment for the City to avoid being substantially out of compliance the moment the Settlement Agreement is approved. Paragraph 89 does not create an affirmative obligation on the *City* to establish a drop-off center. Rather, paragraph 89 reflects the United States' aspiration that *local CCOs* establish drop-off centers:

> The United States expects that the *local CCOs* will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

(Settlement Agreement at ¶ 89; emphasis added).

The United States and the City have further memorialized the fact that third-party CCOs—not the City—bear certain obligations for addressing "gap[s] in the state mental health infrastructure," such as establishing drop-off centers, in paragraph 88 of the Settlement Agreement:

> The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include . . . Community Care Organizations ("CCOs")

(Settlement Agreement at ¶ 88).

Page 19 –    INTERVENER-DEF. PORTLAND POLICE ASSOCIATION'S MEM. IN
SUPPORT OF ENTRY OF PROPOSED SETTLEMENT AGREEMENT

8.    PPA Response to Question 7.

The Court asks:

The Agreement provides that "[a]ppeals to [the Citizen Review Committee] shall be resolved within 21 days." PSA, ¶ 121. In light of the comments raised during the Fairness Hearing, is 21 days a reasonable timeframe in light of the objectives of the Agreement?

Yes, 21 days is a reasonable timeframe to resolve CRC appeals. The Police Bureau's

discipline structure is a multi-layered system involving multiple internal and external Police

Bureau steps, such as a Police Bureau Internal Affairs investigation, a Police Bureau

commander's findings and recommendations, a Police Review Board recommendation, and a

proposed disciplinary determination by the Police Chief. *See* Portland City Code § 3.20.140. The

Settlement Agreement calls for this process, including any appeals to the CRC, to be completed

within 180 days. (Settlement Agreement at ¶ 121). Every step of this multi-layered discipline

process must be accelerated, causing time crunches for persons involved in every step of the

process, not just the CRC. To obtain the United States' overall goal of investigating alleged

officer misconduct in a timely manner, the City has agreed to accelerate its timelines for

administrative investigations. Each party to the Police Bureau's discipline process bears a burden

in this objective. The 21-day review period for CRC is a reasonable balance of timelines,

workload, and the United States' objectives.

9.    PPA Response to Question 8.

The Court asks:

In light of some of the comments raised during the Fairness Hearing, do the Parties believe that the Independent Police Review Division and the Citizen Review Committee provide a fair, reasonable, and adequate process by which citizens can make complaints against Portland police officers and have confidence that complaints will be adequately investigated and resolved?

Yes, the Independent Police Review Division ("IPR") and the Citizen Review Committee ("CRC") provide a fair, reasonable, and adequate process by which citizens can make complaints against Portland police officers and have confidence that complaints will be adequately investigated and resolved. IPR and the CRC members operate under the City's independently elected City Auditor. *See* City Code §§ 3.20.030, 3.20.080. IPR and CRC are components of the City's audit function of the Police Bureau, are independent from the direct influence of the City's Police Bureau, and have well-defined operational structures and procedures and a specifically enumerated scope of authority under the City's Code. *See id.* Beyond anecdotal evidence, there is no evidence that the current makeup of IPR and CRC does not provide for the sort of checks and balances that the community may seek in auditing a police agency's activities.

In any event, changes to the roles of IPR and CRC as they relate to the Police Bureau's disciplinary authority over Portland police officers would implicate mandatorily negotiable collective bargaining matters, such as job security and discipline, which would first need to be resolved with the PPA. *See Amalgamated Transit Union, Division 757*, 22 PECBR at 951–953; *Springfield Police Ass'n*, 16 PECBR at 721; *Portland Fire Fighters Ass'n, Local 43, IAFF*, 16 PECBR at 251-52.

10.    PPA Response To Question 9.

The Court asks:

The Agreement provides that within 90 days after the Effective Date, the City and Portland Police Bureau "shall review its protocols for compelled statements to PSD [Professional Standards Division] and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967)." PSA, ¶ 124. What revisions to the protocols do the Parties currently anticipate will be made? Do the Parties anticipate any changes being made either to the "communication restriction order" or to the "48-hour rule" under ¶¶ 124-125 of the Agreement? How would these changes, or absence of changes, affect the ability of the Agreement to achieve its goals? Should these revisions become part of the Agreement?

