J. ASHLEE ALBIES      OSB #051846
E-mail: ashlee@civilrightspdx.com
CREIGHTON & ROSE, PC
500 Yamhill Plaza Building
815 S.W. Second Avenue
Portland, Oregon  97204
Phone:   (503) 221-1792
Fax:      (503) 223-1516

SHAUNA CURPHEY, OSB # 063063
E-mail: scurphey@curpheylaw.com
CURPHEY & BADGER, P.A.
520 SW 6th Avenue, Suite 1040
Portland, OR 97204
Phone: (503) 241-2848

*Of Attorneys for Amicus AMA Coalition for Justice and Police Reform*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:12-cv-02265-SI |
| Plaintiff, | **RESPONSES TO POST-HEARING** |
| v. | **QUESTIONS FROM THE COURT** |
| CITY OF PORTLAND | |
| Defendant. | |

The Albina Ministerial Alliance Coalition for Justice and Police Reform (AMA

Coalition) hereby submits its responses to Post-Hearing Questions from the Court. Dkt. 61.

## I.      BACKGROUND

In December 2012, the United States Department of Justice (DOJ) filed a complaint

against the City of Portland (City), pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 USC §14141. Dkt 1. The Complaint alleges that the Portland Police Bureau (PPB) has engaged in a pattern or practice of using excessive force on individuals with actual or perceived mental illness, in violation of the Fourth Amendment to the U.S. Constitution. *Id.* The City did not file an Answer. Instead, the City and the DOJ entered a joint motion, under Federal Rule of Civil Procedure 41(a)(2), asking the Court to approve the parties' Proposed Settlement Agreement (PSA or Agreement) and conditionally dismiss this litigation pending the City's implementation of the PSA. Dkt. 3.

Following the City and DOJ's joint motion, the Portland Police Association (PPA) moved to intervene as a defendant in the action, Dkt. 7, and the AMA Coalition moved to intervene on the side of the Plaintiff, Dkt.19. The Court granted the PPA's motion to intervene in the remedy phase. Dkt. 32. The Court denied the AMA Coalition's motion to intervene in the remedy phase, but granted it enhanced *amicus curiae* status, allowing it to present briefing and to participate in hearings in this matter. *Id.* The Court further directed the parties, including the AMA Coalition, to participate in mediation to determine whether to amend the PSA to address the concerns raised by the PPA and the AMA Coalition in their respective motions to intervene. *Id.*

The mediation resulted in no changes to the PSA. Instead, the AMA Coalition entered into a Collaborative Agreement with the City and the DOJ, in which it agreed not to object to entry of the PSA, and that it would continue to advocate to strengthen the Agreement and to oppose efforts to weaken it. Dkt. 55. In addition, at least one of the Collaborative Agreement's terms provides the City, with the input of the AMA Coalition, may adopt a different process than in the Agreement at ¶ 145 for the selection of the Community Oversight Advisory Board ("COAB"). *Id.* at ¶ 11.

After the AMA Coalition entered the Collaborative Agreement, the PPA entered a Memorandum of Understanding with the City and the DOJ, in which it too agreed to withdraw its objections to the PSA. Dkt. 54-1. The PPA, however, reserved its right to file grievances regarding the City's implementation of paragraphs 124 and 127 through revision of protocols for compelling statements and obtaining voluntary statements from officers involved in force events. *Id.* at 2.

The Court held a Fairness Hearing in February 2014 to accept public testimony on whether the PSA is, as a whole, fair, adequate and reasonable. Dkt. 53. The Court received extensive public input, both in written submissions and through oral testimony over the course of two days. Following the hearing, the Court presented questions to the parties regarding particular provisions in the PSA and the Court's supervision of its implementation. Dkt. 61. The issue now before the Court is whether to approve the PSA and grant the City and DOJ's joint motion for voluntary dismissal.

