ELLEN OSOINACH, Oregon State Bar ID Number 024985
Deputy City Attorney
Email: ellen.osoinach@portlandoregon.gov
Office of City Attorney
1221 SW 4th Avenue, Suite 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
Of Attorneys for Defendant

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | **3:12-cv-02265-SI** |
| PLAINTIFF, | |
| v. | **CITY OF PORTLAND'S POST HEARING BRIEF** |
| **CITY OF PORTLAND,** | |
| DEFENDANT. | |

Page i –    CITY OF PORTLAND'S POST HEARING BRIEF

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................ii

I.      INTRODUCTION ..........................................................................................................1

II.     THE SCOPE OF THE FINDINGS IS LIMITED............................................................2

III.    REMEDIES BROUGHT INTO QUESTION BY THE COURT ARE FAIR,
        ADEQUATE, AND REASONABLE BECAUSE THEY SUCCESSFULLY ADDRESS
        PROBLEMS BOTH WITHIN AND OUTSIDE THE SCOPE OF THE COMPLAINT....3

        A.      Community-based mental health services must be enhanced by actors who cannot
                be bound in this Agreement. ...................................................................................3

        B.      Despite the lack of adequate community-based services, the City has worked
                aggressively to improve how the City interacts with existing resources as well as
                advocating for improvements. ................................................................................4

        C.      Officer Accountability. ...........................................................................................6

                1.      Misconduct investigations are professional and thorough...........................7

                2.      The timeliness of the investigations is adequately addressed by the
                        Agreement.................................................................................................8

                3.      The Discipline Guide will improve the timeliness and transparency of
                        misconduct investigations.........................................................................10

                4.      Civilian oversight of misconduct investigations is rigorous and
                        independent...............................................................................................11

                        a.      Overview of process for handling civilian complaints of police
                                misconduct. ................................................................................ 11

                        b.      The Civilian Review Committee's clearly defined role in oversight
                                should remain although its timelines should be reviewed and
                                extended as soon as the Agreement is entered................................ 12

                        c.      The Independent Police Review Division is effective and its role has
                                continued to expand over the last four years. ................................. 14

                5.      Officer Accountability is enhanced outside of the discipline process *via*
                        Performance Evaluations, Early Intervention Systems, and Mobile Audio
                        Video........................................................................................................16

                        a.      Performance Evaluations will enable the City to set expectations and
                                give feedback to employees outside of the discipline process......... 16

                        b.      The EIS system provides detailed information about force trends and
                                individual employee use of force.................................................. 16

                        c.      Mobile Audio Visual (MAV) systems provide direct evidence on
                                which to evaluate interactions....................................................... 16

                6.      The Agreement provides the structure necessary to determine what
                        process should be used to obtain statements from officers who use deadly
                        force. ........................................................................................................17

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

7.      Communications restriction orders have been in place for years and ensure the integrity of investigatory interviews. ...................................................19

IV.    ALTERATION OF THE COURT'S CRITICAL ROLE IN THE EXISTING MULTI-LAYERED OVERSIGHT MECHANISMS WOULD REQUIRE AMENDMENT TO THE AGREEMENT AND IS NOT NECESSARY OR DESIRABLE. ..........................19

A.      The Court plays a critically important role that was carefully crafted by the parties. ...........................................................................................................20

B.      The Court has the authority to direct the parties to appear for a hearing only upon an affirmative allegation of non-compliance by the plaintiff or defendant. ..........23

C.      The Court can (and should) retain jurisdiction while conditionally dismissing the case under Rule 41(a)(2). ..........................................................................24

D.      The Court's role would be fundamentally altered by holding hearings every six months at which the Compliance Officer and parties would be required to appear and report to the Court. ...........................................................................24

E.      Dates and timelines do not require amendment or adjustment. ............................25

F.      Community participation in implementation and oversight of the Agreement best serve the goals of public monitoring and reporting. ..............................................27

G.      Submitting the COCL reports into the Court's record would be of benefit and would not require amendment of the Agreement. ..................................................28

V.     CONCLUSION .................................................................................................28

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

## I.    INTRODUCTION

This Court should accept the proposed Settlement Agreement.  It represents a historic opportunity for the City to engage in focused and sustained efforts to improve outcomes in encounters between persons in need of mental health crisis services and local law enforcement. The remedies in the Agreement specifically targeted to that issue are supported by several mental health organizations,[1] little criticism of them was voiced by objectors at the Fairness Hearing, and none of the Court's questions are directed at them.

The suggested amendments offered by objectors at the Fairness Hearing (and highlighted by the Court's questions[2]) focus almost exclusively on officer accountability measures.  Holding officers accountable for their conduct is an integral part of building community trust, and the City pursues that goal within and outside of the Agreement.

The City never intended to preclude further discussion or reforms to officer accountability, and thus the Agreement does not include every measure that might "give greater effect to and faith in the process."[3]  Nevertheless, the City agreed to substantial and generally applicable improvements in this area that far exceed the scope of the complaint.  It would be ironic if the City's good faith effort to expand the remedies resulted in the Agreement's rejection.

The remainders of the Court's questions are related to its role in the Agreement[4].  The monitoring mechanisms in the agreement were thoughtfully constructed to ensure that the City "owned" these reforms and that the community would be actively engaged in oversight.  The Court's role is a defining feature of the Agreement and changes to it would fundamentally alter

---

[1] *See e.g.* testimony of Lines for Line ("We believe the settlement agreement represents a cutting edge effort to employ best practices in effectively de-escalating crises") and ReEntry and Mental Health Action Team ("We support the Settlement Agreement and strongly emphasize the need for community-based mental health services and crisis intervention")

[2] The Court's questions 5, 7, 8, and 9 all relate to Section 8 Officer Accountability, and Question 12 relates to on-officer recording systems ("body cams"), another officer accountability measure.

[3] Findings Letter at 26.

[4] The Court's question 1-4 ask about the Court's authority and question 10-11 relate to court proceedings called for in the agreement.

Page  1   –    CITY OF PORTLAND'S POST HEARING BRIEF

the agreement's structure, a result which cannot be accomplished without amendments.

## II.     THE SCOPE OF THE FINDINGS IS LIMITED

The complaint in this case alleges a pattern or practice of excessive force against persons in crisis who need or are perceived to need mental health care services.  The United States identified the City's failure to provide adequate policies, training and supervision to PPB officers on the proper use, reporting, and investigation of force as contributing to the violation.

