## *United States v. City of Portland*

**Settlement Agreement Compliance Status Assessment Report –September 10, 2015**

| **Settlement Agreement Heading** | **Status of Compliance** |
|---|---|
| III. USE OF FORCE | Partial Compliance |
| A. Use of Force Policy | Partial Compliance |
| B. Compliance Audits Related to Use of Force | Partial Compliance |
| IV. TRAINING | Partial Compliance |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | Partial Compliance |
| VI. CRISIS INTERVENTION | Partial Compliance |
| A. Addictions and Behavioral Health Unit and Advisory Committee | Partial Compliance |
| B. Continuation of C-I Program | Partial Compliance |
| C. Establishing "Memphis Model" Crisis Intervention Team | Partial Compliance |
| D. Mobile Crisis Prevention Team | Partial Compliance |
| E. Service Coordination Team | Partial Compliance |
| F. BOEC | Partial Compliance |
| VII. EMPLOYEE INFORMATION SYSTEM | Rating Pending |
| VIII. OFFICER ACCOUNTABILITY | Partial Compliance |
| A. Investigation Timeframe | Partial Compliance |
| B. On Scene Public Safety Statements and Interviews | Partial Compliance |
| C. Conduct of IA Investigations | Partial Compliance |
| D. CRC Appeals | Partial Compliance |
| E. Discipline | Partial Compliance |
| F. Communication with Complainant and Transparency | Partial Compliance |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD | Rating Pending |

| | |
|---|---|
| X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT | Partial Compliance |
| A. Compliance Officer/Community Liaison | Partial Compliance |
| B. PPB Compliance Coordinator | Partial Compliance |
| C. Access to People and Documents | Partial Compliance |
| D. Review of Policies and Investigations | Partial Compliance |
| E. City Reports and Records | Partial Compliance |
| F. Enforcement | Partial Compliance |

Page 2 - Attachment 1

## III. USE OF FORCE

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness: (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied. PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible. In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons, including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function. To achieve these outcomes, PPB shall implement the requirements set out below.

### A. Use of Force Policy

66. PPB shall maintain the following principles in its existing use of force policies:

> a. PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | On October 30, 2013, before finalizing the Settlement Agreement, we approved a version of PPB Directive 1010.00 that was subject to our District Court mediation to resolve the objections to the Agreement by the Portland Police Association ("PPA") and Albina Ministerial Alliance Coalition ("AMAC"). COCL cited in its initial quarterly report an alleged lack of clarity in Directive 1010.00. We have initiated a review of the current 1010.00 with COCL, and while COCL has offered comments on the policy, COCL has also solicited comments from COAB. COCL wants the benefit of COAB's comments before finalizing COCL's own comments. We anticipate COCL's comments on these policies by the end of October. <br><br> Current PPB Directive 1010.00 – Use of Force is available at https://www.portlandoregon.gov/police/article/526353. (PPB's 2014 Q4 folder for Paragraph 66 and 67 contains an internet shortcut that appears intended to link to PPB Directive 1010.00, but does not lead to this policy; the shortcut instead directs the user to http://www.police.city/open.cfm?id=1222945547. PPB's 2015 Q1 and Q2 data sets each have empty folders for Paragraph 66.) As currently written, Directive 1010.00 meets the fundamental requirements of Paragraph 66(a). In order to demonstrate that PPB has brought to fruition in practice Paragraph 66(a), PPB must be able to fully report on uses of force and audit force reports and investigations. Short of such reporting and auditing, PPB cannot demonstrate implementation of the force policy. Moreover PPB's accountability system must |

| | function in a substantially compliant manner to enforce the force policy. |
|---|---|
| **Technical Assistance** | We anticipate offering specific comment on 1010.00 in part based on COCL's review and recommendation as approved by a majority vote of the COAB. |

b. PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

| **Status** | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | On October 30, 2013, before finalizing the Settlement Agreement, we approved a version of Directive 315.30 that was subject to our District Court mediation to resolve the objections to the Agreement by the PPA and AMAC. We anticipate further review of this policy following COCL and COAB review of 1010.00, from which policy PPB split the performance standard into the 315.30 stand-alone policy. |
| | Current PPB Directive 315.30 – Satisfactory Performance is available at https://www.portlandoregon.gov/police/article/525571. (PPB's 2014 Q4 folder for Paragraph 66 and 67 contained only the internet shortcut related to Directive 1010.00, noted in our Analysis of paragraph 66(a), above. PPB's 2015 Q1 and Q2 folders were empty.) As currently written, Directive 315.30 meets the requirements of Paragraph 66(b). The concept of a career-long assessment of de-escalation and situation management is laudable. In order to demonstrate that PPB has brought to fruition in practice Paragraph 66(b), PPB must be able to fully report on uses of force and audit force reports and investigations. Short of such reporting and auditing, PPB will hinder its ability to implement and enforce the performance standard. Moreover PPB's accountability system must function in a substantially compliant manner to enforce the performance standard. |
| **Technical Assistance** | We anticipate offering specific comment on 315.30 in part based on COCL's review and recommendation approved by a majority vote of the COAB. |

67. PPB shall add to its use of force policy and procedures the following use of force principles:

a. Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b. In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

Page 4 - Attachment 1

c. The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d. Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | On October 30, 2013, before finalizing the Settlement Agreement, we approved a version of PPB Directive 1010.00 that was subject to our District Court mediation to resolve the objections to the Settlement Agreement by the PPA and AMAC. However, at that time neither the COCL nor the COAB were in place.  Furthermore the Settlement Agreement had not been approved by the Court, and PPB's implementation of the new policy had just begun. For these reasons, DOJ anticipates further review of this policy following COCL and COAB review of Directive 1010.00, from which policy PPB split the performance standard into this stand-alone policy. <br><br> Current Directive 1010.00 – Use of Force is available at https://www.portlandoregon.gov/police/article/526353.  (PPB's 2014 Q4 folder for Paragraphs 66 and 67 contained only the internet shortcut related to Directive 1010.00, noted in our Analysis of paragraph 66(a), above.  PPB's 2015 Q1 and Q2 folders were empty.) <br><br> We will provide PPB with a fulsome critique of 1010.00 once COAB and COCL recommendations become available and we provide the below technical assistance at this time. <br><br> In order to demonstrate that PPB has implemented in practice Paragraph 67, PPB must be able to fully report on uses of force and audit force reports and investigations.  Short of such reporting and auditing, PPB will hinder its ability to implement and enforce the force policy.  Moreover, in order to demonstrate that PPB has brought to fruition in practice Paragraph 67(d), PPB's accountability system must function in a substantially compliant manner.  We anticipate offering specific comment on 1010.00 in part based on COCL's review and recommendation approved by a majority vote of the COAB. |
| **Technical Assistance** | The Directive should specifically address disengagement as required by Paragraph 67(a).  The Directive should more broadly discuss "specialized units," per Paragraph 67(a)'s requirements, rather than address only persons in mental health crisis. <br><br> We anticipate offering additional specific comment on 1010.00 in part based on COCL's review and recommendation approved by a majority vote of the COAB. |

1. Electronic Control Weapons

68. PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapon System to include the following principles:

a. Prohibition against the use of ECWs for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force;

b. Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their ECW;

c. Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following ECW use;

d. Only one ECW at a time may be used on a subject, intentionally, except where lethal force would be permitted;

e. After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each ECW cycle in their use of force reports;

f. Officers shall make every reasonable effort to attempt handcuffing during and between each ECW cycle. Officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant use;

g. ECWs shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of use of force; and

h. Officers receive annual ECW in service training including proficiency and policy changes, if any.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | On October 30, 2013, before entry of the Settlement Agreement, we approved a version of 1051.00 that was subject to our District Court mediation to resolve the objections to the Agreement by the PPA and AMAC. We anticipate further review of this policy following COCL and COAB review of 1010.00.

Current PPB Directive 1051.00 Electronic Control Weapon System is available at https://www.portlandoregon.gov/police/article/526392. (PPB's 2014 Q4 folder for Paragraph 68 contains an internet shortcut that appears intended to link to Directive 1051.00, but does not lead to this policy; the shortcut instead directs the user to http://www.police.city/open.cfm?id=1222945615. PPB's 2015 Q1 and Q2 data sets each have empty folders for Paragraph 68.)

We will provide PPB will a fulsome critique of 1051.00 once COAB recommendations become available but provide the below technical assistance at this time. |

| | |
|---|---|
| | In order to demonstrate that PPB has brought to fruition in practice Paragraph 68, PPB must be able to fully report on uses of force and audit force reports and investigations. As discussed below, the PPB Inspector did not conduct the required specialized audit of ECW use. *See* Paragraph 74 discussion, below.  Short of such reporting and auditing, PPB will hinder its ability to implement and enforce the ECW policy.<br><br>We have not yet substantively assessed ECW training.  Paragraph 68(h) requires training for proficiency and policy changes.  In coming months we will assess curriculum, scenario-based training, and training attendance records. |
| **Technical Assistance** | The Directive does not require PPB members to utilize hand signals where there is a language barrier or the subject is hearing impaired as required by Paragraph 68(b).  Paragraph 68(d) only permits the intentional use of more than one ECW at the same time in situations when "lethal force" would be permitted.  Directive 1051.00, Section 2.11 lessens this standard for simultaneous use to avoid the need for a "higher level of force."  This provision serves as its own justification, *i.e.*, an officer may deem two, intentional, simultaneous uses necessary whether or not lethal force would have been within policy.  Directive 1051.00 omits Paragraph 68(f)'s prohibition of more than three ECW cycles absent exigency. *Cf.* Directive 1051.00, Section 1.9.  Commendably, PPB's prohibition on ECW use against restrained subjects is slightly more restrictive than Paragraph 68(g) describes.  *See* Directive 1051.00, Section 2.5.<br><br>We anticipate offering additional specific comment on 1051.00 in part based on COCL's review and recommendation approved by a majority vote of the COAB. |

2. Use of Force Reporting Policy and Use of Force Report

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that:

a. All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

b. All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

| | |
|---|---|
| **Status** | **Partial compliance – ongoing obligation** |
| **Analysis** | On October 30, 2013, before finalizing the Settlement Agreement, we approved a version of PPB Directive 1010.00 that was subject to our District Court mediation to resolve the objections to the Settlement Agreement by the PPA and AMAC.  We anticipate further review of this policy following COCL and COAB review of Directive 1010.00, and we provide the below technical assistance at this time.<br><br>Section 9.4 of Directive 1010.00 requires members to report other officers' uses of force that violate the constitutional standard.  A recently reported juvenile court trial has called into question whether this occurred.  Going forward, we will more |

|  | comprehensively assess whether PPB has met this standard. |
|---|---|
|  | As discussed herein, PPB failed to timely collect complete Force Data Collection Reports in both officer involved shootings from 2015 for which we requested data. *See* Paragraph 74 discussion, below.  Subsequent interviews with detectives and representatives from Internal Affairs cannot substitute for the narrative portion of Force Data Collection Reports. |
|  | Policies 1010.10 Post Deadly Force Procedures and 416.00 Post Officer Involved Deadly Force are currently under review. |
| **Technical Assistance** | Current PPB Directive 1010.00 includes force reporting provisions in Sections 8.1.3 and 9.  *See* Directive 1010.00, *available at* https://www.portlandoregon.gov/police/article/526353.  (Note that PPB's 2014 Q4 folder for Paragraph 69 contains an internet shortcut that appears intended to link to Directive 940.00 After Action Reports, but does not lead to this policy; the shortcut instead directs the user to http://www.police.city/open.cfm?id=1222945300.  PPB's 2015 Q1 and Q2 data sets each have an empty folder for Paragraph 69.) |
|  | These reporting provisions are deficient in that PPB does not, but must, include a timeliness requirement, *e.g.*, before the end of the officer's shift, unless incapacitated.  *See ibid* at Section 9.2 (not including the required timeliness for Force Data Collection Reports). |
|  | PPB must ensure timely, complete, and accurate Force Data Collection Reports. |
|  | We anticipate offering specific comment on 1010.10 and 416.00 in part based on COCL's review and recommendation approved by a majority vote of the COAB. |

3. Use of Force Supervisory Investigations and Reports

70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

a. Complete After Action Reports within 72 hours of the force event;

b. Immediately notify his or her shift supervisor and PSD regarding all officer['s]['] Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division.  Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted.  PPB shall then provide such counseling or training consistent with this Agreement;

c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

d. Interview officers individually and not in groups.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | This provision requires continued adherence to Directive 940.00.  Based on our review of data PPB produced related to two separate officer involved shootings, as described herein, supervisors failed to use the checklist and conduct the required after action review in both instances.  *See* Directive 940.00, Paragraph 1.5 (requiring an after action report for all non-training, non-negligent firearm discharges), *available at* https://www.portlandoregon.gov/police/article/534096. *Compare* Paragraph 74 discussion, below.  To the extent that PPB views the Detective Division's investigation of these incidents as a substitute for the supervisor's After Action Report, the Settlement Agreement does not provide an exception to the 940 review.<br><br>Separately, we brought a recording of the following incident to the City's attention: PPB detained a person in mental health crisis at a mental health treatment facility, and the individual complained of pain and injury.  *See* https://www.youtube.com/watch?v=NaL196SvFpY.  PPB informs us that the supervisor did not undertake a 940 review, even though a Sergeant was on the scene.<br><br>We will continue to review documentation of PPB's implementation of Directive 940.00 pursuant to our ongoing monitoring..<br><br>Note: PPB's 2014 Q4 data set does not have a folder for Paragraph 70, and PPB's 2015 Q1 data set has an empty folder for Paragraph 70. |
| **Technical Assistance** | PPB must ensure that supervisors complete after action reports with fidelity to the requirements of the Settlement Agreement.<br><br>Going forward, we expect COCL to develop a statistically valid methodology for auditing after action reports with the Force Inspector.  The United States will separately assess compliance through a sampling of after action reports. |

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Status | **Compliance rating pending – insufficient documentation** |
|---|---|
| **Analysis** | PPB asserts in the compliance report that the Bureau continues to maintain the supervisory staffing levels necessary to meet this requirement.  PPB's 2014 Q4 compliance report for Paragraph 71 refers to a staffing chart, but PPB's 2014 Q4 data set does not have a folder for Paragraph 71; PPB's 2015 Q1 and Q2 data sets each have an empty folder for Paragraph 71.  Accordingly, we do not yet have sufficient documentation to assess compliance with this provision.<br><br>We note that on June 16, 2015, the PPA filed a grievance regarding PPB's staffing level and seeking more patrol officers.  We take no position on the grievance or |

| | |
|---|---|
| | grievability of the PPA's claim.  We mention this action, however, to stress that if any resolution of the PPA's grievance requires additional patrol officers, PPB must have a concomitant increase in supervisors sufficient to maintain the staffing ratio established in November 2012. |
| **Technical Assistance** | PPB should provide data on current patrol supervision staffing by precinct and shift. |

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB's 2014 Q4 data set for Paragraph 72 contains the checklist as an MS Word file.  This checklist complies with this provision and the requirement set forth for after action reviews in Paragraph 70, above. |
| | Commendably, the checklist requires the supervisor to meet at another location if the supervisor cannot make the scene of the use of force reasonably safe to conduct the force investigation.  This anticipates an obstacle to compliance with Paragraph 70 that the Parties did not anticipate in drafting the Settlement Agreement. |
| | The checklist includes provisions about "collecting" recordings of the force used or being "unable" to collect them.  It is our understanding that videos from PPB cruisers and PPB's body camera pilot project are recorded digitally and in PPB's possession.  PPB after action reports should:  (1) ensure that such devices were operable and used by the officers; and (2) ensure that officers code the captured recording properly to associate correctly with the force event for late review. |
| | The checklist includes a provision that the supervisor applied all standards listed in Directive 940.00. Section 3.4.2.3 of that policy requires supervisors apply a "best practices" review.  As discussed herein, however, the Force Inspector wrote in the Audit that the Inspector would not hold supervisors responsible for a "best practices" review.  *See* Paragraph 74 discussion, *below*.  To reconcile the paradox between the checklist and the Audit, the Inspector must review for "best practices" as required by the Settlement Agreement.  *See* Settlement Agreement, ¶ 75(e).  To the extent that this standard requires further clarification, we look forward to discussing it with the City. |
| | Based on the review of data PPB produced related to two separate officer involved shootings, as described herein, supervisors failed to use the checklist and conduct the required after action review in both instances.  *See* Directive 940.00, Paragraph 1.5 (requiring an after action report for all non-training, non-negligent firearm discharges), *available at* https://www.portlandoregon.gov/police/article/534096.  *Compare* Paragraph 74 discussion, below.  Though PPB developed an appropriate checklist, PPB failed to properly utilize the checklist in both instances. |

|  | PPB's 2015 Q1 and Q2 data sets each have empty folders for Paragraph 72. |
|---|---|
| **Technical Assistance** | PPB must ensure supervisors comply with checklist use even in critical incidents. |
|  | PPB should consider updating its checklist to reflect use and coding of digital recording devices. |
|  | PPB must apply best practices to its after action reviews and audit that standard. |

73. PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

   a. EIS tracks all Directive 940.00 comments, findings and corrections;

   b. All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

   c. All supervisors in the chain of command are accountable for inadequate reports and analysis;

   d. A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations. Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

   e. When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

   f. Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

   g. The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor.

| **Status** | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB's 2014 Q4 data set has a folder for Paragraph 73 containing two documents. (1) An email simply stating that PPB member conducted an "EIS review" of North Precinct. This email does not provide any further data. (2) An outline for Inspector discussion of EIS Training of Supervisors. This document does not speak to the policy required by Paragraph 73, but may inform discussion of implementation of policy. Commendably, the Inspector's outline points out to supervisors that "Officers deserve a thorough investigation." PPB's 2015 Q1 and Q2 data sets each have an empty folder for Paragraph 73. |

| | |
|---|---|
| | The current Directive 940.00 is available at https://www.portlandoregon.gov/police/article/534096. In significant part Directive 940.00 addresses the requirements of Paragraph 73(b)-(g) with respect to supervisory accountability. *See* Directive 940.00, Section 5. PPB Directive 940.00 states some of these provisions regarding corrective action in passive voice, however. PPB should place the responsibility for corrective action squarely on the chain of command, as contemplated in Paragraph 73.<br><br>Section 5 of Directive 940.00 does not address supervisors' obligations with respect to submitting into the Employee Information System comments, findings, and corrections from after action reviews. This is a necessary step to meet the tracking requirements of Paragraph 73(a). The mere cross reference to the Employee Information System Directive 345.00 in the header to 940.00 is insufficient. PPB personnel are left to guess what PPB intends by that reference. Directive 345.00, Section 4.2 requires supervisors to make entry into the EIS in some instances based on corrective action stemming from after action reviews (i.e., 940s). Directive 345.00 does not, on its own, meet the broader recordation requirements of Paragraph 73(a).<br><br>As discussed herein, the officer involved shooting data requests demonstrated PPB's failure to complete after action reviews. *See* Paragraph 74 discussion, below. PPB is obliged by Paragraph 73(b) to take corrective action. Paragraph 73(g) does not obviate the Settlement Agreement's requirement of an after action review in those instances. The data requests demonstrated that there were no after action supervisor checklists and, even if there had been, the detectives' partially untimely investigations in those instances did not meet the completeness requirements of Directive 940.00 or the chain of command review requirements of Paragraph 73. |
| **Technical Assistance** | PPB should restate Directive 940.00, Section 5 to place responsibility for corrective action on the chain of command.<br><br>PPB must include Paragraph 73(a)'s requirements to track all Directive 940.00 comments, findings and corrections in both the supervisors' responsibilities for after action reports and in the EIS operation.<br><br>PPB must, as an organization, ensure compliance with the after action reporting and supervisory review, even in serious use of force events. |

**B. Compliance Audits Related to Use of Force**

74. In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports to ensure that:

    a. With respect to use of force generally:

        i. reports describe the mental health information available to officers and the role of that information in their decision making;

ii. officers do not use force against people who engage in passive resistance that does not impede a lawful objective;

iii. when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

iv. officers call in specialty units in accordance with procedure;

v. officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

vi. officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

b. With respect to ECW usages:

i. ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits. Discrepancies within the audit should be appropriately investigated and addressed;

ii. officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

iii. officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

iv. officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing so is reasonably calculated to prevent the use of a higher level of force.

c. With respect to use of force reporting, the reports:

i. are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

ii. include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

iii. include a decision point description of the force decision making;

iv. include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

v. include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

vi. include the reason for the initial police presence;

vii. include a description of the level of resistance encountered by each officer that led to each separate use of force and, if applicable, injury;

viii. include a description of why de-escalation techniques were not used or whether they were effective;

ix. include whether the individual was known by the officer to be mentally ill or in mental health crisis;

x. include a general description of force an officer observes another officer apply; and

xi. demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | These audits require consultation between the Inspector and COCL.  PPB was hindered in its ability to fully comply with this provision by the length of time it has taken the City to retain COCL and the time for COCL to establish its operations, given the COCL's dual purpose to serve as both a compliance officer and working with the COAB as a community liaison. |

On July 30, 2015, PPB advised DOJ that PPB is encountering a data problem in the recording of its force and interaction data that inhibits PPB's ability to analyze these data.  PPB switched to the "RegJIN" data recording system from a former customized, but antiquated database.  The switch has resulted in a data gap from May 2015 to present, wherein PPB officers reportedly have completed FDCRs, but PPB analysts have to manually enter the data into RegJIN.  RegJIN also has a geocoding error even for newly created FDCRs in which RegJIN fails to accurately recognize abbreviations for streets and locations.  PPB does not have a defined timeline by which to enter the data backlog or fix the geocoding issue.  PPB has been forthright, however, in advising on the limitation PPB has discovered in RegJIN and is working on finding solutions to both problems.  It currently appears that PPB is unable to perform its required audits and use data to manage its interactions and allocation of resources until PPB resolves the RegJIN data problems.

