

**U.S. Department of Justice**

Civil Rights Division

JS:LC:JG:MJC
DJ 207-61-1

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

October 28, 2014

Tracy Reeve, City Attorney
Office of the City Attorney
1221 SW 4ᵗʰ Avenue, Ste 430
Portland, OR  97204

LaVonne Griffin-Valade
City Auditor
1221 SW 4ᵗʰ Avenue, Room 140
Portland, OR  97204

      RE:   *United States* v. *City of Portland*, 3:12-cv-02265-SI

Dear Ms. Reeve and Ms. Griffin-Valade:

      We have reviewed the Independent Police Review Division ("IPR") annual report for 2013, posted October 23, 2014.  The report offers helpful information.  We thank IPR for assembling the report and synthesizing its data.

      There are two items, however, which cause us immediate concern with respect to the Settlement Agreement in the above-captioned matter: (1) timeliness; and (2) failure to fully investigate use-of-excessive-force complaints.  The Court did not approve the Settlement Agreement until August 29, 2014.  The City, however, publically has asserted that it has been implementing the Settlement Agreement at least since its submission to the court on December 17, 2012.  Accordingly, the City has asserted implementation has been occurring for the time period covered by IPR's 2013 report.

Timeliness:

      IPR must complete its annual reports in a more timely fashion to be useful to the incoming Compliance Officer Community Liaison ("COCL") and Community Oversight Advisory Board ("COAB"), and us in using the report's data for compliance assessment and assisting the City in coming into compliance.  We are mindful that IPR's data for any given year is dependent, in part, on the outcomes of investigations from the preceding year.  We are also mindful that IPR produces some quarterly reports.  Nevertheless, data for the previous year's investigations, from intake through approval of discipline, should take no longer than 180 days (Settlement Agreement Par. 121), e.g., June 29, 2014 for a complaint received December 31, 2013.  IPR's data show that IPR and internal affairs do not require the full 180 days to process most allegations.  Thus, most data should be available in a shorter time frame.  Accordingly, we

would like agreement from the City that it will produce its 2014 IPR annual report no later than March 31, 2015, with the ability to offer amendment to the annual report for any allegations for which the investigative timeframe exceeds this deadline.

<u>Excessive Use of Force:</u>

The City and the Portland Police Bureau ("PPB") must ensure that all allegations of use of excessive force are subject to full and completed internal affairs investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact. (Settlement Agreement Par. 129.) IPR lists examples of complaints it has processed. Among these were complaints that alleged excessive or unreasonable uses of force. There were three (2013-C-0365; 2013-C-0279; 2013-C-0372) that IPR dismissed outright; one (2013-C-0243) that IPR dismissed but referred back to the subject officer's command; one (2013-C-0266) that IPR referred as a service improvement opportunity; and one (2013-C-0264) that internal affairs declined. None of the summaries offered clear and convincing evidence that the allegation of excessive force had no basis in fact. Certainly it would be logically inconsistent to assert clear and convincing evidence exists that no excessive force occurred if IPR felt there existed a basis to make a referral to command (2013-C-0243), identify a service improvement opportunity (2013-C-0266), or make a referral for internal affairs investigation (2013-C-0264). Nor does IPR's report indicate that IPR exercised its independent authority to investigate the use of excessive force allegation that internal affairs declined (2013-C-0264). Accordingly, based on the data presented in IPR's report, none of these six appears to comply with the clear mandate of Paragraph 129.

Within 21 days, please provide us the following:

1.  Documentation showing that the City has clearly directed all internal affairs staff and supervisors to fully investigate all allegations of use of excessive force and prohibited internal affairs from declining to investigate any allegations of use of excessive force;

2.  Documentary evidence demonstrating internal affairs' justification for declining 2013-C-0264;

3.  A listing of all IPR or internal affairs allegations involving any unjustified or excessive force allegation from January 1, 2014 to the present;

4.  Documentation showing that IPR has implemented protocols to prohibit IPR from failing to refer to internal affairs for full investigation any allegations of use of excessive force unless there is clear and convincing evidence that the allegation has no basis in fact; and

5.  IPR's definition of clear and convincing for use in declining excessive-force complaints.

Page 2 - Attachment 2

For our purposes, the clear and convincing threshold is not met merely because there is disagreement among witnesses.  Such a conflicting statement is precisely the reason a full investigation is necessary.

On an ongoing basis, we will audit a sample of allegations that IPR receives and internal affairs investigations.

Please contact us if you have any questions about these requests.  Thank you.

Sincerely,

R. Jonas Geissler
Senior Trial Attorney
Civil Rights Division

David Knight w/permission for

David W. Knight
Special Assistant United States Attorney
United States Attorney's Office
District of Oregon

cc:    Constantin Sever, Esq. (via email)
       Ellen Osoinach. Esq. (via email)
       David Wobiril, Esq. (via email)
       Anil Karia, Esq. (via email)
       J. Ashlee Albies, Esq. (via email)
       Shauna Curphey, Esq. (via email)

3



**U.S. Department of Justice**

Civil Rights Division

JYP:LC:JG:BB
DJ 207-61-1

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

August 10, 2015

*Via email*
Ellen Osoinach, Deputy City Attorney
Office of the City Attorney
1221 SW 4th Avenue, Ste 430
Portland, OR 97204

     RE:    *United States* v. *City of Portland*, 3:12-cv-02265-SI

Dear Ms. Osoinach:

     This letter memorializes the status and process of the United States' ongoing monitoring review of Portland Police Bureau ("PPB") policies in connection with paragraphs 157 and 169 of the settlement agreement in *United States* v. *City of Portland*. We share our understanding of this process to further a cooperative, transparent policy review.

