

**Office of the Compliance Officer and Community Liaison (COCL)**

**Rosenbaum & Watson, LLP**
Dennis Rosenbaum, PhD
Amy Watson, PhD

COCL Office:
421 SW 6th Avenue, Suite 500
Portland, OR  97204
www.cocl-coab.com
rosenbaumandwatsonllp@gmail.com

September 18, 2015

Transmitted by E-mail to:

United States District Judge Michael H. Simon
Cc: AMAC, City of Portland, U.S. Department of Justice, PPA

Re:    <u>**First Quarterly Report of the Compliance Office and Community Liaison**</u>

Dear Judge Simon:

On behalf of Rosenbaum & Watson, LLP and the entire Compliance Officer and Community Liaison (COCL) team, we are pleased to submit the attached first Quarterly Report pursuant to paragraph 162 of the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

A copy of this report was posted on the COCL's website, www.cocl-coab.com and distributed to members of the COAB and the parties to the Settlement Agreement.

Sincerely,

Dennis P. Rosenbaum, PhD

Amy Watson, PhD
For Rosenbaum & Watson, LLP
Compliance Officer and Community Liaison
Portland, Oregon

# QUARTERLY REPORT

# of the

# COMPLIANCE OFFICER AND COMMUNITY LIAISON

**Prepared By:**

**ROSENBAUM & WATSON, LLP**

**Revised Report July 9, 2015**

**For the City of Portland, Oregon**

**First Quarter: January 15 – April 15, 2015**



Quarterly Report July 9, 2015

# Table of Contents

EXECUTIVE SUMMARY .................................................................................................... 1

    INITIAL IMPRESSIONS AND RECOMMENDATIONS ................................................. 3

        Use of Force ........................................................................................................ 3

        Training .............................................................................................................. 4

        Community Based Mental Health Services ........................................................ 5

        Crisis Intervention ............................................................................................. 5

        Employee Information System (EIS) ................................................................... 6

        Officer Accountability ........................................................................................ 7

        Community Engagement and Creation of Community Oversight Advisory Board ......................... 8

        Policy Development ........................................................................................... 9

    ADDITIONAL COMMENTS ...................................................................................... 10

        PPB Approach to Management and Change .................................................... 10

        Additional Recommendations ......................................................................... 11

INTRODUCTION .......................................................................................................... 14

    COMPLIANCE OFFICER AND COMMUNITY LIAISON ............................................. 15

SETTLEMENT AGREEMENT SUMMARY ..................................................................... 17

    USE OF FORCE ....................................................................................................... 17

    TRAINING .............................................................................................................. 19

    CRISIS INTERVENTION ........................................................................................... 20

    EMPLOYEE INFORMATION SYSTEM ...................................................................... 21

    OFFICER ACCOUNTABILITY .................................................................................... 22

    POLICY DEVELOPMENT ......................................................................................... 23

    COMMUNITY-BASED MENTAL HEALTH SERVICES ................................................ 24

    COMMUNITY OVERSIGHT AND ADVISORY BOARD ............................................... 24

    COMPLIANCE OFFICER AND COMMUNITY LIAISON ............................................. 25

DETERMINATION OF COMPLIANCE ........................................................................... 27

SUBSTANTIVE PORTIONS OF THE AGREEMENT ........................................................ 31

    USE OF FORCE ....................................................................................................... 31

        Methodology and Monitoring Activities ......................................................... 31

        Initial Impressions ........................................................................................... 33

Quarterly Report July 9, 2015

*COCL Recommendations* ............................................................................................................ 35

**TRAINING** ................................................................................................................................ 36

*Methodology and Monitoring Activities* .................................................................................. 36

*Initial Impressions* ................................................................................................................... 38

*COCL Recommendations* ......................................................................................................... 39

**COMMUNITY-BASED MENTAL HEALTH SERVICES** ...................................................................... 40

*Methodology and Monitoring Activities* .................................................................................. 40

*Initial Impressions* ................................................................................................................... 43

*COCL Recommendations* ......................................................................................................... 44

**CRISIS INTERVENTION** ............................................................................................................... 45

*Methodology and Monitoring Activities* .................................................................................. 45

*Initial Impressions* ................................................................................................................... 48

*COCL Recommendations* ......................................................................................................... 51

**EMPLOYEE INFORMATION SYSTEM** ........................................................................................... 52

*Methodology and Monitoring Activities* .................................................................................. 52

*Initial Impressions* ................................................................................................................... 53

*COCL Recommendations* ......................................................................................................... 55

**OFFICER ACCOUNTABILITY** ....................................................................................................... 57

*Methodology and Monitoring Activities* .................................................................................. 57

*Initial Impressions* ................................................................................................................... 60

*COCL Recommendations* ......................................................................................................... 62

**COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD** ....... 63

*Methodology and Monitoring Activities* .................................................................................. 63

*Initial Impressions* ................................................................................................................... 68

*COCL Recommendations* ......................................................................................................... 72

**POLICY DEVELOPMENT** ............................................................................................................. 73

*Methodology and Monitoring Activities* .................................................................................. 73

*Initial Impressions* ................................................................................................................... 74

*COCL Recommendations* ......................................................................................................... 79

**ADDITIONAL RECOMMENDATIONS** ............................................................................................ 80

*Establish New Measurement Systems* ..................................................................................... 80

*Move Beyond Current Popular Strategies of Fighting Crime* .................................................... 81

*Expand Community Policing in Portland* ................................................................................... 82

Quarterly Report July 9, 2015

*Evaluate Body Cameras for PPB Officers Consistent with Legislation* ................................................ 84

*Engage in a Reconciliation Process* .................................................................................... 85

**NEXT QUARTER ACTIVITIES** ............................................................................................... 86

**OVERALL CONCLUSIONS AND RECOMMENDATIONS** ................................................................. 88

**REFERENCES** ...................................................................................................................... 90

**APPENDIX A** ....................................................................................................................... 92

**APPENDIX B** ....................................................................................................................... 97

**APPENDIX C** ....................................................................................................................... 98

Quarterly Report Draft May 14, 2015

# <u>EXECUTIVE SUMMARY</u>

This is the first quarterly report of the Compliance Officer and Community Liaison (COCL) as required by the Settlement Agreement between the City of Portland (City) and the United States Department of Justice (DOJ).  The Settlement Agreement stems from a Department of Justice investigation into the City of Portland and Portland Police Bureau.  The DOJ investigation was due to a formal request by the City and the Albina Ministerial Alliance Coalition (AMAC) for an investigation into excessive use of force on the part of PPB against marginalized racial and ethnic populations, including individuals living with mental illnesses.  In September of 2012, the DOJ concluded that the Portland Police Bureau (PPB) engages in a "pattern or practice of using excessive force on individuals with actual or perceived mental illness", which is a violation of the Fourth Amendment to the Constitution.  Subsequently, the United States and the City of Portland entered a Settlement Agreement that addresses seven areas in need of improvement: (1) Use of Force, (2) Training, (3) Community-Based Mental Health Services, (4) Crisis Intervention, (5) Employee Information System, (6) Officer Accountability, and (7) Community Engagement. Pursuant to the Agreement, the City retained Rosenbaum and Watson, LLP to serve as the Compliance Officer and Community Liaison (COCL), beginning January 15th, 2015.  The COCL shall independently: (a) synthesize data related to PPB's uses of force (Par. 160); (b) assess compliance with the Agreement (Pars. 160-163); and (c) conduct certain outcome assessments (Par. 173).

The Settlement Agreement requires the creation of a 20-member Community Engagement and Community Oversight Advisory Board (COAB) to ensure community input and oversight in the Settlement process. Beginning in 2014 and concluding in February 2015, a Selection Committee with representatives from a diverse set of community organizations, the Portland Commission on Disability (PCoD) and the Portland Human Rights Commission (HRC), and Portland's five Council members selected members of the COAB pursuant to the Agreement and a collaborative agreement between AMAC, the City, and the United States.  The COCL also chairs the COAB and the COAB reports to the COCL (Par. 144).

The COCL issues this first quarterly report pursuant to the Agreement to specify: (a) the methodology and monitoring activities employed; (b) the COCL's assessment of compliance with each substantive paragraph of the Agreement; and (c) the COCL's recommendations regarding necessary steps to achieve compliance, as warranted (Par. 162).

Our initial work as the COCL has been largely comprised of gaining a foundational understanding of the Portland Police Bureau and Portland community context, first by identifying and reaching out to agencies, organizations, and individuals who have a stake in the Agreement.  We spent considerable time soliciting and listening to the viewpoints of these individuals and organizational representatives. We met with representatives of community groups, mental health and disability organizations, the PPB, the City, and the U.S. Department of Justice.   We hired former Chief Justice of the Oregon Supreme Court, Paul De Muniz, to regularly engage with the Portland community and facilitate the work of the COAB.  He was a strong presence in Portland as a member of the COCL team, but for personal reasons, tendered his resignation on April 4, 2015. At the time of this report, the COCL team is searching for a replacement for Justice De Muniz.

We have learned a great deal about the Portland Police Bureau from our initial interviews and observations and as such, we are well positioned to commence evaluation of the Bureau's compliance with the Agreement.  While we have yet to evaluate empirically most components of the Agreement, initial information suggests PPB began to implement changes required by the Settlement long before our appointment as COCL.  PPB's efforts to improve the organization have included revisions of policies, the creation of the Behavioral Health Unit, and changes in training.

However, there is much work to be done on the processes and systems necessary for substantive and sustainable change.  In this report we summarize PPB's progress to date, identify areas needing ongoing attention, and make recommendations for continued improvement.

Quarterly Report July 9, 2015

**INITIAL IMPRESSIONS AND RECOMMENDATIONS**

*Use of Force*

Use of force patterns – specifically, a pattern of excessive force against persons experiencing mental health crisis – is the primary issue that led to this Settlement Agreement.  PPB is required to review and revise the manner in which they collect, document, report, and review interactions which involve an officer's use of force.  PPB has historically been a paper-based organization which has not necessarily lent itself to empirical internal evaluation.  Since the creation of the Settlement Agreement, much effort has been put into creating data systems capable of meeting the new requirements of PPB.  We are currently working with the PPB Inspector to audit use of force incidents and ensure that reporting of use of force incidents is done in a way that is accurate, establishes accountability for actions, and is transparent to the community. We believe the initial steps taken by PPB with regard to documenting use of force provide a foundation for compliance with the Agreement.

We recommend that PPB determine reliable ways to measure the elements of force incidents and establish clear criteria for when force is excessive or within policy, thus providing clear direction for avoiding unnecessary or excessive force by PPB officers.   The Portland community is thirsty for an organization that tolerates use of force only when absolutely necessary to preserve safety, that is transparent with the community, and provides them with reports on use of force that will facilitate a more trusting relationship with the police.    PPB must also ensure that their transition to an electronic records management system in the near future will yield valid and reliable data.  Such transitions are always difficult, but the PPB must make this a priority. They will be hiring new crime analysts to assist with this work and we feel this is a good investment of City resources.

Quarterly Report July 9, 2015

*Training*

Training is arguably the most important tool for police reform, as it provides officers with the knowledge and skills necessary for positive and lawful interactions with the public.  While a more complete assessment will be forthcoming in subsequent reports, our initial impressions of PPB's evaluation of training are positive.  PPB is adopting the Kirkpatrick model of evaluation, which is a widely used approach to assessing the extent to which students react positively to a training, are learning from the training, and are changing their behavior based on the training.  The Agreement requires the PPB conduct a needs assessment of training.  Our initial review of the needs assessment process is also positive, although a closer look at the types of measures used in the assessment is needed to assess compliance and whether this information is being used to improve training.

Recently, considerable attention has been given to a report by Portland's City Auditor on PPB training. We have read the Auditor's report and feel it offers a good starting point for a critical evaluation of PPB training programs. The finding that officers are not familiar with the use of force policy is troubling and deserves additional attention in the future. . The Auditor's report, while carefully written, was based on classroom observations and interviews conducted more than a year ago.  Substantial changes have been made since, including the introduction of a needs assessment to inform training, improved training evaluations, steps toward the development of an updated training database, and continuing meetings with the volunteer Training Advisory Council.

While we are encouraged by these changes, the COCL team will be looking to see whether specific training objectives and activities are clearly linked to directives required in the Settlement Agreement and diligently documented. Also, based on preliminary discussions with PPB personnel, we recommend that PPB implement more training in specific areas related to concepts found in the Agreement.  In particular, we recommend that the PPB Training Division give more attention to procedural justice and interpersonal skills needed to achieve positive police-citizen encounters.

Quarterly Report July 9, 2015

*Community-Based Mental Health Services*

The Agreement's requirements under this section are written with the understanding that the City is not solely responsible for community-based mental health services. Indeed, many organizations, both governmental and private, are responsible for providing such services. Nonetheless, the Agreement requires the City to work with other responsible organizations and stakeholders to improve coordination of services and address service system gaps, and specifically to strategize to establish one or more crisis drop-off/walk-in centers.

The creation of a drop-off/walk-in center appears to be moving forward, with multiple entities working together to make the center a reality. The proposed Unity Center is currently scheduled to open in August of 2016. While much still needs to be accomplished to make the Unity Center a reality, the progress to date is encouraging.

For this section of the Agreement, we will request that the City provide documentation of participation of its relevant agencies (PPB and others) in community-based mental health committees, detailing their roles and responsibilities for such participation. We will also request the City provide documentation related to involvement in the creation of Unity Center. By supplying this documentation, we will be in a better position to assess the level of participation, and by extension, the level of compliance with these provisions.

*Crisis Intervention*

Our initial review of this component indicates that PPB has taken many steps to address the Settlement requirements related to crisis intervention (CI) and response to persons with actual or perceived mental illnesses. These actions include changes in policies, changes to CI-Training, creation of a "Memphis" model Crisis Intervention Team (called Enhanced Crisis Intervention Team, (ECIT)) unit and expansion of Mobile Crisis Unit coverage (now called Behavioral Health Response Teams (BHRT)). Our initial impression is that the PPB is moving in the right direction with regards to this section

Quarterly Report July 9, 2015

of the Agreement, although a more complete assessment, including close examination of the extent to which PPB is adhering to the "Memphis" model,  will be forthcoming in future reports.

In terms of training and service delivery regarding crisis intervention, we feel the PPB model may hold considerable promise.  Combining the requirement that all officers complete 40 hours of CI training as a core competency, a "Memphis Model" ECIT program, and co-responder BHRTs to provide follow up, we feel PPB is implementing a potentially comprehensive model of mental health response for police. If implemented well and properly documented, PPB may be able to provide a model for the rest of the nation.  However, we will continue to monitor PPB's progress in these respects, including  conducting training observations, curriculum review, training evaluations, ride-along observations, interviews with relevant service providers, mental health contact follow up surveys with service recipients, and analysis of PPB data.

We recommend PPB diligently document all aspects of their unique combination of mental health response strategies.  As indicated, this combination of services is unique, and while we believe it to have the potential to lead to positive results, we recommend that PPB thoroughly document the process so that it can be assessed.  We recommend they detail both successes and setbacks in order to continuously improve mental health crisis response in Portland and contribute to mental health response models nationwide.

*Employee Information System (EIS)*

The existing Employee Information System (EIS) for the Portland Police Bureau could become a key mechanism for monitoring member behavior, as it includes information on an employee's past training, behavior, reprimands, and commendations. The EIS currently in place at PPB appears to contain the necessary tools to support proper oversight, evaluation, and documentation of Portland police officers and includes a "Discussion Tracker", a chronicle of commentary given with respect to an

Quarterly Report July 9, 2015

officer's performance.  The EIS system has been under-utilized by the PPB and current efforts are underway to correct this situation.

We strongly encourage the PPB administration to make EIS review and commentary a larger priority among supervisors.  EIS should not be used as a substitute for good supervision, but as a supportive tool.  EIS will allow the PPB to better track problem officers, who sometimes move from one supervisor to another without any paper trail.  The Discussion Tracker aspect of EIS should be used to its full capability to assist in the evaluation of officers new to a supervisor's scope.  We also recommend that PPB be proactive in identifying potential warning signs above and beyond the minimum requirements of the Settlement Agreement.  Finally, we recommend full utilization of EIS be institutionalized within PPB.


*Officer Accountability*

In order for any police organization to be successful and to be viewed as legitimate and trustworthy by the public, its employees must be held accountable when they conduct themselves in an inappropriate or unlawful manner.  This requires adequate systems and procedures within the organization to ensure that accountability is delivered in a consistent and fair manner.  Our evaluation of the PPB and the City in this regard will focus on the processes used to ensure officers are held accountable. While we believe the PPB and the City are committed to improving police accountability, we have some concerns regarding the systems and procedures used to fulfill this obligation.  The Administrative Investigations Management system (AIM) utilized by Internal Affairs (IA) and the Independent Police Review (IPR) has been called outdated by members of PPB and shortcomings of the system are routinely addressed in a patchwork manner.  Furthermore, there appears to be a consistent argument on the part of PPB that 180 days (the timeline set out in the Agreement) is an insufficient amount of time to conduct all aspects of an administrative investigation. Finally, we are concerned with the process of developing the discipline guide required by the Agreement, as the public did not have sufficient input into the process.

Quarterly Report July 9, 2015

We recommend the PPB and the City reevaluate the ability of the AIM system to collect data that can be used for analysis.  The results of analysis are only as valid as the tool being used to collect the data, and therefore, we recommend the PPB and the City thoroughly assess the capacity of this system.  We recommend the City and PPB continue to seek solutions to the timeline problem, seeking to balance the need for due process and community input against the desire of all parties to bring closure and see appropriate consequences/accountability for behavior that is outside of policy.  Finally, we recommend PPB be more inclusive of the Portland community when reviewing the discipline guide.  This is a matter of considerable importance to the community.


*Community Engagement and Creation of Community Oversight Advisory Board*

As noted earlier, the Settlement Agreement requires the creation of a Community Engagement and Community Oversight Advisory Board (COAB) to ensure community representation and oversight in the Settlement process. The COCL chairs the COAB and is obliged to comment on the progress and functioning of this group and make recommendations. Since its creation in January of 2015, and despite a delayed orientation to the specifics of its roles and responsibilities regarding the implementation process, and a lack of sufficient administrative support, the COAB has made significant progress by creating a set of bylaws, establishing subcommittees and an executive committee, holding one public hearing, and creating plans for community engagement. The delayed orientation resulted in a lack of clarity regarding the roles and responsibilities of the COAB.  This lack of clarity resulted in prolonged discussions regarding the relationship between the COAB and the COCL; the role of COAB alternates and concomitant confusion regarding member's responsibilities as a public body subject to policy related to public meetings, public records, and ethics.   Much of this disagreement and confusion might have been avoided by an initial provision of the basic training and orientation needed for the group to function as a public body.

In response to these concerns, the COCL team and the DOJ have sought to clarify roles and responsibilities as afforded by the Settlement Agreement through written

Quarterly Report July 9, 2015

letters distributed to the COAB. At the request of COAB members, we have also sought to arrange for additional training on a range of issues so that COAB members have the knowledge and orientation function fully in this new capacity.   To function effectively, it is essential that COAB members understand Oregon law, PPB structure and processes, and PPB data systems.  We recommend that PPB, the City and DOJ continue to work with the COCL team and the COAB to determine what trainings are necessary and assist in providing them.

As another response to these concerns, the COCL team has insisted on a restructuring of resources to make sure the COAB and COCL have the staff support on the ground needed to complete the required work. We have hired a professional facilitator to support the functioning of the COAB and its relationship with the COCL. This individual is currently assisting the COAB as it develops a work plan, prepares agendas for meetings, plans quarterly town hall meetings and public hearings, communicates its needs to the City and the COCL, and provides assistance to the COAB Chair and Executive Committee.  The COCL and COAB will also be supported by a new COAB chair and a full-time administrative support specialist in the near future. Furthermore, the recent establishment of a COAB Executive Committee and Executive Committee Chair and Vice-Chair should go a long way toward stabilizing the COAB, providing leadership, and allowing the group to focus its attention of the terms of the Settlement Agreement.

