ELLEN OSOINACH, Oregon State Bar ID Number 024985
Senior Deputy City Attorney
Email: ellen.osoinach@portlandoregon.gov
Office of City Attorney
1221 SW 4th Avenue, Suite 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
    *Of Attorneys for Defendant City of Portland*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | **Case No. 3:12-cv-02265-SI** |
| **PLAINTIFF,** | |
| v. | **DEFENDANT CITY OF PORTLAND'S NOTICE OF PERIODIC COMPLIANCE REPORT** |
| **CITY OF PORTLAND,** | |
| **DEFENDANT.** | |

Defendant, City of Portland, provides notice to the Court of attachments Exhibit A, Rosenbaum & Watson, LLP correspondence, and Exhibit B, the Compliance Report for Third and Fourth Quarters of the Compliance Officer and Community Liaison (COCL).  Defendant submits COCL's report pursuant to the Amended Order Entering Settlement Agreement.  COCL has provided this report to the United States Department of Justice and the Community Oversight Advisory Board (COAB) and it has been made available to the public on the COCL's website since June of 2016.

    Dated:  July 6, 2016.

                                        Respectfully submitted,

                                        */s/ Ellen Osoinach*
                                        ELLEN OSOINACH. OSB # 024985
                                        Senior Deputy City Attorney
                                        Telephone: (503) 823-4047

Page  1 – DEFENDANT CITY OF PORTLAND'S NOTICE OF PERIODIC COMPLIANCE
          REPORT



### Office of the Compliance Officer and Community Liaison (COCL)

**Rosenbaum & Watson, LLP**                                    COCL Office:
Dennis Rosenbaum, Ph.D.                          525 NE Oregon Street, Suite 250
Amy Watson, Ph.D.                                          Portland, OR  97232
Thomas Christoff, Ph.D.                                    www.cocl-coab.org
with                                          rosenbaumandwatsonllp@gmail.com
Geoffrey Alpert, Ph.D.
Heather Daniel, J.D., B.A.

June 1, 2016

Transmitted by E-mail to:

The United States Department of Justice
The City of Portland
The Community Oversight Advisory Board (COAB)

Re:    **Compliance Report for 3rd and 4th Quarters of 2015**

Dear U.S. Department of Justice, City of Portland, and COAB:

On behalf of Rosenbaum & Watson, LLP and the entire Compliance Officer and Community Liaison (COCL) team, we are pleased to submit the attached *Compliance Report of the Compliance Officer and Community Liaison,* pursuant to paragraphs 162 and 163 of the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

The draft report was revised based on comments from the COAB, DOJ and community members.  We thank them for taking the time to review and improve the report.  A copy of this report will be posted on the COCL's website, www.cocl-coab.org and sent to our email updates list.

Sincerely,


Dennis P. Rosenbaum, PhD                    Amy Watson, PhD

For Rosenbaum & Watson, LLP
Compliance Officer and Community Liaison
Portland, Oregon

Exhibit A

# COMPLIANCE REPORT

# of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

**Prepared By:**

**ROSENBAUM & WATSON, LLP**

**For the City of Portland, Oregon**

**Third and Fourth Quarters:**

**July through December, 2015**



# Table of Contents

**EXECUTIVE SUMMARY** ................................................................................................................ 1

**III. USE OF FORCE** ................................................................................................................... 4

**IV. TRAINING** .......................................................................................................................... 13

**V. COMMUNITY-BASED MENTAL HEALTH SERVICES** .......................................................... 24

**VI. CRISIS INTERVENTION** ..................................................................................................... 27

**VII. EMPLOYEE INFORMATION SYSTEM** ............................................................................... 48

**VIII. OFFICER ACCOUNTABILITY** ........................................................................................... 53

**IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD** ...... 69

**X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT** ..................................................... 79

**LIST OF ABBREVIATIONS** ...................................................................................................... 85

# EXECUTIVE SUMMARY

This is the Compliance Assessment Report of the Compliance Officer and Community Liaison (COCL) for the third and fourth quarters of 2015, as required by the Settlement Agreement (Agreement) between the City of Portland (City) and the United States Department of Justice (DOJ).  COCL Compliance Assessment Reports are required by Par. 162 of the Agreement and "shall specify: (a) the methodology and monitoring activities employed; (b) the COCL's assessment of compliance for each paragraph; and (c) the COCL's recommendations regarding necessary steps to achieve compliance, as warranted" (Par. 162).  Each of these requirements is included in our assessments and is clearly labeled as such.

This report is written to be readable by all stakeholders.  Whenever possible, we used the exact language from the Settlement Agreement.  However, when the provisions of the Agreement are lengthy or complex, we have provided a summary of that language.  In these situations, the reader will be referred to the Agreement for the details of the provision.  As we provide our assessment of each substantive paragraph within the Agreement, we urge the reader to remember that complying with one paragraph can sometimes be dependent on complying with another paragraph.

This report covers the Portland Police Bureau's (PPB's) progress in the third and fourth quarters of 2015.  In certain cases, we learned of developments which occurred in the first quarter of 2016.  In order to maintain chronological consistency, we refrain from commenting on 2016 developments other than stating that they will be covered in our next report.

Report Card.  This report includes a "report card" on the implementation of the Agreement based on the sections identified in the Agreement.  For the majority of provisions, we do not find PPB and the City to be in substantial compliance.  As in previous reports, we continue to see significant progress being made towards the implementation of the Agreement. We will continue to work with PPB and City as they move forward, providing consultation, analysis and assessment.

During the third and fourth quarter of 2015, we worked closely with the PPB and the City in a number of areas.  These include (among others):

- Enhanced Crisis Intervention Training.  In November of 2015, PPB held an Enhanced Crisis Intervention Training (ECIT) for officers to improve their response to persons experiencing (or perceived to be experiencing) a mental health crisis.  We attended the training and provided feedback to PPB in a Technical Assistance (TA) statement prepared jointly with DOJ.  We will be working with PPB to address any issues identified in the 2015 ECIT Training prior to any future ECIT training.

- Force Audits. In the third and fourth quarter of 2015, we finalized a methodology for the auditing for force events with the Inspector and analysts working in the Professional Services Division (PSD).  The new audit methodology, which started in the first quarter

1

of 2016, is designed to monitor the accuracy and completeness of use of force reporting by officers and the quality of supervisory reviews of use of force incidents within the chain of command. Such information will be essential for identifying and rectifying problems in the reporting process.

- <u>Employee Information System (EIS)</u>. EIS is intended to help PPB identify and "flag" potentially problematic officers and if appropriate, provide intervention before more serious problems occur. We spent a significant amount of time assessing how EIS flags are generated, referred, and resolved by PPB administrators and supervisors. We also spent time discussing with PPB their ability to track the decision points within an EIS pathway and provide documentation related to the decision points.

During this period, the Community Oversight Advisory Board (COAB) demonstrated an increase in productive discussions, more informed voting, and an overall improvement in positive working relationships. We continue to work with the COAB to ensure that all of its members are heard and that all the COAB's agenda items receive adequate attention. The COAB invited and received several presentations related to their overall work which helped to inform their deliberations and decisions. Although there was initially a high volume of attendees to COAB meetings in the first quarter of 2015, the second quarter of 2015 saw a decrease in community attendance. However, in the third and fourth quarter of 2015, community commentary and attendance increased.

When reviewing the specific paragraphs, we utilize a four-tiered system of evaluation:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.
- Non-Compliance: The City/PPB has not made any meaningful progress towards the satisfaction of the provision's requirements.
- Not Yet Assessed: The COCL team has not had the opportunity to fully assess the requirements of the provision and elects to withhold assessment of compliance until a more thorough review has occurred.

2

| Settlement Agreement Section | COCL Assessment of Compliance |
|---|---|
| III. USE OF FORCE | Partial Compliance |
| A. Use of Force Policy | Partial Compliance |
| B. Compliance Audits Related to Use of Force | Partial Compliance |
| IV. TRAINING | Partial Compliance |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | Partial Compliance |
| VI. CRISIS INTERVENTION | See Individual Compliance Results* |
| A. Addictions and Behavioral Health Unit and Advisory Committee | See Individual Compliance Results* |
| B. Continuation of C-I Program | Partial Compliance |
| C. Establishing "Memphis Model" Crisis Intervention Team | Partial Compliance |
| D. Mobile Crisis Prevention Team | Partial Compliance |
| E. Service Coordination Team | Partial Compliance |
| F. BOEC | Non-Compliance but Initial Steps Taken |
| VII. EMPLOYEE INFORMATION SYSTEM | Partial Compliance |
| VIII. OFFICER ACCOUNTABILITY | Partial Compliance |
| A. Investigation Timeframe | Partial Compliance |
| B. On Scene Public Safety Statements and Interviews | Partial Compliance |
| C. Conduct of IA Investigations | Partial Compliance |
| D. CRC Appeals | Substantial Compliance |
| E. Discipline | Partial Compliance |
| F. Communication with Complainant and Transparency | Partial Compliance |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD | See Individual Compliance Results* |
| X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT | Partial Compliance |
| A. Compliance Officer/Community Liaison | Not Assessed |
| B. PPB Compliance Coordinator | Substantial Compliance |
| C. Access to People and Documents | Partial Compliance |
| D. Review of Policies and Investigations | Partial Compliance |
| E. City Reports and Records | Partial Compliance |
| F. Enforcement | Not Assessed |

*See Individual Compliance Results: This label indicates that not all paragraphs in this section received the same report card score (the results were mixed) and therefore, a single compliance label is not possible.  In these instances, we urge the reader to refer to the specific paragraph assessment.  For other sections, mixed results are still possible, but one label is appropriate for the majority of paragraphs reviewed.

# III. USE OF FORCE

## A. Use of Force Policy

### Settlement Agreement Paragraph

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. <u>COCL Summary</u>:  Paragraph 67 establishes that the PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the subject, and the appropriate de-escalation of force when no longer necessary.  Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review 1010.00/1010.10 and forward COCL recommendations to DOJ; Receive and review COAB recommendations regarding 1010.10 and parts of 1010.00 |

### Compliance Assessment

     To simplify and coordinate the process of providing feedback to the PPB, the Parties and COCL have agreed upon a system for policy reviews wherein the COCL receives COAB recommendations and comments, documents receipt of this feedback, and forwards these to DOJ.  For directives considered central to the Settlement Agreement or where DOJ has sought a direct response from the COCL, COCL will prepare an independent assessment.  The DOJ then takes into consideration both COAB and COCL comments when preparing technical assistance to the PPB, thus allowing for a unified response to the PPB that contains recommendations from all three entities (COCL, COAB, and DOJ).  The COCL does not edit or revise COAB comments and recommendations when sending them on to DOJ. This system is used for all policy review and should therefore be implied for all other paragraphs related to policy review.

     Directives 1010.00 and 1010.10 are in the Executive Reconciliation Phase of directive review.  PPB cannot move forward on posting the updated Directives until they have received feedback from the COAB, COCL, and DOJ.  COCL has compiled our notes and recommendations on the directives and will await the complete set of recommendations from COAB regarding these directives. While some recommendations related to 1010.00 and 1010.10 were voted on

4

by the COAB and passed during the third and fourth quarter of 2015, COAB was still in the process of reviewing, voting on, and passing further recommendations to 1010.00 in 2016. We will comment on all COAB recommendations in addition to ours in the next report.

As for recommendations to PPB, for the moment we restate our recommendation from our last report that PPB provide red-line strike through versions of policies, which PPB has expressed a willingness to do in the future.

| **COCL Recommendations** | • PPB should provide red-line strike through versions of the directives when revisions have been made |
|---|---|
| **Assessment Rating Based On** | • Directives 1010.00 and 1010.10 being in Executive Reconciliation Phase |

1. Electronic Control Weapons

| **Settlement Agreement Paragraph** |
|---|
| 68. <u>COCL Summary</u>: The PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement). |

| Compliance Label | Not Yet Assessed |
|---|---|
| Methodology | Review Directive 1051.00 and solicit COAB input |

| **Compliance Assessment** |
|---|
| PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System was still in the Universal Review phase during the fourth quarter of 2015. Hence, it was not required to be revised in the third or fourth quarter of 2015, as PPB was still gathering input from all stakeholders. We will address recommendations for this Directive in the future in accordance with the DOJ/PPB directive review schedule. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Rating Based On** | • Directive 1051.00 being in the Universal Review phase |

2. Use of Force Reporting Policy and Use of Force Report

---

### Settlement Agreement Paragraph

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review 1010.00 and forward COCL recommendations to DOJ; Receive and review COAB recommendations regarding parts of 1010.00 |

### Compliance Assessment

Directive 1010.00 is currently in the Executive Reconciliation phase. However, PPB cannot move forward on posting the updated Directive until they have received feedback from the COAB, COCL, and DOJ. We have already compiled our recommendations for Directive 1010.00, though are awaiting the completed set of recommendations from COAB. Due to time constraints of COAB meetings, COAB was not able to finish voting on all recommendations in the third and fourth quarter of 2015. PPB cannot reasonably be expected to make changes before receiving recommendations from COAB, COCL, and DOJ.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Rating Based On** | • Directive 1010.00 being in Executive Reconciliation phase |

---

3. Use of Force Supervisory Investigations and Reports

---

### Settlement Agreement Paragraph

70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including   timeframes for After Action Reports, notification requirements of serious

6

| | use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement). |
|---|---|
| Compliance Label | Partial Compliance |
| Methodology | Review audit process for verifying Directive 940.00; Review Directive 940.00 and solicit COAB input |

**Compliance Assessment**

Directive 940.00 was posted for its annual Universal Review in November of 2015 and is currently in the Executive Reconciliation phase at PPB. The COCL did not provide recommendations to DOJ regarding Directive 940.00 in the third or fourth quarter of 2015 and therefore cannot report on it here. The COAB did not provide recommendations to the COCL in the third or fourth quarter of 2015 and we therefore cannot report on it here. Our next Compliance Assessment will include comments on Directive 940.00 and any recommendations which are forwarded to DOJ.

| COCL Recommendations | • No comments at this time |
|---|---|
| Assessment Rating Based On | • Directive 940.00 being in Executive Reconciliation phase |

**Settlement Agreement Paragraph**

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review FY 2015-2016 Budget indicating Sgt. staffing allocations |

**Compliance Assessment**

PPB has provided the Fiscal Year Budget for 2015-2016 indicating their Sergeant level staffing allocations. We believe this to be acceptable evidence for the moment that the PPB has no intention of falling below the staffing level requirements set out in Par. 71. However, the FY Budget provides information on the number of full-time positions budgeted, not the actual number of full employees working within PPB. We recommend PPB provide COCL with additional documentation displaying the number of full-time Sergeants employed in supervisory positions and fluctuations related to retirement, demotions, and promotions.

7

| | |
|---|---|
| **COCL Recommendations** | • Provide document displaying total number of full-time sergeants employed by quarter in 2015. |
| **Assessment Rating Based On** | • Provision of FY 2015-2016 Budget |

---

**Settlement Agreement Paragraph**

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities.  PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| | |
|---|---|
| **Compliance Label** | <mark>Partial Compliance</mark> |
| **Methodology** | Review Supervisor Checklist |

**Compliance Assessment**

PPB has created a supervisor checklist in accordance with Par. 72.  However, PPB argues in its Q4 Quarterly Update report that their interpretation of the Agreement does not "require supervisors to use the checklist for each After Action and submit a completed copy for chain of command review as evidence of its use" and that "the checklist was intended as a quick-reference device to aid supervisors and not intended to duplicate Directive 940.00 as this would be redundant".

We have discussed this concept with PPB on numerous occasions and disagree with their assessment.  While PPB argues that having to document their use of the checklist is "redundant", we maintain that not requiring such documentation negates the purpose for Par. 72.  The supervisor checklist was created to "*ensure* that supervisors carry out these force investigation responsibilities".  Having documentation that supervisors are using the checklist serves multiple purposes. First, it allows the PPB to know that supervisors are paying attention to a new set of expectations. Second, it allows the PPB to report this information to oversight entities and the community, thus showing transparency and building trust.  Third and most importantly, it encourages supervisors to do a better job of reviewing incidents by the mere fact that they are required to pay greater attention to factors that they may have paid little attention to in the past. And finally, documenting usage of the checklist provides another component for review of supervisory performance, especially in cases where performance is subpar.

