**United States v. City of Portland**

**2016 Settlement Agreement Compliance Assessment**

| Settlement Agreement Heading | |
|---|---|
| III. USE OF FORCE | **Partial Compliance – improvement noted** |
| A. Use of Force Policy | **Partial Compliance – improvement noted** |
| B. Compliance Audits Related to Use of Force | **Partial Compliance – improvement noted** |
| IV. TRAINING | **Partial Compliance – improvement noted** |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | **Substantial Compliance** |
| VI. CRISIS INTERVENTION | **Provisional Substantial Compliance** |
| A. Addictions and Behavioral Health Unit and Advisory Committee | **Partial to Substantial Compliance** |
| B. Continuation of Crisis Intervention ("C-I") Program | **Partial Compliance – improvement noted** |
| C. Establishing "Memphis Model" Crisis Intervention Team | **Provisional Substantial Compliance** |
| D. Mobile Crisis Prevention Team | **Substantial Compliance** |
| E. Service Coordination Team | **Substantial Compliance** |
| F. Bureau of Emergency Communications ("BOEC") | **Partial Compliance** |
| VII. EMPLOYEE INFORMATION SYSTEM ("EIS") | **Partial Compliance – improvement noted** |

| | |
|---|---|
| VIII. OFFICER ACCOUNTABILITY | **Partial Compliance – improvement noted** |
| A. Investigation Timeframe | **Partial Compliance – improvement noted** |
| B. On Scene Public Safety Statements and Interviews | **Partial Compliance – improvement noted** |
| C. Conduct of IA Investigations | **Partial Compliance** |
| D. Citizen Review Committee ("CRC") Appeals | **Substantial Compliance** |
| E. Discipline | **Partial Compliance – improvement noted** |
| F. Communication with Complainant and Transparency | **Substantial Compliance** |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD ("COAB") | **Non-compliance – significant barriers noted** |
| X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT | **Partial to Substantial Compliance** |

## III. USE OF FORCE

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness: (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied. PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible. In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons, including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function. To achieve these outcomes, PPB shall implement the requirements set out below.

| Status | **Partial Compliance—Ongoing obligation** |
|---|---|
| **Analysis** | Compliance with this Paragraph requires that PPB draft policies that incorporate the Agreement's requirements, and that PPB achieve the designated outcomes by training to the policies, applying them, and verifying that the policy requirements are being met in practice. This Paragraph also requires implementation of the subsequent Paragraphs in this Section. <br><br> Policies <br><br> As of this report, PPB has not revised its existing use of force policy. PPB published a draft of its use of force policy, Directive 1010.00, in November 2015. Compliance Officer Community Liaison ("COCL") and COAB commented on the policy in April 2016. During the past year, the Parties have engaged in negotiations surrounding implementation of the Settlement Agreement's force reporting requirements. Though these negotiations have not resolved the issues, Department of Justice ("DOJ") and the City will endeavor to agree upon force policies compliant with the Settlement Agreement. DOJ and PPB are scheduled to discuss necessary changes to the policy in October 2016. <br><br> The current PPB Directive 1010.00 includes some of the requirements of the Agreement, but PPB must revise the policy to comport with all Settlement Agreement requirements. Directive 1010.00 emphasizes that *force must be objectively reasonable under the totality of the circumstances*. But Directive 1010.00 does not require that Members use *force no greater than necessary to accomplish a lawful objective*. The current 1010.00 does not address the *use of non-force and verbal techniques* to effect compliance (although PPB has revised Directive 850.20, "Police Response to Mental Health Crisis," to address this requirement for the subset of calls involving actual or perceived mental illness and |

crisis).  Directive 1010.00 does not call for *minimizing the use of force against individuals in crisis or with mental illness*; it calls only for Members, when deciding whether to use force, to "take into account all information, when feasible, including [indications] that a person has, or is perceived to have, mental illness." Directive 1010.00 does not prohibit Officers from *using force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function*.

Directive 1010.00 provides poor direction to Members on *documentation and reporting of force*.  *See* comments to Paragraph 69.

As to *proper investigation, review, evaluation, and remedies of force*, Directive 940.00 requires After Action Reports for many types of force, but the policy requires further revision.  *See* comments to Paragraph 70.

Training

Portland Police Bureau provided training lesson plans from its 2014 and 2015 Advanced Academy classes (*i.e.*, recent cadet graduates of state law enforcement training), and for in-service training that DOJ and COCL observed in December 2015.  These lesson plans largely reinforced the point that Members may only use *force that is objectively reasonable* under the totality of the circumstances, and that weighing the factors recited in *Graham v. Connor* must support such a determination.  These points were featured in classroom trainings and scenario-based trainings alike.  However, the lesson plans do not instruct Officers to use *force that is no greater than necessary to accomplish a lawful objective*, and in fact, sometimes expressed a contrary view:  several lesson plans opined that "*Graham* does not allow for a 'least force' or 'best option' analysis."  *See, e.g.*, Lesson Plan – 2014-1 Advanced Academy – Use of Force, at 2 (on file).  Use of force lesson plans encouraged Officers to consider known or suspected mental illness, but did not highlight *minimizing use of force against individuals in crisis or with mental illness*.  Use of force trainings did not appear to focus on *verbal de-escalation and non-force techniques*, although DOJ observed such a lesson for Members seeking the specialized Enhanced Crisis Intervention Training ("ECIT") certification, and some of the content therein could be adapted to train the entire police force.

Adhering to the requirements of the Settlement Agreement will require PPB to train Members on *documenting, reporting, and accounting for use of force*.  Among other documents we reviewed was a 2015 PPB lesson plan entitled, "Use of Force and Conflict Reporting."  The lesson plan had many positive features, including instruction on reporting the circumstances justifying the use of force; however, instruction on reporting the actual force used, strangely, received only passing mention.  Force must also be *properly investigated, reviewed, evaluated, and, if necessary, remedied*.  On this point, PPB's 2016 Q1 Force Audit Report called for additional "coaching from command and clear direction on reporting requirements."  Force Audit Rep. at 14.  Supervisors we met with during a visit to PPB facilities reluctantly admitted that, although the Bureau has held discreet

4

meetings in an attempt to message what is required, more formal training in this area is in order.

Performance

We did not find very many incidents that even arguably constituted unreasonable use of force in the sample of force reports and After Action reports that we reviewed. Notwithstanding, PPB's 2016 Q1 audit presented serious concerns that did not arise in the cases in our sample. *See, e.g.,* Force Audit Rep. at 5 (one baton, six hand/foot strikes, one canine bite, one pepper spray deployment, eleven Taser deployments, and nine firearms pointed against subjects who were "tensing up, thrashing around, wiggling"). These concerns will require renewed analysis by PPB.

However, a lack of necessary documentation prevents drawing any broad conclusions, and even on the evidence available, discreet issues persist. For example, supervisors are not consistently recording findings as to *whether officers used the least amount of appropriate force. See* Force Audit Rep. at 6 (Sergeants did not include such a finding in 8% of cases, Lieutenants in 14% of cases, and Captains or Commanders in 21% of cases).[1][2] Documents and information missing from reports also make it premature to reach broad conclusions about whether Members *de-escalate at the earliest possible moment*, as discussed in our response to Paragraph 66(a).

PPB Members must also *attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness.* PPB use of force reports included a number of instances in which PPB Members made good decisions in encounters with individuals with actual or perceived mental illness, particularly in those instances where ECIT Officers were deployed. We noted instances where Officers wisely developed a plan for taking the person into custody with less force than allowed by law. Any time Officers encounter individuals exhibiting signs of mental illness, allowing time to pass and developing a plan can be good practice.

Members do not appear to be consistently adhering to Bureau Electronic Control Weapon "ECW" policy, *see* comments to Par. 74(b), but we cannot say that they are resorting *to use of force weapons, including less-lethal weapons,* more than necessary.

Due at least in part to the confusing force reporting process established in Directive 1010.00, Members are not *properly reporting, documenting, or accounting for all use of force* in the Bureau. *See* Force Audit Rep. at 10 (Officers did not completely and accurately account for their force decision making in more than 22% of the

---

[1] Strangely, even absent this information, the Force Audit Report found that "officers consistently chose force options reasonably calculated to establish or maintain control with the least amount of appropriate force." Force Audit Rep. at 4.

[2] In fairness to the supervisors themselves, PPB has not incorporated this requirement into policy, and guidance on After Action Report drafting has been limited.

| | |
|---|---|
| | cases reviewed by supervisors).<br><br>Although we found many After Action Reports that reflected thorough *investigation, review, and evaluation of force*, After Action Reports were missing important information in as many as 50 cases, of 113 uses of force overall in 2016 Q1. *See* comments to Par. 75(b). This suggests room for improvement.<br><br>Portland Police Bureau's success at *directing individuals in perceived behavioral or mental health crisis, or those with mental illness, to the appropriate services* is discussed in Section VI, Crisis Intervention.<br><br>The Force Audit Report does not capture whether *officers use non-force and verbal techniques to effect compliance whenever feasible*.<br><br>Members used force – sometimes considerable – against individuals who PPB describes as "wiggling, thrashing around, or tensing up." *See* Force Audit Rep. at 5. Portland Police Bureau needs to assess whether such individuals "*pose[d] a threat to officers or others, or impede[d] a valid law enforcement function*." |
| **Technical Assistance** | As described in DOJ's comments throughout this Section, and as confirmed in the Force Audit Report, policies and trainings on use of force, reporting, investigating, and supervisory review all require attention. Portland Police Bureau must urgently improve the guidance that it is delivering to Members, particularly where Members are adapting to unfamiliar processes, such as the audit.<br><br>The Parties have held a monthly videoconference dedicated to addressing comments on one or more policies. Critical policies nevertheless remain outstanding. We recommend an extended summit between the Parties to resolve critical concerns with current policies.<br><br>We also recommend that PPB urgently begin developing training for supervisors on After Action investigation and chain-of-command review, to correct the documentation deficiencies discussed above. |

## A. Use of Force Policy

66. PPB shall maintain the following principles in its existing use of force policies:

   a. PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Policy<br><br>Portland Police Bureau Directive 1010.00 "prohibits force that is not objectively reasonable." This Directive requires that members "[s]atisfy the constitutional standard by using only force that is objectively reasonable under the totality of circumstances" and, "[w]hen applying force, continually assess the amount of force |

required, including the number of Officers required to control a subject and de-escalate as reasonable."

The above-quoted language of Directive 1010.00 presents an alternative formulation of the standard in Paragraph 66(a) of the Settlement Agreement. While 1010.00 largely captures Paragraph 66(a)'s mandate that PPB policy permit only the force that is reasonably necessary, it presents problems for compliance with other Settlement Agreement Paragraphs. *See, e.g.*, comments to Par. 67 (highlighting that the current 1010.00 does not ask Members to de-escalate "the amount of force used, including the number of officers who use force, … to a level reasonably calculated to maintain control with the least amount of appropriate force"). Thus, PPB's alternative formulation fails to achieve compliance.

<u>Training</u>

The Settlement Agreement requires that the City implement Paragraph 66, meaning PPB must train for adherence to Paragraph 66(a). As discussed above, an initial review of PPB lesson plans show that they use the standard of objective reasonableness under the totality of the circumstances; however, the lesson plans teach that *Graham* <u>does not allow</u> for a "least force" review. *See* Lesson Plan – 2014-1 Advanced Academy –Use of Force, at 2 (on file). *See also* PPB Lesson Plan – Defensive Tactics – Course Overview, at 3 ("encouraging" PPB members – but not requiring them—to "seek outcomes that involve less force than the upper maximum allowed by law"). This is an inaccurate restatement of *Graham* and contradicts the terms of the Settlement Agreement that City has agreed to defend. Nothing in the Constitution prohibits PPB from incorporating the terms of the Settlement Agreement into training, including Paragraph 66.

<u>Performance</u>

In DOJ's 2015 *Settlement Agreement Compliance Status Assessment Report*, we noted, "In order to demonstrate that PPB has brought to fruition in practice Paragraph 66(a), PPB must be able to fully report on uses of force and audit force reports and investigations. Short of such reporting and auditing, PPB cannot demonstrate implementation of the force policy." *See also* Settlement Agreement, introductory Par. on Use of Force (requiring that PPB implement its use of force policy); *id.* Par. 172 (requiring that PPB apply policies uniformly and hold Officers accountable).

Members are reporting force and supervisors are conducting investigations. Portland Police Bureau has been able to show its Members' work in these areas through its new audit process and its first Force Audit Report. Portland Police Bureau has serious deficiencies in policy and training, *see, e.g.*, comments to Pars. 69 and 70, and adherence even to current policy has been inconsistent. But force reporting and the advent of the audit have dramatically expanded PPB's capacity to manage force.

The Force Audit Report found that "officers consistently chose force options reasonably calculated to establish or maintain control with the least amount of

<table>
<tr><td></td><td>appropriate force when compared to the subject's resistance."  In light of the data that was missing or incomplete in far too many files, <em>see</em> comments to Par. 75(b), and concerns PPB raised about incomplete Officer narratives, <em>see</em> comments to Par.74(c)(ii),  we think such a broad conclusion is premature.  However, based on the case files that DOJ reviewed, there were a number of instances where Members made and described very good decisions leading up to the use of force.  Here are two examples:

1. Members cornered a bank robbery suspect.  A Member displayed his firearm, and ordered subject to the ground.  The subject fled.  Members caught him, and engaged in a brief struggle involving strikes to the subject.  At one point, a Member threatened to use his Taser, but decided not to.  The subject was subdued without resort to a weapon.

2. Members were dispatched to check on the welfare of a suicidal man; upon arrival, they found him in traffic, confronting vehicles and damaging cars.  The Officers could not get the subject to respond.  They made a plan to take him into custody for medical care.  They decided against pepper spray due to wind.  After multiple warnings, a Member deployed an ECW, but missed.  The subject fled, running through private property.  Officers decided to let subject run rather than tackle him, and the subject finally collapsed.  Officers then took the subject into custody.

Documents PPB produced pursuant to this Paragraph:  PPB did not produce documents related to Paragraph 66 in connection with its 2015 Q4, 2016 Q1, or 2016 Q2 reports.[3]</td></tr>
<tr><td><strong>Technical Assistance</strong></td><td>Portland Police Bureau will need to revise training consistent with the Agreement.

Portland Police Bureau is clearly focused on achieving compliance with Paragraph 66, but Members will need to report on all of the requirements in the Agreement with more consistency in order to create the record necessary to demonstrate compliance with this Paragraph.</td></tr>
</table>

b. PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

<table>
<tr><td><strong>Status</strong></td><td><strong>Partial compliance – ongoing obligation</strong></td></tr>
<tr><td><strong>Analysis</strong></td><td>Policy

Portland Police Bureau Directive 315.30 includes clauses that touch upon the</td></tr>
</table>

---

[3] Portland Police Bureau produces quarterly self-reports on the Bureau's progress towards compliance.  Documents supporting these reports' findings accompany each report.  We make reference to which documents, if any, PPB produces with these reports.

principle embodied in Settlement Agreement Paragraph 66(b).  Among other mandates, Directive 315.30 "requires that members use sound tactics and good decision-making during a confrontation" and, when managing a confrontation, requires that members "make confrontation management decisions based on available options reasonably calculated to resolve the confrontation safely and effectively, with as little reliance on force as practical."  *See also id.* ("The relevant inquiry for this confrontation management standard is whether the member pursued the Bureau's goal of resolving a confrontation safely and effectively with as little reliance on force as practical and whether there is a valid reasoning in the member's confrontation management decision-making.").  This, along with discussion of Members' skill development, adequately captures the requirement of Paragraph 66(b).

Training

Portland Police Bureau must instruct Members on their obligations under Paragraph 66(b).  The in-service use of force training we observed included a section that adequately emphasizes the need for skill development over Members' careers.[4] Ideally, the lesson plan should add a clause encouraging Members to resolve confrontations with *no force* when possible (in addition to the current instruction to use as little force as possible).

Portland Police Bureau will also need to train Officers to ensure the actual skills development.  Thus, PPB will need to address the other gaps in training identified herein, and ensure that skill development is prioritized, in order to support

---

[4] "Directive 315.30 Satisfactory Performance
- In an event that involves both confrontation management and an application of force, member's force use is governed by this Directive, Directive 1010.00, Use of Force, and member's confrontation management is governed by the Bureau's Directive 315.30, Satisfactory Performance. Members must meet the requirements of both policies. Compliance with one policy is not determinative of compliance with the other policy.
- When managing a confrontation, members must make confrontation management decisions based on available options reasonably calculated to resolve the confrontation safely and effectively, with as little reliance on force as practical.
- In applying this standard to a member's performance, the Bureau shall evaluate the member's decision-making from the perspective of the member at the moment the decisions were made.
- This confrontation management standard is separate from and does not modify the use-of-force standard in Directive 1010.00.
- The relevant inquiry for this confrontation management standard is whether the member pursued the Bureau's goal of resolving a confrontation safely and effectively with as little reliance on force as practical and whether there is a valid reasoning in the member's confrontation management decision-making.
- Over the course of their practice of law enforcement, members must develop and display the skills and abilities that allow them to regularly resolve confrontations without resorting to the higher levels of force allowed by the constitutional standard."

|  | Members' professional development and help them regularly resolve confrontations with little or no force.

Performance

Implementation also requires auditing to verify adherence to this standard. Portland Police Bureau has not shared any efforts to assess Members' skill development in this area over the course of their practice of law enforcement. The Force Audit Report does not track Members' use of force over their career (and, in fact, does not even track whether Members use force differently than others or contrary to policy). Routine administrative review of use of force is a relatively recent institution at PPB, so the Bureau will no doubt require time to build a record of Members' skill development. Notwithstanding, documenting such development needs to be prioritized and rigorously conducted.

Portland Police Bureau did not produce any documents in support of compliance with Paragraph 66 related to its 2015 Q4, 2016 Q1, or 2016 Q2 reports. |
|---|---|
| **Technical Assistance** | Portland Police Bureau is laying a foundation for eventual compliance with Paragraph 66(b).

Portland Police Bureau still needs to develop measures of how Members resolve conflicts, and whether they regularly use as little force as appropriate. This should take account of both Members' successful resolution of confrontations and any problems that arise, so that the latter can be addressed. |

67. PPB shall add to its use of force policy and procedures the following use of force principles:

a. Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b. In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

c. The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d. Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

| **Status** | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Policy

Portland Police Bureau has incorporated Paragraph 67(b) into policy. This is not |

the case for other elements of Paragraph 67.  Portland Police Bureau must modify its policies consistent with the below:

- Although the current Directive 1010.00 discusses de-escalation after Members are already applying force, it does not discuss de-escalation prior to an application of force.  Directive 1010.00 needs to direct Members to attempt de-escalation throughout an encounter.

- Paragraph 67(a) is clear:  Members must use de-escalation techniques "when possible;" PPB must adopt this standard.  Currently, Directive 1010.00 only requires de-escalation "as reasonable."

- Similarly, 1010.00 must direct Members to de-escalate any use of force as resistance decreases and to reduce the amount of force used, including the number of Officers who use force, to a level reasonably calculated to maintain control with the least amount of appropriate force.  Currently, 1010.00 only requires de-escalation and reducing the number of Officers "as reasonable."

- Directive 1010.00 does not currently discuss disengagement; the policy must direct Members to use disengagement when possible.

- Portland Police Bureau should review Directive 1010.00 to ensure that it sufficiently directs Officers to take advantage of "specialized units" whenever they would reduce the need for force; currently, the Directive only mentions specialized units in response to persons in known or perceived mental health crisis.

- Portland Police Bureau use of force policies must clearly require corrective action and/or discipline, up to and including termination, for objectively unreasonable uses of force.

- Directive 1010.00 incorporates some of the language of Settlement Agreement Paragraph 67(c) – except that it only requires Members to de-escalate "as reasonable," rather than "de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force," as required by the Agreement.

Training

While lesson plans that teach use of force policy emphasized the objective reasonableness standard, not all of the other elements required by the Settlement Agreement are appropriately addressed.  One Advanced Academy lesson plan discouraged applying "a 'least force' or 'best option' analysis," and stated that, where less force would be safe and effective, Members still need only *consider* reducing the force used (emphasis added).  *See* Lesson Plan – 2014-1 Advanced Academy –Use of Force, at 2 (on file).

The Advanced Academy lesson plans discussed de-escalation, disengagement, and mental illness, but took an uncoordinated approach to these topics.  De-escalation

11

| | |
|---|---|
| | was discussed in greatest detail in the lesson plan on "Critical Incident Resolution," but hardly at all in "Use of Force."  While PPB trainings on crisis response teach Members to utilize learned skills in negotiation and problem solving rather than defaulting to force, PPB's lesson plan on "Use of Force and Conflict Reporting" inappropriately mentions mental illness exclusively in the context of justifying *increased force*.  *See, e.g.*, "Defensive Tactics—Use of Force and Conflict Reporting," at 7 (2015) ("We often are confronted with suspects that are … so mentally altered … that they are stronger and more insensitive to pain than other citizens.  Take the time to share in the report how the technique was expected to achieve a result, but the suspect was able to overcome it.  The lack of success helps provide justification for switching to other methods of control.").<br><br>Performance<br><br>Once PPB revises its policy to comply with Paragraph 67, it must implement the policy and hold Officers accountable for complying with these principles.<br><br>*De-escalation to maintain control with the least amount of appropriate force*:  As discussed in our response to Paragraph 66(a), it would be premature to make broad conclusions about Members' de-escalation and adherence to the "least force" standard, given the missing documents and information discovered in the audit process.<br><br>*Disengagement when possible*:  The Force Audit Report did not assess Members' use of disengagement.  DOJ remains concerned that PPB's policy on disengagement is not always well calibrated to the circumstances, in particular the risks subjects present to themselves or others.  *See* comments to Paragraph 99.<br><br>*Corrective Action for Unreasonable Force*:  Because supervisors are not consistently documenting training, policy, or tactical deficiencies, *see* comments to Paragraph 77(e), we are unable to assess PPB's performance here.<br><br>Documents PPB produced pursuant to this Paragraph:  PPB did not produce documents related to Paragraph 67 in connection with its 2015 Q4, 2016 Q1, or 2016 Q2 reports. |
| **Technical Assistance** | Modify policies to include the requirements of the Agreement.<br><br>Coordinate trainings such that they consistently instruct Members to adhere to policy and observe the principles in the Agreement.<br><br>Ensure that involved Members always submit reports, and that the reports capture all of the requisite elements. |

1. Electronic Control Weapons

68. PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapon System to include the following principles:

a. Prohibition against the use of ECWs for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force;

b. Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their ECW;

c. Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following ECW use;

d. Only one ECW at a time may be used on a subject, intentionally, except where lethal force would be permitted;

e. After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each ECW cycle in their use of force reports;

f. Officers shall make every reasonable effort to attempt handcuffing during and between each ECW cycle. Officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant use;

g. ECWs shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of use of force; and

h. Officers receive annual ECW in service training including proficiency and policy changes, if any.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | Policy<br><br>Portland Police Bureau has not modified its use of force policy, Directive 1010.00, to conform to the Settlement Agreement.  In DOJ's view, Directive 1010.00 should be finalized before Directive 1051.00 (ECW) undergoes review.  Thus, pursuant to a working agreement between the Parties that has functioned effectively in other contexts, PPB has withheld revision of 1051.00.   Our concerns about Directive 1051.00, as shared previously, include the following:<br><br>• The Directive does not require Members to utilize hand signals where there is a language barrier or the subject is hearing impaired as required by Paragraph 68(b).<br><br>• Paragraph 68(d) only permits the intentional use of more than one ECW at the same time in situations when "lethal force" would be permitted.  Directive 1051.00, Section 2.11 lessens this standard for simultaneous use to avoid the need for a "higher level of force."<br><br>• Directive 1051.00 omits Paragraph 68(f)'s prohibition of more than three |

ECW cycles absent exigency.  *Cf.* Directive 1051.00, Section 1.9.

- Commendably, PPB's prohibition on ECW use against restrained subjects is slightly more restrictive than Paragraph 68(g) requires.  *See* Directive 1051.00, Section 2.5.

Training

Implementation requires annual training on electronic control weapons including proficiency and policy changes, if any.  DOJ observed annual in-service training on electronic control weapons in December 2015.  Based on our direct observation of PPB's in-service training, we stated in our technical assistance letter:

> PPB emphasized technical proficiency of ECW applications, but poorly integrated policy and critical decision making.  Classroom training on ECW policy was rushed and referred to a prior legal training presentation, which, itself, was incomplete.  Instruction needed clearer discussion of issuing warnings prior to deploying an ECW, including the fact that people in mental health crisis may need to be given more time to respond to commands.  PPB did not present the full list of exclusions when Officers should not use an ECW. Instruction completely omitted mention of the risk of a subject falling after ECW application.  There was also no discussion of probe removal or policy requirements for rendering aid for probe removal.  COCL observed trainers emphasizing the need to go from "call-to-call" over the need to spend time speaking to subjects in crisis.  Training should discuss the applicability of the crisis intervention policy and the Settlement Agreement mandate to call upon specialized units, such as ECIT Officers, when the situation permits.

*United States v. City of Portland* - Technical Assistance Letter Regarding In-Service Training (Feb. 26, 2016), *available at* https://www.justice.gov/crt/file/847051/download.

Performance

Implementation of the policy also requires performing pursuant to the standards in the Agreement and verification of that performance.  Our review of PPB uses of force revealed concerns about ECW (Taser) deployments, as discussed in our analysis of Paragraph 74(b).

Some Members reported that two ECW models are in circulation in the Bureau.  Pulling the trigger on one model automatically activates a five-second cycle.  That is not the case with the other model:  it remains activated during a continuous trigger pull.

Documents PPB produced pursuant to this Paragraph:  PPB did not produce documents related to Paragraph 68 in connection with its 2015 Q4, 2016 Q1, or 2016 Q2 reports.

| Technical | As described further in response to Paragraph 74(b), PPB continues to see extensive |
|---|---|

| | |
|---|---|
| Assistance | problems with ECW deployments. Too many ECW deployments violated policy; supervisors too often defended these policy violations; and Members candidly shared with DOJ that ECWs often malfunction, preventing appropriate use and reliable accountability. *See also* Force Audit Rep. at 5 (of the 26 cases in which Members deployed ECWs, 11 were used against individuals who were "tensing up, thrashing around, wiggling").

Thus, PPB needs to revisit its ECW program at all levels. The Bureau will be revising all use of force policies, including its ECW policy. It has the necessary ECW trainers, but PPB could better execute ECW training, to include an emphasis on limiting ECW deployments to five seconds. It must also hold Officers accountable for ECW policy violations.

Further, PPB may want to explore the purchase of devices limiting the length of ECW deployments to five seconds. This way, Members would not need to guess how long they have deployed the weapon. (If PPB does provide new equipment, it will of course need to ensure Members receive training on it.) |

## 2. Use of Force Reporting Policy and Use of Force Report

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that:

    a. All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

    b. All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

| | |
|---|---|
| **Status** | **Partial compliance – ongoing obligation** |
| **Analysis** | Policy

According to the Agreement, "All PPB officers that use force . . . [must] draft . . . use of force reports that include sufficient information . . . ." The current PPB Directive 1010.00 requires that, "Members who use force must include a description of that exercise of police authority in the report required by Directive 910.00." *See* Directive 1010.00, section 9.1. Directive 910.00 covers General Offense Reports, often used to convey information about criminal investigations. *See, e.g.*, Directive 910.00, subsection 2.2.2 ("Reports [include] the results of the member's investigation[,] the disposition of any property or evidence taken into custody, the results of records searches, . . . etc."). Use of force reports serve an entire different function from these general offense or incident reports: force management and accountability for Officers' conduct, principally. It is not generally accepted practice to use incident reports to serve these force management and accountability functions. If PPB intends to do so, it needs to be clear about Members' obligations. |

Directive 1010.00 is not sufficiently clear. As to some types of use of force—control holds where no injury occurs—Directive 1010.00 only requires the General Offense Report. As to other types of force, 1010.00 also requires Members to "submit the Force Data Collection Report ("FDCR") section of the General Offense Report." *See* Directive 1010.00, section 9.2 (requiring the FDCR only for "the force options listed on that report"). And for uses of force that qualify as "force events," but not other uses of force, Directive 1010.00 advises Members that they must "initiate the 940.00 process." In sum, the policy is confusing, and does not conform to generally accepted practices for reporting force.

Directive 1010.00 also does not sufficiently instruct Members on what their force reports must contain. Few of the requirements of Settlement Agreement Paragraphs 74(a)(i) and 74(c) appear in Directive 1010.00. Thus, PPB fails to instruct Members to include information on which supervisors will later judge their reports. Compounding the risk of confusion, Members in some cases will be reporting force via a form normally dedicated to reporting crimes, without the Force Data Collection Report to guide them.

In the grand scheme, PPB's revisions to 1010.00 several years ago clearly improved force management by requiring the reporting of use of force. However, maintaining different processes for different types of force makes the force management process unnecessarily complicated for PPB's Members, supervisors, and Chief.

PPB's policies must also include a timeliness requirement, *e.g.*, before the end of the Officer's shift, unless incapacitated. Directive 1010.00 includes no such requirement. Directive 910.00 permits the involved Member to submit the field report the day after the use of force, with supervisor approval. (Additionally, Directive 910.00 does not require sufficient information in the report, as discussed above.)

Portland Police Bureau must also require Members to timely and accurately report shootings in which they are involved, *i.e.*, it will need to undertake revisions to Directive 1010.10.

Directive 1010.00 does not require Members to provide a full and candid account of uses of force that they witness.

<u>Training</u>

Portland Police Bureau produced lesson plans related to reporting use of force. Many aspects of these trainings are sound. The Advanced Academy lesson plan on "Use of Force and Conflict Reporting" instructs Members to "address all of the elements defined under 'totality of the circumstances'" in their report, using PPB's Use of Force directive as a template. The lesson plan distinguishes between the authority to make an arrest, on the one hand, and whether the severity of that crime justifies a given use of force, on the other. The lesson plan encourages Members to cite specific facts in addition to conclusions such as "subject resisted."

However, trainings in this area will need to be improved. For example, the

16

Advanced Academy lesson plan counsels Members to "*positively* report the totality of the circumstances" (emphasis added). Reminding Officers to report neutrally all relevant facts, including those circumstances that support a decision to use force, is appropriate. Repeatedly admonishing Officers to emphasize the positive is disconcerting. Further, these admonitions come at the expense of instructions to include in reports other elements required by the Settlement Agreement, such as discussing the actual force applied.

The training contains other concerning messages. To cite two examples:

- The Advanced Academy lesson plan counsels Officers, "After having survived and been victorious in a force encounter, don't later become victim to legal or administrative review unnecessarily." This choice of words presents several problems. An Officer's "survival" may be at stake in some encounters, but certainly not all cases where force is used. It does not advance the goals of the training to portray all uses of force as a competition or test of survival. Moreover, the City of Portland agreed that the Police Bureau should implement routine administrative review of use of force, and training should not suggest otherwise. Portland Police Bureau's characterization of Officers adhering to such a review as "victims" is also at odds with the terms of the Settlement Agreement and generally accepted practices.

- The Advanced Academy lesson plan tells Officers, "Who gets to define the 'totality of circumstances?' You do." Seemingly, PPB intended this turn of phrase to underscore the importance of Officers reporting the factors they considered in using force. However, the quoted passage also sends the erroneous message that the Officer is the ultimate arbiter of what facts render use of force reasonable or not. A supervisor or judicial Officer may view the totality of the circumstances differently than the Officer does in her or his report; PPB should not promise otherwise.

PPB trainings will also need to instruct Members to include all of the requirements in Agreement Paragraphs 74(a)(i) and 74(c) in their force reports.

Performance

*Timeliness of Involved Officers' Use of Force Report.* Par. 69(a).

As discussed below in response to Paragraph 74(c)(i), PPB's audit of the timeliness of submission of force reports requires further refinement to ensure (1) that it uses reliable data, and (2) that it measures adherence to proper Bureau policy, rather than some other standard. The Force Inspector will also want to explain going forward why no FDCRs were submitted after some uses of force, and why others were days or weeks late, as the audit found.

*Sufficiency of Information in Involved Officers' Use of Force Reports and Witness Officers' Accounts.* Par. 69(a).

