**Status Report before Judge Simon**

**regarding Portland Settlement Agreement**

**Statement by Dr. Dennis Rosenbaum, October, 25, 2016**

Thank you your Honor.  I'm Dennis Rosenbaum, the Compliance Officer and Community Liaison (or COCL).  I will present for several minutes and give the remainder of our time to my colleague Dr. Amy Watson, who will discuss the mental health components of the Settlement Agreement.

Our compliance assessment and rating system is evidence-based, drawing on months of field observations, one-on-one interviews, focus groups, surveys of police personnel, reviews of documents, and analysis of incident data.  As I have stated previously, we are social scientists and police researchers, so we tend to focus <u>not</u> on isolated incidents or preconceptions about the Portland Police Bureau, but rather on the bigger picture of reforms and verifiable patterns of behavior. We are looking at whether the Portland Police Bureau and the City are making a serious, concerted effort toward compliance and are making real progress or whether they are trying to take short cuts or resist the reforms.

Also, we look closely at the capacity of data systems to capture the right information about the process and impact of police reform.  Having the right systems in place to monitor activities and measure change is essential. Finally, because of our background is police research, our inclination is to advise the Bureau about best practices and evidence-based policing so Portland can adhere not only to the requirements of the Settlement Agreement, but advance the Bureau to a higher level of professional practice.

At this point in time, our general conclusion is this:  We see the City and PPB working hard in most areas toward substantial compliance with the terms of the Settlement Agreement, but at present, they have attained only partial compliance in most areas. There have been some notable exceptions to this conclusion.

**Section III.  Use of Force**

The Bureau's policies on use of force and supervisory review of force incidents are being revised based on feedback from DOJ, COAB and the COCL's team of force experts. Most of the problems with language, definitions, and procedures have been corrected. Unfortunately, the policy review process by the parties has been extremely slow. To help expedite the process, the Portland Police Bureau's new leadership has recently committed a full-time City attorney, a Lieutenant and two professional staff to draft policy and review best practices on use of force.

Regarding the management of use of force, the most noticeable improvement since last year has been the successful implementation of the force audit that we developed in conjunction with the Bureau last year. Since the implementation in January of 2016, the auditing system has been successful at identifying errors in force reporting and force review by supervisors. The Inspector is now sending audit reports back to the appropriate Assistant Chief for corrective action and hopefully, this feedback loop will also prevent future mistakes. At first, the Bureau's administration resisted this feedback and sought to marginalize the Inspector ("kill the messenger"). Since the reorganization under Chief Marshman noted above, this resistance has dissipated. Consequently, the audit system is now working to ensure that force reports contain the necessary information to evaluate the reasonableness of the force.

The next big step -- and a challenging one -- is for the PPB to use the force audit methodology to identify force that is in-policy, out-of-policy, or "questionably justifiable." These results will have implications for training, the Employee Information System (EIS), and intervention with employees needing assistance. Overall, the force audit program is progressing very well.

With regard to patterns of force, our previous reports have shown a steady decline in the number of force reports between 2010 and 2014. Our recent analysis of PPB force data indicates that PPB is maintaining a force-per-custody rate of approximately 2.5% to 3%. However, the ways to measure force vary. For example, the Bureau could also look at force-per-contact, whereby officers use force between 3 and 4 times for every 1000 interactions they have with community members. The COCL has highlighted the differences in reporting styles in our Outcomes Assessment report that will be released soon, and we also make recommendations to improve the Bureau's quarterly force reports to increase the public's understanding of the nature and extent of force patterns.

Last year, we reported that the Bureau's new records management system, RegJIN, was a huge obstacle to compliance with force reporting requirements and caused a backlog of 17,000 cases. We have met with the Bureau's records management team and continue to monitor their progress in addressing these issues.  To date, 8 of 14 core problems with RegJIN (contained in a report we requested from PPB) have been resolved and significant progress has been made with the others. As of October 18, 2016, there were only 1,225 records remaining in backlog (94% complete). If Records personnel maintain their current pace, all 2015 records will be completed by the end of November 2016, nearly a year ahead of the projected completion date.  (The 2016 records are up to date).  Also, the conversion to an Incident-Based Reporting system, expected to occur on November 1, 2016, is, in our opinion, a necessity for any progressive police agency and a major advance over the old Uniform Crime Reporting system.

