# Compliance Officer's 1st/2nd Quarter 2016 DOJ Assessment Report:
## City Listens to Secret Committees While Public Ones Implode;
## DOJ and COCL Trade Off Going Easy on PPB
### an analysis by Portland Copwatch October 24, 2016



On October 1, the Compliance Officer/Community Liaison (COCL) posted its latest draft assessment of Portland's compliance with the US Department of Justice (DOJ) Settlement Agreement focusing on excessive police force against Portlanders. Once again, Portland Copwatch (PCW) has found useful information and recommendations alongside alarming revelations, inappropriate lenience toward the City, and unanswered questions. The COCL's 1st/2nd Quarter Compliance Report ("Report") shows some improvement over the past Reports, but continues annoying trends such as failing to identify all persons whose roles are discussed. Alarmingly, the COCL (and DOJ) essentially sign off on letting officers get their stories straight after shootings. Significantly, the Report reveals how advisory groups closed to the public (the Behavioral Health Unit Advisory Council/BHUAC and the "Focus Group" on police oversight) received more attention from the City than the Community Oversight Advisory Board (COAB), which was created specifically to oversee the Agreement. Also frustrating is the fact that the DOJ's scorecard, released on October 18, has significant differences in analysis from the COCL. Below, PCW examines the Report on these matters, looking at key points of information, and breaking out the COCL's analysis into "good, needs work, and say what?" categories established in our last analysis. (The draft Report can be found at <http://cocl-coab.org/library/reports-memos/draft-version-cocls-2016-semi-annual-compliance-assessment-q1-q2>.) For clarity, we have listed the referenced paragraphs of the Agreement in parentheses.

## Alarming Info: Force/Deadly Force/Misconduct Lack Scrutiny, COCL Takes No Responsibility for COAB Collapse

In a shocking concession, the COCL has basically agreed that officers should have up to 6 hours to get their stories straight before being interviewed. Looking at the Agreement's requirement to separate witnesses, in the last report the COCL berated the Bureau for waiting 3-5 hours to issue "Communication Restriction Orders" (CROs) to stop involved and witness officers from tainting an investigation by comparing stories. The new Report concludes "based on the amount of time needed to get detectives to the scene... we believe issuing CRO's between 2-6 hours after the occurrence meets the criteria for 'immediately' issuing CROs." The DOJ's report reveals that the officers in the November 2015 Michael Johnson incident were not interviewed until 4 days after the shooting, and in the May 2016 Timothy Bucher case, police showed infrared video at roll calls before the CROs were lifted. Bonus points for the DOJ mentioning in their analysis that officers should not review video footage before writing reports. Oddly, the DOJ doesn't discuss the timeline for issuing the CROs. Both find the Bureau in partial compliance on this issue. (125)

The DOJ makes numerous references to the improprieties that occurred after former Chief Larry O'Dea shot his friend in the back in April, including but not limited to his efforts to cover up and the Mayor's complicity in not informing IPR or initiating an administrative investigation. (Section VIII-Accountability) They also call out Captain Mark Kruger once again, this time for minimizing the importance of a complaint about an officer under his command who grabbed a videographer's camera. Kruger apparently also filed a hostile work environment complaint about the CRC hearing on that incident at which a CRC member (not, as DOJ points out, any police officer) was doused by a community member's cup of water. (130) The COCL brings up the Chief's shooting only in the context of whether officers complied with policies, asking about CROs and whether "senior administrators" acted consistently with the Agreement. They ask that the Bureau create a culture of "integrity, rule compliance, accountability, transparency and respect for the community." (172)

The COCL did not review documents to see that all Use of Force complaints were investigated, even though they found one case that apparently violated the Agreement in the last Report. DOJ reports that PPB declined one case because the complainant changed her story (which didn't erase the question of whether force was used), and stopped investigating a case in which an officer dragged a bicycle under a patrol car because Commander Dave Hendrie said the officer ramming the bicyclist was not a use of deadly force. DOJ urges Internal Affairs (IA) to re-open the case. (129)

The COCL reveals that in addition to the two officers we know shot at (but didn't hit) Timothy Bucher, a third officer was involved ("he/she"— why can't the gender be revealed?) but wasn't interviewed or asked to do a walk through. As in the last Report, all involved officers who were asked to do walk throughs declined. The DA has offered to be

*(continued)*

present for walk throughs on a "case by case basis," but COCL wisely says all investigations need to be treated the same way. Disturbingly, the DOJ says because all officers were asked to do walk throughs, the City is in substantial compliance, even though the COCL wisely gives a "partial" rating since no officer has yet done so. (127)

Regarding reporting use of force, the PPB expressed concern that an officer taking someone by the arm to "redirect" them could be considered force. The COCL suggests that a supervisory review should not occur in such cases because that action wouldn't require a Force report to be written. PCW notes that if a civilian touched an officer, unwanted, they would be charged with harassment or assault, thus all physical contact done in the course of a police action should be reported as force. An inconsistent policy orders that an "escort hold" be reported to Professional Standards only if the person has mental health issues. (70)

