TRACY REEVE, OSB# 891123
City Attorney
Email: tracy.reeve@portlandoregon.gov
ELLEN OSOINACH, OSB# 024985
Senior Deputy City Attorney
Email: ellen.osoinach@portlandoregon.gov
JUDY PROSPER, OSB# 152214
Deputy City Attorney
Email: judy.prosper@portlandoregon.gov
MARK AMBERG, OSB# 922133
Chief Deputy City Attorney
Email: mark.amberg@portlandoregon.gov
Office of City Attorney
1221 SW 4th Avenue, Suite 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
        *Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | **Case No. 3:12-cv-02265-SI** |
| **PLAINTIFF,** | |
| v. | **DEFENDANT CITY OF PORTLAND'S NOTICE OF PERIODIC COMPLIANCE REPORT** |
| **CITY OF PORTLAND,** | |
| **DEFENDANT.** | |

Defendant, City of Portland, provides notice to the Court of attachments Exhibit A, Rosenbaum & Watson, LLP correspondence, and Exhibit B, the Compliance Report for First and Second Quarters for January through June, 2016 of the Compliance Officer and Community Liaison (COCL). Defendant submits COCL's report pursuant to paragraphs 162 and 163 the Amended Order Entering Settlement Agreement.

Page 1 – DEFENDANT CITY OF PORTLAND'S NOTICE OF PERIODIC COMPLIANCE REPORT

COCL has provided this report to the United States Department of Justice, the intervenor and the enhanced amicus, COCL's email updates list, and it has been made available to the public on the COCL's website since March of 2017.

Dated: March 8, 2017.

Respectfully submitted,

/s/ Ellen Osoinach
ELLEN OSOINACH. OSB # 024985
Senior Deputy City Attorney
Telephone: (503) 823-4047

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
PHONE: (503) 823-4047
FAX: (503) 823-3089



**Office of the Compliance Officer and Community Liaison (COCL)**

__Rosenbaum & Watson, LLP__                                                    COCL Office:

Dennis Rosenbaum, Ph.D.                                            525 NE Oregon Street, Suite 250
Amy Watson, Ph.D.                                                        Portland, OR  97232
Thomas Christoff, Ph.D.                                                    www.cocl-coab.org
with                                                          rosenbaumandwatsonllp@gmail.com
Geoffrey Alpert, Ph.D.
Heather Daniel, J.D., B.A.

March 3, 2017

Transmitted by E-mail to:

The United States Department of Justice
The City of Portland
The Community Oversight Advisory Board (COAB)

Re:    __Compliance Report for 1st and 2nd Quarters of 2016__

Dear U.S. Department of Justice, City of Portland, and COAB:

On behalf of Rosenbaum & Watson, LLP and the entire Compliance Officer and Community Liaison (COCL) team, we are pleased to submit the attached *Compliance Report of the Compliance Officer and Community Liaison,* pursuant to paragraphs 162 and 163 of the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

The draft report was revised based on comments from the COAB, DOJ, AMAC and community members.  We thank them for taking the time to review and improve the report. Due to the 60-day COAB hiatus and weather-related meeting cancellations, we were delayed in gathering the formal recommendations of the COAB, and therefore the finalization of our report. A copy of this report will be posted on the COCL's website, www.cocl-coab.org and sent to our email updates list.

Sincerely,

Dennis P. Rosenbaum, PhD                    Amy Watson, PhD
For Rosenbaum & Watson, LLP
Compliance Officer and Community Liaison
Portland, Oregon

Exhibit A

# COMPLIANCE REPORT
# of the
## COMPLIANCE OFFICER AND
## COMMUNITY LIAISON

**Prepared By:**

**ROSENBAUM & WATSON, LLP**

**For the City of Portland, Oregon**

**First and Second Quarters:**

**January through June, 2016**



# Table of Contents

**EXECUTIVE SUMMARY**................................................................................................................. 1

**III. USE OF FORCE** .................................................................................................................... 4

**IV. TRAINING**........................................................................................................................... 15

**V. COMMUNITY-BASED MENTAL HEALTH SERVICES** ............................................................ 25

**VI. CRISIS INTERVENTION** ....................................................................................................... 30

**VII. EMPLOYEE INFORMATION SYSTEM** .................................................................................. 50

**VIII. OFFICER ACCOUNTABILITY**.............................................................................................. 55

**IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD** ...... 72

**X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT** ...................................................... 81

**LIST OF ABBREVIATIONS**......................................................................................................... 89

**LIST OF PERSONNEL** ............................................................................................................... 91

**APPENDIX A** ............................................................................................................................ 92

**APPENDIX B** ............................................................................................................................

# EXECUTIVE SUMMARY

This is the Compliance Assessment Report of the Compliance Officer and Community Liaison (COCL) for the first and second quarters of 2016, as required by the Settlement Agreement (Agreement) between the City of Portland (City) and the United States Department of Justice (DOJ). COCL Compliance Assessment Reports are required by Par. 162 of the Agreement and "shall specify: (a) the methodology and monitoring activities employed; (b) the COCL's assessment of compliance for each paragraph; and (c) the COCL's recommendations regarding necessary steps to achieve compliance, as warranted" (Par. 162). Each of these requirements is included in our assessments and is clearly labeled as such.

This report is written to be readable by all stakeholders. Whenever possible, we used the exact language from the Settlement Agreement. However, when the provisions of the Agreement are lengthy or complex, we have provided a summary of that language. In these situations, the reader will be referred to the Agreement for the details of the provision. As we provide our assessment of each substantive paragraph within the Agreement, we urge the reader to remember that complying with one paragraph can sometimes be dependent on complying with one or more additional paragraphs.

This report covers progress by the City of Portland (hereafter referred to as "the City") and the Portland Police Bureau (hereafter referred to as "the PPB") during the first and second quarters of 2016. In certain cases, we learned of developments that occurred in the third quarter of 2016. In order to maintain chronological consistency, however, we refrain from commenting on third quarter developments other than stating that they will be covered in our next report.

Report Card. This report includes a "report card" on the implementation of the Agreement which provides an assessment of each paragraph in the Agreement. For each paragraph where sufficient information is available to render a decision, the Report card provides an overall judgment on a 4-point scale, ranging from "Non-compliance" to "Substantial Compliance." For the majority of provisions, we do not find the PPB and the City to be in substantial compliance at this point in time. As in previous reports, we continue to see significant progress being made towards the implementation of the Agreement. The COCL will continue to work with PPB and the City as they move forward, providing consultation, analysis, technical assistance, and assessment.

During the first and second quarters of 2016, we worked closely with the PPB and the City in a number of areas. These include (among others):

- Force Audits. In the first and second quarter of 2016, PPB implemented the methodology for auditing force events. In consultation with the COCL, data were collected, evaluated, and reported. Accountability mechanisms were created for when deficiencies were identified. Late in the second quarter of 2016, COCL and the Inspector began discussions

regarding a reduced set of metrics that, while still responding to the requirements of the Settlement Agreement, will make auditing force events a more efficient process.

- <u>Training Needs Assessment and Evaluation</u>. In the first and second quarter of 2016, the COCL began an extensive review of the Training Division, focusing on PPB's Training Needs Assessment as well as their training evaluation procedures. Technical Assistance Statements (TA Statements) were provided to PPB for each of these areas. In general, we feel that in both of these realms, PPB is making genuine efforts to provide meaningful training to officers, though there is room in each for improvements.

- <u>Mental Health Mask (MHM)</u>. In the first and second quarter of 2016, PPB implemented the Mental Health Mask for collection of data for interactions involving a person with actual or perceived mental illness. The Mental Health Mask is a required form for all interactions that is completed through PPB's intranet. Although there remain some issues with implementing the new system, the MHM is expected to provide data that may ultimately be used to evaluate PPB's unique system of mental health response, contribute to improved training, and lead to enhancements for specialized response throughout the PPB.

During this period, the Community Oversight Advisory Board (COAB) and its subcommittees continued to meet. We worked with the COAB to ensure that all of its members were heard and that all the COAB's agenda items received adequate attention. The COAB passed multiple policy recommendations during this period – on topics including Use of Force, the use of various weapons (including Electronic Control Weapons), and the policy commonly referred to as the "48-hour rule." The COAB also hosted a well-attended community workshop on police-community relations and discussed the results of the 2015 community survey.

In the past, we have provided recommendations to the City/PPB in these compliance reports. The COCL, the United States Department of Justice (DOJ), and the Portland community would benefit from a formal reply by the City to these recommendations or to the report overall.

When reviewing the specific paragraphs, we utilize a four-tiered system of evaluation:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.
- Non-Compliance: The City/PPB has not made any meaningful progress towards the satisfaction of the provision's requirements.
- Not Yet Assessed: The COCL team has not had the opportunity to fully assess the requirements of the provision and elects to withhold assessment of compliance until a more thorough review has occurred.

| Settlement Agreement Section | COCL Assessment of Compliance |
|---|---|
| III. USE OF FORCE | Partial Compliance |
| A. Use of Force Policy | Partial Compliance |
| B. Compliance Audits Related to Use of Force | Partial Compliance |
| IV. TRAINING | See Individual Compliance Results* |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | See Individual Compliance Results* |
| VI. CRISIS INTERVENTION | See Individual Compliance Results* |
| A. Addictions and Behavioral Health Unit and Advisory Committee | Substantial Compliance |
| B. Continuation of C-I Program | Partial Compliance |
| C. Establishing "Memphis Model" Crisis Intervention Team | Partial Compliance |
| D. Mobile Crisis Prevention Team | See Individual Compliance Results* |
| E. Service Coordination Team | Substantial Compliance |
| F. BOEC | Partial Compliance |
| VII. EMPLOYEE INFORMATION SYSTEM | Partial Compliance |
| VIII. OFFICER ACCOUNTABILITY | Partial Compliance |
| A. Investigation Timeframe | Partial Compliance |
| B. On Scene Public Safety Statements and Interviews | Partial Compliance |
| C. Conduct of IA Investigations | Partial Compliance |
| D. CRC Appeals | See Individual Compliance Results* |
| E. Discipline | Partial Compliance |
| F. Communication with Complainant and Transparency | Partial Compliance |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD | See Individual Compliance Results* |
| X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT | Partial Compliance |
| A. Compliance Officer/Community Liaison | Not Applicable |
| B. PPB Compliance Coordinator | Substantial Compliance |
| C. Access to People and Documents | Partial Compliance |
| D. Review of Policies and Investigations | Partial Compliance |
| E. City Reports and Records | Partial Compliance |
| F. Enforcement | Not Applicable |

*See Individual Compliance Results: This label indicates that not all paragraphs in this section received the same report card score (the results were mixed) and therefore, a single compliance label is not possible. In these instances, we urge the reader to refer to the specific paragraph assessment. For other sections, mixed results are still possible, but one label is appropriate for the majority of paragraphs reviewed.

# III. USE OF FORCE

## A. Use of Force Policy

**Settlement Agreement Paragraph**

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. <u>COCL Summary</u>: Paragraph 67 establishes that the PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the subject, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review 1010.00/1010.10 and forward COCL recommendations to DOJ; Receive and review COAB recommendations regarding 1010.10 and parts of 1010.00 |

**Compliance Assessment**

To simplify and coordinate the process of providing feedback to the PPB, the Parties and COCL have agreed upon a system for policy reviews wherein the COCL receives COAB recommendations and comments, documents receipt of this feedback, and forwards these to DOJ. For directives considered central to the Settlement Agreement or where DOJ has sought a direct response from the COCL, COCL will prepare an independent assessment. The DOJ then takes into consideration both COAB and COCL comments when preparing technical assistance to the PPB, thus allowing for a unified response to the PPB that contains recommendations from all three entities (COCL, COAB, and DOJ). The COCL does not edit or revise COAB comments and recommendations when sending them on to DOJ. This system is used for all policy review and should therefore be implied for all other paragraphs related to policy review.

Directives 1010.00 and 1010.10 continue to be in the Executive Reconciliation Phase of directive review. There was no substantial progress in revising these directives in the first and second quarters of 2016 as collaboration between COCL, PPB, and DOJ focused on other directives. COCL and COAB have provided recommendations for these directives, though the directives related to Use of Force and 940 After Action Reports will be considered jointly due to

4

the overlapping nature of the directives. COCL, PPB, and DOJ have agreed to finalize recommendations and revisions to the Use of Force directives in the third and fourth quarter of 2016. All stakeholders are interested in ways to complete the policy review process in a timelier manner. The COCL recommends that the Parties revisit this process and consider procedural changes that will expedite these reviews while maintaining expert analysis and a balance of perspectives.

As for recommendations to PPB, for the moment we restate our recommendation from our previous reports that PPB provide red-line strike through versions of policies, which PPB has expressed a willingness to do in the future.

| **COCL Recommendations** | <ul><li>PPB should provide red-line strike through versions of the directives when revisions have been made</li><li>The process of policy review should be revisited to identify ways of expediting the review and implementation of all policies relevant to the Settlement Agreement.</li></ul> |
|---|---|
| **Assessment Rating Based On** | <ul><li>COCL review of Directives 1010.00 and 1010.10</li></ul> |

1. Electronic Control Weapons

| **Settlement Agreement Paragraph** |
|---|
| 68. <u>COCL Summary</u>: The PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement). |

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Directive 1051.00 |

| **Compliance Assessment** |
|---|
| In the first quarter of 2016, the COAB provided recommendations for Directive 1051.00 related to when the use of Electronic Control Weapons (ECW) should be authorized, clarification of ECW modes and effects, the number of cycles that should be allowed, medical procedure after ECW use, and training considerations. |

Directive 1051.00 has not been jointly reviewed by COCL, PPB, and DOJ. Our comments on Directive 1051.00 will be reported once we have engaged in joint review with PPB and DOJ. The recommendations of the COAB will be included in the joint review of Directive 1051.00

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Rating Based On** | • COCL review of Directive 1051.00 |

2. Use of Force Reporting Policy and Use of Force Report

### Settlement Agreement Paragraph

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review 1010.00 and forward COCL recommendations to DOJ; Receive and review COAB recommendations regarding 1010.00 |

### Compliance Assessment

As noted earlier, Directive 1010.00 continues to be in the Executive Reconciliation Phase of directive review. There was no substantial progress in revising the directive in the first and second quarters of 2016. COCL and COAB have provided recommendations for Directive 1010.00, though the directives related to Use of Force and 940 After Action Reports will be considered jointly due to the overlapping nature of the directives.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Rating Based On** | • COCL review of Directive 1010.00 |

6

3. Use of Force Supervisory Investigations and Reports

---

**Settlement Agreement Paragraph**

70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Directive 940.00; Reviewed areas of different interpretation between PPB and DOJ |

**Compliance Assessment**

Directive 940.00 was not jointly reviewed by COCL, PPB, and DOJ during the first and second quarter of 2016. COCL has discussed with PPB areas where there are differing opinions between PPB and DOJ as to the scope of chain-of-command review and instances which will require After Action Reports. Briefly, PPB is concerned with the interpretation that all supervisors in the chain-of-command must include in their 940 reports the same information (see also Par. 77), thus creating time-consuming redundancy in reporting. PPB has also questioned whether *de minimus* force used against an individual with actual or perceived mental illness requires an After Action Report even when not meeting the criteria for requiring a Force Data Collection Report (FDCR). A *de minimus* force might include a "come-along" hold where the officer takes an individual's arm and physically directs the individual's movement.

While in-depth discussions between COCL, PPB, and DOJ did not occur until the third quarter of 2016, a comment is warranted here since we had informally discussed these issues with PPB prior to the Q3 meeting between the Parties. For the efficient use of time and resources, we consider it unnecessary for all supervisors in the chain-of-command to be required to repeat all elements required of the responding supervisor in the 940 process. The important condition is that they have read, are satisfied with, and are accountable for the responding supervisor's review of the force incident. Should deficiencies be identified through the force audit (see Pars. 74, 75, and 77), it would be the responsibility of each person in the chain-of-command to identify the deficiency. So long as the mechanisms of accountability are in place and the force audit is in place as a PPB system of oversight, we do not object to PPB's interpretation.

Related to whether PPB is required to complete an After Action Report for *de minimus* force, we do not feel this is necessary as the level of force does not meet the requirements for

7

FDCR reporting. Throughout the nation, there is no agreed upon criteria for reporting force and we do not wish to impose one here. If no FDCR is required based on PPB's force reporting requirements, it follows that no After Action Report would be required. With particular attention to individuals with actual or perceived mental illness, PPB currently provides the Professional Standards Division (PSD) and the Inspector with incident details when there is a *de minimus* force. Using the example of the "come-along" hold above, while an FDCR would not be required, PSD would receive notification that an officer held onto the arm of an individual with perceived mental illness and physically directed their movement. We believe this type of supplemental notification for persons with mental illness is beneficial for the Bureau and would recommend heightened data collection for these incidents, though stop short of recommending the requirement of a complete chain-of-command review for *de minimus* force against that population.

In our next Compliance Assessment, we will provide details related to discussions of Directive 940.00 that occur between COCL, PPB, and DOJ in the third and fourth quarter of 2016. The discussion of Directive 940.00 will be conducted in tandem with discussions of Directive 1010.00 and Directive 910.00 (Report Writing).

