# COMPLIANCE REPORT

# of the

# COMPLIANCE OFFICER AND COMMUNITY LIAISON

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**Third and Fourth Quarters:**

**July through December, 2016**



# Table of Contents

**INTRODUCTION**................................................................................................................................1

**EXECUTIVE SUMMARY**....................................................................................................... 4

**III. USE OF FORCE** ................................................................................................................ 9

**IV. TRAINING**..................................................................................................................... 25

**V. COMMUNITY-BASED MENTAL HEALTH SERVICES** ........................................... 41

**VI. CRISIS INTERVENTION** .............................................................................................. 44

**VII. EMPLOYEE INFORMATION SYSTEM** ..................................................................... 67

**VIII. OFFICER ACCOUNTABILITY**................................................................................... 71

**IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD** ...... 92

**X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT** .................................... 101

**LIST OF ABBREVIATIONS**.............................................................................................. 111

**LIST OF PERSONNEL** ..................................................................................................... 113

**APPENDIX A** ..................................................................................................................... 114

**APPENDIX B** ..................................................................................................................... 115

# INTRODUCTION

This is the Compliance Assessment Report of the Compliance Officer and Community Liaison (COCL) for the third and fourth quarters of 2016, as required by the Settlement Agreement (Agreement) between the City of Portland (City) and the United States Department of Justice (DOJ). COCL Compliance Assessment Reports are required by Par. 162 of the Agreement and "shall specify: (a) the methodology and monitoring activities employed; (b) the COCL's assessment of compliance for each paragraph; and (c) the COCL's recommendations regarding necessary steps to achieve compliance, as warranted" (Par. 162). Each of these requirements is included in our assessments and is clearly labeled as such.

This report is written to be readable by all stakeholders. Whenever possible, we used the exact language from the Settlement Agreement. However, when the provisions of the Agreement are lengthy or complex, we have provided a summary of that language. In these situations, the reader will be referred to the Agreement for the details of the provision. As we provide our assessment of each substantive paragraph within the Agreement, we urge the reader to remember that complying with one paragraph can sometimes be dependent on complying with one or more additional paragraphs.

This report covers progress by the City of Portland (hereafter referred to as "the City") and the Portland Police Bureau (hereafter referred to as "the PPB") during the third and fourth quarters of 2016. In certain cases, we learned of developments that occurred in the first quarter of 2017. In order to maintain chronological consistency, however, we refrain from commenting too much on developments in subsequent quarters other than stating that they will be covered in our next report.

Report Card. This report includes a "Report Card" on the implementation of the Agreement which provides an assessment of each paragraph in the Agreement. For each paragraph where sufficient information is available to render a decision, the Report Card provides an overall judgment on a 4-point scale, ranging from "Non-compliance" to "Substantial Compliance." PPB and the City have continued to make significant progress towards the implementation of the Agreement. However, in many areas, more work is necessary to fulfill the requirements of the Agreement. We will continue to work with PPB and the City as they move forward, providing consultation, analysis, technical assistance, and assessment.

When reviewing the specific paragraphs, we utilize a four-tiered system of evaluation:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

- **Non-Compliance**: The City/PPB has not made any meaningful progress towards the satisfaction of the provision's requirements.
- **Not Yet Assessed**: The COCL team has not had the opportunity to fully assess the requirements of the provision and elects to withhold assessment of compliance until a more thorough review has occurred.

| Settlement Agreement Section | COCL Assessment of Compliance |
|---|---|
| III. USE OF FORCE | Partial Compliance |
| A. Use of Force Policy | Partial Compliance |
| B. Compliance Audits Related to Use of Force | Partial Compliance |
| IV. TRAINING | See Individual Compliance Results* |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | Substantial Compliance |
| VI. CRISIS INTERVENTION | See Individual Compliance Results* |
| A. Addictions and Behavioral Health Unit and Advisory Committee | Substantial Compliance |
| B. Continuation of C-I Program | Partial Compliance |
| C. Establishing "Memphis Model" Crisis Intervention Team | See Individual Compliance Results* |
| D. Mobile Crisis Prevention Team | See Individual Compliance Results* |
| E. Service Coordination Team | Substantial Compliance |
| F. BOEC | See Individual Compliance Results* |
| VII. EMPLOYEE INFORMATION SYSTEM | Partial Compliance |
| VIII. OFFICER ACCOUNTABILITY | Partial Compliance |
| A. Investigation Timeframe | Partial Compliance |
| B. On Scene Public Safety Statements and Interviews | Partial Compliance |
| C. Conduct of IA Investigations | Partial Compliance |
| D. CRC Appeals | Substantial Compliance |
| E. Discipline | Partial Compliance |
| F. Communication with Complainant and Transparency | Partial Compliance |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD | See Individual Compliance Results* |
| X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT | Partial Compliance |
| A. Compliance Officer/Community Liaison | Not Applicable |
| B. PPB Compliance Coordinator | Substantial Compliance |
| C. Access to People and Documents | Partial Compliance |
| D. Review of Policies and Investigations | Substantial Compliance |
| E. City Reports and Records | Partial Compliance |
| F. Enforcement | Partial Compliance |

*See Individual Compliance Results: This label indicates that not all paragraphs in this section received the same report card grade (the results were mixed) and therefore, a single compliance label is not appropriate. In these instances, we urge the reader to refer to the specific paragraph assessment. For other sections, mixed results occurred, but one grade is appropriate for the vast majority of paragraphs reviewed.

# EXECUTIVE SUMMARY

In the third and fourth quarter of 2016, the City and the Portland Police Bureau (PPB) made overall progress toward satisfying the requirements of the Settlement Agreement. In this executive summary, we summarize the progress to date for each of the eight (8) major sections of the Agreement and identify work that remains to be done by the City and PPB. The reader should not assume, however, that this summary covers all changes required in the Settlement Agreement and therefore, should refer to the full report for additional details and explanations of our assessments.

## III. Use of Force

In the third and fourth quarter of 2016, PPB took substantial steps toward finalizing a revised version of Directive 1010.00 (Use of Force). As part of the revisions, Directive 1010.00 combines previous PPB directives 940.00 (After Action Reports), 1020.00 (Firearms), 1025.00 (Police Operations at TSA-Governed Airport Facilities), 1030.00 (Baton Use), 1035.00 (Ballistic Shields), 1040.00 (Aerosol Restraints), 1050.00 (Less Lethal Weapons and Munitions), 1051.00 (Electronic Control Weapon System), and 1090.00 (Special Weapons Use).   Rather than retain separate policies for all potential force options, PPB combined them into a single directive along with supervisor responsibilities following a force event.  The revised 1010.00 includes comments and recommendations from a wide variety of sources, including PPB, DOJ, City Personnel, COAB, community members, and COCL.   Although a final version was not approved by the U.S. Department of Justice (DOJ) in the third and fourth quarter, we believe the proposed revisions of 1010.00 are an improvement over past policies.

The reporting of force by the Inspector continued to show improvement during the third and fourth quarter, though progress is still needed in some areas. For example, although the quarterly force summary reports have become more efficient, they still do not identify trends that would assist in crafting training and determining officer/group/environmental differences in force events. We believe the expansion of the Force Audit in 2017 (what can be referred to as "Phase II") will help facilitate the identification of trends and how they may best be addressed. In the fourth quarter of 2016, we discussed implementing Phase II of the Force Audit with PPB, which involves moving some of PPB's auditing attention away from the question of whether force reports are being completed fully and accurately to the question of whether force decisions were justified and within policy and law. As of this report, PPB performs Phase I evaluation on ALL use of force events.  When moving to Phase II, we have agreed with PPB that a stratified sampling methodology (20% of force events) for both Phase I and Phase II is adequate to be confident in the results.  However, PPB will still engage in Phase I review with the 20% sample.  Phase II includes measures to systematically assess the reasonableness of force events and will identify implications for training and policy. Further consultation will be conducted in the first quarter of 2017, including the joint review of cases to ensure reliability of the review process.

## IV. Training

In the third and fourth quarter of 2016, PPB implemented a number of changes that were responsive to recommendations we have made in the past. For instance, PPB expanded their evaluative measures for training, including some competency-based evaluations. We maintain that further evaluation methods are needed to ensure that officers are demonstrating competence in specific areas of training and thus we have provided PPB with guidance on additional evaluation strategies. We believe that the Needs Assessment created by PPB is responsive to the Settlement Agreement, though urge them to revise the format to remove the siloed structure. The Needs Assessment should also be enhanced to include a plan of action for each identified training need.

We observed the 2016 In-Service and Supervisor In-Service and were impressed with the overall structure and delivery of the trainings. One aspect of training which we found particularly encouraging was a scenario-based exercise to reinforce the idea that not all community members pose a danger to officers. PPB also provided a four-hour block of Equity training that allowed officers to hear the perspectives of community members who belong to groups that have experienced historic tensions with the police. These aspects of training are certainly consistent with the concepts of respectful policing and community engagement that we have emphasized in the past, although we continue to recommend more direct and integrated coverage of procedural justice and related concepts. We also noted a consistent emphasis on PPB's use of force policy and the Graham standard. This emphasis was refreshing as it demonstrated to officers the numerous considerations that should be taken into account prior to using force.

We noted several occasions during the training where the message was communicated, either implicitly or explicitly, that the changes to training and policy were required by the Department of Justice or the Settlement Agreement. We maintain that this messaging does a disservice to the Bureau because policy, training and organizational changes are less likely to take root when attributed to an outside source. PPB should reinforce that changes are being made because the Bureau wants to hold itself to the highest standards.

Finally, we urge PPB to obtain a Learning Management System (LMS) as expediently as possible. An LMS will allow PPB to better document training provided and received, as well as allow PPB to see areas where training has succeeded or may need to be revised. PPB made progress in securing a new LMS in the third and fourth quarter of 2016, though it has yet to be implemented.

## V. Community-Based Mental Health Services

The quality of community-based mental health services is not within the control of the City and PPB. However, PPB and the City have shown a desire to proactively participate in enhancing mental health services within the city of Portland, Multnomah County, and the State of Oregon. Working with other community groups and organizations, there has been significant progress in opening the Unity Center, a Psychiatric Emergency Services (PES) center. The Unity Center is slated to open during the first quarter of 2017, and in preparation, PPB has finalized directives to instruct officers on procedures for facilitating transportation to the PES. Additionally, the Service Coordination Team (SCT) joined the State Behavioral Health Collaborative Team, a group whose purpose is to provide a coordinated response to community

Exhibit B
Pg. 7 of 124

mental health issues. We believe PPB and the City have substantially complied with Section V to the extent that can be reasonably expected.

## VI. Crisis Intervention

PPB has created the framework for the mental health response teams required in the Settlement Agreement. We have been impressed by the work of the BHUAC in reviewing PPB policies, training, and Standard Operating Procedures (SOPs), making recommendations, and soliciting feedback for improved operation. PPB also does a reasonably good job of collecting data related to Enhanced Crisis Intervention Team (ECIT) calls, the Behavioral Health Response Team (BHRT), and the Service Coordination Team (SCT). However, the Mental Health Mask (MHM) used by PPB to document interactions with a mental health component is being revised to comply with concerns related to discoverability in criminal cases. Thus, PPB is currently in the process of creating a system of data capture that will allow for a better understanding of ECIT interactions (as well as non-ECIT interactions that have a mental health component).

The work of BHRT and SCT continues to be consistent with the letter and intent of the Settlement Agreement. PPB continues to operate with a modified Memphis model but has yet to produce data to demonstrate its effectiveness and responsiveness to the Portland community. We provided PPB with an evaluation plan to address questions related the frequency of mental health calls, the adequacy of ECIT capacity across Precincts and shifts, outcomes for mental health calls, and differences in outcomes between ECIT and CIT officers. As the modified Memphis model received provisional approval from DOJ and COCL, PPB should use the data currently available to provide an evaluation. This will require data from the revised MHM, which we believe will be operational in the second quarter of 2017.

We observed the CIT training provided by the Bureau of Emergency Communications (BOEC) to their employees. Although we found the training to include revised protocols for triaging calls related to mental illness, we identified a number of issues with the training that we believe should be addressed by BOEC. For instance, the training could have benefited from more subject matter experts, more consistent information across trainings, better role-play exercises, and better engagement of trainees in the scenarios. We expect these issues will be addressed when BOEC provides supplemental training in the second quarter of 2017 as well as when this training is provided to new hires.

## VII. Employee Information System

The procedure of identifying, selecting, and intervening with potentially problematic officers using the Employee Information System (EIS) requires a substantial overhaul. Presently, PPB does not use the capabilities of EIS to identify at-risk employees, nor does the system assess conduct at the supervisor, team, or unit level (Pars. 116-117). Our prior consultation with PPB on ways to enhance EIS has been met with resistance from EIS administrators. Also, while PPB has complied with the thresholds included in the Settlement Agreement, we maintain that if PPB wants an EIS that will be useful to the organization, it should go beyond the required thresholds to include identifiers more likely to flag officers who would benefit from intervention. To assist PPB in this respect, we recommended they implement the SARA model of problem solving as a heuristic device. In a TA Statement provided to PPB, we explained how each step of the SARA model (Scanning, Analysis, Response, and Assessment) could be executed, using EIS

initiatives from other law enforcement agencies as examples. We acknowledge that EIS is still in the early stages of development in the field, but argue that enough is known for PPB to overhaul its EIS program and show significant progress in 2017.

## VIII. Officer Accountability

Although the City continues to work on officer accountability, little progress has been made in revising the accountability process to respond to the 180-day timeline and enable meaningful independent investigations by the Independent Police Review (IPR). An accountability plan was discussed at a town-hall forum, though was ultimately rejected due to community concerns. A subsequent plan from the Auditor was delivered to City Council in the third quarter of 2016, though, again, due to community objections to the plan, no vote on the matter was taken. During the fourth quarter of 2016, a workgroup discussed specific aspects of the accountability process, though the topics discussed were a small portion of the overall proposed changes. The City and PPB have been slow in making important changes and we urge them to propose and implement systematic changes with more expediency.

We reviewed the officer-involved shooting (OIS) which occurred in the fourth quarter of 2016. We maintain that PPB satisfied the requirements of the Settlement Agreement in general, but we continue to note a lack of consistency in how witness officers are identified. We found one officer who we believe should have been considered a witness officer due to his/her vast first-hand knowledge of the event despite not seeing the exact moment of lethal force. Aside from this concern, we note that involved/witness officers were separated in an immediate fashion and Communication Restriction Orders (CROs) were issued as quickly as could be expected.

Work still remains on the issues of *Garrity* and whether an officer may be ordered to provide a public safety statement. Regardless of whether an officer may be compelled to give a public safety statement after an officer-involved shooting (OIS), we recommend volunteer safety statements be encouraged by PPB. We also report that the 48-hour rule has been removed from PPB policy, which is a positive step in response to community concerns. We urge PPB to compel officer statements as soon as reasonable in the context of the investigation.

Complaints of allegations against PPB officers were, on the whole, dealt with in a manner consistent with the Settlement Agreement. We reviewed one case stemming from a finding of liability against PPB and found that PPB did not review all potential violations of policy and does not currently have the systems in place to do so. Finally, although IPR accepts and tracks complaints against PPB members, we believe the process would benefit from a complaint submission survey that queries complainants about their satisfaction with the process. We have opened a discussion of this matter with IPR and the City Auditor.

## IX. Community Engagement and Creation of Community Oversight Advisory Board

In the third and fourth quarter of 2016, the Community Oversight Advisory Board (COAB) was placed on a two-month recess by the City for the purposes of strengthening the community engagement process. In October of 2016, the recess ended, although a finalized community engagement plan—and possible related amendments to the Settlement Agreement—was not created. Work on a revised plan continued

through the end of the fourth quarter of 2016 as well as into the first quarter of 2017 with the support of a facilitator. In the absence of a revised plan for COAB 2.0, there exists no structured group of community members that can execute the community aspects of the Settlement Agreement, i.e., contribute to a finalized Community Engagement and Outreach (CEO) Plan, develop outreach and policing programs, consult on data collection efforts, develop community engagement and outreach metrics, meet with the police representatives, make recommendations regarding implementation of the Settlement Agreement, and act as an avenue for community members to provide feedback on COCL's semi-annual assessments of compliance (Par. 163). Members of the COAB felt that their recommendations were not being adequately considered by the parties and some members felt distrustful towards the COCL as their Chair. We continued to chair COAB meetings during the third and fourth quarter of 2016, as required by the Settlement Agreement, though both entities agreed that they should operate independently.

We maintain that community engagement in this process is of vital importance. The COAB was a new type of board as it relates to consent decrees and settlement agreements. Although issues between the COCL, the Parties, COAB members, and the community ultimately hindered the functioning of the board, community input into the Settlement Agreement should not be lost and Portland should learn from these lessons. We await the City's revised proposal so that community input may resume, and we encourage other stakeholders to work collaboratively with the City to ensure this outcome.

# III. USE OF FORCE

## A. Use of Force Policy

**Settlement Agreement Paragraph**

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. <u>COCL Summary</u>: Paragraph 67 establishes that the PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the subject, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Engaged in 1010.00 policy review with City, PPB, and DOJ |

**Compliance Assessment**

　　In October of 2016 and again in December of 2016, the City, PPB, DOJ, and COCL engaged in discussions of Directives 1010.00 (Use of Force), 1010.10 (Lethal Force), and 940.00 (After Action Reports) (among others). These discussions were held across multiple days in each month and allowed for face-to-face deliberation between the groups. During these discussions, the recommendations of the COAB and other community members were also raised, discussed, and where appropriate, incorporated into the respective directives. DOJ has agreed to provide feedback to the COAB regarding how their recommendations were incorporated.

　　We also take this opportunity to address community member concerns regarding the timeliness of policy review and revision. Particularly with Directive 1010.00 (the primary use of force policy), the discussions between the City, PPB, DOJ, and COCL were extensive and required approximately 4 draft revisions, with each draft requiring everyone to review and provide comments and critiques. After each set of revisions, PPB reconciled the comments/critiques, made changes where appropriate, and provided clarification elsewhere. Thus, the first draft of the revised directive (which combines many directives related to force) was sent to DOJ and COCL in mid-October. After meeting in October and making revisions, drafts went back and forth between the entities with an average of approximately 2-3 weeks for DOJ and COCL to review the drafts, send comments, have PPB consider comments, make revisions, and send a revised draft back to DOJ and COCL for further review.

Although a finalized version of 1010.00 was not approved prior to the end of Q4, the overall form and content of the directive were drafted by the end of 2016. A subsequent meeting occurred in January of 2017 to resolve minor concerns. Based on the changes to Directive 1010.00 we observed in the 3rd and 4th quarter of 2016, we believe the directive sufficiently meets the requirements of Pars. 66 and 67. However, the final version must still be unconditionally approved by DOJ. Therefore, we will await a final version before considering PPB to be in Substantial Compliance with these two paragraphs.

We wish to note the significant change in PPB's level of commitment to the policy review process, not only related to 1010.00 but for all policy reviews. PPB has devoted a team of policy experts, legal counsel, and subject matter experts to each of the directives that we have reviewed. We have been impressed with the review team's competence and diligence in responding to our comments and providing legal and tactical clarification where needed.

We believe the policy has been updated to reflect the requirements of the Settlement Agreement.  However, PPB still has an obligation to train to the policy and ensure that officers and supervisors adhere to the policy.  For our assessment of this paragraph, we only look to whether the policy has been revised.  For PPB's obligation to train on policies, the reader should refer to our assessment of Par. 84 ("All training that PPB provides shall conform to PPB's current policies at the time of training.") as well as Par. 80 ("PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training…").  For PPB's obligation to evaluate adherence, the reader should refer to our assessment of Pars. 74, 75, and 77 (auditing force reports, After Action Reports, and chain-of-command reviews).

| COCL Recommendations | • Obtain final DOJ approval for Directive 1010.00 |
|---|---|
| **Assessment Rating Based On** | • COCL review of proposed Directive 1010.00 |

## 1. Electronic Control Weapons

| **Settlement Agreement Paragraph** |
|---|
| 68. <u>COCL Summary</u>: The PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement). |

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Engaged in 1010.00 policy review with City, PPB, and DOJ |

### Compliance Assessment

Directive 1051.00 was combined with Directive 1010.00 as PPB desired to have 1010.00 viewed as a "one-stop-shop" for all policies related to force. Thus, Directive 1051.00 will no longer exist and its instruction to officers will be transferred to Directive 1010.00. Directive 1010.00 now includes a section directing officers on when they may and may not employ a Conducted Electrical Weapon (CEW)* and the requirements of officers before, during, and after the use of a CEW. The section of 1010.00 which deals with CEW was also subject to the face-to-face meetings between COCL, the City, PPB, and DOJ in October and December of 2016 and, as such, was reviewed for its adherence to the requirements of Par. 68 and best practices. These discussions also considered recommendations provided by the COAB and other community members and where appropriate, such recommendations were incorporated.

Based on the agreement between the Parties during our meetings, we believe the requirements of Par. 68 have been satisfactorily met. However, as with our assessment of Pars. 66 and 67, we will await DOJ final approval before ascribing Substantial Compliance with this paragraph.

We believe the policy has been updated to reflect the requirements of the Settlement Agreement. However, as noted with our assessment of Pars. 66 and 67, PPB still has an obligation to train to the policy and ensure that officers and supervisors adhere to the policy. For our assessment of this paragraph, we only look to whether the policy has been revised. For PPB's obligation to train on policies, the reader is again referred to our assessment of Par. 84 ("All training that PPB provides shall conform to PPB's current policies at the time of training.") and Par. 80 ("PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training…"). For PPB's obligation to evaluate adherence, the reader is referred to our assessment of Pars. 74, 75, and 77 (auditing force reports, After Action Reports, and chain-of-command reviews).

*PPB and the Settlement Agreement had previously used the term Electronic Control Weapon (ECW). As a response to subject matter expert opinion and recommendations from the community, Directive 1010.00 uses the term Conducted Electrical Weapon (CEW). This and future reports will use CEW to remain consistent with current PPB terminology.

| **COCL Recommendations** | • Obtain DOJ final approval for Directive 1010.00 |
| --- | --- |
| **Assessment Rating Based On** | • COCL review of previous proposed Directive 1010.00 |

2. Use of Force Reporting Policy and Use of Force Report

---

**Settlement Agreement Paragraph**

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Engaged in 1010.00 policy review with City, PPB, and DOJ |

**Compliance Assessment**

Reporting requirements for officer uses of force are found within Directive 1010.00. The section of 1010.00 that deals with reporting requirements was also subject to the face-to-face meetings between COCL, the City, PPB, and DOJ in October and December of 2016 and, as such, was reviewed for its adherence to the requirements of Par. 69 and best practices. These discussions also considered recommendations provided by the COAB and other community members and where appropriate, such recommendations were incorporated.

Based on the agreement between the Parties during our meetings, we believe the requirements of Par. 69 have been satisfactorily met. However, as with our assessment of previous paragraphs, we will await DOJ final approval before ascribing Substantial Compliance with this paragraph.

We believe the policy has been updated to reflect the requirements of the Settlement Agreement. However, PPB still has an obligation to train to the policy and ensure that officers and supervisors adhere to the policy. For our assessment of this paragraph, we only look to whether the policy has been revised. For PPB's obligation to train on policies, the reader is again referred to our assessment of Par. 84 ("All training that PPB provides shall conform to PPB's current policies at the time of training.") and Par. 80 ("PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training…"). For PPB's obligation to evaluate adherence, the reader is referred to our assessment of Pars. 74, 75, and 77 (auditing force reports, After Action Reports, and chain-of-command reviews).

| **COCL Recommendations** | • Obtain DOJ final approval for Directive 1010.00 |
|---|---|
| **Assessment Rating Based On** | • COCL review of proposed Directive 1010.00 |

Exhibit B
Pg. 14 of 124

3. Use of Force Supervisory Investigations and Reports

---

**Settlement Agreement Paragraph**

70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Engaged in 1010.00 policy review with City, PPB, and DOJ |

**Compliance Assessment**

The sections of Directive 940.00 that deal with supervisory responsibilities following a force event were combined with Directive 1010.00 as PPB desired to have 1010.00 cover all policies related to force. Thus, the requirements of Par. 70 will no longer be housed within Directive 940.00 and instruction to supervisors regarding their force review responsibilities will be transferred to Directive 1010.00. The section of 1010.00 that deals with supervisory responsibilities was also subject to the face-to-face meetings between COCL, the City, PPB, and DOJ in October and December of 2016 and, as such, was reviewed for its adherence to the requirements of Par. 70 and best practices. These discussions also considered recommendations provided by community members and where appropriate, such recommendations were incorporated.

We also feel it appropriate to provide an update to the issue of After Action Reports being required for all force events that we raised in our last Compliance Assessment. As part of the proposed Directive 1010.00, varying levels of force are identified which each having a corresponding level of review. For events that contain more than one force option, the most severe force option used would dictate the level of review associated with the event.

Category IV includes force that is "intended to establish control of a resistant subject, though not intended or reasonably likely to cause persistent pain or physical injury." For Category IV force, supervisors will be required to complete an abbreviated After Action Report and the After Action Report would be reviewed by the authoring supervisor's immediate supervisor (e.g. if a Sergeant authors the After Action, the supervising Lieutenant would perform the review. If a Lieutenant authors the After Action, the supervising Capt. would perform the review).

For Category III force ("Force that is reasonably likely to cause non-enduring pain, disorientation, physical injury, or the complaint of pain"), a longer-form After Action Report would be used and the review process would go up to and include the RU Manager.

For Category II force ("Force that is reasonably expected to cause enduring pain, physical injury, disability or impairment of any body part), the longer-form After Action Report would be used and the review process would go up to and include the Assistant Chief.

For Category I force, which would include lethal force and in-custody deaths, the City and DOJ have agreed to engage in further discussion regarding the review process. PPB and the City are of the position that since such force events already receive an investigation from the Detective Division, Internal Affairs (IA), and Independent Police Review (IPR), an After Action Report is duplicative. We will await the outcome of the discussion between the Parties related to this point.

Based on the agreement between the Parties during our meetings, we believe the requirements of Par. 70 have been satisfactorily met (pending the resolution of the Category I discussions). However, as with our assessment of previous paragraphs, we will await DOJ final approval before ascribing Substantial Compliance with this paragraph.

