## United States v. City of Portland
## 2017 Settlement Agreement Compliance Assessment

| | |
|---|---|
| III. USE OF FORCE | **Partial Compliance** |
| A. Use of Force Policy | **Partial Compliance** |
| B. Compliance Audits Related to Use of Force | **Partial Compliance** |
| IV. TRAINING | **Partial to Substantial Compliance** |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | **Substantial Compliance** |
| VI. CRISIS INTERVENTION | **Pending to Substantial Compliance** |
| A. Addictions and Behavioral Health Unit and Advisory Committee | **Partial to Substantial Compliance** |
| B. Continuation of Crisis Intervention ("C-I") Program | **Partial to Substantial Compliance** |
| C. Establishing "Memphis Model" Crisis Intervention Team | **Pending to Substantial Compliance** |
| D. Mobile Crisis Prevention Team | **Partial to Substantial Compliance** |
| E. Service Coordination Team | **Substantial Compliance** |
| F. Bureau of Emergency Communications ("BOEC") | **Partial to Substantial Compliance** |
| VII. EMPLOYEE INFORMATION SYSTEM ("EIS") | **Partial Compliance** |

| | |
|---|---|
| VIII. OFFICER ACCOUNTABILITY | **Partial Compliance** |
| A. Investigation Timeframe | **Partial Compliance** |
| B. On Scene Public Safety Statements and Interviews | **Partial to Substantial Compliance** |
| C. Conduct of IA Investigations | **Partial to Substantial Compliance** |
| D. Citizen Review Committee ("CRC") Appeals | **Substantial Compliance** |
| E. Discipline | **Partial Compliance** |
| F. Communication with Complainant and Transparency | **Substantial Compliance** |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD ("COAB") | **Partial Compliance** |

## III. USE OF FORCE

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness: (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied. PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible. In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons, including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function. To achieve these outcomes, PPB shall implement the requirements set out below.

| Status | Partial Compliance |
|---|---|
| Analysis | As discussed in greater detail in other Paragraphs, PPB has made significant progress towards compliance with Section III of the Settlement Agreement, including this Paragraph. <br><br> PPB has undertaken the wholesale revision of its suite of force policies, laying out clear guidelines for when and how officers may use force, how immediate supervisors investigate force, and how chain-of-command supervisors review the work of officers under their command. PPB's policy on reporting and investigating deadly force conflicts with current Settlement Agreement provisions, but the parties have worked cooperatively on a solution. <br><br> PPB's Fall 2017 use of force in-service training substantially improved upon previous editions. <br><br> The improvements in policy and training are recent, however. Our review of force reports and After Action Reports over the past year showed PPB officers were not routinely complying with the Settlement Agreement in their use of ECWs, and supervisors have not held officers accountable for failing to do so. PPB actions in several crowd management incidents also were inconsistent with the Agreement. <br><br> PPB must also critically examine training on de-escalation and properly review force reports substantially to comply with this Paragraph. <br><br> In general, involved officers appear to be timely and thoroughly reporting use of force. <br><br> PPB recently revised its policy to require After Action Reviews of all force (with the exception of deadly force, which PPB's Detective Division and Professional Standards Division investigates). PPB's policy revisions have coincided with periodic and substantial improvements to the After Action Review checklist. PPB now reviews uses of force more comprehensively than it has in the past. <br><br> PPB's Force Inspector has redesigned the Force Audit Reports to be a far superior force management tool. It is as yet unclear how the Chief and Inspector address areas of concern revealed in After Action Reviews and the force audit. |

| Technical Assistance | PPB has laid a good foundation of sound policy, training, and auditing of force.  PPB must also ensure comprehensive training for After Action supervisors; improve compliance in its use of ECWs and in use of force during crowd management; and use the force audit to identify and address areas of concern, in order to achieve substantial compliance with Section III. |
|---|---|

## A. Use of Force Policy

66. PPB shall maintain the following principles in its existing use of force policies:

    a. PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and

| Status | **Partial Compliance** |
|---|---|
| Analysis | <u>Policy</u><br><br>In mid-2017, PPB rewrote Directive 1010.00, Use of Force, to meet the requirements of the Settlement Agreement, including Paragraph 66(a).  Directive 1010.00 now "requires that members use only the objectively reasonable force necessary to perform their duties and overcome the threat or resistance of the subject under the totality of the circumstances."  Directive 1010.00, Use of Force, Policy Section ¶ 2, *available at* https://www.portlandoregon.gov/police/article/647779.<br><br><u>Training</u><br><br>The Settlement Agreement requires that PPB appropriately train all relevant personnel on the provisions of the Settlement Agreement.  *See* Settlement Agreement ¶ 156 (requiring that PPB implement all provisions of the Settlement Agreement), ¶ 33 ("implement" means, *inter alia*, the appropriate training of all relevant personnel).  Thus, DOJ assesses whether PPB has appropriately trained personnel on the provisions of Section III, including the requirement that officers use only reasonably necessary force.<br><br>PPB has improved its use of force training since the DOJ's 2016 Compliance Status Report.<br><br>In the 2017 in-service training DOJ observed, instructors taught officers that force must be objectively reasonable and explained what that means.  Instructors also explained that the maximum force allowed by law does not mean that an officer should always use that level of force.  Instructors emphasized the concept of procedural justice in this context, i.e., a person is more likely to comply with law enforcement if s/he thinks s/he was treated fairly.<br><br><u>Verification of Performance</u><br><br>In addition to promulgating relevant policies and training officers, PPB should ensure consistent and verified performance of Settlement Agreement requirements.  *See* Settlement Agreement ¶¶ 33, 156 (requiring that PPB implement all provisions of the Settlement Agreement).  Many PPB officers use only the force reasonably necessary.  In some cases, third-party witness statements or other external evidence confirm that restraint was exercised by officers.  This indicates successful implementation of Settlement Agreement principles.<br><br>For example, PPB officers responded to a call about a suicidal individual.  The officers arrived in a nearby parking lot out of sight from the individual's residence to speak to the individual by phone first.  Suddenly, the individual appeared across the street, with his forearms bleeding, |

|  | holding two large knives.  Upon seeing the officers, the individual walked toward the officers and a pedestrian sidewalk.  The officers took numerous steps to resolve this crisis without deploying their service weapons.  They first attempted to deploy an electronic control weapon (ECW).  Once the individual dropped the knives, the officers were able to take the individual into custody without further force.

Bureau policy and training has recently adapted to address the kind of situation outlined above.  However, DOJ identified two ways in which the Bureau's force decision-making could improve.

First, as discussed in comments to Paragraph 68, PPB officers have deployed ECWs for durations as long as 13 seconds before releasing, and have deployed an ECW for a second cycle without pausing to issue warnings or to permit the subject to comply.  PPB supervisors have not consistently addressed violations of the ECW policy.  Second, DOJ identified incidents during recent protests where officers appeared to use more force than was necessary.  The After Action supervisors reached the same finding in one of these cases. |
|---|---|
| **Technical Assistance** | PPB should ensure comprehensive training on force After Action Reviews for supervisors, as described in the Paragraph 70 technical assistance.  The training should specifically emphasize supervisory review of ECW use, as described in the Paragraph 68 technical assistance.

The Bureau also should conduct a critical examination of use of force during crowd management events.  This review should incorporate the input of involved officers and their supervisors on the specific challenges and constraints of crowd management.  The review should address and plan corrective action for identified deficiencies in crowd management uses of force, reporting, and After Action Reviews. |

b. PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | Policy

PPB Directive 315.30 historically included clauses that touched upon the principle in Paragraph 66(b), but did not incorporate the provision *per se*.

The current version of PPB Directive 1010.00 now captures the requirements of Settlement Agreement Paragraph 66(b).  It states, "Over the course of their careers, the Bureau expects members to develop and use skills and abilities that allow them to regularly resolve confrontations while minimizing the need to use force."  Directive 1010.00, Use of Force, Policy Section ¶ 4.

Verification of Performance

Like COCL, DOJ has not seen PPB routinely verify performance of Paragraph 66(b). |
| **Technical Assistance** | In order to verify compliance with Paragraph 66(b), PPB should have a process to evaluate the successful development and use of skills aimed at minimizing the need to use force. |

5

67. PPB shall add to its use of force policy and procedures the following use of force principles:

a. Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b. In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

c. The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d. Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

| Status | **Partial Compliance** |
|---|---|
| Analysis | Policy<br><br>PPB's policy development team substantially revised Directive 1010.00 to comply with Paragraph 67 during this reporting period.  Revised Directive 1010.00 incorporates all of Paragraph 67(a)'s mandates.  *See, e.g.*, Directive 1010.00, Use of Force, Procedure section ¶ 1.1 ("Members shall use disengagement and de-escalation techniques, when time and circumstances reasonably permit."); *id.* ¶ 1.1.2 ("When practical and appropriate, members shall consult with and/or call specialized units to respond").<br><br>Training<br><br>*De-escalation*: PPB's Fall 2017 in-service training was excellent overall. The instructor covered the definition of de-escalation (prior to using force) and provided examples.  The instructor also advised officers that as resistance decreases, force should also decrease.  However, de-escalation training needs more clarity, consistent with the technical assistance below.<br><br>*Disengagement and Calling Specialized Units*:  The Fall 2017 in-service training addressed these topics.  COCL reports that PPB's Spring 2017 in-service training also included a course, "Disengagement with a Plan," that satisfied PPB's obligation under Paragraph 84(a)(iv) to continue to train officers on disengagement.  *See* COCL Compliance and Outcome Assessment Report, Dec. 7, 2017 ("2017 COCL Rep.") at 60.<br><br>*Taking into Account Actual or Perceived Mental Illness*:  PPB's ongoing in-service training addressed this topic, both in a discussion of policy and during multiple scenarios (one on force generally, another on ECW usage).<br><br>Verification of Performance<br><br>*De-escalation*<br><br>COCL highlights examples where PPB officers issued pointed directives that, while resulting in the subject's compliance, nevertheless were mislabeled "de-escalation."   Some examples include the use of profane language or threats of immediate, additional force.  DOJ found other examples where supervisors mislabeled actions as de-escalation. |

The converse is also true: PPB officers sometimes employ tactics that strategically slow down encounters and reduce the need for force, but they are not credited with using de-escalation.

PPB training should include more definition and examples of de-escalation. PPB officers should know what the Bureau expects with regard to de-escalation. Both officers and supervisors should know how to appropriately document and evaluate de-escalation efforts.

*Disengagement*

The sample of use of force cases we reviewed included one instance where disengagement appeared to be premature. We saw other instances in which officers made the encounter safer for all involved by using a temporary, tactical withdrawal.

Supervisors do not make consistent findings about whether disengagement was used.

*Specialized Units*

The City has yet to establish a reliable system to measure whether those with special training (Enhanced Crisis Intervention Team ("ECIT") officers) are asked to respond to calls with a mental health component. *See, e.g.*, 2017 COCL Rep. at 79-80 (data from the Mental Health Mask/Template look promising, but are not yet fully accurate, since "It is feasible for a non-ECIT officer to respond to an ECIT type call and close the call without completing any type of report. In that instance, no Mental Health Template would be completed, meaning the lack of ECIT response to an ECIT type call would not be captured.").

*Taking into Account Actual or Perceived Mental Illness*: The sample of reports DOJ reviewed contained relatively few instances in which officers had the opportunity to evaluate for signs and symptoms of mental illness. DOJ looks forward to reviewing PPB's forthcoming analysis of how ECIT and patrol officers respond to calls with actual or perceived mental illness.

| | |
|---|---|
| **Technical Assistance** | PPB should supplement its work on de-escalation through continued training and supervisory review of After Action Reports. PPB should clarify for officers and supervisors how the Bureau defines the term "de-escalation." For instance, verbal commands do not necessarily de-escalate an event or use-of-force incident. An officer's actions, including the tenor of any conversation and the context, will determine whether they qualify as de-escalation. PPB should also clarify that not every situation calls for de-escalation.

PPB training must address the two distinct opportunities for de-escalation outlined in the Settlement Agreement: de-escalation to avoid using force, as discussed in 67(a) (event de-escalation), and de-escalation after the officer begins using force, as discussed in 67(c) (force de-escalation).

PPB should provide clear, consistent examples of de-escalation to ensure comprehension and safe, appropriate use of the tactic

PPB should clarify what qualifies as disengagement through future trainings, After Action Reviews, and the force audit. |

7

1. Electronic Control Weapons

68. PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapon System to include the following principles:

a. Prohibition against the use of ECWs for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force;

b. Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their ECW;

c. Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following ECW use;

d. Only one ECW at a time may be used on a subject, intentionally, except where lethal force would be permitted;

e. After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each ECW cycle in their use of force reports;

f. Officers shall make every reasonable effort to attempt handcuffing during and between each ECW cycle. Officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant use;

g. ECWs shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of use of force; and

h. Officers receive annual ECW in service training including proficiency and policy changes, if any.

| Status | **Partial Compliance** |
|---|---|
| Analysis | Policy<br><br>PPB's policy revision team merged its trunk Directive 1010.00, Use of Force, with the branch policies such as the old Directive 1051.00, Electronic Control Weapon System, incorporating the elements of Paragraph 68 into the new 1010.00. The old Directive 1051.00 lacked many elements of Paragraph 68. *See, e.g.*, Directive 1051.00, Section 2.11 (authorizing simultaneous use of ECWs in order to avoid the need for a "higher level of force," even if lethal force would not be permitted). Revised Directive 1010.00 incorporates all of Paragraph 68's mandates. *See* Directive 1010.00, Use of Force, Procedure Section ¶ 6.4.4.2.<br><br>Training<br><br>PPB provided ECW training in both Spring and Fall of 2017. The training DOJ observed in the Fall surpassed previous editions. Training instructors explained that officers must issue a warning prior to using *any* force, unless it would present a danger to the officer or others. Instructors explained that intentionally applying two ECWs at once is prohibited and engaged officers in a robust question and answer exchange. Training included a significant component |

on responsibilities to ensure medical care following use of force. The training made robust use of scenarios.

Still, instructors needed to convey more clearly what constitutes one ECW cycle; what should happen after each cycle; and that officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant it.

See the comments to Paragraph 80 for additional detail.

Verification of Performance

PPB Members are attempting to adapt to agency policy on ECW usage. Officers told us that they were trained until recently to deploy and continue an ECW cycle until the subject is handcuffed or complies. PPB has now rid its policy and training of such instructions. PPB policy now requires officers to cease each ECW cycle after five seconds, re-evaluate the situation to determine if subsequent cycles are necessary, issue a warning prior to each additional cycle, and wait a reasonable amount of time to allow the subject to comply, unless doing so would present a danger to the officer or others. DOJ expects PPB will adapt to and verify compliance with the new policy in the coming year.

In this review period, DOJ identified many instances where PPB officers have deployed cycles beyond the five-second restriction, did not permit a subject to comply before deploying an ECW a second time, failed to issue a warning and, in one instance, deployed an ECW against a subject who was restrained. Too often, supervisors found these impermissible uses of force to be within policy.

For example, one officer deployed his ECW during a struggle. Another officer involved in the fight told the After Action Sergeant that he "thought the Taser had cycled for 11 seconds." The Taser download report effectively confirmed this: one deployment for six seconds, and the moment the first deployment ended, a second deployment for five seconds. The After Action Sergeant found the deployment(s) "consistent with PPB Policy, the DOJ agreement and best practices." More senior supervisors reached substantially the same conclusions. PPB policy at the time required, "After a [five-second] ECW cycle the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning." The Settlement Agreement includes substantially the same language. The findings of this After Action Review are thus inconsistent with the Settlement Agreement and PPB policy.

Based on our interviews with supervisors, some still improperly endorse cycling beyond five seconds. PPB has issued a new Taser Model X2 battery configuration that only allows a five-second deployment cycle. This is a very positive development. Since these ECW models may be deployed in rapid succession, however, it is important to continue to emphasize the five-second rule.

DOJ found officers adhered to many of the other requirements of Paragraph 68. For example, they called emergency medical responders to remove ECW probes. PPB officers also explained that the Bureau teaches them to attempt to handcuff an individual during cycles.

When officers deployed ECWs for extended durations, they did so largely out of an interest in preserving public safety. As the supervisor in the incident detailed above explained, the ECW was used to end a close-quarters struggle with a wanted suspect. Even so, circumstances that may initially justify using the ECW do not justify an eleven-second ECW deployment. The subject must have an opportunity to comply after a five-second deployment.

| | |
|---|---|
| **Technical Assistance** | PPB should devote additional focus to training supervisors on After Action Review of ECW use. The training should emphasize the need for officers to explain the reasonableness of each application of force, and the need to determine following each application whether the subject understands instructions and is able to comply, before a subsequent ECW is applied. The training also should convey that supervisors must ascertain an officer's justification for the force. |

## 2. Use of Force Reporting Policy and Use of Force Report

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that:

a. All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

b. All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | **Policy** |
| | PPB revised policies to add clarity and increase consistency in the Bureau's directions to officers in reporting and recounting force used and witnessed. As reported in 2016, PPB's old Directive 1010.00 did not require officers to draft use of force reports for all force used. *See, e.g.*, 2016 Settlement Agreement Compliance Assessment, at 15-16, ECF 124-1 ("As to some types of use of force— control holds where no injury occurs—Directive 1010.00 only requires the General Offense Report."). |
| | Revised Directives 1010.00 and 1010.10 now describe exactly when and how officers must report force. Revised Directive 1010.00 categorizes all types of force officers use, and sets out reporting requirements for each category. Involved and witness officers must provide candid and detailed accounts of force used, regardless of circumstances. *See generally* Directive 1010.10, Deadly Force and In-Custody Death Reporting and Investigation, available at https://www.portlandoregon.gov/police/article/656780. |
| | The revised Use of Force Directives contain one significant exception to the FDCR and After Action Review process: officers who use deadly force do not complete a use of force report or interview with a supervisor. Instead, PSD is to interview any officer involved in a deadly use of force "as soon as practicable, but no later than within 48 hours of the event," Directive 1010.10, ¶ 2.2.5.3, and then proceed to conduct an administrative investigation parallel to any criminal investigation. PPB will also obtain information necessary to ensure public safety at the scene. *Id.* ¶ 2.1.3.1.3. The revised Directive 1010.10 is consistent with the amendments to the Agreement proposed by the parties, and the City has developed standard operating procedures to implement the revised Directive, in consultation with the DOJ, PPA, and Multnomah County District Attorney's Office. |
| | **Verification of Performance** |
| | The documentation DOJ reviewed contained numerous examples of timely, thorough use of force reports. |

| | PPB is creating a use of force report form template that will direct officers to report the necessary categories of information. |
|---|---|
| **Technical Assistance** | |

### 3. Use of Force Supervisory Investigations and Reports

70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

a. Complete After Action Reports within 72 hours of the force event;

b. Immediately notify his or her shift supervisor and PSD regarding all officers['] Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement;

c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

d. Interview officers individually and not in groups.

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | Policy<br><br>The revised Directive 1010.00 replaced Directive 940.00 and incorporated previously missing Settlement Agreement provisions. Officers must immediately notify a supervisor about any use of force. Directive 1010.00, Use of Force, Procedure Section ¶ 11.1.1, *available at* https://www.portlandoregon.gov/police/article/647779. Supervisors receiving such notice must report to the scene. *Id.* ¶ 10.1. For all uses of force except deadly force, the supervisor must conduct an administrative review and investigation, document the findings in an After Action Report, complete the After Action Report within 72 hours, and forward the report through the chain of command. *Id.* ¶¶ 12.3, 13.1, 13.3. Uses of force are reviewed by the chain of command, up through and including the Assistant Chief in cases of "Category II" uses of force. *See id.* ¶¶ 10.3-10.5. Use of Force Procedure Section Paragraph 12 and the subparagraphs now include the notification requirements of Settlement Agreement Paragraph 70(b), and Paragraph 70(c)'s requirement to ensure medical attention, when necessary. Supervisors must interview officers and witnesses individually and not in groups. *Id.* ¶ 12.6.<br><br>As previously mentioned, PPB's revised Directives treat deadly force specially. *See* Comments to Paragraph 69, *supra.* PSD investigators, not a chain-of-command supervisor, will conduct the administrative review of deadly force events, including interviewing any officer who uses deadly force. *See* Directive 1010.10, ¶ 6.3. PPB policy directs PSD to conduct the administrative review concurrently with any criminal investigation, *id.* ¶ 6.1, including interviewing the involved officer(s) within 48 hours. *Id.* ¶ 3.1. At the conclusion of the |

11

criminal and administrative investigations into the use of force, PSD provides the results of its administrative review to the involved officer's unit, *id.* ¶ 6.4, so that her/his chain of command supervisor can take any necessary supervisory steps.

