# EXHIBIT B

I hereby certify this document to be a complete and exact Copy of the original as the same appears on file and of Record in my office and in my care and custody on this 10th day of April 2018.　　Mary Hull Caballero

Auditor of the City of Portland

By *Susan Parsons*
　　　　*Deputy*

## ORDINANCE No.　1 8 8 5 6 9　As Amended

*Adopt revised Post Deadly Force Procedures for Police Bureau including requirement for prompt compelled statements by involved officers; authorize and direct City Attorney to pursue legal proceedings to validate that requiring compelled statements will not preclude ability to criminally prosecute  (Ordinance)

The City of Portland ordains:

Section 1.  The Council finds:

1.　Trust between law enforcement agencies and the people they protect and serve is essential in a democratic society.

2.　Procedural justice must be the guiding principle for the policies that govern the interactions between Portland Police Bureau (PPB) and those it serves, and the work of PPB officers.

3.　Effective and transparent accountability systems are necessary to build public trust in PPB and achieve legitimacy.

4.　The City Council is entrusted with the ultimate responsibility for ensuring that PPB carries out its responsibilities in accordance with policies that reflect community values and fulfill constitutional requirements.

5.　The City, the community and PPB officers share an interest in ensuring that any police use of force is constitutional; is no greater than necessary to accomplish a lawful objective; is properly documented and reported; and is properly investigated, reviewed, evaluated and if necessary remedied.

6.　The need for thorough and prompt investigations of use of force is particularly acute in cases involving the use of deadly force and the death of an individual while in police custody.

7.　All uses of deadly force and in-custody deaths must be investigated promptly and with the utmost thoroughness and impartiality to determine whether officers' actions comport with the law and with PPB policies and training.

8.　Following a use of deadly force by an officer, two separate investigations are conducted.  A criminal investigation is conducted to determine if the use of force violates any criminal law.  An administrative investigation is also conducted to determine if the use of force comports with City and PPB policies and training.

9.　Under Oregon law, criminal death investigations shall be conducted under the direction of the District Attorney for the county where the death occurs.  ORS 146.095(1) and ORS 146.100(1).  Such investigations can

188569

ultimately result in criminal prosecution if criminal wrongdoing is found to have occurred.

10.    It is the policy of the City that all employees must comply with all criminal laws in carrying out their employment responsibilities.  Should any employee, including any police officer, commit a crime, the City believes that employee should be subject to criminal prosecution to the full extent of the law.

11.    The City's administrative investigation is conducted by the Internal Affairs Division of the Professional Standards Division of the Portland Police Bureau.  The purpose of the administrative investigation is to determine if the City's employee (the involved officer) followed City policies and training in connection with the use of deadly force.  The administrative investigation can ultimately result in discipline up to and including the termination of employment if the officer is found to have violated City and PPB policies and/or training.

12.    Pursuant to City work rules and the collective bargaining agreement between the City and the Portland Police Association, an officer can be compelled to answer questions in an administrative investigation and, depending upon the circumstances, an officer's refusal to do so can itself form the basis for discipline up to and including termination.

13.    Police officers, like all people in the United States, have constitutional rights including the right against self-incrimination.  The United States Supreme Court has held that it violates the right against self-incrimination for an officer to be compelled to answer questions in an administrative investigation under the threat of potential termination of employment, and have those compelled statements used against them in a criminal prosecution.  *Garrity v. State of New Jersey*, 385 US 493 (1967).

14.    The Oregon Court of Appeals analyzed the Oregon constitutional right against self-incrimination in *State v. Soriano*, 68 Or App 642 (1982), in a decision later affirmed by the Oregon Supreme Court.  *Soriano* did not involve a police officer facing both an administrative and criminal investigation, but did hold that an individual could not be compelled to give grand jury testimony without receiving complete immunity from prosecution for any crimes connected to the testimony.

15.    The Multnomah County District Attorney has asserted  that under *Soriano*, the Oregon courts could hold that it would violate an officer's right against self-incrimination under Article I, Section 12, of the Oregon Constitution to compel the officer to give a statement in an administrative investigation prior to the conclusion of any criminal proceedings, even if that statement is kept fully separate from the criminal investigation, and could further hold that such a compelled administrative statement entitles the officer to full immunity from prosecution.

188569

16.    The Multnomah County District Attorney has made that position known in part through the memorandum attached as Exhibit A, as well as in verbal communications to the City.

17.    Other lawyers, including the National Lawyers Guild, Portland, Oregon Chapter and the American Civil Liberties Union of Oregon, have carefully analyzed the issue and have concluded that it is possible to legally conduct concurrent criminal and administrative investigations without violating an officer's constitutional rights so long as the City's administrative investigation is kept wholly separate from the criminal investigation overseen by the District Attorney.  The National Lawyers Guild, Portland, Oregon Chapter's Legal Memorandum is attached hereto as Exhibit A-1. The American Civil Liberties Union of Oregon testimony is attached hereto as Exhibit A-2.

18.    The Portland City Attorney has reviewed these legal analyses and acknowledges that the law on this issue is not entirely clear.  The City Attorney believes, however, that the Oregon courts would affirm that there is a compelling public interest in a prompt and timely administrative investigation to determine whether an officer who has used deadly force resulting in death violated any City or PPB policies or training.  The City Attorney believes that other Oregon appellate court authority, such as *State v. Buegli*, 126 Or App 290 (1994), and the great weight of federal constitutional law support the reasonable position that a concurrent administrative investigation can be conducted in a manner that preserves and protects the constitutional rights of the involved officer.

19.    Specifically, the City can keep administrative employment investigations conducted by the Professional Standards Division of PPB wholly separate from the criminal investigation overseen by the Multnomah County District Attorney, and thereby comply with all applicable state and federal standards and officers' constitutional rights.

20.    The Portland Police Bureau should implement Post Deadly Force Procedures that both comply with all state and federal statutory and constitutional standards, and also further the City's compelling interests in ensuring that, in the event an officer uses deadly force in a manner that may constitute both a violation of policy and a crime, that officer could be both criminally prosecuted and disciplined or terminated as appropriate.

21.    Given the gravity of the use of deadly force by police officers resulting in death, and the different legal interpretations which have been advanced regarding the effect of a prompt compelled administrative interview on the District Attorney's ability to criminally prosecute in the event of criminal wrongdoing, it is in the City's interest to seek court resolution of these legal issues.

188569

NOW, THEREFORE, the Council directs:

a.   The Portland Police Bureau shall implement forthwith the Post Deadly
     Force Procedures attached hereto as Exhibit B.

b.   The City Attorney is authorized and directed to file and pursue to
     conclusion through all levels of appeal appropriate legal proceedings, and
     to join all appropriate parties, to seek a judicial determination that
     compelling police officers to provide administrative statements as
     provided in Exhibit B does not afford the officers transactional immunity
     from criminal prosecution.

Section 2.  The Council declares that an emergency exists because the Bureau is
implementing and training on a new Directive 1010 governing use of force, and this
Directive 1010.10 must also be implemented to serve the City's compelling interest in
prompt administrative investigations.

Passed by the Council:     AUG 2 4 2017          **Mary Hull Caballero**
                                                Auditor of the City of Portland
                                                By
Commissioner:  Mayor Wheeler
               Commissioner Fish
Prepared by:   Tracy Reeve                                        Deputy
Date Prepared:  08/15/17

City of Portland
                                                Exhibit B, Pg. 4 of 45

945

Agenda No.

**ORDINANCE NO.** 188569 **As Amended**
Title

> *Adopt Revised Post Deadly Force Procedures for Police Bureau Including Requirement for Prompt Compelled Statements By Involved Officers; Authorize and Direct City Attorney to Pursue Legal Proceedings to Validate that Requiring Compelled Statements Will Not Preclude Ability to Criminally Prosecute. (Ordinance)

| INTRODUCED BY | CLERK USE: DATE FILED  AUG 15 2017 |
|---|---|
| Commissioner/Auditor:<br>**Mayor Wheeler**<br>**Commissioner Fish** | |
| **COMMISSIONER APPROVAL** | Mary Hull Caballero<br>Auditor of the City of Portland |
| Mayor—Finance and Administration - Wheeler  KC | |
| Position 1/Utilities - Fritz | By: _____ |
| Position 2/Works - Fish  SN8 for Nick Fish | Deputy |
| Position 3/Affairs - Saltzman | |
| Position 4/Safety - Eudaly | ACTION TAKEN: |
| **BUREAU APPROVAL** | |
| Bureau: City Attorney's Office<br>Bureau Head: Tracy Reeve | |
| Prepared by: T. Reeve<br>Date Prepared: 08/15/17 | |
| Impact Statement<br>Completed ☒   Amends Budget ☐ | |
| Portland Policy Document<br>If "Yes" requires City Policy paragraph stated in document.<br>Yes ☒   No ☐ | |
| **City Auditor Office Approval:**<br>required for Code Ordinances | |
| **City Attorney Approval:**<br>required for contract, code, easement,<br>franchise, comp plan, charter | |
| Council Meeting Date  08/24/17 | |

| AGENDA  1of2 8/24 |
|---|
| **TIME CERTAIN** ☒<br>Start time: **2:00**<br><br>Total amount of time needed: **1.5 hours**<br>(1 of 1 items)<br>(for presentation, testimony and discussion) |
| **CONSENT** ☐ |
| **REGULAR** ☐<br>Total amount of time needed:<br>(for presentation, testimony and discussion) |

| FOUR-FIFTHS AGENDA | COMMISSIONERS VOTED<br>AS FOLLOWS: | | |
|---|---|---|---|
| | | YEAS | NAYS |
| 1. Fritz | 1. Fritz | ✓ | |
| 2. Fish | 2. Fish | ✓ | |
| 3. Saltzman | 3. Saltzman | ✓ | |
| 4. Eudaly | 4. Eudaly | ✓ | |
| Wheeler | Wheeler | ✓ | |

188569
Exhibit A



# Rod Underhill, District Attorney

**1021 SW Fourth Avenue, Room 600**
**Portland, OR 97204-1193**
**Phone: 503-988-3162  Fax: 503-988-3643**
**www.mcda.us**

I hereby certify this document to be a
complete and exact Copy of the original as
the same appears on file and of Record in my
office and in my care and custody on this
10th day of April 2018.
Mary Hull Caballero
Auditor of the City of Portland
By *Susan Parsons*
                                    Deputy

# M E M O R A N D U M

| | |
|---|---|
| **To:** | Rod Underhill |
| **From:** | **Ryan Lufkin** |
| **cc:** | Don Rees |
| **Date:** | 3/27/17 |
| **Subject:** | Analysis of Immunity in Compelled Statements of Public Employees |

**Executive Summary:**

Officer involved use of force events where death or serious physical injury occur are tragic events that deeply impact individuals, family members and the community. In Multnomah County when a law enforcement officer is involved in the use of force and either death or serious physical injury occur an immediate criminal investigation of the involved police officer(s) conduct begins.

Across the country, the public sees events surrounding an officers use of force that erode the public's faith in the criminal justice system's ability to conduct a fair and independent investigation. The public questions, now more than ever, the independence of those investigating the conduct of the officers and those conducting the prosecution review of the event. Officer involved use of deadly force investigations are complex and involve the intersection of a number of important concepts including the need for a complete and thorough investigation, a fair and impartial assessment of the law and facts, the public's undeniable interest in ensuring responsible transparency in police work, employment implications to the involved officer(s) and the constitutional rights of the involved officer(s). It is important to understand the law and the process of how investigations into these extremely important situations occur and what appropriate options are available for policy makers concerning the investigation of the use of force.

Whenever an officer involved use of force event occurs that results in death or serious physical injury and the scene has been secured, police will notify the District Attorney's Office. Where a death has occurred, Oregon statutes provide that "[t]he district medical examiner and the district attorney for the county where death occurs…shall be responsible for the investigation of all deaths requiring investigation. ORS 146.095(1). Further, '[d]eath investigations shall be under the direction of the district medical examiner and the district attorney for the county where the death occurs. ORS 146.100(1).

