# EXHIBIT D

I hereby certify this document to be a complete and exact Copy of the original as the same appears on file and of Record in my office and in my care and custody on this 10th day of *April 2018*

Mary Hull Caballero
Auditor of the City of Portland
By *Deirdre Parsons*
                                    Deputy

## ORDINANCE No.   1 8 8 5 7 0   As Amended

\*Approve amendments to Settlement Agreement Between the United States and the City of Portland in United States District Court Case No. 3:12-cv-02265-SI, and Plan for the Portland Commission on Community-Engaged Policing (Ordinance)

The City of Portland ordains:

Section 1. The Council finds:

1.  On January 29, 2010, Aaron Campbell, an unarmed African American man experiencing a mental health crisis, was shot and killed by a Portland Police Bureau (PPB) officer.

2.  In the aftermath of Mr. Campbell's death, on February 19, 2010, then-Mayor Sam Adams and Commissioner Dan Saltzman (who was then serving as Police Commissioner) were joined by African American community leaders in calling for a United States Department of Justice (DOJ) investigation of the Portland Police Bureau.  Among the community leaders standing with Mayor Adams and Commissioner Saltzman to call for this investigation were the Reverend T. Allen Bethel and Ms. Joyce Harris.  Dr. Bethel is now the Co-Chair of the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and Ms. Harris is a member of that organization's steering committee.  Dr. Bethel, his AMAC Co-Chair the Reverend Dr. LeRoy Haynes, Jr., Ms. Harris and other members of the AMAC steering committee have continued to be active proponents of police reform efforts.

3.  Assistant United States Attorney General Thomas E. Perez announced on June 8, 2011, that the Civil Rights Division of the DOJ would investigate and conduct the review of the PPB with the US Attorney's Office for the District of Oregon.  Mr. Perez stated that the investigation would be independent, thorough, fair and collaborative.

4.  The City of Portland and the PPB cooperated fully with the DOJ investigation.  In September 2012, the DOJ issued a letter to then-Mayor Adams reporting the findings of the investigation.  That letter is attached as Exhibit 1.

5.  In its findings letter, the DOJ thanked the City, the PPB, the Mayor and the PPB Chief of Police *"for initially inviting us into Portland to conduct this investigation.  We acknowledge the professionalism of all of the City officials and counsel involved.  In particular, we appreciate the openness and flexibility of the City and PPB personnel during our two site visits, as well as their diligence in providing requested information, including voluminous responsive documents in a timely fashion.  Further, we are encouraged by PPB's eagerness to improve its processes, as evidenced by the steps that PPB has already taken to address concerns raised during our investigation.  PPB has not waited for our formal findings to begin the process of addressing the deficiencies that are outlined in*

188570

*this letter. We also commend PPB's willingness to seek outside evaluation and consultation in numerous instances before our investigation. This leaves us optimistic that we will continue our collaborative relationship to craft sustainable remedies that address the deficiencies identified in this letter."*

6.    The DOJ stated that it had opened its investigation: *"to consider whether PPB officers engage in a pattern or practice of using excessive force, with a particular focus on the use of force against people with mental illness or in mental health crisis."* The findings were that *"[w]hile most uses of force we reviewed were constitutional, we find reasonable cause to believe that PPB engages in a pattern or practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness."*

7.    The DOJ findings letter recognized *"the challenges that police officers in Portland and elsewhere confront in addressing the needs of people with mental illness. Our findings take place against a backdrop of a mental health infrastructure that has a number of key deficiencies. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Despite the critical gaps in the mental health system, police agencies must be equipped to interact with people in mental health crisis without resulting to unnecessary or excessive force. As Oregon's main population center, Portland police officers encounter people with actual or perceived mental illness with increasing frequency. We are working separately with State officials in a constructive, collaborative manner to address the gaps in the mental health infrastructure. We are confident that the state-wide implementation of an improved holistic, effective community-based mental health infrastructure will be of enormous benefit to law enforcement agencies across the State, as well as to people with mental illness. Implementing these reforms will enhance public safety and officer safety."*

8.    As the DOJ noted, even prior to the issuance of the findings letter, the City and PPB had already begun working collaboratively with the DOJ to undertake steps to improve PPB's performance in key areas.

9.    Immediately following the issuance of the DOJ findings letter in September 2012, the City, the PPB and the DOJ continued the work already underway to agree upon and memorialize the additional steps the City and the PPB would take, with DOJ oversight, to ensure that the PPB delivers police services to the people of Portland in a manner that effectively supports officer and public safety in full compliance with the United States Constitution. Specifically, the parties worked to agree upon a plan to strengthen initiatives already begun by PPB to ensure that encounters between police and persons with perceived or actual mental illness, or experiencing a mental health crisis, do not result in unnecessary or excessive force. Those negotiations culminated in a draft Settlement Agreement between the parties.

