1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF OREGON

3
UNITED STATES OF AMERICA,      )   3:12-cv-02265-SI
4                              )
        Plaintiff,             )
5                              )
             vs.               )   October 25, 2016
6                              )
THE CITY OF PORTLAND,          )
7                              )
        Defendant.             )   Portland, Oregon
8

9

10

11

12

13                 TRANSCRIPT OF PROCEEDINGS

14                   (Status Conference)

15         BEFORE THE HONORABLE MICHAEL H. SIMON

16          UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

APPEARANCES

FOR THE UNITED STATES:

      Bill Williams
      Adrian Brown
      United States Attorney's Office
      1000 SW Third Avenue, Suite 600
      Portland, Oregon  97204


      R. Jonas Geissler
      Laura Coon
      U.S. Department of Justice
      950 Pennsylvania Avenue, NW
      Washington, DC  20530


FOR THE CITY OF PORTLAND:

      Ellen C. Osoinach
      Judy S. Prosper
      Mark P. Amberg
      Office of the City Attorney
      1221 SW Fourth Avenue, Suite 430
      Portland, Oregon  97204


FOR THE PORTLAND POLICE ASSOCIATION:

      Anil Karia
      Public Safety Law Group
      3021 NE Broadway
      Portland, Oregon  97232

1                       APPEARANCES (Continued)

2

3   FOR ENHANCED AMICUS CURIAE:

4                           Jessica Ashlee Albies
                            Creighton & Rose, PC
5                           65 SW Yamill Street, Suite 300
                            Portland, Oregon  97204
6
                            Kristen Chambers
7                           Kirklin Thompson & Pope LLP
                            1000 SW Broadway, Suite 1616
8                           Portland, Oregon  97205

9

10

11

12

13

14

15

16

17

18

19

20

21

22   COURT REPORTER:        Dennis W. Apodaca, RDR, RMR, FCRR, CRR
                            United States District Courthouse
23                          1000 SW Third Avenue, Room 301
                            Portland, OR  97204
24                          (503) 326-8182

25

```
 1                        (October 25, 2016)
 2                   P R O C E E D I N G S
 3            (American Sign Language Interpreters Richard Hall
 4  and Andrea Medlock were sworn by the clerk.)
 5            (Open court:)
 6            THE COURT:  Mary, would you please call the case.
 7            THE CLERK:  Your Honor, this is the time set for a
 8  status conference in civil case 12-2265-SI, USA versus City of
 9  Portland.
10            Can I have plaintiff's counsel begin by stating your
11  appearances for the record.  Then we will go on down the side
12  of the table.
13            Thank you.
14            MR. WILLIAMS:  Good afternoon, Your Honor.
15  Bill Williams on behalf of the United States Attorney's Office.
16            THE COURT:  Welcome.
17            MS. COON:  Good afternoon, Your Honor.  My name is
18  Laura Coon.  I am special counsel with the Civil Rights
19  Division of the Department of Justice here on behalf of the
20  United States.
21            MS. BROWN:  Good afternoon, Your Honor.  Adrian Brown
22  for the United States.
23            MR. GEISSLER:  Good afternoon, Your Honor.
24  Jonas Geissler from the Civil Rights Division for the United
25  States.
```

1              MS. ALBIES:  Good afternoon, Your Honor.

2    Ashlee Albies for the enhanced amicus, Albina Ministerial

3    Coalition for Justice and Police Reform, and with me is

4    Dr. LeRoy Haines.

5              THE COURT:  Welcome.

6              MR. KARIA:  Anil Karia for the Portland Police

7    Association.

8              MS. OSOINACH:  Ellen Osoinach on behalf of the City

9    of Portland.

10             MS. PROSPER:  Good afternoon, Your Honor.

11   Judy Prosper, City of Portland.

12             MR. AMBERG:  Mark Amberg on behalf of the City of

13   Portland.

14             THE COURT:  Welcome.

15             I would also like to welcome to the courtroom the

16   distinguished mayor, Mr. Charlie Hales.  Chief of Police

17   Marshman, welcome.  Commissioner Amanda Fritz and City Auditor

18   Mary Caballero, welcome.  To everyone else who is taking time

19   out of their day to attend this hearing, I thank you.

20             What we will do, unless someone has a --

21             Yes.

22             MS. OSOINACH:  Your Honor, I want to state that

23   IPR Director Constantin Severe is here as well, and you might

24   want to recognize him.

25             THE COURT:  Yes.  My apologies.  Thank you.

1              Mr. Severe, thank you very much.  I apologize.

2    Welcome to the IPR director.  Thank you.

3              Unless anyone has any alternative suggestions, I

4    think it might be useful to go in the following order:  First,

5    hearing from the plaintiff, United States; followed by

6    Defendant City of Portland through their counsel; followed by

7    intervenor, the Portland Police Association, through their

8    counsel; followed by amicus Albina Ministerial Coalition.  Then

9    after that, hearing comments from COCL, the Compliance Officer

10   and Community Liaison.

11             At some point, probably about an hour and a half from

12   now, give or take, at an appropriate time I am going to have

13   probably about a ten-minute recess or so.  Then if there are

14   members of the public who wish to be heard on any of these

15   matters, just make yourself known to my courtroom deputy,

16   Mary Austad, during that break, and she will keep a list of

17   your names.

18             Is there anyone else that I have left out that we

19   should be hearing from soon or any suggestions for an

20   alternative order?

21             Ms. Prosper.

22             MS. PROSPER:  The COAB representative is also here.

23             THE COURT:  Yes, of course.  Who will be speaking for

24   the COAB?

25             MS. PROSPER:  Mr. Tom Steenson.

1              THE COURT:  Excellent.  Very good.

2              Maybe we will do after the Albina Ministerial

3     Coalition, we will go to either the Compliance Officer and

4     Community Liaison and then the COAB, or if someone thinks we

5     should reverse that, let me know, and that will be fine.  Then

6     after that, we will move to members of the public who wish to

7     be heard.

8              Any alternative suggestions or objections to that

9     procedure?

10             All right.  Seeing no hands or hearing no voices, the

11    United States may proceed.

12             MR. GEISSLER:  Thank you, Your Honor.  Shall I take

13    the podium or would Your Honor prefer here?

14             THE COURT:  Whichever you prefer.

15             MR. GEISSLER:  For the sake of my eyes, I think I

16    will take the podium.

17             THE COURT:  Wherever you prefer.

18             MR. GEISSLER:  Your Honor, again I'm Jonas Geissler

19    for the United States.  My colleague, Adrian Brown, and I have

20    a division of labor by topic area to report compliance with the

21    settlement agreement.  However, Your Honor, I would like to

22    start today with an overview.

23             The purpose of this case was to remedy violations of

24    the Fourth Amendment rights of individuals to be free from

25    unreasonable uses of force; namely, by way of law enforcement

1    officers' use of force against predominantly individuals with

2    mental health issues or perceived mental health issues.

3              Because of that focus on people with perceived mental

4    illness or actual mental illness, the remedies in this case

5    touch not just upon the Portland Police Bureau, but also other

6    aspects of the City.  Though this case names the City as the

7    defendant and the case focuses on those individuals, the

8    remedies are more expansive.

9              We negotiated, and this Court found fair, reasonable,

10   and adequate an agreement that placed many responsibilities

11   squarely where they belonged, on the shoulders of the Portland

12   Police Bureau, but also shared some of those responsibilities

13   with other city agencies; namely BOEC.

14             There has been progress since this case began.  When

15   we started, PPB had ten officer-involved shootings or critical

16   incidents per year.  In 2015, there was one.  In 2016, there

17   was one.  There are more people alive today because of the

18   remedies already imposed in this case.

19             When this case started, PPB had given its officers

20   crisis intervention training -- 40 hours for all officers --

21   but there were still unreasonable force events for people with

22   mental health crises.  Today, the Behavioral Health Unit

23   programs have expanded, and as my colleague Adrian Brown will

24   describe, we have given provisional approval to PPB's Enhanced

25   Crisis Intervention program.

1              While there is still work to do in this area,

2    including BOEC training and community-based mental health

3    services, the PPB response so far has been much more swift in

4    this particular area of remedies for this case.

5              There is still a need for improvements.  In our

6    findings, we called confusing -- the accountability system --

7    "Byzantine."  Today, the accountability system is more

8    expeditious, but is no less confounding and frustrating to both

9    the complainants and the officers involved.

10             The COAB -- the experiment in community oversight for

11   a settlement agreement that we began with in this settlement

12   agreement before others began poorly and quickly became worse.

13   The lack of training, volunteer fatigue, infighting have

14   plagued the COAB and called for an examination for how to best

15   fix the COAB going forward.

16             For the topic areas going forward, Your Honor, I will

17   speak about force, training, Employee Information System, and

18   accountability.  My colleague will speak to mental health,

19   crisis intervention, and community engagement.

20             Before we go over compliance, a note about

21   methodology, this most recent compliance report covers the

22   period of August 30th, 2015 through August 29th, 2016.  The

23   report is based upon our direct observations.  We went and saw

24   the training.  We went to meetings, to roll calls, on

25   ride-alongs.

1          This is also based upon interviews directly with the

2    community and with memberships of PPB and the City,

3    contributions from the COAB, contributions from members of the

4    COAB individually, assessments by the COCL contained in its

5    reports, and documents produced by the City in response to our

6    requests as well as our direct examination of documents as we

7    visited sites.

8          For use of force, Your Honor, what does the

9    settlement agreement ask PPB to do?  Principally it asks PPB to

10   use force only in an objectively reasonable manner, to provide

11   full and accurate reporting by those who use force, and

12   on-scene investigations by first-line supervisors.  It then

13   asks that those on-scene investigations be sent up the chain of

14   command for quality control and then an audit of those on-scene

15   investigations to better improve the system.

16         Results of these goals have been varied; varying

17   levels of success.  PPB members have made a devoted effort to

18   force reporting and investigations.  The governing policy for

19   force, 1010.00, which we preliminarily approved before the

20   effective date of this agreement on October 30th, 2013, now

21   stands for revision.  Why?  Officers need clear guidance on

22   what actions to take and what actions to avoid, when force is

23   authorized, and what the reporting requirements are.  Sergeants

24   need guidance on how to accomplish the on-scene investigations,

25   to not accomplish them ad hoc, but to have a consistent system

1    across the entire bureau.

2          PPB currently has a reporting standard for uses of

3    force that omits very low levels of use of force.  PPB does not

4    require reporting of all levels of the use of force, as

5    required by the settlement agreement's expansive definition.

6          PPB's current force data collection report, its force

7    report, also excludes firearm discharges.  Though, the PPB

8    thoroughly investigates and reports on firearm discharges, the

9    exclusion from the form of firearm discharges became a

10   principal point of discussion between the City and the

11   United States going forward that has affected the timeline for

12   review of that policy.

13         Applying PPB standard to capture a wide range of

14   force -- that is most everything in between the very low levels

15   and the firearm discharges -- force has decreased significantly

16   over time since this investigation began.  Though ECW --

17   meaning Electronic Control Weapon -- the use of Tasers has

18   increased in the past, supervisors have justified the use of

19   ECW in their investigative reviews rather than limit its use.

20         Officers have also not appreciated the five-second

21   rules on ECWs.  That is, five seconds is one discharge, and if

22   one continues to hold down the trigger, and it goes longer than

23   five seconds, that counts as a second discharge.  There is a

24   software fix that can be used for the ECWs to limit it to a

25   five-second discharge.  But whether or not that's all for

1   limitations put in place, the current ECWs that PPB uses

2   officers frequently report have operational issues.  There are

3   equipment failures.

4         There is a pendulum on use of force reporting

5   investigation on scene.  When we first began the investigation,

6   the pendulum was swung all to way to barely any on-scene

7   investigations for most uses of force.  Now it swung the other

8   direction into extreme on-scene reporting and investigation of

9   uses of force.

10        Sergeants show up to the scene and fill out what we

11  call 940 reports or after-action reports, dubbed for the policy

12  that PPB uses.  Those 940s go through an audit process.  What

13  has ended up happening is that lieutenants and captains now

14  spend time regurgitating the entire investigation that the

15  sergeant does.  This burns valuable time, and it also delays

16  the final outcome of the 940, thus making it less effective.

17        Going forward, we need to work with the COCL and the

18  PPB to resolve an easier way, if you will, but just as

19  effective a way for lieutenants and captains to review those

20  reports without repeating everything, capturing those things

21  which need to be corrected and sending them back, but without

22  redoing the investigation.

23        Over the next two days the City and the COCL and the

24  United States intend to meet with the United States police

25  practices consultant to go over a new draft 1010.00, the force

reporting policy/the force governing policy with the City to try to arrive at a solution to many questions about the currently existing 1010.00.

For training, Your Honor, the Portland Police Bureau and the City has placed a high priority on training.  Portland has a highly skilled, intelligent cadre of officers.  It has a beautiful training facility.  It has devoted time in officers' schedules each year to go to in-service training.  But that training has not been well informed by the community whom the police serve.  The academy needs to take some next steps.  The academy has asked for and does not yet have up and operational a training management software, and the police bureau suffers for the City's lack of having gotten it.

We have approved the training policy, 1500, and the 850 series of policies concerning crisis intervention.  With our plan to address 1010 and other force policies in short order, our goal is to have the policies up in time for the January 2017 start of in-service training.

The PPB has recently reconvened the Training Advisory Committee, the TAC.  The TAC produced a written report with recommendations.  TAC has asked for and should receive now responses to those recommendations.  It is the means by which the public has direct input into the training material and the effective training on PPB officers.

Your Honor, the EIS, or Employee Information System,

sometimes called an early warning system, sometimes called a

risk management system.  The EIS should act to effectively

mitigate risk, to mitigate the risk against civil rights

violations among those civilians that the police serve, and to

mitigate risk of career-ending behavior by police officers.

How does the EIS work?  It should work when one tries

to find the normal behavior among officers in a peer group,

particularly with respect to force and then identify the

outliers among those peers and then bring them back to the

normative levels.

PPB, as EIS, is very sophisticated in many ways.  It

collects a lot of data.  It is essentially a data warehouse.

But based upon the samples which we reviewed going into actual

EIS entries for officers, they do not necessarily mitigate

risk.  As an example, an officer who we will not name was

recently terminated with respect to an alcohol issue.  The

issue was known to the PPB.  The PPB had definitely addressed

it in some respects in the past, but PPB had not used the EIS

as a tool to track and mitigate that risk between supervisory

positions between assignments.

Ultimately, the EIS in review did not have any

mentions of that issue for that officer, but that officer was

terminated for that issue.  This is the sort of the

career-ending behavior that a risk mitigation tool should

capture.

1          The PPB's EIS system right now cannot compare between

2    finer levels of groups and assignments among PPB.  For example,

3    among the specialized unit, there is a gang unit.  The gang

4    unit has the highest uses of force generally.  The PPB's EIS

5    can compare between the overall command -- all of East, all of

6    Central and all of the command over the gang unit, but cannot

7    compare between distinct shifts and distinct groups like the

8    gang unit.  This then doesn't mean the settlement agreement's

9    mandate, but also doesn't allow the risk mitigation to

10   determine whether or not units, as a whole, are outside the

11   normative level of their peer units.

12         Once triggered, that is crossing a threshold that

13   causes an EIS review.  The response is a narrative.  PPB's EIS

14   system has a discussion tracker.  It is a database which allows

15   the supervisor to input a review of his or her subordinates.

16   The discussion tracker right now does not record -- based on

17   our sample -- corrective action.  We found supervisors did not

18   always address problematic behavior or uses of force that were

19   problematic among their subordinates.

20         Typical EIS responses should be and sometimes are

21   closer management supervision; counseling -- externally or

22   internally; retraining.  Because the PPB's academy does not

23   have the training software up-to-date, that retraining tool

24   that could be used in EIS is hindered, not altogether, but

25   hindered.

1           Accountability, Your Honor.  Colloquially we would
2    say that an accounting system should be designed to give a fair
3    shake to all involved here.  A complainant should be heard,
4    their complaint investigated to a resolution, and officers
5    should be accorded some due measure of due process and be able
6    to come out from under the power of an allegation, which they
7    feel may be fair or unfair.
8           Organizationally an accounting system should engender
9    trust and faith in the police.  In this reporting period IPA
10   and IR have significantly increased the speed with which they
11   process investigative complaints.  PPB investigates criminal
12   allegations largely concurrently with administrative
13   investigations.
14          For the sake of all those watching today, the
15   distinction being, criminal investigations are those which the
16   detectives investigate for criminal prosecution, administrative
17   investigations are those which could be policy violations that
18   an employer like PPB may seek to discipline an officer for.
19          There is at least one officer walk-through for each
20   officer-involved shooting in this assessment period that is a
21   single designated witness officer along with PPB counsel
22   performed a walk-through that is significant and is a step
23   forward and part of what we asked for in the settlement
24   agreement.  However, it is not a contemporaneous walk-through
25   by law officers.  It is not a contemporaneous public safety

1    statement.

2        PPB has asked involved officers to give voluntary

3    statements shortly after officer-involved shootings.  That is

4    precisely what the settlement agreement mandated -- was the

5    asking.  Each time, however, the officers decline.  We believe

6    a public safety statement is the professional standard, absent

7    an objectively reasonable belief of self-incrimination by the

8    officer providing the on-scene public statement.

9        There are challenges going forward.  The system has

10    to be credible to the community and to the police members

11    themselves.  It is a basic principle, as I pointed out in

12    teaching the COAB at one point, Robert Peel's base principles

13    of policing.

14        The greater the officer's ability to persuade and the

15    greater the community trust, the less force police will have to

16    use.  Conversely, when there is no trust, when police are left

17    with fewer options, there is more force, more risk of injury to

18    the civilians and to the officers, lower community

19    participation in investigations, and a lower clearance rate.  A

20    trustworthy accountability system requires accountability at

21    all levels.

22        There is an accountability resolution that we need to

23    reach.  We gave notice to the City in May of 2015 that it ought

24    to engage in a comprehensive accountability reform.  We are not

25    there yet.  We need to reach a timely resolution on

1   accountability reform from soup to nuts, from beginning to end.

2           With that, Your Honor, I would like to turn it over

3   to my colleague, Adrian Brown, unless you have questions with

4   respect to these sections.

5           THE COURT:  Well, I do have some general questions

6   for the United States, but I will wait until after I hear from

7   Ms. Brown.

8           MR. GEISSLER:  Thank you, Your Honor.

9           MS. BROWN:  Thank you, Your Honor.

10          THE COURT:  Welcome.

11          MS. BROWN:  Thank you.  Counsel, distinguished

12  guests.

13          I want to start with an overview of community mental

14  health and proceed to crisis intervention and then discussing

15  community engagement.

16          Community mental health, as noted in paragraph 88 of

17  our settlement agreement, really deserves unqualified credit to

18  the Portland Police Bureau for its leadership in initiating

19  discussions with system partners.  The United States noted in

20  this aspect of the settlement agreement that this is an area

21  that is not mainly the City's responsibility.  It has engaged

22  with system partners in efforts to bridge these gaps in

23  community mental health services, and such services are the key

24  focus of the State's long-awaited performance plan to improve

25  mental health services with adults, particularly those with

1    serious mental illness.

2            This is a different agreement that the DOJ has been

3    working on with the State, and the State presented its plan to

4    the Department of Justice this past summer, and we approved its

5    plan in July.  The State has committed an aggressive three-year

6    implementation plan, and PPB did not miss a beat in stepping up

7    to the plate.  The State has formed a behavioral health

8    collaborative of system partners, which will involve a series

9    of meetings that will start in July and go through December.

10   PPB stepped up to not only apply to be on that collaborative,

11   but is now devoting resources to continue to hold the State

12   accountable, and we have continued to assert that all system

13   partners hold the State accountable for what it has committed

14   to in this plan.

15           As noted in paragraph 89 of our report, the PPB's

16   leadership in this area has stood out immensely in its push for

17   the opening of the Unity Center for Behavioral Health.  While

18   we all know that this will not be a fix to the problems, the

19   plethora of problems created by a weak infrastructure of

20   community-based services, it is intended to provide an

21   emergency psychiatric service, which is a unique particular

22   setting that is not currently available in the City of

23   Portland, along with linkages to co-located system partners.

24           In this regard PPB deserves praise for extensively

25   working with Unity and other systems partners in creating

1    particular transportation protocols.  These protocols will

2    provide transportation of certain persons on mental health

3    holds by ambulance rather than by patrol car.  To support this

4    protocol, PPB didn't just stop at initiating discussions with

5    Unity.  They also engaged the state legislature to support the

6    necessary rule changes.  That dedication deserves notice.

7            In regards to crisis intervention, as my colleague

8    Mr. Geissler pointed out, we have granted the City provisional

9    substantial compliance with this section, Section 6.  PPB does

10   indeed deserve praise for the work in its creation of the

11   Behavioral Health Unit.

12           This is a team of officers that includes both the

13   behavioral health response teams, which involved the pairing of

14   a clinician with Project Respond along with a specially trained

15   officer to follow up on referrals made, not only by officers in

16   the field, but by clinicians, by members of the community, as

17   the BHU has provided to us basically anyone can provide a

18   referral to them.

19           But the BHU also involves coordination of the

20   Bureau's ECIT officers as well as its advisory committee.  The

21   advisory committee is made up of system partners from nonprofit

22   service providers, advocacy organizations, as well as state and

23   local mental health officials and peer advisers.

24           The BHU should be commended for its dedication of

25   working as well with training personnel in developing a robust

1    40-hour enhanced crisis training program.

2             As Mr. Geissler mentioned, part of our monitoring

3    duties has been to observe trainings.  We participated in

4    observing the entire 40 hours of this training program, along

5    with other partners -- the COCL, a member of the COAB, a member

6    of the BHU advisory committee observed this training.

7             In addition to the 40 hours that PPB reports that all

8    officers receive through the basic and advance academies, this

9    40-hour enhanced crisis intervention training is something that

10   really makes the Behavioral Health Unit stand out in its

11   efforts in working to include the most up-to-date resources and

12   information for officers that are responding to mental health

13   calls.

14            However, despite this commendable work, Portland

15   continues to establish its crisis intervention team program.

16   It needs to meet all the core competencies of the Memphis

17   model.  We are not there yet.  Right now, PPB specifically

18   sends specially trained officers to a specific subset of mental

19   health calls.  The Memphis model, for example, sends specialty

20   officers to all mental health calls.

21            We are currently as a provisional status, as PPB

22   continues to determine whether or not its hybrid model does

23   meet those Memphis base core competencies.  To their credit,

24   they have engaged in an extensive effort to determine whether

25   or not the types of calls that all officers go on that relate

1    to mental health calls that are not reserved for the specially

2    trained are handled as adequately as those by the specially

3    trained officers.

4            We are in consultation with a renowned expert in this

5    field, Dr. Mark Munetz.  He is the founder of the Memphis base

6    model.  We are very privileged to have him.  He spent time

7    again this year, as he did last year, in Portland and working

8    with their assessment of their system.  In particular, as

9    Mr. Geissler pointed out, he assessed the BOEC, the Bureau of

10   Emergency Communications' 911 call center and how their

11   dispatchers and call takers are being trained in the future for

12   the crisis triage that they engage in.

13           So those two things:  The BOEC crisis triage as well

14   as assessing whether or not PPB is adequately responding to all

15   mental health calls are the two big areas that the DOJ will

16   continue to assess in our provisional approval.

17           Of note, Mr. Geissler pointed out that we conduct

18   interviews as part of our assessment for compliance.  I think

19   it is in particular of note to the Court that in this area,

20   regarding community mental health and crisis intervention, we

21   reach out to all partners.  Not only do we realize that it is

22   not just the City of Portland that is responsible for making

23   sure persons with mental health are being engaged in a way that

24   protects their civil rights, but we also understand that the

25   state and local officials, all the way from police officers to

1    the sheriff's office to the disability rights organization and

2    NAMI advocacy organizations, that everyone all works together.

3          We know that this is a big area that still needs

4    improvement, and part of our effort in the

5    U.S. Attorney's Office, generally speaking, is to engage the

6    community and make sure that we know where those gaps can be

7    bridged.  That is part of our effort, not in this case, but

8    just in a larger effort with the U.S. Attorney's Office.  So I

9    think it is important that everyone understand that we are

10   always looking for stakeholder input on how things can be

11   improved.

12         Then finally, Your Honor, I'll turn to community

13   engagement.  As noted throughout Section 9 of our compliance

14   report, the City faces significant barriers in its effort to

15   build a sustainable platform for civilian oversight and for the

16   efforts to monitor the implementation of this agreement.

17         While our assessment for this status conference runs

18   from August to August, as Mr. Geissler mentioned, it would be

19   imprudent for the United States to not note the status of the

20   City's efforts at this stage, particularly given the

21   non-compliance rating that we've provided to the Court.

22         THE COURT:  And you know I was going to ask you about

23   that.

24         MS. BROWN:  Yes, sir.

25         Based on a variety of factors, as we reported in our

1   assessment, there was dysfunction within the COAB, to the

2   extent that the City asked for a 60-day recess of COAB

3   meetings.  The landscape was constantly changing at that time,

4   whether it be from members resigning, civil unrest at the

5   meetings, concerns regarding where meetings should take place,

6   how meetings should occur, to ensure the safety of everybody.

7   At that point in time it was the United States' understanding

8   that if you gave the City 60 days, that we would have a

9   proposal about how to restructure the COAB.

10          THE COURT:  And the 60 days expired a few days ago,

11  right?

12          MS. BROWN:  The 60 days has expired, yes, Your Honor,

13  as of Friday.

14          Now, while the City acknowledged that it has provided

15  us a framework for a proposal as of October 12th, we do not

16  have a fully baked proposal from the City, and to some degree

17  the City's effort on that part was intentional in order to have

18  the United States, the Portland Police Association, and the

19  AMAC involved in how to fill in that frame.  However, we were

20  expecting to be much farther along than we are now at the

21  60-day point.  I think everyone was expecting to be further

22  along.  I think the City would acknowledge that they expected

23  to be further along.  It just didn't happen.

24          In a meeting last Friday, the City has committed to

25  hiring a facilitator to further the discussion amongst the

1    parties at the counsel table here, including the PPA and the

2    AMAC, and the United States certainly looks forward to

3    participating in those meetings.

4           However, we urge the City, the PPA, and the AMAC to

5    find common ground together to make a sustainable platform for

6    community engagement.  That platform must last well beyond the

7    United States' investment in this case and the expiration of

8    the settlement agreement.

9           To that end, however, we are still before the Court,

10   and we are at the stage where we are wanting to know what is

11   going to happen, how it is going to happen, when it is going to

12   happen.  Because we do not have additional answers at this

13   point at the 60-day mark, we do ask the Court to schedule a

14   couple of different status conferences.

15          To all fairness and candor to the Court, this was a

16   suggestion that we just recently made known to the other

17   parties an hour or so before the hearing, but we saw it as a

18   way forward, given the rating of non-compliance.  In 30 days,

19   we would ask Your Honor to hold an additional status conference

20   to which the City and the parties involved here can provide the

21   Court how things are moving forward with the restructuring of

22   the COAB.

23          In addition to checking in on that area, we would

24   also request that the Court schedule an additional status

25   conference in 90 days.  That would be in the effort to assess

1    where the parties are at under paragraph 175 of the

2    settlement agreement, and I would like to make note really

3    quick in regards to paragraph 175, just for everyone's

4    edification, this paragraph allows time for reflection,

5    negotiation, and possible amendments to the settlement

6    agreement.

7              It is largely in order to determine whether or not

8    the settlement agreement is achieving its desired outcomes.  In

9    essence, it is an effort to have a court correction, where

10   necessary.

11             So this second status conference that the

12   United States is requesting to be had in 90 days would be the

13   effort on our part to provide the Court with a status update on

14   where we are at with any further conversations with the City in

15   regards to additional amendments, if any are necessary, and

16   where we are at in furthering that process along.

17             In the meantime, as I mentioned previously, we are

18   interested in stakeholder input in this regard.  We have

19   dedicated an e-mail link or an e-mail address, which community

20   members, stakeholders from all avenues, whether it be advocacy

21   organizations, individuals, law enforcement, and that e-mail is

22   community.portland@usdoj.gov.

23             THE COURT:  Say that one more time.

24             MS. BROWN:  It's community.portland@usdoj.gov.  This

25   is not a new e-mail address.  This is an e-mail address that we

1  have had open to the public since the beginning of our case,

2  but we wanted to highlight it again here, because, in

3  particular, we're looking for input on paragraph 175 and the

4  outcomes that the agreement intended to achieve and whether or

5  not those have been met.

