

**Office of the Compliance Officer and Community Liaison (COCL)**

**Rosenbaum & Associates, LLP**                          COCL Office:
Dennis Rosenbaum, Ph.D.                         525 NE Oregon Street, Suite 250
Thomas Christoff, Ph.D.                              Portland, OR  97232
Amy Watson, Ph.D.                                      www.cocl-coab.org
Geoffrey Alpert, Ph.D.              rosenbaumandassociatesllp@gmail.com
Heather Daniel, J.D., B.A.
Ashley Heiberger, J.D.
Megan Mohler, M.A.
Amy Ruiz, B.A.

December 7, 2017

Transmitted by E-mail to:

The United States Department of Justice
The City of Portland

Re:      **Compliance and Outcome Assessment Report for 2017**

Dear U.S. Department of Justice and City of Portland:

On behalf of the entire Compliance Officer and Community Liaison (COCL) team, I am pleased to submit the attached *Compliance and Outcome Assessment Report of the Compliance Officer and Community Liaison*, pursuant to paragraphs 162, 163, and 173 of the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

The draft report was revised based on comments from community members. We thank them for taking the time to review and improve the report. A copy of this report will be posted on the COCL's website, www.cocl-coab.org and sent to our email updates list.

Sincerely,

Dennis P. Rosenbaum, PhD
For Rosenbaum & Associates, LLP
Compliance Officer and Community Liaison, Portland OR

**EXHIBIT A**

# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

## of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**January through September, 2017**



# Table of Contents

**INTRODUCTION**................................................................................................................1

**EXECUTIVE SUMMARY**................................................................................................. 3

**III. USE OF FORCE** ....................................................................................................... 12

**IV. TRAINING**................................................................................................................. 48

**V. COMMUNITY-BASED MENTAL HEALTH SERVICES** ................................................. 72

**VI. CRISIS INTERVENTION** ........................................................................................... 72

**VII. EMPLOYEE INFORMATION SYSTEM** ...................................................................... 97

**VIII. OFFICER ACCOUNTABILITY**................................................................................ 106

**IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD** ......................................................................................................................... 120

**X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT** ....................................... 130

**OVERALL REPORT CARD** ........................................................................................... 134

**LIST OF ABBREVIATIONS**.......................................................................................... 138

**LIST OF PERSONNEL** ................................................................................................. 140

**APPENDICES** ...................................................................................... See Second PDF

# INTRODUCTION

This is the Compliance and Outcome Assessment Report of the Compliance Officer and Community Liaison (COCL) for the period of January through September of 2017, as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (hereafter referred to as "DOJ"). By agreed of the Parties, this report combines the COCL's compliance assessment and outcome assessment into a single document. COCL Compliance Assessment Reports are required by Par. 162 of the Agreement and "shall specify: (a) the methodology and monitoring activities employed; (b) the COCL's assessment of compliance for each paragraph; and (c) the COCL's recommendations regarding necessary steps to achieve compliance, as warranted" (Par. 162). Each of these requirements is included within our assessment.

The Outcome Assessment is required by Paragraph 173, which states that the COCL shall lead "qualitative and quantitative outcome assessments to measure whether the City and PPB's implementation of this Agreement has created: (1) capable systems and resources for responding to persons in mental health crisis; (2) competent accountability and oversight systems; (3) effective training for police officers that increases the knowledge, skills and abilities necessary for effective and successful delivery of service to persons in mental health crisis; (4) proper management of the use of force to meet constitutional standards; and (5) robust systems of community engagement." (p. 66). The COCL has decided to use this "systems" framework to structure each section of this report, since the ultimate goal for the City and PPB is to develop and successfully implement these various systems of accountability and service delivery that can be institutionalized.

<u>Report Card</u>

As with previous COCL Compliance Reports, this report includes a "Report Card" on the implementation of the Agreement which provides an assessment of each paragraph in the Agreement (see Overall Report Card on page 134). For each paragraph where sufficient information is available to render a decision, the Report Card provides an overall judgment on a 4-point scale, ranging from "Non-compliance" to "Substantial Compliance." The Portland Police Bureau (hereafter referred to as "the PPB") and the City of Portland (hereafter referred to as "the City") have made dramatic progress towards compliance in 2017, although more work is needed in specific areas to achieve "substantial compliance." The COCL will continue to work with the PPB and the City as they move forward, providing consultation, analysis, technical assistance, and assessment in areas where substantial compliance has yet to be achieved.

When reviewing the specific paragraphs, we utilize a four-tiered system of evaluation:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.

- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.
- Non-Compliance: The City/PPB has not made any meaningful progress towards the satisfaction of the provision's requirements.
- Not Yet Assessed: The COCL team has not had the opportunity to fully assess the requirements of the provision and elects to withhold assessment of compliance until a more thorough review has occurred.

# EXECUTIVE SUMMARY

In 2017, the City and PPB made dramatic progress toward satisfying the requirements of the Settlement Agreement. In this executive summary, we summarize the progress to date for each of the eight (8) major sections of the Agreement and identify work that remains to be done by the City and PPB. The reader should not assume, however, that this summary covers all changes required in the Settlement Agreement and therefore, should refer to the full report and appendices for additional details and explanations of our assessments.

## III. USE OF FORCE

In this section, we provide an evaluation of whether PPB and the City's implementation of the Settlement Agreement has created "proper management of the use of force to meet constitutional standards" (Par. 173) based on their level of compliance with the paragraphs found within Section III of the Agreement. Compliance is achieved primarily through changes in policy and the regular monitoring of PPB's uses of force through internal auditing systems and other mechanisms. We assess both policy and monitoring in this section.

PPB is required to make a number of changes to their Directive 1010.00 (Use of Force). The revised Directive 1010.00 now includes a cluster of related, but previously separate, policies. For nearly all of the force-related policy requirements found in the Agreement, we were able to identify specific sections of PPB's revised Directive 1010.00 wherein the requirement was incorporated. PPB's policy team has worked closely with DOJ and COCL to revise the directives over many months. Together, and with input from the community, PPB produced numerous revisions to existing directives in order to be responsive to the Settlement Agreement.

Verbatim changes to Directive 1010.00 comply with the language of the Settlement Agreement. However, PPB is expected to implement these changes, which includes appropriate training and auditing (see Par. 33). Hence, we have included in the Force section a large table that summarizes our assessment for each requirement of Subsection A of the Settlement Agreement as well as the policy section of Directive 1010.00 posted to PPB's website. For many of the provisions, we hold reservations about whether officers have been sufficiently trained on the requirements and whether the requirements have actually been enacted in practice. As one example, the new Force directive accurately describes de-escalation techniques, but our review of various cases appears to indicate that PPB's interpretation of de-escalation in practice often includes command and control tactics aimed at producing immediate compliance based on the threat of force (we discuss this issue in greater detail in Section IV, Training). We recommend that PPB provide officers and supervisors with supplemental training on de-escalation, the signs and symptoms of mental illness, tactical handcuffing during a Conducted Electronic Weapon (CEW) cycle, and for supervisors, their responsibilities pertaining to force investigations.

PPB is required to audit force reports and After Action Reports (by supervisors) to ensure that they are complete and contain adequate information for supervisors to evaluate the officers' decision making during the force event. In consultation with COCL, PPB developed a two-phase force audit. Our conclusion is that PPB has done an excellent job of building a Phase I review system to ensure that force reports are complete, accurate and reviewed by supervisors within the chain of command. Using the data available to date, PPB has been able to evaluate levels of compliance with Phase I and have recently revised their reporting format for Force Audit findings to make them more readable. Results have been able to identify common deficiencies at the organizational and precinct levels and can be used for targeted training for improved completeness and accuracy of reports.

The goal of Phase II is to incorporate an independent review of the force reporting and assessment outside of the chain-of-command and determine whether actions were within policy, constitutional, and represent good policing. Although our initial impressions of the Phase II methodology have been positive, the methodology has not been implemented for a long enough time for us to be confident in the results. A more extensive review of force cases by COCL and DOJ is needed to be sure the auditing function is working well and can be validated by outside sources.

## IV. TRAINING

In reference to Section IV of the Settlement Agreement, we examine whether PPB has been able to develop and implement a system of "effective training for police officers that increases the knowledge, skills and abilities necessary for effective and successful delivery of services to persons in mental health crisis" and that contributes to the "proper management of the use of force to meet constitutional standards" (Par. 173).

A effective training system, as established in the Settlement Agreement (Paragraphs 78 to 87), is one where PPB has the capacity to: (1) identify areas where officers require training (needs assessment), (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; and (4) audit the overall training system to ensure that it is accountable to the administration and to the public. Our assessment covers each of these areas:

First, the PPB has created a reasonably good needs assessment system that helps to identify issues and topics where additional training would be beneficial. PPB should also assess whether the Needs Assessment is useful to all trainings (for example, ECIT) and consider using evaluations of past trainings, as well as findings of the Force Audit, to identify additional training needs.

Second, PPB has made considerable strides in 2017 toward developing a legitimate system of training evaluation, using multiple methods to achieve this objective. However, the system is

still in its infancy and the administration of in-class surveys and knowledge tests should consistently follow a protocol to ensure the validity of the data (e.g. no talking while surveys are being administered). Used with only one scenario, the skills test has not been adequately field tested to know whether it will yield reliable data about officers' interactional skills. Nevertheless, PPB has been willing to introduce these methods based on our recommendations and the Training Division is beginning to test and refine them.

As a tool for tracking training and ensuring that it is accountable to all stakeholders, PPB has made significant progress by securing a new Learning Management System (LMS) and hiring a full-time LMS manager. The next step is to populate the LMS with Training Division curricula, lesson plans, training delivered, and attendance rosters for all classes. This electronic system represents a major upgrade from file cabinets and hard copies. Our hope is that the LMS will also be used to document student performance, including knowledge test, range qualifications, scenario proficiency scores, and certifications for all PPB members, as well as student evaluations of particular classes.

Third, and most importantly, is the development and delivery of appropriate and high-quality training for new recruits, officers and supervisors. Here we believe PPB has achieved success in many areas, but not all. In the past, we have written positive reviews of PPB's Advanced Academy training for new recruits. Recently, we took a close look at PPB's general In-Service Training. The primary thrust of this 20-hour program was to train officers regarding specific changes to the language of the Force directive 1010.00. This effort was largely successful, as demonstrated by the in-class coverage of the directive and by students' in-class quizzes and tests. However, whether that knowledge can be translated into practice remains to be seen. The In-Service role-playing scenarios were well designed and executed overall. The content of the training, however, leaves room for improvement. In previous reports, we have called upon the PPB to give greater emphasis to building verbal communication and de-escalation skills that are essential for preventing or minimizing the use of force and to treat people with respect and dignity. To date, however, insufficient time and quality instruction has been devoted to these important behaviors. A large portion of time was spent on conventional training - firearms qualification, defensive tactics (takedowns), rescuing an injured victim, and applying bandages to wounds – all important and perishable skills – but this left little time to cover other topics also important to the Settlement Agreement.

After careful consideration, we maintain that PPB needs to rethink their presentation of de-escalation and procedural justice to be more consistent with best practices. PPB has chosen to focus on de-escalation during a force event (e.g. commands and warnings) rather than de-escalation before a force event (e.g. calm and empathic communication). PPB officers have been well trained to use force techniques to interrupt the force event and keep it from escalating further (via coercive compliance techniques), but given less training in preventing situations that require the application of force. By using non-threatening verbal de-escalation techniques up front, some portion of force events can be prevented altogether. In general, de-

escalation techniques are those utilized to calm an agitated subject, promote rational decision making and gain <u>voluntary</u> compliance that is not based on fear. They can and should be applied in a wide range of encounters beyond those involving a person in a mental health crisis. Some of these techniques were covered during the spring 2017 In-Service, but opportunities to practice these skills have been very limited.

The current In-Service training is not an adequate replacement for supervisor training, which should provide more in-depth coverage of the important roles of supervisors in force events, Crowd control, EIS, vehicle pursuits, and other police operations. Police organizations rely on first-line supervisors to successfully execute many of these complex functions, especially the more high-risk activities. As such, supervisors need the opportunity, in a training setting without other ranks present, to ask questions and discuss supervisory issues among themselves and with trainers.

Fourth and finally, PPB's Training Audit Plan is comprehensive and ensures that the requirements of the Settlement Agreement will be addressed in a reasonable manner. Substantial compliance will be achieved when the PPB: (1) has implemented this plan with integrity (i.e., has made a good faith effort to collect the proposed information) and (2) can report a reasonable level of success (i.e. is able to create, sustain, and utilize record keeping systems and databases in a manner that yields useful information for most of the identified training domains).

## V. and VII. COMMUNITY-BASED MENTAL HEALTH SERVICES and CRISIS RESPONSE

Here we looked at whether PPB and the City have created "capable systems and resources for responding to persons in mental health crisis" (Par. 173) based on their level of compliance with the paragraphs found within Section V (Community-Based Mental Health Services) and Section VI (Crisis Intervention) of the Agreement.

In terms of community-based mental health services, the requirements under Section V are directed towards entities <u>external</u> to PPB and the City, and therefore, the Settlement Agreement lacks the legal authority to compel such entities to perform the tasks outlined. Nevertheless, we have seen a number of initiatives wherein PPB has worked with the various mental health groups, some of which focus on service delivery to targeted individuals while others focus on systemic issues at the intersection of criminal justice and mental health. For example, the Behavioral Health Coordination Team (BHCT) is a PPB initiative which meets bi-weekly and includes partners from Multnomah County, Cascadia, community service providers and advocates, and State/Federal law enforcement. After observing these interactions, we are satisfied that PPB understands the importance of local, county, state, and federal partnerships and has taken steps to initiate or gain membership to groups that gather perspectives from various stakeholders to improve their own role in interacting with persons in mental health crisis as well as improve the overall delivery of mental health services.

In conjunction with the opening of the Unity Center, PPB has revised their directives (850.21 – Peace Officer Custody (Civil); 850.22 – Police Response to Mental Health Director's Holds and Elopement; 850.25 – Police Response to Mental Health Facilities) to reflect the practice of private ambulance transport (AMR) for individuals taken into custody on mental health holds.

Contained within Section VI (Crisis Intervention), Subsection A (Addictions and Behavioral Health Unit and Advisory Committee) requires PPB to create a Behavioral Health Unit (BHU) as an avenue for achieving capable systems and resources for mental health response. The BHU is PPB's principal unit for coordinating the Bureau's mental health crisis response in Portland, evaluating the impact of that response, and using evaluations to modify response where appropriate. As a vehicle for complying with the requirements of Par. 91, we assess BHU to be in substantial compliance in that it oversees and coordinates ECIT, BHRT, and SCT and provides input and oversight on mental health training provided to all officers within PPB.

We believe that some PPB systems are capable and useful for mental health crisis response. Regarding the BHU, BHCT, and BHUAC, we believe the structure in place allows for (1) a wide gathering of relevant perspectives to (2) sharing of data and information in a meaningful fashion to (3) provide informed comments and recommendations to PPB so that (4) PPB can incorporate change where necessary and (5) provide an avenue for continuous feedback. We have been impressed by the overall structure and believe that each group contributes to improved mental health response.

Another group is the BHRT, who we feel is an innovative system of response that allows for PPB to stem repeat contacts. As a result of the structure of BHRT, policies which direct its operations, qualifications of BHRT officers, and training of BHRT officers, PPB's mental health response system is strengthened. Similarly, the SCT has consistently been a positive force for PPB and the City. Particularly given the populations with which the program works, the impact of SCT has been commendable.

The Portland Police Bureau has designed a system of mental health response that, while based on the Memphis Model required in Par. 99 of the Settlement Agreement, is unique to Portland. Our analysis looks at: (1) whether the technical requirements of the Agreement have been met and (2) whether PPB has provided sufficient justification for their deviation from the Memphis Model.

First, COCL has concluded that PPB has met most of the technical requirements (e.g. qualifications, selection, participation, training, and duties of ECIT are consistent with the Agreement, Memphis model, and best practices).

Second, there is the more difficult question of whether PPB can provide a sufficient justification for deviating from the Memphis model of crisis intervention. The primary point of departure between Portland's model and the Memphis Model is that ECIT officers do not respond to all calls involving a pre-identified mental health component. Rather, ECIT response is reserved for

a subset of calls that are more serious in nature (e.g. involve violence, weapons, suicide threats).

In July, we met with members of the Bureau and DOJ monitoring team to discuss the Bureau's plan to assess the effectiveness of their mental health crisis response model. We provided feedback on their plan and have continued to provide consultation on evaluation metrics. However, as of this report, a comprehensive evaluation of PPB's mental health response model has not been delivered. As an evaluation is necessary to justify a deviation from Par. 99, we cannot find PPB in Substantial Compliance with this part of the Settlement Agreement. Similarly, with BOEC, a lack of data collection/data evaluation restricts their ability to conduct meaningful self-monitoring. Without such evaluative tools (and without being able to cross-reference each other's data), the overall effectiveness of the City's mental health response system is unknown.

## VII. EMPLOYEE INFORMATION SYSTEM

PPB is required to enhance its Employee Information System (EIS) to "more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" in accordance with the goal of Section VII. Little progress was made during the first two years of the Agreement, but PPB is now moving forward. With new EIS administrators in place, PPB is in the early stages of implementing a system that is data-driven to identify officers, supervisors, and units in order to provide intervention. Upon complete implementation, the identification of at-risk employees, supervisors, and units will be accomplished in two main ways: through mandated supervisory review of EIS records and through data-driven EIS alerts for individuals, supervisors, and units who may have slipped through the cracks otherwise.

The mandated supervisory reviews for officers new to the command, as well as the regular review of EIS records, have not occurred regularly. Additionally, PPB has the capacity for identifying specific units which are not complying, though tracking does not appear to be occurring for the individual units. Where supervisors or units are not complying, those in charge need to be held accountable.

Where we have seen the most progress is in EIS Administrators sending out more alerts for supervisory review (thereby encouraging greater involvement by those who know most about the officers) and in tracking decision-making at each step of the process. Although there is not sufficient data at this point to make a comprehensive assessment of the process, we believe this represents a large step forward in gaining compliance.

For both manners of achieving compliance (mandated supervisory reviews and EIS alerts), we question the degree of training that supervisors have received to fulfill their obligations. We recommend that a Supervisors In-Service be conducted in 2018 that instructs supervisors: (1) *how* to review EIS records (and supervisors' requirement to do so), (2) *how* to review an officer

alert, and (3) *how* best to intervene with an officer to improve their overall performance. Such training is important so that reviews of officers do not become merely a symbolic occurrence.

## VIII. OFFICER ACCOUNTABILITY

In this section, we provide an evaluation of whether PPB and the City's implementation of the Settlement Agreement have created "competent accountability and oversight systems" (Par. 173) based on their level of compliance with the paragraphs found within Section VIII (Officer Accountability). The focus of the opening paragraph for Section VIII is on a due-process model of administrative investigations and argues for an expanded role of civilian oversight as accomplished by "retaining and enhancing IPR and CRC." Our evaluation of this section rests on these two goals - due process and enhanced civilian oversight. As changes to PPB policy and City code have not yet been finalized, we cannot report that these goals have been accomplished.

However, there have been a number of improvements. The groundwork for a due-process-oriented accountability system has been laid, particularly with the changes to allow the investigating entity to recommend findings. However, we continue to see that a fairly high percent of cases have exceeded the 180-day timeline, leaving both officers and community members in limbo as to the status of the complaint. Perceptions of delay can lead to distrust in the process and may potentially have an impact on perceptions of procedural justice.

IPR as an investigative agency is beginning to achieve the goal of civilian oversight and has dramatically increased the number of investigated cases over the last couple of years. Although the caseload has increased, there remains concern about how well IPR staff is trained to conduct investigations. IPR and IA are jointly developing a training program, which should ensure consistent training between the two entities.

Another aspect of the accountability system which we believe conforms to due process and procedural justice ideas is the information supplied to community members and officers regarding their complaints. Particularly with community members, they are able to file in a number of ways, can track their complaints, receive outcomes, and have the ability to appeal to the CRC. Furthermore, enhancements to the process may be facilitated through the IPR complaints submission satisfaction survey, once it is launched. Officers, too, have due process functions built in for them, including the ability to appeal to the CRC and have PRB as a body to provide recommendations for discipline outside of the RU manager and Chief.

As we anticipate significant progress to be made upon the finalization of PPB and City policies in the near future, we are confident that substantial compliance is not far behind, assuming changes are implemented with high fidelity.

## IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD

In this report we provide an evaluation of whether PPB and the City have created "robust systems of community engagement" (Par. 173) based on their level of compliance with paragraphs 141 to 152 in Section IX of the Settlement Agreement, "Community Engagement and Creation of Community Oversight Advisory Board." We believe the goals of the having an enhanced system of community engagement are found within the opening paragraph of Section IX: "Redefining and restructuring existing community input mechanisms to provide for independent oversight of the Agreement, while also enhancing PPB's current community outreach efforts will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety." Thus, the COCL examined whether these goals have been promoted through (1) The transition from the Community Oversight Advisory Board (COAB) to the Portland Committee on Community-Engaged Policing (PCCEP); and (2) PPB's other efforts at community engagement and responsiveness to community concerns.

First, in terms of the transition from the COAB to PCCEP, our report provides a brief history of the community engagement component of the Settlement Agreement as a way to establish some context and help assess compliance. As documented in our previous reports, the original COAB encountered a number of difficulties early on, which hindered progress toward meeting Settlement Agreement tasks, such as developing a Community Engagement Plan. The COAB was placed on recess by the City in 2016 to allow time to rethink the process of community engagement. After the expiration of members' 2-year terms in January of 2017, the City organized a planning and mediation process that involved the City, PPA, the AMAC and the DOJ to discuss how to move forward. The City also undertook an assessment of the COAB experience to inform a new community engagement body structure, which included interviewing past COAB members, stakeholders, community members, and others with firsthand knowledge of the community engagement process. Ultimately, the City developed a new plan for community engagement named the Portland Committee on Community-Engaged Policing (PCCEP), which was provided to AMAC for review. After community input, a revised PCCEP plan was posted on August 18th and ultimately approved by the Portland City Council August 24, 2017. As of the writing of this report, changes to the Settlement Agreement to substitute PCCEP for COAB are still awaiting approval.

At this point, we felt it was best to highlight the key components of the PCCEP plan and determine whether the plan's intent is consistent with the COAB. A full comparison with COAB can be found in Appendix IX-1. In general, we believe the PCCEP and COAB are reflective of each other and the PCCEP proposal is a valid substitute for the original language of the Settlement Agreement. However, until the DOJ and the City's proposed amendments to the

Settlement Agreement are approved and the PCCEP is fully functioning, we cannot find the City or PPB in Substantial Compliance. We are required to base compliance against the paragraphs contained in the current Agreement. When the PCCEP is operational, we will assess compliance based on the existence and success of that group.

Second, we comment on PPB's efforts to engage the community in other ways. Consistent with our documentation in previous reports, PPB has invested a considerable amount of time and effort to reach out to the community on public safety and policing issues and build trust through a variety of initiatives and programs (For details, see PPB's list of community engagement activities on their website. PPB has also sought to be responsive to community complaints, such as inviting community participation in Directive (policy) review and providing red-line versions to facilitate the review. As another example of responsiveness to community complaints, PPB became one of the first large agencies to abandon their Gang List. The list was a collection of suspected gang members, though there was some community mistrust in the way the list was compiled, used, and kept confidential.

We also document PPB's efforts to collaborate with the community in forums and media venues that allow both sides to listen and better understand each other. We consider all of these outreach efforts to be useful components of PPB's overall system of community engagement and we believe they should help to facilitate positive relationships and mutual trust in the future. We continue to document community and police views of each other through structured surveys of these groups.

## X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT

Although not considered a system per se, Section X focuses on the requirement that PPB and the City implement and enforce virtually all of the provisions of the Settlement Agreement. They are required to maintain all "current policies, procedures, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement" (Par. 156). The paragraphs require the implementation of all provisions that involve revisions to policies, procedures, practices, handbooks, manuals, and forms within 180-days. PPB has not accomplished the required revisions within 180-days, though the fault should not be placed solely at their feet, as many entities were involved in this process.

As we have noted elsewhere, the implementation of the above revised items requires supplemental training and audit mechanisms to ensure that changes have taken effect. In some places, we believe that the definition of "implementation" (Par. 33) has been met. In others, there is still work to be done. Our recommendations pertaining to particular policies and procedures are found within the various sections of this report.

# III. USE OF FORCE

| Par. 66 | Partial Compliance |
|---------|--------------------|
| Par. 67 | Partial Compliance |
| Par. 68 | Partial Compliance |
| Par. 69 | Partial Compliance |
| Par. 70 | Partial Compliance |
| Par. 71 | Substantial Compliance |
| Par. 72 | Substantial Compliance |
| Par. 73 | Partial Compliance |
| Par. 74 | Partial Compliance |
| Par. 75 | Partial Compliance |
| Par. 76 | Partial Compliance |
| Par. 77 | Partial Compliance |

In this section, we provide an evaluation of whether PPB and the City's implementation of the Settlement Agreement has created "proper management of the use of force to meet constitutional standards" (Par. 173) based on their level of compliance with the paragraphs found within Section III (Use of Force). The management of use of force is comprised of goals that are indicated in the opening paragraph of Section III and, as such, we use the goals as a template in our overall evaluation of PPB's system. These include "that all force, particularly force involving persons with actual or perceived mental illness:

a) Is used only in accordance with the Constitution and laws of the United States
b) Is no greater than necessary to accomplish a lawful objective
c) Is properly documented, reported, and accounted for
d) Is properly investigated, reviewed, evaluated, and, if necessary, remediated"

These goals are facilitated through changes in policy and the regular monitoring of PPB's uses of force through internal auditing systems and other mechanisms. We assess both policy and monitoring here before commenting on whether the goals have been achieved and whether they have led to an overall system of force management.

**Use of Force Policy**

In Subsection A (Use of Force Policy) of Section III of the Settlement Agreement, PPB is required to make a number of changes to their Directive 1010.00 (Use of Force). The revised Directive 1010.00 now includes policies which were previously contained in Directives 940.00 (After Action Reports), 1020.00 (Firearms), 1025.00 (Police Operations at TSA-Governed Airport Facilities), 1030.00 (Baton Use), 1035.00 (Ballistic Shields), 1040.00 (Aerosol Restraints), 1050.00 (Less Lethal Weapons and Munitions), 1051.00 (Electronic Control Weapon System), and 1090.00 (Special Weapons Use). Thus, the specific requirements for policy change found in Subsection A are now all contained within Directive 1010.00.

For nearly all of the policy requirements found in Subsection A, we were able to identify specific sections of PPB's revised Directive 1010.00 wherein the requirement was incorporated. PPB's policy team has worked closely with DOJ and COCL to revise the directives. Together, and with input from the community, PPB produced numerous revisions to existing directives in order to be responsive to the Settlement Agreement. Although verbatim changes to Directive 1010.00 have complied with the language of the Settlement Agreement, the opening paragraph of Section III (and more broadly, Par. 156) indicates that in order to achieve the listed outcomes of Section III, "PPB shall implement the requirements set out." In the definitions section of the Agreement, Par. 33 defines "implement" as "the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice through the regular use of audit tools." Subsequently, for many of the provisions we hold reservations about whether officers have been sufficiently trained on the requirements, and whether the requirements have actually been enacted in practice. The table below summarizes our assessment for each requirement of Subsection A of the Settlement Agreement as well as the policy section of Directive 1010.00 posted to PPB's website (https://www.portlandoregon.gov/police/article/647779).

| Settlement Agreement Paragraph | Language of Settlement Agreement Paragraph | Location in Policy | Notes |
|---|---|---|---|
| Section III Opening Paragraph | PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to appropriate services where possible | Policy #6 | Although this requirement has been formalized via policy in Directive 1010.00, at this time we cannot say that PPB has succeeded in attempting to avoid or minimize the use of force against individuals in actual or perceived mental health crisis. Although there appears to be greater documentation of such events, we have noted instances where force may have been avoided, though FDCRs and AARs have justified the force based on other factors. |
| Section III Opening Paragraph | PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have a reason to believe are experiencing a mental health crisis | Procedure 1.1

Procedure 1.1.1

Procedure 5.1.2

Procedure 5.4.4 | We carry substantial concerns regarding PPB's training and implementation of "non-force and verbal techniques to effect compliance with police orders" in general as well as with persons in mental health crisis. We have noted numerous cases wherein verbal techniques are often accompanied by a threat or warning of force. We do not believe this complies with the requirement of "non-force." There appears to be large-scale confusion regarding the intent of de-escalation within the Bureau (see below) and the confusion has yet to be adequately rectified through training and the evaluation of force events. We recommend that officers and supervisors receive additional training in this area before we can be |

| | | | confident PPB has substantially complied with this aspect. |
|---|---|---|---|
| Section III Opening Paragraph | De-escalate the use of force at the earliest possible moment | Procedure 1.4

Procedure 5.1.3 | Although we believe that the term "de-escalate the use of force" has been conflated with verbal techniques for de-escalation (see above), we believe that current PPB policy and force evaluation has complied with the officer requirements here. However, we caution PPB to not consider the de-escalation of force as the primary responsibility of the officer in a potential force event. Rather, force avoidance should be stressed. |
| Section III Opening Paragraph | Only resort to those use of force weapons, including less-lethal weapons, as necessary | Procedure 6.2

Procedure 6.3

Subsections of 6.4 | We interpret the term "as necessary" as synonymous with the requirement of officers to use only force that is reasonable under the totality of the circumstances. PPB's revised 1010.00 notes criteria for each less-lethal weapon which at times may be more restrictive than the totality of circumstances may allow. The training we observed on the revised 1010.00 adequately covers the circumstances where less-lethal force weapons may be allowed. |
| Section III Opening Paragraph | Refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or | Procedure 1.5 | This provision is found in the revised 1010.00 policy language, and the training we observed on the revised 1010.00 adequately covers the responsibility of officers to refrain from using force against individuals who are already under control. |

| | impede a valid law enforcement function | | We found at least one instance where an officer appears to use force against a person who "express[ed] verbal discontent with [the] officer but [did] not otherwise pose a threat to officers or others." In that case, the officer used pepper spray against a community member who appeared to be expressing extreme verbal discontent though did not appear to pose a threat to officers or others, nor did the community member appear to impede a law enforcement function. However, in other protest events we have seen PPB demonstrate great restraint given the level of verbal discontent involved. We recommend PPB continue to encourage restraint while at the same time holding officers accountable for instances where force is used on verbal protest.

Additionally, we urge PPB to evaluate whether a community member's verbal discontent can be an indirect cause for a use of force. For instance, we noted one event where a verbally discontent community member was told to "shut up to get her to back down." Although perhaps more appropriate in a discussion of de-escalation, such actions may nonetheless escalate a person beyond the point of verbal discontent, providing justification for force under the totality of the circumstances. We recommend PPB look at all aspects of a force event in this regard. |

| Par. 66(a) | PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely | Policy #2

Procedure 5.1

Procedure 5.2 | As the crux of PPB's use of force policy, PPB currently evaluates the "moment of force" but does not adequately review all circumstances which may contribute to the presence of force in a situation. In the revised 1010.00, PPB includes three criteria as minimal considerations in making a decision to use force: threat of the individual, severity of the crime, and whether the individual is actively resisting control or attempting to evade capture (5.1).

