

## Office of the Compliance Officer and Community Liaison (COCL)

**Rosenbaum & Associates, LLP**

Dennis Rosenbaum, Ph.D.
Thomas Christoff, Ph.D.
Geoffrey Alpert, Ph.D.
Heather Daniel, J.D., B.A.
Ashley Heiberger, J.D.
Megan Mohler, M.A.
Amy Ruiz, B.A.

COCL Office:
525 NE Oregon Street, Suite 250
Portland, OR  97232
www.portlandcocl.com
rosenbaumandassociatesllp@gmail.com

June 27, 2018

Transmitted by E-mail to:

The United States Department of Justice
The City of Portland

Re:      **Compliance and Outcome Assessment Report: Mental Health Response**

Dear U.S. Department of Justice and City of Portland:

On behalf of the entire Compliance Officer and Community Liaison (COCL) team, I am pleased to submit the attached *Compliance and Outcome Assessment Report: Mental Health Response*, pursuant to the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

We thank community members for taking the time to review and comment on the report. A copy of this report will be posted on the COCL's website, www.portlandcocl.com and sent to the Settlement Agreement Updates email list.

Sincerely,

Dennis P. Rosenbaum, PhD
For Rosenbaum & Associates, LLP
Compliance Officer and Community Liaison, Portland OR

**EXHIBIT B**

# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

# of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**September 2017 to March 2018**



# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 2

EXECUTIVE SUMMARY .............................................................................................................. 3

OVERALL REPORT CARD ........................................................................................................... 6

SECTION I: Compliance Assessment ....................................................................................... 7

    V. COMMUNITY-BASED MENTAL HEALTH SERVICES.................................................... 8

    VI. CRISIS INTERVENTION ................................................................................................ 11

SECTION II: System Assessment ............................................................................................ 28

    TRAINING FOR SYSTEM COMPONENTS ...................................................................... 29

    BOEC .................................................................................................................................... 29

    EVALUATION OF PPB CAPACITY AND OUTCOMES..................................................... 30

    OFFICER VIEWPOINTS AND EXPERIENCES.................................................................. 35

    QUALITY ASSURANCE STRATEGY .................................................................................. 37

    PRIMARY RESPONSE SYSTEM SUMMARY ................................................................... 38

    SECONDARY RESPONSE STRATEGIES .......................................................................... 39

    OVERALL ASSESSMENT OF CITY'S MENTAL HEALTH RESPONSE............................... 48

LIST OF ABBREVIATIONS ........................................................................................................ 49

LIST OF PERSONNEL ............................................................................................................... 51

APPENDICES ............................................................................................................................ 52

# INTRODUCTION

This is the Compliance and Outcome Assessment Report of the Compliance Officer and Community Liaison (COCL) for the period of October 2017 through March of 2018, as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (hereafter referred to as "DOJ"). By agreement of the Parties, this report combines the COCL's compliance assessment and outcome assessment into a single document. Additionally, with the agreement of the Parties, this report focuses on Section V (Community-Based Mental Health Services) and Section VI (Crisis Intervention). For all other sections of the Settlement Agreement, the compliance assessments, recommendations, and technical assistance provided in our last report should be considered ongoing. Updated assessments of other topics will be reported at the end of the second quarter (Section III, Use of Force), third quarter (Section IV, Training), and fourth quarter (Section VII, Employee Information System; Section VIII, Officer Accountability; Section IX, Community Engagement).

The following report is divided into two sections. The first section of this report includes the COCL's assessment of compliance for each paragraph within Section V and Section VI of the Settlement Agreement. For each paragraph discussed in the first section of our report, we identify the methodology and monitoring activities employed, our assessment of compliance, and our recommendations regarding necessary steps to achieve compliance (see Par. 162). The second section of this report includes our evaluation of the City's systems and resources for responding to persons in mental health crisis (see Par. 173).

<u>Report Card</u>

As with previous COCL Compliance Reports, this report includes a "Report Card" on the implementation of the Agreement which provides an assessment of each relevant paragraph in the Agreement (see Overall Report Card on page 134). For each paragraph where sufficient information is available to render a decision, the Report Card provides an overall judgment on a 4-point scale, ranging from "Non-compliance" to "Substantial Compliance." For some paragraphs, we have assessed the City and/or PPB to be in Substantial Compliance, although only conditionally. For these paragraphs, we have determined that the City has nearly satisfied the requirement of the provision in a comprehensive fashion, and all that remains is a particularized set of conditions that we feel can to be accomplished in the near future. In order to inform future reports by DOJ, these instances should be interpreted as, "Should these particular conditions be met, we would recommend Substantial Compliance."

When reviewing the specific paragraphs, we utilize a four-tiered system of evaluation:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.
- Non-Compliance: The City/PPB has not made any meaningful progress towards the satisfaction of the provision's requirements.
- Not Yet Assessed: The COCL team has not had the opportunity to fully assess the requirements of the provision and elects to withhold assessment of compliance until a more thorough review has occurred.

2

# EXECUTIVE SUMMARY

As evidenced by our assessment of compliance in prior reports, PPB had already achieved Substantial Compliance in most areas of Settlement Agreement Section V (Community-Based Mental Health Services) and Section VI (Crisis Intervention). In the fourth quarter of 2017 and the first quarter of 2018, the City and PPB made significant progress in a number of paragraphs for which Substantial Compliance had not yet been reached. By and large, we assess the City and PPB to have substantially complied with these remaining paragraphs though for some, our assessment is accompanied by particular conditions that must be met in the upcoming months. Where applicable, we identify these conditions within our assessment, providing the City and PPB a clear pathway to resolving any remaining issues.

## SECTION I

In Section I of our report, we provide our assessment of the City and PPB's compliance with Settlement Agreement Section V and Section VI. For Settlement Agreement Section V (Community-Based Mental Health Services), we believe that the City and PPB have accomplished all that can reasonably be expected of them, given their role in community-based mental health services. We assess the City and PPB's overall contribution to State and County mental health service delivery (Par. 88), their participation in the establishment and operation of the Unity Center (Par. 89), and their contribution to "immediate and long-term improvements" in the mental health response system (Par. 90) have been well within the intent and letter of the Settlement Agreement. Based on the combination of paragraphs within this section, we believe that the City should be found in Substantial Compliance with the entirety of Section V.

For Settlement Agreement Section VI (Crisis Intervention), the Agreement lays out requirements for PPB's Behavioral Health Unit (BHU) broadly as well as particular subgroups operating under the umbrella of BHU. These include the Behavioral Health Unit Advisory Board (BHUAC), Enhanced Crisis Intervention Team (ECIT), Behavioral Health Response Team (BHRT), and Service Coordination Team (SCT). Additionally, the role of BOEC in the City's mental health response system is detailed. In past reports, we had noted that paragraphs related to BHU, BHUAC, and SCT were in Substantial Compliance with the Settlement Agreement, with an ongoing obligation for continued compliance. Additionally, for paragraphs related to BHRT, the requirement to revise SOP #3-2 (Behavioral Health Response Team) was all that remained for the City to be considered in Substantial Compliance. This was accomplished in the first quarter of 2018 and therefore, we have concluded that the City should be considered in substantial compliance for paragraphs related to BHRT.

Thus, the only outstanding paragraphs within Section VI are paragraphs related to the Enhanced Crisis Intervention Team (ECIT) and the Bureau of Emergency Communication (BOEC). With respect to these two entities, we have seen good progress and believe that Substantial Compliance is achievable in the near future. For example, in order to comply with Paragraphs 99 and 105, PPB has implemented the Mental Health Template for officers to document required data and for PPB to evaluate their mental health response system. PPB has identified some reliability issues with the MHT and has taken steps to improve the data, including reminders, additional training, and roll-call presentations, as well as the development of an audit methodology to be implemented in the near future. However, there remains some work to ensure the template is completed reliably.

3

Additionally, PPB's evaluation of data has revealed a justification for revising the criteria used to determine when an ECIT officer should be dispatched to a mental health crisis. Based on conversations between the City, PPB, BOEC, DOJ, and COCL, the City has agreed to revise the dispatch criteria, thus addressing one of our main concerns related to Par. 99's requirement that PPB will implement a Memphis Model crisis intervention system. Such revisions would also require changes to PPB and BOEC policy, implementation of PPB's proposed audit methodology, and continuation of data monitoring and evaluation.

The City and PPB have provided us with sufficient evidence that changes are already occurring and/or are imminent to enhance the reliability of Mental Health Template data, revise the ECIT dispatch criteria and implement auditing and evaluation. We will need to await implementation of the changes before reaching a final assessment, but we believe that these changes warrant a conditional level of Substantial Compliance. For issues related to the MHT, substantial compliance is conditioned on the resolution of data reliability issues, including supplemental training, data auditing, and ongoing monitoring of data. For issues related to dispatch criteria for ECIT officers, substantial compliance is conditioned upon the implementation of revised dispatch criteria. This will also include an updated evaluation of ECIT response once a sufficient period of data collection has elapsed. Should the above-mentioned conditions be accomplished in the near future, we would recommend that the City be found in substantial compliance with the Settlement Agreement.


## SECTION II

In Section II of this report, we provide a qualitative and quantitative evaluation of the City's primary options for mental health crisis response (including BOEC and ECIT response) as well as secondary response strategies (BHRT and SCT). Overall, we believe that the City is close to having a primary mental health response system which adheres to the intent of the Settlement Agreement. BOEC has provided training to call-takers and dispatchers pertaining to mental health crises. The data indicate that ECIT officers constitute approximately 39% of all operational officers, thus indicating sufficient resources for ECIT officers to respond to crisis calls, and the volume of calls with a mental health component appears to be manageable given the number of ECIT officers. Additionally, the City has set into motion plans to conduct ongoing auditing of BOEC and PPB data. However, PPB's evaluation of mental health call outcomes indicated that while no differences existed between ECIT and non-ECIT officers in terms of arrests, ECIT officers are more likely than non-ECIT officers to transport the subject to a hospital. Additionally, our evaluation of organizational survey data, focus groups, and ride-along observations demonstrated some differences between ECIT and non-ECIT officers in their views of mental health calls. Taken together, we believe that, in order for the City to achieve fully "capable systems and resources for responding to persons in mental health crisis" (Par. 173), it will need to revise its criteria for mental health response as provided in our compliance assessment of Par. 99.

For secondary response strategies, we believe that the BHRT and SCT are operating in a fashion consistent with the letter and intent of the Settlement Agreement. An analysis of BHRT data indicate that differences in referrals by Precinct mirror differences in Precinct differences in the number of mental health contacts found in the Mental Health Template and that ECIT and non-ECIT officers alike appear capable and willing to make referrals to BHRT. Additionally, approximately half of referrals are accepted for BHRT intervention. For those who are not accepted, 40% were already receiving services. For those who are accepted for BHRT intervention, the most common outcome was Coordinated Services (34%). Our analysis also demonstrated that BHRT intervention was associated with a reduced

number of arrests/custodies in the year after BHRT compared with the year prior. Overall, it appears BHRT is a beneficial component of the City's mental health response system.

Likewise, our evaluation of the Service Coordination Team revealed a positive impact for participants. Our analysis of SCT showed that participants (both those who completed SCT and those who did not complete SCT) had a reduced number of arrests/custodies in the year following SCT compared with the year prior. Additionally, those who completed SCT showed a positive increase in employment compared with those who did not complete SCT. Finally, an individual's housing situation was generally improved upon completing the SCT program. Our findings are consistent with prior studies done by Portland State University (PSU) Capstone Study classes, for which we provide a summary of findings for the past 9 years of evaluations.

As a whole, we believe that the City and PPB's primary and secondary response systems for mental illness are overall sufficient. While BHRT and SCT are associated with generally positive outcomes, the immediate crisis response system (in the form of BOEC and ECIT) requires some revision. As discussed, the revisions we recommend are fairly minor and we believe the City and PPB can implement these changes in a relatively short amount of time. Based on this information, we believe that the City has created "capable systems and resources for responding to persons in mental health crisis," as required by the Settlement Agreement, pending the conditional changes.

## OVERALL REPORT CARD

| | |
|---|---|
| Par. 88 | Substantial Compliance |
| Par. 89 | Substantial Compliance |
| Par. 90 | Substantial Compliance |
| Par. 91 | Substantial Compliance |
| Par. 92 | Substantial Compliance |
| Par. 93 | Substantial Compliance |
| Par. 94 | Substantial Compliance |
| Par. 95 | Substantial Compliance |
| Par. 96 | Substantial Compliance |
| Par. 97 | Substantial Compliance |
| Par. 98 | Substantial Compliance |
| Par. 99 | Substantial Compliance - CONDITIONAL |
| Par. 100 | Substantial Compliance |
| Par. 101 | Substantial Compliance |
| Par. 102 | Substantial Compliance |
| Par. 103 | Substantial Compliance |
| Par. 104 | Substantial Compliance |
| Par. 105 | Substantial Compliance - CONDITIONAL |
| Par. 106 | Substantial Compliance |
| Par. 107 | Substantial Compliance |
| Par. 108 | Substantial Compliance |
| Par. 109 | Substantial Compliance |
| Par. 110 | Substantial Compliance |
| Par. 111 | Substantial Compliance |
| Par. 112 | Substantial Compliance |
| Par. 113 | Substantial Compliance |
| Par. 114 | Substantial Compliance |
| Par. 115 | Substantial Compliance – CONDITIONAL |

# SECTION I

# Compliance Assessment

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

Section V of the Settlement Agreement (Community-Based Mental Health Services), establishes expectations for State and County community partners. These include the expectation that City partners will "help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents" (Par. 88), "establish one or more drop-off center(s)" (Par. 89) and establish "addictions and mental health-focused subcommittee(s)" (Par. 90). For each of these actions, PPB is expected to contribute to the process, though it is not expected to be the only or even the primary driving force behind changes to the mental health service delivery system. Thus, for each of the paragraphs within Section V, we assess PPB's contribution as could reasonably be expected given the overarching need for comprehensive reform in the delivery of mental health services.

*88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.*

The language within paragraph 88 indicates that the *primary* responsibility for a "comprehensive community mental health infrastructure" does not lie with PPB as a law enforcement agency or with the City of Portland. Rather, the City's partners (listed above in paragraph 88) are expected to take a collaborative role in the delivering addiction and mental health services.

PPB for its part has demonstrated a desire to work with such partners in order to contribute to an overall mental health system. As detailed in our last report, PPB collaborates with the above listed partners in a number of ways. The Behavioral Health Unit Advisory Committee (BHUAC) includes County, State, CCO, and service provider representatives. The Behavioral Health Coordination Team (BHCT) includes partners from County, CCO, service providers, and State/Federal law enforcement. A representative from PPB's Service Coordination Team (SCT) participated in the Oregon Behavioral Health Collaborative, a group designed to "build a 21st century behavioral health system in Oregon." The collaborative completed its work in the first quarter of 2017, though since then the SCT representative has attended a forum on Transforming Behavioral Health Care in Oregon through Information Technology. Finally, PPB has partnered with researchers at Portland State University (PSU) to obtain input from mental health service delivery partners within the City. Although data collection is still ongoing as of the writing of this report, we have reviewed the methodology and data collection tool and believe they have been well designed. Based on the above examples of collaborative improvement in the delivery of mental health services (and based on our evaluation of other

paragraphs within this section), we believe PPB has substantially complied with the requirements of Par. 88.

*89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.*

As noted in prior reports, the focus of Par. 89 is on CCOs and the expectation that they will establish "one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs." As the Settlement Agreement does not hold authority over CCOs, we may only assess PPB's activities in light of reasonable opportunity for contribution to the drop-off/walk-in centers.

Related to Par. 89, we believe the Unity Center fulfills the expectation of a drop-off/walk-in center. The facility has been operating as a 24/7 drop-off/walk-in center since May of 2017 and addresses the expectation of "appropriate discharge and community-based treatment options…rather than unnecessary hospitalization." To inform law enforcement's role in the process, PPB has implemented and trained officers on Directives 850.21 (Peace Officer Custody (Civil)), 850.22 (Police Response to Mental Health Director's Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). These directives provide the framework for officers to contact AMR for ambulance transport to the Unity Center.

PPB has also continued to serve on a Transportation Workgroup related to the operation of the Unity Center. Since the opening of the Unity Center, meetings of the workgroup have occurred less frequently, though PPB reports that when issues have arisen, PPB and AMR have convened meetings to reach a solution. For instance, PPB reports there had been confusion regarding roles and responsibilities of officers/AMR as well as confusion related to delayed custody. In both of these situations, a resolution was reached. Based on the above noted Directives and PPB's continued contribution to the Transportation Workgroup, we believe PPB has substantially complied with the requirements of Par. 89.

