

## Office of the Compliance Officer and Community Liaison (COCL)

**Rosenbaum & Associates, LLP**

Dennis Rosenbaum, Ph.D.
Thomas Christoff, Ph.D.
Geoffrey Alpert, Ph.D.
Heather Daniel, J.D., B.A.
Ashley Heiberger, J.D.
Megan Mohler, M.A.
Amy Ruiz, B.A.

COCL Office:
525 NE Oregon Street, Suite 250
Portland, OR  97232
www.portlandcocl.com
rosenbaumandassociatesllp@gmail.com

September 24, 2018

Transmitted by E-mail to:

The United States Department of Justice
The City of Portland

Re:      **Compliance and Outcome Assessment Report: Use of Force**

Dear U.S. Department of Justice and City of Portland:

On behalf of the entire Compliance Officer and Community Liaison (COCL) team, I am pleased to submit the attached *Compliance and Outcome Assessment Report: Section III Use of Force*, pursuant to the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

We thank community members for taking the time to review the report. A copy of this report will be posted on the COCL's website, www.portlandcocl.com and sent to the Settlement Agreement Updates email list.

Sincerely,

Dennis P. Rosenbaum, PhD
For Rosenbaum & Associates, LLP
Compliance Officer and Community Liaison, Portland OR

**EXHIBIT C**

# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

# of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

### *Quarterly report: Section III Use of Force*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**October 2017 to July 2018**



COCL Compliance and Outcome Assessment Report: Section III Use of Force

# TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................................ 3

**EXECUTIVE SUMMARY** ......................................................................................................... 4

**OVERALL REPORT CARD** ..................................................................................................... 6

**SECTION I — Compliance Assessment: Use of Force** .............................................. 7

    **Opening Paragraphs of Settlement Agreement Section III** ................................ 8

    **Paragraph 66** ................................................................................................................. 10

    **Paragraph 67** ................................................................................................................. 12

    **Paragraph 68** ................................................................................................................. 15

    **Paragraph 69** ................................................................................................................. 18

    **Paragraph 70** ................................................................................................................. 19

    **Paragraph 71-72** .......................................................................................................... 21

    **Paragraph 73** ................................................................................................................. 21

    **Paragraph 74, 75, 77** ................................................................................................. 24

    **Paragraph 76** ................................................................................................................. 28

**SECTION II: System Assessment** .................................................................................... 33

    **SYSTEM AND RESOURCES FOR PROPER MANAGEMENT OF FORCE TO MEET
CONSTITUTIONAL STANDARDS** ...................................................................................... 34

    **FORCE AUDIT FINDINGS** ...................................................................................... 34

    **QUANTITATIVE ANALYSIS OF FORCE DATA** ............................................... 39

    **THE FINAL STATISTICAL MODEL** ................................................................... 64

    **SUMMARY** .................................................................................................................. 67

**LIST OF ABBREVIATIONS** ................................................................................................ 69

**LIST OF PERSONNEL** .......................................................................................................... 71

**APPENDICES** ........................................................................................................................... 72

# **INTRODUCTION**

This is the Compliance and Outcome Assessment Report of the Compliance Officer and Community Liaison (COCL), as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (hereafter referred to as "DOJ"). By agreement of the Parties, this report combines the COCL's compliance and outcome assessments into a single document. This report's focuses on the City's compliance with Section III (Use of Force) and associated outcomes related to the City's implementation of Section III. For all other sections of the Settlement Agreement, the compliance assessments, recommendations, and technical assistance provided in our prior reports should be considered ongoing.

The following report is divided into two sections. The first section of this report includes the COCL's assessment of compliance with each paragraph within Section III of the Settlement Agreement. For each paragraph, we identify the methodology and monitoring activities employed, our assessment of compliance, and our recommendations regarding necessary steps to achieve compliance (see Par. 162). The second section of this report includes our evaluation of the City's systems and resources for proper management of use of force to meet constitutional standards (see Par. 170).

<u>Report Card</u>

As with previous COCL Compliance Reports, this report includes a "Report Card" on the implementation of the Agreement which provides an assessment of each paragraph in the Agreement (see Overall Report Card on page X). For each paragraph where sufficient information is available to render a decision, the Report Card provides an overall judgment on a 4-point scale, ranging from "Non-compliance" to "Substantial Compliance." For some paragraphs, we have assessed the City and/or PPB to be in Substantial Compliance, although only conditionally. For these paragraphs, we have determined that the City has nearly satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity, and all that remains is a particularized set of conditions that we believe are likely to be accomplished in the near future. In order to inform future reports by DOJ, these instances should be interpreted as, "Should these particular conditions be met, we would recommend Substantial Compliance."

When reviewing the specific paragraphs, we utilize a four-tiered system of evaluation:
-   Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
-   Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
-   Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.
-   Non-Compliance: The City/PPB has not made any meaningful progress towards the satisfaction of the provision's requirements.
-   Not Yet Assessed: The COCL team has not had the opportunity to fully assess the requirements of the provision and elects to withhold assessment of compliance until a more thorough review has occurred.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# EXECUTIVE SUMMARY

The City and Portland Police Bureau (PPB) continue to make progress toward substantially complying with the requirements found within Section III (Use of Force) of the Settlement Agreement. Out of 13 paragraphs within Section III, we believe that PPB has substantially complied with 4 of them. However, PPB is nearly in Substantial Compliance (Substantial Compliance – Conditional) with 9 paragraphs, reflecting considerable improvement in areas such as Force Data Collection Reports (FDCRs), Supervisor After Action Reports, and the auditing of force events. For instance, we believe PPB has nearly substantially complied with the Force Audit requirements of Pars. 74, 75, and 77, leaving the Bureau with a comprehensive system for evaluating the completeness of FDCRs and After Action Reports, as well as the ability to independently assess the findings of the chain-of-command review. All that remains for these paragraphs is ensuring that the feedback system recently implemented by PPB is carried out with fidelity.  Additionally, PPB's approach to addressing Par. 76 (identifying trends) has been greatly improved, leaving only a few methodological alterations to be accomplished prior to attaining substantial compliance.

Additionally, the PPB has substantially complied with a number of Settlement Agreement paragraph subsections related to Conducted Electrical Weapon (CEW) use. Specifically, we see evidence that the PPB has made changes to policy and training that are being translated into street-level applications regarding force. Although some issues remain, they are few when compared with the overall number of CEW-related paragraphs in which we find the City/PPB has been fully responsive to the Settlement Agreement.

We find other areas where PPB has taken steps to reach substantial compliance, though changes have only been recent and we have not had the opportunity to observe their organizational impact. As one example, PPB has held an unconventional interpretation of de-escalation to include command and control tactics. In cases reviewed for this report, we continue to note misidentification of de-escalation. However, the Inspector has also identified such misidentification and has distributed two clarifying documents to PPB officers distinguishing between command and control tactics and de-escalation tactics. We view this as a sizable step toward substantial compliance. Additionally, the Spring 2018 In-Service training addressed this issue, providing further clarification to officers and supervisors regarding de-escalation and its importance. Although we need to examine additional FDCRs and After Action Reports to determine whether the instruction provided is being applied by officers and supervisors, we believe the actions of the Inspector and PPB are a very positive step.

In this report, we also describe our concerns about how CEW events are being interpreted in the context of policy and law. The interpretive issue present relates to the definition of "CEW application" as found in Directive 1010.00. For these cases, we recommend PPB re-evaluate the language of Directive 1010.00 and the facts of the force event.

In addition to our assessment of PPB's compliance with the paragraphs found within Section III of the Settlement Agreement, this report focuses on a qualitative and quantitative assessment of PPB's systems and resources for the proper management of the use of force to meet constitutional standards (see Par. 170). We begin this assessment by reporting PPB Force Audit findings, which show that the number of deficiencies in report writing is very low. Additionally, our own review of force cases indicates that PPB's Inspector is able to independently assess the chain-of-command review and has demonstrated an ability to reach findings that differ from the chain of command.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

Additionally, the COCL has analyzed the force data to illustrate a number of ways to monitor and evaluate PPB's use of force and to track force over time. For many of the analyses, we note a perceived increase in the number of force events, force per custody rates, and other elements during the third and fourth quarter of 2018. However, we stress to the reader that such increases are very likely the result of PPB revising Directive 1010.00 and expanding the number of activities which are considered reportable force. Thus, the reader should not interpret the findings as an increase in the use of force by the PPB but rather as PPB expanding how it measures force to include less serious police-subject force events.

We also provide two higher level statistical analyses in our evaluation of PPB force. These multivariate analyses seek to identify the factors that are significant predictors of the level (severity) of force applied by the PPB, looking at multiple variables simultaneously. While we refer the reader to the complete findings, we note here that for both regressions, a subject's mental health status was not a significant predictor of receiving a more serious type of force. This indicates that the type of force received is explained by factors other than mental health status (e.g. level of reported resistance, presence of weapon, etc.). While mental health was an insignificant predictor, the findings did show that males, African Americans, Hispanics, younger community members, and transients are more likely to have higher levels of force (either in total or in the first force applied by an officer) used against them compared to their counterparts. Additionally, officer characteristics such as precinct, shift, and years of experience were shown to be significant predictors of higher levels of force in one or both the regressions. We encourage the City and PPB to explore these significant relationships, seek to understand the dynamics that contribute to these outcomes, and determine whether any corrective action is needed.

Through the combination of our compliance assessment and outcome assessment, we believe there are still a few areas where improvements can be made. However, we re-iterate that PPB has made many positive steps toward compliance with Section III of the Settlement Agreement regarding use of force, particularly with the force audit and the introduction of de-escalation clarification documents. We are satisfied that PPB continues to make progress and has been responsive to the technical assistance and consultation from both COCL and DOJ.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

## OVERALL REPORT CARD

| Section III Opening Paragraph | Substantial Compliance – CONDITIONAL |
|---|---|
| Par. 66 | Substantial Compliance – CONDITIONAL |
| Par. 67 | Substantial Compliance – CONDITIONAL |
| Par. 68 | Substantial Compliance – CONDITIONAL |
| Par. 69 | Substantial Compliance |
| Par. 70 | Substantial Compliance |
| Par. 71 | Substantial Compliance |
| Par. 72 | Substantial Compliance |
| Par. 73 | Substantial Compliance – CONDITIONAL |
| Par. 74 | Substantial Compliance – CONDITIONAL |
| Par. 75 | Substantial Compliance – CONDITIONAL |
| Par. 76 | Substantial Compliance – CONDITIONAL |
| Par. 77 | Substantial Compliance – CONDITIONAL |

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# SECTION I

# Compliance Assessment: Use of Force

## Opening Paragraphs of Settlement Agreement Section III

*Section III Opening Paragraph - PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to appropriate services where possible*

As evidenced by Force Audit findings, PPB officers and supervisors regularly note their recognition of mental illness, at what point during an interaction such recognition was made, and how such information played into their decision-making skills during a force event. Furthermore, we believe that while some officers and supervisors appear to still struggle with force-avoidance concepts, documents provided by the Inspector and recent training have the potential to largely alleviate those struggles. Additionally, PPB officers have consistently demonstrated an ability to reduce the level of force as a situation de-escalates during their interactions with persons with perceived mental illness (such de-escalation of force is different from de-escalation to avoid force). We believe each of these actions are supportive of PPB's compliance with this paragraph.

As noted in our quantitative assessment of force (see Section II), it is difficult to calculate PPB's avoidance of force without an adequate comparison dataset in the form of non-force interactions with persons with actual or perceived mental illness. With such a database, we could be more confident in PPB's avoidance of force. PPB is currently in the process of compiling non-force events as a comparison database in order to conduct more complex statistical evaluations on force. We are in full support of this PPB initiative.

Finally, our evaluation of PPB force data (see Section II) shows that when controlling for other factors (i.e. weapon and reported resistance, among other factors), PPB officers use substantially the same levels of force against persons with mental illness as they do against persons without mental illness. While we cannot determine whether force is used more often without a non-force comparison dataset, the analyses indicate that the seriousness of force is not a product of a person's mental health status.

*Section III Opening Paragraph - PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have a reason to believe are experiencing a mental health crisis*

In the past, we have described our concerns that "non-force and verbal techniques" did not seem to be readily understood by PPB officers and supervisors, particularly with respect to the concept of "de-escalation." In many cases, we identified command-and-control tactics (e.g. "Get down or you will be Tased") that were mislabeled by officers and accepted by chain-of-command reviewers as "de-escalation." Such command-and-control tactics are not de-escalation and have affected PPB's ability to reliably "ensure" officers are attempting or using force avoidance.

However, in January of 2018 and again in April of 2018, the Inspector released two documents clarifying de-escalation and distinguishing the practice from command-and-control tactics (see Appendix 1 and Appendix 2). Additionally, in May of 2018, the PPB organized a 2-day de-escalation training by the Police Executive Research Forum to train PPB instructors and administrators to help correct this problem. Afterwards, PPB introduced the Spring In-Service for all officers and the Spring In-Service for supervisors

with this new perspective in mind. Our observations indicate that in <u>both</u> of these trainings, de-escalation was distinguished from command-and-control and placed in the broader context of officers' decision making before and during critical incidents, including procedural justice and positive customer service.

We believe that the messaging happening through the documents released by the Inspector and trainings delivered are in-line with our prior recommendations. However, because these are fairly new developments, we have yet to see whether such messaging will transfer to officer reports and supervisor reviews. Nevertheless, PPB has taken a substantial step towards complying with this aspect of the Settlement Agreement.


### <u>*Section III Opening Paragraph - De-escalate the use of force at the earliest possible moment*</u>

As we have noted in the past, PPB officers continue to de-escalate uses of force at the earliest possible moment once the decision to use force has been made. In nearly all of the force reports we have reviewed, officers stopped (or reduced) their use of force in accordance with their assessment of the subject's behavior. PPB has also placed a significant emphasis on re-assessing a situation after each application of force, with officer reports describing subject actions which justified ceasing use of force or utilizing another force application. As this element is enshrined in policy, illustrated in training, and apparent in reports, we believe PPB has substantially complied with this requirement. However, we reaffirm comments in past reports (as well as comments elsewhere in this report) that de-escalation of force is different from de-escalation as a force avoidance tool. While PPB officers have demonstrated an ability to reduce the severity of force as the situation warrants, this is not the same as reducing the <u>need</u> for initial force through de-escalation and force avoidance verbal/non-verbal skills (see, for example, our assessment of Par. 67(a) as well as our comments above related to "non-force and verbal techniques").


### <u>*Section III Opening Paragraph - Only resort to those use of force weapons, including less-lethal weapons, as necessary*</u>

As we have noted in the past, PPB's Directive 1010.00 and training clearly delineate the circumstances where less-lethal weapons may be allowed. Additionally, in twenty-five CEW cases we reviewed for this report, nearly all conformed to this requirement. We found only two cases wherein we identified a CEW may have been used unnecessarily (see our assessment of 67(d)). However, as our concern with those cases more relates to accountability (67(d)), we do not think that they impact PPB's overall substantial compliance with this provision.


### <u>*Section III Opening Paragraph - Refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function*</u>

Similar to our comments about de-escalating uses of force (above), PPB has demonstrated a consistent practice of refraining from force against individuals who are already under control by officers. This concept is also enshrined in policy. Additionally, PPB has included exercises in past trainings to reinforce the policy

that officers should not use force when control of the subject has already been made. Videos have been shown in training and discussed among officers as an example of this concept.

The In-Service training received by all officers in the Spring of 2018 also gave attention to the concept of "contempt of cop" as lacking in justification for force. The Inspector informed officers about regulating emotions ("as emotion goes up, rational thinking goes down") and that when becoming upset or offended by a subject, the officer should separate and have another officer speak to the subject. The Inspector gave an example from a PPB officer to illustrate how a situation might be escalated. This is responsive to our comments in prior reports to (1) demonstrate how officer comments might escalate a situation and (2) use examples from PPB rather than other agencies.

Overall, we did not identify any cases where "contempt of cop" was the impetus for use of force. We recommend PPB continue to evaluate whether a community member's verbal discontent or noncompliance with simple requests can be the cause for a use of force by creating an escalating back-and-forth with an officer and ultimately a use of force. However, PPB has identified this as a potential issue and has attempted to address it with the most recent training.

## **Paragraph 66**

*66(a). PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely*

In our past report, we noted our opinion that PPB evaluated the "moment of force" rather than assessing reasonableness as a product of the totality of circumstances. However, since that report, PPB has taken concrete steps towards clarifying decision-point analysis for supervisors (see below) and including points of review in Phase 2 of the force audit (see Pars. 74, 75, and 77) which represent a "totality" approach.

For both officers and supervisors, the Spring 2018 In-Service included aspects of decision points. For instance, officers discussed how PPB's Mission Statement, Values, and Directives complement and reinforce an overall decision-making model, including gathering information, assessing the situation, identifying options (in light of powers, policies, and obligations), taking action, and re-assessing. For supervisors, the training focused on reviewing FDCRs and at one point, the Inspector stated that the evaluation of the force event begins at the officer's arrival. Supervisors then reviewed two example FDCRs to identify concerns and instances where officers' decisions throughout an interaction might be critiqued.

Additionally, the Inspector's audit includes an assessment of the total interaction, including information gathering, initial response, initial contact with the subject, risk assessment, legal authority, consideration of other options and contingencies, provision of medical aid, post custody actions, and finally the overall reasonableness of the use of force itself. As shown in more detail in our discussion of the Force Audit (see below), we believe that the Inspector has demonstrated an overall ability to accurately assess the totality of the circumstances and remand a force event to Internal Affairs (IA) when appropriate.

Our review of cases from Q1 2018 also showed an improvement in the way supervisors have evaluated pre-seizure conduct for possible precipitating actions and/or missing the opportunity for de-escalation. However, in other cases, supervisors appeared to still evaluate only the moment of force, even when identifying instances where the force may have been avoided.

Given our prior critiques and that officers and supervisors have only recently received comprehensive training on decision points, for the moment we find PPB in conditional substantial compliance with Par. 66(a). To determine the extent to which training has been translated into practice (i.e. "implement"), we will need to review FDCRs and After Action Reports in the upcoming months to further assess whether force events are evaluated on the totality of circumstances. However, as noted, PPB should be recognized for their strong efforts here to improve behavior through training and audits of report writing and After Action supervisory reviews.

*66(b). PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force*

The expectation of skills development over the course of an officer's career to resolve confrontation without resorting to force is enshrined in PPB's Directive 1010.00 (as well as Directive 315.30, Section 2.1). In the past, we noted that while we reviewed cases wherein an officer's lack of experience was considered in evaluating a force event, we had not seen evidence that officers with more tenure were admonished for "you should have known better." We spoke with the Inspector about this issue and the Inspector agreed that there are relatively few cases wherein "you should have known better" is brought up in a supervisory review. As the Inspector told us, "More experienced officers get the bigger picture. They understand that the level of crime is not worth getting into a force event." This is an understandable position and is also supported by research (see, for example, Alpert and Dunham (2004), "Understanding Police Use of Force").

Although a relatively rare event, we were provided with a recent event wherein the chain-of-command commented on someone's use of force in light of his/her considerable on-the-job experience. The reviewing Sergeant noted that the "attempted contact, and arrest are legal and well within the police bureau policy, however I think that [the individual's] choice to pursue and eventually use force is not in line with the spirit of the goals and mission of the bureau, nor the expectations of the community." Likewise, the reviewing Lieutenant noted the individual "should have been aware of the indicators this subject would most likely not comply and a force event would ensue. Absent a greater criminal impact, [the individual] could have disengaged..."

Although this represents only a single case, the rarity of cases for which more senior officers "should have known better" prevents us from having a larger sample. Force experts and police experts on the COCL team have also commented that more experienced officers are less likely to commit "rookie mistakes." As the expectation has been laid out in policy and in training, and there is some evidence that chain-of-command reviewers take this expectation into account, we believe PPB has substantially complied with this requirement.

## **Paragraph 67**

*67(a). Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety*

As part of our assessment of PPB's mental health response (see our 2018 Quarter 1 final report, *Compliance and Outcome Assessment Report: Mental Health Response*), we reviewed a sample of disengagement/delayed custody cases. Our review found no substantial concerns with how PPB officers are choosing to disengage/delay custody. In one case, the officer chose to disengage from a person who claimed to have taken a large amount of medicine – however, the disengagement was upon the advice of a Project Respond worker. In past trainings, we have observed classroom instruction on when disengagement is appropriate and how to formulate a plan for disengagement. PPB policy also includes considerations for disengagement (see Directives 1010.00 and 850.20). As a general practice, based on the information available to us, we believe PPB uses disengagement techniques when possible/practical in accordance with this provision of the Settlement Agreement.

As we have noted above and in past reports, PPB officers' and supervisors' interpretation of de-escalation has been overly broad. Such shortcomings were also present in force reports we reviewed from 2017 Q4 and 2018 Q1. For instance, we reviewed one case wherein an officer walked into an active assault and ordered the subject to get off the victim. The command-and-control tactic was included as a form of de-escalation in the officer's report. In this situation, de-escalation was not appropriate, as there was an active assault in progress when the officer walked in and force was appropriate. In another instance, an officer pushed the subject away to get distance and described this as de-escalation in the report. Despite the belief of the officer and the reviewing supervisor that the push may have been used to avoid a higher level of force, physical force should not be used as an example of de-escalation.

However, it appears that PPB has recognized some of the same concerns that we have (for instance, see Appendix 2 – "In reviewing our force reports, there is still some misunderstanding regarding what actions should be considered de-escalation techniques and when we should use them"). In addition to the documents provided to officers, such concepts were also a focus of the 2018 Spring In-Service we observed. Also, part of the Spring In-Service was instruction from the Inspector that de-escalation is not always a possibility and actions taken by officers which are not de-escalation should not be described as such in FDCRs and After Action Reports. We are pleased to see PPB recognizing these same types of issues and addressing them in Bureau-wide documents as well as in training.

For calling in specialized units, we believe that PPB officers have been adequately trained on the instances where it would be appropriate. It also appears such training is transferring to on-the-street behavior. In our review of cases, we did not identify any clear instances wherein specialized units should have been called but were not.

Although PPB has put forth commendable effort in resolving the issues surrounding de-escalation, we have not seen it fully translate to officer and supervisor reports. Thus, we find them as having only conditionally substantially complied with Par. 67(a) until a time where we are able to see that officer and supervisor reports are consistently compliant with the de-escalation requirement of this paragraph. We believe the documents provided by the Inspector and the training delivered in the Spring 2018 In-Service

may largely resolve these issues, but we will have to review FDCRs and After Action Reports in the upcoming months to verify.

*67(b). In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness*

In the force events we have reviewed, we continue to see a concerted effort on the part of officers to report the known history of mental illness and at what point in the interaction the officer gained such knowledge. Additionally, we have seen supervisory reviews be critical when such information is absent. Furthermore, our review of force events indicates that officers take into account a subject's actual or perceived mental illness when making decisions about the use of force and are able to articulate as such.

Based on our review of training and force reports we believe that PPB has substantially complied with the requirements of Par. 67(b). However, we maintain PPB should hold some type of refresher training on recognizing signs and symptoms of mental illness. For some officers, training specific to signs and symptoms was last provided in 2006 (when PPB provided 40 hours of crisis intervention training to all officers). Although recent In-Services have contained scenarios wherein officers practice their skills of recognizing potential mental illness, training devoted specifically to signs and symptoms would likely be beneficial, especially since memory can fade quickly and this knowledge is perishable.

*67(c). The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force*

We continue to see evidence within police reports of officers de-escalating use of force as reported resistance decreases to ensure maintaining control with the least amount of appropriate force. As we noted in our last report, we believe that this requirement of the Settlement Agreement has been adequately included in PPB policy and has been sufficiently trained upon. We therefore continue to find PPB has substantially complied with Par. 67(c).

*67(d). Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination*

In our review of force events (including all uses of CEWs) we found two cases in which a use of force may be considered objectively unreasonable but was not identified as such in the chain-of-command review. In addition to these cases, we reviewed one case wherein a negligent discharge of a CEW was not identified as objectively unreasonable until reaching the Chief's Office. Although this case was identified as objectively unreasonable by PPB, it is concerning that it was not identified by lower level reviewers.

For the two cases where unreasonable force was not identified as such, the issue for both was interpretative. In both cases, an officer deployed his CEW on a fleeing suspect, but no electrical current was delivered. In one of the instances, the subject struck the officer but afterwards began fleeing. The

Sergeant reviewing the case believed the use of the CEW on the fleeing suspect would have violated the *Graham* standard. However, because the probes got stuck in the suspect's jacket and did not penetrate the suspect's skin or deliver an electrical current, the Sgt. found that he could not have violated *Graham* (although the sergeant did find an administrative violation for the use of CEW).

Per the Sgt.'s review: "In summary, since [the officer] did deploy his CEW but an electrical impulse was not delivered to [suspect], I find there was no violation of the *Graham* standard. However, per Directive 1010.00 use of force, I find the decision to deploy the CEW administratively OUT OF POLICY." In another portion of the Sgt.'s review, the Sgt. noted "Had this been a CEW application, I would have found it out of policy" (PPB 1010.00 defines application as including the delivery of an electric current). In a third portion of the Sgt.'s review, the Sgt. noted "If the CEW deployment had been an actual CEW application, it would have been out of policy." In the section regarding performance deficiencies, the Sgt. noted, "Together, we went over the CEW policy and discussed why I disagreed with his justification [for using the CEW]." Finally, in the chain-of-command review, the Lieutenant too noted "corrective action for the out of policy decision to deploy the CEW (which did not make contact and therefore did not result in a violation of the *Graham* standard).

In another case, the Sgt.'s EIS entry noted the officer "briefly chased a subject with his taser out, turned on, finger on the trigger and pointed toward the subject. [The officers] stumbled and hit the trigger causing the taser to deploy most likely hitting the subject. There was no reaction and the subject fled and was not found. Since there was no reaction to the subject there appears to have been no application. This makes this a non-force event by the Graham Standard. However, he unintentionally deployed a taser on a fleeing subject who did not meet the criteria of 1010.00 for deployment toward a fleeing subject."

Based on the reviews of the Sgt. (and elsewhere in the chain of command) for these two cases, it appears that the interpretation of the *Graham* standard (and thereby an evaluation of the objective reasonableness of the force) rests heavily on whether or not the CEW made contact. We disagree that the evaluation of *Graham* requires contact and delivery of an electrical current and we instead focus on the intent of the officer. In the first case, the case information and supervisory review indicate the officer fully intended to deliver an electric current to the subject. In the second case, the supervisor notes that the officer had his finger on the taser trigger and was pointing it at the subject. In both cases, the supervisor uses the lack of electrical current to justify not evaluating *Graham*. Despite the officers being found administratively out of policy for their uses of force, we believe the uses of force should be evaluated under the *Graham* standard.

However, in our review of all other cases, we did not find any which were objectively unreasonable and not identified as such by chain-of-command reviewers. In some reports, we noted a concerted effort on the part of officers and supervisors to illustrate how each application of force requires its own assessment of reasonableness. For example, in one case, the officer had reasonably used a CEW based on the reported resistance of the subject. However, the subject was able to escape, and in their report the officer noted "I did not deploy the Taser because he was only eluding me." The supervisor in that case also commented on this by saying the officer "cycled his Taser to activate a new cartridge but did not utilize it as the suspect had run off again and was no longer showing active aggression." These types of comments indicate that, at least in this case, both the officer and supervisor understood that each force application must be justified on its own merits and that as resistance decreases, so too must the force.

As we only found two cases that we believe should have been evaluated as potentially unreasonable uses of force, we conclude that on-the-whole, PPB has demonstrated an ability to adequately review uses of force (as well as use only that force which is reasonable under the totality of the circumstances). However, we will need to see such good work carried into the future. The past three quarters of force events appear to be objectively reasonable and systems are in place to address incidents that do not meet this standard. As such, we believe PPB has largely substantially complied with this paragraph, though based on the two cases described, we do not feel they have fully substantially complied with this paragraph.

As Directive 1010.00's definition of "CEW application" *requires* the delivery of an electrical current, similar situations to the two cases above may occur in the future. We recommend PPB revise Directive 1010.00 to address the concerns that the definition of CEW "applications" requires the delivery of a current. As "attempted applications" should also be evaluated under the *Graham* standard, we recommend PPB revise their policy so that supervisors do not hold a contrary position. Additionally, for the two cases described above, we recommend PPB re-visit the cases to evaluate whether, given the facts of the event, they would violate the *Graham* standard.

COCL will assess corrective action and discipline imposed in cases of objectively unreasonable uses of force as part of our Quarter 4 Accountability report.


## Paragraph 68

*68(a). Prohibition against the use of CEW for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force*

PPB continues to incorporate this requirement in the 1010.00 Directive and officers have received sufficient training in the recent past. Our review of CEW events in 2017 Q4 and 2018 Q1 (as well as reviews for past reports) have not contained any instances of CEW use for pain compliance against those known or perceived to be suffering from mental illness or emotional crisis. We therefore believe PPB has substantially complied with the requirements of this paragraph.


*68(b). Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their CEW*

PPB continues to require a verbal warning or hand signal before *all* uses of force, going above and beyond the requirement of the Settlement Agreement. In numerous trainings we have observed, including the officer and supervisor training provided in the Spring of 2018, PPB members were instructed that a warning consists of two parts: (1) a command (e.g. "stop what you are doing") and (2) a consequence (e.g. "or you may be Tased").

In addition to the policy and training, the CEW cases which we reviewed from 2017 Q4 and 2018 Q1 consistently assessed whether officers provided a warning prior to deploying CEWs. Where a warning was not provided, supervisors within the chain-of-command evaluated whether lack of warning was justified based on the circumstances. In cases where such justification was present, we agreed with the

supervisors' evaluation nearly universally. In some cases, we believed that supervisors may have been too strict, admonishing an officer for not using a warning in instances where we felt the officer was justified in not using one. In all, we believe that PPB has substantially complied with this requirement based on their policy, training, and evaluation of officer actions.

### 68(c). Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following CEW use

The requirement to contact Portland Fire and Rescue to remove CEW probes from a subject continues to be enshrined in policy. Additionally, PPB members have received sufficient training on their responsibilities following CEW use and, furthermore, all CEW events we have reviewed demonstrate that officers and supervisors follow the developed protocols. We continue to believe PPB has substantially complied with this requirement.

### 68(d). Only one CEW at a time may be used on a subject, intentionally, except where lethal force would be permitted

We maintain this requirement has been placed in policy and officers have been sufficiently trained on the prohibition against intentionally using more than one CEW at a time on a subject. We have not seen any FDCRs or AARs where more than one CEW was used on a subject intentionally. Based on this information, we believe PPB has substantially complied with the requirement of 68(d).

### 68(e). After one standard CEW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each CEW cycle in their use of force reports

PPB continues to require that officers provide individual justification for each application of force, not only for CEWs but for all uses of force. We believe this requirement is consistent with the intent of the overall Settlement Agreement. Related to this requirement, PPB continues to use CEW batteries which automatically terminate each cycle after five seconds, ensuring that officers cannot go past five seconds without at least having the opportunity to re-assess the subject's resistance.

In the CEW cases from 2017 Q4 and 2018 Q1, we noted that officers nearly universally reported the factors which justified each cycle. For instances where the use of CEW was not justified for each cycle, supervisors in the chain of command rightly identified the concern and implemented corrective action.

Previously we had noted that a number of officers had accidently pressed the arcing button on the side of the CEW. Based on PPB training, it appears this issue has largely been resolved. We found only one case in the past two quarters wherein an officer accidently pressed the trigger on his/her CEW, though this was identified in the chain of command and the officer was found to have violated policy based on this negligent cycle.

Overall, we believe PPB has substantially complied with this requirement. This assessment is based on a couple of factors. First, the technological concerns which allowed officers to cycle a taser for more than five seconds has been addressed through the use of batteries which cut off the cycle after five seconds. Additionally, training has directly addressed the issue officers resting their finger on the arc button. Related to this, instances where officers have accidentally pressed the arc button have been found to violate policy, something that had not been done in cases we had reviewed in prior reports. Taking all these factors into account, we believe this paragraph has been substantially complied with.

_68(f). Officers shall make every reasonable effort to attempt handcuffing during and between each CEW cycle. Officers should avoid deployments of more than three CEW cycles unless exigent circumstances warrant use_

Both requirements of 68(f) have been incorporated into policy and both have been observed in PPB training. For the first part of 68(f) (reasonable efforts to attempt handcuffing during and between CEW cycles), we have previously noted that while this requirement was included in presentations, officers had not practiced this skill in training. However, PPB has recently purchased a CEW dummy to allow officers to practice handcuffing during and between cycles. This dummy has been utilized in Advanced Academy classes but has not yet been used during In-Service. The dummy needs to be used in In-Service to fully comply with this paragraph, though we credit PPB for purchasing the dummy in order to be able to practice.

For the second part of 68(f) (avoiding deployments of more than three CEW cycles unless exigent circumstances warrant use), we identified one case wherein four cycles were used, though exigent circumstances were not present. However, for the last cycle, one of probes had fallen out and thus it was not considered a CEW application (because it did not deliver a current). In that case, the officer reported "I decided to deliver a 4th cycle to [suspect] in an attempt to assist officers in taking him into custody while [suspect] was under power…As [suspect] continued to struggle violently against the officers attempts to control him I thought a 4th cycle would lock [suspect] up and the additional officers would be successful in finally taking [suspect] into custody."

In the evaluation of this event, the Chief's Office review stated, "The fourth cycle, had it delivered electricity, would have been the fourth application against the subject and would have triggered Directive 1010.00 6.4.4.2.1's requirement that there be exigent circumstances justifying the use of the CEW. The justification in the report is 'continued resistance to handcuffing' which alone would not be adequate to support the use of a fourth application. There may have been additional descriptions of the subject's threat to the officers that would help demonstrate exigent circumstances. For instance, the subject could have reached the knife had he broken free and would have then represented a deadly threat and likely would have been the recipient of a much higher level of force."

Herein lies another interpretive issue that we feel should rest on the intent of the officer rather than whether a current was delivered. From the perspective of the officer, "continued resistance to handcuffing" was used as justification for the fourth attempted application. The supervisor notes that this is insufficient, though does not evaluate the officer under 1010.00 (6.4.4.2.1) because no circuit was delivered. As the intent of the officer was to deliver a fourth application, we believe this should have triggered a review under 6.4.4.2.1.

We also noted a second case wherein an officer attempted more than three cycles against a suspect, though two attempted cycles did not deliver an electric current. In that case, supervisors did not evaluate under 6.4.4.2.1 either, though we believe the circumstances of that event likely would have been considered "exigent." However, the same considerations should have applied there – an attempted use of CEW should trigger a review under 6.4.4.2.1, regardless of whether a current is delivered.

Overall, substantial compliance with Par. 68(f) is impacted by the lack of in-service training on handcuffing under CEW power (though PPB is planning to rectify this in the near future) as well as the interpretive issue with attempted CEW vs. actually delivering a current. Coupled with the prior examples of "attempted" CEW, we recommend PPB revise Directive 1010.00 to address the concerns with the definition of CEW "applications" and its current exclusion of "attempted application". We also recommend the above detailed force event be reviewed under 6.4.4.2.1 to determine whether the officer's actions would have been found out of policy given the attempted fourth taser application. We also recommend PPB begin using the taser dummy during In-Service training to allow officers to practice handcuffing under power. Should these conditions be met, we believe PPB will have substantially complied with the requirement of 68(f).


*68(g). CEW's shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of force*

This requirement has been placed in policy and we believe that PPB officers have been sufficiently trained on the prohibition on using CEWs on a handcuffed or otherwise restrained person. We have not seen any FDCRs or AARs where a CEW was used on handcuffed or otherwise restrained person. We therefore believe PPB has substantially complied with the requirement of 68(g).


*68(h). Officers receive annual CEW In-service training including proficiency and policy changes, if any*

Annually, we have observed PPB deliver CEW training during In-Service. As we noted in our last report, the In-Service training on CEW in 2017 was extremely well delivered, giving officers one-on-one instruction on instances where CEW use would be allowed under PPB policy and other considerations for CEW use. We believe that the CEW In-Service training substantially complies with this requirement, though refer the reader to our recommendation related to practicing cuffing under power using the taser dummy (see Par. 76(f)). Although PPB still needs to carry out such training for that paragraph, we believe the overall delivery of CEW In-Service classes has substantially complied with this paragraph.


## Paragraph 69

*69(a). All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers (see also 69(c) - In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in Directive 1010.10 as*

*revised. This will take the place of Directive 940.00 reports for the purposes of paragraphs 70 and 72-77 of this Agreement.)*

Based on the revision of this paragraph approved by the Court in April of 2018, we believe PPB is now in substantial compliance with this requirement. PPB officers involved in non-lethal uses of force are required to submit appropriate reports prior to the end of their shift (unless exigent circumstances exist). For lethal uses of force, the administrative investigation serves as a way to collect the information normally required in an FDCR to facilitate a thorough review of the incident.

For non-lethal uses of force, officers routinely submit reports prior to the end of their shift. We have seen this in our review of force events and this remains an audit point reviewed by the Inspector and analysts. For lethal uses of force, although we have not reviewed the administrative investigation of the most recent occurrence, we are aware that an administrative investigation was begun and involved officers were interviewed within 48-hours of the event.

*69(b). All officers involved or witnesses to a use of force provide a full and candid account to supervisors (see also 69(c) - In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in Directive 1010.10 as revised. This will take the place of Directive 940.00 reports for the purposes of paragraphs 70 and 72-77 of this Agreement.)*

Based on the revision of this paragraph approved by the Court in April of 2018, we believe PPB is now in substantial compliance with this requirement. When a use of force event occurs, on-scene investigating supervisors interview witness and involved officers separately, gaining an independent account from each. Our review of After Action Reports indicate that the information gathered by supervisors are full and candid accounts from each of the officers.

The revisions to the Settlement Agreement as well as the revised 1010.00 and 1010.10 provide the framework for when and how involved and witness officers are required to provide a statement to the on-scene supervisor. For all force events (including lethal force), witness officers are required to provide a full and candid account to supervisors. In cases of lethal force, witness officers provide a statement to the Professional Standards Division (PSD), often within a couple hours of the event. For non-lethal force events, involved officers are required by policy to provide a full and candid account to an on-scene supervisor. However, for lethal force events, PPB policy only requires involved officers to provide a public safety statement in situations where certain information cannot be gathered through other witness officers or the supervisor's firsthand knowledge. The public safety statement is limited in scope (see Directive 1010.10, 2.1.1.2). Where no safety statement is necessary, involved officers are required to provide a statement to PSD investigators upon being compelled. These policy requirements are in line with the amended Settlement Agreement and are consistent with national best practices.

## Paragraph 70

*70(a). Complete After Action Reports within 72 hours of the force event (see also 69(c) - In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting*

*and review requirements as specified in Directive 1010.10 as revised. This will take the place of Directive 940.00 reports for the purposes of paragraphs 70 and 72-77 of this Agreement.)*

Based on the revision of this paragraph approved by the Court in April of 2018, we believe PPB is now in substantial compliance with this requirement.

For non-lethal uses of force, supervisors are required to complete an After Action Report and forward their review through the chain of command (highest level of review is determined by the type of force used). For lethal uses of force, the administrative investigation substitutes for an After Action Report, as the administrative investigation is designed to capture all information that would be required of a supervisor in a traditional After Action. In our review of non-lethal After Action Reports, supervisors consistently complete their investigation within 72 hours. In cases where supervisors have not done so, corrective action has been taken when appropriate.

*70(b). Immediately notify his or her shift supervisor and PSD regarding all officers' Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement*

PPB supervisors regularly notify supervisors and PSD regarding serious uses of force, force against persons with actual or perceived mental illness, and suspected misconduct. Wherein first-line supervisors do not accomplish this (particularly with suspected misconduct), chain-of-command reviewers most often do and alert first-line supervisors to their oversight.

When there is no misconduct, we have seen in many of the force events we reviewed the supervisor identify areas of potential improvement and discuss such areas with the officer. As evidenced by the force audit, supervisors throughout the chain of command appear able and willing to identify training concerns or the need for a debrief (training concerns may also include a suggestion for bureau-wide training). The force audit also serves as a way to track instances where improvements in officers' actions are needed.

We have described some instances where misuses of force were not accurately identified by supervisors, though this is more related to an interpretation issue rather than resistance by PPB to hold officers accountable. On the whole, supervisors appear diligent in alerting the necessary units and PPB utilizes the force audit as a way of tracking such comments. Based on these factors, we believe, overall, that PPB has substantially complied with this requirement.

*70(c). Where necessary, ensure that the subject receives medical attention from an appropriate medical provider*

We continue to believe PPB has substantially complied with this requirement. Directive 1010.00 reflects this requirement and in the After Action Reports we have reviewed, supervisors have consistently noted their efforts to ensure medical attention was rendered. We also note that officers are diligent in securing

medical attention when necessary prior to supervisors arriving. In all, we believe that all members are very aware of their responsibilities in this regard.

### 70(d). Interview officers individually and not in groups

We continue to believe PPB has substantially complied with this requirement. Both policy and training are responsive to this aspect of the Settlement Agreement and in reports we have read, the interviews with supervisors appear to gather the independent recollections of each officer (rather than merely confirmatory, leading questions).

## Paragraphs 71-72

*71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.*

We continue to find that PPB has maintained adequate patrol supervision staffing. For instance, in the fourth quarter of 2017, PPB provided sergeant staffing levels for Central, East, and North Precincts, allowing us to calculate a ratio of patrol officers to patrol sergeants for each Precinct. All three Precincts had reasonable ratios, with Central having a ratio of 6.14 officers per one sergeant, East having a ratio of 5.41, and North having a ratio of 5.0. As we have noted in the past, we believe these ratios are a better measure of "adequate patrol supervision staffing" than raw numbers. Based on these (and past) ratios, we maintain that PPB and the City have substantially complied with the requirements of Par. 71.

*Par. 72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.*

The After Action Report required in each use of force event continues to serve as the supervisor investigation checklist. Additionally, Par. 72's requirement for the checklist to be reviewed and revised annually is memorialized in section 13.2 of Directive 1010.00. In the past year, the form has undergone a number of minor revisions in accordance with changes to 1010.00 and findings from the Inspector's audit. Overall, we continue to find that the use of the After Action Report as the supervisor checklist substantially complies with the requirements of Par. 72.

## Paragraph 73

*73(a). EIS tracks all Directive 940.00 comments, findings, and corrections*

Our review of EIS entries for After Action comments, findings, and corrections demonstrate that PPB supervisors regularly note when officers use force and whether such force would be considered in or out of policy. However, the EIS entries are oftentimes incomplete when considering report writing deficiencies

COCL Compliance and Outcome Assessment Report: Section III Use of Force

identified in the Force Audit. For instance, in one case, the force audit identified an officer who submitted the FDCR two days late – however this fact is not reflected in the EIS entries related to that case. In another case, the Inspector coded "Report Writing" in Phase 2 as a 0 and noted that the officer did not provide legal justification in his/her report. Neither the deficient report writing nor the lack of legal standing was found in the EIS entries. As supervisors receive notification of deficiencies and are required to correct such deficiencies, the EIS should reflect such corrections.

Additionally, a number of entries we reviewed reflect that debriefs occurred related to an officer's decision-making. However, we were able to identify instances where debriefs were not found to be included in the EIS. In one case, the officer was debriefed by the Training Division though this was not reflected in the EIS entries. In that same case, the Sgt. noted a potential violation of Directive 315.30. This too is absent from the EIS entries.

For the moment, we believe PPB has only partially complied with the requirement of 73(a). While PPB does include some comments, findings, and corrections in the sample of EIS entries we reviewed, the records are incomplete. We recommend PPB ensure that all relevant comments, findings, and corrections (including those found throughout the Force Audit) are represented in the Performance Discussion Tracker. In addition, PPB should provide a consistent definition of the "comments, findings, and corrections" that would require an EIS entry. One supervisor may create an EIS entry for an issue that another supervisor would not, leading to potentially inconsistent types of entries based on the supervisors' interpretation of what is important. Finally, although perhaps more directly related to the Accountability section of the Settlement Agreement, PPB should create defining criteria for when a potential policy violation may be handled through a debrief (and corresponding EIS entry) or when the potential policy violation should be forwarded to IA.


### 73(b). All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command

In the past, all supervisors in the chain-of-command received EIS entries for deficiencies. We believe that this practice satisfies the "corrective action" portion of Par. 73(b). However, in our last report, we noted that "discipline" for accuracy and completeness had not yet occurred, particularly for supervisors who demonstrated a underline(trend) in deficient reports. Recently, PPB has put into place a process for progressive discipline for supervisors with such trends. Quarterly, the Inspector meets with each Precinct's RU Manager to identify and discuss supervisors in the chain-of-command with higher rates of deficiencies relative to others. In addition to these meetings, the Inspector has recently implemented a feedback and tracking loop, utilizing EIS flags to ensure corrective action (see Appendix 3). Using the force audit, the Inspector is able to identify supervisors with consistent deficiencies, alert RU Managers to such trends, and have the RU Managers determine a course of action. Should supervisors not improve in their review of force events, discipline might then be imposed.

Although this process is fairly new, we believe it conforms to the requirements of Par. 73(b). However, since there has not been enough time to observe the process from start to finish, we believe that PPB should be found in conditional substantial compliance with this requirement. In the upcoming months, we will monitor what interventions were put into place and observe their impact.

*73(c). All supervisors in the chain of command are accountable for inadequate reports and analysis*

While we maintain our position found in 73(b), we do note that PPB policy and practice holds all supervisors in the chain of command accountable for inadequate reports and analysis. The After Action Report has been revised in the past couple of months to streamline the command review process so that the supervisors were no longer required to parrot the language of subordinate reviewers. Despite such changes in the form, the practice within PPB remains that if a lower level reviewer had a deficiency in reporting, the upper level command reviewer was responsible for correcting it. Based on the effort of PPB and our review of the auditing process, we believe they have substantially complied with Par. 73(c).

*73(d). A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations. Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position*

Similar to our comments for Par. 73(b), we believe that PPB has taken significant steps in putting together a process to address repeat deficient investigations. Should a supervisor repeatedly conduct deficient investigations, EIS entries are made and, where appropriate, interventions designed to correct the trend are implemented. Where deficiencies continue, progressive discipline is imposed. We believe this process satisfies the intent of Par. 73(d), though based on the fact that this is a relatively new process and we have not been able to see the process from start to finish, we find PPB only in conditional substantial compliance with this requirement.

*73(e). When after an investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement*

This requirement is found in policy and sufficiently covered in training. However, our review of the overall accountability system will be discussed in our 2018 Quarter 4 report.

*73(f). Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns*

The Inspector continues to review all use of force events, therefore accomplishing this requirement de facto. However, in past reports we noted that PPB did not have a systematic process for resolving the policy, training, tactical, or equipment concern. Recently, the Inspector has implemented a feedback loop for ensuring that concerns are addressed in a timely fashion (see Appendix 3). We believe the process implemented will ultimately resolve our prior concerns. However, as this is a relatively recent development, we give PPB conditional substantial compliance until such a time when we can observe the process from start to finish.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

*73(g). The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor*

This requirement has been placed in policy and this discretion was discussed in prior trainings, thereby leading PPB to be in substantial compliance. We have not seen any examples of cases wherein the Chief or PSD have reassigned a use of force investigation to the Detective Division or other PPB supervisor.

## Paragraphs 74, 75, 77

*74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)*

*75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)*

*77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement)*

COCL Compliance and Outcome Assessment Report: Section III Use of Force

The Force Audit undertaken by the Inspector and a team of qualified analysts has for some time been an area of significant progress, initiative, and creativity within the sections of the Settlement Agreement. We maintain that PPB's commitment to auditing demonstrated by this team should be recognized and replicated in other areas of the Bureau. The Force Audit looks at two main questions: (1) are officers and supervisors including a level of detail in their reports to facilitate a comprehensive evaluation of force events, as well as the decisions and actions leading up to and including the physical use of force, and; (2) are supervisors within the chain of command performing such comprehensive evaluations and providing organizationally useful recommendations to improve the manner by which PPB uses force?

Consistent with our last report, we have found that the Inspector's audit includes items of review that correlate to each of the required provisions within Pars. 74, 75, and 77. When auditing a case, the analysts read officers' FDCRs (including checkboxes and narratives) and the chain-of-command reviews found in the After Action Report. The analysts then determine whether each of the required points of information found in the audit methodology (see Appendix 4 and Appendix 5) are present and accurately captured. Using a SurveyMonkey input method, the analysts are able to consistently code each of the points of review and export a dataset for analysis.

From the analysis, the Inspector and analysts are able to identify reporting deficiencies as well as various trends in deficiencies (for example, breakdowns by officer, rank, and Precinct). The Inspector and analysts then compile the results in quarterly and annual reports (for example, see Appendix 6 for the 2017 Annual Force Audit Report and Appendix 7 for the 2018 Q1 Force Audit Report). In the past, we have described this process as Phase 1 of the audit and we believe it is responsive to the first main question addressed by the Force Audit.

The documents to capture the data (FDCR and After Action Report) have undergone changes in the past to streamline the process and simplify the form for officers on the street. In the first quarter of 2018, the FDCR underwent another change and additional changes to the After Action Report have been recently implemented. We believe these revisions are an improvement that continues to facilitate the ability of the analysts to perform the first phase of the audit (ensuring all required reporting information). However, conversations with the Inspector indicate that due to the FDCR being more sectioned, some officers have had trouble providing the level of detail found in prior reports (which were more narrative, free-flowing based forms). Other officers have continued to provide the same level of detail, despite the new format. When introducing the new FDCR form, the Inspector provided all officers with examples of how to include the same level of detail in the new format, though we recommend continued monitoring of this concern and, where necessary, supplemental feedback and/or training.

As a matter of process, we conclude that the system used by PPB to evaluate the comprehensiveness of FDCRs and After Action Reports substantially complies with these paragraphs of the Settlement Agreement. A breakdown of reporting deficiencies is found in Section II of this report, though it is clear to us that the Inspector and analysts have a systematic process for reviewing force reports and ensuring the necessary information is contained within them.

As a second phase of the Force Audit, the Inspector reviews the cases and assesses the elements of the officer interaction, including the officers' overall report writing, information gathering, initial response, initial contact with the subject, risk assessment, legal authority, consideration of other options and contingencies, provision of medical aid, post custody actions, and finally the overall reasonableness of the use of force itself. The conceptual framework for Phase 2 of the Force Audit is highly consistent with the

Critical Decision-Making Model (CDM) offered by the Police Executive Research Forum (PERF) and used during the Spring In-Service Training at PPB. Thus, we would expect that officers will improve in their decision making during intense encounters that could result in force.

In cases where the Inspector identifies officers who were deficient in one or more elements in the Phase 2 audit, the Inspector documents the type of deficiency, whether it was identified in the chain-of-command, and whether any actions of the officer (or chain-of-command reviewers) rose to the level of policy violations, training concerns, or whether a debrief is necessary. In addition to these evaluations, the Inspector also evaluates whether the *Graham* standard (i.e. constitutionality) was met as well as whether the chain-of-command noted that the officers' actions are reflective of a trend they have noticed based on other FDCRs they have reviewed.

Up to and including the fourth quarter of 2017, the Inspector utilized a 3-point scale to evaluate each of the Phase 2 elements. Simply, a score of 1 would indicate that the officer's actions were unacceptable given training or that the actions created an unnecessary or serious risk. A score of 2 would indicate that the officer's actions were generally acceptable, though the situation might have been handled better. Finally, a score of 3 would indicate that no concerns were found with the officer's actions.

However, in the first quarter of 2018, the Inspector switched the Phase 2 coding scale to a 2-point scale (roughly considered a pass/fail evaluation). During our review of force audit cases, we independently assessed whether a 2-point scale was adequate to evaluate on.

When reviewing force events and supervisor investigations, we believe the Inspector has demonstrated some ability to act independently of the chain of command. For instance, out of 123 force events audited in the first quarter of 2018, the chain of command was able to identify some type of policy violation in 10 of the events (please note that the policy violations may be administrative – for example, not canvassing for witnesses. The reader should not assume that the policy violations related to the reasonableness of use of force). However, the Inspector was able to identify an additional 12 potential policy violations that went unnoticed by the chain of command. Additionally, the Inspector was able to identify the need for officer debriefs that he felt should have been caught by the chain of command. Based on these facts and our independent evaluation of Phase 2 (see below), we conclude that the Inspector is able and willing to provide an independent assessment of force events.

When a force event reveals policy, training, tactical, or equipment concerns, we have noted in the past that the Inspector did not have a systematic process for disseminating findings and ensuring appropriate resolution of concerns. For findings in the past, the Inspector would discuss them with the appropriate RU Manager and the RU Manager would then be free to take action or not. Thus, no formalized feedback loop was built into the audit system. Responsive to our concerns, the Inspector created a systematic feedback loop wherein the findings are provided to the RU Manager and the RU Manager is still free to take action or not. However, the RU's decision is then reviewed by the Branch Assistant Chief and then the Chief (or Chief's designee) who either accept the RU's decision or may controvert it. Although this process has only been recently implemented, we believe the feedback loop will ensure that all Inspector findings are considered and all RU Manager decisions are justified and approved through the chain of command.

We also performed an independent evaluation of Phase 1 and Phase 2 findings from PPB. We provide our independent assessment of each phase here. The Phase 1 audit is performed by a PPB analyst. At a

minimum, it consists of an Officer and Subject Audit of 35 data points and an Event Level Audit of 96 data points. If a conducted energy weapon, e.g. Taser, was deployed, a separate Taser Audit of 21 data points is performed. The majority of these data points, such as an officer's knowledge or perception of a subject's mental health issues, whether a subject was armed, whether the force used was within policy, etc., are directly related to evaluation of individual force events. Others, such as an officer's anonymized Personal Identification Number, are of administrative significance to PPB. The Phase 1 audit's primary focus is force reporting.

The COCL Phase 1 review was performed using the following methodology. At random, COCL selected 40 cases from 2017 Q3 and Q4. In reviewing these cases, COCL read all documents in the file, and noted positive aspects and any areas of concern. Next, COCL independently conducted a modified Phase 1 audit. (As mentioned above, some of the Phase 1 data points are significant to PPB for administrative reasons, but not directly related to evaluation of force. An example of such a data point is an officer's anonymized Personal Identification Number. Therefore, COCL examined a total of 90 data points from the Officer and Subject Audit and Event Level Audit which were relevant to the use of force. Similarly, if a conducted energy weapon was deployed, COCL reviewed an additional 14 data points from the Taser Audit.) During the modified Phase 1 audit, COCL reached an independent determination on each of the 90 data points (or 104 data points if a conducted energy weapon was deployed). As the final step, COCL then compared its independent determinations with those of the PPB analyst.

In comparing our results with PPB, the COCL team agreed with PPB about the presence or absence of certain elements in FDCR report writing. That is to say, although officer and supervisor deficiencies may have been present in their report writing, we found only a few instances wherein such deficiencies were not identified by the audit team. While we carry concerns that some deficiencies were not identified by the chain-of-command and ultimately had to be identified by the audit team, we are encouraged that the audit team is so well versed in their evaluation that deficiencies did not go completely unnoticed.

Similarly, we performed a Phase 2 review of the force audit, reviewing 60 cases from 2017 Q3-Q4 and 2018 Q1. Upon review, we coded the factors evaluated by the Inspector including report writing, information gathering, initial response, initial contact, risk assessment, legal standing, options and contingencies, communication, tactical communication, and use of force (although there have been slight modifications to the Inspector's coding scheme within this timeline). As the final step, COCL then compared its independent determinations with those of the PPB Force Inspector. As with our review of the Phase 1 process, we found an extremely high rate of agreement between our codes and those of the Inspector (>95%). Again, this does not mean that officers and supervisors were considered perfect in the points of review. Rather, it means that the Inspector and COCL were consistent with one another in coding positive and negative elements of an interaction.

Overall, it appears that the force audit largely accomplishes the two goals we believe it should achieve: (1) evaluates officer and supervisor reports to ensure that they contain the level of detail needed to fully evaluate a force event; and (2) independently assess the reasonableness of force and identify training, equipment, policy, or personnel concerns beyond those identified through the chain-of-command reviews. Additionally, our independent assessment of Phase 1 and Phase 2 revealed large-scale agreement with the Inspector and analysts, indicating that the evaluation tools used are reliable and that the Inspector and analysts are able critically review officer and supervisor reports. However, due to the feedback loop being a relatively new feature of the Inspector's work, we cannot find PPB to be in full

substantial compliance until we have had an opportunity to examine whether it has been implemented with fidelity. As implementation is a condition of compliance, we may only say that PPB has conditionally substantially complied with these paragraphs.

## Paragraph 76

*76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report.*

PPB has attempted to comply with Par. 76 in two main ways. First, PPB has provided Applications of Force Reports, providing officer, precinct, and shift level data on those who have used force. Second, the Force Audit Reports and Force Data Summary Reports include information that is largely responsive to elements of Par. 76. Below, we examine these documents and their relative contributions to compliance with Par. 76.

### Applications of Force Reports

Within the past year, the Inspector and analysts have provided us with numerous "Applications of Force" reports detailing individual PPB members, their force rates (in proportion to arrests, calls-for-service, and GO reports), force applications per event, and the particular force types used within the timeframe of the report. Through these documents, the Inspector and analysts are largely able to determine if significant trends exist and identify officers using force differently or at a different rate. By including officers who use force into a spreadsheet, the Inspector and analysts are able to calculate average rates of force and then identify officers who fall more than one or two standard deviations above the mean. Similarly, the Inspector and analysts are able to calculate standard deviations for force types and identify officers who use a particular force type more frequently than the Bureau as a whole. These actions are consistent with prior COCL recommendations.

PPB's approach to identifying trends substantially complies with particular subsections of Par. 76, although we believe their methodology may be improved in order to strengthen their analyses. One consideration is that the current methodology includes all officers and command personnel equally despite some command having extremely low contacts, reports, and arrests. In these situations, a single force event may cause them to have a higher than average force rate. This higher than average force rate is then included in calculating the overall mean, leading to artificially inflated means and standard deviations. For example, if one officer has 1 force event and 1 arrest, his/her force rate would be 100%[1]. If another officer has 1 force event and 10 arrests, his/her force rate would be 10%. The current methodology would calculate the average by adding 100% and 10% and then dividing by 2, leading to a

---

[1] For this example, we use force per arrest rate.  PPB utilizes a larger spectrum of analyses to identify potentially problematic officers, though for illustrative purposes, we only use force per arrest rate here.

mean force rate of 55% (110/2). This mean force rate is not reflective of a true mean and will lead to over-identifying officers with low arrests and under-identifying officers who are more concerning (in this hypothetical example, someone with a 40% force rate would not be identified because their average is below the mean). Although the Inspector considers the number of arrests in evaluating whether the officer truly represents a potential issue, it would be better to control for this from the outset.

PPB may alter their methodology in a number of ways which would address our concerns with the calculated mean. One way would be to weight each of the officers on a separate variable. For instance, PPB may consider weighting officers on calls-for-service or arrest rates to view force rates in light of their overall police activity. By doing this, the officer's level of activity would better capture the reality of force event rates when calculating the mean and associated standard deviations. Alternatively, PPB may consider removing from the analysis all officers who have fewer than a specified number of arrests. By removing such officers, those with a high force rate attributable largely to low arrest numbers would not impact the overall mean and standard deviations, thus leading to better identification of officers who may be potentially problematic. We look forward to discussing this further with PPB.

PPB also evaluates officers who use a particular force type at a higher rate than other officers, though this evaluation could also be methodologically improved. Here, the Inspector and analysts calculate the mean number of a particular force type and identify officers who use that force type more frequently than the average. However, raw numbers are used and therefore officers who use more force are identified, regardless of whether they use that force type in a higher proportion of force events. For instance, consider one officer who has 2 force events and uses takedown in one of those events. Consider another officer who has 5 force events and uses a takedown in 2 of those events. Because PPB uses raw numbers to calculate the mean and standard deviation, the second officer is more likely to be flagged because he/she has two takedowns compared to the first officer who only has one takedown. PPB would be better served to look at force type as a ratio of force events – the first officer used takedowns in half of their force events and is the more appropriate person to be identified as using takedowns at a higher rate.

Despite the above methodological improvements that can be accomplished, we repeat here that the current analyses performed by PPB is leaps and bounds ahead of the type of force data evaluation performed four years ago. As we noted above, PPB's conceptual framework is sound and is entirely in-line with our expectations for identifying officer-level trends in force rates and force types. While certain tweaks to the methodology would be helpful, we applaud the initiative of the Inspector and analysts in preparing their evaluations.

Although PPB examines officer-level trends in use of force and force types, their evaluation of unit and group levels still contains areas where improvement can be made. For instance, their 2018 Q1 Force Audit Report includes whole numbers for force and force types. Additionally, their 2017 Annual Force Audit breaks uses of force out by Precinct, though the manner in which it is done does not easily allow for comparisons between Precincts. Rather, the side-by-side Precinct table reflects the distribution as a whole and force rate comparison between Precincts requires additional steps on the part of the reader. Similarly, PPB's Quarterly Force Data Summary Reports only includes whole numbers. Although PPB's reporting of whole numbers is a response to community input, interpretation of whole numbers is difficult. As with the above, we believe PPB is making a strong effort to provide comparisons, though we would recommend they enhance their methodology to provide across-the-board comparisons using rates in addition to using whole numbers.

Using FDCR data from Q1 2017 through Q1 2018, we examined the three main Precincts and three main shifts to determine differences between them. Although PPB would be able to conduct a multitude of analyses, we include only a couple here to illustrate how PPB might compare across Precincts and shifts. For instance, we noted that across the three Precincts, PPB's use of force in approximately 0.20% of all calls for service. However, there are some inter-group fluctuations. For instance, East Precinct uses force in approximately 0.24% of calls for service. Alternatively, Central Precinct uses force in 0.18% of calls for service. Although we are talking relatively small variations, PPB may want to determine potential reasons why East Precinct is higher or, alternatively, why Central is lower. Additionally, when studying a large sample of force events, even minor variations can be meaningful if stable over a long enough timeline. Similarly, across all Precincts and shifts, FDCRs on average contain 1.50 applications of force. However, North E-shift FDCRs on average contain 1.65 applications of force, while East E-shift and Central E-shift contain 1.34 and 1.31 applications per FDCR, respectively.

For the above analyses, we note that PPB does already look at the above analytic questions in some respect. We credit PPB with undertaking these evaluations and are simply recommending that they enhance their methodologies to be more systematic.

### Force Audit Reports

The second way that PPB addresses the requirements of Par. 76 is through their quarterly and annual Force Audit Reports. While we cover the Force Audit methodology and findings in detail in our compliance assessment of Pars. 74, 75, and 77 (as well as in Section II of this report), we note that for this paragraph, the information contained within the Force Audit Reports is responsive. For instance, the Inspector and analysts have been able to identify significant trends in the completeness of FDCRs and After Action Reports as well as identify particular officers, units, and groups which are either lacking or exceptional in reporting deficiency rates.

Additionally, the reports provide an evaluation of variation in force practice away from PPB policy. As we have noted in prior reports, out-of-policy force events are relatively rare and therefore meaningful comparisons between units and groups is difficult. We therefore continue to recommend that the Inspector note cases where the force event contained areas for improvement in certain categories and perform comparative analysis between units and groups for each of these categories. We believe this will overall lead to better recommendations for training, policy, and personnel concerns.

### Correct and Duplicate

Finally, Par. 76, subsection (c) requires the Inspector to "determine the reason for any difference and correct or duplicate elsewhere, as appropriate." Similarly, subsection (d) requires the Inspector to "identify and correct deficiencies revealed by the analysis." As we have noted in the past, the Inspector regularly meets with RU Managers to discuss the findings of the various analyses and determine potential reasons and remedies. However, in the past, this has been largely informal and we have recommended the Inspector implement a formal feedback loop to ensure concerns are dealt with expeditiously and consistently. We are pleased to report that in the recent past, the Inspector implemented a formal feedback system (see Appendix 3). We will need to monitor how well the feedback system works, but we

believe this is a large step in complying with these subsections of Par. 76. However, we note that often, the work of the Inspector and analysts focus on areas where correction is necessary. We urge the Inspector and analysts to use the data to recognize when Precincts, shifts, and individuals are using force at lower rates or are using overall lower category force types compared with other comparative groups. Part of controlling force is limiting when it is applied but also recognizing groups that are more restrained in the application of force and can serve as role models. PPB does this in some capacity by identifying individual officers on their internal Force Audit Reports who had zero deficiencies. However, it does not appear that these officers are recognized outside of this document. For instance, we noted one officer who wrote four FDCR's without a single report writing deficiency. We hope the PPB is able to recognize officers like this who can serve as role models for complete and accurate report writing. Similar recognition could be done at the Precinct or Unit level, not only for report-writing but force rates, applications per FDCR, or other findings.

<u>Non-Force Companion Dataset</u>

PPB is in the process of compiling a non-force dataset to act as a companion to their force dataset. PPB contends, and we agree, that determining significant trends for subject demographics requires a non-force comparison. For instance, if PPB wants to examine odds ratios (or probability of occurrence) for persons with perceived mental illness being the subject of a force event (compared with a person without perceived mental illness), a complete dataset with force events and non-force events is necessary. Analyses using an expanded dataset are also able to control for other potentially contributing variables, including presence of a weapon and warrant, among other considerations. Currently, PPB's Quarterly Force Summary Reports (and annual compilations) address subject demographic trends in some respects, however conclusions are difficult to make without a non-force comparison group. We recommend PPB continue to develop the non-force companion dataset and, once finalized, perform statistical analyses that will allow for subject demographic force evaluations.

<u>Overall Assessment of Par. 76</u>

Taking the above considerations together, we believe that PPB (and in particular, the Inspector and analysts) have taken enormous steps toward complying with Par. 76. We note that four years ago, PPB used an extremely rudimentary paper-based system for tracking force events. The paper-based system was unable to provide any details about force events (e.g. precinct, shift, whether the subject had a perceived mental illness, etc.) without having to go and review the particular case file. At that time, PPB had not created any relational database and therefore, any type of meaningful evaluation would be so time-consuming that it would be rendered prohibitive. Now, the Inspector has a group of highly qualified analysts who code each force event, leading to the ability to analyze the data for trends at the individual, group, unit, and organization level. PPB should be credited with this dramatic improvement in data collection, analysis, and personnel.

As we note above, we believe that the conceptual framework used by PPB is indicative of the types of evaluation contemplated by Par. 76. However, we do note some limitations of the methodology used by PPB in performing the analyses. These are relatively minor points, as they simply require a different

method of reviewing the data but do not require any large-scale changes to the data collection or coding methods. We therefore believe that PPB should be found in Conditional Substantial Compliance Par. 76, with full Substantial Compliance achieved when the conditions delineated below have been satisfied.

First, PPB should enhance their methodology for identifying mean uses of force (in the various ways PPB currently does) and associated standard deviations. We provide two suggestions above (weighting and breaking data apart) though we are open to alternative proposals by PPB that accomplishes the same goal. Through enhanced methodology, PPB will be better able to identify officer-level trends in uses of force. Additionally, we recommend that PPB enhance their evaluation of force types by looking at them as a proportion of all types rather than a raw number. As PPB already contains the data to make such improvements, these are relatively minor changes.

Second, PPB should enhance their methodology for identifying trends at the precinct, shift, and unit level. Although PPB currently does this in some fashion, the methodology can be improved identifying rates (rather than distributions and raw numbers) and performing statistically comparative tests. By doing this, PPB can be more confident in their interpretation of the results. As with the above recommendation, PPB already possesses and reports the data necessary to make such improvements.

Additionally, PPB needs to maintain the feedback loop system that it has recently created. Because this is a relatively new system, we are unable to evaluate its impact in this report. However, the documents we have received appear to be comprehensive and responsive to past recommendations. PPB should also be sure to document all steps of the process and maintain a system of ensuring that all actions, corrective or otherwise, to be taken by RU Managers are indeed taken.

Finally, though not a condition of substantial compliance, PPB should continue its pursuit of a non-force companion dataset to perform subject-level analyses of factors that might predict when force is and is not used. PPB's current initiative to create such a dataset is commendable and we look forward to seeing how it is used to inform organizational practices.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# SECTION II

# System Assessment

## SYSTEM AND RESOURCES FOR PROPER MANAGEMENT OF FORCE
## TO MEET CONSTITUTIONAL STANDARDS

For this section of our report, we provide an assessment of outcomes related to PPB's implementation of the Settlement Agreement. Our assessment is divided between two primary topics: (1) an evaluation of the Force Audit Phase 1 and Phase 2 findings; and (2) an evaluation of PPB's use of force data for the past three years. For the evaluation of PPB data, we employ sophisticated statistical analyses, a summary of which is provided prior to the data analysis. We further provide a summary of the findings at the conclusion of this section.

*Force Audit Findings*

While the process of the force audit is discussed in the compliance section (i.e. the survey tool used to code the information present in force reports), we also look at the outcomes in the form of Phase 1 findings and Phase 2 findings. Overall, it appears that PPB officers and supervisors are diligent in ensuring that the information needed to evaluate a use of force event is captured in FDCR's and After Action Reports. The 2017 Annual Force Audit Report (see Appendix 6) and 2018 Q1 Force Audit Report (see Appendix 7) provide breakdowns of deficiencies by rank, category, and Precinct (among others). Without repeating the entirety of the reports, we focus on key findings here.

Overall, PPB continues to demonstrate a relatively low rate of deficiencies in force reporting. Looking at Table 1, PPB's reports suggest that in 2017 and the first quarter of 2018, officers on average had approximately 1.5 reporting deficiencies for each event audited. However, in the fourth quarter of 2017, the rate of deficiencies increased to approximately 2.5 per event audited. This is likely due to the expansion of reportable force types and confusion regarding the level of detail required for Category 4 force event. However, in the first quarter of 2018 and with the revision of the FDCR, this increase in deficiencies largely vanished. We believe continued use of the revised FDCR, as well as the Supervisor In-Service training provided in early Summer, will result in maintaining the lower deficiency rates.

Table 1 also provides the reporting deficiencies for chain-of-command reviews in 2017 and the first quarter of 2018. As we have noted in the past, reporting deficiencies for Sergeants are often higher than officers because they are evaluating the officers' FDCR as well as preparing their own report in the After Action, thus the number potential deficiencies is increased. The Inspector has also noted this in reports and has made a concerted effort to revise the After Action Report format. Also, PPB is providing training to Sergeants on reviewing use of force events in In-Service training this year. However, even before these steps, Sergeants had already been closing the deficiency gap between themselves and officers, with the first quarter of 2018 having only 1.59 deficiencies per event audited, compared with 2.26 in the first quarter of 2017.

Finally, the upper echelons of command level review (Lieutenants and higher) continue to identify deficiencies not found at lower levels and have remanded the reports for correction. By the time the reporting on a force event goes through the entire chain-of-command, the Inspector and analysts have found, on average, one deficiency for every two cases audited (approximate .5 deficiencies per every event). Although the deficiency rate increased in the fourth quarter of 2017 and first quarter of 2018,

COCL Compliance and Outcome Assessment Report: Section III Use of Force

we anticipate the new After Action Report format and supervisor In-Service training should largely resolve these issues.

### Table 1 – Reporting Deficiencies per Force Event (Bureau-wide)

|  | Officers | Sergeants | Lieutenants | RU Managers | Chief's Office |
|---|---|---|---|---|---|
| 2017 Q1 | 1.20 | 2.26 | 0.36 | 0.86 | 0.38 |
| 2017 Q2 | 1.22 | 1.99 | 0.49 | 1.08 | 0.24 |
| 2017 Q3 | 1.10 | 1.42 | 0.31 | 0.26 | 0.19 |
| 2017 Q4* | 2.42 | 1.60 | 0.78 | 0.82 | 0.94 |
| 2018 Q1 | 1.43 | 1.59 | 0.61 | 0.88 | 0.67 |
| **TOTAL** | 1.47 | 1.77 | 0.51 | 0.78 | 0.48 |

*Increase due to expansion of force types collected

We also look at the categories of deficiencies most often found in force reporting (Table 2). For officers, documenting their attempts at de-escalation, the force subject's resistance, and the officers' attempts at identifying witnesses are the most common sources of deficiencies. The reader should note that, as these are percentages of the whole, there will always be categories that are higher than others. The more important analysis is whether large-scale differences are found within categories over time, which may indicate that deficiencies in one category deserve more attention. For instance, in the first quarter of 2017, witness deficiencies accounted for only 8% of overall deficiencies. However, in the first quarter of 2018, this category accounted for 28% of all deficiencies. This category has also shown a consistent increase since Q3 2017 (18%) and Q4 2017 (22%). PPB has indicated that all other categories of deficiencies have decreased in number while the Witness category has remained the same. Therefore, deficiencies in locating witnesses has not decreased in the same way as other categories, resulting in higher proportion (since these are percentages of the whole). This fact may indicate that additional reminders in this area would be beneficial.

### Table 2 – Categories of Deficiencies (Percent of all Deficiencies)

|  | Mental Health and Injuries | Force and Resistance | De-Escalation and Decision Point Analysis | Witnesses | ECW |
|---|---|---|---|---|---|
| 2017 Q1 | 23% | 35% | 28% | 8% | 6% |
| 2017 Q2 | 17% | 34% | 20% | 22% | 7% |
| 2017 Q3 | 15% | 35% | 28% | 18% | 4% |
| 2017 Q4 | 19% | 32% | 25% | 22% | 2% |
| 2018 Q1 | 08% | 28% | 30% | 28% | 5% |
| **TOTAL** | 16% | 32% | 26% | 21% | 4% |

For Sergeants and Chain-of-Command reviewers, it is difficult to compare across ranks due to the number and type of categories present in each analysis. However, we can look at general trends found within the ranks. Particularly for Sergeants, deficiencies in EIS entries have been the most problematic category, historically, between Q1 of 2017 and Q1 of 2018, representing approximately 1/3 of all Sergeant deficiencies within that timeframe. For upper command level reviewers, Completeness of the After Action Report is found to be generally higher, as this also subsumes deficiencies found within the FDCR. However, as with officer deficiencies, PPB and the community should be more appropriately focused on whether category deficiencies correlatively fluctuate with the overall number of deficiencies (see the above example related to deficiencies in locating witnesses).

Finally, we look to see Precinct differences within deficiencies as this may give insight into whether particular training is necessary. As with the Bureau's overall deficiencies, we note the increase in deficiencies for all three Precincts in 2017 Q4 is primarily related to the expansion in types of force collected and confusion related to the level of detail required in Category IV use of force reports. We note that these issues were largely corrected by the first quarter of 2018.

When comparing the three Precincts, North Precinct has consistently demonstrated overall higher rates of officer, Sergeant, Lieutenant, and RU Manager deficiencies compared with East and Central Precinct for the entire timeframe reviewed. In the 2017 Annual Force Audit Report, the Inspector noted the overall higher rates of deficiencies and recommended additional training on officer and supervisor reporting requirements. The same issues with North Precinct persisted in the first quarter of 2018. In May of 2018, we sat in on a meeting between the Inspector and North Precinct Commander. The meeting focused on the overall pattern of deficient report writing in North Precinct and individual officers/supervisors who are above one standard deviation in report writing (among other things).

At the conclusion of the meeting, the Inspector informed the Precinct Commander that an EIS flag would be created for each of the issues discussed, thereby requiring individualized responses to the Precinct trend as well as the officer/supervisor trends. The EIS flag to be created by the Inspector functions in a similar way to EIS flags that are sent out as the result of a threshold being broken (see Section VII of the Settlement Agreement). The EIS flag identifies the issue to be evaluated and requires a response from the supervisor as to (1) how the flag was reviewed and (2) what, if any, action was taken as a result of the review. As an EIS flag relates to the findings of the force audit, an individual EIS flag would be send for: each individual officer/supervisor found to have higher deficiency rates, officer/supervisor found to have higher force rates/types, and Precinct/Unit trends in force or deficient report writing. By doing this, each individual issue is addressed (rather than a single flag for all issues).

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**Table 3 – Reporting Deficiencies per Force Event (North Precinct)**

|          | Officer | Sergeant | Lieutenant | RU Manager |
|----------|---------|----------|------------|------------|
| 2017 Q1  | 1.40    | 3.27     | 0.41       | 1.67       |
| 2017 Q2  | 1.42    | 3.38     | 0.74       | 2.48       |
| 2017 Q3  | 0.74    | 1.86     | 0.58       | 0.33       |
| 2017 Q4* | 3.28    | 2.33     | 0.88       | 1.33       |
| 2018 Q1  | 2.52    | 2.90     | 1.10       | 2.00       |
| **TOTAL** | 1.87   | 2.82     | 0.76       | 1.71       |

*Increase due to expansion of force types collected

**Table 4 – Reporting Deficiencies per Force Event (East Precinct)**

|          | Officer | Sergeant | Lieutenant | RU Manager |
|----------|---------|----------|------------|------------|
| 2017 Q1  | 1.32    | 1.86     | 0.25       | 0.77       |
| 2017 Q2  | 1.18    | 1.45     | 0.36       | 0.34       |
| 2017 Q3  | 0.89    | 0.85     | 0.08       | 0.05       |
| 2017 Q4* | 3.41    | 1.55     | 0.73       | 0.85       |
| 2018 Q1  | 0.69    | 1.14     | 0.28       | 0.29       |
| **TOTAL** | 1.41   | 1.35     | 0.33       | 0.43       |

*Increase due to expansion of force types collected

**Table 5 – Reporting Deficiencies per Force Event (Central Precinct)**

|          | Officer | Sergeant | Lieutenant | RU Manager |
|----------|---------|----------|------------|------------|
| 2017 Q1  | 0.89    | 2.37     | 0.36       | 0.83       |
| 2017 Q2  | 1.44    | 1.72     | 0.47       | 0.94       |
| 2017 Q3  | 1.23    | 2.00     | 0.44       | 0.48       |
| 2017 Q4* | 1.64    | 1.43     | 0.85       | 0.62       |
| 2018 Q1  | 1.24    | 1.32     | 0.29       | 0.78       |
| **TOTAL** | 1.31   | 1.73     | 0.50       | 0.71       |

*Increase due to expansion of force types collected

The outcome results from the Phase 2 audit indicate that officers and supervisors, on the whole, are making good decisions in their uses of force. For this report, we comment on the 2018 Q1 findings from the Inspector (Note: Because some coding schemes have changed within the past 3 quarters, combining the datasets for a longer timeline was not possible). For that quarter, the Inspector coded 10 points of review -- Report writing, information gathering, initial response, initial contact, risk assessment, legal standing, options and contingencies, medical aid, post custody, and use of force (see Appendix 5 for the

COCL Compliance and Outcome Assessment Report: Section III Use of Force

methodology and coding scheme for each category). In addition, the Inspector examined whether the *Graham* standard had been met, as well as whether there were other policy violations, trends, training concerns, or the need for a debrief with the officer. As seen in Table 6, officers' deficiencies in these 123 cases were rare, but varied by type. Officers were more deficient in their report writing than in any other area reviewed by the Inspector. Officers uses of force were deficient (without necessarily violating the *Graham* standard) in a total of 4 cases, and an officers' legal standing at the beginning of the interaction was potentially problematic in 3 cases. The Inspector also noted a total of 22 policy violations (many of these were for some aspect of report writing being absent, though this did not necessarily cause an overall report writing deficiency), 10 of which were identified by a supervisor in the chain of command and 12 of which were identified by the Inspector. Additionally, the Inspector noted 8 instances where a debrief was needed, 4 of such instances having already been identified in the chain-of-command review.

**Table 6 – Inspector Points of Review Findings (Officer)**

| Issue Examined by Inspector | 0 | 1 | Percent Positive Evaluation |
|---|---|---|---|
| Report Writing | 7 | 116 | 94.3% |
| Information Gathering | 0 | 123 | 100% |
| Initial Response | 1 | 122 | 99.2% |
| Initial Contact | 0 | 123 | 100% |
| Risk Assessment | 2 | 121 | 98.4% |
| Legal Standing | 3 | 120 | 97.6% |
| Options and Contingencies | 2 | 121 | 98.4% |
| Medical Aid | 0 | 123 | 100% |
| Post Custody | 0 | 123 | 100% |
| Use of Force | 4 | 119 | 96.8% |

**Table 7 – Inspector Points of Review Findings (Event)**

| Issue Examined by Inspector | 0 | 1 | Percent Positive Evaluation | Identified by Chain-of-Command | Identified by Inspector |
|---|---|---|---|---|---|
| *Graham* Standard Met | 3 | 120 | 97.6.8% | N/A | N/A |
| Policy Violations | 22 | 101 | 82.1% | 10 | 12 |
| Trend | 1 | 122 | 99.2% | 1 | 0 |
| Training Concern | 3 | 120 | 97.6% | 3 | 0 |
| Debrief Needed | 8 | 115 | 93.5% | 4 | 4 |

In sum, based on the force audit process, the force audit results (which we have audited), the recently implemented feedback system for audit findings, and the conscientious application of the audit process by the Inspector and his team, we believe that the force audit system is soundly developed and extremely beneficial to PPB's overall efforts to manage officer uses of force.

*Quantitative Analysis of Force Data*

Apart from our assessment of PPB's Force Audit as a system of force management, our evaluation also examines force data over an extended timeline to identify general trends. In the following pages, we perform simple and complex statistical analyses, looking at how force is used, who force is used on, and who uses force (among other foci). The questions and associated analyses are largely influenced by the questions delineated in Par. 170, Subsection (a).

To answer these questions, COCL examined data coming from two primary sources – PPB's Quarterly Force Data Summary Reports or directly from Force Data Collection Report data collected by PPB. Measures collected by PPB through FDCRs are digitized and checked for inaccuracies by PPB analysts. This process aids in organizing the data and ensuring accurate measurement of certain characteristics involving the use of force. Many of the questions examined by the COCL are descriptive in nature and are often answered using a graphic of some type to depict the trend in force over time. Other questions are explanatory in nature and require robust statistical analyses to control for critical factors related to force use. These are briefly explained in their relative sections.

For the descriptive analyses below (i.e. charts/graphs/tables), we use the timeframe of Q2 2015 to Q1 2018. As PPB switched to a new Records Management System (RMS) in the second quarter of 2015, it would be difficult to compare prior data to data collected after this time. Additionally, for many of descriptive analyses, the reader will note the number of force events appear to increase substantially in the third quarter and fourth quarter of 2017. The reader should not assume that PPB officers began using more force during these quarters. Rather, this increase very likely reflects a change in the type of circumstances which are considered reportable force. Based on PPB's revision to Directive 1010.00, actions such as "Resisted Handcuffing" and "Control Against Resistance" are now considered reportable force. As seen in Figure 3, these two recent additions to what is reportable force represent a substantial portion of the observed increase in force, particularly with Control Against Resistance having over 400 occurrences in the first quarter of 2018. The reader should be aware that this increase represents an expansion of force types being measured by the PPB, leaving them better equipped to manage force as a result of this change.

We also take this opportunity to guide the reader through our analyses and explain the order in which we present our findings. Many of the first graphs and charts examine various aspects force over time. This allows for an evaluation of how force has fluctuated over time and how specific force types vary in relation to other force types. Next, we provide cross-sectional analyses, which means that, rather than evaluating force aspects over time, we choose a single time period and examined force events *within that timeframe* (the selected time period in this report is force that occurred between August 2017 and April 2018, encompassing force events that occurred after the change to Directive 1010.00). For these analyses, the reader will see two types of analyses: bivariate and multivariate.

In performing in-depth analyses for data sets, bivariate statistics are often provided first. Bivariate analyses examine the statistical relationship between two variables <u>without</u> accounting for other factors which may explain that relationship. In social science, a bivariate statistical relationship indicates to a researcher that (1) a relationship exists that is not due to chance and (2) the relationship should be further explored. When a statistical relationship has been identified, multivariate analyses can then be used to further explore that relationship and provide a clearer picture of the relationship between two variables.

Multivariate analyses evaluate two variables' relationship while controlling for other potential explanations. For example, a common example of explaining bivariate analyses compared with multivariate analyses is the existence of a positive bivariate relationship between ice cream sales and murder. Both variables are significantly related to each other, leading a person to potentially, and erroneously, conclude that ice cream leads to murder. However, when including other, more important, factors (in this example, the time of year), the relationship disappears (i.e., the relationship is explained better by other factors). In the ice cream/murder example, ice cream sales increase in the summer time as do murders – that is to say, while they both increase in relation to each other, there is a third factor which explains both of them. Thus, the common phrase is *correlation* (a bivariate analysis) does not equal *causation* (which requires at least a multivariate approach). While we report the bivariate results to indicate areas which should be further explored, the reader should ascribe more importance to the multivariate tests.

We further note that for the bivariate/multivariate evaluations, we provide an examination of two primary foci. The first is an analysis of the <u>first</u> force type applied to a subject. For this, we combine Category II and Category III force events (more serious force) and compare them against Category IV force events (less serious force). The second focal point is an examination of the <u>highest</u> level of force a subject experiences in a force event. For each of these foci, the analysis includes both a bivariate and multivariate analysis.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**How often does PPB use force?**

Use of force among PPB officers has varied to a certain degree from quarter to quarter over the last few years. This variance may have a number of causes and correlates, including aggregate rates of crime, calls for service, training, policy change, and data collection methods, to name a few. However, absent more sophisticated analyses for major contributors and reasons as to *why* force may fluctuate, the fundamental question must be addressed: *Has force increased or decreased over time?*

Using the Quarterly Force Data Summary Reports published by PPB, we report that since Quarter 2 of 2015 there has been a total of 4,903 applications of force in 2,176 cases. The frequency of force events per quarter are depicted in Figure 1 below. The green line shows the trend of force applications prior to the change in Policy 1010.00 (a total of 2,617 applications). The red line shows the applications of force after Policy 1010.00 (a total of 2,286 applications). The purple line is a three-quarter, moving average that depicts the smoothed, average trend over time. Taken together, over the last three years there has not been a great degree of fluctuation with the frequency of force hovering around 280 applications of force per quarter until the change in Policy 1010.00. Policy 1010.00 has substantially increased the scope of force applications captured in their data accounting for almost half of the applications. Given the trend of applications over time and the policy change, there is little evidence to support the notion that force has been increasing outside of changes in definition and data collection. This graph does not take into consideration things such as subject reported resistance and if the person was armed.

**Figure 1 – Frequency of Force over Time**



*Vertical dotted line indicates expansion of force types collected

**Force against persons with a perceived mental health illness**

Apart from overall force trends, another important question that is particularly related to the Settlement Agreement (SA) is: *Has force against persons with a perceived mental health illness increased or decreased over time?* As shown in Figure 2 below, both the count and rate[2] of force applications toward persons with perceived and actual mental health issues has a great degree of variance over time. All measures of application indicate that there was a sizable spike in Q3 of 2016 and a remarkable drop in Q1 of 2017. This rise and fall was followed by the expected rise in Q3 of 2017 due to the 1010.00 policy change. Also of note is the total number of CEW applications used on persons with mental illness. In the past three quarters, there have only been five uses of CEW against persons with mental illness, a substantial reduction from a high of thirteen in the third quarter of 2016.

**Figure 2 – Force Used on Persons with Mental Illness over Time**



*Vertical dotted line indicates expansion of force types collected

---

[2] The rate of force for this graph is calculated by the number of force applications toward a person with a perceived or actual mental health issue divided by the total number of force applications for the quarter (expressed as a percent).

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**How often is each force type used?**

The six most frequently used force types are included in Figure 3 below. Prior to the expansion of collected force types, Takedowns and Pointing of a Firearm were the most frequent types, both of which ranged between 80 and 150 depending on the quarter. This graph showcases how the change in policy 1010.00 influenced changes in force data. Beginning in Q3 2017, Resisted Handcuffing and Control Against Resistance became the most common force types used, with Control Against Resistance having over 400 applications in the first quarter of 2018.

**Figure 3 – Force Applications over Time**



*Vertical dotted line indicates expansion of force types collected

COCL Compliance and Outcome Assessment Report: Section III Use of Force

Drilling down further into the data, we examined the use of CEW when compared with all other force types. As seen in Figure 4, the proportion of force applications represented by CEWs has historically been between 5% and 10%, though in the third quarter of 2016, the proportion reached a high of 10.86%. This is contrast to a low of 5.57% in the fourth quarter of 2015. In the third quarter of 2017, the proportion of force applications represented by CEWs dropped to 4.12% and has decreased from there in each of the past two quarters. However, this is primarily due to the expansion of reportable force types that occurred at this time. In the first quarter of 2018, the proportion was 1.58%.

**Figure 4 – CEW Proportion of All Force Types over Time**



**How often is each force category used (based on PPB's Category I-IV)?**

Using information available on PPB's Quarterly Force Data Summary Reports, we examined the breakdown between categories of force. As Category IV force types occur more commonly that Category II and III force types, we left Category IV as a standalone category while then combining II and III. PPB began collecting data on Force categories on August 19, 2017 (during Q3) and we therefore note that data on categories was not collected for the whole of 2017 Q3 (thus explaining Category IV's lower value in that quarter). The following 11 types of force are considered category II or III: Control Hold with Injury (CHWI), Baton – Strike, Takedown, Strikes/Kicks, Impact Munition, Less Lethal, Aerosol Restraint, Conducted Energy Weapon (CEW), K9 Bite, Pursuit Intervention Technique (PIT), Firearm Discharge (FD) – Aggressive Animal, and Vehicle Ramming. The following 8 types of force are considered category IV: Baton – Nonstrike, Controlled Takedown, Resisted Handcuffing, Pointing of a Firearm (PFA), Hobble Restraint, Firearm Discharge (FD) – Wounded Animal, Box-in, Control Against Resistance. Figure 5 below depicts the frequency of categories accounting for quarterly force since the change in Policy 1010.00. Further illustrating an earlier point of force frequency, the use of force related to Category II and III (most of which were collected prior to the change of 1010.00) remains fairly consistent (though is showing some slight increase over the three-quarter timeline). For Category IV, a much larger increase is demonstrated, though this increase is primarily due to the changes in data collection relating to the revised policy and likely officer improvements in reporting Category IV force.

**Figure 5 – Frequency of Force Categories Since Expansion of Force Types Collected**



COCL Compliance and Outcome Assessment Report: Section III Use of Force

**What has been PPB's rate of force per custody?**

Again using the Quarterly Force Data Summary Reports on PPB's website, the figure below depicts the trend in the rate of force to custody. When someone is taken into custody (arrested), police officers in general are more likely to face a situation where the individual may be upset and disobey the officer, thus requiring the use of force. Hence, in this analysis we look at force rates in the context of custody rates. PPB saw the lowest rate of force to custody in 2017 during Q2 (2.3%). It was subsequently followed by the highest rates. This is consistent with the expansion in reportable force types beginning in 2017 Q3. Due to this policy change, more events were captured, thereby leading to a higher force per custody rate.

**Figure 6 – Force to Custody Rate over Time**



*Vertical dotted line indicates expansion of force types collected

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**Who uses force?**

The specific question addressed here is: *Are there differences in type of force used based on officer characteristics?* To answer this question, COCL used data from the digitized process used by PPB to construct the Quarterly Force Data Summary Reports. Table 8 below provides a bivariate breakdown of officer characteristics and force category. Table 8 examines whether officer characteristics are associated with the severity of force applied, as represented by the three force Categories. For instance, when force is applied by an ECIT officer, 64.7% of it is a Category IV force (least serious), 23.5% of it is Category III, and 11.8% is Category II (more serious). This is not significantly different from the distribution of force types applied by officers who are not ECIT trained. With this in mind, the results indicate that for most officer characteristics, there are no substantial differences in the seriousness of force applied. North Precinct applies significantly less Category II (serious) force compared to the rest of the precincts, and Central Precinct applies significantly less Category III force. Similarly, Shift A, C, and E make up the majority of each type of force applied (See Total sample size). However, when comparing Shifts, Shift A has the highest concentration of force cases in least serious Category IV (73.1%), while Shift C has a relatively higher concentration of force cases in more serious Categories, especially Category II (12.5%). Specialty shifts have far fewer cases in total (N=43), but those cases often involve situations that result in more serious applications of force. Finally, force severity fluctuates depending on the number of years an officer has been with the Bureau. In general, the percentage of force applications that are serious in nature (Category II) is lower in the first 10 years with the Bureau than in next 10 years.

**Table 8 — Percent within officer characteristics by force category, Q3 2017 to Q1 2018**

| Available Officer Characteristics | | Total | Force Category | | |
|---|---|---|---|---|---|
| | | | IV | III | II |
| ECIT trained | *Yes* | *323* | *64.7%* | *23.5%* | *11.8%* |
| | *No* | *1059* | 66.3 | 23.6 | 10.1 |
| Precinct | *Central\*\*\** | *447* | 70.9% | 16.6% | 12.5% |
| | *East* | *485* | 66.0 | 22.5 | 11.5 |
| | *North\*\*\** | *310* | 62.6 | 31.9 | 5.5 |
| | *All other areas* | *136* | 57.4 | 31.6 | 11.0 |
| Shift | A\*\* | 398 | 73.1% | 17.1% | 9.8% |
| | B | 79 | 69.6 | 24.1 | 6.3 |
| | C\*\* | 455 | 59.6 | 27.9 | 12.5 |
| | D | 44 | 61.4 | 29.5 | 9.1 |
| | E | 362 | 69.1 | 22.1 | 8.8 |
| | Special\*\*\* | 43 | 37.2 | 46.5 | 16.3 |
| Average years on the force (SD) | | | 11.2 (7.3) | 11.4 (6.9) | 12.7 (12.8) |
| Years on force categorized\*\*\* | 0-5 years | 283 | 71.0% | 19.1% | 9.9% |
| | >5-10 years | 362 | 64.1 | 29.8 | 6.1 |
| | >10-15 years | 331 | 68.9 | 19.6 | 11.5 |
| | >15-20 years | 215 | 55.3 | 28.4 | 16.3 |
| | >20 years | 190 | 67.9 | 20.5 | 11.6 |

\*\*\**p*<.001, \*\**p*<.01

COCL Compliance and Outcome Assessment Report: Section III Use of Force

To determine if the officer characteristics were predictive of force category, we refer the reader to the Table 15. The ordinal logistic regression model provides effect estimates of importance in predicting force category for all available officer characteristics, while controlling for subject and event factors.

**Who has force used against them?**

The COCL analyzed the force data to look for differences in the application of force by racial/ethnic group, and also by gender. Force-to-custody trends were examined for all racial/ethnic categories in the dataset (White, Black, Hispanic, and Other). Depicted in Figure 7, prior to the 1010.00 policy change, the force to custody trend for White subjects varied between 1.8% and 3.2%. This can be read as: A force event occurs in 1.8 to 3.2% of custodies involving White subjects. Hispanic subjects experienced a higher degree of fluctuation over the last several quarters prior to the 1010.00 change from 2.2% to 4.7%, as did the Other racial category fluctuating from .6% to 6.4%. The high degree of fluctuation in the Other racial category is largely due to the fact that there are so few force cases (often less than 15 cases) for this category per quarter. A similar trend was also observed among Black subjects, though fluctuating between higher values – 2.9% to 5.6%. All trends within racial categories appeared to drop considerably in the quarter prior to the 1010.00 policy change (Q2 of 2017). Immediately following the 1010.00 change, all racial categories experienced a sharp rise in the force-to-custody ratios. This is most likely attributable to the expansion of force definition and data collection, and not necessarily indicative of unequal use of force.

One way to understand the relative trends across racial categories is to compare the trend for each racial category to that of White subjects. To assess if these trends were similar across races, a cross-correlation was conducted comparing each racial trend in force per custody to the White trend. We found that, in spite of the differences in their magnitude, the fluctuations of each racial/ethnic force-to-custody ratio was similar to the fluctuations of White subjects (Black $r=.858$, $p<.05$; Hispanic $r=.638$ $p<.1$; Other $r=.503$ $p>.1$). That is to say, despite potential differences between race/ethnic groups overall force to custody rates, rates went up or down in similar patterns for the groups.

We also note that these trends and calculations do not account for when subjects possessed a weapon or actively resisted (see below for our logistic regression which does control for such event characteristics). Rather, this analysis is simply designed to examine overall rate fluctuations in relation to a subject's race/ethnicity. It is also important to note that because there are so few instances of force being applied to some of these racial/ethnic groups the estimates show greater fluctuation and may depict a relatively imprecise trend due to low sample size. This is most apparent in the "Other" race/ethnicity category.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**Figure 7 – Force to Custody Rate over Time by Race**



*Vertical dotted line indicates expansion of force types collected

COCL Compliance and Outcome Assessment Report: Section III Use of Force

When examining trends of force between men and women, it appears that force-to-custody ratios are much higher for men as they are for women. Shown in Figure 8 the trend of force-to-custody ratios among men is the clear driver of the overall force-to-custody ratio, since men are much more likely to be arrested than women in general. When comparing the trends among men and women subjects, it appears that there is a moderate to weak correlation ($r$=.522 [full set] and $r$=.250 [Pre-1010.00], both p<.1). This suggests that women's force to custody ratio fluctuates in a different manner than experienced by males. However, since the revision to Directive 1010.00, the gap in force to custody ratios between the two sexes has decreased, perhaps suggesting women are subjected more often to Category IV levels of force compared to men (see also the logistic regression results later in this section). In addition to the gap between the sexes closing post-1010.00 revision, the results indicate a higher correlation between the two sexes' trends after the Directive revision – that is to say that since the Directive revision, force per custody rates for both gender fluctuate in a more similar pattern.

**Figure 8 – Force to Custody Rate over Time by Gender**



*Vertical dotted line indicates expansion of force types collected

50

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**Within each subject characteristic, what is the proportion for each resistance category?**

To answer this question, COCL used the data provided by the PPB digitizing system from which they draw information to complete the Quarterly Force Data Summary Reports. Table 9 below provides a breakdown of the force events for each reported resistance category, broken out by race, age, and sex from Q1 2017 to Q1 2018. Percentages shown are those associated within subject characteristic groupings (percentages may add up to >100% since a single person may demonstrate multiple categories of resistance throughout a force event). For instance, when White subjects experience force and are resisting, 13% of the time their reported resistance is Passive, 75% it is Active, and 16.5% it is Aggressive or Deadly. Most notable from this table is that the overwhelming majority of force cases involve a subject that is actively resisting (approximately 75%). This trend generally holds true across demographics. Additionally, Deadly Resistance is consistently low, though Hispanics (4.6%) and persons over the age of 50 (5.8%) demonstrate higher rates of Deadly Resistance compared with other demographic categories. Additionally, the "Other" race/ethnicity category shows higher rates of Passive Resistance (25.3% versus 15% or less) and lower rates of Active Resistance (65.7% compared with other demographic categories which were 72% or more), though this is most likely due to a comparatively lower frequency in the data.

**Table 9 — Percent within subject characteristics by reported resistance category, Q1 2017 to Q1 2018**

| All Subject Characteristics | | Total | Resistance category | | | |
|---|---|---|---|---|---|---|
| | | | Passive | Active | Aggressive | Deadly |
| Race | White | 1110 | 13.1% | 75.2% | 15.0% | 1.5% |
| | Black | 540 | 15.0 | 74.6 | 14.1 | 1.1 |
| | Hispanic | 194 | 11.3 | 72.2 | 19.1 | 4.6 |
| | Other | 99 | 25.3 | 65.7 | 13.1 | 0.0 |
| Sex | Male | 1559 | 14.3% | 73.8% | 15.3% | 1.8% |
| | Female | 385 | 13.0 | 76.1 | 14.0 | 1.0 |
| Age | ≤ 20 | 196 | 15.3% | 71.9% | 19.9% | .5% |
| | 21 − 30 | 640 | 14.8 | 73.9 | 14.5 | 1.1 |
| | 31 − 40 | 616 | 11.5 | 76.1 | 16.4 | 1.3 |
| | 41 − 50 | 320 | 16.2 | 74.4 | 13.1 | 2.2 |
| | ≥ 51 | 155 | 12.9 | 72.9 | 11.0 | 5.8 |

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**What initial call types are commonly associated with force?**

Drawing from the Quarterly Force Data Summary Reports published by the PPB, we compiled the initial call types reported and their associated frequency of force incidents. As depicted by Figure 9, the calls that consistently account for most force events are priority disturbance calls (average of 22% of force incidents associated with initial calls). This was followed by traffic stops (12%) and person contact (86) (8%).



Figure 9 – Most Frequent Call Types Related to Force over Time

*Vertical line indicates expansion of force types collected

52

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**Dispositions after Force**

Using the FDCR data, COCL also aimed to breakdown the proportion of force events that are attributed to dispositions related to felonies, misdemeanors, or unrelated to crimes entirely. Table 10 supplies a global breakdown of dispositions related to force categories applied at the event level from Q3 2017 to Q1 2018. Here we see that felony and misdemeanor arrests make up the majority of category applications (57.6% of all force events). Among misdemeanor arrests, 68.6% of them are Category IV force and 21.7% are Category III force, while only 9.7% are Category II. In contrast, felony arrests consisted of 53.7% of Category IV force, 30.8% of Category III, and 15.5% of Category II. This is relatively consistent with the concepts found within Graham and PPB policy – the severity of the crime is an important aspect in the level of force which may be reasonable. Here, we see that felonies are associated with higher levels of force and, alternatively, when the severity of a crime is lesser (indicated by misdemeanors), the level of force is also reduced. It is also important to note that these proportions are presented as mutually exclusive categories. Additionally, we note that "Release to Medical" does not mean force was used without a crime having been committed. Often, those with a "Release to Medical" disposition receive a citation in lieu of arrest.

**Table 10 — Disposition type per force category**

| Disposition Category | Total | Force Category | | |
| --- | --- | --- | --- | --- |
| | | IV | III | II |
| Arrest and Cited | 27 | 63.0% | 25.9% | 11.1% |
| Arrest – Felony | 354 | 53.7 | 30.8 | 15.5 |
| Arrest – Misdemeanor | 443 | 68.6 | 21.7 | 9.7 |
| Arrest – Other Agency | 7 | 57.1 | 42.9 | 0.0 |
| Arrest – Warrant | 139 | 57.6 | 41.0 | 1.4 |
| Cite and Release | 11 | 100.0 | - | - |
| Detained and Release | 70 | 71.4 | 14.3 | 14.3 |
| Detox | 20 | 100.0 | - | - |
| Escaped | 11 | 54.5 | 36.4 | 9.1 |
| Release to Medical | 301 | 76.4 | 13.3 | 10.3 |

**Chain-of-Command Evaluations of Force**

Drawing from the digitized data for Q3 2017 to Q1 2018, COCL also examined the number of force events' findings in relation to whether the force decision was considered within PPB policy through the chain of command review. Below, Table 11 breaks down the findings of sergeants and lieutenants by force category of the event. Over 95% of all force, regardless of the category, were found to be within PPB's policy expectations. It is important to keep in mind that only 30 or fewer FDCRs were found across the finding categories to be out of policy or lacking agreement across review. Category IV force types were most likely to have the actions found to be in policy by the reviewing Sgt. (as well as being most likely for the Lt. to agree with the Sgt.'s review). This is possibly due to Resisted Handcuffing being considered in-policy by the Sgt. nearly 100% of the time and the Lt. agreeing with that assessment 98.8% of the time (see the bottom portion of Table 11). In summary, for all force categories and most prevalent force types, the results indicate that officers are often found to be within policy for their uses of force.

**Table 11 — Findings on force actions by force category and type**

| Findings on force actions | | Percent within Force Category | | |
| --- | --- | --- | --- | --- |
| | | IV | III | II |
| | *Total per force type* | *811* | *318* | *145* |
| Actions in policy – Sergeant | | 98.4% | 96.2% | 97.9% |
| Consistent with training – Sergeant | | 98.4 | 96.5 | 97.9 |
| Deemed objectively reasonable | | 99.3 | 97.8 | 99.3 |
| Agreement with Sergeant – Lieutenant | | 98.6 | 94.7 | 99.3 |

| Findings on force actions | Percent within Force Type (Top 4 + CEW) | | | | |
| --- | --- | --- | --- | --- | --- |
| | PFA | Resisted HC | Takedown | Control Hold Against Resistance | CEW |
| *Total count per force type* | *227* | *381* | *344* | *309* | *58* |
| Actions in policy – Sergeant | 85.9% | 99.7% | 96.8% | 97.4% | 96.6% |
| Consistent with training – Sgt. | 86.8 | 99.7 | 95.6 | 96.8 | 94.8 |
| Deemed objectively reasonable | 87.7 | 99.5 | 98.5 | 98.1 | 98.3 |
| Agreement with Sergeant – Lt. | 87.7 | 98.8 | 97.0 | 95.6 | 100 |

**Examining the first type of force**

The first type of force used by the officer sets the stage and may determine the direction of the force sequence from that point forward. Therefore, given the importance of the first type of force used, we examine whether the subject or event characteristics influence what type of force is applied by each officer. Specifically, we aimed to answer the question: *Are there differences in the <u>first type of force</u> used based on subject, officer, or event characteristics?* It is important to note that this is not the first type of force applied in the <u>event</u>. Rather, this captures each <u>officer's</u> first application of force as captured in the officer's FDCR.

**Analytical plan.** For the examination of an officer's first application of force, two types of analysis are conducted. First, we examined the characteristics that make up the majority of force category (i.e., "force type") that is first applied by an officer. To determine if the categories differ by each characteristic examined, we conducted tests (i.e., bivariate analyses[3]) to better contextualize the force event distribution by subject characteristics. For this analysis, application of force is dichotomized (i.e., Category IV versus any more serious Category of III or II incidents) for ease of analysis and interpretation. Second, we used advanced statistics to examine which characteristics (if any) are most associated with the category of force applied, while controlling for subject, officer and event characteristics. This multivariate analysis is known as a binary logistic regression and is conducted at the event level.[4] The data used to calculate these are only from August 2017 to March 2018.

**Results.** In Table 12, we examine whether specific subject, officer, and event characteristics are associated with the <u>first</u> type of force that is applied by the officer, comparing the likelihood of receiving Category IV (less serious) or Category II/III (more serious) types of force. Male subjects were significantly more likely than females to receive more serious force applications (20.4% vs. 9.0%), but race of the subject did not influence the first type of force applied. Transient subjects were more likely to be the recipients of more serious force applications than non-transients (21.1% vs. 14.9%), as were subjects where force was used by ECIT officers (22.2% vs 16.5%). More serious types of force were also more likely to be used on subjects who actively resisted, aggressively resisted, or resisted with deadly force than subjects who only passively resisted. For example, 42.7% of those who actively resisted received a more serious application of force, while only 0.8% of those who passively resisted received this level of force. Similarly, the officer's precinct and shift were also associated with force level. Subjects in the East Precinct received lower levels of force than other areas (13.9%), while "All Other" Precincts received the highest percentage of more serious

---

[3] The bivariate examination consisted of chi-square tests when the measure was categorical (e.g., race) and a one-way analysis of variance (ANOVA) was used for the continuous measure of subject age. Flags (*) of statistical significance from these tests indicate that the proportions differ significantly ($p$-value less than .05) across force category.

[4] Analyzing these data at the event level means some subjects may be represented multiple times. It is important to note that the unit of analysis for this regression is *application of force.* Subsequently, the cases being analyzed are applications of force via FDCRs, which means that individual subjects may be listed multiple times in the dataset. In other words, a subject who experienced multiple types of force would be counted multiple times because that subject would have multiple FDCRs. Some argue that this may be problematic because it increases the number of times the subject's characteristics are counted in the model. To correct for this, we weighted the observations by the number of times an individual subject's characteristics appeared in the dataset.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

force (25.0%)[5]. Officers were less likely to give commands before applying force in more serious cases (12.1% vs. 21.1%).

De-escalation techniques were associated with fewer applications of serious force. In particular, serious force was used less frequently when the officer used verbal calming (10.9% vs. 21.3%), allowed a response from the subject (12.6% vs. 20.5%), and safely communicated with the subject (12.3% vs. 19.2%).

When the officer perceived that the subject had a mental health condition or crisis prior to the use of force, more serious applications of force were less likely (13.4% vs 19.2%). However, when subjects were perceived to be deliberately disobedient or antagonistic, serious force was used more often (20.1% vs. 9.5%). Also, other perceived preconditions, such as a medical issue, also lower the use of serious force (13.8% vs. 19.7%).

**Table 12 — Bivariate breakdown of unweighted percentages within characteristic by force category**

| First Force Type | | | Category IV | Category II & III |
|---|---|---|---|---|
| | | *Total* | *1156* | *250* |
| **Subject Sex*** | *Male* | *1081* | 79.6 | 20.4 |
| | *Females* | *310* | 91.0 | 9.0 |
| **Subject Race** | *White* | *804* | 81.7 | 18.3 |
| | *Black* | *385* | 83.6 | 16.4 |
| | *Hispanic* | *128* | 79.7 | 20.3 |
| | *Other* | *74* | 83.8 | 16.2 |
| **Subject was transient**** | Yes | 648 | 78.9 | 21.1 |
| | No | 740 | 85.1 | 14.9 |
| **Subject Age** | *<20 years* | *145* | 80.7 | 19.3 |
| | *20-30 years* | *451* | 82.5 | 17.5 |
| | *30-40 years* | *435* | 82.5 | 17.5 |
| | *40-50 years* | *242* | 83.1 | 16.9 |
| | *>50 years* | *118* | 79.7 | 20.3 |
| **Subject Reported resistance*** | *Passive* | *120* | 99.2 | 0.8 |
| | *Active* | *1083* | 84.4 | 15.6 |
| | *Aggressive* | *178* | 57.3 | 42.7 |
| | *Deadly* | *8* | 75.0 | 25.0 |
| **Has had previous interaction with subject** | Yes | *51* | 82.4 | 17.6 |
| | No | *1340* | 82.2 | 17.8 |
| **Officer was ECIT*** | Yes | *329* | 77.8 | 22.2 |
| | No | *1061* | 83.5 | 16.5 |
| **Officer average years on force (*SD*)** | | | 11.3 (7.3) | 11.5 (6.6) |
| **Officer Precinct**** | *Central* | *459* | 80.8 | 19.2 |
| | *East* | *490* | 86.1 | 13.9 |
| | *North* | *305* | 80.7 | 19.2 |
| | *All Other* | *132* | 75.0 | 25.0 |

[5] "All Other" Precincts includes Detectives, DVD, Family Services, K9, Other (please specify), TOD, Traffic, Transit (PPB Only), and Youth Services.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

| | | | | | |
|---|---|---|---|---|---|
| **Officer Shift**** | A | | 392 | 84.7 | 15.3 |
| | B | | 79 | 87.3 | 12.7 |
| | C | | 466 | 79.6 | 20.4 |
| | D | | 44 | 68.2 | 31.8 |
| | E | | 366 | 84.2 | 15.8 |
| | Specialty | | 41 | 73.8 | 26.2 |
| **Gave command before force**** | Yes | | 503 | 87.9 | 12.1 |
| | No | | 888 | 78.9 | 21.1 |
| **Contact Reason*** | ECIT / Mental Health | | 55 | 92.7 | 7.3 |
| | Traffic stop / accident | | 147 | 80.3 | 19.7 |
| | Welfare check, Flagdown, or Mere conversation | | 97 | 82.5 | 17.5 |
| | Subject stop | | 239 | 79.1 | 20.9 |
| | Property offense call | | 377 | 82.2 | 17.8 |
| | Person offense call | | 405 | 81.0 | 19.0 |
| | Other | | 70 | 94.3 | 5.7 |
| **Type of Call** | Citizen Call | | 1058 | 82.8 | 17.2 |
| | Officer initiated or Outside agency | | 333 | 80.2 | 19.8 |
| **Premise Type** | Private - Indoor or Outdoor | | 504 | 83.7 | 16.3 |
| | Public - Indoor (Includes Law enforcement/MH facility) | | 40 | 87.5 | 12.5 |
| | Outdoor – Public | | 846 | 81.0 | 19.0 |
| **De-escalation Technique** | Verbal Calming*** | Yes | 466 | 89.1 | 10.9 |
| | | No | 925 | 78.7 | 21.3 |
| | Allowed response*** | Yes | 476 | 87.4 | 12.6 |
| | | No | 915 | 79.5 | 20.5 |
| | Communicated Safely** | Yes | 269 | 87.7 | 12.3 |
| | | No | 1122 | 80.8 | 19.2 |
| | Decrease Exposure to Threat | Yes | 92 | 89.1 | 10.9 |
| | | No | 1299 | 81.7 | 18.3 |
| | Used Barriers** | Yes | 61 | 96.7 | 3.3 |
| | | No | 1330 | 81.5 | 18.5 |
| | Appropriate Numbers*** | Yes | 470 | 86.8 | 13.2 |
| | | No | 921 | 79.8 | 20.2 |
| | Moved to safety | Yes | 30 | 90.0 | 10.0 |
| | | No | 1361 | 82.0 | 18.0 |
| | Avoided physical contact* | Yes | 204 | 87.3 | 12.7 |
| | | No | 1187 | 81.3 | 18.7 |
| | Consulted specialized unit | Yes | 96 | 80.2 | 19.8 |
| | | No | 1295 | 82.3 | 17.7 |
| | One-on-one communication | Yes | 86 | 94.2 | 5.8 |
| | | No | 1305 | 81.4 | 18.6 |

COCL Compliance and Outcome Assessment Report: Section III Use of Force

| | | | | | |
|---|---|---|---|---|---|
| **Perceived condition prior to force** | *Subject possibly or actually armed* | Yes | *387* | 82.9 | 17.1 |
| | | No | *1004* | 81.9 | 18.1 |
| | *Mental Illness/Crisis\** | Yes | *335* | 86.6 | 13.4 |
| | | No | *1056* | 80.8 | 19.2 |
| | *Under the influence* | Yes | *720* | 81.9 | 18.1 |
| | | No | *671* | 82.4 | 17.6 |
| **Perceived reason for lack of compliance prior to force** | *Deliberately disobedient/ antagonistic\*\*\** | Yes | *1095* | 79.9 | 20.1 |
| | | No | *296* | 90.5 | 9.5 |
| | *Any other reason (e.g., medical issue)\*\** | Yes | *441* | 86.2 | 13.8 |
| | | No | *950* | 80.3 | 19.7 |
| **Was in pursuit prior to force** | | Yes | *54* | 75.9 | 24.1 |
| | | No | *1337* | 82.4 | 17.6 |

*p<.05, **p<.01, ***p<.001
a. Significance asterisks for categorical measures are placed at first category

COCL Compliance and Outcome Assessment Report: Section III Use of Force

To determine which of these measures predicts the likelihood of that force category is used over the other, we employed a logistic regression. The binary logistic regression will isolate the importance of each measure in predicting Category IV versus Category II/III, controlling for all other characteristics. In addition to the measures that were significantly different in the bivariate tests, other theoretical measures were included to control for their effects on other measures that may influence force decisions, such as the subject's age and officer's number of years on the force. In Table 13 we show the results of the logistic regression predicting the likelihood of the officer using a more serious type of force (Category II & III) as opposed to a less serious type of force (Category IV). Important points to note are that for categorical measures (e.g., race), a reference category must be set to which other categories are compared (e.g., White).[6]

**Table 13 — Weighted binary logistic regression predicting the category of first force applied.**

| Outcome: First Force Category Applied (Category II & III = 1) | | Wald | P | Odds Ratio | 95% C.I. for Odds Ratio | |
|---|---|---|---|---|---|---|
| | | | | | Lower | Upper |
| **Subject Age (≥15 Years Old)** | | .037 | 0.848 | 0.99 | 0.99 | 1.01 |
| **Subject Sex** | Male | 42.76 | <.001 | 2.75 | 2.02 | 3.72 |
| **Subject Race** | White (Ref) | | | | | |
| | Black | 1.13 | 0.288 | 0.88 | 0.70 | 1.11 |
| | Hispanic | 3.31 | 0.069 | 1.36 | 0.98 | 1.88 |
| | Other | 6.91 | .009 | 1.85 | 1.17 | 2.94 |
| **Subject was transient** | | 7.48 | 0.006 | 1.34 | 1.09 | 1.64 |
| **Subject Reported resistance** | Passive (Ref) | | | | | |
| | Active | 7.26 | 0.007 | 5.09 | 1.56 | 16.62 |
| | Aggressive/Deadly | 22.69 | <.001 | 18.23 | 5.52 | 60.21 |
| **Officer Precinct** | Central (Ref) | | | | | |
| | East | 0.69 | 0.405 | 0.90 | 0.70 | 1.15 |
| | North | 0.62 | .0432 | 1.12 | 0.84 | 1.49 |
| | All Other | 10.99 | 0.001 | 1.92 | 1.31 | 2.82 |
| **Officer Shift** | C (Ref) | | | | | |
| | A | 4.40 | 0.036 | 0.75 | 0.58 | 0.98 |
| | D | 3.99 | 0.046 | 0.77 | 0.60 | 0.99 |
| | Other | 2.14 | 0.143 | 1.26 | 0.93 | 1.70 |
| **Officer average years on force** | | 4.41 | 0.036 | 0.99 | 0.97 | 1.00 |
| **Gave command before force** | | 0.75 | 0.387 | 1.22 | 0.78 | 1.93 |

[6] Thus, when interpreting the odds ratio for a certain category, it is important to know that it is compared to the reference category. Reference categories were chosen in accordance with their prevalence (highest proportion of observations) or (stature in an ordinal measure, such as "Passive" in the ranked order of reported resistance). To interpret the odds ratio, the reader should note that an odds ratio of 1.00 indicates no relationship with the outcome measure (i.e. force category first applied). Anything above 1.00 indicates an increased likelihood of the outcome being a more serious use of force type (Category II and III), and anything below 1.00 is a decreased likelihood. The reader should interpret the confidence intervals as the range of possible estimates that the odds ratio could be given the observations in the data. The Wald statistic indicates the strength of that predictor in the model. The higher the Wald, the more important the measure is in predicting the use of force category.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

| Contact Reason | Person offense call (Ref) | | | | | |
|---|---|---|---|---|---|---|
| | ECIT / MH | 2.79 | 0.095 | 0.51 | 0.24 | 1.12 |
| | Traffic | 4.49 | 0.034 | 1.46 | 1.03 | 2.06 |
| | Welfare check, Flagdown, or Mere conversation | 2.37 | 0.124 | 1.40 | 0.91 | 2.15 |
| | Subject stop | 0.96 | 0.328 | 0.86 | 0.63 | 1.17 |
| | Property offense call | 0.33 | .0564 | 0.93 | 0.71 | 1.20 |
| | Other | 11.72 | 0.001 | 0.22 | 0.09 | 0.52 |
| De-escalation Technique | *Verbal Calming* | 15.53 | <.001 | .042 | 0.27 | 0.65 |
| | *Allowed response* | 0.00 | 0.983 | 1.00 | 0.66 | 1.50 |
| | *Communicated Safely* | 0.99 | 0.319 | 0.82 | 0.56 | 1.21 |
| | *Decrease Exposure to Threat* | 0.31 | 0.576 | 1.17 | 0.68 | 1.99 |
| | *Used Barriers* | 22.59 | <.001 | .06 | 0.02 | 0.19 |
| | *Appropriate Numbers* | 0.05 | 0.825 | 0.95 | 0.63 | 1.45 |
| | *Moved to safety* | 2.23 | 0.135 | 1.81 | 0.83 | 3.96 |
| | *Avoided physical contact* | 0.29 | 0.87 | 0.97 | 0.66 | 1.41 |
| | *One-on-one communication* | 8.09 | 0.004 | 0.41 | 0.22 | 0.76 |
| Perceived condition prior to force | *Subject possibly armed* | 22.36 | <.001 | 0.55 | 0.43 | 0.71 |
| | *Mental Illness/Crisis* | 0.07 | 0.798 | 0.97 | 0.73 | 1.27 |
| | *Under the influence* | 2.07 | 0.150 | 0.84 | 0.66 | 1.07 |
| Perceived reason for lack of compliance prior to force | *Deliberately disobedient / antagonistic* | 53.54 | <.001 | 3.72 | 2.61 | 5.28 |
| | *Any other reason (e.g., medical issue)* | 29.94 | <.001 | 0.49 | 0.38 | 0.63 |
| Any subject injury during event | | 29.21 | <.001 | 1.79 | 1.45 | 2.22 |
| Constant | | 54.72 | <.001 | 0.01 | | |

**Diagnostic Summary**

| | | | |
|---|---|---|---|
| Log Likelihood | 2934.08 | Nagelkerke $R^2$ | 0.240 |
| Log Likelihood-ratio χ2 | 601.02 (p<.001) | Percent correct | 83.5 |

The model diagnostic summary (bottom of the table) suggests that it fit the data quite well, and was able to predict the first category of force applied by an officer with about 84% accuracy. These results indicate that when force is applied, the primary predictor of the force category is the level of reported resistance applied by the subject. Those subjects who actively resisted were 5 times more likely to receive the more serious force types (Category II and III force) than those subjects who were only passively resisting. Those who aggressively (or lethally) resisted were 18 times more likely to receive this more serious level of force. Men are nearly three times more likely to experience a more serious level of force than women. Transient subjects were 34% more likely to experience a more serious category of force than subjects who are not transient. These statistically significant results were obtained even after controlling for all other variables included in the equation and shown in the table.

Also increasing the likelihood of an officer's first force application being a more serious category type is if the officer perceives the subject to be deliberately disobedient/antagonistic (3 times more likely). The de-escalation technique of verbal calming decreased the likelihood of having to use a more serious category

of force, as did the use of barriers, which provides officers space and distance between themselves and the subject. While perception of an armed subject appears to decrease the likelihood of using more serious force as the first application by an officer, this is likely due to the fact that pointing of a firearm is defined by PPB as Category IV, the least serious category. Lastly, Hispanic subjects have a 36% higher likelihood of experiencing a more serious type of first force when compared to White subjects, and persons in the "Other" race/ethnicity category have an 85% higher probability.

**Examining the relationship between force type and measured characteristics**

While the above regression examined an officer's first application of force, we also sought to address the following question: *Are there differences in the overall categories of force used based on subject characteristics (e.g. mental illness) or event characteristics (e.g. Precinct) – controlling for other potentially contributing variables?* A primary aim for this question is to determine if force is being used in a consistent manner explained by justifiable, legal factors such as a subject's level of reported resistance and whether the subject was perceived to be armed. PPB's force categories range from IV to I, with Category IV force encompassing the new definition of Policy 1010.00 (e.g., forcible handcuffing), and Category I involving the most serious application of force, deadly force. Due to the fact that Category I has such a low prevalence rate, it is not included in this examination of force. With the creation of new force categories under policy 1010.00, the force is examined as least severe (i.e., Category IV) and increased severity of force (Categories III and then II). These regression-based analyses were conducted with the ordinal measure of force (IV compared to III, compared to II).

***Analytical plan.*** In order to answer the analytic question posed above, two types of analysis were conducted. First, we examined a breakdown of what characteristics make up the majority of each force category (i.e., "force type"). To determine if the categories differ by each characteristic examined, we conducted tests (i.e., bivariate analyses[7]) to better contextualize the force event distribution by subject characteristics. In other words, we first look at whether police use of force is different depending on the subject's race/ethnicity, sex, age mental health status, etc. Second, we used advanced statistics to examine which subject characteristics (if any) are most associated with the category of force applied, while controlling for officer and event characteristics. This is commonly known as a multivariate analysis (i.e., ordinal logistic regression). This analysis was conducted at the event level.[8] The data used for this question were only those collected between August 2017 and March 2018; post-1010.00 change.

---

[7] The bivariate examination consisted of chi-square tests when the measure was categorical (e.g., race) and a one-way analysis of variance (ANOVA) was used for the continuous measure of subject age. Flags (*) of statistical significance from these tests indicate that the proportions differ significantly ($p$-value less than .05) across force category.

[8] Analyzing these data at the event level means some subjects may be represented multiple times. It is important to note that the unit of analysis for this regression is *application of force*. Subsequently, the cases being analyzed are applications of force via FDCRs, which means that individual subjects may be listed multiple times in the dataset. In other words, a subject who experienced multiple types of force would be counted multiple times because that subject would have multiple FDCRs. Some argue that this may be problematic because it increases the number of times the subject's characteristics are counted in the model. To account for this, we weighted the observations by the number of times an individual subject's characteristics appeared in the dataset.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**Results.** Table 14 displays the breakdown of subject characteristics within the force category at the event level. Largely, the proportions across force category for most characteristics do not differ widely. The exceptions to this are a few characteristics that were identified as statistically different across force category. One such exception is the subject's race being Hispanic, as this related to a higher proportion of Category II force types (20.8%) and alternatively a lower proportion of Category IV force types (54.6%) compared with others. The "Other" race/ethnicity category showed an opposite trend in this respect (higher Category IV and lower Category II force types), though this is likely due to a smaller sample size compared with other race/ethnicity categories. The subject's sex also appears to differ across force category, with females more likely to experience Category IV force and less likely to experience Category III force compared with males.

A similar breakdown was observed for subjects with perceived mental health condition or crisis prior to force. Subjects with perceived mental health condition or crisis experienced a significantly higher proportion of Category II force compared to that of subjects without such a perceived condition (17.2% versus 8.1%). This was a similar distribution for Category IV force (71.5% to 63.9%). However, subjects with perceived mental health issues or crisis had significantly lower proportion of Category III force experiences (11.7% versus 27.9%) compared to subjects without such a perceived condition. Thus, we observed a U-shaped curve in force categories, such that subjects with a perceived mental health condition more often seem to receive either a high (Category II) or low (Category IV) level of force, but less often receive a moderate (Category III) level of force relative to those subjects without a perceived mental health condition. The application of force may depend on the circumstances, as described more below.

Lastly, the average age of force type also differed significantly across force category, highlighting the fact that younger subjects are more likely to experience a more serious force category than older subjects. While these findings show differences, we note that such differences may be due to the types of incidents for which these segments of the community are involved in. We stress that bivariate disparity does not necessarily indicate bias, though additional analyses may be helpful in clarifying such issues. We refer the reader to the results of the logistic regressions found below.

The bottom half of Table 14 is a further breakdown of subjects who were perceived as possessing a mental health condition prior to force being applied. The applications of force categories appear to be rather evenly distributed by subject characteristics. White males who were not transient made up the majority of each force type. The only statistically significant difference across the force categories was that of age of someone being the subject to a category IV type of force (less serious) was several years higher than the age of those exposed to category III and II force (more serious). Breaking the subject's age down, we see that subjects under the age of 20, and those who are between the ages of 30 and 40 years old appear to experience a significantly higher proportion of Categories II and III force, compared to that of other age groupings.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**Table 14 — Percent within subject characteristics by force category, Q3 2017 through Q1 2018**

| All Subject Characteristics | | Total | Force Category | | |
|---|---|---|---|---|---|
| | | | IV | III | II |
| Race*** | White | 784 | 67.6% | 22.4% | 9.9% |
| | Black | 378 | 64.0 | 26.7 | 9.3 |
| | Hispanic | 130 | 54.6 | 24.6 | 20.8 |
| | Other | 76 | 75.0 | 22.4 | 2.6 |
| Sex*** | Male | 1064 | 62.2% | 27.4% | 10.3% |
| | Female | 304 | 78.3 | 11.2 | 10.5 |
| Transient | Yes | 634 | 64.0% | 25.9% | 10.1% |
| | No | 731 | 67.3 | 22.0 | 10.7 |
| Mental Illness/Crisis*** | Yes | 337 | 71.5% | 11.7% | 17.2% |
| | No | 1031 | 63.9 | 27.9 | 8.1 |
| Age*** | <20 years | 144 | 51.4% | 23.6% | 25.0% |
| | 20–30 years | 445 | 63.1 | 27.4 | 9.4 |
| | 30–40 years | 428 | 67.1 | 24.1 | 8.9 |
| | 40–50 years | 237 | 69.6 | 21.9 | 8.4 |
| | >50 years | 114 | 81.6 | 13.2 | 5.3 |
| Subject Characteristics with Perceived Mental Health Issue Prior to Force | | Total | Force Category | | |
| | | | IV | III | II |
| Race | White | 229 | 69.4% | 13.4% | 17.0% |
| | Black | 72 | 73.6 | 6.9 | 19.4 |
| | Hispanic | 19 | 72.7 | 10.5 | 15.8 |
| | Other | 17 | 88.2 | 0.0 | 11.8 |
| Sex | Male | 211 | 70.1% | 10.0% | 19.9% |
| | Female | 126 | 73.8 | 13.5 | 12.7 |
| Transient | Yes | 137 | 76.6% | 8.0% | 15.3% |
| | No | 198 | 68.2 | 13.1 | 18.7 |
| Age*** | <20 years | 40 | 47.5% | 17.5% | 35.0% |
| | 20–30 years | 103 | 78.6 | 9.7 | 11.7 |
| | 30–40 years | 98 | 64.3 | 20.4 | 15.3 |
| | 40–50 years | 59 | 76.3 | 1.7 | 22.0 |
| | >51 years | 37 | 89.2 | 0.0 | 10.8 |

***p<.001

*The Final Statistical Model*

Ordinal logistic regression, a multivariate technique, allows for us to estimate what factors predict the likelihood that a force type may escalate from Category IV to Category III or from Category III to Category II, while controlling for subject, event, and officer factors. Controlling for other factors, such as the subject's level of compliance with the officer's command, is important in order to evaluate outcomes based on a range of contributing factors rather than a single variable. As shown in Table 15 below, which presents the final refined model,[9] there are a number of factors that are strongly associated with the likelihood of a more serious force category being used.[10]

Subject characteristics shown to be predictive of force category include age, race, and sex. For every year older a subject is when force is applied, the subject is about 2% less likely to experience a more serious category of force. When force is used and controlling for other factors predictive of force category, Hispanic subjects are nearly three times more likely to experience a more serious category of force compared to White subjects (odds ratio [OR]=2.88, *p*<.001). Black subjects are 41% more likely to experience a more serious category of force compared to White subjects (OR=1.41, *p*<.001). Similarly, men are 41% more likely to receive a more serious category of force than women (OR=1.418, *p*=.001). We also note here that, related to the Settlement Agreement, a subject's mental health status was not predictive of the highest category of force in the use of force event. Therefore, despite the prior bivariate findings of a significant relationship between mental health status and force type, a more sophisticated analysis (which controls for other factors) reveals that PPB does not use different categories of force based on a person's perceived mental health condition.

Officer and event characteristics also yield a number of factors that predict a more serious force category use, when force is applied. Most notable from this list is the highest reported resistance recorded in a force event. Reported resistance type can range from passive (lowest form), to active, to aggressive, and deadly (highest). For the purposes of this analysis, a measure was created to capture the highest level of reported resistance recorded in an event. Aggressive and deadly force were combined due to there being only a few cases of deadly resistance. According to the regression model shown below, reported resistance was one of the strongest predictors of a more serious force category, second only to perceived lack of compliance due to the subject being disobedient/antagonistic and subject injury.[11] When force is used, subjects who resist in an aggressive or deadly manner are 6.18 times more likely to experience a more serious category of force (*p*<.001) compared to instances of passive resistance. When actively resisting, subjects are almost two times more likely to experience a more serious category of force (*p*=.024). This is what would be expected given that the use of force is allowed, by policy and law, to escalate when the level of resistance increases.

Also found, as reasonably expected, was the effect of perceived lack of compliance on force level. As officers perceived the subject's lack of compliance to be due to disobedience (as opposed to other reasons

---

[9] The refined model is the model that excludes those measures that were tested but found to not be predictive and did not improve the model's fit.

[10] Any time COCL describes force at "higher" categories or as "more serious", this means that PPB's Category number is declining. Category II and III are more serious, in general, than Category IV.

[11] Subject injury is an examination that occurs after the application of force. As per the bureau's policy, if a subject sustains injury due to the application of force, the force type category is listed as a Category II. Therefore, the actual use of force may not be more severe but the event is coded as a higher category based on the injury.

subjects may not be complying), they are 8.7 times more likely to use a more serious category of force ($p$<.001). By comparison, when officers perceived the subject's non-compliance to be due to reasons such as medical issue, language barrier, or physical disability, (i.e., the "other" category) they are approximately 27% less likely to use a more serious category of force ($p$=.001). Lastly, there are two significant predictors that yield a higher likelihood to use the more severe force categories (e.g., precincts other than Central, and "Specialty shifts" [e.g., K-9] and Shift C as opposed to A[12]). For the Specialty shifts, the finding that higher categories of force are used may be explainable, given that for some specialty units, any use of force is considered a higher category. For instance, K9 bites are <u>always</u> considered a Category II use of force – therefore, the reader should not assume that the spectrum of force types for such specialty units is the same as a normal patrol officer.

De-escalation techniques were largely associated with a decreased likelihood of more serious force category applications. Avoiding physical contact with the subject and using verbal calming techniques were both associated with at least a 25% less likelihood to use a more serious force category ($p$=.003 and $p$=.018, respectively). However, it is unclear whether the variable "verbal calming techniques" conflates effective de-escalation skills with effective command-and-control tactics (see compliance assessment).

---

[12] Although some exceptions exist, shifts are normally distributed as follows: Shift A: 7:00 AM to 5:00 PM; Shift B: 10:00 AM to 8:00 PM; Shift C: 4:00 PM to 2:00 AM; Shift D: 6:00 PM to 4:00 AM; Shift E: 10:00 PM to 8:00 AM.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

**Table 15 — Weighted estimates of ordinal regression predicting level of force**

| Outcome: Event Force Category Applied (Category IV = 0, III = 1, II = 2) | | Odds Ratio | P | 95% Confidence Interval for Odds Ratio | |
|---|---|---|---|---|---|
| | | | | Lower | Upper |
| Threshold | *IV Force* | 62.852 | <.001 | 31.950 | 1213.642 |
| | *III Force* | 415.492 | <.001 | 208.476 | 828.073 |
| **Subject Characteristics** | | | | | |
| Race (White as reference) | *Black* | 1.411 | <.001 | 1.197 | 1.662 |
| | *Hispanic* | 2.881 | <.001 | 2.254 | 3.683 |
| | *Other* | 0.670 | 0.022 | 0.476 | .994 |
| Sex | *Male* | 1.418 | 0.001 | 1.160 | 1.733 |
| Transient | | 1.021 | 0.796 | 0.875 | 1.191 |
| Mental Illness/Crisis | | 0.992 | 0.943 | 0.801 | 1.228 |
| Subject Age (≥15 years old) | | 0.979 | <.001 | 0.971 | 0.986 |
| **Officer/Event Characteristics** | | | | | |
| Precinct (Central as reference) | *Other* | 1.724 | 0.000 | 1.275 | 2.331 |
| | *North* | 1.519 | <.001 | 1.226 | 1.884 |
| | *East* | 1.901 | <.001 | 1.559 | 2.318 |
| ECIT Officer was Involved | | 1.049 | 0.580 | .885 | 1.245 |
| Shift (A as reference) | *Special* | 4.044 | <.001 | 2.606 | 6.274 |
| | *E* | 1.055 | 0.637 | .846 | 1.315 |
| | *D* | 1.852 | 0.005 | 1.205 | 2.847 |
| | *C* | 1.725 | <.001 | 1.418 | 2.098 |
| | *B* | 1.647 | 0.004 | 1.174 | 2.313 |
| Highest Resistance (Passive as reference) | *Aggressive/Deadly* | 6.179 | <.001 | 3.558 | 10.730 |
| | *Active* | 1.861 | 0.024 | 1.087 | 3.185 |
| Prior to Force Perception | *Possibly Armed* | 1.321 | .001 | 1.118 | 1.560 |
| | *Under the influence* | 1.140 | 0.153 | 0.952 | 1.365 |
| | *Lack of compliance – Disobedient* | 8.679 | <.001 | 6.521 | 11.553 |
| | *Lack of compliance (Other)* | 0.733 | 0.001 | 0.608 | 0.883 |
| De-escalation | *Verbal Calm* | 0.751 | 0.018 | 0.592 | 0.952 |
| | *Allow response* | 0.884 | 0.314 | 0.694 | 1.124 |
| | *Communicate Safely* | 0.921 | 0.491 | 0.727 | 1.165 |
| | *Avoid Physical* | 0.691 | 0.003 | 0.543 | 0.879 |
| Years officer has been on force as of May, 2018 | | 1.012 | 0.022 | 1.002 | 1.023 |
| Subject injury during event | | 3.070 | <.000 | 2.607 | 3.617 |

## SUMMARY

We now return to the question of whether the implementation of the Settlement Agreement has led PPB to have proper systems for managing the use of force. We divide our assessment into two main sections – systems for managing individual force events and systems for managing overall force trends. As to the first system, our reviews of PPB FDCRs, After Action Reports, and Force Audit findings reveal an ability of PPB officers to prepare detailed reports, an ability of supervisors to critically review PPB reports, and an ability of the Inspector and analysts to independently assess the process and contradict the chain-of-command where appropriate. Overall, deficiencies in report writing have generally declined since the implementation of the Force Audit. Additionally, the findings of the Phase 2 audit suggest (and our independent evaluation also supports) that supervisors are often able to identify officer actions which may require supplemental instruction or other action to correct. Where such actions are not identified by supervisors, the Inspector has proven capable of critically reviewing supervisor findings and making a contradictory assessment. In summary, PPB appears to have put into place a sufficient system for evaluating individual force events.

As to systems for managing overall force trends, we note in PPB's quarterly reviews of data as well as in their annual reviews, PPB performs many of the analyses found within this report. A team of skilled analysts now performs a range of force analyses. However, many of the reviews are bivariate explorations of the data and, as such, may at times hide important trends. For instance, many of the tables/graphs found above reflect findings which can be found in PPB reports: force applications and events have remained fairly consistent over the past three years, takedowns and pointing of a firearm are the most often used force types, force-to-custody rates generally fall between 3 and 5% (though for each of these, the revision of 1010.00 has impacted them in the past two quarters). While these are all informative, disparities between subject characteristics, officer characteristics, and event characteristics are oftentimes left unexplained. Because of this, we worked with PPB data to perform higher-level statistical evaluations to control for factors that are important to PPB, the Portland community, and the Settlement Agreement.

The two logistic regressions above reveal two important findings. The first is that when force is used against persons with mental illness, there is no differences in the severity of force used compared to those without mental illness. This finding controls for the presence of a weapon, level of reported resistance, and other important factors which may justify higher levels of force. As the Settlement Agreement has a prime focus on force used against persons with mental illness, this finding indicates that, at least for this group, PPB has not used higher levels of force when force was applied. However, the second important finding of the logistic regression is that there are <u>other</u> populations who are more likely to receive a higher level of force, even when controlling for the presence of a weapon, level of reported resistance, and other important factors. The analyses revealed that males, African Americans, Hispanics, younger community members, and transients are more likely to have higher levels of force (either in total or as the first force applied) used against them compared to their counterparts. Additionally, officer characteristics such as precinct, shift, and years of experience were shown to be significant predictors of higher levels of force in one or both the regressions.

While the PPB force data indicate that actual or perceived mental illness is not a predictor of higher force levels, other characteristics are. PPB possesses the data necessary to identify those other characteristics, determine potential reasons why those characteristics are related to higher levels of

COCL Compliance and Outcome Assessment Report: Section III Use of Force

force, and implement training or other corrective means necessary to resolve any patterns that are not explainable/justifiable.  We also note that some of the predictors of more serious force in both models were reported resistance and disobedience, both factors that one would expect to result in higher levels of force. Therefore, other differences between groups (noted above) cannot be easily dismissed as the result of differences in resistance or disobedience, as these are already being controlled for in the model.

The implication of these analyses by COCL is that PPB should undertake a more sophisticated analysis of its data in order to have a comprehensive system for managing the use of force. Although bivariate statistics are informative in some sense, they may mask underlying issues that could be addressed by PPB. By using more sophisticated statistical tests, PPB may find force patterns that should be addressed by either explanation or corrective action. In the past, PPB analysts have performed higher level statistical evaluations, indicating that the issue is one of bandwidth as opposed to the analysts' skills. Indeed, our conversations with PPB analysts have revealed they possess an in-depth understanding of the importance of multivariate analyses and how to perform them. PPB should provide the resources for on-going multivariate analyses as this would indicate a level of self-monitoring indicative of an effective learning organization. Although solutions may not be simple, we maintain that such analyses and self-assessment are needed for PPB to properly manage their use of force.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# LIST OF PERSONNEL

Chief of Police: Danielle Outlaw

Deputy Chief of Police: Robert Day

Assistant Chief of Operations: Eric Lee

Assistant Chief of Services: Chris Davis

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Steve Jones

Professional Standards Division Principal Management Analyst: Mary Claire Buckley

Inspector: Craig Dobson

Behavioral Health Unit (BHU) Lt.: Chris Wheelwright

EIS Supervisor: Jay Bates

EIS Administrator: Paul Meyer

Training Manager: Erika Hurley

Auditor: Mary Hull Caballero

IPR Director: Constantin Severe

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# **APPENDICES**

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# <u>APPENDIX 1</u>



**VOLUME 2     ISSUE 2**

# Use of Force Q and A

Jan. 19, 2018

## Demystifying De-escalation

**There is some confusion as to what is de-escalation is and when to use it.**

**What is De-escalation?**
*De-escalation:  A deliberate attempt to reduce the necessity or intensity of force to resolve confrontation.*

**There are <u>two</u> types of de-escalation written into Directive 1010.00. The first type is done before you have used force. It is all the things you do <u>before</u> force is used, to avoid or lessen the amount of force you use on a subject. The second type is after or during the force event, and as the subject's resistance decreases you only use the force needed to control the subject.**

**Part 1 - Prior to force**
**Section 1.1.1 of 1010.00 gives you an abbreviated list of things that are considered de-escalation**

*"De-escalation techniques include, but are not limited to: 1) using verbal techniques to calm an agitated subject and promote rational decision making; 2) allowing the subject appropriate time to respond to direction;  3) communicating with the subject from a safe position using verbal persuasion, advisements, or warnings; 4) decreasing exposure to a potential threat by using distance, cover, or concealment; 5) placing barriers between an uncooperative subject and an officer; 6) ensuring there are an appropriate number of members on scene; 7) containing a threat; 8) moving to a safer position; and 9) avoiding physical confrontation, unless immediately necessary."*

Other examples include:
- Physical ways to de-escalate
  - Removing family members from a house so the subject cannot use them or play off of them
  - Offering a cigarette, hamburger or other item
  - Providing time to comply
- Verbal ways to de-escalate
  - Using normal conversation (not commands or demands) with appropriate tone and inflection in your voice to calm the situation and not exacerbate the situation.
  - Offering compromise or transportation

# De-escalation Continued....

Because of our training, we automatically start to assess any situation we are sent to and begin using the above de-escalation tactics and techniques, many of which, in the past, have not been thought of as de-escalation. It is considered de-escalation any time we do something (verbal or non-verbal) that gives us an additional advantage of time and distance, or lowers the chance of having to physically struggle with a subject. We are doing a good job of de-escalating when it is appropriate, we just don't give ourselves credit for it.

## Examples

Scenario: Call of an intoxicated person with a knife, Spanish speaker on the line.
  De-escalation techniques:
  1. Prior to arriving
        a. Requesting a Spanish speaking officer.
        b. Requesting a Less Lethal operator.
        c. Putting officers on scene to get "eyes on" for situational awareness.
        d. Contact with caller for better 1st hand details.
        e. Requesting K9.
  2. Arriving
        a. Making a call into the house asking for the subject to come out.
        b. Evacuating the house of all occupants.
  3. Tactics
        a. Making announcements K9 would be sent in.
        b. Using K9 with camera to search prior to entry.
        c. Telling subject hiding under the blanket to come out and stop playing opossum.

Scenario: Call of subject in crisis inside someone's house, wandering around.
  De-escalation techniques:
  1. Arriving
        a. Talking to the home owner about what is going to to control the home owner's interaction with the situation.
  2. Tactics
        a. Calm communication with subject while attempting to convince subject to leave the house without using force.
        b. Gently guiding subject to the door with a two on one control while continuing to convince to leave the house and explaining it is not their house.

Scenario: Person in crisis with a knife walking down a crowded sidewalk making stabbing motions.
  De-escalation techniques:
  1. Tactics
        a. Officers isolate subject from public.
        b. Officers bring additional resources and tools to scene and form a team, each member having a specific role.
        c. Officers use good distance and physical barriers when engaging the subject in communication.

# De-escalation Continued….

Scenario: Trespassing on public property, contacting a person with possible mental crisis issues.
    De-escalation techniques:
    1.  Tactics
            a.  Contact and ask in calm, friendly non-threatening tone for the subject to pack up and leave the area, explaining the trespassing law, parameters of where they were trespassing, the consequence of failing to leave, and provide additional options of where they could go.
            b.  Contact additional persons trespassing in the same area, allowing the subject to process.
            c.  Return after contacting others and again explain to the subject, calmly, what needs to happen and attempt to convince them to leave and avoid having to take them to jail.

**Although de-escalation should be our aspiration in most calls, <u>de-escalation is not appropriate in every call</u>.** "1010.00, section 1.1. Members shall use disengagement and de-escalation techniques, *when time and circumstances reasonably permit*." **There are situations where time is of the essence and control is more important, based on the totality of the circumstances than slowing things down and trying to gain compliance without force.**

Examples

1.  Subject assaulting another person when you arrive on scene and police intervention is immediately required.

2.  Domestic disturbance where individuals are continuing to assault one another.

3.  Wanted subject running from a car stop.

4.  Subject suddenly starts to fight with officers.

# De-escalation Continued….

### Part 2 – Maintaining Control

**The other type of de-escalation written into directive 1010.00, section 1.4, is the reducing force as subject resistance decreases.**

> *"When force is used, the amount of force used, including the number of members who use force, shall be reduced as resistance decreases.  Only the amount of force reasonably calculated to maintain control shall be used."*

We are doing this as well. We are just not giving ourselves credit. Remember to articulate briefly how you gained control of the situation and as the subject's resistance decreased, you used only the force necessary to control the situation.

Examples

1. After he was in handcuffs, our force was reduced to simply controlling him.
2. After my *(insert force type)*, he stopped resisting and we were able to handcuff him with no further force required.

**Trust your training and your instincts, articulate why you did what you did based on what you knew.**

Sergeants,

1. Currently many officers are only identifying in their reports the last ditch commands and threats that they have used to try to gain compliance prior to their imminent use of force as the only de-escalation they used. In reality, most officers are using many non- force tactics to avoid using force and not articulating them. Please help your officers recognize:

   a. the many types of de-escalation they do beyond giving commands, and

   b. rapidly evolving situations usually don't have time for de-escalation and that's ok.

2. For review purposes, when analyzing de-escalation, focus your evaluation on the tactics or techniques <u>beyond</u> verbal commands that were attempted to reduce the necessity or intensity of force in trying to resolve the confrontation.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# **APPENDIX 2**



April 12, 2018

## De-escalation revisited

**In reviewing our force reports, there is still some misunderstanding regarding what actions should be considered de-escalation techniques and when we should use them.**

1.  De-escalation tactics and techniques are actions that slow down or stabilize a situation so that more time, options and resources are available for the incident to be resolved while minimizing the likelihood of the need to use force and increase the likelihood of voluntary compliance.

2.  De-escalation tactics and techniques should be attempted when it is safe and feasible under the totality of the circumstances, and without compromising law enforcement priorities. When life safety (for the officer(s), subject and nearby citizens) is at risk de-escalation <u>should not</u> be attempted.

3.  De-escalation tactics and techniques can be verbal requests, questions, and other types of communication that are designed to help increase voluntary compliance through persuasion, coaxing, or convincing.

4.  Actions such as, tactically repositioning to provide more distance and time, isolating the subject by removing access to other people, having the appropriate number of officers there to fulfil the roles based on the situation such as  primary, communicator, less lethal cover, custody team, intel gatherer, perimeter positions, supervisor, are also examples of de-escalation.

5.  De-escalation tactics and techniques are <u>not</u> verbal commands, orders, demands, warnings, or any other type of communication or action that could be construed as aggressive, hostile, confrontational, coercive, offensive, or that could escalate the situation.

# De-escalation revisited Continued….

## Examples from Reports

### NOT De-escalation

- "We gave DOE multiple *orders* to leave the property and then walked away given him the option to comply." *(Confrontational - coercive, oppressive, compulsion)*

- "We gave *orders* to drop the knife." *(Confrontational - coercive, oppressive, compulsion)*

- DOE was *told* to stop multiple times. I *yelled*, "you are going to get tackled if you don't stop" *(Confrontational - coercive, oppressive, compulsion)*

- I then held onto one of DOE's arms, made eye contact with him, and firmly *told* him to stop. *(Confrontational - coercive, oppressive, compulsion)*

- I gave *commands* for her to stop and even when she tried to walk away I gave more commands. *(Confrontational - coercive, oppressive, compulsion)*

- Force warnings and *commands* prior to K9 being deployed. (threat & *Confrontational - coercive, oppressive, compulsion)*

- From a distance, I *yelled* to him that he was under arrest. *(Confrontational - coercive, oppressive, compulsion)*

- I GAVE A *WARNING* THAT I WOULD USE MY TASER IF HE DIDN'T STOP RESISTING. (threat & *Confrontational - coercive, oppressive, compulsion)*

Note: there is nothing wrong with using these statements to gain control of a situation; they just should not be considered de-escalation.

### De-escalation

- I allowed the primary officers to leave the scene. DOE appeared to be more upset with Ofc. "A". DOE had calmed down, was sitting in the shade for approximately ten minutes, and had stopped shouting and waiving her arms. I re-contacted DOE from across the street and offered her a cigarette. She answered in a calm voice, "yes". The cigarette was a peace offering, a technique I use regularly to calm agitated individuals.

- We attempted to avoid taking DOE into custody by telling him we just needed his name so he could be excluded from the property.

- I tried numerous times to engage DOE in normal conversation prior to force being used. For example, asked if he would just talk to us about what was going on.

- I explained to him all he needed to do was leave.  Gave him plenty of opportunity to leave.  Advised him I did not want to arrest him but I would be forced to do so if he didn't leave.

- I spoke to him in a calm and collected manner and explained that I only wanted to complete a search of his person since he was under arrest.   I repeatedly explained to Smith that I just needed him to cooperate and that we could be polite to each other during this process.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# **APPENDIX 3**



# AUDIT ACTION ITEM REPORT

Case Number: [                    ]    Reviewing Sgt. [                    ]    Shift: [                    ]

Precinct: [                    ]    Reviewing Lt. [                    ]    Reviewing Capt. [                    ]

PORTLAND POLICE AUDIT TEAM est 2005

INSPECTOR REVIEW DATE: [                    ]    ACTION ITEM ASSIGNED TO: [                    ]

| + | - | ACTION ITEM: | ACTION ITEM TO BE COMPLETED |
|---|---|---|---|

CONCERNS

REQUIRED ACTION

NOTES:

| ASSIGNED PARTY OR DESIGNEE | BRANCH CHIEF OR DESIGNEE | CHIEF OR DESIGNEE | INSPECTORS OFFICE |
|---|---|---|---|
| [                ] | [                ] | [                ] | [                ] |
| ASSIGNED PARTY OR DESIGNEE SIGNATURE | BRANCH CHIEF OR DESIGNEE SIGNATURE | CHIEF OR DESIGNEE SIGNATURE | INSPECTORS OFFICE REPRESENTATIVE |
| DATE COMPLETE | DATE COMPLETE | DATE COMPLETE | DATE COMPLETE |

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# **APPENDIX 4**

# Use of Force Audit – Phase I & II SOP Draft

Phase I:

PPB will audit 100% of the following cases[1]:

- CEW applications
- Serious uses of Force; (1) all uses of force by a member that reasonably appear to create or do create a substantial risk of death, serious disfigurement, disability, or impairment of the functioning of any body part or organ; (2) all critical firearm discharges by a member; (3) all uses of force by a member resulting in a significant injury, including a broken bone, an injury requiring hospitalization, or an injury deemed to be serious by a member's supervisor; (4) all head, neck and throat strikes with an object or carotid neck holds; (5) force used upon juveniles known or reasonably assumed to be under fifteen or individuals known or reasonably assumed to be pregnant; (6) all uses of force by a member resulting in a loss of consciousness; (7) more than two applications of a CEW on an individual during a single interaction, regardless of the mode or duration of the application, regardless of whether the applications are by the same or different officers, and regardless of whether the CEW application is longer than 15 seconds, whether continuous or consecutive; (8) any strike, blow, kick, electronic control weapon system cycle, or similar use of force against a handcuffed, otherwise restrained, under control, or in custody subject, with or without injury; and (9) any use of force referred by a member's supervisor to Professional Standards Division (PSD) which PSD deems serious.

PPB will audit 20% of all other cases (Category II, Category III, and Category IV)[2]:

- PPB will audit every 5th case received. In order to obtain a truly random sample, PPB will roll a die to determine which case to start with and then will audit every 5th case from there.
- According to GAGAS (Generally Accepted Government Auditing Standards) 6.64
  - "When sampling is used, the method of selection that is appropriate will depend on the audit objectives."
    - Phase 1 audit objectives include;
      - Maintenance of real-time auditing
      - Cultivation of a simple random sample that is generally representative of the full population.
- At the end of the quarter, PPB will assess the sample and determine whether or not additional cases should be audited (based on force types, reviewing sergeant, precinct, shift, etc.). If necessary, auditors will select additional cases to audit, so that the sample is reflective of the PPB's bureau-wide use of force.

---

[1] Note: At any time, a supervisor can determine that a case should be audited and submit the case for audit regardless of its assigned category.
[2] PPB will continue to collect 100% of all FDCR level force and to report on it quarterly and yearly.

Cases selected for the Phase I audit will be assessed along the dimensions outlined by items 74, 75, and 77 of the Settlement Agreement. The auditors will assess the reports associated with the cases according to the outlined methodology (attached as appendix i).

Audit findings will be delivered to the Inspector at the end of the quarter. These findings will be discussed with the RU manager of each division, and provided to DOJ and COCL. An annual report on audit findings will be made available to the public.

Phase II:

The Inspector will audit 100% of the following cases:

- CEW applications
- Serious uses of Force; (1) force used upon juveniles known or reasonably assumed to be under age fifteen, (2) force used on individuals known or reasonably assumed to be pregnant, (3) force resulting in a loss of consciousness, (4) uses of force by a member resulting in a significant injury, including a broken bone, an injury requiring hospital treatment or an injury deemed to be serious by a member's supervisor.

The Inspector will audit 20% of all other cases (Category II, Category III, Category IV):

- The Inspector will audit every 5th case received, beginning with a random case selected by the roll of a single die (the Inspector receives cases on a different timeline than the auditors do, therefore the Inspector and auditor may audit some of the same cases, but the full sample will likely be different).

Cases selected for the Phase II audit will be assessed by the Inspector on the following dimensions for detail, accuracy and completeness. Assessment will follow the outlined methodology (attached as appendix ii)

- Officer Report Writing (evaluated for each officer)
- Situation/Information Gathering
- Risk Assessment
- Legal Authority
- Options and Contingencies
- Initial Response to the Call
- Initial contact and Tactical Disengagement
- Communication
- Tactical Communication
- Use of Force
- Additional Comments
- Training Implications

Findings from the Phase II audit will be delivered to the appropriate point of contact (Internal Affairs, Chief's office or Training Division).



# Q2 2017 Audit Methodology and Codebook

# Officer and Subject Audit

## Complete this audit (35 questions) for each subject-officer interaction

1. Case Number
   a. The case number is anonymized using the excel "Anonymized DPSST Case # Generator"
2. Subject PIN
   a. Use either a case number, or name SQL query to retrieve the subject's PIN from RegJIN
3. Officer PIN
   a. The officer PIN is anonymized using the excel "Anonymized DPSST Case # Generator"
4. Officer Precinct
   a. Select the officer's precinct from the drop-down menu. The precinct of the officer can be found using the super roster
      i. Enter the officer's DPSST in the DPSST field
      ii. Under "Fields to Include", select Unit
      iii. Click "Create Roster"
      iv. Enter your DPSST when prompted to enter a password
5. Officer Shift
   a. Select the officer's shift from the drop-down menu. The shift of the officer can be found using the super roster
      i. Enter the officer's DPSST in the DPSST field
      ii. Under "Fields to Include", select Unit
      iii. Click "Create Roster"
      iv. Enter your DPSST when prompted to enter a password
6. Notes
   a. Make necessary notes here
7. Did the officer complete a force report for this event?
   a. Force Reports are located in Versadex RMS. If no force was used (complaint of injury cases, for example), choose "Not Required".
      i. Log on
      ii. Click on "query records"

1

  iii. Click on the "event" tab

  iv. Select "General Offense" on the event type drop down menu

  v. Verify that the year is correct and enter the case number

  vi. When the GO pops up, Select the "attachments" tab.

  vii. Identify the officer for whom you are interested and select that officer's use of force report

    1. Select "Yes" if the force report is complete (ignore accuracy for now)

    2. Select "No" if the force report is not complete/missing (ignore accuracy for now)

8. Were the correct force options selected on the force report?
   a. Determine if the force options indicated in the officer's narrative were selected on the force report. If no force was used, then choose "Not Required".
      i. Select "Yes" if the force options documented by the officer were correctly marked on the corresponding force report.
      ii. Select "No" if the force options documented by the officer were not marked on the corresponding force report – including if the effectiveness was indicated (yes/no), but the force option was not selected. Specify the deficiency in the text box.

9. Force Report Date/Time Stamp
   a. Date/Time stamp from the Force Report

10. Date Time Stamp Force Applied (within Force Report)
    a. Date and Time of the Force Applied are located at the top of the Force Report.

11. Was the Force Report completed by the end of the officer's shift?
    a. Compare the officer's shift with the Force Report Date Stamp to determine if the Force Report was completed in a timely manner.
       i. Select Yes, if the Force Report was completed by the end of the officer's shift.
       ii. Select No, if the Force Report was not completed by the end of the officer's shift.
       iii. Select Not Required, if no force was used.
       iv. Select Unclear, if the answer cannot be determined.

12. Notes
    a. Make necessary notes here.

13. Disposition of Subject
    a. Located in Versadex RMS
       i. Log on
       ii. Click on "query records"
       iii. Click on the "event" tab
       iv. Select "General Offense" on the event type drop down menu
       v. Verify that the year is correct
       vi. Enter the case number
       vii. When the GO comes up, select the "related" tab at the very top of the page.
       viii. Select "related events" from the drop down menu

2

    ix.  Select the arrest booking (AB)

    x.  On the AB document select the "charges" tab

    xi.  The "severity code" field will tell you what type of arrest it is. THERE ARE MULTIPLE CHARGES STORED HERE, BUT THEY ARE ONLY DISPLAYED ONE AT A TIME. Make sure you click the > button to see all the charges, you will be coding the case with the highest charge that is associated with the subject.

1. Arrest – Felony
2. Arrest – Misdemeanor
3. Arrest – Other Agency
4. Arrest – Warrant
5. Arrest – Cited
6. Cite and Release
7. Detained and Released
8. Detox
9. POH
10. Release to Medical
11. Victim
12. Escaped

14. Subject Information

    a.  Weapon - weapon information for subjects can be found in the original CAD call data and the officer reports. Select the appropriate response from the drop down menu.

    i.  Firearm

    ii.  Replica Firearm

    iii.  Firearm-Implied

    iv.  Knife/Edged Weapon

    v.  Blunt Object

    vi.  CEW

    vii.  Bodily Fluids

    viii.  Weapon present or reported but not used or threatened use

    ix.  Other

    x.  None

15. AAR – If medical was needed for the subject, it was requested for (select all that apply). This information is located in the "injuries sustained" section and the narrative of the AAR.

    b.  Injuries – force related

    c.  Self-inflicted Injuries

    d.  Drug/alcohol

    e.  Mental health issues –select this if the officer checked the box "the subject was admitted because of mental health issues" on their use of force report.

    f.  Pre-existing injuries (prior to force being used)

    g.  Other medical issues

    h.  Unclear

3

      i.   Medical not needed

Include whether the individual was known by officer to be mentally ill or in mental health crisis – 74c ix

16. Did the officer have knowledge of the subject's mental health issues prior to using force? Refer to the checkboxes in the Prior to Force, Perceived Mental Health Section.

    j.   Yes, select if the officer had knowledge of the subject's mental health issues prior to the use of force and documented the knowledge in their narrative report.

    k.   No, select if the officer did not indicate that the subject had mental health issues in their narrative report.

    l.   Mental health issues were learned after the use of force, select if the subject had mental health issues, but the issues were learned after the use of force and the officer documented this in their narrative.

    m.   Subject did not have mental health issues, select if the subject did not have mental health issues.

    n.   Unclear, select if the answer cannot be determined.

17. If no, did the officer's narrative report indicate they had no knowledge of Subject's mental health issue prior to the use of force?

    o.   Yes, select if the officer's narrative indicated that they had no knowledge of the subject's mental health issues prior to the use of force.

    p.   No, select if the officer's narrative did not indicate that they had no knowledge of the subject's mental health issues prior to the use of force. Basically, select this if the officer fails to mention the subject's mental health at all.

    q.   Null – MH issue was known prior to use of force

    r.   Null – The subject had no MH issue

    s.   Unclear

18. If yes, did the officer's narrative indicate the subject's mental health issues influenced their decision making? See Force Report – prior to force, perceived mental health section

    t.   Yes, select if the officer's narrative indicated that they knew of the subject's mental health issues prior to the use of force and indicated how those issues influenced their decision making.

    u.   No, select if the officer's narrative indicated that they knew of the subject's mental health issues prior to the use of force, but did not indicate how those issues influenced their decision making.

    v.   Null – the subject's mental health issues were not known prior to force being used

    w.   Null – the subject did not have mental health issues

    x.   Unclear

19. Notes

20. Does the officer's narrative indicate that they used force against someone who was engaged in passive resistance that does not impede a lawful objective (74a ii)?

4

    a. Subject was not engaged in passive resistance, select if the subject's resistance was described as any of the following: (a) Active (b) Aggressive; (c) Deadly

    b. Subject was passively resisting and not impeding lawful objective, select if the subject's resistance was described as passive – going limp, not moving and **not impeding a lawful objective**.

    c. Subject was passively resisting and impeding a lawful objective, select if the subject's resistance was described as passive – going limp, not moving and **impeding a lawful objective**.

    d. Officer failed to submit a report for this event

    e. Null

Decision point analysis and force options used (74av i, 74c iii, 74cv ii, 74c vi)

21. Reason for Contact
    a. Yes – select if the officer checked any of the boxes indicating a reason for contact
    b. No—select if the officers did not check any of the boxes indicating a reason for contact or if there was no force report submitted but there should have been.
    c. Null—select if there was no force report required.

22. Legal Authority for Contact
    a. Yes – select if the officer checked any of the boxes indicating a legal authority for contact
    b. No – select if the officers did not check any of the boxes indicating a legal authority for contact or if there was no force report submitted but there should have been.
    c. Null—select if there was no force report required.

23. Prior to Force – Perceived Conditions
    a. Yes – select if the officer checked any of the boxes indicating perceived conditions prior to the use of force
    b. No – select if the officers did not check any of the boxes indicating the perceived conditions prior to the use of force or if there was no force report submitted but there should have been.
    c. Null—select if there was no force report required.

24. Prior to Force – Perceived lack of compliance
    a. Yes – select if the officer checked any of the boxes indicating a perceived lack of compliance prior to the use of force
    b. No – select if the officers did not check any of the boxes indicating perceived lack of compliance prior to the use of force or if there was no force report submitted but there should have been.
    c. Null—select if there was no force report required.

25. Use of Force was necessary
    a. Yes – select if the officer checked any of the boxes indicating the reason the use of force was necessary.

      b. No – select if the officers did not check any of the boxes indicating the reason that the use of force was necessary or if there was no force report submitted but there should have been.

      c. Null—select if there was no force report required.

26. Did the officer include a description of other force options considered?

      a. Yes

      b. No—failed to include or document consideration of alternative force options.

      c. Null

27. Descriptive Reporting (74cii, 74civ)

      a. Did the officer's narrative report include a detailed description of the unique characteristics of the event?

          i. Yes, select if the officer's report included a detailed description of the unique characteristics of the event.

          ii. No, select if the officer's report did not include a detailed description of the unique characteristics of the event.

          iii. Null, officer failed to complete a narrative report.

      b. Did the officer's report include a detailed description of the force used, to include descriptive information regarding the use of any weapon?

          i. Yes, select if the officer's narrative included a detailed description of the force used including descriptive information regarding the use of any weapon.

          ii. No, select if the officer's narrative did not include a detailed description of the force used – for example, cannot determine if CEW was used in probe vs. drive stun mode, cannot determine the number of applications of force, cannot determine if a baton was used as a pry tool, or not, etc.. Also select no, if the officer failed to complete a narrative report.

          iii. Null, select if no force was used.

28. De-escalation (74cviii) – Refer to De-Escalation section of the Force Report

      a. De-escalation techniques were attempted?

          i. Yes

          ii. No

          iii. Unclear—box is left unmarked.

          iv. Null

      b. De-Escalation techniques were not attempted and/or were not successful

          i. Yes

          ii. No

          iii. Unclear—box is left unmarked.

          iv. Null

      c. When Resistance decreased, I de-escalated to a level reasonably calculated to maintain control.

          i. Yes

          ii. No

        iii.  Unclear—box is left unmarked.

        iv.  Null

    d.  If officer indicated they used de-escalation techniques, did they they explain?

        i.  Yes

        ii.  No

        iii.  Unclear—not a valid choice for this question

        iv.  Null- no de-escalation techniques

Witnessing and witnesses (74cx, 74cxi)

29. Did the officer's narrative include a general description of force an officer observes another officer apply?

    a.  Yes, select if this officer witnessed another officer use force and documented that in the narrative.

    b.  Failed to document another officer's use of force

    c.  No Other Officers Involved- select if there were no other officers who used force or officer did not witness another officer use force.

    d.  Null - select if no force was used.

30. Did the officer's narrative demonstrate that the officer consistently made diligent efforts to document witness observations? Refer to witness checkboxes on use of force report

    a.  Yes-if any of the check boxes regarding witness identification are marked.

    b.  No- failed to check box any boxes or no force report

31. If not, did the officer explain when circumstances prevent them from identifying witnesses or obtaining contact information?

        i.  Yes, select if no witnesses were identified and the officer selected the correct box

        ii.  No, select if no witnesses were identified and the officer did not select the correct box

        iii.  Null, select if the officer's narrative demonstrated that the officer consistently made diligent efforts to document witness observations.

32. Legal Justification (75e). Did the supervisor indicate whether there was or was not legal justification for the original stop and/or detention? Refer to Legal Basis for contact section in the AAR. If the text box below legal basis contains informative critique, add those comments to the notes box.

    a.  Categories I-III

    b.  Yes, select if a reason was selected

    c.  No, select if the box was left blank

    d.  Unclear, select if the answer cannot be determined

    e.  Null – Category IV

33. Policy (75e). (Answer for all levels of command) Applicable Directives Section - checkboxes

    a.  Are the officer's actions consistent with PPB Policy/DOJ Agreement

          i.   Yes

        ii.   No

     iii.   Unclear – left blank

     iv.   Null- categories where command review does not apply.

    b.   Are this officer's actions consistent with training?

          i.   Yes

        ii.   No

     iii.   Unclear – left blank

     iv.   Null- categories where command review does not apply.

    c.   Force used was objectively reasonable?

          i.   Yes

        ii.   No

     iii.   Unclear – left blank

     iv.   Null- categories where command review does not apply.

34. Does command agree with the Sgt.'s finding – Refer to AAR question "I reviewed this after action under the preponderance of the evidence standard and concur with the Sergeant's findings."

    a.   Lt.

          i.   Yes

        ii.   No

     iii.   Unclear - unmarked

     iv.   Null

    b.   RU Manager

          i.   Yes

        ii.   No

     iii.   Unclear - unmarked

     iv.   Null

    c.   CHO

          i.   Yes

        ii.   No

     iii.   Unclear - unmarked

     iv.   Null

35. Notes – enter relevant notes here

# Event Level Audit

## Complete this audit (96 questions) once for each case

1. Case Number
    a. The case number is anonymized using the excel "Anonymized DPSST Case # Generator"
2. Location

8

       a.  Listed in the "Location of Occurrence" field on the AAR.

3.  Division/Precinct/Unit

       a.  Select precinct/unit from drop down menu. Precinct/Unit information is listed at the top of the AAR with the reviewing Sgt.'s information in the "**FROM**:" section.

4.  Shift

       a.  Select shift from drop down menu. If shift is not identified by the Sgt. in the AAR, it can be identified by the Lt. reviewing the AAR.

            i.  To identify Lt. shift go to Super Roster

           ii.  Enter Lt.'s Last Name

          iii.  Select "LT" under Classification

         iv.  Under "Filters" section select PPB-Only and Sworn

          v.  Under "Fields to Include"

               1.  Select "Last, First", "RU", "Shift"

         vi.  Click "Create Roster"

5.  Initial Call

       a.  Initial call type is located in Versadex RMS

            i.  Log on

           ii.  Click on "query records"

         iii.  Click on the "Event" tab

         iv.  Select "CAD call" on the event type drop down menu

          v.  Verify that the year is correct (should match the first two numbers of the case 16-XXXX)

         vi.  Enter the case number

        vii.  Call Type is listed at the top of the page – for this audit we do not use the abbreviated call type.

6.  Initial Call Type

       a.  Citizen Call for Service- select this option if the initial call remarks in the CAD call indicate that the call came from a or a reporting party.

       b.  Officer-Initiated—select this option if an officer initiates the call

7.  Type of AAR, select all that apply:

       a.  Force Event, select when the case involves FDCR-level force use

       b.  Complaint of Injury, select when the case involves no FDCR-level force use and the involved subject(s) complains of injury

       c.  Alleged Criminal Conduct, select when the case involves no FDCR-level force use and the subject alleges the officer engaged in criminal conduct

       d.  Alleged Excessive Force, select when the case involves no FDCR-level force use and the subject alleges the officer engaged in excessive force.

       e.  In Custody Injury, select when the case involves no FDCR-level force use and the subject complains of an injury where an officer was not involved. For example, the subject was left in a holding cell and sustained an injury falling off of a bench.

       f.  Other, enter type of AAR that is not one of the above types of AARs.

8.  Category of Force –use the category that is selected on the AAR.

9

    a.  Category I

    b.  Category II

    c.  Category III

    d.  Category IV

9.  Did this event involve a serious use of force?

    a.  Yes, select this when the case involves any of the following:

        i.  Serious Use of Force Event defined: (1) all uses of force by a member that reasonably appear to create or do create a substantial risk of death, serious disfigurement, disability, or impairment of the functioning of any body part; (2) all critical firearm discharges by a member; (3) all uses of force by a member resulting in a significant injury, including a broken bone, an injury requiring hospitalization, or an injury deemed to be serious by a member's supervisor; (4) all head, neck and throat strikes with an object or carotid neck holds; (5) Force Event, complaint of excessive force or a complaint of injury involving a person known or reasonably assumed to be under fifteen (15) years of age, and females known or reasonably assumed to be pregnant; (6) all uses of force by a member resulting in a loss of consciousness; (7) more than two cycles of an electronic control weapon, regardless of outcome on an individual by one or more members during a single interaction; (8) any strike, blow, kick, electronic control weapon system cycle, or similar use of force against a handcuffed, otherwise restrained, under control, or in custody subject, with or without injury; (9) any use of force referred by a member's supervisor to Internal Affairs which Internal Affairs deems serious.

    b.  No, select for all other cases

10. Was there a mental health component to this case?

    a.  Use officer's reports and AAR to determine the answer to this question.

        i.  Yes – known prior to force, select if the involved officer knew of the subject's mental health issues prior to the use of force.

        ii.  Yes – not known prior to force, select if the subject's mental health issues were discovered after the use of force. For example, learned during the interview of family members, or during the sergeant's investigation.

        iii.  No – no mental health component, select when no mental health issues were identified at any time during the event.

11. Notes

Agreement items: 74a, 74c i, 75a

12. AAR - Was medical requested at the earliest possible opportunity?

    a.  Yes

    b.  No

    c.  Null -No Medical Necessary

13. AAR - If Yes, where was the final location of treatment?

      a.  On-Scene

      b.  Hospital Released

      c.  Hospital Admitted

      d.  Null-No Medical Treatment Necessary

14. Medical Requested CAD Summary Timestamp

      a.  Note: complete these steps only when medical was requested. If a medical response was not requested, skip this question. The medical requested timestamp is located in Versadex RMS

           i.  Log on

          ii.  Click on "query records"

        iii.  Click on the "Event" tab

        iv.  Select "CAD call" on the event type drop down menu

         v.  Verify that the year is correct (should match the first two numbers of the case 16-XXXX)

        vi.  Enter the case number

       vii.  Click on the "Call Summary" button near the top of the window.

      viii.  Read through the CAD call details to find text indicating that medical was requested and note the date and time of the request. This is usually identified with the text "Special Service Request". For example:

05-31-2016 15:06:20  DP12  27751  Special Service Request
**(FR) - FIRE/EMS RESPONSE: FR,DP7,MED TO COME CHK GUY OUT**

15. Average timestamp of when force was used – from involved officer's Use of Force Reports

      a.  Determine the average date/time that force was used using the timestamps recorded in the Officer Level Audit (see Date Time Stamp Force Applied (within Use of Force Report) question) and enter that date/time here.

16. AAR Date/Time of Occurrence

      a.  Date and Time are listed in the "Date and Time of Occurrence" field on the AAR.

17. Date AAR was completed by the Sergeant

      a.  Completed for Categories I-IV

      b.  Use the date from the end of the Sgt.'s review, included in the line that reads "I forwarded this after action to_____on_____ "

18. Date AAR review was completed by the LT.

      a.  Completed for Categories I-IV

      b.  Use the Lieutenant Date Completed date listed on the AAR.

19. Date AAR review was completed by the RU Manager

      a.  Completed for Categories I-III

      b.  Use the RU Manager Date Completed date listed on the AAR.

      c.  Leave Blank for RU Manager for Category IV

20. Date AAR review was completed by the CHO

      a.  Completed for Categories I and II, leave blank for CHO for categories III and IV.

      b. Use the CHO Date Completed date listed on the AAR.

21. Were all the timelines met?

      a. Yes, select if the Sergeant met the 72-hour deadline to complete the AAR; the RU manager met the 21-day deadline to complete their review; the CHO met the 28-day deadline to complete their review.

      b. No – no explanation given, select if any of the timelines were not met and no explanation was given in the AAR regarding why the timeline was not met.

      c. No – with explanation, select if any of the timelines were not met and an explanation was given in the AAR regarding why the timeline was not met.

22. Notes – please enter any necessary notes here

23. Sergeant's (AAR author) PIN

      a. Completed for categories I-IV

      b. Use excel generator to anonymize the investigating sergeant's DPSST.

24. Lieutenant's PIN

      a. Completed for categories I-IV

      b. Use excel generator to anonymize the DPSST of the Lieutenant who reviewed the AAR.

      c. If no LT review, leave blank.

25. RU Manager's PIN

      a. Completed for categories I-III

      b. Use excel generator to anonymize the DPSST of the RU Manager who reviewed the AAR.

      c. If no RU Manager review, leave blank.

26. CHO's PIN

      a. Completed for categories I and II

      b. Use excel generator to anonymize the DPSST of the CHO's who reviewed the AAR.

      c. If no CHO review, leave blank.

27. Number of involved officers (officers who used force)

      a. Select the number of involved officers from the drop-down

28. Officer 1 PIN

      a. The officer PIN is anonymized using the excel "Anonymized DPSST Case # Generator"

29. Officer 2 PIN

      a. The officer PIN is anonymized using the excel "Anonymized DPSST Case # Generator"

30. Officer 3 PIN

      a. The officer PIN is anonymized using the excel "Anonymized DPSST Case # Generator"

31. Officer 4 PIN

      a. The officer PIN is anonymized using the excel "Anonymized DPSST Case # Generator"

32. Officer 5 PIN

      a. The officer PIN is anonymized using the excel "Anonymized DPSST Case # Generator"

33. Officer 6 PIN

      a. The officer PIN is anonymized using the excel "Anonymized DPSST Case # Generator"

34. Notes – please enter any necessary notes here

35. Number of Involved Subjects

      a. Using the drop-down, select the number of involved subjects

36. Subject 1
    a.   Use either a case number, or name SQL query to retrieve the subject's PIN from RegJIN
37. Subject 2
    a.   Use either a case number, or name SQL query to retrieve the subject's PIN from RegJIN
38. Subject 3
    a.   Use either a case number, or name SQL query to retrieve the subject's PIN from RegJIN
39. Subject 4
    a.   Use either a case number, or name SQL query to retrieve the subject's PIN from RegJIN
40. Subject 5
    a.   Use either a case number, or name SQL query to retrieve the subject's PIN from RegJIN
41. Notes – please enter any necessary notes here

Agreement items: 74a ii, 74a iii, 74a vi, 74c v, 74c vii

42. Officer-Subject Force Applied, Subject Resistance, Subject Injury and Subject Treatment Matrix
    a.   Complete this matrix (columns) for **each force application** (rows). Note any reporting discrepancies in the Notes box at the bottom of the audit page.
        i.   Subj (Subject) – for the specific force application, select the involved subject. The subject's listed in the drop-down menu correspond to the subjects listed in the previous subject PINs section
            1.   Subj 1-[Q35]
            2.   Subj 2-[Q36]
            3.   Subj 3-[Q37]
            4.   Subj 4-[Q38]
            5.   Subj 5-[Q39]
        ii.  Offcr. (Officer) – for the specific force application, select the officer who used the force. The officer's listed in the drop-down menu correspond to the officers listed in the previous officer PIN section
            1.   Offcr 1-[Q27]
            2.   Offcr 2-[Q28]
            3.   Offcr 3-[Q29]
            4.   Offcr 4-[Q30]
            5.   Offcr 5-[Q31]
            6.   Offcr 6-[Q32]
        iii. Order of Force – for the specific force application, select the sequence position (when considering all force applied in the case) in which the force was applied
            1.   1st
            2.   2nd
            3.   3rd
            4.   4th
            5.   5th
            6.   6th

13

7.  7th
8.  8th
9.  9th
10. 10th
11. 11th
12. 12th
13. Null, select if no FDCR-level force was used.

iv. Category of Force

1.  See Category of Force Document located on RUM drive in the Methodology Folder for classification. Select a category of force for each force application.
2.  Hands/Feet, strikes/kicks are coded as impact weapons
3.  Beanbag is coded as less lethal
4.  Control holds with injury is coded as physical injury. When a control hold with injury causes physical injury that requires a band-aid it is a category III. When a control hold with injury causes serious physical injury which requires a hospital visit but the subject is released it is a category II. When a control hold with injury causes overnight hospitalization it is coded as a category I

v.  Force App. (Force Application) – for the specific application of force, select the force application type.

1.  Resisted HC
2.  Hobble
3.  CHWI
4.  Takedown
5.  Strikes/kicks
6.  Baton - pry
7.  Baton - strike
8.  Aerosol rest.
9.  CEW
10. Less Lethal
11. PFA
12. K9
13. PIT - VIS
14. Box-in VIS
15. Ram - VIS
16. OIS
17. FD - animal
18. Impact Muni
19. Null, select if no force was used.

vi. Warning issued?

1.  Yes

14

2. No

3. Null- no force used

vii. Subj. Resist. (Subject Resistance) – for the specific application of force, select the subject's resistance as described by the officer prior to the force application.

1. Passive, select if the officer described the subject going limp, or becoming dead weight.

2. Active, select if the officer described the subject as tensing up, squaring up to fight, fleeing/attempting to flee, or thrashing.

3. Aggressive, select if the officer described the subject as kicking, punching, biting, spitting, reaching for waist band.

4. Deadly, select if the officer narrative describes the subject's resistance in a way which is readily capable of causing death or serious injury.

5. Unclear, select if the officer narrative did not describe the subject's resistance.

6. Null, select if no force was used.

viii. Offcr. Doc. Subj. Inj. Or Lack of Inj.? (Officer Documented Subject Injuries or Lack of Injuries?). Ideally, this question would be answered for injuries that were caused by the specific force application, however the officer's narrative is often not specific enough regarding injuries to determine exactly which injuries were caused by each application of force. Therefore, this question may have to be answered for all injuries (or lack of injuries) the subject may have sustained.

1. Yes, select if the involved officer documented the involved subject's injuries, or lack of injuries in their narrative report.

2. No, select if the involved officer did not document the involved subject's injuries, or lack of injuries in their narrative report.

ix. Offcr. Doc. Subj. Treat.? (Officer Documented Subject Treatment?) - Please see note for Offcr. Doc. Subj. Inj. Or Lack of Inj. question.

1. No treat. Req. (No Treatment Required), select if the subject was not injured and no medical treatment was required.

2. Yes, select if the subject received medical treatment and the involved officer documented the treatment in their narrative.

3. No, select if the subject received medical treatment and the involved officer failed to document the treatment in their narrative.

43. Were there any discrepancies with the force options documented by the officers and the force options documented by the supervisor in the AAR?

a. Applies only to Categories I-III – use this space to document discrepancies like incorrect checkboxes on Use of Force Reports and discrepancies between Use of Force reports and AARs. Explain any discrepancies in the notes box at the bottom of the page.

b. Yes, select if discrepancies were found between force options documented by the officers and force options documented by the investigating sergeant in the AAR.

c. No, select if there were no discrepancies.

d. Unclear, select if the answer cannot be determined.

  e. Null – Category IV Force was used, or no Category I-III (i.e. complaint of injury)

44. Were there any discrepancies with the subject resistance documented by the officers and the subject resistance documented by the supervisor in the AAR?

  a. Applies only to Categories I-III

  b. Yes, select if discrepancies were found between the subject resistance documented by the officers and the subject resistance described by the investigating sergeant in the AAR.

  c. No, select if no discrepancies were found.

  d. Unclear, select if the answer cannot be determined.

  e. Null- Category IV force used or no Category I-III (i.e. complaint of injury)

45. Were there any discrepancies with the subject injury documented by the officers and the subject injury documented by the supervisor in the AAR? This includes lack of injury.

  a. Applies to all categories.

  b. Yes, select if discrepancies were found between the subject injuries documented by the officers and the subject injuries documented by the investigating sergeant in the AAR.

  c. No, select if no discrepancies were found.

  d. Unclear, select if the answer cannot be determined.

46. Notes – enter any necessary notes here.

Mental Health – 74a I – Use the AAR to answer the following questions.

47. AAR- Was there a perceived mental health influence?

  a. Categories I-IV

  b. Yes-Checkbox was marked

  c. No – Checkbox was not marked

48. Were there any discrepancies between the subject's mental health status described by the officer(s) and the subject's mental health status described by the Sergeant?

  a. All Categories

  b. Null-subject was not mentally ill

  c. No- no discrepancies

  d. Yes- explain discrepancies in comment field

49. Were specialty units on scene/called? Refer to AAR specialty

  a. All Categories

  b. Yes, select if any reports indicated activation of specialty units.

  c. No, select if reports don't indicate the activation of specialty units.

  d. Unclear, select if the answer cannot be determined.

50. If Yes, select from the list which specialty unit was called (use all officer narratives to determine)

  a. All Categories

  b. Select all that apply from the list. Select "Null" if no specialty unit was called or was already on scene. In the Other text box indicate other specialty units not listed, as well as if an officer that responded (primary/cover) as a specialty unit was already on scene. For example, the primary officer was ECIT.

16

51. Specialty Units – 74a iv - Did the Sergeant find that the officer's did not call in specialty units in accordance with procedure? Use the specialty units analysis section on AAR to answer.
    a. All Categories
    b. Yes, select if the Sergeant indicated that the officer's did not call in specialty units in accordance with procedure.
    c. No, select if the Sergeant did not indicate that the officer's did not call in specialty units in accordance with procedure, or if specialty units were called.
    d. Unclear, select if the Sergeant marked "no, explain" but did not explain.

**52.** Detailed description of the unique characteristics – 74c ii – Find on the Critique and Recommendations Section of the AAR: **There were no material omissions in the involved member(s) reports**
    a. Categories I-III
    b. Yes- Checkbox Marked
    c. No- Checkbox unmarked
    d. Unclear- box unchecked but no explanation, or there was an error that the Sgt. did not catch
    e. Null- Category IV

**53.** Detailed description of the unique characteristics – 74c ii – Find on the Critique and Recommendations Section of the AAR: **Members reports were accurate and materially consistent**
    a. Categories I-III
    b. Yes- Checkbox Marked
    c. No- Checkbox unmarked
    d. Unclear- box unchecked but no explanation, or there was an error that the Sgt. did not catch
    e. Null- Category IV

**54.** Detailed description of the unique characteristics – 74c ii – Find on the Critique and Recommendations Section of the AAR: **Members reports were consistent with the statement given at the scene**
    a. Categories I-III
    b. Yes- Checkbox Marked
    c. No- Checkbox unmarked
    d. Unclear- Unclear- box unchecked but no explanation, or there was an error that the Sgt. did not catch
    e. Null- Category IV

Include a description of why de-escalation techniques were not used or whether they were effective – 74c v iii. Use the AAR De-escalation or Disengagement Section to answer the following questions.

55. AAR-Attempted de-escalation techniques?
    a. Categories I-III

    b.  Yes

    c.  No

    d.  Unclear-marked incorrectly

    e.  Null- Category IV

56. AAR-If yes, were de-escalation techniques effective?

    a.  Categories I-III

    b.  Yes

    c.  No

    d.  Unclear-marked incorrectly

    e.  Null- Category IV

57. AAR-Member(s) attempted or actually disengaged?

    a.  Categories I-III

    b.  Yes

    c.  No

    d.  Unclear-marked incorrectly

    e.  Null - Category IV

58. AAR-Member(s) reduced the force used when resistance decreased?

    a.  Categories I-III

    b.  Yes

    c.  No

    d.  Null-Category IV

**59.** AAR-Reports include a general description of force an officer observes another officer apply – 74c x – FIND IN Critiques and Recommendations: **Members reports included a general description of force an officer observes another officer apply**

    a.  Categories I-III

    b.  Yes-box checked

    c.  No-box unchecked

    d.  Unclear- box unchecked but no explanation, or there was an error that the Sgt. did not catch

    e.  Null- Category IV or no other officers involved

Demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement – 74c xi

60. Witness(es) – are any citizen witnesses listed on the AAR?

    a.  Categories I-III

    b.  Yes, select if there were citizen witnesses listed on the AAR, or if the Sergeant checked the "unidentified witnesses present" box.

    c. The Sergeant failed to identify witnesses --select if there are citizen witnesses indicated in officer narrative reports, but the Sergeant failed to include them in the AAR.

    d. No witnesses – select if Sergeant checked the "no witnesses present" box.

    e. Null- Category IV

61. Answer if yes, does the Sergeant's narrative document the witness account(s) of the event? Use the AAR to answer.

    a. Categories I-III

    b. Yes, select if there were witnesses listed on the AAR and the witness account of the event is also documented on the AAR.

    c. No, witness refused to make statement

    d. The Sergeant failed to document a witness statement.

    e. Null-Category IV

62. If no – but there were witnesses, does the Sergeant's narrative explain circumstances that prevented them from identifying witnesses, or obtaining contact information?

    a. Categories I-III

    b. Yes, select if the Sergeant explained circumstances that prevented them from identifying witnesses, or obtaining contact information when there are citizen witnesses indicated in officer narrative reports, but the Sergeant failed to include them in the AAR.

    c. Sergeant failed to explain circumstances that prevented them from identifying witnesses

    d. Null- Category IV

Review all use of force reports to ensure they include the information required by this Agreement and PPB policy – 75b

Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed – 75h

Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary – 77b

Modify findings as appropriate and document modifications – 77c

63. Did the Sergeant make an attempt to obtain a statement from the subject detailing the event and any injuries?

    a. Categories I-III

    b. Yes, select if the Sergeant documented their attempt to obtain a statement from the subject detailing the event and any injuries. Includes the Sgt. documenting any circumstance that prevented them from interviewing the subject, i.e. subject was sedated.

    c. No, select if the Sergeant failed to document their attempt to obtain a statement from the subject detailing the event and any injuries.

    d. Null- Category IV

64. Were supporting photographs and/or video uploaded to DIMS/Evidence Library?

    a. Log into DIMS

    b. Verify that photos have been uploaded

     c.  For video- log into Evidence Library and DIMS- video evidence will be in one of these two places. MAV video is uploaded to the Evidence Library. All other videos (for example, cell phone video) are uploaded to DIMS.

         i.  Yes, select if the supporting photographs and/or video were found in DIMS/Evidence Library.

         ii.  No – photos/video not found in DIMS/Evidence Library or photos were determined to be inadequate by someone in the chain of command review.

         iii.  Unclear, select if an answer cannot be determined.

         iv.  Null-Category IV

Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct – 75k
Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee – 77g 77f

65. Does the Sergeant's summary indicate that they notified PSD? Use the AAR narrative and checkboxes to answer.

    a.  All categories

    b.  Yes = they did

    c.  No = they should have, but didn't

    d.  Unclear- cannot be determined, or discrepancy exists between boxes and narrative

    e.  No notification necessary

        i.  For example: subject is flagged MH in REGJIN - but subject does not mention MH and subject's behavior does not imply MH. Officers and Sgt. do not document MH status (because they have no reason to believe that the subject is under an MH influence). This situation does NOT require PSD notification.

66. If yes, reason given for notifying PSD (Use the AAR narrative to answer, select all that apply):

    a.  Serious Use of Force

    b.  Use of force against a person with actual or perceived mental illness

    c.  Criminal conduct, or allegation of criminal conduct

    d.  Misconduct

    e.  Null, select if PSD was not notified.

    f.  Other – if needed, enter reason for notifying PSD not listed above

67. Does the Sergeant's summary indicate that they notified the shift supervisor? Use the AAR narrative and checkboxes to answer.

    a.  All categories

    b.  Yes = they did

    c.  No = they should have, but didn't

    d.  Unclear- cannot be determined, or discrepancy exists between boxes and narrative

    e.  No notification necessary

68. If yes, reason given for notifying the shift supervisor (Use the AAR to answer, select all that apply):

    a.  Serious Use of Force

    b.  Use of force against a person with actual or perceived mental illness

    c.  Criminal conduct, or allegation of criminal conduct

    d.  Misconduct

    e.  Null – select if the Sergeant did not indicate that they notified the shift supervisor

    f.  Other – if needed, enter reason for notifying the shift supervisor not listed above

69. Does the Sergeant's summary indicate that the Detective Division was notified? Use the AAR boxes to answer – criminal conduct, and command and detectives notified.

    a.  All Categories

    b.  Yes, select if the Sergeant indicated that the Detective Division was notified (email or phone).

    c.  No, select if the Sergeant did not indicate that they notified the Detective Division.

    d.  Unclear, select if an answer cannot be determined.

70. If yes, reason given for notifying the Detective Division (Use the AAR to answer):

    a.  Criminal conduct, or allegation of criminal conduct

    b.  Null, select if the Sergeant did not indicate that they notified the Detective Division

    c.  Other – if needed, enter reason for notifying the Detective Division not listed above

71. Notes – enter necessary notes here

Use the AAR command review sections to answer the following questions. Answer for each level of command.

Subject Resistance and least amount of appropriate force – 74a iii
Officers consistently choose options and least amount of appropriate force – 74a vi
Include a description of the level of resistance encountered by each officer – 74c vii
Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options – 75g

72. Does the supervisor's review indicate that force may have been avoided?

    i.  Categories I-III

    ii.  Yes, select if the supervisor indicated that force may have been avoided.

    iii.  No, select if the supervisor <u>did not</u> indicate that force may have been avoided.

    iv.  Unclear, an answer cannot be determined.

    v.  Null- category IV force was used.

73. Does the supervisor's review indicate that force may have been avoided through other force options?

    i.  Categories I-III

    ii.  Yes, select if the supervisor indicated that force may have been avoided and indicated that if the officer used other force options the force may have been avoided.

iii. No, select if the supervisor indicated that force may have been avoided, but not by using other force options.

iv. Unclear, select if an answer cannot be determined.

v. Null- category IV or select if the supervisor did not indicate that the force may have been avoided.

74. Did the supervisors indicate that the force might have been avoided through de-escalation techniques?

i. Categories I-III

ii. Yes, select if the supervisor indicated that force may have been avoided using de-escalation techniques.

iii. No, select if the supervisor indicated that force may have been avoided, but not by using de-escalation techniques.

iv. Unclear, select if an answer cannot be determined.

v. Null- category IV or select if the supervisor did not indicate that force may have been avoided.

Medical Procured ASAP – 74av

75. AAR- Medical care procured – Was medical requested at the earliest possible opportunity?

a. Categories I-III

b. Yes

c. No

d. Failed to identify that medical was not requested at the earliest possible opportunity

e. Null - Medical not needed or category IV

Decision Point Analysis – from the AAR – 74ciii, 75d

76. Other Force Options Considered and Documented?

a. Categories I-III

b. Yes

c. No

d. Sgt Review Error – left blank or incorrect

e. Null – Category IV

77. Described each use of Force in their Report

a. Categories I-III

b. Yes

c. No

d. Sgt Review Error – left blank or incorrect

e. Null – Category IV

78. Members documented the resistance they observed

a. Categories I-III

b. Yes

c. No

22

     d.  Sgt Review Error – left blank or incorrect

     e.  Null – Category IV

79. If the subject was engaged in passive resistance, describe how it impeded a lawful objective – answered by the question in Type of Force section "What type of resistance was the subject engaged in? if passive, describe how it impeded a lawful objective"

     a.  Yes- passive resistance impeded lawful objective

     b.  No-passive resistance did not impede a lawful objective

     c.  Sgt. Review Error – left blank or incorrect

     d.  Null – category IV

Missing Force Report

80. If an officer's force report was missing, did the Command document and address the missing FDCR in their review?

     i.  All Categories

     ii.  Yes, select if an officer's use of force report was missing and the supervisor addressed it in their review.

     iii.  No, select if the supervisor failed to address a missing use of force report in their review.

     iv.  No missing force report, select if all required force reports were completed.

     v.  Null, select if no force was used.

Evaluate the weight of the evidence – 75c

Audit the adequacy of chain of command reviews of AARs using the following performance standards to ensure that all supervisors in the chain of command review Directive 940.00 findings using a preponderance of the evidence standard – 77a

81. Supervisor reviewed the after action under the preponderance of the evidence standard and concurs with the Sergeant's findings.

     a.  Lt -- answer for Categories I-IV

     b.  RU Manager – answer for categories I-III

     c.  CHO – answer for categories I and II

         i.  Yes

         ii.  No

         iii.  Unclear – evidence was not present and could not be evaluated/considered – no matter what - select if 2 or more pieces of evidence were missing (missing witness statements, missing subject statements, missing photos, missing reports)

         iv.  Null – category IV

Determine whether additional training or counseling is warranted – 75h

82. AAR-Did the supervisor indicate that additional training or counseling is warranted?
    a. Sgt. – answer for categories I-IV
    b. Lt -- answer for Categories I-IV
    c. RU Manager – answer for categories I-III
    d. CHO – answer for categories I and II
        i. Yes
        ii. No - Additional training or counseling was not warranted
        iii. Unclear – marked yes but did not provide an explanation
        iv. Null- Category IV

83. AAR-Were any Tactical implications or deficiencies noted?
    a. Sgt.—answer for categories I-III
    b. Lt -- answer for Categories I-III
    c. RU Manager – answer for categories I-III
    d. CHO – answer for categories I and II
        i. Yes
        ii. No – no training implications
        iii. Unclear –yes but did not provide an explanation
        iv. Null- Category IV

84. AAR-If yes, which specific discipline within the training division should review this after action
    a. Sgt.—answer for categories I-IV
    b. Lt -- answer for Categories I-IV
    c. RU Manager – answer for categories I-III
    d. CHO – answer for categories I and II
        i. PVO
        ii. Firearms
        iii. Patrol Tactics
        iv. CEW
        v. Other
        vi. Null – no training review necessary

Corrective Action – 75i

85. Did command identify corrective action for any reporting issues?
    a. Yes – command identified ALL reporting errors
    b. No—command did not identify ALL reporting errors
    c. Null – No corrective action necessary – no reporting errors to be identified

Chain of Command Reviews Report Completeness- 77b and 77d

86. Did the Command (Lt-CHO) document and address the lack of completeness of an AAR (missing photographs, witness statements, subject statement, witness officer accounts, etc.)? Refer to the Command review checkbox "I found deficiency with the supervisory review"
    a. Categories I-IIII

24

b.   Yes, select if the member of command checks the box. Include notes of deficiency in the notes box at the bottom of the page

c.   No, select if the supervisor failed to address the lack of completeness of the AAR.

d.   The AAR was complete, select if command members did not check the deficiency box-- were no issues with the completeness of the AAR.

e.   Unclear, select if an answer cannot be determined.

f.   Null – select for levels of command that did not review the event

87.  Additional investigation

a.   Does the supervisor request additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator as appropriate? Refer to the command review "I forwarded or returned this after action to_____on_____"

   i.   Yes- select if the AAR was returned to a lower level of command

   ii.  No- select if the AAR was forwarded to a higher level of command or this is the highest level of review

   iii. Blank- select if empty.

Modified findings – 77c

88.  If the AAR was returned for additional investigation, then did the Command indicate that they modified their findings as appropriate and document modifications.

a.   Yes-select if the supervisor requested additional investigation, and modified their findings. For example, this would include when a supervisor changed their findings from an out of policy decision to a within policy decision after seeing new information that was provided by the additional investigation.

b.   No- select if the supervisor requested additional investigation but did not change their findings.

c.   Unclear- Requested additional investigation and failed to document if they changed their findings.

d.   Null-select if the supervisor did not request additional investigation.

Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer – 77f

89.  Identified that the case needs to be reviewed further for possible criminal conduct – refer to AAR command review

a.   Sgt. – answer for categories I-IV

b.   Lt -- answer for Categories I-IV

c.   RU Manager – answer for categories I-III

d.   CHO – answer for categories I and II

   i.   Yes- checkbox marked

      ii.   No-checkbox not marked

     iii.   Unclear- discrepancy or failed to address an allegation of criminal conduct.

     iv.   Null – category IV

Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee – 77g

90. Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee

    a.   Sgt. – answer for categories I-IV

    b.   Lt -- answer for Categories I-IV

    c.   RU Manager – answer for categories I-III

    d.   CHO – answer for categories I and II

       i.   Yes = command identified misconduct and made correct notifications

      ii.   No = command identified misconduct and did not make correct notifications

     iii.   Audit team identifies misconduct

     iv.   Null = no misconduct

91. Notes – enter any necessary notes here

Agreement item: 75j

92. EIS-Sergeants who investigate a member's force event, vehicle pursuit, or collision and prepare an after action pursuant to Directives; After Action Reports, shall, prior to forwarding their investigation to the next level of review, place an entry in the member's PDT that lists;

    a.   the case number of the incident

       i.   Yes, select "yes" if the EIS entry contains the case number of the incident. This includes the case number in the header for the EIS entry (in other words, it does not need to be in the body of the EIS comment).

      ii.   No, select "no" if the EIS entry does not contain the case number of the incident.

     iii.   NA, select if an EIS entry is not required

    b.   the nature of the incident and, if applicable, the type of force used

       i.   Yes, select "yes" if the EIS entry contains the nature of the incident (for example, the type of force used).

      ii.   No, select "no" if the EIS entry does not contain the nature of the incident.

     iii.   NA, select if an EIS entry is not required

    c.   whether the incident was within policy

       i.   Yes, select "yes" if the EIS entry contains a decision about whether or not the event was within policy

      ii.   No, select "no" if the EIS entry lacks a decision about whether or not the event was within policy.

       iii. NA, select if an EIS entry is not required

d. any positive performance

       i. Yes, select "yes" if the EIS entry includes positive performance by the officer included in the Sergeant's AAR review

       ii. No, select "no" if the EIS entry does not include positive performance by the officer included in the Sergeant's AAR review

       iii. NA, select if no positive performance was documented, or if an EIS entry is not required.

e. any training deficiencies, policy deficiencies, or poor tactical decisions identified as well as any non-disciplinary corrective action taken to remedy them

       i. Yes, select "yes" if the EIS entry includes training deficiencies, policy deficiencies, or poor tactical decisions as well as any non-disciplinary corrective action taken to remedy them

       ii. No, select "no" if the EIS entry does not include training deficiencies, policy deficiencies, or poor tactical decisions and does not include the non-disciplinary corrective action taken to remedy them

       iii. NA, select if no training deficiencies, policy deficiencies, or poor tactical decisions were identified by the Sergeant in the AAR review, or if no EIS entry is required.

93. EIS-When the manager identifies a previously unidentified training deficiency, policy deficiency, or poor tactical decision made by the member, the manager shall make an entry in the member's PDT in accordance with this Directive, in addition to ensuring the appropriate corrective action is provided to the member. The manager concludes the critique, analysis, or other commentary provided by any subordinate level of review is inadequate, inaccurate, or incomplete, the manager shall, if the matter is not referred to the Internal Affairs Division, provide the appropriate non-disciplinary corrective action and document it in the subordinate's PDT with:

    Note: Using the AAR, code to the directive- EIS entries required when someone in the chain of command catches an error ONLY.

a. the case number of the incident

       i. Yes, select if a member of command identified an error in the AAR and made the EIS entry for it – including the case number.

       ii. No, select if a member of command identified an error in the AAR but failed to include the case number.

       iii. NA, no EIS entry was necessary

b. the nature of the incident

       i. Yes, select if a member of command identified an error in the AAR and made the EIS entry for it – including the nature of the incident.

       ii. No, select if a member of command identified an error in the AAR but failed to include the nature of the incident.

       iii. NA, no EIS entry was necessary

c. the nature of the deficiency

        i.   Yes, select if a member of command identified an error in the AAR and made the EIS entry for it - including the nature of the deficiency.

        ii.   No, select if a member of command identified an error in the AAR but failed to include the nature of the deficiency.

        iii.   NA, no EIS entry was necessary

    d.   the non-disciplinary corrective action taken

        i.   Yes, select if a member of command identified an error in the AAR and made the EIS entry for it - including the non-disciplinary corrective action taken.

        ii.   No, select if a member of command identified an error in the AAR but failed to include the non-disciplinary corrective action taken.

        iii.   NA, no EIS entry was necessary

94. Notes – enter necessary notes here

95. This is an interesting AAR

    a.   Yes, if yes explain what about this is interesting or would require a review at the time of the force audit reporting.

    b.   No

96. Final notes box – optional; you can consolidate all of your audit notes in this box if you would like.

# Taser Audit

## (21 Questions -- to be completed for each unique officer:subject combination)

1. Case Number
    a.   Enter anonymized case number here

2. Officer Precinct
    a.   Select involved officer precinct from drop down menu

3. Officer Shift
    a.   Select involved officer shift from drop down menu

4. PIN of subject Taser was used on
    a.   Enter PIN for subject CEW was applied to. Use SQL query to identify subject PIN.

5. PIN of officer who deployed CEW
    a.   Enter anonymized PIN number for officer whose CEW deployment you are documenting.

6. Notes
    a.   Enter any necessary notes.

7. Number of CEW Cycles from officer narrative
    a. Select appropriate number of cycles from drop down box. This is the number of cycles that the officer refers to in his/her narrative. NOTE: this number my not necessarily match the number of cycles used as defined by policy.
8. Number of CEW Cycles used from AAR
    a. Select the appropriate number of cycles from the drop down box. This is the number of cycles listed by the Sgt. in the AAR.
9. How many CEW cycles were listed on the CEW Download Supporting Document?
    a. Select the appropriate number of cycles that were used.
        i. 13 01/18/2002 18:33:32 01/18/2002 10:33:32 FIRE 3s 19°C 94%
        ii. 14 01/18/2002 18:33:52 01/18/2002 10:33:52 FIRE 5s 20°C 94%
        iii. For example, the above download would be coded as 2 cycles (one-three second cycle and one-five second cycle)
    b. If no CEW download document is found, select "CEW was used, but no document found"
10. Number of seconds for each cycle listed on the CEW Download supporting document.
    a. Use drop down menu to record the number of seconds used for each cycle.
11. Were there discrepancies between any of the reports? Select all that apply:
    a. If all reports of CEW use match (in terms of cycles applied), select, "all reports are consistent".
    b. If officer's report and CEW Download match but AAR does not, select, "Officer's report and CEW Download are consistent but AAR is not"
    c. If AAR and CEW Download match, but Officer Narrative does not, select, "AAR and CEW Download are consistent but officer's narrative report is not"
    d. If officer's report and AAR match but CEW Download does not, select, "Officer's report and AAR are consistent but CEW Download document is not"
    e. If none of the reports match, select, "None of the reports are consistent with each other"
12. If previous question identified any discrepancies, were they appropriately investigated and addressed?
    a. If discrepancies were identified, select the appropriate response
    b. If no discrepancies were identified, select "NULL"
13. CEW model number listed on the CEW download supporting document?
    a. Refer to the CEW download document. The model number is listed at the top, for example:

 

| TASER Information | | Offline Report | |
|---|---|---|---|
| Serial | X00-634217 | Local Timezone | Pacific Standard Time (UTC -07:00) |
| Model | TASER X26 | Generated On | 26 Aug 2016 00:45:41 |
| Firmware Version | Rev. 24 | | |
| Application Version | 2.9.2 | | |

14. CEW Usage – Evaluate each cycle – Refer to Documentation of subject Resistance and Documentation of Necessity of Force in officer Force Report.
   a. Did the narrative describe the officer's evaluation of the reasonableness, justification, and need for each cycle?
      i. Yes – select if officer documents BOTH the subj resistance and selects a reason for the necessity of force.
      ii. No – select if the officer fails to document BOTH subj resistance and reason for the necessity of force.
      iii. Null—select if there is a discrepancy in number of cycles – For example, officer documents 2 cycles, but AAR indicates there were 3 cycles. Since the officer would have only documented reasonableness and justification for the 2 cycles, you would select null for the third cycle.
   b. When a cycle was not reasonable, or there was not justification for a cycle, did the command review address and correct the issue?
      i. Yes
      ii. No
      iii. If cycle was reasonable and justified, select "NULL"
15. Notes
16. Does Officer narrative document if an attempt to use hands-on control during a CEW cycle was practical or not? Refer to the force report and the narrative
   a. Yes – the officer indicated that hands-on control was practical, or if not practical included an explanation.
   b. No – the officer failed to indicate whether hands-on control during a CEW cycle was practical, or not.
17. Answer if hands-on control was practical. Does the force report indicate that the officer attempted hands on control
   a. Yes-officer used hands on control- marked box yes
   b. No- officer did not use hands on control- marked box no
   c. Unclear- blank
   d. Null- Hands on control was not practical
18. Were probes deployed or was the CEW application a "drive-stun"? Source: Officer narrative
   a. Evaluate officer narrative and select the appropriate response.
19. Are there discrepancies between the Officer's narrative and the AAR/940 about how the CEW was deployed (probe or drive-stun)

30

    a.   Select the appropriate response

20. (ANSWER FOR DRIVE STUN APPLICATION ONLY) If officer used the CEW to achieve pain compliance from a person who was unable to respond rationally, did the supervisor find that officer did so in order to prevent a higher level of force? Assess AAR under applicable Directives Section. THIS IS ONLY ANSWERED IF IN DRIVE STUN AND APPLIED TO SOMEONE WITH MENTAL HEALTH INFLUENCE. If these conditions are not met, the answer is NULL

    a.   Yes-if the officer selected "pain compliance" AND the supervisor selected the box "to avoid the use of a higher level of force"

    b.   No –if there is a discrepancy between the two

    c.   NULL- when CEW is in probe mode or when subject does not have MH.

21. Notes – enter any necessary notes here

# Phase II – Methodology for Assessment by Inspector

## Section 1 – Report Writing

**1  Officer Description of Event (Report)** – Using all available information, does the officer's report paint a descriptive written picture of what transpired during the incident to leave the reader clearly understanding what occurred?

> 1 = Report lacks major details of Probable Cause and/or the use of force and/or fails to paint a picture of what occurred.

> 2 = Report is adequate, but lacks minor details needed to accurately or clearly depict the event.

> 3 = Report is extremely detailed, leaving no questions as to what occurred or how.

## Section 2 - Decision Making Analysis

**2  Situation / Gathering Information** – As the event played out, did the officer gather a reasonable amount of the available information to understand the situation and to make good decisions? Did the officer reasonably seek out apparent information that was obviously lacking?

> 1 = Officer missed critical piece(s) of readily available information that could have changed the outcome.

> 2 = Officer had sufficient information but;
>    a.  failed to process the information correctly OR
>    b.  lacked the experience / knowledge to interpret the information OR
>    c.  failed to use it in a reasonable / timely manner

> 3 = Officer had sufficient information and used it effectively and in a timely manner.

**3  Risk Assessment** – With the available information and understanding of the situation that the officer possessed at the time of the event, did the officer consider the reasonable and apparent obvious risks they were confronted with?

> 1 = Officer failed to consider obvious serious risk(s) present to themselves, the subject, or others.

> 2 = Officer had sufficient information about the risks present but failed to reasonably mitigate known risks.

> 3 = Officer correctly considered the reasonable risks and reasonably mitigated identified risks.

**4   Legal Authority** – Based on the situation, did the officer consider their reasonable legal authority based on federal, state and local laws, policy, and mutual aid agreements?

> 1 = Officer failed to (or incorrectly) consider any reasonable legal standing(s), authority, community need(s), or policy(ies).

> 2 = Officer considered some reasonable legal standing(s), authority, community need(s), policy(ies), but failed to identify more significant legal standings, or did not address such in a timely manner.

> 3 = Officer correctly considered reasonable legal standing(s), authority, community need(s), policy(ies) in a reasonable timely fashion.

**5   Options and Contingencies** – Based on the situation, available information, risks and legal authority, did the officer consider the reasonable actions and contingencies that could have been taken or were available?

> 1 = Officer did not consider any reasonable options and or contingencies available.

> 2 = Officer considered some reasonable options and or contingencies but failed to consider other more obvious effective options at the time.

> 3 = Officer considered a reasonable number of sufficient options and contingencies to make a sound decision in a timely manner.

## Section 3 – Tactical

**6   Initial Response to the Call** – Considering the situation, the known risks, legal authority, and actionable options, was the officer's initial response to the call reasonable?

> 1 = Actions were not consistent with training or created an unnecessary or serious risk. Actions were provoking / precipitating.

> 2 = Actions generally acceptable but created identifiable risks, or were not the most effective method or tactic.

> 3 = Actions demonstrated sound and effective tactics.

**7   Initial contact and tactical disengagement** – Upon making contact with the subject, was officer's response reasonable?

> 1 = Actions were not consistent with training or create an unnecessary or serious risk. Actions were provoking / precipitating.

> 2 = Actions were generally acceptable but created identifiable risks, or were not the most effective method or tactic.

> 3 = Actions demonstrated sound and effective tactics.

**8   Communication** – Was the officer's communication with the citizen(s) involved reasonable?

   1 = Communication was not consistent with training or created an unnecessary or serious risk. Actions were provoking / precipitating.

   2 =Communication was generally acceptable, but was less than professional, disrespectful, or was not the most effective method or tactic.

   3 = Communication was appropriate.

**9   Tactical Communication** – Was the officer's communication with other officers involved reasonable?

   1 = Communication was not consistent with training, was largely lacking, and/or created an unnecessary or serious risk.

   2 = Communication was generally acceptable, but was not the most effective and could be improved.

   3 = Communication was appropriate.

**10  Use of Force** – Was Officer's choice of force and mechanical application of the force reasonable?

   1 = Actions were not consistent with training or created an unnecessary or serious risk. Actions were provoking / precipitating.

   2 = Actions generally acceptable but created obvious, avoidable minor risks, or were not the most effective method or tactic.

   3 = Actions demonstrated sound and effective tactics.

# Definitions

**Grading:**

Any score of "1" in any of the nine areas requires an Internal Affairs Investigation of the officer's identified material deficiency(ies) and a review of the officer's chain of command for failure to identify the major deficiency(ies).

A score of "2" in multiple areas may require an Internal Affairs investigation of the officer's identified material deficiency(ies) and a review of the officer's chain of command for failure to identify the deficiency(ies). An Internal Affairs investigation will be based on the degree and number of material deficiencies

**Generally for Section 2 - Decision Point Analysis**

1 = The Officer completely missed the mark (Very few cases).

2 = The Officer was just short of the mark (Some cases).

3 = The Officer met minimum requirements (Majority of cases).

**Generally for Section 3 - Tactical**

1 = The Officer's action(s) were unacceptable. The action(s) were provoking, precipitating, created unnecessary or serious risk, or not consistent with training. (Very few cases)

2 = The Officer's action(s) were generally acceptable but should have had some type of informal or formal discussion to correct or improve performance in mitigating risk. (Few cases)

3 = The Officer's action(s) were acceptable and require no actions. (Majority of the cases)

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# <u>APPENDIX 5</u>

## Updated 2018

# Use of Force Audit Methodology – Phase II – Inspector assessment

Phase II Sample: The inspector will audit the same cases that were audited for phase I. The Inspector will audit additional cases as time allows to track overall report writing proficiency and look for additional policy, training and equipment concerns.

Cases selected for the Phase II audit will be assessed by the Inspector on the following dimensions for detail, accuracy and completeness. Assessment will follow the outlined methodology (attached as appendix ii). Each officer's actions will be evaluated under the totality of the circumstances, as well as the incident as a whole.

- Officer Report Writing (evaluated for each officer)
- Situation/Information Gathering
- Initial Response to the Call
- Contact with the subject and Tactical Disengagement
- Risk Assessment
- Legal Authority
- Options and Contingencies
- Medical Aid
- Post Custody
- Use of Force
- Graham Standard
- Policy Violations
- Trends
- Training Concerns
- Policy Concerns
- Debrief required
- Additional Comments

Findings from the Phase II audit will be delivered to the appropriate point of contact (Internal Affairs, Chief's office or Training Division).

Inspector Methodology

1

# Phase II – Methodology for Assessment by  Inspector

## Section 1 – Report Writing

**1  Officer Description of Event (Report)** – Using all available information, does the officer's report paint a descriptive written picture of what transpired during the incident to leave the reader clearly understanding what occurred?

> 0= Report lacks sufficient details of Probable Cause and/or the use of force to paint a adequate picture of what occurred.

> 1 = Report is adequate, it may lack a few minor details but the reader can depict what occurred during the event.

## Section 2 - Decision Making

**2  Situation / Gathering Information** – As the event played out, did the officer gather a reasonable amount of the available information to understand the situation and to make good decisions? Did the officer reasonably seek out apparent information that was obviously lacking?

> 0 = Officer missed critical piece(s) of readily available information that could have changed the outcome. OR failed to process the information correctly OR lacked the experience / knowledge to interpret the information OR failed to use it in a reasonable / timely manner

> 1  = Officer had sufficient information and used it effectively and in a timely manner.

**3  Initial Response to the Call** – Officers responded to the location using sound and effective tactics in a safe and reasonable manner.

> 0 = Actions were not consistent with training/policy or created identifiable risks, or were not the most effective method or tactic.

> 1  = Actions demonstrated sound and effective tactics.

**4  Contact with the subject and tactical disengagement** – Upon making contact with the subject, officers responded reasonably, using good communication skills and sound patrol tactics principles?

> 0  = Actions were not consistent with training or created identifiable risks, or were not the most effective method or tactic. Actions were provoking / precipitating.

> 1  = Actions demonstrated sound and effective tactics and good communication skills.

**5    Risk Assessment** – With the available information and understanding of the situation that the officer possessed at the time of the event, did the officer consider the reasonable and apparent obvious risks they were confronted with?

   0 = Officer had sufficient information about the risks present but failed to reasonably mitigate known risks, OR Officer failed to consider obvious serious risk(s) present to themselves, the subject, or others.

   1= Officer correctly considered the reasonable risks and reasonably mitigated identified risks.

**6    Legal Authority** – Based on the situation, did the officer consider their reasonable legal authority based on federal, state and local laws, policy, and mutual aid agreements?

   0 = Officer failed to reasonably (or incorrectly) consider legal standing(s), authority, community need(s), policy(ies), or did not address such in a timely manner.

   1 = Officer correctly considered reasonable legal standing(s), authority, community need(s), policy(ies) in a reasonable timely fashion.

**7    Options and Contingencies** –The officer(s) considered and articulated the reasonable actions and contingencies that could have been taken or were available?

   0 = Officer did not consider any reasonable options and or contingencies available. OR Officer considered some reasonable options and or contingencies but failed to consider other more obvious effective/prudent options at the time.

   1 = Officer considered a reasonable number of sufficient options and contingencies to make a sound decision in a timely manner.

**8    Medical Aid** – The officer's response to medical aid was appropriate and timely?

   0 = Medical Aid was not consistent with training, not timely or created an unnecessary or serious risk.

   1 = Medical Aid was consistent with training, timely and did not create an unnecessary or serious risk.

**9    Post Custody** – Were the officer's post custody actions, such as transport of the subject or engaging the public, under the totality of the circumstances appropriate?

   0 = The officer's post custody actions were not consistent with training/policy, were largely lacking, and/or created an unnecessary or serious risk.

   1 = The officer's post custody actions were consistent with training, Communication was appropriate.

**10  Use of Force** – Was the Officer's choice of force and mechanical application of the force reasonable, and if multiple officers were involved, tactical communication satisfactory?

> 0 = Actions were not consistent with training/policy, created an unnecessary or serious risk. Actions were provoking / precipitating.

> 1 = Actions demonstrated sound and effective tactics and communication.

## Section 3 – Graham, Policy, Trends and Training

**11  Graham Standard** – Was the Officer(s) Use of force based on the under the totality of the circumstances appropriate?

> 0  = No

> 1  = Yes

12  **Policy Violation** – Did an Officer(s) violate policy?

> 0 = No

> 2 = Yes

**12a Policy Violation** – Did anyone in the chain of command identify the violation?

> 0 = No

> 1 = Yes

**12b Policy Violation** – Who identified the violation?

> S = Sergeant, L= Lieutenant, Captain, CHO= Chiefs office, I = Inspector

**12b Policy Violation** – Policy Number?

**13 Trend** – Is there a trend?

> 0  = No

> 1= Yes

**13a Trend** – Did anyone in the chain of command identify the Trend?

> 0  = No

> 1= Yes

**13b Trend** – Who identified the trend?

      S = Sergeant, L= Lieutenant, Captain, CHO= Chiefs office, I = Inspector

**14 Training Concern** – Is there a training concern?

    0= No

    1= Yes

**14a Training Concern** – Did anyone in the chain of command identify the training concern?

    0 = No

    1= Yes

**14b Training Concern** – Who Identified the concern?

      S = Sergeant, L= Lieutenant, Captain, CHO= Chiefs office, I = Inspector

**15 Concern with Policy** – Is there a concern with policy?

    0= No

    1= Yes

**15a Concern with Policy** – Did anyone in the chain of command identify the concern with a policy?

    1 = No

    1= Yes

**15b Concern with Policy** – Who Identified the policy concern

      S = Sergeant, L= Lieutenant, Captain, CHO= Chiefs office, I = Inspector

**16 Debrief** – Is there need for a debrief?

    0= No

    1= Yes

**16a Debrief** – Identified by chain of command?

      2 = No

      1= Yes


**16b Debrief** – Did anyone in the chain of command identify the need for a debrief?

      S = Sergeant, L= Lieutenant, Captain, CHO= Chiefs office, I = Inspector

**17  IAD Case Number** – If sent to IA what is the case number

**18   Additional Comments and notes**


**Grading:**

Any score of "0" in multiple areas may require an Internal Affairs investigation of the officer's identified material deficiency(ies) and a review of the officer's chain of command for failure to identify the deficiency(ies). A request for an Internal Affairs investigation will be based on the degree and number of material deficiencies.

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# **APPENDIX 6**



**CITY OF PORTLAND, OREGON**

**Bureau of Police**
Ted Wheeler, Mayor
Danielle M. Outlaw, Chief of Police
1111 S.W. 2nd Avenue • Portland, OR 97204 • Phone: 503-823-0000

Integrity • Compassion • Accountability • Respect • Excellence • Service

## MEMORANDUM

January 31, 2018

TO:             Danielle Outlaw
                Chief of Police
                (Through Channels)

FROM:           Craig Dobson
                Inspector, Professional Standards Division

SUBJECT:        Recommendations from the 2017 Annual Force Audit Report.

Attached you will find the executive summary and 2017 Force audit report. I have reviewed the report and concur with the findings. As a unit we have identified three areas where we are looking to improve. Two areas involve reporting errors. The third area directly relates to the audit unit and the feedback loop required to address concerns identified through the after action process or the auditing of those reports.

After review, we believe many of the officer errors and deficiencies are caused by the mechanical way in which officers are required to report force. The current MRE system is not intuitive and does not allow officers to see the template while they are writing a narrative and vice versa. That same problem exists when supervisors review the officer's reports. Sergeants are required to move back and forth between templates and narratives to ensure that all of the required points of 1010.00 have been fulfilled.

- Although the average error rate of officers is low at 1.5 errors per report, we believe that this can be improved through the use of a new FDCR and additional training. The new FDCR will be introduced by spring of 2018. The new FDCR allows the officers to write their report and collect the necessary force data all on one report. The form is chronologically ordered and prompts answers to fulfill all the required areas from directive 1010.00 based on the type of force used. Some minor additional training will be required to familiarize the officers to the new form.

  - Because the information will be better organized and have all the required information required by directive 1010.00 in a systematic and chronological

Danielle Outlaw                                                               January 31, 2018
Chief of Police                                                                        Page 2

order, it will also help decrease the supervisors error rates and improve their
efficiency.

- With this change in FDCRs we will also be retooling the Force After Action report. Now
  that the new FDCR will be capturing much of what supervisors have been capturing in
  the past, the goal of the new AAR is to reduce redundancy of work and focus the
  supervisors effort on the analysis of officer's decision points during an incident.

- Finally, we have looked at our internal processes and in 2018 we will be initiating a
  formal feedback loop for the findings discovered in the force after actions to ensure that:
  - RU command gets quick feedback in regards to their after actions to:
    i.   correct errors in reporting and ensure compliance of EIS entries and;
    ii.  identify patterns or practices that fall outside 1010.00 or best practice by
         officers or supervisors that need to be addressed
  - the audit team can more closely monitor, identify and report on trends or concerns
    by individuals, units, RUs or shifts within the bureau to the appropriate chain of
    command.
  - any policy, training, tactical or equipment issue requiring attention is
    systematically identified and handled through a formal action item reporting
    process.

 We believe these changes in the FDCR, AAR and adding a feedback loop will help bring us into
compliance with the DOJ under paragraphs 74 through 77.

# EXECUTIVE SUMMARY
## 2017 Force Audit Results

The Portland Police Bureau (PPB)'s Inspector conducts a systematic audit of officer's use of force reports and supervisor's After Action reports (AARs) to ensure that they meet the reporting requirements outlined in the United States Department of Justice (US DOJ) Settlement Agreement (SA) paragraphs 74, 75, 76, and 77.

**Summary**

| | |
|---|---|
| Force Cases Audited | 304 |
| Involved Officers | 427 |
| Officer Reporting Deficiencies | 455 |
| Sergeant Reporting Deficiencies | 552 |
| Command Review Deficiencies | 403 |

**Reporting**
- Officer
  - Out of 38-52 potential reporting deficiencies per case audited, officers incurred 1.5 reporting deficiencies per case audited.  On average, officers demonstrated a 96.1% reporting accuracy rate.
  - Quarter on quarter, officers were most deficient in reporting categories: "Force and Resistance" (checkbox errors on the Force Data Collection Report (FDCR)) and "De-Escalation and Decision Point Analysis".
  - Consistent reporting deficiencies around the documentation of decision point analysis and checkbox errors on the FDCR prompted PPB to revise its FDCR.  In the spring of 2018, officers will be using an FDCR specifically designed to require the documentation of decision point analysis and provide less room for error with regard to force type selection.  As such, PPB expects improvement on reporting in these areas.
- Sergeant and Command
  - Out of 54 potential reporting deficiencies per case audited, sergeants incurred 1.8 reporting deficiencies per case audited. On average, Sergeants demonstrated a 96.7% reporting accuracy rate.
  - Out of 25 potential reporting deficiencies per case audited, command incurred 1.3 reporting deficiencies per case audited. On average, Lieutenants and RU Commanders demonstrated a 94.8% reporting accuracy rate.
  - The audit found that sergeant-reporting deficiencies improved in 2017. Reporting deficiencies per case audited were 2.3 (deficiencies/case) in Q1 compared to 1.6 (deficiencies/case) in Q4 2017. The improvement seen in sergeant reporting deficiencies is most likely due to the enactment of the updated Use of Force directive 1010.00 that clearly outlines the Sergeant reporting requirements.
  - Based on Sergeant and Command Reporting deficiencies found, there is a need for additional training in the following areas:
    - Sergeant documentation of officer reporting errors in EIS
    - Lieutenant level awareness of officer and sergeant reporting requirements and the necessary corrective action.

# EXECUTIVE SUMMARY
## 2017 Force Audit Results

- o The audit found that North Precinct Sergeant's reporting deficiencies were noticeably greater than other Patrol sergeants reporting deficiencies. The same pattern was found for North precinct command review deficiencies, but not for North precinct officer reporting deficiencies. Additional supervisor training on officer and supervisor After Action reporting requirements for North Precinct supervisors is recommended.
- o Regarding the Command Review and the "Notification-Misconduct" category; misconduct is defined as reporting deficiencies for the purpose of this audit. A deficiency is noted when someone in the chain of command review does not address officer and/or sergeant reporting deficiencies and subsequently does not make notification of those deficiencies.

**CEW Applications**

- o In 2017, officers at the Portland Police Bureau applied 88 cycles of CEW to subjects. The rate of application declined over the course of the year.
  - In Q1, officers applied 21 cycles.
  - In Q2 officers applied 32 cycles.
  - In Q3, officers applied 19 cycles.
  - And in Q4 officers applied 16 cycles.
- o 32 Subjects were armed when a CEW was applied – some subjects were armed with more than one type of weapon.
  - 5 subjects were armed with a blunt object
  - 2 subjects implied possession of a firearm
  - 15 subjects were armed with a knife or edged weapon
  - 2 subjects were armed with replica firearms
  - 7 subjects were reported to be armed with a weapon, or a weapon was present but not threatened or used.
  - 1 subject attempted to run officers over with their vehicle.
- o 93% of the CEW cycles were applied as probe deployment. Only 6 cycles were applied as "drive-stuns".

# BUREAU WIDE
## 2017 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 304 |
| Involved Officers | 427 |
| Officer Reporting Deficiencies | 455 |
| Sergeant Reporting Deficiencies | 552 |
| Command Review Deficiencies | 403 |

## 2017 Rate and Trends of Force Applied[1,2,3]

| Bureau Wide | | | | | |
|---|---|---|---|---|---|
| 2017 Applications | Type of Force | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 |
| 23 | Aerosol Rest | 0.4% | 1.1% | 0.3% | 0.4% |
| 2 | Impact Weapon (baton) | 0.0% | 0.1% | 0.0% | 0.1% |
| 83 | CEW | 1.6% | 3.0% | 1.7% | 1.5% |
| 12 | CHWI* | 0.1% | 0.6% | 0.2% | 0.3% |
| 8 | K9 | 0.0% | 0.4% | 0.3% | 0.1% |
| 31 | Less Lethal | 0.0% | 2.0% | 0.9% | 0.0% |
| 94 | Strikes/Kicks | 2.0% | 4.4% | 1.1% | 1.3% |
| 235 | Takedown | 6.2% | 9.6% | 4.5% | 1.8% |
| 2 | P.I.T | | | 0.1% | 0.1% |
| 1 | FD to stop an aggressive animal | | | 0.0% | 0.1% |
| 0 | Vehicle Ram | | | 0.0% | 0.0% |
| 2 | Baton (Nonstrike) | | | 0.0% | 0.2% |
| 12 | Box - In | | | 0.3% | 0.8% |
| 94 | Control Against Resistance | | | 0.4% | 8.4% |
| 38 | Controlled Takedown | | | 0.6% | 3.0% |
| 0 | Firearm discharge to end the suffering of a wounded animal | | | 0.0% | 0.0% |
| 8 | Hobble Restraint | | | 0.1% | 0.7% |
| 91 | Resisted Handcuffing | | | 1.1% | 7.4% |
| 332 | PFA | 13% | 10% | 6.0% | 1.9% |

In 2017, the Force Audit Team Audited 1068 applications of force.

Q3 and Q4 witnessed a decrease in takedowns, because the updated use of force directive (1010.00) split the category of takedown into (1) takedown and (2) controlled takedown.

PFAs were highest in Q1 and Q2 because in Q3 the updated use of force directive (1010.00), required the audit of only 20% of Category IV force (PFA is a Category IV event).

[1] CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force cases audited during 2017.
[2] Does not include RRT/Crowd Control events
*Control Hold with Injury includes Control Against Resistance with Injury to Subject.
[3] On August 19, 2017, the Portland Police Bureau implemented an updated Use of Force directive (1010.00); auditing 100% of serious use of force cases, 100% of force cases with substantial injury to the subject (defined as requiring hospital treatment), 100% of CEW cases and 20% of all other use of force cases.  At the end of the Q4 2017, the audited sample is compared to the population of cases in order to verify that the sample is representative.  If the sample is not representative of the population, additional cases are audited to achieve representativeness.  In Q4 2017 an additional 9 cases were audited to ensure the sample was representative of officer precinct, officer shift and force type applied.

# BUREAU WIDE
## 2017 Force Audit Results

| 2017 Rate of Force | | | |
|---|---|---|---|
| Type of Force | Central | East | North |
| Aerosol Rest | 1.1% | 0.4% | 0.3% |
| Impact Weapon (baton) | 0.0% | 0.2% | 0.0% |
| CEW | 1.4% | 3.5% | 2.5% |
| CHWI* | 0.4% | 0.4% | 0.1% |
| K9 | 0.0% | 0.0% | 0.0% |
| Less Lethal | 0.6% | 1.5% | 0.8% |
| Strikes/Kicks | 1.2% | 4.1% | 2.2% |
| Takedown | 7.7% | 7.0% | 4.8% |
| P.I.T | 0.0% | 0.1% | 0.1% |
| FD to stop an aggressive animal | 0.0% | 0.0% | 0.1% |
| Vehicle Ram | 0.0% | 0.0% | 0.0% |
| Baton (Nonstrike) | 0.0% | 0.0% | 0.2% |
| Box - In | 0.0% | 1.0% | 0.1% |
| Control Against Resistance | 3.5% | 3.5% | 1.2% |
| Controlled Takedown | 1.8% | 1.1% | 0.7% |
| Firearm discharge to end the suffering of a wounded animal | 0.0% | 0.0% | 0.0% |
| Hobble Restraint | 0.6% | 0.2% | 0.0% |
| Resisted Handcuffing | 4.7% | 2.5% | 1.1% |
| PFA | 6.7% | 12.2% | 8.0% |

CEW use was consistent and relatively low across the main divisions.

Central, East and North Precinct applications of force make up 89.4% of the total audited force for 2017.

**Use of Force Analysis**

- **CEW**
  - In 2017, officers at the Portland Police Bureau applied 88 cycles of CEW to subjects. The rate of application declined over the course of the year.
    - In Q1, officers applied 21 cycles.
    - In Q2 officers applied 32 cycles.
    - In Q3, officers applied 19 cycles.
    - And in Q4 officers applied 16 cycles.
  - 32 Subjects were armed when a CEW was applied – some subjects were armed with more than one type of weapon.
    - 5 subjects were armed with a blunt object
    - 2 subjects implied possession of a firearm

# BUREAU WIDE
## 2017 Force Audit Results

- - 15 subjects were armed with a knife or edged weapon
  - 2 subjects were armed with replica firearms
  - 7 subjects were reported to be armed with a weapon, or a weapon was present but not threatened or used.
  - 1 subject attempted to run officers over with their vehicle.
- o 93% of the CEW cycles were applied as probe deployment. Only 6 cycles were applied as "drive-stuns".

**2017 Out of Policy Cases -- see Appendix A**

## 2017 Reporting of Force Applied (Audit Results) [4,5]

**Audit Results – Officers**

- On average, officers incurred 1.5 reporting errors per case.  On average, officers demonstrated a 96.1% reporting accuracy rate.
  - o The average rate of officer reporting deficiencies per quarter was as follows;
    - Q1: 1.19 errors per case
    - Q2: 1.22 errors per case
    - Q3: 1.09 errors per case
    - Q4: 2.42 errors per case
  - o The rate of officer reporting errors per case rose in the fourth quarter as a consequence of the 1010.00 policy change which required enhanced reporting of Category IV events.   Sergeants often identified these officer level reporting errors (demonstrated below by the general trend of improved Sergeant reporting quarter on quarter for 2017) and, with the introduction of a new Force Data Collection Report (FDCR) in the spring of 2018, PPB anticipates improved officer reporting for these events.
- Quarter on quarter, officers were most deficient in the Force and Resistance category and the De-Escalation and Decision Point Analysis category.  Each category contains a number of reporting components, see definitions page for further detail.
  - o In the Force and Resistance Category, officer inaccuracies were generally related to checkbox errors on the Force Data Collection Report (FDCR).
  - o Inaccuracies in the Decision Point Analysis category were expected, as in 2017 PPB was still communicating and training officers on how to document their Decision Point Analysis during force events. Training on this topic was delivered to officers during the Fall 2017 In-Service.
  - o Consistent reporting deficiencies around the documentation of decision point analysis and the correct documentation of force types prompted PPB to revise its FDCR.  In the spring of 2018, officers will be using an FDCR specifically designed to require the documentation of decision point analysis and provide less room for error with regard to force type selection.  As such, PPB expects improvement on reporting in these areas.

---

[4]  *Force cases audited during 2017.*

[5]  *Does not include RRT/Crowd Control events*

# BUREAU WIDE
## 2017 Force Audit Results

| Officer Reporting Deficiencies by RU - Q1-Q4 2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | | | | Total Reporting Deficiencies | | | | Precinct | Mental Health and Injuries | | | | Force and Resistance | | | | De-Escalation and Decision Point Analysis | | | | Witness | | | | ECW | | | |
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| 19 | 18 | 26 | 28 | 17 | 26 | 32 | 46 | CENTRAL | 6 | 2 | 5 | 8 | 6 | 13 | 15 | 18 | 4 | 3 | 7 | 9 | 1 | 7 | 4 | 10 | 0 | 1 | 1 | 1 |
| 1 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | DETECTIVES | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 2 | 0 | 5 | DVD | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 |
| 22 | 33 | 27 | 22 | 29 | 39 | 24 | 75 | EAST | 6 | 5 | 6 | 12 | 10 | 12 | 7 | 28 | 8 | 13 | 7 | 17 | 1 | 5 | 4 | 18 | 4 | 4 | 0 | 0 |
| 15 | 24 | 14 | 18 | 21 | 34 | 19 | 59 | NORTH | 6 | 7 | 1 | 14 | 7 | 11 | 4 | 11 | 5 | 5 | 8 | 21 | 3 | 8 | 5 | 11 | 0 | 3 | 1 | 2 |
| 6 | 4 | 2 | 3 | 6 | 0 | 1 | 0 | TOD | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 1 | 6 | 2 | 3 | 1 | 6 | 2 | 0 | TRAFFIC/CANINE | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 1 | 0 |
| 2 | 4 | 0 | 3 | 3 | 1 | 0 | 4 | TRANSIT | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 2 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | YSD | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 66 | 89 | 71 | 78 | 79 | 109 | 78 | 189 | QUARTER TOTAL | 18 | 18 | 12 | 35 | 28 | 37 | 27 | 61 | 22 | 22 | 22 | 48 | 6 | 24 | 14 | 42 | 5 | 8 | 3 | 3 |
| 304 | | | | 455 | | | | YEAR TOTAL | 83 | | | | 153 | | | | 114 | | | | 86 | | | | 19 | | | |

# BUREAU WIDE
## 2017 Force Audit Results

**Audit Results – Sergeants**

- During 2017, Sergeant reporting deficiencies improved. On average, Sergeants demonstrated a 96.7% reporting accuracy rate.
  - Reporting deficiencies per case audited were 2.3 (deficiencies/case) in Q1, 2.0 (deficiencies/case) in Q2 compared to 1.4 (deficiencies/case) in Q3 and 1.6 (deficiencies/case) in Q4 2017.
  - The improvement seen in sergeant reporting deficiencies is most likely due to the enactment of the updated Use of Force directive 1010.00 that clearly outlines the Sergeant reporting requirements.
- Topics with the greatest number of reporting deficiencies:
  - Review of Officer Reporting
  - EIS
  - Reporting deficiencies per case improved in these topics during 2017 (from an average of 1 deficiency/case audited in Q1 and Q2 to an average of less than 0.5 deficiency/case audited in Q3 and Q4. The improvement is most likely due to the enactment of the updated Use of Force directive 1010.00 that clearly outlines the Sergeant reporting requirements.

**Sergeant Reporting Deficiencies by RU - Q1-Q4 2017**

| Total Cases Audited | | | | Total Reporting Deficiencies | | | | Precinct | Timeliness | | | | Review of Officer Reporting | | | | Evaluate the Weight of the Evidence | | | | Decision Point Analysis | | | | Out of PPB Policy | | | | Legal Justification | | | | Tactical and Training Implications | | | | Corrective Action | | | | EIS | | | | Notification | | | | Detective Notification | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| 19 | 18 | 26 | 28 | 45 | 31 | 52 | 40 | CENTRAL | 0 | 0 | 1 | 0 | 12 | 8 | 16 | 8 | 0 | 1 | 0 | 0 | 2 | 0 | 5 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 9 | 10 | 10 | 12 | 18 | 10 | 16 | 14 | 3 | 1 | 1 | 3 | 0 | 0 | 0 | 0 |
| 1 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | DETECTIVES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 22 | 33 | 27 | 22 | 41 | 48 | 23 | 34 | EAST | 1 | 0 | 2 | 0 | 9 | 14 | 6 | 9 | 1 | 1 | 0 | 4 | 2 | 2 | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 3 | 0 | 0 | 8 | 10 | 7 | 13 | 13 | 16 | 3 | 6 | 1 | 1 | 3 | 2 | 0 | 0 | 0 | 0 |
| 15 | 24 | 14 | 18 | 49 | 81 | 26 | 42 | NORTH | 0 | 0 | 1 | 0 | 14 | 25 | 4 | 11 | 1 | 4 | 1 | 1 | 1 | 2 | 5 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 16 | 8 | 18 | 23 | 31 | 7 | 6 | 0 | 2 | 0 | 3 | 0 | 0 | 0 | 0 |
| 6 | 4 | 2 | 3 | 7 | 5 | 0 | 1 | TOD | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 6 | 2 | 3 | 0 | 7 | 0 | 2 | TRAFFIC/CANINE | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | 4 | 0 | 3 | 5 | 5 | 0 | 6 | TRANSIT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 4 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | YSD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 66 | 89 | 71 | 78 | 149 | 177 | 101 | 125 | QUARTER TOTAL | 1 | 1 | 4 | 0 | 35 | 50 | 26 | 31 | 4 | 5 | 2 | 5 | 4 | 12 | 7 | 5 | 2 | 4 | 0 | 0 | 0 | 0 | 1 | 0 | 5 | 3 | 0 | 1 | 30 | 39 | 25 | 45 | 63 | 65 | 26 | 27 | 4 | 6 | 6 | 8 | 0 | 0 | 0 | 0 |
| **304** | | | | **552** | | | | **YEAR TOTAL** | **6** | | | | **142** | | | | **16** | | | | **28** | | | | **6** | | | | **1** | | | | **9** | | | | **139** | | | | **181** | | | | **24** | | | | **0** | | | |

# BUREAU WIDE
## 2017 Force Audit Results

**Audit Results – Command Review**

- On average, Lieutenants and RU Commanders demonstrated a 94.8% reporting accuracy rate.
- When an officer's narrative was missing required information or the sergeant's review was deficient the issue was most often addressed in the CHO's review.[6]
- Topics with the greatest number of reporting deficiencies for Lieutenants:
  - EIS
  - Notification – Misconduct (Reporting Deficiencies)
  - The rate of deficiencies per case audited for these two topics remained at less than 0.5 deficiency/case in 2017 with no improvement seen.[7] With the implementation of the updated Use of Force 1010.00 directive and supervisor training, improvement in these two topics is expected to be seen in 2018.
- Topic with the greatest number of deficiencies for RU Managers (Captains/Commanders):
  - EIS
  - The rate of deficiencies per case audited for this topic improved in 2017. Improvement seen in this topic during Q3 and Q4 2017 is most likely due to category IV force events not requiring a chain of command review beyond the Lieutenant.

(See next page for Lieutenant and RU Manager Reporting Tables)

---

[6] *The Category Notification – Criminal Conduct (77f), refers to section 77f of the USDOJ SA, which states that "all supervisors in the chain of command [will] suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer.  The Category Notification – Misconduct (77g), refers to section 77g of the USDOJSA, which states that "all supervisors in the chain of command [will] report matter[s] to PSD for review and investigation whenever an investigating supervisor, shift commander, or precinct commander finds evidence of apparent misconduct by a PPB officer or employee."  PPB defines the phrase "apparent misconduct" to include reporting errors and inaccuracies.*
[7] *EIS is assessed using 4 questions for each level in the chain of command review. If a member of the chain of command identifies a reporting discrepancy for the officer(s) or sergeant, the corresponding EIS entry should include the case number, nature of the incident, positive performance (if identified) and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). The total deficiencies per case can represent 1-4 deficiencies for each point assessed. Misconduct is represented by reporting deficiencies. A deficiency is noted when someone in the chain of command review does not address officer and/or sergeant reporting deficiencies and subsequently does not make notification of those deficiencies.*

# BUREAU WIDE
## 2017 Force Audit Results

**Lieutenant Reporting Deficiencies by RU - 2017**

| Precinct | Total Cases Audited | | | | Total Reporting Deficiencies | | | | Timeliness | | | | In/Out Policy (75e) | | | | Adequacy of Command Reviews (77a) | | | | Completeness of 940 Reports (77b) | | | | Modify Findings (77c) | | | | Additional Investigation (77d) | | | | EIS (77e) | | | | Notification - Criminal Conduct (77f) | | | | Notification - Misconduct (78g) (Reporting Deficiencies) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Central | 14 | 15 | 25 | 27 | 5 | 7 | 11 | 23 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 16 | 0 | 0 | 0 | 0 | 0 | 2 | 4 | 6 |
| Det. | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| East | 20 | 36 | 25 | 22 | 5 | 13 | 2 | 16 | 0 | 1 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 1 | 5 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 5 | 0 | 9 |
| North | 17 | 23 | 12 | 17 | 7 | 17 | 7 | 15 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 6 | 1 | 4 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 4 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 2 | 5 | 1 | 8 |
| Traffic/K9 | 0 | 2 | 1 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Transit | 1 | 2 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| TOD | 5 | 4 | 2 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| YSD | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Quarter Total | 58 | 82 | 65 | 69 | 21 | 40 | 20 | 54 | 0 | 3 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 4 | 10 | 4 | 10 | 2 | 3 | 2 | 1 | 0 | 0 | 0 | 1 | 8 | 9 | 7 | 16 | 0 | 0 | 0 | 0 | 6 | 13 | 5 | 23 |
| Annual Total | 274 | | | | 135 | | | | 7 | | | | 1 | | | | 3 | | | | 28 | | | | 8 | | | | 1 | | | | 40 | | | | 0 | | | | 47 | | | |

**RU Manager Reporting Deficiencies by RU - 2017**

| Precinct | Total Cases Audited | | | | Total Reporting Deficiencies | | | | Timeliness | | | | In/Out Policy (75e) | | | | Adequacy of Command Reviews (77a) | | | | Completeness of 940 Reports (77b) | | | | Modify Findings (77c) | | | | Additional Investigation (77d) | | | | EIS (77e) | | | | Notification - Criminal Conduct (77f) | | | | Notification - Misconduct (78g) (Reporting Deficiencies) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Central | 18 | 16 | 21 | 13 | 15 | 15 | 10 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 12 | 12 | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 4 | 3 |
| Det. | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| East | 22 | 35 | 19 | 13 | 17 | 12 | 1 | 11 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 12 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 6 |
| North | 15 | 23 | 12 | 9 | 25 | 57 | 4 | 12 | 1 | 2 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 6 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 44 | 1 | 4 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 6 |
| Traffic/K9 | 1 | 5 | 2 | 1 | 0 | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Transit | 2 | 3 | 0 | 2 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOD | 7 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| YSD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Quarter Total | 66 | 86 | 58 | 38 | 57 | 93 | 15 | 31 | 2 | 5 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 2 | 1 | 8 | 2 | 8 | 2 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 44 | 72 | 5 | 4 | 0 | 0 | 0 | 0 | 6 | 3 | 4 | 15 |
| Annual Total | 248 | | | | 196 | | | | 9 | | | | 4 | | | | 4 | | | | 19 | | | | 7 | | | | 0 | | | | 125 | | | | 0 | | | | 28 | | | |

# BUREAU WIDE

## 2017 Force Audit Results

| | CHO Reporting Deficiencies - 2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | | | | Total Reporting Deficiencies | | | | Timeliness | | | | In/Out Policy (75e) | | | | Adequacy of Chain of Command Reviews (77a) | | | | Completeness of 940 Reports (77b) | | | | Modify Findings (77c) | | | | Additional Investigation (77d) | | | | EIS (77e) | | | | Notification - Criminal Conduct (77f) | | | | Notification - Misconduct (77g) (Reporting Deficiencies) | | | |
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Investigations & Services | 10 | 7 | 0 | 0 | 16 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| Operations | 56 | 82 | 53 | 18 | 9 | 17 | 10 | 17 | 2 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 3 | 1 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 4 | 8 | 0 | 0 | 0 | 0 | 5 | 0 | 2 | 6 |
| Quarter Total | 66 | 89 | 53 | 18 | 25 | 21 | 10 | 17 | 2 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 1 | 3 | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 8 | 16 | 4 | 8 | 0 | 0 | 0 | 0 | 7 | 0 | 2 | 6 |
| Annual Total | 226 | | | | 73 | | | | 3 | | | | 2 | | | | 1 | | | | 6 | | | | 6 | | | | 0 | | | | 36 | | | | 0 | | | | 15 | | | |

# CANINE/TRAFFIC
## 2017 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 12 |
| Involved Officers | 16 |
| Officer Reporting Deficiencies | 9 |
| Sergeant Reporting Deficiencies | 9 |
| Command Review Deficiencies | 7 |

## 2017 Rate and Trends of Force Applied[1,2,3]

- Applications of force used by the Canine/Traffic division are documented in the Bureau-wide section of this report.
- Twelve Canine/Traffic division cases were audited this year, including a total of 8 applications of Canine bites.

## 2017 Reporting of Force Applied (Audit Results) [4]

**Audit Results – Officers**

- On average, officers incurred 0.75 reporting errors per case.  This is much lower than the bureau-wide average for officer reporting deficiencies.
- Overall, officer reporting deficiencies were not heavily concentrated in any particular category. The rate of officer reporting deficiencies per quarter was as follows;
  - Q1:  1.0 errors per case
  - Q2:  1.0 errors per case
  - Q3:  1.0 errors per case
  - Q4:  0 errors per case
- In Q4 officers demonstrated substantial improvement in their reporting.

(See next page for Officer Reporting table)

---

[1] CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force cases audited during 2017.

[2] Does not include RRT/Crowd Control events

[3] This table is aggregated at the Sergeant division level.  During Q4 one of the K-9 officers whose reporting is documented here (due to the fact that this is his assigned division) was working at East Precinct when he did a box-in.  That box in is captured under the east precinct Rate of Force page.

*Control Hold with Injury includes Control Against Resistance with Injury to Subject.

[4] CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force cases audited during 2017.

# CANINE/TRAFFIC

## 2017 Force Audit Results

| Officer Reporting Deficiencies - Canine/Traffic - Annual 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quarter | Total Cases Audited | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-Escalation and Decision Point Analysis | Witness | ECW |
| Q1 | 1 | 1 | 0 | 0 | 1 | 0 | 0 |
| Q2 | 6 | 6 | 2 | 0 | 1 | 3 | 0 |
| Q3 | 2 | 2 | 0 | 1 | 0 | 0 | 1 |
| Q4 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 12 | 9 | 2 | 1 | 2 | 3 | 1 |

# CANINE/TRAFFIC
## 2017 Force Audit Results

**Audit Results - Sergeants**

- The rate of Sergeant reporting deficiencies improved during 2017
  - Reporting deficiencies per case audited were 1.2 (deficiencies/case) in Q2 2017 compared to less than 1 deficiency/case audited (0.7) in Q4 2017.
- Topics with the greatest number of reporting deficiencies:
  - Corrective Action (0.25 deficiencies/case audited)
  - EIS[5] (0.33 deficiencies/case audited)

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sergeant Reporting Deficiencies - Traffic/Canine Division - Annual 2017** | | | | | | | | | | | | | |
| Total Cases Audited | Total Reporting Deficiencies | Quarter | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 1 | 0 | Q1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 7 | Q2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 0 |
| 2 | 0 | Q3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 2 | Q4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| **12** | **9** | **TOTAL** | **0** | **2** | **0** | **0** | **0** | **0** | **0** | **3** | **4** | **0** | **0** |

[5] *Deficiencies noted here do not simply capture when an EIS entry has not been made; a deficiency can be 1-4 missing EIS requirements, such as case number, the nature of the incident, positive performance (if identified), and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). If an EIS entry was not made for a case, then the sergeant would receive four deficiencies for each of the EIS requirements for that case.*

# CANINE/TRAFFIC
## 2017 Force Audit Results

**Audit Results - Command Review**

- There were 2 reporting deficiencies for Traffic/K9 lieutenants in 2017 (.5/case).
  - The rate of reporting deficiencies per case audited improved during 2017 – from 1.0 in Q2 2017 to 0 in Q4 2017.
- There were 5 reporting deficiencies for Traffic/K9 RU Managers in 2017 (.36/case).
  - The rate of reporting deficiencies per case audited improved during 2017 – from 0.8 in Q2 2017 to 0 in Q4 2017.

| Traffic/K9 Lieutenant Reporting Deficiencies - 2017 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q2 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Q3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 4 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |

| Traffic/K9 RU Manager Reporting Deficiencies - 2017 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q2 | 5 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| Q3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 9 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |

# CENTRAL PRECINCT

## 2017 Force Audit Results

| Force Cases Audited | 91 |
|---|---|
| Involved Officers | 137 |
| Officer Reporting Deficiencies | 121 |
| Sergeant Reporting Deficiencies | 168 |
| Command Review Deficiencies | 94 |

## 2017 Rate and Trends of Force Applied[1,2]

| 2017 Applications | Type of Force | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 |
|---|---|---|---|---|---|
| | **Central Precinct** | | | | |
| 12 | **Aerosol Rest** | 0.9% | 0.9% | 0.6% | 1.2% |
| 0 | **Impact Weapon (baton)** | 0.0% | 0.0% | 0.0% | 0.0% |
| 15 | **CEW** | 0.3% | 0.3% | 2.2% | 1.9% |
| 4 | **CHWI*** | 0.0% | 0.3% | 0.0% | 0.9% |
| 0 | **K9** | 0.0% | 0.0% | 0.0% | 0.0% |
| 6 | **Less Lethal** | 0.0% | 0.0% | 1.9% | 0.0% |
| 13 | **Strikes/Kicks** | 0.9% | 0.9% | 0.3% | 1.9% |
| 82 | **Takedown** | 6.5% | 10.6% | 6.2% | 2.2% |
| 0 | **P.I.T** | | | 0.0% | 0.0% |
| 0 | **FD to stop an aggressive animal** | | | 0.0% | 0.0% |
| 0 | **Vehicle Ram** | | | 0.0% | 0.0% |
| 0 | **Baton (Nonstrike)** | | | 0.0% | 0.0% |
| 0 | **Box - In** | | | 0.0% | 0.0% |
| 43 | **Control Against Resistance** | | | 1.2% | 12.1% |
| 19 | **Controlled Takedown** | | | 0.9% | 5.0% |
| 0 | **Firearm discharge to end the suffering of a wounded animal** | | | 0.0% | 0.0% |
| 6 | **Hobble Restraint** | | | 0.3% | 1.6% |
| 50 | **Resisted Handcuffing** | | | 2.2% | 13.4% |
| 72 | **PFA** | 9.0% | 6.8% | 5.3% | 1.2% |

In 2017, the Force Audit Team audited 322 applications of force used by officers at Central Precinct.

---

[1]*CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force audited and PFAs reported during Q3 2017.*

[2] *Does not include RRT/Crowd Control events*

*Control Hold with Injury includes Control Against Resistance with Injury to Subject.*

# CENTRAL PRECINCT
## 2017 Force Audit Results

| 2017 Rate of Force - Central Precinct | |
|---|---|
| **Type of Force** | **Central** |
| **Aerosol Rest** | 3.7% |
| **Impact Weapon (baton)** | 0.0% |
| **CEW** | 4.7% |
| **CHWI\*** | 1.2% |
| **K9** | 0.0% |
| **Less Lethal** | 1.9% |
| **Strikes/Kicks** | 4.0% |
| **Takedown** | 25.5% |
| **P.I.T** | 0.0% |
| **FD to stop an aggressive animal** | 0.0% |
| **Vehicle Ram** | 0.0% |
| **Baton (Nonstrike)** | 0.0% |
| **Box - In** | 0.0% |
| **Control Against Resistance** | 13.4% |
| **Controlled Takedown** | 5.9% |
| **Firearm discharge to end the suffering of a wounded animal** | 0.0% |
| **Hobble Restraint** | 1.9% |
| **Resisted Handcuffing** | 15.5% |
| **PFA** | 22.4% |

All CEW cases are audited.  CEW use at Central Precinct accounts for less than 5% of audited force for 2017.

Takedowns and the Pointing of Firearms account for almost 50% of Central Precinct's audited force in 2017.

# CENTRAL PRECINCT
## 2017 Force Audit Results

---

### 2017 Reporting of Force Applied (Audit Results) [3,4]

**Audit Results – Officers**

- On average, officers incurred 1.32 reporting errors per case.  This is below the bureau-wide average for 2017. On average, Central Precinct officers demonstrated at 96.5% reporting accuracy rate.
- The rate of officer reporting deficiencies per quarter was as follows;
  - Q1: 0.89 errors per case
  - Q2: 1.44 errors per case
  - Q3: 1.23 errors per case
  - Q4: 1.64 errors per case
- Officers at Central Precinct were most deficient in their reporting for the Force and Resistance Category. These deficiencies are largely related to checkbox errors on the Force Data Collection Report.

| Officer Reporting Deficiencies - Central Precinct - Annual 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Quarter** | **Total Cases Audited** | **Total Reporting Deficiencies** | **Mental Health and Injuries** | **Force and Resistance** | **De-Escalation and Decision Point Analysis** | **Witness** | **ECW** |
| **Q1** | **19** | **17** | 6 | 6 | 4 | 1 | 0 |
| **Q2** | **18** | **26** | 2 | 13 | 3 | 7 | 1 |
| **Q3** | **26** | **32** | 5 | 15 | 7 | 4 | 1 |
| **Q4** | **28** | **46** | 8 | 18 | 9 | 10 | 1 |
| **TOTAL** | **91** | **121** | **21** | **52** | **23** | **22** | **3** |

---

[3] *Force cases audited 2017.*

[4] *Does not include RRT/Crowd Control events*

# CENTRAL PRECINCT
## 2017 Force Audit Results

**Audit Results - Sergeants**

- During 2017, Central Precinct Sergeant reporting deficiencies improved. On average, Central Precinct Sergeants demonstrated a 96.5% reporting accuracy rate.
  - Reporting deficiencies per case audited were 2.4 (deficiencies/case) in Q1 and 1.7 (deficiencies/case) in Q2 compared to 2.0 (deficiencies/case) in Q3 and 1.4 (deficiencies/case) in Q4 2017.
  - The improvement seen in sergeant reporting deficiencies is most likely due to the enactment of the updated Use of Force directive 1010.00 that clearly outlines the Sergeant reporting requirements.
- Topics with the greatest number of reporting deficiencies:
  - Review of Officer Reporting
  - EIS[5]
  - Reporting deficiencies/case improved in these topics during 2017 (from an average of near 1 deficiency/case audited in Q1 and Q2 to an average of less than 0.5 deficiency/case audited in Q3 and Q4. The improvement is most likely due to the enactment of the updated Use of Force directive 1010.00 that clearly outlines the Sergeant reporting requirements.

| Sergeant Reporting Deficiencies - Central Precinct - Annual 2017 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Quarter | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 19 | 45 | Q1 | 0 | 12 | 0 | 2 | 0 | 0 | 1 | 9 | 18 | 3 | 0 |
| 18 | 31 | Q2 | 0 | 8 | 0 | 0 | 2 | 0 | 0 | 10 | 10 | 1 | 0 |
| 26 | 52 | Q3 | 1 | 16 | 1 | 5 | 0 | 0 | 0 | 10 | 16 | 3 | 0 |
| 28 | 40 | Q4 | 0 | 8 | 0 | 2 | 0 | 0 | 1 | 12 | 14 | 3 | 0 |
| 91 | 168 | TOTAL | 1 | 44 | 1 | 9 | 2 | 0 | 2 | 41 | 58 | 10 | 0 |

---

[5] *Deficiencies noted here do not simply capture when an EIS entry has not been made; a deficiency can be 1-4 missing EIS requirements, such as case number, the nature of the incident, positive performance (if identified), and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). If an EIS entry was not made for a case, then the sergeant would receive four deficiencies for each of the EIS requirements for that case.*

# CENTRAL PRECINCT
## 2017 Force Audit Results

**Audit Results - Command Review**

- Central Lieutenants had 46 review deficiencies for cases reviewed in 2017 (.57/case). On average, Central Precinct Lieutenants demonstrated a 98% reporting accuracy rate.
  - Topics with the greatest number of reporting deficiencies for Central Lieutenants:
    - EIS
    - Notification – Misconduct (Reporting Deficiencies)
    - The average rate of deficiencies per case audited for these two topics remained at less than 0.5 deficiency/case in 2017 with some improvement seen.[6]
- Central RU Managers had 48 review deficiencies for cases reviewed in 2017 (.71/case). On average, Central Precinct RU Managers demonstrated a 98.5% reporting accuracy rate.
  - Topic with the greatest number of deficiencies for Central Precinct RU Managers (Captains/Commanders):
    - EIS
    - The rate of deficiencies per case audited for this topic improved in 2017 (from 0.67 deficiencies/case audited in Q1 2017 to 0 deficiencies/case audited in Q4 2017). Improvement seen in this topic during Q4 2017 is most likely due to category IV force events not requiring a chain of command review beyond the Lieutenant.

| Central Precinct Lieutenant Reporting Deficiencies - 2017 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Precinct** | **Total Cases Audited** | **Total Reporting Deficiencies** | **Timeliness** | **In/Out Policy (75e)** | **Adequacy of Chain of Command Reviews (77a)** | **Completeness of 940 Reports (77b)** | **Modify Findings (77c)** | **Additional Investigation (77d)** | **EIS (77e)** | **Notification - Criminal Conduct (77f)** | **Notification - Misconduct (77g) (Reporting Deficiencies)** |
| Q1 | 14 | 5 | 0 | 0 | 0 | 1 | 0 | 0 | 4 | 0 | 0 |
| Q2 | 15 | 7 | 2 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 2 |
| Q3 | 25 | 11 | 1 | 0 | 0 | 2 | 1 | 0 | 3 | 0 | 4 |
| Q4 | 27 | 23 | 0 | 0 | 0 | 1 | 0 | 0 | 16 | 0 | 6 |
| **Total** | **81** | **46** | **3** | **0** | **1** | **5** | **2** | **0** | **23** | **0** | **12** |

---

[6] *EIS is assessed using 4 questions for each level in the chain of command review. If a member of the chain of command identifies a reporting discrepancy for the officer(s) or sergeant, the corresponding EIS entry should include the case number, nature of the incident, positive performance (if identified) and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). The total deficiencies per case can represent 1-4 deficiencies for each point assessed. Misconduct is represented by reporting deficiencies. A deficiency is noted when someone in the chain of command review does not address officer and/or sergeant reporting deficiencies and subsequently does not make notification of those deficiencies.*

# CENTRAL PRECINCT

## 2017 Force Audit Results

| Central Precinct RU Manager Reporting Deficiencies - 2017 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 18 | 15 | 1 | 0 | 0 | 0 | 1 | 0 | 12 | 0 | 1 |
| Q2 | 16 | 15 | 0 | 0 | 0 | 1 | 1 | 0 | 12 | 0 | 1 |
| Q3 | 21 | 10 | 0 | 0 | 0 | 1 | 1 | 0 | 4 | 0 | 4 |
| Q4 | 13 | 8 | 0 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| Total | 68 | 48 | 1 | 2 | 2 | 3 | 3 | 0 | 28 | 0 | 9 |

# DETECTIVES
## 2017 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 1 |
| Involved Officers | 2 |
| Officer Reporting Deficiencies | 2 |
| Sergeant Reporting Deficiencies | 2 |
| Command Review Deficiencies | 0 |

## 2017 Rate and Trends of Force Applied[1,2,3]

- Applications of force used by the Detectives division are documented in the Bureau-wide section of this report.
- One Detectives division case was audited this year.

## 2017 Reporting of Force Applied (Audit Results)

**Audit Results- Officers**

- Two detectives used force in one case during this quarter. They each incurred one reporting deficiency in the force and resistance category.

| Officer Reporting Deficiencies -Detectives - Annual 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quarter | Total Cases Audited | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-Escalation and Decision Point Analysis | Witness | ECW |
| Q1 | 1 | 2 | 0 | 2 | 0 | 0 | 0 |
| Q2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 1 | 2 | 0 | 2 | 0 | 0 | 0 |

---

[1] *Force cases audited during 2017.*
[2] *Does not include RRT/Crowd Control events*

# DETECTIVES
## 2017 Force Audit Results

**Audit Results – Sergeants**

- During 2017, a Sergeant assigned to Detectives reviewed one case and had two reporting deficiencies in the EIS topic. Note that the EIS is assessed using 4 questions for each level in the chain of command review. If a member of the chain of command identifies a reporting discrepancy for the officer(s) or sergeant, the corresponding EIS entry should include the case number, nature of the incident, positive performance (if identified) and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). The total deficiencies per case can represent 1-4 deficiencies for each point assessed.

| Sergeant Reporting Deficiencies - Detectives - Annual 2017 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Quarter | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 1 | 2 | Q1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| 0 | 0 | Q2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | Q3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | Q4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 2 | TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |

# DETECTIVES
## 2017 Force Audit Results

**Audit Results - Command Review**

- In 2017, one case was audited that was reviewed by members of the Detectives Division chain of command. The audit found no deficiencies in the review.

| Detectives Lieutenant Reporting Deficiencies - 2017 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

| Detectives RU Manager Reporting Deficiencies - 2017 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

# Drugs and Vice Division (DVD)

## 2017 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 0 |
| Involved Officers | 5 |
| Officer Reporting Deficiencies | 7 |
| Sergeant Reporting Deficiencies | 0 |
| Command Review Deficiencies | 0 |

**Types of Force Applied**

- Use of Force by DVD officers was reviewed by Central Sergeants.  Applications of force used by DVD officers are documented in the Central Precinct Use of Force Table.

## 2017 Reporting of Force Applied (Audit Results) [1,2]

**Audit Results – Officers**

- On average, DVD officers incurred 1.75 reporting errors per case.  This is higher than the bureau-wide average for officer reporting deficiencies.
- The rate of officer reporting deficiencies per quarter was as follows
  - Q1: (no cases audited)
  - Q2: 1.0 errors per case
  - Q3: (no cases audited)
  - Q4: 2.5 errors per case
- Officer reporting deficiencies were concentrated in the areas of witness documentation and the documentation of force and resistance.

| Officer Reporting Deficiencies - DVD - Annual 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quarter | Total Cases Audited | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-Escalation and Decision Point Analysis | Witness | ECW |
| **Q1** | **0** | **0** | 0 | 0 | 0 | 0 | 0 |
| Q2 | * | **2** | 0 | 1 | 0 | 1 | 0 |
| **Q3** | **0** | **0** | 0 | 0 | 0 | 0 | 0 |
| Q4 | ** | **5** | 1 | 2 | 0 | 2 | 0 |
| **TOTAL** | | **7** | **1** | **3** | **0** | **3** | **0** |

*Two cases involving DVD officers, both reviewed by Central Sergeants.  Both cases are counted under Central Precinct for Total Cases Audited.
**Two cases involving DVD officers, both reviewed by Central Sergeants.  Both cases are counted under Central Precinct for Total Cases Audited.
***All DVD force applications are counted under Central Precinct totals.

---

[1] *Force cases audited during 2017.*
[2] *Does not include RRT/Crowd Control events*

# Drugs and Vice Division (DVD)

## 2017 Force Audit Results

**Audit Results – Sergeants**

- Force used by officers assigned to DVD was reviewed by Sergeants assigned to other precincts/divisions. No Sergeant assigned to DVD reviewed a force event during 2017.

**Audit Results – Command Review**

- DVD cases were reviewed by Central Precinct chain of command.  Results from the chain of command audit are contained in the Central Precinct Audit Report.

# EAST PRECINCT
## 2017 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 104 |
| Involved Officers | 151 |
| Officer Reporting Deficiencies | 167 |
| Sergeant Reporting Deficiencies | 146 |
| Command Review Deficiencies | 77 |

### 2017 Rate and Trends of Force Applied[1,2]

In 2017, the Force Audit Team audited 402 applications of force used by officers at East Precinct.

| East Precinct | | | | | |
|---|---|---|---|---|---|
| 2017 Applications | Type of Force | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 |
| 4 | Aerosol Rest | 0.2% | 0.5% | 0.2% | 0.0% |
| 2 | Impact Weapon (baton) | 0.0% | 0.2% | 0.0% | 0.2% |
| 37 | CEW | 3.0% | 3.7% | 1.5% | 1.0% |
| 4 | CHWI* | 0.2% | 0.5% | 0.2% | 0.0% |
| 0 | K9 | 0.0% | 0.0% | 0.0% | 0.0% |
| 16 | Less Lethal | 0.0% | 3.0% | 1.0% | 0.0% |
| 44 | Strikes/Kicks | 1.0% | 6.7% | 1.2% | 2.0% |
| 75 | Takedown | 5.5% | 8.2% | 4.0% | 1.0% |
| 1 | P.I.T | | | 0.0% | 0.2% |
| 0 | FD to stop an aggressive animal | | | 0.0% | 0.0% |
| 0 | Vehicle Ram | | | 0.0% | 0.0% |
| 0 | Baton (Nonstrike) | | | 0.0% | 0.0% |
| 11 | Box - In | | | 0.7% | 2.0% |
| 37 | Control Against Resistance | | | 0.0% | 9.2% |
| 12 | Controlled Takedown | | | 0.7% | 2.2% |
| 0 | Firearm discharge to end the suffering of a wounded animal | | | 0.0% | 0.0% |
| 2 | Hobble Restraint | | | 0.0% | 0.5% |
| 27 | Resisted Handcuffing | | | 1.0% | 5.7% |
| 130 | PFA | 13.2% | 11.9% | 4.2% | 3.0% |

---

[1] *CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force audited during 2017.*

[2] *Does not include RRT/Crowd Control events*

*\*Control Hold with Injury includes Control Against Resistance with Injury to Subject.*

# EAST PRECINCT
## 2017 Force Audit Results

| 2017 Rate of Force - East Precinct | |
|---|---|
| **Type of Force** | **Central** |
| **Aerosol Rest** | 1% |
| **Impact Weapon (baton)** | 0% |
| **CEW** | 9% |
| **CHWI*** | 1% |
| **K9** | 0% |
| **Less Lethal** | 4% |
| **Strikes/Kicks** | 11% |
| **Takedown** | 19% |
| **P.I.T** | 0% |
| **FD to stop an aggressive animal** | 0% |
| **Vehicle Ram** | 0% |
| **Baton (Nonstrike)** | 0% |
| **Box - In** | 3% |
| **Control Against Resistance** | 9% |
| **Controlled Takedown** | 3% |
| **Firearm discharge to end the suffering of a wounded animal** | 0% |
| **Hobble Restraint** | 0% |
| **Resisted Handcuffing** | 7% |
| **PFA** | 32% |

All CEW cases are audited. CEW use at East Precinct accounts for less than 10% of audited force for 2017.

Takedowns and the Pointing of Firearms account for just over 50% of East Precinct's audited force in 2017. This trend in use of force is similar to that of Central Precinct.

# EAST PRECINCT
## 2017 Force Audit Results

**2017 Reporting of Force Applied (Audit Results)** [3,4]

**Audit Results – Officers**

- On average, officers incurred 1.60 reporting errors per case.  This is just above bureau-wide average for 2017. On average, East Precinct officers demonstrated a 95.7% reporting accuracy rate.
- The rate of officer reporting deficiencies per quarter was as follows;
  - Q1: 1.31 errors per case
  - Q2: 1.18 errors per case
  - Q3: 0.88 errors per case
  - Q4: 3.40 errors per case
- In Q4 officers demonstrated substantial decline in their reporting. The Audit team attributes this to the 1010.00 policy change in Q3 requiring enhanced reporting for Category IV events.

| Officer Reporting Deficiencies - East Precinct - Annual 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quarter | Total Cases Audited | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-Escalation and Decision Point Analysis | Witness | ECW |
| Q1 | 22 | 29 | 6 | 10 | 8 | 1 | 4 |
| Q2 | 33 | 39 | 5 | 12 | 13 | 5 | 4 |
| Q3 | 27 | 24 | 6 | 7 | 7 | 4 | 0 |
| Q4 | 22 | 75 | 12 | 28 | 17 | 18 | 0 |
| TOTAL | 104 | 167 | 29 | 57 | 45 | 28 | 8 |

---

[3] *Force cases audited during 2017.*
[4] *Does not include RRT/Crowd Control events*

# EAST PRECINCT
## 2017 Force Audit Results

**Audit Results - Sergeant Review**

- One hundred and four East Precinct cases were audited during 2017 and 146 reporting deficiencies (1.4 deficiencies/case audited) for East Sergeants were identified by the audit. On average, East Precinct Sergeants demonstrated a 97.4% reporting accuracy rate.
  - Reporting deficiencies/case were 1.9 (deficiencies/case) in Q1, 1.5 (deficiencies/case) in Q2 compared to 0.9 (deficiencies/case) in Q3 and 1.5 (deficiencies/case) in Q4 2017.
  - The improvement seen during 2017 in sergeant reporting deficiencies is most likely due to the enactment of the updated Use of Force directive 1010.00 that clearly outlines the Sergeant reporting requirements.
- Topics with the greatest number of reporting deficiencies:
  - Review of Officer Reporting (0.4 deficiencies/case audited)
  - Corrective Action (0.4 deficiencies/case audited)
  - EIS[5] (0.4 deficiencies/case audited)

| Sergeant Reporting Deficiencies - East Precinct - Annual 2017 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Quarter | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 22 | 41 | Q1 | 1 | 9 | 1 | 2 | 2 | 0 | 4 | 8 | 13 | 1 | 0 |
| 33 | 48 | Q2 | 0 | 14 | 1 | 2 | 1 | 0 | 3 | 10 | 16 | 1 | 0 |
| 27 | 23 | Q3 | 2 | 6 | 0 | 2 | 0 | 0 | 0 | 7 | 3 | 3 | 0 |
| 22 | 34 | Q4 | 0 | 9 | 4 | 0 | 0 | 0 | 0 | 13 | 6 | 2 | 0 |
| 104 | 146 | TOTAL | 3 | 38 | 6 | 6 | 3 | 0 | 7 | 38 | 38 | 7 | 0 |

---

[5] *EIS is assessed using 4 questions for each level in the chain of command review. If a member of the chain of command identifies a reporting discrepancy for the officer(s) or sergeant, the corresponding EIS entry should include the case number, nature of the incident, positive performance (if identified) and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). The total deficiencies per case can represent 1-4 deficiencies for each point assessed.*

# EAST PRECINCT
## 2017 Force Audit Results

**Audit Results - Command Review**

- Overall errors
  - East Lieutenants had 36 review deficiencies for cases reviewed in 2017 (.34/case). On average, East Precinct Lieutenants demonstrated a 98.6% reporting accuracy rate.
  - East RU Managers had 41 review deficiencies for cases reviewed in 2017 (.46/case). On average, East Precinct RU Managers demonstrated a 98.1% reporting accuracy rate.
- The greatest number of reporting deficiencies were seen in EIS entries and the Notification of Misconduct[6] in reporting.
  - A large majority of the RU Manager errors stemmed from EIS entry deficiencies in Q1 and Q2. These deficiencies dropped significantly in Q3 and Q4.

| East Precinct Lieutenant Reporting Deficiencies - 2017 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 20 | 5 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 2 |
| Q2 | 36 | 13 | 1 | 0 | 0 | 2 | 1 | 0 | 4 | 0 | 5 |
| Q3 | 25 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| Q4 | 22 | 16 | 2 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 9 |
| Total | 103 | 36 | 3 | 1 | 0 | 9 | 3 | 0 | 4 | 0 | 16 |

| East Precinct RU Manager Reporting Deficiencies - 2017 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 22 | 17 | 0 | 1 | 0 | 0 | 0 | 1 | 12 | 0 | 3 |
| Q2 | 35 | 12 | 2 | 0 | 0 | 1 | 1 | 0 | 8 | 0 | 0 |
| Q3 | 19 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| Q4 | 13 | 11 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 6 |
| Total | 89 | 41 | 2 | 1 | 0 | 6 | 3 | 0 | 20 | 0 | 9 |

---

[6] *EIS is assessed using 4 questions for each level in the chain of command review. If a member of the chain of command identifies a reporting discrepancy for the officer(s) or sergeant, the corresponding EIS entry should include the case number, nature of the incident, positive performance (if identified) and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). The total deficiencies per case can represent 1-4 deficiencies for each point assessed. Misconduct is represented by reporting deficiencies. A deficiency is noted when someone in the chain of command review does not address officer and/or sergeant reporting deficiencies and subsequently does not make notification of those deficiencies.*

# NORTH PRECINCT
## 2017 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 71 |
| Involved Officers | 93 |
| Officer Reporting Deficiencies | 133 |
| Sergeant Reporting Deficiencies | 198 |
| Command Review Deficiencies | 144 |

### 2017 Rate and Trends of Force Applied[1,2]

In 2017, the Force Audit Team audited 237 applications of force used by officers at North Precinct.

| 2017 Applications | Type of Force | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 |
|---|---|---|---|---|---|
| 3 | **Aerosol Rest** | 0.0% | 1.3% | 0.0% | 0.0% |
| 0 | **Impact Weapon (baton)** | 0.0% | 0.0% | 0.0% | 0.0% |
| 27 | **CEW** | 0.8% | 6.8% | 2.1% | 1.7% |
| 1 | **CHWI*** | 0.0% | 0.0% | 0.4% | 0.0% |
| 0 | **K9** | 0.0% | 0.0% | 0.0% | 0.0% |
| 9 | **Less Lethal** | 0.0% | 3.8% | 0.0% | 0.0% |
| 24 | **Strikes/Kicks** | 2.5% | 6.3% | 1.3% | 0.0% |
| 51 | **Takedown** | 6.3% | 8.4% | 4.6% | 2.1% |
| 1 | **P.I.T** | | | 0.4% | 0.0% |
| 1 | **FD to stop an aggressive animal** | | | 0.0% | 0.4% |
| 0 | **Vehicle Ram** | | | 0.0% | 0.0% |
| 2 | **Baton (Nonstrike)** | | | 0.0% | 0.8% |
| 1 | **Box - In** | | | 0.0% | 0.4% |
| 13 | **Control Against Resistance** | | | 0.0% | 5.5% |
| 7 | **Controlled Takedown** | | | 0.0% | 3.0% |
| 0 | **Firearm discharge to end the suffering of a wounded animal** | | | 0.0% | 0.0% |
| 0 | **Hobble Restraint** | | | 0.0% | 0.0% |
| 12 | **Resisted Handcuffing** | | | 0.4% | 4.6% |
| 85 | **PFA** | 16.0% | 11.4% | 7.2% | 1.3% |

[1]CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force cases audited during 2017.

[2] Does not include RRT/Crowd Control events

*Control Hold with Injury includes Control Against Resistance with Injury to Subject.

# NORTH PRECINCT
## 2017 Force Audit Results

| 2017 Rate of Force - North Precinct | |
|---|---|
| **Type of Force** | **Central** |
| **Aerosol Rest** | 1.3% |
| **Impact Weapon (baton)** | 0.0% |
| **CEW** | 11.4% |
| **CHWI\*** | 0.4% |
| **K9** | 0.0% |
| **Less Lethal** | 3.8% |
| **Strikes/Kicks** | 10.1% |
| **Takedown** | 21.5% |
| **P.I.T** | 0.4% |
| **FD to stop an aggressive animal** | 0.4% |
| **Vehicle Ram** | 0.0% |
| **Baton (Nonstrike)** | 0.8% |
| **Box - In** | 0.4% |
| **Control Against Resistance** | 5.5% |
| **Controlled Takedown** | 3.0% |
| **Firearm discharge to end the suffering of a wounded animal** | 0.0% |
| **Hobble Restraint** | 0.0% |
| **Resisted Handcuffing** | 5.1% |
| **PFA** | 35.9% |

All CEW cases are audited. CEW use at North Precinct accounts of just over 10% of audited force in 2017.

Takedowns and the Pointing of Firearms account for 60% of North Precinct's audited force in 2017. This is consistent with the use of force trends in the other main divisions.

# NORTH PRECINCT
## 2017 Force Audit Results

---

### 2017 Reporting of Force Applied (Audit Results) [3,4]

**Audit Results – Officers**

- On average, officer incurred 1.87 reporting errors per case.  This is above the bureau-wide average for 2017. On average, North Precinct officer demonstrated a 95% reporting accuracy rate.
- The rate of officer reporting deficiencies per quarter was as follows;
  - Q1: 1.4 errors per case
  - Q2: 1.4 errors per case
  - Q3: 1.3 errors per case
  - Q4: 3.27 errors per case
- In Q4 officers demonstrated substantial decline in their reporting.  The audit team attributes this to the 1010.00 policy change in Q3 requiring enhanced reporting for Category IV events.
- Officer reporting deficiencies were concentrated in the categories of documentation of force and resistance and documentation of de-escalation and decision point analysis.

| Officer Reporting Deficiencies - North Precinct - Annual 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quarter | Total Cases Audited | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-Escalation and Decision Point Analysis | Witness | ECW |
| Q1 | 15 | 21 | 6 | 7 | 5 | 3 | 0 |
| Q2 | 24 | 34 | 7 | 11 | 5 | 8 | 3 |
| Q3 | 14 | 19 | 1 | 4 | 8 | 5 | 1 |
| Q4 | 18 | 59 | 14 | 11 | 21 | 11 | 2 |
| TOTAL | 71 | 133 | 28 | 33 | 39 | 27 | 6 |

---

[3]  *Force cases audited during 2017.*
[4]  *Does not include RRT/Crowd Control events*

# NORTH PRECINCT
## 2017 Force Audit Results

**Audit Results - Sergeants**

- During 2017, 71 North Precinct force cases were audited and 198 deficiencies were identified for Sergeant reporting (2.8 deficiencies/case). On average, North Precinct Sergeants demonstrated a 94.8% reporting accuracy rate.
- North Precinct Sergeant's reporting deficiencies were more than two times greater than East Precinct Sergeant's and nearly two times greater than Central Precinct Sergeant's reporting deficiencies in 2017. The same pattern was found for North precinct command review deficiencies, but not for North precinct officer reporting deficiencies. Additional supervisor training on officer and supervisor After Action reporting requirements is needed to correct the disparity.

| 2017 Overall Sergeant Reporting Deficiencies Per Case Audited | | | |
|---|---|---|---|
| | Central | East | North |
| Q1 | 2.4 | 1.9 | 3.3 |
| Q2 | 1.7 | 1.5 | 3.4 |
| Q3 | 2.0 | 0.9 | 1.9 |
| Q4 | 1.4 | 1.5 | 2.3 |
| Year | 1.8 | 1.4 | 2.8 |

- Similar to Central and East Sergeants, North Precinct Sergeant reporting deficiencies improved in 2017 – from 3.3 deficiencies/case in Q1 2017 to 2.3 deficiencies/case in Q4 2017. The improvement seen in Sergeant reporting deficiencies is most likely due to the enactment of the updated Use of Force directive 1010.00 that clearly outlines the Sergeant reporting requirements.
- Topics with the greatest number of reporting deficiencies:
  - Review of Officer Reporting
  - EIS[5]
  - Reporting deficiencies/case improved in these topics during 2017 (from an average of 1 deficiency/case audited in Q1 and Q2 to an average of approximately 0.5 deficiency/case audited in Q3 and Q4. The improvement is most likely due to the enactment of the updated Use of Force directive 1010.00 that clearly outlines the Sergeant reporting requirements.

---

[5] *EIS is assessed using 4 questions for each level in the chain of command review. If a member of the chain of command identifies a reporting discrepancy for the officer(s) or sergeant, the corresponding EIS entry should include the case number, nature of the incident, positive performance (if identified) and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). The total deficiencies per case can represent 1-4 deficiencies for each point assessed.*

# NORTH PRECINCT
## 2017 Force Audit Results

| Sergeant Reporting Deficiencies - North Precinct - Annual 2017 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Quarter | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 15 | 49 | Q1 | 0 | 14 | 1 | 1 | 0 | 0 | 0 | 10 | 23 | 0 | 0 |
| 24 | 81 | Q2 | 0 | 25 | 4 | 2 | 1 | 0 | 0 | 16 | 31 | 2 | 0 |
| 14 | 26 | Q3 | 1 | 4 | 1 | 5 | 0 | 0 | 0 | 8 | 7 | 0 | 0 |
| 18 | 42 | Q4 | 0 | 11 | 1 | 2 | 0 | 1 | 0 | 18 | 6 | 3 | 0 |
| 71 | 198 | TOTAL | 1 | 54 | 7 | 10 | 1 | 1 | 0 | 52 | 67 | 5 | 0 |

**Audit Results – Command Review**

- Overall errors
  - North Lieutenants had 46 review deficiencies for cases reviewed in 2017 (.67/case). On average, North Precinct Lieutenants demonstrated a 97.3% reporting accuracy rate.
  - North RU Managers had 98 review deficiencies for cases reviewed in 2017 (1.66/case). On average, North RU Managers demonstrated a 93.3% reporting accuracy rate.
- The greatest number of reporting deficiencies were seen in EIS entries and Notifications of Misconduct in Reporting[6].
  - A large majority of the RU Manager errors stemmed from EIS entry deficiencies in Q1 and Q2. These deficiencies dropped significantly in Q3 and Q4.

| North Precinct Lieutenant Reporting Deficiencies - 2017 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77h) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 17 | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 4 | 0 | 2 |
| Q2 | 23 | 17 | 0 | 0 | 1 | 6 | 1 | 0 | 4 | 0 | 5 |
| Q3 | 12 | 7 | 1 | 0 | 0 | 1 | 0 | 0 | 4 | 0 | 1 |
| Q4 | 17 | 15 | 0 | 0 | 1 | 4 | 1 | 1 | 0 | 0 | 8 |
| Total | 69 | 46 | 1 | 0 | 2 | 12 | 2 | 1 | 12 | 0 | 16 |

---

[6] *EIS is assessed using 4 questions for each level in the chain of command review. If a member of the chain of command identifies a reporting discrepancy for the officer(s) or sergeant, the corresponding EIS entry should include the case number, nature of the incident, positive performance (if identified) and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). The total deficiencies per case can represent 1-4 deficiencies for each point assessed. Misconduct is represented by reporting deficiencies. A deficiency is noted when someone in the chain of command review does not address officer and/or sergeant reporting deficiencies and subsequently does not make notification of those deficiencies.*

# NORTH PRECINCT

## 2017 Force Audit Results

| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | North Precinct RU Manager Reporting Deficiencies - 2017 | | | | | | | | |
| Q1 | 15 | 25 | 1 | 1 | 0 | 1 | 0 | 0 | 20 | 0 | 2 |
| Q2 | 23 | 57 | 2 | 0 | 2 | 6 | 1 | 0 | 44 | 0 | 2 |
| Q3 | 12 | 4 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| Q4 | 9 | 12 | 0 | 0 | 0 | 2 | 0 | 0 | 4 | 0 | 6 |
| Total | 59 | 98 | 5 | 1 | 2 | 10 | 1 | 0 | 69 | 0 | 10 |

# TACTICAL OPERATIONS DIVISION (TOD)
## 2017 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 15 |
| Involved Officers | 12 |
| Officer Reporting Deficiencies | 7 |
| Sergeant Reporting Deficiencies | 13 |
| Command Review Deficiencies | 3 |

## 2017 Rate and Trends of Force Applied[1,2]

- Applications of force used by the TOD division are documented in the Bureau-wide section of this report.
- Fifteen TOD cases were audited this year.

## 2017 Reporting of Force Applied (Audit Results) [3,4]

**Audit Results – Officers**

- On average, officers incurred 0.46 reporting errors per case.  This is lower than the bureau-wide average for officer reporting deficiencies.
- The rate of officer reporting deficiencies per quarter was as follows;
  - Q1: 1.0 errors per case
  - Q2:  0.0 errors per case
  - Q3:  0.5 errors per case
  - Q4:  0.0 errors per case
- Overall, officer reporting deficiencies were not heavily concentrated in any particular category.

| Officer Reporting Deficiencies -TOD/SERT - Annual 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quarter | Total Cases Audited | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-Escalation and Decision Point Analysis | Witness | ECW |
| Q1 | 6 | 6 | 0 | 2 | 3 | 1 | 0 |
| Q2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q3 | 2 | 1 | 0 | 0 | 0 | 1 | 0 |
| Q4 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 15 | 7 | 0 | 2 | 3 | 2 | 0 |

---

[1]  *Force cases audited during 2017.*
[2]  *Does not include RRT/Crowd Control events*
*Control Hold with Injury includes Control Against Resistance with Injury to Subject.*
[3]*CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force case audited during 2017.*
[4]  *Does not include RRT/Crowd Control events*

# TACTICAL OPERATIONS DIVISION (TOD)
## 2017 Force Audit Results

**Audit Results - Sergeants**

- Fifteen TOD force cases were audited during 2017. Thirteen Sergeant reporting deficiencies were identified by the audit.
- The rate of Sergeant reporting deficiencies improved during 2017
  - Reporting deficiencies/case audited were 1.2 (deficiencies/case) in Q1 2017 compared to less than 1 deficiency/case audited (0.9) in Q4 2017.
- Topic with the greatest number of reporting deficiencies:
  - EIS[5] (0.4 deficiencies/case audited)

| Sergeant Reporting Deficiencies - Tactical Operations Division (TOD) - Annual 2017 | | | | | | | | | | | | | |
| Total Cases Audited | Total Reporting Deficiencies | Quarter | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 7 | **Q1** | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 |
| 4 | 5 | **Q2** | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 |
| 2 | 0 | **Q3** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 1 | **Q4** | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **15** | **13** | **TOTAL** | **1** | **1** | **1** | **0** | **0** | **0** | **0** | **3** | **6** | **1** | **0** |

---

[5] *Deficiencies noted here do not simply capture when an EIS entry has not been made; a deficiency can be 1-4 missing EIS requirements, such as case number, the nature of the incident, positive performance (if identified), and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). If an EIS entry was not made for a case, then the sergeant would receive four deficiencies for each of the EIS requirements for that case.*

# TACTICAL OPERATIONS DIVISION (TOD)
## 2017 Force Audit Results

**Audit Results – Command Review**

- Overall errors
  - TOD Lieutenants had 3 review deficiencies for cases audited in 2017 (.27/case).
  - TOD RU Managers had 0 review deficiencies for cases audited in 2017.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOD Lieutenant Reporting Deficiencies - 2017** | | | | | | | | | | | |
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 5 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Q2 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Q3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 11 | 3 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOD RU Manager Reporting Deficiencies - 2017** | | | | | | | | | | | |
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q3 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

# TRANSIT

## 2017 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 9 |
| Involved Officers | 7 |
| Officer Reporting Deficiencies | 8 |
| Sergeant Reporting Deficiencies | 16 |
| Command Review Deficiencies | 6 |

## 2017 Rate and Trends of Force Applied[1,2]

- Applications of force used by Transit division are documented in the Bureau-wide section of this report.
- Nine Transit division cases were audited this year.

## 2017 Reporting of Force Applied (Audit Results) [3,4]

**Audit Results – Officers**

- On average, officers incurred 0.88 reporting errors per case.  This is lower than the bureau-wide average for officer reporting deficiencies.
- The rate of officer reporting deficiencies per quarter was as follows;
  - Q1: 1.5 errors per case
  - Q2:  0.25 errors per case
  - Q3: -
  - Q4: 1.33 errors per case
- Officer reporting deficiencies were concentrated in the force and resistance category and were related to the correct documentation of the force officers applied.

| Officer Reporting Deficiencies - Transit - Annual 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quarter | Total Cases Audited | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-Escalation and Decision Point Analysis | Witness | ECW |
| Q1 | 2 | 3 | 0 | 1 | 1 | 0 | 1 |
| Q2 | 4 | 1 | 1 | 0 | 0 | 0 | 0 |
| Q3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 3 | 4 | 0 | 2 | 1 | 1 | 0 |
| TOTAL | 9 | 8 | 1 | 3 | 2 | 1 | 1 |

---

[1] *CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force cases audited during 2017.*

[2] *Does not include RRT/Crowd Control events*

*Control Hold with Injury includes Control Against Resistance with Injury to Subject.*

[3] *CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force cases audited during 2017.*

[4] *Does not include RRT/Crowd Control events*

# TRANSIT
## 2017 Force Audit Results

**Audit Results - Sergeants**

- Nine Transit force cases were audited during 2017. Sixteen Sergeant reporting deficiencies were identified by the audit.
- The rate of Sergeant reporting deficiencies decreased in 2017
  - Reporting deficiencies per case audited were 2.5 (deficiencies/case) in Q1 2017 compared to 2.0 deficiencies/case audited in Q4 2017.
- Topic with the greatest number of reporting deficiencies:
  - EIS[5] (0.7 deficiencies/case audited)
  - Reporting deficiencies improved in this topic during 2017 from 2.0 deficiencies/case audited in Q1 2017 to 0 deficiencies/case audited in Q4 2017.

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sergeant Reporting Deficiencies - Transit Division - Annual 2017** | | | | | | | | | | | | | |
| Total Cases Audited | Total Reporting Deficiencies | Quarter | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 2 | 5 | **Q1** | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| 4 | 5 | **Q2** | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 1 | 0 |
| 0 | 0 | **Q3** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | 6 | **Q4** | 0 | 2 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| **9** | **16** | **TOTAL** | **0** | **3** | **1** | **3** | **0** | **0** | **0** | **2** | **6** | **1** | **0** |

---

[5] *Deficiencies noted here do not simply capture when an EIS entry has not been made; a deficiency can be 1-4 missing EIS requirements, such as case number, the nature of the incident, positive performance (if identified), and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). If an EIS entry was not made for a case, then the sergeant would receive four deficiencies for each of the EIS requirements for that case.*

# TRANSIT
## 2017 Force Audit Results

**Audit Results – Command Review**

- Overall errors
  - Transit Lieutenants had 2 review deficiencies for cases audited in 2017 (.5/case).
  - Transit RU Managers had 4 review deficiencies for cases audited in 2017 (.57/case).

| Transit Lieutenant Reporting Deficiencies - 2017 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| Q2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 4 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |

| Transit RU Manager Reporting Deficiencies - 2017 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| Q1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q2 | 3 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| Q3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 7 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |

# YOUTH SERVICES DIVISION (YSD)

## 2017 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 1 |
| Involved Officers | 2 |
| Officer Reporting Deficiencies | 1 |
| Sergeant Reporting Deficiencies | 0 |
| Command Review Deficiencies | 0 |

## 2017 Rate and Trends of Force Applied[1,2]

- Applications of force used by the Youth Services Division are documented in the Bureau-wide section of this report.
- One case was audited this year.

## 2017 Reporting of Force Applied (Audit Results) [3,4]

**Audit Results – Officers**

- There was one officer reporting deficiency in the Youth Services division case that was audited this year.  This deficiency was related to the documentation of the mental health status or injury status of the subject.

| Officer Reporting Deficiencies - YSD - Annual 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quarter | Total Cases Audited | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-Escalation and Decision Point Analysis | Witness | ECW |
| Q1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q2 | * | 1 | 1 | 0 | 0 | 0 | 0 |
| Q3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Q4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 1 | 1 | 1 | 0 | 0 | 0 | 0 |

*This case invloved a YSD officer but was reviewed by a Sergeant in North Precinct, is counted under the North Precinct Total Cases Audited total

---

[1] *Force cases audited during 2017.*
[2] *Does not include RRT/Crowd Control events*
*Control Hold with Injury includes Control Against Resistance with Injury to Subject.*
[3] *CHWI: Control Holds with Injury; PFA: Pointing a Firearm. Force cases audited during 2017.*
[4] *Does not include RRT/Crowd Control events*

# YOUTH SERVICES DIVISION (YSD)
## 2017 Force Audit Results

**Audit Results - Sergeants**

- One YSD force case was audited in 2017. There were zero Sergeant reporting deficiencies.

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sergeant Reporting Deficiencies - Youth Services Division - Annual 2017** | | | | | | | | | | | | | |
| Total Cases Audited | Total Reporting Deficiencies | Quarter | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 0 | 0 | **Q1** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | **Q2** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | **Q3** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 0 | **Q4** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **1** | **0** | **TOTAL** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

**Audit Results – Command Review**

- There were no review deficiencies for the YSD Command in Q4. For the one force case reviewed during the year, the Lieutenant was serving as an Acting Captain, making him the highest level of review necessary for a Category III event.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **YSD Lieutenant Reporting Deficiencies - 2017** | | | | | | | | | | | |
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) (Reporting Deficiencies) |
| **Q1** | **0** | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Q2** | **0** | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Q3** | **0** | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Q4** | **1** | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

# APPENDIX A
## 2017 Force Audit Results

| Case | Force Type(s) | Type of Arrest | Type of Event | Number of Officers Who Used Force | Number of Out of Policy Officers | Number of Involved Subjects |
|---|---|---|---|---|---|---|
| | **Appendix A: Out of Policy Cases for 2017** | | | | | |
| 1 | Aerosol Restraint, Takedown | Arrest – Misdemeanor | Citizen Call for Service | 2 | 1 | 1 |
| | Context: Out of policy for directives 1010.00, 315.30, and 1040.00. Officer did not wait long enough after arriving on scene to properly determine threat level. Subject was a white male. | | | | | |
| 2 | Takedown | Arrest – Misdemeanor | Citizen Call for Service | 1 | 1 | 1 |
| | Context: In policy for directive 1010.00, out of policy for 315.30. Supervisor found officer could have utilized additional officers on scene to possibly eliminate the need for force. Subject was a black male. | | | | | |
| 3 | Takedown, Strikes/Kicks | Arrest – Felony | Citizen Call for Service | 1 | 2 | 1 |
| | Context: In policy for directive 1010.00, out of policy for 315.30. Supervisor found officer could have utilized additional officers on scene to possibly eliminate the need for force. One officer out of policy for 940.00 for not immediately reporting force to a supervisor. Subject was a hispanic male. | | | | | |
| 4 | CEW (2 cycles) | Arrest – Misdemeanor | Citizen Call for Service | 2 | 1 | 1 |
| | Context: Out of policy for directive  1051.00. Taser download indicates 6 second taser cycle. Case occurred before issuance of batteries preventing cycles of over 5 seconds. Subject was a black male. | | | | | |
| 5 | Takedown, Strikes/Kicks | Arrest – Felony | Officer Initiated | 3 | 2 | 1 |
| | Context: Out of policy for directive 940.00. Officer did not make timely disclosure of force to a supervisor. Subject was a white male. | | | | | |
| 6 | Takedown | Arrest – Felony | Officer Initiated | 2 | 4 | 1 |
| | Context: Out of policy for directive 650.00. Officers did not properly search subject to ensure he was clear of weapons prior to transport. Subject was a white male. | | | | | |
| 7 | PIT | Escaped | Officer Initiated | 1 | 1 | 1 |
| | Context: Out of policy for directive 630.05. Officers did not have cause to engage in vehicle pursuit. Subject was a white female. | | | | | |
| 8 | Control Against Resistance, Hobble | Arrest – Warrant | Officer Initiated | 3 | 2 | 1 |
| | Context: Out of policy for directive 1010.00. Officers did not make timely disclosure of force to a supervisor. Subject was a white male. | | | | | |
| 9 | Takedown, Resisted Handcuffing, Control Against Resistance | Arrest – Misdemeanor | Citizen Call for Service | 4 | 2 | 1 |
| | Context: Out of policy for directive 315.00. Officers did not have cause to engage in a foot pursuit. Subject was a white female. | | | | | |
| 10 | Aerosol Restraint | Detained and Released | Citizen Call for Service | 1 | 1 | 2 |
| | Context: Out of policy for directive 1010.00. Did not deliver a proper warning prior to deploying aerosol restraint. Subjects were black females. | | | | | |
| 11 | Resisted Handcuffing, CEW (2 cycles), Hobble | Arrest – Felony | Citizen Call for Service | 4 | 1 | 1 |
| | Context: Out of policy for directive 1010.00. Did not deliver a proper warning prior to deploying CEW. Subject was a white female. | | | | | |

# APPENDIX A
## 2017 Force Audit Results

| | | | | | | |
|---|---|---|---|---|---|---|
| **Appendix A: Out of Policy Cases for 2017 (continued)** | | | | | | |
| **Case** | **Force Type(s)** | **Type of Arrest** | **Type of Event** | **Number of Officers Who Used Force** | **Number of Out of Policy Officers** | **Number of Involved Subjects** |
| 12 | Resisted Handcuffing, Control Against Resistance, Hobble | Release to Medical | Citizen Call for Service | 2 | 2 | 1 |
| | Context: Out of policy for directive 1010.00. Not an approved application of a hobble. Subject was a white male. | | | | | |
| 13 | Pointing of a Firearm | Arrest – Felony | Officer Initiated | 1 | 1 | 2 |
| | Context: Out of policy for directive 1010.00. Officer did not make timely disclosure of force to a supervisor. Subjects were black males. | | | | | |
| 14 | Takedown | Arrest – Warrant | Officer Initiated | 1 | 1 | 1 |
| | Context: Out of policy for directive 1010.00. Officer did not make timely disclosure of force to a supervisor. Subject was a white male. | | | | | |
| 15 | Takedown, Resisted Handcuffing | Arrest – Misdemeanor | Citizen Call for Service | 2 | 1 | 1 |
| | Context: Out of policy for directive 1010.00. Did not issue a warning prior to takedown. Subject was a white male. | | | | | |
| 16 | CEW (2 cycles) | Arrest – Felony | Citizen Call for Service | 4 | 1 | 1 |
| | Context: Out of policy for directive 1010.00. Officer did not provide a warning prior to second taser cycle. Sergeant used low level of force to control subject once he arrived on scene but still investigated force incident. Subject was a black male. | | | | | |
| 17 | Less Lethal, CEW (1 cycle) | Arrest – Felony | Citizen Call for Service | 5 | 3 | 1 |
| | Context: Out of policy for directive 1010.00. Officers did not provide a proper warning prior to using force. Subject was a white male. | | | | | |
| 18 | CEW (1 cycle) | Arrest – Felony | Citizen Call for Service | 1 | 1 | 1 |
| | Context: Out of policy for directive 1051.00. Warning provided by outside agency officer ("taser taser taser") was insufficient per PPB policy. Subject was a white male. | | | | | |
| 19 | Aerosol Restraint | Arrest – Felony | Citizen Call for Service | 1 | 1 | 1 |
| | Context: Out of policy for directive 1040.00. Force used was not proportional to resistance offered by the subject in the moment. Subject was a black male. | | | | | |
| 20 | CEW (2 cycles) | Arrest – Felony | Citizen Call for Service | 2 | 1 | 1 |
| | Context: Out of policy for directive 1010.00. Officer did not reevaluate necessity of force between taser cycles. Subject was a white male. | | | | | |
| 21 | CEW (3 cycles) | Arrest – Felony | Assist Outside Agency | 1 | 1 | 1 |
| | Context: Out of policy for directive 1010.00. Officer did not reevaluate necessity of force between 2nd and 3rd taser cycles. Subject was a black male. | | | | | |

# Category II-III Force[1,2]

| | |
|---|---|
| **Control Holds with Injury** | A control hold with injury event occurs when a member applies physical control to a person and an injury results.  The physical control may not have caused the injury but an FDCR will be completed and a force investigation will occur. |
| **Takedown** | A takedown occurs when a member moves a subject from an upright position to the ground by applying some amount of force. It is *not* a takedown if the subject goes to the ground under their own power. |
| **Strikes/Kicks** | Strikes/Kicks events occur when a member uses their hands, elbow, knees or feet to strike a subject as an application of force. These are different events from strikes with a baton, which are captured in the "Impact Weapon" category. |
| **Impact Weapon** | Uses of a baton or a less lethal weapon are considered the use of an impact weapon. A baton-impact weapon event occurs when an officer strikes a subject with a baton.  A less lethal impact weapon event occurs when a member fires less lethal impact munition at a subject, whether the subject is struck or not. |
| **Aerosol Restraint** | An aerosol restraint event occurs when a member uses pepper spray on a person. |
| **CEW** | A CEW (Conducted Electrical Weapon) event occurs when a member deploys the CEW to a subject in probe or drive stun mode.  CEW uses are counted whether they  were effective applications or not. |
| **K-9 Bite** | A K-9 bite occurs when a K-9 is deployed and delivers a bite to a subject. |
| **Maximum Restraint** | Maximum restraint was discontinued as an approved use of force in April 2015.  Numbers are as follows: Hobble:  Q1 2014-16, Q2 2014-13; Maximum Restraint: Q3 2014-9, Q4 2014-8, Q1 2015-5, and Q2 2015-1.<br><br>Previous Force Data Collection Reports (FDCR) featured this category labelled as "Hobble" although |

---

[1] Categories II-IV force events require that a sergeant complete an After Action Report (AAR). Category II force events require a Lieutenant, RU Manager (Captain or Commander) and Chief's office (CHO review. Category III force events require a Lieutenant and RU Manager (Captain or Commander) review. Category IV force events require a Lieutenant review.

2 Twenty percent of Category III and IV cases are audited with the exception of Category III CEW cases in which 100% of those cases are audited. One hundred percent of serious use of force and CEW cases are audited; while 20% of Category II vehicle ram, canine bites, firearm discharges to stop an aggressive animal, and launched impact munitions with contact  cases are audited.

it was not used to track all hobble applications, only those used to accomplish maximum restraint. The FDCR and subsequent quarterly reports were changed to more accurately reflect the data tracked.

# Category IV Force[3,4]

| | |
|---|---|
| **Box In** | Box-in is a coordinated tactic of positioning police vehicles around a subject's vehicle to stop or prevent the start of a pursuit.  When a member performs a Box- in, the driver of the vehicle is considered the subject of the force event. |
| **Baton – non-striking** | Non-Striking use of the baton includes the use of the baton as a pry tool. |
| **Controlled Takedown** | A controlled takedown is defined as a takedown performed in a completely controlled manner where there is minimal resistance and no injury |
| **Response to Resisted Handcuffing** | Resisted handcuffing is handcuffing that occurs while a subject is resisting, this includes a subject tensing up, or any resistance that requires a member to push the subject's hands together for handcuffing. |
| **Pointing of Firearm** | A pointing of a firearm event occurs when a member points a firearm at a subject. This includes handguns, lethal shotgun and rifles. This does not include pointing a CEW or less lethal launcher at a subject. |
| **Hobble Restraint** | A hobble restraint is used to control a subject beyond the capability of handcuffs. It is used to secure a combative subject's legs together to prevent kicking. A hobble may also be used on the upper arms and legs of a subject, if the subject has demonstrated the intent to slip their handcuffs to the front. |
| **Control against Resistance** | Control against resistance refers to a member use of a control hold against a subject's resistance. |
| **Firearm Discharge – End the suffering of an injured animal** | A member may discharge their firearm to end the suffering of a critically injured animal. |
| **For additional definition of Force Categories,  please refer to Portland Police Bureau Directive 1010.00** | |

# Table and Measurement Definitions[5]

| | |
|---|---|
| **Officer Table – Total Cases Audited** | This is the total number of unique cases (identified |

---

[3] The PPB began counting and auditing the use of Category IV force on 8/19/2017
[4] Twenty percent of most Category III and IV cases are audited. One hundred percent of serious use of force (Category II) and CEW (Category II and III) cases are audited; while 20% of Category II vehicle ram, canine bites, firearm discharges to stop an aggressive animal, and launched impact munitions with contact  cases are audited.
[5] Please refer to the USDOJ Settlement Agreement (https://www.portlandoregon.gov/police/article/506328) for additional information.

| | |
|---|---|
| | by case number) that included an FDCR-level force event audited during the reporting period. Multiple subjects within the same case may have had force used against them, but the case will only be counted once. |
| **Officer Table – Total Reporting Deficiencies** | The audit of officer reports assesses compliance to twenty-one paragraphs of the DOJ Settlement Agreement (74ai-74biv) using fifty-six questions. This is the total reporting deficiencies found. |
| **Officer Table – Mental Health and Injuries** | The Mental Health and Injuries topic includes the results of auditing officer reports for compliance to DOJ Settlement Agreement paragraphs 74ai, 74cix, 74av, and 74cv using multiple questions. The answers to these questions are compiled to determine the total number of officer reporting deficiencies found for each of the four SA paragraphs audited within this topic. |
| **Officer Table – Force and Resistance** | The Force and Resistance topic includes the results of auditing officer reports for compliance to DOJ Settlement Agreement paragraphs 74aii, 74aiii, 74avi, 74civ, 74cvii, and 74ci using multiple questions. The answers to these questions are compiled to determine the total number of reporting deficiencies found for each of the six SA paragraphs audited within this topic. |
| **Officer Table – De-Escalation and Decision Point Analysis** | The De-Escalation and Decision Point Analysis topic includes the results of auditing officer reports for compliance to DOJ Settlement Agreement paragraphs 74cvi, 74ciii, 74cviii, 74cii, and 74aiv using multiple questions. The answers to these questions are compiled to determine the total number of officer reporting deficiencies found for each of the five SA paragraphs audited within this topic. |
| **Officer Table – Witness** | The Witness topic includes the results of auditing officer reports for compliance to DOJ Settlement Agreement paragraphs 74cx and 74cxi using multiple questions. The answers to these questions are compiled to determine the total number of reporting deficiencies found for each of the two SA paragraphs audited within this topic. |
| **Officer Table – ECW** | The ECW topic includes the results of auditing officer reports for compliance to DOJ Settlement Agreement paragraphs 74bi, 74bii, 74biii, and 74biv using multiple questions. The answers to these questions are compiled to determine the total number of officer reporting deficiencies found for each of the four SA paragraphs audited within this |

| | topic. |
|---|---|
| **Sergeant Table – Total Cases Audited** | This is the total number of unique cases (identified by case number) that included a Category II-IV use of force. A Sergeant is required to complete an After Action Report (AAR) for each event in which Category II-IV force was used. Multiple subjects within the same case may have had force used against them, but the case will only be counted once. |
| **Sergeant Table – Total Reporting Deficiencies** | The audit of sergeants After Action Reports (AARs) assesses compliance to twelve paragraphs of the DOJ Settlement Agreement (75a-75l) using ninety-six questions. This is the total reporting deficiencies found. |
| **Sergeant Table – Timeliness** | The Timeliness topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75a. These are the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. |
| **Sergeant Table – Review of Officer Reporting** | The Review of Officer Reporting topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75b using multiple questions. The answer to these questions are compiled to determine the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. |
| **Sergeant Table – Evaluate the Weight of the Evidence** | The Evaluate the Weight of the Evidence topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75c using multiple questions. The answers to these questions are compiled to determine the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. |
| **Sergeant Table – Decision Point Analysis** | The Decision Point Analysis topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75d using multiple questions. The answer to these questions are compiled to determine the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. |
| **Sergeant Table – Out of PPB Policy** | The Out of PPB Policy topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75e using multiple questions. The answers to these questions are compiled to determine the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. ***Note:*** |

| | *When a sergeant is unclear, or the sergeant does not determine whether an officer's actions are in/out of PPB policy, it is counted as a deficiency.* |
|---|---|
| **Sergeant Table – Legal Justification** | The Legal Justification topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75f. This is the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. |
| **Sergeant Table – Tactical and Training Implications** | The Tactical and Training Implications topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraphs 75g and 75h using multiple questions. The answers to these questions are compiled to determine the total number of sergeant reporting deficiencies found for the two SA paragraphs audited within this topic. |
| **Sergeant Table – Corrective Action** | The Legal Justification topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75i. This is the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. |
| **Sergeant Table – EIS** | The EIS topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75j using multiple questions. The answers to these questions are compiled to determine the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. *Note: Deficiencies noted here do not simply capture when an EIS entry has not been made; a deficiency can be 1-4 missing EIS requirements, such as case number, the nature of the incident, positive performance (if identified), and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). If an EIS entry was not made for a case, then the sergeant would receive four deficiencies for each of the EIS requirements for that case.* |
| **Sergeant Table – Notification** | The Notification topic includes the results of auditing sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75k using multiple questions. The answer to these questions are compiled to determine the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. |
| **Sergeant Table – Detective Notification** | The Detective Notification topic includes the results of auditing sergeant After Action Reports for |

| | compliance to DOJ Settlement Agreement paragraph 75l. These are the total number of sergeant reporting deficiencies found for the SA paragraph audited within this topic. |
|---|---|
| **Command Table – Total Cases Audited** | This is the total number of unique cases (identified by case number) that included a Category II-IV use of force. A Sergeant is required to complete an After Action Report (AAR) for each event in which Category II-IV force was used.  Category IV cases are reviewed by a Lieutenant. Category III cases are reviewed by a Lieutenant and RU Manager (Captain or Commander). Category II cases are reviewed by a Lieutenant, RU Manager and the Chief's Office (CHO). Multiple subjects within the same case may have had force used against them, but the case will only be counted once. |
| **Command Table – Total Reporting Deficiencies** | The audit of the review of sergeants After Action Reports by members of command assesses compliance to seven paragraphs of the DOJ Settlement Agreement (75a, 75e, 77a-77g) using twenty-seven questions. This is the total reporting deficiencies found. |
| **Command Table – Timeliness** | The Timeliness topic includes the results of auditing the chain of command review of sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75a using multiple questions. The answer to these questions are compiled to determine the total number of chain of command reporting deficiencies found for the SA paragraph audited within this topic. |
| **Command Table – In/Out of Policy** | The In/Out of Policy topic includes the results of auditing the chain of command review of sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 75e using multiple questions. The answer to these questions are compiled to determine the total number of chain of command reporting deficiencies found for the SA paragraph audited within this topic. ***Note: The number of deficiencies reflects whether the determination of In/Out of Policy was not made or was unclear.*** |
| **Command Table – Adequacy of Chain of Command Reviews** | The Adequacy of Chain of Command Reviews topic includes the results of auditing the chain of command review of sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 77a using multiple questions. The answer to these questions are compiled to determine the total number of chain of command reporting |

| | |
|---|---|
| | deficiencies found for the SA paragraph audited within this topic. |
| **Command Table – Completeness of After Action Reports (940 Reports)** | The Completeness of After Action Reports (940 Reports) topic includes the results of auditing the chain of command review of sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 77b using multiple questions. The answer to these questions are compiled to determine the total number of chain of command reporting deficiencies found for the SA paragraph audited within this topic. |
| **Command Table – Modify Findings** | The Modify Findings topic includes the results of auditing the chain of command review of sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 77c using multiple questions. The answer to these questions are compiled to determine the total number of chain of command reporting deficiencies found for the SA paragraph audited within this topic. |
| **Command Table – Additional Investigation** | The Additional Investigation topic includes the results of auditing the chain of command review of sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 77d using multiple questions. The answer to these questions are compiled to determine the total number of chain of command reporting deficiencies found for the SA paragraph audited within this topic. |
| **Command Table - EIS** | The EIS topic includes the results of auditing the chain of command review of sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 77e using multiple questions. The answer to these questions are compiled to determine the total number of chain of command reporting deficiencies found for the SA paragraph audited within this topic. ***Note: EIS is assessed using 4 questions for each level in the chain of command review. If a member of the chain of command identifies a reporting discrepancy for the officer(s) or sergeant, the corresponding EIS entry should include the case number, nature of the incident, positive performance (if identified) and training deficiencies, policy deficiencies, or poor tactical decisions (if identified). The total deficiencies per case can represent 1-4 deficiencies for each point assessed.*** |
| **Command Table – Notification Criminal Conduct** | The Notification Criminal Conduct topic includes the results of auditing the chain of command review of sergeant After Action Reports for compliance to DOJ |

| | |
|---|---|
| | Settlement Agreement paragraph 77f using multiple questions. The answer to these questions are compiled to determine the total number of chain of command reporting deficiencies found for the SA paragraph audited within this topic. ***Note: Deficiencies in this topic represent when a case needs to be reviewed for an allegation/evidence of criminal conduct but the allegation/evidence was not addressed. This does <u>not</u> reflect the number of cases where someone in the chain of command identified criminal conduct.*** |
| **Command Table – Notification Misconduct (Reporting Deficiencies)** | The Notification Misconduct topic includes the results of auditing the chain of command review of sergeant After Action Reports for compliance to DOJ Settlement Agreement paragraph 77g using multiple questions. The answer to these questions are compiled to determine the total number of chain of command reporting deficiencies found for the SA paragraph audited within this topic. ***Note: Misconduct is defined as reporting deficiencies for the purpose of this audit. A deficiency is noted when someone in the chain of command review does not address officer and/or sergeant reporting deficiencies and subsequently does not make notification of those deficiencies.*** |

COCL Compliance and Outcome Assessment Report: Section III Use of Force

# **APPENDIX 7**

## Portland Police Bureau
## Professional Standards Division

# Force Audit Report*

## Q1 2018

## January 1 - March 30, 2018

*In an effort to distinguish between reporting data analyzed during the audit process and force data compiled under a different timeframe, modifications have been made to this report compared to previous Quarterly Audit reports. This report focuses on PPB Members' reporting and review of force incidents. A complete use of force analysis will be provided in the Q1 2018 Force Data Summary Report.

Prepared by
Lieutenant Craig Dobson, Inspector
Auditors Kate Bonn, Heidi Busche, and Shannon Smith
April 2018



# Executive Summary
## Q1 2018 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 91 |
| Involved Officers | 166 |
| Officer Reporting Deficiencies | 130 |
| Sergeant Reporting Deficiencies | 145 |
| Command Review Deficiencies | 114 |

**Reporting**

- Officer Reporting
  - The rate of officer reporting deficiencies decreased from 2.42 errors per case in Q4 2017 to 1.43 errors per case in Q1 2018.
  - Officer reporting generally improved across all categories, with the greatest improvement seen in the "force and resistance" and "mental health and injuries" categories. This improvement is likely due to greater clarification in reporting requirements for Category 4 force events.
  - Ninety-seven officers who wrote force reports incurred no deficiencies.
- Sergeant and Command Reporting
  - Based on Sergeant and Command Reporting deficiencies, there is a need for attention to :
    - Sergeant documentation of officer reporting errors in EIS
    - Sergeant identification of inaccuracies in officer reporting, relative to 1010.00.
    - Lieutenant level awareness of officer and sergeant reporting requirements and the necessary corrective action.
  - Reporting by members of North Precinct command was problematic.
    - The rate of Sergeant reporting deficiencies at North Precinct is more than double the rate of deficiencies among their counterparts at Central and East Precinct this quarter
    - North Precinct Lieutenants and North Precinct RU Managers had the highest rate of deficiencies per case audited among Patrol.
    - These numbers indicate the need for North Precinct command to utilize the Supervisor Use of Force Checklist provided on 1/25/2018 when reviewing force incidents.

**CEW Applications**

- 11 CEW Cases, 24 CEW Applications (there were 16 CEW Applications in Q4 2017)
  - 20 cycles were probe deployments, 4 cycles were drive stun
  - Regarding number of cycles applied, the Officer's Report, AAR and the Taser download were consistent in 9 cases.
  - CEW usage requires additional reporting elements from members. PPB policy requires that members make an effort to use hands on control when practical during CEW cycles and that this is documented in member reports.  With regard to CEW reporting (and its various additional reporting requirements) officers were most deficient in documenting when hands on control was practical during a cycle.
  - CEW warnings were delivered prior to 17 of the 24 CEW cycles applied this quarter.

# BUREAU WIDE

## Q1 2018 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 91 |
| Involved Officers | 166 |
| Officer Reporting Deficiencies | 130 |
| Sergeant Reporting Deficiencies | 145 |
| Command Review Deficiencies | 114 |

### Audited Force[1,2]

| Force Types Used - Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ALL CASES | | | | | *In Q3 2017, the Force Audit Team began stratifying the number of cases audited based on force types used. See footnote for a complete breakdown. Figures to the left represent all force cases from Q1 2018. Figures to the right represent cases audited. | AUDITED CASES | | | | |
| Central Precinct | East Precinct | North Precinct | Other Divisions | All Bureau | Force Type | Central Precinct | East Precinct | North Precinct | Other Divisions | All Bureau |
| 1 | 3 | 0 | 0 | 4 | Aerosol Restraint | 1 | 1 | 0 | 0 | 2 |
| 1 | 0 | 0 | 0 | 1 | Baton (nonstrike) | 1 | 0 | 0 | 0 | 1 |
| 0 | 0 | 0 | 0 | 0 | Baton (strike) | 0 | 0 | 0 | 0 | 0 |
| 5 | 9 | 8 | 1 | 23 | Box-In | 1 | 4 | 2 | 0 | 7 |
| 2 | 5 | 3 | 1 | 11 | CEW | 2 | 5 | 3 | 1 | 11 |
| 1 | 1 | 0 | 0 | 2 | CHWI | 1 | 0 | 0 | 0 | 1 |
| 48 | 46 | 43 | 13 | 150 | Control Against Resistance | 17 | 13 | 17 | 6 | 53 |
| 0 | 0 | 0 | 0 | 0 | Firearm Discharge - Aggressive Animal | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | Firearm Discharge - Suffering Animal | 0 | 0 | 0 | 0 | 0 |
| 2 | 9 | 5 | 1 | 17 | Hands/Feet | 1 | 2 | 3 | 1 | 7 |
| 4 | 4 | 1 | 1 | 10 | Hobble | 3 | 0 | 1 | 0 | 4 |
| 0 | 0 | 0 | 7 | 7 | K9 | 0 | 0 | 0 | 5 | 5 |
| 2 | 0 | 0 | 1 | 3 | Less Lethal | 0 | 0 | 0 | 1 | 1 |
| 1 | 2 | 3 | 0 | 6 | P.I.T. Maneuver | 1 | 0 | 1 | 0 | 2 |
| 11 | 23 | 13 | 7 | 54 | Pointing of a Firearm | 3 | 10 | 3 | 5 | 21 |
| 35 | 40 | 32 | 9 | 116 | Resisted Handcuffing | 8 | 12 | 10 | 3 | 33 |
| 11 | 12 | 15 | 6 | 44 | Takedown (II and III) | 4 | 4 | 5 | 3 | 16 |
| 8 | 10 | 12 | 4 | 34 | Takedown (IV) | 0 | 3 | 5 | 1 | 9 |
| 0 | 0 | 0 | 1 | 1 | Vehicle Ram | 0 | 0 | 0 | 1 | 1 |

---

[1]CHWI: Control Holds with Injury; CEW: Conducted Electronic Weapon (Taser). Force audited during Q1 2018.

[2] Does not include RRT/Crowd Control events

*On August 19th, 2017 the Portland Police Bureau initiated a refined audit protocol; auditing 100% of serious use of force cases, 100% of force cases with substantial injury to the subject (defined as requiring hospital treatment), 100% of CEW cases and 20% of all other use of force cases.  At the end of the quarter the audited sample is compared to the population of cases in order to verify that the

# BUREAU WIDE
## Q1 2018 Force Audit Results

**Officer CEW Reporting**

- 11 CEW Cases, 24 CEW Applications (there were 16 CEW Applications in Q4 2017)
  - 20 cycles were probe deployments, 4 cycles were drive stun
  - Regarding number of cycles applied, the Officer's Report, AAR and the Taser download were consistent in 9 cases. In the two cases with an inconsistency, the reasons for the discrepancy were addressed by command. In one case, the CEW download document had a blank field for the length of the Taser cycle. The error was forwarded to the Training Division for review. In the second case, the officer had a negligent discharge of their Taser, resulting in an unintentional cycle. The officer was counselled by command.
  - With regard to CEW reporting, officers were most deficient in documenting when hands on control was practical during a cycle. Deficiencies in this category are counted per cycle. In one case, one officer delivered five cycles but did not include the practicality of hands on control. This resulted in a majority of the deficiencies seen in this category across all officers.
  - CEW warnings were delivered prior to 17 of the 24 CEW cycles applied this quarter.   In the following cases, warnings were not delivered prior to CEW applications.
    - Case 1 - The officer gave a warning prior to any Taser deployment but did not deliver subsequent warnings for repeated cycles. The lack of subsequent warnings was not addressed by command on the After Action.
    - Case 2 – The cycle delivered was unintentional, meaning no warning was given. The case was forwarded to Training for review to address equipment concerns. The officer was found out of policy for 1010.00 and 315.30 and the case was forwarded to IA.
    - Case 3 – During a fight, one officer delivered two Taser cycles, neither of which relayed current to the subject. The officer explained his immediate fear of the subject obtaining another officer's firearm as his reasoning for not providing a warning. The Sergeant counselled the officer that warnings are required per policy which the officer understood.

**Audit Results – Officers [3]**
- Compared to last quarter
  - The rate of officer reporting deficiencies per case decreased (from 2.42 to 1.43)
  - Officer reporting generally improved across all categories, with the greatest improvement seen in the "force and resistance" and "mental health and injuries" categories. This improvement is likely due to greater clarification in reporting requirements for Category 4 force events.
  - East Precinct especially saw significant improvement in reporting requirements, going from 75 deficiencies in Q4 2017 to 20 deficiencies in Q1 2018. Improvement was especially seen in the reporting of identification of witnesses (18 deficiencies in Q4, compared to 2 deficiencies in Q1).
  - North Precinct did not improve in reporting requirements across most categories. North officers improved in reporting mental health and injury requirements, but remained constant in the "force and

---

[3] Reporting accuracy formula: $\underline{\text{Total Number of Errors (\# of possible errors) x (\# of FDCRS or Cases)} - \text{Actual Number of Errors}}$
Total Number of Possible Errors

# BUREAU WIDE
## Q1 2018 Force Audit Results

resistance" and "de-escalation and decision point analysis" categories, and worsened in their reporting of witness identification. Their total number of deficiencies did not decrease as the other major precincts did.

- Out of 38 potential reporting deficiencies per case audited, Officers incurred an average of 1.43 reporting deficiencies per FDCR audited.  Bureau wide, Officers demonstrated a 98.3% review/reporting accuracy rate.
- Ninety-seven officers who wrote force reports incurred no deficiencies. This is a significant improvement from the previous quarter. In Q4 2017, 54 officers wrote force reports and incurred no deficiencies.
- Sixteen officers wrote force reports for more than one case and incurred no deficiencies.
- Three categories were almost equal in the number of deficiencies. "Force and Resistance", "De-escalation and Decision Point Analysis", and "Witness" categories incurred 37, 39, and 36 deficiencies, respectively. Significant improvements were seen in the force and resistance category from Q4 2017, with improvements in the other two categories being less pronounced.

| Officer Reporting Deficiencies by RU - Q1 2018 | | | | | | |
|---|---|---|---|---|---|---|
| Precinct | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-escalation and Decision Point Analysis | Witness | ECW |
| Central Precinct | 31 | 3 | 10 | 6 | 7 | 5 |
| North Precinct | 53 | 4 | 10 | 18 | 19 | 2 |
| East Precinct | 20 | 2 | 8 | 8 | 2 | 0 |
| Canine/Traffic | 3 | 0 | 1 | 2 | 0 | 0 |
| Detectives | 4 | 0 | 2 | 1 | 1 | 0 |
| FSD | 2 | 0 | 1 | 0 | 1 | 0 |
| TOD/SERT | 0 | 0 | 0 | 0 | 0 | 0 |
| DVD | 5 | 0 | 1 | 1 | 3 | 0 |
| Training | 0 | 0 | 0 | 0 | 0 | 0 |
| Transit | 10 | 2 | 4 | 2 | 2 | 0 |
| YSD | 2 | 0 | 0 | 1 | 1 | 0 |
| Total | 130 | 11 | 37 | 39 | 36 | 7 |

# BUREAU WIDE
## Q1 2018 Force Audit Results

**Audit Results – Sergeants**

- Sergeant reporting deficiencies were consistent with Q4 2017
  - 1.59 deficiencies/case during the Q1 2018 reporting period compared to 1.60 (deficiencies/case) during Q4 2017 reporting period and 1.42 (deficiencies/case) during the Q3 2017 reporting period.
- Out of 54 potential reporting deficiencies per case audited, Sergeants incurred an average of 1.59 reporting deficiencies per case audited. Bureau wide, Sergeants demonstrated a 97.0% review/reporting accuracy rate.
- Topics with the greatest number of deficiencies:
  - Identification of Necessary Corrective Action
  - Documentation of Corrective Action in EIS
- Last quarter the topics with the greatest number of deficiencies were
  - Identification of Necessary Corrective Action
  - Review of Officer Reporting
- One Sergeant completed their AAR outside of the 72-hour timeline.
- Fifteen Sergeants reviewed cases this quarter and incurred no deficiencies for their reviews.
- Six of the Sergeants with no deficiencies reviewed more than 1 case.

| Sergeant Reporting Deficiencies by RU - Q1 2018 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Precinct | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 21 | 61 | NORTH | 0 | 6 | 3 | 6 | 4 | 0 | 0 | 12 | 26 | 4 | 0 |
| 25 | 33 | CENTRAL | 0 | 4 | 3 | 1 | 1 | 2 | 0 | 14 | 3 | 5 | 0 |
| 29 | 33 | EAST | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 8 | 18 | 1 | 1 |
| 6 | 6 | TRAFFIC/CANINE | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 |
| 5 | 5 | TOD/SERT | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 |
| 3 | 4 | TRANSIT | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 |
| 1 | 2 | DETECTIVES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 1 | 1 | DVD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 91 | 145 | | 1 | 14 | 9 | 9 | 6 | 2 | 1 | 43 | 48 | 11 | 1 |

# BUREAU WIDE
## Q1 2018 Force Audit Results

---

### Sergeant Reporting – 1 year historical perspective

**Sergeant Reporting Deficiencies by RU - Q2 2017- Q1 2018**

| Total Cases Audited | | | | Total Reporting Deficiencies | | | | Precinct | Timeliness | | | | Review of Officer Reporting | | | | Evaluate the Weight of the Evidence | | | | Decision Point Analysis | | | | Out of PPB Policy | | | | Legal Justification | | | | Tactical and Training Implications | | | | Corrective Action | | | | EIS | | | | Notification | | | | Detective Notification | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| 18 | 26 | 28 | 25 | 29 | 52 | 40 | 33 | CENTRAL | 0 | 1 | 0 | 0 | 8 | 16 | 8 | 4 | 4 | 0 | 1 | 0 | 3 | 0 | 5 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 10 | 10 | 12 | 14 | 10 | 16 | 14 | 3 | 1 | 1 | 3 | 5 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | DETECTIVES | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | DVD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 33 | 27 | 22 | 29 | 47 | 23 | 34 | 33 | EAST | 0 | 1 | 0 | 0 | 14 | 6 | 9 | 2 | 1 | 0 | 4 | 0 | 2 | 2 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 1 | 13 | 8 | 6 | 18 | 1 | 3 | 2 | 1 | 0 | 0 | 0 | 1 |
| 24 | 14 | 18 | 21 | 80 | 26 | 42 | 61 | NORTH | 1 | 0 | 0 | 0 | 28 | 4 | 11 | 6 | 4 | 1 | 1 | 3 | 2 | 2 | 5 | 6 | 1 | 0 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 16 | 8 | 18 | 21 | 31 | 7 | 6 | 18 | 3 | 2 | 2 | 1 | 0 | 0 | 0 | 0 |
| 4 | 2 | 3 | 5 | 5 | 0 | 1 | 5 | TOD | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 2 | 3 | 6 | 7 | 0 | 6 | 6 | TRAFFIC/CANINE | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 3 | 3 | 0 | 3 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 6 | 0 | 3 | 3 | 7 | 0 | 6 | 4 | TRANSIT | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 3 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | YSD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 89 | 71 | 78 | 91 | 173 | 101 | 125 | 145 | QUARTER TOTAL | 1 | 4 | 0 | 1 | 50 | 26 | 31 | 14 | 5 | 2 | 5 | 9 | 4 | 12 | 7 | 9 | 4 | 0 | 0 | 6 | 0 | 0 | 1 | 2 | 3 | 0 | 1 | 1 | 39 | 25 | 45 | 43 | 65 | 26 | 27 | 48 | 6 | 6 | 8 | 11 | 0 | 0 | 0 | 1 |
| 329 | | | | 544 | | | | YEAR TOTAL | 6 | | | | 121 | | | | 21 | | | | 32 | | | | 10 | | | | 3 | | | | 5 | | | | 152 | | | | 166 | | | | 31 | | | | 1 | | | |

### Audit Results – Command Review

- Bureau wide, Lieutenants had fewer errors when reviewing After Action Reports.
- Out of 25 potential reporting deficiencies per case audited, Lieutenants incurred 0.61 deficiencies per case audited (54 deficiencies/88 cases audited). On average, Lieutenants demonstrated a 97.5% review/reporting accuracy rate.
- Out of 25 potential reporting deficiencies per case audited, RU Managers incurred 0.88 deficiencies per case audited (42 deficiencies/48 cases audited). On average, RU Managers demonstrated a 96.5% review/reporting accuracy rate.

**Lieutenant Reporting Deficiencies by Division/Precinct**
**Q1 2018**

| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CENTRAL | 24 | 7 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| DETECTIVES | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DVD | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST | 29 | 8 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 5 |
| NORTH | 20 | 22 | 0 | 4 | 1 | 5 | 0 | 0 | 0 | 0 | 12 |
| TOD | 4 | 4 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 |
| TRAFFIC | 6 | 5 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| TRANSIT - NON PPB | 3 | 5 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 2 |
| **Total** | **88** | **54** | **3** | **6** | **3** | **12** | **1** | **0** | **0** | **0** | **29** |

> Misconduct deficiencies were related to failure to identify/take action on officer reporting errors

# BUREAU WIDE
## Q1 2018 Force Audit Results

| RU Manager Reporting Deficiencies by Division/Precinct Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Precinct | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification – Criminal Conduct (77f) | Notification – Misconduct (77g) |
| CENTRAL | 9 | 7 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 1 |
| DVD | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST | 17 | 5 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| NORTH | 11 | 22 | 0 | 4 | 1 | 5 | 0 | 2 | 4 | 0 | 6 |
| TOD | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TRAFFIC | 5 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| TRANSIT | 3 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| Total | 48 | 42 | 2 | 4 | 1 | 10 | 0 | 2 | 8 | 0 | 15 |

| All Bureau CHO Reporting Deficiencies Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| CHO | Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification – Criminal Conduct (77f) | Notification – Misconduct (77g) |
| OPERATIONS | 27 | 18 | 0 | 2 | 1 | 4 | 0 | 0 | 4 | 0 | 7 |
| TOTAL | 27 | 18 | 0 | 2 | 1 | 4 | 0 | 0 | 4 | 0 | 7 |

7

# CENTRAL PRECINCT

## Q1 2018 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 25 |
| Involved Officers | 44 |
| Officer Reporting Deficiencies | 31 |
| Sergeant Reporting Deficiencies | 33 |
| Command Review Deficiencies | 14 |

## Audited Force[1,2]

| Force Types Used - Q1 2018 | | |
|---|---|---|
| ALL CASES | *In Q3 2017, the Force Audit Team began stratifying the number of cases audited based on force types used. See footnote for a complete breakdown. Figures to the left represent all force cases from Q1 2018. Figures to the right represent cases audited. | AUDITED CASES |
| Central Precinct | Force Type | Central Precinct |
| 1 | Aerosol Restraint | 1 |
| 1 | Baton (nonstrike) | 1 |
| 0 | Baton (strike) | 0 |
| 5 | Box-In | 1 |
| 2 | CEW | 2 |
| 1 | CHWI | 1 |
| 48 | Control Against Resistance | 17 |
| 0 | Firearm Discharge - Aggressive Animal | 0 |
| 0 | Firearm Discharge - Suffering Animal | 0 |
| 2 | Hands/Feet | 1 |
| 4 | Hobble | 3 |
| 0 | K9 | 0 |
| 2 | Less Lethal | 0 |
| 1 | P.I.T. Maneuver | 1 |
| 11 | Pointing of a Firearm | 3 |
| 35 | Resisted Handcuffing | 8 |
| 11 | Takedown (II and III) | 4 |
| 8 | Takedown (IV) | 0 |
| 0 | Vehicle Ram | 0 |

---

[1] *CHWI: Control Holds with Injury; CEW: Conducted Electronic Weapon (Taser). Force audited during Q1 2018.*

[2] *Does not include RRT/Crowd Control events*

# CENTRAL PRECINCT
## Q1 2018 Force Audit Results

**Audit Results – Officers**

- Out of 38 potential reporting deficiencies per FDCR audited, Central Precinct officers incurred deficiencies at a rate of .54 per FDCR. This is down from the .68 errors per FDCR rate seen in Q4 2017.
- Officers at Central Precinct demonstrated a 98.5% review/reporting accuracy rate. This is slightly better than the Bureau wide rate of 98.3%.
- One officer had the most reporting errors this quarter (reported by number of errors and rate of error)
  - Central/A, 5 errors, 2.5 per FDCR
- Twenty-eight officers had zero reporting deficiencies.
- The largest number of reporting deficiencies were found in the force and resistance category (10 deficiencies). The audit team uses several questions to evaluate each of these broad reporting categories. This quarter, within the force and resistance category, officers incurred the most deficiencies (7) related to force options being documented incorrectly.

| Central Precinct Officer Reporting Deficiencies - Q1 2018 | | | | | |
|---|---|---|---|---|---|
| Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-escalation and Decision Point Analysis | Witness | ECW |
| 31 | 3 | 10 | 6 | 7 | 5 |

**Audit Results - Sergeant Review**

- The rate of Sergeant reporting deficiencies per case audited decreased in Q1 2018.
  - Sergeants at Central Precinct incurred 1.32 deficiencies per case audited in Q1 2018 compared to 1.43 deficiencies per case audited in Q4 2017. This is the second quarter in a row that Sergeant reporting in Central Precinct has improved.
  - Four Sergeants reviewed cases this quarter and incurred no deficiencies for their reviews.
- Out of 54 potential reporting deficiencies per case audited, Sergeants at Central Precinct incurred an average of 1.32 reporting deficiencies per case audited. Sergeants at Central Precinct demonstrated a 97.5% review/reporting accuracy rate. This is slightly better than the Bureau wide rate, 97.0%.
- Two Sergeants had the most reporting errors this quarter (reported by the number of errors and the rate of error).
  - 8 errors, 4/case
  - 5 errors, 2.5/case
- Topics with the greatest number of deficiencies:
  - Corrective Action
    - Corrective Action was also the category with the most deficiencies for Sergeants at Central Precinct last quarter.

# CENTRAL PRECINCT

## Q1 2018 Force Audit Results

- Corrective action deficiencies are related to the Sergeant's failure to identify officer reporting errors and to take corrective action for those errors.
  - o Notification
    - The notification category includes notification of PSD and the RU manager for a serious use of force, the use of force against a person with actual or perceived mental illness, criminal conduct or the allegation of criminal conduct, and/or misconduct.
    - Notification deficiencies generally reflect inconsistencies within the After Action (between the checkboxes and the narrative) regarding either to whom the notification was made or the reason for notification.
- All Sergeants completed their AARs within the 72-hour timeline.

| Central Sergeant After Action Reporting - Q1 2018 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 25 | 33 | 0 | 4 | 3 | 1 | 1 | 2 | 0 | 14 | 3 | 5 | 0 |

**Audit Results - Command Review:**

- The topic with the greatest number of deficiencies for Lieutenants was notification of misconduct in reporting. Note: misconduct deficiencies were related to failure to identify, or take action on officer reporting errors.
- The topic with the greatest number of deficiencies for RU Managers was EIS. These deficiencies stemmed from properly identifying errors in the Sergeant's investigation, but not subsequently documenting those errors in the Sergeant's EIS.
- Out of 25 potential reporting deficiencies per case audited, Lieutenants at Central Precinct incurred 0.29 reporting deficiencies per case audited (7 deficiencies/24 cases audited), which is less than half of the Bureau-wide rate of 0.61 deficiencies per case audited. Lieutenants at Central Precinct demonstrated a 98.8% review/reporting accuracy rate, which is greater than the Bureau-wide rate of 97.5%.
- Out of 25 potential reporting deficiencies per case audited, RU Managers at Central Precinct incurred 0.78 reporting deficiencies per case audited (7 deficiencies/9 cases audited), which is less than the Bureau-wide rate of 0.88 deficiencies per case audited. RU Managers at Central Precinct demonstrated a 96.9% review/reporting accuracy rate, which is greater than the Bureau-wide rate of 96.5%.
- One acting Lieutenant had 5 reporting deficiencies during the quarter.
  - o 5 errors, 0.55 errors/case
- Three Lieutenants had no deficiencies
  - o One Lieutenant had 0 reporting deficiencies and reviewed 9 cases during the quarter.

# CENTRAL PRECINCT

## Q1 2018 Force Audit Results

| Central Precinct - Lieutenant Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 24 | 7 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |

| Central Precinct - RU Managers Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 9 | 7 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 1 |

# EAST PRECINCT
## Q1 2018 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 29 |
| Involved Officers | 55 |
| Officer Reporting Deficiencies | 20 |
| Sergeant Reporting Deficiencies | 33 |
| Command Review Deficiencies | 13 |

## Audited Force [1,2]

| Force Types Used - Q1 2018 | | |
|---|---|---|
| ALL CASES | *In Q3 2017, the Force Audit Team began stratifying the number of cases audited based on force types used. See footnote for a complete breakdown. Figures to the left represent all force cases from Q1 2018. Figures to the right represent cases audited. | AUDITED CASES |
| East Precinct | Force Type | East Precinct |
| 3 | Aerosol Restraint | 1 |
| 0 | Baton (nonstrike) | 0 |
| 0 | Baton (strike) | 0 |
| 9 | Box-In | 4 |
| 5 | CEW | 5 |
| 1 | CHWI | 0 |
| 46 | Control Against Resistance | 13 |
| 0 | Firearm Discharge - Aggressive Animal | 0 |
| 0 | Firearm Discharge - Suffering Animal | 0 |
| 9 | Hands/Feet | 2 |
| 4 | Hobble | 0 |
| 0 | K9 | 0 |
| 0 | Less Lethal | 0 |
| 2 | P.I.T. Maneuver | 0 |
| 23 | Pointing of a Firearm | 10 |
| 40 | Resisted Handcuffing | 12 |
| 12 | Takedown (II and III) | 4 |
| 10 | Takedown (IV) | 3 |
| 0 | Vehicle Ram | 0 |

---

[1]CHWI: Control Holds with Injury; CEW: Conducted Electronic Weapon (Taser).  Force audited during Q1 2018.

[2] Does not include RRT/Crowd Control events

# EAST PRECINCT
## Q1 2018 Force Audit Results

**Audit Results – Officers**

- Out of 38 potential reporting deficiencies per FDCR audited, East Precinct officers incurred deficiencies at a rate of .28 errors per FDCR this quarter. This is a significant improvement from the 1.04 errors per FDCR rate seen in Q4 2017.
- East Precinct officers demonstrated a 99.2% reporting/review accuracy rate. This is better than the Bureau wide rate of 98.3%.
- One officer had the most reporting errors this quarter (reported by number of errors and rate of error)
  - 6 errors, 3 per FDCR
- The largest number of reporting deficiencies were found in the Force and Resistance (8 deficiencies) and the De-escalation and Decision Point Analysis (8 deficiencies) categories. The audit team uses several questions to evaluate each of these broad reporting categories. Within these categories, officers incurred 4 deficiencies related to the correct documentation of force options used, and 8 deficiencies related to the documentation of alternative force options that were considered during the event.

| East Precinct Officer Reporting Deficiencies - Q1 2018 | | | | | |
|---|---|---|---|---|---|
| Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-escalation and Decision Point Analysis | Witness | ECW |
| 20 | 2 | 8 | 8 | 2 | 0 |

**Audit Results - Sergeant Review**

- The rate of Sergeant reporting deficiencies decreased in Q1 2018.
  - 1.13 deficiencies per case in Q1 2018 compared to 1.55 deficiencies per case in Q4 2017. This quarter's deficiency rate is more consistent with previous quarters (0.85 deficiencies per case in Q3 2017).
- Out of 54 potential reporting deficiencies per case audited, Sergeants at East Precinct incurred an average of 1.13 reporting deficiencies per case audited. Sergeants at East Precinct demonstrated a 97.8% review/reporting accuracy rate. This is slightly better than the Bureau wide rate, 97.0%.
- Six Sergeants reviewed cases this quarter and incurred no deficiencies for their reviews.
- Three of the Sergeants with zero deficiencies reviewed more than 1 case.
- Topics with the greatest number of deficiencies
  - EIS
    - EIS entries for involved officers require the documentation of 5 elements of the event. A Sergeant incurs a deficiency for each element that they do not document in the officer's EIS

# EAST PRECINCT
## Q1 2018 Force Audit Results

entry.  Anytime a Sergeant failed to make an EIS entry for an officer they would incur multiple deficiencies within this category.

- o Corrective Action
    - ▪ Corrective action deficiencies are related to the Sergeant's failure to identify officer reporting errors and to take corrective action for those errors.
- All Sergeants completed their AARs within the 72-hour timeline.

| East Sergeant After Action Reporting - Q1 2018 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 29 | 33 | 0 | 2 | 0 | 1 | 1 | 0 | 1 | 8 | 18 | 1 | 1 |

**Audit Results - Command Review**

- The topic with the greatest number of deficiencies for Lieutenants and RU Managers was notification of misconduct in reporting. Note: misconduct deficiencies were related to failure to identify, or take action on officer reporting errors.
- Notably, there were again no deficiencies for EIS reporting, which previously had the highest number of deficiencies in 2017 (see Q1 and Q2 2017 reports).
- Out of 25 potential reporting deficiencies per case audited, Lieutenants at East Precinct incurred 0.28 deficiencies per case audited (8 deficiencies/29 cases audited), which is less than half of the Bureau-wide rate of 0.61 deficiencies per case audited. Lieutenants at East Precinct demonstrated a 98.9% review/accuracy rate, which is better than the Bureau-wide rate of 97.5%.
- Out of 25 potential reporting deficiencies per case audited, RU Managers at East Precinct incurred 0.29 deficiencies per case audited (5 deficiencies/17 cases audited), which is approximately three times less than the Bureau-wide rate of 0.88 deficiencies per case audited. RU Managers at East Precinct demonstrated a 98.8% review/accuracy rate, which is better than the Bureau-wide rate of 96.5%.
- Overall errors
    - o One Lieutenant had 4 reporting deficiencies during the quarter.
        - ▪ 4 errors, 0.67 errors/case
    - o One Lieutenant had 1 reporting deficiency in 14 cases reviewed during the quarter.
        - ▪ 1 error, 0.07 errors/case

**[See next page for Command Reporting Tables]**

# EAST PRECINCT
## Q1 2018 Force Audit Results

| East Precinct - Lieutenant Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 29 | 8 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 5 |

| East Precinct - RU Managers Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 17 | 5 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |

15

# NORTH PRECINCT
## Q1 2018 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 21 |
| Involved Officers | 44 |
| Officer Reporting Deficiencies | 53 |
| Sergeant Reporting Deficiencies | 61 |
| Command Review Deficiencies | 44 |

## Audited Force[1,2]

| Force Types Used - Q1 2018 | | |
|---|---|---|
| ALL CASES | *In Q3 2017, the Force Audit Team began stratifying the number of cases audited based on force types used. See footnote for a complete breakdown. Figures to the left represent all force cases from Q1 2018. Figures to the right represent cases audited. | AUDITED CASES |
| North Precinct | Force Type | North Precinct |
| 0 | Aerosol Restraint | 0 |
| 0 | Baton (nonstrike) | 0 |
| 0 | Baton (strike) | 0 |
| 8 | Box-In | 2 |
| 3 | CEW | 3 |
| 0 | CHWI | 0 |
| 43 | Control Against Resistance | 17 |
| 0 | Firearm Discharge - Aggressive Animal | 0 |
| 0 | Firearm Discharge - Suffering Animal | 0 |
| 5 | Hands/Feet | 3 |
| 1 | Hobble | 1 |
| 0 | K9 | 0 |
| 0 | Less Lethal | 0 |
| 3 | P.I.T. Maneuver | 1 |
| 13 | Pointing of a Firearm | 3 |
| 32 | Resisted Handcuffing | 10 |
| 15 | Takedown (II and III) | 5 |
| 12 | Takedown (IV) | 5 |
| 0 | Vehicle Ram | 0 |

[1]CHWI: Control Holds with Injury; CEW: Conducted Electronic Weapon (Taser). Force audited during Q1 2018.
[2] Does not include RRT/Crowd Control events

# NORTH PRECINCT
## Q1 2018 Force Audit Results

**Audit Results – Officers**

- Out of 38 potential reporting deficiencies per FDCR audited, North Precinct officers incurred deficiencies at a rate of 1.02 errors per FDCR this quarter. This is improved from the 1.96 errors per FDCR rate seen in Q4 2017.
- North Officers demonstrated a 97.3% reporting/review accuracy rate. This is slightly less than the Bureau wide rate of 98.3%.
- There were 19 North Precinct officers who were error-free in their use of force reports this quarter. This is an increase from only three officers who went error-free in their reporting in Q4 2017.
- Three officers had the most reporting errors this quarter (reported by number of errors and rate of error)
  - North/C, 5 errors, 5/FDCR
  - North/C, 4 errors, 2/FDCR
  - North/C, 4 errors, 4/FDCR)
- The largest number of reporting deficiencies were found in the De-Escalation and Decision Point Analysis category (19 deficiencies).  This is consistent with last quarter. The audit team uses several questions to evaluate each of these broad reporting categories. This quarter, within the De-Escalation and Decision Point Analysis category, officers incurred the most deficiencies (21) related to documentation of the consideration of an alternative force option (De-Escalation and Decision Point Analysis).  This is consistent with last quarter.

| North Precinct Officer Reporting Deficiencies - Q1 2018 | | | | | |
|---|---|---|---|---|---|
| Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-escalation and Decision Point Analysis | Witness | ECW |
| 53 | 4 | 10 | 18 | 19 | 2 |

**Audit Results - Sergeant Review**

- The rate of Sergeant reporting deficiencies increased per case audited when compared to Q4 2017.
  - 2.90 deficiencies per case audited in Q1 2018 compared to 2.33 deficiencies per case audited in Q4 2017.
    - This is the 2nd quarter in a row that Sergeant deficiencies have increased at North Precinct.  In Q3 2017 the rate of deficiencies per case at North Precinct was 1.86.  In Q4 2017 the rate of deficiencies per case at North Precinct was 2.33.
    - The rate of Sergeant reporting deficiencies at North Precinct is more than double the rate of deficiencies among their counterparts at Central and East Precinct this quarter
- Out of 54 potential reporting deficiencies per case audited, Sergeants at North Precinct incurred 2.90 reporting deficiencies per case audited.  Sergeants at North Precinct demonstrated a 94.6% review/reporting accuracy rate.  This is less than the Bureau wide rate, 97.0%.
- Three Sergeants who reviewed cases this quarter incurred zero deficiencies for their reviews.

# NORTH PRECINCT
## Q1 2018 Force Audit Results

- One Sergeant had the most reporting deficiencies this quarter (reported by the number of errors and the rate of error).
  - 16 errors, 5.3/case
- Topics with the greatest number of deficiencies
  - EIS
    - EIS entries for involved officers require the documentation of 5 elements of the event.  A Sergeant incurs a deficiency for each element that they do not document in the officer's EIS entry.  Anytime a Sergeant failed to make an EIS entry for an officer they would incur multiple deficiencies within this category.
  - Corrective Action
    - Corrective action deficiencies are related to the Sergeant's failure to identify officer reporting errors and to take corrective action for those errors.
- All Sergeants completed their AARs within the 72-hour timeline.

| North Sergeant After Action Reporting - Q1 2018 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 21 | 61 | 0 | 6 | 3 | 6 | 4 | 0 | 0 | 12 | 26 | 4 | 0 |

**Audit Results – Command Review**

- The topic with the greatest number of deficiencies for Lieutenants and RU Managers was notification of misconduct in reporting. Note: misconduct deficiencies were related to failure to identify, or take action on officer reporting errors.
- Out of the 25 potential reporting deficiencies per case audited, Lieutenants at North Precinct incurred 1.1 deficiencies per case audited (22 deficiencies/20 cases audited), which is poorer than the Bureau-wide rate of 0.61 deficiencies per case audited. Lieutenants at North Precinct demonstrated a 95.6% review/accuracy rate, which is below the Bureau-wide rate of 97.5%.
- North Precinct Lieutenants had the highest rate of deficiencies per case audited among Patrol (0.29, Central and 0.28, East). The rate of deficiencies per case audited increased when compared to Q4 2017 (0.88 Q4 2017 compared to 1.1 Q1 2018) indicating that Lieutenants at North Precinct require implementation of a review checklist.
- Out of the 25 potential reporting deficiencies per case audited, RU Managers at North Precinct incurred 2.0 deficiencies per case audited (22 deficiencies/11 cases audited), which is more than two times greater than the Bureau-wide rate of 0.88 deficiencies per case audited. RU Managers at North Precinct demonstrated a 92.0% review/accuracy rate, which is below the Bureau-wide rate of 96.5%.
- North Precinct RU Managers had the highest rate of deficiencies per case audited among Patrol (0.78, Central and 0.29 East). The rate of deficiencies per case audited increased when compared to Q4 2017 (1.33 Q4 2017

# NORTH PRECINCT
## Q1 2018 Force Audit Results

compared to 2.0 Q1 2018) indicating that RU Managers at North Precinct require further training on Use of Force reporting and After Action Report requirements or should implement a review checklist.

- Overall errors
  - One Lieutenant and 1 Acting Lieutenant had 8 reporting deficiencies during the quarter.
    - 8 errors, 1.33 errors/case
    - 8 errors, 1.33 errors/case

| North Precinct - Lieutenant Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 20 | 22 | 0 | 4 | 1 | 5 | 0 | 0 | 0 | 0 | 12 |

| North Precinct - RU Managers Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 11 | 22 | 0 | 4 | 1 | 5 | 0 | 2 | 4 | 0 | 6 |

# DETECTIVES DIVISION
## Q1 2018 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 1 |
| Involved Officers | 1 |
| Officer Reporting Deficiencies | 4 |
| Sergeant Reporting Deficiencies | 2 |
| Command Review Deficiencies | 2 |

**Audit Results – Officers[1,2]**

- One FDCR was audited from the Detectives Division in Q1. One detective incurred four errors
    - Detectives/A, 4 errors, 4/FDCR
- The Detectives division demonstrated an 89.4% review/reporting accuracy rate. This is less than the Bureau wide rate of 98.3%.

| Detectives Reporting Deficiencies - Q1 2018 | | | | | |
|:---:|:---:|:---:|:---:|:---:|:---:|
| Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-escalation and Decision Point Analysis | Witness | ECW |
| 4 | 0 | 2 | 1 | 1 | 0 |

**Audit Results - Sergeant Review**

- A Sergeant reviewed 1 case and had 2 deficiencies.
- Out of 54 potential reporting deficiencies per case audited, the Sergeant at the Detectives division incurred 2.0 reporting deficiencies per case audited.  The Sergeant at the Detectives division demonstrated a 96.2% review/reporting accuracy rate.  This is slightly less than the Bureau wide rate, 97.0%.
- The AAR was not completed within the 72-hour timeline.
    - No explanation was provided as to why the timeline was not met.

**[See next page for Sergeant Reporting Table]**

---

[1] *Force audited during Q1 2018.*
[2] *Does not include RRT/Crowd Control events*

# DETECTIVES DIVISION
## Q1 2018 Force Audit Results

| Detective Sergeant After Action Reporting - Q1 2018 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

**Audit Results – Command Review**

- For the one Detectives division force case audited during Q1 2018, the Acting Lieutenant had 2 reporting deficiencies or 2.0 deficiencies per case audited. The case was a Category IV force case making the Acting Lieutenant the highest level of review necessary.

| Detectives Division - Lieutenant Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

21

# Drugs and Vice Division (DVD)
## Q1 2018 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 1 |
| Involved Officers | 4 |
| Officer Reporting Deficiencies | 5 |
| Sergeant Reporting Deficiencies | 1 |
| Command Review Deficiencies | 2 |

**Audit Results – Officers[1,2]**

- Out of 38 potential reporting deficiencies per case audited, DVD officers incurred deficiencies at a rate of 1.25 errors per FDCR this quarter. This is down from the rate of 1.66 errors per FDCR seen in Q4 2017.
- DVD officers demonstrated a 96.7% review/reporting accuracy rate. This is slightly less than the Bureau wide rate of 98.3%.
- The largest number of reporting deficiencies were found in the Witness category (3 deficiencies). Officers incurred the most deficiencies related to the documentation of witness or the circumstances that prevented officers from documenting witnesses.

| Drugs and Vice Division (DVD) Officer Reporting Deficiencies - Q1 2018 | | | | | |
|---|---|---|---|---|---|
| Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-escalation and Decision Point Analysis | Witness | ECW |
| 5 | 0 | 1 | 1 | 3 | 0 |

**Audit Results – Sergeant Review**

- A Sergeant reviewed 1 case this quarter and had 1 deficiency.
  - The Corrective Action deficiency is related to failure to identify and take corrective action for officer reporting errors.

---

[1] *Force audited during Q1 2018.*

[2] *Does not include RRT/Crowd Control events*

# Drugs and Vice Division (DVD)
## Q1 2018 Force Audit Results

- Out of 54 potential reporting deficiencies per case audited, the Sergeant at the Drugs and Vice division incurred 1.0 reporting deficiency per case audited.  The Sergeant at the Drugs and Vice division demonstrated a 98.1% review/reporting accuracy rate.  This is slightly more than the Bureau wide rate, 97.0%.
- The AAR was completed within the 72-hour timeline.

| DVD Sergeant After Action Reporting - Q1 2018 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

**Audit Results – Command Review**

- The topic with the greatest number of deficiencies for Lieutenants and RU Managers was notification of misconduct in reporting. Note: misconduct deficiencies were related to failure to identify, or take action on officer reporting errors.
- Both the Lieutenant and the RU Manager at DVD had lower review/reporting accuracy rates than Bureau wide – 96.0% compared to 97.5% Bureau wide Lieutenants and Bureau wide 96.5% RU Managers.

| Drugs and Vice Division (DVD) - Lieutenant Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

| Drugs and Vice Division - RU Managers Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

# TACTICAL OPERATIONS DIVISION (TOD)
## Q1 2018 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 5 |
| Involved Officers | 2 |
| Officer Reporting Deficiencies | 0 |
| Sergeant Reporting Deficiencies | 5 |
| Command Review Deficiencies | 5 |

**Audit Results – Officers** [1,2]

- All audited TOD officers submitted error-free reports this quarter.

| TOD/SERT Officer Reporting Deficiencies - Q1 2018 | | | | | |
|---|---|---|---|---|---|
| Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-escalation and Decision Point Analysis | Witness | ECW |
| 0 | 0 | 0 | 0 | 0 | 0 |

**Audit Results - Sergeant Review**

- Three Sergeants reviewed TOD cases this quarter. On average, Sergeants incurred deficiencies at a rate of 1 deficiency per case audited.
- Out of 54 potential reporting deficiencies per case audited, Sergeants in the Tactical Operations division incurred an average of 1.0 reporting deficiencies per case audited.  Sergeants in the Tactical Operations division demonstrated a 98.1% review/reporting accuracy rate.  This is slightly more than the Bureau wide rate, 97.0%.
- Deficiencies related to Corrective Action were most common.
  - Corrective action deficiencies are related to the sergeant's failure to identify officer reporting errors and to take corrective action for those errors.
- All AARs were completed within the 72-hour timeline.

**[See next page for Sergeant Reporting Table]**

---

[1] *Force audited and PFAs reported during Q1 2018.*
[2] *Does not include RRT/Crowd Control events*

# TACTICAL OPERATIONS DIVISION (TOD)
## Q1 2018 Force Audit Results

| TOD Sergeant After Action Reporting - Q1 2018 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 5 | 5 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 |

**Audit Results – Command Review**

- The topic with the greatest number of deficiencies for Lieutenants and RU Managers was the completeness of After Action Reports.
- Out of 25 potential reporting deficiencies per case audited, Lieutenants at TOD incurred 1.0 reporting deficiencies per case audited (4 deficiencies/4 cases audited). Lieutenants at TOD demonstrated a 96.0% review/reporting accuracy rate, which is less than the Bureau wide rate, 97.5%.
- Out of 25 potential reporting deficiencies per case audited, the RU Manager at TOD incurred 0.50 reporting deficiencies per case audited (1 deficiency/2 cases audited). The RU Manager at TOD demonstrated a 98.0% review/reporting accuracy rate, which is greater than the Bureau wide rate, 96.5%.

| Tactical Operations Division (TOD) - Lieutenant Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 4 | 4 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 1 |

| Tactical Operations Division (TOD) - RU Managers Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 2 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |

# TRANSIT

## Q1 2018 Force Audit Results

| | |
|---|---|
| Force Cases Audited | 5 |
| Involved Officers | 5 |
| Officer Reporting Deficiencies | 10 |
| Sergeant Reporting Deficiencies | 5 |
| Command Review Deficiencies | 8 |

**Audit Results – Officers [1,2]**

- Out of 38 potential reporting deficiencies per FDCR audited, Transit Officers incurred deficiencies at a rate of 2.0 errors per FDCR this quarter. This is an increase from the 1.0 errors per FDCR rate seen in Q4 2017.
- Transit Officers demonstrated a 94.7% reporting/review accuracy rate. This is lower than the Bureau wide rate of 98.3%
- The largest number of reporting deficiencies were found in the Force and Resistance category (4 deficiencies). The audit team uses several questions to evaluate each of these broad reporting categories. Within the Force and Resistance category, officers incurred the most deficiencies (2) related to correct documentation of the force option used.

| Transit Officer Reporting Deficiencies - Q1 2018 | | | | | |
|---|---|---|---|---|---|
| Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-escalation and Decision Point Analysis | Witness | ECW |
| 10 | 2 | 4 | 2 | 2 | 0 |

---

[1] *Force audited and PFAs reported during Q1 2018.*
[2] *Does not include RRT/Crowd Control events*

# TRANSIT
## Q1 2018 Force Audit Results

**Audit Results - Sergeant Review**

- Three Sergeants reviewed cases this quarter.  Transit Sergeants averaged a deficiency rate of 1.33 errors per case audited.
- Out of 54 potential reporting deficiencies per case audited, Sergeants at the Transit division incurred an average of 1.33 reporting deficiencies per case audited.  Sergeants at the Transit division demonstrated a 97.5% review/reporting accuracy rate.  This is slightly more than the Bureau wide rate, 97.0%.
- One Transit Sergeant reviewed one case and incurred no deficiencies for their review.
- Two Sergeants had the most reporting errors this quarter (reported by the number of errors and the rate of error). Neither Sergeant is a PPB Sergeant.
  - 2 errors, 2/case
  - 2 errors, 2/case
- All Sergeants completed their AARs within the 72-hour timeline.

| Transit Sergeant After Action Reporting - Q1 2018 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | Review of Officer Reporting | Evaluate the Weight of the Evidence | Decision Point Analysis | Out of PPB Policy | Legal Justification | Tactical and Training Implications | Corrective Action | EIS | Notification | Detective Notification |
| 3 | 4 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 |

**Audit Results – Command Review**

- The topic with the greatest number of deficiencies for Lieutenants and RU Managers was notification of misconduct in reporting. Note: misconduct deficiencies were related to failure to identify, or take action on officer reporting errors.
- Out of 25 potential reporting deficiencies per case audited, the Lieutenant at the Transit division, who is not a member of PPB, incurred 1.67 reporting deficiencies per case audited (5 deficiencies/3 cases audited). The Lieutenant demonstrated a 93.3% review/reporting accuracy rate, which is less than the Bureau wide rate, 97.5%.
- Out of 25 potential reporting deficiencies per case audited, the RU Manager at the Transit division incurred 1.0 reporting deficiencies per case audited (3 deficiencies/3 cases audited). The RU Manager demonstrated a 96.0% review/reporting accuracy rate, which is less than the Bureau wide rate, 96.5%.

**[See next page for Command Reporting Tables]**

# TRANSIT
## Q1 2018 Force Audit Results

| Transit Division - Lieutenant Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 3 | 5 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |

| Transit Division - RU Managers Reporting Table Q1 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cases Audited | Total Reporting Deficiencies | Timeliness | In/Out of Policy (75e) | Adequacy of Chain of Command Reviews (77a) | Completeness of 940 Reports (77b) | Modify Findings (77c) | Additional Investigation (77d) | EIS (77e) | Notification - Criminal Conduct (77f) | Notification - Misconduct (77g) |
| 3 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |