1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF OREGON

3                        PORTLAND DIVISION

4
   UNITED STATES OF AMERICA,        )
5                                    )
                        Plaintiff,   )  Case No. 3:12-cv-02265-SI
6                                    )
                   v.                )
7                                    )  October 4, 2018
   THE CITY OF PORTLAND,             )
8                                    )
                        Defendant.   )  Portland, Oregon
9  _____)

10

11

12

13                      STATUS CONFERENCE

14                 TRANSCRIPT OF PROCEEDINGS

15            BEFORE THE HONORABLE MICHAEL H. SIMON

16             UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

```
1                        APPEARANCES

2   FOR THE PLAINTIFF:
                         BILLY J. WILLIAMS
3                        U.S. Attorney's Office
                         1000 SW Third Avenue
4                        Suite 600
                         Portland, OR 97204
5
    FOR THE PLAINTIFF:
6                        JARED HAGER
                         U.S. Attorney's Office
7                        1000 SW Third Avenue
                         Suite 600
8                        Portland, OR 97204

9   FOR THE PLAINTIFF:
                         R. JONAS ALEXANDER GEISSLER
10                       U.S. Department of Justice Civil Rights
                         Division
11                       950 Pennsylvania Avenue, N.W.
                         Washington, DC 20530
12

13  FOR THE PLAINTIFF:
                         RENATA GOWIE
14                       U.S. Attorney's Office
                         1000 SW Third Avenue
15                       Suite 600
                         Portland, OR 97204
16
    FOR DEFENDANT CITY OF PORTLAND:
17                       DENIS M. VANNIER
                         City Attorney's Office
18                       1221 SW Fourth Avenue
                         Room 430
19                       Portland, OR 97204

20  FOR DEFENDANT CITY OF PORTLAND:
                         MARK P. AMBERG
21                       City of Portland
                         City Attorney's Office
22                       1221 SW Fourth Avenue
                         Suite 430
23                       Portland, OR 97204

24

25
```

```
 1                            APPEARANCES

 2                            (Continued)

 3   FOR DEFENDANT CITY OF PORTLAND:
                              TRACY POOL REEVE
 4                            City Attorney's Office
                              City of Portland
 5                            1221 SW Fourth Avenue
                              Suite 430
 6                            Portland, OR 97204

 7   FOR INTERVENOR DEFENDANT PORTLAND POLICE ASSOCIATION:
                              ANIL KARIA
 8                            Public Safety Labor Group
                              3021 NE Broadway
 9                            Portland, OR 97232

10   FOR AMICUS ALBINA MINISTERIAL ALLIANCE COALITION FOR JUSTICE
     AND POLICE REFORM:
11                            KRISTEN A. CHAMBERS
                              Wyse Kadish LLP
12                            900 SW Fifth Avenue
                              Suite 2000
13                            Portland, OR 97204

14   FOR AMICUS ALBINA MINISTERIAL ALLIANCE COALITION FOR JUSTICE
     AND POLICE REFORM:
15                            JESSICA ASHLEE ALBIES
                              Albies & Stark, LLC
16                            210 SW Morrison Street
                              Suite 400
17                            Portland, OR 97204

18   FOR AMICUS MENTAL HEALTH ALLIANCE:
                              JUAN C. CHAVEZ
19                            Attorney at Law
                              PO Box 5248
20                            Portland, OR 97208

21   COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                        United States District Courthouse
22                      1000 SW Third Avenue, Room 301
                        Portland, OR 97204
23                      (503)326-8191

24

25                            *   *   *
```

1                    TRANSCRIPT OF PROCEEDINGS

2                         (October 4, 2018)

3  (In open court:)

4              THE COURT:  Good morning.

5              DEPUTY COURTROOM CLERK:  Your Honor, this is the time

6  set for a status conference in Civil Case 12-2265-SI.  United

7  States of America v. City of Portland.

8       Could I have counsel in court, beginning with plaintiff,

9  the government, identify yourself for the record, please?

10             MR. HAGER:  Jared Hager on behalf of the United

11 States.

12             MR. GEISSLER:  Jonas Geissler on behalf of the United

13 States, Your Honor.

14             MS. CHAMBERS:  Kristen Chambers.

15             THE COURT:  I think the U.S. Attorney was going to

16 introduce himself.

17             MR. WILLIAMS:  Bill Williams on behalf of the United

18 States.

19             THE COURT:  Good morning.

20             MS. GOWIE:  Renata Gowie on behalf of the United

21 States.

22             THE COURT:  Good morning.  All right.  Ms. Chambers.

23             MS. CHAMBERS:  Kristen Chambers for Albina

24 Ministerial Alliance Coalition for Justice and Police Reform.

25             MS. ALBIES:  Ashlee Albies for the AMA Coalition as

1   well.

2           THE COURT:  Good morning.

3           MS. CHAMBERS:  I would like to introduce our clients

4   Dr. Haynes and Dr. Bethel.

5           THE COURT:  Good morning.

6           MR. CHAVEZ:  Juan Chavez for the Mental Health

7   Alliance.  I'm joined also by Mr. Bob Joondeph, who is with

8   Disability Rights Oregon.

9           THE COURT:  Welcome.

10          MR. KARIA:  Good morning, Your Honor.  Anil Karia for

11  Police Association.

12          THE COURT:  Good morning.

13          MS. REEVE:  Tracy Reeve on behalf of the City of

14  Portland, Your Honor.

15          THE COURT:  Good morning.

16          MR. VANNIER:  Good morning, Your Honor.

17  Denis Vannier for the City of Portland.

18          THE COURT:  Good morning.

19          MR. AMBERG:  Mark Amberg for the City of Portland.

20          THE COURT:  Anyone else?

21      All right.  Welcome, all.

22      I understand that the City has recently adopted the

23  regulations for the ordinance establishing the PCCEP, that

24  training has taken place and is taking place and that the first

25  meeting is scheduled for early November.

1    So to the extent that I was hoping to hear today "How are

2  things going with the PCCEP," I understand the limitations on

3  our information.

4    As you all know, when we had our last conference, which

5  was the annual conference earlier this spring, I approved, in

6  large part, the amendments that the parties had agreed upon to

7  the settlement agreement, and I deferred the approval of the

8  amendments relating to the replacement of the community

9  oversight board -- the COAB with the PCCEP structure -- so we

10  can learn a little bit more about how that was proceeding

11  before giving approval.

12    One of the concerns that I had is that if I were to

13  approve that at that time, the way the amendment is structured,

14  I believe, would not provide for much continuing court

15  oversight of any changes to the PCCEP mechanism as long as it

16  was consistent with what was put forth in the amendment.  That

17  gave me some concern.  I wanted to make sure it was working

18  before essentially writing a blank check.

19    Looking at this entire settlement in hindsight, I'm not

20  quite so sure that it was the right thing to do to approve the

21  settlement at the outset without having a court-approved

22  monitor.  But that's what both parties presented to me.  It was

23  still in the area of a sufficiently novel and creative solution

24  to a serious problem.  I wanted to see how that worked, and so

25  I gave approval to it after our fairness hearing.  But I'm

1    still reluctant to turn over a blank check, and so I do want to

2    see how things have been going.  That's why I did ask for this

3    six-month interim status conference.

4         I have read, and I appreciate everyone's report.  I did

5    read the City of Portland's memorandum updating me on the

6    status, along with the declaration from Ms. Reeve, the

7    declaration of Mandi Hood, and the attachments.  I appreciate

8    that.

9         I have read the plaintiff's post-status conference status

10   report, and I appreciate the plaintiff's views on it and also

11   answering the questions that I raised at our last meeting; so

12   thank you for doing that.

13        I have received the status report and read it from the

14   Albina Ministerial Alliance, as always, found it very helpful

15   and informative; so I appreciate your efforts there.

16        I've also received four pieces of written correspondence

17   that I found very helpful.  I received from the League of Women

18   Voters a memorandum dated October 1st.  I have received from

19   the -- Mr. Dan Handelman and Portland Copwatch a very

20   informative and helpful email dated October 3rd, and I've also

21   received helpful and informative emails from Ms. Anne Brayfield

22   and Mr. Joe Walsh.

23        I think I've asked my courtroom deputy to circulate those

24   to the parties.  If you don't have copies of any of those four

25   items, let Mary know, and we'll make sure you have them.

1          In addition, as you saw in the agenda that I distributed,

2     what I plan on doing is hearing some presentation and comments

3     from the United States, as plaintiff, first; followed by the

4     City of Portland; followed by the Albina Ministerial Coalition;

5     followed by the Portland Police Association; followed -- if the

6     compliance officer of the COCL wants to make any comments, that

7     would be welcome as well; followed by friend of the court, the

8     Mental Health Alliance.  And then we would hear any comments

9     from any members of the public who wish to provide public

10    comments beyond what I've just described and what we have all

11    just heard.  I think there was a sign-up sheet that -- Mary, do

12    you -- was that distributed back there and do we have --

13          DEPUTY COURTROOM CLERK:  You know, I don't have it.

14          THE COURT:  So we'll see how that looks, and I'll

15    inform you how that looks.  Depending upon how many people wish

16    to speak, if we can get everything completed before our lunch

17    break, we'll do it; if we can't, I've set aside the entire day

18    for this hearing, if needed, and -- but we will have a lunch

19    break if we're going to do that.  And so when I get the sign-up

20    sheet of who wishes to speak, we'll give further information

21    and direction about that.

22          But that's it for my preliminary or introductory comments.

23    Again, I do appreciate all the hard work, not only that you all

24    have done in getting me the reports that you have provided, but

25    the real hard work, the real important work, is done not in

1    this courtroom but as part of implementation of the settlement
2    agreement.   And from what I have read, everyone has been
3    working hard to implement the settlement agreement and the
4    spirit behind it, and I recognize that and I appreciate that.
5         I look forward to comments from the United States.
6         MR. HAGER:   Thank you, Your Honor.   We respectfully
7    renew the joint stipulated motion to amend the settlement
8    agreement.   That's electronic court filing ECF 157.   In May,
9    the Court approved most of the proposed amendments through
10    ECF 171.   The remaining amendments to the framework for
11    community engagement replacing the community oversight advisory
12    board with the Portland Committee on Community-Engaged Policing
13    are the only items before the Court today.
14         The Court has conditionally approved these changes.   That
15    must mean, at a minimum, on their face, these changes aren't
16    unreasonable, aren't patently inadequate.
17         The Court has allowed the parties to perform as if the
18    amendments were approved, and we have.
19         As a result, we don't have to rely just on a facial
20    assessment at this time.   We have experience too.   The PCCEP
21    reflects an intentional and inclusive effort to create a
22    perpetual body to restore community confidence in the Portland
23    Police Bureau through systemic oversight and engagement.   It
24    deserves our faith and our support.
25         Your Honor, we ask that you now give full unconditional

1    approval to the Portland Committee on Community-Engaged

2    Policing.   Our request is supported by four reasons.

3         First, the amendments are the product of a process

4    established by the agreement at paragraph 184.   That process

5    was previously ruled to be fair, adequate, and reasonable.   And

6    that's ECF 86, 96, and 99.

7         To briefly remind the Court, the agreement builds in

8    substantial safeguards to ensure that amendments are fair and

9    worthy of approval.   The changes were proposed by the City, but

10   it took an act of council.   The council gave multiple

11   five-to-zero unanimous votes but not before much public comment

12   and many revisions.

13        In short, Your Honor, the Court should approve the changes

14   because they're stipulated and because they're presented in

15   accordance with paragraph 194.

16        Second, in April the Court conditioned approval on

17   appearance at this hearing for this Court's further evaluation

18   of whether the PCCEP process is going well, specifically to

19   assess if the committee gets formed according to plan and

20   functioned according to its design.   And I'll reference

21   page 139 and 140 of the Court's transcript.

22        The process is going well.   The effort has been deliberate

23   and thorough, facilitated by effective leadership, as described

24   in the City status report.   ECF 183 to 185.

25        The City, the mayor's office, and the facilitator have

1    welcomed us, the United States, and the compliance officer at

2    every step along the way, and there have been many steps to

3    date.

4         The committee was formed as required by paragraph 141 and

5    has been given the authority described in paragraph 142.

6         Now, that paragraph sets minimum authority -- a floor.

7    The committee can go further, and, in fact, the plan does go

8    further.  PCCEP's authority includes evaluating performance.

9    It includes oversight, independent oversight, and it includes

10   the ability to make recommendations.  And I'll direct the Court

11   and the public to Section VIII of the PCCEP plan regarding

12   statement of work.

13        The committee members are diverse and personally invested

14   in the mission of police reform as required by paragraph 143.

15   The City is providing substantial administrative support an

16   ongoing obligation paragraph 144.

17        Now, it's true, as the Court recognized, that PCCEP

18   members are still in the middle of training.  And their first

19   regularly scheduled public meeting won't occur until November.

20   But that shouldn't impact the Court's approval today.  We

21   shouldn't conflate adequacy of the amendment with adequacy of

22   performance.  That analysis isn't contemplated by paragraph 184

23   or any legal standard, that I'm aware of, and it isn't needed

24   in this case, Your Honor.  The training is mandatory.  It's

25   required, and it's been scheduled.  Regular public meetings are

1   mandatory.  This group, Your Honor, is worthy of our faith.

2       Six months ago the PCCEP was just an idea, a written

3   proposal.  Today, it is 13 members.  It is six alternates, and

4   it's two expert facilitator groups.  It has the support of

5   Chief Outlaw and the rank and file officers of the police

6   bureau as represented by Portland Police Association today.  It

7   has the support of Mayor Wheeler and city council and their

8   staffs.  Because the committee is functioning well to date, we

9   ask that the Court also show its support by giving final

10  approval for -- and cementing PCCEP's existence.

11      Third, the amendments should be approved today because

12  they are fair, adequate, and reasonable.  Notwithstanding any

13  snapshot of performance.  The changes are entirely consistent

14  with the principles embodied by the agreement.  They create a

15  great chance of a lasting framework for community engagement

16  and oversight.

17      The new framework addresses problems while preserving and

18  enhancing the COAB's defining characteristics, including its

19  mission to independently assess implementation of the agreement

20  and its duty to regularly engage the public, elected city

21  leaders, and the police bureau.

22      But PCCEP goes further than COAB by divorcing the body

23  from the compliance officer, by untethering it from the four

24  corners of the settlement agreement, the amendments give

25  community oversight and engagement a longer life, a broader

1  mandate, and the empowerment of self-determination.  The

2  changes are facially reasonable.  The plan is facially

3  reasonable.  The United States respectfully submits that the

4  committee can and should be expected to discharge its work in

5  good faith through public meetings.  Accordingly, the Court

6  should approve the changes.

7      Finally, the United States believes that committee members

8  and the committee itself would benefit from having the Court's

9  full unconditional approval today, not later.

10     Conditionality is not without cost.  Conditionality casts

11  a cloud.  Potential disapproval could very well discount the

12  perceived value of an all-in effort of the members.  We know

13  from experience that volunteering in this context is a

14  significant burden.  There's good cause not to pile on this

15  burden, the weight of a conditional existence, based on these

16  members' performance.

17     The Court's approval today would provide a real benefit to

18  committee members as they tackle tough topics for the first

19  time as a group.  Faith and support build confidence, and

20  confidence breeds strength, courage, and success.  This

21  committee merits our confidence.  At its core, conditional

22  approval does one thing.  It preserves the possibility of

23  rejection.

24     At this stage, however, with the City now fully committed

25  and with volunteer members on the cusp of investing significant

time and effort, rejecting the PCCEP amendment would be a
disproportionate response to potential problems that might
arise.  I can think of many less intrusive alternatives.
Collaboration among the parties in the amici, compliance
officer reports, status conferences with the Court.  All of
these would be better than continuing that cloud of potential
rejection.

    Whatever must happen ultimately, should happen
immediately.  If the Court were to reject the PCCEP framework,
it would be useful to know sooner.  Just the same, the Court
should approve the framework if it is fair, if it is
reasonable, if it is an adequate way to meet the purpose of
restoring community confidence, and which believe that it is.

    Your Honor, we respectfully ask you to grant the joint
motion to amend the settlement agreement.

            THE COURT:  Thank you, Mr. Hager.  Let me ask you a
few follow-up questions if I may.  The AMA coalition and their
status update notes at the top of page 2 that for the past
two years the City has been in noncompliance with the
settlement agreement in the area of community oversight.

    Does the government -- does the plaintiff agree?

            MR. HAGER:  We certainly believe that we have not
been able to find compliance given the nonexistence of the
Community Oversight Advisory Board.

            THE COURT:  In the plaintiff's view, have all parties

1    been acting in good faith since the outset of the settlement

2    agreement?

3              MR. HAGER:  I think so.  Yes, Your Honor.

4              THE COURT:  And so notwithstanding everyone's acting

5    in good faith, we still have not -- we still had a situation of

6    noncompliance with the settlement agreement; is that right?

7              MR. HAGER:  That's right.

8              THE COURT:  Okay.  Now, the AMA also points out in

9    the middle of page 2 that whereas the settlement agreement

10   required court approval of any amendment or modifications, the

11   details of the PCCEP, the Portland Committee on

12   Community-Engaged Policing, are set forth in a document that is

13   separate from the settlement agreement and can be modified

14   without the -- as AMA puts it, without entry into the court

15   record.

16        Does plaintiff agree with that?

17             MR. HAGER:  I think we would reserve our right to

18   disagree with the premise.  Paragraph 184 suggests that

19   amendments and the amendment process, which has been deemed

20   fair, adequate, and reasonable, allows the parties, with an act

21   of council, with the agreement of the United States

22   collaboration of the parties, to amend the agreement without

23   further action of the Court.  We would preserve that argument.

24   The point is well taken, though.

25        And to not fight the hypothetical, the second aspect of

1   that, we do believe there's some value to having a community

2   board have some flexibility to change some of the terms without

3   having an act of council, without having to run changes up the

4   flagpole of the United States, which can be time-consuming, to

5   give it that ability to respond to problems more immediately.

6       So that was by design to have some of the bylaws or the

7   specifics outside of the agreement.  But it is well taken that

8   that can be changed without court oversight.

9       Now, it cannot be changed without the approval of the

10  United States or without collaboration with both the AMA and

11  the PPA, which is codified in the settlement agreement.

12          THE COURT:  And you say "collaboration," does that

13  mean that the AMA has veto authority to override or overrule

14  any proposed changes to the PCCEP agreement?

15          MR. HAGER:  That wouldn't be my understanding of the

16  definition of "collaboration," but at the same time, I would

17  just want to note for the record that, you know, we have a

18  democratically elected local city council, and they have been

19  very responsive to concerns raised by the AMA and other

20  citizens too.

21          THE COURT:  And I certainly mean no disrespect for

22  our democratically elected city council at all by this process,

23  and I assume neither does the United States.

24          MR. HAGER:  That's right.

25          THE COURT:  But the United States sued the City,

1   didn't they?

2           MR. HAGER:  That's right, Your Honor.

3           THE COURT:  And I assume you had a good-faith basis

4   for bringing this lawsuit?

5           MR. GEISSLER:  We did, Your Honor.

6           THE COURT:  All right.  You mentioned that the

7   members have been appointed.