Paragraph 124 of the Settlement Agreement requires the City to "review" its compelled statement protocols and "revise as appropriate" if those protocols fail to comply with applicable law and current professional standards. The PPA is not aware of any anticipated changes to the Police Bureau's protocols regarding compelled officer statements, including changes to either the "communication restriction order" or to the "48-hour rule." The Police Bureau's current protocols comply with applicable law and current professional standards. The absence of changes to either the "communication restriction order" or the "48-hour rule" would not affect the United States' goal of transparency in the Police Bureau's administrative investigation process.

Objections to the "communication restriction order" and to the "48-hour rule" are primarily limited to deadly force events, and are grounded in a fundamental misunderstanding of the concurrent yet separate criminal and administrative investigations that occur after a Portland police officer uses deadly force in the line of duty. A Portland police officer who uses deadly force in the line of duty immediately becomes the subject of both an investigation into possible criminal misconduct and an administrative investigation into possible Police Bureau policy violations. The criminal investigation is conducted by detectives from various local police agencies, including the Portland Police Bureau, along with the Multnomah County District Attorney's Office. The administrative investigation is conducted by the Police Bureau's internal affairs investigators. The Police Bureau draws a bright line between the criminal investigation and the administrative investigation, and both are subject to different protocols and procedures.

The Police Bureau's communications restriction orders are used by detectives in the criminal investigation and by internal affairs investigators in the administrative investigation. The communications restriction orders are given to police officers who are involved in or have

witnessed the use of deadly force. The communications restriction orders exist specifically for the purpose of preserving the integrity of any ongoing investigation into a police officer's conduct by ensuring that police officers do not discuss the event with anyone except their representatives. With the communications restriction orders in place, officers are prohibited from communicating with one another regarding the event.

The so-called "48-hour rule" is a due process provision enshrined in Article 61.2.1.3 of the PPA's collective bargaining agreement with the City that applies to all non-criminal, administrative investigations, including but not limited to the Police Bureau's administrative investigation into a police officer's use of deadly force in the line of duty. The provision simply provides the officer with notice of the nature of the administrative allegations against the officer not less than 48 hours before the administrative interview commences. (Karia Decl. at Ex. A, p. 42).

The 48-hour due process provision in the PPA's collective bargaining agreement does *not* apply to a *criminal investigation*. Instead, the Fifth Amendment of the United States Constitution applies. That is, there is no mandated 48-hour notice period under the collective bargaining agreement that prohibits a criminal investigator from seeking a voluntary statement from a police officer involved in the use of deadly force in the line of duty. A police officer shares the same rights as any citizen under the Fifth Amendment when faced with a criminal investigation into his or her conduct in the line of duty, and is free to speak or not speak with criminal investigators at any time. The 48-hour due process provision in the collective bargaining agreement only applies to the Police Bureau's *non-criminal, administrative investigations*, and is triggered only when the Police Bureau affirmatively chooses to compel a police officer to speak with administrative investigators regarding the officer's conduct.

Neither the communications restriction order nor the 48-hour due process provision serve as an impediment to the orderly and efficient investigation into deadly force encounters. Rather, both promote order and efficiency in the Police Bureau's investigations. There is simply no evidence that either the communications restriction order or the 48-hour due process provision interferes with the Police Bureau's accountability measures.

In any event, changes to practices surrounding the communications restriction orders and the 48-hour due process provision necessarily affect the PPA's collective bargaining rights under both its collective bargaining agreement and Oregon's collective bargaining law. The Police Bureau's practices surrounding communications restriction orders are working conditions that are protected by Articles 3, 61.7, and 61.8 of the PPA's collective bargaining agreement. (Karia Decl. at Ex. A, pp. 8, 43). Similarly, the 48-hour due process provision is explicitly enshrined in Article 61.2.1.3 of the PPA's collective bargaining agreement. (Karia Decl. at Ex. A, p. 42). Changes to either the communications restriction orders or the 48-hour due process provision without the PPA's express consent would result in violations of the PPA's collective bargaining agreement, which runs through June 30, 2017 and thereafter under the agreement's evergreen clause at Article 68.2. (Karia Decl. at Ex. A, p. 49).