## II.      RESPONSES TO QUESTIONS FROM THE COURT

The AMA Coalition has, for more than a year, endeavored to make the Proposed Settlement Agreement (PSA) as effective as possible in addressing the Plaintiff's excessive force findings. Although mediation with the Parties did not result in changes to the PSA, the AMA Coalition remains committed to reform of the Portland Police Bureau, and to giving voice to longstanding community concerns regarding police misconduct and oversight in Portland. Toward that end, the AMA Coalition entered into a Collaborative Agreement with the City and the DOJ, in which the AMA Coalition agreed not to object to the entry of the PSA, but would offer comment to this Court regarding areas where it could be stronger. Dkt. 55.

Thus, the AMA Coalition's responses to the Court's post-Fairness Hearing questions

should not be taken as a request that the Court reject the PSA. Rather, they represent the AMA

Coalition's honest assessment of the questions posed, many of which address areas where the

AMA Coalition has called for reform for years. The AMA Coalition hopes that its responses will

move the City and the DOJ to address the concerns raised by the Court's inquiries. The AMA

recognizes that the Court's acceptance of the PSA is merely a first step of a long journey toward

reforming the PPB, and will continue to work to ensure that those reforms result in lasting,

systemic change.

**QUESTION 1**

> If the Agreement were approved and the case conditionally dismissed with the
> Court expressly retaining jurisdiction to enforce the Agreement, would the Court
> have jurisdiction to direct all four Parties to appear for periodic hearings to
> provide the Court with reports on the status of compliance in the absence of an
> affirmative allegation by the Plaintiff or the Defendant of non-compliance? If so,
> what legal authority supports this conclusion?

Yes. If the Court approves the Agreement, dismisses the case, and retains jurisdiction to

enforce the Agreement, the Court would have jurisdiction to direct all four Parties to appear for

periodic hearings in the absence of an allegation of non-compliance. The parties have asked the

Court to conditionally dismiss this action pursuant to Federal Rule of Civil Procedure 41(a)(2).

Rule 41(a)(2) provides, in pertinent part, "Except as provided in Rule 41(a)(1), an action may be

dismissed at the plaintiff's request only by court order, *on terms that the court considers proper*."

Fed. R. Civ. P. 42(a)(2) (emphasis added).[1] Thus, if the Court approves the Agreement, and

enters an order granting the City and DOJ's joint motion under Rule 41(a)(2), the Court may,

under the terms of that rule, direct the Parties to appear for periodic hearings as a condition of

---

[1] Rule 41(a)(1) provides for dismissal upon a joint stipulation of all the parties. Fed. R. Civ. P.
41(a)(1)(A)(ii). Here, the Agreement specifically requires that the City and the DOJ request "that the
Court enter the Agreement pursuant to Federal Rule of Civil Procedure 41(a)(2), and conditionally
dismiss this action with prejudice, while retaining jurisdiction to enforce the Agreement."

voluntary dismissal.

Moreover, under Rule 41(a)(2), "the parties' compliance with the terms of the settlement contract (or the court's 'retention of jurisdiction' over the settlement contract) may, in the court's discretion, be one of the terms set forth in the order." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994). If the dismissal order incorporates the settlement terms, a violation of those terms would amount to a violation of the court's order, such that "[t]he court would then have ancillary jurisdiction to 'vindicate its authority.'" *O'Connor v. Colvin*, 70 F.3d 530, 532 (9th Cir. 1995).

Even absent a party alleging a violation, however, a district court has broad ancillary jurisdiction to enforce the terms of a settlement agreement incorporated in a court order. "Ordinarily, when a district court incorporates the terms of a settlement agreement or a stipulation into an order, it retains subject matter jurisdiction to interpret and enforce the contents of that order." *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860 (9th Cir. 2007); *see also Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 451 (9th Cir. 2010) (for purposes of court's ancillary jurisdiction, the difference between a consent decree and a settlement agreement incorporated in court order is "immaterial"); *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) ("A consent decree is 'essentially a settlement agreement subject to continued judicial policing.'") (internal citation omitted).