In its presentation at the Fairness Hearing, the United States acknowledged that the allegations in the complaint are based on and restricted to its findings in six limited areas: (a) excessive force against people experiencing a mental health crisis; (b) excessive electronic control weapon (ECW) use against persons in, or perceived to be in a mental health crisis; (c) unnecessary escalation of force against persons in actual or perceived mental health crisis; (d) lack of specialized training and units dedicated to mental health crisis calls; (e) inadequate supervisory review when officers use force against persons experiencing a mental health crisis; (f) failure to implement timely corrective action following investigations of force against persons experiencing a mental health crisis.

The requirements of the Settlement Agreement are divided into the following sections: (1) use of force, (2) training, (3) community-based mental health services, (4) crisis intervention, (5) employee information system, (6) officer accountability, (7) community engagement and community oversight; and (8) agreement implementation and enforcement.  The Court's questions about specific remedies are directed at only two areas of the Settlement Agreement: Community-Based Mental Health Services and Officer Accountability.

In every section of the Agreement, there are additional remedies agreed to by the City that go beyond the scope of the DOJ's allegations.  For example, the City agreed to changes in the way it handles all administrative investigations rather than limiting those changes only to investigations in which force was used against a person experiencing a mental health crisis.

Page  2  –    CITY OF PORTLAND'S POST HEARING BRIEF

III.    **REMEDIES BROUGHT INTO QUESTION BY THE COURT ARE FAIR, ADEQUATE, AND REASONABLE BECAUSE THEY SUCCESSFULLY ADDRESS PROBLEMS BOTH WITHIN AND OUTSIDE THE SCOPE OF THE COMPLAINT**

    A.    <u>Community-based mental health services must be enhanced by actors who cannot be bound in this Agreement.</u>[5]

The Settlement Agreement does not require the City to build, fund, or operate a Walk-In or Drop-Off Center nor does it assign the City responsibility for remediating systemic deficiencies in the State mental health care system.  Rather, the section of the Agreement discussing community-based mental health services was intended to provide reassurance **to the City** about the United States' expectations for the State, County, and other community partners in correcting those deficiencies.

As the United States noted in its findings letter, gaps in the State's mental health system lead to an increase in police encounters with persons in need of mental health crisis services. Specifically, the United States identified the lack of adequate support systems to help people avoid a mental health crisis and a lack of an adequate system to provide services to people who are actively in crisis as gaps which the DOJ and State were working collaboratively to address. At the time the DOJ issued its findings letter to PPB, however, the State was only beginning to undergo the "the health care transformation process,"[6] and neither the DOJ nor the State could accurately predict when those gaps might be filled.  When placed in context, it is clear that the statement in paragraph 89 "[t]he United States expects that the local CCOs will establish, by mid-2103, one or more drop-off center(s) for first responders" is meant to give the City some estimate of when relief might be coming.  Thus, no amendments to this paragraph are necessary to prevent the City from being out of compliance if the Agreement is entered.

Even though the State's health care transformation process is just beginning, a significant amount of additional mental health investment dollars have been given to Multnomah County for

---

[5] This section includes information responsive Court's Question 6
[6] (Findings Letter at 7)

Page  3  –    CITY OF PORTLAND'S POST HEARING BRIEF

expansion of the operational hours of the current walk-in center, enhancement of the Project Respond team, and the addition of a forensic ACT team to the jail diversion program.  Even though these improvements do not address the core need of the City for a drop-off center, they are a hopeful beginning.

      B.     <u>Despite the lack of adequate community-based services, the City has worked aggressively to improve how the City interacts with existing resources as well as advocating for improvements.</u>

The Agreement does not require the City to undertake any specific action to remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents.  Nevertheless, the City has actively engaged in this issue by lobbying the United States and the State of Oregon for more funds for mental health services; allocating significant City funds for the last three years to Multnomah County's Community Crisis Assessment and Treatment Center; and coordinating multiple meetings between various players in the mental health system.

The Agreement properly requires the City to ensure that its officers are appropriately trained and supervised as they respond to the burden placed on them of being "the first and sometimes the only responder to a crisis."[7]  The City has vigorously implemented the twenty-five detailed provisions of section six which are designed to add new capacity and expertise to deal with persons experiencing a mental health crisis.  One of the most dynamic and fully realized components of this section is the City's new Behavioral Health Unit (BHU).  The BHU is comprised of four inter-related programs that have enabled the City to provide specialty policing services.

First, BHU oversees and implements bureau-wide crisis intervention training.  Since 2012, City has required all front-line officers to complete at least 40 hours of crisis intervention training.  And every year the City reinforces that training through bureau-wide mandatory

---

[7] (Findings Letter at 8)

Page 4  –    CITY OF PORTLAND'S POST HEARING BRIEF

refreshers.  The CIT Training provides a history of the mental health system, the challenges and barriers to seeking help, and the effects of stigma.  Officers hear directly from mental health care service consumers, as well as from officers who have family members experiencing mental illness.

Second, the BHU conducts enhanced crisis training for officers who have volunteered to field mental health crisis calls.  When the Bureau issued the initial call for volunteers, they were not sure what to expect.  The response was overwhelming, and within the first year, the Bureau had trained fifty officers.  They will train forty more in May.  These officers are assigned to patrols in each precinct, and they are the go-to responders on mental health crisis calls on their shift.

Third, BHU oversees the Service Coordination Team, or SCT.  SCT facilitates the provision of services to individuals who commit criminal acts and who also experience mental illness or addiction.  SCT has had documented success in connecting people with services and stopping the "rotating door in and out of the criminal justice system"[8].  The SCT predated the Settlement Agreement, and the City committed in the Agreement to continue its important work.

Fourth, BHU deploys the mobile crisis units.  Mobile Crisis Units (MCU) pair a specially trained clinician with a specially trained officer who work together proactively with individuals in advance of a mental health crisis.  Every precinct now has a MCU.

The Agreement rightfully imposes obligations on the City to improve its ability to successfully deal with the predictable consequences when individuals fail to receive appropriate mental health care services.  But is does not and should not impose mandates beyond the scope of the City's authority related to systemic problems, such as the lack of a drop-in center, that must be addressed by the State, County, and care providers.

---

[8] Findings Letter at 7.

Page  5  –    CITY OF PORTLAND'S POST HEARING BRIEF

C.    Officer Accountability.[9]

Officer Accountability is one of eight core requirements in the Agreement.  It is also the area in which careful analysis of what constitutes management rights and employee rights must occur.  Officer accountability measures are spread throughout the agreement in significant ways. And when the City entered into its memorandum of agreement with the PPA, the City resolved the labor impacts alleged by the PPA related to those provisions.