In its July 9, 2015 first quarterly report on compliance, COCL recommended that PPB's Force Inspector change PPB's force audits for Paragraphs 74-77.  *See* COCL report, at 32.  (COCL offered a similar recommendation in its May 4, 2015 draft report, to which we responded with formal comment pursuant to Paragraph 163.)  In our June 12, 2015 letter to COCL, we reminded COCL of its responsibility for "an active role going forward in shaping audits and analyses with the inspector," pursuant to Paragraphs 74-77.  *See* DOJ Comments, at 2.  The Settlement Agreement requires that COCL and the Inspector work "in consultation" on the required audits of FDCRs and 940s.  Thus, PPB and the COCL should actively engage with one another in developing the sample size and methodology for the audits and discuss the qualitative assessments of the sample with COCL's police practices expert.  If PPB has concerns about such consultation, we recommend that PPB consult with DOJ at the time the concern arises.

PPB's 2014 Q4 data set has a folder with five items for Paragraph 74:

Page 14 - Attachment 1

1. A January 2015 memo from the Force Inspector explaining that COCL has not yet collaborated on a methodology for audits but a meeting is set and an explanation of staffing level and logistical challenges with paper-based records.

2. A January 2015 job listing for a crime analyst.

3. A July 1, 2014 to September 30, 2014 force data summary. The Inspector identified an increase in PPB officers' use of takedowns in the summary. Disappointingly, however, the Inspector largely presented generalized speculation about possible causes of the increase. The Inspector provided one solid data point: 57 Force Data Collection Reports for the takedowns of 28 individuals. Although multiple reports may increase PPB's count for the number of takedowns, each PPB officer should already have been completing force reports for force actions in which they took part. The Inspector's speculation leads the reader to believe that the Inspector has identified a cause. In fact, there may simply have been an actual increase in takedowns, not just reporting. The Inspector did not audit to find out which was the case. Significantly, in this form, the Inspector also notes that four force cases "were referred"—we do not know by whom based on the Inspector's writing—to Internal Affairs ("IA"). The Inspector notes that while IA is conducting investigation of two of those force instances, IA *declined* one force incident and IA is conducting additional intake to determine *whether or not* to open an investigation. The Inspector should be well aware of the Settlement Agreement's accountability requirements. IA does not have the authority to decline any force investigation. *See* Paragraph 129.

4. July 1 through September 30, 2014 demographic data providing an overview of the ethnicity and gender of people against whom PPB has employed force in each of PPB's categories of uses of force. This is not required by paragraph 74(a)-(c). Nonetheless these are useful data.

5. Force Data Summary Graphs. These graphs cover only three months. A longer term graphing using the already available data may assist the Inspector in identifying trends.

PPB's 2015 Q1 data set has a folder with four items for Paragraph 74:

1. January 1 through March 31, 2015 demographic data provides an overview of the ethnicity and gender of people against whom PPB has employed force in each of PPB's categories of uses of force. This is not required by paragraph 74(a)-(c). Nonetheless these are useful data.

2. The Force Inspector audit of force reports and force investigations from January 1 to March 31, 2015. PPB has posted this same report online. *See* https://www.portlandoregon.gov/police/article/533601

   - The Inspector employed a sampling methodology, namely selecting at random only *two* of each type of force for auditing. *See* Audit at 3-4. As COCL has already expressed to DOJ, this small sample is

statistically invalid.  As noted above, the COCL must take an active role in shaping this and other aspects of the audit going forward.

- The audit specifically excluded the two officer-involved shootings, stating that such uses of force are already subjected to internal affairs review and, therefore, not subject to after action reports, *i.e.*, 940's.  Audit at 5.  This is wrong.  Settlement Agreement Paragraph 70(b) requires that supervisors make notifications under their 940 investigations for all "Serious Uses of Force."  The Settlement Agreement defines Serious Uses of Force to include all force with a substantial risk of causing death and those causing significant injury.  Paragraph 58.  The Inspector should include in the audit whether After Action Reports occur as required by PPB's own policy and the Settlement Agreement.

Additionally, in excluding lethal uses of force from the audit, among other things, the audit reached the faulty finding that PPB officers, "consistently completed their force reports immediately upon the completion of the incident."  Audit at 6.  That statement may prove true in a statistically valid sample of force reports generally, but in the case of officer-involved shootings, PPB officers routinely refuse to complete force data collection reports as required by PPB's own policy and the Settlement Agreement.  This has been a perennial failing that the Inspector should readily identify in the following quarter's audit.

June 28, 2015 Officer-Involved Shooting Investigation

For example, on June 30, 2015 we requested documents regarding a June 28, 2015 officer-involved shooting.  PPB provided us the compiled data through July 7, 2015.  Both involved officers' force data collection reports are dated July 2, 2015.  The FDCRs were, therefore, not timely as required by Settlement Agreement Paragraph 69.  The FDCRs also states "LEGAL MANDATE The United States Department of Justice mandates the collection of data on the use of force."  In those late reports, the officer failed to provide the required narrative; instead they refer to later interviews with IA.  This, too, contravenes the requirements of Settlement Agreement Paragraph 69.

PPB's data file included a transcript of the interviews for the two officers.  Each of the transcribed interviews PPB provided to us, conducted with the officers' legal counsel, was divided into voluntary statements and *Garrity*-compelled[1] statements (PPB did not provide the *Garrity*-protected portion of the interview, if IA completed one).  Thus, by deferring any narrative in a timely and complete FDCR, PPB forewent any meaningful non-*Garrity*-protected, ministerial force reports as required by PPB's own policy and the Settlement Agreement.

---

[1] *See Garrity* v. *New Jersey*, 385 U.S. 493 (1967); Paragraph 124 discussion, below.

Instead, PPB obtained late, incomplete FDCRs with inadequate reference to an allegedly *Garrity*-protected interview and no data of any utility.  In addition, there was no chain-of-command review of the FDRCs and after action report (*i.e.*, 940s).  The Force Inspector should identify this major deficiency in the upcoming audit.

Moreover, even if the officers had properly filled in the FDCRs, the forms themselves do not even have the appropriate data field for discharge of a firearm; the form lists "pointing of firearm," but not discharge as a force data point.  The Inspector should advise PPB to take the steps necessary to capture this data as well.

May 17, 2015 Officer-Involved Shooting Investigation

On June 30, we also repeated an earlier request regarding a May 17, 2015 officer-involved shooting.  Like the other incident described above, PPB's data production included an FDCR by the involved officer submitted on May 20, three days after the incident, not timely as required by Settlement Agreement paragraph 69.  The FDCR merely referred to an interview that was to occur but provided no description of the event, also not in conformance with Settlement Agreement paragraph 69.  The FDCR form contained the same admonition characterizing force reporting as a legal mandate from Department of Justice rather than PPB's own policy.  The form likewise did not contain an adequate data field to capture discharge of a firearm.  Importantly, even though the May 17 officer-involved shooting concerned a person cutting himself, the involved officer responded "NO" to all five mental health indicator questions on the FDCR.  The Inspector should scrutinize the FDCRs concerning serious uses of force to ensure the accuracy of reporting and assist PPB's management in effectively governing uses of force, as required by Settlement Agreement Paragraph 74(a)(i).  In the end, the involved officer's interview appears to have been voluntary and not *Garrity*-compelled.

An involved Sergeant also filled in an FDCR on May 19 for the May 17 incident.  Like the others, that FDCR simply refers to a later interview and provides no substantive narrative.  Also similar to the involved officer, the Sergeant's FDCR marks unknown for the subject's mental health and "NO" to the other four mental health indicators.

The data file for the May 17 incident included communication restriction orders for the involved PPB members and, apparently, the witness officers.  Curiously, however, the file contained a series of memos dated June 9, 2015 from internal affairs lifting the communication restriction orders retroactively to June 1.  PPB explains that the subject officers were informed *orally* on June 1 of the lifting of the CROs, even though the memoranda were not printed until June 9.  The involved PPB members gave their recorded interviews on May 19 and 20, before the lifted restriction.

The data file for the May 17 incident also includes a supervisor's checklist. This is a useful tool, but did not ensure that PPB took all required actions in this case. The checklist should prompt the supervisor to include pictures of the subject's injuries in the data file. The checklist reminds the supervisor to request on-scene interviews with the involved officers and document the response. Importantly, the checklist does not include a public safety statement. Unsurprisingly, then, the data file also does not contain public safety statements by the involved officers as required by PPB's own policy and Settlement Agreement Paragraph 126.

The Inspector should not disregard lethal force investigations. To the contrary, the Inspector should identify all of the problems that we outline to fulfill the Inspector's Settlement Agreement-defined role and help bring PPB into compliance. These incidents are among PPB's most high profile uses of force. If they are justifiable, then PPB's failure to abide by its own policies for timely FDCR's, public safety statements, and the like cast an unjustified pallor over the officers' actions.

- The Inspector states that it is unrealistic to expect supervisors to apply best practices in their 940 reviews. Audit at 7. The Inspector, therefore, gives a pass to supervisors for this Settlement Agreement requirement. Paragraph 75(e). The Inspector does not have the authority to do so and must revise its methodology.

- Commendably, the Inspector has identified some issues and suggested resolutions even in the early quarterly audit.

- The Inspector did not identify trends as required by Settlement Agreement Paragraph 76, although this audit was so early in the process that trends would be difficult to recognize. Given that COCL has already opined that the Inspector's sample size was too small, however, this audit failed to establish a statistically valid baseline from which to identify trends going forward.

- The Inspector offered brief mention of unidentifiable samples from the inspector's qualitative assessments of FDCRs and 940s, but provided no underlying data of the qualitative assessments in the audit. Paragraphs 74 and 75 require such qualitative assessments.

- The Inspector's samples included ECW (*i.e.*, Taser) use, but the audit does not mention summary findings for any of the ECW-specific qualitative assessments required by Settlement Agreement Paragraph 74(b). Given that there is no underlying data for the qualitative assessments, the audit does not support that PPB actually performed any of the requirements of Paragraph 74(b), as opposed to the general force assessments under 74(a).

| | |
|---|---|
| | 3.  Q1 Force Data Summary for January 1 to March 31, 2015.<br><br>    -   These are quantitative data that could help the Inspector identify issues for qualitative analysis.  For example, the report lists three instances of ECW use over three cycles.  The Inspector could analyze this data set for its audit pursuant to Paragraph 74(b).  The report also identifies 51 incidents of "force" without custody, which would include the active targeting with a firearm.  From this set, the Inspector could identify whether any instances of force without custody occurred beyond active targeting and if so, why.<br><br>4.  Force Data Summary Graphs<br><br>    -   These graphics illustrate the significantly higher uses of force in East Precinct.  The Inspector could use these data to identify the issue and seek out root causes of the disparity in force use in its next audit.<br><br>The 2015 Q2 data set does not contain any documents in the folder corresponding to Paragraph 74. |
| **Technical Assistance** | The Force Inspector and COCL should consult to develop statistically valid sample sizes for force audits.  A valid sample size is necessary to establish a baseline for trends going forward.  Any concerns regarding such consultation should be brought to our attention.<br><br>The Inspector should make sure that 940s occur as required by PPB's own policy and the Settlement Agreement.<br><br>The Inspector should not speculate as to root causes, but should endeavor to develop evidence to establish the root causes of identifiable deleterious trends and systemic problems.<br><br>The Inspector should identify failures to comply with accountability requirements identified in the course of the Inspector's audits.<br><br>The Force Inspector must review uses of deadly force, including reporting requirements.<br><br>The Force Inspector must identify deficiencies in PPB's force reporting system that undermine the public confidence in PPB.<br><br>PPB's failure to abide by its own policy requiring Force Data Collection Reports in uses of deadly force serves to undermine the public confidence in PPB.<br><br>The Inspector must specifically audit ECW use as required by the Settlement Agreement.<br><br>The Inspector should provide at least a sample of the qualitative analysis done for the audits, including corrective action when the Inspector identified deficient FDCRs, supervisory reviews, and 940s.  The Inspector should use the Settlement Agreement provisions to create a checklist for qualitative analysis and use completed checklists to provide a data sample. |

| | PPB should bring to fruition the Inspector's suggestions, contained in the audit, regarding establishing processes for corrective action. |
|---|---|

75. In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

a. Complete a Supervisor's After Action Report within 72 hours of notification;

b. Review all use of force reports to ensure they include the information required by this Agreement and PPB policy;

c. Evaluate the weight of the evidence;

d. Use a "decision-point" approach to analyze each use of force;

e. Determine whether the officer's actions appear consistent with PPB policy, this Agreement, and best practices;

f. Determine whether there was legal justification for the original stop and/or detention;

g. Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;

h. Determine whether additional training or counseling is warranted;

i. Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

j. Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

k. Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

l. Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | PPB's 2014 Q4 data set has a folder for Paragraph 75 that contains the same memo from the Inspector provided for Paragraph 74.  The same analysis provided above for Paragraph 74 also applies here.<br><br>PPB's 2015 Q1 data set has a folder for Paragraph 75 that contains the same Inspector audit provided for Paragraph 74.  The same analysis provided above for Paragraph 74 also applies here.<br><br>PPB's 2015 Q2 data set has an empty folder for Paragraph 75. |

| Technical Assistance | The same technical assistance provided for Paragraph 74 applies here. |
|---|---|

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

    a. Determine if significant trends exist;

    b. Determine if there is variation in force practice away from PPB policy in any unit;

    c. Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate;

    d. Identify and correct deficiencies revealed by the analysis; and

    e. Document the Inspector's findings in an annual public report.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB's 2014 Q4 data set does not have a folder for Paragraph 76. <br><br> PPB's 2015 Q1 data set has a folder for Paragraph 76 that contains the same Inspector audit provided for Paragraph 74.  The same analysis provided above for Paragraph 74 also applies here. <br><br> PPB's 2015 Q2 data set has an empty folder for Paragraph 76. |
| **Technical Assistance** | The same technical assistance provided for Paragraph 74 applies here. |

77. In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that all supervisors in the chain of command:

    a. Review Directive 940.00 findings using a preponderance of the evidence standard;

    b. Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

    c. Modify findings as appropriate and document modifications;

    d. Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

    e. Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

f. Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer; and

g. Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | PPB's 2014 Q4 data set does not have a folder for Paragraph 77. PPB's 2015 Q1 data set has a folder for Paragraph 77 that contains the same Inspector audit provided for Paragraph 74.  The same analysis provided above for Paragraph 74 also applies here. PPB's 2015 Q2 data set has an empty folder for Paragraph 77. |
| Technical Assistance | The same technical assistance provided for Paragraph 74 applies here |

## IV. TRAINING

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety.  To achieve these outcomes, PPB shall implement the requirements below.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | PPB did not include a folder for Paragraph 78 in either its 2014 Q4 data set, its 2015 Q1 data set, or its 2015 Q2 data set. |
| Technical Assistance | In order to comply with Paragraph 78, PPB must comply with all of Section IV. To further public trust, we recommend that training protocols be made publically available, to the extent possible. |

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Status | **Partial compliance – ongoing obligation** |
|--------|---------------------------------------------|
| Analysis | In PPB's 2014 Q4 data set, PPB provided a 2014 draft training assessment dated January 13, 2015.  In PPB's 2015 Q1 data set, PPA provided the final version of this training assessment published on February 18, 2015.  This assessment is partially compliant, but some areas require renewed attention from PPB. |
| | Even though Portland just settled this use-of-force litigation with the United States, and even though there have been recent reported findings of uses of excessive force in a civil case and a juvenile case, the training assessment found that there were "no identified training needs at this time as these processes were implemented in late 2014,"with respect to "problematic uses of force."  *See* report at 22.  To be certain, PPB's assessment identified perennial training needs on usual perishable force skills, but PPB's assessment affirmatively declares that its methodology identified no problems.  Given the facts known about problematic uses of force under existing training, this conclusion cannot be correct. |
| | The training assessment states that its authors[2] reviewed Independent Police Review ("IPR") reports on complaints and did not reach any conclusion on training needs, but said the division would consult with internal affairs.  *See* report at 21.  This is an incomplete assessment as it:  (1) did not reach any conclusions; and (2) looked to consult with IA, but not IPR. |
| | The training assessment describes what the Training Advisory Council ("TAC") is, *see* report at 26, but gives the TAC no role in the training assessment.  Rather TAC's only definite role is coordinating live actors.  *Ibid.*  Paragraph 79 specifically requires that PPB take community input into consideration in constructing its training assessment.  PPB's 2014 Q4 data set included a training status update for October to December 2014.  Similarly PPB's 2015 Q1 data set included a training status update for January to March 2015.  Both reports provide some insight into the efforts PPB is making to comply with Section IV of the Settlement Agreement.  Neither provides much information on any substantive work TAC has contributed to compliance.  PPB separately reports that the TAC did not provide any "formal recommendations"; we have not had the opportunity to verify this report. |
| | PPB's 2015 Q1 data set included PPB's 2015 Annual In-Service Annual Training Plan dated May 14, 2015.  Commendably, the plan listed several scenarios in its patrol tactics portion which included provision of medical care, communication and attempted disengagement for a drug-affected individual, communication with a suicidal subject, and a disturbance with an armed, intoxicated, possibly suicidal person. |

---

[2] The assessments authors are all sworn PPB officers, except PPB's non-sworn Training Development Officer, a psychologist; what PPB reports is a research analyst; and two PPB training and development analysts.  There were no listed civilian authors or contributors.

|  | The training plan also sets aside three hours for discussion of the Settlement Agreement.  DOJ requests that we review this area of instruction to better understand how this message is being delivered.  We encourage all Departments to own their policy and institutional changes for the greater good. PPB's 2015 Q1 data set and compliance did not include the City Auditor's March 2015 report: "POLICE TRAINING DIVISION:  Progress made, but evaluating impacts on officer performance must be improved," available at https://www.portlandoregon.gov/auditor/article/520697.  In that report, the Auditor offers a critical assessment of training.  Among other things, the Auditor provides a ready source of information for the PPB to further comply with Paragraph 79.  For example, the Auditor identifies a misplaced assumption by a training instructor that PPB members do not need further in-service training on the policy standards for the use of force:  "In the 2014 In-Service Defensive Tactics training class we observed, none of the twelve participants could correctly articulate the Bureau policy on when to use force when they were asked by the instructor."  *See* Auditor's Report at 13.

PPB's 2015 Q2 data set had one document in the folder related to Paragraph 79: a status update on the training needs assessment (although no update to the assessment itself, as that is an annual requirement).  The status update describes the resources consulted for each area of assessment – consultation with PPB's Compliance Coordinator concerning training needs related to the Settlement Agreement, for example.  PPB notes some useful steps; for example, the Training Division obtained data from the City's bureau on officer disability concerning officer safety. This status update did not provide the necessary level of detail, however.  For example, the status update states that PPB's Training Division worked with the TAC's Executive Committee to obtain community input; no further detail about the sources of community input or the nature of the feedback is provided.  Past updates have included more information. |
|---|---|
| **Technical Assistance** | PPB must have a more candid training assessment, inclusive of community and IPR input, and unafraid to specifically identify problems that indicate a need for training.

PPB necessarily will have to revise its training assessment and training plan as PPB further implements the Settlement Agreement.

PPB must own its training and policy changes, and take care not to rely on DOJ requirements as prompting the need for the changes.

PPB's training assessment is hindered by inadequate Audits by the Inspector.  *See* Paragraph 74, above.

Utilizing the City Auditor's training report may offer PPB opportunities to improve future training assessments. |

| | |
|---|---|
| | The United States has not yet engaged in a substantive review of compliance by assessing training at the academy since the entry of the Settlement Agreement. Going forward, we will observe training, review more records, and interview trainers, students, and TAC members. |
| | Directive 1500 – Training is currently under public comment and review. |

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum.  These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs.  This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB's 2014 Q4 data set has a folder for Paragraph 80 that contains one file: Training Division Status Update for October through December 2014, dated January 14, 2015.  This four-page document describes surveys planned for ECIT and supervisor course evaluations.  Also included is the supervisor in-service course evaluation form. |
| | PPB's 2015 Q1 data set has a folder for Paragraph 80 that contains one file: Training Division Status Update for January 1 – March 31, 2015, dated April 15, 2015.  This two-page document describes surveys planned for ECIT, in-service, and advanced academy training. |
| | PPB's 2015 Q2 data set has a folder for Paragraph 80 that contains two documents: Training Division Status Update for April—June, 2015, dated July 15, 2015; and a final version of the 2014 Enhanced Crisis Intervention Training assessment. |
| | PPB and the City Auditor report that the Training Division is in process of developing a more scientific assessment of training efficacy based on the Kirkpatrick Model (*i.e.*, a four-step analysis of reaction, learning, behavior, and results).  Establishing this system is a work in progress. |
| **Technical Assistance** | Surveys are one means by which to evaluate effectiveness of training.  PPB must broadly assess all areas of training required by the Settlement Agreement.  PPB should also assess efficacy of training through:  competency-based testing at the completion of each course; utilizing the Inspector's Audits of FDCRs and 940s; utilizing community surveys; and outcomes assessment such as training needs identified in crisis situation reports, internal affairs reviews, or force review boards. |
| | PPB should implement its scientific assessment of training efficacy.  We will monitor PPB's training assessment going forward. |

|  | PPB apparently has not yet produced a training audit report to the Training Division Manager but must do so pursuant to Paragraph 80. |
|---|---|

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | PPB reports that it conducted an assessment of in-house Bureau technology, and concluded that the Bureau's own resources could not meet the demands of this Paragraph.  PPB also reports that it has finalized a request for proposals and is seeking authorization to engage an outside vendor.  These are helpful steps towards realizing the requirements of Paragraph 81, but it appears an electronic database dedicated to training has not yet been brought online.  PPB continues to maintain at least some training records by member name accessible from its prior data management system, Skills Manager, as evident by the training records attached to the investigations of officer-involved shootings.  *See* Paragraph 74, above.