     As you know, the District Court's order entering the settlement agreement has been subject to appeal and mediation. The parties have reached resolution and, on Thursday, July 30, the District Court entered the agreed amended order approving the settlement agreement. We thank the City for its efforts in mediation to resolve the appeal and its continuing efforts to implement portions of the settlement agreement remedies during the pendency of the appeal. With the rededication of resources following the resolution of appeal we continue to develop our compliance monitoring plan, including seeking a more efficient review of policies.

     We continue to seek to provide comments to policies within the 45-day timeframe afforded under the settlement agreement, and in coordination with PPB's current Universal Review process.[1] Thus far, under that process, we have recommended substantial reconsideration of crisis intervention and mental health policies and officer accountability policies. Also under that process, we have asked for PPB forbearance on reconciliation of certain policies. Namely, for officer accountability and force reporting policies the City must first meet the settlement agreement's conditions precedent concerning those issues before promulgating and implementing policies.

---

[1]  Within 180 days of the effective date, i.e., August 29, 2014 to February 25, 2015, the settlement agreement required the revision and/or development of all policies, procedures, protocols, training curricula, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement to ensure that they are consistent with, incorporate, address, and implement all provisions of the agreement.. *See* Paragraph 169. The settlement agreement also provides the United States and COCL 45 days within which to comment on new or revised policies. *Ibid.* Though the City did not meet the 180-day deadline for development/revision of policies, we commend the City on including a 30-day public comment period in the Universal Review process for receipt and consideration of public input.

The parties acknowledged in the settlement agreement that community input is critical to promote public confidence in PPB.  Despite the 30-day timeframe for public comment under the existing Universal Review process, given the settlement agreement requirement that the COAB vote on settlement agreement recommendations (Par. 151), and the COAB's meeting schedule, DOJ and COCL likely will not have time to consider COAB recommendations prior to submitting our comments with the current structure of the Universal Review Process.[2]  We therefore ask the City to consider an extension of the Universal Review process timeline on specific policies that the City and the United States identify as relating to settlement agreement compliance, to allow time to consider COAB comments on those identified policies before we submit our comments.  Moreover, to allow the United States time to consider COAB and public comment prior to submitting our comments, we request our initial 30 days to run at the close of the public comment period.  We will continue to offer joint comment with the COCL where we can reach agreement in a timely fashion.

Under this approach, a policy will not be considered approved under the settlement agreement until after:  (a) PPB produces a final policy following PPB's internal reconciliation, i.e., "revised" policies "as they are promulgated" under Paragraph 169, and (b) the United States then reviews and approves the revised policy for compliance with the settlement agreement and constitutional standards.  The parties anticipated this final step in our earlier discussions regarding policy review, which is consistent with paragraph 169 of the settlement agreement. We earlier sought to fold into Paragraph 169's 45-day time frame the 30 days for Universal Review and 15 days for final approval after PPB reconciliation.  With the exception of the requested extensions to provide COAB a process to comment, we still seek to accomplish approvals within this timeframe, though we anticipate PPB's reconciliation between these steps will vary in length of time depending on comments and prerequisites for policies.

Regarding the substance of our policy review, we seek to apply a trunk-and-branch rubric to the policy areas specific to the settlement agreement.  If we first approve a trunk policy, PPB can more consistently and logically address all branch policies that flow from the trunk.  For example, all force policies for use of different devices and reporting must follow from the principle force policy that governs the overall force standard.  There are four policy trunks relating to provisions of the settlement agreement:  (1) force; (2) training; (3) crisis intervention and mental health; and (4) accountability.  A fifth area related to the settlement agreement, Employee Intervention System, is a stand-alone policy.

We have identified the following policies as relating to settlement agreement compliance for which we anticipate providing review and comment, and we propose a process that will allow for efficient processing of review and comments by the public, COCL, and COAB:

**Force – Settlement Agreement Section III:**

| Directive 1010.00 – Use of Force | On October 30, 2013, before entry of the settlement agreement, we approved a version of 1010.00 that was subject to our district court mediation to resolve the objections to the |
|---|---|

---

[2]  COAB's review of policies has only recently begun in earnest.  On July 20, 2015, the COCL provided a document request form to COAB members.  It is our understanding that COAB subcommittees or workgroups are seeking production of documents to facilitate their review of certain policies.