We appreciate that the City has worked diligently to assist with the successful planning and execution of COAB meetings, including finding and providing meeting space and appropriate accommodations and working with individual COAB members to address their needs and concerns.  However, the unfinished business includes the training mentioned earlier and hiring the administrative support specialist.


*Policy Development*

While the Settlement Agreement does not list Policy Development as a unique section, the concept permeates the whole of the Agreement and thus we have broken

it out in order to afford it special attention.  To that point, we feel the current process for policy development within PPB falls short in several regards.  Of notable mention is the lack of extensive outside perspective and concerns regarding the priorities of PPB in drafting and releasing policies.  We have seen instances within PPB where policy and training were inconsistent, where old policy drafts were put into effect over revised drafts, and where documentation required by policy is insufficient.  On top of this, we have concerns that policies are often created, revised, and enacted with limited outside input or perspective.

In order to establish an effective policy process, we recommend that PPB be diligent in how policies are created, implemented and trained upon.  Consistency with respect to version control and training are needed to remove any confusion in the minds of officers and ensure that all officers are trained in a uniform policy consistent manner. We also recommend that PPB consider an outside perspective when drafting policy, including both expert opinion and community input.  PPB Directive 010.00 requires outside consultation *before* a draft is completed and we recommend PPB solicit such perspective at this point.

## ADDITIONAL COMMENTS

*PPB Approach to Management and Change*

The Portland Police Bureau appears to have the capacity to implement the terms of this Settlement and has the leadership to meet this challenge.  The COCL team is impressed with the new Chief of Police and the Compliance Coordinator in the Strategic Services Division who oversees the Settlement activity of the PPB.  Maximum success will require not only a community-oriented approach to leadership, but a business approach to strategic planning.  PPB appears to have a history of patch-work solutions to problems.  Too often the data systems, policy responses, and training elements have been the victim of a "Band-Aid" style of problem solving, wherein problems are addressed but rarely solved.  Rather than rely on a "stop the bleeding" approach, more

Quarterly Report July 9, 2015

strategic planning is needed in general, but especially around data systems and community engagement.

*Additional Recommendations*

The COCL team, because of our experience assessing the current state of knowledge and innovation in American policing, is able to provide additional recommendations to help the Portland Police Bureau reach a new level of professionalism and become a model for community-oriented policing nationwide. While not explicitly required by the Agreement, we believe these recommendations are related to underlying concepts found within many sections of the Agreement and would be appropriate for consideration as part of PPB's Community Engagement and Outreach (CEO) Plan These recommendations are as follows:

- *Establish new measurement systems*: By measuring what matters to the public (e.g. fair and respectful treatment by the police), Portland can increase the chances that reforms will be sustained and institutionalized. Contact surveys are a good example, where community members are asked to evaluate their recent contact with a PPB officer.

- *Move beyond current popular strategies of fighting crime:* Because investigatory stops (and searches) have been shown to be biased by race and ethnicity in other cities, Portland should explore plans to rely less on these aggressive strategies, as we have recommended to President Obama's Task Force on 21st Century Policing.

- *Enhance community policing in Portland:* We believe that the PPB could become a national model by pursuing several community policing strategies: (1) create monthly beat meetings where officers and community members can interact and solve neighborhood problems; (2) expand PPB initiatives that are consistent with the Respectful Engaged Policing (REP) model, where officers on foot and bicycle

Quarterly Report July 9, 2015

patrols have the opportunity to get to know the beat they are serving, have positive encounters with youth, and solve neighborhood problems; and (3) experiment with new models of training that seek to strengthen the officers' ability to treat people with dignity and respect and prevent interactions from escalating to the point where force is needed.

- *Evaluate body cameras for PPB officers consistent with legislation:*    Initial studies in the US and Europe suggest that this new technology holds the potential to increase transparency during encounters, increase accountability and civility on both sides, provide evidence to resolve disputes, reduce complaints, and reduce force and injury for all parties.  We encourage Portland to continue with its plans to employ body cameras not only to achieve these objectives, but to become a leader in using body camera footage as a training tool for individual officers.  Given community concerns about this technology, it will be important for PPB to work with the community ensure concerns are addressed in this process.

- *Engage in a reconciliation process:*    Given the level of tension between individuals living with mental illness, marginalized racial and ethnic communities, and the PPB, we recommend a "truth and reconciliation" process that involves acknowledgement of past mistakes and a commitment to work together in the future.

Should PPB and the City desire to take these additional steps, the COCL team can provide direction in each of the areas listed above. We can assist the City and PPB in making connections to existing training programs and organizations devoted to these new models of policing. Members of the COAB have expressed interest in working with other community leaders to plan and implement a truth and reconciliation process. Creating this process is important, but we caution the COAB about making this a central focus of the COAB agenda given the multitude of tasks already delineated in the

Quarterly Report July 9, 2015

Settlement Agreement. This process should involve a wide range of stakeholders in Portland, and perhaps be independent of the Settlement work.

Quarterly Report July 9, 2015

# INTRODUCTION

This first report will begin with a brief overview of the Settlement Agreement's history and content as a means of providing the reader with some context.  In 2010, the City of Portland and the Albina Ministerial Alliance Coalition (AMAC) initiated contact with the United States Department of Justice requesting they investigate the death of Aaron Campbell, a young black man, shot and killed by a member of the PPB, as well as claims of excessive use of force on the part of PPB against marginalized racial and ethnic populations and individuals living with mental illnesses more broadly.  In June of 2011, the Civil Rights Division of the United States Department of Justice initiated the investigation.  In September of 2012, the DOJ released its findings to the City of Portland and initiated the litigation process associated with this Agreement.

Among the most noteworthy findings, the DOJ found that the City of Portland and the Portland Police Bureau (PPB) engaged in "a pattern or practice of using excessive force in encounters involving people with actual or perceived mental illnesses (DOJ Letter of Findings).  In other words, the pattern or practice finding was exhibited in situations where the level of threat did not warrant such a high level of force.  With this, the DOJ also found inappropriate and excessive use of electronic control weapons (ECW, commonly called Tasers) during PPB officers' interactions with such persons. Finally, the DOJ found that PPB officers were engaging in high levels of force during arrests, citing unnecessary escalation of emotions prompted by PPB officers.  For each of these findings, the DOJ was able to identify and provide real life examples that were characteristic of each infraction.

The DOJ reached these conclusions following a thorough investigation that included interviews with PPB and City of Portland personnel, community feedback, policy review, document review, data analysis, and expert consultation.   Upon completion of their investigation, the DOJ identified three systematic deficiencies which contributed to the above findings: (1) Deficiencies in responding to persons with mental illnesses or in mental health crisis, (2) Deficiencies in supervisory review of officers' use of force, and (3) Failure to implement timely corrective action following

Quarterly Report July 9, 2015

investigations of officer misconduct.  Specific aspects of each deficiency were also provided in the Letter of Findings which directly contributed to the provisions set out in the Agreement.

Based on the findings of the DOJ, a lawsuit was filed in the United States District Court, District of Oregon, on December 17, 2012.  In an effort to avoid further litigation, the DOJ and the City of Portland entered into negotiations for a Settlement Agreement. After creating a draft of the Agreement, members of the public were provided an opportunity to comment on it in front of the court.  These comments were incorporated in the Agreement and a final draft of the Agreement was developed.  While individual provisions of the Agreement are still being debated, the substantial aspects of the negotiations were agreed upon and approved by Judge Michael Simon on August 29, 2014.  This approved Settlement Agreement provides the framework for all tasks required of the City of Portland, PPB, and other parties.


## COMPLIANCE OFFICER AND COMMUNITY LIAISON

Upon the implementation of the Settlement Agreement, a search was initiated for candidates to fill the position of Compliance Officer and Community Liaison (COCL). The COCL is a position specifically created by the Settlement Agreement.   The requirements to be considered as a candidate for this position were an expertise in police practices, community engagement and crisis intervention methods.  The COCL position entails a multitude of functions, including working with the PPB Inspector to audit use of force incidents, working with the Behavioral Health Unit(BHU) Advisory Committee, chairing and providing support to the COAB, developing metrics to evaluate PPB community engagement and outreach, and "synthesizing data related to PPB's use of force, reporting to the City Council, DOJ, and the public, and gathering input from the public related to PPB's compliance with the Agreement" (Paragraph 160 of the Agreement).  The COCL team is to report on the progress of their work in quarterly reports, as well as "lead semi-annual qualitative and quantitative outcome

assessments" to measure the creation of capable systems, proper oversight, and substantive community engagement.

In December of 2014, after a diligent process involving the City of Portland, Portland community members, mental health advocates, and various other community groups, Rosenbaum and Watson, LLP was selected as the COCL.  Members of our COCL team included Dr. Dennis Rosenbaum (expert on community policing, procedural justice and police organizations), Dr. Amy Watson (expert on police response to people living with mental illnesses), Justice Paul De Muniz (former Chief Justice of the Oregon Supreme Court), Dr. Geoffrey Alpert (expert on police use of force and police oversight), and Mr. Tom Christoff (statistician and records expert) (See Appendix A for complete team bios).  We are in the process of replacing Paul De Muniz after his decision to resign on April 4, 2015 for personal reasons.

Members of the COCL team have a deep understanding of American policing. We have done research on police agencies in more than 100 American cities and have testified before the President's Task Force on 21st Century Policing regarding how to improve public trust and confidence in the police. Additionally, we have conducted research on police response to mental health crisis and the Crisis Intervention Team model, and have submitted testimony to the Congressional Subcommittee on the Constitution, Civil Rights and Human Rights hearing on Law Enforcement Response to Disabled Americans. Thus, our understanding of the reform efforts in Portland is conditioned by this experience and three decades of research on the police. Furthermore, because some members of the COCL team do not live in Portland, we are not only independent, but have a unique perspective as we "look in" at Portland and compare it to other cities.

Quarterly Report July 9, 2015

# SETTLEMENT AGREEMENT SUMMARY

The Settlement Agreement was created to include seven sections of actionable and reportable provisions designed to address the deficiencies in the Portland Police Bureau (PPB) identified in the DOJ Letter of Findings.  These sections include: (1) Use of Force, (2) Training, (3) Community-Based Mental Health Services, (4) Crisis Intervention, (5) Employee Information System, (6) Officer Accountability, and (7) Community Engagement and Creation of Community Oversight Advisory Board (COAB). In addition to this, we have included an eighth section: Policy Development.  Although Policy Development is not listed explicitly as a section of the Agreement, the process of administrative rule making is considered a central tool for strengthening police accountability and instituting reform (Alpert and Dunham, 2004) and has been a central focus of consent decrees in other cities. As such, we will treat it as a separate section in our review.  The eight sections of the Agreement are being summarized in this first report as a means to provide insight into the Agreement.  Subsequent quarterly reports will not contain such lengthy summaries, though we feel it to be appropriate for this report to provide clarity and a framework for subsequent reports.

## USE OF FORCE

The section of the Agreement which deals with Use of Force can be seen as having four parts: (1) use of force in general, (2) use of force against individuals with actual or perceived mental illnesses, (3) the use of ECW's, and (4) the reporting of information related to each of the above.  Each part is summarized here.  For Use of Force (General), PPB is required to document officer use of force in a manner that allows for auditing (discussed below).  By requiring PPB to alter and improve the way they collect and house data related to use of force incidents, the Agreement seeks to create a more transparent and accountable police bureau.  Along with this, PPB is required to alter and improve the way in which supervisory reviews of use of force incidents occur.  While officers on the street must abstain from excessive use of force,

Quarterly Report July 9, 2015

it is also the role of supervisors to investigate and evaluate each use of force incident to confirm the facts of the case and take appropriate action.

Regarding the use of force against individuals with actual or perceived mental illnesses, there is a strong interest in identifying and approaching these interactions in a constitutional and compassionate manner. PPB is required to take all available mental health information into account when interacting with Portland community members. For example, paragraph 67(b) of the Settlement Agreement states that when deciding whether to use force, officers should take into account "behavior, reports, and known history…indicating that a person has, or is perceived to have, mental illness". Therefore, the decision to use force should in part be dictated by whether the officer has information that a person may be experiencing a mental health crisis. This information is also required to be documented by PPB in order track and analyze such use of force interactions, both during supervisory reviews and by external entities.

Based on the findings of the DOJ, the Settlement Agreement also identifies Electronic Control Weapons (ECW) use as an area needing improvement within the PPB. While the revision of policy is a main factor in controlling excessive ECW deployment (to be discussed in the Policy Development section), proper documentation and review of all ECW incidents is necessary. PPB is required to identify witnesses, gather testimony, and document the number of ECW's utilized, the number of ECW cycles, the length of each cycle, and the rationale for each cycle. Through the improved documentation of such incidents, PPB is expected to be able to better review and comment on each incident, thus informing their ability to reduce and avoid excessive or unnecessary incidents involving ECW's.

To report on each of the above areas per the Settlement Agreement, , PPB is required to produce quarterly use of force reports, examining specified aspects of use of force incidents in order to identify trends, differences between officers of a same group (rank, shift, beat, assignment, etc.), systematic/training deficiencies, or policy violations. These quarterly reports are designed to allow PPB, and the public in general,

Quarterly Report July 9, 2015

the ability to evaluate PPB's use of force practices and identify ways to remedy potentially problematic occurrences.


**TRAINING**

The section of the Settlement Agreement on Training can be seen as having three parts: (1) a training needs assessment, (2) training form and content, and (3) training evaluation.  For the needs assessment, PPB is required to examine a variety of resources, including internal data  (e.g. trends in officer safety issues  misconduct complaints, and other trends) and external data (e.g. Oregon state law, best practices in police training ).  Suggestions from PPB officers and community members should be part of the needs assessment process. These resources are to be examined and incorporated into the curricula in areas where current PPB training is considered insufficient.  This is to be an ongoing process, wherein future training should be informed by the internal and external sources and then re-evaluated annually.

PPB is also required to revise the form and content of their training, incorporating exercises designed to better prepare PPB officers for their day-to-day encounters.  These exercises should include role-playing scenarios, communication skills, and problem solving techniques designed to inform officers of alternatives to using force.  These changes to training are also applicable to supervisors, increasing their awareness and proficiency at monitoring their officers' use of force and efforts to avoid such force interactions.

Finally, PPB is required to institute methods for evaluating their current training and the real-world implications of that training.  Through the quarterly use of force reports and the supervisory reviews (discussed above), PPB is to evaluate the outcomes of their training, identify deficiencies in training, and make alterations to the training based on their analysis.  Also informing PPB should be internal training surveys conducted with officers and supervisors who have recently completed training.  These training surveys should measure students' evaluation of the training, the impact of the

Quarterly Report July 9, 2015

training on officers' knowledge and attitudes, and eventually, the effects of training on their performance on the job.


**CRISIS INTERVENTION**

The section of the Settlement Agreement on Crisis Intervention can be seen as having two parts: (1) various units of PPB which interact with individuals having, or perceived to be having, a mental health crisis, and (2) collection of data to capture interactions with such individuals.   The Agreement requires the establishment of a Behavioral Health Unit (BHU), which is to oversee and coordinate with all units responsible for interacting with individuals having, or perceived as having, a mental illness or experiencing a mental health crisis.  These units include the Crisis Intervention Team (ECIT), the Mobile Crisis Prevention Team (now referred to as the Mobile Crisis Unit or MCU), and the Service Coordination Team (SCT).   Specific provisions for each unit are also outlined in the Agreement, such as the ECIT should incorporate a "Memphis Model" of operation, the MCU should expand its reach of operations, and the SCT should continue its functions.   The tasks and efforts of BHU will be informed by an Advisory Committee comprised of a City, County, State, and Community employee, as well as representatives of mental health organizations.  This Advisory Committee is also responsible for advising on the coordination of PPB and the Bureau of Emergency Communications (BOEC) as well as the process and training for the proper triage of calls related to mental health issues.

The collection of data related to interactions with individuals having, or perceived to be having, a mental health crisis is a critical aspect of the Crisis Intervention section, as well as the Agreement as a whole.  As the mistreatment of these individuals was the principle finding of the DOJ, the collection of data related to these interactions must be improved in order to document reduction in mistreatment over time and provide feedback that can be used to make program adjustments.  With this, the Agreement identifies many areas of data which should be tracked in order to accomplish this goal.   These areas include incident characteristics, suspect

Quarterly Report July 9, 2015

characteristics, officer characteristics, and mental health unit response.  These data are then to be analyzed by all units within the BHU in order to inform their policies, response strategies, training, and officer evaluations.


## EMPLOYEE INFORMATION SYSTEM

The section of the Settlement Agreement that deals with the Employee Information System (EIS) has two main parts: (1) the use of thresholds which should trigger an automatic review of a PPB officer and (2) the preventive use of EIS, regardless of triggering thresholds, to proactively identify potentially problematic officers.  There are three thresholds explicitly mentioned in the Settlement Agreement which are to trigger an automatic review of a PPB officer.  Two of these thresholds were already in place at the time of the Agreement and one was to be added by PPB.  The two thresholds already in place are an automatic review of any officer who uses force in at least 20% of their arrests within a six month period and any officer who has used force more than three times the average of other officers working the same shift.  The Agreement requires PPB to also include a threshold of any officer who uses force three times within a one month period.  These requirements do not prevent PPB from implementing other thresholds which may initiate a review of the officer.

As the Employee Information System is a reference for identifying potentially problematic officers, the Agreement requires PPB supervisors to conduct immediate and subsequent reviews of all officers under their supervision as well as any officer who is new to their command.  Along with this, administrators of the EIS are to "regularly conduct data analysis of units and supervisors to identify and compare patterns of activity" (paragraph 116(c) of the Agreement).  These regular reviews are designed to provide an ongoing evaluation of employees within PPB and as such, PPB is required to collect and document the data necessary to conduct reviews at the unit level as well as the supervisory level.

Quarterly Report July 9, 2015

## OFFICER ACCOUNTABILITY

The section of the Settlement Agreement that deals with Officer Accountability can be seen as having five parts: (1) initial investigation elements, (2) Internal Affairs (IA)/Independent Police Review (IPR) investigation elements, (3) Appeals, (4) discipline guidelines, and (5) general timeline and other provisions.  Once a use of force incident occurs, an initial investigation of the event must occur.  This investigation includes the use of force report from the officer, as well as an immediate on-scene investigation by the officer's supervisor.  These on-scene investigations are documented in the 940 After Action Reports which must be completed within 72 hours of the use of force incident. For lethal force events (i.e. any use of force likely to cause death or serious physical injury), additional requirements include the separation of officers and witnesses, officers who witnessed the event must brief the on-scene supervisor, and (when possible) an on-scene walk through with the involved officer(s) must be conducted.

Should the investigating supervisor feel that the use of force rises to the level of excessiveness, or if there is an external allegation of excessive force, the IPR and IA both have the authority to investigate the incident.  Currently, there is redundancy between the investigations of these two entities. The City is required to develop a plan to reduce this redundancy. Additional procedures for the Police Review Board (PRB) – the entity responsible for making recommended findings as to any policy violation – are also found within the Agreement.   These additional procedures deal with PRB personnel, qualifications for PRB membership, and cause for removal from PRB.

Should any person decide to appeal a judgment arising from an administrative investigation, the Citizen Review Committee (CRC) is responsible for hearing such appeals.  The Agreement provides additional procedures for CRC hearings, including increasing the number of CRC members, the rejection of administrative findings, and the ability to request additional information in its review of the facts.

The Agreement addresses the issue of discipline for "sustained allegations of misconduct" (paragraph 137 of the Agreement).  PPB is required to develop and

Quarterly Report July 9, 2015

implement a guide for a predictable and consistent discipline process.  This guide is to take into consideration "the nature of the allegation and defined, consistent, mitigating and aggravating factors" (paragraph 137 of the Agreement).