PPB states they must revise Directive 940.00 before requiring supervisors to document utilization of the supervisor checklist as they cannot require personnel to adhere to something not enshrined in policy.  While this may be true for discipline, we are unaware of any administrative obstacles that would keep the PPB from informing supervisors that such policy change is coming and that supervisors should begin providing completed checklists now on a

8

"trial basis." When Directive 940.00 is completed, PPB should also include the 940 report form and the Supervisor Checklist as an appendix so supervisors and the community are familiar with their contents.

| COCL Recommendations | • PPB should provide a "heads up" to supervisors and request they begin documenting the use of the supervisor checklist before the policy is changed.<br>• Upon completion of Directive 940.00, provide 940 report form and Supervisor Checklist as an appendix |
|---|---|
| Assessment Rating Based On | • Provision of Supervisor Checklist |

---

**Settlement Agreement Paragraph**

73. COCL Summary: Paragraph 73 directs the PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review audit process for verifying Directive 940.00; Review Directive 940.00 and solicit COAB input |

**Compliance Assessment**

Directive 940.00 was posted for Universal Review in November of 2015 and is currently in the Executive Reconciliation phase at PPB. The COCL did not provide recommendations to DOJ regarding Directive 940.00 in the third or fourth quarter of 2015 and therefore cannot report on it here. We will comment in our next Compliance Assessment report. The COAB subcommittee charged with this review decided against any recommendations on Directive 940.00.

In the third and fourth quarter of 2015, the COCL and PPB finalized a process for auditing use of force reports and subsequent 940 After Action Reviews. PPB began the process of auditing force events in January of 2016 and we therefore will provide an update in our next Compliance Assessment Report.

| COCL Recommendations | • No recommendations at this time |
|---|---|

9

| **Assessment Rating Based On** | • Directive 940.00 being in Executive Reconciliation<br>• Finalization of auditing process |
| --- | --- |

**B. Compliance Audits Related to Use of Force**

**Settlement Agreement Paragraph**

74. COCL Summary:  Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately; In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary:  Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees.  Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

77. COCL Summary:  "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action.  The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of

10

the evidence" standard.  Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS.  (For details and exact language, see the Settlement Agreement)

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Review process for Inspector's Audit |

**Compliance Assessment**

        The COCL recommended a comprehensive methodology for auditing use of force events, officer reports, supervisor reports, and chain of command reviews.  This process was then refined by the PPB inspector and his staff (with approval of the COCL) and converted to web-based data entry.  The methodology includes the collection of approximately 300 variables (auditing questions) and is discussed in both of our Outcomes Assessment Reports to date.  The process examines each subsection of Pars. 74, 75, and 77 and quantifies each requirement so that a consistent and comparable analysis of use of force events can occur. PPB invested considerable time grouping the variables into meaningful subsections and finalizing a workable system for auditing use of force events.  Data collection began in the first quarter of 2016 and will be reported on in our next Compliance Assessment Report.  COCL will also review the data collected by PPB, take a sample of cases to code ourselves, and determine (in consultation with PPB) whether any changes to the process need to occur, whether any variables are potentially redundant, and what percent of force cases should be audited to ensure a representative sample.

| **COCL Recommendations** | • Continue auditing process for Use of Force cases<br>• Continue to inform COCL on implementation progress and process issues when they arise |
| --- | --- |
| **Assessment Rating Based On** | • Finalization of auditing process |

**Settlement Agreement Paragraph**

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report.

11

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Quarterly Force Reports and provided feedback; Review revised format and provided additional feedback |

### Compliance Assessment

The PPB has significantly revised their manner and process for reporting force events in their Force Data Summary Report.  Incorporating suggestions from the COCL, the PPB provided a revised template for reporting force events.  The COCL then provided a second round of suggestions to the PPB which were largely incorporated into their report.  The new PPB report format also includes analysis of data elements which were not suggested by the COCL which are informative and clear (for example, see the "heat maps" provided for each precinct) and will ultimately help the PPB in identifying training needs, trends, and implications for policy and operations.  We have indicated to PPB that other changes might be necessary in the future, though we advised PPB to issue the current reports to the public.  We will work with PPB in the future to implement any additional revisions that might be necessary; however we believe much improvement has occurred. We requested PPB seek and incorporate the views of the public regarding their new reporting format as these reports are largely for the benefit of the community. Specifically, we recommend PPB include community recommendations regarding an overall force by race statistic and, where appropriate and informative, both raw numbers and percentages.  We continue to recommend PPB gather community input on these and other suggestions by the community.

| COCL Recommendations | • PPB should include an overall force by race statistic in their Force Data Summary Report<br>• Where appropriate and informative, PPB should include both raw numbers and percentages in their Force Data Summary Report<br>• PPB should seek and incorporate other views from the public regarding the new reporting format for the Force Data Summary Report |
|---|---|
| Assessment Rating Based On | • Provision of revised report format<br>• Inclusion of previous COCL recommendations for report format |

12

# IV. TRAINING

<table>
<tr><td colspan="2"><strong>Settlement Agreement Paragraph</strong><br><br>78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety.  To achieve these outcomes, PPB shall implement the requirements below.</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Not Yet Assessed</td></tr>
<tr><td><strong>Methodology</strong></td><td>N/A – Summative and contingent upon satisfying paragraphs below</td></tr>
<tr><td colspan="2"><strong>Compliance Assessment</strong><br><br>        This paragraph will be assessed upon "implement[ation] of the requirements below". As this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to training.<br>        We call to attention one phrase in Par. 78 -- "All aspects of PPB training" will receive the attention required in relevant subsequent subsections.  We interpret "All aspects of PPB training" to include ECIT, Advanced Academy, In-Service, and Supervisor In-Service.  The available evidence suggests that PPB is making a genuine effort to improve these major training programs, although more information is needed regarding supervisory training. We cannot provide a summative judgement on Par. 78 until we have documents indicating that "all aspects of PPB training" conform to the "requirements below."</td></tr>
<tr><td><u><strong>COCL</strong></u><br><u><strong>Recommendations</strong></u></td><td><ul><li>Substantially comply with all paragraphs within Section IV – Training</li><li>Ensure that the requirements found in Section IV are applied to "all aspects of PPB training" listed above</li></ul></td></tr>
<tr><td><u><strong>Assessment Rating</strong></u><br><u><strong>Based On</strong></u></td><td><ul><li>N/A – Summative and contingent upon satisfying paragraphs below</li></ul></td></tr>
</table>

<table>
<tr><td><strong>Settlement Agreement Paragraph</strong><br><br>79. The Training Division shall review and update PPB's training plan annually.  To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i)</td></tr>
</table>

13

the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review 2015 Needs Assessment; Review Q3 and Q4 Needs Assessment Status Update for In-Service |

### Compliance Assessment

In the third quarter of 2015, PPB issued the finalized version of its 2015 Needs Assessment.  Our recommendations were not included in the 2015 Needs Assessment as any formal recommendations provided by the COCL or COAB "would need to be submitted to the Training Division by August 1, 2015, in order to be considered for the 2016 In-Service" (Page 7 of 2015 Needs Assessment).  We therefore restate the recommendations from our Q2 report to be incorporated into the 2016 Needs Assessment. The 2015 Needs Assessment does indicate input from the Training Advisory Council, addressing one of our recommendations from our previous report.

In addition to our previous recommendations, we will comment on the wording of survey items designed to identify training needs.  The survey item designed to identify "Trends in Hazards" reads "In the last 12 months, have you encountered any new hazards while performing your duties?  If so, please describe them here."  The wording would not necessarily capture the largest hazards faced or the hazard most often faced.  Evaluating "trends in hazards" would include whether the most serious or pressing hazards from the previous year have continued.  We encourage the PPB to craft survey items that would best help the Bureau assess training needs overall.

Also, as indicated in the DOJ-COCL Technical Assistance letter on in-service training (February 26, 2016), PPB "did not use written, individually identifiable, competency-based quizzes of policy or tactics."  We maintain that the assessment of students' knowledge and skills at the individual level should be used to inform the annual needs assessment.

| COCL Recommendations | <ul><li>Add training on interpersonal communication skills and respectful treatment of all people in routine encounters that can lead to an escalation of conflict and use of force if not handled properly.  At present, the bulk of the training is focused on extreme, high risk circumstances</li><li>Review wording of survey items to optimize responses</li><li>Involve the Portland community to a greater degree when identifying training needs, including the continued input of TAC.</li><li>Consult with outside training experts and, where appropriate, contract with them to deliver evidence-based, cutting edge training</li></ul> |
|---|---|
| Assessment Rating Based On | <ul><li>Provision of 2015 Needs Assessment</li></ul> |

14

**Settlement Agreement Paragraph**

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review to-date application of Kirkpatrick Model of evaluation |

**Compliance Assessment**

As we have previously reported, PPB has begun to implement the Kirkpatrick model of program evaluation. To-date, PPB has implemented Step One (Student Satisfaction) for some modules of their training, as well as Step Two (Student Learning) for ECIT training, though not for in-service. While there has been some initial progress in creating measurement tools for Steps Three, there is much that remains to be done. We recommend PPB consult with COCL on methodologies to measure success at all stages of the Kirkpatrick model. PPB incorporated one aspect of knowledge evaluation for their ECIT training in 2015. This took the form of a pre/post-test, though the test was anonymous and therefore, no individual evaluations could occur. While the initial purpose of the survey was to evaluate the training overall, the post-test could also be used to assess the acquisition of knowledge at the individual level. If the tests were not anonymous (for courses where individual performance is relevant), the test data could be analyzed to assess changes in ECIT knowledge and establish a benchmark for passing the training. Individualized testing would allow the PPB to identify individuals who are struggling and need additional instruction. Results of individualized testing can then be aggregated for overall course assessment, as is currently the case. However, evaluations of the course and the instructor should remain anonymous to ensure honest evaluations from the students. For now, we credit PPB for including measures of attitude change in the pre/post-test. This is a positive step forward. Supplementing this with additional attitudinal and knowledge measures would be helpful to achieve a comprehensive evaluation.

PPB has not finalized steps to strengthen the research design, methods, and measures to identify individual or organizational changes that could be attributed to the training. We recommended that PPB work with the COCL to implement a contact survey for all individuals who have had a recent contact with a PPB officer, including persons who have had contact due to a possible mental health crisis. Such a contact survey would be a key strategy to measure the "extent to which program graduates are applying the knowledge and skills acquired in training to their jobs" (Par. 80). Arguably, the best way to evaluate the quality of police-community interactions is to ask the community members who are involved in the interaction.

15

Preliminary discussions about methods and logistics of these surveys were initiated in 2016 and we look forward to continued progress on this issue.

We have reviewed Steps One and Two of the Kirkpatrick model for the ECIT Training which occurred in November of 2015. PPB has expanded the number and quality of questions they asked of training participants, but we remain concerned with the form being utilized for the survey. One statement in the instructions for the survey is problematic. The survey begins by stating PPB is "currently working on a system to protect the confidentiality of these records. They currently could be subject to public records requests." This statement, apparently alluding to the Settlement Agreement, will likely bias responses to the survey if officers feel their answers may somehow be linked to them, or feel that because of the Settlement Agreement, they should give a favorable evaluation of the training. The survey is anonymous and therefore, officers should not be concerned about their identities being linked to their answers. Whatever the motive for this statement, we recommend PPB remove it from all future training evaluations.

Related to Step Two, PPB did add measures to assess attitude changes and learning due to the ECIT training. We provide additional feedback on their approach in the ECIT Technical Assistance Statement.

| **COCL Recommendations** | • Consult with COCL for methodologies of measurement for Steps Three and Four of the Kirkpatrick Model<br>• Introduce individualized testing for classes where such testing is relevant<br>• Work with the COCL and the City to develop and implement contact surveys to measure  the impact of training<br>• Remove problematic statement from Step One evaluations |
|---|---|
| **Assessment Rating Based On** | • Provision of forms and results related to Steps 1 and 2 of Kirkpatrick model |

| | **Settlement Agreement Paragraph**<br><br>81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly-accessible, and organized file system.  Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually. |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Interview PPB personnel; Review LMS Updates for Q3 and Q4 |

**Compliance Assessment**

PPB states in their Q3 Learning Management System (LMS) Update that "the current

16

systems in place meet, at a minimum level, the requirements of Paragraphs 81" regarding the tracking, maintaining, and reporting of training materials.  However, PPB has stated from the start of the COCL's tenure that the old system (Skills Manager) is archaic and technologically outdated.  The system has been in place for approximately 11 years and is fairly antiquated.  PPB has previously stated that our assessment of Par. 81 should be based on the new system.  We therefore only comment on the progress of acquiring a new Learning Management System (LMS) rather than the qualities of the current systems.

The new system being pursued by PPB will "allow the Police Bureau to add multiple levels of new and enhanced functionality to officer learning, including the delivery of eLearning.  In addition, it will provide significantly more robust reporting capabilities than what is currently available in Skills Manager.  These new features and functionalities will allow the Training Division to operate with increased efficiencies in relation to the management of its data" (PPB Q4 Quarterly Update).

As of the third and fourth quarter of 2015, there has been a significant delay in acquiring the LMS vendor originally desired by PPB.  This is due to vendor contract issues and therefore, PPB has been given authority to seek additional vendors that can satisfy the system requirements we referenced in our previous report.  The COCL understands that difficulties can arise when negotiating contracts with vendors.  We look forward to the resolution of these issues and anticipate progress in the first and second quarter of 2016.

The ability of PPB to implement a protocol for supervisory review of training records for officers in their command (see Par. 116 of the Agreement) is contingent upon the acquisition of the new LMS.  For now, PPB has begun an interim solution to review training records.  PPB should be credited with attempting to satisfy the conditions of the Agreement while seeking a new LMS.  However, any new LMS acquired by PPB should be compatible with EIS allowing for the reviews required in Par. 116.

| COCL Recommendations | • Continue efforts to secure contract with a vendor that can satisfy system requirements and better address the requirements of the Settlement Agreement. |
|---|---|
| Assessment Rating Based On | • Provision of LMS requirements (see COCL Q2 report)<br>• Implementation of interim solution to training records review |

---

**Settlement Agreement Paragraph**

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Course Attendance Summary Reports |

**Compliance Assessment**

17

PPB has provided us with Course Attendance Summary Reports which indicates the number of students who have attended and successfully completed training classes. We continue to provide PPB Substantial Compliance for this paragraph, although uncertainty remains with regard to how knowledge and skill competency is assessed at the individual level. PPB has indicated that if an officer is having difficulty completing course objectives, the Training Division would keep working with this student until s/he was able to pass. Identifying students who are having difficulty, however, is difficult without standardized testing. We recommend PPB consult with COCL in the first and second quarter of 2016 to clarify how measurements might be enhanced related to the satisfactory completion of training courses.

PPB has provided us with Course Attendance Summary Reports which indicates the number of students who have attended and successfully completed training classes. We continue to provide PPB Substantial Compliance for this paragraph.

| COCL Recommendations | • Consult with COCL regarding measurement of course completion and competency |
|---|---|
| Assessment Rating Based On | • Provision of Course Attendance Summary Reports |

---

**Settlement Agreement Paragraph**

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgement has been rendered against the City in the last five (5) years based on the officer's use of force.

| Compliance Label | Not Yet Assessed |
|---|---|
| Methodology | Review SOP document "Training Division Instructor Selection Standards" |

**Compliance Assessment**

The SOP document "Training Division Instructor Selection Standards" (AKA SOP 1-19) is not due for review until January of 2016. Thus, we maintain our recommendations provided in our last report. We will report any changes to the SOP in our next report.

| COCL Recommendations | • Provide explanation of vague terms found within trainer selection guideline SOP (see examples in last report)<br>• Provide framework for consideration of civil judgements |
|---|---|

18

| | • Provide framework of the process of making exceptions to SOP criteria that fall outside the requirements of Par. 83 |
|---|---|
| **Assessment Rating Based On** | • SOP 1-19 is not due for review until January of 2016 |

### Settlement Agreement Paragraph

84. (<u>COCL Summary</u>) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors.  It begins by stating that "All training that PPB provides shall conform to PPB's current policies at the time of training.  PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled."  The subsections of Par. 84 relate to the types of training required for patrol officers, including increasing scenarios for use of force events, de-escalation techniques, procuring medical care, proactive problem solving, civil or criminal liability, and positive communication skills without derogatory language.  Particular attention is given to police interactions with individuals who have, or are perceived to have, mental illness.  The subsections also refer to supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions.

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Observe 2015 In-Service Training; Review training material for 2015 In-Service |

### Compliance Assessment

In the third and fourth quarters of 2015, members of the COCL team observed In-Service training for PPB officers.  After observing the training in the fourth quarter, the COCL and DOJ jointly created a Technical Assistance Letter that was provided to the City and PPB.  For this report, we highlight some of the larger trends in training which we identified for PPB to address before the 2016 In-Service training.   We recommend PPB share the Technical Assistance Letter with the Training Advisory Council (TAC) to help the TAC formulate recommendations for the 2016 In-Service training.

One issue that appeared at several points during In-Service training is the reiteration of an "us vs. them" mentality within PPB officers.  Such a mentality sets a wall between officers and the people they are charged with to serve.  While this is endemic to police agencies throughout the country, PPB could take a number of steps to diminish the notion.   For instance, PPB could include members of the community in the training to provide an alternate perspective on contentious interactions.  This might help officers to understand and have empathy toward others and their circumstances, as well as diminish perceived differences between officers and community members.