Portland Police Bureau is almost certainly underreporting force. Directive 1010.00

| | |
|---|---|
| | does not require Members to complete FDCRs for control holds when they do not result in injury, so at a minimum, PPB has limited data about such incidents. Portland Police Bureau also chose to exclude from its audit some instances in which firearms were pointed at subjects. *See, e.g.*, Force Audit Rep. at 2 ("Pointing of a Firearm … was audited only when used with another AAR generating force option (takedown, for example). … This number [of pointing firearms cited in the Report] is not representative of the total number of PFA applications."). Without a comprehensive and precise picture of all PPB uses of force, it is difficult to gauge how effectively Members are reporting force. |
| | As PPB's audit and our review of the existing data both found, Members' reports are too frequently incomplete (and supervisors are too often failing to identify problems). *See* comments to Paragraph 74(c). |
| | *Witness Officer Accounts.*  Par. 69(b). |
| | We reviewed many cases in which investigating supervisors interviewed numerous witnesses, both Officer and civilian, including some that bordered on exhaustive. Likewise, the Force Audit Report found, "The investigating Sergeant personally spoke to the involved witness member to make an inquiry sufficient to describe the nature of the force and the member's justification in 85 (94%) of the 90 AARs audited that included a witness officer." Force Audit Rep. at 13.  The five outlier cases noted in the audit need to be addressed appropriately. |
| | Documents PPB produced pursuant to this Paragraph:  PPB did not produce documents related to Paragraph 69 in connection with its 2015 Q4, 2016 Q1, or 2016 Q2 reports. |
| **Technical Assistance** | The Bureau should revise 1010.00 to direct Members who use force (or supervise the use of force) to complete a single use of force report with the necessary data and narrative description for all types of force. |
| | Portland Police Bureau should also require Members to report all uses of force that they witness in writing.  Properly done, this would satisfy Paragraph 69(b) and enable PPB supervisors to review some uses of force in a more streamlined manner. Portland Police Bureau supervisors can still interview witness Officers as needed. |
| | Policy and training on force reporting needs to advise Members of all of the elements that their force reports must contain. |
| | See comments to the other Paragraphs referenced in the above analysis for technical assistance. |

### 3. Use of Force Supervisory Investigations and Reports

70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward

their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

a. Complete After Action Reports within 72 hours of the force event;

b. Immediately notify his or her shift supervisor and PSD regarding all officers['] Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division.  Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted.  PPB shall then provide such counseling or training consistent with this Agreement;

c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

d. Interview officers individually and not in groups.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | Policy |
| | The Settlement Agreement defines "Force" as "any physical coercion used to effect, influence or persuade an individual to comply with an order," beyond "ordinary handcuffing of an individual who does not resist."  Settlement Agreement Par. 31.  Portland Police Bureau must ensure that "all force . . . is properly investigated, reviewed, evaluated, and, if necessary, remedied."  *Id.*, Introduction Paragraph, Use of Force section.  What constitutes proper investigation, review, evaluation and remedies may vary depending on the type of force applied and other considerations:  the use of a control hold against minimal resistance may require less post hoc review than an officer-involved shooting, for example.  Nevertheless, according to the Agreement, PPB must appropriately investigate, review, evaluate and remedy deficiencies in both of these examples. |
| | Against this backdrop, Paragraph 70 requires that PPB enforce Directive 940.00, that is, require supervisors to investigate and review all "force events," document investigative findings, and submit the findings for chain-of-command review.  The definition of "force" appears above; the Settlement Agreement does not separately define "force event."  Thus, while PPB may be at some liberty to define "force event," it must operate to ensure that force is properly reviewed, evaluated, and if need be, investigated and remedied.  Moreover, the policy should meet generally accepted practices for review of force.  *See* Settlement Agreement, Introduction Paragraph, Use of Force section. |
| | The Directive does not currently meet these requirements.  Currently, Directive 940.00 defines "force event" by reference to those types of force that PPB chooses to list in the Force Data Collection Report section of the General Offense Report.  This creates several problems.  First, the policy definition will fluctuate as the FDCR form changes, which is far too fluid a means for defining what use of force |

require what level of review. Defining those "force events" that must be investigated by reference to those types of force listed in the use-of-force report also creates the counterproductive incentive for PPB to minimize the categories of force listed on its force reporting form, so as to eliminate the need to investigate them. In fact, PPB has done just this by omitting 'control hold without injury' from the FDCR. It is unclear what supervisory review, if any, these control holds receive. Finally, Directive 940.00 itself currently excludes an important type of use of force—pointing a firearm—from any type of 940.00 review requirement. PPB policy must ensure a proper investigation, review, and evaluation of every use of force by a PPB Member. What constitutes proper investigation, review, and evaluation may vary. But PPB must clearly define the parameters for all investigations, reviews, and evaluations, even where more abbreviated in scope.

Our other policy concerns include the fact that Directive 940.00 requires completion of the After Action Report within 72 hours, but provides for an extension that is not in the Agreement. Moreover, the grounds for the extension are not set forth in policy.

Finally, PPB policies contain language that is similar to, but materially different than, the requirements of 70(b) and (c). Neither Directive 940.00 nor Directive 1010.00 contains the language in Paragraph 70(d).

Training

Command staff shared that force reporting has given Members the opportunity to hone report-writing skills, but PPB members consistently suggested PPB provide them additional, formal training on the force reporting and After Action Review process. The most recent such in-service training may pre-date the effective date of the Settlement Agreement.

Performance

Portland Police Bureau's Force Audit Report says that certain types of force did not trigger an After Action Review. *See, e.g.*, Force Audit Rep. at 2 ("Cases involving [pointing a firearm] only do not generate an AAR."). But PPB does not describe what review, investigation, or evaluation supervisors undertook in response to use of force that did not receive AAR treatment. This presents a challenge to assessing compliance with the Settlement Agreement's requirements regarding use of force investigations.

The Force Audit Report found that almost all After Action Reports were completed within 72 hours. *See* comments to Par. 75(a).

The Force Audit Report did not adequately assess and describe performance under subparagraph 70(b). *See* comments to Pars. 75(k)-(l).

Documents PPB produced pursuant to this paragraph: PPB did not produce documents related to Paragraph 70 in connection with its 2015 Q4, 2016 Q1, or 2016 Q2 reports.

| Technical Assistance | As stated above, PPB policy must set forth a clear process that requires review and evaluation of force, and where necessary, investigation and corrective action.  This applies to all control holds and pointing of firearms, just as with other types of force.  PPB should use the definition of "force" from the Settlement Agreement to ensure that this takes place. |
|---|---|
| | The rigorous investigation and review process that is beginning to take hold at PPB is reasonable for most types of force. |
| | A more limited review process for control holds that do not result in injury, for example, could conform to the Agreement if it were properly implemented.  Under the right circumstances, Sergeants could be permitted to assess Members' use of control holds (without injury or complaint thereof) based on written statements from involved and witness Officers and other available evidence.  Sergeants could interview Officers as necessary.  PPB would also need to ensure thorough and accurate written reports by involved and witness Officers, and hold Sergeants strictly accountable for making thorough and accurate findings.  Chain of command supervisors would review the Sergeant's findings and conclusions.  This would free up supervisors to better oversee field operations and ensure accountability for more problematic uses of force. |

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Status | **Substantial compliance – ongoing obligation** |
|---|---|
| Analysis | Portland Police Bureau reported 134 Sergeants and 651 Police Officers in fiscal year 2012-13, *see* Michael Reese and Charlie Hales, Memorandum Re:  Police Bureau FY 2013-14 Budget Request, Attachment at 34 (Feb. 4, 2013), *available at* https://www.portlandoregon.gov/cbo/article/433623, a staffing level of just less than one Sergeant to every five Officers. (1:5.1) |
| | Portland Police Bureau reported 135 Sergeants and 684 Police Officers in fiscal year 2015-16, *see* Lawrence P. O'Dea III and Charlie Hales, Memorandum Re: Police Bureau FY 2016-17 Budget Request, Attachment at 44-45 (Feb. 1, 2016), *available at* https://www.portlandoregon.gov/cbo/article/561732 ("FY 2016-17 Requested Budget"), a staffing level of just better than one Sergeant to every five Officers. (1:4.8) |
| | Note:  PPB anticipates that a "staffing level crisis" will leave it with 120 fewer sworn Officers at the end of fiscal year 2015-16 than at the beginning of fiscal year 2013-14.  FY 2016-17 Requested Budget, at 2.  Reduced staffing levels have resulted from budget cuts in fiscal year 2013-14 and the subsequent departure of more than 80 Officers.  *Id.*  Hiring has not kept pace with this attrition.  *Id.* Portland Police Bureau does not report that reduced staffing will reduce the ratio of |

21

| | |
|---|---|
| | sergeants to officers.  FY 2016-17 Requested Budget, Attachment at 44-45 (requesting funding for 592 Officers and 125 Sergeants). Documents PPB produced pursuant to this paragraph:  in 2016 Q1 and Q2, PPB produced one-page memoranda showing the distribution of Sergeants by precinct and shift for each quarter. |
| **Technical Assistance** | N/A |

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities.  PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| **Status** | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Portland Police Bureau included in its documentation in support of its 2016 Q1 and Q2 quarterly reports a copy of the supervisor's checklist form. The supervisors with whom DOJ spoke stated that they frequently do not use PPB's checklist at all, and in some cases, individual supervisors or precincts have developed alternative checklists or methodologies to guard against leaving mandatory information out of an After Action Report. DOJ and PPB's own Force Inspector appear to agree that mandating the use of a single checklist would benefit the force review and audit processes.  Members and supervisors would benefit from a set of shared expectations about what each report must contain. DOJ discussed with PPB the possibility of creating a data entry portal or form that obligates the user to enter (or find 'not applicable') every piece of information required by the Settlement Agreement, while also prompting the user to enter narrative information as appropriate.  Such a portal, if properly designed and implemented, could define expectations for supervisors, while helping PPB to satisfy the requirements of paragraph 72.  PPB took the helpful step of starting to design a portal that could form the basis for progress on this front. PPB reports delaying the mandatory annual revisions to the checklist until Directive 940.00 is revised. |
| **Technical Assistance** | In order to provide clear guidance, set clear expectations, and ensure that the responsibilities in the checklist are carried out, PPB policy needs to mandate the elements of the investigation included in the checklist. |

73. PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

a. EIS tracks all Directive 940.00 comments, findings and corrections;

b. All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

c. All supervisors in the chain of command are accountable for inadequate reports and analysis;

d. A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations.  Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

e. When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

f. Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

g. The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | <u>Policy</u><br><br>Section 5 of Directive 940.00 does not address supervisors' obligations with respect to submitting into the Employee Information System ("EIS") comments, findings, and corrections from after action reviews.  This is a necessary step to meet the tracking requirements of Paragraph 73(a).  The mere cross reference to the "Employee Information System Directive 345.00" in the header to 940.00 is insufficient.  Directive 345.00 does not, on its own, meet the broader recordation requirements of Paragraph 73(a).<br><br>Current PPB policy does not specify that Members, and those who review their reports may receive discipline for inaccurate or incomplete reports (although the disciplinary matrix does say that failure to submit a report may result in discipline). Directive 940.00 requires that conducting or permitting subordinates to conduct repeated deficient investigations will be "addressed," but does not specify that supervisors may be demoted and/or removed from a supervisory position as a consequence.<br><br><u>Training</u><br><br>Portland Police Bureau will need to advise Members of these provisions during |

| | |
|---|---|
| | training on force reporting and investigations.  The trainings DOJ reviewed did not include discussion related to Paragraph 73.<br><br>Performance<br><br>The Force Audit Report found that supervisors rarely *use EIS to document their discussion of policy or training deficiencies or poor tactical decisions.  See* Force Audit Rep. at 21; *compare* Par. 73(a).  This instills little confidence that EIS is effectively tracking any other Directive 940.00 comments, findings or corrections, as required by Paragraph 73.<br><br>The Force Audit Report provided some indication of the actual completeness, accuracy, and adequacy of reports, sharing that additional investigation was often needed, but not ordered.  *See* comments to Par. 77(b); comments to Par. 74(c).  *Cf.* comments to Par. 75(b).  But, the Report never says whether supervisors' failure to resolve these incomplete investigations resulted in "*corrective action or discipline*."  *Compare* Par. 73(b).  We cannot say whether *supervisors in the chain of command are held accountable for inadequate reports and analysis.  Compare* Par. 73(c).<br><br>The Force Audit Report did not mention whether the Force Inspector and or Chief *was notified of policy, training, tactical, or equipment concerns*, notwithstanding that more than 30% of supervisor reviews identified some tactical or training issue.  *See* Force Audit Rep. at 7.  The Force Audit Report also did not discuss whether PPB conducted any necessary training or resolved the tactical issues found.  This is of particular concern given that PPB has well-known equipment problems that require redress.  *See* Technical Assistance in response to Paragraph 68.<br><br>The Force Audit Report did not directly address whether a supervisor *repeatedly conducted deficient investigations* or more senior supervisors *repeatedly permitted them*.  However, 22% of supervisory reviews should have identified an incomplete report and did not.  *See* comments to Par. 76(c).<br><br>Documents PPB produced pursuant to this paragraph:  PPB did not produce documents related to Paragraph 73 in connection with its 2015 Q4, 2016 Q1, or 2016 Q2 reports. |
| **Technical Assistance** | Note that ensuring that supervisors include in After Action Reports the items on Paragraph 72's checklist or other Settlement Agreement required contents does not equate to requiring that such information occupy a specific line on a specific form. If supervisors include the requisite information in a report, they should not be penalized for placing the information in an unpreferred location on that form.  PPB must empower its supervisors to investigate Members' compliance with the policy elements corresponding to the standard in this Paragraph, and empower more senior supervisors to join or dissent from the Sergeants' findings, as appropriate. Unnecessarily penalizing supervisors demoralizes, rather than empowers.<br><br>At the same time, we are eager to find solutions that work for PPB's Force Inspector and auditing staff to make the process work for them, too. |

**B. Compliance Audits Related to Use of Force**

74. In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports to ensure that:

  a. With respect to use of force generally:

  i. reports describe the mental health information available to officers and the role of that information in their decision making;

  ii. officers do not use force against people who engage in passive resistance that does not impede a lawful objective;

  iii. when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

  iv. officers call in specialty units in accordance with procedure;

  v. officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

  vi. officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

  b. With respect to ECW usages:

  i. ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits. Discrepancies within the audit should be appropriately investigated and addressed;

  ii. officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

  iii. officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

  iv. officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing so is reasonably calculated to prevent the use of a higher level of force.

  c. With respect to use of force reporting, the reports:

  i. are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

  ii. include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

  iii. include a decision point description of the force decision making;

  iv. include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

v. include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

vi. include the reason for the initial police presence;

vii. include a description of the level of resistance encountered by each officer that led to each separate use of force and, if applicable, injury;

viii. include a description of why de-escalation techniques were not used or whether they were effective;

ix. include whether the individual was known by the officer to be mentally ill or in mental health crisis;

x. include a general description of force an officer observes another officer apply; and

xi. demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| **Analysis** | In 2015, we asked that "PPB and the COCL . . . actively engage with one another in developing the sample size and methodology for the audits and discuss the qualitative assessments of the sample with COCL's police practices expert." Settlement Agreement Compliance Status Assessment Rep., at 14 (Sept. 10, 2015). Portland Police Bureau did consult with COCL to develop a methodology for the audit, and audited force reports and After Action Reviews in 2016 Q1. As noted above, this is an important first step. We appreciate the hard work of those PPB Members who have accurately memorialized the instances in which they have been compelled to use force; Sergeants (and other frontline supervisors) who have rigorously investigated force incidents and memorialized their findings; supervisors in the chain of command who have reviewed findings; and criminal analysts who reviewed, compiled, and distilled the information in the force reports. |

Significant work remains. Improvements in policies and training noted herein will provide Members with clarity on their respective obligations to report, review, investigate, and ensure accountability for use of force. The audit also requires improvements, including:

- Developing better measurements (for example, the component data for its decision-point analysis);

- Reporting how it reached some conclusions;

- Ensuring that far-reaching conclusions are based upon complete and accurate data in reports; and,

- Eliminating typographical errors from the data and statistics reported.[5]

These concerns are discussed in greater detail herein.

Documents PPB produced pursuant to this Paragraph included:

- Force Audit Report 2016 Q1;

- Force Audit Report Cover Memo;

- Force Data Summary Reports for 2015 Q4 and 2016 Q1 and Q2;

- Audit details for several dozen individual force cases.

(Paragraphs 74-77 almost universally referenced the same sets of documents from one report to the next.)

Use of Force

The audit must ensure that force *reports describe the mental health information available to Members and its role in their decisions. See* Par. 74(a)(1).  To ensure this outcome, the audit must first identify in which cases Members had information about a subject's mental health and in which they did not.  The Force Audit Report does not describe whether the Force Inspector made this assessment.  The Report says that in 52 cases, Members did say that mental health information was available; as to the other 159 cases, the Report does not say whether mental health information was available or not.  (Concerns about the accuracy of the data are underscored by the fact that many Members described the mental health information available to them, but did not check a box to that effect.)  If Members are not reporting whether mental health information is available or not, it may be that PPB policy does not direct them to.

The Force Audit Report does reveal that those Members who state that they had mental health information available could articulate some role that the information played in their force decision-making.  This is promising.

Portland Police Bureau's distinction between "passive" and "active" resistance does not comport with the Settlement Agreement, making it impossible to gauge to what extent its Members "*use force against people who engage in passive resistance that does not impede a lawful objective.*"  Par. 74(a)(ii).  The Settlement Agreement defines "passive resistance" as "non-compliance with officer commands that is non-violent and does not pose an immediate threat to the officer or the public."

---

[5] Two examples may be representative:
- The Report says that a subset totaling 17 ECW applications equates to 40% of the total Bureau-wide ECW applications for the quarter, and a second subset of 13 applications equates to 60% of the total.  *See* Force Audit Rep. at 9.  It appears that PPB mixed up the percentage attributable to each of the two subsets.
- The Report says in one paragraph that nine serious use of force cases occurred during the first quarter, then in the next paragraph says that five such cases occurred.  *See* Force Audit Rep. at 20.

Par. 46.  The Settlement Agreement's definition would include "wiggling" and "tensing up," and in many cases might include "thrashing around"—all behaviors that PPB excludes from its own definition of "passive resistance."

Portland Police Bureau Members pointed firearms and used batons, hand and/or foot strikes, K9 bites, pepper spray, Tasers, and takedowns against individuals who were tensing up, thrashing around, and/or wiggling.  Future audits will need to review these incidents with the scrutiny mandated by the Settlement Agreement to determine whether they meet the Settlement Agreement's definition of passive resistance, and whether the force used was appropriate.

Supervisors are not consistently recording findings as to whether officers used the *least amount of appropriate force*.  *See* Par. 74(a)(vi); Force Audit Rep. at 6 (Sergeants did not include a finding in 8% of cases, Lieutenants in 14% of cases, and Captains or Commanders in 21% of cases).  Investigations lacked important data and testimony, including missing FDCRs and Taser download reports.  *See* comments to Par. 76.  Finally, PPB's understanding of what force is appropriate also appears to conflict with the language of the Settlement Agreement.  *See infra* (pointing out disparity between PPB definition of "passive resistance" and that in the Settlement Agreement).  Absent this information and analysis, and given PPB's misapplication of the Settlement Agreement, it is hard to concur with the Force Audit Report's broader conclusion that "officers consistently chose force options reasonably calculated to establish or maintain control with the least amount of appropriate force."  *Id.* at 4.

The Force Audit Report's review of whether *officers called in specialty units in accordance with procedure* was helpful.  The Report cites the three most common specialized units called.  The Report cited one supervisor's finding that a specialized unit should have been called but was not.  At the same time, the Report acknowledges that PPB is still developing an independent, reliable measure for whether or not officers are calling specialized units in accordance with policy.

*Audit reports to ensure that officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event.*  Par. 74(a)(v).

The Force Audit Report states that officers consistently documented the medical care subjects received.  Force Audit Rep. at 12.  But the Report does not state whether subjects received care at the earliest available opportunity.  This will be a focus of our review going forward.

ECW (Taser) Usage

The Inspector conducted many of the requisite reviews.  The Force Audit Report, in conjunction with other data and our independent review of PPB ECW (Taser) deployments, raised concerns.

For example:

- ECW deployment data was missing from 5 of the 22 ECW deployment cases in 2016 Q1.  *See* Force Audit Rep. at 8.  This prevents the Inspector

> from *assessing deployment data for consistency with officer testimony or identifying discrepancies.  See* Par. 74(b)(1).

- We also found inconsistencies between the actual deployments of ECWs and the Members' intended and/or perceived deployments:  for example, a single ten-second cycle when a Member reportedly perceived two five-second cycles; a seven-second cycle following by an eight-second cycle that the member "intended . . . to be one continuous cycle"; etc.  These unintended discharges were rarely explained sufficiently or appropriately scrutinized by superiors.

- Current PPB Directive 1051.00 requires, "*After an ECW cycle the member shall reevaluate the situation to determine if subsequent cycles are necessary*, including waiting for a reasonable amount of time to allow the subject to comply with the warning.. . . When the operator of the ECW overrides the automatic five (5) second shut down by continually commanding energy delivery, each additional five (5) seconds or fraction thereof, is a unique cycle and requires justification by the operator."  Directive 1051.00.  Portland Police Bureau Members did not consistently adhere to this policy, and supervisors did not consistently enforce it.  Some PPB Taser deployments extended beyond the standard five-second cycle.  In some cases, supervisors failed to note the policy violation—and even defended their conclusions, despite access to the policy demonstrating otherwise and the opportunity to reflect upon the case.  This is problematic and inconsistent with the Settlement Agreement, policy and generally accepted practice.

- The Force Audit Report provided voluminous information associated with *officers' attempts to use hands-on control during ECW cycles* (Par. 74(b)(iii)), but never arrived at the critical issue:  whether Members diligently attempted to use control holds in lieu of continued ECW cycles.  The Report did indicate involved Members' opinions about whether hands-on control was practical; whether the involved Member's narrative contained sufficient information; and considerations weighed by the Members in deciding between further ECW deployments and hands-on control.  We encourage including this information in future reports, although it needs to be synthesized to describe whether Members are making appropriate judgments about whether hands-on control can be achieved.  This section of the Report was difficult to parse, in part because the Report switched between discussing ECW 'cases' and ECW 'cycles' when citing figures.

- The Report does not discuss whether ECW's were used for *pain compliance.  Compare* Par. 74(b)(iv).

- In one case, the officer reported that he deployed his ECW because the subject was holding a screwdriver while in "a ready stance or aggressive posture"—the meaning of which was unclear.  To make matters worse, the

Captain in the chain of command reported that the officer deployed his ECW, "to stop [the subject from] eluding on foot . . .." Somehow, the Captain also found that the subject "still . . . presented an immediate threat to the officer." Ambiguities in the reporting and review process like this call into question the versions of events reported and set unclear standards for Members.

- The actual ECWs in circulation at PPB may be subject to malfunction. One supervisor acknowledged that PPB is not providing Members with equipment designed to capture accurate data: "some of the older Tasers show inaccurate deployments."

- At least one supervisor misunderstands how ECW technology works. The supervisor commented that a hand/foot strike was appropriate because an alternative force option—the Taser—could have delivered an electrical charge to the officer applying a control hold. In actuality, the ECW will only affect the subject onto whom the ECW barbs attach. This is a training issue PPB must address.

Finally, PPB-wide statistics raise serious concerns. Portland Police Bureau's gross ECW use has remained fairly constant, even as PPB makes 25% fewer arrests over the past two years. *See* 2016 Q2 Force Data Summary Rep., at 18 (demonstrating that, while the number of custodies each quarter has dropped to 6,600 from a peak of 9,000 in the past two years, quarterly ECW deployments have fluctuated between 14 and 25). Thus, Members are using ECWs more frequently as a function of custodies. In addition, of the 26 cases in which Members deployed ECWs, 11 were used against individuals who were "tensing up, thrashing around, wiggling" (what PPB defines as "active resistance"). *See* Force Audit Rep. at 5.

Force Reporting

*Whether reports are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy.* Par. 74(c)(1).

Because the Force Audit Report assumed that "an FDCR . . . submitted one day after the event [could] still [fall] within the officer's shift," it erroneously applied the premise that all "FDCRs . . . submitted within one day of the force event [should be] coded as submitted on time." Members are generally required to submit 910.00 reports, i.e., General Offense Reports, by the end of their shift. *See* PPB Directive 910.00, section 1.1; *cf.* Force Audit Rep. at 14-15. There is no reason to assume that submitting a report within one day of the event is timely.

The policy needs to be modified to more clearly require timely submission of reports, including the FDCR. Submission of all relevant information by the end of shift would be consistent with generally accepted practices. However, current policy imposes one deadline for submission of the General Offense Report, and no deadline for submission of the FDCR. Further, even the deadline for submission of the report is qualified. This is confusing.

The audit found that 90% of involved officers reported submitting their FDCR

within one day of the use of force.  Force Audit at 14.  However, the reliability of the data appears questionable.  The Force Audit Report assessed timeliness by relying on the dates that the respective officers manually entered on their FDCRs. We appreciate the effort that Members have put forth to implement this honor system, and the Force Audit Report's assessment of report timeliness has some value, even if based upon the dates that officers are entering themselves.  However, the unreliability of the current system is demonstrated by six reports dated *prior to* the use of force they were describing, and other reports dated so close in time to the call for service or use of force as to question the accuracy.  The Force Audit Report acknowledges that an automatically generated time stamp is necessary to truly verify the time at which an FDCR is submitted.  We agree.  This solution would help simplify the lives of officers and auditors alike.

Five Officers audited failed to complete FDCRs after using force, two reports were submitted 2-10 days after the use of force, and two FDCRs were submitted 30 or more days after the use of force.  The Force Audit Report does not discuss these incidents further.  Portland Police Bureau needs to examine the causes for the late or non-submissions, and take steps to address them.

 *Whether reports use common everyday language to sufficiently describe the unique characteristics of the event.*  Par. 74(c)(ii).

Portland Police Bureau has clearly mobilized in an effort to more consistently, and in greater detail, report their use of force.

There is still significant room for improvement in this area, however.  The audit found that the officer's narrative was not a complete and accurate account of the force decision making in more than 22% of the cases reviewed by supervisors.  *See* Force Audit Rep. at 10 (102 of 452 supervisor reviews should have identified these errors, but did not).  Although PPB attributes this statistic to a coding issue related to descriptions of alternative force options, the problem actually seems more extensive:  "the most common information missing from an officer's narrative report was (1) documentation of witness statements, (2) description of other force options considered, and (3) description of the subject's injuries or lack thereof." Force Audit Report at 14.  DOJ's review confirmed that many reports included insufficient detail.  For example, Members often substitute conclusions for key facts:

- A report said that the subject was "verbally hostile and non-cooperative" immediately before force was used.  The report does not tell what the subject actually said.

- Another report attributed an "aggressive and agitated manner" to the subject, but offered no facts to support this conclusion.

- An officer said he "deescalated the situation," but did not explain how.

This prevents supervisors from conducting an adequate review.  The Advanced Academy training explained how to avoid doing exactly this.  *See* comments to Par.

69.  Perhaps in-service training could include a refresher on this point.

*Whether use of force reports include a decision point description.*  Par. 74(c)(iii).

The Force Inspector appears to have made a sincere attempt at auditing reports for whether they include a decision point description of events surrounding the use of force.  However, the data points audited are insufficient to measure whether the officers included a decision-point description.

'Decision-point analysis' refers to analyzing each use of force from the inception of the police-citizen encounter rather than focusing narrowly on the ultimate use of force.  *See* Police Assessment Resource Center, National Guidelines for Police Monitors (2009), *available at* http://www.parc.info/national-guidelines-for-police-monitors/.  "An officer-involved shooting, for example, is best analyzed from the moment police officers are dispatched. Each key strategic or tactical decision by the officers thereafter should be subject to thorough review in which alternatives are considered."  *Id.*  As but one paradigm, police-citizen encounters can be broken down into four phases:

> Violent police-citizen confrontations are usually initiated by a direct observation or a summoning by radio by another police officer or by a citizen.  In response to this initial information, the officer makes preliminary decisions, then confronts the citizen or citizens of concern in the transaction, and finally engages in a direct exchange of information, usually verbal, that leads more or less directly to the violence.  For purposes of analysis, it is convenient to think of the transaction in four phases:  anticipation, entry, inform-ation exchange, and the final decision that leads to an act of violence.

Arnold Binder & Peter Scharf, *The Violent Police-Citizen Encounter*, 452 Annals Am. Acad. Pol. & Soc. Sci. 111, 116 (Nov. 1980).  Each phase is subject to separate analysis.

By contrast, "The [Force Inspector's] audit methodology collects two data points at the officer level designed to measure a decision point description of the force decision making[:] (1) documentation of the subject's resistance prior to the application of force and (2) documentation of alternative force options considered."  These two data points relate to the final decision to use force.  By the Force Inspector limiting his assessment to these two data points, he excludes what Binder and Scharf call the anticipation, entry, and information exchange phases of the encounter.

*Whether reports describe suspect injuries, complaint of injury, or lack of injury.*  Par. 74(c)(v).

The Force Audit Report does a very good job of breaking out the number of force reports that document injuries, complaint of injury, lack of injury, and, importantly, the number of reports that were silent as to injuries.  Portland Police Bureau's thorough review brought to light a specific outcome:  even where officers noted the

subject's injury or lack thereof in the FDCR, they often did not include this information in the narrative portion of the report (as would seem to be necessary to comply with Subparagraph 74(c)(v)). This outcome demonstrates for PPB the pitfalls of requiring Members to submit different kinds of reports for different uses of force, each on different deadlines. Portland Police Bureau can simplify this process for Members and improve the data it receives.

*The Reason for Initial Police Presence.* Par. 74(c)(vi).

The Force Audit Report found that only four of the 113 involved Members' reports audited neglected to include the reason for the initial police presence. The Report found that all Sergeants audited included this information.

*Whether reports included a description of the level of resistance encountered.* Par. 74(c)(vii).

Portland Police Bureau's audit found that, universally, Officers adequately reported the level of resistance encountered, and that supervisors almost always did the same. *See* Force Audit Rep. at 11.

*Description of why de-escalation techniques were not used or whether they were effective.* Par. 74(c)(viii).

The Force Audit Report noted that in 23% of cases, Officers did not claim to use de-escalation techniques, Force Audit Rep. at 3, but the Report does not discuss why de-escalation techniques were not used in those cases. The Report also does not analyze whether de-escalation was effective when used.

*Whether the individual was known to be mentally ill or in mental health crisis.* Par. 74(c)(ix).

The Force Audit Report shares that some Members "indicated knowledge" of a subject's mental illness prior to use of force, Force Audit Rep. at 19, but the audit does not appear to have analyzed whether the Members who did not so indicate actually knew of the subject's mental illness.

*Whether the reports include a description of force an officer observes another officer apply.* Par. 74(c)(x).

The Force Audit Report's presentation of this issue was confusing. The Report says that PPB audited "209 officer-subject interactions, with 224 force options applied." Even were we to accept these figures as accurate,[6] it is not clear from the statistics presented that PPB analyzed every report to check for observations. Twenty-six of the 209 officer-subject interactions involved officers working alone. *See* Force Audit Rep. at 13. That leaves 183 Officer-subject interactions involving multiple Officers. If we understand Officer-subject interaction to refer to a use of force, it is unclear why PPB should not expect 183 reports from the Officers

---

[6] As noted elsewhere, it appears that this number does not accurately reflect PPB's actual use of force during the quarter.

| | |
|---|---|
| | involved.  Instead, PPB only cites 134 remaining reports at issue:  126 where Officers included observations, and 8 where they did not.  *See id.*<br><br>Even were we to accept PPB's representation that eight Members neglected to report a use of force by another Member, that raises the question of what corrective action PPB took.  The Report needs to speak to this.<br><br>*Whether reports demonstrate officers' diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses, and include identifying information for anyone who refuses.*  Par. 74(c)(xi).<br><br>In 27 of 113 cases, the investigating Sergeant included no contact information for a witness who declined to provide a statement.  *See* Force Audit Rep. at 13.  This leaves room for improvement. |
| **Technical Assistance** | PPB should view the audit and Force Audit Report as serving two functions.  First, they can provide PPB command staff with information critical to PPB's force management, including information about Members' use of force and the reporting and review systems.  Second, the Force Audit Report can also demonstrate progress towards compliance.  The Report should be designed with these two purposes in mind, and messaged accordingly.  If information in the Report is not helping command staff manage force, and is not relevant to PPB's compliance status, PPB may be well served to question the value of including such information.<br><br>Portland Police Bureau should be asking involved Members to report (a) whether *mental health information was available*; (b) if so, what information; (c) whether the information played a role in force decision making; and (c) if so, what role it played.<br><br>Portland Police Bureau's review of the force used against individuals who were "tensing up, thrashing around, or wiggling" seems to have been based upon the false assumption that this constitutes "active," rather than "passive," resistance. PPB needs to renew its review of these cases from Q1.<br><br>For Technical Assistance related to ECW (Taser) usage, please see our comments associated with Paragraph 68.<br><br>We agree with the Force Audit Report's conclusion that PPB would benefit from an automatically generated time stamp to verify the time at which an FDCR is submitted.<br><br>In addition, each level of the chain of command should be closely reviewing reports, including the time at which reports are submitted. When discrepancies are discovered, corrective action should be taken.  Supervisors should not wait for the audit to identify untimely reports.<br><br>Portland Police Bureau should ensure that its training adequately teaches all of the information that officers and supervisors must include in their reports.  When the information included in a report is inadequate or missing, PPB should take |

|  | corrective action and document it. |
|---|---|
|  | Portland Police Bureau's decision-point analysis needs to capture all of the phases of the police-citizen encounter.  (And, as previously mentioned, PPB should instruct its Members via policy and training to include the necessary information in reports.) |
|  | As discussed above, PPB should modify the use of force policy to require a single report with all of the requisite data for every type of use of force. |

75. In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

a. Complete a Supervisor's After Action Report within 72 hours of notification;

b. Review all use of force reports to ensure they include the information required by this Agreement and PPB policy;

c. Evaluate the weight of the evidence;

d. Use a "decision-point" approach to analyze each use of force;

e. Determine whether the officer's actions appear consistent with PPB policy, this Agreement, and best practices;

f. Determine whether there was legal justification for the original stop and/or detention;

g. Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;

h. Determine whether additional training or counseling is warranted;

i. Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

j. Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

k. Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

l. Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

| Status | **Partial Compliance—Ongoing Obligation** |
|---|---|
| Analysis | *Whether After Action Reports are being completed within 72 hours.*  Par. 75(a). |
|  | According to the Force Audit Report, "Three of 113 AARs were not completed within the required 72-hour period.  The audit found that 2 of the 3 overdue AARs included an explanation and that the delay was approved."  This is a helpful starting |

point.  However, the Settlement Agreement imposes a strict requirement that AARs be completed within 72 hours, and does not provide for "approved" delays beyond this window.  Obviously, more explanation of what PPB means is necessary.