The RegJIN system, however, continues to have problems, such as the development of the Cognos software to properly analyze the data for force reports.  Also, we are concerned that officers on the street feel that RegJIN is a major burden.   A number of officers have told us that the system takes hours of their time each day to enter and extract data, which they claim lowers morale and reduces the time available for proactive police work We will continue to investigate this matter to determine the extent to which this problem is inherent in the system or can be alleviated with better training.

## IV. Training

Training is an essential component of police reform that can be used to educate officers about new policies, communicate new values and priorities, and strengthen skills and tactics that reduce the probability of using force. The COCL continues to devote substantial time to assessing PPB's training needs assessment, training curricula, training evaluation, and training audit as required by the Settlement Agreement.  To identify training needs, PPB utilizes a wide range of sources, but we have recommended that additional input be sought from the community and rank and file officers.

To evaluate training, PPB has adopted the Kirkpatrick model, which calls for the measurement of officers' reactions to the training content and delivery, changes in their knowledge and attitudes, changes in their behavior, and organizational impacts.  We believe this is a sound

3

model, but must be implemented with rigor for the Bureau and the community to have confidence that new training is being delivered in the most effective manner. For example, we recommend the use of pretests before training starts to measure changes in learning. Our recommendations are contained in a separate Technical Assistance report.

In terms of training coverage, while we are impressed with the quality and quantity of crisis intervention training in Portland, we still encourage the Bureau to explore additional options to strengthen officers' communication skills and tactics for all situations that involve intense emotions and noncompliance by the community member. For example, innovative training initiatives on de-escalation and procedural justice are currently under development around the country and we hope that the City will participate in this work.

For the training audit, we have provided consultation on all subsections of Par. 85, either through Technical Assistance Statements or through other informal documents. We will continue to consult with the Bureau to finalize an audit methodology for training and to help finalize a sound evaluation plan.

In addition to Bureau's internal efforts, the COCL's annual survey of officers was designed, in part, to capture changes in officers' beliefs, attitudes, and skills relevant to new training. In a moment, Dr. Watson will talk about officers' reactions to Crisis Intervention training and their perceptions of mental health crisis calls.

## VII. Employee Information System (EIS)

As part of the Settlement Agreement, the Bureau agreed to enhance its Employee Information System (EIS) "to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends" (Par. 116).

Over the past year, the Bureau has made some headway with its EIS system, especially efforts to require that supervisors document the activities of their officers, both desirable and undesirable behaviors. However, we continue to maintain that much more can be done using EIS to intervene early with at-risk employees to prevent force problems, save officers' careers, and even identify those few officers who should be removed from the Bureau. Research shows that the best predictor of future behavior is past behavior.

First, we believe the thresholds for flagging an officer for supervisory review, as set in the Settlement Agreement, are too broad or lenient and may not identify at-risk officers (e.g. any officer who has used force more than 3 times more than the average of officers on the same shift).  This is an example where best practice may exceed the Settlement Agreement. Here, we continue to encourage the Bureau to use an empirical approach and determine the best thresholds (using Portland's own data), while remembering that context is important – officers work in different neighborhoods with different teams and face different risks, so you can't compare apples and oranges.

Second, we have recommended that the Bureau work with experts who are using advanced statistical modeling to identify the best predictors of adverse events.  Creative thinking here means "going upstream" to identify risk factors.  In other cities, for example, factors such as the number of suicide calls that an officer has responded to is a good predictor of subsequent use of force, perhaps reflecting stress on the officer that could be addressed. But don't overlook the obvious – the best predictor of future adverse events is the number of past adverse events.

Third, when an officer is flagged in EIS, we have requested that the Bureau document the decision making process and rationale for those decisions. That has not happened to date, so we are operating in a black box. Specifically, why was a particular case flagged? Why are more than 90% of the flags not forwarded for supervisory review but disposed of by the EIS administrator? When cases are forwarded to supervisors, what decisions are being made to address the problem? What types of interventions are recommended, if any, including training, coaching, counseling, and/or discipline? Finally, what are the effects of intervention on future behavior? To date, we do not have answers to any of these questions. The process is new, but systems of measurement should be created now to document both current process decisions and future outcomes.

As EIS is ultimately about helping officers avoid a potentially career ending event, we feel that it needs to be utilized more comprehensively as a tool for supervisors and managers. Clearly, there is a need for PPB to develop a plan that documents the use of EIS information to identify and intervene with officers and a plan to evaluate the impact of their work on both supervisors and officers.

Our survey of Bureau employees continues to show that sworn personnel have little confidence in EIS as a system for identifying officers at-risk of getting in trouble. Officers may feel differently in the future if the recommendations by COCL and DOJ are heeded and the program is messaged differently. Many officers are concerned that EIS will be used exclusively as punitive tool for discipline rather than for coaching or supervision.