The DOJ has found the City out of compliance on its efforts to engage the community using the COAB and for the failure for COAB to continue its public meetings. The COCL blames the disintegration of the COAB on "disruptions by community activists, resignations, [and] lack of quorum." It's clearly pejorative to use the term "activist" instead of saying "community members," harkening back to the earliest COCL report that sought to discredit activists who pushed the COAB for accountability. More importantly, the disruptions were fueled by the COCL's office, with actions such as squashing COAB efforts to discuss certain topics, arguing with community members about the content of their testimony, and creating arbitrary rules about where video cameras could be used at public COAB meetings. While the COCL explains they do not want to pass judgment on their own performance, they need to take some responsibility for what happened. The section on the COAB also talks about the COCL's request to separate from the COAB "to spend more time engaging in compliance and monitoring" and the 60 day recess imposed on COAB by the City and DOJ, all of which happened in Q3 2016— an anomaly for most of the other analysis in the Report. After pushback on the last Report, the COCL included a reference to the AMA Coalition for Justice and Police Reform (AMAC), which has enhanced amicus status in the DOJ lawsuit, as a party with an interest in the COAB. The AMAC is not mentioned at all this time. For its part, the DOJ notes the City had a year to come up with a plan for seating alternate and new COAB members, but failed to do so, and that four City Council members did not replace their appointees who resigned. (141-145, 154) We suppose the COCL's partial compliance could be justified because their report covers Q1/Q2 and the DOJ's goes up until September, but this lack of ownership leads to the question on when the COCL's performance will be assessed, and by whom. The COCL's behavior is particularly hypocritical as they call out the Bureau for blaming certain requirements on the Settlement Agreement instead of taking ownership and telling officers how actions will benefit them. (For example, needing to fill out the "Mental Health Mask", a computerized form to track whether encounters included a mental health component [102].) *-1

One other surprise in the Report: The Bureau apparently finished its 2015 annual report (in July) but forgot to post it on line. The DOJ inquired about it, leading the Bureau to post the annual report on line on October 6. PCW hasn't studied the 11-page report yet, but is wary of a compliance report about use of force that has a cover photo with a young girl petting a police dog to send a feel-good message. The COCL moved this up from "not assessed" to "partial compliance," even though they also note the Bureau has not met the Agreement requirements to hold three meetings in the community and one at City Council to go over the report. This should be shown as minimal compliance. (150)

### Non-Public Advisory Groups Get More Respect on Policy Recommendations

The COCL rightly points out in several places that the COAB has made numerous recommendations to the Bureau about policy issues and has heard virtually no response from the City or the DOJ (66/67, 68,69, 86, 151). DOJ found COAB in substantial compliance for making recommendations, but until mid-October, had only finalized one Directive using COAB's input. (151) While it's good that the COCL repeats that quality is more important than speed (156), there's no clear reason why finalizing policies has taken so long; perhaps part of it is that DOJ and the COCL are both from out of town. (66) DOJ gives itself a "partial" compliance rating for following up on proposed policies; the COCL doesn't weigh in. (157) The COCL offers to meet with DOJ and the City to figure out how to speed things up ("happy to attend"). (169/170/171) The DOJ did not measure these sections.

In stark contrast, the BHU Advisory Committee, which does not hold its meetings in public, made recommendations about the Bureau of Emergency Communications (BOEC), suicide calls, the Enhanced Crisis Intervention Team
*(continued)*

(ECIT), dispatch, standards/training for the Behavioral Health Response Team (BHRT) and the Standard Operating Procedures (SOPs) for the BHU units, and the Bureau and BOEC responded to their input. (95, 96, 108, 109, 113)*-2 Pursuant to BHUAC's recommendations, the Bureau conducted trainings on suicide intervention, Trauma Informed Care, and civil commitments, which was fairly easy to do as there are only three BHRT officers. The COCL asked for documentation about HIPAA training, which was also recommended, but doesn't address BHUAC's suggestion to train on "threat assessment." (also 109) The COCL also refers to BHUAC's input into a Mental Health directive that was updated, but not COAB's. (111)

While the COCL calls on the BHUAC to add to its current practice of posting minutes and reports on line (which PCW wasn't aware of until reading this Report) by creating an email list for interested parties. (94) PCW has expressed concerns since the creation of the BHUAC that their closed meetings are a violation of the spirit of the Agreement. The fact that their input is being implemented and being responded to while the COAB's fifty-some recommendations languish shows that the BHUAC should either be required to open their meetings to the public, or at least bring their recommendations to COAB for review and discussion. BHUAC has to stop operating in a vacuum. The DOJ and COCL eventually got the Training Advisory Council (TAC) to take public input at its meetings, which has led to more thoughtful deliberations. Despite their recent efforts to shut down public comments on the Portland Police Association (PPA) contract, City Council usually allows public comment before they vote on city policies. The Citizen Review Committee (CRC) is fighting to keep the City from removing public input at its appeal hearings.

On that subject, the COCL sneakily repeats criticism of City's "Focus Group" on the future of the oversight system, saying it won't repeat concerns about the "closed door format" (but doing so by including that sentence). They note the first proposal from the City based on the Focus Group's report would have merged the (closed door) Police Review Board with the CRC and contained "extremely limited public involvement," going on to say that the revised version (which allows attendance at hearings but no public comment) "may need revisions." The COCL also suggests, in contrast to the Focus Group's findings, that supervisory investigations (for lower level non-disciplinary complaints) should have the same possible findings as fully investigated ones for clarity. (121)

## DOJ vs COCL

We have asked rhetorically in the past who has the final say in deciding whether the City is in compliance— the DOJ or the COCL? The Settlement Agreement clearly leaves that monitoring function to the DOJ, but because the two reviewing bodies have differences of opinion, we can understand why the Bureau, the City and the public might be unclear on how much progress has been made. In some areas the DOJ is being way more generous to the Bureau than the COCL. We found 17 ratings by DOJ that were higher than the COCL's.*-3 On the other hand, COCL is still sometimes giving the Bureau too much credit, giving 14 ratings higher than DOJ's.*-4