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Rating Based On** | • COCL review of Directive 940.00 |

### Settlement Agreement Paragraph

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed authorized sergeants; Reviewed span of control summary |

### Compliance Assessment

For the first and second quarter of 2016, PPB provided documentation of the number of sergeants authorized for each precinct and shift. We have asked PPB to provide evidence of the actual number of sergeants (as opposed to authorized sergeants). In response, PPB states that the number of sergeants at each precinct changes regularly due to various factors (vacations, retirements, transfers, etc.). Thus, a single number across the entire quarter is not possible as there is ebb and flow in the actual number throughout the quarter. This reality is common in police organizations.

In place of documentation of a single number, PPB provided an analysis of officer-to-sergeant ratio between August of 2014 and August 2016. Throughout all precincts in August of 2016, there was a ratio of 4.83 officers for each sergeant compared to a ratio of 5.58 in August of 2014. This analysis is informative. Generally, a good ratio for adequate supervision (or "span of control") is considered 8 officers per each sergeant supervisor (Walker, 2005). PPB is nearly half this ratio, indicating fewer officers per supervisor and therefore allowing more one-on-one interaction between supervisor and officer. We recommend PPB continue to monitor their span of control as this is more telling than the number of supervisors alone.

| COCL Recommendations | • Continue to monitor span of control |
|---|---|
| Assessment Rating Based On | • COCL review of number of authorized sergeants<br>• COCL review of span of control summary data |

---

### Settlement Agreement Paragraph

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Supervisor Checklist |

### Compliance Assessment

PPB continues to present the supervisor checklist as a reference for supervisors when conducting an After Action Report investigation. As Directive 940.00 has yet to be jointly reviewed by COCL, PPB, and DOJ, we have decided that supervisors cannot be required to complete the checklist at this time. However, we recommend that any revisions to the After Action Report policies include a requirement that supervisors utilize a standard PPB checklist.

| COCL Recommendations | • Upon completion of Directive 940.00, provide 940 report form and Supervisor Checklist as an appendix and require the use of a checklist as part of Directive 940.00 |
|---|---|
| Assessment Rating Based On | • COCL review of Supervisor Checklist<br>• COCL review of the Settlement Agreement<br>• COCL discussions with PPB |

**Settlement Agreement Paragraph**

73. <u>COCL Summary:</u> Paragraph 73 directs the PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review audit process for verifying Directive 940.00; Review Directive 940.00 and solicit COAB input |

**Compliance Assessment**

Directive 940.00 was not jointly reviewed by COCL, PPB, and DOJ during the first and second quarter of 2016. In the first and second quarter of 2016, the COCL and PPB revised the process for auditing use of force reports and subsequent 940 After Action Reviews (see our assessment of Pars. 74, 75, and 77). The revisions to the process do not substantially change *what* is being measured and instead reduce the number of variables required to measure the elements of After Action Reports.

| <u>COCL Recommendations</u> | • No recommendations at this time |
|---|---|
| <u>Assessment Rating Based On</u> | • COCL review of Directive 940.00<br>• COCL/PPB analysis and revision of the auditing process |

**B. Compliance Audits Related to Use of Force**

**Settlement Agreement Paragraph**

74. <u>COCL Summary:</u> Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and

10

within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether <u>supervisors</u> consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement)

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed and commented on reporting format; Revised process for audit; Performed independent review of audit results |

**Compliance Assessment**

In the second quarter of 2016, we provided a Technical Assistance (TA) Statement to PPB detailing our impressions of audit implementation, new developments, and issues that still needed to be addressed (see Appendix A). While we will not repeat the entire TA Statement here, we will summarize the main points as related to the first and second quarter.

The force audit data collection instrument includes 204 variables for review (272 variables if the interaction involves the use of an Electronic Control Weapon). The large number of variables to collect were purposefully included in order to ensure that "no stone was left unturned" and that all elements of Pars. 74, 75, and 77 could be addressed. After two quarters of data collection and auditing, the Inspector and analysts maintain that the Agreement can be addressed in a more efficient fashion with fewer variables. Initial proposals discussed with the COCL to improve efficiency, while still addressing the provisions of the Agreement, are reasonable. However, we will need to see a finalized proposal before commenting further.

The force audit has been very successful at detecting a range of deficiencies in the force reporting and review process. PPB has now proceeded to create a process for disseminating the findings to PPB administrators. This process includes sending an Audit Findings Report to responsible parties in the chain-of-command and requiring a response as to how the deficiencies were remedied (EIS entry, revised force report, meeting with those involved, etc.). The completed forms are then provided to the appropriate Assistant Chief, who is tasked with reviewing the responses and determining whether the action taken was appropriate and sufficient. This process is also designed to identify repeat problems or patterns of deficiencies. We believe this system is appropriate to address trends in deficiencies and reduce them in the long run.

As part of our Semi-Annual Outcome Assessment, we took a random sample of force events and performed an independent review. For the large majority of data points, our coding mirrored that of PPB's. Most of the differences between PPB and COCL coding pertained to the codes "Yes," "No," and "N/A" and the appropriate use of "N/A." For instance, if there are no mental health issues identified, questions about the role of mental health issues in the officer's decision making should be coded "N/A." One area of dispute between PPB and COCL is the definition of the term "De-Escalation." PPB continues to include command-and-control tactics as de-escalation since they often lead to a subject submitting to the officer's authority (e.g. "Stop what you are doing now or else I will have to Tase you!"). We have expressed our difference in interpretation with PPB in the past and expect this difference to be resolved in 2016.

We have indicated in previous reports that auditing should serve two functions: identifying the scope of deficiencies, and deterrence. Identifying the scope of deficiencies would require a sample that is statistically representative of all force events. Assuming 125 force events per quarter, approximately half of all force events would need to be audited. Instead, during the first and second quarter of 2016, PPB performed their review on *all* force events and 940 reviews in order to identify the type and scope of deficiencies in the force reporting process. While this is beneficial for the initial phases of data collection to identify the scope of reporting deficiencies, it will not be necessary in the future to meet the deterrence function of an audit. Furthermore, auditing all events is time-consuming and will restrict PPB's ability to focus on reporting findings, identifying trends, and devoting time to other responsibilities of the Inspector and analysts (see Pars. 76 and 85).

COCL recommended a sampling of cases, and PPB proposed a sampling process wherein every fifth case (20%) of force reports would be selected for auditing, with the exception of ECW events, where all incidents would be reviewed. We have indicated to PPB our recommendation that stratified random sampling be used, to ensure that different precincts (chains of command) and types of force are represented in the audit sample. While we still need to come to agreement

on the precise method for stratification, we agree with PPB that 20% is a sufficient sample size for auditing purposes.

As one last point, we believe PPB, the Inspector, and the analysts working under the Inspector should be recognized for their substantial effort in creating, implementing, evaluating, and revising the process for auditing force events and 940 reviews. The audit process is a prime example of PPB taking ownership of the changes related to the Settlement Agreement. We believe the Inspector and analysts have recognized the purpose and benefit of the audit and have been dedicated to comprehensively implementing it.

| **COCL Recommendations** | • Provide COCL with complete revision proposal<br>• Engage in discussion with COCL and DOJ regarding the definition of "de-escalation"<br>• Begin sampling of force events |
| --- | --- |
| **Assessment Rating Based On** | • COCL review and independent validation of auditing codes<br>• COCL review of audit and feedback reports. |

### Settlement Agreement Paragraph

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Review Quarterly Force Reports |

### Compliance Assessment

The PPB continues to issue quarterly Force Data Summary Reports, informing their ability to address subsection (a) of Par. 76. While further consultation is required for these reports, PPB has taken steps to be able to address the other subsections of Par. 76 as well. For example, in the first and second quarter of 2016, PPB began utilizing a Force Audit Dashboard, which allows for comparison between precincts and shifts. The information found in the Force Audit Dashboard will allow PPB to address subsections (b) through (d) of Par. 76. In the third and fourth quarter of 2016, we will consult with PPB on how these results may be organized into the annual public report required by subsection (e) of Par. 76 and how sampling cases for full audit will affect the requirements of Par. 76.

In past reports, we recommended PPB solicit and include suggestions from the community for the quarterly force reports. In response, PPB has included a comment at the end

13

of their quarterly force reports saying, "You can submit comments or suggestions about this report by navigating to this address: [webpage]." Although included in the 2016 Q1 Quarterly Force Summary Report, PPB indicates that no recommendations have been made using this mode to date. However, members of the community have offered recommendations in the past through other means and we recommend PPB consider those in any changes to their reports made. We also recommend PPB continue to include this type of solicitation, though place it near the front of the report where it cannot be missed (currently the invitation to provide feedback is at the very end of the report). We also recommend the Portland community take notice of this effort by PPB and provide suggestions to the PPB on how to improve their force reporting.

| **COCL Recommendations** | • Move the public input solicitation to a more apparent location<br>• Consider previous community recommendations when making future changes<br>• Consult with COCL on Force Data Summary Reports and organizing them into an annual report |
|---|---|
| **Assessment Rating Based On** | • COCL review of quarterly Force Data Summary Reports<br>• PPB utilization of Force Audit Dashboard |

14

# IV. TRAINING

### Settlement Agreement Paragraph

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.

| Compliance Label | Not Yet Assessed |
|---|---|
| Methodology | N/A – Summative and contingent upon satisfying paragraphs below |

### Compliance Assessment

As stated in paragraph 78, to achieve the defined outcomes, the PPB shall "implement the requirements below." As this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, training.

We interpret "All aspects of PPB training" to include ECIT, Advanced Academy, In-Service, and Supervisor In-Service. The available evidence suggests that PPB is making a genuine effort to improve these major training programs. We cannot provide a summative judgment on Par. 78 until we have documents indicating that "all aspects of PPB training" conform to the "requirements below."

We will evaluate training progress in terms of both the implementation conditions described below and the achievement of outcomes listed in paragraph 78, namely, the constitutional treatment of individuals who have or are perceived to have mental illness, the building of community partnerships, the increase of public trust, and the increase of public safety.

| COCL Recommendations | • Substantially comply with all paragraphs within Section IV – Training<br>• Ensure that the requirements found in Section IV are applied to "all aspects of PPB training" as defined above |
|---|---|
| Assessment Rating Based On | • N/A – Summative and contingent upon satisfying paragraphs below and achieving the outcomes listed in paragraph 78. |

### Settlement Agreement Paragraph

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment

15

annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Training Needs Assessment development and documentation |

### Compliance Assessment

In the first and second quarter of 2016, we conducted an in-depth review of PPB's Training Needs Assessment and provided PPB our recommendations for improvement (see Appendix B). Here we summarize the main points as they relate to the first and second quarter.

Overall, we believe PPB has made a serious effort to conduct the 2015 Training Needs Assessment in a manner consistent with accepted practices in the field of program evaluation. Available data were used to identify training needs and the report covers the major requirements of the Settlement Agreement as well as additional topics of training. However, there are some areas that need to be enhanced in order to be considered comprehensive.

One particular area that should be enhanced is the diversity of voices and opinions that inform each section of the Training Needs Assessment. Currently, most sections of the Training Needs Assessment identify Command Staff and/or Training Division Supervisors as the primary sources of input. While these voices are important, the input of others should be sought for each section of the Training Needs Assessment. Street-level officers, community members, Training Advisory Council (TAC), and community organizations (among others) provide recommendations in some sections, though should be included as a source of input for all sections of the needs assessment. We recommend PPB introduce an online "Training Suggestion Box" that will allow all interested parties to provide input on where they feel PPB officers could benefit from training. The Training Suggestion Box should be well publicized so that all are aware of its existence.

Our TA Statement was based on our review of the 2015 Training Needs Assessment. Documentation provided by PPB indicates that the 2016 Training Needs Assessment Report "is expected to be finalized and available on September 15, 2016." We look forward to discussing with PPB how our technical assistance has been incorporated into the 2016 report and how input from other sources might be sought in the future.

| COCL Recommendations | • Introduce an online Training Suggestion Box to gather input from a diverse set of voices |
|---|---|
| Assessment Rating Based On | • Review of 2015 Needs Assessment |

### Settlement Agreement Paragraph

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed to-date application of Kirkpatrick Model of evaluation |

### Compliance Assessment

As part of our April 2016 Outcomes Assessment, we provided a review of the Kirkpatrick model of training evaluation. Furthermore, we reviewed the evaluation methodology in the first and second quarter of 2016 and provided an in-depth evaluation in a TA Statement. The TA Statement was not released until the third quarter of 2016, and is discussed in more detail in our October 2016 Outcome Assessment. While not repeating all of our points here, we provide an overview of our review and recommendations.

Generally, we find PPB's current effort contains the necessary elements of an evaluation, though it lacks the methodological rigor we believe would make results and conclusions reliable. PPB should incorporate pre-test and post-test measures and be able to identify officers during evaluation to ensure they are mastering important course content. Pre-test data are important to establish initial levels of knowledge/skill and provide a baseline for measuring change and informing future training needs (e.g. In-service training may not be needed for topics where baseline scores are high). We also believe evaluation at each step of the Kirkpatrick model should be expanded, including the Reaction-level measures (course content, course delivery, impressions of the presenter) and Knowledge-level measures (to make sure students are actually learning what is being taught). PPB should enhance their measures for Behavioral and Organizational change as well. This includes the addition of measurement tools such as contact surveys and community surveys.

In previous communication with PPB, we recommended they remove or modify an introductory statement at the beginning of evaluation surveys indicating that the survey results might be subject to public records request. We met with PPB in the second quarter of 2016 and agreed upon a temporary revision that addresses the issue, though future discussion may be necessary.

| COCL Recommendations | • Enhance the methodological rigor associated with training evaluation |
|---|---|

| | |
|---|---|
| | • Introduce individualized testing for classes where such testing is relevant<br>• Work with the COCL and the City to develop and implement contact surveys to measure the impact of training<br>• Continue to work with the COCL to arrive at measurement tools and evaluation designs that meet scientific standards. |
| **Assessment Rating Based On** | • COCL review of training evaluation tools and measures<br>• COCL review of PPB response document |

---

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed LMS Updates for Q1 and Q2 |

| | |
|---|---|
| **Compliance Assessment** | |

In the first half of 2016, PPB began drafting a three-year contract with Cornerstone OnDemand for a Learning Management System (LMS) to electronically monitor training-related activities within the PPB. PPB has indicated to us that implementation of the new system will begin in the fourth quarter of 2016. Upon complete implementation of the LMS, we will ask PPB for a technical demonstration to ensure that it adheres to the requirements of Par. 81.

| | |
|---|---|
| **COCL Recommendations** | • Completely implement the LMS, evaluate its adequacy for meeting PPB's training-related needs, and provide COCL with feedback and a technical demonstration |
| **Assessment Rating Based On** | • Drafted contract with Cornerstone OnDemand for LMS |

---

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |

| Methodology | Review Course Attendance Summary Reports |
|---|---|

**Compliance Assessment**

PPB has provided us with Course Attendance Summary Reports which indicate the number of officers who have attended and successfully completed training classes. We continue to provide PPB Substantial Compliance for this paragraph. However, the content of training reports should adhere to the criteria we have laid out in regards to Par. 80 and the elements of evaluative training.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Rating Based On** | • COCL review of Course Attendance Summary Reports |

**Settlement Agreement Paragraph**

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed SOP 1-19; Reviewed "Work History Review Sheet" |

**Compliance Assessment**

In the first quarter of 2016, SOP 1-19 (Training Division Instructor Selection Standards) became effective. We have reviewed SOP 1-19 and believe it contains the requirements of Par. 83 in language. There remains a lack of clarity regarding the process for "tak[ing] into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force" but the COCL believes this can be handled on a case-by-case basis. Therefore, we recommend that if the PPB decides to hire a trainer involved with the civil judgment, the training director provide a justification and explanation as to why the officer is fit for service as a trainer and the civil judgment is not a disqualifying factor. In addition, we request that PPB notify COCL when an exception is made to the criteria set out in SOP 1-19.

In the first quarter of 2016, PPB hired one officer to serve in the Training Division. PPB provided the "Work History Review Sheet" for that position's hiring process which demonstrates PPB's adherence to the Settlement Agreement's requirements. The review of whether the officer

has been subject to disciplinary action for mistreatment of persons with mental illness follows the same process as ECIT and BHRT reviews (see Pars. 101 and 108). There were no civil judgments against any of the applicants.

| **COCL Recommendations** | • Notify COCL when an exception is made to SOP 1-19's criteria<br>• Provide a justification for hiring a trainer involved in a civil judgment. |
|---|---|
| **Assessment Rating Based On** | • COCL review of SOP 1-19<br>• COCL review of "Work History Review Sheet" |

### Settlement Agreement Paragraph

84. (COCL Summary) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. It begins by stating that "All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled." The subsections of Par. 84 relate to the types of training required for patrol officers, including increasing use of scenarios related to use of force events, de-escalation techniques, procuring medical care, proactive problem solving, civil or criminal liability, and positive communication skills without derogatory language. Particular attention is given to police interactions with individuals who have, or are perceived to have, mental illness. The subsections also refer to supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions.

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Observe 2015 In-Service Training; Review training material for 2015 In-Service |

### Compliance Assessment

　　　No In-Service training occurred in the first or second quarter of 2016. The 2016 In-Service training is scheduled to begin in September of 2016 and run through November. We will observe the In-Service training and provide assessment in our next report. We also requested all materials for all classes in the 2016 In-Service, including lesson plans and training evaluation materials, for topics related to the Settlement Agreement. The request of this information occurred in the third quarter of 2016 and will be included in our discussion of the 2016 In-Service. As there was no In-Service training during the first or second quarter of 2016, we maintain our recommendations from our previous report.