We believe the policy has been updated to reflect the requirements of the Settlement Agreement.  However, we again emphasize that PPB still has an obligation to train to the policy and ensure that officers and supervisors adhere to the policy.  For our assessment of this paragraph, we only look to whether the policy has been revised.  For PPB's obligation to train on policies, the reader is referred to our assessment of Par. 84 ("All training that PPB provides shall conform to PPB's current policies at the time of training.") and Par. 80 ("PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training…").  For PPB's obligation to evaluate adherence, the reader is referred to our assessment of Pars. 74, 75, and 77 (auditing force reports, After Action Reports, and chain-of-command reviews).

| **COCL Recommendations** | • Obtain DOJ final approval for Directive 1010.00 |
|---|---|
| **Assessment Rating Based On** | • COCL review of Directive 1010.00 |

---

**Settlement Agreement Paragraph**

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed authorized and actual sergeants |

**Compliance Assessment**

As of December 31, 2016, PPB documentation shows a shortage of actual ranked sergeants in each of the three Precincts compared with the number of authorized sergeants, though the current sergeant staffing level is not lower than minimally required by Par. 71. In total, there are ten fewer sergeants in rank than currently authorized. A sergeant's exam was conducted in the first quarter of 2017 to address this deficiency and we expect that the shortage will be resolved soon afterwards. PPB also indicates that acting sergeants are utilized to maintain sufficient supervision at all times. While this is an acceptable short-term solution, we recommend PPB continue to evaluate the need for ranked sergeants and train where necessary.

We further recommend PPB resume the documentation of span of control rather than the raw numbers of sergeants. Span of control is a ratio of officers to sergeants and provides better insight into staffing levels than raw numbers. The number of sergeants alone is insufficient without an understanding of how many officers they are tasked with supervising (with too many officers, a sergeant cannot give adequate attention to each; with too few officers, a supervisor's resources are not being used efficiently). Generally, an acceptable span of control is 8 officers per every 1 supervisor (though individual agencies and circumstances may differ). PPB had provided this to us in the past and we believe span of control is a more appropriate indicator of "adequate patrol supervision staffing."

| | |
|---|---|
| **COCL Recommendations** | • Evaluate need for ranked sergeants and train where necessary<br>• Resume monitoring and reporting span of control |
| **Assessment Rating Based On** | • COCL review of number of authorized and actual sergeants |

**Settlement Agreement Paragraph**

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed Supervisor Checklist |

**Compliance Assessment**

The After Action Report required of supervisors following a force event has been converted to an interactive PDF that queries supervisors on whether they have satisfactorily completed of all their force investigation responsibilities. The interactive PDF thus acts as the "supervisor investigation checklist" required by the paragraph. As it would not be possible for a supervisor to adequately complete the After Action Report without responding to each of their

responsibilities, we believe the PDF is sufficient to act as a checklist. Furthermore, rather than "checking the box" (as would be the case with a checklist), the interactive PDF requires supervisors to provide the detailed information for each checklist item.

As this is related to Directive 1010.00, we will await DOJ final approval before ascribing Substantial Compliance with this paragraph.

We believe the policy has been updated to reflect the requirements of the Settlement Agreement. However, again, PPB still has an obligation to train to the policy and ensure that officers and supervisors adhere to the policy. For our assessment of this paragraph, we only look to whether the policy has been revised. For PPB's obligation to train on policies, the reader is referred to our assessment of Par. 84 ("All training that PPB provides shall conform to PPB's current policies at the time of training.") and Par. 80 ("PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training…"). For PPB's obligation to evaluate adherence, the reader is referred to our assessment of Pars. 74, 75, and 77 (auditing force reports, After Action Reports, and chain-of-command reviews).

| **COCL Recommendations** | • Obtain DOJ final approval for Directive 1010.00 |
|---|---|
| **Assessment Rating Based On** | • COCL review of Supervisor Checklist<br>• COCL discussions with PPB |

**Settlement Agreement Paragraph**

73. <u>COCL Summary:</u> Paragraph 73 directs the PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removal from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Engaged in 1010.00 policy review with City, PPB, and DOJ |

**Compliance Assessment**

The sections of Directive 940.00 that deal with After Action Report chain-of-command reviews were combined with Directive 1010.00 as PPB desired to have 1010.00 cover all policies related to force. Thus, the requirements of Par. 73 will no longer be housed within Directive 940.00 and instruction to command staff regarding their After Action Report review responsibilities will be transferred to Directive 1010.00. The section of 1010.00 that deals with After Action Report chain-of-command reviews was also subject to the face-to-face meetings between COCL, the City, PPB, and DOJ in October and December of 2016 and, as such, was reviewed for its adherence to the requirements of Par. 73 and best practices. These discussions also considered recommendations provided by community members and where appropriate, such recommendations were incorporated.

As discussed in our evaluation of Par. 70, the final level for chain-of-command reviews is determined by the highest category of force associated with the event. For more serious force types, there are more individuals in the chain-of-command reviews. However, regardless of what category the force falls into, the requirements of Par. 73 apply to all individuals in the chain-of-command.

Based on the agreement between the Parties during our meetings, we believe the requirements of Par. 73 have been satisfactorily met. However, as with our assessment of previous paragraphs, we will await DOJ final approval before ascribing Substantial Compliance with this paragraph.

We believe the policy has been updated to reflect the requirements of the Settlement Agreement. However, PPB still has an obligation to train to the policy and ensure that officers and supervisors adhere to the policy. For our assessment of this paragraph, we only look to whether the policy has been revised. For PPB's obligation to train on policies, the reader is referred to our assessment of Par. 84 ("All training that PPB provides shall conform to PPB's current policies at the time of training.") and Par. 80 ("PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training…"). For PPB's obligation to evaluate adherence, the reader is referred to our

| | |
|---|---|
| assessment of Pars. 74, 75, and 77 (auditing force reports, After Action Reports, and chain-of-command reviews). | |
| **COCL Recommendations** | • Obtain DOJ final approval for Directive 1010.00 |
| **Assessment Rating Based On** | • COCL review of Directive 1010.00 |

**B. Compliance Audits Related to Use of Force**

---

**Settlement Agreement Paragraph**

74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors <u>at all levels in the chain of command</u> are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement.)

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed process for force audit; Provided proposals for next phase of force audit |

## Compliance Assessment

PPB continues to make significant progress regarding the force audits required by Pars. 74, 75, and 77. They have implemented a system for reviewing force reports in order to ensure that all necessary information is included, as well as reviewing supervisory reviews. We refer to this as "Phase I" of the force audit. PPB has demonstrated initiative by creating a force audit that is responsive to the informational needs of the organization and, where needed, has consulted with us as required by the Settlement Agreement. After implementation of Phase I of the Force Audit, PPB consulted with us on the requirements of Phase II (described below), though this will require continued discussion during the first and second quarter of 2017.

Given that the auditing system was tested by using all force events, that strategy is no longer necessary to maintain the system and drains resources from other important auditing tasks. Hence, in December of 2016, the COCL provided PPB with a proposed methodology for stratifying cases across force categories as well as by Precinct and shift.  In our proposal, we recommended PPB sample 20% of force events.  As we recommended a stratified sample, we asked PPB to examine the distribution of force across (1) force types, (2) Precincts, and (3) shifts. By ensuring that the distribution of the sampled cases is reflective of the distribution of ALL force events, PPB can be more confident that the findings are representative of the whole.  For example, if PPB finds that in Central Precinct during Shift A, 50% of *all* force events are Pointing of a Firearm, they should check to see that roughly 50% of the *sampled* cases for Central Precinct during Shift A are Pointing of a Firearm.  That way, the sampled cases are an accurate reflection of the PPB's use of force events.

At the same time, COCL provided PPB with a proposed expansion of Force Audit variables to be collected that better identify problematic (though perhaps technically in-policy) uses of force behaviors that may have training implications, officers who may benefit from supplemental instruction, and trends across units and supervisors. This expansion of variables pertains to what we call "Phase II" of the force audit, wherein the PPB audit extends beyond an assessment of whether force reports contain the necessary information to drawing conclusions about whether the force used was necessary and appropriate to the circumstances. In essence, Phase II requires

the independent evaluation of force events by the Inspector to determine whether the force was justified. We have been informed that the Inspector already conducts these evaluations informally, though we have not seen any evidence of a systematic audit that is consistent with our recommendations for Phase II. The evaluations performed by the Inspector should be systematically completed, using known standards, and carefully documented so that we can be confident the results are reliable and valid across cases.

While the proposed documents we provided were briefly discussed in December, the larger priority at that time was finalizing Directive 1010.00 so that force audits and force training could be consistent with policy. More in-depth discussions regarding our proposals are slated for the first and second quarter of 2017 and thus we will provide more details in our next report.

Upon finalizing a stratification sampling methodology and agreeing to a final set of elements to be reviewed, the COCL will review a sample of force audit findings to verify that the coding of cases is occurring in a consistent manner. The joint review will eventually determine whether the COCL and the Inspector have independently reached the same conclusion about the justifiability of force and whether we both identify the implications of that decision for PPB's corrective actions.

Quarterly, PPB has prepared a Force Audit Report, identifying compliance rates for each of the subsections of Pars. 74, 75, and 77. For this report, we use PPB's Q3 Force Audit Report to identify areas of success and concern.

Of note, PPB reports that many of the requirements in Pars. 74, 75, and 77 show fairly high compliance rates (90% or higher). In other areas, there is substantial improvement that that should be continued. For instance, the Force Audit Report indicates that in approximately 70% of force events, the force options (e.g. takedowns, pointing of a firearm, etc.) identified by the officer were consistent with the force options identified by supervisors. Although this is a drastic improvement over previous reviews, it still leaves nearly 30% of cases with inconsistencies. In another section of the report, PPB states that 80% of officers included their efforts to document witness observations, a significant improvement from Q2 (53% compliance). This is a sizeable gain in compliance, but one in every five force events are still missing efforts to document witness observations. For each of these areas, PPB should be credited with improvements, but work remains to be done. PPB has a process in place to identify discrepancies, make EIS entries, and resolve issues. With this process in place, we believe the number of discrepancies will continue to be reduced in the future.

In other areas, there is incomplete information. For instance, PPB notes that 5 officers failed to complete a Force Data Collection Report (FDCR) for a force event and that "after receiving instruction from their chain of command regarding the missing FDCRs, 4 of the missing FDCRs were submitted." PPB does not comment on the fact that this still leaves one FDCR missing. The reason for the missing FDCR and the follow-up steps taken should be reported.

In some cases, the reporting is confusing as to the findings. For instance, PPB notes "In 82% of AARs audited officer reporting was found to be a complete and accurate account of the force decision making by investigating sergeants. In 6 cases (7%) the sergeant found that the officer's reports were not complete and accurate accounts of the force decision making." This appears to only represent 89% of cases, leaving the reader to question whether the other 11% of cases were complete and accurate accounts of the force decision making.

We continue to maintain that the Force Audit Reports need to go beyond reporting "checkbox" compliance (i.e. whether the information is merely present) and extend to whether it is accurate in the eyes of the Inspector. For instance, FDCRs are required to indicate the level of resistance put forth by the subject. As DOJ has pointed out in their report and as we have seen in our review of force events, the stated level of resistance in officer reports isn't always supported by the rest of the narrative. The Inspector must be able to look at whether the resistance level is included in the narrative as well as determine whether other facts within the narrative support the stated resistance level.

This evaluative process will be reinforced during the implementation of Phase II of the Force Audit. There, cases will be reviewed for the totality of the circumstances, including Graham factors, START-IT (see PPB Directive 1010.00), and the four phases of police-citizen encounters identified by Binder & Scharf (1980). The details collected during Phase I of the Force Audit will be examined and incorporated into the overall review of the event. We met with PPB during the fourth quarter of 2016 to begin consultation on Phase II, and additional meetings occurred in the first quarter of 2017. We have agreed with PPB to review five cases in accordance with the evaluative focus of Phase II and determine the degree of correspondence between our independent evaluations.

Additionally, the Force Audit Report contains data that are responsive to the identification of trends required by Par. 76. For instance, PPB provides a comparison of force options used for each precinct/division in the Force Audit Report. The Force Audit also compares data to past quarters in some instances. PPB should be commended for evaluating trends in these instances. These are the types of analyses that we feel are missing in the Quarterly Summary Force Reports.

As a final note regarding the Force Audit, we see in this domain of reform (as in other domains such as training and evaluation) continued references to the Settlement Agreement as the driving force behind change. For instance, the very first line of the Force Audit Report states, "This audit was created to satisfy the Department of Justice's requirement for presentation and analysis of the data capture on officers' use of force." In another section of the report, it states, "The Department of Justice's (DOJ) Settlement Agreement (SA) requires that officers consistently choose force options reasonably calculated to establish and maintain control with the least amount of appropriate force when compared to the subject's resistance." We maintain that these continued references to DOJ requirements are inconsistent with the larger goal of achieving sustained change within the PPB regarding use of force on the streets. Considering that less than 20% of officers believe the Settlement Agreement will improve the PPB (see our November 2016 Outcomes Assessment), explicit statements that the Force Audit is meant to respond to the Agreement may cause officers to dismiss the Audit's importance. The Force Audit is being conducted by the PPB for the benefit of PPB. PPB is the entity that requires officers to choose reasonable force options and we encourage the Inspector's office and the administration to serve as a model of how ownership over reform is achieved.

| **COCL Recommendations** | • Provide response to COCL's proposals to expand the force audit variables |
|---|---|
| | • Initiate evaluative process for force events (Phase II) |

| | • Remove unnecessary references to Department of Justice and/or Settlement Agreement |
|---|---|
| **Assessment Rating Based On** | • Implementation of initial phase of force audit<br>• Initial discussions to implement Phase II |

### Settlement Agreement Paragraph

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Quarterly Force Reports; Met with Inspector and Analysis Team |

### Compliance Assessment

In the fourth quarter of 2016, PPB issued a condensed version of their Force Data Summary Reports, making the reports more readable and less cumbersome. We support the changes that PPB has made to date and believe they allow PPB to better address the requirements of Par. 76. Although the contents of the report still require PPB to expound upon the implications, the report represents an improvement over the 40+ page reports previously issued by PPB.

Using the quarterly force summary reports, PPB is required to "determine whether significant trends exist" (subsection a). In the Q4 summary report, PPB includes a number of data points that are useful for determining trends. For example, the "heat maps" indicate Precincts and shifts with higher and lower number of force events. Trends are not possible to observe over a single report, and therefore, we recommend that PPB look at potential trends over multiple reports. For instance, we notice that East Precinct on Tuesday between 6:00 PM and midnight has had higher numbers of force incident in each of the last three reports. In order to make the quarterly force summary reports complete, a discussion about this trend would be beneficial. For instance, are crime rates higher in this day/time/Precinct combination? Are there other situational factors that may explain the higher numbers of force event (e.g. higher number of armed suspects in this combination)? Are there potential supervisor factors? The purpose of such discussions is not to determine the reasonableness of each force event (that is the function of the Force Audit). Rather, the purpose is to identify the trend, seek to explain it, and if necessary, identify potential ways to remedy it. This should also be done in coordination with the area commanders and supervisors.

PPB has also indicated that there will always be a day/time/Precinct that has more force events than other. We agree and understand that by the sheer presence of variance in any dataset, one will always be higher than the rest. However, the point of trend discussion is to *reduce* force events where possible and to first recognize that these differences do have causes that may or may not be controllable.

PPB has other areas within the Q4 report that lend themselves to trend analysis. For instance, we note that in 57% of force events in Q4, the suspect had a firearm pointed at them. This represents an increase from Q3 (47%), Q2 (49%), and Q1 (49%). The increase in pointing of a firearm, to the point that more than half of all force events include pointing of a firearm, warrants a review. This trend may be the result of improved reporting by officers rather than a change in force events, but that is unclear. Any analysis by PPB should seek potential explanations for the trend and ways to reduce the occurrences where appropriate.

To some degree, the annual reports provide an analysis of trends over a year timeframe, though no commentary is made on the trends as to potential reasons. For instance, the "perspectives" section includes commentary on the gross number of force types over the entire year. However, there is no commentary on noticeable changes in force types over the various quarters (see for instance, Pointing of a Firearm). As with the quarterly reports, the annual report should comment on the trends and provide some commentary.

Subsection (b) of Par. 76 requires PPB to "determine if there is variation in force practice away from PPB policy in any unit." Currently, PPB's quarterly summary reports do not perform this function. However, we believe Phase II of the Force Audit will be helpful in making such determinations, particularly the category of "justified but concerning." Despite community beliefs, PPB does not have so many out-of-policy force events that trends would be easily identifiable if at all. Thus, more informative would be whether there are trends in "concerning" uses of force that may still be considered in-policy. During Phase II of the Force Audit, we will ask PPB to categorize the implications of concerning force events (policy, training, tactical, etc.). Should trends be seen across different units, precincts, and supervisors, then the PPB can be confident that there is an organization-wide need for action. However, should training implications be localized (i.e. one Precinct/shift having more training implications), then additional training or other responses may be needed in that area. We recommend PPB work with us to implement Phase II so that subsection (b) might be addressed.

Subsections (c) of Par. 76 requires PPB to "determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate." As it relates to "any officer" or "group of officers," we suggest the Inspector work with the Employee Information System (EIS) administrators in accordance with our recommendations in that regard. With EIS, we have recommended they not only look at the current thresholds, but review officers who have the highest rates of force/complaints over a particular timeline. This is one area where PPB may escape the "silo mentality" we have discussed in the past. This may also inform whether "groups of officers" use force more often if the same officers continue to be identified in the data. As to "PPB units," we believe the heat maps described above could be used to help identify trends, though require more discussion to "determine the reason for any difference and correct or duplicate elsewhere."

We also suggest PPB look at the statement "or duplicate elsewhere." PPB should not only comment on areas with higher levels of force but also areas/trends that demonstrate lower levels of force. What environmental, tactical, supervisory (etc.) considerations may have contributed to those areas having lower numbers of force and how might that knowledge be applied to other units? As an example, we note that in the first, second, and third quarters of 2016, the call type "Disturbance – Priority" was consistently the most common call type associated with force events. In all three of those quarters, the "Disturbance – Priority" had at least twice as many force events as the next highest call type ("Traffic Stop"). However, in the fourth quarter of 2016, the number of force events associated with "Disturbance – Priority" substantially dropped to be equal to that of "Traffic Stop" (force events associated with traffic stops remain constant over the same four-quarter period). PPB might look at potential reasons for the drop in the number of force events associated with "Disturbance – Priority" and attempt to replicate the change, where possible, with other call types.

Subsection (d) of Par. 76 requires PPB to "identify and correct deficiencies revealed by the analysis." This requirement calls back to our above recommendations – what are the reasons for the trends and what are potential ways to address them? Thus, we have no specific recommendations for satisfying this subsection other than referring PPB to the statements we have made above. Similarly, subsection (e) of Par. 76 ("document the Inspector's findings in an annual public report") requires PPB to combine findings, trends, and resolutions from the quarterly reports into an overall annual report. PPB has yet to do this, though we recommend the changes we have identified above occur prior to issuing an annual report. Should PPB make the above stated changes, such actions would contribute significantly to the completion of a comprehensive report at the end of 2017.

| COCL Recommendations | • Comment on trends over time and make suggestions for correcting/duplicating elsewhere<br>• Incorporate aspects of Force Audit and EIS into quarterly reports |
|---|---|
| Assessment Rating Based On | • COCL review of quarterly Force Data Summary Reports<br>• COCL discussions with Inspector and analysis team |

# IV. TRAINING

### Settlement Agreement Paragraph

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.

| Compliance Label | Not Yet Assessed |
|---|---|
| Methodology | N/A – Summative and contingent upon satisfying paragraphs below |

### Compliance Assessment

As stated in paragraph 78, to achieve the defined outcomes, the PPB shall "implement the requirements below." As this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, training.

We interpret "All aspects of PPB training" to include ECIT, Advanced Academy, In-Service, and Supervisor In-Service. The available evidence suggests that PPB is making a genuine effort to improve these major training programs. We cannot provide a summative judgment on Par. 78 until we have documents indicating that "all aspects of PPB training" conform to the "requirements below."

We will evaluate training progress in terms of both the implementation conditions described below and the achievement of outcomes listed in paragraph 78, namely, the constitutional treatment of individuals who have or are perceived to have mental illness, the building of community partnerships, the increase of public trust, and the increase of public safety.

| COCL Recommendations | • Substantially comply with all paragraphs within Section IV – Training<br>• Ensure that the requirements found in Section IV are applied to "all aspects of PPB training" as defined above |
|---|---|
| Assessment Rating Based On | • N/A – Summative and contingent upon satisfying paragraphs below and achieving the outcomes listed in paragraph 78. |

**Settlement Agreement Paragraph**

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed 2016 Training Needs Assessment |

**Compliance Assessment**

In October of 2016, PPB released the *2016 Annual Training Needs Assessment*, utilizing input from training evaluations, supervisors, various data sources, IPR, IA, legal sources, trainings, conferences, agency visits, community, and DOJ/COCL technical assistance. In all, we believe PPB is utilizing a wide range of sources that will ultimately reflect where training can be improved. Further to this, in some areas of the Needs Assessment, a course of action is specified for the identified need. We continue to believe that PPB is taking the requirement of a Needs Assessment seriously based on the 2016 report.

However, there are still some issues that we identified in our TA Statement on the Needs Assessment that remain in the 2016 Needs Assessment. One of the issues relates to assessments of learning. The 2016 Needs Assessment utilized evaluation tools from the 2015 In-Service and ECIT training. We have critiqued those tools in previous reports though note that PPB improved their evaluation tools in 2016. As such, we expect the improved tools will be incorporated in future Needs Assessments appropriately.

We continue to question the utility of separating out the sources of information found in Par. 79 (subsections a-k) with the "five core law enforcement disciplines" identified by PPB rather than incorporating subsections a-k into the five core disciplines. For example, in nearly all of the a-k subsections of the Needs Assessment, we identified needs that would be considered "Defensive Tactics." However, rather than all needs being located in the Defensive Tactics section, they are separated out, requiring PPB training personnel to look in multiple areas when crafting a training plan. Furthermore, segregating sources from the five disciplines only reinforces the mentality that PPB instructors are obliged to consult them rather than incorporate them into lesson plans. By integrating the sources into each of the disciplines, PPB can send the message that officers, supervisors, community members, and other sources are partners in identifying patrol tactic needs, defensive tactic needs (and so on). We recommend PPB continue to utilize the five core disciplines and incorporate each source of information into them.

We also notice inconsistency when it comes to identifying the specific need and indicating a plan of action for each. For instance, the section "Trends in Hazards Officers are Encountering in Performing Their Duties" lists the specific training topic, the year it was

suggested, and a notes section that indicates a potential plan of action. This format is also found for sections "Changes in Oregon and Federal Law," "Changes in PPB Policy," "Professional Standards List of Open Tasks Assigned to Training Division," "Individual Precinct Needs," and "Research Reflecting Best Practices and Latest in Law Enforcement Trends." This format is informative for the reader as it makes sure that PPB is responding to training needs rather than simply listing them. However, other sections do not suggest a plan of action, but only that the needs exist. We recommend PPB provide a preliminary plan of action for each training need that is being identified.

| COCL Recommendations | • Incorporate subsections a-k into the five core disciplines rather than separating them out<br>• Identify needs and indicate preliminary plan of action for each section |
|---|---|
| Assessment Rating Based On | • Review of 2016 Needs Assessment |

### Settlement Agreement Paragraph

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed to-date application of Kirkpatrick Model of evaluation |

### Compliance Assessment

In response to our previous Outcomes Assessments, Compliance Assessments, and TA Statements, PPB has made marked improvement in the evaluation of training. Of largest note is the competency-based testing linked to changes in Directives. In these instances, officers are required to complete an evaluation on specific aspects of revised Directives. We recommend PPB continue these evaluations in order to identify potential issues with the clarity of language within the Directives as well as provide an evaluation of officer understanding.

PPB has expanded their reporting of training evaluation, as evidenced in their July 2016 report assessing the 2015 In-Service Training. In that report, each In-Service class was reviewed for (1) officer reaction, (2) results of learning evaluations, and (3) on-the-job outcomes. This largely covers the elements of the Kirkpatrick model (except for organizational change which should not be viewed as pertaining to a single class).

While we appreciate PPB engaging in the evaluations of these three steps, we believe that some steps have not completely realized the methodological rigor we have recommended in previous reports and TA Statements. Particularly for learning evaluations, PPB reports continue to speak in generalities in relation to competency-based assessment of training. For instance, in the evaluation of the Box Drill, PPB reports, "The students demonstrated reasonable use of force decision making within the context of each exercise. Overall, when given a situation where they would need to use force, they made reasonable force decisions and when given a situation that did not require the use of force, they did not." These statements are vague generalities rather than specific metrics of officer competency. In other areas, estimations of competency are used. For example, in the evaluation of CPR and AED techniques, PPB reports, "By estimation, approximately five percent of the students' performance indicated a need for additional training." Although using an estimate is more in-line with the type of reporting we believe would help craft future training or identify officers who would benefit from supplemental training, having exact numbers would enhance the utility of the evaluations.

We continue to stress the importance of assessing the classroom performance of individual students, especially for recruits. We believe PPB understands that more needs to be done in the way of individual competency-based evaluation. In their Q4 update for Par. 80, the Training Division states, "Near the end of this quarter, the Training Division began transitioning the training learning assessment tasks (which included competency-based evaluations) to other staff members."  While the learning assessment tasks will remain within the Training Division, they are being distributed to a larger number of people within the division.  We look forward to discussing with PPB how this transition will take place, whether individual officers will be evaluated, and whether exact percentages will be included in future reports.

We recommend PPB examine the course objectives when determining the extent of evaluation that would be appropriate. As a guide for PPB, we have created a referral chart for the types of evaluation that would be most appropriate given the training objectives for each class (see Appendix A). For example, if a certain training class is aimed at ensuring officers reach or maintain a level of proficiency, this would require a post-test only methodology. However, if training contains new information or if PPB wants to determine the extent of information retention, this would be better measured with a pre-/post-test methodology. Thus, the objective for the class would inform how best to measure the training.

As an example, we use the Equity class delivered in the 2016 In-Service. This class introduced new information to officers and was designed to increase officer understanding of historical inequity as well as alter officer attitudes. In order to view (1) whether officers already knew the information and (2) whether officer knowledge/attitudes changed as a result of the class, a pre-test and post-test would be required. Alternatively, if PPB wants to ensure officers are proficient in technical skills (e.g. firearms or takedown maneuvers), a pre-test is not necessary as changes in skill are not the focus – only that officers can demonstrate the skill.