The chain of command supervisor must still report to the scene and, among other steps, procure any medical attention necessary. *See* Directive 1010.00, Use of Force, ¶ 12.2.

<u>Training</u>

PPB has provided substantial training on After Action Reviews for many immediate supervisors. Specifically, the Force Inspector conducted a series of trainings with many different shifts at different precincts. The Force Inspector developed the training, and met with most of PPB's first-line supervisors. The training was well received by the attendees with whom DOJ spoke.

Use of the After Action Report template described in Paragraph 72 reinforces the necessary elements of the After Action Review.

The training targeted sergeants. It is not clear that all sergeants were able to attend, and some sergeants still rely largely upon other trainings on force After Action Reviews that may be inconsistent.

<u>Verification of Performance</u>

As noted above, PPB policy only recently required After Action reporting for certain types of force. The types of force PPB used to exempt from the AAR process included failed ECW deployments, pointing of firearms, and control holds where no injury resulted. PPB officers abided faithfully by this Bureau policy. Accordingly, PPB had not complied with Paragraph 70 for 2016 and much of 2017.

To the extent that previous Bureau policy incorporated the requirements of Paragraph 70, officers complied at a high rate. Immediate supervisors responded to the scene of uses of force as required, interviewed Bureau officers and witnesses, completed investigations and After Action reviews, and memorialized findings in a report. Supervisors completed and submitted reports within 72 hours at a high rate – a practice that was confirmed when, midway through the reporting period, PPB introduced a version of the AAR template that timestamps when reports are submitted up the chain of command.

PPB officers did, however, bring one issue to DOJ's attention. They explained that it is impossible for Rapid Response Team supervisors to submit a thorough After Action Report within 72 hours due to operational demands. When the Rapid Response Team was deployed several days in a row to respond to extended street protests, supervisors were unable to review all available evidence to draft a thorough report within that timeframe. RRT supervisors have been forced to submit incomplete reports, knowing they will be returned for additional investigation, in order to "comply" with the 72-hour deadline. DOJ will discuss this issue with City and PPB leadership.

Supervisors appear to be consistent in requesting medical attention when necessary.

PPB regularly notifies PSD of serious uses of force and use of force against individuals with mental illness. Although DOJ has reviewed the notices, we have not seen data tracking PPB's performance in this area.

As noted elsewhere, PPB has not consistently identified all potential misconduct. *See, e.g.*, Comments to Paragraphs 66 and 68, *supra*. Accordingly, PPB has not yet substantially

| | complied with the notification and non-disciplinary corrective action requirements of Paragraph 70. |
|---|---|
| **Technical Assistance** | The Bureau should expand the Force Inspector's trainings to all relevant supervisors, to ensure consistent expectations for receipt and review of After Action Reports. The training should emphasize each rank's role in the review. The training will also need to emphasize the specific areas of focus mentioned in our comments to Paragraphs 66 and 68. |

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | Portland Police Bureau reported 134 sergeants and 684 police officers in fiscal year 2012-13, *see* Michael Reese and Charlie Hales, Memorandum Re: Police Bureau FY 2013-14 Budget Request, Attachment at 34 (Feb. 4, 2013), *available at* https://www.portlandoregon.gov/cbo/article/433623. Thus, the baseline staffing level is roughly one sergeant to every five Officers. (1:5.1) |
| | Portland adopted a budget for 134 sergeants and 647 police officers in fiscal year 2017-18, *see* Adopted Budget City of Portland, Oregon, Fiscal Year 2017-18, Volume One, *available at* https://www.portlandoregon.gov/cbo/article/649444. This equates to a staffing level of just better than one sergeant to every five officers (1:4.82). PPB reports that this translates to at least one patrol sergeant to every 5.1 patrol officers at each precinct. |
| **Technical Assistance** | |

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | <u>Policy</u> |
| | The new version of PPB Directive 1010.00 designates the After Action Report form as the checklist to ensure supervisors carry out force investigation responsibilities, and requires that the form be reviewed and revised at least annually for adequacy and relevance. *See* Directive 1010.00, Use of Force, Procedure Section ¶ 13.2, *available at* https://www.portlandoregon.gov/police/article/647779. |
| | PPB has developed an After Action Report template that is designed to guide and in some cases oblige supervisors to input the data required by the Settlement Agreement and Directive 1010.00. The template is available on PPB's intranet, and can be edited on the browser. The user is required to enter certain data; when some data points are entered, new fields open up that must also be completed. For example, the form prompts the user to check a box to indicate |

| | |
|---|---|
| | whether a given officer or subject was injured; if the user checks the box, a series of further questions appear, asking whether the injury predated the use of force, whether medical care was procured, and the like.  Many questions prompt the user to explain their check-box response with a narrative supplement below.<br><br>Performance<br><br>Supervisors are using the After Action Report template.  As one sergeant told us, "The force audit points [needed to be] put into a worksheet, like what we're getting to now with the drop-downs.  The After Action Report form now is a pretty good end result."<br><br>PPB revises the After Action Report form periodically. |
| **Technical Assistance** | |

73. PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

a. EIS tracks all Directive 940.00 comments, findings and corrections;

b. All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

c. All supervisors in the chain of command are accountable for inadequate reports and analysis;

d. A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations.  Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

e. When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

f. Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

g. The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | Policy<br><br>Prior to 2017, PPB policy did not incorporate all of the elements Paragraph 73.  *See* 2016 Settlement Agreement Compliance Assessment, at 23-24, ECF 124-1.<br><br>PPB incorporated the required elements into Directive 1010.00 during the omnibus revisions to the force policy this year.  *See* Directive 1010.00, Use of Force, Procedure Section paragraph 13 and subparagraphs. |

<u>Verification of Performance</u>

*EIS Tracking of After Action comments, findings, and corrections, 73(a)*

As COCL notes, "the Force Audit indicates that the absence of an EIS entry is one of the more common deficiencies attributable to supervisors." 2017 COCL Rep. at 35-36.

*Corrective Action and Accountability for Reporting, 73(b) and 73(c)*

PPB is not yet universally holding supervisors accountable for inadequate reports or analysis, nor is the Bureau taking corrective action or discipline when After Action Reports are inaccurate or incomplete. *See, e.g.*, Comments to Paragraph 68, *supra* (describing conclusions that uses of ECW were in-policy, notwithstanding cycles lasting beyond five seconds and repeated cycles without pausing).

*Repeated Deficient Investigations, 73(d)*

Some supervisors reviewed multiple ECW deployments of duration greater than five seconds, but concurred with the After Action supervisor below them that the deployments were each "in-policy." PPB administered no corrective action of which DOJ is aware.

*Corrective Action for Misconduct, 73(e)*

Gaps in the City's compliance with the accountability requirements of the Settlement Agreement are documented in our comments to Section VIII.

*Identifying and Addressing Policy, Training, Tactical and Equipment Concerns, 73(f)*

Paragraph 73(f) requires two distinct measures: first, immediate supervisors must notify the Inspector and the Chief of Police of policy, training, tactical, or equipment concerns indicated by a use of force; second, the Inspector and the Chief of Police must ensure that PPB timely conducts necessary training and timely resolves policy, tactical, or equipment concerns.

To their credit, some immediate supervisors and even some officers are identifying areas of concern for the Bureau. For example, a handful of officers' ECW batteries lost their charge prematurely. They discovered that a new model of holster was incompatible with the model of ECW then in circulation, causing the ECW's battery to discharge while holstered. These officers brought the issue to the attention of the Training Division immediately, and the Training Division procured new holsters and issued them as alternates.

PPB has not demonstrated a process by which such concerns are routinely channeled to the Force Inspector and Chief, however. Certainly, representatives of the Chief and Force Inspector review every After Action Report. Supervisors sometimes indicate training concerns on the After Action Reports, and some policy, tactical, and equipment concerns are raised *ad hoc*. But PPB is not documenting that supervisors raise such concerns consistently, and there needs to be a more systematic feedback loop to ensure concerns raised on After Action Reports are addressed by the Chief or Inspector (such as by ensuring that the Training Division incorporates skills and knowledge concerns into training).

PPB produced two emails wherein the Inspector identified concerns: in one, the Inspector notified Patrol Division of a series of minor injuries traced to the construction of PPB patrol vehicles; in the other, the Inspector raised concern that officers were using the side of patrol vehicles as leverage to restrain arrestees. The Inspector did not know what became of the first concern; the latter concern was resolved without any follow-up. Neither email nor any other

|  | documentation DOJ reviewed demonstrates that the Chief or Inspector has formalized a system for addressing concerns as required by Paragraph 73(f). |
|---|---|
| **Technical Assistance** | PPB should train supervisors on After Action Reviews, with specific emphases on reviewing ECW deployments, as discussed in DOJ's technical assistance to Paragraphs 66, 68, and 70. <br><br> The Chief and Force Inspector should set a clear expectation that immediate supervisors must determine whether each use of force indicates policy, training, tactical, or equipment concerns. The Chief and Force Inspector should clearly describe how they want immediate supervisors to document such concerns and communicate them through channels to the Chief and Inspector, i.e., how the immediate supervisors should implement Procedure section 13.9 of Directive 1010.00. The Chief and Inspector will need a process for consistently capturing such concerns, and ensuring that each concern is addressed. |

## B. Compliance Audits Related to Use of Force

74. In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports to ensure that:

a. With respect to use of force generally:

i. reports describe the mental health information available to officers and the role of that information in their decision making;

ii. officers do not use force against people who engage in passive resistance that does not impede a lawful objective;

iii. when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

iv. officers call in specialty units in accordance with procedure;

v. officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

vi. officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

b. With respect to ECW usages:

i. ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits. Discrepancies within the audit should be appropriately investigated and addressed;

ii. officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

iii. officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

iv. officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing so is reasonably calculated to prevent the use of a higher level of force.

c. With respect to use of force reporting, the reports:

    i. are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

    ii. include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

    iii. include a decision point description of the force decision making;

    iv. include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

    v. include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

    vi. include the reason for the initial police presence;

    vii. include a description of the level of resistance encountered by each officer that led to each separate use of force and, if applicable, injury;

    viii. include a description of why de-escalation techniques were not used or whether they were effective;

    ix. include whether the individual was known by the officer to be mentally ill or in mental health crisis;

    x. include a general description of force an officer observes another officer apply; and

    xi. demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement.

| Status | **Partial compliance** |
|---|---|
| **Analysis** | <u>Policy</u><br><br>PPB Directive 1010.00 now requires the Inspector to conduct routine audits of force reports and force-related After Action Reports. *See* Directive 1010.00, Use of Force, Procedure Section ¶ 13.11.<br><br>PPB also incorporated the line-item requirements of Paragraph 74 into policy.  For example, Directive 1010.00 now prohibits using force against people who engage in passive resistance that does not impede a lawful objective.  *See* Directive 1010.00, Use of Force, Procedure Section ¶ 4.1.<br><br><u>Verification of Performance</u><br><br>PPB has taken a number of steps towards an effective force audit.  PPB officers are providing the Bureau with considerable information on each use of force.  The Force Inspector has created a reliable method for examining each report for data required by the Settlement Agreement: Appendix III-5 to the 2017 COCL Report explains that PPB's audit includes a question correlating to each provision of Paragraphs 74, 75, and 77.  The force auditors then enter these data points into a common database.  The Inspector converts the data into reportable figures in |

| | |
|---|---|
| | its Force Audit Reports.  PPB has even improved the format of its Force Audit Reports to make them easier to digest, as COCL says.<br><br>In some cases, the force audit helps to bring about appropriate outcomes.  For example, officers are reporting the mental health information available to them, according to recent Force Audit Reports.  *See, e.g.*, 2017 COCL Rep. App'x III-1, at 3 (just 16 reporting deficiencies related to mental health information and ensuring medical care in Q4 2016).  *See also* 2017 COCL Rep. at 22 ("[W]e have noted a concerted effort on the part of officers to report the known history of mental illness and at what point in the interaction the officer gained such knowledge.  Additionally, we have seen supervisory reviews be critical when such information is absent.").<br><br>On the other hand, the force audit is not always identifying significant issues, particularly related to Tasers.  The Inspector does not use the force audit reports to highlight important uses of force, such as the common PPB practice of deploying an ECW beyond five seconds.  To the extent the data related to such deployments is included in the force audit reports, it is buried within more general categories, such as the frequency of ECW use compared to other force tools.  PPB also lacks a system to ensure that issues identified by force audit reports are addressed in practice.<br><br>As mentioned in comments to Paragraph 73, the Chief and the Force Inspector need to formalize a system for ensuring that RU managers act upon the findings in the Force Audit Reports.<br><br>We raise one final concern with the implementation of Paragraph 74: the Bureau's approach to decision-point analysis.  The Bureau has not provided officers with one coherent model for decision-point analysis.  Officers are unclear as to the Bureau's expectations.  Some supervisors have adopted a decision-point analysis in reviewing force, accurately explaining that officers face decision points before even arriving at the scene.  But understanding of the concept varies greatly across the Bureau.  One officer candidly confided in us, "I don't get decision-point-analysis."  *Accord* 2017 COCL Rep. at 17 ("PPB currently evaluates the 'moment of force' but does not adequately review all circumstances which may contribute to the presence of force in a situation."). |
| **Technical Assistance** | PPB needs to adopt one model for decision-point analysis and train officers to abide by it.<br><br>Implementing the technical assistance included elsewhere herein—such as training on After Action reviews, including review of ECWs, and renewal of the Inspector and Chief's efforts to address the issues that arise through the force audit—should help ensure that the force audit results in the necessary outcomes. |

75. In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

a. Complete a Supervisor's After Action Report within 72 hours of notification;

b. Review all use of force reports to ensure they include the information required by this Agreement and PPB policy;

c. Evaluate the weight of the evidence;

d. Use a "decision-point" approach to analyze each use of force;

e. Determine whether the officer's actions appear consistent with PPB policy, this Agreement, and best practices;

f. Determine whether there was legal justification for the original stop and/or detention;

g. Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;

h. Determine whether additional training or counseling is warranted;

i. Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

j. Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

k. Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

l. Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | <u>Policy</u><br><br>As discussed above, PPB Directive 1010.00 now requires the Inspector to conduct routine audits of force reports and force-related After Action Reports. *See* Directive 1010.00, Use of Force, Procedure Section ¶ 13.11.<br><br>PPB also incorporated the line-item requirements of Settlement Agreement Paragraph 75 into policy. Each of Paragraph 75's subparagraphs (that does not appear elsewhere in policy) appears in a separately numbered subparagraph of Procedure Section Paragraph 13.4.10.1 of PPB Directive 1010.00. *See* Directive 1010.00, Use of Force, Procedure Section ¶ 13.4.10.1.<br><br><u>Verification of Performance</u><br><br>The force audit methodology includes questions dedicated to Paragraph 75's subparagraphs, *see* 2017 COCL Rep. App'x III-5. The auditors report that they are reviewing each After Action Report and asking questions related to each of the criteria in Paragraph 75.<br><br>Although the Force Inspector has generated quarterly force audit reports that include actionable data since Q4 2016, PPB did not include these force audit reports in its supporting documentation for its Q4 2016 and Q1 2017 progress reports. PPB produced force audit reports for Q4 2016 and Q1-Q2 2017 in late September 2017 after DOJ concluded its 2017 on-site observations. In the next reporting period, DOJ will verify whether PPB's force audit meets the criteria of Paragraph 75 by reviewing the auditing process and underlying data with PPB. |
| **Technical Assistance** | The Chief and Inspector should routinely review the audit results, ensure that areas of deficiency are addressed, and document the corrective action taken. |

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

    a. Determine if significant trends exist;

    b. Determine if there is variation in force practice away from PPB policy in any unit;

    c. Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate;

    d. Identify and correct deficiencies revealed by the analysis; and

    e. Document the Inspector's findings in an annual public report.

| Status | Partial Compliance |
|---|---|
| Analysis | The entire Bureau, and particularly the office of the Force Inspector, deserves credit for improvements in compliance with Paragraph 76.<br><br>Force Audit Reports now describe patterns in individual officers' use of force in much more revealing ways than in the past.  The Chief, the Inspector, and Precinct command staff are now positioned to identify which officers or groups of officers use force differently than their peers.<br><br>Likewise, Force Audit Reports also identify deficiencies in reporting by rank and Precinct/Unit. These figures are presented helpfully in the new report format.<br><br>COCL states its expectation that the Inspector will also evaluate trends with officers and supervisors to identify those who consistently fail to produce accurate and complete reports and After Action Reports.  We concur.<br><br>Paragraph 76 requires the Inspector to analyze force data to attempt to determine the reason why any officer, unit or group of officers uses force differently, not just to identify the difference. We do not see documentation of this as a practice.<br><br>Paragraph 76 also requires that the Inspector take action to correct any deficiencies revealed by the force analysis.  The Inspector has notified his fellow command staff of areas of concern, but the Bureau does not routinely take corrective measures to address deficiencies.<br><br>PPB has not produced an Annual Public Report that captures the good practices it has refined over the course the first two quarters of 2017.  We understand that Report is in progress. |
| Technical Assistance | The Force Audit Reports do not report data on use of force during crowd management.  These figures should be reported (although it may be reasonable for PPB to address these uses of force in a distinct way in the Report.)<br><br>The Inspector should correct deficiencies identified through the force audit process.  The Chief should take an active role in this process, consistent with the Settlement Agreement. |

77. In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that all supervisors in the chain of command:

a. Review Directive 940.00 findings using a preponderance of the evidence standard;

b. Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

c. Modify findings as appropriate and document modifications;

d. Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

e. Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

f. Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer; and

g. Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

| Status | **Partial Compliance** |
|--------|------------------------|
| *Analysis* | Policy<br><br>As discussed above, PPB Directive 1010.00 now requires the Inspector to conduct routine audits of force reports and force-related After Action Reports. *See* Directive 1010.00, Use of Force, Procedure Section ¶ 13.11.<br><br>PPB also incorporated the line-item requirements of Paragraph 77 into policy. Each of Paragraph 77's subparagraphs appears in a separately numbered subparagraph of Procedure Section Paragraph 13.4.10.2 of PPB Directive 1010.00. *See* Directive 1010.00, Use of Force, Procedure Section ¶ 13.4.10.2.<br><br>Verification of Performance<br><br>The force audit methodology includes questions dedicated to each of Paragraph 77's subparagraphs. *See* 2017 COCL Rep. App'x III-5. That is, auditors are reviewing each After Action Report and the associated chain-of-command review to determine whether it satisfies each of the criteria in Paragraph 77.<br><br>The improved After Action Report template helps facilitate this process in some ways by guiding the supervisor through each of the findings he or she must make, under policy and the Settlement Agreement. In the case of Paragraph 77, questions in the AAR template prompt the chain-of-command reviewer to make a decision whether the case involves potential misconduct or criminal conduct, and whether the investigation below is satisfactory.<br><br>PPB has only reported gross numbers of command-level deficiencies for the past two quarters, so there is not enough data to determine whether the force audit is ensuring the outcomes in Paragraph 77. We are encouraged to see deficiencies in the chain-of-command reviews drop |

| | from the first to the second quarters of 2017.  At the same time, it is of some concern that supervisors at the rank of lieutenant and above overlooked evidence of potential misconduct in several cases in each quarter.  We look forward to reviewing further data. |
|---|---|
| Technical Assistance | PPB should implement the technical assistance described in our analyses of Paragraphs 74-76, *supra*. |

## IV. TRAINING

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety.  To achieve these outcomes, PPB shall implement the requirements below.

| Status | Partial Compliance – Continued Improvement |
|---|---|
| Analysis | PPB has advanced training consistent with agency expectations for constitutional policing and community relationships.  Substantial compliance with Paragraph 78 will require compliance with all of Section IV.<br><br>As PPB, PPA, and DOJ finalized policies consistent with the Agreement, PPB's training division adroitly moved to integrate those updated policies into existing training and adopt new training to emphasize PPB's new use of force and force reporting policy.  Much of this training in the Fall of 2017 included scenarios and tactics designed to model constitutional policing for all people, but specifically focusing in certain aspects on individuals who have or are perceived to have mental illness.<br><br>Additionally, PPB responded to community partnership concerns in implementing equity training in its Spring 2017 in-service training. |

79. The Training Division shall review and update PPB's training plan annually.  To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration:  (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB continues to maintain substantial compliance with this provision.  This provision has two aspects:  a training needs assessment and a training plan.  Even though PPB has achieved most of Paragraph 79's requirements, PPB should update its comprehensive training plan to cover all major trainings, not just in-service training. |

Training Needs Assessment:

PPB has completed a thorough training needs assessment.  It was released after the drafting of our prior assessment report.  *See* 2016 Annual Training Needs Assessment, October 2016, available at https://www.portlandoregon.gov/police/article/635142.