March 27, 2017

In addition to the notification to the District Attorney's Office the involved officer(s) will have legal counsel and union representative respond to the scene. Homicide unit detectives will be assigned and will begin an investigation of the shooting. Further, the involved agency's internal affairs unit will open an investigation into the agency's practices, policies and orders (non-criminal administrative investigation) to determine, for example, whether the involved officer(s) complied with internal policies and/or orders.

Within hours, the following personnel are frequently present at the scene:

* Involved officer(s)
* Witnesses
* Homicide Unit Detectives
* District Attorney representative(s)
* Medical Examiner Personnel
* Medical Personnel
* Command staff of the involved Police Agency
* Union representatives for the involved officer(s)
* Lawyers for the involved officer(s)
* Internal Affairs Unit Detectives (Administrative Investigation)
* Mayor's Office Personnel
* Media
* Community members

**Separation of the Criminal Investigation from the Administrative Investigation**

Recently, and with more frequency, it has been suggested, or indeed has been implemented, that the involved officer(s) should be compelled, induced, ordered or otherwise forced to provide an immediate, or close in time to the event, statement about what occurred surrounding the officer(s) use of force. This "statement" includes not only verbal answers from the involved officer(s) but also other forms of furnishing evidence. This analysis intends to address these concepts and explain the intersection of Oregon law and the legal ramifications of following suggestions or practices of compelling, inducing, ordering or otherwise forcing an involved officer to make a statement.

An involved officer, like any other Oregonian, has inalienable rights under the Oregon and United States Constitution. Oregon law is extremely clear that a public servant, including a police officer, does not forfeit their Constitutional protections when they perform the duties of a law enforcement officer. Central to this discussion is understanding that under Oregon and federal law, as it relates to a criminal investigation, a police officer has a right not to incriminate themselves and not to be forced to provide evidence that may be used against them. Violation of this "right to remain silent" by forcing the police officer to speak with the threat that if they do not they will suffer an adverse consequence to their employment (through the Administrative Investigation), has been the subject of much litigation.

March 27, 2017

Courts (detailed legal analysis below) have analyzed the criminal investigation consequences for violating an officer's right to remain silent and compelling either a statement or the furnishing of evidence include one, or more, of the following:

1) Use immunity
    The officer's statements or furnishing of evidence cannot be used against them
2) Use and derivate use immunity
    The officer's statements or furnishing of evidence and any evidence discovered tied to those statements or evidence cannot be used against them
3) Transactional immunity
    The officer cannot be criminally prosecuted for the use of force

Use immunity alone has been eliminated as an appropriate sanction by the Court for the violation of an individual's right to remain silent. Thus, the minimum realistic sanction the State will incur as a result of violating an officer's right to remain silent is to lose all evidence gathered after the statement, or other furnishing of evidence, was compelled unless the State could prove that the evidence was derived wholly independently from the statement. Finally, the most significant sanction that the Court could impose is that the officer could not be prosecuted for any criminal offense, including a homicide, related to the compelled statement.

This analysis will examine the practical implications of the minimum realistic sanction – use and derivative use immunity.

Most proposals for compelling officers to make a statement or otherwise furnish evidence focus on the understandable desire to have responsible transparency regarding the event and to disseminate information to family members of the deceased and the general public as soon as practicable. That is, the involved officer(s) should be ordered and/or compelled to provide a statement or otherwise furnish evidence about what happened surrounding the officer's use of force to help satisfy that need to know. This statement, in turn, could be provided to the family of the deceased, the public and the media to aid in ensuring responsible police transparency. Proponents also believe that the officer's memory will be most thorough and complete shortly after the event.

March 27, 2017

Providing this information to the family of the deceased, the community and the media would make any argument that the criminal investigation did not rely on those compelled statements or other forms of furnishing evidence in formulating its criminal investigation absolutely impossible. The only way to prove that every piece of evidence that followed a compelled statement was not tainted by the contents of the compelled statement is to ensure that the investigation team had no contact with, or knowledge of, any of the content of the compelled statements. Obviously if those statements are made public, that would not be the case. Thus, as it relates to the criminal investigation, we can anticipate that all evidence would be suppressed by the Court since all evidence would be collected well after this initial compelled statement is demanded of the officer. With all evidence suppressed by the Court, the practical consequence is that even the use and derivative use immunity sanction would result in a complete inability to successfully prosecute a criminal case.  Further, even if the compelled statements are not released to the deceased family members or to the public but, instead, were "walled off," Oregon case law has determined that that effort is "impossible" to achieve and will be discussed further below.

If the initial statement is compelled and not provided to the public then its utility in providing responsible transparency to police work is greatly diminished. Further, the criminal investigative team must now be segregated from the internal administrative investigation team and no information that the internal administrative investigation team collects must reach any personnel that will have contact with the criminal investigation team. For example, the involved agency's Police Chief should not know the nature or content of the compelled statements since the Police Chief would have contact with the criminal investigation team. It is important to note that this is already the current practice of police shooting investigations in Multnomah County.

Second, this analysis addresses the more significant consequence that could occur as a result of a violation of the officer's right to remain silent – transactional immunity

Transactional immunity is the complete immunity from prosecution for criminal offenses related to the compelled statements. Since 1984, the Oregon Supreme Court has endorsed the view that Article I, Section 12 of the Oregon Constitution requires transactional immunity as a substitute for an individual's right to remain silent. In the absence of providing transactional immunity, the court may impose sanctions as a consequence of violating an individual's right to remain silent. This was reinforced as recently as 2010.

March 27, 2017

Thus, the fundamental problem with the desire to force an officer to provide a statement is both a practical and a legal one. Legally, violating an officer's right to remain silent <u>will</u> result in a criminal investigation sanction that, at a minimum, will suppress all evidence that the State cannot prove was obtained wholly independently of the tainted statements. At maximum, the criminal investigation sanction will provide the officer complete immunity from prosecution. Practically, the criminal investigation team cannot erect a wall between the criminal investigation and the internal administrative investigation if, for example, the very first thing that occurs is a compelled statement that is made available for public consumption or otherwise becomes known to criminal investigators. In conclusion, it would be wholly inadvisable to implement a policy or practice that would make the prosecution of a potential homicide committed by a police officer impossible. The nature and degree of just how impossible it would be (eg. use and derivative use immunity vs. transactional immunity) seems to be missing the forest through the trees – either would create an intolerable result in an event where a homicide by a police officer goes unprosecuted.

City of Portland
Exhibit B, Pg. 10 of 45

March 27, 2017

Finally, this entire scenario is predicated on the idea that an officer, who just committed a possible homicide, would choose to speak under threat of their employment. However, the threat to the officer's employment is entirely nonexistent for the specific conduct of refusing to provide a statement. The Oregon Supreme Court has made it abundantly clear that sanctions imposed for refusing to speak, absent a sufficient grant of immunity, are intolerable and will be reversed. Thus, there is no real risk to the officer when presented with the ultimatum to speak or be sanctioned – it should be anticipated that the sanction will not be sustained. A simple outcome chart may help explain these concepts:

Attempting to compel a statement

| Event | Result of threat | Info gained? | Info to public? | Punish officer? | Punishment Sustained? | Immunity? | Case still prosecutable[1]? |
|---|---|---|---|---|---|---|---|
| * Officer refuses to speak on scene | Officer still chooses not to speak | No | No | Yes | No | N/A – no statements obtained | Yes |
| * Officer refuses to speak on scene | Officer chooses to speak | Yes | No | No | N/A | Yes | Yes – provided all info stays only with IA team |
| *Officer refuses to speak on scene | Officer chooses to speak | Yes | Yes | No | N/A | Yes | No |
| *Officer chooses to speak on scene | N/A – No threat needed | Yes | Yes | N/A | N/A | No | Yes |

---

[1] Prosecutable: Distilling the information from this memo it should be clear that either use and derivative use immunity or transactional immunity would practically result in the near impossibility of prosecuting the officer

City of Portland
Exhibit B, Pg. 11 of 45

March 27, 2017

## Summary of Oregon and Relevant Federal Caselaw

After a review of case law concerning transactional immunity in Oregon and after consultation with the Oregon Attorney General's Office, it is clear that the problem first identified by the US Supreme Court in Garrity v New Jersey, 385 US 493 (1967) remains a significant impediment to threatening discipline of a public employee to compel speech as part of an investigation. In Garrity, the United State Supreme Court held, "There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price…We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in a subsequent criminal proceeding of statements obtained under threat of removal from office, and that it extends to all, whether they are the policeman or other members of our body politic." Id.

The Oregon Court of Appeals grappled with this question in State v Soriano, 68 Or App 642 (1984) whose opinion was later adopted in whole by the Oregon Supreme Court in State v Soriano, 298 Or 392 (1984). In Soriano, the Court explained that there are three types of immunity that flow from compelled testimony: (1) Use immunity, (2) Use and Derivate use immunity and (3) Transactional immunity. These immunize, in order: (1) only the statements compelled, (2) the statements compelled and evidence discovered as a product of the compelled statements and finally (3) protection from prosecution whatsoever regarding the subject of the compelled statements. The Court in Soriano determined that where the State compelled testimony through the use of contempt of court proceedings, "We hold that Article I, Section 12, of the Oregon Constitution requires transactional immunity as a substitute for the right not to testify against oneself." Id. The Court further explained its concern with use immunity was not only concerning the actual production of compelled statements at a later trial but, also, the non-evidentiary use of such statements that a prosecutor or law enforcement officer may make of such statements in investigation or prosecution of the case. Simply knowing the coerced statements may make a prosecutor more or less inclined to charge a particular offense or offer a particular plea bargain. The Court further opined that the State could not realistically erect a wall between the officers who solicit a compelled statement and the prosecution team. "It is unrealistic to give a dog a bone and to expect him not to chew on it…We hold that Article I, Section 12, of the Oregon Constitution forbids giving the dog the bone. Only transactional immunity is constitutional in Oregon."

City of Portland
Exhibit B, Pg. 12 of 45

March 27, 2017

In State v Graf, 316 Or 544 (1993) the Court examined whether a State agency could complete a termination of an employee where the termination procedures afforded the employee an opportunity to speak and present evidence at a termination hearing. The employee, who was subject to a criminal investigation, claimed that he could not be forced to choose between attempting to maintain his employment by fully participating in the termination hearing and his right to remain silent. The Supreme Court disagreed and found such a circumstance not compelling, "Contrary to the assertion of defendant's lawyer in his letter to the department...neither the department's letter nor the rule put any burden on the defendant 'to refute the charges or face dismissal'. Saying that a rule is coercive does not make the rule coercive; saying 'I feel coerced' when the rule is not coercive does not create coercion...The Court of Appeals erred in concluding the defendant 'was forced to relinquish his constitutional right to remain silent in order to gain his right to a full due process hearing.' Because we conclude that OAR 105-80-003(3) exerted no compulsion on defendant to testify at the pre-termination hearing, we do not reach the transactional immunity question." *Id.*

Even though the Oregon Supreme Court explicitly did not reach the transactional immunity question in Graf, the Court of Appeals in Beugli nonetheless found that Graf created room in Oregon law for use immunity despite the language in Soriano. In State v Beugli, 126 Or App 290 (1994) the Court said, "The right to transactional immunity arises only when the legislature has granted it as a substitute right against self-incrimination guaranteed by Article I, Section 12 of the Oregon Constitution. State v Soriano, *supra* n1, 68 Or App at 662. In the absence of a legislative decision to grant immunity, the remedy for unconstitutionally compelled testimony is suppression of that testimony and any evidence derived from it. State v Graf, 114 Or App 275 (1992). Thus with Graf so interpreted, the Court of Appeals held that the collective bargaining agreement for a police officer did not expressly grant the officer transactional immunity from prosecution in a circumstance involving admittedly coerced statements and therefore the State was not precluded from prosecution by virtue of transactional immunity but, rather, simply precluded from use of the compelled testimony and derivate evidence pursuant to use immunity.