City of Portland
Exhibit D, Pg. 2 of 184

188570

10.    On October 26, 2012, then-Mayor Adams transmitted a Memorandum to City Council providing an Overview of Settlement Agreement between the United States, the City of Portland and the Portland Police Bureau. That Memorandum is attached as Exhibit 2.

11.    The Portland City Council took testimony on the Settlement Agreement on November 1 and November 8, 2012, and on November 14, 2012, passed Ordinance 185736 As Amended (Authorize Mayor to execute an Agreement with the United States Department of Justice Civil Rights Division and United States Attorney for the District of Oregon regarding changes to policies and procedures in and oversight of the Portland Police Bureau). The Settlement Agreement approved by City Council was amended following the first public hearing in response to public testimony, and identified seven major categories to be addressed by the City and the PPB: Use of Force (Section III); Training (Section IV); Community-Based Mental Health Services (Section V); Crisis Intervention (Section VI); Employee Information System (Section VII); Officer Accountability (Section VIII); and Community Engagement and Creation of Community Oversight Advisory Board (Section IX).

12.    On December 17, 2012, the United States and the City signed the Settlement Agreement as authorized by Council and, as contemplated, the United States then filed a Complaint in the United States District Court for the District of Oregon to ensure that the Court would have jurisdiction to enforce the Agreement should it ever become necessary. Further, on this day, the City and the United States filed a Joint Motion to Enter Settlement Agreement and Conditional Dismissal of Action. Paragraph 178 of the Settlement Agreement (contained in Section X pertaining to Agreement Implementation and Enforcement) provided in relevant part that: *"The parties agree jointly to file this Agreement with the United States District Court for the District of Oregon.... The joint motion shall request that the Court enter the Agreement . . . and conditionally dismiss the complaint in this action with prejudice, while retaining jurisdiction to enforce the Agreement...."*

13.    Two days after the filing of the Complaint, on December 19, 2016, the United States and the City filed a Joint Motion to Enter Settlement Agreement and Conditionally Dismiss Action. The City did not wait for court approval to begin to perform under the Agreement, but rather actively continued its efforts to implement the agreed-upon steps for improvement. That effort has continued throughout the legal process described below.

14.    The oversight structure of the Settlement Agreement set forth in Section X – Oversight and Implementation – was unique. The parties sought to continue their collaborative relationship and determined it was not necessary or desirable to have the traditional form of entry of a consent decree with court oversight and a court-appointed monitor.

15.    Instead, the parties agreed that they would themselves be responsible for progress under the Agreement, with the DOJ having enforcement authority. The parties

188570

agreed that the Court would conditionally dismiss the action, but would retain jurisdiction to enforce the Agreement if the DOJ determined it was necessary to seek court enforcement following a process specified in the Agreement at Paragraphs 181 through 186. Short of invocation of that process by the DOJ, however, the Settlement Agreement does not provide for or depend upon active, independent participation by the Court for its monitoring or implementation.

16.   This structure was extremely important to the City Council because it placed direct responsibility for oversight of the Agreement with the City's elected officials, thereby ensuring that the public knows who is responsible and accountable for managing the PPB in conformance with the community's values. The City Council is directly responsive to and elected by the people of Portland while an appointed federal judge is not.

17.   Section X of the Agreement provided several key components for implementation and enforcement. First, the City would select a Compliance Officer and Community Liaison (COCL) who would be responsible for synthesizing data related to PPB's use of force; collecting data and reporting to the City Council, the DOJ and the public on PPB's implementation of each substantive provision of the Agreement; and gathering input from the public related to PPB's compliance with the Agreement. The COCL would also oversee the Community Oversight and Advisory Board (the "COAB"). Second, the City would hire or retain a PPB Compliance Coordinator to serve as a liaison between the PPB, the COCL and the DOJ, and to assist with the PPB's compliance with the Agreement. Third, the PPB would revise and/or develop policies, procedures, protocols, training and practices to implement the Agreement, which would be provided to and reviewed by both the DOJ and the COCL, as well as being available to the public. To facilitate this, the City would provide both the DOJ and the COCL with access to all needed personnel and documents, and would prepare status reports. In turn, the DOJ and the COCL would develop compliance assessments which would be publicly available and, in particular, available to the community engagement body developed under Section IX of the Agreement.

18.   Section X outlines mechanisms (written notice, responses, meetings and mediation) to be used to address any areas where the DOJ determines that the City has failed to implement the terms of the Agreement.