6         Thank you.

7         THE COURT:  Thank you.

8         All right.  Let me follow up with you, Ms. Brown and

9  Mr. Geissler.  I want to make sure we're all on the same page,

10 because I think what I'm about to ask is consistent with what

11 you've just been describing in the last few minutes.

12        It's my understanding under the settlement agreement,

13 and so I'm going to ask you if you agree or disagree, and

14 obviously any of the parties will be able to weigh in on this

15 when it is their turn to speak.

16        It is my understanding under the settlement

17 agreement, beginning with the enforcement section, Section 178,

18 that this Court retains jurisdiction over this action until the

19 City has substantially complied with all provisions of the

20 agreement and has maintained substantial compliance with all

21 provisions for one year.

22        In addition, the United States has the right to seek

23 enforcement of the provisions of this agreement if it

24 determines that the City or the Portland Police Bureau have

25 failed fully to comply with any provision of this agreement.

1           Now, if the United States does believe that the City

2    has failed to implement the terms of the agreement, there are a

3    number of steps that needs to take place.  One is that the

4    United States promptly notifies the City in writing, identifies

5    and specifies the portion or portions of the agreement about

6    which the United States has concerns.  Then there is

7    discussion.  There's an opportunity even for mediation.  But if

8    the mediation fails to resolve the concerns, then the

9    United States or the City may file a motion with this court to

10   enforce compliance with the terms of the agreement or to seek a

11   declaration regarding the meaning of any particular provision

12   of this agreement.

13           The Court will then determine, after appropriate

14   hearing, whether or not the agreement has been breached or what

15   the meaning of any particular provision in the agreement

16   requires.  And if the Court determines that a provision of the

17   agreement has been breached, this Court has the power to issue

18   an appropriate remedy.

19           I want to stop there.  Well, I will add one more

20   thing.  It is also my understanding that, unless and until

21   there is a motion presented to the Court, either to interpret a

22   provision of the agreement or to determine if the agreement has

23   been breached, until that happens, really the only thing that

24   this court is able to do is hear periodic status conferences

25   and hear from the parties how things are going.  Then if I

1    don't receive a motion, then all I can do is receive

2    information and receive input, really from a wide variety of

3    sources.  But if a motion were to be filed, then after

4    appropriate due process with respect for everyone's rights, the

5    Court will decide whether or not the agreement has been

6    breached.  If not, then I suppose that's the end of that

7    motion.  And if so, then the Court has the power to decide on

8    an appropriate remedy.

9           Let me first ask the Government now, do I understand

10   the agreement correctly?

11          MR. GEISSLER:  Yes, Your Honor.  That's an accurate

12   reading of the agreement.

13          THE COURT:  Obviously if any other parties disagree,

14   when it is your turn to speak, you certainly may.  I may have

15   some more specific questions for the Government a little bit

16   later, but I would like to hear from the other parties for now.

17          For right now, I appreciate all the effort that the

18   United States has spent on this.  By the way, I did thoroughly

19   read the submission by the Government, the second periodic

20   compliance report.  I recognize all the hard work that has gone

21   into it.  It is very well organized.  It is very clear.

22          I think that there are many areas in it that are

23   showing tremendous positive movement forward.  As you have

24   identified in your comments, and as I saw consistent with your

25   comments in the written record, there are a few areas of very

 1  serious concern.  But we all recognize that this is a

 2  multi-year agreement.  No one expected all problems to be

 3  solved in the first year and, frankly, even the second year.

 4  That's why you have in paragraph 175 the opportunity for a

 5  comprehensive review after the second year.

 6       So I commend the United States for all of its efforts

 7  here.  I suppose I will ask this question of you, and it is a

 8  bit asking you to predict the future.  But I'll say this:  We

 9  know that come January 20th of 2017, we are going to have a new

10  administration.  We know that it is one of the hallmarks of

11  this country that we have a peaceful transfer of civilian

12  power.

13       We don't know exactly who will be filling the various

14  positions within the new administration from the top to the

15  other political appointments.  But let me ask you, if you can

16  tell me, what does the United States Department of Justice

17  expect with respect to your continuing involvement in this case

18  after we have a new administration?

19       MR. GEISSLER:  Your Honor, based on the past record,

20  I suspect that our involvement will continue as it is now.  I

21  have been privileged and blessed to have the opportunity to do

22  police cases for almost 13 years now, and I anticipate that our

23  office will continue to do the enforcement on this case just as

24  it does now.

25       THE COURT:  Excellent.  Very good.  Thank you.

1              All right.  Before turning to the City of Portland, I

2    do want to acknowledge our American Sign Language interpreters

3    and also thank the City of Portland.  I think this was your

4    idea.

5              Am I right on that?

6              MS. OSOINACH:  Yes, Your Honor.

7              THE COURT:  Very good.  I commend you for that.  It

8    is a good idea.  We have as American Sign Language interpreters

9    Mr. Richard Hall and Ms. Andrea Medlock.  Before I took the

10   bench, the clerk of the court did administer an oath of

11   translation to them.  I, again, express my appreciation and

12   commendation to the City of Portland for having that excellent

13   idea.  I appreciate it.

14             All right.  I look forward to any comments from the

15   City of Portland.

16             MS. OSOINACH:  Thank you, Your Honor.  Ellen Osoinach

17   appearing on behalf of the City of Portland.

18             I do want to say in response to your gracious

19   comments about the City suggesting American Sign Language

20   interpreters, the City -- specifically those of us sitting at

21   the table -- have come to that conclusion through the hard work

22   of many people, including Philip Wolfe, who is here today, who

23   has certainly provided an education to the City and to those of

24   us at this table about the importance of including multiple and

25   varied forms of communication.  So I specifically want to thank

1    him for his continued efforts to assist the City in being a

2    better partner.

3            THE COURT:  You have the Court's appreciation as

4    well.

5            MS. OSOINACH:  So I would like to give you a roadmap

6    of what the City would like to present to you today and, of

7    course, to all the members that have attended here today.  We

8    have got members from the Albina Ministerial Alliance.  I can

9    see members from the mental health association.  The League of

10   Women Voters.  Kathleen Saadat, who chaired the COAB for so

11   long.  Kalei Luyben.  We have members from the Portland Police

12   Bureau and from the Bureau of Emergency Communications, and

13   they are all here because they are deeply invested and deeply

14   care about the work that is being conducted under the

15   settlement agreement and about policing in the city of Portland

16   in general.

17           Personally I would like to say that I have benefited

18   tremendously, both as an attorney and certainly as someone who

19   is working on the settlement agreement, from all of the

20   good-hearted and good-faith efforts of everyone in working on

21   this project.

22           So the roadmap today that we would like to talk about

23   is, first of all, the City's response to mental health and

24   crisis intervention and to rightly claim our seat at the table

25   as an emerging national leader on these issues.

1          Second, I would like to talk about use of force and

2    force investigations and particularly recognize, because this

3    is such a data-driven assessment of our work, I wanted to

4    recognize specifically the work of the analysts who are here in

5    the courtroom today.

6          If you will wave your hands.

7          These are civilians with a tremendous amount of

8    expertise, and they are dedicating that expertise to making

9    policing in Portland better and to supporting the work of the

10   settlement agreement by putting in tremendously long hours in

11   analyzing data so that decision makers and police officers and

12   the Department of Justice and all of the stakeholders here

13   today can better understand on a granular level in a

14   data-driven way what's happening at the City.

15         So after I talk a little bit about force, I know this

16   Court in particular has expressed an interest in body cameras

17   and how they might be deployed, how they might be useful, what

18   are some of the concerns.  So Mark Amberg is here to talk about

19   body cameras and the process the City is engaging in to ensure

20   that the body camera adoption and use is meeting the needs of

21   the community as well as officers.

22         The next area I would like to cover is something

23   where I'm hoping to engage in a discussion with

24   you, Judge Simon, about the First Amendment and the robust free

25   speech that we both enjoy in this country and in particular in

1    the city of Portland and how the desire of people to make their

2    voices known and to participate in the public process has too

3    often, over the course of the last several months, veered into

4    criminal activity and has impaired the rights of those who were

5    denied the opportunity to speak.

6              I would very much like to engage in a discussion with

7    you about your thoughts on that, given your background, of

8    course, but also your work over the course of your career.  So

9    that would be very helpful to the City, and I think to all

10   present to have that sort of a discussion.

11             Then we want to address the area of non-compliance,

12   which is the Community Oversight and Advisory Board.

13   Judy Prosper will be addressing the work that the City has

14   done, that we intend to do, and how the challenges that we have

15   experienced we think that we can turn into opportunities,

16   because the challenges that we have experienced have been the

17   result of passionate people wanting to make a difference and

18   sometimes disagreeing about the way forward.

19             But here in Portland, that's the way we do things.

20   We engage all of the stakeholders.  Sometimes those discussions

21   are volatile.  But we believe that's a strength for the City of

22   Portland and Portlanders, and we want to talk about how we can

23   harness those strengths in moving forward to cure that area of

24   non-compliance.

25             Then finally, I thought that it would be helpful for

1    this Court in particular to have some demonstrative evidence,

2    not that you don't love talking to attorneys every day, but at

3    my request I asked several people who bravely volunteered to

4    appear on video for me, describing their interactions.  So I

5    chose three particular incidents that I think illustrate the

6    very thoughtful and challenging and difficult experiences that

7    people have and how they have overcome what are understandable

8    fears -- both police officers being able to stand in a moment

9    of being fearful and vulnerable and yet still reaching out to

10   connect and, similarly, community members, who in their moment

11   of vulnerability and fear, reached out to police officers.

12          It is not designed to say that everything is just

13   fine, but I thought to provide some context for this Court

14   about what is occurring on our streets today, it would be

15   helpful for you to see that.

16          THE COURT:  That's fine.  Although let me ask you a

17   procedural question.  It is difficult for a court reporter to

18   take down what is said sometimes in a video or an audio

19   recording.  So would it be acceptable to the City -- I'll watch

20   that now.  We will play that in court.  But I would like to

21   relieve the court reporter from any obligation to take that

22   down from the audio and just ask the City at its convenience to

23   submit for the record an appropriate electronic copy of that so

24   we can have that for any record, if need be, but it will not be

25   part of the official court transcript.

1                Any objection?

2                MS. OSOINACH:  No objection.

3                THE COURT:  Any objection from any other party?

4                MS. ALBIES:  No, Your Honor.

5                MS. BROWN:  No, Your Honor.

6                THE COURT:  Very good.

7                MS. OSOINACH:  So in the area of crisis intervention,

8        we have continued to make significant progress, as I detailed

9        in the memo that I wrote to you.  What I particularly wanted to

10       call out is the fact that the work and the progress that the

11       City was able to make in this particular area of the settlement

12       agreement could not have happened but for the coming together

13       of numerous stakeholders.

14                This was not a project that the City ever intended or

15       could have undertaken alone.  So the Behavioral Health Unit

16       Advisory Committee -- BHUAC for short -- is made up of an

17       amazing group of individuals who have served for several years.

18       There are peers and consumers and providers and police

19       officers, and they sit together on this committee and come up

20       with training recommendations.

21                They directly interact with police officers on both

22       individual cases, larger cases, systemic issues.  That work has

23       resulted in, as I pointed out in the memo, an enhanced crisis

24       intervention training program that is the best in this nation.

25       You can see the results of that from the surveys of individual

1    officers who are telling the City and telling others that they

2    believe in this work.   It is so important to them.   They

3    understand that it is important to the administration, and it

4    is important to the elected officials.   And they are behind it

5    100 percent.

6         We were very pleased to see that The New York Times,

7    in their continuing love affair with the City of Portland,

8    rightly pointed out that we are writing the playbook for

9    conflicts involving mental illness.

10        What was important about The New York Times article

11   was that they did not say, "Successful outcomes every time in

12   the City of Portland."   What they said was, "Here was an

13   innovative approach to a situation that appeared very

14   dangerous."   And after the officers engaged in that situation,

15   they allowed the reporter to sit in and listen to their

16   thinking about it.   Did they make the right decision?   Should

17   they have done something differently?   Should they have

18   engaged?   Should they have disengaged?

19        That, I think, is what I think the citizens of

20   Portland and the Portland Police Bureau should be proudest of;

21   that officers are deeply engaged in the work of attempting to

22   figure these situations out, and they are being very

23   transparent about their thinking and the way that they are

24   managing these situations, because they've come to the

25   conclusion that they don't have all the answers, and the most

1    important thing is to learn from specific incidents.   That was

2    very heartening to see that The New York Times both reported on

3    that thoughtfulness, but also the difficulties that citizens

4    and police experience in resolving these situations.

5            THE COURT:   The New York Times also had an

6    interesting cover story last Sunday on body cameras.

7            MS. OSOINACH:   Yes, they did.   I wondered if you had

8    read that, Your Honor.   It was very interesting to hear about

9    Seattle's experience and we, of course, are looking to them for

10   both guidance and what the pitfalls are.

11           Similarly, this is challenging work.   It is a

12   challenging time to be working on policing issues, both as

13   advocates, as people within the Government working on them,

14   and, as you know and everyone knows, we are in the midst of a

15   national conversation that has at times been toxic and painful.

16           So in that context it was very gratifying to have the

17   Portland Police Bureau and the Behavior Health Unit and be

18   asked to present at the International Crisis Intervention

19   Training Conference where we got to describe our multi-layered

20   approach and particularly emphasize how important it was to us

21   to engage in multiple stakeholders.

22           So we had both police officers, but also Lisa Otis,

23   who has graciously agreed to serve and has been just a warrior

24   for justice.   She also presented, along with

25   Officer Christopher Burley, at the CIT conference.   It is those

 1    sorts of experiences, where community members have expressed a

 2    willingness and a vulnerability, to come together with law

 3    enforcement.  I think you will see that is also what the video

 4    is also designed to express -- that there were lots of

 5    divisions, but there are so many ways in which the community

 6    and the police have come together.  It is in fact changing the

 7    bureau culture, and I think it is changing the culture of the

 8    City of Portland for the better.

 9            Do you have any comments or questions about that,

10    Your Honor?

11            THE COURT:  Not yet.  Although you've probably

12    noticed that I'm not shy about interrupting.

13            MS. OSOINACH:  "Shy" is not a word that I associate

14    with you, Your Honor.

15            THE COURT:  No.  I appreciate what you are saying,

16    and I am tracking you.

17            MS. OSOINACH:  So I would like to move on to use of

18    force and force investigations.  This year was the first year

19    that the City of Portland undertook what we are calling a force

20    audit.  The analysts that I just referred to seated in the back

21    of the room were asked to do a herculean task, and that was to

22    gather information in an overbroad way about 133 data points.

23            What we discovered is that much of the information

24    that was gathered and crunched was not actionable.  In fact, it

25    created a situation where there was a lot of work that was

1    being done by officers, sergeants, and people in the chain of

2    command that was not useful and was in fact redundant, but was

3    required by the settlement agreement.

4            In consultation with the Department of Justice and

5    their police practices expert, and, frankly, in direct

6    communication with our sergeants, what we learned is that there

7    was actionable information that would be helpful in the force

8    audit.  So we intend over the course of next several days to

9    discuss with the Department of Justice how it is that we can

10   have an operationally sound force audit, because that's

11   everyone's goal, is to be sure that we're adequately

12   supervising force, but in a way that's operationally sound.

13           So I think we will see significant progress and

14   relief for the members of the Portland Police Bureau who are

15   doing the work and just want it to be done in a way that helps

16   them and that helps the community to understand the work that

17   is being done.

18           We were very gratified to see that the reports of

19   force, the individual reports of force that we provided to the

20   Department of Justice, in their review of those, that they did

21   not find constitutional violations.

22           We were also pleased to see that in our first ever

23   force audit, which I should point out is something that very

24   few other jurisdictions in the United States are even

25   attempting, that in our very first use of force audit that the

1    sergeants with minimal training and an unclear policy were able

2    to hit all 133 data points 92 percent of the time.  That's an

3    A minus.  I think, while the United States pointed out that

4    8 percent of the time we didn't get it right, they are a

5    taskmaster, I think, that this Court and the community should

6    be proud of because they want to hold us to an A plus standard.

7    For our first ever force audit 92 is something that I think we

8    are very proud of, and I think should be.

9           Similarly, the work that is being done and will be

10   done over the next year to refine the force audit will provide

11   information to elected officials, to policymakers.  But most

12   importantly for the Portland Police Bureau, it will provide

13   information to the community.  This year the force inspector

14   went to all of the precincts and presented information and to

15   the training advisory council to present information about the

16   force audit.

17          That information was so well received in terms of

18   people being hungry for it.  So that validated the City's sense

19   that the more information that we can generate and provide in a

20   reasonable, actionable way for the community and will

21   facilitate the kind of informed engagement that we've already

22   seen occurring, and the more that we've refined it, the better

23   able we will be to engage with community members who are

24   rightly concerned about what type of force officers are using

25   and under what circumstances, and, of course, officers are also

1   very interested in understanding when other officers are using

2   force and what those outcomes are.

3          So we are continuing to work towards that, and we

4   feel very good about our progress under the settlement

5   agreement in that regard and continue to look forward to

6   producing even better and clearer information.

7          So now I would like to turn it over to Mr. --

8   actually, Your Honor -- I know you are not shy -- but do you

9   have any questions or comments about that?

10         I will turn it over to Mark Amberg to talk about body

11  cameras.

12         THE COURT:  Thank you, Ms. Osoinach.

13         Mr. Amberg, welcome.

14         MR. AMBERG:  Thank you, Your Honor, Counsel, and

15  members of the audience.

16         I am going to touch briefly hopefully on the subject

17  of body cameras, which has been in the forefront for the last

18  couple of years, particularly Portland has come to the

19  forefront in the context of the City's negotiation of a new

20  contract with the Portland Police Association.

21         While I recognize that body cameras are not directly

22  a part of the settlement agreement, they most certainly are an

23  important part of a system of police accountability.  There is

24  lots of issues and limitations that come with the use of body

25  cameras, a lot of misconceptions and misperceptions about what

1    body cameras can do and what body cameras can't do.

2            But one thing that I think is fairly clear at this

3    point is studies have shown that the use of body cameras only

4    captures a view of an event in question, certainly not the view

5    or a comprehensive view of the event in question.  Use of body

6    cameras significantly reduces use of force overall.  Frankly,

7    it improves the behavior of all involved, whether we are

8    talking about community members involved in an interaction with

9    the police or the police officers themselves.

10           The City's efforts to implement use of body cameras

11   began a couple of years ago.  The first step was working on

12   legislation here in the state of Oregon, House Bill 2571, which

13   the legislation was implemented to help define in the statute

14   some of the primary issues regarding the use of body cameras

15   policies and procedures for the use, retention, and storage of

16   body cameras recordings, creating an exception in the law,

17   which restricts the recording of conversations, use of body

18   camera video in criminal proceedings, public records issues,

19   and very importantly privacy concerns primarily for the

20   citizens involved.

21           Body cameras, as I think as is fairly obvious to

22   everybody, it doesn't record very well the actions of the

23   officer.  It records the actions of what the officer is seeing.

24   So there are significant privacy concerns for the citizens who

25   are involved when body cameras are deployed.

1            The legislation includes prohibition on the use of

2    facial recognition, biometric recognition technology,

3    prohibition on the use of body cameras recordings for anything

4    other than legitimate law enforcement purposes.  The City was

5    very involved in working on that legislation.

6            So following passage of the legislation, the City

7    turned its attention to gathering information on body cameras

8    and body cameras systems and receiving general public input on

9    body cameras.  There were a number of public forums that were

10   held -- six public forums.

11           There was quite a volume of information that was

12   taken in.  The intent at that point was that very thing -- to

13   gather general information about body cameras, body camera

14   systems without having necessarily a specific policy in place,

15   but to gather that general information to help inform a policy

16   on body cameras.

17           The City fully recognized at that point that it was,

18   again, not gathering public input about a specific body camera

19   policy, but to gather information to help inform the policy.

20   While gathering general public input about body cameras, the

21   City, along with the Portland Police Association, the police

22   union, worked on the specifics of a draft body camera policy,

23   recognizing and intending that the draft policy would be

24   publicly circulated for further public comment and input.

25           We think the draft policy -- while certainly not

1    perfect, and there are issues that we are well aware of, the

2    public has some very serious and very significant concerns

3    about that are in the draft policy, that will be resolved as we

4    go forward.  Overall the policy, we believe, is a comprehensive

5    draft policy that addresses most aspects of the use of body

6    cameras, including member and supervisor responsibilities, when

7    cameras are and aren't activated, preservation for evidence,

8    review of audio/video footage, retention and access to video,

9    training, public records requests, and public release of body

10    camera footage.

11          This draft body camera policy, as I believe

12    Your Honor is aware of, has ended up being part of the

13    tentative agreement that was entered into with the police

14    union.  It was approved by City Council on October 12th.  It

15    will take effect on November 11th of this year.  But again, a

16    major reason for including that body camera policy with that

17    tentative agreement was to memorialize the significant work

18    that had been done by the parties in coming up with this draft

19    policy, with the full understanding, the full intent that it

20    was going back out -- now that we have a specific policy -- it

21    was going back out for public review, comment, and input before

22    there was a final policy that was agreed on.

23          THE COURT:  Explain to me how that will work.  We

24    have a draft policy now.  You envision public input before

25    there is a final policy.  How does all of that relate to what

1   is going into the police association contract or collective

2   bargaining agreement?   How do the pieces fit together?

3           MR. AMBERG:   The body camera policy is not a part of

4   the police contract.   It was part of the tentative agreement.

5   The best way I can describe it, it was part of the quid pro quo

6   in the bargaining process.   There was, again, a recognition by

7   the parties.   There had been significant work on the policy.

8   We hadn't come to agreement on it, and they wanted to

9   memorialize that as part of this tentative agreement going

10   forward.

11           THE COURT:   So if I'm following you, you are saying

12   that the collective bargaining agreement will not have a body

13   camera policy; is that right?

14           MR. AMBERG:   That's correct.

15           THE COURT:   Then to what extent does the City have

16   the ability to put together and implement a final body camera

17   policy in light of the collective bargaining agreement?   Or is

18   the answer, because it is not covered in the collective

19   bargaining agreement, the City has full authority to do what is

20   appropriate in a body camera policy?

21           MR. AMBERG:   And that's true, Your Honor, with the

22   understanding, as was recognized in the tentative agreement,

23   that the police union has their legal collective bargaining

24   rights to make a demand to bargain over the body camera policy,

25   or at least impacts of the body camera policy to file

1    grievances.

2          If we were standing here today, and there was no

3    tentative agreement reached with the police union over the

4    police contract, and we were putting forward a body camera

5    policy/standalone body camera policy, we would be in exactly

6    the same boat that we're in right now, frankly, with the police

7    contract.

8          Now, there is no question there are issues out there

9    in terms of what's perhaps mandatory for bargaining, what's not

10   mandatory for bargaining.  Frankly, another issue that we

11   haven't thought far enough down the road to fully resolve,

12   because we hope we don't have to, is how some of the aspects of

13   the body camera policy -- for example, I would say primarily

14   review of audio/video recordings, how that fits in with the

15   settlement agreement and to the extent that might fall under

16   the jurisdiction of the settlement agreement as opposed to

17   state collective bargaining laws.

18         THE COURT:  I was going to ask you about that.

19   Frankly, let me do it right now.  Although I certainly don't

20   have an intention to jump to any conclusions or to dictate any

21   solutions -- that's not my role -- but can you give me an

22   understanding of both sides of the argument, and if there is

23   more than two sides, all three sides, or more.

24         What is the debate about in terms of review of body

25   camera film footage or pictures before or after an officer gets

1    interviewed or is required to submit a report?  What are both

2    sides of the debate?  If there are more than two sides, what

3    are the third and fourth sides of that debate?

4          MR. AMBERG:  Well, in fairness, I think there are a

5    number of sides to that debate, Your Honor.  I think the

6    primary issues are whether -- on the one side of the issue, I

7    would say the critics of that practice would say, well, that

8    gives the officer an opportunity to basically line up their

9    recollection before they write a report, before they are

10   interviewed as part of some formal investigation rather than

11   just giving their spontaneous -- I'll call it untainted

12   recollection of the event that has not been influenced by

13   reviewing the body camera video -- that somehow it gives the

14   officer an opportunity to kind of line things up so they are

15   telling a good story.  That's one viewpoint.

16         The other viewpoint is that when officers prepare a

17   report, they don't see everything.  They don't hear everything.

18   They don't notice everything.  It gives the officer, in

19   writing, a good report about an event that happened.  Whether

20   it was a use of force event or some other event, the officers

21   are trying diligently to report accurately what happened during

22   the course of that event.

23         If you look at it from that aspect, before they write

24   their report, they want to have everything available they can

25   possibly have to help them determine or recollect what happened

1    during the event.  I think those are really the two main

2    thoughts on it.

3              THE COURT:  If you could do the same -- what are the

4    different dimensions -- pros and cons if you will -- of the

5    options on when to activate the camera and when an officer may

6    deactivate or fail to activate?  What are the issues there?

7              MR. AMBERG:  Well, again, one school of thought would

8    be, as soon as the officer comes on duty, he or he should

9    activate the body camera.  I will note that in the draft policy

10   that's been prepared, at least under the draft policy, Portland

11   police officers who'd use body cameras, the body camera would

12   be on the moment they come on the shift, but there is a button

13   where they can actually activate it.

14             I wanted to clarify that, because what that means is

15   that the body camera is actually working.  It is actually

16   recording.  When there is an activation -- let's say an officer

17   is going to take some kind of law enforcement action, and they

18   activate the camera, depending on the system you are talking

19   about, it will actually capture -- go back about 30 seconds or

20   so, or maybe a minute before the actual activation, so it picks

21   up the recording before the actual event.  I wanted to clarify

22   that point.

23             But one school of thought is they should be on all

24   the time.  Of course, there were significant concerns that were

25   raised.  It came up during the course of our conversation about

1  the legislation, in particular with the ACLU -- I don't want to

2  speak for the ACLU, and I am sure they wouldn't want me

3  speaking for them either -- but there was a concern that they

4  were in favor of body cameras, but they were also very

5  concerned about privacy, particularly of the citizens who are

6  involved.

7          Then there is also the privacy -- I'll call them the

8  privacy concerns of the officers involved.  So if it is on

9  24/7, so to speak, there are a number of issues with regard to

10  that.  Do you really want to record their private activities

11  while they are taking a break or something like that?

12          One example that is always used is if they are going

13  to record, they have to go tell a mom that their teenager was

14  just killed in a car accident.  Do you really want to have that

15  recorded on a body camera?  We think the legislation addresses

16  that and the policy addresses that too.  We don't think that's

17  a good policy for anybody.

18          Or somebody who is experiencing some kind of serious

19  emotional or mental health crisis.  Do you really want to have

20  that on body cam video, so to speak, for the world potentially

21  to see?  We don't think so.

22          So the other school of thought, where we think under

23  the draft policy we struck a balance, which is when the officer

24  is going to take some kind of law enforcement action, that's

25  when they are obligated to -- assuming there is not a safety

1    issue or some other exigent circumstances -- that's when they

2    activate the body camera video, and under the draft policy they

3    could not turn that off until that event is -- is --

4            THE COURT:  That's helpful.  Thank you.

5            I know you touched on it before, but now if you could

6    take me through what is the process from which we get from this

7    draft body camera policy to a final policy.

8            MR. AMBERG:  Sure.  We are on the 30-yard line, and

9    we're moving towards getting over the goal line here.  Again,

10   there was a recognition.  There was further public comment and

11   input.  When this matter came before City Council on the

12   ordinance to approve the tentative agreement with the Portland

13   police union, there was mention of the body camera policy going

14   out for further public comment and input, but it really wasn't

15   fleshed out very well.  Council made -- there was an amendment

16   to the ultimate ordinance that was adopted that requires --

17           First of all, it directed the Police Bureau to

18   convene a stakeholder committee to review the draft body camera

19   policy and -- I'll use air quotes here -- "best national

20   practices," to the extent there are national best practices

21   with regard to the use of body cameras.

22           The City is in the process right now of putting

23   together that stakeholder committee.  Council confirmed in the

24   ordinance there will be further public input through the

25   bodies, established a universal review process for new or

1    revised policies or directives, and the Council directed that

2    this stakeholder committee, once it's convened, once it comes

3    up with whatever conclusions it comes up with, is to present a

4    report to Council regarding the body camera policy.

5           Under the ordinance that report will be subject to

6    further public input to potential amendments and Council

7    approval.  So at that point we hopefully will have a body

8    camera policy.