Although these three "are of primary consideration," the Directive continues by noting "a reasonableness inquiry is not limited to these factors and force will be evaluated under the totality of the circumstances" (5.2). Such other factors are touched on in 5.3 – however we have seen evidence that "approach to confrontations" and "precipitate a use of force" are oftentimes dismissed in favor of a "moment of force" standard that evaluates the three criteria found in 5.1.

As an example, we noted one force event where an officer was concerned about a large dog in the backseat of a vehicle and told the subject he did not want to fight because it might provoke the dog to attack. The officer told the subject that he would be "pretty pissed off" if the subject forced the officer to hurt the subject's dog. The officer then noted that the |

| | | | |
|---|---|---|---|
| | | | subject's demeanor "instantly changed." From the report, it appears the officer's approach to the confrontation contributed to the subject's antagonistic demeanor and subsequent actions. This in turn increased the subject's threat, which was then used to justify the use of force. This was not discussed by the supervisor or anyone in the chain of command.<br><br>Although PPB notes in Directive 1010.00 and covers in training the impact of an officer's approach to a situation, such impacts are not consistently considered as part of the "totality of circumstances" which may resolve confrontations effectively and safely. PPB has argued that their force directive is stricter than the Graham standard. We believe that, on paper, the evaluation of force from a "whole event" standard is indeed stricter. However, in PPB reviews of force, we have commonly noted a "moment of force" standard, which we believe is inconsistent with the Settlement Agreement. |
| Par. 66(b) | PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force | Policy #4 | Although this element is found within the policy and was mentioned during In-Service training, we have neither seen any mechanism for actually measuring this, nor have we seen this consideration be brought up in the review of force. We have seen instances where supervisory critique of officers' tactical decisions has accounted for an officer's limited |

| | | | |
|---|---|---|---|
| | | | experience, and we believe that in such instances, the rationalizations have been appropriate. However, we have yet to identify an instance wherein extensive experience was considered as rationale for why an officer *should not* have engaged in some behavior. We recommend PPB include a mechanism for measuring the experience of an officer and whether the officer should have taken a different course of action given that experience. |
| Par. 67(a) | Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety | Policy #5<br><br>Procedure 1.1<br><br>Procedure 1.1.2<br><br>Procedure 5.4.4 | We continue to have concern with PPB's interpretation, training, and review criteria for the term "de-escalation" and believe the interpretation prevents PPB from complying with 67(a) and other areas of the Settlement Agreement.<br><br>While 1010.00 section 1.1 accurately describes de-escalation techniques, our review of various cases appears to indicate that PPB's interpretation of de-escalation in practice often includes command and control tactics aimed at producing immediate compliance based on the threat of force. In many circumstances, such command and control techniques can be effective and appropriate to gain control of an unsafe situation involving an individual who is able to make a rational choice in the moment (not impaired by mental illness symptoms, fear, or other factors). However, such techniques are not de-escalation |

techniques. In other instances, an officer may explain to a person that, out of fear for the officer's safety, he or she may deploy force. This, in contrast to yelling commands and/or threatening use of force, might be considered part of a de-escalation strategy if the aim is to help an individual regain composure, understand why the officer is making specific requests (e.g. "put the knife down") and comply voluntarily.

Our examination of PPB force reports and supervisor reviews repeatedly demonstrates the mislabeling of command and control techniques as de-escalation. We noted one event where an officer told a subject "You need to [expletive] stop or you may be shot!" and "If you don't stop, you're going to get [expletive] hurt." Both the officer and supervisor considered such commands to be de-escalation and that profanity was used to emphasize the seriousness and importance of the commands.

In another case (a protest event), an officer noted the use of de-escalation when, after using a takedown, the officer told the community member to put her hands behind her back. The community member complied and the officer determined that this de-escalated the need for further force. The supervisor agreed, noting the officer "gained cooperation from their verbal commands."

As described in the PPB reports, the officers' actions cannot reasonably be categorized as de-escalation techniques based on any accepted definition. PPB appears to conflate the de-escalation of force with strategies aimed at de-escalating a situation or agitated individual in order to gain voluntary compliance without the use of force. Although differentiated in policy (compare 1.1 and 1.4 in Directive 1010.00), the in-service training on the revised Directive we observed primarily focused on 1.4 (de-escalation of force as resistance decreased) rather than 1.1 (proactive de-escalation steps). While the concept of de-escalation was generally referred to during training, officers were given no real direction on "proactive steps to eliminate the immediacy of the threat, establish control, and minimize the need for force" (1.1). De-escalation was expected as part of some scenarios (and officers performed satisfactorily in this regard in the trainings we observed), but based on our review of on-the-street descriptions of de-escalation, it appears PPB falls short of ensuring de-escalation as an alternative to force. Note that while the supervisor in-service training held last spring did include a PowerPoint slide that listed de-escalation techniques, this content was not explicit in the officer in-service trainings we observed.

21

| | | | As a way to correct the misinterpretation of de-escalation, we recommend PPB provide a supervisor's in-service course on how to define de-escalation, how to evaluate whether an officer's actions are consistent with the definition, whether an officer could have *reasonably* de-escalated a call (not all situations reasonably allow for the tactic), and whether force could have been avoided through de-escalation. We feel Directive 1010.00 is sufficient to comply with the Settlement Agreement in this respect but the application and focus are problematic. Thus, a supervisory remedy is recommended. Additionally, next year's in-service training for officers should revisit the concept and provide full coverage of the definition of de-escalation and de-escalation techniques. |
|---|---|---|---|
| Par. 67(b) | In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness | Procedure 1.3<br><br>Procedure 5.4.3<br><br>Procedure 11.1.9.3 | The revised Directive 1010.00 includes the language of Par. 67(a) and in force events we have reviewed, we have noted a concerted effort on the part of officers to report the known history of mental illness and at what point in the interaction the officer gained such knowledge. Additionally, we have seen supervisory reviews be critical when such information is absent.<br><br>However, recognizing signs and symptoms of mental illness is a perishable skill. While officers receive extensive training in this area during Advanced Academy, we are not aware of any recent In-Service |

| | | | refresher training directed at recognizing signs and symptoms. We recommend PPB include this in future In-Service trainings. |
|---|---|---|---|
| Par. 67(c) | The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force | Procedure 1.4<br><br>Procedure 5.1.3 | Officers have been sufficiently trained on the changes to 1010.00 regarding de-escalating the use of force when resistance decreases. Additionally, we have seen evidence of this in reports and believe this provision is being substantially complied with. However, as noted above, we urge PPB to not stress the importance of this requirement over the requirement to avoid initial force through verbal de-escalation tactics and procedurally just behaviors. |
| Par. 67(d) | Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination | Policy #2 | Although the majority of the force reports and evaluations we reviewed indicated objectively reasonable force, there have been instances where the Force Audit process has identified unreasonable uses of force and forwarded these cases on to PSD for investigation. The work of the Inspector and Force Audit team has proven able to identify deficient supervisory investigations in some of these instances. However, aside from the Inspector and Audit team, PPB's chain-of-command reviews do not always identify when force is unreasonable and hold officers accountable.<br><br>For instance, we have already commented on a use of force against a person who demonstrated verbal |

| | | | discontent towards officers but who did not otherwise pose a threat. In this force event, the community member was standing a reasonable distance away from officers, holding a phone or iPad to record, and was pointing at officers in an angry manner when he was pepper sprayed by a PPB officer. Although it may be argued that prior actions by the community member impeded a lawful objective, at the time of the pepper spray, we believe the force was unreasonable.<br><br>Additionally, prior to being pepper sprayed, the same community member had been pushed by another PPB officer. We believe that in other circumstances, the push may have been justified. However, in this instance, the community member was positioned at the top of stairs (the PPB officer indicated he did not recognize the presence of stairs until after using force). Additionally, the forcefulness with which the officer pushed the community member was substantial, causing the community member to fly backwards into other protestors and down the stairs. These factors appear to contradict PPB Policy Numbers 7 ("with as little reliance on force as practical") and 8 ("resolving confrontations, when practical, with less force than the maximum that may be allowed by law") (see the previous version of Policy 1010.00). Furthermore, given the totality of circumstances as outlined in START-IT (see the previous version of Policy |
|---|---|---|---|

| | | | 1010.00), the strength of the push does not appear to correlate with the officer's stated objective (clearing the immediate area), particularly given the likelihood of the subject falling down the stairs.<br><br>In another protest event, video shows an officer coming around a stopped bus and executing a takedown on a community member. Here again, the chain of command review finds the officer to be within policy, though the video and officer reports do not appear to support this finding. Using the totality of circumstances found in START-IT (see the previous version of Policy 1010.00), it does not appear the overall forcefulness of the takedown was justified. Although the officer notes that there was probable cause the community member was committing the crimes of Disorderly Conduct II and Interfering with Public Transportation, these are relatively low severity crimes and the community member was not described as fleeing but rather "started to walk slowly away." Although the officer noted the use of force was necessary to "Defend Another," the narrative portion of the FDCR is speculative regarding this – "I also did not want them to be able to attack or interfere with other officers around that were making arrests around us. I have had people jump on my back and try to pull me away while making arrests at other events." The officer does not indicate how this particular |
|---|---|---|---|

| | | | community member posed such a threat and the video does not appear to support the claim that the community member did pose a threat. Consistent with the AAR, the video appears to indicate the community member was walking "slowly away." Although there is a governmental interest in clearing the streets, that interest and the actions taken against the community member do not appear balanced.<br><br>We also found two force events using CEW's where officers were not able to justify each cycle. In both of these cases, it is believed the officer accidently pressed the arc button, causing the Taser to deliver a cycle. However, the officers did not remember doing this. Curiously, in both cases the reviewing supervisor and the chain of command found the accidental applications of CEW to be justified despite the fact the officer did not allow time to reassess the situation and give the community member time to comply with demands and despite that fact that the officer could not articulate a justification for the use. In one case, the supervisor states, "We don't know if he intentionally did this in response to the continued active aggression they were seeing from the suspect or not, but the deployment was completely justified and appropriate." Later, the supervisor writes, "All three deployments were within policy and consistent with DOJ settlement agreement and best practices." We |
|---|---|---|---|

| | | | |
|---|---|---|---|
| | | | don't believe either of these statements are true. Each CEW cycle must be justified from *the perspective of the officer* – if the officer cannot remember deploying the CEW cycle, then they cannot justify it. Furthermore, the CEW cycle is not consistent with policy, the DOJ Settlement Agreement or best practices because the officer cannot justify it.<br><br>It should be noted that these are individual cases and our stance should not be interpreted as indicating that all or most PPB force evaluations are deficient. However, it is concerning that they were able to be forwarded through the chain of command without *any* critique of the officers' actions, regardless of whether PPB found them out of policy and worthy of corrective action and/or discipline. Thus, while we cannot generalize these force events to the Bureau as a whole, we can say that these officers do not appear to have been held accountable despite multiple layers of review and that some of these particular uses of force have been defended in conversations with other PPB members. |
| Par. 68(a) | Prohibition against the use of CEW for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to | Procedure 6.4.4.2.1 | We believe this requirement has been placed in policy and officers have been sufficiently trained on the prohibition of using CEW for pain compliance against those suffering from mental illness or emotional crisis. |

| | | | |
|---|---|---|---|
| | avoid the use of a higher level of force | | We are unaware of any instance where this has occurred. |
| Par. 68(b) | Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their CEW | Procedure 3.1 | In the revised Directive 1010.00, we note that PPB requires a verbal warning or hand signal before *all* uses of force. Although not required by the Agreement, we agree with the intent of PPB in this regard. Furthermore, the training we observed on the revised 1010.00 adequately covers officers' responsibility to issue a verbal warning unless it would present a danger to the officer or others. We noted during the training that officers were provided detailed instruction that the prior version of 1051.00 (Electronic Control Weapon System) included the phrase "when feasible" for when a warning was required. The training instructor independently asked *each* officer for the new standard ("unless it would present a danger to the officer or others") prior to completing a CEW exercise.<br><br>Additionally, we have noted training that informs officers that simply saying "Taser" is insufficient as a warning and that the warning must contain (1) a direction and (2) a consequence. We believe such training substantially complies with Par. 68(b). Furthermore, we have not seen on-the-street occurrences where violations of this provision have |

28

| | | | been noted by supervisors, at least for the first application. |
|---|---|---|---|
| Par. 68(c) | Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following CEW use | Procedure 9.7 | We believe this requirement has been placed in policy and officers have been sufficiently trained on the content of the protocols. Officers are required to summon Portland Fire and Rescue to remove probes from a subject of a taser use and are not allowed to remove the probes themselves. Additionally, officers are required to summon EMS if a taser is used (either in drive-stun or probe mode) if the subject of force is in a prohibited category (e.g., medically fragile, under the age of 15, pregnant). These requirements were also sufficiently trained based on our observations. Additionally, officers were previously required to follow these procedures and our reviews of FDCRs and AARs indicate that such protocols are routinely followed. |
| Par. 68(d) | Only one CEW at a time may be used on a subject, intentionally, except where lethal force would be permitted | Procedure 6.4.4.3.2 | We believe this requirement has been placed in policy and officers have been sufficiently trained on the prohibition on intentionally using more than one CEW at a time on a subject. We have not seen any FDCRs or AARs where more than one CEW was used on a subject intentionally. |
| Par. 68(e) | After one standard CEW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are | Procedure 5.4.1 | The requirement for officers to provide individual justification for each application of force applies not only to CEWs, but to all uses of force (5.4.1). We believe PPB's decision to apply this to all force events |

| | | | |
|---|---|---|---|
| | necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each CEW cycle in their use of force reports | Procedure 6.4.4.3.5 | is consistent with the intent of the Settlement Agreement. We also note that PPB has replaced its prior CEW with a model that terminates each cycle after five seconds, alleviating prior concerns of officers using a 6 (or more) second taser cycle without the ability to justify "each CEW cycle" (since a standard cycle is 5 seconds).<br><br>We have also seen in the past incidents where accidental arcing (due to the arcing button being on the side where officers are trained to rest their trigger finger on firearms) led to CEW cycles that were not individually justified. We believe this issue has been addressed in training, though note the concerns with accountability when this has occurred (see above). |
| Par. 68(f) | Officers shall make every reasonable effort to attempt handcuffing during and between each CEW cycle. Officers should avoid deployments of more than three CEW cycles unless exigent circumstances warrant use | Procedure 6.4.4.3.4<br><br>Procedure 6.4.4.2.1 | While the first part of Par. 68(f) has been incorporated into policy and we observed mention during PPB's presentation on the revised force directive, we did not observe officers having the opportunity to perform handcuffing under power. We recommend PPB deliver training on tactical handcuffing during a cycle.<br><br>PPB also prohibits deploying three or more cycles unless exigent circumstances warrant use (exigent circumstances defined in this instance as "immediate and serious bodily harm to a person or persons is |

| | | | about to occur"). We believe that this aspect was sufficiently trained and have not reviewed any FDCRs or AARs where three cycles were used on a subject. |
|---|---|---|---|
| Par. 68(g) | CEW's shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of force | Procedure 6.4.4.2.4 | We believe this requirement has been placed in policy and officers have been sufficiently trained on the prohibition on using CEWs on a handcuffed or otherwise restrained person. We have not seen any FDCRs or AARs where a CEW was used on handcuffed or otherwise restrained person. |
| Par. 68(h) | Officers receive annual CEW In-service training including proficiency and policy changes, if any | Not found in policy. | For this provision, we refer the reader to our evaluation of Par. 79 (Needs Assessment) as well as our evaluation of training overall. |
| Par. 69(a) | All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers | Partially found in policy (Procedure 11.1.4). | Par. 69(a) states that "All PPB officers that use force, including supervisory officers, draft timely use of force reports…" (emphasis added). However, in part based on *Garrity* concerns (see pg. 111 of this report for a broader discussion of the issues present here), PPB members who are involved in a deadly force event are not required to complete a force report. Related to this partial inclusion in policy, we have been in meetings between DOJ, PPB, PPA, and the City |

| | | | |
|---|---|---|---|
| | | | where the acceptability of such partial inclusions have been discussed, deliberated, and debated. If a revised Settlement Agreement is accepted through the proper channels, we anticipate the current version of 1010.00 and the adopted City Council version of 1010.10 will be in line with the Settlement Agreement revisions. |
| Par. 69(b) | All officers involved or witnesses to a use of force provide a full and candid account to supervisors | Partially found in policy (Procedure 11.1.3; Procedure 11.1.6). | Par. 69(b) requires "All officers involved…[in a use of force event] provide a full and candid account to supervisors." For officers involved in non-lethal force events, this requirement has been included in policy and officers have been trained on their responsibilities. However, with the same *Garrity* consideration as Par. 69(a) in mind, officers involved in a lethal force event are not required to provide a statement to an on-scene supervisor unless the on-scene supervisor "is unable to obtain from witness members, initial observations and/or other sources the necessary information to ensure the safety of the public" (see Directive 1010.10 as adopted by City Council on 8/24/17). In such instances (sometimes referred to as Public Safety Statements), the supervisor may require the involved member to answer questions that are "strictly necessary to immediately protect life and ensure public safety." An officer involved in a lethal force event will still ultimately be required to provide a statement to PSD. |

| | | | |
|---|---|---|---|
| | | | Related to this partial inclusion in policy, we have been in meetings between DOJ, PPB, PPA, and the City where the acceptability of such partial inclusions have been discussed, deliberated, and debated. If a revised Settlement Agreement is accepted through the proper channels, we anticipate the current version of 1010.00 and the adopted City Council version of 1010.10 will be in line with the Settlement Agreement revisions. |
| Par. 70(a) | Complete After Action Reports within 72 hours of the force event (SUPERVISOR) | Partially found in policy (Procedure 13.3). | In partial compliance with Par. 70(a), After Action Reports are only required for Category II-IV force incidents. These include all uses of force that are not deadly force (e.g. resisted handcuffing, takedowns, CEW, pointing of a firearms, etc.). Category I force events do not require an After Action Report since "the administrative review serves this function (see Directive 1010.10, Procedure 2.9.3 as adopted by City Council on 8/24/17).<br><br>Related to this partial inclusion in policy, we have been in meetings between DOJ, PPB, PPA, and the City where the acceptability of such partial inclusions have been discussed, deliberated, and debated. If a revised Settlement Agreement is accepted through the proper channels, we anticipate the current version of 1010.00 and the adopted City Council version of 1010.10 will be in line with the Settlement Agreement revisions. |

| Par. 70(b) | Immediately notify his or her shift supervisor and PSD regarding all officers' Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement (SUPERVISORS) | Procedure 12.8<br><br>Procedure 12.9<br><br>Procedure 13.4.10.1.6<br><br>Procedure 13.4.10.2.4<br><br>Procedure 13.4.10.2.8<br><br>Procedure 13.4.10.2.10<br><br>Procedure 13.5 | Although this requirement has been placed in policy, certain aspects of it have not been consistently adhered to. Primarily, "where there is no misconduct," supervisors are required to determine whether additional training or counseling is warranted. However, we note many cases where an officer's use of force did not violate policy but minor deficiencies could be identified. Deficiencies were often found in interpersonal communication skills, report writing, tactical approach, and de-escalation. While perhaps commented on by the supervisor, actions apart from an EIS entry appear to be rarely taken.<br><br>In evaluating the 2016 supervisor's in-service training, we commented on an instructor's statement to supervisors: when reviewing an officer's force report, ask yourself "Is this the way I want my officers to act every time?" We noted that this standpoint was absolutely in-line with the intent of the Settlement Agreement and the purpose of reviewing force events. However, in practice, we do not believe this has been achieved. We recommend PPB stress to supervisors that providing additional counseling and training does not indicate the officer was wrong or deserving of criticism – rather it means that something could have been improved. This should not be considered discipline and supervisors should not be afraid to identify ALL areas where improvement may occur. |

| Par. 70(c) | Where necessary, ensure that the subject receives medical attention from an appropriate medical provider (SUPERVISORS) | Procedure 12.2 | We believe this requirement has been placed in policy and supervisors have been sufficiently trained on their responsibility to ensure medical attention from an appropriate medical provider. We have also reviewed numerous AARs where supervisors noted their efforts to ensure medical attention. |
|---|---|---|---|
| Par. 70(d) | Interview officers individually and not in groups (SUPERVISORS) | Procedure 12.6 | This requirement has been placed in policy and supervisors have been sufficiently trained on their responsibility to interview officers individually. Additionally, upon reviewing AARs, we find that officer accounts indicate they were interviewed separately. Rather than supervisory interviews simply confirming facts (e.g. leading questions), supervisors appear to gather the independent recollections of each officer. |
| Par. 72 | PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually. | Procedure 13.2 | We believe this requirement has been placed in policy and supervisors have been trained to use the AAR as a supervisor checklist. As noted elsewhere, we are not convinced that supervisors have been properly trained on evaluating the information required by the checklist, but this does not affect compliance with par. 72. As a format for ensuring supervisors carry out their investigative responsibilities, we believe the AAR to be a sufficient checklist. |
| Par. 73(a) | EIS tracks all Directive 940.00 comments, findings, and corrections (SUPERVISORS) | Procedure 13.4.10.1.7 | We believe this requirement has been placed in policy. However, we note that the most recent findings of the Force Audit indicate that the absence of an EIS entry is one of the more common deficiencies attributable to |

| | | | |
|---|---|---|---|
| | | Procedure 13.4.10.2.8<br><br>Procedure 13.6 | supervisors (see Appendices III-1 through III-3). Therefore, as a matter of practice, we do not believe supervisors consistently utilize EIS as a way to track comments, findings, and corrections. We recommend this be included in Supervisor's In-Service training. |
| Par. 73(b) | All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command (SUPERVISORS) | Procedure 13.7 | Currently, all supervisors in the chain of command may receive EIS entries for deficiencies, though we have seen no evidence that supervisors "receive corrective action or discipline" for deficient reviews of FDCRs. Particularly, we would expect to see an evaluation of trends with officers and supervisors to identify those who <u>consistently</u> fail to produce accurate and complete After Action Reports. Although Force Audit reports indicate trends in deficiencies by Precinct/Unit, Par. 73(b) requires corrective action or discipline at the individual level. |
| Par. 73(c) | All supervisors in the chain of command are accountable for inadequate reports and analysis (SUPERVISORS) | Procedure 13.7 | While we have not seen evidence that all supervisors in the chain of command have been subjected to corrective action as a result of deficient reports and reviews (see above), even though all supervisors are part of the chain-of-command reviews. The Force Audit routinely identifies supervisors up the chain of command, including the Chief's Office, when there are deficiencies found through the audit. |
| Par. 73(d) | A supervisor receives the appropriate corrective action, | Procedure 13.7 | As with our evaluation of 73(b) and (c), we have not seen evidence of any corrective action or discipline |

| | | | |
|---|---|---|---|
| | including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations. Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position (SUPERVISORS) | | based on repeated deficiency in evaluating force events. PPB has reported to us one occurrence where the Chief's Office raised the issue of a supervisors deficient reporting to the Precinct Commander and, as a result, there have not been subsequent deficiencies by the supervisor. However, it is unclear how formal the corrective action was in that occurrence and whether it would fit the intent of Par. 73(d).<br><br>While deficiencies are routinely identified in the Force Audit, responsive action has not yet been demonstrated (see also Par. 73(f)). We have noted here and in the Training section that additional training for supervisors as a whole would reduce the need for corrective action with individual supervisors. |
| Par. 73(e) | When after an investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement (SUPERVISORS) | Procedure 13.8 | This requirement is found in policy and sufficient in training. In cases we have reviewed, the Discipline Guide has been referenced and RU Manager's recommended discipline often fall in line with the guide. Where proposed discipline falls outside the guide's recommendations, a rationale has accompanied the proposed discipline. However, in order to be sure that the actual discipline imposed is consistent with the guide, we will still need to review a random selection of cases. |

| Par. 73(f) | Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns (SUPERVISORS) | Procedure 13.9 | As the Inspector receives and reviews all use of force events, this requirement is accomplished de facto. However, we have not seen evidence that the interactions between the Inspector and the Chief have resulted in "necessary training and that PPB timely resolves policy, tactical, or equipment concerns." Documents provided by PPB indicate the Inspector has identified trends in use of force events related to equipment concerns or training recommendations. The documents indicate that the Inspector forwarded these concerns onto the appropriate personnel but it does not appear that the Chief participated in the process. There also does not appear to be a feedback mechanism in place, as once recommendations are made, there is no expectation of receiving a formal response. Thus, there appears to be a lack of accountability in resolving the policy, tactical, or equipment concerns. We recommend PPB see the value in having the weight of the Chief's office when resolving the concerns. |
| --- | --- | --- | --- |
| Par. 73(g) | The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor (SUPERVISORS) | Procedure 13.10 | We believe this requirement has been placed in policy and this discretion was discussed during the review of the revised 1010.00. To date, we have not seen an example of this occurring. |

Subsection A also contains the requirement for PPB to "maintain adequate patrol supervision staffing" (Par. 71). In our last report, we found PPB in Substantial Compliance with Par. 71 due to their maintenance of sergeant staffing levels required in the Agreement. We also noted that there was a shortage of ranked sergeants in each of the three Precincts compared with the number of authorized sergeants. A sergeant's exam was conducted in the first quarter of 2017 and the promotions stemming from the exam have resolved the shortage issue. As of June 30, 2017, PPB is no longer experiencing a shortage (see Appendix III-4).

We also recommended in our previous reports that PPB evaluate "span of control" in addition to raw sergeant numbers. Span of control is a ratio of officers to sergeants and provides better insight into efficiency and effectiveness of supervision compared to raw numbers. Also included in Appendix III-4 is the span of control for each Precinct. PPB currently holds a span of control between 4.6 and 5.1 officers to every 1 sergeant, depending on the Precinct. A reasonable span of control ratio is approximately 8 to 1, which PPB has clearly achieved. We will continue to monitor their span of control to ensure that PPB remains in Substantial Compliance with the requirement of Par. 71.

| Recommendations Par. 66-73 | <ul><li>PPB should provide officers and supervisors supplemental training on de-escalation, particularly as a means to avoid force.</li><li>PPB should consider the totality of circumstances (including actions preceding the application of force) when evaluating force events rather than a "moment of force" standard. The evaluation should also include whether an officer's experience should have led the officer to choose actions that would have avoided the force.</li><li>PPB should provide a refresher training to all officers on recognizing signs and symptoms of mental illness.</li><li>PPB should provide a training course on tactical handcuffing during a CEW cycle.</li><li>PPB should train supervisors on their responsibilities in investigating force events and documenting the use of force event in EIS.</li></ul> |
| --- | --- |

**Use of Force Audits**

In Subsection B (Compliance Audits Related to Use of Force) of Section III, PPB is required to audit force reports and After Action Reports to ensure that they are complete and contain adequate information for supervisors to evaluate the force event. As such, in consultation with COCL, PPB developed a two-phase force audit to ensure that all requirements in Pars. 74, 75, and 77 are present within officer and supervisor reports and are reviewed through the chain of command (see Appendix III-5). The goal of the audit was two-fold: (1) ensure that officer reports contained the information required by the Settlement Agreement and detail sufficient for supervisors to evaluate the use of force event, and (2) incorporate an independent system of evaluation outside the chain-of-command to ensure that force events are reasonable under the totality of the circumstances and that supervisors are thoroughly investigating the circumstances of force events. We provide our assessment of these goals separately and then discuss their combined impact on PPB's ability to self-monitor.

*Phase I*

In Appendix III-6, we identify each of the requirements found in 74, 75, and 77 and note their presence in the force audit methodology. The COCL's conclusion is that, through Phase I, PPB has an initial system in place to ensure that each of these aspects are included in reports and are reviewed by supervisors within the chain of command. However, as we noted in our evaluation of Subsection A, a detailed account of the complete force event is not always included in FDCR's and ARR's and therefore may not be captured in the Phase I approach. For example, the Force Audit can identify whether de-escalation was listed as occurring during an event – however, it requires a critical assessment to ensure the definition of de-escalation was not used too broadly. Therefore, as PPB continues to deliver training to bring policies in line with Subsection A, we recommend the analysts working under the Inspector remain updated on the expectations for implementation and interpretation. We also note that, to date, we have been particularly impressed by the work performed by the analysts and Inspector (past and present) in developing the methodology for the Force Audit. As PPB continues to train on the requirements of Subsection A, we expect the analysts to be updated, though their effort and dedication so far have been commendable. In fact, the skill set they possess could be used to audit a wide range of functions within the PPB.

Using the data available to date, PPB has been able to evaluate levels of compliance with Phase I and have recently revised their reporting format for Force Audit findings to make them more readable, in our opinion (see Appendices III-1 through III-3). For instance, in the 2016 Q4 Force Audit Report, PPB began to report categories of deficiencies rather than individual items, which were left incomplete by officers/supervisors. For example, if there are 6 items pertaining to officer descriptions of "Force and Resistance" and a report is deficient on *any* of the 6, the category as a whole is reported as deficient. Thus, a deficiency should not be interpreted as

lacking <u>any</u> description of "Force and Resistance." Instead, it is possible that only a single element was missing while other descriptions were present. Overall, we believe this categorical reporting lends itself better to the identification of trends in deficiencies, and thus enhances the capacity to identify potential training implications.

Bureau-wide deficiencies are broken out by officer, supervisor, and chain of command and are categorized by Precinct. Additionally, each Precinct/Division is reviewed individually and areas for improvement are identified within each. Without repeating the entirety of PPB's Force Audit Reports here, we highlight some findings to demonstrate the progress that has been made. As seen in Table 1, officer report writing deficiencies occur at a rate of approximately 1.2 to 1.3 deficiencies per case audited. However, given the number of items found within each category, we believe this to be a relatively low number. Furthermore, nearly half of all officers who have written FDCRs in the past 9 months have had zero deficiencies on their reports. As a side note, we caution PPB against relying exclusively on the total number of deficiencies rather than ratios when reporting deficiencies broken out by Precinct. For instance, in the 2017 Q2 report, East Precinct has 39 total reporting deficiencies – most of any Precinct. However, when calculating East Precinct's ratio of deficiencies per case audited, the result is 1.08 – significantly lower than North Precinct's ratio (1.48) and Central Precinct's ratio (1.73). Although East Precinct had more deficiencies, they also had more cases audited, resulting in an overall lower ratio.

Supervisors demonstrate a higher ratio of deficiencies per case audited compared with officers. (approximately 2.0 across the last 9 months), though this is influenced by the fact that supervisors are evaluated on (1) whether they performed their own reporting requirements and (2) whether they identified officer deficiencies in reporting. Thus, there are more categories of review for each supervisor. For instance, in the 2017 Q2 Force Audit Report (Appendix III-3), nearly 30% of supervisor deficiencies involved not identifying officer reporting deficiencies. When removing that category, supervisors had a ratio of 1.38 deficiencies per case audited.