*90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ["BHU"], the [BHU] Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators to divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursuing tele-psychiatry.*

As with the above paragraph, Par. 90 holds expectations of CCOs to create subcommittees for PPB to serve on, with a list of initial goals to be accomplished. However, CCO's are not under the authority of the Settlement Agreement and we therefore only evaluate PPB on what can reasonably be expected of the agency given the lack of opportunity from CCOs. Although PPB representatives had participated in a HealthShare subcommittee in prior years, that subcommittee disbanded after completing its work.

Since then, PPB has participated in the Statewide collaborative (discussed above) and has continued to attend the Legacy Emergency Department Outreach meetings. Additionally, PPB has put forth a methodology to gather input from mental health service partners in order to inform future operations. While not all of the "initial improvements" listed in Par. 90 have come to fruition, PPB continues to do what can be reasonably expected and we find them to be substantially compliant with Par. 90. As a future course, we recommend PPB continue to reach out to CCOs to gather updated information about potential subcommittees to which PPB can contribute to further support the goals of this paragraph.

# VI. CRISIS INTERVENTION

Section VI of the Settlement Agreement (Crisis Intervention) lays out requirements for PPB's Behavioral Health Unit (BHU) broadly as well as particular subgroups operation under the umbrella of BHU. These include the Behavioral Health Unit Advisory Board (BHUAC), Enhanced Crisis Intervention Team (ECIT), Behavioral Health Response Team (BHRT), and Service Coordination Team (SCT). In general, we believe the BHU and its subgroups are well-structured and operating within the spirit of the Settlement Agreement. Although we assess each individual paragraph below, we want to recognize PPB's overall efforts related to mental health response. PPB and the BHU have maintained a commitment to improving their response to mental health crisis calls and reducing the number of overall contacts with law enforcement.

## A. Addictions and Behavioral Health Unit and Advisory Committee

*91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an [Behavioral Health Unit] ["BHU"] within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the [BHU]. [BHU] shall oversee and coordinate PPB's [Enhanced] Crisis Intervention Team ["ECIT"], [Behavioral Health Response Team] ["BHRT"], and Service Coordination Team ("SCT"), as set forth in this Agreement.[1]*

As it relates to Par. 91, the Behavioral Health Unit (BHU) continues to conform to the structure set out in this paragraph. The BHU operates within the PPB and is managed by a Lieutenant under the command of the Central Precinct Commander. The BHU also oversees and coordinates the three main branches of PPB's mental health response (ECIT, BHRT, and SCT). Additionally, the command structure as it relates to ECIT is consistent with the Memphis Model.

In all, we find that PPB has substantially complied with the requirements of Par. 91, though recommend PPB continue to explore strategies to audit the work of ECIT, BHRT, and SCT in order to improve the oversight and coordination required within this paragraph. PPB has already provided plans to audit the data associated with ECIT (and non-ECIT) responses (see Section II) and we believe this type of oversight would be consistent with our recommendation here.

*92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.*

PPB has implemented several strategies to share data, as lawfully allowed, with Multnomah County to decrease law enforcement interactions or mitigate potential uses of force in law enforcement interactions with persons with mental illnesses. As reported in our prior compliance report, as of June 2017, all BHU Electronic Referral System (BERS) referrals made by PPB officers are transmitted to Multnomah County Crisis Line on a weekly basis. This includes people the BHRT is working with as well as those that do not currently meet criteria for BHRT service. MCCL places a BHRT flag on individuals that are accepted on the BHRT caseload. That way, if MCCL has contact with the person, they can reach out to the BHRT clinician. For referrals not accepted on to the BHRT caseload, if there has not

---

[1]  The names of PPB groups, at times, vary from the names found in the Settlement Agreement. Where SA paragraphs contain references to the alternative name, we have included the current name in brackets.

been any other follow-up, MCCL attempts to provide care coordination and linkage. For example, if the person has received services within the County system, MCCL can reach out to their clinician. Additionally, when they have contact information, they reach out directly to the person to attempt to connect or reconnect them to services. Per MCCL, between June 29, 2017 and March 6, 2018, they received 344 referrals from PPB, 195 were assigned to BHRT services, and 149 were unassigned.

Per Directive 850.20, PPB officers are required to contact MCCL when they determine the safest strategy for a mental health crisis related call is to delay engagement or disengage. MCCL documents these events and provides internal follow-up within their system. For example, they can contact the person's provider or attempt to provide outreach and linkage. HIPAA/legal restrictions prevent MCCL from sharing identifiable mental health service information regarding post disengagement linkage and outcomes with PPB. However, within a 48-hour window, they are able to provide the CAD number to the BHU for tracking and to match with PPB data. While MCCL is just beginning to formally track this information, they estimate that they have transmitted CAD numbers on disengagements back to BHU approximately 50 times between May 2017 and March 2018. Officers also sometimes call MCCL to provide information only (not specifically a disengagement or delayed engagement). MCCL notes this information in the system and will provide follow-up if indicated.

Additionally, the Behavioral Health Coordination Team (BHCT) meets biweekly to discuss individuals identified by the BHU as having repeat PPB contacts and/or presenting an escalating concern. On average, there are about 30 people per month on the agenda for staffing. BHCT includes representatives from numerous County and City agencies and programs, including Probation, the Sheriff's Department, Cascadia Behavioral Health, and Multnomah County Forensic Diversion. Representatives from these agencies can also ask to discuss individuals they have identified. Notably, in late October 2017, the BHU reached out to the Portland Fire and Rescue's Community Healthcare Assessment Team (CHAT) and discussed possibilities for collaboration around subjects who are high utilizers of the 911 system. The CHAT Coordinator now attends the BHCT meetings. We have reviewed BHCT agendas and minutes as well as observed these meetings. The discussions during meetings pertain to individuals in the community who have had frequent police contact but have been difficult to engage in ongoing services. BHCT members share information that is subject to lawful disclosure and develop coordinated plans in order to reduce future criminal justice contacts.

Finally, the Mental Health Template captures if disengagement or delayed custody was used by the officer. In order to assess the process of disengagement/delayed custody, we sampled and reviewed 20 cases each in which the officer checked that he/she used the strategy (i.e. 20 cases of disengagement and 20 cases of delayed custody). The timeframe of cases for our review was between April of 2017 and September of 2017. While in some cases, the strategy was checked but did not appear to have been used as described in Directive 850.20, we did not note problematic use of disengagement or delayed custody strategies. In general, when the tactics were employed per 850.20, officers documented the required concerns and notifications (e.g. reports described efforts to refer the community member to MCCL as required by policy). Overall, we believe the sharing of information with MCCL in these instances helps mitigate potential uses of force by PPB as well as contributes to linking individuals with services.

We recommend that PPB review these data on a regular basis to examine the use of these strategies and identify related training implications. PPB may also want to pursue obtaining de-identified MCCL data regarding disengagement delayed custody actions to examine outcomes related to the use disengagement (with a plan) as a strategy. MCCL also collects some data, as officers are required to contact MCCL when they use disengagement. HIPAA/legal restrictions prevent MCCL from sharing identifiable mental health service information regarding post disengagement linkage and outcomes

with PPB. De-identified MCCL data would allow PPB to further assess this strategy and to identify and propose solutions to systematic issues.

Overall, PPB has made significant efforts related to sharing information with Multnomah County, as lawfully allowable, in the interest of decreasing interactions between police officers and person with mental illnesses and reducing the potential for uses of force when these interactions occur.

Based on the above examples of data-sharing with Multnomah County (as well as other entities) and the use of such data-sharing to reduce police contact, we believe PPB has substantially complied with the requirements of Par. 92.

_93. [BHU] shall track outcome data generated through [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction._

Internally, BHU has several mechanisms for reviewing data and using it to inform various Unit activities. In June of 2017, a memorandum was issued to all BHU personnel detailing the "Frequent Contact Referrals" process for reviewing mental health mask/mental health template data and notifying the BHU Lieutenant, CIT Coordinator, and SCT Coordinator when a person has been the "subject of three or more ECIT designated calls AND a General Offense (GO) report was written and/or was the subject of a call that warranted a mental health template" within the preceding 30 days. This process identifies persons with repeated contacts with police and creates an opportunity for proactively linking the individual to mental health services via a referral to BHRT that may have otherwise been lost. This is a new response strategy for "repeat calls for service" as identified in Par. 93(a) and complies with BHRT's requirements in Par. 110 ("utilize [ECIT] data to proactively address mental health service").

Between June 20, 2017 and February 28, 2018, there were 151 unique individuals who were identified by the "Frequent Contact Referrals" process. Of these, 119 (79%) had a BHRT referral, either one already in the system or initiated once identified via the frequent contact criteria. According to PPB, some identified individuals were not referred because they: 1) have already been receiving care or services, 2) could not be located in the Record Management System database (no identifying information), 3) may have died (i.e. suicide), 4) could have been misidentified as the subject of the mental health template, or 5) their behavior was attributable to drugs/alcohol. Of the 119 referred, 85 (71%) met criteria and were assigned to the BHRT caseload.

In order to communicate important information to precinct officers, BHRT officers prepare informational bulletins on some BHRT clients that are sent to the precincts. These bulletins are not issued on all BHRT clients. Rather they are issued for specific purposes, including: when BHU is trying to locate a person they do not have an address for; when there is a need to pass information to patrol regarding someone with whom PPB is having repeated contacts; to share a safety concern about an individual known to BHU (threats made, web postings); or if a probation officer is looking for a particular person known to BHU. In order to address privacy concerns, the bulletins only include behavioral information, not diagnostic information. Additionally, the bulletins include a warning that the information is confidential and for PPB use only. They are not retained in a data base. While PPB does not track the number of bulletins issued or how often precinct officers contact BHU in reference to a person due to bulletins, they report some success with this effort. Officers do contact BHU when they encounter these individuals on the street and this allows BHU to follow up, assess and link them.

Also, during the fourth quarter of 2017, a memo issued by the BHU Lieutenant "Procedures: BERS Cross-Reference in GOs," instructed BHU staff to begin auditing police reports to determine if BERS

referrals are completed when officers have indicated in their reports that they have notified BHU or made a BERS referral. If the identified individual has not been referred to the BHU, a BHU Sergeant or BHU staff will then create a referral based on the cross-referenced information. This process will also help BHU identify and resolve gaps in the BERS referral system.

BHU also continues to forward force reports for calls involving a subject with mental illness to the Training Division and PSD for review. Even prior to PPB's revisions to Directive 1010.00 (which expanded the types of force that required a Force Data Collection Report), all uses of force (even those that did not require an FDCR) were forwarded to the Professional Standards Division as well as the Training Division. These force events were then evaluated for training and policy implications.

Finally, the quarterly BHU Newsletter regularly highlights officer performance warranting commendation. We have reviewed all BHU Newsletters in the past and find that they continue to not only highlight individual officers but also highlight the operations of BHU in general. These newsletters can be found on PPB's website and give significant insight into different factions of BHU.

Based on the above considerations, we believe that PPB has substantially complied with the requirements of Par. 93.


*94. Within 90 days of the Effective Date, PPB shall also establish an [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.*

Through observation of meetings and through updated rosters provided by PPB, the Behavioral Health Unit Advisory Committee (BHUAC) has continued to seat personnel from the entities listed within Par. 94. The meetings include contributions from all involved and discussions are robust in their content. In May of 2018, the terms of various members will expire and PPB has indicated the positions will be promptly filled. For positions explicitly mentioned in Par. 94, the organization or entity will designate a replacement. For at-large members, PPB has initiated an outreach process to solicit interested persons. This includes speaking with mental health service delivery organizations, persons with lived experience, and references from current BHUAC members. As of this report, the membership of BHUAC continues to conform to the representation envisioned in Par. 94 and we therefore continue to find PPB in substantial compliance. However, continued substantial compliance is dependent on maintaining such representation when new BHUAC members are seated. Upon new members being seated, we will reassess the compliance with this paragraph.


*95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.*

We continue to believe that the efforts of BHUAC committee members have assisted "the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services." As detailed in our last report, BHUAC meeting minutes (as

well as the BHUAC meetings we have personally attended) have focused on PPB and BOEC policies, procedures, and training while also addressing systemic issues in providing mental health services. These topics of conversation continued in the second half of 2017 and January of 2018 (see Appendix 1 for a summary of BHUAC meetings between June 2017 and January 2018).

On a monthly basis, the BHUAC has provided updates on recommendations and sent those updates to the personnel identified in Par. 95. We have reviewed documentation of BHU responses to BHUAC recommendations and believe this process is working as intended.

Overall, we find the requirements of Par. 95 to be substantially complied with.

*96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.*

On a near-monthly basis, we have been provided with BHUAC recommendations for improvement to the PPB mental health response system as well as BOEC Crisis Triage. Such recommendations relate to policies, operation, and training related to mental health response and the interaction of law enforcement with persons living with mental illness. The recommendations have been informed by presentations from external stakeholders, ECIT officers, BHU data analysts, and BOEC representatives (among others). Overall, we have seen BHUAC meeting topics cover the gamut of mental health response topics, including training for officers, emergency contact (e.g. BOEC and ECIT), non-emergency contact (e.g. BHRT), and ongoing care (e.g. SCT and external stakeholders). As a committee, the BHUAC continues to operate as intended.

Additionally, the BHU provides a response document to BHUAC recommendations which includes the specific recommendation, whether BHU agrees or disagrees with the recommendation, and a rationale for their response. We have reviewed numerous response documents and believe they are consistent with the requirement to "utilize [BHUAC] recommendations in determining appropriate changes to systems, policies, and staffing.

Based on the work of BHUAC and PPB's demonstrated commitment to incorporating BHUAC recommendations into PPB operations (or provide sound rationale when not incorporating the recommendations), we believe the requirements of Par. 96 have been substantially complied with.

**B. Continuation of C-I Program**

*97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.*

*98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.*

All officers within PPB have received 40 hours of crisis intervention training, with new recruits receiving 40 hours between the State academy and PPB's Advanced Academy training. We have

reviewed the training plans/curriculum for the entire 40 hours received by PPB recruits, and we have personally observed a number of crisis intervention training classes provided by PPB. We find the content to be consistent with crisis intervention training found in other agencies, though we continue to suggest PPB look into potential benefits and limitations of receiving the 40 hours over a longer timeframe (as opposed to the more traditional 40-hour block of training).

Additionally, we have reviewed the training plans and curriculum for all refresher training provided within the past three years as well as personally observed the delivery of such training. PPB efforts related to the delivery of the training as well as the measurement of officer retention of the material indicate PPB's agreement that crisis intervention is a "core competency skill for all sworn police officers."

As related to the provision that BHUAC consult on the "subjects and scope" of recruit and In-Service training, we have seen ample evidence of this occurring. BHUAC most recently reviewed a presentation on the content of the ECIT In-Service refresher training, though had no recommendations related to that training. For past In-Service training for all officers, BHUAC has also been consulted and we believe the development of training has benefited from BHUAC review.

Given our review of crisis intervention training material and observation of the trainings' delivery, as well as our review and observation of BHUAC contribution to such training, we believe that PPB has substantially complied with the requirements of Pars. 97 and 98.


## C. Establishing "Memphis Model" Crisis Intervention Team

*99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").*

PPB has implemented a system that, while similar in many aspects to Memphis Model CIT programs, deviates from the Memphis Model in its protocol for deployment of specially trained officers (i.e. Enhanced Crisis Intervention Team, or ECIT). In the Portland model, ECIT officers are not dispatched to all calls involving a pre-identified mental health component. Instead, ECIT response is reserved for a subset of mental health calls (i.e., subject is violent; subject has a weapon; subject is threatening or attempting suicide or threatening to attempt; subject is threatening to jump from a bridge/structure or threatening to obstruct vehicle traffic; call is at a residential mental health facility; community member/other officer requests ECIT response). These criteria are considered to be indicative of higher acuity and greater risk of harm to the subject or others. As all PPB officers have received 40 hours of crisis intervention training, PPB's model maintains that non-ECIT officers are equipped to respond to lower acuity calls while reserving the above subset of calls for an enhanced response.

As part of DOJ's provisional approval of Directive 850.20 (Police Response to Mental Health Crisis), the City and PPB agreed to collect Mental Health Template data (informed by Par. 105), expand ECIT criteria to include attempted/threatened suicide calls, and provide an analysis of mental health response under the provisional Directive (see Appendix 2). Upon receipt of the analysis, DOJ would "make an independent assessment as to whether or not the dispatch protocols, or other provisions of the policy must be further revised to come into compliance with the Agreement." As we note in Section II of this report (as well as in prior reports), PPB has collected the required data, included attempted/threatened suicide as an ECIT dispatch criterion, and provided analysis sufficient to make an assessment as to the necessity of further revision.