8       Am I correct that the city council just affirmed the

9   appointment of the members a week ago yesterday?

10  September 26th?

11          MR. HAGER:  That's correct.

12          THE COURT:  And you mentioned that the first public

13  meeting has not yet occurred.

14          MR. HAGER:  That's correct.

15          THE COURT:  And it's scheduled for when in November

16  of 2018?

17          MR. HAGER:  That will be up for the board to decide

18  or the committee to decide, and I don't think they've tackled

19  that issue yet.

20          THE COURT:  Have I heard you -- I'm not sure I heard

21  this correctly, but I thought I heard you say the committee is

22  functioning well today.  You didn't mean the PCCEP committee,

23  did you?

24          MR. HAGER:  Oh, I did, Your Honor.

25          THE COURT:  But they have not yet had their first

1   public meeting.  Am I correct?

2           MR. HAGER:  Part of the PCCEP functioning well, I

3   believe, is the training that they have been undertaking.  Part

4   of the PCCEP functioning well is the formation of the PCCEP,

5   and that process went well with diverse input and diverse

6   results.

7           THE COURT:  So we have good input, a composition of

8   the committee that the United States supports.  But when you

9   say the committee is functioning well, you are not intending to

10  imply that they have had well functioning meetings, public

11  meetings, because those haven't yet occurred and are not yet

12  scheduled to occur until November.  Am I correct?

13          MR. HAGER:  That's right, Your Honor.  The statement

14  of work is a little bit broader than just public meetings.  It

15  does require some of these training activities, not only to get

16  to know each other and the process of being a committee under a

17  city structure, but engaging with the police bureau, through

18  ride-alongs and community academy, and that's happening this

19  week.  The final trainings will occur next week.

20          THE COURT:  And once we start with the public

21  meetings in November, what's the anticipated frequency of

22  public meetings?  Is it --

23          MR. HAGER:  Well, it's at least once per month, and

24  that is a floor again.  The committee will be free to decide

25  for itself if it wants to meet more regularly than that.  In

1  addition, there have been the allowance for subcommittees and

2  subcommittee meetings at the behest of the AMA.

3         THE COURT:  I take it, because I have not seen any

4  paperwork or submission on this point, my assumption is that I

5  do not have a recommendation from the committee itself, as a

6  committee, the PCCEP committee, as a PCCEP committee, saying

7  they think it is a good idea to approve the amendment at this

8  time as opposed to wait to see how things are going.

9     Am I correct that I don't have that formal recommendation

10 from the committee yet?

11        MR. HAGER:  I certainly have not seen that formal

12 recommendation, Your Honor.

13        THE COURT:  All right.  Thank you very much,

14 Mr. Hager.  I do recognize the good faith and the hard work

15 that has been put in, frankly, by everyone.  You sense some

16 skepticism in my questions, but please do not interpret that

17 skepticism as a lack of respect for everyone's good faith and

18 hard work.

19        MR. HAGER:  Very good.  Thank you, Your Honor.

20        THE COURT:  The skepticism is simply about when is

21 the right time for the Court to give approval to an agreement

22 or an amendment that the Court will then not really be able to

23 continue to monitor if further amendments are needed or even

24 brought about.

25        MR. HAGER:  I understand.

1              THE COURT:  Thank you.

2         All right.  I look forward to hearing comments from the

3    City of Portland.

4              MS. REEVE:  Thank you, Your Honor.  Tracy Reeve,

5    Portland city attorney, on behalf of the City of Portland.

6         The City is delighted to be here today to report back to

7    the Court, the parties, the amici, the public, and to welcome

8    the Mental Health Alliance as an additional amicus.

9         With the help and engagement of the community, the

10   evaluation committee, the Selection Advisory Committee, the

11   enhanced amicus Albina Ministerial Alliance Coalition for

12   Justice and Police Reform, the Department of Justice, the City

13   and PCCEP staff, and the hard work of the PCCEP facilitators.

14   Thirteen outstanding individuals from diverse backgrounds

15   across a broad spectrum of our community have been seated on

16   the Portland Committee on Community-Engaged Policing.

17        I would like to ask that any of the PCCEP members who were

18   able to be present today, please stand to be acknowledged when

19   I read your name.  The 13 new PCCEP members are

20   Sebastian Chevalier.  And Sebastian is a youth member.

21   Yolanda Clay, Lakayana Drury, LaKeesha Dumas, Bob Dye,

22   Sharon Gary-Smith, Aden Hassan, Andrew Kalloch, Michelle Lang,

23   Patrick Nolen, Sam Sachs, Zachary Thornhill, and

24   Kalonji Williams -- excuse me, Kalonji Williams, another youth

25   member.

1          THE COURT:  Let me interrupt right there and say I do

2     recognize and appreciate your willingness to serve on this very

3     important committee for the good of our entire community, so

4     thank you.

5          MS. REEVE:  Thank you, Your Honor.

6        The City is also very grateful that the PCCEP members have

7     agreed to serve and hopes the Court will have the opportunity

8     to hear from some of them during the public testimony of

9     today's proceedings if they so elect.

10       The PCCEP will hold its first public meeting next month,

11    as the Court has heard.  After close to two years without a

12    functioning community engagement body, this is a huge step

13    forward.

14       I'm going to deviate a little bit from my prepared remarks

15    to address one of the questions -- actually, two, which I think

16    are related, questions about the process, which is the Court

17    asked is it true that the City has been in noncompliance for

18    two years, and it's of course true that the City has not been

19    in substantial compliance for two years.  And the Court's

20    question about whether it's appropriate to have the process for

21    making changes to the community engagement plan occur outside

22    the framework of amendments to the settlement agreement.

23       I think those two things are not unrelated.  The City was

24    without a functioning community engagement body for two years

25    because, once the problems developed with the existing

1    structure, the City was required to -- under the terms of the

2    settlement agreement, to go through the process of amending the

3    agreement.  That process, in large measure, is what caused the

4    delay of two years.  Because there was a lengthy collaboration

5    process, there were a number of city council hearings on the

6    proposed amendments before we even got to that process to

7    select, the City collaborated with the Department of Justice

8    and the AMAC about the amendments.  There was a mediation

9    process.

10        There were then three or four city council hearings, at

11   which there was robust public participation and testimony.  The

12   council finally approved those amendments in late August of

13   2017 for the new structure for the community engagement body.

14        It then took until December 26th of 2017 to get final

15   approval from the Department of Justice and all of the parties

16   to get the stipulated motion filed.  And then through the

17   process since that time, then the hearing was held before this

18   Court in April, but another status conference was set now.

19        So one of the reasons that the City is --

20             THE COURT:  And the committee appointed last week or

21   the -- and the committee approved by the city council last

22   week?

23             MS. REEVE:  Correct.  Correct.  And that process --

24   and I'll go a little bit through what that process was, but my

25   point is simply that because there is a very exhaustive process

1  that has to be followed for amendments to the settlement

2  agreement, that also proved to be a process that was very

3  cumbersome when difficulties with the community engagement

4  structure were identified, and the parties very purposefully

5  drafted the amendments so that that process would not have to

6  occur should future difficulties arise so that we wouldn't have

7  a delay of that length of time again, and the idea is to allow

8  more nimble efforts to correct difficulties that arise while

9  still having safeguards in place.

10      And those safeguards that are in place include

11  consultation with the Portland Police Association and enhanced

12  amicus AMAC.  They include Department of Justice approval.  And

13  because this plan was set up and approved by city council, they

14  also include city council approval.

15      And so that is certainly a robust process, but it is one

16  that is not as lengthy and time-consuming as securing actual

17  amendments to the settlement agreement.

18      I just want to second what the United States said.  The

19  other reason that the PCCEP plan was designed to be referred to

20  in the settlement agreement and to have floor requirements set

21  forth in the settlement agreement, but to be independent, is

22  that we're establishing the PCCEP at a very different moment

23  than was -- the COAB was established.

24      The settlement agreement was negotiated in 2012, and at

25  that point, the terms regarding the COAB were contemplated.

1    The COAB was intended to be created extensive with the

2    beginning, essentially, of the City's compliance efforts.

3    We're six years down the road from that point in time, and the

4    City is much farther along in its path to substantial

5    compliance than it was in 2012.  All of the parties and the

6    City certainly understand that robust community engagement is

7    necessary to fully achieve the purposes contemplated by the

8    settlement agreement.  Constitutional policing and a trusting

9    relationship between the Portland community and the police

10   bureau which serves that community and the other city public

11   safety functions.

12        In order to ensure that that body continues to perform

13   that crucial function or to help perform that crucial function,

14   it's essential that the PCCEP have an existence that continues

15   well beyond whatever date it is when the City achieves

16   substantial compliance and Your Honor finally dismisses this

17   case.

18        And so that is the -- one of the major reasons that the

19   PCCEP was designed to have, as I say, four requirements in the

20   settlement agreement but an existence separate and apart from

21   the settlement agreement that will continue after the

22   settlement agreement.

23        I would like to -- I would also like to concur with the

24   United States to the point that the AMAC raised in its status

25   report, that it's true that the primary focus of the PCCEP is

1    to serve that crucial community engagement function.  But the

2    PCCEP's mission is broad, and the PCCEP also has an oversight

3    role with regard to the settlement agreement and the authority

4    to independently assess the settlement agreement using the

5    tools outlined in the plan.  And there are many tools outlined

6    that PCCEP has the ability to gain information, to gain written

7    responses from the City.  It really has much more robust tools

8    than the COAB had.

9         AMAC also noted that under the PCCEP plan, PCCEP members

10   are appointed by the mayor, which is, of course, true.

11        Again, that was by design so that there is a more straight

12   connection between the PCCEP and the politically accountable

13   mayor, who's also the police commissioner.  And should a

14   different commissioner be the police commissioner, the PCCEP

15   will also have that relationship.

16        And, again, one of the difficulties created with the COAB

17   was that it was not a part of the -- or at least not clearly a

18   part of the City but was working through the COCL which ended

19   up -- although it was well-intentioned, it ended up being an

20   awkward structure.

21        The selection process was overseen by a Selection Advisory

22   Committee, which had one community member appointed by each

23   city commissioner, including the mayor.  All applicants who met

24   the minimum required qualifications for eligibility were

25   evaluated by the Selection Advisory Committee which determined

1   who to interview.  All appointed PCCEP members, all of the 13

2   members who had been appointed, were interviewed and

3   recommended by the Selection Advisory Committee, and the final

4   appointment decision was made by the mayor in consultation with

5   council offices and then the city council confirmed all the

6   PCCEP members.

7       So there was robust community engagement and involvement

8   by city council members other than the mayor.

9       I'd also like to briefly touch on some of the other

10  concerns raised by the Albina Ministerial Alliance Coalition in

11  its submission.  One of the concerns is that -- and I'm quoting

12  from their brief.  It is critical for the community to have a

13  live voice at the meetings, not solely via electronic means,

14  and that decisions are not made before public comment.

15      And the City took this concern to heart, and the amended

16  PCCEP plan specifies that meeting agendas shall be structured

17  in a manner that provides a meaningful opportunity for public

18  comment.  Prior to the conclusion of deliberations and voting,

19  it also provides that public meetings will be generally open to

20  the public, and it also provides that facilitators will ensure

21  that no votes are taken without the public having the

22  opportunity to be present.

23      The AMAC also addressed a concern about PCCEP's limited

24  ability to meet without the public present should good cause be

25  shown due to safety concerns.  AMAC stated that this language

should be limited to legitimate threats to safety, and the City
and the facilitators concur with that.  The City does not
believe that legitimate threats to public safety should be
limited to physical safety, but it does concur that good cause
needs to be shown and legitimate threats to safety need to be
shown.

The City will apply the good-cause requirement to mean
that PCCEP could only meet in private in the face of a
legitimate threat to safety, such as physical violence or
ongoing verbal abuse.  Certainly not merely the discussion of
uncomfortable topics.

The City also acknowledges AMAC's concerns about the
timeliness of notice for meetings, and the PCCEP staff and
facilitators have committed to providing a minimum of two weeks
and generally at least three weeks of PCCEP meetings.

The PCCEP website will have all PCCEP notices, minutes,
and reports posted and will link to the COCL's website for
compliance reporting.

The City also acknowledges AMAC's legitimate frustration
about quick requested turnaround times for reviewing documents
and drafts and will try to do better.  And we note our
appreciation for AMAC's recent extensive participation in the
PCCEP plan, amendment process and discussions back and forth.
That process lasted approximately six weeks from the time that
we contacted the AMAC.  And during that period of time, a

1    meeting was held and numerous emails and correspondence were

2    exchanged regarding actual language and the City and the AMAC

3    were able to agree on almost all changes.

4        There was some time sensitivity, as the City needed to

5    have the amend PCCEP plan approved by counsel and by the

6    Department of Justice.  After the consultation process and

7    before the PCCEP members could be appointed and seated, and the

8    City appreciations AMAC's quick turnaround time to enable us to

9    accomplish that.

10       AMAC also raises a legitimate concern about ensuring a

11   process for the selection of alternates to the PCCEP, and I'm

12   happy to report on that.  Six alternates were chosen by the

13   mayor.  Four adults and two youths.  Those alternates have all

14   been invited to participate in the current retreat and

15   on-boarding process for PCCEP members, including participation

16   in PPB ride-alongs and also the PPB community academy.

17       They're also welcome to attend all PCCEP meetings and

18   subcommittee meetings and will be provided full access to all

19   information that PCCEP members have access to.  Alternates are

20   not currently ranked, and this was intentional.

21       Because the City is not mandating their attendance at

22   PCCEP meetings, given the substantial time commitment, should

23   it become necessary to replace a current PCCEP member, the City

24   will assess each alternate based on their level of

25   participation in PCCEP activities and their familiarity with

1  the work of the PCCEP, along with their original application

2  and interview, to determine who to appoint from the alternate

3  pool.

4       In addition, in anticipation of terms expiring, the City

5  will reopen the application process to interested Portlanders.

6  And through this process, which will adhere to the parameters

7  set forth in the PCCEP plan, the alternate pool will be

8  expanded and replenished and alternates will continue to be

9  trained alongside new PCCEP members.

10      The City did also consider AMAC's suggestion that the

11 Selection Advisory Committee be retained to meet annually, but

12 ultimately decided against it, given the burden this places on

13 individuals who are not City employees whose time commitments

14 cannot be foreseen and who are not otherwise connected to or

15 obligated under the settlement agreement.

16      Nonetheless, every effort will be made should it become

17 necessary to reconvene the original Selection Advisory

18 Committee.  And if that is not possible, the affected

19 commissioners, those commissioners whose member was not able to

20 continue, will be asked to appoint another committee member to

21 serve.  The City hopes that this information is responsive to

22 the concerns raised by the AMAC in its memo.

23      I would like to very briefly touch on some of the steps

24 the City has taken to initiate the PCCEP.  And I'm not going to

25 go through everything that's in our brief, but it may seem

like, "Well, why are you just now seating them?"  Some of the
difficulty -- among the many difficulties faced by the COAB,
the City took to heart and really heard that the COAB was not
given enough time for training, was not provided enough support
to come together and coalesce as a group and establish shared
goals and a shared work plan.  And so the City is really
committed to doing things differently this time.

    The City, in -- as I mentioned, on December 26th of 2017,
all parties and enhanced amicus Albina Ministerial Alliance
filed a joint stipulated motion to enter the amended settlement
agreement with the Court.  The City issued a revised request
for proposals for PCCEP facilitators in February.  It was
revised because the original RFP issued by the City in November
did not generate as robust of responses as the City had hoped.
And with the help of the evaluation committee, which the City
did a renewed RFP in February 2018, and that evaluation
committee was comprised of -- and I apologize if I'm
mispronouncing anyone's name, Freda Ceaser, Director of Equity
and Inclusion at Central City Concern.  Dana Coffee from the
Portland Commission on Disability.  Jan Friedman, Attorney with
Disability Rights Oregon.  Janie Gulickson, Executive Director
of the Mental Health Association of Oregon.  Kalei Luyben, a
member of the Albina Ministerial Alliance Coalition for Justice
in Police Reform.  And Daniel Portis-Cathers, a member of the
NAACP.

1          THE COURT:  And the Court does thank them and

2   recognize them for their hard work and its important role.

3          MS. REEVE:  The City initially set one facilitator,

4   but when the responses were received, the evaluation committee

5   determined that the top two candidates were phenomenal and that

6   working together they would best serve to engage the community,

7   and so two facilitators were therefore hired by the City on

8   that recommendation.

9       On of the two facilitators chosen was Training for

10  Transformation, led by Hun Taing and Brandon Lee.  And I

11  believe Mr. Lee is present.  There he is.

12         THE COURT:  Welcome.  Thank you, sir.

13         MS. REEVE:  The City would like to acknowledge

14  Mr. Lee's and Ms. Taing's hard work as well as the hard work --

15  excuse me.  Training for Transformation and some Oregon state

16  certified minority business enterprises that specialize in

17  equity focused community building between law enforcement and

18  the diverse residents they serve.

19      The other facilitator selected was the Brad Taylor Group,

20  an emerging small business specializing in developing

21  communication strategies through training seminars, conflict

22  resolution, and facilitation services.  And Mr. Taylor has

23  extensive experience working with and advocating for some of

24  Portland's most vulnerable residents, including those who have

25  lived experience with mental illness.

1   The facilitators really hit the ground running in May of

2   2018, and their outreach strategy focused on removing barriers

3   to participation for historically marginalized communities and

4   empowering Portlanders with lived experience to take the lead

5   in the process.

6   To date, the facilitators have put in well over 500 hours

7   of work.

8   The facilitators also recommended the certain limited

9   changes to the PCCEP plan, and, very briefly, the goal of those

10  changes was to increase the size of the PCCEP to allow youth

11  participation, to reduce the number of required monthly

12  meetings to make the time commitment more manageable, and to

13  establish some committees with open meetings to do additional

14  work that the full PCCEP wasn't required for, also to provide

15  for alternative training protocols for any PCCEP members who

16  felt an accommodation was needed and to give the PCCEP greater

17  control over the methods to be used for community engagement in

18  order to be able to put an emphasis on community gatherings and

19  nontraditional methods of meeting Portlanders where they are.

20  The conditionally approved amendments to Section IX laid

21  out the process, the roadmap, for those changes at paragraph

22  142.  That process was followed, and, as I've already

23  mentioned, enhanced amicus AMAC participated, and we appreciate

24  that.  Intervenor PPA also participated, and both PPA and AMAC

25  provided suggestions to the City which were incorporated and

1    which approved the amendment.

2        The amendments were subsequently approved by the DOJ and

3    then by city council.  In the meantime, the Selection Advisory

4    Committee was appointed and those -- each council member

5    appointed one member.  Dr. Cynthia Fowler, a psychiatrist and

6    Chair of the Health Committee of the NAACP, was appointed by

7    Commissioner Saltzman.  Julie Ramos, a mental health advocate

8    and the recent Vice Chair of the Citizen Review Committee,

9    appointed by Commissioner Fritz.  Musse Olol, Chairman of the

10   Somali American Council of Oregon, was appointed by

11   Commissioner Eudaly.  Bobbin Singh, Executive Director of the

12   Oregon Justice Resource Center, was appointed by Commissioner

13   Fish.  And Derald Walker, a psychologist and Executive Director

14   of Cascadia Behavioral Health, was appointed by Mayor Wheeler.