In addition, both the communications restriction orders and the 48-hour due process provision implicate job security and discipline issues, both of which are mandatorily negotiable bargaining subjects under the PECBA, Oregon's collective bargaining law. *See Springfield Police Ass'n*, 16 PECBR at 721; *Portland Fire Fighters Ass'n, Local 43, IAFF*, 16 PECBR at 251-52. Under the PECBA, the PPA must expressly agree to any changes to the Police Bureau's use of communications restriction orders or to PPA members' 48-hour due process rights. *See Amalgamated Transit Union, Division 757*, 22 PECBR at 951–953.

Further, short of a judicial finding of liability that Portland police officers engage in unconstitutional policing practices, the Court cannot mandate unilateral changes to these collective bargaining matters without the PPA's express consent. *See United States v. City of Los Angeles*, 288 F.3d 391, 400 (9th Cir. 2002) (citing *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 528-30 (1986), and *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 771 (1983)).

       11.    <u>PPA Response To Question 10.</u>

The Court asks:

> The Agreement, as it appeared in December 2012, anticipated that the City will have substantially complied with all provisions by October 12, 2017. PSA, ¶ 178. Is that still the expectation of the Parties? If not, does this portion of the Agreement require amendment?

Yes, the PPA expects that the City will have substantially complied with all provisions of the Settlement Agreement by October 12, 2017 and, therefore, no amendment to the Settlement Agreement is necessary. As explained above, the City has already begun to implement or has already implemented many of the changes called for in the Settlement Agreement. (*See supra* at pp. 7-8).

       12.    <u>PPA Response To Question 11.</u>

The Court asks:

> The Agreement anticipates that the Parties may ask the Court to terminate the Agreement after the City has substantially complied with all provisions of the Agreement "and maintained substantial compliance with all provisions for one year. PSA, ¶ 178(c). Is one year a sufficient period of time to promote the objective of maintaining substantial compliance with the Agreement? Would a five-year period of maintenance after substantial compliance better satisfy the objectives of the Agreement? Would extending the period of time for demonstrating maintenance of "substantial compliance" require an amendment to the Agreement?

Yes, one year is a sufficient period of time to promote the objective of maintaining substantial compliance with the Settlement Agreement. Thus, no amendment to the Settlement Agreement is necessary. Before the one-year monitoring period is triggered, the City will have fully integrated the policy and practice changes set forth in the Settlement Agreement into the Police Bureau's day-to-day affairs. Thereafter, the one-year ongoing compliance period allows the United States to actively monitor the Police Bureau's ongoing compliance with the Settlement Agreement.

Requiring a five-year period of maintenance would require an amendment to the Settlement Agreement. As explained above in the PPA's general response, any such material amendment to the Settlement Agreement would nullify the PPA's Memorandum of Agreement with the City and the United States.

13.   PPA Response To Question 12.

The Court asks:

A number of police departments provide officers with "on-officer recording systems" (also known as "body cameras," "body cams," or "cop cams"), which are small, pager-sized cameras that clip onto an officer's uniform or glasses or are worn as a headset. These devices record audio and video of the officer's interactions with the public. Please explain whether requiring these devices would promote the objectives of the Agreement and, if so, why such a requirement was not included.

Requiring the Police Bureau to use body cams would not better promote the objectives of the Settlement Agreement because the Police Bureau is already using Mobile Audio Visual cameras ("MAVs") in some of its marked patrol vehicles. *See* https://www.portlandoregon.gov/police/article/404420. Like body cams, MAVs record audio and video of the officer's interactions with the public.