Thus, once a district court incorporates a settlement agreement in an order, it is "not reduced to . . . hoping for compliance." *Nehmer*, 494 F.3d at 860. Rather, the district court has inherent authority to enforce compliance, to hold parties in contempt and to modify a decree or order. *Id; see also Peacock v. Thomas*, 516 U.S. 349, 356-57, 116 (1996) (ancillary jurisdiction extends to "a broad range of supplementary proceedings"); *State Dept. Soc. Servs. v. Leavitt*, 523

F.3d 1025, 1033 (9th Cir. 2008) (district court had power to grant discovery request as "part of its inherent power to enforce judgments").

Here, the Agreement states "[t]he Court shall retain jurisdiction of this action *for all purposes* until the City has substantially complied with all provisions of this Agreement." PSA, ¶ 178(b) (emphasis added). Thus, although the Agreement sets forth a process for the DOJ and the City to resolve disputes regarding compliance, it does not constrain the Court from asking that the Parties report to it directly. Therefore, if the Court's order of dismissal incorporates the terms of the Agreement, it could order the periodic hearings as part of its inherent enforcement authority.

## QUESTION 2

> May the Court approve the Agreement without dismissing the complaint with prejudice and then stay the action in anticipation of dismissing the complaint with prejudice after the City has substantially complied with all provisions of the Agreement and maintained substantial compliance with all provisions for one year, as envisioned in PSA, ¶ 178? In other words, is an amendment to the Agreement necessary for the Court to approve the Agreement without dismissing the complaint with prejudice at this time?

The Court may approve the Agreement without dismissing the complaint with prejudice at this time. The Agreement does not require that the Court dismiss the complaint with prejudice. Rather, it merely provides that the City and the DOJ will file a joint motion that "shall request that the Court . . . conditionally dismiss the complaint in the action with prejudice." PSA, Dkt. 4-1, ¶ 178. It does not require that the Court grant that request. Moreover, the City and DOJ Joint Motion to Enter Settlement Agreement does not ask the Court to dismiss the complaint with prejudice, and instead asks that the Court place the Agreement on the Court's inactive docket. Dkt. 3 at p. 2.

As the AMA Coalition's response to Question 1 demonstrates, however, even if the Court

dismisses the complaint with prejudice, it nonetheless may retain jurisdiction to enforce the

Agreement. *See, e.g., Abbate v. Ramsey*, 355 F. Supp. 2d 377, 378 (2005) (granting parties' joint

motion to dismiss the case with prejudice, except to the extent of retaining jurisdiction to enforce

the parties' settlement agreement as expressly provided by its terms). The AMA Coalition

therefore does not have a position on whether the Court should dismiss the complaint with

prejudice, so long as the Court retains jurisdiction over enforcement of the Agreement.


**QUESTION 3**

> If the Court approves the Agreement and stays the litigation without dismissing
> the complaint with prejudice at this time, and if the Court directs all four Parties
> to appear for periodic hearings to provide the Court with reports on the status of
> compliance, may the Court also direct the Compliance Officer Community
> Liaison ("COCL") to appear before the Court at these periodic hearings and report
> to the Court on the status of compliance? Is an amendment to the Agreement
> necessary for the Court to achieve this result?

Yes. The Court may direct the Compliance Officer Community Liaison (COCL) to

appear before the Court, along with the four Parties, and report to the Court on the status of

compliance. As explained in the AMA Coalition's response to Question 1, the Court's inherent

enforcement authority allows it to make such an order. Moreover, no amendment to the

Agreement is required. The Agreement provides, "The Parties agree that COCL reports may be

used to evidence compliance or non-compliance with this Agreement, subject to the weight

afforded to such reports by the Court." PSA, ¶ 164.