As noted below, the process by which the City holds officers accountable for their use of force includes non-disciplinary reviews of employee performance, detailed evaluations of specific use of force events, data-driven trend analysis of individual and unit force use, and rigorous misconduct investigations with multi-layered civilian oversight.  The Agreement requires the City to implement and track all of these processes to ensure that they are adequate to remedy the problems identified in the complaint.

The DOJ recommended, and the City agreed, that it should make certain generally applicable reforms to its oversight systems rather than limiting those efforts to use of force.  By broadening the scope of reform in this area, however, the City provoked considerable disagreement amongst the various interested parties.  Advocates argue that the Agreement should enshrine even broader reforms, while the PPA claims that the Agreement cannot unilaterally impose such requirements.

There is no question that altering the officer accountability measures in the manner suggested by objectors at the Fairness Hearing (and highlighted by the Court's questions) would require amendments.  It would be unfair for this Court to reject the Agreement by reasoning that systemic reforms outside the scope of the complaint should have extended beyond those to which the four parties could agree in this litigation.  Many of the amendments offered at the Fairness Hearing have been the subject of intense debate in various Council settings over the years.  The City's elected officials are the appropriate persons to address these broader issues; there is

---

[9] This section includes information responsive to Court's questions 5, 7, 8, 9, 12

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

nothing in the Agreement that prevents them from doing so; and the City already has a demonstrated commitment to working on them.

> 1. <u>Misconduct investigations are professional and thorough.</u>

The impression one might have gotten from some of those testifying in opposition to the settlement agreement is that the City's method for conducting and overseeing misconduct investigations is broken. That is not the case.

In its findings regarding officer misconduct investigation, DOJ noted that the primary deficiency in PPB's force oversight was its failure to have a supervisor on scene to ensure a full inquiry afterwards. Thus, the Agreement has detailed recommendations regarding supervisory investigations and reports following a use of force.[10] This part of the Agreement has been successfully implemented for over two years.

In addition, DOJ praised the City's misconduct investigations as being thorough. That is consistent with outside audits of PPB's internal affairs investigations which have found the City's investigations to be rigorous and transparent particularly in critical incidents. In 2012, the OIR group observed that "The Bureau's development in [its mechanisms for investigating and reviewing critical incidents] has been remarkable. Quite unlike many municipalities where the City has seen significant reports commissioned and then subsequently buried, the PPB has been responsive…and the result is that today the PPB conducts thorough, professional investigations into its officer-involved shootings."[11] And in 2013, the OIR group reported that "Portland certainly has been at the forefront of this move toward increased attention to officer-involved shootings." In 2001, the City of Portland created an external oversight mechanism that, over the years, has grown in authority and scope. There has been a tremendous increase in transparency… with records from investigations and grand jury proceedings made available to

---

[10] Docket 4-1, Proposed Settlement Agreement (Agreement) ¶¶ 70-73.
[11] OIR Group: Review of Officer-Involved Shootings and In-Custody Deaths, May 2012, p.2, at www.portlandonline.com/auditor/index.cfm?c=54263&a=454619 (last visited March 11, 2014).

Page 7 –    CITY OF PORTLAND'S POST HEARING BRIEF

all who are interested."[12]

DOJ also did not allege that the City fails to hold officers accountable upon sustaining an allegation of misconduct.  Contrary to the assertion of several people who testified at the fairness hearing, the City has been both willing ***and able*** to impose the ultimate sanction for misconduct: termination.  From 2005 to 2012, the outcome of the complaint process included ten terminations and thirty-three resignations or retirements.  In other words, about forty-three officers were either asked to leave or voluntarily left during the complaint process.

2.    The timeliness of the investigations is adequately addressed by the Agreement.

What DOJ did allege was that the effectiveness of our misconduct investigations was undercut by the length of time it takes for the City to impose corrective action in certain cases. The City agrees that investigations of allegations of officer misconduct are effective and fair to the officer, complainant and community only if they can be completed in a timely manner. As it relates to this case, the DOJ found that PPB's force review process was "difficult to follow and needlessly lengthy."[13]

The Agreement addresses that finding in several ways.  The time requirements in the Agreement must be read as a whole.  Collectively, the discipline process time line provisions will force the City to make thoughtful, interconnected decisions about the time needed for each stage of its process.  The Agreement's provisions on the discipline process timeline contain both a general requirement and specific requirements.  As to some parts of the process, DOJ was willing to decide how to balance the trade-offs necessary to achieve the specified time limit. Prudently, DOJ left decisions on many other time line tradeoffs to the City and its political processes.

---

[12] OIR Group:  Report to the City of Portland on Portland Police Bureau Officer Involved Shootings and Deaths, Second Report, July 2013, p. 2, at https://www.portlandonline.com/auditor/index.cfm?c=54263&a=455591 (last visited March 11, 2014).
[13] Findings Letter at 27.

Page 8  –    CITY OF PORTLAND'S POST HEARING BRIEF

The general requirement is contained in paragraph 121 which requires the City to complete all administrative investigations within 180 days of receipt of a complaint of misconduct or discovery by other means.

This number was the result of intense negotiations in which both parties sought to preserve valuable functions of the City's extensive process while making it operate more quickly.  The product of the negotiations is fairly characterized as an agreement on four conclusions:  there is value in dedicating time to all the system's remaining components, the process takes too long, no matter how the City rearranges the time line it will be no easy task to reduce the process to 180 days and, in the context of the negotiations, it was possible to make only a few of the many decisions necessary to bring the completion times into a reasonable range.  The negotiators did not try to do too much in micromanaging the changes necessary to a shorter process.  Instead, the 180 day limit places tremendous pressure on the City to trade off beneficial functions valued by our process-committed body politic against other equally-valued beneficial functions.  Given the modification provision in the Agreement, in conjunction with the pressure applied by the 180 day limit, the court can be assured that the details of the uniquely Portland discipline system will be the subject of political activity for years to come.

Other paragraphs in the Agreement impose specific time restrictions:

Paragraph 70(a) requires completion of Directive 940.00 after action reports within 72 hours of the force event.

Paragraph 70(b) requires immediate notification of the Professional Standards Division of any Serious Use Of Force or any use of force against a person with mental illness.

Paragraph 121 requires the City to complete all administrative investigations within 180 days of receipt of a complaint of misconduct or discovery by other means.