PPB's 2014 Q4 data set includes request-for-proposal documents for PPB's planned training software and an internet shortcut that appears intended to link to Directive 120.00 – Inspections, Responsibility, and Authority, but which instead directs the user to http://www.police.city/open.cfm?id=1222944248.

2015 Q1 data set has a folder for Paragraph 81(a) that contains one file: a quarterly learning management system update.  This is simply a one-page statement that the training division is awaiting demonstration of a potential software program to serve as the training management tool.

The 2015 Q2 data set has a folder for Paragraph 81(a) that contains another quarterly learning management system update.  This memorandum lists a series of meetings dedicated to PPB's evaluation of a new learning management system and development of a request for proposals.

PPB's 2015 Q1 and Q2 data sets did not produce documents in their respective folders for Paragraph 81(b).

The current Directive 120.00 – Inspections, Responsibility, and Authority, is available at https://www.portlandoregon.gov/police/article/525400.  In pertinent part, PPB revised Directive 120.00 to require that supervisors inspect their subordinates' training records for timeliness and completeness of training.  *See* Directive 120.00, Section 5.1.2.1.

Notwithstanding that policy, the City Auditor found in March 2015 that PPB needs to improve its tracking of outside classes not sponsored by the Training Division.  *See* Auditor's Report at 15. |

| Technical Assistance | PPB must bring its data management system to fruition, but should be careful to ensure that the system addresses all aspects required by this provision of the Settlement Agreement. |
|---|---|
| | PPB would benefit from considering the City Auditor's recommendation to track training for officers to ensure they are trained in all PPB weapons to which they have access. *See* Auditor's Report at 18, 22-25. |

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | PPB's 2014 Q4 data set contained a course attendance summary listing trainings PPB provided for July to December 2014 and a memo explaining that PPB offered no in-service during this same period.  PPB's 2015 Q1 data set has a folder that contains the same documents.  Although PPB's 2015 Q2 quarterly report mentions the semiannual report, the corresponding data set did not produce documents in the folder for Paragraph 82. |
| Technical Assistance | To make this report more meaningful, PPB will have to bring to fruition its training management systems consistent with Paragraph 81, which should provide PPB executives with more useful data on training utilization. |

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force.  The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | PPB's quarterly compliance report states that PPB issued Training Division Standard Operating Procedure 1-19, effective January 1, 2014, including the prohibition on trainer selection found in Paragraph 83. |
| | The current SOP 1-19 – Training Division Instructor Selection Standards, is available at http://media.oregonlive.com/portland_impact/other/trainingsops.pdf. The SOP contains the prohibitions as described in Paragraph 83, albeit that PPB has minimized the civil-judgment requirement to a mere asterisk to the SOP, *i.e.*, offsetting the clause as not having the same weight as other considerations. |

|  | PPB's 2014 Q4 data set does not contain a file for Paragraph 83. Neither PPB's 2015 Q1 nor Q2 data sets produced documents in their respective folders for Paragraph 83. |
|---|---|
| **Technical Assistance** | Going forward, we will assess for each current trainer whether he or she meets the requirements of Paragraph 83. |

84. All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

    a. With respect to patrol officers, PPB shall:

        i. increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

        ii. emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

        iii. continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

        iv. continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

        v. describe situations in which a force event could lead to potential civil or criminal liability; and

        vi. continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently  appropriate for person-center communication, such as the term "mentals," in all work-related settings and communications, as well as when interacting with the public.

    b. With respect to supervisors, provide additional training on how to:

        i. conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3;

        ii. evaluate officer performance as part of PPB's annual performance evaluation system; and

        iii. foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | PPB's 2014 Q4 data set does not have a file for Paragraph 84.  PPB's 2015 Q1 data set has a folder for Paragraph 84 that contains an empty file. |
| | The folder for Paragraph 84 in PPB's 2015 Q2 data set contained a preview of the content of the in-service training, apparently drafted prior to initiation of the training in March 2015. |
| | In its quarterly compliance report, PPB reported that there was effectively no regular in-service training for three consecutive quarters from July 2014 to March 2015.  PPB reports, however, having conducted supervisor training in the fourth quarter of 2014 on Employee Information System, Directive 940.00 After Action Reviews, and Performance Evaluations.  PPB did not provide these training materials in its usual data request, but we will assess these going forward.  Based on the Inspector's statement in the Audit that supervisors should not apply the best practices standard to After Action Reports as required by the Settlement Agreement, we have concern that the curriculum that the Inspector reportedly developed may be lacking on that point. |
| | PPB's content overview indicates that the in-service training contains many of the elements on which PPB must train patrol officers, including use of force scenarios, tactical disengagement, and PPB's Use of Force policy. The training reportedly sets aside three hours for discussion of the Settlement Agreement.  As we stated with respect to Paragraph 79, we would like to review how this instruction is being delivered as PPB should own its institutional change for the greater good.  We have not yet observed and substantively assessed PPB's revised training since the entry of the Settlement Agreement.  We note, however, that the City Auditor generally praised the use of scenarios in PPB's 2013 in-service training and ECIT training. *See* Auditor's Report at 20.  The Auditor noted backsliding to fewer and more poorly constructed scenarios in PPB's 2014 in-service training.  *Ibid* at 21.  We also note the Auditor's concern for lack of training on the provision of medical care. *Ibid* at 23.  Going forward our assessments of PPB's training will include our assessment of the Auditor's critiques of PPB's training. |
| Technical Assistance | PPB must ensure that its training on After Action Reviews is consistent with the standard set forth in the Settlement Agreement. |
| | We will conduct further independent monitoring of PPB's training as implementation progresses.  PPB need not wait, however, to work toward compliance with this provision.  PPB should give careful consideration to the Auditor's critiques and determine whether those may serve as a roadmap toward further compliance. |

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

      a. Conducts a comprehensive needs assessment annually;

b. Creates a Training Strategic Plan annually;

c. Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training;

d. Maintains accurate records of Training delivered, including substance and attendance;

e. Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ;

f. Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and

g. Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Like audits of Force Data Collection Reports and After Action Reports, this training audit required collaboration between the Inspector and COCL.  PPB was hindered in its ability to fully comply with this provision by the length of time it has taken the City to retain COCL and the time for COCL to establish its operations.  While waiting, PPB produced an independent training audit in the first quarter of 2015. |
| | PPB's 2015 Q1 data set includes several files for Paragraph 85, some of which repeat previous files' documents.  Significantly, PPB's data include training status updates that describe further involvement of the TAC in obtaining public input to training, *e.g.*, community outreach by TAC.  Also significantly, PPB's data show survey results for participants in advanced academy training.  Participants overwhelming found ECIT, use of force, and force reporting training useful. |
| | Among the documents provided is a two-page memo that purports to be the training audit itself.  Though laudable that the Inspector would conduct a training audit while awaiting COCL participation, it does not yet meet the requirements of Paragraph 85(a) and (b).  Similarly, even though the Training Division is awaiting a new record management system and the Auditor has faulted the Training Division for not tracking outside training (Auditor's Report at 15), the Inspector credited the antiquated recording system as compliant with Paragraph 85(d)—and by extension Paragraph 85(e).  For Paragraph 85(g), the Inspector declared that the Training Division provides "high quality instruction to all members."  While that may be true, the conclusion is premature given that PPB acknowledges in its 2015 Q1 compliance report that its implementation of a training evaluation system based on the Kirkpatrick model is still in progress.  *See* 2015 Q1 Compliance Report, Item 80.  Future training audits could be made more useful by engaging in a sufficiently critical and candid assessment. |
| | PPB's 2015 Q2 data set contained only one document in the folder related to Paragraph 85:  minutes from the TAC meeting in May 2015.  The minutes report that TAC discussed the Inspector's audit.  It appears that TAC largely reported out |

|  | conclusions about the members' concerns about the trainings themselves, not the audit.

Current Directive 010.00 is available at https://www.portlandoregon.gov/police/article/503833. Directive 010.00.  Section 7.1 includes the requirements of Paragraph 85(g), second clause.  PPB reports a high rate of officers acknowledging receipt of new policies, and provides supporting data in its Paragraph 85(g) folder in its 2015 Q2 data set.

(PPB's 2014 Q4 folder for Paragraph 85(g) contains an internet shortcut that appears intended to link to PPB Directive 010.00, but does not lead to this policy; the shortcut instead directs the user to http://www.police.city/open.cfm?id=1204100047.  PPB's 2015 Q1 data set includes in its Paragraph 85(g) folder an internet shortcut that also appears intended to link to PPB Directive 010.00, but instead directs the user to http://www.police.city/ack/dojreport.cfm.) |
|---|---|
| **Technical Assistance** | COCL must work with the Auditor as expeditiously as possible to develop a reliable training audit.  As a starting point, COCL should assess the Training Division's planned methodology for training assessments.  If COCL has a basis to assert a change in those methods, PPB should have fair warning of such change before fully implementing its training assessments.

PPB's Inspector must be willing to be more critical and candid. |

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council.  The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented.  The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies.  The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| **Status** | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Unsurprisingly, the absence of a COCL with whom to coordinate on force and training audits hindered PPB's ability to fully comply with this provision.  Laudably, the Inspector attempted to achieve some compliance with Paragraph 86 by some problematic uses of force for training review.  *See* PPB 2014 Q3 and Q4 compliance reports, Item 86.

PPB's 2015 Q1 and Q2 data sets each have empty folders for Paragraph 86.

PPB's 2014 Q4 data set include only a Power Point slide presentation on force investigations.  PPB's Inspector presented this to TAC.

PPB did not produce any written recommendations from the Training Division or |

| | |
|---|---|
| | TAC as required by Paragraph 86, second sentence.  Notably, based upon a review of the minutes from the July meeting, and observation at the September meeting, the Inspector did not present a quarterly force report to the TAC. |
| | PPB did not produce data indicating that the Chief's office had directed remediation for problematic patterns of uses of force. |
| | PPB reports that the data gap from May 2015 to present, which has correlated with its switch to the RegJIN data recording system, has inhibited its ability to comply with this provision. |
| **Technical Assistance** | Consistent with the technical assistance described in Paragraph 85, above, COCL must work with the Inspector as expeditiously as possible to develop a reliable training audit to produce the required data for the quarterly presentation to TAC. |
| | The Training Division and TAC must memorialize their recommendations. |
| | The Training Division and Inspector should complete their assessments of problematic patterns of uses of force and record their transmission to the Chief of any such patterns and their recommended remedies.  The Chief's office should memorialize timely remedial measures. |
| | Substantial compliance with this provision must include the Inspector's quarterly force report presentations, to include presentation to the TAC, and their written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. |

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | The United States has observed a recent TAC meeting where members of the public attended and provided comment at the end of the meeting.  Nevertheless, it raised concerns to find the following in minutes from a TAC meeting in May 2015: "Reiteration of the confidentiality of any material discussed within the TAC meetings."  If the minutes are accurate, this admonishment has been issued more than once, and imposes confidentiality on all material discussed at all TAC meetings.  This is antithetical to Paragraph 87.  PPB's quarterly report for 2015 Q2 does not address this concern.  (In fact, the quarterly report does not acknowledge that a TAC meeting was held in Q2.) |
| | PPB's 2014 Q4 folder included TAC's agenda and minutes for TAC's November 6, 2014 meeting.  PPB's 2015 Q1 folder included TAC's agenda and minutes for TAC's February 5, 2015 meeting.  PPB's 2015 Q2 folder included TAC meeting minutes for the May 7, 2015 meeting. |

|  | Also of note: there was no quorum at the meeting to approve minutes in two of the meeting minutes reviewed.  Insufficient attendance hinders the intended purpose of the TAC. |
|---|---|
| **Technical Assistance** | Like many other volunteers in this process, TAC members are deserving of thanks. |
|  | We are pleased that the TAC meetings are now open to the public and will include time for public comment; however there are several steps PPB can take to provide information to the public about the TAC's work.  First while the TAC website has posted agendas for its meetings from 2013 and 2014, no minutes of those meetings were posted. Second, agendas were not posted in advance for either the July or September meetings.  And, if there was a meeting in 2015 prior to July, no minutes or agenda were posted for that meeting. *See* https://www.portlandoregon.gov/police/61449. |
|  | Agendas should be posted in advance of each meeting to assist the public in determining whether they have an interest in attending.  Also, minutes should be posted shortly after they are approved by the Council.  In addition to the minutes, any written recommendations to the Chief as required by the settlement agreement, or as otherwise submitted to the Chief should also be posted. |
|  | Finally, TAC should maintain an email list of members of the public who are interested and want to be notified of future TAC meetings.  While posting of the meeting dates and agendas on the TAC website in advance is helpful, if meeting dates change (as they recently did from quarterly to bi-monthly), or due to a holiday (such as the upcoming November meeting), members of the public would not be on notice unless they are consistently checking the website. And, an email list is an efficient way to disseminate such information to alert interested persons to check the website when meeting dates change, agendas have been posted, etc.  PPB needs to secure sufficient participation to make TAC representative of the community and useful to fulfill the public input requirements of the Settlement Agreement.  A more robust TAC is not only a better use of the Training Division's valuable time, but should serve to buttress public confidence in PPB. |

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action.  Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents.  The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals,

health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Status | Not measured |
|---|---|
| Analysis | PPB operates within the context of serious gaps in community-based mental health services throughout the state.  Such gaps impacting PPB include the lack of an adequate number of Assertive Community Treatment (ACT) Teams and other wrap around services, respite support, and supported housing.  While DOJ continues to work separately with the state to address these gaps, PPB must continue to work with its community partners to educate them on the issues facing PPB due to the gaps in services, and collaboration on solutions.<br><br>Additionally, appropriate resources directed at transporting and treating subjects suffering from addiction or mental illness will help alleviate the strain placed on current responders.  PPB identifies indicators of progress in this area, including:<br><br>• Meetings among partners at least every few months to discuss the issues confronting Portland;<br><br>• The creation of a Transportation Task Force designed to shift responsibility from PPB to EMS to transport those with a civil hold; and<br><br>• Plans to establish the Unity Center for Behavioral Health.  *See* response to Paragraph 89.<br><br>While these steps may be positive, it remains to be seen whether they will substantially help remedy the lack of community-based addiction and mental health services. |
| Technical Assistance | We are encouraged by the meetings the BHU regularly participates in to coordinate resources with community partners, and we recommend that BHU begin to share BHU Electronic Referral System (BERS) data on trends of issues being addressed in addition to discussion regarding individual cases referred to the BHU. |

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | While a compliant drop off/walk in center has not been established, we appreciate the City's efforts to engage stakeholders in the development of such a service.  PPB has participated in a workgroup addressing this concern.  The Legacy Health hospital system, Oregon Health & Science University, and for- and non-profit health care organizations (Adventist Health and Kaiser Permanente) signed a letter |

| | |
|---|---|
| | of intent in February 2015 to develop the Unity Center for Behavioral Health.  On August 13, 2015, the Unity Center announced that all four providers have signed a Joint Operating Agreement to proceed with the formation of the Center.  The Unity Center is expected to provide emergency psychiatric services, a co-located centralized inpatient facility, and enhanced partnerships with community organizations providing behavioral health and substance use disorder services.  The Unity Center is anticipated to open in November 2016.  *See* http://www.legacyhealth.org/for-health-professionals/tools-and-resources-for-providers/edoctalk/2015-04-edition/apr-2015-unity-update.aspx . |
| **Technical Assistance** | While the provision of state and Medicaid funded behavioral health services is charged to the counties and CCOs, the City acknowledges the importance of delivering such services to persons who are in mental health crisis.  The City devoted $500,000 in the 2015-16 budget towards capital costs of the Unity Center's emergency care department.  We recommend that the City continue involvement in the workgroup discussions, not just concerning transportation of individuals to the Center, but also to provide input on coordination with community partners regarding the importance of the inclusion of community-based services at the intended Unity Center. |

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU"), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff.  These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include:

a. Increased sharing of information, subject to lawful disclosure, between agencies and organizations including BOEC, Multnomah County, and health care providers to create an information exchange among first responders and providers to better serve those suffering from mental illness.

b. Creation of rapid-access clinics so those in crisis have access to timely medication management appointments;

c. Enhancing access to primary care providers to shift low-to moderate acuity patients to primary care programs creating more capacity for acute patients in existing outpatient crisis mental health systems;

d. Expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders;

e. Addressing issues of unmet needs identified by Safer PDX and its community partners;

f. Expanding and strengthening networks of Peer-Mediated services to:

i. develop a referral guide delineating these services and locations and assist with accessing information;

ii. better educate the community of the viability of these services as alternative first engagement sites/programs for those having difficulty engaging with "professional driven" services;

iii. expand peer services connected to peer supports in the community for inpatient psychiatric units (including Emergency Departments) and in the community;

iv. add peer guides to work alongside Emergency Department guides for those patients with behavioral health issues entering the Emergency Department; and

v. evaluate opportunities to expand use of peers to coordinate with PPB ABHU (as described herein) and function as a link with impacted individuals; and

g. pursue tele-psychiatry (a provision of mental health care by video conferencing) as a way for first responders to take advantage of existing IT infrastructure to provide direct care or provider evaluation supporting the provision of appropriate services to an individual in crisis.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB initially reported that the CCOs had created such subcommittees, and that the BHU command participated in both the Health Share Oregon and Family Care CCO subcommittees.  *See* https://www.portlandoregon.gov/police/article/452158, and quarterly reports 2014 Q1-2015 Q1. PPB now reports that the CCOs disbanded these subcommittees – for unknown reasons.  We agree that the City cannot force the CCOs to create or maintain such subcommittees. Notwithstanding, the sharing of information between partners concerning the improvements for behavioral health services indicated in subparagraphs (a)-(g) above is critical to linking individuals to services and, by extension, helping to avoid unnecessary contact with law enforcement.  For example, the BHU does not currently have access to or provide information to the Emergency Department Information Exchange (EDIE) system. Including PPB in the access to this exchange (to the extent allowed by law) is key for ensuring information is shared, and that such high risk individuals who repeatedly visit the ER are linked to appropriate services.  *See* http://www.orhealthleadershipcouncil.org/our-current-initiatives/emergency-department-information-exchange-edie. |
| **Technical Assistance** | PPB should inquire with the local hospitals and with the anticipated Unity Center as to whether PPB can provide information and/or access the EDIE system.

While PPB cannot force the CCOs to initiate or participate in such addiction and mental health subcommittees, PPB must find other ways to coordinate with health care partners to address both immediate and long-term solutions, consistent with the goals outlined in Paragraph 90. For example, CCO behavioral health representatives could be invited to the BHU follow-up meeting along with the other community partners where such goals and solutions could be addressed.

Also, PPB reports in its 2015 Q2 update that the Service Coordination Team (SCT) program continues its connections with various Emergency Department Diversion |

| | Programs, as well as attending the Legacy ED Community Outreach meetings. We applaud these efforts to gather information which may be useful for officers to connect individuals with services. While the meeting minutes indicate that various presenters share information about the resources they have available, it is unclear if such connections and presentations are addressing long-term solutions identified above in subparagraphs a-g. |
|---|---|

## VI. CRISIS INTERVENTION

The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises. The PPB will add new capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis as required by this Agreement. Despite the critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force.

### A. Addictions and Behavioral Health Unit and Advisory Committee

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | As set forth in response to Paragraph 99, PPB does not currently deploy a true Memphis Model crisis intervention team. PPB has taken some steps in this direction, and we anticipate continuing to work with PPB to ensure that specially trained officers with experience responding to mental health crises respond when needed.

*Establishing ABHU:* PPB has established the Behavioral Health Unit (BHU). As noted in our August 17, 2015 technical assistance letter, we commend PPB on the development and dedication of the BHU and its coordination with the BHU Advisory Committee and other community partners.

*Addictions and Behavioral Health Unit oversight of Crisis-Intervention Team, Mobile Crisis Prevention Team, and Service Coordination Team:*

The BHU includes a mobile crisis prevention team, called the Behavioral Health Response Team (BHRT); a Service Coordination Team (SCT); and a Coordinator for Enhanced Crisis-Intervention Team (ECIT) officers. The BHU assists in the development of Academy-level Crisis-Intervention Training and Enhanced Crisis-Intervention Training.

The PPB chain of command provides for the Behavioral Health Unit's coordination with, but not necessarily oversight of, ECIT-trained officers. ECIT |

|  | officers report via their chain of command to their precinct commander and, ultimately, the Assistant Chief of Operations; PPB reports that the ABHU does not directly supervise ECIT officers. Supervisors within an ECIT officer's precinct determine training and discipline, although the early-intervention system will notify the BHU if an ECIT officer engages in misconduct, and the Lieutenant overseeing the BHRT can take (an unspecified) role in the disciplinary process. PPB's 2014 Q4, 2015 Q1, and 2015 Q2 folders contained an organizational structure chart.  None of the org charts demonstrated that the ABHU conducts meaningful oversight of the dozens of ECIT officers assigned to precincts.  To the contrary, the only link between the ABHU and the ECIT patrol officers was a dotted line between the ECIT officers and the ABHU's "ECIT Coordinator" – a position not currently occupied by a supervisor.  Such structure leaves some lack of clarity as to the level of oversight of the BHU commander as required by Paragraph 91.

(Note that the 2015 Q1 data set also contained an announcement for a job opening as a BHU Seargent.)