| | |
|---|---|
| | agreement by the PPA and AMAC. COCL cited in its initial quarterly report an alleged lack of clarity in policy 1010.00. We have initiated a review of the current 1010.00 with COCL and while COCL has offered comments on the policy, COCL has also solicited comments from COAB. COCL wants the benefit of COAB's comments before finalizing COCL's own comments. We anticipate COCL's comments on these policies by the end of August. |
| Policy 315.30 – Satisfactory Performance | On October 30, 2013, before entry of the settlement agreement, we approved a version of 315.30 that was subject to our district court mediation to resolve the objections to the agreement by the PPA and AMAC. We anticipate further review of this policy following COCL and COAB review of 1010.00, from which policy PPB split the performance standard into this stand alone policy. |
| Directive 416.00 – Post Officer Involved Deadly Force/Temporary Altered Duty (overlaps 48-hour rule issue)<br><br>Directive 1010.10 – Post Deadly Force Procedures (overlaps 48-hour rule issue) | On June 30, 2015, we advised PPB that PPB had not completed the conditions precedent in Paragraphs 124-127, necessary to promulgate these policies. We further advised that we had requested COCL to opine on these policies. Finally, we requested certain documents to assess the current practice with respect to these policies. Accordingly, we requested PPB to forebear on reconciliation of these policies. We anticipate COCL comments on these policies by the end of August. We anticipate coordinating with COCL to provide comments shortly after COAB completes its review. |
| Policy 940.00 – After Action Reports and Operation Orders | |
| Policy 910.00 – Filed Reporting Handbook Instructions | |
| Directive 1051.00 – Electronic Control Weapon | On October 30, 2013, before entry of the settlement agreement, we approved a version of 1051.00 that was subject to our district court mediation to resolve the objections to the agreement by the PPA and AMAC. We |

3

| | |
|---|---|
| | anticipate further review of this policy following COCL and COAB review of 1010.00. |
| Policy 630.45 – Emergency Medical Care Custody Transports | |
| 1010.20 – Physical Force | If not replaced by revised 1010.00, no longer listed as a separate policy. |
| 1020.00 – Firearms | |
| 1030.00 – Baton Use | |
| 1040.00 – Aerosol Restraints | |
| 1050.00 – Less Lethal Weapons and Restraints | |
| 1090.00 – Special Weapon Use | |
| Policy 635.10 – Crowd Management/Crowd Control | |
| Executive Order re Directive 850.30 – Temporary Detention and Custody of Juveniles | To the extent it implicates use of force, force reporting, and medical care |
| Executive Order re Directive 850.50 – Arrests, Felony Processing of Adults | To the extent it implicates use of force, force reporting, and medical care |
| 870.20 – Custody & Transportation of Subjects | May also relate to crisis and mental health, if no separate policy is developed for transport to the anticipated Unity Center for Behavioral Health[3] |

**Training – Settlement Agreement Section IV**

| | |
|---|---|
| Executive Order 1500.00 – Training | This policy is currently in a comment period. |
| Policy 690.00 – Training – Precinct/Division | |
| Policy 210.05 – Field Training | |
| Policy 412.00 – Employee Retraining Program | |

---

[3] The Unity Center for Behavioral Health is being developed to provide psychiatric emergency services, a co-located centralized inpatient facility, and enhanced partnerships with community organizations providing behavioral health and substance use disorder services, and is anticipated to open in November 2016. See http://www.legacyhealth.org/for-health-professionals/tools-and-resources-for-providers/edoctalk/2015-04-edition/apr-2015-unity-update.aspx.

4

**Crisis Intervention – Settlement Agreement Section VI**

| | |
|---|---|
| Directive 850.20 – Mental Health Crisis Response | On May 8, 2015, we provided PPB with DOJ comments on these policies, with which COCL concurred. |
| Directive 850.21 – Peace Officer Custody | |
| Directive 850.22 – Police Response to Requests for Mental Health Custody | On May 12, 2015, we met with representatives of the City and COCL to review these policies. The City withdrew the policies and agreed to redraft. |
| Directive 850.25 – Police Response to Mental Health Facilities | On June 23-24, 2015, we provided our expert, Dr. Mark Munetz, for meetings with PPB and BOEC to assess implementation and provide technical assistance that would inform the redraft of the policies.  The City is currently considering our technical assistance in its further redrafting of these policies. |
| 640.30 – Communications with People with Disabilities | |
| BOEC Mental Health Reference Guide, Suicide Reference Guide, and Project Respond Reference Guide | BOEC furnished the Mental Health Reference guide during our June 23-24, 2015 assessment with Dr. Mark Munetz.  We have requested, but have yet to receive, the other two guides. |
| Policies regarding transportation, handover, and referral to the anticipated  Unity Center for Behavioral Health | With the expected development of the Unity Center facility, we expect PPB to develop protocols for its officers' interactions with the facility, which protocols we will review. |

**Employee Intervention System – Settlement Agreement Section VII**

| | |
|---|---|
| Policy 345.00 – Employee Information System | On May 8, 2015, we provided PPB with written comments on this policy.  On May 14, 2015 we met with City officials and provided comments to this policy. |

**Officer Accountability – Settlement Agreement Section VIII**

| | |
|---|---|
| Directive 330.00 – Internal Affairs, Complaint Intake and Processing | On May 8, 2015, we provided PPB with written comments on these policies.  On May |

5

| | |
|---|---|
| Directive 331.00 – Service Improvement Opportunities | 14, 2015, we and COCL met with PPB and IPR officials to discuss these policies and the requirements of the settlement agreement. Our expert, Chief Charles Reynolds, and COCL's expert attended by telephone. We asked PPB and IPR to convene a work group to undertake the tasks required by the settlement agreement in order to revise the policies in a compliant fashion. PPB still has these policies under consideration. |
| Directive 332.00 – Administrative Investigations | |
| Directive 330.00 – Criminal Investigations of Police Bureau Employees | |
| Directive 334.00 – Performance Deficiencies | |
| Directive 335.00 – Discipline Process | |
| Directive 336.00 – Police Review Board | |
| Directive 337.00 – Police Review Board Selection | |
| Directive 338.00 – Discipline Guide | |
| Policy 341.00 – Discipline | Unless replaced |
| Policy 220.40 – Lawsuits and Claims | |
| Policy 120.00 – Inspections | |
| Directive 310.20 – Retaliation Prohibited | |
| Directive 310.50 – Truthfulness | |
| Directive 315.00 – Laws, Rules, and Orders | |
| Directive 344.00 – Prohibited Discrimination | |
| Directive 344.05 – Bias-Based Policing | |
| Executive Order re: Directive 215.00 – Sworn Performance Evaluations | |
| Executive Order re: Directive 310.00 – Conduct, Professional | |
| Directive 310.40 – Courtesy | |

Page 9 - Attachment 2

We thank you and the PPB for its continued efforts toward implementation of the settlement agreement with respect to meaningful policy revision, and we look forward to further discussing this process with you.