Throughout the accountability process, certain timelines and other provisions are included in order for there to be a reliable process that is consistent across all investigations.  Therefore, all administrative investigations of misconduct are to be completed within 180 days of the complaint.  This is to include CRC appeals, which are to be completed within 21 days.   Furthermore, should PRB request additional information, the supplemental investigation must be completed within ten business days.  The Agreement also requires that complainants in excessive force cases be kept informed regarding the status of the complaint.  This is accomplished by providing a tracking number for each complaint and providing the complainant with information regarding the status, outcome, and corrective action taken as part of the outcome.


## POLICY DEVELOPMENT

There is no section explicitly devoted to Policy Development within the Settlement Agreement.  However, there are explicit mentions of PPB's requirement to review, revise, create, and evaluate policies strewn throughout the Agreement, and do so in a manner that is consistent with best practices in the field.  For instance, PPB is required to revise their use of force policies to include specific criteria for when they may employ an ECW, as well as specific criteria for the number of cycles, the length of cycles, and other aspects of ECW use. As noted earlier, policy development, also known as administrative rule making, is a widely accepted means of both managing and reforming police organizations and controlling police discretion in critical incidents where the risk of injury to the public or police officers is higher than normal. The implicit provision across all policy development is that it is carried out in a logical, empirical fashion.  Therefore, each policy must be crafted in a way that satisfies the Agreement and addresses the fundamental concerns that led to the policy being mentioned in the Agreement.  PPB is required to draft each policy in this way.

Quarterly Report July 9, 2015

**COMMUNITY-BASED MENTAL HEALTH SERVICES**

The above summaries examine the sections of the Agreement which primarily fall under the responsibility of the Portland Police Bureau.  Two further sections are present in the Agreement whose responsibilities are assumed by entities outside the PPB.  These sections are the Community Based Mental Health Services section and the Community Engagement and Community Oversight Advisory Board (COAB) section.  The first is the collective responsibility of the City, County, State, Community Care Organizations (CCO's), and other non-governmental organizations.  The function of the Community Care Organizations can be seen as having two parts: (1) Drop-off Center creation and (2) Mental Health Services Subcommittees.  As a way to more adequately respond to persons with addictions or mental health needs, it is expected that "the local CCOs will establish…one or more drop-off center(s) for first responders and public walk-in centers" (paragraph 89 of the Agreement).  Rather than simply providing "unnecessary hospitalization", these centers should provide treatment options and care plans designed to assist the individual in getting the best help possible.

The Agreement also requires "addictions and mental health-focused subcommittee(s)" (paragraph 90 of the Agreement) which are to discuss and implement improvements in health care responses to individuals with addictions and mental health issues. These subcommittees are to include individuals from the BHU (as well as its advisory board), BOEC, Portland Fire and Rescue, and other City agencies.  The Agreement identifies specific areas of improvement to health care responses, such as information sharing, enhanced access to primary care providers, improved BOEC call diversion, and improvement of Peer-Mediated services, among others.

**COMMUNITY OVERSIGHT AND ADVISORY BOARD**

The final section of the Settlement Agreement requires the creation of a Community Engagement and Community Oversight Advisory Board (COAB).  As the title suggests, the COAB is to be comprised of community representatives who, along with the COCL, will engage the community and oversee the implementation of the

Quarterly Report July 9, 2015

Settlement. This section of the Agreement lays out the framework for community involvement in the oversight process.  This section can be seen as having two parts: (1) COAB elements and (2) the Community Engagement and Outreach Plan (CEO Plan).

The COAB is a twenty person committee (15 voting members, 5 non-voting member representing PPBs) whose responsibility is to independently assess the implementation of the Settlement Agreement.  This is to be accomplished through a collaborative process designed to ensure community input in COCL tasks, police strategies, and community engagement with the police. While the responsibilities of the COAB are vast, subcommittees are to be formed to assist the COAB in its tasks.

The COAB is responsible for working with PPB and the City to develop and implement the CEO plan, designed to "ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence" (paragraph 146 of the Agreement).  The PPB's CEO Plan is to be informed by insights gained from community surveys, police surveys, prior outreach efforts of PPB, public hearings, PPB contact demographic data, and external experts, among others. An annual PPB report describing their "problem-solving and community policing activities" will also be incorporated into the COAB's review.  Upon the gathering of such information, the COAB is responsible for working with PPB to create a CEO plan for the PPB that can be both implemented and evaluated, allowing for the plan to be revised to ensure broad outreach and maximum impact on the community.


## COMPLIANCE OFFICER AND COMMUNITY LIAISON

To oversee the implementation of the Settlement Agreement, we have been appointed as the Compliance Officer and Community Liaison (COCL).  Our responsibilities, as outlined in the Agreement, can be seen as having two parts: (1) Assess PPB's compliance with the Settlement Agreement and (2) Serve as a liaison to the community and the COAB. To assist the COAB in its duties, and to independently evaluate the success of PPB, quarterly and semi-annual reports detailing PPB compliance with the Agreement are to be prepared.  The quarterly reports are designed

Quarterly Report July 9, 2015

to provide insights into the activities of PPB as they relate to the Agreement.  The present report represents the first of such quarterly reports.  The semi-annual reports are designed to be "qualitative and quantitative outcome assessments" that evaluate PPB on their mental health crisis response systems, accountability systems, training, use of force, and community engagement (paragraph 173 of the Agreement) and provide guidance to further improve and sustain improvements.  The Agreement details the types of data which are to inform the semi-annual reports in each of these areas.

Our role as community liaison is meant to provide an avenue for community sentiments to be heard.  The community may bring their concerns and proposals to the COAB and the COCL, where they can be discussed and used to inform recommendations to the City and PPB.  As the Chair of the COAB, it is our responsibility to provide guidance to COAB members and assist them in working efficiently and within the requirements of the Settlement Agreement and the rules governing public meetings. The COCL also is expected to provide the COAB with expertise in policing and mental health crisis response to assist them in their planning process, including their recommendations for the CEO plan.

Quarterly Report July 9, 2015

# DETERMINATION OF COMPLIANCE

Our ability to evaluate PPB's compliance with the Agreement is driven by three core concepts: (1) PPB's response to the numbered list of provisions found within the Agreement;(2) the extent and quality of the process used by PPB to implement each provision and (3) the impact of the reform efforts on police behavior and community perceptions.  The first begins by examining the DOJ Quarterly Updates found on the PPB website ([http://www.portlandoregon.gov/police/62613](http://www.portlandoregon.gov/police/62613)).  These quarterly updates address the numbered list of provisions which PPB is responsible for and gives an update as to the efforts by PPB to satisfy them.  The second core concept involves a more substantive process evaluation, requiring a more thoughtful and meticulous approach to assessing how the provisions are implemented. The third core concept will be examined through community surveys and police records.

The distinction here can be easily illustrated using training as an example. The Settlement requires in-service training for patrol officers that involves an increased use of "…role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness…" (Para. 84.a.1). Any training by the PPB that involves role playing and making force decisions in mental health cases would qualify as compliance with the Settlement if the COCL team were to simply use a "check the box" approach to indicate the task has been completed. However, the instructor could be horrible; the scenarios could be poorly selected or implemented; the students may not be engaged in the learning process, etc. Hence, a more careful evaluation would be needed to determine the quality of training implementation, and an even more rigorous evaluation would be required to determine whether the students learned anything from the training and applied it on the job. Whether the training ultimately affects the behavior of officers on the street and whether these changes are noticed by the community are empirical questions.

For many provisions within the Agreement, broad changes are required, although the specific steps to be taken are not described.  For other provisions, specific

Quarterly Report July 9, 2015

information related to compliance is spelled out, yet the process for the collection and analysis of that information is left open.  For example, see Section III (B)(74)(a)(i) (Compliance Audits Related to Use of Force).  This provision indicates that the Inspector's reports must "describe the mental health information available to officers and the role of that information in their decision making". While these pieces of data are required, the form that the descriptions must take is unclear.  Therefore, our responsibility is to (a) ensure that some description is found within the reports and (b) that the descriptions are reported in such a way to provide meaningful direction to PPB, thus fulfilling both aspects of compliance.

The methods described in previous sections will be used in tandem to evaluate the processes employed by the PPB.  Given our background, we are acutely aware of the strengths and weaknesses of the various methods of inquiry.  Each method can provide a piece of the puzzle, while a combination of methods can paint a more complete picture.  In order to provide a solid evaluation of PPB's efforts, multiple methods will be used to make sure that the reforms are appropriate and will lead to substantive change.   These evaluations will focus on relevant qualitative and quantitative outcomes as they pertain to both officers and the public.  The goal is to conduct a holistic evaluation of each change to assess the impacts for all parties.   We reserve the right to pursue additional methods of inquiry not delineated in this report in the event that such methods are deemed necessary to monitor and evaluate a specific action or actions.

For most provisions of the Agreement, we will give serious attention to the process of implementation and institutionalization of change.  The PPB and the Portland community would not be well served if we affirmed initial organizational changes without examining the processes in place to support, sustain, and if needed, revise those changes.  This will be our approach to defining compliance with the Agreement and reporting on compliance in future reports. While we are aware of many efforts by PPB to adhere to the provisions of the Agreement, at this early stage of our work, we are unable to determine compliance or noncompliance.  Fully assessing compliance with the provisions and spirit of the Agreement will take time and multiple strategies.  It

Quarterly Report July 9, 2015

cannot be done meaningfully with a simple "check the box" approach. Thus, we will refrain for the moment from assigning the label of compliance and instead provide our initial perceptions and evaluations of the provisions of the Agreement. More field observations, interviews, and data analyses are needed to reach firm conclusions regarding the extent and quality of compliance.

We should point out, however, that it is not the fault of the PPB if a particular Settlement provision or set of provisions is implemented well but do not produce the desired outcomes . Not all of the required changes will be effective reform tools. The PPB will be judged largely on the extent and quality of implementation. In the evaluation field, we distinguish between "implementation failure" and "theory failure." Theory failure occurs when a strategy is implemented "by the book" but does not produce the desire effects. Implementation failure occurs when the strategy is not fully implemented with high integrity or not implemented at all, and thus produces the same null results. The PPB is primarily responsible for avoiding implementation failure. However, the Bureau must also have some understanding of theory. Good implementation implies a knowledge of best practices and in this case, requires a solid understanding of current research on police-citizen interactions and use of force. So from our standpoint, to implement provisions of the Agreement "by the book" requires the PPB to take a close look at the "right" book before creating a new training program.

If indicated, we will address "theory failure" by recommending additions to the provisions that increase the probability that the Portland Police Bureau will achieve the goals of rebuilding public trust and enhancing public safety. Our understanding is that Portland wants a police Bureau that is on the cutting edge of best practices in the field. As such, the COCL team will not only assess compliance with the terms of the Settlement, but make recommendations to build community policing approaches in Portland that are theoretically and empirically designed to yield positive results. The COCL team has been evaluating community policing initiatives for many years and will share this knowledge in our quarterly reports.

Quarterly Report July 9, 2015

Finally, we note that the data collection process needed to evaluate compliance will involve individual, one-on-one interviews with members of the PPB, City, the community, and other stakeholders.  Although we keep records of our contacts, we will make every effort not to quote individuals or identify them as the authors of particular comments without their permission. This is essential if we intend to gather open, honest, and complete information about the PPB.  Otherwise, individuals, especially those working within the PPB, will have no compelling reason to cooperate with the COCL. Although we avoid naming individuals, we are glad to release the names of agencies and organizations that we have made contacted and spoken with during the first quarter (see Appendix C).

Quarterly Report July 9, 2015

# SUBSTANTIVE PORTIONS OF AGREEMENT

**USE OF FORCE**

*Methodology and Monitoring Activities*

In the first quarter, our prime methodology for evaluating the PPB's revision of use of force policies and force reporting requirements has been interviewing personnel responsible for various tasks found within this section of the Settlement Agreement. On multiple occasions, we have interviewed the Directives Manager (in reference to Pars. 66-70 and 73) and the Inspector (in reference to Pars. 72 and 74-77). We believe our interviews have placed us in a suitable position for employing subsequent methodologies to evaluate PPB's ability to ensure "that all force, particularly force involving persons with actual or perceived mental illness: (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied" (Section III, introductory paragraph).

The Settlement Agreement pays substantial attention to the role of policy in ensuring that all use of force is reasonable and within the confines of the law (see Pars. 66-70 and 73). We agree that good policy is an essential first step in directing the behavior of employees. Therefore, PPB must have a sound policy development plan in place. In upcoming quarters, we will take time to evaluate policies related to use of force which have already been crafted as a result of this Agreement, paying close attention to PPB's process and commenting on the history and appropriateness of each policy. Our criteria for evaluating each force policy are the following: Is the policy (a) clear in meaning, (b) comprehensive in coverage, (c) informed by reliable data and best practices, (d) legal and constitutional; (d) able to be empirically evaluated for successful outcomes; and (e) in compliance with the requirements of the Settlement Agreement. The concept of process will also be important to all other areas of this section of the Settlement Agreement. For example, the requirement that PPB develop a supervisor checklist will not be a simple checking of the box (Par. 72). This checklist

Quarterly Report July 9, 2015

will be evaluated as part of our more general assessment of the provisions related to the Inspector (described below), though we will also be interested in reviewing the process used to develop the checklist and the rationale for including each item on the list.

In upcoming quarters, we will evaluate compliance with subsection B of section III. Subsection B pertains to the auditing and reporting of use of force events within PPB. We have discussed with the Inspector the current process of how use of force events are tracked and reviewed, though there remains some confusion regarding what the process should look like for compliance with the Agreement. We have reached an agreement with the Inspector that he should perform an audit of a limited number of force incidents in order for us to receive, review, and comment upon the process he is using. The audits performed by the Inspector will focus on the characteristics of the force event and corresponding 940 force report (Par. 74), the supervisor actions upon receiving a force report and completing a corresponding 940 (Par. 75), and the "adequacy of chain of command reviews of [940s]" (Par. 77). While the Inspector reviews all use of force incidents and corresponding 940's as part of his normal duties (Par. 35), these audits are specifically related Paragraphs 74, 75, and 77 of the Agreement.

In upcoming quarters we will evaluate the process taken by the Inspector to report force data and 940 reports in PPB's quarterly report (Par. 76). We have received and reviewed the current iteration of such reports but have not yet examined the rationale behind the reporting structure. We will perform a quantitative analysis of the data used for such reports and help PPB determine whether other reporting structures might provide for a more informative analysis. Eventually, we will employ statistical tests to evaluate whether significant trends can be observed (Par. 76(a)) and whether differences exist between officers, PPB units, or other groupings (Par. 76(c)).

Finally, we will examine the ability of PPB data systems to ultimately support PPB's compliance with provisions within this section. Two main data systems are crucial in this task: RegJIN and TRIM. The RegJIN system is the records management system

Quarterly Report July 9, 2015

for all data pertaining to documented PPB interactions. The TRIM system houses the 940s and is largely a PDF manager which can be altered to allow for limited searching within the system. Our approach for this examination will largely focus on the number and types of data contained within the systems and the system's ability to contribute to trend analysis. On top of this, we will also assess the reliability of data measures found within the systems. Our approach will therefore incorporate both qualitative and quantitative assessments of these systems.

*Initial Impressions*

While policy is certainly an important element of this section of the Agreement, we will reserve our initial impressions for the overall policy section found later in this report. Rather than approach policy in each section of this report, we have combined our initial impressions of policy development into a singular section.

Our interviews with PPB personnel revealed a drastic change in how PPB is recording and tracking use of force events since the implementation of the Settlement Agreement. Because PPB was historically a paper-based reporting system, their previous manner of tracking use of force events was simply keeping a manual account on a notepad. This was the practice until as recently as April 2014. Since then, much effort has been put into electronically documenting and tracking use of force events and their corresponding 940s. However, there are still some concerns regarding PPB data systems' ability to be useful in the future.

The supervisor 940 reports which correspond to use of force events are saved in a system called "TRIM". The TRIM system can be seen as a "file cabinet" which contains all the PDFs of 940s. As a document manager, the PDF's themselves cannot be searched. However, "sticky notes" can be applied to the file, allowing a limited degree of searching within TRIM. For example, if someone wanted to know how many takedowns occurred between January 2015 and April 2015, they would search the term "takedown" and that date range. This search would result in X number of PDF's which have the sticky note "takedown" associated with it and that were entered between

Quarterly Report July 9, 2015

those dates.  However this does not allow for a quick search with multiple terms, nor does it yield much benefit if a person is attempting to quantify and compare characteristics across use of force events.

Our conversations with PPB personnel also revealed a concern regarding the accuracy and consistency with which officers are reporting interaction characteristics into the RegJIN system.  As PPB has historically been a paper based organization, officers would fill out their police reports and supply those reports to individuals within the Records Division.  The Records Division personnel were trained to read the officers reports, assign codes to specific characteristics, and place those codes into the old records management system.  With RegJIN, it is the officers themselves who are tasked with putting the characteristics of the incident into the system.  Supervisors are then supposed to check the accuracy of the information.  Future reports will assess whether this is done consistently and reliably.  This question about the validity of the data is one that must be addressed.

Our conversations with PPB personnel have also revealed a lack of utilization of the quarterly use of force reports that are compiled.  As of now, the quarterly reports are compiled and the Inspector gives his informed opinion as to why the numbers are what they are.  We have been told that no in-depth analysis of the data has been done, other than what is reported in the quarterly use of force reports.  There have been initial conversations between the Inspector and the Training Division regarding 940s, though feedback has yet to be given to the Inspector as to how their exchanges have been incorporated into training.  There has been no in-depth analysis as to overall trends or even the most appropriate way to approach such an analysis.  In part, this is due to the limited number of analysts currently working on this aspect of the Agreement.  Two further analysts are in the process of being hired to assist in this area, though they will not be available until the next quarter.

Quarterly Report July 9, 2015

*COCL Recommendations*

In order for PPB to be in full compliance with this section of the Agreement, a number of things must happen.  First, a process for the auditing of use of force events and their subsequent supervisor reviews must be developed and refined.  We recommend PPB put serious thought into both *how* they are auditing such events, as well as *why* they are auditing them.  Our conversations with the Inspector and other PPB personnel have resulted in a mutual agreement that understanding the purpose of such audits will ultimately assist in the process.  We look forward to seeing the first iteration of these audits and working with PPB to better refine them.

The importance of use of force data for informing the PPB about their practices and training needs cannot be overstated.  However, the data should be collected and presented in a way that is logical.  As of now, there appears to be confusion regarding how best to measure use of force events.  For instance, a use of force event may have two officers using two different types of force on two suspects.  How is this measured – by the number of officers, the number of force types, the number of suspects, or as a single force event?  The Settlement Agreement is silent on how exactly force incidents should be measured and thus PPB must determine the exact mode for measuring force.  However, we recommend PPB take into consideration the data's ability to inform their practices as well as inform the community about the true picture of force in Portland.  We recommend PPB examine reporting criteria from other agencies that have improved their force reporting systems and consider various formats when making their decisions.

Finally, we recommend PPB seek ways to monitor and ensure that the data being reported by officers is valid.  We are aware that PPB has provided training to their officers and supervisors in the proper documentation of use of force events.  That is an important first step, although there remains uncertainty about whether this training has resulted in accurate and consistent reporting behavior.  Some type of auditing program should be implemented to check the quality of the data.  By ensuring quality data, PPB will be in a position to make sound decisions about what course of action is most appropriate.

Quarterly Report July 9, 2015

**TRAINING**

*Methodology and Monitoring Activities*

In the first quarter, our prime methodology for evaluating the PPB's Training Division has been interviewing the various individuals within PPB responsible for improvements within the division. These individuals have included the Training Captain (in reference to Par. 84), police training analysts (in reference to Pars. 79 and 80), and others within the Training Division. These interviews have given us some context and foundation for developing a plan to evaluate compliance with the Settlement Agreement.