In many cases, the training conformed to the current policies of PPB.  However, for the use of Electronic Control Weapons (ECWs), the policy was addressed hastily without in-depth

discussion of when an officer may and may not use an ECW.  We recommend the 2016 In-Service provide a more thorough examination of policies related to ECW use during the ECW portion of training.

Overall we believe the scenario aspect of training was well managed, though we believe there were a few areas of concern which should be addressed before the 2016 In-Service.  In addition to the concerns noted in the Technical Assistance Letter (including the "us vs. them" perspective note above), we believe much attention was given to extreme circumstances in the scenarios as opposed to what officers would encounter on a daily basis.  PPB has chosen to focus on low frequency/high risk encounters.  Certainly, potentially life-threatening incidents deserve special attention, but a host of other circumstances have the potential to escalate to that level.  We recommend that additional scenario time be given to commonly encountered situations so that officers can practice positive interaction and procedural justice skills.

No specific supervisor training occurred in the third or fourth quarter of 2015 for us to be able to review.  We have been informed that no supervisor In-Service training has occurred since January of 2014 and that training related to 940's, the use of the EIS system, and the annual performance evaluation system occurred in November of 2014.  While supervisors attend trainings required of all PPB officers, these trainings are not tailored to supervisory staff and do not address the unique issues dealt with by supervisors.  We recommend PPB provide a supervisor In-Service to allow for refresher training related to 940's, EIS, and annual performances (once COCL and DOJ approve revised policies), as well as any other issues uniquely related to supervisory staff.

| **COCL Recommendations** | <ul><li>Reduce examples and language that perpetuates "us vs. them" in In-Service training</li><li>Provide more thorough examination of policies related to ECW use</li><li>Include commonly encountered situations in scenarios with attention to procedural justice and empathy</li><li>Provide supervisor In-Service training</li></ul> |
|---|---|
| **Assessment Rating Based On** | <ul><li>Observation of 2015 In-Service training</li></ul> |

**Settlement Agreement Paragraph**

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on

areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review May 2015 Audit provided by Inspector; Review supporting documents related to subsections of Par. 85 |

**Compliance Assessment**

The COCL did not meet with the Inspector regarding the requirements of Par. 85 in the third or fourth quarter of 2015.  However, the COCL did meet with the Inspector in the first quarter of 2016 and discussed the conditions for a sufficient audit of the training program, such as the complete implementation of the Kirkpatrick model and accountability measures for officers who do not review directives within 30 days of their release.  An agreement in form was reached between PPB, the Inspector, and COCL regarding audit methodology and these discussions will be detailed in our next report.

| COCL Recommendations | • Engage in a qualitative audit of the training program to supplement check-the-box approach<br>• Evaluate current resources for Inspector's responsibilities |
|---|---|
| Assessment Rating Based On | • Provision of initial Training Audit (see COCL Q2 report) |

**Settlement Agreement Paragraph**

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council.  The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented.  The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies.  The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Quarterly Force Reports and provide feedback; Review revised format and provide additional feedback; Review TAC minutes and other corresponding documents |
| | |

**Compliance Assessment**

Some items in this provision are related to the Inspector preparing and disseminating Quarterly Force Reports.  As indicated in our assessment of Par. 76, the Inspector put forth considerable effort to revise the form and content of the Quarterly Force Reports utilizing COCL input.  Because the COCL and Inspector were consulting on how to revise the reports, no presentations were made to TAC during the third and fourth quarter of 2015. Hence, the TAC was not expected to "make recommendations to the Chief…based on the data presented" and the Chief was not expected to address identified deficiencies.  A presentation on force data from quarters 3 and 4 was made in January of 2016 and will be covered in our next report. With the new reporting format, we recommend PPB resume quarterly presentations to TAC.

PPB staff indicated in their Q4 Quarterly Update Report that during their presentation to TAC, "comments on patterns and trends will await enough longitudinal information".  We recommend PPB identify patterns and trends in their presentations to TAC if any such patterns can be found in the data.

In September of 2015, TAC provided recommendations to Directive 1500.00 (Training). This Directive was not finalized and posted in the third or fourth quarter of 2015 and we therefore cannot comment on the extent to which PPB incorporated TAC's recommendations. We anticipate being able to comment upon the incorporation of TAC recommendations in our next report.

Finally, PPB has publicly indicated in their Q4 Quarterly Update Report their belief that the COCL has not yet consulted with them as required by this paragraph.  We disagree with PPB's contention and remind them that we have provided extensive consultation regarding the identification and presentation of pertinent force data and that such consultation occurred in the 4th Quarter.

| COCL Recommendations | • Resume quarterly presentations to TAC<br>• Include identified patterns and trends in TAC presentation |
|---|---|
| Assessment Rating Based On | • Provision of revised Quarterly Use of Force reports (see Par. 76)<br>• Provision of TAC recommendations to Directive 1500.00 |

**Settlement Agreement Paragraph**

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review PPB website regarding TAC; Review TAC agendas and minutes |

**Compliance Assessment**

22

The Training Advisory Council (TAC) has incorporated our recommendations regarding opportunities for public comment and notification to non-TAC members via an email list.  On the PPB website, there is an email address for members of the community to sign up for TAC notifications.  Furthermore, members of the community have access to agendas and minutes from TAC.  While the agendas for TAC are up to date, the most recent posted minutes are from September of 2015.  We are aware of TAC meetings in the 4th Quarter which occurred after September and recommend minutes from these meetings be posted.

We also recommend that PPB define the types of "public safety concerns" that might justify a closed meeting of the TAC.   We are unaware of any TAC meeting that has been closed to the public for such reasons.  In general, the public has a strong interest in transparency and accountability, so we will assume that TAC meetings not open to the public will be rare and when they do occur, the reasons for such actions will be articulated.

Recently, PPB and the City have expanded the types of training material that are open to the public.  This training material previously required TAC members to sign letters of confidentiality to review.  We commend the PPB and City for this gesture as it contributes to public transparency and legitimacy.

| COCL Recommendations | • Post minutes for meetings occurring after September<br>• Provide some framework that helps the public understand a topic of discussion that might be defined as "confidential" or "raises public safety concerns" |
|---|---|
| Assessment Rating Based On | • Information available on PPB website<br>• TAC minutes indicating public comment period |

# V. COMMUNITY-BASED MENTAL HEALTH SERVICES

### Settlement Agreement Paragraph

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Compliance Label | Not Yet Assessed |
|---|---|
| Methodology | Continue to monitor the City and PPB continuing to work with community partners |

### Compliance Assessment

This paragraph will be assessed upon the City and PPB's continuing relationship with community partners.  As this is a summative paragraph, it can only be assessed in a summative fashion.

| COCL Recommendations | • Continue relationship with community partners |
|---|---|
| Assessment Rating Based On | • N/A – Summative paragraph |

### Settlement Agreement Paragraph

89.  The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs.  All such drop off/walk in centers should focus care

24

plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review minutes from Unity Transportation Workgroup; Review Unity Center Monthly Update |

**Compliance Assessment**

Progress on the Unity Center, a Psychiatric Emergency Services (PES) center, continues. PPB has been involved in the development of the Unity Center by actively participating in the Transportation Workgroup.  We have reviewed the minutes from the Unity Transportation Workgroup and have found documentation of PPB employees participating as workgroup members and attending the meetings. PPB also plans on having a seat on the Unity Center Advisory Committee and participating in American Medical Response/Emergency Management System (AMR/EMS) training on policy and procedure changes.  Both of these activities are slated to occur in 2016 and we will report on them when developments occur.

| COCL Recommendations | • Continue participation in Transportation Work Group |
|---|---|
| Assessment Rating Based On | • Provision of Unity Transportation Workgroup minutes |

**Settlement Agreement Paragraph**

90.  The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU"), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff.  These committees will pursue immediate and long-term improvements to the behavioral health care system.  Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Community Outreach Meeting minutes; Review HealthShare Council Agendas |

**Compliance Assessment**

The Settlement Agreement does not hold any legal power over Coordinated Care Organizations (CCOs) and we therefore cannot hold PPB responsible for participation in CCO subcommittees if no such subcommittees are available.  PPB had previously participated in a Task Force with HealthShare, though this Task Force completed its work.  In the third and fourth quarter of 2015, PPB attended monthly meetings for Legacy ED Community Outreach. PPB administrators made inquiries as to their ability to serve on councils for HealthShare and Providence Health and Service.  PPB continues to participate in outreach meetings which involve CCOs and various other partners.

We recommend PPB break out the subsections of Par. 90 and provide evidence as to how they are being individually addressed.  We further recommend PPB plan to meet with COCL in the first and second quarter of 2016 so that a plan for compliance can be formulated.

| **COCL Recommendations** | • Break out subsections of Par. 90 to individually address them<br>• Consult with COCL to formulate a plan for compliance |
|---|---|
| **Assessment Rating Based On** | • Provision of Legacy ED Community Outreach minutes<br>• Provision of Substance Abuse Disorders Task Force report (see COCL Q2 report) |

# VI. CRISIS INTERVENTION

## A. Addictions and Behavioral Health Unit and Advisory Committee

**Settlement Agreement Paragraph**

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB.  PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU.  ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT").  Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures.*

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHU Unit Structure; Interview BHU command personnel |

**Compliance Assessment**

PPB has provided to COCL updated unit structures, including when changes to personnel have occurred.  In terms of personnel and BHU's general oversight, the BHU continues to conform to the requirements of Par. 91, as evidenced by the BHU unit structure and our observations of BHU coordinating ECIT, BHRT, and SCT operations.  While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, ECIT data collection, etc.), ECIT officers directly report to their precinct level chain of command.  This command structure conforms to the Memphis Model.

We echo our previous report that Substantial Compliance with Par. 91 does not indicate that the functions of ECIT, BHRT, and SCT are in Substantial Compliance with their respective paragraphs.  Merely, the establishment of BHU and the general oversight structure requirements have been satisfied in their current iteration.

| **COCL Recommendations** | • Continue to update COCL and DOJ on changes to personnel when applicable |
|---|---|
| **Assessment Rating Based On** | • Provision of unit structures and personnel |

27

**Settlement Agreement Paragraph**

92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor.  PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systematic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review BHUAC meeting minutes for 2015 Q3 and Q4; Review ECIT Advisory Council minutes related to MH Mask; Interview PPB personnel; Review PPB data collection efforts; Review BHRT Referral Reports; Review SCT Outcome Measures |

**Compliance Assessment**

     The PPB continues to collect data regarding the effectiveness of their unique system of mental health response.  We are continuing to work with PPB regarding their data collection efforts and progress is ongoing.

     In the first quarter of 2015, PPB implemented an ECIT data form (the ECIT Template) for ECIT officers to complete when they utilized their CI training during the interaction.  Data included in the ECIT Template consist of information related to incident characteristics, officer characteristics, community member characteristics, and crisis response tactics utilized.  For the time period of Q2 through Q4 of 2015, there were approximately 180 ECIT Templates completed for each quarter (see COCL Outcomes Assessment).  PPB has used the data from the ECIT Templates in part to determine the scope of mental health interactions related to Par. 101.  The data is housed within the BHU.

      The PPB has developed a mental health data entry interface that they are calling the "mental health mask" for all interactions involving a mental health component.  Previously, PPB implemented a study code for interactions with a mental health component – a box which would be checked on PPB reports if officers noted a mental health component to the call.  However, by PPB's own admission, the reliability of these study codes, their accuracy, and the consistency with which officers used them were lacking.  With the mental health mask, officers will be required to indicate, for every call they respond to, whether or not the interaction involved a mental health component.  All PPB email users received an email instructing them that the use of the mental health mask is required of the primary officer on all calls.  This

requirement will be enshrined in PPB policy in the future. If they answer in the affirmative, the officer will then be required to complete specific mental health related fields on the report about the interaction.

The MH Mask contains data fields similar to the ECIT data form, but will be required of all officers. By implementing a MH Mask, PPB should be able to more accurately capture interactions with individuals having a mental health condition.

In October of 2015, the ECIT Advisory Council devoted an entire meeting to reviewing the MH Mask and providing input for enhancing data collection. We thank the ECITAC for their input and recommend PPB utilize the comments from this group to better enhance the MH Mask. Data from the MH Mask will not be available until the first and second quarter of 2016 and we will need to verify the data have been reliably collected. We will provide an assessment regarding the implementation of the MH Mask in our next report.

PPB continues to collect and utilize data for the facilitation of SCT and BHRT services (e.g. assessing individual risk, evaluating fitness to receive SCT/BHRT services, etc.). While PPB has identified outcome goals for both BHRT and SCT and collects data related to outcome goals for both, BHRT does not appear to do this as consistently or extensively as SCT. For SCT, outcomes look at short term, intermediate, and long term (up to one year) goals for SCT participants related to housing, mental health/addiction, and criminality issues. The measures appear to be relevant to the participants as well as the program. BHRT outcome goals and related data should be analyzed on with a similar approach on a consistent basis.

One way to measure improvement in mental health crisis response is to implement a mental health contact survey. The COCL discussed such a survey with PPB in the third and fourth quarter of 2015. PPB has expressed concern that a survey tailored to consumers of mental health services who have had contact with the police may trigger trauma symptoms and have negative repercussions. The literature does not support this notion and previous research utilizing similar methodologies have not had such negative results. In 2016, we have had discussions with PPB and have made progress working through these concerns as well as feasibility issues and we hope to move forward and capture this critical input from the persons most directly impacted by PPBs approach to mental health response.

The implementation of a mental health contact survey would also provide measurements for other areas of the Settlement Agreement (i.e. effectiveness of ECIT training). In the first and second quarter of 2016, we will discuss the implementation of such methodology with PPB, including the possibility of embedding this survey within a larger survey of all police contacts to evaluate the effects of training.

| **COCL Recommendations** | <ul><li>Identify issues with implementation of MH Mask when they arise</li><li>Implement recommendations identified by ECIT Advisory Council</li><li>Ensure that data related to BHRT outcome goals are consistently collected and analyzed (similar to the SCT approach</li></ul> |
|---|---|
| **Assessment Rating Based On** | <ul><li>Provision of ECIT Template</li><li>Provision of mental health mask draft</li><li>Provision of ECIT Advisory Council minutes</li><li>Provision of SCT outcome measures</li></ul> |

| **Settlement Agreement Paragraph** |
| --- |
| 94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services. |

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review BHUAC roster of members; Review BHUAC minutes; Review PPB website for BHUAC materials |

| **Compliance Assessment** |
| --- |
|      The Behavioral Health Unit Advisory Committee (BHUAC) continued to meet in the third and fourth quarter of 2015.  The advisory committee is a diverse group with representatives from law enforcement, CCO's, City and County representatives, and mental health community representatives/peer support specialists.  In the third quarter of 2015, PPB added a peer support specialist to replace the person who previously held that spot.  The BHUAC has one peer support specialist and one community representative on their roster.  However, concerns have been raised by COAB and community members about adequate representation of culturally diverse communities and persons with lived experience.<br>     In our previous report, we related concerns regarding to the transparency of BHUAC operations, such as posting agendas and minutes online.  Our review of the PPB website related to BHUAC operations (http://www.portlandoregon.gov/police/68666) show that agendas and minutes for the third and fourth quarter of 2015 have been posted, along with the BHUAC membership roster.  However, when new agendas and minutes are posted to the PPB website, an email notification list should be utilized to keep interested parties apprised of the new postings. |

| COCL Recommendations | • BHUAC should assess COAB and community member concerns regarding adequate representation of culturally diverse communities and persons with lived experience<br>• Implement an email notification list for when new agendas and minutes are posted<br>• Continue practice of posting BHUAC agendas and minutes |
| --- | --- |
| Assessment Rating Based On | • Provision of BHUAC roster<br>• Information provided on PPB website |

**Settlement Agreement Paragraph**

95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services.  The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters.  The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHUAC minutes for third and fourth quarter of 2015 |

**Compliance Assessment**

In the third and fourth quarter of 2015, the BHUAC met approximately once a month to discuss plans for the continued development and expansion of BHU entities.  We received and reviewed the minutes from the BHUAC and noted discussions, presentations, and recommendations related to Crisis Intervention training for the 2016 In-Service, the expansion of SCT and criteria for SCT participants, the Unity Center Project, qualifications for ECIT officers, and the November ECIT Training.  Furthermore, the BHUAC demonstrated they were looking ahead to 2016 by listing their scope of work for the next year.  Such organization indicates they take their role seriously.