*Whether use of force reports include the requisite information.* Par. 75(b).

The audit revealed grave concerns about the completeness of officers' reports.  Members did not completely and accurately account for the force decision making in more than 22% of the cases reviewed by supervisors.  *See* Force Audit Rep. at 10.  Five of 209 involved officers failed to complete an FDCR, and supervisors did not take note.  *See* Force Audit Rep. at 16.  The investigating supervisor failed to upload supporting photographs and/or videos to the database in twelve of 113 cases audited, and these failures were rarely caught.  *See id.*  The investigating sergeant did not request a statement from the subject in 13 of 113 force cases audited.  *Id.* The force audit identified "20 . . . cases [in which] witness observations were not documented, and supervisors failed to explain the circumstances that prevented them from identifying witnesses." *Id.* at 13.  That is, almost one in five investigations did not disclose whether witnesses to a use of force existed or not.  The Force Audit Report does not share how many cases suffered from more than one such infirmity.  Thus, the Report leaves open the possibility that as many as 50 of the 113 force cases audited lacked information fundamental to the investigation.

*Weight of the Evidence.* Par. 75(c).

Although the Force Audit Report cites the number of cases in which supervisors at each level considered the weight of the evidence in reaching their decision, it does not describe its criteria for reaching this determination.  More detail is necessary about how PPB made this assessment.

Per the Force Audit Report, "[T]he Sergeant did not consider the weight of the evidence in 8 of 113 cases reviewed, the Lieutenant in 13 of 113 cases reviewed, the RU Manager in 11 of 113 cases reviewed, and the CHO in 10 of the 113 cases reviewed."  Taken literally, this means that at least one in every 15 force incidents did not receive proper review.  In conjunction with the Force Audit Report's findings concerning omitted evidence, this delivers a clear message that additional steps are necessary to ensure the integrity of PPB's supervisory force reviews.

*Use of a "decision-point" approach to analyze each use of force.* Par. 75(d).

"The [Force Inspector's] audit methodology collects two data points at the officer level designed to measure a decision point description of the force decision making[:] (1) documentation of the subject's resistance prior to the application of force and (2) documentation of alternative force options considered."  These two limited data points fail to capture most of the phases of any given police-citizen encounter, as discussed in relation to subparagraph 74(c)(iii).  PPB will need to reassess its methodology for assessing subparagraph 75(d).

The auditors are not the only PPB Members confused about decision-point analysis.  Supervisors make the statement that a "decision point analysis" was conducted, but, in our visit to PPB in August, several supervisors struggled to describe what the

term means or how such an analysis is conducted.

*Consistency with PPB policy, the Settlement Agreement, and best practices.*  Par. 75(e).

Given the number of reports that lacked necessary documentation, witness accounts, or other critical information, we cannot agree with the finding that all but a handful of officers' conduct comported with policy, the Settlement Agreement, and best practices.  *See* Force Audit Rep. at 15.  If, as the audit says, supervisors made this finding notwithstanding the absence of information critical to such a determination, this raises questions about the integrity of the review process.

*Whether there was legal justification for the original stop and/or detention.*  Par. 75(f).

The Force Audit Report states that supervisors found justification for the stop or detention that preceded use of force in 92% of cases – but does not say what happened in the other 8% of cases.  *See* Force Audit Rep. at 13.  The reader could reasonably interpret the Report as stating that eight percent of the stops or detentions in which force was used had no legal basis.  The Report simply cannot be silent on these issues.

The Force Audit Report anticipates changes to "guidance" in order to address this last problem.  It would be helpful to know if the Report is referring to changes to policy, training, or both.

*Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options.*  Par. 75(g).

It is not clear from the Force Audit Report that supervisors consistently assessed incidents for tactical and training implications.  The Force Audit Report said that a supervisor had a tactical and/or training concern in 30% of cases, *see* Force Audit Rep. at 7, but does not share what assessment supervisors made in the other 70% of cases.

There is reason for close scrutiny.  DOJ review found that supervisors did not identify all of the actual policy, training, or tactical issues that arose from officers' conduct.  For example, several supervisors read into the ECW policy a non-existent exception to the 5-second deployment rule.  *See* comments to paragraph 68.

Further, officers may not be supplying all of the information supervisors need to make this determination.  In addition to other deficiencies, the audit found that only 30% of officer narratives documented force options considered besides the one used.  *See* Force Audit Rep. at 11 (62 of the 209 officer narratives audited contained such analysis).

The Force Audit Report states that no supervisors found that force may have been avoided through de-escalation.  *See* Force Audit Rep. at 3.  This conveys relevant information to PPB command staff.  PPB should also share whether any supervisors

neglected to review the need for de-escalation.

*Determine whether additional training or counseling is warranted.*  Par. 75(h).

Although supervisors raised tactical and training concerns in response to some cases, the Force Audit Report does not share whether this translated into additional training or counseling.

*Whether corrective action was implemented for reporting omissions or inaccuracies, or failing to report a use of force.*  Par. 75(i).

The Force Inspector undertook this review, and found as follows:  "On average, supervisors failed to take corrective action when there were material omissions or inaccuracies with officers' reports 86% of the time."  *See* Force Audit Rep. at 21. The Force Inspector recommends revising the reporting directive and training for supervisors, in order to better explain this point.

Five officers failed to complete FDCRs for their use of force, but PPB's audit found that no supervisor reported taking corrective action.

*Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS.*  Par. 75(j).

Rarely did supervisors use EIS to document their discussion of policy or training deficiencies or poor tactical decisions with officers.  *See, e.g.*, Force Audit Rep. at 21 (finding that, when a training deficiency, policy deficiency, or poor tactical decision was identified for supervisors, the EIS entry contained the information in 8 of the 330 EIS entries audited).

*Whether supervisors notify designated personnel of every serious use of force, and any use of force that could appear to constitute misconduct.*  Par. 75(k).

The Force Audit Report states that all nine serious uses of force were referred to the Professional Standards Division.  *See* Force Audit Rep. at 20.

Evidence of misconduct triggers a requirement that supervisors report the matter to Professional Standards Division ("PSD") and other designated entities, under subparagraphs 75(k) and 77(g).  Auditing to ensure compliance with these subparagraphs must begin by determining in which cases evidence of misconduct surfaced, and then looking at what happened in those cases.

It is difficult to decipher whether PPB took the first step.  The Force Audit Report cites a total number of cases that required PSD notification, but does not say how many of those cases included misconduct.  *See* Force Audit Rep. at 20.  It is not clear that the Force Inspector independently reviewed each case for evidence of misconduct.  PPB will need to clarify these points in future reports.

*Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear that an officer engaged in criminal conduct.*  Par. 75(l).

Although they employ slightly different wording, subparagraphs 75(l) and 77(f) require that PPB supervisors in the chain-of-command notify certain entities within PPB whenever the investigation evidences criminal conduct.  (Subparagraph 77(e)

| | |
|---|---|
| | also requires that PPB suspend the use of force investigation when such evidence surfaces.)  Auditing to ensure compliance with this subparagraph must begin by determining in which cases evidence of criminal conduct surfaced, and then looking at what happened in those cases.  The Force Audit Report skips the first step.  The Force Inspector does not independently review each case for evidence of criminal conduct.  Instead, it looks only at the set of cases in which supervisors notified other entities, and asks whether criminal conduct was at issue.  *See* Force Audit Rep. at 20.  This is insufficient. |
| **Technical Assistance** | We agree with the Force Audit Report's repeated recommendation that PPB must revise its reporting directive and provide training.  *See, e.g.*, Force Audit Rep. at 16, 21.  PPB must urgently revise its policies to capture the requirements of the Settlement Agreement and best practices, as Members should be looking to a single, sufficiently directive source (i.e., policy) for guidance on their actions.  As discussed elsewhere herein, PPB has not accomplished this yet.  The paragraph 72 checklist should be amended to capture all requirements that investigating supervisors must meet, and appended to the policy so that supervisors know that it is mandatory. |
| | Subjects of PPB Members' force often refused to give a statement or they responded with negligible factual details.  PPB will inevitably receive some such responses.  Notwithstanding, it may help for the investigating supervisor to explain to subjects that her/his role is to investigate the officers' conduct, and that the subject can assist in that effort. |
| | PPB policy and training must provide supervisors with sufficient guidance so that they will weigh the evidence according to the terms of the Settlement Agreement *and* document their determination. |
| | PPB should take care not to limit "misconduct" to violations of the *Graham* standard, as it does in writing subparagraph 75(k) into policy.  Members can engage in misconduct during a given encounter, *independent* of the reasonableness of the use of force. |
| | Auditing supervisors' performance may require the Force Inspector to independently review the cases in order to verify that the supervisor did not miss anything. |

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

   a. Determine if significant trends exist;

   b. Determine if there is variation in force practice away from PPB policy in any unit;

   c. Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate;

d. Identify and correct deficiencies revealed by the analysis; and

e. Document the Inspector's findings in an annual public report.

| Status | **Partial Compliance—Ongoing Obligation** |
|---|---|
| Analysis | Portland Police Bureau encloses with its supporting documents in response to paragraph 76 each quarter a copy of its "Force Data Summary Report."  With its 2016 Q2 quarterly report, PPB also enclosed a copy of its Force Audit Report, Q1 2016. |

<div style="padding-left: 2em;">

Force Data Summary Report

The Force Data Summary Report includes:

- Breakdowns of use of force and arrests by demographic of the subject, precinct, shift, type of force used, and nature of the call for service, among others;

- Comparisons between the incidence of each type of force and the number of custodies PPB executed; and the total number of "FDCR-level" uses of force;

- Comparisons between the incidence of each type of force and the total number of "FDCR-level" uses of force;

- A chart of the gross number of uses of each type of force, chronologically quarter by quarter; and

- A separate section on "heat mapping" that shows the number of uses of force during each shift at each of the three precincts.

Portland Police Bureau shared with DOJ and the COCL during a meeting in August 2016 the reasons it produces the Force Data Summary Report:  members of the public have expressed appreciation to PPB for regularly sharing these data, and it informs Members of statistics in other precincts and Bureau wide.  Meanwhile, compiling the data and producing the report impose a relatively modest burden on PPB's Crime Analysts.  We appreciate the value to the public and PPB in producing the Force Data Summary Report, and encourage PPB to continue to do so.  Recommendations for improving the utility of the Force Data Summary Report are included herein.

However, as PPB acknowledged during our meetings, the contents of the Force Data Summary Report do not map neatly onto the requirements of paragraph 76. Paragraph 76 requires, *inter alia*, that PPB identify trends; units that use force away from policy; units or groups of officers that use force differently or at different rates than others; and deficiencies revealed by the analysis.  The Force Data Summary Report largely focuses on Bureau-wide findings, plus "heat mapping" that breaks force down by shift and precinct.  It does not identify units or groups of officers using force differently or away from policy, and does not share deficiencies in Members' use of force.  As described in the below technical assistance, the

</div>

analyses in the report could conform more closely to generally accepted practices, yield the trends required by the Agreement, and at the same time increase the value for PPB command staff seeking to manage the Bureau's use of force.

The Force Data Summary Report produces a few statistics relevant to Settlement Agreement compliance. First, the gross number of Taser uses by PPB Members has remained largely constant over several years, notwithstanding a 25% drop in the number of custodies. Second, five individuals were subjected to 3 or more Taser applications during a single encounter in Q2. Third, individuals in mental health crisis constituted eleven of the twenty subjects to whom Tasers were applied in Q2. Each of these findings is worthy of closer analysis.

Force Audit Report

The Force Audit Report, produced for the first time with PPB's 2016 Q2 report, begins to address some of the requirements of paragraph 76. As stated above, we appreciate the work at all levels that formed the basis for the Force Audit Report. The Report includes a number of statistics from the quarter. Further analysis of these statistics may lead to reliable trends or variations in the use of force.

The Force Audit Report brought to light some patterns that will help PPB manage force going forward. To cite a few examples:

- Everyone in the force reporting system, from involved Members to the Chief, would benefit from a system to time-stamp reports with the actual time they are submitted.

- Fifty-two of 209 Members involved in uses of force in Q1 reported mental health information available to them at the time. *See* Force Audit Rep. at 17. But only 27 FDCRs had a check mark in the box for "Officer had Prior Knowledge of Subject's Mental Health History." *Id.* Clearly, the box on the FDCR is not serving the purpose that PPB hopes. The Report recommends modifying the language on the FDCR and additional training.

- Supervisors are not taking corrective action even where they identify deficiencies. *See* Force Audit Rep. at 21 ("On average, supervisors failed to take corrective action when there were material omissions or inaccuracies with officers' reports 86% of the time.").

- Even if supervisors are discussing policy or training deficiencies or poor tactical decisions with Members, EIS does not reflect that. *See* comments to subparagraph 75(g).

As to some of the Report's other findings, more analysis is required to determine what, if anything, the statistics means for force management. For example, the Force Audit Report says, "East Precinct used the takedown force option less than the other precincts and used the hands/feet (strikes/kicks) force option more than any other precinct/division – almost 3 times more frequently than any other precinct/division." *See* Force Audit Rep., Q1 2016 (January - March), at 3. As PPB notes, the Bureau must undertake further study of the uses of force that give

41

rise to statistics like this.  *See* Force Audit Rep. at 3.  Portland Police Bureau will want to know if some East Precinct Members or units use strikes more often than others.  Portland Police Bureau will want to know more about the resistance East Precinct officers faced in this class of cases.  Portland Police Bureau will also want the facts known by the Members at the time they used strikes on a subject.  Portland Police Bureau must undertake these second order analyses in order to determine whether the trend is significant, whether East Precinct Members are using force differently (or, instead, are just faced with different situations); whether the Members use of force deviates from policy; and whether any deficiencies exist.

Many of the Report's farthest-reaching conclusions are subject to question, however.  For example, the Force Audit Report found that "officers consistently chose force options reasonably calculated to establish or maintain control with the least amount of appropriate force" and "[t]he force options chosen by the officers were consistent with training and policy."  *See* Force Audit Rep. at 4.  However, PPB does not cite data that would support these conclusions, and other evidence in the Report tends to call it into question.  For example:

- In 24 cases, at least one chain-of-command reviewer neglected to render an opinion on whether the involved Member chose the appropriate force option.  *Id.* at 6.  It seems counterintuitive that the Force Inspector found that Members were choosing the appropriate option "consistently," even without the benefit of chain-of-command opinions in nearly one-quarter of uses of force.

- The Force Audit Report cites twelve cases in which Members pointed firearms at subjects who were either passive or were "tensing up, thrashing, or wiggling."  *See* Force Audit Rep. at 5.  This is a use of force that could have deadly consequences, used against individuals who reportedly exhibited little resistance.  Portland Police Bureau justifies these uses of force because (a) they were "high risk traffic stops," *Id.* at 4-5, and/or (b) the subject passively resisting was "impeding a lawful objective," *Id.* at 4.  Portland Police Bureau presents no facts to substantiate either claim or clarify its usage of these terms.  Moreover, the Settlement Agreement does not give PPB per se authorization to point firearms at individuals just because their passive resistance "impedes a lawful objective." It does, however, require that use of force be objectively reasonable.

The Force Audit Report claims that officers' FDCRs and narrative reports were "comprehensive," *see* Force Audit Rep. at 4, but many case files lacked critical pieces of information that could corroborate or refute the officers' accounts.  For example, 10 FDCRs and 73 narrative reports failed to discuss injury to the subject or lack thereof.  *Id.* at 5.  (The Force Audit Report also mentions two subjects who sustained broken bones during encounters with PPB Members, but does not discuss these cases in any detail.)  Also Taser download reports were missing from 5 of the 22 Taser cases in Q1.  *See id.* at 8.  Review of specific cases also raises doubts about PPB's broad conclusions above.  For example, in one case, an officer

| | |
|---|---|
| | deployed his ECW for "a continuous seven seconds." The officer conceded he "held the trigger down as the Taser did not have the immediate effect . . . [that] he simply held down the trigger until the subject was not a threat." (The subject was reportedly large and quite violent.) PPB policy requires re-evaluation after each five-second ECW cycle or fraction thereof. The officer's conduct clearly violated policy; his supervisors approved his actions. We identified other, similar cases. |
| **Technical Assistance** | Force Data Summary Report <br><br> • As described elsewhere herein, PPB should focus on assessing members' "use of force" – rather than "FDCR-level force," "FDCR Force," "Force Event," "Applications of Force," or other terms used in the Force Data Summary that are not defined in the Settlement Agreement (and do not necessarily promote better force management). Using so many different terms to refer in different ways to uses of force by PPB Members risks obscuring, rather than clarifying, the information in the Force Data Summary Report's tables, graphs, and narrative sections. To the extent that the terms listed above reflect current PPB policy, PPB will need to modify its policies in this area. <br><br> • As a general principle, if PPB is excluding one or more categories of "force" as the Settlement Agreement defines that term when producing these data, many critical statistics may be rendered unreliable. For example, it appears that PPB excludes control holds that do not result in injury from the entire Force Data Summary Report, notwithstanding that such holds may constitute "force." <br><br> • In comparing the incidence of use of force to PPB activities more generally, the best denominator that PPB has used thus far is "custodies," as the 2016 Q2 Force Data Summary Report defines that term. Use of force as a function of total "calls for service" is not a helpful statistic, as many calls for service have or should have a very low probability of ever escalating to a situation where force is required. <br><br> • It was not immediately clear to DOJ what value PPB derives from comparing each type of force (control holds, takedowns, etc.) to total applications of force in a graph. The parties may benefit from discussing these graphs before PPB includes them in the next report. <br><br> • The graph displaying number of uses of force by day and shift for each precinct (the "heat maps," as the COCL has described them) has value. PPB must drill deeper, however, to units and groups of officers who are using force differently (including use of force inconsistent with policy). <br><br> • In several cases, the Force Data Summary Report includes facts that seem to require more context to understand. For example, the heat map shows increased use of force on weekend nights in Central Precinct compared to other shifts at that precinct. It would be helpful to know whether the |

number of visitors to the Precinct peaks at these times, whether Members are more likely to be faced with an armed subject at these times, and whether the nature of the crimes reported and committed bears distinctive characteristics at these times, among other contextual factors.

- The Report generally shares little about the resistance Members faced in using force.  The Force Audit Report could make additional inquiries that would address this requirement.  For example, pages four and five of the Report recite which types of force were used most prevalently against which levels of resistance.  This provides little guidance about whether the force was appropriate.  Moreover, the Report provides almost no context by which to judge whether the type of force was necessary to accomplish some objective:  whether facts justified the use of a higher level of force than ordinarily associated with the subject's actions,[7] or conversely whether some consideration suggested less force should be used.

- The 'Perspectives' subsection under each section devoted to a type of force seems to repeat much of the data found in each corresponding 'Force Charts' section.

Force Audit Report (as it relates to paragraph 76)

In the Force Audit Report, PPB draws a number of comparisons between different numerical figures.  The value of some of these was not immediately clear.  For example, we did not understand the value of presenting:

- The overall number of force applications per force case, *see* Force Audit Rep. 2016 Q1, at 2;

- The overall number of force options utilized per officer, *id.*;

- The ratio of the number of force applications to the number of force cases audited, for each of the three patrol precincts, *id.* at 3;

- The frequency with which subjects exhibited each of PPB's categories of resistance, *id.* at 4;

- The frequency with which subjects exhibited a category of resistance when multiple force applications were used, *id.*;

- The most frequent type of resistance encountered when each type of force was used – that is, the narrative portion on pages five and six that repeats the information in the table, *id.* at 5.  (The table on page five is valuable, however.)

It may help to discuss these further.

---

[7] Although the Force Audit Report refers to three incidents in which officers pointed firearms at subjects who only passively resisted as "high risk traffic stops" this generalization does not provide much detail that would help understand the facts known to the officers at the time.

|  | In addition:<br><br>• As in the Force Data Summary Report, PPB acknowledges at various points of the Force Audit Report that its figures do not capture all force used by PPB Members.  *See, e.g.*, Force Audit Rep. at 2 (a Member pointing a firearm at a suspect "was audited only when used with another AAR generating force option (takedown, for example)").  Clearly, PPB is underreporting its use of force as a result.<br><br>• The use of jargon such as "high risk traffic stop" may hold specific meaning for PPB.  However, the lawfulness of use of force is, at its core, a fact-dependent question, and thus the mere invocation of jargon does little to address either the lawfulness or consistency with policy of a specific use of force.  We discourage the practice of using such terms where, instead, close analysis of the facts is called for.<br><br>• As discussed above, identifying the items called for by paragraph 76 will require additional analysis of the types of data PPB collected and presented in the Q1 Report. |
|---|---|

77. In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that all supervisors in the chain of command:

a. Review Directive 940.00 findings using a preponderance of the evidence standard;

b. Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

c. Modify findings as appropriate and document modifications;

d. Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

e. Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

f. Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer; and

g. Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

| Status | **Partial Compliance-Ongoing Obligation** |
|---|---|
| **Analysis** | *Application of the preponderance standard.*  Par. 77(a). |

The Force Audit Report provides the percentage of cases where supervisors "measured … to determine whether the evidence supporting the officer's account was greater than any alternative account."  *See* Force Audit Rep. at 14.  The Report does not make clear how it determined that supervisors undertook this measurement, nor whether their method of measuring was sound.  More detail is necessary about how PPB purports to make this assessment.

Even were we to accept the Report's outcomes as accurate, the Report found that in only 88% of cases did command staff measure whether the evidence supporting the officer's account was greater than any alternative account.  Literally, this means that in one of every nine cases, PPB cannot say whether an alternative finding should have been reached, based upon the evidence.  Clearly, additional policy guidance and training are necessary, as recommended by the Force Audit Report (and as discussed elsewhere herein).  A single, clearly-structured force report template may also help bring this number up.

*Completeness of 940.00 reports and ordering additional investigation and whether additional investigations were ordered when it would assist.*  Par. 77(b).

Subparagraph 77(b) requires PPB audits to ensure that supervisors review Sergeants' 940.00 reports, ensure completeness, and order additional investigation when necessary.  Likewise, subparagraph 77(d) requires that PPB audit to ensure that supervisors "[o]rder additional investigation when it appears that there is additional relevant evidence that may assist[,] . . . and counsel the investigator."  Of the 452 supervisory reviews (presumably, the sum of 113 reviews each by Sergeants, Lieutenants, Captains, and the Chief's Office), the Force Audit Report found that 105 should have requested additional investigation, and did not.  More than one in four force investigations was incomplete, and thus at least one in four investigating Sergeants is not receiving the necessary counseling.  This appears to be an extraordinarily high number, and may reflect Bureau policy and training deficiencies the Report mentions.

A chart on page 22 of the Force Audit Report breaks down the 105 flagged supervisor reviews, it appears, by the rank of the supervisor and the unit. Supervisors neglecting to request additional information when they should "was a common deficiency across all levels of command and units, but seemed slightly elevated at North precinct[,]" according to the Report.  The Report lists the types of necessary information that supervisors at North Precinct failed to request; these included failure to photograph the subject (2 cases), failure to get a statement from the subject or witnesses (3), and failure to require witness officer statements (2). This information is helpful:  it gives the reader some sense of PPB's criteria for measuring completeness of reports, and highlights areas that may require

improvement.

PPB needs to describe its findings in greater detail.  PPB should list the criteria by which completeness is assessed. In addition, the deficiency was common across all levels of command and units, but the Report only provides details about North Precinct.

More analysis is also necessary here.  The Report should make clear how the additional information is necessary or could assist in resolving inconsistencies or improve the reliability or credibility of the findings.  Perhaps a discussion of representative cases would be helpful; PPB discussed individual cases in a different context on page four, for example.  In addition, the Report should recommend more specific solutions and provide a basis for these proposals; although we share PPB's confidence that its supervisory personnel are capable of improving, the Bureau will only achieve the "clearer process" that the Report calls for if the Force Inspector explains how the process can be clarified.

One discreet point requires clarification:  in some instances, it appears supervisors pointed out the need for additional investigation, while their superiors in the chain of command either disagreed or overlooked the issue.  For example, the Chief's Office missed the need for additional evidence in ten cases from North Precinct, but the Lieutenants and Captains in North Precinct only missed nine and seven, respectively.  This suggests that reports exist where a Lieutenant and/or Captain requested additional investigation, but the Chief's Office (erroneously) did not share this view.  Portland Police Bureau should describe why this might be.

*Whether findings modified as appropriate, and modifications documented.*  Par. 77(c).

Subparagraph 77(c) asks that PPB audit to ensure that supervisors in the chain-of-command modify AAR findings "as appropriate" and document those modifications.  The Force Audit Report counts the number of modifications that supervisors documented.  *See* Force Audit Rep. at 22.  The Report does not assess whether the modifications were appropriate, and it does not present a tally of necessary modifications that never took place.  In the absence of such assessments, and in light of the Report's findings that 12% of reviews did not assess the evidence according to a preponderance standard and 25% of supervisor reviews should have prompted additional information but did not, we are skeptical that findings are being modified as appropriate.

*Whether additional investigations were ordered when it would assist.*  Par. 77(d).

See above.

*Documentation of training deficiencies, policy deficiencies, and poor tactical decisions; Supervisory discussion of poor tactical decisions, and documentation in EIS.*  Par. 77(e).

The Force Audit Report gives some indication of what training, policy, or tactical issues are being identified.  *See, e.g.*, Force Audit Rep. at 7 ("Aside from the

| | |
|---|---|
| | tactical or training issues categorized as 'Other', the most common tactical or training issue identified was failure to wait for/request cover (21 findings), followed by handcuffing (12 findings)."). We invite more discussion of these points, as they represent opportunities for the Chief to manage force and Members to refine their practices.<br><br>As noted above, those issues that were identified were rarely documented in EIS. *See* comments to subparagraph 75(g).<br><br>*Whether supervisors suspended the investigation and notified the appropriate entities when evidence of apparent criminal conduct surfaced.* Par. 77(f).<br><br>Portland Police Bureau did not make this assessment. *See* comments to subparagraph 75(l).<br><br>*Report to PSD when evidence of misconduct surfaces.* Par. 77(g).<br><br>It is not clear that PPB made this assessment. *See* comments to subparagraph 75(k). |
| **Technical Assistance** | Each more senior supervisor in the chain of command should review documentation of a given use of force, and independently assess the reasonableness of and necessity for the force used.<br><br>However, senior supervisors need not always restate all of the Sergeant's findings or analyses. To the extent that the Lieutenant, Captain, or Assistant Chief's findings and analyses are already captured by the Sergeant's written assessment, the more senior supervisor can concisely describe his decision making process and concur with the findings and analysis below. Of course, where adequate review calls for a command-level supervisor to make alternative or additional findings, s/he should document such findings. |

## IV. TRAINING

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.

| Status | **Partial Compliance – improvement, ongoing obligation** |
|---|---|
| **Analysis** | Portland Police Bureau does not include entries for paragraph 78 in its quarterly report. Portland Police Bureau did not produce documents in support of paragraph 78 compliance in its associated data production for its quarterly report. Given that the second sentence of this paragraph refers to the paragraphs that follow, the absence of PPB's statement for paragraph 78 is understandable.<br><br>We note, however, that the first sentence does contain a substantive requirement— |

|  | one with which PPB has made progress in the past year, as described in our assessment of paragraphs 79-87, below.<br><br>We agree with COCL that:<br><br>We interpret "All aspects of PPB training" to include ECIT, Advanced Academy, In-Service, and Supervisor In-Service. The available evidence suggests that PPB is making a genuine effort to improve these major training programs. We cannot provide a summative judgment on Par. 78 until we have documents indicating that "all aspects of PPB training" conform to the "requirements below."<br><br>We will evaluate training progress in terms of both the implementation conditions described below and the achievement of outcomes listed in paragraph 78, namely, the constitutional treatment of individuals who have or are perceived to have mental illness, the building of community partnerships, the increase of public trust, and the increase of public safety.<br><br>*See* COCL Compliance Report, January through June 2016, at Par. 79.<br><br>As laid out in further detail below, we have informed our assessment of this and all other training provisions based on document review and direct observation of the training academy. |
|---|---|
| **Technical Assistance** | In order to comply with paragraph 78, PPB must comply with all of Section IV. |

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration:  (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| **Status** | **Substantial Compliance – significant improvement, ongoing obligation** |
|---|---|
| **Analysis** | Portland Police Bureau **has made significant progress in informing its training plan and collecting input from various sources, though additional work will be required as this process matures.**<br><br>Portland Police Bureau completed a training needs assessment in September 2015, an evaluation of in-service training in July 2016, and a revised in-service training plan in September 2016.  We agree with COCL's most recent compliance report that:  "PPB has made a serious effort to conduct the 2015 Training Needs Assessment in a manner consistent with accepted practices in the field of program |

evaluation. Available data were used to identify training needs and the report covers the major requirements of the Settlement Agreement as well as additional topics of training." *See* COCL Compliance Report, January through June 2016, at Par. 79.

COCL recently produced a technical assistance statement to assist the City in coming into compliance with this provision. *See* TECHNICAL ASSISTANCE STATEMENT, Subject: Training Needs Assessment, Prepared by ROSENBAUM & WATSON, LLP, Compliance Officer and Community Liaisons (COCL), July 1, 2016, available at http://www.cocl-coab.org/sites/default/files/COCL%20Training%20Needs%20Assessment%20TA%20Statement%20submitted%207.5.2016.pdf.

COCL acknowledges that prior to this technical assistance, it had not engaged in a "detailed discussion of the Training Needs Assessment." *Ibid.* at 2. Thus, only recently has PPB had the benefit of COCL's additional guidance on this provision.

Although COCL recommended in its technical assistance statement that PPB conduct citywide surveys for trends in "performance hazards" for Par. 79(a) (*ibid.* at 5), the Settlement Agreement does not require that effort. Rather, PPB's after action reviews provide the agency data on current performance hazards and the Training Division solicited performance hazard information from interviews of precinct commanders. *See* DOJ: Training Division Status Update In-Service Training Needs Assessment, April - June 2016, dated July 28, 2016. In lieu of a separate survey, PPB could inform its training plan by outcomes of the Community Engagement and Outreach Plan ("CEO Plan"), once the City and COAB have brought that plan to fruition. *See* Settlement Pars. 141, 146.

Commendably, PPB met with its Training Advisory Council ("TAC") to inform the Bureau's training plan. *See* Par. 87 assessment, below. TAC serves as the community voice in PPB's training plan. In June 2016, TAC provided specific recommendations on training. *See* "2016 TRAINING AND USE OF FORCE REPORT RECOMMENDATIONS," Portland Police Bureau Training Advisory Council, June 14, 2016, available at https://www.portlandoregon.gov/police/article/581581. We agree with COCL's assessment in its most recent quarterly report that PPB specifically should address the TAC recommendations in its Training Needs Assessment.

Also, commendably, PPB solicited assessment of training needs from reviews of allegations of misconduct by both Independent Police review ("IPR") and PSD. *See* DOJ: Training Division Status Update In-Service Training Needs Assessment, April - June 2016, dated July 28, 2016. Portland Police Bureau's solicitation of IPR's and TAC's input to its training is responsive to DOJ's 2015 report card critique and technical assistance.

Portland Police Bureau's Behavioral Health Unit ("BHU") Advisory Committee also informed the training plan. *See* Par. 95 assessment, below.