## VIII. Officer Accountability

In terms of officer accountability, the events surrounding the resignation of the previous Chief of Police certainly tainted the public's view of police accountability. However, the restructuring of the Bureau that resulted from these events has significantly strengthened the Bureau's accountability process and capacity to respond to the Settlement Agreement, so this crisis appears to have had a silver lining. Importantly, Chief Marshman has dramatically elevated the status of accountability and oversight functions within the Bureau. For example, Steve Jones, the former Inspector, has been promoted to acting Commander of the new Strategic Development and Oversight Group to ensure that changes to accountability are fully integrated into the Bureau's overall mission and daily operations rather than something imposed by DOJ or COCL. This includes oversight of Professional Standard, Behavioral Health Unit, Training, and SSD. The Inspector position has been upgraded from Lieutenant to Captain and given additional resources, including a full-time Lieutenant to absorb some of the workload from force audits and other auditing functions.

In terms of Investigations by the Independent Police Review (IPR), we have seen a steady increase in the number and quality of investigations of community complaints. Certainly, there is still room for improvement and civilian oversight continues to be source of tension and public debate. The accountability process, including the 180-day timeline for complaint resolution, has hit some roadblocks. There is currently no approved plan for a revised accountability process, though we expect this to be resolved in the near future.

In terms of on-scene statements and interviews of officers, from the very beginning we recommended that the Bureau abandon the "48-hour rule," in light of research findings and loss of public trust, so we are pleased to see that policy has been removed from the latest police contract.

We should also be cognizant of the accountability process from the police officers' perspective. Nearly 9 out of 10 survey respondents (89.2%) do not feel that "officers who consistently do a poor job are held accountable," and more than 8 out of 10 (84.8%) do not feel that "officers who consistently do a good job are rewarded."  These two issues – the administration's ability to recognize and respond appropriately to positive and negative performance by officers – were identified as the most egregious accountability problems from the officers' perspective.

Finally, to strengthen accountability, Chief Marshman is considering a contact survey to measure the level of public satisfaction with police services when interacting with community members. We endorse this idea and feel that it would be an important accountability tool and a mechanism to give voice to the community.

## IX. Community Engagement and Creation of Community Oversight Advisory Board

The Settlement Agreement requires that the COCL chair the Community Oversight Advisory Board.  We have done our best to support and facilitate the work of this body. We have employed some of the most respected individuals in Oregon to chair the COAB, including former Oregon Chief Justice Paul DeMuniz and community leader Kathleen Saadat.

Apparently, no one -- the City, DOJ, the COCL or members of the COAB -- had any idea how challenging it would be to create and support this advisory body.  Despite some early successes, in the final analysis the COAB, as originally conceived, did not work. We do not feel it is our position to opine on the reasons for this outcome – we will leave that to the Parties, the community and possibly the court.  However, we have officially requested that the COCL and COAB be separated so that the investigation of compliance with the terms of the Settlement Agreement can be independent of the process of community engagement. We will, however, continue to uphold our responsibility to chair the COAB until such time that the Settlement Agreement has been officially modified.

I have devoted much of my professional career to understanding and improving police-community relations, so I deeply value the importance of community engagement in public safety and truly hope that the City can arrive at a workable model.

**Closing Commentary**

This is a very difficult time in the history of policing nationwide. Community members are rightfully angry about police injustice over the years and are demanding change and accountability. At the same time, we have to think carefully about the best ways to achieve reform in policing nationwide and in Portland.

My biggest hope is that everyone approaches this reform with sincere intentions to help improve the Portland Police Bureau through constructive criticism and collaborative reform.  As someone with no dog in this fight, I am saddened by the level of distrust of motives and lack of cooperation between the police and community members affiliated with the Settlement Agreement.  Greater transparency, trust, and empathy should go a long way toward achieving the goals of the Settlement Agreement.

As someone who has studied organization behavior and police culture in 100 American cities, I will caution Portland that reforms can backfire if they are viewed simply as systems of punishment for all employees, when the actual number of "bad cops" is relatively small.  Our research and that of other policing scholars suggests that organizational change is more likely when officers have confidence in the leadership of the organization, feel that the reasons for change have been clearly explained to them, believe the system is fair and just, and believe they have a voice in the process.