We've already given some examples where the DOJ agrees with the COCL's critique of the City, but gives a "substantial" rating rather than "partial" rating. Some other examples include:

—The COCL is much harsher on the Bureau's efforts to conduct administrative investigations at the same time as criminal ones, noting that four of five supposedly concurrent investigations in Q1 did not indicate when the Internal Affairs investigations started. On the other hand, they say that in most cases the investigations started on the same day (presumably gleaned from Q2 statistics). One criminal case was opened two weeks after IA, in another case the IA case didn't start until almost two months after the criminal investigation started, but the Bureau didn't explain why. Again, the DOJ agrees that this was inappropriate, but gives a "Substantial" rating to the Bureau. (122) *-5

—DOJ calls ECIT dispatching in substantial compliance even though COCL finds "partial" and recommends testing on what the criteria are and notes that BOEC hadn't been trained by the end of the reporting period— which DOJ acknowledges (urging training to happen by early 2017- 103).

—The COCL says the Bureau did not create a training manual or take other steps to pass on institutional knowledge among Employee Information System (EIS) coordinators, thus only have them a partial rating on training a second administrator. The DOJ agrees, but probably because the second person was technically put in place, gave a "substantial" rating. (120)

*(continued)*

In other cases, the DOJ doesn't reference the COCL's findings and just gives the City a higher rating:

—In the last Report there had been no training for supervisors since 2014, continued in this Report, but a note claims there was to be a half day of training in Q3/Q4. (84) The COCL thus gave a partial rating while the DOJ gave a substantial rating.

—The COCL says the ECIT team has 99 officers, 74 of them on patrol. The Settlement Agreement calls for 80 but says the number should vary based on data. DOJ calls the Bureau in substantial compliance even though COCL notes the data to advise how many officers are needed isn't ready. (100)

—DOJ calls highlighting work of ECIT "substantial" even though COCL says there is no evidence of input from the BHUAC as required by the Agreement (104).

—The COCL wisely re-states a request that the City incorporate the Police Review Board's ability to send cases back for more investigation into City Code, giving a partial compliance rating on the matter. DOJ thinks the PRB facilitator giving an instruction to the Board that they may choose to send cases back is sufficient and gives a Substantial rating. (132)

—The COCL has diminished the rating for the section giving the Bureau 10 days to complete further investigation of complaints when ordered by CRC from "substantial" to "partial." This is appropriate, since the Bureau has not been consistently following the Agreement's direction to finish such investigation in 10 days. The Bureau did not submit a written reason for why one of its cases took longer. However, the DOJ still finds substantial compliance. To their credit, both indicate that having a full investigation trumps speed. (135/136) *-6

—Though the COCL indicated they would support Portland Copwatch's comment that IPR should automatically update complainants on the status of their cases, rather than having to fill out a form, that recommendation doesn't appear in their assessment of the online tracking provision of the Agreement. (138) With regard to getting information back to the complainant about outcomes, COCL wisely points out that state law does allow findings of administrative investigations to be released in certain circumstances, but the City has not necessarily noted if those exceptions apply to some (or all) complaints. The COCL promises to discuss this issue with the City Attorney. (140) However, the COCL supports IPR's scant sharing of information with complainants based on another state law, saying IPR can't release documents created by the Bureau. (139) PCW suggests (1) that the COCL should list the laws in question and (2) that questions be raised about whether the documents created by IPR in their "independent" investigations are being shared with complainants. The COCL still gives only a "partial" rating to all three of these issues while DOJ says IPR is in "substantial" compliance with all three, following the COCL's logic that IPR is doing all it can in the confines of the law.

Side note: IPR was reluctant to re-start its previous efforts to survey users of the system, questioning the "utility" of past results (which showed little satisfaction with the IPR process). The COCL is a big fan of surveys and should not let IPR deter them from finding out what people think about the oversight system.

—The COCL says City is in partial compliance of providing documents, while DOJ gives them a "substantial" rating. (166)

In two areas, the differences may be because the DOJ doesn't use the COCL's "non-compliance with steps taken" rating (which we call "minimal compliance"). In other words, DOJ has three tiers (non-compliance, partial compliance, substantial compliance) and COCL has four.*-7 In one case, the DOJ was harder on the City, in the other, COCL was:

—The COCL continues to find the City in partial compliance with the requirement to have the Chief and Police Commissioner meet with the COAB twice a year, though no such meeting has ever happened. On the plus side, after Portland Copwatch and the COAB pointed out the rating should not be "partial compliance," the COCL lowered the rating in the Q3/Q4 2105 Report to minimal compliance. They reveal the City had agreed to such a meeting on May 24, when COAB cancelled their meeting to hold a retreat. Acting Chief Donna Henderson "declined to reschedule." DOJ outright finds the City is out of compliance on this item. (152)

—Regarding on-scene statements to be given by officers involved in deadly force incidents, the COCL indicates the City, DA, PPB and DOJ are (still) discussing how to make it work. Thus, the PPB receives a minimal compliance rating, while the DOJ gives a "partial" rating. This is a good example of why the COCL's rating system is superior to the DOJ's. (124)

*(continued)*

Another example of a DOJ finding that is more critical of the City:

—In discussing that the Directive on Retaliation (310.20) was up for review in July 2015 but still hasn't got the language of the Settlement Agreement in it, the COCL repeats that the policy needs to clearly protect people who complain about misconduct, giving a "partial compliance" rating. The DOJ goes further in relating how the Chief discouraged his Assistants from reporting his off-duty shooting, and Captain Kruger's hostile attitude toward the camera-grabbing complaint, finding the City out of compliance on this matter. (130)

And finally, the COCL reviews a section that the DOJ did not assess:

—The COCL's evaluation of the paragraph requiring officers to sign statements that they understand the Settlement Agreement talks about new hires in 2015 and 2016 having the officers' supervisors confirm they had read the Agreement. The COCL asks for more direct proof of when the officers read the agreement so they can properly assess the situation. This doesn't answer what happens with all the older officers, whose responses to the COCL's survey showed an 82% distrust that the Agreement will improve the Bureau.*-8 (190)

## Portland Copwatch Rates COCL Analysis: Good, Needs Work, and Say What???

As with our last analysis, PCW found that in addition to the above issues, three kinds of analyses appeared in the Report: (1) Items useful for promoting change— including positive movement by the Bureau, (2) items that indicate the COCL or PPB needs more information and encouragement to improve, and (3) items that just seemed to miss the mark.

(1) The Good (though we note that most of these comments come with caveats):

—The Report reveals that the case of Jason Cox, whose beating by police was caught on surveillance camera and led to a $562,000 judgment, was finally sent back for investigation through Internal Affairs after a dispute about the Settlement Agreement's terms was worked out. (133)

—The COCL notes that one witness officer gave a briefing about a shooting incident six days after the incident. They also reveal that an officer who helped take Timothy Bucher into custody using force was not interviewed. They repeat their recommendation for the Bureau to clearly define what a witness officer is. (126) This was another area where DOJ agreed with the COCL's concerns but still found substantial compliance rather than partial.

—The COCL repeats the recommendation for the Bureau to put out "redline" versions of Directives so the public can see what they're proposing to change. As with the last Report from 6 months ago, this is being promised "in the future." (66/67)

—The Report calls for a diversity of voices to be added to the Training Needs Assessment (TNA), including rank-and-file police, the TAC, community members and community organizations. However, the COCL's solution is to create an online "suggestion box." (79) Unlike the COCL, the DOJ thinks the Bureau's work on the TNA is "substantial."

—The COCL continues to say that review of training isn't "rigorous" enough to be reliable. They ask again for pre- and post- training tests, and to measure "behavioral and organizational change." The Bureau finally agreed to "temporarily" revise their warning that student surveys could be public records in Q2 2016. (80)

—The Report also repeats old recommendations to reduce "us vs. them" attitudes in training, to give more detail about the Taser policy, and to include common scenarios (not just extreme ones). (84)

—Officers currently check a box to say they read new Directives, but COCL says they should give details on receiving, reading, and having the ability to ask questions, noting this could help the Bureau decide to clarify rules if multiple cops don't understand the same policy. (85)

—We fully agree with the COCL that the Force Inspector Lt. Steve Jones' presentation of data to TAC wasn't in depth, that he mostly spoke about process of audit, while actual data were only briefly mentioned in the 15 minute agenda item. The COCL reveals that TAC told Jones a visual presentation wasn't necessary. On the other hand, the COCL thinks TAC satisfied its charge in making recommendations for the TNA, even though their report barely touched on actual force or training issues, and was mostly about information delivery. PCW did a healthy critique of that document on July 12 and sent a copy to the COCL. (86)

*(continued)*

—The Bureau's SOP on who qualifies to be on the ECIT (#3.3) doesn't say officers will be automatically removed if they get a sustained finding of excessive force or mistreatment of a person with mental health issues. It only says a Lieutenant will "review" their participation. The COCL recommends saying "shall initiate removal proceedings," though they also suggest such a removal would be cleared through the Central Precinct Commander. The BHU sits under Central Precinct while individual officers on the ECIT report to their individual supervisors. COCL should say with the "appropriate" commander. (101)

—The COCL calls out the Bureau for spending a half an hour on an icebreaker in the Trauma Informed Care class, since it was only a 2 hour class. (102)

—The Report says officers are filling out the "Mental Health Mask" long after interactions, noting PPB warns officers if they are 7 days late. The COCL recommends a rule be implemented that the Mask be completed before the end of the officers' shifts. (105) Side notes: (a) The Report notes that the Mask is not providing reliable data (92/93), and (b) local attorneys have won the right to look at the Mask data that gets entered for their clients.

—The Bureau still interprets requirements about the Employee Information System regarding supervisory use to mean that supervisors have to document looking at the database, not that they have to analyze trends of problem officers. It's astounding this hasn't been resolved in the 6 months since the last report. In terms of supervisors looking at the EIS for current and new officers in their command, the COCL reports a wide variety of compliance, from the low at Central Precinct for 6-month reviews (52%) to the high in North Precinct (100%). Once again only 9% of officers flagged by EIS were sent to supervisors for review, a figure the PPB called "high"— and the COCL wisely disagreed. (Note here, we have no idea what the raw number of officers flagged was, since the COCL only used percentages.*-9) The Bureau failed to document why officers were not sent on for review. However, they apparently did review whether the EIS could predict which officers might be involved in an "adverse event," that is, something leading to a payout of more than $5000 and the officer being given one day off or more punishment. Though the COCL says the analysis showed EIS had little ability to predict bad behavior, the report says 5% of officers noted as problematic were involved in such incidents while only 2% of other officers were. Thus, EIS is 250% more likely to show a bad cop than random guesswork, which is the nicest thing we've ever said about the system. The COCL expresses concern that officers think the database is for punishment, so they don't trust it— which is odd since it's just a database collecting factual information about them.(116/117)