　　　No specific supervisor training occurred in the first or second quarter of 2016. As part of the 2016 In-Service, supervisors will go through a half-day of supervisor-specific training in the third and fourth quarter of 2016. We will observe this training as well and will provide assessment in our next report.

| | |
|---|---|
| **COCL Recommendations** | • Reduce examples and language that perpetuates "us vs. them" in In-Service training<br>• Provide more thorough examination of policies related to ECW use<br>• Include commonly encountered situations in scenarios with attention to procedural justice and empathy |
| **Assessment Rating Based On** | • COCL observation of 2015 In-Service training |

**Settlement Agreement Paragraph**

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Consulted with PPB on technical assistance process; Prepare TA Statements to inform Inspector |

**Compliance Assessment**

As part of the Inspector's ability to conduct a thorough training audit, an agreement was reached between the COCL and PPB that technical assistance should be provided for some aspects of Par. 85 before the Inspector would be able to audit. In response, the COCL has issued TA Statements related to Training Needs Assessment (see Par. 79) and Training Evaluation (see Par. 80). Furthermore, we have discussed with PPB subsections (b), (e), and (g) of Par. 85 though have yet to put our recommendations in a TA Statement format. Having completed our TA Statement on Training Evaluation, we are prepared to move forward with PPB in now crafting the format for the Training Audit. We believe this will occur in the fourth quarter of 2016 and will provide updates to our progress in our next report.

Because the COCL has weighed in on the elements of a comprehensive needs assessment and key components of a rigorous training evaluation, the PPB has many of the essential ingredients to construct a training audit. The COCL will also discuss other elements of the audit process with the PPB relevant to paragraph 85. As one example, subsection (g) of this paragraph

21

seeks to ensure that officers have received and reviewed all policies relevant to this Settlement Agreement by requiring that they sign an acknowledgement statement. In May of 2016, we observed the process for reviewing policy and providing an acknowledgement statement. As currently designed, officers are required to check a box indicating they "agree with the above statements" although they were not provided with any "above statements." Missing from this page was the statement that they had "received, read, and had an opportunity to ask questions about the directive." This is the type of gap that the Training Audit, once implemented, should be able to detect.

On a positive note, PPB has introduced knowledge checks to ensure that officers truly understand the information contained in directives. We recommend the Training Audit review the results of the knowledge tests to determine whether directives require clearer language as well as review individual results to identify officers who may benefit from an enhanced review of the directives.

The COCL will continue to work with the PPB to ensure that the Training Audit effectively addresses the subsections of Par. 85. We should note, however, that the responsibility for high quality training, including a comprehensive needs assessment, strategic plan and training evaluation, rests with the training division and not the training auditor.

| COCL Recommendations | • PPB should continue to plan the Training Audit, drawing on the information provided by the COCL in previous technical assistance reports |
|---|---|
| Assessment Rating Based On | • COCL consultation with PPB<br>• PPB's previous efforts on Training Audit |

---

**Settlement Agreement Paragraph**

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observed Inspector presentation to Training Advisory Council (TAC); Reviewed TAC recommendations to Directive 1500.00; Reviewed TAC report |

**Compliance Assessment**

In the second quarter of 2016, the Inspector gave a presentation to TAC regarding the use of force. Members of the COCL Team were present at the meeting. While further consultation regarding force data is necessary, the presentation to TAC could have benefited from a more in-depth review of the force data that are currently available. Much of the presentation by the Inspector focused on explaining PPB's progress in implementing the force audit. We believe this is important information for TAC, as the force audit will provide TAC with improved metrics for making training recommendations and monitoring progress. However, the actual force data from the quarter were only briefly mentioned. Although the TAC was provided with a full report in advance of the meeting, the Inspector was allowed only 15 minutes to give the presentation, so there were limitations on the scope and depth of topics which could be covered and discussed. As these presentations are a requirement of the Settlement Agreement, TAC should provide enough time to the Inspector to cover the necessary information and engage in a discussion with the group. Furthermore, no visual presentation was provided for TAC members to be able to observe short-term trends, though we have been informed that TAC indicated that a visual presentation was not necessary. We recommend the Inspector prepare a visual presentation for future meetings and that enough time be set aside for a thorough exchange of ideas.

To address paragraph 86 and other paragraphs in the Settlement Agreement related to force data and the identification of trends, the COCL will continue to consult with PPB in the fourth quarter of 2016. The consultation in the fourth quarter will focus on agreeing on what measures must be collected to identify "patterns and trends in officers' uses of force" and how they should be presented in order for TAC to perform their duties. Currently, PPB's Quarterly Summary Reports for force contain many of the necessary elements for trend identification and analysis. However, we maintain they could be improved and such improvements will be a key discussion point during our consultation. We expect to report the results of such consultation in a TA Statement and will provide updates in our next report. For the time being, we recommend PPB consider how current reporting formats might inform the identification of trends for this and other paragraphs.

In the third quarter of 2015, TAC and COAB made recommendations regarding Directive 1500.00 (Training) that we refrained from commenting on in that report. This was due to the fact that Directive 1500.00 was not yet reviewed by COCL, PPB, and DOJ. In the second quarter of 2016, COCL, PPB, and DOJ engaged in an extensive review of Directive 1500.00, which included the recommendations made by TAC and COAB. The directive has taken into account all recommendations and is currently awaiting release by DOJ.

Additionally, TAC issued a report in the second quarter of 2016 which included 23 recommendations related to use of force training, organizational attitudes, and force reporting. The report was thoughtful and appeared to be informative to the Training Division, Chief of Police, and Inspector. We look forward to seeing how TAC's recommendations are incorporated into future Training Needs Assessments and force trend analysis.

Insofar as the responsibilities of TAC, we believe they have substantially satisfied their charge under the Settlement Agreement, provided they continue to operate in their current manner. Before we can ascribe Substantial Compliance to this paragraph as a whole, PPB and COCL must consult as described above. We look forward to doing so in the coming quarters.

| | |
|---|---|
| **COCL Recommendations** | • Review current reporting formats for identification and reporting of trends<br>• Allow sufficient time for a thorough presentation and discussion of patterns and trends in force<br>• Incorporate TAC recommendations into Training Needs Assessment and force trend analysis<br>• Consult with COCL to identify patterns and trends in officer use of force |
| **Assessment Rating Based On** | • COCL observations of Inspector presentation to TAC<br>• TAC "2016 Training and Use of Force Report Recommendations"<br>• COCL review of PPB quarterly force summary reports |

| | |
|---|---|
| **Settlement Agreement Paragraph**<br><br>87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB website regarding TAC; Review TAC agendas and minutes |
| **Compliance Assessment**<br><br>     The Training Advisory Council (TAC) meetings have continued to be open to the public, though we still have not been informed how "confidential or raises public safety concerns" might be defined. In addition, TAC has posted up-to-date minutes (upon approval) to the PPB website as well as previous agendas. In addition to this, TAC is now using an email list and allows public testimony at meetings. | |
| **COCL Recommendations** | • Provide criteria for TAC being in executive session |
| **Assessment Rating Based On** | • COCL review of information available on PPB website<br>• COCL review of TAC minutes |

24

# V. COMMUNITY-BASED MENTAL HEALTH SERVICES

### Settlement Agreement Paragraph

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Compliance Label | N/A |
| --- | --- |
| Methodology | Continue to monitor the City and PPB continuing to work with community partners |

### Compliance Assessment

This paragraph will be assessed upon the City and PPB's continuing relationship with community partners. As this is a summative paragraph, it can only be assessed in a summative fashion.

| COCL Recommendations | • Continue relationship with community partners |
| --- | --- |
| Assessment Rating Based On | • N/A – Summative paragraph |

### Settlement Agreement Paragraph

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care

25

plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Reviewed minutes from Unity Transportation Workgroup |

**Compliance Assessment**

We point out that this paragraph indicates an expectation of Community Care Organizations (CCOs). However, the Settlement Agreement holds no legal power to require CCOs to do anything. Therefore, while we assess the progress of the Unity Center here, we would like to clarify that PPB and the City are not responsible for opening the Unity Center. Our assessment and compliance rating pertain to PPB's and the City's participation in the process – not the ultimate success or failure of the Unity Center.

Progress on opening the Unity Center, a Psychiatric Emergency Services (PES) center, continues. PPB has been involved in the development of the Unity Center by actively participating in the Transportation Workgroup. We have reviewed the minutes from the Unity Transportation Workgroup and have found documentation of PPB employees participating as workgroup members and attending the meetings. In the first quarter of 2016, PPB provided written testimony in support of Oregon rule changes regarding the transportation of persons experiencing mental health crisis. This rule change facilitates the transfer of community members in ambulances rather than police vehicles.

As part of the planning for the Unity Center, AMR is conducting beta testing to identify the number of individuals who meet criteria for transport to the Unity Center and whether AMR crews are following the determined protocol. This began in the second quarter of 2016 and continues. The Unity Transportation Workgroup provided initial results to the beta testing, indicating that the protocol is working and providing data that are informative to both the medical professional and PPB (for instance, behavioral health patients are frequently encountered in the evening).

Based on PPB and the City's participation in the process to date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph. We recommend PPB continue their participation in the development of the Unity Center and in the Transportation Work Group.

| **COCL Recommendations** | • Continue participation in Transportation Work Group |
| --- | --- |
| **Assessment Rating Based On** | • COCL review of Unity Transportation Workgroup minutes |

26

**Settlement Agreement Paragraph**

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU"), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Community Outreach Meeting minutes; Review HealthShare Council Agendas; Solicit PPB response to Par. 90 inquest document |

**Compliance Assessment**

The Settlement Agreement does not hold any legal power over Coordinated Care Organizations (CCOs) and we therefore cannot hold PPB responsible for participation in CCO subcommittees if no such subcommittees are available. PPB had previously participated in a Task Force with HealthShare, though this Task Force completed its work. In the first and second quarter of 2016, PPB continued to attend monthly meetings for Legacy ED Community Outreach.

Furthermore, PPB provided documentation indicating the Service Coordination Team applied to join with the State Behavioral Health Collaborative Team, a statewide group "with an emphasis on cross-system coordination and collaboration" (application document). Although not under the authority of the Settlement Agreement, the collaboration's goals appear consistent with the intent of the Par. 90 in that mental health response must include the efforts of a wide number of stakeholders.

In the second quarter of 2016, we provided PPB a document with the subsections of Par. 90 included and asked PPB to indicate what, if anything, PPB has done to address each of the subsections. PPB provided a response to our document suggesting many of the questions related to Par. 90 and subsections should more appropriately be directed to Community Care Organizations (CCOs) and other State organizations. We agree and are aware that, for many of Par. 90's subsections, PPB and the City are not the appropriate bodies to enact change. For instance, neither PPB nor the City can be expected to enhance access to primary care providers – this more appropriately falls within the purview of CCO's and health providers. However, the Settlement Agreement does not hold legal power over the CCO's or health providers and we have no authority to require they complete our inquest document.

For the past several years, there has been a federal investigation into the State of Oregon related to many of the elements present in Par. 90 of this Settlement Agreement. On

27

July 25, 2016, the DOJ and the State of Oregon came to an agreement on the State's plan to expand services (US DOJ Letter to Oregon Attorney General), though the majority of work occurred prior to the State and DOJ's agreement. Specifically, the plan expands services related to "Assertive Community Treatment Services…; Crisis services; Supported housing; Peer-delivered services; Oregon State Hospital discharges and linkages to services; Acute psychiatric care discharges and linkages to services; Emergency department services; Supported employment services; Secure Residential Treatment Facility discharges; Criminal Justice diversion; Quality and performance improvement and; Data reporting" (Oregon Performance Plan Executive Summary). Thus, we anticipate that many of the changes related to the State Performance Plan will impact the changes required in this Settlement Agreement.

The issues surrounding the necessary collaboration with external stakeholders may be resolved pending the outcome of the Performance Plan. However, we are less confident that the statewide investigation and outcome will effectually compliment the City's settlement for all provisions of this paragraph. Thus, in the third and fourth quarter of 2016, we will consult with the Parties to determine whether changes to the Settlement Agreement are needed with regard to this paragraph and, if no changes are agreed upon, a determination as to what is required of PPB and the City to be found in Substantial Compliance with this paragraph.

| | |
|---|---|
| **COCL Recommendations** | • Parties should consult with each other to determine whether changes to the Settlement Agreement are needed or what would be required of PPB and the City to be in substantial compliance |
| **Assessment Rating Based On** | • PPB application to State Behavioral Health Collaborative Team<br>• PPB involvement with Legacy ED Community Outreach |

28

# VI. CRISIS INTERVENTION

## A. Addictions and Behavioral Health Unit and Advisory Committee

**Settlement Agreement Paragraph**

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures.*

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed BHU Unit Structure; Interviewed BHU command personnel |

**Compliance Assessment**

PPB has provided to COCL updated unit structures, including when changes to personnel have occurred. In terms of personnel and BHU's general oversight, the BHU continues to conform to the requirements of Par. 91, as evidenced by the BHU unit structure and our observations of BHU coordinating ECIT, BHRT, and SCT operations. While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, ECIT data collection, etc.), ECIT officers directly report to their precinct level chain of command. This command structure conforms to the Memphis Model.

We echo previous reports that Substantial Compliance with Par. 91 does not indicate that the functions of ECIT, BHRT, and SCT are in Substantial Compliance with their respective paragraphs. Merely, the establishment of BHU and the general oversight structure requirements have been satisfied in their current iteration.

| **COCL Recommendations** | • Continue to update COCL and DOJ on changes to personnel when applicable |
|---|---|
| **Assessment Rating Based On** | • COCL review of unit structures and personnel |

29

**Settlement Agreement Paragraph**

92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systematic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Discussed Mental Health Mask issues with PPB; |

**Compliance Assessment**

The implementation of the Mental Health Mask (MHM) occurred during the first and second quarter of 2016. The MHM is a form that officers must complete following all interactions to collect data on call involving a mental health component. This form replaces previous efforts to capture mental health interaction data, including study codes.

During the initial phases of the MHM implementation, PPB experienced issues with the execution of the MHM, as is common when introducing any new data collection tool (see our assessment of Par. 105). Until all issues are resolved and the data are deemed by PPB and COCL as reliable, comprehensive outcome data for mental health interactions are not possible.

PPB has provided us outcome data for both BHRT and SCT. In general, we believe the outcome measures for BHRT and SCT are adequate for developing new response strategies. As our October 2016 Outcome Assessment allows greater opportunity to describe and comment on the measures and associated data, we refer the reader to that report.

We continue to recommend a mental health contact survey to measure changes and areas for improvement in PPB's system of mental health response. Discussions have been ongoing related to the mental health contact survey as well as our recommendation to roll it into a more general community contact survey. In the third and fourth quarter of 2016, we will continue discussions with PPB.

| COCL Recommendations | • Continue to address MHM issues as they arise<br>• Continue discussions with COCL regarding mental health contact data |
|---|---|
| Assessment Rating Based On | • COCL review of MHM issues<br>• COCL review of BHRT and SCT outcome measures |

**Settlement Agreement Paragraph**

94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed BHUAC roster of members; Reviewed BHUAC minutes; Reviewed PPB website for BHUAC materials; Observed BHUAC meetings |

**Compliance Assessment**

    The Behavioral Health Unit Advisory Committee (BHUAC) continued to meet in the first and second quarter of 2016. The advisory committee is a diverse group with representatives from law enforcement, CCO's, City and County representatives, and mental health community representatives/peer support specialists. As COCL has personally observed numerous BHUAC meetings, we are confident that the group has a diverse number of voices contributing to meetings. This diversity increased further in Q3, which will be discussed in our next report. BHUAC continues to post meeting minutes, agendas, and reports related to their efforts. We continue to recommend BHUAC utilize an email list to inform interested individuals when new minutes, agendas, and reports are posted. Where BHUAC has previously interacted with COAB subcommittees, we recommend they continue such practice and coordinate with the full board where possible. Other than this, we continue to find PPB has substantially complied with this paragraph.

| COCL Recommendations | • Implement an email notification list for when new agendas and minutes are posted |
|---|---|
| | • Continue interaction with COAB subcommittees and coordinate with full COAB board where possible |
| Assessment Rating Based On | • COCL review of BHUAC roster |
| | • COCL review of information provided on PPB website |
| | • COCL observations of BHUAC meetings |

**Settlement Agreement Paragraph**

31

95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Reviewed BHUAC minutes for first and second quarter of 2016; Observed BHUAC meetings |

**Compliance Assessment**

In the first and second quarter of 2016, the BHUAC met approximately once a month to discuss plans for the continued development and expansion of BHU entities. We received and reviewed the minutes from the BHUAC and noted discussions, presentations, and recommendations related to BOEC policy pertaining to suicide and ECIT dispatch, SOP's related to BHU, ECIT and BHRT, and ECIT Training and evaluation. BHUAC recommendations are included in the minutes and appear to be well thought out and informative to the BHU and PPB. Furthermore, PPB has provided written responses to the BHUAC's recommendations, satisfying recommendations we have made in previous reports. Thus, we recommend PPB and BHUAC sustain the progress they have made to date.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Rating Based On** | • COCL review of BHUAC minutes and agendas <br> • COCL observing BHUAC meetings |

**Settlement Agreement Paragraph**

96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Reviewed BHUAC recommendations found in BHUAC minutes |

| **Compliance Assessment** | |
|---|---|
| BHUAC continues to meet and provide recommendations to BHU and PPB (see Par. 95). In accordance with recommendations we have made in previous reports, PPB has provided responses to BHUAC for each of their recommendations. These responses are detailed when necessary and are consistent with what we would expect. Based on these responses, we are satisfied that PPB is "utiliz[ing] the BHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing." | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Rating Based On** | • COCL review of BHUAC status reports and recommendations<br>• COCL review of PPB responses to BHUAC recommendations |

**B. Continuation of C-I Program**

| **Settlement Agreement Paragraph** | |
|---|---|
| 97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I. | |
| **Compliance Label** | <mark>Partial Compliance</mark> |
| **Methodology** | Review Advanced Academy C-I Training material |
| **Compliance Assessment** | |
| In our last report, we provided a review of the C-I training content. Although we found the content to be overall very good, we must observe the training in order to be sure the content is being delivered as planned and taught well. PPB held Advanced Academy in the first and second quarter of 2016 with a total of 18 new officers. We were not able to observe the Advanced Academy during those quarters but expected to observe the training in September of 2016. However, we were informed that the September Advanced Academy training has been postponed to January of 2017 due to the small number of recently hired officers (only four officers). We agree that training resources should await a higher number of officers, and recommend that PPB provide COCL with the class schedule for the next Advanced Academy so that we might be able to plan observations accordingly. Our observations will give special attention to the C-I and use of force components from a policy and practice standpoint. | |
| **COCL Recommendations** | • Provide COCL with schedule of upcoming Advanced Academy training |

33

| Assessment Rating Based On | • COCL review of Advanced Academy CI Training materials |
|---|---|

---

### Settlement Agreement Paragraph

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Advanced Academy CI training materials; Observed 2015 In-Service training; Reviewed 2015 In-Service training materials |

### Compliance Assessment

Officers are required to complete a minimum of 40 hours of CI training before they are allowed to assume independent patrol or call-response duties. The 40 hours of CI training is split between the State Academy and the Advanced Academy. As no officers are allowed to assume independent patrol duties before they complete the Advanced Academy, officers would not be allowed to do so before completing the full 40 hours of CI training.