We also continue to recommend that PPB utilize contact surveys as a way to evaluate behavioral change related to certain classes, especially classes that seek to improve officers' interactions with individuals who are perceived to be facing a mental health crisis, as required by the Settlement Agreement (see Paragraph 78).

| COCL Recommendations | • Enhance the methodological rigor associated with training evaluation<br>• Introduce individualized testing for classes where such testing is relevant<br>• Work with the COCL and the City to develop and implement contact surveys to measure the impact of training<br>• Continue to work with the COCL to arrive at measurement tools and evaluation designs that meet scientific standards. |
|---|---|
| Assessment Rating Based On | • COCL review of training evaluation tools and measures<br>• COCL review of PPB response document |

### Settlement Agreement Paragraph

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed LMS Updates for 2016 Q3 and Q4 |

### Compliance Assessment

In the third quarter of 2016, PPB signed a contract with Cornerstone to design and implement a Learning Management System that conforms to the requirements of Par. 81. In the fourth quarter of 2016, PPB spent time with Cornerstone personnel to become acquainted with various system options and customize the LMS for the Bureau. However, PPB indicated in their quarterly summary report that a full-time position to maintain and train others on the LMS had not been posted as of the fourth quarter. As the contract with Cornerstone was signed in September of 2016 and the meeting between PPB and Cornerstone did not occur until November of 2016, it is unclear why the full-time management position was not filled or even posted during this period of time. We recommend PPB post and fill this position immediately so that the manager can be fully acquainted with the system when it launches.

| COCL Recommendations | • Post and fill system management position immediately<br>• Once the LMS has been implemented, provide COCL with technical demonstration |
|---|---|
| Assessment Rating Based On | • Review of LMS updates for Q3 and Q4 |

**Settlement Agreement Paragraph**

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Course Attendance Summary Reports |

**Compliance Assessment**

PPB has provided us with Course Attendance Summary Reports that indicate the number of officers who have attended and successfully completed training classes. Upon reviewing the summary reports, we noticed discrepancies in the total number of training hours for some classes based on the number of employees. PPB informed us that the discrepancies were due to the information being hand-entered. The fact that information on these reports is hand-entered further underscores the need for PPB to secure the LMS identified in Par. 81 ("electronically tracking, maintaining, and reporting complete and accurate records"). PPB needs to implement the LMS as soon as possible in order to avoid "hand-entered" mistakes in the future. We also continue to recommend PPB update the content of training reports so that they might better reflect results of individual competency-based evaluations (e.g. percent of officers who pass/fail). This, too, is impacted by the LMS not being functional at this time. Once the LMS is implemented within PPB, we would expect the reports to be updated.

| COCL Recommendations | • Secure and implement LMS<br>• Update training report content |
|---|---|
| Assessment Rating Based On | • COCL review of Course Attendance Summary Reports |

**Settlement Agreement Paragraph**

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed SOP 1-19; Reviewed "Work History Review Sheet" for Q4 hires |

**Compliance Assessment**

SOP 1-19 (Training Division Instructor Selection Standards) remained in effect during 2016 Q3 and Q4. As we indicated in our previous report, we believe the SOP contains the requirements of Par. 83 in language. We maintain that if a trainer is involved in a civil judgment within the last five years based on their use of force, PPB should provide a justification and explanation as to why the officer is fit for service as a trainer and the civil judgment is not a disqualifying factor. As PPB is only required to "take into account" a trainer's prior civil judgment, it is not possible for strict criteria to be established here. Should PPB hire such a trainer, we will review the justification and explanation using a common-sense standard. We also continue to recommend PPB notify COCL if an exception to the criteria of SOP 1-19 is made.

We reviewed the Work History Review Sheet for Q4 hires and believe PPB performs due diligence when hiring instructors. We observed no exceptions to the criteria of SOP 1-19 and no prospective trainer had been involved in a civil judgment. However, when reviewing the Work History Review Sheet, we noticed two columns in the document that state, "DOJ Action Item 83." These columns are related to the review of Civil Judgments and whether the officer was disciplined for force or the mistreatment of people with mental illness, as required by Par. 83. However, by associating the reviews with Par. 83, the reviews become "something DOJ is making us do." PPB has SOP 1-19 that contains the requirements for the reviews and we recommend PPB change the Work History Review sheet to reference PPB practices rather than the Settlement Agreement.

| | |
|---|---|
| **COCL Recommendations** | • Notify COCL when an exception is made to SOP 1-19's criteria<br>• Provide a justification for hiring a trainer involved in a civil judgment<br>• Revise Worksheet to indicate SOP 1-19 instead of DOJ Action Item 83 |
| **Assessment Rating Based On** | • COCL review of SOP 1-19<br>• COCL review of "Work History Review Sheet" |

**Settlement Agreement Paragraph**

84. (COCL Summary) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. It begins by stating that "All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled." The subsections of Par. 84 relate to the types of training required for patrol officers, including increasing use of scenarios related to use of force events, de-escalation techniques, procuring medical care, proactive problem solving, civil or criminal liability, and positive communication skills without derogatory language. Particular attention is given to police interactions with individuals who have, or are perceived to have, mental illness. The subsections also refer to supervisor training,

including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observe 2016 officer and supervisor In-Service training |

**Compliance Assessment**

In November of 2016, we observed the entirety of PPB's In-Service training as well as Supervisor In-Service Training. Overall, we believe the training was well conceived and professionally delivered. Furthermore, we identified a number of elements that we have recommended in the past being implemented in the In-Service training we observed. As to the specific requirements of Par. 84's subsections, we observed nearly all of them being incorporated into the In-Service. One aspect specifically required by Par. 84 that was in absent in training on "the importance and impact of…peer intervention." We feel this may be addressed in a scenario situation wherein an actor officer demonstrates behavior that would warrant peer intervention. For instance, the scenario might require a call for back-up and upon arrival, the actor officer may use derogatory or escalating language. Students would then be expected to intervene to improve the interaction.

A fair amount of training that we observed involved technical or tactical instruction to officers, such as correct foot positioning when firing a rifle from the ground or proper technique for gauze packing an open wound. We have no reason to question the accuracy of these presentations. Rather, our review will focus more on the messaging of training, how to improve police-community relations, and the avoidance of force when possible (through de-escalation or other alternative approaches to avoid force). Thus, our review of the 2016 In-Service training focuses on these elements.

This analysis will not cover every single part of the 2016 In-Service training here due to space limitations. Furthermore, additional observation will occur in 2017 after new policies have been implemented and additional changes have been introduced. In the meantime, we offer our observations on segments that we found to be particularly positive as well as parts that we found to be particularly troubling. Again, PPB should be recognized for their efforts to deliver training that is consistent with agency needs, best practices, and the Settlement Agreement. We believe there are still aspects of PPB training that require change, though we credit PPB for the changes they have made to date.

As part of the 2016 In-Service, a four-hour training block was reserved for a class dealing with Equity. Considering the totality of the In-Service was 20 hours, the Equity class represented a one fifth of the total In-Service training time. Given the sometimes differing perspectives between law enforcement and the public they serve (for example, see 2017 Pew Report "Behind the Badge"), this class was a good opportunity for officers to hear the perspectives of community members, particularly those from people of color and those with less resources available to them. At the beginning of the class, the presenter stated that the Equity class was being provided because of a commitment by the City and PPB to ensure fair treatment of all members of the community (indeed, the Equity class has been provided to other City employees). Furthermore, the presenter reinforced the message that the City and PPB are taking the issue seriously and

that the Equity class "isn't a one-time deal. We are going to keep moving forward [with teaching issues of equity]."

The Equity training included a wide variety of learning styles, including PowerPoint slides, multiple videos, small-group discussions, large-group discussions, and a summary debriefing session at the end of the class that included a discussion of how to apply lessons learned from the class. Although we maintain that this section could have benefited from a pre-/post-test to measure learning (see our evaluation of Par. 80), it appeared that officers at least gained the perspective of portions of the community and may be able to incorporate such perspectives in future street encounters. While it was clear that some officers may not have agreed with the perspectives (nor should training *require* officers to agree with other perspectives), the training succeeded in its ability to introduce the perspective of some community members and provide historical background for the formulation of those perspectives.

The Equity training serves as a good introduction to the issues. Going to the next level (translating ideas into practice), officers will need to be introduced to, and have the opportunity to practice, specific communication skills that send the message of fairness, respect, and compassion. We will discuss this further below and in future reports.

The In-Service training also included portions devoted to upgrading officers' Conducted Electrical Weapons (CEWs), familiarizing officers with the upgraded CEWs (including a video from the manufacturer), and practicing using the CEWs in accordance with policy, best practices and the Settlement Agreement. Again, we do not comment on the technical aspects of CEWs (such as proper arcing), though some aspects of the CEW presentations are cause for concern. PPB trained officers on CEW policy, though noted that the policy would likely change in the near future (the requirement to train to current policy is required by the Settlement Agreement, even if that policy is likely to change in the future). At some points in the training, presenters made comments at times disparaging the current and future policy changes and attributing the reason for changes to the DOJ and the Settlement Agreement. For instance, at one point, the presenter mentioned that "DOJ has told us they view Taser as a higher level of force" with the slide attributing the quote to DOJ. In another instance, the presenter appeared to openly criticize the newer policies on CEW, and made mention that there was "never really an issue" with past CEW practices. We remind PPB that these types of statements during training will only act to undermine changes. Trainers should be encouraged to communicate the message that changes to policy and procedure are made in the best interest of the Bureau.

We also observed the CEW training instructor make a number of positive points that we believe are consistent with the reform efforts. For instance, the instructor provided explicit instances where using a CEW would not be an appropriate use of force (e.g. suicide threats where the situation is not deteriorating; limited situations where drive-stun would be appropriate; unreliability of CEW for pain compliance). Additionally, the presenter gave real-world applications of the material covered in class, as well as practical information for writing reports related to CEW use (e.g. specific information to include to capture the totality of the circumstances for supervisory review).

Officers were also able to practice their CEW skills in a range setting. Consistent with the intent of the Agreement, officers were instructed to provide a verbal warning prior to deploying their CEWs. However, they were instructed to deliver two cycles during the simulation and most officers did not issue a second warning prior to the second cycle. Furthermore, although officers

were trained to aim for the belly of suspects, some officers' probes struck the face of the target. These deviations from instruction may be due to officers recognizing they were in a training exercise and not on the street. In any event, we recommend that PPB monitor the individual members more closely for policy and tactical adherence. While CEW aim was observed and critiqued in one of the scenarios, we believe it deserves attention in all aspects of training.

Officers were subjected to a number of scenarios as part of the In-Service training. Some of the scenarios were low-frequency/high-risk situations. Others were high-frequency/low-risk situations. Others were somewhere in between. We commend PPB for providing scenarios that reinforce to officers that not all encounters should be considered a call for force.

We highlight one particular aspect of scenarios that we felt was very well delivered in the message it sent to officers. Officers were asked to face the wall, and (when instructed) turn around and react to the actions of a second person. In the first situation, when the officer turned around the second person was pointing a gun at the officer. Appropriately, the large majority of officers responded by drawing their weapon and firing. In the very next situation, when the officer turned around the second person was simply walking with his hands in his pockets. Officer responses were varied here, with about half the officers drawing their weapons, ordering the person to get down, to show his hands, or some other response indicating the person was viewed as a threat. The other approximately half of officers (though potentially wary of the person) asked the person how his day was, where he was going, and asking (rather than ordering) if the officer could see his hands. One officer stated, "Hey, how're you doing?" When the second person said "Fine, just going to the store," the officer responded "Have a good time there."

We found the debriefings to be particularly helpful to the officers. During this group debriefing session, the instructor stressed that officers must remember that just because force may have been appropriate in their last interaction, each interaction must be judged on its own merits. Although not all officers responded perfectly, we take this scenario as a demonstration that PPB agrees that scenarios should include everyday encounters in addition to high-risk/low-frequency encounters. We encourage PPB to continue including scenarios designed to have officers think about many community members as harmless. Maintaining a heightened sense of danger is not a flawed strategy, so long as this internal state is not externally displayed in a manner that leads to unnecessary force events.

We noticed that in nearly all classes where force was part of the presentation or activities (PVO, Takedowns, AR-15, CEW, Scenarios, etc.), presenters provided an overview of PPB's force policy and the Graham standard. We believe this is good practice by PPB as it does not separate the technical application of force from the constitutional threshold for applying it. The constitutional threshold was continually reinforced and we encourage PPB to continue to discuss policy and appropriateness of force prior to all sessions dealing with its application.

Finally, like many training academies, we saw a strong emphasis on tactical responses, which are important in split-second force events. However, many potential force situations emerge from conflictual, non-cooperative encounters between an officer and a community member that carry the potential for de-escalation to mitigate the need for force. As such, we cannot emphasize enough the need for training in communication skills, procedural justice, and empathy to prevent the escalation of conflict. In the 2017 In-Service, we will be on the lookout for this type of content and delivery. Also, just as firing a weapon requires practice and the achievement of proficient standards, we maintain that interpersonal skills require lots of

practice, feedback, and more practice. This is generally lacking in policing training and could be strengthened in the PPB in the classroom as well as in scenarios. For instance, the Advanced Academy training holds numerous classes on procedural justice, communication, and avoiding force precipitation. Refresher classes in these areas would be of benefit to officers in addition to being one of many debriefing points during scenarios.

We also observed the Supervisor In-Service training in November of 2016. As there had not been a Supervisor In-Service held since we began our field work in 2015, this was the first opportunity to observe this training. The Supervisor In-Service covered a variety of topics which we will comment on individually. In general, we note that class time was not well-managed and other topics may have been included to better utilize the allotted time. For instance, one class was scheduled for 45 minutes though was completed in 10 minutes. One supervisor questioned why the information could not have simply been put on PPB's intranet. During another class, the presenter started by saying, "After I'm done with this, it's lunch time which I say at the front end because it usually cuts the number of questions in half." We observed other examples of this type of commentary in other classes. As this was the first Supervisor In-Service since 2014, these statements and inefficient use of time appear to be counterproductive. For instance, the Chief's Chat portion's time allotment could have been expanded so that information on the comprehensive use of the Employee Information System (EIS) or positive changes made within the Bureau as a result of the Settlement Agreement could be discussed.

During the Chief's Chat portion of the training, an Assistant Chief covered some of the larger issues within PPB, including current staffing levels, recruitment and hiring, redistribution of specialty units, eliminating a shift, IT and Criminal Justice Information Services (CJIS), After Action Reports, promotions, and officer morale (among other things). For each of the topics, the Assistant Chief provided updates where appropriate and allowed for the supervisors to ask questions. We did not find any issues of concern with this portion of the Supervisor In-Service as we felt the Assistant Chief demonstrated ownership and a sense that changes are being made to improve the organization, particularly with regard to questions about how to improve officer morale.

Supervisors received an update of the process related to After Action Reports for force events. Here, supervisors were informed that changes to the After Action Reports and chain-of-command reviews would likely occur (see our assessment of Pars. 70, 72, and 73) and thus supervisors would be further updated when changes were finalized. For the time being and where the policy did not yet match the Settlement Agreement, supervisors were instructed to explain the differences to officers and give updates once an agreement between the Parties about the force policy had been reached.

During the After Action Report portion of the Supervisor In-Service we found examples of both positive and negative instances of messaging. For instance, the presenter referenced DOJ reports when saying that "tensing up, thrashing around, and wiggling did not impress *our monitor* as justification for strikes" (emphasis added). The reference to "our monitor" makes it seem as if PPB does not agree with the DOJ position and may consider those actions as justification for strikes. In other portions of the presentation, the Settlement Agreement and DOJ were also referenced, again taking away from ownership of the changes.

In other places, the presenter's comments were completely in-line with the concept of ownership. For instance, one supervisor asked if the collective changes to the Force Data

Collection Report (FDCR) would "make the DOJ happy." The presenter responded with "It will make us happy because we are putting out a quality product." In another instance where DOJ had argued that a certain force event should have been found as a policy violation, the presenter agreed, telling the supervisors that when something violates policy, it needs to be identified as such.

As for the content of the After Action Report section, the presenter stressed the importance of FDCRs including all information for supervisors to make an informed assessment of the officers' actions (see, for instance, the points found in Par. 74(a) and 74(c)). The presenter also stated that rather than reviewing FDCRs for technical adherence to policy, supervisors should review FDCRs and ask, "Is this the way I want my officers to act every single time in this situation?" We found this to be a very much needed statement for supervisors to hear as this puts the focus on improving officers' decision making rather than simply observing policy. Although supervisors were instructed on how to review FDCRs and offer guidance to officers on how to more comprehensively complete them, nearly all in the room agreed that supplemental instruction to officers on what a comprehensive FDCR looked like was necessary (including descriptions of vague terms, difference between verbal and force de-escalation, etc.).

The Supervisor In-Service also included a section related to Workplace Harassment and another section related to supervisors identifying and articulating reasonable suspicion that an officer may be intoxicated on duty. Most of the content related to these sections is legalistic. Perhaps more time could have been spent on non-legal strategies for addressing such issues. Also, we would encourage the PPB to spend more time on supervisory skills needed to identify issues with community interaction and communication skills, how to intervene with appropriate coaching and counseling, and how to monitor progress over time.

Research in dozens of police organizations indicates that the willingness of police officers to follow policies and support management decisions will depend on whether they feel they are being treated fairly and respectful by those in authority positions – what is typically called organizational justice. Therefore, we would recommend that any course on responding to problematic behavior be supplemented with a course on good supervision in general.

We stress that, on the whole, we found the officer and supervisor In-Service trainings to be fairly well delivered. We recommend PPB be on the look-out for messaging of training, as we observed negative messaging in both trainings. Positive trends in PPB training include Equity training, scenarios reinforcing that not all community members are criminals, reinforcement of force policy in many classes, and (in some classes) ownership of changes related to the Settlement Agreement. Additional classroom instruction in communication skills, both as officers and as supervisors, combined with existing scenario sessions, would strengthen the PPB In-Service Training and will likely reduce problematic behavior during encounters with the public.

In the first and second quarter of 2017, we will observe Advanced Academy training as well as the 2017 In-Service training. Our observations will be attuned to similar aspects as to those which we have detailed in this report. We will provide our observations of those trainings in our next report.

| | |
|---|---|
| **COCL Recommendations** | • Increase references to ownership and organizational responsibility for changes |

| | |
|---|---|
| | • Continue to include commonly encountered situations in scenarios with attention to procedural justice and empathy<br>• Finalize policies in order for training not to reference future changes<br>• Increase non-tactical training and scenarios on topics related to interpersonal communication skills and procedural justice<br>• Revisit the classes provided to supervisors to use the time more efficiently and strengthen coursework related to "good supervision" around addressing problematic behavior, coaching, organizational justice.<br>• Add supervisory training on EIS |
| **Assessment Rating Based On** | • COCL observation of 2016 officer and supervisor In-Service training |

---

**Settlement Agreement Paragraph**

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed all documents related to Par. 85 and prior training paragraphs; Provided audit plan based on previous TA Statements and corresponding paragraphs in the Settlement Agreement |

**Compliance Assessment**

In December of 2016, COCL provided PPB and the Inspector with a training audit plan which covered each of the sections of Par. 85. Using previous TA Statements (Needs Assessment, Training Evaluation) as well as subsections' corresponding paragraphs in the Settlement Agreement as a template, we identified the types of considerations we felt were necessary to perform a comprehensive audit of PPB's training program. Some of the sections of the audit plan measure technical adherence (e.g. making training records accessible to certain people) while others require a far more critical assessment of the training program.

The sections identified in the training audit plan largely mirror the types of considerations we have included in our past reports. For instance, when reviewing the adequacy of the Training Needs Assessment, we asked PPB to consider previous training evaluations and how the input of various stakeholders was sought and incorporated. When reviewing the adequacy of training evaluation, we asked PPB to consider the types of evaluation tools used given the objectives of the course. When reviewing whether PPB "trains officers, supervisors, and commanders on areas specific to their responsibilities," we asked PPB to consider the total responsibilities of each ranking and evaluate whether all were being adequately met. For all sections of the training audit, we asked PPB to go beyond auditing the *existence* of training material and instead audit the *quality* of the material.

As we provided PPB our audit plan in December, they were unable to provide a response prior to the end of the fourth quarter. Thus, we anticipate discussions with PPB in the first and second quarter of 2017. The fruits of those discussions will be included in our next report.

| COCL Recommendations | • Provide a response to our audit plan and begin work to create a 2017 training audit report |
|---|---|
| Assessment Rating Based On | • PPB's previous efforts on training audit |

### Settlement Agreement Paragraph

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observed Inspector presentation to Training Advisory Council (TAC); Reviewed TAC recommendations to Directive 1500.00; Reviewed TAC report |

### Compliance Assessment

In the third quarter of 2016, the Inspector gave a presentation responsive to Par. 86. This included an in-depth discussion about CEW use as requested by the TAC. A presentation during the fourth quarter was scheduled, though due to time constraints, the presentation was

rescheduled for the first quarter of 2017. We have personally observed a number of the Inspector's presentations to TAC and will continue to attend TAC meetings to observe the presentations.

Although the Inspector provided information regarding CEW trends to the TAC, we believe the Inspector's presentations on overall force trends would benefit from the types of trend review and discussion which we have recommended in our assessment of Par. 76. Such trend review and discussion would satisfy the Inspector's requirement to "present data and analysis" as required by Par. 86. In the presentations to TAC we have observed, the Inspector has touched upon force numbers in a cursory fashion. The presentations include a review of cross-sectional data and do not look at force trends over more than one quarter. PPB has approximately two years of data that may be used to identify trends in force types, Precincts, shifts, subject information (e.g. whether subjects are armed), etc. and should begin data review over a longer timeline. TAC members have begun performing their own evaluations of data to identify trends and they are in the process of forming a subcommittee to review trends more systematically. We appreciate the willingness of TAC to look at these trends independently, though would recommend that the Inspector play an active role in working with the subcommittee.

As to the Inspector's responsibility in Par. 86 to "identify problematic use of force patterns and training deficiencies," we again believe Phase II of the Force Audit will assist the Inspector in performing this function. We have recommended that the Inspector classify problematic trends as having implications for training, tactics, supervision, etc., and thus, the prevalence of such classifications will allow TAC to see where recommendations are most needed.

As we noted in our last report, TAC issued a list of 23 recommendations related to use of force training, organizational attitudes, and force reporting during the second quarter of 2016. In turn, the Chief issued a response to each of the recommendations from TAC, identifying those with which he agreed, agreed in part, or agreed to further review. The response was detailed and we look forward to seeing the recommendations incorporated into future PPB training.

| COCL Recommendations | • Report trends in a manner consistent with our recommendations for Par. 76 |
| | • Incorporate findings of Phase II of the Force Audit into presentations |
| | • Inspector should work with TAC subcommittee as an integral partner |
| | • Incorporate TAC recommendations into Training |
| Assessment Rating Based On | • COCL observations of Inspector presentation to TAC |
| | • TAC "2016 Training and Use of Force Report Recommendations" and response from the Chief |
| | • COCL review of PPB quarterly force summary reports |

**Settlement Agreement Paragraph**

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB website regarding TAC; Review TAC agendas and minutes |

**Compliance Assessment**

The Training Advisory Council (TAC) meetings have continued to be open to the public. We have also not seen any instance where TAC had to discuss matters deemed confidential or which raised public safety concerns to such an extent that the group was required to go into an executive session. In addition, TAC has posted up-to-date minutes (upon approval) to the PPB website as well as previous agendas.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Rating Based On | • COCL review of information available on PPB website<br>• COCL review of TAC minutes |

# V. COMMUNITY-BASED MENTAL HEALTH SERVICES

### Settlement Agreement Paragraph

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Compliance Label | N/A |
|---|---|
| Methodology | Continue to monitor the City and PPB continuing to work with community partners |

### Compliance Assessment

This paragraph will be assessed upon the City and PPB's continuing relationship with community partners. As this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section.

| COCL Recommendations | • Continue relationship with community partners |
|---|---|
| Assessment Rating Based On | • N/A – Summative paragraph |

| **Settlement Agreement Paragraph** |
| --- |
| 89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization. |

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Reviewed minutes from Unity Transportation Workgroup |

**Compliance Assessment**

We point out that this paragraph indicates an expectation of Community Care Organizations (CCOs). However, the Settlement Agreement holds no legal power to require CCOs to do anything. Therefore, while we assess the progress of the Unity Center here, we would like to clarify that PPB and the City are not responsible for opening the Unity Center or the quality of services it provides. Our assessment and compliance rating pertain to PPB's and the City's participation in the process – not the ultimate success or failure of the Unity Center.

Progress on opening the Unity Center, a Psychiatric Emergency Services (PES), continued in the third and fourth quarter of 2016. For PPB's responsibilities, revisions of Directives 850.21, 850.22, and 850.25 were made to reflect the practice of AMR providing transportation for a person on a mental health hold. The revisions were made in consultation with DOJ and COCL and the Directives received DOJ approval in the fourth quarter of 2016. However, the directives have not yet been signed by the Chief as the practice of AMR transports is contingent upon the opening of the Unity Center. This is to be accomplished in the first quarter of 2017.

Based on PPB and the City's participation in the process to date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph. We expect that PPB will issue the revised directives once the Unity Center PES comes on line and train members on the revised directives to ensure comprehension throughout the Bureau. This training should include a test of comprehension and PPB should also include measures for adherence to policy on the street.

| COCL Recommendations | • Issue revised directives once Unity Center PES opens.<br>• Train and test members on revised directives. |
| --- | --- |
| Assessment Rating Based On | • COCL review of Unity Transportation Workgroup minutes |

**Settlement Agreement Paragraph**

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU") [Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Community Outreach Meeting minutes; Review HealthShare Council Agendas; Review Behavioral Health Collaborative documents |

**Compliance Assessment**

The Settlement Agreement does not hold any legal power over Coordinated Care Organizations (CCOs) and we therefore cannot hold PPB responsible for participation in CCO subcommittees if no such subcommittees are available. PPB had previously participated in a Task Force with HealthShare, though this Task Force has completed its work. In the third and fourth quarter of 2016, PPB continued to attend monthly meetings for Legacy ED Community Outreach. Additionally, the Service Coordination Team's (SCT) application to join the State Behavioral Health Collaborative Team was approved and SCT personnel began service on that committee. As indicated in our last report, the collaboration's goals appear consistent with the intent of Par. 90.