The needs assessment included a series of recommendations for potential future training.  These numerous recommendations exceeded the finite amount of time and resources the Bureau could devote to training.  Accordingly, PPB could not implement all recommendations contained in its needs assessment.  For example, PPB provided CEW training in both Spring and Fall of 2017 that covered many of the CEW priorities identified in the prior training assessment.  *Id.* at 21.

Among other things, PPB's survey of its prior years' in-service participants informed the needs assessment.  *Id.* at 13, 15, 19, 21.  PPB also informed its needs assessment by examination of the prior year's injury data and officer-involved shootings, out-of-policy uses of force, public complaints, legal case summaries provided by the City Attorney's Office, revised statutes, and training requests from PSD and command staff.  *Id.* at 25-37, 44-47.  Additionally, PPB sent training division representatives to several outside trainings to keep apprised on best practices.  *Id.* at 48-49.  This is consistent with Paragraph 79.  PPB's quarterly reports indicate that these same efforts are ongoing.

PPB's training assessment also tracked prior training recommendations.  This was useful.  A 2014 recommendation for instruction on managing job-related stress came to fruition in a 2017 in-service module concerning the Employee Assistance Program and PPB's volunteer chaplaincy program.

PPB's needs assessment considered prior recommendations from the DOJ 2015 compliance assessment report and a 2016 technical assistance letter.  *Id.* at 40-41; DOJ Letter to the City, Feb. 26, 2016, available at https://www.justice.gov/crt/file/847051/download.  PPB also considered COCL's multiple training reports and recommendations (2016 Annual Training Needs Assessment, at 41-42), as well as TAC's recommendations (*id.* at 42-43).  *See also* Comments to Paragraph 87.

PPB's 2017 Fall in-service training reflected these recommendations.  The training integrated policy with technical skills, covered the rendering of aid, instructed on ethical decision-making and peer intervention, emphasized communications skills in scenarios, and implemented individually identifiable, competency-based evaluations.  We appreciate the sincere and effective effort to incorporate this feedback.

PPB will inform future training needs assessments based on the outcomes of the training audit PPB has begun to implement pursuant to Paragraph 80.

Training Plan:

Though PPB's website does not include a current training plan, PPB provided DOJ with in-service training plans in both the Spring and Fall of 2017.  *See* 2016 Sworn Member In-Service Training Plan, available at https://www.portlandoregon.gov/police/article/620802; PPB_0102849.  PPB and DOJ, in consultation with PPA, also produced several policies shortly before PPB commenced its Fall 2017 in-service training.  PPB adapted its planned in-service training to these recently enacted policies.  PPB expanded its Fall 2017 training from 10 hours to 20 hours to accommodate these requirements.  PPB has worked with COCL and DOJ to

make changes consistent with the Agreement, current policy, and training needs identified from several sources.

The training plans DOJ received, however, present a descriptive list of classes offered only for each in-service training. Paragraph 79 is not limited to in-service training. PPB informed DOJ that the Training Division is currently planning and conducting advanced academy, sergeants' academy, supervisory in-service, and numerous specialized trainings, and will address each of these in its training plan at a later date. As COCL correctly points out, planning is also part of PPB's conceptual framework for training illustrated in PPB's training planning and implementation diagram, pictured below. *See* 2017 COCL Rep. at 49.



| Technical Assistance | PPB's training audit should inform future training needs assessments.<br><br>PPB should publish its dynamic, comprehensive training plan for all of PPB's major trainings. PPB should use this to track and respond to training recommendations developed pursuant to Paragraph 73(f). This is critical to establishing a quality-improvement loop for PPB.<br><br>As recommended in last year's compliance assessment report, PPB could inform its training plan by outcomes of the Community Engagement and Outreach Plan ("CEO Plan"), once it is completed. *See* Comments to Paragraphs 141, 146. |
|---|---|

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Status | **Partial Compliance – Significant Improvement** |
|---|---|
| Analysis | PPB has made significant gains in class surveys and competency-based evaluations and developed some means of assessing application of training to job performance. However, due to resource limitations, PPB could not complete surveys or competency-based evaluations for all of its main trainings in the past year. PPB is slated to implement a comprehensive training audit, developed with COCL's assistance, though it is too early to assess implementation of this audit. Once brought to fruition, these survey, testing, and audit data will assist PPB in fulfilling its stated goal of implementing the Kirkpatrick Model (i.e., a four-step analysis of reaction, learning, behavior, and results). |

Student Surveys:

PPB has conducted student surveys for many, but not all of its major trainings. COCL points out that PPB did not conduct course evaluations for its July 2017 ECIT training or for its 2017 supervisory training. *See* 2017 COCL Rep. at 50. COCL is correct that PPB did not provide a record of 2017 ECIT training surveys, and PPB did not conduct separate supervisory training in 2017 apart from standard in-service training. Similarly, PPB reported that it placed evaluations of its EIS training "on hold, pending resolution on staffing capacity." *See* Training Division Status Update Training Program Evaluation Jan. to March 2017, March 21, 2017, at 4. PPB responded to COCL's report that it has requested additional staff to complete assessments of training. PPB Comments, Sept. 28, 2017.

Despite resource limitations, PPB reported that it had analyzed its 2016 ECIT training surveys, thus informing training. *See* Training Division Status Update Training Program Evaluation Jan. to March 2017, March 21, 2017, at 2-3. Also with respect to ECIT, PPB endeavored to assess application of training to job performance as required by Paragraph 80. *Id.* PPB's Training Division and Behavioral Health Unit ("BHU") continue to work with a consultant to conduct practitioner interviews and form focus groups. *Id.* at 3; PPB Quarterly Update Report, Par. 80, Aug. 15, 2017.

In the 2016 compliance assessment report, DOJ noted having observed that PPB implemented class surveys for its in-service classes, but DOJ agreed with COCL that the surveys lacked "methodological rigor [to] make results and conclusions reliable." *See* COCL Compliance Report, January through June 2016, Par. 80.

Following the 2016 in-service training, PPB conducted an analysis of the data its class surveys produced. *See* 2016 In-Service Training Evaluation Results. Though this contained thoughtful analysis, PPB conceded in its discussion that the low survey response rate limited the utility of the surveys of some modules. *See, e.g., id.* at 9, 13, 16 ("The generalizability of these findings to all In-service attendees are limited by the low survey response rate.").

PPB adapted subsequent surveys to add greater methodological and analytical rigor. PPB presented records of class surveys throughout the course of the Bureau's 2017-1 Advanced Academy. These records indicated high response rates and included thorough analysis of the data collected in each survey.

PPB also responded to COCL and DOJ recommendations regarding surveys of its Fall 2017 in-service training. PPB implemented a daily survey of students seeking both multiple choice response and written comments. DOJ observed PPB administering student surveys during the Fall 2017 in-service training. The head of the training division expressed to all attendees the importance of feedback in examinations and surveys. The instructors provided students time to take the survey without disruption and left the classroom so as not to pressure the outcome of the survey by their presence.[1]

Competency-Based Evaluations:

DOJ agrees with COCL that PPB has made significant improvements in evaluating student performance in the past year. PPB employs several means of evaluating learning through

---

[1] COCL notes that it observed disruption and that students were told that they did not need to take the surveys. *See* 2017 COCL Rep. at 54. DOJ observed a later fall 2017 in-service training session than COCL did. PPB had addressed COCL's issues by the time of DOJ's observation.

25

demonstrated competence, though PPB was unable to complete such evaluations for all of PPB's major trainings.

***Knowledge Checks***:  At a basic level, PPB now requires all officers to perform a quiz called a "knowledge check" for most newly implemented or newly revised policies.  Officers complete these remotely as PPB distributes new policies electronically to each officer.  Officers must pass these knowledge checks before certifying that they have read and understood each such directive.  PPB reported continuing these knowledge checks for all but one revised directive from the third quarter of 2016 through the second quarter of 2017.  *See* PPB Quarterly Update Report, Par. 80, Aug. 15, 2017.  For directives that become the subject of a specific PPB training course, PPB may require students to perform a knowledge check on the directive before attending the course.  *See, e.g.*, 2016 In-Service Training Evaluation Results, at 25 (stating that before attending class, students had to pass the knowledge check for Directive 850.20 - Police Response to Mental Health Crisis).

***In-Class Responsive Quizzes***:  In some of PPB's classroom presentations, PPB shows the entire class a series of multiple-choice questions projected onto a screen.  PPB asks students to choose the correct answer using a remote control "clicker" device.  PPB made some improvements to the use of these clicker quizzes between the 2016 and 2017 in-service trainings.  These clicker quizzes were anonymous and, thus, not used to gauge individual students' learning.  Rather, PPB used the clicker quizzes to keep the students engaged and reinforce the lesson in segments during a long classroom lecture.  With rare exception, PPB was successful in providing students the correct answers following clicker quizzes and thereby reinforcing the learning objectives as a group.  This also served as a means of transforming purely didactic instruction to a more interactive, and sometimes Socratic, classroom discussion. COCL noted some technical difficulties with the clicker devices.  *See* 2017 COCL Rep. at 53. During our observation, PPB had a sufficient number of devices to replace any inoperable clickers and did so.

***Knowledge Tests***:  For some classes, particularly the major classes concerning use of force and force reporting in the Fall 2017 in-service training, PPB utilized individualized, written examinations.  As COCL notes, PPB was able to administer the examinations via links PPB sent to each student's Bureau-issued iPhone.  *See* 2017 COCL Rep. at 54.  PPB sent the links at the end of classes and instructed officers not to share the information, thus controlling confidentiality of the examination from future test takers.  DOJ representatives observed some testing and reviewed results, which PPB was able to produce almost immediately.  All students successfully passed the examination.

PPB reports that 841 of the students who attended the spring 2017 in-service training passed the written examination on CEW.  *See* 2016 In-Service Training Evaluation Results, at 18-19. A handful of students either had already taken the same examination or still had to take the examination as of the date of PPB's report.  *Id.*  The Bureau's vendor, Taser, provided the examination as a means of certification for the Taser X2 model, to which PPB transitioned. PPB should ensure that any outside vendor examination does not conflict with PPB's force policies, revised since that in-service training.  *See* Directive 1010.00-Force, revised July 21, 2017.

***Demonstrated Skills and Oral Examination***:  During both PPB's Spring and Fall 2017 in-service trainings, PPB conducted courses on use of CEW, Tactical Emergency Casualty Care ("TECC"), and defensive tactics.  Each of these classes required officers to demonstrate

proficiency and thereby show that officers acquired the skills set forth in the learning objectives.

In the Spring 2017 in-service training, each student completed the written CEW examination described above and had to complete drills on the use of the new X2 Taser. *See* 2016 In-Service Training Evaluation Results, at 18-19. Students also completed stress drills with shoot-don't-shoot reactions for the CEW. *Id.* at 21-22.

Of particular note, one of PPB's Master Taser Instructors, whom DOJ observed in the Fall 2017 in-service training, did an outstanding job. He gave each participant in the class an oral examination, one at a time, on the criteria for when a CEW may be used and what warnings are required under PPB's revised policies. He had each participant demonstrate multiple different skills and provided constructive criticism. The instruction incorporated policy into instruction and required demonstrated proficiency. This was a successful individualized assessment of student learning.

PPB has updated its TECC training with a more extensive lifesaving course. This course consisted of both classroom instruction and practical exercises. Classroom instruction integrated PPB's policy on medical aid and a video from another department on the use of a tourniquet following a shooting. *See* PPB Directive 630.50 - Emergency Medical Aid, effective Sept. 5, 2003. The class also include a four-question, oral quiz, used as a knowledge check rather than an individualized examination. In partner- and self-application of the tourniquet, the instructor only checked some tourniquet applications. In a practicum with training mannequins, however, each student had to demonstrate proficiency with tourniquets, wound packing, use of a nasal tube, and use of chest seal and to distinguish when to properly use each. PPB has also removed its prior expression of an "us vs. them" mindset from TECC training that was noted in DOJ's 2016 technical assistance letter. *See* DOJ Letter to the City, Feb. 26, 2016, available at https://www.justice.gov/crt/file/847051/download.

***Scenario Evaluations***: PPB utilizes scenarios to demonstrate how to act during a hypothetical police interaction. Instructors provide officers a brief of a hypothetical call for service or officer-initiated call and permit the officers to act in response to roles played by other instructors as subjects, witnesses, and bystanders.

In the Fall 2017 in-service training, COCL assisted PPB in more thoroughly formulating a grading rubric to assess individual officers' performance during the scenarios. DOJ agrees with COCL that the scenarios often required the use of good interpersonal communication to avoid the application of force. *See* 2017 COCL Rep. at 55.

Application to Job Performance:

As COCL explains in its report, PPB has not yet developed systemic measures for job performance outcomes related to PPB's in-service trainings. *See* 2017 COCL Rep. at 56. PPB has engaged, however, in some efforts to secure outcome measures in discrete areas.

COCL points out that PPB's BHU is gathering data on the efficacy of the ECIT interactions. *Id.* As discussed in Section VI, Crisis Intervention, this data collection presents part of the picture. It collects data once an ECIT intervention occurs. It does not necessarily collect information on the efficacy of dispatch or whether officers should call for ECIT intervention. These are components of general CIT in-service training for all officers. *See* 2016 In-Service Training Evaluation Results, at 25 (showing learning objectives for "BHU: Directive 850.20,

27

| | Police Response to Mental Health Crisis"). We discuss this below in Section VI, Crisis Intervention. |
|---|---|
| | PPB set up a basic means of assessing the efficacy of its Spring 2017 in-service training on firearms, specifically, a new course on broad familiarity with the AR-15. *See* 2016 In-Service Training Evaluation Results, at 13. There was no actual feedback, however, in this assessment. This is understandable. Assessing application of training to job performance would require a longer term view of job performance after training. Utilizing FDCR data and force audit data could be one valid means of assessing the efficacy of training if PPB is able to complete the quality-improvement loop. *See* Comments to Paragraphs 73(f), 79. |
| | PPB's TECC instructor provided students with contact information for the TECC Committee points of contact. The instructor asked that students report on any uses of Individual First Aid Kits ("IFAK"). IFAKs include tourniquets, chest seals, clotting wound packing material, and a nasal tube. PPB invested heavily in furnishing most PPB vehicles with IFAKs. By means of this self-reporting back to the TECC Committee, PPB should be able to analyze the utilization of IFAKs. To access the application of TECC training to job performance, the TECC Committee could establish a protocol to review officers' reports when they report IFAK use. |
| **Technical Assistance** | PPB should complete surveys and, especially, competency-based evaluations for supervisory training. |
| | Once PPB develops more rigorous data, PPB must review those data and should apply its data analysis to a quality-improvement loop. |
| | As DOJ stated in last year's compliance assessment report: PPB should consider data from the community in assessing "the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs." 2016 Settlement Agreement Compliance Status Assessment, at Paragraph 80, ECF No. 124-1. In part, PPB could use the CEO Plan for this purpose. *See* Comments to Paragraphs 141, 146. |

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Status | **Partial Compliance – Improvement** |
|---|---|
| **Analysis** | PPB has faced obstacles in bringing Learning Management System ("LMS") to fruition. |
| | DOJ previously reported that PPB intended to electronically track its training records through LMS software, and that the City had delayed purchase of LMS. *See* 2016 Settlement Agreement Compliance Status Assessment, at Paragraph 81, ECF No. 124-1. DOJ also noted attempted workarounds to aggregate training data. However, these were incomplete and did not meet either Paragraph 81's requirements or assist in meeting Section VII's requirements that supervisors check their subordinates' EIS records. *Id.* |
| | Though the City ultimately acquired LMS, the City did not approve the LMS Administrator position and post the job listing until March 20, 2017. *See* Job Bulletin - Business Systems Analyst (Limited Term), opening date March 20, 2017. PPB filled the position on June 26, |

28

| | |
|---|---|
| | 2017.  *See* PPB Quarterly Update Report, Par. 81(a), Aug. 15, 2017.  PPB reported that the LMS Administrator is in the process of developing a system to input training records and bring LMS on line.<br><br>DOJ will reassess LMS when it becomes operational. |
| **Technical Assistance** | As stated last year, PPB must bring its data management system to fruition, and ensure that the system addresses all aspects of this provision of the Settlement Agreement.<br><br>PPB supervisors must assume the role of checking their subordinates' training records, though this would not exclude the Training Division's currently very useful review of in-service training for state certification criteria. |

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Status | Substantial Compliance |
|---|---|
| **Analysis** | DOJ agrees with COCL that PPB has maintained substantial compliance with this provision.<br><br>PPB reported delivery of 5993.25 hours of external training and an additional 12,845 hours of internal training in the first half of 2017.  *See* Course Attendance Summary Report, 2017 Course Attendance – External Courses January – June 2017, dated July 9, 2017; Course Attendance Summary Report, 2017 Course Attendance – Internal Courses January – June 2017, dated July 9, 2017.  These records include a list of course titles, hours per course, and number of attendees. DOJ agrees with COCL's observation that "a fully functioning LMS would supplement PPB's current compliance with Par. 82."  *See* 2017 COCL Rep. at 67. |
| **Technical Assistance** | |

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force.  The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Status | Substantial Compliance |
|---|---|
| **Analysis** | PPB has maintained substantial compliance with this provision and memorialized trainer selection criteria in PPB's directives.<br><br>As described in last year's compliance assessment report, PPB added necessary trainer selection criteria to its Standard Operating Procedure ("SOP") 1-19.  *See* 2016 Settlement Agreement Compliance Status Assessment, at Paragraph 83, ECF No. 124-1.  COCL observed no deviation from the SOP's selection criteria contained.  *See* 2017 COCL Rep. at 67.   During |

this past year, PPB adopted a revised training directive that includes restrictions on the selection of trainers consistent with Paragraph 83:

12.  Selection of Sworn Trainers:

12.1.  The Training Division shall select officers to serve as trainers consistent with the following:

12.1.1.    No officer with a history of using excessive force shall serve as a trainer. A history of using excessive force shall be determined by the following criteria:

12.1.1.1.    If the officer has been subject to disciplinary action based upon a use of force within the preceding three (3) years, or twice in the preceding five (5) years.

12.1.2.    No officer may serve as a trainer if they are subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years.

12.1.3.    The selection of officers to serve as trainers shall, at a minimum, take into account whether a civil judgment has been rendered against the City of Portland in the last five (5) years based on the trainer-candidate's use of force.

*See* Directive 1500 – Training, revised Nov. 29, 2016, available at https://www.portlandoregon.gov/police/article/526474.   After recent discussions with COCL and DOJ, PPB added similar restrictions on the selection of Field Training Officers.  *See* Directive 1501 – Field Training Program, not yet enacted.