In State v Vondehm, 348 Or 462 (2010) the Supreme Court issued its most thoughtful analysis on these immunity questions since Graf. The Court in Vondehm repeated its admonishment in Soriano that "the Oregon Constitution prohibits the State from requiring a witness to relinquish their Article I, Section 12, right against self-incrimination unless it provides the witness with an alternative that affords the same basic protection as the constitution...The Court held that the State could not compel the statements of a witness without granting transactional immunity because, without protecting the witness from all evidentiary and nonevidentiary use of compelled statements, the State would not afford the witness the same protection the Constitution confers – the right to remain silent." Vondehm also clearly stated that there was no Constitutional difference between compelling testimony in court or compelling a statement in an investigation. "Thus, the court has long interpreted Article I, Section 12, to impose no distinction between compelled statements and physical evidence derived from such statements or between the use of compelled statements to obtain evidence and as testimony in trial."

March 27, 2017

In Oatney v Premo, 75 Or App 185 (2015) the Court discusses in more detail whether Article I, Section 12 itself confers transactional immunity and a defendant's right to challenge punitive consequences for invoking their right to remain silent. "We have subsequently explained, however, that Article I, Section 12, protects only the right not to be compelled to testify against oneself; it does not, in itself, confer transactional immunity whenever that testimony is given…We explained [in Graf] that where 'there is no statute authorizing [a] grant of immunity to the defendant – the defendant's decision to testify, even under compulsion, does not automatically confer transactional immunity on him…Thus, Article I, Section 12, does not, in itself, *provide* transactional immunity. Instead, Article I, Section 12 protects a defendant from *any adverse consequence* of refusing to testify in the absence of transactional immunity."

**Analysis**

It should be clear from the above recitation that there is significant tension between the apparent wholesale rejection of use/derivative use immunity in Soriano, a Court of Appeals decision that was adopted as the opinion of the Oregon Supreme Court in 1984, and the implementation of use and derivative use immunity as a sanction in subsequent cases. The most cogent reconciliation of these opinions occurs in Oatney v Premo which is not a Supreme Court opinion but explains that the Constitution requires transactional immunity to legally compel speech from an individual. The Oatney court then explains that the sanction for illegally and unconstitutionally compelling speech is use and derivative use immunity and protection from any adverse consequence of refusing to testify in the absence of transactional immunity. Thus, even under this explanation a public employer would be prohibited from lawfully compelling speech from a police officer and if the public employer attempted to sanction the officer for refusing to speak – those sanctions would be overturned. Further, if the officer spoke under compulsion the evidence derived from that speech would be suppressed.

However, there are several other possible explanations that explain the tension between Soriano and other cases. For example, the Court of Appeals opinions affirming use and derivative use immunity could be held wrongly decided in light of Soriano and Vondehm. Under this construction, the Oregon Supreme Court has reserved the sanction of transactional immunity for at least some forms of compelled statements. In assessing this possibility it is notable that the flagrant and wholesale adoption of a systemic policy that purposefully violates an individual's right to remain silent would be significant factor in assessing the appropriate sanction. After thoughtful review, I cannot conclude that there is a clear answer to this tension based on current caselaw. Further, given the Court's extremely strong language in Soriano against even passive knowledge of coerced statements reaching the prosecutor's ear, I do not believe a prosecutor should accept the risk of transactional immunity on the hope that a coerced statement would "only" result in use and derivative use immunity.

March 27, 2017

Finally, a cursory review of Federal law since <u>Garrity</u> shows over 1200 citations in the ensuing 47 years including 151 cases that distinguished the rule of <u>Garrity</u> into different factual circumstances. However, the narrow question of whether use/derivate use immunity is sufficient over transactional immunity appears settled. In <u>Kastigar v US</u>, 406 US 441 (1972) the United States Supreme Court held, "The statute's explicit proscription of the use in any criminal case of 'testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)' is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege." *Id.*

**Conclusions**

The state of the law in Oregon regarding the extent of the remedy available to a public employee who has been compelled to speak despite an invocation of their right to remain silent is unsettled. However, what is completely clear is that that such compulsion, absent a sufficient grant of immunity, is unlawful and violates Article I, Section 12 of the Oregon Constitution. <u>Soriano</u> explains that the only form of immunity that may lawfully be substituted for a person's right to remain silent is a promise of full transactional immunity. The breadth of consequences for not providing full transactional immunity is what remains unclear. Certainly, the consequence is use and derivative use immunity. However, it is also possible transactional immunity may be required in certain circumstances. No prosecutor should risk immunity of any sort on a significant case given that the bedrock of cases on this topic were written over twenty years ago and, even then, were obviously in tension. I would advise law enforcement to assume the rule expressed by the Supreme Court in <u>Soriano</u> and reaffirmed in <u>Vondehm</u> is still good law until and unless it is overturned by the Oregon Supreme Court. Thus, I would advise law enforcement that compelling a public employee to speak despite an invocation of his right to remain silent by threat of discipline, and without the lawful substitute of transactional immunity being promised, will result in a certain risk of suppression of all such statements and derivative evidence, a certain risk that sanctions imposed on an officer who refused to speak would fail and a high risk that such institutionalized compulsion would result in an sanction of transactional immunity.

ELLEN F. ROSENBLUM
Attorney General



FREDERICK M. BOSS
Deputy Attorney General

**DEPARTMENT OF JUSTICE**
APPELLATE DIVISION

March 27, 2017

Rodney Underhill, District Attorney
Multnomah County Courthouse
1021 S.W. Fourth Avenue, Room 600
Portland, Oregon 97204

    *Re*: Current status of immunity law

Dear Mr. Underhill:

    At the request of DDA Ryan Lufkin, we have reviewed his memorandum dated March 14, 2017, summarizing the current status of the law in Oregon on immunity and compelled speech, as it pertains to public employees. From our perspective, it is correct, albeit with the caveat that, as the memo notes, certain issues are not quite settled yet.

    Please let me know if you have any questions.

                       Sincerely,

                       Timothy A. Sylwester
                       Assistant Attorney General

City of Portland
Exhibit B, Pg. 16 of 45

# NATIONAL LAWYERS GUILD

## PORTLAND, OREGON CHAPTER



3519 NE 15ᵀᴴ AVE #155
PORTLAND, OREGON 97212

## MEMORANDUM

DATE:             AUGUST 2, 2017

TO:               PORTLAND CITY COUNCIL

FROM:             PORTLAND CHAPTER OF THE NATIONAL LAWYERS GUILD

ENDORSED BY:      AMA COALITION FOR JUSTICE AND POLICE REFORM
                  OREGON JUSTICE RESOURCE CENTER
                  NAACP PORTLAND BRANCH

CC:               PORTLAND CITY AUDITOR
                  IPR DIRECTOR
                  MULTNOMAH COUNTY DISTRICT ATTORNEY
                  OREGON DEPARTMENT OF JUSTICE

RE:               RESPONSE TO THE CITY'S COMPELLED OFFICER TESTIMONY
                  PROPOSAL

## I. INTRODUCTION

The City of Portland is currently shaping its policy regarding compelled statements from officers involved in deadly force incidents. The public has a strong interest in obtaining prompt interviews of police officers who use deadly force. At the same time, there is a risk that compelling an officer to respond to questions about a deadly force incident in violation of the officer's right against self-incrimination could jeopardize a criminal prosecution of the officer, if adequate safeguards are not in place.

Mayor Wheeler's current proposal for handling this issue, as described below, does not appropriately balance these competing concerns. The proposal is founded on an inaccurate assessment of Oregon law. In addition, the proposal requires an inadequate policy to remain in operation while the City attempts to obtain a court opinion on a policy that does not go far enough to hold officers accountable.[1]

As this memo demonstrates, Oregon law clearly supports immediate implementation of a directive that compels officers who have used deadly force to provide a statement within 24 hours. The National Lawyers Guild (NLG) urges the City to take this course, starting with policies and procedures that ensure separate administrative and criminal investigations, with a plan to transfer the administrative investigation piece to the Independent Police Review (IPR) as soon as possible.

## II.  BACKGROUND

When an officer is involved in a deadly force incident, two investigations take place. Detectives from the Portland Police Bureau (PPB) homicide division conduct a criminal investigation, while members of the PPB's Professional Standards Division (Internal Affairs/IA) conduct an administrative review to determine if the officer should be subject to workplace discipline. As to the latter investigation, when and how the City may compel an officer to answer questions about the use of deadly force has been a subject of controversy for many years.

In June 2011, the U.S. Department of Justice (DOJ) commenced an investigation into whether the PPB engaged in civil rights violations relating to officers' use of force. At the time of the DOJ investigation, the Portland Police Association's (PPA) collective bargaining agreement with the City provided that, in an employment discipline investigation, an officer must receive 48 hours of advance notice before being required to submit to an interview or write a report, so long as the delay did not jeopardize the investigation.[2] Police practices experts and police accountability advocates roundly criticized this provision, known as the "48-hour rule."[3]

---

[1] The arguments in this memo are not intended to apply to procedures for obtaining statements from suspects who are not police officers. Police officers are permitted to do things that members of the public are not. Because officers are authorized to use force on behalf of the government and  may therefore violate the constitutional rights of others, they need to be held to standard of accountability that factors in their special responsibilities.

[2] Labor Agreement Between the Portland Police Association and the City of Portland, July 1, 2010 - June 30, 2013, at p. 33.

[3] *See* Constantine Severe, Director of Independent Police Review, Memorandum to Mayor Ted Wheeler and Police Chief Michael Marshmen, June 9, 2017, at p.  2, 4 (noting this opposition).

In 2012, the DOJ issued the findings of its investigation, which concluded that the PPB had engaged in a pattern or practice of using excessive force on individuals with actual or perceived mental illness.[4]  The DOJ's findings letter also found that the PPB's supervisory review of officers' use of force was "insufficient to identify and correct patterns of excessive force in a timely fashion."[5]  The DOJ noted that "Multnomah County District Attorney previously requested that PPB not conduct IA investigations of officer-involved shootings until after the completion of the DA's investigation and/or criminal prosecution."[6]

The DOJ, however, recommended that "PPB should make clear in its policy that administrative and criminal investigation shall run concurrently."[7]  It further stated that "PPB should also clearly set forth in policy that though IA may use criminal investigation material in appropriate circumstances, all administrative interviews compelling statements, if any, of the subject officer and all information flowing from those interviews must be bifurcated from the criminal investigation in order to avoid contamination of the evidentiary record in the criminal case."[8]  The DOJ also took issue with the 48-hour rule, because it delayed statements from officers and their completion of use of force reports and thereby defeated "contemporary, accurate data collection" regarding use of force incidents.[9]

Near the end of 2012, the DOJ filed a complaint against the City of Portland, which, consistent with the DOJ's findings, alleged that the PPB had engaged in a pattern or practice of using excessive force on individuals with actual or perceived mental illness, in violation of the Fourth Amendment to the U.S. Constitution.  At the same time, the City and the DOJ asked the Court to approve the parties' Proposed Settlement Agreement.  The Settlement Agreement requires that the PPB review its policies for compelled statements from officers and submit them to the DOJ for review and approval.[10]

Despite this provision in the Settlement Agreement, the 48-hour rule remained part of the City's collective bargaining agreement with the PPA until 2016.  In February 2016, the DOJ publicly opposed the rule and took the position that officers' routine completion of use-of-force reports or discussion of the use of force with department officials did not implicate their rights

---

[4] Thomas E. Perez, Assistant Attorney General, Civil Rights Division, Findings Letter to Mayor Sam Adams, Sept. 12, 2012.
[5] *Id.* at  22.
[6] Id. at  30.
[7] *Id.* at 31.
[8] *Id.*
[9] *Id.*
[10] *United States v. City of Portland*, No. 12-cv-2265, Settlement Agreement Pursuant to Federal Rule of Civil Procedure 41(a)(2), at ¶ 124.

against self-incrimination.[11] The Multnomah County District Attorney's Office was involved in the "ongoing conversations on this topic."[12] Finally, in September 2016, the City, under then-Mayor Hales, reached a new collective bargaining agreement with the PPA, agreeing to police pay raises projected to cost $6.8 million a year in exchange, in part, for the elimination of the 48-hour rule.[13]

In March 2017, however, the Multnomah County District Attorney's office authored a memo, in line with its position articulated in 2012, taking the position that if the City compelled an officer who has used deadly force to complete an administrative interview, there is a high risk that it would confer "transactional immunity" to the officer. (hereinafter "DA's memo"). See Exhibit A to the City's proposed ordinance, attached. Transactional immunity means the officer would be completely immunized from criminal prosecution for the incident. This memo recently became public, after the PPB announced its proposed Directive 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures, and the Albina Ministerial Alliance Coalition for Justice and Police Reform issued a press release with concerns about the directive.[14]

The new Directive 1010.10 provides that the PPB shall not compel statements from officers who have used deadly force until **after the DA has concluded the criminal investigation**, except in exceptional circumstances where information is immediately necessary to protect life or otherwise ensure the safety of the public. A homicide detective may ask the officer involved to give a voluntary statement, but the officer has the right to refuse. Additionally, the officer is not required to complete a written report of the incident.