19.   If those mechanisms are unsuccessful in resolving concerns, then the Agreement provides for the United States to file a motion with the Court to enforce compliance or seek a ruling on the disputed issue. Were such a motion to be filed, the Court would then have the power to determine whether the Agreement had been breached and to issue an appropriate remedy.

20.   Following the filing of the United States' Complaint and the Joint Motion to Enter Settlement Agreement and Conditional Dismissal of Action, the Court subsequently granted the motion of the Portland Police Association to intervene

188570

as a party and, while denying the AMAC's motion to intervene as a party, granted the AMAC enhanced amicus or "friend of the court" status.

21.    The Court held a fairness hearing on February 18 and 19, 2014, to determine whether the Settlement Agreement was fair, reasonable and adequate.

22.    On August 28, 2014, the District Court approved the Settlement Agreement as "fair, reasonable, and adequate," but entered an Order imposing additional conditions to which the City had not agreed which required the City, the COCL and additional parties to appear at hearings whenever called by the Court and to produce any evidence directed by the Court.

23.    The City appealed that Order to clarify the authorized frequency, scope, procedure, and evidentiary burdens the Court could impose.

24.    After the City filed its appeal, the parties engaged in mediation of the issues raised with the assistance of Ninth Circuit Mediation Program and Senior Ninth Circuit Judge Edward Leavy.

25.    The parties agreed to settle the City's appeal.  The City agreed to dismiss its appeal on the basis that there would be one annual non-evidentiary status conference before the District Court at which the parties, the COCL, a representative of the Community Oversight Advisory Board (COAB), the Portland Police Association (PPA) and the AMAC would appear to describe to the Court the status of progress on the Settlement Agreement and related agreements and that the case would otherwise be conditionally dismissed and placed on the Court's inactive docket, subject to recall to the active docket should the United States move to enforce the Settlement Agreement; and

26.    The Court entered an Order so providing on July 30, 2015.

27.    The first annual Status Conference was held on September 14, 2015, before the Court in accordance with the parties' Settlement Agreement and the Court's Order.

28.    The second annual Status Conference was held on October 25, 2016.

29.    At the second annual Status Conference, the Court heard reports from the United States, the City, the COCL, the COAB representative, the AMAC and the PPA generally providing that the City had made significant progress under the Settlement Agreement over the preceding year and was in partial or substantial compliance in all major areas but one.

30.    The United States reported (and the City concurred) that the City was not in substantial compliance with regard to the COAB, noting that the City had faced substantial barriers to compliance in this area, including civil unrest at COAB meetings.

188570

31.    The Court then invited members of the public to appear and provide commentary. It was requested that the Court schedule additional status conferences prior to the next annual status conference (then set for October 5, 2017). When the Court indicated its intent to do so, the City filed objections.

32.    The Court issued an Order on November 10, 2016, ordering the City to appear for a Status Conference on January 31, 2017, and opining that the Court has inherent authority to require the City to appear and be present for any status conferences deemed appropriate by the Court.

33.    The City filed a petition for a Writ of Mandamus with the Ninth Circuit Court of Appeals on the issue of whether this was appropriate.

34.    In Resolution 37253 authorizing the filing of the Writ, the Council was explicit that the City was *only seeking clarification on these procedural issues and was not challenging the terms of the Settlement Agreement itself.* Council noted that the City and the PPB were actively continuing to make progress toward achieving substantial compliance with those terms, and would continue to do so. The City Council explicitly stated that the City was NOT seeking to stay implementation or enforcement of the Settlement Agreement.

35.    As to the COAB, the City reported at the October 5, 2017 Status Conference that it was actively working to develop a framework for a more effective and functional structure to replace the COAB, and that it was working with the parties, intervenor and amicus to facilitate this.

36.    Section IX of the Settlement Agreement provided that the COAB would be a community board of 15 voting members (and 5 advisory PPB members) "from a reasonably broad spectrum of the community" which would "leverage the ideas, talent, experience, and expertise of the community." The COAB was authorized to: "(a) independently assess the implementation of the Agreement; (b) make recommendations to the Parties and the COCL on additional actions; (c) advise the Chief and Police Commissioner on strategies to improve community relations; (d) provide the community with information on the Agreement and its implementation; (e) contribute to the development and implementation of a PPB Community Engagement and Outreach Plan; and (f) receive public comments and concerns" (Settlement Agreement Paragraphs 141-142).