9           Again, we've left aside a little bit the collective

10   bargaining issues on this.  The union has asserted their right

11   to assert their collective bargaining rights.  In the tentative

12   agreement we did agree that at least the review of audio/video

13   was a mandatory subject of bargaining.  There has been a lot of

14   discussion about that.  We have had our own internal thoughts

15   about whether that is mandatory or not mandatory.

16          In essence what was done in the tentative agreement

17   with the union, we agreed with the union -- we agreed not to

18   fight that fight with the union.  Our intent in that was to

19   focus on actually working on the substance of a body camera

20   policy, which I think all concerned, certainly including the

21   union and the police officers, want to have to --

22          THE COURT:  And what are the implications of that

23   decision of agreeing that it is going to be the subject of

24   mandatory bargaining and the implications of that?

25          MR. AMBERG:  Well, it means that we agreed that we

1    have to sit down and bargain with the union and talk to the

2    union about that provision.  It doesn't mean it is resolved one

3    way or the other.  We're saying we've given up our right to go

4    in and say, "Sorry.  That's a permissive subject.  We don't

5    have to talk to you about that."

6             THE COURT:  So what happens if you then sit down and

7    bargain with the union, and you can't reach agreement?  What

8    happen next?

9             MR. AMBERG:  Well, again, we're sincerely hopeful,

10   and we sincerely think we will never ever get to that point.

11            THE COURT:  I'm sorry?  Did someone say something?

12            UNIDENTIFIED SPEAKER:  Arbitrator --

13            THE COURT:  As I said, if any members of the public

14   want to speak, just identify yourself to my courtroom deputy

15   during our break.  I will hear from you at that time.

16            You may continue, Mr. Amberg.

17            MR. AMBERG:  And that's a good question.

18            It is a little bit unclear, because under normal

19   process if we were leaving aside the settlement agreement that

20   we're here to -- the reason why we are here today -- normally

21   that would go to a labor arbitrator if we can't reach

22   agreement.  The parties would submit their different proposals

23   on that, and the labor arbitrator would make a decision which

24   way to go, which policy to adopt.  That's a very simplified

25   overview of what would happen.

1              The one issue that we're, frankly, not clear on at

2    this point is whether ultimately, because of the settlement

3    agreement, and we'd have to look at the overall effect of the

4    settlement agreement, of whether that dispute would actually

5    come before this Court or would go in front of a labor

6    arbitrator.  We have not fully analyzed that.

7              THE COURT:  Two years ago, and you probably know, I

8    did announce my view -- and no party is bound by it.  Anyone,

9    if they wish, can challenge it in the appropriate appellate

10   fashion.  I did announce my view that if I do find that there

11   is a violation of the settlement agreement, and it is up to me

12   to decide an appropriate remedy, then I'm not bound by anything

13   in the collective bargaining agreement in fashioning an

14   appropriate remedy.  You don't need to respond to that right

15   now, but I did say that two years ago, and I still hold that

16   opinion.

17             MR. AMBERG:  Thank you.

18             THE COURT:  By the way, do you have an expectation of

19   a time frame for reaching a final body camera policy?

20             MR. AMBERG:  One thing I've learned here in Portland

21   is that things take much longer than you expect to get through

22   the process.  And I'm not saying that as a bad thing.  I think

23   in many ways that slow-cooking process in the end maybe it's

24   more difficult and less expedient than immediately in the long

25   term.  I think in the long-term that slow-cooking process is

1    beneficial.  You end up with a better policy, a better program.

2              So I would expect, in terms of convening the

3    stakeholder group, bringing this back to Council, going through

4    all the discussions that we have to have, I would be hopeful

5    that by July 1st of next year we might have a body camera

6    policy.  Again, I will say this:  The work that we have done

7    upfront and significant work we've done upfront, in sitting

8    down particularly with the union and gathering a lot of public

9    input already and trying to come up with what we think is a

10   fairly solid body camera policy, albeit there are some clearly

11   disputed provisions in there, we've already hammered through a

12   lot of the details.  We are hopeful that will be at least a

13   good starting point.  It won't take us forever to get to a

14   policy.

15             THE COURT:  Thank you.

16             MR. AMBERG:  I think I've answered the Court's

17   questions.

18             THE COURT:  You have.

19             MR. AMBERG:  So I have covered basically the process.

20             Just one other final note, on the practical side, the

21   City has also been moving forward with looking at different

22   body camera systems.  They are looking at storage retention

23   issues.  So even though that work is not out in the forefront

24   right now, that work is going on.  So the City, once we get

25   this policy issue worked out, there are obviously some

1   financing issues and those types of things.  But our hope is

2   that this is all going to coincide.  So once the policy issues

3   are worked out, the practical issues will also be worked out,

4   and the City will at least be good to go and ready to go with a

5   body camera system.

6          THE COURT:  I think the only thing we know with

7   certainty is that, as time progresses, it gets less expensive

8   and easier to store more and more data it if wants to.

9          MR. AMBERG:  Right.  The other advantage of taking

10  more time is hopefully we will be able to learn by other

11  people's mistakes.

12         In any event, there is much more to be done

13  policy-wise on the practical side, but the goal is, again, not

14  necessarily a fast process.  But in the end, we hope it is a

15  good process that results in having the best possible body

16  camera policy and program for the City of Portland.

17         THE COURT:  Thank you, Mr. Amberg.

18         MR. AMBERG:  Thank you.

19         MS. OSOINACH:  So I would like to transition now into

20  talking about the First Amendment public meetings and criminal

21  activity.

22         THE COURT:  Oh, no.  Now you're going to ask me

23  questions, right?

24         MS. OSOINACH:  I might.  If you are willing.

25         THE COURT:  Go ahead.

1           MS. OSOINACH:   So as you know, Your Honor, the City

2      over the course of probably the last year has been grappling

3      with the control of its public meetings.  By "public meetings,"

4      I refer to City Council meetings and meetings of volunteer

5      boards.  The Oregon Public Meetings Manual is very clear that a

6      presiding officer at any meeting is responsible and has the

7      authority to control the public meeting.

8           What we've experienced is that that role of the

9      presiding officer is particularly challenging right now.  In

10     fact, over the course of the last year there have been a number

11     of arrests at public meetings.  Over the course of the last

12     several months those arrests have resulted in criminal

13     convictions here in Multnomah County.

14          The United States Department of Justice in their

15     compliance report euphemistically referred to one of these

16     criminal incidents as "throwing water" and in a rather

17     dismissive tone failed to indicate that the activity that

18     occurred at this public meeting of volunteers was criminal

19     harassment.

20          The individual was convicted of that crime.  In his

21     own allocution he acknowledged that his desire to make his

22     views -- his important views about police accountability

23     known -- had veered into inappropriate criminal activity for

24     which he took full responsibility.  The case is being appealed,

25     but certainly during his allocution --

1            Importantly, the judge in that case expressed,

2    I think, what many in the city have felt, which is that the

3    desire to engage in police reform and make one's views known

4    about it should not take away from the right and the

5    responsibilities that other people have also to engage in the

6    system.

7            The judge in the particular case, the criminal

8    harassment, was very concerned about the larger impacts to the

9    system that this kind of criminal activity has.  It discourages

10   other people from participating.  It creates fear and anxiety.

11           I think that there are many members even here today

12   in this audience who I can see who have been subject to

13   arrest -- not many but some -- here in the audience.  Yes, they

14   are raising their hands.

15           So I thought it would be helpful to engage in a

16   discussion with the Court, because certainly the folks that

17   have raised their hands here today, I have personally engaged

18   in discussions.  I know that they strongly believe that their

19   First Amendment rights include the need to disrupt public

20   meetings.  That is something that the City has experienced an

21   enormous challenge because the presiding officers, some of whom

22   are seated here today at City Council, strongly value public

23   input.

24           I think exactly this Court has experienced each party

25   needs to have its time to be able to express their views to

1    decision makers, and that's part of the challenge.  The

2    criminal activity that is occurring has led to an inability of

3    the City to conduct its business and has resulted in the City

4    having to take increasingly drastic measures in order to ensure

5    that the public's business can get done in a transparent way.

6         So I would be interested in your thoughts about the

7    relationship between civil disobedience and the need and the

8    strong history in Portland of people taking to the streets to

9    express those views.

10        THE COURT:  Well, one thing I will do, and in a

11   moment I will get back to you with a question.  But it occurs

12   to me that people who disrupt a meeting may do so for different

13   reasons.  They have different purposes, different motives,

14   different objectives.  Sometimes they are understandable or

15   legitimate objectives or motives that can be re-channeled into

16   a more productive way.

17        My question really is, has the City or any other

18   organization that you know, because I can't think of any, ever

19   held a type of public discussion, hearing views from everyone,

20   on the best way to hear from everyone?  In other words, taking

21   it out of the context of any particular agenda item.  If we're

22   talking about agenda item X, and someone has very, very strong

23   feelings about agenda item X, well, those strong feelings will

24   come out, and they may come out in an inappropriate fashion.

25   They may come out in a disruptive or inappropriate fashion.

1            But what if we were to proceed to talk what's the

2   best way in our community -- we all live together in the same

3   community -- what if we all were to all talk about, and I don't

4   know whether this is maybe a City-convened discussion.   Maybe

5   the amicus convenes this type of discussion.   Maybe you already

6   have.   Maybe it is a group of people that convene this.

7            But it sounds like we might want to have a discussion

8   of the best way to have public input and have public

9   decision-makers receive information in a way that is respectful

10  to everyone, to make sure that everyone is heard.   And what's

11  the best way to do that?   Totally separated from any specific

12  agenda item so that way we don't have one's feelings about a

13  particular agenda item coloring that discussion, and maybe that

14  will result in a set, if you will, Portland protocols.   This is

15  the way we have public dialogue in Portland.   Maybe we will

16  have an agreement; maybe we won't have an agreement.

17            By the way, I want to tell you, because I'm going to

18  bring it over to some specifics in a moment, and I'll outline a

19  little bit later all the items that I have read.   I have

20  received a lot of information, and I appreciate, Ms. Saadat,

21  the information you've given me about what has been happening

22  at COAB.   I wasn't there.   I have not had an evidentiary

23  hearing, so it is not my place, and no one is calling upon me

24  to judge who did what at the COAB meetings and who may be right

25  and who may be wrong and things like that.

1           But I do note that this is a very serious problem,

2    and it is not just at Portland City Council meetings.  It is

3    not just at COAB meetings.  I will say that I'm very

4    appreciative and very lucky that it is not in this courtroom.

5    For that, I appreciate and thank everyone who participates.

6           But I think we need to have a public dialogue about

7    different ways of doing a public dialogue and hear from

8    everybody on that and maybe come up with a set of protocols or

9    best practices.  Maybe it is different in different

10   circumstances.  Maybe the way one conducts oneself in a

11   City Council meeting may be different than a courtroom.  I

12   don't know.  Maybe it is the same; maybe it is different at a

13   COAB meeting.  Maybe it should be different; maybe it should be

14   the same.

15           I really don't know the answer, but I do believe that

16   there are many people in our community that are both very wise

17   in this view and who probably have differing opinions.  And

18   before we come up with a protocol or roadmap or blueprint for

19   how we are going to have these public discussions in the way

20   that will accomplish the objective that you've articulated, and

21   I really think are the correct objectives to make sure that

22   everyone's voice gets heard, I think it would be very useful to

23   have that, if you will, meta discussion about the best way to

24   do that.

25           Maybe the Department of Justice has already convened

1    those types of meetings.  I haven't read anything about that in

2    the media, but I do think it might be time in the next few

3    months, if that hasn't already been done, for us to come

4    together as a community to talk about:  What types of problems

5    take place when we have meetings that are disruptive?  Why do

6    people feel a need or desire to disrupt?  Is there a better way

7    to allow those people to express their feelings and to express

8    their views and to be heard and not to block off and intimidate

9    the views of others?

10          I don't know if we can reach a consensus on that, but

11   we will never find out until we have a discussion or dialogue

12   about what are the various motivations and can we reach a

13   consensus or agreement.

14          MS. OSOINACH:  Those comments and thoughts are so

15   helpful and exactly what I had hoped to hear.  I think that

16   is -- I'm one person.  But I can look around.  I think that is

17   exactly what's needed.

18          We respectfully disagree with the United States'

19   position that what needs to happen are deadlines.  "In 30 days

20   we will come back to you; in 90 days we will come back to you."

21   That's not the Portland way.  We need to have an opportunity

22   for the community to tell us and for the City to be able to

23   engage in a way that gets to what you are saying, which is,

24   apart from a discrete issue, we need to talk about the way

25   we're talking.

1              THE COURT:  You know, I was agreeing with you so

2    much -- everything you said -- until that last point -- because

3    look at it.  I think that these types of annual status

4    conferences and discussions are incredibly helpful.

5              MS. OSOINACH:  I agree, Your Honor.  The annual

6    status conferences are helpful.

7              THE COURT:  Without pointing any fingers, at least

8    one party at this table resisted that when I first proposed

9    that.

10             MS. OSOINACH:  That is correct, Your Honor.  When we

11   have the hearing, we did in fact object to that.  But the

12   status conferences are very helpful.  To the extent there was

13   ever any indication that our resistance was based on the fact

14   that they would not be helpful, then I would extend a sincere

15   apology.

16             THE COURT:  No apology needed.  We are all struggling

17   to find the best way to move forward.

18             What Mr. Geissler proposed earlier, he didn't suggest

19   an evidentiary hearing in 30 days or the 90 days, but a status

20   conference.  I, frankly, think that that's not a bad idea.

21   Whether the right time period is 30 or 90, less or more

22   frequently, or a little bit longer and less frequently, we will

23   talk about.

24             But I do think it is a good idea to put down markers,

25   as you have in your settlement agreement, of coming together

1    and reviewing it.  Frankly, right now, as we are approaching

2    the two-year anniversary that is discussed in paragraph 175,

3    this is a perfect time to do that.  I think it probably does

4    make sense to come back in approximately 30 days and come back

5    in approximately 90 days.  I assure you I'm not planning on

6    ordering an evidentiary hearing, but if any party, and that

7    includes the amicus, wants a court hearing, just ask for one,

8    and you will get one.

9          Here is what we don't want to have happen, at least I

10   don't think this is what we want to have happen:  We know,

11   under the agreement, if the United States files a motion that

12   the settlement agreement is not in compliance, then I hold a

13   hearing.  If I find that is correct, I make a remedy.  And then

14   I have way more responsibility than I really want in this

15   process.  I will not be shy about exercising it if I have to,

16   but that's not the right way.

17          MS. OSOINACH:  So, Your Honor, what would be helpful,

18   I think, is to talk about the purpose of a status conference.

19          THE COURT:  Okay.

20          MS. OSOINACH:  The purpose of a status conference

21   from the advocates' point of view is to inform the Court about

22   the progress or lack of progress being made.  From the Court's

23   point of view, I assume that what is also quite helpful for the

24   Court, as you've described, you have responsibilities for

25   enforcement.  So in order to manage your own docket and your

1 | own work flow, it is helpful for the Court to know whether or

2 | not work may be coming your way.

3 | THE COURT:  Precisely.

4 | MS. OSOINACH:  So in that regard the coming before

5 | this court in 30 days or 90 days to continue to inform you

6 | about whether or not you may be called upon in the future to

7 | address an area of non-compliance or conduct enforcement action

8 | is premature.

9 | You will hear in a moment from Judy Prosper, who has

10 | done an enormous amount of work on the COAB.  I would like to

11 | give you one example of how setting deadlines, while the intent

12 | may be to hold folks' feet to the fire, it may have detrimental

13 | effect.

14 | When the COAB was first being formed, the City

15 | undertook a leadership role in partnership with the AMAC and in

16 | partnership with others in the community.  The selection of the

17 | five at-large members occurred entirely from members of the

18 | community, vetting applicants, and choosing applicants.  We got

19 | five wonderful people to serve on the COAB.  That process took

20 | a long time, because it was so important to everyone to have

21 | people who were committed to police reform, who were informed,

22 | and who understood what they were getting into.

23 | The City's work plan for after the selection of the

24 | COAB was that we would take some time to orient, train, so that

25 | people wouldn't be thrown right in.  The United States at that

1    time pointed out that that would be not in compliance with the

2    settlement agreement because the COAB needed to be established

3    by a certain date.  So rather than taking time prior to the

4    establishment of the COAB and to avoid a finding of

5    noncompliance, the City convened the COAB, and I believe in the

6    words of Kathleen Saadat, which I'm very glad to see you have

7    read her submission --

8              THE COURT:  Two submissions.

9              MS. OSOINACH:  Yes, two submissions.  We were

10   building a plane while we were flying it.  And that was not an

11   ideal situation either for the City, but, more importantly, for

12   the volunteers that served on the COAB.

13             So that is an example of where imposing these

14   deadlines actually hinders progress.  So that is why when an

15   hour ago the Department of Justice suggested that we continue

16   to periodically come before the Court, that the City -- our

17   initial response is that we would like some time to continue to

18   work with the stakeholders involved to figure out exactly on a

19   higher level what you suggested, which is how we, as a

20   community wanting and able to be engaged in this work, and then

21   what are some of the concrete plans that we have.

22             So it is not coming from a place of being obstinate.

23   It is coming from a place of wanting to move forward, and there

24   is plenty of fire on these feet.  I do not think the Court's

25   involvement, particularly because you have that potential

1    enforcement role, is warranted at this time.

2              I will turn it over to Ms. Prosper at this time.

3              THE COURT:  You make some very good points.  But also

4    tying it back to the points that you made a little bit earlier

5    in your presentation, I do think one of the reasons why we may

6    be seeing disruptions at various public meetings, whether they

7    be City Hall, whether they be COAB, and other contexts maybe --

8    and I don't know this, because we haven't had that full of a

9    discussion on this -- maybe is in part driven because of public

10   frustrations with the perception of how slowly things are

11   moving.  I'm not saying things are moving slowly, but nor am I

12   saying they are not.  But that may be a source of some public

13   frustration.

14             One of the ways to address that may be with more

15   transparency, more public hearings.  It doesn't have to be in

16   this vehicle.  But if that's what one of the parties is

17   suggesting, I am going to make this Court's time and this

18   Court's courtroom available to assist -- if that's what one of

19   the parties think.

20             But I'd like to leave it alone for right now.  We

21   will be taking a break a little bit later.  I will hear from

22   Ms. Prosper in a few moments.  But let me encourage you and

23   Mr. Geissler to discuss these issues during our break.  I will

24   hear from both sides after the break.  If you have reached an

25   agreement, I will most likely adopt whatever you all have

 1   agreed upon.  And if you don't have an agreement, I will do

 2   what courts do when parties have a disagreement, and that is

 3   make a ruling.  I encourage you to speak with each other during

 4   our break.

 5           Now I am looking forward to hearing from Ms. Prosper.

 6           Dennis, if you are all right, let's keep going a bit

 7   little further.

 8           MS. PROSPER:  Thank you.  I am going to go over to

 9   the podium.

10           THE COURT:  Wherever you wish.

11           MS. PROSPER:  Good afternoon again, Your Honor.  I am

12   actually thrilled today.  It is a great privilege for me to

13   appear before you because this is my very first court

14   appearance in the state of Oregon.

15           While I have been an attorney for almost two decades,

16   I moved to Portland and joined the City Attorney's Office two

17   years ago, a little more, in the fall of 2014, and I absolutely

18   love Portland.  The City has warmly welcomed my family, and I

19   am delighted to have made this move.

20           Shortly after my arrival to the office, I was asked

21   to "help out" with implementation of the settlement agreement.

22   And here I stand, right?  Two years later, I'm proud to be a

23   full-fledged member of the team.  I have submerged myself in

24   the history that gave rise to the need for the settlement

25   agreement, and I continue to seek to understand the nuanced

1    perspectives of the various stakeholders.

2         As mentioned, I will address the Court regarding the

3    City's community engagement obligations under the settlement

4    agreement, mostly found in Section 9, but also in other places.

5         These areas have been deemed to be in non-compliance

6    with significant barriers, as the DOJ mentioned.  So I want to

7    start by saying that meaningful community engagement on police

8    reform is very, very challenging, but also very, very

9    necessary.

10        The City is committed to considering informed input

11   in recommendations from all voices -- be they small,

12   individual, collective, or very powerful.  The City is

13   immensely grateful for the volunteer community oversight and

14   advisory board members, both past and present, who dedicated

15   countless hours, well beyond that which was expected to work on

16   this very important experiment in direct community

17   participation in police reform.

18        It is, however, painfully clear to the City that

19   there have been several obstacles in the way of COAB's ability

20   to be successful at its stated goals and tasks.  All parties --

21   amicus and intervenor included -- agree that the settlement

22   agreement structure to support the COAB must be reconsidered.

23   All have agreed to continue working to develop a clearer path

24   forward.

25        Going back to the beginning, as my colleague pointed

1    out, in late 2014, in early 2015, it is clear that the vetting

2    process for the selection of COAB members could have been more

3    streamlined.  It could have been more informative to both those

4    who were tasked with collecting as well as those ultimately

5    chosen to serve from the community at large.

6            Aggressive and, in hindsight, unreasonable deadlines

7    resulted in the COAB being seated before receiving a

8    comprehensive orientation and training for its members prior to

9    beginning their work.  Looking back, it's also clear that the

10   agreement failed to adequately delineate and focus the scope of

11   the work expected of COAB members.

12           As the COAB's own report points out, the amount of

13   work expected was completely underestimated and impossible to

14   accomplish in the "ten hours per month" that they were told it

15   would take.

16           Because of these foundational deficits, the Board's

17   priorities shifted often.  This, unfortunately, delayed the

18   invitation of the mayor and police chief until November of

19   2015.  That invitation was postponed by the COAB executive

20   committee to accommodate another training they needed.

21           Many could not interpret the City's legally required

22   processes, procurement rules, and state law requirements for

23   the City's use of funds.  That's because we never had a chance

24   to really clearly articulate them.  But that's on us.  And even

25   seasoned city employees are not fully versed with the many

1   restrictions on the use of city funds.

2          Obligations and requirements of public service as

3   "public officials" were only described to the members as issues

4   arose, causing great confusion and mistrust.  Again, that's on

5   us.

6          The COAB seemed to begin to coalesce after a private

7   facilitated retreat last spring, and I want to piggyback on

8   what Your Honor said and say that common rules for common

9   ground were created and voted on by the full COAB, and there

10  was an expectation that those who attended the meetings as well

11  as the COAB members with each other would respect a certain

12  level of decorum.

13         Soon afterward the meetings started to become very

14  difficult.  The civil unrest at COAB meetings referred to by

15  the DOJ resulted in COAB members, the chair, city employees,

16  and members of the public expressing concern for their physical

17  safety at COAB meetings and facing reputational harm due to

18  both verbal attacks, attacks in person, and electronically

19  online.

20         There were online communities with the sole purpose

21  of disrupting and disbanding COAB.  These individuals were

22  organized in their goal and would grind public COAB meetings to

23  an abrupt halt without stating their intended purpose for doing

24  so.

25         Memberships of the public have had to be excluded for

1  disrupting the meetings and arrests for criminal behavior, as

2  mentioned earlier, have unfortunately been necessary.  It is

3  not a good optic when police officers come in to arrest

4  citizens at a meeting for police accountability and reform.

5          Several COAB members called for a temporary halt to

6  activities to cope with the increasing difficulties to the

7  proper functioning of COAB.  Again and unfortunately, the April

8  meeting where the mayor and the chief were again invited had to

9  be canceled by the COCL because the meeting preceding it ended

10  abruptly due to extreme circumstances.

11          Several COAB members resigned, bringing the

12  membership from 15 voting members to a mere eight.  As the DOJ

13  points out, the effort to keep the COAB functioning began to

14  require a disproportionate amount of time and resources from

15  all sides, with mixed results, at best, in actually achieving

16  what was envisioned.

17          At its July 14th meeting of this year, the COAB made

18  a recommendation to the parties requesting to be independent of

19  the COCL.  On July 19th, the COCL delivered a petition to the

20  parties requesting relief from its contractual obligations to

21  chair and manage the COAB.  This has colloquially been referred

22  to as "the divorce."

23          Both requests would require structural amendment to

24  the agreement.  The summer was upon us, and it seemed like

25  folks just needed a little break to reset, restore, maybe take

1    a vacation, and spend a little more time with their families.

2            In late August, after consultation, the City and the

3    United States agreed that a 60-day hiatus of COAB activities

4    would give everyone this breathing room.

5            I just want to say a little bit about the 60 days.

6    We all know lawyers are not very good with math.  We sort of, I

7    think in the beginning, requested an open-ended time frame, but

8    we knew that wouldn't fly, so someone -- probably me -- came up

9    with 60 days.  It was a number.  And again, as my colleague

10   points out, a lot of times things don't get done.  Quite

11   frankly, I could use a lot more time to check in with

12   stakeholders.

13           During the break the understanding of the parties was

14   that the City would engage the amicus party, Albina Ministerial

15   Alliance, the intervenor, the Portland Police Association, PPB

16   community groups, constituencies, our commissioners to seek a

17   different and less challenging path to incorporate community

18   input into the City's work.

19           I want to make a note here.  You have heard that the

20   City could "fix" the COAB simply by reappointing new members to

21   fill the vacancies created by the slate of resignations.  It is

22   true, that despite the peril of lack of forum, the mayor and

23   three city commissioners have not appointed replacement members

24   as the appointees resigned.  This was not a lighthearted or

25   casual decision on their parts.

1          Four council appointees resigned almost

2    simultaneously.  All appointees gave varying personal reasons

3    for their resignations.  But the difficulties faced by COAB's

4    lack of cohesion and functionality were among them.  Each, like

5    all the other dedicated members of COAB, gave generously of

6    their time and talent to the process, but were met with

7    daunting obstacles to their success.

8          Counsel members want the current issues addressed

9    before appointing new members, recognizing that such

10   appointments could prove to be an exercise in futility and

11   discourage interested and dedicated volunteers from accepting

12   such appointments in the future.

13         The City staffs over 100 boards and commissioners.

14   We realize that more needs to be done to ensure their success.

15   A project for on-boarding on all city volunteers is actually in

16   the works toward that end.

17         At the beginning of the 60-day period of reflection

18   the City drafted a survey and circulated it at a public forum

19   generously hosted by Maranatha Church on September 12th and

20   then beyond to anyone who wished to give their input, be it

21   anonymously or citing who they were.

22         I personally spoke with several mental health peer

23   support specialists, many advocates and providers for those

24   experiencing mental health challenges.  Council staffers and I

25   spent many hours with the steering committee of the AMAC to

1    engage our city commissioners and their staffs on their

2    thoughts.

3          I spoke to other police accountability bodies and

4    sought advice from community leaders such as the faith

5    community and police forum.  We interviewed almost every former

6    and current COAB member, with Commissioner Fritz sitting in on

7    the former and current COAB members so she could report back to

8    her colleagues.  The COCL and former COAB chair were also

9    consulted.  We continued to meet with stakeholders to gather

10   their diverse perspectives to include this input in our new

11   proposal.

12         Despite the recess, the City provided resources to

13   the remaining members of COAB to have two work sessions to help

14   them craft their report for the Court today.  Toward the end of

15   the 60-day recess the City drafted an outline for a proposal to

16   move forward based on the comments and recommendations

17   received.

18         I just want to say something about being fully baked.

19   Since I have arrived to the City, we have been criticized over

20   and over for fully baking the cake and presenting it for people

21   to slice up.  We didn't do that this time.  We didn't fully

22   bake the cake.  We put out a couple of eggs, some flour, some

23   sugar, and some butter, and we asked for continued input from

24   the parties to get the thing together.

25         It should be noted that one of the most pervasive

comments was that the settlement agreement gave the COAB too

much work, and the Board needed to be focused with fewer

tangible deliverables.  The City proposed this loose

framework -- cake not quite baked -- as a starting point for

party discussion in a way forward.

COAB's recess has ended.  It ended last Friday, as

you pointed out, Your Honor.  There is a COAB meeting scheduled

for this Thursday, October 28th, that will be -- per the

settlement agreement -- chaired by the COCL.

The framework for conceptual amendments were shared

with the parties, including the intervenor and amicus prior to

an October 14th meeting.  The parties met again a week later to

set some parameters for further discussion on what the future

COAB structure should be, including a selection process.

Again, I want to point to what Your Honor said

earlier:  We're lawyers.  We're used to fighting, or not being

on the same side.  Thus, the parties agreed to facilitate

future conversations in moving the way forward.  This was

pointed out, I believe by Ms. Brown earlier.