Finally, we look to see whether deficiencies are not recognized by <u>anyone</u> in the chain of command. This can be assessed by looking at the number of deficiencies missed in the Chief's Officer (CHO) review and dividing that number by the number of cases audited. The results demonstrate that for approximately every four cases audited, only one reporting category is found deficient. We believe this demonstrates a fairly high degree of oversight by the chain of command and indicates that higher level supervisors are not simply signing off on deficient report writing. They appear to be reading reports, identifying deficiencies, and addressing them.

Table 1 – Selected Force Audit Results (2016 Q4 through 2017 Q2)

|  | **2016 Q4** | **2017 Q1** | **2017 Q2** |
|---|---|---|---|
| Ratio of officer reporting deficiencies per case audited | 1.26 | 1.20 | 1.22 |
| Ratio of supervisor reporting deficiencies per case audited | 1.83 | 2.23 | 1.94 |
| Percent of officers who wrote reports and had zero deficiencies | 48.8% | 44.2% | 48.7% |
| Ratio of deficiencies to cases audited – Not identified by anyone in chain-of-command | Unavailable | .27 | .24 |

When looking at the types of deficiencies found for officers across the past three quarters, deficiencies in the "Force and Resistance" category appear to consistently constitute a substantial percentage of the overall deficiencies (approximately 30% of officer deficiencies across the past 9 months). Similarly, "De-Escalation and Decision Point Analysis" makes up approximately 27% of officer report writing deficiencies across the past 9 months. For supervisors, deficiencies in EIS reporting and reviewing officer reporting commonly appear as the most frequent deficiencies found. These two may be tied together, however, as a supervisor is responsible for making an EIS entry for an officer when their reporting is deficient. Should a supervisor not recognize an officer's mistake, the supervisor's report would be deficient for (1) not recognizing it and (2) not putting in an EIS entry. Similarly, EIS category deficiencies are commonly the highest deficiencies for all levels of the chain of command. Although these findings represent progress over time, there is still room for improvement. We have noted that it may be beneficial to conduct an in-service training to refresh officers on their reporting responsibilities and recommend the findings of the audit be included in training needs assessments.

As an aside, our interviews with officers, supervisors, and command indicate that officers generally perceive EIS entries to be punitive when officers are called out for omitting one element of reporting although they include all other elements. With the advent of the Phase II methodology (described below) and its inclusion of an overall report writing metric, we would recommend PPB not include EIS entries for minor omissions but rather include an EIS entry when an officer's overall report writing is deficient in some way. Although specific deficiencies are still tracked at the individual officer level to inform potential training implications, we do not believe it to be necessary for PPB to create an EIS entry for the officer for individual

omissions. However, officers and supervisors must still be held accountable for overall deficient report writing in accordance with 69(a) (officers) and 73(e) (supervisors).

Beginning in September of 2017, the Force Audit Team within PPB began evaluating force events using a 20% sampling methodology. As we have noted in past reports, we believe auditing 20% reduces the burden on the Force Audit Team while still maintaining the capacity of the audit to gain an overall picture of the completeness and accuracy of officer and supervisor reports. While information necessary to identify trends in force (see below for our assessment of Par. 76) are still being captured for <u>all</u> use of force events, the audit's function of ensuring quality reporting is still accomplished using the 20% benchmark. Because PPB is using a stratified random sample with regular feedback of results to commanders, good reporting can be assured by identifying areas where improvements are needed and serving as a continuous deterrent against weak reporting (since any officer's report could be randomly selected for auditing). As we have noted in the past and PPB has agreed to, we recommend the Force Audit Team periodically check to confirm that the audited cases are representative of PPB's overall use of force numbers. This includes checking to confirm that the distribution of Precincts and force types found within the audited cases is similar to PPB's overall use of force.


*Phase II*

The goal of Phase II is to incorporate an independent review of the force reporting and assessment outside of the chain-of-command and determine whether actions were within policy, constitutional, and represent good policing. Part of this goal is already accomplished within the Phase I methodology, as a number of items examine whether (1) a certain element was included and (2) if not, whether it should have been. The independent review in Phase I looks more at the report writing aspect rather than an overall assessment of the use of force. The Phase II methodology approaches this more directly.

In the second quarter of 2017, PPB, DOJ, and COCL undertook a series of force event reviews to agree on a methodology for Phase II of the Force Audit. Phase II builds on Phase I in that it allows the Inspector to perform an independent assessment of the overall quality/completeness of officer and supervisor reports, each officer's decision-making process (including information gathering, risk assessment, legal authority, and consideration of other options/contingencies), and each officer's tactical actions (including initial response to the call, initial contact/disengagement, personal communication, tactical communication, and the overall reasonableness of the use of force). Through this process, we have reviewed the Inspector's evaluation of force events and find that they are thorough, and generally consistent with the COCL's independent evaluation of the same events. The Inspector has also demonstrated a willingness to be independent of the chain-of-command findings and identify deficiencies not previously commented on. In the future, we would expect trends in the evaluation of reasonableness to be included in PPB's Force Audit Reports.

Although our initial impressions of the Phase II methodology have been positive, the methodology has not been implemented for a long enough time for us to be confident in the results. The initial cases reviewed were hand-picked by PPB in order for us to review cases which are exceptional in some way. We believe this was appropriate for a test-run of the methodology, but a more extensive review of force cases by COCL and DOJ is needed to be sure the auditing function is working well and can be validated by outside sources.

Overall, our assessment leads to the conclusion that PPB has the necessary audit methodology in place to comply with the requirements of Par. 74, 75, and 77. However, Phase I must be reflective of improved definitions and documentation in-line with our comments in Subsection A, and reporting must also include the findings of Phase II. Given these advancements, we believe the combination of Phase I and Phase II methodologies will allow the Inspector to track the quality of FDCRs and After Action Reports, identify instances of problematic uses of force, and determine trends in personnel, training, or policy implications.

Subsection B of Section III also contains Par. 76, a requirement that PPB "conduct a quarterly analysis of force data and supervisors" [After Action Reports] designed to:

a) Determine if significant trends exist;
b) Determine if there is variation in force practice away from PPB policy in any unit
c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate
d) Identify and correct deficiencies revealed by the analysis; and
e) Document the Inspector's findings in an annual public report"

Although full compliance with Par. 76 necessarily requires adherence with our recommendations for Subsection A and the Force Audit, we appreciate the work done to date in identifying trends and determining areas where improvement is needed. As noted above, quarterly audit findings reports have indicated trends in report writing that are helpful to determine where additional training may be beneficial. Other trends noted in the quarterly audit reports include a review of the proportionality of types of force (e.g. takedown, CEW, baton, etc.) across the past four quarters as well as a comparison of force type proportionality between the three main precincts. In addition to presenting the data, the audit reports actually comment on noted trends. For instance, in the 2017 Q2 report, the report notes that Central Precinct uses takedowns at a substantially higher proportion than East and North Precinct but alternatively uses Strikes/Kicks at a substantially lower proportion. Deeper-dive trend analysis was also conducted by the analysts, including "day/time of force events; likelihood of officer injuries associated with use of force and subsequent cost to City; etc." (see PPB's 2017 Q2 Quarterly DOJ Update Report).

PPB is moving away from providing Quarterly Summary Force Reports in exchange for having an open force data portal. The open force data portal will be on the PPB website and allow

community members to examine force trends using various filters, though PPB will continue to undertake their own internal reviews of force trends. As PPB moves away from the quarterly reports, we would recommend some of the elements from the Quarterly Summary Force Reports be transferred into the Quarterly Audit Reports. For instance, we have indicated previously that the "heat map" evaluation for Precincts and shifts would be beneficial to RU Managers for operational considerations. Additionally, we would recommend a demographic comparison of force to arrest rates as this is a better metric than raw numbers. Finally, when moving to the open force portal, we recommend PPB include protest force in the searchable data. Currently, protest force is not included in PPB's Quarterly Summary Force Reports, leading to an incomplete picture of use of force.

We do not believe PPB can adequately measure "variation in force practice away from PPB policy in any unit" (76b) using an out-of-policy standard. This is due to a small amount of force events being found out of policy (for instance, the 2017 Q2 Force Audit Report identified 2 cases out-of-policy for Directive 1010.00 – one being an administrative violation). Even with improved accountability measures, we hesitate to believe that enough out-of-policy cases will occur to allow the identification of meaningful trends. As an alternative, we would recommend PPB evaluate the number of types of "policy, training, tactical, or equipment concerns" as well as "additional training or counseling" identified by either a supervisor or the Inspector. We believe this evaluation would have a higher set of cases and would identify areas for improvement rather than areas of disparity.

Although not included in the Quarterly Force Audit Reports, we have seen documentation of analysis to "determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others." This has come in the form of individual officer evaluations and supervisory evaluations (see Appendices III-7 and III-8). However, with PPB's current reporting format, conclusions can be difficult to draw and we will consult with PPB in the near future on the best method for evaluating the data. For instance, evaluating an officer's force-to-arrest ratio may be skewed as an officer may use force but not have the arrest attributed to him/her. A potentially better evaluation is the officer's force-to-reports written ratio, as this gives an indication of the officer's level of activity and is more reliable than arrests since the officer would be required to complete a report regardless of whether s/he was credited with the arrest. Another informative evaluation is the ratio of force applications to force events, as this may indicate officers who are over-reliant on force during a confrontation. All of the data required to perform these analysis is provided in Appendices III-7 and III-8 and PPB has informed us that reviews are already occurring.

In addition to this analysis, PPB has also performed regression analysis to identify officers who may show a preference for a particular type of force (see Appendix III-9) rather than allowing the situation to dictate which force type is most appropriate. Altogether, the evaluations done are responsive to both criteria of the "using force differently or at a different rate" requirement. However, not currently present in the reports are PPB's efforts to "determine the

reason for any difference and correct or duplicate elsewhere, as appropriate." Causality is a difficult thing to establish, so we recommend that PPB share their plans for determining causality with COCL before any evaluation is performed.

PPB is also required to "identify and correct deficiencies identified by the report." Quarterly, the Inspector meets with each RU Manager and provides the results of the Audit, thus satisfying the "identify" portion of 76(d). The meetings cover the Force Audit Reports, individual officer evaluations, and trends in deficiencies. However, upon the conclusion of the meeting, the RU Manager can do what he or she wants with the information, including having lower level supervisors address issues or doing nothing at all. As a way to comply with the "correct deficiencies" component of Par. 76(d), we recommend the Inspector implement a feedback loop to determine whether corrections have been implemented or not, and what impact the actions taken by RU Managers has had.

Finally, PPB is required to prepare an annual report documenting the Inspector's Findings. We have yet to see an annual report, though note that PPB has continued to refine their methodology and therefore an annual report may not have been possible given the changing methodology. When PPB does prepare an annual report, we would recommend all of the above factors be integrated, including the individual officer analyses, evaluations of policy, training, tactical, or equipment concerns, feedback from supervisors regarding trends, etc.

| Recommendations Par. 74-77 | |
|---|---|
| | • The Inspector should ensure that identified trends and tactical, equipment, policy, or training concerns are promptly remedied and implement a feedback system to track recommendations. |
| | • PPB should alter their EIS entry protocol for minimally deficient reporting and instead include an EIS entry for an officer when the officer's reporting is deficient as a whole. |
| | • PPB should transfer some elements (for example, Precinct and Shift "heat maps") from the Quarterly Summary Force Reports upon launching the force data portal. |
| | • PPB should ensure the force data portal includes protest force events |
| | • In addition to out-of-policy force events, the Inspector should evaluate 76(b) using trends in policy, training, tactical, or equipment concerns and identified instances where additional training or counseling is recommended. |

| | |
|---|---|
| | • PPB should complete an annual report with the findings of the force audit, individual officer analysis, and feedback from supervisors regarding trends. |

Evaluation of System

We now return to the question of whether PPB's progress has led to systems to ensure "that all force, particularly force involving persons with actual or perceived mental illness:

a) Is used only in accordance with the Constitution and laws of the United States
b) Is no greater than necessary to accomplish a lawful objective
c) Is properly documented, reported, and accounted for
d) Is properly investigated, reviewed, evaluated, and, if necessary, remediated"

We believe their overall system of force management has yet to accomplish these goals, though significant progress has been made. However, we have noted above specific examples of force that appears to be greater than necessary to accomplish lawful objectives, particularly in the context of recent protest events. Additionally, the Force Audit has found that documentation of force in particular categories demonstrate deficiency (for example, "Force and Resistance"), with the results of the force audit providing a blue print of where officers and supervisors need to be trained better on the completeness and accuracy of their reports. Finally, we have noted that all four conditions of goal (d) have room to improve. The COCL would like to stress the importance of remediation under the fourth condition as a tool for improving organizational accountability while at the same time improving officer performance when honest mistakes are made.

# IV. TRAINING

| Par. 78 | Not Yet Assessed |
|---------|------------------|
| Par. 79 | Substantial Compliance |
| Par. 80 | Partial Compliance |
| Par. 81 | Partial Compliance |
| Par. 82 | Substantial Compliance |
| Par. 83 | Substantial Compliance |
| Par. 84 | Partial Compliance |
| Par. 85 | Partial Compliance |
| Par. 86 | Partial Compliance |
| Par. 87 | Substantial Compliance |

In this section, we examine whether PPB has been able to develop and implement a system of "effective training for police officers that increases the knowledge, skills and abilities necessary for effective and successful delivery of services to persons in mental health crisis" and that contributes to the "proper management of the use of force to meet constitutional standards" (Par. 173). As we noted previously, the achievement of long-term training outcomes listed in paragraph 78 focuses on the constitutional treatment of individuals who have or are perceived to have mental illness, and the building of community partnerships that increase public trust, and public safety. Here we provide assessment on PPB's compliance with set of requirements that contribute to an effective training system needed to achieve these intermediate and long-term goals.

An effective training system, as established by the Settlement Agreement, is one where PPB has the capacity to: (1) identify areas where officers require training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; and (4) audit the overall training system to ensure that it is accountable to the administration and the public. These components provide the framework for our current review of compliance and outcome measures.

In our May 2017 Outcome Assessment, we mentioned PPB's conceptual framework for training (see figure below), which is helpful for identifying needs, developing and delivering training, and evaluating officer reactions to the training and on-the-job outcomes. We found this to be a sound conceptual framework and its feedback loops support continuous improvements in the

training process. The next step is to examine "where the rubber meets the road" and look at whether key aspects the training system are being implemented conscientiously with the right objectives in mind.



**Identifying Training Needs**

Training Plan and Needs Assessment

We begin with the identification of particular training needs and whether PPB accomplishes this for "all aspects of training" as required in Paragraph 79. COCL's methodology for this assessment included reviews of PPB's Training Plan and Needs Assessment and interviews and correspondence with Training Division personnel. Previously, the Training Needs Assessment identified needs for the annual In-Service Training but did not include identified needs for ECIT training or Supervisor In-Service Training. Beginning in the first and second quarter of 2017, however, PPB began incorporating information relevant to these two trainings into the overall training needs assessment. As part of PPB's evaluation of ECIT, they ask ECIT officers about their future training needs as part of the feedback survey. The survey asks, for example, how often ECIT officers feel they need follow-up training and what topics should be covered. PPB also identifies ECIT training needs through other sources, such as outcome data, BHU program supervisors, the Behavioral Health Advisory Committee, and research on policing and mental health.

However, because of a shortage of analysts at the Training Division, there is no course evaluation process in place for ECIT training or supervisory training. The ECIT training in July, 2017 was not evaluated, thus limiting the information available for the needs assessment. However, the review of laws, court cases, and research findings continues and may help to identify new training needs. PPB has requested additional analysts for the needs assessment and evaluation of training and is awaiting a decision on this request.

PPB will continue its needs assessment despite resource constraints. We had previously noted that in the 2016 Training Needs Assessment, a number of topic areas (e.g. "Trends in Hazards Officers are Encountering in Performing their Duties") list the specific training need identified, the year it was suggested, and a notes section that indicates a potential plan of action. Other sections do not follow such a format. We have recommended standardization, and have been informed that all sections of the 2017 Training Needs Assessment will follow this format so that PPB can be sure that it is responding to training needs rather than simply listing them.

Based on the information available to us at the time of this report, we continue to believe that PPB is taking the requirement of a Needs Assessment seriously and is currently in substantial compliance.

Examining and Discussing Force Patterns

The Settlement Agreement also looks at training needs from the perspective of force patterns and community input. Par. 86 requires the Inspector to provide presentations to the Chief of Police, PPB Training Division, and to the Training Advisory Council (TAC) on a quarterly basis that includes patterns and trends in officers' uses of force. Our methods for assessing compliance included the following: Reviewed PPB quarterly force summary reports; observed

the Inspector's presentations to TAC; reviewed TAC reports; PPB website regarding TAC, and reviewed TAC agendas and minutes. First, TAC meetings have been open to the public (Par. 87), as meeting minutes are regularly posted online, allowing us to review the written record for times when we were not in the room. In the past, TAC has taken the lead by asking the Inspector to cover specific force issues. We believe this assists TAC with their work and the questions they provided the Inspector appear to be carefully thought out.

We have some concern about whether the prior Inspector's responses to certain TAC questions were sufficiently informative. For instance, in the TAC meeting minutes from 2/8/17 (see Appendix IV-1), one question posed was whether there is "analysis of use of force that is delineated just by gender or just by ethnicity." The response was that PPB evaluates the use of force on incident but that "we do recognize there are differences." This does not get to the heart of the question. With consultation from COCL, PPB is beginning to conduct more detailed analyses of the force data, but this work is very preliminary. In response to another question at the February meeting, the Inspector stated that 1.2% of custodies result in use of force. This is inaccurate (the number for the Q3 that was being presented was about 3%), though it is unclear whether this was a mistake in the minutes or a mistake on the part of the Inspector.

For the presentations of uses of force to the Training Division, we have seen evidence of the Inspector identifying "problematic use of force patterns and training deficiencies." For instance, in his recommendations for the 2018 In-Service training, the Inspector identified seven (7) areas where concerns were noted. These included box-ins, force on fleeing suspects, handcuffing tactics that may lead to force, takedowns, waiting for cover, and pursuits. We have yet to see how these will be incorporated into the Needs Assessment and Training Plan, though appreciate the Inspector's work to identify such trends. Also, we look forward to PPB's more detailed analysis of "problematic use of force patterns" through a more thorough analysis of variables, including demographic factors.

| Recommendations Par. 79 and 86 | • For par. 79, restore the ECIT student surveys that serve to inform the Needs Assessment for ECIT In-Service Training and Supervisory In-Service<br>• For par. 86, prepare an analysis of force patterns using a variety of geographic, time, and demographic variables that allow the PPB and the community to determine whether any of the patterns are problematic or reflect bias in the use of force |
| --- | --- |

**Developing a Valid and Useful System of Training Evaluation**

Par. 80 requires that PPB "...develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum." To evaluate compliance with par. 80, the COCL team reviewed PPB's efforts to apply the Kirkpatrick Model of evaluation (described in previous COCL reports), consulted with PPB evaluators on the content and methods of training evaluation (including surveys and tests), interviewed and advised Training Division managers and instructors, and observed all In-Service trainings.

PPB continues to show improvement in the methods and measures it uses to evaluate its training. This path has been slow and contentious, but after multiple consultations with COCL, PPB has taken significant steps toward developing a system of evaluation that will benefit the organization for years to come, assuming it is well implemented, adequately resourced, and utilized effectively for feedback on individual and organizational performance.

As we noted in previous reports, the Bureau had expanded the training evaluation in an attempt to capture officers' reactions to the training, learning, and on-the-job outcomes (key elements in the Kirkpatrick model of evaluation). It introduced some competency-based testing, but we noted our concern that the assessments were vague and not quantifiable. We also noted that measures were not standardized across classes or across different trainings; that only a few measures were used to evaluate the content or delivery of training; that measurement was occurring after two days of instruction; that measurement was focused on classes rather than individual students; and that the evaluation design (post-test only) did not allow the PPB to make causal inferences about the effectiveness of training, despite DOJ's approval of the post-test only. In sum, improvements had been made in early 2017, but methodological rigor in all aspects of measurement left much to be desired, thus compromising the validity and utility of the results.

As PPB began to plan for the second part of the 2017 In-Service Training (beginning September 6, 2017), the COCL decided to use this opportunity to assess the current state of training evaluation within the PPB. The COCL and PPB held a series of meetings (some attended by DOJ) to discuss the In-Service evaluation plans. Many of the recommendations offered by the COCL in 2017 prior to the In-Service training (and also found in our Technical Assistance Statement on training evaluation in August, 2016) were not adopted by the PPB training staff, thus requiring a series of last-minute adjustments prior to the start of In-Service on September 6, 2017.

When the final evaluation plans were in place in September of 2017, PPB had made a number of improvements regarding its capacity to evaluate training in a useful and valid manner. Several are worth noting. First, the evaluation measures used to assess the quality of instruction have been standardized across classes and have been expanded significantly to include ratings of the instructor's knowledge, pedagogical style, level of difficulty, student participation, learning, and other dimensions of instruction. Second, the knowledge test has improved from the fill-in-the-blank mode to multiple choice, and is administered at the end of each day of training rather than after two days. Third, clicker quizzes are being used with most

classroom presentations to ensure that students are listening and retaining information as the class progresses. Fourth, knowledge tests are scored at the individual level rather than the group level, thus allowing PPB to determine individual competency/proficiency and passing scores. Fifth, PPB has introduced a quantitative scoring system for one of its role-play scenarios, thus allowing PPB to begin scoring individual performance during a skill task.

Attached to this Compliance and Outcome report is Appendix IV-2, a COCL report that discusses in greater detail the COCL's observation and assessment of In-Service Training. Several members of the COCL team observed the two-day training session, both on September 13-14 and on September 15-16. Here we summarize a few key observations related to the <u>evaluation</u> component of training. The <u>content</u> of training is covered under Par. 84.


<u>In-Class Quizzes</u>

Classroom clickers were used to give quizzes on students' knowledge of the material being covered and facilitate the class discussion. The percent of students who answered each question correctly was shown by some instructors and not by others. We pointed out that showing the correct answer to each question is a useful way to make sure all students know the correct response. PPB has since adopted this approach.

During our observations we noted some issues with the use of the clickers. Sometimes, the clickers did not work for the instructor. Also, when we looked at the quiz data, we found that questions 1 – 4 had an abnormally high percentage of incorrect answers, but this was a coding error, as PPB was rushed to provide COCL with the data. Using the clickers for quizzes is new to the Training Division staff, and as with any new system, it takes time to "get the bugs out." We have been informed that PPB has since corrected these technical problems.

Despite deployment issues with the clickers, the quizzes appear to have facilitated discussion and served as some measure of understanding, making a positive addition to the classroom. We recommend that PPB (1) encourage all instructors to consistently show the clicker results to students during class to facilitate discussion and reinforce the correction information (2) ensure that correct and incorrect answers are scored consistently across training days, so that the data can be analyzed to produce meaningful and accurate results.


<u>Surveys: Student Assessment of the Class</u>

The student surveys at the end of each day are important for assessing the quality of instruction, and should allow the Academy managers to make adjustments to the content and delivery of material for future classes. While the content of the surveys has improved dramatically, the surveys were poorly administered.

In terms of survey findings, students were uniformly positive about trainers. For example, between 89.9% and 100% of the students reported that the trainer(s) were "organized and well prepared." However, in terms of overall satisfaction with the class, there was noticeable variation between classes in whether the students felt the class was "a good use of my training time," ranging from 72.1% to 98.2%. The lecture-driven classes on force, crowd control, and pursuit driving received lower scores than classes involving hands-on field operations, including Firearms/CEW training, defensive tactics training, and emergency care training. The Employee Assistance Program, although lecture-driven, was an exception, also receiving high scores. The classes on force, crowd control, and pursuit driving required students to pay attention to detailed changes in policy, which can be mentally taxing, some of which they clearly disagreed with. For example, officers disagreed with the policy changes to pursuit driving because they felt the policy restricted their ability to pursue suspects who would otherwise escape. For the force and crowd control classes, perhaps because so much material was covered, students reported on the evaluation survey that they wanted more time for "questions and discussion" relative to ratings given to other classes.

In terms of survey administration, several problems occurred that needed to be addressed. First, on the days they we observed, students were not given enough uninterrupted time to complete the survey. They were told they would have 10 to 15 minutes, but the instructor began to interrupt them half way through this period to start the Knowledge test. Second, students were told the survey is voluntary and anonymous. They were told that if they didn't want to take it, they should do something else. The importance of the survey was never communicated by the survey administrator, and in fact, the rushed presentation seemed to send the opposite message. Finally, students were allowed to talk to each other <u>during</u> the survey period and were laughing loudly. This not only invalidates the survey as an independent assessment by students of the classes and the instructors, but disrupts other students who were trying to complete the survey in a quiet environment. We have been informed, however, that these problems were corrected the following week after feedback from the COCL.


<u>Knowledge Tests</u>

After/during the survey, students were given a knowledge test using an online software program, with the link accessible through their Bureau-assigned iphones. (PCs were provided for the few officers who came without their phones). Again, students were allowed to talk during the exam period that we observed, thus bringing into question the validity of the findings. This experience demonstrates that PPB Training staff should re-examine their procedures for administering surveys and exams. There were also some technological issues that resulted from using this online software for the first time, which is to be expected. Procedures used to administer the survey and knowledge test were improved the following week.

The results indicate that the Academy was successful in helping students achieve the required level of knowledge to pass the In-Service training exam. With one exception, all students passed the exam, receiving a passing score of at least 80% correct. The one student who didn't pass was able to immediately retake the exam and obtain a passing score. PPB has since learned now to "lock" the test so it cannot be retaken. Seven out of ten students (70.1%) answered at least 14 out of 15 questions correctly.

One problem is that the test questions were changed over the three different administrations of the exam, which makes it difficult to examine change or improvement in instruction quality. PPB decided to introduce a new written test after consulting with the COCL , but in the future, PPB should stick to a standard set of questions across the entire In-Service Training. PPB has agreed to standardization before the third session of In-Service begins.

We feel obligated, given our knowledge of program evaluation methods, to point out that knowledge proficiency is desired, but is not the same as measuring "learning" attributable to training. As we have pointed out repeatedly, without a pre-training exam or survey, or without a control group, PPB cannot state with confidence that students' understanding or knowledge has increased as a result of training. However, DOJ has indicated that PPB is not required to administer a pretest as part of the Settlement Agreement.

One of four scenarios was used to test officers' skills. COCL provided consultation on the content and methodology. At the time of this report, we do not have data from this skills test. We will discuss this further with PPB and suggest refinements as needed. At present, two trainers are involved in a paper-and-pencil evaluation of each student on several dimensions (The dimensions of evaluation are not described here to avoid influencing students who have yet to be tested). If this scenario pilot test is successful, we will recommend that it be expanded to other scenarios. Having student scores on more than one scenario will give students an opportunity to perform well in multiple settings and also provides the Training Division with a more reliable and fair estimate of officer performance.


Scenarios

The Patrol Tactics Scenarios were also evaluated as part of the course evaluation surveys. Overall, the students were impressed with the scenarios, with between 87.7% and 94.8% indicating that they were "well designed and executed" and between 91.2% and 94.8% reporting that enough time was allotted for "questions and discussion." The highest rating were given to settings that involve providing medical assistance and rescuing someone. Less favorable ratings were given to dealing with someone in crisis and someone resisting service of a warrant. Unlike the medical and rescue scenarios, these interactions require officers to use good interpersonal communication to persuade individuals to voluntarily comply prior to any application of force. COCL observations indicate that these scenarios provided excellent opportunities to practice de-escalation and procedural justice. Our impressions of the

debriefing sessions, especially the domestic violence setting where a trained professional provided extensive comments to the students, is that they were quite good.


Creating Feedback Loops

With evaluation systems in place, the next challenge for the PPB is to use the findings effectively to improve training. This will require the creation of feedback loops and processes to review the findings and draw out the implications for training content and delivery. PPB's conceptual framework captures this, and should be used to guide the development and implementation of a feedback system.


Evaluation of Other Training Programs

As noted earlier, because of a shortage of resources at the Training Division, there is no survey data from the July 2017 ECIT training and there is no plan to evaluate supervisory training. Also, the system of evaluation for the Advanced Academy deserves additional study to determine its adequacy. In any event, we strongly recommend that the PPB and City make training evaluation a priority and fund additional analysts who have the skills to design surveys, analyze data, and prepare evaluation reports.


On-the-Job Outcomes

The third component in the Kirkpatrick model of training evaluation focuses on measuring changes in officers' behavior on the job as a result of training. Elsewhere in this report we discuss how that is being attempted by the PPB in the area of ECIT training, such as officers utilizing mental health services and facilities to resolve encounters, and other data collected from the Mental Health Mask. For In-Service Training, PPB has not articulated a plan for measuring on-the-job outcomes for individual officers. On many occasions, we have recommended contact surveys to capture police behavior from the perspective of community members with a recent police contact. This is especially useful for organizational outcomes as well, showing that PPB officers are engaging in the types of communication and de-escalation skills that are known to build public trust and legitimacy and reduce the likelihood of force. Contact surveys can also be used to measure how PPB officers are interacting with persons experiencing mental health crises. These interaction scores could be linked to other police data, such as officers' individual test scores at the training academy, use of force reports, citizen complaints, and other relevant information. PPB is in the process of linking course objectives to various on-the-job outcomes. We await their progress on this task.

<u>Comments on Training Success and Outcomes</u>

PPB is expected to produce data sufficient "for evaluating the effectiveness of training" (85(c)) and "effectiveness" is defined as training that "increases the knowledge, skills, and abilities" of officers (173(3)). If training is expected to <u>increase</u> these outcomes, then PPB must either (1) gather data <u>prior to</u> training to show <u>change</u> in these outcomes associated with training or (2) conduct a randomized control trial with a posttest only. While we recommend PPB conduct an evaluation using one of these designs, DOJ is not requiring it.

Finally, due to insufficient resources, the Training Division is no longer able to conduct surveys of students as part of the training evaluation for ECIT Training or Supervisory training. This provides additional evidence that the Training Division is understaffed. The Training Division has some excellent staff with expertise in research and mental health responses, but apparently, is unstaffed when it comes to providing these basic evaluation services.

| Recommendations Par. 80 | <ul><li>Elevate evaluation data to a higher standard by following a protocol for administering surveys and tests consistently, with an understanding of how test administration influences test results</li><li>Refine and expand the systematic ratings of skill scenarios to capture desired behavior in a reliable manner</li><li>Demonstrate that the results of surveys and tests can be effectively utilized with a system of feedback designed to improve individual and instructor performance</li><li>To better measure training success, introduce a pretest on knowledge, skills, and abilities, at least as a pilot test of new training.</li><li>Continue to develop and implement behavioral outcomes to measure the impact of training</li><li>Work with the COCL and the City to develop and implement contact surveys to measure training effectiveness and monitor the quality of police-community interactions in the future</li></ul> |
|---|---|

**Deliver Appropriate and High-Quality Training**

To some extent, the Training Division has sought to incorporate the results of the Needs Assessment and best practices when developing training for PPB members. For In-Service Training, however, the primary emphasis has been on satisfying specific requirements of the Settlement Agreement imbedded in the new force directive. Whether this mixture of inputs can result in high-quality, impactful training is an empirical question, which should be measured through empirical methods.