With guidance from the COCL, PPB engaged in an evaluation as contemplated by DOJ's provisional approval letter. While we provide a summary of PPB's findings in Section II, we note here that the results suggest that ECIT's response capacity is sufficient to support revision of the ECIT criteria and that such revisions are justified by differential outcomes in ECIT and non-ECIT response. Using non-ECIT calls to compare the two groups, PPB found that there were not statistically significant differences between ECIT and non-ECIT officers in whether an encounter would result in an arrest. However, ECIT officers were significantly more likely to have "Transport to Hospital" as an outcome compared with non-ECIT officers. PPB's evaluation found that the difference between the two groups equated to approximately 7.7 more transports per every 100 contacts. Given the number of mental health contacts (8,939 for the evaluation timeframe), we believe that the potential impact on individuals and the community may be substantial.

In the first quarter of 2018, numerous discussions between the City, PPB, DOJ, and COCL pertained to revised criteria for ECIT response which would better capture calls with a significant potential for escalation and poor outcomes, such that an ECIT officer should be dispatched if available. Following discussions, the COCL provided a proposed revision which we believe is consistent with the definition of Mental Health Crisis found in Par. 40 of the Settlement Agreement:

> *"Mental Health Crisis" means an incident in which someone with an actual or perceived mental illness is experiencing intense feelings of personal distress (e.g., anxiety, depression, anger, fear, panic, hopelessness), obvious changes in functioning (e.g., neglect of personal hygiene, unusual behavior) and/or catastrophic life events (e.g., disruptions in personal relationships, support systems or living arrangements; loss of autonomy or parental rights; victimization or natural disasters), which may, but not necessarily, result in an upward trajectory of intensity culminating in thoughts or acts that are dangerous to self and/or others.*

Put in an operational context, our proposed revision of the BOEC dispatch criteria would include calls where the call taker identifies that the <u>primary</u> component of the call is a mental health crisis, which poses the potential risk for escalation and negative outcomes. In addition to the calls included in the current criteria, this would capture calls in which the subject's behavior suggests he/she is experiencing psychosis, when the caller indicates the person needs to go to the hospital for psychiatric reasons (and is not simply requesting ambulance transport), and/or when the caller provides information that the persons disruptive behavior is due to mental illness symptoms.

In creating our proposed revision to ECIT dispatch criteria, we considered two key areas which may be affected by revising the criteria, the first of which is the impact on the overall number of calls to which ECIT officers are dispatched. Although confirmatory measurement would be required, our initial impressions are that for many calls which would fit the proposed criteria, ECIT officers are already being dispatched under the current criteria. Additionally, for calls which do not fit the current criteria but would likely fit revised criteria, non-ECIT officers often request ECIT assistance – the revised criteria would then simply get ECIT officers to the call more directly as the initial response.

Second, we acknowledge that the City prefers a system in which non-ECIT officers get experience responding to calls with a mental health component that pose relatively less risk of negative outcomes. With respect to the City's position, we do not believe the revised criteria would unduly limit opportunities for non-ECIT officers to gain experience communicating with persons living with mental illness. Based on PPB's preliminary data, as well as our review of data PPB has provided COCL in the past, there are many calls with a mental health component to which non-ECIT officers would be dispatched.

In response to our proposed revision to ECIT dispatch criteria, the City (including PPB and BOEC) requested an opportunity to propose their own revision to dispatch criteria, one which would be more readily understood by BOEC call-takers and dispatchers in the context of their operation. In addition, the City, COCL, and DOJ discussed particular steps that will be important for achieving unconditional substantial compliance for Par. 99. In order to achieve substantial compliance, DOJ and COCL will need to review the implementation of the City's proposed revision to ECIT dispatch criteria.    Upon our review, we will need to verify that it meets the intent of the Settlement Agreement and is consistent with prior technical assistance offered by both COCL and DOJ. Additionally, PPB will need to revise Directive 850.20 and BOEC will need to revise their policies and procedures so that there is consistency between the two bureaus. Upon revising their policy, BOEC has agreed to conduct roll-call training with call-takers and dispatchers, informing them of the new policy and how to recognize when a call meets the revised ECIT dispatch criteria. Based on conversations between the City, PPB, BOEC, DOJ, and COCL, it is our belief that these steps can be accomplished by June 2018 and that data collection to evaluate the revised dispatch protocol can begin immediately thereafter.    Additionally, if the next evaluation indicates a need for further revision of the ECIT dispatch criteria, the City has committed to making the necessary changes.    Prior to performing the evaluation, the COCL will be available to provide guidance on evaluation methods most suited to the questions at hand and needs of the Bureau.

After a reasonable amount of time and a sufficient amount of data have been collected the City has agreed to implement a quality assurance process, described in Section II of this report. The City is already implementing some of the elements described in Section II, including utilizing a unified dataset between PPB and BOEC. Other elements, such as audit functions, will require two to four months of data to be collected before they can begin.

Should these steps be accomplished prior to DOJ's next report, we would recommend the City be found in substantial compliance with the Settlement Agreement.

_100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers._

The makeup of ECIT continues to comprise volunteer officers who have received the additional 40 hours of ECIT training. PPB has long satisfied the "initial goal of 60-80 volunteer, qualified officers." However, we have stated in the past that substantial compliance should be weighed more on "demand for [ECIT] services" rather than the initial goal. Currently, there are 118 operational ECIT trained officers, which represents approximately 38% of PPB's operational force. Additionally, PPB indicates in their evaluation that ECIT officers respond to approximately 75% of calls coded by BOEC as "ECIT." In our last report, we noted an approximate 85% response rate for ECIT type calls which received a mental health template (whereas PPB's reported 75% response rate also includes calls which did not receive a mental health template). Finally, PPB has evaluated response rate differences in Precincts and shifts and has recommended selection criteria of future ECIT officers to be influenced by such differences.

As Substantial Compliance for Par. 100 is contingent upon PPB evaluating their "demand for ECIT services," we look to see whether they have accomplished this since our last reporting period. Based on their recent analysis of ECIT services, the ECIT representation in operational officers, the approximate 75% response rate, PPB's efforts to use precinct/shift as one factor in selecting ECIT

officers, and PPB's proposed audit plan (see Section II), we believe they have accomplished this. We recommend that PPB continue to monitor ECIT response rates and make adjustments to capacity as necessary.

_101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT]._

In past reports, we have noted that SOP #3-3 (Enhanced Crisis Intervention Team) did not automatically require removal of ECIT officers who had a sustained finding regarding use of force on a person with mental illness. In December of 2017, PPB presented changes to SOP #3-3 to the BHU Advisory Committee to address this issue. The changes included the language of Par. 101 and are responsive to recommendations we have made in the past. The SOP became effective in January of 2018. We have also noted that PPB has a process for verifying that incoming ECIT officers do not violate this provision as well as a process for the ongoing review of ECIT officers to ensure continued compliance.

As PPB has made the recommended changes and has a system in place to verify adherence to this provision, we believe they have substantially complied with Par. 101.

_102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model._

In prior reports, we have noted that the ECIT training provided by PPB substantially complies with the "specially train" provision of Par. 102, and we maintain that viewpoint here. ECIT training includes classroom and scenario-based training in a number of topic areas including: mental health treatment and diagnoses; consumer/family panels; crisis communication skills; mental health risk assessment; psychosis and communication; suicide intervention; trauma informed care; mental health service resources; site visits, and; ECIT response and considerations. We have observed ECIT trainings for the past three years and have found them to be well conceived and delivered.

In February of 2018, several members of the COCL team observed the one day/10-hour ECIT Refresher Training which was provided to all ECIT officers. The refresher training included the following topics: introduction of the COMTEK communications kit; helping individuals with autism; juveniles in crisis; stress and resiliency for crisis responders; and discussions related to the mental health template and system changes. Delivery of the material included interactive lecture, case study vignettes, discussions and table top exercises. Training participants were generally engaged and attentive throughout the training day. Notably, the presentation on responding to individuals with autism was co-led by a PPB officer who shared her experience with her own son who is living with autism.

In the session on the Mental Health Template, the discussion indicated confusion about who should be completing templates and when. The Mental Health Template (MHT) is the primary tool for documenting PPB interactions involving persons with mental illness, capturing the requirements of Par. 105 as well as other elements of the interaction. As this is an important aspect of PPB's ability to perform ongoing evaluation of mental health response, the confusion we observed suggests some issues need to be resolved. These include the protocol and instructions related to the template in order to streamline the process and ensure reliable data are being recorded. In the session on system

changes, information was provided and feedback was elicited from participants about their experiences and concerns with the new transport policy and other system issues.

Prior to observing the training, we reviewed the training curriculum and PowerPoint presentations. We found the curriculum and delivery of the training accomplished the goals of updating and reinforcing ECIT knowledge and skills. We also believe PPB should be given credit for developing a refresher training for ECIT officers, as this action indicates PPB's dedication to having "qualified officers" (Par. 100) and ensuring that such officers are being provided continued training.

Furthermore, all training related to ECIT (whether refresher training or the initial 40 supplemental hours of ECIT training) has been developed in coordination with BHUAC. In our past report, we noted at least five meetings wherein BHUAC provided input on ECIT training. In addition to these prior meetings, BHUAC provided input on the ECIT refresher training in January of 2018.

*103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event.*

In accordance with Par. 103, ECIT members retain normal patrol duties until dispatched as an ECIT officer to a set criteria of mental health component calls. Additionally, an ECIT officer may be dispatched by BOEC or requested by a non-ECIT officer. We therefore continue to find PPB to be in substantial compliance with Par. 103.

*104. PPB will highlight the work of [ECIT] to increase awareness of the effectiveness of its work.*

Regularly, PPB highlights the work of ECIT officers, as well as other components of the Behavioral Health Unit, through a BHU newsletter. These newsletters are regularly posted to the PPB website. Additionally, BHU members have made presentations at academic conferences, including a CIT International Conference presentation on aspects of the Portland model. Other outreach efforts have included "Coffee with a Cop" and "Shop with a Cop" both of which are community engagement efforts to highlight the work of BHU officers.

Overall, we believe that the efforts of PPB to highlight the work of BHU (including ECIT officers) have substantially complied with the requirements of Par. 104.

*105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event.*

PPB currently utilizes a Mental Health Template (MHT) for crisis events to which ECIT officers are dispatched. Whenever a call meets ECIT criteria or when an ECIT officer responds to a mental health component call and utilizes crisis intervention skills, they are required to complete a MHT. In addition, non-ECIT officers are also required to complete a MHT whenever the subject of the call has a mental illness and some type report is completed as part of the call (for example, a General Offense Report). The MHT contains the particular elements found within Par. 105, including the event characteristics, subject characteristics, and relevant outcomes. Overall, we find that the form used by PPB is compliant with Par. 105.

We have also reviewed the training for officers on when and how to complete the MHT. In general, we believe that the training has been done fairly well on how to fill out the MHT (i.e. the mechanical steps for completion). Additionally, the training included information on when to complete the MHT for both ECIT and non-ECIT officers. Although the overall training was well designed, confusion on when to complete a MHT appears to remain. During our observation of the ECIT refresher training in February of 2018, many ECIT officers expressed confusion as to when they are required to complete a MHT. Prior to the ECIT refresher training, PPB had attempted to provide clarity to officers on when/how to complete the MHT, though it was clear from the training that more might need to be done.

We continue to recommend PPB include a Signs and Symptoms refresher training to all PPB officers in order to better identify when a person may be exhibiting symptoms of mental illness, thus informing when to complete the MHT. This will increase the overall reliability of the MHT as a data collection tool. PPB should consider including a Signs and Symptoms refresher in the annual Spring or Fall In-Service or, if not, should consider promulgating videos and/or other documents which may achieve the same result as In-Service training. Finally, PPB should explore whether the MHT can be streamlined or better automated in any way to reduce the complexity of completing the template. Although this may not be possible given PPB's software, it is something they may wish to evaluate.

Currently, all officers who indicate a mental health component and complete a General Offense report for a call are required to complete the MHT resulting in multiple MHTs for some calls. Such a practice may become excessive and lead to less reliable data in cases where contradictory information is provided based on each officer's subjective opinion. We recommend PPB consider changing this practice to assign a single person to complete the template. In calls which meet ECIT criteria, the responding ECIT officer may be the most appropriate person. In other calls, the primary officer may be more appropriate. PPB has been receptive to a single person completing the MHT, though more discussion is required before PPB's current practice can be changed.

Finally, we looked at the data being gathered on mental health calls and note some system and user shortcomings that PPB has begun to address. For example, PPB reports that out of 1,001 calls cleared as ECIT between April and September of 2017, there were 209 calls wherein the mental health indicator was left blank. Additionally, there were 33 calls where an ECIT call had "No" in the field for whether mental illness was present. One potential reason is that the system takes the last officer's indication of a mental health component. So, even though another officer on-scene may have indicated a mental health component, the system only registers the closing officer's coding. Another potential reason is that officers are simply neglecting to complete this field, though it is unclear how often this is the case.

In order to improve the reliability of mental health call data, PPB has begun to address both system and user issues. For system issues, PPB has begun to explore programming options to better automate the MHT data output process, though further work is required. Also, we have noted in the past that other data about mental health contacts are not always reliably captured, including the disposition and whether an ECIT officer was on-scene (as this is currently gathered from the perception of the officer completing the MHT). PPB has begun to evaluate the root of these reporting and data problems and has taken actions to address them. For instance, PPB and BOEC have begun using a unified dataset (see Section II) which should more accurately capture whether an ECIT officer was on scene. Using a unified dataset should also ensure data consistency between the two bureaus.

For user issues, PPB has taken steps to reinforce to officers the importance of comprehensively completing the template, including roll-call presentations and discussions with shift supervisors. We

also observed a video presentation from the Chief's office during the ECIT refresher training which reinforced the importance of the MHT. Through such steps, PPB has improved the overall reliability of the MHT since it was introduced in April of 2017. PPB provided the below chart indicating that between October of 2017 and January of 2018, the proportion of mental health templates with an unanswered indicator of mental health status has been decreasing. Based on the chart, it appears that many instances of an unanswered indicator would likely have been coded as no mental health indication. Although the below chart uses Bureau-wide data, PPB reports that decreases in unanswered templates have been fairly consistent across Precincts. As part of the City's audit plan (see Section II), the proportion of unanswered mental health indicators will continue to be monitored.



Figure 1 – MHT Yes/No/Unanswered Response

Although we have identified some issues with the mental health template, we believe these concerns should be placed in the broader context of mental health response documentation in Portland. PPB is a rare agency to attempt to comprehensively collect data on mental health calls and, despite the above concerns, we believe that PPB's efforts are well within the spirit and intent of the Par. 105. PPB has also shown a self-initiated drive to identify data collection issues and resolve them through various means, including training, roll-call presentations, and discussions with supervisors. As with any newer system of data collection, continual re-assessment and improvement should be a primary goal and PPB has demonstrated actions in accordance with that goal. We will continue to monitor the work of PPB to increase the reliability of mental health contact data, though note that the collection of reliable data appears to be improving.

Based on the above considerations, we believe PPB has substantially complied with Par. 105, though such substantial compliance is conditioned on the resolution of data reliability issues. These include the introduction of supplemental training for all officers on when and how to complete the MHT, as well as continuing to monitor the presence of unanswered questions on the form. Where issues are found, PPB should continue to identify whether they are system or user errors and remedy the issue accordingly. As noted above, we believe that this has already begun, further justifying our finding of substantial compliance, though PPB's work should not be considered done. Should these conditions not be met, we will re-assess PPB's compliance with Par. 105 given the progress made.

**D. Mobile Crisis Prevention Team (Behavioral Health Response Team)**

*106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.*

*107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer.*

PPB continues to have a BHRT team in each Precinct, with each BHRT comprised of an ECIT-trained officer and a qualified mental health professional from Project Respond. We continue to find PPB in substantial compliance with this paragraph, though agree with DOJ's recommendation in their 2017 Compliance Assessment that PPB should consider the potential for expanding BHRT based on resources and community needs. PPB has begun exploring this option, though expansion is not a requisite for substantial compliance.

*108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].*

As with Par. 101, PPB's prior SOP #3-2 (Behavioral Health Response Team) did not automatically require the removal of BHRT officer who had a sustained finding regarding use of force on a person with mental illness. In December of 2017, PPB presented changes to SOP #3-2 to the BHU Advisory Committee to address this issue. The changes included the language of Par. 108 and are responsive to recommendations we have made in the past. The SOP became effective in January of 2018. As with ECIT officers, PPB has set up a system for verifying incoming BHRT officers and conducting ongoing reviews of BHRT officers to ensure continued compliance.

Therefore, for the same reasons as we have laid out in our assessment of Par. 101, we believe PPB has substantially complied with the requirements of Par. 108.

*109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members.*

In Q2 2016, BHRT recommended five trainings for BHRT members to attend, including Applied Suicide Intervention Skills Training (ASIST), Trauma Informed Care, Civil Commitment Investigator Training, HIPAA and Law Enforcement, and Threat Assessment (see Appendix 3 – BHUAC Recommendations April 2016). All BHRT officers have received such training and have also attended ECIT training. In addition to PPB-delivered trainings, BHRT officers have received external training where opportunity and resources exist.