15       The Selection Advisory Committee and facilitators were

16   supported by staff and engaged in a broad outreach strategy to

17   reach as many Portlanders as possible, including presenting at

18   community meetings, informational sessions, targeting informal

19   conversations within their respective network, and six more

20   formal information sessions held in geographically diverse

21   locations around the city.  The facilitators also did very

22   targeted outreach to particular individuals and communities.

23       Because of this great work -- and I really do want to give

24   kudos to the facilitators -- over 100 applications to receive

25   on the -- to serve on the PCCEP were received from a broad

1    spectrum of Portlanders.

2        The Selection Advisory Committee focused on the following

3    areas in assessing those applications:  Lived experience as a

4    member of a marginalized community, lived experience with

5    mental or physical health issues, interpersonal skills,

6    experience working within and advocating for marginalized

7    communities, and experience utilizing social services and

8    engaging in government processes.

9        The Selection Advisory Committee selected the candidates

10   to interview and then conducted interviews in August, this past

11   August, which all, as you've heard, were monitored by a

12   representative of the Department of Justice or the COCL.

13       The Selection Advisory Committee then provided a slate of

14   candidates -- a suggested slate of candidates to the mayor,

15   along with alternates.  Mayoral interviews occurred also in

16   August and were also attended by the United States Attorney's

17   Office.  The mayor announced his selection of PCCEP members and

18   alternates on September 11th, and those appointments were

19   confirmed by the city council on September 26th.

20       As you've heard, the PCCEP members have already begun

21   their extensive on-boarding and training process, and the first

22   public PCCEP meeting will occur next month.

23       The City is now in a position to fully come into

24   compliance with its obligations under Section IX of the

25   settlement agreement, and the City has not achieved full

1   substantial compliance yet because that requires PPB to be

2   engaging with the PCCEP, but we're poised to do that now that

3   we have a PCCEP and an outstanding PCCEP to work with.

4       And Mr. Vannier, at whatever point the Court wants to hear

5   argument on the issue of whether final approval shall be

6   granted, will discuss that.  But I would just concur with the

7   United States that we're -- we're asking these 13 community

8   members to step up, give a huge time commitment to do difficult

9   work, controversial work, taxing work, and I would urge the

10  Court to consider that they're entitled to have a framework

11  within which they're doing their work, to have -- to be

12  established unconditionally as the Portland Committee on

13  Community-Engaged Policing.

14      Should any issues crop up, we've already shown that the

15  PCCEP plan can be successfully amended with the process

16  specifically set forth.  We don't anticipate that.  We are not

17  aware of any issues.  But we have a mechanism to do it that

18  won't take two years the next time.  And these committee

19  members would be willing to do this work on behalf of the City.

20  We would urge the Court to give them the ability to do that and

21  not under a cloud.

22      Finally, I just wanted to mention Section X of the

23  settlement agreement, which largely concerns accountability and

24  the COCL's work, but paragraph 160 refers to the COCL's

25  required town hall meetings to present draft reports to the

1  community.  Under this paragraph, the COCL and the City, in

2  consultation with the PCCEP, shall ensure that the time and

3  location of these quarterly town hall meetings are well

4  publicized with sufficient advanced notice to procure

5  attendance of broadly representing a community body.

6      To date, the City and COCL -- the COCL has been holding

7  such town halls with support from the City.  Now that the PCCEP

8  is seated, it will have the responsibility of coordinating with

9  the COCL to host the town hall meetings at which the COCL

10 presents its report, and the COCL and PCCEP receive comment.

11     Because PCCEP has not yet completed its training process,

12 that will not occur for the next quarterly town hall meeting

13 because that is occurring in about two weeks.  I want to make

14 sure that everybody who's here who is interested has that

15 information.  It's also gone out to the distribution list and

16 has been posted.  But that next COCL quarterly town hall will

17 be held on October 17th.  It will be hosted by the COCL and the

18 City at 6:00 p.m., in room 2500-B of the 1900 building, which

19 is at 1900 Southwest Fourth Avenue.  Future town halls,

20 following that town hall, will be coordinated with the PCCEP,

21 and that will allow the City to come into full compliance with

22 Section X of the settlement agreement as well.

23     In conclusion, Your Honor, the City is extremely gratified

24 to finally be able to be before you today to report that great

25 strides have been made toward achieving substantial compliance

1    with the community engagement requirements of the settlement

2    agreement, and the City is very grateful for all of the support

3    from the community and the parties and the Albina Ministerial

4    Alliance and the volunteers to get us to this point.

5        As I said, I don't know if the Court wants to hear

6    argument now or later on the --

7                    THE COURT:  Probably later.

8                    MS. REEVE:  Okay.

9                    THE COURT:  But let me ask you two follow-up

10   questions.  I appreciate your comments, Ms. Reeve, and I thank

11   you very much.

12       You mentioned the facilitators, and I do recognize their

13   hard work in this training toward transformation and the

14   Brad Taylor Group.  Is there a term of the facilitator's

15   contract with the City?

16                   MS. REEVE:  My understanding, Your Honor, was the

17   initial term was for a year with an option for an additional

18   six months, and of course under City procurement rules, that

19   can always being extended.

20                   THE COURT:  And has the year expired, or when does it

21   expire?

22                   MS. REEVE:  No.  They began working, Your Honor, in

23   May of 2018.

24                   THE COURT:  So that will continue through May of

25   2019?

1          MS. REEVE:  Yes.  And, as I say, there's already

2     provisions for another six months, should that be deemed

3     necessary.

4          THE COURT:  The second question I have is I get that

5     difficult matters take a long time.  I get it.  I -- I do

6     not -- I'm not being critical.  But my question is given all

7     that had to be done and that the city council's decision just

8     occurred a week ago yesterday, September 26th, as you say, was

9     there a relationship, any connection at all, between the timing

10    of the City's decision last week and the long-scheduled hearing

11    in this case for today?

12         MS. REEVE:  No, Your Honor.  That's just how --

13         THE COURT:  Pure coincidence.

14         MS. REEVE:  Honestly, Your Honor, that is -- we --

15    we -- let me say this:  We absolutely wanted that process

16    completed before we came back to Your Honor, but other than

17    that, no, there was no connection.  That was the soonest we

18    could get it done with the PCCEP plan amendments that came from

19    the community and the facilitators and the process of needing

20    to go through those amendments and have a meaningful -- as I

21    say, the collaboration process with PPA and AMAC took six weeks

22    itself.  DOJ needs time for approval.  So, no, Your Honor, it

23    wasn't scheduled to occur the week before the hearing.

24    Although, we did want it completed before this hearing.

25         THE COURT:  I get it.  There's a lot of work to be

1    done.  I fully accept what you're saying.  I do note

2    occasionally having an externally imposed deadline is not a bad

3    idea for a whole bunch of things in life.  I get it.

4        Mr. Vannier, I think it will be most helpful, if you were

5    going to urge me to approve the amendment today, as opposed to

6    after the PCCEP has had an opportunity to do -- have some

7    meetings and see how it works, I think that argument will be

8    most welcome after we've heard all of the reasons why I

9    shouldn't do that.

10        All right.  Thank you very much.

11            MS. REEVE:  Thank you, Your Honor.

12            THE COURT:  All right.  I look forward to hearing

13    from Albina Ministerial Alliance.

14            MS. CHAMBERS:  Good morning, Your Honor.  The AMAC

15    does acknowledge that there have been a lot of progress and

16    some improvements in the PCCEP plan and greatly appreciates the

17    City's cooperation and making some of those changes.  However,

18    AMAC still has some concerns similar to what the Court has

19    about full approval of the PCCEP plan at this time.

20        As AMAC has raised with this Court many times, the process

21    by which the PCCEP plan was created was a very exclusionary

22    process involving an appeal to the Ninth Circuit and a

23    mediation that specifically excluded AMAC.

24        We have noticed time and time again that when the City

25    talks about collaboration with AMAC, the City defines what

1  "collaboration" means and that sometimes that means that AMAC

2  is included in the conversation after some sort of preliminary

3  decision or draft has already been made or is given pretty

4  last-minute notice to be able to provide some input.

5      Based on that past experience, the AMAC feels strongly

6  that we need to see how the PCCEP is actually functioning and

7  that if we were to wait six months and see how the PCCEP is

8  actually operating, that this Court would be in a much better

9  position to fully approve the plan.

10      Now, that's not to say that AMAC is rejecting the PCCEP or

11  not appreciating the work of the community members and the plan

12  as it's stated, but we have to remember that even the

13  criticisms today and the critique by AMAC of this plan is based

14  on what is already understood to be set in stone, and so

15  they're fine-tune critiques when what we were working on a

16  couple of years ago was, in AMAC's view, a much more robust and

17  community-involved oversight of the system.

18      If you wouldn't mind, I would like to ask your permission

19  that my clients, Dr. Haynes and Dr. Bethel, may also speak?

20          THE COURT:  Of course.

21          DR. HAYNES:  Thank you to The Honorable and

22  distinguished Judge Michael H. Simon in the case of United

23  States of America v. the City of Portland.  Case

24  No. 3:12-02265.  The Albina Ministerial Alliance for Justice

25  and Police Reform was given enhanced amicus curiae by the

request of the Court to collectively engage in mediation with
other intervenors and the Department of Justice.  We faithfully
engage in mediation that produced the settlement agreement that
was accepted by all parties.  After several modifications of
the original settlement agreement, we stand before the Court
with a new modification of the original settlement agreement.

On April the 19th, 2018, the fairness hearing was held on
the most recent amendment to the original settlement agreement.
All parties agree to a joint stipulated motion to enter the
amended settlement agreement.

On May the 5th, 2018, the Court approved the amendments to
the settlement agreement and conditionally approved the changes
to Section IX and X, relating to the community oversight
engagement.  AMAC agrees with the amendment and goals and
concept and plan of PCCEP with some concerns.  Many of those
have been adequately responded to by the City while others
necessarily have not.

We believe that the thrust of the Portland Community on
Engagement Policing is a critical component to reforming the
Portland Police Bureau and building trust between the
historical and polarized diverse communities and the Portland
Police Bureau.  But history has clearly shown that there is no
one approach, a plan, or solution to our problem.  We must
always have a multifaceted approach and plan.

Most of these concerns have been shared with the City and

1  the city council and some have been adjusted.  One, that in the

2  procedure and process of PCCEP meetings and that the public is

3  given face-to-face opportunities to voice their opinion and

4  comments in an open session prior to the decisions that are

5  made in PCCEP.  We are glad to hear that the City responded to

6  that.

7      Two, that PCCEP establish protocol and internal procedures

8  to carry out its duty and responsibilities of reviewing the

9  settlement agreement and its review on evaluation of the

10 agreement of whether it is progressing or not progressing.  I

11 must say that there was only when AMAC introduced this -- that

12 it was added to the plan and that the language was changed on

13 this because -- and that's one of your great visions,

14 Judge Michael, in making AMAC enhanced amicus curiae, because

15 that would not have been in the original PCCEP plan.

16      PCCEP -- that PCCEP provide the opportunities to hear

17 voices of diverse citizens on issue of police reform.  We're

18 not interested in just having sensitivity sessions, but we are

19 interested in collecting the ideas of the community on the

20 issues of reform to make the Portland Police Bureau a model for

21 the nation.

22      Three, that PCCEP provide -- after providing

23 opportunities, that PCCEP participate, not organize, which is

24 quality hearing of COCL, and that has been added by the City.

25 We're concerned deeply about some other issues, in terms of my

1  idea -- my friends and colleagues with DOJ in their particular

2  statement that PCCEP is functioning well.  We're going to have

3  to disagree.  Nothing can be functionally well until the actual

4  meetings begin to take place and we can do an evaluation of

5  whether it's functioning well.

6      Also, there's other concerns that we have that concern

7  deeply about the militarization of the local police force and

8  the escalation of the handling of a mass protest by the

9  Portland police.  We're concerned also by the gap in the

10  training and the implementation when it comes to the policy of

11  the escalation within the Portland Police Bureau.

12      One of the things that we conclude, in agreement with you,

13  Judge, that there needs to be an evaluation period of how the

14  PCCEP is working or not working following the beginning of

15  meetings.

16      In conclusion, the late, beloved dreamer and practitional

17  prophet in America, Dr. Martin Luther King, once said human

18  progress is neither automatic nor inevitable.  Every step

19  towards the goal of justice requires sacrifice, suffering, and

20  struggle, the timeless exertion, and passionate concern of

21  dedicated individuals.

22      And so at this time I'm going to turn it over to my

23  colleague Dr. T. Allen Bethel.

24          THE COURT:  Thank you, Dr. Haynes.  I appreciate your

25  wisdom and comments.

1        Dr. Bethel.

2              DR. BETHEL:  Thank you.  Good morning, Judge, and

3     thank you so much for this opportunity to be at this status

4     conference again.  I want to cover just a few points,

5     particularly regarding the PCCEP and some generals about the

6     Portland Police Bureau.

7        Unfortunately, I sit here today in the aftermath of

8     another police-involved, officer-involved shooting.  The

9     killing of a young African-American man.  Mr. Patrick Kimmons.

10       While I understand that it does take time to get

11    information, I do want to encourage that in this process that

12    we get information as soon as possible to help keep peace

13    within the city.  When rumors begin to swell, it's hard to take

14    rumors back and quiet things down.

15       I'm reminded of something that I believe worked well and I

16    would suggest to the bureau to consider doing again.  It

17    happened under Chief Foxworth's reign.  We would have what I

18    would class as a "Here's what we know" meeting.  It happened

19    the day after a shooting or no more than a second day after a

20    shooting.  "Here is what we know" so that the information was

21    in the community and the community had something to deal with,

22    whether to deal with speculations and rumors.

23       With that being said, let me talk a little bit more about

24    PCCEP.  And I want to say, before I move from that, I want to

25    express my appreciation to the Portland Police Bureau for the

1   fine work that their fine officers do.  I understand that there

2   are issues.  We do appreciate their work, and I must also say I

3   appreciate so far what I know that Chief Outlaw is doing and is

4   proposing to do, as I heard her share with us yesterday in our

5   partners meeting.

6       When we deal with PCCEP, here are some other concerns:

7   Continuity.  I heard the City say that there's something about

8   giving it a long life, being able to continue.  One of the

9   issues that we had in the beginning with the COAB that brought

10  it to its demise is, number one, we didn't have clear

11  procedures as to how replacements of alternates would be

12  selected.  I think that that needs to be reiterated today, and

13  it needs to be written and put as a part of what's going to

14  happen with the PCCEP plan so we are not caught again wondering

15  how we were going to do this.

16      Secondly, in terms of dealing with the alternates, we want

17  to make sure that there is a long life of the PCCEP, and the

18  only way to do that is to make sure that there is facilitation

19  that is granted and doesn't disappear in a year and hope that

20  we can extend it six months or go through procurement processes

21  to extend it another six months.

22      One of the big issues was COAB, number one,

23  Judge De Muniz had -- I didn't pronounce his name right, and I

24  apologize for that -- had left.  We brought in another person

25  and ended.  Kathleen Saadat and ended.  Then we had a whole

two-year period of nothing.  Facilitation has got to be understood as a key to PCCEP continuing and not be relegated to a discussion between members of the PCCEP as to who will be the chair or vice chair, whatever, to keep these meetings going. Outside facilitation, non-biased, is going to be the best thing, and I'm going to urge the City and the Court to urge the City and the DOJ to make sure that that is a part of the PCCEP plan and is a continuing plan that is put there.

I don't, and I'm not very comfortable with it being lying in the hands of a political move.  In the next few years, we will be electing or may have the same mayor, police commissioner or we may not, and that always brings about an informational change as to whether I like this person or this group or I want to change it based on where I am.  I'm not speaking of myself.  I'm speaking about the political movements and machines that we have.

The process so far, I can say it has been good in terms of getting it started, but we'll never know how well the door on -- the close of -- the vehicle will operate until that door has been opened and closed several hundreds of thousands of times to see if there will be any defects that needs to be corrected before it is actually rolled out and given to the public to be used.  I want to encourage and say that while I believe what we have done is progressing in the right way, it is too early to give a report card to say, "Pass this with

1    flying colors."

2        I want to urge the Court and the DOJ to understand that

3    AMA is not rejecting what we have in the PCCEP plan.  We feel

4    that it is too early to say give it final approval.

5        We would urge that at least six months after the first

6    meeting that it is brought back into a conference to then give

7    final approval or conditional approval, whatever the Court may

8    decide at that time, but -- but presently, we do not have

9    enough information to say that it is functioning well or that

10   it has gained the confidence back of the community with the

11   Portland Police Bureau because there has not been any

12   engagement of the public in a large way that we will be able to

13   give any type of evaluation on that.

14       With that, Judge, I thank you very much for the

15   opportunity to present to the Court again today.

16            THE COURT:  Thank you, Dr. Bethel.  I appreciate

17   those comments and your wisdom.

18       I have a follow-up question, sir.  It's a follow-up

19   question for the AMA, whether it's Dr. Bethel, Dr. Haynes, or

20   Ms. Chambers who wants to tackle it.  I leave that to you all.

21       I appreciate what you're all saying that we need to see if

22   it works.  We need to give it enough time to see that it works.

23   Here is my question for you all:  What does working look like?

24   Let's suppose we give it six months after the first meeting.

25   Maybe even longer?  I don't know.  But we come back, and then

1  we ask the question, "Has it worked?"  What's the criteria that

2  we should use then?  In other words, well, the door opens and

3  closes and it hasn't fallen off and it keeps out the -- keeps

4  out the environment like it's supposed to.  What does working

5  look like?  Any thoughts on that?

6          DR. HAYNES:  Thank you, Your Honor.  Working would be

7  in both quantitative and qualitative terms.  Quantitative means

8  in terms of -- the meetings, the number of engagements in the

9  community, the process of the feedback.  The qualitative terms

10  has to be measured in terms of expressions of the beginning of

11  the building of relationships in the community between the

12  Portland Police Bureau and its citizens.  In particular, these

13  citizens who are here today and the African-Americans who are

14  definitive, quantitative in number of people who have been

15  harmed or shot by the Portland Police Bureau.

16      I also think in terms of -- and that's not going to be an

17  overnight process.  I don't -- I don't think, in terms of

18  having a meeting, that sometimes it will be called a

19  difficulty.  In any kind of public meeting and democracy, we're

20  going to have sporadic situations that erupt, and so -- but the

21  thing of the building of those relationships and the

22  development in the beginning, I think we will see certain steps

23  there and whether they're doing what they say they will do.

24      Do you want to add something?

25          DR. BETHEL:  In addition, Judge Simon, I would say

1   that the communications would be enhanced greatly.  So that the

2   community at large knows when, where, and that places are

3   chosen where it is accessible to the community as well.  I want

4   to see trust being established or reestablished with the bureau

5   where we look at accountability and openness to the public.