Even if the Police Bureau wished to employ body cams, the City would be obligated to negotiate the collective bargaining ramifications surrounding the use of body cams with the PPA. The use of body cams implicates officer safety, a mandatory collective bargaining subject under the PECBA. *See* ORS 243.650(7)(f). The use of body cams also implicates job security and discipline, both of which are mandatory collective bargaining subjects under the PECBA. *See Springfield Police Ass'n*, 16 PECBR at 721; *Portland Fire Fighters Ass'n, Local 43, IAFF*, 16 PECBR at 251-52; *see also City of Mountlake Terrace*, Decision 11702 (WA PECB, 2013) (Washington's Public Employment Relations Commission determined that the use of video camera systems by a police agency is mandatory for collective bargaining given the use of the video camera footage in employee discipline matters). These mandatorily negotiable issues would need to be bargained and resolved with the PPA before the City may implement the use of body cams. *See Amalgamated Transit Union, Division 757*, 22 PECBR at 951–953.

Further, short of a judicial finding of liability that Portland police officers engage in unconstitutional policing practices, the Court cannot mandate unilateral changes to these collective bargaining matters without the PPA's express consent. *See City of Los Angeles*, 288 at 400.

            14.    PPA Response To Question 13.

The Court asks:

Do the Parties want additional time to consider amending the PSA in light of any of the comments raised during the Fairness Hearing or in these post-hearing questions from the Court? If so, how much time do the Parties want? If not, please discuss how the PSA is fair, reasonable, and adequate in light of the comments raised during the Fairness Hearing and the issues presented in these post-hearing questions from the Court.

Amending the Settlement Agreement is unnecessary. For the reasons set forth above, the Settlement Agreement in its current form is a fair, adequate, and reasonable resolution to the allegations in the United States' complaint.

III.    CONCLUSION

The Court should approve and enter the Settlement Agreement.

DATED this 11th day of March, 2014.

TEDESCO LAW GROUP

By: _/s/ Anil S. Karia_____
ANIL S. KARIA**,** OSB No. 063902
3021 NE Broadway
Portland, OR  97232
Telephone:  866-697-6015
Facsimile:  503-210-9847
E-mail: anil@miketlaw.com
        Attorneys for Intervener-Defendant
        Portland Police Association

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing INTERVENER-DEFENDANT PORTLAND

POLICE ASSOCIATION'S MEMORANDUM IN SUPPORT OF ENTRY OF PROPOSED

SETTLEMENT AGREEMENT on:

| | |
|---|---|
| S. Amanda Marshall<br>Adrian L. Brown<br>Billy J. Williams<br>United States Attorney's Office<br>District of Oregon<br>1000 SW Third Ave., Ste 600<br>Portland, OR  97204-2902<br>    Attorneys for Plaintiff United States | Thomas J. Morse<br>R. Jonas Geissler<br>Michelle Jones<br>David W. Knight<br>Civil Rights Division<br>U.S. Department of Justice<br>50 Pennsylvania Ave., NW<br>Washington, D.C.  20530<br>    Attorneys for Plaintiff United States |
| Harry Auerbach<br>Ellen Osoinach<br>David Woboril<br>City Attorney's Office<br>1221 SW Fourth Ave., Ste 430<br>Portland, OR  97204<br>    Attorney for Defendant City of Portland | Shauna M. Curphey<br>Curphey & Badger. P.A.<br>520 SW 6th Ave., Suite 1040<br>Portland, OR 97204<br>    Attorneys for Amicus Albina Ministerial<br>    Alliance Coalition for Justice and Police<br>    Reform |
| Jessica Ashlee Albies<br>Creighton & Rose, PC<br>815 SW Second Ave, Suite 500<br>Portland, OR 97204<br>    Attorneys for Amicus Albina<br>    Ministerial Alliance Coalition for<br>    Justice and Police Reform | |

by service electronically pursuant to LR 100.7.

DATED this 11th day of March, 2014.


TEDESCO LAW GROUP


By: <u>/s/ Anil S. Karia</u>
ANIL S. KARIA**,** OSB No. 063902
    Attorneys for Intervener-Defendant
    Portland Police Association