**QUESTION 4**

> If the Court were to hold hearings every six months during which all four Parties
> and the COCL would provide the Court with periodic reports on the status of
> compliance, even in the absence of an affirmative allegation by the Plaintiff or the

Defendant of non-compliance, would that be an appropriate frequency of hearings
to promote compliance with the Agreement?

Yes. The AMA Coalition believes that every six months, at a maximum, is an appropriate

interval between hearings to promote compliance with the Agreement.

**QUESTION 5**

In the Agreement, "supported by evidence" is defined as meaning the standard of
proof applied in Citizen Review Committee appeals pursuant to Portland City
Code Section 3.21.160, which refers to the "reasonable person" standard. PSA, ¶
61; see also PSA, ¶ 67(d). In light of the comments raised during the Fairness
Hearing, is this standard of review, as opposed to, for example, a "preponderance
of the evidence" standard, adequate to achieve the objectives of the Agreement?

No. The "reasonable person" standard of review is not adequate to achieve the objectives

of the Agreement.  The Citizen Review Committee, per Portland City Code Section 3.21.160,

determines whether the Police Bureau's findings are "supported by the evidence." Portland City

Code Section 3.21.020(S) provides, "A finding . . . is supported by the evidence when a

reasonable person could make the finding in light of the evidence, whether or not the reviewing

body agrees with the finding." As the Court notes, the Agreement, at ¶ 61, requires that the City

leave this definition unchanged.

As the testimony at the Fairness Hearing demonstrated, the AMA Coalition is not alone

in its criticism of the "reasonable person" standard of review. In 2010, City Council convened a

Police Oversight Stakeholder Committee to recommend improvements to Portland's police

oversight system.[2] The Committee made a unanimous recommendation to eliminate the

"reasonable person" standard in favor of a "preponderance of the evidence" standard. *Id.* at 8.

The Committee cited to the Luna-Firebaugh Report, a 2008 assessment of the Independent Police

---

[2] Police Oversight Stakeholder Committee, Final Report, Sept. 21, 2010, Dkt. 21-1, also *available at*:
http://lwvpdx.org/issues-and-advocacy/police-oversight/stakeholder-committee-report-2010 (last
visited March 8, 2014).

Review Division, which made the same recommendation. *Id.* at 8, 47.

Perhaps more importantly, the CRC members themselves have criticized the "reasonable person" standard of review. In 2011, the Citizen Review Committee told the City that changing the standard of review remained a priority for reform.[3] Just last year, CRC members voiced their frustration with the standard of review during a February 2013 appeal hearing.[4] Additionally, at hearings in August and October of 2013, CRC members took a symbolic vote employing the "preponderance of the evidence" standard.[5]

As the foregoing demonstrates, the community has long sought to replace the "reasonable person" standard of review. Thus, the AMA Coalition seeks to empower the CRC to conduct a *de novo* review of whether the Bureau's findings are supported by the evidence, without having to defer to the Police Bureau decision-maker, as currently required by the Agreement and City Code Section 3.21.020(S). The Agreement not only disregards this call for reform, it requires that the City maintain the current "reasonable person" standard. The AMA Coalition therefore contends that, at a minimum, ¶ 61 should be struck from the Agreement, but prefers to see ¶ 61 changed to allow the CRC to conduct a *de novo* review to determine whether an investigation finding is supported by the evidence.

///

---

[3] Jamie Troy, Draft Memo on CRC Priorities Recommended to City Council, Sept. 12, 2011, *at:* http://www.portlandonline.com/auditor/index.cfm?a=363961&c=52678 (last visited March 8, 2014).

[4] Minutes, Citizen Review Committee Meeting, Feb. 6, 2013, p. 9, *at:* http://www.portlandonline.com/auditor/index.cfm?c=62018&a=445001 (last visited March 8, 2014).