Paragraph 123 requires the City to develop an action plan should it not be able to meet the 180 day limit.

Page 9  –  CITY OF PORTLAND'S POST HEARING BRIEF

Paragraph 128 requires the City to implement, within 120 days of approval of the Agreement, a plan to eliminate redundant interviews by IPR and IA and enable meaningful independent investigation by IPR when IPR determines such independent investigation is necessary.

Paragraph 132 requires that investigators provide additional investigation required by a Police Review Board within ten days of a request or ask for more time in writing.

Paragraph 134 improves the ability of the CRC to accomplish its work in a timely manner by increasing the number of members to 11 while maintaining the quorum requirement at the existing level.

Paragraph 136 limits the amount of time that may be expended in any re-investigation phase of a CRC appeal by allowing only one set of re-investigation requests and requiring IA to complete the additional investigation in 10 days.

The Agreement anticipates that the current IPR practice of reporting on the performance of the discipline process will continue.

3.  The Discipline Guide will improve the timeliness and transparency of misconduct investigations.

The importance of the guide in improving Portland's oversight system cannot be overstated. Effective March 1, 2014, PPB adopted a Discipline Guide that correlates types of misconduct allegations with the kinds of corrective action typically imposed for sustained allegations.[14] The guide is intended to provide direction and information to actors in the oversight system who make disciplinary recommendations, including the Chief. The City anticipates that it will also improve the timeliness of investigations, provide consistency in disciplinary actions, and give information to officers and the public regarding possible outcomes.

The Agreement's requirement that the City adopt a discipline guide was repeatedly highlighted by the PPA in its filings to this court as a prime example of why the Court could not

---

[14] https://www.portlandoregon.gov/police/index.cfm?&a=482707

enter the agreement over PPA's objection.  PPA did not simply object to the single paragraph requiring a guide, they correctly noted that the guide was an integral part of the overall reforms contained in the officer accountability section.

As will be discussed more fully below, the memorandum of agreement resolving the PPA's concerns is unlikely to survive if the proposed amendments to the officer accountability section are adopted.  Thus, the parties will be required to return to mediation or proceed to litigation resulting in delays that no one desires.

    4.  Civilian oversight of misconduct investigations is rigorous and independent.

The creation of the Independent Police Review (IPR) and the Citizen Review Committee (CRC) provided the foundation for independent, civilian oversight of the Portland Police Bureau that has developed markedly since 2001, in response to the public's desire for greater accountability and transparency.  Portland's police oversight system is the result of several attempts by the Portland City Council to address perceived flaws in police accountability, premised on significant civilian involvement and final discipline resting with the Police Commissioner.

    a.  Overview of process for handling civilian complaints of police misconduct.

A citizen-initiated complaint involving force is initially received and handled by IPR.  It is then forwarded to Internal Affairs for a full investigation.  The investigation is submitted to IPR for its approval, and when IPR is satisfied with the quality of the investigation, it is sent to the subject officer's supervisor for a recommendation regarding findings (*i.e.* whether the allegation are supported by the evidence) and recommended corrective action, if any.

In many cases, another oversight body, the Police Review Board (PRB) additionally makes findings and recommends corrective action.  The PRB is made up of civilians, IPR representatives, police bureau members, and police managers.  Reports of their recommendations

Page  11  –   CITY OF PORTLAND'S POST HEARING BRIEF

are semi-annually released to the public, and 2014 code changes submitted by IPR have greatly increased the detail and accessibility of these reports.

If either the complainant or the officer disagrees with the manner in which the supervisor or PRB came to its decision regarding findings, he or she can file an appeal to CRC. The purpose of the CRC hearing is to audit the quality of the decision-making. If CRC deems the supervisor's or PRB's analysis to be reasonable, the investigation is then forwarded to the Chief for final discipline.

        b.    <u>The Civilian Review Committee's clearly defined role in oversight should remain although its timelines should be reviewed and extended as soon as the Agreement is entered.</u>

CRC serves many roles including gathering community concerns about police services, developing policy recommendations, advising IPR and PPB on complaint handling, and hearing appeals of misconduct case from either community members or police officers. Past CRC reports have led to changes to PPB's tow polices and IPR's organizational structure. In order to better serve appellants, the CRC revamped its appeal procedure and created Appeals Process Advisors (APA), who guide appellants through the appeals process to make it more accessible and user-friendly to appellants.

To put the appeal work of CRC into context, it is helpful to look at the number and kind of the cases they hear. In 2012, the CRC heard three appeals filed by community members, all force cases; in 2013, the CRC heard four appeals (two force, one courtesy, one unprofessional conduct- off duty); and in 2014, the CRC has heard two appeals (one unprofessional off duty conduct, one excessive force/ warrantless arrest).

CRC appeal hearings are open to members of the public and at each appeal there is healthy debate among the CRC members prior to reaching a decision. The CRC has access to the full investigative case file and is able to request additional investigation, if it feels that is necessary. In response to legitimate concerns raised by CRC members about the inconvenience

Page 12 –  CITY OF PORTLAND'S POST HEARING BRIEF

of the City's current security protocols, the City will provide less burdensome access to those investigative files. But as CRC members have pointed out, greater access to files is unlikely to enable it to meet a 21-day timeline. The City believes that CRC has adequately demonstrated that it needs more time to complete its work.

Even though CRC conducts only a few appeals each year, it is an integral part of the oversight system. Once the Agreement is entered, the City will immediately propose to the United States that when an appeal is filed with CRC the City will be in substantial compliance with the Agreement so long as the total length of the misconduct investigation does not exceed 204-days. In other words, in the limited number of misconduct investigations involving a CRC appeal, the length of the misconduct investigation should be extended by forty-five days to give CRC additional time. In the typical case, however, the investigation should be completed within the 180-day timeline proscribed by the Agreement.

A change in CRC's standard of review is not necessary to achieve the objectives of the Agreement. The Agreement seeks to improve the quality of the City's management decisions, and the standard of review is intended for the exact same purpose. Council has repeatedly decided that the role of CRC is to audit the performance of the City's managers as they make employment decisions rather than to make those decisions itself, To this end, the standard of review limits CRC to deciding if various City actors have been reasonable in their thinking about a case. The Code that describes the appeal process is PCC 3.21.160(A)(1). It states:

> At the Appeal Hearing the Committee shall decide by majority vote:
>
> a. To recommend further investigation by IAD or IPR; or
>
> b. If the finding is supported by the evidence. In a case where the majority of the voting members of the Committee affirms that the Bureau's recommended findings are supported by the evidence, the Director shall close the complaint; or
>
> c. If the finding is not supported by the evidence. In a case where a majority of the voting members of the Committee challenges one or more of the Bureau's recommended findings by determining that one or more of the findings is not supported by the evidence, and

Page 13 –   CITY OF PORTLAND'S POST HEARING BRIEF

recommends a different finding, the Director shall formally advise
the Bureau in writing of the Committee recommendation.