*Command-level Supervision:*  The Central Precinct Commander oversees the BHU, including both the BHRT and SCT.  A Lieutenant oversees the day-to-day operations of the BHRT; the SCT Program Manager oversees the SCT. |
| **Technical Assistance** | BHU will have to better define its oversight of the ECIT officers.  Currently, ECIT officers report to the chain of command of their assigned precinct.  However, the BHU lieutenant (assigned to the Central Precinct) and ultimately the Central Precinct commander must oversee and coordinate the ECIT officers.  *See* Settlement Agreement Paragraph 91.  To ensure such oversight, the CIT Coordinator, her sergeant, Lt. Hager, and, as necessary, the Central Precinct Commander must regularly involve themselves in supervision of ECIT officers, including, but not limited to: reviewing ECIT reports, identifying and addressing concerns as needed, and taking part in training or discipline related issues.  If BHU is engaged in such oversight, it is not currently memorialized in writing.  We recommend that BHU memorialize its role in review and oversight of ECIT officers to ensure all involved clearly understand the set expectations.  We will continue to monitor compliance with the relevant provisions of the Settlement Agreement, and will reassess the adequacy of BHU's oversight upon memorialization of its role in overseeing the ECIT team.  Further, PPB should evaluate whether the CIT Coordinator position requires a member of a supervisory rank in order to ensure adequate review and oversight. |

92. ABHU will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor.  PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | PPB reports that it holds bi-monthly meetings with system partners, including Multnomah County system partners such as the mental health diversion court program (to include probation and parole), and the Sheriff's office, in which attendees problem-solve challenging cases or individuals with whom they have repeat encounters.  Other community-based partners, such as Project Respond and Veterans Affairs, also attend these meetings.<br><br>PPB has not reported what role data plays in the meetings, and whether and how coordination with the system partners decreases law enforcement interactions with consumers of mental health services.  In June 2015, PPB reported that the BHU's Crime Analyst can retrieve data from the BHU Electronic Referral System (BERS).  PPB reported that it was willing to share data from the BERS system with Multnomah County, but said PPB still needed to ask the County what data the County needs.  Likewise, interviewees during our visit to PPB in June reported that regular meetings between health providers and PPB focused on problem solving tough cases, rather than sharing data. |
| Technical Assistance | As noted in Paragraph 88, we are encouraged by the meetings the BHU regularly participates in to coordinate resources with community partners, and we recommend that BHU began to share BERS-related data on trends of issues being addressed, in addition to discussion regarding individual cases referred to the BHU. |

93. ABHU shall track outcome data generated through the C-I Team, MCPT, and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | *Tracking Outcome Data:*<br><br>The BHU is tracking deployments of ECIT officers.  ECIT officers generate the data by completing a separate, mandatory report after using their ECIT training in the field.  During our June meetings, the BHU provided a statistical report on the data it collected from 267 ECIT reports regarding mental-health-related calls between February 15 and May 23, 2015.  In the 2015 Q2 report, PPB states that there were 207 calls for which an ECIT officer applied his/her training (an average of 2.3 calls per day). Of note, PPB reports that the use of force was reported in 2% of these calls (4 of the 207 calls). However, without collecting data on all mental-health-related calls as provided by the Memphis Model, PPB is not in compliance with the data tracking that the Memphis Model CIT would generate. |

|  | The BHU is likewise tracking BHRT referrals and follow-up through its BERS system. PPB reports that any PPB member can make a referral to the BHU through BERS, and such referral is assigned to a BHRT if it meets certain criteria. In 2015 Q2, PPB reports there were 291 referrals to BHU (including individuals with multiple referrals), 197 of which were new referrals. Of those new referrals, 87 (43%) were assigned to a BHRT for follow-up. Further in 2015 Q2, PPB reported there were 123 cases (117 individuals) that had reached an outcome and thereby were transferred to inactive status. The most frequent outcome was "coordinated services" (44 cases), whereas jail/criminal justice system only accounted for 7 cases. Other categories are as follows: concern mitigated (35 cases); unable to locate (14 cases); systems coordination (10 cases); refused assistance (7 cases); civil commitment (5 cases); other (1 case, handled by Neighborhood Response Team). Tracking such data trends and the reasons for such outcomes could be helpful in the bi-monthly meetings with partners.

PPB also produced aggregate data of the number of entrants to SCT's program; the number of graduates; those that were able to find housing and/or a job after the program; and the aggregate number of arrests for program participants before the program as opposed to after. The statistics provided a broad overview of the scope of the program, but also have limitations, discussed in further detail in our response to Paragraph 112.

*Developing New Strategies for Repeat Calls:* PPB has not reported any such strategies or described how the data tracked will lead to strategy development.

In their 2015 Q2 update, PPB notes that the BHU developed and began tracking performance measures which will eventually provide outcome data. Such data will be used to identify new response strategies for repeat calls, training needs, and possible solutions for system issues that impede its work. DOJ looks forward to reviewing such data and strategies. |
| **Technical Assistance** | While the "ECIT" code is used by BOEC to track dispatch to the current protocol of limited calls involving a mental health component for which ECIT may be dispatched, all other calls that may involve a mental health component are only given one code for the situation (*e.g.*, welfare check, disturbance, etc.). For these other calls, a regular patrol officer is dispatched regardless of whether there is a mental health component to the situation. There is currently no reliable way to determine how many of these other coded situations involve a mental health component.

Data on the number and type of all mental-health-related calls is critically needed to inform this discussion. In the interim (until such data is collected and assessed) at the very least, PPB and BOEC should include all suicide calls to the ECIT protocol, as those are known mental health related calls.

Further guidance on this issue is addressed in our technical assistance letter dated 8/17/15. |

94. Within 90 days of the Effective Date, PPB shall also establish an ABHU Advisory Committee. The ABHU Advisory Committee shall include representation from: PPB command leadership, CIT, MCPT, and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Status | **Substantial compliance – ongoing obligation** |
|---|---|
| Analysis | A roster of ABHU Advisory Committee members provided by PPB includes all of the organizations and personnel listed in Paragraph 94, (noting that the Oregon State Department of Health and Human Services has been since been restructured and the relevant state component is the Oregon Health Authority (OHA)). |
| | The United States has observed ABHU Advisory Committee meetings.  The attendees have included the BHU Lieutenant; two ECIT-trained officers; BOEC representatives; a representative of the Multnomah County Sheriff's Office; members of advocacy groups; representatives of mental health service providers and coordinated care organizations; persons with lived experience with mental health services; a representative of the metropolitan public defender's office; a representative of the Oregon Health Authority; and a graduate from PPB's SCT program.  The attendees did not include PPB commanders more senior than Lieutenant. The moderators of the discussion we observed invited broad participation, and all attendees offered thoughts on the issue discussed. |
| | Minutes from BHUAC meetings in the fourth quarter of 2014 and the first quarter of 2015 suggest that the BHUAC has encountered some difficulty ensuring the presence of the PPB commander overseeing the BHU; representatives from civilian City government; and Oregon States Department of Health and Human Services representatives (now OHA). |
| Technical Assistance | In order for us to fully assess the formation of the Advisory Committee and ongoing participation of its members, PPB should be providing information about how members are recruited, and should continue to provide minutes of meetings. |
| | PPB also should engage in concerted and documented efforts to ensure that all required ABHU Advisory Committee members consistently participate in meetings. |

95. The ABHU Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of C-I Team, MCPT, SCT, BOEC Crisis Triage, and utilization of community-based mental health services.  The ABHU Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters.  The ABHU Advisory Committee shall report its recommendations to the ABHU Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Minutes from ABHU Advisory Committee meetings and the Committee's reports show that the Committee reviews many of the issues contemplated by Paragraph 95. The Committee reports that it assisted in the development of the ECIT training, including recommending that the training dedicate time for two panel discussions. Many Committee members attended training sessions and some participated in the panels. The Committee offered feedback on the training sessions. The Committee also hosted guest speakers on policies and training, and engaged the guests in question-and-answer. |

The written training recommendations the Committee delivered to PPB on June 2, 2014 included recommendations for additional classes on mental illness; peer perspectives on police interactions; time allotment for consumer and family panels; classroom layout; and interactive exercises. The Committee also wrote in 2014 that PPB incorporated many of the Committee's 2013 suggestions. However, some Committee members expressed concern during the March 2015 meeting that prior suggestions for scenario-based trainings were not accepted by PPB.

In its 2015 Q2 supporting documents for Paragraph 96, PPB provides a response to the Committee's recommendations for changes to the 2014 ECIT training, which are largely accepted.

The Committee has offered substantive written recommendations on other subjects too, such as SOPs, a directive, and expansion of the SCT. The status report that the Committee produced in April 2015, which was provided in the 2015 Q2 supporting documents within the folder for Paragraph 96, includes formal recommendations to Directive 850.20 and 850.25 (although no changes were recommended to 850.20), but also notes the following: "At our April 2015 meeting, the BHUAC reviewed Directives 850.20 and 850.25 in response to the Second Universal Review: 4/13/15 – 5/2/15. We did not have time to review Directives 850.21 and 850.22 at this meeting." No further formal recommendations to these remaining directives appear to have been provided. The meeting minutes PPB produced did not state any formal Committee recommendations (although individual Committee members often made recommendations during discussions).

The Committee is reserving written comment on BOEC protocols so that it can gather more information. During the observation of the June meeting, the Committee began working on recommendations for the upcoming in-service refresher training on crisis intervention and mental health related issues.

In its 2015 Q2 report, the BHUAC minutes provide a robust discussion on the SCT expansion proposal (to include six dedicated beds for stabilization of mental health issues). A DOJ representative observed this meeting. While Committee members were supportive of the concept of the bed expansion, the Committee did not make formal recommendations to SCT, other than the general support for the concept. A formal motion was also made and passed to include a recommendation

|  | that a preference be provided for peer involvement in direct services, planning, and management. |
|---|---|
|  | By way of summary, the ABHU Advisory Committee appears to provide a forum for discussion of critical mental health-related policies and practices.  The Committee has delivered thoughtful recommendations on training, a majority of which PPB reports that it has implemented.  The ABHUAC has also commented on other documents.  Recommendations on other matters within the Committee's ambit may be forthcoming.  Paragraph 95 anticipates an even more expansive role for the ABHU Advisory Committee in guiding PPB's mental health related work; nothing about the Committee's work to date suggests that that cannot be achieved. |
| **Technical Assistance** | As the City implements the changes we suggest for ECIT use, BOEC protocols, and other matters as described herein, PPB should necessarily utilize the ABHU Advisory Committee.  The City's ongoing implementation obligations for the Committee, therefore, go hand-in-hand with bringing all of the crisis intervention sections of the Settlement Agreement to fruition. |

96. Within 240 days of the Effective Date of this Agreement, the ABHU Advisory Committee will provide status reports on the implementation of the ABHU and BOEC Crisis Triage, and identify recommendations for improvement, if necessary.  PPB will utilize the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| **Status** | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | The ABHU Advisory Committee reviewed changes to BOEC's Dispatch Criteria for calls with a mental health component in 2013, and in December 2014, some Committee members attended a presentation at BOEC regarding the Crisis Triage system.  In its Q2 2015 quarterly report, PPB provides the Committee's report on the status of implementation of the BHU and the BOEC Crisis Triage System.  However, the Committee notes that it did not have a quorum at the meeting regarding BOEC crisis triage policies, and therefore no formal recommendations were made concerning this issue.  Also, the Committee did not make recommendations for improvement to the BHU generally. |
|  | PPB reports that, in 2014, the ABHU Advisory Committee offered comments on PPB policies related to police response to persons in mental health crisis and police response to mental health facilities.  As noted above and herein PPB provided the United States with the details of the ABHU Advisory Committee's review in 2015 regarding PPB policy 850.20 and a recommendation concerning the expansion of the SCT, however, comments on BOEC's crisis triage policies have not been received, and the Committee's report provided with the 2015 Q2 update provides that the Committee hopes to address this issue in the year ahead.  Furthermore, while we received a copy of BOEC's Mental Health reference guide during our June meetings, we have not received the related Suicide or Project Respond |

| | Reference Guides. |
|---|---|
| | In it 2015 Q2 compliance chart, PPB lists recommendations from the Committee. *See* 2015 Q2 compliance report, Item 96.<br><br>• Expansion of the Service Coordination Team's available resources to include six mental health beds and an increase in the array of outpatient services offered by the program.<br><br>• Recommends a preference to involve peers (people with lived mental health experience) in direct services, planning and management with an emphasis on training peers for management levels.<br><br>• Made recommendations on proposed mental health directives. |
| **Technical Assistance** | PPB needs to provide the missing BOEC policies referred above to the United States (and have the BHUAC review them), so we can begin the process of review and comment, and PPB and BOEC can go on to train staff on the new/revised policies. |

**B. Continuation of C-I Program**

97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City.  PPB shall continue to train all officers on C-I.

| **Status** | **Substantial compliance (pending review of training records) – ongoing obligation** |
|---|---|
| **Analysis** | PPB reports compliance.<br><br>The United States will review training records from PPB; upon review of such records, PPB's substantial compliance with this provision may be confirmed. |
| **Technical Assistance** | PPB should provide auditable training records. |

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call response duties.  Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with ABHU Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| **Status** | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB's proposed policy language requires some revision to comply with this Paragraph. Proposed PPB policy language would require C-I training for new sworn members, although the proposed policy did not require that the training take |

| | |
|---|---|
| | place before the officers assumed independent duties, and did not specify the number of hours. The proposed policy did require annual refresher C-I training. PPB reports that officers are receiving the appropriate training. |
| | PPB has not produced any comments from the ABHU Advisory Committee on Academy or refresher training. The United States understands that such discussion for the 2016 in-service refresher training occurred at the June and July Committee meetings. We look forward to receiving any formal comments forthcoming from the Committee, and to the response from PPB as to whether such recommendations will be implemented. |
| **Technical Assistance** | While PPB has provided lesson plans for the 40 hours of basic crisis intervention training taught at the basic and advanced academies, we do not have the lesson plans or agenda for the upcoming in-service refresher training, and we will need additional time to review such training before providing further comment on compliance with this paragraph. In its 2015 Q2 report, PPB provided the content overview for the 2015 In-Service training. It appears that the scenario training will include some elements concerning an individual in a behavioral health crisis. Full analysis of this scenario will require observation. |
| | Note that full compliance will require considering and addressing ABHU Advisory Committee recommendations regarding the Advanced Academy and In-service trainings. |

## C. Establishing "Memphis Model" Crisis Intervention Team

99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").

| Status | Partial compliance – ongoing obligation |
|---|---|
| **Analysis** | While PPB has created a volunteer cadre of officers under its Enhanced Crisis Intervention Team (ECIT) program, PPB's model does not currently comport with some of the core elements of a Memphis Model Crisis Intervention Team. |
| | The "Memphis Model" includes, among other core elements: |
| | • Training dispatchers to identify calls that may involve mental illness; |
| | • Having officers with extensive crisis-intervention training and experience (most comparable to PPB's "ECIT" officers) respond to all such calls; and |
| | • Having officers with extensive crisis-intervention training and experience assess the situation and when appropriate take control of the scene. |
| | Some aspects of PPB's approach to crisis intervention are consistent with the Memphis Model. All PPB officers receive 40 hours of training in crisis intervention at the Academy; Patrol Officers can volunteer to take an additional 40 hours of in-service training focused on crisis intervention; PPB calls these officers "ECIT officers." Dispatchers call exclusively ECIT-trained officers for a set of |

calls that may involve mental illness (such as a subject threatening to commit suicide by jumping). Broadly speaking, none of these aspects conflicts with the Memphis Model.

Portland's model differs from the Memphis Model because it does not reserve all or even nearly all mental health-related calls for the most highly-trained crisis-intervention officers. BOEC does not currently assess whether mental illness is involved in a call for service, instead dispatching ECIT officers to calls that fit a list of clearly-defined categories that could not possibly capture all calls involving mental health. Accordingly, BOEC dispatches a considerable number of calls involving mental illness as it would any call for service. Likewise, PPB does not require that ECIT officers respond to all or even most calls suspected to involve mental illness. Even where an ECIT officer responds to a call where the police recognize that mental illness is in play, PPB places no obligation on the ECIT officer to take control of the scene. Because there is no evidence that ECIT officers respond to a higher volume of mental illness-related calls than CIT officers do, whether the ECIT officers accrue specialized experience with mental illness as quickly as Memphis Model officers do is highly questionable.

The City pointed out in commenting on this Report that ECIT officers serve as patrol officers, thereby responding to all variety of calls, some of which may involve persons with mental illness. However, neither PPB nor BOEC currently employs a means of identifying all mental health related calls, meaning neither PPB nor the United States have a means of identifying how many mental-health related calls ECIT officers respond to.

Despite the Settlement Agreement's unequivocal requirement that PPB implement a Memphis Model crisis-intervention team, PPB is concerned that expanding the coverage of mental health related calls directly dispatched to ECIT officers will impede ECIT officers from responding to higher risk calls.

The problem with PPB's stated concerns is that there is no data to support them. Data on the number of calls based on mental illness is critically needed to inform this discussion.

The United States will continue to enforce the terms of the Settlement Agreement as written, including Paragraph 99. PPB does not currently have a Memphis Model crisis intervention team.

We encourage PPB to gather the data necessary to renew its proposal for an alternative approach, and we are open to continuing the discussion. In the meantime, the United States recommend the following interim changes to its protocols::

- To add "all suicide threats" to the list of types of calls that BOEC dispatches to ECIT officers;

- In addition to abiding by the BOEC dispatch protocol, as modified, PPB will require the responding patrol officer to assess the need for requesting an ECIT when the responding officer finds any one of the following:

|  | o  Mental Health Disorders |
| :--- | :--- |
|  | o  Traumatic incidents |
|  | o  Sudden deaths |
|  | o  Attempted suicides |
|  | o  Medical assists/Well-being checks (with a mental health related component) |
|  | o  Breach of Peace/disorderly conduct (with a mental health related component) |
|  | o  Trespassing/refusing to leave property (with a mental health related component) |
|  | Furthermore, policies concerning this assessment should reflect that the responding patrol officer accountable for assessing this "secondary dispatch" function, and the responding officer's performance reviews will consider whether the officer executed this function where appropriate. |
|  | • As discussed in greater detail herein, PPB policy should also require officers to consult with mental health professionals before disengaging from a scene where the subject presents a risk of harm to self or others. |
| **Technical Assistance** | Extensive technical assistance on PPB's ECIT program is provided in a separate letter dated 8/17/15. |

100. PPB's C-I Team shall be comprised of officers who volunteer for assignment to the C-I Team. The number of C-I Team members will be driven by the demand for C-I Team services, with an initial goal of 60-80 volunteer, qualified officers.

| **Status** | **Partial – ongoing obligation** |
| :--- | :--- |
| **Analysis** | As set forth above, PPB has implemented some aspects of a Memphis Model C-I Team.  PPB's policies governing encounters with persons in crisis and Portland's dispatch protocols do not allow for ECIT officers to gain the accelerated experience with mental illness-related calls that a Memphis Model C-I Team would. |
|  | Also, as mentioned above, PPB lacks the data concerning calls involving mental illness to gauge the demand for ECIT officers. During our visit to PPB in June, representatives of the Bureau reported 62 ECIT officers currently available to receive calls.  PPB has held three ECIT courses to date: two in May 2013 and another in April 2014.  PPB has reported that and additional class is scheduled for November 2015, which will likely add 25 additional ECIT officers. |
|  | The proposed language of PPB's policy on police response to mental health crises defines ECIT officers as volunteer.  *See* Directive 850.20-Police Response to Mental Health Crisis, Second Universal Review: 4/3/15-5/2/15. |

| Technical Assistance | We recommend that PPB plan to conduct two ECIT trainings per year, starting in 2016. Class sizes will be determined by PPB's data on of calls involving mental illness. |
|---|---|

101. No officers may participate in C-I Team if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of C-I Team service, or during C-I Team service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the C-I Team.

| Status | **Compliance rating pending – insufficient documentation** |
|---|---|
| Analysis | PPB has reported that it has a vetting process for ECIT applicants that conforms to this provision.  PPB has not yet provided us with the policies or documentation to demonstrate compliance with this requirement, however. |
| | PPB has not reported consultation with the ABHU Advisory Committee on these matters.  During our observation of the August meeting, the Committee was provided an opportunity to comment on the qualification criteria for the upcoming training. |
| | PPB reports that it screened participants in the 2014 ECIT training for compliance with Paragraph 101 of the Agreement, but has not yet provided the criteria used or any documentation of the actual screening.  In its quarterly compliance report, PPB reports that it will apply this selection criteria for the Fall 2015 training, but that it has not yet completed a standard operating procedure for analysis of PSD materials. *See* PPB 2015 Q2 compliance report, Item 101. |
| | PPB did not produce documents in folders related to this Paragraph in support of its self assessment for 2014 Q4 or 2015 Q1 or Q2. |
| Technical Assistance | PPB should provide its selection criteria and PSD SOP to the ABHU Advisory Committee before applying such criteria, and report on any advice provided by the Committee.  PPB should ensure that both comply with the requirements of Paragraph 101 and provide both to the United States for review. |

102. PPB shall specially train each C-I Team member before such member may be utilized for C-I Team operations. PPB, with the advice of the ABHU Advisory Committee, shall develop such training for C-I Team members consistent with the Memphis Model.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | As noted above, PPB's ECIT model includes aspects the Memphis Model, including certain elements of training as provided below and in our technical assistance letter date 8/17/15. |

|  | As discussed in response to Paragraph 95, the Committee has provided recommendations on ECIT training.<br><br>We commend PPB for reaching out to the Global Health Center at OHSU and a peer support specialist from the Urban League of Portland regarding integrating ECIT and BHU programs into diverse populations as well as to seek opportunities to incorporate more diversity into future crisis intervention training.  *See* 2015 Q2 Quarterly Update Report, Paragraph 102. |
|---|---|
| **Technical Assistance** | The United States has not observed an ECIT training yet; to date, we have only reviewed elements of the curricula and course agenda.  Thus, while reserving our right to modify these comments after reviewing training sessions in person, we provide further technical assistance by letter dated August 17, 2015.<br><br>While the academy trainings should be considered as a foundation on which to build ECIT training, it should not be assumed that officers in an ECIT class remember all of the content from the academy trainings or would not benefit from some review of critical basic material.  Even with the annual in-service refresher training, it may have been many years since the academy training occurred for some of the ECIT volunteer officers.  For example, a brief overview (mental health 101 type of review) of the common mental disorders and how persons with such disorders may present themselves to first responders would be helpful as a foundation for field engagement with consumers, family members, providers, and the general public.<br><br>We are encouraged by the inclusion of presentations of consumers and family, peer recovery, and early assessment of psychosis (EASA).  However, we currently do not have enough information to assess these presentations and we look forward to observation of the training to provide further guidance.<br><br>We recommend the following areas for improvement to conform PPB's ECIT training to best practices:<br><br>• ECIT Training should reflect a community partnership throughout the agenda.<br><br>    o While a consumer-and-family panel is an important component of the training, there appears to be little exposure to the mental health community during the classroom component.  During our June meetings with PPB and community partners, we were informed that the ECIT class was taught by a variety of community stakeholders in the professional community, as well as consumers and family members.  From the training plan provided by PPB the sessions taught by mental health professionals outside of PPB primarily appear only on the first day of training:  the peer and family panels, forensic diversion programs available within Multnomah County, the EASA program, a presentation from NAMI, as well as suicide intervention and mental status indicators (presented on day two by a psychiatric nurse from Project Respond).  The ECIT |

training report also indicates that Dr. Liesbeth Gerritsen was the lead or co-lead on much of the training.

o   While it is commendable that PPB employs a full-time mental health professional with the experience and knowledge that Dr. Gerritsen possesses, the inclusion of multiple mental health professionals (psychiatrists, psychologists, social workers, nurses) presenting throughout the week-long training course encourages the development of community and inter-governmental partnerships. Certainly, many topics currently included in the training can be co-presented (either formally or informally) by a community-based mental health professional or government agency provider, and a PPB instructor, such as:

   ▪   history of mental health treatment

   ▪   ECIT community resources

   ▪   mental health risk assessment

   ▪   BOEC dispatch protocols for mental health calls

   ▪   crisis response (all sessions on day 3 of training)

   ▪   all of the scenario based role playing.