Sincerely,

BILLY J. WILLIAMS
Acting United States Attorney
District of Oregon

*/s/ R. Jonas Geissler*
R. JONAS GEISSLER
Senior Trial Attorney

*/s/ Adrian Brown*
ADRIAN L. BROWN
Assistant U.S. Attorney

*/s/ Brian Buehler*
BRIAN BUEHLER
Trial Attorney

cc:    Shuana Curphey, Esq.
       Ashlee Albies, Esq.
       Anil Karia, Esq.
       Kathleen Sadaat
       Dennis Rosenbaum, Ph.D.
       Amy Watson, Ph.D.
       Tom Christoff
       *via email*



**U.S. Department of Justice**

Civil Rights Division

JCP:LCC:RJG:ALB:BDB
DJ 207-61-1

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

August 17, 2015

*Via email*
Ellen Osoinach, Deputy City Attorney
Office of the City Attorney
1221 SW 4th Avenue, Ste 430
Portland, OR 97204

RE:    **Technical Assistance Regarding Crisis Intervention and Behavioral Health,**
       ***United States* v. *City of Portland*, 3:12-cv-02265-SI**

Dear Ms. Osoinach:

This letter provides technical assistance concerning crisis intervention and behavioral health policies, practices, and training of both the Portland Police Bureau (PPB) and the Bureau of Emergency Communications (BOEC). This letter follows up on our visit to PPB on June 23-24, 2015, conducted with counsel for the Department of Justice (DOJ) and our expert consultant Mark R. Munetz, M.D.[1] While this letter provides technical assistance intended to assist the City of Portland (the City) in its efforts to implement certain terms of our Settlement Agreement in the above-listed case, this letter is not intended to cover all aspects of the City's obligations concerning crisis intervention and behavioral health as provided by our Settlement Agreement, nor is this letter intended to serve as a compliance review of such obligations. We are providing our compliance assessment separately from this letter.

As you know, the parties engaged in a discussion on May 12, 2015 with counsel for the City and PPB concerning our initial comments on PPB's draft policies related to crisis intervention and behavioral health. Both Dr. Munetz and Amy Watson, Ph.D., a member of the COCL team, attended the meeting by phone and previously concurred on the written comments provided. At that meeting, the City invited Dr. Munetz to meet with members of PPB's Behavioral Health Unit (BHU) and related community partners for an overview of the current structure of PPB's crisis intervention and behavioral health response program. We agreed. In anticipation of our June visit, PPB then provided us copies of the following materials: crisis intervention training lesson plans for courses taught during the 40 hours of training provided to all PPB patrol offices; enhanced crisis intervention training lesson plans and course agenda; as

---

[1] Dr. Mark Munetz serves as the Margaret Clark Morgan Foundation Endowed Chair in Psychiatry at the Northeast Ohio Medical University. He was a contributing author to the Crisis Intervention Team Core Elements, published by the University of Memphis in September 2007 (available at the following website: http://www.cit.memphis.edu/information_files/CoreElements.pdf). Dr. Munetz also serves on the Board of Directors of CIT International, a non-profit membership organization whose primary purpose is to facilitate understanding, development and implementation of Crisis Intervention Team (CIT) programs throughout the United States and in other nations worldwide in order to promote and support collaborative efforts to create and sustain more effective interactions among law enforcement, mental health care providers, individuals with mental illness, their families and communities, and also to reduce the stigma of mental illness. *See* http://citinternational.org/.

well as BOEC's Mental Health Reference Guide.  During our meetings, PPB provided us with a report titled "2014 Enhanced Crisis Intervention Training" dated May 12, 2015 ("2014 ECIT Training Report"), which PPB provided during his visit.

During the June meetings, Dr. Munetz and counsel for DOJ met with members of the Behavioral Health Unit (Lt. Tashia Hager and Officer Amy Bruner-Dehnert), members of the training division (Dr. Liesbeth Gerritsen and Sgt. Troy King), Project Respond staff and Behavioral Health Response Team (BHRT) members, BOEC training and operations staff, several ECIT officers (including Dr. Munetz's participation in an ECIT ride along), the Behavior Health Unit Advisory Committee (BHUAC) Chairperson and observation of a BHUAC meeting, Multnomah County mental health staff involved with diversion programs, and PPB command staff.  Dr. Munetz also participated in a ride along with a patrol officer who had received the 40 hours of crisis intervention training required for all PPB officers (but not ECIT training). Finally, Dr. Munetz met with members of the Mental Health and Crisis Response Subcommittee of the Community Oversight Advisory Board (COAB).