As with other sections of the Agreement, the PPB must demonstrate to the COCL that not only have certain requirements been implemented, but they have done so with a sound process. This is particularly true when reviewing and updating the PPB training plan (Par. 79). The needs assessment required by the Agreement is a necessary starting point, and the Agreement specifies eleven areas which must be considered. We will examine the current and future needs assessments to evaluate whether these eleven considerations are (1) present and (2) implemented in a comprehensive fashion. These considerations require a wide array of methodological tools, including statistical analyses (considerations a and b), qualitative reviews of use of force incidents and corresponding 940s (considerations c and d), qualitative interviews and comment analyses (considerations e, f, and j), and legal/academic research (considerations g, h, i, and k).

The same methodological buffet will also be used to evaluate compliance with Par. 80 of the Agreement. This paragraph discusses the PPB's requirement to analyze current and past training in order to best inform future training. This will require surveying students (both before and after training) to assess changes in knowledge and attitudes, a quantitative analysis of police records to measure changes in officers' on-the-job behaviors over time , and finally, a qualitative and quantitative analysis of organizational change that can be directly attributed to the training. We will evaluate the steps in the training cycle over the lifetime of the Settlement Agreement, making

Quarterly Report July 9, 2015

sure that PPB has an evaluation process in place that can be continued beyond the tenure of this Agreement.  The processes to be reviewed include needs assessment, training, evaluation, efficacy and feedback for quality improvement.

Our methodology in upcoming quarters for the tracking and reporting of the Training Division elements identified in Pars. 81 and 82, and the selection of training personnel identified in Par. 83 will go beyond simply "checking the box".  Again, a focus on process will be at the forefront of our efforts, and we will examine data to check that training is being tracked and reported with transparency and accuracy (Pars. 81 and 82).  We will also examine the process of selecting trainers, with the hope that their qualifications meet or exceed the minimum requirements of Par. 83. We will inquire about the amount and quality of training received by trainers to prepare them to be instructors at the training academy.

We feel that the provisions set out in Par. 84 are truly important, as they draw attention to aspects of training that, if properly implemented, should lead to improved decision making by officers about use of force and improved relations with the community. Therefore, we will play close attention to quality of "role-playing scenarios…de-escalation techniques…medical care…proactive problem solving…civil or criminal liability" and respectful interaction trainings required of the officers.  We will work closely with the police training analysts with regards to training evaluations for each of these topics.  We will then evaluate how the results of the needs assessments and training evaluations are incorporated into revised curriculum.

The PPB's work in the above areas, should they accept our recommendations, should result in an auditing and reporting process as required in Pars. 85 and 86.  We will work with the Inspector on how the above training characteristics can be examined to perform this audit.  As with the Inspector's audits of use of force reports and 940s, we will ask the Inspector to perform a limited initial audit, and then allow the COCL team to comment on the process he has employed.  We are aware that much of the 2015 training will have been completed before any substantial evaluation and

Quarterly Report July 9, 2015

subsequent change can be incorporated.  Therefore, the 2016 training is mostly like to benefit from this type of audit and feedback.


*Initial Impressions*

The understanding and application of sound police practices by street-level officers originates with proper training.  In addition to substance, good training requires proper oversight and documentation of training curriculum.  While we are aware of some deficiencies in PPB's past training (with regard to substance, oversight, and documentation), they have taken the Agreement seriously and have initiated steps in the right direction.  Substantial changes have been introduced since the Agreement, including the introduction of a needs assessment to inform training, improved training evaluations, steps towards the development of an updated training database, and continuing meetings with the Training Advisory Council (among other changes).

The PPB should be commended for hiring a competent individual with good research skills to conduct needs assessments and evaluations of training.  Currently, the Kirkpatrick Model is being employed for training evaluations.  Our initial research into the Kirkpatrick Model has revealed it to be well established in training evaluation, though research applying the model to criminal justice organizations is absent.  Our conversations with the training analyst have focused on the application of the Kirkpatrick Model to PPB training, and it appears at this moment to have the potential for working as well here as it has in other organizational settings.

Based on our limited interviews and reviews of curricula, we feel that the PPB training program is headed in the right direction, though we suspect there is room for improvement when it comes to training about police-citizen encounters.  The proper interaction dynamic between police and citizens is critically important for preventing force events.  Too often, training programs focus on use of force and how to apply the use of force continuum or related models.  We feel this can be distracting in that very few incidents ever reach the point of using force.  More importantly, resources should be invested in training officers how to identify the situations that may escalate into

Quarterly Report July 9, 2015

conflict and how to prevent these events or de-escalate them once they start.   Training related to procedural justice that was provided by an outside consultant in 2014 was not well received by PPB officers, but this area is too important to let go.   The PPB should make sure that interpersonal communication and procedural justice are covered thoroughly for both basic and in-service training. Prevention is much more cost effective than dealing with use of force incidents after the fact.

Our initial impressions of the Training Division are also influenced in a limited way by Auditor's Office report which was made public in March of this year.  While the Auditor's report explicitly states that "it is not the purpose of [their] report to present the status of Bureau work on DOJ issues", there is surely some overlap which gives us some preliminary insights.  We have found the Auditor's Office report to be informative in their findings, although we encourage caution when interpreting some of the results. The Auditor's report noted that PPB officers were not familiar with the Bureau's use of force policy.  We will revisit this question in the future. The Auditor's report was based on classroom observations and interviews more than one year ago.  Substantial changes have been introduced since, and these changes will be the focus of our independent evaluation of PPB compliance with the training requirements of the Settlement.

*COCL Recommendations*

The potential for training to influence the actions of PPB officers is immense. With this in mind we approach training recommendations with the upmost care.  We first recommend that PPB take a closer look at the content of their training curricula and if appropriate, take advantage of recent innovations in procedural justice training and incorporating this work into their curriculum.  Procedural justice training focuses on teaching officers to listen to the public, be respectful of the public, and be fair in decision making.  A large body of research has shown these interaction techniques to be related to citizen satisfaction with the police, citizen compliance and cooperation with the police, and higher levels of trust and confidence in the police (Rosenbaum, et al., 2015).  These outcomes carry the potential for reduction in use of force and citizen

Quarterly Report July 9, 2015

complaints about rudeness and force. Therefore, the PPB should explore the option of incorporating this knowledge into its curricula, including responses to mental health incidents (Watson, et al., 2008; Watson & Angell, 2013).

We further recommend that PPB continue to incorporate and enhance their use of scenarios during training.  Training throughout the nation often consists of "talking heads" – instructors lecturing with PowerPoint and the absence of adult education pedagogy.  Portland is beginning to use interactive scenarios and we applaud that.  We recommend further scenario based training focused on strengthening social and communication skills with routine encounters and with difficult encounters.  These scenarios should also incorporate aspects of persons having a mental health crisis or persons who are emotionally distraught or intoxicated.

Finally, we recommend PPB consider a more transparent process for incorporating results from the needs assessments and training evaluations into any revised training curricula.  Our interviews at the PPB have revealed that after these reports are completed, the training analyst (and author of the reports) is no longer involved with the formation or finalization of the training plan.  The training plan is formulated at the supervisory level.  We recommend that PPB document exactly how these reports are being incorporated, if at all, into the final training plan so that all relevant parties can help to assess the merits and limitations of this knowledge utilization process.


## COMMUNITY-BASED MENTAL HEALTH SERVICES

*Methodology and Monitoring Activities*

In the first quarter, our primary methodology for evaluating the City's role in remedying the "lack of community-based addiction and mental health services" has consisted of qualitative interviews and media content analysis.  While much of our efforts this quarter have been spent on other sections of the Agreement where the City and PPB have much more direct influence, our initial observations for this section have

Quarterly Report July 9, 2015

been informative and have set the stage for a more in-depth analysis in upcoming quarters.

Many provisions within the Community-Based Mental Health Services section of the Settlement Agreement refer to outside entities not necessarily controlled by the City. The Agreement "only legally binds the City to take action" (Par. 88), thus our methodologies and monitoring activities for this section are limited to those directives specifically aimed at the City.  However, as the City is required to assist other entities referenced in this section, we report our methodologies for evaluating the degree to which the City has lent its support. With this in mind, we report our approach to evaluating compliance with this section.

Community Care Organizations (CCOs) are expected to create "one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs" (Par. 89).  Our review of the City's assistance with this task will not focus on whether they have taken the lead role in this endeavor; instead, we will assess the level of assistance/resistance the City provides in this effort.  To do so, we will seek the input of CCO representatives and other key stakeholders. The City is required to take specific steps for "long-term improvements to the behavioral health care system" (Par. 90), as outlined in subsections a through g. As these initial improvements can be empirically measured, we will evaluate the City's efforts using a mix of qualitative and quantitative methods.  We may measure the level of information sharing (subsection a) through conversations with BOEC, Multnomah County, and health care providers.  We will ask representatives from these organizations to describe their historical relationships before the Agreement's implementation and comment on changes in interaction conditions.  We will seek the input of mental health advocacy groups and individuals living with mental health conditions to evaluate their access to rapid-access clinics (subsection b) as well as primary care providers (subsection c).

We will interview City representatives and determine the "options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental

Quarterly Report July 9, 2015

health providers as first responders" (subsection d) that were present before the implementation of the Agreement.  We will then evaluate whether the "options and available capacity" have indeed been expanded, looking at the number of options, the quality of options, and the resources provided to BOEC to comply with this provision.  We will also interview representatives from City agencies and Safer PDX to identify what unmet needs are present and how they have historically been and are presently being addressed (subsection e).  We will also examine the City's review of tele-psychiatry and evaluate the City's steps for implementing this requirement (subsection g).

The City will be asked to provide documentation regarding access to Peer-Mediated services (subsection f), with close attention to the requirements outline in i through v of subsection f.  We will review these documents to evaluate whether (1) documentation of compliance exists and (2) whether the approach taken by the City was done so in a way likely to benefit consumers of Peer-Mediated services.  Our review of these sections will again focus on process.  For example, the City is required to "better educate the community of the viability of [Peer-Mediated services] as alternative first engagement sites/programs for those having difficulty engaging with 'professional driven' services" (Par. 90(f) (ii)).  How the City goes about their duty to educate the community is more important, in our opinion, than answering the question of "Did they do it in any capacity?"

The ability to accomplish the above Agreement requirements, while perhaps not the direct responsibility of the City, will require an improved relationship between the City and other entities.  These relationships are often times directed by policies within the City.  Therefore, we will examine the way policy shapes how the City interacts with the other entities described in this section of the Agreement.  We will review and comment on the policies referencing these relationships, with our primary review being geared towards policies with BOEC and other entities regarding drop-off/walk-in centers.

Quarterly Report July 9, 2015

*Initial Impressions*

The Settlement Agreement acknowledges that the community mental health system is not under the sole control of the City. Rather, it is a State function with funding streams that incorporate federal, state, local, and private dollars. However, the Agreement does require the City to work with CCOs and other stakeholders to improve coordination, work to address gaps in services, and specifically strategize to establish a crisis drop-off/walk-in center(s) as described above. Our initial impression reported here will only reference the aspects which the City has control over and/or has directly participated in. We reserve comment on activities taken by outside entities for future reports once we have established participation by the City in those activities.

According to PPB quarterly Settlement Agreement reports and corresponding documentation, there is Substance Use Disorders System of Care (SUDs SOC) Committee that has included in its membership the Portland Police Bureau. However, in no documentation do we find representatives of Portland Fire and Rescue or the Bureau of Emergency Communications (BOEC) on this committee. We will inquire as to whether, and to what degree, these Bureaus (as well the Police Bureau) participate in this committee. We will address these elements in future reports.

The establishment of a drop-off center appears to be moving forward with encouraging progress being made. According to a presentation made to the BHU in November of 2014, and subsequent media reports, Legacy Health, Adventist Health, Kaiser Permanente, and Oregon Health and Science University have formed a collaboration and have plans underway to establish the Unity Center for Behavioral Health. This center will provide psychiatric emergency and inpatient service for both adults and adolescents. The center was modeled after Alameda Health System Psychiatric Emergency Service based in California. With current plans to open in August of 2016, the Unity Center would serve as a crisis drop-off/walk-in center for persons experiencing mental health crisis with the capacity to serve 45-55 persons a day, as well as 79 adult and 22 adolescent inpatient beds. As with other aspects of the Agreement, the City's participation in the creation of the Center must be examined

more thoroughly, though we are pleased that the creation of the Center appears to be moving forward.


*COCL Recommendations*

As with our methodology and initial impressions, our recommendations may only be directed towards the City as they are the focus of the Settlement Agreement.  Our recommendations are thus limited, especially in this quarter since we have not had the opportunity to interview City personnel as to their actions which may lead to compliance with this section.  Nevertheless, we can provide some guidance to the City as to how they may ultimately gain compliance.  Our first recommendation revolves around the City's documentation as to their role in the SUDs SOC committee described above.  We have received agendas and charters regarding this group, though the specific participation of City groups (PPB, BOEC, etc.) is not clear.  We recommend the City provide better clarity as to the role they have taken in this group, as well as any other groups that might satisfy Par. 90 of the Agreement.

We also recommend the City provide better documentation as to their role in creating the drop-off/walk-in center(s) identified in Par. 89 of the Agreement.  We are acutely aware that the creation of such centers does not happen overnight and that much planning, discussion, and coordination must occur during the process.  While we understanding this, we will examine the specific ways in which the City is contributing to this process.  While both of these recommendations deal with documentation and do not necessarily provide guidance, the COCL team must observe what has been done to date by the City before we are in a position to inform the City regarding other steps that could be taken to achieve compliance.

Quarterly Report July 9, 2015

## CRISIS INTERVENTION

*Methodology and Monitoring Activities*

In the first quarter, our prime methodologies for evaluating PPB's "capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis" (Section VI, Introductory Paragraph) has been interviewing individuals involved with the BHU, observations of BHU Advisory Committee meetings, and interviewing PPB personnel responsible for data related to this section of the Agreement. We believe our initial methodologies and observations have laid the groundwork for a more detailed evaluation of PPB's "capacity and expertise" to deal with incidents that may involve persons with mental illnesses.

Our evaluation of the BHU (Par. 91) and BHU Advisory Committee (Par. 94) will begin with two questions: (1) were these entities created? and (2) was the process for their creation suitable and sustainable for the purposes of the Settlement Agreement? We have interviewed and sat in on meetings for these committees and can therefore say with confidence that they do exist. Our evaluation of the process for the creation of these bodies will focus on how personnel were selected for these roles (what qualifications did they possess, what experience did they have, etc.).

Importantly, we will ask a third question - How do these bodies function and are they carrying out the duties as delineated in Pars. 92, 93, 95, and 96, respectively? For instance, Par. 92 requires the BHU to "manage the sharing and utilization of data" related to PPB mental health interactions and "use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions" with such populations. Whether such data is managed and used is one aspect of the Agreement, though we will also evaluate whether the management and utilization yield informative results. This distinction between presence and presentation will be made for many of the provisions found within this section. We expect to have a better understanding of the BHU work when we receive the recommendations for improvement required of the BHU Advisory Committee in Par. 95 of the Agreement.

Quarterly Report July 9, 2015

Along with the PPB's requirement to utilize data related to police interactions with consumers of mental health services, we are planning a survey to independently measure police interaction with consumers of mental health services.  This will be the Mental Health Contact Survey.  This survey will systematically reach out to individuals within this group who have had a recent contact with the police to evaluate the quality of treatment they received and determine whether police performance has improved over time.  We therefore see the Mental Health Contact Survey as an ongoing effort, whereby letters will be mailed weekly to relevant persons asking them to complete the survey through a web or telephone modality.  Through various research projects, we have developed and validated a wide array of survey questions but we welcome input from the mental health community and the COAB regarding additional survey items.

The requirement for PPB to continue to train all officers in Crisis Intervention (Par. 97) and provide refresher training (Par. 98) will follow the same methodology as identified in the Training section above.  Briefly, we will examine the needs assessment, training, and training evaluation to ensure that PPB continuously assesses their Crisis Intervention training and makes modifications when issues present themselves.

The PPB is also directed by the Agreement to establish a "Memphis Model" Crisis Intervention Team.  The COCL team is quite familiar with the Memphis Model, with multiple members having worked with the original designers of the Memphis Model in the past.  As the Agreement specifically identifies this model as the choice for PPB, we do not believe PPB's responsibility is to implement the model "in name only".  We are aware of PPB's past variance from the Memphis Model and will evaluate the Bureau based on its ability to come back to the model in philosophy and practice.

The PPB will be evaluated in terms of its ability to satisfy direct requirements of the Agreement, such as officers volunteering to become ECIT officers (Par. 100), exclusions from CI-Team participation (Par. 101), and retaining of normal duties (Par. 103).   Furthermore, we will incorporate methodologies to evaluate less concrete provisions regarding training (Par. 102) and increased awareness of CI-Team work (Par. 104).  For example, PPB's requirement to "highlight the work of the CI-Team to increase

Quarterly Report July 9, 2015

awareness of the effectiveness of its work" (Par. 104) begs two questions: (1) has the work been highlighted? (and if so, how?); and (2) has awareness of the effectiveness of its work been increased?   This will require interviews, focus groups, and survey methodology to gather all perspectives about increased public awareness.

Our assessment of the collection of data required of PPB and BHU in Par. 105 of the Agreement will examine both the physical data collected as well as ability of data systems to make meaningful associations with other systems.   We have already commented on some aspects of PPB data systems and will hold the same mentality when evaluating the systems utilized by BHU – namely, does the system allow for the connection of data across systems to make meaningful comparisons and identify potential trends not required by the Agreement but possibly important to avoid future problems?

Our evaluation of the Mobile Crisis Prevention Team subsection (Subsection D) of the Agreement (now referred to by PPB as the Behavioral Health Response Team (BHRT)) will follow a similar methodology as our evaluation of the Crisis Intervention Team (ECIT).   The expansion, staffing, exclusions, training, and policies referred to within the Agreement will be examined to determine whether they have satisfied the minimal requirements, and then a more in-depth analysis will determine the adequacy of the process used.   The first examination will be a check of PPB records and roll calls, while the second analysis will require interviews and other methods.

The provision referring to the Service Coordination Team (Par. 112) will follow other methodologies outlined above.   Briefly, we will interview individuals involved with the SCT and solicit their input on the process of connecting services with individuals who have a "criminal record, addictions, and highly acute mental or physical health service needs".   We will inquire as to what services options are available and determine the process for how services are provided.

Finally, the subsection dealing with BOEC is important to the overall goal of making PPB a national model.   Oftentimes, BOEC employees are the first people in the line of contact for police services and their role in making determinations of who is best

Quarterly Report July 9, 2015

to respond to calls related to mental health issues is extremely important.   The Settlement Agreement identifies three areas of change within BOEC: (1) Policies, (2) Training, and (3) a Crisis Triage for calls related to mental health issues.  We will apply previously discussed methodologies for examining the policy and training portions of subsection F, though we will comment deeper on the Crisis Triage portion of this subsection. We will examine policy and procedures for crisis triage and interview those involved in CIT about the process.

*Initial Impressions*

In terms of policy review for this section of the Agreement, we will reserve our initial impressions for the policy section found later on in this report. The requirement for PPB to establish a BHU as well as a BHU Advisory Committee appears to be moving in the right direction for compliance.   The BHU has been formed and we have interviewed personnel currently involved in this unit.  Subsequent reports will comment on the process for the formation of the BHU, though our initial impressions of this unit indicate that the formation has been satisfactory for compliance.  We will continue to examine the BHU as we go along.  According to PPB Quarterly Settlement reports and our own personal observations, PPB has convened the BHU Advisory Committee required by the Agreement.   Additionally, the Quarterly Settlement reports from PPB have indicated BHU personnel having been actively involved in multiple addictions and behavioral health related subcommittees that are pursuing improvements in the behavioral health care system, in compliance with provisions listed in the Community Based Mental Health Services section of the Agreement.