We did not receive any documentation related to PPB providing a written response to BHUAC recommendations and restate our recommendation that for all written recommendations from BHUAC, PPB provide a written response.

| COCL Recommendations | • Provide written response to all BHUAC recommendations |
|---|---|
| Assessment Rating Based On | • Provision of BHUAC minutes and agendas |

**Settlement Agreement Paragraph**

96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary.  PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

31

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review BHUAC Recommendations |

**Compliance Assessment**

The BHUAC continues to provide status reports for each month in which recommendations are made to PPB.  PPB reports they regularly provide responses to BHUAC regarding how recommendations are incorporated into systems, policies and staffing. We recommend that PPB provide documentation of this work.

| COCL Recommendations | • Provide documentation of response to BHUAC recommendations. |
|---|---|
| Assessment Rating Based On | • Provision of BHUAC status reports |

**B. Continuation of C-I Program**

**Settlement Agreement Paragraph**

97. PPB provides C-I Training to all its officers.  C-I is a core competency skill for all sworn police officers in the City.  PPB shall continue to train all officers on C-I.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Advanced Academy C-I Training material |

**Compliance Assessment**

We have reviewed the content of the Crisis Intervention (C-I) training provided to recruits in PPB's Advanced Academy.  We believe the scope and content of the C-I training is consistent with the Memphis Model.  We report on some aspects of the training here.

In regards to specific elements of the training, we believe the classroom material on crisis communication is very relevant and well developed.  The lesson plan for this class involves step-by-step suggestions for a positive result, including suggestions for before the interaction (limit visual and audio stressors such as lights and sirens), at the beginning of the interaction (use your first name and find something to initially agree on), during the interaction (use disarming words and effective listening skills), and in creating a resolution (shifting from listening to problem solving).  These skills are of upmost important in crisis response and are necessary for any officer.

Another important aspect of the training is the "hearing voices" exercise.  In this

32

exercise, the officers put on headphones and listen to a recording designed to create the sensation that they are hearing voices. They are then asked to complete tasks while hearing the voices. This exercise is designed to create empathy for persons who experience auditory hallucinations. The exercise helps officers learn to recognize that a person experiencing auditory hallucinations my not respond to commands immediately, and may become distracted and or respond to things the officer does see or hear.

The Advanced Academy training also covers signs and symptoms of common mental illnesses, including illnesses related to mood disorders, anxiety disorders, and psychosis. Furthermore, a consumer panel allows officers to hear real life stories of living with mental illness and provides an opportunity for officers to ask questions. This is another way for officers to develop empathy for when they are dispatched to mental health crises.

Finally, the training includes an extensive review of the Behavioral Health Unit (BHU), including the structure and function of BHU elements (ECIT, BHRT, SCT), referring a community member to BHU, executing a police officer hold (POH), and policies related to mental health response. As a reference, the BHU portion of the training was also provided to the COAB during the one of its meetings.

Part of the Memphis Model of Crisis Intervention training is input on the training from community stakeholders. The BHUAC has identified the need to review the Advanced Academy CIT training in their December Meeting minutes. While the BHUAC reviews the content of the training, we also ask they weigh the implications of spreading the crisis intervention training out over the course of the Advanced Academy training. Most Memphis Model CIT trainings are delivered in a concentrated 40 hour training week which may assist in reinforcing concepts, as opposed to spreading the training out over a longer training period. There is no research on this specific CIT issue to support one approach over another, thus, we simply recommend this as a topic to seek feedback on.

We have only reviewed the content of the Advanced Academy training though have not had the opportunity to observe the training in-person. We recommend PPB provide us with a detailed schedule of upcoming Advanced Academy training so that we might be able to plan an observation schedule.

| **COCL Recommendations** | • Solicit community stakeholder input when planning Advanced Academy Training<br>• Provide COCL with schedule of upcoming Advanced Academy training |
|---|---|
| **Assessment Rating Based On** | • Review of Advanced Academy CI Training materials |

### Settlement Agreement Paragraph

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's

on-going annual officer training.  PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observe 2015 In-Service training; Review 2015 In-Service training materials |

**Compliance Assessment**

Officers are required to complete a minimum of 40 hours of CI training before they are allowed to assume independent patrol or call-response duties.  The 40 hours of CI training is split between the State Academy and the Advanced Academy.  As no officers are allowed to assume independent patrol duties before they complete the Advanced Academy, officers would not be allowed to do so before completing the full 40 hours of CI training.

Currently, the refresher CI training that officers receive as part of In-Service training is not adequate for the purposes of supporting the CI skills that officers need to safely and effectively manage interactions with persons experiencing mental health crises.  The CI training is incorporated into other parts of In-Service and is not the primary training objective of the class.  While integrated training can be beneficial if done properly, in this context, such an approach does not recognize the fact that an officer's last exposure to CI training could have been more than five years ago. Core competencies and principles in CI training must be reviewed.  Over time, skills may diminish or drift, which could lead to higher likelihood of use of force in a mental health crisis call.

We are aware that the number of In-Service hours devoted to other topics is partially dictated by State mandated training requirements as well as other areas of the Settlement Agreement.  To address the time constraint issue, we recommend that every three years PPB should reserve a block of time solely dedicated to CI training.  We are not suggesting that CI refresher training should not be a part of each year's In-Service.  If PPB can keep the refresher training as it was for 2015, this would be adequate if then every three years, a more in-depth and specialized refresher occurred.  Similarly, PPB can reinforce CI principles by releasing video training, Tips and Techniques, and encouraging supervisory support for CI approaches.   All these should be done in consultation with BHUAC.

We have identified several examples where PPB officers did not utilize the basic CI skills when interacting with persons known to be experiencing a mental health crisis (see our Outcome assessment report).  These incidents underscore the need for a substantial refresher course.

| **COCL Recommendations** | • Create In-Service training wherein CI Response is the primary objective of the class |
|---|---|
| **Assessment Rating Based On** | • Observation of In-Service training<br>• Review of case documents involving persons experiencing mental health crisis |

**C. Establishing "Memphis Model" Crisis Intervention Team**

<table>
<tr><td colspan="2" align="center">**Settlement Agreement Paragraph**<br><br>99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]").</td></tr>
<tr><td>Compliance Label</td><td>Partial Compliance</td></tr>
<tr><td>Methodology</td><td>Review BHU/ECIT data; Interview BHU/ECIT/PPB Personnel</td></tr>
<tr><td colspan="2" align="center">**Compliance Assessment**<br><br>    PPB continues to operate a unique model of crisis intervention. In order to assess the merit of their model, they, in consultation with DOJ and the COCL, have developed a strategy to collect data on all mental health related encounters.  The Mental Health Mask data form will facilitate collection and analysis of mental health call data to be used to examine operational issues and outcomes related to PPBs mental health crisis response strategy.<br>    In response to DOJ and COCL recommendations, PPB has expanded the criteria for ECIT response to include all mental health crisis calls where the subject is attempting or threatening suicide.  COCL will continue to monitor progress in this area and work with PPB to evaluate their model once sufficient data has been collected.</td></tr>
<tr><td>**COCL Recommendations**</td><td><ul><li>Continue data collection efforts to evaluate unique model of crisis intervention</li><li>Provide updates to COCL of issues which arise or might arise</li></ul></td></tr>
<tr><td>**Compliance Rating Based On**</td><td><ul><li>Review of mental health mask draft</li><li>Expansion of ECIT criteria</li></ul></td></tr>
</table>

<table>
<tr><td colspan="2" align="center">**Settlement Agreement Paragraph**<br><br>100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers.</td></tr>
<tr><td>Compliance Label</td><td>Partial Compliance</td></tr>
<tr><td>Methodology</td><td>Review ECIT Roster found in Q3 and Q4 supporting documents; Review ECIT Advisory Council minutes related to MH Mask; Interview BHU/ECIT/PPB personnel; Review Directive 850.20</td></tr>
<tr><td colspan="2" align="center">**Compliance Assessment**</td></tr>
</table>

35

The ability of PPB to determine the "demand for [ECIT] services" is contingent upon the implementation of the Mental Health Mask detailed in our assessment of Pars. 92 and 93. The data from this mask should provide PPB with an indication of how prevalent mental health interactions are. The mask should also provide PPB with insight as to how ECIT officers should be apportioned based on district, shift, and other considerations. We recommend PPB begin their efforts to collect systematic, reliable data related to this topic.

Based on the ECIT rosters provided by the PPB, there are now approximately 85 ECIT trained officers operating in the East, North, and Central Precincts. This is in addition to other ECIT trained personnel found within other divisions. Thus, PPB's "initial goal" continues to be satisfied. However, the final number of ECIT officers should be "driven by demand" for ECIT services and thus we cannot find PPB in substantial compliance until the MH Mask has been implemented and useful data are available.

| COCL Recommendations | • Continue efforts to implement MH Mask and analyze data to determine demand for ECIT services |
|---|---|
| Compliance Rating Based On | • Provision of mental health mask draft<br>• Provision of ECIT rosters |

**Settlement Agreement Paragraph**

101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT].

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review BHUAC August 26, 2015 minutes; Review ECIT Position Announcement; Review SOP #43; Review process for evaluating qualification of potential ECIT officers |

**Compliance Assessment**

In August of 2015, the BHUAC provided recommendations to the criteria for qualification, selection, and ongoing participation of officers in ECIT. These recommendations included the revisions of some criteria and the additions of other criteria.

We have reviewed the appraisal and selection process for incoming ECIT officers who were trained in November of 2015. PPB put forth substantial effort in evaluating the work history, supervisor evaluations, Precinct/Shift, and other attributes of officers before selecting them for participation in the ECIT training. We believe the effort put forth is consistent with the letter and intent of this paragraph, though would recommend PPB provide some

36

documentation of how each of these aspects are weighed during the actual selection process. The depth of review given to potential ECIT officers is noteworthy.

PPB has further implemented SOP #43 ("Notification of BHU Regarding ECIT or BHU Officer Performance Issues").  In this SOP, the Professional Standards Division (PSD) is responsible for monitoring EIS alerts and administrative investigations.  Whenever one of these occurs, PSD is required to check a master list of ECIT officers to determine whether the alert or investigation prevents them from continuing in their role as an ECIT officer and notify BHU in such an event.  COCL feels this process is adequate to ensure ongoing review of ECIT participation.  We recommend PPB provide notice to COCL and DOJ when an ECIT officer has a disciplinary action related the use of force or mistreatment of people with mental illness so that we might review the process.

| COCL Recommendations | • Provide documentation related to the weighting of considerations for ECIT selection<br>• Provide documentation that ECIT officers have been reviewed for continued eligibility in this role. |
|---|---|
| Compliance Rating Based On | • Provision of BHUAC recommendations<br>• Provision of appraisal and selection process for incoming ECIT officers<br>• Provision of SOP #43 |

## Settlement Agreement Paragraph

102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations.  PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observe November 2015 ECIT training; Review ECIT training documents; Interview PPB/BHU personnel |

## Compliance Assessment

Between November 17 and November 20, 2015, members of the COCL team personally observed the entire 40 hour ECIT training provided to members of the Portland Police Bureau over a four day period. Each day involved approximately 9 hours of curriculum comprised of classroom lecture, group table top exercises, consumer and family panels, site visits, role play scenarios, and discussion groups.  Overall, we find the majority of content delivered during the training was relevant, well organized, and delivered effectively.  The curriculum covered a range of topics, most of which was very similar to the Memphis Model of CIT training, with some advanced and additional content accounting for the slightly different role played by ECIT officers and the prior CI-training they have already completed.

37

We have memorialized our evaluation of the ECIT training in a Technical Assistance Statement that has been provided to the PPB.    While we find it repetitive to include the entirety of the TA Statement here, in essence, the majority of the ECIT training, as it relates to content, is in line with what we would expect.  Our critiques of the ECIT training address methods of evaluation, facilitation of learning, and time-management.    Our assessments of these constructs are more appropriately discussed in Par. 80, and we have thus included them in that paragraph above. We offer a few general comments related to our assessment here but direct the reader to the ECIT Technical Assistance Statement in our Outcome Assessment Report.

While handouts were distributed to officers for material presented on Thursday and Friday, to our knowledge, officers were not provided with handouts for ALL of the lecture presentations included in the training or any type of binder of course materials.  Additionally, very little notetaking was observed during these segments of the training.  Given the amount of detailed information covered during the training, hard copies of the materials (e.g. PowerPoint handouts) would help to reinforce the information, facilitate notetaking, and improve retention.  We are aware that different students may learn in different ways and may not need to take notes.  However, for students who learn best through notetaking, providing the materials would facilitate their learning.  Thus, we recommend that in future trainings, officers be provided with a training binder that includes all training materials, resource information and notes pages.

Also, many CIT programs include a graduation ceremony at the end of the CIT training week, often with the agency Chief or Police Commissioner awarding completion certificates and CIT pins/patches.  This underscores the importance of the role the newly trained officers play in the department's mission to provide effective, safe and respectful responses to persons experiencing mental health crises.  It is a symbolic and important gesture.  We recommend that PPB include a graduation ceremony in future ECIT trainings.  We recognize that it is a very packed 40 hour week.  However, several training days ended 30 minutes early.  Thus, there is likely room in the schedule for an hour at the end of the training for this ceremony.

In our previous report, we expressed concern related to adequate community and stakeholder involvement in the delivery of ECIT training.  Related to this, PPB sought and incorporated advice from the BHUAC for the ECIT training.  We recommend the solicitation of BHUAC input continue for subsequent ECIT training.  We also recommend PPB work to incorporate scenarios that capture the culture and contexts relevant to diverse communities and that may also trigger implicit bias.  While we do not recommend a specific model for doing this, we recommend seeking input from the BHUAC, the COAB, and other community groups to identify potential intersectionality of mental health, race/ethnicity, economic status, and other attributes.

Finally, while all participants were very engaged during the scenarios, many officers did not get the opportunity to directly participate due to only one scenario being run at a time.  Breaking the officers into groups and running several scenarios at once would provide additional opportunities for officers to practice skills.  We recognize this would require additional training staff though believe it to beneficial for the involved officers.

Apart from the above identified issues, we believe the ECIT training was well executed, and done professionally.  The delivery of ECIT training will require modifications to address the issues we have identified and this will continue to be an ongoing process with PPB related to

38

content, evaluation, and community input.  However, PPB has indicated a willingness to work with COCL and we will document advancements in future reports.

| | |
|---|---|
| **COCL Recommendations** | • Provide officers with ECIT course binder with all handouts and resource material to support note-taking and retention.<br>• Acknowledge the achievement of completing ECIT training with a graduation ceremony.<br>• Increase opportunities for participation in scenarios<br>• Include elements of cultural diversity in the scenarios<br>• Continue to solicit BHUAC and COAB input regarding ECIT training |
| **Compliance Rating Based On** | • Observation of ECIT training<br>• Review of ECIT training documents |

| **Settlement Agreement Paragraph** |
|---|

103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event.

| | |
|---|---|
| **Compliance Label** | <mark>Partial Compliance</mark> |
| **Methodology** | Review Job Posting for ECIT officer; Review data related to BOEC and PPB dispatch of ECIT officers; Interview PPB personnel |

| **Compliance Assessment** |
|---|

The job posting for ECIT officers included the statement that "ECIT officers will perform their regular duties" if no crisis calls are waiting.  Furthermore, we have received and reviewed data related to ECIT officers being dispatched by both BOEC and PPB.  However, our interviews with PPB personnel still indicate that non-ECIT officers are not completely familiar with the required dispatch criteria for ECIT officers.  Related to this, BOEC dispatchers have not been provided training that we believe is sufficient to make them feel  prepared to recognize crisis events (see our assessment of Par. 113).  We recommend PPB implement efforts to refresh non-ECIT officers on the criteria for ECIT referral.  We also recommend BOEC implement some type of training to orient dispatchers and call-takers to the signs and signals of mental health crisis.  We discussed this recommendation with BOEC during the third and fourth quarter of 2015 and have provided with literature regarding such training.

| | |
|---|---|
| **COCL Recommendations** | • Provide refresher training for non-ECIT officers on ECIT criteria<br>• Recommend BOEC implement crisis recognition training for call takers and dispatchers |
| **Compliance Rating Based On** | • Review of ECIT job posting |

| **Settlement Agreement Paragraph** |
|---|

104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review PPB public awareness efforts |

| **Compliance Assessment** |
|---|

PPB performs a wide variety of tasks designed to increase awareness of the work performed by BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe that PPB has made a serious effort to highlight the work of the BHU in its entirety, not only ECIT. We restate the recommendation from our last report, however, that input from the BHUAC should be solicited regarding further efforts so that the work of the BHU can reach all corners of Portland. The members of BHUAC are diverse and are likely to have good insights regarding communities who might require additional awareness.