Portland Police Bureau provided categorical data responsive to each subsection of

| | Par. 79(a)-(k). *See* DOJ: Training Division Status Update In-Service Training Needs Assessment, April - June 2016, dated July 28, 2016. In addition to PPB's written statements regarding actions taken to comply with Par. 79, other sources during our monitoring support PPB's compliance:
| | <ul><li>We directly observed in-service training with our expert consultant and COCL's police practices consultant. We found many positive aspects and others in which to offer technical assistance. *See United States* v. *City of Portland* - Technical Assistance Letter Regarding In-Service Training, dated Feb. 26, 2016, available at https://www.justice.gov/crt/file/847051/download. While we observed PPB's significant dedication to training, one area of serious concern was the training offered by an Assistant City Attorney. That session emphasized the City's asserted defenses to problematic uses of force, rather than demonstrating compliance with Par. 79(d)'s direction to use problematic uses of force to inform training needs.</li></ul>
| | <ul><li>One of PPB's recently re-investigated force incidents reveals an effective feedback loop to inform training needs based on problematic uses of force, as envisioned in Par. 79(d). In our 2015 report card for Par. 121, we discussed at length allegation 2014-C-0265. Portland Police Bureau recently completed a re-investigation of that allegation, for which the investigation identified a failure to train in the particularized, individualized suspicion requirement for *Terry* stops. As an outgrowth of this more fulsome investigation, the reviewing supervisor provided a memo to the training division on the lack of a record of training on this basic constitutional requirement. *See* 2014-C-0265. While we critique the adequacy of the investigation and finding in that case (*see* Section VIII, below), we laud PPB's use of an administrative investigation to identify a training need.</li></ul>
| | <ul><li>Par. 79(h) requires that PPB research best practices for training. Following our provision of technical assistance in a February 26, 2016 letter, we engaged in follow-up discussions with PPB. We recommended that PPB employ a de-escalation training scheme approved by the Court monitor in our Seattle Police matter. *See United States* v. *City of Seattle*, 2:12-cv-01282-JLR, D.E. 198-1, Filed 04/01/15. PPB's Training Captain reported that PPB had already sought out and planned to use those very same materials. This is emblematic of PPB's willingness to adopt best practices.</li></ul>
| | Lastly, after lengthy and detailed negotiations, DOJ recently approved a revised Policy 1500, which includes provisions that govern PPB's training plan. DOJ and the City specifically considered and incorporated, where appropriate, COAB's recommendations to Policy 1500. |
| **Technical Assistance** | We will assess whether and how PPB responds to the TAC recommendations as we continue to monitor compliance with this provision.<br><br>The PPB's Employee Information System ("EIS"), though not yet fully matured, also should inform future training plans. |

| | |
|---|---|
| | As before, as PPB further implements other provisions of the Settlement Agreement, PPB necessarily will have to revise its training assessment and training plan.  Specifically, PPB and COCL have not yet brought the training audit to fruition.  This audit will inform future iterations of the training plan. |

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum.  These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs.  This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Status | **Partial Compliance – significant improvement** |
|---|---|
| **Analysis** | **PPB has come far in its collection of data to assess training efficacy based on the Kirkpatrick Model (i.e., a four step analysis of reaction, learning, behavior, and results) though PPB still has more work to do.** |
| | Whereas we noted in last year's report card that PPB had only presented plans for some survey tools, this year, PPB provided analysis of completed survey data for a number of its in-service training weeks.  Thus, PPB has taken demonstrable steps toward data collection and analysis.  However, we agree with COCL that "PPB's current effort contains the necessary elements of an evaluation, though it lacks the methodological rigor we believe would make results and conclusions reliable." *See* COCL Compliance Report, January through June 2016, at Par. 80. |
| | We diverge from one significant COCL recommendation.  COCL recommended that PPB incorporate pre-test measures to ensure officers are mastering course content. *Id.* While pre-tests may yield useful data, the Settlement Agreement does not require them.  Moreover, pretests are not a standard practice for police academies nationally and would consume valuable, but limited, training time. |
| | Based on our direct observation of PPB's in-service training, we stated in our technical assistance letter: |
| | Settlement Agreement paragraph 80 requires that PPB implement data collection and analysis regarding the effectiveness of training.  Specifically, these data must include student satisfaction, learning, and application. PPB previously has asserted that it is applying the Kirkpatrick model for data collection, analysis, and improvement of training.  However, we did not witness the necessary data collection to |

feed into this model.

For the observed in-service training, PPB did not use written, individually identifiable, competency-based quizzes of policy or tactics.[8] For one class, PPB instructors gave an eight-question use-of-force policy quiz. However, the quizzes were anonymous.  Theoretically, PPB could use the results to evaluate instructors, but not students.  Similarly, PPB distributed an anonymous survey of the entire training.  Strangely, though, this anonymous survey points out that it could be subject to a public records request.  That admonition seems intended to discourage criticism.  Such comments are not typical or appropriate for this type of survey research.  [COCL similarly found that the public-records admonition is highly unusual in police research, but problematic for ensuring quality data.  *See* COCL Compliance Report, January through June 2016, at Par. 79]. For some practicum instruction, PPB required that all class members successfully complete certain exercises, e.g., firearm qualification.  For other exercises, however, PPB did not include any mechanisms or measures to assure or measure students' understanding or competence.  For example, PPB did not check whether most students properly applied tourniquets and therefore did not determine whether students learned the material.  In previous reports, the COCL has recommended a more rigorous evaluation plan for training. We reiterate the importance of data collection and analysis of training.

*See United States* v. *City of Portland* - Technical Assistance Letter Regarding In-Service Training, dated Feb. 26, 2016, available at https://www.justice.gov/crt/file/847051/download.

| Technical Assistance | Portland Police Bureau should implement competency-based evaluations to determine student learning. |
| --- | --- |
| | Once PPB develops more rigorous data, PPB must review those data and should apply its data analysis to a quality improvement loop. |
| | Portland Police Bureau should consider data from the community in assessing "the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs."  *See* Par. 80.  In part, PPB could use the CEO Plan for this |

---

[8] In PPB's documents produced in support of its quarterly reports, PPB asserted that this observation from our February 26, 2016 letter was its first notice that PPB should use competency-based evaluations.  *See* Action Item 80 Learning Assessments 2nd Quarter:  April - June 2016.  Actually, in our 2015 report card, we told PPB:  "PPB should also assess efficacy of training through:  **competency-based testing** at the completion of each course; utilizing the Inspector's Audits  FDCRs and 940s; utilizing community surveys; and outcomes assessment such as training needs identified in crisis situation reports, internal affairs reviews, or force review boards."  *See* Settlement Agreement Compliance Status Assessment Report –September 10, 2015, (emphasis added) available at https://www.justice.gov/crt/case-document/file/771296/download.

| | purpose. *See* Settlement Pars. 141, 146 |

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Status | **Partial Compliance – improvement** |
|---|---|
| Analysis | **The City has delayed PPB's long-intended use of Learning Management System ("LMS") software in place of PPB's in-house Skills Manager program. LMS will electronically monitor training-related activities within PPB.** |
| | Portland Police Bureau reported that it has been attempting to procure LMS since the first quarter of 2015. More recently, PPB reported delays caused by the City's unwillingness to procure the software, and then the City's need to coordinate the software with a larger cloud services contract. *See* PPB Quarterly Report, Par. 81(a), August 15, 2016. LMS implementation was not set to begin until August 17, 2016. *See* Q2 Learning Management System Update Memo, August 8, 2016. |
| | While PPB contended that its use of Skills Manager since 2005 met the obligations of paragraph 81, we disagreed in our 2015 assessment. Skills Manager did not track all trainings, particularly those provided outside of the academy at the unit level. Thus, the City's delay in LMS has hindered its agency's ability to comply with this provision. |
| | **Absent a fully functional LMS, PPB supervisors must rely on an incomplete training record to review their subordinates' training records.** |
| | Commendably, PPB has attempted work-around fixes to track officers' training. PPB readily admits that has encountered several problems in doing so. *See* PPB Quarterly Report, Par. 81(b), August 15, 2016. The PPB's Snapshot program reports training by the year whereas the State's DPSST reports compliance with 84-hour requirement for a three-year period. *Id.* Portland Police Bureau also receives DPSST's compliance reports until after the reporting period. *Id.* Accordingly, PPB's Training Division is running reports on certification requirements for officers. *Id.* This effort has yielded reports listing officers whom have not met their annual in-service training requirements and PPB has acted to provide the necessary trainings. *See* email from LT Kraig McGlathery PPB Training Division, undated. |
| | This work-around process, while productive, is not the same as the supervisory review of training records that the Settlement Agreement envisions. First, the Settlement Agreement does not limit the training review to only in-service training. Supervisors should review records for not only in-service training, but also any assignment-specific training officers should have, e.g., Special Emergency |

| | |
|---|---|
| | Reaction Team ("SERT") or K-9.  Second, this work-around removes the goal of having the supervisor who is responsible for his or her subordinates familiar with their training and training needs.  This Settlement Agreement goal dovetails with the Settlement Agreement requirement that supervisors check their subordinates' EIS entries.  *See* Section VII, herein. |
| **Technical Assistance** | PPB must bring its data management system to fruition, but should be careful to ensure that the system addresses all aspects required by this provision of the Settlement Agreement. |
| | As with COCL, "Upon complete implementation of the LMS, we will ask PPB for a technical demonstration to ensure that it adheres to the requirements of Par. 81." *See* COCL Compliance Report, January through June 2016, at Par. 80. |
| | Portland Police Bureau supervisors must assume the role of checking their subordinates' training records.  Supervisors' role would not obviate the utility of Training Division's review of in-service training for state certification criteria. |

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Status | Substantial Compliance – ongoing obligation |
|---|---|
| **Analysis** | Commendably, PPB delivered nearly 17,000 hours of internal training and nearly 5,000 hours of external training to its officers in just the first half of 2016.  *See* Course Attendance Summary Report, 2016 Course Attendance – Internal Courses January – June, July 11, 2016; Course Attendance Summary Report, 2016 Course Attendance - External Courses January – June, July 11, 2016.  We agree with COCL that while PPB has achieved substantial compliance with this paragraph, the content of PPB's training reports should adhere to the criteria we have laid out for paragraph 80 and the elements of evaluative training.  *See* COCL Compliance Report, January through June 2016, at Par. 82 |
| **Technical Assistance** | To make this report more meaningful, PPB will have to bring to fruition its training management systems consistent with Paragraph 81, which should provide PPB executives with more useful data on training utilization. |

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force.  The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Status | Substantial Compliance – ongoing obligation |
|--------|--------------------------------------------|
| Analysis | Commendably, PPB directly responded to our critique in our 2015 report card. Portland Police Bureau revised Standard Operating Procedure 1-19 - Training Division Instructor Selection Standards, moving the civil-judgment requirement from paragraph 83 of the Settlement Agreement to the standard list of criteria for consideration of instructor applicants.  Portland Police Bureau also described in its 2016 Q1 report the application of the criteria from paragraph 83 to a candidate for a position at the Academy's Armory. <br><br> We note, as did COCL, that PPB also demonstrated compliance with the prohibition on selecting as instructors any officer who has been subject to discipline for mistreatment of persons with mental illness, following the same process as ECIT and BHRT reviews (see Pars. 101 and 108).  *See* COCL Compliance Report, January through June 2016, at Par. 83. |
| Technical Assistance | We agree with COCL that if PPB decides to hire a trainer involved in a relevant civil judgment, the training director should provide a justification and explanation as to why the officer is fit for service as a trainer and the civil judgment is not a disqualifying factor.  *See* COCL Compliance Report, January through June 2016, at Par. 83. |

84. All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

    a. With respect to patrol officers, PPB shall:

        i. increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

        ii. emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

        iii. continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

        iv. continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

v. describe situations in which a force event could lead to potential civil or criminal liability; and

vi. continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-center communication, such as the term "mentals," in all work-related settings and communications, as well as when interacting with the public.

b. With respect to supervisors, provide additional training on how to:

i. conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3;

ii. evaluate officer performance as part of PPB's annual performance evaluation system; and

iii. foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action.

| Status | Substantial Compliance – ongoing obligation |
|---|---|
| Analysis | PPB provided documentation evidencing that it provided training on the Settlement Agreement to new officers attending the Advanced Academy in April 2016. Likewise, we observed PPB's in-service training in December 2015, which also included a teaching session concerning the Settlement Agreement. <br><br> COCL stated that it will assess the 2016 in-service training, now occurring, and later supervisor training to evaluate materials for topics related to the Settlement Agreement. *See* COCL Compliance Report, January through June 2016, at Par. 84. |
| Technical Assistance | We note that in speaking with officers about the ECIT program, some noted that they understood they only needed to take certain action because the Department of Justice made PPB do so. As the current Chief has stated correctly, PPB owns its own reform. We encourage PPB to emphasize that it is undertaking reform at the direction of its Chief, not the Department of Justice. |

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

a. Conducts a comprehensive needs assessment annually;

b. Creates a Training Strategic Plan annually;

c. Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training;

d. Maintains accurate records of Training delivered, including substance and attendance;

e. Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ;

57

f. Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and

g. Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Status | **Partial Compliance – ongoing obligation** |
|---|---|
| Analysis | Portland Police Bureau's ability to comply with these audit provisions has been linked to COCL's collaboration to construct an effective audit.  COCL and PPB report that COCL agreed to provide PPB technical assistance concerning training evaluation as a prerequisite to the audit.  *See* COCL Compliance Report, January through June 2016, at Par. 85; PPB 2016 Q1 and Q2 compliance report, at Par. 85.  Accordingly, COCL issued technical assistance statements related to Training Needs Assessment (*see* Par. 79) and Training Evaluation (*see* Par. 80).  COCL has not yet produced technical assistance in connection with paragraph 85(b), (e), and (g).  *See* COCL Compliance Report, January through June 2016, at Par. 85. |
| Technical Assistance | COCL and PPB must complete consultation regarding the audit and implement a usable tool. |

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council.  The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented.  The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies.  The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Status | **Partial Compliance – ongoing obligation** |
|---|---|
| Analysis | As with the prior provision, PPB's ability to comply has been linked to COCL's collaboration to construct a model for effective data gathering and analysis.  Portland Police Bureau's Inspector reported waiting on the COCL for collaboration, which then delayed PPB's compilation of longitudinal data.  *See* PPB 2015 Q3 and Q4 compliance report, at Par. 86.  This year, COCL consulted with PPB's Inspector on the force report and PPB has implemented its force reporting to PPB's training manager, Assistant Chief, and TAC.  *See* PPB 2016 Q1 and Q2 compliance report, at Par. 86; *see also* Training Advisory Council Meeting Minutes, May 11th, 2016 (describing the Inspector's presentation to TAC).  COCL acknowledged that it must further consult with the Inspector, but also advised that the Inspector should present |

|  |  |
|---|---|
|  | more force data to subsequent TAC meetings.  *See* COCL Compliance Report, January through June 2016, at Par. 86. |
|  | Commendably, in June 2016, the community volunteers who comprise the TAC provided specific recommendations on training.  *See* "2016 TRAINING AND USE OF FORCE REPORT RECOMMENDATIONS," Portland Police Bureau Training Advisory Council, June 14, 2016, available at https://www.portlandoregon.gov/police/article/581581.  *See also* Par. 79, above.  We agree with COCL that TAC's report was thoughtful and informative.  TAC's report provided recommendations concerning coaching of PPB instructors, evaluation of training, and force reporting.  *Id.*  We do not reach conclusions, however, on the TAC's recommendations. |
|  | We have not, as yet, received from PPB an established process for the Chief's office to assess force patterns and implement remedies.  COCL and PPB must complete their consultation on data analysis to bring this later step to fruition. |
| **Technical Assistance** | COCL must complete its collaboration with PPB's Inspector to assist PPB with coming into compliance. |
|  | PPB should respond to each item in TAC's recommendations. |
|  | Once PPB completes its COCL consultation, we expect PPB to provide demonstrable evidence of data analysis for patterns of uses of force, followed by remedial training to address deficiencies, if any. |

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Status | **Substantial Compliance – ongoing obligation** |
|---|---|
| **Analysis** | TAC has been conducting public meetings.  TAC even received extensive public comment from Portland Copwatch.  *See* Training Advisory Council Meeting Minutes, May 11th, 2016.  Portland Police Bureau has listed TAC agendas and minutes, as well as TAC's report.  *See* https://www.portlandoregon.gov/police/61449. |
| **Technical Assistance** | As we stated last year, like many other volunteers in this process, TAC members deserve thanks. |
|  | We will assess TAC's planned review of its report. |

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis.  Under a separate agreement, the United States is working with State of

Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Status | Not measured |
|---|---|
| Analysis | **The State now has a plan for improved, community-based mental health services.**<br><br>We recognize that PPB continues to operate within the context of serious gaps in community-based mental health services throughout the State, and PPB deserves praise for initiating engagement with community partners in the effort to bridge the service gaps.<br><br>Portland Police Bureau has done so by working with the Unity Center, further discussed below, and with for-profit area hospitals, and by initiating conversations with the Oregon Health Authority regarding the issues Officers face due to the system gaps. In July 2016, the State finalized a Mental Health Performance Plan for Adults with Serious and Persistent Mental Illness (the "Plan"). Input from law enforcement was a key factor in the negotiation of the State's Plan. As a result, the State has committed to increasing the array of community-based mental health care services, including services to assist in decreasing the number of contacts with law enforcement.<br><br>The reforms in the State's Plan include:<br><br><ul><li>Improving transitions from institutionalized levels of care (Oregon State Hospital, Acute Psychiatric Care Facilities, Secured Residential Treatment Facilities, and Emergency Departments ("EDs")) to integrated community-based treatment;</li><li>Increasing access to crisis services (e.g., mobile crisis), and community-based supports (e.g., Assertive Community Treatment ("ACT")) to avoid incarceration or unnecessary hospitalization for adults with SPMI;</li><li>Expanding supported housing and peer support services (There is also a reporting requirement on supported employment); and</li><li>Reducing the contacts between persons with SPMI and law enforcement due to mental health reasons, through better criminal justice diversion</li></ul> |

|  | strategies. |
|---|---|
|  | The Plan also adds accountability to the State's efforts with a requirement for an Independent Consultant to publicly report on the State's progress and to provide the State technical assistance. |
|  | The Department of Justice wrote to the State concerning its Plan and DOJ's expectations regarding implementation.  The Plan, as well as DOJ's letter to the State, are both publicly available at the following link: http://www.oregon.gov/oha/bhp/Pages/Oregon-Performance-Plan.aspx |
|  | In 2016 Q2, PPB reports it applied to serve on the Behavioral Health Collaborative, established by the Oregon Health Authority to assist in the effort of the State's implementation of the Plan.  We look forward to continued feedback from PPB and other law enforcement partners on the impact of the State's Plan as the State implements the Plan over the next three years. |
| **Technical Assistance** | We applaud BHU's regular participation with community partners, and we are pleased to learn that the BHU is looking at ways to share BHU Electronic Referral System (BERS) data on trends of issues being addressed, as we previously advised in our 2015 compliance report. |

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs.  All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| **Status** | **Partial compliance, significant improvement – ongoing obligation** |
|---|---|
| **Analysis** | **The City and PPB have actively participated in establishing the Unity Center.** |
|  | DOJ recognizes that the City is not responsible for the delivery of mental health services.  However, to the extent that the City interacts with persons having mental health service needs, the City has a vested interest in engaging its partners to address the concerns.  Commendably, PPB has continued to actively participate in addressing these concerns. |
|  | As reported in our 2015 assessment, the Legacy Health Hospital System, Oregon Health & Science University, and for- and non-profit health care organizations (Adventist Health and Kaiser Permanente) will open the Unity Center for Behavioral Health.  We expect the Unity Center to provide emergency psychiatric services, a co-located centralized inpatient facility, and enhanced partnerships with community organizations providing behavioral health and substance use disorder services. |
|  | The Unity Center now has a dedicated website, http://unityhealthcenter.org/, and |

|  | reports a projected opening in early 2017.<br><br>Portland Police Bureau has been steadfast in its efforts with the Transportation subcommittee concerning utilization of ambulance services rather than police vehicles for transporting individuals who are placed on a director's hold to the center.  We commend the City and PPB for engaging the legislature to support a change in administrative rules to allow for such transportation, and for working with Unity on the beta testing of the transport protocol. |
|---|---|
| **Technical Assistance** | As noted in our 2015 report, we encourage the City to continue its involvement in the workgroup discussions, not just concerning transportation of individuals to the Center, but also to provide input on coordination with community partners regarding the importance of the inclusion of community-based services at the Unity Center.  We look forward to PPB's report on its role on the Unity Advisory Committee, which the City reported will begin later in 2016. |

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU"), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff.  These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include:

a. Increased sharing of information, subject to lawful disclosure, between agencies and organizations including BOEC, Multnomah County, and health care providers to create an information exchange among first responders and providers to better serve those suffering from mental illness;

b. Creation of rapid-access clinics so those in crisis have access to timely medication management appointments;

c. Enhancing access to primary care providers to shift low-to moderate acuity patients to primary care programs creating more capacity for acute patients in existing outpatient crisis mental health systems;

d. Expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders;

e. Addressing issues of unmet needs identified by Safer PDX and its community partners;

f. Expanding and strengthening networks of Peer-Mediated services to:

i. develop a referral guide delineating these services and locations and assist with accessing information;

ii. better educate the community of the viability of these services as alternative first engagement sites/programs for those having difficulty engaging with "professional driven" services;

62

iii. expand peer services connected to peer supports in the community for inpatient psychiatric units (including Emergency Departments) and in the community;

iv. add peer guides to work alongside Emergency Department guides for those patients with behavioral health issues entering the Emergency Department; and

v. evaluate opportunities to expand use of peers to coordinate with PPB ABHU (as described herein) and function as a link with impacted individuals; and

g. pursue tele-psychiatry (a provision of mental health care by video conferencing) as a way for first responders to take advantage of existing IT infrastructure to provide direct care or provider evaluation supporting the provision of appropriate services to an individual in crisis.

| Status | Substantial Compliance |
|---|---|
| Analysis | **Portland Police Bureau has sought collaboration even after CCOs disbanded mental health subcommittees.**<br><br>Portland Police Bureau initially reported that the CCOs had created mental health subcommittees, and that the BHU command participated in both the Health Share Oregon and Family Care CCO subcommittees. *See* https://www.portlandoregon.gov/police/article/452158, and quarterly reports 2014 Q1-2015 Q1. Portland Police Bureau previously then reported that the CCOs disbanded these subcommittees – for unknown reasons.<br><br>We continue to acknowledge that the City cannot force the CCOs to create or maintain such subcommittees. Notwithstanding this jurisdictional barrier, the sharing of information between partners concerning the improvements for behavioral health services indicated in subparagraphs (a)-(g) above is critical to linking individuals to services and, by extension, helping to avoid unnecessary contact with law enforcement.<br><br>As noted in our analysis in Paragraph 88, above, we applaud PPB on their initiative to serve on the Behavioral Health Collaborative, established by the Oregon Health Authority to assist in the effort of the State's implementation of its Mental Health Performance Plan. We look forward to continued feedback from PPB and other law enforcement partners as the State implements the Plan over the next three years.<br><br>We further applaud PPB's other creative efforts to engage its partners to meet the spirit of this provision. For example, PPB reports that the SCT Program Manager continues to attend the Legacy Emergency Department Outreach monthly meetings, and manages referrals from ED diversion programs. |
| Technical Assistance | We encourage PPB to champion the efforts by the BHU, including the SCT, to seek out opportunities to engage system partners. |

## VI. CRISIS INTERVENTION

The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises. The PPB will add new capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis as required by this Agreement. Despite the critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force.

### A. Addictions and Behavioral Health Unit and Advisory Committee

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU.  ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

| Status | Substantial Compliance |
|---|---|
| Analysis | **Portland Police Bureau has fully established behavioral health response teams, pairing Project Respond clinicians with specially trained Officers** |
| | Despite the lack of a Memphis Model crisis intervention team as discussed in more detail in our analysis of Paragraph 99, PPB has established a Behavioral Health Unit ("BHU") (the equivalent of the "ABHU" required by this Paragraph), and the BHU substantially functions in an oversight and coordination role as required by this Paragraph. |
| | *Establishing ABHU:*  PPB has established the Behavioral Health Unit (BHU). As noted in our 2015 report, we commend PPB on the development and dedication of the BHU and its coordination with the BHU Advisory Committee and other community partners ("BHUAC"). |
| | *Addictions and Behavioral Health Unit oversight of Crisis-Intervention Team, Mobile Crisis Prevention Team, and Service Coordination Team:*  The BHU includes a mobile crisis prevention team, called the Behavioral Health Response Team ("BHRT"); the SCT; a Coordinator for ECIT Officer s, and a Crime Analyst. The BHU assists in the development of Academy-level Crisis-Intervention Training and Enhanced Crisis-Intervention Training. |
| | The PPB chain of command provides for the Behavioral Health Unit's coordination with ECIT-trained Officers, as well as certain oversight responsibilities.  ECIT Officers report via their chain of command to their precinct commander and, ultimately, the Assistant Chief of Operations.  This structure is consistent with the Memphis Model. |
| | While the BHU does not directly supervise ECIT Officers, we commend PPB for developing a new SOP to clarify BHU's oversight role of these Officers. |

|  | Specifically, the SOP clarifies that BHU is "tasked with assisting in the oversight of ECIT Officers to ensure they continue to meet . . . qualifications." This task requires the BHU Lieutenant to coordinate with ECIT Officers' command staff and the Professional Standards Division, to ensure that there is an updated list of ECIT Officers, monitor EIS alerts regarding ECIT Officers, communicate alerts to ECIT Officers' commanders, review sustained IA investigations involving force or misconduct against a person with mental illness, and notify the Central Precinct Commander of actions that may impact Officers continuing on the ECIT. See, Standard Operating Procedure #1-2. We expect the City to continue to monitor the performance and supervision of ECIT Officers, and to expand the oversight functions of BHU as necessary. While the current unit structure of the BHU conforms to the Memphis Model, how ECIT is deployed does not. *Command-level Supervision:* The Central Precinct Commander oversees the BHU, including both the BHRT and SCT. A Lieutenant oversees the day-to-day operations of the BHRT; the SCT Program Manager oversees the SCT. |
|---|---|
| **Technical Assistance** | Portland Police Bureau should continue to update COCL and DOJ on changes to personnel where applicable, and consider evaluating and expanding BHU's oversight functions to include evaluation and review of ECIT reports and an increased role in discipline-related issues. To ensure adequate review and oversight, PPB should staff the Crisis Intervention Coordinator position with a Member of supervisory rank. |

92. ABHU will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

| **Status** | **Partial compliance, improvement – ongoing obligation** |
|---|---|
| **Analysis** | **Portland Police Bureau conducts coordinating meetings with law enforcement and mental health partners and is now developing data to help mitigate future law enforcement interactions.** Portland Police Bureau reports that it holds Behavioral Health Coordination Team ("BHCT") meetings every other week with system partners, including Multnomah County system partners such as the Mental Health Diversion Court program (including Probation and Parole), and the Sheriff's office. BHCT attendees problem-solve challenging cases or individuals with whom their agencies have repeat encounters. Other community-based partners also attend these meetings. While such meetings are commendable, we are concerned about team members' absence rates. In a review of attendance records from 2015 Q4 – 2016 Q2, absenteeism ranged from a high of 74% to a low of 39%, with a typical absentee rate of at least 50%. This is concerning given the purpose of the meeting is to share |

|  | information between partners.  DOJ will further address this concern as we gather additional information from the BHCT. |
|  | This year, PPB reportedly began sharing BHU Electronic Referral System ("BERS") data with partners at the BHCT in the form of "snapshots" that contain a summary of an individual's status with BHU, contacts with police, and referral information.  It is unclear, however, how BHU or system partners use those snapshots in order to decrease law enforcement interactions or mitigate potential uses of force.  The snapshots represent a limited selection of the data that may be shared between the County and PPB, and focus on individuals, rather than looking at data that might help address broader trends in interactions with mental health service consumers and use of force.  Portland Police Bureau also reported that in April 2016, it presented to the BHCT PPB's analysis of BERS trends of law enforcement contacts pre and post and BHCT referrals. |
|  | Portland Police Bureau's own collection of data pursuant to the Mental Health Mask is still in initial stages.  Once available, these data may assist PPB and its partners in evaluating program effectiveness.  These data may also have other potential uses to advance the goals of this Paragraph. |
|  | Portland Police Bureau reports that the SCT continues to meet and manage referrals through coordination with several partners. |
| **Technical Assistance** | We continue to commend BHU for regularly participating in meetings to coordinate resources with community partners.  We are pleased to learn that PPB is considering how to present trends in data compiled by BERS.  We recommend that BHU pursues additional avenues or methods for sharing BERS-related data on trends of issues being addressed, in addition to discussion regarding individual cases referred to the BHU.  BHU should explore avenues for using the data contained in the "snapshots" to advance the objectives in Paragraph 92.  BHU should additionally monitor data that is obtained through the Mental Health Mask to find information that may be shared with the County to advance mutual goals. |
|  | In 2016 Q1 and Q2, PPB reported that the BHU produces a "BERS trend report," and that BHU was compiling a list of partners with whom to share the report.  We are pleased that PPB is planning to share this information.  However, the report provided does not address trends.  Rather the report is a snapshot in time as to the status of referrals.  We encourage BHU to assess trends by comparing data over a period of time. |

93. ABHU shall track outcome data generated through the C-I Team, MCPT, and SCT, to:  (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Status | **Compliance Rating Pending – Insufficient Documentation** |
|---|---|
| Analysis | **Portland Police Bureau is implementing a data collection system to assess staffing of mental health related calls that requires Officer participation to generate useful data.** |

*Tracking Outcome Data:*

The BHU's compliance with the requirement to track outcome data depends upon successful implementation of PPB's Mental Health Mask, first implemented by PPB's Strategic Services Division (SSD) during 2016 Q1. The Mask, developed with DOJ input, requires all Officers to fill out an electronic form for each citizen interaction to track a number of measures, including whether there was a mental health component to the interaction, use of ECIT resources, and outcomes. It replaces the previously used "ECIT Template" that was only used by ECIT Officers and only after utilizing crisis intervention skills during an interaction. As noted by the COCL's analysis, fluctuations in the number of ECIT Templates indicated that it was not being used consistently.

During our compliance visit in August 2016, we spoke to a number of Officers regarding the Mental Health Mask. At its initial implementation, the Mask had a number of IT issues that made its use difficult. Additionally, some Officers stated that some of the questions on the Mask were vague and difficult to answer. Officers also reported that some Officers would fill out the Mask to indicate no mental health component, even where there existed indications of a mental health component, to avoid having to fill out the remainder of the form. Accordingly, several Officers indicated that they did not believe the initial data produced by the Mental Health Mask would be accurate.

Portland Police Bureau has taken steps to improve the Mental Health Mask in response to problems, including addressing many of the IT concerns and altering problematic questions. It is too early to assess the success of the Mental Health Mask in tracking ECIT and other data now that initial problems have been addressed. We will conduct further assessment once PPB has collected adequate data.

The BHU continues to track BHRT referrals and follow-up through its BERS system. Portland Police Bureau reports that any PPB Member can make a referral to the BHU through BERS, and such referral is assigned to a BHRT if it meets certain criteria. In 2016 Q2, PPB reports that there were 246 referrals to BHU (including individuals with multiple referrals), 162 of which were new referrals. Of those new referrals, 88 (54%) were assigned to a BHRT for follow-up. Further, in 2016 Q2, PPB reported that there were 135 cases (131 individuals) that had reached an outcome and thereby were transferred to inactive status. The most frequent outcome was "coordinated services" (43 cases), whereas jail/criminal justice system accounted for 15 cases, representing an increase of 8 from 2015 Q2. Other categories are as follows: concern mitigated (25 cases); unable to locate (20 cases); refused assistance (15 cases); civil commitment (6 cases); and

|  | other (5 cases). We are concerned about the increase, albeit small, in individuals who ended in the criminal justice system, were not located, refused assistance, or were civilly committed.  We urge BHU to track such data trends and the reasons for such outcomes, and address trends in the semi-weekly meetings with partners.

Portland Police Bureau also produced aggregate data of the number of entrants to SCT's program; the number of graduates; those who were able to find housing and/or a job after the program; and the aggregate number of arrests for program participants before the program as opposed to after.  The statistics provided a broad overview of the scope of the program, but continue to have limitations, discussed in detail in our response to Paragraph 112.