Our surveys of Portland police officers document a serious downward trend on these dimensions over the past year. In 2016, our survey (administered shortly before the change of administration in the PPB), revealed that officers feel the Bureau is less fair, less participatory, and more punitive than in 2015.  Consequently, satisfaction with the Bureau as a place to work has dropped from 57% to 21% in one year and burn out has increased from 29% to 41%.

One potential adverse effect of this type of work environment is what we call de-policing, where officers reduce their effort on the streets to avoid punishment. Nearly 9 out of 10 officers (88%) told us that officers are "much less willing" to stop and question people who seem suspicious.  Use of force received similar responses.  While some may view this as a positive trend, I remind you that proactive policing, as opposed to simply laying low and taking calls, has

been shown to reduce crime and disorder in other cities and that use of force is absolutely necessary in some situations and we expect the police to exercise such authority.

In light of these organizational dynamics and realities, my advice to the City is this:  Not only does the Bureau need strong leadership that values positive community engagement and transparency, but it also needs leadership that can create, and justify to the its officers, a system of accountability and supervision that rewards positive actions and decisions and holds officers accountable for poor decisions that put lives at risk and threaten the legitimacy of the police. The reorganization of the Bureau appears to be a major shift in the right direction.

Thank you your Honor. Dr. Watson will complete the presentation of the COCL.

**Status Report before Judge Simon**

**Regarding Portland Settlement Agreement**

**Statement by Amy C Watson, PhD, October, 25, 2016**

**Good afternoon your Honor.**

In my brief comments, I will address several Settlement Agreement sections as they relate to the Portland Police Bureau's steps to create capable systems for responding to mental health response.  As our most recent compliance report indicates, the Bureau has achieved compliance on a number of paragraphs and made substantial progress towards compliance on many others related to mental health crisis response.  Given time constraints, I will limit my comments today to a couple of areas-the Bureau's Mental Health Crisis Response Model, training, BOEC and Data systems.  My comments and assessments are based on various data sources, which include analysis of Bureau data, the organizational survey of Bureau personnel, focus groups with ECIT and non-ECIT officers, training and field observations, interviews and document review.

First-I will briefly mention that as we indicate in our Compliance report draft, it is difficult for us to assess the City's compliance with Section V of the Settlement Agreement pertaining to CCOs and creation of various community based mental health services, beyond the participation of the City and BUREAU in the Unity Center.  Other requirements of CCOs and the mental health system are beyond the control of the Bureau and the City.  Thus, we have recommended in our reports that the Parties discuss modifying these requirements and or seek clarification on criteria for compliance.

Within Section VI (Crisis Intervention), I would like to make particular note of the areas where we feel the Bureau has substantially complied with the Settlement Agreement.  The first is the Behavioral Health Unit as an overall unit of mental health response.  Although there are specific areas within mental health response that still require improvement, the shell structure has been set up in a way that is consistent with both the language and the intent of the Settlement Agreement.

The second area of effective functioning is the Behavioral Health Unit Advisory Committee.  We have sat in numerous BHUAC meetings, have read all of their meeting minutes, and have observed the working relationship between them and the Bureau.  For example, we have seen documentation and witnessed firsthand recommendations from BHUAC and have seen evidence of the Bureau taking their recommendations and incorporating them into policies and trainings.  BHUAC has also been responsive to recommendations made by us such as being more transparent to the community by posting minutes onto the Buraus's website.  In all, we believe BHUAC also conform with the letter and intent of the Agreement.

Finally, the Behavioral Health Response Team and Service Coordination Team are operating in an effective manner.  While for the most part, they have substantially complied with the Settlement Agreement, the next steps for these two entities involves using collected data to improve services where possible.  Although not filed with the Court today, our upcoming Outcome Assessment examines trends for these entities over a two to three-year period.  We believe these trends will be helpful to BHRT and SCT to identify areas where improvement may be possible, though this will require lengthier discussions with them.

**Now, I will discuss the Bureau's Crisis Response Model**

In assessing the City's progress in creating a capable system for responding to mental health crisis and specifically, the requirement in para 99 that the Bureau adopt a Memphis model approach it is important to note that the Bureau's strategy diverges from the Memphis model in regards to the specific role of the ECIT officer and a narrower criteria for dispatching an ECIT officer.  Since last October, Bureau directives, BOEC policies, and the dispatch criteria for ECIT have been modified to come closer to the Memphis Model-in which <u>all calls</u> involving a person believed to have a mental illness or be experiencing a mental health crisis meet criteria.  This has included adding all calls coded by BOEC as suicide threats to the criteria for ECIT response. Previously, only a subset of calls coded as Suicide Threats were included. At last report, it was not clear the extent to which the expanded criteria would strain ECIT capacity or if the new class of ECIT officers held in November 2015 would provide adequate capacity to meet demand.  We are not able to empirically answer this question at this time due.  While we requested BOEC data that would allow us to begin to look at this for our Outcomes report, ultimately, the data was not provided to us as it had been in the past.  To our knowledge, the Bureau has not analyzed the current status of this issue.  Additionally, the Mental Health Mask data, which I will discuss more shortly, does not contain the data needed to determine the match between ECIT criteria and response.