—While the COCL repeats the City's claim that CRC is six months behind in scheduling appeal hearings (but not providing the community any evidence) and that the average time to complete an appeal is 149 days (which doesn't account for PPB/IPR's role in those delays), their wise final conclusion is not to try repairing the system in haste. (121)

—The Report shows the Bureau doesn't always explain why complaints take longer than 180 days to investigate, and only offer as a remedy "this won't happen again." In one case, Internal Affairs "let sit" an investigation that ended up not concluding for just over a year, with the excuse it should have been "better managed." (123)

(2) Needs Work:

—Use of Force policies and Use of Force reports are still being reconciled, 6 months after the last Report said that (66/67, 69). Similarly, the COCL gives "partial compliance" ratings about policies on Tasers (68) and After Action Reports (70, 73) despite new policies not having been finalized and no analysis from the COCL on the existing policies. This is also true for the Bureau's discipline guide, an area where the COCL found one case where the reason for a corrective action wasn't explained. (137)

—The Bureau is still working on getting software to track training, 2 years into the Settlement Agreement. It is not clear whether COCL looked at the software the City is looking to purchase to see if it would fit the needs. (81)

—The COCL finds PPB in substantial compliance with matching the thresholds that trigger review, but repeats a previous recommendation that the thresholds should be lowered to flag more officers. The DOJ agrees, though they (correctly) say the Bureau is only in partial compliance. (118/119)

—The Report mentions that TAC posts minutes and agendas, but leaves off that they continue to use an email list and to invite public testimony. The COCL also has dropped its previous recommendation that the City define why "public safety concerns" would lead to excluding the community from meetings. (87)

*(continued)*

—The Bureau didn't provide lesson plans of its in-service training to the COCL. The Report repeats its previous recommendation to refresh Crisis Intervention training (98).

—The COCL saw a plan for BOEC training based on policy changes, but BHUAC did not weigh in on it. BOEC can only do 8 hours of training due to their labor contract, and the COCL admits it is unknown if that will be sufficient. (114)

(3) What the What??

—The required audit of the PPB's training is going to start in Q4 2016, nearly 2.5 years into the Settlement Agreement. (85)

—The Report notes a ratio of one sergeant per 5.58 officers in 2014 is now one per 4.83 cops, while they say a good "span of control" is 8. If the Bureau has such a huge staffing shortage, why would we have, assuming 600 patrol officers, 120 Sergeants with 5 subordinates as opposed to 75 with 8? (71)

—The COCL says the Bureau's Service Coordination Team report is confusing because some numbers are raw numbers and others are percentages, which is an interesting critique as we've leveled it against the COCL and the Force data reports. The COCL admires that the SCT holds a graduation ceremony, but still fails to address the low graduation rate listed in the outcomes reports (16-20%), upping the finding from partial to substantial. (112)

—Though the Agreement calls for input into demographics collected by police at stops by the end of 2013 (yes, nearly 3 years ago), the COCL casually notes that COAB did not meet with PPB management in Q1/Q2. They do suggest, though, that a meeting should happen when COAB's recess is over. (147/148)

—While COCL notes input from various advisory committees, there is no recognition of the community's comments made in response to the Bureau's requests for input. (170 and throughout)

—The COCL agrees with the Bureau that not all levels of commanders need to review After Action reports, saying that audits will catch problems. However, the COCL also agrees that the Bureau only needs to audit 20-50% of those reports. (74/75/77)

—In our last analysis we praised the COCL for calling out supervisors who knew a force investigation checklist had been created, but weren't using it because the policy doesn't require them to. The COCL apparently talked to the DOJ and PPB and decided not to push the issue. (72)

—At the request of the COCL, the Force Inspector invited public input on data reports, but the Report claims nobody weighed in. Our response: (a) That's the fault of the PPB and COCL because nobody publicized the opportunity, (b) the Bureau doesn't alert the public when the quarterly reports are posted, and (c) PCW made recommendations in our analysis of the COCL's last Outcomes report in April, within the scope of this report, so what are we, chopped liver? (76)

—The COCL still hasn't assessed training on whether the Bureau teaches constitutional rights, though the Report now does mention that the assessment should include whether they urge constitutional treatment "of individuals with mental illness." In the COCL's defense, that's actually what the Settlement Agreement says... so everyone else's rights be damned? (78)

—Even though the COCL notes that reports on how many officers are trained lack all the criteria from the Agreement, they do not list any recommendation to fix that, instead calling the reports in substantial compliance (82).

—The COCL finds substantial compliance in screening out trainers who have bad histories, even though they note there's no clear criteria if an officer is found liable in a civil judgment. They ask to be notified if such an officer is hired in training, saying it's ok to look at this on a "case by case basis." (83)

—Because of private entities' progress on the Unity Center (set to open in 2017), the Report gives substantial compliance for the envisioned drop-off center— even though multiple testimonies to COAB said the Unity Center doesn't fulfill that need... and the DOJ says this is only in partial compliance. (89)

—The report notes that the "48-hour rule" was to be removed in a tentative agreement in Quarter 3, but doesn't look at the loopholes created by that same agreement. In addition, the previous recommendation by the COCL that officers fill out their Force reports before the end of their shifts has disappeared, though the DOJ reiterated it in their report. (124)