No In-Service training occurred in the first or second quarter of 2016. The 2016 In-Service training is scheduled to begin in September of 2016 and run until November. The COCL team will observe the 2016 In-Service training and provide recommendations in our next report. As we have not yet been provided lesson plans for the 2016 In-Service, we cannot comment on the content or whether our previous recommendations have been incorporated into the 2016 In-Service. We therefore maintain the recommendation from our previous report that CI response refresher be the primary objective of a training class to refresh officer CI knowledge and skills.

| COCL Recommendations | • Create In-Service training wherein CI Response refresher is the primary objective of the class |
|---|---|
| Assessment Rating Based On | • COCL observation of previous trainings |

### C. Establishing "Memphis Model" Crisis Intervention Team

---

### Settlement Agreement Paragraph

---

34

| | |
|---|---|
| 99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]"). | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed BHU/ECIT data; Interview BHU/ECIT/PPB Personnel; Reviewed implementation of Mental Health Mask; Conducted focus groups with ECIT and non-ECIT officers |

**Compliance Assessment**

PPB continues to operate a unique model of crisis intervention. In order to assess the merit of their model, PPB has begun to collect data through the use of the Mental Health Mask, wherein all officers are required to indicate whether a police interaction included the presence of a mental health component. As with most new data collection tools, issues surrounding the Mental Health Mask are still being worked out (see our Outcomes Report for a full discussion). As such, PPB does not yet have the data necessary to assess if their variation on the Memphis Model has created an effective system of mental health response for the Portland Community. However, PPB's effort has been in earnest and the development of the Mental Health Mask has been done in consultation with COCL, DOJ, and BHUAC. We will continue to monitor progress as it occurs.

PPB continues to include calls labeled by BOEC as suicide threats and suicide attempts as part of their criteria for ECIT response. The inclusion of this category for ECIT response was done as part of an agreement to shift PPB's ECIT model closer to that of the Memphis Model while awaiting Mental Health Mask data. However, focus groups conducted by the COCL and other informal discussions with members of PPB have indicated that there is potential confusion with the definition of a suicide attempt. Some PPB officers were of the belief that accidental drug overdose was considered a suicide attempt for the purposes of ECIT notification. Discussion with members of BHU have indicated that this is not consistent with the definition of suicide attempt and officers (both ECIT and non-ECIT) will receive further training that overdoses do not require an ECIT response. We also recommend BOEC policies and training (see Pars. 113 and 114) ensure that dispatchers are clear on this distinction as well.

| | |
|---|---|
| **COCL Recommendations** | • Continue data collection efforts to evaluate unique model of crisis intervention<br>• Provide updates to COCL of issues which arise or might arise |
| **Compliance Rating Based On** | • COCL review of Mental Health Mask forms<br>• PPB Expansion of ECIT criteria<br>• Focus groups with PPB personnel |

**Settlement Agreement Paragraph**

100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review ECIT Roster found in Q3 and Q4 supporting documents; Review ECIT Advisory Council minutes related to MH Mask; Interview BHU/ECIT/PPB personnel; Review Directive 850.20 |

### Compliance Assessment

The ability of PPB to determine the "demand for [ECIT] services" is contingent upon the implementation of the Mental Health Mask detailed in our assessment of Pars. 92 and 93. The data from this mask should provide PPB with an indication of how prevalent mental health interactions are and PPB's ability to provide ECIT response when criteria are met. The mask should also provide PPB with insight as to how to apportion ECIT officers based on shift, Precinct, and other considerations.

Based on PPB documentation, there were a total of 99 individuals within PPB who have received ECIT training, as of 2016 Q2. Of these 99, a total of 74 have "Patrol" as their primary assignment. Thus, PPB's "initial goal" continues to be satisfied. However, the final number of ECIT officers should be "driven by demand" for ECIT services. Until Mental Health Mask data are available and all issues resolved, PPB cannot determine this factor.

| COCL Recommendations | • Continue Mental Health Mask data collection and analysis to determine demand for ECIT services |
|---|---|
| Compliance Rating Based On | • COCL review of Mental Health Mask forms<br>• COCL review of ECIT rosters |

### Settlement Agreement Paragraph

101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT].

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed BHUAC meeting minutes; Reviewed SOP #43; Reviewed SOP #3.3 |

### Compliance Assessment

36

There were no new ECIT officers trained during the first or second quarter of 2016. Therefore, no incoming officers were subject to the screening requirements of Par. 101. PPB continues to use the process identified in SOP #43 ("Notification of BHU Regarding ECIT or BHU Officer Performance Issues") wherein the BHU is notified if an officer is flagged in the EIS system or has a sustained allegation of force or misconduct against a person with mental illness. As we have previously indicated, we believe the process set forth in SOP #43 is appropriate for ensuring continued adherence to the requirements of this paragraph.

In the first quarter of 2016, the BHUAC accepted a revised version of SOP #3.3 ("Enhanced Crisis Intervention Team") with the addition of some minor changes. This SOP provides criteria for qualification, selection, and ongoing participation of officers in ECIT. There are eight (8) minimum criteria for ECIT qualification, each of which must be met for consideration in ECIT. Furthermore, the elements for selection (work history review, Internal Affairs review, EIS review, and supervisor/command staff input) are identified in the SOP. In previous quarters, we have seen evidence of the selection process in action whereby these selection criteria were taken into consideration. Finally, the elements of SOP #43 are listed in the SOP.

In order for PPB to be considered in Substantial Compliance with this paragraph, we make one recommendation. SOP #3.3 does not indicate an automatic removal from ECIT service in the event of a sustained allegation of force or misconduct against a person with mental illness. Rather, SOP #3.3 states the BHU Lieutenant will "Review any sustained IA investigation involving force or misconduct…" From the March 23, 2016 BHUAC meeting, the minutes indicate that "Any sustained complaint will likely lead to the removal of the ECIT officer from the team." The Settlement Agreement does not contemplate a review of a sustained complaint or the likelihood of an ECIT officer being removed in the event of a sustained complaint. Under section 2 of the SOP, we recommend the language be revised to say, "The BHU Lieutenant shall:…*Initiate removal proceedings in the event of* any sustained IA investigation involving force or misconduct against a person with mental illness" (new language in *italics*). This may be coupled with the bullet point that "Any decision to remove an ECIT officer from the team will be coordinated by the Central Precinct Commander."

| **COCL Recommendations** | • Revise SOP 3.3 to become consistent with the Settlement Agreement |
|---|---|
| **Compliance Rating Based On** | • COCL review of BHUAC recommendations<br>• COCL review of SOP #3.3<br>• COCL review of SOP #43 |

### Settlement Agreement Paragraph

102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Reviewed ECIT training documents; Observed ECIT refresher training |

### Compliance Assessment

In May of 2016 and July of 2016, PPB provided an ECIT refresher class to officers who went through ECIT training prior to new material being added to the curriculum. Although we observed the July training (which would be the third quarter of 2016) the material and presentations were the same between the two and we therefore offer our observations and recommendations in this report.

Overall, we found the refresher training to be well-delivered. We note two issues that we recommend be addressed for future trainings. The first issue relates to PPB explaining the Mental Health Mask as being used to satisfy the Settlement Agreement data requirements and to document for DOJ the high frequency of mental health calls. We have previously commented on the message that changes are the result of "something DOJ/COCL is making us do" and that this message is counterproductive to sustained change. The data from the Mental Health Mask have many operational benefits, yet these were not presented to the students in the class. We stress that PPB should stop presenting changes as the will of DOJ/COCL and take ownership of the changes occurring. If, however, the PPB genuinely believes that such changes are not beneficial to the organization and have little redeeming value, these concerns should be expressed to DOJ and the COCL in advance for discussion.

The second issue that we found related to a single class (Trauma Informed Care). This was a two-hour class, though the first 30 minutes were used to break the ice between the presenter and the officers. While students should feel comfortable with presenters, it should not come at the expense of providing full coverage of the class material. Some key concepts in the lesson plan were only superficially touched upon, defined inaccurately, or not covered at all. Although officers appeared to enjoy the presentation, we recommend this class be reviewed by PPB and ensure that time is being used as efficiently as possible and that all important points from the lesson plan are adequately covered.

| COCL Recommendations | • Present changes in policy or training topics as something beneficial to the Bureau rather than as a response to DOJ/COCL<br>• Ensure that trainings utilize time efficiently and cover key points |
| --- | --- |
| Compliance Rating Based On | • COCL observation of ECIT refresher training |

### Settlement Agreement Paragraph

103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event.

38

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Interviewed PPB personnel; Interviewed BOEC personnel |

**Compliance Assessment**

In our previous report, we recommended that PPB provide some refresher training to non-ECIT officers related to the criteria for ECIT response to a call involving a person with mental illness. Although included in the ECIT refresher, we believe non-ECIT officers also require such refresher information as our focus groups with non-ECIT officers indicated the ECIT criteria was not universally known. We recommend this information be included in the 2016 In-Service that will occur in the third and fourth quarter of 2016. Related to this, BOEC dispatchers have also not yet received updated training, though this will also occur in the third and fourth quarter of 2016. We also recommend the criteria for ECIT dispatch be included in knowledge tests during the evaluation of the trainings.

| **COCL Recommendations** | • Provide refresher training for non-ECIT officers on ECIT criteria<br>• Include ECIT criteria in the knowledge-level test |
| --- | --- |
| **Compliance Rating Based On** | • COCL interviews of PPB and BOEC personnel |

**Settlement Agreement Paragraph**

104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Reviewed PPB public awareness efforts; Reviewed BHU website |

**Compliance Assessment**

PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe that PPB has made a serious effort to highlight the work of the BHU in its entirety, not only ECIT.

Although we believe PPB does a good job in highlighting the work of BHU, we have seen no evidence of our recommendation that input from the BHUAC be solicited regarding further efforts so that the work of the BHU can reach all corners of Portland.

We have noticed that another of our recommendations (update BHU webpage so that it no longer references the Mobile Crisis Unit (MCU)) has been addressed. The current BHU webpage has all pages under the BHU up to date.

| | |
|---|---|
| **COCL Recommendations** | • Consult with BHUAC to determine future outreach efforts |
| **Compliance Rating Based On** | • COCL review of public awareness/education documents<br>• PPB updating BHU webpage<br>• COCL review of BHUAC meeting minutes |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event. | |
| **Compliance Label** | <mark>Partial Compliance</mark> |
| **Methodology** | Reviewed Mental Health Mask Screenshots; Interviewed BHU and PPB personnel |
| **Compliance Assessment** | |

The Mental Health Mask being used by PPB is designed to capture the data points required in Par. 105. There are current issues with the implementation of the Mental Health Mask that we comprehensively review in our October 2016 Outcome Assessment Report. However, we will touch upon some of the issues here.

Most of the issues related to the implementation of the Mental Health Mask are technological issues that have impacted officers' ability to fill the mask in. For instance, early versions of the mask would not progress to the next screen if officers indicated there was a mental health influence. As each IT issue has been identified, notification has been sent to Strategic Services Division (SSD) and the issue has been fixed. However, PPB does not currently believe the Mental Health Mask data can be considered reliable as issues are still being discovered and resolved.

There is also some concern that officers are not completing the Mental Health Mask immediately after each call and instead are waiting until the end of their shift or even longer. Currently, PPB provides a notification to an officer if they have an outstanding Mental Health Mask for more than 7 days. Although officers received an email instructing them that they are required to complete the Mental Health Mask for each call, there is no current policy indicating a specific timeframe. We recommend PPB put into policy that the Mental Health Mask be completed at the conclusion of each call unless the officer has a call holding (in what case the Mental Health Mask should be completed as soon as reasonably possible). The COCL

| | |
|---|---|
| recommends that PPB require the Mental Health Mask be completed by the end of the next shift, as trying to remember whether a call from more than two days ago had a mental health component is less likely to result in reliable information. | |
| **COCL Recommendations** | • Continue to MHM issues as they arise<br>• Enshrine timeframe of requirement for completion into policy |
| **Compliance Rating Based On** | • COCL review of Mental Health Mask screenshots<br>• COCL interviews with BHU and PPB personnel |

**D. Mobile Crisis Prevention Team**

| |
|---|
| **Settlement Agreement Paragraph** |
| 106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.<br><br>107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed BHU Unit Structure |

| |
|---|
| **Compliance Assessment** |
| PPB continues to have a BHRT car in each precinct comprised of one officer and one qualified mental health professional. For the officer, the BHRT is considered their full time assignment. With regards to the PPB's requirements of these paragraphs, they continue to be in substantial compliance. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • COCL review of BHU Unit Structure |

41

**Settlement Agreement Paragraph**

108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed BHUAC minutes; Reviewed SOP #3-2; Reviewed SOP #43 |

**Compliance Assessment**

In the first and second quarter of 2016, the BHUAC reviewed SOP #3-2 ("Behavioral Health Response Team") and provided recommendations related to training requirements and BHRT responsibilities (among others). The BHUAC minutes reflect thoughtful questions in order to make appropriate recommendations. PPB indicates that a revised version of SOP #3-2 will be provided in the third quarter of 2016. We look forward to seeing the revised version.

PPB continues to use SOP #43 ("Notification of BHU Regarding ECIT or BHU Officer Performance Issues") to check qualifications for ongoing service of BHRT officers. This is the same process as identified with ongoing service of ECIT officers (see Par. 101) and we have commented on the SOP's suitability for this paragraph in previous reports.

| COCL Recommendations | • Provide revised version of SOP #3-2 |
|---|---|
| Compliance Rating Based On | • COCL review of BHUAC minutes<br>• COCL review of SOP #3-2<br>• COCL review of SOP #43 |

**Settlement Agreement Paragraph**

109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed BHUAC recommendations for SOP #3-2 |

**Compliance Assessment**

In the second quarter of 2016, BHUAC provided recommendations to SOP #3-2 ("Behavioral Health Response Team") which included recommendations for BHRT training. The BHUAC recommended five areas of training for BHRT: (1) Applied Suicide Intervention Skills Training (ASIST); (2) Trauma Informed Care; (3) Civil Commitment Investigator Training; (4) HIPAA and Law Enforcement and; (5) Threat Assessment.