Beginning in the third and fourth quarter of 2016 and continuing in the first quarter of 2017, the Parties began discussions related to potential changes in the Settlement Agreement (see Par. 175). We recommend the Parties include this paragraph in their review. Given the Agreement's lack of authority regarding CCO's and given PPB's proactive attempts at satisfying the intent of Par. 90, we believe they have substantially complied with this provision. Pending the revision of the Agreement, we will reassess PPB's responsibilities at that time.

| **COCL Recommendations** | • Parties should include Par. 90 in consideration of any changes to the Settlement Agreement |
|---|---|
| **Assessment Rating Based On** | • PPB involvement with Behavioral Health Collaborative Team<br>• PPB involvement with Legacy ED Community Outreach |

# VI. CRISIS INTERVENTION

## A. Addictions and Behavioral Health Unit and Advisory Committee

**Settlement Agreement Paragraph**

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures.*

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed BHU Unit Structure; Interviewed BHU command personnel |

**Compliance Assessment**

PPB has provided to COCL updated unit structures, including when changes to personnel have occurred. In terms of personnel and BHU's general oversight, the BHU continues to conform to the requirements of Par. 91, as evidenced by the BHU unit structure and our observations of BHU coordinating ECIT, BHRT, and SCT operations. While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, ECIT data collection, etc.), ECIT officers directly report to their precinct level chain of command. This command structure conforms to the Memphis Model.

We echo previous reports that Substantial Compliance with Par. 91 does not indicate that the functions of ECIT, BHRT, and SCT are in Substantial Compliance with their respective paragraphs. Compliance with Par. 91 indicates that the establishment of BHU and the general oversight structure requirements have been satisfied in their current iteration.

| **COCL Recommendations** | • Continue to update COCL and DOJ on changes to personnel when applicable |
|---|---|
| **Assessment Rating Based On** | • COCL review of unit structures and personnel |

**Settlement Agreement Paragraph**

92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systematic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed BHCT, BHRT, and SCT coordination team meeting agendas and minutes; Reviewed discoverability issues with PPB; Reviewed BHRT and SCT outcome measures |

**Compliance Assessment**

PPB utilizes a number of work groups to collaborate on ways to "decrease law enforcement interactions [and] mitigate the potential uses of force in law enforcement interactions with consumers of mental health services." For instance, the Behavioral Health Coordination Team (BHCT) meets on a bi-weekly basis to discuss current and potential BHRT clients. The BHCT is comprised of  a number of community partners including representatives from Multnomah County, Cascadia, and Federal/State law enforcement. PPB informs us that a core groups of partners attends consistently, with other partners attending as needed.

The discussions during these meetings are designed to problem-solve and create strategies to reduce future criminal justice contacts for individuals that have frequent contact but have been difficult to engage in ongoing services. BHU personnel indicate that information on individuals discussed is only shared if it is subject to lawful disclosure. To insure this, all partners brought their agency lawyers to the initial meetings to ensure all were fully informed of HIPPA and other privacy law considerations. BHU personnel indicate the BHCT has been a particularly valuable collaborative strategy.

The Service Coordination Team also conducts weekly meetings to discuss potential clients and make determinations about eligibility for SCT Services. Meetings include community partners and representatives from various entities in Multnomah County. The meetings also review current SCT clients in order to "facilitate continuation of care" for clients (PPB Q4 Quarterly Update). We believe these meetings meet the spirit of Par. 92.

The collection of data through the Mental Health Mask (MHM) continued during the third and fourth quarter of 2016. However, concerns about the ability to produce MHM data for discovery have caused PPB to reconsider the method by which mental health interaction data are captured. A revised plan for data collection was discussed in the first part of 2017, with a

plan for implementation by May 2017. Once in place, the data produced should be utilized to identify individuals and locations with repeat calls for service and develop response strategies.

Relevant outcome measures are collected for BHRT and SCT. These outcome measures were discussed during our November 2016 Outcome Assessment and is further explored in our May 2017 Outcome Assessment.

Finally, we continue to recommend a mental health contact survey to measure changes and areas for improvement in PPB's system of mental health response. Discussions have been ongoing related to the mental health contact survey as well as our recommendation to roll it into a more general community contact survey.

| COCL Recommendations | • Implement revised process for collecting data on mental health interactions<br>• Plan a mental health contact survey with the assistance of COCL |
|---|---|
| Assessment Rating Based On | • COCL review BHCT, BHRT, and SCT coordination meeting agendas and minutes<br>• COCL review of BHRT and SCT outcome measures |

## Settlement Agreement Paragraph

94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed BHUAC roster of members; Reviewed BHUAC minutes; Observed BHUAC meetings |

## Compliance Assessment

The Behavioral Health Unit Advisory Committee (BHUAC) continued to meet in the third and fourth quarter of 2016. The advisory committee is a diverse group with representatives from law enforcement, CCO's and City and County agencies, as well as mental health community representatives/peer support specialists. As COCL has personally observed numerous BHUAC meetings, we are confident that the group has a diverse number of voices contributing to meetings.

We also take time here to respond to community concerns we have heard that BHUAC meetings are closed to the public. On two separate occasions (first upon BHUAC creation and later revisiting the issue), BHUAC members have discussed whether meetings should be open to

the public. Although some members believed the community should be allowed to attend meetings, the committee ultimately voted to keep meetings closed. We have reviewed the minutes of this discussion and spoken with BHUAC members about the issue. Members have genuine concerns that by opening the meeting to the community, committee members may be guarded in their desire to openly discuss sensitive topics. As a compromise for achieving transparency, BHUAC now posts meeting minutes online. BHUAC has recognized that despite being closed to the public, more can be done to communicate with community members through the COAB and other outreach mechanisms. We recommend BHUAC explore options for accomplishing this.  One such option would be to hold a subset of BHUAC meetings open to the public.  For instance, BHUAC may hold every third meeting publicly, allowing for the community to present comments in some capacity.

The discussions around whether meetings should be open or closed have been thoughtful and considered both pros and cons of remaining closed to the public. Thus, since the meetings are not required to be open to the public, we are satisfied with the result of the committee's discussion.

| **COCL Recommendations** | • Explore options for communicating with the community, including holding some  of BHUAC meetings open to the public. |
|---|---|
| **Assessment Rating Based On** | • COCL review of BHUAC roster<br>• COCL review of BHUAC minutes<br>• COCL observations of BHUAC meetings |

---

### Settlement Agreement Paragraph

95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed BHUAC minutes; Observed BHUAC meetings |

### Compliance Assessment

In the third and fourth quarter of 2016, BHUAC met on a monthly basis to discuss and make recommendations in a number of areas. Topics covered in the BHUAC's agendas include review of training related to 850.20, BHU data, discussions regarding cultural diversity in ECIT

scenario training, BHU outreach efforts, BHU Mission Statement, MHM, Oregon Performance Plan (State MH support system), revised COAB, CIT training for BOEC personnel, and various PPB SOP's. We personally observed some of the meetings during the third and fourth quarter and for other meetings, we have reviewed BHUAC minutes. We continue to believe the work of BHUAC substantially complies with the requirements of Par. 95 and continue to recommend that PPB and BHUAC sustain the progress they have made to date.

| COCL Recommendations | • Sustain progress made to date |
|---|---|
| Assessment Rating Based On | • COCL review of BHUAC minutes and agendas<br>• COCL observing BHUAC meetings |

### Settlement Agreement Paragraph

96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed BHUAC recommendations found in BHUAC minutes |

### Compliance Assessment

BHUAC continues to meet and provide recommendations to BHU and PPB (see Par. 95). Furthermore, BHUAC reviewed the course curriculum for BOEC CIT training (including Crisis Triage) and made recommendations where appropriate. Thus, there has been substantial compliance with the first section of Par. 96. After making recommendations, we have seen regular documentation of PPB providing responses to BHUAC for each of their recommendations. For instance, in August of 2016, the BHU Lieutenant provided responses to recommendations for SOPs #1-3, #2-1, and #1-2. In the response, the Lieutenant indicated BHU's agreement with the recommendation and an affirmative statement of how the recommendation will be integrated into the SOPs. Thus, the system used by BHU and BHUAC provides for a continuous feedback loop and is done so in a manner consistent with the Agreement. Thus, the second section of Par. 96 is substantially satisfied. We recommend BHUAC and PPB continue the quality of work we have seen to date.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Rating Based On | • COCL review of BHUAC status reports and recommendations<br>• COCL review of PPB responses to BHUAC recommendations |

Exhibit B
Pg. 50 of 124

**B. Continuation of C-I Program**

| **Settlement Agreement Paragraph** | |
|---|---|
| 97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I. | |
| **Compliance Label** | Substantial Compliance – Ongoing Obligation |
| **Methodology** | Review Advanced Academy C-I Training material |
| **Compliance Assessment** | |
|     In a previous report, we provided a review of the C-I training content and assessed it to be overall in-line with C-I training we have reviewed in other jurisdictions. Although PPB did not hold an Advanced Academy training in the third or fourth quarter of 2016, all officers receive C-I training and PPB has demonstrated a commitment to continuing to train all officers. In the first and second quarter of 2017, PPB will hold Advanced Academy for a total of 16 recruits and members of the COCL Team will personally observe the CIT classes for that Advanced Academy to ensure that the training delivered continues to comply with the requirements of this paragraph. | |
| **COCL Recommendations** | •   No recommendations at this time |
| **Assessment Rating Based On** | •   COCL prior review of Advanced Academy CI Training materials |

| **Settlement Agreement Paragraph** | |
|---|---|
| 98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed Advanced Academy CI training materials; Observed 2016 In-Service training; Reviewed 2016 In-Service training materials |
| **Compliance Assessment** | |

**Exhibit B**

Officers are required to complete a minimum of 40 hours of CI training before they assume independent patrol or call-response duties. The 40 hours of CI training is split between the State Academy and the Advanced Academy. As no officers are allowed to assume independent patrol duties before they complete the Advanced Academy, this portion of Par. 98 has been satisfied.

In the fourth quarter of 2016, we observed the 2016 In-Service training which contained classes related to mental health response. The training was crafted in consultation with the BHUAC.

Officers were provided an update to the progress of the Unity Center and the presenter detailed the benefits to both consumers of mental health services as well as the officers. Rather than describing the Unity Center as a response to the Settlement Agreement, the presenter demonstrated the advantages over prior mental health response and the anticipated long-term benefits. We felt the presentation on the Unity Center was well delivered.

Officers were then provided an update to Mental Health Mask data and an exhortation on improving the accuracy and reliability of the data. As we have said in previous reports, new data collection tools are likely to increase in accuracy and reliability over time as officers become more accustomed to the tools and receive supplemental training. Thus, we encourage PPB to continue to train officers on a standardized process for completing MHM's to make them more reliable. Furthermore, once the revision of the MHM is complete, PPB should refresh officers as to when and how to use it. As in other trainings we have observed, the presenter indicated that one reason for improving officer completion of the MHM is that PPB believes the current number of calls involving a mental health component found in the MHM data may be underreported.

Officers were also provided a review of mental health Directive 850.20, which outlines officer procedure when responding to a call involving a mental health crisis. Officers had reviewed this directive when it was released and were required to take a knowledge-test during that review. At the beginning of the In-Service class session, officers participated in an interactive exercise to determine their level of knowledge retention since the revised 850.20 took effect. Although the responses were not individually identifiable (thus not a measure individual retention), we believe the manner of assessment was sufficient to observe overall retention and meet the requirements of 850.20 (provided PPB analyzes the data to identify potential needs for clarifying 850.20). Officers were also encouraged to view ECIT as a resource and to not be hesitant to request ECIT assistance. Finally, the review of 850.20 contained refresher information on many areas related to mental health response, including when to call an ECIT officer, tactics for disengagement, de-escalation, and others.

Based on PPB policy of not allowing officers to assume independent patrol duties prior to completing the Advanced Academy coupled with the C-I refresher training we observed during the 2016 In-Service training, we believe PPB has substantially complied with the requirements of this paragraph. We recommend that future In-Service trainings continue to include C-I refresher training in consultation with BHUAC.

We have reviewed the current CIT training material from PPB and will be addressing that material in our next report. We recommend PPB provide us with updated basic academy CIT training material so that we might review the full 40 hours that the trainees receive.

| COCL Recommendations | • When Advanced Academy offered, provide documentation of CIT training in basic and advanced academies |
|---|---|
| Assessment Rating Based On | • COCL observation of 2016 In-Service training |

## C. Establishing "Memphis Model" Crisis Intervention Team

**Settlement Agreement Paragraph**

99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]").

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed BHU/ECIT data; Interview BHU/ECIT/PPB Personnel; Reviewed Mental Health Mask data; Reviewed BOEC data; Conducted focus groups with ECIT and non-ECIT officers |

**Compliance Assessment**

PPB continues to operate a modified "Memphis" model of crisis intervention. PPB's approach may be a reasonable alternative to the traditional Memphis model, but that remains uncertain. After two full years under the Settlement Agreement, we do not believe PPB has the data systems in place to adequately measure the effectiveness of their unique system.

In order for PPB to evaluate their modified model and justify a deviation from the original Memphis CIT model, we recommend that they set up data analysis systems and utilize existing data to answer the following questions in a comprehensive fashion. These questions pertain to three areas: 1. Assessing volume, resource allocation and response capacity; 2. Assessing outcomes of mental health related calls (ECIT and CIT with MH Component), 3. Comparing outcomes of calls handled by ECIT and CIT officers.

1. What percent of calls that PPB responds to have a mental health component?
   a. What percent of mental health component calls is the person experiencing mental illness the *primary* subject of the interaction (e.g. not a witness or reporting party)?
2. What percent of mental health calls that PPB responds to meet ECIT criteria?
3. What is the Precinct distribution of calls coded as ECIT by BOEC?
4. What is the Shift distribution of calls coded as ECIT by BOEC?
5. What is the number of ECIT officers in each Precinct/Shift compared with the number of calls that meet the ECIT dispatch criteria?
6. In what percent of calls that meet ECIT dispatch criteria is an ECIT officer required to travel two or more patrol areas to reach the call?

7. What is the percent of calls coded as ECIT by BOEC that receive an ECIT response?
    a. Are there Precinct/Shift differences in this regard?
8. For calls that meet the ECIT dispatch criteria, are there differences between ECIT and non-ECIT officers in the following outcomes:
    a. Use of Force
    b. Disposition (e.g. arrest, referral, etc.)
    c. Transport to Hospital/PES
    d. Contact survey results (to be implemented)
9. For calls that have a mental health component (but do not meet the ECIT dispatch criteria), are there differences between ECIT and non-ECIT officers in the following outcomes:
    a. Use of Force
    b. Disposition (e.g. arrest, referral, etc.)
    c. Transport to Hospital
    d. Contact survey results (to be implemented)
10. What is the degree of collaboration between PPB, BOEC, and other City/community partners in the ongoing review and subsequent development of ECIT?

PPB has asked for time to collect data to evaluate their modified Memphis model of mental health response. COCL and DOJ provisionally agreed that PPB should be given the room to demonstrate that their model is responsive to the needs of the Portland community. While we have seen some success anecdotally with PPB's approach, we have yet to see a comprehensive evaluation. As we are moving into Year 3, we recommend PPB collect and analyze appropriate evaluation data to address the questions posed above.

| **COCL Recommendations** | • Develop and utilize data systems capable of demonstrating the responsiveness of PPB's modified Memphis model |
|---|---|
| **Compliance Rating Based On** | • COCL review of Mental Health Mask data<br>• COCL review of BOEC data<br>• COCL meetings with BHU and PPB personnel<br>• COCL ride-alongs with ECIT officers<br>• Focus groups with PPB personnel |

### Settlement Agreement Paragraph

100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers.

| Compliance Label | Partial Compliance |
|---|---|

| Methodology | Review ECIT Roster found in Q3 and Q4 supporting documents; Review MHM data; Interview BHU/ECIT/PPB personnel; Review Directive 850.20 |
|---|---|

**Compliance Assessment**

Although PPB has certainly met the "initial goal of 60-80 volunteer, qualified officers" (PPB had 106 operational ECIT members in Q4 of 2016), we have seen no evidence that allows us to determine if current number is a consistent with the demand for ECIT services. In our assessment of Par. 99, we identify analyses that PPB should perform to evaluate their mental health response model. The results of these analyses should provide PPB with an understanding of the demand for ECIT services and the number/distribution of officers that is needed to cover the demand. PPB should utilize the data that currently exist to begin addressing this point.

| **COCL Recommendations** | • Utilize existing data to assess demand for ECIT services |
|---|---|
| **Compliance Rating Based On** | • COCL review of Mental Health Mask data<br>• COCL review of ECIT rosters |

**Settlement Agreement Paragraph**

101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT].

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed SOP #43; Reviewed SOP #3-3; Reviewed evaluation documents for potential ECIT officers |

**Compliance Assessment**

In the fourth quarter of 2016, a new class of ECIT officers was trained by PPB. We reviewed documents related to 22 potential ECIT officers to evaluate adherence to the Settlement Agreement regarding the selection of ECIT officers. We also reviewed the BHUAC's recommendations regarding qualification and selection criteria for ECIT officers.

Our analysis showed that the review of ECIT candidates was thorough and in-line with the recommendations of BHUAC and the mandates of the Settlement Agreement. The pre-training evaluation of potential ECIT officers included a supervisor questionnaire (which includes questions in-line with BHUAC recommendations), evaluations of EIS entries, evaluation of

Internal Affairs history (including whether the officer was subject to discipline for use of force or mistreatment of people with mental illness), and a review of their probationary status.

Two officers had pending Internal Affairs cases related to the use of force or mistreatment of people with mental illness. These two officers were allowed to participate in ECIT training conditionally, with the understanding that they would not be allowed to commence ECIT service until the complaints were resolved. PPB informs us that the complaint against one officer was not sustained and that officer has begun ECIT service. The other officer's complaint is still pending and this officer is not identified as an ECIT officer in BOEC or PPB databases. This approach is consistent with the paragraph 101 and PPB's criteria for ECIT service.

In the third quarter of 2016, the BHUAC again reviewed SOP #3-3 ("Enhanced Crisis Intervention Team"). Upon review, the SOP was signed by the Central Precinct Commander on September 2, 2016. However, the language of the SOP continues to say the BHU Lieutenant will "Review any sustained IA investigation involving force or misconduct…" As we have previously noted, the Settlement Agreement does not contemplate a review of a sustained complaint; rather it requires an automatic removal of the officer from ECIT service.

Our report (as well as DOJ's) identifying the discrepancy was released *after* the signing of the SOP. Given that, we recommend PPB make the changes as soon as possible. As recommended language, the SOP could be revised to say "The BHU Lieutenant shall:…*Initiate removal proceedings in the event of* any sustained IA investigation involving force or misconduct against a person with mental illness" (new language in *italics*). This may be coupled with the bullet point that "Any decision to remove an ECIT officer from the team will be coordinated by the Central Precinct Commander."

| COCL Recommendations | • Revise SOP 3-3 to become consistent with the Settlement Agreement |
|---|---|
| Compliance Rating Based On | • COCL review of SOP #3-3<br>• COCL review of SOP #43<br>• COCL review of evaluation documents |

**Settlement Agreement Paragraph**

102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed ECIT training documents; Observed ECIT 40-hour training; Observed ECIT refresher training |

**Compliance Assessment**

Over the past year and a half, we have observed the complete ECIT 40-hour training as well as an ECIT refresher class for officers who went through ECIT training prior to new material being added to the curriculum. We have spoken with PPB, BHU, and Training Division members regarding the development, execution, and evaluation of the ECIT training. Last year, we provided a Technical Assistance (TA) Statement regarding the 40-hour training as well as conveyed our critiques of the ECIT refresher training in our last compliance report.

PPB has made a number of changes to their ECIT training that are responsive to our recommendations, including providing binders, holding a graduation ceremony, facilitating panel discussions, and increasing cultural diversity in scenarios (e.g. having scenario actors come from varying racial, ethnic, and cultural backgrounds). For these and other changes, the BHU coordinated with the BHUAC as evidenced in meeting minutes. Such collaboration is entirely within the spirit of the Settlement Agreement.

Although PPB has an ongoing obligation to evaluate the ECIT training and make necessary adjustments, we believe that they have substantially complied with the requirements of Par. 102. Although we find the training to be consistent with the Memphis model in terms of the content, PPB's overall evaluation of their unique mental health response model (see our assessment of Par. 99) will determine whether future changes may be necessary.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • COCL observation of ECIT 40-hour training<br>• COCL observation of ECIT refresher training<br>• COCL review of PPB responses to previous recommendations |

---

| **Settlement Agreement Paragraph** |
|---|
| 103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed PPB personnel; Interviewed BOEC personnel; Reviewed Directive 850.20; Reviewed knowledge check; Observed 2016 In-Service training |

**Compliance Assessment**

In accordance with Par. 103 (and the Memphis model of mental health crisis response), ECIT members retain their normal duties until dispatched for use as ECIT. BOEC personnel have received training on the criteria for dispatching an ECIT to a call (see our assessment of Par. 114). Additionally, PPB's Directive 850.20 includes the criteria for when an officer is required to request ECIT assistance. Upon the release of Directive 850.20, officers were required to perform

a knowledge check to make sure they understood the Directive. The knowledge check includes a test question on ECIT response criteria as well as a question on how to make a request for ECIT assistance. Of 817 officers who took the knowledge check on Directive 850.20, 814 (99.63%) correctly identified the response options that would require an ECIT dispatch. All 817 officers correctly identified the requirement to request an ECIT officer through BOEC. Furthermore, in PPB's 2016 In-Service, officers were provided refresher information on the content of Directive 850.20 and engaged in an evaluation of officer retention. Results of the In-Service evaluation should inform the 2017 Needs Assessment. Taken together, we believe PPB has substantially complied with the requirements of Par. 103, though PPB should continue to evaluate officer comprehension and adherence to Directive 850.20 using organizational data.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • COCL interviews of PPB and BOEC personnel; Directive 850.20 and associated knowledge check; 2016 In-Service |

---

### Settlement Agreement Paragraph

104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed PPB public awareness efforts; Reviewed BHU website; Reviewed BHUAC minutes |

### Compliance Assessment

PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe that PPB has made a serious effort to highlight the work of the BHU in its entirety, not only ECIT.

Per BHUAC meeting minutes, on October 26, 2017, PPB presented to BHUAC a list of outreach efforts to increase awareness of BHU, ECIT, BHRT, and SCT. This is responsive to a recommendation we have made in previous compliance reports. BHUAC appeared impressed by the type and scope of outreach performed by BHU. Upon review by BHUAC, a discussion ensued about areas where outreach may be enhanced, though no formal recommendations were made on additional outreach. Based on this and our previous review of PPB outreach efforts, we believe the requirements of Par. 104 have been substantially complied with. PPB should continue to highlight the work of all aspects of BHU.

| COCL Recommendations | • Continue to highlight the work of all aspects of BHU |
|---|---|
| Compliance Rating Based On | • COCL review of public awareness/education documents<br>• COCL review of minutes for presentation to BHUAC |

### Settlement Agreement Paragraph

105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Mental Health Mask data; Interviewed BHU and PPB personnel |

### Compliance Assessment

In the third and fourth quarter of 2016, PPB used the Mental Health Mask (MHM) as the method for collecting the data points required in Par. 105. Although there remain some issues with reliability related to the MHM (see our last report), we believed it was overall sufficient to capture the data points. However, issues of discoverability in the legal process has forced PPB to modify the process and when the MHM information will be collected.

Per PPB, the data collected on ECIT mental health interactions will likely not be significantly affected – ECIT officers will still be required to complete a data template on calls where they are acting in an ECIT capacity. Additionally, ECIT and non ECIT officers will complete the data template for all calls with a mental health component in which a General Offense Report (GO) is completed. We ask PPB to consider the potential for an ECIT call (as coded by BOEC) being handled by a CIT officer when an ECIT officer is not available but without the completion of a GO. In that case, the officer should be required to complete a MH template.

In addition to tracking mental health calls using the MHM, the BHU is required to report on the data collected. As part of PPB's supporting documents for their quarterly reports, we have reviewed reports that summarize the MHM data as it relates to ECIT involvement such calls, community member demographics, the presence of a weapon, the techniques used (e.g. de-escalation, disengagement, etc.), the use of force, injuries related to the call, the presence of supervisors or mental health professionals, and the disposition of the call. PPB should utilize such data to assess their current strategies and identify potential ways to improve response. Although we have reviewed the reports, they do not appear on the PPB's BHU website and

| | therefore the community does not have the benefit of reading them.  We recommend PPB post these reports on the BHU website. |
|---|---|
| **COCL Recommendations** | • Evaluate future data collection tools for mental health interactions to ensure that data are collected for all calls meeting ECIT criteria<br>• Utilize MHM reports to assess current strategies and identify potential ways to improve response<br>• Post MHM data reports on website |
| **Compliance Rating Based On** | • COCL review of Mental Health Mask data<br>• COCL interviews with BHU and PPB personnel |

### D. Mobile Crisis Prevention Team

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.

107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Reviewed BHU Unit Structure |

**Compliance Assessment**

PPB continues to have a BHRT car in each precinct comprised of one officer and one qualified mental health professional. For the officer, the BHRT is considered their full-time assignment. With regards to the PPB's requirements of these paragraphs, they continue to be in substantial compliance.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • COCL review of BHU Unit Structure |

**Settlement Agreement Paragraph**

108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed BHUAC minutes; Reviewed SOP #3-2; Reviewed SOP #43 |

**Compliance Assessment**

In the third quarter of 2016, SOP #3-2 ("Behavioral Health Response Team") was signed by the Central Precinct Commander. In the same vein as SOP #3-3 ("Enhanced Crisis Intervention Team"), the language of SOP #3-2 indicates that the BHU Lieutenant will "Review any sustained IA investigation involving force or misconduct…" As with our assessment of Par. 101, the SOP was signed prior to our last report (when we first identified the inconsistency with the Settlement Agreement). We therefore recommend PPB refer to the language we set forth in our assessment of Par. 101 when revising SOP #3-2 so that it reflects the requirements of the Agreement.

Upon this revision and the continued use of SOP #43 (for ongoing participation), we believe PPB will have sufficiently defined criteria for qualification, selection and ongoing participation of officers in the BHRT and done so using the consultation of the BHUAC.

| **COCL Recommendations** | • Revise SOP 3-2 to become consistent with the Settlement Agreement |
|---|---|
| **Compliance Rating Based On** | • COCL review of SOP #3-2<br>• COCL review of SOP #43 |

**Settlement Agreement Paragraph**

109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed BHUAC recommendations for SOP #3-2 |

**Compliance Assessment**

**Exhibit B**
**Pg. 61 of 124**

In the third quarter of 2016, SOP #3-2 ("Behavioral Health Response Team") was signed by the Central Precinct Commander. The recommendations of BHUAC regarding BHRT member training is memorialized within SOP #3-2. The SOP contains a declaration of PPB's "strong commitment" to BHRT officers continuing to attend training "based on availability and funding" (SOP #3-2). We commend PPB for documenting this commitment in the SOP.