PPB produced documentation indicating that it has operationalized these trainer selection criteria.  PPB provided a recent position announcement for CEW instructors that includes the same trainer selection criteria.  *See* Position Announcement, Detached CEW (Taser) Satellite Instructor, Feb. 8, 2017.  PPB also provided documentation indicating that it had performed the necessary reviews of instructor's disciplinary records and absence of civil judgments with fidelity to Paragraph 83's requirements.  *See* Training Division Work History Review Sheets. Accordingly, once PPB enacts Directive 1501, it should be able to comply with Paragraph 83. *See* Paragraph 33 (defining implementation to include establishing the procedure and consistent and verified performance through regular audit tools).

| **Technical Assistance** | DOJ agrees with COCL that if PPB decides to select a trainer after considering a relevant civil judgment, the training director should provide a justification and explanation as to why the officer is fit for service as a trainer and the civil judgment is not a disqualifying factor.  *See* COCL Compliance Report, January through June 2016, at Par. 83; 2017 COCL Rep. at 67. |
|---|---|

84. All training that PPB provides shall conform to PPB's current policies at the time of training.  PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

a. With respect to patrol officers, PPB shall:

i. increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

ii. emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

iii. continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

iv. continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

v. describe situations in which a force event could lead to potential civil or criminal liability; and

vi. continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-center communication, such as the term "mentals," in all work-related settings and communications, as well as when interacting with the public.

b. With respect to supervisors, provide additional training on how to:

i. conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3;

ii. evaluate officer performance as part of PPB's annual performance evaluation system; and

iii. foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action.

| Status | 84(a) Substantial Compliance – Significant Improvement |
| --- | --- |
| | 84(b) Partial Compliance |
| Analysis | PPB provided all officers training on newly enacted policies concerning topics covered in Paragraph 84(a). However, PPB's force investigations, employee evaluations, and accountability systems now are in flux. Once permanent policies are approved and in place, PPB will need to implement supervisory training consistent with Paragraph 84(b). PPB has not yet conducted this needed comprehensive supervisor retraining. |
| | The Fall 2017 in-service training represents the best measure of compliance with Paragraph 84(a), given that this is the first comprehensive training since PPB enacted its revised force and force reporting policy, Directive 1010.00, which dovetails with the previously enacted Directive 850.20 - Police Response to Mental Health Crisis and Directive 630.50 - Emergency Medical Aid. DOJ agrees with COCL that many of PPB's talented administrators and instructors worked to improve the Fall 2017 in-service training. *See* 2017 COCL Rep. at 63. PPB was responsive to DOJ and COCL's technical assistance to improve the content of the training, survey, and examinations. *Id.* |

***Use of Force Instruction:***  PPB divided the classroom instruction for its new directive on use of force between two highly skilled instructors, the first covering authorized uses and prohibitions, the second covering reporting requirements.  Both instructors utilized slide presentations that largely reflected lesson plans COCL reviewed in advance of the training.

PPB was successful in highlighting distinctions between the prior multiple force policies and PPB's newly enacted omnibus force policy.  *See* Directive 1010.00, enacted Aug. 19, 2017. PPB emphasized the fundamental legal standard of objective reasonableness from *Graham* v. *Connor*, 490 U.S. 386 (1989), and then built on this foundation by discussing:  the factors PPB considers in determining reasonableness; when officers must make those reasonableness determinations; restrictions on uses of force by policy, even if otherwise lawful; and when officers must provide warnings.

PPB told students that they must "look at decision points" but did not define what decision points are.  DOJ found that officers and supervisors in patrol lacked a common understanding of this term.  *See* Section III, *supra*.  DOJ also found confusion in the field about whether or not an application of a CEW was a use of force when there was no clear miss, but there was not a perceived neuro muscular interference.  In-service instruction did not resolve these issues. Clearer agency-wide direction and training is necessary.

PPB specifically referred to the four pillars of procedural justice from DOJ's Community Oriented Policing Services and emphasized community-based legitimacy as a basis of police powers.  PPB also accentuated the newly added duty to intercede in any unlawful use of force by another officer and a separate duty to render aid to others.

PPB instructed on new force reporting obligations but refrained from delving into reporting requirements for Level I, the highest level of force, as these are the subject of a revised Directive 1010.10 - Post Deadly Force Procedure that was not enacted until August 2017.  PPB effectively used videos demonstrating hypothetical force events to poll the class on what level of force officers should report based on the actions of officers and both actions and statements of subjects.  PPB emphasized that its new dynamic After Action Report forms serve as a checklist for After Action Investigations.

***Crowd Control Training:***  PPB used a lecture-based instruction describing what the Rapid Response Team does in a crowd control situation, though the instructor notified the students that the precincts may be the ones who address a crowd management situation.  PPB distinguished between lawful demonstrations/civil disobedience and unlawful civil disturbance.  PPB made clear the necessity to articulate the basis for arrest by individual and the practical need to make judgment calls on whether to conduct an arrest when there is a larger crowd management issue to address.

***Peer Intervention:***  PPB utilized a video of a serious force incident from another jurisdiction as a catalyst for conversation about ethical policing.  An instructor led the discussion, but solicited from students their impressions and asked what they would do if they encountered a similar situation.  This reinforced an officer's "duty to intervene," which PPB added to Directive 1010.00 – Use of Force.

***Firearm Training:***  PPB's instruction consisted mainly of annual firearm qualification requirements.

***CEW Training:***  As described above, PPB successfully integrated policy and decision making into highly individualized CEW training.

| | |
|---|---|
| | ***TECC:***  As described above, PPB reinforced policy and required demonstration of skills proficiency for each student.<br><br>***Scenarios:***  In-service training is ongoing.  Instructors have provided constructive feedback to students at the close of each scenario, reinforcing positive outcomes and encouraging students to consider alternative options or what actions students would have taken under potential variations on the scenarios.<br><br>***Defensive Tactics:***  PPB focused on takedown exercises.  Students paired up and practiced on one another.  PPB used the takedown instruction to quiz orally students on reporting levels for the force used.  PPB also reinforced its policy prohibition on uses of chokeholds.  PPB also used the defensive tactics class to point out that groin strikes with an impact weapon are Level I uses of force, and that there is only one approved PPB impact weapon, the ASP, not long batons used for crowd control. |
| **Technical Assistance** | PPB instructed students to apply de-escalation to all calls—adopting a definition of de-escalation from Directive 850.20.  As our expert observed in both classroom instruction and practicum settings, PPB would benefit from better recognizing two distinct opportunities for de-escalation:  (1) before a force event occurs to avoid the use of force; and (2) during a force event to reduce the level of force or stop the use of force.<br><br>At an agency-wide level, PPB should address confusion about decision point analysis and application of a CEW.<br><br>PPB will need to implement supervisory training consistent with Paragraph 84(b) once PPB enacts revised directives for force investigations, employee evaluations, and accountability systems. |

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

a. Conducts a comprehensive needs assessment annually;

b. Creates a Training Strategic Plan annually;

c. Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training;

d. Maintains accurate records of Training delivered, including substance and attendance;

e. Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ;

f. Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and

g. Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Status | Partial Compliance |
|--------|--------------------|
| Analysis | PPB recently published its first training audit.  Neither DOJ nor COCL has had the opportunity to thoroughly review the audit.

To develop the training audit, PPB consulted with COCL and developed a basic outline of domains.  *See* Source Material Request for Training Audit, Annual Needs Assessment Methodology 85(a), Annual Training Plan Methodology 85(b), Process for Evaluation of Effectiveness of Training Methodology 85(c), Training Record Review Methodology 85(d), Training Records Accessibility Methodology 85(e), and Review of ADORE Records Methodology 85(f), June 7, 2017; 2017 COCL Rep. at 68-69.

As discussed above, PPB requires officers to read and acknowledge new and revised directives. With respect to Paragraph 85(g), PPB has provided consistent data on the numbers of officers who sign within the timeframe PPB prescribes.  *See* PPB Quarterly Update Report, Par. 85(g), Aug. 15, 2017. Consistently in the past year, 3-5% fail to timely read and acknowledge new directives.  *Id.*  Though a low percentage, this amounts to 32-40 officers.  *See, e.g.*, Directive Acknowledgement Compliance, March 3-16, 2017.  Generally, the failures are attributable to officers being on leave.  *See* PPB Quarterly Update Report, Par. 85(g), Aug. 15, 2017.  It is unclear to us what, if anything, PPB has done to ensure that officers acknowledge new policies enacted while officers are on leave.  PPB informs us that it will address this issue in the revision of Directive 010.00 - Directives Manual and 210.21 - Leave of Service.  *See* PPB responsive email, Oct. 4, 2017. |
| Technical Assistance | As Paragraph 85 contemplates, PPB should continue to consult with COCL as PPB conducts future training audits.

Upon return to service, PPB should ensure that officers acknowledge new policies enacted while officers are on leave. |

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council.  The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented.  The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies.  The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Status | Substantial Compliance |
|--------|------------------------|
| Analysis | PPB's force inspector presented TAC information concerning potentially problematic uses of force and potential training deficiencies, as required by Paragraph 86.  The force inspector presented a quarterly force report to TAC on May 10, 2017.  On July 12, 2017, DOJ observed TAC continue discussion related to the force data and training recommendations.

Prior to the Force Inspector's meeting with TAC on February 8, 2017, PPB emailed TAC members a link to its Force Data Summary Report.  *See* email from Jody Lalia to TAC members, Jan. 30, 2017; PPB Force Analysis Summary Report, covering July 1, 2016 to |

|  | Sept. 30, 2016, available at https://www.portlandoregon.gov/police/article/620681. This contained the raw data on force used by unit, demographic group, and type of force, as well as the percentage of force used as a portion of calls for service. *Id.*

Similarly, prior to the force inspector's presentation at the May 10, 2017 TAC meeting, PPB emailed TAC members its Force Data Summary Report for the fourth quarter of 2016. *See* email from Jody Lalia to TAC members, May 2, 2017; PPB Force Analysis Summary Report, covering Oct. 1 to Dec. 31, 2016. This included both a statement on the overall uses of force in 3% of custodies by PPB's own reporting, and a breakdown of those force incidents by geographic precinct, ethnicity, gender, number of subjects with perceived or actual mental illness, type of force used, and type of call leading to the force event. *Id.* Accordingly, PPB has provided the information to TAC that COCL recommends and as required by Paragraph 86.

TAC has made minutes of its meetings since our last compliance assessment report, but did not produce a new comprehensive report on training recommendations. Paragraph 86 does not necessarily require that TAC produce such a report annually. The last comprehensive TAC report is still publicly available. *See* 2016 Training and Use of Force Report Recommendations, June 14, 2016, available at https://www.portlandoregon.gov/police/article/581581. As PPB's 2017 in-service training comes to a close and as PPB brings to fruition its training audit, DOJ anticipates that TAC will revisit its prior recommendations, assess whether PPB has adopted them, and provide any new, comprehensive recommendations based on more recent data.

DOJ's prior compliance assessment report recommended that PPB respond to each item in TAC's recommendations. It did so and PPB's former Chief formally responded to the TAC recommendations in a publicly available memorandum. *See* Memorandum to Training Advisory Council from Chief Mike Marshman regarding TAC 2016 Training and Use of Force Report Recommendations, Sept. 14, 2016, available at https://www.portlandoregon.gov/police/article/597212. PPB has implemented changes that address some of TAC's recommendations, e.g., graphic representations of force by officer-initiated and community-initiated calls for service. Other recommendations apply to the delivery of training and response to training recommendations, which is addressed in the analyses of Paragraphs 79 and 84. |
| **Technical Assistance** | As PPB brings its training audit to fruition, PPB should provide audit data to TAC for its consideration in further recommendations.

TAC should consider a revised training recommendation report based on newly available data and consideration of its past report.

As discussed in Paragraphs 79 and 80, above, PPB should implement a quality-improvement loop for training to track and implement recommended changes to training. |

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Status | **Substantial Compliance** |

| Analysis | DOJ representatives attended the July 12, 2017 TAC meeting.  The meeting was orderly and constructive. TAC members welcomed discussion, including public comment.  TAC members discussed recruitment of new members. |
|---|---|
| | PPB's Training Division and Strategic Services Division have supported TAC's mission.  Officers from each division have frequently attended TAC meetings too.  *See* TAC Meeting Minutes 2016-2017. |
| | PPB is currently seeking more volunteers for TAC.  *See* Training Advisory Council, Application for Membership, available at https://www.portlandoregon.gov/police/article/656174.  *See also* "Police Bureau Seeks Volunteers for Training Advisory Council," The Skanner, Sept. 27, 2017. |
| Technical Assistance | |

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis.  Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure.  The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness.  The United States acknowledges that this Agreement only legally binds the City to take action.  Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents.  The City's partners in the provision of community-based addiction and mental health services include:  the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Status | **Not measured - Paragraph Sets Expectations for City's Partners** |
|---|---|
| Analysis | DOJ recognizes that PPB continues to operate within the context of serious gaps in community-based mental health services throughout Oregon.  PPB has done a commendable job in engaging with community partners in the effort to bridge the gaps.  DOJ also concurs with COCL's assessment that these requirements impose obligations on entities outside of the City or PPB, and therefore evaluates the City only in terms of its engagement in the process and formation of partnerships with the outside entities. |
| | PPB has continued to work with service system partners, including the now fully operational Unity Center.  In July 2016, Oregon finalized a Mental Health Performance Plan for Adults with Serious and Persistent Mental Illness ("Plan").  Input from law enforcement was a key factor in the development of the Plan.  As a result, Oregon has committed to increasing the array of community-based mental health care services, including services to assist in decreasing the number of contacts with law enforcement. |
| | The Plan's reforms include: |

|  | • Improving transitions from institutionalized levels of care (Oregon State Hospital, Acute Psychiatric Care Facilities, SRTFs, and EDs) to integrated, community-based treatment;<br><br>• Increasing access to crisis services (e.g., mobile crisis), and community-based supports (e.g., ACT) to avoid incarceration or unnecessary hospitalization for adults with SPMI;<br><br>• Expanding supported housing and peer support services (There is also a reporting requirement on supported employment); and<br><br>• Reducing the contacts between persons with SPMI and law enforcement due to mental health reasons, through better criminal justice diversion strategies.<br><br>The Plan also adds accountability to Oregon's efforts by requiring an Independent Consultant to publicly report on progress and provide technical assistance.  The Independent Consultant's first report was published in March 2017.<br><br>Admirably, a PPB representative, the Service Coordination Team ("SCT") Program Manager, applied to join the Behavioral Health Collaborative Team advising the Oregon Health Authority on its implementation of the plan, and was accepted.  As a law enforcement representative, she participated in meetings until the completion of its work in the first quarter of 2017.<br><br>The Plan, as well as the Independent Consultant's Report, data sets, and other documents related to the Plan and the Behavioral Health Collaborative Team, are publicly available at the following link: http://www.oregon.gov/oha/bhp/Pages/Oregon-Performance-Plan.aspx. |
|---|---|
| **Technical Assistance** | PPB should continue to seek opportunities to strengthen partnerships within the expanding service system. |

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs.  All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | PPB has consistently worked with the Unity Center and with the Transportation Subcommittee to facilitate transfer of individuals by ambulance to Unity or hospital emergency rooms.  PPB established directives to allow for such transport.  PPB is currently bringing individuals to treatment centers for involuntary or voluntary treatment by ambulance or police vehicle, depending on the preference of the individual. |
| **Technical Assistance** | As noted in DOJ's 2015 and 2016 reports, the City should continue its involvement in the work group discussions concerning transportation of individuals to the Unity Center, and provide input on coordination with community partners regarding the importance of the expansion of community-based services. |

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU"), the ABHU Advisory

37

Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include:

a. Increased sharing of information, subject to lawful disclosure, between agencies and organizations including BOEC, Multnomah County, and health care providers to create an information exchange among first responders and providers to better serve those suffering from mental illness;

b. Creation of rapid-access clinics so those in crisis have access to timely medication management appointments;

c. Enhancing access to primary care providers to shift low-to moderate acuity patients to primary care programs creating more capacity for acute patients in existing outpatient crisis mental health systems;

d. Expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders;

e. Addressing issues of unmet needs identified by Safer PDX and its community partners;

f. Expanding and strengthening networks of Peer-Mediated services to:

   i. develop a referral guide delineating these services and locations and assist with accessing information;

   ii. better educate the community of the viability of these services as alternative first engagement sites/programs for those having difficulty engaging with "professional driven" services;

   iii. expand peer services connected to peer supports in the community for inpatient psychiatric units (including Emergency Departments) and in the community;

   iv. add peer guides to work alongside Emergency Department guides for those patients with behavioral health issues entering the Emergency Department; and

   v. evaluate opportunities to expand use of peers to coordinate with PPB ABHU (as described herein) and function as a link with impacted individuals; and

g. pursue tele-psychiatry (a provision of mental health care by video conferencing) as a way for first responders to take advantage of existing IT infrastructure to provide direct care or provider evaluation supporting the provision of appropriate services to an individual in crisis.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | The requirements in this Paragraph are directed towards entities external to PPB and the City. Assessment must accordingly be measured by PPB and the City's participation in the process.<br><br>As PPB previously indicated, the CCOs have created mental health subcommittees, but these subcommittees were subsequently disbanded. While the City cannot force the CCOs to create or maintain such subcommittees, the City should share information with partners about the improvements for behavioral health services in subparagraphs (a)-(g) to link individuals to services and, by extension, help avoid unnecessary contact with law enforcement.<br><br>As noted in the analysis of Paragraph 88, it was effective to have an officer serve on the Behavioral Health Collaborative. Although the Behavioral Health Collaborative has completed its work, PPB and other law enforcement partners will continue to provide feedback as Oregon implements the Plan over the next two years. |

| | |
|---|---|
| | PPB's other creative efforts to engage its partners also meet the spirit of this provision.  PPB reports that the SCT Program Manager continues to attend the Legacy Emergency Department Outreach monthly meetings.  The SCT Program Manager and BHU Lieutenant also met with representatives from service system partners to identify strategies to improve access and impact vulnerable populations. |
| **Technical Assistance** | |

# VI. CRISIS INTERVENTION

The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises.  The PPB will add new capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis as required by this Agreement.  Despite the critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force.

## A. Addictions and Behavioral Health Unit and Advisory Committee

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB.  PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU.  ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

| Status | Substantial Compliance |
|---|---|
| **Analysis** | This assessment has remained consistent since the 2016 report.  PPB has established and maintained a BHU (the equivalent of the "ABHU" required by this Paragraph), and the BHU substantially functions in an oversight and coordination role as required by this Paragraph.<br><br>The BHU continues to include mobile crisis prevention teams, called Behavioral Health Response Teams ("BHRTs"); an SCT; a Coordinator for ECIT officers; and a Crime Analyst.  The BHU assists in developing Academy-level Crisis-Intervention Training and Enhanced-Crisis-Intervention Training.<br><br>The PPB chain of command includes an officer responsible for BHU's coordination with ECIT officers, as well as certain oversight responsibilities, including screening applicants to see if they meet ECIT criteria.  ECIT officers report up their chain of command to their precinct commander and, ultimately, the Assistant Chief of Operations.  This structure is consistent with the Memphis Model. |
| **Technical Assistance** | PPB should continue to update COCL and DOJ on changes to personnel where applicable.  PPB should also consider evaluating and expanding BHU's oversight functions to include evaluation and review of ECIT reports. |

39

92. ABHU will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor.  PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

| Status | **Partial Compliance** |
|---|---|
| Analysis | BHU is using and sharing data to decrease law enforcement interactions or mitigate potential use of force against mental health service consumers.  BHU shares data in three ways: (1) weekly reports of referrals from the BHU Electronic Referral System ("BERS") (that is, individuals referred for working with BHU through BHRTs) to the Multnomah County Crisis Line; (2) Behavioral Health Coordination Team meetings involving a number of partners discussing individuals who have had frequent police contact; and (3) regular meetings between SCT and service system partners to coordinate services and manage referrals.  These efforts to coordinate with partners to facilitate services for high-need individuals who have frequent police contact benefit the community.  The challenge of data sharing and utilization that has been expressed in discussions with BHU staff indicates that PPB works hard to provide data to Multnomah County, but does not receive data in return.  Because of strict legal limits on release of this type of data, it is challenging to establish an effective two-way exchange. |
| | The information provided by PPB that BHU has updated its BERS system to be able to track referrals from when a sergeant evaluates them may help establish a dataset to understand how the community members are served.  This is a starting point to be able to examine trends in BERS referrals.  However, as discussed in the 2016 report, the sharing of data from the BERS system appears to remain focused on "snapshots" of individual cases, rather than trends over time to improve services overall. |
| | An important aspect of this data-sharing requirement is the consistent use of trend data to identify gaps, needs, and opportunities.  The current data-sharing mechanisms, above, while both necessary and important, are focused on a relatively small subset of mental health service consumers and persons who experience crisis who have encounters with law enforcement.  Accordingly, reliable trend data based on interactions between patrol officers (including ECIT officers) and these individuals will be essential to accomplish the goals envisioned by Paragraph 92.  As discussed in greater detail in COCL's assessment of Paragraph 105, and the assessment below, efforts to collect this data over time were stymied by technical issues with the Mental Health Mask, and collection of data through the new Mental Health Template is in its infancy.  When sufficient Template data has been collected, DOJ will assess PPB's efforts to collaborate with service system partners to decrease law enforcement interactions or mitigate potential uses of force. |
| Technical Assistance | BHU should continue to establish systems to analyze trends in BERS referrals, and monitor data that is obtained through the new Mental Health Template to find information that may be shared with the County for the advancement of mutual goals. |

93. ABHU shall track outcome data generated through the C-I Team, MCPT, and SCT, to:  (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Status | **Compliance Rating Pending – Insufficient Documentation** |
|---|---|
| **Analysis** | There are multiple methods of internal data review to inform the work of BHU, as discussed in the COCL report and PPB's 2017 Q2 compliance report, including reviewing Mental Health Template data and identifying trends in calls for service at mental health treatment facilities. |

Ultimately, BHU's compliance with the requirement of tracking outcome data depends upon successful implementation of PPB's relatively new Mental Health Template, which replaced the Mental Health Mask and ECIT template, both of which were unsuccessful at obtaining reliable data over time.  Anecdotal reports from ECIT and non-ECIT patrol officers support the proposition that the Mental Health Template is being completed more frequently and more consistently than its predecessors, and will generate more reliable data.  However, officers also expressed need for clearer guidance on some aspects of the Template, including parameters for determining whether a call for service has a mental health component, and whether an officer has used ECIT skills during a call, as well as a greater variety of options for indicating which ECIT skills are being used.