In sum, under the new policy, officers who have used deadly force can choose to remain entirely silent, including by refusing to write a police report, until after they are cleared of all criminal charges, without negative consequence. Thus, instead of the 48-hour rule, officers who use deadly force now have a much longer time--potentially weeks or months[15]--before they are required to answer questions about the incident.

---

[11] Maxine Bernstein, "Feds want Portland police who use deadly force to file an account immediately," The Oregonian, Feb. 2, 2016, *available at:*
http://www.oregonlive.com/portland/index.ssf/2016/02/federal_justice_officials_pres.html.
[12] *Id.*
[13] Brad Schmidt, "Portland police union reaches tentative deal on pay hikes, end of 48-hour rule," The Oregonian, Sept. 13, 2016, *available at:*
http://www.oregonlive.com/portland/index.ssf/2016/09/portland_police_union_reaches.html.
[14] PPB to Create 'New 48-Hour Rule' for Officer Involved Shootings"
*available at* http://media.oregonlive.com/portland_impact/other/AMACoalitionreleaseJuly2017.pdf.
[15] *See* Constantine Severe, Director of Independent Police Review, Memorandum to Mayor Ted Wheeler and Police Chief Michael Marshmen, June 9, 2017, at p. 4 (noting that the DA's proposal creates a "de facto 40-day rule.").

Despite public opposition to the new rule, Mayor Wheeler has not delayed its implementation. Instead, he introduced an ordinance to address the issue, a copy of which is attached to this memo. The proposed ordinance is two-fold. First, it sets forth a proposed alternative Directive 1010.10 (Exhibit B, attached), which requires an administrative interview of officers who use deadly force within 48 hours of the incident and directs the City Attorney to seek a court ruling to clarify whether the City may adopt that policy without immunizing the involved officers from criminal prosecution. Second, the ordinance provides that while the City awaits that ruling—which could take years or not be allowed at all[16]—the original proposed Directive 1010.10 (Exhibit C, attached), which permits officers to wait until the criminal investigation is over before providing a statement or being interviewed by administrative investigators, will remain in place.

## III.  ANALYSIS OF THE DA'S MEMO: The Oregon Constitution does not grant transactional immunity to police officers who are the subject of parallel internal and criminal investigations.

Contrary to the DA's memo, Oregon law is clear on the issue of officer immunity--it is derivative use immunity, not transactional immunity that applies when an officer is compelled to speak.

Article I, section 12,[17] of the Oregon Constitution, like the Fifth Amendment[18] to the United States Constitution, protects Oregonians from self-incrimination. The DA's memo asks the City to make a troubling choice in the name of the Oregon Constitution: either forfeit immediate and complete investigations into a police officer's use of deadly force *or* forfeit a subsequent prosecution of any police officer who complies with that investigation.

---

[16] It is questionable whether a court will have jurisdiction to hear the City's case in the first place. Oregon has "a strong precedent against advisory opinions. Mere difference of opinion as to the constitutionality of an act does not afford ground for invoking a judicial declaration having the effect of adjudication." *Gortmaker v. Seaton*, 252 Or 440, 444, 450 P2d 547, 549 (1969) (citation omitted0. *See also TVKO v. Howland*, 335 Or 527, 534, 73 P3d 905, 908 (2003) ("[C]ourts cannot issue declaratory judgments in a vacuum; they must resolve an actual or justiciable controversy."); *Eacret v. Holmes*, 215 Or 121, 125, 333 P2d 741 (1958) ("There is no case for declaratory relief where the plaintiff seeks merely to vindicate a public right to have the laws of the state properly enforced and administered.") (citations and quotations omitted); *Morgan v. Sisters Sch. Dist. No. 6*, 353 Or 189, 195, 301 P3d 419, 423 (2013) (for a declaratory judgment, "there must be some injury or other impact upon a legally recognized interest beyond an abstract interest in the correct application or the validity of a law") (citation and quotations omitted); ORS 33.710(4) requires a justiciable controversy.

[17] Article I, section 12, provides that "No person shall * * * be compelled in any criminal prosecution to testify against himself."

[18] The Fifth Amendment provides that "No person * * * shall be compelled in any criminal case to be a witness against himself."

That ultimatum is unnecessary.  Rather, an internal investigation that compels testimony may proceed contemporaneously with a criminal investigation.  The only limitation on the criminal investigation is that, if the internal investigation compels the officer to speak, the compelled testimony and the evidence derived from it must be excluded from the criminal trial.  The Oregon Constitution does provide *some* limits on the criminal prosecution but it does not, as the DA's memo threatens, forestall it.

### A.  The District Attorney's interpretation of Article I, section 12, conflicts with binding case law from the Court of Appeals and the Oregon Department of Justice's previous position on the issue in the Court of Appeals.

The Oregon Court of Appeals has squarely rejected the idea that Article I, section 12, of the Oregon Constitution grants a police officer transactional immunity when he is compelled to testify as part of an internal investigation.[19]  In *State v. Beugli*, the criminal defendant was an Oregon State Police Trooper accused of a series of crimes, including sexual abuse in the second degree, official misconduct, and harassment.  The charges arose out of complaints that the Trooper had inappropriately touched multiple women.  The Oregon State Police initiated an internal investigation into the complaints.  Internal investigators interviewed the Trooper multiple times pursuant to the internal investigation.  During each interview, the investigators advised the Trooper that he was required to answer questions and submit a report about the alleged sexual contact.  The Trooper complied.

While the internal investigation was underway, the Oregon State Police initiated a parallel criminal investigation.  The criminal investigatory team was given the names of the women who had reported that the Trooper assaulted them, but it was not provided the statements or reports that the Trooper created during the internal investigation.

Four months after the criminal investigation began, the Marion County District Attorney filed an information charging the Trooper with multiple crimes.  The Trooper moved to dismiss the information, arguing that he was entitled to full transactional immunity because he was compelled to make statements during the internal investigation.  The trial court agreed with the Trooper and dismissed the indictment, concluding that transactional immunity was required.

The Oregon Department of Justice (ODOJ), represented by a now-Supreme Court Justice, appealed.  The ODOJ acknowledged that the Trooper was compelled to testify during the internal investigation.  But, the ODOJ argued, the remedy for that violation was simply the

---

[19] *State v. Beugli*, 126 Or App 290, 868 P2d 766, *rev den*, 320 Or 131 (1994).  Former Oregon Supreme Court Chief Justice Paul De Muniz authored *Beugli* when he was on the Oregon Court of Appeals.

exclusion of the compelled statements and any evidence derived from it in the criminal case; transactional immunity was not required.

The Court of Appeals agreed with the ODOJ. Specifically, the court held that Article I, section 12, does not and cannot affirmatively grant transactional immunity. Transactional immunity could be guaranteed by statute or contract (say, during plea negotiations with the DA's office), but never by Article I, section 12. The court wrote:[20]

> The right to transactional immunity arises only when the legislature has granted it as a substitute for the right against self-incrimination guaranteed by Article I, section 12, of the Oregon Constitution. In the absence of a legislative decision to grant immunity, the remedy for unconstitutionally compelled testimony is suppression of that testimony and any evidence derived from it.

Because the Trooper was not promised or contractually guaranteed transactional immunity in exchange for his testimony, transactional immunity was not available. Instead, the presumptive Article I, section 12, remedy applied—the compelled statements and the evidence derived from them were excluded from the criminal prosecution.

Other cases from the Oregon Court of Appeals interpreting *State v. Soriano* are consistent with *Beugli*. For example, in *Graf*, the Court of Appeals explained that, under Article I, section 12, a "[d]efendant's constitutional right is the right not to be compelled to testify against himself, not a right to immunity."[21] Similarly, in *State v. White*,[22] the Court of Appeals concluded that, under *Soriano*, "The authority to immunize a witness derives solely from statute[,]" not from Article I, section 12. And, in 2015, the court reaffirmed that "Article I, section 12, protects only the right to not to be compelled to testify against oneself; it does not, in itself, confer transactional immunity whenever that testimony is given."[23]

The Oregon Court of Appeals has clearly stated that derivative use immunity, not transactional immunity, is required when an internal investigation compels officer testimony. The City should not, in the name of the Oregon Constitution, sacrifice the public's need for a timely and independent investigation into police use of deadly force.

---

[20] *Beugli*, 126 Or App at 294 (citations omitted).
[21] 114 Or App at 282.
[22] 96 Or App 713, 773 P2d 824, *rev den*, 308 Or 382 (1989).
[23] *Oatney v. Premo*, 275 Or App 185, 369 P3d 387 (2015), *rev den*, 359 Or 847 (2016).

### B.  The District Attorney's interpretation of *Soriano* is incorrect.

The DA's argument that Article I, section 12, conveys transactional immunity to a police officer when an internal investigation compels his testimony relies on the Supreme Court's 1984 decision in *Soriano*. As a preliminary matter, it is worth noting that the position in the DA's memo is solely based on that 1984 case; there are no more-recent cases supporting such a position, and, in fact, all of the Oregon appellate cases interpreting *Soriano* have rejected the DA's position.

The underlying case in *Soriano* was a contempt case. The defendants were subpoenaed to testify at a Klamath County Grand Jury hearing. They invoked their rights under the 5th Amendment and Article I, section 12, not to testify. The trial court nevertheless ordered them to testify, and granted them derivative use immunity under two, now amended, Oregon statutes.[24] The defendants still refused to testify, and the trial court held them in contempt.

The defendants appealed, arguing that the Oregon statutes limiting the available immunity to derivative use immunity, rather than transactional immunity, violated Article I, section 12. The Oregon Court of Appeals agreed, and the Oregon Supreme Court adopted the decision of the Court of Appeals as its own.

In so concluding, the court relied on the United States Supreme Court's admonition that "It is quite clear that *legislation* cannot abridge a constitutional privilege, and that it cannot replace or supply one[.]"[25] That reliance was appropriate, since the question in *Soriano* was whether an immunity *statute* must grant transactional immunity in order to support a contempt conviction. That is, the question in *Soriano* was *not* whether Article I, section 12, of the Oregon Constitution requires transactional immunity whenever a person's right against self-incrimination is violated.

The answer to the latter question—the proper remedy for an Article I, section 12, violation—has been resolved and reaffirmed in numerous cases in the Oregon appellate courts. In *State v. Vondehn*,[26] the Oregon Supreme Court rejected the state's argument that something *less* than derivative use is required to remedy an Article I, section 12, violation. Rather, there, the Supreme Court definitely stated that, when the state violates a person's rights under Article I, section 12, "[t]hat constitutional violation requires suppression of both the answers that [the] defendant gave in response to, and the [physical evidence] that the police identified and seized as

---

[24] *Former* ORS 136.617 (1984) and *former* ORS 136.619 (1984).
[25] *Soriano*, 68 Or App at 662 (quoting *Counselman v. Hitchcock*, 142 US 547, 585, 12 S Ct 195, 35 L Ed 1110 (1892) (emphasis added)).
[26] 348 Or 462, 476, 236 P3d 691 (2010).

a result of, that interrogation."[27] The remedy for an Article I, section 12, violation is the exclusion of the compelled statements and any evidence derived from those statements from the defendant's criminal trial.