37.    The COAB was to report to and be chaired by the COCL. All of its meetings were to be open to the public. It was to consult with community members; hold public hearings; conduct surveys; consider input from the Human Rights Commission on its prior work to implement the PPB 2009 Plan to Address Racial Profiling; and contribute to the development of a PPB Community Engagement Plan, which would include strategies for outreach to a broad cross section of the community. The COAB would then be required to present its recommended CEO Plan in writing to the Chief within 90 days of its completion of survey analysis. The COAB was also authorized to provide information to PPB on other areas

188570

related to community engagement and outreach to contribute to the development of the CEO Plan including: i) integration of community and problem-oriented policing principles into PPB's management, policies and procedures; ii) recruitment, selection, training, promotion, and personnel evaluations; iii) tactics and deployment of resources; and iv) systems of accountability. It was also authorized to "make recommendations approved by a majority of its membership regarding the implementation of the terms of the Agreement." Paragraphs 144, 146, 151.

38.     For a variety of reasons, including tight deadlines and a lack of experience with the new and unique structure of the COAB (which, unlike other City boards, did not report directly to the City but rather to the COCL), it is clear with the benefit of hindsight that the City did not provide a sufficiently informative vetting process and did not provide sufficient training to the COAB members prior to them being seated or beginning their work.

39.     It is also clear that the very broad charge to the COAB; the disparate views of its members as to what the most important focus of work should be; the lack of trust on the part of many community members in the PPB resulting from their own perceptions and experiences; and the lack of a coherent framework created very significant (albeit unintended) obstacles to the COAB's success.

40.     For example, the only deliverable product explicitly required of the COAB in the Agreement was to provide a recommended Community Engagement and Outreach Plan ("CEO Plan") to the Chief of Police. The City must adopt such a plan to meet its obligations under the Agreement. The Agreement required COAB to "review PPB's prior community outreach efforts to contribute to the development of a new CEO Plan," as well as to gather information from the community about community experiences with and perceptions of PPB's prior community outreach efforts. In an effort to assist COAB in its information-gathering function, the City arranged to have PPB make a presentation on its existing outreach efforts at the COAB's first public hearing on April 3, 2015. This was greeted with derision by some in attendance as a public relations campaign, and did not facilitate positive interactions between community board members and advisory PPB members sitting on the COAB. In retrospect, it would have been better to provide more training for the COAB prior to the first hearing, and to give the COAB greater agenda-setting authority as to how to approach the tasks of reviewing PPB's prior outreach efforts and developing a recommended CEO Plan.

41.     The initial local representative of the COCL selected to chair the COAB was retired Oregon Supreme Court Chief Justice Paul DeMuniz. Chief Justice DeMuniz was regrettably forced to resign for personal health reasons shortly after the first, contentious public hearing.

188570

42.     Justice DeMuniz was replaced by Kathleen Saadat, an extremely well-respected
        and talented leader with deep experience in and ties to Portland's African
        American, Civil Rights and LGBTQ communities.

43.     Ms. Saadat worked valiantly to support the COAB's efforts to function
        effectively.  Many volunteer COAB members dedicated countless hours – well
        beyond that which was expected when they agreed to serve – to work on a
        very important experiment in direct community participation in systemic reform,
        motivated only by a desire to effect change for the greater good.

44.     Nonetheless, serious problems persisted and -- as Ms. Saadat noted in her June 26,
        2016 Exit Report transmitted to the COCL, the Mayor, the Chief, the DOJ and the
        AMAC -- a lack of clarity regarding the COAB's role, mission, process and
        structure resulted in what eventually became insurmountable barriers to the
        success of the body.  Ms. Saadat's report is attached as Exhibit 3.

45.     Ms. Saadat devoted immense effort to righting the COAB ship, and made many
        improvements.  Difficulties continued, however, including unacceptable and
        hostile behavior directed at Ms. Saadat, who eventually felt compelled to resign
        herself.

46.     By July of 2016, many COAB members had resigned leading to difficulties
        obtaining and sustaining a quorum.  Online communities existed with the sole
        purpose of "disrupting and disbanding COAB."  It was unclear how best to
        replace members and, critically, whether it was responsible of the Council to do
        so given the difficulties.  Public unrest and criminal behavior became regular
        features of meetings, resulting in arrests and many participants (board members,
        members of the public and staff) expressing safety concerns.

47.     Around this time, amidst mounting tension between the COCL and COAB for
        various reasons, the COAB requested to be separated from the COCL and the
        COCL requested to be relieved of its responsibility to chair the COAB.

48.     As a result of the above-described circumstances, several COAB members called
        for a temporary halt to COAB activity to cope with the increasing difficulties that
        frustrated the ability to hold functional meetings.

49.     In late August 2016, after consultation regarding these issues the City and the
        United States agreed to a 60-day hiatus of the COAB's activities.   During that
        time, it was understood that the City and the DOJ would engage the AMAC, the
        PPA, the PPB and the COAB itself to seek a more effective path for community
        involvement.