Another thing on timing and something I make very,

very clear when we agreed to do this.  We need to follow the

procurement processes of the City and State of Oregon.  Those

things take time.

So hopefully within the next week or so we will agree

on somebody who we think can facilitate us.  Then we will

1    engage the procurement process.  So that's going to take time.
2    And I hate to say it, but 30 days from now maybe we will have a
3    contract.  So there might not be too much to report back on in
4    30 days.
5          All the parties agree that the settlement agreement
6    structure needs to be reconsidered.  All the parties have
7    agreed to continue working to develop that structure.
8          Were do we go from here?  What's next?  Giving up on
9    informed community input is not an option.  The City is
10   dedicated to moving forward with the benefit of hindsight,
11   acknowledging the areas where we are lacking.
12         We have a renewed dedication to improving intentional
13   and well-informed community engagement on police reform.  We
14   wish to continue to improve upon what we have done well and
15   attempt not to repeat what we have not.  The City looks forward
16   to addressing the issues that have overwhelmed COAB as we
17   consider modifications to the settlement agreement.
18         Thank you for this opportunity to stand before the
19   Court, on behalf of Portland, and for this Court's unyielding
20   dedication to this case.
21         THE COURT:  Thank you, Ms. Prosper.
22         Let me share with you one reaction you said about
23   deadlines, lawyers, numbers, and timing.  You know from your
24   practice -- maybe not that much in this district, but it is
25   pretty constant around the country -- that judges set

1   deadlines.  For some responses our deadlines are 14 days;

2   others it's 21 days.  Other types of things, you have deadlines

3   of 30 days.  The specific number isn't that critically

4   important, as you know, because more often than not, if someone

5   asks for a reasonable extension, they get it.

6          But I've noticed, and my guess is you probably have

7   too as a practicing lawyer for some time, that deadlines are

8   good to actually get the attention of the lawyers and others to

9   actually do something.  I do think that deadlines are valuable

10  for that purpose because they tend to focus attention that

11  enough time has gone on.  We now have to do something about a

12  particular problem before a deadline comes up.

13         Without that, we run into too great of a risk of

14  other priorities, other matters that we have to attend to,

15  maybe that do have other deadlines taking precedent because we

16  don't have a deadline for something else.

17         So I do believe that deadlines play a good and

18  valuable role in getting things accomplished and done.  That

19  said, and I'll say a few more comments in a few moments, that I

20  also recognize that we don't always necessarily get things

21  right the first time.  It is constantly an iterative process of

22  learning and improving.

23         But I am quite sympathetic to and supportive of a

24  suggestion that we have some deadlines, as Mr. Geissler

25  proposes, and I'll leave to the parties to discuss exactly what

1    those right parameters and quantities should look like during

2    our recess, but I'm quite supportive of that.

3         By the way, I will say right now a comment I was

4    going to say a little bit later, but I will say it right now.

5    I recognize this country has a tremendous history of making

6    efforts and realizing that sometimes we don't get it right.

7    Then we go back to the drawing board.  We're constantly

8    improving, but we don't necessarily always get it right.  We

9    recognize the flaws, and then we build on them and improve.

10         You know, the cleanest example that I can think of

11   right now was when our country started, after we won the

12   Revolutionary War, we came up with the Articles of

13   Confederation.  It looked like a good idea at the time to the

14   Continental Congress, and it proved it wasn't working.  It had

15   too many serious flaws.

16         Then we had our Constitution.  We had our

17   Constitutional Convention in 1787, and that was a dramatic

18   change from the Articles of Confederation.  They still didn't

19   quite get it right.  That's why the First Congress in 1791

20   proposed the Bills of Rights that were ratified, and that was a

21   nice step forward, an improvement, but it still wasn't far

22   enough.  It didn't accomplish enough.

23         Ultimately, we had the Civil War.  One of the good

24   things that brought us was the Reconstruction Amendments, the

25   Thirteenth, Fourteenth, and Fifteenth Amendments going in the

 1   right direction -- and I'm just talking Constitutional changes.

 2   I'm not even getting into statutory issues.  But that didn't go

 3   far enough.

 4          Ultimately, we needed the Nineteenth Amendment, and

 5   my guess is that we haven't gone far enough and that someday

 6   historians or others will look back and say in this time period

 7   we hadn't gone far enough, and we need it even more.  So we are

 8   getting there.

 9          So I'm not being overly critical of what has taken

10   place in the last two years.  I do acknowledge the parties have

11   agreed we're not in compliance with settlement agreement.

12   However, we're not done.  Nobody expected that this would be

13   fully complied with in just two years.  We need to keep moving

14   forward.  We can't lose sight of it.  I do recognize the

15   contributions of everyone here toward that objective.

16          So moving forward, we will get it done.  It may come

17   with three steps forward and two steps back, but we are making

18   progress.  We are moving forward.

19          Ms. Osoinach, I know you wanted to show a video.

20   Approximately how long is that?

21          MS. OSOINACH:  It is approximately ten minutes.

22          THE COURT:  Maybe we should do this:  I would like to

23   relieve our court reporter at this time -- although when I stop

24   talking, of course.  Then we will listen to and watch the

25   video.  Then we will take a ten-minute recess right after the

1   video ends.  It sounds like the City is done with its opening

2   comments, am I correct, after the video?

3            MS. OSOINACH:  Yes.  I would like to make a few

4   comments to set the video in context.

5            THE COURT:  We will do that.  After the video ends,

6   it sounds like the City will be done with the presentation.

7            MS. OSOINACH:  We will have no further comments.

8            THE COURT:  Then we will take a ten-minute recess.

9            After that, I would like to hear, Mr. Karia, if you

10  have any comments on behalf of Portland Police Association.

11           Ms. Albies and Dr. Haines, if you have any comments

12  on behalf of the Albina Ministerial Coalition.

13           I also look forward to hearing from our COCL,

14  Dr. Rosenbaum, Dr. Watson, and Dr. Christoff.  You can tell me

15  what you all want to do.

16           I do want to hear from the COAB representative,

17  Mr. Steenson.

18           Ms. Saadat, that is you.  If you would like to share

19  comments after Mr. Steenson, I would like to hear your

20  perspective.

21           Ms. Hardesty, I received a letter from Mr. Hardesty.

22  I would be interested in hearing your comments, Ms. Hardesty.

23           Frankly, anyone else who wants to speak.

24           I have got Dr. Bethel.

25           Frankly, the invitation is open.  Just see Mary

1   afterwards.

2            What I would like to do is after the COCL and COAB,

3   Mr. Steenson, then hear from Ms. Saadat, Ms. Hardesty,

4   Dr. Bethel, if you wish.

5            Mr. Walsh, if you are willing to share some of your

6   views.

7            MR. WALSH:  Oh, yes.

8            THE COURT:  I would be very interested in hearing

9   your views a little bit later, including the point about what

10  can and should be done to make COAB meetings more productive

11  and less disruptive.  I would like to hear from you on that,

12  sir.

13           Anybody else, just let Mary know, and we will hear

14  from you after our break.

15           So the floor is now yours, Ms. Osoinach, to set the

16  stage.

17           Yes, Ms. Albies.

18           MS. ALBIES:  Your Honor, for the AMA Coalition,

19  Dr. Haines was going to give a presentation, but also I was

20  going to direct the Court to Dr. Bethel for a brief

21  presentation.

22           THE COURT:  Of course.  I leave it in your hands to

23  decide how AMA best decides to present whatever you wish.

24           So it is in your hands, Ms. Osoinach, to set the

25  stage for the video.  Whenever you tell us you are ready, we

1    will then start the video.  I will relieve the court reporter.

2    When the video ends, we will take a ten-minute recess.

3            MS. OSOINACH:  Thank you.

4            So I mentioned this first, but I just wanted to make

5    clear, this is a video that was prepared specifically for this

6    court proceeding as demonstrative evidence for you at my

7    request.

8            I spoke to the individuals who agreed to appear on

9    this video, and I cannot thank them enough.  Some of them were

10   going to try to be here today and weren't able to be.  These

11   are officers and citizens who had interactions that transformed

12   them, and they agreed to make themselves vulnerable in

13   describing the challenges that they faced in coming together,

14   but how it made a difference in both of their lives.

15           I thought it would be very helpful, not only for the

16   Court, but all of us, after the discussion we've had, about how

17   challenging it was to have public discourse at the COAB and

18   other meetings and to have micro examples of the fact that

19   those challenges have not overwhelmed, nor will they, the

20   good-hearted efforts of people to come together to work on

21   police reform in Portland.

22           UNIDENTIFIED SPEAKER:  I am going to object to this.

23           THE COURT:  Pardon me?

24           I don't know what you are saying, but I look forward

25   to what you are saying later.

 1              UNIDENTIFIED SPEAKER:  Should I come on video with

 2    the people I have recorded?

 3              THE COURT:  You are welcome to say anything you want.

 4    Just talk to Mary, and we will get you on the list.

 5              (Technical difficulties with the presentation.)

 6              THE COURT:  Let's take a ten-minute recess.  We will

 7    watch it when we come back.

 8              (Recess.)

 9              (Open court; proceedings resumed:)

10              THE COURT:  All right.

11              Mary, did we get that taken care of?

12              Dennis, you don't need to take this.

13              You may proceed.

14              MS. OSOINACH:  Your Honor, we are still working on

15    the video, so if we could have just a few moments.

16              After the last status conference, after conferring

17    with our clients, there were some things that we felt it was

18    important to put in the record and so Mr. Amberg would like to

19    put a few things on the record.  Then we will play the video.

20              THE COURT:  Very good.

21              MR. AMBERG:  Thank you, Your Honor.

22              Referring back to the body cameras -- and I apologize

23    if I misstated some things.  I wanted to make sure that they

24    were clarified for the record before the Court.

25              The body camera, we have the tentative agreement that

1   was agreed to with the Portland Police Association.  Then we

2   have the labor contract itself.

3        I wanted to clarify, first of all, there is no body

4   cameras policy that is part of the contract.  It is not part of

5   the contract.  There is not a body camera policy that was

6   agreed to as part of the tentative agreement.  It was a draft

7   body camera policy.  It was referred to as part of the

8   tentative agreement.  There has been no agreement on a body

9   camera policy.  I wanted to make sure to clarify that.

10        I also stated per the -- the ordinance was adopted by

11   Council.  Under the ordinance that was adopted by Council, I

12   may have implied that there was a report from stakeholder

13   groups that was going to come back to Council for approval.  I

14   didn't want to imply that it was a report that was going to be

15   approved by Council.  I want to make clear it is the body

16   camera policy will come back to Council for further public

17   input and ultimately approval by Council on the body camera

18   policy.

19        The bargaining over the mandatory subject, we believe

20   that there are a number of aspects that are mandatory for

21   bargaining.  That was acknowledged in the tentative agreement.

22   As I tried to say, we didn't want to fight that fight with the

23   union.  We acknowledge that.  It wasn't that we were giving up

24   something that we thought we had in the first place.  We didn't

25   come to the conclusion that we felt it was mandatory for

1    bargaining.

2              There is no decisions made by Council ultimately on

3    body cameras, and also there has been tremendous money spent

4    already by the City, close to about $850,000, looking into

5    implementing the body camera program.

6              So I wanted to make sure to clarify those things for

7    the record.

8              THE COURT:  Very good.  Thank you, Mr. Amberg.

9              MS. PROSPER:  Your Honor, one more thing -- I won't

10   go to the podium -- about timing.

11             THE COURT:  Yes.

12             MS. PROSPER:  We respect deadlines.  One of the

13   reasons we may seem reluctant to have such a short deadline is

14   we have a new administration starting in January, and we would

15   really like to have the opportunity to check in with the new

16   mayor in January before we finalize a lot of these things.  So

17   we are not opposed to deadlines; we are just opposed to

18   unrealistic ones.

19             THE COURT:  I understand that.  And I look forward to

20   hearing the results of the discussion between the City and the

21   United States.

22             MS. OSOINACH:  Thank you very much, Mary, and my

23   legal assistant, Katherine Kehoe, for the video.

24             THE COURT:  Watch out for the volume on that.

25             (The video was played in open court.)

 1                 (Proceedings resumed:)

 2                 THE COURT:  That is the end of the video, I assume.

 3                 All right.  Thank you very much.

 4                 Let me invite Mr. Karia on behalf of Portland Police

 5      Association.

 6                 MR. KARIA:  Thank you, Your Honor.

 7                 While our attention has been focused particularly

 8      laser-like on the details of the City's technical compliance

 9      with the terms of the settlement agreement, we believe it is

10      important for this Court and everybody in attendance to

11      consider an important aspect of our reality in the Police

12      Bureau, which is we are in the midst of an unprecedented

13      staffing crisis.  We are facing 10 percent shortage in officers

14      compared to our desired strength of the Police Bureau.  We are

15      also anticipating 385 officers will retire within the next four

16      to five years.

17                 We have been working diligently with the Police

18      Bureau to ensure that we have focused, constructive solutions

19      to our recruiting and retention problems.  We want the best and

20      brightest officers, officers with diverse backgrounds and life

21      experiences.

22                 But fixing the staffing crisis will take time, and

23      the Police Bureau has found itself in the position of having to

24      make incredibly difficult cuts to units which serve the public,

25      whether they be the transit division, the traffic division, or

1   gang enforcement.

2          The staffing crisis has strained the Police Bureau's

3   ability to do the very things we just saw in this video -- to

4   proactively engage with the community, to take time in these

5   incredibly sensitive and important calls.

6          Notwithstanding that shortage, Portland's officers,

7   our members have diligently showed the desire to focus their

8   attention on serving the community in the various ways we've

9   seen, not just in this video, but daily.

10          Time and again we have seen Portland police officers

11   engage with our communities.  We have seen them attempt to

12   humanize the badge -- whether it is in simple community

13   relation events like Shop-with-a-Cop or more complex public

14   policy discussions such as Race Talks.

15          Our officers are dedicated, they are diligent, and

16   they are to be commended for their commitment, not just to the

17   community, but to the mental health component of the settlement

18   agreement, which we are here to provide you an update with.

19          For example, as has been mentioned already by the

20   United States and the City, Portland's Behavioral Health Unit

21   has received national attention for its creative and effective

22   approach to handling our community's mental health service

23   needs.  We have seen Portland officers volunteer to take on the

24   responsibility, to take on the duties, both to their chief of

25   police and to their community to serve on the Enhanced Crisis

1    Intervention Team.  They want to be part of the solution.

2            As Ms. Brown mentioned, we also have to be cognizant

3    that the solution to our mental health services needs in this

4    city and our community cannot start and stop solely with police

5    officers in the Portland Police Bureau.  We cannot forget that,

6    although we demand that our officers are the frontline

7    responders to individuals in mental health crisis, that we need

8    to ensure that there are robust federal, state, and

9    county-funded mental health infrastructures so that we can

10   address mental health issues in a holistic manner.

11           On a daily basis Portland officers handle incredibly

12   important and at times potentially volatile situations with

13   professionalism, skill, and patience.  It is what the

14   settlement agreement demands of them.  It is what their chief

15   and police commissioner demand of them.  It is what they demand

16   of themselves.

17           In our discussions about the City's compliance with

18   the settlement agreement, we must not forget all of these

19   positive steps that our officers have taken, whether they are

20   small steps -- the steps we don't see every day -- or the big

21   steps on larger policy initiatives.

22           To borrow the sentiments from Dr. Rosenbaum, one of

23   the esteemed COCL members in his written sentiments to this

24   Court, for this process to be successful, the process that

25   we're sitting here today discussing with you, Your Honor, we

1    have to ensure that our officers have confidence in the

2    Police Bureau's leadership; that the system is fair and just

3    for both the community's members and for the officers who serve

4    the community; and that the officers have a voice, as our

5    Police Bureau evolves, under this settlement agreement.

6             To that end and with regard to, for example, the

7    COAB, the Portland Police Association's President Daryl Turner

8    has actively participated in the stakeholder discussions in how

9    to reformulate the COAB so that it is successful.  He fully

10   intends and the Portland Police Association fully intends to

11   continue in that endeavor to be part of the solution.

12            With respect to body-worn cameras, while the

13   body-worn camera policy is not in the collective bargaining

14   agreement, we all acknowledge that both under our collective

15   bargaining agreement and under state law both the City and the

16   PPA have an obligation to collective bargain, to negotiate, to

17   come to an agreement through good-faith processes on a

18   body-worn camera policy.  We respect that obligation, and we

19   take it seriously.  We will continue to negotiate with the

20   City.  We will continue to push for our final body-worn camera

21   policy.  Even after all the public input, we will continue to

22   talk with the City.

23            We will ensure that it is a cost-effective program;

24   that it respects the rights of our citizens -- their privacy

25   rights, among others -- and it respects the due process rights

1    of the officers who will be utilizing those cameras.

2            We believe, as the City has said, this is an ongoing

3    discussion.  As this Court has mentioned, this is an evolution,

4    and we fully intend to be part of the evolution.

5            Thank you.

6            THE COURT:  Thank you, Mr. Karia.

7            MR. KARIA:  Thank you.

8            THE COURT:  Ms. Albies.  By the way, I did receive,

9    and I did read the status report from Albina Ministerial

10   Alliance for Justice and Police Reform.  I thank you for that.

11   The Court has also read the report from the United States and

12   the City and from the COCL.

13           MS. ALBIES:  Thank you, Your Honor.  Briefly, before

14   I introduce Dr. Haines, I want to introduce Kristen Chambers.

15   She is co-counsel.  She filed a notice of appearance just a few

16   weeks ago in this case.

17           THE COURT:  Welcome, Ms. Chambers.

18           MS. ALBIES:  She will be with me for the next couple

19   of status hearings and beyond.  The AMA Coalition appreciates

20   the Court's attention to issues in this case and welcomes the

21   Court's invitation to the community to give their perspective

22   as well.

23           To give the AMA's position beyond what's in the

24   status report, I am going to present Reverend Dr. LeRoy Haines

25   who was recently awarded the first annual award of

 1    Advocate for Community Policing by the U.S. Attorney General,

 2    which is a great honor.  He is a long-time community oversight

 3    police reform activist.

 4              THE COURT:  Welcome, Dr. Haines.  Congratulations on

 5    that award.

 6              DR. HAINES:  Thank you.  To the Honorable Judge

 7    Michael H. Simon and to the other distinguished members of the

 8    party, I am the Reverend Dr. LeRoy Haines, Junior, Chairperson

 9    of the Albina Ministerial Alliance for Justice and Police

10    Reform.

11              The process of implementation of the court-issued

12    settlement agreement has been a long and hard road, but a road

13    that is necessary for us to get it right and to come into that

14    perfect union in our community.  We have seen significant

15    progress in a few areas like the community-based mental health

16    services and the mobile crisis prevention team, yet there are

17    other major areas of the settlement agreement that I want to

18    highlight that significant progress has not been made.

19              The AMA Coalition agrees to advocate for the

20    implementation of the settlement agreement reform.  The AMA

21    further agrees to oppose any attempt that is part our aspect of

22    the settlement agreement -- of our enhanced amicus.  So we have

23    been diligently engaged.  In fact, we set up a couple of the

24    forums in order to continue the process of engagement.

25              In reference to the Community Oversight Advisory

1    Board and the Compliance Oversight Community Liaison, the AMA

2    Coalition is greatly concerned about the implementation of the

3    community oversight of the settlement agreement.  The COAB got

4    a rocky start.  Thirteen members have resigned due to lack of

5    support from sometime the City and sometime also from the

6    Bureau as well as other personal issues.

7         The City and the COAB itself has made over 50

8    recommendations and unclear expectations regarding the Board's

9    role and its purpose became also a hindrance.  This is an

10   alarming number considering that the Board has had only 15

11   members.  Many of those who resigned were Council appointees

12   rather than those that were at large.  In addition,

13   Kathleen Saadat was appointed to replace Judge De Muniz after

14   he stepped down on April 20, 2015 as chair of COAB and COCL.

15        Despite pleas from the AMA Coalition in numerous

16   meetings of the selection of new members, we have a

17   disagreement respectfully with the City, but it has not taken

18   action to fill the vacancies.  The AMA Coalition participated

19   in discussions with the City on plans to fill vacancies thereby

20   committed to at-large members of the COAB, but the City did not

21   implement those plans.

22        There are currently four vacancies on the COAB that

23   the commission can fill by appointment.  They have not done so.

24   As a result of the City's failure to appoint replacement

25   members, the COAB lacks a quorum to carry out its most

1   important work.

2          On July 11, 2016, the COCL team requested that the

3   settlement agreement be amended to separate COCL and COAB

4   because of its contractual obligation relating to community

5   oversight.

6          On August 19, 2016, the DOJ agreed with the City to

7   place COAB on a 60-day recess while the City worked out changes

8   to the constructure, which it would present to DOJ as a

9   conceptual amendment to the settlement agreement.  As a result,

10  the work of COAB was put on hold, as it could not meet and hold

11  votes.

12         The AMA Coalition opposed this period of time and

13  felt that it could have about done parallel; that we could have

14  had parallel structures moving at the same time in trying to

15  come up with structure changes as well as keeping the COAB

16  moving.  So we strongly opposed this recess and raised concerns

17  in advance that this would be seen as abandonment in the eyes

18  of the community of the settlement agreement.  The AMA

19  Coalition instead asks that they would provide for a settlement

20  agreement and that the city commissioners appoint members of

21  the COAB so that the work would continue.

22         The AMA Coalition has serious concerns that the City

23  will request more and more time from the DOJ to develop a new

24  COAB and select new members.  Any further delay will harm

25  public perception and engagement of community involvement, and

police accountability will also prolong the non-compliance in the settlement agreement.

It reminds me, as a young civil rights worker, when we were marching to break down the laws of Jim Crow, that we had a theme "Freedom now," but folks kept saying, "Wait, wait." We waited a hundred years, but never got nothing done.

The AMA Coalition met with members of the COAB and representatives from the City regarding moving forward with improvement to the COAB structure. Based upon these meetings, the AMA Coalition made several recommendations to the City regarding the COAB structure, and these include:

1. The COAB would have adequate funding.

2. The COAB would have no bars in hiring its own staff.

3. The COAB staff would be able to fill roles of management, administrative support, and community organizing.

4. The COAB members would receive stipends,

5. The COAB chair would be selected from its membership and serve the role of a traditional board chair with a facilitator available, if needed.   ***he skips 6

7. The number of city appointees to be limited to two to three members.

8. A criteria be established for the selection of Portland Police Bureau members of the COAB, including having expertise in the areas addressed by the settlement agreement.

1          Moreover, the AMA Coalition has advocated the funds

2     allocated to COCL to be redirected towards the COAB in light of

3     the COCL request to seize operation of oversight of the COAB.

4     The AMA Coalition understands that the COAB members themselves

5     have proposed a court monitor.  The Coalition is concerned with

6     that proposal that it may eliminate community engagement and

7     meaningful involvement in the oversight process.

8          The City provided the AMA Coalition with a

9     confidential proposal regarding the new COAB on October 12,

10    2016.  The AMA Coalition met representatives from the City,

11    DOJ, and PPA to discuss that proposal on October 14th, 2016.

12         At the meeting the AMA Coalition provided its

13    criticism of the proposal, and the City proposed that the COAB

14    hold public meetings to seek input directly from the public on

15    the COAB structure.  The City indicated, as several former COAB

16    members had recently resigned, were willing to reconvene for

17    that purpose.

18         The COAB serves an extremely important function as to

19    the community laws and oversight of the implementation of the

20    settlement agreement.  The process and decision making of COAB

21    should be transparent and accessible to the public and

22    community.

23         In light of that, the AMA Coalition does not oppose a

24    plan to seek proposals for former COAB members, so long as the

25    current COAB members continue to do the work of COAB as well as

1   discuss how to move forward.

2          The COAB is gravely concerned that the original

3   60-day hiatus, which ended on October 21st with no plan in

4   place to implement the settlement agreement reform related to

5   community oversight implementation of the settlement agreement.

6          The AMA Coalition also notes that in the year and a

7   half in implementation of this agreement there has been little

8   development of community outreach engagement plan pursuant to

9   the settlement agreement.

10          In the area of the 48-hour rule, as the Court is

11   aware, the AMA Coalition has long advocated 12 years ago,

12   beginning with the Kendra James case, that the provision of the

13   PPA collective bargaining agreement, that officers involved in

14   serious use of force have 48 hours providing a statement on the

15   incident.  The Coalition has repeatedly criticized that

16   provision.  It runs counter to national standards and policies

17   of best practices.  The settlement agreement in paragraph 124

18   required that the PPA review its protocols for compelling

19   statements and revised them as appropriate according to the

20   applicable law and current professional standards.

21          The City recently approved changes in its agreement

22   with the PPA removing the concrete language of the 48-hour rule

23   embedded in the contract.  We are thankful for that.  The AMA

24   Coalition welcomes it and appreciates this long overdue chain.

25          The elimination of 48-hour rule, however, did not

1    fully address the problem with officers' statements.  The

2    City's tentative agreement, which clarifies the contract, would

3    become city policy and provides that the officer be afforded a

4    reasonable opportunity to review the officer police report and

5    body cam audio/video before submitting to an investigative

6    interview in not deadly force cases.

7          As a result, this could potentially circumvent the

8    purpose of eliminating the 48-hour rule when it comes to Taser

9    less than deadly force cases, as officers would have the

10   opportunity to review footage without clear time limitation.

11   Furthermore, officers might have decided not to cooperate with

12   the on-scene investigation of the less than lethal force by

13   sergeants that would implement it as part of the agreement if

14   they feel they need to review the video.

15         I want to say, Judge Michael, this is one of the most

16   volatile issues, not only in the city of Portland, but in our

17   nation today.  The communities throughout this nation and in

18   the city of Portland feel that this is an undermining of

19   community policing; that it is undermining the settlement

20   agreement; and that it is undermining the relationship that has

21   been built so far with the Portland Police Bureau.  That

22   particular provision has created such outage in our

23   community -- not only in Portland but throughout this nation.

24         So the AMA Coalition has serious concern about the

25   manner in which the City has negotiated the agreement with PPA.

1    The outgoing mayor and the PPA negotiated the agreement without

2    public participation.  This was a departure from a prior

3    practice, which allowed the public to observe at least some of

4    the bargaining session.

5          The AMA Coalition and other community groups have

6    strongly advocated the City to consider proposed changes to the

7    CBA's several areas of accountability, not just limited to the

8    48 hours.  But the City does not appear to advocate or propose

9    these changes in the bargaining agreement.

10          In addition, the AMA Coalition is outraged regarding

11    the manner in which the City passed the ordinance adopting the

12    agreement and the time was moved up for consideration.  There

13    could have been more community input.  The way that it was

14    handled, it was not handled in what we call "the Portland way."

15          The City's use of police to get the civil

16    disobedience protestors out of City Hall was an overuse of

17    police force.

18          Also, we believe in terms of the independent police

19    review and the citizen review committee, in the settlement

20    agreement, paragraph 123, the AMA Coalition has advocated for a

21    less complicated system for police oversight and for increased

22    power for the IPR, including the authority to compel officer

23    testimony and the ability to investigate serious use of force

24    in cases involving the death of community members.

25          The proposals would reduce the complexity of the

1    current system, which has two different entities -- IPR and

2    Internal Affairs, IA -- conducting administrative

3    investigations of the use of force incident.

4            In addition, under the current IPR system, the IPR

5    cannot interview an officer unless a bureau member is present

6    in order to comply with the restriction on IPR authority

7    embedded in the agreement with the union.

8            The new agreement, however, maintains that the

9    provision that prohibits IPR from conducting investigations in

10   deadly force cases and from compelling officer testimony.  The

11   City failed to bargain or address the issue, and the agreement

12   prohibited effective oversight of the Portland Police Bureau by

13   IPR and hinder accountability and effective oversight.  The

14   City auditor and director of IPR weighed in regarding their

15   frustration with this, and we wonder whether that was a

16   consultation process to get their opinion during the

17   negotiation.

18           Auditor Caballero wrote that a significant

19   overarching concern is that the proposed collective bargaining

20   agreement was negotiated with no notice to community

21   stakeholders and a break from previous contract negotiation.

22   IPR was not notified that the City was engaged in the

23   collective bargaining with the Portland Police Association, and

24   the City did not request IPR input.

25           We are concerned, Judge Michael, that the veil of

1   secrecy has been invoked in the proposed contract, and its

2   creation stands to do long-term harm to the City's effort to

3   build a strong police-accountability system.