We interpret "all aspects of PPB training" (Par. 78) to include In-Service (including Supervisory In-Service) and Advanced Academy and will therefore assess PPB training delivered to these groups. To inform our evaluation of training and par. 84, we used the following methods: Reviewed PPB's training evaluation tools and measures; reviewed PPB responses to COCL recommendations; observed Advanced Academy and In-Service Training; reviewed applications of Kirkpatrick Model of evaluation; and interviewed and consulted with Training Academy management and instructors

In-Service Training

We have observed In-Service training for the past three years, including the In-Service training which began on September 7th of this year. Where possible, we use classes from the Fall 2017 training as examples of compliance with Par. 84 as these are more recent and have had the benefit of additional COCL/DOJ input via prior compliance assessments, technical assistance, and consultation. However, where a particular subject was not included in the Fall 2017 training, we look to see whether In-Service within the past has adequately covered it to determine whether subsections (a) and (b) have been satisfied through a combination of In-Service courses. The table below provides an assessment of each section of paragraph 84. For additional details, please see Appendix IV-2 (COCL In-Service Training Observations)

| Settlement Agreement Paragraph | How incorporated into In-Service Training |
|---|---|
| 84(a)(i) "…increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention." | In the Fall 2017 training, PPB has a total of 4 scenarios dealing with a variety of topics (These scenarios will not be named here to avoid influencing students who have yet to take the training)> . Additionally, PPB has begun incorporating interactive knowledge checks regarding proper force decision making. For the Fall 2017 training, we noted that the interactive knowledge checks were used to facilitate discussion and further the conversation on when force may or may not be acceptable.<br><br>In each of the In-Service trainings we have observed, PPB has included one or more scenarios of people who have or are perceived to have mental illness. |

| | |
|---|---|
| | Finally, PPB has responded to our recommendation to include some type of thought-exercise on peer intervention. |
| 84(a)(ii) "…emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force." | As part of PPB's presentation on the revised force policy, de-escalation is highlighted as having a role in conflict management and that PPB holds the "expectation that de-escalation skills are applied throughout an encounter" (2017 In-Service 1010.00 Directive Update). Additionally, de-escalation skills are assessed during some of the scenarios. PPB has, in past In-Service trainings, discussed the importance of de-escalation skills and covered them again in Sept. 2017. However, we maintain the PPB's definition of de-escalation is problematic, giving too much attention to command and control tactics instead of presenting de-escalation as a tool to gain voluntary compliance (See Appendix IV-2). PPB needs to rethink and expand its concept of de-escalation in the future, particularly given the impact on measurement (see for example, our evaluation found in Section VI. Crisis Intervention). |
| 84(a)(iii) "…continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any." | In the 2017 Fall training, PPB's review of the revised 1010.00 includes Material that will satisfy this requirement. Additionally, PPB has included a question on this topic during the in-class knowledge check as well as on the individually scored knowledge evaluation at the end of Day 1. We have not seen any deficiencies identified by the Inspector related to procuring medical attention in a timely fashion. |
| 84(a)(iv) "…continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a | The Fall 2017 training includes both scenario and course coverage of the concepts listed in |

| | |
|---|---|
| subject, summoning reinforcements, requesting specialized units, including [ECIT] officers and mental health professionals, or delaying arrest." | Par. 84(a)(iv) as part of the changes to the Directive 1010.00.<br><br>In past In-Service trainings, we have also noted the aspects of Par. 84(a)(iv) incorporated into training, notably in the Spring 2017 In-Service training through the "Disengagement with a Plan" course. |
| 84(a)(v) "…describe situations in which a force event could lead to potential civil or criminal liability" | In each year of In-Service we have observed, a Legal Update is provided, examining changes in criminal and/or civil case law which may lead to civil or criminal liability. Furthermore, classes covering use of force emphasize the constitutional requirements for use of force, providing guidance to officers as to when they may be held liable. |
| 84(a)(vi) "…continue to train officers to avoid using profanity, derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-centered communication, such as the term 'mentals,' in all work-related settings and communications, as well as when interacting with the public." | The requirements of Par. 84(a)(vi) center around the concept of respectful policing and procedural justice. In past reports, we have stressed the importance of respectful communication. For instance, in our 2016 Q3/Q4 Compliance Assessment, we noted "we cannot emphasize enough the need for training in communications skills, procedural justice, and empathy to prevent the escalation of conflict…just as firing a weapon requires practice and the achievement of proficient standards, we maintain that interpersonal skills require lots of practice, feedback, and more practice."<br><br>For the Fall 2017 training, trainers mentioned (in passing) the concept of procedural justice and how it may lead to the community viewing them as more legitimate. However, the classroom coverage was a cursory mention and inaccurate. PPB did include two scenarios where officers had opportunities to practice respectful and procedurally just policing, however, the |

| | |
|---|---|
| | debriefing for only one scenario reinforced these practices. |
| 84(b)(i) [SUPERVISOR TRAINING] "...conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3." | The Fall 2017 training includes a section on use of force reporting for supervisors as well as the requirements for investigating officer uses of force. As the training detailed the revised 1010.00 which contains all aspects of "Section III.A.3" (see our assessment of Par. 70), we feel the requirements of Par. 84(b)(i) have been sufficiently met. However, the material was rushed and too much for an all-purpose In-Service training. We strongly recommend a separate In-Service for supervisors that covers force investigations, EIS, Crowd Control, and other matters where appropriate supervisory actions are critical. |
| 84(b)(ii) [SUPERVISOR TRAINING] "...evaluate officer performance as part of PPB's annual performance evaluation system." | The Spring 2017 training included a course on EIS and supervisor evaluations of officers. However, in both of the iterations of the course which members of the COCL attended, we do not feel supervisors were provided any real direction on *how* to perform such evaluations, nor does Directive 345.00 contain such direction other than that "supervisors will review the information available in EIS, including the various external data sources, [Performance Discussion Tracker], and [Alert Management System]". While we comment more on this in our assessment of Section VII, we do not believe supervisors have received sufficient training on evaluating officer performance. |
| 84(b)(iii) [SUPERVISOR TRAINING] "...foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action." | Similar to our comments for Par. 84(b)(ii), we look at the requirements of Par. 84(b)(iii) as tied in with supervisor training on EIS which includes officer evaluation and management. The ability of supervisors to "foster positive career development" and impose "non-disciplinary corrective action" stems from |

| | the adequate review of the employee. Without training on *how* to review an employee, the supervisor's job is unclear. Furthermore, successful employee interventions require a variety of skills and tactics. Thus, we would strongly recommend PPB enhance their EIS training for supervisors. |
|---|---|

CEW Training

In addition to the requirements of Par. 84, we also include in our assessment here PPB's requirement to provide "annual [CEW] in service training including proficiency and policy changes, if any" as included in Par. 68(h). For this requirement, we have found CEW training in all years that we have observed In-Service training. However, we have also noted limitations in PPB's previous CEW training, ranging from adequate feedback to students about proper warnings prior to CEW deployment to the use of inferior training videos. Overall, previous trainings on CEW lacked a comprehensive delivery of "proficiency and policy changes."

In the Fall 2017 In-Service, however, the classroom training around CEW usage improved significantly. The classroom lectures articulated relevant changes to the new force policy, including changes to the list of "restricted" persons, restrictions on Tasering someone who is running away, restrictions on the number of applications, etc. The hands-on practice with CEWs was used very effectively to integrate policy and practice. The instructor did an excellent job of querying students regarding their knowledge of CEW policy and the conditions under which CEWs could and could not be deployed. This class was designed to give students practice opportunities in areas where problems have traditionally occurred, such as the subject being too close to the officer, too far away or on the run.

Recruit Training: The Advanced Academy

We also looked to see whether recruit officers are gaining a sufficient introduction to the topics listed above during the Advanced Academy. In the first and second quarter of 2017, we observed select courses provided in Advanced Academy and have reviewed lesson plans and presentation material for others. Overall, we were impressed with the Advanced Academy courses, particularly with the emphasis on procedural justice, positive communication, and respectful policing that came at the beginning of the academy rather than as an afterthought. As noted earlier, the Training Division contracted with a curriculum development specialist in 2014 to re-evaluate the Advanced Academy, and this effort appears to have been a good

investment. We have concluded that PPB has incorporated the subsections of Par. 84(a) with respect to new officers.


General comments on In-Service Training

After the COCL team spent a total of 100 hours at the Training Academy observing the latest In-Service classes, as well as conducting one-on-one and group interviews with training academy administration and instructors, we have reached several general conclusions about In-Service training that extend beyond specific classes:

➢    Many of the instructors are very talented and have demonstrated their ability to effectively engage the students in the process of adult education and training; the quality of instruction varied, as would be expected in any large organization.

➢    PPB administrators, including senior staff and instructors at the Training Academy, worked many hours beyond what they were being paid, to improve the level of instruction during the 2017 In-Service Training. They have made a good-faith effort to be responsive to the many recommendations of the COCL and DOJ, and to a large extent, have succeeded. However, the PPB Training Academy needs additional resources and staff to provide more comprehensive training (as recommended by COCL) and bring them to the cutting-edge of police practice in the 21st century.

➢    The general thrust of the In-Service Training was to educate officers regarding specific changes to the language of the Force directive 1010.00. This effort was largely successful, as demonstrated by their in-class quizzes and tests. Whether that knowledge can be translated into practice remains to be seen.

➢    The scenarios were well designed and executed overall. The debriefings after the scenarios were generally thoughtful and the questions caused students to think about their decisions (both good and bad) and missed opportunities as they engaged in active role playing.

➢    The In-Service Training did give some attention to verbal communication skills, which we have continuously emphasized for the prevention and de-escalation of force encounters, but we maintain that insufficient time and quality instruction was devoted to this important set of behaviors. A large portion of time was spent on conventional training, such as defensive tactics, but at the cost of other topics relevant to the Settlement Agreement. The coverage of communication skills and de-escalation in the classroom was limited and at times inaccurate (e.g. list of procedural justice principles was wrong). The scenario coverage was good, providing several opportunities to practice verbal skills, although the debriefing was more variable on this task in particular. We encourage PPB to give more attention to the prevention of force encounters in future trainings and look for best practices in this field.

➢      PPB should rethink their presentation of de-escalation and procedural justice to be more consistent with best practice. PPB has chosen to focus on de-escalation <u>during</u> a force event (e.g. commands and warnings) rather than de-escalation before a force event (e.g. calm and empathic communication). PPB officers have been well trained to use force techniques to interrupt the force event and keep it from escalating further (coercive compliance techniques), but given less training in preventing situations that require the application of force. By using non-threatening verbal de-escalation techniques up front, some portion of force events can be prevented altogether. De-escalation techniques are those utilized to calm an agitated subject, promote rational decision making and gain <u>voluntary</u> compliance that is not based on fear. They can and should be applied in a wide range of encounters beyond those involving a person in a mental health crisis. Some of these techniques were covered during the spring 2017 In-Service, but opportunities to practice these skills have been very limited.

➢      This In-Service training is not a replacement for supervisor training, which is sorely needed to provide more in-depth coverage of the important roles of supervisors in force events, Crowd control, EIS, vehicle pursuits, and other police actions. If anything, this In-Service drew attention to how much the PPB organization relies on first-line supervisors to successfully execute many of its complex and high-risk operations. Supervisors need the opportunity to ask questions and discuss issues among themselves, without other ranks present.

| Recommendations Par. 84 | <ul><li>Ensure that classroom technology is fully functional prior to the start of training</li><li>Encourage all instructors to consistently use technology such as clickers to facilitate discussion and reinforce the correction information</li><li>Standardize the protocol for administering surveys and tests to students and train instructors on this protocol</li><li>Expand the use of class time and scenarios where officers learn about, and practice, communication skills and tactics useful in difficult conversations and encounters with noncompliant individuals</li><li>Develop a plan to provide adequate resources to the Training Academy, so that staff are able to achieve all training objectives, including evaluation and feedback to instructors</li><li>With an eye toward reducing the number of use of force events in Portland, PPB's In-Service training should give more attention to verbal communication skills -- especially regarding procedural justice, de-escalation, and empathy -- at</li></ul> |
|---|---|

<table>
<tr><td></td><td>the front-end of police-community interactions. Beef up the coverage of these skills with "how to" details for both in-class presentations and scenarios

● Come to agreement with COCL and DOJ about the conceptualization of <u>de-escalation</u> and how the concept should be messaged by leadership and trained in the Training Division. We maintain that PPB should give less attention to techniques of forced compliance (e.g. controlling commands as a warning of impending force) and more attention to voluntary compliance (e.g. calming, listening, talking prior to the force decision).

● PPB should develop a comprehensive In-Service Training program exclusively for supervisors that covers the many roles they must assume in force events, crowd control, EIS, coaching at-risk officers, and vehicle pursuits. The current In-Service programs for both officers and supervisors do not meet this need.</td></tr>
</table>

**Documenting and Reporting Training**

<u>Electronic Tracking of Training</u>

When training has been completed, PPB needs to keep good records of what has transpired and report the results to the administration. The requirement in Par. 81 that PPB "ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records" will be accomplished through PPB's new Learning Management System (LMS). PPB purchased the LMS software in 2016, but it is a time-intensive process to bring this program to full implementation . In 2017 PPB hired a full-time manager for LMS. We have met with her and are impressed with her skills and the progress she is making in adapting this software to meet the needs of the PPB Training Academy and the needs of the Settlement Agreement.

In September of 2017, we were provided a technical demonstration of the LMS software as it currently operates. Using the 2017 Fall In-Service as grounds for testing the software, PPB's demonstration was impressive and the software appears capable of satisfying the requirements of Par. 81, including "electronically tracking, maintaining, and reporting complete and accurate records" of the following information delineated in the Settlement Agreement:

➢    Current curricula and lesson plans

- o    The LMS is capable of linking each class with the corresponding in-class presentations, handout materials, lesson plans, and other related documents.
- ➢    Training delivered
- o    The LMS tracks each class planned and delivered. The technical demonstration provided to us contained each In-Service course and in some cases, the corresponding training documents. Although the LMS is currently in a trial run (i.e. not all related documents are included in the system at this time), we are satisfied the system has the capabilities for tracking, maintaining and reporting all training delivered and received by PPB officers.
- ➢    Attendance records
- o    The LMS is capable of linking each class with the corresponding attendance rosters. Additionally, officers can be individually viewed, allowing PPB to evaluate training at the class-level as well as the individual-level. This will assist officer supervisors in their review of the database (see below).
- ➢    Other training materials
- o    The LMS is capable of storing evaluations of officer proficiency on both the class-level and the individual-level. For instance, in the 2017 Fall In-Service training, attendees were required to complete a knowledge test at the end of Day 1. The results are linked to both the overall results of the class as well as the individual officer's score. However, PPB notes that each individual officer's score in the scenario performance will not be captured in the LMS. We believe PPB would benefit from having this captured in the LMS as such information, combined with the officer's score on the knowledge check, would inform supervisors about areas where officers may require supplemental instruction. For instance, given the focus of the scenario and the performance of the officer, supervisors may be able to reinforce strengths while mitigating weakness.
- o    We also note that "training delivered" includes external training received by PPB members and there are plans in the future to include "voluntary" training videos produced by PPB. Thus, an officer's training record contains all training received rather than only the training delivered by PPB. We believe this will provide a more complete picture to supervisors when performing their reviews and support PPB's plans for including these aspects.

Although we have only been provided a framework of the LMS capabilities, our initial impression is that the system will contain the information necessary for "each officer's immediate supervisor [to] review the database for the officers under his/her command." We note that at the time of this report, the LMS has not been populated with all training information and supervisors do not have the ability to review officer training. However, we believe there has been substantial progress in this area given the prior issues with securing the software (see our previous reports).

Additionally, we believe that a fully functioning LMS would supplement PPB's current compliance with Par. 82 (below). Although PPB currently provides Course Attendance Summary Reports to the Assistant Chief of Operations that we believe substantially comply with Par. 82 (see COCL's 2016 Q3/Q4 Compliance Assessment), we have noted that the reports would benefit from including information about the success of the course in regard to officers' evaluations of the classes, knowledge levels, and proficiency when such elements are measured. A fully functioning LMS would also reduce the "hand-entered" mistakes we noted in our past report. However, these considerations will need to await the comprehensive implementation of the LMS, complete with the above information for each class.

## Reporting of Training Delivered

Par. 82 requires that PPB "report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ." As noted in our previous compliance report, PPB has provided us with Course Attendance Summary Reports that indicate the number of officers who have attended and successfully completed training classes. Because the information on these reports is hand-entered and errors have been detected, we expect fewer mistakes when the LMS program is fully functional.

## Trainer Selection

We reviewed the Work History Review Sheet for Q1 and Q2 hires in 2017 and believe PPB performs due diligence when hiring instructors that "do not have a history of using excessive force," especially against persons with mental illness (par. 83). We observed no exceptions to the criteria of SOP 1-19 (Training Division Instructor Selection Standards) and no prospective trainer had been involved in a civil judgment. Additionally, PPB has acted on our recommendation to remove the reference to the Settlement Agreement in the work history review sheets and the review sheets and now reference SOP 1-19. In addition, revised Directive 1501 now contains this hiring requirement for field training officers.

We maintain that if a trainer is involved in a civil judgment within the last five years based on their use of force, PPB should provide a justification and explanation as to why the officer is fit for service as a trainer and the civil judgment is not a disqualifying factor. As PPB is only required to "take into account" a trainer's prior civil judgment, it is not possible for strict criteria to be established here. Should PPB hire such a trainer, we will review the justification and explanation using a common-sense standard. We also continue to recommend PPB notify COCL if an exception to the criteria of SOP 1-19 is made.

| Recommendations Par. 81-83 | <ul><li>Continue on the current path toward full-scale implementation of LMS, so that curricula, lesson plans, training delivered, and attendance rosters are in the system and fully accessible</li><li>Use LMS to document student performance in training, including knowledge tests, range qualifications, scenario proficiency scores, and certifications</li><li>Use LMS to document students' collective evaluations of particular classes and areas</li><li>Continue to report training delivered and received semi-annually</li><li>Include all Course Attendance Summary Reports in LMS</li></ul> |
|---|---|

**Audit the Training Program**

At the request of PPB, in December of 2016, COCL provided PPB and the Inspector with a framework that would help guide the development of a Training Audit Plan. Using previous TA Statements as well as paragraphs from the Training Section of the Settlement Agreement as a template, we identified the types of considerations we felt were necessary to perform a comprehensive audit of PPB's training program. Some of the sections of the audit plan measure technical adherence (e.g. making training records accessible to specific people) while others require a far more critical assessment of the training program.

In response, the PPB developed an 18-page Training Audit Plan in July of 2017, and asked for COCL's feedback. The COCL prepared a 14-page analysis of PPB' plan (See Appendix IV-3). In a nutshell, we conclude that PPB's Training Audit Plan is "comprehensive and ensures that the requirements of the Settlement Agreement will be addressed in a reasonable manner." We point out, however, that substantial compliance will be achieved when the PPB: "(1) has implemented this plan with integrity (i.e., has made a good faith effort to collect the proposed information) and (2) can report a reasonable level of success (i.e. is able to create, sustain, and utilize record keeping systems and databases in a manner that yields useful information for most of the identified training domains)."

In their Training Audit Plan, PPB lists a wide range of documents and records that would be needed to conduct the training audit. We view this as a comprehensive listing that, if gathered and examined, should provide a solid foundation for a thorough training audit. We maintain that such records can go beyond the basic questions about "Who is getting what training from whom?" to "How good is the training?" and "Does the training make a difference in the knowledge, attitudes, skills and street-level behavior of the trainees?" (par. 80 and 85c)

The PPB has articulated a methodology for assessing the Annual Needs Assessment following the parameters laid out in Para. 85a. The Needs Assessment being evaluated should be based not only best practices in legal decisions (which PPB has done), but also "research reflecting best practices" (Par. 79(h)) relevant to force and factors that contribute to the use of force. We emphasize that legal decisions are minimum practices—what agencies need to do to act lawfully. Best practices, in contrast, are what agencies should be striving to achieve (based on expert consensus in the field, research and evidence) to be excellent, not merely lawful.

As specified in Para. 85c, the Training Audit will determine whether the PPB has developed and implemented "a process for the evaluation of training." However, we have been very clear that the Inspector's job is to ensure that evaluation plans are implemented well, not to develop such standards, which requires expertise in program evaluation. The COCL has provided sufficient guidance to the PPB on evaluation standards, including TA statements and our assessment of compliance with par. 80.

The Training Audit plan offers a detailed proposal for assessing whether accurate records of the training delivered are being maintained (Para. 85d) and are accessible to the key administrators (85e). PPB's plan to retain individual training data will increase accountability, as well PPB's strong interest in upgrading the records system from paper to an electronic format.

PPB also articulated its plans for reviewing the training and supervision for probationary officers (85f, 85d). The ADORE system will allow the Inspector to monitor assignments and rotation through five phases of FTO training.

COCL's analysis of PPB's Training Audit Plan goes beyond the provisions of paragraph 85 to provide feedback on PPB's upcoming In-Service plans, as well as recommend new directions in police training. On 7/12/2017, the COCL and Compliance Coordinator met with the Training Division commander and command team to further this objective. Our report and face-to-face meetings communicated several additional points beyond evaluation and auditing: First, instructors need to integrate a discussion of new policy into skills training; Second, some training should be based on "research reflecting best practices" including research showing that procedurally just actions by the police are strongly valued by the community and are important for gaining voluntary compliance, cooperation, public trust, and legitimacy.

Along these lines, we recommended that PPB trainers build scenarios and practice sessions that strengthen communication skills during difficult conversations and encounters with noncompliant individuals. (We were encouraged to see that PPB did this – see par. 84). Also, we emphasized that supervisory training is essential and should not only cover the basic requirements of the Settlement Agreement (e.g. After Action Reports, EIS entries), but also focus on "good supervision" and the techniques involved in active listening, coaching, and counseling officers, especially those at risk of problematic behavior. We have yet to see this happen, but the bigger message here is that the Training Audit should address the content of training and not simply count the number and type of trainings that are conducted.

| Recommendations Par. 85 | <ul><li>Implement the Training Audit Plan successfully by exploiting the LMS training records system to increase training accountability and produce useful information for the PPB</li><li>Training audit should continue to check that Needs Assessment report is updated, reviewed by Training Division and integrated into training curricula</li><li>Training audit should ensure that leading research on procedural justice is reflected in the Needs Assessment and in the training curricula</li></ul> |
|---|---|

Evaluation of System

We now return to whether the implementation of the Settlement Agreement has allowed PPB to create a training system able to (1) identify areas where officers require training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; and (4) audit the overall training system to ensure that it is accountable to the administration and the public.

The Bureau has created a reasonably good needs assessment system that helps to identify issues and topics where additional training would be beneficial. We encourage PPB to assess whether the Needs Assessment is useful to all trainings (for example, ECIT and the Advanced Academy) and consider using evaluations of past trainings as well as findings of the Force Audit to identify training needs.

At the core of the training agenda is the development and delivery of appropriate and high-quality training for new recruits, officers and supervisors and here we believe PPB has achieved success in many areas, but not all. With an eye toward reducing the number of use of force events in Portland, PPB's In-Service training should give considerably more attention to verbal communication skills -- especially regarding procedural justice, de-escalation, and empathy -- at the front-end of police-community interactions. We have concluded that de-escalation was not given sufficient or accurate attention in training. DOJ and COCL must come to an agreement with PPB on the definition of de-escalation before significant progress can be made in this domain.

Furthermore, the development of training should include a comprehensive In-Service Training program exclusively for supervisors that covers the many roles they must assume in force events, crowd control, EIS, coaching at-risk officers, and vehicle pursuits. The current In-Service programs for both officers and supervisors do not meet this need.

PPB has made considerable strides in 2017 toward developing a legitimate system of training evaluation, using multiple methods to achieve this objective. However, the system is still in its

infancy and those responsible for administering in-class surveys and knowledge tests have not demonstrated sufficient appreciation of the importance of establishing and strictly following a protocol to ensure the validity of the data (e.g. no talking while surveys are being administered). Used with only one scenario, the skills test has not been adequately field tested to know whether it will yield reliable data about officers' interactional skills. Nevertheless, PPB has been willing to introduce these methods based on our recommendations and is beginning to test and refine them.

As a tool for tracking training and ensuring that it is accountable to the administration, Settlement Agreement and public, PPB has made significant progress toward building their LMS system and has hired a full-time LMS manager. Fully loading the LMS with Training Division curricula, lesson plans, training delivered, and attendance rosters for all classes will be a major upgrade from the current file cabinets. Our hope is that the LMS will be used to document student performance, including knowledge test, range qualifications, scenario proficiency scores, and certifications for all PPB members. It can also be used document student evaluations of particular classes and for needs assessment.

Finally, PPB's Training Audit Plan is comprehensive and ensures that the requirements of the Settlement Agreement will be addressed in a reasonable manner. Substantial compliance in this domain will be achieved when the PPB: (1) has implemented this plan with integrity (i.e., has made a good faith effort to collect the proposed information) and (2) can report a reasonable level of success (i.e. is able to create, sustain, and utilize record keeping systems and databases in a manner that yields useful information for most of the identified training domains).

# V. COMMUNITY-BASED MENTAL HEALTH RESPONSE

# VI. CRISIS INTERVENTION

| | |
|---|---|
| Par. 88 | Substantial Compliance |
| Par. 89 | Substantial Compliance |
| Par. 90 | Substantial Compliance |
| Par. 91 | Substantial Compliance |
| Par. 92 | Partial Compliance |
| Par. 93 | Substantial Compliance |
| Par. 94 | Substantial Compliance |
| Par. 95 | Substantial Compliance |
| Par. 96 | Substantial Compliance |
| Par. 97 | Substantial Compliance |
| Par. 98 | Substantial Compliance |
| Par. 99 | Partial Compliance |
| Par. 100 | Partial Compliance |
| Par. 101 | Partial Compliance |
| Par. 102 | Substantial Compliance |
| Par. 103 | Substantial Compliance |
| Par. 104 | Substantial Compliance |
| Par. 105 | Partial Compliance |
| Par. 106 | Substantial Compliance |
| Par. 107 | Substantial Compliance |
| Par. 108 | Partial Compliance |
| Par. 109 | Substantial Compliance |
| Par. 110 | Partial Compliance |
| Par. 111 | Substantial Compliance |

| Par. 112 | Substantial Compliance |
| Par. 113 | Substantial Compliance |
| Par. 114 | Substantial Compliance |
| Par. 115 | Partial Compliance |

In this section, we provide an evaluation of whether PPB and the City's implementation of the Settlement Agreement have created "capable systems and resources for responding to persons in mental health crisis" (Par. 173) based on their level of compliance with the paragraphs found within Section V (Community-Based Mental Health Services) and Section VI (Crisis Intervention). We also provide an evaluation of whether PPB and the City's implementation of the Settlement Agreement have created "effective training for police officers that increases the knowledge, skills, and abilities necessary for effective and successful delivery of service to persons in mental health crisis" (Par. 173). For our evaluation in this respect, we include training provided to BOEC emergency communicators as an additional focal point given the importance of collaboration between the two entities for creating a capable response system.


**Community-Based Mental Health Services**

We maintain our position from previous reports that the requirements under Section V (Community-Based Mental Health Services) are directed towards entities external to PPB and the City, though the Settlement Agreement lacks the legal authority to compel such entities to perform the tasks outlined. While PPB and the City may reasonably be assumed to be participants in Community-Based Mental Health Services, they cannot (and should not) be assumed as the primary driver of community services. Thus, we continue to evaluate PPB and the City on their reasonable participation in the process given the opportunities available to them.

In Par. 88, the Settlement Agreement identifies the City's partners in delivery of mental health services as "the State of Oregon Health Authority, area Community Care Organizations ('CCOs'), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ('NGOs') such as community-based mental health providers, and other stakeholders." Given this list of partners, we look to see how PPB interacts with these groups in PPB-driven initiatives as well as initiatives driven by the external groups.

We have seen a number of initiatives wherein PPB has worked with the above groups, some of which focus on service delivery to targeted individuals while others focus on systemic issues at the intersection of criminal justice and mental health. For example, the Behavioral Health Coordination Team (BHCT) meets bi-weekly and includes partners from Multnomah County,

Cascadia, community service providers and advocates, and State/Federal law enforcement. At these meetings, community members with mental illness, addiction, and higher levels of criminality are discussed to coordinate a multi-system response. These meetings inform the work of PPB by providing a planned response for people most likely to repeatedly come in contact with the criminal justice system.

The Behavioral Health Unit Advisory Committee (BHUAC) acts as a PPB-driven avenue for gathering the input of community partners in delivering community-based mental health services. The BHUAC contains representatives from PPB command leadership, ECIT, BHRT, SCT, BOEC, Multnomah County Sheriff's Office, State/County/local mental health services, CCO's, City and County representatives, and mental health community representatives/peer support specialists (in compliance with Par. 94). We have observed numerous meetings of BHUAC and have been continuously impressed by the collaborative and respectful nature of the meetings. We have also reviewed meeting agendas, minutes, recommendations and PPB response to recommendations.

Finally, a representative from SCT has been participating in the Oregon Behavioral Health Collaborative. The collaborative examines statewide issues with mental health service delivery and "is made up of nearly 50 Oregonians from peer support services, advocates, counties, behavioral health providers, courts, DHS, Oregon's coordinated care organizations, hospitals, education, law enforcement, a representative from an Oregon Tribe, and an urban Indian organization" (Behavioral Health Collaborative Report – http://www.oregon.gov/oha/HPA/CSI-BHP/Documents/Behavioral-Health-Collaborative-Report.pdf).

Given the above relationships, we are satisfied that PPB understands the importance of local, county, state, and federal partnerships and has taken steps to initiate or gain membership to groups that gather perspectives from various stakeholders to improve their own role in interacting with persons in mental health crisis as well as improve the overall delivery of mental health services. In the past, we have noted that Par. 88 is a summative paragraph and that compliance with Par. 88 would be based on a summative assessment of other paragraphs within Section V. We now turn to those other paragraphs to assess whether PPB's appreciation of community partnerships has led to compliance with the remainder of Section V.

Paragraphs 89 and 90 of the Settlement Agreement hold expectations of Community Care Organizations (CCOs) and rather than binding PPB and the City to an explicit requirement, instead can be read as creating an implicit responsibility of PPB and the City to participate in the overall process. The process PPB has been afforded the most opportunity to participate in has been in the establishment of the Unity Center, a psychiatric emergency service that addresses many of the expectations of Par. 89. From its initial planning, PPB has participated in the Transportation Workgroup, a "task force charged with creating a system in which EMS replaces PPB as the transporter of those placed on a civil hold."