Based on the utilization of BHUAC input, PPB's continued commitment to sending BHRT officer (as well as other BHU members) to training, and BHRT officers' attendance at the ECIT refresher, we believe that Par. 109 has been substantially complied with.

*110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers.*

Although we refer the reader to Section II of this report for our complete qualitative and quantitative assessment of BHRT operations, we provide a summary here in order to assess compliance with Par. 110. Overall, we find that the operation of BHRT uses ECIT data (through the Mental Health Template) to connect service recipients to service providers. For instance, if a community member is the subject of three mental health templates within a 30-day period, a referral to BHRT is made. In addition to this, officers are able to make referrals to BHRT through the BERS system at any time. As noted in Section II, community members accepted for BHRT intervention most often have services coordinated for them by the BHRT team. Additionally, BHRT is associated with reduced number of arrests after the intervention. Overall, we believe that BHRT is operating as intended under Par. 110 and positively contributes to the City's system of mental health response.

*111. Within 180 days of the Effective Date, PPB, with the advice of the [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process.*

In the second quarter of 2017, PPB enacted Directives 850.21 (Peace Officer Custody (Civil)), 850.22 (Police Response to Mental Health Director's Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). The language of the directives utilized BHUAC input and informs officers of the process for transferring individuals to the Unity Center via AMR ambulance service. At the time of this report, these policies were undergoing an annual review period though we continue to believe the currently enacted directives are substantially responsive with the requirement of Par. 111.

## E. Service Coordination Team

*112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.*

Although we refer the reader to Section II of this report for our complete qualitative and quantitative assessment of SCT operations, we provide a summary here in order to assess compliance with Par. 112. Overall, we find that SCT facilitates the provision of services to individuals with lengthy criminal records, high levels of addiction, and who experience a higher degree of houselessness. Our qualitative and quantitative outcome assessment revealed that SCT was associated with a decreased number of arrests after participation in SCT (both for individuals who successfully completed SCT and those who did not), increased levels of employment, and improved housing status. We believe that SCT is operating as intended under Par. 112 and positively contributes to the City's system of mental health response.

## F. BOEC

*113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding*

*new or revised policies and protocols to assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals.*

The policies and procedures enacted by BOEC for "calls related to mental health issues" remain in effect. Upon receiving a call with a mental health component, BOEC call-takers assess whether one or more of the ECIT criteria are present (subject is violent; subject has a weapon; subject is attempting suicide or threatening to attempt suicide with corresponding plans/means to do so); subject is threatening to jump from a bridge/structure or threatening to obstruct vehicle traffic; call is at a residential mental health facility; community member/other officer requests ECIT response). If one or more of these conditions is present, the policies and procedures require BOEC to dispatch an ECIT officer.

The policies and procedures also contain guidelines for assigning calls to the Multnomah County Crisis Call Center (MCCL). Should a call contain a mental health component but not meet ECIT criteria, emergency communicators are directed to transfer calls to MCCL when suicidal threats, feelings, or intent are present but the caller does not have the direct means to carry out a suicide, does not need immediate medical attention, and is not threatening to jump from a bridge/structure or to block vehicle traffic. Using data provided by BOEC, calls which get transferred to MCCL are rarely diverted back for any police response (~10%) and ever more rarely for ECIT response (<3%).

Related to Par. 113's requirement that BOEC "assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals," this is a near impossibility given systemic issues. Members of the Behavioral Health Response Team (BHRT) are not first responders and neither are NGOs or community based mental health providers. As we evidenced in our last report, the intent of this provision appears to be best accomplished through MCCL, which has the resources to provide immediate counseling as well as future links to services and care coordination. Thus, although not within the letter of Par. 113, BOEC's current system is better suited to satisfy the intent of the paragraph.

Given our assessment of Par. 99, BOEC may need to further revise their policies and procedures regarding when to dispatch an ECIT officer based on the City's next evaluation of data. However, BOEC's current policies and procedures presently meet the requirements articulated in    Par. 113 and we therefore find them to be in substantial compliance.

*114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers.*

Although not completed within the 180 days expected by the Settlement Agreement, BOEC has provided Crisis Triage training for all current call-takers and dispatchers. On two separate occasions, we observed the training provided by BOEC. After our first observation, we noted some concerns which hindered BOEC from gaining substantial compliance for Par. 114. We relayed these concerns to BOEC and they were promptly addressed in the next iteration of BOEC training (see our December, 2017 report). Subsequent BOEC hires will also receive this training, and there is a new class of BOEC employees who will receive the training in April of 2018. We therefore believe that the initial training provided to BOEC call-takers and dispatchers substantially complies with Par. 114.

Par. 114 also contains a requirement that "ongoing training" be developed by the City, utilizing the advice of the BHUAC. Given that the initial training was completed less than a year ago and a new batch of BOEC employees will not start until April of 2018, there has not been an opportunity or need

to conduct refresher training for call-takers and dispatchers. However, BOEC has indicated they are planning a refresher for 2019, using BHUAC input in the development of the training. As part of our next report on mental health responses in 2019, we will comment on whether the refresher training has been conducted in accordance with Par. 114.

*115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.*

Through observations of BOEC call-takers and dispatchers, and through evaluation of BOEC audio/CAD printouts, we believe that BOEC personnel are dispatching calls to ECIT officers or diverting calls to the MCCL in accordance with the policies and procedures described in Par. 113 and the training described in Par. 114. For this report, we reviewed two different samples of calls to ensure appropriate triage from BOEC call-takers and dispatchers.

In the first sample, we used data from the Mental Health Template to identify calls wherein the designation of meeting ECIT criteria was made by PPB officers on-scene rather than BOEC personnel. Between April and September of 2017, we found a total of 15 calls where this occurred and for each call, we reviewed the audio file and CAD printouts associated with the call. Our review revealed that although a mental health component was present in many of the calls, there was no information present to the call-taker that would indicate the call met ECIT criteria.

In the second sample, we used data provided by BOEC to identify initial call types which were most often associated with a final call type of ECIT. For the timeframe of April and September of 2017, we randomly selected 30 calls that had an initial call-type of Suicide (SUICD), Suicide with Weapon (SUICDW), Disturbance Priority (DISTP), and Welfare Check Priority (WELCKP). Our review of these 30 calls revealed no major concerns with BOEC's ability to recognize calls involving a mental health component.

Although not related to the actual triaging of crisis calls, we note that BOEC does not always code calls as ECIT in accordance with its policies and procedures. Through observation of call-takers and through discussions between COCL, DOJ, PPB, and BOEC, it has been discovered that when a responding officer requests ECIT assistance, BOEC dispatches an ECIT officer but does not reflect ECIT criteria being met in their coding. While this does not violate the policy to dispatch ECIT, it does create problems for both PPB and BOEC to self-assess their progress and make data-informed decisions to improve operations. As a way of resolving such problems, PPB and the BOEC have agreed to utilize a single dataset which will contain all variables related to ECIT dispatch. Although we will have to wait until such a dataset is available before we can make any definitive statements, we believe the joint dataset may be sufficient for this issue.

Given our review of BOEC operations and our samples of calls, we believe that BOEC call-takers and dispatchers are triaging crisis calls in accordance with policies and the training they have received. Although reliable data coding has proven to be an issue, we believe this is a point that can be remedied through supplemental training as well as with the unified dataset agreement between PPB and BOEC. Our review of the two case samples revealed no significant concerns, though BOEC should consider implementing its own auditing process in the future in order to continue to ensure adherence with policies and training.

Although substantial compliance is warranted by the above information, BOEC will need to demonstrate a "fully operational" triage system in accordance with revised ECIT criteria using the

proposed audit discussed in Section II. Therefore, the substantial compliance is conditioned upon adherence to the steps for implementing revised dispatch criteria, as well as the ensuing outcome data.

# SECTION II

# System Assessment

The City of Portland's comprehensive system for mental health response encompasses primary options for responding to mental health crises (in the form of BOEC call triage and ECIT response) as well as secondary and preventative services (in the form of BHRT and SCT). Within this section, we look at each portion of the City's system and identify various measurements of impact in order to comment on the system as a whole. Overall, the City's combination of response strategies appears to be working well. Pending the revision of ECIT dispatch criteria (discussed in our assessment of Par. 99 and below), we believe that the implementation of the Settlement Agreement has "created: (1) capable systems and resources for responding to persons in mental health crisis" (Par. 173).

## TRAINING FOR SYSTEM COMPONENTS

An important component of the overall response strategy is the training provided to all officers, ECIT officers, BOEC emergency communicators, and BHRT Officers. As indicated in our assessment of the Settlement Agreement paragraphs, the initial and refresher training provided to all officers (Pars. 97 and 98), ECIT officers (Par. 102), BHRT officers (Par. 109), and BOEC emergency communicators (Par. 114) has been done in consultation with the BHUAC. We have observed the above trainings (aside from BHRT which is often external training) and, when necessary, have offered technical assistance which has been incorporated into the training curriculum. Overall, the training provided to the various groups has been well designed, well delivered, and has provided the foundation for personnel to perform their respective roles in the overall system.

## BOEC

In this section, we provide an assessment of the operation of BOEC in terms of identifying mental health crises calls and PPB's Enhanced Crisis Intervention Team (ECIT) in terms of providing emergency response to mental health crises calls. When a call comes into BOEC, the call-takers have been trained to listen for signs and symptoms which may indicate the subject of the call may be experiencing a mental health crisis. Where a mental health component is present and one of the ECIT criteria is also identified (weapon, violent, mental health facility, suicide, or at the request of a community member/other officer), BOEC will dispatch an ECIT officer to the scene if one is available. Where a mental health component is present but the call does not meet ECIT criteria, BOEC may transfer the call to the Multnomah County Crisis Line (MCCL) or may dispatch a non-ECIT officer if necessary. For each of these steps, we have been provided data and/or conducted observation and interviews in order to assess the consistency to which this process is followed and have examined outcomes as they relate to BOEC.

To evaluate BOEC's operation when the call comes in and to ensure that call-takers and dispatchers are acting in accordance with the policies (Par. 113) and training received (Par. 114), we reviewed two different samples of calls to assess crisis triage. In the first sample, we used data from the Mental Health Template to identify calls wherein the designation of meeting ECIT criteria was made by PPB officers on scene rather than by BOEC personnel. This allowed us to examine if there was information suggesting the call met ECIT criteria that was missed by BOEC personnel. Between April and September of 2017, we found a total of 15 calls where this occurred and for each call, we reviewed the audio file and CAD printouts associated with the call. Our review revealed that although a mental health

29

component was present in many of the calls, there was no information present to the call-taker that would indicate the call met ECIT criteria.

In the second sample, we used data provided by BOEC to identify initial call types which were most often associated with a final call type of ECIT. In order to assess if BOEC personnel may be missing opportunities to pre-identify ECIT calls, we sampled calls from these categories. For the timeframe of April and September of 2017, we randomly selected 30 calls that had an initial call-type of Suicide (SUICD), Suicide with Weapon (SUICDW), Disturbance Priority (DISTP), and Welfare Check Priority (WELCKP). Our review of these 30 calls did not reveal any concerns about BOEC personnel failing to identify calls as meeting ECIT criteria.

In order to assess whether BOEC is dispatching ECIT officers when ECIT criteria is met, we utilized BOEC data for all ECIT calls between April and September of 2017. In all, there were 1,177 cases in the dataset where Case Type was coded as "ECIT." When identified as meeting ECIT criteria, BOEC dispatched an ECIT officer in more than nine out of 10 cases (93.8%). There were only 77 calls in which an ECIT officer was not dispatched. This is most likely due to an ECIT officer not being available at the time of the dispatch. In cases where an ECIT officer was dispatched, the BOEC data indicate that an ECIT officer arrived on scene approximately 70.4% of the time. This is consistent with our prior reports, though we note that PPB has reported an ECIT response rate of approximately 75%. We believe the difference between these two response rates is most likely due to the fact that BOEC has not been coding as an "ECIT call" instances where a non-ECIT officer requests an ECIT response (see our assessment of Par. 115). Thus, it is likely that the true response rate is closer to 75%, though PPB and BOEC would benefit from working with a common dataset. Plans for this have already been discussed between PPB and BOEC as well as with COCL and DOJ.

When a call contains a mental health component but does not meet the criteria for an ECIT response, BOEC call-takers have the option of forwarding the call to the Multnomah County Crisis Line (MCCL) if they determine no immediate on-scene response is needed from the PPB. As detailed extensively in our last report, MCCL has response options far beyond that of officer dispatch. MCCL can "spend time talking with the community member, engage in safety planning, facilitate transportation to walk-in centers, or encourage the community member to go to the Unity Center" (COCL October 2017 report). MCCL can also work with individuals covered by HealthShare and can identify the community member's mental health care provider as well as provide light care coordination. Additionally, MCCL has a number of partner organizations to whom they can refer the community member based on eligibility.

<u>EVALUTION OF PPB CAPACITY AND OUTCOMES</u>

For the evaluation of PPB's response to mental health crises, we have previously asked PPB to address a number of topic areas which would provide insight into the overall capacity and outcomes of their model (see COCL's 2016 Q3/Q4 report). Although other manners of measurement may provide further specific insight into PPB's operation, we believe addressing the topic areas below is sufficient for an overall evaluation. PPB has provided us a response to each of these topic areas and, in turn, we have used them to justify our assessment of Par. 99. The topics are:

- The percent of calls to which PPB responds wherein the primary subject of the interaction has an actual or perceived mental illness
- The percent of mental health calls which meet ECIT criteria
- Precinct, Shift, and Time distribution of ECIT dispatches
- The proportionality of ECIT officers in each Precinct/Shift compared with the number of calls that meet the ECIT dispatch criteria
- Rate at which an ECIT officer responds to ECIT calls and Precinct/Shift differences
- Rate of ECIT calls where an ECIT officer travels from another Precinct
- Outcome analyses related to:
  - Use of Force
  - Arrest
  - Transport to Hospital
- The degree of collaboration between PPB, BOEC, and other City/community partners in the ongoing review and subsequent development of ECIT

*ECIT Capacity*

To measure capacity, we first examine the number and precinct distribution of mental health calls that PPB responds to. During an approximate 5-month timeframe (April 25, 2017 to September 30, 2017), 8,939 calls (8% of all calls for service) involved a primary subject who was suffering from actual or perceived mental illness. This is also consistent with estimates of the relative proportion of police calls involving persons with mental illnesses found in prior studies (see Livingtson, 2016). PPB's response also indicated around 1,000 calls that were identified as meeting the ECIT criteria by BOEC. Given the five-month time period, this equates to approximately 6.29 calls per day which BOEC identifies as meeting ECIT criteria. The calls appear to be disproportionately divided between the three Precincts, with 43% of the calls emanating from Central Precinct, 29% coming from East Precinct and 28% coming from North Precinct. Additionally, the majority of ECIT calls occurred between the times of 2:00 PM and 10:00 PM (see Table 2 provided by PPB wherein the Y-Axis indicates the hour of day in military time). When comparing the proportion of ECIT call distribution (precinct, shift, time) to the distribution of ECIT officers on these factors, there is relative parity in the distributions.

|  | Number of ECIT-Type Calls | Percent |
|---|---|---|
| CENTRAL | 433 | 43.3% |
| EAST | 290 | 29.0% |
| NORTH | 275 | 27.5% |
| OTHER | 1 | .1% |
| **TOTAL** | **999** | **100%** |