6   While we are here, concerned in this case about

7   officer-involved shootings and excessive use of force and that

8   which is around the issues of those who are mentally ill or who

9   are perceived to have mental illness, we also must also include

10  that part of this PCCEP working and bringing it together would

11  also be the handling of complaints from citizens against the

12  bureau, and they would be investigated in a timely fashion and

13  that they would be open to the public having some transparency

14  and seeing what is happening in those particular cases or those

15  complaint situations that would come forward.

16      The other piece about what would it be in terms of its

17  working is that you would hear on the streets, in community

18  meetings, people saying there is hope again in the community

19  working with the Portland Police Bureau and serving the

20  community and protecting her citizens.

21      Thank you.

22          THE COURT:  I find that very helpful.

23      Now, to help me further, let me repeat back a little bit

24  of what I'm hearing from you to make sure I understood it.

25  That in order to understand whether the proposed amendment and

1   specifically the PCCEP structure is working, it will take a

2   look at -- we should take a look at both, as you put it,

3   quantitative and qualitative factors or considerations.  Among

4   some of the quantitative or measurable factors, it might be the

5   number of meetings, the frequency of the meetings, whether

6   there's sufficiently advanced notice of all of the information

7   that needs to go out and the feedback that comes in, how -- how

8   often do they satisfy the obligation to give sufficient

9   advanced notice versus just notice a minute or two or an hour

10  or a day before.

11       Relatedly, is their timing -- is the handling of

12  complaints done in a timely fashion?  How long does it take to

13  respond or to have public informational meetings?  Those are

14  all quantitative factors.

15       But you are also telling me another aspect of

16  consideration of whether it's working is the qualitative

17  factors, such as is there, by and large, community acceptance?

18  Is there a community perception that complaints are being well

19  handled, transparently handled, and timely handled?  And as you

20  just put it so well, is there a general feeling within the

21  community that there's a renewal of hope?

22       Do I understand what you're saying correctly?

23            DR. HAYNES:  Yes, I believe you are -- really have a

24  comprehensive concept of what we're saying.

25       In addition to that, Judge Simon, the quantitative would

1  also include the evaluation that is actually taking place of

2  the settlement agreement by PCCEP.

3           THE COURT:  Understood.  There is that old adage that

4  if you can't measure it, you can't improve it.  But I also

5  think as much as there's some truth to that, quantitative

6  measurements are the important thing to do, but it's not the

7  only thing.  I very much respect what you're saying about the

8  qualitative aspects as well.  If I hear what you're saying, you

9  think that probably six months after the first meeting is

10  sufficient time.  It may or may not be.  That remains to be

11  seen.  But you need at least six months after the first

12  meeting.  Is that what I'm hearing?

13           DR. HAYNES:  Yes, sir.

14           DR. BETHEL:  Yes, sir.

15           THE COURT:  All right.  Anything further,

16  Ms. Chambers?

17           MS. CHAMBERS:  No, thank you, Your Honor.

18           THE COURT:  You know, we're making good progress, and

19  I'll tell you about the list that I've received.  It has eight

20  names on it.  Let's hear from Portland Police Association, and

21  then we'll take our midmorning break soon enough.  And so I

22  look forward to comments from Mr. Karia.

23           MR. KARIA:  Thank you, Your Honor.  I'll keep my

24  comments relatively brief.  We heard a lot from the United

25  States and the City the details of our PCCEP today.  I do want

1    to start by thanking Dr. Bethel, in particular, for his

2    acknowledgment of the police bureau and the officers in the

3    police bureau.  It is important and refreshing to hear,

4    Dr. Bethel, coming from you, in particular, the support which

5    is necessary to make sure the settlement agreement becomes

6    lasting as part of the police bureau, and it's important that

7    officers hear that their commitment is not going unnoticed.

8         Your Honor, for all the reasons that Mr. Hager has

9    eloquently stated and Ms. Reeve has stated, the PPA joins the

10   USA and the City in asking this Court for final approval of the

11   PCCEP amendments today.

12        If, as it was intended, PCCEP is to be an autonomous

13   lasting body, it must be built on the foundation of this

14   Court's support which should come through final approval of the

15   enabling amendments.  I share Ms. Reeve's sentiment and

16   Mr. Hager's sentiment that it is an important message coming

17   from Your Honor and this Court.

18        THE COURT:  Let me interrupt for a moment and say I

19   agree with you.

20        MR. KARIA:  Thank you.  As -- without getting caught

21   in the weeds and without stealing Mr. Vannier's thunder, if I

22   can take the liberty to speak very briefly as to what I believe

23   to be the narrow legal issue before this court, as it will help

24   flesh some of where we put some of the comments we hear for the

25   rest of the day in our analysis.

1          I would note that I believe the question before this Court

2    is whether the settlement agreement amendments in Section IX of

3    the proposed revised settlement agreement are fair, adequate,

4    and reasonable.  And this Court asked a very good practical

5    question, which is part of that measurement whether the -- is

6    that -- part of that measurement was whether PCCEP is working,

7    and I would offer, Your Honor, that what the parties have asked

8    this Court to do under, as you acknowledged, sir, the very

9    unique nature of this settlement agreement, we have asked this

10   Court to make sure that the enabling amendments for PCCEP to be

11   built and to flourish are approved and that the question of is

12   it working is left to the parties, to include the AMAC, to

13   determine.  And once the USA sees substantial compliance that

14   PCCEP is working, that that will be brought back before this

15   Court and explained to this Court why it is the USA and COCL

16   have measured that success in the way that they have, both

17   qualitatively and quantitatively.

18         Thank you, Your Honor.

19             THE COURT:  Thank you.  I appreciate those comments.

20         Does the compliance officer/community liaison wish to be

21   heard?

22             DR. ROSENBAUM:  Yes, Your Honor.

23             THE COURT:  All right.

24             DR. ROSENBAUM:  Thank you, Your Honor.

25   Dennis Rosenbaum on behalf of compliance officer.

1            THE COURT:  Welcome, sir.

2            DR. ROSENBAUM:  Your Honor, I thank you for this

3   opportunity to address this matter and report on this.  We've

4   been closely following the development of the Portland

5   Committee on Community-Engaged Policing, or PCCEP.  We believe

6   this model has some strengths not found in the original

7   framing, including the separation of the PCCEP from our

8   investigative work as the compliance officer.  There should be

9   a separate community engagement component that's self-directed.

10  Your recognition and conditional approval of that distinction

11  last year has allowed us to take an independent look at this

12  model of engagement.  Excuse me.  So we can verify some of the

13  comments that have been made here today.

14      Despite a very slow start to all of this and a very slow

15  planning process, we have been impressed with the process used

16  to recruit and select members of the PCCEP.  As you know, two

17  groups facilitated this process, and in terms of recruitment,

18  first of all, they engaged in various serious outcome --

19  outreach efforts, excuse me, that resulted in more than a

20  hundred people applying to sit on the PCCEP with diverse

21  backgrounds.

22      The Selection Advisory Committee of five respected

23  community members was appointed, as you know, by the Mayor and

24  members of the city council, as well, and we consider this a

25  democratic process because the council members are elected by

1  the people of Portland.

2      We have closely observed the work of the selection

3  committee, which met several times to establish criteria for

4  deciding who should be interviewed, weighing all of those

5  factors.  I won't repeat that here.  But it was a very thorough

6  effort.  They interviewed 22 people, and these interviews were

7  done in a manner that was consistent with everyone.

8      When evaluating the applicants -- and we have observed --

9  was there -- the selection committee was candid, thorough, fair

10  and thoughtful in their observations and deliberations as they

11  recommended potential members and alternates to the PCCEP.

12      Mayor Wheeler, as you know, interviewed these individuals

13  in a transparent setting with others in the room, including the

14  Department of Justice and COCL, and then on -- in September,

15  early, appointed 13 members and two youth.

16      As you've heard this past week, the PCCEP members

17  participated in a retreat and that we participated in to get to

18  know one another.  We coalesced, gained some clarity about

19  their mission, and established organizational structure.

20      My understanding from these observations is that the event

21  was successful and the group is making progress toward

22  achieving these goals.

23      In the near future, as you know, the City is planning more

24  formal training.  We think the ride-alongs with police officers

25  are going to be very helpful so they can understand better the

1   police function.

2        So, overall, we're impressed with the process of

3   recruiting, selecting, and orienting members of the PCCEP.  We

4   feel this process has been what I would call procedurally just,

5   in that the organizers sought input from a variety of sources,

6   treated applicants with dignity and respect, used various

7   methods to ensure that the selection process was fair,

8   including diverse selection criteria and standardized interview

9   questions, and showed concern for the welfare of those who were

10  willing to come forward and participate.

11       So, in summary, we were, you know -- although we were

12  originally disappointed in the amount of time it took to

13  reformulate the community engagement component of the

14  settlement agreement, I have to admit we have been impressed

15  recently with the results.

16       Undoubtedly, some of the challenges for PCCEP will occur

17  when the group begins to hold public meetings later this year.

18  As you know, Portland can be a tough environment for this kind

19  of work, but the -- with continued training and support from

20  the City, this group has the capacity, I believe, to serve as a

21  role model for respectful and healthy community engagement and

22  police-community relations.

23       The City will need to provide the necessary training and

24  resources to the PCCEP to develop the community engagement plan

25  and oversee a citywide survey of community residents that will

1    measure some of the things that folks here today have said are

2    important, along with other community engagement activities.

3        And the PCCEP will need to hear from all segments of the

4    Portland community, and we're counting on them doing that.

5        We offer our assistance, as needed.  As you know, we have

6    produced a number of reports, quarterly reports.  The most

7    recent one just came out October 1st.  A draft for the public

8    to review during the next month on training and early

9    intervention, and we'll make those reports available to PCCEP

10   as needed.

11       And we agree with the recommendation of AMAC and encourage

12   PCCEP to participate in and promote the town hall meetings with

13   the community and seeking the community impact -- impact --

14   input to our reports and on other matters of community

15   engagement.

16       The -- as the city attorney has pointed out, the first one

17   is October 17th at 6:00 p.m.

18       Anyway, overall, Your Honor, I think that I'll close by

19   just saying that we would be comfortable with your approval of

20   the amendments to change the community engagement section of

21   the settlement agreement.  Although, we want to stress that

22   this does not imply that there is substantial compliance with

23   Section IX.  I mean, we --

24           THE COURT:  As of right now, there's not.

25           DR. ROSENBAUM:  Yeah.  And we intend to continue to

1  monitor that, as does DOJ.  So we just want to reassure you of

2  that.  Thank you.

3          THE COURT:  Thank you, Dr. Rosenbaum.  I appreciate

4  your comments and I also appreciate all the hard work you're

5  putting in into this project.

6      In a moment or two we'll take a break, but let me talk to

7  you about where we're going to go after that.  After a

8  15-minute recess, I would like to hear comments from the --

9  from the friend of the court Mental Health Alliance.  And after

10  that, I have a sign-up sheet with eight names on it, and we'll

11  go in this order, and I would like folks in this order to keep

12  their comments to five minutes or less, please.  And the order

13  in which you've signed up is the order in which I would like to

14  hear from you.

15      The order is Mr. Dan Handelman.  Kalei Luyben.  Joe Walsh.

16  Lightning, Philip Wolfe, Debbie Aiona, Kristin Malone, and

17  Linda.

18      I will remind you of those names when we come back from

19  our break, but that's the order in which I plan on calling on

20  you after I hear from Mental Health Alliance.

21      After I hear from those eight individuals -- and, by the

22  way, I think we'll be able to complete this by -- I'm sorry,

23  before our lunch break.

24      So, Jill, if you plan on doing what you need to do,

25  whether it be yourself or with assistance, I think we'll be

1  able to complete this before our lunch break.

2      And then after I hear from the final member of the public

3  who signed up, Linda, I would like to hear back from the City's

4  attorney, Mr. Vannier, and you're welcome to argue about

5  anything you wish to argue about.  But let me tell you a couple

6  of the items that I would like you to address so you can think

7  about those and prepare.  And that is -- number one is what

8  does it look like to say we have a fully functioning committee?

9  Along the lines that we've heard earlier, it probably does have

10  some quantitative and qualitative aspects to it.  What's the

11  City's view of what it would look like and how we know that we

12  have a well-functioning committee that's working?

13      Second question, how long after the first meeting does the

14  City realistically think it will take before we might have

15  enough information to make that judgment?

16      So those are the two issues on my mind.  I will, of

17  course, listen to anything else that you wish to say, and then

18  final issue, my mind is still open, but you can read what you

19  want into this, I encourage counsel to look at their calendars

20  for June.

21      We'll be in recess 15 minutes.

22                      (Recess taken.)

23          DEPUTY COURTROOM CLERK:  All rise.

24          THE COURT:  A couple of preliminary matters.  I'll

25  wait for everybody to be seated.

1          A couple of preliminary matters.   First, let me ask.

2    Someone asked during the break, one of the clerk staff, whether

3    a transcript will be available to the public and how to get it.

4    My expectations have been generally that one of the parties or

5    all of the parties have ordered transcripts.

6          Am I correct in that?  And if that's going to be the case

7    here, does that get posted to someone's website so that members

8    of the public who can see it, can see it?  Because the Court is

9    generally not in the business of posting transcripts to a court

10   website.

11         Maybe someday we will be or should be, but we haven't yet.

12   Does anybody know the answer to that?

13              MS. REEVE:  Your Honor, I believe, in the past the

14   transcripts have been ordered.  I'm not aware that they have

15   been publicly posted.  If the Court and the court reporter have

16   no objection to that, the City would have no objection to that,

17   assuming that some party orders the transcript again.

18              THE COURT:  Jill, am I correct that you wouldn't

19   mind, is that correct, if someone orders the transcript?

20   Everybody is looking at you now.

21         Can I ask the plaintiff, the United States, to take care

22   of that, please?

23              MR. HAGER:  Yes, Your Honor.  Happy to do it.

24              THE COURT:  Thank you.  Second preliminary matter:

25   During the break someone expressed a little confusion to me --

one of my staff expressed some confusion to me as to exactly

what did I mean when I told Mr. Karia that I agree with him.  I

just want to clarify that.  I get how important it is that the

PCCEP be given authority from the Court, that the proposal be

approved, that they understand that this is part of the way the

settlement is being implemented, and that's what I meant when I

say, "I agree with you, sir."  I get that that is important.

I didn't hear you say -- maybe I missed it -- that that be

done today.  If you said it and I missed it, I apologize.  That

wasn't necessarily the part that I agreed with, as you can hear

from my questions.

I'm skeptical about whether we should give approval today,

as opposed to wait and see once it gets started.  They haven't

had their first public meeting.  Let's let them have their

first public meeting.  Let's see if it does work.  And I assure

everyone if it works, I'll approve it; if it doesn't work, you

don't want me to approve it.

So I wanted to clarify that that's what I meant when I

said, "I agree with you, sir."  I didn't hear the "today" part

of it.  But one of my staff did hear you say "today," and said,

"Did you really mean today?"  So I'm clarifying that.

MR. KARIA:  Thank you, sir.

THE COURT:  Thank you.  All right.  I look forward to

hearing comments from the amicus and AMA, American Mental

Health Alliance.  And Mr. Chavez.

1          MR. CHAVEZ:  Good morning, Your Honor.  First, I

2    would like to extend the Mental Health Alliance's gratitude for

3    being granted amicus status in this case.  Their voice is an

4    important one to be heard, and we'll -- we're grateful to be

5    here at this table, working on solutions, and fulfilling the

6    intent and goals of all the parties to this settlement

7    agreement to provide a safer, healthier Portland, especially

8    for those suffering from mental illness, as they navigate our

9    city.

10        Much of the changes to the policies and practices of the

11   Portland Police Bureau are necessary.  A change of culture is

12   also needed to ensure the ends that we seek.

13        Allowing this alliance to speak is the first step to

14   changing the culture around the needs of Portlanders with

15   mental illness.  As has been noted, all three organizations

16   have participated at some juncture in the implementation of the

17   settlement agreement, and we look forward to, as amicus,

18   working to relay to the Court the kind of useful knowledge that

19   we have gained through that process.

20        Without delaying our opinion on the amendments at hand

21   today, for that matter, we join AMAC in saying that it is too

22   early for this Court to accept the PCCEP amendments in total

23   finality.

24        To express in more detail our concerns with that, I would

25   like to invite one of our clients, Mr. Jason Renaud, who is

1    part of the Mental Health Commission of Portland.

2            MR. RENAUD:  Thank you, Judge Simon, for approving

3    our proposal, our request, and I just thank you for having this

4    status hearing.  It's been almost -- it's been two years have

5    elapsed since Mayor Wheeler resigned the members of the COAB

6    that we discussed, public oversight to the settlement

7    agreement.  But to close observers, the COAB ceased to be

8    effective almost a year before that in the late spring of 2016.

9    That is caused by a lack of training that has been observed,

10   inexperienced facilitation for that particular sort of meeting.

11   Sort of tedious disconnect between the Mayor's office, now,

12   that's the former mayor, and the community concerned with

13   police use of force.  Add to that some frustrated testifiers,

14   political incidences, slow walk by the DOJ to respond to COAB

15   decisions, and the city council not replacing COAB members, and

16   it really seems to have been an intentional mess.

17        There's been not one, but three hearings, here with -- in

18   this courtroom with no public oversight, and the Court -- I

19   think you knew that they were off the rails long before

20   Mayor Wheeler stepped in.  That's at least 600 days of

21   noncompliance, as everyone has agreed upon, observed by this

22   court.

23        So the work now with the COAB is probably lost.  Unless

24   the PCCEP members demand the review of the work and use it, the

25   time spent by COAB members will be wasted, and we're -- worse,

1    the work of the COCL, from 2014 until now, must also be

2    reviewed by the PCCEP members and understood and incorporated

3    into their future work.

4         The PCCEP members are really stepping in the middle of a

5    river.  I've met with the members of the COAB, and I've just

6    recently had a chance to meet with most of the members -- at

7    least get introduced to most members of the PCCEP.  And there's

8    a significant difference between the two committees.  The first

9    came through -- basically through recruitment.  And the second

10   came basically through application.  And the skill sets, the

11   experience, the notability, the community recognizability

12   and -- are quite different.

13        One committee had no training and professional meeting

14   facilitation.  This committee will have professional training

15   and no meeting facilitation.  There's no governance set for

16   this committee.  There's no chairperson.  There's no complaints

17   or appeals process.  There's no, sort of, structure about how

18   the committee will function, and that was largely where it

19   derailed the COAB.

20        By comparison, the scope of the PCCEP's work has been

21   limited, yet widened to include issues beyond harmed people

22   with mental illness by police, this -- the scope of this

23   settlement.  So perhaps their work has gotten harder.

24        I'm interested in the PCCEP because three brave

25   applicants, selected by Mayor Wheeler, identified themselves to

1    him as people with mental illness and/or addiction, just like

2    those described in the DOJ findings.

3        Those three persons have an extraordinary interest in the

4    success of this agreement.  They represent the interests of

5    tens of thousands of Portlanders just like them, and I ask to

6    speak regularly to this Court to the credibility and value of

7    those voices that are going to provide some oversight to this

8    agreement.

9        If those three persons -- two of whom are in this room --

10   don't believe they are safe in calling at least for help, then

11   this agreement has not been successful, if you want a

12   qualitative measure of our feeling safe with police officers.