[5] Minutes, Citizen Review Committee Meeting, Aug. 7, 2013, p. 2, *at:* www.portlandonline.com/auditor/index.cfm?c=62018&a=481593 (last visited March 8, 2014); Minutes, Citizen Review Committee Meeting, Oct. 28. 6, 2013, p. 3-4, *at:* www.portlandonline.com/auditor/index.cfm?c=62018&a=481831 (last visited March 8, 2014).

**QUESTION 6**

The Agreement provides that the local Community Care Organizations "will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs." PSA, ¶ 89 (emphasis added). This has not yet occurred. Does this portion of the Agreement require amendment in order to avoid being substantially out of compliance the moment the Agreement is approved?

No. The Agreement acknowledges that it only legally binds the City to take action and recognizes that Community Care Organizations are not a party to this suit. PSA, ¶ 88. Thus, the Agreement does not bind the City itself to set up drop-off centers. Rather, it expects that Community Care Organizations, who are not a party to this suit, will have established drop-off centers and public walk-in centers. *Id.* at ¶ 89. Therefore, the Agreement does not require amendment because the City will not be substantially out of compliance the moment the Agreement is approved.

The Agreement envisions that the City will work in collaboration with partners in the provision of community-based addiction and mental health services to establish drop-off and walk-in centers. The AMA Coalition believes that the City's efforts in this area have been inadequate, as the comments to this Court from the Mental Health Association of Portland demonstrate. The AMA Coalition is deeply troubled that, without drop-off centers, police will place people experiencing a mental health crisis in jail, and without public walk-in centers or other appropriate services, police will continue to be the first responders to people in crisis. The Coalition therefore believes the City must do more to address this need, and part of that work should include collaboration with community-based organizations that have expertise in this area including the Mental Health Association of Portland, Disability Rights Oregon, the National Alliance on Mental Illness Multnomah, and Empowerment Initiatives.

///

**QUESTION 7**

The Agreement provides that "[a]ppeals to [the Citizen Review Committee] shall be resolved within 21 days." PSA, ¶ 121. In light of the comments raised during the Fairness Hearing, is 21 days a reasonable timeframe in light of the objectives of the Agreement?

No. As the testimony provided to the Court during the Fairness Hearing has demonstrated, the 21-day timeframe set forth in the Agreement is insufficient to allow CRC members time to review the file, hear from the appellant and issue a determination. As volunteers, the CRC members' time is limited. They should not be required to speed up their review process to make up for delays in investigations conducted by City personnel.

Moreover, although the AMA Coalition supports a requirement that the City provide CRC members secure, online access to the entire case files, this measure alone is not sufficient to enable the CRC to complete an appeal within 21 days. The CRC holds a case file review before the appeal hearing, a step that has been crucial to ensure that the CRC has received all relevant information. Because the CRC meets monthly, the 21-day timeline would not allow enough time for the case file review and the appeal hearing.

The AMA Coalition therefore contends that the requirement that "[a]ppeals to the CRC shall be resolved within 21 days" should be struck from the Agreement. PSA, ¶ 121. Additionally, appeals to the CRC should not be included in the 180-day timeframe to complete administrative investigations. *Id.*

**QUESTION 8**

In light of some of the comments raised during the Fairness Hearing, do the Parties believe that the Independent Police Review Division and the Citizen Review Committee provide a fair, reasonable, and adequate process by which citizens can make complaints against Portland police officers and have confidence that complaints will be adequately investigated and resolved?

No. As the Fairness Hearing testimony has demonstrated, the community does not have

faith in the current system. The AMA Coalition likewise maintains its longstanding position that the City's police oversight system, in its current form, is not adequate to provide oversight of and accountability within the Police Bureau. Although the Agreement makes several changes regarding existing police oversight bodies, the AMA Coalition believes that these changes do not go far enough in addressing the current system's flaws, which fundamentally relate to a lack of genuine independent oversight. The AMA Coalition has long maintained that Independent Police Review (IPR) must have the power to conduct investigations and to interview and compel statements from officers involved in *any* level of force, including lethal force.