The definition of "supported by the evidence" is found in 3.21.020: "[a] finding regarding a complaint is supported by the evidence when a reasonable person could make the finding in light of the evidence, whether or not the reviewing body agrees with the finding."

Thus, the City's Code expressly prohibits CRC from becoming a decision maker on the merits of a case and requires it to evaluate the quality of a manager's thinking. This is a very important auditing function that supports the goals of the Agreement. CRC's view of the weight of the evidence can, of course, inform its decision about the reasonableness of a manager's thinking, but the only subject of CRC's conclusion must be the manager's thinking. In this way, the standard of review serves a principal goal of the Agreement – to judge and improve the quality of City managers' decision making.

Adoption of a standard of review that would make CRC a discipline decision maker is likely to add additional length to the City's discipline process, which was of great concern to DOJ, as well as the technical quality of discipline decisions that are tested in arbitration. Involving CRC in decisions on the merits of cases would add time and complexity to the review process, in direct conflict with the goal of shrinking the discipline timeline and improving results in arbitration.

> c.    The Independent Police Review Division is effective and its role has continued to expand over the last four years.

IPR has evolved significantly since its creation.  At the heart of IPR's mission is receiving complaints from community members. Its goal is to provide a welcoming, emotionally safe environment to the public where their concerns can be heard and processed in a timely manner. Every PPB investigations that results from citizen complaints is reviewed by IPR and cannot move forward until IPR's standards are met as to the quality of the investigation and any findings.

Page  14  –   CITY OF PORTLAND'S POST HEARING BRIEF

IPR's ability to conduct vigorous police oversight was enhanced by comprehensive code changes in 2010 and 2014.  In 2010, City Council re-constituted the PRB adding IPR as a member with the ability to vote on what findings and corrective action should be recommended to the Chief and Police Commissioner.  In addition, the selection of the citizen members of the PRB was delegated to the Auditor and City Council rather than the Police Chief.  Finally, Council required PRB to issue bi-annual public reports.

City Council also granted IPR additional independent authority to conduct investigations by authorizing IPR to initiate investigations in the absence of a community member's complaint.  And Council greatly expanded IPR's role in oversight by requiring IPR's review and approval of investigations, allowing them to refer any cases to PRB for review, and confirming IPR's authority to subpoena witnesses and documents.

In 2014, Council again changed the City Code.  A member of the Citizen Review Commission now serves on the PRB, which is significant because it allows individual CRC members to step outside of the auditing role and participate in a forum where recommendations are being formulated.  As part of the Agreement's requirement that the City enable "meaningful independent investigation" by IPR,[15] Council clarified that IPR has unambiguous authority to directly interview all PPB employees and that IPR must receive notice prior to the termination of misconduct investigations.

In the last year IPR has hired four new investigators, all of whom have extensive experience serving community members experiencing mental illness.  These new hires have significantly increased IPR's investigative resources allowing the office to better meet its complaint handling timelines, as well as allowing IPR to conduct policy reviews of PPB practices and procedures.  Currently, IPR is conducting two independent investigations and just completed its first independent investigation since the creation of the office in 2001.  The

---

[15] Agreement ¶ 128.

Page  15  –   CITY OF PORTLAND'S POST HEARING BRIEF

additional resources have also allowed IPR/IA to work towards reducing redundancies in the

investigative process as required by the Agreement ¶ 128.

     5.    <u>Officer Accountability is enhanced outside of the discipline process *via*</u>
<u>Performance Evaluations, Early Intervention Systems, and Mobile Audio</u>
<u>Video.</u>

     a.    <u>Performance Evaluations will enable the City to set expectations</u>
<u>and give feedback to employees outside of the discipline process.</u>

The City successfully negotiated a provision in the new collective bargaining agreement

requiring annual performance evaluations.  The evaluations will emphasize skills in appropriate

community engagement, and officers will be evaluated on their ability to have successful, non-

enforcement related contacts with the public.

     b.    <u>The EIS system provides detailed information about force trends</u>
<u>and individual employee use of force.</u>

The City has implemented a robust Early Intervention System (EIS) that can track officer

specific information as well as unit level and trend data. The City utilizes the system to identify

individual officers, supervisors, and units for non-punitive corrective action, and to assess gaps

in policy, training, supervision and accountability.  This change was also required by the

Agreement as a means to improve officer accountability.

     c.    <u>Mobile Audio Visual (MAV) systems provide direct evidence on</u>
<u>which to evaluate interactions.</u>

Every year, the City tests body cameras and has concluded that the technology is not yet

sufficient for its needs.  Serious limitations in viewing angles and data management make their

widespread deployment ill-advised.  The rapidly evolving nature of this technology has led the

City to conclude it is better to wait for improvements.

The City has determined, however, that the present in-car camera systems are

technologically feasible for deployment.  Following a pilot project where MAV was placed in 10

police cars, PPB determined that the in-car system warranted a significant investment.  City

Council has currently budgeted funds to expand the use of MAV.

Page  16  –   CITY OF PORTLAND'S POST HEARING BRIEF

6.    <u>The Agreement provides the structure necessary to determine what process should be used to obtain statements from officers who use deadly force.</u>

The City intends to comply with the Agreement by reviewing its protocols for compelled statements and revising them as appropriate.  This will be a complex endeavor, requiring the participation of the Mayor's Office, IPR, PPB, PPA, individual members of the PPA and the criminal defense attorneys who represent them after deadly force events, the District Attorney and members of the public.  This wide array of necessary participants does not represent constituencies:  rather, it manifests the complex brew of social, legal and labor interests that made it impossible to embody a particular solution or require a particular result in the context of the DOJ Agreement.

The legal principle that dominates policies about taking statements from officers who have used deadly force is found in *Garrity v. New Jersey*:  a statement compelled from an officer as a condition of employment and all evidence that is obtained as a direct or indirect result is not admissible in a criminal prosecution of the officer.  The upshot of *Garrity* is that, if an agency takes a compelled administrative statement when there is a parallel criminal investigation and prosecution, the prosecutor must prove that none of the evidence used in the prosecution is derived from the compelled statement.  If information from the administrative investigation "taints" critical evidence in the prosecution, the prosecution is doomed.