•   Provide a full-day for site visits and ride-along with a community treatment provider.

o   Currently the ECIT training plan provides 1.5 hours for a site visit – which appears to allow only time for one site visit by each officer. Many CIT courses include two half days or a full day for site visits, and we recommend expanding this effort.  We also suggest a ride-along with an Intensive Case Manager (ICM) or an Assertive Community Treatment (ACT) team member.  Such outreach during training instills a key component of the specialized knowledge that ECIT officers can bring to bear in their work – relationships with mental health providers and consumers.

•   Crisis Response Resource (Day 3 of ECIT Training) should focus on engagement and de-escalation.

o   A review of the lesson plan for day three and discussion with Sgt. King indicates that the teaching philosophy on engagement and communication for ECIT offices is based on practices of a crisis negotiation team (CNT).  While CNT tactics may incorporate parallel issues also seen in behavioral crisis response or response to persons with mental illness, the focus of CIT training should be on engagement and de-escalation, while acknowledging that officer and community safety always comes first.  Incorporating an outside mental health professional (*e.g.*, someone from Project Respond) throughout the lessons for this

day will provide a mental health perspective on de-escalation as the sessions are taught.

o   As further discussed below in regards to coverage of mental health calls, to conform with CIT core elements, ECIT officers should be trained as first responders and generally serve as the primary officer on the scene, rather than that of a supporting officer as is typical for CNT officers, or K-9 officers (as noted in the BHU overview in the CIT training lesson plans).

•   Continue to keep role playing scenarios updated, include community mental health providers, and include several rounds of officers in the exercise.

o   While the six ECIT scenarios reviewed in 2014 ECIT training report appear well considered for the type of encounters and issues officers may face in the field, we recommend continually updating these scenarios based on recent experiences of ECIT officers in the field. And, as provided above, incorporating community mental health providers into these role playing scenarios will further the partnerships necessary for successful outcomes.

The report notes that each scenario is handled by a single pair of officers and the reviews of the scenarios indicate that some were not handled as the instructors hoped. To increase officer involvement in the training, we recommend each scenario build upon itself by a successive pair of officers, such that after an initial intervention by the first pair, the scenario is stopped and "freeze framed" and then a second pair pick up where the first left off. This can continue for three or four pair of officers, until the situation resolves safely. Safe resolution almost always means the individual agreeing to leave the scene and be transported to a treatment facility. Trainer can coach role players so the situation doesn't resolve until several groups have rotated through managing the situation.

•   Include additional topics in the ECIT Training

o   Include a "mental health 101" overview as described above

o   Review CIT core elements and the "Memphis Model."[3] *See* http://www.cit.memphis.edu/information_files/CoreElements.pdf

o   Incorporate how to communicate with individuals in the midst of psychosis, using hearing distressing voices training. While the 40 hours of basic crisis training for all officers incorporates a lesson plan created by Dr. Pat Deegan as provided by the

---

[3] To assist in further development of a Memphis Model CIT program, BHU, training staff, and ECIT officers should be encouraged to attend the CIT International Conference, to the extent possible, April 25-27, 2016 in Chicago http://citconferences.org/.

|  | National Empowerment Center, Inc., for hearing voices that are distressing, this lesson does not appear in the ECIT lesson plan. ECIT training should include a review of this curriculum or incorporating this type of issue in scenario based role playing to help sensitize officers to what it is like to hear voices while in an encounter with law enforcement, and how to communicate with individuals in the midst of psychosis. |
|  | o   Enhanced focus on verbal de-escalation. |

103. C-I Team members will retain their normal duties until dispatched for use as a C-I Team. BOEC or PPB may dispatch C-I Team members to the scene of a crisis event.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | While ECIT officers do retain their normal duties until dispatched, they are currently only directly dispatched for the narrow classes of calls outlined in BOEC's protocol. |
|  | The current BOEC dispatch protocol requires dispatching of an ECIT officer if one or more of the following is present: |
|  | o   The subject is violent |
|  | o   The subject has a weapon |
|  | o   The subject is threatening to jump from a bridge or structure or to impede/obstruct any vehicular traffic |
|  | o   The call is at a known mental health facility |
|  | o   Upon request of the responding officer |
|  | o   Upon request of a citizen (any caller) |
|  | While ECIT officers are being dispatched to these types of calls, a Memphis model C-I team would respond to all related mental health calls. |
|  | As provided in the 2015 Q2 update, PPB has agreed to expand the dispatch criteria to include all suicide calls.  This limited expansion is helpful as an interim measure. |
| Technical Assistance | BOEC and PPB must collect data on the response by patrol officers to all calls with a mental health related component. |

104. PPB will highlight the work of the C-I Team to increase awareness of the effectiveness of its work.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | PPB has produced a BHU pamphlet, BHU newsletters, a BHU webpage, a |

|  | newsfeed, and a calendar that lists trainings, conferences, and outreach events. We commend the BHU for the numerous outreach events in the community (including the commendation to two officers who have established regular outreach to NorthStar) and its upcoming participation in the Northwest Regional CIT conference this September in Vancouver, Washington, as reported in its 2015 Q2 update. Steps to highlight CIT's work can be increased, and public awareness about the ECIT program in particular will increase accordingly. For example, based on our conversations with the chair of the BHUAC and Project Respond staff, many residents of Portland are likely unaware that they can request an ECIT officer to respond when they place a call for service. This quotient can increase. |
|---|---|
| **Technical Assistance** | PPB should continue to pursue documented community outreach to help inform the community about the existence, roles, and availability of the C-I Team. |

105. For each crisis event to which a C-I Team is dispatched, the C-I Team member shall gather data that ABHU shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include:

    a. Date, time, and location of the incident;

    b. Subject's name, age, gender, and address;

    c. Whether the subject was armed, and the type of weapon;

    d. Whether the subject is a U.S. military veteran;

    e. Complainant's name and address;

    f. Name and DPSST number of the officer on the scene;

    g. Whether a supervisor responded to the scene;

    h. Techniques or equipment used;

    i. Any injuries to officers, subject, or others;

    j. Disposition;

    k. Whether a mental health professional responded to the scene;

    l. Whether a mental health professional contacted the subject as a result of the call; and

    m. A brief narrative of the event (if not included in any other document).

| **Status** | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | In February 2015, PPB addressed its unacceptable low recording of ECIT interaction by introduction of a template for recording interactions. *See* PPB compliance report 2015 Q1, Item 105. |
|  | PPB has begun collecting the above data, and as of April 2015, PPB reports that an automated ECIT template is now available. The report as provided in the 2015 Q2 update appears to collect the data anticipated by this provision. However, the proposed policy governing this reporting requirement only required the report of |

| | |
|---|---|
| | "ECIT members who participate in a mental health crisis call *by using their crisis intervention skills.*"  *See* Directive 850.20-Police Response to Mental Health Crisis, Second Universal Review: 4/3/15-5/2/15 (emphasis added).  And, the ECIT report for 2015 Q2 provides that the data for were collected "to which an ECIT officer applied his/her advanced training." *See* PPB 2015 Q2 compliance report, Item 105. As provided by this section PPB needs to capture data for all crisis events (regardless of whether advanced training skills were used) to which ECIT are dispatched. Certainly such a form can include a breakdown of the types of skills used for assessment of the overall data.<br><br>PPB has begun reporting data, although it can report the data in a more meaningful way.  PPB needs to develop metrics to assess whether it is achieving desired outcomes from encounters with persons in crisis. |
| **Technical Assistance** | PPB must complete its revision of crisis intervention directives and BOEC dispatch policies.  Only when there is consistency and broad use of ECIT interactions will PPB be able to develop more reliable data. |

### D. Mobile Crisis Prevention Team

106. PPB currently has an MCPT comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand MCPT to provide one MCPT car per PPB precinct.

| **Status** | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB reports that each precinct has an MCPT (now called Behavioral Health Response Team or BHRT) unit, which is comprised of a PPB BHU officer and a Cascadia Project Respond staff member. We observed, and our consultant conducted a ride-along with, one such unit in the Central Precinct. |
| **Technical Assistance** | As noted in our technical assistance letter dated 8/17/15, we commend PPB for its established BHRT unit. |

107. Each MCPT car shall be staffed by one sworn PPB officer and one qualified mental health professional. MCPT shall be the fulltime assignment of each such officer.

| **Status** | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB reports that each precinct's BHRT car is staffed by a PPB officer and a mental health professional from Project Respond.  The United States' observations confirmed this was the case at Central Precinct.  During our June meetings, PPB informed us that it currently funds these three full-time Project Respond staff members. |

| Technical Assistance | |
|---|---|

108. No officers may participate in MCPT if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of MCPT service, or during MCPT service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the MCPT.

| Status | Compliance rating pending – insufficient documentation |
|---|---|
| Analysis | PPB has not reported that the ABHU Advisory Committee has assisted in defining the relevant criteria.  Furthermore, PPB states that there was a selection process for MCPT, but PPB does not set forth any formal selection process, let alone a procedure for assessing disciplinary records through PSD.  *See* PPB compliance report 2014 Q4.  The 2015 Q2 update provides that BHU continues to monitor BHRT member to ensure they meet the qualifications, but no SOP for this process is identified, and PPB did not produce any documents in its folder corresponding this Paragraph.<br><br>This contrasts with PPB reporting on the mirror provision in above in Paragraph 101.  Therein, PPB acknowledges it must have a formal selection process and SOP for interactions with PSD to screen ECIT candidates.<br><br>The United States' assessment of this provision is not meant to imply that any MCPT (now BHRT) member does not meet the criteria defined by this provision. PPB reports that it reviews all applicants for compliance with this criteria.<br><br>PPB did not produce documents in folders related to this paragraph in support of its self assessment for 2014 Q4 or 2015 Q1 or Q2. |
| Technical Assistance | PPB must formalize a process with the ABHU Advisory Committee.  PPB should consider having a simplified process and SOP that applies to both Paragraph 101 and this Paragraph. |

109. PPB shall specially train each MCPT member before such member may be utilized for MCPT operations. PPB, with the advice of the ABHU Advisory Committee, shall develop such training for MCPT members.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | PPB lists a number of trainings outside PPB in which BHRT members participated. *See* PPB 2015 Q2 compliance report, Item 109.  PPB reports that the additional training for BHRT units is outlined in SOP 3-2, which was reviewed by the BHU Advisory Committee in August 2014.  The Committee's status report, provided in Item 96 for the 2015 Q2 Quarterly update, provides a listing of the SOPs reviewed |

| | relating to the BHU, including SOP 3-2. |
|---|---|
| **Technical Assistance** | PPB must continue to seek the advice of the ABHU Advisory Committee's contribution to BHRT training every two years as required by the SOP. |

110. MCPT shall utilize C-I Team data to proactively address mental health service, in part, by connecting service recipients with service providers.

| **Status** | **Partial Compliance – ongoing obligation** |
|---|---|
| **Analysis** | During our June meetings, the BHU provided specific examples of how the BHRT proactively connects individuals referred to the BHU with service providers, and continues follow-up with such individuals to determine the success of such contacts.<br><br>PPB lists a number of collaborative meetings. *See* PPB 2015 Q2 compliance report, Item 110. This includes discussion of jail diversion and "Justice Triage Beds" at CATC. *Ibid.* But there are no examples of utilization. |
| **Technical Assistance** | PPB needs to provide additional examples of how it is using data to implement this Paragraph.<br><br>Consistent with Paragraph 105, above, PPB must develop consistent, reliable data. Use of such data is necessary to implement Paragraph 110. |

111. Within 180 days of the Effective Date, PPB, with the advice of the ABHU Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of MCPT officers in the process.

| **Status** | **Noncompliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB reports that it previously initiated some discussions with system partners to define moment of transfer, and that PPB would initiate discussions with the United States for clarification of what Paragraph 111 requires. *See* PPB compliance report 2014 Q2 - 2015 Q2. PPB continues to assert they need clarification from the United States on this provision. While the United States is certainly willing to engage is such discussions, we confirmed that we previously did not receive a request from PPB for such a meeting. Furthermore, no supporting documentation was provided to confirm that any discussion with the BHU Advisory Committee has taken place concerning this provision, nor what the discussion with system partners included.<br><br>This assessment of non-compliance is not a claim that PPB is unwilling to work on developing such policies and procedures. Indeed, other work PPB is undertaking |

| | |
|---|---|
| | demonstrates that PPB is interested in implementing this type of provision.  For example, in its reporting for Paragraph 89, PPB asserts it has been part of a transportation task force to use EMS for transports to the new Unity Center when appropriate in place of a patrol car.  *See* PPB 2015 Q2 compliance report, Item 89.  This effort and policies surrounding it should be part of the policy discussion occurring between PPB and the BHU Advisory Committee. |
| **Technical Assistance** | PPB must work with the BHU Advisory Committee to draft policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies.  The United States looks forward to PPB initiating a meeting with us to further discuss. |

## E. Service Coordination Team

112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.

| | |
|---|---|
| **Status** | **Partial compliance – ongoing obligation** |
| **Analysis** | PPB reports that SCT continues to serve the target population, and that it proposed and received approval from City Council on June 25, 2015 to add six (6) "behavioral stabilization beds" to its transitional care facility, as well as increasing the capacity of the program generally.  Such expansion did not require additional funding, but reallocated the budget through a contract with Central City Concern.  *See* PPB 2015 Q2 compliance report, Item 112.  We commend PPB for using such transitional facilities to assist BHRT to connect individuals to community services, and that the SCT program will include peer support.

In its proposal to add the behavioral stabilization beds, PPB identifies measures for whether the program is working.  We look forward to reviewing PPB's analysis of such data for whether these or other outcomes are being met (e.g. housing stability and reduction of arrests).  For example, the data collected for Q1 of FY2014-15 included a comparison of the number of arrests for all program participants before and after participation; presumably much more time elapsed before each participant entered the program than since, however, and PPB provides no measure of how the number of arrests relates to time. |
| **Technical Assistance** | We will continue to assess SCT's expanded services in the coming year.

PPB should track program outcomes to evaluate the efficacy of SCT. |

## F. BOEC

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the ABHU Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call

Center, and adding new or revised policies and protocols to assign calls to the PPB ABHU or directly to NGOs or community-based mental health professionals.

| Status | Noncompliance – ongoing obligation |
|---|---|
| Analysis | BOEC has established protocols for direct dispatch of ECIT officers, as well as diverting calls to the Multnomah County Crisis Line (MCCL). While the United States received copies of these two protocols during our visit in June 2015 (showing the last revision date as May 14, 2014), we have not received supporting documentation that such protocols were revised with the advice of the BHU Advisory Committee. In addition, BOEC and the City disclosed that the agency does not make a determination whether incoming calls involve a mental health component. <br><br> PPB states that BOEC protocols for triaging mental health calls date prior to the signing of the Agreement, and prior to the inception of the BHUAC. Such protocols include diverting calls to the MCCL and ECIT dispatch. While BOEC asserts that such protocols were initially reviewed by the BHU Advisory Committee, PPB's quarterly updates do not reflect that such advice was sought, nor are any supporting documents provided demonstrating that either BOEC or PPB have revised these protocols with the advice of BHUAC. <br><br> Furthermore, while the reference guide for diverting calls to the MCCL refers to both a Suicide Reference Guide and a Project Respond Reference Guide, the United States has not been provided with a copy of these guides, nor is there any indication or supporting documentation that either PPB or BOEC has sought the advice of the BHUAC on these related protocols. <br><br> Moreover, because BOEC and PPB track only those subsets of mental health calls dispatched to ECIT or assigned to the County Crisis Call Center, and not those calls dispatched to Non-ECIT officers, Portland has no data to demonstrate that the *status quo* in any way adequately triages the mental health calls received. <br><br> Portland has agreed to collect such data. In the meantime, PPB has asserted that it has revised the BOEC ECIT dispatch protocols and implemented the same, to include all suicide calls as discussed herein. This is a positive step. The Memphis Model also calls for intake to make an initial assessment of whether each call involves a crisis event, and to dispatch all such calls to crisis-intervention specialists; even BOEC's modified protocol would not, as yet, encompass this core element of the Memphis Model. We look forward to reviewing all future revisions to the dispatch protocols. <br><br> PPB includes the following documents in its folders related to paragraph 113 for 2014 Q4-2015 Q2: graphical breakdowns of the number of calls BOEC transferred to the Multnomah County Crisis Line (MCCL) each month, and for 2014 Q4, statistical descriptions of ECIT calls. PPB reports BOEC having diverted 339 calls in the past three quarters to MCCL (124 calls in 2014 Q4; 123 calls in 2015 Q1; and 92 calls in 2015 Q2). *See* PPB 2014 Q4 -2015 Q2 compliance reports, Item 113. We commend BOEC for such results, and look forward to receiving reports on any further efforts to divert calls directly to the BHU/BHRT, and/or NGOs or other |

| | community based mental health professionals as provided in this provision. |
|---|---|
| **Technical Assistance** | As discussed herein, the City has agreed to update its BOEC protocols for the direct dispatch of ECIT officers to include all suicide calls. Additional steps are required for compliance with the Memphis Model.  We look forward to receiving further information on efforts to triage and divert calls to other other services. |
| | Even with the commendable use of the MCCL, we must receive supporting documentation that PPB has sought the with the advice of the BHU Advisory Committee for any revisions or additional protocols relating to this provision going forward. |

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the ABHU Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | We appreciate PPB engaging BOEC to take a role in BOEC training.  The slide presentation PPB produced appears to be thoughtfully prepared and represents a net benefit.  PPB has reported in their 2014 Q4 update and 2015 Q1 update that the BHU Sergeant, CIT Coordinator, and Crime Analyst presented at BOEC In-Services training on October 20-21, and Nov 7-8, 2014; as well as January 15-16, 2015. |
| | Nevertheless, this Paragraph contemplates a more expansive training, and  PPB needs to obtain the guidance of the BHUAC in developing a compliant training.  A core element to a crisis intervention program is training dispatchers to not only recognize a call involving a behavioral crisis event, but the appropriate questions to ask the caller that will help the responding officer. |
| **Technical Assistance** | Technical assistance on this issue is provided by separate letter. |
| | Once BOEC and PPB develop the policies and procedures required by Paragraph 113, the City will have to develop training consistent with those policies and procedures. |

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Status | **Noncompliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB and BOEC have established protocols for direct dispatch of ECIT officers and diversion of calls to the MCCL, and it appears from the data received on dispatch of ECIT officers and calls diverted to MCCL that BOEC is following those |

| | protocols. As set forth above, the United States remains concerned as to whether the policies and practices in place ensure that mental health-related calls are adequately covered. BOEC and PPB candidly admit that many calls with a mental health component are not coded as such nor dispatched to ECIT officers. This does not comply with the Memphis Model.<br><br>BOEC asserts that it will dispatch officers as prescribed by PPB. As stated above, PPB has agreed to expand BOEC's protocol to include all suicide calls to the set of calls it diverts to ECIT officers, and the United States has recommended as an interim measure that PPB officers be required to assess whether a secondary dispatch for an ECIT officer is appropriate where mental health issues arise at the scene. PPB continues to gather data in an effort to demonstrate that its current triage processes suffice. |
|---|---|
| **Technical Assistance** | Technical assistance on this issue is provided by separate letter dated 8/17/15. |