Based upon the above review of materials and information received before and during our meetings, DOJ, in consultation with Dr. Munetz, provides the following technical assistance:

**1.  PPB should change terminology of "CIT" to refer to Crisis Intervention *Training* instead of PPB's specialized crisis *"Team."***

Throughout our meetings and as provided in the public BHU pamphlet, PPB uses the acronym "CIT" to mean "crisis intervention training," which provides all PPB officers 40 hours of training during the Basic and Advanced police academies, as well as updates during annual in-service training.  And, the term "ECIT" as used by PPB refers to its "Enhanced Crisis Intervention Team" of officers who have volunteered to receive an extra 40 hours of training, and, in addition to their assigned duties, serve as specialized responders to situations involving mental illness or a behavioral health crisis.

The term "CIT" as used by PPB to refer to training lends confusion to who actually serves in the specialized capacity as PPB's crisis intervention team.  Nationally, the "CIT" abbreviation as used by mental health and law enforcement communities refers to the Crisis Intervention *Team* of volunteer officers, for which PPB has ascribed to its ECIT officers. We commend PPB for continuing to require that all PPB officers receive 40 hours of basic crisis intervention training, and we take no exception to PPB's preference to refer to their specialized team of responders as ECIT officers. However, to further boost the specialized status of these ECIT officers, and to clarify any confusion by BOEC dispatch when members of the public request a "CIT" officer or an officer to provide crisis assistance, the initial 40-hour crisis intervention training that all officers receive should be renamed.  A course title for the academy trainings such as "Behavioral Health Training" prevents conflating such training with the team of ECIT officers, who form PPB's crisis intervention team.  And, as we further describe below, the suggested name change for basic crisis-trained officers should assist to distinguish the specialized ECIT officers in dispatch.  BOEC call takers and dispatchers should be trained to dispatch an ECIT officer when a member of the public requests the assistance of a "CIT" or "crisis" officer.

2

2. **Public Recognition of ECIT officers as a specialized response team**.

As we further note in this letter, ECIT officers are PPB's specialized response for mental health related calls. Not only have ECIT officers volunteered to serve in this capacity, one of the foundations of a CIT program is that such self-selection process attracts officers with the desire, interest, and personality to match the unique skills necessary for communication and engagement with persons in a behavioral health crisis or with a mental illness. It is important for the public to recognize such officers as being distinguished from patrol officers without such enhanced training and experience. An important part of the CIT tradition is that this specialized team of officers can be identified by a pin on their uniform (there are best pin contests at every CIT International conference), and consumers and family members learn to look for an officer wearing a CIT pin. However, we also recognize that pins may not stay secure on a uniform, and an additional option is to develop a unique uniform patch for ECIT officers. One option for further developing relationships with consumers and family members would be to invite them to submit designs for an ECIT pin and patch.

3. **PPB should expand ECIT Training to include additional community partners.**

While we provide technical assistance concerning training in this section, it is with the caveat that neither DOJ nor Dr. Munetz has observed the current crisis intervention training nor the ECIT training. We look forward to observing the training at the next available opportunity. For the purposes of this letter, we provide guidance on the 40 hours of ECIT training based on the materials received (including the 2014 ECIT training report), and our June meetings with PPB and BOEC personnel. As mentioned this course is an additional 40 hours of training that builds upon the 40 hours of crisis intervention training that all PPB officers receive in the Basic and Advanced academy trainings. While those academy trainings should be considered as a foundation on which to build, officers in an ECIT class may not remember all of the content from the academy trainings and may benefit from some review of critical basic material. Even with the annual in-service refresher training, many years may have elapsed since some of the ECIT volunteer officers took the academy training. ECIT training should include foundational information as well as more sophisticated topics, such as field engagement with consumers, family members, providers, and the general public.

The ECIT-training consumer and family panels, and presentations on peer recovery and early assessment of psychosis (EASA) all appear encouraging. However, we currently do not have enough information to assess these presentations and we look forward to observation of the training to provide further guidance on these.

We recommend the following areas for improvement to conform PPB's ECIT training to best practices:

- ECIT Training should reflect a community partnership throughout the agenda.

    o While a consumer-and-family panel is an important component of the training, there appears to be little exposure to the mental health community during the classroom component. During our June meetings with PPB and community partners, we were informed that a variety of community stakeholders in the professional community as well as consumers and family

members taught the ECIT class.  From the training plan provided by PPB, the sessions taught by mental health professionals outside of PPB primarily appear only on the first day of training:  the peer-and-family panels, forensic diversion programs available within Multnomah County, the EASA program, a presentation from NAMI, suicide intervention, and mental status indicators (presented on day two by a psychiatric nurse from Project Respond).  The ECIT training report also indicates that Dr. Liesbeth Gerritsen was the lead or co-lead on much of the training.

o   While it is commendable that PPB employs a full-time mental health professional with the experience and knowledge that Dr. Gerritsen possesses, the inclusion of multiple mental health professionals (psychiatrists, psychologists, social workers, nurses) presenting throughout the week-long training course encourages the development of community and inter-governmental partnerships.  Certainly, many topics currently included in the training can be co-presented (either formally or informally) by a community-based mental health professional or government agency provider, and a PPB instructor, such as:

- History of mental health treatment;
- ECIT community resources;
- Mental health risk assessment;
- BOEC dispatch protocols for mental health calls;
- Crisis response (all sessions on day 3 of training); and
- All of the scenario based role playing.