It also appears that PPB is moving back towards a "Memphis Model" of Crisis Intervention with their ECIT program.  PPB initially established its CIT program in 1994. Identifying Crisis Intervention as a core competency, in 2007 PPB made the decision to make 40 hours of CI training mandatory for all officers.   This deviates from the "Memphis Model" of CIT, in which a subgroup of the patrol force volunteer to receive CIT training and become specialists in crisis response.  We understand and applaud the

Quarterly Report July 9, 2015

effort to increase the level of knowledge and skill among all PPB sworn personnel, but we believe this effort came at a price, particularly as implemented without also maintaining a specialist "Memphis Model" unit.  One cost comes from the need to "mass" produce the components of the 40 hour CIT curriculum, which may degrade some of the elements thought to be critical.  It also stretches the 40 hours of CI training over a much longer period of time than the traditional 40 hour CIT week of training.   It also eliminates the "Team" component of the model; limits opportunities to practice CIT skills and become familiar with resources; and spreads responsibility to officers that may be less compassionate than the officers that volunteer for a specialist CIT unit.

To date, PPB has moved back towards the Memphis Model by creating an enhanced Crisis Intervention Team (ECIT) that includes 78 trained officers.  ECIT officers are volunteers that complete an additional 40 hours of training in crisis intervention, thus bringing the total training to 80 hours.  These officers have regular patrol duties, but are also available to be dispatched to mental health crisis calls when needed.  Along with the ECIT officers, all officers continue to receive 40 hours of CI training prior to assuming independent patrol or call response duties.  New officers receive an initial 12 hours of CI training during their 16 weeks at the Oregon Department of Public Safety Standards and Training Basis Academy (DPSST Basic Academy).  The remaining 28 hours of CI training are completed during their 12 weeks at the PPB Advanced Academy.  On top of this, CI refresher training is included in PPB annual in-service training, though it is unclear the number of hours dedicated each year in the refresher training.

The Behavioral Health Response Teams (BHRT) represent another area where PPB appears to be headed in the right direction.  The newly created BHU Electronic Referral System (BERS) appears to be a good resource for PPB, allowing the BHRTs the ability to provide follow up and service linkage to individuals referred through the BERS.  According to BHU personnel, the BHRT units follow up and address system issues, working to engage persons with mental illnesses in services and prevent repeat contact with the police.  Thus, BHRTs are not the primary responders to crisis calls.  Instead, cases are staffed internally, as well as with community providers, to coordinate

Quarterly Report July 9, 2015

referrals and resolve issues that threaten the stability of clients in the community.  We are eager to examine this process and observe how cases are staffed and what criteria go into making these determinations.

We have had initial conversations with PPB training and BHU personnel to learn about the approach to CI training and Mental Health Crisis Response.  On top of this, we have also requested and received training and evaluation materials for the CI and ECIT trainings, as well as reports related to the volume of ECIT calls and BHRT caseloads.  In the coming quarters, we will review these materials, along with training evaluation data and reports and data on mental health related calls. We also intend to observe selected trainings, engage in further meetings with PPB personnel, and implement additional approaches to evaluate the adequacy of these trainings and their ultimate impact on officer behaviors and outcomes in the community.

Overall, our initial impressions are that it appears the approach PPB is now implementing to improve mental health crisis response has great potential.  While more analyses must be done, we are encouraged that PPB is pursuing a unique combination of (1) requiring that all officers complete 40 hours of CI training as a core competency, (2) creating a Memphis Model ECIT program, and (3) introducing co-responder BHRTs to provide follow up.  This combination of interventions has the potential for excellent results, and this is an empirical question we hope to answer down the road.  The establishment of a crisis drop-off/walk-in center by the CCOs (as detailed in the Community Based Mental Health Response section of the Agreement) could further enhance the effectiveness of PPB's efforts.  If implemented well and appropriately documented, PPB could become a model for the rest of the nation.  The COCL team looks forward to delving into the details of these efforts, making sure appropriate data are collected and analyzed, facilitating community feedback loops and providing guidance for the future.

Quarterly Report July 9, 2015

*COCL Recommendations*

Our conversations with relevant personnel and initial document review related to the Crisis Intervention section of the Agreement indicate that much work on the part of PPB has been accomplished.  As stated above, we are excited to see the outcomes from the unique combination of efforts currently being put forth by PPB.  We want the PPB to recognize and understand that their efforts are unique.  With this comes the recommendation that PPB diligently document each step of the way to identify successes and failures as they relate to the Agreement, as well as they relate to mental health response in general.   While we may only hold PPB accountable for their satisfaction of the Agreement, they must be able to identify how the BHU, ECIT, CIT, BHRT, SCT, and other elements of Crisis Intervention interact with each other, influence each other, inform each other, and perhaps inhibit each other.  The unique combination of elements is one that PPB must keep a close eye on, and we recommend their documentation go beyond what they may have historically done.

We also recommend PPB stay the course in their return to the Memphis Model and away from deviations from the model.   The Settlement Agreement specifically names the Memphis Model and we feel this is no accident.   We recommend PPB personnel review the research currently associated with the Memphis Model and refer to the central tenants associated with it.  The Memphis Model cannot be employed in name only – instead, there are specific criteria associated with it and we recommend PPB continue to structure their ECIT with respect to such criteria and the underlying CIT philosophy.  In future reports we will closely examine the extent of PPB's adherence to the Memphis Model and the resulting outcomes.  We will also pay close attention to the extent to which PPB's policy, training and program structure support culturally sensitive and competent mental health crisis responses.

Quarterly Report July 9, 2015

## EMPLOYEE INFORMATION SYSTEM

*Methodology and Monitoring Activities*

In the first quarter, our prime methodology for evaluating the PPB's enhancement of EIS has been interviewing the administrators of EIS and gaining a foothold on the system's ability to "more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116).  These interviews will be followed by other methodologies to evaluate EIS's ability to achieve these goals.

A system such as EIS, regardless of the data it contains, is only useful to extent that it is appropriate managed and utilized.  Supervisors are required by the Agreement to utilize EIS in a way that will be informational to the PPB (Par. 116(a-c)).  To evaluate the supervisors' ability to fully exploit EIS, we must determine whether they are being trained in a way that will allow them to do this.  In upcoming quarters, we will review and assess the training materials provided to supervisors and determine whether they are merely instructional ("do this") or insightful ("this is why we are asking you to do this").  Through training and other means, efforts should be made to convince supervisors that the consistent use of EIS has positive outcomes for officers, the PPB, and the community.  If supervisors are convinced of the merits of EIS, they will be persuaded without prodding, to conduct reviews of EIS for current and new employees under their supervision.  The belief in positive outcomes will also steer "EIS staff [to] regularly conduct data analysis of units and supervisors" (Par. 116(c)).  Overall, training that demonstrates to supervisors the merits of EIS should create more "buy in" and more consistent use of the EIS tools, which would go a long way towards satisfying this section of the Agreement.  If supervisors do not believe in the EIS system, then PPB should study the reasons for this skepticism and design a response that directly addresses their concerns.

In upcoming quarters, we will also examine whether the data collected by PPB to evaluate supervisor and team trends is sufficient (Par. 117).  We will observe the form that such analyses take and whether the data presented is a valid representation

of group patterns.  These analyses will be informed by the thresholds identified in Pars. 118 and 119.  While we will check PPB's codes to ensure these are in fact programmed to trigger a review, we are also interested in observing the process for such reviews and how the PPB determines which employees require more in-depth attention.  We are aware that being flagged by the EIS system is by no means a definitive finding – we will sample flagged cases to assess whether a real issue exists or whether an officer was flagged due to some anomaly.  The COCL team will assess whether the EIS system is being used as intended.   Interviews of current EIS administration and reviews of cases will be used to reach this decision.

*Initial Impressions*

While policy is certainly an important part to this section of the Agreement, we will reserve our initial impressions for the overall policy section found later on in this report.  The existing Employee Information System for the Portland Police Bureau is designed to provide a one-stop-shop for all relevant information regarding a police employee.  The system includes information on an employee's past training, behavior, reprimands, and commendations.  A key aspect of this system is the Discussion Tracker, a chronicle of commentary given with respect to an officer's performance.  Taken together, the EIS currently in place at PPB has an initial appearance as being more than capable for supporting the proper oversight, evaluation, and documentation of Portland police officers.  While we find no major faults with the system after a preliminary review, there is much to be said regarding the historical lack of utilization of the system by the PPB.  Our conversations with EIS personnel revealed that this system has been in place for approximately seven years, though only recently has there been any substantial attempt to use this database for the purpose it was intended.  Even today, the EIS system does not appear to be used consistently or to its full capacity.

The Discussion Tracker aspect of EIS is one that should be used more by PPB, and our conversations with EIS personnel indicate their agreement.  The Discussion Tracker is useful for a number of tasks.  A systematic semi-annual review has recently been

started for all officers and supervisors, and the Discussion Tracker has the potential for providing an in-depth review of officer activities and level of performance.  The initial implementation of the semi-annual review, however, only requires supervising officers to indicate that they have reviewed the Discussion Tracker. Discussion Tracker could be utilized more comprehensively by supervisors.  This would also provide a mechanism for up-the-chain oversight, as each supervisor could be evaluated regarding his/her contribution to the Discussion Tracker.

There also appears to be a lack of general knowledge of the EIS system among PPB personnel.  The staff that was trained originally in EIS have since transferred or retired, and this knowledge was not passed along.  Although some individuals have managed to use the EIS system effectively, there has been little consistency in information input and usage.   We are encouraged to hear that progress has been made in regaining an understanding of the system by EIS personnel.  Training of supervisors in the proper utilization of EIS occurred in November of 2014 and considerable progress has been made in the consistent use of EIS; however our understanding is that there is still considerable room for supervisors to gain a better understanding and use of the system.  Equally important, officers on the whole are also unfamiliar with the specifics of EIS and hold a negative image of it as a system of punishment. More accurately, the EIS system captures and makes available to management the entirety of an officer's work, good and bad.

EIS could be a valuable tool for identifying at-risk or problematic officers. However, this would require the PPB to have in place a uniform process for when an officer is flagged as potentially problematic. We recognize the impracticality of making judgments on an officer simply because a flag is raised by EIS.  Further research into the nature and reason for flagging is required to determine whether the deviation was a statistical anomaly, a justifiable deviation (e.g. special operations assignment) or whether a pattern exists that is a true cause for concern.  "Human insight", as stated by EIS personnel, is necessary to make this determination, and we cannot disagree. Because EIS is important to the Settlement Agreement, we encourage the PPB to use the system for maximum benefit.

We wonder, however, whether the existing thresholds that activate an automatic review of an officer are the right ones. For example, an officer who uses force more than three times the average of other officers working the same shift would be pretty extreme. Similarly, an officer who uses force three times within a one month period may also be extreme.  This begs the question of whether the EIS system will overlook less extreme officers who are also at risk of problematic behavior.  Of course, the COCL team will want to see how many officers are flagged by the current system and whether, in the judgment of EIS experts, the system is capturing the "right" population of at-risk employees. If EIS rarely flags officers, then it is not really serving its purpose.  To be clear, these thresholds were established in the Settlement Agreement as the minimum requirement, but PPB is free to lower these thresholds if warranted.

We strongly caution that EIS systems are not a substitute for good supervision. Supervisors should know their employees well and be able to identify and intervene with individual officers who are at risk of problematic behavior.  As such, the COCL team will pay close attention to the quality of supervisory training. But EIS can help supervisors and allow the PPB to keep a record of problematic employees who move from one supervisor to another, previously without any paper trail. EIS can be a starting point for supervisors who are prepared to intervene and provide guidance to employees who are experiencing problems.


COCL Recommendations

EIS personnel must be fluent in all things that the system can and cannot do. Our conversations with EIS personnel revealed some limitations of the system, though we were informed that new functions of EIS are still being discovered.  We recommend PPB be staffed with personnel who are familiar with similar database systems and who can work with the manufacturer of the EIS system to become completely familiar with the capabilities of the system. These individuals should have the skill sets to make changes to the programming if necessary.

Second, while the Agreement includes several specific criteria to trigger a flag for potential problems with an officer, PPB must be proactive in its efforts to identify additional potential warning signs. Currently, PPB has supplemental criteria for such identification, though we are unsure of the process which has been used to settle upon those criteria or whether they are being used consistently. We encourage PPB to look at the use of EIS in other police departments to make sure they are on the cutting edge of early intervention trends.

Along these lines, we recommend that PPB review its data and consider whether the thresholds established by the PPB and the Settlement Agreement are reasonable and capture a sufficient number of at-risk officers. There is nothing restraining the PPB from creating lower thresholds. Certainly, we do not want to encourage a system that is producing too many "Type I errors" (i.e. flagging officers who are not at risk), but we also don't want to see the PPB making too many "Type II errors" (i.e. not flagging officers who are at risk). At present, we are more concerned about the latter until we see the EIS results and how they compare to known supervisor assessments of these individuals.

We also encourage PPB to utilize the Discussion Tracker aspect of EIS to the fullest extent possible. The Agreement requires PPB to document their reviews in the Discussion Tracker, though we also believe the Discussion Tracker to be an important tool for supervisors who are conducting reviews of their employees. Beyond the current requirement that PPB supervisors merely indicate they have checked Discussion Tracker when conducting six month reviews of their employees, we recommend there be a systematic process put in place to ensure that EIS and Discussion Tracker are applied to the review.

Finally, there is little point in making the above changes if the system is not be used consistently or will be forgotten in a few years. PPB must continually stress the importance of EIS to supervisors and administrators. EIS personnel estimate that it could take between one to two years of consistent and proper use of EIS for it to become institutionalized. We agree with this assessment and encourage ongoing feedback from

end users to make sure the system is serving their needs as well.  We recommend that PPB check to determine whether the training for both supervisors and employees discusses the merits of the EIS system for each group. For supervisors, it can be a springboard for coaching and mentoring of at-risk employees. For employees, it can provide constructive, positive feedback about performance as well as being an important tool for saving an officers career. The preventative benefits (vs the punitive consequences) of EIS should be emphasized.

## OFFICER ACCOUNTABILITY

*Methodology and Monitoring Activities*

In the first quarter, our prime methodology for evaluating the City's and PPB's responsibility in this section has been interviewing personnel from the Independent Police Review (IPR) and Internal Affairs (IA).  The City and PPB are required to accomplish a number of goals within this section of the Agreement, primarily to "ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent" (Section VIII, Introductory Paragraph).

The expeditious review of potential issues of police misconduct is of great importance for community trust and belief in the accountability process.   Our methodology for ensuring that administrative investigations of potential misconduct are completed within 180 days (Par. 121) will be in the form of allegation audits.  We will request copies of any investigation which goes over the 180 day benchmark and examine the "source of delays and...action plan for reducing them" (Par. 123).  We are also aware that the current benchmark of 180 days is viewed with some skepticism by PPB personnel, who have argued that to include all possible steps "from intake of allegations through approval of recommended findings...including appeals" (Par. 121) is perhaps an overly ambitious goal.  Our work in upcoming quarters will be to identify factors that

Quarterly Report July 9, 2015

contribute to the delays, determine the City's plan to reduce the time spent at each phase of the investigation and document implementation of this plan within the terms of the Settlement Agreement.

The review of lethal force events, although statistically rare, should be approached with the upmost diligence.  The Agreement requires specific steps to be taken in these instances, such as the separation of witnesses, separation of involved officers, a communication restriction order (CRO) to all witnesses and officer, mandated witness officer (officers who were witnesses to the lethal force event) on-scene briefings, and requesting a voluntary, on scene walk-through and interview with involved officers (Pars. 125-127).  We will review in-depth any occurrence of lethal force to identify whether these elements have been documented, as well as examine the scope and process for PPB's actions when investigating lethal force events.  We are also very familiar with the standards set out in *Garrity v. New Jersey* and will examine collected compelled statements to ensure that they adhere to *Garrity*'s findings (Par. 124).

The requirements described in Pars. 128 through 130 will ultimately require a strong evaluation of PPB's and the City's process of satisfying these provisions.  While other paragraphs may require, as part of compliance, a check to ensure that specific elements are present, the requirements in Pars. 128 through 130 deal more with a broad scope of measurement tools.  For instance, the City is expected to "develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA" (Par. 128).  We will examine not only whether a plan exists, but what discussions occurred between IPR, IA, and the City to formulate a plan, how the plan was implemented, and how the plan has been measured for success/failure.  Similarly, the requirement in Par. 130 for the City and PPB to "continue to expressly prohibit all forms of retaliation" cannot be measured simply by whether they have a policy in place.  We will examine how the City and PPB proactively assess whether such retaliation has occurred and what discipline is in place for violation of this prohibition.

Quarterly Report July 9, 2015

We have not yet delved into the procedures regarding the Police Review Board, though the requirements for the City and PPB in Par. 131 are fairly clear. For this paragraph (and all subsections) we will employ similar methodology as described for Pars. 125-127 described above. Generally, we will seek to ensure that both the letter and the intent of the provisions are followed. For example, the requirement that PRB members must "[p]articipate in ride-alongs to maintain sufficient knowledge of police patrol procedures" (131(d)(iv)) does not indicate the frequency which this must occur. The letter of the provision simply says they must participate in such ride-alongs, though the intent indicates they must do so with enough frequency to "maintain sufficient knowledge". This examination of both the letter and the intent of the provision will be applied to the entirety of Par. 131.

The requirements found in Par. 133 also require an in-depth review, similar to that found for Pars. 128 through 130. The review will require record checks (for items 1 and 3), and qualitative evaluation of process for all items in the paragraph. For example, item 5 of this paragraph requires PPB to "work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding". We will be evaluating the depth of such conversations and whether all reasonable effort was put forth to examine the disparity in findings.

Our methodologies for the rest of this section (Pars. 134 through 140) will mimic methodologies discussed above. Generally, both the letter and the intent of the provision will be reviewed. We will review best practices as they relate to the discipline guide identified in Par. 137. A discipline guide must ensure, as stated in the paragraph, that discipline is "reasonably predictable and consistent". The COCL team has much experience collecting data related to fair and consistent discipline, and we will compare the current PPB discipline guide against best practices to ensure that it includes aspects of public interest, the degree of harm, the officer's experience, the intentionality of the error, and the officer's past record in the consideration of discipline (Stephens, 2011).

Finally, we intend to capture the views of those most affected by these changes – the officers and the complainants involved – to assess whether they believe the process resulted in the "fair and expeditious resolution of complaints." To evaluate the efficacy of the accountability system, a sample of officers and complainants will be surveyed, focusing on process and outcome fairness.

*Initial Impressions*

As an initial step in addressing this section of the Agreement, we have discussed aspects of officer accountability with individuals both inside IA and IPR.   Our conversations have focused on the ability of PPB's current systems to aide in assuring accountability, the ability of PPB to complete administrative investigations with the 180 day timeframe required by the Agreement, and the creation and implementation of the new discipline guide.  These items are discussed in more detail below.

Our first impression is that the obligations of Internal Affairs are taken very seriously by the responsible personnel.   There appears to be genuine concern for creating a working environment of police accountability.   However, at this point in time, the systems required for full accountability are not in effect.  The current data system used to review and document IA investigations is the AIM system.  This system is responsible for tracking both citizen and departmental complaints against officers. There appears to be a difference of opinion between PPB and IPR as to the functionality of the AIM system.  PPB has indicated that AIM is an "off the shelf" program (limiting its ability to be modified), and does not yield a relational, searchable database.  The PPB has done some "patchwork" to make the system work for Portland, but it is not optimal by any means.  On the other hand, IPR personnel have indicated they believe AIM, while certainly an older system, is still very useful to them.  Currently, they are able to search the database, track complaints and generate reports based on the data.

Furthermore, the AIM system has been in place for approximately ten years, yet we have been informed by the PPB that only within the past two years has it been consistently used and standards for utilization created.  Several individuals within the

Quarterly Report July 9, 2015

PPB have informed us that because of renewed attention to the system, its range of functions is constantly being discovered. Though again, there appears to be a difference in opinion between IPR and PPB. IPR has indicated that they have consistently used all the functions of AIM for over a decade. The adequacy of the AIM system for ensuring officer accountability must be evaluated, and if found wanting, it should be replaced. However, PPB and IPR must be on the same page regarding the functionality of AIM before any decisions can be made.