We notice that on the BHU website, the Behavioral Health Response Team's page still references the "Mobile Crisis Unit" (MCU) rather than the current moniker of BHRT. We recommend PPB ensure that all pages under the BHU are up to date so as not to create confusion among members of the community.

| COCL Recommendations | • Consult with BHUAC to determine future outreach efforts<br>• Update webpages for all BHU divisions |
|---|---|
| Compliance Rating Based On | • Review of information on PPB website<br>• Provision of public awareness/education documents |

| **Settlement Agreement Paragraph** |
|---|

105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques uses, injuries, disposition, presence of mental health professional on scene, and a narrative of the event.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review MH Mask; Review ECIT Advisory Council minutes related to |

| MH Mask; Interview PPB personnel |
|---|

**Compliance Assessment**

      As we have indicated in our assessment of previous paragraphs, PPB is implementing a mental health mask designed to capture the data points required in Par. 105.  We have reviewed the MH Mask and reviewed ECIT Advisory Council input on the mask.  We feel the mask is sufficient to capture the required data elements, though have concerns about whether it will be used consistently by officers.  In the third quarter of 2015, BHU saw a decline in the number of ECIT templates being filled out.  PPB states in their Q3 Quarterly Update Report that the "reason for the decline in the number of templates from last quarter was not readily apparent."  In response, BHU "sent out a memo reminding officers of the ECIT template process, the importance of measuring and capturing the work of the ECIT officers, and why it is crucial that ECIT officers fill out an ECIT Template…on every call where there is a person in mental health crisis".  We commend PPB for addressing this decline in a timely fashion.  However, the COCL is concerned that if officers who are specially trained in mental health response calls are noncompliant, then what can we expect from officers who are not ECIT trained?  Thus, we are recommending that PPB institute a method for ensuring officer compliance with utilizing the MH Mask and provide a system of accountability when they do not properly document mental health interactions.

| **COCL Recommendations** | • Fully implement MH Mask<br>• Institute mechanisms for ensuring officer compliance with the task of completing the MH Mask |
|---|---|
| **Compliance Rating Based On** | • Provision of mental health mas draft<br>• Provision of ECIT advisory council minutes |

**D. Mobile Crisis Prevention Team**

**Settlement Agreement Paragraph**

106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional.  Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.

107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional.  [BHRT] shall be the fulltime assignment of each such officer.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHU Unit Structure |

| **Compliance Assessment** |
|---|

PPB continues to have a BHRT car in each precinct comprised of one officer and one qualified mental health professional.  For the officer, the BHRT is considered their full time assignment.  With regards to the PPB's requirements of these paragraphs, they continue to be in substantial compliance.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Provision of BHU Unit Structure |

| **Settlement Agreement Paragraph** |
|---|

108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service.  PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review SOP #3-2; Review BHRT Job posting; Review BHUAC meeting minutes |

| **Compliance Assessment** |
|---|

PPB has provided COCL with SOP #3-2 which describes the BHRT program and organizational structure.  The SOP also contains some criteria for the qualification of BHRT officers.  However, the current version of SOP #3-2 is from 2014 and is in need of an upgrade. For instance, it includes the moniker "MCU" even though the division has been known at the BHRT since at least the start of COCL's tenure.  We have been advised that SOPs are reviewed on a schedule much as the Directives are, and this SOP is scheduled to be reviewed in the coming months.  We also note that in the December 2015 minutes of the BHUAC, the upcoming agenda items state that the "criteria for qualification, selection and ongoing participation [for BHRT] will be written into an SOP and need to be reviewed by the BHUAC".

PPB has implemented SOP #43 regarding the ongoing service of BHRT officers.  This is the same process as identified with ongoing service of ECIT officers.  As stated before, we find this to be an adequate system to address the "ongoing participation of officers in the [BHRT]" aspect of Par. 108.

| **COCL** | • Gather input from BHUAC on review of SOP #3-2 (regarding |
|---|---|

42

| Recommendations | criteria for qualification, selection, and ongoing participation of officers in the BHRT) |
| Compliance Rating Based On | • Provision of SOP #3-2<br>• Provision of SOP #43 |

**Settlement Agreement Paragraph**

109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations.  PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members.

| Compliance Label | Partial Compliance |
| Methodology | Review agendas for outside conferences, seminars, and training |

**Compliance Assessment**

While BHRT officers are trained in ECIT, PPB offers no in house specialized training to BHRT members.  Our previous conversations with PPB personnel indicated that BHUAC had "provided recommendations for BHRT training", though we still have not been provided documentation that such training had occurred.

The Agreement states "PPB shall specially train each [BHRT] member".  This statement holds two parts: (1) PPB is required to provide the training and (2) the training must be specialized for BHRT.  The documentation provided by PPB is related to trainings, conferences, and seminars outside of PPB that BHRT personnel have attended.  While these trainings appear to be relevant, it is not clear that there is a well-developed training plan for BHRT members. We recommend that PPB develop a specialized training plan for BHRT personnel and solicit BHUAC input on this matter.

| COCL Recommendations | • Create specialized training plan for BHRT personnel<br>• Solicit and incorporate BHUAC input related to BHRT training |
| Compliance Rating Based On | • Provision of documents related to outside conferences, seminars, and training |

**Settlement Agreement Paragraph**

110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers.

| Compliance Label | Partial Compliance |

43

| Methodology | Review MH Mask; Interview PPB/BHU personnel |
|---|---|

**Compliance Assessment**

    PPB's ability to substantially comply with this provision of the Agreement is intrinsically tied to its ability to satisfy the conditions of Par. 105 of this Agreement through the implementation of the MH Mask. While BHRT has had the opportunity to utilize ECIT data to a certain extent, BHRT cannot adequately "proactively address mental health service" until the MH Mask has been reliably implemented. Until such a point, we cannot ascribe substantial compliance to this provision.

| **COCL Recommendations** | • Fully implement MH Mask |
|---|---|
| **Compliance Rating Based On** | • Provision of mental health mask draft |

---

**Settlement Agreement Paragraph**

111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Directive 850.20 |

**Compliance Assessment**

    The policies related to the transfer of custody or voluntary referral for individuals are currently in the Executive Reconciliation phase. There has been much discussion between PPB, COCL, and DOJ related to the revision of such policies. The finalized versions are slated to be released in the first and second quarter of 2016 and we will detail them in our next report.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Directive 850.20 being in Executive Reconciliation phase |

44

**E. Service Coordination Team**

| **Settlement Agreement Paragraph** | |
|---|---|
| 112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review SCT outcome measures; Review contract with CCC; Review Participants' Demographics Report; Review SCT Referrals Report |
| **Compliance Assessment** | |
|      In our previous report, we asked SCT to create outcome measures related to SCT success.  SCT has created such measures related to housing, employment, mental health/chemical dependency treatment, and criminality.  We believe the measures created are sufficient to measure SCT success.  We look forward to discussing the implications of these outcomes with SCT and how they are utilizing to facilitate services to the target audience identified in Par. 112. | |
| **COCL Recommendations** | • Continue collecting data related to SCT outcomes<br>• Use outcome data to inform program improvements |
| **Compliance Rating Based On** | • Provision of SCT outcome measures |


**F. BOEC**

| **Settlement Agreement Paragraph** | |
|---|---|
| 113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals. | |
| **Compliance Label** | Non-Compliance but Initial Steps Taken |
| **Methodology** | Interview BOEC personnel |
|  | |

**Compliance Assessment**

In the fourth quarter of 2015, COCL conferred with BOEC regarding Pars. 113 through 115. In our conversations, BOEC agreed that completing the policies and procedures related to Par. 113 were necessary before progress could be made on subsequent paragraphs. We were informed that BOEC was scheduled to make a presentation to BHUAC regarding the policies and procedures and to solicit BHUAC input. We will report on this progress in our next report.

In addition to drafting policies and procedures, BOEC has expressed interest in creating or attending training for call-takers and dispatchers consistent with Memphis Model CIT training. We are fully in support of BOEC's desire to have call-takers and dispatchers trained. We provided literature to BOEC and, in one face-to-face meeting with BOEC, received literature from BOEC's independent exploration into such training. We recommend BOEC continue in its pursuit of training for call-takers and dispatchers.

| | |
|---|---|
| **COCL Recommendations** | • Solicit and incorporate BHUAC input on policies and procedures<br>• Continue pursuit of Memphis Model CIT training for call-takers and dispatchers |
| **Compliance Rating Based On** | • Current status of policies and procedures |

---

**Settlement Agreement Paragraph**

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| | |
|---|---|
| **Compliance Label** | Non-Compliance but Initial Steps Taken |
| **Methodology** | Interview BOEC personnel |

**Compliance Assessment**

Our assessment of Par. 114 is contingent upon compliance with Par. 113. We restate our support for BOEC seeking Memphis Model CIT training for call-takers and dispatchers.

| | |
|---|---|
| **COCL Recommendations** | • Complete the policies and procedures identified in Par. 113 so that the training of BOEC dispatchers is possible. |
| **Compliance Rating Based On** | • Current status of policies and procedures |

46

| Settlement Agreement Paragraph |
|---|
| 115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff. |

| Compliance Label | Non-Compliance but Initial Steps Taken |
|---|---|
| Methodology | Interview BOEC personnel |

| Compliance Assessment |
|---|
| Our assessment of Par. 115 is contingent upon compliance with Par. 113. |

| COCL Recommendations | • Complete the policies and procedures identified in Par. 113 |
|---|---|
| Compliance Rating Based On | • Current status of policies and procedures |

47

# VII. EMPLOYEE INFORMATION SYSTEM

### Settlement Agreement Paragraph

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee.  *See* PPB Manual 345.00.  PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion.  Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117.  PPB agrees to collect data necessary to conduct these analyses at supervisor- and team-levels.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review PPB compliance chart for Par. 116; Interview EIS/PPB personnel; Review Directive 345.00 |

### Compliance Assessment

In the third and fourth quarter of 2015, COCL engaged in a series of discussions with PPB regarding their use of EIS.  These discussions related to the types of data to be collected and analyzed by PPB and the definition of PPB's requirement to "enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion".  In our previous report, we provided rationale for a comprehensive and predictive system of employee information.  The COCL and DOJ have provided PPB information related to the work occurring with the University of Chicago and the Charlotte-Mecklenburg Police Department.  We recommend PPB undertake steps to enhance their EIS to a point where it might be utilized for prediction, though will coordinate with them more directly in the first and second quarter of 2016.

Our review of these paragraphs is related to the overarching objective of Par. 116. Specifically, "PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. *Accordingly*, within 90 days of the Effective Date, PPB shall…" (emphasis added).  Through the use of the term "accordingly", the Settlement Agreement implies that each subsection is designed to achieve the goal of "effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends".

As it relates to "at-risk employees", subsections (a) and (b) requires supervisors to

48

examine EIS records of "employees under their supervision" and "officers new to their command".    Under these two subsections, commanders and supervisors can compare employees on the individual level.  An officer can be compared against all other officers under the same command, against officers in similar positions or units under other commands, or against all officers.  This is the first level of review designed to "address potentially problematic trends" and requires careful analysis on the part of the supervisor.

PPB may understandably argue that subsections (a) and (b) only require commanders and supervisors to "review EIS records" and "document the review has occurred in the EIS performance tracker".  This literal interpretation does not include a sense of purpose.  The purpose of subsections (a) and (b) is found in the overarching objective – "identify at-risk employees".  Inherent in PPB's ability to do this is the requirement of comparison rather than a simple "review".  Simply reviewing EIS and documenting the review does not achieve the objective of identification.

Par. 116 (c) expands the identification of potentially problematic trends to a second tier – that of the unit and supervisor.  This requires a higher position of reviewer, thus the responsibility is assigned to EIS staff.  This 2nd level of review would involve comparing supervisors against other supervisors in the precinct, all supervisors citywide, and/or supervisors in similar units. This same type of comparative analysis would apply to units or team and would be different than the supervisor analysis in situations where the unit or "team" has more than one supervisor, e.g. entire shifts (Perhaps the problem occurs on the night shift rather than the day shift) or special units, such as tactical or special operations. O

All levels of review – at the individual, supervisor or team/unit levels- are achieving the same overarching objective of Par. 116.  In the fourth quarter of 2015, PPB changed their reporting structure to identify units and supervisors where a pattern of failure for subsections (a) and (b) occurred.  Again though, the current PPB singular focus on whether or not a review occurred falls short of the intent of Par. 116 ("identify at-risk employees").

We recommend PPB expand their criteria for identifying at-risk employees to include issues of force, accountability, and other matters which led to this Settlement Agreement.  We are glad to assist PPB in researching sites such as the University of Chicago and finding literature related to such predictive functions of EIS.  We admit that the current knowledge of EIS capabilities is still in the development phase, but this work has drawn national attention. We do believe that EI Systems in general and PPB's EIS are capable of identifying a profile of individuals who are more likely to be problematic.  Through such identification, there may be enhanced intervention to reduce such likelihood.  We cannot claim that such systems will not miss some individuals who are prone to problematic behavior – this is the limitation of all predictive systems, however sophisticated. The function of EI Systems is to reduce the likelihood of such omissions and our recommendations to PPB, if carried out properly, are designed to achieve such reduction.

While we are recommending the expansion of EIS utilization, we recognize PPB's efforts to evaluate the current level of utilization.  For the criteria of review, PPB reports over 90% compliance and was able to identify a problematic unit where supervisors were not performing reviews.  PPB reports that remedial action for this unit will occur in the first quarter of 2016. We continue to support the work to date and do not recommend that PPB abandon these efforts.  Rather, we recommend that PPB expand its EIS work in the manner outlined here.

| COCL Recommendations | • Coordinate with COCL in 2016 Q1 and Q2 regarding the comprehensive utilization of EIS as a means for identification and prediction of at-risk employees, supervisors, and teams/units |
|---|---|
| Compliance Rating Based On | • Current level of data analysis related to utilization of EIS |

**Settlement Agreement Paragraph**

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interview EIS/PPB personnel; Review EIS program |

**Compliance Assessment**

PPB continues to use the threshold triggers identified in Pars. 118 and 119. While the Agreement identifies these specific thresholds, we carry concern that these triggers are too generous. For instance, should the PPB not be concerned if an officer is using force at double the rate of other officers in the same shift (whereas the Agreements requires 3x the rate)? We suggest PPB re-examine the thresholds for triggering case management review to increase the chance of detecting problematic behavior patterns. However, we will only assess compliance on the agreed upon criteria and our suggestion for more narrowed thresholds will not influence PPB's compliance label as it relates to these paragraphs.

While PPB has implemented the required thresholds, we believe the process of "case management review" can be enhanced. In the third and fourth quarter Quarterly Update Reports, PPB has indicated that between 6% and 12% of EIS flags were forwarded on for an RU Manager review. COCL expressed concern to PPB regarding the low percentage of RU Manager and Supervisor review for EIS alerts. As a response to our concerns, PPB drafted an "EIS Alert Process Explanation," detailing how alerts are reviewed and sent on for RU Manager and Supervisor review. We consider this a good management decision and have incorporated the information contained within it into this assessment.

As indicated in PPB's EIS Alert Process Explanation, an officer's "shift lieutenant and/or sergeant are most likely to be the supervisors with the most day to day contact with the employee under review". We also interpret this to mean that the shift lieutenant or sergeant

is most likely to be in a best position to assess potential reasons for an officer's breaking a threshold. We are unsure then why the large majority of EIS flags are reviewed by individuals within the Professional Standards Division. Our interviews with the EIS Administrators indicate they are thoughtful, conscientious individuals. Our issue is with the process and the fact that the officer's supervisors are more familiar with the officer and are in a better position to assess the officer than are the EIS Administrators.

PPB reports that EIS alerts that are not sent for an RU review generally fall into one of five separate categories: duplicate, transfer, singular use of force, data error, and other. We understand declinations as a result of duplications and data error (provided no other issues are identified) as the responsibility of the EIS administrators. However, we feel declinations as a result of transfers, singular use of force, and "other" should fall under the purview of the supervisor. Singular use of force may have the same implications as multiple uses of force within a certain timeframe. A threshold break as a result of a transfer may indicate different cultures within units. Or, in the instance of a promotion, may indicate more field activity than desired for a supervisor. PPB's definition of "other" is vague ("none of the above criteria applied" – PPB Q3 Quarterly Update Report). In September of 2015, 20% of all declinations were in this "other" category. Unless the "other" reasons are similar to those of duplication or data error, we urge PPB to send them for supervisory review.

In the EIS SOP provided by PPB, the "decision to send an alert to the Responsibility Unit (RU) should be based on the administrator's best judgement about whether the employee could stand to gain something from a review and intervention at the RU level." We disagree with this position. The decision to decline sending an alert to the RU should be the exception to the rule. Rather than the criteria being that "the employee could stand to gain something", the COCL maintains there should be declinations only in situations where the employee stands to gain absolutely nothing. We feel this flipping of standards will result in an increase in the number of alert reviews as well as improvement in the quality of reviews. We do not intend to devalue the combined experience of the EIS Administrators in their judgment of sending out flags. We instead believe that it is wise to cast a larger net than a smaller one in this instance, and to further engage supervisors in their core role of supervising.