*Developing New Strategies for Repeat Calls:*  Although PPB indicated in 2015 Q2 that data will be used to develop strategies, it still has not reported any such strategies or described how the data tracked will lead to strategy development. |
|---|---|
| **Technical Assistance** | BOEC uses the "ECIT" code to track dispatch for the current limited category of calls involving a mental health component for which ECIT may be dispatched. BOEC codes all other calls that may involve a mental health component with only one code for the situation (*e.g.*, welfare check, disturbance, etc.).  For these other calls, a regular Patrol Officer is dispatched regardless of whether there is a mental health component to the situation.  Until PPB fully and successfully implements the Mask, it will not be possible to know how many calls *not* coded as ECIT involve a mental health component.  We urge PPB to continue to refine and update the Mask in response to input from Officers, the COCL, and DOJ, in order to improve accuracy in the collected data.  As part of this effort, it will be crucial to inform Officers about why PPB is collecting these data, rather than simply conveying that it is a DOJ requirement, as has been done in the past.  Accurate input into the Mental Health Mask requires buy-in from Patrol Officers, which is more likely when they understand the reasons PPB collects and uses these data.

Data on the number and type of all mental health-related calls remains critically needed to inform this discussion.  In order to measure the success of PPB's non-Memphis Model ECIT program, it will be critical to have accurate information from the Mask in order to assess outcomes across cases involving a mental health component. |

94. Within 90 days of the Effective Date, PPB shall also establish an ABHU Advisory Committee.  The ABHU Advisory Committee shall include representation from:  PPB command leadership, CIT, MCPT, and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from:  the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Status | Substantial compliance – ongoing obligation |
|--------|---------------------------------------------|
| Analysis | **ABHU Advisory Committee members successfully engage in constructive feedback to PPB on policy and training.**<br><br>A 2016 Q2 roster of ABHU Advisory Committee members provided by PPB includes all of the organizations and personnel listed in Paragraph 94 (noting that the Oregon State Department of Health and Human Services has been since been restructured and the relevant state component is the Oregon Health Authority ("OHA").  A member representing the Metropolitan Public Defenders Office resigned due to leaving the office.  While this position is not required by the Agreement, we acknowledge PPB's interest in hearing from a critical piece of the system and we encourage a replacement be made quickly.<br><br>DOJ has observed ABHU Advisory Committee meetings throughout this past year.  While members' attendance at the meetings varies, the present committee members all engage in insightful and useful dialog in ensuring PPB looks at all the angles of a concern. |
| Technical Assistance | DOJ commends the BHU and its Advisory Committee for its ongoing work on the implementation of this agreement, and for maintaining strong membership in the Advisory Committee.  In order for us to continue to assess the formation of the Advisory Committee and ongoing participation of its members, PPB should be providing information about how PPB recruits committee members, and should continue to provide minutes of meetings.<br><br>Portland Police Bureau also should continue to engage in concerted and documented efforts to ensure that all required BHU Advisory Committee members consistently participate in meetings. |

95. The ABHU Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of C-I Team, MCPT, SCT, BOEC Crisis Triage, and utilization of community-based mental health services.  The ABHU Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters.  The ABHU Advisory Committee shall report its recommendations to the ABHU Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Status | Substantial compliance – ongoing obligation |
|--------|---------------------------------------------|
| Analysis | Minutes from BHU Advisory Committee meetings and the Committee's reports show that the Committee reviews many of the issues contemplated by Paragraph 95, and issues well thought-out and informed advice and comments on a number of documents and items relevant to the requirements of Paragraph 95.  In 2016, BHUAC has reviewed and offered insight into BOEC protocols and ECIT and |

| | |
|---|---|
| | BHU Crime Analyst SOPs, as well as having conducted ongoing review of ECIT training content and instructors.  The City has adopted many of the changes and comments recommended by BHUAC. |
| **Technical Assistance** | Portland Police Bureau should continue to utilize the BHU Advisory Committee's comments to improve its policies, procedures, and training methods.  The City's ongoing implementation obligations for the Committee go hand-in-hand with bringing all of the crisis intervention sections of the Settlement Agreement to fruition. |
| | We recommend that the City continue to look for ways to utilize the amount of experience on the board.  One member conveyed to us that she wanted to move on from "checking the boxes" and get into the more substantive issues.  For example, PPB reported in its 2016 Q2 update that the BHUAC recommended that the BHU develop a special opportunity at the training center for members of the community.  This request has come from community members as well, and PPB could utilize the expertise on the BHUAC to assist in developing and planning such an event. |

96. Within 240 days of the Effective Date of this Agreement, the ABHU Advisory Committee will provide status reports on the implementation of the ABHU and BOEC Crisis Triage, and identify recommendations for improvement, if necessary.  PPB will utilize the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| | |
|---|---|
| **Status** | **Partial compliance – ongoing obligation** |
| **Analysis** | **BHUAC has met and provided useful recommendations, and must report on BOEC's implementation of crisis triage.** |
| | In 2016, PPB reports that the BHUAC made formal recommendations, including voting to accept BOEC's procedure on processing calls involving suicidal threats, attempted suicide, and suspected or actual deaths, as well as voting to accept recommended changes to BOEC ECIT dispatch protocols.  BHUAC also commented on ECIT SOPs.  Portland Police Bureau has accepted most of the recommendations made by BHUAC.  The updated BOEC protocols, however, do not reflect true Crisis Triage as envisioned by this Agreement, and the protocols themselves have yet to be implemented fully, with staff trainings planned for 2016 Q4 and 2017 Q1.  The BOEC protocols were developed without concurrent comment and approval from DOJ.  Successful compliance with Paragraph 96 will require BHUAC to provide status reports on the implementation of BOEC Crisis Triage as it is currently conceived, and identification of recommendations for improvement in order to reach capacity so that dispatch is able to conduct Crisis Triage that more fully reflects the requirements of this Agreement. |

| Technical Assistance | As new BOEC protocols were recently put into place, BHUAC is tasked with providing status reports on their implementation. BHUAC should seek to identify improvements that may be made to dispatch protocols to achieve a more fully developed Crisis Triage, including direct dispatch of community service providers where appropriate. |

## B. Continuation of C-I Program

97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.

| Status | **Partial compliance – ongoing obligation, documentation required** |
|---|---|
| Analysis | Portland Police Bureau reports compliance, but documentation provided must be auditable. Portland Police Bureau reports that 781 Officers in operations are certified with 40 hours of training. As part of its documentation supporting this position, PPB has provided lesson plans for its "Advanced Academy," the training that is provided to all Officers. However, despite specific requests, the City has not provided a course agenda for either the basic or the advanced academy which would show the number of hours each course provides. Furthermore, PPB's certification records do not contain information to ascertain whether or not the 781 Officers are all whom must be trained. |
| Technical Assistance | As noted in our 2015 report, PPB still must provide auditable training records in order to comply with this provision.<br><br>Portland Police Bureau reports that it is awaiting learning management system software. Once installed, this program should provide an efficient method for auditing records. |

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with ABHU Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| Status | **Partial compliance – ongoing obligation, documentation required** |
|---|---|
| Analysis | As part of its 2016 Q2 documentation for this Paragraph, PPB included a PowerPoint overview of the BHU. This is not responsive documentation. This is a similar issue that was addressed in last year's assessment. The purpose of this paragraph is to ensure that all Officers in patrol or response duties receive a minimum of 40 hours of training, and ongoing refresher training, in crisis |

| | |
|---|---|
| | intervention skills. |
| | While PPB provided advance academy lesson plans, which included C-I materials in response to a separate request, no course curriculum was provided. Therefore, we are not able to discern whether or not Officers have satisfied the required number of hours, nor can we compare what is provided at the basic academy vs. the advanced academy – which together make up the 40-hour requirement.  Upon specific request, PPB did provide a roster showing crisis intervention certification for 781 Officers, but the records are not detailed enough for a substantial compliance rating. |
| | Portland Police Bureau reports that it is including a crisis intervention refresher training in its 2016 in-service training, which started in September.  We look forward to observing this training for our next assessment. |
| | We are pleased to note that PPB consulted the BHUAC regarding the subject areas to be covered during this refresher training.  We look forward to reviewing the materials PPB indicates it will release for the next quarterly report. |
| **Technical Assistance** | As noted in our 2015 report, PPB still must provide auditable training records in order to comply with this provision. |
| | Portland Police Bureau reports that it is awaiting a software learning management system update, which once installed, should provide an efficient method for auditing records. |

## C. Establishing "Memphis Model" Crisis Intervention Team

99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").

| Status | Compliance rating pending– insufficient documentation |
|---|---|
| **Analysis** | **The Parties agreed to a plan to gather data to assess whether PPB's modified Memphis Model meets the requirements of this provision.** |
| | While PPB has created a volunteer cadre of Officers under its ECIT program, PPB's model does not comport with some of the core elements of a Memphis Model Crisis Intervention Team. |
| | The "Memphis Model" includes, among other core elements: |
| | <ul><li>Training dispatchers to identify calls that may involve mental illness;</li><li>Having Officers with extensive crisis-intervention training and experience (most comparable to PPB's "ECIT" Officers) respond to *all* such calls; and</li><li>Having Officers with extensive crisis-intervention training and experience assess the situation and, when appropriate, take control of the scene.</li></ul> |

Some aspects of PPB's approach to crisis intervention are consistent with the Memphis Model. All PPB Officers receive 40 hours of training in crisis intervention at the Academy; Patrol Officers can volunteer to take an additional 40 hours of in-service training focused on crisis intervention; PPB calls these Officers "ECIT Officers." Dispatchers call exclusively ECIT-trained Officers for a subset of calls that may involve mental illness. Broadly speaking, none of these aspects conflicts with the Memphis Model.

Portland's model differs from the Memphis Model because it does not reserve all or even nearly all mental-health-related calls for the most highly-trained crisis-intervention Officers, those who have received ECIT training. BOEC has resisted making assessments of whether mental illness is involved in a call for service, instead dispatching ECIT Officers to calls that fit a list of clearly-defined categories that could not possibly capture all calls involving mental health. BOEC call takers and dispatchers have yet to receive training on the updated protocols that are intended to introduce some crisis triage elements.

Accordingly, BOEC dispatches a considerable number of calls involving mental illness as it would any call for service. Likewise, PPB does not require that ECIT Officers respond to all or even most calls suspected to involve mental illness. Even where an ECIT Officer responds to a call where the police recognize that mental illness is in play, PPB places no obligation on the ECIT Officer to take control of the scene unless the incident meets one of the pre-selected criteria for ECIT response. Because there is no reliable evidence (pending successful implementation of the Mental Health Mask) that ECIT Officers respond to a higher volume of mental illness-related calls than do Crisis Intervention Officers, whether the ECIT Officers accrue specialized experience with mental illness as quickly as do Memphis Model Officers, is highly questionable.

Neither PPB nor BOEC currently employs a means of identifying all mental-health-related calls, meaning neither PPB nor DOJ have a means of identifying the number of mental-health-related calls to which ECIT Officers respond. The development of the Mental Health Mask and the data it collects, once successfully implemented, will aid in making this determination.

Despite the Settlement Agreement's unequivocal requirement that PPB implement a Memphis Model crisis-intervention team, PPB is concerned about expanding the coverage of mental-health-related calls directly dispatched to ECIT Officers will impede ECIT Officers from responding to higher risk calls. Overall, ECIT Officers report that the program is generally working effectively as currently conceived. However, there were a number of reports of issues with several aspects of the ECIT program. ECIT Officers have expressed to us that they are already overwhelmed with the number of calls that require ECIT attendance. Due to the limited number of available ECIT Officers on any given shift, they are sometimes called to attend to calls for service outside of their patrol area, resulting in delays due to long transit times. At times, the calls will be resolved before the ECIT Officers arrive.

There exist other challenges to the full implementation of a Memphis Model Crisis

| | |
|---|---|
| | Intervention Team. Deficiencies in the Multnomah County mental health system create pressure on PPB and Project Respond. Lack of a "police friendly" drop-off facility results in delays that occur when police take people in crisis to hospital emergency rooms. Finally, Oregon law restricts criteria for civil commitment. |
| | Nonetheless, PPB is pursuing its alternative approach, which it considers an "improved version" of the Memphis Model. PPB's new crisis response policy, 850.20, was developed and implemented in 2016 Q2. The policy, incorporating input from DOJ, the BHU, and the COAB, contains provisions that provide for increased usage of ECIT Officers, while still not requiring an ECIT Officer to attend to all mental-health-related calls. The policy was drafted to reflect PPB's view that this alternative model will be better adapted to Portland's unique crisis response needs. DOJ has granted provisional approval to the policy, conditioned upon the City's agreement to collect and analyze agreed-upon data on the dispatch of all Officers to mental-health-related calls. |
| | We commend PPB's effort to train its Members on this new crisis response policy. PPB reports that the new 850.20 policy is the first directive rolled out with a knowledge check or test included. |
| | Accordingly, determination of compliance with this Paragraph requires forthcoming data and analysis. |
| **Technical Assistance** | The City and PPB must successfully implement the Mental Health Mask with refinements that allow for data collection on the response to and outcome of all calls with a mental health component. Once the Mental Health Mask has been implemented to gather accurate data, PPB must present an analysis that allows us to assess whether its alternative approach represents an acceptable alternative to the Memphis Model. |
| | DOJ continues to evaluate how PPB deploys its method of disengagement in crisis settings. While the new crisis policy only requires Officers to notify a mental health provider before disengaging, we encourage PPB to work towards protocols allowing for an Officer to consult with a mental health provider in forming a disengagement strategy. Such protocol will encourage and facilitate the responsiveness PPB and the community seek from mental health professionals. |

100. PPB's C-I Team shall be comprised of officers who volunteer for assignment to the C-I Team. The number of C-I Team members will be driven by the demand for C-I Team services, with an initial goal of 60-80 volunteer, qualified officers.

| Status | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | **ECIT Officers volunteer for their assignment.  PPB should ensure sufficient ECIT Officers for each shift and area.** |
| | As set forth above, PPB has implemented some aspects of a Memphis Model C-I |

74

|  | Team.  PPB's policies governing encounters with persons in crisis and Portland's dispatch protocols may not allow for ECIT Officers to gain the accelerated experience with mental illness-related calls that a Memphis Model C-I Team would.  In order to make this determination, data from a successful Mental Health Mask implementation is required. |
|---|---|
|  | Nonetheless, PPB's alternative approach to crisis response consists of ECIT Officers who volunteer for assignment, and the current roster of 94 operational ECIT Members exceeds the initial goal of 60-80 volunteer, qualified Officers.  As noted above, some ECIT Members mentioned to us that there are insufficient ECIT Officers in some patrol areas during some shifts, requiring ECIT Officers to travel long distances to respond to calls.  Thus, in order to ensure the number of team Members is "driven by demand" for ECIT services, PPB should conduct an ongoing assessment of staffing requirements in conjunction with Mental Health Mask data to determine whether additional ECIT Members are warranted. |
| **Technical Assistance** | We recommend that PPB continue to train sufficient volunteer Members to maintain adequate staffing, and conduct ongoing assessment of staffing levels to determine if additional ECIT Members are required based on data recovered from the Mental Health Mask and other available sources. |

101. No officers may participate in C-I Team if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of C-I Team service, or during C-I Team service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the C-I Team.

| **Status** | **Compliance rating pending provision of auditable records** |
|---|---|
| **Analysis** | Portland Police Bureau has reported that it has a vetting process for ECIT applicants who conform to this provision.  Portland Police Bureau has recently implemented a new SOP that contains the requirements for participation in ECIT required by this Paragraph.  Portland Police Bureau has reported consultation with the BHU Advisory Committee on development of the SOP.  Additionally, as noted by COCL, SOP 3.3 (ECIT) does not provide for automatic removal of an ECIT Officer from service in the event of a sustained allegation of force or misconduct against a person with mental illness. |
|  | No new ECIT Officers were trained during the first or second quarter of 2016. |
| **Technical Assistance** | Portland Police Bureau should fully implement SOP 3.3 (ECIT), and continue to enforce requirements for qualification, selection, and ongoing participation with ECIT.  Portland Police Bureau should additionally modify SOP 3.3 (ECIT) to ensure that an ECIT Member who is subject to a sustained allegation of force or misconduct against a person with mental illness is removed from the team. |

| | Portland Police Bureau reports in its 2015 Q4 update that it used the screening process for each officer selected.  And PPB provides extensive email documentation showing that such reviews were conducted.  Portland Police Bureau should provide an auditable record, such as a spreadsheet, showing the complete list and categories for review of the ECIT candidates and showing screening for prior disciplinary history involving force or mistreatment of people with mental illness. |
|---|---|

102. PPB shall specially train each C-I Team member before such member may be utilized for C-I Team operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for C-I Team members consistent with the Memphis Model.

| **Status** | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | **Subject to the caveat of our assessments to Paragraphs 97 and 98, PPB trains its ECIT officers on its modified Memphis Model.** |
| | As noted above, PPB's ECIT Model includes aspects of the Memphis Model, including certain elements of training.  A member of the DOJ team observed the ECIT training in November 2015, and it was an overall success.  We conferred with COCL on their assessment of the training and concur with COCL's technical assistance.  Our consultant plans to observe the upcoming training. |
| | In May and July of 2016, PPB also provided refresher course trainings to ECIT Officers who had previously received ECIT training before PPB updated its training material.  We applaud PPB for their efforts in implementing this refresher training in accordance with our prior technical assistance.  COCL observed the July 2016 training and provided positive feedback.  COCL noted two issues: |
| | First, PPB explains the requirement of the Mental Health Mask as merely a DOJ requirement.  Portland Police Bureau failed to provide Officers the meaningful basis for the Mental Health Mask, namely that it creates benefits to PPB and PPB's ability to effectively provide services to the people of Portland.  This failure to explain the reasoning behind the Mental Health Mask has negative implications for the accurate recording of data, as discussed above.  COCL's commentary accords with DOJ's discussions with ECIT and patrol Officers during its August 2016 visits.  Through direct conversation with officers, we observed the negative perception Officers had of the Mental Health Mask and other initiatives that are presented as DOJ requirements.  Indeed, an Officer we interviewed conveyed his negative perception of the mask as just a DOJ mandate.   Once we discussed the purpose and potential benefits of the data gathering, the Officer changed his perspective.  Multiple Officers stated they would be more willing to use the Mask as intended once informed of the policy considerations behind its implementation. |
| | Second, COCL indicated that one of the classes did not provide adequate instruction due to mismanagement of time during the lesson.  This appears to be a |

| | criticism that was limited to one training and a particular instructor and does not necessarily reflect the training as a whole or impact PPB's compliance with the requirements of this section. Generally, as COCL noted after conducting a thorough review of ECIT lesson plans and observing multiple days of training, PPB's ECIT training is consistent with other crisis intervention trainings across the country. |
|---|---|
| **Technical Assistance** | Portland Police Bureau must own the messaging to its Officers—changes in policy or training are beneficial to Officers' ability to do their jobs effectively, and not merely something DOJ or the Settlement Agreement requires. Without providing Officers an understanding for the tasks PPB asks them to do, filling out the Mental Health Mask represents little more than an additional, mindless task. And, Officers are likely to continue to find ways to avoid diligently completing it, rendering the resulting data less valuable. Officers have indicated that they would like to know this information, but PPB has not provided it. |

103. C-I Team members will retain their normal duties until dispatched for use as a C-I Team. BOEC or PPB may dispatch C-I Team members to the scene of a crisis event.

| Status | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Portland Police Bureau has currently reached substantial compliance with this requirement, subject to the caveat that ECIT Members are only dispatched to the scene of crisis events that meet the criteria provisionally approved by DOJ, pending the collection of data in the Mental Health Mask. BOEC protocols now reflect the expanded criteria in the provisionally approved policy. This status may change if the data does not support PPB's continued deviation from the Memphis Model of crisis response. |
| **Technical Assistance** | BOEC must complete training on updated dispatch protocols slated to be completed by 2017 Q1. |

104. PPB will highlight the work of the C-I Team to increase awareness of the effectiveness of its work.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | **Portland Police Bureau consistently highlights the work of its ECIT and BHRT Members.** Portland Police Bureau reports solid efforts to highlight work by its ECIT Officers over the past year. For example, in the first half of 2016, BHU Members participated in over 65 outreach events, including presenting PPB's crisis response model and BHU program at the 2016 CIT International Conference in Chicago. Portland Police Bureau has engaged in a number of activities designed |

| | |
|---|---|
| | to highlight the work of BHU and its components, resulting in positive publicity. Additionally, BHU presented during the visit of the Attorney General as part of a national Community Policing Tour.  BHU regularly publishes a newsletter regarding its activities, and maintains a web site that includes information on BHU components and activities and a reference guide to mental health resources. |
| **Technical Assistance** | We encourage PPB to continue to pursue documented community outreach to help inform the community about the existence, roles, and availability of the C-I Team, and to continue to reach out to the community for input on how to best highlight the work in a way that it will be consumed by the public. |

105. For each crisis event to which a C-I Team is dispatched, the C-I Team member shall gather data that ABHU shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include:

    a. Date, time, and location of the incident;

    b. Subject's name, age, gender, and address;

    c. Whether the subject was armed, and the type of weapon;

    d. Whether the subject is a U.S. military veteran;

    e. Complainant's name and address;

    f. Name and DPSST number of the officer on the scene;

    g. Whether a supervisor responded to the scene;

    h. Techniques or equipment used;

    i. Any injuries to officers, subject, or others;

    j. Disposition;

    k. Whether a mental health professional responded to the scene;

    l. Whether a mental health professional contacted the subject as a result of the call; and

    m. A brief narrative of the event (if not included in any other document).

| Status | **Pending – Data not yet available** |
|---|---|
| **Analysis** | Compliance with this Paragraph depends upon successful implementation of the Mental Health Mask.  The Mask contains questions intended to capture the enumerated criteria.  However, as that data has only recently begun to be gathered, it is too early to assess whether it has been accurately collected.  As we noted above, there are reasons to believe that the initial implementation of the Mask has not provided usable data.  First, IT issues made the Mask difficult to use.  Second, some of the questions as initially conceived were vague or did not accurately reflect Officers' experiences responding to calls.  Third, Officers reported that some Officers would mark "no mental health component" in the |

| | case of any ambiguity to avoid having to respond to the follow-up questions. Finally, Officers indicated that they would at times wait until long after the actual incident to fill out the Mask.  Portland Police Bureau has already made improvements to the Mask since its initial rollout, including resolving many of the IT issues.  Until PPB collects sufficient data to track and analyze trends over time, we cannot assess the success of the Mask. |
|---|---|
| **Technical Assistance** | Portland Police Bureau must actively work together with Officers, BHU, COCL, and DOJ in order to continue refining the Mask and explaining its purpose to Officers in order to ensure that accurate data are being collected. |

## D. Mobile Crisis Prevention Team

106. PPB currently has an MCPT comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand MCPT to provide one MCPT car per PPB precinct.

| **Status** | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Portland Police Bureau reports that each precinct has an MCPT (now called Behavioral Health Response Team or "BHRT"), which is comprised of a PPB BHU Officer and a Project Respond staff member.  No substantial changes have been made to the BHRT unit since we found substantial compliance in our 2015 assessment. |
| **Technical Assistance** | We commend PPB for its established BHRT model. |

107. Each MCPT car shall be staffed by one sworn PPB officer and one qualified mental health professional. MCPT shall be the fulltime assignment of each such officer.

| **Status** | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | Portland Police Bureau continues to report that each precinct's BHRT car is staffed by a PPB Officer and a mental health professional from Project Respond.  Portland Police Bureau and Project Respond are commended for their efforts in creating a model that seeks to pull individuals out of the gaps of the crisis system and connect them with community partners. |
| **Technical Assistance** | We encourage PPB to assess the need for increasing capacity of BHRT on a periodic basis. |

79

108. No officers may participate in MCPT if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of MCPT service, or during MCPT service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the MCPT.

| Status | Compliance rating pending – insufficient documentation |
|---|---|
| Analysis | Portland Police Bureau has reported that it has developed criteria that were subject to review by BHUAC.  Those criteria are laid out in SOP 3.2 BHRT, but we have not yet received the implemented, executed SOP.  The SOP includes a limitation on participation for those with sustained complaints involving force or mistreatment of a person with mental illness.  As with SOP 3.3 (ECIT), SOP 3.2 (BHRT) does not call for immediate removal of an Officer who has a sustained IA investigation involving use of force or misconduct against a person with mental illness.  It merely requires that the BHU Lieutenant will work with the Professional Standards Division to "review" the investigation, notify the Central Precinct Commander if the action impacts their continued participation in BHRT, and coordinate a decision to remove a BHRT Officer.  

DOJ's assessment of this provision is not meant to imply that any BHRT Member does not meet the criteria defined by this provision.  Portland Police Bureau reports that it reviews all applicants for compliance with this criterion. |
| Technical Assistance | Now that PPB has finalized the SOP, PPB should provide us and COCL a version of the finalized SOP that has been signed and implemented.  Portland Police Bureau should additionally provide documentation to indicate that current BHRT members meet the criteria as defined by Paragraph 108.  Portland Police Bureau should modify the SOP to set forth removal criteria. |

109. PPB shall specially train each MCPT member before such member may be utilized for MCPT operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for MCPT members.

| Status | Substantial Compliance – ongoing obligation |
|---|---|
| Analysis | Portland Police Bureau indicates that all BHRT personnel have been trained in ECIT, as well as Applied Suicide Intervention Skills Training ("ASIST"), Trauma Informed Care, and Civil Commitment Proceedings.  Portland Police Bureau also lists a number of outside trainings that BHRT Officers have attended during the course of their employment.  PPB's documentation for the 2016 Q2 Compliance Report includes a certificate of attendance for one Officer at the FBI's Basic Crisis Negotiator Course.  Additionally, SOP 3.2 (BHRT) includes recommendations for training, and was developed with the advice of BHUAC. |

| Technical Assistance | *See* Paragraphs 97 and 98 regarding training records. |
| --- | --- |

110. MCPT shall utilize C-I Team data to proactively address mental health service, in part, by connecting service recipients with service providers.

| Status | **Partial Compliance – ongoing obligation** |
| --- | --- |
| Analysis | As discussed in multiple sections above, the data collected by ECIT Officers has been in flux.  Some data were available based on the ECIT Template that PPB has now phased out.  As discussed herein, however, due to fluctuations in reporting, it is unclear how accurate those data were.  Nonetheless, those data provided some information that, in combination with other information (such as BHRT and SCT enrollment information), could be used to proactively address mental health service.  Once PPB successfully implements the Mental Health Mask and the Mask is generating consistent and reliable data, there should be further data available to assist PPB in developing systems to connect service recipients with service providers.  This will work in conjunction with Oregon's statewide mental health plan for improvement of community resources.  In order to achieve substantial compliance, PPB should provide documentation and explanation of how its units are utilizing the increasing amount of data available from ECIT Officer interactions to proactively address mental health service. |
| Technical Assistance | Portland Police Bureau needs to provide additional examples of how it is using data to implement this Paragraph.<br><br>Consistent with Paragraph 105, above, PPB must develop consistent, reliable data.  Use of such data is necessary to implement Paragraph 110. |

111. Within 180 days of the Effective Date, PPB, with the advice of the ABHU Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies.  These policies and procedures shall clearly describe the roles and responsibilities of these entities and of MCPT officers in the process.

| Status | **Partial compliance – ongoing obligation** |
| --- | --- |
| Analysis | **Portland Police Bureau is working on an agreement with an emergency medical transportation provider and received provisional approval for emergency transport policies.**<br><br>The Parties discussed the issues represented in this Paragraph in 2015 Q4 and agreed that successful compliance will depend upon adjusting to the anticipated opening of the Unity Center's Psychiatric Emergency Services.  Additionally, since |

| | |
|---|---|
| | DOJ provisionally approved PPB's main "trunk" mental health crisis intervention policy (850.20), PPB has developed "branch" policies intended to cover the transport of people with mental illness for treatment, psychiatric holds, and responding to calls at mental health facilities.  Portland Police Bureau solicited input from the BHUAC, DOJ, and COCL and received DOJ's provisional approval.  (While COAB provided comments on the trunk crisis response policy, 850.20, it did not comment on the branch policies, 850.21, 850.22, and 850.25).  We encourage additional review of these policies with the BHUAC once the Unity Center transportation protocols on finalized. |
| | Additionally, we recognize that PPB has been in discussions with AMR, the local emergency transport company, to provide for EMS transport of individuals for psychiatric treatment.  Although these discussions have yet to produce an agreement, we urge PPB to continue to work to secure EMS transport, and to revise and update its "branch" policies to accommodate the opening of the Unity Center's facility. |
| | It should be noted that the "branch" policies do not include a description of the roles and responsibilities of BHRT Officers during the process. |
| **Technical Assistance** | Portland Police Bureau should continue to work to develop the necessary agreements, policies, and procedures to provide for transport of persons under a police or director's hold by EMS, and to revise policies and procedures as necessary, with input from the BHUAC, in order to establish a smooth process for interaction with the Unity Center facility as it becomes operational. |

## E. Service Coordination Team

112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.

| Status | Substantial Compliance – ongoing obligation |
|---|---|
| **Analysis** | We concur with COCL's assessment of the SCT as provided in COCL's April 2016 Outcome Assessment Report.  While many SCT clients do not complete the program, for those who do, data provided shows a remarkable increase in employment.  We commend PPB for its efforts in this program, with both the clients they serve, and the community partners they engage to create successful outcomes. |
| **Technical Assistance** | SCT should continue to look for ways to analyze data regarding the program, any trends, and outcomes for clients. |

**F. BOEC**

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the ABHU Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB ABHU or directly to NGOs or community-based mental health professionals.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | **BOEC successfully diverts calls to a warm transfer to the Multnomah County Crisis line**<br><br>Pursuant to this paragraph, BOEC created an updated Suicide Reference Guide and Mental Health and ECIT Dispatch Protocol, which BHUAC reviewed.  The updated protocols are intended to reflect PPB's alternative ECIT response criteria, rather than a true Memphis Model crisis response system.  The protocol essentially captures PPB's criteria for ECIT dispatch, with an additional caveat.  The BOEC protocol includes "threatening or attempting suicide" as stated in PPB's Police Response to Mental Health Crisis policy and requires that the individual has the means to follow through with the threat to fit into this category.<br><br>The system for transferring calls to the Multnomah County Crisis Call Center appears to be functioning as intended, with BOEC transferring approximately 90-100 calls per month, serving over 2,000 unduplicated individuals on a yearly basis, with only a small percentage being returned to BOEC for a police response.  The Crisis Center also fields calls from PPB Officers requesting information.  Most calls come from ECIT Officers.<br><br>BOEC still lacks, however, a system for assigning calls directly to PPB BHU or to NGOs or community-based mental health professionals.  BHU's response team, or Project Respond, only become involved in a call once patrol Officers (including ECIT Officers) respond to a call and then refer the call for later follow-up or assistance, or if BHU hears a call over the air and self dispatches.  Personnel at BOEC conveyed to us the challenges and costs associated with developing a system for direct assignment of responders other than the police, emergency medical services, or the fire department.  It should be noted that BOEC evidently possesses a dedicated and well trained staff, with very challenging jobs.  BOEC staff demonstrated their commitment to providing for the safety of first responders and to citizens in need of help.  Nonetheless, BOEC is currently experiencing a drastic staffing shortage, and its employees are already stretched thin.  Accordingly, it does not appear that the City has made serious efforts to explore possibilities for developing the capacity to assign calls directly to BHU, NGOs, service providers or other non-police responders.   It is our understanding that BOEC has attempted to receive funding for a nurse triage line, without success. While we sympathize with BOEC's shortages, the City must attempt to reach compliance with this Paragraph before it is determined that doing so is not feasible. |

| Technical Assistance | The City and BOEC should evaluate the possibility of assigning calls directly to NGOs or community service providers as required by this paragraph, or to directly dispatch BHU to calls involving known participants in BHU programs. The City and BOEC should document these efforts, and coordinate with BHUAC to identify the obstacles to achieving direct service dispatch, and look into possible solutions. |
|---|---|

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the ABHU Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | **BOEC has developed, but not implemented, required training.** |
| | In coordination with PPB, BOEC has now completed training to reflect updates to the BOEC protocols. BHUAC approved the training. COCL and DOJ experts also reviewed the training. The training appears to be well developed, but due to limitations in BOEC's labor contract, it is unable to complete the 16 hours of training until 2017 Q1. The training will be divided into two, 8-hour sessions to accommodate the labor requirements. Although the original 180-day deadline has long passed, we appreciate BOEC's work in preparing the trainings to address the changes in protocol, and the difficulties in scheduling training during a time of staffing shortfalls. |
| Technical Assistance | Proceed with training dispatchers as currently scheduled. |

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Status | **Partial compliance, improvement – ongoing obligation** |
|---|---|
| Analysis | **Though BOEC successfully diverts many calls to alternative services, Crisis Triage is not fully operational.** |
| | The core components of this Paragraph are progressing, as BOEC has developed additional protocols to track PPB's alternative crisis intervention model, and has developed training in coordination with BHUAC that is scheduled to be delivered in two sessions over the ensuing months. BOEC is successfully transferring appropriate calls to MCCL. Some aspects of fully operational Crisis Triage are lacking, as stated above in the analysis of Paragraph 113. |
| | BOEC's successful implementation of fully operational Crisis Triage will require |

<table>
<tr><td></td><td>

an evaluation once training is complete, and a comparison of BOEC data with data captured through PPB's usage of the Mental Health Mask.