In our focus groups with ECIT and non ECIT officers, ECIT officers were concerned about the expanded criteria and its impact on their workload and need to travel across precincts. Both ECIT and non ECIT officers expressed the view that the expanded ECIT categories were not necessary-as all officers are CI-trained and capable.  Several ECIT officers also indicated expanded criteria would act as a deterrence for officers to become (or remain) ECIT.

12

While most Bureau personnel feel they have had adequate training for providing mental health crisis response, there were some differences between ECIT and non-ECIT officers in responses on the organizational survey.  For instance, ECIT officers indicated greater confidence in their preparation, skills, familiarity with MH crisis response directives, and endorsement of the CI-approach than their non ECIT peers.  Additionally, more than 70% of all survey respondents indicated that calling an ECIT officer to assist on a call was useful for "effectively resolving the situation." This provides some support for the value of the ECIT specialist role in responding to mental health crisis calls.

I reiterate, at this point, we cannot empirically assess the extent to which ECIT capacity meets demand based on current criteria or determine if the criteria can or should be further expanded to include all MH related calls.

As it relates to operational tactics and definitions, we continue to have concerns regarding the Bureau's delayed engagement and disengagement approaches.  We certainly see the potential value for both for preserving life in specific situations, but still have some unanswered questions about the specific policy and training guidance to officers and frequency and outcomes of their use.  To date, we have not found documentation of consistent definitions, clear guidelines, or reliable data that allows us to examine the use of these approaches.

Our focus group discussions did touch upon de-escalation and disengagement as response strategies.  Officers seemed to have mixed feelings about the consistency with which these strategies are utilized.  Some officers felt that disengagement and delayed engagement are useful options to have. However, other officers felt these options are overused at the expense of the safety of the community.   A couple of officers perceived the message was that it is easier to

13

defend non-action than it is to defend action that results in negative consequence.  We recognize that disengagement/non-engagement (with a plan) are useful options to consider as long as safety and preservation of life are the foremost concern. However, we have concerns about the implementation of these strategies that we are currently unable to further examine with existing data.  We will continue to work with the Bureau to address this issue.

**Now, will comment on the Bureau's Training related to Mental Health crisis response**

The Bureau held an ECIT class in November 2015 and now reports a total of 99 sworn members, including 74 assigned to Patrol, as ECIT certified.   Thus, the Bureau's "initial goal" of 60-80 has been surpassed, though Par. 100's requirement for the number of ECIT officers to "be driven by the demand for [ECIT] services" has not been determined at this time.  COCL team members observed this training and have also examined Bureau training evaluation data. We have provided the Bureau with TA statements on both the ECIT training and training evaluation.

In general, the ECIT training was very good in terms of both content and delivery.  The Bureau implemented pre and post knowledge and attitude tests for the first time, which positive change from the pretest to the posttest.  The Bureau has issued a report on the training evaluation and we also report on this data in our upcoming outcomes report.

The Bureau has also held ECIT refresher training for ECIT officers.  The COCL team observed this training and provided feedback.  Again, this training was generally very good.  One notable point of feedback related to how the new Mental Health Mask, an electronic data form officers must complete on all calls, was presented to officers.  Specifically, it was presented as being something they had to do to satisfy the Settlement Agreement and prove they are

14

responding to a high volume of mental health related calls.  While we have had conversations with members of the BHU that suggest they see the Mask data as being operationally useful, the message that the Mask is good for officers rather than "something DOJ is making us do" was not conveyed.  We have discussed this with the Bureau and anecdotally have heard they have taken this feedback to heart and are working to adjust this message.

While we have not had opportunity to observe the CI-portion of the Advanced Academy training-as it was not offered this fall as planned.  However, we have reviewed the training lesson plans and as we indicate in our prior reports, the content is consistent with Memphis model CIT training.