*(continued)*

—Using a double negative, the COCL states that they have "no reason to believe the CRC members are not neutral [and] unbiased." While we don't necessarily disagree with the sentiment, the fact that nobody from the COCL Chicago team has observed a CRC hearing in nearly 2 years makes this assessment unscientific. The "methodology" listed in the paragraph about the size of CRC and qualifications of members is that the COCL looked at the City Code. (134)

—The COCL notes that the Community Engagement and Outreach plan has stalled because of the COAB's inability to function, but points to developments such as the presentation of survey results and work on the Bureau surveying people after interactions. Apparently, the outreach to focus groups of youth, LGBT, houseless and persons with mental illness were not, as previously suggested, conducted by the COAB's CEO plan subcommittee, but rather turned over to DHM, the contractor who did the broader community survey. The focus groups were held in Q3. It's not clear if that happened before or after COAB was put on recess. The COCL also notes that the COAB was unable to meet with the Community Police Relations Committee to discuss racial profiling issues because that group took a self-imposed hiatus in early 2016 and never re-convened. (146)

—The COCL is planning to work on a contact survey with the Bureau, but doesn't ask for community input on the content of that survey. They claim that metrics, including the community survey and the focus groups, were developed jointly by the DOJ, COCL, PPB and COAB, but that's sleight of hand— some concepts were worked on by some of those groups, but most were not worked on by all of them collectively. (149)

—The COCL continues to say that the City Attorney has been giving the COAB "sound legal advice" even though it's mostly been advice that is least favorable to a strong, independent oversight body. (155)

—The COCL says that the Bureau's failure to post all of its reports to the website is despite a "genuine effort." That doesn't cut it. Getting information to the community is a high priority of both the Settlement Agreement and the Agreement between the City and the AMA Coalition. Furthermore, the COCL refers to the contact survey as "customer satisfaction," which we've noted before is not an apt analogy for people who may have been stopped inappropriately by police— they're not buying jeans. There is also no mention of how the COAB gets the data it needs to carry out its responsibilities. (158/159)

—Despite the fact that the Compliance Coordinator for the Bureau is supposed to have been hired for the duration of the Agreement, and Captain Mike Marshman, the person holding that role, was promoted to Chief in Q2 2016, the COCL finds substantial compliance, noting changes in Q3 which actually took place in Q2. (165)

### Technical Assistance Memos Expose Other Issues

The two attached "Technical Assistance" statements from the COCL focus on Force Audits and Training Needs Assessments. The former exposes one of the key problems with the way the Settlement is playing out: It focuses more on making sure all force is documented than on reducing the use of force in the first place. The second one asks the Bureau to be more specific about how the Bureau called a meeting of supervisors to talk about hazards faced by officers, asking to specify whether an identified trend came from street level officers or command staff. Considering how frequently the COCL supports obscuring such information, that suggestion is a welcome sign.

In the TNA report, the COCL also notes to the Bureau that although extreme incidents are rare, they have impacts on human life, lawsuit payouts, and legitimacy with the public. Apparently the Bureau examined 19 incidents looking for "problematic use of force," which, by the terms of the Agreement, should be made public. There is no reference to the annual analysis by the OIR Group into deadly force incidents.

Also, the COCL asks the Bureau to have the COAB help gather community input into the TNA. Furthermore, the COCL notes that "best practices" is not the same as "evidence-based" practices, but rather often represents what is most popular. We agree.

One final note on the TNA report: the Bureau lists its five core disciplines of policing as defensive tactics, "electronic control equipment" (ie electroshock weapons), firearms, patrol tactics and vehicle operations. We should hope that "communication" would be added as the number one discipline important to police.

### General Content Comments on the Report

—Sometimes the COCL will note that a recommendation is carried over from one or more previous Reports, but sometimes language is just cut and pasted in (106/107). It would help to say how long the same information has been

*(continued)*

true to give a sense of ongoing compliance / non-compliance. Also, the COCL should be clear when writing statements about past recommendations, for example saying regarding the SOP on Behavioral Health qualifications they have "commented on the SOP's suitability for this paragraph in previous reports." That doesn't say whether the comment indicated it was or was not suitable. (108)

—While the new Report adds a long-awaited list of personnel, the list is limited and doesn't include, for instance, Assistant Chief Donna Henderson (who was acting Chief from late May to late June 2016— within this time frame). A more thorough roster identifying persons whose activities are covered in the report would be helpful, such as but not limited to the head of Professional Standards, the EIS supervisor, the IPR Director, and the Assistant Chiefs. Not only would such a list clarify for contemporary readers but it contextualizes for future historians.

—References to the outcomes report now generally include a summary of the COCL's findings, such as in paragraph (80). Some exceptions include sections (92/93) and (146).

—COCL refers to CRC as the "Citizens [sic] Review Committee" (instead of "Citizen"- 121) and, despite our pointing out to them their omission, continues not to list CRC in its table of acronyms.

—Even though updated acronyms are used in some summary paragraphs (such as "BHU" instead of "ABHU"), the old ones are used in some places (such as paragraph 90); the COCL did add italics for the new names in some places (91, for example).

—The COCL previously indicated they would include short summaries of the paragraphs that have been skipped (157, 160-164, 167-168, 173-175 and 178-189), but did not.

—For the record, we found that the COCL moved 9 areas to "substantial compliance,"*-10 and six to "partial compliance," one of which was a step down for the Bureau.*-11

## Conclusion

Once again, PCW thanks the COCL for a more readable and thorough report. We appreciate the feedback given to all comments on the semi-annual reports. We hope the Bureau will take note and also create such a feedback loop, which is one way to build community trust. Most of all we hope we can help reduce the use of force, bias-based policing, and other misconduct that led the DOJ to Portland in the first place. Once again we look forward to hearing the COAB's comments on the Report*-12 and seeing the final version.