PPB indicates that "All BHRT personnel have completed ECIT, ASIST, Trauma Informed Care, and Civil Commitment proceedings training" (PPB 2016 Q2 Update Report). Furthermore, PPB has informed us that BHRT officers received a Threat Assessment class during ECIT training. PPB indicates in their 2016 Q2 Quarterly Update Report for this paragraph that "Training opportunities are based on availability of officers, available funding, and impact on the BHU's operational mission." Given that there are only three BHRT officers, we understand that PPB might be limited in their resources to conduct in-house training when external options are available. As we have seen evidence that BHRT officers have gone through nearly all the BHUAC recommended trainings (either through external training or through the ECIT training), we believe PPB has substantially complied with this paragraph. Although we believe BHRT officers are quite familiar with HIPAA requirements, we request HIPAA training documentation from PPB to be sure this has been covered. We further recommend PPB evaluate the amount of time that has passed since BHRT officers have received these trainings in order to assess whether refresher training is needed. Finally, we recommend PPB examine the external training to determine whether supplemental information specific to Portland might be beneficial to officers and, if so, create a PPB "Tips and Techniques" or other similar training to address such needs.

| **COCL Recommendations** | • Develop "Tips and Techniques" or other similar training when applicable to address supplemental training specific to Portland's BHRT members<br>• Provide COCL documentation of HIPAA training<br>• Determine whether refresher training for BHRT officers is necessary |
|---|---|
| **Compliance Rating Based On** | • COCL review of BHUAC recommendations<br>• COCL review of external trainings |

**Settlement Agreement Paragraph**

110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed implementation of Mental Health Mask |

**Compliance Assessment**

43

PPB's ability to substantially comply with this provision of the Agreement is intrinsically tied to its ability to satisfy the conditions of Par. 105 of this Agreement through the implementation of the Mental Health Mask. While BHRT has had the opportunity to utilize ECIT data to a certain extent, BHRT cannot adequately "proactively address mental health service" until the MH Mask has been reliably implemented. Also, once reliable data have been collected, such data will need to be analyzed to describe the nature of the mental health problem and its relationship to service delivery. PPB should begin to think about how the Mental Health Mask data will be used in practice to evaluate and improve existing services.

| | |
|---|---|
| **COCL Recommendations** | • Continue Mental Health Mask data collection and begin to conceptualize analysis plan and data utilization to improve service |
| **Compliance Rating Based On** | • COCL review of Mental Health Mask forms |

---

### Settlement Agreement Paragraph

111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed Directive 850.20; Reviewed Directives 850.21, 850.22, and 850.25; Engaged in policy review with PPB and DOJ |

### Compliance Assessment

Directive 850.20 is considered the "trunk" directive for mental health response while Directives 850.21, 850.22, and 850.25 are considered "branch" directives. These latter three directives speak more specifically to "policies and procedures for the transfer of custody or voluntary referral of individuals" and are thus more applicable to Par. 111. However, the "trunk" directive was reviewed first, as revisions to 850.20 will inform revisions to the "branch" directives.

During the first and second quarter of 2016, a revised version of 850.20 ("Police Response to Mental Health Crisis) was discussed between COCL, PPB, and DOJ. The revised version of Directive 850.20 was approved by the three entities during the second quarter of 2016 (in the early part of the third quarter of 2016, the Directive was posted to PPB's website).

Directives 850.21, 850.22, and 850.25 were also reviewed during the second quarter of 2016, though no substantial revisions occurred until the third quarter of 2016. We will provide updates in our next report on progress related to the "branch directives."

| | |
|---|---|
| **COCL Recommendations** | • Continue to engage in review of Directives 850.21, 850.22, and 850.25 with COCL and DOJ |
| **Compliance Rating Based On** | • COCL review of Directive 850.20<br>• COCL review of Directives 850.21, 850.22, and 850.25 |

**E. Service Coordination Team**

**Settlement Agreement Paragraph**

112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed SCT outcome measures; Reviewed SCT Referrals Report |

**Compliance Assessment**

PPB continues to track outcome results for SCT related to housing stability, financial stability, mental health/chemical dependency treatment, and criminality. Results were provided for the entirety of 2015 and we have been informed that the table provided to us will be completed on an annual basis. Many of the outcome measures track success for a one year timeline. Although it is difficult to comment on the results due to a lack of comparative data from other agencies, the outcome results reported appear to be initially positive. However, some results are provided in percentages while others are provided in whole numbers, making comparisons between measures difficult. In the third and fourth quarter of 2016, we plan on discussing with PPB what implications these outcomes have and how they will inform future changes to SCT operations.

We also make note here of other SCT steps that are consistent with the intent of the Settlement Agreement. We have already commented on SCT's application to be included in the State Behavioral Health Collaborative Team (see Par. 90). We also note that SCT conducts a graduation ceremony for clients that complete the program. This is a positive reinforcement of success. We encourage SCT to continue the above activities and recommend they continue seeking new ways of improving the program.

| | |
|---|---|
| **COCL Recommendations** | • Continue collecting data related to SCT outcomes<br>• Use outcome data to inform program improvements |

45

| | • Continue efforts to collaborate with other State stakeholders |
|---|---|
| **Compliance Rating Based On** | • COCL review of SCT outcome measures<br>• COCL review of graduation announcement<br>• COCL review of State Behavioral Health Collaborative Team application |

**F. BOEC**

| **Settlement Agreement Paragraph** |
|---|
| 113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Interviewed BOEC personnel; Reviewed BOEC protocols; Reviewed BHUAC minutes |

| **Compliance Assessment** |
|---|
|     In the first quarter of 2016, BOEC presented revised policies and procedures for calls related to mental health and mental health crises to the BHUAC. The BHUAC reviewed the revised policies and procedures, asked meaningful questions, and made recommendations to BOEC. BOEC made further revisions based on the feedback from BHUAC and submitted the final policies and procedures for BHUAC's approval. We have reviewed the protocols provided by BOEC and find they are thorough and consistent with PPB's policies for ECIT response. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • COCL review of BOEC protocols for ECIT dispatch<br>• COCL review of BOEC protocols for suicidal callers<br>• COCL review of BHUAC minutes |

### Settlement Agreement Paragraph

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interviewed BOEC personnel; Reviewed Training Plan Overview; |

### Compliance Assessment

Upon the completion of the policies and procedures required in Par. 113, BOEC began planning for training required in this paragraph. Throughout the first and second quarter, BOEC provided the COCL team with updates related to planned content of the training and plans for evaluation. The training for BOEC personnel is scheduled to occur in the third and fourth quarter of 2016.

BOEC has crafted their training to be consistent with PPB ECIT training. A workgroup of PPB and State of Oregon personnel was convened to identify important areas of State and City mental health crisis training so that they might be incorporated into BOEC training. We believe this is a good idea as it allows all involved groups to be on the same page where there is overlap yet still allows BOEC to include training only relevant to call-takers and dispatchers. Although not approved by BHUAC until the third quarter of 2016, we have reviewed the Training Plan Overview for BOEC training. The overview includes the class topic, class objectives, and activities/resources for each class. The overview seems well developed.

Due to BOEC's labor contract, they are only able to provide an 8-hour training to call-takers and dispatchers. As emergency communicator CIT training is relatively rare throughout the nation, we have no professional opinion as to whether eight hours is sufficient to impart the necessary information. We recommend BOEC evaluate this training and are available for consultation if needed.

| **COCL Recommendations** | • Commence training of BOEC personnel<br>• Evaluate BOEC training |
|---|---|
| **Compliance Rating Based On** | • COCL review of Training Plan Overview<br>• COCL review of workgroup documents |

| **Settlement Agreement Paragraph** |
| :--- |
| 115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff. |

| Compliance Label | Partial Compliance |
| :--- | :--- |
| Methodology | Interviewed BOEC personnel; Reviewed Training Plan Overview |

| **Compliance Assessment** |
| :--- |
|       The ability of BOEC to comply with Par. 115 is contingent upon the successful delivery of training, BOEC personnel conformance with the training, and BOEC's ability to provide data indicating that "Crisis Triage is fully operational." BOEC has made significant progress in creating revised policies and procedures and preparing for training. In the future, we will discuss with BOEC the types of data necessary to demonstrate adherence with this paragraph. |

| **COCL Recommendations** | • Commence training of BOEC personnel<br>• Evaluate BOEC training |
| :--- | :--- |
| **Compliance Rating Based On** | • COCL review of BOEC protocols for ECIT dispatch<br>• COCL review of BOEC protocols for suicidal callers<br>• COCL review of Training Plan Overview<br>• COCL review of workgroup documents |

48

# VII. EMPLOYEE INFORMATION SYSTEM

## Settlement Agreement Paragraph

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to collect data necessary to conduct these analyses at supervisor- and team-levels.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed PPB compliance chart for Par. 116; Interviewed EIS/PPB personnel |

## Compliance Assessment

There continues to be a difference of opinion as to the intent of Pars. 116 and 117 and whether the current EIS utilized by PPB has the capability of providing the outputs requested by COCL and DOJ. For the moment, PPB has continued to measure the subsections of 116 as they relate to supervisor reviews of EIS and identifying trends within supervisor review. Here, we will report updates as provided by PPB. However, we recommend that the Parties meet as soon as possible to work towards a mutually agreed upon plan of action for how to satisfy the requirements of Pars. 116 and 117. We recommend the following questions be considered by the Parties: (1) What was the original intent by the authors of the Agreement? (2) What is EIS's current capacity for predicting potentially problematic trends (and what is the definition of a potentially problematic trend)? (3) How might the EIS be "enhance[d]" to satisfy these paragraphs without necessarily requiring the system to be replaced? (4) Should the EIS system be replaced? The COCL is inclined to bring in an IT expert to render an independent judgment on these matters.

When focusing on PPB's approach to measurement (i.e. number of reviews performed by supervisors), the Bureau reports approximately 83.4% compliance between the first and second quarter of 2016 for the requirements of Par. 116 (a) and (b). At the Branch level, the Services Branch demonstrated the lowest percent of compliance with 65.7% (23 EIS reviews completed out of 35 required). The Chief's Office had 100% compliance (13/13 required reviews) and the Operations Branch had 87.9% compliance (167/190 required reviews). Overall, there were

49

markedly higher compliance rates related to subsection (b), EIS reviews for officers new to a unit. However, there was also a much substantially lower compliance rate for subsections (a) and (b) in the second quarter of 2016 (79%) compared to the first quarter of 2016 (91%).

For the second quarter of 2016, PPB provided a more detailed table of compliance for Par. 116 (a), reviews of EIS every six months. For instance, Central Precinct in the Operations Branch had a 52% compliance rate for Par. 116 (a) in the second quarter, compared to East Precinct (86.7%) and North Precinct (100%). If PPB is planning to use the current practice as a way of identifying "patterns of activity," we would expect that future reports would include commentary on the patterns. However, two quarters of data is not enough to do so now and we therefore await a couple more quarters of data.

Although in past reports, discussion of threshold breaks and case management reviews have been included in our assessment of Pars. 118/119, we believe they are more appropriate to discuss here as they are related to PPB's ability to "identify at-risk employees, supervisors, and teams." In the first and second quarter of 2016 we continued to focus on the process for reviewing EIS threshold breaks, forwarding flags on for supervisory review, and the disposition for such reviews. The first and second Quarterly Update Reports of 2016 provided by PPB indicated that approximately 9% of EIS flags were forwarded on for supervisory review. PPB notes this as a "high number" (PPB Q2 Quarterly Summary Report), though in the past we have stated that "supervisors are more familiar with the officer and are in a better position to assess the officer than are the EIS Administrators" (COCL 2015 Q3/Q4 Compliance Assessment). We therefore do not agree that 9% should be considered a high number and recommend declinations for supervisory review be considered the exception to the rule rather than constituting 91% of threshold break dispositions.

In our last report, we recommended that PPB implement a systematic documentation of each step taken by EIS administrators in their evaluation process, including the decision to send the flag for RU review, and the disposition of the flag. In the corresponding document folders provided by PPB, there were no documents related to Pars. 118-119. Consequently, we are unable to determine how decisions are made to send flags on for supervisory review or not. Nor do we have any information on how the flags were handled at the supervisor end when they receive the alert. We have been previously informed by PPB that some type of systematic review for EIS flags would occur, though we see no evidence of it yet. We maintain our recommendation that PPB collect such data for several months to establish the transparency and soundness of the decision making process. No doubt, many of the declinations are justified, but we need to see those decisions on a case by case basis in order to determine whether the review process meets the minimal conditions of the Settlement Agreement and even goes further to reflect sound management decision making.

Finally, COCL and DOJ have indicated to PPB that they should be using EIS as a way of predicting potentially problematic behavior patterns. In response, PPB authored a review of the effectiveness of EIS to predict which officers will have an adverse event. For their review, an adverse event was defined as "an event that caused the City to pay more than $5,000, and an event that resulted in the employee receiving at least one day off without pay" (PPB Q2 Quarterly Summary Report). To summarize their findings, only 5% of officers flagged by EIS went on to experience an adverse event compared with 2% who were not flagged by EIS. Thus, while EIS thresholds demonstrated a minimal ability to predict which officers would experience an adverse

event, the results imply that efforts to predict behavior are not efficient. We appreciate PPB engaging in a study of their system's ability to identify potentially problematic officers, but there is much more to be said about this subject at another time and place. We look forward to discussing the methodology and findings with PPB, we believe this is another area where the Parties must convene to discuss the original intent as drafted by the Agreement's authors and decide whether PPB's current EIS has the capacity to produce data consistent with that intent.

Some of the resistance surrounding EIS can be attributed to how the system is viewed by employees. Our survey shows that they do not have confidence in the system, and in fact, discussions with officers indicate that they feel it is designed to punish them. The messaging around EIS is extremely important. The COCL maintains that such systems should be used largely for supervisory coaching to save careers and help officers lower their exposure to discipline.

| **COCL Recommendations** | • Bring in an independent IT expert to assess the current EIS system as well as other PPB data systems |
| | • Hold a meeting between COCL, PPB, and DOJ to agree upon a plan of action for satisfying the requirements of Pars. 116 and 117 |
| | • Revisit the criteria for sending EIS flags for RU review |
| | • Conduct a systematic documentation of EIS flagging decisions |
| | • Consider new messages to employees about the purpose of EIS and follow it with real actions |
| **Compliance Rating Based On** | • COCL review of EIS and threshold review process |
| | • COCL discussions with EIS Administrators |

**Settlement Agreement Paragraph**

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period.

| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interviewed EIS/PPB personnel; Reviewed EIS program |

**Compliance Assessment**

The thresholds PPB is required to maintain based on Par. 118 continue to be used to flag officers for case management reviews. PPB has also expanded the thresholds to include the requirement of Par. 119. Thus, PPB has substantially complied with these two paragraphs.

51

However, as in previous reports, we have argued that the thresholds identified in the Settlement Agreement are too broad to adequately capture individuals who might benefit from a case management review. In the interest of accomplishing the theoretical goals of an EIS, we maintain our recommendation that PPB consider revised thresholds for EIS review. However, the authors of the Settlement Agreement agreed on the thresholds present in Pars. 118 and 119 and, therefore, PPB's compliance should not be judged on the basis of a higher standard. We therefore assess PPB's compliance utilizing the current thresholds.

| COCL Recommendations | • Explore the potential for lower thresholds to identify a larger population of at-risk employees<br>• |
|---|---|
| Compliance Rating Based On | • COCL review of EIS thresholds |

### Settlement Agreement Paragraph

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Directive 345.00; Reviewed EIS Program |

### Compliance Assessment

In our previous report, we recommended PPB create a training manual for future EIS Administrators. No such training manual has been created. PPB continues to rely on "on-the-job" training for EIS administrators. However, without a training manual, we are essentially left in the dark as to what topics were covered, how they were covered, and what messaging about the EIS process was transmitted during the on-the-job training. Without knowing these things, we cannot evaluate the training required in this paragraph. Furthermore, in the event of an organizational overhaul (which PPB has recently experienced), a training manual would be beneficial should an administrator be re-assigned. Documenting the processes involved would also help to eliminate lingering doubts we have about the decision-making process used by EIS administrators. Thus we maintain our initial recommendation.

| COCL Recommendations | • Create and implement training manual for EIS Administrators |
|---|---|
| Compliance Rating Based On | • PPB previous training of EIS Administrators |

# VIII. OFFICER ACCOUNTABILITY

## A. Investigation Timeframe

---

### Settlement Agreement Paragraph

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, including appeals, if any, to CRC. Appeals to CRC shall be resolved within 21 days.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | |

### Compliance Assessment

In the second quarter of 2016, the City provided a memorandum detailing the notes and areas of discussion for the Accountability Focus Group. The focus group reported 10 key areas of discussion, including a simplified flowchart for the accountability process, a revised system to ensure all citizen complaints are investigated, clarification of disposition terms, the responsible entity for findings, and reconsidering the role of the Citizens Review Committee (among other topics). Based on the notes accompanying the memo, it appears the focus group was deliberate in their discussions, utilizing input from all members and subject experts.

We have previously touched upon our concerns for the closed-door format and other factors related to the focus group. We do not re-hash those concerns here as we believe it to more appropriate to discuss developments in this area. Instead, we provide our perspective on the conclusions of the focus group and commentary on the proposed model that flowed from the focus group discussions.

As the focus group explored the accountability system broadly, the group's conclusions display an attentiveness to the legitimacy and effectiveness of the process for all involved. An important and recurring theme within their discussions is communication – communicating the process to the public (providing a flowchart, formalizing mediation, etc.), ensuring the City is listening to the public and individual complainants (investigating all complaints, limiting dismissals, maximizing public access to complaint and commendation forms, facilitating the formation of allegations, attending to the framing and semantics of allegations and dispositions). The legitimacy and clarity of the process was also a significant concern (determining what body investigates each case, ensuring maximum transparency in officer-involved shootings and in-custody deaths, improving the effectiveness and efficiency of the citizen appeal process).

The proposed model that has flowed from the focus group discussion is promising, but we expect that some aspects will likely need to be revised after the model is put into practice

and evaluated. The initial City proposal merged CRC hearings into the PRB process, with extremely limited public involvement. While a second proposal discussed in the third quarter of 2016 removes that merge, the City must be able to evaluate the implications of whatever plan is put forward.