In the third and fourth quarter, members of BHRT (as well as other members of BHU) attended trainings related to trauma informed care, threat assessment, crisis negotiation, crisis intervention, and mental health holds. Where appropriate, we recommend PPB create supplemental training material specific to Portland.

| | |
|---|---|
| **COCL Recommendations** | • Develop supplemental training material specific to Portland context where appropriate (for example, resource guides and updates) |
| **Compliance Rating Based On** | • COCL review of SOP #3-2<br>• COCL review of external training documents |

---

**Settlement Agreement Paragraph**

110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Mental Health Mask data |

**Compliance Assessment**

PPB initiated the Mental Health Mask (MHM) in the first quarter of 2016. Although PPB puts forth summary information on MHM results it is not clear if BHRT is currently using the data to connect specific "service recipients with service providers." One way that PPB could accomplish this is to cull through the MHM data to identify individuals who may have repeat contacts with PPB officers but who have not been referred to BHRT. This would be a proactive attempt to identify persons that may benefit from BHRT services without having to rely on referrals from PPB officers. PPB may also consider identifying areas, locations, and facilities where interactions involving persons with mental illness have higher frequencies and determine whether additional resources or strategies are necessary. Although this could be done with the current iteration of the MHM, future revised versions of the MHM should also ensure that these types of analyses can be accomplished.

| | |
|---|---|
| **COCL Recommendations** | • Use current MHM data to identify potential BHRT clients<br>• Ensure that future revised versions of the mask retain the ability to identify potential BHRT clients |

| | |
|---|---|
| **Compliance Rating Based On** | • COCL review of Mental Health Mask data and BHU reports.<br>• Lack of evidence related to BHRT utilizing MHM data to identify individuals for intervention. |

<br>

**Settlement Agreement Paragraph**

111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed Directives 850.20, 850.21, 850.22, and 850.25; Engaged in policy review with PPB and DOJ |

**Compliance Assessment**

    Revisions of Directives 850.21, 850.22, and 850.25 were made in the third quarter of 2016 to reflect the practice of AMR providing transportation for a person on a mental health hold. The revisions were made in consultation with DOJ and COCL and the Directives received DOJ approval in the fourth quarter of 2016. However, the directives have not yet been signed by the Chief as the practice of AMR transports is contingent upon the opening of the Unity Center. This is to be accomplished in the first quarter of 2017. We expect that PPB will issue the revised directives once the Unity Center PES comes on line and train members on the revised directives to ensure comprehension throughout the Bureau. This training should include a test of comprehension.

| | |
|---|---|
| **COCL Recommendations** | • Issue revised directives once Unity Center PES opens<br>• Train and test members on revised directives |
| **Compliance Rating Based On** | • COCL review of Directives 850.20, 850.21, 850.22, and 850.25 |

Exhibit B
Pg. 63 of 124

**E. Service Coordination Team**

<table>
<tr><td colspan="2" align="center">**Settlement Agreement Paragraph**<br><br>112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs.</td></tr>
<tr><td>**Compliance Label**</td><td>Substantial Compliance</td></tr>
<tr><td>**Methodology**</td><td>Reviewed SCT outcome measures; Reviewed SCT Referrals Report</td></tr>
<tr><td colspan="2" align="center">**Compliance Assessment**<br><br>        PPB continues to facilitate the provision of services to individuals who experience drug-addiction, mental illness, and are chronically involved in criminal behavior. The SCT coordinates access to housing, medical, counseling, and addiction/mental health services. Members of the SCT are proactive in seeking out collaborations with other stakeholders in the State of Oregon. SCT currently has a graduation rate of approximately 20%. Those who do graduate, have significant improvements on measures of employment. We continue to believe SCT substantially complies with the requirements of Par. 112 and commend them for the work they are doing.</td></tr>
<tr><td>**COCL Recommendations**</td><td>• Continue collecting data related to SCT outcomes<br>• Use outcome data to inform program improvements<br>• Continue efforts to collaborate with other State stakeholders</td></tr>
<tr><td>**Compliance Rating Based On**</td><td>• COCL review of SCT process<br>• COCL review of SCT outcome measures<br>• COCL review of State Behavioral Health Collaborative Team application</td></tr>
</table>

**F. BOEC**

<table>
<tr><td colspan="2" align="center">**Settlement Agreement Paragraph**<br><br>113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals.</td></tr>
<tr><td>**Compliance Label**</td><td>Substantial Compliance</td></tr>
</table>

| Methodology | Interviewed BOEC personnel; Reviewed BOEC protocols; Reviewed BHUAC minutes |
|---|---|

**Compliance Assessment**

As indicated in our previous report, BOEC has completed the policies and procedures prescribed within Par. 113. The BOEC policies and procedures direct call-takers and dispatchers when to transfer a call to an ECIT officer (i.e. mental health crisis and: (1) upon request of a community member; (2) upon request of the responding officer; (3) where the subject is violent; (4) where the subject has a weapon; (5) where the subject is threating or attempting suicide or; (6) the call is at a residential mental health facility) or when to transfer a call to the Multnomah County Crisis Line.   Although there is no process to assign calls directly to NGOs or community-based mental health professionals, the Crisis Line acts as a referral point and is better equipped to identify potential resources for the person with mental illness than BOEC.  Crisis Line can determine if the person already has a mental health services provider and can help coordinate care.   Crisis Line has information on referrals for persons not connected to services. Furthermore, the Crisis Line can dispatch Project Respond.  Finally, the Crisis Line will re-engage BOEC if they identify an imminent threat involved with the call (e.g. overdose or presence of a weapon) and BOEC can then dispatch an ECIT officer.  Thus, while BOEC's policies do not require them to dispatch to a NGO or community-based mental health provider, their partnership with Crisis Line meets the intent of Par. 113 within the system available to them.

Additionally, the policies and procedures were created with feedback from BHUAC. In future reports, we will be looking at the application of the policies and procedures and interviewing BOEC and PPB personnel to identify potential barriers in the process.  Should barriers be identified, we recommend BOEC consult with BHUAC on how they might be resolved, and revise accordingly. However, at this time, we believe BOEC has substantially complied with the requirements of Par. 113.

| **COCL Recommendations** | • Conduct periodic assessment of policies and procedures to identify issues or concerns, consult with BHUAC on potential resolutions, and revise accordingly |
|---|---|
| **Compliance Rating Based On** | • COCL review of BOEC protocols for ECIT dispatch<br>• COCL review of BOEC protocols for suicidal callers<br>• COCL review of BHUAC minutes |

**Settlement Agreement Paragraph**

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| Compliance Label | Partial Compliance |
|---|---|

| Methodology | Observed BOEC CIT Training |
|---|---|

## Compliance Assessment

In November of 2016, the COCL team observed an eight-hour CIT training provided by BOEC to a group of emergency communicators (call-takers and dispatch personnel). We note that BOEC had originally planned for a 16-hour training on CIT, though were initially unable to do so. BOEC employees who received the 8-hour training will receive an additional 8 hours in the second quarter of 2017. New hires will receive the 16-hour training as a single block, which we are told will begin in the second and third quarter of 2017.

This training was developed in consultation with BHUAC. In December of 2016, we provided BOEC with an oral assessment of our perceptions of the training and subsequently provided them with a Technical Assistance (TA) Statement in the first quarter of 2017. Although our TA Statement was not released until the first quarter of 2017, the work was performed in 2016 Q4 and is therefore appropriate to include in this report.

One issue that we observed in the training was a lack of subject matter experts in several segments of the training. For these segments, BOEC supervisors presented the material despite not being content experts in mental health response and mental illness. During these sessions, it was clear that the BOEC supervisors were not completely familiar or comfortable with the subject material. For all training topics outside the expertise of BOEC supervisors, subject matter experts should present the material.

We also note that, although handouts were provided for some segments of the training, there were not handouts for all segments and the materials were distributed inconsistently across different training days. For instance, a member of DOJ attended the BOEC training the day after we observed. When comparing our notes with DOJ, we found that the training attended by COCL received handouts not provided to students at the training observed by DOJ. This was apparently the result of two different instructors teaching the session on different days.

In other sections, the information was not delivered in a manner consistent with most CIT trainings. For example, the emergency communicators watched a video that simulated a person "hearing voices." Although "hearing voices" exercises are common in CIT trainings, it is more often the students themselves who go through the experience rather than watching a video of someone else experiencing it. This can be accomplished through the use of headphones or other means. However, the point of the exercise is for the student to gain greater understanding of how difficult it is to complete seemingly easy tasks when experiencing auditory hallucinations.

As another example, emergency communicators watched a video wherein individuals with schizophrenia discussed life with mental illness. In most CIT trainings, a consumer or family panel is used to facilitate discussion, though in this instance, the video was used as a substitute. While the video saved time and resources compared with having a family or consumer panel, there is a net loss compared with the experience and insight that would have come with a panel. The video also does not allow for a question/answer session, is not unique to the Portland experience, and was solely focused on schizophrenia. BOEC has informed us that future trainings will include a panel portion.

The scenario portion of the BOEC training contained several issues that should be addressed for future trainings. One issue was an apparent lack of engagement by the emergency

communicators, who did not approach the scenarios as an opportunity to practice the skills they had just learned. We believe this may have been mitigated by holding the scenarios in a more true-to-life manner. During the scenarios, all emergency communicators sat around a table and only four of them actually participated in a scenario. The others were asked to write down suggestions if one came to mind to assist that participant. Instead, we suggest that future training scenarios have the emergency communicator be at a work station where they are required to type information into a computer and where there is not outside assistance. This would be much more real-life and would force the participants to focus on the task at hand.

We also noted that the debriefing session for the scenarios only focused on the positive actions taken by the participant and did not offer constructive feedback on things that could be improved. This may be due to the BOEC supervisor acting as the assessor of behavior rather than a subject matter expert. In the future, those more familiar with crisis communication skills would be preferable as they would be able to provide a more comprehensive assessment of student performance.

Finally, the policies and procedures referenced in Par. 113 were presented to the emergency communicators. Although the policies and procedures were already enacted by BOEC, the training session gave the participants a chance to ask questions and receive clarity. We noted a number of concerns regarding the revised BOEC policies or the reasons why the changes were necessary. We have been informed that many of BOEC personnel's concerns related to liability for utilizing discretion for when to transfer calls to the Multnomah County Crisis Call Center and when to dispatch an ECIT officer. In the first and second quarter of 2017, we will probe these concerns by interviewing emergency communicators, identifying the specific causes of the concerns, and working with BOEC to resolve the issues.

| COCL Recommendations | • Continue training all emergency communicators<br>• Obtain subject matter experts for all relevant classes<br>• Ensure consistent distribution of information across all trainings<br>• Include exercises and panels in place of videos<br>• Enhance scenario portion of CIT training |
|---|---|
| Compliance Rating Based On | • COCL observation of BOEC training<br>• Review of Training Materials |

| **Settlement Agreement Paragraph** |
|---|
| 115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff. |

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observed BOEC Training |
| **Compliance Assessment** | |

The ability of BOEC to comply with Par. 115 is contingent upon the successful delivery of training, BOEC personnel conformance with the training, and BOEC's ability to provide data indicating that "Crisis Triage is fully operational." This conforms to the overall model that sound policies should lead to sound training, which in turn should lead to improved behavior (appropriately measured).  Currently, BOEC has created revised policies and procedures that we believe are in accordance with the requirements of Par. 113 (see above).  Additionally, BOEC begun training emergency communicators on the policies and procedures as well as in CIT in general. As evidenced in our assessment of Par. 114, we cannot yet categorize the delivery of training as "successful" until further improvements are made.  Thus, at this part of the model, BOEC needs to refine the training so that they can better measure adherence to the policies and procedures.

In the first and second quarter of 2017, we will interview BOEC personnel to assess understanding of (and by extension, conformance with) the new policies and procedures. Upon the successful evaluation of these aspects, we will then work with BOEC to set up systems of self-monitoring to assess their Crisis Triage data and establish benchmarks for what may be considered "fully operational."

To comprehensively evaluate whether Crisis Triage is "fully operational," we believe BOEC may need to hire an analyst position. Currently, BOEC is unable to produce or analyze data in a manner that is responsive to the Settlement Agreement. We recommend that BOEC either hire an analyst or coordinate with PPB to perform joint analysis of mental health response.

| **COCL Recommendations** | <ul><li>Continue training all emergency communicators</li><li>Obtain subject matter experts for all relevant classes</li><li>Ensure consistent distribution of information across all trainings</li><li>Include exercises and panels in place of videos</li><li>Enhance scenario portion of CIT training</li><li>Obtain an analyst to evaluate BOEC responsibilities</li></ul> |
|---|---|
| **Compliance Rating Based On** | <ul><li>COCL observation of BOEC training</li><li>Review of training materials</li><li>Unfulfilled request for data</li></ul> |

# VII. EMPLOYEE INFORMATION SYSTEM

### Settlement Agreement Paragraph

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to collect data necessary to conduct these analyses at supervisor- and team-levels.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Discussions with EIS/PPB personnel; Reviewed PPB EIS analysis |

### Compliance Assessment

In the absence of compelling evidence that PPB had developed a fully functioning EIS program, the COCL, on several occasions, has encouraged the PPB to do so. PPB then asked for consultation on EIS enhancements. In December of 2016, the COCL provided a draft Technical Assistance Statement (TA Statement) to PPB regarding specific ways in which PPB could improve the process of assessing EIS flags, forwarding them on for supervisor or panel review, determining an appropriate intervention, and monitoring officer conduct post-intervention (see Appendix B). Our model for enhancing the EIS process used the SARA model of problem solving as a heuristic device (S=Scan the environment to identify the problem; A=Analyze the problem to understand contributing factors; R=Respond to the problem with interventions; A=Assess the effectiveness of the interventions and make adjustments as needed). COCL provided various ways in which each step of the SARA model could be executed using other police agencies as examples. Rather than acting as a prescriptive document (i.e. imposing certain actions to be taken by PPB), the TA Statement identifies the tenets of a comprehensive system for preventing future adverse events involving officers and allows PPB to determine a course of action which best fits with its organizational structure and workforce issues.

We also note that, compared with other sections of the Settlement Agreement, the enhancement of EIS has made the least progress. Time and again, we have been told by EIS personnel that the way EIS is currently being used is sufficient to satisfy the Settlement

Agreement, despite the continued disagreement from COCL and DOJ. Consequently, we have seen little in the way of meaningful progress during this review period, with little more than academic arguments about the predictive value of EIS. After two years, we believe more progress should have been made and urge PPB to make substantive changes in 2017. In particular, we are asking PPB to have an open mind about the potential benefits of a fully-functioning EIS program and to develop a program that is tailored to the specific needs and work environment of the PPB.

As for their current procedure of evaluating subsections (a) and (b) of Par. 116, PPB reports some decreases in compliance with supervisory reviews. For subsection (a) (supervisors performing semi-annual reviews), compliance was at approximately 60% for both the third quarter (Q3) and fourth quarter (Q4) of 2016. PPB indicates that the restructuring of the Bureau prior to Q3 has impacted the rates. As the re-organization of the Bureau settles, we would expect this percent to improve to previous levels. For subsection (b) (supervisors performing reviews to officers new to their command), compliance rates dipped to approximately 65% in Q3, which ranged from 84% to 99% in previous quarters. PPB identified this decrease as an issue of concern and quickly responded. In the fourth quarter, compliance with subsection (b) increased to 88.7%. We commend PPB for moving quickly to address the lower compliance rates in Q3 and recommend that they continue to monitor and respond to compliance rates for these subsections.

Despite PPB's efforts to monitor compliance with reviews required in Pars. 116 and 117, COCL maintains that the intent of this requirement goes much further than simply conducting reviews of employees. These reviews and presumed responses were meant to be grounded in the analysis of PPB data and observed patterns of personnel behavior: "PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion." This has yet to happen in a systematic manner.

A century of social science research is based on the premise that human behavior is not random and that past behavior is often indicative of future behavior. In the current context, some officers engage in more at-risk behaviors than others. When adequately measured, certain variables have the power to identify officers whose future behavior are more likely to be problematic for the Bureau, the community, and the officer's employment. In 2016, EIS administrators rejected this premise.

When PPB reviews an EIS flag, the evaluation should focus on the <u>pattern</u> of force events and potential explanations rather than the individual events that caused the flag. The evaluation should address why that person demonstrates a higher rate of force, complaints, community member injuries, etc. compared with other similarly situated officers, assuming there exists some meaningful pattern. Based on the reasons for higher rates, interventions may (or may not) be developed and implemented for the officer and performance would then be monitored to determine whether further intervention is necessary. We urge the PPB to develop an EIS program that is more comprehensive, not only by utilizing existing PPB data but by encouraging supervisors and commanders to become more involved in the systematic review of at-risk officers. Allowing one or two EIS administrators to decide whether a flag has merit is not consistent with the intent of EIS. EIS should be a tool that encourages and supports supervisory intervention in a preventative manner and is overseen by senior PPB administrators.

| COCL Recommendations | • Reassess EIS process in accordance with our TA Statement<br>• Create measurements for each step of the EIS process to ensure consistent and reliable interventions |
|---|---|
| Compliance Rating Based On | • COCL review of EIS and threshold review process<br>• COCL discussions with EIS Administrators |

### Settlement Agreement Paragraph

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed EIS/PPB personnel; Reviewed EIS program |

### Compliance Assessment

The thresholds PPB is required to maintain based on Par. 118 continue to be used to flag officers for case management reviews. PPB has also expanded the thresholds to include the requirement of Par. 119. Thus, PPB has substantially complied with these two paragraphs. However, as in previous reports, we have argued that the thresholds identified in the Settlement Agreement are too broad to adequately identify individuals who might benefit from a case management review (many will go undetected). In the interest of developing a comprehensive and effective EIS program based on best practices, we maintain our recommendation that PPB consider revised thresholds for EIS review. Hopefully, that will occur in the context of revisiting Par. 117. However, the authors of the Settlement Agreement agreed on the thresholds present in Pars. 118 and 119 and, therefore, PPB's compliance should not be judged on the basis of a higher standard. We therefore assess PPB's compliance utilizing the current thresholds.

| COCL Recommendations | • Explore the potential for lower thresholds to identify a larger population of at-risk employees |
|---|---|
| Compliance Rating Based On | • COCL review of EIS thresholds |

| Settlement Agreement Paragraph | |
|---|---|
| 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed Directive 345.00; Reviewed EIS Program |

**Compliance Assessment**

PPB report in their Q4 update that a Sergeant has been transferred to the Professional Standards Division and will become an additional EIS Administrator, bringing the total to three for the timeframe of this report (however, this was not meant to be a permanent change and the total has since returned to two EIS Administrators). This new EIS Administrator will also compile a "reference library containing material that will supplement the on-the-job training and identify domains of knowledge necessary for successful functioning as an EIS Administrator." We believe this is consistent with our recommendation in previous reports to compile a training manual for EIS and have resources devoted to the pursuit of best practices and evidence-based policing. Therefore, substantial compliance will be achieved pending the sufficient completion of the manual.

| **COCL Recommendations** | • Move forward with plans to create and implement reference library for EIS Administrators<br>• Provide COCL with updates as necessary |
|---|---|
| **Compliance Rating Based On** | • PPB previous training of EIS Administrators |

# VIII. OFFICER ACCOUNTABILITY

## A. Investigation Timeframe

### Settlement Agreement Paragraph

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, including appeals, if any, to CRC. Appeals to CRC shall be resolved within 21 days.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Campbell DeLong Resources, Inc. Stakeholders Report; Observe City Council Presentation; Review draft of proposed accountability changes |

### Compliance Assessment

Using the memorandum provided by the Accountability Focus Group in the second quarter of 2016 (see our previous compliance assessment), the City crafted an overhaul to the accountability system which streamlined the process of complaint investigation (removing the "byzantine" structure), allowed for supervisory investigations of lower-level complaints, limited the criteria by which a complaint may be dismissed (leading to the investigation of nearly all complaints), and combined the PRB/CRC. In this proposal, the responsibility for findings stayed with the RU Manager. The proposal was met with disapproval from community members during a town-hall held in August of 2016. As a result of the community disapproval, the proposal was not put in front of the Council as had been previously scheduled.

In September of 2016, the City Auditor and Director of IPR went before City Council with a separate proposal for changes to City Code that they believed would respond to the requirements of the Settlement Agreement. This separate proposal included steps to reduce the number of days taken to perform an administrative investigation, maintain the separation of the Citizen Review Committee (CRC) and Police Review Board (PRB) meetings (thus keeping CRC open to the public), allow for the investigating agency to prepare findings, limit the authority of the Independent Police Review (IPR) to dismiss cases, and expand the potential for "meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary" (see Par. 128).

During the City Council meeting, a number of comments from community organizations, citizens, and CRC members demonstrated public opposition to some aspects of the proposal. Based on the concerns heard, the City Council continued the hearing on the accountability plan

indefinitely so that a public-held stakeholders group could be convened to discuss the more contentious aspects of the Auditor's plan. That workgroup held two meetings in November.

The workgroup identified areas of agreement as well as issues which still remain in debate. Expanding the number of CRC members, quorum levels, and the presence of public comment were all considered areas where the various stakeholders agreed. The point in the CRC meeting where public comment is appropriate (prior to or after a decision is rendered) was heavily debated with no consensus gained. The ability of CRC to take public comment at the case file review hearing was also debated, though not as contentiously. The workgroup also identified nine topic areas for future discussion.

The time taken to form an accountability plan that responds to the Settlement Agreement and that reduces the number of days for an administrative investigation has been harrowing. As the City Auditor stated in her testimony to City Council, "These conversations have been going on for over a year." In response to City Council tabling the discussion for future consensus on the accountability proposal, one Commissioner stated "I don't believe there will ever be a proposal on this issue that has consensus support."

We agree with the City Auditor that these conversations have been going on for a long time. We also agree with the Commissioner that proposed changes cannot be delayed until consensus by all involved is achieved. Indeed, proposals for accountability reform have continuously evolved and yet there remains disagreement between the various stakeholders on a number of issues. We agree that the closed-door meetings of the original workgroup (see our April 2016 compliance assessment) did not meet the spirit of the Settlement Agreement and therefore applaud the City Council for delaying voting on any proposal until community input could be gathered. However, the workgroup did not meet until two months after the decision of the City Council and no proposed accountability changes have been accepted to date.

Simply stated, discussion on this issue cannot continue indefinitely due to a lack of consensus. A finalized plan needs to be crafted and implemented as soon as possible utilizing input from the community. Furthermore, any plan must not be "band-aids on a bullet wound." Small changes which do not lead to substantive improvements in the police accountability system are not sufficient. IPR, IA, and the City Council need to create a plan for reform and implement the changes necessary to satisfy Par. 121 as well as Par. 128 (see below). We believe that some changes recommended by the City Auditor and IPR are important to accomplishing the reform goal. For instance, we agree that the investigating entity should also propose findings as they are most familiar with the facts of the case. Additionally, we believe that expanding the role of IPR is beneficial. However, we await a final proposal before providing a final assessment.

In our previous report, we indicated that CRC appeals were experiencing a 6-month delay in being heard. In the September 2016 hearing before City Council, the City Auditor indicated a 9-month backlog of hearing appeals, stating "the current backlog extends to next June." However, around that time, CRC doubled their efforts to hear appeals, which led to the current absence of any backlog. We appreciate the efforts of CRC to eliminate the backlog, but hearing more appeals can come at the expense of preparing for and engaging in other CRC responsibilities. In the final analysis, doubling down efforts by relying on the current number of CRC members is not sustainable and we therefore agree with stakeholders and the City Auditor that membership should be expanded and rotating panels be implemented.

| COCL Recommendations | • Create and implement a plan for satisfying Par. 121 as well as 128 |
|---|---|
| Compliance Rating Based On | • COCL discussions with community members, City officials and PPB<br>• COCL review of Stakeholders Report prepared by Campbell DeLong Resources, Inc.<br>• COCL review of City Auditor Proposal |

---

### Settlement Agreement Paragraph

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Criminal-IA Concurrent Investigation Audit Reports for 2016 Q3 and Q4; Reviewed Directive 0330.00 |

### Compliance Assessment

In the third and fourth quarter of 2016, PPB continued to provide documentation indicating when Internal Affairs investigations began compared with when criminal investigations began. For nearly all cases, the investigations began within a couple days of each other and therefore meet the criteria for "concurrent." There are two cases where this did not occur.

In the first case, the administrative investigation began more than one month after the criminal investigation. PPB states in their quarterly summary reports that "Due to personnel changes with the CHO and the PSD Captain, IAD was not notified of this case until 8/19/2016, at which time a concurrent administrative investigation was opened." As the criminal investigation ended on 8/18/2016 and the administrative investigation began on 8/19/2016, it cannot be considered a "concurrent investigation" in any respect. We understand that personnel changes come with an expected learning curve. However, this also brings up concerns regarding procedures within PPB, specifically, when a criminal investigation begins, what is the requirement for notifying IA and who is responsible for notification? Furthermore, as notification did not occur, was an EIS entry made for the party responsible for this failure to act? If not, we recommend an EIS entry be made.

In the second case, the documentation implies that a criminal investigation began ten days after the initiation of the administrative investigation. We spoke with PPB regarding this case and were informed a criminal investigation was in fact opened the day after the administrative investigation began, though documentation in AIM did not occur until 10 days

later. Thus, while the cases were, in fact, investigated concurrently, documentation fell short. This again raises concern about consistency in procedure. We recommend in this instance as well that an EIS entry be made.

The language of Directive 0330.00 remains in contrast with the Settlement Agreement. COCL, PPB, and DOJ have engaged in revisions of policy related to the Agreement, though have not yet discussed Directive 0330.00. When this directive is discussed, PPB must ensure that it is consistent with Par. 122.

| **COCL Recommendations** | • Revise Directive 0330.00 to reflect the requirement of Par. 122<br>• Make EIS entries for failure of notification/documentation |
| --- | --- |
| **Compliance Rating Based On** | • COCL review of Criminal-IA Concurrent Investigation Audit reports |

**Settlement Agreement Paragraph**

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Interviewed City/PPB personnel; Reviewed Q1 and Q2 overdue case documents |

**Compliance Assessment**

PPB continues to provide reports indicating which cases went beyond the 180-day timeline. In those reports, PPB identified the source of the delays and provided remedies for avoiding future occurrences as required by the Agreement. While we await the finalization of a revised accountability process, we urge the PPB to continue to reduce the time taken at each step of the process.