DOJ and COCL crisis response experts also agree that in order to obtain sufficient data to track outcomes of calls for service, calls identified by PPB as having a mental health component must be compared with calls identified as having a mental health component by 911 call takers at the BOEC.  As discussed in the assessment of Paragraph 114, BOEC call takers have received training in crisis triage.  BOEC can identify many calls for service as likely involving a person experiencing mental illness or in crisis.  BOEC should have a mechanism whereby the call taker may document that there is a mental health component to the call so these can be tracked.  The data obtained by this method should complement the Mental Health Template data filled out by PPB officers in the field.  This should form part of an ongoing feedback loop between BOEC and PPB to track the frequency and nature of calls that BOEC does not identify as having a mental health component, but officers on the scene so determine, and vice versa.  This information was previously tracked by BOEC, but the process was discontinued due to concerns about stigma.  Accordingly, the new process should be careful to train call takers and dispatchers about stigmatization and use terms and processes that avoid labelling individuals and generating negative connotations.

PPB has developed guidelines for outcome measurements of its crisis response services, including the three categories of data required by this Paragraph.  These outcome measurements are in the process of being adjusted with input from DOJ and COCL.  Once implemented, the outcome measurements will help to provide consistent metrics for tracking performance among the several BHU components.

Comparing outcomes of calls for service that involve a mental health component but do not meet the criteria for ECIT response is an additional crucial step for evaluating the performance of PPB's crisis response model.  This is discussed further below in the assessment of Paragraph 99.

| | |
|---|---|
| **Technical Assistance** | PPB quickly introduced the Mental Health Template once the Mental Health Mask was determined to be unworkable.  PPB should continue to refine and update the Mental Health Template in response to feedback from officers, COCL, and DOJ, in order to improve accuracy in the collected data.  As part of this effort, PPB should continue to inform officers why PPB is collecting these data.  Patrol officers may be more likely to accurately fill out the Mental Health |

| | Template if they understand why PPB collects the data, how PPB uses the data, and when officer input improves on the Template's specific questions. |
| --- | --- |
| | Data on the number and type of all mental health-related calls continues to be critically important to inform this discussion. Measuring the success of PPB's ECIT Model requires accurate information from the Template and from BOEC. The City should introduce a mechanism for BOEC to track all calls that the call taker believes involve a mental health component in order to compare this information with data generated through the Template. This mechanism should be rolled out in a way that is sensitive to concerns of service consumer and provider communities. |

94. Within 90 days of the Effective Date, PPB shall also establish an ABHU Advisory Committee. The ABHU Advisory Committee shall include representation from: PPB command leadership, CIT, MCPT, and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Status | **Substantial Compliance** |
| --- | --- |
| **Analysis** | A 2017 Q2 roster of BHUAC members PPB provided includes all of the organizations and personnel listed in Paragraph 94 (noting that the Oregon State Department of Health and Human Services has been since been restructured and the relevant state component is the Oregon Health Authority), as well as additional partners. DOJ has observed BHUAC meetings throughout this past year. As stated in the 2016 report, while members' attendance at the meetings varies, the committee members engage in insightful and useful dialog in ensuring PPB looks at all the angles of a concern. |
| **Technical Assistance** | In order to continue to assess the formation of BHUAC and ongoing participation of its members, PPB should provide information about how members are recruited, and should continue to provide minutes of meetings. |

95. The ABHU Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of C-I Team, MCPT, SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The ABHU Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The ABHU Advisory Committee shall report its recommendations to the ABHU Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Status | **Substantial Compliance** |
| --- | --- |
| **Analysis** | As in 2016, minutes from BHUAC meetings and BHUAC's reports show that BHUAC reviews many of the issues contemplated by Paragraph 95, and provides informed advice and comments on a number of documents and items relevant to the requirements of Paragraph 95. |

|  | In 2017, BHUAC discussed coordinating efforts between law enforcement and the community mental health system, and provided input on BOEC crisis triage. |
|---|---|
| **Technical Assistance** | PPB should continue to utilize BHUAC's comments to improve policies, procedures, and training methods.  PPB should also continue to document BHUAC recommendations. |

96. Within 240 days of the Effective Date of this Agreement, the ABHU Advisory Committee will provide status reports on the implementation of the ABHU and BOEC Crisis Triage, and identify recommendations for improvement, if necessary.  PPB will utilize the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | BHUAC has discussed changes to policies, procedures, and training methods, and made recommendations for improvements.  BOEC's Crisis Triage is still in the initial stages of implementation.  BHUAC has been involved in reviewing and providing recommendations on BOEC's Crisis Triage training curriculum.  In August 2017, BOEC presented an update on training and the implementation of Crisis Triage to BHUAC. |
| **Technical Assistance** | To sustain substantial compliance, PPB must continue to provide documentation demonstrating that BHUAC is regularly reporting on the status of implementation of BHU and BOEC Crisis Triage.  PPB also must continue to use the information provided by BHUAC to identify improvements that may be made to BHU, dispatch, and call-transfer protocols to achieve a fully functioning Crisis Triage. |

## B. Continuation of C-I Program

97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City.  PPB shall continue to train all officers on C-I.

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | DOJ noted in the 2016 report that substantial compliance with this Paragraph required auditable training records that had not been provided.  Based on COCL's assessment and observations of annual Advanced Academy and In-Service Crisis Intervention Training, this requirement is being met. |
| **Technical Assistance** | To maintain substantial compliance, PPB must provide auditable training records demonstrating that all officers are being trained in crisis intervention. |

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call response duties.  Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with ABHU Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| Status | Substantial Compliance |
|---|---|
| Analysis | As stated in the 2016 report, substantial compliance with this Paragraph requires auditable training records that have not been provided.  Based on COCL's assessment and observations of annual Advanced Academy and In-Service Crisis Intervention Training, DOJ is satisfied this requirement is being met.<br><br>PPB's crisis intervention training subject matter was developed in consultation with BHUAC. |
| Technical Assistance | To maintain substantial compliance, PPB must continue to provide auditable training records demonstrating that all officers are being trained in crisis intervention for a sufficient number of hours prior to assuming any independent patrol or call-response duties. |

## C. Establishing "Memphis Model" Crisis Intervention Team

99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").

| Status | Compliance Rating Pending– Insufficient Documentation |
|---|---|
| Analysis | As COCL states, and as reported in the 2016 DOJ report, PPB has created a volunteer cadre of officers under its ECIT program.  However, PPB's ECIT model does not comport with a core element of a Memphis Model Crisis Intervention Team:  that a specialized officer respond to all pre-identified types of calls that involve a mental health component.<br><br>Some aspects of PPB's approach to crisis intervention are consistent with the Memphis Model. All PPB officers receive 40 hours of training in crisis intervention at the Academy, but patrol officers can volunteer to take an additional 40 hours of in-service training focused on crisis intervention and become what PPB calls "ECIT officers," or enhanced crisis intervention officers.  BOEC dispatches ECIT officers to a subset of calls that involve mental illness. Broadly speaking, none of these aspects conflicts with the Memphis Model.<br><br>Portland's model differs from the Memphis Model because it does not reserve all mental-health-related calls for the most highly trained crisis-intervention officers, those who have received ECIT training.  Although BOEC dispatchers are provided training to identify calls that may involve a mental health component, ECIT officers are only dispatched to calls that meet one of a list of clearly defined categories that do not capture all calls involving mental health.<br><br>Accordingly, BOEC dispatches many calls involving mental illness as it would any call for service.  Likewise, PPB does not require that ECIT officers respond to these calls.  Even where an ECIT officer responds to a call where the police recognize that mental illness is in play, PPB places no obligation on the ECIT officer to take control of the scene unless the incident meets one of the preselected criteria for ECIT response.<br><br>PPB contends that all patrol officers are sufficiently trained in crisis intervention to handle calls with a mental health component that do not meet the ECIT criteria, and that expanding the ECIT criteria to cover all calls with a mental health component would mean that the more highly trained officers are overwhelmed and prevented from responding to the calls with the highest |

| | risk.  This has yet to be assessed by looking at reliable data.  Such an analysis should be forthcoming from PPB. |
|---|---|
| | The newly implemented Mental Health Template should provide a mechanism for identifying all mental-health-related calls. BOEC should also flag calls that, based on the call taker's observations, potentially involve a mental health component.  Once these calls are reliably identified, PPB has agreed to conduct an outcome comparison to measure the sufficiency of its ECIT Model.  The comparison will examine whether there are differences in the results of calls for service with a mental health component that do not meet ECIT criteria, depending on whether an ECIT officer or non-ECIT officer responds.  In that situation, both ECIT and non-ECIT officers would be responding as part of their regular patrol duties.  Such an analysis should demonstrate whether increased negative outcomes are occurring on mental-health-related calls because non-ECIT officers are responding. |
| | Accordingly, determination of compliance with this Paragraph requires more data and analysis.  PPB has agreed to provide these as they become available. |
| **Technical Assistance** | The City and PPB must successfully implement the Mental Health Template and collect data from BOEC on all calls with a mental health component.  Once accurate data is available, PPB must demonstrate that its ECIT Model is effective, and thus an acceptable alternative to the Memphis Model. |

100. PPB's C-I Team shall be comprised of officers who volunteer for assignment to the C-I Team.  The number of C-I Team members will be driven by the demand for C-I Team services, with an initial goal of 60-80 volunteer, qualified officers.

| **Status** | **Substantial Compliance** |
|---|---|
| **Analysis** | PPB's alternative approach to crisis response consists of ECIT officers who volunteer for assignment, and the current roster of approximately 118 operational ECIT members exceeds the initial goal of 60-80 volunteer, qualified officers.  Some ECIT members report there are insufficient ECIT officers in some patrol areas during some shifts, requiring ECIT officers to travel long distances to respond to calls.  However, COCL reports that recent data from the Mental Health Template shows a substantial improvement in the number of ECIT calls that are serviced by ECIT officers, compared to data previously obtained from the Mental Health Mask (although this difference may be at least partially explained by differences in the data collection methods).  Because ECIT is comprised of volunteer officers, enrollment has exceeded the initial goal by a significant number, and indicators from the Mental Health Template show that ECIT officers respond to over 70% of calls flagged ECIT, PPB has substantially complied with Paragraph 100 at this time.  DOJ will continue to assess compliance in light of outcome measurements PPB is developing. |
| **Technical Assistance** | To ensure the number of team members is driven by demand for ECIT services, PPB should conduct ongoing assessments of whether it has trained sufficient a number of ECIT officers.  PPB should continue to train sufficient volunteer members to maintain adequate staffing. |

101. No officers may participate in C-I Team if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of C-I Team service, or during C-I Team service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the C-I Team.

| Status | Partial Compliance |
|---|---|
| Analysis | PPB has implemented a system to ensure the ongoing eligibility of ECIT officers that involves EIS flags or internal investigations being forwarded to the BHU Lieutenant.  BHU solicits feedback from supervisors on all applicants for the ECIT program, as well as information on complaints against the applicants. <br><br> PPB does not provide for automatic removal from the ECIT program for officers who are subject to disciplinary action based on a sustained allegation of force or misconduct against a person with mental illness, as explicitly required by this Paragraph. |
| Technical Assistance | PPB must fully implement SOP 3.3 (ECIT), and continue to enforce requirements for qualification, selection, and ongoing participation with ECIT.  PPB must modify SOP 3.3 (ECIT) to disallow an officer from participating in the ECIT program if the officer is subject to disciplinary action based on a sustained allegation of force or misconduct against a person with mental illness. |

102. PPB shall specially train each C-I Team member before such member may be utilized for C-I Team operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for C-I Team members consistent with the Memphis Model.

| Status | Substantial Compliance |
|---|---|
| Analysis | In December 2016, DOJ observed the 40-hour training provided to ECIT officers.  Part of the training was postponed due to inclement weather.  Nonetheless, training was found to be of good quality.  PPB showed a commitment to conducting effective, engaging training.  The training provided to ECIT officers complies with the requirements of this Paragraph. <br><br> As stated above in our assessment of Paragraphs 97 and 98, PPB's electronic management system for tracking training records is in the process of being implemented.  Accordingly, auditable electronic training records for officers should be forthcoming. |

| Technical Assistance | Although the training provided to ECIT officers meets the requirements of this Paragraph, comments are offered here as technical assistance, based on observations in December 2016 and best practices.  The ECIT training differs from a traditional Memphis Model crisis intervention training insofar as the officers have already received PPB's patrol crisis intervention training provided to all officers, and the ECIT training is considered an advanced course.  The tactics and procedures of PPB's Crisis Negotiation Team influences ECIT training.  This is generally a strength of the program, but also creates some challenges, as it takes away time from verbal and non-verbal de-escalation training to focus on tactical planning that may not be required in most interactions of police with individuals with mental illness or in crisis. |
|---|---|
| | To further improve the empathy-building function of the training, it would be preferable to have the community panels (the family panel and NAMI overview) on the first day of the training, and the several hours of ECIT response and crisis communication skills later. |
| | Also for PPB to consider: |
| | - Using audience response "clickers" to gauge baseline knowledge about mental illness and key concepts; |
| | - Changing the "trauma informed care" session to "trauma informed policing" and help students understand why use of force or handcuffing might be re-traumatizing for some individuals; |
| | - Addressing trauma experienced by police officers during their work and officer risk of suicide; |
| | - Adding a panel of hospital emergency department and Unity Center staff to discuss communication with persons in psychiatric crisis and the civil commitment process; |
| | - During scenarios, having more officers take on the primary communicator role, possibly by "freeze framing" scenarios; |
| | - Running scenarios until there is a clear outcome, especially when the desired outcome is for the person to agree to voluntarily go for an assessment; and |
| | - Including outside PPB leaders in the graduation ceremony. |

103. C-I Team members will retain their normal duties until dispatched for use as a C-I Team.  BOEC or PPB may dispatch C-I Team members to the scene of a crisis event.

| Status | **Substantial Compliance** |
|---|---|
| Analysis | ECIT members retain their normal duties until dispatched to a call that meets ECIT-specific provisionally approved criteria.  BOEC has established protocols to dispatch ECIT officers to the scene of a crisis event that meets these criteria, and PPB officers may specifically call for an ECIT officer when they believe the situation would benefit from ECIT involvement. |
| Technical Assistance | The City should continue to inform the community about the ability specifically to request an ECIT officer at the scene of any crisis event. |

104. PPB will highlight the work of the C-I Team to increase awareness of the effectiveness of its work.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB reports solid efforts to highlight work by its ECIT officers over the past year.  For example, in the second half of 2017, BHU members participated in 45 outreach events, including presenting on crisis response at the APA Conference in San Diego, California.  PPB has engaged in a number of activities designed to highlight the work of BHU and its components, resulting in positive publicity.  BHU regularly publishes a newsletter regarding its activities, and maintains a web site that includes information on BHU components and activities and a reference guide to mental health resources.  On April 26, 2017, the United States Attorney for the District of Oregon honored BHU in a ceremony at the Justice Center for their accomplishments. |
| Technical Assistance | PPB should continue to engage in and document community outreach efforts to inform the community about the existence, roles, and availability of the C-I Team.  PPB should also engage the community for input on how to best publicize the C-I Team's work.  While PPB made significant efforts to highlight BHU's work, some community members, including service providers, are still unfamiliar with BHU services, including the ability of any 911 caller to request an ECIT officer. |

105. For each crisis event to which a C-I Team is dispatched, the C-I Team member shall gather data that ABHU shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include:

a. Date, time, and location of the incident;

b. Subject's name, age, gender, and address;

c. Whether the subject was armed, and the type of weapon;

d. Whether the subject is a U.S. military veteran;

e. Complainant's name and address;

f. Name and DPSST number of the officer on the scene;

g. Whether a supervisor responded to the scene;

h. Techniques or equipment used;

i. Any injuries to officers, subject, or others;

j. Disposition;

k. Whether a mental health professional responded to the scene;

l. Whether a mental health professional contacted the subject as a result of the call; and

m. A brief narrative of the event (if not included in any other document).

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | The Mental Health Template contains questions intended to capture the enumerated criteria. However, data collection using the Template did not begin until April 2017.  Thus, it is too early to assess whether ECIT officers have accurately collected data.  Likewise, there is insufficient usable data to track and analyze trends. |
| **Technical Assistance** | PPB should regularly solicit input from ECIT officers to assess the Template, and PPB should provide clear guidance and training on how to answer questions consistently in order to ensure the quality of data collected.  In particular, PPB should provide guidance to officers on what constitutes a mental health component to a call, especially in oft-encountered ambiguous circumstances (e.g., when a call for service strongly suggests a mental health component, but the subject of the call cannot be located).  Providing guidance would help to obtain more consistent data among different officers and different shifts.  Additionally, multiple ECIT officers had questions about the query of whether they used their ECIT skills, as there is an argument that nearly every call involves use of skills refined during ECIT training, such as communication techniques.  Officers asked for clarity on how to answer that question, and on additional categories of techniques that may be marked down as ECIT skills used (e.g., developing rapport). |

## D. Mobile Crisis Prevention Team

106. PPB currently has an MCPT comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand MCPT to provide one MCPT car per PPB precinct.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | PPB reports that each precinct continues to have a MCPT (now called BHRT), comprised of a PPB BHU officer and a Project Respond staff member.  No material changes have been made to the BHRT unit during the period covered by this compliance assessment. |
| **Technical Assistance** | |

107. Each MCPT car shall be staffed by one sworn PPB officer and one qualified mental health professional. MCPT shall be the fulltime assignment of each such officer.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | PPB reports that each precinct's BHRT car is staffed by a PPB officer and a mental health professional from Project Respond.   PPB and Project Respond are commended for their efforts in creating a model that seeks to pull individuals out of the gaps of the crisis system and connect them with community partners. |

| Technical Assistance | PPB should assess the need for increasing capacity of BHRT on a periodic basis, as funding may become available. |
|---|---|

108. No officers may participate in MCPT if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of MCPT service, or during MCPT service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the MCPT.

| Status | **Partial Compliance** |
|---|---|
| Analysis | SOP 3.2 (BHRT) does not disallow an officer from participating in BHRT if the officer has been subject to disciplinary action based upon a sustained IA investigation involving use of force or misconduct against a person with mental illness.  Instead, it requires the BHU Lieutenant to work with PSD to review the investigation, notify the Central Precinct Commander if the action impacts the officer's continued participation in BHRT, and coordinate a decision to remove a BHRT officer.