Finally, the DA's memo makes much of the court's statement in *Soriano* that it is "unrealistic to give a dog a bone and to expect him not to chew on it."[28] That statement in *Soriano* was actually a quotation from an earlier Oregon case, *State ex rel Johnson v. Woodrich*.[29] In *Woodrich*, the prosecutor in a criminal case compelled testimony via a psychiatrist that the prosecutor hired. And in *Soriano*, the prosecutor attempted to compel testimony during a Grand Jury. Thus, the court used the analogy to explain that the prosecutor could not fairly "unsee" evidence that its own team compelled.

But in the scenario at issue here, the prosecutor is not the same entity compelling the testimony; the internal investigator, not the prosecutor, has the "bone." Correctly structured, there would be no evidence for the prosecutor to "unsee." That is, if the dog does not have a bone, there is no risk that he will chew on it. To the extent that the DA's memo offers the metaphor to persuade the City, its reliance on it is—at best—unavailing.

This analysis reveals that the Mayor's proposal to seek permission from a court before implementing its proposed Directive 1010.10 (Exhibit B, attached, which requires officers to submit to administrative interviews before any criminal investigation is over) is unnecessary and will unreasonably delay implementation of a critical police accountability policy. The City has a choice of routes it can legally pursue to maintain the integrity of the administrative and criminal investigations, which are explored in the next section.

## IV. PROPOSED SOLUTIONS: Separate investigations are the standard and should be implemented.

The City has options in structuring a policy that maintains the integrity of both the administrative and the criminal investigations. The City could 1) grant IPR the authority to conduct independent investigations of deadly force incidents; or 2) wall-off IA investigations from the PPB criminal investigation or use an outside agency to conduct the criminal investigation.

Both of these options are intended to create a barrier between the administrative and criminal investigations so they run concurrently and do not contaminate the other. As explained

---

[27] *See also State v. Delong*, 357 Or 365, 371-72, 350 P3d 433 (2015) (explaining *Vondehn*).
[28] 68 Or App at 665.
[29] 279 Or 31, 566 P2d 859 (1977).

above, the rule in Oregon is derivative use immunity; when an officer is compelled to testify in an administrative proceeding, the prosecutor cannot use the compelled statements or any evidence obtained as result of the compelled statements in the criminal prosecution. In other words, the criminal investigation must be entirely independent from the administrative investigation. This is not an uncommon arrangement—federal law provides derivative use immunity for officers who give compelled statements upon threat of termination.[30]

The seminal case establishing the rule of immunity for compelled testimony was *Garrity v. New Jersey*.[31] That case held that "protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of [termination]."[32] Later cases clarified the rule.[33] From these cases evolved what is now known as a "*Garrity* Warning." A *Garrity* Warning advises officers of their rights when they are compelled to speak and the consequences of any voluntary statement. Based on this long-standing legal standard, many law enforcement agencies have developed practical ways to facilitate successful parallel investigations, as explained below.

### A. Have IPR conduct the parallel administrative investigation.

It is the NLG's position that investigations of PPB deadly force incidents should be conducted by IPR. This would serve the dual purposes of walling off the administrative investigation from the criminal investigation and increasing public trust in police accountability. The perceived barriers to giving IPR this authority that have been raised in the past are surmountable and do not outweigh its value and benefits.

One such perceived barrier is that IPR does not have authority to compel officer testimony. This is not true. The City can require the Police Commissioner or Chief to administer the *Garrity* warning and instruct the officer to answer all IPR's questions under threat of

---

[30] *Garrity v. New Jersey*, 385 US 493, 87 S Ct 616, 17 L Ed 2d 562 (1967); *Kastigar v. United States*, 406 US 441, 92 S Ct 1653, 32 L Ed 2d 212 (1972).

[31] 385 US 493, 87 S Ct 616, 17 L Ed 2d 562 (1967).

[32] *Id.* at 500.

[33] *See, e.g., Gardner v. Broderick*, 392 US 273, 278, 88 S Ct 1913, 20 L Ed 2d 1082 (1968) (holding that public employees may be compelled to answer questions directly related to the performance of their official duties, but they cannot be terminated for refusing to waive their right to immunity); *Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation*, 392 US 280, 283, 88 S Ct 1917, 20 L Ed 2d 1089 (1968) (holding that public employees cannot be terminated from their employment for refusing to voluntarily answer questions after being told that their responses could be used against them in subsequent proceedings); *Kastigar*, 406 US at 461 (holding that use and derivative use immunity, not transactional immunity, applies when testimony is compelled).

termination.[34]  This is precisely how the City of Minneapolis handles this situation.[35] Moreover, Portland's City Code already provides:[36]

> A Bureau employee shall attend investigative interviews conducted by IPR, cooperate with and answer questions asked by IPR during an administrative investigation of a member conducted by IPR. If an employee refuses to attend an investigative interview after being notified to do so by IPR or refuses to answer a question or questions asked by IPR during an investigative interview, the Police Chief or Police Commissioner shall direct the employee to attend the interview and answer the question or questions asked.

Another perceived barrier is the fact that IA has more resources, expertise, and investigators than IPR. This barrier can be overcome by diverting funds from (and sharing certain resources, like training from experienced investigators, between) Internal Affairs to IPR.

The NLG recognizes that this course of action will require changes to City Code, a potential minor change to the PPA collective bargaining agreement, and a restructuring of the City's funding and resources for investigations of police misconduct. Considering the reality that some of these changes will take time, the NLG proposes the City implement the protocol in the next section until these changes can be made.

**B.  Have the Portland Police Bureau or an outside agency continue to conduct the parallel administrative investigation independently of the criminal investigation.**

As the DOJ recommended five years ago in its Findings Letter,[37] a criminal prosecution of an officer can be successful where an administrative investigation is already underway, so long as the criminal investigation is not contaminated by compelled statements obtained during the administrative investigation.  To accomplish this, the IA administrative interviews

---

[34]The NLG has argued that IPR can administer *Garrity* warnings, since IPR is involved in officer discipline.  IPR is a voting member of the Police Review board, and the Auditor recommends the Board's citizen member. Portland City Code 3.20.140. IPR also has authority to controvert findings or proposed discipline and compel review by the Police Review Board. Portland City Code 3.20.140; 3.21.070.  The NLG maintains this argument, but recommends here that the the Chief/Commissioner administer the warning because it is a more likely approach for the City to presently adopt.

[35] *See* Minneapolis Civilian Police Review Authority Administrative Rule 7(D), *available at* http://www.ci.minneapolis.mn.us/news/news_20030924crarules ("A 'Notice to Give Garrity Warning' shall be sent by the Manager to the chief requesting him/her to order the Officer(s) to cooperate with the investigation. With this order to cooperate, the chief shall give a *Garrity* Warning.)

[36] Portland City Code 3.21.220.

[37] DOJ Findings Letter at 31.

compelling statements of an officer and all information flowing from those interviews should be bifurcated from the criminal investigation.

Adequate protections are already in place, since parallel criminal and administrative investigations are standard practice for local, state, and federal governments. For example, as the DA's memo notes,

> the criminal investigative team must now be segregated from the internal administrative investigation team and no information that the internal administrative investigation team collects much reach any personnel that will have contact with the criminal investigation team. For example, the involved agency's Police Chief should not know the nature or content of the compelled statements since the Police Chief would have contact with the criminal investigation team. It is important to note that this is already the current practice of police shooting investigations in Multnomah County.[38]

And the Use of Force Directive currently provides that, "all personnel involved in the administrative review shall keep information garnered from the Professional Standards Division interview strictly confidential, nor permitting disclosure of any such information or its fruits to the criminal investigation."[39] Further, a current directive also requires "involved and witness members not to discuss the incident,"[40] which reduces the risk that compelled statements will contaminate the concurrent criminal investigation.

Other municipalities have pursued two general models of bifurcated investigations. In some cities, bifurcated investigations are successfully accomplished within the police agency, and, in others, the city utilizes an outside agency.

One example of the former is Eugene, Oregon's system. While the investigators for the criminal investigation are employed by the bureau, Eugene's policy provides that no administratively coerced statements will be provided to the criminal investigators.[41] It appears that the City of Portland's current policies are consistent with this model.

One example of the latter is the protocol in Wisconsin. The Wisconsin DOJ leads criminal investigations of officer-involved deaths and then presents findings to the DA.[42] Thus,

---

[38] DA's memo at 4.
[39] PPB Directive 1010.10, Policy Para. 3.
[40] PPB Directive 1010.10.2.3.1.2.
[41] Eugene, Oregon Police Department, Policy No. 810.4.2(d), Use of Deadly Force Incident Criminal Investigation, Criminal Investigation Procedure (2014).
[42] Amari L. Hammonds, Katherine Kaiser Moy, Rachel R. Suhr & Cameron Vanderwall, Stanford Criminal Justice Ctr., At Arm's Length: Improving Criminal Investigations of Police Shootings 19 (2016).

no investigators employed by the same agency as the involved officer are part of the criminal investigation. This allows the criminal investigation to proceed without any concern that it will be contaminated by compelled statements or evidence obtained through them.

Ultimately, it is important to recognize that parallel criminal and administrative investigations occur regularly at all levels of government. While an outside agency creates a clearer and stronger barrier between the two investigations, properly separated internal investigations can maintain the integrity of the criminal investigation.

## V.  CONCLUSION

As explained above, transactional immunity is *not* required by Oregon law.  It would be a disservice to the public and a threat to justice if the City waits for a court opinion on this issue before implementing a policy to hold officers administratively accountable. While the NLG does not believe that a court ruling on transactional immunity is necessary, it understands the City's desire to feel confident in its approach.

Therefore, while the City is awaiting a ruling from the court, it should immediately implement a directive similar to proposed 1010.10 (Exhibit B) but with the requirement that officers give a statement or undergo an administrative interview within 24 hours, which is more time than it already requires of witness officers.[43] As the DOJ pointed out in 2012, delaying officer statements defeats "contemporary, accurate data collection." It also provides the opportunity for officers to prepare coached statements after consulting with their attorney and union representative. Neither of these serve the interests of accountability and justice.  We urge the City to be rid of the 48-hour rule for good!

Compelling the officer's statement in the context of a bifurcated, parallel investigation is clearly permissible under Oregon law, and outweighs the risks (and potential benefits) of approaches that attempt not to do so.  The NLG recommends the City take this course, starting with policies and procedures that ensure separate administrative and criminal investigations, with a plan to transfer the administrative investigation piece to IPR as soon as possible.

---

[43] *See* PPB Directive 1010.10.1.2.5.

**Testimony of Kimberly McCullough, Policy Director**
**Concerning Portland City Council Item No. 871**
**August 3, 2017**

Mayor Wheeler and Council Members,

The American Civil Liberties Union of Oregon[1] appreciates your consideration of our testimony concerning Item No. 871, an ordinance which would adopt new Post Deadly Force Procedures for Portland Police Bureau and authorize legal proceedings to determine whether requiring officers to provide statements in connection with an administrative deadly force investigation would preclude criminal prosecution.

**We submit this testimony to express concern about this ordinance as drafted, and to urge you to either reconsider its adoption altogether or amend the ordinance before moving forward.** We make this suggestion while appreciating the gravity of the tension presented when the City considers the constitutional, civil and public rights at stake when police officers use deadly force against members of the public they are sworn to serve.

On the one hand, we are longstanding and fierce advocates for the protections provided by the Fifth Amendment of the United States Constitution and Article I, section 12 of the Oregon Constitution, both for members of the public and law enforcement. It was because of this fact that we submitted an *amicus curiae* brief in *State v. Soriano,* 68 Or App 642 (1984) supporting the rights of a defendant held in contempt for refusing to testify in criminal proceedings.

On the other hand, a prompt administrative investigation into deadly force incidents is crucial for police accountability. Already this year, the City of Portland has seen multiple instances of deadly or serious harm at the hands of police officers, including the taking of the lives of two young men of color, Quanice Hayes and Terrell Johnson. The losses of those lives are tragedies for both their families and for our community. The public should not have to endure these tragedies without adequate investigatory procedures and full accountability if and when misconduct has occurred.