50.     Through the October 2016 Status Conference, the City took numerous steps to
        engage with the community on a way forward.  The City circulated a survey at a
        public forum generously hosted by Maranatha Church on September 12, 2016;
        spoke with several mental health peer support specialists, advocates and providers

City of Portland
Exhibit D, Pg. 8 of 184

188570

for those experiencing or with a history of mental illness; spent many hours in discussions with members of the AMAC steering committee; sought input from other community and faith leaders; and met with the COCL, Ms. Saadat, and Chief Justice DeMuniz to seek their counsel and perspective on the issues. City staff also interviewed almost every former and current COAB member to get their perspective.

51. On October 12, 2016, the City shared with the parties, including amicus AMAC, a proposed framework for conceptual amendments to Section IX of the Agreement, which set forth the requirements for the COAB. The proposed framework attempted to incorporate the pervasive feedback that the Settlement Agreement gave the COAB too much work to do with too little definition as to scope and deliverables.

52. On October 14, 17 and 21, 2016, the City met with the AMAC, the United States and the PPA to discuss how to move forward with improvements to the community engagement body. Mayor Hales and Commissioner Fritz attended the October 14 meeting and assured the AMAC of the City's continuing commitment to meaningful community engagement. At the October 21, 2016 meeting, the City suggested that a facilitator might be useful to further advance discussions. Both the PPA and the AMAC indicated they would try and agree upon a facilitator.

53. The PPA and the AMAC met without the City or the DOJ on November 8, 2016. On November 14, 2016, the PPA and the AMAC suggested two facilitators to the City, and the City promptly retained one of them, John Wolfe. On November 16, 2016 and December 28, 2016, the AMAC and the PPA again met without the City or the DOJ. On January 9, 2017, the AMAC and the PPA jointly submitted a document reflecting their respective proposals for a community engagement body. While the AMAC and the PPA agreed on many items, they disagreed on key issues, such as the primary purpose of a community engagement body and the appropriate scope of the COAB's work.

54. In consideration of the many issues that plagued the COAB, and the series of board member resignations that occurred in response to those issues, the City opted to let the COAB expire with the terms of its remaining members on January 31, 2017. The final meeting of the COAB was on January 26, 2017.

55. On January 26, 2017, February 21, 2017 and March 13, 2017, the City, the PPA, the AMAC and the DOJ held facilitated meetings to discuss how to move forward with a community engagement board. The parties also traded various proposals between these meetings. At the final facilitated meeting, it was agreed that the City and the DOJ would meet without the other parties to prepare a detailed proposal.

188570

56. Many of the meetings concerned the issue of whether the community engagement body should engage in "oversight." Following many discussions, the parties agreed to define "oversight" as the ability to review and make recommendations.

57. The DOJ requested that the parties agree to again participate in the Ninth Circuit Mediation program to address the issues raised by its Writ of Mandamus. The City and the PPA did not object, and on March 22, 2017, the DOJ filed its Unopposed Motion to Refer the City of Portland's Petition for a Writ of Mandamus to Court Mediation.

58. Amicus AMAC requested to participate in the mediation. As the AMAC is not a party to either the Settlement Agreement or the lawsuit, it was determined that initial mediation discussions should occur between the parties, but that the AMAC should be included in a full day session once the parties had initial discussions so that the AMAC could be informed of the status of the parties' discussions and provide input.

59. Since that time, the parties have utilized the mediation process to engage in meaningful discussions on how to move forward in the few but key areas where progress toward substantial compliance had stalled. Principal among these was the community engagement body set forth in Section IX of the Agreement, which fell on the implementation and activities of the COAB. The other key issues relate to: (1) officer accountability (specifically, (a) harmonizing the parties' desired outcome of prompt administrative investigations of use of lethal force with the Multnomah County District Attorney's legal interpretation that compelling a statement from the officer would or could result in immunity from prosecution; (b) harmonizing the intended outcome of robust civilian involvement in the accountability system with the intended outcome of timely results in administrative investigations; and (c) granting the City's investigative bodies (IPR and IAD) the ability to make recommended findings based on its investigation); (2) the City's Crisis Intervention Model and measuring its effectiveness; and (3) the Employee Information System (EIS) and how best to use data to identify potentially problematic trends at the supervisor and team levels given difficulties utilizing EIS effectively for this purpose.

60. In these discussions, the parties recognized that it has been almost five years since the Settlement Agreement was first negotiated. In a few areas, the actual experience has been different than anticipated in one respect or another and some changes to the specific language of the Settlement Agreement are necessary to allow the City to achieve the outcomes intended by the Settlement Agreement and to come into full substantial compliance.