4           Also, the AMA Coalition agrees with Auditor Caballero

5   that the IPR's current practice of interviewing through the IA,

6   necessarily be left intact by the City's failure to address the

7   IPR, does not address the City's obligation under the

8   Department of Justice's settlement agreement, which requires

9   that the IPR be provided with the means to conduct independent

10  investigations of police officer misconduct.  As such, the AMA

11  Coalition believes that the City failed to address these

12  issues.

13          The City auditor proposed changes to our IPR and CRC,

14  which include limited public input in CRC hearing and creating

15  an appeal panel with a smaller number of CRC members to hear

16  the appeal.  The AMA Coalition strongly opposes any limit on

17  public involvement; any decrease in diversity of the appeal

18  panel.

19          We find that the proposed agreement of an attempt at

20  least to convene another stakeholder group to deal with

21  proposed changes of IPR and CRC, and the AMA Coalition intend

22  to participate, but we also want to understand that there are

23  other topics that need to be addressed.

24          Finally, I want to talk about the body camera.  In

25  approving the settlement agreement, the Court acknowledged the

1   role that the body-worn cameras could play in the role of
2   police oversight.

3        To that end, the AMA Coalition expects the City to
4   engage with the community, not as a footnote or an afterthought
5   after designing a proposal, but to be engaged from the
6   beginning, engage in drafting a proposal related to policies of
7   body-worn cams.

8        The City solicited input from the public in a forum
9   that we believe, as we count, our count is three forums with
10  little notice and a small public participation.  However, when
11  the proposal was introduced in the agreement, with negotiation
12  with the PPA, that draft created a struggle within our city.

13       The AMA Coalition was one of many community groups
14  who opposed the proposed policy, as written, because it affords
15  the officer to review body camera footage before writing their
16  reports.  Because the City concedes the issue when the officer
17  could review body camera footage is subject to mandatory
18  bargaining under state law, the AMA Coalition notes that the
19  City did not even appear to seek a legal opinion from the city
20  attorney on the issue of whether there was an issue subject to
21  permissive mandatory bargaining until the day before the City
22  adopted the new contract.  It appears the City did not get the
23  legal opinion prior to bargaining and submitting this proposal.

24       The AMA Coalition has been clear in its opposition to
25  officer reviewing footage of excessive force and other serious

1    incidents.  I just want to say that we feel that this will be a

2    backstep to eliminating the 48-hour rule for officers in

3    writing up their report to be able to review the body cam

4    footage.

5              We thank you, Mayor.  We have been at this over 12

6    years on the battlefield -- for 12 years.  We are at this

7    point, and we still believe that we can come out with a

8    community policing program that will be a model for this

9    nation.

10             Thank you very much.

11             THE COURT:  Thank you very much, Dr. Haines.

12             Anyone else from the AMA Coalition?

13             MS. ALBIES:  Yes.  We have Dr. T. Allen Bethel, who

14   is co-chair of Justice for Police Reform.

15             THE COURT:  Good afternoon, Dr. Bethel.

16             DR. BETHEL:  Good afternoon, Judge Simon, and all of

17   the esteemed counselors who are here, and my friends who are

18   part of this community.  I will take a couple of minutes to

19   just reiterate a few things and make a statement.

20             In regards to the proposal by the Department of

21   Justice to have a status conference in a 30-day period, plus 90

22   days, and whatever else to come, we are not opposed

23   conceptually to the idea.  Our concern is the delay that may

24   occur, if and when this is extended.  What we would like to see

25   is exactly what it seems the City doesn't want, which is a

1    deadline.

2          Judge Simon, if you might remember, I stood on that

3    side of the courtroom during the fairness hearing.  One of the

4    things that I said that you needed to retain was the hammer.  I

5    walked in this room today to say that the City is out of

6    compliance.  They snuck the COAB back in so they wouldn't have

7    to face that.  But for 60 days they were out of compliance,

8    even though I know they got the agreement with the DOJ to do

9    that.

10         Since the 21st of October, there has still been

11   nothing that has happened.  So I still think I want to ask you

12   to drop the hammer on this non-compliance.

13         THE COURT:  If I can interrupt you for one second to

14   make sure we are on the same page.  Under the settlement

15   agreement, I don't have a hammer yet.  Under the settlement

16   agreement, I do not have a hammer until the U.S. Department of

17   Justice files a motion to enforce the settlement agreement,

18   after going through the notice provision and the mediation

19   provision.

20         But under the settlement agreement they have to give

21   notice to the City that they are out of compliance.  They have

22   to go through the other steps outlined in the settlement

23   agreement.  Then they file a motion with me.  That filing a

24   motion with me is the legal equivalent of handing me the

25   hammer.  I will exercise my authority with that hammer, in my

1   opinion, judiciously, fairly, appropriately, and consistent

2   with the Rule of Law.  But I don't have a hammer until it is

3   handed to me, consistent with the settlement agreement.  I want

4   to make sure we are on the same page.

5           I am sorry for interrupting, but now I look forward

6   to the rest of your comments.

7           DR. BETHEL:  That's no problem at all, Judge.  You

8   have the right interrupt any time you want.  You are the judge.

9   This is your courtroom.

10          THE COURT:  I wasn't going to say that.  (Laughter.)

11          DR. BETHEL:  But I understand your position and you

12  made that very clear at the fairness hearing as well.  We still

13  have that understanding, and we are still on the same page.

14          That hammer is not so much perhaps in the legal sense

15  now, but to help encourage us to set deadlines.  We set

16  deadlines with some stipulations in there that the AMC and all

17  the parties will be able to receive information in a timely

18  manner.  You cannot be expected to be called to a meeting two,

19  three days out and try to reach something.  I feel that the

20  last two weeks, even though we met in good faith to talk about

21  getting this COAB process restarted, was a push to have

22  something to be said by the time we got here to this status

23  hearing.

24          If the judge would be so kind to re-read the City's

25  submission -- I don't have it before me.  In one place they do

1   reference they have had a meeting, and the implication seems to

2   be that they've had another meeting to continue to discuss the

3   restructuring of the COAB.  I find it very amazing that the

4   report can be submitted several days ahead of the second

5   meeting and yet already be included in there as having

6   happened.

7           So my support, my statement, as we talk about these

8   deadlines, let's impose the deadlines, and let's work on them.

9   We have come enough times downtown.  We've gathered together at

10  the last minute to try to put a forum together to be able to

11  have an opportunity to talk about some changes.  We are tired

12  of doing that.  We are tired of being disappointed with the

13  delays.  We want to see some action as we move forward.

14          This process of selection and getting alternates and

15  all, the first COAB meeting at the library with Judge De Muniz,

16  during a break I mentioned to him, "We don't have a process in

17  which to replace anybody."  He said, "Okay, we are going to

18  work on that."  We are two years in, and we still don't have

19  that process.  When will we get the process?  When will the

20  City finally say we are going to give the City something to

21  deal with?  And when will the City listen to us?  Listen to

22  us -- not with your ears -- but with your understanding.

23          Bear in mind that you have to make decisions, as the

24  mayor and as the council.  I do want to remind you that you are

25  serving at the pleasure of these, who are your constituents.

1    We know that as we put you in that seat, we know how to take

2    you out of that seat.  You all are going to want to respond to

3    the community and what we feel needs to happen for us, and I

4    think we are going to mount some campaigns to take you out of

5    your seats and find somebody who is willing to say they are

6    going to do it during campaign time, but they will do it during

7    that time.

8            Public meetings and discussions of the Portland

9    Police Association contract.  Our current mayor said during the

10   campaign, "I know how to make that happen.  I'll take several

11   other council members with me, and then it will become a public

12   meeting, and the public can be there and hear."  He didn't get

13   it.

14           During this time of the injury, we want the COAB

15   fully functioning during this time being able to carry out its

16   work, being able to give recommendations so that we can reach a

17   conclusion of reinstating a full COAB that's functioning with

18   its powers and its duties.  Whatever becomes the intended plans

19   of the City, don't keep them until you hand us a document a

20   couple of days before and say, "Read this and let's discuss."

21   Come to us on the front page.

22           I am reminded, as I am moved to my seat, when I was

23   about eight years old I used to go up to New York.  You see, I

24   grew up in the country.  We couldn't afford to ride the

25   expensive train.  We had to ride what was known as "the local."

1   The local would come.  Sometimes the local would be late,

2   because it would break down.  It could never get to where it

3   was supposed to be on time.

4           We set there impatiently and waited, and it took time

5   to hear the train horn blow.  The old riders would say, "Oh,

6   that's not it."  And I was all excited, because the train was

7   finally coming.  But it didn't come.  Finally the horn blew and

8   they said, "There she blows," and all we got up and got ready

9   to make that trip.

10          City of Portland, the horn has blown.  There she

11  blows.  Let's make this trip.

12          THE COURT:  Thank you, Dr. Bethel.

13          Ms. Albies, anything further from AMAC at this time?

14          MS. ALBIES:  Nothing further.  That you very much.

15          THE COURT:  Thank you very much.

16          I would like to hear from the compliance officer and

17  the community liaison, whether it be Dr. Rosenbaum, Dr. Watson,

18  Dr. Christoff, or some combination.

19          Dr. Rosenbaum, welcome.

20          DR. ROSENBAUM:  Thank you.  I am Dennis Rosenbaum,

21  Compliance Officer and Community Liaison, or COCL.  I am going

22  to present for a few minutes and then leave the time for

23  Dr. Watson to discuss the mental health components of the

24  agreement.

25          I will start by saying that I am a proud native of

1    Portland, Oregon.  It is a great city, and it can even be

2    greater.

3         Our compliance assessment and our rating system is

4    evidence-based in the sense that we've spent months of field

5    observations and one-on-one interviews and focus groups and

6    surveys of all the police personnel and reviews of documents

7    and analysis of incident data, et cetera.  We are not only

8    looking here for compliance with specific terms of the

9    agreement, but we also examine the capacity of data systems to

10   capture the right information about the process of reform and

11   about the impact of reform.

12        Finally, I want to say that through technical

13   assistance and consultation, we've advised the Portland Police

14   Bureau about best practices and evidence-based policing so that

15   Portland can actually reach beyond the requirements of the

16   settlement agreement to a higher level of professional

17   practice.

18        At this point, you know, I know that there is

19   frustration in many ways, but our general conclusion is that we

20   see the City independently, quite frankly, I want to say that,

21   because I don't live here now.  We see the City and the

22   Portland Police Bureau working quite hard in most areas towards

23   substantial compliance with the terms of the settlement

24   agreement.  But at present, they've obtained only partial

25   compliance with most of the areas.  It is definitely, as you

1    said, Judge, an iterative process.  It is going to take time.

2    But there has been progress, and I think we have to acknowledge

3    that.

4              First, I'm going to talk about Section 3, use of

5    force.  I will comment on that.  The Bureau's policies on use

6    of force and supervisory review of force incidents are being

7    revised based on feedback from DOJ, from the COAB, and from the

8    COCL's team of force experts.  Most of the problems with that,

9    with the language, the definitions, the procedures have been

10   corrected, in our opinion.  Unfortunately, that policy review

11   process -- and there are many policies -- has been extremely

12   slow.  I think to help expedite that, recently the City and the

13   Police Bureau have committed more resources to that, and we

14   have offered, as the COCL, to help the Department of Justice

15   with its review process to help speed that up.

16             Regarding the management of use of force within the

17   police bureau, the most noticeable improvement, I think since

18   last year, has been the successful implementation of the force

19   audit.  DOJ has already talked about that as well as the City,

20   so I won't belabor that much.

21             We helped develop that system with the Bureau.  Since

22   it was implemented in January of this year, the audit system

23   has been quite successful at identifying errors in the way that

24   force reports and force reviews are done.  Now the inspector is

25   sending these audit reports back through the chain of command

1    to the appropriate assistant chief for corrective action.

2    Hopefully that feedback loop will prevent future mistakes in

3    report writing.

4            But the next big step, frankly, is a more challenging

5    one, which is to take data and use this force audit to identify

6    force patterns and force that's inside of policy, force that's

7    outside the policy, force that is questionably justified, and

8    those results will have important implications for training and

9    for the Employee Information System and intervening, frankly,

10   with employees who need assistance.  So overall I think the

11   audit program is progressing quite well, but there is a lot yet

12   to be done now to put it to work

13           Last year we reported the Bureau's new record

14   management system, this RegJIN.  It was a huge obstacle, the

15   compliance with the force reporting requirements, and it caused

16   a backlog of 17,000 cases within the police bureau.  Just

17   briefly I want to say that we worked with them.  They

18   identified 14 areas of problems in the system; eight of those

19   have been addressed pretty seriously.  They have resolved this

20   to the point where 94 percent of the backlog cases of those

21   17,000 have been eliminated, and 2016 is up-to-date.  So within

22   the next month or so they should be caught up on that.

23           THE COURT:  I thought I read it was November 1st.

24           DR. ROSENBAUM:  November 1st, it should be.

25           THE COURT:  That's next week.

1          DR. ROSENBAUM:  Yeah.  They are very close.  There is

2     only 1,000 out of 17,000 left.  So the RegJIN system, though, I

3     want to say, continues to have problems such as development of

4     the software to properly analyze the data once you get it in

5     there on force.

6          Also, we have concerns, frankly, from interviewing a

7     number of officers on the street.  They feel the system is a

8     major burden.  There are hours of time spent every day entering

9     data and extracting data because of the cumbersomeness of the

10    system.  So it reduces their time they feel to do other

11    proactive kind of policing.  So we are going to investigate

12    that more in the months ahead to see if that is really a flaw

13    in the system and to what extent that can be alleviated with

14    better training, et cetera.

15         Moving on to training, Section 4, I don't need to say

16    this, but I'm going to because I'm a big fan of training.  It

17    is an essential component of police reform that can be used to

18    educate officers about new policies, communicate new values and

19    priorities of the Bureau and strengthen their skills and

20    tactics that reduce the probability of using force.  They were

21    required in the settlement agreement to do a number of

22    things -- identify training needs.

23         To do that, they've utilized a wide number of

24    sources, but we also feel they also need to get more community

25    input on that and also more rank-and-file officers and not just

1    command-level folks

2         To evaluate training, we have spoken with them

3    extensively, and they've chosen to adopt what is called the

4    Kirkpatrick model of evaluation, which is basically four

5    questions:

6         How well was the training developed and delivered?

7         Did the officers learn anything in terms of knowledge

8    and attitude change?

9         Did the training affect their actual behavior on the

10   job?

11        Finally, did it change the organization?  Did it

12   change the way they're doing business?  Did it change the

13   police culture, et cetera?

14        We believe that's a sound model, quite frankly, but

15   it must be implemented rigorously so that both the Bureau and

16   the community has confidence that, in fact, this training is

17   being delivered in the most effective way.  So we have given a

18   lot of recommendations there, frankly, to help them improve

19   that through technical assistance reports.

20        In terms of training coverage, we are very impressed

21   with the quality and quantity of crisis intervention in

22   Portland.  Dr. Watson will talk more about that, but we still

23   encourage the Bureau to explore different options to strengthen

24   an officer's communication skills -- that's such a big deal

25   today in policing -- and the tactics for all situations that

1    involve intense emotions and non-compliance by community

2    members with officers' instructions

3            For example, right now there is very innovative

4    training being developed in de-escalation and procedural

5    justice in other parts of the country, and we encourage the

6    City to participate in that.

7            Section 7, Employee Information Systems.  That's part

8    of the settlement agreement.  The Bureau has agreed to enhance

9    its Employee Information System to learn -- to more effectively

10   identify at-risk employees, supervisors, and teams to address

11   potentially problematic trends.

12           Now, over the past year the Bureau has made some

13   headway with its EIS system, but we continue to maintain that

14   much more can be done using EIS to intervene early with at-risk

15   employees, to prevent force problems, to save officers'

16   careers -- to put it in a positive way -- and even identify

17   those few officers that should be removed from the Bureau.

18           First, we believe that there is thresholds that

19   they've created in the settlement agreement.  We disagree with

20   those thresholds.  We think they are too low and too lenient.

21   For example, an officer has to have used force three times more

22   than the average officer on the same shift in order to be

23   identified as one of the thresholds.  You're just not going to

24   get too many people that way.

25           Secondly, we recommend the Bureau work with experts

1  to use advance statistical modeling to identify the best

2  predictors of adverse events.  This is being done.  This is the

3  kind of creative thinking that I think the Bureau is capable of

4  doing -- going upstream to identify risk factors that

5  contribute to force.  In other cities, for example, in

6  analyzing a thousand algorithms have discovered things you

7  wouldn't predict, like the number of calls an officer has

8  handled that involve suicide increases that officer's

9  probability of using force.  Is that stress?  We don't know

10 what's going on.

11         Other factors:  Days off -- sick leave.  Excuse me.

12 But again, the best predictor -- I am a psychologist by

13 training.  The best predictor of future adverse events is past

14 adverse events.  There are patterns in behavior and in data.

15 But this EIS should not be a substitute for good supervision; I

16 will say that a hundred times.  It is a tool to help the

17 Bureau.

18         Third, when an officer is flagged in the EIS system,

19 we have requested that the Bureau document the decision-making

20 process and rationale for those decisions.  That has not

21 happened today.  We hope that that does happen.  Otherwise, it

22 is kind of a black box.  Specifically, for those of you who are

23 not familiar with this, these EIS administrators go through

24 these force reports, and they flag and determine whether there

25 is a problem with an individual case.

1          We don't know why is a particular case flagged?  Why

2     are more than 90 percent of the flags not forwarded for

3     supervisory review, but disposed of that EIS administrator?

4     When cases are forwarded to supervisors, what decisions are

5     being made to address the problem by those supervisors?  What

6     type of intervention was recommended, if any?  Training,

7     restraining, coaching, counseling, or discipline.  We don't

8     know.

9          Finally, down the road, we'd love to know what the

10    effects of those interventions are on future officer behavior.

11    So there is a lot of missing pieces yet that need to be put

12    together.  I am confident that they will be over time.  Again,

13    we all have to be vigilant and stay with this.

14         Finally, I want to say that this process is somewhat

15    new, but the measurement systems, again, need to be created now

16    to document both current process decisions and future outcomes.

17         Again, EIS is a tool to help officers avoid

18    potentially career-ending events, and we feel it needs to be

19    utilized more comprehensively as a tool for supervisors and

20    managers.

21         Section 8, officer accountability.  That has been

22    talked about today.  The events surrounding -- I should say --

23    I do want to make a comment.  The events surrounding the chief

24    of police -- the previous police chief kind of tainted, I

25    think, the public's view of accountability and policing.

1    However, I do want to say that the restructuring of the Bureau

2    that resulted from that gives me confidence that there is a

3    silver lining here.

4            Chief Marshman has done a number of changes that have

5    dramatically restructured things so that both the status and

6    the resources that are devoted to accountability and to

7    oversight functions through this new strategic development and

8    oversight group are significantly better than what was in place

9    before.

10           So by upgrading and integrating these functions,

11   including training under this one group, there is a higher

12   probability, frankly, even though it has yet to be seen, that

13   the reforms will be infused into the Bureau's overall mission

14   and the daily operations of the Bureau rather than something

15   imposed by DOJ, the COCL, or someone else.

16           There has been talk already -- while we are talking

17   about accountability -- of the Independent Police Review.  We

18   have seen some steady increase in the number and quality of the

19   investigations of community complaints, but certainly there is

20   still lots of room for improvement, and the civilian oversight

21   continues to be a source of contention.  I don't need to tell

22   you guys that.  You know that better than I do.

23           Public debate.  The accountability process, including

24   the 180-day timeline for complaint resolution, has hit

25   roadblocks.  Consequently, at this time there is no approved

1    plan for a revised accountability process yet.

2           In terms of on-scene statements, I can't say -- we

3    have been working on this 12 years, but certainly in our very

4    first statement here more than a year ago we recommend the

5    elimination/abandonment of the 48-hour rule.  That was based on

6    research and findings in other cities as well as the loss of

7    public trust in the system.  We are very pleased that that

8    clause has been removed from the latest police contract.

9           I do want to recognize and have us be cognizant of

10   the accountability process from the police officer's view.  The

11   only person here who probably mentioned that was you.  Our

12   survey data shows that nine out of ten of the survey

13   respondents of officers in Portland do not feel that officers

14   who consistently do a poor job are held accountable.  Eight out

15   of ten feel that officers who do a good job are not praised.

16          Again, this idea that the administration -- the

17   ability to recognize and respond appropriately to positive and

18   negative performance by individual police officers was

19   identified by the officers themselves as one of the more

20   serious accountability problems that needs to be addressed.

21          THE COURT:  Although in that area, in addition to

22   Mr. Karia's comments, the video shown by the City of Portland

23   showed some superb behavior by police, and I praise them for

24   that.  I know they have already been praised, and I will add my

25   praise to them for that.

1           DR. ROSENBAUM:  Yes, absolutely.  I think there could

2      be positive trends there with a new administration and a new

3      police chief, who I see who is here today, Chief Marshman.

4           Section 9, community engagement and the creation of

5      the community oversight work.  Well, that's a big one.  There

6      has been plenty said about that.  That's the COAB, one of the

7      primary mechanisms that was created for community engagement.

8      We, frankly, have done our best to support and facilitate the

9      work of this body.  We have employed some of Oregon's most

10     respected individuals to chair and be the presiding officer of

11     the COAB, including former Oregon Chief Justice Paul De Muniz

12     and community leader Kathleen Saadat, who is here today in red.

13          They did a fantastic job, in my opinion, under the

14     circumstances.  But with input from the City and DOJ, and given

15     the level of disruption that you've all heard about already

16     that was faced, we were forced, frankly, we felt to change the

17     venue at one meeting, to schedule meetings differently, to keep

18     members of the COAB and the community safe, and to keep the

19     business of the COAB moving forward, which was part of our job.

20          It wasn't perfect.  Some people objected to it, but

21     we felt it was the best we could do under the circumstances.

22     Apparently nobody -- the City, DOJ, the COCL, ourselves, or

23     members of the COAB -- had any idea how difficult and

24     challenging it would be to create and support this advisory

25     body and keep control of these meetings and keep them moving,

1    frankly, in this current environment.

2            So despite some early successes, and there really

3    were some, so let's not forget them.  In the final analysis the

4    COAB, as currently conceived, did not work.  We do not feel it

5    is our position to opine on the reasons for this outcome,

6    although I could spend an hour doing that --

7            THE COURT:  No, you can't.

8            DR. ROSENBAUM:  I could, but I can't here exactly.

9    We tried to keep the parties, though, all of us, on the hot

10   seat to deal with this, and it has been a challenge.  However,

11   we did officially request that the COAB and the COCL be

12   separated so that the investigation of compliance with the

13   settlement agreement could be independent of the process of

14   community engagement.  We will, however, continue to uphold our

15   responsibility to chair the COAB until such time as the

16   settlement agreement has been officially modified.

17           I want say, though, for those people -- there are

18   various perspectives on this, but I personally have devoted

19   much of my professional career over the last 35 years to deeply

20   understanding and trying to improve police-community relations.

21   I have written books about stuff.  I've talked about this.  I

22   deeply value the importance of community engagement in public

23   safety and in policing and truly hope the City can arrive at a

24   workable model that gives voice to the many different

25   stakeholders that make up Portland.

1           I just wanted to make a couple of closing comments.

2   Obviously this is a very difficult time in the history of

3   policing nationwide and certainly here in Portland.  I think

4   community members rightfully are angry about police injustices

5   over the years and are demanding change and accountability.

6           We encourage everyone, however, to think about the

7   best ways to achieve reform in policing.  Just a couple of

8   quick thoughts:  My biggest hope is that everyone approaches

9   this reform with sincere intentions to help improve the

10  Portland Police Bureau through constructive criticism and

11  collaborative reform.

12          I am saddened by -- I think we have to be vigilant

13  all the time of government.  There is no question.  But I am

14  saddened by the distrust of motives and the lack of cooperation

15  in many ways about this.  I feel strongly that greater

16  transparency, trust, listening, and empathy in all directions

17  could go a long way toward finding common ground and achieving

18  the goals of the settlement agreement.

19          Secondly, as someone who has spent a lot of time

20  studying police behavior and organizational behavior in 100

21  American cities, I caution Portland that reforms can backfire

22  if they are viewed simply as systems of punishment for all

23  employees within this organization, when the actual number of

24  bad cops, I have learned over the years, is relatively small.

25  Yes, there is rudeness.  There are other various things that go

1    on, I know that.  But really bad cops are rare.

2           But my point here is our research and other research

3    by other scholars suggests that organizational change and

4    reform is more likely to occur when officers have confidence in

5    the leadership of the organization, when they feel the reasons

6    for change have been clearly explained to them, when they

7    believe the system that they are working in is fair and just,

8    and they believe they have a voice in the process.  Just as the

9    community here has expressed its desire for a voice, so do

10   officers.  It is about them.  It is about their lives, their

11   careers, their families.  Unfortunately, I usually don't hear

12   much about that.

13          Our surveys, for example, recently in Portland

14   document the serious downward decline in those things I've just

15   mentioned over the past year, where it has resulted in the 36

16   percentage point drop in job satisfaction in 2016 versus 2015

17   among PPB officers.  The last survey I should say was finished

18   prior to the appointment of the new chief.

19          One potential adverse effect -- I'm pointing this out

20   for a reason.  I'm not some cop chaser who believes in let's

21   support the police all the time.  I've just spent a lot of time

22   thinking what they are going through.  There is a need for

23   reform.

24          One potential adverse effect is what we call

25   de-policing.  You have heard about that, the post-Ferguson

1    effect, whatever you want to call it, where officers reduce

2    their effort on the streets to avoid punishment.

3              In fact, even the vast majority of officers in our

4    survey told us that they are much less willing now to stop

5    anybody who is suspicious, to use force, et cetera.  Some of

6    this you could argue is good news.  We want them to maybe use

7    less force.

8              But the alternative of this kind of proactive

9    policing is what we call reactive policing, where the police

10   just lay low, do the minimum amount, respond to the calls they

11   have to do -- this is just not Portland.  I have been in many

12   cities where I hear this.

13             One of the consequences of that -- we have studies in

14   many cities that show that proactive policing actually reduces

15   crime and violence and disorder, whereas officers who just lay

16   back, don't do much, doesn't help.  I am not saying they are

17   all going out and doing this.  Good cops will go out and do

18   their job every day.  But there is right now a mood of not

19   wanting to do as much.

20             I want -- my last point, use of force, for example,

21   is an absolute necessity in some situations, and we must expect

22   that police -- we gave the police the authority to do that.  We

23   must expect them to exercise that authority, when there is no

24   alternative at all.  We don't ever talk about that.  I hope

25   that's part of the dialogue, because most -- force is a complex

1    issue that we don't talk even about.

2            Anyway, in light of all these organizational dynamics

3    and realities, my advice to the City is this:  Not only does

4    the Bureau need strong leadership that values positive

5    community engagement and transparency, it also needs leadership

6    that can create a system of accountability and supervision that

7    rewards positive action and decisions by officers and holds

8    officers accountable for poor decisions that put lives at risk

9    and threaten the legitimacy of the Portland Police Bureau.

10            Our first impression is that the recent

11   reorganization of the Bureau appears to be a major shift in the

12   right direction.

13            Thank you, Your Honor.  Dr. Watson is --

14            THE COURT:  I do want to say this.  I have read the

15   entirety of your report and Dr. Watson's.  It is 18 pages.  I

16   have read the entirety of it.  It is available on the public

17   record.  It is Docket 129, filed yesterday in the public

18   record.  I have read the entirety of it.

19            I do want to turn to some of the other people that

20   would like to speak.  I would like to see if we can conclude

21   this by 5:30.

22            So let me ask, Dr. Watson, is there one or two points

23   you would like to make very briefly, but speaking slowly.  If

24   it is one or two minutes, if you possibly can.  I have read the

25   entirety of your report, and it is public record.

1          DR. WATSON:   I will try not to cover something that

2    has already been covered by other people's testimony.   I think

3    one of the important things is just looking at the City's

4    crisis intervention model.   We know that it varies somewhat

5    from the Memphis model, where the Memphis model has a CIT

6    officer/specialist officer dispatched to any

7    mental-health-related call.

8          The Portland model has an CIT officer dispatched to

9    calls meeting the criteria that is a little bit narrower than

10   that.  So it is just a subset of the calls.   There are some

11   reasons for that.   Part of that, it is hard for the City to do

12   the Memphis model when they already have everybody with 40

13   hours of crisis intervention training.