In conjunction with the opening of the Unity Center, PPB has revised their directives (850.21 – Peace Officer Custody (Civil); 850.22 – Police Response to Mental Health Director's Holds and Elopement; 850.25 – Police Response to Mental Health Facilities) to reflect the practice of private ambulance transport (AMR) for individuals taken into custody on mental health holds. In our past report, we noted that posting of the revised directives was delayed until the opening of the Unity Center. In February of 2017, the Unity Center opened for walk-in patients only. However, in May of 2017, the Unity Center opened for both walk-ins and drop-offs and currently operates as a 24/7 care facility. Concurrent with the Unity Center opening for drop-offs, PPB enacted the corresponding directives.

The requirements of Par. 90 are problematic due to the lack of opportunity for PPB to participate in CCO subcommittees which, within the past two years, have not been active. In the past, PPB participated in a Health Share Task Force that completed its work in 2015. PPB does continue to participate in Legacy ED Community Outreach monthly meetings which are also attended by "staff from all area hospitals…Family Care, Health Share, clinics, homeless shelters, Portland Fire and Rescue, Portland Police, and multiple community mental health agencies" (see PPB 2016 Q2 Summary Update). Furthermore, PPB's own committees (BHCT and BHUAC) have CCO representatives. Thus, while PPB does not currently participate in subcommittees created by CCO's as required by the letter of the Settlement Agreement, we may consider the spirt of the Settlement Agreement being fulfilled by the other avenues of interaction.

As to the "initial improvements" to the behavioral health care system identified in the subsections of Par. 90, we note that PPB cannot achieve the improvements alone and does not determine the direction of the committees they serve on. Regardless, through the implementation of the Settlement Agreement or through the boards that PPB participates in, a number of the initial improvements have occurred. Improvements include an increased sharing of information between agencies and organizations (e.g. BHCT, partnerships with MCCL and BOEC, BHUAC, etc.), expanded options and available capacity for BOEC emergency communicators to divert calls to qualified mental health providers as first responders (i.e. BOEC's ability to transfer a call to MCCL who may then send Project Respond to a call), development of a referral guide for services and locations (See Appendix V-1), and expanded use of peers to coordinate with BHU (e.g. peer membership on the BHUAC). Thus, although we have not seen evidence of each subsection of Par. 90 being accomplished, we assess that PPB can only go so far without CCO's voluntarily creating subcommittees for each subsection in order for PPB to participate. We therefore believe PPB has substantially complied with the requirements of Par. 90 that they can reasonably be expected to fulfill.

| Recommendations Par. 88-90; 94 | • PPB should continue to work with partners on current avenues of mental health response as well as expanding avenues when possible. |
|---|---|

|  | • PPB should monitor ongoing collaboration efforts and evaluate functioning of new transport and response directives.<br>• PPB should continue to identify additional community partners when issues demonstrate such a need |
|---|---|

**BHU, BHCT, and BHUAC**

Contained within Section VI (Crisis Intervention), Subsection A (Addictions and Behavioral Health Unit and Advisory Committee) requires PPB to create a Behavioral Health Unit (BHU) as an avenue for achieving capable systems and resources for mental health response. The BHU is PPB's principal unit for coordinating the Bureau's mental health crisis response in Portland, evaluating the impact of that response, and using evaluations to modify response where appropriate. Even prior to the Settlement Agreement being signed, PPB had already begun the process of creating the BHU and the substructures within it (BHUAC, ECIT, BHRT, and SCT). As a vehicle for complying with the requirements of Par. 91, we assess BHU to be in substantial compliance in that it oversees and coordinates ECIT, BHRT, and SCT and provides input and oversight on mental health training provided to all officers within PPB.

One of the repeating themes found within Subsection A is the collection, sharing, evaluation, and tracking of data related to mental health response, as well as a BHU Advisory Committee (BHUAC) that can use the information compiled by PPB to create a continuous feedback loop. For instance, Par. 92 requires the BHU to "manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County." The goal here is to "use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services." This is being accomplished through several means. For example, as of June 2017, the BHU compiles a weekly report of "all BERS referrals" within that week and sends it to the Multnomah County Crisis Line. These reports allow MCCL to review those who do not meet BHRT eligibility criteria and allow MCCL to facilitate care through their referral network (see below under BOEC for a summary of MCCL partners). MCCL can identify a community member's service provider (if the community member has one) to provide reconnection, dispatch Project Respond, and/or provide referral and light linkage to services in the community. This data sharing process has the capacity to reach people PPB cannot serve, including those for which ongoing police intervention is unnecessary. As this is a relatively new process, we do not have a sufficient number of cases to evaluate its effectiveness. However, we commend PPB for initiating this process.

The Behavioral Health Coordination Team (BHCT) includes representatives from numerous County agencies and program, including Probation, the Sheriff's Department. We have reviewed BHCT agendas and minutes as well as observed these meetings. The discussions during meetings identify individuals in the community who have had frequent police contact but have been difficult to engage in ongoing services. BHCT members share information that is subject to lawful disclosure and develop coordinated plans in order to reduce future criminal justice contacts.

Internally, BHU has mechanisms for reviewing data to inform the work of other areas of the Unit. In June of 2017, the BHU Lieutenant distributed a memorandum to all BHU personnel which included procedures for reviewing mental health mask/mental health template data and notifying the BHU Lieutenant, CIT Coordinator, and SCT Coordinator when a person has been the "subject of three or more ECIT designated calls AND a General Offense (GO) report was written and/or was the subject of a call that warranted a mental health template" within the preceding 30 days. This process identifies persons with repeated contacts with police and creates an opportunity for proactive delivery of mental health services that may have otherwise been lost. This is a new response strategy for "repeat calls for service" as identified in Par. 93(a) and complies with BHRT's requirements in Par. 110 ("utilize [ECIT] data to proactively address mental health service"). As this is a relatively new process, we do not have a sufficient number of cases to evaluate its effectiveness, though we see this as a promising strategy.

Data on calls meeting the criteria for completion of a mental health template are also reviewed by BHU to identify potential training needs and, where training needs are indicated, forwarded to the Training Division for inclusion in the Needs Assessment. This accomplishes the requirement of Paragraph 93(b) while the broader work of the BHCT and BHUAC assists in proposing solutions to systematic issues. The data have also been used to identify exemplary officer performance (see Appendix VI-1). PPB may also want to pursue obtaining de-identified MCCL data regarding disengagement actions to examine patterns related to the use disengagement (with a plan) as a strategy. Currently, the Mental Health Template captures if disengagement was used by the officer. MCCL also collects some data, as officers are required to contact MCCL when they use disengagement. HIPAA/legal restrictions prevent MCCL from sharing identifiable mental health service information regarding post disengagement linkage and outcomes with PPB. De-identified MCCL data would allow PPB to further assess this strategy and to identify and propose solutions to systematic issues. Overall, PPB currently appears to be doing everything within its control to comply with the requirements of Par. 93.

Utilizing the data and information generated by PPB (as well as information provided by committee members), the BHUAC then provides "guidance to assist the City and PPB in the development and expansion of" the Behavioral Health Unit, the sub-units within (ECIT, BHRT, and SCT), BOEC, and the overall system of mental health response. Consistent with Pars. 95 and 96, we have either observed or reviewed BHUAC minutes wherein "changes to policies, procedures, and training methods" related to PPB's mental health response have been

77

discussed and, where appropriate, recommendations for improvement have been made. Upon receipt of recommendations from BHUAC, the BHU Lieutenant has provided a response, indicating areas of agreement or, when disagreeing with a recommendation, providing a detailed justification as to why the recommendation has been rejected.

| Recommendations<br>Par. 91-93; 95-96 | <ul><li>PPB should continue to share information with partners when allowed by law</li><li>PPB has an ongoing obligation to continue the work of BHU, BHUAC, and BHCT</li></ul> |
| --- | --- |

## CIT and ECIT

The Portland Police Bureau has designed a system of mental health response that while based on the Memphis Model required in Par. 99 of the Settlement Agreement, is unique to Portland. As Subsections B (Continuation of C-I Program) and C (Establishing "Memphis Model" Crisis Intervention Team) of Section VI contain technical requirements as well as requirements for the overall model, our analysis breaks these two apart to determine (1) whether the technical requirements have been met and (2) whether PPB has provided sufficient justification for their deviation from the Memphis Model.

Subsection B of Section VI notes that Crisis Intervention is "a core competency skill for all sworn police officers in the City" (Par. 97) and requires PPB to maintain their current "40 hours of [Crisis Intervention] training to all officers before they are permitted to assume any independent patrol or call-response duties" (Par. 98). Additionally, annual In-Service training is required to include Crisis Intervention refresher components, determined in part with the consultation of BHUAC.

We have observed each year of annual In-Service training and selected courses within the Advanced Academy and believe that both are sufficient to meet the requirements of Pars. 97 and 98. Additionally, the *quality* of both Advanced Academy and In-Service Crisis Intervention training is good, and the content is consistent with a Memphis Model CIT training (though we do note that the delivery varies from the Memphis Model as it is taught over a period of weeks to inexperienced personnel rather than in a one week block for experienced officers who have volunteered).

Subsection C (Establishing "Memphis Model" Crisis Intervention Team) contains a number of technical aspects (SA Pars. 100-105) which we will deal with before discussing whether PPB's

model is a justifiable deviation from Par. 99. For personnel who comprise ECIT, we assess the qualification (Par. 101), selection (Par. 101), participation (Par. 101), training (Par. 102), and duties (Par. 103) are mostly consistent with the Settlement Agreement, the Memphis Model, and best practices. For instance, we have reviewed SOP #3-3's (see Appendix VI-2) criteria for selecting ECIT officers, including the requirement they be volunteer officers (Par. 100), that they not have been "subject to disciplinary action based upon use of force or mistreatment of people with mental illness" in the three years prior to ECIT service/during ECIT service (Par. 101), and that they will retain their normal duties until dispatched as ECIT (Par. 103). The criteria found in this SOP were also created in consultation with BHUAC (Par. 101) (See Appendix VI-3). Additionally, we have reviewed documents related to the process of ECIT selection, including work history reviews and supervisor questionnaires.

PPB has implemented a system to ensure the ongoing eligibility of ECIT officers (Par. 101) wherein any EIS flag and/or IA investigation is forwarded to the BHU Lieutenant for review. We believe this process is sufficient to ensure continued eligibility for ECIT service. However, we note that SOP #3-3 still contains that language that when an ECIT officer has become "subject to disciplinary action based on the use of force or mistreatment of people with mental illness," the BHU Lieutenant will coordinate with the Central Precinct Commander on the decision to remove that officer from ECIT service. This stands in contrast with the Settlement Agreement which requires removal unequivocally.

The "initial goal of 60-80 volunteer, qualified [ECIT] officers" (Par. 100) has been met and exceeded as PPB now reports 133 ECIT certified members, approximately 118 of which are operational. Of the 118 who are operational, 104 have a primary assignment of patrol. However, the requirement of Par. 100 indicates that the total number should be "driven by the demand for [ECIT] services." In the past, we have recommended PPB take a data-driven approach to determining the number of ECIT officers needed. In February of 2017, the ECIT Advisory Council discussed ECIT coverage at Precincts and members expressed an "interest in having more morning relief officers with ECIT training, especially at Central and East Precincts" (see Appendix VI-4). We note that in our previous Outcome Assessment, we found lower rates of ECIT response to ECIT identified calls in these Precincts during the morning hours. We commend PPB for using data to determine ECIT training needs. PPB also provided an ECIT training in July of 2017, bringing the total number of sworn ECIT officers to 133. Given this number of officers, we would recommend PPB evaluate whether a sufficient number of ECIT officers are now in place to provide adequate coverage for ECIT type calls.

Using the data available to evaluate the frequency with which PPB has an ECIT officer at an ECIT type call, we note some improvement since our last Outcome Assessment (though see below for a potential caveat). In our last report, we evaluated the Mental Health Mask data and noted that ECIT officers responded to 69.7% of calls meeting ECIT criteria. Using the Mental Health

Template data available between April 25, 2017 and June 30, 2017[1], an ECIT response was provided to 84.7% of ECIT type calls. Although all three precincts demonstrated an increase in this metric, we continue to note inter-precinct differences in ECIT response, as Central Precinct continues to provide an ECIT response at a lower percentage than East and North Precinct.

|  | 3/1/16 – 1/31/17 | 4/25/17 – 6/30/17 |
|---|---|---|
| **Central** | 61.6% | 78.7% |
| **North** | 76.9% | 88.2% |
| **East** | 73.0% | 92.0% |
| **TOTAL** | 69.7% | 84.7% |

We note that one potential cause of the change in response rates may be the switch to the Mental Health Template over the Mental Health Mask (see below for an explanation of the switch). The data from our last Outcomes Assessment used the Mental Health Mask while the data from 4/25 to 6/30 comes from the Mental Health Template and so the comparison should not be viewed as "apples to apples." It is feasible for a non-ECIT officer to respond to an ECIT type call and close the call without completing any type of report. In that instance, no Mental Health Template would be completed, meaning the lack of ECIT response to a ECIT type call would not be captured. It is unclear how often this occurs; thus, the data should be interpreted with some degree of caution. Additionally, we recommend PPB utilize BOEC data to determine whether all calls coded as ECIT have a corresponding Mental Health Template.

ECIT officers have further been specially trained with 40-hours of advanced content beyond the initial 40-hours received between the State Academy and PPB's Advanced Academy. In past reports, we have provided input on where ECIT training might be enhanced and in our April 2017 Compliance Assessment we reported that PPB was responsive to our recommendations. The overall content of ECIT training is consistent with the Memphis Model and includes classroom and/or scenario training in the following areas (among other areas):

- Mental Health Treatment and Diagnoses
- Consumer/Family Panels
- Crisis Communication Skills
- Mental Health Risk Assessment
- Psychosis and Communication
- Suicide Intervention
- Trauma Informed Care

---

[1] The Mental Health Template is a fairly new endeavor for PPB after the issues with the Mental Health Mask. Therefore, only two months of data were available at the time of our request. In future reports, we will evaluate a larger dataset.

- Mental Health Service Resources
- Site Visits
- ECIT Response and Considerations

Furthermore, the training provided to ECIT officers has received input from BHUAC on more than one occasion (see Appendix VI-5 (9/23/15 minutes), Appendix VI-6 (10/28/15 minutes), Appendix VI-7 (4/20/16 minutes), Appendix VI-8 (5/25/16 minutes), Appendix VI-9 (10/26/16 minutes), and, the process is established so that BHUAC input will continue to be solicited for future ECIT classes. For each of the times ECIT training has been reviewed by BHUAC, the minutes reflect a thoughtful consideration of the training.

PPB has revised its protocol for the data collection required in Par. 105. The District Attorney expressed concerns regarding the discoverability of the Mental Health Mask (see our previous reports), thus the Mental Health Template is now being used to collect information on mental health related calls meeting specific criteria. These criteria include when there is an actual or perceived mental health crisis and one of the following conditions exist:

- A general offense report is written (non-ECIT officers)
- An ECIT officer responds to the scene and utilizes his or her crisis intervention skills.

Although these criteria do not capture all mental health interactions, we understand the legal concerns expressed by the DA are not under the control of PPB. Although the Mental Health Template includes all of the elements of Par. 105, PPB indicates that not all fields are reliably captured. For instance, we have been informed that the "Disposition" field found in the MHT data and whether an ECIT officer was on-scene are variables collected from the *perspective* of the officer and may not be accurate. We recommend PPB enhance their data collection efforts with the MHT in order to make sure that it is reliably and consistently filled out. To that end, PPB should continue to communicate with all officers (ECIT and non-ECIT) how to recognize a mental health component and the limited set of actions that would be considered utilizing crisis intervention skills.

Finally, PPB has continued to make serious efforts to highlight the work the entire BHU, including ECIT, thus conforming to the requirements of Par. 104. PPB highlights the work through flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts.

We now turn to the most crucial paragraph of Subsection C which is the requirement of PPB to implement a Memphis Model Crisis Intervention Team. In assessing PPB's compliance with this paragraph, we first touch upon the elements which make up the "Memphis Model" and determine where PPB's model adheres to and differs from the Memphis Model.

The core of the Memphis CIT model is partnership and collaboration between the law enforcement and justice system (police, emergency communicators, corrections, judiciary); the mental health system; and the community, which includes advocates, family members and

persons with lived experience of mental illness. It is a community program that works to support safer and more effective responses to persons experiencing mental health crises. One element of the program is specialized training for police officers that self-select (and are vetted) into the specialist CIT role. These officers complete a one week, 40-hour CIT training that includes content on signs and symptoms of mental illnesses, co-occurring disorders, and mental health resources in the community. Extensive emphasis is put on practicing verbal de-escalation skills in realistic scenarios. Trainees also interact with panels of mental health providers, family members and persons with mental illnesses and do site visits to mental health agencies in the community. Post training, they retain normal patrol duties, but are available to be dispatched to calls involving a mental health crisis. In this specialist role, they further hone their skills and develop relationships with providers, families and community members.

CIT collaborations also work to develop a comprehensive community crisis response system that includes no refusal entry points to emergency mental health care. Evaluation is a critical ongoing element of the CIT program to analyze program effectiveness and identify/address barriers to more effective mental health crisis response.

Portland was an early adopter of the Memphis CIT model in the mid-1990s. However, over time, drift from the core elements of the model occurred, and as detailed in the DOJ findings letter (See Appendix VI-10), PPB was not supporting effective mental health crisis response.

Program issues noted by DOJ include:

- PPB personnel generally perceived it a low in professional status
- The training curriculum was not viewed as relevant
- Officers generally viewed membership negatively
- CIT was not considered a special status
- Officers viewed CIT as "just providing transport to people in crisis without extra pay or prestige"

In response to public outcry following the 2006 in custody death of James Chasse, Portland convened a Mental Health Task Force which recommended that PPB require the 40-hour CIT training for all officers. For new officers, the 40 hours is completed over the course of their pre-service academy training, not in a 40-hour block as is typical of Memphis Model CIT training. While this ensured all officers had some basic mental health response competency, it eliminated PPB's capacity to provide specialized mental health response by officers who *desired* to be the point of contact for mental health crisis, who practiced their skills regularly and developed relationships with providers, families and persons with mental illnesses.

Just as not all officers are well suited to be SWAT officers, the DOJ Findings Letter stated, "not every officer is well suited to effectively deal with people with mental illness." By moving away from the specialized model, PPB put the onus of mental health response on all officers, some of whose interest, skills and expertise are better used for other duties. Additionally, moving away from the specialist CIT model, reduced the ability of officers to practice mental health crisis

response skills regularly and build the relationships that support better ongoing partnerships and response.

As part of the Settlement Agreement, PPB was required to implement a Memphis Model CIT program. To recapture the specialist element of the Memphis Model, the Bureau created the Enhanced Crisis Intervention Team (ECIT), comprised of officers who volunteer and are vetted to take on the specialist role. These officers complete an additional 40 hours of training. Portland's ECIT program holds many things in common with the Memphis Model and responds to many of the critiques found with DOJ's Findings Letter. The partnership between law enforcement, mental health advocates, and mental health providers/educators/practitioners is apparent within BHUAC, BHCT, BHRT, and SCT. Within each of these subgroups, a diverse set of perspectives is synthesized to provide mental health response unique to the needs of the Portland community. Additionally, ECIT training is created with the input of many stakeholders and provided to a specialized group of officers who have volunteered and been selected to be ECIT specialists. Consistent with our recommendations in a TA Statement from March of 2016 (see Appendix VI-11), PPB holds a graduation ceremony for ECIT officers in order to facilitate a sense of pride, ownership and ECIT identity.

The primary point of departure between Portland's model and the Memphis Model is that ECIT officers do not respond to all calls involving a pre-identified mental health component. Rather, ECIT response is reserved for a subset of calls. An ECIT response is required when a subject has actual or perceived mental illness and one of the following elements is present (as determined by BOEC):

- The subject is violent
- The subject has a weapon
- The subject is threatening or attempting suicide (with specific plans and the means to carry out the threat or attempt)
- The subject is threatening to jump from a bridge or structure or threatening to obstruct vehicle traffic
- The call is at a residential mental health facility
- A community member requests an ECIT response
- A responding officer requests an ECIT response

Pre-identified mental health related calls not meeting these criteria are assigned to the nearest available officer regardless of ECIT status, as the Bureau maintains that all officers have completed 40 hours of CIT training and are equally qualified to provide safe and effective response, and to request an ECIT officer if needed. PPB was given provisional approval by DOJ to implement this variation on the Memphis Model, with the agreement that the Bureau would evaluate the effectiveness of this approach (another element of the CIT Model is ongoing evaluation). Data on mental health crisis calls are now being collected using the Mental Health

Template and the Bureau is working on a plan to use these data to examine the operation and effectiveness of its mental health crisis response model.

In our 2016 Q3&4 Compliance report, we provided an outline of analyses that could help PPB evaluate and demonstrate the adequacy of their model of mental health crisis response. Subsequently, in our Semi-annual Outcomes report released in May 2017, we conducted some of the outlined analysis, with caveat that we were not able to obtain BOEC or MCCL data and the Mental Health Mask data from PPB that we did use was limited in terms of reliability. Thus, any conclusions should be viewed with caution. The purpose of conducting the analysis was to demonstrate the type of analysis the Bureau should be doing on a regular basis to monitor the effectiveness of their model and to get an initial, but guarded sense of the current state of their response approach.

In July, we met with members of the Bureau and DOJ monitoring team to discuss the Bureau's plan to assess the effectiveness of their mental health crisis response model. We provided feedback on their plan and have continued to provide consultation on evaluation metrics. However, as of this report, a comprehensive evaluation of PPB's mental health response model has not been delivered. As an evaluation is necessary to justify a deviation from Par. 99, we cannot find PPB in Substantial Compliance with this part of the Settlement Agreement. Furthermore, a Memphis Model CIT program is a significant part of the overall Settlement Agreement and therefore, we believe without a comprehensive evaluation, PPB cannot be found in Substantial Compliance with Section VI (Crisis Intervention).

We stress that when completing the comprehensive evaluation, the Bureau will need to work with its partners, such as BOEC and MCCL to incorporate their data to assess the overall Portland mental health crisis response system. Based on our assessment, data to evaluate the program exist and should be fully utilized. Only then can the City determine whether the currently implemented model is meeting the requirements of the Settlement Agreement and the Portland Community.

We also stress to PPB the need to evaluate both components of their mental health response (ECIT and non-ECIT) as both will inform whether the current model is effective. Although a direct comparison is difficult given the types of cases ECIT officers may be asked to respond to, there are some comparisons that may be informative. For instance, with the understanding that MHT data carries some limitations with reliability, we evaluated the data provided by PPB related to Par. 105 to examine call dispositions when an ECIT officer was on scene when and ECIT officer was not. Although this is an iterative process and the inclusion of data outside the scope of the MHT may impact the results (e.g. presence of a warrant), the initial data analysis suggests an overall significant difference in dispositions depending on whether an ECIT officer was on scene or not ($p<.001$) and that these differences were maintained even when controlling for whether a weapon was present.

Table 2 – All MHT Cases (Controlling for Weapon) (p<.001)

|  | No ECIT On Scene | ECIT On Scene |
|---|---|---|
| Arrest (Physical) | 26.8% | 11.6% |
| Report Written (No Arrest) | 62.2% | 71.1% |
| Referred/Other Agency Handled | 4.7% | 4.5% |
| Assignment Completed | 4.1% | 8.2% |
| Some Other Disposition Code | 2.2% | 4.6% |

We also looked to see whether dispositional differences were based on whether a call met the criteria for ECIT or not. The findings indicate that in most situations, different dispositions occur when an ECIT officer is on scene. For instance, when a call does not meet ECIT criteria, calls with an ECIT officer are less likely to be cleared with an arrest and are more likely to be cleared with the disposition code "Report Written (No Arrest)." These findings remain even when controlling for the presence of a weapon (p<.05).

Table 3 – Non-ECIT Type Calls (Controlling for Weapon) (p<.05)

|  | No ECIT On Scene | ECIT On Scene |
|---|---|---|
| Arrest (Physical) | 27.2% | 13.5% |
| Report Written (No Arrest) | 61.8% | 68.0% |
| Referred/Other Agency Handled | 4.7% | 4.5% |
| Assignment Completed | 4.3% | 4.3% |
| Some Other Disposition Code | 2.0% | 9.7% |

For calls that meet ECIT criteria and a weapon is not present, no substantial differences in disposition were found between an ECIT response or not. There were not enough cases to perform an evaluation of ECIT Type calls with a weapon present.

Table 4 – ECIT Type Calls (No Weapon Present)

|  | No ECIT On Scene | ECIT On Scene |
|---|---|---|
| Arrest (Physical) | 12.5% | 8.2% |
| Report Written (No Arrest) | 75.0% | 77.6% |
| Referred/Other Agency Handled | 12.5% | 4.5% |
| Assignment Completed | 0.0% | 4.5% |
| Some Other Disposition Code | 2.0% | 9.7% |

| Recommendations Par. 97-105 | <ul><li>PPB should revise SOP #3-3 to require removal of an ECIT officer that has become "subject to disciplinary action based on the use of force or mistreatment of people with mental illness."</li><li>PPB should evaluate whether the current number of ECIT officers (with the addition of the July 2017 class) is sufficient to provide adequate coverage for ECIT type calls.</li><li>PPB should utilize BOEC data to determine whether all calls coded ECIT have a corresponding Mental Health Template</li><li>PPB should enhance their data collection efforts with the Mental Health Template to make sure that it is reliably and consistently filled out.</li><li>PPB should continue to communicate with all officers how to recognize a mental health component and the limited set of actions that would be considered utilizing crisis intervention skills</li><li>PPB should provide a comprehensive evaluation of their unique system of mental health response.</li></ul> |
|---|---|

**BHRT**

Subsection D of Section VI pertains to the Behavioral Health Response Team (BHRT). The BHRT is a two-person team comprised of a PPB officer who has received ECIT training and a Project

Respond staff member. Referrals of persons with mental illness who may benefit from BHRT intervention are made through the BHU Electronic Referral System (BERS). BHRT members then evaluate the community member to determine whether their situation meets the criteria for being assigned to the BHRT caseload. These criteria include:

- Risk to Others
- Frequent Contacts
- Escalating Behavior
- Risk to Self
- Other

The goal of BHRT is preventative intervention in that BHRT teams "proactively work with individuals who have multiple contacts with police to attempt to connect them with appropriate services in advance of a mental health crisis" (https://www.portlandoregon.gov/police/article/458966). With the participation of Project Respond clinicians paired with ECIT officers, community members can be connected to services related to mental health, addiction, housing, or emergency care depending on their needs. Our previous reports have indicated that BHRT has an approximate 60% acceptance rate. We recommend PPB monitor referrals and acceptance/decline rates to determine if current BHRT capacity is sufficient.

PPB's responsibilities under the Settlement Agreement primarily include requirements that are designed to improve the training/operation of the BHRT teams. PPB has substantially complied with these requirements and has implemented changes with a high degree of integrity. The BHRT team is comprised of a sworn officer and qualified mental health professional and teams operate within each PPB Precinct (Par. 106). The sworn officers have BHRT service as their fulltime assignment (Par. 107), though may assist on immediate crisis calls if no ECIT officers are available (see Appendix VI-12).

In accordance with the Settlement Agreement, BHRT operations and training have been developed in consultation with BHUAC (Par. 108). For instance, the "criteria for qualification, selection, and ongoing participation of officers in the [BHRT]" (Par. 108) was discussed with BHUAC in March of 2016 (see Appendix VI-3) as well as April of 2016 (see Appendix VI-7). Within SOP #3-2, the minimum qualifications for BHRT service are listed:

- Police Officer, non-probationary
- Strong interest in helping to improve the quality of life for people experiencing behavioral crisis
- Effective skills for communicating with people in crisis
- Excellent report-writing skills
- Strong investigative skills
- Strong collaborative skills
- Strong working knowledge of Police Bureau policies

- Must not have an IA disciplinary history that would be detrimental to the unit
- Must not have a sustained use of force or mistreatment complaint involving a person with mental illness within the last three years
- Commitment to serve one year in the position

In addition to the above criteria for qualification, new BHRT officers are required to "ride with an experienced officer or clinician before being permanently paired with a partner." This goes above and beyond the requirements of the Settlement Agreement, though we would recommend the practice continue to orient new BHRT officers to the responsibilities.

After the criteria for qualification, SOP #3-2 also includes a selection process which includes a work history review, input from supervisors and command staff, and an interview process. Upon selection, BHRT officers are subject to the same ongoing eligibility process as with ECIT officers (SOP #43). However, as with the ongoing eligibility with ECIT officers, we note that SOP #3-2 still contains language that when a BHRT officer has become "subject to disciplinary action based on the use of force or mistreatment of people with mental illness," the BHU Lieutenant will coordinate with the Central Precinct Commander on the decision to remove that officer from BHRT service. As with SOP #3-3, this stands in contrast with the Settlement Agreement which requires removal unequivocally.

In the April 2016, BHUAC provided consultation on training expectations for BHRT members (Par. 109). Item three on SOP #3-2 indicates that BHRT members will receive the "Bureau's 40-hour Enhanced Crisis Intervention Team (ECIT) training" and that PPB has "strong commitment to ensuring BHRT officers and clinicians" attend training on Applied Suicide Intervention Skills Training, Trauma Informed Care, Civil Commitment Investigator Training, HIPAA and Law Enforcement, and Threat Assessment. Although PPB notes that receiving the training is "based on availability and funding," we have reviewed documents demonstrating that BHRT members have received training on nearly all the recommended training topics.

As discussed in our assessment of Par. 89 above, PPB has enacted "policies and procedures for the transfer of custody or voluntary referral of individuals" to the Unity Center, in accordance with Par. 111 (see PPB Directives 850.21, 850.22, and 850.25). In reviewing these directives, we believe that they "clearly describe the roles and responsibilities" of BHRT officers when performing a transfer.

Our evaluation of Par. 110, (the requirement of BHRT to "utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers") is described in our assessment of Subsection A (see Pg. 77) as part of the systematic review of data for continuous improvement in BHRT response.

| Recommendations Par. 106-111 | • PPB should revise SOP #3-2 to require removal of a BHRT officer that has become "subject to disciplinary action based on the use of force or mistreatment of people with mental illness." <br> • PPB has an ongoing obligation as to the operation of BHRT |
|---|---|

## SCT

Subsection E (Service Coordination Team) of Section VI includes a single paragraph (Par. 112), requiring the Service Coordination Team (SCT) to "facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs." As a program, we assess SCT as substantially complying with this requirement and have seen the positive impact coming from their work. Although outcomes for SCT are described in our overall assessment of BHU, we report here how the program facilitates the provision of services required by Par. 112.

Using data within PPB, SCT identifies people who have a mental illness, experience houselessness, and have high levels of criminal offending and addiction. Such co-occurring characteristics often make SCT clients unapproachable by other social service providers. Given the frequent police contact by SCT clients, the program is designed to offer cost-effective treatment to impact the cycle of re-offending. SCT does this through a staged housing and treatment program. SCT clients are first allowed to reside in low-barrier housing where they are provided initial services without the requirement of sobriety. After time, clients are transferred to a clean-living facility where a condition of living is that the client remain sober.