Table 1 – ECIT Type Calls and Precinct Distribution

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Grand Total |
|---|---|---|---|---|---|---|---|---|
| 0 | 11 | 7 | 2 | 3 | 4 | 7 | 7 | 41 |
| 1 | 6 | 5 | 4 | 6 | 2 | 4 | 3 | 30 |
| 2 | 7 | 2 | 3 | 6 | 2 | 4 | 6 | 30 |
| 3 | 3 | 1 | 1 | 2 | 4 | 4 | 2 | 17 |
| 4 | 2 | 1 | 2 | 2 | 1 | 3 | 1 | 12 |
| 5 | 3 | 3 | 0 | 3 | 1 | 2 | 0 | 12 |
| 6 | 1 | 3 | 1 | 2 | 0 | 3 | 3 | 13 |
| 7 | 2 | 0 | 3 | 0 | 5 | 2 | 3 | 15 |
| 8 | 5 | 6 | 4 | 1 | 1 | 3 | 4 | 24 |
| 9 | 4 | 4 | 8 | 3 | 10 | 8 | 4 | 41 |
| 10 | 4 | 4 | 6 | 10 | 4 | 4 | 6 | 38 |
| 11 | 6 | 4 | 8 | 5 | 3 | 6 | 4 | 36 |
| 12 | 7 | 8 | 7 | 6 | 10 | 9 | 6 | 53 |
| 13 | 5 | 4 | 8 | 11 | 7 | 6 | 8 | 49 |
| 14 | 1 | 10 | 7 | 15 | 6 | 6 | 5 | 50 |
| 15 | 3 | 8 | 9 | 9 | 11 | 5 | 2 | 47 |
| 16 | 2 | 19 | 10 | 6 | 4 | 7 | 5 | 53 |
| 17 | 7 | 12 | 8 | 13 | 5 | 10 | 12 | 67 |
| 18 | 12 | 10 | 13 | 7 | 6 | 12 | 10 | 70 |
| 19 | 11 | 6 | 14 | 9 | 9 | 6 | 6 | 61 |
| 20 | 11 | 7 | 8 | 6 | 13 | 6 | 16 | 67 |
| 21 | 8 | 5 | 3 | 10 | 9 | 10 | 11 | 56 |
| 22 | 12 | 17 | 6 | 8 | 5 | 9 | 11 | 68 |
| 23 | 14 | 9 | 3 | 4 | 4 | 6 | 9 | 49 |
| Grand Total | 147 | 155 | 138 | 147 | 126 | 142 | 144 | 999 |

Table 2 – ECIT-Type Calls and Day/Time Distribution

Next, we examine the rate at which PPB is able to provide an ECIT response to calls which meet ECIT criteria. PPB reports that they have an approximate 75% response rate based on their MH Template data. When reviewing data provided by BOEC for this report, we found an approximate 70.4% response rate – however, the data provided by BOEC do not reflect calls where a non-ECIT officer requested an ECIT response. As such calls meet the criteria for "ECIT" but have not been previously coded by BOEC (see our assessment of Par. 115), we believe that PPB's reported response rate is likely more accurate. PPB's evaluation also revealed some Precinct differences in ECIT response rates, though these differences are relatively small (East Precinct had an approximate 70% response rate while Central and North Precinct were between 76% and 78%). Bureau-wide, there were some response rate differences in terms of time of day, with 9:00 AM to 4:00 PM showing lower ECIT response rates in all three Precincts. We caution the reader to not interpret instances where an ECIT officer does not respond as indicating that PPB failed to follow policy. Rather, the first on-scene officer may clear the call before ECIT officers were able to respond or the ECIT officer may have been called off for some other reason. PPB reports that in 19.4% of ECIT type calls, the ECIT officer was cleared or called off prior to arrival. We also note that in other agencies, a 70% to 80% response rate for specialized mental health response is common. Thus, PPB is consistent with other agencies in this regard.

| | ECIT Response Rate |
|---|---|
| **Bureau-Wide (Total)** | **75%** |
| *2:00 AM to 8:59 AM* | *79%* |
| *9:00 AM to 3:59 PM* | *70%* |
| *4:00 PM to 9:59 PM* | *77%* |
| *10:00 PM to 1:59 AM* | *79%* |
| **Central Precinct (Total)** | **77%** |
| *2:00 AM to 8:59 AM* | *83%* |
| *9:00 AM to 3:59 PM* | *74%* |
| *4:00 PM to 9:59 PM* | *80%* |
| *10:00 PM to 1:59 AM* | *72%* |
| **East Precinct (Total)** | **70%** |
| *2:00 AM to 8:59 AM* | *71%* |
| *9:00 AM to 3:59 PM* | *65%* |
| *4:00 PM to 9:59 PM* | *65%* |
| *10:00 PM to 1:59 AM* | *91%* |
| **North Precinct (Total)** | **78%** |
| *2:00 AM to 8:59 AM* | *79%* |
| *9:00 AM to 3:59 PM* | *68%* |
| *4:00 PM to 9:59 PM* | *84%* |
| *10:00 PM to 1:59 AM* | *80%* |

Table 3 – ECIT Response Rates (Overall and by Precinct)

One strategy to examine ECIT capacity and distribution is to examine how often dispatchers have to look outside of the precinct in which a call is located to find an available ECIT officer. Using data provided by BOEC, we analyzed how often an ECIT officer was dispatched from one Precinct to respond to an ECIT call in another Precinct. BOEC policy is to look for an ECIT officer within the Precinct of occurrence and if one is not available, dispatchers will look in the adjacent Precinct to find one. This was a relatively rare occurrence, as only about 7.1% of calls that met ECIT criteria involved dispatching an ECIT officer from another Precinct. PPB has also reported to us that it is rare (about 1% of ECIT identified calls) for there not to be any ECIT officer available to respond. Thus, for the large majority of cases, an ECIT officer can be found within the Precinct of call occurrence, and only in rare instances is there no ECIT officer available.

We note here that for many of the above issues (parity of ECIT officers to ECIT calls, response rate, Precinct/Shift differences, etc.) PPB has sought the input of BHUAC. For example, we have commented in our last report and elsewhere in this report that BHUAC has recommended officer shift and Precinct be considered in the selection criteria for new ECIT officers in order to address parity and response rate issues. At times, collective bargaining agreements may limit PPB's ability to fully implement these recommendations. However, we believe PPB has identified many of the same concerns that we have noted, consulted with BHUAC, and instituted a plan to resolve those concerns. In all, we believe that PPB and BHUAC have demonstrated good faith efforts to review data, make informed recommendations, and do what can reasonably be expected to address these issues.

*ECIT/Non-ECIT Officer Outcomes*

We asked PPB to examine differences in call outcomes between ECIT and non-ECIT officers. PPB provided the results of two logistic regressions[2] that used data on calls with a mental health component that did not meet ECIT criteria. These calls were used instead of ECIT calls because there were too few ECIT calls that were handled by non-ECIT officers to make statistically meaningful comparisons. The analysis examined the differences between ECIT and non ECIT officers on the following outcomes: transport to jail (arrest) or transport to the hospital/Unity Center. The analysis controlled for Precinct, call priority, the presence of weapons, subject injury, the involvement of mental health professional, and whether the subject had an active warrant. In our original technical assistance to PPB, we had also asked them to look at differences between ECIT and non-ECIT officers on the prevalence of force in interactions with persons with mental illness. However, only 22 cases fit the criteria for the study, thereby precluding a reliable quantitative analysis. We have reviewed the use of force cases in a qualitative sense and did not find any differences which could be attributed solely to ECIT status.

Based on PPB's analysis, there were no statistical differences between ECIT and non-ECIT officers on whether the subject of the call was transported to jail (i.e. arrested). However, there were differences between the two groups on whether the subject would be transported to the hospital or Unity Center for mental health evaluation. The analysis revealed that ECIT officers were significantly more likely than non-ECIT officers to transport individuals to the hospital/Unity, with an odds ratio of 1.5 (p<.001). Though an odds ratio of 1.5 is considered a small effect size, it is a statistically significant and meaningful effect. Put in another way, for every 100 subjects that officers respond to, ECIT officers would transport 7.7 more to the hospital/Unity Center than would non-ECIT officers. Considering the number of mental health calls which PPB responded to in the timeframe of the study (April 25, 2017 to September 30, 2017), this difference has the potential for meaningful impact on those experiencing a mental health crisis.

Finally, as we have noted in our assessment of individual paragraphs and have commented on in prior reports, PPB's level of engagement with various stakeholders in the mental health community has been admirable to date. PPB collaborates with many partners in the form of BHUAC/BHCT and has an ongoing relationship with researchers at Portland State University to evaluate PPB's relationship with staff at mental health facilities and gather the staffs' perceptions on PPB's mental health response. Additionally, through BHRT and SCT, PPB has taken an active role in helping persons living with mental illness gain access to services. Overall, we believe PPB's coordination with external stakeholders is

---

[2]  In the assessment of various aspects of PPB's system of mental health response (ECIT, BHRT, SCT), we reference statistical tests which lay persons may not be familiar with. We provide a quick explanation here.

Logistic Regression: Examining an independent variable's effect on a dichotomous dependent variable while controlling for other potential contributors

Independent Samples T-Test: Comparing means between two different groups

Paired Samples T-Test: For this report, this test was used to compare means of the same group at two different times (T1 and T2)

Chi-Square: For this report, this test was used to examine differences in categorical variables between groups

consistent with the "system" approach to mental health policing that is found in the original Memphis Model.

Based on the above findings, we examine the question of whether PPB's system of mental health response meets the intent of the Settlement Agreement. As it currently operates, we believe that slight revisions to ECIT criteria are necessary based on the evaluation presented here. First, the difference in outcomes on non-ECIT criteria calls indicates that the two groups (ECIT and non-ECIT officers) are performing differently. Calls that are responded to by ECIT officers are more likely to result in the community member being transported to the hospital/Unity Center compared with calls that do not involve ECIT officers. In the absence of more detailed data on various response and referral options, such transports are generally considered a proxy for a positive outcome associated with specialized response (based on the literature). As such, the results indicate a benefit for revised criteria in order to get ECIT officers to more of these calls and more directly via BOEC dispatch. The results also indicate that PPB has the personnel capacity to revise the criteria without overburdening ECIT officers. Although PPB has expressed concerns that their overall response rate to ECIT calls may be impacted by revised criteria, we believe they have a solid evaluation plan (see below) which can measure the impact of any such changes, allowing them to make further adjustments to criteria or capacity where indicated.


## OFFICER VIEWPOINTS AND EXPERIENCES

In addition to examining the operational outcomes of PPB's system of mental health response, it is useful to assess the viewpoints and experiences of PPB personnel. To do so, we examined data from three years of our organizational survey of PPB officers and compared the responses of ECIT and non-ECIT officers. This provides a glimpse into the impact of ECIT specialization. The results from all three years indicate consistent differences between ECIT and non-ECIT officers on some but not all items. We summarize the results here and provide a complete breakdown of all items by year in Appendix 4. Where appropriate, statistically significant differences are identified with their corresponding p-value.

One set of survey questions focused on officers' views of the administrative push for officers to adopt crisis intervention strategies as well as the priority given by PPB to an effective mental health response. Overall, personnel perceive there to be a high level of organizational importance placed on the crisis response model, though in 2015 and 2016, ECIT and non-ECIT officers differed in their views of the organizational priority given to effective mental health response (ECIT officers viewed it as a higher priority than non-ECIT officers). However, this difference was not present in 2017 as non-ECIT officers showed an increase from prior years in the priority given to mental health within PPB. Additionally, there were no group differences in their opinions about whether top leadership was trying to get employees to adopt the CI Approach. Personal support for the CI approach did differ between ECIT and non-ECIT officers, with ECIT officer expressing higher support for the CI approach than non-ECIT officers. However, both groups demonstrated an overall relatively high level of support for the approach.

Another important component of PPB's system is the quantity and quality of training provided to officers (both ECIT and non-ECIT). Herein again, there are some similarities and differences in viewpoints between the two groups. For instance, both groups indicated large-scale agreement that PPB had provided "enough training on how to effectively respond to calls with a mental health

35

component." However, in terms of rating the training received, ECIT officers more often rated their training higher than non-ECIT officers, with the difference reaching statistical significance in both 2016 and 2017.

We also examined if there were differences between the groups in confidence in their CI skills. ECIT officers expressed significantly higher levels of confidence in their ability to recognize signs and symptoms of a mental health crisis and to de-escalate a situation involving a mental health crisis than did their non-ECIT peers. ECIT officers were also more confident in their ability to make referrals using BERS. Alternatively, both groups demonstrated similar levels of confidence in linking a person to appropriate mental health services as well as in their fellow officers' abilities to manage a person with mental illness.

Next, differences between ECIT and non-ECIT officers were examined on items related to assessments of mental health calls, approaches to mental health calls, and views of the ECIT system in general. For the approach to mental health call items, both groups of officers viewed mental health calls to be dangerous but also ones which require compassion. Both groups also challenged the negative statements about crisis intervention and officer engagement. For example, both groups generally disagreed with the statement, "the best course of action for a mental health crisis is to not get involved." As to the role of ECIT officers, neither group believed ECIT service prevented officers from "performing more important activities" nor did they believe the ECIT program turned officers into "ineffective social workers." Both groups were likely to agree that PPB was effective in keeping people with mental illness out of jail, though agreement with this statement was tempered compared with other items. Finally, both groups expressed similar sentiments regarding the importance of mental health response as a function of law enforcement. These responses, collectively, suggest organizational buy-in to the Bureau's crisis intervention policing strategies.

In several areas, the responses of ECIT and non-ECIT officers were significantly different. For instance, the two groups differed in their assessment of ECIT outcomes, with ECIT officers being more likely to agree that ECIT reduces the risk of officer injuries and that calling an ECIT officer is useful for effectively resolving a mental health crisis (though this difference was not present in the 2017 data). Related to this, ECIT officers were more likely to agree that the BHU was an effective resource for reducing repeat contacts involving persons with mental illness. In 2016, non-ECIT officers were more likely to believe that the ECIT program did not provide officers with enough guidance for handling events, however, this difference was not statistically significant in the 2017 survey findings. Finally, non-ECIT officers were less likely to agree that it is easy to access an ECIT officer when needed and were more likely to agree that expanding ECIT criteria would improve PPB's effectiveness in responding to mental health calls.

In prior reports, we have commented on differences between ECIT and non-ECIT officers based on focus groups. In addition to the focus groups, a member of the COCL team conducted ride along observations with ECIT and non-ECIT officers. We have also engaged in informal conversations with officers, both ECIT and non-ECIT regarding their views of PPB's mental health response system. Many of the above described quantitative findings from the surveys were apparent in our qualitative discussions with officers in terms of both the similarities and differences between ECIT and non-ECIT officers that were noted. For instance, many officers we spoke with believed that non-ECIT officers

can be generally as good as ECIT officers at handling mental health calls and that personality (more so than training) is a better indicator of how well one handles such calls.

The majority of officers we spoke with expressed that every call should be approached on its own merits, with the officer adapting his/her approach to the situation. They pointed out that the first issue that is addressed by all officers is safety. Subsequently, officers expressed the importance of patience and communication when dealing with people in crisis. Both groups of officers discussed the importance of information gathering prior to going into a situation, such as checking call history and getting more information from the caller, friends, and family if possible.

Nevertheless, the focus groups and ride alongs did find some differences that echo the survey results. For instance, numerous ECIT officers indicated that they felt more confident in their knowledge of resources after going through ECIT training compared with their initial 40-hour crisis intervention training. When on a call, both groups identified similar skills used to deal with mental health calls, including identifying prior history and calling Project Respond when appropriate. Additionally, both groups felt patience and communication skills were imperative. However, ECIT officers differed from non-ECIT officers in that ECIT officers were more likely to evoke the importance of taking a holistic approach. This includes stressing the importance of a working understanding of mental health issues, considering many different options when making decisions, and seeking to address the "big picture." In this approach, ECIT officers seem to want to help address the larger underlying issues, but often felt frustrated by the lack of options in their role as a police officer, recognizing that they are not mental health clinicians. In contrast, because many non-ECIT officers felt confident in their skills, they indicated they would request an ECIT officer only as a policy requirement rather than for the belief that ECIT officers possessed any additional skill. Certainly, many non-ECIT officers have very good crisis response skills. However, the perception of some non-ECIT officers that they possess the same skills of ECIT officers (as revealed in the focus group and survey themes above) may indicate a possible lack of awareness of advanced ECIT skills or, for some officers, overconfidence in their own skills. This is a common finding for non-specialized officers in other agencies and should not be considered unique to Portland.


## QUALITY ASSURANCE STRATEGY

The City has initiated plans for an ongoing quality assurance strategy for their mental health response system. The proposal includes three levels of quality assurance, including efforts to establish the reliability and validity of data, using data to inform decisions, and the exploration/reporting of data. As to the first level (reliability and validity of data), the City has noted the difficulty in using multiple datasets to measure the various aspects of mental health response (e.g. number of MH calls, ECIT dispatched, ECIT on-scene, etc.). In response, PPB and BOEC have begun utilizing a single dataset which will contain all variables related to ECIT dispatch. As we too have noted difficulty in merging various datasets, we believe this is a good step forward and is an excellent example of collaboration.

The second level of quality assurance is using data to inform decisions. This is a defining characteristic of "learning organizations" and consistent with the emerging model of "evidence-based policing." In a similar approach to that which we have described above, PPB will review operational data to

determine the adequacy of ECIT staffing, ECIT response, and potential training/policy implications (among other things). Upon review of the data, results will be shared with the BHUAC and the ECIT Advisory Council in order for those entities to make informed recommendations on training curriculum, SOPs and Directives, and the ongoing monitoring of ECIT dispatch protocol (among other things).