13       Second, I'm also concerned about unity.  Unity is a basic

14   part of this agreement, sort of a facility that started after

15   the agreement was written, and it's been a lot of trouble, and

16   it's necessary that we have these enhanced mental health

17   services, but -- well, here is what I don't know:  I -- I don't

18   know why Legacy hasn't responded to the March 2018 OSHA report

19   that there were hundreds of assaults by patients against staff

20   members.  So I don't know how that happened.  I don't know what

21   it represents.  I don't know how or if it was remedied.  I just

22   don't know.

23       The Oregon Health Authority, as you've read in the news,

24   closed Unity in July in response -- well, partially closed it

25   in response to media reports about deaths at Unity.  I don't

1   know why the authorities didn't do something earlier because

2   they knew these deaths had occurred weeks and months before.

3   They knew that these assaults were occurring.  They knew that

4   there were other clinical and design deficits at Unity that

5   were unaddressed.

6        Now, Unity is still in jeopardy of being closed by the

7   feds, and there is no plan B.  I don't know why the Oregon

8   Health Authority and Multnomah County not working on an

9   alternative to Unity.  They're not.  The catch phrase is "It's

10  too big to fail."  At this point, that's poor management.

11       Courts and physicians should not have to send fragile

12  people needing help for psychiatric illness to rooms where

13  hundreds of assaults have occurred.

14       Multnomah County has suspended senior staff in the mental

15  health division, launched an internal investigation to

16  determine why the division stopped investigating complaints.  I

17  don't know why and the State doesn't know why and the County

18  doesn't know why the County stopped investigating patient abuse

19  complaints.  Allegations of abuse.

20       The County has also started an audit of the mental health

21  division.  That should be interesting.

22       I also don't understand why Unity has been connected in

23  this case so closely to the ideal of a drop-in -- drop-off or

24  walk-in center.  It doesn't conform to the common standard

25  definitions of those.  We'll be going away from the -- coming

1    back with some writing to define those better for you based on

2    other comparable miles.  Thank you.

3            THE COURT:  Thank you very much.  I appreciate the

4    contributions from the Mental Health Association Alliance.

5            MR. RENAUD:  I would like to introduce my colleague

6    Bob Joondeph also.

7            THE COURT:  Welcome, Mr. Joondeph.

8            MR. JOONDEPH:  Thank you, Judge Simon.  Thank you

9    very much for allowing us to have this status before you.

10   Disability Rights of Oregon has become involved in this way in

11   the case even though we have been very involved with the case

12   in other ways over the years.  In fact, we have been involved

13   with police issues in Portland for over 30 years in various

14   ways.  And during that time, all of those years, I really

15   believe that everyone has worked, as you have said, in good

16   faith and have worked hard in order to address these issues,

17   and I think the complexity and difficulty of these issues are

18   reflected in the fact that they're still here working on it.

19       The -- when the settlement agreement was arrived at, we

20   were thrilled.  We think that the settlement agreement is an

21   excellent agreement.  And what it focuses on, as you know, of

22   course, is the treatment of people who have mental illness and

23   perceived mental illness in our community.  There are aspects

24   of the settlement agreement that talk about police practices,

25   but also there's a very important part, as Mr. Renaud was

1    addressing, that talk about the need for adequate mental health

2    services in Portland.

3        We understand that there's different enforcement abilities

4    for those two portions of the settlement agreement; however, I

5    think it was -- it's said in that agreement and it's been

6    acknowledged repeatedly that the success of one is dependent on

7    the success of the other.  And this is really why the Mental

8    Health Coalition has coming together -- or the alliance, I

9    should say, has come together because we are concerned that the

10   attention to the mental health services and how police

11   interacted with that particular community could possibly be

12   diminished as the -- as the case goes forward.

13       It's been noted that the question before you is whether

14   amendments to this settlement agreement are fair, adequate, and

15   reasonable, and we think it's premature to make that judgment

16   at this point, and I'll explain why.

17       In fact, it might have been represented by some comments

18   by the parties today.  I believe Mr. Hager said that the --

19   the -- as we look at the settlement agreement today, we have

20   the agreement and the amendments, but then we have an attached

21   document that's from the parties about how this new PCCEP will

22   operate.

23       When I look at the amendments themselves, I was unable to

24   find the phrase "mental illness" in those amendments, and there

25   doesn't appear to be any direct reference to those amendments,

1    in terms of the tasks that the PCCEP was supposed to take on.

2         When you take a look at attachment, it does talk about

3    that, and it does have some of the qualities that have been

4    mention today, and we appreciate those.

5         However, as Ms. Reeve pointed out, the way it's been

6    presented to you allows the parties to amend without delay, to

7    change the terms of the agreement without delay, so that it can

8    be nimble, and that is a desirable quality.

9         However, our concern is that that can mean because PCCEP

10   is, as people have expressed it, a type of democratic process,

11   which has been articulated as being positive, and we agree with

12   that.  However, we view this as a civil rights action that is

13   specifically designed to enforce the civil rights of people

14   with mental illness.

15        Part of the problem, I believe, over 30 years we have

16   worked on this, is that sometimes the democratic process

17   doesn't put the energy into the needs of traditionally

18   disadvantaged populations in our community because it

19   represents a broader voice.

20        So that brings us to conclude that there still needs to be

21   clear judicial oversight over the settlement agreement, which

22   is designed to address the civil rights of people with mental

23   illness.

24             THE COURT:  It was originally brought as a civil

25   rights complaint, settled as a civil rights complaint for the

1   settlement that required continuing court availability.

2            MR. JOONDEPH:  And so, just to conclude, I would say

3   that your questions about how will we tell if it's working, the

4   one thing that wasn't mentioned, that might be included in one

5   way, is how is it working for people with mental illness?

6            THE COURT:  Good point.

7            MR. JOONDEPH:  Thank you, Your Honor.

8            THE COURT:  Thank you, Mr. Joondeph, I appreciate

9   that.

10       All right.  What we're going to do next is hear from the

11   nine folks.  There was a last-minute addition to the list.  The

12   order, again, would be Mr. Dan Handelman, Kalei Luyben,

13   Joe Walsh, Lightning, Philip Wolfe, Debbie Aiona,

14   Kristin Malone, Linda, and Ann Casper.

15       Again I would ask that the comments be made from the

16   podium to the Court.  Please address your comments to me, and

17   also please keep your comments to five minutes.

18       Mr. Handelman, where you, sir?

19            MS. REEVE:  Your Honor, if I may, Mr. Lee --

20   Brandon Lee, one of the facilitators, would like to speak, but

21   didn't sign up on the sheet.

22            THE COURT:  I'll add Mr. Lee to the end of the list.

23       Good morning, Mr. Handelman.

24            MR. HANDELMAN:  I would like to note that in the past

25   we've had multiple members of our group testify for you, and

1    there are three of us here today.  I'm hoping that you might

2    indulge me for ten minutes, rather than five, so that I can get

3    the comments in that we have prepared collectively.

4          THE COURT:  Let's see how it goes, but don't speak --

5    but don't read quickly.

6          MR. HANDELMAN:  The more you limit me, the faster I

7    talk.

8        Okay.  Judge Simon, Portland Copwatch sent in written

9    comments and presented at the Fairness Hearing in April about

10   the status of the settlement agreement.  We recognize that

11   today's focus is on the community engagement part.  We are

12   updating some of the comments.

13         THE COURT:  Hold on for a second.  You're going to

14   wear out our court reporter.

15         MR. HANDELMAN:  Okay.

16         THE COURT:  You can read slowly.  I won't limit you

17   to a strict five minutes.  I will make it reasonable, but

18   please read slowly.

19         MR. HANDELMAN:  We are focusing these comments on the

20   community engagement part, and this is based on our

21   observations of public documents and meetings.  These comments

22   are not being made on behalf of the AMA Coalition.  We also

23   take note and it was mentioned briefly before that this Sunday

24   the Portland police killed the third young African-American man

25   in two years.  Most of the people who have been killed by the

1    Portland police, since the DOJ came to town, have been in

2    mental health crisis.

3        Also, the PPB used a chokehold at the end of August, which

4    we believed had been banned in 1985 after an African-American

5    man was killed by the same move.  So we mentioned previously

6    that many of the changes made to the PCCEP were made behind

7    closed doors.  The AMA Coalition was not always invited to be

8    part of those discussions.  And I should add that part of the

9    delay in getting those discussions moving was that the City had

10   filed -- I don't have to remind you of this, Your Honor -- had

11   filed an objection to the Court asking them to come to an extra

12   status agreement, which made your own role in this left in

13   question.

14       THE COURT:  Everyone is always welcome to appeal.

15   That's part of our process.

16       MR. HANDELMAN:  I know they're welcome to, but that's

17   partly what caused the delay, and I don't want that to go

18   unmentioned today.

19       So our concern about lack of community engagement, when

20   we're trying to find how police are going to engage with the

21   community, is of key importance.

22       When city council inducted the members of the PCCEP last

23   week, the Mayor did not allow public testimony at council.

24   It's ironic when we were taking about how to improve community

25   engagement.

1    We support the mental health alliances we found.  And
2 amicus status will help open up the discussion to more members
3 of the public.  We were kind of alarmed at seeing the Portland
4 Police Association and the DOJ's opposition, in light of the
5 fact that Your Honor invited people to apply for amicus status
6 at the hearing in April.
7    On to the community engagement concerns.  It would be
8 appropriate for the Court -- inappropriate for the Court to
9 accept that the City has met its obligations to create a new
10 COAB replacement.  Since the body was deactivated 611 days ago,
11 there's been no meeting of a new civilian board in those
12 611 days.
13    The PCCEP is now in the middle of its orientation and not
14 expected to have its first meeting until November, as you know.
15 That will be 21 months since COAB was dismantled.
16    Various oversight bodies that are supposed to improve
17 police behavior and accountability listed in the agreement have
18 either fallen apart, which is a community police relations
19 committee and the COAB.  They failed to hold public meetings,
20 which is the BHU Advisory Council and the Police Review Board
21 or to continue to struggle with the lack of powers for
22 transformative policy recommendations.  The Citizen Review
23 Committee and the Training Advisory Council.
24
25    The shootings and the violence, particularly at protest

1    actions, are continuing, despite the existence of all these

2    committees.

3        Specific to the PCCEP structure, we believe the COAB was

4    mostly sound and much of its failure was due to the influence

5    of the COCL.  And it was mentioned already that one of the most

6    important changes made was removing COCL from the board and

7    allowing them to choose their own chair.

8        On that note, we really think that leadership of PCCEP is

9    very crucial.  It doesn't mean that the staff person have to

10   tell them what to do, but they have to remind them of their

11   commitments and obligations they made at previous meetings,

12   hold them to continuing their work on an ongoing basis, and

13   continue pressing forward with the old recommendations made by

14   the COAB and any recommendations the new body makes so that

15   they don't get forgotten from meeting to meeting.

16       To meet the Court's approval, we'd like to see the PCCEP

17   actively functioning for at least six months, and we want to

18   make sure that they can.  And it's here, our -- our criteria

19   that we laid out.  Independently assessing the implementation

20   of the agreement that's acquired of COAB, stated by council in

21   its task list for PCCEP, give feedback on COCL reports at

22   quarterly town halls, hold open meetings, and work -- also, we

23   join the AMAC in being concerned that they're allowed to shut

24   people out based on safety concerns that are not adequately

25   defined.

1    But we do like the fact that the PCCEP now is required to

2    take public comment before voting.  The AMAC mentioned

3    electronic means.  We're very concerned that there was talk

4    about having the public put in a separate room and then the

5    only way they can communicate is by video.  We don't think

6    that's adequate.

7        We want to make sure that new body maintained at the first

8    membership, the six alternate members were not mentioned

9    publicly; although, a member of the MHA was able to get a list

10   that they shared with us.

11       There's no criteria to decide who gets seated in what

12   order; although, we heard some from the City Attorney this

13   morning or how to refill the alternate posts.  This was another

14   problem that led to the downfall of the COAB.

15       They need to engage the entire city council, not just the

16   Mayor, on the progress and changes in the PPB.  They have to

17   help develop metrics to measure possible bias in police stops.

18   And that's actually outlined in that section of the agreement

19   as well.

20       There -- they need to meet with community groups and other

21   advisory boards that are mentioned in the founding document.

22   We would also like to see the PCCEP make a report to the Court

23   before a decision made -- is made about the adequacy of the

24   structure.  And I think Your Honor is hinting at that today,

25   but I think hearing from the members themselves would be

1    useful.

2         Although, it's not tied to the new board, the --

3    envisioned by the agreement of the bureau to present annual

4    reports, we only know that this happened in 2016 after -- after

5    the fact.  It was -- they had poorly promoted public

6    presentations, and there was no report that we can find on the

7    website created in 2017 or 2018.

8         We have repeatedly suggested the public presentations

9    should involve civil rights organizations, provide

10   counterpoints to claims about force, bias-free policing, and

11   people's rights and responsibilities, which are all outlined in

12   the agreement but are not happening.

13        In the absence of an oversight board, the City has been

14   holding monthly committee forums since February.  Only a few

15   were geared to listen to community concerns.  Others seem to be

16   designed to let panelists run out the clock, talking about

17   everything but use of force.  And at the last several, it was a

18   member of the community who used the term "use of force."

19        With regard to timeliness, paragraph 146 required the new

20   board to be selected, trained, and seated to provide the

21   content of a new community service within -- survey, sorry --

22   within four months of the agreement being amended, which would

23   have been in August.  So the City already missed one important

24   deadline.

25        Furthermore, we remind the Court that despite the rosy

1   picture in the COCL's reports, which are created out of whole

2   cloth, a new category of substantial compliance, conditional,

3   the City must attain full compliance and sustain it for a full

4   year to satisfy the terms of agreement.

5       We continue to have many other concerns about the language

6   in the agreement and the COCL's analysis.  We recognize the

7   other concerns are not front and center today.  We hope there

8   will be another -- annual status conference no later than

9   April of 2019 -- though, it sounds like it will be in June --

10  to raise those issues and revisit the PCCEP and look at their

11  progress.

12          THE COURT:  I just have a monstrous trial calendar in

13  April and May.

14          MR. HANDELMAN:  Okay.  I appreciate your giving us a

15  time frame, anyway.

16      Thank you very much, Your Honor.  I think that concludes

17  it.

18          THE COURT:  Thank you very much, Mr. Handelman.  As

19  always, I do appreciate your comments.

20      Kalei Luyben.

21      Welcome.

22          MS. LUYBEN:  Good morning, Your Honor.  I concur with

23  the amicus on the subject of the mental health crisis that's

24  going on in the city right now.  I won't belabor it.  And I

25  also concur with what Dan Handelman has said, and I won't

1  belabor that.

2      What I'm bringing up at this point is the fact that the

3  COAB was not the only noncompliance issue.  The other

4  noncompliance issue was what happened with the investigation of

5  the former chief of police, whose name I won't mention, but you

6  have it in writing in front of you.

7      So on July 26th of 2018 my husband and I went down to the

8  district of -- I think it's called the Oregon Board on Public

9  Safety Standards and Training, and what happened I heard at

10  that meeting is that the City of Portland had sent such highly

11  redacted records and made such obscure points that the -- the

12  committee that was preliminarily charged with reviewing the

13  case thought that there should be no disciplinary action

14  against the former chief.  And their idea was that the press

15  had vastly overstated the culpability and liability of the

16  former chief.  And so the original idea was no discipline

17  whatsoever, and that became a problem of conscience for the

18  chairman of the board of the DPSST, and so he asked and/or

19  directed that the policy committee reconsider.

20      And it felt, to me, like unless we citizens share the

21  burden of responsibility and speak up from our own points of

22  view, then we become culpable with the failure our own

23  democracy, and I didn't want that to happen.

24      I also would like to mention a name, and it's the name of

25  Chris Davis.  He was one of the people that recommended that

1    disciplinary action be taken.  And so you can see from the

2    writing that I've submitted to you that we ended up prevailing

3    but by a very narrow margin of one.  So the certification of

4    the former chief was revoked.

5         But I guess what I really want to say is that part of my

6    duty and my responsibility is to carry the heavy load that the

7    police carry, and this was a heavy load, not just for the

8    police, but certainly for the police, and it certainly would

9    have been, from my point of view, tragic for our new chief of

10   police to have available for double dipping an undisciplined

11   former chief of police hovering somewhat like a ghost over the

12   city of Portland.

13        I just wanted to call this to your attention because there

14   are really serious legal issues that we citizens have to deal

15   with, and though the Mayor of Portland would like to have a

16   cheery PCCEP with wonderful activities for our community

17   engagement and I totally support cheerfulness on the part of

18   all of us, there still needs to be someone -- I won't name any

19   names, but I will -- I will address myself to you.  There

20   still --

21             THE COURT:  Someone who's grumpy.

22             MS. LUYBEN:  I join you in that one.

23        But I still require that you maintain control over this

24   case.  Thank you, Your Honor.

25             Thank you, Ms. Luyben.

1        Mr. Walsh, welcome.

2        Mr. Walsh, do you want a chair?

3            MR. WALSH:  What, sir?

4            THE COURT:  Would you like a chair?

5            MR. WALSH:  No, Your Honor.  I'm going to be short.

6   As we get old, we shrink, so I'm getting shorter.

7            THE COURT:  Well, if you change your mind and want a

8   chair, Mary will bring you a chair.

9            MR. WALSH:  The first COAB meeting there were about

10  200 people at that meeting and most of them were citizens.

11  They were not activists.  And they lined up and they expressed

12  the problems that they were having with the police department.

13  And all of the activists that I knew who were really excited

14  because we like citizens that come and tell their stories, so

15  we get tired of fighting, and sometimes we need to rest.  And

16  we want the citizens to say, "I ran into this police officer,

17  and he was rude," or "I ran into this police officer and he was

18  delightful."  We need to hear that.

19       The next meeting of the COAB, there were about a hundred

20  people that showed up.  And we were worried.  What happened?

21  It should be going the other way.  Because you asked the

22  question, Your Honor, how do we know it's succeeding?  And when

23  we know it was succeeding is when we have more people come to

24  the meetings, that we do outreach, that we don't hide in the

25  darkness, but we only had a hundred.

1    At the third meeting, there were less than 50, and the

2    fourth meeting it was the activists.  And we were outraged.

3    And we kept saying, "What are you doing?"

4    And then we found out that the people that were giving

5    their time on the COAB could not even get a stipend.  It was

6    totally volunteer.  But the head of COAB was making a hundred

7    thousand dollars a year.  Then we got really outraged, and we

8    said, "What are you doing?  How can you justify that?"  You're

9    going to do it again because the people that are on this

10   committee are not getting stipends.

11   Now, look, folks, you can figure out a way of giving them

12   a stipend.  Cover their costs.  Whatever.  They put in more

13   than 30 hours a week; for God sakes, give them a stipend.  You

14   created a committee to fail.  That's what COAB was.  It was

15   created, Your Honor, to fail.  They did everything to fail.

16   COAB did their jobs.  They submitted a hundred recommendations.

17   A hundred.  Where are they?  Nobody knows.  Where are they,

18   Your Honor?  They've acted on one.  Rosenbaum acted on one.

19   The way it was set up, my understanding of this, and I

20   could be wrong, was that COAB was submitted to the COCL and the

21   COCL was submitted to the Justice Department and they would act

22   on it.  What happened?  They spent two years working.  I'm

23   sorry.