The Agreement provides that, "[w]ithin 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary." PSA, ¶ 128. The Agreement does not provide a definition of "meaningful independent investigation," however, and leaves too much discretion to IPR to determine whether to conduct such an investigation. The AMA Coalition is wary of that discretion in light of the fact that, according to its most recent annual report, IPR dismissed 77 percent of citizen complaints at intake.[6]

A "meaningful independent investigation" is essential to community confidence in the fairness and objectivity of Portland's police oversight system. Thus, "meaningful independent investigation" should mean an investigation that is conducted by non-PPB employees, rather than the current practice, which largely depends on Internal Affairs or police personnel. The City needs to provide adequate financial resources and infrastructure support so that IPR can conduct

---

[6] Independent Police Review, Annual Report 2012, p. 11, *at*:
http://www.portlandonline.com/Auditor/Index.cfm?c=27727&a=449483 (last visited March 9, 2014).

independent investigations with its own investigators. Likewise, rather than relying on IPR to determine whether an independent investigation is necessary, such investigations should be mandated in cases of high importance to the community: specifically, with respect to claims of excessive force by PPB resulting in serious injury; shootings by police officers; and deaths in custody.

Moreover, the Agreement does not require that the City consider community input when it formulates this plan pursuant to ¶ 128. Although the Agreement requires that the City establish a Community Oversight Advisory Board (COAB), the City has 90 days to create the Board. PSA, ¶ 141. Moreover, once established, COAB's initial focus is the creation of a Community Engagement and Outreach Plan (CEO Plan). *Id.* at ¶ 141, 146. Thus, it is unlikely that the COAB can provide much, if any, input to the City before the City's 120-day deadline to implement a plan to allow meaningful independent investigations.

Additionally, the AMA Coalition believes that the City is unlikely to consider community input without an explicit requirement that it do so. As reflected in the AMA Coalition's initial motion to intervene, the City convened a stakeholder group in 2010 to look at these very issues, and then failed to adopt the majority of the recommendations on which the stakeholder group worked very hard to reach consensus. *See* AMA Coalition Memo in Support of Motion to Intervene ("AMA Coalition Mem."), Dkt. 20, p. 2-3; Haynes Declaration in Support of AMA Coalition Motion to Intervene ("Haynes decl."), Dkt. 21, ¶ 6; City of Portland, Oregon, Police Oversight Stakeholder Committee Final Report, Sept. 21, 2010, Dkt. 21-1. In November 2012, the AMA Coalition provided input to the City and the DOJ regarding specific provisions in the Agreement related to police oversight, none of which resulted in substantial changes to the Agreement. AMA Coalition Mem., Dkt. 20, p. 8; Haynes decl., Dkt. 21, ¶¶ 15-16.

Finally, the AMA Coalition is concerned that the Agreement may constrain grassroots efforts to reform Portland's police oversight system. The Agreement, provides, "If the City establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, or otherwise reviewing the operations of PPB or any aspect thereof, the City agrees to ensure these functions and entities are consistent with the terms of this Agreement." PSA ¶ 4. Although the Agreement also provides that the Parties may jointly stipulate to make changes to the Agreement, PSA ¶ 187, the community is concerned that if they undertake independent, grassroots reform efforts, such as a ballot initiative, for example, the Agreement would constrain the City from making changes.

## QUESTION 9

The Agreement provides that within 90 days after the Effective Date, the City and Portland Police Bureau "shall review its protocols for compelled statements to PSD [Professional Standards Division] and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967)." PSA, ¶ 124. What revisions to the protocols do the Parties currently anticipate will be made? Do the Parties anticipate any changes being made either to the "communication restriction order" or to the "48-hour rule" under ¶¶ 124-125 of the Agreement? How would these changes, or absence of changes, affect the ability of the Agreement to achieve its goals? Should these revisions become part of the Agreement?