Unlike most state prosecutors, the Multnomah County District Attorney has for many years presented every use of deadly force to a grand jury for consideration of criminal charges.  As a result, in Multnomah County, every use of deadly force makes an involved officer the subject of a criminal investigation.  The fact that a criminal process always parallels the City's administrative review has far-reaching effects.

Under current state and federal law, Portland officers have a constitutional right to refuse to speak voluntarily with criminal investigators following a use of deadly force. When an officer does not make a voluntary statement and the City compels a statement in an administrative

Page  17  –   CITY OF PORTLAND'S POST HEARING BRIEF

investigation, the City must, pursuant to *Garrity*, wall that statement off from the criminal investigation if the City does not wish to risk tainting the criminal investigation.  Supporting the integrity of the criminal investigation in this way comes at a cost to the City and the public:  until the question of criminal liability is resolved (usually by the grand jury), the information in the compelled statement is not available for public use by the managers of the Police Bureau and the Police Commissioner.

A PPB Chief or Commissioner of Police who releases compelled information publicly prior to the grand jury proceeding risks valid criticism for having jeopardized the ongoing criminal investigation.  Further, any suggestion that the City should release compelled statements earlier puts the City official at odds with the elected District Attorney who does not want to increase the risk of contamination of the rare, but important criminal prosecution of a police officer.  At present, given these rules and competing interests, the best route through this thicket begins when an officer makes a voluntary statement at a time that investigators are first prepared to take it.  And paragraph 127 of the Agreement requires the City to ask for a voluntary statement on-scene.

But if an officer will not give a voluntary statement to investigators, the appropriate course of action is less clear and requires careful balancing of the interests described above.  The issue of *when* the City should force the officer to give an involuntary interview is one facet of this complex debate but is by no means the primary driver of it.  The City has a great deal of discretion in the timing of these interviews.  The so-called "48-hr rule" refers to a provision in the City's contract with the PPA that generally requires the City to give an officer 48-hours notice prior to a compelled administrative interview so long as the delay will not thwart the investigation.  In other words, the timing of the interview involves the exercise of discretion by management and that discretion is informed by the contract.

Page  18  –   CITY OF PORTLAND'S POST HEARING BRIEF

As outlined above, the City intends to balance the competing demands and interests involved in securing officer statements in officer involved shootings with the full benefit of input from a variety of sources in public settings on the agreed schedule.  Given the important interests at stake, the Agreement wisely avoided proscribing a particular outcome and instead focuses on ensuring that appropriate decision-making occurs.

       7.     <u>Communications restriction orders have been in place for years and ensure the integrity of investigatory interviews.</u>

The communications restriction was designed by the auditors of the Police Assessment Resource Center in response to the perception that officers would collude before giving interviews.  To address this perception, and to reduce the possibility of misbehavior, PPB requires detectives to deliver letters to involved and witness officers as soon as possible ordering them not to communicate about an incident.  The restrictions remain in effect until the administrative review process is entirely complete.

## IV.    ALTERATION OF THE COURT'S CRITICAL ROLE IN THE EXISTING MULTI-LAYERED OVERSIGHT MECHANISMS WOULD REQUIRE AMENDMENT TO THE AGREEMENT AND IS NOT NECESSARY OR DESIRABLE.[16]

The Agreement, absent amendment, does not provide the Court an opportunity to stay this case.  Paragraph 2 states:

> [U]pon execution of this Agreement by both Parties, the United States agrees to conditionally dismiss the complaint it filed with prejudice,[17] subject to the court retaining jurisdiction to enforce the Agreement, followed by final dismissal with prejudice upon performance of this Agreement.

In a litigation settlement, there can be no more fundamental consideration than dismissal. The City has agreed to relinquish its defenses to the complaint, which are substantial and getting

---

[16] This section includes information responsive to Court's questions 1-4, 10 and 11.

[17] This section has created confusion with its reference to dismissal *with* prejudice both at the time of the Agreement's approval and upon "final dismissal."  Although the Court can certainly dismiss the case with prejudice and retain jurisdiction to enforce the Agreement as requested by the parties, the Court can also dismiss the Complaint without prejudice upon approval of the Agreement and still retain jurisdiction.

Page  19  –   CITY OF PORTLAND'S POST HEARING BRIEF

stronger as time passes, to eliminate the uncertainty, burden, expense, inherent and unwanted conflict and public spectacle of litigation.  The City is dedicated to reform and chose to enter into this particular Agreement not to avoid it but rather to ensure its success.  The compliance mechanism contemplated by plaintiff's voluntary dismissal and the court's ancillary jurisdiction is most likely to support the goal of reform.  An end to the distractions of litigation is central to this goal.

While the legal arguments here are that DOJ would be in substantial breach of the Agreement should it fail to dismiss the case, and there is no end to which the Court can, *sua sponte*, apply information it receives through monitoring, there are other reasons the court should not impose hearings on the parties and command performances on the COCL.  As described below, the success of the extensive compliance, reporting and consulting mechanisms so carefully crafted by the parties depend on the court playing a role that is most effective because it is limited.

> A.    The Court plays a critically important role that was carefully crafted by the parties.

The implementation and enforcement structures in the Agreement were founded on observations by DOJ that PPB had already adopted many modern police management components and that its management was capable of the needed management improvements.  In designing the Agreement, the parties shared the expectation that the pace of compliance and City performance post-Agreement will benefit from the City "owning" the reform rather than responding to edicts from an outside monitor.  While some situations require a strong outside command authority to force a teardown of the old and building of a new management structure, the agreed goal of the parties was to build on the City's already-extensive efforts.

The City intended to avoid an unhealthy dynamic that has arisen in some consent decree / monitor settings.  When cities have no role in developing reforms and feel their only responsibility is to respond to edicts from a court, serious problems and stagnation can develop.

Page  20  –   CITY OF PORTLAND'S POST HEARING BRIEF

Initiative and detailed direction must come from the court or monitor - a daunting task - and the effort of the municipality becomes merely to achieve minimal compliance with standards set by others.  When this occurs, there too often follows years of conflict between the monitor and host city, little progress, poor morale and incredible waste of resources and opportunity.  On the West Coast alone, there are examples of the consent decree / monitor model requiring over a decade to produce the desired results.