## VII. EMPLOYEE INFORMATION SYSTEM

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall:

> a. Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;

> b. Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and

> c. Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to collect data necessary to conduct these analyses at supervisor- and team-levels.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Current Directive 345.00, Employee Information System, is available at https://www.portlandoregon.gov/police/article/525764. (PPB's 2014 Q4 folder for Paragraphs 116 and 117 contains an internet shortcut that appears intended to link to Directive 345.00, but does not lead to this policy; the shortcut instead directs the user to http://www.police.city/open.cfm?id=1219908401.) On May 8, 2015, we provided PPB with written comments on this policy. On May 14, 2015, we met with City officials and provided comments to this policy.<br><br>PPB's 2015 Q1 and Q2 data sets include memos from the EIS administrator |

| | |
|---|---|
| | regarding compliance with Paragraph 116(b) regarding a supervisor's responsibility to perform an EIS review for officers newly under their command. The EIS administrator provides concrete data and identifies a lack of timely EIS reviews. The administrator also suggests strategies to increase compliance, namely a tracking of tardy supervisors and a method for following up with them. This is solid work in identifying and addressing a compliance issue. The Q2 memo addresses compliance with Paragraph 116(b).<br><br>In PPB's quarterly compliance report, PPB explains its tracking of supervisor training on EIS use. This is helpful to understand the steps necessary for full EIS utilization.<br><br>PPB's quarterly report also states that PPB has a new methodology for sampling units for EIS assessment. Going forward, we will assess this methodology and its efficacy.<br><br>As discussed in Paragraph 74, above, on July 30, 2015, PPB advised us that it is encountering a data problem in the recording of its force and interaction data that inhibits PPB's ability to analyze these data. PPB switched to the RegJIN data recording system from a former customized, but antiquated database. The switch has resulted in a data gap from May 2015 to present, wherein PPB officers reportedly have completed FDCRs, but PPB analysts have to manually enter the data into RegJIN. RegJIN also has a geocoding error even for newly created FDCRs in which RegJIN fails to accurately recognize abbreviations for streets and locations. PPB has been forthright in advising on the limitation it discovered in RegJIN and is working on finding solutions to both problems. In response to our specific questions, PPB was candid that RegJIN's data issues inhibit PPB's ability to use its EIS. Accordingly, until RegJIN is fully functional, PPB has at least a time lag in the entry of data available for the EIS system. This undercuts the early-intervention aspect of the EIS. |
| **Technical Assistance** | PPB should revise Directive 345.00 consistent with our provided comments.<br><br>PPB must take the next step to ensure trained supervisors are utilizing EIS for all of their subordinates, not merely for new officers.<br><br>PPB's failure to collect Force Data Collection Reports and After Action Reviews for officer involved shootings, as described in Paragraph 74, above, prevents PPB from coming into compliance with the Paragraph 117. PPB must collect accurate force data from all members in order to conduct supervisor- and team-level analyses.<br><br>PPB's EIS will not provide effective early intervention until PPB and its vendor can resolve RegJIN's data gaps. |

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews:

    a. Any officer who has used force in 20% of his or her arrests in the past six months; and

b. Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.

| Status | Compliance rating pending |
|---|---|
| Analysis | Commendably, PPB contracted with an outside vendor to adapt its existing EIS system to include the "three uses of force in a one-month period" as required by Paragraph 119.  PPB completed this revision and operationalized the new trigger in 2014 Q4.<br><br>PPB reports that, in the following quarter, EIS triggered 129 force-related alerts, but PPB's EIS administrator determined that only two of those should be sent to the officers' supervisors.  *See* PPB 2015 Q1 compliance report, Items 118-119.  This appears to be quite a low level of referral, and we will follow up with PPB to more closely examine this issue in our ongoing monitoring.<br><br>For 122 of those force-related alerts, the EIS administrator justified declining referrals stating that the force events were "within policy and there were no patterns of activity to address."  We plan to follow up with the EIS administrator on-site to review and assess these declinations.<br><br>PPB's compliance report and data sets do not indicate that the EIS administrator referred the 127 declined EIS triggers to PPB's Professional Standards Division. Directive 345.00 requires such a Professional Standards review.  *See* Directive 345.00, Section 2.1.2.  We will conduct further research into this issue in our ongoing monitoring.<br><br>PPB's 2015 Q2 data set did not contain documents in the folders dedicated to Paragraphs 118-119. |
| Technical Assistance | The EIS Administrator must be willing to critically assess triggered events and utilize supervisors for reviews.  Supervisors are more familiar with officers in their chain of command and deserve the opportunity to utilize the EIS for career-saving and career-enhancing interventions.<br><br>PPB must ensure that it follows its own policy for Professional Standards reviews of EIS triggers for which there is no Supervisory Review. |

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Status | Compliance rating pending |
|---|---|
| Analysis | PPB's 2015 Q1 and Q2 data sets each have an empty folder for Paragraph 120. PPB's 2014 Q4 data set has no folder for Paragraph 120. |

| | |
|---|---|
| | PPB's quarterly compliance report indicates that PPB selected and trained a second EIS administrator in 2014, but that a different person has served in that role since March 2015.  PPB 2015 Q2 compliance report, Item 120.  We will verify that the current second administrator is trained on EIS administration during our ongoing monitoring. |
| **Technical Assistance** | PPB should ensure its second EIS administrator is trained as such. |

## VIII. OFFICER ACCOUNTABILITY

PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent.  The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.

### A. Investigation Timeframe

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means.  For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, including appeals, if any, to CRC.  Appeals to CRC shall be resolved within 21 days.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | PPB's 2014 Q4 data set folder for Paragraph 121 includes a memo from the commander of the Professional Standard Division ("PSD") describing investigations that exceeded 180 days.  IA has allocated its portions of the 180-day timeline for each step in its process.  For these investigations, the PSD identified each step that exceeded its allocated portion of the timeline.  Some justifications for exceeding the timeline were reasonable, *e.g.*, disabled status of the involved officer (Case #2013-B-0035); some were not, *e.g.*, loss of a file by a responsible unit manger (Case #2013-B-0046) or a 21-day delay for an officer interview due to inclement weather (Case #2014-B-0001).  With some consistency, PSD's memos identified four sources of delays within PPB:  (1) delays in officers providing interviews, (2) delays in responsible unit managers timely returning files, (3) delays for additional administrative investigation, and (4) delays for consideration of associated criminal allegations.  The memos also identified delays outside PPB, namely delays in IPR's intake or IPR's review of findings.<br><br>PPB provides some solid data on PSD's tracking of its portion of the 180-day deadline.  *See* PPB 2015 Q1 compliance report, Item 121; Memorandum RE "2014 Year End Report/Response to US-DOJ Action Item #123, Administrative |

Investigation Timeframe Targets," Aug. 21, 2015 (produced in PPB 2015 Q2, Folder 123). PPB reports that only 26% of 2013 internal affairs investigations met the 180-day deadline. In 2014, 32% of investigations met the deadline. PSD reports that 50% of the cases completed in each of the first two quarters of 2015 met the 180-day deadline. This is laudable progress.

PPB has taken some steps to address the missed deadlines. PPB provided copies of memoranda requiring that investigative files be logged in and out, implementing interim deadlines for review, and requiring that Responsible Unit commanders explain in writing the cause for any investigations that extend beyond the 180-day deadlines. *See* PPB 2015 Q2 Quarterly Report, Paragraph 121; PPB 2015 Q2, Folder 123.

The City has reportedly passed an ordinance change to collapse the time for CRC appeals from 60 to 21 days. *See* PPB 2015 Q1, Folder 123, DOJ Updates Notes. However, it does not appear that any appeal has been filed pursuant to this new ordinance. *See* Auditor's Office-IPR/CRC Procedures and Guidelines available at http://www.portlandonline.com/auditor/index.cfm?c=27455. DOJ will continue to monitor this issue.

Note: PPB's 2015 Q1 and Q2 folders for Paragraph 121 did not contain documents.

On February 10, 2015, we conducted an interview of IPR staff to discuss compliance with the accountability provisions of the Settlement Agreement. With respect to Paragraph 121, IPR noted that its four additional investigators should shorten the timelines for its investigations. IPR also explained various timelines for different types of cases and that IPR freely provided extensions of time for its portion of investigations. Understandably, as an independent agency IPR's extensions and timeliness do not depend on PSD's approval or disapproval. IPR and PSD still must come together to address in a more global fashion the timeline, division of labor, and reducing redundancies as discussed in our May 14, 2015 meeting with the City.

On June 24, 2015, the PPA President sent a letter to the City Auditor claiming that Settlement Agreement Sec. VIII and Paragraph 121 (incorrectly cited as 120 in the letter) create a due process right for subject officers accused of wrongdoing. Further, the author stated that IPR investigation 2014-C-0265 of three PPB members stemming from a juvenile court case must be dismissed based on this alleged due process violation. The underlying premise that Section VII or Paragraph 121 creates a due process right is incorrect. Settlement Agreement Paragraph 5 plainly states that no person or entity is intended to be a third party beneficiary of any provision for any administrative action and no person may assert a right as a beneficiary under the Settlement Agreement. IPR informed us that it would continue its investigation notwithstanding PPA's letter. This is an appropriate way to proceed. Though the City must complete investigations in a timely fashion, there is no basis to dismiss this investigation for the City's failure to have resolved the investigation within the 180-day timeframe. On August 10, 2015, we provided PPA with clarification on this point by letter. We understand that IPR has refused PPA's request, as well.

| Technical Assistance | Within PPB, there are at least two sources of delays that PPB management should definitively address:  late officer interviews and responsible unit manager reviews.  Even setting aside the 48-hour issue addressed below, delays of officer interviews have routinely exceeded 48 hours.  PPB management should make the expectation clear that officers and complainants are entitled to expeditious resolution of IA complaints.  Officers must timely provide interviews.  Likewise, PPB management should make clear the expectation that responsible unit managers meet their deadlines or PPB will hold them accountable.<br><br>As discussed in our May 14, 2015 meeting with the City must address in a more global fashion IPR's and PSD's timelines, division of labor, and redundancies.<br><br>The City should make clear that there is no statute of limitations on reaching resolution to internal affairs complaints. |
|---|---|

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident.  All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Status | **Compliance rating pending** |
|---|---|
| Analysis | PPB represents that its current practice is to conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident.  With our continued monitoring, we will review a sample of investigations to verify this claim.  We will also be looking for documentation of the tolling periods and overall time periods for resolving administrative investigations.  PPB did not produce documentation in its folder related to self-assessment of this Paragraph between 2014 Q4 and 2015 Q2. |
| Technical Assistance | The City should consider interaction with between the District Attorney and the Chief of Police to accelerate those prosecutors' consideration and resolution of potentially criminal allegations that involve PPB members. |

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | On February 10, 2015, we met with representative of IPR and PSD.  We inquired with both offices regarding their progress in meeting the Settlement Agreement's requirement for timely administrative investigations and any efforts to identify and remedy cause of delays.  Both offices had worked on timeliness, but neither had a |

| | |
|---|---|
| | remediation plan.

On February 27, 2015, PPB's Chief provided us a memo in response to Paragraph 123.  Therein, the Chief outlined PPB's 13 separate administrative tracks for investigation, candidly assessed timeliness, and described direction PPB gave to responsible unit supervisors regarding the timeliness of their reviews.  The memo contained a frank assessment, but not the final word on the source of delays or plans of remediation.  The Chief's memo made clear that PPB has more work to do.

Both the PPB's 2014 Q4 and PPB's 2015 Q1 data sets have folders for Paragraph 122 that contain the same sort of memoranda discussed above in Paragraph 121.  Namely, these are memos for each internal affairs investigation that spanned more than 180 days.  This is a significant undertaking.

PPB provided a more comprehensive written review of delays, including identifying steps in the process where these delays manifest.  The memorandum stated that changes designed to bring PPB practices into compliance with the Settlement Agreement have addressed previous sources of delay; the memorandum did not focus on additional steps that could be taken to resolve current delays.

A December 31 memo from the PSD Lieutenant to the PSD commander did propose one solution.  The Lieutenant recommends a solution to the timeline for officer involved shooting cases:

> As we have previously discussed, my proposal to fix this issue is to eliminate the RU manager's findings and many of the other redundant review stages.  This is in line with OIR recommendations, and it would allow us to drastically reduce the time for this case track.  According to the proposed timeline developed by Christina Snider, we would save 58 days and have a case track that was only 126 days.  If this case track is implemented, I would recommend putting four weeks of the saved time back into the investigation (administrative/criminal) and training analysis stages.  This would give us a case track that would be completed in 154 days, with a total of ten weeks dedicated to the critical investigative portion of the process.

PPB could use these observations and suggestions in ultimately developing a plan as required by Paragraph 123 and as part of the larger effort to address IPR's and PSD's timelines, division of labor, and redundancies discussed in our May 14, 2015 meeting with the City. |
| **Technical Assistance** | PPB's multi-track system adds to the byzantine structure of administrative investigations.  As part of a global assessment of administrative investigations, PPB would benefit from simplification of its system.

PPB along with IPR should engage in a root-cause analysis of the timeliness of administrative investigations and, based on that analysis, produce the written action plan required by Paragraph 123. |

## B. On Scene Public Safety Statements and Interviews

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967).  The City will submit the revised protocol to DOJ for review and approval.  Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Status | Noncompliance – ongoing obligation |
|---|---|
| **Analysis** | PPB's compliance report states that PPB has determined that its protocols are consistent with *Garrity*.  PPB 2015 Q2 compliance report, Item 124.  In practice, that is not the case.  As discussed in Paragraph 74, above, in some of the most high profile uses of force, officer-involved shootings, PPB failed to collect non-*Garrity* Force Data Collection Reports, as required by professional standards and PPB's own policy.  Officers must complete routine force reports and may not assert a *Garrity* protection unless the authoring officer has an objectively reasonable belief that he or she will subject him or herself to criminal self incrimination.  *See* Department of Justice Letter to Mayor Michael McGinn, November 23, 2011 (containing our prior guidance on this issue), available at http://www.justice.gov/crt/about/spl/documents/seattlepd_TA_11-23-11.pdf. |
| | PPB's compliance report also states that PPB is working on a standard operating procedure with the district attorney and union for eventual submission to the Department of Justice.  PPB 2015 Q2 compliance report, Item 124. |
| | PPB's did not produce documents related to Paragraph 124 in support of its quarterly compliance self-assessments reports for 2014 Q4, 2015 Q1, or 2015 Q2. |
| **Technical Assistance** | PPB must complete its protocol based on a candid assessment of its current practice. |
| | PPB must not give any indication that a non-*Garrity* Force Data Collection Report is anything but that.  PPB must remove its Department of Justice mandate language from the top of its reporting forms. |
| | As noted in Paragraph 180 of the Settlement Agreement, the DOJ recognizes that many portions of the Agreement will not only take time to implement, but may require changes to collective bargaining agreements, city code, and/or current city policies. |

125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event.  Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event.  The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | We requested and PPB provided the investigative files for the May 17, 2015 and June 28, 2015 officer involved shootings. These files included communication restriction orders for the involved PPB members and, apparently, certain witness officers. |
| | With respect to the June shooting incident, a Sergeant issued one involved Officer a communication restriction order on 6-29-15 at 0303, 3 hours 15 minutes after the shooting. *See* casebook 15-216504, PDF page 518, Bates page 512. The Sergeant issued the other involved Officer a communication restriction order on 6-29-15 at 0235, 2 hours 45 minutes after the shooting. See casebook 15-216504, PDF page 520, Bates page 514. In the time between the shooting and before the notification or arrival of IPR staff, however, PPB permitted the involved officers to view a video taken from a Taco Bell restaurant at the scene shooting. *See* July 20, 2015 IPR memo. The entire 604-page casebook for 15-216504 does not make any mention of the Taco Bell video. Settlement Agreement Paragraph 125 requires "immediate" communication restriction orders. The 2:45-3:15 delay in this case, and the intervening review of a Taco Bell video not even mentioned in the casebook, present a serious impediment to compliance with Paragraph 125. |
| | On July 20, 2015, IPR sent PPB a memo informing them that neither IA nor IPR was notified for more than 2.5 hours after the shooting. Nevertheless, the documentary record PPB supplied surrounding the shooting contained no mention of this delay, of the delay in imposing the CROs, nor of the viewing of the video in the interim. |
| | PPB reports no officer involved shootings in the last quarter of 2014, and one in the first quarter of 2015. PPB produced no documents in its 2014 Q4 and 2015 Q1 folders. The 2015 Q2 folder included communication restriction orders for the two aforementioned officer involved shootings in 2015 Q2, and the related rescission orders. |
| **Technical Assistance** | PPB should clarify in the relevant directive which entity is responsible for the administration of communication restriction orders and how the date should be recorded when a communication restriction order is lifted. |
| | PSD and the Inspector also should continue to ensure that CROs are in place in a timely fashion and not removed until the threshold under Paragraph 125 passes. |

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Status | Compliance Pending– ongoing obligation |
|---|---|
| Analysis | PPB represents that there were no witness officers to provide an on-scene briefing for the officer involved shootings on June 28 this year. For the May shooting, PPB treated the officer who used a less lethal round as an involved officer, not a witness officer. PPB's quarterly 2014 Q4 folder does not exist for Paragraph 126. PPB's quarterly Q1 folder for paragraph 126 is empty. The 2015 Q2 folder for Paragraphs 125 and 126 contained only the communication restriction orders, mentioned above. |
| Technical Assistance | PPB should clearly delineate that officers who do not use lethal force during a lethal force incident are witness officers rather than involved officers, even if they are involved in non-lethal force occurring during the incident. |

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | In PPB's quarterly compliance report, PPB indicates that voluntary interviews occurred for officer involved shootings in 2013 and 2014, and that the officers involved in all three 2015 shootings declined to submit to voluntary interviews. *See* PPB 2015 Q2 compliance report, Item 127. Narratives from the investigating detectives reported that the officers involved in the 2015 shootings were asked to provide walk-throughs and interviews, and declined on the advice of their counsel.<br><br>PPB represents that it does not take public safety statements from involved officers. PPB did not provide evidence of any consultation with the Multnomah County District Attorney. (PPB's quarterly 2014 Q4 folder does not exist for Paragraph 127. PPB's quarterly Q1 folder for Paragraph 127 is empty.) |
| Technical Assistance | PPB must continue to collaborate with the Multnomah County District Attorney on this issue and provide us evidence of these collaborations.<br><br>PPB departs from national policing best practices by not requiring public safety statements from involved officers. |

**C. Conduct of IA Investigations**

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable

meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Status | **Noncompliance – ongoing obligation** |
|---|---|
| Analysis | Both IPR in the February 10, 2015 interviews and PPB in its compliance report cited the addition of new IPR investigators and IPR's ability to conduct independent investigations under revised City ordinances as improvements.  These are laudable achievements. |
| | PPB's quarterly compliance report states that IA and IPR are working well together but provides no plan.  *See* PPB 2015 Q1 compliance report, Item 128.  Paradoxically, the report states "[t]his plan is in effect," but gives no such plan.  *Ibid.*  For Paragraph 128, PPB's quarterly 2014 Q4 folder does not exist and PPB's quarterly 2015 Q1 and Q2 folders for paragraph 128 are empty. |
| | As addressed above in Section A (Paragraphs 121-123), in our May 14, 2015 meeting, we asked the City to establish a work group to fundamentally address this requirement of the Settlement Agreement.  In connection with that meeting and suggested work group, we offered comments on: |
| | Directive 330.00 – Internal Affairs, Complaint Intake and Processing |
| | Directive 331.00 – Service Improvement Opportunities |
| | Directive 332.00 – Administrative Investigations |
| | Directive 330.00 – Criminal Investigations of Police Bureau Employees |
| | Directive 334.00 – Performance Deficiencies |
| | Directive 335.00 – Discipline Process |
| | Directive 336.00 – Police Review Board |
| | Directive 337.00 – Police Review Board Selection |
| | Though we offered comments to PPB's exiting Directive proposals, PPB should not feel wedded to the existing structure.  Rather, PPB's work group can consider what shape a more global reform of officer accountability should take.  We can provide comment to new policies, if the work group develops new ones. |
| Technical Assistance | As discussed in our May 14, 2015 meeting with the City, the City must address in a more global fashion IPR's and PSD's timelines, division of labor, and redundancies.  Then it must develop, submit, and ultimately implement a formal plan. |

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Status | **Partial compliance – ongoing obligation** |
|---|---|

| | |
|---|---|
| **Analysis** | As discussed in Paragraph 74, above, in the Inspector's July 1, 2014 to September 30, 2014 force data summary, the Inspector noted that four force cases "were referred"—we do not know by whom based on the Inspector's writing—to IA. PPB 2014 Q4 data set Folder 74. The Inspector notes that while IA is conducting investigation of two of those force instances, IA declined one force incident and IA is conducting additional intake to determine whether or not to open an investigation. *Ibid.* IA does not have the authority to decline any force investigation. The Inspector should be well aware of the Settlement Agreement's accountability requirements.<br><br>On October 28, 2014, we wrote the City in response to excessive force complaints described in IPR's 2013 annual report, posted October 23, 2014. Though the Court did not approve the Settlement Agreement until August 29, 2014, the City publicly asserted that it has been implementing the Settlement Agreement at least since its submission to the court on December 17, 2012, i.e., the time period covered by IPR's 2013 report. As described in that letter, IPR dismissed outright three force complaints (2013-C-0365; 2013-C-0279; 2013-C-0372); IPR dismissed one but referred it back to the subject officer's command (2013-C-0243); IPR referred one as a service improvement opportunity (2013-C-0266); and internal affairs declined one (2013-C-0264). None of the summaries offered clear and convincing evidence that the allegation of excessive force had no basis in fact. These all failed to comply with Paragraph 129.<br><br>Both the Inspector's Audit and our own monitoring confirm that at least until February 2015, PSD continued to decline excessive force investigations. On February 10, 2015, we met with representatives from PSD and the City Attorney's Office and discussed IA's declination of force cases. PPB reports that, since that meeting, IA has not declined any force cases. We will continue to monitor this issue.<br><br>On March 10, 2015, we met with the City Auditor. In part, we discussed the clear-and-convincing standard in Paragraph 129. On March 20, the City Auditor provided us a memo stating that IPR has instructed its staff on the standard as memorialized in revised IPR operation manual dated March 16, 2015, referencing City Code 3.21.070. Accordingly, IPR has promulgated the appropriate clear-and-convincing evidentiary standard for Paragraph 129.<br><br>PPB's quarterly 2014 Q4 folder does not exist for paragraph 129. PPB's quarterly 2015 Q1 and Q2 folders for paragraph 129 are empty. |
| **Technical Assistance** | PPB should continue to track all complaints that include allegations related to force to ensure that PSD has not sought to decline or effectively declined any force complaints since February 10, 2015.<br><br>Going forward, we will sample administrative investigation to ensure all force claims IPR forwards to PSD receive complete investigation. |