- Provide a full day for site visits and ride-along with a community treatment provider.

o   Currently the ECIT training plan provides 1.5 hours for a site visit, which appears to allow only time for one site visit by each officer. Many CIT courses include two half days or a full day for site visits, and we recommend expanding this aspect of PPB's training.  We also suggest a ride-along with an Intensive Case Manager (ICM) or an Assertive Community Treatment (ACT) team member.  Such outreach during training instills a key component of the specialized knowledge that ECIT officers can bring to bear in their work and fosters relationships with mental health providers and consumers.

- Crisis Response Resource (Day 3 of ECIT Training) should focus on engagement and de-escalation.

o   A review of the lesson plan for day three and discussion with Sgt. King indicates that the teaching philosophy on engagement and communication for ECIT offices is based on practices of a crisis negotiation team (CNT).  While CNT tactics may incorporate parallel issues also seen in behavioral crisis response or response to persons with mental illness, the focus of CIT training should be on engagement and de-escalation, while acknowledging that officer and community safety always comes first.  Incorporating an outside mental health professional (e.g., someone from Project Respond) throughout the

4

lessons for this day will provide a mental health perspective on de-escalation as the sessions are taught.

- o As we further discuss below in regards to coverage of mental health calls, to conform with CIT core elements PPB should train ECIT officers as first responders and they should generally serve as the primary officer on the scene. They should generally not be supporting officers, as is typical for CNT officers or K-9 officers (as noted in the BHU overview in the CIT training lesson plans).

- Continue to keep role-playing scenarios updated, include community mental health providers, and include several rounds of officers in the exercise.

    - o While the six ECIT scenarios reviewed in 2014 ECIT training report appear well-considered for the type of encounters and issues officers may face in the field, we recommend continually updating these scenarios based on recent experiences of ECIT officers. And, as provided above, incorporating community mental health providers into these role-playing scenarios will further the partnerships necessary for successful outcomes.

        The training report notes that each scenario is handled by a single pair of officers; the reviews of the scenarios indicate that some were not handled as the instructors hoped. To increase officer involvement in the training, we recommend each scenario seek participation by several successive pairs of officers, such that after an initial intervention by the first pair, the scenario is stopped and "freeze framed" and then a second pair pick up where the first left off. This can continue for three or four pair of officers, until the situation resolves safely. Safe resolution almost always means the individual agreeing to leave the scene and be transported to a treatment facility. Trainers can coach role-players so the situation doesn't resolve until several groups have rotated through managing the situation.

- Include additional topics in the ECIT Training.

    - o Include a "Mental Health 101" overview as described above.

    - o Review CIT core elements and the "Memphis Model."[2]  *See* http://www.cit.memphis.edu/information_files/CoreElements.pdf

    - o Incorporate how to communicate with individuals in the midst of psychosis, using hearing distressing voices training. While the 40 hours of basic crisis training for all officers incorporates a lesson plan created by Dr. Pat Deegan as provided by the National Empowerment Center, Inc., for hearing voices

---

[2] To assist in further development of a Memphis Model CIT program, BHU, training staff, and ECIT officers should be encouraged to attend the CIT International Conference, to the extent possible, April 25-27, 2016, in Chicago. *See* http://citconferences.org/.

that are distressing, this lesson does not appear in the ECIT lesson plan.  ECIT training should include a review of this curriculum or incorporating this type of issue in scenario-based role-playing to help sensitize officers to what it is like to hear voices while in an encounter with law enforcement, and how to communicate with individuals in the midst of psychosis.

o   Enhanced focus on verbal de-escalation.  The day 3 lesson plan on the various aspects and approaches to verbal de-escalation should also include a community mental health provider as a co-presenter.

4.  **Continue Improvement of Selection Process and Increase Number of ECIT Officers.**

We commend PPB for developing a current roster of about 62 active ECIT officers who have volunteered to take on this additional duty.  And, we are encouraged to learn that another class of 25 officers is expected to take ECIT training later this year.  The volunteer nature of such a specialized team is a key core element to the Memphis Model.  We did not receive assurances in the materials provided, or during our interviews, that PPB currently utilizes an application and interview/screening process for the selection of the officers.  We request that PPB provide us such materials or, if they do not yet exist, we recommend that PPB develop such a process, as provided by the Settlement Agreement.  PPB must seek the advice of the BHUAC for criteria defining the qualification, selection, and ongoing participation of ECIT officers.

Based on information we received during our meetings, ECIT officers account for 17.9% of actual officers in patrol operations as of June 18, 2015.  Based on interviews during our meetings, it was clear that the numbers of ECIT officers must increase to ensure adequate 24/7 coverage in all three precincts.  While PPB began tracking the number of ECIT officers directly dispatched to calls, and the number of calls where ECIT officers participated in any way based on their training, neither PPB nor BOEC currently tracks data to know how many mental health related calls are handled through dispatch or identified by non-ECIT officers in the field.  These data are essential to know how many ECIT officers are needed to ensure 24/7 coverage throughout Portland.  As described below, BOEC must change some of its training and protocols to capture such data.  While the Memphis Model originally proposed the team of specialized officers for crisis response make up 20-25% of the patrol force, the goal is to have an adequate number of officers to ensure coverage at all times.  The 20-25% range is likely an underestimate for PPB given the number of persons with mental illness in Multnomah County (10,062 as of 2011[3]), the number of suicide calls received by BOEC (1200 in 2011[4]) and the large homeless population in Portland (as much as 25% of whom suffer from mental illness[5]).  While the City is accumulating data about the number of mental health-related calls, we recommend setting the goal that ECIT compose 30% of patrol officers.  To obtain that goal, a single ECIT class per year is probably not adequate. We suggest planning for two ECIT training classes in 2016, and each year thereafter until PPB reaches that goal, or data indicates PPB has sufficient ECIT officers to meet the needs of mental health-related calls.