The Agreement identifies a timeline of 180 days to complete an administrative investigation. This timeline "includes all steps from intake of allegations through approval of recommended findings by the Chief, including appeals, if any, to CRC" (paragraph 121 of the Agreement). Currently, an investigation can take up to 300 days if all extensions of the process are involved (PRB, CRC, etc.). In our conversations with PPB, they have expressed some frustration with the requirement to complete all administrative investigations in less than 180 days yet still provide enough time for personnel at each step to complete their tasks. This is especially true when all extensions listed above are involved in the process. A plan for reducing the amount of time administrative investigations take was recently proposed to City Council, though discussion of that proposal was postponed. Because Portland is committed to robust community input as different levels of government, the process is inherently long. We look forward to assisting the City in finding ways of reducing investigation time.

The Portland Police Bureau, in accordance with paragraph 137 of the Agreement, has created a discipline guide, enacted in March of 2014. Members from various divisions within PPB, as well as "IPR, City Attorney's Office, PPA, PPCOA, AFSCME, Professional Standards, and Internal Affairs" were all part of the workgroup involved in creating this discipline guide. However, the community was not invited to directly participate in the development of this guide. Furthermore, while we were able to find a copy of the discipline guide on the internet, it is not a part of Directive 338.00 that is currently posted to the Portland Police Bureau's website (http://www.portlandoregon.gov/police/article/508023). In order to achieve Universal Review of this directive, the actual guide should be attached for the community to

Quarterly Report July 9, 2015

provide their comments.  When Directive 338.00 is reviewed, we ask that the guide be included for the community to observe and comment upon.  We also implore the community to provide concise, actionable comments regarding this discipline guide. We will also review the guide to see whether it incorporates the latest thinking about police discipline by properly including public interest, the degree of harm, the officer's experience, the intentionality of the error, and the officer's past record in the consideration of discipline (see Stephens, 2011).

*COCL Recommendations*

We begin our recommendations by reminding PPB of the critical importance of effective systems for the reliable collection of data.  Regardless of the COCL's need for compliance data, it is essential that PPB generate reliable and valid data for purposes of self-evaluation in the years ahead.   Any changes that PPB makes must be based on data that can be trusted.  We therefore recommend PPB evaluate the AIM system (among other systems already discussed in this quarterly report) to ensure that it has the capability of not only collecting data, but producing data that are useful to the end users and useful for future evaluations of organizational performance.  According to PPB personnel, the AIM system is "really outdated" and PPB must re-evaluate its ability be a useful system.

We also recommend PPB embarks on cutting the time it takes to perform an administrative investigation with the same mentality as business organizations looking to see where costs can be cut.  PPB personnel have expressed genuine concern about how it is possible to cut time spent on investigations while maintaining the current quality of such investigations.  However, we are bound by the Settlement Agreement to determine compliance with the 180 day timeline, and we have not received any compelling statement indicating that 180 days cannot be obtained.  We recommend that PPB determine which time cuts are actually harmful to the quality of work and which are potentially harmful.

Quarterly Report July 9, 2015

We also recommend the PPB be more inclusive of the Portland community in the creation of future documents like the discipline guide.  The COCL recommends that the review process for Directive 338.00 include the discipline guide for the community to observe and comment upon.  We also implore the community to provide concise, actionable comments regarding this discipline guide.  The process of Universal Review should not be disregarded by the public and instead should be embraced as the public's opportunity to provide insight and recommendations regarding PPB policy.

## COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD

*Methodology and Monitoring Activities*

From the start, it must be stated that our methodology and monitoring activities are not geared towards the activities of the COAB.  Our responsibility is to ensure that the City has fulfilled the obligations required of them in the creation and support of the COAB.  Also, because the COCL chairs the COAB and has responsibility for the "efficient operation" of the COAB, we feel obliged to comment on the progress and functioning of this group and make some recommendations. While our Initial Impressions section will discuss our opinions as to how this entity is progressing, our focus is largely on the City's responsibility to provide support for the COAB. That said, the COAB must be functioning adequately to work with the City and the PPB in a collaborative manner.

The COAB is authorized to perform a number of functions related to the Agreement, including the authorization to "(a) independently assess the implementation of this Agreement; (b) make recommendations to the Parties and the COCL on additional actions; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) provide the community with information on the Agreement and its implementation; (e) contribute to the development of a PPB Community Engagement and Outreach Plan ("CEO Plan"); and (f) receive public

comments and concerns" (Par. 141).  Our objective here is to qualitatively determine whether the COAB has received City support to accomplish each of these tasks.

The requirements set out in Pars. 142 and 145 of the Agreement identify the members who should serve on the COAB, with the process for at-large membership being the result of a Collaborative Agreement between the AMAC, the City of Portland, and the DOJ.  We have observed this process from the beginning and will continue to monitor the COAB membership in the future to ensure that the representatives identified within these paragraphs are indeed included in COAB membership.

We will also ensure that the COAB has the administrative support it requires to "perform the duties and responsibilities identified in this Agreement" (Par. 143).  We have examined, and will continue to examine, the individuals charged with providing such support as well as the quality of support received by the COAB.  This will include the facilities for COAB meetings, forums for COAB interaction, and information provided to the COAB, among other support.

The requirements of the City detailed in Par. 146 are tied to its responsibility for creating a CEO Plan that will assist in PPB's ability to "ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase public confidence".  We feel the CEO Plan is a lynchpin to accomplishing the City's overall goal of a mutually respectful relationship between the PPB and the Portland community.  Thus, we will ensure that each subsection of Par. 146 is followed with the upmost care.

The requirement of 146(a) instructs the City, in consultation with the COAB, to "conduct a reliable, comprehensive, and representative survey of members of the Portland community, including civilians and PPB officers".  Because the COCL will use this survey to evaluate the Settlement outcome and is facilitating the work of the COAB, the COCL has provided direction and oversight on this task.  The COCL has separated this requirement into two parts specifically mentioned in this statement: (1) a survey of Portland community members and (2) a survey of PPB sworn and civilian personnel. Both surveys are in their final stages of development.  We are also planning a survey to

Quarterly Report July 9, 2015

capture perceptions of a population not specifically mentioned in the Agreement but is directly related to the development of the CEO Plan.  This survey will be a PPB Partnership survey.  A brief explanation of each survey and how they satisfy the elements of the Agreement is provided below.

The first survey we will employ is the Police-Community Relations Survey (previously referred to as the Annual Community Survey of Police Services).  This survey is intended to measure the public's "experiences with and perceptions of PPB's prior community outreach efforts and accountability efforts and where those efforts could be improved" (Par. 146a).  Furthermore, this citywide community survey will serve the related purpose of measuring the public's confidence in PPB's ability to respond appropriately during public encounters well as the public's view of PPB as a legitimate government authority.  The Agreement highlights the police-community tensions in Portland, and a growing body of scientific literature has indicated that problematic encounters can undermine police legitimacy.  As this tends to occur more often with African American and Latino populations, as well as young adults, particular attention will be paid to these groups.  This survey will oversample these racial, ethnic and age populations in order to ensure their voices and perceptions are captured. The COCL has received constructive feedback and recommendations from COAB members regarding the content of this survey.

The second survey has been designed to ascertain the views and experiences of Portland Police Bureau officers and civilian personnel.  To achieve this goal, the COCL will implement a baseline survey of PPB personnel.  This survey will gather information about officers' views of PPB's community outreach efforts and accountability; aspects of police culture that may be impacted by the Agreement reforms; accountability; attitudes toward the community; and views about use of force.  We have previously implemented an officer survey in 100 cities nationwide and will utilize some of these validated survey questions; however, we will include additional settlement-specific questions.  Many of the survey questions have been used in various other research studies in the US and other countries, as well as by independent monitors of other DOJ consent decrees.

Quarterly Report July 9, 2015

A PPB Partnership survey, designed to measure PPB's current relationships with organizations throughout Portland will also be conducted.  Community, business, and service organizations will be asked to describe the nature and extent of their collaboration with PPB and to evaluate the quality of those relationships.  This Partnership survey, along with the community survey described above, will assist the COCL and COAB in determining how well PPB is engaged with other organizations, and can be used to evaluate whether PPB is working in partnership "to resolve neighborhood problems" (Par. 146).

The Settlement Agreement (Par. 146 (b)) requires that the COAB, in conjunction with the PPB, hold two public hearing meetings in order to "gather public input on PPB's outreach efforts".  The PPB must be informed as to how the community has perceived their outreach efforts so that they can make adjustments as needed.  Our methodology for measuring compliance with this provision will focus on whether the City and PPB make a good faith effort to participate fully in these public hearings. One public hearing has already occurred, and our evaluation of that event can be found within our Initial Impressions section.  Suffice to say here, while the first of the two public hearings did not meet expectations, the resources and structures were not in place for the proper planning of this event. We have conferred with the DOJ and have decided along with the COAB to push back a second public hearing until the process can be improved, thus making the second public hearing more informative and productive.

The provisions found within 146(c) through 146(g) require the COAB to examine documents and provide feedback to the City and PPB, such as PPB's prior community outreach efforts or CEO plan.  The COAB will need the full cooperation of the City and PPB to look at a range of issues (e.g. current community and problem oriented policing strategies, personnel selection-training-evaluation, 2009 plan to address racial profiling, etc). Our methodology for assessing compliance with these subsections is whether the City has provided all documents that are reasonably related to the COAB's function in these respects.  The PPB Chief's Office is then required to utilize the results of the COAB's review of those documents, as well as other subsections of 146 described

Quarterly Report July 9, 2015

above, in developing and implementing a CEO Plan.  We will require the Chief's Office to provide specific detail on how the COAB's work and recommendations have been incorporated.  The COAB is the voice and advisory board for the Portland community and PPB will be evaluated on how they incorporate the community's sentiments into their community plan.

The same may be said for Pars. 147 through 149 and Par. 152.  These provisions require the PPB to work with the COAB to "develop outreach and policing programs" (Par. 147), "enhance data collection [efforts]" to address community concerns about discriminatory policing (Par. 148), "develop metrics to evaluate community engagement and outreach" (Par. 149), and "solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing" (Par. 152). We will evaluate the PPB in part, on the degree to which they take seriously and incorporate the suggestions and recommendations of the COAB regarding these tasks.

A draft of the PPB Annual Report will be reviewed by the COAB before the report is released to the public (Par. 150).  The COCL would recommend that the review take into consideration whether the report includes "a summary of its problem-solving and community policing activities", as well as the rationale behind these activities. The COCL will independently evaluate the report on the inclusion of use of force characteristics described in the Use of Force section of this quarterly report.  We will examine and comment on the manner in which use of force and PPB stops data are measured and reported.  By examining best practices in the field, and evaluating PPB data systems for their capability of documenting and utilizing reliable data, the COCL and COAB will assist PPB in ensuring these reports are as informative to the Portland community as possible.

Finally, the City is required to provide legal advice to the COCL and appropriate training to the COAB.  The COCL team, as well as the City, has agreed that the initial training for the COAB was insufficient "to comply with requirements of City and State law" (Par. 155).  In upcoming quarters, we expect the City, in consultation with the COAB, to provide trainings that will adequately allow them to fulfill their function as

Quarterly Report July 9, 2015

defined in the Settlement Agreement.  We will work with the City and DOJ to ensure that all "appropriate training" is provided.


*Initial Impressions*

Our initial impressions for this section should begin with a comment on the current functioning of the COAB.  As stated earlier, we are tasked with evaluating only the City and PPB's compliance with the provisions of the Settlement Agreement. However, we consider the COAB a central element in Settlement Agreement and therefore, the success of the compliance and reform efforts by the City and PPB can be facilitated or hindered by the success of the COAB.  While the rest of our initial impressions will focus on the progress to date of the City and PPB, we first offer our views on the successes and challenges of the COAB's functioning as a group.

In Portland, the strong desire for community oversight is very laudable and relatively unique.  The diverse members of the COAB have been carefully selected by members of the City Council, the Human Rights Commission, the Portland Commission on Disability, and the community at large (Par. 142(a)).  These members were selected for their experiences, expertise, and representation within the community. To date, despite a delayed orientation to the specifics of its roles and responsibilities regarding the implementation process, and a lack of sufficient administrative support, the COAB has made significant progress in their four meetings by creating a set of bylaws, establishing subcommittees, holding a public hearing, and creating plans for community engagement via a second public hearing and community surveys.  The COAB has also created an Executive Committee, designed to lead and guide the COAB in its work.  On top of this, three subcommittees have been created and are meeting regularly, including the Mental Health Crisis Response Subcommittee (to assess changes in PPB mental health response and related policy and training), the Community Engagement and Outreach Plan Subcommittee (to assess PPB's CEO Plan and gather community perceptions of the PPB), and the Data Systems, Use of Force, and Compliance Subcommittee (to assess PPB data systems and the measurement, documentation and

Quarterly Report July 9, 2015

analysis of Use of Force events).   However, the COAB has been constrained in its progress by uncertainty about the roles and responsibilities of the group and preferred strategies for bringing about police reform.  There have been some disagreements over the independence of the COAB from the COCL and the role of COAB alternates, and there has been confusion about the methods of communication between members as a public body subject to public records laws. We attribute much of this disagreement and confusion to the failure to provide the COAB, early on, the basic training and orientation needed to function as a public body.

In response to these concerns, the COCL team and the DOJ have sought to clarify roles and responsibilities as afforded by the Settlement Agreement through written letters distributed to the COAB. At the request of COAB members, we have also sought to arrange for additional training on a range of issues so that COAB members have the knowledge and orientation to function fully in this new capacity.   The ability of the COAB to understand Oregon law, PPB structure and processes, and PPB data systems is crucial.  We recommend that PPB, the City and DOJ continue to work with the COCL team and the COAB to determine what trainings are necessary and assist in providing them.

Some COAB members and public participants in COAB meetings have expressed their views with emotion and intensity.  We appreciate the passion that members bring to this work; unfortunately, some of the COAB members perceived these exchanges as disrespectful.  The COAB must be a place where everyone has a voice, where people feel safe, and where no one perspective is allowed to dominate. Effective oversight and reform is best achieved if the COAB, COCL and PPB have a working relationship with mutual respect for the individuals involved. We encourage COAB members to make a good faith effort to work with individual police officers and the Portland Police Bureau to bring about the necessary reforms.  Conversely, we also encourage the PPB to make a good faith effort to work with the COAB and assist the group in learning more about the operations and systems of the PPB.  Strong community oversight should begin with a basic knowledge of the PPB. Overall, we envision the COAB as a direct link to the community. That is, the COAB should receive input from all segments of the Portland

Quarterly Report July 9, 2015

community through public hearings and other mechanisms. Conversely, the COAB is expected to communicate to the public the quarterly findings produced by the COCL. The COCL is tasked with monitoring and measuring PPB compliance with the Settlement, documenting the effectiveness of these reforms, and making recommendations to the PPB about reforms as well as innovations in community policing.  The COCL will seek input from the COAB regarding specific tasks or recommendations and the COAB will provide feedback to the COCL regarding their views of PPB's progress as measured by the standards delineated in the Settlement Agreement and by the COCL reports.  We now turn our attention to our initial impressions of the City's and PPB's efforts regarding this section of the Agreement.  As part of the Settlement Agreement, the City of Portland is required to "provide administrative support" in order for us as the COCL to "perform the duties and responsibilities identified in [the] Agreement" (Par. 160).  In order for the City to adhere to this provision, they have agreed to provide support in a number of ways.  This has included providing legal support, accommodations during COAB meetings, support for COAB meetings, office space for the COCL team, and administrative assistance (among other considerations).  The City has worked very hard to satisfy their responsibilities as they relate to COAB and COCL work, but progress is still needed in several areas.

At the beginning of our appointment as COCL, we negotiated with the City for office space that COCL Team members could utilize. Originally, we sought an office within the Rosewood community, though due to problems associated with the office space, we temporarily relocated to a different office.  After careful consideration, we have decided that the COCL's only office space will be at the Office of Equity and Human Rights, 421 SW 6th Avenue.  The administrative person to be hired will work out of this location and can respond to any inquiries from the community. Other members of the COCL team and COAB subcommittees may hold meeting there if necessary (with easy access to buses and the Max).  Regular office hours to meet with a COCL representative will be announced after all staff are in place. The Portland community at large also has opportunities for input through COAB meetings, subcommittees, and the online forum created by the COCL.  We thank the Office of Equity and Human Rights

Quarterly Report July 9, 2015

for accommodating our need for administrative office space. We are still waiting for a permanent administrative assistant.  To date, we have had temporary administrative assistants while a search for a permanent one is ongoing.  We have been pleased with the work but are eager for the full-time appointment.   On top of this, there are certain administrative activities that we are awaiting completion of, including the written transcripts of the COAB's most recent public hearing.  We hope that the City can identify and contract with a permanent administrative assistant within this next quarter.

As discussed in the Methodology and Monitoring Activities section of this report, the City, PPB, DOJ, or the COCL have not provided the range of trainings necessary for COAB members to gain the understanding necessary to accomplish their full range of goals as set out in the Agreement.  .  However, we are now in conversations with all Parties on what trainings are necessary and how they should be delivered within the next quarter.

The COAB, in coordination with the PPB, has held one public hearing in partial compliance with Par. 146(b).  In attempt to hold the first hearing within Agreement dictated timelines, planning on the part of COCL, COAB and the involved Parties was rushed.  This created confusion and miscommunication as to the purpose and structure of the public hearing, and significant frustration for all. Additionally, the hearing did not achieve the desired results of PPB presenting its outreach program and listening to public reaction.   The PPB presented videos and testimony which covered approximately half the time allotted for the public hearing, which many members of the Portland community felt was counter-productive to the intent of the hearing.  While we believe the PPB must present their outreach efforts in order to gather input on those efforts, the amount of time taken and the format which PPB used to present their efforts was perhaps inappropriate for the event. Notifications about the next public hearing should be clear regarding the purpose of the meeting (i.e. to discuss the outreach plan) so that members of the public have the right expectations when they arrive. The COAB and PPB have received an extension by the DOJ for the second public hearing to better prepare

for it and create a plan of action wherein all members of the public can have their voices heard.


*COCL Recommendations*

Our recommendations will be limited to the City and PPB, as they are the two entities for whom we are measuring compliance.  The statements in the Initial Impressions section above are only advisory.

In order to be found in compliance with the Settlement Agreement, we first recommend that the City and PPB implement trainings as necessary for the proper function of the COAB.  Many members of the COAB are community representatives and may not understand the operations, rules, and constraints of both the City and PPB. The COAB must gain a full understanding and appreciation of history of the Settlement Agreement, the provisions within it, and their roles as defined by it.  We recommend the City and PPB consider all the background knowledge they possess and how it has influenced their decisions and then consider the COAB must make similar decisions as a public body.  The City, PPB, and the COAB must be on the same page in order for this collaborative relationship to work.

We also recommend the City fulfills its requirements to provide the COCL administrative support in the forms of office space that is centrally located and a permanent administrative assistant.  While we have made due to this point, and have been pleased with the temporary administrative support, we require more concrete and consistent accommodations.  The ability of community members to have an office wherein they can directly communicate with members of the COCL is important, as we seek to strengthen our connection with the community after the resignation of Justice De Muniz. The COCL team is currently searching for a replacement for Justice De Muniz.

Finally, we recommend the City and PPB consider their relationship with the community and determine how it may be improved, specifically in the areas of collaborative partnerships and information dissemination.   Many members of the

Quarterly Report July 9, 2015

Portland community have expressed concern during COAB meetings that they do not currently have a positive relationship with the PPB and do not feel the PPB is transparent and open to community advisement   The Settlement Agreement provides opportunities to repair damaged relationships.  We recommend the City and PPB take these opportunities to work with the COAB and be open to thoughtful community input regarding City and PPB operations.