Finally, we have had conversations with PPB and the EIS Administrators on creating a systematic review of when an EIS flag is sent out for RU Review. We provided PPB a sample database to capture steps in the decision making process. This database included variables related to the reason for the flag, all steps in the evaluation process, the decision to send the flag for RU review, and the disposition of the flag. Initially, our request was met with hesitation from PPB. However, recent conversations have indicated that some form of our database will be put into effect. This will require much more conversation with PPB and will be covered in greater scope in upcoming reports.

| **COCL Recommendations** | • Explore the potential for thresholds to capture a larger population<br>• Revisit the criteria for sending EIS flags for RU review<br>• Engage in a systematic process for tracking EIS flags |
|---|---|
| **Compliance Rating Based On** | • Maintenance and expansion of thresholds to trigger EIS review |

| **Settlement Agreement Paragraph** | |
|---|---|
| 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator.  This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Interview PPB/EIS personnel; Review Directive 345.00; Review EIS Program |

| **Compliance Assessment** |
|---|
|     We have learned that EIS Administrators receive their training on the job.  Certainly some tasks required of the EIS Administrators can be learned through kinesthetic education. However, such "on-the-job" training does not allow the COCL to evaluate the quality of training, as required for other units, nor does it allow for the systematic transfer of lessons learned to those newly assigned to the unit, which is especially important in this newly revamped system.  We encourage the Bureau to create a training manual for the edification of future EIS Administrators. With any new system, the absence of formal training is understandable while the system is being built.  As PPB transitions out of this learning phase, the knowledge of EIS management needs to be institutionalized for when personnel changes occur. |

| **COCL Recommendations** | •   Create and implement training manual for EIS Administrators |
|---|---|
| **Compliance Rating Based On** | •   Actions of EIS Administrators |

# VIII. OFFICER ACCOUNTABILITY

## A. Investigation Timeframe

**Settlement Agreement Paragraph**

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means.  For the purposes of this provision, completion of administrative investigations include all steps from intake of allegations through approval of recommended findings by the Chief, including appeals, if any, to CRC.  Appeals to CRC shall be resolved within 21 days.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interview City/PPB personnel; Review Q3 and Q4 overdue cases |

**Compliance Assessment**

PPB, the City, and DOJ have engaged in conversations related to creating revised timelines for investigations of misconduct complaints, which COCL has either sat-in on or been briefed on.  As these are ongoing discussions between the Parties and no finalized plan has been reached, we will reserve our comments until documentation has been distributed for public consumption.  For this report, we simply note that a focus group has been convened to examine the pros and cons of the proposed model and that we are confident the Parties are earnest in working in earnest to satisfy this paragraph of the Settlement Agreement.

In the interim, PPB continues to provide documentation of cases that exceeded the 180 day timeline, including the entity responsible for delays and potential remedies for delays.  For the third and fourth quarter of 2015, delays were attributed to steps which fell under the responsibility of both IA and IPR.  In some cases, delays were unavoidable whereas in other cases, PPB noted the potential need for more investigators.

Until an approved revised process for investigations of misconduct complaints is created, we recommend PPB continue reporting cases that exceed the 180 day timeline.  We will continue to monitor the status of a revised timeline and will provide updates when available.

| **COCL Recommendations** | • Continue system of reporting cases that exceed the 180 day timeline<br>• Continue ongoing analysis and planning for possible changes to the current model of investigating misconduct complaints |
|---|---|
| **Compliance Rating Based On** | • Documentation of overdue cases |

---

### Settlement Agreement Paragraph

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident.  All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Criminal-IA Concurrent Investigation Audit Reports for Q3 and Q4; Review Directive 0330.00 |

### Compliance Assessment

   PPB has provided documentation in the third and fourth quarter of 2015 showing criminal investigations and administrative investigations normally being initiated within two weeks of each other.  In one instance, the administrative investigation began approximately one month after the initiation of the criminal investigation.  For this case, the criminal investigation was conducted by an outside agency (Clark County, Washington) and PPB was asked to delay their administrative investigation.  As the Clark County incident appears to be a rare situation and Clark County is not bound by the Settlement Agreement, we do not believe this constitutes a pattern of non-compliance.  We appreciate the format used by PPB to report the initiation of criminal and administrative investigations. The COCL will conduct an audit before our next report to ensure there are no unnecessary delays in the complete process.

   Directive 0330.00 is currently in the Executive Reconciliation phase of policy review and thus still contains the phrase "*may* be investigated concurrently" regarding criminal and administrative investigation (emphasis added).  As we have said in our previous report, the wording of Directive 0330.00 must be changed for PPB to be considered in substantial compliance.  As we have received no documentation of correspondence from PPB to DOJ regarding potential exceptions to this mandate (see COCL's Q2 report), we assume that PPB concedes Directive 0330.00 requires change.

| COCL Recommendations | • Revise Directive 0300.00 to reflect the requirement of Par. 122 |
|---|---|
| Compliance Rating Based On | • Provision of Criminal-IA Concurrent Investigation Audit reports |

---

### Settlement Agreement Paragraph

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a

written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interview City/PPB personnel; Review Q3 and Q4 overdue cases; Review Q3 cases signed by the Chief |

### Compliance Assessment

PPB currently provides reports indicating which cases went beyond the 180 day timeline and identifies the source of the delays.  In some instances, an action is taken to remedy the delay.  For instance, PPB and IPR put certain steps of the investigative process "on the clock" with a sign-in/sign out system.  This led to reduced overall investigation time.  In other instances, recommendations were made, though it is unclear whether any action was taken.

As PPB, the City, and DOJ are currently in discussion regarding a revised 180 day timeline model, we will reserve further judgement on this provision until the revised model is available for public consumption.  In the interim, we recommend PPB continue with their reports of cases which have exceeded the 180 day timeline.

In the third quarter of 2015, PPB provided documents indicating that individual cases exceeding the timeline were sent to the Chief.  Upon receipt of those cases, the Chief reviewed the reasons for exceeded the 180 day timeline, reviewed what entity was responsible for exceeding their individual timelines, and signed his acknowledgement of receipt and review of the cases.  These documents were not provided in fourth quarter supporting documentation. COCL believes that having this type of review is beneficial for the Bureau and recommends PPB resume this practice.

| **COCL Recommendations** | • Continue system of reporting cases that exceed the 180 day timeline<br>• Resume practice of having Chief review and sign individual cases which exceed the 180 day timeline |
|---|---|
| **Compliance Rating Based On** | • Provision of overdue case documentation |


### B. On Scene Public Safety Statements and Interviews

### Settlement Agreement Paragraph

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967).  The City will submit the revised protocol to DOJ for review and approval.  Within 45 days of

obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Compliance Label | Non-Compliance but Initial Steps Taken |
|---|---|
| Methodology | Review Officer Involved Shooting case files; Interview PPB and City personnel; Review Directive 1010.10 |

**Compliance Assessment**

The revision of protocols for compelled statements to the Professional Standards Division has not yet occurred. PPB has not provided any supporting documentation for either the third or fourth quarter. The Quarterly Update provided by PPB indicates that discussions involving PPB, the City, the Multnomah County District Attorney, and DOJ continue, though "the solution has yet to be determined". As COCL has largely been left out of these meetings, we await some type of update related to the progress being made. Until we have been provided documentation of significant progress, we cannot ascribe partial or substantial compliance for this paragraph.

We have reviewed four (4) officer involved shootings which occurred in 2015. There was one officer involved shooting still in the investigative phase which was not reviewed. Although the policy of "48 hours" is currently in effect, in only one of the cases was an officer interviewed 2 days after the lethal force event. In two cases, the officer was interviewed 3 days after the lethal force event. In the other case, the officer was interviewed 4 days after. We restate our recommendation that the "48-hour" rule be abandoned. However, while discussions continue between the Parties regarding *Garrity*, we recommend that officers be interviewed as soon as possible and that unnecessary delay not occur. As we noted in our last report, a large body of research on stress and memory does not support the claim that "two sleep cycles" are needed for memory to be fully restored (for a review of hundreds of studies, see Christianson, 2008). We further echo the sentiments of DOJ that *Garrity* restrictions do not apply to officers completing a Force Data Collection Report (FDCR).

We are the first to admit that we are not attorneys and are not experts regarding the full legal implications of *Garrity*. We therefore give deference to DOJ's legal assessment found within their September 10, 2015 Compliance Assessment Report. Our expertise in psychology and police research allows us to address the issue of perceived fairness as it relates to community views of their police, as well as the science of memory and recall, as noted above. We believe that not requiring officers to provide a statement within the first 48 hours of an officer involved shooting and not requiring officers to fill out the Force Data Collection Report can have serious implications for community trust. We recommend PPB officers be required to complete FDCR's within the same timeframe that would be expected of them in any other force event.

Reference: Christianson, S. (2008). "Emotional Stress and Eyewitness Memory: A Critical Review," In Jackie Andrade, (ed.), *Memory.* London and New York: Routledge.

| COCL Recommendations | • Provide COCL an update related to *Garrity* progress |
|---|---|

| | |
|---|---|
| | • Abandon the "48-hour" rule<br>• Require officer to complete FDCR's for OIS as in any other force event |
| **Compliance Rating Based On** | • Provision of Officer Involved Shooting case files |

---

**Settlement Agreement Paragraph**

125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Officer Involved Shooting case files; Interview PPB personnel |

**Compliance Assessment**

As part of the Homicide Detail Supervisor's Checklist for Officer-Involved Shooting, supervisors confirm they have identified and separated witnesses, "including police officers that are witnesses". In three of the four officer involved shooting case files we reviewed, the supervisor's checklist was provided. As a matter of consistency, we recommend PPB include supervisor checklists for all officer involved shootings as part of the case file.

In all four case files, however, an initial responding supervisor (usually a Sgt.) included their efforts to separate all witness and involved officers once the scene has been secured. Although the reports fail to detail a specific timeline for the separation (e.g. "Approximately 10 minutes after my arrival and after ensuring the scene was secure, I separated the witness and involved officer), we have no indication that separation was unduly delayed. In three of the cases, evidence of witness and involved officer separation was documented multiple times, by the supervisor as well as officers directed to guard the witness/involved officer.

The documents we have received and reviewed suggest that the separation of witnesses and involved officers occurs at the earliest feasible time, although on-scene observation is the only way to confirm this. However, in one instance, a non-involved officer was allowed to retrieve the involved officer's "personal phone and bag from his car". We suggest PPB discuss with COCL the circumstances of this instance in order for us to determine whether this type of interaction violates the requirement for separation.

We have reviewed the Communication Restriction Orders for all officer involved shootings. PPB is required to issues CRO's "immediately following any lethal force event". For the four cases we reviewed, CRO's were issues between 3 and 5 hours after the event. When a

lethal force event occurs, we have been told it takes the Detective Division approximately one hour to be notified and arrive on the scene.  Upon arrival, detectives are briefed by the on-scene supervisor and identify the involved officer, witness officers, and community member witnesses.  Once detectives have accomplished these tasks, they interview witness officers and issue CRO's at the conclusion of their interviews.  It is the combination of these tasks which account for the 3 to 5 hours.

We have no doubt that it takes responding detectives approximately one hour to be notified and get to the scene.  However, we are not convinced that CRO's cannot be issued immediately upon arrival or shortly thereafter.  We have been told by Detective Division personnel that issuing CRO's immediately upon arrival might cause confusion to the officers – they may believe they cannot even talk with the detectives.  However, officers should be well acquainted with protocol when there is an officer involved shooting.  They should expect that they will be issued a CRO and will subsequently be required to speak with the Detective Division.  Issuing the CRO immediately upon arrival should not create so much confusion within the officer that they believe they are no longer required to speak with the Detective Division. Assuming such confusion does arise, PPB may address this by including in the CRO the exceptions for who the officer is allowed to speak with (e.g. Detective Division, IA, IPR).  We therefore recommend CROs be issued immediately upon the Detective Division identifying witness and involved officers.  By doing this, the amount of time between the incident and the issuance of the CRO should be shortened. Also, if necessary, the detectives conducting the interviews should clarify that witness officers are allowed to speak with them and such conversations are not covered by the CRO.

In our previous report, we note that the current CRO form indicates it will be rescinded upon completion of the Detectives Division investigation.  The Agreement explicitly states the CRO will continue until the conclusion of the Grand Jury or a disposition by the District Attorney.  Our interviews with Detective Division personnel have indicated that the Grand Jury or DA disposition sometimes occurs before the completion of the Detective Division's investigation.  This may occur if the Detective Division has an open investigation for some element other than the lethal force element.  Should this be the case, the wording of the CRO should still be in compliance with the Settlement Agreement.  To accommodate the Detective Division's concerns, we recommend wording to the effect of "The CRO will be rescinded upon the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.  In the event the Detective Division investigation is still ongoing at the conclusion of the Grand Jury or District Attorney disposition, the CRO will remain in effect until the conclusion of the Detective Division investigation."  Through this wording, the Settlement Agreement is satisfied and contingencies are accounted for. Apparently, in Portland, policy dictates that all officer involved shootings are required to have a Grand Jury.  Therefore, the statement "or, if no Grand Jury is convened" is somewhat superfluous.  However, we recommend the wording of the CRO not change from that of the Agreement, as there is the potential for policy to change in the future.

| **COCL Recommendations** | • Include supervisor checklists for all officer involved shootings<br>• Explicitly inform involved and witness officers they are restricted from talking to *anyone*, even before issuance of CRO's |
|---|---|

| | |
|---|---|
| | • Issue CRO's immediately upon Detective Division identifying witness and involved officers<br>• Revise wording of CRO rescinding to comply with Par. 125 |
| **Compliance Rating Based On** | • Provision of Officer Involved Shooting case files |

### Settlement Agreement Paragraph

126. PPB shall continue to require witness officer to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Officer Involved Shooting case files; Interview PPB personnel |

### Compliance Assessment

Our review of the four officer involved shooting case files has allowed us to assess documentation of officers identified as "witnesses" being required to provide briefings to both responding supervisors as well as members of the Detective Division. However, there appear to be irregularities in how officers are classified as "witness officers". In some cases, only officers who were on scene at the time of the lethal force are considered witness officers." In these cases, officers who arrive after shots have been fired are not classified as "witness officers," even if they provide medical assistance to the subject. In other cases, responding officers who provide lethal cover and medical assistance but were not physically present during the lethal force event are classified as "witness officers," are interviewed by detectives, and are provided CRO's.

PPB has directed us to the definition of "witness member" found in Directive 1010.10. The directive states: "Witness Member: A member who observes or has firsthand knowledge of the events surrounding an in-custody death or the use of deadly physical force by another member, and other than observing the incident, did not use deadly physical force." The term "firsthand knowledge of the events" is vague, as it indicates all officers who arrive on the scene to provide medical assistance, lethal cover, or assistance in the arrest could be considered "witness members". However, this standard is not applied consistently across all events.

COCL recommends more consistent classification of witness officers. This may mean that only officers who personally witness the lethal force even will be classified as witnesses. More appropriately though, COCL recommends that all officers who have meaningful insight into the event (whether they witnessed the event, provided medical assistance, lethal cover, assistance in the arrest, or simply were the first on scene and received the initial explanation of events) be considered witness members. These individuals may be able to provide additional

59

details for the investigation and should be interviewed to "ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required."

| **COCL Recommendations** | • PPB should be consistent in its classification of witness officers and consider broadening the definition to gain a more complete understanding of the events that transpired. |
|---|---|
| **Compliance Rating Based On** | • Provision of Officer Involved Shooting case files |

---

**Settlement Agreement Paragraph**

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Officer Involved Shooting case files; Interview PPB personnel |

**Compliance Assessment**

In all four lethal force cases we reviewed, involved officers were asked to provide an on-scene walk-through and interview. In each of the cases, the response was fairly uniform: "On the advice of my attorney, I decline." We recognize police officers have 5th Amendment rights afforded to all citizens and should not be criticized for asserting that right. In the context of community trust however, we suggest PPB encourage the use of voluntary public safety statements whenever possible, with the understanding that a full interview will occur later.

We have received no documentation that there has been collaboration with the Multnomah County District Attorney. PPB needs to provide such documentation to be considered in substantial compliance with this provision.

| **COCL Recommendations** | • Provide documentation of collaboration with the Multnomah County District Attorney |
|---|---|
| **Compliance Rating Based On** | • Provision of Officer Involved Shooting case files |

**C. Conduct of IA Investigations**

---

**Settlement Agreement Paragraph**

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA.  Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interview City/PPB personnel |

**Compliance Assessment**

    Our assessment of Par. 128 ties in with the dialogue and planning process discussed in Par. 121.  The conversation occurring between the Parties related to the 180 day timeline also includes discussions of a plan to enable meaningful independent investigation by IPR.  When the plan is made available for public consumption, we will comment upon it.

| COCL Recommendations | • The Parties should come to an agreement regarding the plan for Pars. 121 and 128 |
|---|---|

---

**Settlement Agreement Paragraph**

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review case files for allegations of use of excessive force; Review case files for declination of investigation; Interview IPR/IA personnel |

**Compliance Assessment**

    In November of 2015, COCL requested and was provided case files for fourteen (14) allegations of use of excessive force investigated by the Internal Affairs Division of the PPB and considered "closed".  COCL also requested and was provided case files for four (4) declined investigations by IPR for the third and fourth quarter of 2015.  We have reviewed all case files

61

for information related to Par. 129.