The success of PPB's crisis response model relies on capturing data. BOEC's coding system could be improved to assist in better capturing data regarding the number of calls that have a mental health component. BOEC's previous code for "mental" calls was eliminated after it was determined that the term was offensive, and it was requested by providers that calls not be specifically noted as calls involving mental illness. Now, the only code for calls with a mental health component is the "ECIT" code for calls that meet the criteria for dispatch of an ECIT officer. BOEC may recode as a call progresses due to changing information. A welfare check may be recoded to an ECIT call, if it is determined that ECIT involvement is called for. It appears that BOEC may only track ECIT calls that were initially dispatched as ECIT calls, as compared to calls that originated as a different call type. Capturing the information regarding frequency of conversion to ECIT by original call type could provide insight into the type of calls that frequently require ECIT involvement.

BOEC purposefully does not attempt to capture other calls that might involve a mental health component but do not call for an ECIT Officer. This is an apparent effort to avoid stigmatization of a group of people through assignment of a label, which may be unwarranted. While we appreciate the desire to avoid stigmatizing people, best practices in the C-I Team model seek to reduce stigmatization about mental illness by acknowledging how common such conditions are and by encouraging Crisis Intervention Officers to have contact with people with mental health disabilities both during a crisis and when the person is not in crisis. It is critically important to know how many mental-illness-related calls PPB Officers are asked to respond to. A fully operational Crisis Triage will include better mechanisms for capturing data regarding these calls.

</td></tr>
<tr><td>

**Technical Assistance**

</td><td>

BOEC may consider options such as a code modifier on all calls that the call taker, dispatcher, or officer at the scene believes may contain a mental health component. For example, a "welfare check" call ("WELCK") could be modified to "WELCKE" call, if it is suspected that an ECIT Officer may be necessary. This is similar to the code modifiers BOEC currently employs by adding "W" for "weapon" if it is known that the call involves a weapon. It should be clear to call takers, dispatchers, and PPB Officers, however, that they are in no way expected to distinguish aberrant behavior secondary to substance use from crisis unrelated to substance use.

</td></tr>
</table>

## VII. EMPLOYEE INFORMATION SYSTEM

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall:

a. Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;

b. Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and

c. Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to collect data necessary to conduct these analyses at supervisor- and team-levels.

| Status | **Partial Compliance – significant improvement, ongoing obligation** |
|---|---|
| Analysis | **Portland Police Bureau has made significant progress in its implementation and utilization of its EIS in the past year.  Now that PPB is using EIS for reviews more regularly, PPB must take the next steps in data analysis to effectively identify and address at-risk employees, supervisors, and teams.**<br><br>Portland Police Bureau has made concerted efforts to increase EIS utilization.  PPB's EIS Administrator and Professional Standards Division have actively sought out training for supervisors charged with using the EIS system for their subordinates.  Likewise, the EIS Administrator and PSD have issued reminders to PPB personnel concerning their obligations to use EIS.<br><br>**116(a):  performance reviews:**<br><br>This past year, the EIS Administrator's data show supervisors' high rates of review of officers under their command during six-month performance evaluations:  2015 Q3:  77.6%; 2015 Q4:  85.1%; 2016 Q1:  81.7%; and 2016 Q2:  80.5%.  *See* PPB 2015 Q3 2016 Q2 Compliance Reports, at Par. 116-117.  Portland Police Bureau employed a sampling methodology and excluded from its sample Officers on extended leave, Officers reviewed by the Training Division (*see* disagreement noted below), and Officers who worked directly for the Portland Police Association.  The City must address any proposed exclusions in connection with the Parties' Paragraph 175 discussions of potential modifications of the Settlement Agreement.<br><br>Prior to the second quarter of 2016, PPB did not review its Sergeants' EIS entries in connection with performance evaluations.   *See* PPB 2016 Q2 Compliance Report, at Par. 116-117.  At the time of its first measurement, PPB supervisors had completed EIS reviews of only 53.1% of PPB's Sergeants.  Based on PPB's frequent reminders to supervisors and the pattern for successfully increasing Officer-level reviews, we anticipate this Sergeant-level review increasing over time.<br><br>**116(b):  new assignees reviews:**<br><br>In our 2015 report card, we reported that PPB's EIS Administrator provided data |

evidencing supervisors had reviewed 49% of Officers' EIS entries as required by Paragraph 116(b). This past year, the EIS Administrator's data show supervisors' high rates of review of Officers newly under their command: 2015 Q3: 94%; 2015 Q4: 94%; 2016 Q1: 99%; and 2016 Q2: 84%. *See* PPB 2015 Q3-2016 Q2 Compliance Reports, at Par. 116-117. These are commendable compliance rates.

**116(c), 117: unit and supervisor analysis:**

Based on on-site reviews of the system and an assessment of PPB's data, we conclude that the EIS system is not set up to provide a clear analysis of unit and supervisor levels. EIS does not give a straight-forward comparison by group and shift, as the Settlement Agreement intends. As explained to us, in order for an EIS Administrator to compare teams or groups, the Administrator must identify a single Officer from one group, look up his or her statistics relative to his or her assigned group; then the Administrator must do the same for an individual Officer from the comparative group. In other words, the EIS Administrator reverse-engineers a group-level comparison. While the ingenuity is laudable, it is hardly practical. Nor is it complete. The EIS allows comparison only at higher levels of command by this reverse engineering methodology. It does not permit even an ad hoc comparison of specialized teams. For example, the comparison looks at the whole of the Tactical Operations Division ("TOD"), but not the units within TOD, such as the Gang Enforcement Team that uses force with greater frequency. Nor does the reversed-engineered comparison capture a supervisor's effect on his or her subordinates, as the Settlement Agreement intends.

**116: Effectively identifying and addressing at-risk employees, supervisors, and teams:**

We agree with COCL that although PPB could have used its available data to identify patterns, PPB did not do so in its supporting documentation or Quarterly Summary Report. *See* COCL Compliance Report, January through June 2016, at Par. 116. We observed several EIS discussion tracker entries for Officers whose actions had resulted in civil liability or career-ending behavior. Discussion tracker is the narrative portion of EIS in which the EIS Administrator lists a threshold action or actions that require the supervisor to consult with the subject Officer. The supervisor then records the results of the conversation in the discussion tracker. This creates a record over time on interactions to praise or critique Members. Most discussion tracker entries we saw were benign, i.e., merely stating matter-of-factly a force incident that gave rise to an EIS entry. In reviewing one Officer's discussion tracker, however, even after the Officer's use of an ECW gave rise to both a finding of civil liability and an internal debriefing on proper cuffing during use of an ECW, the supervisor entered praise in the discussion tracker: "The review (of the civil liability finding) did not find any areas for concern. [The Officer] did not have any questions and was receptive to the review." Rather than address poor behaviors, the supervisor used EIS to validate them. Similarly troubling was the case of one PPB Sergeant whose career ended. Prior to his termination, his EIS discussion tracker showed notations for "no concerns" on three occasions. The Sergeant had a record of use of alcohol and drug use that ultimately

|  | ended his career.  As PPB's EIS matures, PPB should utilize the EIS to mitigate risk as the Settlement Agreement intends —both for Officers and for the public. |
|---|---|
|  | PPB's EIS should also draw data from its training database and its traffic incident database.  PPB does not currently use these data sources for EIS, though PPB uses them independently. |
|  | After numerous face-to-face meetings, we recently approved Policy 345.00 governing EIS.  We would be eager to revisit the EIS policy; however, to address the suggested thresholds we discuss in our assessment of Paragraphs 118 and 119, below. |
| **Technical Assistance** | As COCL suggests, the Parties should come together to discuss the purpose behind EIS, i.e., its use for risk mitigation.  EIS is an expensive and time-consuming task.  Portland Police Bureau's significant investment of resources and organizational dedication to the collection of data is worthy of a deeper dedication to data analysis.  Portland Police Bureau should be able to achieve a better return on its investment. |
|  | As we stated in 2015, PPB must collect timely Force Data Collection Reports and After Action Reviews for officer involved shootings, as described in Paragraph 74, above, to come into substantial compliance with the Paragraph 117, and PPB must collect accurate force data from all Members in order to conduct supervisor- and team-level analyses. |

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews:

      a. Any officer who has used force in 20% of his or her arrests in the past six months; and

      b. Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.

| **Status** | **Partial Compliance – significant improvement, ongoing obligation** |
|---|---|
| **Analysis** | **We agree with COCL that the parties should revisit the thresholds for EIS review to make the system more effective.  Portland Police Bureau has improved its EIS compliance in implementing the required thresholds for paragraphs 118 and 119, though these triggers did not always result in management reviews by members' supervisors as required.** |
|  | In our 2015 Report Card, we noted the low level of referral of EIS triggers to supervisory reviews (two referrals for 129 triggers).  *See* PPB 2015 Q1 Compliance Chart, Items 118-119.  In response, PPB provided a more in-depth, written explanation of its referral process for referral of EIS triggers for supervisory |

review.  *See* "EIS Alert Process Explanation," PPB 2015 Q3 production.  Portland Police Bureau also met with COCL and DOJ on several occasions to discuss the EIS.  Based on these documents and discussions, we found that PPB currently triggers a review when a Member crosses the Settlement-Agreement-defined thresholds.  However, PPB's review may be truncated within the administration of the EIS, and approved by PSD, without reaching a "management review" by the Member's supervisor.  Often this is perfectly explainable.  For example, a single PPB Member will trigger the same threshold each morning when the EIS system is reset, even though the trigger is based on the same data as the previous day.  Other times, PPB has created criteria to exclude Officers from further review that the Settlement Agreement does not permit.  These included excluding from supervisory review Officers whose force ratio is greater than his or her peers (Par. 119(b)) only because the Officer transferred to a unit that uses lower levels of uses of force.  Portland Police Bureau also excludes Officers who serve within their probationary period and are still subject to Training Division reviews.  These exclusions violate the Settlement Agreement.  The exclusions also skew the data for the teams to which the excluded Members belong.  Accordingly, PPB must stop these exclusions and use the EIS for "any officer."

Portland Police Bureau has set up a redundant review system to try to ensure that if a responsible unit manager or supervisor declines to intervene with a Member after an EIS trigger, then the PSD reviews that declination.  Overall, PPB declines supervisory review for 91% of the triggers EIS produces.  While PPB views its corollary 9% rate of supervisory review as high (PPB 2016 Q2 Quarterly Summary Report), we agree with COCL that "supervisors are more familiar with the officer and are in a better position to assess the officer than are the EIS Administrators."  *See* COCL 2015 Q3/Q4 Compliance Assessment.  *See also* DOJ 2015 Report Card at Par. 118-119, technical assistance.  *See also* TECHNICAL ASSISTANCE STATEMENT:  Employee Information System, Prepared by ROSENBAUM & WATSON, LLP, Compliance Officer and Community Liaisons, January 4, 2016, at pp. 4-5.

Moreover, the time between the trigger and an intervention is too long to be effectively "early."  Portland Police Bureau's flow chart provides for 60 days between reaching a threshold and providing an intervention.  DOJ, COCL, PPB Discussion, Feb. 8, 2016.

Portland Police Bureau's complex system could be made less time and resource consuming if there were more effective triggers.  In our meetings with PPB, we commented that the triggers the City had negotiated during the Settlement Agreement process were so high as to be ineffective.  An EIS, we recommended, should seek to find the behavioral outliers among a Member's peers.  This, too, is consistent with COCL's assessment.  *See* COCL Compliance Report, January through June 2016, at Par. 118-119.

Commendably, PPB engaged in its own study seeking to evaluate the efficacy of the current PPB EIS system.  Portland Police Bureau presented its study asserting that PPB's EIS is five times more predictive than the general population of

Officers, but generates nine false positives for every true positive. *See* May 24, 2016 meeting. Portland Police Bureau set as a threshold for its study an adverse event, which PPB defined as: (a) an event that caused the City to pay more than $5,000, or (b) an event that resulted in the member receiving a day or more suspension. *Id.* Portland Police Bureau found that only 5% of Officers flagged by EIS went on to experience an adverse event compared with 2% who were not flagged by EIS. *Id.* As PPB presented its study to us, PPB questioned the ability of EIS to accurately predict poor outcomes. *Id.* Like COCL, we appreciate PPB's willingness to be introspective about its EIS. We suggest, however, that PPB's study could lead to a better refinement of PPB's EIS. Rather than discount the utility of any EIS, the parties should seek thresholds that could best predict poor outcomes.

In consultation with COCL, we recommended that PPB adopt more useful thresholds than those negotiated by the City's attorneys in Paragraph 119. Specifically, COCL recommended, and DOJ and its consultant supported, adding the following thresholds to Policy 345.00:

- Officer Detail Force Ratio: A sworn Member has a force ratio that is in the top 15% of their detail in the preceding three (3) months.

- Officer Precinct Force Ratio: A sworn Member has a force ratio that is in the top 15% of their Precinct in the preceding three (3) months.

- Detail Force Ratio: A detail has a force ratio that is greater than 5% above the average detail force ratio in the preceding three (3) months.

- Precinct Force Ratio: A Precinct has a force ratio that is greater than 5% above the Bureau-wide average in the preceding three (3) months.

- Force Ratio: A sworn Member's force ratio is greater than or equal to 5% of his or her arrests in the preceding three (3) months.

- Complaint in Same Category: A Member receives two (2) or more complaints for events in the preceding three months.

- Traumatic Incidents: A Member experiences two (2) or traumatic incidents in the preceding thirty (30) days

Unfortunately, PPB demurred from our request. While the Settlement Agreement does not require these more nuanced thresholds, the few thresholds contained in the Settlement Agreement may not serve to meet the intended purpose of effectively identifying at-risk employees, supervisors, and teams. Par 116.

| | |
|---|---|
| **Technical Assistance** | As we stated in 2015, supervisors are more familiar with Officers in their chain of command and deserve the opportunity to utilize the EIS for career-saving and career-enhancing interventions. |
| | We agree with COCL that PPB must improve its messaging around its EIS system to its own members. *See* COCL Compliance Report, January through June 2016, at Par. 118-119. COCL's surveys of Officers found that Officers do not have |

90

|  | confidence in the system. *Id.* Discussions with Officers indicate that they feel EIS is designed to punish them. *Id.*<br><br>Portland Police Bureau must not exclude from its EIS Administrator review or supervisory review officers who have moved between assignments and meet a threshold due to the change in force ratios relative to their new units. Portland Police Bureau also must not exclude from EIS tracking and review probationary Officers who are also subject to supervision of the Training Division. |
|---|---|

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Status | **Substantial Compliance** |
|---|---|
| Analysis | Portland Police Bureau's principal EIS Administrator is tremendously dedicated and knowledgeable about PPB's EIS system. A Lieutenant from PPB's PSD serves as both the supervisor for the EIS Administrator and the secondary EIS Administrator. |
| Technical Assistance | We agree with COCL that the EIS Administrator should memorialize his vast knowledge and experience in a training document for the benefit of any future EIS Administrators. The EIS Administrator has already produced documents to us that may serve as a basis for such a training document. *See* "EIS Alert Process Explanation," PPB 2015 Q3 production. |

## VIII. OFFICER ACCOUNTABILITY

PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.

| Status | **Partial Compliance – substantial compliance issues** |
|---|---|
| Analysis | **PPB and the City have made certain advancements in the processing of complaints under the existing system. However, the City has not brought to fruition necessary comprehensive accountability reform as we suggested—and the City agreed to undertake—in May 2015.**<br><br>**Going forward with a new chief, PPB must right the ship to earn both community and officer faith in the system. The City's current effort to engage** |

**stakeholders and the community in direct dialogue about comprehensive accountability reform is a significant step in the right direction.**

PPB's Prior Non- and Partial-Compliance:

In our 2015 report card, we reported that the City and PPB failed to achieve compliance with most accountability provisions. *See* Settlement Agreement Compliance Status Assessment Report pp. 63-81, 90 ECF No. 105-1 (Sept. 10, 2015). In that Report, we found the City and PPB non-compliant with Paragraphs 124, 128, and 130. *Id.* And, we found PPB was only partially complaint with Paragraphs 121, 123, 125, 127, 129, 132, 133, and 135-140. *Id.* We lay out in our compliance review for the following paragraphs, PPB's and IPR's progress and hurdles in implementing a system for full and fair investigations of misconduct complaints. PPB and IPR have been addressing many challenges:

- tracking timeliness of investigations (Par. 121);

- performing concurrent criminal and administrative investigations (Par. 123);

- working on—though not resolving—the 48-hour rule (Par. 124);

- issuing many Communication Restriction Orders ("CROs") when required (Par. 125);

- beginning a process for a witness officer's walk through of critical incidents (Par. 126);

- Seeking contemporaneous interviews of officer involved in critical incidents (Par. 127);

- adding IPR investigators (Par. 128); and

- providing greater direction to Police Review Boards (Par. 132).

Still, PPB and IPR have not overcome all challenges to ensure officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent:

- the former Chief's covering up alleged misconduct (Sec. VIII);

- the former Chief's boycotting of CRC (Sec. VIII);

- failing to hold officers accountable in certain circumstances (Sec. VIII, Par. 129);

- subverting CROs by sharing videos (Par. 125);

- permitting a perennially obstreperous Captain to discourage the filing of a complaint (Par. 130); and

- begrudgingly addressing a liability finding, albeit absent assistance from the very plaintiff's attorney who sought that remedy (Par. 133).

Ultimately, comprehensive accountability reform should address current structural redundancies and inefficiencies, as well as a lack of faith in and efficacy of the

accountability systems.

<u>Former Chief's Alleged Off-Duty Shooting and Aftermath</u>:

Tragically, conduct by the former PPB Chief illustrated PPB's accountability failures. The current Chief and current command staff were not a party to the former Chief's conduct.

In May 2016, we sent representatives to meet with the then Chief about accountability compliance, globally. However, on the day we arrived, he was suspended and has not returned. Around that time, we learned of an off-duty incident and an on-duty cover up.

On Thursday, April 21, 2016, the then Chief, while on vacation, discharged a rifle injuring his friend. That same day, the then Chief made statements to a Harney County Sheriff's Deputy investigating the incident, asserting that it appeared that the shooting victim's injury was self-inflicted.[9] The then Chief did not immediately report the incident as required.[10] The then Chief subsequently called the shooting victim and apologized for causing the injury.

Four days after the incident, on Monday, April 25, 2016, the then Chief reported the shooting to Police Commissioner—who is also subject to the Settlement Agreement. That same day, the then Chief told the then PPB Assistant Chiefs about the discharge and injury. This group included the then Assistant Chief, who was in command of investigations into events such as the reported discharge. Later that day, the then Chief also informed the former Captain who supervised PPB's Professional Standards Division, i.e., the internal affairs unit, of the discharge and injury. None of these individuals—not the Police Commissioner, nor the then Assistant Chief in charge of investigations, nor the then internal affairs Captain—initiated an administrative investigation as required by the Settlement Agreement. *See* Sec. VIII. The then Chief told his subordinates that his weapons discharge would be handled as a private, personal matter. He undercut the usual accountability systems and placed his subordinates in an untenable situation.

It is undisputed that neither PPB nor City personnel whom the then Chief informed of the shooting reported anything about the matter to IPR. Indeed, the IPR director launched an independent investigation on his own accord, only after learning of the

---

[9] The existence of a criminal investigation does not obviate PPB's and the City's obligation to concurrently conduct an administrative investigation. *See* Par. 122. Failure to conduct the administrative investigation concurrently, absent evidence of a specifically enumerated exception, is also a violation to Paragraph 122.

[10] PPB Directive 315.00, Procedure (8), requires that members "immediately notify an on duty supervisor . . . if they become aware they are a suspect in a law enforcement investigation." PPB has previously suspended, investigated, and disciplined officers for off-duty shootings. *See, e.g.*, Dirk VanderHart, "Did Larry O'Dea's Shooting Mistake Get Special Treatment," The Portland Mercury, June 1, 2016, available at http://www.portlandmercury.com/news/2016/06/01/18155701/did-larry-odeas-shooting-mistake-get-special-treatment.

allegations of the then Chief's firearm discharge through The Willamette Week's twitter feed on May 20, 2016.  This public press account was the first notice of the incident that IPR received.[11]  Up to that point, the City and PPB failed to issue communication restriction orders and failed to collect evidence.  The delay prejudiced the IPR investigation of the incident and its aftermath.

The Police Commissioner's and former Chief's failure to act obstructed a "fair and expeditious resolution" of the alleged misconduct and failed to hold officers "accountable pursuant to a disciplinary system that is fair and consistent."  *See* Section VIII.  Rather than timely fulfilling this obligation for the Defendant, a city official texted:  "Don't worry chief we got your back."  Failure to disclose the shooting to IPR prevented IPR from initiating a "meaningful independent investigation."  *See* Paragraph 128.  The former Chief's conduct discouraged of PPB personnel from reporting misconduct, making a misconduct complaint, or cooperating with an investigation of misconduct.  *See* Paragraph 130.  Under the former Chief, PPB failed to consistently apply its own policies on the reporting and investigation of off-duty firearm discharges.[12]  *See* Paragraph 172 (PPB must

---

[11] Under City Code 3.21.070, IPR is authorized to initiate, monitor, and conduct administrative investigations.  According to IPR policy, when there is an allegation of possible misconduct by a Police Bureau member of the rank of Captain or higher, IPR will conduct an independent investigation.

[12] While we do not reach a conclusion on what the outcome of the administrative investigation should be, the undisputed facts give rise to the need to determine compliance with the following non-exclusive list of PPB Directives:

Directive 310.00, Conduct, Professional.
  • "Police Bureau members, whether on duty or off duty, shall be governed by the reasonable rules of good conduct and behavior, and shall not commit any act tending to bring reproach or discredit upon the Police Bureau or the City of Portland."
  • "Members shall not … make any written or oral statements which would impair or diminish the orderly and effective operations, supervision, or discipline of the Police Bureau."

310.50, Truthfulness
  • "No member shall knowingly or willfully be dishonest or untruthful in giving testimony, in rendering a report, in any official oral or written communication, or in giving any statement about actions taken that relate to the member's own or another member's employment or position."
  • "Members will not make any false statements to justify a criminal or traffic charge, or seek to unlawfully influence the outcome of any investigation."

315.00, Laws, Rules, and Orders
  • "Members shall immediately notify an on duty supervisor when cited for a violation, other than a traffic infraction, when arrested for a criminal offense, if their driver's license is suspended, if they become subject of or violate a restraining order, or when they become aware they are a suspect in a law enforcement investigation."

316.00, Alcohol Use

"apply policies uniformly and hold officers accountable for complying with policy and procedure").

<u>Boycotting CRC</u>:

On March 30, 2016, a private civilian attending a CRC meeting threw water at a CRC member following a heated discussion.  In response to the water throwing, the former Chief wrote a letter to IPR stating that he did not support having PPB personnel attend future CRC meetings.  *See* Memo from Chief Larry O'Dea to IPR Director Constantin Severe, "Citizen Review Committee Workplace Environment," Mar. 31, 2016; *see also* Maxine Bernstein, "Police chief, police union urge officers not to attend citizen review panel hearings," Oregonian, April 4, 2016, available at http://www.oregonlive.com/portland/index.ssf/2016/04/police_chief _police_union_urge.html.  This position—equating to PPB's temporary institutional boycott of CRC—not only undercut public confidence in the accountability systems, but violated the City and PPB's pledge of "retaining and enhancing" CRC in Settlement Agreement Section VIII.

<u>Case Study, IA 2014-C-0265</u>:

In our 2015 report card, we mentioned IA case 2014-C-0265 as an example of a lengthy investigation under paragraph 121.  Enhanced Amicus expressed to the Court particular interest in that case 2014-C-0265.  The case concluded in December 2015.  Now that the case is concluded, we address it as a case study on compliance with Section VIII's requirements that PPB and the City ensure that, "all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable . . .."  Section VIII.

In short, the key to the entire allegation was whether the first officer to initiate the stop had a constitutional basis to stop a juvenile subject.  IPR conducted the investigation of the incident.  PPB wrote the findings.  PPB was critical of the quality of IPR's investigation.  For example, the IPR investigator did not ask the sole, uncharged juvenile witness his/her location, thus permitting PPB to discount the witness' statement.  Finding Memo, IA #2014-C-0265, p. 19.

Two separate judges presided over separate criminal trials stemming for the stop in

• "Members consuming alcoholic beverages off duty shall limit the quantity consumed so as not to be impaired to any degree, or have the odor of alcoholic beverages on their breath, or about their person, upon reporting for duty."

330.00, Internal Affairs, Complaint Intake and Processing

• "Bureau members who become aware of possible misconduct will report such allegations to any of the following personnel:  Any supervisor within or outside the chain of command, Office of the Chief of Police, Personnel Division, Internal Affairs, Bureau of Human Resources, City Auditor's Independent Police Review Division, and/or City Attorney's Office."

question:  one for the juvenile subject and another for his brother.  Both judges definitively ruled that the first officer did not have a constitutional basis to stop the juvenile.  IPR and PPB had the benefit of the judges' rulings when conducting the investigation and drafting the administrative findings:  "In order to sustain the allegation I must take the additional step of showing that [the first officer] was on notice that stopping someone without sufficiently particularized reasonable suspicion is a violation of law and therefore also of the Police Bureau's rules." Finding Memo, IA #2014-C-0265, p. 7, February 8, 2016.  PPB focused on the word "particularized" from the judges' ruling—equating that term with suspicion of the particular individual stopped.  *Id.* at 8.  PPB asserted that the first officer was not trained on the "particularized" requirement for a reasonable suspicion.  In so doing, PPB excluded from its consideration the officer's lack of constitutionally required subjective or objectively reasonable basis to initially stop the juvenile. Moreover, a careful examination of the training records on which PPB relied do not support PPB's conclusion that the officer did not have knowledge of the individualized suspicion requirement.  The training material actually repeatedly stated that the officer must have a legal basis to stop "that person."  "Thus, statutorily, an officer may stop and detain a person for a non-traffic infraction when they have reasonable grounds that an infraction was committed by **that person**." Advanced Academy 2011-2, Person Encounters (emphasis added) at p. 6.  That same training incorporated PPB's then-existent stop and detention policy 153.039, which likewise required that officers have a reasonable suspicion that "that person" committed an offense.  *Id.* at p. 6.  "The officer must subjectively believe that **the person stopped** has committed a crime, and that belief must be objectively reasonable under the circumstances."  *Id.* at p 7 (emphasis added).  Accordingly, PPB's rationale to justify a non-sustained finding—that the initial officer was not aware of the legal requirement for a stop—is incorrect.  PPB acknowledged as much:  "I can see that [the officer's] record shows she attended the AA 2011-2 law session, which you sent to us, and which **does covered to topic of reasonable suspicion**."  Email from IPR Investigator Casey Biederich to CAPT Bryan Parman, January 7, 2016 (emphasis added).

PPB's interaction with the juvenile led to a force incident, one in which the juvenile actively fought with two officers.  The juvenile's actions were dangerous.  A Sergeant who had no part in the unconstitutional stop, came upon the scene of the active fight, and proceeded to aid the officers.  The juvenile fell on the Sergeant's leg tearing the Sergeant's Anterior Cruciate Ligament ("ACL") and incapacitating him for an extended period of time.  According, what began with an unconstitutional stop led to both the arrest (and later acquittal) of the juvenile and a serious, career-threatening injury to the Sergeant.  PPB did not hold the officer who made the initial stop accountable.

| Technical Assistance | As discussed later, herein, PPB is now undertaking a comprehensive accountability reform.  PPB must bring reform to fruition in a meaningful fashion with the support of community and City stakeholders. |
|---|---|

## A. Investigation Timeframe

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, including appeals, if any, to CRC. Appeals to CRC shall be resolved within 21 days.

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Status | Partial compliance – ongoing obligation |
|--------|------------------------------------------|
| Analysis | **The City's plan to address Portland's police accountability system in a more holistic fashion, including the length of time to complete investigations, is in flux right now. The City has proposed various ordinance changes, but many have met some level of opposition. The issues remain unresolved.** <br><br> Comprehensive Accountability Reform: <br><br> In May 2015, we issued the City an initial assessment of PPB's accountability systems and timelines. We stated that "the City must address in a more global fashion IPR's and PSD's timelines, division of labor, and redundancies." The City was responsive, albeit through a lengthy process. The City convened its own work group from June to December 2015 to address the task of revising the accountability systems. *See* PPB 2015 Q4 Compliance Report, at Par. 121. On January 7, 2016, the City first convened a focus group comprised of both City stakeholders and community members. *See* Officer Accountability Focus Group Meeting Notes January 7, 2016. <br><br> As COCL describes in its assessment, the focus group ultimately produced a memorandum reporting on 10 key areas of discussion, including a simplified flowchart for the accountability process, a revised system to ensure all citizen complaints are investigated, clarification of disposition terms, the responsible entity for findings, and reconsidering the role of the Citizens Review Committee. *See* COCL Compliance Report, January through June 2016, at Par. 121. *See also* Memo from Mark Amberg, Chief Deputy City Attorney, to Mayor Charlie Hales, June 22, 2016. <br><br> The focus group's work resulted in a proposed ordinance change, which, among other things, would have merged CRC hearings into the Police Review Board ("PRB") process with more limited public involvement. On August 1, 2016, the City presented the changes through a town hall. Many stakeholders expressed opposition and, the next day, the Mayor withdrew the proposed ordinance from consideration. The City Auditor then proposed a separate ordinance dropping the |

merger of the CRC and PRB but retaining a savings of labor by dividing CRC into three-person review panels akin to a Federal Court of Appeals. *See* Proposed Ordinance 3.20.140 Police Review Board. Additionally, the Auditor proposed to make the PRB process open, in part, to the complainant. *Id.* The Auditor's proposal would also require that the case investigator propose findings and recommend discipline based on the discipline matrix. *Id.* The Auditor's proposed ordinance revisions are still pending with the City Council.

We agree with COCL that the Auditor's proposed model would significantly improve the timeline for investigations by moving the *proposed findings* from the Responsible Unit manager to the case investigator. Under the current system, the investigator who is most familiar with the case and credibility determinations of the witnesses does not reach a conclusion. Rather, the case file goes to the Responsible Unit manager for the subject officers. The Responsible Unit manager must learn anew the entire case file without the benefit of any personal interactions with the interviewees. This is both time consuming and counterproductive. Under the proposal, the Responsible Unit manager would still have the options to controvert—that is, to write why he or she disagrees with the investigator's proposed findings—or concur with the proposed findings.

Timeliness:

Like last year, PPB presented data and memoranda identifying case deadlines and explaining, in part, some of those that exceeded the 180-day deadline. PPB reports that 41% of closed cases exceeded the 180-day deadline, attributable to both PPB and IPR. *See* PPB 2016 Q1, Q2 Compliance Report, at Par. 121. Like before, some extensions beyond 180 days were perfectly reasonable. A few were unreasonably lengthy or without sound basis. To PPB's credit, PPB has worked well to track sources of delays and addressed them. *See* 180 Day Memos 2016 Q2. However not all explanations are sound. As COCL point out, PPB does not always articulate the reason for some delays, stating instead: "this won't happen again," or "Moving forward, such delays will not occur absent exceptional circumstances of which would be rare at best." *See* COCL Compliance Report, January through June 2016, at Par. 123.