We have reviewed PPB in-service training, which has included CI-content and related scenarios.  However, we encourage PPB to consider a stand-alone CI- focused in-service training, or CI refresher, as many officers received their initial CI-training more than 5 years ago. We will be evaluating whether this has occurred when we observe in-service training in November.

Based on data from our PPB organizational survey, officers on the whole feel they are sufficiently trained to interact with persons in mental health crisis.  A total of 86.5% of respondents indicated they had "more than enough training" or "just the right amount" of training for responding to mental crisis calls.  Furthermore, respondents were not only supportive of the quantity of training they received, but also the quality as about three quarters indicated the training they received was "excellent" or "good."  ECIT officers endorsed their training and skills more positively than their nonECIT peers. Notably, in the focus groups, they indicated the

scenario portions of their trainings were the most useful. They were less enthusiastic about the classroom portions.

Officers overall report a high degree of confidence in their own (and their fellow officers') knowledge and skills in recognizing mental illness, interacting with persons with mental illness, connecting consumers with services, and initiating a follow-up with the Behavioral Health Response Team-again, with ECIT officers' confidence in their own skills being the higher than their non ECIT peers as we would expect.

To fully assess the effectiveness of Mental Health crisis response training, the Bureau will need to address phases 3 (Behavioral Change) and 4 (Organizational Change) of the Kirkpatrick Model. Once they are confident the MH Mask data are valid and reliable, it will be useful for examining MH crisis response in the community and the impact of the training. Contact surveys with community members who have received such responses would also provide invaluable information.

**Turning briefly to BOEC**

In the first quarter of 2016, the Bureau of Emergency Communication (BOEC) presented revised policies and procedures for calls related to mental health and mental health crises to the Behavioral Health Unit Advisory Committee (BHUAC). The BHUAC reviewed the revised policies and procedures, asked meaningful questions, and made recommendations to BOEC. BOEC made further revisions based on the feedback from BHUAC and submitted the final policies and procedures for BHUAC's approval. We have reviewed the protocols provided by BOEC and find they are thorough and consistent with PPB's policies for ECIT response. BOEC is also implementing training of their personnel (OCT/NOV 2016). At their request, we

provided input on training content and their evaluation approach.  Additionally, they

incorporated input from BHUAC.  We plan to observe this training in November and will report

on it in our next compliance report.

**Data Systems**

Para 92 and 93 of the SA require the Bureau to create a data system that will allow them

to better track the frequency, location, nature and response to mental health related calls and

collect data required by the SA.   They developed the Mental Health Mask for this purpose The

Mask is a required data form for all calls that asks officers to indicate whether they believe

individuals involved in calls are impacted by mental illness or exhibiting signs or symptoms of

mental illness.  If so, they are asked to record information about the call in the Mask data

template.  This approach was born out of lessons learned from prior attempts to capture this

information that did not produce reliable or valid data; as well as consultation with DOJ, the

COCL.  The Mask was piloted in central precinct in early 2016, and shortly thereafter

implemented Bureau wide.  The purpose of the mask is not to have officers screen community

members for mental illness, as some recent media reports suggest.  Rather, it is to collect data on

calls that officers perceive involve a mental health component so that PPB can assess the

frequency, nature and other characteristics of mental health related calls they respond to,

evaluate their response and make resource, training and operational decisions based on good

information to improve the effectiveness of their mental health crisis response system.

As would be expected, there have been some technical and implementation hiccups, but

we believe PPB is moving in the right direction so that the mask will soon produce reliable and

valid data.  We have examined the initial Mask data and report on this in our upcoming outcomes

report.  One concern we have noted related to the timeliness of Mask completion.  Ideally, to

17

ensure reliability of the data, he Mask should be completed immediately following the call.  We recognize this is often not possible.  However, we recommend that PPB implement a policy that Masks should be completed by the end of the officer's next shift and that accountability systems be in place to insure timeliness and accuracy of the Mask data.

The Mask data, combined with BOEC data, community survey data and other feedback loops will be essential for assessing the impact of the policy and training reforms that PPB has put in place.  PPB will need to take ownership of ongoing analysis of this data.  We will continue to recommend a mental health contact survey to measure changes and areas for improvement in PPB's system of mental health response. Discussions have been ongoing related to the mental health contact survey as well as our recommendation to roll it into the more general community contact survey being considered by Chief Marshman. We encourage PPB and the City to move forward on this.

To conclude, the Bureau has made substantial progress towards a capable system for responding to mental health crisis.  There is still work to be done.  As their data systems improve, they will be able to examine the effectiveness of the reforms and modify their approach when indicated.

Thank you.