*-1 Regarding the Mental Health Mask, the DOJ found the City in substantial compliance, even though they agreed with COCL's analysis which said they should stop blaming the Agreement for the new requirement.

*-2 Regarding training for the BOEC, the COCL gives a "substantial" compliance rating but the DOJ labeled it "partial."

*-3 ...with four more areas that the DOJ rated but COCL didn't assess.

*-4 ...and 1 rating to a paragraph DOJ didn't review.

*-5 Note: the COCL references the fact that Directive 330.00, which is about Internal Affairs, hasn't been updated, but then also references Directive 300.00 (Statement of Ethical Conduct).

*-6 We also note that the we informed the COCL of a third case that happened in Q3/Q4 2015 where CRC required more investigation, but the COCL did not include analysis of that case in either Report.

*-7 Nonetheless, it would probably be good to have a fifth tier representing "considerable compliance" so as to cover the grey area between "partial" and "substantial."

*-8 Survey released by COCL in July 2016, probably will be part of Outcomes report.

*-9 In the past, DOJ said that 2 of 124 officers were sent for review in 2015 (which is just 2%), and COCL said last time that 6-12% of flagged officers were sent on for review.

*-10 Four of the sections the COCL moved up to "substantial" were considered "partial" by DOJ— (86), (96), (113), and (118/119). The other five were (71), (83), (87), (109) and (112).

*-11 Those were (68), (114), (115), (149), (150), and (135/136).

*-12 Despite the COCL and COAB's mutual desire for a "divorce," the Agreement still requires that quarterly town halls on compliance be presented by COCL to the COAB. Thus, the COCL's invitations in July and October indicating COAB members aren't required to attend are not in compliance with the Agreement. (154 and 163)

# OTHER PERSPECTIVES: THE PORTLAND POLICE ASSOCIATION CONTRACT
### a fact sheet by Portland Copwatch

October 24, 2016

In the interest of giving a balanced perspective to the "City Employees, Colleagues, [and] Portlanders" invited to the "City Employee Forum on City Hall Safety, Public Process, and the Police Contract," Portland Copwatch offers the following information.

## CONTENT OF THE CONTRACT AND THE SUPPORTING ORDINANCE

Much of the City's argument about what is or is not in the contract is based on semantics, as some of the issues the community objects to are included in the "Tentative Agreement" which was connected to the contract in the ordinance that passed.

> **ONE OF THE ONLY ITEMS CHARLIE HALES HAS RIGHT:** "There is still a lot of misinformation out there about the police contract, the public's access to offer testimony, and the process of removing the protestors from City Hall."

The elimination of 12 PPA Grievances breaks down like this:

- 7 have to do with officer shifts/ overtime/ assignments
- 1 has to do with parking
- 1 has to do with cameras in police cars
- 1 is about "mere conversation"— no details given.

The final two which remotely touch on accountability?
- 1 is the PPA agreeing not to complain that more than one IPR investigator might be in the room during administrative investigations
- 1 objected to the Bureau's discipline guide, but PPA dropped the grievance "based on City representation that Chief may reduce proposed discipline based on truthfulness issue... after mitigation hearing."

Most significantly, the Agreement says "withdrawal is not a general waiver of PPA rights; withdrawal is limited to circumstances raised in grievances." In other words, PPA could still file a grievance about other aspects of the Discipline Guide.

## ELIMINATION OF THE "48-HOUR RULE" AND WHAT'S MISSING

While it is true that the community pushed for a long time to get the 48-hour rule eliminated, the demand was part of a larger package of proposed reforms that should have addressed, among other things:

—The binding arbitration clause that led to the City having to re-hire Officer Ron Frashour, who shot unarmed Aaron Campbell in the back in 2010; and

—Parts of the contract that inhibit "meaningful independent investigations" (as described by the DOJ Agreement), such as the ability of a civilian agency to compel officer testimony or to investigate deadly force.

As it happens, PPA members did not think giving up the 48-hour rule would affect them (*Portland Tribune*, October 4), and in cases that involve less than deadly force, such as the use of Tasers, "bean-bag" guns, broken arms, etc., the Tentative Agreement reinforces that officers will have a "reasonable amount of time" to review their police reports and video footage before being interviewed.

## BODY CAMERAS

It is also true that Body Cameras are not part of the actual contract, but rather are in the Tentative Agreement which is now public policy. The Agreement references the draft policy that was circulated by the City, and notes that "the PPA and City specifically agree that the subject of review of audio/video as set forth in [the draft policy] is mandatory for bargaining." That draft policy allows officers to review footage before writing police reports. The City Attorney released a memo on October 11, the day before the vote, saying they believe the subject of Body Cameras is "permissive" for bargaining. In other words, the policy the City signed is contrary to their attorneys' belief and now binds the city to negotiate over cameras even if courts rule that it is not mandatory to do so.

## FINANCIAL BENEFIT TO THE PPA

The City's excuse for pushing the contract through is that it will raise officers' salaries and allow retired officers to be re-hired. It's been reported that some officers have already come back and others are interested in joining the Police Bureau based on the contract— but in fact, because the contract was approved as part of a "non-emergency ordinance," it doesn't go into effect until November 11. Thus, the City took action based on the assumption the contract would pass, not taking into account any public concerns about the content.