We suggest that one conclusion of the focus group needs further discussion and review. Regarding final dispositions, we strongly agree with the focus group that dispositions, and the discipline implemented, should be consistent. In accord with this, we are pleased that the City is considering a model where the investigator makes findings and recommends a discipline category level, with the supervisory review concurring or controverting. However, the group suggested that supervisor-level investigations (versus IPR or IA investigations) only require two or three disposition options. We suggest that all levels of investigation should use the same terminology for findings, to ensure a consistency and clarity for both the public and PPB members. It may be appropriate to limit supervisory investigations to a subset of findings (e.g. "Dismissed—no jurisdiction" would not be an appropriate finding at the supervisory level, since the member was identified), but the City should think very carefully about whether entirely different definitions should be used.

We are confident that the City of Portland, with input from all stakeholders, can arrive at a new model of civilian oversight that is efficient, fair, and effective. But this process will take time and must build on feedback from all interested parties. The COCL continues to gather information and will weigh in further during the next reporting period. Streamlining the process of misconduct investigations to achieve the 180-day timeline will be very difficult, given that appeals to the Citizen Review Committee (CRC) are currently taking an average of 149 days, with new cases *scheduled* for hearing 6 months out, not accounting for subsequent delays. However, if steps to achieve the 180-day timeline are not done in haste, we believe success can be achieved.

| **COCL Recommendations** | • The City should engage in a transparent process that engages all stakeholders<br>• The City should review the strengths and weaknesses of independent review models developed in other cities<br>• The City should reconsider different disposition options for different review paths |
|---|---|
| **Compliance Rating Based On** | • COCL discussions with community members, City officials and PPB<br>• COCL review of Accountability Focus Group meeting minutes and June 2016 synopsis |

---

**Settlement Agreement Paragraph**

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as

otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Reviewed Criminal-IA Concurrent Investigation Audit Reports for 2016 Q1 and Q2; Reviewed Directive 0330.00 |

**Compliance Assessment**

In the first and second quarter of 2016, PPB continued to provide documentation indicating when Internal Affairs investigations began compared with when criminal investigations began. However, the first quarter document was incomplete, with four out of five cases not having an indication of when the IA investigation began. PPB's Quarterly Summary Report indicates a total of seven investigations that should have been represented in the document. We believe the manner which PPB has reported concurrent investigations to us (in the form of Concurrent Investigation Audits) is suitable, though the documentation must be a reflection of all investigations.

For the majority of cases, investigations by IA and the Criminal Division were commenced on the same day or within one day of each other. In one case, the criminal investigation was initiated two weeks after the IA investigation. It is possible that the IA investigation resulted in evidence of a criminal act, thus resulting in a criminal investigation being commenced. However, PPB provided no explanation for the two-week difference and we therefore cannot be certain of the reasons for the time delay. In another case, the criminal investigation began on February 16, 2016. However, no IA investigation was commenced until April 6, 2016. This month and a half delay was also not explained. The month and a half delay does not meet the standard of "concurrent." We recommend PPB provide to COCL a rationale for these two cases and the delay found in the timelines.

The language of Directive 0330.00 remains in contrast with the Settlement Agreement. COCL, PPB, and DOJ have engaged in revisions of policy related to the Agreement, though have not yet discussed Directive 0330.00. When this directive is discussed, PPB must ensure that it is consistent with Par. 122.

| COCL Recommendations | • Revise Directive 0330.00 to reflect the requirement of Par. 122<br>• Report all concurrent investigations to the COCL for review<br>• Explain the absence of concurrence in some cases |
| --- | --- |
| Compliance Rating Based On | • COCL review of Criminal-IA Concurrent Investigation Audit reports |

**Settlement Agreement Paragraph**

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interviewed City/PPB personnel; Reviewed Q1 and Q2 overdue case documents |

**Compliance Assessment**

PPB continues to provide reports indicating which cases went beyond the 180-day timeline. In those reports, PPB identified the source of the delays and provided remedies for avoiding future occurrences as required by the Agreement. While we await the finalization of a revised accountability process, we urge the PPB to continue to reduce the time taken at each step of the process. However, our confidence that the problem of delays can be easily solved is limited for several reasons. One of them is that the actual reasons for the delay are not always adequately or sufficiently described. For instance, in one report, the "Reason for Delay" was described: "Internal Affairs is allotted seven (7) days to process and assign an administrative investigation. This process was completed in eight (8) days." This description provides no actual reason for the delay and instead merely states that a delay occurred.

Furthermore, remedies are not always articulated other than "this won't happen again." For instance, one case took 367 days at the Internal Affairs stage of investigation. The reason provided was that the investigator "did some work on this but let it sit for much of the 360 days it was assigned" to that investigator. The remedy was that the investigation "should have been better managed" and that "Moving forward, such delays will not occur absent exceptional circumstances of which would be rare at best." This remedy does not include actionable steps.

We understand that at times, delays will occur. However, when they do occur they should be reviewed in detail and definitive steps should be articulated to prevent future occurrences.

| COCL Recommendations | • Provide articulated reasons for delays<br>• Provide definitive steps for preventing future delays |
|---|---|
| Compliance Rating Based On | • COCL review of overdue case documentation |

**B. On Scene Public Safety Statements and Interviews**

**Settlement Agreement Paragraph**

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Compliance Label | Non-Compliance but Initial Steps Taken |
|---|---|
| Methodology | Reviewed PPB Quarterly Updates |

**Compliance Assessment**

The revision of protocols for compelled statements to the Professional Standards Division has not yet occurred. The Quarterly Update provided by PPB indicates that discussions involving PPB, the City, the Multnomah County District Attorney, and DOJ continue. In order for us to be able to intelligently report on this paragraph, we recommend PPB provide us with a document that summarizes these discussions and identifies the roadblocks to progress relative to paragraph 124.

Related to this paragraph, the "48-hour rule" remains in effect. However, through collective bargaining, a tentative agreement regarding the "48-hour rule" was reached in the third quarter of 2016. We will provide updates to further progress in our next report.

| COCL Recommendations | • Provide COCL an update related to *Garrity* progress<br>• Abandon the "48-hour" rule |
|---|---|
| Compliance Rating Based On | • Absence of documentation related to discussions of *Garrity* |

**Settlement Agreement Paragraph**

125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed CRO's for 2016 Q2 OIS |

### Compliance Assessment

During the second quarter of 2016, there was one (1) officer-involved shooting (OIS). We reviewed the casefile for this incident. A total of 34 CRO's were issued related to the OIS. All CRO's were issued within at least four hours of each other. The first CRO was issued approximately 2 hours after the lethal force. Based on the amount of time needed to get detectives to the scene and gather a rudimentary understanding of the occurrence and people involved, we believe issuing CRO's between 2-6 hours after the occurrence meets the criteria for "immediately" issuing CROs. This is not to say that we would find it acceptable to wait 2-6 hours before separating witness and involved officers. Separating officers is the responsibility of the responding supervisor and should occur without delay in all OIS events.

The CRO form used in the OIS does not reflect the changes we recommended in our previous report so that the language might be consistent with the language of the Settlement Agreement. In our previous report, we suggested a language change to, "The CRO will be rescinded upon the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney. In the event the Detective Division investigation is still ongoing at the conclusion of the Grand Jury or District Attorney disposition, the CRO will remain in effect until the conclusion of the Detective Division investigation."

| **COCL Recommendations** | • Revise wording of CRO rescinding to comply with Par. 125 |
|---|---|
| **Compliance Rating Based On** | • COCL review of CRO's for 2016 Q2 OIS |

### Settlement Agreement Paragraph

126. PPB shall continue to require witness officer to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Officer Involved Shooting case files; Interview PPB personnel |

### Compliance Assessment

For the 2016 Q2 Officer Involved Shooting, the casefile identifies 13 "witness personnel." Twelve of the witness personnel provided an on-scene briefing the night of the incident. One person identified in the casefile as "witness personnel," however, did not provide a statement until 6 days after the event. As this person was identified in the official case file as "witness personnel," the briefing should have occurred "on-scene."

The terms "witness officer" or "witness personnel" appear to be used inconsistently or loosely in this OIS. Directive 1010.10 defines a "witness officer" as a "member who observes or has firsthand knowledge of the events surrounding an in-custody death or the use of deadly physical force by another member, and other than observing the incident, did not use deadly physical force." Given this definition, we believe other officers should likely have been considered "witness officers." Our review of the casefile for this event reveals that many more officers had "firsthand knowledge of the events surrounding…the use of deadly physical force" but were not identified as "witness personnel." For instance, one officer was instrumental in taking the suspect into custody and used force during the interaction. Other officers were the first responders and received the initial information about the suspect. However, for these officers, the casefile only includes their reports rather than on-scene Detective Division interviews.

The COCL interprets the term "witness officers" to include all officers who have firsthand knowledge of the event (whether they witnessed the event, provided medical assistance, lethal cover, assistance in the arrest, or simply were the first on scene and received the initial explanation of events) and believe this interpretation is in-line with the definition found in the present version of Directive 1010.00. We believe these individuals may be able to provide additional details for the investigation and should be interviewed by the Detective Division on-scene to "ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required."

| | |
|---|---|
| **COCL Recommendations** | • PPB should be consistent in its classification of witness officers and consider broadening the definition to gain a more complete understanding of the events that transpired. |
| **Compliance Rating Based On** | • COCL review of OIS casefile |

---

### Settlement Agreement Paragraph

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review Officer Involved Shooting case files; Interview PPB personnel |

| Compliance Assessment |
| --- |
| In the 2016 Q2 OIS, two officers who were identified as "involved officers" were asked to give an on-scene walk-through and interview. Both officers declined. Related to these two officers, we maintain our previous recommendation that, in the context of community trust, PPB encourage the use of voluntary public safety statements whenever possible, with the understanding that a full interview will occur later. |
| In the casefile for this OIS, there was a third officer identified as being "involved." There is only a brief report from this third officer indicating that he/she was "involved in the use of deadly force." However, there is no report from the Detective Division related to the officer, and therefore no documentation of the officer being asked to provide a voluntary on-scene walk-through and interview. We asked PPB about this officer and were told that the officer was a supervisor and did not actually use lethal force. |
| This again raises concern about terminology found in the OIS casefile. The official casefile identifies the officer as "involved," the officer wrote a report saying he/she was "involved in the use of deadly force," and yet for the purposes of investigation, the officer was not treated as being "involved." |
| The terms used by PPB and their definitions found in policy are designed to be fixed. When someone is identified as an "involved" or "witness" officer, that carries a certain meaning. That designation also requires that certain actions be taken as a result of that label. We recommend PPB set upon definitions for these terms and train the Detective Division and officers to only use the terms clearly with their intended purpose. |
| The requirement of "agreement and collaboration with the Multnomah County District Attorney" has not been satisfied. We are aware that ongoing discussions between DOJ, the City, and the District Attorney's Office have occurred in the past year. The PPB maintains that the DA's willingness to be present during any on-scene walk-through, on a case-by-case basis, is sufficient to meet the requirement of "agreement and collaboration." The COCL interprets "agreement and collaboration" to mean that the PPB and DA have reached an agreement about requiring walk-throughs and interviews for all future incidents. Because these discussions are ongoing with the Parties, and involve issues surrounding the "48-hour rule" and on-scene statements, we will await resolution of these differences before ascribing Substantial Compliance to this paragraph. |

| | |
| --- | --- |
| **COCL Recommendations** | • Use terms in a standard fashion<br>• Resolve the issue of what constitutes "agreement and collaboration"<br>• Encourage the use of voluntary public safety statements |
| **Compliance Rating Based On** | • COCL review of OIS case file sections |

60

**C. Conduct of IA Investigations**

---

**Settlement Agreement Paragraph**

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed proposal for accountability process |

**Compliance Assessment**

Our assessment of Par. 128 ties in with the dialogue and planning process discussed in Par. 121. The proposal related to the 180-day timeline also includes sections related to "meaningful independent investigation by IPR." We will discuss updates that occurred in the third quarter in our next report.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • COCL review of accountability process proposal |

---

**Settlement Agreement Paragraph**

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed SOP #19 |

**Compliance Assessment**

PPB operates under SOP #19 ("Case Intake and Assignment") as it relates to this paragraph. In SOP #19, the language of the Agreement is included under the section Assignment for Investigation by IA. Therefore, the letter of the Agreement has been enshrined in policy. In

---

the first and second quarter of 2016, COCL did not review case documents for allegations of use of excessive force. In our next report, we will include Q1 and Q2 cases as part of our evaluation of this paragraph, as well as discuss how proposed changes to the complaint review process might impact these statistics.

For the moment, we do take note of IPR's expanding capability for conducting initial investigations into allegations against the PPB. In the past three years, IPR has gone from 2.5 full-time investigators to 7 for this budget year. In addition to this, the background experience of the investigators retained by IPR appear to be relevant to IPR's work. IPR also has a training program that appears capable of preparing investigators to do comprehensive investigations. However, we have not personally observed the IPR training and therefore cannot comment on specific content.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • COCL's previous reviews of case files<br>• COCL review of SOP #19 |

### Settlement Agreement Paragraph

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Directive 310.20 |

### Compliance Assessment

Directive 310.20 was reviewed in July of 2015 and is slated to for an annual Universal Review in July of 2016. We restate the assessment from previous reports that Directive 310.20 must "expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct." As it currently stands, Directive 310.20 speaks to retaliation in general but does not provide the express prohibition found in this provision.

| COCL Recommendations | • Revise Directive 310.20 to fully comply with Par. 130 |
|---|---|
| Compliance Rating Based On | • COCL's review of Directive 310.20 |

**Settlement Agreement Paragraph**

131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, and the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Reviewed Directive 336.00; Reviewed City Code 3.20.140 |

**Compliance Assessment**

No changes to PPB Directive 336.00 nor City Code 3.20.140 have occurred since our previous reports. PPB indicates in the Quarterly Summary Report that changes to the accountability process would dictate changes to policy. We will await resolution of the changes to the accountability process before making further recommendations related to PRB membership, qualifications, and removal.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Compliance Rating Based On** | • Prior PPB/City incorporation of some aspects of Par. 131 |

**Settlement Agreement Paragraph**

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Reviewed PPB Directive 336.00; Reviewed City Code 3.20.140 |

**Compliance Assessment**

We have no indication that a case was returned by PRB in the first or second quarter of 2016. While PPB Directive 336.00 contains the provisions of this paragraph, City Code 3.20.140 does not. As the requirements of this paragraph are not impacted by proposed changes to the accountability process, we find no reason why City Code 3.20.140 cannot be revised. As its last revision occurred in February of 2014, we recommend the City provide a revised version of the Code.

| | |
|---|---|
| **COCL Recommendations** | • Revise City Code 3.20.140 to be consistent with the requirements of the Settlement Agreement. |
| **Compliance Rating Based On** | • COCL review of PPB Directive 336.00 |

**Settlement Agreement Paragraph**

133. <u>COCL Summary</u>: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement).

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed SOP #42 |

**Compliance Assessment**

There were no findings of liability in the first or second quarter of 2016. However, there was finding of liability against PPB in September of 2014 and the requirements of Par. 133 have not been satisfied for that finding as of this report. Some this delay has been due to discussions between PPB and DOJ about interpretation of certain segments of this paragraph's requirements. However, in first and second quarter of 2016, PPB initiated an IA investigation related to the incident. In the third quarter of 2016, the case file was sent to IPR for approval. Therefore, in our next report, we will discuss PPB's and IPR's progress on the requirements of this paragraph.

64

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • COCL review of SOP #42 (officer's fitness to participate in specialized units) |

**D. CRC Appeals**

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.</td></tr>
<tr><td>Compliance Label</td><td>Substantial Compliance</td></tr>
<tr><td>Methodology</td><td>Reviewed City Code 3.21.080</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">We have reviewed City Code 3.21.080 and find that the wording of Par. 134 continues to be satisfactorily incorporated into the code. We have no reason to believe the CRC members are not "neutral, unbiased, and capable of making objective decisions." We will continue to monitor the compliance with this paragraph and the functioning of the CRC as a body. Proposals are being developed to change the composition and operation of the CRC. We will report on these proposals in our next report.</td></tr>
<tr><td>COCL Recommendations</td><td>• No recommendations at this time</td></tr>
<tr><td>Compliance Rating Based On</td><td>• COCL review of City Code 3.21.080 found on City website</td></tr>
</table>

<table>
<tr><td align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td>135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.</td></tr>
</table>

65

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review PSF-5.03 |

### Compliance Assessment

Under the City's website, Charter Code and Policies, PSF-5.03 related to CRC, the changes we recommended in our previous report have been incorporated. The City has brought PSF-5.03 into compliance with the wording of the Agreement.

In the first and second quarter of 2016, IPR informed us of two instances wherein the CRC requested additional investigation or information. In one of the occasions, the additional investigation was completed within the 10-day time period though it took several months to get the case re-scheduled in front of the CRC.

In the second occasion, the CRC was told at the hearing that the investigation would take longer than 10 days as the request for additional investigation and information required interviews of five additional persons and new findings based on the results of the interviews. Based on the scope of work requested, it was foreseeable that the 10-day timeline would not be met. While a "written statement to the CRC" was not provided, CRC was informed from the outset that the 10-day timeline was not possible.

We hesitate to provide too much comment on the failure to re-schedule hearings in a reasonable time or deficient investigations which result in large-scale requests for additional investigation or information. As we await changes to the overall accountability process, we feel it is enough to point these failures out and recommend that changes to the accountability process include them as areas to avoid in the future.