Remedies for delays identified by PPB have improved in some respects (see our previous report), though there continue to be instances where actionable steps in remedies are not present. For instance, one case was delayed "due to the wrong directive being submitted with the original findings packet." The IA Lieutenant stated "With the constant revising of directives, it has been difficult to determine which version of a directive was in place at the time of the incident. I know that there have been strides made within the division to ensure this kind of error will not happen again." Without explanation of the strides, the action plan does not contain the documentation needed for review.

We saw numerous instances where the delay was due to an incomplete investigation (witnesses not interviewed, missing allegations, etc.) which caused the case to be sent back, thus adding to the total number of days needed for the review. In some instances, the remedy was

an exhortation on the importance of a complete and thorough investigation, which does not qualify as actionable steps. In other instances, the investigative steps needed by investigators was reinforced, which is more in-line with actionable steps. Additional action may be necessary if deficient investigations continue to be identified (e.g. EIS entry).

Other cases were confusing in the information reported by PPB. For instance, the recommended action plan for one case stated, "A large part of the delay on the part of IA was with the officer being unavailable due to LOS status for 27 days. This should be considered a tolling period." We agree that Leave of Service (LOS) time should not count against PPB (see below). However, the IA investigation period was 57 days overdue and thus the remaining 30 days are not explained. Furthermore, the LOS section of the report indicates the officer was on LOS from June 7 through June 19 (12 days). In the IA Investigative section of the report, it states the officer was on LOS from May 9 through June 19 (41 days). Thus, the report is not only incomplete in its justification, but internally inconsistent.

As an example of actionable steps, one IA Lieutenant entry stated, "In the future, [complicated cases with many witnesses], especially when assigned to newer investigators, will have a more senior investigator assigned to deal with the potentially overwhelming complexity." This is a specific, actionable plan, which directly responds to the problem of delay with a specific remedy. We recommend all action plans contain this type of response and that actionable responses be memorialized in relevant SOPs. If additional analysis is needed to identify the source of the problem, then it should be performed. For example, other plans indicated more investigators were needed to reduce caseloads, suggesting that understaffing was part of the problem. In response, PPB hired three new investigators, which should reduce the total number of days needed.

For cases where officers are on LOS, we do not believe those delays are within the control of PPB. However, we also noted some instances where the investigators vacation time was the reason for the delay. This is not the same as LOS and would not be an acceptable reason for delays, since proper scheduling of personnel should address this issue, assuming adequate staffing. To their credit, PPB has hired more investigators and has begun cross-training in order to account for vacation time. We would expect that delays due to vacation would become less common in the future.

Although not required by this paragraph, it may be helpful for IPR to undertake a process similar to the reports provided by PPB. In many cases, we noted instances where stages under the direction of IPR were overdue, though no explanation or plan of action was provided because it is a PPB document. We anticipate these issues may be addressed when a finalized accountability process is put into place. However, for the internal operation of IPR, these types of reports may provide utility.

| **COCL Recommendations** | • Provide definitive steps for preventing future delays<br>• Include individual accountability steps in addition to system steps |
|---|---|
| **Compliance Rating Based On** | • COCL review of overdue case documentation |

**B. On Scene Public Safety Statements and Interviews**

---

**Settlement Agreement Paragraph**

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Participate in 1010.00 discussions |

**Compliance Assessment**

    Protocols for compelled statements were included as part of the Directive 1010.00 discussions which occurred in 2016 Q3 and Q4, though this particular aspect was largely punted until the first quarter of 2017. We will report on the proposed revisions to the protocols in our next report, as substantive discussion on *Garrity* and the issue of compelled statements did not occur until February. Based on the initial discussions which occurred in the third and fourth quarter of 2016, we believe PPB has partially complied with this paragraph.
    In the fourth quarter of 2016, the PPA contract was negotiated to remove the "48-hour rule" which required a two-day period before officers could be compelled to provide a statement to the Internal Affairs. We support the decision to remove the 48-hour rule, though caution PPB not to informally continue the practice by delaying statements more than that necessary to gather the relevant facts of the event. The issue surrounding the 48-hour rule was that statements of involved officers were not being collected with expediency. Thus, with the impediment of the 48-hour rule removed, PPB can now compel statements as soon as practical.

| COCL Recommendations | • Compel statements as soon as practical |
|---|---|
| Compliance Rating Based On | • Participation in 1010.00 discussions |

---

**Settlement Agreement Paragraph**

125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding

the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed CRO's for 2016 Q4 OIS |

### Compliance Assessment

During the fourth quarter of 2016, there was one officer-involved shooting (OIS). We reviewed the case file for this incident. A total of 11 CRO's were issued related to the OIS. There was one witness officer who was not issued a CRO, though this officer is employed by Gresham Police Department and was assigned to the Transit Division based out of the Central Precinct. We spoke with PPB regarding the non-PPB employee and the potential for issuing a CRO. PPB stated that they have no authority to issue a CRO to a non-employee. We agree that PPB has no legal authority to direct the actions or communication of someone who is not employed by them. However, we suggest PPB craft a non-binding statement for non-employees, urging the necessity to "safeguard the integrity of the investigation" (quotation from PPB's CRO form). Language from the current CRO form may be altered so that the message remains without the form being a mandate. The non-employee would not be required to sign the form – rather, it is just an information sheet. An alternate possibility would be to read language at the end of a non-employee witness interview that again would be non-binding. We make these suggestions in order for PPB to document their efforts in such situations, given the possibility that information can be easily transmitted through non-PPB employee witnesses. Although not required by the letter of Par. 125, we believe this type of agreement certainly fits within the spirit of it.

To determine the immediacy with which witness and involved officers were separated, we use the time where the medical unit arrived on-scene as a reference point. We believe this point in time is a good indication of when a scene might be considered "secure" and when supervisors ought to begin performing their post-shooting responsibilities. In the Q4 OIS, BOEC records indicate that medical was called in from their staging position at 12:35 AM and arrived on-scene at 12:36 AM.

At 12:39 AM, BOEC records indicate that all officers on-scene were directed to report to a particular Sergeant so that a determination of who was a witness and who was involved could be made. A supplemental report from that Sergeant states that after determining who would be designated as witness officers, they were separated and assigned an uninvolved officer to stand with them. We found two supplemental reports from uniformed officers indicating they acted as "companion officers." One supplemental report related to the companion officer for the involved member. The second supplemental report related to the companion officer for a witness member. Although the casebook for this OIS indicates 11 witness officers and 1 involved officer, there are only two supplemental reports from companion officers. We recommend PPB instruct all companion officers to complete reports in order to comprehensively document the separation of witness/involved officers.

At approximately 3:40 AM, the Detective Division began interviewing witness officers. CRO's are issued immediately after the completion of Detective Division interviews. Based on

the documentation provided in the casebook, the first CRO was issued at 4:10 AM and the final CRO was issued at 6:06 AM. Thus, all CRO's were issued between 4 and 6 hours after the scene could be considered "secure." As we have said in previous reports, considering the time needed to arrive on-scene and gather a rudimentary understanding of the occurrence and people involved, and conduct Detective Division interviews, we believe this meets the criteria for "immediately" issuing CROs.

The CRO form used in the OIS does not reflect the changes we recommended in our previous report so that the language might be consistent with the language of the Settlement Agreement. In our previous report, we suggested a language change to, "The CRO will be rescinded upon the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney. In the event the Detective Division investigation is still ongoing at the conclusion of the Grand Jury or District Attorney disposition, the CRO will remain in effect until the conclusion of the Detective Division investigation."

| COCL Recommendations | • Require reports from all companion officers<br>• Revise wording of CRO rescinding to comply with Par. 125 |
|---|---|
| Compliance Rating Based On | • COCL review of CRO's for 2016 Q2 OIS |

---

**Settlement Agreement Paragraph**

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Officer Involved Shooting case files; Interview PPB personnel |

**Compliance Assessment**

For the 2016 Q4 Officer Involved Shooting, the case file identifies 11 "witness personnel." Of those witness officers, the casebook is not clear on the number who gave an on-scene briefing to supervisors. Nor is it clear which supervisors requested a briefing from which officers. The Detective Division report indicates that at least two witness officers gave an immediate briefing to the Detective Division (one witness officer provided an on-scene walkthrough). We recommend PPB come up with a standardized practice of determining which officers will be required to provide on-scene walkthroughs, as it is unclear why only one witness officer was asked to provide one. We also recommend PPB explicitly document which officers provided briefings to which supervisors.

Exhibit B
Pg. 80 of 124

The case file also contains transcripts of interviews for all witness officers by the Detective Division (including the Gresham PD officer). We therefore consider PPB complying with Par. 126 in this respect. However, we continue to believe that the term "witness officer" is inconsistently used for OIS events. Directive 1010.10 defines a "witness officer" as a "member who observes or has firsthand knowledge of the events surrounding an in-custody death or the use of deadly physical force by another member, and other than observing the incident, did not use deadly physical force."

In the Q4 OIS, we identified at least one officer who would seemingly meet this description. This officer was positioned near the subject and reported that he/she (1) observed the subject exit the residence multiple times, (2) observed the subject potentially attempting to create a "Molotov cocktail," (3) observed the subject exit the residence with a "long gun" (which ultimately led to the involved officer using lethal force), and (4) observed the subject position on the sidewalk after the use of lethal force. At the exact time of the use of lethal force, this officer was taking shelter behind a wall due to the subject holding the "long gun" and the officer's desire to not be exposed. Although this officer did not witness the exact moment when lethal force was used, we believe his/her overall observations would be considered "firsthand knowledge of the events" and therefore the officer should have been considered a witness officer regardless of whether he/she witnessed the exact moment.

| COCL Recommendations | • PPB should be consistent in its classification of witness officers and consider broadening the definition to gain a more complete understanding of the events that transpired. |
|---|---|
| Compliance Rating Based On | • COCL review of OIS case file |

### Settlement Agreement Paragraph

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Officer Involved Shooting case files; Interview PPB personnel |

### Compliance Assessment

In the 2016 Q4 OIS, the one officer who was identified as "involved" was asked to give an on-scene walk-through and interview. The officer declined. Related to this, we maintain our previous recommendation that, in the context of community trust, PPB ought to encourage the use of voluntary public safety statements whenever possible, with the understanding that a full interview will occur later. Although we understand potential *Garrity* legal concerns with this practice, we refer to a 2016 COPS Office Report ("Officer-Involved Shootings: A Guide for Law

Enforcement Leaders"): "Agencies need not grant *Garrity* use immunity automatically, since responding to questions and providing any statement are part of an officer's routine job duties, just as is the filing of an incident, arrest, or other report." Therefore, a public safety statement is appropriate in this instance.

We have not been provided evidence to demonstrate satisfaction of the requirement for "agreement and collaboration with the Multnomah County District Attorney." The PPB maintains that the DA's willingness to be present during any on-scene walk-through, on a case-by-case basis, is sufficient to meet the requirement of "agreement and collaboration." If PPB can provide us with documentation of the DA's commitment, we would consider them to be in substantial compliance with this paragraph.

| COCL Recommendations | • Resolve the issue of what constitutes "agreement and collaboration" <br> • Encourage the use of voluntary public safety statements |
|---|---|
| Compliance Rating Based On | • COCL review of OIS case file sections |

### C. Conduct of IA Investigations

| Settlement Agreement Paragraph |
|---|
| 128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary. |

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed proposal for accountability process |

### Compliance Assessment

Our assessment of Par. 128 ties in with the dialogue and planning process discussed in Par. 121. The proposal related to the 180-day timeline also includes sections related to "meaningful independent investigation by IPR." See our assessment of Par. 121 for updates which occurred in the third and fourth quarter of 2016.

We also believe that until a revised accountability proposal is proffered, IPR faces barriers to enabling meaningful independent investigation. One such barrier is training for IPR investigators which will ensure quality investigations comparable with PPB's Internal Affairs. We have spoken with IPR about training for investigators to "enable meaningful independent

| | |
|---|---|
| investigation." IPR informs us that training for investigators is likely to occur in April of 2017 and, if so, we will provide our impressions of the training in our next report. | |
| **COCL Recommendations** | • Engage in changes related to Par. 121 |
| **Compliance Rating Based On** | • COCL review of accountability process proposal |

---

### Settlement Agreement Paragraph

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed SOP #19 |

### Compliance Assessment

PPB operates under SOP #19 ("Case Intake and Assignment") as it relates to this paragraph. In SOP #19, the language of the Agreement is included under the section "Assignment for Investigation by IA." However, Directive 0330.00 has yet to be revised to include this language.

A review of all allegations of excessive force for 2016 within the AIM database revealed two instances where IA declined to investigate an allegation. Although these occurred in the first and second quarter of 2016, we did not review them in our last report and therefore review them here.

In one instance, the allegation of excessive force was initiated through Internal Affairs as the result of a tort claim. Upon reviewing Mobile Audio Video (MAV) associated with the incident, IA determined the allegation was not supported by the video. After watching the video, IPR agreed with IA's decision and further investigation was declined. Although IA was the entity which declined to investigate the force allegation, it was done with the agreement of IPR that the evidence showed the allegation had no basis in fact. Had IPR not been consulted we would have found this to be against the spirit of the Agreement. For future instances where a case is initiated through IA and an allegation investigation is declined, we recommend PPB continue the practice of consulting IPR and memorialize this in SOP #19 and Directive 0330.00.

In the second instance, the allegation of excessive force was initiated through IPR and forwarded on to IA after an initial IPR review. Although IA investigated other force allegations within the complaint, one force allegation was declined because officer reports and statements from the complainant indicated that the alleged officer did not have physical contact with him. In this instance too, IPR was consulted and approved IA declining the allegation. Although IA

consulted with IPR in this instance, we feel the dismissal is inconsistent with the Settlement Agreement. At least initially, IPR felt the allegation had merit on its face and therefore the allegation should have been fully investigated. It is likely, based on the information from PPB, that the officer would have been exonerated of the allegation and so there was no need to decline the investigation. This is similar to a 2015 case which DOJ commented on in their second assessment report. Related to that case, DOJ commented "Portland Police Bureau had the evidence needed to reach a finding. Instead, the officer was left under the pallor of an unresolved allegation." We believe the same may be said for this case and recommend PPB re-open the allegation, perform an investigation, and provide a reasonable finding.

| COCL Recommendations | • Re-open allegation, perform an investigation, and provide a reasonable finding |
|---|---|
| Compliance Rating Based On | • COCL review of AIM data<br>• COCL review of SOP #19<br>• COCL review of PPB Directive 0330.00 |

<br>

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. | |

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Directive 310.20; Reviewed HR Admin Rule 2.02; Reviewed HR Admin Rule 11.03 |

**Compliance Assessment**

PPB Directive 310.20 is considered part of the "300 series" of policy review. During the third and fourth quarter of 2016, the 300 series was not reviewed and therefore PPB policy still does not "expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, *against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.*" Directive 310.20 expressly prohibits PPB members from retaliating against a community member for filing a misconduct claim (2.1.1.2). However, it does not expressly prohibit retaliation against another PPB member for reporting misconduct and does not speak to the aspect of cooperating with an investigation of misconduct.

We believe this can be easily remedied during the revision of 310.20 by altering the language of subsection 1.1 to say, "…the Police Bureau prohibits members from engaging in any form of retaliation (including, but not limited to, discouragement, intimidation, coercion, or adverse action) against other members, employees of the City, or community member. The

prohibition applies to adverse responses to claims of harassment or discrimination, reports of misconduct, complaints of misconduct, cooperation with any investigation thereof, or any other similar action."

We note that in 2016, PPB initiated a total of 7 retaliation investigations covering retaliation against PPB members as well as community members. The retaliation investigations covered officers of various ranks. However, we agree with DOJ that retaliation investigations have not always been opened when appropriate (see DOJ's second annual compliance assessment report). PPB should ensure that all claims of retaliation are sufficiently investigated (including findings) as required by overall accountability system changes.

As to the City's responsibility to expressly prohibit the action identified in Par. 130, we were directed to Human Resource Administration Rule 2.02 ("Prohibition Against Workplace Harassment, Discrimination, and Retaliation"). Although HR Admin Rule 2.02 contains language within the spirit of Par. 130 ("Conduct that would likely deter an individual from reporting or supporting a claim…Examples of retaliation towards an individual include demotion, suspension…failing to treat impartially when making employment related decisions…shunning by co-workers."), the rule is specific to sexual harassment and discrimination against protected classes. Thus the focus of 2.02 is not necessarily related to Par. 130.

The City also has HR Admin Rule 11.03 ("Duty to Report Unlawful or Improper Actions") which contains some admonition against retaliation ("The City will not tolerate any retaliation against an employee for filing a complaint or report under this rule or for cooperating in an internal or external government investigation"). However, the admonition does not contain the level of detail found within Par. 130. Furthermore, 11.03 speaks to retaliation against City employees and leaves out a prohibition of retaliation against community members.

Thus, as it relates to misconduct complaints and *any person* (to include community members) who reports misconduct or makes a complaint, we do not find where the City has an expressed prohibition. We recommend the City resolve this issue.

| **COCL Recommendations** | • Revise Directive 310.20 to fully comply with Par. 130<br>• City should create policy related to Par. 130 |
|---|---|
| **Compliance Rating Based On** | • COCL review of Directive 310.20<br>• COCL review of HR Admin Rule 2.02<br>• COCL review of HR Admin Rule 11.03 |

**Settlement Agreement Paragraph**

131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, and the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Directive 336.00; Reviewed City Code 3.20.140 |

**Compliance Assessment**

No changes to PPB Directive 336.00 nor City Code 3.20.140 have occurred since our previous reports. PPB indicates in the Quarterly Summary Report that changes to the accountability process would dictate changes to policy. We will await resolution of the changes to the accountability process before we can ascribe Substantial Compliance with this paragraph.

In previous reports, we have questioned whether PRB members are required to submit to ongoing qualification (e.g. attending annual in-service or participating in annual ride-alongs). We spoke with PPB representatives who informed us that although PRB members are not subject to ongoing qualification, they are provided opportunities to refresh themselves on PPB practices. Whenever new PRB members are required to receive Bureau training in accordance with Par. 131(d)(ii), existing PRB members are invited to participate as well. We are informed that some existing PRB members take advantage of the opportunity while others do not. In addition, PRB members are always welcome to participate in ride-alongs. Furthermore, PRB members are provided the most recent version of policies related to the case they are hearing and may receive clarification on how they differ from previous versions of policy they may have seen in previous cases. Thus, as it relates to ongoing qualification, we believe PPB affords the opportunity for PRB members to remain familiar with Bureau operations.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Prior PPB/City incorporation of some aspects of Par. 131 |

**Settlement Agreement Paragraph**

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed PPB Directive 336.00; Reviewed City Code 3.20.140 |

**Compliance Assessment**

We have no indication that a case was returned by PRB in the third or fourth quarter of 2016. While PPB Directive 336.00 contains the provisions of this paragraph, City Code 3.20.140 does not. The changes to City Code for Par. 132 need not await revisions to the overall accountability process since those revisions are related to 3.21.120. There is no reason why 3.20.140 cannot be revised to be in compliance with Par. 132. We recommend the City make the necessary revisions as soon as possible.

| COCL Recommendations | • Revise City Code 3.20.140 to be consistent with the requirements of the Settlement Agreement. |
|---|---|
| Compliance Rating Based On | • COCL review of PPB Directive 336.00 |

**Settlement Agreement Paragraph**

133. COCL Summary: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed SOP #42 |

**Compliance Assessment**

We reviewed PPB Standard Operating Procedures (SOPs) related to the requirements of Par. 133. Specifically, we reviewed PPB SOP #32 ("Civil Liability and Tort Claims") which requires the IA Lieutenant to confirm that an EIS entry has been made (Par. 133, subsection 1) and that an evaluation of the officer's fitness to participate in specialized units has been conducted (Par. 133, subsection 2). SOP #32 also contains other requirements if an IA investigation had not previously been initiated or if an IA investigation did not reach a Sustained finding (Par. 133, subsections 3-5). While SOP #32 requires that an IA investigation be opened (if not previously done), it does not contain the Settlement Agreement's requirement that the civil trial findings create a "rebuttable presumption that the force used also violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of the evidence." We recommend SOP #32 be revised to include this presumption.

We also reviewed PPB SOP #42 ("Evaluation of Members Fitness to Participate in All Current and Prospective Specialized Units when the Use of Force Results in a Finding of Liability in a Civil Trial") which contains the procedure for the above referenced evaluation of the member. We find the procedure outlined by PPB to be sufficiently compliant with the intent of Par. 133.

There were no findings of liability in the third or fourth quarter of 2016. However, there was a finding of liability against PPB in September of 2014 and updates to PPB's progress in that case occurred within this report's timeframe. There were three officers involved with the use of force that led to the finding of liability against PPB. The investigation resulted in an allegation against one officer being Sustained and allegations against the other two officers being Not Sustained.

In September of 2016, the investigation of the officers was completed. As a result of the administrative investigation, allegations of excessive force against two officers were Not Sustained by the RU Manager. For one of the officers, we discussed with PPB two pieces of evidence found within the case file that appear to call into question the finding of Not Sustained. First, the officer indicated that upon delivering a five-second ECW cycle, he/she waited and gave the subject more commands to put his hands behind his back. However, the ECW download indicated that approximately 1 second passed between the first and second five-second cycles. The versions of Directive 1051.00 (Taser) and 1010.20 (Physical Force) that were in effect at the time of this event did not expressly require an officer to re-evaluate the need for continued force, attempt handcuffing during or between Taser cycles, or issue warnings between each application of force (as does the proposed revised 1010.00 policy). We spoke with PPB about these concerns. PPB indicated that there was no explicit requirement in the 1051.00 or 1010.20 directives for the officer to provide a warning in-between each Taser cycle or attempt handcuffing. PPB also indicated that their investigation led them to believe that the subject "flailing" led the officer to determine that a second Taser cycle was justified and that such a determination could be made in the 1 second timeframe. While the officer was not found out-of-policy based on the directives enacted at the time of occurrence, the directives has since been revised to require officers to allow time for the subject to comply with the officer's instructions, reassess and issue subsequent warnings in-between Taser cycles, and attempt to handcuff in-between cycles.

Second, the officer indicated during a debriefing that he/she was unaware that (1) subjects could be handcuffed during a Taser cycle and (2) that he/she could hold down the Taser

trigger to provide a continuous current. The debriefing found that "It appeared that [officer] learned valuable features of the Taser immediately following the event." We spoke with PPB to ask whether the investigation should have considered Directive 315.30 (Unsatisfactory Performance) and a member's responsibility to "maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions." PPB informed us they did not review the available training at the time of the occurrence and therefore could not make a determination as to whether the officer would have been trained on the "valuable features of the Taser" or whether the officer violated their responsibility to "maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions." Furthermore, PPB indicated that it would be difficult to determine the exact training the officer would have received as they did not have an adequate Learning Management System (similar to what is required in Par. 81). Thus, we do not believe PPB has the systems in place for this aspect of the accountability system.

For the third officer, an allegation of excessive force was Sustained by the RU Manager. In November of 2016, the RU Manager recommended a one to two week suspension without pay. The case was then referred to the Police Review Board. In December of 2016, the PRB agreed that the allegation against the officer should be Sustained. However, because the officer no longer works as a sworn employee, the PRB did not recommend discipline (though indicated they would have recommended a 1-day suspension without pay had the officer still been a sworn member).

For the two officers where allegations were Not Sustained, we viewed the EIS records for both officers showing that (1) the civil liability finding was entered into EIS (October 2014) and (2) an employee review (May 2015) occurred consistent with SOP #42. As the IA investigation was initiated after the finding of liability, subsections 4 and 5 of Par. 133 are not applicable.

For the one officer where an allegation of excessive force was Sustained, we viewed the EIS record for that officer showing the civil liability finding was entered into EIS (October 2014). As to PPB's responsibilities under subsection 2 of Par. 133, the officer was no longer a sworn member at the time and therefore no employee review was conducted. As the IA investigation was initiated after the finding of liability and the investigation reached a sustained finding, subsections 4 and 5 are not applicable.

| | |
|---|---|
| **COCL Recommendations** | • Revise SOP #32<br>• Revise systems to ensure all aspects of an investigation are in place. |
| **Compliance Rating Based On** | • COCL review of SOP #42<br>• COCL review of SOP #32<br>• COCL review of IA case<br>• COCL review of PRB findings<br>• COCL review of EIS entries |

**D. CRC Appeals**

---

**Settlement Agreement Paragraph**

134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed City Code 3.21.080 |

**Compliance Assessment**

      We maintain that City Code 3.21.080 is in substantial compliance with this paragraph. We have attended CRC meetings, reviewed CRC minutes, and have spoken with CRC representatives. Based on our review, we believe the CRC members are "neutral, unbiased, and capable of making objective decisions." We will continue to monitor the compliance with this paragraph and the functioning of the CRC as a body.

      The changes to the overall accountability proposal includes the potential for the number of CRC members to expand to 15 and having rotating, 5-7 member panels hear cases. We believe these proposed changes are still within the intent of this paragraph, provided the individual panels are representative of the diversity required of the CRC as a whole.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • COCL review of City Code 3.21.080 |

---

**Settlement Agreement Paragraph**

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up

requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PSF-5.03; Review CRC minutes |

**Compliance Assessment**

Under the City's website, Charter Code and Policies, PSF-5.03 related to CRC, the changes we recommended in our previous report have been incorporated. The City has brought PSF-5.03 into compliance with the wording of the Agreement.

We reviewed the minutes for CRC meetings during the third and fourth quarter of 2016. Based on our review, no cases were sent back by the CRC for additional investigation. Thus, there was no opportunity for us to observe whether the investigating entity (IPR or IA) provided response within 10 days.

The City and PPB have substantially complied with these paragraphs based on the changes to code, though have an ongoing obligation. Also related to this paragraph (as well as others), we continue to recommend IPR provide a quarterly or semi-annual report similar to the format provided by PPB.

| COCL Recommendations | • Relevant City agencies should provide the COCL with data they keep relevant to compliance with these paragraphs. |
|---|---|
| Compliance Rating Based On | • COCL review of Charter Code and Policy Code PSF-5.03<br>• COCL review of CRC minutes |

**E. Discipline**

**Settlement Agreement Paragraph**

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Directive 338.00 and corresponding Discipline Guide; Review Corrective Action Recommendation Form; Review revised SOP #34 |

**Compliance Assessment**

Directive 338.00 and its corresponding Discipline Guide have yet to be jointly reviewed by COCL, PPB, and DOJ. This is considered part of the "300 series" and is scheduled to be reviewed in the near future. At this time, we have no new recommendations. Upon the joint review of Directive 338.00, we will revisit the compliance label associated with this paragraph.