Our assessment of this provision is not meant to imply that any BHRT member fails to meet the criteria defined by this provision.  PPB reports that it reviews all applicants for compliance with this criterion.  However, PPB procedures do not make explicitly clear that successful applicants serving on the BHRT will be removed from the BHRT if subject to discipline for mistreating a person with mental illness. |
| Technical Assistance | PPB must modify SOP 3.2 to disallow an officer from participating in BHRT as required by Paragraph 108. |

109. PPB shall specially train each MCPT member before such member may be utilized for MCPT operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for MCPT members.

| Status | **Substantial Compliance** |
|---|---|
| Analysis | PPB indicates that all BHRT personnel have been trained in ECIT, as well as Applied Suicide Intervention Skills Training ("ASIST"), Trauma Informed Care, and Civil Commitment Proceedings.  PPB also lists a number of outside trainings that BHRT officers have attended.  PPB's documentation for the 2016 Q2 report includes a certificate of attendance for one officer at the FBI's Basic Crisis Negotiator Course.  Additionally, SOP 3.2 (BHRT) includes recommendations for training developed with the advice of BHUAC. |
| Technical Assistance | See Paragraphs 97 and 98 regarding training records. |

110. MCPT shall utilize C-I Team data to proactively address mental health service, in part, by connecting service recipients with service providers.

| Status | Partial Compliance |
|---|---|
| Analysis | In April 2017, PBB began implementing the Mental Health Template. Once the Template generates reliable data for a period of time, there should be sufficient data available to assist PPB in developing systems to connect service recipients with service providers. BHU is using new internal review mechanisms to improve the work of its components. Specifically, BHU notifies unit leadership when a person is identified as having been the subject of repeated contacts with police. Additionally, BHU is tracking trends in calls for service at mental health treatment facilities in order to identify needs. These efforts benefit the community, and DOJ looks forward to the results of proactive application of Template and BOEC data as it becomes available. |
| Technical Assistance | PPB should provide additional examples of how it is using data to implement this Paragraph, as the data becomes available.<br><br>The City should take steps to have BOEC track all calls that may have a mental health component. PPB should document and explain how its units are utilizing the data available from ECIT officer interactions proactively to address mental health service. |

111. Within 180 days of the Effective Date, PPB, with the advice of the ABHU Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of MCPT officers in the process.

| Status | Substantial Compliance |
|---|---|
| Analysis | In May 2017, PPB enacted policies to transfer custody or voluntarily refer individuals between PPB, receiving facilities, and local mental health and social service agencies, as required by this Paragraph (Directives 850.21, .22, and .25). Additionally, in the past several months, the Unity Center became fully operational, and currently accepts ambulance transfers as well as walk-ins and transfers from other hospitals. PPB is currently using AMR ambulances to transport individuals to Unity and hospital emergency departments. This is a significant positive development, and both PPB officers and Unity staff have provided anecdotal reports that the system is functioning fairly well. |
| Technical Assistance | PPB should continue to evaluate and refine its transportation and transfer of custody procedures in order to ensure that services are being delivered optimally. |

## E. Service Coordination Team

112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.

| Status | **Substantial Compliance** |
|---|---|
| Analysis | The SCT program is benefiting both the clients it serves, and the community partners it engages to create successful outcomes. |
| Technical Assistance | SCT should continue to look for ways to analyze data regarding the program, any trends, and outcomes for clients. |

## F. BOEC

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the ABHU Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB ABHU or directly to NGOs or community-based mental health professionals.

| Status | **Substantial compliance** |
|---|---|
| Analysis | Pursuant to this Paragraph, BOEC, with the advice of BHUAC, completed policies and procedures to triage calls related to mental health issues, including protocols for assigning calls to the Multnomah County Crisis Line ("MCCL"). While these policies and procedures were not completed within the 120-day time period required by this Paragraph, they demonstrate compliance with the ultimate purpose of the first clause. The policies for dispatching ECIT officers reflect the call categories requiring ECIT response in the provisionally approved Directive 850.20. The updated protocols are intended to reflect PPB's alternative ECIT response criteria. |
| | The system for transferring calls to the MCCL appears to continue functioning as intended, with only approximately 10% of calls returned to BOEC for a police response. MCCL also fields calls from PPB officers requesting information, and has the ability to contact Project Respond to attend the scene of a crisis incident. |
| | As the system currently functions, BOEC does not assign calls directly or indirectly to the PPB BHU, to NGOs, or directly to community-based mental health professionals. Under PPB's model, BHRTs are follow-up units, not first responders that BOEC dispatches to calls for service. BHUAC agreed that the current BHRT model should be maintained, and that they should not be dispatched by BOEC. DOJ has approved the current model. |
| | With regard to NGOs or community-based mental health professionals, BOEC cannot directly dispatch Project Respond to a call for service. MCCL may call Project Respond once a call has been transferred to MCCL, or first responding officers may call Project Respond for assistance once they arrive on the scene. BHUAC members concluded it would be difficult, if not impossible, to require treatment providers to directly respond to 911 calls without police support, and would overburden Project Respond's limited capacity. Similarly, DOJ's expert consultant noted that it would present a possible danger to treatment providers to respond directly to calls without police support, and that this would be an outlier in crisis response nationwide. |

| | |
|---|---|
| | Because of Portland's hybrid model crisis response procedures, however, this service arrangement leaves a notable gap.  BOEC only dispatched ECIT officers to a specific and more serious subset of calls involving a person with mental illness or in crisis, and calls may only be transferred to MCCL if the caller is the person in crisis or is physically with the person.  This means that calls involving a person who is apparently experiencing mental illness or in crisis —for example, a call from a business owner that a person appears to be acting bizarrely in front of their business—receive a police response, from non-ECIT patrol officers.  Because the data are still in initial stages of collection and analysis, it is unknown at this point how often these calls occur, whether these calls are a burden to patrol officers and responders other than PPB could handle them, or whether or not regular patrol officers are appropriately handling these calls. |
| Technical Assistance | The City, BOEC, and PPB should continue to work with MCCL, in consultation with BHUAC, to ascertain the impact of the gap described above and to explore possible solutions. |

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the ABHU Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| Status | Substantial Compliance |
|---|---|
| Analysis | In coordination with PPB and BHUAC, BOEC designed training to reflect updates to the BOEC protocols.  COCL and DOJ reviewed the training and provided feedback.  In September 2016 and January 2017, call takers and dispatchers were trained on the new policies and procedures.  In August 2017, DOJ observed training in crisis triage for new employees.  BOEC's work in preparing the trainings to address the changes in protocol, and in delivering training during a time of staffing shortfalls indicates their dedication. |
| | DOJ agrees with COCL that the training was generally of good quality.  The motivation and commitment of both the instructors and the students is excellent.  It is clear that City personnel have a genuine intent to provide excellent service to callers experiencing mental illness or in crisis.  DOJ also agrees with COCL's advice to improve the training.  In addition, more detailed, critical feedback following scenarios could help to guide students, and evaluations may be more effective if filled out after each session, rather than after the entire training. |
| Technical Assistance | The City should continue to refine its training of BOEC call takers and dispatchers with the advice and guidance of BHUAC and COCL. |

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Status | Partial Compliance |
|---|---|
| Analysis | As reported in 2016, the core components of this Paragraph are progressing, as BOEC has developed additional protocols to track PPB's alternative crisis intervention model, and has |

|  | developed and delivered training in coordination with BHUAC.  BOEC continues to successfully transfer appropriate calls to MCCL.

BOEC's successful implementation of fully operational Crisis Triage will require an ongoing evaluation once sufficient time has passed since the completion of training and sufficient data is available to compare BOEC data with PPB's Mental Health Template data.

As COCL reports, the success of PPB's crisis response model relies on capturing data.  As reported in 2016, BOEC's coding system could be improved to better capture data regarding the number of calls that have a mental health component.

The addition of a tracker for all calls involving a potential mental health component is discussed in the assessment of Paragraph 110.  BOEC's previous code was discontinued after community members expressed concerns.  The only code currently used for calls with a mental health component is the "ECIT" code for calls that meet the criteria for dispatching an ECIT officer.

 As previously discussed, BOEC does not track calls that might involve a mental health component but do not require dispatching an ECIT officer.

It is critically important to know how many mental-illness-related calls to which PPB officers are asked to respond, and to determine training needs by identifying situations where BOEC identifies a call involving a mental health component but the responding officer does not, or vice versa.  A fully operational Crisis Triage must capture data regarding these calls. |
|---|---|
| **Technical Assistance** | BOEC should develop a secondary coding system (a code modifier) to include on all calls that the call taker or dispatcher, or officer at the scene believes may contain a mental health component.  Call takers and dispatchers should not be expected to distinguish aberrant behavior secondary to substance use from crisis unrelated to substance use, and should not be expected to identify specific disorders. |

## VII. EMPLOYEE INFORMATION SYSTEM

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee.  *See* PPB Manual 345.00.  PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion.  Accordingly, within 90 days of the Effective Date, PPB shall:

a. Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;

b. Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and

c. Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

| **Status** | **Partial Compliance** |
|---|---|
| **Analysis** | PPB's EIS has not proven effective, thus far, in identifying employees at risk of problematic behaviors. |

***116 Effectively identifying and addressing at-risk employees, supervisors, and teams:*** DOJ assessed PPB's use of EIS during July 14, 2017 and August 24, 2017 on-site compliance assessments. During 2017 Q1, there were 232 alerts, 36 (15.5%) of which were sent out to RU for review; the remaining 196 (84.5%) were "closed at PSD." Of those sent to RU, only five resulted in any type of intervention and 22 did not even go to the supervisor for review. Of the total 232, 180 (78%) were force related; however, PPB provided no breakdown on the 36 sent out to the RU for review. During Q2, there were 277 alerts (216 force related), of which 88 were sent to RU for review; also, no breakdown was provided on the 88; PPB administratively closed the remainder of the alerts without further action.

PPB implemented SOP 44 - EIS Alert Processing Guide on July 1, 2017. A review of alerts PPB tracked in the third quarter from July 5, 2017 to August 29, 2017 (PPB updated its data following our August 24 meeting) showed PPB's EIS administrator approved 71 of 150 alerts to forward to RUs. Forwarding a larger portion of the alerts to RUs suggests that SOP 44 has been effective in limiting administrative closures of alerts and caused more alerts to go to RUs for response. Still, of those 71 alerts, RUs had already declined intervention on 22 alerts. The others remained outstanding with an approximately six-week window from the assignment date to the initial RU response due date. There were no data since the implementation of SOP 44 showing RU interventions. These data are consistent with COCL's independent analysis of alert rates and intervention data in the third quarter of 2017. *See* 2017 COCL Rep. at 101.

***116(a) supervisors' review of subordinates' EIS records:*** By policy, supervisors are to review EIS records during the performance review process. *See* Directive 345.00 – Employee Information System, Procedure 2.2, effective Jan. 31, 2017. This Directive should provide a consistent means of ensuring supervisors fulfill the requirements of Paragraph 116(a). However, many supervisors did not comply. PPB reports on whether its officers have had semi-annual performance evaluations recorded in the EIS performance tracker. To accomplish this reporting, PPB previously drew a sample of 75 randomly selected officers and reported on the percentage of those in the sample whose performance tracker recorded having had a timely performance evaluation. In the first quarter of 2017, PPB switched from a sampling methodology to a check of all officers' discussion trackers. Under this more rigorous assessment, PPB's rate of compliance dropped from the 77-85% reported in the prior year to 60.9%. 116a Compliance – All Ranks/All RUs/All Branches, PPB_0102088, 2017 Q1. However, PPB found a problem with the first quarter report in that PPB had mistakenly reported compliance even when the supervisors had not completed the required review within the timeframe PPB requires. *See* 2017 PPB Q2 Quarterly Update Report, Par. 116(b). PPB revised its compliance rate to 46% in 2017 Q1 and 39.3% in 2017 Q2. *Id.*

Likewise, DOJ found that in 2017 Q1, zero of 11 officers assigned to youth services had performance evaluations. *See* 116a Compliance – All Ranks/All RUs/All Branches, PPB_0102088, 2017 Q1. PPB's chosen means of implementing supervisors' review of subordinates' EIS records—i.e., during performance evaluations—is inconsistent. Because more dependable data reveal a significantly lower compliance rate than PPB previously reported, DOJ cannot find substantial compliance with Paragraph 116(a).

***116(b) new assignees' reviews:*** Supervisors are required to check their new subordinates' EIS entries within 30 days of assignment. *See* Directive 345.00 – Employee Information System, Procedure 2.1, effective Jan. 31, 2017. In the third quarter of 2016, PPB noticed a relatively low level of compliance with the requirement that supervisors review EIS discussion tracker entries of officers new to their command. *See* 2017 PPB Q1 Quarterly Update Report, Par.

|  | 116(b).  In response, Professional Standards Division began sending emails and teaching the importance of this requirement at in-service training.  *Id.*  Compliance rates increased to 88% in 2016-Q4 and 92.4% in 2017-Q1.  *Id.*  In 2017 Q2, however, PPB had more transfers and compliance dropped again.  Supervisors timely checked their transferees' discussion tracker in only 70.8% of that quarter's transfers.  *See* 2017 PPB Q2 Quarterly Update Report, Par. 116(b).<br><br>On July 14, 2017, DOJ checked EIS discussion tracker entries for a series of newly transferred officers and employees who had been the subject of allegations of misconduct.  PPB had a discussion tracker entry for 18 of the 21 employees sampled.  However, DOJ's expert found the qualitative review of the discussion tracker entries to show that many of the employees' entries had either no mention of a known allegation of misconduct or had condoned behavior before completion of an administrative investigation for misconduct or serious force use.<br><br>***116(c), 117 unit and supervisor analysis:***  PPB has acknowledged the need for further training in order to comply with 116(c):  "Please note that neither the EIS Administrator, nor anyone on the EIS Team, is trained on methods of analysis . . . ."  EIS Quarterly reporting – 2017 Q1 – Addendum, PPB_0102094.  Though this statement appeared intended to give context to the accuracy of a chart that followed it, it speaks to current barriers to compliance with Paragraph 116(c).  PPB must train its EIS administrator to be able to conduct the analysis and compare the patterns of activity required by this provision. |
|---|---|
| **Technical Assistance** | In order to consistently comply with Paragraph 116(a), PPB should ensure remedial action for supervisors who fail to timely check their subordinates' EIS records as part of the performance evaluation process.<br><br>PPB should train its EIS Administrator to conduct the analysis and identify patterns as required by Paragraph 116(c).<br><br>DOJ agrees with COCL that PPB should train supervisors on their required use of EIS and, where training has failed, hold supervisors accountable.  *See* 2017 COCL Rep. at 97 n.1.<br><br>DOJ also agrees with COCL that PPB should train supervisors in light of the recently enacted SOP 44 regarding PPB's expectations for supervisors' reviews of EIS data and what actions to take when supervisors receive notice of an EIS alert.  *See* 2017 COCL Rep. at 103. |

117. PPB agrees to *use force audit data* ~~collect data necessary~~ to conduct *similar* ~~these~~ analyses at supervisor- and team-levels."

| Status | **Compliance Rating Pending – Insufficient Documentation** |
|---|---|
| **Analysis** | The parties have agreed to a change in the Settlement Agreement, which is pending the Court's consideration.  PPB has not yet produced sufficient data to assess compliance with this revised provision.  PPB noted that the quarterly report documents it produced for Paragraph 116(c) also apply to Paragraph 117.  PPB has not presented any data in support of Paragraph 117 compliance.  Instead, the City has proposed to amend the Agreement to manage risk at the supervisor and team levels of PPB with a use-of-force audit system—developed with COCL pursuant to Paragraphs 74-77—rather than with EIS.  PPB's organizational model, which assigns multiple supervisors to each officer and lacks a unity-of-command structure, makes its EIS system uniquely unsuitable for supervisor- and team-level analysis.  Accordingly, PPB has |

| | |
|---|---|
| | a structural barrier to using the EIS to correlate individual officer data with supervisor- and team-level data, as Paragraph 117 currently requires.  DOJ has agreed to the change.  PPB is now in the process of developing procedures for using the audit data to effectively identify at-risk supervisors and teams to address potentially problematic trends in a timely fashion. |
| Technical Assistance | DOJ agrees with COCL that whatever risk identification system PPB ultimately implements for supervisors and teams, PPB should develop intervention plans to address the alerts.  *See* 2017 COCL Rep. at 103. |

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews:

     a. Any officer who has used force in 20% of his or her arrests in the past six months; and

     b. Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.

| Status | **Substantial Compliance** |
|---|---|
| Analysis | DOJ agrees with COCL that PPB has implemented the thresholds required by Paragraphs 118 and 119, though these triggers did not always result in management reviews by members' supervisors as required. |
| Technical Assistance | PPB's complex system could be made less time-and-resource consuming if there were more effective triggers.  DOJ agrees with COCL that PPB should examine its thresholds in this regard.  *See* 2017 COCL Rep. at 104. |

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator.  This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Status | **Partial Compliance** |
|---|---|
| Analysis | PPB has a second EIS administrator.  As observed in last year's compliance assessment report, PPB's EIS administrators are dedicated and knowledgeable about PPB's EIS system.  PPB's aforementioned statement that "neither the EIS Administrator, nor anyone on the EIS Team, is trained on methods of analysis . . . ." indicates a need for further training.  EIS Quarterly reporting – 2017 Q1 – Addendum, PPB_0102094.  In order for the EIS administrators to conduct the analysis required by Paragraph 116(a), PPB must train the second administrator to conduct the analysis, or train the supervisor sufficiently in analytical methods to supervise those who conduct the analysis.  Accordingly, DOJ agrees with COCL that this provision must be rated at partial compliance for the time being. |

| Technical Assistance | As suggested in last year's compliance assessment report, DOJ agrees with COCL that the EIS administrators should memorialize their vast knowledge and experience in a training document for the benefit of future EIS administrators. |
|---|---|
| | PPB should train its EIS administrators to conduct the analysis and identify patterns as required by Paragraph 116(c). |

## VIII. OFFICER ACCOUNTABILITY

PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.

172. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | PPB and IPR are in the midst of formalizing a change in the way the City conducts administrative investigations of alleged officer misconduct. However, this change is not yet complete. While change may be forthcoming, DOJ assesses PPB and the City's accountability process as it currently stands. |
| | In the past year covered by this compliance assessment report, PPB and IPR have made significant progress in tracking and handling allegations of misconduct. As an example, PPB and IPR completed investigations of PPB's prior chief and, based on that experience, IPR made constructive recommendations to help ensure the integrity of accountability systems and concurrent criminal and administrative investigations. |
| | Section VIII requires that the City's accountability system meet four criteria: (1) all investigative findings are supported by a preponderance of the evidence; (2) all findings are documented in writing; (3) officers and complainants receive a fair and expeditious resolution of complaints; and (4) all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. Paragraph 172 addresses the fourth criterion. |
| | DOJ agrees with COCL that the City's ability to achieve compliance with Section VIII rests with changes to IPR's ordinances and PPB's directives to: make consistent the City's handling of complaints, whether investigated by IPR or PPB; to resolve complaints more expeditiously; and ensure that administrators fairly and consistently reach findings supported by a preponderance of evidence. *See* 2017 COCL Rep. at 107. In consultation with COCL and DOJ, the City has agreed to make the two systems for handling complaints—IPR and IA—mirror one another in process and quality up through recommended investigative findings. The City has also agreed to require the factual investigator, whether |

| | |
|---|---|
| | from IPR or PPB, to draft the recommended administrative findings. Recommended findings will be based on set definitions requiring a preponderance of evidence for sustained (the preponderance of evidence shows a violation of policy or procedure); exonerated (the preponderance of evidence shows the officer's conduct was lawful and within policy); or unfounded (the preponderance of evidence shows the allegation was false or devoid of fact or there was no credible basis for a possible violation of policy or procedure). *See* Draft Directive 332.00 – Administrative Investigations (not finalized). If a preponderance of evidence does not support a finding, then the finding would not be sustained (the evidence was insufficient to prove a violation of policy or procedure). *Id.*<br><br>DOJ reviewed a sample of administrative investigations by both IPR and IA. Based on the evidence presented in the investigations, DOJ found that all completed investigations were supported by a preponderance of the evidence. *See* Comments to Paragraph 128. PPB wrote findings for all allegations presented that were not dismissed. *See id.* PPB and IPR did not always investigate complaints in an expeditious fashion, however. *See* Comments to Paragraphs 121 and 123. DOJ found at least one exception to the uniform application of PPB's disciplinary matrix. *See* Comments to Paragraph 137. In certain circumstances, potentially out-of-policy uses of force identified in After Action Reviews did not result in IA investigations. *See* Comments to Paragraph 129. |
| **Technical Assistance** | The City needs consistent policies for the intake, classification, and investigation of complaints of misconduct for both PPB and IPR that still allow for independent investigation by IPR. Joint training of PPB and IPR investigators will help facilitate that. |

## A. Investigation Timeframe

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, including appeals, if any, to CRC. Appeals to CRC shall be resolved within 21 days.