We believe, however, that these competing concerns can be adequately addressed by simply keeping administrative and criminal investigations wholly separate. Portland's Independent Police Review of the Portland City Auditor's Office has already provided

[1] The American Civil Liberties Union of Oregon (ACLU of Oregon) is a nonpartisan, nonprofit organization dedicated to preservation and enhancement of civil liberties and civil rights, with more than 23,000 members in the City of Portland and over 44,000 members in the State of Oregon.

helpful legal analysis to this body outlining how separate investigations may occur without violating constitutional rights, and the National Lawyers Guild is submitting a separate memo with similar analysis and suggestions. We urge the City to carefully review these memos and pass an ordinance allowing for separate, but concurrent investigations as they suggest.[2]

It is a standard best practice for employers to implement internal policies and processes by which to ensure their employees are conducting themselves in their jobs appropriately. It is also a standard best practice to investigate employees, including collecting statements from them, when it is believed that internal policies may have been breached. The same is true when a potential broken rule results in the loss of life of another at the hands of a police officer.

Such investigations allow the employer to improve their policies and change their procedures to prevent future harm. And, if need be, such investigations allow the employer to fairly train, discipline or remove employees when harm could have been avoided and/or misconduct occurred.

The City of Portland and Portland Police Bureau (PPB) must be able to conduct an internal assessment of its employees and officers. The public needs a police bureau committed to ongoing improvement, transparency and the protection of civilian lives—even when those civilians are suspected of criminal action. When an officer causes harm to the public, prompt and independent scrutiny of personnel and policy concerns must occur to ensure future harm can be avoided and necessary changes are made.

Police officers are professionals. Professionals of all types—lawyers, doctors, engineers—have professional standards and employment policies that must be followed. Additionally, employees of all types must answer to their employer when they fail in their duties. Insulating police officers from professional standards or significantly delaying employer scrutiny only serves to promote public harm and distrust in the system. Police officers who breach PPB policies or standards should not be given special treatment that the rest of the hard-working public does not enjoy.

We were dismayed to read the Multnomah County District Attorney's (DA's) assertion that criminal investigations may not be kept independent from the police bureau's internal investigation given the close relationship between the two agencies. While we disagree

---

[2] Because we generally agree with both of these carefully-crafted memos, we will not provide additional constitutional analysis in this testimony beyond stating that (a) *Soriano* is clearly distinguishable from the facts and circumstances related to fully separated criminal and administrative investigations into deadly force by law enforcement, and (b) we agree with the court in *State v. Beugli*, 126 Or App 290, 294 (1994), that use and derivative use immunity—not transactional immunity—is the proper remedy when the right against self-incrimination is violated, absent a legislative grant of further immunity.

with the DA office's legal analysis, it was more troubling for us to see an elected office willing to create roadblocks rather than offer solutions to rebuild the public's trust in our law enforcement bodies.

It is the DA's responsibility to vigorously advocate for the public in cases of potential criminal misconduct by law enforcement. Rather than pushing for a less-accountable system, we hope that the DA's office will instead work with the City and PPB to ensure complete separation of administrative and criminal investigations. And if an officer claims transactional immunity when a truly independent criminal investigation has occurred, we hope that the DA will oppose such a claim in court.

In conclusion, the ACLU of Oregon believes that the PPB personnel investigation and any criminal investigation can occur separately, and simultaneously, without infringing upon a police officer's constitutional rights.

We urge you to reconsider or amend this ordinance, and not delay in adopting policy to allow for separate internal investigations to move forward with prompt collection of involved officers' statements. Rather than waiting for a court to give a green light, this policy should take effect as soon as possible. Failing to do so further risks the community's faith in its elected leaders' commitment to police accountability and breaks promises made to the public about the removal of the 48-hour rule.

188569
Exhibit B

**1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures**

**Refer:**

- *Graham* v. *Connor*, 490 U.S. 386 (1989)
- ORS § 146.095, Investigation
- ORS § 161.015, General Definitions
- DIR 315.30, Satisfactory Performance
- DIR 330.00, Internal Affairs, Complaint Intake and Processing
- DIR 333.00, Criminal Investigations of Police Bureau Employees
- DIR 416.00, Post Officer Involved Deadly Force/Temporary Altered Duty
- DIR 630.45, Emergency Medical Custody Transports
- DIR 630.50, Emergency Medical Aid
- DIR 640.10, Crime Scene Procedures
- DIR 900.00, General Reporting Guidelines
- DIR 1010.00, Use of Force

I hereby certify this document to be a complete and exact Copy of the original as the same appears on file and of Record in my office and in my care and custody on this 10th day of April 2018.

Mary Hull Caballero
Auditor of the City of Portland
By *Susan Parsons*
Deputy

**Definitions:**

- Communication Restriction Order:  An order issued during an investigation that prohibits indirect or direct communications among the involved member(s) and witness member(s) regarding the facts of the case.  This restriction will be given in writing and will be lifted in writing.

- Constitutional Force Standard:  Under *Graham v. Connor* and subsequent cases, the federal courts have established that government use of force must comply with the "reasonableness" requirement of the Fourth Amendment.  Under this standard, members must choose from the objectively reasonable force options at a scene.  See the definition of "objectively reasonable" below.

- Deadly Force, also known as Lethal Force:  Any use of force likely to cause death or serious physical injury, including the use of a firearm, carotid neck hold, or strike to the head, neck or throat with a hard object.

- *Garrity* Warning:  An advisement given to a member who is the subject of an internal administrative investigation or review.  A *Garrity* warning apprises the member that they are required to answer questions asked by Professional Standards Division investigators and are subject to discipline, up to and including termination, for failing or refusing to answer the questions.

- In-Custody Death:  Occurs when a subject dies while under physical control of a member, dies as a direct result of police action, or dies while in police custody.  Physical control includes the use of an electronic control weapon system.

- Involved Member:  For the purposes of this directive, 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures, an involved member is a Bureau member who applies deadly force or directs another to use deadly physical force, or a member who has used physical force against, or a member who assumes control care or custody of, a subject who dies in police custody.

- Negligent Discharge:  Any unintentional discharge of a firearm by a sworn member that is not due to equipment malfunction.

- Objectively Reasonable:  The reasonableness of a use of force is based on the totality of circumstances

1

known by an officer at the time of action or decision-making.  It shall be judged from the perspective of a reasonable officer on the scene, without the clarity of 20/20 hindsight after the event has concluded. The measure of reasonableness gives consideration to the reality that officers are often forced to make split-second decisions in circumstances that are tense, uncertain and rapidly evolving.  In the application or evaluation of the use of force, the uses of the terms reasonable and reasonably in this policy refer to objective reasonableness.

- Police Action:  Any circumstances, on or off duty, in which a sworn member exercises or attempts to exercise police authority.

- Public Safety Statement:  A response by a member to questions asked by an on-scene supervisor to elicit information necessary to protect life and/or ensure public safety.

- Serious Physical Injury:  As defined in ORS §161.015(8), physical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of function of any bodily organ.

- Witness Member:  For the purposes of this directive, 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures, a witness member is a Bureau member who observes or has firsthand knowledge of the events surrounding an in-custody death or the use of deadly physical force by another member, and other than observing the incident, did not use deadly physical force.  Additionally, a member who observes or has firsthand knowledge of the events surrounding a member's direction to another to use deadly force.

**Policy:**
1. This policy establishes the specific guidelines and reporting requirements for the reporting and investigation of incidents involving uses of deadly force, death as a result of member use of force, and in-custody deaths.

2. The Portland Police Bureau recognizes that a member's use of deadly force or the death of an individual while in police custody requires impartial and timely review.  It is the policy of the Bureau that uses of deadly force, death as a result of member use of force, and in-custody deaths, whether on or off duty, be investigated with the utmost thoroughness, professionalism and impartiality so as to determine whether member actions comport with applicable law and Bureau policies and training.

3. The Bureau acknowledges that the investigations of these incidents are of critical importance to the involved member, the Bureau, and the community.  The Bureau entrusts the Detective Division with the responsibility to conduct the criminal investigation of the incident objectively and thoroughly.  Concurrently, the Professional Standards Division (PSD) shall also conduct an administrative review of each such incident.  The Detective Division may provide information and/or findings from the criminal investigation to PSD; however, all personnel involved in the administrative review shall keep information garnered from the PSD investigation of the involved member(s) strictly confidential, not permitting disclosure of any such information or its fruits to the criminal investigation.

4. Bureau members will be afforded all rights guaranteed under the United States and State of Oregon Constitutions and the benefits of the current collective bargaining throughout the investigation.

5. To ensure public accountability, the Bureau is committed to establishing open communication and transparent practices with the public in an effort to cultivate and build community trust; however,

information that could jeopardize the integrity of any investigation or any pending prosecution may be withheld from release until it is appropriate or a court of competent jurisdiction directs release.

6. The Bureau understands the impact that these traumatic incidents have on members and acknowledges the need to be sensitive when conducting the required investigation. The Bureau encourages its members to take proactive steps and contact available employee assistance resources following such an event if needed.

7. The Bureau also understands the impact that these traumatic incidents has on the families and communities of those persons upon whom deadly force is used and acknowledges the need to be sensitive when conducting the required investigation. All interviews and conversations with family or community members will be conducted in a manner that strives to be respectful while balancing the need to obtain critical information.

**Procedure:**

1. Pursuant to ORS §146.095 (1), the District Attorney (DA) shall be responsible for the criminal investigation of all deaths following member use of deadly force. The Bureau shall be responsible for the administrative review of these incidents to determine compliance with Bureau policies, training, and procedures. Over the course of the administrative review, the Bureau shall ensure that compelled information gathered or any information derived from the *Garrity*-protected interviews is not shared with the DA, Homicide investigators, or any other person performing the criminal investigation of the involved member.

2. Duties and Responsibilities Following the Use of Deadly Force Causing Death (within Portland City Limits).
   2.1. On-Scene Responsibilities Immediately Following the Use of Deadly Force Incident.
      2.1.1. Involved member(s).
         2.1.1.1. The involved member(s) shall notify an on-duty supervisor at the precinct of occurrence. The member(s) shall make the notification(s) as soon as practicable. The involved member(s) shall make it known to the on-scene supervisor that they are an involved member, as defined in this Directive.
         2.1.1.2. If directed by the on-scene supervisor, the involved member(s) shall provide a Public Safety Statement. The on-scene supervisor will be limited to asking the following questions:
            a) Did you (involved member) fire a single shot or multiple shots?
            b) Did the suspect fire any shots?
            c) What is the direction of the shot(s) fired by officers and suspects?
            d) What is the location of injured persons?
            e) What are the description of at-large suspects and their direction of travel?
            f) How much time has elapsed since the suspects were last seen?
            g) What is the description of any suspect weapons?
         2.1.1.3. After providing a Public Safety Statement to the on-scene supervisor, the involved member(s) may consult on scene with their union representative and attorney(s).
         2.1.1.4. The involved member(s) may elect to provide a voluntary statement and on-scene walk-through to the investigating Homicide Detective. An involved member(s) has the right to decline a request by Homicide Detectives to provide a voluntary detailed account of the incident and on-scene walk-through.
         2.1.1.5. The involved member(s), unless injured, shall remain at the scene until released by the Detective Division Homicide Sergeant and PSD. The member(s) shall not be held at the scene any longer than necessary.

2.1.2.   Witness Member(s).
    2.1.2.1.   Witness member(s) shall make it known to the on-scene supervisor that they are a witness to the incident, as defined in this Directive.
    2.1.2.2.   As required by the on-scene supervisor, witness member(s) shall give an on-scene Public Safety Statement, which shall consist of the information listed in Section 2.1.1.2.
    2.1.2.3.   After providing any required Public Safety Statement to the on-scene supervisor, witness member(s) may consult on scene with their union representative.
    2.1.2.4.   Witness member(s) shall also be subject to on-scene interviews to discuss the incident with detectives.  They shall provide a full and candid account of the use of force event.
    2.1.2.5.   All witness member(s), unless injured, shall remain at the scene until released by the Homicide Sergeant and PSD.  Witnesses shall not be held at the scene any longer than necessary.