61. The Settlement Agreement itself anticipated that amendments could be necessary or desirable. Paragraph 187 provides: "Nothing prohibits the Parties from engaging in any informal or formal discussions regarding this Agreement or the City's compliance…. The Parties may jointly stipulate to make changes, modifications, and amendments to this Agreement, which shall be effective,

188570

absent further action from the Court, 45 days after a joint motion has been filed with the Court. Any modification of this Agreement by the City of Portland must be approved by the City Council of the City by written ordinance."

62.   As a result of the mediation discussions, members of the DOJ team, City staff and the PPA reached conceptual agreement on a number of amendments to the Settlement Agreement, including the provisions relating to the community engagement body. Draft Settlement Agreement amendments and a draft plan for a new Portland Committee on Community-Engaged Policing (PCCEP) were provided to the AMAC on July 7, 2017, and an all-day mediation session facilitated by the Chief Ninth Circuit Mediator Claudia Bernard and Senior Ninth Circuit Judge Edward Leavy was held at the Pioneer Courthouse on July 14, 2017. The AMAC was represented by counsel, one of its co-chairs and several members of its steering committee. Representatives from the DOJ, the City and the PPA were all present, as well.

63.   The AMAC provided the parties with thoughtful comments and concerns at the mediation and the parties agreed to several revisions to the draft PCCEP Plan at that time. The revised draft PCCEP Plan reflecting these revisions was provided to the AMAC on July 17, 2017.

64.   The AMAC provided additional comments in a letter dated July 21, 2017. Additional changes have been made to both the draft Amended Settlement Agreement and the draft PCCEP Plan (which is Exhibit 4-1 to the draft Proposed Amended Settlement Agreement) in response to AMAC's comments.

65.   The draft Proposed Amended Settlement Agreement, reflecting the work of the parties in the mediation process and incorporating changes to address many of the AMAC's comments and concerns, is attached hereto as Exhibit 4 (in redline form).

66.   The proposed amendments to Section IX provide for a new Portland Commission on Community-Engaged Policing, which is intended to endure beyond the effective date of the Settlement Agreement. The key changes from the prior COAB structure are: more clarity as to the scope of work; more training (which will be informed by the Saadat Report, Ex. 3, and in which the AMAC will participate); a simplified appointment process; a separation between the COCL and the community engagement body; a smaller body, with no standing PPB advisory members; a structure that requires regular public meetings yet also permits the Commission to conduct some work in meetings which are not open to the public, if its members so elect; greater agenda-setting authority by the body itself; the ability for the body (after the first year) to select its own chair from among its members; more clearly defined deliverables; more clarity as to how the body interacts with the City and what staff support will be provided; an obligation on the part of the City to respond in writing to the written recommendations of the body; and greater accountability for and to the body through its placement in the Mayor/Police Commissioner's office. The amendments and the proposed Plan

City of Portland
Exhibit D, Pg. 11 of 184

188570

also provide more clarity that PCCEP may, should it choose to do so, facilitate community "oversight' of the City's compliance with the Settlement Agreement (as defined by the parties and the AMAC to mean the ability to review compliance and make recommendations).

67.    Responsibility for monitoring the City's compliance with the terms of the Agreement remains with the COCL and the DOJ, with the DOJ retaining its authority to seek Court enforcement of the terms of the Agreement.

68.    The structure and activities of PCCEP are intended to increase community members' access to the PPB by creating spaces in which community members are able to air grievances, and voice policy concerns and recommendations to PCCEP members (and PPB members in attendance), who would then convey that information to the PPB. Conversely, as the PPB is required to provide information to PCCEP on its initiatives and policy development and implementation process, PCCEP will be able to make transparent much of the PPB's work in specific areas of concern for the community.

69.    The PCCEP's activities will involve assisting PPB's Office of Community Engagement in reassessing and establishing the Office's programmatic priorities. This reflects an understanding by the City that community-engaged policing cannot be meaningful if it is not directly responsive to the community it serves. For this to manifest, community input – both from the PCCEP, directly, and the wider Portland community – in the Office's direction is critical.

70.    The PCCEP was also developed in response to the PPB's articulated concerns around the absence of a framework for assessing and measuring the outcomes of community engagement initiatives.  Though there has been significant effort on the part of the PPB to increase community engagement, very little data has been collected by the PPB to track PPB member involvement and feedback, and measure success.