14         The other thing is the Memphis came out in 1988,

15   where most rank-and-file officers had at best about three

16   hours' training responding to what was then called aberrant

17   behavior.   So your floor competency for most officers was very

18   low.   I think the expectation of policing generally in Portland

19   is higher than that now.   So that could be part of, I guess, an

20   argument for the particular Portland model.

21         What we don't have right now is the data to assess

22   the extent to which the current criteria that the ECIT capacity

23   can meet the need for calls that meet their current criteria or

24   the data to look at if there is reason to expand that criteria.

25         So I think as the City moves forward with the

1    implementation of their mental health mask, which is a data

2    template for actually collecting data on mental health calls so

3    they can look at that -- will be better able to opine on -- is

4    the current criteria adequate to really meet the needs of the

5    community for a specialist that responds to certain

6    mental-health-related calls?  So I think that's something that

7    there is a lot of progress that has been made.  It is something

8    that we need to continue to watch and work with the City on.

9              Also, I think I would encourage the City to take a

10   look at the data from the Bureau of Emergency Communications.

11   We didn't get that for our current outcomes report.  We are

12   hoping to look at that soon.  But look at the calls that they

13   identify as meeting criteria for an ECIT response:  Is there

14   somebody available?  And are they having to have an ECIT

15   officer from one precinct travel to another precinct, so they

16   can get a better handle on what the capacity is, are they

17   meeting demand, and do they need to expand that capacity?

18   Again, as we talked about last year, if the need for capacity

19   would change if they released that criteria to all

20   mental-health-related calls.

21             The other thing that hasn't been talked about too

22   much there is that has been progress on the BHUAC side.  They

23   have updated their policies.  They got feedback from the

24   Behavior Health Advisory Committee.  They took that feedback to

25   heart.  They are in the process of implementing training for

1   all of their RegJIN communicators so that they are better able

2   to identify the calls that should get an ECIT response.

3        So I think there is certainly progress there that we

4   hope to report on in our next compliance report, as we will

5   actually be able to observe that training.  But in the interest

6   of time and the fact that this is all available, I will end.

7        THE COURT:  Thank you very much, Dr. Watson.  I

8   appreciate it.

9        Let me tell you I would like to go next briefly to

10  Mr. Steenson, if you want to talk on behalf of the COAB,

11  Ms. Saadat, Ms. Hardesty then, and Mr. Walsh.

12       MR. WOLFE:  (Interpreted by ASL)

13       Your Honor, may I request that we delay the meeting

14  potentially until 6:00.  I think Dennis Rosenbaum went on for

15  several minutes, and there are several members of the community

16  that want to speak briefly.  I think in all fairness, I think

17  it would be reasonable to ask that we delay it until 6:00.

18       THE COURT:  Here is what we are going to do:  I am

19  not going to impose an artificial deadline, like 5:30 or 6:00.

20  I will be here as late as we need to to hear from everybody.

21       But, Mr. Walsh, I encourage everyone, including you,

22  to be relatively brief.  No one needs to repeat what has

23  already been said.  If everyone can speak for a minute or two

24  and make your point, I am very interested in hearing it.  I

25  won't impose an artificial deadline.  Let's respect everyone's

1  time.

2          All right.  Mr. Steenson, welcome.

3          MR. STEENSON:  It is actually good evening now,

4  Your Honor, since it is past five o'clock.

5          THE COURT:  But I don't want to say "good morning" to

6  you though.

7          MR. STEENSON:  I am one of the eight remaining COAB

8  members.  Because we were placed on hiatus, this year we don't

9  have an officially approved COAB report.  We had to work this

10 out through a couple of work sessions in the last month and a

11 half.  I assure you, though, that the report has been carefully

12 prepared.  It has taken into account community input, and it is

13 endorsed by all eight of the remaining COAB members.

14         THE COURT:  I will tell you, I have received a

15 report.  It is dated October 24th, 2016.  It is 22 pages.  I

16 have read it in its entirety.  And I found it very, very

17 interesting.  So thank you for that.

18         MR. STEENSON:  Briefly, we want to talk about the

19 expansive nature of the activities we have been engaged in.  We

20 want to talk about what has befallen us.  We want to talk about

21 the twelve recommendations we have to try to save the COAB.

22         Two of the recommendations involve complete

23 independence from the City and the COCL, except for necessary

24 funding and a provision of resources.  The second one is, we

25 believe, given the three years or so that has passed and the

 1   obvious concerns about the adequacy of the settlement

 2   agreement, that the Court should conduct another fairness

 3   hearing to allow the community to be heard.

 4            THE COURT:  Let me respond to that.  A fairness

 5   hearing is to decide whether a particular agreement or change

 6   to the agreement is or is not fair.  If someone presents me

 7   with a proposed amendment to the agreement, I will hold a

 8   comprehensive fairness hearing on deciding whether or not to

 9   approve it.  If nobody presents me with that, but someone does

10   present me with a motion to enforce, I will deal with that.

11   But in the absence of a motion to enforce or a motion to amend

12   the agreement, I don't think I can hold a fairness hearing

13   per se.

14            MR. STEENSON:  I know I don't have authority, but I

15   would move to divorce ourselves from the COCL right now.  I

16   don't know why the parties couldn't join in that today and get

17   it done.

18            Our duties have been extensive.  There are duties

19   requiring us to make recommendations, to advise the police

20   chief, to reach out to the community and listen to them, to

21   work on a community engagement plan, and receive public

22   comments and concerns.  The areas in the settlement agreement

23   are expansive.  Virtually nothing that the police bureau does

24   or shouldn't be doing isn't covered by the areas in the

25   settlement agreement.  Given that, the task that we have had to

1    try to address those areas has been daunting to say the least.

2          We have four subcommittees and an executive

3    committee.  Most of the work is done in what I would consider

4    the "think tanks" of the subcommittee level.  Sometimes we also

5    use workgroups comprised of either subcommittee members or

6    members of the community at large.  What they do is carefully

7    examine Portland Police Bureau policies, look at information

8    that may be needed and requested from the bureau, look at best

9    practices throughout the country in cities such as Seattle and

10   New Orleans where the Department of Justice has sued and

11   reforms have been implemented.  We also look back at the

12   repeated consults that the City has received over the years on

13   police reform and look at what they haven't implemented and

14   taken those also as best practices.

15         Finally, we receive from Portland public input.  Then

16   we develop recommendations.  We move them on to the COAB, and I

17   can say with very, very few minor exceptions the full COAB over

18   the last year and a half have approved almost all of those

19   recommendations.

20         In total, we've approved 48 recommendations for

21   reform of the Portland Police Bureau.  There have been some

22   other recommendations that are related to procedural matters.

23   Many of them are complex with multiple subparts and almost all

24   are based on existing best practices in cities such as Seattle

25   and New Orleans or based upon what the City's consultants have

1  told them over the years they should be doing, but they failed

2  to do it.

3         Of those recommendations, four address how to respond

4  to mental health crisis situations, six address training, seven

5  address police accountability issues, including the elimination

6  of the 48-hour rule, officer-compelled testimony, and allowing

7  the IPR to investigate all misconduct and getting the Internal

8  Affairs Division out of that business.  17 address use of

9  force, including an important comprehensive de-escalation

10  policy required by the settlement agreement, and in many, many

11  ways serious restrictions on the current level of force that's

12  allowed, either non-deadly force or deadly force.

13         Lastly, we've approved nine bias-free policing

14  recommendations that address the fact that the Bureau

15  continues, after data they've kept for 16 or 17 years, to

16  racially profile.  Mayors, chiefs of police, stakeholder groups

17  have all called the City out on it, and nothing has happened.

18  So we've passed nine recommendations to try to address that

19  serious problem.

20         Unfortunately, we have to report that our

21  recommendations seemingly have been ignored.  We have heard

22  nothing directly from the DOJ or the City about our

23  recommendations other than to say "we've got them."  We have

24  heard indirectly in a couple of minor respects the DOJ has

25  approved either provisionally or otherwise changes in policy

1    that they say they took into account our recommendations, but

2    it is unclear what they took into account, what they rejected.

3    There is no interactive process.  We don't hear anything.

4           Also, it is not acceptable to us to hear from the DOJ

5    or the City that they are busy and that they live with a

6    bureaucracy, and that's the excuse for the justification they

7    offer for this inordinate delay in trying to move police reform

8    through the police bureau.

9           Another problem we've had, we haven't been able to

10   consider some recommendations because, as you've heard, the

11   City has been responsible for allowing our membership lapse to

12   the point where we are almost dead, and they put us in recess

13   over our objection for two months, which has further prevented

14   us on working on some recommendations.  Ironically the most

15   important ones that are outstanding and ready for COAB review

16   are 46 recommendations that are comprehensive and detailed

17   regarding police accountability in the City.  It is the most

18   comprehensive list of recommendations that have been put

19   together for any stakeholder that I can find.

20          Although I presented it personally at a public

21   meeting to I think four or five of the commissioners and

22   otherwise I believe they are aware of the recommendations that

23   are going to be passed, we've heard nothing from the City about

24   those.

25          One of the primary objections the community had to

1   the new collective bargaining agreement was it did not address

2   any of the necessary police accountability changes, some of

3   which are restricted by the language of the collective

4   bargaining agreement.

5          What we fear is now that the agreement has been

6   passed -- rushed through -- for the next three-and-a-half

7   years, unless the union wants to agree to reopen the contract,

8   we are stuck with provisions that will prohibit better and more

9   comprehensive accountability because of the collective

10  bargaining agreement.  Two of those are the IPR cannot

11  investigate some matters, and the other one is

12  officer-compelled testimony by the IPR

13         We also have run into a brick wall in trying to

14  recommend or get through recommendations with the COCL.  When

15  they put out a compliance report, for example, in 2015, we

16  recommended that 14 of their recommendations were too lenient.

17  They were talking about partial compliance, and it should have

18  been much less than that.  The response was, "We're right, and

19  you are wrong."  I'm not sure that is true.  But again, our

20  recommendations went unheeded.

21         We've also spent time working our processes.  The

22  processes were not good, and there have been some difficulties.

23         Because a number of people today have spoken about

24  the issue of -- some people call it civil unrest; some people

25  call it civil disobedience.  I prefer the words

1    "civil disobedience."  This country has a long history of civil

2    disobedience by people trying to get the attention of the

3    government.  It is not always nice.  Sometimes it is criminal

4    in nature, but it is an attempt for people to express

5    themselves.

6         This is what I want to say about the COAB meetings.

7    I can't speak to the City Council meetings that may have been

8    disrupted.  The second chair we had from the COCL -- I am going

9    to make this my personal observation, because I have not

10   discussed this with all of the existing COAB members -- ran

11   meetings very, very tightly, was on occasion rude, and I think

12   in part also because of the history of the COCL and the fact

13   that the community did not want Rosenbaum and Watson hired, it

14   created a lot of tension.

15        The meetings erupted, so to speak, or there were

16   problems.  They all involved meetings chaired by the COCL.  I

17   personally facilitated or chaired countless subcommittee

18   meetings with some of the same people there, some of the same

19   people who raised their hands and said, "I was arrested."  They

20   may not be easy meetings to get through, but with some respect

21   and some patience you can get through the meetings.  Nobody

22   gets arrested, and you go home.

23        We also at various times have been allowed to

24   facilitate full COAB meetings.  By that, I mean us, the COAB,

25   and work sessions.  Again, those have gone off without a hitch.

1    No one has been arrested, and we've all gone home.  It doesn't

2    answer the problem or answer the question raised about the

3    process to address it.

4             I think respect for people and patience goes a long

5    way.  Much of the problems that are being described could have

6    been avoided with a more careful approach how to interact with

7    the community at large.

8             THE COURT:  Mr. Steenson, would you please convey to

9    the current and former members of the COAB the recognition and

10   appreciation of the Court for their hard work, their patience,

11   their tolerance.

12            Thank you, Mr. Steenson.

13            MR. STEENSON:  I will.  Thank you.

14            THE COURT:  All right.

15            MR. STEENSON:  The City is responsible for actually

16   all 15 of the appointments to the COAB; five, one each from the

17   city commissioners; five from two other public bodies run by

18   the City; five from a selection committee at large.  Two-thirds

19   of the 21 appointed have resigned; one was actually removed.

20            I did not know as clearly until I heard it today that

21   apparently the four commissioners, including Mayor Hales, who

22   have not appointed people to fill the vacancies have done so

23   and apparently intend to keep us in that situation.

24            THE COURT:  We have heard that before earlier today.

25   May we make time for other people who wish to speak this

1    evening?

2         MR. STEENSON:  I want to make the point that the

3    violation of the settlement --

4         THE COURT:  That point has been made.

5         MR. STEENSON:  I think under the settlement

6    agreement, the way I read it, just because the parties want to

7    ignore something serious like that, I think with your

8    continuing jurisdiction, sua sponte I believe, you have the

9    authority to step in and try to intervene and save the COAB.

10        We have recommended 12 specific things that should

11   happen to make the COAB work.  I want to list those because

12   nobody is talking about anything --

13        THE COURT:  What I would rather you do than list,

14   because I want to hear from everyone else, you are certainly

15   welcome to file whatever you wish to file.  We will make it

16   part of the public record, and I will read it.

17        By the way, I will also encourage you to re-read

18   paragraph 178 of the settlement agreement, but we will talk

19   about that at another time.

20        MR. STEENSON:  And I would encourage Your Honor to

21   read 187.

22        THE COURT:  I know.  Fairer arguments can be made,

23   but I'm not being called upon to rule on anything now.  We will

24   see what I decide to do if I do anything sua sponte.

25        Thank you.  Mr. Steenson, may we please make room for

1    someone else.

2             MR. STEENSON:  One more point.  I want to say for the

3    record, once again, it feels much like the COAB is being sent

4    to the back of the bus and not being allowed to fully present

5    as others have, including Dr. Rosenbaum, who spoke for 20 or 25

6    minutes.  So I would be remiss if I didn't express our

7    disappointment in not being fully heard.

8             THE COURT:  Well, I did read the entirety of the

9    22-page submission from the members of the COAB that was sent

10   in yesterday.  I did read the entirety of that.

11            MR. STEENSON:  One other point.  In every other

12   jurisdiction where the DOJ has got in, if I did my homework

13   correctly, there has been a court-appointed monitor.

14            THE COURT:  That's correct.

15            MR. STEENSON:  Court-appointed monitors have teeth.

16   They have relationships with police bureaus and cities, and

17   they get things done.  Substantial reforms get done.  They get

18   done relatively quickly, usually with the consent of the

19   parties once the monitor has stepped in.

20            We believe one of the serious problems in the delay

21   in this case in addressing our reforms or reforms that

22   otherwise may be out there and need to be put in place is the

23   lack of the court-appointed monitor.  We highly recommend the

24   parties consider doing that.

25            THE COURT:  As you know, there was no court-appointed

1   monitor put in as part of the agreement here that the parties

2   reached.   To the extent that the parties reach an agreement now

3   and propose to amend the settlement agreement to make a

4   court-appointed monitor a part of the amended settlement,

5   obviously I will consider that.   Maybe even if there is not an

6   agreement, to the extent the Government moves to show that the

7   City is not in compliance, then obviously if I make that

8   finding, and I'm not going to prejudge that, but if I were to

9   make such a finding, I would ask all parties to provide input

10   as to what an appropriate relief should be.   If there is a

11   proposal as part of that appropriate relief to have a

12   court-appointed monitor, then I believe it would be within my

13   authority to do that.   Again, I'll keep an open mind and would

14   allow all parties to be heard on that issue before making a

15   final decision.

16           Thank you, Mr. Steenson.

17           Ms. Saadat.

18           And I thank you for your past work as chair of the

19   COAB.

20           MS. SAADAT:   Thank you very much.   Thank you for

21   thanking me and thank you for giving me the time to speak.

22           First of all, I want to say that I took the job after

23   Mayor Hales asked me about it.   I took it because I thought it

24   was important.   The important part for me was that there would

25   be a voice from the community that would help shape policy with

1    things like democratic principles to me.

2          I last time I was involved with any kind of

3    police-community relationship was when Kendra James was killed,

4    12 years before that.  So this was a serious

5    coming-out-of-retirement decision for me, and I see it as very

6    big, very complicated.  My report that I wrote and a number of

7    people have read talks about institutions and structures that

8    are barriers to the efficient operation of the COAB.  I wanted

9    to talk first about the COAB.

10         In my report Chapter 1 is "The Dead Horse," so I am

11   going to beat it one more time.

12         THE COURT:  By the way, I did read your

13   September 13th letter and also your June 26th memorandum,

14   "The Dead Horse" memorandum, and I thank you for those.

15         MS. SAADAT:  We are starting to is discuss the

16   revision of the COAB in the wrong place.  We need to discuss

17   the processes that create the COAB in order to get an efficient

18   body.  To start back here is to ignore all the things that went

19   on before or didn't go on before, which is more important.

20   That led to a lot of the confusion, anger, frustration, both on

21   the part of the COAB members and the public.

22         I haven't heard anybody talk about that first part,

23   where people were not told what the tasks were in a clear way,

24   where they were not told about their status as public

25   officials, or they were not told about, you know, just training

1    and in general how to be on the board.  Those are essential if

2    you are going to have a really, really good board.

3              A couple of other points I want to address.  I firmly

4    believe -- it is my strong opinion -- that revision of the COAB

5    has no place in the City Attorney's Office.  It should not be

6    there.  The City Attorney defends the City, it defends the

7    police, and it is also responsible for defending the COAB.

8    There is a place for that -- to me -- where it gets pretty

9    messy.  If I teased that, I could probably tease that out.

10   Right now, that's not a very good picture.

11             I also think that there needs to be included within

12   whatever revision there is -- not just the parties -- but

13   trainers, human resource people, people who do the dynamic

14   human stuff, because the plan was good.  It is a good idea

15   poorly executed.  The execution fell down around issues of

16   human dynamics, around how we were going to get people to do

17   what they want to do, which started with not training the

18   people to do what we wanted them to do.

19             My third thing is the role of the unions in all of

20   this has to be addressed some kind of way.  When you have an

21   entity that is not accountable to the same people that sets

22   policy, it de facto sets policy, and we don't have anything to

23   say about that -- we, the community.  So there has to be some

24   talk about how to resolve that.

25             I think the thing that people heard me scream loudest

1   the most was:  Who is in charge?  Who is in charge?  Who is

2   ultimately making the decisions?  It is hard to find those

3   people a lot of times.  There were people who simply

4   disappeared.  They weren't there.  There were people who didn't

5   know who was in charge.  They weren't there.

6          I think until it is clear that the City knows who is

7   in leadership and responsible for the outcome of the settlement

8   agreement and that there is some identifiable point at which we

9   can look and say that's where we need to go, it is still going

10  to be a mess.

11         So I am going to say you can rewrite the settlement

12  agreement all you want to.  It is not going to fix the problem.

13  It is not going to fix the COAB problem.  And it is not going

14  to fix the accountability problem for who is in charge of

15  overseeing the COAB and the dynamics between the COAB and the

16  people in the city of Portland and the other structures,

17  because there are other structures that need to change also.

18  You can't just change the police bureau and think that that's

19  going to stand alone.

20         I'm going to end by thanking some folks:

21  Mike Marshman, Diana, Joyce Harris, Dante James, Richard Brown,

22  Commissioner Fritz, Joanne Hardesty.  There are lots more

23  people, including the COCL staff.  But those are people that

24  tried to help me get answers over and over again.  Judy and

25  Ellen were part of the people that I talked with almost daily

1   to help me get some kind of direction as a COAB chair.  I agree

2   that there needs to be some restructure with the COAB, but not

3   a whole bunch.  Let the COAB elect its chair executive/hire an

4   executive director.

5           Thank you.

6           THE COURT:  Thank you very much, Ms. Saadat.

7           Ms. Hardesty.

8           MS. HARDESTY:  Thank you, Judge Simon.  It is a

9   pleasure to be here today, and I will be very brief.

10          There are a couple of points that I wanted to make

11  sure were on your record.  I have been an activist my entire

12  life, but never have I showed up to provide my input at a

13  City Council meeting with the doors of City Hall locked and

14  armed police standing outside.

15          But because I'm someone that doesn't take no for an

16  answer, when they tell me that I can't come in because there is

17  a secret list of six people, and nobody knows how you get on

18  the list, but we know those are the only six people that will

19  be allowed in City Hall that day.  But then I hear somebody

20  say, "But if you are escorted by a city employee, you can get

21  in the building."  So guess what?  I got a city employee to

22  escort me into the building.

23          Then I get to the City Council chambers.  Once again,

24  we have armed guards from Homeland Security, Portland Police,

25  TriMet, Gresham Police, all standing there preventing the

1    public from having entry into their City Council chambers.

2    Imagine my shock when, once again, I'm told there's a list.

3    They can't tell me how to get on the list, but all they can

4    tell me is that if your name is not on the list, you cannot

5    provide your voice.

6         Now, I was inside City Hall the day that community

7    members went out of their mind and started screaming and

8    yelling and cursing, and I sat in that chambers because I came

9    to provide public testimony.  So I sit in that chambers, and I

10   waited for the City Council to come back, because they went

11   running from the room.  So I sat there, and I wait.  And I

12   wait.  And I wait.  I waited until 1:15, when it occurred to me

13   they weren't coming back, and so I left.

14        Thursday was the day I came back, and City Hall was

15   locked up.  Nobody was allowed in except the people on the

16   secret list of six people.  And so once I got inside City Hall,

17   once again, there were armed police officers from Homeland

18   Security, Portland Police, TriMet, preventing the public from

19   going inside the chambers.

20        But then I heard a police officer say to the media,

21   "But don't worry; when the doors open, we will let the media

22   in."  So I put my KBOO hat on and said, "Hi, I am here

23   representing KBOO," and I went into the City Hall chambers.

24        So inside the City Council chambers it became clear

25   who the six people were who were on the secret list.  Then I

1   found out they were people who didn't get to testify before.

2   So that was where the secret list came from.

3           Because I knew my friend and colleague

4   Dr. Reverend LeRoy Haines was in the air, his name was called.

5   So, of course, I stood up in the City Council chambers and

6   said, "I am here representing the AMA Coalition.  I would like

7   to speak on behalf of Dr. Reverend LeRoy Haines," and the mayor

8   gave me the opportunity to do that.

9           I've got to tell you, I've never had such subterfuge

10  to actually be able to get my voice heard by my elected

11  officials.  I have been an advocate my entire life.  I have

12  never, ever encountered a City Hall where the doors were locked

13  and where Homeland Security had facial recognition cameras

14  taking pictures of all the people who came in to actually

15  provide their input to their elected leaders.

16          I want to tell you I hope I never have that

17  experience again in the city of Portland when I go to let my

18  elected officials know what I think, and they didn't want to

19  hear it, and so they get armed police.

20          Now, it is kind of ironic, because they were trying

21  to convince us that we had this shortage of police officers.

22  If you had been at City Hall, you would have known there was no

23  shortage of police officers, because they were clearly standing

24  around making sure that the public did not get access to their

25  elected leaders.

1          So I want you to know, Judge Simon, I am thrilled

2     that you are a judge that wants to hear from the public,

3     because you didn't have to let us talk -- the public -- today.

4     I appreciate you.  I appreciate the fact that I have this

5     ability to talk to you.

6          I want to let you know that I believe that when you

7     shut the public out of a severe public deliberation that is

8     about policy, it's about community safety, when you shut the

9     public out and you tell them that you don't want to hear them,

10    you, Judge, ruled that you can exclude someone from a public

11    meeting at the meeting that you are being disruptive at.

12    Ironically the mayor called all four disrupters by name when

13    they disrupted the City Council meeting, but yet the entire

14    public was shut out.  How is that a democracy?  How does that

15    work?

16         So I am here today to say that I appreciate that we

17    at least have a federal judge that is willing to hear from the

18    public.  I am absolutely frustrated that I have a City Council

19    that decides because they get an e-mail, that they are going to

20    shut the entire public out of the building.  I think that's

21    appalling.  I think that somebody has to do something about

22    that.

23         We are looking to find out, legally, what is the

24    community's right when our voices have been shut down, when the

25    City is about to spend millions more dollars on things we

1    should have input into?  Where is our ability to actually have

2    our voices heard when City Hall is locked and armed guards are

3    preventing us from being inside?

4         The last thing I will say is the biggest barrier to

5    the COAB is that most of us volunteer police accountability

6    people, we don't get paid.  We spend our own money to drive

7    downtown.  We spend our own money to actually pay those parking

8    tickets, because the meetings always run longer than they are

9    supposed to.

10        THE COURT:  Like court hearings.

11        MS. HARDESTY:  Well, I am in the garage today,

12   because I knew this was going to take a while.

13        So the fact that COAB members have never been given

14   one dime for their participation, but I hear today that we have

15   spent $840,000 on body cams, and we don't even have a policy,

16   right.  But the policy that has been given away by the City of

17   Portland is the only two things that the public has an interest

18   in, right.

19        The City has given away the police get to review the

20   video before they provide a written report, and they have a

21   reasonable amount of time.  When I asked the mayor and City

22   Council, so is that two days?  Two months?  Two weeks?  Two

23   years?  What?  It is unwritten.

24        The second thing is if you're under investigation,

25   you get to review any video before you are interviewed.  Again,

1    why would the public agree to spend millions of dollars for

2    body cam footage that they have no access to, only the police

3    get to see, and the police get to write their reports based on

4    what they see on the camera.  It's absolutely a waste of public

5    resources.  Absolutely we don't want body cams, especially

6    under this condition.  We don't want them.  We should not be

7    spending the money.  We are hiring analysts to actually

8    evaluate body cam footage that we don't even have yet, because

9    we don't have body cams.  It is absolutely stupid.

10            Thank you.

11            THE COURT:  Thank you, Ms. Hardesty.

12            Let's go to Mr. Walsh.  Then my not-so-secret list

13    shows we have Philip Wolfe, a person whose name only appears as

14    "Lightning," if that makes sense.  You are welcome to come up

15    after Mr. Wolfe, Robert West, and Ann Brayfield.

16            Mr. Walsh.  Welcome, sir.

17            MR. WALSH:  Again, Your Honor, I have trouble with my

18    voice.  So if I get too loud, just tell me.

19            THE COURT:  Mary, would you take Mr. Walsh a cup of

20    water too.

21            THE CLERK:  Yes.

22            MR. WALSH:  Your inquiring with the city attorney

23    completely changed my presentation to you because two years ago

24    we suggested exactly what you suggested.  We needed a group to

25    get together to figure out why does such hostilities between

1    the City Council and the activists.  Now, I draw a difference

2    between "activist" and "advocates."  I think activists throw

3    rocks.  I am an activist.  There are advocates.  And you've

4    heard from them today.  They advocate for something special --

5    police accountability.

6            Us activists are involved in everything.  We just see

7    the injustice, and we go after it.  So we are always in trouble

8    with City Council, with the COAB, with Human Rights Commission,

9    with people that are on the opposite side of us, like the

10   police union.  We are always in trouble with them, and that's

11   okay, because there is nothing they have that we want.  We

12   don't want grants.  We don't want special interests.  We don't

13   want to be known.  What we want is for them to do their job --

14   that's all -- just do your job and convince us that you are

15   trying.

16           THE COURT:  Can I make a suggestion there?  I think

17   that if you throw "verbal rocks," you are more likely to

18   achieve that result than if you throw real rocks.  Obviously I

19   know you don't throw real rocks, but maybe the metaphor needs

20   to be changed to try to accomplish more of the legitimate goal

21   that you are trying to accomplish.

22           MR. WALSH:  It was a metaphor.  I really believe in

23   what Gandhi talked about, but Gandhi also talked about

24   confrontation.  There must be confrontation with the

25   authorities if you need to change something, because they are

1    not going to do it.  It is going to come out from the bottom.

2    They are only going to do it when it is to their advantage, and

3    so the activists have to figure out how to make it to their

4    advantage.  And we do that sometimes.

5            I am very complimentary sometimes to the City

6    Council -- not all the time -- but sometimes.  I think that

7    there are really good people in this room and very bright.  You

8    are all very bright, and your heart is in the right place.  Why

9    do we fail?  Why do we fail so badly?  Why did COAB

10    disintegrate?

11           The reason is we do not have a capacity to look in

12    the mirror and say, "Joe, what's your responsibility on this

13    failure?"  Not "You did something wrong.  You didn't do it

14    right.  You violated some rules."

15           All of us, and I beg you, look in the mirror and say,

16    "Could I have done something more?"  Could I have been easier?

17    You are right.  Could I have thrown verbal instead of real

18    rocks that hurt people's feelings?

19           THE COURT:  Or that frighten them.

20           MR. WALSH:  Or that frighten them, you are right.  I

21    have people who said to me, "You frighten me."  I say, "Wait.