Partnering with Central City Concern (CCC), SCT clients are provided services related to housing, employment, mental and physical health service, and peer support. Our review of SCT data, as well as research performed by Portland State University, has shown that SCT participation has led to marked improvements in clients' housing, employment, and criminal recidivism. Such improvements are amplified when the client completes the entire program.

| Recommendations Par. 112 | • PPB has an ongoing obligation as to the operation of SCT |
|---|---|

**BOEC**

When a person is experiencing a mental health crisis, a response is oftentimes set into motion through the actions of the Bureau of Emergency Communications (BOEC). When assessing BOEC, we examine whether (1) BOEC has the policies set in place to determine an appropriate response, (2) whether BOEC emergency communicators have been trained to identify mental health crisis and act in accordance with policy, and (3) whether the available data indicates emergency communicators are consistently following policy and using the training provided to them.

As in past reports, we find that BOEC has developed "policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center" and that the policies and procedures substantially comply with Par. 113 of the Settlement Agreement. The policies and procedures provide examples of signs that may indicate a person is experiencing a mental health crisis (e.g. intense feelings of personal distress, disordered thoughts/perceptions, obvious changes in functioning, traumatic life events, behaviors that may be dangerous to self or others) and sufficient direction on when they are to send ECIT officers (and, depending on the situation, ambulance and fire responders) or transfer the call to the Multnomah County Crisis Line (MCCL). These policies have also been created in consultation with the BHUAC (see Appendix VI-13 and Appendix VI-14).

Mirroring the ECIT criteria observed by PPB, emergency communicators are required to dispatch ECIT officers when a subject has actual or perceived mental illness and one of the following elements is present:

- The subject is violent
- The subject has a weapon
- The subject is threatening or attempting suicide (with specific plans and the means to carry out the threat or attempt)
- The subject is threatening to jump from a bridge or structure or threatening to obstruct vehicle traffic
- The call is at a residential mental health facility
- A community member requests an ECIT response
- A responding officer requests an ECIT response

Additionally, BOEC's policies and procedures direct emergency communicators to transfer calls to MCCL when "a caller, or someone physically with the caller, expresses suicidal threats, feelings, or intent **and**:

- Does not have a weapon, or means to harm themselves.
- Does not need immediate medical attention.
- Is not threatening to jump from a bridge, structure or jump in the path of a moving vehicle (including trains, MAX Light Rail, trolley/street car, etc.)."

The policies and procedures provide step-by-step directions for performing the transfer to MCCL, including language to provide to the community member as well as language to use with the MCCL crisis worker. Should MCCL be the most appropriate avenue for a person experiencing mental health crisis or threatening suicide, the MCCL counselors are able to spend time talking with the community member, engage in safety planning, facilitate transportation to walk-in centers, or encourage the community member to go to the Unity Center (either on their own or via transferring the caller back to BOEC for an AMR response).

Additionally, for individuals covered by HealthShare, MCCL can identify the person's mental health care provider and provide relinkage and light care coordination. Should the community member not already be connected to services, MCCL can provide information on referrals to no cost/low cost providers and those who accept Medicaid and/or Medicare. MCCL is also able to provide transport options to accommodate the community member. Furthermore, MCCL partners with the following resources:

- Lines for Life (a "nonprofit organization that helps prevent substance abuse and suicide…promote better mental health, improved access to mental health services, and to diminish public health threats" - https://www.linesforlife.org/)
- 211 (a directory for "helping people identify, navigate, and connect with the local resources they need" – http://211info.org/) – This resource is also available to BOEC regardless of whether the call was transferred to MCCL
- Aging and Disability Resource Connection (a services connection group for elderly and persons with disabilities – https://www.adrcoforegon.org/consite/index.php)
- Call to Safety (a domestic and sexual assault victim advocacy group which provides "a comprehensive 24/7 crisis line, follow-up advocacy for survivors, support groups, community outreach and education, and sexual assault medical advocacy" - https://calltosafety.org/)
- David Romprey Oregon Warmline (a mental health line "designed and provided by persons who have or had challenges in mental health and are able to support their peers who are struggling with a variety of mental health issues" http://communitycounselingsolutions.org/warmline/)

Based on the ability of BOEC to dispatch an ECIT officer, refer a non-life-threatening call to MCCL, and the range of community-based groups which MCCL partners with, the spirit of Par. 113's requirements for "assigning calls Multnomah County Crisis Call Center…assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals" is sufficiently met.

Upon completing the policies and procedures to triage calls related to mental health issues, BOEC provided an initial eight-hour training to call-takers and dispatchers in 2016. Following the training, we provided verbal feedback and a written technical assistance statement. In the TA statement, we made several recommendations related to presenter content expertise,

handout materials and strategies for improving engagement in the scenario exercises. We were aware at the time that a second day of training that included consumer and family member panels and additional content on trauma awareness was planned for all staff in the Spring 2017. While we did not observe the Spring training, we did review the course materials and observe the full two-day training provided to new staff in September 2017. Updates to BOEC's training were also presented to BHUAC in July of 2016 (see Appendix VI-15) and May of 2017 (see Appendix VI-16).

The two-day training included the following sessions: Overview of CIT, Brief History of the Mental Health System, Clinical States, Hearing Voices Simulator, Lived Experience, Crisis Cycle De-escalation, Suicide Policy review and table top drills, Trauma Awareness, Family Lived Experience, ECIT Policy Review, ECIT Officer Perspective and Scenarios. At the end of the training, BOEC employees were also provided an evaluation of the training.

It is very apparent that BOEC incorporated the feedback we provided in our January 2017 TA statement. All presenters were content experts in the areas they covered and handout material was much improved. The use of ECIT officers as scenario actors and the more realistic setting (call taker terminal) fully engaged trainees. Additionally, the feedback on scenario performance was more structured and constructive.

Overall, the two-day training was well constructed and delivered. Students were engaged throughout and asked thoughtful questions. We note a few areas where we have recommendations to strengthen future training, though note that, by and large, the training provided by BOEC has been much improved and substantially complies with the requirements of Par. 114.

1. The objective of the "Clinical States" session was to help students learn the signs and symptoms of serious mental illnesses and intellectual/developmental disabilities. It appears the instructor for this session believed the session was primarily on assessing mental status. While she was clearly very knowledgeable, she did not have any power point presentation or handouts and completed her material 30 minutes into the two-hour time block. At that point, the Training and Development Manager jumped in and directed students to the handouts BOEC provided on mental illnesses and the went through them with the session instructor and students. In the end, the intended material was covered, and the instructor provided very knowledgeable responses to student questions and good tips for communicating with people in crisis. The session could be improved with better preparation of the instructor on the course objectives and some structured content supported by handouts or power-point.

2. The peer panel consisted of one person with lived experience of mental illness. She was very engaging and though she had never called 911 in crisis, she provided a very useful perspective for students. If possible, for future trainings it might be useful to have several people on the panel to provide some diversity of experience.

3. The family panel consisted of two women that worked with families of persons with mental illnesses and were themselves family members and had experience calling 911 for assistance with their loved ones. This panel provided excellent information from the perspective of parents of children with emotional and behavioral disorders. It was a little unstructured but over all students seemed to benefit. To strengthen this session in future trainings, we recommend providing more structure by having some pre-set questions, sent in advance to speakers, and having a BOEC trainer ask them to speak to each of the questions before opening it up for general questions from the class. Also, if possible, including family members caring for adults with mental illnesses on the panel (perhaps someone from NAMI) would provide additional valuable perspective for the class. Finally, it may be of value to have family members who live in Multnomah County to incorporate a more local experience.

Although BOEC has demonstrated compliance with revising policies/procedures and has delivered training to BOEC personnel consistent with our recommendations, we do not believe they currently have the capacity to "ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff" (Par. 115). As "implementation" is defined by the Settlement Agreement as including "the consistent and verified performance of that policy or procedure in actual practice through the regular use of audit tools" (Par. 33), we have not yet seen that BOEC has the resources available to verify actual practice.

For past reports, BOEC has not been able to provide data on calls involving a mental health component or calls that meet ECIT criteria. For a prior Outcome Assessment, PPB used one of their analysts to pull data (since they have access to the same database). For other assessments, BOEC was only able to produce PDF documents which do not lend themselves to evaluation. For the present report, an analyst from the Bureau of Technology Services was used to pull data from the CAD. While we appreciate the City's willingness to provide data, there is a need for BOEC to be able to routinely audit practice and monitor trends. We recommend the City provide BOEC a dedicated analyst, similar to the analysts who work for the Strategic Services Division of PPB. The evaluation of data should not be so cumbersome that it deters the practice. By having a dedicated analyst who can evaluate BOEC data for adherence to policy (as well identify potential training issues or other operational concerns), BOEC will be able to move toward self-monitoring which we view as the ultimate goal of the Settlement Agreement.

Also, for BOEC to be able to monitor their adherence to policy and procedure, we recommend they expand the range of data they collect. Currently, BOEC codes mental health crisis calls that meet ECIT criteria. However, if a call with an identified mental health component does not meet ECIT criteria, there is not a consistent code to indicate the mental health component. For example, BOEC may get a call requesting a well-being check on an individual believed to be experiencing a mental illness. That is coded as a well-being check. The mental health information *may* be included in the text portion of the call information, though it is not required. There is also no data field or code that records this information in a way that would allow for cases to be easily identified. This makes it very difficult to systematically analyze the non-ECIT mental health component calls. The Bureau has some capacity to capture these calls if the responding officer completes a Mental Health Template, but this only done for a subset of calls.

For BOEC to be able to ensure that mental health crisis calls that meet ECIT criteria are receiving an ECIT dispatch, it needs to be able to audit all mental health crisis calls – a capacity it does not currently have. To do so BOEC would need to code all mental health component calls (regardless of whether they meet ECIT criteria). Previously, BOEC required emergency communicators to record this information in the narrative, but has since removed the requirement and it is therefore an unreliable source of mental health information (though some emergency communicators still include mental health indicators). We recommend that BOEC create a field for documenting a call has an identified mental health component (rather than include it in the narrative). Given prior concerns with terminology for indicating a mental health component, we recommend BOEC consult with BHUAC to make sure the strategy is sensitive to concerns about potential stigma.

Additionally, as a Memphis Model crisis response system necessitates collaboration between law enforcement, emergency communicators, and mental health service providers, BOEC may consider coding the specific ECIT criteria that has been met when dispatching ECIT officers. By understanding the frequency of different criteria, both PPB and BOEC may be able to use that data to inform expectations during training.

Despite BOEC not having the in-house capability to pull and evaluate data on a regular basis, the dataset provided for this report contains some areas of interest that may help PPB evaluate their overall model of mental health response. The data from BOEC indicates that when a call meets ECIT criteria, the emergency communicator is able to dispatch an ECIT officer in approximately 95.9% of the cases. However, an ECIT officer actually arrives on scene in approximately 80% of cases which may be due to a variety of factors. In some instances, the ECIT officer may be called off by a Sgt. or the case may be resolved prior to the ECIT officer being able to be on scene. Additionally, when officers are dispatched to an ECIT type call, an average of 1.58 ECIT officers are on scene as well as an average of 2.85 non-ECIT officers. This means that for every ECIT type call, there is an average of 4.3 officers on the call.

BOEC also provided data on a total of 568 calls which, rather than being sent out for dispatch, were sent to the Multnomah Crisis Call Line (MCCL). Little can be determined from the dataset regarding these calls as we do not have MCCL data to determine what occurred in them. However, the data provided by BOEC indicates that a total of 13 calls (out of 568 or ~2.2%) were returned from BOEC to be dispatched as an ECIT call.

| Recommendations Par. 113-115 | • The City should provide BOEC a dedicated analyst to perform data evaluation and audit functions<br>• BOEC should expand the range of data they collect to include a mental health data field and specific ECIT criteria met<br>• BOEC should enhance their work with PPB as a system partner |
|---|---|

Evaluation of System

Overall, we believe the mental health response system of PPB and the City has demonstrated the highest levels of compliance with the Settlement Agreement. PPB has demonstrated a willingness and dedication to identify and work with a large variety of partners within the mental health system. Based on what can be expected of them in relation to Section V (Community-Based Mental Health Services), we believe they have Substantially Complied with that section of the Agreement and that their work in this area has contributed to the development of "capable systems and resources for responding to persons in mental health crisis" (Par. 173). Although PPB and the City have an ongoing obligation to continue to work with their partners in Section V, we believe the work that has been accomplished thus far to create systems of mental health response that substantially complies with their responsibilities.

When assessing Section VI, we believe that some PPB systems should be viewed as capable and useful for mental health crisis response. Regarding the BHU, BHCT, and BHUAC, we believe the structure in place allows for (1) a wide gathering of relevant perspectives to (2) sharing of data and information in a meaningful fashion to (3) provide informed comments and recommendations to PPB so that (4) PPB can incorporate change where necessary and (5) provide an avenue for continuous feedback. We have been impressed by the overall structure and believe that each group contributes to improved mental health response.

Another group is the BHRT, who we feel is an innovative system of response that allows for PPB to stem repeat contacts. As a result of the structure of BHRT, policies which direct its operations, qualifications of BHRT officers, and training of BHRT officers, PPB's mental health response system is strengthened. Similarly, the SCT has consistently been a positive force for

PPB and the City. Particularly given the populations with which the program works, the impact of SCT has been commendable.

Where PPB and the City lack in being able to demonstrate capable systems of mental health response is in the evaluation piece. For instance, PPB needs to be able to evaluate their model of mental health response. Even though we are aware that PPB is currently working on evaluating their model, as of this report we cannot say for certainty whether it contributes to the overall system of mental health response. Similarly, with BOEC, a lack of data collection/data evaluation restricts their ability to conduct meaningful self-monitoring. Without such evaluative tools (and without being able to cross-reference each other's data), the overall effectiveness of the City's mental health response system is unknown.

# VII. EMPLOYEE INFORMATION SYSTEM

| Par. 116 | Partial Compliance |
|----------|--------------------|
| Par. 117 | Partial Compliance |
| Par. 118 | Substantial Compliance |
| Par. 119 | Substantial Compliance |
| Par. 120 | Partial Compliance |

In this section, we provide an evaluation of whether PPB and the City's implementation of the Settlement Agreement have created "competent oversight and accountability systems" (Par. 173) based on their level of compliance with the paragraphs found within Section VII (Employee Information System). In our 2016 Q3/Q4 Compliance Assessment, we noted that PPB made the least progress in EIS compared to all other sections of the Settlement Agreement. However, since that report, there has been a strong effort to accomplish Section VII's goal to "enhance [PPB's] EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116). While there are enhancements yet to be made, PPB should be commended for their effort in recent months.

PPB historically has viewed Par. 116 and subsections as a specific requirement for EIS review of officer work history. Although we have asked PPB to expand their interpretation to focus more on a proactive process to "more effectively identify at-risk employees, supervisors, and teams" (Par. 116), we believe that their historical reviews also have merit and are important for competent oversight and accountability systems. We therefore review PPB's compliance with reviewing officer work history before turning towards the overall function of EIS, including the review of threshold breaks.

Subsections (a) Par. 116 requires commanders and supervisors to "conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker." PPB performs this review as part of their evaluation of officers. Directive 215.00 (Member Performance Evaluations) guides supervisors' evaluations, including topics to review and discuss with each officer. This directive is currently being reviewed by COCL, DOJ, and PPB and a finalized version has not yet been released. The revised Directive (as it currently stands) provides clear instruction for supervisors. However, supervisor's reviews of EIS and the documentation of those reviews have not reached acceptable levels[2], as PPB

---

[2] We do not offer a recommendation for what should constitute "acceptable levels" as it relates to the evaluation of 116 (a) and (b). Ideally, PPB should strive for 100% compliance. Our larger concern is training supervisors on

reported a 46% compliance rate in 2017 Q1 and a 39% compliance rate in 2017 Q2 (see Directive 215.30 for the category of officers included in these analyses). Furthermore, in Q1, PPB revised their methodology for determining compliance for Subsection (a). Previously, compliance was evaluated as only whether a supervisor reviewed EIS and documented the review, not whether the review occurred within the required timeframe. Thus, prior compliance ratings (around 60% in 2016 Q3 and Q4) are easily misinterpreted. As will be discussed throughout this section, we recommend PPB complete a Supervisors In-Service in 2018 that can address the number of deficiencies related to Section VII (see also 84(b)(ii-iii) – training on how to evaluate officer performance and foster positive career development).

Par. 116(b) requires commanders and supervisors to "promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker." Although this process may be seen as similar to the regular evaluations of officers, supervisors are not sufficiently instructed as to how they should conduct such reviews according to policy. PPB has informed us that Section 2 of Directive 345.00 speaks specifically to this process, though Section 2 of Directive 345.00 states that supervisors "shall review the sworn members' Employee Information System (EIS) record and document this review occurred..." This amounts to little more than "You will conduct the EIS review by reviewing the EIS." We recommend PPB include some of the same considerations in the "new to command" reviews as it does in Directive 215.00 (e.g., identify performance strengths, identify performance weaknesses, determine how to provide guidance on correcting areas of concern, etc.). Additionally, supervisors should be trained on their responsibilities in the same manner we have recommended in our discussion of 116(a).

Documents provided by PPB indicate that the reviews required by Subsection (b) have shown higher levels of compliance than Subsections (a) and (c). For instance, in 2017 Q2, the compliance rate was determined to be 71%, though this is down from 92% in 2017 Q1 and 89% in 2016 Q4. Contrary to Subsection (a), the determination of compliance for Subsection (b) was not changed. However, there was still approximately 30% non-compliance in Q2 with Subsection (b) and we recommend supervisors be reminded of their responsibilities during our recommended Supervisors In-Service for 2018.

Subsection (c) of Par. 116 requires the EIS staff to "regularly conduct data analysis of units and supervisors to identify and compare patterns of activity." Thus, the compliance rates reported by PPB are averages between Subsections (a) and (b). However, the evaluation of Subsection (c) allows PPB to identify whether there are units that have substantially less compliance than others (see Appendix VII-1). The documents provided by PPB indicate that the Transit, Training, and Detective Divisions have had generally lower rates of compliance compared with other Precincts Divisions. PPB notes in their 2016 Q1 Quarterly Updates that they have "received feedback from the DOJ that the information used to compile the numbers for Item 116(c) could

their responsibilities and, where training has failed, holding supervisors accountable. As we have recommended a Supervisor's In-Service for 2018, we will look to see how that impacts compliance levels.

also be used to conduct a trend analysis for PPB's precincts and divisions." As a result, PPB provided a chart for overall compliance with Subsections (a) and (b) at the organizational level (the average of which relates to Subsection (c) – see Appendix VII-2), though these charts do not show trends within the individual precincts and divisions. We recommend PPB look at trends *within* the data rather than the overall compliance rates. For instance, are the compliance rates within a single precinct or division increasing or decreasing over the past year? How can PPB address precincts and divisions that have consistently lower compliance rates? Are there supervisors within those precincts and divisions who have consistently lower compliance rates compared with others? These types of questions (and the answers to them) will allow PPB to provide targeted feedback to individual precincts and divisions rather than simply assessing the Bureau as a whole.

One aspect of the EIS system that appears capable of informing supervisors during reviews of officer work history is the Performance Discussion Tracker (PDT). Directive 345.00 states that when supervisors "observe positive behavior or performance," they are "<u>encouraged</u> to discuss the observation with the sworn member and make an entry to the sworn member's PDT" (emphasis added). But, when supervisors "counsel a member or engage in other non-disciplinary corrective action," the supervisor "<u>shall</u> make an entry about the event and the corrective action undertaken in the sworn member's PDT" (emphasis added). When reviewing a random selection of officers' PDT entries, we looked at two aspects. First, given the difference in language of 345.00 ("encouraged" for potentially positive entries vs. "shall" for potentially negative entries), we looked to see whether PDT contained positive, negative, and neutral entries needed to facilitate an accurate review of the officer's complete work history. Second, we looked to see whether the content of entries contained sufficient narrative (including event descriptors, critiques, praises, officer receptiveness, applicable history, etc.) or whether they fell into the category of "Talked with officer – Officer understood."

We chose 10 officers at random and reviewed the PDT records found in their history. We noted that the entries were diverse (including positive, negative, and neutral topics) and were detailed enough to give other reviewers a sufficient amount of information to understand the event which led to the entry. These entries were also often accompanied by references to reports or people that could facilitate a further review should the supervisor so choose. Overall, we were very impressed with the number, type, and comprehensiveness of PDT entries and believe that they can act as an informative tool for supervisors during the Par. 116 (a) and (b) reviews. Additionally, PPB members expressed to us that they too believed the Performance Discussion Tracker contained a complete picture of their work history, including the positive, negative, and neutral comments entered by their supervisors.

Based on COCL and DOJ technical assistance, PPB has enhanced the manner in which they are utilizing EIS as a performance evaluative tool compared with our assessment in prior reports. In July of 2017, PPB made SOP #44 effective (see Appendix VII-3) which provides, "step-by-step instructions on how to process alerts, including: Assigning alerts to a case manager; Researing

the employee who is the subject of the alert; Analyzing the available information; Making a determination on whether an alert should be sent for RU review; Monitoring alerts after initial processing." We believe that this SOP is responsive to a number of critiques that we have had about the initial processing of alerts, though more work is necessary.

For instance, we noted in past reports that there did not seem to be consistency as to when a flag would be sent for an RU review. PPB responded in SOP #44 by including five types of incidents wherein a alert might be closed without any further action. These include the alert being caused by a single use of force, the alert being a duplicate alert with no new use of force incidents, the alert was the result of a system error (e.g. miscoding), the alert involves an employee not subject to an EIS review, or an exceptional closing which requires the approval of the PSD lieutenant. These narrowed criteria should be sufficient to ensure that alerts that would benefit from supervisory review are sent out while not sending out cases that would be extraneous.

Additionally, the SOP identifies a variety of data sources the Administrator should summarize prior to sending out an alert to the RU manager, based on the type of alert. These data sources include the Administrative Investigation Management (AIM) database, alert histories, commendation/complaint history, among others. As we have noted in prior reports and Technical Assistance Statement, PPB may consider expanding the types of sources they include in the initial evaluation. For example, we have noted that the number of "Resisting Arrest" charges may be associated with higher numbers of potentially problematic force. This is just one area for PPB's consideration.

Finally, certain timelines are associated with RU Manager review, direct supervisor reviews, and implementing an appropriate intervention (see Directive 345.00). Directive 345.00 puts the responsibility on the PSD Lieutenant for notifying the PSD Captain of any overdue alerts. We believe this built-in mechanism is in-line with the intent of the Settlement Agreement and systems of accountability. However, based on the timelines found in Directive, the notification process may take up to 120 days to complete (and potentially more if the alert is returned for any reason). This does not include the time taken to carry out an intervention which may include a 90-day monitoring period or referral to training. These timelines do not meet the requirement of Par. 116 to "address potentially problematic trends in a timely fashion." We recommend PPB evaluate the notification process in order to see where time delays could be resolved.

We have found in the past the PPB members do not have confidence in EIS being effective at identifying officers who are at-risk. In 2015, approximately 22.4% of PPB members agreed that EIS was effective, while in 2016 only 17.7% agreed. Our 2017 PPB survey found that 16.2% of members agreed (for the complete results of the 2017 organizational survey, see Appendix S-1). As PPB seeks to enhance their EIS, the utility of it should be conveyed to members, and reinforced by supervisors. Our discussions with PPB members revealed a fear that EIS may be

misused as a disciplinary tool, particularly if Type I (false positive) errors are present. PPB should consider addressing these issues in our recommended 2018 Supervisors In-Service.

We have also noted that in the past, PPB did not systematically code RU Manager's and direct supervisor's response to alerts to ensure that "like alerts get like responses." PPB has begun to set up a coding system for the entire process. At this time, insufficient data exist to comprehensively evaluate the process. However, it should be noted that this represents a large step forward for PPB. We have reviewed the data sheet on which PPB documents the process. The data sheet contains such variables as the alert type, whether it was sent to the RU Manager (or the reason for decline if it was not sent to the RU Manager), the officer involved, and the supervisory action taken. We have recommended that PPB continue to track the exact intervention provided to the officer (if applicable) as well as develop an analysis plan for determining the comparative impact of different interventions. The tracking of interventions has recently begun, though we will need to evaluate the process once there is enough data.

Looking at the data for the approximate two-month period that PPB has been collecting them, the results show that approximately 53% of alerts are forwarded on for RU Manager review. This is a large increase over one year ago (2016 Q3), when the rate of forwarding an alert to the RU was approximately 11%. By forwarding a larger percent of cases to the RU Manager, the officers' direct supervisors are performing the review. As we have noted in the past, supervisors are in a much better position to evaluate their officers than are the EIS Administrators. However, we do not yet have data on what interventions supervisors are providing their officers or what the outcomes have been. PPB reports they have begun collecting this data, though more data is necessary to assess progress.

When an alert is received by an RU Manager, they are required to "review the content of the alert and make a reasonable determination supported by the facts about whether to require a Supervisor Review" (Directive 345.00). Upon review of the officer, the direct supervisor recommends an intervention, which may include monitoring (30, 60, or 90 days), coaching, commendation, debriefing, EAP referral, mandatory training, temporary reassignment, training referral, or some other type of intervention. If the RU Manager agrees with the recommended intervention, the supervisor "shall document the Supervisory Action(s) recommended and the reasons for the Supervisory Action(s) in the case notes section of the alert" (Directive 345.00). The policy is sound, but during implementation, we recommend that PPB be specific about who is ultimately responsible for ensuring that various Supervisory Actions are carried out.

To conduct these analyses on the supervisor and team levels (Par. 117), PPB has proposed using force audit data and aggregating upwards. The EIS Administrators have indicated that the data found in EIS are incapable of aggregating to the supervisor level, though using the force audit data in EIS's stead carries its own limitations. For example, the force audit data identifies the supervisor who authors the After Action Report. However, this may not be the same supervisor who has the most influence on the officer. One of the main purposes of EIS at the supervisor and unit level is to identify individuals who may have a negative influence on a group of

officers. As PPB has put forth this option as a proposal, we would have to see whether force audit data can actually serve the originally intended function. This is an empirical question that has yet to be answered.

We also recommend PPB examine the value of analyzing complaint allegations at the supervisory level, particularly more frequent allegation types such as Procedure, Conduct, and Courtesy. Although the number of complaints in 2016 was lower than the number of force events, there were more allegations (since one complaint could have more than one allegation). This provides for greater trend potential and may be a resource for identifying potentially problematic supervisors. PPB should consider performing an initial evaluation to determine how an analysis of complaint allegations may supplement the work to be done with force.

There appears to be some initial support that complaints may be able to be used to identify trends. An evaluation of data on complaints generated since October of 2016 indicates that, at least within the 3 main Precincts (North, Central, and East), variations exist that may be further explored. In the table below, we identify some complaint categories which show differences between the three Precincts.

Within the table, we identify the allegation name, the number of times it was alleged within each Precinct, and the percentage for which that allegation makes up all allegations within that Precinct. For instance, in East Precinct, Directive 315.30 (Satisfactory Performance) makes up 19% of all allegations within that Precinct (compared to 12.1% for Central and 1.7% for North). Conversely, East Precinct has a comparatively lower proportion of allegations related to Directive 310.00 (Conduct, Professional). Although it is difficult to interpret the results without further consultation with PPB, there do appear to be differences in allegation categories across the Precincts.

Table 5

|  |  | Central | East | North |
|---|---|---|---|---|
| Conduct, Professional (310.00) | Count | 27 | 9 | 17 |
|  | % within Precinct | 15.5% | 3.9% | 14.2% |
| Courtesy (310.40) | Count | 24 | 45 | 23 |
|  | % within Precinct | 13.8% | 19.5% | 19.2% |
| Laws, Rules and Orders (315.00) | Count | 9 | 13 | 12 |
|  | % within Precinct | 5.2% | 5.6% | 10.0% |
| Satisfactory Performance (315.30) | Count | 21 | 44 | 2 |
|  | % within Precinct | 12.1% | 19.0% | 1.7% |

We also note, PPB does not have any intervention plan for when potentially problematic supervisors and units are identified. There are no criteria for what a unit alert might be, when to forward the alert for review, or intervention options. It is not enough for PPB to have the capability to identify supervisors and units which may require a closer look – the closer look itself must actually occur. We recommend PPB determine a process for supervisors and units similar to the process developed for individual officers.

In order to remind supervisors about the importance of performing the reviews required in Par. 116, as well as their responsibilities in performing case management reviews, we believe additional training in EIS is important. In 2014, PPB provided a training on EIS and AAR responsibilities to supervisors. At this time, the ink on the Settlement Agreement was fairly fresh and PPB did not have the benefit of COCL and DOJ expectations related to the EIS section. In the Spring of 2017, PPB conducted another training for supervisors on EIS including a review of Directive 345.00. For this training, we observed the class on two different days. We were pleased that the instructors communicated the importance of EIS and role of supervisors in the review process, but the training did not cover *how* supervisors should review officer performance. Much of the training was devoted to hearing supervisor impressions of EIS and the EIS process, and thus became a listening exercise for the EIS Administrators. To be sure, hearing how the process impacts those who use it the most is important for improving the system. But in light of the new directive and SOP for PSD, supervisors should now be trained regarding the kinds of things to review for semi-annual evaluations and when an EIS alert occurs.

PPB has incorporated and maintained the thresholds required in Pars. 118 and 119. However, as we have noted before, we are not convinced that the thresholds currently utilized by PPB

are, in reality, the most informative for identifying potentially problematic officers. While PPB is in Substantial Compliance with these paragraphs, we recommend they undertake a review of thresholds, identify which ones appear to best capture concerning officers, and enhance the thresholds which do not. COCL and DOJ have offered PPB suggestions for thresholds which may prove to be more beneficial, though PPB has rejected these suggestions. PPB may consider using the data it is currently collecting to reduce Type I (i.e. false positive) and Type II (i.e. false negative) errors, as well as identify alerts that often meet the criteria for an Administrative Closure. For instance, alerts for "Force 1 and 2" thresholds are administratively closed at an approximate 67% rate, meaning they are never sent to the RU Manager for review. Still, other force alert events are administratively closed over 80%. Given the narrowed criteria for administratively closing an alert, the high amounts of closure should indicate that the force thresholds are not very informative. We have recommended a more flat-rate threshold (e.g. top 15% of officers who use force) while accounting for differing circumstances where officers are assigned to different shifts, precincts or units (e.g. compare gang enforcement team officers to other gang enforcement team officers). We recommend that PPB run additional analyses to look at thresholds in new ways. Although PPB has indicated that EIS Administrators are not trained in "methods of analysis,' this capability is needed within the Bureau.

PPB currently has two EIS Administrators, in accordance with Par. 120. As we have noted in the past, the requirement of Par. 120 included the provision that the second EIS Administrator (and, in fact, all future EIS Administrators) must be sufficiently trained to perform the job duties. PPB had previously argued that training occurred on-the-job and that this was sufficient to meet the requirements. However, after consulting with us and DOJ, they agreed to put together written documents for future Administrators to be able to reference. In some respect, SOP #44 fulfills the obligation for a training manual as it contains information for EIS Administrators to accomplish their responsibilities. However, PPB has also indicated they are putting together a "training manual and reference library" that will "supplement on the job training and identify domains of knowledge necessary for successful functioning as an EIS Administrator" (PPB 2017 Q1 DOJ Quarterly Updates). We look forward to reviewing the final product.