Finally, the City will put into place methods for the exploration and reporting of data which includes three proposed audit methodologies. The first methodology relates to officer-identified contacts with a mental health component, evaluating the reliability of the Mental Health Template data and ensuring that officers are completing the template accurately. The next methodology relates to BOEC-identified ECIT calls, evaluating ECIT calls that do not receive an ECIT response and identifying potential reasons for such outcomes. Finally, the third methodology relates to evaluating the accuracy of BOEC dispatch of ECIT officers, evaluating whether calls that have a mental health component, but did not get coded as ECIT, were coded properly. Although we would need to see these audits be put into practice, the proposed methodologies appear sound and address major components of the mental health response system. We believe the methodologies represent a positive step towards data quality assurance and system oversight.

## PRIMARY RESPONSE SYSTEM SUMMARY

Given our above assessment, we now turn to the question of whether the system for primary response to mental health crisis is in line with the focus and intent of the Settlement Agreement. To a large degree, the policies, training, and operation of PPB and BOEC comply with the requirements of the Agreement. As BOEC is often the first-line of communication during a mental health crisis, they have conducted training for call-takers and dispatchers as to (1) recognizing mental illness as a component of a call and (2) recognizing when the elements of a call require an ECIT response and dispatching an ECIT officer accordingly. BOEC also coordinates with the Multnomah County Crisis Line when calls do not require an immediate police response and initial results appear to indicate this process is running smoothly.

For calls receiving a police response, PPB has indicated that approximately 8% involve a primary subject with actual or perceived mental illness. Additionally, the data indicate that PPB responds to approximately 6.29 ECIT calls per day. These numbers indicate that operational ECIT officers (118 in number and constituting approximately 39% of all operational officers) have a relatively large capacity for responding to calls involving a mental health crisis.

We also note here that the results of the organizational survey over the last three years demonstrate organization-wide support for crisis intervention and overall positive perceptions of critical aspects of mental health response, regardless of ECIT status. However, there are certain areas in the survey where ECIT officers were significantly more positive and efficacious, thereby demonstrating some group differences that should not be discounted.

Additionally, PPB's own evaluation identified some differences in the outcome of non-ECIT calls between the two groups of officers. While there were no statistically significant differences in whether

a subject was arrested, there were significant differences in whether the subject would be transported to the hospital/Unity Center. Findings suggest that when ECIT officers respond, an additional 7.7 out of 100 cases are transported. When taken over a longer timeline, the results may have tangible implications for connecting persons in mental health crisis to services.

Finally, the City has set into motion plans to conduct an ongoing audit of data collected from BOEC and PPB officers. As we have noted some concerns with the reliability of PPB and BOEC data, the City should be credited with taking initiative in recognizing the same shortcomings and immediately identifying problem-solving strategies. Therefore, we are satisfied that the issue of ongoing quality assurance is being addressed.

Taking the above factors, we believe that PPB is close to having a primary mental health response system which adheres to the intent of the Settlement Agreement. However, based on the above information and in accordance with our evaluation of Par. 99, we recommend the City revise the ECIT criteria in order to directly dispatch ECIT officers to calls more indicative of    mental health crises. We do not believe our recommendation will overburden ECIT officers, remove the chance for non-ECIT officers to respond to mental health component calls (as demonstrated in various places above), or substantively change PPB's unique system. Our recommendation is based on survey results where ECIT officers exhibited more positive viewpoints of mental health response, the number of ECIT officers compared with ECIT calls, and different outcomes compared to non-ECIT officers. Should the City implement revised criteria in accordance with our recommendations, we believe they would substantially comply with the intent and language of the Settlement Agreement.


## SECONDARY RESPONSE STRATEGIES

In addition to strategies to provide primary mental health crisis response, PPB maintains two strategies aimed at reducing repeat calls for service and connecting persons with mental illnesses to care. These two approaches are the Behavioral Health Response Team (BHRT) and the Service Coordination Team (SCT). For both of these programs, we received data regarding the types of clients served as well as the short- and long-term outcomes associated with each approach. As detailed below, we believe that both of these programs are operating in a capacity that is positively contributing to the City's overall mental health response system.

### BHRT

For BHRT, we were provided a dataset that included all BHRT referrals between 10/1/2015 and 9/30/2017 (a two-year timeframe). The dataset contained 1,954 referrals on a total of 1,445 individuals, though some individuals were referred to BHRT more than once. For instance, there were 12 individuals who had six or more referrals (1.2% of the individuals in the sample). However, the majority of individuals (59.7%) had only a single referral and approximately 95% had three or fewer referrals.

The majority of the referrals were for individuals who were white (74.8%), male (65.4%), and in the age range of 30-49 (45.4%). The second most common race was Black/African American, making up 15% of the referrals. The second most common age group for referrals was persons over 50 (28.1%),

followed by those 18 to 29 years of age (22.9%). Of the 1,954 referrals, 32.1% were made by ECIT officers, while the other 67.9% came from non-ECIT officers. There were also individual officer differences in the number of referrals made, as 12.3% of referrals came from only 7 officers. It is very likely that some of these officers worked within the BHU, wherein a primary responsibility is reviewing PPB interactions and making referrals through BERS. There were also Precinct differences in the number of referrals, with 47.7% coming from Central Precinct (which houses the BHU), 27.9% coming from East Precinct, and 24.4% coming from North Precinct.

After the referral is made, the case is evaluated to determine whether they meet certain criteria to receive BHRT intervention (see below for the reasons for acceptance). Of the 1,954 referrals, 50.3% were accepted and assigned to the BHRT. However, when looking at persons who were referred to BHRT, 52.6% get assigned at some point. Similar to those who get referred, the majority of the individuals accepted to the BHRT were white (73.7%), male (71.2%), and in the age range of 30-49 (45.8%).

| | Referred to BHRT | Accepted by BHRT |
|---|---|---|
| **Race/Ethnicity** | | |
| *Caucasian* | 74.8% | 73.7% |
| *Black/African American* | 15.0% | 19.5% |
| *Hispanic* | 4.2% | 0.0% |
| *Asian/Pacific Islander* | 3.1% | 3.4% |
| *Other/Unknown* | 2.9% | 3.4% |
| **Gender** | | |
| *Male* | 65.4% | 71.2% |
| *Female* | 34.6% | 28.8% |
| **Age Group** | | |
| *Under 18 Years Old* | 3.6% | 2.8% |
| *18-29 Years Old* | 22.9% | 22.7% |
| *30-49 Years Old* | 45.4% | 45.8% |
| *Over 50 Years Old* | 28.1% | 28.7% |

Table 4 – BHRT Client Demographics

For those who do not get accepted for BHRT service, the most common reasons for declination were "Received or Engaged in Services" (40%), "Low Safety Concern" (22%), and "Infrequent Police Contact" (15%). Very few referrals were declined for capacity or workload issues (1.2% combined).



Figure 2 – Reason for BHRT Declination

Additionally, information for all referrals to BHRT is forwarded on to the Multnomah County Crisis Line (MCCL). Between June 29, 2017 and March 6, 2018, MCCL had received 344 referrals from PPB, 195 of which were assigned to BHRT services and 149 were unassigned. Upon receiving information on an unassigned referral, MCCL attempts to provide care coordination and linkage to services. Where a person is accepted by BHRT, MCCL places a BHRT flag on those individuals. If MCCL then has subsequent contact with that person, they can reach out to the BHRT clinician.

We examined categories of eligibility (reasons for acceptance) for those who are accepted for BHRT services. The most common categories were "Escalating Behavior" (33.9%), "Risk to Others" (25%), "Frequent Contacts" (22.9%), and "Risk to Self" (11.1%). Upon selection of an individual, the BHRT attempts to coordinate provision of services which occurs for approximately 34.3% of individuals who receive BHRT intervention. Other common outcomes were "Concern Mitigated" (21%), "Unable to Locate" (14.5%), "Refused Assistance" (7.7%), "Jail" (9.4%), "Systems Coordination" (8.5%), and "Civil Commitment" (4.2%). These frequencies are in-line with evaluation done in prior reports.



Figure 3 – Reason for BHRT Acceptance



Figure 4 – BHRT Outcomes

Of primary interest in this report is how the long-term outcomes associated with BHRT can be assessed. One of the fundamental goals of BHRT intervention is to coordinate services in order to quell future criminal justice contacts. To perform our analysis, PPB provided us with data related to arrests/custodies for all persons accepted for BHRT intervention. While this does not identify <u>all</u> police contacts, the arrest/custody data captures the more serious interactions with law enforcement. For this evaluation, we looked at arrests/custodies for one year prior to the subject's discharge from BHRT and one year after (where a community member was on the BHRT caseload more than one time, their

first discharge was used). As we only included community members for whom a full year would have passed since their discharge, the sample for this evaluation was 252 individuals.

We performed a paired samples t-test to look at the mean number of arrests/custodies for each individual in the sample before and after BHRT intervention. Based on t-test, it appears that BHRT intervention is associated with reduced arrests/custodies for the following year. Community members in the sample were arrested, on average, 2.37 times in the year prior to their first discharge by BHRT. In the year after BHRT, community members in the sample were arrested, on average, 1.67 times. This resulted in a mean decrease of .67 arrests per person which is statistically significant (t(251)=3.62, p<.001). In the absence of a more sophisticated evaluation design (with control groups), we cannot be entirely confident that these reductions are due to the BHRT intervention (other factors may be involved), but the findings are suggestive of a positive impact.

Taking the above considerations, we believe that BHRT is a beneficial component of the City's overall mental health response system. The Precinct breakdown in referrals is reflective of the Precinct breakdown in mental health contacts based on the MHT data described above and BHRT appears to have adequate capacity for referrals. Referrals are rarely declined due to "Reached Capacity of BHU Care" and "Workload Capacity" (1.2%). Instead, nearly half the referrals (40%) are already receiving services from the mental health system, and thus BHRT linkage is not needed. For those who are accepted, nearly one third of the cases have services coordinated through BHU while in another 20% the concern is mitigated through BHRT teams reaching out to the person. Therefore, the system overall appears to be getting to the right people and coordinating services in a systematic way.

Additionally, short-term follow-up data (one year after BHRT intervention) indicate significantly lower arrests/custody for BHRT clients than they experienced prior to the program. While our analysis did not control for other factors which may influence the arrests/custodies for these individuals, the results do indicate some differences between Time 1 and Time 2. In the future, BHU may want to consider whether the reasons for referral or the disposition are related to the number of arrest/custodies after BHRT intervention. Other evaluations may consider a longer follow-up period or include police contacts other than arrest/custody. Regardless, our evaluation here indicates that overall, the system is working as intended in providing secondary services with persons with mental illness.

*SCT*

As another secondary response component of PPB's overall system of mental health response, we evaluate the operation of the Service Coordination Team (SCT). The SCT provides housing and treatment for persons who experience high rates of houselessness, criminality, and substance abuse, as well as are comparatively higher risk and have higher service needs. Many of the individuals who are served by SCT are not eligible for other service programs due to their significant criminal histories and complex needs. In this section, we analyze data for persons who exited the SCT program in 2016 in order to look at their overall completion rates, arrests before/after SCT participation, employment before/after SCT participation, and housing before/after SCT participation. For our analyses, we purposefully chose individuals who had exited SCT in 2016 in order to examine a one-year time frame for before and after the program.

Within the dataset, there were 137 individuals who exited SCT in 2016. Of these, 33 individuals (24.1%) successfully completed SCT while another 17 individuals (12.4%) did not complete the program but instead left for other housing (e.g. a residential treatment facility or another housing option). The remaining 87 individuals (63.5%) did not complete the program. The 24.1% completion rate represents an increase from findings within our prior reports (previously around 20%) and PPB continues to explore options for improving the completion rate. We also continue to remind the reader of the difficulty of retaining SCT's target populations for the full program (e.g. comorbidity and seriousness of personal problems) and therefore, the more appropriate measures of success, for now, would be changes in arrest rates, employment, and housing. We now turn to analyses of these more critical elements.

PPB provided us a dataset which included instances of PPB arrest/custody for each of the individuals in the sample. For our analysis, we looked at the number of arrests/custodies one year prior to entering SCT and one year after exiting SCT. We compared those who had completed the program (N=33) and those who did not complete the program, including those who left SCT for better housing (N=104). The results indicate that for both groups, participation in the SCT program was associated with fewer arrests in the year after exiting the program than the year prior to entering. For those who did not complete the SCT program, a paired-samples t-test revealed their mean number of arrests/custodies in the year prior was 3.82. However, in the year after SCT, their mean number of arrests/custodies was 2.73 – leading to an average decrease of 1.08 arrests for the year after SCT. This decrease was significant (t(100)=3.2, p=.002).

For those who did complete the SCT program, a paired-samples t-test revealed their mean number of arrests/custodies in the year prior was 2.21. In the year following SCT, their mean number of arrests/custodies was .45 – an average decrease of 1.76 arrests/custodies. This decrease was also significant (t(32)=4.6, p=.000). When comparing the two groups' decreases in arrests, an independent samples t-test revealed that there was no significant difference (t(133)=-.92, p=.359) between the average decrease – that is to say both groups demonstrated similar decreases in arrests. Such decrease in arrests across all SCT clients has also been identified in prior Capstone Class studies on SCT by Portland State University (see Appendix 5).

We also looked to determine whether there were inter-group differences in those who completed the SCT program and those who did not complete it. The results demonstrated statistically significant differences between the two groups for both the number of arrests/custodies prior to entering SCT ((t(88.7)=3.18, p=.002) and the number of arrests/custodies after exiting SCT (t(131.9)=6.4, p=.000). That is to say that, although both groups showed statistically significant decreases in arrests/custodies, there were significant differences between the two groups from the outset. The clients who go on to complete the program were more likely to have fewer arrests/custodies prior to entering SCT compared with those who do not complete the program.

44

| | One Year Prior to Entering SCT | | One Year After Exiting SCT | |
|---|---|---|---|---|
| | Completed SCT | Did Not Complete SCT | Completed SCT | Did Not Completed SCT |
| Mean Number of Arrests/Custodies | 2.73 | 3.82 | .45 | 2.21 |
| Mean Decrease in Arrests/Custodies | – | – | 1.76 | 1.08 |

Table 5 – SCT Arrests/Custodies

Finally, we looked to determine whether group differences could be found within the types of crimes committed by SCT participants. Prior to entering SCT, the types of crime committed by the two groups were nearly identical – approximately 60% were crimes against society, between 16% and 20% were property crimes, and between 6% and 8% were person crimes. An additional 11% to 13% were labeled as "Not a Crime," i.e., offenses that did not fit an operationalized definition in the "Crime Against" category. However, upon leaving SCT, the types of crime committed between the two groups shifted, particularly with those who completed the program and a chi-square test revealed trending differences between the two groups (p=.068). As indicated above, the <u>overall number</u> of arrests/custodies was reduced for both groups. Thus, those who completed the program only had 15 total arrests/custodies in the year after SCT. For those who were arrested, 46.7% were for crimes against society (down from 60.3%) and there were no arrests for crimes against persons. This caused the proportionality of property crimes to increase to 26.7% - however, this was the result of only 4 arrests. For those who did not complete the program, the proportionality of each "Crime Against" category was roughly the same. Based on a relatively similar distribution in crime categories between the two groups upon entering the program, it appears that completing the program has some relationship to the distribution of crimes after leaving SCT – however, with a small N (only 15 cases), more data would be required before we can have confidence in these findings.

| | One Year Prior to Entering SCT | | One Year After Exiting SCT | |
|---|---|---|---|---|
| | Completed SCT | Did Not Complete SCT | Completed SCT | Did Not Completed SCT |
| Crime Against Person | 8.2% (N=6) | 6.6% (N=30) | 0% (N=0) | 7.1% (N=25) |
| Crime Against Property | 19.2% (N=14) | 16.9% (N=77) | 26.7% (N=4) | 19.9% (N=70) |
| Crime Against Society | 60.3% (N=44) | 61.5% (N=280) | 46.7% (N=7) | 65.0% (N=228) |
| Not A Crime | 11.0% (N=8) | 13.8% (N=63) | 26.7% (N=4) | 7.4% (N=26) |

Table 6 – SCT Types of Crime

As another measure of the SCT program's impact, we looked at employment status upon entry and upon exit and performed t-tests to identify differences within each group as well as between them. As with arrests, there appear to be inter-group differences in employment from the outset. Approximately 15% of individuals who complete SCT entered the program with some type of employment compared to 4% of individuals who did not complete SCT. While this is a marginally significant difference (t(37.9)=-1.7, p=.096), it does indicate a trend between the two groups. Differences between the two groups in employment after SCT are more dramatic, with 55% of those who completed SCT being employed while 7% of those who did not complete SCT were employed (t(37.2)=-5.2, p=.000).