24             THE COURT:  It's okay.  Be just a little -- a little

25   quieter.

1            MR. WALSH:  I'm really working on lowering my voice.

2            THE COURT:  You've done a good job.

3            MR. WALSH:  They spent two years, two years working

4    on those recommendations.

5            THE COURT:  Mr. Walsh?

6            MR. WALSH:  What did you do with them?

7            THE COURT:  Mr. Walsh, to me.  To me.

8            MR. WALSH:  Yeah.  The activists that I know want so

9    much to bridge a gap between the police and us.  We've reached

10   out.  You haven't.  You haven't.

11           THE COURT:  You need --

12           MR. WALSH:  I get thrown out of every other meeting

13   at city council because -- the last time I got thrown out, it

14   was because the Mayor selected these people without input from

15   the citizens, and the way he did it was he said it was a report

16   and reports do not have to have citizens' input at the council

17   meetings.  It's an option by the presiding official, and he

18   won't do it.

19       So he -- he appointed all these people without any

20   significant input.  Nobody contacted me.  I don't know about

21   you guys and how much you had to say about these appointments.

22   I think the Mayor did it on his own.  I may be wrong, but

23   nobody is saying, "No, Joe, you're wrong."  He appointed these,

24   and as long as that happens, Your Honor, you have to keep

25   jurisdiction.  You have to say, "I'm not approving this today.

1    I've got to watch a little bit longer.  I'm going to see what
2    it looks like to succeed."
3        And you said something the last time I was here that
4    really struck me.  You said maybe what you people need to do is
5    to hold meetings to figure out how to hold meetings.  Has that
6    happened, City?  No.  No.  How many years ago was that?  I
7    don't know.  Two?
8        Has the City, in good faith, reached out to the activists
9    and said, "Let's hold a meeting to figure out how we can get
10   along"?  Just that one concept.  Have you done that?  No.  But
11   everything is okay.  Eight years ago you shot Keaton Otis --
12              THE COURT:  No, we're not going to go into that.
13   We're not going to go into that.
14              MR. WALSH:  Pardon?
15              THE COURT:  It's been about seven minutes, sir, if
16   you would please wrap it up.
17              MR. WALSH:  Okay.  I'm going to wrap it up right now.
18       Eight years ago you shot Keaton Otis 30 times; hit him 20.
19   Someday it will happen again.
20       So when you ask the question, Your Honor, how are we
21   doing, my answer is how many shots were fired Sunday night and
22   why?  And then decide how we're doing.
23       Thank you for your patience.
24              THE COURT:  Thank you, Mr. Walsh.  Thank you for your
25   comments.

1          Lightning.

2          Good morning, sir.

3          LIGHTNING:  Good morning, Your Honor.  My name is

4    Lightning.  On Section IX in the contract settlement agreement

5    itself, I think, pertaining to PCCEP, we need to give it about

6    a 12-month time frame and come back and really analyze on how

7    it's working.  One of the points on PCCEP and really what we

8    want to do is -- the outcome we want to see is that I want to

9    give -- just from my position, I think the Portland police are

10   making strides in a positive manner on dealing with the people

11   that have a mental illness or the perception of that.

12          I think they're beginning to have a more deescalation-type

13   process on letting people kind of voice their concerns and --

14   and don't react too fast.  Kind of have a -- an understanding

15   that people out in the community might not express themselves

16   in what some people consider to be normal in the community,

17   might have anger issues that seem to be inappropriate to some

18   people in the community; but, I think, the police are beginning

19   to process that with their training and understand that

20   sometimes a more relaxed "at ease" approach is beneficial for

21   all parties involved.  I think in the community we're seeing

22   that, so I will say that about the police at this time.

23          Now, knowing that there's many more improvements to be

24   made, I think Unity Center was a positive direction to go.  I

25   think what we are experienced in seeing at the overall

1    situation at the Unity Center is that we have a much more

2    complicated situation out on the streets and through the

3    communities than we thought we had.  And that's going to take a

4    tremendous amount of training within the Unity Center to

5    understand how to deal with people now maybe coming from the

6    street into Unity Center very angry, very upset, and how to

7    deal with them now in a reasonable manner and understand their

8    needs to, when they go back out in the community, has it been

9    beneficial to go to that Unity Center?

10         As you know, on the LEAD program, which

11   Attorney Underhill -- or District Attorney Underhill has been

12   working on, and it's been pushed through, has been very

13   beneficial.

14         I still want to see, when we're talking the affordable

15   housing issue and implementing more services in those units

16   that we build, as you know, for the mentally ill, for the

17   people with addictions, for people with the need of supportive

18   services added to their current living situation, to prevent

19   that, which, again, isn't necessarily always the police's

20   fault, but to prevent that interaction out on the streets with

21   the homeless person, it's obviously better to have them in

22   housing with supportive services.  And we have already

23   calculated that we save money by doing that.  We save money in

24   the long-term; that they don't have that interaction with the

25   police, go to jail, come back out on the street, and it becomes

1  a revolving-door cycle that we see, and we see that in data now

2  just recently.  50 percent of the homeless are in the arrest.

3      And we have to analyze that and try to solve that problem

4  by getting more housing, which we're doing.  We did the

5  affordable housing bond, the City.  We're working on the Metro.

6  We're working on the supportive housing to implement into those

7  units throughout the communities.

8      And, again, from my position, I really think we have a

9  really good police chief.  I really do.  And I think that she

10 views a lot of this in a very open-minded but almost a caring

11 approach, and I -- I like to see that.  You can see by the way

12 that she responds to certain things that it's -- it's a caring

13 approach also in trying to have an understanding that to really

14 call it community policing, anyone out on the street, under a

15 bridge, on the sidewalk, that is our community.  That -- these

16 are the people we need to begin to possibly lift up at a

17 certain degree, at least, and to be conscious of, you know

18 we're dealing with people out here.  People that need

19 assistance, that need supportive services, that need housing,

20 and we have to take that all in consideration on how we might

21 interact with them.

22     We can't come in aggressive to somebody that's been

23 traumatized for many years.  You just can't do that because

24 their first response is to, you know, push back aggressively,

25 and that's what they've done their whole lives.

1       We're trying to lift them up, trying to have the community

2   show a little bit of acceptance and have the proper services to

3   keep them stabilized out in the community; stabilized, to where

4   they can function in a reasonable manner and live a reasonable

5   life in our city, which we should all be working to help them.

6       So, again, just on PCCEP, I think it will be very

7   positive.  I like to the direction it's going.  The only

8   concern I've had on this -- I always like a separation from the

9   police commissioner making decisions over PCCEP or who gets

10  appointed, who -- who ends up being on the committees.  I like

11  that independent separation, especially when we're talking the

12  settlement agreement itself on Section IX.

13      Thank you for your time.

14          THE COURT:  Thank you very much.  I appreciate those

15  comments very much, Lightning.   Thank you.

16      Philip Wolfe.

17          MR. WOLFE:  Good morning.  Good morning, Your Honor.

18  It's really nice to see you again.  I'm glad to be here this

19  morning.  Before I proceed, I would like to request an

20  additional minute to allow for the interpreting process.  Would

21  that be okay with you?

22          THE COURT:  Don't worry.

23          MR. WOLFE:  Thank you.  So before I start, I would

24  really like to address Tracy's comments about the PCCEP and its

25  functioning.  It hasn't even been established yet.  I think she

1   needs to take back -- they need to take back that comment.   To

2   say that everything is running well, I don't even think it's

3   functioning yet, and I just want to emphasize that that comment

4   should be redacted.

5        There was also a comment that the COAB was set up, and

6   they had the chair running it, and they stepped down, and then

7   Kathleen took over the process as chair, and then they -- that

8   person stepped down, and since then there's been no one

9   involved.   But I take that a little bit personally and feel

10  offended by that because there were people that stepped up and

11  took -- took that on, even though they weren't paid.

12       And the running chair, there were a lot of people arrested

13  in the community, and then they were also thrown out of

14  meetings, and that's been an ongoing process.

15       But with my time as chair, running that, it didn't happen.

16  And so I think that says a lot in comparison to how it

17  functioned previously.

18       And COAB was really the truly only independent oversight

19  body.   And now with PCCEP, we'll see.

20       With the first rounds, I was interviewed during the first

21  round of the selection process, and I feel like -- and then I

22  was rejected, and I felt like that was a slap to the face

23  because I have been committed in working for the past several

24  years for public safety.   I love Portland.   Portland is my

25  home, and I'm very concerned about the safety of its citizens.

1    And then later, out of the blue, Ted called me in and said
2    I want to have a conversation with you, and I was kind of
3    questioning the selection process and how it was being run at
4    that point.  I didn't -- it wasn't clear what exactly the
5    dialogue would be.
6    But, again, I had a conversation, and it seemed to be an
7    interview.  And then I was denied again, and that was a punch
8    to the stomach.  And I've had a lot of feedback into that
9    process.  But my point is, my concerns about PCCEP is I want
10   you to hold off.  I don't want you to approve anything yet.
11   I'll admit, I'm excited, but I have some nervousness around it.
12   You know, by Ted, the Mayor himself, the police commissioners,
13   and now the running of PCCEP.
14   So I feel nervous and I feel excitement; but for the
15   citizens and the public, this person is not a well-liked person
16   who is running it, and I'm wondering how that is going to
17   impact the process.  So I have some concerns.
18   And then on the 4th, I was involved with the protests, and
19   the police did attack the community for no reason.  And there
20   was a police shooting, and I understand there was about a 45 --
21   a line of about 45, and then there was something that was
22   lethal -- sorry.  Just one moment.  The explosive device, the
23   flash-bang device that was used for crowd control, the angle of
24   how that was shot was considered lethal and there was lots of
25   documentation, photos and videos that were taken, and while the

1  chief of police -- first, I want to recognize that the chief of

2  police and the chief deputy, thank you for coming in without a

3  gun.  It's makes me feel like we're on the same playing field.

4  We're equals.  So I want to recognize that I appreciate that.

5     But having a conversation with an ultraconservative

6  person, their comment was blaming the community for starting

7  the uprising.

8     And since that, it's been about two months from what

9  happened, there's been no proof or anything.  There's no

10 investigation that's been completed.  And for the chief of

11 police to blame that on the citizens for the uprising -- I

12 understand from what's been going on, there's really no trust.

13 No police accountability.  And three people have been killed

14 three year by police.  Two of them black men, black people, and

15 then the other one was in mental crisis.

16    And excessive force has been used.  It's been escalated.

17 And so my question is with all of this going on, all of these

18 issues still coming up without the investigations, without the

19 accountability -- and I -- I -- I think it's pre-PCCEP.

20 There's been six different meetings, and the numbers have

21 dwindled in those last six meetings.  And last time there were

22 only ten members from the community that showed up, myself

23 being one of them.

24    So I think you need to take a serious look at the process,

25 at what is going on before you make your final determination.

1    I think there's still no trust from the community in the PCCEP

2    that's been established.

3        I have pictures here that show the protests from the 4th

4    and the police lined up and looking at the community, not

5    looking at the opposing -- the Proud Boys, the opposing

6    protesters, and the angles of the gun are show -- of the

7    explosive device are shown here in this photo as well.

8        And then reporter Doug Brown was filming, and the police

9    were attacking the reporter, and that's just not acceptable.

10       And this shows -- this was pictures from the ER.  There

11   was injury to the back of the person's head, and they had

12   said -- the ER said, "If it wasn't for wearing a helmet, you

13   would be dead."  And that's a big concern.

14       And this is a picture of chemical burns.  Chemical burns?

15   This is warfare.  This is not just controlling your population.

16   And looking at this happening, I -- I envision this happening

17   again at future protests.  Will things like this continue to

18   happen?  When is this going to change?  When is it going to

19   improve?

20       And how can PCCEP improve the situation if there's no

21   trust in that body, and that's one -- I did a protest

22   through -- or a complaint through an independent police review.

23   And, really, I would love to have an opportunity with you,

24   Chief Outlaw, to bring things into alignment and work with the

25   DPST -- DPSST and police training.  I'm a community member.  I

1    live in downtown.   I see the police every day.   I study them.

2    I've taken film.   I've taken photos.   And I have a unique

3    perspective just from my experience living here in Portland.   I

4    would love to have a dialogue with you around what I -- what

5    I've seen, and I'm hoping that one day we can truly sit down

6    and have a heart to heart.

7        I'm not here to attack you.   I'm not here to cause unrest.

8    I just want to -- you, Your Honor, to take this all into

9    consideration before you make this final approval.

10        Would you like me to provide you with these photos?

11            THE COURT:   No.   I saw them when you held them up.

12   And I don't want to turn this into an evidentiary hearing that

13   decides specific issues like that.   But I do very much

14   appreciate all of your comments, Mr. Wolfe, and, as always, I

15   appreciate you being here.

16            MR. WOLFE:   Thank you, Your Honor.

17            THE COURT:   Debbie Aiona.

18        And, Ms. Aiona, I received and read the letter from you

19   and the League of Women Voters, so I thank you for that.

20            MS. AIONA:   Thank you.   Thank you, Your Honor.   I'm

21   Debbie Aiona, spelled A-I-O-N-A, representing the League of

22   Women Voters of Portland.

23            THE COURT:   Sorry.   I mispronounced your name.

24            MS. AIONA:   That's okay.   Took me a while to learn it

25   too.

1        The League has mixed feelings about whether the Court

2   should lift conditional approval for Section IX of the

3   settlement agreement.  It is our sense that the Court expected

4   that the PCCEP would be up and running by now, but the

5   committee has yet to hold its first public meeting.

6        The City has, however, made significant improvements to

7   the plan with community input and has devoted considerable

8   effort to the recruitment and selection of committee members.

9        It appears the City is on the right track.  But until we

10  have seen the committee in action, final approval is not

11  merited.

12       The League is several items to highlight regarding the

13  PCCEP plan.  The updated plan places as greater emphasis on

14  open public meetings.  As an organization that values informed

15  and active participation in government, the League believes

16  this practice is an essential requirement for any public body.

17       We understand that committees quite often prefer to

18  conduct team building and bonding sessions in private, but

19  trainings on the history and content of the settlement

20  agreement and the responsibilities of public officials should

21  be open to the public.

22       These provide valuable learning opportunities for

23  community members and benefit the City in the long run by

24  improving the quality of informed public participation.

25       The plan does not describe designated committee member

1   alternates.  It was good to hear that the City has identified

2   six people to be alternates; however, that process -- that part

3   of the process should be included in the plan, and we also urge

4   the City to keep those 13 seats full at all times, you know,

5   give or take.

6       We commend the City for including interactions with the

7   community and settings other than traditional committee meeting

8   but encourage the PCCEP to hold regular meetings where policy

9   matters are discussed and deliberated and the public is invited

10  to provide comment.

11      Staff support should enable the committee to more

12  effectively carry out its duties.  It is our expectation that

13  this support will include staff drafting of reports at the

14  committee's direction and with their final approval.

15      The League is particularly supportive of the following

16  provisions.  Subcommittee meetings will be open to the public,

17  public comment will be taken before committee votes.  PCCEP

18  will meet with the Police Commissioner, Chief, and other key

19  officials at least twice a year.  Recommendations will receive

20  a City response within 60 days.  The Mayor's office will

21  produce annual reports on the committee's work.  The committee,

22  with mayoral approval, will have the authority to review and

23  comment on police bureau directives outside the usual two-year

24  cycle.

25      We also have comments on a couple of other items.

1        The monthly public safety meetings organized by the

2   Mayor's office have been extremely valuable both in terms of

3   information and dialogue.  The League encourages their

4   continuation, perhaps on a less frequent basis, once the PCCEP

5   is meeting regularly.

6        Finally, at the April 19th Fairness Hearing, the question

7   of internet access to all the information related to the

8   settlement agreement was raised.  The Court indicated an

9   expectation that the City or COCL would maintain a website

10  where the public could find all the relevant information.  Our

11  volunteers who worked on this memo can tell you from firsthand

12  experience that we needed to visit several online locations to

13  find the relevant documents.

14       In our view, the Portland COCL website would be the ideal

15  location for all of the materials, and we encourage more active

16  and comprehensive management of that site.

17       Thank you for considering the community's perspective as

18  you deliberate on the next steps in this process.

19            THE COURT:  Thank you very much, Ms. Aiona.

20       I thought when we talked about this last time that all the

21  materials were available on the City's website, or where did

22  you tell me they were available?  Do you recall?

23            MS. REEVE:  I believe the compliance materials,

24  Your Honor, are available on the COCL website, and the intent

25  is, as the PCCEP is up and running, to have all the PCCEP

1    materials available there but to link to the COCL website.

2              THE COURT:  Thank you.

3         Kristin Malone, please.  Welcome.

4              MS. MALONE:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MS. MALONE:  My name is Kristin Malone.  I'm the

7    Chair of the Citizen Review Committee.  We appear actually in

8    Section VIII of the settlement agreement, so I'm sorry if I'm a

9    bit off topic.  I've come here today because the settlement

10   agreement is being positioned as a barrier to improvements to

11   the police oversight system in ways that the CRC at least

12   doesn't believe are founded, and because this is an opportunity

13   to stand in front of most of the relevant people who could sort

14   that out.

15        Specifically, the CRC has recommended not for the first

16   time a change to its standard of review on which it hears

17   appeals of officer misconduct.  The CRC currently is required

18   to defer quite significantly to the responsible unit manager of

19   the accused officer in reviewing findings.

20        So while we are an advisory body, most often the chief is

21   not getting our advice.  This refers not just to questions of

22   what happened or did not happen, but what the policies mean and

23   how they are interpreted.  This has extended, for example, to

24   questions to whether accidental cycles of a Taser were in

25   compliance with a policy that said each cycle of a Taser must

1    be separately justified.  That case was actually appealed all

2    the way to city council.  And city council, using our same

3    standard of review, decided that they needed to defer to the

4    interpretation offered by the Bureau of Management.

5        So in our capacity in our ability to advise, we have

6    requested that our standard view of review would be changed.

7    Our standard of review is mentioned in the settlement agreement

8    as a definition.  That's definition 61.  And then again in

9    paragraph 135 CRC appeals, which says simply the City and PPB

10   agree that the CRC may find the outcome of an administrative

11   investigation is unreasonable if the CRC finds the findings are

12   not supported by the evidence.

13       We believe that the agreement should function and should

14   be recognized as a floor, not a ceiling, to the citizen

15   oversight.  And in our conversations with city councilors, we

16   have received support for the principle behind our change, but

17   the response has been a fear that the settlement agreement

18   doesn't allow it.

19       So I -- I guess I would just appreciate the guidance of

20   the Court, if possible, or any people in this room who would

21   like to work it out.

22           THE COURT:  Let me ask you a question or two in

23   follow-up.

24       Have you put that -- or has the CRC put that request and

25   proposal in writing with the City?

1          MS. MALONE:  Yes.

2          THE COURT:  And dated when?

3          MS. MALONE:  Dated several months ago.

4          THE COURT:  Okay.  Have you received a written

5    response from the City or the United States?