The AMA Coalition supports the "communication restriction order" and believes it should be strictly enforced with accountability for any violations. Additionally, the Coalition recognizes that the Agreement requires that the PPB must request that officers involved in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. PSA, ¶ 127. The AMA Coalition, however, is not optimistic regarding changes to the current policies on compelled statements, for the reasons explained below.

The AMA Coalition has long advocated that the 48-hour rule should be eliminated; it has, for over 10 years, used available vehicles to address this issue, but to no avail. The current Collective Bargaining Agreement between the City and the PPA provides that an officer shall receive 48 hours advance notice before an interview for an Internal Affairs investigation, unless delay will jeopardize the investigation or criminal culpability is at issue.[7]

The AMA Coalition notes, however, that the 48-hour rule jeopardizes all Internal Affairs investigations, to the extent it provides an officer time to prepare his or her response. Perhaps most importantly, the notice period undermines public confidence in the fairness of the investigative process, which in turn may serve to deter people from reporting misconduct. The AMA Coalition therefore contends that the 48-hour rule undermines the ability of the Agreement to achieve its stated goal that "all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent." PSA, ¶ 43.

The OIR Group, hired by the City to review and evaluate certain in-custody deaths, stated in its May 2012 report:

> We also believe it is time for the Bureau and the City to end the 48-hour rule that exists in the current labor agreement so that full and contemporaneous accounts of these critical and sometimes controversial incidents can be obtained from the involved officers.  In our view, the next time the labor contracts become due, July 1, 2013, the elimination of the 48-hour rule should be one of the primary objectives of any future collective bargaining.

---

[7] The 48-hour rule provides that, prior to being interviewed regarding an IAD investigation that could lead to discipline

Whenever delay in conducting the interview will not jeopardize the successful accomplishment of the investigation or when criminal culpability is not at issue, advance notice shall be given the officer not less than forty-eight (48) hours before the initial interview commences or written reports are required from the officer. The advance notice shall include whether the officer is a witness or a suspect, the location, date and time of the incident, the complainant's name, and the nature of the allegation against the officer.

2013-2017 Labor Agreement Between the Portland Police Association and the City of Portland, art. 61.2.1.3, *available at* http://www.portlandonline.com/auditor/index.cfm?a=475649&c=31332

Recommendation 8:  The Bureau and the City should begin as soon as possible a dialogue with the PPA and the PPCOA to remove the 48-hour rule restriction on interviewing involved officers in shootings and in-custody deaths.[8]

The AMA Coalition, moreover, contends that the timing of interviews of officers under investigation is not a mandatory subject of bargaining. The Coalition, along with other community groups, therefore urged the City to exclude this provision from the collective bargaining agreement – to no avail. The failure of the City to address or change the 48 rule, which was urged by the community during negotiation of the recent collective bargaining agreement –*which took place in the midst of this lawsuit*—left in place the status quo, despite great community concern and pressure on this issue. Moreover, the PPA's Memorandum of Understanding with the City and the DOJ that resolves the PPA's opposition to the Agreement reserves the PPA's right to grieve issues related to obtaining officer statements and thus leaves uncertainty on this important issue. Dkt. 54-1.


**QUESTION 10**

The Agreement, as it appeared in December 2012, anticipated that the City will have substantially complied with all provisions by October 12, 2017. PSA, ¶ 178. Is that still the expectation of the Parties? If not, does this portion of the Agreement require amendment?

No. The AMA Coalition does not expect that the City will have reached substantial compliance with all of the Agreement's terms by October 12, 2017. This portion of the Agreement does not require amendment, however, because the Agreement indicates that the Court "shall retain jurisdiction . . . until the City has substantially complied with all provisions"

---

[8] Report to the City of Portland on Portland Police Bureau Officer Involved Shootings and Deaths, First Report, May 2012, OIR Group, May 30, 2012, pp. 68-9, at www.portlandonline.com/auditor/index.cfm?c=54263&a=454619 (last visited March 13, 2014).

and has maintained substantial compliance for one year. PSA, ¶ 178(b). Thus, sustained

substantial compliance, as determined by this Court, is the proper measure of when the

Agreement will terminate.