The City intended to create an efficient management structure in which its employees are motivated to design the hundreds of solutions necessary to satisfying the Agreement while knowing that their work will be subject to intense public scrutiny by the Compliance Officer (COCL), DOJ and the Community Oversight Advisory Board (COAB).  And should DOJ invoke the attention of the Court on any particular issue, their work will be further subjected to judicial scrutiny.

A second goal of both the City and DOJ was to immediately begin building better ties with the public through involvement of the public in the reform effort.

The court's intended role in creating this healthy and beneficial dynamic is, much like a trial jury's role in promoting settlement, to be available should the parties get mired in disagreement.  The City expects that the availability of the court will cause the City and DOJ to solve problems and resolve conflicts quickly, anticipating that the court will be tough on any party that does not perform its role well.

This approach has already generated the hoped-for success.  IPR has secured from Council necessary changes to the City Code and PPB has made great progress on half of the tasks that will be assigned it by the Agreement.  Of particular significance, as the Findings centered on force against people with mental illness, PPB has already modified its force policy and its force review practices to directly address the use of force against people with mental illness and fielded both a dedicated CIT unit and the Behavioral Health Unit; both of which have

Page  21  –   CITY OF PORTLAND'S POST HEARING BRIEF

citizen advisory boards in place and contributing.   In addition, the Bureau of Emergency

Communication has changed how it handles calls about behavioral health crises.  In another area

of citizen involvement, members of the CRC now sit on the Performance Review Board to make

substantive recommendations on discipline and over thirty citizens serve on the new Training

Advisory Council.

To institutionalize this dynamic, in Portland fashion, the City and DOJ crafted a singular

enforcement mechanism that augments the contractual approach often used by DOJ but is

intentionally not a consent decree.  The concept of limited Court intervention was a central

theme in the partyies' earliest discussions.  DOJ and the City jointly announced the result of the

initial negotiations on this point in the Statement of Intent released on September 12, 2012:

> The parties commit to continue to work towards finalizing an
> agreement.  The agreement will be filed with the Court, but the
> action will be dismissed and the Court will review compliance only
> upon an assertion by the United States of a material breach that
> cannot be resolved though [sic] good faith negotiations between
> the parties.

The City and DOJ then designed unique reporting, oversight, compliance monitoring,

citizen involvement, amendment, dispute resolution and termination mechanisms to fit this

model.  Critically important to the City's vision of community involvement and policing

legitimacy was DOJ's agreement that the City would report first to a respected member of the

Portland public (*i.e.* the COCL) and an advisory board (*i.e.* the COAB).  The City sees

tremendous benefits flowing from a system that requires thousands of interactions between City

staff and citizens as they work together to improve policing and satisfy the terms of the

Agreement, not the least of which is the emotional investment that results when a community

earns the right to solve its own problems rather than being told what to do.

There is a critical role for the court in this model:  the presence of the court makes

success mandatory.  At the same time, the Court can help considerably by holding back on

offering solutions, direction or general oversight, thus forcing the City's employees to design and

Page  22  –   CITY OF PORTLAND'S POST HEARING BRIEF

champion solutions that will satisfy the public and DOJ.  The City envisions vigorous, public

interaction between its employees, the COCL and the members of the COAB about the details of

police management in Portland.  Those interactions will be less impactful should the Court take

on a general oversight role.

　　　　To implement this model, the Agreement contains only two roles for the court.  All

references to retained jurisdiction, conditional dismissal and other admittedly poorly- and

inconsistently-used terms of art are, structurally, in support of these two roles, which are very

clearly described and strictly limited.  The City intended no other roles for the court, and there is

no textual reference to the type of compliance monitoring implicit in the Court's question.

　　　　B.　　The Court has the authority to direct the parties to appear for a hearing only upon
　　　　　　　　an affirmative allegation of non-compliance by the plaintiff or defendant.

　　　　In paragraphs 181 – 186, the City and DOJ created a mechanism intended to promote

communication and provide for resolution of disputes.  These paragraphs make the court

available to DOJ as a referee of disputes over particular provisions that survive the extensive

dispute resolution process.  They are also intended by the City to provide the City access to the

court for protection against unrealistic DOJ interpretations of particular provisions of the

Agreement.  The intended role of the court in this dispute resolution mode is to be available as a

last resort in response to a motion of a party to perform only the following functions:

　　　　1.　　force compliance with a provision already in the
　　　　　　　　Agreement,

　　　　2.　　issue a declaration as to the meaning of a provision;

　　　　3.　　announce that the City is in breach of a provision;

　　　　4.　　when the City is unable to comply with a provision due to
　　　　　　　　lack of control or impossibility, and when the parties are
　　　　　　　　unable to reach agreement on an adjustment of the
　　　　　　　　agreement that will achieve the purpose of the violated
　　　　　　　　provision, craft a remedy or modification that will
　　　　　　　　accomplish the same result as intended by the provision at
　　　　　　　　issue.

Page  23  –　 CITY OF PORTLAND'S POST HEARING BRIEF

Other than the limited grant of equitable power in function 4, above, there is no other textual reference anywhere in the Agreement that might authorize the court to exercise equitable power to fashion any other remedy and no intended implication of such authorization.

      C.    <u>The Court can (and should) retain jurisdiction while conditionally dismissing the case under Rule 41(a)(2).</u>

As for the second role of the court, in paragraphs 2 and 178, the parties created mechanisms to dismiss the case and terminate the Agreement.  In these paragraphs, the City and DOJ ask the court to be involved in their affairs only to the extent of entering judgments in the court's docket in response to their requests and refereeing any disputes about whether the City has attained substantial compliance and is entitled to termination of the Agreement and the case.  Although the Agreement will be entered as an Order of the Court, the City did not agree to any exercise of equitable authority in conjunction with providing this help to the parties, there is no textual reference to the exercise of equitable authority in these paragraphs, and the City intended no implication of the existence of any equitable authority other than the authority to command what the Agreement already requires, should DOJ ask for that assistance.  The intended role of the court as to determination of substantial compliance is to call the balls and strikes at the request of either the City or DOJ should there be disagreement and dismiss the case as requested by the Agreement.

      D.    <u>The Court's role would be fundamentally altered by holding hearings every six months at which the Compliance Officer and parties would be required to appear and report to the Court.</u>

As the court recognized in sending the parties to mediation, it is preferable to have intervenor-defendant PPA consent to entry of the Agreement rather than engaging in protracted litigation to resolve complex questions about whether the Agreement unlawfully infringes on the PPA's bargaining rights of which legal forum is authorized to answer those questions[18].