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Status | Noncompliance – ongoing obligation |
|--------|-----------------------------------|
| Analysis | Current PPB Directive 310.00 – Conduct, Professionalism is available at https://www.portlandoregon.gov/police/article/525489.   This directive does not explicitly prohibit retaliation against persons who report misconduct or cooperate in misconduct investigations, but could have been read to generally include intimidation within the rubric of unprofessional conduct.  (PPB's 2014 Q4 folder for Paragraph 130 contains an internet shortcut that appears intended to link to PPB Directive 310.00, but does not lead to this policy; the shortcut instead directs the user to http://www.police.city/open.cfm?id=1210059393.  PPB's 2015 Q1 and Q2 data sets have empty folders for Paragraph 130.)<br><br>In its quarterly compliance report, PPB states that it enacted a separate Directive, number 310.20, on November 19, 2014.  *See* PPB 2015 Q2 compliance report, Item 130.  Current Directive 310.20 Retaliation Prohibited is available at https://www.portlandoregon.gov/police/article/539607.  This directive generally meets the prohibition requirements contained in Paragraph 130, but the City has nevertheless failed to substantively address allegations of intimidation.<br><br>Allegations of intimidation and harassment have undermined the credibility of the accountability system in both the eyes of IPR and PPA.  We specifically do not take sides or opine on the veracity of allegations from either side of this issue, but describe a breakdown that has obstructed the City's compliance with Paragraph 130.<br><br>On June 14, 2014, before the effective date but after the City represents that it was already implementing the Settlement Agreement, the City Auditor provided the PPB and the City a memo describing allegations of perceived intimidation following an IPR interview.  Specifically, the Auditor claimed that a soliloquy between the PPA president and the IPR investigator left the investigator feeling intimidated.  In response, IPR instituted a two-person rule, requiring two IPR investigators at interviews of officers—a significant dedication of time and expense to the City.  The Auditor's memo also cites a June 9, exchange between IPR and the City's Human Resources Director, allegedly resulting in the Director's determination that the PPA president had a "special relationship" with the City and, therefore, no investigation occurred for potential violation of Directive 310.00 (before Directive 310.20's enactment).  Accordingly, the City did not investigate the allegation or reach any findings.  IPR was left without an answer to its allegation and the subject officer, i.e., PPA's president, was left under the cloud of an unresolved accusation.<br><br>In response to IPR's two-person rule, on October 6, 2014, PPA filed a grievance (2014-11).  PPA accused IPR of intimidating its members by the mere presence of two IPR investigators during administrative investigation interviews of PPA members. |

| | |
|---|---|
| | Subsequently, in our February 10, 2015 interview with IPR staff, IPR detailed a situation in which they again alleged intimidation. Specifically, IPR staff alleged that the then PPB Chief had reportedly released confidential background information about one of IPR's investigators and that PPA's president obtained that information and had confronted others in a manner that IPR perceived as intimidating.<br><br>On March 12, 2015, the City Auditor provided City Commissioners a memo describing the same allegation IPR raised in our February 10, 2015 interview. The Auditor opined that the alleged incident undermined the accountability system and threatened to interfere with the City's compliance with the Settlement Agreement. The Auditor specifically requested inquiry into whether other PPB members were involved in the alleged disclosure of the confidential background investigation. The Auditor also made reference to the prior Auditor's June 14, 2014 memo. Thus, the City was aware of allegations of intimidation and had received a specific request to remedy the allegation.<br><br>On March 13, 2015, the Mayor responded to the Auditor. The Mayor agreed to conduct background investigations by an outside entity. This was a practical and positive remedy to address future occurrences, but did not address the past allegation. The Mayor indicated that there is "little" the City can do about allegations against a non-employee, i.e., the former PPB Chief. And the Mayor agreed with the Human Resource Director's June 2014 assessment that there would be no action taken against the subject officer, i.e., due to the assertion of "a special relationship" with the PPA president. Thus, the City received an allegation on intimation by a sworn officer after the effective date of the Settlement Agreement and no investigation occurred for the potential violation of Directive 310.20. The Auditor was left without an answer to its allegation and the subject officer, *i.e.*, PPA's president, was left under the cloud of an unresolved accusation. |
| **Technical Assistance** | The City must not leave unanswered allegations of intimidation against individuals who report misconduct, make a misconduct complaint, or cooperate with an investigation of misconduct. Rather than assume that a "special relationship" merits the lack of an investigation, the City should develop a robust factual record to determine whether allegations occurred and, if they did, whether those allegations violated policy or were "otherwise authorized by law or policy" within the context of union representation. Directive 310.20. Likewise, the City should determine whether former officers took part in any alleged intimidation. The City's refusal to conduct a full investigation of allegations of intimidation undermines the public confidence in the PPB and thereby unfairly clouds public perceptions of all officers. |

131. The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below:

a. Currently, seven voting members of the PRB review use of force incidents, including two citizen members. When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members.

b. The CRC slot on the PRB in use of force cases will rotate among the CRC membership so that different CRC members participate on the PRB. Within 60 days of the Effective Date, the Auditor shall develop a membership rotation protocol.

c. All members participating in the PRB must maintain confidentiality and be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions and "just cause" requirements set forth in Portland City Charter, City rules, and labor agreements.

d. All community members and CRC members must meet the following qualifications to participate on the PRB:

> i. Pass a background check performed by the Bureau.

> ii. Participate in Bureau training to become familiar with police training and policies, including the PRB process.

> iii. Sign a confidentiality agreement.

> iv. Participate in ride-alongs to maintain sufficient knowledge of police patrol procedures.

e. Current city code provides that the City Auditor and the Chief have authority to recommend to City Council the removal of citizen members from the PRB pool. Likewise, the City Auditor or Chief shall have authority to recommend to City Council removal of a CRC member from serving on the PRB.  The Chief or the City Auditor may recommend that City Council remove a community member or member of the CRC from the pool for the following reasons:

> i. Failure to attend training;

> ii. Failure to read Case Files;

> iii. Objective demonstration of disrespectful or unprofessional conduct;

> iv. Repeated unavailability for service when requested;

> v. Breach of confidentiality;

> vi. Objective demonstration of bias for or against the police; or

> vii. Objective demonstration of conflict of interest.

f. Removal from participation in the PRB shall not affect CRC membership.

g. Like current PRB citizen members, CRC members serving on the PRB may serve in that capacity for no more than three (3) years.

h. A CRC member who participates in a PRB review shall recuse himself/herself during any later appeal of the same allegation(s) to the CRC.

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct.  The investigating entity must make

reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | The City partially complies with the city code requirements for Paragraphs 131 and 132, and must demonstrate ongoing implementation. |
| | Current Directive 336.00 is available at https://www.portlandoregon.gov/police/article/525753.   The revised PRB directive became effective October 30, 2014.  *See* PPB 2015 Q1 compliance report, Items 131, 132.  (PPB's 2014 Q4 folder for Paragraphs 131 and 132 contains an internet shortcut that appears intended to link to PPB Directive 336.00 –Police Review Board, but does not lead to this policy; the shortcut instead directs the user to http://www.police.city/open.cfm?id=1219923552.  PPB's 2015 Q1 data set has an empty folder for Paragraphs 131 and 132; the corresponding folder for 2015 Q2 contains a list of policies.) |
| | Directive 336.00, Section 3.1.1.6, provides for a CRC member to the PRB in force cases as required by Paragraph 131(a).  The Directive does not describe rotation of CRC members as required by Paragraph 131(b).  Section 3.1.1.6 refers to City Code 3.21.080 – Citizen Review Committee; however, that code provision does not address rotation, either. |
| | Directive 336.00, Section 12, provides for the confidentiality requirement of PRB information as required by Paragraph 131(c).  However, Directive 336.00 does not address Paragraph 131(c)'s other provisions concerning bias and objectivity. |
| | Paragraph 131(d) sets forth required qualifications for CRC and community PRB members.  Directive 336.00 does not address these.  However, City Code separately answers qualifications criteria for each group.  City Code 3.21.080(A)(3) requires CRC members to pass criminal background checks and not have a conflict of interest.  Likewise, City Code 3.21.080(B) requires CRC members to take training, participate in ride-alongs, and sign a confidentiality statement.  Similarly, City Code 3.20.140(C)(1)(b) requires community volunteers to pass a background check, participate in training, sign a confidentiality statement, and participate in ride-alongs. |
| | Paragraph 131(e) sets forth removal criteria for CRC and community PRB members.  Directive 336.00 does not address these.  However, City Code 3.20.140(C)(1)(c) provides removal criteria for community members identical to Paragraph 131(e).  City Code 3.20.140(C)(3) makes CRC participants in the PRB subject to the same qualification and removal criteria. |
| | City Code 3.20.140(C)(5) provides that a CRC member's removal for the PRB process shall not affect CRC membership as required by Paragraph 131(f). |
| | Through City Code 3.20.140(C)(3)'s application of selection and removal criteria to CRC members, City Code 3.20.140(C)(1)(a) limits CRC members to a three-year term, as required by Paragraph 131(g). |

|  | City Code 3.20.140(C)(4) provides that a CRC member who participates in a PRB review of an incident cannot participate in a later appeal to the CRC of the same allegation(s). This provision prohibits by ordinance what would give rise to requirement for recusal of CRC members as required by Paragraph 131(h). |
|  | Directive 336.00, Section 7.5 mirrors the additional factual investigation requirements of Paragraph 132. |
| **Technical Assistance** | Note that in order to address the timeliness of administrative investigations, PPB may need to include in its potential substantive reform the 14 days permitted for subject review before a PRB hearing. *See* Directive 336.00, Sections 8.3, 10.1. |
|  | PPB has developed a compliant policy and City Code, on its face. Going forward, in order to determine whether the City is in substantial compliance with Paragraphs 131 and 132, we will assess the PRB practice to ensure conformance with the revised PRB Directive and City Code. |
|  | Additional consideration should be given to include the text of Directive 336.00 in the City Code. Also, PPB should consider staggering the terms of the CRC members serving on the PRB to maintain experience given the limited number of cases that come up for review in any given year. |

133. If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall: (1) enter that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units ; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial finding creating a rebuttable presumption that the force used also violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the IA investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.

| **Status** | **Partial compliance – ongoing obligation** |
| **Analysis** | PPB's quarterly 2015 Q1 folder for paragraph 133 contains new Standard Operating Procedure 42. PPB implemented this SOP on February 24, 2015. (PPB's quarterly 2014 Q4 folder does not exist for paragraph 133; PPB did not produce documents in its 2015 Q2 folder.) |
|  | SOP 42 concerns evaluating officers' fitness to participate in specialized units after those officers' use of force results in a finding of liability in a civil trial. The purpose of SOP 42 is consistent with Paragraph 133(2). Commendably, SOP 42 provides for a broad data set to evaluate officer fitness for participation in |

specialized units.  However, except for the summary entry of the civil finding in EIS, the listed data in SOP 42 do not include an examination of the civil finding of liability, itself.  Nor does SOP 42 refer to the trainer selection criteria discussed above in Paragraph 83.

In September 2014, *i.e.*, after the Effective Date of the Settlement Agreement, a civil jury reached a verdict in favor of a plaintiff on an excessive force claim stemming from a June 18, 2011 incident (PPB Case No. 11-050814).  Shortly after the verdict, in response to our inquiry, the City reported having entered the civil finding in PPB's EIS as required by Paragraph 133.

The Multnomah County Prosecuting Attorney referred the same allegation to the PPB for investigation in June or July 2011.  PBB initiated an administrative investigation on July 22, 2011 (2011-C-0237).  We requested and the City provided what purports to be the entire administrative investigation file.  This was PPB's original investigative file, not the trial record.

In ongoing discussions with the City, the City ultimately has asked the Department of Justice to opine whether the documents provided demonstrate PPB has, in fact, previously conducted an administrative investigation of 2011-C-0237.  When the City has conducted an administrative investigation and there has been a subsequent civil verdict on the same incident, PPB must apply Paragraph 133(4) or (5).  When there has been *no* administrative investigation and there has been a subsequent civil verdict on the same incident, PPB must apply Paragraph 133(3).

Though the Department of Justice did not seek specific enforcement of the Settlement Agreement during the pendency of the City's appeal, with the July 30, 2015 resolution of the appeal, we now request that the City specifically perform its obligations as required by Paragraph 133.

To that end, based on our review of the entire investigative file that the City provided to us, the City may appropriately address PPB Case No. 11-050814 within Paragraph 133(4) or (5).  PSD did conduct an administrative investigation in 2011 marking administrative findings of "exonerated" for all three officers, thus removing the allegation from 133(3).  However, if PPB determines that this allegation fits 133(5), *i.e.*, no evidence from trial justifies reopening, it must reconcile the paradox between the jury's finding excessive force by a preponderance of evidence and PSD's summary declination and exoneration shown in the investigative file.

Our review of the PPB investigative file indicates some issues PPB should address in conducting its Paragraph 133 analysis.  The investigative file included three apparently credible non-officer witness interviews, including the PPB's longtime volunteer chaplain, but did not include an interview from the complainant or *Garrity* notices and interviews of the three subject officers.  The investigative file included the ECW data download from Taser International showing five separate five-second uses of the ECW.  Notably, in the force debrief section, one of the involved officers stated that she was unaware that she could attempt to handcuff a subject during an ECW use.  The investigative file did not include pictures of the ECW application sites.  The Force Data Collection Report did not mark "other"

| | |
|---|---|
| | under subject injuries for ECW marks described on the ECW report.  This incident occurred before PPB implemented Directive 940 – After Action Review; accordingly, there is not a separate force investigation on which to rely.

PPB reports that it has applied SOP 42 to the three involved officers and PSD has submitted its report for review by an assistant chief.  *See* PPB 2015 Q1 compliance report, Item 133. |
| **Technical Assistance** | PPB should revise SOP 42 to include specific consideration of the liability finding itself.  Further, PPB should ensure that SOP 42 is consistent with Paragraph 83 and with PPB's revised accountability directives.

PPB should furnish us records demonstrating that PPB has applied its SOP 42 to the three officers involved in PPB Case No. 11-050814.

PPB must candidly and thoroughly engage in the required Paragraph 133(4) or (5) analysis.  This should include PPB's indicia and reasoning for selecting between subsections (4) and (5).  We will audit the resulting information. |

## D. CRC Appeals

134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.

| **Status** | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | City Code 3.21.080 Citizen Review Committee, as amended effective February 7, 2014, expands CRC membership to eleven while leaving CRC's quorum unchanged as required by Paragraph 134.  City Code 3.21.080(A).  The code includes the required "neutral, unbiased, and capable of making objective decisions" criteria.  City Code 3.21.080(A)(3). |
| **Technical Assistance** | We thank CRC volunteers for their continued involvement.  Going forward, we will continue to assess the efficacy of the CRC system. |

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request be voted on by a quorum, the members voting

must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | The City Auditor's office has posted a series of policies and rules for operation of IPR and CRC.  *See* http://www.portlandonline.com/auditor/index.cfm?c=27455. Generally, the City needs to update these to ensure that they comply with the Settlement Agreement.  CRC's appeals process, for example, is set forth in PSF-5.03 – Citizen Review Committee - Independent Police Review Division - Appeals Procedures, *available at* http://www.portlandonline.com/auditor/index.cfm?c=27455&a=9030, allows a majority to vote to challenge PPB's findings in any undefined way.  That rule does not tell CRC that to reach such a decision it "may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence."  Paragraph 135.  Currently posted CRC rules address disagreement with PPB findings; the rules do not contemplate CRC appeals of IPR's newly wholly independent administrative investigations. |
| Technical Assistance | In considering updates to IPR and CRC rules, the City should consider consulting with these groups when globally reviewing the accountability systems as discussed in our May 14, 2015 meeting. |
| | In revising CRC's rules, the City should ensure their conformance with these and other provisions of the Settlement Agreement, particularly timeliness. |

**E. Discipline**

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | Current Directive 338.00 is available at https://www.portlandoregon.gov/police/article/525761.  (PPB's 2014 Q4 folder for paragraph 137 contains an internet shortcut that appears intended to link to PPB Directive 338.00 – Discipline Guide, but does not lead to this policy;  the shortcut instead directs the user to http://www.police.city/open.cfm?id=1219923647. PPB's 2015 Q1 and Q2 data sets each contain an empty folder for paragraph 137.)  On May 8, 2015, we provided PPB with written comments on Directive 338.  On May 14, 2015, we and COCL met with PPB and IPR officials to discuss these policies and the requirements of the Settlement Agreement.  Our expert policing consultant and COCL's expert attended by telephone.  We asked PPB and IPR to convene a work group to undertake the tasks required by the Settlement Agreement in order to revise the policies in a compliant fashion.  PPB still has this and other directives |

| | |
|---|---|
| | under consideration. |
| | A discipline guide is designed to give fair notice to all accused and their accusers of guidance for the potential scope of disciplinary actions that may result from sustained findings.  Officers should know that they are treated fairly, not subject to arbitrary discipline or excuse based upon their relationships with superiors. |
| | Even if the other aspects of the accountability system were fully functioning as intended, PPB recently took an action which undercuts the purposes of the discipline guide: PPB revoked imposed discipline for a sustained finding without any new evidence affecting the validity of that finding.  In June 2014, *i.e.*, before the Effective Date but after the City publicly asserted it was already implementing the Settlement Agreement, the City settled a notice of tort claim filed by a PPB member.  The settlement included erasing two disciplinary actions based on 2010 findings.  By erasing these findings, PPB leadership validated the officer's conduct that PPB had previously declared outside of policy. |
| | After non-career-ending discipline, officers have room to reconcile, earn advancement, and win commendation.  However, nowhere in Directive 338.00 or the disciplinary matrix developed in connection with that directive is there a means to erase past sustained findings from an officer's record.  Nor should there be. |
| | The effectiveness of PPB's implementation of the discipline guide necessarily depends on an accountability system that functions as required by the Settlement Agreement.  Accordingly, to come into compliance with Paragraph 137, PPB must substantially comply with the accountability provisions of the Settlement Agreement as well. |
| **Technical Assistance** | PPB should finalize it directive and matrix as part of its global consideration of officer accountability. |
| | PPB should memorialize that, absent new evidence, it will not expunge past accountability findings and discipline. |
| | We cannot fairly say the PPB has implemented a discipline guide, in the absence of an accountability system that functions as required by the Settlement Agreement.  Accordingly, to come into compliance with Paragraph 137, PPB must substantially comply with the accountability provisions of the Settlement Agreement. |

## F. Communication with Complainant and Transparency

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail,

email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | IPR has added to its internet page a form requesting status of a complaint. *See* http://www.portlandonline.com/auditor/index.cfm?c=64452. |
| Technical Assistance | Whether or not the City has complied with these obligations will require an audit of administrative investigation files, including notice letters, resolution letters, and records that show case-by-case consideration if disclosure of corrective actions. In the coming year we will assess a sample of such records. |

## IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD

141-145. COAB duties and selection

| Status | **Not measured** |
|---|---|
| Analysis | The City Council selected the COCL on November 12, 2014. |
| | The Collaborative Agreement with the AMAC modified the selection process for the at-large community members of the COAB. The selection committee announced COAB members and at-large alternates on January 22, 2015. Since that time there have been several resignations and alternates appointed. |
| | Furthermore, Paragraph 144 provides that "[f]ollowing the removal of a COAB member, an alternative shall be selected from the same pool of applicants as the removed COAB member." Counsel for United States and the City in consultation with the COCL and Counsel for the AMAC have conferred and determined that while this provision is sufficiently clear for alternates to be selected for the PCOD/HRC, HRC, City Commissioner, and PPB Advisory appointments, the process needs to be further clarified for the selection and appointment from the pool of applicants for alternates for the five community at-large positions. We have requested that counsel for the City meet to confer with us on such a proposal. Such a meeting has not yet occurred, but should occur before the October COAB meeting. |

146. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan:

a. Within 90 days of the COAB selection, the City, in consultation with COAB, will conduct a reliable, comprehensive, and representative survey of members of the Portland community, including civilians and PPB officers, regarding their experiences with and

perceptions of PPB's prior community outreach efforts and accountability efforts and where those efforts could be improved, to inform the development and implementation of the CEO Plan;

b. COAB, in conjunction with PPB, shall consult with community members (not only through PPB Advisory Councils and Roundtables) and hold at least two (2) public hearings, completed within 90 days of the COAB selection, in addition to the representative survey described above, to gather public input on PPB's outreach efforts; the hearings shall be held in locations to ensure that PPB receives input from all parts of the Portland community;

c. COAB shall review PPB's prior community outreach efforts to contribute to the development of a new CEO Plan;

d. COAB shall solicit and consider input from the Human Rights Commission's Community Police Relations Committee ("CPRC"), including its work to implement the 2009 PPB "Plan to Address Racial Profiling";

e. Within 60 days of the anticipated due date for survey results, the COAB and PPB, in consultation with the appropriate City resources knowledgeable about public outreach and survey analysis, shall review and analyze the results of the survey and other public comments discussed above;

f. The CEO Plan shall include strategies to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members. The Plan shall also identify gaps in available resources to achieve its goals.

g. The COAB may also provide information to the PPB on other areas related to community engagement and outreach to contribute to the development of the CEO Plan, including:

    i. integration of community and problem-oriented policing principles into PPB's management, policies and procedures;

    ii. recruitment, selection, training, promotion, and personnel evaluations;

    iii. tactics and deployment of resources; and

    iv. systems of accountability.

g(2). COAB shall submit its recommended CEO Plan to the Chief, in writing, within 90 days of the COAB's completion of survey analysis.

h. The Chief's Office, in consultation with the five PPB advisory members of the COAB shall utilize the COAB's recommendations in developing and implementing the CEO Plan. The Chief's Office shall present the final proposed CEO (with implementation timeline) to the COAB for a vote of approval within 240 days of the effective date of this Agreement.