---

[3]  *See* PPB Report on Police Interactions with Persons in Mental Health Crisis, March 21, 2012, pages 7-8, accessible at https://www.portlandoregon.gov/police/article/440249.
[4]  *Id.* at 4,14.
[5]  *Id.* at 11 (citing the National Coalition for the Homeless, 2009).

**5.  Expand BOEC's coding of mental health calls and ECIT dispatch protocol.**

The Memphis model includes the following core elements regarding dispatch and coverage of mental health calls:

- Training call takers and dispatchers on the crisis intervention team program, identifying calls that may involve mental illness, and soliciting information from the caller that will help the responding officer;
- Dispatching the nearest ECIT officer to respond to all such calls; and
- ECIT officers assess the situation and when appropriate take control of the scene.

PPB's current model does not align with these core elements because of BOEC's current training and protocols for coding mental health calls, the existing ECIT dispatch protocol, and, in part, because of PPB's approach to ECIT.

The current BOEC dispatch protocol requires dispatching of an ECIT officer only if the call has a mental health component *and* one of more of the following is present:

- The subject is violent
- The subject has a weapon
- The subject is threatening to jump from a bridge or structure or to impede/obstruct any vehicular traffic
- The call is at a known mental health facility
- Upon request of the responding officer
- Upon request of a citizen (any caller)

Moreover, BOEC does not use a code that tracks all calls with a mental health component.  BOEC uses the "ECIT" code to track dispatch of the above list of seven types of calls.  BOEC codes other calls only a single code that is more specific to the situation (e.g., welfare check, disturbance, etc.).  But, BOEC does not have an additional means of coding all calls, regardless of type, that also have a mental health component.  For these other calls, BOEC dispatches a regular patrol officer regardless of whether there is a mental health-related component to the situation.  There is currently no reliable way to determine how many of these other coded situations involve a mental health component.  BOEC codes suicide calls separately.  Based on ECIT reports received and tracked by the BHU between February 15, 2015 and May 23, 2015, out of the 267 calls in which ECIT officers participated in any way based on their crisis training, ECIT secondarily assisted on 42 calls (15.7 %) coded as suicide and 68 calls (25.5%) coded as welfare check.  ECIT officers also assisted with 23 calls (8.6%) coded as disturbance, 10 calls (3.7%) coded as assist, and 61 calls (22.8%) coded as "other," which includes but is not limited to: area checks, "domestic," and vandalism.[6]

---

[6] Appendix D in the 2014 ECIT report contains the one page report completed by ECIT officers.  One of its fields is called "Mental health crisis response per directive 250.20". We recommend some changes to this form to help in the data collection effort. First, providing the same box for custody/arrest conflates mental health custody (emergency commitment) with arrest. Also, transport to treatment, either voluntary or involuntary is an important disposition to capture, along with arrest. Also, referral to BHRT should be a possible disposition. Finally, the term "De-escalate" may mean "resolved at the scene", which conflates a technique with an outcome.

In other words, 204 of the 267 (76.4%) of ECIT reports received between February and May 2015, in which the ECIT officer participated in the call based on their crisis training, involved a call with a mental health component outside of the above listed protocol, and ECIT was directly dispatched to 63 calls (23.6%) based on the existing protocol provided above. But, we have no way of knowing how many more calls to which BOEC dispatched non-ECIT patrol officers involved a mental health component. At bottom, BOEC must expand their call taker training and protocol to allow coding for all mental health related calls, in order for PPB to properly collect and assess data to assist further discussion on the ECIT dispatch protocol.

Based on our meetings we understand that PPB officers have an option of adding a study code after completing their response to call to indicate whether there was a mental health component to the call. However, both PPB and BOEC agree that such data are not reliable, and currently cannot be compared to BOEC data. Instead if BOEC adds a modifier code that would indicate whether a mental health component was known at the time of dispatch, either to compare with the study codes, or as independent data, an estimate of the number of calls involving a mental health component could be achieved.

Furthermore, PPB currently trains officers that ECIT officers should only be primary responders on the limited set of higher risk mental health calls as provided in the current BOEC protocol, unless such support is requested by the responding officer, or upon request of a citizen. Such reluctance to expand the dispatch of ECIT officers is currently based on concerns, in part, that the number of lower risk mental health related calls would overwhelm the ECIT program, impeding the ability of ECIT to respond to the higher risk calls, and causing patrol officers to dump calls. PPB does not have sufficient data to verify these concerns. PPB should increase the size of the ECIT program to the recommended 30%, and reassess after such data is accumulated and analyzed. And, the initial ECIT reports noted above indicate that PPB utilizes ECIT officers on a broader range of calls than what is provided for in the current dispatch protocol. Data on the number and type of all mental health-related calls is critically needed to inform this discussion. In the interim (until such data is collected and assessed), at the very least, PPB and BOEC should include all suicide calls to the ECIT protocol, as those are known mental health related calls. In addition, we recommend that patrol officers responding to a call also be required to call for an available ECIT officer to respond ("secondary dispatch") where there in a mental health component and one of the following exists:

- Mental Health Disorders
- Traumatic incidents
- Sudden deaths
- Attempted suicides
- Medical assists/Well-being checks
- Breach of Peace/disorderly conduct
- Trespassing/refusing to leave property

PPB should hold patrol officers accountable for appropriately exercising this secondary dispatch function, and during meetings with the DOJ appeared amenable to such an accountability system.