## POLICY DEVELOPMENT

A running theme in the Settlement Agreement is the requirement that PPB address issues surrounding their current policies or lack thereof.  Indeed, the creation and diffusion of sound policies goes a long way toward enhancing PPB's ability to direct the behavior of officers and hold them accountable when violations of policy occur. There are at least eight sections of the Agreement where there is an explicit mention of policy revision, with each section having numerous provisions to be incorporated into policy.  For this first quarterly report, because the compliance process is in its early stages, we feel that policy development, deserves its own review. For future reports, policy review and analysis will be incorporated the substantive sections of the Settlement Agreement.


*Methodology and Monitoring Activities*

Our methodology for the review of policy will focus on both the substance and process of policy development.  On the substantive side, we will assess whether the policy adheres to the Settlement Agreement, is clear in meaning, comprehensive in coverage, informed by reliable data and best practices, legal and constitutional, and able to be empirically evaluated for successful outcomes.  For this first report, we will focus on the process employed by PPB when crafting and reviewing the policy.  This will include the how subject matter experts are selected and used and the process by

which community comments on the policy draft are solicited and incorporated into the final policy.

*Initial Impressions*

We begin with a general description of the process by which policies are developed and implemented at PPB.  In this way, the reader can become familiar with the terms we will use in future reports when referencing policy review and the PPB is afforded the opportunity to be make adjustments in the policy development process as needed.

Once a policy has been drafted, the policy is placed on the PPB website for the public to review and comment upon.  This is referred to as the Universal Review stage.  The policy is sometimes directed towards experts in the field as well as specified officers within the Bureau.  This is referred to as the Directed Review stage.  The Universal Review and Directed Review occur concurrently and last for a period of 30 days.  The Department of Justice and the COCL team are allowed an extra 15 day period to submit their comments.  The suggestions that stem from the Universal Review, Directed Review, and DOJ/COCL comments are presumably incorporated into the policy, which is then sent to the Chief for his signature.  Each policy is initially reviewed after 6 months, and thereafter, annually.  If a policy is found to require changes during either the 6th month review or annual review, the process starts over again.

We begin by acknowledging that the PPB has developed and implemented a methodology for satisfying their responsibilities related to policy changes.  They have created the job of directives manager and have filled that position with an individual who is more than capable of drafting and implementing policy.  The directives manager has initiated a process that has the potential for substantive positive change.  With this framework in place, PPB has revised or created over 100 directives since the early stages of the Settlement Agreement.  The PPB should be commended for these actions.

Quarterly Report July 9, 2015

As of now, there appear to be three conceptual aspects to policy development in the Portland Police Bureau: Version, Priority, and Process. We accept these concepts as instrumental in creating policies, although we find general and specific problems with their implementation. We address these issues individually and begin with Version. The most recent version of a comprehensive policy book was published in 2009, though there have been many Directives and Executive Orders which have superseded the information contained in this most recent version. While all officers are required to adhere to the most recent versions of policy, we feel an updated comprehensive manual is in order. Naturally, changes to policy will likely result from the recommendations of the COCL and COAB, as well as DOJ, but it should be the intention of PPB to publish a comprehensive collection of all policies within the next year in order to avoid confusion within the department and with the public. This will serve the goal of increased transparency.

We also have some concerns that the "Priority" component of policy creation/revision may be overtaking the "Process" component. As an example, we point to the Mental Health Response Policy (Directive 850.20) recently up for six month review within PPB. While this policy has since been split into three parts, the process involved prior to the split contained problems that we hope can be avoided in the future. Due to a glitch within PPB, the policy version that was put into effect in July of 2014 did not reflect the most current revisions. For six months, before the correction was made, PPB was operating under a policy that was outdated.

Our largest concern in the policy arena is with the Process that guides policy development. As of now, policy development is guided by Directive 010.00, which lays out the steps to be taken when creating or revising policy. While adequate in its guidance, we see one particular deviation from this directive that affects some policies that have been developed recently. Provision 2.3 requires PPB to "identify a subject matter expert(s) for the directive topic, solicit and document input from that expert(s), *before* creating a recommended directed draft" (Provision 2.3 of Directive 010.00, April 30, 2014, emphasis added). Our initial review of policy development process indicates that in some instances, subject matter experts are consulted *after* drafting the

Quarterly Report July 9, 2015

directive, during a Directed Review which runs concurrently with Universal Review. Provisions for Directed Review are not found within Directive 010.00. We feel that the decision to consistently solicit expert opinion before rather than after drafting could improve the overall draft.

Through our field interviews we have also identified potential issues with the range of perspectives involved in the policy development process. At present, the Lead Reviewer in drafting policy is always an internal position within PPB. We are concerned that this may constrict PPB's ability to gain a fresh perspective on administrative rule making. At present, a single individual is often times responsible for compiling the Lead Reviewer Packet, acting as the Lead Reviewer, putting the policy out for review, compiling comments and incorporating them into a revised policy, and putting the revised policy through the chain of command. This is an area where more resources may be needed given the importance of policy development for guiding the street-level behavior of the police.

While we have articulated our initial impressions of policy review generally, here we will focus on one specific policy, the Mental Health Crisis Response policy, now split into three parts. We are in the process of conducting an in-depth review of these directives and will be discussing our recommendations with the PPB, City and DOJ in the near future. For now, we offer a preliminary review as a framework for how future reports may look.

In January 2015, Directive 850.20 (Mental Health Crisis Response) was posted for six month Universal Review. Following the 30 day public comment period, a decision was made to significantly revise the directive, breaking it into three separate directives (850.20, 850.21, and 850.22) and reposting for Universal Review. At the time of writing this quarterly report, a thorough review of these new directives is in progress. The 30 day public comment period closes May 2, followed by a 15 day period for the DOJ compliance team and the COCL to comment. During this period, the Mental Health Crisis Response Subcommittee of the COAB is also providing review and comment. The COCL team will incorporate both the public and the COAB feedback into our review and

Quarterly Report July 9, 2015

make formal conclusions on compliance recommendations for improvement in our second quarterly report.

Here we discuss a preliminary concern we have noted about the revised directives that we will further explore.  Both versions of the directives include provisions for non-engagement, disengagement and delaying custody. (We focus our preliminary comments on the newest versions of the directives except to note that the July 2014 version also included language requiring specific labeling of reports of calls in which non-engagement or dis-engagement are used that is absent in the most recent revisions). The directives define disengagement as "The intentional decision, based on the totality of the circumstances, to discontinue the current contact after initial attempts with a person in mental health crisis." Non-engagement is defined as "The intentional decision, based on the totality of the circumstances, not to make contact with a person in mental health crisis."  Per Directives 850.20, 850.21 and 850.22, these tactics can be used when it is determined that contact, or continued contact would result in an undue safety risk to the officer, person in crisis, or others.  A supervisor must be notified to determine whether a plan for contact at a different time should be developed.

According to directive 850.22 Police Response to Requests for Mental Health Custody, dis-engagement or non-engagement may be used in response to a Community Mental Health Director's Civil Custody Request and police notification that the Director has "probable cause to believe that the person is imminently dangerous to self or to any other person." If the officer determines this is the best approach, he or she must notify a supervisor and determine a plan to take the person into custody at a later time. As written, it appears the PPB officer can override the mental health professional's judgement of imminent danger and not take the person into custody for evaluation. We recommend that the policy require that a mental health professional be consulted in these situations.

This change in policy was heralded as innovative in the media and clearly does have potential to improve safety if implemented appropriately.  In conversations with

Quarterly Report July 9, 2015

PPB personnel, we asked if there are specific SOPs or guidelines for when dis-engagement or non-engagement is to be used.  We were told there is not an SOP; however, the basic guideline is that in a situation where a person in crisis will not open the door or otherwise engage, as long as no one else is at risk, they can disengage or delay custody. This is to avoid escalating a situation to the point that deadly force is required. PPB representatives stressed that the practice is always "disengage with a plan" to follow up and link the person to services.

The COCL Team requested documentation from calls in which disengagement or delayed custody has been used in order to get a better idea on how this policy is being implemented and perhaps make recommendations to refine the stated guidelines. However despite the July 2014 version of the policy directive requiring documentation in the incident summary line and "ME" close out code (the PPB's designation for incidents with a mental health component), we were told the Bureau does not have a mechanism to track all calls in which disengagement was used by an officer.  They do track interactions in which force was used with a person with a mental illness. These force reports include information about whether the officers made any attempts at strategic disengagement. However, it appears that no formal tracking is done in instances when no force was used (perhaps due to delayed custody or disengagement). So, for example, if the police received a call about an armed person threatening suicide, but this individual would not allow the responding officers to enter his/her home or takes off, the officers could leave the scene after consulting with a supervisor. If this type of incident is not documented, then the effectiveness of the disengagement policy cannot be evaluated.

While we acknowledge that strategic disengagement/delay in custody can be effective to improve safety in some situations, it could also have tragic results.  Thus, it is critical to have clear guidelines and to track outcomes to ensure that the policy is being implemented appropriately.  As PPB works to improve their tracking of mental health related calls in general, the COCL team will work with them specifically around this issue so that informed guidelines can be developed and evaluated. At this time, we

recommend that a mental health professional be consulted when strategic disengagement/delay in custody is being considered.

Another aspect of 850.21 that we note in our preliminary review is the requirement that when taking a person with alleged mental illness into custody on a "Police Officer Hold" for mental health evaluation, officers must transport the person to an appropriate facility and remain at the facility until a physician determines if the person will be admitted. This creates a significant disincentive for officers to transport an individual in crisis for evaluation, as arresting and taking the person to jail may be more efficient in terms of officer time. Jurisdictions across the country implementing CIT programs have created MOUs with designated evaluation facilities (often EDs) that expedite officers' return to their duties after providing relevant information. We are aware that Oregon state law dictates the current approach and that this is beyond the scope of Settlement requirements. However, it is an issue that might be worth addressing in the state legislature. The creation of a "drop-off" or walk-in crisis center as described in the Agreement could mitigate this issue as well.

The above preliminary review of Directives 850.20, 850.21, and 850.22 should provide a framework for the type of scrutiny we will apply to other policies explicitly or implicitly referenced in the Settlement Agreement. We look forward to working with the Directives Manager on gathering material and conducting interviews to ensure that the other policies discussed in the Settlement Agree receive a similar level of scrutiny.

*COCL Recommendations*

Our recommendations flow from the current information we have on the process of policy development and review. As we have outlined above, there are several areas where we feel PPB may improve their process to ensure the finest quality of policy development possible within the Bureau. First, we recommend that PPB given more attention to quality than quantity when it comes to producing new or revised policies. We are aware of the importance of meeting deadlines set out by the Agreement;

Quarterly Report July 9, 2015

however we recommend that PPB be diligent in releasing policies that are carefully crafted and represent the latest version.

We further recommend that the current version of all policies be documented in a way that uniform adherence is possible and that training and policy are consistent. Improved communication within the PPB will help to remedy this problem.

We have learned that any PPB officer or any community member has the ability to suggest new policies be created, separate from recommendations during the Universal Review period.  To date, however, our understanding is that no new policy suggestions have been made by either group.  We recommend the PPB make a concerted effort to inform the community and officers that they have a right to suggest new policies and that their suggestions will be taken seriously.  We also recommend that PPB document how each public or officer suggestion is taken into consideration, deliberated, and acted upon.


**ADDITIONAL RECOMMENDATIONS**

The COCL team, after assessing the current state of knowledge and innovation in American policing, feels obligated to offer additional recommendations that could help the Portland Police Bureau reach a new level of professionalism and become a model for community oriented policing nationwide.  While these recommendations are not required by the Agreement, we believe they are consistent with the intent of the Agreement and would be appropriate for consideration as part of PPB's Community Engagement and Outreach (CEO) Plan.


*Establish New Measurement Systems*

History tells us that reform efforts often dissipate with the passage of time and the "changing of the guard."  We believe that one of the best ways to institutionalize and sustain programmatic and organizational change in policing is to establish new measurement systems.  PPB is required to do that with use of force data and

administrative responses to such incidents. We would also encourage Portland to continue some of the survey work that we will start under this Settlement, including annual surveys of PPB employees and community contact surveys that measure the quality of interactions that occur between the police and citizens (These are essentially customer satisfaction surveys).   Across many studies and many cities, community members consistently report that they care more about how they are treated by the police than whether the police are effective in reducing crime. Yet crime is all that is measured by police organizations with any regularity.   Hence, we recommend that Portland routinely measure those aspects of police performance that matter most to the community (see Rosenbaum et al., 2015).

*Move Beyond Current Popular Strategies of Fighting Crime*

The organizational reforms outlined in the Settlement Agreement will go a long way toward achieving constitutional policing and building PPB legitimacy.   However, we have argued before the President's Task Force on 21st Century Policing and in Congressional briefings that the most effective way of improving police-community relations in the long run is to change the fundamental style of policing in America (Rosenbaum, 2015).   Over the past two decades, police leaders and researchers have essentially promoted a two-prong strategy to maximize police effectiveness in fighting crime: (a) "hot spots" policing (putting more cops in high-crime areas) and (b) investigatory stops  of cars and pedestrians to search for contraband ("Stop and Frisk" falls under this category as well).   While these strategies and tactics have been successful to some extent as crime fighting tools, we have argued for years that the collateral damage is enormous (e.g. see Rosenbaum, 1993; 2006) Specifically, the problems with this popular style of policing in urban areas include the following: (a) the hit rate is very low, and hence, most people are inconvenienced or offended for no reason; (b) it results in disproportionate stopping, citing, arresting and imprisoning African American and Latino populations, especially marginalized racial and ethnic youth; (c) it leaves those stopped with a bad feeling and embarrassment after being

deprived of their freedom and suspected of criminality, often in the presence of other people; and (d) all of these factors contribute to more negative public sentiment toward the police.  Although we have not studied Portland's policing strategy in any detail, we encourage them to avoid these models of policing whenever possible.


*Expand Community Policing in Portland*

We recommend that the Portland Police Bureau lead the nation in restoring the community policing philosophies and strategies that were popular in the 1990s (see Cordner, 1997; Rosenbaum, 1994). This involves building partnership with the community, engaging the community in dialogue, and jointly solving problems. We will recommend three core models to pursue:

(1) Create Monthly Beat Meetings

Chicago has led the nation in promoting this approach, where officers hold monthly meetings with citizens on their beat (See Skogan & Hartnett, 1997). These meetings provide an opportunity for citizens to get to know the officers who work in their neighborhood, to discuss neighborhood problems, and to work jointly together to solve these problems. Of course, implementation can be a challenge, but structured and routine opportunities for community engagement (vs incident-driven crisis meetings) are an excellent mechanism for community policing.

(2) Adopt the Respectful Engaged Policing Model

Given the fundamental problems with stop-and-frisk and consent searches as currently practiced across the country, we are recommending that Portland consider what we call Respectful Engaged Policing (REP)[1]. Essentially, this involves positive foot and bike patrol, where officers are expected to make positive contacts without any intention of an investigation or interrogation.   The potential benefits of the REP

---

[1] In 2013, Dr. Rosenbaum recommended this approach during a Congressional briefing in Washington DC.  He repeated this recommendation in 2015 during his testimony before the President's Task Force on 21st Century Policing.

Quarterly Report July 9, 2015

approach are many:  (a) officers can restore respect and trust in high crime neighborhoods and with racial and ethnic populations, persons with mental illnesses, and specific marginalized groups; (b) officers can engage in serious problem oriented policing (solving neighborhood problems), thus reducing crime and fear of crime overall; (c) investigatory stops and consent searches will be used less frequently and more judiciously because the officers will be knowledgeable about the social ecology of the neighborhood (i.e. who deserves to be searched and who doesn't based on actual behavior); and (d) when youth, houseless, and others on the street are treated in a fair and respectful way, cooperation with the police should increase, use of force should decline, and legitimacy should be strengthened.

The Portland Police Bureau should be credited with field testing a version of the REP model for 6 months in 2014, called the Neighborhood Involvement Locations (Ni-Loc patrols). The Ni-Loc program involved short (15 minute) foot patrols that were primarily non-investigatory (see Stewart et al., 2014).  This is a very good start, but we recommend a more substantial commitment to foot and bike patrols with less focus on crime reduction and more on problem solving and learning the neighborhood. Apparently, the only training provided to Ni-Loc officers was in the form of an internal "Tips and Techniques" memo and a speech during roll call.  We believe the officers need special training in foot patrol encounters, as described below. In sum, the PPB is currently engaged in innovation that could help set the stage for a new model of policing locally and nationwide.   When supplemented with serious training, this approach holds considerable promise for reducing crime, disorder and fear, while simultaneously strengthening police-community relations in Portland.  We therefore recommend PPB continue with this program and establish metrics for continuous evaluation and fine-tuning in order for this model to contribute to the overall success of PPB's organizational change.

(3) Experiment with New Models of Training

Earlier we highlighted the need for additional attention to training on procedural justice and social competencies that would serve to prevent the escalation of conflict

Quarterly Report July 9, 2015

and increase levels of cooperation by residents who have contact with the police. Along these same lines, we are also proposing a training enhancement that, to our knowledge, has yet to be implemented in policing, namely the use of body camera data, combined with training on interpersonal communication.  The idea is that PPB officers would be equipped with body cameras and then participate in in-service training (another version of this can be applied to new recruits). The trainer would review specific videos with the officer and discuss areas where performance was strong and areas where performance could be improved.  Today, training can go far beyond the "talking heads" in the classroom to a one-on-one micro-analysis of human interaction during specific contacts. Training should focus on the words used, the gestures used, the sequencing of the exchange, points where the encounter begins to decline, and how conversations can be repaired.  We know that effective interpersonal communication includes various elements and particular sequences of behavior, so police training should reflect this understanding of social behavior. In fact, such training should go beyond procedural justice to build social competencies in general, which will come in handy during any police-public encounter.

*Evaluate Body Cameras for PPB Officers Consistent with Legislation*

We encourage Portland to continue with its efforts to experiment with the use of body cameras for PPB officers as a means to increase transparency, accountability, and legitimacy. The community and the police should be involved in the process of determining when, where, and how body cameras should be used and in developing PPB policy on this issue. Also, researchers should be involved in documenting the process and impact of this technology.

The research on body cameras is new, but the results from several studies to date are very promising. Research in the US and Europe (White, 2014) suggests that body cameras can produce a sizeable reduction in the number of citizen complaints, use of force incidents, and assaults on officers.  A recent study with 600 officers in San Diego confirms these findings (Perry, 2015). There can also be evidentiary benefits, as

Quarterly Report July 9, 2015

the body cameras in England and Scotland have helped to resolve citizen complaints and reduce the filing of false reports. Of course, there are real concerns, including citizen privacy, officer privacy, and the resources needed for training, policy development, data storage, and data retrieval. Some of these issues are currently the subject of Oregon legislation.    Current legislation aside, we believe all of these concerns can be effectively addressed and that the PPB should work with, and learn from, other police agencies that are currently testing body cameras.

*Engage in a Reconciliation Process*

We have noted that the tension between people living with mental illness, marginalized racial and ethnic communities, the Portland Police Bureau, and the City of Portland is deep and long-lasting.  The severity of this sentiment represents a significant obstacle to the development of a working relationship. Thus, we would encourage Portland to engage in a "truth and reconciliation" process to gain a fresh start with these groups.  In recent years, this approach has received considerable attention as a possible mechanism for building police-community relations (see Mentel, 2012), which involves a dialogue between the police and the community about past behavior and plans for moving forward to solve neighborhood problems.  We have heard it said in Portland that "the police never apologize for their behavior." Although our litigious society often prevents apologies by government officials, nevertheless, acknowledging the mistakes and wrongdoing of the past can be a good starting point for restoring trust. Therefore, we encourage community leaders and the faith community to work with the PPB and other City agencies to foster a conversation about police, race, mental health, and related issues.  We COCL team has offered to connect interested parties with national experts in this area.