For allegations of use of excessive force, all cases appear to have been given a full and complete IA investigation. Each investigation has corresponding findings and in all but one file, documentation of findings was found in a letter addressed to the complainant. In one file, documentation of findings was found, though no letter addressed to the complainant was found. While we cannot be sure whether a letter was sent (and just not included in the case file), we recommend IA ensure that a letter of findings is always sent to the complainant and the documentation of such letters is always included in the case file.

For declinations of IPR investigations, we found one case that did not necessarily meet the language of the Settlement Agreement. In this case, the complaint was filed 20 months after the incident occurred. In the dismissal notification, IPR states, "Complaints must be timely filed for a variety of good reasons including memories are fresher, witnesses are easier to locate and physical evidence may still be recovered." COCL agrees that cases filed nearly two years after the incident are more difficult to investigate. However the language of the Agreement states that the allegation must have "no basis in fact". We recommend IPR re-open this case in order to comply with the Settlement Agreement.

The difficulty of the investigation should not be the primary determinant of whether a case is investigated if the case appears to have some degree of factual merit. In another case of declination (though declined for more legitimate reasons), the complaint was filed nine years after the occurrence. One IPR investigator commented in that case, "Not clear, to IPR investigator, whether this has to be a full administrative investigation based on force allegation, or whether other dismissal reasons – such as timely filing – are applicable here." Thus there appears to be some confusion, even within IPR, as to the supremacy of the Agreement's wording. We recommend that in cases of such confusion, the Agreement takes precedent and cases be declined only when the allegation has no basis in fact (the case was ultimately declined because the involved officers either worked for another agency or had since retired. Therefore, IPR would not have jurisdiction to investigate the officers).

| COCL Recommendations | • Ensure letter of findings is sent to complainant and included in case file documentation<br>• Provide supremacy to the wording of the Agreement over other declination reasons, such as timely filing |
|---|---|
| Compliance Rating Based On | • Provision of case files for allegations of excessive use of force<br>• Provision of case files for declinations of allegations of excessive use of force |

### Settlement Agreement Paragraph

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Directive 310.20 |

### Compliance Assessment

Directive 310.20 was reviewed in July of 2015 and is slated to for an annual Universal Review in July of 2016.  We restate the assessment from our last report that Directive 310.20 must "expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct".  As it currently stands, Directive 310.20 speaks to retaliation in general but does not provide the express prohibition found in this provision.

| COCL Recommendations | • Revise Directive 310.20 to fully comply with Par. 130 |
|---|---|
| Compliance Rating Based On | • General retaliation prohibited but not specific |

### Settlement Agreement Paragraph

131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below".  The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, and the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Directive 336.00; Review City Code 3.20.140 |

### Compliance Assessment

Neither PPB Directive 336.00 nor City Code 3.20.140 has undergone changes since our last report.  Furthermore, we have not been provided documentation related to a membership rotation protocol from the Auditor or a protocol for ensuring continued qualification for subsection (d).  There also remains the lack of consistency between the Directive and City Code.  Thus, we reiterate the recommendations from our last report and look forward to speaking with PPB and the Auditor in the first and second quarter of 2016 to resolve these

| | |
|---|---|
| issues. | |
| **COCL Recommendations** | • Revise Directive 336.00 and City Code 3.20.140 to comply with Par. 131 and subsections<br>• Provide documentation of the membership rotation protocol required in subsection (b)<br>• Provide documentation for ongoing qualifications required in subsection (d) |
| **Compliance Rating Based On** | • Prior incorporation of some aspects of Par. 131 |


**Settlement Agreement Paragraph**

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review PPB Directive 336.00; Review City Code 3.20.140 |

**Compliance Assessment**

    PPB has complied with this provision in that Directive 336.00 includes this language. However, such authority has not been memorialized in City Code 3.20.140.  As with our assessment of Par. 131, both the PPB Directive and City Code should reflect the requirements of the Settlement Agreement.  We have also not had the opportunity to observe whether the language of the directive is actually being put into practice, as no cases were returned by the PRB in the third or fourth quarter of 2015.  We will continue to monitor compliance with this provision in practice.

| | |
|---|---|
| **COCL Recommendations** | • Revise City Code 3.20.140 to be consistent with the requirements of the Settlement Agreement. |
| **Compliance Rating Based On** | • Revision of Directive 336.00 to include language of Par. 132 |

**Settlement Agreement Paragraph**

133. <u>COCL Summary</u>:  Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions.  The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding.  (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review SOP #42 |

**Compliance Assessment**

There were no findings of liability in the third or fourth quarter of 2015.  Upon an instance wherein an officer is found liable in a civil trial, we will evaluate the requirements of Par. 133.

| <u>COCL Recommendations</u> | • No recommendations at this time |
|---|---|
| <u>Compliance Rating Based On</u> | • Provision of SOP #42 (officer's fitness to participate in specialized units) |

**D. CRC Appeals**

**Settlement Agreement Paragraph**

134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions.  The quorum of CRC members necessary to act may remain at its existing level.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review City Code 3.21.080 |

**Compliance Assessment**

We have reviewed City Code 3.21.080 and find that the wording of Par. 134 continues

to be satisfactorily incorporated into the code.  We have no reason to believe the CRC members are not "neutral, unbiased, and capable of making objective decisions."  We will continue to monitor the compliance with this paragraph and the functioning of the CRC as a body.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • City Code 3.21.080 found on City website |

---

### Settlement Agreement Paragraph

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review.  The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed.  The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted.  The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PSF-5.03 |

### Compliance Assessment

Under the City's website, Charter Code and Policies, PSF-5.03 related to CRC, the changes we recommended in our previous report have been incorporated.  The City has brought PSF-5.03 into compliance with the wording of the Agreement.  We have not been provided any documentation indicating there has been an appeal wherein a request for additional information occurred.  We recommend PPB provide COCL with documentation when such an occasion occurs.

| **COCL Recommendations** | • Provide COCL with documentation when a request for additional information occurs |
|---|---|
| **Compliance Rating Based On** | • Charter Code and Policy code PSF-5.03 found on City website |

66

**E. Discipline**

---

### Settlement Agreement Paragraph

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Directive 338.00 and corresponding Discipline Guide; Review Corrective Action Recommendation Form; Review revised SOP #34 |

### Compliance Assessment

Directive 338.00 and its corresponding Discipline Guide are still in the Executive Reconciliation phase.    Thus we have no recommendations at this time other than recommendations stated in previous reports.

PPB has provided documentation requiring supervisors to check a box indicating they have consulted the Discipline Guide when recommending corrective action.  In addition, should a supervisor go outside the suggested corrective action, they must provide a written explanation for deviation from the suggested corrective action.

We are in support of the steps taken by PPB to utilize the Discipline Guide and require a written rationale for any deviation.  We anticipate the release of the finalized version Directive 338.00 and the corresponding discipline guide.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Directive 338.00 being in Executive Reconciliation phase<br>• Provision of Corrective Action Recommendation form |

---

**F. Communication with Complainant and Transparency**

---

### Settlement Agreement Paragraph

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the

---

67

City shares with complainants requested documentation about his or her own compliant to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action.  The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review IPR website; Review IPR protocols |

**Compliance Assessment**

We reviewed the requirements of Pars. 138 and 140 in our last report and found them to be satisfied with the documentation we had been provided.  We remind the City that all documentation references in Par. 140, including a mailed letter of findings, must be sent and kept in the case file (see our assessment of Par. 129).  With regards to Par. 139, we have yet to discuss with IPR how its protocols have changed (if at all) as a result of a protocol review.  We will discuss this with IPR in the first and second quarter of 2016. We will also encourage the City to conduct a periodic review (if not already done) to ensure that complainants are satisfied with the website complaint process (par. 138) and have received details about the processing and outcome of the complaint (par. 139 and 140).

| COCL Recommendations | • IPR should discuss with COCL how protocols have been revised<br>• If not currently done, the City should periodically review the IPR protocol to ensure that access and documentation is adequate from the perspective of complainants |
|---|---|
| Compliance Rating Based On | • Information found in IPR website |

# IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD

**Settlement Agreement Paragraph**

141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Community Oversight Advisory Board ("COAB"), within 90 days of the Effective Date of this Agreement. The COAB shall be authorized to: (a) independently assess the implementation of this Agreement;(b) make recommendations to the Parties and the COCL on additional actions; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) provide the community with information on the Agreement and its implementation; (e) contribute to the development and implementation of a PPB Community Engagement and Outreach Plan ("CEO Plan"); and (f) receive public comments and concerns.

142. Membership of the COAB shall be comprised of fifteen (15) voting members, five (5) advisory members, and the COCL. (See Settlement Agreement for specific selection criteria).

143. The 15 voting members of COAB are independent of the City and PPB and shall not be currently employed by the City. Members must agree to serve for a minimum of a two-year term, and may be reappointed for one additional year. The COAB may create an executive committee or other subcommittees, as appropriate, to accomplish the tasks designated to it under this Agreement. The City shall provide administrative support so that the COAB can perform the duties and responsibilities identified in this Agreement.

144. The COAB shall report to the COCL. The COCL will chair the COAB, preside over COAB meetings, take and count votes, and perform such other activities as are necessary for the efficient operation of the COAB. If the COCL determines that a COAB member is no longer fit to serve on account of misconduct, the COCL shall consult with DOJ prior to removing such member. Following the removal of a COAB member, an alternative shall be selected from the same pool of applicants as the removed COAB member.

145 (See Settlement Agreement for description of selection process for five community members)

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Interview City personnel and COAB members; Observe and participate in COAB process |

**Compliance Assessment**

Given that this is an assessment of PPB's and the City's compliance with the Settlement

Agreement, we will only comment here on specific issues which are the responsibility of the City.

The City has continued to provide support for meeting space, refreshments, accommodations, audio-video needs, and IT support for the COAB.  COAB meetings are able to occur in convenient locations for members of the Portland community, located near light rail, streetcar, and bus stops.  In addition to resources for COAB meetings, the City has continued to provide resources for personnel related to COAB functions, including a Program Support Specialist and a Mental Health Specialist.  The City has also helped to clarify public meeting laws and resolve disputes and complaints that have arisen. Furthermore, the City has provided resources to the COCL in the form of a permanent office space that is located near light rail, streetcar, and bus stops.  In our opinion, this permanent office meets the criteria identified by DOJ.

As the COAB is now in its second year, we restate the urgency of our previous report that the City work with the COCL, DOJ, AMAC, and other stakeholders to clarify the process for replacing alternates and replacing COAB members when their term ends in February of 2017. Initial conversations occurred in the third and fourth quarter of 2015, but process must continue.

| COCL Recommendations | • Continue to work with COCL and COAB to provide administrative and material support necessary to the ongoing work<br>• Work with stakeholders to clarify the process for replacing alternates<br>• Work with stakeholders to plan for the end of COAB term in February of 2017 |
|---|---|
| Compliance Rating Based On | • Observation of COAB meetings<br>• COCL utilization of permanent office space |

---

**Settlement Agreement Paragraph**

146. COCL Summary:  Paragraph 146 states that, "To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan." The subsections of Par. 146 include items related to the Community Survey, the survey of PPB members, two public hearings to gather community feedback on PPB community engagement plan, COAB review of PPB CEO plan, COAB solicitation of input from Human Rights Commission Community Police Relations Committee, including work to implement 2009 PPB "Plan to Address Racial Profiling, and COAB recommendations on CEO plan. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Community Survey results; Review PPB Internal Survey |

| | results; Review results of public hearing; Interview City personnel and COAB members; Observe PPB presentation of prior community outreach efforts |
|---|---|

### Compliance Assessment

Found within Par. 146 are nine (9) subsections of tasks related to the development of a CEO Plan.  We provide updates to the progress which has been made for each of these tasks.

Subsection (a) requires the City to conduct a survey of Portland community members and police regarding perceptions of PPB outreach efforts, accountability efforts, and areas for PPB improvement.  The City conducted such a survey, contracting with DHM Research.  The results of the survey were released by DHM Research in September of 2015.  In December of 2015, COCL released the complete survey results for personnel within the Portland Police Bureau.  Both of these surveys have been reviewed by the COAB and will be incorporated into the CEO Plan.

Also related to Subsection (a), we are recommending that the City and PPB implement a police-community contact survey, which is essentially a client satisfaction survey.  While the survey performed by DHM reached a representative portion of the Portland Community, a large percentage of community members had not been in contact with a Portland police officer within the past year.  Thus, the opinion of individuals who interact with the police may not be adequately captured through a community survey.  The opinion of people living with mental illness should also be captured via the contact survey.  Thus, we are proposing a contact survey that will give voice to most Portland residents who have had a recent contact with a PPB officer, including people living with mental illness.  These data are not only critical for evaluating the effectiveness of police training, but can provide importance guidance to the CEO Plan.  We have had initial conversations with the City and PPB regarding contact survey in the third and fourth quarter of 2015 and will address survey details in the first and second quarter of 2016. (The contact survey is discussed in greater detail in the COCL's Outcome Assessment report).

We are recommending the City, in cooperation with the COAB and COCL, begin a focus group methodology to gain a more in-depth understanding of the populations served by the PPB.  This includes multiple focus groups for people living with mental illness, as well as focus groups for youth, LGBT, and houseless populations.  In the third and fourth quarter of 2015, we secured a financial pledge from the City for focus groups and will be working to agree on the methodology for the focus groups in the first and second quarter of 2016.

Subsection (b) requires the COAB to hold two (2) public hearings.  The first of these public hearings has already occurred and the second public hearing is slated to occur in late July/early August of 2016.  Community sentiment after the first public hearing indicated a more thoughtful approach was necessary for the second public hearing.  Thus, COCL, COAB, and PPB have dedicated time and energy to ensuring a smooth, informative public hearing rather than attempt to put one together hastily.

Subsection (c) requires the COAB to review PPB's prior community outreach efforts.  In November of 2015, members from the PPB presented to the COAB on the style and scope of current, prior, and future community outreach.  We observed this meeting and felt the

71

presentation was informative and insightful.

Subsection (d) requires COAB to solicit and consider input from the HRC's Community Police Relations Committee (CPRC). In November of 2015, the CPRC attended the COAB's Community Engagement and Outreach Plan Subcommittee (CEOPS) meeting. Further consultation will occur in the first and second quarter of 2016.

Subsection (e) requires the COAB and PPB to review and analyze the results of the survey and other public comments. This occurred in the first quarter of 2016 and will therefore be discussed in our next report.

Subsection (f) describes what PPB's CEO Plan should consist of. The CEO Plan requires further input from the community, informed through the methodologies described above. The CEO Plan is therefore pending contingent upon completion of other tasks found in Par. 146.

Subsection (g) provides COAB the authority to provide information to the PPB on other areas related to community engagement and outreach. This has occurred through the collective discussions and votes from COAB meetings.

Subsection (g2) requires COAB to submit its recommended CEO Plan to the Chief within 90 days of the COAB's completion of survey analysis (Please note that a typo found within Par. 146 results in there being two instances of a subsection being labeled (g). We refer to the second instance as Subsection (g2)). The presentation of the community survey occurred in January of 2016 and will therefore be discussed in our next report.

Subsection (h) requires PPB to utilize COAB recommendations and develop a final proposed CEO Plan. This CEO Plan is then to be presented to the COAB. As the COAB has not yet provided a recommended CEO Plan, PPB has not had the opportunity to create a final proposed CEO Plan.

| COCL Recommendations | • The City should implement a police-community contact survey and focus group methodologies. The contact survey should include both mental health and non-mental health contacts within Portland<br>• COAB and PPB should continue to work together to move towards the creation of a CEO Plan |
| --- | --- |
| Compliance Rating Based On | • Observation of COAB meetings<br>• Observation of public hearing<br>• Review of community survey results<br>• Review of PPB internal survey results |

**Settlement Agreement Paragraph**

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, together with the COAB, may develop outreach and policing programs specifically tailored to the residents of the precincts.