CRC Timelines:

As COCL reports, appeals to CRC are currently taking an average of 149 days, with new cases scheduled for hearing 6 months out, not accounting for subsequent delays. While there is criticism of the Settlement Agreement's 180-day deadline (including CRC appeals), in 2015 only 5 cases went to CRC appeals. *See* Interview with Auditor's Office, August 17, 2016. Accordingly, aside from a small handful of cases, CRC appeals do not impede compliance with the 180-day deadline. The Parties should address a means of cordoning off these relatively few cases from the 180-day deadline, while still ensuring prompt resolution, even for appeals.

| | |
|---|---|
| **Technical Assistance** | We identified late officer interviews as a source of delays in our 2015 report card. This continues to require management direction to set the expectations for timely |

|  | interviews. |
|---|---|
|  | The City's proposed change to consolidate findings with the investigator should address, in large part, the other source of delay we noted in our 2015 report card: lengthy Responsible Unit manager reviews. |
|  | As discussed in our May 14, 2015 meeting and herein, the City should bring to fruition its comprehensive accountability reform.  As we stated in our 2015 report card, PPB's multi-track system adds to the byzantine structure of administrative investigations and the ensuing delays.  As part of a global assessment of administrative investigations, PPB would benefit from simplification of its system. |

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident.  All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Status | **Substantial compliance – ongoing obligation** |
|---|---|
| Analysis | **Aside from the former Chief's and City's subversion of the timely administrative investigation of the former Chief's actions, PPB has been timely in conducting concurrent administrative and criminal investigations.** |
|  | With respect to the former Chief, once IPR learned of the incident, IPR timely initiated an investigation.  The criminal investigation, by outside agencies, began before that time.  Now, IA case 2016-B-0014, involving the former Chief, is not proceeding concurrently with the criminal investigation.  However, this is understandable given that outside criminal investigative agencies possess much of the evidence required to complete the administrative investigation.  IPR email, August 8, 2016. |
|  | PPB treats investigations of officer involved shootings as both criminal and administrative investigations.  PPB has concurrently investigated both officer involved shootings in the past year.  *See* IA 2015-B-0031, IA 2016-B-0015. |
|  | Likewise, we concur with COCL's assessment that PPB has presented data showing concurrent start dates for most criminal and administrative investigations in 2016.  *See* COCL Compliance Report, January through June 2016, at Par. 122.  Additionally, IPR provided data indicating that PPB timely processed administrative investigations concerning allegations of improper sexual conduct by officers.  Improper Sexual Conduct, Feb. 17, 2015 to Aug. 17, 2016, report dated Aug. 30, 2016.  Moreover, PPB has appropriately reported when an outside criminal investigation agency has specifically requested that PPB not commence its administrative interviews, thus triggering PPB's tolling of the administrative investigation.  *See* PPB 2015 Q4 Report, Par. 122. |

| Technical Assistance | We concur with COCL that PPB should provide an explanation for the anomalous case in which PPB did not begin an administrative investigation for a month after starting a criminal investigation, and provide such explanations in future data productions. |

## B. On Scene Public Safety Statements and Interviews

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967).  The City will submit the revised protocol to DOJ for review and approval.  Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Status | **Partial compliance – ongoing obligation** |
| --- | --- |
| Analysis | **The City, PPA, Multnomah County District Attorney, and DOJ continue to discuss issues surrounding the 48-hour rule, required reporting, and when to compel statements from involved officers.  The City is considering a new collective bargaining agreement with the PPA that addresses, in part, the 48-hour rule, but does not address all aspects of the pending accountability issues.** |
| | As we stated in last year's report card, officers must complete routine force reports and may not assert a *Garrity* protection unless the authoring officer has an objectively reasonable belief that he or she will subject him or herself to criminal self incrimination.  *See* Department of Justice Letter to Mayor Michael McGinn, Nov. 23, 2011 (containing our prior guidance on this issue), available at http://www.justice.gov/crt/about/spl/documents/seattlepd_TA_11-23-11.pdf. |
| | "[C]urrent professional standards," require that, absent incapacitation, involved officers provide on-scene public safety statements limited to pre-defined questions tailored to exigent safety needs, and that this is distinct from a full administrative interview. |
| | If a compelled interview is necessary, the administrative interviews should be separate from criminal investigators; however, administrative investigators may be present for non-compelled criminal interviews.  Compulsion, and its concomitant *Garrity* protection, should not have to apply to witness officers.  Witness officers have no objectively reasonable fear of self incrimination. |
| | After the May 24, 2016 non-fatal officer involved shooting, investigators conducted an on-scene walk through with a witness officer and his attorney from the PPA.  *See* IA 2016-B-0015; Par. 125 analysis, herein.  This did not equate to a public safety statement as the walk through occurred three hours after the event and the officers who discharged their firearms did not provide an attributed public safety statement. |

100

| Technical Assistance | As we noted in last year's report card, we recognize that many portions of the Agreement will not only take time to implement, but may require changes to collective bargaining agreements, city code, and/or current city policies. We remain committed to working with the City, PPA, and Multnomah County District Attorney to timely resolve these issues. |
|---|---|

125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Status | **Partial compliance – significant improvement, ongoing obligation** |
|---|---|
| Analysis | **Portland Police Bureau has had dramatically fewer lethal force events in the past year than when our investigation began. For the two major, on-duty lethal force events (one of which resulted in a fatality), PPB successfully managed the investigation and issued most required CROs. The former Chief and City subverted the process that would have produced timely CROs for the former Chief's use of lethal force; this prevents a substantial compliance rating.**<br><br>Fatal OIS:<br><br>On November 6, 2015, PPB was involved in a shooting outside of the Good Samaritan Hospital. *See* IA 2015-B-0031. PPB engaged the subject in discussion in attempts to resolve the situation. During the incident, PPB called to the scene ECIT, Crisis Negotiation Team ("CNT"), and SERT teams. The subject was armed with a pistol, which he fired twice into the ground and then raised the gun toward officers who discharged. The Officers' discharge occurred at 7:15 a.m., and PPB timely began medical care as soon as the subject was cleared from the weapon at 7:22 a.m. PPB's incident file contained 17 CROs, but did not include a CRO for one witness officer and did not include a CRO for the on-scene ECIT officer. The file PPB provided to us did not contain any FDCRs or 940s for this incident. The file did not contain contemporaneous notes for any on-scene public safety statement or officer walk throughs by involved or witness officers. In this instance, however, there were numerous supervisors on scene who saw the action as it occurred. Interviews of the two officers who used deadly force occurred November 10. The file contained a detailed timeline and several witness statements, including from individuals outside of PPB.<br><br>Portland Police Bureau engaged in a thorough and helpful training analysis and |

separate findings based on this incident.  Portland Police Bureau formulated two recommendations from these analyses that it should implement:  (1) long term acting Sergeants should attend PPB's Sergeants' Academy, and (2) involved officers in a justified lethal force incident should not be listed in RegJIN as "homicide suspects."

<u>Non-fatal OIS:</u>

On May 24, 2016, at 7:26 p.m., BOEC dispatched PPB to a call of an armed subject.  *See* IA 2016-B-0015.  Portland Police Bureau diverted a school bus from the scene to protect the public.  *Id.*  Portland Police Bureau called to the scene SERT and CNT.  *Id.*  The subject fired rounds both inside his home and in the direction of officers.  *Id.*  One officer whom the subject fired upon returned fire.  *Id.*  Another officer used cover fire while SERT officers used gas canisters to cause the subject to exit, whereupon PPB deployed a police canine.  *Id.*  The subject fought with the dog.  *Id.*  An officer deployed an ECW, ending the fight with the dog, and officers cuffed the subject.  *Id.*  Officer on scene provided the subject care and confirmed he was not shot.  *Id.*

On May 24, 2016 at 11:36 p.m., PPB investigators conducted an on-scene walk through with one witness officer and his attorney from the PPA.  *See* Narrative Text Hardcopy, Scene Walk Through, June 17, 2016.  Following the walk though, the witness officer left the scene and provided a recorded interview to detectives.  *Id.*  Investigators specifically asked the other two involved officers if they were willing to provide on-scene walk throughs and interviews.  *See Id.* at 185, 215.  Both declined.  *Id.*

On May 28, 2016, PPB completed a 940 report.  However, the Sergeant who completed the 940 was also involved in the incident.  *Id.*  And, though a Lieutenant reviewed the 940 on June 9, 2016, there was no approval beyond that level and no record on the 940 correcting the Sergeant for completing a 940 of an incident in which he was involved.  *Id.*

On May 24, 2016, a witness officer completed a force report for pointing of a firearm.  *Id.*  On May 25, 2016, a PPB SERT officer completed a force report for the use of gas canisters.  *Id.*  On June 1, 2016, PPB's involved canine officer completed a force report for the canine deployment.  *Id.*  However, the involved officers who actually used lethal force did not complete timely force reports.  *Id.*  As has been the standard practice—and one with which we disagreed in last year's report card—two involved officers filled in force reports days later, referring to the investigation without furnishing a narrative.  *Id.* at p. 000179, 000209.

In our 2015 report card, we admonished the former Assistant Chief for permitting officers to view surveillance videos before providing their statements.  We found that permitting the officers to view the video served as an "indirect communication between the officers regarding the facts of the event," in violation of Paragraph

| | 125. |
|---|---|
| | Even after that admonishment, PPB showed the FLIR[13] video from the May 2016 incident at roll call within days of the incident and before PPB rescinded CROs. Auditor interview August 17, 2016.  Though this may have been innocuous in this case, generally the sharing of videos between officers may serve to subvert the effectiveness of the CROs. |
| | On June 7, 2016, the Multnomah County Grand Jury returned a no true bill.  *See* Email from George Burke to Mark Slater, June 9, 2016.  This would be the point after which PPB could have rescinded CROs and used the FLIR video.  Portland Police Bureau appropriately rescinded the CROs on July 5, 2016.  *See* Memo from CAPT John Brooks, July 5, 2016 |
| **Technical Assistance** | Videos and distortion of subjective belief/collusion:<br><br>We have previously advised that PPB should not permit officers to view video footage before completing use of force reports and providing statements because of the risk of collusive reporting.  Moreover, viewing videos before submitting one's initial report distorts an officer's subjective belief of what occurred.  Accordingly, we have recommended that both involved and witness officers not view any video of the force incident prior to providing a full statement and force report.  After providing these, officers should be permitted to view video, if they choose, and submit a supplemental report. |

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| **Status** | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | **In both on-duty lethal force events, a witness officer provided an on-scene walk through.**  Though these efforts did not cover all "witness officers," PPB supervisors were at the scene of both uses of lethal force and directed the actions of officers.  Their presence may have obviated the need for PPB to require each witness officers to provide a statement.<br><br>We agree, however, with COCL that PPB needs to make clear why only one witness officer participated in the walk throughs.  Portland Police Bureau's directive indicates that all the officers at the scene were witness officers.  As COCL points out, Directive 1010.10 defines a "witness officer" as a "member who observes or has firsthand knowledge of the events surrounding an in-custody death or the use of deadly physical force by another member, and other than observing |

---

[13] Forward Looking Infrared, a thermographic camera typically attached to a helicopter.

| | |
|---|---|
| | the incident, did not use deadly physical force." |
| **Technical Assistance** | Portland Police Bureau should clearly delineate that officers who do not use lethal force are witness officers.<br><br>Where there are multiple witness officers, PPB should determine when additional witness officers' perspectives would be constructive and, if so, then require those witness officers' walk throughs and statements. |

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| | |
|---|---|
| **Status** | **Substantial compliance – ongoing obligation** |
| **Analysis** | **In both on-duty lethal force events, PPB requested that the involved officers provide walk throughs and interviews.**  All involved officers declined. |
| **Technical Assistance** | Involved officers' unwillingness to provide voluntary statements accentuates the need to resolve protocols for compelled statements vs. public safety statement and timely force reports pursuant to Paragraph 124. |

## C. Conduct of IA Investigations

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA.  Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| | |
|---|---|
| **Status** | **Partial compliance – ongoing obligation** |
| **Analysis** | **Ultimate compliance with this provision hinges on comprehensive accountability reform.**<br><br>IPR now has more personnel, but does not have full access to LEDS or RegJIN, which contains LEDS information.  Auditor Interview August 17, 2016.  This is a structural barrier to IPR's independent authority to conduct investigations.  Also, PPB's PSD continues to cite the quality of IPR investigations as a source of concern, which causes PSD to seek additional information from IPR. *See, e.g.*, IA #2014-C-0265.<br><br>The timeliness memos that the City produced in response to Paragraph 123, in part, evidence an effort to reduce time consumed by redundant efforts between PPB and IPR.  But these identify symptoms, e.g., an investigator's leave or reassignment of a |

| | |
|---|---|
| | case, not a systemic cure, i.e, structural redundancies between IPR and PSD, or inefficiencies such as findings by unit managers who did not conduct the investigation rather than by investigators.  We agree with COCL that the City's planning process for comprehensive accountability reform, Paragraph 121 herein, will affect compliance with this provision. |
| **Technical Assistance** | In last year's report card, we recommended that the City develop, submit, and ultimately implement a plan to address redundancies and inefficiencies, as we discussed in our May 14, 2015 meeting with the City.  This recommendation stands.  Portland Police Bureau must bring its comprehensive accountability reform to fruition.<br><br>IPR would benefit from training its investigators in methods that would assure PSD's faith in the investigative reports and interviews that IPR produces.  For example, IPR investigators could cross train with PPB officers for an understanding of PPB directives and IPR investigators could all take a common course on investigative methods to assure fidelity from investigator to investigator. |

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| | |
|---|---|
| **Status** | **Partial compliance – significant improvement, ongoing obligation** |
| **Analysis** | **Though we noted in our prior report card that PPB previously had declined to fully investigate allegations of excessive force, PPB has nearly eliminated that practice.**<br><br>COCL recently observed that PPB SOP #19 ("Case Intake and Assignment") includes the language of this Settlement Agreement provision.  *See* COCL Compliance Report, January through June 2016, at Par. 129.  However, COCL also noted that it did not review any case files for its assessment of compliance.  *Id.*<br><br>Explicitly Declined Force Allegation:<br><br>Our sample of 23 accountability files we reviewed revealed that PPB wrongfully declined only one force investigation.  *See* 2015-C-0273.  The investigation included three allegations.  *Id.*  Portland Police Bureau properly resolved a discourtesy allegation by way of a service improvement opportunity.  *Id.*  However, PPB specifically coded the force allegation "E – Declined."  *Id.*  "I have determined that there is no basis for a full administrative investigation."  Memo from CAPT Derek Rodrigues to CMDR Chris Uehara, Sept. 25, 2015.  As a commander noted, the Complainant did not respond to requests for follow up interviews.  *See* 2015-C-0273.  Also, PPB had documentation from the involved officers and the detective's notes in which the complainant changed her story.  *Id.*  PPB used these facts as justification to decline the investigation, rather than facts to reach a finding. |

| | |
|---|---|
| | Though this section of the Settlement Agreement created a remedy that largely benefits complainants whose allegations did not receive a full investigation, the provision also benefits officers.  Portland Police Bureau had the evidence needed to reach a finding.  Instead, the officer was left under the pallor of an unresolved allegation.  Portland Police Bureau should re-open the investigation and reach a finding. |
| | _De facto Declination of a Force Allegation_: |
| | Portland Police Bureau recently declined to complete an internal affairs force investigation in derogation of the Settlement Agreement's prohibition on doing so.  An IPR Assistant Program Manager sought to have PPB review the use of a car as a lethal force review.  _See_ Email from Rachel Mortimer to John Brooks, Aug. 3, 2016; Auditor Interview, August 17, 2016.  The PPB investigative file, 2016-B-0025, reveals a troubling memo.  A PPB supervisor wrote that the officer "used the police vehicle to intentionally hit the back tire of the [subject's] bicycle causing the subject to fall off of the bike."  Memo from CMDR Dave Hendrie to AC Matthew Wagenknecht, July 29, 2016.  _See also_ PPB Assets G7R86779, G7R86774 (photos of rear of bike under PPB cruiser).  The supervisor then opined that the use of force was not a deadly use of force and successfully convinced PSD to suspend the administrative investigation.  _See_ Hendrie Memo.  Thus, even though IPR pushed for a full administrative investigation on the use of force—i.e., IPR did not find clear and convincing evidence that the allegation had no basis in fact—PPB effectively declined the investigation.  Moreover, PPB's case file contained two separate civilian witness statements opining that the force use was not justified.  _See_ 16-240814 Witness Summaries.  Portland Police Bureau must lift the suspension and complete the force investigation. |
| **Technical Assistance** | Portland Police Bureau is using its AIM database to track all complaints that include allegations related to force, as we commended in our 2015 report card.  PPB should ensure its command staff and PSD act with fidelity to SOP# 19 to ensure that no allegations of excessive force go unresolved. |
| | Portland Police Bureau should re-open and resolve the two above-described allegations. |

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Status | Noncompliance – ongoing obligation |
|---|---|
| **Analysis** | **An accountability system that treats both complainants and officers fairly builds trust.  An accountability system perceived as unfair—because of discouragement, intimidation, coercion, or adverse action—erodes legitimacy of the police and give rise to a concomitant increase in the likelihood that** |

**officers must rely upon force rather than trust and persuasion. Thus, a high ranking officer who evades accountability endangers all fellow officers and the public.**

Above, Section VIII, we described how the former Chief, with the assistance of the police commissioner, subverted the accountability system and placed his subordinates in an untenable situation by discouraging them from reporting his firearm discharge to IPR or IA.

Separately, another PPB supervisor has played a particularly poignant role in discouraging the filing of complaints. In our 2015 report card, we described this PPB Captain who entered into a June 2014 settlement with the City which erased two disciplinary actions based on 2010 findings. *See* 2015 report card at Par. 137. By erasing these findings, then PPB leadership validated that Captain's conduct, which PPB had previously declared outside of policy. This year, that same Captain continued to undercut accountability systems.

In 2015, we notified the City that we received a complaint about an officer's use of force in allegedly seizing a camera phone. The complainant recorded the interaction. Commendably, PPB's former Assistant Chief was immediately responsive and swiftly initiated an investigation. *See* PPB Complaint No. 2015-C-325; *see also* Doug Brown, "A Portland Cop Deserves Discipline for Taunting A Local Activist, A Citizen Committee Says," Portland Mercury, March 31, 2016, available at http://www.portland mercury.com/blogtown/2016/03 /31/17803174/a-portland-cop-deserves-discipline-for-taunting-a-local-activist-a-citizen-committee-says. However, the Captain who later reviewed the incident—the same Captain discussed in last year's report for securing unjustified expungement—not only reached a finding contradicted by the plain evidence, but also explicitly discouraged the filing of the complaint in his findings: "Even more disturbing was [the Captain's] description of the Internal Affairs investigation as 'pettifogging'[14] and not worthy of an administrative investigation. [The Captain's] behavior at the Police Review Board was hostile and combative. [The Captain] was disrespectful to Internal Affairs and openly disdainful towards to IPR." Memo from IPR Director Constantin Severe to PSD CAPT Derek Rodrigues, Feb. 1, 2016. These actions violate Section III, preamble, Section VIII, and Paragraphs 129, 130, 137, and 172. Arguably, the Captain's undermining of the complaint also was insubordinate to the Assistant Chief who properly accepted the complaint. Portland Police Bureau merely made an entry into the Captain's EIS discussion tracker, but brought no administrative charges. Portland Police Bureau, therefore, did not hold the Captain accountable. Thus, the Captain, again, undercut the accountability system.

That was not the end. At the CRC hearing of IA 2015-C-325, a private activist threw a cup of water at a CRC member. The same PPB Captain who had provided

---

[14] Pettifogging: 1. insignificant; petty: pettifogging details. 2. dishonest or unethical in insignificant matters; meanly petty.

<table>
<tr><td></td><td>the supervisory review of IA 2015-C-325 was in attendance at the CRC. Following the CRC, that Captain filed a hostile-work-environment complaint against the IPR Director based on the water-throwing incident. The IPR Director did not throw the water. The water was not thrown at the Captain. Yet, the Captain continues to attack the very accountability systems deigned to build confidence in legitimate policing. Thus, the Captain continues to undermine public confidence in PPB and makes every officer's job less safe.

Also in our 2015 report card, we detailed two separate allegations by the City's Auditor involving the President of the Portland Police Association ("PPA"). The City refused to investigate either allegation. IPR was left without an answer to its allegation and the PPA president was left under the cloud of an unresolved accusation. Despite our clear statement in the 2015 report card that: "The City must not leave unanswered allegations of intimidation against individuals who report misconduct, make a misconduct complaint, or cooperate with an investigation of misconduct," the City has done precisely that. The City has continued to refuse to complete an investigation of these allegations. Auditor interview, August 17, 2016.

To the City's credit, PPB and IPR did investigate five other allegations of retaliation. Retaliation Complaints, February 17, 2015 to August 17, 2016, report dated August 30, 2016. Depending on how one would categorize the allegations of retaliations, the allegations described herein would amount to up to an additional nine allegations that have not been subject to full administrative investigation.</td></tr>
<tr><td><strong>Technical Assistance</strong></td><td>We agree with COCL that Directive 310.20 (available at https://www.portlandoregon.gov/police/article/528859) would benefit from revision to include a more explicit prohibition on "all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." Portland Police Bureau must give effect to Directive 310.20 by demonstrating enforcement of it. We will assess whether PPB has done so in next year's report card.

Our admonitions from 2015 still stand:

The City must not leave unanswered allegations of intimidation against individuals who report misconduct, make a misconduct complaint, or cooperate with an investigation of misconduct.

The City's refusal to conduct a full investigation of allegations of intimidation undermines the public confidence in PPB and thereby unfairly clouds public perceptions of all officers.</td></tr>
</table>

131. The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below:

a. Currently, seven voting members of the PRB review use of force incidents, including two citizen members. When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members.

b. The CRC slot on the PRB in use of force cases will rotate among the CRC membership so that different CRC members participate on the PRB. Within 60 days of the Effective Date, the Auditor shall develop a membership rotation protocol.

c. All members participating in the PRB must maintain confidentiality and be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions and "just cause" requirements set forth in Portland City Charter, City rules, and labor agreements.

d. All community members and CRC members must meet the following qualifications to participate on the PRB:

       i. Pass a background check performed by the Bureau.

       ii. Participate in Bureau training to become familiar with police training and policies, including the PRB process.

       iii. Sign a confidentiality agreement.

       iv. Participate in ride-alongs to maintain sufficient knowledge of police patrol procedures.

e. Current city code provides that the City Auditor and the Chief have authority to recommend to City Council the removal of citizen members from the PRB pool. Likewise, the City Auditor or Chief shall have authority to recommend to City Council removal of a CRC member from serving on the PRB.  The Chief or the City Auditor may recommend that City Council remove a community member or member of the CRC from the pool for the following reasons:

       i. Failure to attend training;

       ii. Failure to read Case Files;

       iii. Objective demonstration of disrespectful or unprofessional conduct;

       iv. Repeated unavailability for service when requested;

       v. Breach of confidentiality;

       vi. Objective demonstration of bias for or against the police; or

       vii. Objective demonstration of conflict of interest.

f. Removal from participation in the PRB shall not affect CRC membership.

g. Like current PRB citizen members, CRC members serving on the PRB may serve in that capacity for no more than three (3) years.

h. A CRC member who participates in a PRB review shall recuse himself/herself during any later appeal of the same allegation(s) to the CRC.

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Status | **Substantial compliance – ongoing obligation** |
|---|---|
| Analysis | As we stated in last year's report card, the City memorialized the requirements of Paragraph 131 in PPB Directive 336.00 (available at https://www.portlandoregon.gov/police/article/525753) and/or City Code 3.20.140 (available at https://www.portlandoregon.gov/citycode/article/479642). We stated last year that these changes to policy and code were compliant on their face. They have been operational over the past year. There have been no exclusions of CRC members from the PRB process. Auditor Interview, August 17, 2016.<br><br>In the third quarter of 2015, PPB implemented an instruction to PRB, read by the facilitator, to ensure that the PRB members are aware of the option to return the investigation for more information. PPB reports that in the past year, the PRB has not returned any cases for more investigation. |
| Technical Assistance | We agree with COCL that the Parties may have to revisit these provisions as a portion of the City's planned comprehensive accountability reform. |

133. If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall: (1) enter that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units ; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial finding creating a rebuttable presumption that the force used also violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the IA investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.

| Status | **Partial compliance – ongoing obligation** |
|---|---|
| Analysis | **COCL correctly states that there were no new no liability findings giving rise to this provision. However, the same case we detailed in our 2015 report card remains outstanding and unresolved.** |

| | |
|---|---|
| | We notified the City of its failure to adequately investigate a use of force that gave rise to a civil judgment. *See* IA 11-050814; *see also* Aimee Green, "Man beaten, shocked with Taser by Portland police awarded $562,000 by jury," Oregonian, Sept. 29, 2014, available at http://www.oregonlive.com/portland/index.ssf/2014/09/portland_jury_awards_to_man_be.html; compare Settlement Agreement Compliance Status Assessment Report, pp. 76-78, ECF No. 105-1 (Sept. 10, 2015).  In repeated conversations and follow-up meetings, including directly with the former Chief, we made clear that PPB's failure to investigate this incident violates the Settlement Agreement. *See* Section VIII, and Paragraphs 121, 128, 129, 130, 133, 137, and 172.  Finally, PPB conducted an extensive investigation, but has not yet reached findings for want of an interview with the complainant. |
| | The complainant in the case was represented by counsel in the civil proceeding. That counsel is the very same attorney who requested the inclusion of this Paragraph's remedy during the process of vetting the original Settlement Agreement with stake holders.  Ironically and tragically, that attorney also refused to participate in securing the interview of his client.  *See* IA 11-050814.  Even after we directly contacted the attorney, he referred PPB to prior testimony, thereby demurring from our request that he furnish the complainant to complete to administrative investigation.  We were disappointed. |
| | IPR has opined that PPB may seek out the complainant for interview.  Thus, PPB now is attempting to bring closure to the matter. |
| **Technical Assistance** | Once PPB completes the investigation and reaches findings, we will then assess whether those findings meet the requirement of Paragraph 133. |

## D. CRC Appeals

134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.

| Status | Substantial compliance – ongoing obligation |
|---|---|
| **Analysis** | As we stated in last year's report card, the City memorialized CRC membership expansion as required by Paragraph 134 in City Code 3.21.080 (available at https://www.portlandoregon.gov/citycode/article/479665).  The code has been operational over the past year. |
| **Technical Assistance** | We thank CRC volunteers for their continued involvement.  The Parties may have to revisit the quorum provision of this Paragraph as a portion of the City's planned comprehensive accountability reform. |

111

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed.  The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted.  The additional request be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Status | **Substantial compliance – ongoing obligation** |
|---|---|
| Analysis | **CRC's governing regulations now reflect the requirements of Paragraphs 135 and 136.**  The City Auditor, pursuant to its rule-making authority has adopted revised regulations that govern the CRC's operations.  *See* PSFD 5.03, revised Nov. 20, 2015, available at https://www.portlandoregon.gov/citycode/?c=27455&a=9030.  The auditor has incorporated in the regulations directions to inform CRC that it "may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence."  Paragraph 135.  COCL points out that one CRC request for more information resulted in greater than ten days' work.  Portland Police Bureau reported this to CRC without a writing.  Like COCL, we find the necessary delay for more fulsome information reasonable, even without a writing. |
| Technical Assistance | COCL has asked for a single point of contact for Settlement Agreement compliance to address both PPB and IPR issues.  We agree, in part, with COCL; IPR should report its compliance quarterly just as PPB does. |

**E. Discipline**

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| Status | **Partial compliance – substantial improvement, ongoing obligation** |
|---|---|
| Analysis | **PPB has given effect to current Directive 338.00, which implements the discipline guide (available at http://www.portlandoregon.gov/police/article/488981?), but only for cases that** |

|  | **PPB has appropriately investigated.** |
|---|---|
|  | Where PPB has not adequately investigated allegations of misconduct, such as some of the individual cases cites above, PPB is not able to reach the issue of applying its Discipline Guide to those cases that would be sustained.  For cases PPB has sustained, however, PPB is ensuring that supervisors apply the Discipline Guide.  Portland Police Bureau requires supervisors to complete Corrective Action Recommendation Memo Forms indicating routing to:  PRB, letter or reprimand, or command counseling.  Commendably, PPB has added a check box to that form for supervisors to indicate that they have referred to the Discipline Guide in making a recommendation.  Portland Police Bureau also has memorialized SOP #34 directing the use of this step on this form.  Portland Police Bureau reports that, since implementing the check box, supervisors failed to use the check box on only two occasions, but nonetheless had consulted the Discipline Guide as required.  *See* PPB 2015 Q4 Compliance Report, at Par. 137. |
|  | Portland Police Bureau's Auditor also reports that PPB uses the discipline matrix with fidelity, as intended.  Auditor Interview, August 17, 2016.  *See* COCL Compliance Report, January through June 2016, at Par. 79. |
|  | We note, however, that the current Discipline Guide does not appear to impose discipline for inadequate reports, as required by the Force Section of the Settlement Agreement.  The Force Audit Report did not describe any corrective action or discipline, if any, for inadequate reporting (despite extensive deficiencies). |
| **Technical Assistance** | As we stated last year:  After non-career-ending discipline, officers have room to reconcile, earn advancement, and win commendation.  However, PPB should memorialize that, absent new evidence, it will not expunge past accountability findings and discipline. |
|  | As we also stated in last year's report card, we cannot fairly say PPB has implemented a discipline guide in the absence of an accountability system that functions as required by the Settlement Agreement.  Accordingly, to come into compliance with Paragraph 137, PPB must substantially comply with the accountability provisions of the Settlement Agreement. |
|  | Failure to accurately report force should be subject to consistent corrective action. |

## F. Communication with Complainant and Transparency

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or

IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Status | Substantial compliance – improvement still necessary, ongoing obligation |
|---|---|
| Analysis | **The City makes certain information available to complainants, but needs protocols to ensure it does so to the extent permitted by law.** |
| | As we reported last year, IPR's website includes a page at which complainants may request the status of their complaints. *See* http://www.portlandonline.com/auditor/index.cfm?c=64452. A complainant may enter his or her complaint number into the IPR website. The next business day, an IPR staff member will send the complainant an email with the status update. *See* Auditor Interview, August 17, 2016. However, the information IPR provides is relatively limited. As COCL points out and IPR confirmed, IPR grants community members access to "any items that the complainant has provided to [IPR]" and the "[t]ranscription of complainant interview, if one exists." *See* COCL Compliance Report, January through June 2016, at Par. 139; Auditor Interview, August 17, 2016. |
| | As COCL points out, the City reports that Oregon Law prohibits the disclosure of corrective actions in most circumstances, but the City has not produced documentation that "disclosures of corrective action are provided if they meet such exceptions." *See* COCL Compliance Report, January through June 2016, at Par. 139. The City should provide protocols, as required by Paragraph 139, for the provision of all information requested by the complainant "to the extent permitted by law." Par. 139. |
| | As COCL found and we verified in our sampling of administrative investigations, IPR routinely provides the complainant a written document including the tracking number (case number), allegations, investigating agency and investigation process, and the outcome of the complaint. *See* COCL Compliance Report, January through June 2016, at Par. 140. |

## IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD

There is significant community and City interest in improving PPB's community relationships. The community is a critical resource. Redefining and restructuring existing community input mechanisms to provide for independent oversight of the Agreement, while also enhancing PPB's current community outreach efforts will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety. To achieve this outcome, at a minimum, PPB shall implement the requirements below.

141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Community Oversight Advisory Board ("COAB"), within 90 days of the Effective Date of this Agreement.  The COAB shall be authorized to:

(a) independently assess the implementation of this Agreement;

(b) make recommendations to the Parties and the COCL on additional actions;

(c) advise the Chief and the Police Commissioner on strategies to improve community relations;

(d) provide the community with information on the Agreement and its implementation;

(e) contribute to the development and implementation of a PPB Community Engagement and Outreach Plan ("CEO Plan"); and

(f) receive public comments and concerns.

142. Membership of the COAB shall be comprised of fifteen (15) voting members, five (5) advisory members, and the COCL.

a. The 15 voting members and the five advisory members shall be selected as follows:

i. Each member of City Council will select one representative to serve on the COAB, for a total of five voting representatives;

ii. The chair of the Human Rights Commission shall designate one Human Rights Commissioner to serve on the COAB;

iii. The chair of the Portland Commission on Disability shall designate one Commissioner on Disability to serve on the COAB;

iv. The chair of the Human Rights Commission and the chair of the Portland Commission on Disability shall jointly select three community members to serve as representatives of the mental health community on the COAB, after soliciting and reviewing applications from the public.  These three COAB members will possess demonstrated expertise in the field of mental health in the form of either: (a) certification as a Qualified Mental Health Professional; or (b) no less than ten (10) years of demonstrated service to persons with mental illness.  These three selections shall be completed within 60 days of the COCL selection.

v. The community-at-large will select five voting representatives directly from the community. The process used for this selection is discussed in paragraph 145 herein; and,

vi. The Chief will select a diverse group of five sworn officers within various ranks to serve as advisors and non-voting members of the COAB, and may consider whether the officer resides in Portland ("Advisory Members").

b. The COAB's membership will come from a reasonably broad spectrum of the community, such as:  areas of expertise, advocacy experience, community involvement, profession, education, race, ethnicity, gender, gender identity, sexual orientation, national origin, age, religion, mental or physical disability and geographic identification. COAB members, including Advisory Members, must live, work, worship, or attend school in the

City of Portland. COAB members shall not have an actual or perceived conflict of interest with the City of Portland.

143. The 15 voting members of COAB are independent of the City and PPB and shall not be currently employed by the City.  Members must agree to serve for a minimum of a two-year term, and may be reappointed for one additional year.  The COAB may create an executive committee or other subcommittees, as appropriate, to accomplish the tasks designated to it under this Agreement.  The City shall provide administrative support so that the COAB can perform the duties and responsibilities identified in this Agreement.