## NEGOTIATION PROCESS

> **BETTER LUCK, MAYOR OF 2021** Because this contract expires in June, 2020, its successor will be negotiated after the next Mayoral primary in May that year.

The City began negotiating the contract, which didn't expire until June 30, 2017, early in 2016. They did not call for bargaining sessions to be public (which they were at least in part in 2010 and 2013). Council did not invite the Auditor or IPR to give input into the contract, even though they are responsible for police accountability. The Auditor and IPR Director wrote a sharply worded memo revealing this fact, asking that the contract be modified to allow them to compel officer testimony, and noting that the policy of allowing officers to view body camera footage before making statements or writing reports is bad policy.

*(more, over)*

## PRIVATE LOBBYING BY A PUBLIC OFFICIAL

After the Auditor's memo came out, the Mayor's office wrote emails to numerous entities which receive funding from the City asking for support of the contract, including Neighborhood Associations, the day before the October 5 hearing. When one Association declined to weigh in, partly because their bylaws require a vote that could not happen in time, the Mayor's staff berated them. In addition, several of the emails said disparaging things about protestors opposed to the contract, such as: "Thanks to a lot of genuine pain and trauma created by police shootings elsewhere in our country, people in Portland have recently spoken loudly about the need for reform. That is good and helpful. What is NOT good nor helpful is that some of these advocates have seized on this new police union contract as 'the problem here' and are urging the City Council not to approve it."

The Mayor also called in representatives from several organizations who had testified about the contract. He told some of them to reverse their positions. He confronted some of them with photos of the young woman who was tragically killed by a car on SE Hawthorne. When asked why he didn't negotiate for the accountability measures the community has been asking for, the Mayor's reply was "mea culpa."

## SUSPENDING RULES TO SUPPORT COUNCIL'S ACTIONS

Portland Copwatch has alerted the Council to at least three ways in which their actions violated City Code:
1) They took items out of numerical order without taking a majority vote to do so. (3.02.040[D][4])
2) They set a meeting outside of the proscribed time (2 PM Thursdays) on less than 24 hours notice (3.02.010 & 3.02.020)
3) They recessed to a location other than Council Chambers without a majority vote. (3.02.010)

While it can be claimed that the Council was "suspending the rules" to take these actions (which, itself requires a majority vote- 3.02.040[I][8]), the obvious question is then why does the Mayor cling to the part of City Code that says no testimony will be taken on a second reading? (3.02.040 [G][4][b]) Code clearly says that people will be able to testify at a first reading for up to three minutes. (3.02.040[G][6]).

And yet, people who came to the continuation of the first reading on October 5/6 were not allowed to speak unless they'd signed up on September 28— even though the Mayor had introduced amendments between the morning and afternoon sessions on that date after many people had left City Hall.

> **If Council was willing to suspend the rules to lock out the community, why did they not instead choose to suspend the rules to allow more testimony? Surely that would have taken less time and effort, and not involved police violence, arrests, and the presence of Homeland Security..**

## SEPARATING THE PUBLIC FROM THE COUNCIL

Mayor Hales separated the public from the Council on two occasions, Thursday October 6 and Wednesday October 12. In 24 years as an organization, we have never seen such drastic action taken. Council has seen raucous community behavior at any number of hearings— the gas terminal, the covering of Portland's reservoirs, fluoridation, and other issues in recent years. They have never used such passion/actions to claim a "threat to disrupt" Council, and then invoke the Oregon's public meetings law's very narrow exception to meet in a separate room.

> **PCW is all for employees bargaining for good wages and benefits, but the PPA can't continue to direct City policy that inhibits accountability. It seems as if the City doesn't believe that the community has a sense of history, a stake in its own future, or the ability to read what is in the documents the City has presented to us.**

On 10/6 people who signed up to testify had to be escorted from the Portland Building into City Hall by an accredited City employee. Then, people were only let into Council Chambers one at a time to give testimony. Not only did this take up an enormous amount of time (coming from one building to the other, the Mayor explaining the rules to each person), but it guaranteed there would be a lot of repetition in the testimony since people weren't able to hear each other speak. On October 12, even though people who had signed up to testify on multiple agenda items received red raffle tickets to enter Chambers, once the Mayor recessed the meeting to the Rose Room, the stairways were blocked by 2 dozen armed police and only one person with a ticket was ever allowed up to speak.

## POLICE VIOLENCE AGAINST COMMUNITY MEMBERS

The videos of the 10/12 police action show officers were pushing too many people down the narrow, steep, and uncarpeted stairway on the West side of City Hall. Whatever one thinks of the protestors' actions, the police were not exhibiting de-escalation tactics that are supposed to be a cornerstone of the DOJ Agreement. Instead they were pepper-spraying people (including an infant) and pushing people as if they were volleyballs, landing them onto concrete.

> **TOO MANY SUPERVISORS? We're told the PPB has a staffing crisis, but the (COCL) Compliance report shows one Sergeant per 5 officers when an ideal "span of control" is 8.**

## CONCLUSION

In summary, the City has passed a contract that gives officers a sweet deal with more money and no more accountability. The discipline guide issue is a smokescreen hiding that binding arbitration and lack of civilian oversight into police shootings were not addressed. The process including the shutting out of testimony at Council was done to suppress the community's voice, administratively and physically. Stand up to bullying. Ask Council to rescind the contract before it kicks in on November 11.

---

This flyer was prepared October 2016 by
**Portland Copwatch**
PO Box 42456                              copwatch@
Portland, OR 97242          portlandcopwatch.org
(503) 236-3065      Incident report line: (503) 321-5051