Also related to this paragraph, we recommend that each entity in the City provide COCL with information related to compliance with the Settlement Agreement in a manner similar to PPB. PPB has provided a Quarterly Summary Update that includes information and supporting documents for all items under their responsibility. However, as CRC is under the authority of IPR, we cannot expect PPB to be responsible for providing supporting documents for them.

| **COCL Recommendations** | • Relevant City agencies should provide the COCL with data they keep relevant to compliance<br>• Include past failures as learning points when revising accountability process |
|---|---|

| Compliance Rating Based On | • COCL review of Charter Code and Policy Code PSF-5.03 |
|---|---|

**E. Discipline**

<table>
<tr><td colspan="2" align="center"><b>Settlement Agreement Paragraph</b><br><br>137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.</td></tr>
<tr><td><b>Compliance Label</b></td><td>Partial Compliance</td></tr>
<tr><td><b>Methodology</b></td><td>Review Directive 338.00 and corresponding Discipline Guide; Review Corrective Action Recommendation Form; Review revised SOP #34</td></tr>
<tr><td colspan="2" align="center"><b>Compliance Assessment</b><br><br>     Directive 338.00 and its corresponding Discipline Guide have yet to be jointly reviewed by COCL, PPB, and DOJ. This is considered part of the "300 series" and is scheduled to be reviewed in the near future. At this time, we have no new recommendations. Upon the joint revision of Directive 338.00, we will revisit the compliance label associated with this paragraph.<br>     PPB has provided evidence that the discipline guide is being used when determining the appropriate discipline for officers. The large majority of Corrective Action Recommendations we reviewed specify the recommendation, the reason for the recommendation, the violations for the matter, and a corrective action history for the employee. However, in one Q2 document, the reason for the recommendation is not filled out. PPB should ensure that all sections of the Corrective Action Recommendation are completed for each incident.</td></tr>
<tr><td><b>COCL Recommendations</b></td><td>• Ensure all Corrective Action Recommendations are completely filled in</td></tr>
<tr><td><b>Compliance Rating Based On</b></td><td>• COCL Review of Corrective Action Recommendations</td></tr>
</table>

67

**F. Communication with Complainant and Transparency**

<div style="border:1px solid black;">

### Settlement Agreement Paragraph

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own compliant to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review IPR website; Reviewed IPR policy; Reviewed findings letters |

### Compliance Assessment

IPR currently has a form where community members can inquire as to the status of their complaint using as little information as their first and last name. Furthermore, we have reviewed evidence in the past that the complainant receives a written document including the tracking number (case number), allegations, investigating agency and investigation process, and the outcome of the complaint. Based on current Oregon State Law (ORS 192.501(12)), disclosing corrective action (or in the case of no corrective action, 181A.830) is not allowed except under certain conditions. Such exceptions are a fine legal point and we look forward to discussing this with the City Attorney's Office on how this has been addressed in accordance with the Settlement Agreement. Apart from this one singular point, we believe the requirements of Pars. 138 and 140 have been satisfied based on the documentation we have received.

Furthermore, IPR has provided us their policy related to giving case file access to complainants. Based on the provided policy, IPR grants community members access to "any items that the complainant has provided to [IPR]" and the "Transcription of complainant interview, if one exists." Due to City Code 3.21.110, IPR indicates they are "unable to provide requesting complainants witness or officer interviews" and "can only release items that [IPR] has generated." Materials generated by the PPB cannot be released by IPR and community members are directed to PPB Records Division for requests for information generated by PPB. We believe IPR has done its due diligence when releasing case information "to the extent permitted by law" (Par. 139).

</div>

We have also spoken with IPR about re-introducing a satisfaction survey for complainants to ensure they are satisfied with the complaint process and the receipt of information. In principle, IPR has expressed agreement that a satisfaction survey is beneficial, though expressed some concerns about the utility of previous survey effort results. We agree with IPR that any results from a complainant satisfaction survey must have organizational and public utility and will continue the discussion in the future on the best methodology for achieving that goal.

| **COCL Recommendations** | • Consult with COCL on the case-by-case determination for disclosing corrective action<br>• Consult with COCL on re-introducing a complaint satisfaction survey |
|---|---|
| **Compliance Rating Based On** | • COCL review of IPR policy<br>• COCL review of complaint tracking webpage<br>• COCL review of findings letter to complainant |

# IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD

### Settlement Agreement Paragraph

141. To leverage the ideas, talent, experience, and expertise of the community,  the City, in consultation with DOJ, shall establish a Community Oversight Advisory  Board ("COAB"), within 90 days of the Effective Date of this Agreement. The COAB  shall be authorized to: (a) independently assess the implementation of this Agreement;(b) make recommendations to the Parties and the COCL on additional actions; (c) advise  the Chief and the Police Commissioner on strategies to improve community relations; (d)   provide the community with information on the Agreement and its implementation; (e)  contribute to the development and implementation of a PPB Community Engagement and   Outreach Plan ("CEO Plan"); and (f) receive public comments and concerns.

142. Membership of the COAB shall be comprised of fifteen (15) voting  members, five (5) advisory members, and the COCL. (See Settlement Agreement for specific selection criteria).

143. The 15 voting members of COAB are independent of the City and PPB  and shall not be currently employed by the City. Members must agree to serve for a minimum of a two-year term, and may be reappointed for one additional year. The COAB may create an executive committee or other subcommittees, as appropriate, to accomplish the tasks designated to it under this Agreement. The City shall provide   administrative support so that the COAB can perform the duties and responsibilities   identified in this Agreement.

144. The COAB shall report to the COCL.  The COCL will chair the COAB,  preside over COAB meetings, take and count votes, and perform such other activities as   are necessary for the efficient operation of the COAB. If the COCL determines that a  COAB member is no longer fit to serve on account of misconduct, the COCL shall  consult with DOJ prior to removing such member. Following the removal of a COAB  member, an alternative shall be selected from the same pool of applicants as the removed  COAB member.

 145 (See Settlement Agreement for description of selection process for five community members)

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interview City personnel and COAB members; Observe and participate in COAB process |

### Compliance Assessment

70

Given that this is an assessment of PPB's and the City's compliance with the Settlement Agreement, we will only comment here on specific issues which are the responsibility of the City.

The City has continued to provide support for meeting space, refreshments, accommodations, audio-video needs, and IT support for the COAB. COAB meetings are able to occur in convenient locations for members of the Portland community, located near light rail, streetcar, and bus stops. In addition to resources for COAB meetings, the City has continued to provide resources for personnel related to COAB functions, including a Program Support Specialist and a Mental Health Specialist. The City has also helped to clarify public meeting laws and resolve disputes and complaints that have arisen. Furthermore, the City has provided resources to the COCL in the form of a permanent office space that is located near light rail, streetcar, and bus stops. In our opinion, this permanent office meets the criteria identified by DOJ.

Despite a strong start, the COAB experienced difficult times during the second quarter of 2016. This was the result of numerous factors, including meeting disruptions by community members, a strained relationship between the Chair and certain members of the COAB, resignations of COAB members, the lack of reappointments by the City, a lack of quorum for both the executive committee and the full COAB, and other issues. These constraints ultimately resulted in the COCL and City requesting that the COAB be given a recess to allow the Parties to rethink the community engagement process.

The COCL and the COAB independently asked for a change to the Settlement Agreement that would separate the COAB from the COCL, thus allowing the COAB to function more independently, and allow the COCL to focus on compliance and monitoring functions. Such a change would require alteration of the Settlement Agreement and is subject to deliberations between the Parties as allowed under Par. 175. No alterations to the Settlement Agreement were made during the first or second quarter of 2016.

| **COCL Recommendations** | • Use the recess effectively to revisit all aspects of the COAB, including the body's mission, membership selection criteria, leadership and responsibilities, as well as the most effective way to "leverage the ideas, talent, experience, and expertise of the community"<br>• Include all interested entities when revisiting the operation of the COAB, including DOJ, PPB, AMAC, PPA, COCL, current and former COAB members, and community members as a whole |
|---|---|
| **Compliance Rating Based On** | • COCL observation of COAB meetings<br>• COCL and COAB recommendations |

## Settlement Agreement Paragraph

146. COCL Summary: Paragraph 146 states that, "To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes

to develop and finalize a CEO Plan." The subsections of Par. 146 include items related to the Community Survey, the survey of PPB members, two public hearings to gather community feedback on PPB community engagement plan, COAB review of PPB CEO plan, and COAB solicitation of input from Human Rights Commission Community Police Relations Committee, including work to implement 2009 PPB "Plan to Address Racial Profiling, and COAB recommendations on CEO plan. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Community Survey results; Review PPB Internal Survey results; Review results of public hearing; Interview City personnel and COAB members; Observe PPB presentation of prior community outreach efforts |

### Compliance Assessment

In the first and second quarter of 2016, a number of efforts to gather the perspectives of community members occurred in order to contribute to the CEO Plan required in Par. 146. While issues with the efficient operation of the COAB stalled further advances, solid gains were made that must be built upon in the future with joint effort by PPB and the community. For instance, in the first quarter of 2016, Davis, Hibbitts, and Midghall (DHM) Research provided a presentation to the COAB on a community survey performed in 2015. During the presentation, COAB members had an opportunity to discuss the survey results, ask questions, and discuss implications of the findings. As this presentation was open to the public, the larger community was also able to hear the results of the survey (video of this meeting can be found at https://www.youtube.com/watch?v=2ebTy9VK-z8). In our April 2016 Outcome Assessment, we provided extensive review of the survey results.

The new PPB administration has taken a leadership role in planning a police-community contact survey to measure the quality of PPB service during interactions with the public. We believe there is desire on the part of PPB to engage the community after every police encounter and seek their opinion about how well PPB officers are doing and what can be improved. If designed thoughtfully, this type of performance metric could have numerous benefits for Portland and serve as a model for the rest of the nation. The COCL can assist in managing this database if it comes to fruition.

Plans for focus groups with mentally ill, youth, LGBT, and houseless populations were finalized in the first and second quarter of 2016 with continued input from COAB's Community Engagement and Outreach Plan Subcommittee (CEOPS). Utilizing input from CEOPS and COCL, the City and DHM finalized a methodology for the focus groups. In the third quarter of 2016, a total of six focus groups were held. We provide results of these focus groups in our October 2016 Outcome Assessment and will also provide results in our next Compliance Report. The focus groups were conducted prior to the COAB's 60-day recess and COAB input was sought and incorporated at every step of the process.

In April of 2016, the COAB hosted a Community Engagement Workshop, with round table discussions of "3 Big Questions" developed by the Community Engagement and Outreach

72

Subcommittee. The three questions discussed were: (1) What do we want the relationship between the police and the community to look like?; (2) What is the Police Bureau's responsibility to achieve that vision? and; (3) What is the community's responsibility to achieve that vision? Attendee feedback on the workshop was positive and informative for the overall development of the CEO Plan. Furthermore, the questions were also made available in an online survey to gather additional input as COAB sought to develop recommendations for the CEO Plan.

In previous quarters, initial consultation occurred between the COAB and Community Police Relations Committee (CPRC). Based on the requirement for COAB to solicit and consider input from CPRC, further meetings were planned for the second quarter of 2016. However, due to HRC entering a restructuring period during which CPRC was no longer meeting, the collaboration between COAB and CPRC did not occur. Upon CPRC resuming its duties, we will provide updates to this section.

| **COCL Recommendations** | • The PPB should continue to develop its plan for a police-community contact survey. The contact survey should include both mental health and non-mental health contacts within Portland.<br>• The PPB should continue to work on the creation of a CEO Plan and be prepared to discuss it with the COAB after the recess. |
|---|---|
| **Compliance Rating Based On** | • COCL observation of COAB meetings<br>• COCL review of community survey results<br>• COCL observation of Community Engagement Workshop |

---

**Settlement Agreement Paragraph**

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, together with the COAB, may develop outreach and policing programs specifically tailored to the residents of the precincts.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex, and perceived mental health status of the subject, and provide such information to the CPRC to contribute to their analysis of community concerns regarding discriminatory policing. In consultation with the COAB and CPRC, PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Reviewed Precinct demographics tables compiled by PPB |

**Compliance Assessment**

PPB provided demographic tables for different precincts as part of their supporting documents in 2016 Q1. The demographics collected continue to include elements related to race/ethnicity, gender, age, economic status, disability, education, and housing status. We maintain our position in previous reports that the demographics collected are sufficient to satisfy the first part of Par. 147. Due to issues surrounding COAB meetings in the first and second quarters of 2016, no meetings occurred between the Precinct Commanders and COAB to "develop outreach and policing programs specifically tailored to the residents of the precincts." As the COAB began a recess in the third quarter of 2016, no meetings are planned for the foreseeable future. We believe that the joint development of outreach and policing programs are an important aspect of community policing. We therefore recommend these meetings be scheduled as soon as possible when the COAB reconvenes. In the meantime, we recommend PPB attempt to accomplish the spirit of Par. 147 outside the realm of COAB, even if informally.

Furthermore, although PPB currently collects demographic data, PPB's ability to satisfy the requirements of Par. 148 has been hindered by the CPRC being inactive. CPRC has met only once in 2016 and has not met since March. PPB will have to wait until the end of a restructuring period of the Human Rights Commission (CPRC's parent group) before continuing their consultation with CPRC.

| | |
|---|---|
| **COCL Recommendations** | • Continue to collect demographic data during COAB and CPRC recesses. |
| **Compliance Rating Based On** | • COCL review of Precinct demographic data |

| | |
|---|---|
| **Settlement Agreement Paragraph**<br><br>149. The COAB, COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed Community Survey results; Reviewed PPB Internal Survey results; Reviewed results of public hearing; Interviewed City personnel; Observed PPB presentation of prior community outreach efforts; Reviewed results of community focus groups; Reviewed results of officer focus groups |
| **Compliance Assessment** | |

The ability of the COAB, COCL, PPB, and DOJ to jointly develop metrics to evaluate community engagement and outreach is partially contingent upon the satisfaction of Par. 146's

provisions. As stated above, progress has been made in regards to the community-wide survey to measure public trust in PPB, levels of community engagement, and reactions to reform efforts. COCL and PPB have created joint measures for the annual survey of PPB employees, which measures police culture, views of the community, view of PPB, and reactions to the reforms. COCL and PPB are also in the development phase of a police-community contact survey, assessing the quality of police-community interactions. Finally, COCL, COAB, and the City have conducted focus groups with varying populations, asking about their perceptions of police and how community relationships might be improved.

All of these methodologies include metrics that have been created jointly between the entities identified in Par. 149. We recommend that such metrics continue to be developed, implemented, and refined in order to best evaluate community engagement and outreach. We continue to be open to providing technical assistance to PPB and the City on new metrics.

| **COCL Recommendations** | • Continue to develop, implement, and refine metrics to evaluate community engagement and outreach |
|---|---|
| **Compliance Rating Based On** | • Joint development of metrics related to community survey, PPB survey, community contact survey, and focus groups |

### Settlement Agreement Paragraph

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be reviewed by the COAB before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed "PPB Annual Progress Report 2015" |

### Compliance Assessment

In the second quarter of 2016, PPB issued their "Annual Progress Report 2015" after meeting with the COAB to present a draft report and solicit feedback. However, a search of PPB's website did not produce a copy of the Annual Progress Report. Thus, community members who were not present at the COAB meeting when the report was discussed would not be able to find it. We recommend the final report be posted to PPB's website and that future reports be posted once they are released.

PPB's Annual Progress Report 2015 includes sections related to the BHU, equity, Professional Standards Division (PSD) and the accountability process, community engagement, training, stops data (and results of the Stops Data Reports), and use of force. The report also includes a statement from the Chief of Police. Overall, we believe the Annual Progress Report includes summary information on PPB's many activities, events, and decisions from the previous year, including "problem-solving and community policing activities."