PPB has provided evidence that the discipline guide is being used when determining the appropriate discipline for officers. We reviewed the evidence for the third and fourth quarter of 2016 and found them to be completed in a manner consistent with the intent of this paragraph by specifying the recommendation, the reason for the recommendation, the violations associated with the complaint, and a corrective action history for the employee. As DOJ points out in their second annual compliance assessment and as we have seen in our work with the Force Audit, discipline does not always occur when minor infractions repeatedly occur (as is the case with deficient report writing). We believe this will be resolved with the continued improvement of the Force Audit data collection.

| **COCL Recommendations** | • Engage in review of Directive 338.00<br>• Enhance discipline guide to include remedies for repeated minor infractions |
| **Compliance Rating Based On** | • COCL Review of Corrective Action Recommendations |

### F. Communication with Complainant and Transparency

**Settlement Agreement Paragraph**

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own compliant to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Compliance Label | Partial Compliance |
| Methodology | Review IPR website; Reviewed IPR policy; Reviewed findings letters |

**Compliance Assessment**

We continue to see evidence of IPR conforming with parts of Pars. 138 and 139. We refer the reader to our previous report for IPR progress to this date. However, we have continued our dialogue with IPR about re-introducing a satisfaction survey for complainants to ensure they are satisfied with the complaint process and the receipt of information. Community members with whom we have spoken were very supportive of this idea. We have opened a dialogue with the City Auditor and IPR director regarding the survey. The data collected from this effort will help substantiate whether the City's website has been sufficiently enhanced (Par. 138).

We have spoken with the City Attorney's office regarding their responsibility in Par. 140 to "determine whether disclosures regarding corrective action are required on a case-by-case basis." When a request for corrective action is received and there is ambiguity as to whether Public Records Law would require disclosure, the City Attorney's office provides an opinion on the matter. This is often done informally (either by phone or email). If the decision is that the request does not meet the "public interest" criteria of disclosure (ORS 192.501), the requesting party can appeal. In instances where there is an appeal, the City Attorney's office would issue a formal response which is documented in the public records request database (https://www.portlandoregon.gov/66961).

The City Attorney's office has indicated that there are no specific criteria set out in ORS 192.501 that would require disclosure. ORS 192.501 states "The following public records are exempt from disclosure….unless the public interest requires disclosure in the particular interest." The City Attorney's office indicated that since the legislation is vague, the decision to disclose is often directed by case law. The City Attorney's office stated that if (1) the event involved a higher ranking officer and (2) the allegation was of a serious nature, then case law supports the act of disclosure. We consider these protocols for disclosure are sufficient to meet the requirements of Par. 140.

| | |
|---|---|
| **COCL Recommendations** | • Continue to work with COCL to develop and introduce a new complainant satisfaction survey |
| **Compliance Rating Based On** | • COCL review of IPR policy<br>• COCL review of complaint tracking webpage<br>• COCL review of findings letter to complainant<br>• Interview of City Attorney |

# IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD

### Settlement Agreement Paragraph

141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Community Oversight Advisory Board ("COAB"), within 90 days of the Effective Date of this Agreement. The COAB shall be authorized to: (a) independently assess the implementation of this Agreement;(b) make recommendations to the Parties and the COCL on additional actions; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) provide the community with information on the Agreement and its implementation; (e) contribute to the development and implementation of a PPB Community Engagement and Outreach Plan ("CEO Plan"); and (f) receive public comments and concerns.

142. Membership of the COAB shall be comprised of fifteen (15) voting members, five (5) advisory members, and the COCL. (See Settlement Agreement for specific selection criteria).

143. The 15 voting members of COAB are independent of the City and PPB and shall not be currently employed by the City. Members must agree to serve for a minimum of a two-year term, and may be reappointed for one additional year. The COAB may create an executive committee or other subcommittees, as appropriate, to accomplish the tasks designated to it under this Agreement. The City shall provide administrative support so that the COAB can perform the duties and responsibilities identified in this Agreement.

144. The COAB shall report to the COCL. The COCL will chair the COAB, preside over COAB meetings, take and count votes, and perform such other activities as are necessary for the efficient operation of the COAB. If the COCL determines that a COAB member is no longer fit to serve on account of misconduct, the COCL shall consult with DOJ prior to removing such member. Following the removal of a COAB member, an alternative shall be selected from the same pool of applicants as the removed COAB member.

145 (See Settlement Agreement for description of selection process for five community members)

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interview City personnel and COAB members; Observe and participate in COAB process |
| | |

**Compliance Assessment**

Given that this is an assessment of PPB's and the City's compliance with the Settlement Agreement, we will only comment here on specific issues which are the responsibility of these entities.

During periods in the third and fourth quarter of 2016 when the COAB was active, the City provided support for meeting space, refreshments, accommodations, audio-video needs, and IT support. COAB meetings occurred in convenient locations for members of the Portland community, located near light rail, streetcar, and bus stops. In addition to resources for COAB meetings, the City provided resources for personnel related to COAB functions, including a Program Support Specialist and a Mental Health Specialist.

In the third quarter of 2016, the City, with the approval of DOJ, placed the COAB on a 60-day recess "to evaluate the successes and failures of the community engagement and oversight provisions of the agreement," according to an August 19 memo from DOJ to the City Attorney.

After the 60-day recess expired, no revised plan was provided and the COAB resumed functioning. Although the COAB and COCL agreed that they should operate independently, we continued to chair COAB meetings as required by the Settlement Agreement until the recommended separation has been formally approved.

At the end of the fourth quarter, no revised plan of action for community input and oversight of changes related to the Settlement Agreement had been submitted by the City, with the two-year COAB appointments set to expire early in the first quarter of 2017.  However, we continue to find the City in Partial Compliance with the requirements of these paragraphs as a result of their continued conversations with stakeholders.  Although a finalized proposal has not been released, the City has not refrained from attempting to satisfy these paragraphs.  However, Partial Compliance is not Substantial Compliance and the City must continue their efforts to provide a revised plan of action for community input and oversight.

Given the importance of broad community input regarding police reform efforts in general, we await a revised proposal for community input and oversight of the changes related to the Settlement Agreement. We encourage other stakeholders to work collaboratively with the City to ensure this outcome and we encourage the City to take ownership and a leadership role in this effort. Additionally, where not bound by mediation, we recommend the City provide updates to the broader community as to the progress made towards a revised proposal for community input and oversight.

| | |
|---|---|
| **COCL Recommendations** | • City should submit a revised plan of action for community input and oversight of changes related to the Settlement Agreement<br>• Where not bound by mediation, the City should provide updates to the broader community as to the progress made towards a revised proposal for community input and oversight |
| **Compliance Rating Based On** | • COCL observation of COAB meetings<br>• COCL and COAB recommendations |

**Settlement Agreement Paragraph**

146. <u>COCL Summary</u>: Paragraph 146 states that, "To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan." The subsections of Par. 146 include items related to the Community Survey, the survey of PPB members, two public hearings to gather community feedback on PPB community engagement plan, COAB review of PPB CEO plan, and COAB solicitation of input from Human Rights Commission Community Police Relations Committee, including work to implement 2009 PPB "Plan to Address Racial Profiling," and COAB recommendations on CEO plan. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Community Survey results; Review PPB Internal Survey results; Review results of public hearing; Interview City personnel and COAB members; Observe PPB presentation of prior community outreach efforts |

**Compliance Assessment**

In the third and fourth quarter of 2016, the progress of community engagement was stalled during the 60-day recess, and weather-related meeting cancellations further contributed to delays in progress. However, some activities related to gathering the perspective of community members did occur in the third quarter. In August of 2016, Davis, Hibbitts, and Midghall (DHM) Research conducted focus groups with a number of demographic populations in Portland, including persons with mental illness, youth, LGBT, and houseless populations. Focus group questions were created in collaboration with COAB's Community Engagement and Outreach Plan Subcommittee (CEOPS).

Subjects were recruited through phone calls to community members wherein screening questions related to the desired groups were asked to identify potential participants. Potential subjects were also recruited through flyers asking interested parties to contact a DHM representative. If the subject met the criteria for the desired group, they were invited to the focus groups and provided a financial incentive for participating. Between August 15 and August 18, 2016, a total of six focus groups were held – one focused on the houseless community, one focused on the LGBTQ+ community, one focused on youth, and three focused on persons living with mental illness (with subjects organized into one group per Precinct).

The results of the focus groups indicated that participants were "uncomfortable with the current state of policing" (DHM Report). While participants understood the difficulty of policing, many felt there was room for improvements in three main areas: recruitment, training, and community involvement. Participants also indicated that PPB does an "adequate job" (DHM Report) of performing traditional police tasks (e.g. fighting crime) but can improve on contemporary notions of policing (e.g. respectful treatment, interpersonal communication, etc.).

Combined with the other subsections of Par. 146, PPB and COAB have made some strides towards the required groundwork for crafting a CEO Plan over the course of the last two years, with consultation from the COCL. A "reliable, comprehensive, and representative survey of members of the Portland community" was conducted (146a) with the above described focus groups convened to gather supplemental perceptions. Two iterations of the PPB organizational survey have also occurred in order to gather officer perspectives (146a). The COAB and PPB have reviewed the results of the surveys, in accordance with Par. 146(e). The COAB and PPB held two public meetings to "gather public input on PPB's outreach efforts" (146b). A community engagement workshop occurred, allowing the COAB to "review PPB's prior community outreach efforts" (146c) and gather further community perspectives. An initial consultation between the COAB and the CPRC occurred in accordance with subsection (d) (though a more in-depth meeting has yet to occur due to the suspension of CRPC activity).

Although these strides were made, no recommendations to the Chief regarding the CEO Plan has been made to date. PPB continues to engage the Portland community in a variety of ways outside the requirements of Par. 146 (see our prior Outcomes Assessments). We recommend that PPB continue these community engagement efforts and incorporate them into an overall CEO Plan once a revised plan for community input is submitted by the City.

| **COCL Recommendations** | • City should submit a revised plan of action for community input and oversight of changes related to the Settlement Agreement |
|---|---|
| **Compliance Rating Based On** | • COCL observation of COAB meetings<br>• COCL review of community survey results<br>• COCL observation of Community Engagement Workshop |

---

### Settlement Agreement Paragraph

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, together with the COAB, may develop outreach and policing programs specifically tailored to the residents of the precincts.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex, and perceived mental health status of the subject, and provide such information to the CPRC to contribute to their analysis of community concerns regarding discriminatory policing. In consultation with the COAB and CPRC, PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Reviewed Precinct demographics tables compiled by PPB; Reviewed demographic data for police encounters |

**Compliance Assessment**

PPB provided demographic tables for different Precincts as part of their supporting documents in 2016 Q4. The demographics collected continue to include elements related to race/ethnicity, gender, age, economic status, disability, education, and housing. We maintain our position in previous reports that the demographics collected are sufficient to satisfy the first part of Par. 147. However, no meetings occurred between the Precinct Commanders and COAB to "develop outreach and policing programs specifically tailored to the residents of the precincts."

While awaiting a resolution to a revised plan of action for community input and oversight, we recommend PPB and Precinct Commanders engage in discussions with community leaders and groups for each Precinct in the absence of COAB. Although PPB's ability to interact with the COAB may be hindered at this moment, there is nothing preventing PPB from engaging in the spirit of Par. 147, even if informally.

Although PPB currently collects demographic data regarding the subjects of police encounters, PPB's ability to satisfy the requirements of Par. 148 continued to be hindered by the CPRC being inactive. As with Par. 147, we encourage PPB to consider ways to satisfy the spirit of Par. 148 in the absence of CPRC.

| COCL Recommendations | • PPB should satisfy its obligations under Pars. 147 and 148 in preparation for meetings with CPRC. |
|---|---|
| Compliance Rating Based On | • COCL review of Precinct demographic data<br>• COCL review of demographics of police encounters |

**Settlement Agreement Paragraph**

149. The COAB, COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed prior evaluations |

**Compliance Assessment**

In the third and fourth quarter of 2016, only the focus groups provided metrics on evaluating community engagement and outreach. There have been numerous evaluations of community engagement over the last two years (community focus groups, community survey, PPB survey), and these evaluations have largely served as baseline data, prior to various PPB reforms. Neither the COAB nor PPB incorporated the baseline evaluations into a recommended CEO Plan for PPB, and PPB did not issue a final CEO Plan. We view the metrics identified in Par.

| | 149 as measuring the successful implementation of the CEO Plan, showing changes from the baseline data. Given that no CEO Plan has been recommended or implemented by the end of 2016, no further progress on this paragraph has been made. As the COAB appointments were set to end in early 2017, PPB will be left without input on a CEO Plan from the community. |
|---|---|
| **COCL Recommendations** | • Determine the future of community engagement in order to obtain community input on PPB's CEO Plan<br>• Continue to monitor community engagement and police-community relations through community and police surveys |
| **Compliance Rating Based On** | • Prior evaluations of community engagement. |

---

### Settlement Agreement Paragraph

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be reviewed by the COAB before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Reviewed "PPB Annual Progress Report 2015"; Interviewed PPB Personnel |

### Compliance Assessment

PPB had issued their annual report in the second quarter of 2016 and, consistent with the recommendation in our last report, has made it publicly available on their website. However, the report which contains "a summary of its problem-solving and community policing activities" is alluded to on the website as "DOJ Annual Progress Report" despite the title of the report being "Portland Police Bureau Annual Progress Report 2015." We understand why PPB labels their "DOJ Quarterly Updates" as such, since they identify and respond to each substantive paragraph of the Settlement Agreement. However, we maintain that the *annual* report should not be associated with DOJ and doing so only serves to undermine the lack of PPB ownership of organizational changes. The current administration believes in the importance of these reforms on the whole, and therefore, deserves its own report.

In the third quarter of 2016, Precinct Commanders held meetings in each of the three Precincts to discuss the Annual Report and engage in conversations with community members. Our interviews revealed that the meetings were constructive and that both PPB members and the community felt the meetings were successful. We echo DOJ's comment that such meetings

should continue "outside the mandate of our Agreement."   However, some community members did not feel they were provided adequate notification of the Precinct meetings.  PPB should review their notification process to determine whether enhancements can be made to ensure that a broad representation of community members are notified.

Despite the successful meetings in each of the three Precincts, no meeting in front of City Council occurred in the third and fourth quarter of 2016. City Council is required to have a presentation of the Annual Report and we recommend this occur as soon as possible. As the Annual Report was issued in July of 2016, City Council should not delay the meeting so much that it would render the presentation moot.

| **COCL Recommendations** | • Revise PPB website to remove the label "DOJ Annual Progress Report" from Annual Report<br>• Review Precinct meeting notification process to determine whether enhancements can be made<br>• Hold City Council meeting to present report |
|---|---|
| **Compliance Rating Based On** | • COCL review of Annual Progress Report |

---

| **Settlement Agreement Paragraph** |
|---|
| 151. The COAB may make recommendations approved by a majority of its membership regarding implementation of the terms of this Agreement. |

| **Compliance Label** | N/A |
|---|---|
| **Methodology** | N/A |

| **Compliance Assessment** |
|---|
| As the Chair of the COAB, we refrain from making compliance determinations regarding COAB responsibilities. However, we note that due to vacancies on the COAB board, a "majority of its membership" was not always possible. In the fourth quarter of 2016, COAB altered its own bylaws to reduce the number of people necessary for a quorum and majority. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • COAB actions and recommendations |

**Settlement Agreement Paragraph**

152. The COAB shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Team, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The COAB shall also provide the opportunity for public comment at each of its meetings to keep open lines of communication with the public-at large.

| Compliance Label | Non-Compliance but Initial Steps Taken |
|---|---|
| Methodology | Observed COAB meetings; Observed PPB presentation on prior community engagement efforts |

**Compliance Assessment**

No progress was made during the third and fourth quarter of 2016 on these meetings. A meeting that would have satisfied Par. 152 was scheduled for the second quarter but was cancelled and not rescheduled during the third and fourth quarter. Given that COAB appointments are to expire in the first quarter of 2017, we do not anticipate any meaningful discussions between the entities described in Par. 152 and the COAB in the near future. When viewed individually, the reasons for delays in holding these meetings have been understandable, but taken together, they represent a failure to accomplish the goals of Par. 152.

| COCL Recommendations | • Determine the future of community engagement |
|---|---|
| Compliance Rating Based On | • COCL observation of COAB meetings |

**Settlement Agreement Paragraph**

153. A representative of the Oregon U.S. Attorney's Office shall be invited to attend all COAB meetings.

| Compliance Label | N/A |
|---|---|
| Methodology | N/A |

**Compliance Assessment**

A representative of the Oregon U.S. Attorney's Office has been invited to attend all COAB meetings. A representative has, in fact attended nearly all COAB meetings.

Exhibit B
Pg. 101 of 124

| COCL Recommendations | • N/A |
|---|---|
| Compliance Rating Based On | • N/A |

---

**Settlement Agreement Paragraph**

154. COAB shall meet as needed to accomplish their objectives as set forth in this Agreement. All COAB meetings shall be open to the public. In addition, COAB shall attend quarterly meetings with the COCL as provided in Par. 163. To the extent that COAB meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the COCL to ensure compliance with those laws and agrees to represent COCL in any challenges regarding compliance with those laws.

155. The City shall provide COAB members with appropriate training necessary to comply with requirements of City and State law.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed DOJ and City personnel; Observed COAB meetings |

**Compliance Assessment**

The City's responsibilities in Pars. 154 and 155 continue to be fulfilled to the extent that the COAB and COCL have requested their assistance. Upon any indication of legal issues dealing with the operation of the COAB, identified by the COCL, COAB, or the City, we have requested legal advice from the City Attorney's Office. We have asked on many occasions for the City to opine on legal matters and the City Attorney's Office has assisted in every instance. As such, the City has substantially complied with the requirements of these Paragraphs.

Depending on the future of the COAB or any other community board, we would expect the City Attorney's Office to continue to provide relevant legal advice. Additionally, in accordance with Par. 154, the proposal for a revised community input and oversight board should include the requirement that the board hold meetings that are open to the public.

| COCL Recommendations | • City should include in their proposal for a revised community board the requirement that the board hold meetings that are open to the public |
|---|---|
| Compliance Rating Based On | • Observation of COAB meetings<br>• Requests to the City Attorney's Office |

# X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT

### Settlement Agreement Paragraph

156. PPB shall implement immediately all provisions of this Agreement which involve the continuation of current policies, procedures, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. Except where otherwise specifically indicated, PPB shall implement all other provisions of this Agreement no later than within 180 days of the Effective Date.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed documents related to policies, procedures, practices specific to force, training, community-based mental health services, crisis intervention, EIS, officer accountability, and community engagement; Interviewed City/PPB personnel; Observed meetings and trainings |

### Compliance Assessment

As we have cautioned in previous reports, substantially implementing the conditions of the Agreement will take time, resources and continued commitment by the Portland Police Bureau and the City of Portland. We encourage the PPB and the City to prioritize their efforts to implement provisions which are time sensitive, with the understanding that we will work with them to respect these priorities. Delays in implementation have not always been the fault of the City, as there are many stakeholders with a voice in this process. To a large extent, we believe that the City and PPB are making a good faith effort to implement the recommended changes, although we may disagree about the level of progress that has been achieved to date. While timeliness is important, we maintain that the quality of work should supersede expeditiousness. We encourage the City and PPB to work conscientiously to meet and, in some places, exceed the terms of the Agreement in order to implement best practices and evidence-based policing (i.e. knowledge of what works in policing).

| COCL Recommendations | • Continue to prioritize efforts to implement provisions which are time sensitive<br>• Continue to work expeditiously while maintaining quality of work in the pursuit of best practices<br>• Continue to work with DOJ and the COCL to communicate concerns and expectations |
|---|---|
| Compliance Rating Based On | • COCL review of all related documents identified throughout this report |

**Settlement Agreement Paragraph**

158. All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations. Audits and reports shall be posted on PPB's website.

159. PPB shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to PPB decision making and activities, and compliance with this Agreement, in accordance with the Oregon Public Records Law.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed PPB website; Reviewed PPB Quarterly Updates |

**Compliance Assessment**

Regarding Paragraph 158, the PPB posts reports, audits, and other data/information relevant to their work in implementing the Agreement to their website. PPB also posts their Quarterly Updates for public review.

Regarding Paragraph 159, there are areas that would benefit from enhanced data collection. These include the review of EIS flags, data on officer interactions with the public, and the overall data management systems. We continue to work with PPB on how these can be enhanced to meet the requirements of the Settlement Agreement. With budget adjustments, the COCL will devote existing COCL resources to an analysis of PPB's data systems to identify limitations and propose corrective actions. We will also provide a plan for collecting data from the community to ensure that various segments of the community (especially persons experiencing a mental health crisis and persons of color) are treated with dignity and respect. This is delineated in our May 2017 Outcomes Assessment report.

| COCL Recommendations | • Collect additional data to monitor organizational performance, engage the community, and increase accountability and transparency |
|---|---|
| Compliance Rating Based On | • COCL review of information found on PPB website<br>• Assessment of existing data collection systems |

**B. PPB Compliance Coordinator**

**Settlement Agreement Paragraph**

165. PPB will hire an employee familiar with the operations of PPB for the duration of this Agreement, to serve as a PPB Compliance Coordinator. The Compliance Coordinator will serve as a liaison between PPB and both the COCL and DOJ and will assist with PPB's compliance with this Agreement. At a minimum, the Compliance Coordinator will: (COCL summary) coordinate compliance activities, maintain and provide documentation to COCL and DOJ, assign compliance tasks to PPB personnel, and accept primary responsibility for the collection the information required by the COCL.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed Compliance Coordinator and other PPB and City personnel; Evaluated responses to requests made by the COCL |

**Compliance Assessment**

In the third and fourth quarter of 2016, the Compliance Coordinator position was re-staffed due to the prior Compliance Coordinator taking over the role of Chief of Police. The previous Inspector was named as the current Compliance Coordinator. Despite the change in personnel, the COCL team continues to be impressed by the professionalism and competence of the Compliance Coordinator team. On the whole, they have been very responsive to our inquiries, arranged meetings, provided access to information, and assisted us in navigating the organizational terrain of the PPB. The Compliance Coordinator now reports directly to the Chief of Police and thus has the authority to ensure that changes in policy, training, or other requirements of the Settlement Agreement are implemented with minimal resistance.

| COCL Recommendations | • Keep the current reporting structure for the Compliance Coordinator team to ensure compliance with the Settlement Agreement |
|---|---|
| Compliance Rating Based On | • Weekly conferences with PPB Compliance Coordinator |

**C. Access to People and Documents**

**Settlement Agreement Paragraph**

166. The COCL shall have full and direct access to all PPB and City staff, employees, facilities, and documents that the COCL reasonably deems necessary to carry out his/her duties. If a document requested by the COCL is privileged attorney-client communication, the COCL shall not disclose the document in a manner that destroys that privilege without the approval of the City Attorney. The COCL shall cooperate with PPB and the City to access people, facilities, and documents in a reasonable manner that minimizes, to the extent possible, interference with daily operation. In order to report on PPB's implementation of this Agreement, the COCL shall regularly conduct

reviews to ensure that PPB implements and continues to implement all measures required by this Agreement. The COCL may conduct on-site reviews without prior notice to PPB or the City.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Request access to PPB and City staff, employees, facilities and documents |

**Compliance Assessment**

In general, PPB and the City have been accommodating to the COCL's requests, although they have been unable to meet some requests. They have followed our recommendation that all documents related to compliance have been included in their corresponding folders in the supporting documents section of the Quarterly Update reports. In instances where we feel further documentation is warranted, the PPB has responded in a timely manner.

| **COCL Recommendations** | • Continue to make every effort accommodate COCL requests in accordance with the Settlement Agreement |
|---|---|
| **Compliance Rating Based On** | • PPB's general accommodation to COCL requests |

**D. Review of Policies and Investigations**

**Settlement Agreement Paragraph**

169. Within 180 days of the Effective Date, PPB shall revise and/or develop its policies procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. PPB shall revise and/or develop as necessary other written documents such as handbooks, manuals, and forms, to effectuate the provisions of this Agreement. PPB shall send new or revised policies, procedures, protocols, and training curricula regarding use of force, interactions with persons in mental health crisis and systems of accountability to DOJ as they are promulgated, with a copy to the COCL. DOJ and the COCL will provide comments within 45 days and will not unreasonably withhold recommendations about policies, procedures, protocols, and training curricula. The COCL shall seek the timely input of the relevant members of the Training Division and patrol officers, as well members of the community. If the City disagrees with DOJ's comments, the City shall, within 14 days of being informed of the DOJ's comments, inform the Parties in writing of the disagreement. Within 14 days thereafter, the Parties shall meet and confer on the disagreement at a mutually agreeable time. Upon approval by the Parties, policies, procedures, training curricula, and manuals shall be

implemented within 30 days of agreement or the Court's decision. PPB shall provide initial and in-service training to all officers and supervisors with respect to newly implemented or revised policies and procedures. PPB shall document employee review of and training in new or revised policies and procedures.

170. The Chief shall post on PPB's website final drafts of all new or revised policies that are proposed specific to force, training, community based mental health services, crisis intervention, employee information system, officer accountability, and community engagement, to allow the public an opportunity for notice and comment, prior to finalizing such policies.

171. The Chief's Office shall coordinate a review of each policy or procedure required by this Agreement 180 days after such policy or procedure is implemented, and annually thereafter (on a regularly published schedule), to ensure that such policy or procedure provides effective direction to PPB personnel and remains consistent with the purpose and requirements of this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Engaged in policy review with PPB and DOJ |

**Compliance Assessment**

     PPB continues to post directives up for Universal Review to their website to solicit and gather community input on revisions. The joint review of directives by COCL, PPB, and DOJ has been slow but deliberate. We continue to make progress on reviewing, revising, and passing directives, though progress needs to speed up, so that appropriate training and other organizational changes can be introduced.

     Only a few policies have received final approval after nearly two years. We recommend that the Parties meet to agree on a revised process that will accelerate policy review. The COCL has offered to take a more direct leadership role in the policy review process and coordinate efforts with DOJ.

| **COCL Recommendations** | • Parties should revisit the policy review process |
|---|---|
| **Compliance Rating Based On** | • COCL, PPB, and DOJ joint policy review |

**Settlement Agreement Paragraph**

172. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

| Compliance Label | Partial Compliance |
|---|---|

| Methodology | Reviewed directives and accountability mechanisms |

**Compliance Assessment**

Our evaluation of Par. 172 is found within various provisions assessed in previous sections. We will continue to evaluate whether policies are uniformly applied and officers are held accountable when they violate policies. This requires new forms of documentation and measurement systems as described in this report and in a separate Outcomes report prepared by the COCL. Some new forms of documentation and measurement systems recommended by the COCL have been implemented in some fashion; others have yet to be implemented. However, progress is being made and we will continue to monitor such progress.