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | DOJ agrees with COCL that a reformed accountability system should assist in reducing timelines for completing internal investigations, particularly with the factual investigator now making recommended findings. *See* 2017 COCL Rep. at 107. |

PPB and IPR share the duty to timely investigate allegations of officer misconduct.  PPB reported 9 cases not meeting the 180-day deadline in the third quarter of 2016; all 9 had delays by both IPR and IA.  PPB Quarterly Update Report, Par. 123, Aug. 15, 2017.  PPB reported 19 cases not meeting the 180-day deadline in the first quarter of 2017.  *Id.*  All 19 had delays by IA and 17 had delays by IPR.  *Id.*  PPB reported 15 cases not meeting the 180-day deadline in the second quarter of 2017.  *Id.*  All had delays by IA and 12 had delays by IPR.  *Id.*  Sometimes delays have been quite significant, with IPR not interviewing one officer within 200 days of alleged misconduct.

Timeliness of complaints is important to accountability and both internal and external perceptions of fairness in the treatment of complainants and accused officers.  As PPA pointed out to us, officers routinely wait six to twelve months for the resolution of even minor complaints.  As COCL points out, in survey responses, 92% of PPB officers agreed that resolution of civilian complaints takes too long.  *See* 2017 COCL Rep. at 118.  PPB is aware that improving the timeliness of investigations requires implementation of proposals to "revise Police Bureau and IPR policies to mirror one another."  PPB 2017 Q2 Quarterly Update Report, Par. 121.

Commendably, PPB recently filled an investigator position and transferred a second sergeant position to IA to work on PPB's backlog of administrative investigations.  *Id.*  However, PPB also acknowledged that it has two vacancies for IA investigators.  *Id.*

Paragraph 123 requires that where PPB fails to meet the 180-day deadline for administrative investigations, PPB will:  (1) identify the source of the delay, and (2) take corrective action.  PPB consistently has identified administrative investigations that exceed 180 days and often PPB is able to identify the sources of delays.  PPB memorializes these analyses in "180-day memos."  Some delays are beyond PPB's control (e.g., a complainant declining to provide records that the complainant asked be included in the file (2016-C-0013) or an outside agency providing necessary information (2016-B-0003)).  More often, however, the delays are within the control of PPB or IPR.  For example, for 2016-C-0237, PPB identified a failure to interview as the source of delay:

> This case was delayed at the investigation stage in large part because the investigator did not interview a sergeant who wrote an after action.  Once the investigator was direct[ed] to do so the interview took more than three weeks to schedule.  Also this case was turned in and then sent back for more work including additional attempts to contact the complainant.

This report went on to suggest that the delays could be remedied if investigators begin work on cases immediately, notify members immediately, and conduct timely interviews of those named in the complaint.  The sergeant has emphasized these points over the last 6 months.

Memo from Internal Affairs Captain, 2016-C-0237.  PPB has acknowledged its need to address delays frequently caused by sick leave, vacations, and training:

> We cannot allow cases to sit idle for this long.  We need to be proactive in managing our investigators' caseloads, and, when the investigators are sick

|  | or are busy with cases which require immediate attention, cases may need to be reassigned. **This will become a regular agenda item at our weekly staff meetings, so myself, the lieutenant and the sergeant are all looking at all overdue cases every week.** As we work our way back up to full investigator staffing, work toward hiring our vacant PASS position, and discuss adding a second sergeant, we will increase our capacity to deal with issues like this. |
|  | 2016-C-0199 (emphasis added). Accordingly, PPB has suggested a process for regular follow-up to delays identified in 180-day memos. We look forward to PPB's implementation of its solutions to the self-identified issues with investigative delays. |
|  | Separately, the parties have agreed to remove CRC appeals from the 180-day deadline in which the City and PPB must complete administrative investigations, and to permit CRC more time to process appeals: |
|  | For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, ~~including~~ excluding appeals, if any, to CRC. Appeals to CRC sh~~ould~~all be resolved within ~~21~~ 90 days. |
|  | *See* Proposed Amended Settlement Agreement, ¶ 121. This change is pending the Court's consideration. |
| **Technical Assistance** | PPB should hold investigators responsible when 180-day memos identify delays within investigators' control. |
|  | IPR should likewise implement corrective action plans to address significant delays in its investigations. To this end, DOJ suggests IA and IPR's mirrored investigation policies include measures to eliminate known and correctable sources of delay. |

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| **Status** | **Partial Compliance** |
| **Analysis** | <u>PPB Reporting on Concurrent Investigations</u> |
|  | PPB reports on the specific internal affairs investigations it initiates and the corresponding dates of any parallel criminal investigation. *See* PPB Quarterly Update Report, Par. 122, Aug. 15, 2017. With rare exception, the City reports consistently initiating administrative investigations concurrently with criminal investigations. *Id.* PPB implemented our prior technical assistance request to explain anomalous cases in which PPB did not concurrently initiate investigations. *See* 2016 Settlement Agreement Compliance Assessment, at 100, ECF 124-1. In the third quarter of 2016, PPB did not timely notify its IA |

division of an allegation due to a personnel change, leading to a one-month delay in initiating the administrative investigation. *See* PPB Quarterly Update Report, Par. 122 (citing 2016-C-0283), Aug. 15, 2017. Similarly, in the first quarter of 2017, PPB's detectives delayed notifying IA for 23 days of an allegation that led to another administrative investigation. *Id.* (citing 2017-C-0023). In the same quarter, IPR did not report a criminal allegation to PPB while IPR conducted a six-week intake investigation. *Id.* (citing 2017-C-0006). Similarly, in the second quarter of 2017, IPR received allegations two weeks before notifying PPB in one case and nine days before notifying PPB in another. *Id.* (citing 2017-C-0147 and 2017-C-0150). Also in that quarter, criminal detectives failed to timely notify IA of an allegation leading to a nearly six-week delay in initiating an administrative investigation. *Id.* (citing 2017-C-0141).

<u>2016-B-0014 and IPR Recommendations</u>

The *former* police commissioner delayed a concurrent administrative investigation of a *former* PPB Chief, which impacted compliance during this rating period. IPR completed that administrative investigation during this rating period. The City's Bureau of Human Resources reviewed the investigation and proposed findings. Findings Memorandum IA 2016-B-0014, July 6, 2017. PPB also had a role in the administrative investigation, however. The current police commissioner approved the findings and added additional findings to PPB personnel records. *Id.*

In follow-up to the case, IPR spoke to the *former* police commissioner's role in delaying the City's administrative investigation, conducting it concurrently with the criminal investigation by an outside agency, and making inconsistent public statements during the prosecution. IPR found that the City's initial failure to ensure that the appropriate agencies were informed of the *former* Chief's actions contributed to the length of both the criminal and administrative investigations. IPR also found that the former police commissioner's criticism of the State Attorney General for the length of the investigation and subsequent criminal prosecution served to undermine the City's administrative investigation in this matter.

IPR Recommendations Memorandum 2016-B-0014, Aug. 30, 2017.

<u>SOPs for Concurrent Investigations</u>

When PPB uses lethal force, PPB conducts a criminal and an administrative investigation. The Multnomah County District Attorney has statutory authority over the criminal investigation. *See* ORS §146.095. Even when there is no allegation of misconduct, PPB routinely conducts an administrative investigation to determine whether the use of lethal force was within policy, and a training assessment. *See* PPB Directive 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures, Policy ¶ 2, effective Sept 27, 2017. If there is an allegation of misconduct associated with the force incident, PPB policy requires an administrative investigation to determine if there is a sustained violation of any directives. *See* PPB Directive 330.00, Internal Affairs, Complaint Intake and Processing, effective Oct. 30, 2014; PPB Directive 332.00, Administrative Investigations, effective Oct. 30, 2014.

| | The City has worked with DOJ, PPA, and the Multnomah County District Attorney's Office to formalize PPB's SOPs for the concurrent administrative and criminal investigations following a lethal use of force or in-custody death. These went into effect on December __, 2017. |
|---|---|
| **Technical Assistance** | Anomalous, slight delays in reporting allegations for parallel investigations will not necessarily affect compliance ratings. However, PPB and IPR should reinforce among current staff the City's obligation to ensure administrative investigators notify criminal detectives—and vice versa—of allegations of criminal conduct by officers. The City must meet its obligation to conduct effective concurrent investigations, even if IPR conducts the initial administrative investigation. |

## B. On Scene Public Safety Statements and Interviews

124.    Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | Over the past year, the City made substantial efforts to revise policy and develop protocols that comply with applicable law and current professional standards for cases of lethal force and in-custody deaths. The City met with the DOJ, PPA, COCL, and the Multnomah County District Attorney's Office to reconcile Oregon state law and current professional standards as to obtaining compelled statements from involved officers in such cases. |
| | Revised Directive 1010.10 was enacted by City Council on August 24, 2017. The City and DOJ have agreed to substitute Revised Directive 1010.10's procedures for the FDCRs and After Action Reviews currently required by Paragraph 69. The proposed amendments will become effective absent affirmative action by the Court. |
| | Revised Directive 1010.10 went into effect on September 27, 2017. PPB officers have read and acknowledged understanding it. However, DOJ has yet to assess its implementation. |
| | The City, DOJ, PPA, and the Multnomah County District Attorney's Office have met to discuss standard operating procedures to ensure consistency in obtaining compelled statements and separation from the criminal investigation to minimize the risk of jeopardizing a potential prosecution. The SOPs are anticipated to go into effect soon. The City remains responsible for ensuring that officers are advised on, understand, and appropriately implement the applicable protocols. |
| **Technical Assistance** | As noted in previous compliance reports, DOJ recognizes that some parts of the Agreement will take time to implement and may require changes to collective |

| | |
|---|---|
| | bargaining agreements, city code, and/or current city policies. DOJ remains committed to working with the City, PPA, and the Multnomah County District Attorney's Office to ensure Revised Directive 1010.10 is properly implemented. |

125.    Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witnesses and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB has had fewer lethal force events in the years since our investigation began. In this reporting period, PPB produced case files for two fatal OIS events. |
| | Incident 2017-B-0006, February 9, 2017: |
| | On February 9, 2017, PPB was involved in an on-duty, officer-involved shooting. *See* PPB_0196151-0197078.  The same day, PPB formally issued 17 CROs to the involved officer and witness officers.  *See* PPB_0196932-0196966.  The next morning, the involved officer provided a compelled interview to PSD consisting of candid answers to open, non-leading questions.  *See* PPB_0198132-0198155.  PPB properly kept the CROs in place until March 21, 2017, when the Multnomah County District Attorney's Office provided written notice that the Grand Jury found the lethal force justified and declined to indict.  *See* PPB_0196932-0196966, PPB_0197074. |
| | Incident 2017-B-0028, May 10, 2017: |
| | On May 10, 2017, PPB was involved in an on-duty, officer-involved shooting. *See* PPB_0161777-0163011.  The same day, PPB issued CROs to the involved and witness officers.  *See* PPB_0161788-0161791.  On direction of the Multnomah County District Attorney's Office, the involved officer did not provide a compelled interview to PSD until the conclusion of Grand Jury proceedings.  *See* PPB_0161785.  On June 23, 2017, the Grand Jury found the lethal force justified and declined to indict.  PPB properly rescinded the CROs the same day.  *See* PPB_0162945-0162949. |
| Technical Assistance | |

126.  PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Status | Substantial Compliance |
|---|---|
| Analysis | In both lethal force events, a witness officer provided an on-scene briefing sufficient to ensure the safe resolution of the events. *See* 2017-B-0006, PPB_0196251; 2017-B-0028, PPB_0162497.  In both cases, witness officers provided recorded interviews. *See* 2017-B-0006, PPB_0196315-0196761; 2017-B-0028, PPB_0162607-0162691.

PPB's incident files for these events are thorough and voluminous, identifying victims, suspects, and witnesses, and cataloging relevant evidence. *See generally* PPB_0157508-0164025, PPB_0196151-0197078. |
| Technical Assistance |  |

127.  In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| Status | Substantial Compliance |
|---|---|
| Analysis | In the two reported cases of fatal OIS events, PPB asked the involved officers to provide voluntary on-scene walk-throughs and interviews, and the officers declined.  *See* 2017-B-0006, PPB_0196256; 2017-B-0028, PPB_0162490.

The City has collaborated with the Multnomah County District Attorney's Office on protocols for responding to lethal force and in-custody death events.  PPB's policies and procedures include a requirement to ask involved officers in lethal force and in-custody death events to provide a voluntary, on-scene walk-through and interview. |
| Technical Assistance |  |

## C. Conduct of IA Investigations

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA.  Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Status | Partial Compliance |
|---|---|
| Analysis | As described above, the City has agreed to make its two systems for handling complaints—IPR and internal affairs—mirror one another in process and quality up through recommended investigative findings.  The City's proposed changes to |

| | PPB and IPR administrative investigations of alleged officer misconduct would enable the factual investigator (the entity most familiar with the facts) to propose findings. However, comprehensive accountability change is not yet complete. |
|---|---|
| | Based on the existing system, both PPB and IPR have authority to conduct administrative investigations, but there is a need for consistency in the policies that govern those investigations and in the training and skills of investigators. |
| | As the City stated in its ordinance seeking approval of amendments to other provisions of the Agreement, the parties have utilized the Ninth Circuit mediation process "to engage in meaningful discussions on how to move forward in the few key areas where progress toward substantial compliance has stalled." Ordinance Par. 59. Among these issues were "granting the City's investigative bodies (IPR and IA) the ability to make recommended findings based on its investigation." *Id.* |
| | DOJ reviewed a sample of administrative investigations by both IPR and IA. Based on the evidence presented in the investigations, DOJ found that all completed investigations were supported by a preponderance of the evidence. PPB wrote findings for all allegations presented that were not dismissed. |
| **Technical Assistance** | IPR and its investigators will benefit from training alongside IA investigators, which the City is undertaking with the assistance of outside subject matter experts, OIR Group. Joint training would help assure PPB's trust in the investigative reports and interviews that IPR produces. |

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | DOJ agrees with COCL that PPB's IA did not "decline"—summarily dismiss—any investigations. *See* 2017 COCL Rep. at 113. Filed complaints of excessive force resulted in findings after investigation. |
| | However, COCL's review of After Action Reports showed two instances of community members' statements that they believed that officers used excessive force. *Id.* COCL found that supervisors investigated this through an After Action Report, rather than immediately referring these to IA. *Id.* After Action Reports do not satisfy Paragraph 129's requirement for IA investigations resulting in findings. |
| | Of 102 allegations contained in multiple administrative investigations closed in the second quarter of 2017, PPB did not decline any. *See* Accountability Report for Cases Closed in 2nd Quarter 2017, July 9, 2017. |
| | Of 86 allegations contained in multiple administrative investigations closed in the first quarter of 2017, PPB did not decline any. *See* Accountability Report for Cases Closed in 2nd Quarter 2017, April 13, 2017. |

|  | Among all open force allegation investigations at the end of the second quarter, PPB did not decline any.  *See* PPB Use of Force Investigation Case List, July 9, 2017.  IPR declined one, 2017-C-0123, based on a complainant withdrawal.  *Id.* |
|  | Among all open force allegation investigations at the end of the first quarter, PPB did not decline any.  *See* PPB Use of Force Investigation Case List, April 21, 2017.  IPR declined one, 2017-C-0028, based on its finding of no misconduct. *Id.* |
| **Technical Assistance** | PPB should continue enforcement of SOP 19 to ensure that all allegations of excessive force are resolved. |
|  | DOJ agrees with COCL that a supervisor's duty to refer allegations of excessive force to IA should be part of the suggested comprehensive supervisory training.  *See* 2017 COCL Rep. at 113. |
|  | PPB should have a system to assure supervisors refer allegations of policy violation identified in After Action Reports for IA investigations and that IA initiates investigations. |

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | PPB has made progress in revising its retaliation directive and, with slight exception, has held officers accountable for discouraging complaints. |
|  | As COCL reports, PPB is currently in the process of revising its Directive 310.20 - Discrimination, Harassment and Retaliation Prohibited.  *See* 2017 COCL Rep. at 114.  The revised directive would prohibit retaliation to include: adverse conduct towards an individual, not otherwise authorized by law or policy, which is in response to an action taken or perceived to be taken by the individual, and conduct that would likely deter an individual from reporting or supporting a claim or harassment or discrimination may constitute retaliation, even if the underlying complaint of harassment or discrimination is not substantiated.  *See* Draft Directive 310.20 - Discrimination, Harassment and Retaliation Prohibited, revised July 12, 2017. |
|  | In last year's compliance assessment report, DOJ noted an allegation that a PPB Captain had discouraged the filing of a complaint.  *See* Memo from IPR Director to PSD CAPT, Feb. 1, 2016.  During this reporting period, PPB reported that there has been no administrative investigation of IPR's allegations regarding this event. |
| **Technical Assistance** | The City should expeditiously implement its revised retaliation policy.  The City also should investigate IPR's allegations regarding the Captain's discouraging the filing of a complaint. |

131. The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below:

> a. Currently, seven voting members of the PRB review use of force incidents, including two citizen members. When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members.

> b. The CRC slot on the PRB in use of force cases will rotate among the CRC membership so that different CRC members participate on the PRB. Within 60 days of the Effective Date, the Auditor shall develop a membership rotation protocol.

> c. All members participating in the PRB must maintain confidentiality and be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions and "just cause" requirements set forth in Portland City Charter, City rules, and labor agreements.

> d. All community members and CRC members must meet the following qualifications to participate on the PRB:

>> i. Pass a background check performed by the Bureau.

>> ii. Participate in Bureau training to become familiar with police training and policies, including the PRB process.

>> iii. Sign a confidentiality agreement.

>> iv. Participate in ride-alongs to maintain sufficient knowledge of police patrol procedures.

> e. Current city code provides that the City Auditor and the Chief have authority to recommend to City Council the removal of citizen members from the PRB pool.  Likewise, the City Auditor or Chief shall have authority to recommend to City Council removal of a CRC member from serving on the PRB.  The Chief or the City Auditor may recommend that City Council remove a community member or member of the CRC from the pool for the following reasons:

>> i. Failure to attend training;

>> ii. Failure to read Case Files;

>> iii. Objective demonstration of disrespectful or unprofessional conduct;

>> iv. Repeated unavailability for service when requested;

>> v. Breach of confidentiality;

>> vi. Objective demonstration of bias for or against the police; or

>> vii. Objective demonstration of conflict of interest.

> f. Removal from participation in the PRB shall not affect CRC membership.

> g. Like current PRB citizen members, CRC members serving on the PRB may serve in that capacity for no more than three (3) years.