2.1.3.   On-Scene Supervisor.
    2.1.3.1.   After complying with scene security and first aid provisions as found within Directive 640.10, Crime Scene Procedures, the on-scene supervisor shall complete the following:
        2.1.3.1.1.   Locate and separate all witness and involved members.  If the number of individuals to be physically separated is so great to be impractical, a supervisor or detective shall be posted to ensure that no communication regarding the incident takes place.
        2.1.3.1.2.   Prior to CRO issuance by the Detective Division, admonish involved and witness members not to discuss the incident.
        2.1.3.1.3.   The supervisor shall obtain from witness members and other sources the public safety information in Section 2.1.1.2.
        2.1.3.1.4.   If the on-scene supervisor is unable to obtain the necessary public safety information from witness members, initial observations, and/or other sources, the arriving supervisor shall require the involved member(s) to provide a Public Safety Statement.
            2.1.3.1.4.1. Supervisors shall document the involved member's response.
        2.1.3.1.5.   If ambulance transport is required, ensure that someone other than the involved or witness member(s) is assigned to accompany the injured member or community member to the hospital in the ambulance.
        2.1.3.1.6.   Ensure that a single entry point into and out of the scene is established and advise the Bureau of Emergency Communications (BOEC) of its location.
        2.1.3.1.7.   Ensure that a Crime Scene Log is maintained at the entry point.
        2.1.3.1.8.   Ensure that the following required notifications are made in order as listed (when feasible):
            2.1.3.1.8.1. Chain of Command,
            2.1.3.1.8.2. Detective Division Homicide Sergeant (up team),
            2.1.3.1.8.3. PSD,
            2.1.3.1.8.4. Auditor's Office of Independent Police Review (IPR),
            2.1.3.1.8.5. Public Information Officer (PIO),
            2.1.3.1.8.6. Employee Assistance Coordinator, and
            2.1.3.1.8.7. Appropriate bargaining unit representative.
    2.1.3.2.   Ensure that involved and witness member weapons are retained in their holsters, pending weapon examination by responding detectives.
        2.1.3.2.1.   When circumstances are such that a member is unable to holster or secure their weapon at the conclusion of the incident, the on-scene supervisor shall assign an uninvolved member to safeguard the weapon until a criminalist is

able to photograph and collect the weapon at the direction of the Homicide Detective.

2.1.3.3.   Instruct involved and witness members to remain at the location until instructed otherwise by the lead detective or until they are released from the location by the Homicide Sergeant and PSD.

2.1.3.4.   Assign a member, other than an uninvolved or witness member, to drive each involved member to a location determined by the Homicide Sergeant, if required. Witness members may drive themselves. Whenever practical, each involved member and witness member should be transported in a separate vehicle.

2.1.3.5.   Upon the Homicide Sergeant-and-PSD-authorized release of the involved and witness members from the scene, supervisors shall:

    1.3.1.12.1.   Instruct members facilitating transport for involved members to proceed to detectives or the designated area, as determined by the Homicide Sergeant.

    1.3.1.12.2.   Direct involved and witness members to refrain from changing out of the clothes worn at the time of the incident until they receive specific permission to do so from the Homicide Sergeant.

    1.3.1.12.3.   Any exceptions to the preceding actions shall only be authorized by the Homicide Sergeant.

2.1.4.   Precinct or Division Commander.

2.1.4.1.   The precinct or division commander will notify the appropriate Assistant Chief, who will then notify the Chief of Police and the other Assistant Chiefs.

2.1.4.2.   The Assistant Chief of Services will notify:

    2.1.4.2.1.   The City Attorney, and

    2.1.4.2.2.   The Training Division.

2.1.5.   Chief of Police.

2.1.5.1.   The Chief of Police will make the appropriate notification to the Commissioner-in-Charge.

2.1.6.   Homicide Sergeant.

2.1.6.1.   The Homicide Sergeant shall make the following required notifications:

    2.1.6.1.1.   Detective Division Command,

    2.1.6.1.2.   On-call detectives,

    2.1.6.1.3.   District Attorney's (DA) Office,

    2.1.6.1.4.   Medical Examiner's Office, and

    2.1.6.1.5.   Forensic Evidence Division (FED), ensuring criminalists are responding to the scene.

2.1.6.2.   Pursuant to ORS § 181A.790(5), the Homicide Sergeant shall request assistance from the East County Major Crime Team.

2.1.6.3.   Respond to and assume responsibility for the scene after receiving a briefing from the supervisor in charge of the scene.

2.1.6.4.   Identify all involved and witness members and any members with pertinent investigative information.

2.1.6.5.   Make investigative and scene processing assignments.

2.1.6.6.   Ensure CROs are issued pursuant to Section 8 of this directive.

2.1.6.7.   Ensure all involved weapons have been examined, documented, and retained, if necessary; ensure member(s) are supplied with a replacement weapon by Training, if appropriate.

2.1.6.8.   After consultation with PSD and DA, release the involved and witness members from the scene.

2.1.7.   Homicide Detective.

2.1.7.1.    The Detective shall:

2.1.7.1.1.    Request a voluntary statement and on-scene walk-through from the involved member.

2.1.7.1.1.1. The involved member shall be allowed to discuss this request with an on-scene attorney or union representative.

2.1.7.1.1.2. If the member agrees, the Homicide Detective shall conduct complete and thorough interviews of involved members to ensure that all applicable information is obtained.  The Detective shall ensure that all information that would otherwise be necessary to thoroughly complete a use of force report is captured over the course of the voluntary interview and walk-through.  The Detective shall include a full and candid account of any voluntary statements made by the involved member in their written report.

2.1.7.1.1.2.1. If the involved member declines to provide a voluntary statement and on-scene walk-through, the Detective will not compel a statement or walk through.

2.1.7.1.2.    Direct any necessary witness members to provide an on-scene walk-through.

2.1.7.1.2.1. The Detective shall have the discretion to audio record the witness member(s)'s statement during the walk-through.

2.1.7.1.3.    Ensure that scene sketches and diagrams are completed;

2.1.7.1.4.    Manage the processing of evidence;

2.1.7.1.5.    Collect all firearms involved in the incident, including Special Emergency Reaction Team (SERT) weapons;

2.1.7.1.6.    Collect any other weapons (e.g., conducted electrical weapon (CEW)) used (or attempted to be used) in the application of force to the Property Evidence Division (PED); and

2.1.7.1.7.    Direct the assigned criminalists to collect all evidence including involved members' uniforms and all outer clothing (including duty belt) and retain as evidence until instructed otherwise by the lead detective of the investigation.

2.1.7.1.8.    Admonish the uninvolved member(s) from collecting any evidence from the involved member(s) when accompanying them to the hospital.

2.1.8.  PSD.

2.1.8.1.    The PSD Captain or designee shall coordinate with the Homicide Sergeant to authorize the release of involved and witness members from the scene.

2.1.8.2.    The PSD Captain or designee shall accompany the IPR Director, or designee, at the scene and assist in gathering information from Detectives, when applicable (i.e., when IPR elects to respond to the scene).

2.1.8.3.    PSD may compel a statement or walk through, after provision of a *Garrity* warning.

2.2. Follow-Up Responsibilities Following Departure from the Incident Scene.

2.2.1.  Involved Member(s).

2.2.1.1.    Involved member(s) may elect to provide a voluntary interview to the investigating Homicide Detective.

2.2.1.1.1.    An involved member's refusal to provide a voluntary statement to Homicide Detectives shall not be grounds for any disciplinary action based on failure to follow directives.

2.2.1.2.    Involved member(s) that elect not to provide a voluntary interview to the investigating Homicide Detective will be compelled to provide a statement to PSD consistent with the provisions of Section 2.2.5 below.

2.2.1.2.1.    When compelled, involved member(s) shall provide submit to an audio-recorded

interview with PSD.

    2.2.1.2.2.    Any answers provided by the member after being issued a *Garrity* warning cannot be used against the member in any criminal proceeding.

2.2.2.   Witness Member(s).

    2.2.2.1.   Witness member(s) shall be required to submit to an audio-recorded interview if requested prior to going off shift. If injured, the witness member will be interviewed when medically stable.

    2.2.2.2.   When compelled, witness member(s) shall provide a statement to PSD.

2.2.3.   Homicide Sergeant.

    2.2.3.1.   The Homicide Sergeant shall:

        2.2.3.1.1.   Regularly provide updates to the Detective Division Commander, the PIO, the PSD Captain, and the Chief of Police;

        2.2.3.1.2.   Ensure a thorough and complete investigation is conducted;

        2.2.3.1.3.   Ensure the appropriate checklists are used and case notebooks are prepared; and

        2.2.3.1.4.   As soon as practicable, provide transcripts and/or recordings of all witness interviews to PSD.

2.2.4.   Homicide Detective.

    2.2.4.1.   The Homicide Detective shall conduct a complete and thorough investigation of all in-custody deaths and deadly force incidents. PSD and the Training Division shall use the investigation to determine if the use of deadly physical force was justified, as well as to identify any training or policy concerns regarding the actions of the member(s). The Detective shall:

        2.2.4.1.1.   Complete the General Offense Report;

        2.2.4.1.2.   Conduct complete and thorough interviews of witness members and supervisors to ensure that all applicable areas are covered. All interviews wherein material facts of the case are discussed shall be audio recorded in their entirety;

        2.2.4.1.3.   Conduct interviews of civilian witnesses. Any interview shall be audio recorded in its entirety, unless the witness declines. The refusal shall be documented in writing;

        2.2.4.1.4.   Submit all firearms involved in the incident, including Special Emergency Reaction Team (SERT) weapons, to the Oregon State Crime Lab for appropriate testing, and document the condition of the firearm(s) (as found), to include serial number, rounds in chamber and number of rounds in each magazine;

        2.2.4.1.5.   Submit any other weapons (e.g., conducted electrical weapon (CEW)) used (or attempted to be used) in the application of force to the Property Evidence Division (PED);

        2.2.4.1.6.   Request a voluntary interview with the involved member.

            2.2.4.1.6.1.  The involved member shall be allowed to discuss this request with an attorney or union representative.

            2.2.4.1.6.2.  If the member agrees, the detective shall conduct complete and thorough interviews of involved members to ensure that all applicable information is obtained. The detective shall ensure that all information that would otherwise be necessary to thoroughly complete a use of force report is captured over the course of the voluntary interview. Detectives shall include a full and candid account of the pertinent information normally collected in the use of force report form in their written report.

                2.2.4.1.6.2.1. All interviews wherein material facts of the case are discussed shall be audio-recorded in their entirety.

2.2.4.1.6.3. If the involved member declines to provide a voluntary interview, the Detective will not compel a statement.

2.2.4.1.7. Conduct an investigative follow up;

2.2.4.1.8. Ensure that reports include detailed information related to any weapons involved, accounting for all shots fired, their point of impact, if ascertainable, and any injury or damage to property;

2.2.4.1.9. Complete a Summary Report and case notebooks to include all transcripts of all recorded statements;

2.2.4.1.10. Submit all cases involving the use of deadly force resulting in death and in-custody deaths to the DA for review;

2.2.4.1.11. Coordinate and consult with the DA's Office throughout the investigation;

2.2.4.1.12. Complete the investigative case book; and

2.2.4.1.13. Refer to Section 3 of this directive for information regarding reporting responsibilities. Exceptions to witness members providing on-scene statements must be limited to those situations where the number of witnesses or the complexity of the crime scene make it necessary for the investigators to obtain additional details of the incident prior to beginning an interview, and the detective must justify any such exceptions. Those exceptions must be approved by the Detective Division Commander.

2.2.5. PSD.

2.2.5.1. The PSD Captain or designee shall ensure that the involved member(s) provides a compelled statement as soon as practicable, but no later than within 48 hours of the event, unless the member is physically incapacitated and unable to provide a statement.

2.2.5.2. Voluntary statements.

2.2.5.2.1. If an involved member provides a voluntary statement to the Homicide Detective within 48 hours of the event, the PSD Captain shall determine when any further administrative interviews will be scheduled.

2.2.5.3. Compelled statements.

2.2.5.3.1. The PSD Captain or designee shall schedule an interview with the involved member as soon as practicable, but no later than within 48 hours of the event, unless the member is incapacitated and unable to provide a statement.