71.    PCCEP will build on the excellent work of the COAB in its review of PPB directives related to the DOJ Settlement Agreement and/or key areas of concern. Recognizing the need for increased transparency in the directive review process, PCCEP's review of directives and development of recommendations will be integrated into the PPB's review process in order to streamline the work and make the PPB immediately responsive to PCCEP's feedback. Moreover, PCCEP will share information received from the PPB and its own recommendations with the community. Community recommendations will be compiled by PCCEP and shared with PPB.

72.    In order to properly establish the PCCEP and develop training for its members, the City of Portland will seek the services of an organizational development consultant.

188570

73.     Another significant amendment relates to use of force investigations following an officer-involved shooting or in-custody death. The DOJ and City staff held numerous discussions on the issue of compelled statements following an officer-involved shooting, including a meeting between the United States Attorney for the District of Oregon, the Multnomah County District Attorney, the City Attorney and other representatives on March 28, 2017. At that meeting, the District Attorney explained his position that Oregon law would provide transactional immunity to an officer if the City compelled that officer to answer questions as part of an administrative employment investigation into an officer-involved shooting prior to the conclusion of the criminal investigation. The District Attorney said that as a result this would preclude him from prosecuting an officer criminally if that officer's statement had been compelled by the City, even if an investigation revealed the officer's conduct to be criminal.

74.     The City Attorney has advised that the District Attorney has the statutory authority to oversee criminal investigations into officer-involved shootings or other in-custody deaths and that the District Attorney also has the legal discretion to determine whether or not to bring a criminal prosecution.

75.     The City Attorney has also advised that the issue of the scope of immunity *from criminal prosecution,* which is legally afforded to an officer as a result of a compelled statement in an *administrative employment proceeding,* is unclear and not legally resolved by *State v. Soriano* (1984), the Oregon case on which the District Attorney relies.

76.     It is the policy of the City and a requirement of the Settlement Agreement that uses of deadly force will be promptly reported and investigated. It is City Council's policy that the City should take all legally permissible steps to promptly (within 48 hours) compel a statement from an officer who uses force resulting in death. It is also the City Council's policy that the City not take any action which would or could preclude holding an employee accountable through the criminal justice system for criminal behavior.

77.     The proposed amendments to paragraph 69.c. (Ex. 4) permit the City to comply with the Settlement Agreement by implementing revised directive 1010.10 under which PPB will not compel an officer to make a statement in an administrative interview following an officer-involved shooting until the criminal investigation (and prosecution were one to occur) is concluded.

78.     The City Attorney is directed to seek an interpretation of Oregon law that would permit the City to promptly compel statements in administrative employment investigations (within 48 hours of the event) without affording full immunity from prosecution in the criminal investigation. Should the City have legal authority to do so, this Council will implement an alternative Directive 1010.10 requiring compelled statements within 48 hours.

188570

79.    The proposed amendment to paragraph 117 of the draft Amended Settlement Agreement (Ex. 4) enables the City to use force audit data rather than EIS data to conduct analyses at the supervisor-and team-levels which have proven problematic to conduct using EIS data. The analysis will be substantially similar to the analysis conduct at the employee level using EIS data.

80.    The amendment to paragraph 121 of the draft Amended Settlement Agreement (Ex. 4) will exclude appeals to CRC from the 180-day timeline for completion of all administrative investigations of officer misconduct. This change will permit the City to balance its interest in the prompt conclusion of administrative investigations with its interest in robust civilian oversight of those investigations.

81.    The amendment to paragraph 131.i. (Ex. 4) will assist the City in reducing the complexity of its accountability system and the time to completion in certain investigations by permitting the City Council to adopt code authorizing a stipulated discipline exception to the full discipline process. This would occur where an officer elects to accept the investigative findings and recommended discipline following a full investigation of the alleged misconduct, issuance of the investigative findings and concurrence with those findings by the Independent Police Review, the Professional Standards Division, and the member's branch chief. Prior to stipulated discipline becoming available, the City Council will have to pass authorizing code which shall set forth the scope and nature of the cases eligible for stipulated discipline. At a minimum, cases involving alleged use of excessive force; alleged discrimination, disparate treatment or retaliation; officer-involved shootings and in-custody deaths; other categories of cases identified by Council in the code; and cases in which the Chief of Police or Police Commissioner does not agree to Stipulated Discipline shall not be eligible.

82.    The proposed amendments to Section X.A. of the draft Amended Settlement Agreement (Ex. 4) are intended to accomplish two purposes. First, the amendments are intended to permit the COCL to focus its quarterly reports by topic area (accountability or use of force or crisis intervention, for example) rather than covering all items in each quarterly report so long as all items are addressed over the course of the year. This is based on DOJ's experiences with this format in other jurisdictions and is intended to make COCL's reports more focused, meaningful, accessible to the public and useful to DOJ.