22    I am 74.  I'm on oxygen.  I walk with a cane.  How can I

23    frighten you?"  They say, "Your words are so angry sometimes."

24           I spend a lot of my time crying, because we are in a

25    mess, and it is down here.  It is right here.  We are one

1    incident away from Ferguson -- one incident.  If we have one

2    major killing of an innocent person, this city will explode.

3    That's what makes me cry.  That's what makes me so angry,

4    Commissioner Fritz.

5          When you see me angry, that's what makes me angry.

6    We have good people here.  I don't want us to point fingers

7    anymore.  I want you to go home, Judge, and say, "Can I do

8    more?  Can I go out on a limb?"  I want Joe Walsh to go home

9    and say, "You promised you would be easier at 74.  Will you

10   please do it.  You are running out of time."

11         Thank you.

12         THE COURT:  Thank you, Mr. Walsh.  It was a pleasure

13   to hear from you, sir.

14         Mr. Philip Wolfe.

15         MR. WOLFE:  (Interpreted through ASL)

16         Hello, Your Honor.  My name is Philip Wolfe.  Thank

17   you for allowing me a moment to speak.

18         I am the chair of the executive committee.  I have

19   been the chair for about six months.  I was appointed after

20   someone resigned.  It has really been a great experience.  It

21   has been challenging.  There has been a diversity of energy, so

22   I am in the middle of trying to figure out what the exact

23   issues are.

24         I've re-read and re-read the settlement agreement,

25   and I'm seeing that the problem is that COAB and COCL are

1    united.   I think that we need to be truly independent from each
2    other to accomplish our work without interruption from COCL.
3            Looking back, COCL has caused the disruption.   They
4    are not experts at community engagement.   They have failed at
5    community, and that is a proven fact.   I, as the executive
6    committee chair, have tried to engage with them, educate with
7    them, set up meetings, create less of an "us versus them"
8    feeling, and to no avail.
9            We've finally figured out how to run meetings, but
10   without their involvement.   At the same time the City, the
11   chief of police, the mayor, the city commissioners, they have a
12   dark history.   There has been media.   There has been articles
13   documenting this.
14           Where is the transparency?   That is what is key --
15   transparency is important -- and trust.   And right now, there
16   is none.   For COAB to be successful, that trust must be
17   present, and trust needs to happen by disassociation from COCL
18   and COAB.
19           Any couple who asks for a divorce, either party who
20   requests that, is granted.   They haven't asked us for a
21   divorce.   They went straight to the Department of Justice.   We
22   were not informed of that.   We are here, and we were not
23   informed.
24           I'm hoping to make a request.   I did file a complaint
25   with the Department of Justice.   I found many issues where the

1    City is not in compliance.  You have already heard this from

2    other people.  They have already accounted how they are not

3    within compliance.  I filed that report two weeks ago.  I've

4    heard nothing.  I've sent follow-up e-mails.

5           The Department of Justice, they have the authority.

6    I'm hoping they will read my complaint, forward it to you, if

7    you have that authority, but nothing has happened.  I have

8    tried everything I can.

9           The settlement agreement needs to be modified.  We

10   have made recommendations for that to the DOJ and the City.  We

11   have been trying to get all four parties involved in that

12   agreement, but nothing has happened.

13          In order for COAB to survive, we need redirection.

14   We need to be disassociated from COCL, and that's what needs to

15   happen in order for to us continue.  Communities all over the

16   U.S. are depending on us.  For other cities, we need to become

17   a model.  It is a challenge because in bigger cities they have

18   a lot of issues, but here in Portland we are unique.  For us to

19   have the chance for a police reform to happen, we can truly

20   have an impact on the rest of the nation.  So please, I hope

21   you honor my request.

22          Thank you

23          THE COURT:  Thank you very much, Mr. Wolfe.  I

24   appreciate those comments.  Thank you.

25          Lightning.

1          I would ask Lightning to be brief, but I don't think

2     I need to.  I think it happens by definition.  I am being

3     facetious.  Take your time.

4          LIGHTNING:  Now, Judge, I might say a few things that

5     you may not like to hear from me.

6          THE COURT:  As long as it is brief, I will listen to

7     anything.

8          LIGHTNING:  It will be brief, sir.

9          The gentleman that got removed by the U.S. Marshal, I

10    think that was completely inappropriate.  I think he did have a

11    right to sign up for public communication.  When the individual

12    went up to him and asked what he was doing, he responded, "You

13    don't have any right to tell me or ask me what I'm doing at

14    this point."  I don't think he should have been dropped to the

15    ground and removed.  That's just my statement to you, sir.

16         THE COURT:  I appreciate that.  I will tell you, I

17    was not in the courtroom at the time.  I did not observe that.

18    One of the things I've learned in this job is not to draw

19    conclusions until I hear all of the evidence.  But I understand

20    what you are saying, but I'm not drawing any conclusions.

21         LIGHTNING:  Thank you, sir.

22         My next issue is that I want you to know that I truly

23    enjoyed The Odd Couple show, and it is something to always be

24    remembered.  I watched that when I was a young kid, so I want

25    you to know that.  I think you know what I'm saying right now.

1          Now moving to public communication issues.  One of

2     the things that I want to have very clear for the Mayor and the

3     commissioners is, do you think public communication is

4     necessary?  I would like to have an understanding and your

5     opinions on that.  Do you think it is necessary?  Do you think

6     it is necessary for the public to have the right to talk about

7     the issues?  Do you think it is necessary to have the public

8     have additional time, if needed, to talk about the issues?  Do

9     you think it is important for the public to have communication

10    for you to be able to do your job, because a lot of the public

11    right now doesn't think you believe that.

12         A lot of the public thinks that you want to make

13    these decisions.  You want to push these contracts through.

14    And you really don't care what the public has to say.  We are

15    seeing a lot of resistance from the public.  We saw what

16    happened at City Hall.

17         There has to be that element of reasonableness, due

18    to the public communication, the points they want to stress to

19    you and understand that public communication is a necessity in

20    a limited public forum, and it is First Amendment rights of the

21    public to speak to you in a reasonable manner, give their

22    opinions, and also be respected at the same time.

23         If you don't have respect for the public, please step

24    down from your jobs.  We will get people in there that do and

25    understand that as part of the process it is necessary.

1            I went to an EPA meeting where they had public

2   communication all day long, every other day, to the point I

3   walked out of there, and I said, "I love this, because I like

4   public communication," and I respected them for the way they

5   did their jobs.  They even told me to go over to their office

6   if I wanted to talk to them and would be glad to talk and

7   communicate, and they did.  And I have a lot of respect for the

8   way they did their job.

9            Thank you.

10           THE COURT:  Lightning, let me tell you, I think part

11  of the genius of the original Odd Couple -- don't get me

12  started on the current stuff.  Part of the genius of the

13  original Odd Couple is that it shows that people with very

14  different perspectives, attitudes, values, and habits can live

15  together, learn to respect each other, and see what's good

16  about each other, even though they come at it from different

17  perspectives, and that's a very good lesson for our community.

18           LIGHTNING:  Laughter is so very important, and I do

19  agree.

20           THE COURT:  Thank you.

21           Mr. Robert West.

22           MR. WEST:  How are you doing today, Your Honor?  My

23  name is Robert West.  I am from Police 911.  I videotape the

24  police.  I have been videotaping City Hall and stuff like that.

25           Let me go through my experiences.  When I first went

1   to COAB, I would get on a subject, and if there is something

2   that the leader, Ms. Saadat, didn't like, I was interrupted.

3   She would explain something, and it would go to the next

4   person.  She had like three minutes per person.

5           To me, I felt disrespected that way.  I felt

6   belittled and stuff like that.  There was a big outcry about

7   what she was doing.

8           Okay.  Later on, one of the individuals called a guy

9   that films the police -- not me but another guy -- "a Nazi that

10  goes after blacks," and the guy is Jewish, which is a major

11  problem, you know, you don't -- it is really bad when you

12  disrespect people like that.

13          I have observed -- I have had several confrontations

14  with police because they will say, "We want you to be beyond

15  that pole," which is over a hundred yards away, or "we want you

16  past this sign," which is a block away, or "we want you across

17  the street on 122nd," or some like that, right.

18          I have had issues with police as far as -- "Well, we

19  need you to go across the street right now.  Well, I'm in the

20  middle of the block.  Can I go around the corner?  No, you go

21  across the street."  Then they want to come over and have a

22  confrontation with me because I jaywalked, you know.

23          They've had -- there is just continuous stuff like

24  that.  It has gotten to the point where there has been

25  disrespect.  They have had their license plates videotaped, and

1    they are all upset about that.

2            But not to go off the subject, I went to City Hall

3    several times, right.  The mayor tries to control everything.

4    I think he is too forceful in his controlling.  If you use the

5    "F" word, he warns you that you can't use the "F" word.  If you

6    use it again, he excludes you, which has caused a lot of

7    problems.  People say, "Well, I'm not going to go because I use

8    the 'F' word.  It is freedom of speech."

9            And so people wind up getting arrested and stuff like

10   that.  I was arrested at City Hall just sitting there

11   videotaping.  I couldn't believe it.  I was sitting there

12   videotaping.  They closed the chambers.  Joe Walsh just got

13   injured by G4S.  I was standing there to make sure he wasn't

14   injured or reinjured and stuff like that.

15           When I stepped down, I asked Mike Cohen, which is

16   security for G4S, "Am I being trespassed?"  He goes, "No, you

17   are not trespassing.  We just don't want you in there."  When I

18   stepped out, they arrested me for interrupting the City Council

19   meeting, and all I did was film, and trespass, which Mike Cohen

20   told me I was not trespassing.  So that's kind of the stuff

21   we're facing.

22           There is the incident where they gave us little

23   tickets to testify on different subjects and stuff like that.

24   Well, if you are an activist, your name was never called.

25   People got upset.  They put tents up in there, but people were

1    still hostile.  They were decent to the police.  They were

2    decent to everybody else.  If someone from the City wanted to

3    leave, they let them leave.  There was an incident at the

4    elevator where I got shoved in the back and got a criminal

5    charge for that.

6              So then what happened was they weren't happy, and so

7    they brought in their little riot squads and proceeded in

8    shoving people and literally picked one dude up and slammed him

9    into a pillar at City Hall.  I was appalled at that.  That was

10   the first act of violence by anyone there, was when an activist

11   was picked up and slammed into the pillar.

12             The second act of violence was when he turn around

13   and swung at one of them.  Excuse me.  If somebody picked me up

14   and threw me into a pillar, I think I would swing too.  You

15   have a right to defend yourself in this country, although the

16   Portland Police don't agree with that.

17             Then it escalated.  As they were having people leave,

18   they were literally pushing people.  When they got near the

19   doors, you are trying to squeeze 100 people out of a door where

20   there are two small doors.  Then you've got stairs.  We had the

21   elderly, we had disabled, and stuff like that.

22             THE COURT:  Mr. West, there are a few more people on

23   the list.  I would like to make sure to get to them this

24   evening.  If I could ask you to wrap up.

25             MR. WEST:  That's what I'm doing, Your Honor.

1          THE COURT:  Thank you.

2          MR. WEST:  So when they got outside, right, the riot

3   squad showed up.  They decided that it was necessary to pepper

4   spray four ladies that were sitting down there asking what was

5   happening.  The Portland Police have been out of control for a

6   while.  They have basically been waging war, arresting

7   Cop Watchers for little minor stuff that they don't arrest

8   anyone else for.

9          If there is a march, and I'm standing there filming

10  it, they don't arrest the marchers.  They arrest Cop Watchers.

11  That day they arrested six Cop Watchers, and that's what I

12  wanted to bring up.

13         THE COURT:  Thank you, Mr. West.  I appreciate you

14  being here.

15         Let me hear from Ann Brayfield, David Davis,

16  Mary Eng, and I believe Laurel Vanderlyn.

17         So Ms. Ann Brayfield.

18         MS. BRAYFIELD:  Thank you, Your Honor.  I appreciate

19  the opportunity to speak this afternoon.  One of my hopes out

20  of this that's happened here today is that others around the

21  room in whatever position they happen to be in will see the

22  value of public speaking.

23         You've shown right now, right here today, that it is

24  a good thing.  You have shown it is not something to be afraid

25  of.  It is something you have been willing to interact with --

1   the community -- following everyone else.  And I would hope,

2   whether it is the chief, whether it is commissioners, the DOJ,

3   the union, the city attorneys, whomever, I would hope that you

4   could listen to the public and find a way to do that.

5          Personally I often send e-mails.  What I find -- I

6   have a question; I have a thought.  I don't go on.  I don't get

7   a response.  It is very, very rare.  I think that if people can

8   interact with each other, we will have less of the kind of

9   thing that is happening where people take the streets, people

10  perhaps are disruptive.  I think that respect and listening to

11  one another is one of the ways that we're going to move forward

12  here.  I would just ask that we all step back and take a moment

13  to do that when someone reaches out, or to reach out yourself.

14         Thank you.

15         THE COURT:  Thank you, Ms. Brayfield.  I appreciate

16  those comments.

17         David Davis, followed by Mary Eng.

18         MR. DAVIS:  My name is David Davis.  I am with

19  Multnomah County Cop Which, is a separate entity than Portland

20  Cop Watch.  Thank you for this opportunity for public comment,

21  because I know you didn't need to allow the public to speak.

22  You have respect for the First Amendment and the public, where

23  a lot of the people, like Mayor Hales/police commissioner and

24  Mike Marshman --

25         THE COURT:  Let's keep it more to the policy issues,

1   if we may.

2          MR. DAVIS:  I pretty much view policing these days as

3   "death by a thousand cuts" policing basically, you know.

4   Anyone familiar with that concept -- I'm sure there are a lot

5   of people in this room.  But there are serious problems when

6   the police can't even sign their union contract without

7   launching a DOJ report on itself by its treatment of mentally

8   ill, handicap people, women, and children.

9          I even saw the police mace G4S guys.  Speaking for

10  G4S, G4S Security is frequently as an extra-legal mechanism to

11  prosecute and intimidate people, especially Cop Watchers.

12         Then you have Ellen Osoinach over here.  She accused

13  me of up-skirting her at a COAB meeting in front of

14  Mike Marshman who was then just the COAB liaison.  He wasn't

15  the chief of police.  That was before the O'Dea shooting

16  unraveled.

17         They are saying that people who disrupt a meeting,

18  you know, the real disruption is coming from the mayor himself

19  who can't handle any dissenting voices at City Hall.  There is

20  this Orwellian language change, like Judith Prosper, who used

21  to work for former Haitian Dictator Aristide.

22         They are trying to frame freedom of speech and the

23  First Amendment as being disruptive civil unrest.  Give me a

24  break.  You don't know what civil unrest is.  Civil unrest is

25  what happens when our voices are frequently trampled on,

1  stomped on, and beaten out of us by a bunch of fascist goons

2  that think they represent the community.

3         You know, the use of force at City Hall, you know,

4  that was ridiculous.  I saw people with prosthetic legs being

5  pushed down the stairs.  People that had brain surgery three

6  weeks previous to that weren't allowed to exit out the front

7  door.  They had to go out and be herded out and pushed down the

8  stairs.  Sarah Hobbs, who comes to City Hall, which Amanda

9  Fritz and Charlie Hales know about her brain injury.

10         All this stuff -- I view COCL actually as a weapon

11  against the mentally ill.  It has been used as a weapon against

12  the mentally ill.  I have PTSD.  I was invited to a COAB

13  meeting by Vianni Rivera over there to do a presentation about

14  the treatment of mentally ill and homeless people and my

15  experiences of people at Cop Watcher.

16         You know what?  I am one of the people that has been

17  arrested at City Hall and at these COAB meetings.  The reality

18  of the situation is, I have been arrested four times since

19  June.  All four cases are dropped.  So your narrative totally

20  fails in a court of law.  Half the time these charges were

21  dropped even before I made it home.

22         So these toxic advocates of the City who portray

23  themselves as lawyers that serve the best interests of the

24  community, they are far from it.  They think sprinkling a

25  little mace and trampling on the First Amendment rights of

1  citizens and all that is a great thing.

2          One of the main reasons for COAB and COCL unraveling

3  is because I was called a white supremacist.  I am a Jewish

4  person.  My family fled Kiev.  We fled for a reason -- to

5  escape this same type situation that's going on and --

6          THE COURT:  Mr. Davis, were you called a white

7  supremacist by a member of COAB or COCL?

8          MR. DAVIS:  Yes, by Bud Fueless.  Kathleen Saadat is

9  a very good friend with him.  She drove him in her car and

10  dropped him off at his front doorstep.  She also lied and said

11  she was intimidated by some people that were filming her.

12  Judith Mallory, a city employee, even sent out an e-mail

13  talking about how Kathleen Saadat felt intimidated.

14          Well, you can go look at the video.  It is on

15  Mike BlueHair from the Film Portland Police Channel.  You can

16  see just how intimidated she was when she is chuckling about me

17  getting arrested and Bud Fueless is talking about, "Yeah, I

18  called him a skinhead; ha, ha, ha, ha, ha."

19          So that's one of the main reasons this whole thing

20  unwrapped, because when you have this thing that's just based

21  on public perception, and then members of the public actually

22  come in and engage and ruin your narrative because it is

23  totally false, fabricated.

24          I think you should go back to Haiti and go join the

25  dictatorship again or some other dictator because your

1   dictatorship in Hales administration isn't working out.

2           Building a plane wall.  We are flying it.  It doesn't

3   ever work out and it will always lead to plane crashes and

4   fatalities.

5           THE COURT:  Mr. Davis.  Thank you, sir.  I appreciate

6   that.

7           MR. DAVIS:  That's all I have got to got to say.  I

8   could go on for ten minutes, but I am going to allow others to

9   speak.

10          THE COURT:  Thank you.  I appreciate it, sir.

11          All right.  Mary Eng, Laura Vanderlyn, Linda Senn,

12  followed by Dan Handleman, Trudy Cooper, and Mike Schumann, and

13  that's the end of my list.

14          MS. ENG:  Can you hear me all right?

15          THE COURT:  Yes, I can.

16          MS. ENG:  My birth name is Mary Rose Lenore Eng.  I

17  have been going as "Mr. Eng," because I've really had to

18  "man up" for this whole situation.  So is a little joke between

19  me and Charlie Hibbs.

20          I would like to apologize to you for those comments.

21  I found them disgraceful, insulting, and I also don't

22  understand the context from which they arise.  They don't know

23  much about the history of that country.  So I just want to

24  apologize from my personal point of view.

25          I also wanted to bring up -- I wanted to give you

1    this book.  So don't let me get out of here -- it is not a

2    bribe at this point, unlike the COAB house deal with the PDC.

3            THE COURT:  I will consider it as a submission to the

4    Court much like any other court filing.

5            MS. ENG:  Read page 47.  There is a wonderful poem.

6    It is from my father, which I spare -- it is called

7    Golden Eagle.  It is about what it was like to be 23 when

8    Kennedy was killed.

9            So there is a new loophole the Walsh/Eng decision.

10   Have you heard of it?

11           THE COURT:  No, but please be brief.  We have a lot

12   more people to hear from.

13           MS. ENG:  Great.  Great.  It is called "the corkscrew

14   exemption."  What you do is you take a perfectly innocent

15   lovely Catholic school girl like me and then you say:  Gee, we

16   really don't like her.  She is always so polite.  She uses

17   proper manners.  We just really want to get rid of her.  She

18   hasn't quite committed a crime.  Why don't we have her arrested

19   and brutalized on false charges of a weapon planted on my bag.

20           It turns out that G4S does want metal detectors.  And

21   I am on the bandwagon, if we need more security at City Hall

22   that is reputable, fair, and honest.  The dirty dealings with

23   "the corkscrew exemption" -- Charlie Hales got -- one week

24   after asked to resigned on the O'Dea shooting, in a very

25   cordial and polite manner, regarding the squirrel shooting

1    episode.  I did so in his job.  I felt more comfortable

2    speaking to him that way.  But he had me arrested and

3    brutalized and bruised.  Constantin Severe has all the

4    pictures.

5            But what's so interesting is for the three years I

6    worked on the Benjamin Pickering case, he is now dispositioned

7    in the Oregon State Hospital after an unfortunate June 2nd,

8    where I nearly lost my life as my head was being crushed, as he

9    accused me of being a secret agent.

10           So I got into a choke hold with that, and he is not

11   fit to stand trial for anything.  It was never my goal that

12   someone who was a Portland Police brutality victim in 2013

13   would be failed by Providence, failed by Cascadia, failed by

14   the City of Portland, by everyone in four counties.

15           THE COURT:  Thank you, Ms. Eng.

16           Ms. Eng, you are welcome to deliver the book to my

17   courtroom deputy.  I will take a look at it.  Thank you for

18   being here.

19           MS. ENG:  I met your lovely wife down in Astoria.

20           THE COURT:  I do not discuss her in this building.

21   It is separation of powers, but thank you.

22           All right.  Laurel Vanderlyn.

23           MS. VANDERLYN:  Thank you very much for allowing the

24   public to speak today.

25           I am Laura Vanderlyn.  I am an artist.  I am a mother

1   of five.  I was one of the persons that was arrested also.  I

2   was arrested on June 9th for speaking robustly.  Maybe the

3   attorneys are really not understanding what the word "robust"

4   means, it is true that in fact I was speaking "robustly."  We

5   do speak robustly in meetings when we are feeling it

6   necessary -- when we find it necessary to speak up.

7            I went to a meeting on June 9th, and I found that the

8   procedure and the protocols were so offensive that we had to

9   get up and speak up.  And we were given instructions that we,

10  as a public body, could speak robustly.  That's exactly what we

11  did.  And for that, I was arrested.  As I was leaving the

12  building, I was arrested.  Four or five or six police officers

13  who was running after me.

14           I have never been arrested in my life.  I left the

15  building.  They came from behind me, and they escorted me out.

16  They took me out from the left side of the door.  I didn't

17  choose to walk out that door.  They escorted me out.  I tried

18  to give my belongings to a friend, and they refused.  They

19  refused.

20           I did not leave the jail.  They had my phone.  They

21  had my keys.  They had everything.  I did not leave the jail

22  until after midnight -- after midnight.  I have never been

23  arrested.  I felt like I was a domestic abuse -- I have a good

24  husband.  I have never been abused, but I understand that

25  feeling of having like a domestic abuse violence happening to

1    you.  I had no choice.

2              THE COURT:  Thank you, Ms. Vanderlyn.

3              MS. VANDERLYN:  I just want to say that we are not an

4    audience.  We are civically engaged citizens that may have had

5    an experience with police or a system, and then we are there to

6    engage.  We have a mind.  We are not an audience.  I've heard

7    this over and over:  The audience -- dot, dot, dot.  We are

8    civically engaged citizens.  We care.

9              THE COURT:  The whole purpose, including the COAB, is

10   to get the community's advice and the community's input.  It is

11   a critically important part of this process.

12             MS. VANDERLYN:  I tried.  I suggested that they do a

13   settlement agreement in audio form.  They have ignored me over

14   and over.  They have this way of talking to you where they

15   spinning and spinning and spinning.  You're just talking in

16   circles.

17             You ask a question and no question can be answered

18   because we get this like talking and talking and talking in

19   circles.  We then go to these meetings and we speak robustly.

20   I was also arrested on October -- on the 5th, when we did --

21   there was like a demonstration.  I was leaving.  I wasn't even

22   part of the demonstration.  My name wasn't called down to be

23   excluded.  As I was leaving the building, again, I was

24   arrested.

25             My phone was taken away that day for video evidence.

1    No charges are against me on either one of those arrests.   My

2    phone is still -- the City of Portland still has my phone.

3    Refusing to give it to back to me, and I don't know why.

4         THE COURT:   Thank you, Ms. Vanderlyn.   May I move on

5    to any other people or do you have any final comments?

6         MS. VANDERLYN:   I just want to make one more comment.

7    Childcare has been provided.   It is a very elitist way.   They

8    make the procedure and protocol so difficult.   What they do,

9    the City says that you have ten days -- call us ten days ahead

10   of time.   Nobody needs a babysitter when you can plan ten days

11   ahead of time.   You need a childcare provider -- people are

12   coming to the meeting that are broken and hurt and poor and

13   impoverished.

14        THE COURT:   Have you tried Court Care at Multnomah

15   County Courthouse?

16        MS. VANDERLYN:   COAB has childcare provided, but they

17   don't provide it unless you call ten days ahead.   I think the

18   whole system is so flawed.   It is just like it is a joke.   They

19   have never provided childcare the entire two years, but yet

20   they have childcare available.   That's all I wanted to say.

21        THE COURT:   I understand.

22        All right.   Thank you, Ms. Vanderlyn.

23        I am going to Linda Senn, Dan Handleman,

24   Trudy Cooper, and then close with Mike Schumann.

25        But then I am going to Mr. Geissler and ask you if

```
 1   you've had any further discussions regarding any items and what
 2   we should do on our agenda/calendar.
 3             MS. OSOINACH:  Your Honor, there was a name left off
 4   the list, Commissioner Fritz, who was the last person to sign
 5   up on the list.
 6             THE COURT:  I didn't see that.  Of course.  Then we
 7   will end with Commissioner Fritz.
 8             All right.
 9             Linda Senn.
10             MS. SENN:  My name is Linda Senn.  I am extremely
11   nervous right now.  My heart is beating really fast.
12             First and foremost, thank you, Your Honor, for having
13   us speak out today.  I am a member of the subcommittee for the
14   COAB.  I get it mixed up with the abbreviations.  I also
15   applied for the chair position, because I feel like police
16   accountability, above and beyond, needs be ratified.  It needs
17   to be re-purposed.  That's a word I used in one of our
18   meetings.  Retooling.
19             I don't think that police should be abolished.  I
20   think we are all humans.  We all err.  And forgiveness is
21   necessary.
22             Like I forgive Officer Nicholas -- I will use his
23   first initial of the last name, which is B -- for the
24   incredible injustice that he did to me by macing me right in my
25   eye.  I don't know if you were able to see that on media
```

1   coverage across the our nation.  That was me pouring milk into

2   my eye.

3           I was brought to the COAB and the COCL through

4   Cop Watch because I reached out through another friend because

5   my son was brutalized by Gladstone Police Department -- yet to

6   receive their abuse report, the report they are supposed to do

7   when they beat up somebody.

8           He was 15 -- he was 14 then.  He is 15 now.  What

9   they have done to my son and other people's sons and daughters

10  and mothers, there is no excuse for that treatment of life.

11          We were brought into this world by our parents.

12  Discipline by our parents is what we expect as we grow up.

13  Harsh discipline by community representatives that are there to

14  protect us is not something that we grow up expecting.  We grow

15  up understanding that there is a line to toe.  We grow up

16  understanding that there is a line not to cross.

17          But we don't grow up with an understanding that if

18  you do that, that you may lose your life.  This loss of life is

19  a tragedy beyond all tragedies, especially when it can be

20  stopped by the adult behind the weapon.  When it is loss of

21  life due to inconsideration of your position, it's disgusting.

22  It is a tragedy that no one -- none of us should have to

23  reflect on when we take that time out to look in the mirror and

24  go, "What did I do to help?"  I joined the committee.  I tried

25  to get the job as the chair.

1          I'm still reaching out through other agencies.  I

2  have just become a board member of a distinguished board.  I am

3  expecting to be a board member at Sisters of the Road Cafe

4  where I have extended several times to everyone here to come

5  and have a cup of joe, talk to some of us.  Sometimes it is

6  just that we are tired; we are not mentally ill.  But you need

7  to know the difference.  Training our officers in that is

8  imperative.

9          Thank you for your time.

10          THE COURT:  Thank you, Ms. Senn.

11          Mr. Dan Handleman.

12          MR. HANDLEMAN:  Good evening, Judge Simon.  Thank you

13  very much for letting the community speak too.  I am a member

14  of the steering committee of the AMA Coalition.  I am speaking

15  on behalf of Portland Cop Watch.  In any case, our counsel is

16  here, so they are informed of my contact with you.

17          I wanted to ask before we run out of time if it is

18  okay -- I heard you took ex parte contact from other people,

19  including Ms. Hardesty, into the court record.  Is it okay if

20  we send our analyses to you as well?

21          THE COURT:  Absolutely.

22          MR. HANDLEMAN:  All right.  We will do that in the

23  future.  In fact, I would like to offer our analysis to the

24  COCL report before I leave tonight.

25          THE COURT:  Give it to my courtroom deputy, and we

1    will enter it into the public record probably tomorrow.