Evaluation of System

Given the above information, PPB has not enhanced its EIS to "more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" in accordance with the goal of Section VII. PPB is in the early stages of implementing a system that is data-driven to identify officers, supervisors, and units in order to provide intervention. Upon complete implementation, the identification of at-risk employees, supervisors, and units will be accomplished in two main ways: through mandated supervisory review of EIS records and through data-driven EIS alerts for individuals, supervisors, and units who may have slipped through the cracks otherwise.

The mandated supervisory reviews for officers new to the command, as well as the regular review of EIS records, have not occurred regularly. Additionally, PPB has the capacity for identifying specific units which are not complying, though tracking does not appear to be occurring for the individual units. Where supervisors or units are not complying, those in charge need to be held accountable.

Where we have seen the most progress is in EIS Administrators sending out more alerts for supervisory review (thereby encouraging greater involvement by those who know most about the officers) and in tracking decision-making at each step of the process. Although there is not sufficient data at this point to make a comprehensive assessment of the process, we believe this represents a large step forward in gaining compliance.

For both manners of achieving compliance (mandated supervisory reviews and EIS alerts), we question the degree of training that supervisors have received to fulfill their obligations. We recommend that a Supervisors In-Service be conducted in 2018 that instructs supervisors: (1) *how* to review EIS records (and supervisors' requirement to do so), (2) *how* to review an officer alert, and (3) *how* best to intervene with an officer to improve their overall performance. Such training is important so that reviews of officers do not become merely a symbolic occurrence.

| Recommendations Par. 116-120 | <ul><li>PPB should complete a 2018 Supervisor's In-Service to inform supervisors of their responsibilities when completing a work history review and when receiving an EIS alert</li><li>PPB should compare trends in work history and review deficiencies within precincts or divisions across time to identify those with consistently lower compliance rates as well as whether individual supervisors have consistently lower compliance rates compared to others.</li><li>PPB should evaluate the EIS alert notification process to determine where time delays could be resolved.</li><li>PPB should track the exact intervention provided as well as develop an analysis plan for determining the comparative impact of different interventions.</li><li>PPB should examine the value of analyzing complaint allegations at the supervisory level to identify potential trends.</li><li>PPB should determine an alert and intervention process for supervisors and units.</li><li>PPB should undertake a review of thresholds to determine which may be enhanced to accomplish the goals of EIS.</li></ul> |
|---|---|

# VIII. OFFICER ACCOUNTABILITY

| | |
|---|---|
| Par. 121 | Partial Compliance |
| Par. 122 | Substantial Compliance |
| Par. 123 | Partial Compliance |
| Par. 124 | Partial Compliance |
| Par. 125 | Substantial Compliance |
| Par. 126 | Substantial Compliance |
| Par. 127 | Substantial Compliance |
| Par. 128 | Partial Compliance |
| Par. 129 | Partial Compliance |
| Par. 130 | Partial Compliance |
| Par. 131 | Partial Compliance |
| Par. 132 | Partial Compliance |
| Par. 133 | Substantial Compliance |
| Par. 134 | Substantial Compliance |
| Par. 135 | Substantial Compliance |
| Par. 136 | Substantial Compliance |
| Par. 137 | Partial Compliance |
| Par. 138 | Substantial Compliance |
| Par. 139 | Substantial Compliance |
| Par. 140 | Substantial Compliance |

In this section, we provide an evaluation of whether PPB and the City's implementation of the Settlement Agreement have created "competent accountability and oversight systems" (Par. 173) based on their level of compliance with the paragraphs found within Section VIII (Officer Accountability). The focus of the opening paragraph for Section VIII is on a due-process model of administrative investigations (e.g., "investigative findings are supported by a preponderance of the evidence"; "fair and expeditious resolution of complaints"; "officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent").

106

The opening paragraph further argues for an expanded role of civilian oversight as accomplished by "retaining and enhancing IPR and CRC." Our evaluation of this section rests on these two goals (due process and enhanced civilian oversight).

Perhaps the largest impact on PPB and the City's ability to achieve the goals of Section VIII rests with recent passage of ordinances within City Council pertaining to conducting administrative investigations and the revision of PPB's Directive 333.00. In the third quarter of 2017, the Auditor's Office submitted changes to Portland City Code 3.21 to reflect changes necessary to comply with Par. 121 of the Settlement Agreement (180-day timeline), Par. 123 (implement action plan when source of delays are identified), and Par. 128 (IPR conducting meaningful independent investigations into officer misconduct). Related to this, an ordinance was passed by City Council on August 24, 2017 to amend the Settlement Agreement to include a provision that would exclude the CRC from the 180-day timeline. Additionally, PPB, the City, IPR, DOJ, and COCL engaged in policy discussions related to Directive 333.00 in order to ensure that both PPB and IPR's policies mirror each other.

The changes are in-line with both COCL and DOJ contentions in prior reports. For instance, the changes to City and PPB practices includes the requirement for the investigating entity (i.e. Internal Affairs or IPR) to recommend findings for the investigation. Prior to these changes, the RU Manager would review the case file and recommend findings, though as we have noted, the RU Manager is not the one who investigated the matter and, therefore, is not in the best position to make a recommendation. Additionally, this prior finding process was time-consuming and added unnecessary days to the process.

The changes to City and PPB procedures also reflect compliance with Par. 123 (PPB shall provide "a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.") In past reports, we have noted many "action plans" put forth during the review of overdue investigations amounted to little more than "This won't happen again." Although we continue to see some instances of single-case evaluative conclusions (e.g. vacation time as a reason for delay, OIS events causing delays, etc.), responsive changes to prior action plans have occurred, including PSD gaining additional investigators in order to reduce the overall timeline. The Par. 121 overhaul recently undertaken by PPB and the City is much more in line with our recommendations for definitive steps rather than minor changes. We look forward to the implementation of the overall plan as a way to reduce the overall timelines.

IPR has also expanded the number and types of cases that it has independently investigated, particularly given that IPR had not performed *any* independent investigations when the Settlement Agreement was drafted in 2012. IPR reports that it performed one investigation in 2013 and two investigations in 2014. By comparison, IPR reporting initiating 29 investigations in 2016. Furthermore, the cases in 2016 were not merely an increase in volume—they were an increase in complexity. IPR reports that protest cases, which necessarily involve multiple parties and complicated legal issues, have increased. IPR has expanded their investigations, but we

recommend they review their timelines in a manner similar to IA (i.e. "action plans" for cases which go over the allotted number of days for each stage of the investigation). We have noted numerous cases where various stages under the direction of IPR appear to consistently go over (see below).

At the same time as the increase in protests cases, IPR began an investigation that demanded their most independence to date: that of the police chief himself as well as four of his assistant chiefs and the captain of IA. Although the investigation of the Chief and others did not occur within the 180-day timeline, these cases appear to have been pursued to conclusion in a professional manner.

Based on the revisions to PPB policy and IPR Code, the range of investigations under IPR's purview includes "cases of public interest" (PPB Directive 330.00) which may include crowd control, disparate treatment/retaliation against a community member, vulnerable or mentally ill persons, sworn members of the rank of Captain or higher, as well as any matters the IPR Directors deems are in the public interest and "over which IPR has jurisdiction under City Code" (PPB Directive 330.00). The expansion of such investigative types gives IPR authority over administrative complaints that are of most interest to the community and which may draw the most community suspicion were they to be investigated directly by PPB.

While we support the expansion of IPR's role, we have noted in previous reports that training for IPR investigators was a barrier to meaningful independent investigations. While systems are being put in place that will address the issue, it is unclear how soon training for IPR investigators will occur. IPR and IA are developing a comprehensive, four or five-day training session to be attended by both IPR and IA investigators. Early drafts of the expected training topics are promising, including: complaint process, writing findings, policy, law, and practical experience such as a PPB ride-along and time at BOEC. We believe that in order to be sure IPR can engage in meaningful independent investigations, the training would not only need to be developed but also successfully delivered in accordance with agreed upon policies between IPR and PPB. Policies for both entities are still being finalized.

It should be noted that IPR investigators are not currently completely without training, but the training has been somewhat haphazard and unstandardized. IPR reports that all their investigators have a background in administrative investigations and IPR fosters a "close mentorship" for new investigators. In addition, four investigators have had additional outside training. In terms of specifically understanding police functions and PPB policies, IPR reports that the investigators have attended the Citizen's Academy and some specialized PPB training, and that three have attended crowd-control training. Additionally, two of the IPR investigators attended Day 1 of In-Service in late September, allowing members of IPR to gain a better understanding of PPB operations.

Further related to Par. 128, we note that the City has eliminated some redundancy in witness interviews. In the past, IPR engaged in an extensive "intake investigation" prior to assigning a

case for administrative investigation. This normally involved interviewing witnesses as well as complainants. Thus, whether the case was ultimately assigned to IA or IPR, witnesses would then be re-interviewed during the full investigation. IPR has streamlined this intake process and no longer routinely interviews witnesses for investigations it passes on to IA, reducing the overall timeline associated with Par. 121.

Finally, the revised Directive 330.00 addresses the problem of time lost due to administrative complaints being delayed until the completion of a criminal complaint. The Directive now states that "allegations of member misconduct, which include a possible criminal law violation, <u>shall</u> be investigated concurrently as a criminal and administrative investigation" (emphasis added, wherein the previous version of 330.00 indicated they <u>may</u> be investigated concurrently). This revision complies with the requirement of Par. 122 ("PPB shall conduct administrative investigations concurrently with criminal investigations…") and our recommendation in previous reports.

Overall, our joint review of Par. 121 (and other paragraphs related to the 180-day timeline) and Par. 128 reveal that while meaningful steps have been taken, PPB and the City have not yet substantially complied with either paragraph. For both paragraphs, the primary mechanisms for compliance have not been fully implemented and we, therefore, cannot assess the success. However, the initial steps appear to be acceptable, including a better delineation of when IPR has authority to investigate cases, the reduction of redundancy in investigations, and an overall movement to continue to reduce the timeline for administrative investigations.

Nevertheless, as the last two quarters of overdue case reports indicate, between 65% and 70% of cases are overdue (though there may be overlap between the cases included within these two quarters). Although our last Outcomes Assessment found that the median number of days to complete a full investigation (with findings) was 188 days (PPB now reports this to be 182 days), there is still room for improvement for both PPB and IPR. Below, we provide an analysis of overdue cases and where in the process delays are most likely to occur for each entity. We note that <u>all </u>stages are not represented here – only those in which cases are consistently overdue.

As seen, both entities have areas where cases have been overdue in the past two quarters. For IA, delays are most attributable to the investigation, investigation review, and disposition review stages. For IPR, delays are most attributable to the intake decision, investigation review, and findings review stages. Upon the revised system generating a sufficient amount of data with the new procedures, we will revisit PPB and the City's compliance with the timelines, though recommend IA and IPR review the stages which have historically shown overdue timelines in order to provide targeted improvement.

Table 6 – IA Overdue Investigations

| | 2017 Q1 (19 of 27 Cases Overdue) | | 2017 Q2 (15 of 23 Cases Overdue) | |
|---|---|---|---|---|
| | # Cases Overdue at Track | # Days Overdue (Median) | # Cases Overdue at Track | # Days Overdue (Median) |
| Findings Prep | 2 | 4 | 4 | 3.5 |
| Disposition Review | 6 | 7 | 4 | 7.5 |
| Findings Review | 1 | 1 | 6 | 1 |
| Intake | 8 | 5.5 | 5 | 7 |
| Investigation Review | 6 | 9 | 6 | 2.5 |
| Standard Investigation | 17 | 55 | 13 | 68 |

Table 7 – IPR Overdue Investigations

| | 2017 Q1 (19 of 27 Cases Overdue) | | 2017 Q2 (15 of 23 Cases Overdue) | |
|---|---|---|---|---|
| | # Cases Overdue at Track | # Days Overdue (Median) | # Cases Overdue at Track | # Days Overdue (Median) |
| Disposition Review | 1 | 6 | 1 | 13 |
| Findings Review | 7 | 6 | 4 | 6 |
| Intake | 6 | 4.5 | 7 | 2 |
| Investigation Review | 14 | 13 | 6 | 18 |
| Intake Decision | 7 | 7 | 6 | 6.5 |

| Recommendations Par. 121-123; 128 | • The City and PPB should finalize changes to PPB Directives and Portland City Code to fully implement the changes to the accountability process. This will also require changes to the Settlement Agreement.<br>• IPR should review their timelines in a manner similar to IA (i.e. "action plans" for cases which go over the allotted number of days for each stage of the investigation).<br>• PPB and IPR should develop and deliver joint training on investigations in accordance with agreed upon policies. |
|---|---|

Subsection B of Section VIII (On Scene Public Safety Statements and Interviews) deals with Officer Involved Shooting (OIS) events and related procedures. As has been well publicized in media accounts, the content of revised protocols for compelled statements to IA in order to comply with "applicable law and current professional standards, pursuant to *Garrity v. New Jersey*" (Par. 124) has shifted back and forth within the past year. As part of the City's labor negotiations with the Portland Police Association in October of 2016, the "48-hour rule" was removed, allowing IA investigators the ability to compel statements as soon as the investigation allowed for it rather than investigators being required to provide 48-hours' notice before compelling a statement.

After a subsequent OIS event led to the involved officer being interviewed expeditiously, the District Attorney provided an interpretation of case law arguing that compelling a statement from an officer before the completion of the criminal investigation created a risk of transactional immunity being granted to the officer, meaning "the officer cannot be criminally prosecuted for the use of force" (see Appendix VIII-1). In accordance with the DA's interpretation, PPB, the City, DOJ, and COCL engaged in the revision of Directives 1010.00 and 1010.10 under the assumption that compelled statements from the involved officer should, as a matter of applicable state law, not occur until after the completion of the criminal investigation.

The crux of the DA's position was that a wall is necessary to keep the administrative investigation from tainting the criminal investigation. The DA relied on *State v. Soriano* in arguing that such a wall is impossible to erect ("The Court further opined that the State could not realistically erect a wall between the officers who solicit a compelled statement and the prosecution team. 'It is unrealistic to give a dog a bone and expect him not to chew on it…'"), and the consequences of breaching the wall is transactional immunity under Oregon's state Constitution. In August of 2017, the City Council revisited the issue, noting that "other lawyers … have carefully analyzed the issue and have concluded that it is possible to legally conduct

concurrent criminal and administrative investigations without violating an officer's constitutional rights." The City Council noted that this position had the support of the Portland City Attorney since "other Oregon appellate court authority … and the great weight of federal constitutional law" indicate that such a wall could be maintained (see Appendix VIII-2). As a result, Portland City Council directed PPB to implement a revised Directive 1010.10 that would require involved officers to submit to a compelled administrative interview within 48-hours of a lethal force event.

PPB complied with City Council's direction, and enacted a revised Directive 1010.10 on August 24, 2017. It went into effect on September 24, 2017. However, PPB has yet to revise its standard operating procedures to reflect the new Directive's requirements and to account for the DA's concern about the viability of a wall. Moreover, DOJ has not yet approved the revised Directive 1010.10 or related procedures as required by Par. 124. We anticipate these issues to be resolved in the coming months.

There were two officer involved shooting events (OIS) within the timeframe of this report for which there were completed casefiles. In both cases, there were reports from supervisors and Detectives which indicated that the involved/witness officers were identified and separated. However, for both of the case files, documentation of the requirements of Par. 125 can be enhanced to demonstrate "separation of all witness and involved officers to lethal force events." In prior OIS events, supplemental reports from support or companion officers (officers who would stand with involved/witness officers) would be included in the casefile. However, in both of the casefiles for this report, supplemental reports were found for only a couple of the support officers.

Par. 125 also requires PPB to issue Communication Restriction Orders (CRO) to "all witness and involved officers, prohibiting direct or indirect communication between those officers regarding the facts of the event." For both of the OIS events we reviewed, CROs were issued for each of the involved and witness officers within approximately 4 hours for one OIS and between 4-6 hours for the other OIS (however, this OIS involved a large number of witness officers). As we have noted in past reports, this timeframe for issuing CRO's appears to be reasonable given the number steps necessary prior to their issuance. Additionally, supervisors give verbal orders prior to the issuance of CRO's, creating a temporary communication restriction before the more formal CRO is issued.

Par. 126 requires witness officers to "give an on-scene briefing to any supervisor and/or a member of the Detective Division." In both OIS cases we reviewed, a witness supervisor provided an on-scene briefing and walkthrough with members of the Detective Division. Additionally, all witness officers provided a recorded statement to the Detective Division immediately before receiving the CRO. In our review of the OIS cases, it appears all officers who had "firsthand knowledge of the events" (Directive 1010.00) were identified as witness officers. This is an improvement over our prior reports, where some apparent witness officers were not identified as such.

Finally, under Subsection B of Section VIII, Par. 127 requires PPB to request the involved officer "provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated." The request for the involved officers to provide the walkthrough and interview is listed in 1010.10, though are voluntary due to potential 5th Amendment issues. In both OIS events we reviewed, the involved officer(s) was asked to provide an on-scene walk-through and interview. In each OIS event, the involved officer(s) declined.

| Recommendations Par. 124-127 | • PPB and the City should revise standard operating procedures to reflect the revised Directive 1010.10's requirements and to account for the DA's concern about the viability of a wall. |
|---|---|

Subsection C of Section VIII (Conduct of IA Investigations) includes Par. 128 (discussed above), though other paragraphs look at particular steps and criteria within the accountability system. For instance, Par. 129 includes the requirement that "all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact." For this report, we did not find any cases filed with IPR or IA which were dismissed without IPR's initial determination. However, we found a couple incidents wherein a community member would state on-scene that they believed the officer used excessive force. In these cases, a supervisor came on-scene to complete the AAR, investigate the use of force and based on the investigation, made the determination the claims were without merit. The supervisor then documented the reasons for the determination in the AAR, which would then be reviewed up the chain of command. However, the cases were never forwarded on to PSD for a full and completed IA investigation.

We discussed with PPB that these actions were a technical violation of the Settlement Agreement as they amounted to a declaration and the allegations were not subject to a "full and completed IA investigation." PPB agreed with this assertion and noted that it is the responsibility of the supervisor completing the AAR to forward the case to PSD. However, when the AAR author does not do this, the chain of command is responsible for catching the omission and rectifying it. In our discussions with PPB, we were informed that the breakdown in the process has been due to the perception that when an AAR investigation appears to be largely the same as what would be expected from an IA investigation (e.g. interviewing officer, suspect, witnesses), the expected findings would not be different, and therefore, the IA investigation would be largely redundant. We don't necessarily disagree with this assertion; however, the assertion disagrees with the Settlement Agreement. We have recommended a Supervisors In-Service for the future (for example, see the Sections on EIS and Training), and this requirement should be included, as we did not see it in the Fall 2017 In-Service.

113

Par. 130 requires the prohibition of all forms of retaliation and lists a number of actions which may fall under that category. Between the second and third quarter of 2017, COCL, DOJ, and PPB engaged in a series of policy revisions including Directive 310.20 (Discrimination, Harassment and Retaliation Prohibited), though a finalized version has not yet been approved. In the proposed Directive revisions, retaliation is prohibited against both City employees and community members. This is responsive to a recommendation we had included in our 2016 Q3/Q4 Compliance Assessment. Furthermore, the revised Directive now contains sufficient information for employees to understand the range of actions which may encompass retaliation. For the prohibition of retaliation against other City employees and community members, examples of actions which may constitute retaliation are delineated. However, given the past concerns with retaliation going unaddressed (see DOJ's 2016 Settlement Agreement Compliance Assessment), we believe that members need to be adequately trained on the new Directive before we can ascribe Substantial Compliance to this paragraph.

Finally, when an officer is found to have violated policy and faces discipline of one or more days of suspension, the officer's case is sent to the Police Review Board (PRB) for a recommendation to the Chief of Police. The Settlement Agreement's requirements related to PRB (Pars. 131-132) have not yet been fully realized, as the changes to accountability are, at this point, proposed. However, we note that some aspects of the Settlement Agreement are already part of the PRB City Code, including the qualifications to participate on the PRB and removal criteria. However, other requirements have not been incorporated, most notably the requirement to draw one of the citizen member slots from the CRC on reviews of all use of force cases (currently, City Code 3.20.140 pertaining to PRB requires this action on only a subset of force cases rather than all force cases). As part of COCL and DOJ's review of PPB Directive changes related to accountability, we have asked PPB and IPR to have their policies mirror each other before approval. This process is still occurring, though we anticipate resolution in the near future.

Finally, in Subsection C is a PPB requirement to perform certain actions if an officer's use of force "gives rise to a finding of liability in a civil trial" (Par. 133). There were no incidents of a finding of liability in the timeframe of this report and the previous instance has now received a completed IA investigation.

| Recommendations Par. 129-133 | • PPB should train supervisors on their responsibility to notify PSD when a community member makes a complaint of excessive force.<br>• PPB should train members and supervisors on the revised 310.20 (Discrimination, Harassment, and Retaliation Prohibited).<br>• The City should revise City Code 3.20.140 regarding the requirement for PRB to draw one of the citizen member slots from CRC on reviews of all uses of force.<br>• PPB and the City should ensure that Directive changes related to accountability are mirror images between PPB and IPR. |
|---|---|

Subsection D of Section VIII (CRC Appeals) deals exclusively with the CRC process. After an investigative finding is rendered, parties to the complaint (either the complainant or the officer) have the ability to appeal the finding to the Citizen Review Committee (CRC). As we have noted in past reports, changes to CRC required by the Settlement Agreement (Pars. 134-136) have already satisfactorily occurred, including the expansion of members, the requirement of CRC members to be neutral, unbiased, and capable of making objective decisions, and the ability of CRC to find the outcome of an administrative investigation unreasonable or request additional investigation be completed. As part of Portland's overall system of accountability, we believe the requirements related to CRC continue to be in substantial compliance with the Settlement Agreement.

| Recommendations Par. 134-136 | • No recommendations, though CRC has an ongoing obligation to meet the requirements of these paragraphs. |
|---|---|

Subsection E of Section VIII (Discipline) contains a single paragraph (Par. 137) that requires "PPB and the City [to] develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent." In August of 2017, COCL, PPB, DOJ, and PPA discussed Directive 338.00 (Discipline Guide) along with the corresponding guide, though a finalized version of the Directive has not yet been approved.

The guide contains categories of alleged conduct "based on the nature of the allegation" and provides avenues when mitigating/aggravating factors are present. Additionally, the discipline guide provides a framework for what may be considered a mitigating or aggravating factor, including prior discipline history, willingness or failure to accept responsibility, and the officer intentions. Although RU Managers are allowed to impose discipline outside the recommended category, they must provide justification when doing so, thus making the guide capable of providing "discipline that is reasonably predictable and consistent." Although we have reviewed cases where the RU Managers proposed discipline has been consistent with the Discipline Guide, Substantial Compliance with Par. 137 will require a review of a random selection of cases to determine whether the imposed disciplinary decisions are consistent with the Guide.

| Recommendations Par. 137 | • No recommendations at this time. |
|---|---|

Subsection F of Section VIII (Communication with Complainant and Transparency) contains three paragraphs seeking to increase the information provided to complainants from IPR during and after a community member files a complaint. Based on our review of the three paragraphs, we believe IPR has substantially complied with Subsection F of Section VIII. We reviewed a random selection of IPR case files and identified written letters for various stages of the IPR process including intake, initial decision (i.e. decline or forward to PPB), and disposition. In all case files except two, there was an Initial Contact Letter (ICL). For the two which did not have formal ICL's, the complaint was opened based on third-party information and neither of the individuals responded to IPR requests for contact. Although no formal ICL was sent, attempts at contact with the individuals referenced a tracking number.

For the cases which did have ICL's, the letters contained a case tracking number, a summary of the complaint, who was assigned to perform the intake investigation, and a list of possible outcomes. For all cases where an ICL was provided, we identified a second letter regarding the initial decision. These letters contained the tracking number and the decision as to whether the case would be sent on for further investigation. In cases where the decision was made to forward the case for additional review, a list of allegations was provided.

Finally, when a complaint investigation has been completed, complainants receive a letter indicating the tracking number, the allegations, assignment, and outcomes. We have further seen evidence of these letters in our review of full IA casefiles. Taken altogether, we believe that where appropriate and unless otherwise noted, IPR has provided the following information in accordance with the Settlement Agreement:

- A tracking number in all correspondence with complainants (Par. 140)
  - o The tracking number allows a community member to track his or her complaint of officer misconduct on the IPR website. Community members are also able to file on the website (Par. 138), as well as in person at IPR, on the phone, by email, by phone, at other City Offices, at a PPB Precinct, or during a street encounter.
- A written and mailed letter (Par. 140) upon the completion of the intake investigation which includes
  - o The complaint classification (Par. 140)
    - ▪ Our review indicates that these may only occur when the complaint is forwarded on for additional investigation. However, our discussions with IPR regarding the complaint submission satisfaction survey has included classification as an item to be listed on correspondence, regardless of whether the complaint was forwarded on or not. We recommend IPR include classification on all letters to complainants.
  - o Assignment (Par. 140)
  - o The future direction of the complaint investigation (either dismissed or forwarded on for a full investigation)
- A written and mailed letter (Par. 140) upon completion of the full investigation which includes
  - o The outcome of the complaint (sustained, unproven, etc.) (Par. 140)
  - o Instructions for appealing the outcome to the CRC (see Par. 135)

As we have noted in past reports, the City Attorney's Office determination of "whether disclosures regarding corrective action are required" is largely dictated by law and that a decision to disclose corrective action is supported when: (1) the event involved a higher-ranking officer and (2) the allegation was of a serious nature. We believe this meets the criteria for Par. 140 provided the City Attorney's makes a determination on "a case-by-case basis."

Furthermore, we maintain the City and IPR have substantially complied with the requirements of Par. 139 insofar as IPR is permitted by law to provide complainants with requested documentation of a complaint. As we have previously noted, IPR may only share documents that were provided by the complainant and a transcript of the complainant interview but is not permitted to share documents related to the interview of an accused officer nor investigative material about the complaint. As this is "the extent permitted by law," we believe the City has substantially complied.

Finally, we have previously recommended that IPR implement a complaint submission satisfaction survey as a way to enhance the complaint submission process and be responsive to issues experienced by community members. In the second and third quarter of 2017, we coordinated with IPR on creating survey items that are organizationally useful for IPR and yield actionable results. The survey items discussed relate to the ease of complaint submission, the expediency of the intake investigation, expected outcomes, treatment by IPR representatives,

confidence in the outcome of a full investigation, and overall satisfaction with the process. The survey will allow IPR to identify differences within respondents based on the type of complaint, intake investigation outcome, and modes of complaint submission, and other groupings. The complaint submission survey is completely in line with the intent of the Settlement Agreement to provide communication and transparency with the complainant and the community.

| Recommendations Par. 138-140 | • Include complaint classification on all correspondence with community members, regardless of whether the complaint has been forwarded on for additional investigation |
|---|---|

Evaluation of System

Given the totality of the above requirements in the Settlement Agreement, we return to our previously stated two goals that we sought to evaluate in this section: an accountability system built on due process and enhanced civilian oversight. As changes to PPB policy and City code are not as yet finalized, we do not believe that either of these goals have been accomplished. However, there have been a number of improvements.

As a first step, we believe that the groundwork for a due-process-oriented accountability system has been laid, particularly with the changes to allow the investigating entity to recommend findings as they are the ones in the best position to do so. However, we continue to see that a fairly high percent of cases being over the 180-day timeline, leaving both officers and community members in limbo as to the status of the complaint. Delays often come at the investigative phase and we urge both PPB and IPR to secure the investigators they have requested as soon as possible. Such delays are also identified by PPB members. Our 2017 survey of PPB indicated that more than 92% of members agreed that it takes too long to "resolve citizen complaints" and more than 90% agreed that it takes too long to "investigate accusations of police misconduct." Perceptions of delay can lead to distrust in the process and may potentially have an impact on perceptions of organizational justice as a result. Procedural justice is also important to the complainants.

IPR as an investigative agency begins to meet the goal of civilian oversight and have exponentially increased the number of investigated cases over the last couple of years. Although IPR has increased the number of investigations they have performed, there has been concern with how well trained they are to do investigations. We believe it to be a step in the right direction for IPR and IA to be jointly developing training as this will ensure consistent training between the two entities.

118

Another aspect of the accountability system which we believe conforms to due process and procedural justice ideas is the information supplied to community members and officers regarding their complaints. Particularly with community members, they are able to file in a number of ways, can track their complaints, receive outcomes, and have the ability to appeal to the CRC. Furthermore, enhancements to the process may be facilitated through the IPR complaints submission satisfaction survey, once it is launched. Officers, too, have due process functions built in for them, including the ability to appeal to the CRC and have PRB as a body to provide recommendations for discipline outside of the RU and Chief. In addition to this, discipline must be considered predictable and consistent with the goals of the Discipline Guide.

Furthermore, accountability is a perception of the community (similar to legitimacy) which PPB should be careful to maintain. Accurate report writing to avoid the perception of misdoings is an important aspect of this and nowhere is this more important than during an officer involved shooting. Steps must be taken to continuously identify witness and involved officers, separate them out, and interview them. Documentation at each step of this process is crucial.

Therefore, we do not believe that all necessary steps toward satisfaction of this section have yet occurred and where improvements are needed, we have made appropriate recommendations. As we anticipate significant progress to be made upon the finalization of PPB and City policies in the near future, we are confident that substantial compliance is not far after that provided PPB and the City implement those changes with integrity.

# IX. COMMUNITY ENGAGEMENT AND CREATION OF COMMUNITY OVERSIGHT ADVISORY BOARD

| Par. 141 | Partial Compliance |
|----------|--------------------|
| Par 142 | Partial Compliance |
| Par. 143 | Partial Compliance |
| Par. 144 | Partial Compliance |
| Par. 145 | Partial Compliance |
| Par. 146 | Partial Compliance |
| Par. 147 | Partial Compliance |
| Par. 148 | Partial Compliance |
| Par. 149 | Partial Compliance |
| Par. 150 | Partial Compliance |
| Par. 151 | N/A |
| Par. 152 | Partial Compliance |

In this section, we provide an evaluation of whether PPB and the City's implementation of the Settlement Agreement have created "robust systems of community engagement" (Par. 173) based on their level of compliance with the paragraphs found within Section IX, Community Engagement and Creation of Community Oversight Advisory Board (Par. 141-152). We believe the goals of the having an enhanced system of community engagement are found within the opening paragraph of Section IX – "Redefining and restructuring existing community input mechanisms to provide for independent oversight of the Agreement, while also enhancing PPB's current community outreach efforts will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety." We therefore look to evaluate whether community confidence and strong police/community relationships have been promoted through:

➢ The transition from the Community Oversight Advisory Board (COAB) to the Portland Committee on Community-Engaged Policing (PCCEP)
➢ PPB's other efforts at community engagement and responsiveness to community concerns

Our methods of assessing community engagement included: interviews City personnel and community members; observation of City Council meetings, review of documents, and analysis of survey data.