Despite the initial differences between the two groups, those who completed the SCT program made substantially larger gains in employment compared with those who did not complete the program. A

paired-samples t-test for both groups showed that the 40% gain for those who completed the program was significant (t(32)=-4.6, p=.000) while the 3% gain for those who did not complete the program was not a significant increase (t(103)=-1.3, p=.181). The difference between the two groups in their respective gains was also significant (t(36)=-4.1, p=.000) based on an independent samples t-test. Thus, the difference between completing SCT and not completing the program has a tangible relationship to a person's gain in employment after leaving the program.

|  | One Year Prior to Entering SCT | | One Year After Exiting SCT | |
|---|---|---|---|---|
|  | Completed SCT | Did Not Complete SCT | Completed SCT | Did Not Completed SCT |
| Percent Employed | 15% | 4% | 55% | 7% |
| Increase in Percent Employed | – | – | 40% | 3% |

Table 7 – SCT Employment

Finally, we looked to see whether the housing status of SCT participants was improved after SCT. For this analysis, we were provided a range of possible housing statuses for before and after SCT. In order to look at improvements in housing, we categorized the status in terms of desirability. However, the categorizations should be interpreted with some degree of caution as it is a somewhat subjective task to determine what may or may not be considered "desirable." The categorizations are found in the table below, wherein a categorization of 0 would be considered "Least Desirable," a categorization of 1 would be considered "Somewhat Desirable," and a categorization of 2 would be considered "Most Desirable."

| | |
|---|---|
| Safe Haven | |
| Emergency shelter, including hotel or motel paid for with emergency shelter voucher | |
| Place not meant for habitation | 0 |
| Jail, prison, or juvenile detention facility | |
| Hospital or other residential non-psychiatric medical facility | |
| Psychiatric hospital or other psychiatric facility | |
| Substance abuse treatment facility or detox center | |
| Hotel or motel paid for without emergency shelter voucher | |
| Transitional housing for homeless persons (including homeless youth) | 1 |
| Staying or living in a family member's room, apartment, or house (either temporarily or permanently) | |
| Staying or living in a friend's room, apartment, or house (either temporarily or permanently) | |
| Permanent housing (other than Rapid Re-Housing) for formerly homeless persons | |
| Rental by client, no ongoing housing subsidy | 2 |
| Owned by client, no ongoing housing subsidy | |
| Rental by client, with other ongoing housing subsidy | |

Table 8 – SCT Housing Categorization

When looking at all SCT clients, a large contingent of those who completed SCT came into the program in the lowest desirability category. Upon exiting, the majority of them were going into the highest desirability category. Such improvement was not seen with those who did not complete the program, for whom many remained in the lowest desirability category. A chi-square analysis revealed a statistically significant difference between the two groups in post-SCT housing categories.

| | Upon Entering SCT | | Upon Exiting SCT | |
|---|---|---|---|---|
| | Completed SCT | Did Not Complete SCT | Completed SCT | Did Not Complete SCT |
| Least Desirable Living Category | 62.5% | 68.0% | 3.0% | 63.8% |
| Somewhat Desirable Living Category | 37.5% | 30.0% | 30.3% | 31.9% |
| Most Desirable Living Category | 0.0% | 2% | 66.7% | 4.3% |

Table 9 – SCT Housing

Our evaluation for this report revealed findings that are consistent with prior studies done by Portland State University (PSU) Capstone Study classes. We spoke with the PSU faculty member who has conducted prior evaluations and were provided reports detailing the research questions, methods, and findings of each evaluation. Beginning in 2008, PPB was interested in evaluating the SCT program which at that time had been in operation for five years. PPB reached out to PSU faculty in order for PSU to provide external evaluation of various aspects of the program. In response, PSU initiated a Capstone Class project to provide written evaluation reports to SCT. The relationship between PPB and PSU has been positive and collaborative. Each year, the research questions for the Capstone Class evaluation are developed through collaborative meetings between PPB and PSU, with PPB describing areas and outcomes that require evaluation.

To date, the class has produced nine annual reports and will be producing their tenth report in the Spring of 2018. A consistent topic covered in the reports is captured in two research questions: (1) Does participation in the SCT provide a measurable change in behavior with regard to future arrests? and (2) Are there cost savings for administering the SCT when comparing program costs to changes in crime and system costs? Past reports have also looked at individual differences clients who have successfully completed the program in order to identify those who might need more attention.

After each report is completed, the report is sent to PPB to inform decision making for future SCT operation. For instance, females have historically made up a smaller percentage of SCT clients compared with males and the program appears to be less effective for females. One possible reason is that SCT had fewer gender-specific programs and resources available for chronic female offenders. Upon reading this finding, PPB started to incorporate women-focused programs. In subsequent reports, the class found an increase in positive outcomes for the women in SCT. The finding is modest due to small sample size but has been a consistent trend. Another example is the change in approach to working with opiate users. In early reports, those who identified opiates as their drug of choice performed worse than their peers and were considered more difficult to manage. This finding led to adjustments in their approach to this group. In subsequent reports the class found a significant positive increase in the performance of opiate users in the program.

In Appendix 5, we provide a summary of each year's report findings from PSU. Around 2014, the Capstone Study classes began to include other aspects of BHU in their evaluation, though here we only include findings related to SCT. Overall, the findings appear to consistently demonstrate that the SCT

program is associated with reductions in police contacts and/or arrests and indicate that SCT is cost-effective from a cost/benefit analysis.

Considering the population served by SCT, the operation of SCT (as described in prior reports), the findings of our evaluation, and the findings of prior PSU Capstone Class studies, we believe that SCT is a valuable component of the City's overall response to mental health. The combined findings from our evaluation as well as PSU's findings demonstrate reduced arrests/custodies, improved employment, and improved housing, as well as cost/benefit outcomes associated with SCT. Overall, it appears SCT is operating in accordance with the letter and the intent of the Settlement Agreement.

## OVERALL ASSESSMENT OF CITY'S MENTAL HEALTH RESPONSE

We now look at the City's entire system of mental health response considering both their primary response (in the form of BOEC and ECIT/non-ECIT response) as well as their secondary responses (in the form of BHRT and SCT). Overall, we believe that the City's model sufficiently responds to persons living with mental illness and/or facing a mental health crisis, though we note some specific modifications that are needed before Substantial Compliance may be unconditionally recommended.

When receiving a call involving a mental health crisis, BOEC call-takers and dispatchers are generally able to recognize the signs and symptoms of the mental health crisis and dispatch emergency responders in accordance with their policies and training. When appropriate, BOEC may divert a call away from an emergency response and instead connect a community member with MCCL. For mental health related calls which do not meet ECIT criteria, there does not appear to be a difference in arrests outcomes between ECIT and non-ECIT officers. Likewise, ECIT and non-ECIT officers share similar perspectives on mental health response to a large extent and both groups appear capable of referring persons through BERS. The City has also initiated plans to routinely audit BOEC and PPB operations related to mental health crises, allowing them to engage in an ongoing quality assurance process. Secondary elements of PPB's mental health response are also operating well. BHRT service is associated with reduced arrests/custodies for community members and a substantial proportion of BHRT clients receive services coordinated through PPB. Similarly, SCT participation is associated with reductions in the number of arrests/custodies for clients (particularly those who complete the program) as well as increased employment and improved housing for those who complete.

The largest outstanding issue for PPB and the City with regard to their system of mental health response is the way they dispatch ECIT officers. We have recommended that the City review and revise its dispatch criteria for ECIT response. This recommendation stems from the premise that ECIT officers are uniquely qualified to respond to persons experiencing a mental health crisis given their level of training and experience in the field. The results of PPB's analysis, for example, demonstrated a significant difference in transporting community members to the hospital/Unity Center. In addition, PPB's analysis demonstrated available capacity for revising the ECIT dispatch criteria. Finally, we have found differences between ECIT and non-ECIT officers in their understanding and perception of mental health crises. Upon discussing the implications of these findings, we will look to see whether PPB implements revised ECIT dispatch criteria in accordance with our recommendations, including appropriate policy revision, training of BOEC call-takers and dispatchers, quality assurance, and evaluation.   However, for the moment we believe that the mental health response systems in place indicate that the City has conditionally complied with the Settlement Agreement, pending the implementation of these steps.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

# **LIST OF PERSONNEL**

Chief of Police: Danielle Outlaw

Assistant Chief of Operations: Chris Uehara

Assistant Chief of Services: Chris Davis

Acting Assistant Chief of Investigations: Dave Hendrie

Commander of Professional Standards Division/Compliance Coordinator: Steve Jones

Professional Standards Division Principal Management Analyst: Mary Claire Buckley

Behavioral Health Unit (BHU) Manager: Chris Wheelwright

EIS Administrator: Paul Meyer

Training Manager: Bob Day

Auditor: Mary Hull Caballero

IPR Director: Constantin Severe

BOEC Training and Development Manager: Melanie Payne

# **APPENDICES**

1.  BHUAC Meeting Summaries by COCL

2.  U.S. Department of Justice Letter of Provisional Approval of PPB Directive 850.20

3.  April 2016 BHUAC Votes and Recommendations

4.  Organizational Survey Outcomes

5.  PSU SCT Findings

# APPENDIX 1

## BHUAC Meeting Summaries by COCL

**June 2017**

The majority of the June meeting focused on a presentation by the Joint Office of Homeless Services.  The presentation discussed the issue of homelessness within Portland and the interaction with the criminal justice system. Of note is that a substantial percentage of those experiencing homelessness have mental health issues. The presentation served to address the complexity of issues surrounding homelessness as well as provide some insight into potentially effective strategies.

**July 2017**

The July meeting discussed how BOEC interacts with those in crisis, including a review of the triage system and discussion on when calls are transferred to the crisis line and/or ECIT officers are dispatched. The BHUAC also discussed an October 2016 recommendation from DOJ regarding directly dispatching calls to service providers and the Behavioral Health Response Team (BHRT). The BHUAC's response to this recommendation was that BHRT is limited in capacity and would not be able to respond directly to all in-progress calls involving crisis. Instead, it was pointed out that PPB has the option to call Project Respond to in-progress calls, whereas other agencies do not. Based on this discussion (and other discussions with PPB personnel), DOJ dropped this recommendation in their December 2018 report and has accepted the current dispatch model.

The July 2017 meeting also included a presentation from Unity Center representative. Since the opening of the Unity Center, issues involving PPB have arisen, including a Unity Center policy that PPB officers not enter the facility armed.  Additionally, Unity Center cannot admit individuals in need of mental health treatment that are acutely intoxicated, as they must first be medically cleared. When such issues are encountered, PPB and Unity have attempted to resolve them and lines of communication continue to remain open.

**September 2017**

The September meeting centered around a discussion from an invited guest who represented Peer Support Specialists. The guests were advocates for using lived experiences of mental health and substance abuse issues and how they intersect with the criminal justice system to offer guidance to those with similar struggles. Most of their work as peer support does not involve legal support, but rather setting people up for success and helping to build important life skills. In regards to the criminal justice system, the guests recommended that PPB spend more time in the community with youth. During the discussion the council wondered how the BHU could integrate Peer Programs.  Although an initial review of this possibility has occurred, it would require further discussion and assessment from BHUAC and BHU.

**October 2017**

The October meeting included three ECIT officers as guest speakers. During the discussion common themes were improvement and progress. The speakers indicated training gets better each year and the culture and attitude

towards crisis intervention is improving within the PPB (this is also supported by the results of COCL's internal surveys). Some concerns touched on issues present in the July meeting on the Unity Center. For example, they discussed how ECIT officers interact with mental health service providers and possible conflicts that arise. The officers also discussed issues with discharge, how it is frustrating to see somebody released hours after they were sent by PPB to receive behavioral health care. The presenters noted that it is important to keep in mind that ECIT cannot provide care, but rather their role is to intervene and assist when necessary.

As a follow up to the July meeting, the committee discussed challenges with the Unity Center. Some of the problems surround transport include: emergency service providers (AMR personnel) lacking the necessary training to communicate with those in crisis; transportation in ambulance (being strapped down) can be traumatic; and aggressive behavior by the client putting the emergency service providers at risk. Another issue resulting from the new transport protocol is that information is sometimes lost between police and Unity Center service providers.


**December 2017**

The December meeting was primarily concerned with discussing the directives pertaining to police response to mental health situations. In a review of Directive 850.25: Police Response to Mental Health Facilities, the group discussed the definitions of different type of mental health facilities. There was confusion among the group on whether the policy only applies to secure and non-secure residential mental health facilities or any facility that deals with mental health (as well as any local hospital). There was further confusion regarding the definitions of "designated" and "residential" in the directive. The council recommended clarification of the language and consistency of its use throughout the policy. The council agreed to submit a recommendation to clarify the definition in the directive.

The committee also reviewed Directive 850.22: Police Response to Mental Health Directors' Holds and Elopement. The group pointed out that the tactic of delayed response may conflict with the ORS statute on Directors' Holds. If there is a director's hold in place, the police are expected to take individuals into custody.  However, in some situations, custody is delayed if it cannot be done in a safe manner. This has caused confusion at facilities, and the City Attorney is currently looking into this. The committee further discussed how outcomes of disengagements are tracked. The Bureau clarified the difference between delayed engagement and disengagement. In both cases, there is always a follow up plan. After review of the directive, the committee recommended to define "Directors Designee" and clearly define who can write a director's hold.


**January 2018**

The January meeting involved a review of SOPs, the ECIT refresher training, and a presentation by guests from Multnomah Intensive Transition Team (MITT). In the review of SOP #3-2 and #3-3, the lieutenant reviewed recommended changes to the language. These recommended changes included that there will be a: "review of any sustained IA investigation against an ECIT [BHRT] member involving force or misconduct against a person with mental illness. No officers may participate in the ECIT [BHRT] program in they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of ECIT [BHRT] service, or during the ECIT [BHRT] service." The group had concerns with the stipulation that this review would only occurs with cases involving a person with mental illness, instead they suggested the language to be amended to include any person (those with or without mental illness).

The ECIT in-service agenda was reviewed and BHUAC members responding positively. They did not have any suggested changes.

The January 2018 meeting also include representatives from Multnomah Intensive Treatment Team (MITT).  The representatives shared what their organization does and how they fit in to the mental health community. MITT works to set up those currently in the hospital for behavioral health issues with long term care. MITT does not directly provide the care but instead works with the clients in the short term to bridge the period between discharge from the hospital and long-term treatment.

Finally, the group discussed the goals of the committee going forward in 2018. They spoke about how the purpose of presentations from outside entities is to identify gaps in knowledge and services. A member commented that they should also be looking into what to do with that information, once the gaps are identified, how is that information being used. Another topic discussed was how PPB approaches substance use and mental illness, how do they differentiate them, and how they decide which to address. The ECIT coordinator discussed how this is a constant issue for officers, but they are doing their best to make educated and informed decisions when it comes to responding to these calls. The council also discussed stigma against addiction and how that might be greater than the stigma against mental illness and wondered how that might affect police response.

# **APPENDIX 2**

U.S. Department of Justice Letter of Provisional Approval of PPB
Directive 850.20

**U.S. Department of Justice**

Civil Rights Division

---

SHR:LLC:RJG:BDB:SDW:AB
DJ 207-61-1

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

July 1, 2016

Ellen Osoinach
Senior Deputy City Attorney
Office of the City Attorney
1221 S.W. 4th Ave., Suite #430
Portland, OR  97204
*via email*

      RE:     Provisional Approval of PPB Directive 850.20,
               *United States* v. *City of Portland*, 3:12-cv-02265-SI

Dear Ms. Osoinach:

      Pursuant to the Settlement Agreement ("Agreement") in the above-captioned case, the DOJ monitoring team is pleased to provide provisional approval of Portland Police Bureau's (PPB) promulgated revised Directive 850.20, *Police Response to Mental Health Crisis. See* Attachment.  Our approval is contingent upon the collection of data agreed upon, pursuant to Paragraph 105(a)-(m) of the Agreement, regarding PPB's response to calls involving mental health, and is subject to our reassessment of Directive 850.20 once PPB produces sufficient data for our analysis.

      We greatly appreciate the Behavioral Health Unit's (BHU) interest and willingness to engage with DOJ on the complexities underlying this policy, and our mutual interests to establish policies seeking to keep both members of the public and officers safe.  We also greatly appreciate the work of the citizen volunteers and police advisory members who serve on the Community Oversight Advisory Board (COAB).  The COAB provided timely comments and recommendations on the draft policy, which the DOJ and its expert consultant reviewed and considered in reaching this provisional approval.

### Background

      As we stated in our September 12, 2012 Findings Letter, we recognize that PPB officers are often first responders to incidents for which behavioral health or crisis resolution is intertwined with public safety issues.  Unfortunately, PPB's involvement plays out against a back drop of a weak community-based mental health system with far too few resources for persons with serious and persistent mental illness and persons in crisis.  While we do not expect PPB officers to substitute for mental health providers, PPB policy must direct officers how to interact with persons with perceived or actual mental illness, or experiencing a mental health crisis, and how to engage with the community mental health system when appropriate, in order to minimize use of force against such individuals and promote public safety.