6          MS. MALONE:  No.

7          THE COURT:  In a few moments, or later today in this

8    hearing, I'm going to ask them, "Did you receive it?  Do you

9    plan on responding?  What's the right process?"

10        But I also encourage you at our next hearing to come

11   forward and let me know what's happened between today and the

12   next hearing on this question.

13        Let me just invite either the City or the United States

14   now, if you wish, anybody have any comments or questions on

15   this particular issue?  I don't want to spend too much time on

16   it.

17        Mr. Geissler?

18        MR. GEISSLER:  Your Honor, the United States has not

19   received a written request.  Rather, I believe, the request

20   went to the City.  The City should opine upon that request,

21   should consider whether or not it complies with the city code,

22   and whether or not the City wants to ask for an amendment to

23   the settlement agreement and present that to the United States.

24        THE COURT:  Thank you, Mr. Geissler.

25        Anything from the City at this time?

1        MS. REEVE:  Your Honor, I'm aware that the request

2   has been made.  I'm not in receipt of the written version of

3   the request, and the -- the -- in addition to the settlement

4   agreement issue, there are bargaining issues, and I would let

5   Mr. Karia address that if he wishes to.  But it would be a

6   change that would likely have to be bargained with the Portland

7   Police Association.

8        THE COURT:  Any comments you wish to make, Mr. Karia?

9        MR. KARIA:  Yes, Your Honor.  Just to reiterate what

10  Ms. Reeve said, yes, there are bargaining obligations from our

11  standpoint, and we did provide Ms. Malone, along with

12  Chief Outlaw and -- excuse me -- the IPR Director Severe a

13  letter responsive to the discussion laid out our -- the

14  association's thoughts on the general subject.

15      So there has been some dialogue and some healthy dialogue

16  to include representatives of the association meeting with

17  representatives of the CRC.

18        THE COURT:  Ms. Malone, did you receive a letter from

19  Portland Police Association?

20        MS. MALONE:  Yes.  And the CRC views there being two

21  barriers here.  One is the settlement agreement and one is the

22  bargaining issue.  So either one of them.

23        THE COURT:  It's pretty significant hurdles to

24  overcome.

25      On the settlement issue -- here is what I would suggest to

1   you, and you are welcome to let me know at our next hearing how

2   things are developed.  Provide copies in writing of whatever

3   you want, feel free, to the attorneys of record in this case.

4       My courtroom deputy can make sure you have the email

5   addresses.  It's also, I think, on the docket -- electronic

6   docket sheet for this case.  But provide that to them,

7   including the friends of the court -- besides the intervenor,

8   Portland Police Association; friend of the court AMA; and our

9   new friend of the court, the Mental Health Alliance.

10      And to the extent that an amendment to the settlement

11  agreement is needed and appropriate, they are the parties that

12  know how to present that amendment to me.  So that would be

13  step one.

14      To the extent that this is an issue that requires

15  bargaining with the Portland Police Association and the City,

16  as I think we discussed about four or five years ago, there's

17  not a whole lot I can do about that, except under certain

18  circumstances under this settlement agreement, and we're not

19  there yet.

20      Does that make sense?

21          MS. MALONE:  Yes.  I guess I was just trying to get

22  clarity on whether it's even worth bargaining if it would or

23  would not violate the settlement agreement.

24          THE COURT:  That is a question to which I cannot

25  answer.

```
 1          MS. MALONE:  I would say I have some paper copies of
 2   our proposal here today.  I will be in the back.
 3          THE COURT:  You're welcome to deliver paper copies to
 4   counsel of record, including for the amicus.
 5       Thank you, Ms. Malone.
 6          MS. MALONE:  Thank you.
 7          THE COURT:  Linda.
 8       Linda, I did not get your last name.  If you want to give
 9   it to us, you're welcome.  If you would rather not, you don't
10   have to.
11          MS. SENN:  We've moved into afternoon, Your Honor.
12          THE COURT:  Okay.  Not yet.  I can still say good --
13          MS. SENN:  Still good morning.
14       For the record, my name is Senn.
15          THE COURT:  How do you spell that?
16          MS. SENN:  S-e-n-n.
17          THE COURT:  Thank you.
18          MS. SENN:  Thank you, Judge Simon, for this time
19   before you, and I would also like to say thank you to the
20   Honorable Reverends Bethel and Hayes.
21       Sorry.  I'm a little bit nervous.  And I would also like
22   to say thank you that the Mental Health Association was here
23   and said our names.
24       I do want to also extend that I have seen PPB attempting
25   to adjust the way they interact with our community.  As far as
```

1    for the PCCEP, I will woefully ask that Your Honor wait.  I

2    continue to watch the process.  And before approving or denying

3    this committee, that you would be able to use an equitable lens

4    to see that folks that have perceived or known mental health

5    illnesses are being lifted up in this community in what way

6    that is equitable for them.

7        Because our community has felt the lack of compliance by

8    PPB's use of force and continued abuse on our community, Unity

9    being one of the ways that folks with mental health illnesses

10   known or perceived have been extended abuse through PPB that

11   way by placing folks that are houseless, that -- the difference

12   between exhaustion, addiction, and mental health seems to be a

13   struggle for PPB to really understand what that looks like and

14   how our community also receives extended use of force from PPB

15   is something called "BIDs."  Business Improvement Districts.

16   It should just say it all.  It should be said business

17   inclusion districts.

18       And, furthermore, abuse towards our citizens by the -- I

19   don't know how to say it nicely, the use of Wapato as a

20   comprehensive shelter space for people that are experiencing

21   houselessness or small crimes that would -- would have, like,

22   crimes like erecting shelters or illegal campsites that could

23   send people to jail or, as Daryl Turner said, an option to go

24   to Wapato.  Your Honor, I believe the place is still a jail,

25   regardless.

1           THE COURT:  An unused building that was built as a

2    jail that I know a number of people are struggling with to try

3    to figure out what type of effective and beneficial use to make

4    of it.

5           MS. SENN:  I hear you, Your Honor.

6        Furthermore, I was in the streets on Sunday morning when

7    Patrick Kimmons -- I guess it's an investigation, was

8    occurring, where family members were mourning the loss of their

9    loved ones in the streets and witnessed PPB being extremely

10   inappropriate with their behaviors towards the family and the

11   community at that time.

12       Also, PPB, in the evening, put the community and the

13   family at risk in the night asking us to please move our

14   barriers and remove the vigil from the streets when family

15   members were still standing there openly mourning in the

16   community.

17       PPB, then, after community members and family members were

18   engaged with vehicles in the night, where we're not visible so

19   much, after a few folks came into close encounters with

20   vehicles, PPB then said, "Well, we'll allow you to put back up

21   the tape for a little while."

22       I think that when there's mourning in the streets, that

23   PPB should also tilt their hats.

24       There's a lot of things that have brought me to this day.

25   One of them, I think, if you can recall, a few years ago, when

1   I spoke before you about my son and the encounters that he had.

2   Since then, I have moved with our community through different

3   avenues to support by being present at meetings for COCL and

4   COAB and also being present in the community, engaged in

5   different activities where use of force and police brutality on

6   community members is just unacceptable.

7       I also have recently spent the last year as the vice

8   president of the board of directors of Sisters of the Road, and

9   the work we do there is based upon community engagement and

10  community input and community needs and community ideals.

11      If that doesn't give Your Honor a hint that we are a

12  community organizing organization, I think that PPB has reached

13  out to us, and I appreciate that.  But I would also appreciate

14  that PPB would please end this -- please start listening to

15  what our community is saying.

16      Our nation is -- is this seeping wound, so to speak, right

17  now, and our communities really need those that are in lead to

18  support us, and we're just not seeing that.

19      That's all I have to say, Your Honor.

20          THE COURT:  Thank you very much, Ms. Senn.  I

21  appreciate your comments and appreciate you being here again.

22      Final two presenters will be -- and then we'll go back to

23  counsel -- Ann Casper, followed by Brandon Lee.

24      Ms. Casper.

25          MS. CASPER:  I guess it's still good morning,

1    Judge Simon.   We have one more minute.

2              THE COURT:   Good morning.

3              MS. CASPER:   I would like to -- and I didn't get back

4    to you because I didn't know how to.   Last time I was here, I

5    told you I would tell you about peer support.   I didn't know

6    how to reach you.   So how do I get that information to you?

7              THE COURT:   Well, the best thing to do is probably to

8    send a PDF my email to my courtroom deputy, Ms. Austed.

9              MS. CASPER:   I don't have a way to make a PDF.   Can I

10   make it a regular Word document?

11             THE COURT:   Yes.   Just send it to her attention.

12   She'll have it PDF's and scanned, and we'll distribute copies

13   to all of the parties in this case.

14             MS. CASPER:   Oh, thank you.

15             THE COURT:   Anything that comes to me, I really do

16   think it's appropriate to share with all the parties in the

17   case.

18             MS. CASPER:   What's her email address?   Do you know?

19             THE COURT:   Mary will write it down and hand it to

20   you.

21             MS. CASPER:   I just didn't have it last time.   I feel

22   like I had homework and I didn't do it.

23             THE COURT:   That's all right.   No problem.   She'll

24   write it down and give it to you.

25             MS. CASPER:   In the light of peer support, I was

1   asking somebody else, I only saw two support people here.  One

2   person said she couldn't do it because she's part of the

3   committee.  So I asked Jason Renaud to come stand up with me of

4   peer support, and this is part of peer support.  So he is being

5   here holding space for me mutually.  He may not agree with what

6   I say.  So what I say may not be what he thinks.  Just to let

7   you know that.

8        But he is holding safe that on my path -- I'm walking my

9   path, and he's going to hold the path with me.  Okay?

10        So this is part of peer support.

11        First, I would like to thank you for -- I guess you had

12   asked Jared -- what's Jared's last name?

13             THE COURT:  Mr. Hager?

14             MS. CASPER:  Yes, Mr. Hager.  About how many arrests

15   had been done at Unity?  Because I had been searching this

16   for six months and --

17             THE COURT:  And he did supply that information in

18   writing --

19             MS. CASPER:  Great.

20             THE COURT:  -- in the written status report to the

21   Court, and that is available on our website.  If you have

22   difficulty obtaining that afterwards, just contact my courtroom

23   deputy, and she will print you off a copy of the United States'

24   status report.

25             MS. CASPER:  So what we found out -- what I found out

1    is that 30 people at that address have been arrested and taken

2    to jail from the mental health facility.

3        Ten people were confirmed patients.  So we have patients

4    literally taken from the mental health facility to jail.  Two

5    of those I saw personally.  That's why I brought this up last

6    time.

7        And two people --

8              THE COURT:  Ms. Casper, I'd just ask if you could

9    direct your comments to me.

10             MS. CASPER:  Oh, absolutely.  I saw other people

11   doing that too.

12             THE COURT:  I know.

13             MS. CASPER:  It's all good.

14             THE COURT:  And I try and encourage people to make

15   their comments to me.

16             MS. CASPER:  Oh, you know, I get so nervous anyway.

17   Thank you.

18             THE COURT:  I appreciate that.  Have Mr. Renaud stand

19   there.  Please be --

20             MS. CASPER:  Please, more support.  No, no, don't

21   touch.  No.  Stand there.

22       Thanks, Jason.  All right.  Handshake.  Okay.

23       So from that, we found out 30 people had been arrested.

24   That was a shock to me.  I didn't think so many had been.  I

25   helped build the center, and I had been in these centers

1  before.  And ten people, literally patients, two people I saw

2  were actually not patients, and so I know two of them had been

3  in the hospital or tried to get in.  I happened to talk to

4  Sheriff Reese and the jail system, and I said, "Do you have a

5  way to know" -- make sure that the medical records at Unity,

6  people in Unity, are transferred to the jail?  So they're given

7  the same medications.  Because when you're given different

8  medications, you're off kilter and it's even worse.  There is

9  no procedure.

10      In fact, Sheriff Reese didn't even know people had been

11  taken from Unity to jail.  I also asked the top psychiatrist in

12  the jail system, "Do you have a procedure to make sure that

13  these records are transferred directly?"  No procedure.

14      So I would like to -- I don't know if it's PCCEP, who to

15  ask, to make sure that medical records are directed -- and the

16  booking procedure, the psychiatrist said it's up to the booking

17  nurse to determine if they've been.  So what's missing here?

18  Some kind of communication.  Let's make sure that communication

19  happens.  Okay?  I don't know who has to do it, how it happens.

20  Yeah.  Let's just somehow -- if PCCEP, or whoever, let's make

21  sure if you're taken as a patient in a mental hospital to jail

22  that all the records are transferred before you get there so

23  they have your medical things ready for you.

24          THE COURT:  Thank you.

25          MS. CASPER:  Thank you.

1        I would also like to suggest that -- that we get support

2   and money for trauma groups.  So those -- those of us who have

3   been in and out of the mental health systems, which -- and

4   special -- it's different to be put in as a patient, as

5   Jason Renaud said, there have been assaults.  Well, he said the

6   patients had assaulted people.  But if we look at it the other

7   way around, why are they assaulting people?

8        I have one friend who was actually pepper-sprayed as

9   patient in Unity.  She was trying to shield her eyes and get

10  away.  They actually took her to Multnomah County Court and

11  charged her with assault.

12       So something -- something here -- something is difficult

13  here.  So we -- and even I consider myself a Unity survivor.  I

14  was there.  It's so silly.  I helped build it, and I end up

15  there.  But it was the worst treatment in 36 years I've had.

16       So I actually had a hard time even driving by it for

17  six months because I would get so angry just looking at the

18  building.  So I would suggest that the City and the County and

19  somebody get some money for trauma groups.  For those of us who

20  have been through these systems, let us work out our trauma

21  together.

22       Peers are trained in peer support.  We can run our groups.

23  One really good group I've seen run groups over the past

24  30 years is called DBSA, Depression and Bipolar Support

25  Alliance.  Of all the mental health support groups that have

1    been in Portland, they run the best groups.  And they know how

2    to handle people who are not doing well and so -- in the group.

3    And keep things going.

4         So I would suggest through them -- they also work with

5    NAMI and other places.  Let's work together.  Even people who

6    have been with trauma from police, let's work that trauma out.

7    We as peers can work it out together.  We just need some money.

8    We don't have money for food or for places.  You know, we just

9    need -- even for facilitation, we can facilitate it ourselves.

10   We just need that.

11        And let us work out our trauma, so we can work well with

12   everybody.

13        Another thing with the PCCEP, I didn't apply because I

14   looked at the materials and mental health was always number two

15   and number three on the list of things that was being described

16   as.  I'm like, well, I'm really for mental health.  Why isn't

17   mental health number one?

18             THE COURT:  What was number one?

19             MS. CASPER:  I can't remember.  What was number one?

20   Can somebody tell me?  It was -- was it -- I don't know how to

21   say it.  Was it race relations?  I just don't -- I just

22   remember mental health being number three, and I thought, well,

23   I don't really fit in there.  So I'll let other people do that

24   work.

25        And I'm glad we're talking about civil rights, and it's

1    interesting to look at to -- qualitative or quantitative, what

2    Bob Joondeph was saying.  How does it work for mental health --

3    people in the mental health realm?

4         So the COAB, as I said before, only four out of the 44

5    recommendations had to do with mental health.  So as a person

6    in the mental health communities -- there's many communities --

7    not just one -- I would say that's not a very good score

8    that -- if I look at a committee that is supposed to be talking

9    about mental health and only four of the recommendations touch

10   upon mental health out of 44, that's not a good ratio.

11        I was very disappointed with that.

12             THE COURT:  On the other hand --

13             MS. CASPER:  Yeah, go ahead.

14             THE COURT:  There's 27 amendments to the U.S.

15   Constitution and only one of them touches on freedom of speech.

16             MS. CASPER:  Okay.

17             THE COURT:  That's really, really important.  I would

18   urge you don't just count up the numbers.

19             MS. CASPER:  Okay.

20             THE COURT:  That's just my perception.

21             MS. CASPER:  Yes, that's good.  Oh, yes.  Okay.

22   You're right.  Qualitative is also very important.

23        I would also like -- so I've been on this committee.  It's

24   called the Mental Health Subcommittee.  It's actually a

25   committee run by -- it's a long acronym, so be careful here.

1   LPSCC, which is the Local Public Safety Coordinating Council,

2   which is actually chaired half by Mayor Wheeler and half by the

3   Chair of Multnomah County.

4        And I would like Mayor Wheeler, as the chair, through this

5   to ask that this mental health community start meeting monthly.

6   It used to be monthly for about 10 to 12 years, and then it

7   switched to every four months.

8        So what helps, if it meets monthly, these are -- it helps

9   us as peers, as people in the community, know what they're

10  planning, what is going on, and then we get monthly reports.  I

11  just think it would be helpful to get that back to the monthly

12  session.  Otherwise we don't know what's going on.  Through

13  that committee, we can.

14       And I would also like to say I would like to see the CRC

15  reach out to the mental health community.  As a person, I never

16  thought about it until I started coming to these meetings.  I

17  never heard about the CRC.  So I wouldn't even think about --

18  I've been in touch -- well, I've been taken by police twice,

19  and I guess if I had problems, I wouldn't even think about CRC

20  because that's not in my realm.  So how can they reach out to

21  our mental health community?

22       I also wanted to speak about this morning, Linda was the

23  only one who talked about us with the words that I personally

24  agree with, who's talked about people with mental health

25  issues.

1              THE COURT:  Well, but Mental Health Alliance spoke

2      about --

3              MS. CASPER:  What I heard them say is "fragile

4      people" and "disadvantage people suffering from mental health

5      illness."  That's not the language I would personally use for

6      myself.  What I use is "people" first.  "Persons who have been

7      diagnosed with mental health issues," people with -- always

8      "people" first.

9          And, also, if you're going to use "fragile" or

10     "vulnerable," add "resilient."  I heard this from somebody

11     else.  So vulnerable and resilient people.  Fragile and

12     resilient.  Because we're still alive.  We still made it

13     through.

14         I did want to end with a short story.  Yesterday I was

15     coming home, going to my car in the park in southeast Portland.

16     There was a man on the ground.  His friends were around him.

17     Apparently, he had taken an overdose.  I got down and

18     listened -- listened for his -- for his breathing a little bit,

19     and then checked for a pulse.  He had no pulse.

20         So these people did not want to call the authorities, and

21     they were trying to figure out on their own how they were

22     bringing him back to life.  There was no way that was going to

23     happen.

24         So it was really interesting that people who -- he was

25     dead.  He really was dead.

1   And I was -- finally, a woman -- I didn't have my phone

2   with me.  Finally got a woman to call.  She called.  The

3   ambulance showed up later.  First, the fire showed up, police

4   showed up, and I would like to say thank you to Officer Fox.  I

5   don't know if he's a lieutenant or what.  I don't know those

6   titles.  I didn't ask him.  He did very well.  I was very happy

7   to see Officer Fox do that.

8       There was another policeman with him, a shorter man.  I

9   don't know his name.  He did not do so well.  Interesting in

10  the same occasion because the -- the man's friends were very

11  scared and -- scared to even call authorities even to get him

12  back to -- to life.