**QUESTION 11**

> The Agreement anticipates that the Parties may ask the Court to terminate the
> Agreement after the City has substantially complied with all provisions of the
> Agreement "and maintained substantial compliance with all provisions for one
> year. PSA, ¶ 178(c). Is one year a sufficient period of time to promote the
> objective of maintaining substantial compliance with the Agreement? Would a
> five-year period of maintenance after substantial compliance better satisfy the
> objectives of the Agreement? Would extending the period of time for
> demonstrating maintenance of "substantial compliance" require an amendment to
> the Agreement?

As the AMA Coalition explained in its response to Question 1, the Court is the final

arbiter on whether the City has maintained substantial compliance. If the Court makes that

decision, after input from the Parties, including the AMA Coalition, on that issue, the AMA

Coalition believes that process would be sufficient to satisfy the objectives of the Agreement.


**QUESTION 12**

> A number of police departments provide officers with "on-officer recording systems"
> (also known as "body cameras," "body cams," or "cop cams"), which are small,
> pager-sized cameras that clip onto an officer's uniform or glasses or are worn as a
> headset. These devices record audio and video of the officer's interactions with the
> public. Please explain whether requiring these devices would promote the objectives
> of the Agreement and, if so, why such a requirement was not included.

The AMA Coalition recognizes that body cameras may be effective tools to reduce

officers' use of force and to hold officers accountable for their interactions with members of the

public. The Coalition, however, also notes that the use of such cameras also raises significant

privacy concerns. As a result, the AMA Coalition is not prepared to take a position on the

efficacy of body cameras at this time, but would consider conditional support of this measure if

appropriate policies were put in place and adequately enforced to protect civil liberties.

**QUESTION 13**

> Do the Parties want additional time to consider amending the PSA in light of any
> of the comments raised during the Fairness Hearing or in these post-hearing
> questions from the Court? If so, how much time do the Parties want? If not, please
> discuss how the PSA is fair, reasonable, and adequate in light of the comments
> raised during the Fairness Hearing and the issues presented in these post-hearing
> questions from the Court.

The AMA Coalition has endeavored from the outset to make this Agreement stronger,

and despite its sustained and concerted effort, few substantial changes have been made. The

AMA Coalition strongly believes the Parties should take more time to amend the Agreement to

address the community concerns raised at the Fairness Hearing, as well as the specific

recommendations the AMA Coalition provided to the City and the DOJ in November 2012. Dkt.

21-11.

The AMA Coalition is therefore disappointed that the DOJ, the City, and the PPA are not

willing to consider amendments at this time. If the Court accepts the Agreement, the AMA

Coalition fully intends, as contemplated by its Collaborative Agreement with the City and the

DOJ, to continue to push for the changes it sees as necessary to achieve lasting reform of the

Portland Police Bureau. It hopes that the Parties will act as partners in that process, but firmly

believes that the Court's active supervision and enforcement is necessary to reach that final goal.


**III.    CONCLUSION**

The AMA Coalition sees the Agreement as the establishing the foundation for the

reforms required to address the DOJ's finding that the Portland Police Bureau has engaged in a

pattern or practice of using excessive force on individuals with actual or perceived mental

illness. It expects that the Court, the Parties and the community will continue to engage to build

upon the structures set by the Agreement. The AMA Coalition remains committed to that

process.

DATED: March 11, 2014

Respectfully Submitted,              _____*s/ J. Ashlee Albies*_____
                                     J. Ashlee Albies, OSB # 051846
                                     ashlee@civilrightspdx.com

                                     __ *s/ Shauna Curphey*_____
                                     Shauna Curphey, OSB # 063063
                                     scurphey@curpheylaw.com