---

[18] "[T]o what extent would the Court's view of what areas of the proposed settlement agreement would or would not be subject to collective bargaining…be an impermissible advisory opinion versus a non-advisory and perfectly permissible decision as part of the Court's decision-making process here to approve or disapprove a settlement." (Docket 45, Status Conference Transcript of Proceedings 38/8-14).

Page  24  –  CITY OF PORTLAND'S POST HEARING BRIEF

Accommodations by the City in a very difficult mediation eliminated conflict as to the agreement before you.  Given the role of the court is so clearly described in the proposed Agreement, any addition of equitable authority would require amendment and either additional mediation or litigation.

The speculative value of amending the Agreement to provide for additional court involvement is outweighed by the certainty of the harm that will result from the delay in entering the Agreement. As long as the fate of the Agreement remains unsettled, the City cannot move forward confidently to remediate the problems identified in the complaint.  If the City is forced to return to mediation in order to re-define the core oversight mechanism in the Agreement, the Agreement's interlocking requirements must be unraveled, re-evaluated, and re-negotiated.  If renewed mediation fails to produce consent on an amended Agreement, the delay may ultimately prove fatal to DOJ's ability to succeed at trial as the City has already and will continue to change the status quo upon which the DOJ's complaint rests.

E.    Dates and timelines do not require amendment or adjustment.

Dates and timelines are necessary, as in any plan for performance, but are not central to the Agreement.

The October, 2012, date serves three purposes in the agreement, all of which it will continue to serve if it is not changed to reflect the delay in approval of the Agreement.

The date is intended as a default goal line that will help to organize and push the pace of compliance efforts.  As to this purpose, the date is seen as a standard that is realistic but that can be bettered with effort.  As PPB has already made substantial progress on over half of the tasks required by the Agreement, the City believes the delay in adoption has been more than matched by the necessary rate of progress and the date does not need to be extended.

/////

/////

Page  25  –   CITY OF PORTLAND'S POST HEARING BRIEF

The date is also a marker on the Agreement timeline that entitles the City to first approach the court unilaterally for a finding of substantial compliance.  The date is the result of an agreement with DOJ that five years of effort under the Agreement would entitle the City to make its case for termination of the Agreement even if DOJ disagreed.  As the City has been aggressively implementing the terms of the Agreement in the 15 months since Council approval, this marker will still represent the five years of effort the parties agreed would entitle the City to a finding on compliance.

Finally, the date is a logically necessary trigger in an agreement that is not intended to be perpetual.  The date is the point in time at which the parties must decide, with or without the help of the Court, whether to terminate the agreement or make other plans for future decision points.  Once the parties came to agree the City would have earned the right to unilaterally approach the court for termination with five years of effort, it made sense to use that date as this check-in and case management decision point.  As above, because the City has already been working toward implantation, there is no need to extend the date.  That said, because the Agreement requires a year of substantial compliance before termination and some efforts can not begin before entry of the Agreement, termination in October, 2017 has become less likely.  Still, the City feels the present date, though perhaps becoming more difficult to meet with every day of delay, is more helpful for motivation and in setting a good pace than a more remote date.

The 1-yr compliance maintenance period adopted by the parties should not be seen as the only, nor an insubstantial, indication of City effort and commitment.  Compliance in any reform effort is the result of preparatory work, often very extensive.  In the case of the new force policy adopted at the beginning of 2014, work began in 2012.  It included extensive drafting and solicitation of input, negotiation with the PPA in several contexts, including the collective bargaining and DOJ Agreement mediation processes, in-service training of every officer by the City Attorney's Office over the course of 2013, re-drafting in late 2013 and continuing in-service

Page  26  –   CITY OF PORTLAND'S POST HEARING BRIEF

training on the re-draft through May of 2014.  In all, by the end of the 1-year compliance period in 2015, the City will have put in the expected effort for two and a half years and will have made the desired change in force doctrine.  When this kind of effort is required and the organization is pointed in a proper direction, the Court and public can expect the results to persist: organizational inertia, continual monitoring of outcomes through permanent mechanisms and the continued availability to the public, media and internal and external auditors of data streams created by the Agreement should hold the City on a steady course.  Any dismantling of the new systems, processes and policies will certainly draw the attention of Portland's public and a political response.  In addition, it is hard to identify any increased risk of reforms failing on their own in years two, three, and four once the bugs have been worked out and they have successfully operated for a year.

> F.   Community participation in implementation and oversight of the Agreement best serve the goals of public monitoring and reporting.

Community participation in the oversight of this agreement will be important to its success. A community body will be adopted to assess on an ongoing basis the implementation of this agreement, make recommendations to the parties on additional actions, and advise the Chief and Mayor on strategies to improve community relations. The body will also provide the community with information on the agreement, its implementation and receive comments and concerns. Membership will be representative of the many and diverse communities in Portland, including persons with mental illness, mental health providers, faith communities, minority, ethnic, and other community organizations, and student or youth organizations.

In addition, several advisory committees have been set up to provide direct community input to police training and policy.  Submissions from ABHU Advisory Committee ("we are committed to being partners in this work") and the Trainng Advisory Committee ("we stand ready and willing to participate in the relevant settlement agreement terms") detail the significant contributions they've already made as well as their willingness to continue participating to give

Page  27  –   CITY OF PORTLAND'S POST HEARING BRIEF

PPB the benefit of community input.

      G.    <u>Submitting the COCL reports into the Court's record would be of benefit and would not require amendment of the Agreement.</u>

The City would welcome the Court's posting of the COCL's quarterly reports on the Court's website and in PACER.  The City's goal is to increase community engagement and the Court has demonstrated that it is a valuable partner in relaying information to the public.  Having such reports already in the Court's records may also be of benefit of the Court should it be called upon to mediate disputes.

## V.    CONCLUSION

To be continually relevant, an Agreement must be flexible during implementation to adjust to changing circumstances and accommodate new ideas.  This Agreement has a clause that serves that purpose.  But adoption now of changes proposed at the Fairness Hearing or suggested by the Court's questions would require the creation of a new Agreement, and the Court surely recognizes what a monumental task that would be.  This Court has the opportunity to put the parties solidly on the road to success now by approving the Agreement.

      Dated:  March 11, 2014

                      Respectfully submitted,

                      */s/ Ellen Osoinach*
                      ELLEN OSOINACH, OSB # 024985
                      Deputy City Attorney
                      Telephone: (503) 823-4047

Page  28  –   CITY OF PORTLAND'S POST HEARING BRIEF