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, together with the COAB, may develop outreach and policing programs specifically tailored to the residents of the precincts.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental

health status of the subject, and provide such information to the CPRC to contribute to their analysis of community concerns regarding discriminatory policing.  In consultation with the COAB and CPRC, PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

149. The COAB, COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach.

| Status | Compliance rating pending–further documentation needed |
|--------|--------------------------------------------------------|
| Analysis | PPB, along with other City components, share obligations under the provisions in paragraphs 146-149 with COCL and/or COAB.  Unsurprisingly, then, while PPB began to implement many portions of the Settlement Agreement before the effective date, PPB could not independently bring these to fruition while awaiting the appointment of COCL and selection of the COAB.

While waiting, PPB took some steps on its own.  PPB established its own CEO Plan steering committee and compiled lists of existing community engagement opportunities.  *See* 2014 Q4 PPB data set, folder 146.  On May 15, 2015, PPB issued to the Department of Justice a memo as PPB's Data Collection Enhancement Report.  *See* PPB 2015 Q1 data set, folder 48.  This included discussion of PPB's new record management system, EIS, and ECIT template, all discussed above. *Ibid.*  PPB also has a racial profiling policy that prohibits bias and profiling based on a number of personal characteristics.  *See* Directive 344.05-Bias-Based Policing/Racial Profiling Prohibited, *available at* https://www.portlandoregon.gov/police/article/525763.

PPB posted stop data on the PPB website.    *See* Stop Data Collection, First Quarter 2015, *available at* https://www.portlandoregon.gov/police/article/529596.

Notwithstanding these independent efforts by PPB, these provisions of the Settlement Agreement relate to long-running community concerns.  The importance of these issues requires collaborative work from PPB and COCL/COAB to build a bilateral relationship between PPB and the community.

Since the appointment of the COCL and COAB members, the COAB, the City and PPB have attempted to meet some of the requirements of these paragraphs. Subparagraph (b) requires that "COAB, in conjunction with PPB, … hold at least two (2) public hearings,… held in locations to ensure that PPB receives input from all parts of the Portland community" in order "to gather public input on PPB's outreach efforts."  The COAB and PPB held a hearing regarding PPB's outreach efforts on April 2 at the Charles Jordan Community Center.  PPB reports that the meeting did not achieve its goals, and that a different strategy and format is in order for the next public hearing.  This appears to be a useful review to undertake, as the COAB and PPB received considerable feedback on the sequence of events and allocation of time to each event at the hearing.

Steps have also been taken towards conducting the survey called for in subparagraph (a). |

|  | As of September 10, 2015, PPB had not yet reported having engaged in the discussions surrounding demographic data.  PPB tracks demographic data under its current rubric, namely perceived ethnicity, gender, age, and mental health status.  *See* https://www.portlandoregon.gov/police/article/529596, Appendix A.  However, COAB members' comments in response to the COCL's quarterly reports indicate their desire to modify the classification of individuals with whom PPB interacts.<br><br>COCL has now developed a Community Engagement & Outreach Plan Development Timeline.  There are many tasks and a lengthy timeline designed to result in the CEO Plan.  Going forward, we will monitor this process, and participate where required by Paragraph 149.<br><br>Furthermore, the City must ensure that other City-supported bodies, such as the CPRC, receive adequate support and guidance to fulfill their requirements under this Agreement. As you may recall, this body was specifically reinserted back into the draft Settlement Agreement after the initial presentation to City Council and public comment.  However, based on our observation and comment at the CPRC's July meeting, we are concerned that CPRC does not currently receive adequate guidance and support to fulfill its obligations under the Settlement Agreement. |
|---|---|
| **Technical Assistance** | COAB and PPB should include the need for language access services in the tracking of data to tailor outreach and community policing.<br><br>PPB should actively participate with COCL and COAB as they proceed through the CEO Plan Development Timeline.<br><br>We recommend that PPB and the COAB assess the feedback it did receive concerning community outreach at the public hearing.<br><br>The City should engage the CPRC to ensure that they have the support and guidance necessary to perform its functions, including implementing the plan to address racial profiling. |

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities.  A draft of the Annual Report shall be reviewed by the COAB before the report is finalized and released to the public.  Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| **Status** | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | PPB has not produced an up-to-date, compliant report for Paragraph 150.  PPB's most recent report covers 2013.  *See* 2013 Statistical Report, *available at* https://www.portlandoregon.gov/police/29863.  PPB maintains an internet page for DOJ-related documents, including quarterly and annual reports.  *See* https://www.portlandoregon.gov/police/62642.  PPB does not present any more |

| | current annual report on this page. *Ibid.* |
| --- | --- |
| | PPB originally anticipated its annual report in June 2015, *see* PPB 2015 Q1 compliance report, Item 150, but appears to have modified the anticipated date to January 2016, *see* PPB 2015 Q2 compliance report, Item 150.  PPB did not provide an explanation for the change. |
| | PPB's compliance officers presented COAB a report on PPB's implementation of the Settlement Agreement; however, this does not take the place of a comprehensive PPB annual report. |
| **Technical Assistance** | PPB must complete the report required by Paragraph 150, submit the report to COAB, and publically present the finalized report. |
| | Note that compliance with this requirement will require coordination with the COAB. |

151. The COAB may make recommendations approved by a majority of its membership regarding implementation of the terms of this Agreement.

| Status | Not measured |
| --- | --- |

152. The COAB shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The COAB shall also provide the opportunity for public comment at each of its meetings to keep open lines of communication with the public-at large.

| Status | Partial compliance – ongoing obligation |
| --- | --- |
| **Analysis** | The Mayor and Chief and numerous other PPB members have attended COAB meetings.  However, COAB has not yet hosted the meeting required in Paragraph 152.  COAB began meeting on February 9, 2015.  More than six months have passed.  A Paragraph 152 meeting has not occurred.  PPB states that it is planning its first such meeting for this fall.  PPB 2015 Q2 compliance report, Item 152. |
| | *See* Paragraphs 146-49 discussion, above (addressing PPB's efforts toward establishment of a CEO Plan). |
| **Technical Assistance** | The Police Commissioner and PPB should include plans for twice yearly productive exchanges with the COAB, as required by Paragraph 152, as part of PPB's engagement on the CEO Plan Development Timeline. |

153. A representative of the Oregon U.S. Attorney's Office shall be invited to attend all COAB meetings.

| Status | Substantial compliance – ongoing obligation |
|---|---|

154. COAB shall meet as needed to accomplish their objectives as set forth in this Agreement. All COAB meetings shall be open to the public.  In addition, COAB shall attend quarterly meetings with the COCL as provided in Par 163.  To the extent that COAB meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the COCL to ensure compliance with those laws and agrees to represent COCL in any challenges regarding compliance with those laws.

155. The City shall provide COAB members with appropriate training necessary to comply with requirements of City and State law.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | COAB has met regularly since its establishment. |
| | COAB's formation and establishment was challenging.  COAB is a new type of entity assessing implementation of a Settlement Agreement.  As such, COAB had no pattern to follow.  COAB needed to develop its bylaws, subcommittees, and processes. |
| | The City provided COAB advice on compliance with laws governing open public records and open public meetings.  The City provided COAB legal advice concerning ethics for public officials and questions of prayer in public meetings.  The City offered civilian police academy and ride-alongs to COAB members.  IPR provided training on the accountability systems. |
| | Separately, the United States provided COAB a "Settlement Agreement 101" training and memoranda on the roles and limitations of the COAB. |
| | COCL maintains a COAB/COCL website providing abilities to store training material and memoranda, post documents, host online fora, and publicize COAB meeting schedules and agenda.  *See* http://www.cocl-coab.org/. |
| Technical Assistance | As new members join COAB, the City will need to ensure those members receive timely training. |
| | COAB could continue to benefit from ongoing training as it addresses specialized subject matter, *e.g.*, crisis intervention and training. |

## X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT

156. PPB shall implement immediately all provisions of this Agreement which involve the continuation of current policies, procedures, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. Except where otherwise specifically indicated, PPB shall implement all other provisions of this Agreement no later than within 180 days of the Effective Date.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | The Settlement Agreement's Effective Date is August 29, 2014.  Accordingly, the 180-day deadline passed on February 25, 2015.  The City began to implement some portions of the Settlement Agreement even before the Effective Date.  As described in this Report, some efforts have had laudable results, but not all efforts have been fully compliant.  For the majority of Settlement Agreement provisions, PPB will need to finalize and obtain U.S. approval on a pertinent PPB policy, train staff on the policy, and then demonstrate through its audits that staff consistently follow the policy. |
| Technical Assistance | As described in the United States' August 10, 2015 policy review letter, with the resolution of the appeal on July 30, 2015, we look forward to the parties' rededication of resources to continue to develop compliance monitoring, and a more efficient review of policies that includes COCL and COAB input. |

157. With regard to any provision that provides for DOJ's review and approval, including review of all policies that must be revised, approval will be granted in a timely fashion provided that the PPB's action reasonably satisfies the requirements and standards set forth in the relevant provision(s).

| Status | **Not measured** |
|---|---|

158. All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations. Audits and reports shall be posted on PPB's website.

159. PPB shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to PPB decision making and activities, and compliance with this Agreement, in accordance with the Oregon Public Records Law.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | *See* Paragraph 150 discussion, above.  PPB has posted its quarterly self-audits on its website.  *See* https://www.portlandoregon.gov/police/62642. <br><br> COCL/COAB have posted their reports on their shared website.  *See* http://www.cocl-coab.org/. <br><br> IPR's latest available report covers the fourth quarter of 2014.  *See* http://www.portlandonline.com/auditor/index.cfm?c=40870&a=525357. |
| Technical Assistance | The City's reports are out of date.  The City is, in part, hindered by the difficulties with the RegJIN software system described above.  Even so, PPB and IPR should |

| | bring their public reporting up to date to the extent that data are available to do so. |
|---|---|

## A. Compliance Officer/Community Liaison

160-164. COCL Selection and Duties

| Status | Not measured |
|---|---|
| Analysis | The City Council selected COCL November 12, 2014.<br><br>COCL has now published a quarterly report schedule to which the parties agreed. |

## B. PPB Compliance Coordinator

165. PPB will hire or retain an employee familiar with the operations of PPB for the duration of this Agreement, to serve as a PPB Compliance Coordinator. The Compliance Coordinator will serve as a liaison between PPB and both the COCL and DOJ and will assist with PPB's compliance with this Agreement. At a minimum, the Compliance Coordinator will:

a. Coordinate PPB's compliance and implementation activities;

b. Facilitate the provision of data, documents, materials, and access to PPB personnel to the COCL and DOJ, as needed;

c. Ensure that all documents and records are maintained as provided in this Agreement;

d. Assist in assigning compliance tasks to PPB personnel, as directed by the Chief of Police or the Chief's designee; and

e. Take primary responsibility for collecting the information the COCL requires to carry out his/her assigned duties.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | PPB appointed a Captain as compliance coordinator who, along with a civilian experienced in mental health services, has ably coordinated compliance reporting to the United States.  These individuals and their staff have also provided data and communicated openly when called upon.  We thank all of these staff for their efforts. |
| Technical Assistance | This compliance report is intended to serve as a roadmap to assist PPB in furthering compliance.<br><br>In the coming year, with the resolution of the appeal, we will seek to finalize policies with the input of COCL and COAB.  We will request samples of Force Data Collection Reports and After Action Reviews on an ongoing production basis. We will audit administrative investigations.  These efforts will place demands on PPB's compliance officers. |

## C. Access to People and Documents

166. The COCL shall have full and direct access to all PPB and City staff, employees, facilities, and documents that the COCL reasonably deems necessary to carry out his/her duties. If a document requested by the COCL is a privileged attorney-client communication, the COCL shall not disclose the document in a manner that destroys that privilege without the approval of the City Attorney. The COCL shall cooperate with PPB and the City to access people, facilities, and documents in a reasonable manner that minimizes, to the extent possible, interference with daily operations. In order to report on PPB's implementation of this Agreement, the COCL shall regularly conduct reviews to ensure that PPB implements and continues to implement all measures required by this Agreement. The COCL may conduct on-site reviews without prior notice to PPB or the City.

167. For the purpose of monitoring this Agreement, DOJ and its consultative experts and agents shall have full and direct access to all PPB and City staff, employees, facilities, and documents, that DOJ reasonably deems necessary to carry out the enforcement and monitoring provisions of this Agreement to the extent permitted by law.  DOJ and its consultative experts and agents shall cooperate with PPB and the City to access involved personnel, facilities, and documents in a reasonable manner that minimizes interference with daily operations; however, DOJ may conduct on-site reviews without prior notice to PPB or the City. DOJ shall provide PPB or the City with reasonable notice of a request for copies of documents. Upon such request, PPB or the City shall provide DOJ with copies (electronic, where readily available) of any documents that DOJ is entitled to access under this Agreement, except any documents protected by the attorney-client privilege. Should PPB decline to provide DOJ with access to a document based on attorney-client privilege, PPB promptly shall provide DOJ with a log describing the document, including its author, recipients, date of production, and general topic.

168. All non-public information provided to the COCL or DOJ by PPB or the City shall be maintained in a confidential manner.  Nothing in this Agreement requires the City to disclose documents protected from disclosure by the Oregon Public Records Law to third parties.

| Status | Not measured |
|--------|--------------|

## D. Review of Policies and Investigations

169. Within 180 days of the Effective Date, PPB shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. PPB shall revise and/or develop as necessary other written documents such as handbooks, manuals, and forms, to effectuate the provisions of this Agreement.  PPB shall send new or revised policies, procedures, protocols, and training curricula regarding use of force, interactions with persons in mental health crisis and systems of accountability to DOJ as they are promulgated, with a copy to the COCL. DOJ and the COCL will provide comments within 45 days and will not unreasonably withhold recommendations about policies, procedures, protocols, and training curricula.  The COCL shall seek the timely input of the relevant members of the Training Division and patrol officers, as well members of the community. If the City disagrees with DOJ's comments, the City shall, within 14 days of

being informed of the DOJ's comments, inform the Parties in writing of the disagreement. Within 14 days thereafter, the Parties shall meet and confer on the disagreement at a mutually agreeable time.  Upon approval by the Parties, policies, procedures, training curricula, and manuals shall be implemented within 30 days of agreement or the Court's decision.  PPB shall provide initial and in-service training to all officers and supervisors with respect to newly implemented or revised policies and procedures. PPB shall document employee review of and training in new or revised policies and procedures.

170. The Chief shall post on PPB's website final drafts of all new or revised policies that are proposed specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement, to allow the public an opportunity for notice and comment, prior to finalizing such policies.

171. The Chief's Office shall coordinate a review of each policy or procedure required by this Agreement 180 days after such policy or procedure is implemented, and annually thereafter (on a regularly published schedule), to ensure that such policy or procedure provides effective direction to PPB personnel and remains consistent with the purpose and requirements of this Agreement.

| Status | **Partial compliance – ongoing obligation** |
|--------|---------------------------------------------|
| Comment | Please refer to our August 10, 2015 policy review letter. |

172. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

| Status | **Partial compliance – ongoing obligation** |
|--------|---------------------------------------------|
| Analysis | *See* Accountability section, above. |

173. In addition to compliance reviews, the COCL shall lead semi-annual qualitative and quantitative outcome assessments to measure whether the City and PPB's implementation of this Agreement has created: (1) capable systems and resources for responding to persons in mental health crisis; (2) competent accountability and oversight systems; (3) effective training for police officers that increases the knowledge, skills and abilities necessary for effective and successful delivery of service to persons in mental health crisis; (4) proper management of the use of force to meet constitutional standards; and (5) robust systems of community engagement. These outcome assessments shall be informed by the following:

    a. Use of Force Data:

        i. the number of police interactions where force was used on individuals with actual or perceived mental illness, including the type of force used; the reason for the interaction, i.e., suspected criminal conduct or a well-being check; the threat to public safety, including whether the person was armed and if so, with what; a description of the type of resistance offered, if any; and a description of any attempts at strategic disengagement;

ii. the rate of force used per arrest by PPB; force implement used; geographic area (i.e., street address, neighborhood, or police precinct or district); type of arrest; and demographic category;

iii. the rate of force complaints that are sustained, overall and by force type; source of complaint (internal or external); type of arrest; type of force complained of; demographic category;

iv. uses of force that were found to violate policy overall and by force type; type of arrest; demographic category; force implement used; and number of officers involved;

v. the number and rate of use of force administrative investigations/reviews in which each finding is supported by a preponderance of the evidence;

vi. the number of officers who frequently or repeatedly use force, or have more than one instance of force found to violate policy;

vii. the rate at which ECW usage decreases or increases compared to the use of force overall and by weapon; and

viii. the rate at which officer and subject injuries decrease or increase overall and by severity of injury.

b. Mental health interaction data on:

i. MCPT dispositions;

ii. the flow of people in mental health crisis through PPB, the County jail, emergency receiving facilities, and community agencies;

iii. officer and agency staff satisfaction with the transfer process;

iv. the rate of repeat calls for service involving individuals in mental health crisis;

v. the use of the mental health commitment law; and

vi. the availability of appropriate treatment options;

c. Training data, including:

i. officer evaluation of adequacy of training; and

ii. the Training Division's assessment of incidents involving officer or civilian injury.

d. Performance data, including:

i. uses of force found to be unreasonable, complaints sustained and not sustained, and other performance related indicators for supervisors/commanders promoted pursuant to the requirements of this Agreement, and for the units these supervisors/commanders command; and

ii. initial identification of officer violations and performance problems by supervisors, and effectiveness of supervisory response.

e. Accountability data, including:

i. the number of complaints (broken out by type of complaint), with a qualitative assessment of whether any increase or decrease appears related to access to the complaint process;

ii. rate of sustained, not sustained, exonerated complaints;

iii. the number and rate of complaints in which the finding for each allegation is supported by a preponderance of the evidence;

iv. the number of officers who are subjects of repeated complaints, or have repeated instances of sustained complaints; and

v. the number, nature, and settlement amount of civil suits against PPB officers regardless of whether the City is a defendant in the litigation.

174. In conducting these outcome assessments, the COCL may use any relevant data collected and maintained by PPB, provided that it has determined, and the Parties agree, that this data is reasonably reliable and complete.  Additionally, the COCL shall solicit input from community groups or initiatives that have relevant experience conducting statistical analyses.  The COCL will contribute to and review the Annual Community Survey.

| Status | Compliance rating pending– more information needed |
|--------|---------------------------------------------------|
| Comment | COCL has not completed such a specific outcomes assessment, yet.  COCL must do so. |

175. Two years after the Effective Date, DOJ shall conduct a comprehensive assessment to determine whether and to what extent the outcomes intended by the Agreement have been achieved.  DOJ will further examine whether any modifications to the Agreement are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the Agreement's requirements. This assessment also shall address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating full and effective compliance.  Based upon this comprehensive assessment, DOJ may recommend modifications to the Agreement that are necessary to achieve and sustain intended outcomes. Where the City agrees with DOJ's recommendations, the Parties shall stipulate to modify the Agreement accordingly.  Nothing in this assessment shall empower DOJ to unilaterally modify the terms of this Agreement.

| Status | Not measured |
|--------|--------------|
| Comment | Our two-year comprehensive assement will be due by August 29, 2016, since the effective date was August 29, 2014.  As noted in our cover letter, this compliance assessment report provides the available compliance status through August 28, 2015. |

**E. City Reports and Records**

176. Beginning with the COCL's first quarterly report, as set forth in paragraph *[162]166* of this Agreement, PPB shall prepare a status report no later than 45 days before the COCL's quarterly report is due.  The PPB Compliance Coordinator shall lead the effort in preparing this status report and shall provide copies to the COCL, DOJ, and the public.  PPB's report shall delineate the steps taken by PPB during the reporting period to comply with each provision of this Agreement.

177. PPB shall maintain all records, as applicable, necessary to document their compliance with the terms of this Agreement and all documents expressly required by this Agreement.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | PPB has produced very helpful quarterly reports and data sets.  However, as outlined above, we have questioned the reliability of some of the conclusions reached in the reports.  *See, e.g.*, Paragraphs 74, 125 discussion, above. |

**F. Enforcement**

178-90. Court entry, good faith, notice, mediation, motion, defense

| Status | Not measured |
|---|---|
| The parties moved jointly to enter the Settlement Agreement.  The United States has not instituted an enforcement action. | |