Finally, PBB's current ECIT philosophy is to utilize such officers more as secondary responders, back-up, and/or coaches to patrol officers rather than to serve as primary responders at the scene. Such philosophy is expressed in the current dispatch protocol as well as the training materials. While certainly ECIT officers should make an assessment to determine if the initial responding officer is handling a situation well, and if so, to allow that officer to continue, the general CIT philosophy under the Memphis Model provides for the specialized crisis intervention team officer to typically assume overall charge of the scene. This philosophy is based upon the facts that: (1) this is a cadre of specialized officers who are interested in this work; (2) their dispatch to more mental health-related calls provides them increased exposure and experience beyond that of patrol officers; and (3) their relationships with the mental health community (including both providers and consumers) are key to rapport and trust-building at the scene.

**6. BHU should enhance its oversight of the ECIT program.**

We commend PPB on the development and dedication of the Behavioral Health Unit, and its coordination with the BHUAC and other community partners. Furthermore, the three BHRT units are a great resource for Portland. And, we are pleased that PPB provides the funding for three Cascadia (Project Respond) employees to work full time as co-responders with the BHU officers to follow a case load of high risk individuals. The co-responder model is an excellent way to work with complex, high risk, but not committable individuals. We further commend PPB for providing patrol officers the ability to make case referrals to BHU for follow-up by a BHRT, and encouraged to hear that both ECIT and non-ECIT officers are making such referrals. We are also encouraged that the BHU is meeting regularly with community mental health providers for further collaboration. We recommend that such collaboration provide the ability for referrals to be made both from the BHU to community providers and vice versa. We are further encouraged to learn that BHRT training includes trauma informed care, and that the BHU is considering such training for ECIT officers.

BHU will have to better define its oversight of the ECIT officers, however. Currently, ECIT officers report to the chain of command of their assigned precinct. However, the BHU lieutenant (assigned to the Central Precinct) and ultimately the Central Precinct commander must oversee and coordinate the ECIT officers. *See* Settlement Agreement ¶ 91. To ensure such oversight, the CIT coordinator, her sergeant, Lt. Hager, and, as necessary, the Central Precinct Commander must regularly involve themselves in supervision of ECIT officers, including, but not limited to: reviewing ECIT reports, identifying and addressing concerns as needed, and taking part in training or discipline related issues. If BHU is engaged in such oversight, it is not currently memorialized in writing. We recommend that BHU memorialize its role in review and oversight of ECIT officers to ensure all involved clearly understand the set expectations. We will continue to monitor compliance with the relevant provisions of the Settlement Agreement, and will reassess the adequacy of BHU's oversight upon memorialization of its role in overseeing the ECIT team. Further, PPB should evaluate whether a CIT Coordinator of the rank of Officer, rather than as a Sergeant, impacts the ability to conduct such review and oversight.

9

7.  **PPB should revise policies and procedures concerning disengagement and delaying custody.**

Current policies and procedures provide that officers may choose to actually leave a scene even if the individual is at risk of harming self or others.  Such cases pose great liability to PPB and present an inappropriate level of risk of harm to the individual or others in the community.  While there are options other than immediate confrontation or leaving, such options require time, patience, and continued efforts at finding a way to engage an individual.  And, if alcohol or controlled substances are involved, time to sober up may be necessary.  If it is truly an emotional storm, such crises dissipate over time.  The challenge with waiting is the drain on resources and emotions of officers involved.  One option is to not only require input from the supervising sergeant prior to making the decision to disengage, but also include consultation with a mental health professional (i.e., Project Respond) before disengaging (which would include delaying custody to the point of leaving a potentially dangerous scene).[7]  If PPB adopts such an approach, we recommend that PPB collect comprehensive outcome data from any call ending with disengagement, for analysis and evaluation in determining whether such policies should be further revised.

We hope the assistance provided in this letter is helpful as you continue to grow your ECIT program.  We look forward to discussing any questions you may have about the guidance and recommendations provided in this letter.

Sincerely,

BILLY J. WILLIAMS                                    JUDY PRESTON
Acting United States Attorney                   Acting Chief
District of Oregon                                       Special Litigation Section
                                                                  Civil Rights Division

                                                                  LAURA COON
                                                                  Special Counsel

*/s/ Adrian Brown*                                    */s/ R. Jonas Geissler*
ADRIAN L. BROWN                                 R. JONAS GEISSLER
Assistant U.S. Attorney                             Senior Trial Attorney

                                                                  */s/ Brian Buehler*
                                                                  BRIAN BUEHLER
                                                                  Trial Attorney

---

[7] In discussions with the DOJ, PPB and the City have expressed their amenability to implementing policies requiring officers to consult with a mental health professional before disengaging from situations where an individual presents a risk of harm to self or others.  Ultimately, PPB will resubmit its policies for DOJ's review, comment, and compliance assessment.

Page 20 - Attachment 2

cc:   Shauna Curphey, Esq.
      Ashlee Albies, Esq.
      Anil Karia, Esq.
      Kathleen Sadaat
      Dennis Rosenbaum, Ph.D.
      Amy Watson, Ph.D.
      Tom Christoff
      *via email*

11