Quarterly Report July 9, 2015

# NEXT QUARTER ACTIVITIES

Having immersed ourselves in the Portland Police Bureau, its practices, and the sentiment of the community, we are prepared to begin examining the processes and documents necessary to evaluate compliance with the Settlement Agreement.  The Agreement is vast, so we plan to focus on several key aspects of the Agreement in the next quarter.  The following activities we will undertake in the next quarter are in no particular order.

We will take time to evaluate policies which have already been crafted as a result of this Agreement, paying close attention to whether each policy is responsive to the Settlement Agreement, is clear in meaning, comprehensive in coverage, informed by reliable data and best practices, legal and constitutional, and able to be empirically evaluated. We will work with the DOJ to select key policies for review that are considered the most important and urgent for the PPB.

The COCL team will also give considerable attention to the presence and capabilities of data systems within PPB.  As reported earlier, many of the data systems currently being utilized by PPB are either outdated or have a "patch-work" system of function.  These data systems will be analyzed to determine whether they have the capable of collecting relevant data and that the data are readily accessible for empirical evaluation.

As indicated in the Settlement Agreement, the COCL team will advise the Inspector regarding the PPB's use of force audits.  We will work with the COAB to identify data points that are important to the community and relay those to the Inspector.  Concurrent with our evaluation of data systems discussed above, we will evaluate PPB's ability to gather these points of data and present them in a manner that is informative to the community and future reform initiatives.

The COCL will begin its evaluation of the PPB Training Division and particular training classes most relevant to the Settlement.  We will examine the content and delivery of such training. While we will certainly report our efforts in the next quarterly

Quarterly Report July 9, 2015

report, the evaluation of training, as well as organizational change more broadly, is an ongoing process that will take considerable time to show effects.

In order to examine PPB's activities to improve crisis response, in the next quarter, we will spend time meeting with BHU personnel, gathering information on BHU Advisory Committee activities and carefully reviewing CI and ECIT training curriculum and evaluation activities.  When possible, we will observe trainings and BHU Advisory Committee meetings.  We will also work with the COAB Mental Health Crisis Response Subcommittee (MHCRS) to identify specific questions and approaches to assessing PPB Crisis Response activities that reflect concerns important to the community.

With MHCRS and PPB input, we will develop the contact survey to be used to measure the experiences of individuals who have mental health related encounters with PPB officers. This contact survey will remain in the field for an extended period until a sufficient sample of contacts is obtained.  Finally, we will work with PPB to ensure systems are in place to capture the data necessary to evaluate the impact of Settlement-related enhancements to their ability to safely and effectively respond to mental health crises.

The work of the COAB will assist us in our efforts this upcoming quarter.  Already, sub-committees have been formed and each sub-committee has begun initial work in their specific areas of study.  We look forward to working with the COAB to engage the community and gain insights about PPB's compliance with the Settlement.   We will spend considerable time working with the COAB members and sub-committees to gather public comments on the PPB, the Settlement process, and ideas for improving police-community relations.

Quarterly Report July 9, 2015

# OVERALL CONCLUSIONS AND RECOMMENDATIONS

Through one quarter as COCL, we have come to understand many things about the Portland Police Bureau, the City of Portland as a governmental entity, the city of Portland as a community, and the manner in which they interact.  We have conducted interviews with representatives from each of these entities and have listened to their concerns.  As a result of our work to date, we have come to some general conclusions.

With regards to the Portland Police Bureau, we are relatively confident that the PPB administration is committed to significant, positive organizational change. Having said that, there is much work still to be done.  Rather than rehash the recommendations found throughout this report, we close with a few general recommendations that may be universally applied to all areas of the Bureau.  First, we encourage the PPB to think about "big picture" organizational change and how all the moving parts fit together to produce certain desired outcomes. In appendix B, we have attached a broad conceptual framework or "theory of change" to visualize the organizational change process.  This is not a complete picture of the process, but it does spell out many of the hypothesized causal linkages.  Second, and on a related note, PPB should seek to avoid any patch-work solutions to problems.  When data systems, policy responses, and training elements are the victim of a "Band-Aid" style of problem solving, problems are addressed but rarely solved.  Rather than take a "stop the bleeding" approach, which is prevalent in police organizations that engage in crisis-style management, the PPB has a golden opportunity to adopt a more strategic approach to planning, especially around data systems. At this point, we will not address the question of whether PPB should have a universal data system, but certainly more attention to information needs is warranted.

With regards to the Portland community in general, and the COAB in particular, we are encouraged by the strong desire to participate in the reforms that lay ahead, and by the emergence of structure, roles, and leadership.

Above everything else, we implore all parties and stakeholders in the Agreement to make a conscientious effort to approach this work with open minds, acknowledging

history, but setting personal grievances aside. We strongly recommend that the PPB and the COAB come together in the spirit of cooperation, collaboration, and mutual respect to systematically address the changes that are needed. We hope the COAB will recognize and acknowledge when the PPB has made real and substantive changes, and assist them in correcting mistakes and missteps that may happen during the course of these reforms. We hope to facilitate the process of building trust between the community and the police, while keeping our eye on the job of assessing compliance with the terms of the Settlement.

Quarterly Report July 9, 2015

# REFERENCES

Alpert, G., and R. Dunham (2004) *Understanding Police Use of Force: Officers, Suspects, and Reciprocity*. New York: Cambridge University Press.

Hickman, M. J., Piquero, A. R., & Garner, J. H. (2008). Toward a National Estimate of Police Use of Nonlethal Force. *Criminology and Public Policy*, 7(4):564-604.

Mentel, Z (2012).    *Racial reconciliation, truth-telling, and police legitimacy.* Washington, DC: U.S. Department of Justice, Office of Community Oriented Policing Services.

Perry, T. (2015). "San Diego police body camera report: Fewer complaints, less use of force."  Los Angeles Times (www.latimes.com, March 15, 2015, 10:21 AM)

Rosenbaum, D.P., (2015) "Strike up a Conversation, not an Interrogation: The Respectful Engaged Policing (REP) Model." Testimony before the President's Task Force on 21st Century Policing.  February 13, 0215.

Rosenbaum, D. P., Lawrence, D. S., Hartnett, S. M., McDevitt, J., & Posick, C. (2015). Measuring Procedural Justice and Legitimacy at the Local Level: The Police-Community Interaction Survey. *Journal of Experimental Criminology.*

Skogan, W. G., & Hartnett, S.M., (1997). *Community policing Chicago style*.  New York: Oxford University Press.

Stephens, Darrel W. (2011) "Police Discipline: A Case for Change". *New Perspectives in Policing*. June, 2011.

Stewart, G. et al. (2014).  *Action Plan:  Portland Oregon's Neighborhood Involvement Locations Project.*  Submitted to the Smart Policing Initiative, Bureau of Justice Assistance, Office of Justice Programs, Washington, DC.

Watson AC, Angell B, Morabito MS, & Robinson N. (2008) Defying negative expectations:  Dimensions of fair and respectful treatment by police officers as perceived by people with mental illness. *Administration & Policy in Mental Health & Mental Health Services Research*. 35, 449-457.

Watson, AC & Angell, B (2013). The Role of stigma and uncertainty in moderating the effect of procedural justice on cooperation and resistance in police encounters with persons with mental illnesses. *Psychology, Public policy and Law*. Vol 19(1), 30-39. doi: 10.1037/a0027931

Williams, H., & Murphy, P. V. (1990).  "The Evolving Strategy of Policing:  A Minority View". *Perspectives on Policing*, January, No. 13.  National Institute of Justice, Office of Justice Programs, U.S. Department of Justice.

Quarterly Report July 9, 2015

White, Michael D. 2014. *Police Officer Body-Worn Cameras: Assessing the Evidence*. Washington, DC: Office of Community Oriented Policing Services.

# APPENDIX A

### Biographies for Rosenbaum and Watson, LLP COCL Team

**Dennis P. Rosenbaum, Ph.D.**

Dr. Rosenbaum is a Professor of Criminology, Law and Justice and Director of the Center for Research in Law and Justice at the University of Illinois at Chicago. Previously, he served in the positions of Director of Graduate Studies and Department Head. He also served as Dean of the School of Criminal Justice, SUNY Albany.  In 2014 Dr. Rosenbaum was elected the first Chair of the Division of Police for the American Society of Criminology, helping to promote police research and knowledge utilization worldwide.

Dr. Rosenbaum's areas of research expertise include law enforcement organizations, public perceptions of the police, police-community relations, policing strategies, and multi-agency partnerships for crime control and prevention.  He has directed many national evaluations for the National Institute of Justice and has completed many scholarly books.  He is the Executive Director of the National Police Research Platform, a longitudinal research program in 100 cities designed to advance the current state of knowledge and innovation in American law enforcement.

Dr. Rosenbaum regularly serves as an advisor to local, state, federal and international agencies in the public safety field.  Dr. Rosenbaum has developed and evaluated training programs on police-citizen encounters that focus on encouraging fair, respectful, and compassionate behavior on the part of police officers.

He has developed and implemented a standardized evaluation system in 55 cities to measure procedural justice during police contacts with the public.  Dr. Rosenbaum has also developed measures of internal police culture related to perceptions of the community and other aspects of organizational behavior.  He has translated this work into practical feedback for 100 participating agencies so they can strive for organizational excellence when comparing themselves to other agencies. Dr. Rosenbaum grew up in the Portland area and attended Central Catholic High School.

Quarterly Report July 9, 2015

**Amy Watson, Ph.D.**

Dr. Watson is an associate professor at Jane Addams College of Social Work at University of Illinois at Chicago.  Her research focuses on police encounters with persons with mental illnesses and the Crisis Intervention Team (CIT) model.  She has conducted National Institute of Mental Health (NIMH) funded research on the experiences of persons with mental illnesses in police encounters (Police, Procedural Justice and Persons with Mental Illnesses) and developed a measure of perceived procedural justice in these encounters that is being used in projects in the United States and Canada.  She has completed several federally funded studies of the Crisis Intervention Team model and is currently in the field with a $3.1 million multi-method study of Chicago's CIT program (CIT & MH Service Access in Police Contacts: Impact on Outcomes of Persons with Serious Mental Illnesses) that examines crisis encounters from officer and call subject perspectives and the role of service accessibility and neighborhood characteristics in outcomes for persons with mental illnesses in the 12 months following their focal police encounter.  Dr. Watson has published extensively on this work and presented findings to local, national and international audiences.

Dr. Watson has also conducted research and provided consultation to programs serving persons with mental illnesses with criminal justice system involvement.  These include mental health courts and prison re-entry programs.

Prior to joining the faculty at UIC, she was the project director and co-investigator National Institute of Mental Health Research Infrastructure Support Program grant that funded the Chicago Consortium for Stigma Research (PI Corrigan).  This was an interdisciplinary project focused on understanding and reducing mental illness stigma that included multiple studies and dissemination of findings to academic, professional and advocacy and community audiences.  Dr. Watson continues to be interested in mental illness stigma and incorporates considerations of the impact of stigma in all of her work.

Dr. Watson work has been recognized locally and internationally. In 2008, she received the Young Researcher of the Year Award from NAMI of Greater Chicago and in 2013, she was the recipient of the Crisis Intervention Team International CIT Researcher of the Year Award.

Early in her career, Dr. Watson worked as a probation officer on a specialized mental health team.

Quarterly Report July 9, 2015

**Paul J. De Muniz, J.D. (COCL Team Member during First Quarter)**

The Honorable Paul J. De Muniz was elected to the Oregon Supreme Court in 2000 and served as the court's chief justice and administrative head of the Oregon Judicial Department from January 2006 to May 2012, retiring from the court at the end of 2012. Between 1990 and 2000, he sat on the Oregon Court of Appeals and served as presiding judge on one of the three panels that comprise that body. Prior to ascending to the bench, De Muniz was in private practice for 13 years with the Salem, Ore., law firm of Garrett, Seideman, Hemann, Robertson and De Muniz P.C., where he specialized in complex criminal and civil litigation, as well as appeals. From 1975 to 1977, he was a deputy public defender for the State of Oregon. De Muniz is currently a Distinguished Jurist in Residence at Willamette University College of Law.

In November 2011, De Muniz was inducted into the National Center for State Courts' Warren E. Burger Society in recognition of his commitment to improving the administration of justice within the states. In addition to his work within Oregon, he also was a member of the Conference of Chief Justices and was elected to its board of directors in 2008. He is on the board of trustees for the National Judicial College. In 2011 De Muniz completed a three-year term as a member of the Harvard Kennedy School's Executive Session for State Court Leaders in the 21st Century. In 2002, De Muniz founded a rule-of-law partnership with judicial leaders in the Russian Far East, working with lawyers and judges in Russia to implement reforms within the Russian criminal justice system. De Muniz currently serves on the board of directors of the National Crime Victim Law Institute and Susan G. Komen for the Cure, Ore. & SW Wash.

Justice De Muniz speaks frequently to both national and international audiences on the importance of maintaining independent state judiciaries, improving state court administration and the need for adequate state court funding. He has served as the 2009 Robert H. Jackson Lecturer for the National Judicial College and, in 2010, addressed judicial leaders from 55 countries at the Asian Pacific Courts Conference on the ways and means of judicial branch strategic planning. Later that year, De Muniz gave the 17th annual Justice William Brennan Lecture on State Courts and Social Justice at New York University Law School, discussing the need for reengineering state court operations. In 2013 De Muniz addressed the National Academy of Sciences in Washington, D.C. on the subject of evaluating eyewitness identification evidence in court.

Justice De Muniz's work has been recognized with a number of state and national awards, among them: the National Judicial College's *2009 Distinguished Service Award*, the National Association of Criminal Defense Lawyers' *Judicial Recognition Award*, the

Quarterly Report July 9, 2015

Oregon Area Jewish Committee's *2010 Judge Learned Hand Lifetime Achievement Award*, the Oregon Hispanic Bar Association's *Paul J. De Muniz Professionalism Award*, the Edwin J. Peterson *Racial Reconciliation Award,* the Oregon Criminal Defense Lawyers' Association *Ken Morrow Lifetime Achievement Award*, the Marion County Bar's *Paul De Muniz Professionalism Award,* the Oregon Classroom Law Project's *2011 Legal Citizen of the Year Award*, the Campaign For Equal Justice *2012 Public Access to Justice Award,* and the 2013 Oregon State Bar *Judicial Excellence Award.*

He was raised by his mother in Portland, Ore., and attended Portland's public schools. After finishing high school, he joined the U.S. Air Force and served a one-year tour of duty in Viet Nam. After his discharge from the service, he received his bachelor degree from Portland State University in 1972 and his juris doctor from the Willamette University College of Law in 1975. In 2010, Hispanic Business Magazine named him among the 100 most influential Hispanics in America. In 2012, Willamette University awarded De Muniz the honorary degree of Doctor of Laws. De Muniz and his wife, Mary, reside in Salem, Ore., and have three grown children and two grandchildren.

## Geoffrey P. Alpert, Ph.D.

Geoffrey Alpert is professor in the Department of Criminology and Criminal Justice at the University of South Carolina. Dr. Alpert has been conducting research on high-risk police activities for three decades, and has published more than 100 journal articles and 15 books. His books include *Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight* (with J. Noble) and *Understanding Police Use of Force: Officers, Suspects, and Reciprocity* (with R. Dunham) which was published by Cambridge University Press. Dr. Alpert completed a major study on police officer decision making, funded by the National Institute of Justice, as well as investigations of racial profiling for the Miami-Dade County, Florida Police Department and the city of Los Angeles, California. Dr. Alpert has been the Principal Investigator on a major study of use of force, conducted energy devices and injuries funded by the National Institute of Justice. He is currently one of the monitors for a consent decree in New Orleans.

## Tom Christoff, M.A.

Tom Christoff is a Ph.D. Candidate at the University of Illinois at Chicago. For the last 3 years, Mr. Christoff has been working with the National Police Research

Quarterly Report July 9, 2015

Platform, assisting with the development of survey tools and research methodology, as well as the collection/analysis of police-community interaction data.  Mr. Christoff's personal research during this time has focused on specific issues in communication skills of police during police-community interactions.    After receiving his B.A. in Law Enforcement and Justice Administration from Western Illinois University, Mr. Christoff obtained his M.A. in Criminology and Criminal Justice from the University of Memphis. In his time at the University of Memphis, Mr. Christoff worked with Dr. Randy Dupont and Major Sam Cochran in the CIT Center.  Mr. Christoff assisted in multiple phases of CIT, including training for officers, CIT site development, and development of the CIT national resource website.   Mr. Christoff has strong statistical skills and knowledge of police records.

Quarterly Report July 9, 2015

# APPENDIX B

**Theory of Change: Portland Settlement Agreement**

| System Changes → | Organizational/Officer Behavior → | Street-level Changes → | Outcomes |
|---|---|---|---|
| **New PPB Management and Accountability Systems**<br>• New Policies on use of force, weapons, mental health encounters, etc.<br>• New data systems to monitor officer performance (Employee Information System) and respond to complaints<br>• New Addictions and Behavioral Health Unit (ABHU)<br>• Improvements in staffing and structure of other mental health service teams<br>• New data systems to monitor and manage training<br>**New Training Programs**<br>• New training in use of force<br>• New eCIT training / improvements to CIT training<br>• New training in police-citizen interactions<br>• Evaluation of training enhancements<br>**Enhanced Approaches to Oversight and Accountability of Employees**<br>• Administrative reviews<br>• Investigations of use of force<br>• After Action Reports<br>• Chain of command reviews<br>• Checklists<br>• Compliance audits and reports | **Mental Health Services**<br>• Better coordination of MH services and teams<br>• Better crisis triage<br>**Responses to Officer Problems**<br>• Complaints faithfully investigated in timely manner<br>• Citizen & employee input maximized<br>• Misconduct disciplined appropriately<br>**Police Orientation to Work**<br>• Knowledge and positive views of new policies and reforms<br>• Commitment, job satisfaction, reduced stress & cynicism<br>• Improved views of discipline, voice (organizational justice)<br>**Police Orientation to the Community**<br>• Attitudes toward the public and special populations<br>• Support for engaged policing styles and reduced use of force<br>• Support for increased use of de-escalation strategies | **Police Responses to MH calls**<br>• Lower force rates and force-arrests in MH cases<br>• Greater use of non-force, verbal techniques<br>• De-escalation of force<br>• Referrals to appropriate MH services<br>• Compassionate treatment<br>**Police Responses to other Populations**<br>• Lower force rates and force-arrests in minority communities<br>• Greater use of non-force and de-escalation techniques<br>• Shared police-community values<br>• Respectful and fair treatment of minorities and youth<br>**Public Engagement and Reassurance**<br>• More frequent non-investigatory contacts | **Satisfaction with Police Services**<br>• Quality of treatment (civility, respect, listening)<br>• Quality of decision making (fair, trustworthy)<br>• Visible and responsiveness to local concerns<br>**Police Legitimacy and Public Trust**<br>• Trust and confidence in the PPB decision making and actions<br>• Perceptions of transparency<br>• Willingness to obey police orders<br>• Willingness to cooperate during investigations<br>**Citizen Complaints**<br>• Fewer complaints<br>• Quicker investigations<br>• More input from citizens and officers<br>**Police Partnerships**<br>• More and better police-agency partnerships<br>**Public Safety and Officer Safety**<br>• Crime rates and trends<br>• Clearance rates<br>• Citizens and officers injured |

# APPENDIX C

**COCL First Quarter Meetings**

*FEDERAL*

- Department of Justice, Civil Rights Division


*CITY of PORTLAND*

- Office of the Mayor
- City Attorney's Office
- City Council
- City Auditor
    - Independent Police Review
- Office of Equity and Human Rights


*PORTLAND POLICE BUREAU*

- Patrol Division
- Strategic Services Division
- Training Division
- Professional Standard Division
- Behavioral Health Unit
- Portland Police Association


*MENTAL HEALTH*

- Behavioral Health Unit Advisory Committee
- Mental Health Association of Portland


*COMMUNITY LEADERS*

- Albina Ministerial Alliance Coalition
- Community Oversight and Advisory Board
- CopWatch
- Consult Hardesty


*POLICE RESEARCHERS*

- Portland State University