148. PPB shall continue to require that officers document appropriate demographic data

regarding the subjects of police encounters, including the race, age, sex, and perceived mental health status of the subject, and provide such information to the CPRC to contribute to their analysis of community concerns regarding discriminatory policing. In consultation with the COAB and CPRC, PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Review demographic maps, place of birth table, and Precinct demographics tables compiled by PPB |

**Compliance Assessment**

PPB has compiled tables and maps displaying demographic variables for different Precincts.  The demographics collected include elements related to race/ethnicity, gender, age, economic status, disability, education, and housing.  We believe the range of demographics collected is sufficient to satisfy the first part of Par. 147.  However, Par. 147 also requires the Precinct Commanders to coordinate with the COAB to develop outreach and policing programs specifically tailored to the residents of the precincts.  To our knowledge, this has not yet occurred and we recommend Precinct Commanders schedule time with the COAB to accomplish this.  We further recommend COAB review the demographics shown in the PPB tables and solicit input from a sample of community members from various demographic groups in order to better contribute to the discussion with the Precinct Commander.

PPB gathers demographic data regarding the subjects of police encounters, though we await the implementation of the MH Mask to better capture perceived mental health status. The Stops Data Reports are provided on the PPB website and have been created for the third and fourth quarter of 2015 (as well as previous quarters).  However, to our knowledge, PPB has not consulted with COAB regarding enhancements to data collection efforts, and we have not been provided documentation that consultation with CPRC has occurred.

Although PPB provided COCL with a Data Enhancement Report in the first quarter of 2015, PPB has not provided COCL with one since.  We recommend PPB provide this to COCL in the supporting documentation folders each quarter.

| **COCL Recommendations** | • Coordinate with COAB to develop specifically tailored outreach and policing programs |
| --- | --- |
| | • Coordinate with COAB and CPRC regarding enhancements to data collection efforts |
| | • Provide COCL with Data Enhancement Report quarterly |
| **Compliance Rating Based On** | • Provision of Precinct demographic data |

**Settlement Agreement Paragraph**

149. The COAB, COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach.

| Compliance Label | Not Yet Assessed |
|---|---|
| Methodology | Review Community Survey results; Review PPB Internal Survey results; Review results of public hearing; Interview City personnel; Observe PPB presentation of prior community outreach efforts |

**Compliance Assessment**

The ability of the COAB, COCL, PPB, and DOJ to jointly develop metrics to evaluate community engagement and outreach is contingent upon the satisfaction of Par. 146's provisions.   In 2015, significant progress was made by implementing the citywide Community survey and the PPB internal survey. The development of new metrics should continue in 2016 with the Contact survey and other methods preferred by the COAB and other stakeholders.

| COCL Recommendations | • Reiterating par. 146, develop and institutionalize a contact survey to measure public satisfaction with police encounters<br>• In collaboration with the COAB, develop other metrics and methods for engaging demographic segments of the community |
|---|---|
| Compliance Rating Based On | • Absence of elements necessary for metric development |

---

**Settlement Agreement Paragraph**

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be reviewed by the COAB before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| Compliance Label | Not Yet Assessed |
|---|---|
| Methodology | Interview PPB personnel |

**Compliance Assessment**

| | |
|---|---|
| PPB did not release an Annual Report in the third or fourth quarter of 2015. However, PPB did release a draft of the Annual Report in the first quarter of 2016 and we anticipate being able to discuss the Annual Report in our next assessment. | |
| **COCL Recommendations** | • Gather and incorporate community input into finalized version of Annual Report through precinct meetings, City council meetings, and COAB meetings |
| **Compliance Rating Based On** | • PPB Annual Report not due in third or fourth quarter of 2015 |

---

**Settlement Agreement Paragraph**

151. The COAB may make recommendations approved by a majority of its membership regarding implementation of the terms of this Agreement.

| Compliance Label | N/A |
|---|---|
| Methodology | N/A |

**Compliance Assessment**

As the Chair of the COAB, we refrain from making compliance determinations regarding COAB responsibilities. However, we will comment on the progress of the COAB and any factors related to the efficient operation of the COAB. The COAB has made multiple recommendations regarding the implementation of the terms of this Agreement. The large majority of recommendations focus on policy change. We continue to work with the COAB to refine the process for reviewing recommendations and PPB policy directives so that the COAB has the time to hear from all of its members and attend to other aspects of the COAB's agenda that have received less attention.

The COCL has compiled the COAB's recommendations and forwards them to DOJ for review prior to policy discussions with PPB. DOJ takes into consideration recommendations from the COAB and COCL (when such recommendations are available) before engaging in policy discussions with PPB. In some instances, we have incorporated COAB recommendations into the COCL's recommendations to PPB and the City through our compliance and outcome reports. We are aware that COAB has felt frustration at the lack of feedback related to their work. Numerous formal recommendations by the COAB have received very little commentary from DOJ, the COCL, or PPB. This is, no doubt, upsetting and discouraging to COAB members. This is one issue that needs to be addressed to further validate the work of the COAB. We thank the COAB for their time and encourage them to continue with the quality of work we have seen from them thus far.

| **COCL Recommendations** | • COAB continue to create a balanced agenda that gives time to all segments of the Portland community and all agenda items |
|---|---|

| | • COAB continue to work with the PPB on community engagement and police-community relations |
|---|---|
| **Compliance Rating Based On** | • COAB actions and recommendations |

---

### Settlement Agreement Paragraph

152. The COAB shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Team, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The COAB shall also provide the opportunity for public comment at each of its meetings to keep open lines of communication with the public-at large.

| **Compliance Label** | Non-Compliance but Initial Steps Taken |
|---|---|
| **Methodology** | Observe COAB meetings; Observe PPB presentation on prior community engagement efforts |

### Compliance Assessment

The COAB worked with PPB and the City to outline a plan to co-create the CEO Plan. As part of this work plan, an initial meeting with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Team, and a representative of the Office of Neighborhood Involvement Crime Prevention was placed on hold until after COAB had a chance to review PPB's prior community engagement efforts (Par. 146(c)). This review of PPB's prior community engagement efforts began in November 2015 with a presentation, and COAB's Executive Committee requested follow up in Q1 2016. However, to date, the required meeting of the COAB with the officials designated in paragraph 152 has not occurred. We strongly recommend that at least one such meeting occur before the end of the second year of the Settlement Agreement.

| **COCL Recommendations** | • PPB and the City need to meet with COAB by the end of the second year of the Settlement Agreement |
|---|---|
| **Compliance Rating Based On** | • COAB meetings<br>• PPB presentations |

---

### Settlement Agreement Paragraph

153. A representative of the Oregon U.S. Attorney's Office shall be invited to attend all COAB

| | |
|---|---|
| meetings. | |
| **Compliance Label** | N/A |
| **Methodology** | N/A |

**Compliance Assessment**

A representative of the Oregon U.S. Attorney's Office has been invited to attend all COAB meetings.  A representative has, in fact attended nearly all, if not all, COAB meetings. The COAB meetings have often been enriched by information and insight provided by such representatives.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Compliance Rating Based On** | • Observation of COAB meetings |

**Settlement Agreement Paragraph**

154. COAB shall meet as needed to accomplish their objectives as set forth in this Agreement. All COAB meetings shall be open to the public. In addition, COAB shall attend quarterly meetings with the COCL as provided in Par. 163. To the extent that COAB meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the COCL to ensure compliance with those laws and agrees to represent COCL in any challenges regarding compliance with those laws.

155. The City shall provide COAB members with appropriate training necessary to comply with requirements of City and State law.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interview DOJ and City personnel; Observe COAB meetings |

**Compliance Assessment**

The City's responsibilities in Pars. 154 and 155 continue to be fulfilled to the extent that the COAB and COCL have requested their assistance.  Upon any indication of legal issues dealing with the operation of the COAB, identified by the COCL, COAB, or the City, we have requested legal advice from the City Attorney's Office. We have asked on numerous occasions for the City to opine as to legal matters and the City Attorney's Office been assisted in every instance. We expect that the City will continue to provide sound legal advice, and feel they have substantially complied to this point with the requirements of these Paragraphs.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Compliance Rating Based On** | • Observation of COAB meetings |

# X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT

### Settlement Agreement Paragraph

156. PPB shall implement immediately all provisions of this Agreement which involve the continuation of current policies, procedures, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement.  Except where otherwise specifically indicated, PPB shall implement all other provisions of this Agreement no later than within 180 days of the Effective Date.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review documents related to policies, procedures, practices specific to force, training, community-based mental health services, crisis intervention, EIS, officer accountability, and community engagement; Interview City/PPB personnel; Observe meetings and trainings |

### Compliance Assessment

As we cautioned previously, substantially implementing the conditions of the Agreement will take time, resources and continued commitment by the City of Portland.  We encourage the PPB and the City to prioritize their efforts to implement provisions which are time sensitive, with the understanding that both DOJ and the COCL will work with the City to respect these priorities.  Delays in implementation have not always been the fault of the City. Core policy directives related to use of force and mental health need to be finalized so that the PPB can prepare a revised training curriculum for 2016.   The COCL is confident that the City and PPB are making a good faith effort to implement the recommended changes.  We maintain that the quality of work should supersede expeditiousness, and while that PPB and the City should work quickly, we are more concerned that they work conscientiously.

In the third and fourth quarters of 2015, the City, PPB, DOJ and the COCL have worked together in a coordinated fashion to facilitate communication and reasonable expectations.  As a result, we feel the process has been significantly improved.

| COCL Recommendations | • Continue to prioritize efforts to implement provisions which are time sensitive<br>• Continue to work expeditiously while maintaining quality of work<br>• Continue to work with DOJ and the COCL to communicate concerns and expectations |
|---|---|
| Compliance Rating Based On | • Provision of all related documents identified throughout this report |

79

**Settlement Agreement Paragraph**

158. All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations.  Audits and reports shall be posted on PPB's website.

159. PPB shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to PPB decision making and activities, and compliance with this Agreement, in accordance with the Oregon Public Records Law.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review PPB website; Review PPB Quarterly Updates |

**Compliance Assessment**

PPB posts reports, audits, and other data/information relevant to their work in implementing the Agreement to their website.  PPB also posts their Quarterly Updates for public review.

Some members of the COAB have made requests for data regarding PPB activities. Given multiple requests, a process was created by the COCL to coordinate and respond to such requests.  While some information requests have been fulfilled by the PPB, while others have not for a host of reasons. This is an ongoing and difficult process that will be discussed more in our next report, as we try to establish reasonable requests for access to data in 2016.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Information found on PPB website |

**Settlement Agreement Paragraph**

165. PPB will hire an employee familiar with the operations of PPB for the duration of this Agreement, to serve as a PPB Compliance Coordinator.  The Compliance Coordinator will serve as a liaison between PPB and both the COCL and DOJ and will assist with PPB's compliance with this Agreement.  At a minimum, the Compliance Coordinator will: (COCL summary) The subsections of Par. 165 identify the requirements of the PPB Compliance Coordinator, including coordination of compliance activities, maintaining and providing documentation to COCL and DOJ, assigning compliance tasks to PPB personnel, and being primarily responsible for collection the information the required by the COCL.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interview  Compliance Coordinator and other PPB and City personnel |

### Compliance Assessment

We continue to have weekly interactions with the Compliance Coordinator.  The COCL team has been impressed by the professionalism and competence of the Compliance Coordinator and his staff. On the whole, they have been very responsive to our inquiries, arranged meetings, provided access to information, and assisted us in navigating the organizational terrain of the PPB.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Weekly conferences with PPB Compliance Coordinator |

### Settlement Agreement Paragraph

166. The COCL shall have full and direct access to all PPB and City staff, employees, facilities, and documents that the COCL reasonably deems necessary to carry out his/her duties.  If a document requested by the COCL is privileged attorney-client communication, the COCL shall not disclose the document in a manner that destroys that privilege without the approval of the City Attorney.  The COCL shall cooperate with PPB and the City to access people, facilities, and documents in a reasonable manner that minimizes, to the extent possible, interference with daily operation.  In order to report on PPB's implementation of this Agreement, the COCL shall regularly conduct reviews to ensure that PPB implements and continues to implement all measures required by this Agreement.  The COCL may conduct on-site reviews without prior notice to PPB or the City.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Request access to PPB and City staff, employees, facilities and documents |

### Compliance Assessment

In general, PPB and the City have been accommodating to the COCL's requests.  They have followed our recommendation to ensure that all documents related to compliance have been included in their corresponding folders in the supporting documents section of the Quarterly Update reports.  In instances where we feel further documentation is warranted, it often takes no more than an email or phone call to request and be provided such documents.

However, in one area, we have been met with hesitation related to requested documents. We have requested, but have not received raw data from the training evaluations. The argument given is that release of information would somehow breach confidentiality with training participants. We disagree. Currently, surveys are anonymous, meaning that the officer's name or other identifying information is not included on the survey. Even if identifying information were on the surveys, it could be deleted from the data file sent to the COCL. The COCL is concerned with how the class is rated, how much students are learning, and what implications this has for changing the training class and improving the PPB. We look forward to resolving this issue with PPB.

| **COCL Recommendations** | • Provide the training evaluation data to the COCL |
|---|---|
| **Compliance Rating Based On** | • General accommodation to COCL requests |

---

### Settlement Agreement Paragraph

169. Within 180 days of the Effective Date, PPB shall revise and/or develop its policies procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. PPB shall revise and/or develop as necessary other written documents such as handbooks, manuals, and forms, to effectuate the provisions of this Agreement. PPB shall send new or revised policies, procedures, protocols, and training curricula regarding use of force, interactions with persons in mental health crisis and systems of accountability to DOJ as they are promulgated, with a copy to the COCL. DOJ and the COCL will provide comments within 45 days and will not unreasonably withhold recommendations about policies, procedures, protocols, and training curricula. The COCL shall seek the timely input of the relevant members of the Training Division and patrol officers, as well members of the community. If the City disagrees with DOJ's comments, the City shall, within 14 days of being informed of the DOJ's comments, inform the Parties in writing of the disagreement. Within 14 days thereafter, the Parties shall meet and confer on the disagreement at a mutually agreeable time. Upon approval by the Parties, policies, procedures, training curricula, and manuals shall be implemented within 30 days of agreement or the Court's decision. PPB shall provide initial and in-service training to all officers and supervisors with respect to newly implemented or revised policies and procedures. PPB shall document employee review of and training in new or revised policies and procedures.

170. The Chief shall post on PPB's website final drafts of all new or revised policies that are proposed specific to force, training, community based mental health services, crisis intervention, employee information system, officer accountability, and community

engagement, to allow the public an opportunity for notice and comment, prior to finalizing such policies.

171. The Chief's Office shall coordinate a review of each policy or procedure required by this Agreement 180 days after such policy or procedure is implemented, and annually thereafter (on a regularly published schedule), to ensure that such policy or procedure provides effective direction to PPB personnel and remains consistent with the purpose and requirements of this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review PPB website for directives |

### Compliance Assessment

PPB continues to post directives up for Universal Review to their website to solicit and gather community input on revisions.  PPB is currently waiting to post many revised directives related to this Agreement. The delays experienced are more related to the process of COCL and DOJ review than any unnecessary delay on the part of PPB.  (The COAB is also far ahead of the review schedule).

| COCL Recommendations | • No recommendations |
|---|---|
| Compliance Rating Based On | • Information found on PPB website |

### Settlement Agreement Paragraph

172. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review directives and accountability mechanisms |

### Compliance Assessment

Our evaluation of Par. 172 is found within various provisions assessed in previous sections.  We will continue to evaluate whether policies are uniformly applied and officers are held accountable when they violate policies.  This requires new forms of documentation and measurement systems as described in this report and in a separate Outcomes report prepared by the COCL.  Some new forms of documentation and measurement systems recommended by the COCL have been implemented in some fashion; others still must be implemented.

| However, progress is being made and we will continue to monitor such progress. | |
|---|---|
| **COCL Recommendations** | • See recommendations made in previous sections |
| **Compliance Rating Based On** | • Preponderance of documents and systems of accountability previously addressed in this report |

---

**Settlement Agreement Paragraph**

176. Beginning with the COCL's first quarterly report, as set forth in paragraph 166 of this Agreement, PPB shall prepare a status report no later than 45 days before the COCL's quarterly report is due.  The PPB Compliance Coordinator shall lead the effort in preparing this status report and shall provide copies to the COCL, DOJ, and the public.  PPB's report shall delineate the steps taken by PPB during the reporting period to comply with each provision of this Agreement.

177. PPB shall maintain all records, as applicable, necessary to document their compliance with the terms of this Agreement and all documents expressly required by this Agreement.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB Quarterly Update reports and corresponding documents |

**Compliance Assessment**

PPB has consistently provided the Quarterly Update reports required in Par. 176 of the Agreement.  These status reports contain the delineation of "steps taken by PPB during the reporting period to comply with each provision of this Agreement".  We credit the PPB for their efforts in providing these reports and look forward to receiving them each quarter.

PPB has also maintained relevant records related to their compliance efforts and documents expressly required by the Agreement.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Information available on PPB website |

84

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizens Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**Parties, The:** The Parties involved with the Settlement Agreement – The City of Portland (City) and the Department of Justice (DOJ)

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council