144. The COAB shall report to the COCL. The COCL will chair the COAB, preside over COAB meetings, take and count votes, and perform such other activities as are necessary for the efficient operation of the COAB. If the COCL determines that a COAB member is no longer fit to serve on account of misconduct, the COCL shall consult with DOJ prior to removing such member. Following the removal of a COAB member, an alternative shall be selected from the same pool of applicants as the removed COAB member.

145. Selection of the five (5) community voting members shall be made as follows:

a. Each neighborhood coalition in Portland may propose a candidate for membership on the Committee.  Any other non-profit organization within the City may also propose a candidate for membership.  Any other person who lives, works, or is enrolled in school in Portland and is over the age of 15 may be considered provided they provide the City with the names of 50 verified residents over the age of 15 of the City of Portland who support his or her nomination;

b. The City shall widely advertise and hold a public meeting where previously nominated candidates will be selected. Any Portland resident is welcome to attend and participate in the selection process.  The City will publicize the meeting throughout all the various communities of Portland;

c. At the public meeting, candidates will be given an opportunity to speak and ask for support.  In their statements, candidates must indicate whether they live, work, worship, and/or attend school within the City of Portland;

d. Attendees at the public meeting and will be asked to select their choice of candidates;

i. If there are ten or fewer candidates, then the attendees present will select the top five candidates receiving the most votes;

ii. If there are more than ten candidates, a preliminary vote will be taken and the top ten candidates receiving the most votes will be selected and a second vote will be taken to reduce the number to the five persons that will serve on the COAB;

iii. The next two candidates who receive the most votes shall be identified as potential alternates, should a COAB member be removed or incapacitated; and,

iv. Because the number of persons who may be interested in participating in this process is unknown, the City may adopt other procedures necessary to conduct the meeting and to carry out the intent of these provisions.

e. This process of selecting the five community members shall be completed within 60 days of the COCL selection.

| Status | Non-Compliance, Significant Barriers |
|---|---|
| Analysis | While the City diligently worked with the Parties and the community to establish a COAB, the City has been unable to create a sustainable platform for the COAB to carry out the functions required by Paragraphs 141-145.  Given significant barriers further addressed herein, the City placed the COAB on a 60-day hiatus of all public meetings to allow it time to prepare an alternative proposal for the structure and mission of the board.  The 60-day window closes on October 21, 2016.  At the time of this filing, the City has not submitted its alternative proposal to DOJ. |
|  | At the Court's 2015 status conference, the COAB representative noted that an initial barrier concerned the board's roles and function, which were not specified in detail in the Settlement Agreement, not well understood by the board members, and/or not agreed upon by the members.  Furthermore, stakeholders collectively have agreed that the selection process, as well as the lack of orientation and training on the front end, created a weak foundation upon which the COAB would work to fulfill its duties. Finally, all Parties did not fully appreciate the amount of work placed upon the COAB's valuable volunteers. |
|  | While COAB members demonstrated their commitment to their appointment through service on the board - typically involving five hours of meetings a month - in addition to monthly subcommittee meetings, and volumes of reading materials required to prepare for the meetings, individual COAB members, COCL, and community members alike all conveyed concern that the board members were voting on recommendations in subject areas for which they had not been trained. |
|  | We concur with COCL's Third and Fourth Quarter 2015 Compliance Report, that the City provided "support for meeting space, refreshments, accommodations, audio-video needs, and IT support for the COAB.  COAB meetings occurred in convenient locations for members of the Portland community, near light rail, streetcar, and bus stops."  And the independent office space the City negotiated met the spirit of this Agreement.  Moreover, the City devoted resources such as a Program Support Specialist, to assist in the administrative functioning of the board.  However, the volunteer members and local COCL expressed consistent frustration by the bureaucratic delay in obtaining City resources to accomplish the board's tasks. |
|  | In her June 26, 2016 exit report, Ms. Kathleen Saadat stated that institutional barriers made her role as COAB Chair a challenging one.  Because the COAB had to depend on slower moving, bureaucratic institutions for funding and operation, the result was an "inability for the COAB to be agile, timely and creative in response to the challenges of doing the work of public engagement."  As an example, Ms. Saadat cited the City's procurement procedures, which make it difficult for the COAB to "readily select meeting sites congruent with the need to |

engage community."

Ms. Saadat identified leadership issues as another serious challenge facing the COAB's success. In her exit report, Saadat writes, "There is no apparent leadership group/person in charge of the overall work of driving the initiatives into the institution(s) being reformed." PPB Community Engagement Outreach Plan ("CEOP") Committee reflected similar sentiment during a June 9, 2016 meeting with a DOJ Outreach Specialist and DOJ Counsel. Attendees expressed frustration that no single group or person was there to take charge and make final decisions. At a PPB general staff meeting, members also expressed concern that while PPB is being held accountable for their implementation of the Settlement Agreement, City leadership is not being held accountable provisions outside of PPB's scope.

Unfortunately, in addition to these foundational issues, beginning in late April and early May 2016, civil unrest from a small group of community members occurred at various COAB meetings, eventually resulting in several COAB members expressing fear for their safety, COCL requesting security for COAB members at the meetings, and the COAB general meetings being adjourned early due to multiple disruptions. Despite the Parties conferring with each other, COCL and the COAB in an attempt to address these concerns, the situation became untenable. The City requested and DOJ consented to providing a temporary (60 day) suspension of official COAB meetings to allow the City to prepare a proposal to correct these issues.

Additionally, despite our request in our 2015 report, the City has yet to provide DOJ with a plan to fill the vacancies of the at-large committee members.

On November 30, 2015, DOJ Counsel and the City, in consultation with COCL and Counsel for the AMAC, conferred and determined that while the process was clearly established for alternates to be selected for the PCOD/HRC, HRC, City Commissioner, and PPB Advisory appointments, the process needed to be further clarified for the selection and appointment of alternates for the five community at-large positions. On April 29, 2016, the same parties met again to clarify the process, and the City Attorney's office outlined a work plan to replace COAB members. The City did not move forward on this plan, and empty COAB positions remain unfilled.

Furthermore, several members of the COAB who were appointed by City Council members resigned over the last year. City Council failed to appoint new members.

Finally, while the Agreement is clear that COCL shall chair the COAB, this arrangement has proven to be untenable. On July 11, 2016, COCL sent a petition to DOJ and the City requesting a separation from COAB "as the result of nearly two years of ambiguity, disrespect, and willful undermining of the COCL's authority to run the COAB," *see* July 11, 2016 COCL Petition for Amendments to Settlement Agreement. And on July 14, 2016, a quorum of COAB members voted in favor of separation from COCL, as well and the ability to choose their own chair.

| Technical Assistance | DOJ agrees that the Settlement Agreement's structure to support the COAB must be reconsidered.  The City must provide a robust proposal that is developed with stakeholder input to reformulate the structure and deliverables of a community oversight board. DOJ expects to provide additional technical assistance upon receipt of the City's proposal. |
|---|---|

146. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan:

a. Within 90 days of the COAB selection, the City, in consultation with COAB, will conduct a reliable, comprehensive, and representative survey of members of the Portland community, including civilians and PPB officers, regarding their experiences with and perceptions of PPB's prior community outreach efforts and accountability efforts and where those efforts could be improved, to inform the development and implementation of the CEO Plan;

b. COAB, in conjunction with PPB, shall consult with community members (not only through PPB Advisory Councils and Roundtables) and hold at least two (2) public hearings, completed within 90 days of the COAB selection, in addition to the representative survey described above, to gather public input on PPB's outreach efforts; the hearings shall be held in locations to ensure that PPB receives input from all parts of the Portland community;

c. COAB shall review PPB's prior community outreach efforts to contribute to the development of a new CEO Plan;

d. COAB shall solicit and consider input from the Human Rights Commission's Community Police Relations Committee ("CPRC"), including its work to implement the 2009 PPB "Plan to Address Racial Profiling";

e. Within 60 days of the anticipated due date for survey results, the COAB and PPB, in consultation with the appropriate City resources knowledgeable about public outreach and survey analysis, shall review and analyze the results of the survey and other public comments discussed above;

f. The CEO Plan shall include strategies to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members. The Plan shall also identify gaps in available resources to achieve its goals.

g. The COAB may also provide information to the PPB on other areas related to community engagement and outreach to contribute to the development of the CEO Plan, including:

i. integration of community and problem-oriented policing principles into PPB's management, policies and procedures;

ii. recruitment, selection, training, promotion, and personnel evaluations;

119

iii. tactics and deployment of resources; and

iv. systems of accountability.

g(2). COAB shall submit its recommended CEO Plan to the Chief, in writing, within 90 days of the COAB's completion of survey analysis.

h. The Chief's Office, in consultation with the five PPB advisory members of the COAB shall utilize the COAB's recommendations in developing and implementing the CEO Plan. The Chief's Office shall present the final proposed CEO (with implementation timeline) to the COAB for a vote of approval within 240 days of the effective date of this Agreement.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | While PPB has the responsibility to develop and finalize the CEO Plan required by Paragraph 147, PPB is only able to accomplish this task with coordination from the COAB and offices within the City who work on neighborhood involvement issues. Portland Police Bureau reported internal efforts to establish a framework for the CEO Plan before the COAB was formed, and reported successfully working with the Community Engagement subcommittee of the COAB upon initiation. Furthermore, COCL worked with CEOPS in developing a task oriented monthly work plan to complete the CEO Plan.  Unfortunately, the deadlines in this work plan have all passed, and PPB has been unable to finalize a plan, in large part due to the ineffective functioning of the board as discussed above in Paragraphs 141-145, prohibiting further consultation with the COAB. However, the required community survey was accomplished prior to the COAB's breakdown.  In consultation with the COAB, the City contracted with the firm Davis, Hibbitts, and Midghall (DHM) to perform the required community survey. In 2015 Q4, DHM presented their findings, as required by section (e), to the COAB and members of the public. (Video of this meeting can be found at https://www.youtube.com/watch?v=2ebTy9VK-z8).  COCL provided a review of the survey results in their April 2016 Outcome Assessment. *See* http://www.cocl-coab.org/library/reports-memos/april-2016-cocl-semi-annual-outcome-assessment-report. Through the beginning of 2016, PPB worked collaboratively with COCL, CEOPS, the City, and DHM to find ways to reach community groups that were overlooked or not reached during the mailed community survey.  In the third quarter of 2016, Professional facilitators from DMH ran six focus groups, to gather more qualitative information and feedback from youth, LGBT, and homeless populations with mental illness. While the initial meeting required under Paragraph 146(b) was unsuccessful in its plan to gather input from the public, the second public outreach event made great strides.  COAB, in coordination with PPB, planned and scheduled a Community Engagement Workshop on April 14, 2016, at the Ambridge Event Center.  All |

| | |
|---|---|
| | reported that the meeting successfully facilitated dialogue between the Police Officer, COAB members, and community members in attendance. *See* 2016 Q2 PPB data set, folder 146. On May 5, 2016, members of the CEOP subcommittee and PPB led a similar workshop with the Tongan, Samoan, and Pacific Islander communities at a church in East Portland. The PPB described this event as "lively and inclusive" and said a crowd of around forty "youth and elders" attended. DOJ Tasks/Quarterly Update Report, 146.

Compliance with Paragraph 146(d) is further discussed in the analysis in Paragraph 148. |
| **Technical Assistance** | We commend PPB and the COAB CEOPS subcommittee on their efforts to move forward with the community survey, and to coordinate the successful Community Engagement Workshop. The City must find a way forward to finalize and present the CEO Plan.

While not required by the Settlement Agreement, we concur with COCL's recommendation that PPB conduct contact surveys as a way to gather additional information for the CEO Plan. As COCL has noted on several occasions, such surveys can also be utilized to better understand the effectiveness of training. *See* COCL Compliance Assessment Report, 2016 Q1-Q2 draft report (referencing previous recommendations for such surveys), http://www.cocl-coab.org/sites/default/files/Draft%20COCL%202016%20Q1-Q2%20Compliance%20Assessment%20w%20Appendices.pdf. |

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, together with the COAB, may develop outreach and policing programs specifically tailored to the residents of the precincts.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and provide such information to the CPRC to contribute to their analysis of community concerns regarding discriminatory policing. In consultation with the COAB and CPRC, PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

149. The COAB, COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | In order to fulfill requirements in Paragraphs 146(d) and 148, the City must ensure that City-supported bodies referenced in the Agreement, such as the Community Police Relations Committee (CPRC), receive adequate support and guidance. The COAB's CEOP subcommittee invited the CPRC to present its update of the 2009 |

| | |
|---|---|
| | Racial Profiling Plan to the full COAB in June 2016. *See* DOJ Tasks/Quarterly Update Report 146(a-g). However, on May 10, 2016, a news release stated that the Human Rights Commission (CPRC's umbrella organization) unanimously voted to take a "two- to three-month pause" to "reorganize." *See* May 10, 2016 HRC News Release. CPRC is the volunteer board with which City must consult regarding community engagement. As of the date of this filing, the work of the CPRC has not been reinstated by the City.<br><br>On May 23, 2016, DOJ inquired with the City's counsel regarding how the City intends to fulfill its obligations under this provision given the decision to suspend the CPRC's work. As of the date of this filing, DOJ has not received a substantive response.<br><br>Pursuant to part one of Paragraph 147, PPB continues to "collect appropriate demographic data for each precinct," including information related to race/ethnicity, gender, age, economic status, disability, education, and housing. *See* 2016 Q1 PPB data set, folder 147. However, PPB has not reported on meetings between the COAB and Precinct Commanders to "develop outreach and policing programs specifically tailored to the residents of the precincts." Furthermore, it is unclear whether and how PPB considered comments received from the CPRC.<br><br>Finally, metrics cannot be established until the formulation of the CEO Plan. |
| **Technical Assistance** | The City must engage with DOJ on how it intends to address the significant barriers it faces to accomplish the requirements of this provision. These issues are at the forefront of the national consciousness, and Oregon is not immune. |

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be reviewed by the COAB before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| | |
|---|---|
| **Status** | **Partial compliance – ongoing obligation** |
| **Analysis** | Portland Police Bureau produced a draft of its 2015 Annual Report to the COAB on March 10, 2016, *available at http://www.cocl-coab.org/sites/default/files/2015%20ANNUAL%20REPORT%20-WORD-TP.pdf.* The Report was subsequently raised for discussion and review pursuant to Paragraph 150 at the March 24, 2016 general COAB meeting, which can be viewed at *https://www.youtube.com/watch?v=5hZPuff1XjE.* It is unclear whether and how PPB considered COAB's comments in the final version of the Report. |

| | |
|---|---|
| | Another requirement pursuant to Paragraph 150 is that the Annual Report be made publicly available. Portland Police Bureau maintains an internet page for DOJ-related documents, including quarterly and annual reports. PPB made this Report public on October 5, 2016, after inquiry of the posting by DOJ. *See* https://www.portlandoregon.gov/police/62642

Lastly, PPB reported that the precinct commanders had successfully hosted their meetings required by this Paragraph. Portland Police Bureau reports that the meetings at both the North and East Precincts had full community rooms of participants, and that participants expressed appreciation for the opportunity to engage in dialogue. Unfortunately, as of the date of this filing, City Council had not hosted a meeting for PPB to present its Annual Report to educate the community about its efforts, pursuant to Paragraph 150. |
| **Technical Assistance** | We applaud the North and East precincts' efforts to provide an opportunity for open dialogue. We encourage PPB to continue to offer such events outside the mandate of our Agreement. Furthermore, PPB should consider utilizing its Annual Report to provide information about its community policing activities both internally and publicly. |

151. The COAB may make recommendations approved by a majority of its membership regarding implementation of the terms of this Agreement.

| Status | **Substantial Compliance – ongoing obligation** |
|---|---|
| | The COAB has shown the ability to make recommendations approved by a majority of its membership for both administrative issues and policy recommendations. For example, on April 28, 2016, the COAB voted to recommend the City end the "48-hour rule" for officers who are involved in a deadly use of force incident. And the COAB drafted a well-reasoned paper supporting this recommendation.

The COAB has also put forward recommendations on several PPB directives such as 344.05, bias-based policing/racial profiling prohibited, Directive 1051.00 Electronic Control Weapon System, Directive 1090.00 Special Weapon Use, and Recommendation 100815-9 consent searches, among others, *see* http://www.cocl-coab.org/library/coab-recommendations/approved-coab-recommendations.

The COAB approved over two dozen recommendations in the first two quarters of 2016 alone. |

152. The COAB shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The

COAB shall also provide the opportunity for public comment at each of its meetings to keep open lines of communication with the public-at large.

| Status | Non Compliance |
|--------|----------------|
| Analysis | A meeting that would have satisfied Paragraph 152 was scheduled for May 26, 2016, but the meeting did not happen for a number of reasons.  While numerous PPB officials have attended COAB meetings, the COAB has yet to "meet at least twice per year" with the officials listed in Paragraph 152 "in regards to community outreach, engagement, and problem-solving policing."<br><br>On May 24, 2016, the former PPB chief was placed on paid administrative leave and the acting chief declined to reschedule the meeting.  The previous chief then retired on June 26, 2016.  Upon the appointment of Chief Marshman, the COAB was in its throws of civil unrest. |
| Technical Assistance | The Police Commissioner and PPB should include plans for twice yearly productive exchanges with the COAB, as required by Paragraph 152, as part of PPB's engagement on the CEO Plan Development Timeline. |

153. A representative of the Oregon U.S. Attorney's Office shall be invited to attend all COAB meetings.

| Status | Substantial compliance – ongoing obligation |
|--------|----------------------------------------------|

154. COAB shall meet as needed to accomplish their objectives as set forth in this Agreement. All COAB meetings shall be open to the public.  In addition, COAB shall attend quarterly meetings with the COCL as provided in Par 163.  To the extent that COAB meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the COCL to ensure compliance with those laws and agrees to represent COCL in any challenges regarding compliance with those laws.

| Status | Non-Compliance – substantial barriers |
|--------|----------------------------------------|
| Analysis | Our 2015 compliance report noted that the COAB's formation and establishment was challenging, and that the COAB is a new type of entity created for assessing implementation of a Settlement Agreement.  As such, COAB had no pattern to follow and it had to develop bylaws, subcommittees, and processes.  Unfortunately those hurdles were not overcome through the following year, and as a result the City placed the COAB meetings in hiatus in August 2016 as discussed above. Since that time the COAB has not been able to officially meet to accomplish the tasks required of the board under the Agreement.<br><br>Despite the hurdles addressed above, COCL maintains a robust COAB/COCL website providing an extensive library of materials from COAB meetings and |

| | |
|---|---|
| | COCL's reports, as well as other resources for the public. *See* http://www.cocl-coab.org/. Such a resource should continue to be updated and utilized as way for COCL to provide additional information to the public, until such time that a revised structure is approved and implemented. |
| **Technical Assistance** | As noted, the City requested 60 days to propose an alternative to the current structure and objectives of the COAB. The City's deadline is Thursday, October 21, 2016. Given the status at the time of this filing, the City should provide an interim plan for consideration by DOJ while it finalizes the proposal. |

155. The City shall provide COAB members with appropriate training necessary to comply with requirements of City and State law.

| **Status** | **Substantial compliance – ongoing obligation** |
|---|---|
| **Analysis** | We noted in our 2015 report that the City provided COAB advice on compliance with laws governing open public records and open public meetings. The City also provided legal advice concerning ethics for public officials, and questions of prayer in public meetings. The City also offered civilian police academy and ride-alongs to COAB members. And, IPR provided training on their authority to investigate complaints and the City's accountability systems for police officers. |
| **Technical Assistance** | Despite the City diligently fulfilling this role through the City Attorney's Office, there was a desire from some members of the COAB to have independent legal counsel. As we provided in guidance to the COAB, the City Attorney does not have an actual conflict of interest in providing counsel to the board on the requirements of City and State law regarding public meetings. However, we commend the City Attorney's Office for staffing a Deputy City Attorney for this task who is not involved in advising PPB leadership. |

## X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT

156. PPB shall implement immediately all provisions of this Agreement which involve the continuation of current policies, procedures, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. Except where otherwise specifically indicated, PPB shall implement all other provisions of this Agreement no later than within 180 days of the Effective Date.

157. With regard to any provision that provides for DOJ's review and approval, including review of all policies that must be revised, approval will be granted in a timely fashion provided that the PPB's action reasonably satisfies the requirements and standards set forth in the relevant provision(s).

158. All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations. Audits and reports shall be posted on PPB's website.

159. PPB shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to PPB decision making and activities, and compliance with this Agreement, in accordance with the Oregon Public Records Law.

| Status | Partial compliance – ongoing obligation |
|---|---|
| Analysis | **The Parties are working together to implement the substantive provisions of the Settlement Agreement, though the 180-day deadline has passed.** <br><br> The Settlement Agreement's effective date is August 29, 2014. The 180-day deadline, therefore, passed on February 25, 2015. However, the Parties did not resolve the City's appeal until July 30, 2015. As we reported last year, the City began to implement some portions of the Settlement Agreement even before the effective date. <br><br> The City has already met with some success, as described in this compliance report, achieving substantial compliance with several provisions. For other provisions, described herein, the City and PPB must still work though issues on their own or with the Department of Justice to come into compliance. <br><br> Portland Police Bureau provides public access to information through its and others' online websites, frequent press releases, and public meetings. As described in the Paragraph 150 analysis, above, PPB has posted its quarterly self audits and its annual report on its website. *See* https://www.portlandoregon.gov/police/62642. Additionally, IPR produces very useful monthly, quarterly, and annual reports. *See* https://www.portlandoregon.gov/ipr/27068. COCL reports and COAB recommendations are publicly available on their shared website. *See* http://www.cocl-coab.org/library. As described in the analysis of Section IX, herein, the City's transparency has been hindered, at least in part, by the dysfunctional nature of the COAB meetings and the failure of the former Chief and Mayor to meet with the COAB. |
| Technical Assistance | The City and DOJ intend to conduct more expeditious policy reviews going forward. This should expedite some areas of compliance. <br><br> Implementation of the technical assistance set forth in Section IX, herein, would contribute to a more transparent, public process for Settlement Agreement implementation. |

A. Compliance Officer/Community Liaison

160-164. COCL Selection and Duties

| Status | Not measured |
|---|---|
| Comment | The City Council selected COCL November 12, 2014.<br><br>COCL has now published its reports on a schedule to which the Parties agreed. |

## B. PPB Compliance Coordinator

165. PPB will hire or retain an employee familiar with the operations of PPB for the duration of this Agreement, to serve as a PPB Compliance Coordinator. The Compliance Coordinator will serve as a liaison between PPB and both the COCL and DOJ and will assist with PPB's compliance with this Agreement. At a minimum, the Compliance Coordinator will:

a. Coordinate PPB's compliance and implementation activities;

b. Facilitate the provision of data, documents, materials, and access to PPB personnel to the COCL and DOJ, as needed;

c. Ensure that all documents and records are maintained as provided in this Agreement;

d. Assist in assigning compliance tasks to PPB personnel, as directed by the Chief of Police or the Chief's designee; and

e. Take primary responsibility for collecting the information the COCL requires to carry out his/her assigned duties.

| Status | Substantial Compliance – ongoing obligation |
|---|---|
| Analysis | Portland Police Bureau appointed a Captain as compliance coordinator who, along with a dedicated civilian experienced in mental health services, has ably coordinated compliance reporting to DOJ.  These individuals and their staff have also provided data and communicated openly when called upon.  We thank all of these individuals for their efforts. |
| Technical Assistance | This compliance report is intended to serve as a roadmap to assist PPB in furthering compliance. |

## C. Access to People and Documents

166. The COCL shall have full and direct access to all PPB and City staff, employees, facilities, and documents that the COCL reasonably deems necessary to carry out his/her duties. If a document requested by the COCL is a privileged attorney-client communication, the COCL shall not disclose the document in a manner that destroys that privilege without the approval of the City Attorney. The COCL shall cooperate with PPB and the City to access people, facilities, and documents in a reasonable manner that minimizes, to the extent possible, interference with daily operations. In order to report on PPB's implementation of this Agreement, the COCL shall regularly conduct reviews to ensure that PPB implements and continues to implement all

measures required by this Agreement. The COCL may conduct on-site reviews without prior notice to PPB or the City.

167. For the purpose of monitoring this Agreement, DOJ and its consultative experts and agents shall have full and direct access to all PPB and City staff, employees, facilities, and documents, that DOJ reasonably deems necessary to carry out the enforcement and monitoring provisions of this Agreement to the extent permitted by law.  DOJ and its consultative experts and agents shall cooperate with PPB and the City to access involved personnel, facilities, and documents in a reasonable manner that minimizes interference with daily operations; however, DOJ may conduct on-site reviews without prior notice to PPB or the City. DOJ shall provide PPB or the City with reasonable notice of a request for copies of documents. Upon such request, PPB or the City shall provide DOJ with copies (electronic, where readily available) of any documents that DOJ is entitled to access under this Agreement, except any documents protected by the attorney-client privilege. Should PPB decline to provide DOJ with access to a document based on attorney-client privilege, PPB promptly shall provide DOJ with a log describing the document, including its author, recipients, date of production, and general topic.

168. All non-public information provided to the COCL or DOJ by PPB or the City shall be maintained in a confidential manner.  Nothing in this Agreement requires the City to disclose documents protected from disclosure by the Oregon Public Records Law to third parties.

| Status | Substantial Compliance – ongoing obligation |
|---|---|
| Analysis | The City and PPB have provided us with access to employees and information upon our request.  The individuals with whom we spoke provided data and communicated openly.  We thank all of these individuals and the Assistant City Attorneys for facilitating access. |
| Technical Assistance | As described in the analysis for Paragraph 97, the City should fulfill the outstanding data request for C-I training. |

D. Review of Policies and Investigations

169. Within 180 days of the Effective Date, PPB shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. PPB shall revise and/or develop as necessary other written documents such as handbooks, manuals, and forms, to effectuate the provisions of this Agreement.  PPB shall send new or revised policies, procedures, protocols, and training curricula regarding use of force, interactions with persons in mental health crisis and systems of accountability to DOJ as they are promulgated, with a copy to the COCL. DOJ and the COCL will provide comments within 45 days and will not unreasonably withhold recommendations about policies, procedures, protocols, and training curricula.  The COCL shall seek the timely input of the relevant members of the Training Division and patrol officers, as well members of the community. If the City disagrees with DOJ's comments, the City shall, within 14 days of

being informed of the DOJ's comments, inform the Parties in writing of the disagreement. Within 14 days thereafter, the Parties shall meet and confer on the disagreement at a mutually agreeable time.  Upon approval by the Parties, policies, procedures, training curricula, and manuals shall be implemented within 30 days of agreement or the Court's decision.  PPB shall provide initial and in-service training to all officers and supervisors with respect to newly implemented or revised policies and procedures. PPB shall document employee review of and training in new or revised policies and procedures.

170. The Chief shall post on PPB's website final drafts of all new or revised policies that are proposed specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement, to allow the public an opportunity for notice and comment, prior to finalizing such policies.

171. The Chief's Office shall coordinate a review of each policy or procedure required by this Agreement 180 days after such policy or procedure is implemented, and annually thereafter (on a regularly published schedule), to ensure that such policy or procedure provides effective direction to PPB personnel and remains consistent with the purpose and requirements of this Agreement.

| Status | Not measured |
|--------|--------------|
| Comment | Please refer to our August 10, 2015 policy review letter. |
|  | The City and DOJ intend to conduct more expeditious policy reviews going forward.  This should expedite some areas of compliance. |

172. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

| Status | Partial compliance – ongoing obligation |
|--------|------------------------------------------|
| Analysis | *See* Accountability section, above. |

173. In addition to compliance reviews, the COCL shall lead semi-annual qualitative and quantitative outcome assessments to measure whether the City and PPB's implementation of this Agreement has created:  (1) capable systems and resources for responding to persons in mental health crisis; (2) competent accountability and oversight systems; (3) effective training for police officers that increases the knowledge, skills and abilities necessary for effective and successful delivery of service to persons in mental health crisis; (4) proper management of the use of force to meet constitutional standards; and (5) robust systems of community engagement. These outcome assessments shall be informed by the following:

    a. Use of Force Data:

        i. the number of police interactions where force was used on individuals with actual or perceived mental illness, including the type of force used; the reason for

the interaction, i.e., suspected criminal conduct or a well-being check; the threat to public safety, including whether the person was armed and if so, with what; a description of the type of resistance offered, if any; and a description of any attempts at strategic disengagement;

ii. the rate of force used per arrest by PPB; force implement used; geographic area (i.e., street address, neighborhood, or police precinct or district); type of arrest; and demographic category;

iii. the rate of force complaints that are sustained, overall and by force type; source of complaint (internal or external); type of arrest; type of force complained of; demographic category;

iv. uses of force that were found to violate policy overall and by force type; type of arrest; demographic category; force implement used; and number of officers involved;

v. the number and rate of use of force administrative investigations/reviews in which each finding is supported by a preponderance of the evidence;

vi. the number of officers who frequently or repeatedly use force, or have more than one instance of force found to violate policy;

vii. the rate at which ECW usage decreases or increases compared to the use of force overall and by weapon; and

viii. the rate at which officer and subject injuries decrease or increase overall and by severity of injury.

b. Mental health interaction data on:

i. MCPT dispositions;

ii. the flow of people in mental health crisis through PPB, the County jail, emergency receiving facilities, and community agencies;

iii. officer and agency staff satisfaction with the transfer process;

iv. the rate of repeat calls for service involving individuals in mental health crisis;

v. the use of the mental health commitment law; and

vi. the availability of appropriate treatment options;

c. Training data, including:

i. officer evaluation of adequacy of training; and

ii. the Training Division's assessment of incidents involving officer or civilian injury.

d. Performance data, including:

i. uses of force found to be unreasonable, complaints sustained and not sustained, and other performance related indicators for supervisors/commanders promoted

pursuant to the requirements of this Agreement, and for the units these supervisors/commanders command; and

ii. initial identification of officer violations and performance problems by supervisors, and effectiveness of supervisory response.

e. Accountability data, including:

i. the number of complaints (broken out by type of complaint), with a qualitative assessment of whether any increase or decrease appears related to access to the complaint process;

ii. rate of sustained, not sustained, exonerated complaints;

iii. the number and rate of complaints in which the finding for each allegation is supported by a preponderance of the evidence;

iv. the number of officers who are subjects of repeated complaints, or have repeated instances of sustained complaints; and

v. the number, nature, and settlement amount of civil suits against PPB officers regardless of whether the City is a defendant in the litigation.

174. In conducting these outcome assessments, the COCL may use any relevant data collected and maintained by PPB, provided that it has determined, and the Parties agree, that this data is reasonably reliable and complete. Additionally, the COCL shall solicit input from community groups or initiatives that have relevant experience conducting statistical analyses. The COCL will contribute to and review the Annual Community Survey.

175. Two years after the Effective Date, DOJ shall conduct a comprehensive assessment to determine whether and to what extent the outcomes intended by the Agreement have been achieved. DOJ will further examine whether any modifications to the Agreement are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the Agreement's requirements. This assessment also shall address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating full and effective compliance. Based upon this comprehensive assessment, DOJ may recommend modifications to the Agreement that are necessary to achieve and sustain intended outcomes. Where the City agrees with DOJ's recommendations, the Parties shall stipulate to modify the Agreement accordingly. Nothing in this assessment shall empower DOJ to unilaterally modify the terms of this Agreement.

| Status | Not measured |
|---|---|
| Comment | Following the filing of this two-year report card and the October 26, 2016 hearing, DOJ will meet with the Parties to discuss potential enhancements to the Settlement Agreement. In part, these discussions will rely on COCL's outcomes assessments. |

E. City Reports and Records

131

176. Beginning with the COCL's first quarterly report, as set forth in paragraph *[162]166* of this Agreement, PPB shall prepare a status report no later than 45 days before the COCL's quarterly report is due.  The PPB Compliance Coordinator shall lead the effort in preparing this status report and shall provide copies to the COCL, DOJ, and the public.  PPB's report shall delineate the steps taken by PPB during the reporting period to comply with each provision of this Agreement.

177. PPB shall maintain all records, as applicable, necessary to document their compliance with the terms of this Agreement and all documents expressly required by this Agreement.

| Status | Substantial Compliance – ongoing obligation |
|---|---|
| Analysis | Portland Police Bureau has provided very useful quarterly compliance reports from 2014 Q1 through 2016 Q2.  We thank all of the individuals involved for their efforts. |
| Technical Assistance | As PPB points out its quarterly reports, some provisions of the Settlement Agreement are not PPB's responsibility.  Whereas PPB's regular reporting has fostered deliberate compliance efforts, BOEC has not had such a catalyst for change.  BOEC would benefit from deliberately and consistently focusing on compliance.  *See* Paragraphs 113-115, above. |

F. Enforcement

178.-190.

| Status | Not measured |
|---|---|
| Comment | The Parties moved jointly to enter the Settlement Agreement.  DOJ has not instituted an enforcement action. |