PPB cannot reach Substantial Compliance with this paragraph until it holds "at least one meeting in each precinct area and at a City Council meeting, annually, to present" the report. PPB indicates that this will not occur until the third quarter of 2016.

| COCL Recommendations | • Post final report onto PPB website<br>• Hold precinct and City Council meetings to present report |
|---|---|
| Compliance Rating Based On | • COCL review of Annual Progress Report |

---

### Settlement Agreement Paragraph

151. The COAB may make recommendations approved by a majority of its membership regarding implementation of the terms of this Agreement.

| Compliance Label | N/A |
|---|---|
| Methodology | N/A |

### Compliance Assessment

As the Chair of the COAB, we refrain from making compliance determinations regarding COAB responsibilities. However, we will comment on the progress of the COAB and any factors related to the efficient operation of the COAB. In the first and second quarter of 2016, COAB approved nearly two dozen policy recommendations, but there continued to be frustration on the part of COAB related to perceived non-responsiveness of the Parties to COAB policy recommendations. Joint policy reviews by DOJ, COCL, and the City continue, although the process has been slower than expected. DOJ is aware of this problem.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • COAB actions and recommendations |

| Settlement Agreement Paragraph | |
|---|---|
| 152. The COAB shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Team, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The COAB shall also provide the opportunity for public comment at each of its meetings to keep open lines of communication with the public-at large. | |
| Compliance Label | Non-Compliance but Initial Steps Taken |
| Methodology | Observed COAB meetings; Observed PPB presentation on prior community engagement efforts |
| Compliance Assessment | |
|      While a planned meeting between COAB and the groups listed in Par. 152 was scheduled for May 26, 2016, a number of issues prevented the meeting from occurring or being rescheduled within this period.<br>     On May 18, the planned COAB meeting was postponed. The COAB held a mini-retreat on May 26 in lieu of a meeting to discuss ways to support each other when faced with meeting disruptions. The previous PPB chief was placed on paid administrative leave on May 24 and shortly after, the acting chief declined to reschedule the meeting until more was known about whether the previous chief would return from leave. On June 26, the previous chief retired.<br>     We recommend PPB plan for how this paragraph might be satisfied with the input of the community. | |
| COCL Recommendations | • Plan for meetings with the input of the community |
| Compliance Rating Based On | • COCL observation of COAB meetings |

| Settlement Agreement Paragraph | |
|---|---|
| 153. A representative of the Oregon U.S. Attorney's Office shall be invited to attend all COAB meetings. | |
| Compliance Label | N/A |
| Methodology | N/A |
| Compliance Assessment | |

A representative of the Oregon U.S. Attorney's Office has been invited to attend all COAB meetings. A representative has, in fact, attended nearly all COAB meetings. The COAB meetings have often been enriched by information and insight provided by such representatives.

| **COCL Recommendations** | • N/A |
|---|---|
| **Compliance Rating Based On** | • N/A |

---

**Settlement Agreement Paragraph**

154. COAB shall meet as needed to accomplish their objectives as set forth in this Agreement. All COAB meetings shall be open to the public. In addition, COAB shall attend quarterly meetings with the COCL as provided in Par. 163. To the extent that COAB meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the COCL to ensure compliance with those laws and agrees to represent COCL in any challenges regarding compliance with those laws.

155. The City shall provide COAB members with appropriate training necessary to comply with requirements of City and State law.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed DOJ and City personnel; Observed COAB meetings |

**Compliance Assessment**

The City's responsibilities in Pars. 154 and 155 continue to be fulfilled to the extent that the COAB and COCL have requested their assistance. Upon any indication of legal issues dealing with the operation of the COAB, identified by the COCL, COAB, or the City, we have requested legal advice from the City Attorney's Office. We have asked on numerous occasions for the City to opine on legal matters and the City Attorney's Office assisted in every instance. We expect that the City will continue to provide sound legal advice, and feel they have substantially complied to this point with the requirements of these Paragraphs.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

| **Compliance Rating Based On** | • Observation of COAB meetings<br>• Requests to the City Attorney's Office |

# X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT

### Settlement Agreement Paragraph

156. PPB shall implement immediately all provisions of this Agreement which involve the continuation of current policies, procedures, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. Except where otherwise specifically indicated, PPB shall implement all other provisions of this Agreement no later than within 180 days of the Effective Date.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed documents related to policies, procedures, practices specific to force, training, community-based mental health services, crisis intervention, EIS, officer accountability, and community engagement; Interviewed City/PPB personnel; Observed meetings and trainings |

### Compliance Assessment

As we have cautioned in previous reports, substantially implementing the conditions of the Agreement will take time, resources and continued commitment by the City of Portland. We encourage the PPB and the City to prioritize their efforts to implement provisions which are time sensitive, with the understanding that both DOJ and the COCL will work with the City to respect these priorities. Delays in implementation have not always been the fault of the City. The COCL is confident that the City and PPB are making a good faith effort to implement the recommended changes. We maintain that the quality of work should supersede expeditiousness. While the PPB and the City should work quickly, we are more concerned that they work conscientiously to meet the terms of the Agreement and seek to implement best practices and evidence-based policing.

| COCL Recommendations | <ul><li>Continue to prioritize efforts to implement provisions which are time sensitive</li><li>Continue to work expeditiously while maintaining quality of work</li><li>Continue to work with DOJ and the COCL to communicate concerns and expectations</li></ul> |
|---|---|
| Compliance Rating Based On | <ul><li>COCL review of all related documents identified throughout this report</li></ul> |

**Settlement Agreement Paragraph**

158. All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations. Audits and reports shall be posted on PPB's website.

159. PPB shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to PPB decision making and activities, and compliance with this Agreement, in accordance with the Oregon Public Records Law.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed PPB website; Reviewed PPB Quarterly Updates |

**Compliance Assessment**

PPB posts reports, audits, and other data/information relevant to their work in implementing the Agreement to their website. PPB also posts their Quarterly Updates for public review. In some places in this report, we have identified documents that have not been posted to PPB's website. Overall, though, we believe PPB makes a genuine effort to post reports and documents to their website.

Regarding Paragraph 159, we have noted in this report areas where additional data collection would benefit the Monitor and Compliance Officer and/or the public. Keeping records on how EIS administrators make decisions about force reports is one example where the COCL has provided a template. As other examples, establishing contact surveys with complainants and with persons having contact with a PPB officer would show enormous transparency with the community and establish a community voice.

Finally, the software used to manage police records is dated and may need to be replaced. This was discussed earlier. A closer look is needed by COCL to determine the current system can be modified to meet the requirements of the Settlement Agreement.

| COCL Recommendations | • Consider additional data collection efforts to improve organizational performance, engage the community, and increase accountability and transparency<br>• Bring in IT expertise to evaluate the PPB records keeping system |
|---|---|
| Compliance Rating Based On | • COCL review of information found on PPB website<br>• Assessment of existing data collection systems |

81

**Settlement Agreement Paragraph**

165. PPB will hire an employee familiar with the operations of PPB for the duration of this Agreement, to serve as a PPB Compliance Coordinator. The Compliance Coordinator will serve as a liaison between PPB and both the COCL and DOJ and will assist with PPB's compliance with this Agreement. At a minimum, the Compliance Coordinator will: (COCL summary) coordinate compliance activities, maintain and provide documentation to COCL and DOJ, assign compliance tasks to PPB personnel, and accept primary responsibility for the collection the information required by the COCL.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed Compliance Coordinator and other PPB and City personnel; Evaluated responses to requests made by the COCL |

**Compliance Assessment**

We continue to have weekly interactions with the Compliance Coordinator. The COCL team has been impressed by the professionalism and competence of the Compliance Coordinator and his staff. On the whole, they have been very responsive to our inquiries, arranged meetings, provided access to information, and assisted us in navigating the organizational terrain of the PPB. Some dramatic reorganization of the PPB occurred in the third quarter of 2016, including the Compliance Coordinator position. We will comment on this in our next report.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Weekly conferences with PPB Compliance Coordinator |

**Settlement Agreement Paragraph**

166. The COCL shall have full and direct access to all PPB and City staff, employees, facilities, and documents that the COCL reasonably deems necessary to carry out his/her duties. If a document requested by the COCL is privileged attorney-client communication, the COCL shall not disclose the document in a manner that destroys that privilege without the approval of the City Attorney. The COCL shall cooperate with PPB and the City to access people, facilities, and documents in a reasonable manner that minimizes, to the extent possible, interference with daily operation. In order to report on PPB's implementation of this Agreement, the COCL shall regularly conduct reviews to ensure that PPB implements and continues to implement all

measures required by this Agreement. The COCL may conduct on-site reviews without prior notice to PPB or the City.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Request access to PPB and City staff, employees, facilities and documents |

**Compliance Assessment**

In general, PPB and the City have been accommodating to the COCL's requests. They have followed our recommendation that all documents related to compliance have been included in their corresponding folders in the supporting documents section of the Quarterly Update reports. In instances where we feel further documentation is warranted, the PPB has responded in a timely manner.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • PPB's general accommodation to COCL requests |

**Settlement Agreement Paragraph**

169. Within 180 days of the Effective Date, PPB shall revise and/or develop its policies procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. PPB shall revise and/or develop as necessary other written documents such as handbooks, manuals, and forms, to effectuate the provisions of this Agreement. PPB shall send new or revised policies, procedures, protocols, and training curricula regarding use of force, interactions with persons in mental health crisis and systems of accountability to DOJ as they are promulgated, with a copy to the COCL. DOJ and the COCL will provide comments within 45 days and will not unreasonably withhold recommendations about policies, procedures, protocols, and training curricula. The COCL shall seek the timely input of the relevant members of the Training Division and patrol officers, as well members of the community. If the City disagrees with DOJ's comments, the City shall, within 14 days of being informed of the DOJ's comments, inform the Parties in writing of the disagreement. Within 14 days thereafter, the Parties shall meet and confer on the disagreement at a mutually agreeable time. Upon approval by the Parties, policies, procedures, training curricula, and manuals shall be implemented within 30 days of agreement or the Court's decision. PPB shall provide initial and in-service training to all officers and supervisors with respect to newly implemented or revised policies and procedures. PPB shall document employee review of and training in new or revised policies and procedures.

170. The Chief shall post on PPB's website final drafts of all new or revised policies that are proposed specific to force, training, community based mental health services, crisis intervention, employee information system, officer accountability, and community engagement, to allow the public an opportunity for notice and comment, prior to finalizing such policies.

171. The Chief's Office shall coordinate a review of each policy or procedure required by this Agreement 180 days after such policy or procedure is implemented, and annually thereafter (on a regularly published schedule), to ensure that such policy or procedure provides effective direction to PPB personnel and remains consistent with the purpose and requirements of this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Engaged in policy review with PPB and DOJ |

**Compliance Assessment**

PPB continues to post directives up for Universal Review to their website to solicit and gather community input on revisions. In response, community members have provided input, comments, and recommendations that have been considered by PPB during policy reviews. However, the joint review of directives by COCL, PPB, and DOJ has been slow but deliberate. We continue to make progress on reviewing, revising, and passing directives, though progress needs to speed up.

Only a few policies have received final approval after nearly two years. We recommend that the Parties meet to agree on a process that will expedite policy review. The COCL would be happy to participate in this meeting.

| **COCL Recommendations** | • Parties should revisit the policy review process |
|---|---|
| **Compliance Rating Based On** | • COCL, PPB, and DOJ joint policy review |

**Settlement Agreement Paragraph**

172. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed directives and accountability mechanisms |

**Compliance Assessment**

Our evaluation of Par. 172 is found within various provisions assessed in previous sections. We will continue to evaluate whether policies are uniformly applied and officers are held accountable when they violate policies. This requires new forms of documentation and measurement systems as described in this report and in a separate Outcomes report prepared by the COCL. Some new forms of documentation and measurement systems recommended by the COCL have been implemented in some fashion; others still must be implemented. However, progress is being made and we will continue to monitor such progress.

As it relates to this paragraph, we make specific mention of the circumstances surrounding the off-duty shooting involving the previous Chief of Police. In this incident, we do not believe that PPB policies and accountability procedures relevant to use of force incidents were uniformly applied such as the communication restriction orders (CROs) and the immediate reporting of the force incident. This incident raised concern that senior administrators did not embody or model the types of actions that the Settlement Agreement is seeking or that is expected of professional police leaders. The new Chief has a deep knowledge of the reform process, so we do not envision this type of incident to be repeated. In the final analysis, the question is whether senior managers, middle managers, and first-line supervisors are able to create a police culture that places a high value on integrity, rule compliance, accountability, transparency, and respect for the community.

| COCL Recommendations | • See compliance recommendations made in previous sections regarding policies and accountability |
| --- | --- |
| Compliance Rating Based On | • Preponderance of documents and systems of accountability previously addressed in this report |

---

**Settlement Agreement Paragraph**

176. Beginning with the COCL's first quarterly report, as set forth in paragraph 166 of this Agreement, PPB shall prepare a status report no later than 45 days before the COCL's quarterly report is due. The PPB Compliance Coordinator shall lead the effort in preparing this status report and shall provide copies to the COCL, DOJ, and the public. PPB's report shall delineate the steps taken by PPB during the reporting period to comply with each provision of this Agreement.

177. PPB shall maintain all records, as applicable, necessary to document their compliance with the terms of this Agreement and all documents expressly required by this Agreement.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Reviewed PPB Quarterly Update reports and corresponding documents |
| | |

| | |
|---|---|
| **Compliance Assessment** | |

PPB has consistently provided the Quarterly Update reports required in Par. 176 of the Agreement. These status reports contain the delineation of "steps taken by PPB during the reporting period to comply with each provision of this Agreement."

PPB has also maintained relevant records related to their compliance efforts and documents expressly required by the Agreement.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • COCL review of provided documents |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

190. All PPB officers and persons related to the implementation of this Agreement shall sign a statement indicating that they have read and understand this Agreement within 90 days of the effective date of this Agreement. Such statement shall be retained by PPB. PPB shall require compliance with this Agreement by their respective officers, employees, agencies, assigns, or successors.

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Reviewed Excel sheets of new hires; Reviewed confirmation emails for officers reading Settlement Agreement |

| | |
|---|---|
| **Compliance Assessment** | |

In the past, we have not provided an evaluation for this paragraph. Beginning in 2015 Q3, PPB has provided COCL with information on new PPB hires. In the second quarter of 2016, PPB provided emails from supervising officers, confirming that new hires under their command had read the Settlement Agreement and acknowledged their understanding within a 90-day timeline.

Rather than providing emails indicating a new employee has reviewed the emails, we recommend PPB provide a printout from the intranet showing the date the employee read and acknowledged the Settlement Agreement. This type of documentation is more formal and more easily audited than a third-party statement. We also recommend PPB provide this type of documentation for all officers which were previously required to acknowledge the Agreement upon it being finalized and signed.

| **COCL Recommendations** | • Provide intranet printouts showing review<br>• Provide documentation for all officers previously required to provide acknowledgement |
|---|---|

| **Compliance Rating Based On** | • COCL review of confirmation emails |
|---|---|

In addition to the above assessed paragraph, there are a number of paragraphs that would require us to evaluate our own work or the responsibilities of DOJ. As our charge is to report findings "related to PPB's compliance with this Agreement," we refrain from assessing ours or DOJ's execution of responsibilities. However, for the purpose of record maintenance, we include here the language of those paragraph or, in the instance of long sections, a summary of the language.

157: With regard to any provision that provides for DOJ's review and approval, including review of all policies that must be revised, approval will be granted in a timely fashion provided that the PPB's action reasonably satisfies the requirements and standards set forth in the relevant provision(s).

160: (COCL Summary) Par. 160 requires the City to select a COCL. It also identifies the overall responsibility of the COCL, the independence of the COCL, and the City's requirement to provide administrative support to the COCL.

161: In order to collect data and report on PPB's implementation of each substantive provision of this Agreement, the COCL shall conduct the reviews specified in the paragraph 173 of this Agreement and such additional reviews regarding the implementation of this Agreement as the COCL, the City, or DOJ deems appropriate. Based on the COCL's reviews and community input, the COCL shall make recommendations to the City regarding measures necessary to ensure full and timely implementation of this Agreement.

162/163/164: (COCL Summary) Pars. 162 and 163 requires the COCL to conduct the reviews reflected in this report, specifying methodology, compliance assessment, and recommendations for compliance. Drafts of COCL's reports are to be provided to the Parties and the COAB for comment. COCL is also required to hold Town Halls and gather community comments to our reports. Par. 164 then requires COCL to consider the comments and make appropriate changes prior to issuing a final report. The Parties may submit COCL's reports to the Court and COCL's reports may be used to evidence compliance before the Court.

167: (COCL Summary) Par. 167 requires the DOJ to have full and direct access to all PPB and City personnel and documents. Par. 167 also provides for when exceptions may be made and how exceptions may be remedied.

168: All non-public information provided to the COCL or DOJ by PPB or the City shall be maintained in a confidential manner. Nothing in this Agreement requires the City to disclose documents protected from disclosure by the Oregon Public Records Law to third parties.

173/174: (COCL Summary) Pars. 173 and 174 detail the Semi-Annual Outcome Assessment required of the COCL. Such Outcome Assessments will measure whether the City and PPB have created systems and resources for responding to persons in mental health crisis, competent accountability and oversight systems, effective training for officers to deliver service to persons in mental health crisis, proper management of use of force, and robust systems of community engagement. Pars. 173 and 174 also the type of data which may inform the Outcome Assessments.

175: (COCL Summary) Par. 175 requires DOJ to conduct a comprehensive assessment of PPB and the City's compliance with the Settlement Agreement. Par. 175 also allows for modifications to the Agreement if necessary, provided the City agrees with the modification.

178 – 189: (COCL Summary) Pars. 178-189 provide requirements for the Settlement Agreement's enforcement, including provisions related to jurisdiction, termination, enforcement, additional considerations in required changes, process for non-compliance or misinterpretation of Agreement provisions, discussion of Agreement amendments, and defense of the Agreement.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

# LIST OF PERSONNEL

**Previous Chief of Police:** Larry O'Dea

**Current Chief of Police:** Mike Marshman

**Assistant Chief of Police:** Matt Wagenknecht

**Assistant Chief of Police:** Mike Leloff

**Assistant Chief of Police:** Chris Uehara

**Previous Compliance Coordinator:** Mike Marshman

**Current Compliance Coordinator:** Steve Jones

**Previous Inspector:** Steve Jones

**Current Inspector:** Mike Krantz

**Behavioral Health Unit (BHU) Manager:** Tashia Hager

**EIS Administrator:** Frank Gorgone

**EIS Administrator:** Jake Jenson

**Training Manager:** Bob Day

**Auditor:** Mary Hull Caballero

**IPR Director:** Constantin Severe