We note that the process of uniformly applying policy and holding officers accountable requires the incorporation of a complete system of organizational management. Sound policies should lead to sound training (appropriately measured). Sound training should lead to officers demonstrating sound tactics and communication techniques on the street (also appropriately measured). Behavior on the street should then inform policy, training, and officer decisions. Apart from having these systems set in place, PPB needs to ensure that the cultural tone of the Bureau reinforces these processes. We have measured the cultural tone in organizational surveys (see our October 2015 and November 2016 Outcomes Assessments) and implore PPB to continue measuring the cultural tone to determine whether there is organizational buy-in for the operations they are engaging in and the reforms they are introducing.

Self-monitoring systems must be established that encourage self-regulation and prevent officers from acting in ways that could harm community members or themselves and could damage the reputation of the Bureau. In such an environment, officers will be inclined to step in *before* another officer engages in problematic behavior (peer-intervention). And when policy violations occur, PPB command and the community at large should be confident that interventions will occur, whether they be counseling, discipline, or some other response. Such systems of self-monitoring are essential for achieving organizational accountability and for gaining overall compliance with the Settlement Agreement.

| **COCL Recommendations** | • See compliance recommendations made in previous sections regarding policies and accountability |
|---|---|
| **Compliance Rating Based On** | • Preponderance of documents and systems of accountability previously addressed in this report |

**E. City Reports and Records**

---

**Settlement Agreement Paragraph**

176. Beginning with the COCL's first quarterly report, as set forth in paragraph 166 of this Agreement, PPB shall prepare a status report no later than 45 days before the COCL's quarterly report is due. The PPB Compliance Coordinator shall lead the effort in preparing this status report and shall provide copies to the COCL, DOJ, and the public. PPB's report shall delineate the steps taken by PPB during the reporting period to comply with each provision of this Agreement.

177. PPB shall maintain all records, as applicable, necessary to document their compliance with the terms of this Agreement and all documents expressly required by this Agreement.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed PPB Quarterly Update reports and corresponding documents |

**Compliance Assessment**

    PPB has consistently provided the Quarterly Update reports required in Par. 176 of the Agreement. These status reports contain the delineation of "steps taken by PPB during the reporting period to comply with each provision of this Agreement."

    PPB has also maintained relevant records related to their compliance efforts and documents expressly required by the Agreement.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • COCL review of provided documents |

---

**F. Enforcement**

---

**Settlement Agreement Paragraph**

190. All PPB officers and persons related to the implementation of this Agreement shall sign a statement indicating that they have read and understand this Agreement within 90 days of the effective date of this Agreement. Such statement shall be retained by PPB. PPB shall require

compliance with this Agreement by their respective officers, employees, agencies, assigns, or successors.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Reviewed Excel sheets of new hires; Reviewed prior confirmation emails for officers reading Settlement Agreement |

| **Compliance Assessment** |
| --- |
|     In our previous report, we recommended that PPB provide a printout from the intranet showing the date that each employee read and acknowledged the Settlement Agreement. This type of documentation is more formal and more easily audited than a third-party statement. We have not yet received this type of documentation and recommend that PPB provide this so that we might see evidence that all employees have read and understood the Agreement. |

| **COCL Recommendations** | •   Provide intranet printouts showing review |
| --- | --- |
| **Compliance Rating Based On** | •   COCL prior review of confirmation emails |

In addition to the above assessed paragraph, there are a number of paragraphs that would require us to evaluate our own work or the responsibilities of DOJ. As our charge is to report findings "related to PPB's compliance with this Agreement," we refrain from assessing ours or DOJ's execution of responsibilities. However, for the purpose of record maintenance, we include here the language of those paragraph or, in the instance of long sections, a summary of the language.

157: With regard to any provision that provides for DOJ's review and approval, including review of all policies that must be revised, approval will be granted in a timely fashion provided that the PPB's action reasonably satisfies the requirements and standards set forth in the relevant provision(s).

160: (COCL Summary) Par. 160 requires the City to select a COCL. It also identifies the overall responsibility of the COCL, the independence of the COCL, and the City's requirement to provide administrative support to the COCL.

161: In order to collect data and report on PPB's implementation of each substantive provision of this Agreement, the COCL shall conduct the reviews specified in the paragraph 173 of this Agreement and such additional reviews regarding the implementation of this Agreement as the COCL, the City, or DOJ deems appropriate. Based on the COCL's reviews and community input, the COCL shall make recommendations to the City regarding measures necessary to ensure full and timely implementation of this Agreement.

162/163/164: (COCL Summary) Pars. 162 and 163 requires the COCL to conduct the reviews reflected in this report, specifying methodology, compliance assessment, and recommendations for compliance. Drafts of COCL's reports are to be provided to the Parties and the COAB for comment. COCL is also required to hold Town Halls and gather community comments to our reports. Par. 164 then requires COCL to consider the comments and make appropriate changes prior to issuing a final report. The Parties may submit COCL's reports to the Court and COCL's reports may be used to evidence compliance before the Court.

167: (COCL Summary) Par. 167 requires the DOJ to have full and direct access to all PPB and City personnel and documents. Par. 167 also provides for when exceptions may be made and how exceptions may be remedied.

168: All non-public information provided to the COCL or DOJ by PPB or the City shall be maintained in a confidential manner. Nothing in this Agreement requires the City to disclose documents protected from disclosure by the Oregon Public Records Law to third parties.

173/174: (COCL Summary) Pars. 173 and 174 detail the Semi-Annual Outcome Assessment required of the COCL. Such Outcome Assessments will measure whether the City and PPB have created systems and resources for responding to persons in mental health crisis, competent accountability and oversight systems, effective training for officers to deliver service to persons in mental health crisis, proper management of use of force, and robust systems of community engagement. Pars. 173 and 174 also the type of data which may inform the Outcome Assessments.

175: (COCL Summary) Par. 175 requires DOJ to conduct a comprehensive assessment of PPB and the City's compliance with the Settlement Agreement. Par. 175 also allows for modifications to the Agreement if necessary, provided the City agrees with the modification.

178 – 189: (COCL Summary) Pars. 178-189 provide requirements for the Settlement Agreement's enforcement, including provisions related to jurisdiction, termination, enforcement, additional considerations in required changes, process for non-compliance or misinterpretation of Agreement provisions, discussion of Agreement amendments, and defense of the Agreement.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

# LIST OF PERSONNEL

Chief of Police: Mike Marshman

Assistant Chief of Police: Matt Wagenknecht

Assistant Chief of Police: Mike Leloff

Assistant Chief of Police: Chris Uehara

Compliance Coordinator: Steve Jones

Inspector: Mike Krantz

Behavioral Health Unit (BHU) Manager: Tashia Hager

EIS Administrator: Frank Gorgone

EIS Administrator: Jake Jenson

Training Manager: Bob Day

Auditor: Mary Hull Caballero

IPR Director: Constantin Severe

**APPENDIX A**

| Training Objective | Measurement | Population or sample |
|---|---|---|
| 1. To ensure that trainees have achieved or maintained proficiency levels | Trainee survey: Measure knowledge, attitudes, and skills of <u>individual</u> trainees immediately <u>after</u> training | All trainees; Most classes as resources permit |
| 2. To ensure that training content is necessary and is targeted to specific deficiencies | Trainee survey: Measure knowledge, attitudes, and skills of the <u>trainee cohort</u> some time <u>before</u> training | Sample of potential trainees; Select classes where proficiency or necessity is most uncertain |
| 3. To evaluate the impact of training on proficiency levels | Trainee survey: Measure knowledge, attitudes, and skills of the <u>trainee cohort</u> <u>before</u> and <u>after</u> training<br>Contact survey: Measure skills during police-community interactions | All trainees[1];<br>Selected classes where measuring impact is most important<br>Community members who recently interacted with trainees from these classes, including persons with a mental health crisis |
| 4. To evaluate the impact of training overall on the organization | PPB Officer survey: Longitudinally measure knowledge, attitudes, and skills of all officers;<br>Contact survey: Longitudinally measure officers' skills during police-community interactions | All sworn officers in the PPB; Community members with recent police contact in general; |

---

[1] A minimal research evaluation plan would include a pretest and immediate posttest of the trainees, but a much stronger plan would include a control group of officers who did not receive the training at that time, preferably by random assignment. This can be difficult, but not impossible for agencies interested in knowing the true effectiveness of their training.

Exhibit B
Pg. 116 of 124

**APPENDIX B**

# TECHNICAL ASSISTANCE STATEMENT[2]

## Subject: Employee Information System (EIS)

Prepared by

**Compliance Officer and Community Liaisons (COCL)**

for

Portland Police Bureau

City of Portland, Oregon

January 9, 2017

---

[2] This technical assistance statement is authorized by paragraph 161 of the Settlement Agreement, wherein "the COCL shall conduct the reviews specified in paragraph 173 of this Agreement *and such additional reviews* regarding the implementation of this Agreement as the COCL, the City, or DOJ deems appropriate" (emphasis added).

We issue this Technical Assistance Statement to the City of Portland and the Portland Police Bureau (PPB) regarding the requirements set forth in Section VII of the Settlement Agreement (Employee Information System) and specifically paragraphs 116 through 119. This Technical Assistance Statement provides guidance on how the use of PPB's Employee Information System might be expanded.

In 2017, we encourage the PPB to give more attention to the Settlement Agreement's stipulation that EIS be able to "more effectively identify at-risk employees, supervisors, and teams to address potentially problematic trends in a timely fashion" (Par. 116). This TA Statement is meant to assist the PPB by articulating some steps that can be taken to help achieve this goal.

### Focus On Performance Rather Than Prediction

In the past, we have indicated EIS can be used to predict which officers are more likely than others to experience an adverse event within their career. Although we still maintain that prediction is possible, we are not interested at this time in continuing a debate about this subject at the risk of being distracted from the primary benefit of EIS systems. Hence, for the immediate future, we recommend that EIS be used as a performance-based evaluation tool that can be applied at the individual, supervisor, and unit level. We recommend that over the next year, PPB invest in enhancing the processes for reviewing flags, creating an intervention strategy, and monitoring officer performance.

In the future, we still urge PPB to consider how EIS can serve as a useful tool to identify and assist officers who are at-risk of costly behaviors. We encourage the PPB to take both a quantitative and qualitative approach to EIS. For now, we recommend that EIS be conceived as a SARA model of problem solving (see Walker & Archbold, 2014) for evaluating officer performance. This model has four stages: Scanning (identifying problematic behavior), Analysis (evaluating identified officers and selecting officers for intervention), Response (initiating intervention to address the problematic behavior), and Assessment (post-intervention review). Here we introduce this framework and use it as a heuristic device to illustrate the process and provide examples from other agencies that demonstrate the utility of EIS not yet developed by the PPB. We offer this with the assumption that PPB is interested in best practices and evidence-based policing, which may exceed the requirements of the Settlement Agreement. In either case, these principles and practices can be instructive.

**Scanning:** The scanning step should use the data currently available to PPB to locate officers whose performance could be improved. We have previous stated our position that the current thresholds found in Par. 118 of the Settlement Agreement are insufficient to identify potentially problematic behavior patterns as these thresholds are too high. However, this is an empirical question, and if PPB is able to identify a reasonable number of officers with these thresholds, then the EIS process can move forward. If not, the thresholds should be lowered or expanded to help identify officers that are shown to have concerning performance patterns. We encourage the PPB to arrive at a set of thresholds that does not grossly over-identify or grossly under-identify a group of officers who could benefit from assistance. But we emphasize that at the Scanning stage, PPB is expected to error on the side of over-identification because the next step, Analysis, is designed to screen out officers who are not appropriate for

intervention.  Under-identification is a much larger problem at this phase – a problem for which there is no method of recovery.

Consistent with this line of thought, expanding the range of variables can assist with the scanning process and identify other sources of patterns. We believe the following factors should be considered when identifying officers, supervisors, or groups that would benefit from supplemental instruction.  These factors have been gleaned from EIS approaches in Seattle, Albuquerque, Phoenix, as well as research by Merrick Bobb, Samuel Walker, and Robert Worden.

Variables for consideration are listed below, but others may be important in the PPB work environment. For developing additional thresholds (as well as developing variables for the Analysis section below), we suggest PPB engage in a two-step process to ensure that all factors are being considered.  The first step is to convene a group of individuals from all levels of PPB to brainstorm about possible factors associated with what is considered "problematic behavior," especially during interactions with the public. This focus group approach should be based on officers' experiential knowledge, i.e. street experience, not book knowledge.  These meetings should give attention to both the problematic outcomes and factors that contribute to these outcomes.

We also encourage PPB to continue to work with Dr. Worden to use quantitative data to identify contributing factors to problematic behavior.  This requires looking at a range of variables over an extended period of time (single variables over a short-term period will not be productive).  We encourage PPB to think about the full body of knowledge that is available about each officer and engage in analyses that will assist administrators and supervisors by identifying clusters of variables that are correlated over several years.  By using both a qualitative and quantitative approach, PPB can be confident that they are capturing the universe of contributing factors.  As EIS's may contain "as few as five or as many as 25 indicators" (Walker and Archbold, 2014) the range of variables considered varies with data systems and resources.

We ask that PPB indulge COCL in attempting to examine whether the current EIS data (or other sources of data) can be useful in identifying correlates.  We are recommending a one-time collection of data on the part of PPB using the below listed variables (that are available) for the time period January 1, 2005 through December 31, 2009 (five years) to determine whether they correlate with (1) sustained complaints, (2) the filing of a lawsuit between the years 2010 and the present, or (3) higher rates of use of force.  The COCL is willing to assist PPB with these analyses.

After developing a tentative plan for thresholds, we ask that the PPB discuss these with the COCL, and then compile a dataset to see whether officer, supervisor, and group trends can actually be identified without the number of flags being overbearing for the EIS Administrators.  The goal of the scanning step is to strike a balance between identifying too many officers (thus straining resources at the response step) and too few officers (thus limiting EIS's ability to help officers in need of assistance and protect the PPB from costly events).  Thus, the thresholds will likely require modification and continuous monitoring if the system is to be legitimate and work to the benefit of PPB.

- Force (Overall as well as within shift/precinct)
    - Number of incidents
    - Number of out-of-policy incidents
    - Number of "justified but concerning"

- o   Ratio of force to arrests
- Force Injuries
  - o   Ratio of force events to subject injuries
  - o   Ratio of force events to officer injuries
- Complaints (Overall as well as within shift/precinct)
  - o   Number of complaints
  - o   Type of Complaint (e.g. Criminal Misconduct)
  - o   Number of sustained/SIO/mediation complaints
  - o   Ratio of complaints to interactions
- Vehicle or Foot Pursuits
  - o   Number of incidents
- Sick Leave
  - o   Number of sick leave time
- Number of interactions (Overall as well as within shift/precinct)
  - o   Total number of calls for service responded to
- Resisting arrest charges (Overall as well as within shift/precinct)
  - o   Ratio to all arrests

As noted earlier, a single variable is not very likely to be a reliable picture of an officer's overall performance.  Thus, the PPB should consider a combination of factors to identify officers whose performance is atypical across a number of variables.  For instance, an officer using force in 20% of his or her arrests OR an officer who uses force at the 3x the rate of other officers in the same shift are single variable flags.  However, it may be just as problematic if an officer uses force in 15% of his or her arrests AND uses force at 2x the rate of other officers in the same shift.  The second officer would not receive a flag, though the behavior pattern across two variables might be appropriate for a review nonetheless.  As another example, Walker and Archbold (2014) provide the following scenario:

> "Resisting arrest charges filed by an officer…, meanwhile, are seen by many experts as a device by which officers cover their own use of force by charging the citizen with an offense that would justify the use of force.  Criminal suspects do resist arrest and even the best officers will file resisting arrest charges, but an EIS can identify a pattern where an officer is filing a much higher rate of such charges than peer officers, and *where there are other indicators of potential problems*" (emphasis added).

In an effort to help the PPB continue to encourage good, constitutional policing, we suggest also looking at officers who are the most proactive on the force.  In other agencies which rewards productivity by count, officers who are most proactive may be cutting corners to "get ahead" and be recognized. Officers that are several "standard deviations" above similar peer officers (to use a statistical concept) on the number of traffic stops, number of searches, number of citations, and number of arrests are worthy of a closer look.  We have observed in other cities, and the media has reported, individuals who are overly aggressive on some of these indicators. Especially important is whether stops and searches are justified constitutionally and whether they are indicative of "good policing."   Body cameras, in-car cameras, and witnesses are used more often in the current environment to assess whether there was probable cause or reasonable suspicion.  Also, the percent of times that contraband is found after a search, relative to peer officers, could be suggestive of a pattern of decision making that has questionable constitutionality.  In the final analysis, the PPB should continue to be interested in encouraging all officers to stay within the

limits of policy and the constitution, and thereby ensure the stability of their own careers and the legitimacy of the PPB within the Portland community of stakeholders.


**Analysis:**   During the Analysis stage, PPB should examine the underlying conditions that may have contributed to a particular officer being flagged in the Scanning stage, and determine whether or not an intervention is needed. We have previously stated our position that the officer's supervisor and the shift or precinct commander should be part of the review process as they have more first-hand knowledge of the involved issues.  PPB has indicated that approximately 90% of flags are not forwarded for supervisory review based on the evaluation of the EIS Administrator.  PPB has also indicated that they have formalized the EIS Administrator's decision-making (through a revised SOP) to ensure consistency across similar officer circumstances and quality equal to that of the officer's immediate supervisor.

For the moment, we suggest the EIS Administrator eliminates the portion of flags where it is very clear that statistical anomalies led to the flag.  Such declinations should be documented systematically, using a list of reasons for disposing of such cases and being able to show that declinations are consistent across like circumstances.   Where such statistical anomalies are not present, we suggest the decision as to whether an intervention is necessary comes from outside the EIS Administrator.

One way of determining whether an officer requires intervention is to have their direct supervisor review the officer's performance data.  Seattle's EIS policy requires the supervisor to conduct an "Early Intervention Assessments" when determining whether an intervention is necessary.  This is somewhat similar to what PPB currently does, though it is the supervisor (not the EIS Administrator) who determines whether it is a false positive or not.

Another way to make the determination for intervention is to use a panel.  The Los Angeles County Sheriff's incorporate a Performance Review Committee (PRC) to make such a determination.  The PRC is comprised of three commanders on a rotating basis who review flagged officers' performance.  The number of PRC members in other agencies varies.  In Seattle, there are six members (with the potential for a seventh).  In Phoenix, a meeting of five constitutes a quorum (though we are uncertain about the total number of members).  For both a supervisory decision and a panel decision, we find pros and cons, though present them to PPB as potential paths to consider.

Whatever the method chosen, the review of an officer's performance history should include an analysis of *why* a threshold was broken and thus a decision as to whether an intervention is capable of improving the officer's performance in the future.  Thus, some sources of review may include past performance evaluations, traumatic events, high-stress call types (e.g. suicide, domestic abuse, child harm), and other potential explanatory considerations.  These considerations are not meant as a vehicle to *excuse* the officer's performance but rather as a pointer to what may be the most effective path towards correcting the behavior.

We also want to emphasize that explanatory factors may include situational and environmental variables that are not unique to the individual officer, and therefore, do not warrant individual intervention, but perhaps call for group or agency level intervention, or no intervention.  Analysis by the PPB, the COCL or Dr. Worden may determine, for example, that situational risk is the primary driver of problematic behavior, whether the behavior is excessive force, citizen complaints, or lawsuits.  High adrenaline foot

and vehicle pursuits, for example, may result in higher levels of unjustified force, regardless of officer characteristics. Such information, however, can be extremely valuable to the PPB, as it may suggest that certain types of incidents require extra training and policy adjustments. Also, intervention may be needed for certain high-risk assignments, such as gang or tactical units that are more likely to have contact with less compliant individuals.  This is the type of risk information that can be result of a full-functioning EIS program that relies on both qualitative and quantitative data.

**Response:**  If the review process does not eliminate a case as a false positive, then the next step in the SARA model is to determine the appropriate intervention for the officer.  We have looked at a couple agencies' policies related to interventions and tracking and include them here for PPB's review.  In terms of determining an appropriate intervention, we again believe the immediate supervisor should have a central role in this process.  In Seattle, a "mentoring plan" is proposed by the immediate supervisor, though it is sent through the chain of command for approval.  We believe that sending it through the entire chain of command is potentially too many steps (similar to the issues with the 940 process) and may take away from the personalized aspect of the mentoring plan.  In other agencies, the Performance Review Committee determines the intervention.   Although this controls for consistency across interventions, this lacks the personal insight of a supervisor.  In Phoenix, the plan and personnel involved varies by intervention, though this is potentially confusing as it creates somewhat of a matrix.

We suggest that the creation of an intervention plan should be the responsibility of the immediate supervisor, subject to review by a Performance Review Committee.  As EIS is not designed to be disciplinary, it does not seem necessary to involve the entire chain of command (as would a disciplinary proceeding or a determination of policy violation).  If the supervisor believes that an intervention is not necessary, this decision should be reviewed by either the EIS administrators or a Performance Review Committee.  However, we would recommend looking at Seattle and Phoenix's policies as they relate to crafting appropriate interventions that involve others in the process.

The intervention should "identify specific performance issues to be addressed, identify specific methods/trainings that will be utilized to address the identified performance issues, and identify specific time frames for completing assigned tasks or training" (Seattle EIS Policy).  Although the intervention is developed by the immediate supervisor, it should be reviewed by the Performance Review Committee to ensure "uniformity and consistency in the treatment of similarly-situated officers" (Seattle EIS Policy) and that it is consistent with the goals of the PPB and EIS.  The intervention should also be consistent with the findings of the performance review in order to provide individualized assistance to the officer.  Finally, the intervention should not only focus on direct contributors to the officer's negative performance but, whenever possible, on indirect contributors as well (e.g. underlying personal problems)

**Assessing Results:**

After reviewing the EIS protocols from several agencies, we suggest PPB also utilize the Performance Review Committee as a means to monitor officer progress towards satisfaction of the intervention plan. As the determination of adherence to intervention plans may vary across supervisors, we look at PRC's as a mechanism for consistency here too.  The officer's supervisor should provide updates to the PRC

indicating their own impressions as to whether the officer has adhered to the mentoring plan and whether the supervisor has seen any changes in the officer's behavior. Some agencies require a bi-monthly status report from the officer's immediate supervisor, documenting the progress of the officer. Other agencies only require reports once a month. PPB should establish a monitoring policy that is reasonable for command staff.

The PRC, upon reviewing the status reports from the officer's immediate supervisor, should make a final recommendation as to whether the officer has completed the mentoring plan. In the agencies we reviewed, the recommendation is made to the appropriate Assistant Chief who makes a final determination. Again, PPB should consider whether this level of review is necessary or whether the PRC's determination is sufficient in light of the composition of the PRC.

As an evidence-based learning organization, the PPB should establish ways to evaluate the effectiveness of its EIS interventions and make adjustments as needed. In addition to individual interventions, the PRC should look at trends in interventions, including whether certain interventions are more effective than others. Furthermore, the PRC should evaluate thresholds to determine whether any modifications are need based on previous officers who have been flagged. This is in-line with the effective monitoring of EIS to maintain organizational legitimacy and utility.

## Summary

In summary, we understand that PPB seeks to be in compliance with the Settlement Agreement and believes that the thresholds and review process currently used comply with the terms. Although the thresholds may be in compliance (to be determined after a review of the actual data), the intent of paragraph 116 has not been achieved from our perspective. The adequacy of the current review process is unknown because of a lack of documentation, but on its face, does not appear sufficient in light of best practices. Also, a system of intervention has not been established to our knowledge which is the primary goal of EIS systems. As such, we see no evidence that officers who could truly would benefit from supplemental instruction and guidance are receiving it.

In every agency we have observed, officers and supervisor are able to identify individuals who put them and the agency at risk in terms of safety, career security, law suits, and public trust and legitimacy. Such officers are not hidden, undetectable employees, or "random noise" in PPB records; they can be identified using EIS, supported by observant supervisors and peers. We have provided PPB an expanded list of variables which research suggests may help to identify them, but PPB should rely on both officer experience in the field and records to achieve this goal. By only sticking with the thresholds identified in the Settlement Agreement because that's all PPB is "required to do," it is unlikely that these officers will be given the opportunity to improve their performance.

We recognize that the EIS, as articulated here, has significant implications for first-line supervisors. We have maintained all along that supervisors must step up and play an important role in evaluating their employees and assessing whether an intervention is necessary and most appropriate for particular officers. A 9% referral rate does not give supervisors the courtesy they deserve to weigh in on whether an officer they supervise on a daily basis needs additional support. Of course, if the PPB creates the expectation (and requirement) that first-line supervisors and their bosses engage fully with their officers

as mentors and coaches (and sometimes, disciplinarians), this will likely involve additional training. In the future, it may also require more careful attention to the process of promotion and whether the right individuals are being selected for these critically important positions.

We have provided direction for intervention plans to improve the performance of officers, while at the same time providing a suggestion for ensuring consistency across officers.  Hopefully, PPB will establish a process of developing new and impactful interventions for officers at risk.  For example, we encourage the PPB to look at the New Orleans Police Department's Peer intervention program, whereby peers are trained to intervene when an officer is about to engage in problematic behavior.  This may reduce some of the burden on first-line supervisors and encourage more informal social control at the peer level, as it should be. (From ride-alongs, we discovered that the PPB gang unit effectively practices this type of intervention in part).

Finally, we have provided PPB with suggestions for reviewing the effectiveness of intervention plans both at the individual level as well as the organizational level.  We have argued that EIS should not be viewed as a fixed process but rather one that needs to be periodically updated in achieve maximum effectiveness for individuals and maximum benefit for the organization.

At each step of the process, we have included other agencies that have taken similar steps.  We encourage PPB to go beyond these examples and propose new ideas tailored to Portland.

PPB has asked us to provide them with direction as to how the current system might be enhanced to satisfy the Settlement Agreement.  This document attempts to be responsive to that request, providing both a framework and some methods of implementation.  We expect that the PPB will agree with some recommendations and disagree with others.  For areas where the PPB staff disagree, we ask that they suggest alternative options.  While our consultation can contribute to EIS progress in 2017, PPB's program should be heavily influenced by the creative thinking of civilian and sworn personnel within the Bureau and best practices in the field of policing.