> h. A CRC member who participates in a PRB review shall recuse himself/herself during any later appeal of the same allegation(s) to the CRC.

| Status | Partial Compliance |
|---|---|
| Analysis | As stated in prior compliance assessment reports, the City memorialized the requirements of Paragraph 131 in PPB Directive 336.00 (available at https://www.portlandoregon.gov/police/article/525753) and/or City Code 3.20.140 (available at https://www.portlandoregon.gov/citycode/article/479642).<br><br>COCL correctly points out an oversight in the drafting of City Code 3.20.140. *See* 2017 COCL Rep. at 114.  Paragraph 131(a) requires a CRC member sit on all PRBs concerning force.  *Id.*  City Code 3.20.140 defines these PRBs to include a slightly more restrictive subset of force allegations.  *Id.* |
| Technical Assistance | PPB and IPR should preserve the requirements of Paragraph 131 in their revised policies.  The City must conform City Code 3.20.140 to Paragraph 131(a) without limitation to type of force. |

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct.  The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB reports that its PRBs have not returned any administrative investigations for additional investigation from the third quarter of 2016 through the second quarter of 2017.  PPB Quarterly Update Report, Par. 132, Aug. 15, 2017.  DOJ also reviewed all PRB memos, which summarized the substantive discussions of PRB members, whether additional information was needed and what outcome, e.g., counseling or discipline, would be appropriate in each case. |
| Technical Assistance |  |

133. If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall:  (1) enter that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units ; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial finding creating a rebuttable presumption that the force used also violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the IA

investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB had no new civil liability findings during the past year that would have triggered the application of this provision. <br><br> In December 2016, PPB completed its IA investigation of the same civil claim described in our 2015 and 2016 compliance reports. *See* IA 2011-C-0237; PPB 11-050814; 2015 Settlement Agreement Compliance Status Assessment Report, at 76-78, ECF No. 105-1; 2016 Settlement Agreement Compliance Status Assessment, at 110, ECF No. 124-1. The underlying incident occurred in 2011 and involved three officers using force in arresting one subject. *See* IA 2011-C-0237. <br><br> As required by Paragraph 133(4), PPB reviewed the deposition and trial transcripts. IA 2011-C-0237, Investigative Report, at 3, July 18, 2016. PPB sustained an allegation of excessive force against one of the involved officers but did not sustain allegations of excessive force against the other two involved officers. IA 2011-C-0237, Findings Memo, July 18, 2016. The sustained allegation concerns unauthorized head strikes. PPB found another officer's use of four separate ECW cycles within policy. At the time the incident occurred, PPB's ECW policy 1051.00 did not bar using more than three ECW cycles unless exigent circumstances warrant, as required by Paragraph 68(f). *See* Directive 1051.00, Electronic Control Weapon System. That prohibition is now contained in Directive 1010.00, Use of Force, ¶ 6.4.4.2.1, effective Aug. 19, 2017. The officer, however, presented justification for each ECW applications, including, for the last one, the officer's perceived exigency based on the subject's attempt to hit another officer. IA 2011-C-0237 Findings Memo, at 9, July 18, 2016. The subject and the subject's attorney did not participate in the IA investigation. IA 2011-C-0237, Memo, September 27, 2016. IPR, PSD, and the Operations Branch Assistant Chief all agreed with PPB's findings. IA 2011-C-0237, Notice Letter, December 9, 2016. The subject did not seek an appeal of the finding with CRC. IPR email Sept. 20, 2017. Accordingly, any issues raised by this case are now resolved. |
| Technical Assistance | |

## D. CRC Appeals

134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.

| Status | Substantial Compliance |
|---|---|
| Analysis | As stated in prior compliance assessment reports, the City memorialized CRC membership expansion as required by Paragraph 134 in City Code 3.21.080 (available at https://www.portlandoregon.gov/citycode/article/479665). |
| Technical Assistance | |

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed.  The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted.  The additional request be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Status | Substantial Compliance |
|---|---|
| Analysis | As stated in prior compliance assessment reports, CRC's governing regulations reflect the requirements of Paragraphs 135 and 136.  The City Auditor adopted revised CRC regulations pursuant to its rule-making authority.  *See* PSFD 5.03, revised Nov. 20, 2015, available at https://www.portlandoregon.gov/citycode/?c=27455&a=9030.  The regulations provide that CRC "may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence." |
| Technical Assistance | IPR should report its compliance with relevant parts of the Agreement quarterly, as does PPB. |

**E. Discipline**

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| Status | Partial Compliance |
|---|---|
| Analysis | As stated in last year's compliance assessment report, PPB has given effect to current Directive 338.00, which implements PPB's Discipline Guide (available at |

|  | http://www.portlandoregon.gov/police/article/488981?), but only for cases that PPB has appropriately investigated. |
|  | PPB's corrective action memoranda indicate that RU managers consult PPB's Discipline Guide in making corrective action recommendations. |
|  | Corrective action memoranda that PPB provided show that supervisors report referring to the Guide when recommending corrective action for sustained findings.  In some cases, supervisors further articulate consideration of aggravating and mitigating circumstances.  Similarly, in PRB report memoranda, authors discuss discipline classification in accordance with the Guide and PRB members' consideration of aggravating and mitigating factors. |
|  | The City has deviated from the Discipline Guide in at least two cases concerning PPB executives.  In the first case, PPB sustained findings that an executive who was in charge of internal affairs failed to investigate allegations of misconduct. PPB IA 2016-C-0030.  The former Chief categorized the allegation as fitting within category E of the Guide and recommended discipline within the presumptive range according to the Guide.  Yet, the City changed the discipline to the mitigated level without a change in facts as a basis for this mitigation.  *Id.* In the second case, PPB sustained an allegation against the same executive also for a category E allegation.  PPB 2016-B-0011.  The City imposed the same level of discipline on that executive, though the Guide requires progressive discipline and the imposed discipline was below the level permitted for a second violation of a category E allegation.  *Id.*  In the same investigation, but concerning a different PPB executive, PPB sustained findings that the executive had retaliated against a PPB employee for alleging misconduct by another employee, and that the executive had failed to report alleged misconduct.  *Id.*  In response to the sustained findings for two violations, PPB approved a three-day suspension, but instead of imposing the suspension, the City promoted the executive and permitted the executive to retire.  *Id.*  Promotion deviated from the Guide's range of outcomes for any category of allegation. |
| **Technical Assistance** | The City must ensure adherence to the established and required processes for using the Discipline Guide and PRBs, which are necessary to hold members uniformly accountable. |

## F. Communication with Complainant and Transparency

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action.  The City Attorney's

Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Status | Substantial Compliance |
|---|---|
| Analysis | DOJ agrees with COCL that IPR has substantially complied with the communication requirements of Paragraphs 138-140. *See* 2017 COCL Rep. at 116-117. |
| | As stated in prior compliance assessment reports, IPR's website allows complainants to check the status of their complaints by entering their complaint number. *See* http://www.portlandonline.com/auditor/index.cfm?c=64452. The next business day, an IPR staff member will email the complainant a status update. Auditor Interview, August 17, 2016. However, state law permits IPR to provide relatively limited information. IPR also gives community members access to items that the complainant has provided to IPR and the transcript of the complainant's interview, if one exists. *See* COCL Compliance Report, January through June 2016, at Par. 139; Auditor Interview, August 17, 2016. |
| Technical Assistance | PPB and IPR should preserve the requirements of Paragraphs 138-140 in their revised policies. |

## IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD

There is significant community and City interest in improving PPB's community relationships. The community is a critical resource. Redefining and restructuring existing community input mechanisms to provide for independent oversight of the Agreement, while also enhancing PPB's current community outreach efforts will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety. To achieve this outcome, at a minimum, PPB shall implement the requirements below.

141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Community Oversight Advisory Board ("COAB"), within 90 days of the Effective Date of this Agreement. The COAB shall be authorized to:

(a) independently assess the implementation of this Agreement;

(b) make recommendations to the Parties and the COCL on additional actions;

(c) advise the Chief and the Police Commissioner on strategies to improve community relations;

(d) provide the community with information on the Agreement and its implementation;

(e) contribute to the development and implementation of a PPB Community Engagement and Outreach Plan ("CEO Plan"); and

(f) receive public comments and concerns.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | During the past year, it became apparent that the COAB framework was not achieving the goals of the Agreement.  Accordingly, the City ceased its efforts to maintain COAB and instead proposed a new framework for community engagement: the Portland Committee on Community-Engaged Policing ("PCCEP").<br><br>The City's PCCEP proposal addresses shortcomings with the COAB model in a number of ways.  As with COAB, PCCEP will have authority to "independently assess the Settlement Agreement."  *See* City of Portland Plan for Portland Committee on Community-Engaged Policing (PCCEP), Section II.  In contrast with COAB, the membership of PCCEP will be smaller, comprised of "a diverse group of between nine and eleven mayoral-appointed volunteers."  *See* City of Portland Plan for Portland Committee on Community-Engaged Policing (PCCEP), Section III.<br><br>Stakeholders collectively agreed that the selection process, as well as the lack of orientation and training on the front end, created a weak foundation for COAB.  COAB's 20 members were selected through various means, leading to confusion and stagnation following the removal or resignation of a COAB member.  In response to that feedback, the City has proposed a more centralized vetting and selection process for PCCEP.  The Mayor will appoint PCCEP's volunteers.  The Mayor, in consultation with other Council offices and a community panel, will develop criteria and public outreach strategies for PCCEP's member selection process.<br><br>The PCCEP proposal contemplates more extensive and formalized training for new members.  Prior to the first PCCEP meeting, members will learn about the history of the Settlement Agreement, attend the PPB community academy, participate in a ride along with PPB, review lessons learned from COAB, receive subject matter and Committee trainings, and learn about PPB's structures and processes.<br><br>The PCCEP proposal also more clearly defines the City's responsibility for ensuring PCCEP's success.  Beyond administrative support and training, the PCCEP plan lays out other duties and responsibilities of the City.  For example, the City will seek the services of an organizational development consultant to structure Committee orientation, and provide resources for member training as needed throughout PCCEP's existence.<br><br>At times, COAB struggled to navigate the particulars of both public meetings and public records laws.  To address this challenge, PCCEP will not be required to open all meetings to the public.  Community input regarding experiences with and perceptions of PPB's community outreach will be solicited through round tables, quarterly town halls, and consultation with Portland's various organizations and commissions.<br><br>Responsibility for the success of COAB was more diffuse than responsibility for the success for PCCEP.  For example, whereas COCL was required to consult with DOJ prior to removing a COAB member, the City's proposal gives the |

| | Mayor sole discretion to remove a PCCEP member. The same vetting and selection process described above will be used to replace vacancies on the Committee. |
|---|---|
| | Moreover, the City is also required to be more responsive to PCCEP recommendations and requests. The City is required to provide thorough and timely responses to PCCEP recommendations and requests for information and shall endeavor to do so within 60 days. And unlike COAB, which worked to review policies independently and send feedback to DOJ, PPB will be required to meet with PCCEP during a universal review period, to brief PCCEP on policies, and to solicit PCCEP input. |
| | Finally, whereas COAB was not designed to endure beyond the life of the Settlement Agreement, PCCEP is intended to provide permanent police oversight and community engagement. |
| **Technical Assistance** | The City should proceed to implement its new community police oversight body once the changes to the Agreement take effect. |

142. Membership of the COAB shall be comprised of fifteen (15) voting members, five (5) advisory members, and the COCL.

    a. The 15 voting members and the five advisory members shall be selected as follows:

        i. Each member of City Council will select one representative to serve on the COAB, for a total of five voting representatives;

        ii. The chair of the Human Rights Commission shall designate one Human Rights Commissioner to serve on the COAB;

        iii. The chair of the Portland Commission on Disability shall designate one Commissioner on Disability to serve on the COAB;

        iv. The chair of the Human Rights Commission and the chair of the Portland Commission on Disability shall jointly select three community members to serve as representatives of the mental health community on the COAB, after soliciting and reviewing applications from the public. These three COAB members will possess demonstrated expertise in the field of mental health in the form of either: (a) certification as a Qualified Mental Health Professional; or (b) no less than ten (10) years of demonstrated service to persons with mental illness. These three selections shall be completed within 60 days of the COCL selection.

        v. The community-at-large will select five voting representatives directly from the community. The process used for this selection is discussed in Paragraph 145 herein; and,

        vi. The Chief will select a diverse group of five sworn officers within various ranks to serve as advisors and non-voting members of the COAB, and may consider whether the officer resides in Portland ("Advisory Members").

    b. The COAB's membership will come from a reasonably broad spectrum of the community, such as: areas of expertise, advocacy experience, community involvement, profession, education, race, ethnicity, gender, gender identity, sexual orientation, national origin, age,

religion, mental or physical disability and geographic identification. COAB members, including Advisory Members, must live, work, worship, or attend school in the City of Portland. COAB members shall not have an actual or perceived conflict of interest with the City of Portland.

143. The 15 voting members of COAB are independent of the City and PPB and shall not be currently employed by the City.  Members must agree to serve for a minimum of a two-year term, and may be reappointed for one additional year.  The COAB may create an executive committee or other subcommittees, as appropriate, to accomplish the tasks designated to it under this Agreement.  The City shall provide administrative support so that the COAB can perform the duties and responsibilities identified in this Agreement.

144. The COAB shall report to the COCL. The COCL will chair the COAB, preside over COAB meetings, take and count votes, and perform such other activities as are necessary for the efficient operation of the COAB. If the COCL determines that a COAB member is no longer fit to serve on account of misconduct, the COCL shall consult with DOJ prior to removing such member. Following the removal of a COAB member, an alternative shall be selected from the same pool of applicants as the removed COAB member.

145. Selection of the five (5) community voting members shall be made as follows:

a. Each neighborhood coalition in Portland may propose a candidate for membership on the Committee.  Any other non-profit organization within the City may also propose a candidate for membership.  Any other person who lives, works, or is enrolled in school in Portland and is over the age of 15 may be considered provided they provide the City with the names of 50 verified residents over the age of 15 of the City of Portland who support his or her nomination;

b. The City shall widely advertise and hold a public meeting where previously nominated candidates will be selected. Any Portland resident is welcome to attend and participate in the selection process.  The City will publicize the meeting throughout all the various communities of Portland;

c. At the public meeting, candidates will be given an opportunity to speak and ask for support. In their statements, candidates must indicate whether they live, work, worship, and/or attend school within the City of Portland;

d. Attendees at the public meeting and will be asked to select their choice of candidates;

i. If there are ten or fewer candidates, then the attendees present will select the top five candidates receiving the most votes;

ii. If there are more than ten candidates, a preliminary vote will be taken and the top ten candidates receiving the most votes will be selected and a second vote will be taken to reduce the number to the five persons that will serve on the COAB;

iii. The next two candidates who receive the most votes shall be identified as potential alternates, should a COAB member be removed or incapacitated; and,

iv. Because the number of persons who may be interested in participating in this process is unknown, the City may adopt other procedures necessary to conduct the meeting and to carry out the intent of these provisions.

e. This process of selecting the five community members shall be completed within 60 days of the COCL selection.

| Status | **Partial Compliance** |
|---|---|
| Analysis | See analysis for Paragraph 141. |
| Technical Assistance | |

146. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan:

a. Within 90 days of the COAB selection, the City, in consultation with COAB, will conduct a reliable, comprehensive, and representative survey of members of the Portland community, including civilians and PPB officers, regarding their experiences with and perceptions of PPB's prior community outreach efforts and accountability efforts and where those efforts could be improved, to inform the development and implementation of the CEO Plan;

b. COAB, in conjunction with PPB, shall consult with community members (not only through PPB Advisory Councils and Roundtables) and hold at least two (2) public hearings, completed within 90 days of the COAB selection, in addition to the representative survey described above, to gather public input on PPB's outreach efforts; the hearings shall be held in locations to ensure that PPB receives input from all parts of the Portland community;

c. COAB shall review PPB's prior community outreach efforts to contribute to the development of a new CEO Plan;

d. COAB shall solicit and consider input from the Human Rights Commission's Community Police Relations Committee ("CPRC"), including its work to implement the 2009 PPB "Plan to Address Racial Profiling";

e. Within 60 days of the anticipated due date for survey results, the COAB and PPB, in consultation with the appropriate City resources knowledgeable about public outreach and survey analysis, shall review and analyze the results of the survey and other public comments discussed above;

f. The CEO Plan shall include strategies to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members. The Plan shall also identify gaps in available resources to achieve its goals.

g. The COAB may also provide information to the PPB on other areas related to community engagement and outreach to contribute to the development of the CEO Plan, including:

i. integration of community and problem-oriented policing principles into PPB's management, policies and procedures;

ii. recruitment, selection, training, promotion, and personnel evaluations;

iii. tactics and deployment of resources; and

iv. systems of accountability.

g(2). COAB shall submit its recommended CEO Plan to the Chief, in writing, within 90 days of the COAB's completion of survey analysis.

77

h. The Chief's Office, in consultation with the five PPB advisory members of the COAB shall utilize the COAB's recommendations in developing and implementing the CEO Plan. The Chief's Office shall present the final proposed CEO (with implementation timeline) to the COAB for a vote of approval within 240 days of the effective date of this Agreement.

| Status | **Partial Compliance** |
|---|---|
| Analysis | While PPB is responsible for the CEO Plan required by Paragraph 146, PPB can accomplish this task only with coordination from COAB and City staff who work on neighborhood involvement issues. Progress towards the development of a CEO Plan was therefore halted this year due to the City placing COAB on a 60-day hiatus from August through October of 2016, and disbanding the Board in January 2017. |
| | Despite the absence of COAB, the Bureau took steps to centralize community engagement efforts. PPB reports it has developed a Community Engagement Unit, which will initially be staffed by a full-time PPB officer and a Community Liaison Program Manager. An intern from PSU's Masters of Social Work program has been developing a structure for a Youth Advisory Council. |
| | Additionally, PPB reports involvement in multiple community events and programs, including a week-long Spring Break Youth Basketball Camp, Coffee with a Cop, and the Slavic Information Fair. PPB also provided a variety of assistance to help those in need during the historic cold snap and snowstorm in January 2017. |
| | The City also worked to fulfill requirements of Paragraph 146(a) by continuing to collect community perspectives. In December 2016, after the last compliance report, the City's contractor, Davis, Hibbitts, and Midghall, completed and updated the community survey. *See* http://www.cocl-coab.org/sites/default/files/City%20of%20Portland%20Community%20Policing%20Survey%20Fall%202016--00482--FINAL%20Repor....pdf. |
| Technical Assistance | PPB should continue engaging in and documenting community outreach efforts pending finalization of the community board format. |

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, together with the COAB, may develop outreach and policing programs specifically tailored to the residents of the precincts.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and provide such information to the CPRC to contribute to their analysis of community concerns regarding discriminatory policing. In consultation with the COAB and CPRC, PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| Status | **Partial Compliance** |
|---|---|
| Analysis | See analysis for Paragraph 141. Because the City's framework for community engagement is in flux, DOJ can evaluate only part one of both Paragraphs 147 and 148. Pursuant to Paragraph 147, PPB provided demographic tables for different precincts as |

| | supporting documents in 2016 Q4.  PPB continues to "collect appropriate demographic data for each precinct," including information related to race/ethnicity, gender, age, economic status, disability, education, and housing.  Likewise, PPB continues to gather demographic data regarding the subjects of police encounters, and to report this data quarterly and annually on its website.  *See* Stops Data Collection, *available at* https://www.portlandoregon.gov/police/65520. |
| --- | --- |
| | These data collection efforts are consistent with the requirements of Paragraphs 147 and 148. |
| **Technical Assistance** | PPB should continue collecting and documenting appropriate demographic data pending finalization of the community board format. |

149. The COAB, COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach.

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities.  A draft of the Annual Report shall be reviewed by the COAB before the report is finalized and released to the public.  Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

151. The COAB may make recommendations approved by a majority of its membership regarding implementation of the terms of this Agreement.

152. The COAB shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The COAB shall also provide the opportunity for public comment at each of its meetings to keep open lines of communication with the public-at large.

153. A representative of the Oregon U.S. Attorney's Office shall be invited to attend all COAB meetings.

154. COAB shall meet as needed to accomplish their objectives as set forth in this Agreement.  All COAB meetings shall be open to the public.  In addition, COAB shall attend quarterly meetings with the COCL as provided in Par 163.  To the extent that COAB meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the COCL to ensure compliance with those laws and agrees to represent COCL in any challenges regarding compliance with those laws.

155. The City shall provide COAB members with appropriate training necessary to comply with requirements of City and State law.

| Status | **Partial Compliance** |
|---|---|
| Analysis | See analysis for Paragraph 141. |
| Technical Assistance | |