2.2.5.3.2. The PSD Captain or designee shall compel statements after provision of a *Garrity* warning. At the conclusion of a *Garrity* warning, the involved member(s) shall answer all Internal Affairs questions.

2.2.5.3.3. An involved member's refusal to provide information after being compelled to do so upon the administration of *Garrity* warnings may be grounds for a disciplinary action based on failure to follow directives.

2.2.5.4. No member of PSD may disclose any compelled statements taken pursuant to this Directive, any evidence derived from those statements, or any information whatsoever gathered as part of the PSD investigation to anyone outside of PSD until the conclusion of any and all criminal proceedings against the involved member(s), and then only with approval of the PSD Captain.

2.2.5.4.1. The PSD Captain is responsible for ensuring compliance with this requirement.

2.2.5.5. The PSD Investigator shall refer to Sections 3 and 6 of this directive for information regarding reporting requirements and review responsibilities.

3. Use of Deadly Force Reporting Requirements.

3.1. For use of deadly force resulting in death, the more comprehensive administrative review conducted by PSD is intended to capture all information required in a use of force report. Therefore, in those

cases, involved members are not required to complete a use of force report.

3.2. While a criminal investigation and/or prosecution is pending, the PSD investigator shall ensure that all information that would otherwise be necessary to thoroughly complete a use of force report is captured over the course of the administrative interview. The investigator need not complete the narrative report form itself, but shall instead include a full and candid account of all pertinent information from the form in their own written report, in lieu of the involved member completing the use of force report.

3.3. For Category I force incidents where the Detective Division completes a criminal investigation and PSD completes an administrative review, the completion of a force After Action report is not required because the administrative review serves this function.

4. Duties and Responsibilities Following the Use of Deadly Force and In-Custody Deaths (Outside of Portland City Limits).
    4.1.   Involved Member Responsibilities.
        4.1.1.  Notify the jurisdiction of occurrence, and
        4.1.2.  Notify an on-duty patrol supervisor if the involved member's supervisor is not present.
        4.1.3.  Members shall also follow the requirements listed in Section 2.1.1 of this directive.

    4.2.   Supervisor Responsibilities.
        4.2.1.  Supervisors will make notification as required of the on-scene supervisor. Refer to Section 2.1.3.1.8 of this directive.

    4.3.   Detective Division Commander or Designee Responsibilities.
        4.3.1.  Contact the investigating agency to provide an offer of assistance.

    4.4.   PSD Responsibilities.
        4.4.1.  The PSD Captain, or a designee, shall:
            4.4.1.1.  Act as the Bureau's liaison;
            4.4.1.2.  Respond to the scene, if feasible;
            4.4.1.3.  Compel statements from witness members at any time;
            4.4.1.4.  Coordinate with the Homicide Sergeant to authorize the release of involved and witness members from the scene; and
            4.4.1.5.  Refer to Sections 3 and 6 of this directive for information regarding reporting requirements and review responsibilities.

5. Deadly Force/In-Custody Death by an On-Duty Peace Officer from Another Jurisdiction (within Portland City Limits).
    5.1.   Bureau Procedures:
        5.1.1.  The agency in charge of investigating deaths in Multnomah County is the DA. If the Bureau investigates, the Homicide Sergeant shall be the supervisor and detectives shall be responsible for the investigation and shall follow the procedures in Section 2.2.4.

    5.2.   The Bureau's On-Scene Supervisor shall:
        5.2.1.  Comply with scene security and first aid provisions as found within Directive 640.10, Crime Scene Procedures;
        5.2.2.  Ensure that an on-duty supervisor of the peace officer's agency is notified;
        5.2.3.  Locate and separate all involved peace officers and any witness members and/or witness peace

officers.  If the number of individuals to be physically separated is so great to be impractical, a supervisor or detective shall be posted to ensure that no communication regarding the incident takes place;

5.2.4.  Prior to CRO issuance, admonish involved peace officers and any witness members and/or peace officers not to discuss the incident; and

5.2.5.  Obtain information that is necessary to protect life and ensure the safety of the public (e.g., outstanding suspects, witnesses, etc.) from any witness members and/or peace officers and other sources.

5.2.5.1.  If the on-scene supervisor is unable to obtain the necessary public safety information from witness members and/or witness peace officers, initial observations, and/or other sources, the on-scene supervisor may ask the involved peace officer to answer the Public Safety Statement questions in Section 2.1.1.2.

5.2.5.1.1.  If the involved peace officer refuses to provide a response, the supervisor shall not compel a statement from the peace officer and shall document the refusal in a report.

5.3.  Witness members who are members of the Bureau shall follow the procedures set forth in Section 2.1.2 of this directive.

5.4.  Unless there is some immediate need to seize weapons, the involved peace officer shall be allowed to keep their weapon(s) until their agency supervisor arrives.  Upon arrival, the agency supervisor shall take custody of the firearm, and if necessary, surrender it to the investigator.

5.5.  The Homicide Sergeant shall notify the appropriate Bureau Precinct Commander and Assistant Chief.

6.  PSD Review.

6.1.  PSD shall conduct administrative reviews concurrently with criminal investigations, if any, concerning the same incident.  PSD shall reach recommended findings with respect to all areas of review and any allegation of misconduct pursuant to Directive 332.00, Administrative Investigations, and Directive 335.00, Discipline Process.

6.2.  PSD shall consider all available relevant evidence, including recordings by Homicide Detectives or others of witness and involved member interviews; physical evidence; and documentary evidence.

6.3.  In accordance with PSD SOP #7, PSD shall conduct an administrative review of the incident, to include the events preceding the use of deadly force, the decision making surrounding the use of deadly force, the management/supervision of the incident, and the events following the use of deadly force to determine whether member actions were consistent with policy and if there are possible policy deficiencies.

6.4.  PSD shall provide its investigation materials to the appropriate RU manager at the conclusion of the administrative review and criminal proceedings against the involved member.

6.5.  The lead PSD investigator shall present the results of the administrative review of the deadly force incident to the Police Review Board, as appropriate, at the conclusion of all criminal proceedings against the involved member.

6.6.   The PSD investigator shall refer to Section 3 of this directive for information regarding reporting requirements.

6.7.   If there is an allegation of misconduct and PSD is the investigative body, PSD shall prepare a recommended finding in accordance with the procedures established in Directive 332.00, Administrative Investigations.

6.8.   RU Manager Responsibilities.
    6.8.1.   The RU manager shall utilize PSD's investigation materials to draft a findings memorandum to determine whether member actions were within policy.  These findings shall be presented to the PRB.
    6.8.2.   If there is an allegation of misconduct, the RU manager shall review PSD's or IPR's recommended findings memorandum and submit with that recommended findings memorandum their own concurrence or controvert memorandum for presentation to the PRB.

6.9.  The PSD investigator shall act in accordance with the prescribed timelines and procedures established in Directive 332.00, Administrative Investigations.

7.  Training Review.
    7.1.   Training Division Responsibilities.
        7.1.1.   Upon completion of the criminal investigation and administrative review, the Training Division shall conduct a review of the incident and an analysis of the investigative findings to determine whether member actions were consistent with training and/or those actions reflect training deficiencies.
        7.1.2.   The Training Division shall then provide its review to the involved member's RU manager.

    7.2.   RU Manager Responsibilities.
        7.2.1.   The RU manager shall discuss the Training Division's review with the involved member.

8.  Communication Restriction Order (CRO).
    8.1.   The Detective Division Commander, or their designee, shall issue CROs to all witness and involved officers immediately following the incident.  The CRO process shall include:
        8.1.1.   Issuing CROs to all witness and involved members;
        8.1.2.   Providing copies of the CROs to a Detective Homicide Detail supervisor;
        8.1.3.   Providing copies of the CROs to the PSD Captain; and
        8.1.4.   Documenting that the CROs were issued and to whom.

    8.2.   The CRO shall prohibit direct or indirect communications among any and all involved and witness officers regarding the facts of the event.

    8.3.   Members under a CRO may communicate with any of the following regarding the case:
        8.3.1.   Representatives from PSD,
        8.3.2.   Representatives from the Independent Police Review Division (IPR),
        8.3.3.   The investigating Homicide Detective
        8.3.4.   Representatives from the City Attorney's Office,
        8.3.5.   Union representative,
        8.3.6.   Attorney,
        8.3.7.   Spouse,

8.3.8.   Clergy person,

8.3.9.   Doctor,

8.3.10. Psychotherapist, and/or

8.3.11. Any other person recognized by a court with jurisdiction in the State of Oregon as having a protected relationship entitling them to privileged communications.

8.4.   Union representatives shall not communicate to either involved members or witness members what has been told to them by any individual they are representing.

8.5.   The CRO shall continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the DA, and until the conclusion of the administrative review.  The CRO shall remain in effect until revoked in writing by the PSD Captain.

8.6.   On a case-by-case basis, the Chief of Police, or designee, may extend a CRO issued in a criminal investigation or an administrative review, for reasons including, but not limited to the case being under review by another federal, state, or local law enforcement agency.

8.7.   Members not involved in a deadly force or in-custody death incident shall not communicate with a member who has been designated as an involved or witness member about factual aspects of the investigation, unless authorized to do so, and until the involved or witness member is no longer under a CRO.

8.8.   Members may speak with Traumatic Incident Committee members.  Members should avoid directly discussing factual aspects of the incident with Traumatic Incident Committee members. Traumatic Incident Committee members are directed to steer the conversation away from the facts and focus instead on the emotional issues confronting the member(s).  Traumatic Incident Committee members shall not elicit the factual aspects of the incident from involved or witness member(s).

9.   Release of Information.

9.1.   The Bureau shall provide timely and appropriate information when members use deadly force. However, the Bureau must weigh the public's right to know with what is in the best interest of the investigation.  As a general rule, the Bureau shall release, as soon as possible, accurate information which shall not compromise an ongoing investigation or the potential prosecution of a suspect(s). However, under no circumstances shall any statements or information provided to PSD be subject to disclosure or release until the conclusion of all criminal proceedings.  Absent a specific and lawful request, the Bureau shall not release the prior criminal history or prior law enforcement booking photo of the individuals involved in a member's use of deadly force or in-custody death.

9.2.   The PIO, who reports directly to the Chief of Police, shall be called out to all use of deadly force incidents.  As soon as possible, the PIO shall coordinate with the Detective Division Sergeant in charge of the investigation, the DA's on-scene representative, and a union representative of the involved member(s) to determine what information shall be released.

9.3.   During the course of the criminal investigation, the Detective Division will coordinate the release of information through the PIO.  The Chief of Police is ultimately responsible for approving information available for release.

9.4.  The Bureau also has a responsibility to ensure that community members, in particular the families of community members directly affected by the use of deadly force, along with members of the Bureau, receive timely information.

9.5.  The Chief of Police will convene a briefing the next business day after the incident.

9.6.  To provide timely and accurate information, the Detective Division should direct the Crisis Response Team (CRT) to assign a liaison to assist in providing information to members of the community directly affected by a use of deadly force.  CRT shall not release information that has not been approved for release by the Homicide Sergeant in charge of the investigation and the DA.  Internal communication shall be coordinated through the Chief of Police.

9.7.  As soon as possible, the PIO shall release to the public the available information. Typically, the information shall include:
   9.7.1.  Nature of the call,
   9.7.2.  Time of the call and member arrival,
   9.7.3.  Number of members directly involved in the use of deadly force,
   9.7.4.  Years of service of members directly involved in the use of deadly force,
   9.7.5.  General information about the community member(s) involved in the deadly force encounter; and
   9.7.6.  Other information as determined by the Detective Division and the DA.

9.8.  The identity of Bureau member(s) involved in the incident shall be released within twenty-four hours, absent a credible security threat.  In incidents involving the death of a Bureau member, or member of the public, the identity will be released with approval of the Detective Division and the Medical Examiner's Office.

9.9.  All public records requests for any material relating to investigations shall be routed to the Records Division for standard public records request routing.

9.10.  Because the Bureau has an interest in continuing to provide the community with information in the days that follow the use of deadly force, the Detective Division will continue to coordinate the release of other relevant information with the PIO.