83.    Second, it is contemplated under the amendments and PCCEP Plan that the new PCCEP will be required to coordinate with the COCL to host the COCL quarterly town hall meetings (which role will otherwise be filled by the COCL directly with City administrative support). PCCEP is also required to facilitate community oversight (review of and recommendations regarding) compliance by receiving public comment on compliance assessments and recommendations. Though PCCEP is not required to review and prepare responses to the COCL's draft reports, PCCEP does have the discretion to provide feedback should it elect to do so.

188570

84.    The proposed amendments reflected in Exhibit 4 have been developed in discussions between the parties, and also reflect revisions following discussions with and consideration of the comments of the enhanced amicus AMAC. The City cannot stipulate to the proposed amendments until they are approved by this Council. The United States will accordingly not provide final review and approval until the proposed amendments have been approved by the City Council. Once both Council and the United States provide approval, the parties will file a joint motion to amend the settlement agreement.

85.    Staff recommends that Council approve these amendments in order to permit the City to come into full substantial compliance with its obligations under the Settlement Agreement.

NOW, THEREFORE, the Council directs:

a.    The amendments to the Settlement Agreement reflected in the Proposed Amended Settlement Agreement attached as Exhibit 4 are approved. The City Attorney is authorized to sign a Joint Motion to Amend Settlement Agreement with the United States reflecting amendments substantially in the form of Exhibit 4.

b.    The PCCEP Plan attached as an Exhibit to the Proposed Amended Settlement Agreement is approved. The Mayor is authorized to take all necessary steps to constitute this body.

Section 2. The Council declares an emergency exists because it is in the public benefit to send the ordinance to the Department of Justice and the judge as soon as possible; therefore, this ordinance shall be in full force and effect from and after its passage by the Council.

Passed by the Council:    AUG 2 4 2017

Commissioner:  Mayor Wheeler
Prepared by:    Tracy Reeve
Date Prepared:  7/25/17

**Mary Hull Caballero**
Auditor of the City of Portland
By    _Susan Parsons_
                        Deputy

872 095 946

Agenda No.

**ORDINANCE NO.** 1 8 8 5 7 0   As Amended

Title

Approving amendments to Settlement Agreement Between the United States and the City of Portland in United States District Court Case No. 3:12-cv-02265-SI, and Plan for the Portland Commission on Community-Engaged Policing. (Ordinance)

| INTRODUCED BY Commissioner/Auditor: **Mayor Wheeler** | CLERK USE: DATE FILED ___ **JUL 2 5 2017** ___ |
|---|---|
| **COMMISSIONER APPROVAL** | Mary Hull Caballero |
| Mayor—Finance and Administration - Wheeler | Auditor of the City of Portland |
| Position 1/Utilities - Fritz | By: _____ |
| Position 2/Works - Fish | Deputy |
| Position 3/Affairs - Saltzman | |
| Position 4/Safety - Eudaly | ACTION TAKEN:    **As Amended** |
| **BUREAU APPROVAL** | AUG 0 3 2017 PASSED TO SECOND READING  AUG 0 9 2017 1:00 PM TIME CERTAIN |
| Bureau: City Attorney's Office Bureau Head: Tracy Reeve | AUG 0 9 2017 **CONTINUED TO** AUG 2 4 2017 2 P.M Time Certain |
| Prepared by: T. Reeve Date Prepared: **7/25/17** | |
| Impact Statement Completed ☒   Amends Budget ☐ | |
| Portland Policy Document If "Yes" requires City Policy paragraph stated in document. Yes ☒   No ☐ | |
| **City Auditor Office Approval:** required for Code Ordinances | |
| **City Attorney Approval:** required for contract, code, easement, franchise, comp plan, charter | |
| Council Meeting Date  8/3/17 | |

| AGENDA |   | FOUR-FIFTHS AGENDA | COMMISSIONERS VOTED AS FOLLOWS: | | |
|---|---|---|---|---|---|
| | 2017 8/24 | | | YEAS | NAYS |
| **TIME CERTAIN** ☒ Start time: **3:10** | | 1. Fritz | 1. Fritz | ✓ | |
| **Total amount of time needed: 1.5 Hours (2 of 3 items)** (for presentation, testimony and discussion) | | 2. Fish | 2. Fish | ✓ | |
| | | 3. Saltzman | 3. Saltzman | ✓ | |
| **CONSENT** ☐ | | 4. Eudaly | 4. Eudaly | ✓ | |
| **REGULAR** ☐ Total amount of time needed: _____ (for presentation, testimony and discussion) | | Wheeler | Wheeler | ✓ | |