2             MR. HANDLEMAN:  Thank you.

3             One of the things we've observed is that the more

4    secret a committee is, the more the Bureau and the City listens

5    to them.  The Behavioral Health Unit Advisory Committee does

6    not have open, public meetings, but the reports from the DOJ

7    and the COCL reveal that their recommendations have been

8    adopted by the Bureau.  They have gotten feedback on all of

9    their recommendations and that they are allowed to participate

10   in training.  That is not true for the COAB or for any

11   community committees.

12            The Training Advisory Council has open meetings.

13   They only recently opened it up to open comment because the DOJ

14   thankfully asked them to do that.  They have put in their

15   recommendations, and we have heard now that they have gotten

16   feedback on their recommendations.  COAB still hasn't.

17            The focus group that they put together to talk about

18   the accountability system met behind closed doors, and the

19   people who were on it understood, even if it wasn't accurate,

20   but they understood that they weren't to communicate with their

21   organizations about what was going on.  So a member of the CRC

22   and a member of the steering committee of the AMA were on that

23   group, but we had no idea what was going on.  Then when the

24   City came out with a proposal that was terrible, they were

25   surprised that people didn't like it.  But that's because there

1    was no public input.

2         THE COURT:  Mr. Handleman, if I can interrupt for a

3    moment.  At the risk of making you go a little bit longer, let

4    me ask you speak a little more slowly.  I have been working our

5    court reporter hard all afternoon, so a little bit slower.

6         MR. HANDLEMAN:  I have been told that many times,

7    believe me.

8         ALS INTERPRETER:  The interpreters as well.

9         MR. HANDLEMAN:  Sorry about that.

10        The Police Review Board meets behind closed doors.

11   They make recommendations to the chief, and they get responses

12   about their recommendations.  The Citizen Review Committee

13   makes recommendations.  They have public meetings.  They hardly

14   hear back.  They make recommendations on crowd control, in

15   fact, but they never heard back from the chief or the City

16   about those.

17        COAB, of course, we have talked.  The Committee

18   Police Relations Committee not only didn't get as much feedback

19   on the recommendations as they could, but they have fallen

20   apart due to lack of support, which happened to a lot of

21   groups.

22        One of the comments that was made was that there was

23   no excessive force found in the last year, but there was an

24   incident in one of the reports about an a bicyclist who was hit

25   by a police car.  They refused to investigate it because they

1   said it wasn't deadly force.

2           The Graham standard, as I understand it, says you

3   can't use 20/20 hindsight as the perspective of the officer at

4   the time of the incident.  So allowing them to review footage

5   to write their reports and interviews completely throws that

6   out the window, because then they will know it becomes their

7   20/20 hindsight because they can look at video.  So that has

8   got to be avoided.

9           You've heard already the contract doesn't have the

10  body cameras in it, but the agreement that they signed gave

11  away the story.  It says, "Mandatory bargaining," even though

12  the lawyers put together a memo saying, "We argue that it is

13  permissive," so they gave away the story on that one.  There is

14  nothing we can do about that when we make our recommendation

15  about the body camera policies.

16          Somebody used the term "suicide by cop" here today.

17  That's not a good term.  Our group that reviews shootings for

18  the City of Portland discussed how it is a homicide.  And when

19  we use that term, it takes the responsibility off the police

20  for taking away life.

21          On that note, the last person who was killed by the

22  Portland Police last year in November was a mental health

23  crisis outside a hospital, and the officers who shot him

24  received awards for it.  15 years ago when Jose Mejia was shot

25  and they gave awards, the City realized that was not a good

1    idea because the community became outraged.  But now that

2    policy has gotten back into place.

3           We have made numerous recommendations about how to

4    fix the accountability system, and we never get listened to.

5    Hopefully there is a stakeholder group where there is some

6    limited discussion about it, but again, because the focus group

7    that talked about it was done in secret, we want to open up the

8    whole process again from beginning.  Our proposal is to take

9    the Citizens Review Committee that meets in public, the Police

10   Review Board that meets in private and try to merge them so it

11   is all in public.  The original proposal from the City was to

12   merge them all and put them in private.  That was not

13   acceptable to anybody.

14          Incidentally, the testimony that you heard that the

15   new recommendation is to limit public input at appeals

16   hearings, it is actually to eliminate public input at appeals

17   hearings.  Other people call that "the Cop Watch clause,"

18   because they don't like hearing us talk.

19          I know you have been listening.  I also know that

20   Dr. Rosenbaum is supposed to be holding a town hall meeting at

21   six o'clock.  I know he is not starting it because I know he is

22   behind me right now.  I would like to get to that myself

23   because I have some comments on that.

24          THE COURT:  Hand those comments to my courtroom

25   deputy.

1          MR. HANDLEMAN:  Yeah.  We will type up some more

2    comments.

3          The video that was shown, nobody is going to dispute

4    that those were moving stories.  You heard moving stories here

5    from people who were at City Hall.  I left City Hall early that

6    day because City Council had shut us out, voted on a contract

7    without taking public input.  I watched the video of the people

8    being pushed down the stairs.  That's even more emotional for

9    me to watch.  But we weren't allowed to bring that in the

10   courtroom.  We didn't know they were preparing something like

11   that.  I would have brought that video.

12         I think that's the way the City plays it:  Look at

13   these great things.  But they never admit things aren't going

14   well.  That's what we need to hear.  I think the way to fix all

15   the problems we have talked about today is to engage in active

16   listening.  Even if they disagree with it, they can say thanks

17   for that idea you had about whatever it is to show that they

18   heard what you said.  That's a good step forward to do some

19   active listening, City.  I am really encouraging that.

20         I just want to let you know also there are seven

21   members of the Portland Cop Watch here today to observe these

22   hearings.  A lot of people think I do this work alone.  I

23   don't.  I appreciate my group and all the support they have

24   given to make these analyses possible and our work possible.  I

25   will send in more stuff in writing because I know you want to

1    get on.

2           THE COURT:  Thank you very much, Mr. Handleman.  I

3    look forward reading to whatever you submit.

4           All right.  We will have Trudy Cooper, Mike Schumann,

5    and then Commissioner Fritz.

6           MS. COOPER:  Thank you, Judge Simon, for the

7    opportunity to speak.

8           I would like to speak to two things that you raised

9    that I thought were challenges to all of us -- one of them

10   being the 30, 60, 90, whatever -- it is being called the status

11   conference.  Then the second being how to have a dialogue about

12   how to have a dialogue.  I think those two are very related

13   because I think they have the same source, the resistance to

14   them has the same source.

15          The way I was hearing what you were proposing was

16   like a pause and assess, an opportunity to say where the

17   progress was at this point, to take stock of where you are.

18   The way I think it is heard instead is an opportunity to pause

19   and be judged or pause and be condemned or pause and be graded.

20          I think that the City sees itself in a adversarial

21   role in relation to the community and also in relation to your

22   role, and I will always recall in the Council meeting when the

23   Council was considering making a decision -- was making a

24   decision that they wanted to challenge your role and to have it

25   be this role that we have here today.  The "pre-hammer role" is

1   what we have anyway.  But one of the commissioners said, "It is

2   as if we're on probation."  It's as if we are all on probation.

3   We all, as Joe Walsh said, have had a contribution to the

4   adversarial atmosphere that exists.  We can all reflect and

5   have that dialogue about how to have a dialogue.

6        THE COURT:  Let me respond to that briefly, because

7   on this probation point, remember how we all started here

8   two-something years ago.  The United States Department of

9   Justice filed a lawsuit.  It was against the City.  The City

10  had every right to defend itself and to go to trial.  Instead,

11  they chose not to, and they chose to enter into a settlement

12  agreement.  That is not at all uncommon.  But it is their

13  decision.

14       They entered into a settlement agreement, and now

15  we're talking about implementing the settlement agreement.

16  Part of that settlement agreement included continuing court

17  oversight to ensure that all of the terms of settlement

18  agreement were being complied with, because everyone recognized

19  they couldn't comply with it instantly, and we're just

20  implementing the settlement agreement.

21       So no one is really on probation.  Frankly, what

22  we're doing is implementing the parties' agreement.  The

23  United States Department of Justice and the City of Portland

24  both acted very responsibly in entering into an agreement.

25  Part of that calls for the Court to keep jurisdiction over the

1    case, and that's all we are doing.

2            So I hope nobody really does view it as probation,

3    because it really is the parties have entered into an

4    agreement, and they have brought the Court into that.  And I'm

5    just following my role under the agreement.

6            MS. COOPER:  Right.  What I'm saying is I think that

7    should be the frame of reference; that it is an iterative

8    process; that the settlement agreement is an iterative process.

9    We can all think about it together.

10            But if we want to have dialogue, we have to have

11    processes that use the arts of dialogue.  We don't have that.

12    As Tom was saying and as Philip was saying, in pockets we have

13    that.  Left on their own, they can have a meeting.  Sometimes

14    it is rough.  But it happens.

15            But in the City overall we don't have that kind of

16    sponsorship or trust.  It is an adversarial atmosphere.  But we

17    could have that.  The tools for genuine dialogue are known.

18    They exist.  They are well tested.  We could do that.

19            I'm hoping that that is what we are going to do.  You

20    challenged us to figure out how to engage people so that they

21    don't feel their only option is to clam up or blow up.  I know

22    we can do that.  Thank you.

23            THE COURT:  Thank you.  I agree with you.

24            All right.  Mike Schumann, please, and then

25    Commissioner Fritz.

1            MR. SCHUMANN:  Your Honor, my name is Mike Schumann.

2    I am a former attorney, now retired, and I have been

3    volunteering with an organization called Portland Cop Watch.

4            I will try to be brief.  I want to talk about

5    Dr. Rosenbaum's testimony.  He has a great system for finding

6    police officers that are using excessive force repeatedly.

7    Then what happens, after they are identified and disciplined,

8    is they then file a union grievance and then they go to

9    arbitration.  Arbitration, under the Portland Police contract,

10   based upon the things that they've done in the past, in the

11   past they've never found officers in any kind of problems where

12   they give them serious discipline or terminate them.  They

13   don't terminate them.

14           So the result of that is, even though Dr. Rosenbaum

15   has this great system, the result of that is going to be that

16   nobody gets disciplined.  If you have an organization and the

17   people at the top -- there was an officer that got fired by the

18   mayor and the former police chief, for good reason, because he

19   shot somebody he shouldn't have shot and killed him.  He went

20   to union arbitration, he filed a grievance, and they put him

21   back on the force, and that's where he is today.

22           This problem with the City isn't going to get solved

23   until somebody deals with that.  For the City to go and do what

24   they did, which is in rapid-fire succession they suspended the

25   COAB and then they secretly negotiated the union contract, put

1    in that same system of arbitration that has been the problem

2    year after year, and then they decided they were going to

3    reform the IPR.

4              In fact, I don't see good faith over here.  I don't

5    see good faith on how they could have signed that union

6    contract and put that same arbitration clause back in that

7    contract.  They did it secretly, and that's why everybody got

8    mad.

9              Thank you.

10             THE COURT:  Thank you, Mr. Schumann.  I appreciate

11   your comments and being here.

12             Commissioner Fritz, welcome.

13             COMMISSIONER FRITZ:  Good evening, Your Honor.  Thank

14   you so much for hearing us and thank you for setting up this

15   process for having this annual check-in.  I was nervous about

16   it.  What I've seen this afternoon and tonight means you were

17   absolutely right.  So I'm glad we are having this conversation.

18             I want to, first of all, just put some information

19   into the record.  The body cam money was just set aside.  It

20   has not been spent.  Council would have to have a public

21   hearing on whether to have body cameras.  Then we would need to

22   have another public hearing on which kind of body cameras.

23   Then we will have a third one -- maybe we will be combining

24   them -- on which what should the rules be.  So it has been in

25   some ways helpful that we have had so much controversy over the

1   past month because all of those things have come to light, and

2   we now know what needs to be fixed, at least some of them.  So

3   thank you for that.

4           Second, one of the things that people don't know

5   about the contract we just got is that the union agreed to a

6   standard discipline guide.  So what was mentioned by the person

7   who testified before, that's how it used to be.  The mayor has

8   fired 12 members of the Police Bureau since he has been in

9   office.  Chief Marshman has fired four just since he has been

10  the chief.  Those will stay fired because the union in the

11  contract, through their grievances, has agreed to the

12  discipline guide.  So the standard is no longer what did we do

13  previously.  It is if you did this, then the discipline guide

14  says you get this.  The union has agreed to that.

15          So that, coupled with the 48-hour rule going away, I

16  think those are two of the main things that we really needed to

17  fix in this contract.  That's why I am enthusiastically

18  espousing on it.

19          You very kindly said that you would listen to all

20  sides.  The Council is not on trial for what happened with the

21  contract, nor is City Hall.  There have been many complaints

22  filed with the Independent Police Review, and the mayor has

23  promised a full report on that.  I'm sure everyone will have

24  the opportunity to do that.

25          I wanted to tell you that every Wednesday Council

1    convenes at 9:30 in Council chambers.  Everybody is allowed in.

2    You said very clearly in another case that even people who were

3    disruptive -- causing a disruption yesterday could not be kept

4    out the next day.

5            THE COURT:  What I said was that anyone who was

6    disruptive in a meeting may be removed by the chair or the

7    presiding officer for that meeting.  You are not allowed to

8    disrupt a meeting.  However, you may not be punished so as to

9    be precluded from attending future meetings.  But if you were

10   to attend a future meeting and be disruptive, the presiding

11   officer has every right and every legal authority to remove

12   someone who is being disruptive from that meeting.

13           COMMISSIONER FRITZ:  Thank you, sir.

14           So we did take hours of testimony on the police

15   contract, and we had to stop because various members of the

16   Council had other things they committed to.  So everybody who

17   was still supposed to speak but had signed up was allowed to

18   speak at the next one.

19           I've lost track of which particular meetings got

20   disrupted.  I do remember one, though, where people signed

21   up -- five people can sign up for citizen communications on any

22   Council calendar.  The fourth person was a Franklin High School

23   Russian teacher who wanted to introduce to the Council and

24   community a visiting dignity from Russian.

25           Thank you.  I am very nervous.

1          THE COURT:  By the way, one of the things that we all

2    do when we are nervous is we speak too quickly, and I am really

3    sympathetic to our court reporter.

4          COMMISSIONER FRITZ:  And I should breathe

5    occasionally.

6          The protestors disrupted that testimony.  So we did

7    exclude that person who was disruptive.

8          Then the next one was the proclamation cerebrating

9    Filipino-American month, and the assembled dignitaries of the

10   Filipino-American community were not able to speak because so

11   many people were disrupting the meeting and saying, "Get to the

12   police contract.  Get to the police contract."  So over and

13   over again they have been disrupted.

14         Then also there is staff at City Hall that are not

15   assigned to be in Council chambers who are supposed to be doing

16   work in their various offices, including the auditor's staff

17   and the IPR staff.  We've had situations where we have had

18   hundreds of people in City Hall with doors locked just banging

19   on our doors and not letting staff do their work, and it is

20   really frightening.

21         So we appreciate your suggestion to have a

22   conversation without a particular topic, but just a

23   conversation about how to have a conversation.

24         With respect, Your Honor, I don't think we are

25   supposed to do that if we are supposed to come back in 30 days

1   for how we are going to move forward with the COAB.  I helped

2   set up the rules for the COAB when Mayor Sam Adams was

3   negotiating with Amanda Marshall, and so I take full

4   responsibility for the fact that this hasn't worked, despite

5   all of our best efforts.

6           I don't know what to do to make it work.  You said

7   that we are not probation, but in a way we are because it is

8   our police force that has to change.  It is our community that

9   has to begin to trust our police.

10          So I was asked to not be very much involved with the

11  COAB in its first stages so they could figure out amongst

12  themselves what they wanted to do.  Yet there is that:  Do they

13  report to the COCL?  Do they report to you?  They certainly

14  don't report to me, but then they expect the City to respond to

15  their requests.

16          Mr. Steenson said they've developed dozens and dozens

17  of recommendations.  It is not clear to me at least whether

18  that's in the settlement agreement.  I do know that we don't

19  have a formal community engagement oversight plan, which is in

20  the settlement, and so it would be really helpful -- if we do

21  come back in 30 days -- for you to tell us what should the COAB

22  be focusing on.  How should we appoint the members?  Even in

23  the AMAC's summary to you they said "to be determined," in

24  terms of how do these people get selected.

25          Four members of the Council have had their members

1    resign.  Each of them have said they can't in good conscience

2    ask somebody else to come in when they don't know what they are

3    doing, they are subject to verbal abuse at every meeting, and

4    the scope of work is at least 20 hours every month, not ten,

5    and so I would appreciate your direction.

6            THE COURT:  Although let me just respond to it this

7    way, and, then, of course, we will let counsel think about this

8    as the days proceed.  We have a lawsuit here between primarily

9    the United States and the City of Portland.  It settled with a

10   settlement agreement where the parties have agreed to continued

11   court jurisdiction.  I will do whatever the parties ask me to

12   do; footnote, provided that it is constitutional and otherwise

13   legally appropriate.

14           If the parties come together and give the Court a

15   question, an assignment, and ask me to provide direction, I

16   will do whatever the parties jointly ask me to do.  But until

17   then, and unless that happens, this is the parties' settlement.

18   The parties are to work together.  If the parties working

19   together want to go ask a third party to do something, they can

20   do that.  If they want to ask the Court to do something, they

21   can do that.

22           But if they don't agree, then the only real vehicle

23   that is left under the law is for the United States to file a

24   motion before me.  If they file a motion, I'll go through

25   appropriate due process and give everybody an opportunity to be

1     heard.  I will give the best decision that I can, consistent

2     with the law and the facts.  Whoever doesn't like my decision

3     will have an opportunity, to the extent the law permits, to

4     appeal that, and that's how we proceed.

5              So you can ask me to do something, and that's fine.

6     But my suggestion back to you is:  Ask the City -- through

7     their counsel -- to discuss this with the plaintiff, the United

8     States -- through their counsel -- and if the parties jointly

9     ask me to do something, I will do it.  Footnote:  Assuming it

10    is legal.

11             COMMISSIONER FRITZ:  Thank you, sir.  And I feel the

12    same way.  I am sorry that we haven't gotten further than we

13    have.  I'm sorry that at the beginning of this meeting, this

14    hearing, we heard a lot about partial compliance and

15    substantial compliance, and the big part that's not compliance

16    is the part that I feel responsible for, which is the community

17    engagement.

18             I need to know either from the four parties or you or

19    both what you want me to do and what authority do I have then

20    to do it.  And do I stay away?  Do I guide them?  And the

21    Council needs to know what are we going to be asking our

22    appointees to do when we appoint them.

23             The other piece I would like everybody to consider,

24    in terms of a timeline, we do have a new mayor coming in on

25    January 1st.  He will be the police commissioner, and he has to

1    buy into whatever it is we decide.  So I would really like to

2    have him involved in setting the course for the next year of

3    the COAB.

4            THE COURT:  Not to set an inappropriate tone on that,

5    whether he buys in or not, he is legally bound to the

6    settlement.

7            MS. OSOINACH:  Your Honor, I would like to step in

8    here because Commissioner Fritz has been a warrior for the

9    COAB.  So I think what I am hearing and what I might ask is

10   that the City wants to take ownership of this.  While I

11   appreciate the Court's willingness to set deadlines and have

12   this come before you, there are a number of complicated

13   factors, and so what we would like is to be able to talk to the

14   Department of Justice, the AMAC, the PPA, the COAB, the COCL,

15   and if we need to come back before this Court for a status

16   conference, we would like to be able to at least to confer

17   other than the five minutes that we have been given to come and

18   ask you and to do that.

19           THE COURT:  I will turn to Mr. Geissler in a moment.

20           Let me respond to one aspect you just said.  The

21   reason why we don't have a court monitor in this settlement

22   agreement is because the parties, when they negotiated the

23   settlement agreement, didn't want a court monitor.  If I recall

24   the arguments that were being made to me two years ago in the

25   fairness hearing, the City said that they want to take

1    ownership of this, and that's why they were the ones who would

2    be contracting with the COCL and ultimately forming the COAB.

3             I approved the settlement as fair, reasonable, and

4    adequate.  It may not have been perfect.  It may have had some

5    mistakes, in hindsight, but on balance I concluded that it was

6    a fair, reasonable, and adequate resolution of the problems

7    identified in the complaint.

8             We are all now bound to the settlement agreement and

9    follow its procedures.  But I do react when you say that the

10   City wants to take ownership, because that's what I heard two

11   years ago for the reason why we don't have a court monitor,

12   which I approved, and it is too late to go back in that river.

13            MS. OSOINACH:  Your Honor, to be clear, the City has

14   taken ownership, and I appreciate very much your comments today

15   recognizing.  We are talking about one area, an important area

16   of the settlement agreement.  It is not fair to say, as

17   Ms. Saadat pointed out, that there hasn't been progress made

18   with the COAB; that the City hasn't taken ownership.  There

19   have been enormous challenges, and we are continuing to work on

20   them.

21            THE COURT:  I agree.  As we've heard today, including

22   the United States in its opening remarks commented, there has

23   been some tremendous achievements already accomplished under

24   the settlement agreement.  All parties should be commended for

25   moving us forward in the positive way that we have already

1   moved forward to achieve.

2          However, we all recognize there is more work to be

3   done, as the United States in both their written in oral

4   comments, have identified.  There are some aspects, including

5   an important one, where there is non-compliance with the

6   settlement agreement.

7          Now, in addition to the parties figuring out how we

8   continue to move forward and accomplish that which the

9   settlement agreement was designed to achieve, we also need to

10  be mindful, or at least we start with the parties, be mindful

11  of what we should do about the non-compliance and when should

12  we do it.

13         With that, I will hear another comment from

14  Ms. Osoinach and then turn to Mr. Geissler.

15         MS. OSOINACH:  The City is standing before you today

16  with the recognition that is an area in which we are

17  non-compliant, and I applaud Commissioner Fritz, my client, for

18  her willingness to stand before you today and discuss the

19  challenges that we face, and I will allow her to finish her

20  comments.

21         THE COURT:  That's between client and lawyer.  I'm

22  staying out of that one.

23         COMMISSIONER FRITZ:  I just wanted to repeat the

24  City's commitment, my commitment, and you make a good point.

25  The new mayor doesn't have a choice about this, and I have been

1   telling him that ever since he started running.  So if we had

2   some time to do it properly, because what I heard especially

3   from Ms. Saadat, if we are pushed into deadlines, then

4   community members -- and that's the other thing to remember.

5   These are volunteers.

6          I'm told often we are not appointing new council

7   members.  I can't make a volunteer show up to ten meetings.  So

8   that's where we have got to be very clear, so it is something

9   that my colleagues can actually go to somebody and say, "I bet

10  you would want to do this, this is what you are going to do,

11  and this is what the product is."

12         At this point I don't think we are quite there.

13  Thank you so much.

14         THE COURT:  Thank you, Commissioner.  I appreciate

15  it.

16         Mr. Geissler.

17         MR. GEISSLER:  Thank you, Your Honor.

18         I was remiss in not giving my thanks to all of the

19  members of the community with whom we have worked and are

20  parties and their counsel who we have worked with over the past

21  two years.  It has been a pleasure to work with them.  I will

22  offer one slight correction.

23         My learned colleague, Mr. Karia, said that he

24  believed that we all are in agreement that body-worn cameras

25  were a mandatory subject of bargaining.  The United States does

1   not believe that.  It is a permissive category of bargaining,

2   just as it has not been mandatory subject of bargaining, mobile

3   video cameras or other surveillance cameras that have been used

4   heretofore.

5           THE COURT:  So the record is clear on this, I am not

6   expressing an opinion on that.  That issue is not before me.

7   If it ever does come before me, I will be glad to review

8   briefing, hear oral argument, make whatever ruling is

9   appropriate at the time, but I've expressed no opinion on that

10  question.

11          MR. GEISSLER:  Thank you, Your Honor.

12          With respect to the issue of status conferences, I

13  believe the time we had to speak was abbreviated.  There is

14  room still to come to reach an agreement, both on the

15  scheduling and the mere logistics of the holidays that we face

16  now.  I believe the parties would benefit with the ability to

17  speak with one another before providing Your Honor the

18  proposition of setting dates on Your Honor's own.

19          THE COURT:  I wouldn't think it would be appropriate

20  for me to set a deadline of when counsel will respond to me on

21  additional scheduling issues.  Does that sound reasonable, and

22  if so what, what would you propose?

23          MR. GEISSLER:  It does.  I am in town this week,

24  Your Honor.  I imagine we can speak this week.  Perhaps one

25  week from day we can have the agreements from both the Civil

1   Rights Division, the U.S. Attorney's Office, as well as the

2   other parties.

3            THE COURT:  All right.  I don't think I need to right

4   now today, although I will if you want, set another annual

5   status conference for next year.  But perhaps what the parties

6   can do is think about what they would like to see in the next

7   twelve months.  If it turns out a status conference in X number

8   days or every month or every other month or quarterly, you talk

9   about it and let me know what you want.

10           I could set a conference now, a public hearing, or

11  our third annual hearing for the fall of 2017, or I could wait

12  and let the parties discuss and see how it fits into the big

13  picture.  I will tell you this, though, that there will be no

14  fewer than one meeting per year.  It does sound like there will

15  also be several interim meetings between now and next fall.

16           Should I set next fall's meeting now or should I wait

17  and see what you all want to talk about?

18           MR. GEISSLER:  Without providing too daunting a task

19  for our one-week assignment -- I don't want to withdraw my

20  offer of that one-week deadline -- I think perhaps we could

21  spend some of our time talking about the proposed schedule

22  going forward so that the City and the other parties can come

23  to an agreement when best to have a hearing and set the

24  briefing schedule.

25           THE COURT:  Very good.

1              MS. OSOINACH:  Your Honor, from the City's point of

2    view, we request that you set the annual status conference

3    today, mainly because when you did that last year, it provided

4    advance notice to everyone, including members of the public who

5    were here, and I found that to be very helpful.

6              THE COURT:  Very good.  Does Thursday, October 5th,

7    2017, work for counsel?  2017.  Feel free to check.

8              MR. GEISSLER:  Yes, Your Honor.

9              MS. OSOINACH:  Yes for the City, Your Honor.

10             MR. KARIA:  Yes, sir.

11             MS. ALBIES:  Yes, sir.

12             THE COURT:  All right.

13             Then let's set our next conference.

14             Our next annual conference -- I forgot to ask Mary.

15             Mary, do you agree that will work?

16             THE CLERK:  Yes.

17             THE COURT:  October 5, 2017 at 10:00 a.m. in this

18   courtroom.  I look forward to receiving -- probably the best

19   thing to do is file it as a formal publicly filed document,

20   either as a status report or a request for the next conference.

21   File something after you have conferred.  If you would like to

22   know about the Court's availability before you put anything on

23   paper on that, just call or e-mail my courtroom deputy.  She

24   has our calendar, and I will do my very best to accommodate

25   whatever you all have agreed upon.

1            If for whatever reason you can't agree, then let me
2    direct the United States to take the lead in preparing a joint
3    status report stating what is the United States' position.
4    Confer with the City and put in that same document what is the
5    City's position.  Confer with Intervenor Police Association,
6    and let me he know what their position is.  Then confer with
7    Amicus AMA Coalition.  If you agree, I will give you darn near
8    anything you ask for.  If you disagree, I will make a prompt
9    ruling.

10            MS. OSOINACH:  Thank you.

11            MR. GEISSLER:  Thank you.

12            THE COURT:  All right.  As I think I said earlier
13    today, I thank everyone for their hard work and their
14    tremendous accomplishments so far.  There is more to do, as you
15    all know and as you all recognize, but we have come a long way.
16    There is more work to do, but I think we all live in this
17    community together.  I am sort of including the COCL in that,
18    even though I understand what you said geographically.

19            We all live in this community together.  We are
20    trying to solve an important problem to make things better for
21    everyone.  We have different perspectives, different
22    experiences, different views on how to make things better.  But
23    I do believe that everyone in this room is trying to make
24    things better for everyone, and I appreciate everyone's hard
25    work in this.

1          Thank you.  We will be in recess.

2          (Recess.)

1                              --oOo--

2

3            I certify, by signing below, that the foregoing is a

4    correct transcript of the record of proceedings in the

5    above-entitled cause.  A transcript without an original

6    signature, conformed signature, or digitally signed signature

7    is not certified.

8
     /s/ Dennis W. Apodaca                    November 5, 2016
9    DENNIS W. APODACA, RDR, RMR, FCRR, CRR              DATE
     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25