### Transitioning from the Community Oversight Advisory Board (COAB) to the Portland Committee on Community-Engaged Policing (PCCEP)

In order to understand the need for a transition from the COAB to the PCCEP, a brief history of events is in order. As part of the Settlement Agreement, the City was required to establish a Community Oversight Advisory Board. Almost immediately upon the creation of the Board, it began experiencing issues which hindered progress on meeting Settlement Agreement tasks. These issues have been well-documented in our previous reports, from inadequate initial training, a lack of response from the City and DOJ to the COAB's many policy recommendations, and difficulty scheduling required meetings with the Mayor and Police Chief. In the first and second quarters of 2016, COAB's work was further hindered by meeting disruptions, a strained relationship between the Chair and certain members of the COAB, resignations (and subsequent lack of reappointments from City representatives), a lack of quorum for both the executive committee and the full COAB, and other issues. These constraints ultimately resulted in the COCL and City requesting that the COAB be given a recess to allow the Parties to rethink the community engagement process.

In early July 2016, the COCL and the COAB independently asked for a change to the Settlement Agreement that would separate the COAB from the COCL, thus allowing the COAB to function more independently, and allow the COCL to focus on compliance and monitoring functions. Such a change would require alteration of the Settlement Agreement and would be subject to deliberations between the Parties as allowed under Par. 175. However, no alterations to the Settlement Agreement were made and the original structure found in Section IX continues to be maintained.

In the third and fourth quarter of 2016, the COAB was placed on a two-month recess by the City for the purposes of strengthening the community engagement process. In October of 2016, the recess ended, although a finalized community engagement plan—and any required amendments to the Settlement Agreement—was not created.

In late 2016, the COAB resumed meetings though little progress was made on Settlement Agreement related tasks. Meetings continued into the first quarter of 2017, though on January 31, the two-year initial terms of the member expired. According to the August 24, 2017 Adopted Ordinance approving amendments to Settlement Agreement between the United

States and the City of Portland, "On January 26, 2017, February 21, 2017 and March 13, 2017, the City, the PPA, the AMAC and the DOJ held facilitated meetings to discuss how to move forward with a community engagement board. The parties also traded various proposals between these meetings. At the final facilitated meeting, it was agreed that the City and the DOJ would meet without the other parties to prepare a detailed proposal. Many of the meetings concerned the issue of whether the community engagement body should engage in 'oversight.' Following many discussions, the parties agreed to define 'oversight' as the ability to review and make recommendations." The discussions focused on "how to move forward in the few but key areas where progress toward substantial compliance had stalled," particularly community engagement.

In the spring and early summer of 2017, the City undertook an assessment of the COAB experience in lieu of reappointing COAB members. The assessment was performed to inform a new community engagement body structure and included interviewing past COAB members, stakeholders, community members, and others with firsthand knowledge of the community engagement process.

Using the information learned from the assessment process, the City developed a new plan for community engagement named the Portland Committee on Community-Engaged Policing (PCCEP), which was provided to AMAC on July 7, 2017 and discussed in an all-day mediation session on July 14. Based on AMAC feedback, the plan was revised before release to the public.

As initially proposed to the public, the group would be comprised of 5 to 9 members reporting directly to the Mayor, with a mission to "work to assess PPB's current community engagement and develop recommendations and strategies for systems to increase public outreach and engagement with a broad cross-section of the community to build confidence, facilitate positive police/community relationships and promote public safety." The group had the option to meet privately once or twice a month, and was expected to hold quarterly public meetings.

Based on the initial proposal, community testimony at the August 3 City Council Meeting was almost uniformly critical, specifically around the removal of the COAB's charge to "independently assess" implementation of the Settlement Agreement, the Mayor's perceived control of the group, and the lack of public meetings. In response, multiple amendments were made that broadened the council's role in the group's selection process, as well as directed the group to report to not only the Mayor, but also the director of the Office of Equity and Human Rights.

On August 18, a revised PCCEP plan was posted, which the Portland City Council considered and ultimately approved on August 24. Significant changes included expanding the group's size to 9-11 members, expanding the group's mission to include independent assessment of the

Settlement Agreement and review of PPB policies, opening more meetings to the public, making clear the group's right to appear at status conferences, adding mental health advocates to the group's initial training, and extending the timeline for the group to complete recommendations toward a Community Engagement Plan.

As of the writing of this report, changes to the Settlement Agreement to substitute PCCEP for COAB are still awaiting approval. However, as outlined in the PCCEP plan, the City plans to lay the groundwork for seating the new body in advance of approval of the revised Settlement Agreement by the Court. This work includes appointing a community selection panel to develop selection criteria and public outreach strategies for the PCCEP selection process, as well as creating and posting a written, downloadable application on the City's website, the deadline for submission, selection criteria, selection process and a description of PCCEP member responsibilities. The City is currently working on an RFP for the organization development consultant that will assist in seating the PCCEP. The timeline for the additional advance work is not yet in place.

Given the history of the COAB and the difficulties which surrounded it, we understand the City's diligence in desiring to get it right with PCCEP. There is an interest by all involved to make sure that PCCEP members are thoughtfully chosen, trained, and supported to accomplish the tasks required of them. To the extent the City has the power to do so, we recommend the Settlement Agreement be revised as quickly as possible in order for PCCEP to have the authority to act – however, we believe that, to date, the City has taken the steps within its control.

Until the proposed amendments to the Settlement Agreement have been approved (and they have not at this time) and the PCCEP is fully functioning, we cannot find the City or PPB in Substantial Compliance with the paragraphs related to the COAB. We are required to base compliance on the current Agreement. When the PCCEP is operational, we will assess compliance based on the existence and success of that group, though for this report, we feel it best to highlight the key components of the PCCEP plan/proposed Settlement Agreement revisions and determine whether their intent is consistent with the COAB. A full comparison with COAB can be found in Appendix IX-1. Below, we provide a summary of the similarities and differences between PCCEP and COAB.

In our view, there are many similarities which should assist the City in ensuring a smooth transition to Substantial Compliance with the Agreement. While some community members remain critical that not all PCCEP meetings are required to be open to the public and there is skepticism surrounding mayoral appointment of members, the PCCEP plan as approved by City Council appears to be on the whole structured to achieve the core goals of the COAB. These goals include soliciting community input, creating recommendations regarding a Community

Engagement Plan, and receiving and commenting on PPB progress towards compliance with the Settlement Agreement.

<u>Selection Process</u>

COAB's 20 members were selected in multiples ways, including council appointments, designees from the Human Rights Commission and Portland Commission on Disability, PPB members appointed by the Chief of Police, and members chosen by a community selection committee. Alternatively, PCCEP member selection is streamlined and has more City input and control. Similar to COAB's community-appointment members, a community selection panel will be involved in creating a public application, reaching out to potential applicants, and vetting applicants. However, City staff will do an initial applicant screen, and the final selection is left to the mayor following interviews and council input (due to time constraints, community-selected COAB members were not interviewed prior to selection). Council will confirm all 9 to 11 members. This approach is similar to other City boards and commissions, and the higher level of vetting—plus a list of activities to do and background materials to review prior to seating—should serve to ensure that all appointees fully understand the expectations and responsibilities of their work on PCCEP. However, there is understandable community skepticism about council-confirmed Mayoral appointees remaining fully independent.

<u>Member Qualifications</u>

We note that the largest change for the qualifications for COAB members and PCCEP members is the fact that PCCEP members have a list of particular actions which they must accomplish prior to their first meeting. This includes actions such as:

- Learn about the history of the *United States v. City of Portland* Settlement Agreement.
- Attend PPB community academy.
- Participate in a ride-along with PPB (1 per PCCEP member).
- Review lessons learned from the COAB.
- Participate in subject matter and board trainings.

By having these qualifications, PCCEP members can avoid one of the major challenges faced by COAB – namely having deadlines for deliverables so soon that members did not have time to familiarize themselves with the Agreement's history or PPB operations. Although many COAB members did go through the community academy, it was not a requirement and neither was it a requirement to participate in a ride-along with a PPB member. These opportunities for members become comfortable with the work they are doing should ultimately lead to an improved product.

Structure

The PCCEP plan is much clearer than COAB in terms of group structure and support, including initial training, administrative staffing, and specified deliverables and responsibilities. Unlike COAB—which sometimes struggled to adhere to the ins and outs of both public meetings and public records laws—PCCEP is not required to open all of its meetings to the public.

Members are tasked with a list of prep activities and background documents, to get up to speed before the PCCEP is seated. Training on the Settlement Agreement and its origination is specified and comprehensive. While background and prep work were minimally provided to the COAB, many members felt like the amount received was insufficient given the scale of tasks. Furthermore, the City is providing an organizational development consultant to help PCCEP get off the ground and is providing funding for community organizing and outreach, in addition to the administrative support that was provided to COAB.

City and PPB Responsibilities

The City and PPB's responsibilities as they related to PCCEP are more clearly delineated and involved than they were for COAB. For example, PPB will meet with PCCEP during a universal policy review period to discuss a policy and gather feedback. Previously, COAB did this work independently and sent their board-approved written feedback to DOJ. Sometimes it was incorporated, and sometimes it was not, but COAB rarely received a response to their recommendations. Beyond policy review, the City is also required to provide "thorough and timely responses" to PCCEP recommendations and information requests, and the Mayor or a delegate "shall endeavor to attend" all public meetings of PCCEP.

Ongoing Responsibilities

The COAB's responsibilities, as listed in the Settlement Agreement, were particular and had exact due dates. However, in the PCCEP proposal, there are a number of elements that may be considered "ongoing responsibilities," including evaluating national best practices regarding policing and community engagement, analyzing prior community surveys and consulting with the City to conduct additional surveys, and reviewing PPB directives and making recommendations. While these responsibilities were not necessarily outside the purview of the COAB, their explicit mention in the PCCEP proposal gives the appearance of an ongoing obligation.

Missing Elements

We note some aspects of the Settlement Agreement which do not seem to have a corresponding provision within the PCCEP proposal. Some of these missing elements are

administrative. For instance, PCCEP proposal does not identify whether a simple majority is sufficient to pass recommendations. Additionally, there is no indication whether an executive committee or subcommittees are authorized the way they were in the COAB. Other differences are more substantive. For example, the PCCEP proposal and proposed revised Settlement Agreement does not include PCCEP in the joint development of community engagement metrics. PCCEP is able to review the metrics and suggest additional ones.

<u>Potential Stumbling Blocks</u>

We note that some of the PCCEP requirements have the potential to become stumbling blocks and we recommend the City create a plan for prioritizing tasks so that PCCEP can accomplish the most immediate goals first. With the additional goals of assessing the Settlement Agreement (which, similar to the COAB, is not clearly defined in the PCCEP plan) and policy review, PCCEP may find itself similarly struggling to balance members' competing priorities with limited volunteer time. COAB approved dozens of policy recommendations, including line edits to PPB policies, and spent considerable time debating how best to independently assess implementation of the agreement (some members, for example, felt that COAB needed to analyze PPB data directly, rather than assess COCL's analysis of such data through a community lens). As a result, COAB did not have enough bandwidth to make significant progress toward recommendations for a Community Engagement Plan, despite a positive reception from community members for initial steps taken. While PCCEP has a longer timeline—a full year, versus COAB's 240 days — to make recommendations toward a Community Engagement Plan, it is worth noting that after two years COAB did not achieve this deliverable, and the COAB subcommittee charged with overseeing this work drew the fewest COAB members. PCCEP members must prioritize this key Settlement Agreement deliverable.

## Other PPB/City Efforts to Engage the Community

In past reports, we have noted that the PPB is regularly involved in a considerable range of community engagement activities. The Bureau maintains a list of community engagement activities on their website (https://www.portlandoregon.gov/police/30379) and we will therefore not repeat our past comments here. Some PPB initiatives, such as Coffee with a Cop, or the School Liaison Program, offer specific ways to engage adults and youth, respectively. Additionally, PPB reports the development of a new Community Engagement Unit which has recently began operation. In addition, we have seen several recent actions and programs from the Bureau that also fall outside the structured community engagement board required by the Settlement Agreement and deserve mention. These actions are consistent with the concept of community policing and PPB should be recognized for engaging in them.

One of the ways PPB has responded to community requests has been through a more engaged policy review process. Although PPB has accepted recommendations for policy review for some time now, they have delivered on a pledge to provide red-line versions of policies up for review. In the past, PPB offered the revised version but did not indicate what had changed from the past policy, leaving community members to manually determine the extent to which the new policy deviated from past policy. By providing the red-line versions, the process is much more transparent, collaborative and in-line with community policing principles.

More recently, PPB did away with their Gang List. The list was a collection of suspected gang members, though there was some community mistrust in the way the list was compiled, used, and kept confidential (http://www.newsweek.com/gang-violence-portland-police-tear-gang-member-list-effort-rebuild-community-665374). Although the elimination of the Gang List was not a requirement of the Settlement Agreement, it is considered a significant response to community member concerns, as PPB is one of the first agencies in the country to abandon such a list. This is a prime example of listening to community concerns about a particular practice, evaluating the practice's organizational utility at the expense of community relations, and prioritizing the relationship with the community when the Bureau believes it outweighs the utility of the practice.

We continue to recommend PPB seek out opportunities for improving relationships with the community it serves. However, we note that on the whole, PPB officers have a generally positive view of the community, as evidenced in our annual PPB surveys. The survey results are summarized in Appendix S-1. For instance, over 80% of respondents <u>disagreed</u> with the statement "Officers have reason to be distrustful of most citizens." Furthermore, the 2017 survey reports that 67.7% of sworn members are in agreement with the statement "Most people respect the police," which is an increase from 2016 (59%) (this sentiment was also conveyed during ride-alongs with PPB officers and sergeants). Conversely, the majority of respondents (61.1%) admitted that the relationship between the police and community at this time is not very good. This number represents a slight decrease from that reported in 2016 (66.8%) but is still an increase from that reported in 2015 (54.3%). In addition, there is strong sentiment that the media treats the police unfairly, with 86.8% of officers agreeing and levels of agreement remaining near 90% for all three years we have collected responses.

Where there appears to be nearly universal agreement between officers is in response to the item "The public doesn't understand what it means to be an officer." This is a common sentiment in law enforcement, though not one PPB has not recognized and taken steps to address. In January of 2017, members of PPB "hosted a community academy for the cast and crew of the Hands Up monologues… [and in March of 2017, PPB] hosted a private showing of the monologues and invited [PPB] members that helped on the academy day to see the show"

(personal correspondence with PPB). About 22 members of PPB viewed the showing of the Hands Up monologues, followed by an approximate 90-minute discussion after. The benefit of this was for officers to understand the perspectives of community members, though it lacked the ability of community members to understand the perspectives of the officers.

In order for police and community to come together collaboratively, both sides need to be heard. PPB members are developing a police monologues (from the perspective of officers), with a desired performance date in the spring of 2018. We believe this would be another example of PPB innovation in attempting to secure community trust and would conceivably reduce the percentage of officers who feel the community doesn't understand them. We also note that based on the conversations we have had with PPB and based on a City Club of Portland Friday Forum about the topic (see https://youtu.be/UGRLXAeehDk), we do not believe the efforts by PPB amount to any sense of "whataboutism" – an attempt to diminish the perspectives of others by pushing the perspectives of police. Rather, the effort appears to be a genuine attempt to gain mutual understanding between the police and communities who may hold distrust of them. We support PPB's efforts here and recommend they continue to find ways to address both community and officer misperceptions of each other.


Evaluation of System

Given the above information, we now return to whether PPB and the City have promoted community confidence in PPB and facilitated positive police/community relations through enhanced community input mechanisms. Without the implementation of PCCEP, we cannot conclude that the City and PPB have achieved substantial compliance with the Settlement Agreement. Particularly given the centrality of a Community Engagement and Outreach Plan to the original COAB function (as well as to the proposed PCCEP function), there needs to be a board in place to work with the police. We believe the PCCEP and COAB are reflective of each other and the PCCEP proposal is a valid substitute for the original language of the Settlement Agreement. Simply stated, the City must gain Court approval of the proposal and begin seating the PCCEP. We recommend the City keep in mind the lessons learned from the COAB as they embark on implementing PCCEP.

In addition to the more structured format of COAB/PCCEP, PPB has put forth a great deal of time and energy to engage the community in other ways. Beyond these diverse programs and initiatives, PPB has found ways to be responsive to community complaints by inviting community participation in the review of new and revised Directives, (and including red-line versions to facilitate the review), eliminating its Gang List, and engaging communities with

128

historical mistrust of the police. All of these contribute to PPB's overall system of community engagement and we believe will strengthen police-community relations.

| Recommendations Par. 141-152 | <ul><li>The City should make every effort to obtain DOJ and Court approval of the PCCEP proposal</li><li>Once approved, priority should be given to selecting and training the members, staffing the PCCEP, and beginning the work of developing a viable Community Engagement and Outreach Plan</li><li>The City and PCCEP members should keep in mind the lessons learned from the COAB experience as they embark on this initiative</li><li>Meanwhile, PPB should continue its community outreach programs and activities to solidify partnerships with organizations and continue the process of building trust with members of various Portland communities</li><li>Continue the annual Community-wide Survey of Portland residents to monitor changes in public trust and community engagement</li></ul> |
|---|---|

# X. AGREEMENT IMPLEMENTATION AND ENFORCEMENT

| Par. 156 | Partial Compliance |
|----------|-------------------|
| Par. 158 | Substantial Compliance |
| Par. 159 | Substantial Compliance |
| Par. 165 | Substantial Compliance |
| Par. 166 | Substantial Compliance |
| Par. 169 | Partial Compliance |
| Par. 170 | Substantial Compliance |
| Par. 171 | Substantial Compliance |
| Par. 172 | Partial Compliance |
| Par. 176 | Substantial Compliance |
| Par. 177 | Substantial Compliance |
| Par. 190 | Substantial Compliance |

Although not considered a system in the manner which sections above are reviewed, Section X focuses on the requirement that PPB and the City implement and enforce virtually all of the provisions of the Settlement Agreement. Thus, Section X includes many paragraphs for which Substantial Compliance is important in order for PPB to succeed in other areas. As they do not all fit neatly into a single system, we address them individually and tie them to sections above where appropriate.

We have referenced Par. 156 in the Use of Force section though it and Par. 169 apply universally throughout the Settlement Agreement as a requirement to maintain all "current policies, procedures, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement" (Par. 156). The paragraphs require the implementation of all provisions which require revision to policies, procedures, practices, handbooks, manuals, and forms within 180-days. PPB has not accomplished the required revisions within 180-days though the fault should not be placed solely at their feet. Delays in establishing a policy review schedule, numerous revisions for many Directives, and input from diverse stakeholders have created a situation wherein the timeline could not have been met. We believe that PPB and the City have continued to make a good-faith effort to engage in policy review and revision. As noted in prior sections, the implementation of the above revised items requires supplemental

training and audit mechanisms to ensure changes have taken effect. In some places, we believe that the definition of "implementation" (Par. 33) has been met. In others, there is still work to be done. Our recommendations pertaining to particular policies and procedures are found within the various sections above.

Section X also includes Pars. 170 and 171. In Par. 170, PPB is required to post proposed drafts of all directives in order to "allow the public an opportunity for notice and comment, prior to finalizing such policies." As noted in the Community Engagement section, we believe that PPB has met the requirements of Par. 170 as they provide red-line versions of revised Directives and provide ample opportunity for public input. As related to Par. 171, PPB is required to perform an annual review of "each policy or procedure required by this Agreement." Only a few policies have been subjected to an annual review because of the delayed review and approval process, but where possible, we have seen PPB engage in such reviews.

The implementation of policies necessarily requires adherence by members of the PPB and Par. 172 requires PPB to "hold officers accountable for complying with PPB policy and procedures." Most notably in the Use of Force Section, we found that officers are not consistently held accountable and that this may be the result of deficient supervisory investigations or deficient training. Furthermore, as noted in the Accountability section, we will be undertaking a randomly selected review of discipline cases to evaluate whether imposed discipline has been consistent with RU Manager recommendations and the Discipline Guide. Our recommendations pertaining to particular accountability issues are found within the various sections above.

Multiple paragraphs relate to the transparency of organizational change that PPB is currently undergoing (see Pars. 158, 159, and 176). In accordance with these paragraphs, PPB regularly posts audits and reports to their City website (Par. 158) and provides a Quarterly Update for public review (Par. 176). Furthermore, PPB has begun to collect and maintain crime and force raw data on their website (Par. 159). These actions serve the purpose of ensuring "transparency and wide public access to information related to PPB decision making and activities." The issues of the COAB are not due to action or inaction by the PPB and where PPB has had the ability, they have substantially complied with these paragraphs.

PPB maintains an impressive Compliance Coordinator team in accordance with Par. 165. The team has been instrumental in providing COCL with access to documents and employees (Par. 166), often with short turn around periods. In all areas of the Settlement Agreement, the Compliance Coordinator team has helped us to engage in analysis where possible, and where not possible, has attempted to provide alternate routes to obtain the needed information. The Compliance Coordinator team also maintains "all records, as applicable, necessary to document [PPB's] compliance with the terms of this Agreement and all documents expressly required by this Agreement" (Par. 177). As a result, we find PPB in substantial compliance with Pars. 165, 166, and 177.

Finally, in accordance with Par. 190, PPB continues to provide us the names of new hires and indicating that each has read the Agreement and acknowledged such. We find them in Substantial Compliance with this requirement.

| Recommendations<br><br>Agreement Implementation and Enforcement Section | • Recommendations pertaining to particular agreement implementation and enforcement issues are found within the various sections above.<br>• PPB has an ongoing obligation to comply with paragraphs in this section that they are already substantially complying with. |
|---|---|

*In addition to the above assessed paragraph, there are a number of paragraphs that would require us to evaluate our own work or the responsibilities of DOJ. As our charge is to report findings "related to PPB's compliance with this Agreement," we refrain from assessing ours or DOJ's execution of responsibilities. However, for the purpose of record maintenance, we include here the language of those paragraph or, in the instance of long sections, a summary of the language.

157: With regard to any provision that provides for DOJ's review and approval, including review of all policies that must be revised, approval will be granted in a timely fashion provided that the PPB's action reasonably satisfies the requirements and standards set forth in the relevant provision(s).

160: (COCL Summary) Par. 160 requires the City to select a COCL. It also identifies the overall responsibility of the COCL, the independence of the COCL, and the City's requirement to provide administrative support to the COCL.

161: In order to collect data and report on PPB's implementation of each substantive provision of this Agreement, the COCL shall conduct the reviews specified in the paragraph 173 of this Agreement and such additional reviews regarding the implementation of this Agreement as the COCL, the City, or DOJ deems appropriate. Based on the COCL's reviews and community input, the COCL shall make recommendations to the City regarding measures necessary to ensure full and timely implementation of this Agreement.

162/163/164: (COCL Summary) Pars. 162 and 163 requires the COCL to conduct the reviews reflected in this report, specifying methodology, compliance assessment, and recommendations for compliance. Drafts of COCL's reports are to be provided to the Parties and the COAB for comment. COCL is also required to hold Town Halls and gather community comments to our reports. Par. 164 then requires COCL to consider the comments and make appropriate changes

prior to issuing a final report. The Parties may submit COCL's reports to the Court and COCL's reports may be used to evidence compliance before the Court.

167: (COCL Summary) Par. 167 requires the DOJ to have full and direct access to all PPB and City personnel and documents. Par. 167 also provides for when exceptions may be made and how exceptions may be remedied.

168: All non-public information provided to the COCL or DOJ by PPB or the City shall be maintained in a confidential manner. Nothing in this Agreement requires the City to disclose documents protected from disclosure by the Oregon Public Records Law to third parties.

173/174: (COCL Summary) Pars. 173 and 174 detail the Semi-Annual Outcome Assessment required of the COCL. Such Outcome Assessments will measure whether the City and PPB have created systems and resources for responding to persons in mental health crisis, competent accountability and oversight systems, effective training for officers to deliver service to persons in mental health crisis, proper management of use of force, and robust systems of community engagement. Pars. 173 and 174 also the type of data which may inform the Outcome Assessments.

175: (COCL Summary) Par. 175 requires DOJ to conduct a comprehensive assessment of PPB and the City's compliance with the Settlement Agreement. Par. 175 also allows for modifications to the Agreement if necessary, provided the City agrees with the modification.

178 – 189: (COCL Summary) Pars. 178-189 provide requirements for the Settlement Agreement's enforcement, including provisions related to jurisdiction, termination, enforcement, additional considerations in required changes, process for non-compliance or misinterpretation of Agreement provisions, discussion of Agreement amendments, and defense of the Agreement.

# OVERALL REPORT CARD

| | |
|---|---|
| Par. 66 | Partial Compliance |
| Par. 67 | Partial Compliance |
| Par. 68 | Partial Compliance |
| Par. 69 | Partial Compliance |
| Par. 70 | Partial Compliance |
| Par. 71 | Substantial Compliance |
| Par. 72 | Substantial Compliance |
| Par. 73 | Partial Compliance |
| Par. 74 | Partial Compliance |
| Par. 75 | Partial Compliance |
| Par. 76 | Partial Compliance |
| Par. 77 | Partial Compliance |
| Par. 78 | Not Yet Assessed |
| Par. 79 | Substantial Compliance |
| Par. 80 | Partial Compliance |
| Par. 81 | Partial Compliance |
| Par. 82 | Substantial Compliance |
| Par. 83 | Substantial Compliance |
| Par. 84 | Partial Compliance |
| Par. 85 | Partial Compliance |
| Par. 86 | Partial Compliance |
| Par. 87 | Substantial Compliance |
| Par. 88 | Substantial Compliance |
| Par. 89 | Substantial Compliance |
| Par. 90 | Substantial Compliance |
| Par. 91 | Substantial Compliance |

| | |
|---|---|
| Par. 92 | Partial Compliance |
| Par. 93 | Substantial Compliance |
| Par. 94 | Substantial Compliance |
| Par. 95 | Substantial Compliance |
| Par. 96 | Substantial Compliance |
| Par. 97 | Substantial Compliance |
| Par. 98 | Substantial Compliance |
| Par. 99 | Partial Compliance |
| Par. 100 | Partial Compliance |
| Par. 101 | Partial Compliance |
| Par. 102 | Substantial Compliance |
| Par. 103 | Substantial Compliance |
| Par. 104 | Substantial Compliance |
| Par. 105 | Partial Compliance |
| Par. 106 | Substantial Compliance |
| Par. 107 | Substantial Compliance |
| Par. 108 | Partial Compliance |
| Par. 109 | Substantial Compliance |
| Par. 110 | Partial Compliance |
| Par. 111 | Substantial Compliance |
| Par. 112 | Substantial Compliance |
| Par. 113 | Substantial Compliance |
| Par. 114 | Substantial Compliance |
| Par. 115 | Partial Compliance |
| Par. 116 | Partial Compliance |
| Par. 117 | Partial Compliance |
| Par. 118 | Substantial Compliance |
| Par. 119 | Substantial Compliance |

| Par. 120 | Partial Compliance |
| Par. 121 | Partial Compliance |
| Par. 122 | Substantial Compliance |
| Par. 123 | Partial Compliance |
| Par. 124 | Partial Compliance |
| Par. 125 | Substantial Compliance |
| Par. 126 | Substantial Compliance |
| Par. 127 | Substantial Compliance |
| Par. 128 | Partial Compliance |
| Par. 129 | Partial Compliance |
| Par. 130 | Partial Compliance |
| Par. 131 | Partial Compliance |
| Par. 132 | Partial Compliance |
| Par. 133 | Substantial Compliance |
| Par. 134 | Substantial Compliance |
| Par. 135 | Substantial Compliance |
| Par. 136 | Substantial Compliance |
| Par. 137 | Partial Compliance |
| Par. 138 | Substantial Compliance |
| Par. 139 | Substantial Compliance |
| Par. 140 | Substantial Compliance |
| Par. 141 | Partial Compliance |
| Par 142 | Partial Compliance |
| Par. 143 | Partial Compliance |
| Par. 144 | Partial Compliance |
| Par. 145 | Partial Compliance |
| Par. 146 | Partial Compliance |
| Par. 147 | Partial Compliance |

| | |
|---|---|
| Par. 148 | Partial Compliance |
| Par. 149 | Partial Compliance |
| Par. 150 | Partial Compliance |
| Par. 151 | N/A |
| Par. 152 | Partial Compliance |
| Par. 156 | Partial Compliance |
| Par. 158 | Substantial Compliance |
| Par. 159 | Substantial Compliance |
| Par. 165 | Substantial Compliance |
| Par. 166 | Substantial Compliance |
| Par. 169 | Partial Compliance |
| Par. 170 | Substantial Compliance |
| Par. 171 | Substantial Compliance |
| Par. 172 | Partial Compliance |
| Par. 176 | Substantial Compliance |
| Par. 177 | Substantial Compliance |
| Par. 190 | Substantial Compliance |

# <u>LIST OF ABBREVIATIONS</u>

**<u>AAR:</u>** After Action Report (also referred to as 940)

**<u>ADORE:</u>** Automated Observation Reports and Evaluations

**<u>AMR/EMS:</u>** American Medical Response/Emergency Medical Service

**<u>AS:</u>** Accountability Subcommittee (COAB)

**<u>BHRT:</u>** Behavioral Health Response Team

**<u>BHCT:</u>** <u>Behavioral Health Coordination Team</u>

**<u>BHU:</u>** Behavioral Health Unit

**<u>BHUAC:</u>** Behavioral Health Unit Advisory Committee

**<u>BOEC:</u>** Bureau of Emergency Communications

**<u>CCO:</u>** Coordinated Care Organization

**<u>CEOPS:</u>** Community Engagement and Outreach Subcommittee (COAB)

**<u>CI Training:</u>** Crisis Intervention Training

**<u>CIT:</u>** Crisis Intervention Team

**<u>COAB:</u>** Community Oversight and Advisory Board

**<u>COCL:</u>** Compliance Officer and Community Liaison

**<u>CPRC:</u>** Community Police Relations Committee

**<u>CRC:</u>** Citizen Review Committee

**<u>CRO:</u>** Communication Restriction Order

**<u>DHM:</u>** Davis, Hibbitts, & Midghall, Inc. Research

**<u>DOJ:</u>** Department of Justice

**<u>DSUFCS:</u>** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**<u>ECIT:</u>** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

# LIST OF PERSONNEL

Chief of Police – Timeline of Report: Mike Marshman

Acting Chief of Police – Timeline of Report: Chris Uehara

Assistant Chief of Police: Matt Wagenknecht

Assistant Chief of Police: Chris Davis

Assistant Chief of Police: Chris Uehara

Compliance Coordinator: Steve Jones

Inspector: Craig Dobson/Mike Krantz

Internal Affairs/Performance Standards Division: Jeff Bell

Behavioral Health Unit (BHU) Manager: Tashia Hager/Chuck Lovell

EIS Administrator: Mike Fort

EIS Administrator: Amanda McMillan

EIS Administrator: Paul Meyer

Training Manager: Bob Day

Auditor: Mary Hull Caballero

IPR Director: Constantin Severe