1

Within DOJ's role as monitor in this case, we are tasked with reviewing policy and approval of modified and newly added policies in accordance with the reforms agreed upon in our Agreement. *See* Settlement Agreement ¶ 169, Dkt. No. 4-1 (Dec. 17, 2012). We previously outlined our process for such review in our letter dated August 10, 2015. This process includes consultation with our expert, coordination with the COCL, and consideration of COAB recommendations and public comments. As further provided by our letter, DOJ employs a "trunk and branch" rubric to our policy review, such that the comments we provide to the "trunk" mental health policy, 850.20, should serve PPB in determining necessary revisions to the "branch" policies, including Directives 850.21, 850.22, and 850.25.

### Provisional Approval Process

DOJ initially provided written comments on the City's proposed revised Directive 850.20 in May 2015, and the parties met to discuss DOJ's comments and concerns relating to the policy shortly thereafter. As a result of our questions and concerns, the City invited our consultant, Dr. Mark Munetz, to observe PPB's response to crisis calls and to gather further input on PPB's crisis intervention efforts in June 2015. In consultation with our expert, we provided technical assistance based on our assessment of that visit by letter, dated August 17, 2015. We incorporate here the guidance in that letter by reference. Specifically, that letter stated that the types of calls for which Enhanced Crisis Intervention Team (ECIT) officers are dispatched are too limited and that such limits did not comply with the core competencies under the Memphis Model. In November 2015, a representative of our monitoring team observed the ECIT training, and, consistent with our August letter, we informally provided additional feedback to the BHU and Training Division. Between December 5 and January 19, 2016, the Parties exchanged additional comments on revisions to the Directive. On March 9, the City provided a revised draft of Directive 850.20 for DOJ consideration. On April 5, DOJ provided additional comments to the City's revised draft. The Parties met and conferred on April 11 and agreed in principle on final changes to the policy. The City provided DOJ with the attached promulgated Directive 850.20 on May 11, 2016.

### COAB Recommendations

Throughout this process DOJ consulted with our expert, Dr. Munetz, and conferred with Dr. Amy Watson of the COCL team. Dr. Munetz also met with the Mental Health and Crisis Response Subcommittee of the COAB, and DOJ reviewed and considered COAB's recommendations to PPB's mental health policies.

The COAB made four specific recommendations. First, COAB recommended that PPB train officers on trauma-informed care and cultural competency. PPB included trauma-informed care training at the November 2015 ECIT training.[1] We understand that PPB's upcoming in-service training will devote time to cultural competency; we recommend that PPB's staff, including the BHU and Training Division, discuss the COAB's cultural competency recommendation in advance of this upcoming training, in order to draw on COAB's resources and make any improvements that can be achieved. Second, COAB recommended that PPB

---

[1] PPB retained an outside consultant to teach this portion of the training.

increase the number of ECIT-trained officers to 40% of all officers.  As stated in our August 17, 2015 technical assistance letter, DOJ concurs that PPB must increase the number of ECIT officers to meet the demand for calls for service.  The data that PPB has agreed to collect, as discussed below, will assist in determining the appropriate number.  While it may seem intuitive to increase the ECIT corps of officers as much as possible, we remain mindful that one of the core competencies of the Memphis Model is that the crisis-trained officers form a team.  The Memphis Model envisions a select team of officers trained to handle these sensitive calls, who develop accelerated experience in identifying signs and symptoms of mental illness and appropriate responses as they respond regularly to such calls, and who gain rapport with mental health professionals.  These considerations informed our August 2015 recommendation that PPB estimate initially that 30% of its officers will require ECIT training; in the absence of further data, we are reluctant to suggest that a higher ratio will be necessary.  Third, COAB recommends that all officers receive *advanced* crisis intervention training ("more robust than the current 40 hours").  Fourth, COAB recommends that PPB establish outcome measures to determine the effectiveness of training.  In our view, PPB should consider these recommendations in revising its training policies and training curricula, but such recommendations need not be added to Directive 850.20.

### Conclusion

DOJ's provisional approval of this policy is conditioned upon the City's agreement to the following:

(1) PPB will collect agreed-upon data on the dispatch of all officers to mental health related calls pursuant to paragraph 105(a) – (m).  Furthermore, we agreed that the data to be collected in (k) – (l) is interpreted as follows:
   a. Paragraph 105(k), whether a mental health professional responded to the scene.  The pertinent data to be collected is whether a mental health professional actually responds to the scene, rather than advising officers by phone or otherwise.
   b. Paragraph 105(l), whether a mental health professional had contact with the subject on scene.

(2) The protocol for the types of calls for which an ECIT officer will be dispatched, shall be revised to include when a subject is threatening or attempting suicide; and

(3) Once PPB has collected the data, it will provide DOJ its analysis of such data as well as the underlying raw data, and DOJ will make an independent assessment as to whether or not the dispatch protocols, or other provisions of the policy must be further revised to come into compliance with the Agreement.

Pursuant to paragraph 170 of the Agreement, we require that PPB post this letter, the promulgated provisionally approved Directive 850.20, and the forms attached as appendices to that Directive to PPB's website.

Sincerely,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

/s/ Laura Coon
LAURA COON
Special Counsel

/s/Adrian L. Brown
ADRIAN L. BROWN
Assistant U.S. Attorney

/s/ Jonas Geissler
R. JONAS GEISSLER
Senior Trial Attorney
BRIAN BUEHLER
SETH WAYNE
Trial Attorneys

Attachment (as noted)

cc:    Rosenbaum & Watson, LLC, COCL
       Ashlee Albies, Counsel for AMAC
       Anil Karia, Counsel for PPA
       *via email*

4

# **APPENDIX 3**

April 2016 BHUAC Votes and Recommendations

To:        Lieutenant Tashia Hager
            Portland Police Bureau, Behavioral Health Unit (PPB, BHU)

            Captain Mike Marshman
            Portland Police Bureau, Compliance Coordinator

            Dennis Rosenbaum
            Compliance Officer and Community Liaison

            Frank Ray
            Chair, Bureau of Emergency Communications User Board

From:    Shannon Pullen
            Chair, Behavioral Health Unit Advisory Committee (BHUAC)

On:        May 18, 2016

Re:        April 2016 BHUAC Votes and Recommendations

---

The BHUAC met April 20, 2016 and reviewed the following agenda:

**April 2016 Meeting Agenda**

- Intros and Updates
- Discussion and vote: March Minutes and Report/Recommendations
- Discussion and review: Standard Operating Procedure #3-2
- Presentation and discussion: PPB Training Division re: Nov 2015 ECIT Training

Below are the BHUAC's official Votes and Recommendations from this meeting:

**April 2016 Committee Votes and Recommendations**

The BHUAC reviewed and approved Standard Operating Procedure #3-2 with the following recommendations:

1) Under #2, add the word "minimum" to read "Officers must meet the following minimum qualifications to apply for the position:"
2) Also under #2, add "Strong collaborative skills" to list of minimum qualifications
3) Change all references of "Project Respond clinicians" to "clinicians" throughout document
4) Change all references of "client" or "consumer" to "individual" throughout document
5) Change all references of "social service resources" to "community resources" throughout document
6) Under #3, Remove the 3rd sentence and bullet points and replace with the following: "Portland Police Bureau has a strong commitment to ensuring BHRT officers and clinicians attend the

following training based on availability and funding:
- Applied Suicide Intervention Skills Training (ASIST)
- Trauma Informed Care
- Civil Commitment Investigator Training
- HIPAA and Law Enforcement
- Threat Assessment"

7) Under #6 (3rd bullet) Change "Connect to community mental health services" to "Connect to appropriate community services"

8) Under #7 (1st sentence of 2nd paragraph) Change "mental health services" to "community services"

9) Under #8 MCU Officer responsibilities and #9 MCU Clinician responsibilities, add the following bullet: "Assist in engaging the individual."

10) Change the order by moving the entire paragraphs #10 and #11 to follow #7 and come before #8

11) Under #13 (1st sentence) Change ""are mentally ill." to "have actual or perceived mental illness."

12) Under #14 (3rd bullet) Change "a person with mental illness." to "an individual with actual or perceived mental illness."

# APPENDIX 4

## Organizational Survey Outcomes

| Responding effectively to mental health crisis calls is a priority for PPB. | **2015*** | **2016**** | **2017** |
|---|---|---|---|
| **ECIT** | 3.53 | 3.45 | 3.46 |
| **Non-ECIT** | 3.26 | 3.2 | 3.37 |
| How much has the current top leadership in the Bureau tried to get employees to adopt the CI approach? | **2015** | **2016** | **2017** |
| **ECIT** | 4.59 | 4.43 | 4.84 |
| **Non-ECIT** | 4.46 | 4.33 | 4.73 |
| What is your view of the CI approach? | **2015** | **2016**** | **2017*** |
| **ECIT** | 4.48 | 4.32 | 4.56 |
| **Non-ECIT** | 4.22 | 3.97 | 4.20 |
| Do you feel the PPB has provided you with enough training on how to effectively respond to calls with a mental health component? | **2015** | **2016*** | **2017** |
| **ECIT** | 3.18 | 3.48 | 3.32 |
| **Non-ECIT** | 3.07 | 3.23 | 3.32 |
| How would you rate the training you have received on how to handle calls that involve a mental health component? | **2015** | **2016***** | **2017**** |
| **ECIT** | 3.18 | 3.42 | 3.42 |
| **Non-ECIT** | 2.92 | 2.83 | 3.04 |
| How confident are you that you have the knowledge and skills to recognize signs and symptoms of a mental health crisis? | **2015** | **2016*** | **2017**** |
| **ECIT** | 3.65 | 3.76 | 3.86 |
| **Non-ECIT** | 3.5 | 3.59 | 3.7 |
| How confident are you that you have adequate skills to de-escalate a situation involving a person in mental health crisis? | **2015** | **2016**** | **2017*** |
| **ECIT** | 3.48 | 3.69 | 3.72 |
| **Non-ECIT** | 3.34 | 3.48 | 3.52 |

| How confident are you in linking a person experiencing a mental health crisis to appropriate mental health services? | **2015** | **2016** | **2017** |
|---|---|---|---|
| **ECIT** | 3.15 | 3.23 | 3.39 |
| **Non-ECIT** | 3 | 3 | 3.28 |
| How confident are you in your fellow officers' abilities to manage persons with mental illness? | **2015** | **2016** | **2017** |
| **ECIT** | 3.18 | 3.37 | 3.48 |
| **Non-ECIT** | 3.28 | 3.32 | 3.52 |
| How confident are you in using the BHU Electronic Referral System (BERS) to make a referral to the BHU? | **2015*** | **2016*** | **2017*** |
| **ECIT** | 3.47 | 3.52 | 3.56 |
| **Non-ECIT** | 3.07 | 3.1 | 3.3 |
| Responding to mental health crises is an important function of law enforcement | **2015** | **2016*** | **2017** |
| **ECIT** | 2.68 | 2.8 | 2.78 |
| **Non-ECIT** | 2.65 | 2.5 | 2.54 |
| The best course of action when a call involves someone with a mental health crisis is to not get involved. | **2015** | **2016** | **2017** |
| **ECIT** | 2.12 | 2.12 | 2.08 |
| **Non-ECIT** | 2.1 | 2.3 | 2.19 |
| Mental health calls are dangerous for police officers | **2015** | **2016** | **2017** |
| **ECIT** | 3.35 | 3.54 | 3.36 |
| **Non-ECIT** | 3.38 | 3.42 | 3.38 |
| Responding to calls where there are mental health issues requires compassion. | **2015** | **2016** | **2017** |
| **ECIT** | 3.53 | 3.45 | 3.48 |
| **Non-ECIT** | 3.37 | 3.2 | 3.36 |
| Enhanced Crisis Intervention Team (ECIT) reduces the risk of officer injuries. | **2015** | **2016*** | **2017*** |
| **ECIT** | 2.76 | 2.82 | 2.96 |
| **Non-ECIT** | 2.65 | 2.34 | 2.65 |
| The ECIT program prevents patrol officers from performing more important activities, such as responding to emergency calls. | **2015** | **2016** | **2017** |
| **ECIT** | 2.24 | 2.36 | 2.22 |
| **Non-ECIT** | 2.29 | 2.55 | 2.39 |

| The ECIT program takes good police officers and turns them into ineffective social workers. | **2015** | **2016**\*\* | **2017** |
|---|---|---|---|
| **ECIT** | 2.06 | 2 | 1.94 |
| **Non-ECIT** | 2.15 | 2.3 | 2.11 |
| The ECIT program does not provide officers with enough guidance for handling incidents. | **2015** | **2016**\*\*\* | **2017** |
| **ECIT** | 2 | 1.85 | 1.92 |
| **Non-ECIT** | 2.2 | 2.21 | 1.97 |
| It is easy to access an Enhanced Crisis Intervention Team (ECIT) officer when needed. | **2015**\*\*\* | **2016**\*\* | **2017** |
| **ECIT** | 3.12 | 2.72 | 2.85 |
| **Non-ECIT** | 2.75 | 2.39 | 2.66 |
| Calling an ECIT officer to assist in a mental health crisis is useful for effectively resolving the situation. | **2015**\* | **2016**\*\*\* | **2017** |
| **ECIT** | 3.03 | 3 | 3 |
| **Non-ECIT** | 2.74 | 2.56 | 2.82 |
| The Behavioral Health Unit is an effective resource for reducing the number of repeat contacts officers have with persons with mental illnesses. | **2015** | **2016**\*\* | **2017**\*\* |
| **ECIT** | 3.15 | 3.07 | 3.19 |
| **Non-ECIT** | 2.92 | 2.73 | 2.88 |
| PPB is effective in keeping people with mental illness out of jail. | **2015** | **2016** | **2017** |
| **ECIT** | 2.53 | 2.59 | 2.77 |
| **Non-ECIT** | 2.47 | 2.51 | 2.75 |
| Expanding ECIT criteria to cover all mental health related calls would improve PPB's effectiveness for addressing mental health related calls. | **2015** | **2016** | **2017**\*\*\* |
| **ECIT** | X† | 1.86 | 1.85 |
| **Non-ECIT** | X† | 2.08 | 2.25 |

\*p≤.05, \*\*p≤.01, \*\*\*p≤.001
†This item was not measured in the 2015 survey.

# APPENDIX 5

## PSU SCT Findings

| YEAR | FINDINGS |
|------|----------|
| 2009 | Pre- and Post-test showed reduction in custodies |
| | Included independent variables were not predictive |
| 2010 | 63% of SCT clients interviewed had reductions in booking and days in jail after leaving SCT |
| | Total bookings decreased by 29% |
| | Total days in jail decreased by 10% overall |
| | Clients with higher levels of risk (using LSCMI) had a higher number of bookings |
| | Cumulative impact of treatment and housing on decreases in the number of bookings |
| | Treatment services delivered by agencies outside SCT did not impact the number of bookings after SCT. |
| | Minority over-representation; Post-SCT interviews revealed historical and geographical explanations |
| 2011 | Affirmed prior results of SCT impact on reducing the number of bookings |
| | Outpatient treatment had the most significant effect on post-SCT bookings |
| | Minority overrepresentation a function of geographical location of SCT (Old Town) |
| | Cost benefit ratio of program indicate that for every $1 spent on SCT, there is a corresponding reduction of $8 in crime and system costs |
| 2012 | Comparison of post-conviction programs indicated SCT had higher levels of recidivism, though this is likely related to higher risk levels of SCT participants |
| | SCT had significantly higher Case Management scores and Case Management scores compared to other two post-conviction programs, indicating more responsivity than other two programs |
| 2013 | Comparison of supervision groups indicated LSCMI scores was positively correlated with number of bookings, despite demographic differences in each groups' clients |
| | Length of program treatment associated with number of bookings |
| 2014 | Long-term evaluation (4 years) resulted in 36% of clients had immediate and sustained reductions in re-arrest between 50% and 100%; 30% of subjects had increasing re-arrests of over 50% |
| | Cost benefit indicate that benefit could be "cut in half, rendering it half as effective as it is [and] the program would still benefit over the costs of jail and system costs." |
| | SCT success a product of client's personal attitudes and level of criminal background |
| 2015 | Avoided crime and system cost is 14X SCT program costs for participants who remain engaged over 180 days. |
| | Total program cost is 23% more than system costs, but effectiveness of program vs. status quo is indisputable |
| 2016 | Police contacts were reduced by 35.4%; 74% of individuals had a reduction in police contacts |
| | Average Crime Reduction Quotient (CRQ) was .44 |
| 2017 | SCT participant demographics have changed over the years |
| | Average Crime Reduction Quotient (CRQ) was .4 |

| | Those who completed the program had an 82% reduction in post-SCT arrests compared to pre-SCT arrests (75% reduction for ALL participants) |
|---|---|