13      So the -- the other man, the other officer didn't do well

14  because he tried to help encourage a friend to move away from

15  the dead man.  He literally was dead.  And the man didn't want

16  to move away because he was scared of the authorities.  And

17  that man said, "Does that man have a mental illness?"  And he

18  didn't.  He was traumatized.  He was traumatized that his

19  friend was dead.  He was traumatized that the system was there.

20  And it's kind of interesting, but I would like to say

21  Officer Fox did a fantastic job.

22      I did want to say that he came -- through Narcan, he came

23  alive again, and I'm so grateful for that.

24              THE COURT:  Very good.

25              MS. CASPER:  So I do want to say to PCCEP, I'm

1    looking forward to see what happens.  Unity -- I like --

2    Judy Shiprack was a commissioner here.  She had an idea about

3    having different what's called crisis assessment treatment

4    centers.  Little centers around Portland in the areas where

5    people live.

6         So example, when we would take people to the hospital, we

7    didn't take them to Adventist because it was too far out there.

8    We didn't want to visit them.  So we would -- so think about

9    instead of one big hospital, having community hospital places

10   where families are closer, friends are closer, and it matches.

11   Because in Portland we have different communities in different

12   areas, and the mental health treatment matches that community

13   of that area.  I think that would be a lot healthier.

14        But Unity is still there, and we'll just work with it.

15   And I want to thank you very much.

16            THE COURT:  Thank you very much, Ms. Casper.

17        Thank you, Mr. Renaud, for your support.

18        Mr. Lee.

19        Welcome.

20            MS. LEE:  Good morning, Judge Simon.  I wanted to be

21   here today, number one, to introduce myself officially.  I also

22   want to give thanks to all the stakeholders who took the time

23   to be here.  I'm really excited to see the investment of all of

24   those that planned to be here.

25        In light of the time, we do have a committee member from

1    the PCCEP, and, in light of the time, I wanted to know if I

2    could share my time with Ms. Clay to give her personal

3    experience thus far.

4               THE COURT:  Of course.  Of course.

5          Just state your name, please.

6               MS. CLAY:  My name is Yolanda Clay.  PCCEP member.  I

7    just wanted to express -- I -- as a member of PCCEP, I

8    understood the responsibility of becoming a PCCEP member all

9    the way through the application, and then being selected as a

10   member.  And then going through the retreat and the on-boarding

11   process, I developed an even greater understanding of that

12   responsibility both at a micro and macro level.  And I've had

13   the opportunity to meet most of the PCCEP members, and I find

14   that each and every one of them bring a skill set and life

15   experience that will only enhance our ability to work on this

16   important issue with an openness and like mind that will

17   hopefully bring effective and positive results.

18         Thank you, Your Honor.

19              THE COURT:  Don't go away yet.  Number one, I want to

20   thank you in advance for your volunteering and for your service

21   on PCCEP; and, two, I want to add to one of your

22   responsibilities on PCCEP.  At some appropriate time, I am

23   going to ask you and your colleagues on PCCEP whether in your

24   opinion it is now time to give approval to the amendment that

25   establishes and creates the framework for PCCEP.  I'm going to

1   want to know what your opinions are.

2        Sorry to add to your responsibilities, but I'll say in

3   advance that I thank you in anticipation for your insight and

4   your contribution.

5             MS. CLAY:  Thank you.

6             THE COURT:  Anything further, Mr. Lee?

7             MS. LEE:  Yes.  I'll make it brief.  So I won't touch

8   on every point, but I wanted to be able to offer some context

9   to a couple of points that were made.

10       Coming in, we had an initial meeting within our first

11  month with AMAC and other stakeholders together.  And so one

12  point that comes up -- one that comes up often is in regards to

13  electronic -- having community separate from the PCCEP

14  community process in a room, and watching it electronically.

15       Some context:  We were within -- our first month, we were

16  in the middle of recruitment, and so I want to make it clear

17  publicly, and I think I've taken time to reach out to AMAC

18  privately just to ensure that we -- we at the PCCEP

19  facilitators more importantly wanted to create some time and

20  space for the PCCEP committee to form to establish and make

21  sure they had an opportunity to -- to incorporate processes

22  that they thought were best.

23       So we, as facilitators, were not held to electronic or

24  specific particular processes that have come up, and I just

25  wanted to make that clear.  That particular amendment, just so

1   you know, came from a study out of Google that said, "How do

2   you put together the best performing team?"  And one of

3   those -- the most important was to preserve psychological

4   safety.  And so there was a reason why they came out but were

5   not held to that.

6       We were required to and agree with quarterly town hall

7   meetings.  And so the concept of our -- of our proposed

8   community engagement forum was to try to bring some innovation

9   to the typical town hall process that COAB had utilized and

10  other processes had utilized.

11      I'll give you an example from my outreach, particular

12  outreach, I was able to glean insights from vulnerable

13  community members where they were in the community -- not going

14  through community leaders, et cetera -- and were able to bring

15  those insights back to the City to be able to work on policies,

16  et cetera.  And so we see community engagement as a direct link

17  to community oversight.

18      And being from Oakland, we have gone through our own

19  oversight process.  And it took decades, quite frankly, because

20  we had the privilege to begin with recommendations from the

21  COAB.  We need to honor those community members that invested

22  in that process and resulted in recommendations.  So because of

23  that, we weren't -- we felt we didn't have to come in and

24  mandate out recommendations the first year, and, quite frankly,

25  just saw community engagement as a focal point to be able to

1   build on for later dates.  So I just wanted to provide some

2   context to -- and I think -- the last thing that I would like

3   to mention was the purpose of the retreat and training

4   mechanisms -- one thing that we felt was necessary was this

5   community oversight effort is in the nation.  And there are

6   some cities that have been a little bit more progressive and

7   some that are further behind.

8        One thing that we wanted to do in the retreat and

9   throughout this year is to bring our process in alignment with

10  those best practices that have really been supportive for all

11  respective stakeholders.

12            THE COURT:  Let me add to that.

13            MS. LEE:  Yes.

14            THE COURT:  And I appreciate the need for the

15  retreat, the orientation, the training that needs to take place

16  in the beginning and the environment in which it needs to take

17  place.

18       I also heard an interesting comment from one of our public

19  commenters that as we also talk about the history of the

20  settlement agreement and that the needs and objectives of the

21  settlement agreement, which really are multifaceted, you can

22  hear there's a number of different pieces to it, a number of

23  different objectives.

24       The comment that was made was they'd like some public

25  participation into that part of the orientation or training.

1       So one possibility -- and, by the way, I'm not going to

2  micromanage what is done -- but I want to just channel back one

3  of the comments that I heard, and that is that perhaps as you

4  do your orientation, retreat, history, in a relatively private

5  environment for the needs that that environment will foster,

6  there may also be a benefit to doing a part two where we then,

7  as a part two -- maybe, you know, the advanced class on the

8  history and objectives of the settlement -- bring in and invite

9  members of the public to continue that discussion.  And to that

10  extent, maybe one has one's cake and eats it too.

11       Just something to think about.

12            MS. LEE:  I agree.  It's in the works.

13            THE COURT:  Thank you, Mr. Lee.  I appreciate you

14  being here, sir.

15            MS. LEE:  Thank you.

16            THE COURT:  All right.  I will invite counsel for any

17  final remaining comments, and I will begin with Mr. Vannier.

18  And you're welcome to address any issues that you wish.

19            MR. VANNIER:  Thank you, Your Honor.  I will touch

20  upon the first questions from about an hour ago that you asked

21  me.  But, first of all, I wanted to just formally say that the

22  City at this time renews the joint stipulated motion to enter

23  the amended settlement agreement.  And we join in the arguments

24  that were made by Mr. Hager for the United States.

25       In particular, I just want to highlight briefly that the

1    standards for amending the settlement agreement were adopted as

2    part of the agreement itself and were found by this Court to be

3    fair, adequate, and reasonable at that time.   And those

4    standards are governed by paragraphs 172 and 184 of the amended

5    settlement agreement, which specifically pertains to amendments

6    being acceptable if they are necessary to achieve and sustain

7    the intended outcome of the settlement agreement and that they

8    are stipulated to by the parties.   And we have that in this

9    case.   And so, as a matter of law, it is our position that the

10   amendments should be entered at this time.

11         Now, turning to the, I guess, the more general questions

12   that this Court asked earlier, one of the things that has

13   become apparent, I think, through some of the comments here is

14   there is some confusion about what acceptance means.   We are

15   not here talking about whether the City is in substantial

16   compliance with the PCCEP plan or the PCCEP amendments or even

17   whether the PCCEP works at this point, because, as Your Honor

18   knows, the PCCEP has not met at this point, and we understand

19   that.

20         But whether the PCCEP works or whether the City is in

21   substantial compliance is a question of, in fact, compliance

22   under the settlement agreement.   It is not a question that is

23   relevant to the legal determination of whether the settlement

24   agreement should be entered at this time -- I'm sorry, the

25   amendments should be entered at this time.

1          And for the reasons I previously stated, as a matter of

2     law, the parties are entitled to the amendments being entered.

3          Now, at a -- I guess a more substantive level it is also a

4     matter of fairness and clarities, not only to the parties, but

5     to the members of the PCCEP.

6          As Mr. Hager alluded to, what conditional approval means

7     is simply that if, say, six months down the line, if this Court

8     were to decline to enter those amendments on a permanent basis,

9     we then default back to where we are two years ago at this

10    point with the COAB, which is a process that, as Mr. Hager

11    noted, despite the good faith efforts of the parties, had

12    proved not workable at that time.

13          THE COURT:  I don't think that's exactly right.  I

14    don't think it's we default back to the COAB.  The parties

15    disbanded the COAB.  We default back to a situation where the

16    City is in breach -- material breach of the settlement

17    agreement.

18          MR. VANNIER:  That's correct, Your Honor.

19          And so what I'm trying to get to is that there is a need

20    for clarity, not only for the City and the United States, but

21    also for the --

22          THE COURT:  I probably did that.

23          MR. VANNIER:  -- for the PCCEP itself and for the

24    citizens of the City of Portland to know what exactly the

25    parties -- what the City is going to have to be in substantial

1   compliance with.

2       And there's a need for certainty at that point.  The --

3   the PCCEP cannot be in a position where six months from now

4   there is a possibility that it will have the rug pulled from

5   under it.  There is a need for permanency.

6       Now, turning to Your Honor's questions earlier, what does

7   a fully functioning PCCEP look like?  The answer to that is

8   provided by the settlement agreement itself.  It is a PCCEP

9   that in the opinion of the monitor, who is the United States,

10  satisfies the criteria outlined in Section IX of the settlement

11  agreement.

12      Your Honor's question was how long after the first meeting

13  will that evaluation take.  And that's, again, up to the

14  monitor.  That's up to the United States.

15      Now, what I do want to point out as a practical matter --

16  because I understand Your Honor's concerns about not losing the

17  momentum that has happened up to now and having this sort of

18  public conversation about the settlement agreement amendments

19  and the -- and the progress that the City is making towards

20  substantial compliance.

21      Now, as Your Honor knows, we already have a date.  Sounds

22  like it might actually be moved, unfortunately; but we have a

23  date set in April for the next annual status conference.

24          THE COURT:  Let me double-check.

25          MR. VANNIER:  I may be mistaken.

1          THE COURT:  I don't see it.

2          MR. VANNIER:  I thought a date had been set.  I

3    apologize.

4        We will be back, as Your Honor has said, for the next

5    annual status conference.  And I can commit on behalf of the

6    City, the City will be presenting about the PCCEP, how it has

7    worked up to them.  By that point, if the hearing is in June,

8    there will have been, what, if I'm counting correctly, seven

9    PCCEP meetings.

10          THE COURT:  Seven months of PCCEP experience.

11          MR. VANNIER:  Exactly, Your Honor.

12        And at that time, the U.S. DOJ will be able to give you

13    their assessment.  The COCL will be able to weigh in on its

14    perspective of that.

15        But, again, whether the PCCEP works as Your Honor stated

16    or whether the City is in substantial compliance, that's a

17    separate issue than whether these amendments should be entered

18    at this time.

19        And for the reasons I've explained, as a matter of law, we

20    believe that the parties are entitled to that certainty.  We

21    believe that is the fair and reasonable thing to do, and we'd

22    ask Your Honor to enter those amendments at this time.

23          THE COURT:  All right.  I appreciate your argument.

24        I don't think that I have enough information at this time

25    to make an informed decision on whether or not to enter the

1   final amendments now.  So I will continue with my conditional

2   approval.

3        I am hopeful that when we all get back together again

4   there will much more information that I have and have received

5   and that that information will be sufficiently positive that I

6   will feel comfortable that the amendments are consistent with

7   the criteria set forth in the settlement agreement, including

8   any amendments that have already been approved.

9        I probably shouldn't share the following with you, but I'm

10  going to anyway.  There is an old story -- I don't know whether

11  it's true or just apocryphal about when President Nixon was

12  first going to China and he wanted to find some way to break

13  the ice -- I think it was with Chairman Mao at the time --

14  before getting into their controversial topics that divided

15  them.  To find some area of common ground that they could talk

16  about in a noncontroversial way, and I know that at least it's

17  been reported that President Nixon was a student of world

18  history.  He had been informed that Chairman Mao was also a

19  student of world history.

20       So at their first meeting -- at least the way I heard the

21  story, President Nixon says to Chairman Mao, "Do you think that

22  the French Revolution has been good or bad overall for the

23  world?"

24       And Chairman Mau's response was, "It's too soon to tell."

25       So let's talk about when we get back together.  Frankly,

1    looking at my calendar, I don't think we have a meeting in

2    April.

3         Mary, do you know?

4              DEPUTY COURTROOM CLERK:  I don't think we have it

5    scheduled now.

6              THE COURT:  Okay.  Looking at my trial calendar,

7    would it be feasible -- could we find a time in June, perhaps

8    even maybe the first half of June, for us to have our -- if you

9    want to call it an annual status conference, fine; if you want

10   to call it our next interim status conference, that's fine.

11        And I would be very hopeful that we would have enough

12   information from all of the parties, including the intervenor,

13   including the amicus curiae, Albina Ministerial Alliance

14   Coalition, the amicus curiae Mental Health Alliance.  Maybe

15   even some input from the COCL, as well as a recommendation from

16   the PCCEP, as to how things are going and whether they've met

17   some of the qualitative and quantitative criteria that we have

18   been discussing today to see if this new direction is working.

19   So I -- I am hopeful that we will have enough information that

20   the Court can make a decision at that time.

21        Would sometime in the first part of June work for folks?

22   Any preferences.

23              MR. GEISSLER:  My only preference, Your Honor, is it

24   not be on a Monday or a Friday.

25              THE COURT:  Not a Monday or a Friday.

```
 1            MR. GEISSLER:  Yes, Your Honor.

 2            THE COURT:  Mary, what looks good on our calendar?

 3            DEPUTY COURTROOM CLERK:  We could do June 6th at

 4   9:00 a.m.

 5            THE COURT:  One second.

 6       You know, let me change that for a second.  I'm just

 7   worried that the meeting, the jury instruction meeting the

 8   previous week will probably get moved to that.  We can make --

 9   I'm also thinking about June 13th, notwithstanding that other

10   matter that's on our calendar.

11            DEPUTY COURTROOM CLERK:  Okay.

12            THE COURT:  Do you all have any particular

13   preferences as between Thursday, June 6th, or Thursday,

14   June 13th?  I guess June 6th would work fine.

15       June 6th.  Will that work for you all?

16            MR. GEISSLER:  It will, Your Honor, thank you.

17            MR. VANNIER:  Yes, Your Honor.

18            MS. REEVE:  It will, Your Honor.

19            THE COURT:  All right.  Thank you.  Schedule our --

20   "annual" just seems a funny word to use in these days in this

21   context.  So our next interim status conference will be June 6,

22   2019, start at 9:00 a.m.

23       And is there anything else to be addressed at today's

24   hearing?  I'll start with the City.

25            MR. VANNIER:  Thank you, Your Honor.  Yes.  I was
```

1    wondering if Your Honor could clarify what it views as the

2    criteria that will have to be satisfied for full approval in

3    June.

4            THE COURT:  That's a very interesting question, and

5    let me reflect on all of the comments that were made today, and

6    I will see if I'm able to put something in writing and send it

7    to you.

8            MR. VANNIER:  Thank you, Your Honor.

9            THE COURT:  Thank you.  Anything else from the United

10   States?

11           MR. HAGER:  Yes, Your Honor.  I just wanted to make

12   clear that the parties can still perform under the

13   conditionally approved amendments; and, secondarily, that the

14   United States and the compliance officer, as we prepare our

15   annual reports and quarterly reports of the compliance officer,

16   that we can assess compliance as to the amended or red-lined

17   agreement, at that ECF 171 as opposed to the original

18   agreement.

19           THE COURT:  Thank you for that clarification.  Not

20   only do you have the Court's permission, I think that's a very

21   wise idea.

22       I would also note, too, that -- and I'll leave this to the

23   discretion of the parties, but as I think it was --

24   Mr. Handelman noted in his comments on behalf of Portland

25   Copwatch, paragraph 146 of the revised agreement requires the

1   new board -- the PCCEP to be selected, trained, and to advise

2   the content of a new community survey within four months of the

3   agreement being amended, technically, that part of the

4   agreement hadn't been amended.  I will say that if you choose

5   to go forward with a new community survey, I certainly won't

6   find that to be in violation of anything.

7        Similarly, if you don't choose to go forward with that

8   community survey, that's technically not a violation of

9   anything, but it might be a good idea.

10        So I'll leave that to the discussion and discretion of the

11   parties.

12            MS. REEVE:  Your Honor, we will be moving forward

13   with the community survey.  Thank you.

14            THE COURT:  Thank you.  Good idea.

15        Anything else from the United States?

16            MR. HAGER:  No.  Thank you, Your Honor.

17            THE COURT:  Anything else from the intervenor,

18   Portland Police Association?

19            MR. KARIA:  No, sir.

20            THE COURT:  Thank you.

21        Anything further that we should discuss or address from

22   the Albina Ministerial Coalition?

23            MS. CHAMBERS:  No, thank you, Your Honor.

24            THE COURT:  Anything else that should be addressed

25   from the perspective of the Mental Health Alliance?

1          MR. CHAVEZ:  Not at this time, Your Honor.  Thank
2    you.
3          THE COURT:  Thank you all very much.  I appreciate
4    everyone's participation and contributions and your indulgence
5    into going into the lunch hour.  We're adjourned with this
6    hearing today.  I look forward to hearing from you all and
7    seeing you on June 6th.
8                        (Hearing concluded.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                  C E R T I F I C A T E

 2

 3        United States of America, v. City of Portland,

 4                      3:12-cv-02265-SI

 5                     STATUS CONFERENCE

 6                      October 4, 2018

 7

 8           I certify, by signing below, that the foregoing is a

 9    true and correct transcript of the record, taken by

10    stenographic means, of the proceedings in the above-entitled

11    cause.  A transcript without an original signature, conformed

12    signature, or digitally signed signature is not certified.

13

14    /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
      _____
15
      Official Court Reporter       Signature Date: 11/2/18
16    Oregon CSR No. 98-0346        CSR Expiration Date:  9/30/20

17

18

19

20

21

22

23

24

25
```