

**Office of the Compliance Officer and Community Liaison (COCL)**

**Rosenbaum & Associates, LLP**                    COCL Office:
Dennis Rosenbaum, Ph.D.                    525 NE Oregon Street, Suite 250
Thomas Christoff, Ph.D.                    Portland, OR  97232
Geoffrey Alpert, Ph.D.                    www.portlandcocl.com
Heather Daniel, J.D., B.A.          rosenbaumandassociatesllp@gmail.com
Ashley Heiberger, J.D.
Megan Mohler, M.A.
Amy Ruiz, B.A.

November 16, 2018

Transmitted by E-mail to:

The United States Department of Justice
The City of Portland

Re:       **Compliance and Outcome Assessment Report: Use of Force**

Dear U.S. Department of Justice and City of Portland:

On behalf of the entire Compliance Officer and Community Liaison (COCL) team, I am pleased to submit the attached *Compliance and Outcome Assessment Report: Section IV Training and Section VII Employee Information System*, pursuant to the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

We thank community members for taking the time to review and comment on the report. A copy of this report will be posted on the COCL's website, www.portlandcocl.com and sent to the Settlement Agreement Updates email list.

Sincerely,

*Dennis Rosenbaum* (signature)

Dennis P. Rosenbaum, PhD
For Rosenbaum & Associates, LLP
Compliance Officer and Community Liaison, Portland OR

**EXHIBIT A**

# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

# of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

*Quarterly report: Section IV Training and Section VII Employee Information System*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**October 2017 to October 2018**



# TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................................3

**EXECUTIVE SUMMARY**......................................................................................................4

**SECTION IV —Training**.....................................................................................................10

    **Paragraph 78**...............................................................................................................10

    **Paragraph 79**...............................................................................................................11

    **Paragraph 80**...............................................................................................................12

    **Paragraph 81**...............................................................................................................17

    **Paragraph 82**...............................................................................................................17

    **Paragraph 83**...............................................................................................................17

    **Paragraph 84**...............................................................................................................21

    **Paragraph 85**...............................................................................................................32

    **Paragraph 86**...............................................................................................................38

    **Paragraph 87**...............................................................................................................39

    **Training System Assessment**.....................................................................................39

**SECTION VII – Employee Information System**................................................................42

    **Paragraph 116**.............................................................................................................42

    **Paragraph 117**.............................................................................................................49

    **Paragraph 118**.............................................................................................................51

    **Paragraph 119**.............................................................................................................51

    **Paragraph 120**.............................................................................................................51

    **EIS System Assessment**.............................................................................................52

**LIST OF ABBREVIATIONS**...............................................................................................60

**LIST OF PERSONNEL**......................................................................................................61

**APPENDICES**....................................................................................................................62

# INTRODUCTION

This is the Compliance and Outcome Assessment Report of the Compliance Officer and Community Liaison (COCL), as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (hereafter referred to as "DOJ"). By agreement of the Parties, this report combines the COCL's compliance and outcome assessments into a single document. This report's focuses on the City's compliance with Section IV (Training) and Section VII (Employee Information System). Our assessment of Sections IV and VII include evaluation of associated outcomes related to the City's implementation the Settlement Agreement. For all other sections of the Settlement Agreement, the compliance assessments, recommendations, and technical assistance provided in our prior reports should be considered ongoing.

For both Section IV and Section VII assessments, our report includes two main sections. The first section includes the COCL's assessment of compliance with each paragraph. For each paragraph, we identify the methodology and monitoring activities employed, our assessment of compliance, and our recommendations regarding necessary steps to achieve compliance (see Par. 162). The second section includes our evaluation of the City's systems and resources related to Training and Employee Information System (see Par. 170).

<u>Report Card</u>

As with previous COCL Compliance Reports, this report includes a "Report Card" on the implementation of the Agreement which provides an assessment of each paragraph in the Agreement. For each paragraph where sufficient information is available to render a decision, the Report Card provides an overall judgment on a 4-point scale, ranging from "Non-compliance" to "Substantial Compliance." For some paragraphs, we have assessed the City and/or PPB to be in Substantial Compliance, although only conditionally. For these paragraphs, we have determined that the City has nearly satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity, and all that remains is a particularized set of conditions that we believe are likely to be accomplished in the near future. In order to inform future reports by DOJ, these instances should be interpreted as, "Should these particular conditions be met, we would recommend Substantial Compliance."

When reviewing the specific paragraphs, we utilize a four-tiered system of evaluation:
- <mark>Substantial Compliance</mark>: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- <mark>Partial Compliance</mark>: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- <mark>Non-Compliance but Initial Steps Taken</mark>: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.
- <mark>Non-Compliance</mark>: The City/PPB has not made any meaningful progress towards the satisfaction of the provision's requirements.
- <mark>Not Yet Assessed</mark>: The COCL team has not had the opportunity to fully assess the requirements of the provision and elects to withhold assessment of compliance until a more thorough review has occurred.

# EXECUTIVE SUMMARY

### Section IV Training

An effective training system, as established by the Settlement Agreement, is one where PPB has the capacity to: (1) identify areas where officers require training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system to evaluate training, both in the short term and long term; (4) document and report on training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public. These components provide the framework for our current review of compliance and outcome measures.

Training Plan and Needs Assessment

We reviewed PPB's 2017 Needs Assessment and Training Plan and asked questions of PPB personnel, and we conclude that PPB has identified training needs pertinent to all relevant aspects of training. The Needs Assessment gives attention to the five "core law enforcement disciplines" (Control tactics, Electronic Control Equipment, Firearms, Patrol Tactics and Police Vehicle Operations), as well as Oregon's recertification requirements and the Settlement Agreement requirements. The assessment draws information from a variety of sources, ranging from force and complaint data to surveys of officers. The challenge for PPB is to find ways to better utilize the findings of the Annual Needs Assessment for future training, as discussed in this report.

Valid and Useful System of Training Evaluation

When PPB entered into the Settlement Agreement (SA), PPB's training evaluations were very limited, using methods and measures grossly inadequate for producing any meaningful assessment of training. However, PPB has taken significant steps to develop a system of measurement that will benefit PPB for years to come. The major training evaluation components are now in place, including standardized student evaluations of specific classes, knowledge tests, and a scoring system for role-playing scenarios.

With evaluation systems in place, the next challenge for PPB was to create a plan to effectively utilize the evaluation findings. Although PPB has provided informal feedback to trainers in the past, in 2018 they created an extensive plan to introduce feedback loops for several key training blocks. This upgraded system of feedback is still in the implementation stage and will vary depending on the nature and extent of the training block. COCL will continue to monitor progress, but overall, we are satisfied that PPB has taken a comprehensive approach to providing feedback using training evaluation data.

Documenting and Reporting Training

PPB is required to keep accurate electronic records of the training delivered to and received by department members. PPB is also required to ensure that supervisors review their officers' training records (Par. 81), report trainings delivered and received to the administration (Par. 82), and institute guidelines for the selection of trainers to ensure that they do not have a history of using excessive force (Par. 83).

PPB continues to be in Substantial Compliance with Paragraphs 82 and 83. However, COCL rates PPB in Partial Compliance for Par. 81. The Learning Management System (LMS) is PPB's primary response to the

requirements in Par. 81. LMS has the capacity to maintain and make accessible the information delineated in the Settlement Agreement: Current curricula, lesson plans, training delivered, attendance records, and other training materials. As demonstrated to us, LMS has the ability to track each class planned and delivered. At the time of our audit on July 31, 2018, all records for 2018 training were in LMS. However, some 2017 training records were not included. More generally, PPB has experienced difficulty getting the "Historic Data Load" (i.e. past training records) into LMS. This type of data migration problem is not unusual for police departments that implement new records management software. PPB anticipates having the Historic Data Load in LMS before the end of 2018.

The COCL audit also sought determine whether LMS is currently meeting the requirements of Par. 81. COCL randomly selected officers and found that LMS did not contain a full set of information regarding the attendance records and test scores. Also, not all supervisors had access to officer training records in LMS. In the absence of a fully functioning LMS, the Training Division has been manually preparing reports for supervisors and management. This manual system is noteworthy, but is not a substitute for "electronically tracking, maintaining, and reporting complete and accurate records" (Par. 81) relevant to training. PPB reports it is actively addressing these concerns and anticipates resolving them before this Q3 report is finalized.

Most supervisors can access training records, but how can PPB ensure that supervisors are doing so, as required by the SA? PPB has modified its annual Performance Evaluation form to cue supervisors to address the issue and has instituted a reminder system to encourage compliance, however the system remains self-reported. COCL encourages PPB to move from this self-report system to an electronic record that independently verifies compliance.

In sum, COCL assigns Partial Compliance for Par. 81 until COCL can determine that PPB has a system in place that: (1) includes historical training records; (2) allows the Training Division to access training records "in a central, commonly-accessible" file system, including class evaluation summaries; and (3) can independently verify supervisor's reviews of LMS records.

<u>Content and Delivery of Training</u>

As one of the core pillars of the Settlement Agreement, Par. 84 describes the content and delivery of training expected for patrol officers and supervisors. The training must conform to PPB's current policies, which have been revised as part of the Settlement Agreement. The subsections of Par. 84 relate to the types of training required for patrol officers, with particular attention given to police interactions with individuals who have, or are perceived to have, mental illness. The subsections also refer to supervisor training.

Since the inception of the Settlement Agreement, PPB has made significant strides in the development, delivery and evaluation of training for recruits, officers, supervisors, and commanders. Training is more responsive to the defined needs of the community and the officers, more comprehensive in content, and more pedagogically sound. The re-conceptualization of de-escalation is especially noteworthy, as PPB now encourages officers to use various techniques to calm an agitated subject, promote rational decision making, and gain <u>voluntary</u> compliance whenever possible without force. This work is imbedded in a larger Critical Decision-Making model that has been delivered very effectively.

To enhance evidence-based training in Portland, over the past four years COCL has emphasized the need for training in procedural justice and communication skills to encourage respectful and fair encounters

5

with the public that will build public trust and reduce the need to use force. For the fall in-service training, the Training Division offered a 4-hour session on procedural justice and implicit bias. This class was well planned and executed as a joint initiative between PBB and Portland State University. Two of the videos depicted realistic situations with community members and PPB officers who were acting the roles to illustrate core principles of procedural justice and implicit bias. We credit PPB for engaging segments of the African American and houseless communities to help create these effective videos.

Discussions about better police-community interactions are only the first step. COCL has strongly encouraged PPB to integrate communication skills and procedural justice into skills and scenario practice, since they have historically been covered only in the classroom. Our conclusion is that PPB has taken significant strides toward achieving this integration. Not only did the Training Division recently devote one scenario specifically to procedural justice skills, but many of the drill exercises and scenarios during Day 2 sought to strengthen officers' interpersonal communication skills. However, because most of the skills training involved extreme encounters with gun shots and the threat of death, it was not the ideal setting for practicing communication skills (e.g. asking officers to treat someone with respect or care after the subject has just tried to kill the officer in an ambush).

COCL acknowledges these enhancements. Our one remaining concern is PPB's capacity to give officers ample opportunities to identify and rehearse the interpersonal skills necessary for respectful, fair, empathic, and effective communication with members of the community. To reach the goal line, the desired procedural justice skills must be: (1) displayed so that officers can see what these behaviors look like, and (2) practiced so that officers can remember and repeat these responses in real-world encounters. PPB has made significant strides toward displaying the desired (and undesired) behaviors in the videos it created for the 2018 fall in-service and the discussions around these; the only area where additional work is needed is giving each officer the chance to practice these verbal and nonverbal behaviors through live scenarios and/or online software, in settings that are more typical of day-to-day encounters with the public (vs. armed conflict or ambushes). In sum, we can provide PPB with Substantial Compliance – Conditional for Par. 84, with the condition that PPB make a good faith effort to provide officers with additional opportunities to rehearse the desired behaviors.

COCL acknowledges that PPB is building more capacity in the Training Division. PPB is creating three new positions – one to build new leadership training, one to strengthen training in ethics and procedural justice, and one to enhance training on officer wellness and stress. Each of these training initiatives should have a beneficial effect on police-community interactions.

Audit the Training Program

Par. 85 requires that PPB, in consultation with COCL, conduct an audit of PPB's training program on several performance dimensions. In 2017 a team of analysts and the Inspector in the Professional Standards Division reviewed materials and interviewed key members of the Training Division to prepare the first Training Audit Report in October of 2017. Overall, the Audit Report is responsive to the seven audit criteria established in Par. 85 of the Settlement Agreement. For each criterion, the Audit report includes a description of the background, observations and findings, conclusions and recommendations. The Audit team was able to identify some deficiencies in training records that are being corrected. In June of 2018, the Training Manager provided a formal response to the recommendations found in the Audit Report. The PPB audit team will return to the Training Division in October of 2018 to assess how the findings from 2017 have been implemented. COCL will continue to document how the Training Division uses the audit findings to improve PPB's training.

Auditing all areas of training in a single audit would be an insurmountable task. Consequently, the Audit team selected the Advanced Academy (recruit training) and the Field Training and Evaluation Program (FTEP) for review in the first Audit. We understand this objective, given limited resources, but encourage the PPB to conduct a more comprehensive audit of the Training Division, including In-service, Supervisory training and ECIT as needed.

The Audit did not document the content of training and whether it adequately reflected the current issues facing PPB. The Audit team maintains that such documentation is beyond the scope of their mission. If so, we ask that the Training Division accept this responsibility as part of its Needs Assessment and Training Plan.

One of COCL's primary concerns is that the Audit did not address the status of LMS implementation, which should be a primary database for future audits. Also, the Audit focuses largely on issues in 2016 and does not address any progress made in 2017, with the Needs Assessment or the tools used to evaluate training.

Overall, COCL is impressed with PPB's first training audit, despite some concerns, and therefore, is prepared to give Substantial Compliance – Conditional for Paragraph 85. The conditions for achieving substantial compliance are the following: As part of the 2018 Training Audit, in addition to reviewing progress on the 2017 audit recommendations, PPB needs to:

- Review the status of LMS implementation and identify any remaining obstacles to full-scale implementation
- Review the adequacy of the 2017 Needs Assessment and determine the extent to which it was used by the Training Division to develop a Training Plan for 2018
- Describe the methods used by the Training Division to evaluate training so as to memorialize this work and make it available to future training evaluations at PPB
- When describing findings and conclusions, the audit reports need to clearly separate the views of the auditors from the views of training instructors and supervisors interviewed. Audits, by definition, are independent investigations.

**Section VII Employee Information System (EIS)**

Section VII of the Settlement Agreement details requirements of PPB related to the Employee Information System (EIS). The EIS uses a range of metrics to identify potentially problematic officers, supervisors, units, and groups and, when appropriate, provides interventions designed to improve officer performance. In the past year, PPB has continued to move toward Substantial Compliance for the entire section. In our prior report, we assessed PPB as having substantially complied with two of the five paragraphs found within Section VII (Pars. 118 and 119). For this report, we maintain our assessment for those two paragraphs and also believe PPB has now substantially complied with Par. 120 based on their creation of an EIS training manual for the edification of future EIS Administrators.

The major focus of Section VII, in our opinion, lies in Pars. 116 and 117, which detail PPB's requirements to enhance EIS to more effectively identify potentially problematic officers (using single-member thresholds), as well as groups and units (using aggregated force audit data). Additionally, Par. 116 also

details PPB supervisor responsibilities to consult EIS during annual performance evaluations and when officers are new to the supervisor's command. For these two paragraphs, we believe that PPB has made significant steps forward, though we detail a list of final steps needed before we are able to assess them as having substantially complied with the requirements.

For Par. 116, we break our assessment into the specific supervisor reviews required in subsections (a-c) as well as in the broader requirement for PPB to "enhance EIS" to identify potentially problematic officers, groups, and units. For the reviews required under subsections (a-c), data summaries provided by PPB show an overall high degree of compliance (97%) for subsection (a) reviews – required for annual performance evaluation – though this high level of compliance was only for 2018 Q2. Prior quarters showed compliance at or around 50%. Reviews required under subsection (b)– new-to-command reviews – have fluctuated in the past three months, shifting between 85% and 56%.

In order to ensure higher compliance rates in the future, PPB has implemented a notification system to inform Responsibility Unit (RU) Managers when reviews are required of supervisors under their command. Additionally, RU Managers will now be receiving Performance Discussion Tracker (PDT) entries when reviews are not conducted in the prescribed timeframe. Such PDT entries will also be made when RU Managers oversee a Unit or Division that consistently does not complete the required reviews. By implementing this system, we believe compliance rates in the future will ultimately increase; however, until we can see the effects of the recently implemented system, COCL cannot say that PPB has substantially complied.

For the broader requirement of PPB to enhance EIS, PPB has implemented a systematic approach to initial reviews of EIS alerts and our assessment of PPB data indicates that a high proportion of EIS alerts are forwarded on for RU review. However, particularly for force alerts, a relatively small proportion receive some type of recorded intervention (approximately 19%). Interventions can include coaching and/or a monitoring period. PPB notes that the relatively low rate of interventions for force may be caused by supervisors holding conversations with officers but not adequately documenting such discussions as "interventions." In the Spring 2018 In-Service, PPB instructed supervisors that such conversations should be documented as an intervention – though we will have to await further data to determine whether this results in a higher proportion of interventions. Additionally, alerts related to Complaints rarely receive an intervention, though this is because conversations related to Complaints may lead to a potential double-jeopardy situation if one of the complaints is open (i.e. supervisor discussions with officers may be considered "command counseling", thereby prohibiting future discipline). We discuss potential ways to resolve such concerns, though PPB may not have the ability to change this using their present thresholds.

Overall, we do not believe that PPB has effectively enhanced their EIS system, though note that this is primarily due to PPB's adherence to the Settlement Agreement. Using the thresholds identified in Par. 118 (and maintaining prior thresholds in accordance with Par. 119), PPB has generated an overwhelming number of alerts that are forwarded to supervisors; alerts appear inefficient at identifying actually problematic officers (since many incorporate a 6-month timeline); and COCL surveys have demonstrated an ongoing suspicion of EIS' capabilities as a tool for identifying at-risk employees. Although PPB has begun using a multi-variate approach to identify at-risk employees, that system is still being tested and modified. In the future, once a finalized approach has been implemented, we believe such a multi-variate approach represents a better system than the one currently being used by PPB.

For Par. 117, the revised Settlement Agreement (accepted during the April 2018 status hearing), requires PPB to utilize Force Audit data to identify potentially problematic supervisors, groups, and units. PPB has provided COCL and DOJ their process for performing such evaluations, though we have asked PPB to further delineate the criteria they use when deciding to send an alert to the RU Manager (or, alternatively, their criteria for not forwarding an alert), and the types of analyses performed when unit or group trends are found. We anticipate such refinement of the process will occur within the next couple of months.

We also provide a qualitative and quantitative outcome assessment of EIS alerts that have occurred within the past year. In summary, our assessment found that force alerts constituted the majority of alerts (approximately 65%) and that an extremely high proportion (96%) of non-force alerts are forwarded on for RU review (for force alerts that are not forwarded, approximately 82% were not forwarded because no new force event occurred despite the alert being created). Additionally, we found that interventions are much more common for Commendation alerts (45.5%) and Traumatic Incident alerts (73.4%) compared with Complaint alerts (2.8%) and Force alerts (19.6%). Reasons for this have been summarized above and are further detailed within the report. Overall, our system assessment of EIS largely mirrors our overall findings for Par. 116's broader requirement to enhance EIS. Namely, by adhering to the strict requirements of the Settlement Agreement, PPB's EIS is less than effective. Through the creation of more effective thresholds or through the full implementation of PPB's multi-variable risk assessment tool, we believe PPB would in a better position to identify potentially problematic officers, groups, units, and supervisors.

# SECTION IV – TRAINING

| | |
|---|---|
| Par. 78 | Substantial Compliance |
| Par. 79 | Substantial Compliance |
| Par. 80 | Substantial Compliance |
| Par. 81 | Partial Compliance |
| Par. 82 | Substantial Compliance |
| Par. 83 | Substantial Compliance |
| Par. 84 | Substantial Compliance – Conditional |
| Par. 85 | Substantial Compliance – Conditional |
| Par. 86 | Substantial Compliance |
| Par. 87 | Substantial Compliance |

*78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.*

COCL Assessment: The COCL team has reviewed and critiqued numerous training-related documents and has observed several trainings since our last report in 2017. We have concluded, based on these analyses and observations, that PPB has substantially complied with Par. 78 by communicating these expectations to its officers. This assessment is based on PPB's compliance with a set of requirements delineated is subsequent paragraphs for the development, implementation, and evaluation of effective training programs.

In this training section, we continue to examine whether PPB has introduced a system of police training that "…increases the knowledge, skills and abilities necessary for effective and successful delivery of services to persons in mental health crisis" and that contributes to the "proper management of the use of force to meet constitutional standards" (Par. 173). An effective training system, as established by the Settlement Agreement, is one where PPB has the capacity to: (1) identify areas where officers require training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public. These components provide the framework for our current review of compliance and outcome measures.

**Identifying Training Needs**

*79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy*

<u>Training Plan and Needs Assessment</u>

<u>COCL Assessment</u>: Based on our review of PPB's 2017 Needs Assessment and Training Plan, as well as interviews and correspondence with PPB personnel, we have concluded that PPB has identified training needs pertinent to all relevant aspects of training. The Needs Assessment gives attention to the five "core law enforcement disciplines" (Control tactics, Electronic Control Equipment, Firearms, Patrol Tactics and Police Vehicle Operations), as well as Oregon's recertification requirements and DOJ requirements. The assessment draws information from a variety of sources, ranging from force and complaint data to surveys of officers.

The Needs Assessment focuses primarily on In-Service Training, but also covers ECIT training and Supervisor In-Service Training. The Department of Justice (DOJ) has noted that the Needs Assessment should include the Advanced Academy Training for recruits, and consequently, surveys of recruits have been collected in 2018. The 2018 Needs Assessment has yet to be released, but we have been told that it includes an addendum ("Change Sheet") covering the Advanced Academy.

A key method for assessing future training needs has been course evaluation surveys at the Training Division. For example, to help PPB assess future training needs for supervisors in 2019, PPB supervisors were asked to prioritize seven different topics on a 5-point scale from "Low priority" to "High priority." COCL analysis of the data indicates that the highest priority was given to a training class on managing stress from sources inside PPB (mean score: 3.98). This type of questioning is important because it allows PPB to look at training priorities from the perspective of supervisors. We also encourage the PPB to continue to seek input from community members and other sources on issues that extend beyond the five "core disciplines," and where others topics might be given a higher priority (e.g. crowd control tactics). PPB's does seek input via the Training Advisory Council (TAC) and includes some of this information in its training Needs Assessment. PPB also identifies ECIT training needs through other sources, such as outcome data, BHU program supervisors, the Behavioral Health Advisory Committee, and research on policing and mental health.

PPB has struggled to find the resources to evaluate every course and therefore, requested additional analysts for the Needs Assessment and evaluation of training. This request was not approved in the FY2018-19 budget, but to their credit, some other important positions at the Training Division were approved relevant to the Settlement Agreement (discussed later). Despite a shortage of analysts, PPB has managed to conduct in-class surveys for all major training programs in 2018.

Furthermore, PPB has continued its review of laws, court cases, and research findings relevant to new training needs. Some key studies are listed in Appendix D of the Needs Assessment (Literature reviews), although the research on procedural justice and implicit bias is not included. PPB has followed our recommendation that the sections of the Needs Assessment be standardized, so that for specific topics, the training needs are identified, the year they were identified, and a potential plan of action is listed. PPB maintains a list of training needs and whether each has been addressed to date].

Based on the information available to us at the time of this report, we conclude that PPB is taking the requirement of a Needs Assessment seriously and remains in substantial compliance. The 2018 Needs Assessment, which will be directed at training in 2019, will be released in the fall and will be used to monitor sustained compliance.

### Developing a Valid and Useful System of Training Evaluation

*80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.*

COCL Assessment: To evaluate compliance with par. 80, the COCL team reviewed PPB's efforts to apply the Kirkpatrick Model of evaluation (described in previous COCL reports), consulted with PPB evaluators on the content and methods of training evaluation (including surveys, quizzes, tests and scenarios), interviewed and advised Training Division managers and instructors, and observed in-service trainings in the Spring and Fall of 2018. As noted in our previous reports, the COCL team has provided extensive feedback on PPB's evaluation methods through meetings, compliance reports, and technical assistance reports over the past 3 years.

When the Settlement Agreement first started, PPB's training evaluations were very limited, using methods and measures grossly inadequate for producing any meaningful assessment of training. However, PPB has taken significant steps to develop a system of measurement that will benefit the organization for years to come. Since late 2017, PPB has been very responsive to the detailed feedback provided by the COCL team. The major training evaluation components are now in place. If PPB's evaluation program can be adequately resourced and the data can be effectively exploited by the PPB for instructional purposes, it could serve as a national model.

Specifically, the Training Division continues to refine its training evaluation model to capture officers' reactions to the training, learning, and on-the-job outcomes (key elements in the Kirkpatrick model of evaluation). We documented some of the key improvements in our last report, including: (1) the standardization of evaluation measures across classes, (2) the expansion of measurement content to include instructor's knowledge, pedagogical style, level of difficulty, student participation, learning, and other dimensions of instruction (3) the improvement of knowledge test to include multiple choice questions; (4) the administration of knowledge tests at the end of each day of training rather than after

two days; (5) the use of clicker quizzes in classroom presentations to ensure that students are listening and retaining information as the class progresses; (6) the scoring of knowledge tests at the individual level rather than the group level, thus allowing PPB to determine individual performance and passing scores; and (7) the introduction of a quantitative scoring system for some role-play scenarios, thus allowing PPB to begin scoring individual competency/proficiency during a skill task.

Below we briefly describe some of the measurement tools employed by the Training Division and the current state of usage. Some issues with these methods of evaluation remain, but on the whole, these tools are working effectively to generate useful information.

<u>In-Class Quizzes</u>

The Training Division continues to employ in-class quizzes on students' knowledge of the material being covered. These quizzes in turn facilitate a more robust class discussion. COCL observations indicate that in-class quizzes were used more consistently in 2018 than 2017 and consistent with our recommendation, instructors were more inclined to show and discuss the correct answer with students. This practice helps to reinforce the correct information. We noticed fewer technical issues in 2018 than in 2017, as nearly all instructors were able to get the system up and running without delay. In general, the quizzes facilitated discussion and were a positive addition to the classroom.

<u>Class Evaluation Surveys</u>

In the past, COCL has recommended that PPB administer class evaluation surveys that allow students the opportunity to assess the quality and content of instruction. PPB has been using evaluation surveys for years, but we recommended that such surveys include a wider range of content and be administered at the end of each day of training, so that students do not confuse one class with another. By 2018, both of these recommendations had been successfully implemented by PPB.

In terms of survey administration, the problems noted in 2017 were largely resolved by 2018, although some issues remained in the spring in-service. Specifically, COCL encouraged the person administering the surveys to follow a standard protocol that includes explaining the following to PPB members: (1) the survey is anonymous, so be candid about what you liked and didn't like about the training; (2) no talking during the survey to avoid influencing or distracting other students; (3) you have a set time (e.g. 10 minutes) to complete the survey; and (4) you should remain seated until you have completed both the survey and the exam (or you can leave the room quietly). By the fall of 2018, was PPB able to resolve all of these problems and demonstrate a professional approach to data collection. At this point, we are satisfied that PPB is administering surveys in a manner that will yield reliable and valid data about training.

<u>Regular In-service Student Evaluations</u>: For the spring in-service, students reported mostly positive opinions. Students (N=786) were asked to rate each of the following four classes: De-escalation, Legal Updates, Bloodborne Pathogens, and Implicit Bias. Each class was rated in the following areas: organized, knowledgeable trainers, positive interaction with the trainers, and good use of time. The scale for each response was 1-6, with 1 representing the most negative opinion (strongly disagree) and 6 representing the most positive opinion (strongly agree). The average responses for all questions ranged from a 3.99 – 5.56, thus representing mostly positive responses. The most well received class was the bloodborne pathogens class with 93.1% of students agreeing that the trainers were organized, 98.8%

agreeing that the trainers were knowledgeable, 95.1% agreeing that the interaction between the trainer and the class was positive, and 84.2% agreeing that it was a good use of their time. The least well received class was the implicit bias class, although the ratings were very positive, typically in the low 90 percent range. Implicit bias is a challenge to teach because it addresses unconscious psychological processes in the brain. Instructors in May of 2018 were focused on introducing officers to the concept of implicit bias rather than applying it specifically to police work. In September, PPB able to introduce a different approach where officers were able to grasp how implicit bias can impact their work and were more engaged because of relevant videos, facilitated discussions, and role-play scenarios. Although survey results are not yet available, officers were exposed to four hours of in-service training on implicit bias and procedural justice, as well as role playing scenarios.

Supervisor In-service: Overall, attitudes towards the supervisor training in the spring were mostly favorable. The supervisors (N=175) were asked to rate each of the following classes: After Action, EIS, policy 1010.10, policy 330, Mental Health Template, and Case Management. Each class was rated in the following areas: organized, knowledgeable trainers, positive interaction with the trainers, and good use of time. The scale for each response was 1-6, with 1 representing the most negative opinion (strongly disagree) and 6 representing the most positive opinion (strongly agree). The average responses for all questions ranged from a 4.41 – 5.41, thus representing mostly positive responses. The students tended to look most favorably at the EIS class and less favorably at the 1010.10 class. It should be noted, that this difference is marginal and overall, attitudes remained mostly positive towards all of the training classes.

Knowledge Tests

At the conclusion of in-service training, students were given an online knowledge test using an online software program accessible through their Department-issued phones. The exam was administered better in 2018, as students were instructed not to talk during the test.

Regular In-service Knowledge Test Results: During the spring in-service, the average score was 14.12 out of 15. Only 17 out of the 823 students who took the test (2.1%) received below an 80%. In comparison 598 students (72.7%) received a score of 93.3% or better. The most commonly missed question asked about the three core principles of PPB's Decision-Making Model. We encourage PPB to continue to emphasize the Decision-Making Model annually to ensure retention.

Supervisor In-service Knowledge Test Results: After the spring supervisor training, the 177 supervisors present were given a knowledge test of the information covered. This test consisted of 15 questions and had 2-4 questions for each specific class. Out of a total possible score of 15, the average score was 12.99, representing an 86.6% average. Analysis of the knowledge test shows that for the most part, supervisors did well with questions covering policy 1010.10 and case management, though some struggled more with test questions on EIS and the Mental Health Template. These areas have been the source of some confusion among officers and supervisors in the past, but have been addressed. The Supervisor In-service training in the fall of 2018 was much stronger than the spring training at explaining when to fill in the Mental Health Template and how to use EIS effectively.

14

Scenarios

Scenarios that involve role playing are a good opportunity to practice specific skills, be evaluated, and be given constructive feedback. The Police Executive Research Forum (PERF) train-the-trainers session in May included some good scenarios for instructors. The PPB Training Division did not include any scenarios in the Spring In-Service Training, but the staff did add one scenario and several "drills" to the Fall In-Service.[1] The scenario provided officers with the opportunity to use their decision making and communication skills, including procedurally just behaviors, during an encounter with a distressed individual with a weapon who may be having a mental health crisis.

For the Fall In-Service, PPB was able to refine the systematic ratings of scenarios to capture more of the desired behaviors. The revised rating system, which was tested on the mental health/procedural justice scenario, provides PPB with a more reliable means of evaluating officers' proficiency and skill level and gives instructors a framework for conducting post-scenario debriefings in a consistent manner across students. This rating system allows instructors to evaluate performance on three different dimensions of communication (not listed here to avoid influencing officers who have yet to participate in the scenario). It also includes five other dimensions for evaluation including decision making. Overall, the system appears to be comprehensive, but whether instructors can adapt to the information demands of the system and make quick assessments on the spot, will be determined as the fall in-service progresses.

For the evaluation of drills, the debriefing was structured by the Training Division so that instructors were expected to review topics on three laminated sheets – one on the Decision-Making model, one on Procedural Justice, and one on the CSCSC model (the focal point of this particular in-service – described later in this report).

PPB views these measurement enhancements as a key component of its long-term strategy plan to move PPB training beyond the traditional five components to a six component – communication skills.

Creating Feedback Loops

With evaluation systems in place, the next challenge for PPB was to create a plan to effectively utilize the evaluation findings to improve training. Although PPB has provided informal feedback to trainers in the past, in 2018 they created an extensive plan to introduce feedback loops for Enhanced Crisis Intervention Team Training, In-Service, Supervisor's In-Service, and Advanced Academy training (see Appendix A). PPB's plan includes Level One and Level Two feedback loops. Level One feedback occurs during the training event and involves timely feedback to Training Division personnel. This type of immediate feedback is most relevant to in-service training because the training extends for many weeks and could be quickly modified if feedback indicates the need for specific corrections. Analysts seek to provide knowledge test results within two days of the training event and preliminary survey results as soon as possible. Feedback is given to the Training Division's in-service lieutenant, sergeant, and lead instructors.

Level Two feedback occurs at the conclusion of the training sessions, when the final survey data and knowledge test data, as well as any other feedback (e.g. classroom observations), can be compiled and

---

[1] Although role-playing scenarios were absence in the spring In-service, PPB did provide students with engaging activities, including videos that students were encouraged to dissect on de-escalation and bias, and a presentation by African-American youth on police-youth encounters.

fully analyzed. Level Two feedback to the Training Division management team serves to evaluate the training program and identify future training needs. The training Lieutenant and Sergeant will then follow up with the lead instructors, administrative staff, and Curriculum Development Unit to provide additional feedback and discuss areas where improvement is needed.

This upgraded system of feedback – intended for all major trainings — is still in the "implementation stage" and will vary depending on the nature and extent of the training event. The full evaluation process, including Level One and Level Two feedback, was successfully tested with the Supervisor training in May of 2018. PPB is keeping a calendar that indicates when various feedback meetings were held. COCL will continue to monitor progress, but overall, we are satisfied that PPB has taken a comprehensive approach to providing feedback using training evaluation data.

On a related note, the Force Inspector has created a feedback loop for training pursuant to Par. 77(e) and 73(f), after identifying force issues when reviewing After Action reports. This feedback is also linked to the Training Needs Assessment, which acknowledges the Inspector's contribution to the current and planned force training.

Evaluation of Other Training Programs

We were able to observe the new In-Service training for supervisors, Advanced Academy training for recruits, specialized training for Commanders, and Accountability training for employees of both PPB's Internal Affairs (IA) and the Office of Independent Police Review (IPR). With the exception of the Commander (i.e. rank of lieutenant and above) training, surveys and knowledge tests were administered for all trainings in 2018, including dozens of surveys and tests for the recruit training. For all of these trainings, the same methods and measures used for the general in-service were used, with some appropriate modifications. COCL is satisfied that PPB has made a strong, good-faith effort to evaluate the full range of training programs and receive feedback from sworn personnel about the content and delivery of training. The City's Independent Police Review also supported the IA-IPR training evaluation.

On-the-Job Outcomes

The Kirkpatrick model includes an assessment of the impact of training on officers' behavior on the job. A contact survey is a very good tool for measuring officers' performance during contacts with the public. COCL has learned that the PPB is planning to partner with the Police Foundation in Washington, DC to develop and field test a new contact survey that will measure community members' experiences with PPB officers. Given that COCL has recommended a contact survey in past reports, we strongly support this initiative. Essentially, this will be a survey that measures public satisfaction with police services, and if properly designed, can capture key dimensions of procedural justice (one of the focal points of the Fall In-Service training), such as the level of respectful, fair, and compassionate communication by PPB officers they encounter – factors known to build public trust in law enforcement, increase cooperation with police officers and reduce the need to use force. Contact surveys might also be used to measure how PPB officers are interacting with persons experiencing mental health crises and other subgroups within the Portland community.

Portland has been selected as the only pilot site to test a new contact survey for the Police Foundation's National Law Enforcement Applied Research and Data Platform, a program funded by the National Institute of Justice to advance knowledge and practice in American policing. The results of the Portland

16

project will be used to guide the development of a generic contact survey for cities throughout the United States. We look forward to tracking the progress of this initiative, as we expect that it will be helpful to evaluate training (Par. 85c) and other aspects of the Settlement Agreement.

Also, the PPB has made some effort to measure street-level tactical behaviors. As one example, the Training Division, after delivering training on tourniquet use, reviewed on-the-street uses of tourniquets to determine whether these training techniques were being applied in the field. As another example, the Inspector's audit looks for deficiencies regarding the procurement of medical care, and to date, has found no deficiencies.

More generally, the success of street-level tactics is captured through PPB's audit of force incidents, as described in detailed in our second quarter report on use of force. Finally, PPB is working with researchers at Portland State University to evaluate PPB's relationship with the staff at mental health facilities, as described in our first quarter report on mental health responses. These measures may capture, indirectly, some of the effects of in-service and specialized trainings.

<u>Comments on Training Success and Outcomes</u>

In 2018 PPB dramatically improved its capacity to evaluate the effectiveness of training (Par. 85c). Using content-rich student surveys, the Training Division is now able to evaluate the material covered in training and the pedagogical skills of the instructors. The addition of the contact survey will establish the PPB as a leader in evidence-based policing, especially if the survey is institutionalized and used to provide regular feedback to the PPB to improve police-community relations. PPB has effectively utilized the surveys, tests, and observations to provide feedback to training managers and instructors.

Previously, we noted that PPB was unable to conduct surveys of students as part of the ECIT, Supervisory, and Advanced Academy training due to insufficient resources. Although the Training Division remains understaffed with regard to evaluation services, it has managed to conduct surveys of all trainings in 2018. ECIT also includes a 3-month follow-up survey after officers have left the training.

In summary, based on PPB's comprehensive approach to training evaluation, its upgraded two-phase feedback system, and its plans to implement an independent contact survey for community members, COCL concludes that PPB has substantially complied with the requirements of Par. 80.

**Documenting and Reporting Training**

*81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.*

*82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.*

*83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall*

*prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgement has been rendered against the City in the last five (5) years based on the officer's use of force.*

Electronic Tracking of Training

COCL Assessment: PPB's new Learning Management System (LMS) is the Bureau's response to the requirement in Par. 81 that "…the Training Division is electronically tracking, maintaining, and reporting complete and accurate records" relevant to training. We have met several times with the Manager of the LMS system and her supervisor to discuss PPB's progress in bringing the system to full functionality and were given a demonstration of the system's capability. In July, we conducted an audit of LMS to determine its content and capabilities.

LMS has the capacity to maintain and make accessible the information delineated in the Settlement Agreement: Current curricula, lesson plans, training delivered, attendance records, and other training materials. As demonstrated to us, the LMS has the ability to track each class planned and delivered. At the time of our audit on July 31 2018, all 2018 training records had been loaded into LMS. However, some 2017 training records were not included in LMS, including 2017 in-service. More generally, PPB has experienced difficulty getting the "Historic Data Load" (i.e. past training records) into LMS. (These records are contained in five spreadsheets, each with up to 357,000 rows of data.) This problem is not unique to Portland. In our experience, data migration is a problem for many police departments when they implement new records management software. PPB anticipates having the Historic Data Load in LMS before the end of the year. Aside from the delays in capturing all of the historic data, which we will continue to monitor, COCL's audit sought to determine whether the LMS system is currently functioning to achieve the objectives delineated in par. 81 and beyond.

COCL Audit of LMS

COCL's audit of LMS was comprised of three main components. The first audit component assessed whether LMS contained information regarding the attendance records and test scores of 10 officers randomly selected by COCL pertaining to four training modules. We found that only one of the four basic modules was present in LMS. PPB advised that the other modules were included in the 2017-2 In-Service training, which is part of the "Historic Data Load" problem discussed earlier. However, the supervisory in-service training was present in LMS. The audit also found that test scores pertaining to a de-escalation scenario, the knowledge check (quiz) for the fall 2017 In-Service, and the knowledge check for the most recently revised directive were not in the system. Regarding the absence of scenario data, PPB opined that this was a "training evaluation versus performance evaluation" situation, and did not record scores in LMS because the feedback was only for training purposes and not to assess individual performance. Regarding the absence of knowledge check scores, PPB advised that these data are recorded in the QuestionPro software, not LMS.

The second component of the LMS audit assessed whether class evaluations were being captured in LMS. COCL selected five classes for auditing and found that none of the class evaluations were present in LMS at the time of the audit. PPB advised that the evaluations are not anonymous because the

software attributes everything to an employee's record, so the class evaluation survey data are kept on a separate server at the Training Division, using Voxco survey software.

The third component of the LMS audit focused on whether LMS contained a record of the attendance of employees at underline(external) (non-PPB) training. COCL selected two employees known to have outside training and found that the first employee's training (in 2017) was in LMS, but the second employee's training (in 2018) was not. PPB maintains that, generally speaking, external training records are up to date in LMS. COCL would need to select a larger sample to confirm this assertion. However, PPB notes that getting external training records in LMS is contingent upon Training Division staff receiving the record (typically a paper training certificate) from the employee's RU.

Finally, COCL looked at the utility of LMS for supervisors. Specifically, we examined whether supervisors have access to officer training records in LMS. In addition, we raised the question of whether supervisors are, in fact, using this training information if it is available to them. As required by Par. 81, "Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually." In the absence of a fully functioning LMS, the Training Division has been manually preparing reports for supervisors and management. Reports are being sent to the Chief, who shares them with all commanders to ensure that all officers were current with their training requirements. If an officer is deficient in training, the officer's supervisor is expected to directly inform the officer, rather than wait for LMS. This manual system is noteworthy, but is not a substitute for "electronically tracking, maintaining, and reporting complete and accurate records" relevant to training.

At the time of the COCL Audit, the LMS Manager had made significant progress in reformatting existing PPB records so they would be accepted by LMS and data from most Divisions had been entered into the system. The remaining records should be entered before the end of 2018. Most supervisors should now be able to view training records for their officers using LMS. Sergeants have access to information about officers on their shift, and lieutenants and above have access to information about officers in their precinct or division. Training record information available to supervisors includes a description of the training, the date of training, the total training time, and the training provider. Training records can be searched using these details, but the question remains--how can PPB ensure that all supervisors are reviewing the database, as required by the Settlement Agreement? (Note: Performance evaluations are now annual rather than semi-annual).

To address this concern, PPB has instituted a change to the annual Performance Evaluation form so that supervisors are required to check two boxes indicating that they have (1) reviewed EIS and (2) checked the training records of their subordinates. Supervisors also receive a reminder at the beginning of each month indicating whose Performance Evaluations are due, and then another reminder mid-month. Also, monthly correspondence from the commander of EIS to RU Managers/supervisors includes a few lines reminding them to check the new boxes regarding EIS and training records. PPB reports that these reminders have been particularly effective, achieving near perfect compliance rates with supervisors reporting that they have reviewed the officer's training records. Thus, PPB has gone to considerable lengths to ensure compliance and document that supervisors are reviewing the training records of their

19

employees. However, COCL encourages PPB to move from this self-report check-box system to an electronic record to independently verify that supervisors have accessed LMS records of their employees.

Apparently, the LMS system links all data to an individual's record. This linkage is functional for documenting an officer's attendance and for recording test results regarding the employee's knowledge or skill proficiency. However, as noted in our audit of LMS, this system is problematic for maintaining survey results whereby officers (as students) are asked to evaluate the class and the instructor. To circumvent this loss of anonymity and allow officers to provide honest feedback without retribution, PPB stores the training evaluation data on a separate server at the Training Academy and will be using Voxco software. We support this decision for surveys, as Voxco has a respected software program for managing survey data. However, we encourage PPB to provide summary information (not individual responses) about class evaluations in the LMS system. LMS is used as a repository for other files such as lesson plans, PowerPoints, and other training materials. This would allow the Training Division to access training information "in a central, commonly-accessible, and organized file system" (Par. 81).

In sum, COCL is assigning Partial Compliance for Par. 81 until it can determine that PPB has a system in place that: (1) includes historical training records; (2) allows the Training Division to access training records "in a central, commonly-accessible" file system, including class evaluation summaries; and (3) can independently verify supervisor's reviews of LMS records.

Reporting of Training Delivered

Par. 82 requires that PPB *"report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ."*

COCL Assessment: PPB currently provides Course Attendance Summary Reports to the Assistant Chief of Operations, and therefore, we believe PPB has substantially complied with Par. 82. (COCL has also received copies of these reports). However, when the LMS system is fully functional, we hope that the Training Division will be able to provide the PPB administration with additional details about the classes offered and class evaluation results.

Trainer Selection

COCL Assessment: Par. 83 requires that PPB "institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force." PPB continues to utilize the Work History Review Sheet when considering and selecting trainers. For all trainers hired, the Work History Review Sheet (informed by SOP 1-19 which guides selection criteria) is completed to ensure that PPB operating procedures and the Settlement Agreement have been complied with. For 2018 Q1 and Q2, PPB provided the Work History Review Sheet for two positions (40mm Less Lethal Operator and AR-15 Instructors). As in past reports, we maintain that if a trainer is involved in a civil judgment within the last five years based on their use of force, PPB should provide a justification and explanation as to why the officer is fit for service as a trainer and the civil judgment is not a disqualifying factor. However, to date, this issue has not arisen. In sum, PPB continues to be in Substantial Compliance with Par. 83.

**Deliver Appropriate and High-Quality Training**

*84. (COCL Summary) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. It begins by stating that "All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled." The subsections of Par. 84 relate to the types of training required for patrol officers, including increasing scenarios for use of force events, de-escalation techniques, procuring medical care, proactive problem solving, civil or criminal liability, and positive communication skills without derogatory language. Particular attention is given to police interactions with individuals who have, or are perceived to have, mental illness. The subsections also refer to supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions.*

COCL Assessment: In this section we review PPB's success in meeting the requirements of Par. 84 for the following trainings: in-service training for all officers, supervisory training, training for Internal Affairs (IA) and the Independent Police Review (IPR) employees, and recruit training (Advanced Academy). We continue to use a full range of methods to evaluate compliance, including a review of curricula and lesson plans; in-person observations of training for both content and delivery; interviews with key personnel in the Training Division and elsewhere; a review of PPB's training evaluation measures and methods, including an assessment of how the Kirkpatrick model is being applied; and an assessment of PPB responsiveness to recommendations by COCL and DOJ. COCL has consulted with the managers and instructors at the Training Division and with the PPB administration regarding recommendations to improve training.

Training to Policy

The PPB has done an excellent job of incorporating changes to policy directives and procedures into new training. Especially important are changes to PPB's use of force (1010.10), which have been accurately covered by instructors during in-service training for both officers and supervisors. The bigger challenge has been to translate policy and standard operating procedures into practical training techniques that will help to achieve PPB's goal of treating all community members with respect, increasing voluntary compliance with requests, and de-escalating intense situations, thus reducing the need for force or the amount of force required. PPB has made significant strides to meet this challenge in 2018, as the Training Division has been very responsive to recommendations from DOJ, COCL, and feedback from the Training Advisory Council (TAC), its own members and local experts.

In-Service Training

In-service training for all PPB officers is the backbone of police training, and therefore, will receive the most attention in our compliance assessment. Equally important is the special training provided to supervisors, who have an enormous impact on the day-to-day actions of PPB officers and influence their acceptance of organizational reforms. In 2017, COCL strongly recommended a new in-service for supervisors that would address outstanding issues in the Settlement Agreement, and in 2018, PPB has responded to this recommendation.

Every year the COCL team has observed PPB's annual in-service training and has made recommendations for improvement. Below we evaluate each section of par. 84 as it applies to PPB's in-

service training for officers (section a) and supervisors (section b). We draw upon current and past training to determine whether PPB has adequately addressed the requirements of the Settlement Agreement.

*84(a)(i) "…increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention."*

COCL Assessment: As noted previously, in the fall 2017 training, PPB produced four scenarios dealing with a variety of topics and they were generally well executed. In the spring of 2018, PPB did not schedule any formal scenarios, per se, because of time restrictions and the need to cover a range of topics within this one-day 10-hour training. However, PPB's fall 2018 in-service included several role-playing scenarios and interactive exercises (many are called skills training or "drills" by PPB). Day One involved 10 hours of classroom training. Day Two involved 10 hours of skills training. Interactive exercises focused on the strengthening of skills involving firearms, Taser usage, and control tactics (e.g. takedowns), as well as one patrol scenario focused on the diffusion of tension with a person in crisis. The debriefings (i.e. feedback to students after the exercises) included the applicable directives and reference to the Critical Decision Making (CDM) model (described below), which should be helpful in officers' force decisions and diffusion of conflict.

One scenario required officers to interaction with a person who is perceived to have mental illness and is in a state of crisis. This scenario was well executed and provides students with opportunities to practice interpersonal communication, including the application of knowledge covered on Day One regarding procedural justice and implicit bias.

Ethical decision making was given some attention in the spring in-service, but was covered more fully in the fall in-service as part of the modules on Procedural Justice, Implicit Bias and the CDM model. Procedural Justice training in the fall gave particular attention to the four key principles for interacting with a community member: (1) give the person voice; (2) treat the person respectfully; (3) treat the person fairly, according to the law, without bias; and (4) act in a trustworthy manner by showing concern for the person's welfare. Implicit bias training covered the nature of implicit bias as a human proclivity, how it can affect police work, and methods for countering it. This entire 4-hour block was, arguably, about "…the importance and impact of ethical decision making…" (Par. 84(a)(i)). Peer intervention was not covered in the fall in-service, but was given two hours of coverage in the spring.

In the spring and fall in-service, instructors employed interactive pedagogical techniques. For example, most of the classes included interactive knowledge checks (within online tests) to facilitate discussion and further the conversation. In addition, instructors included a wide range of videos, often from YouTube, illustrating problematic (and occasionally, desirable) behavior on the part of police officers prior to, or during, the use force. During the Procedural Justice and Implicit Bias class, for example, students observed a video reenactment of a crime scene, broke into small groups, and answer questions about procedural justice, legitimacy, and implicit bias. After watching force videos in the CDM class, students were given short time periods to answer questions (e.g. 60 seconds to answer 6 questions) to help them think through the quick decision-making process that is required in some critical incidents.

The PPB should be credited with creating its own videos for some classes. They partnered with community members to role play situations that would be relevant to procedurally just communication skills, from crime scenes to houseless settings.

*84(a)(ii) "…emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force."*

COCL Assessment: According to Directive 1010.10, PPB expects that "[w]hen feasible, members are expected to use de-escalation tactics in order to avoid the need for or reduce the amount of force." In previous reports, COCL has expressed concern that de-escalation has not received adequate attention during PPB's In-service Training. Furthermore, we have argued that PPB's definition of de-escalation is problematic, giving too much attention to command-and-control tactics instead of presenting de-escalation as a tool to gain voluntary compliance and reduce the intensity of encounters. In response to this concern, PPB hired PERF in the spring of 2018 to "train the trainers." This one-day training in May was required for all PPB trainers, as well as administrators involved in the Settlement Agreement process, such as the Professional Standards Division. The three-person team from PERF did an excellent job of providing training materials and instructional techniques to teach officers how to diffuse critical incidents safely and effectively. The PERF team introduced their ICAT program (Integrating Communications, Assessment, and Tactics) that provides officers with tools needed to address critical, intense situations, such as those where individuals are not armed (or are not armed with a firearm) and may be suffering from a mental health crisis. The training modules covered: the Critical Decision-making Model (CDM), crisis recognition, tactical communications, operational tactics, and scenario-based exercises and video case studies. The scenarios were particularly effective at demonstrating that even experienced PPB instructors can learn from these de-escalation exercises. PPB was able to capitalize on the PERF training and use this knowledge to help plan its spring in-service training for June of 2018.

Specifically, PPB's spring in-service was able to give attention to de-escalation and communication skills that incorporate the principles of procedural justice into a broader framework of police-community encounters. Most importantly, PPB's coverage of the CDM approach was effective and engaging, calling on officers to think more critically about their decisions and response options, and putting de-escalation issues into context. The instructor was able to communicate something that COCL has emphasized repeatedly, namely, that commands for control, however necessary at times, are not de-escalation techniques. De-escalation allows the officer to slow things down and thus make better decisions, and every effort should be made to a diffuse tension before it escalates. Also, by giving attention to the quality of human interaction and engaging the officers on this topic, the instructor was able to link procedural justice to the prevention of force and police legitimacy (i.e. every PPB interaction, whether it be a call for service, custody, use of force or other interaction, is an opportunity to leave an impression, good or bad). When making an arrest, voluntary compliance was put forth as the most desirable outcome. The mix of presentation, class discussion, props (e.g. poster boards to keep key concepts in view throughout) and videos with follow-up analysis seemed highly effective.

*84(a)(iii) "…continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any."*

COCL Assessment: In the 2017 fall training, an instructor reviewed with members the revised 1010.00 directive that included course material to satisfy this requirement. An in-class knowledge check was also administered to ensure that members were familiar with their responsibilities. Medical care was covered well in the 2018 spring in-service, using PPB's dummy and giving attention to wound packing. As noted earlier, the Training Division reviewed on-the-street uses of tourniquets to determine whether these training techniques were being applied in the field.

Calling for medical coverage was covered in the 2018 fall in-service via a "cover fire" drill, where responding officers faced the challenge of rescuing a person on the ground while under fire from another person. This scenario was well executed with a strong debriefing about decision making options. As noted earlier, the Inspector's audit has found no deficiencies to date regarding the procurement of medical care.

*84(a)(iv) "…continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including [ECIT] officers and mental health professionals, or delaying arrest."*

COCL Assessment: Reflecting changes to Directive 1010.00, PPB's in-service training in 2017 and 2018 included both scenario and course coverage of the concepts listed in Par. 84(a)(iv). As noted above, the CDM model covered all of these concepts and provides officers with a framework for integrating and making sense of the staged-decision making process. Also, we refer the reader to COCL's second quarterly report on Mental Health Responses, where we discuss requesting ECIT officers and mental health professionals, and the proficient application of these skills on the job when dealing with mental health crises.

*84(a)(v) "…describe situations in which a force event could lead to potential civil or criminal liability"*

COCL Assessment: We have observed the Legal Update class during each in-service training in 2017 and 2018, wherein the Office of the City Attorney discussed recent changes in criminal and civil case law which may lead to civil or criminal liability. Legal issues received two hours of class time in June of 2018 and one hour in September of 2018. The City Attorney's office has addressed current trends in legal issues, with particular attention to search and seizure with warrantless searches and the concept of reasonable suspicion that provides the legal justification to stop or detain individuals. The Legal Update class covered the individualized reasonable suspicion requirement, which can lead to escalation, injury, and liability if not followed. The proper application of force was covered directly in the CDM class as well as the Firearms, Taser and Control Tactics skills, where the constitutional requirements for using force and the civil and criminal consequences of such decisions were discussed.

*84(a)(vi) "…continue to train officers to avoid using profanity, derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-centered communication, such as the term 'mentals,' in all work-related settings and communications, as well as when interacting with the public."*

<u>COCL Assessment</u>: The requirements of Par. 84(a)(vi) center on the concept of respectful policing and procedural justice. Over the past four years, COCL has recommended that PPB give more attention to training officers in interpersonal communication to avoid the escalation of conflict and force, gain cooperation, and gain the public's trust. The four-hour class devoted to procedural justice and implicit bias in the Fall 2018 In-service represents a significant effort to underscore the importance of respectful and unbiased interactions with the public. The lesson plans and PowerPoints were comprehensive, creative yet practical, and organized in a manner that acknowledged the strong scientific evidence behind these principles.

COCL has also stressed that interpersonal communication is a skill set, like firing a weapon or taking down a suspect, that requires practice scenarios and feedback on performance. We strongly recommend that PPB add one or more scenarios on this topic. For the fall 2017 training, PPB included two scenarios where officers had opportunities to practice procedurally just policing, but that type of work needs to be repeated until the skills have been fully acquired. Procedural Justice was the cornerstone of PPB' fall In-service training, consuming the opening four hours (along with implicit bias). Using a variety of integrated methods (lecture, video, group exercises), PPB did an excellent job of underscoring the importance of respectful "person-centered" communication with the public and how it contributes to public cooperation with, and trust in, the police. COCL is very familiar with the research and training around this topic and concludes that PPB did an excellent job of translating this work into In-service training.

As noted above, as part of the fall 2018 In-service, PPB included a scenario that involves a person facing a mental health crisis. The scenario required officers to practice good decision making and communication skills with a distressed person carrying a weapon. The instructors did an excellent job of debriefing the students, asking them about procedural justice, while at the same time testing a new system for evaluating students' communication skills.

*84(b)(i) [SUPERVISOR TRAINING] "…conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3."*

<u>COCL Assessment</u>: As we noted in our last report, PPB's Fall 2017 In-service Training includes a section on use of force reporting for supervisors as well as the requirements for investigating officer uses of force, including the details of the revised Directive 1010.00 which contains all aspects of "Section III.A.3." Although the requirements of Par. 84(b)(i) have been met technically, we noted that the material was rushed and too much for an all-purpose in-service training. We strongly recommended a <u>separate</u> in-service for supervisors that covers force investigations, as well as EIS and other important supervisory functions.

PPB has been responsive to COCL's recommendation for a stand-alone supervisory training in 2018 (See description below). Overall, the supervisory training in 2018 was strong. The class on Officer Involved

25

Shootings covered Directive 1010.10 on use of force. This is a fairly complex directive, which places considerable demands on supervisors who are expected to conduct a thorough on-scene investigation. As such, we would recommend that the instructor include a summary of key points at the conclusion for students to review. The class on writing After Action Reports was well delivered and provided some practical exercises around officers' force reports (FDCRs) and supervisors' After Action reports.

*84(b)(ii) [SUPERVISOR TRAINING] "…evaluate officer performance as part of PPB's annual performance evaluation system."*

COCL Assessment: The Spring 2017 training included a course on EIS and supervisor evaluations of officers. After observing these classes, COCL concluded that supervisors were not provided adequate direction on *how* to perform such evaluations. PPB has responded to this concern by providing additional in-service EIS training in 2018.

The class objective was to "inform PPB Supervisors of EIS updates and reinforce the policy, philosophy, and intent of EIS" (Lesson plan), and the instructor was very effective at achieving this objective. He sought to actively engage the students by inviting input about what they see as working and not working with EIS. He conveyed a realistic understanding of the system's strengths, weaknesses, and potential as a management tool, and encouraged supervisors to take ownership of, rather than blame, the EIS system. (For additional details, see COCL's evaluation of Section VII of the Settlement Agreement, EIS, in this report.)

As discussed earlier, PPB has enhanced its Performance Evaluation system by requiring that supervisors review EIS records and training records as part of the performance evaluation. The Discussion Tracker in EIS has useful information for supervisors and soon, the LMS should be informative as well.

*84(b)(iii) [SUPERVISOR TRAINING] "…foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action."*

COCL Assessment: We evaluate compliance with Par. 84(b)(iii) in terms of supervisor training on EIS, which includes officer evaluation and management. Supervisors must conduct adequate reviews of their employees in order to "foster positive career development" and impose "non-disciplinary corrective action." (For additional details, see COCL's evaluation of Section VII of the Settlement Agreement regarding EIS, in this report.) Here, we simply note that PPB's EIS supervisory training in 2018 provided solid coverage of: the importance of using EIS frequently to document employee behavior (both positive and negative); the various types of interventions that are available to supervisors if necessary; and the importance of interpersonal communication that doesn't begin with "you are screwing up," but rather communicates to the employee that "you are responsible for your actions." The class also integrated PPB's policy on personnel evaluations with EIS.

We also note that PPB provided command training on the Discipline Guide that was well executed and well received (see detailed below). This training was especially useful for supervisory decisions to "impose appropriate disciplinary sanctions."

26

COCL's Summary of PPB Training Programs

Here we provide a summary of each major training program provided by PPB as it relates to the Settlement Agreement and to COCL's prior recommendations.

In-Service Training

By June of 2018, PPB had made significant strides in several key areas of training that we had previously identified as problematic: breaking down training silos (e.g. integrating weapons and force policy training), infusing training with core values (e.g. procedural justice, customer service, and the value of human life), and taking ownership of the changes that are being made as a result of the Settlement Agreement. Leadership was present throughout much of the 2018 in-service training, communicating the importance of this training to officers' work. This was particularly meaningful since several of the topics are typically met with skepticism by officers. The Chief and Deputy Chief set a positive tone at the start of the in-service training and participated periodically as needed.

As noted earlier, the de-escalation/CDM portion was very well presented. This class, which consumed 25% of the in-service class time, encouraged officer buy-in by positioning the concepts within a framework that officers could easily understand and connect to their daily work. The Critical Decision-Making model guides officers through the process of gathering information, assessing threats and risks, and evaluating options and contingencies. This framework encourages officers to buy time whenever possible (since bad decisions are often made under pressure) and consider all possible tactics for diffusing tension before resorting to force.

Procedural justice was not covered in the spring (except indirectly via the de-escalation/CMD class), as PPB decided to delay coverage until the fall and integrate it with coverage of implicit bias. The spring implicit bias class was taught by two officers who did a fine job of explaining the implicit bias concept and making officers aware that all humans have unconscious biases. However, this class did not adequately link implicit bias to police work, but left this task to the fall in-service. The instructors briefly mentioned how bias might impact police work and how it might be countered. To offer a community perspective, PPB brought in three teenage males and one facilitator from African-American communities in the north and east sections of Portland to share their stories of negative police interactions, ranging from feelings of being racially profiled to excessive force. Questions or comments were not allowed – the police were expected to listen and learn from these stories. This represented a limited attempt by PPB to apply the concept of bias to police work, but considerably more work was needed.

For the fall in-service training implicit bias and procedural justice were combined into a four-hour class. This module was delivered by a sworn PPB officer in the classroom and a professor from Portland State University who appeared on video to provide a very clear understanding of human bias and procedural justice based on scientific research. The PowerPoint material was very well organized and included three videos prepared by the PPB that engaged the officers in group exercises. Two of the videos depicted real-life situations with community members and PPB officers who were acting the roles to illustrate some of the core principles of procedural justice and implicit bias. We credit PPB for engaging segments of the community (African American youth and adults and houseless persons) to help create these effective videos. Many of the slides include questions used to engage the officers in a discussion and apply these concepts to daily police work (e.g. how has implicit bias impacted your work? what can be done about it?). The instructor was skilled at engaging the officers and moving the discussion in the

direction of a deeper understanding of why these principles are important and how they can be applied to police work.

In terms of planning for the 2018 fall in-service training, PPB clearly worked hard to integrate the knowledge acquired in Day 1 training into the skills practice in Day 2 training. COCL has strongly encouraged PPB to integrate communication skills and procedural justice into skills and scenario practice, when it is typically covered only in the classroom. The COCL team has considerable expertise in this area, so we approached this training with a very critical eye. Our conclusion is that PPB has taken significant strides toward achieving this integration. The Training Division devoted one scenario specifically to procedural justice skills, and all of the drill exercises and scenarios during Day 2 sought to strengthen officers' interpersonal communication skills. The Training Division integrated this work into every activity, from control tactics training to ambush training. Because most of the skills training involved extreme encounters with gun shots and the threat of death, it was not the ideal setting for practicing communication skills (e.g. asking officers to treat someone with respect or care for the person's well-being after the subject has tried to kill the officer in an ambush is no easy task). Instructors usually discussed the directives and topics covered in Day 1 at the start and the end of a scenario or skills training. At the conclusion of the training session, the debriefing was structured by the Training Division so that instructors reviewed topics on three laminated sheets – one on the Decision-Making model, one on Procedural Justice, and one on the CSCSC[2] model (the focal point of this particular in-service).

PPB views this work as a key component of its long-term strategy plan to move PPB training beyond the traditional five "core law enforcement disciplines"[3] to a sixth core discipline – communication skills. This new development, if implemented, should place PPB on the cutting edge of police training in the United States.

Feedback from Students.

As reported above, all of the classes within the Spring 2017 In-Service received fairly high ratings from PPB members. Fall student evaluations were not available at the time of this report.

Supervisor Training

The one-day supervisor training in the spring included EIS, deadly force/officer-involved shooting policy, and use of force reporting, as noted above, including Settlement-related changes to PPB directives and Standard Operating Procedures regarding force. In addition, the In-service included Accountability, which focused on the process of handling complaints against officers and the roles of Internal Affairs and the Independent Police Review. In-service also covered the Mental Health Audit Tool designed to help supervisors determine whether officers have completed the Mental Health Template correctly and how to submit case management reminders. This helped to remove the confusion noted by COCL in previous reports about the use of the Mental Health Template and when to call in ECIT officers.

---

[2] CRCRC applies to attack or ambush situations: C = seek Cover, R = Reload, C = Issue commands, R= provide Radio updates, C= Check yourself and others for injuries.

[3] The five core law enforcement disciplines where training has traditionally focused are Control Tactics, Conducted Electronic Weapon, Firearms, Patrol Procedures, and Police Vehicle Operations.

Similar to the general In-service, command staff introductions conveyed the importance and credibility of supervisor training. The topics covered were of particular importance to supervisors and clarified some recently made changes to policy. The training includes good practical exercises around After Action reporting and FDCRs, and were linked to the Critical Decision Making (CDM) model, where supervisors are expected to evaluate officers' actions at each decision point (decision point analysis). These exercises might have been more effective if all supervisors were required to attend the all-rank in-service training prior to the supervisor training, which gave considerable attention to the CDM. (As this was a scheduling issue, some supervisors were able to attend the general In-service prior to the supervisors In-service and some were not). Throughout the day there was an emphasis on using existing processes (e.g. EIS, Supervisor Investigations) to mentor and coach officers, not merely to discipline, which we consider a positive trend.

Overall, supervisors' evaluations of the Supervisory In-service training were very positive and their knowledge of the subject matter was high, as indicated by the surveys and knowledge test, as noted earlier. Their open-ended comments on the survey were more mixed and informative. Several commented on the methods of teaching: too much information was covered in a short time, which doesn't contribute to long-term retention; supplemental readings and videos should be made available on LMS; and all-day classroom lectures with no skills training is not the best learning model. Also, several officers wanted some training beyond traditional patrol operations, such as criminal investigations or proactive street work. One questioned the CDM model, arguing that it doesn't reflect how people make decisions under pressure.

<u>Advanced Academy Training</u>

During 2017 and 2018 we observed classes within the Advanced Academy Training to determine whether Par. 84(a) was being covered adequately for police recruits. As noted in our last report, we were very satisfied with the classes that covered communication and procedural justice. In 2018, we focused our attention on use of force and reporting. The 3-hour class for new recruits focused on good report writing when force is used. The *Graham* factors were individually addressed in great detail, with a focus on how to record details relevant to each factor. The recommendations on force reporting went well beyond the guidance typically provided by other agencies. In addition to the standard points, recruits were instructed to include in their reports additional considerations such as addressing any mental health influences, any de-escalation techniques or tactics considered or attempted, and any force options considered but not used.

Incorporating these factors into the reporting process is crucial as the agency refines its perspective on force. Too often in the law enforcement field, the law and policy are viewed as the only consideration when using force. Here, the instructor emphasized the concept that "<u>can</u> does not mean <u>should</u>." For this training session, an abundance of solid content was delivered in a professional manner by an instructor who used a blend of instructional techniques to facilitate adult learning. In this class, little time was devoted to explaining the new provisions of Directive 1010 on use of force or the importance of de-escalation and diffusion of tension. However, these issues were addressed in other Advanced Academy classes, including Policy and Procedure, Use of Force, and Use of Force Decision Making.

<u>CEW Training</u>

PPB is required by Par. 68(h) to provide annual CEW in-service training, including proficiency and policy changes. This has been done every year, including the 2018 spring and fall in-service. Although we have previously expressed concerns about CEW training, by the fall of 2017 the classroom training around CEW usage had improved significantly. The classroom lectures now cover changes to the force policy. The fall 2018 CEW skills training occurred was realistic and includes an integration of policy and practice. The instructors used PPB's new training dummy to practice handcuffing under power. The training allows officers to practice handcuffing during and between CEW cycles. COCL noted only one problem: Instructors did not consistently reinforce the need for both a warning, when feasible, ("Stop or I will Tase you") <u>and</u> a deployment alert to other officers ("Taser Taser Taser"). However, we observed on the first day of skills training, when the process is being tested for the first time. We were informed by the Training Division leadership that the issue would be corrected immediately.

<u>Command Training</u>

In July of 2018, PPB held a command-level training on use of the Discipline Guide for all personnel at the ranks of Lieutenant, Captain, and Commander. The class was taught by the Commander of the Professional Standards Division and the Chief Deputy City Attorney. The training covered a number of issues, including when to use the Discipline Guide, how to address conduct that may appear to fall into more than one Guide category, responding to minor and major deviations from policy, responding to multiple sustained allegations, and how to review mitigating and aggravating factors that will lessen or increase the consequences of sustained allegations. (Mitigating factors might include, for example, work and disciplinary history, officer's intent, and the circumstances of the incident. Aggravating factors might include potential or actual harm or injury, negative effect on the Bureau's mission or operations, and specific relevant training.)

COCL has observed the training and concludes that it was well executed. The PowerPoint was comprehensive and the instructors did an excellent job of presenting information and facilitating directed discussions. The students were engaged and actively participated in the directed discussions and multiple small group scenario exercises. Participants appeared to understand the material and seemed capable of properly using the Discipline Guide.

<u>Accountability Training for Internal Affairs and Independent Police Review</u>

In February of 2018, an outside consulting firm, OIR, was hired by the City to conduct a joint training of investigators from PPB's Internal Affairs (IA) and from the City Auditor's Office of Independent Police Review (IPR). Given the increased authority of IPR to conduct its own investigations of complaints and recommend its own findings, and given some overlap of IA and IPR investigations in the past (see prior DOJ and COCL reports), this training was intended to help investigators better understand their roles and responsibilities. However, COCL, as well as PPB and DOJ, recognized that this training was unable to achieve this goal for investigators in IA and IPR.

PPB and IPR managers were already planning a follow-up training for IA and IPR investigators and used this opportunity to fill in the gaps that remained after the February training. Hence, a new training program was implemented in April of 2018. This IA-IPR training was co-taught by the Captain in charge of IA and the Director of IPR. COCL observed both trainings and will provide an assessment of the

content and delivery in its Fourth Quarter Report on Accountability. Suffice it to say that the second training was a major improvement, as the instructors specified the authority and roles of both IA and IPR and described the complaint process, from start to finish, within the framework of local laws and directives.

General Comments about PPB Training

Since the inception of the Settlement Agreement, the PPB has made significant strides in the development, delivery and evaluation of training for recruits, officers, supervisors, and commanders. Training is more responsive to the defined needs of the community and officers it serves, more comprehensive in content, and more pedagogically sound for adult learners. The reconceptualization of de-escalation is especially noteworthy, as PPB now encourages officers to use various techniques to calm an agitated subject, promote rational decision making and gain <u>voluntary</u> compliance whenever possible without force. Also, PPB's system of course evaluation, feedback, and adjustment is now superior to what can be found at many training academies. The Training Division has managed to standardize the protocol for administering surveys and tests to students, analyze survey and test data, and provide feedback to administrators and instructors in a timely manner.

COCL acknowledges these enhancements. Our one remaining concern is about PPB's capacity to give officers ample opportunities to identify and rehearse the interpersonal skills necessary for respectful, fair, empathic, and effective communication with members of the community. Without a doubt, PPB has invested substantial time and resources into new training on implicit bias, procedural justice, and de-escalation, and should be commended for these initiatives. However, officers need to practice these critical skills, as they do with firearms training, in order for these skills to be deeply imbedded in their standard repertoire of responses during encounters with the public. Research suggests that these communication skills can increase public cooperation with officers, reduce the likelihood of using force, increase law-abiding behavior, and build public trust in the PPB. To reach the goal line, the desired procedural justice skills must be: (1) <u>displayed</u> so that officers can see what these behaviors look like, and (2) <u>practiced</u> so that officers can remember and repeat these responses in real-world encounters. PPB has made significant strides toward displaying the desired (and undesired) behaviors in the videos it created for the 2018 fall in-service and the discussions around these; the only area where additional work is needed is giving each officer the chance to practice these verbal and nonverbal behaviors through live scenarios and/or online software, with constructive feedback on performance. Ambush encounters are extremely rare and not the optional setting to practice these skills. In sum, we can provide PPB with Substantial Compliance – Conditional for Par. 84, with the condition that PPB make a good faith effort to provide officers with additional opportunities to rehearse the desired behaviors.

We are pleased that the PPB is building more capacity in the Training Division. With budgetary support, PPB is creating three new positions – one to build new leadership training, one to strengthen training in ethics and procedural justice, and one to enhance training on officer wellness and stress. Each of these training initiatives should have a beneficial effect on police-community interactions. These new appointments, along with the new Training Division Captain, should help the Division move beyond training on "tactics" to build a culture of learning that values community-oriented and evidence-based approaches training in Portland.

### Audit the Training Program

*85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.*

Background

We begin with background information to establish some context for PPB's audit of training. At the request of PPB, in December of 2016, COCL provided PPB and the Inspector with a framework that would help guide the development of a Training Audit Plan. COCL emphasized the need for a training audit that not only measures technical adherence (e.g. are training records made accessible to specific people?) but also assesses the quality and delivery of training (Was training well executed and impactful?). In response, the PPB delivered a Training Audit Plan in the second quarter of 2017, and asked for COCL's feedback. COCL prepared an analysis of PPB's plan. In a nutshell, we concluded that PPB's Training Audit Plan is "comprehensive and ensures that the requirements of the Settlement Agreement will be addressed in a reasonable manner." We point out, however, that substantial compliance will be achieved when the PPB: "(1) has implemented this plan with integrity (i.e., has made a good faith effort to collect the proposed information) and (2) can report a reasonable level of success (i.e. is able to create, sustain, and utilize record keeping systems and databases in a manner that yields useful information for most of the identified training domains)."

Between April and October of 2017, a team of analysts and the Inspector in the Professional Standards Division reviewed materials and interviewed key members of the Training Division to prepare the first Training Audit Report in October of 2017 (See Appendix B). In January of 2018, COCL team provided PPB with our assessment of the Audit Report. Overall, the Audit Report is responsive to the seven audit criteria established in Par. 85 of the Settlement Agreement. For each criterion, the Audit includes a description of the background, observations and findings, conclusions and recommendations. In June of 2018, the Training Manager provided the Training Division's formal response to the recommendations found in the Audit Report. The PPB audit team will return to the Training Division in October of 2018 to assess how the findings from 2017 have been implemented. COCL will continue to document how the Training Division has used the audit findings to improve PPB's training.

Here COCL examines whether PPB's first Training Audit adequately covers the domains required by the Settlement Agreement in Par 85. In other words, the Audit should assess whether PPB has adequately completed the following tasks:

*Performance standard 85(a): Conducts a comprehensive needs assessment annually; 85(b): Creates a Training Strategic Plan annually*

<u>COCL Assessment</u>: The Needs Assessment is intended to inform the Training Strategic Plan. PPB's auditors reviewed PPB's 2016 Needs Assessment and concluded that the Curriculum Development Unit of the Training Division did a fine job of utilizing a comprehensive set of source materials, but the Audit team concluded that the Needs Assessment was "too broad to guide training," and therefore, was not really used by the Training Division to plan training in 2017. COCL maintains that the Needs Assessment should be used as a tool to help inform and guide training plans and should be given greater weight by the Training Division. The Needs Assessment should not be expected to identify exact classes or the content of those classes, but only to identify needs.

The PPB Audit team elected to audit the 2016 Needs Assessment, not the 2017 Needs Assessment, because 2016 provided the most recent full year of data for auditing. However, the PPB Training Division made considerable improvements in 2017 and 2018, as documented in this report and elsewhere. Therefore, we ask that the 2018 Audit examine the utility of the 2017 Needs Assessment for the Training Division to determine whether any improvement is shown.

The Training Plan is expected to delineate the "who, what, when, where, and why" of training for the next year. The Training Audit report notes that the development of this plan is an "ad hoc process" rather than a formal process, and needs to be standardized. COCL agrees with this recommendation and the Training Division has already started a formal strategic plan that will cover the next three years. Also, COCL notes that the Needs Assessment is explicitly (and by definition) designed to inform the training plan (Par. 79 of Settlement Agreement), yet the sources identified by the Training Manager in 2017 as informing the Training Plan do not include the Needs Assessment ("These include, but are not limited to: meetings with the Operations Branch, informal conversations with members, instructor leads, sergeants, lieutenants, and other sources"). The Audit team discovered that the Training Division in 2017 did not use the 2016 Needs Assessment for planning 2017 training, in part because it was based on information gathered over an 18-month period, focused on training conducted in 2016, and was not published until November of 2017. If possible, the timing of the Needs Assessment should coincide with the planning of the next training. For that reason, the Training Division has asked for the 2018 Needs Assessment to be completed in September of 2018 to help inform the 2019 In-service training. Also, the future timing of the Annual Needs Assessment and the Annual Training Plan have been memorialized in SOP 2-28, which requires the former to be completed by August 1st and the later by October 1st of each year. We fully support this decision.

The Audit also recommends that the Training Plan "should be informed by the needs of the Bureau rather than being driven by third party requests" and should not be "hobbled by last minute changes made at the direction of third parties on topics not shown by PPB analysis to be immediately necessary." In response, the Training Division is planning to modify SOP 1-21 to indicate that all third-party requests specifically must adhere to the SOP's existing requirement that training be submitted to the In-service Lieutenant at least 60 days prior to the requested training. COCL does not disagree with the desire to plan well in advance, but unusual circumstances can arise that call for third party input, such as when DOJ and COCL are asked to review draft curricula and evaluation plans at the last minute.

We agree that PPB should be allowed time to plan, develop and field test new training modules. Weeks, if not months, are required for thorough planning and development. The timing of input should not be

confused with the need for input. Third parties can represent viewpoints that are not adequately represented within the walls of the PPB, such as community members, policing scholars, legal and law enforcement experts, and others who bring to the table alternative perspectives on policing and needed scientific evidence. We completely agree with the PPB that such input should be received well in advance of training.

The Audit did not address the amount and type of training contained in the Training Plan, and the shortage of certain content areas recommended previously by COCL. PPB auditors maintain that this recommendation falls outside the purpose of the audit plan for Par. 85. We disagree and will revisit this issue under 85(d) below.

The Training Division's ability to conduct a thorough Needs Assessment, while at the same time conduct a thorough evaluation of training, has been constrained by the shortage of analysts who can perform these tasks. The Training Audit acknowledged this problem and recommended that analyst resources be temporarily reallocated until more positions can be created. SSD has provided extensive analytic support in 2018, but the Training Division clearly needs additional personnel.

In sum, COCL encourages the Training Division to give more weight to the Needs Assessment as a primary source for the Training Strategic Plan and ensure that sufficient analytic resources are available for these evaluation tasks. The Training Division now has a plan for doing this, as delineated in SOP 2-28. The next Training Audit should evaluate how the Needs Assessment is being utilized.

*Performance standard 85(c): Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training*

COCL Assessment: Par. 80 of the Settlement Agreement requires that PPB "develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training." We agree with the Audit's general conclusion that the Training Division has "implemented a program to evaluate the effectiveness of training" and has "built the foundation for this process." (See COCL's assessment of Par. 80 above.) However, we again note the lamentation of third-party feedback, specifically the technical assistance provided by COCL regarding the use of in-class surveys:

Audit finding: *"Third parties provided feedback on the survey tool, which generalized the information gathered. The feedback was geared towards creating a tool that would be informative for research purposes; however, many of these suggestions conflict with best practices in training evaluation."*

Audit conclusion: *"Due to incorporation of third-party feedback, the evaluation tool provided less actionable information at the expense of rich, officer-need driven survey data."*

In 2016 and 2017 the COCL team, which has considerable experience in this area, provided the Training Division with extensive feedback and technical assistance regarding the training evaluation. Although initially met with some resistance (as reflected in the Training Audit), the PPB has adopted many of the recommendations designed to improve the training evaluation methods, as discussed earlier in this report. Here, we underscore the need for the audit team to separate its own position from the views of the Training Division staff whom they interviewed. Any "finding" and "conclusion" should represent the position of the auditors and not persons being audited, unless specifically labeled as such.

Finally, the audit could have documented what specifically was done to measure student reactions to the classes, student learning, and on-the-job performance. Although the Audit team only analyzed training records for 2016, they also gathered materials and conducted interviews between April and October of 2017, which would have included the new in-class surveys and knowledge tests. What proficiency and knowledge tests were administered and what improvements are needed? The Training Division should have received credit for the evaluation progress it made in 2017. Also, the Audit did not mention the extent to which the evaluation methods and procedures have been standardized by the Training Division to increase the validity of the results. By not mentioning these methods and procedures, the Audit does not acknowledge their importance for documenting the quality of the evaluation methods employed per Par. 85(c). The Audit team's primary response is that they focused entirely on 2016, including surveys and methods.

*Performance standard 85(d): Maintains accurate records of Training delivered, including substance and attendance; 85(e): Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ*

COCL Assessment: PPB is required to electronically track, maintain, and report "complete and accurate records" on PPB training (Par. 81). The audit team did a respectable job of assessing this requirement. By auditing the training records of a random sample of 501 sworn officers and interviewing Training Division Police Administrative Support Specialists (PASSes), the Audit team was able to identify several deficiencies in the Training Division's record keeping process and make meaningful recommendations for improvement.

The Audit revealed that a certain percentage of officers and supervisors were missing specific trainings that are required by the Bureau. For example, 7.6% of supervisors were missing records showing that they had taken 24 hours of supervisor or leadership training over a three-year period, and 5.6% of officers were missing documentation of at least one of the required 2016 in-service courses. What is unclear is whether these supervisors and officers actually missed the training or the training they got was simply not recorded. If the records are incomplete, the Bureau should investigate potential reasons and identify the scope of the problem. If the members missed the training, the Bureau should find out why and deliver the required training. Also, the Audit recommended that the records system include materials for courses other than In-service and Advanced Academy (e.g. Specialty training), and include complete information on officers who hold secondary certifications and their expiration dates. Given these gaps, the Audit report recommends the creation of a "quality assurance process." The Training Division has started to develop a quality assurance process for reviewing members' training records, but at this time, it is a manual process because of the difficulties associated with automation via LMS.

What is not clear from this PPB Training Audit is whether existing Training Division records are adequate to understand not only the existence of training, but the content, depth of coverage, and how well the training was received. COCL maintains that PPB should audit the "substance" of the training (Par. 85e) to ensure that it provides sufficient coverage of critically-important topics, knowledge and skills (as established through the Needs Assessment and police research) and that the coverage includes enough "dosage" to make a difference. PowerPoint coverage of changes in PPB directives is important, but insufficient. In the interest of teaching real skills, for example, a comprehensive audit would document how many scenarios were introduced in what classes or request that the Training Division complete this

task. How many hours of instruction were provided for each topic? What were the students' overall evaluations of each class? These types of questions are not raised or addressed by the current Audit.

Finally, the Audit on 85(d) and 85(e) does not include an update on the Learning Management System (LMS), which was being implemented as the new records management system in 2017 and was facing significant obstacles (see Par. 81 above). We understand that the Audit team chose to analyze 2016 training records and LMS was not implemented at that time. As a result, the Audit focuses exclusively on Skills Manager and Snapshot (software by Crown Pointe Technologies). However, LMS was being implemented in 2017 during the period when the Audit team was gathering information, and deserved mention. (A contract was signed with Cornerstone in September of 2016 and a full-time Learning Management Administrator was hired by PPB in June of 2017. LMS was up and running, as demonstrated to COCL, prior to the completion of the Training Audit). Specifically, how much progress was made toward the full implementation of LMS by October of 2017 and were there issues with implementation that might have warranted additional recommendations in the Audit report?

*Performance Standard 85(f): Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities*

<u>COCL Assessment</u>: Auditing all areas of training in a single audit would be an insurmountable task. Consequently, the Audit team selected the Advanced Academy (recruit training) and the Field Training and Evaluation Program (FTEP) for review in this first Audit. We would encourage the PPB to develop a schedule for auditing other training programs in the years ahead, so that all training receives some scrutiny at some point in time. In-service and Supervisor training are especially important for the successful operation of a large police department.

The Audit adequately describes the roles and responsibilities of most employees involved in the recruit and FTEP training programs, as established by Directives and SOPs. The Audit also clearly identifies a variety of problems with communication and awareness of responsibilities (e.g. uncertainty about whether Recruit Training Sergeants (RTSs) in each precinct are aware of "the responsibilities of FTOs and their own responsibility to evaluate FTO performance."). For example, the Audit found that RTSs have not been "notif[ying] the Training division (in writing) of any performance deficiencies with FTOs," as required by PPB. The Audit also makes a series of clear recommendations to address these problems.

The Audit speaks highly of the capabilities of the ADORE software to track recruit progress (including recruit journals, performance evaluations by FTOs, and data analysis). However, the Audit does not describe how frequently ADORE is being used for various functions and whether such information is being captured by the system.

The Audit recommends that Directive 1501 be updated to clarify responsibilities and improve communication within the FTEP program. It also recommends iPads or tablets for recruits to improve their access to ADORE. In response to these recommendations, FTEP coordinators and the FTEP sergeant have been asked to describe the processes and procedures pertinent to their roles, including communication between the FTEP program and the precincts. This information has been used to update the SOP and the FTEP manual. Also, the Training Manager has updated Directive 1501.00 regarding FTEP

36

current roles and responsibilities. At this time, the Training Division is not able to purchase iPads or tablets for recruits because the budget does not include funds.

*Performance Standard 85(g): Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.*

COCL Assessment: To evaluate compliance with this performance standard, the Audit team has interviewed relevant personnel about the process of handling delinquent signatures and was given access to the Directive Acknowledgement System to look for unsigned directives. They found that 7 sworn members had 7 or more unsigned directives in 2016. The Audit team also found no process in place to notify these officers of outstanding directives after 30 days and no accountability for a member's failure to acknowledge directives. Consequently, the Audit includes a number of good recommendations for improving the process of review and accountability, including the establishment of additional notification after 60 days, the continual display of outstanding directives on the member's PPB portal page, and the creation of accountability and quality assurance mechanisms. Overall, the audit of compliance with performance standard 85(g) is solid. Hopefully, the next Audit will comment on whether the new LMS is able to incorporate the requirements of 85(g), as indicated by PPB.

Summary Comments on Training Audit

The PPB Training Audit represents a serious attempt to audit aspects of the PPB's training program. In general, COCL found that the Audit was sound and constructive, given the limited time and resources available. We have no issues with the vast majority of the Audit team's conclusions or recommendations, although the Audit team at times fails to distinguish its own conclusions from those of the Training Division.

The Training Division has reason to be frustrated by "third party" input at the 11th hour and has put in place mechanisms to ensure that input is timely. However, we stress that third party input remains important, including research-based input. The best police training academies today are evidence-based, and therefore, based on research, evaluation, and best practices, especially in such areas as procedural justice and diffusion of conflict. Having an open mind about such approaches is in the best interest of the PPB, its employees, and the residents of Portland.

The 2017 Audit was clearly limited in scope to the requirements of Par. 85 of the Settlement Agreement, and even there, was limited to specific training programs. We understand this objective, but encourage the PPB to conduct a more comprehensive audit of the Training Division, including In-service, Supervisory training and ECIT as needed. Apparently, the PPB is planning to expand PPB's audit capacity by adding three new analyst positions. The audit function is expected to reach beyond Training to other divisions of the Bureau. COCL endorses this decision, as large police agencies have many operational areas where routine auditing is an indispensable management function. Perhaps some functions, however, are best left to outside independent auditors, who can easily distinguish their own analysis from the analysis provided by the unit being audited.

The Training Audit did not document the content of training and whether it adequately reflected the current issues facing the PPB. The Audit team maintains that such documentation is beyond the scope of their mission. We will not object to that decision here, but instead, ask the Training Division to accept this responsibility as part of its Needs Assessment and Training Plan. The Training Audit also did not describe the specific methods used to evaluate the training, except to criticize the in-class surveys (either reflecting their own views or the views of the unit being audited – it remains unclear which is being represented). In reality, the evaluation methods have improved dramatically during the past two years, as determined by COCL.

Finally, we have previously recommended that the Audit team and the PPB administration require that the Training Division provide an official response to each Audit recommendation. PPB has provided us with an Excel spreadsheet that was sent to the Training Division and the Training Division has since responded to each recommendation. We consider this an important interactive component of PPB's new accountability process.

COCL is impressed with PPB's first training audit, despite some concerns, and therefore, is prepared to give Substantial Compliance – Conditional for Paragraph 85. The conditions for achieving substantial compliance are the following: As part of the 2018 Training Audit, in addition to reviewing progress on the 2017 audit recommendations, PPB needs to: (1) review the status of LMS implementation and identify any remaining obstacles to full-scale implementation; (2) review the adequacy of the 2017 Needs Assessment and determine the extent to which it was used by the Training Division to develop a Training Plan for 2018; (3) describe the methods used by the Training Division to evaluate training so as to memorialize this work and make it available to future training evaluations at PPB; and (4) when describing findings and conclusions, the audit reports need to clearly separate the views of the auditors from the views of training instructors and supervisors interviewed. Audits, by definition, are independent investigations.


*86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.*

COCL Assessment: On a quarterly basis, the Inspector has presented force data to the Training Advisory Council (TAC). The presentations utilize the Quarterly Force Data Summary Reports, examining trends in both overall force and particular force types. We have observed each of the past five TAC meetings and have reviewed the transcripts for those meetings as well. Overall, we are satisfied that the Inspector's presentations meet the letter and intent of Par. 86. Additionally, we continue to note that not only does the Inspector provide presentations to TAC, TAC continues to request particular analyses in order to inform their work. Where appropriate, the Inspector and analysts have been responsive to the TAC's requests, in particular providing a more in-depth analysis of CEW use. Recently, the Inspector and analysts provided a presentation on using the online force data portal, further allowing TAC members to

dive into the data to drive particular questions for the Inspector. Such abilities, we believe, will ultimately better inform future interactions between TAC members and the Inspector.

In addition to presentations to TAC, the Inspector also identifies force patterns and trends and provides recommendations to the Chief of Police as well as the PPB Training Division. In 2017, the Inspector identified 7 patterns and trends for the Training Division to address (box-ins, force on fleeing suspects, handcuffing tactics that may lead to force, takedowns, waiting for cover, and pursuits). Additionally, in 2018, the Inspector identified 2 patterns and trends for the Training Division to address (pursuit After Action review and CEW use by more tenured officers). For the Inspector's 2017 recommendations, we observed many of these addressed in the spring 2018 training. The 2018 Training Plan (informing training in 2019) was not available at the time of this report, but COCL will evaluate whether the Inspector's recommendations are taken under review in a similar fashion to the 2017 recommendations.

The TAC too has made recommendations for Training, though their 2017 recommendations have only recently been discussed and have not yet been formally approved by TAC. In 2016, the TAC provided a recommendations report to the Chief of Police – the Chief then provided a response to the TAC's report. As TAC appears to be one year behind in providing their recommendations (as of this report writing, they have not approved their 2017 recommendations), we would suggest updated recommendations for 2018 be provided as soon as possible. In other places, TAC has provided informal feedback to the Training Division. For instance, in the Spring of 2018, TAC members attended a "dry-run" of PPB's Implicit Bias training and provided the Training Division with comments and suggestions. A member of the Training Division then provided feedback to each substantive comment. Although formal recommendations still need to be made and reviewed for 2018, we credit TAC for their informal comments to the Implicit Bias training as well as credit PPB for their detailed responses.

Taken altogether, we believe that PPB and TAC have substantially complied with the requirements of Par. 86, though urge TAC to formally approve the 2017 recommendations and issue 2018 recommendations soon so that PPB might benefit from their input.


*87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.*

<u>COCL Assessment</u>: Training Advisory Council meetings continue to remain open to the public and no meetings have been closed based on the confidentiality/public safety exemptions allowed under Par. 87. In addition, TAC meetings have, in the past year, utilized full transcripts to document their meetings (for instance, see https://www.portlandoregon.gov/police/76343). These transcripts allow the public to see word-for-word the discussions, deliberations, questions asked/answers received, and decisions of the TAC. PPB has indicated to us that the creation of transcripts will occur in the near future and, although we cannot comment on the resources required for a transcript of each meeting, we believe they are extremely useful and would encourage PPB do so despite transcripts not being a requirement of Par. 87. In sum, we believe that PPB and TAC have substantially complied with the requirements of Par. 87.

### Training System Assessment

Taking a systems approach, the basic question is whether the implementation of the Settlement Agreement has allowed PPB to create a training system able to (1) identify areas where officers require

training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; and (4) audit the overall training system to ensure that it is accountable to the administration and the public.

First, we are satisfied that PPB has created a strong Needs Assessment system that, despite some timing issues, will help PPB identify issues and topics where additional training would be beneficial. We encourage PPB to expand the Needs Assessment to other trainings as needed and continue to use recent student evaluations and new findings from the Force Audit to identify training needs. In any event, PPB should find a way to better utilize the findings of future Needs Assessments, beginning with the 2018 Needs Assessment to be released soon.

Second, PPB needed to develop appropriate and high-quality training for new recruits, officers and supervisors. We believe PPB has achieved success in all of these areas. Seeking to reduce preventable force incidents, increase accountability for decisions to use force, and increase public trust, the PPB has redefined de-escalation and has added a collection of strong training classes that focus on decision making in critical/stressful incidents, de-escalation, procedural justice and strategies to reduce bias. The use of interactive scenarios to strengthen officers' skills in these areas is only in its infancy, but the PPB leadership seems committed to advancing the methods of rehearsal training.

Furthermore, consistent with our prior recommendations, PPB has developed and successfully implemented a comprehensive in-service training program exclusively for supervisors that covers the many roles they must assume in force events, EIS, coaching at-risk officers, and vehicle pursuits. Selecting the right instructors for each class is critical, i.e., individuals who can motivate and inspire officers to achieve a higher standard of performance.

Third, the PPB has developed a legitimate system of training evaluation, using multiple methods to achieve this objective. By 2018, the Training Division had established and strictly followed a protocol for ensuring the validity of data collected through course evaluation surveys and knowledge tests (e.g. no talking while surveys are being administered). PPB continues to explore new options for assessing performance during live scenarios. With respect to measuring performance in the field, PPB is partnering with the Police Foundation to begin a contact survey of community residents to seek their input on whether PPB officers are interacting with them in a fair and respectful manner.

Fourth, PPB's Training Audit was comprehensive and used a multi-method approach to collecting data. Future training audits can be further strengthened by providing a more detailed examination of the Needs Assessment and its utility for the Training Plan. Along these lines, the content and dosage of training also deserves additional attention by the Training Division (if not the Training Auditors) to ensure that the training delivered is maximally responsive to the current needs of the community and the PPB.

The next training audit must include an analysis of the new LMS database and its capacity to provide the needed records and reports for the PPB and the auditors. PPB has made significant progress toward building the LMS system to track the delivery of training and has hired a full-time LMS manager. However, loading the LMS system with historic data has been a major challenge for the Training Division. LMS should be fully populated with data by the end of the third quarter and then, the challenge will be demonstrating its utility to the Bureau for training accountability.

In sum, we believe PPB has made substantial progress toward the development of an effective training system that is able to identify training needs, develop and deliver high-quality training, evaluate that training, and audit the training system. Consequentially, the PPB in 2018 is more accountable to the police administration, City government, and the public it serves. The conditions for achieving Substantial Compliance with the Settlement Agreement have been delineated within this section.

**Section VII. Employee Information System (EIS)**

| Par. 116 | Substantial Compliance – Conditional |
|---|---|
| Par. 117 | Substantial Compliance – Conditional |
| Par. 118 | Substantial Compliance |
| Par. 119 | Substantial Compliance |
| Par. 120 | Substantial Compliance |

*116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. See PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall:*

*a. Require that commanders and supervisors conduct prompt review of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;*

*b. Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and*

*c. Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.*

COCL Assessment: Our evaluation of Par. 116 has historically broken out the paragraph into two main parts: (1) the specific EIS reviews required in subsections (a) and (b), as well as the combined unit/supervisor analysis described in (c) and; (2) the requirement of PPB to "enhance its EIS to more effectively identify at-risk employees, supervisors and team to address potentially problematic trends in a timely fashion" (emphasis added). Here, we continue to provide such a breakdown.

**Specific EIS Reviews**

PPB addresses subsection (a) through each member's annual performance evaluation (see PPB Directive 345.00 – Employee Information System (section 2.2) as well as PPB Directive 215.00 – Member Performance Evaluations). PPB addresses subsection (b) through Directive 345.00 as well (section 2.1). Thus, the requirement of supervisors to conduct EIS reviews for both elements of Par. 116 is enshrined in policy and supervisors have received corresponding training (see below).

For subsection (a), the EIS Lieutenant generates on a monthly basis a list of members who require reviews and provides a list to Responsibility Unit (RU) Managers of those members at the beginning of the month. Near the middle of the month, the EIS Lieutenant provides RU Managers a reminder email of all members for whom a review has not been conducted. For subsection (b), the EIS Lieutenant receives

42

a Personnel Action Form (PAF) for all transfers and promotions, giving EIS notification that a review under subsection (b) is required. Similar to reviews required under subsection (a), an initial email and reminder email are then sent to the RU Manager and subsequently sent to the supervisor responsible for the review.

The use of initial and reminder emails has resulted in a sizeable increase in compliance with Par. 116 (a) and (b). However, only recently have there been a follow-up system for non-compliance put into place. In August of 2018, the EIS Lieutenant implemented a process wherein RU Managers for supervisors who had not completed an EIS review within the required 30 days were sent a third email, noting that should the review still remain outstanding after an additional 30 days, the RU Manager would receive a Performance Discussion Tracker (PDT) entry. Although PPB may consider including this admonition (PDT entry) within the first and second email, we credit PPB with implementing a system wherein RU Managers will receive a PDT entry which are then reviewed during the RU Manager's annual performance evaluation. As such entries are part of the considerations for promotion and pay scale, RU Managers have incentive to ensure the required reviews are completed.

Between the processes for both subsections (a) and (b), we believe PPB has in place a sufficient system for (1) informing supervisors of their review responsibilities (by way of PPB Directives) and (2) informing supervisors when a review is required of them. Additionally, by having PDT entries for continued non-compliance, PPB has in place a system of accountability for RU Managers and supervisors. Because this system is new, we will continue to monitor its implementation.

We also evaluate whether supervisors have been provided sufficient instruction on <u>how</u> EIS reviews should occur as they relate to subsections (a) and (b). As part of the 2018 Supervisors In-Service, PPB included a class on EIS, a portion of which discussed the "How and What to Review in the Member's EIS Record." Our observations of this class indicate that PPB has taken sufficient steps to provide training to supervisors on how to evaluate EIS (though we continue to suggest they update Directive 345.00 to provide the "How and What to Review" aspect for future supervisors). Member evaluations for the EIS class also indicated a positive reception; COCL's analysis found that over 90% of supervisors indicating some level of agreement with the statement "The [EIS] class was a good use of my training time." Based on our observations, as well as the perceptions of PPB supervisors, we believe that supervisors have been provided sufficient instruction on the "How and What" to review in EIS.

Aside from the review of EIS being included in policy and supervisors receiving training, we analyzed whether the reviews, in fact, occur as required and within the required timeline. Quarterly, PPB provides an assessment of required reviews and compliance rates. Particularly with subsection (a) reviews, PPB has seen a substantial increase since implementing the email reminder system described above. In the second quarter of 2018, supervisors completed subsection (a) reviews 97% of the time, a dramatic increase from 50% in the prior quarter. For subsection (b) reviews, progress has been less stable within the past three quarters. For instance, compliance rates saw steady gain between the second and fourth quarter of 2017, increasing from 71% in the second quarter to 85% in the fourth quarter. However, in the first quarter of 2018, compliance rates dropped to 56% and then increased to 79% in the second quarter of 2018. Discussions with the EIS Lieutenant indicate that email notifications were not provided in the first quarter for subsection (b) reviews, leading to lower compliance rates. After the first quarter, email notifications resumed for subsection (b) reviews, and compliance rates increased. This natural experiment provides compelling evidence of the importance of email notifications.

43



*Chart provided by PPB

Combining the findings from subsection (a) and (b) reviews, PPB also evaluates compliance based on units and supervisors in accordance with subsection (c). PPB's process for identifying overall compliance based on units and supervisors is sufficient, identifying the overall rate for each RU Manager. As seen in Table 1, reviews required under subsections (a) and (b) showed a large-scale overall increase in the second quarter of 2018 compared with the three prior quarters. As noted earlier, this increase is likely due to the email notification system, though we will have to ensure that the overall high rate of compliance continues in the following quarters. Additionally, the table below allows for comparisons between the individual units. Compared with other Units, the Training Division and Youth Services Division have consistently lower rates of compliance. Although compliance rates for both Divisions increased in the second quarter of 2018, the increase was not as prevalent as other Units. Although a discussion with the RU Managers of these Divisions may occur, historically, no further actions have been taken. However, similar to our comments found in 116a and 116b, EIS has recently implemented a system wherein RU Managers whose entire Unit/Division show lower rates of compliance will receive a PDT entry. As this system was only implemented in August, we have not yet seen the process play out in practice.

In addition to PTD entries for lower rates of compliance, PPB may also consider a reward system for Divisions and Units which consistently show higher rates of compliance. Despite Bureau-wide lower rates of compliance leading up to 2018 Q2, some Divisions and Units regularly perform at a high rate with regard to required reviews. For instance, the Drugs and Vice Division (DVD) had a 96.3% compliance rate over the past three quarters. Additionally, East Precinct had compliance rates consistently near 80%

44

from 2017 Q3 to 2018 Q1 and an 89% compliance rate in 2018 Q2. Traffic Division too has consistently shown comparatively higher rates of compliance, achieving an 82.3% compliance rate average over the past three quarters. These Divisions/Units should be recognized for their demonstrated commitment to performing the required reviews and positive PDT entries should be considered.

**Table 1: Compliance Rates by Unit**

| UNIT | 2017 Q3 | 2017 Q4 | 2018 Q1 | 2018 Q2 | TOTAL |
|------|---------|---------|---------|---------|-------|
| Central | 69/123 (56.1%) | 28/67 (41.8%) | 40/86 (46.5%) | 60/72 (83.3%) | **197/348 (56.6%)** |
| Chief's Office | 1/12 (8.3%) | 5/6 (83.3%) | 0/1 (0%) | 15/21 (71.4%) | **21/40 (52.5%)** |
| Detectives | 25/63 (39.7%) | 9/35 (25.7%) | 25/45 (55.6%) | 24/28 (85.7%) | **83/171 (48.5%)** |
| DVD | 7/11 (63.6%) | 9/9 (100%) | 11/11 (100%) | 6/7 (85.7%) | **33/38 (86.8%)** |
| East | 80/101 (79.2%) | 63/81 (77.8%) | 51/63 (81%) | 73/82 (89%) | **267/327 (81.7%)** |
| FED | 9/9 (100%) | 6/7 (85.7%) | 6/7 (85.7%) | 2/3 (66.7%) | **23/26 (88.5%)** |
| Fiscal | 0/1 (0%) | 0/1 (0%) | 0/0 (NA) | 0/0 (NA) | **0/2 (0%)** |
| FSD | 3/3 (23.1%) | 3/15 (20%) | 6/12 (50%) | 5/5 (100%) | **17/35 (48.6%)** |
| North | 49/127 (38.6%) | 37/71 (52.1%) | 23/80 (28.8%) | 57/66 (86.4%) | **166/278 (59.7%)** |
| PED | 0/1 (0%) | 0/0 (NA) | 0/1 (0%) | 0/0 (NA) | **0/2 (0%)** |
| Personnel | 8/19 (42.1%) | 19/26 (73.1%) | 7/31 (22.6%) | 9/12 (75%) | **43/88 (48.9%)** |
| PSD | 4/6 (66.7%) | 2/2 (100%) | 2/3 (66.7%) | 1/1 (100%) | **9/12** |

| | | | | | (75%) |
|---|---|---|---|---|---|
| Records | 0/2 (0%) | 0/1 (0%) | 0/0 (NA) | 1/1 (100%) | **1/4 (25%)** |
| SSD/CIU | 3/5 (60%) | 0/2 (0%) | 1/3 (33.3%) | 2/2 (100%) | **6/12 (50%)** |
| TOD | 8/20 (40%) | 8/15 (53.3%) | 8/16 (50%) | 34/40 (85%) | **58/91 (63.7%)** |
| Traffic | 31/45 (68.9%) | 13/16 (81.3%) | 25/32 (78.1%) | 13/14 (92.9%) | **82/107 (76.6%)** |
| Training | 0/11 (0%) | 0/11 (0%) | 4/11 (36.4%) | 10/15 (66.7%) | **14/48 (29.1%)** |
| Transit | 4/12 (33.3%) | 1/11 (9.1%) | 5/10 (50%) | 7/7 (100%) | **17/40 (42.5%)** |
| YSD | 5/17 (29.4%) | 4/9 (44.4%) | 1/11 (9.1%) | 4/6 (66.7%) | **14/43 (32.6%)** |
| **TOTAL** | **306/598 (51.2%)** | **207/385 (53.7%)** | **215/423 (50.8%)** | **323/382 (84.6%)** | **1,051/1,788 (58.8%)** |

Finally, we evaluated the quality of EIS entries made as a result of the reviews required by subsections (a) and (b). Our methodology for this analysis was to select 15 members who required an EIS review in accordance with their annual performance evaluation and 15 members who required a "new to command" EIS review. We then reviewed the EIS entries related to those evaluations to determine how informative the entries might be to a future supervisor reviewing the member's EIS. For both review types (annual performance evaluation and "new to command" reviews), we found the EIS entries by supervisors typically exceeded simple statements like, "I reviewed EIS." Indeed, supervisor entries were oftentimes more detailed, including assessment summaries such as "utilizes appropriate resources," "writes good reports," "performs at a high level" and other such summary phrases. Additionally, some supervisors noted the extent of their review within the Performance Discussion Tracker entry, making notes such as, "I reviewed all the performance and work categories, arrests, complaints, leave usage, etc." On the whole, the entries indicate that not only are supervisors performing the required reviews and documenting that the reviews occurred, but often the documentation is of high quality, going beyond a mere "check-the-box" approach.

Taken together, we believe that PPB has nearly complied with the specific review requirements of Par. 116 and subsections (a-c). Supervisors are made aware of their responsibilities generally through Directives as well as specifically through the tailored email system used by the EIS administrator. Particularly through the email notification process, PPB has seen compliance rates for subsection (a) and (b) increase compared with one year prior. Furthermore, PPB has recently begun PDT entries for RU Managers who do not ensure that 116a and 116b reviews are completed as well as for RU Managers whose Precinct/Division continue to show comparatively lower compliance rates. Because this system was only implemented in August, substantial compliance is conditioned on PPB's demonstration that PDT entries are made when reviews are not performed and continued maintenance of overall higher compliance rates.

### Enhanced EIS

Under Par. 116, we also provide an evaluation of PPB's efforts to "enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion." In prior reports, we have noted a number of issues with EIS, in particular the informal nature of EIS Administrator initial review of alerts, the oftentimes low rate of supervisor review and intervention, and the EIS timelines found in Directive 345.00 which appear to inhibit PPB's ability to "address potentially problematic trends in a timely fashion." In the Outcomes Assessment portion for Section VII (found below), we provide an extended evaluation of these issues, though provide a summary here as it relates to compliance with Par. 116.

As it relates to past critiques, PPB now appears to have implemented a systematic approach to EIS Administrator initial reviews of EIS alerts. As a matter of practice, EIS Administrators forward all alerts to the RU Manager that do not meet delineated closure criteria (single use of force related to the alert; duplicate alert with no new use of force incident; system error; employee not subject to review; exceptional closure with PSD Lieutenant approval). This is an improvement over what may have previously been described as subjective closure by prior EIS administrators.

As described in further detail below, the data we reviewed indicate that a high proportion of EIS alerts are being forwarded to the officer's RU Manager. While Force type alerts show a relatively lower proportion of being forwarded on to the RU (45.1%), this is primarily due to the fact that many of the non-forwarded alerts were created despite no new uses of force. Would this declination criterion not be met, Force type alerts would be forwarded on to the RU approximately 87% of the time.

We also note here the sheer volume of EIS alerts that are being sent to RU managers. In the one year of data we note a total of 911 alerts forwarded on for RU review (not counting alerts administratively closed by EIS). This equates to approximately 2.5 alerts per day that RU Managers as a whole must review and decide whether to send it on to the lower-level supervisors. Conversations with PPB have indicated that supervisors often feel overwhelmed with the volume of alerts which require review. While we do not decry PPB having so many alerts (i.e. "casting a wider net"), PPB should continue to assess the organizational utility of their current thresholds given the potential for the number of alerts to grow so large that it creates doubt in the minds of supervisors as to the effectiveness of the system.

Particularly for Force type alerts, the data indicate a low proportion of alerts receive some type of recorded intervention (19.6%). Additionally, Complaint or Criminal Complaint almost never receive some type of recorded intervention, as ongoing investigations will prohibit a supervisor from discussing individual complaint allegations. Although avoiding discussion with officers about ongoing investigations is understandable, no formal follow-up system is in place, leaving complaint (and criminal complaint) threshold breaks largely without a systematic resolution. Alternatively, Commendations and Traumatic Incident receive a comparatively higher rate of recorded interventions (45.5% and 73.4%, respectively) as interventions related to these alerts are associated with less negative stigma.

Finally, although EIS policy timelines allow for up to 120 days for an intervention, the reality is that EIS alerts are often resolved in a much shorter timeframe. For instance, over 60% of EIS alerts are resolved in less than 30 days. Even for EIS alerts which result in some type of intervention, 40% are resolved in less than 30 days, indicating a relatively expeditious review system.

Taken together, we believe that PPB has addressed many of the issues we have noted in our past reports. A large proportion of EIS alerts are forwarded on for RU review and EIS alerts appear to be resolved in a "timely fashion" even when resulting in some type of recorded intervention. However, particularly for force, alerts have an approximate 1-in-5 chance of receiving a recorded intervention (though PPB has implemented training to better define the types of actions which should be coded as an "intervention"). Additionally, EIS alerts related to complaints and criminal complaints are rarely discussed with the employee due to open investigations of specific complaints, calling into question the utility of such alerts.

To address these issues, we recommend PPB continue to stress to supervisors the types of actions that are considered "intervention" (in the context of the EIS system) and track whether outcomes are improved as a result of the recent training. Should intervention rates remain low, we recommend PPB consider the effectiveness of their current thresholds to identify potentially problematic officers. Additionally, should PPB supervisors not be allowed to discuss complaint trends due to open investigations, PPB should consider a follow-up process for alerts related to Complaints and Criminal Complaints so that identified trends do not go unaddressed. Both PPB and COCL agree that deferred intervention is not as effective as more immediate intervention, but we note that intervention at some point with officers who exhibit a pattern of complaints is better than no intervention at all, and protects the PPB and the community against future costly mistakes.

Finally, though not necessarily a criterion for substantial compliance, PPB might evaluate whether their current thresholds create an overwhelming volume of EIS alerts and whether this volume is contributing to supervisors' mistrust of EIS as an "effective" system for identifying potentially problematic officers. In the near future, PPB will implement a process wherein Category IV force events contributing to a threshold break will be considered in a different fashion than Category II or III force events. In the dataset that we received, Category IV force events were part of approximately 40% of EIS Force alerts. This process is expected to reduce the volume of force type alerts (currently 65% of all EIS alerts), though the full impact of this change is uncertain. Based on the above findings and recommendations, and combining the findings from the reviews required in subsections (a-c), we believe PPB has conditionally substantially complied with the requirements of Par. 116.

*117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.*

COCL Assessment: As part of the revisions to the Settlement Agreement in the Spring of 2018, PPB now uses data gathered from the force audit and aggregates these data to identify groups of officers who use force at a higher rate compared with others. While the Inspector has, in the past, identified individual officers using force more frequently (see our prior report's assessment of Par. 76) and current EIS thresholds are also used to identify potentially problematic individual officers, the focus of Par. 117 looks at clusters of officers. PPB has provided us with a revised draft SOP 47 which details the process used by PPB to identify potentially problematic groups, units, and supervisors. However, as PPB has only recently provided COCL with a revised draft and we continue to have some questions about this process. Hence, further discussion with PPB is necessary before we can determine whether they have substantially complied with the requirement of Par. 117.

In order to identify groups, units, and supervisors, PPB uses the Force Applications Report that we described in our analysis of Par. 76 (see our July 2018 report). This Force Applications Report includes only officers who have used four or more applications of force over the past year. By excluding officers who have used three or fewer applications of force over the past year, PPB is able to focus on those officers who may be considered potentially problematic (though not necessarily problematic). However, this also impacts the true mean of (and variance within) groups, units, and supervisors, as officers with fewer uses of force are not included. Both approaches have pros and cons and PPB has noted that including all officers may be possible with updated software. While we encourage PPB to obtain such software to include all officers, we believe the current inclusion/exclusion criteria is sufficient in the interim.

Using the Force Applications Report, PPB looks at two primary areas of review. The first looks at Precinct/Shift dyads and compares mean rates of force per arrest and other considerations (e.g. applications of force per FDCR, force per calls for service, types of force used, etc.). For instance, our independent analysis noted that while the mean force per arrest rate for the entire Bureau in the Force Applications Report was approximately .10 (meaning an FDCR was completed once for every 10 arrests), some Precinct/Shift combinations showed a force rate of .17 (Central D-shift and North A-shift – see Table 2 below). However, PPB performed an Analysis of Variance (ANOVA) – a statistical test – and found no statistical difference between the means. Of course, this again raises the question of whether including officers who did not use four or more applications of force would have changed the force rates to the degree where statistical differences may have been found. The exclusion of such officers raises the overall means so that contrasts may be starker, but because of the lower number of officers, statistical significance might be lost. By including all officers, differences between groups may be less stark but smaller differences may still be significant when there are more people in the sample. Again, there are pros and cons to each approach and PPB might consider both in the future.

**Table 2: Force Per Arrest Rate (Precinct and Shift)**

|      | A    | B    | C    | D    | E    | NRT/DET | PPI  | SCU  |
|------|------|------|------|------|------|---------|------|------|
| CE   | 0.1  | NA   | 0.13 | 0.17 | 0.12 | 0.07    | 0.05 | 0.13 |
| EA   | 0.13 | 0.11 | 0.12 | NA   | 0.09 | 0.09    | NA   | NA   |
| NO   | 0.17 | NA   | 0.08 | NA   | 0.1  | NA      | NA   | NA   |

*NA indicates that no officer with the Precinct/Shift dyad used four or more applications of force

The second analysis performed by PPB looks at intra-Precinct/Shift dyads to compare groups of officers who work the same Precinct and same Shift but have different days off. Because PPB does not have a Unity of Command structure (i.e. where an officer has a single Sgt. supervisor), this process is PPB's approach to identifying potentially problematic clusters. Similar to the inter-Precinct/Shift analysis, PPB identifies groups that demonstrate a significantly higher rate of force (among other analyses) to identify outliers. Through their analysis, PPB was able to identify a group of officers that showed a statistically significant higher rate of force per arrest compared with other officers who worked the same Precinct and same Shift. After diving deeper into the data, the Inspector noted that the group of officers were more experienced and overall made fewer arrests, which increased their force-to-arrest ratio. By only arresting when "necessary," the officers were more likely to choose other dispositions for low-severity crimes (e.g. citation in lieu of arrest). Thus, the group was not deemed problematic or requiring intervention.

Although we understand how the Inspector and analysts came to their conclusions regarding this singular finding, PPB has not sufficiently memorialized the steps taken once an outlier has been identified nor have criteria adequately been defined for when a group of officers will be forwarded on for RU review. Conversations with PPB and a draft SOP provided by PPB reveal that should additional analyses not identify the reason for the groups' higher rate of force, then it would be forwarded on to the RU. However, this is not a defined set of criteria. As further conversation with PPB regarding their draft SOP is necessary, at this point PPB has only conditionally complied with Par. 117. COCL is not dictating a particular set of analyses and acknowledges that PPB should have the flexibility to run a variety of analyses to help identify and understand patterns. However, PPB's protocol requires consistent parameters in order to increase accountability to the Bureau's administration and the public.

Finally, as also expressed elsewhere in this report, we question whether the use of single person thresholds by PPB (see Pars. 116, 118, and 119) has created so many EIS alerts as to overburden RU Managers and supervisors. Should that be the case, PPB may be hesitant to forward group-level alerts to RU Managers, thus adding to their workload. We continue to suggest PPB explore other options for individual level alerts to reduce the number of alerts so that group-level alerts may also be forwarded at a higher rate without adding to the current burden of reviews. As we have noted with past EIS reports, direct supervisors are in a better position than EIS Administrators and the Inspector to determine whether "potentially problematic" is "actually problematic." By forwarding a higher number of alerts on to direct supervisor, decisions and interventions about individuals or groups can be done by those who work with the officers routinely. However, this would need to be done in a way that does not overwhelm supervisors with alerts, otherwise, this action will essentially negate the informative power of EIS.

*118. PPB shall continue to use existing thresholds, and specifically continue to use the following thresholds to trigger case management reviews:*

> *a. Any officer who has used force in 20% of his or her arrests in the past six months; and*

> *b. Any officer who has used force three times more than the average number uses of force compared with other officers on the same shift*

*119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.*

COCL Assessment: PPB has maintained the above thresholds to trigger an EIS alert for review by EIS administrators. We therefore continue to believe PPB has substantially complied with the requirements of Pars. 118 and 119. However, we maintain the thresholds identified in Pars. 118 and 119 have limited effectiveness based on the volume of EIS alerts and the relatively low intervention rate, particularly for Force, Complaint, and Criminal Complaint type alerts.

As an alternative to the thresholds currently used, PPB has begun exploring a multivariate approach to identifying potentially problematic officers. Using various measures for all officers (including force data, complaints, overtime worked, sick time used, and the number of EIS alerts), PPB can identify officers who are one or two "standard deviations" above the mean on a wide spectrum of variables. PPB then takes this information and ranks officers based on the number of categories wherein the officer measures high. We believe this approach is in line with recommendations we have made in prior reports regarding methods to identify potentially problematic officers across a range of categories (rather than single focus thresholds). Although PPB's methodology for identifying potentially problematic officers has not been finalized and additional areas of review are being considered, we believe it carries considerable potential. Hence, COCL supports PPB in its efforts to explore this multivariate approach, especially if the analyses incorporate larger time periods (e.g. 1 or 2 years) and broader range of focal points. Therefore, while PPB has substantially complied with the specific thresholds required by Pars. 118 and 119, we look forward to reviewing the results of the multi-variate approach now being tested by PPB.

*120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.*

COCL Assessment: PPB continues to have two EIS administrators who have received training on the operational and technological aspects of EIS. Additionally, the Professional Standards Division employs a person who acts in an analyst capacity for EIS, documenting and tracking compliance with reviews required by Par. 116(a-b) and EIS alerts. Our discussions with the analyst indicate that she is familiar with the types of data analysis related to EIS functions and is capable of performing such analyses.

Additionally, we have recommended in the past that PPB compile an EIS manual that would describe in detail how future EIS Administrators should evaluate alerts and forward them on for RU manager review. Our recommendation was particularly designed to provide a frame of reference should a situation arise where both administrators were fairly new and institutionalized knowledge was lost. In

fact, such a situation recently occurred, though a compilation of EIS reference material had already been completed. Since then, a more polished EIS manual has been drafted. We have reviewed the manual and are satisfied that it contains the necessary information for future EIS administrators. The manual includes sections related to the purpose of EIS, EIS access, how supervisors may utilize EIS, how to process alerts, Performance Discussion Tracker, and other EIS functions. For the sections pertaining to how supervisors may benefit from utilizing EIS, PPB distributed and discussed those sections during the Spring 2018 Supervisor In-Service training and are currently in the process of posting those sections to the PPB intranet.

In summary, PPB continues to have two EIS administrators who have been trained and who have created a training manual for future administrators (thus passing on institutional knowledge). Relevant material is also accessible by supervisors, allowing for future reference. Additionally, the Professional Standards Division employs an analyst to perform the types of analysis necessary to engage in ongoing review of the system. Taking the above information, we believe that PPB has now substantially complied with the requirements of Par. 120.

## Outcome Assessment of EIS

Overall, there are eight ways that an officer may receive an EIS alert:

- Commendations: Member receives 2 commendations in a 6-month period
- Complaint Count: Member receives 3 complaints in a 6-month period
- Complaint Category: Member receives 2 complaints with an allegation in the same category in a 6-month period
- Criminal Complaint: Member receives any complaint that includes an allegation of criminal conduct
- Force Ratio: Member's force ratio is 20% (1 FDCR to 5 arrests) or higher in a six-month period
- Relative Force Ratio: Member's force ratio is 3X or more that of their shift's average ratio
- Force Count: Member files 3 FDCRs in a 30-day period
- Traumatic Incident: Member experiences 3 traumatic incidents in a 30-day period

Using the past four quarters of EIS data (2017 Q3 to 2018 Q2), we provide an overall evaluation of the EIS system and its outcomes. For ease of presentation and clarity, we collapse the two Complaint thresholds into a single category ("Complaint") as well as collapse the three force thresholds into a single category ("Force"). As seen below, Force type alerts are by far the most common alert created by the EIS system (65.3%). Traumatic Incident type alerts comprise 20.2% of all alerts, while all other categories represent <10% of the alerts created.

**Table 3: EIS Alerts by Category**

| Alert Type | Number of Alerts | Proportion of Alerts |
|---|---|---|
| Commendations | 42 | 2.9% |
| Complaint | 111 | 7.7% |
| Criminal Complaint | 57 | 3.9% |
| Force | 944 | 65.3% |
| Traumatic Incident | 292 | 20.2% |
| **TOTAL** | **1446** | **100%** |

EIS Alerts Forwarded to RU Manager

In our October 2017 report, we reported that EIS Administrators had created systematic criteria for determining which EIS alerts were forwarded onto RU Managers. By identifying five "Closure Criteria" (single use of force related to the alert; duplicate alert with no new use of force incident; system error; employee not subject to review; exceptional closure with PSD Lieutenant approval), the EIS Administrators forward on all alerts which do not meet such criteria. The use of these criteria has continued and, through this process, PPB has seen the proportion of EIS alerts forward for RU review steadily increase from approximately 6% in the fourth quarter of 2015 to 65.4% in the second quarter of 2018. Each of the past four quarters more than 60% of the EIS alerts have been forwarded to the RU Managers.

However, the decision to forward an alert on for RU review appears to be substantially impacted by whether the alert is related to force or not. Of the 502 non-Force related alerts, 485 (96.6%) were forwarded on for RU review, while for the 944 Force related alerts, only 426 (45.1%) were forwarded on for RU review.

**Table 4: EIS Alerts Forwarded to RU by Type**

| EIS Alert Type | Forwarded to RU | |
|---|---|---|
| | Yes | No |
| Commendations (N=42) | 90.5% (N=38) | 9.5% (N=4) |
| Complaint (N=111) | 97.2% (N=108) | 2.8% (N=3) |
| Criminal Complaint (N=57) | 94.7% (N=54) | 5.3% (N=3) |
| Force (N=944) | 45.1% (N=426) | 54.9% (N=518) |
| Traumatic Incident (N=292) | 97.6% (N=285) | 2.4% (N=7) |

Looking further into the issues, we note that of the 518 Force related alerts in the past year that were not forwarded to an RU, 423 of them (81.6%) were not forwarded (at least partially) because the alert was created despite no new force being used (see PPB SOP #44 for exclusion criterion "arrest data falling out of the look back period, duplicate FDCR entry, or new allegation added to already open complaint"). This single exclusion criterion largely explains the reason why force cases are not forwarded to an RU Manager. Should PPB have suspended this singular exclusion criteria, only 123 cases would have met one of the other exclusion criteria, meaning that approximately 87% of force cases would have been forwarded to the RU Manager. Therefore, we find that EIS Administrators are forwarding a fairly high proportion of EIS alerts for supervisor review and, where force alerts are concerned, alerts that are not forwarded are based on an absence of new force events.


EIS Alert Outcomes

Despite a greater proportion of EIS alerts being forwarded onto RUs (compared with prior years), approximately 40% of alerts that do get forwarded on to the RU level stop there rather than being sent to the officer's direct supervisor. For instance, of the alerts forwarded on to the RU Manager, 9.9% were declined by the RU Manager and an additional 29.5% receive an RU Manager review only. In addition to this finding, out of the 876 EIS alerts that were forwarded to the RU and had an outcome[4], only 301 (34.4%) resulted in some type of intervention (defined as monitoring, debrief, or discussion with the employee). Expanding this analysis outward, this means that only 21.3% of all alerts receive some type of recorded intervention (including those not forwarded to the RU Manager).

However, these findings too are impacted by the type of alert that is created. For alerts forwarded to the RU Manager, "Traumatic Incident" and "Commendation" alerts receive a recorded intervention at a substantially higher rate than the other alert types. As seen in Table 5, Traumatic Incident alerts received a recorded intervention 73.4% of the time, while Commendations received a recorded intervention 45.5% of the time. For Force type alerts, a recorded intervention is made in 19.6% of alerts forwarded to the RU Manager, while an additional 51.1% are reviewed by the officer's supervisor but not discussed with the officer. For Complaints and Criminal Complaints, they are nearly universally not discussed with the officer because administrative/criminal investigations are often still open at the time of the alert. We discuss this in more depth below.

---

[4] In the dataset, there were 35 alerts that had been forwarded to the RU but had not yet received an outcome because they were fairly recent cases. These 35 alerts have been excluded from the analysis.

**Table 5: Alert Type by Outcome**

| Alert Type | RU Review – Not Forwarded to Supervisor | Supervisor Review – No Further Action | Intervention |
|---|---|---|---|
| Commendations (N=33) | 36.4% (N=12) | 18.2% (N=6) | 45.5% (N=15) |
| Complaint (N=108) | 92.6% (N=100) | 4.6% (N=5) | 2.8% (N=3) |
| Criminal Complaint (N=54) | 100% (N=54) | 0% (N=0) | 0% (N=0) |
| Force (N=403) | 29.3% (N=118) | 51.1% (N=206) | 19.6% (N=79) |
| Traumatic Incident (N=278) | 21.9% (N=61) | 4.7% (N=13) | 73.4% (N=204) |

While Traumatic Incidents and Commendations often result in, at minimum, a discussion with the officer, we focus here on the relatively lower proportion of Force alerts which result in some type of intervention. We do not believe this finding is due to a disinterest in intervening on the part of the RU Manager or supervisor, although that may occur in some cases. Rather, we believe, based on discussions with PPB personnel, that supervisors are intervening, but are not documenting their discussions with officers.

As our prior organizational surveys have indicated, EIS has historically been negatively viewed by PPB officers and supervisors. Our last PPB employee survey indicated that only 16.2% of responding members believed EIS was an effective tool for identifying at-risk officers. Additionally, PPB personnel have told us that many officers and supervisors view EIS as a tool for punishment and is a negatively oriented system. Therefore, despite supervisors having discussions with officers who receive an alert, the supervisors may be hesitant to codify such discussions as an "intervention" given the perceived negative implications of the term. For example, a supervisor may have a discussion with an employee wherein the supervisor says "I reviewed the alert, I don't find any concerns with the force events that led to the creation of the alert, and I don't believe there to be any concern with your work overall." Although this should be coded as "Discussion with Employee" and, therefore, an intervention, PPB personnel have stated that it is often not coded as such. However, by not coding it as an "intervention" PPB should be aware that it leaves the impression that supervisors are not approaching officers at all and/or are not taking EIS alerts seriously.

In the Spring 2018 Supervisor In-Service, PPB attempted to resolve this issue by clearly defining the types of "intervention" that might be used when an alert is forwarded to them and how they should be coded when supervisors employ them. Under the "Coaching Conducted" intervention, PPB describes the intervention as "A discussion with the member focusing on areas where it is believed that they could improve their performance in the future or where the performance is positive and confirmation is given." The second aspect of the definition captures what may be occurring in practice but not being accurately captured in the data. Additionally, the Supervisor In-Service training reinforced to supervisors that officers' negative perception of EIS was within the supervisors' power to change. The instructor noted the need for supervisors to follow up with officers who have received an alert and use the EIS system to record positive changes and good work. If EIS is only seen as having a negative perception,

this may cause officers to disengage when receiving an alert. By documenting a positive review of an EIS alert, the supervisors can influence officers' perceptions on the system. Through the EIS training, PPB's hope is that supervisors are willing to code their conversations with employees more accurately rather than a resulting impression that supervisors are not discussing the alert with their employees at all.

The improvement in coding supervisor coaching will likely impact Force type alerts more than other types of alerts. For Commendations and for Traumatic Incidents, it appears supervisors are more likely to document the interventions provided as these categories of alerts hold less negative stigma than Force type alerts. We agree with PPB that the power to alter the negative perception of EIS lies with the supervisors and that including positive reinforcement in the definition of "Coaching Conducted" will help with this.

We also comment here on PPB's position of not discussing Complaint trends with officers. Our discussions with PPB and PPA representatives indicate that supervisors are restricted from discussing complaint trends if one of those complaints is still the subject of an active investigation. Should such a discussion occur, this may be viewed as "Command Counseling" and any discipline resulting from the active investigation would therefore be considered dual punishment for the same offense. Although we do not argue the position that both PPB and the PPA take, we note such a position undermines the function of EIS as an intervention tool for identified trends rather than any single occurrence. For instance, we note that 86 officers received an alert based on the compliant thresholds in the past year, i.e. demonstrating a pattern of complaints. This indicates that officers who receive a complaint alert are a relatively small proportion of all officers – that distinction (i.e. exhibiting a pattern) is what should be discussed rather than the individual complaint. COCL is not suggesting that supervisors or command personnel should discuss with an officer the merits of a particular complaint, but instead the presence of a broader trend. PPB has begun doing this in some ways with the multi-variate risk assessment approach. However, this approach has not been finalized and neither COCL or DOJ has had a chance to evaluate whether this approach contributes to PPB's overall system of identifying potentially problematic officers. While we believe it carries such potential, we would need to see a fully implemented process to comment further.

Another option, should PPB maintain that discussion with members cannot occur while an investigation is ongoing, may be for PPB to consider delaying intervention until after the investigation is complete. However, as an administrative investigation may take up to 180 days, both PPB and COCL have noted that such an approach (deferred discussions with the officer) may be less effective than discussions which happen closer to the events which led to the EIS alert. This alternative would only be available if the administrative investigation is completed relatively quickly (or if the third complaint is administratively closed), thereby making an effective intervention still possible. Rather than a blanket prohibition in complaint alerts, this would allow for some interventions to occur.

Despite the overall lower rates of intervention for all alert types, we find that officers who receive a higher number of EIS alerts are more likely to receive an intervention for at least one of the alerts compared with officers who receive only a single EIS alert. Using the last four quarters of data, officers who received a single alert in the past year received some type of intervention 30.5% of the time. As the number of alerts an officer received over the year increased, so did their likelihood of receiving an intervention for at least one of the alerts. For instance, officers who received 2 EIS alerts received some type of intervention for at least one of the alerts 38.5% of the time. Expanding outward, officers who

received five EIS alerts received some type of intervention for at least one of the alerts 61.8% of the time. This may indicate an adherence to the law of averages (i.e. as the number of alerts increases, so do the odds that at least one of them will receive an intervention, whether it be the first alert, last alert, or any of the alerts in-between), though this pattern may also indicate that as officers continue to break thresholds, supervisors are more likely to take the additional step of providing an intervention.

**Table 6: Percent of Officers Receiving Intervention by Number of Alerts**

| Officer's Total Number of Alerts | Intervention For At Least One Alert | |
| --- | --- | --- |
| | No | Yes |
| 1 (N=203) | 69.5% (N=141) | 30.5% (N=62) |
| 2 (N=91) | 61.5% (N=56) | 38.5% (N=35) |
| 3 (N=63) | 55.6% (N=35) | 44.4% (N=28) |
| 4 (N=44) | 54.5% (N=24) | 45.5% (N=20) |
| 5 (N=34) | 38.2% (N=13) | 61.8% (N=21) |
| 6 (N=21) | 61.9% (N=13) | 38.1% (N=8) |
| 7 (N=20) | 50% (N=10) | 50% (N=10) |
| 8 (N=12) | 33.3% (N=4) | 66.7% (N=8) |
| 9 (N=7) | 0% (N=0) | 100% (N=7) |
| 10 (N=2) | 50% (N=1) | 50% (N=1) |
| 11 (N=2) | 50% (N=1) | 50% (N=1) |
| 12 (N=3) | 33.3% (N=1) | 66.7% (N=2) |
| 13 (N=1) | 100% (N=1) | 0% (N=0) |
| 14 (N=1) | 100% (N=1) | 0% (N=0) |

EIS Alert Timeline

In our last report, we commented that based on the timelines found in Directive 345.00, the notification process for EIS alerts may take up to 120 days to complete, which does not include time taken to carry out an intervention. Despite this possibility, the past year of EIS data indicates that EIS alerts are resolved in a more expeditious fashion. Looking at cases that were forwarded to the RU Manager (i.e. excluding cases which met one of the five EIS Administrator closure criteria), the average number of days from the alert being created to the alert being closed was 34.35 days, while the median number of

days was 22. Nearly 80% of EIS alerts were closed in 60 days or fewer and approximately 60% were closed in 30 days or fewer. For alerts that received some type of intervention, the average number of days between alert creation and alert closure was 49.15, while the median number of days was 37. Even for cases which resulted in some type of intervention, approximately 70% of cases were closed within 60 days or fewer and 40% were closed within 30 days or fewer. These results indicate that while policy allows for a potentially lengthy alert review process, in practice alerts are oftentimes expeditiously reviewed.

### Overall System Assessment

We now provide an assessment as to whether the implementation of the Settlement Agreement has led PPB to possess an effective system for identifying potentially problematic officers, supervisors, and units and providing an intervention. Herein, we believe PPB finds itself in a Catch-22. Although we believe they have nearly substantially complied with all requirements of Section VII, ironically, PPB's strict compliance with the Settlement Agreement has limited the effectiveness of EIS overall.

There is considerable positive news. Supervisors are able to access EIS to perform evaluations of officers in regards to annual performance evaluations and transfers, and the data contained within EIS (including the Performance Discussion Tracker component) appear to provide a sufficient picture of officer performance. PPB has also implemented a system for requiring supervisors to consult EIS data (through Directives and email notifications), including PDT entries for RU Managers whose lower-level supervisors do not consult the system. EIS Administrators are well trained, possess an operations manual, and have criteria for determining which alerts should be reviewed by RU Managers/supervisors. Additionally, PPB has proposed a system for identifying potentially problematic groups, units, and supervisors (though further discussion is needed regarding group identification and the decision-making process used when forwarding findings to RU Managers). All of these aspects are positive contributors to the overall EIS system and PPB should be given full credit for implementing these components of EIS.

However, by strictly adhering to the requirements of Pars. 118 and 119, the thresholds designed to alert supervisors to potentially problematic behavior create an overabundance of alerts, causing so much noise around the data as to render the alerts suspect. As reported above, in the past year PPB has seen 911 alerts forwarded to RU Managers (and 1,446 alerts overall), leading, in part, to a system wherein less than 20% of members believe EIS is an effective tool for identifying potentially problematic officers. Additionally, as we noted in our May 2017 Outcome Assessment, the current thresholds' short time periods (6 months) sometimes result in PPB being unable to identify officers who demonstrate a long-term pattern of complaints.

As the Settlement Agreement <u>requires</u> PPB to use the prescribed thresholds, PPB should not be seen at fault for the system. Although COCL continues to recommend PPB revise the criteria for alerts and DOJ has concurred (see DOJ's December 2017 report – "PPB's complex system could be made less time-and-resource consuming if there were more effective triggers…PPB should examine its thresholds in this regard"), PPB is in the position of wanting to comply with the Settlement Agreement's terms. Supplemental to the Settlement Agreement, PPB has begun evaluating officers on a range of factors, including applications of force, complaints filed against members, accidents, overtime worked, use of sick time, and EIS alerts. In our opinion, this multi-variable approach has the potential to supplant PPB's

current thresholds and we encourage PPB to continue exploring this methodology. We further encourage PPB to carry out the methodology on a longer timeline, substituting a 6-month timeline (as is found with many of the present thresholds) for a one- to two-year timeline to better identify trends. However, the requirements of the Settlement Agreement remain and PPB continues to comply with them.

Taking the above into account, we find ourselves in an unpleasant situation of commenting that PPB's EIS system is less than effective because of PPB's strict adherence to the Settlement Agreement. Many elements of the EIS system appear beneficial, including the PDT and review process. Additionally, some EIS thresholds appear, at times, capable of identifying potentially problematic officers – however, the volume of alerts seemingly overwhelms the system, causing mistrust in EIS' capabilities. The short-term thresholds also contribute to misidentifying or not identifying officers as potentially problematic. Also, supervisors are presently unable to formally discuss complaint trends with an officer under investigation for a single complaint (i.e. unable to initiate an "intervention" consistent with other EIS alerts). Thresholds based on longer time periods would help to address these problems, as would PPB's new approach to analysis. PPB's multi-variable approach is still being developed though our initial impression is that it is better suited for intervention than the current thresholds. We therefore suggest PPB continue to develop this model, and if it proves effective, substitute it as the primary system for identifying potentially problematic officers.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**CIU:** Criminal Intelligence Unit

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**NRT:** Neighborhood Response Team

**PCCEP:** Portland Committee on Community Engaged Policing

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PPI:** Portland Patrol Incorporated

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SCU:** Sex Crimes Unit

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**YSD:** Youth Services Division

# LIST OF PERSONNEL

Chief of Police: Danielle Outlaw

Deputy Chief of Police: Robert Day

Assistant Chief of Operations: Eric Lee

Assistant Chief of Services: Chris Davis

Assistant Chief of Investigations: Jami Resch

Acting Commander of Professional Standards Division/Compliance Coordinator: Jeff Bell

Professional Standards Division Principal Management Analyst: Mary Claire Buckley

Inspector: Craig Dobson

Behavioral Health Unit (BHU) Acting Lt.: Casey Hettman

EIS Supervisor: Jay Bates

EIS Administrator: Paul Meyer

Training Captain: Erika Hurley

Auditor: Mary Hull Caballero

IPR Director: Constantin Severe

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

# **APPENDICES**

COCL Compliance and Outcome Assessment Report: Section IV Training
and Section VII Employee Information System

# **APPENDIX A**

## Training Evaluation Feedback Loops

Below offers a brief description of the Level One and Two feedback loops for the Enhanced Crisis Intervention Team Training, In-service, Supervisor's In-service, and Advanced Academy training evaluation processes. The process for all four programs is largely similar, but is tailored slightly depending on factors such as the length of the training program sessions, one-time versus repeated trainings, the number of internal versus external instructors, etc.

Portions of these evaluation processes are still in the implementation stage. For instance, the Training Division began implementing full Level One and Two evaluations for the Supervisor's In-service in May 2018 and is currently analyzing this data and implementing the related feedback processes.

### Enhanced Crisis Intervention Team Training

*During the training event:*

Since this training is typically conducted in one 4-day training block, usually no formal feedback loops are conducted during the training sessions unless an ECIT Training Manager, lead instructor, the ECIT Program Coordinator, or the Bureau's Mental Health Professional (MHP) requests additional evaluation information during the training event. In the sessions, there are discussions, question and answer, case study participation, skill-builder exercises, scenarios, and other participatory activities to help gauge student understanding and ability to apply the concepts and skills.

*During the evaluation process:*

Once the analysis of the survey and learning assessment results are nearly complete, the evaluation analyst(s) meet with the Bureau's Mental Health Professional and the ECIT Coordinator to provide preliminary results and collect their feedback regarding student performance and engagement, their perspective on training logistics, their feedback on particular survey or test result findings, student verbal feedback they received, and any additional information needed to properly interpret the evaluation results. A plan for collecting the feedback from the instructors is then developed at this time. Typically, the ECIT Program Coordinator, the Bureau's Mental Health Professional, and the evaluation analyst will meet with the lead instructors together to obtain their observational feedback. However, the analyst may meet with some of the internal instructors individually and the ECIT Program Coordinator or the Bureau's MHP may meet with some of the external instructors separately, depending on schedules and what arrangements best meet the need to collect the most candid information.

The main evaluation results are presented to the ECIT Training Managers, the ECIT Program Coordinator, and the Bureau's MHP. At this time, these individuals also provide input on additional information missing from the evaluation results and any future evaluation priorities.

*After the level one and two evaluation process has been completed:*

Once the Level One and Two evaluation process is complete and the main areas for additional follow-up are identified, the ECIT Training Managers, the ECIT Program Manager, and the Bureau's MHP follow-up with the instructors, administrative staff, and the Curriculum Development Unit, as needed, to further discuss any topic areas identified and/or develop

strategies for enhancing program planning, curriculum, instruction, or logistics for future ECIT training. This is typically done through individual meetings.

## In-Service Training

*During the training event:*

During the timeframe the In-service sessions are being held, preliminary survey results will periodically be provided to the In-service Lieutenant, Sergeant, and lead instructors. The knowledge test results will be provided to the In-service Lieutenant and Sergeant (and potentially related lead instructors) within two working day after each test session.

The In-service Lieutenant and Sergeant will follow-up with the lead instructors regarding evaluation findings as needed while the sessions are on-going. Additional evaluation findings will also be compiled for the In-service Training Managers upon request during this timeframe.

*During the evaluation process:*

At the end of all the In-service sessions, the final survey, knowledge test, and any additional learning assessment data will be aggregated and analyzed for the purposes of training program evaluation and identifying any related training needs pertaining to the needs assessment process. Once the analysis of the survey and learning assessment results are nearly complete, the evaluation analyst(s) meet with the lead instructors to obtain their observations on student performance and engagement, their perspective on training logistics, their feedback on particular survey or test result findings, verbal feedback they received from students, and any additional information needed to properly interpret the evaluation results.

The main evaluation results are presented to the In-service Lieutenant and Sergeant. At this time, these training managers also weigh in on additional information missing from the evaluation results.

*After the level one and two evaluation process has been completed:*

Once the Level One and Two evaluation process is complete, and the main areas for additional follow-up are identified, the In-service Lieutenant and Sergeant will follow-up with the lead instructors, administrative staff, and the Curriculum Development Unit, as needed. At this time, further development of the next In-service training plans may also take place. This will be done through a large
group meeting or individual meetings, depending on what is most practical given the topic area(s) and scheduling logistics.

## Supervisor's In-Service Training

*During the training event:*

During the timeframe that the Supervisor's In-service is being held, preliminary survey results will periodically be provided to the Supervisor's In-service Lieutenant and Sergeant,

as well as any lead instructors upon request. The knowledge test results will be provided to the Supervisor's In-service Lieutenant and Sergeant within two working days after each test session.

The Supervisor's In-service Lieutenant will follow-up with the lead instructors regarding evaluation findings, as needed, while the sessions are on-going for the purposes of refining instruction or clarifying curriculum. Additional evaluation findings will also be compiled for the Supervisor's In-service Training Managers upon request during this timeframe.

*During the evaluation process:*

At the end of all the Supervisor's In-service sessions, the final survey, knowledge test, and any additional learning assessment data will be aggregated and analyzed for the purposes of training program evaluation and identifying any related training needs pertaining to the needs assessment process. Once the analysis of the survey and group-level competency-based testing results are nearly complete, the results will be shared with the Supervisor's In-service Lieutenant and Sergeant. At this time, feedback regarding student performance and engagement, their perspective on training logistics, their feedback on particular survey or test result findings, student verbal feedback they received, and any additional information needed to properly interpret the evaluation results will be reviewed.

*After the level one and two evaluation process has been completed:*

The Supervisor's In-service Lieutenant will follow-up with instructors, as needed, to further discuss any results pertaining to enhancing instruction, logistics, and/or curriculum for any future related trainings.

The evaluation analyst(s) may follow-up with instructors as needed for additional information that may arise to fulfill the evaluation reporting requirements.

**Advanced Academy**

*During the training event:*

During the 10-week Advanced Academy, preliminary survey results are periodically provided to lead instructors and training managers to address areas such as student training needs, inconsistencies in instruction, and/or challenges in class sequencing.

The lead instructors are involved in grading the competency-based tests and are therefore familiar with the individual-level results of these measurements during the Academy. These results are utilized to determine whether a student needs to receive additional training and testing in a particular area prior to graduating from the Advanced Academy. Depending on the results, they may also identify a group training need.

The Advanced Academy Training Managers follow-up with the lead instructors regarding evaluation findings as needed during the Academy. Additional evaluation findings are also compiled for the Training Managers upon request.

*During the evaluation process:*

Once the analysis of the survey and group-level competency-based testing results are nearly complete, the evaluation analyst(s) meet with the lead instructors of the main disciplines to

obtain their observations on student performance and engagement, their perspective on training logistics, their feedback on particular survey or test result findings, verbal feedback they received from students, any changes in their evaluation priorities for future Academies, and any additional information needed to properly interpret the evaluation results.

The main evaluation results are presented to the Advanced Academy Training Managers. At this time, the Training Managers also weigh in on additional information missing from the evaluation results and their future evaluation priorities.

*After the level one and two evaluation process has been completed:*

Once the Level One and Two evaluation process is complete and the main areas for additional follow-up are identified, the Advanced Academy Training Managers meet with the lead instructors, administrative staff, and the Curriculum Development Unit, as needed, to further discuss any topic areas identified and/or to develop strategies for enhancing program planning, curriculum, instruction, or logistics for future Academies. This is done through a large group meeting or individual meetings, depending on what is most practical given the topic area(s) and sometimes this has been dependent on scheduling logistics.

The Advanced Academy Training Managers or their designee also meet with External trainers who teach stand-alone classes at the Academy to discuss the trainer's evaluation results. Typically this is done by one of the Training Managers; however, occasionally one of the curriculum development or evaluation specialists will be assigned if the results are particularly complex or they are already working with the instructor on curriculum development.

COCL Compliance and Outcome Assessment Report: Section IV Training
and Section VII Employee Information System

# **APPENDIX B**



PORTLAND POLICE BUREAU
TRAINING DIVISION

# EVALUATION REPORT
# 2017 ANNUAL TRAINING NEEDS ASSESSMENT

NOVEMBER 2017



**Ted Wheeler** Mayor
**Danielle Outlaw** Chief of Police
**Robert Day** Captain, Training Division

2017 In-Service Training Program Managers and Lead Instructors:
Captain Robert Day, Lieutenant Leo Besner, Lieutenant Kraig McGlathery, Sergeant Ryan Coffey, Ofc. Ryan Albertson, Ofc. Andy Christopher, Ofc. Erik Daniels, Ofc. Derrick Foxworth, Ofc. Zach Flippo, Ofc. Leo Harris, Ofc. Josh Howery, Ofc. Scott Klinger, Ofc. Dennis Mako, Ofc. Matt Manus, Ofc. Bob Pippen, Ofc. Pete Taylor, and Ofc. Trevor Tyler

2017 Curriculum Development Unit and the Training Division's Non-Sworn Mental Health Professional:
Lieutenant Kraig McGlathery, Emma Covelli, M.S., Troy Fultz, M.S., Jody Halia, M.S.T., and Liesbeth Gerritsen, Ph.D.

Report prepared by:
Emma Covelli, M.S. and William Breslin, in partnership with the 2017 In-service training program managers, lead instructors, and curriculum development specialists

Analysis conducted by:
Emma Covelli, M.S. and William Breslin

# Table of Contents

INTRODUCTION ................................................................................................................ 4

MAINTENANCE CERTIFICATION REQUIREMENTS FOR LAW ENFORCEMENT ................... 6

DOJ AGREEMENT.............................................................................................................. 7

CONTROL TACTICS.......................................................................................................... 10

CONDUCTED ELECTRONIC WEAPON .............................................................................. 12

FIREARMS ...................................................................................................................... 14

PATROL TACTICS ............................................................................................................ 16

POLICE VEHICLE OPERATIONS....................................................................................... 19

TRENDS IN HAZARDS OFFICERS ARE ENCOUNTERING IN PERFORMING
THEIR  DUTIES AND OTHER OFFICER SAFETY ISSUES.................................................... 21

MISCONDUCT COMPLAINTS............................................................................................ 23

APPLIED USE OF FORCE DATA ....................................................................................... 25

CONCERNS REFLECTED IN COURT DECISIONS............................................................... 27

CHANGES IN OREGON AND FEDERAL LAW..................................................................... 28

CHANGES IN PPB POLICY .............................................................................................. 31

INPUT FROM THE COMMUNITY AND OTHER EXTERNAL STAKEHOLDERS...................... 34

INDIVIDUAL PRECINCT NEEDS........................................................................................ 37

RESEARCH REFLECTING BEST PRACTICES AND LATEST IN LAW
ENFORCEMENT TRENDS ................................................................................................. 40

APPENDIX A: DOJ AGREEMENT, SECTION III.A.3............................................................ 43

APPENDIX B: MENTAL HEALTH RESPONSE RELATED TRAINING NEEDS.......................... 45

APPENDIX C: RETENTION RATES..................................................................................... 46

APPENDIX C: LITERATURE REVIEWS................................................................................ 50

## INTRODUCTION

*Purpose of the Training Needs Assessment*

The first step of developing a training plan includes a needs assessment to identify where gaps exist between organizational or individual-level performance goals and current skill or knowledge levels. The gaps may stem from multiple causes, such as: changes in laws or policy, new equipment, changes in job duties, and the natural perishability of uncommonly used skills. The needs assessment begins the process of deciphering what gaps may be best addressed by training; however, often further processing will be required to fully prioritize the training topics, determine how many training hours are feasible, and identify the best delivery method for the material.

The process of a needs assessment is critical for increasing efficiency in the use of training time and maintaining a more comprehensive view of the training needs, especially in environments where the training needs are vast and compete with allotted training times. The format of needs assessments can vary greatly and they can include formal or informal methods of data collection.

This needs assessment focuses on the training needs that are applicable for tenured officers delivered at In-service training, although it also covers some elements of Supervisors' In-service and the Enhanced Crisis Intervention Team In-service training[1]. It formalizes the analysis of some data that has been tracked by the Training Division for years, as well as implementing additional systems to receive further input from in-service attendees and monitor organizational outcomes.

This report focuses on the five core core law enforcement disciplines (Control Tactics, Electronic Control Equipment, Firearms, Patrol Tactics, and Police Vehicle Operations), re-certification requirements for Oregon law enforcement, training needs pertaining to the DOJ agreement, and the following topics and sources outlined in the DOJ agreement:

- Trends in hazards officers are encountering in performing their duties
- Analysis of officer safety issues
- Misconduct complaints
- Problematic uses of force
- Input from members at all levels of PPB
- Input from the community
- Concerns reflected in court decisions
- Research reflecting best practices
- The latest in law enforcement trends
- Individual precinct needs
- Any changes to Oregon or federal law or PPB policy

---

[1] The Training Division plans on expanding the needs assessment for these other in-service trainings as staffing capacity allows.

The process for this needs assessment and the collection of related information will be reviewed and refined as needed in order to best meet the needs for training and curriculum planning. This document is not intended to be a final plan for what topics will be covered during In-service, Supervisors' In-service, or Enhanced Crisis Intervention Team In-service training, nor is it intended to become the only source of information to be used during the formation of the strategic and in-service training plans. It is critical that any information or suggestions in this document are reviewed within the following context: (1) to whom does this information primarily relate; (2) what is the best method for disseminating this information; and (3) who should distribute this information. Some information will be best delivered through training events and other information would be better disseminated through webinars, roll call videos, unit managers, direct supervision, or other means of communication. It is also important that training plans prioritize genuine training needs and training requirements, as opposed to reacting to random suggestions or events.

*Purpose of In-Service Training*

The purpose of in-service for law enforcement is to receive training pertaining to officers' state maintenance certification and OSHA requirements, the maintenance of perishable skills, new trends and equipment, updates on policy and procedural changes, and advanced law enforcement training. In general, skills perish over time when they are not used regularly. Law enforcement faces a particular challenge as they are forced to make split-second decisions in circumstances that are tense, uncertain, and rapidly evolving. These decision points are analyzed through the totality of the circumstances and the reasonableness of the officer's actions. Continual training is critical for ensuring that officers can perform at their best under these unpredictable and complicated circumstances.

## MAINTENANCE CERTIFICATION REQUIREMENTS FOR OREGON LAW ENFORCEMENT

**Training Requirements from the Department of Public Safety Standards and Training (DPSST)**

- Every three years officers need to accrue 84 hours of training for their Oregon Law Enforcement re-certification.
  - Twenty-four of these hours need to be in use of force (eight hours annually). Use of force training includes Firearms, Defensive Tactics, Conducted Electronic Weapon, and portions of the Patrol Tactics program (e.g. scenario training).
  - Three hours need to be in ethics training (1 hour annually).
  - Three hours every three years need to be in mental health training.
- All sergeants and above must have an additional 24 hours in leadership training.
- DPSST mandates that every two years officers are required to receive CPR / First Aid re-certification training.

**Training Requirements from OSHA**

- Every year officers are required to receive training in blood borne pathogens. No specific amount of hours is required for this training.

**Re-certification Requirements from Taser**

- Taser requires officers to deploy two cartridges every year to maintain their certification. Deployments that occur both on the job and in training can count towards this requirement. All officers and sergeants assigned to the Operations Branch are required to carry a conducted electronic weapon.

## DOJ AGREEMENT

### Identified DOJ Agreement Related Training Needs For In-Service[2]

| Topic / Skill Area | Notes |
|---|---|
| De-escalation | The Training Division is currently exploring additional de-escalation training materials, such as those offered by Polis Solutions T3. The Training Division is planning to integrate additional de-escalation training into the 2018-2 In-service. |

### Identified DOJ Agreement Related Training Needs For Supervisors' In-Service[3]

| Topic / Skill Area | Notes |
|---|---|
| Use of Force Reporting and Processes:<br><br>After Action Reviews: update on process (including reporting for CEW), each rank's review responsibilities, and managing administrative violations<br><br>Reporting related to de-escalation: identifying de-escalation and justifying approach or why other approaches couldn't have been used<br><br>Crowd Control: review of reporting and how force is reviewed | Planning for 2018 Supervisors' In-service training. |
| Crowd Management: Guidelines on expectations of the various roles in a crowd control event and how to effectively manage an event prior to RRT arrival. | Considering for 2018 Supervisors' In-service training. |
| Employee Information System | Planning for 2018 Supervisors' In-service training. |

[2] These DOJ related training needs were obtained from the Commander overseeing the implementation of the DOJ agreement and the PPB's DOJ Coordinator in November of 2017.
[3] These DOJ related training needs were obtained from the Commander overseeing the implementation of the DOJ agreement and the PPB's DOJ Coordinator in November of 2017.

## CIT Refresher Training Needs[4]

- These are currently under consideration. For information on identified mental health response related training needs see Appendix B.

## In-Progress Training Requirements within the DOJ Agreement[5]

### For In-Service

| Topic / Skill Area | Notes |
|---|---|
| Increase the use of role-playing scenarios and interactive exercises that illustrate reasonable use of force decision making, specifically including interactions with people who have, or are perceived to have, mental illness, including training officers on the importance and impact of ethical decision making and peer intervention (DOJ 84 – a.i). | The Training Division is currently in the process of planning the scenario portion of the 2018 In-service trainings at the time of this report. The Training Division is currently planning to conduct scenario training in the 2018-3 In-service. |
| Emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force (DOJ 84 – a.ii). | The Training Division will continue to integrate this item into 2018 In-service trainings. |
| Continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event (DOJ 84 – a.iii). | The Training Division conducted training in Tactical Emergency Casualty Care during the 2015, 2016, and 2017 In-services. The Training Division will continue to integrate refreshers as needed. |
| Continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized unit (including ECIT officers and mental health professionals), or delaying arrest (DOJ 84 – a.iv). | The Training Division conducted training in these areas during the 2015, 2016, and 2017 In-services. This item will continue to be considered for future In-service trainings. |
| Annual CIT refresher for all officers. PPB's Training Division, in consultation with ABHU Advisory Committee, shall determine the subjects and scope of initial and refresher crisis intervention training for all officers (DOJ 98). | The Training Division will continue to integrate this item into 2018 In-service trainings. |

[4] The in-service CIT refresher training needs are determined by the Behavioral Health Unit, the external Behavioral Health Unit Advisory Committee, and the Training Division's non-sworn mental health professional. Evaluation findings from the Enhanced Crisis Intervention Team and In-service training evaluation processes are utilized, as well as other sources of information.

[5] These items were obtained from the DOJ Agreement, case number 3:12-cv-02265-SI. This list includes items that have not yet been fully achieved or need to be continued and may not otherwise be integrated into training planning.

**For Supervisors' In-Service**

| Topic / Skill Area | Notes |
| --- | --- |
| Conduct use of force investigations, including the supervisor's investigatory responsibilities identified in Section III.A.3 (DOJ 84 – b.i).<br><br>Section III.A.3 includes the enforcement of Directive 940.00, maintaining adequate patrol supervision staffing, a supervisor checklist for carrying out force investigation responsibilities, and policies concerning the chain of command reviews of After Action Reports (see Appendix A for all items under Section III.A.3). | The Training Division will continue to integrate this item into the 2018 Supervisors' In-service. |
| Evaluate officer performance as part of PPB's annual performance evaluation system (DOJ 84 – b.ii). | The Training Division is considering conducting additional training on this item during the 2018 Supervisors' In-service. |
| Foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action (DOJ 84 – b.iii). | The Training Division is considering conducting training on this item during the 2018 Supervisors' In-service. |

## CONTROL TACTICS

In Control Tactics (previously Defensive Tactics), officers obtain training in how to safely make contact with subjects, conduct searches, take subjects into custody, and how to counter when subjects attack an officer, including an attempt to gain control of an officer's weapon. Inadequate control results in the risk of injury or death to the public and officers, the failure to reduce crime, and the potential for civil and criminal liability. The program stresses reasonable control given the totality of the circumstances. Control Tactics techniques require refresher trainings due to the natural perishability of the skills. Training on new techniques is necessary to keep current with developments in policy, equipment, and procedure(s).

### Identified Training Needs

| Topic / Skill Area | Notes | Source(s)[6] |
|---|---|---|
| Self-defense / defending from assaults | Portions planned for 2018 In-service and 2020 In-service. | 1 |
| Ground control | Planning for 2018 and 2019 In-services. | 1, 6 |
| Grappling / close-quarter encounters | Portions planned for 2018 and 2019 In-services. | 1 |
| Takedowns | Planning for 2018 In-service. | 1, 2, 4, 6 |
| Techniques involving multiple officers | Portions planned for 2018 In-service. | 1, 4 |
| Weapon retention | Planning for 2019 In-service. | 1, 6 |
| Searches | To be determined. | 1, 2, 4 |
| Con sims / skill drills | Planning for 2018 In-service. | 6 |

### Additional Considerations for Training Planning

- Ongoing training, multiple times a year, is needed to be proficient in control tactics skills.
- There are some requests for tailoring situations towards detectives/investigators (e.g. situations that can come up in an interview room).
- There are some requests for training pertaining to communication, such as verbal judo.
- Two and a half hour training blocks are ideal for retention and maximizing training time.

---

[6] Source coding: 1) Feedback obtained from 2015 through 2017-1 In-service survey responses, 2) 2015 In-service learning assessment results, 3) 2016 In-service learning assessment results, 4) 2016 feedback from lead instructors on their top priorities, 5) Identified through other sections of the needs assessment, and 6) 2017 feedback from lead instructors.

### Retention Rates

The Training Division is continuing to collect information pertaining to retention rates of law enforcement skills. This process includes obtaining feedback from training participants, lead instructors, and Training Division supervisory staff; reviewing related external research, and utilizing internal research findings. Future needs assessments will provide progress updates on this research although this will take years to fully develop. For an update on the estimated retention rate schedule for the core Control Tactics training skills/knowledge areas, please see Appendix C.

## CONDUCTED ELECTRONIC WEAPON

Officers are trained to carry and use a CEW (Conducted Electronic Weapon) to quickly and safely resolve a violent or potentially violent encounter. These tense and quickly evolving encounters necessitate a dynamic training environment. In order to train officers to make the most reasonable decision during these confrontations, the training regimen includes weapons manipulation as well as dynamic, scenario-based training with a role player, simulating a real-world situation(s), while emphasizing reasonable decision making while under physical and mental stress.

### Identified Training Needs

| Topic / Skill Area | Notes | Source(s)[7] |
|---|---|---|
| Scenarios (including small spaces, drawing from holster, and decision making) | Scenarios utilizing CEW are incorporated into Patrol Tactics scenarios. | 1, 4 |
| Box drill exercises (includes action/reaction decision making) | These were conducted during 2016 In-service. This teaching modality will be considered again during 2019 and 2020 In-service planning. | 1, 3 |
| Failed deployment | Planning for 2019 In-service, as well as being considered for a portion of 2018 In-service. | 1, 6 |
| CEW usage combined with custody skills | Planning for 2018 In-service. | 1, 6 |
| Utilizing CEW within effective distances | Planning for 2018 In-service. | 2, 3 |
| Accuracy in probe placement when deploying under stress | Planning for 2018 In-service. | 3, 4, 6 |
| CEW policy refresher | Planning for 2018 In-service. | 1, 5, 6 |
| Basic manipulation of the X2 | Planning for 2018 In-service. | 3, 6 |

### Additional Considerations for Training Planning

Conducting CEW stress courses would be beneficial and new for PPB officers. This training methodology is used by Taser International and provides officers with opportunities for quick decision making under stress and a variety of circumstances. In general, Taser International encourages the incorporation of dynamic

---

[7] Source coding: 1) Feedback obtained from 2015 through 2017-1 In-service survey responses, 2) 2015 In-service learning assessment results, 3) 2016 In-service learning assessment results, 4) 2016 feedback from the lead instructor on their top priorities, 5) Identified through other sections of the needs assessment, and 6) 2017 feedback from the lead instructor

training methodologies. The CEW stress course is staff intensive, requiring 20 to 25 staff people to operate. It also requires more physical exertion.

## Retention Rates

The Training Division has begun collecting information pertaining to retention rates of law enforcement skills. This process includes obtaining feedback from training participants, lead instructors, and Training Division supervisory staff; reviewing related external research, and utilizing internal research findings. Future needs assessments will provide progress updates on this research although this will take years to fully develop. For an update on the estimated retention rate schedule for the core Conducted Electronic Weapon training skills/knowledge areas, please see Appendix C.

## FIREARMS

In Firearms, officers are trained in critical skills for ensuring safe and accurate use of firearms under various circumstances that officers may encounter. Firearms are used infrequently during the course of daily patrol. However, when an incident occurs which requires the use of deadly force, it involves a high level of safety risk and often complex circumstances. Due to the nature of these incidents, it is critical that officers come into these unexpected encounters ingrained with substantial muscle memory in firearm skills to allow more cognitive capacity for rapidly evolving decision making. Ongoing refreshers and new trainings in firearms are critical due to the perishability of these skills, new policies, and technological advances in firearms training.

### Identified Training Needs

| Topic / Skill Area | Notes | Source(s)[8] |
|---|---|---|
| Moving and shooting | Planning for 2018 and 2019 In-services. | 1, 6 |
| Tactical courses and/or scenario-based training (including stress, decision making, coordinated team movement, and use of force) | Planning for 2018 and 2019 In-services. | 1, 4, 6 |
| Shooting in non-standard positions (including sitting in a car) | Planning for 2018, 2019, and 2020 In-services. | 1, 2, 6 |
| Use of cover / shooting from cover | Planning for 2018 and 2019 In-services. | 1 |
| Speed and accuracy | Planning for 2018 and 2019 In-services. | 1, 4, 6 |
| Use of firearms under stress | Planning for 2018 and 2019 In-services. | 1 |
| Shoot / don't shoot exercises | Planning for 2018 and 2019 In-services. | 1 |
| Low light conditions | Planning for 2019 In-service. | 1 |
| Weapon transitions | Planning for 2019 In-service (under Control Tactics). | 1 |
| Shotgun skills | Planning for 2018 and 2019 In-services. | 1, 2, 4, 6 |
| Malfunction drills and reloads | Planning for 2018, 2019, and 2020 In-services. | 1, 6 |

---

[8] Source coding: 1) Feedback obtained from 2015 through 2017-1 In-service survey responses, 2) 2015 In-service learning assessment results, 3) 2016 In-service learning assessment results, 4) 2016 feedback from lead instructor(s) on their top priorities, 5) Identified through other sections of the needs assessment, and 6) 2017 feedback from the lead instructor.

| Target recognition with backdrop changes | Planning for 2018 and 2019 In-services. | 1 |
| AR-15 refresher | To be determined. | 3 |

## Additional Considerations for Training Planning

Ongoing training, multiple times a year, is needed to be proficient in firearms skills.

## Retention Rates

The Training Division is continuing to collect information pertaining to retention rates of law enforcement skills. This process includes obtaining feedback from training participants, lead instructors, and Training Division supervisory staff; reviewing related external research, and utilizing internal research findings. Future needs assessments will provide progress updates on this research although this will take years to fully develop. For an update on the estimated retention rate schedule for the core Firearm training skills/knowledge areas, please see Appendix C.

# PATROL TACTICS

Patrol Tactics is the discipline of synthesizing all of an officer's mental and physical skills and tools to accomplish a goal in a police contact or incident. It is the training that prepares officers for the complexity, stress, and fluid nature of patrol work. It prepares them to manage scenes by using a full repertoire of communication skills, legal knowledge, decision-making, and tactical skills. Patrol Tactics utilizes a combination of scenario-based, skills-based, and classroom training methods. Training on new techniques is necessary to keep up with trends in calls officers are encountering on the job, national trends, lawsuits, and new procedures.

### Identified Training Needs

| Topic / Skill Area | Notes | Source(s)[9] |
|---|---|---|
| Active shooter | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1, 4, 5 |
| Critical incident response, including a perimeter refresher, ensuring sergeants stay in the role of scene management, and developing and communicating tactical plans | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1, 2, 5 |
| Force training in general (e.g. decision making, deadly force encounters) | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1, 4, 5 |
| Building searches | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1, 2 |
| Ambush response / officer safety | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1, 4, 5 |
| High risk vehicle stops | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1 |

[9] Source coding: 1) Feedback obtained from 2015 through 2017-1 In-service survey responses, 2) 2015 In-service learning assessment results, 3) 2016 In-service learning assessment results, 4) 2016 feedback from lead instructor(s) on their top priorities, 5) Identified through other sections of the needs assessment, and 6) Added to list due to retention rate feedback.

| | | |
|---|---|---|
| Officer / Citizen rescue | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 7 |
| Post-shooting / shield | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 7 |
| Foot pursuits | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1 |
| Scenario training, including force on force decision making, tailored scenarios for plainclothes assignments, increased complexity / fully completed scenarios, interacting with uncooperative people, mental health related scenarios (including disengagement with a plan, more challenging/less common mental health symptoms), medical components, increased stress, ambush, the use of cover and movement, crossfire awareness, and shields) | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1, 2, 5 |
| Investigator / detective specific training | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1, 5 |
| Interacting with uncooperative people (e.g. uncooperative occupants during a building clear, uncooperative protesters) | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 1 |
| De-escalation skills (including identifying when de-escalation attempts are ineffective) | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 3, 5 |
| Assessing scene risk and subject threat levels | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 3, 5 |
| Counterterrorism and explosive devices | To be determined: The Patrol Tactics training priorities for the 2018 In-services are still under discussion during the time of this report. | 4 |

**Additional Considerations for Training Planning**

- In general, more training time and opportunities are needed for effectively meeting the full scope of training needs.
- Other portions of the evaluation process found these additional following areas that intersect with Patrol Tactics:
  - Integrating reminders, where appropriate, pertaining to officers explaining the reasoning behind their actions or lack of actions in certain circumstances may help reduce some complaints (more information can be found on page 23).
  - Integrating more opportunities, where they naturally fit in with scenarios, for officers to verbally explain their understanding of policy. Providing this in the context of how they would respond to a sergeant arriving on scene to review an incident may be particularly helpful (found on page 23).
- Development of the upstairs of the Training Complex would allow for conducting more scenarios simultaneously, maximizing training time.

**Retention Rates**

The Training Division is continuing to collect information pertaining to retention rates of law enforcement skills. This process includes obtaining feedback from training participants, lead instructors, and Training Division supervisory staff; reviewing related external research, and utilizing internal research findings. Future needs assessments will provide progress updates on this research although this will take years to fully develop. For an update on the estimated retention rate schedule for the core Firearm training skills/knowledge areas, please see Appendix C.

## POLICE VEHICLE OPERATIONS

In Police Vehicle Operations (PVO), officers receive training related to safely and efficiently handling police vehicles in challenging traffic environments, various road conditions, during pursuits and emergency situations, and with multiple distractions. PVO training integrates tactical decision-making, state law, and bureau policy with physically operating the police vehicle under stress in different conditions and circumstances. Refresher training is critical for ensuring officers will be able to utilize low frequency vehicle maneuvers, such as pursuit intervention techniques (PIT), safely and accurately when needed. Continual training is also important for reducing liability with collision avoidance, staying proficient in driving fundamentals, practicing PVO techniques with new police vehicles, integrating new policy changes, and staying apprised of technological advances in car safety and driving systems.

### Identified Training Needs

| Topic / Skill Area | Notes | Source(s)[10] |
|---|---|---|
| Pursuits (including scenarios, pursuit driving on a track, management, decision making, spike strips) | Planning for 2018 In-service. | 1, 4, 5 |
| Scenarios (including PIT and Box-in techniques, ambush with escape driving) | Scenarios are being planned for 2018 In-service. | 1 |
| Driving in FIUs | Planning for 2018 In-service. | 1 |
| PIT (including post-positioning) | Planning for 2018 In-service. | 1, 2, 4 |
| Box-in (including post-positioning and making contact with at least two points of the car) | Planning for 2019 In-service. | 1, 4, 5 |
| High speed driving | Planning for 2018 In-service. | 1 |
| Backing (with FIUs) | Planning for 2019 In-service. | 1 |
| Skidcar | Planning for 2018 In-service. | 1 |
| Intersections | Planning for 2019 In-service. | 1 |
| Collision avoidance drills | Planning for 2019 In-service. | 1, 4 |

[10] Source coding: 1) Feedback obtained from 2015 through 2017-1 In-service survey responses, 2) 2015 In-service learning assessment results, 3) 2016 In-service learning assessment results, 4) 2016 feedback from lead instructor(s) on their top priorities, 5) Identified through other sections of the needs assessment, 6) Collision data, and 7) 2017 feedback from lead instructor(s).

| Lane changes | Planning for 2019 In-service. | 1 |
| Threshold braking | Planning for 2019 In-service. | 1 |
| Accurately judging distance | Planning for 2018 In-service. | 6 |
| Vehicle inspection refresher | Planning for 2019 In-service. | 7 |

## Retention Rates

The Training Division is continuing to collect information pertaining to retention rates of law enforcement skills. This process includes obtaining feedback from training participants, lead instructors, and Training Division supervisory staff; reviewing related external research, and utilizing internal research findings. The needs assessments will provide progress updates on this research although this will take years to fully develop. For an update on the estimated retention rate schedule for the core Police Vehicle Operation training skills/knowledge areas, please see Appendix C.

## TRENDS IN HAZARDS OFFICERS ARE ENCOUNTERING IN PERFORMING THEIR DUTIES AND OTHER OFFICER SAFETY ISSUES

Officers encounter numerous hazards and other officer safety issues on a regular basis as a normal part of their job. These include, but are not limited to, driving hazards, being assaulted during arrests and other policing encounters, exposure to pathogens and hazardous materials, issues with sleep disruption common for shift workers, exposure to excessive amounts of trauma, and exposure to the effects of gunfire. In addition to these hazards and officer safety issues, officers may encounter new hazards due to changes in cars or equipment, road conditions or structure, coverage for their shift or precinct, policy, radio dead spots, crime or call types, etc.

### Identified Training Needs

| Topic / Skill Area | Notes | Source(s)[11] |
|---|---|---|
| Legal authority for calls for service to abandoned homes of transients moving in the home. No person in charge, owner or bank representative is able to be reached to approve the removal. Sometimes the property does not have a trespass agreement. | Considering for 2018 video legal updates, in combination with some requests under Individual Precinct Needs. | 1 |
| PVO training on a track with intersections, decision making, radio use, etc. | PVO training utilizing a track, decision making, and radio use is planned for 2018 In-service. | 1, 2, 6 |
| Managing job related stress for officers. (Including reducing and managing stress during work-related investigations and complaint processes.) | To be determined. | 1, 2, 6 |
| Ambush; fatal attacks on officers | To be determined. | 1, 2, 3 |
| Command staff and supervisory training on organizational health strategies, including:<br><br>How to choose and implement organizational health strategies<br><br>Identifying and appropriately supporting employees in regards to healthcare needs, including the appropriate and inappropriate use of accommodations | To be determined. | 2, 6 |

---

[11] Source coding: 1) Feedback obtained from 2014 through 2017-1 In-service survey responses, 2) Feedback from the Training Division supervisor and command staff, the PPB's Injury and FPDR Liaison Sergeant and/or Officer, and/or the PPB's nurse, 3) 2016 DOJ Organized Crime Conference, 4) FPDR injury data, 5) Use of Force case injury data, and 6) Identified through other sections of the needs assessment.

| | | |
|---|---|---|
| More control/defensive tactics training (including weapon defense) | The Training Division is working on increasing its training offerings in control/defensive tactics. | 1, 2, 4, 5 |
| Reminders about proper lifting techniques when it relates to what is being covered during skills or scenario training. (Many of these cases may not be preventable as more of the injuries are related to assisting uncooperative subjects than static lifting.) | The Training Division will continue to integrate reminders into training. | 2, 4 |

## MISCONDUCT COMPLAINTS

### Identified Training Needs For General In-Service Audience[12]

| Topic / Skill Area | Notes |
| --- | --- |
| Officers explaining the reasoning behind their actions. This includes being aware of how reasonable policing actions may be perceived by community members and taking a moment to explain after the fact, for example, how their direct commands were utilized for the purpose of maintaining safety. Remembering they are often interacting with people at their lowest points of their lives. | Integrate related reminders in training and/or roll call debriefings where appropriate. |
| Officers explaining their lack of action in certain circumstances. For example, people often want officers to make an arrest or take an action they cannot do. At times it may be beneficial for officers to be more thorough in explaining the limits of their authority.<br><br>How to communicate the news that you cannot take action in certain areas. What is the Bureau's position on why we are not taking action in certain areas? | Integrate related reminders in training and/or roll call debriefings where appropriate. |
| Training pertaining to officer health / reducing compassion fatigue | A portion (EAP services) is being covered in the 2017-2 In-service. The rest is to be determined, potentially after related training has been provided for supervisors. |

### Identified Training Needs For Supervisors' In-Service Audience[12]

| Topic / Skill Area | Notes |
| --- | --- |
| Crowd control management strategies: when to take action and what type of action, when to wait a situation out, etc. | The Training Division is currently covering Directive 635.10 on Crowd Control in 2017-2 In-service. A follow-up course with a greater focus on practical application will be considered for 2018. |

---

[12] The information for the misconduct complaint section was gathered through reviewing Independent Police Review (IPR) Annual Reports, additional analyses provided by the IPR Analyst, and discussions with the IPR Director, Internal Affairs Lieutenant and Sergeant, and Training Division In-service Lieutenant and Sergeant.
Some of the items from previous needs assessments remained, as they were identified as still applicable to current training needs.

General leadership and management skills, including:

Dealing with difficult employee behavior, such as interpersonal behavioral issues and performance issues.

Motivating employees.

Supervising fairly, including between different groups such as non-sworn, officers, command staff.

To be determined.

## APPLIED USE OF FORCE DATA

Training needs pertaining to equipping officers for use of force decision making and application are documented throughout this needs assessment. For the officers input on use of force training needs, please see the Control Tactics, Firearms, Patrol Tactics, and Conducted Electronic Weapon sections of this document. This section is specifically for a review of data related to use of force data collection systems, including related complaints and Internal Affairs Investigations.

### Identified Training Needs For General In-Service Audience

| Topic / Skill Area | Notes | Source(s)[13] |
|---|---|---|
| Reminder to request, and if possible, wait for cover | Considering for a roll call debrief topic area. | 1, 2 |
| Control Tactics for turtled up subjects | Planning for 2018 In-service. | 2 |
| Box-in: making contact with the car in at least two points | Planning for 2019 In-service. | 2 |
| Takedowns with fleeing subjects | To be determined. | 2 |
| Pursuit initiation and management | Planning for 2018 In-service. | 2 |
| Utilizing plain language in use of force reporting | To be determined. | 3 |
| Verbally describing use of force actions, such as when a sergeant arrives on scene to review an incident | To be determined. | 3 |

---

[13] Source coding: 1) Use of Force Audit Report, 2) Feedback from Use of Force Audit Lieutenant and/or Analysts, 3) Feedback from the Training Division and/or Internal Affairs supervisors and command staff, 4) Training Division's review of problematic uses of force, 5) Training Division's review of officer involved shootings, and 6) Additional analyses of force data.

Problematic uses of force are defined as cases outside of the Portland Police Bureau directive. The Portland Police Bureau's Use of Force Directive is stricter than the constitutional standard. Therefore, cases determined to be unconstitutional would be included. Cases that have the potential for being problematic uses of force are referred to the Internal Affairs of the Professional Standards Division, either through internal means or by the Independent Police Review.

**Identified Training Needs For Supervisors' In-Service Audience**

| Topic / Skill Area | Notes | Source(s)[13] |
|---|---|---|
| Use of Force related documentation in EIS | Considering for 2018 Supervisors' In-service. | 1, 2 |
| Conducting use of force debriefs on scene, including what questions to ask officers. | To be determined. | 3 |
| Critical Incident Management: including rapidly evolving incidents in which the Incident Commander has little information when assuming command. | Considering a broader Critical Incident Management class for 2018 or 2019 Supervisors' In-service. If this is conducted, this will be incorporated. | 5 |

## CONCERNS REFLECTED IN COURT DECISIONS

### Identified Training Needs[14]

| Topic | Notes |
|---|---|
| Search and Seizure<br>• The boundaries regarding when a passenger can be seized at a traffic stop.<br>• Factors pertaining to traffic cases crossing state lines.<br>• Reassessing legal authority when circumstances shift (e.g. after an emergency dissipates).<br>• Factors pertaining to searching shared living spaces.<br>• What can be searched under consent, based on type of suspicion.<br>• Affirm how to remedy incorrect warrant information.<br>• Boundaries pertaining to home entry without a warrant and cases involving the emergency aid exception. | The Training Division is planning on providing legal updates to all sworn members during 2018. Which topics will be focused on and how the information will be delivered is to be determined. |
| Consent<br>• Who has authority to give consent?<br>• What actions constitute giving consent?<br>• The importance of proximity between unlawful police conduct and the defendant's consent.<br>• Exceptions to consent. | The Training Division is planning on providing legal updates to all sworn members during 2018. Which topics will be focused on and how the information will be delivered is to be determined. |
| Reasonable Suspicion<br>• The increased restrictions pertaining to the officer-safety exception.<br>• Identifying what qualifies as objectively reasonable suspicion.<br>• Traffic stop investigations in areas beyond those reasonably related to the stop. | The Training Division is planning on providing legal updates to all sworn members during 2018. Which topics will be focused on and how the information will be delivered is to be determined. |

---

[14] The Training Division works in collaboration with the City Attorney's Office for identifying trends reflected in court decisions. The City Attorney's Office examines state and federal court cases to identify court decisions that may be applicable to Oregon law enforcement. The sources for these cases primarily come from the United States Supreme Court, Ninth Circuit Court, Oregon Supreme Court, and Oregon Court of Appeals rulings. The findings from these cases are summarized and provided to the Training Division for review as a part of the training needs assessment process. Since the 2016 needs assessment, the Training Division received 63 additional case summaries (all occurring between August 2016 and June 2017). The Training Division examines the findings for trends and relevancy to training for Portland Police Bureau Officers. This examination utilizes the court decision findings as well as other information gathered throughout the needs assessment process.

## CHANGES IN OREGON AND FEDERAL LAW

**Identified Training Needs for Oregon Law Changes**[15]

| Law | Notes |
| --- | --- |
| HB 2597 – Revised ORS 811.507 to prohibit drivers from holding an electronic device in their hands while operating a motor vehicle on public highways. The penalties for violations of ORS 811.507 were also increased. | Tips and Techniques |
| HB 2988 – Modifies ORS 166.065 to reclassify harassment of family and household members to a class A misdemeanor when the offense is committed in the immediate presence of, or is witnessed by, the person's or the victim's minor child, stepchild, or a minor child residing within the household of the person or victim. | For City Attorney or District Attorney portion of In-service. |
| HB 2987 – Eliminates the specific purpose requirement in ORS 162.385 and expands criminal liability to those who provide false information to the police. | For City Attorney or District Attorney portion of In-service. |
| SB 257 – Modifies ORS 162.415 to elevate certain cases of official misconduct in the second degree to official misconduct in the first degree. | For City Attorney portion of In-service. |
| SB 357 – Modifies ORS 166.116 to change the penalties for the offense of interfering with public transportation. | For City Attorney or District Attorney portion of In-service. |
| SB 101 – Amends ORS 419B.045 regarding child abuse investigations in school settings. The amendments relate to where investigations can take place, limits of the investigation, and boundaries pertaining to disclosing information. | For City Attorney or District Attorney portion of In-service. |
| HB 2225 – Authorizes circuit court judge to authorize execution of search warrant outside judicial district of court for search related to certain offenses involving victim 65 years of age or older. | Tips and Techniques |
| HB 2776 – Authorizes peace officer to apply for and circuit court to enter ex parte emergency protective order when court finds probable cause that person was victim of domestic disturbance or abuse and protective order is necessary to prevent abuse. | Tips and Techniques |

---

[15] The listing of new 2017 Oregon laws changes were obtained from the Oregon State Bar's 2017 Oregon Legislation Highlights report. The list was vetted through some of the Training Division's sergeants and command staff to determine which warranted a future training need for officers. Some items from the 2016 needs assessment also remained as they were still in progress.

| | |
|---|---|
| HB 2335 – Revises definition of "enter or remain unlawfully" for purposes of crimes of burglary and criminal trespass. | Tips and Techniques |
| HB 2356 – Creates crime of invasion of personal privacy in the first degree. | Tips and Techniques |
| HB 2596 – Provides that person who records another person's intimate areas commits crime of invasion of personal privacy. | Tips and Techniques |
| HB 2693 – Creates crime of encouraging sexual assault of an animal. | Tips and Techniques |
| SB 173 – Authorizes person licensed to carry concealed handgun to present valid license instead of providing firearm to peace officer for examination when possessing firearm in public building. | Tips and Techniques |
| SB 525 – Prohibits possession of firearm or ammunition by person who is subject to certain court order protecting intimate partner or child of person or intimate partner, or who has been convicted of certain misdemeanor crimes committed against family member. | Tips and Techniques |
| SB 614 – Provides that peace officer may enter motor vehicle and impound animal when peace officer is authorized by law and has probable cause to believe animal is being subjected to certain criminal offenses. | Tips and Techniques |
| HB 2601 – Requires member of law enforcement agency who has probable cause to believe custodial interference or kidnapping with respect to child has occurred to notify Oregon State Police missing children clearinghouse within 24 hours. | Tips and Techniques |
| HB 2317 – Extends statute of limitations of certain sex crimes from six to 12 years after commission of crime or, if victim was under 18 years of age, anytime before victim attains 30 years of age. | Tips and Techniques |
| SB 641 – Prohibits law enforcement agency from obtaining by forensic imaging information from portable electronic device without warrant except when authorized by consent. | Tips and Techniques |

| | |
|---|---|
| HB 4094 – Provides person is immune from prosecution for offense of possession of alcohol by persons under 21 years of age if a person was in need of medical assistance due to alcohol consumption or if a person sought medical assistance for another person in need of medical assistance due to alcohol consumption, and evidence of offense resulted from person's having sought or obtained medical assistance. | Tips and Techniques |
| HB 4124 – Establishes a Youth Suicide Intervention and Prevention Coordinator within Oregon Health Authority. | Tips and Techniques |
| HB 2385 – Provides that person commits crime of luring a minor if offense involves police officer posing as minor or agent of police officer posing as minor. | Tips and Techniques |
| HB 3468 – Adds threatening to cause physical injury to animal to induce other person to engage in conduct as manner of committing crime of coercion. | Tips and Techniques |
| SB 839 – Exempts specified persons from arrest and prosecution for certain offenses and for certain violations of terms of release or supervision if evidence of offense was obtained because emergency medical services or law enforcement agency was contacted to obtain necessary medical assistance due to drug-related overdose. | Tips and Techniques |
| SB 1556 - legalization of possessing, transferring or producing marijuana for persons 21 years of age or older. | Tips and Techniques |
| HB 4066 – prohibits weaponizing unmanned aircraft systems, creates a new violation for interfering with the flight of another aircraft, and requires the development of policies and procedures for safeguarding the information gathered. | Considering developing a 2018 training video in partnership with the flight crew. |

### Identified Training Needs for Oregon Law Changes[16]

There were no federal law changes identified for the time period of August 2016 through May 2017 that change Oregon law relevant for law enforcement. The City Attorney's Office will continue to examine federal court decisions for changes in federal law.

---

[16] Federal law changes are obtained from the City Attorney's Office throughout the year. A City Attorney reviews and summaries Oregon and Federal court decisions which are applicable to the Portland Police Bureau.

## CHANGES IN PPB POLICY

### Identified Training Needs[17]

| Policy | Notes |
| --- | --- |
| 635.20 Community Member Observation of Police | An online knowledge check was conducted. Considering a video to reinforce learning. |
| 640.31 Custodial Interference | An online knowledge check was conducted. Considering a video to reinforce learning. |
| 640.32 Abandoned Baby Procedures | An online knowledge check was conducted. Considering a video to reinforce learning. |
| 720.00 SERT and CNT Use | An online knowledge check was conducted. Considering a SERT and CNT portion of 2018 Supervisor's In-service. If this occurs, reinforcement of this policy will be incorporated. |
| 1021.00 Weapons Qualifications | An online knowledge check was conducted. Planning a Tips and Techniques bulletin. |
| 630.05 Vehicle Interventions and Pursuits | An online knowledge check was conducted and this policy is being reinforced during the 2017-2 In-service. Additional reinforcement pertaining to pre-emptive Box-ins will be considered during 2018 In-service planning. |
| 635.10 Crowd Management / Crowd Control | An online knowledge check was conducted. This is currently being reinforced in 2017-2 In-service. The Training Division is also considering a Mobile Field Force portion of 2018 Supervisor's In-service. If this occurs, reinforcement of this policy will be incorporated. |
| 1010.10 Deadly Force and In-Custody Death Reporting and Investigation Procedures | An online knowledge check was conducted. Additional reinforcement of this policy is being considered for 2018 Supervisor's In-service. |

---

[17] A list of Portland Police Bureau directives that were newly formed or amended between September 2016 and September 2017 was obtained from the PPB's Policy Lieutenant and Analysts. The list was vetted through the Policy Lieutenant and Analyst, as well as the Training Division's In-service Lieutenant and Sergeant to determine which directives warranted future consideration during training planning.

## Upcoming Directives Still Under Review

| Policy | Notes |
| --- | --- |
| 344.05 Bias-Based Policing/Racial Profiling Prohibited | Planning for an online knowledge check. Related concepts will be reinforced through the equity trainings. |
| 330.00 Internal Affairs, Complaint Intake and Processing | Planning for an online knowledge check. Additional reinforcement of the 330 directive series is being considered for 2018 Supervisor's In-service. Which portions are to be determined. |
| 331.00 Supervisory Investigations | Planning for an online knowledge check. Additional reinforcement of the 330 directive series is being considered for 2018 Supervisor's In-service. Which portions are to be determined. |
| 332.00 Administrative Investigations | Planning for an online knowledge check. Additional reinforcement of the 330 directive series is being considered for 2018 Supervisor's In-service. Which portions are to be determined. |
| 333.00 Criminal Investigations of Police Bureau Employees | Planning for an online knowledge check. Additional reinforcement of the 330 directive series is being considered for 2018 Supervisor's In-service. Which portions are to be determined. |
| 334.00 Performance Deficiencies | Planning for an online knowledge check. Additional reinforcement of the 330 directive series is being considered for 2018 Supervisor's In-service. Which portions are to be determined. |
| 335.00 Discipline Process | Planning for an online knowledge check. Additional reinforcement of the 330 directive series is being considered for 2018 Supervisor's In-service. Which portions are to be determined. |
| 336.00 Police Review Board | Planning for an online knowledge check. Additional reinforcement of the 330 directive series is being considered for 2018 Supervisor's In-service. Which portions are to be determined. |
| 337.00 Police Review Board Personnel Selection | Planning for an online knowledge check. Additional reinforcement of the 330 directive series is being considered for 2018 Supervisor's In-service. Which portions are to be determined. |

| | |
|---|---|
| 338.00 Discipline Guide | Planning for an online knowledge check. Additional reinforcement of the 330 directive series is being considered for 2018 Supervisor's In-service. Which portions are to be determined. |

## INPUT FROM THE COMMUNITY AND OTHER EXTERNAL STAKEHOLDERS

The Training Division tracks and vets community and stakeholder input pertaining to the training needs of tenured officers. Input from the community and external stakeholders come from a variety of sources, and the sources referenced below are not an exhaustive list. The Training Division continues to look for ways to improve our connection with the community and external stakeholders in order to solicit feedback on the training needs of officers.

The recommendations included below are specific to training content. Recommendations related to training processes have been noted and continue to be monitored by the Portland Police Bureau.

### Identified Training Needs

| Topic / Skill Area | Notes | Source(s)[18] |
|---|---|---|
| Training on use of force requires modifications to incorporate all aspects of the Settlement Agreement, including provisions on de-escalation, appropriate disengagement, and consideration of signs and symptoms of mental illness. Portland Police Bureau needs to prioritize these revisions so that officers and supervisors clearly understand their roles and responsibilities in the field. | The Training Division will continue to integrate this item into the 2018 In-service and Supervisors' In-service trainings. | 1 |
| Coordinate trainings such that they consistently instruct members to adhere to policy and observe the principles in the Agreement. | The Training Division will continue to integrate this item into the 2018 In-service and Supervisors' In-service trainings. | 1 |

---

[18] Source coding: 1) Plaintiff's Notice of Second Periodic Compliance Assessment Report *United States v. City of Portland*, Case No. 3:12-cv-02265-SI Document 124 Filed 10/18/16 https://www.portlandoregon.gov/police/article/595056
2) Semi-annual Outcome Assessment Report.  May 2017
http://coclcoab.org/sites/default/files/COCL%20May%202017%20Outcome%20Assessment%20-%20Final%20with%20appendices.pdf
Compliance Report of the Compliance Officer and Community Liaison.  First and Second Quarters:  January through June 2016. March 3, 2107.
http://cocl-coab.org/sites/default/files/COCL%202016%20Q1-Q2%20Compliance%20Assessment%20-%20Final.pdf
Semi-annual Outcome Assessment Report.  November, 2016.
http://cocl-coab.org/sites/default/files/COCL%20November%202016%20Outcomes%20Assessment.pdf
3) Recommendations from  work of the COAB can be found here:
https://docs.google.com/spreadsheets/d/1DARWrlvbfd17pb4iDuqwDV8_O0ZrZLCaa0zZREcTdmE/edit?pref=2&pli=1#gid=0
4) From the Training Advisory Council. The Report is available to read on the TAC website
http://www.portlandoregon.gov/police/61449
5) From the Professional Standards Division's list of training requests that come through the Police Review Board, the Department of Justice, the PPB case review processes, the City Auditor, and various other auditors and community advisory groups.
6) Rosenbaum, D., Watson, A., and Christoff, T. Views from Inside the Portland Police Bureau: A Survey of Sworn and Civilian Employees, May, 2015.
Many of the items above are provided by a Training Division curriculum development specialist assigned to tracking and vetting community input pertaining to the training needs of tenured officers and a Training Division Auditing Sergeant. The Training Division Auditing Sergeant position became vacant in July 2017.

| | | |
|---|---|---|
| Improve the guidance where members are adapting to unfamiliar processes, such as the audit. | The Training Division will continue to integrate this item into the 2018 In-service and Supervisors' In-service trainings. | 1 |
| Training on force reporting needs to advise members of all of the elements that their force reports must contain. | The Training Division is planning on continuing to reinforce this during the 2018 Supervisors' In-service trainings. | 1 |
| Training should better integrate policy. | The Training Division will continue to reinforce policy through discussions and debriefs. | 1 |
| Portland Police Bureau must own the messaging to its officers. | The Training Division will continue to integrate this item into the 2018 In-service and Supervisors' In-service trainings. | 1 |
| Provide specific training on the interpersonal aspects of policing, including mental health crisis response, diversity/sensitivity, and de-escalation. | The Training Division will continue to integrate this item into the 2018 In-services. | 2, 7 |
| Ensure that the requirements found in Section IV of the Settlement Agreement – Training are applied to ECIT, Advanced Academy, In-Service, and Supervisors' In-service. | The Training Division will continue to integrate these items into the 2018 In-service and Supervisors' In-service trainings. | 2, 7 |
| Include commonly encountered situations in scenarios with attention to procedural justice and empathy. | This has been provided during 2016 and 2017 In-service trainings. The Training Division will continue to consider this for future trainings. | 2 |
| Create In-service training wherein CI response refresher is the primary objective of the class. | The Training Division provided a crisis intervention classroom refresher on ROADMAP, disengagement, and the utilization of ECIT officers in the 2017-1 In-service. This format will continue to be utilized when it best fits with CI refresher training objectives. | 2 |
| The Portland Police Bureau should develop and implement an Instructional System Design Model (ISDM) for comprehensive use of force training to provide a systemic methodology to address its training needs. | To be determined. | 3 |

35

| | | |
|---|---|---|
| The PPB's ISDM should rely upon and/or incorporate the Seattle Police Department's ISDM for comprehensive use of force training which reflects best practices and which in DOJ v. Seattle was approved by the Department of Justice and its police practitioner expert, Robert Davis, the former Chief of Police of San Jose and former president of the Major City Chief's Conference. | To be determined. | 3 |
| Provide Organizational Change Management leadership training (or something similar) for the Chief, all senior management, and selected trainers. | To be determined. | 4 |
| Use of cover course. | Planning for 2018 and 2019 In-services. | 5 |
| Ballistics restrictions with surface types and shooting through glass training. | A training video was in progress but is not yet complete. | 5 |
| Briefing – Assignment of involved officers to tactical roles. | Considering for 2018 Supervisors' In-service. | 5 |
| Supervisor pursuit management. | Considering for 2018 Supervisors' In-service. | 5 |
| General leadership and management skills, including: Motivating employees, supervising fairly, fostering employee development, utilizing positive interventions such as coaching and counseling for some corrections, holding employees accountable, and rewarding good work ethic. | To be determined. | 6 |

## INDIVIDUAL PRECINCT NEEDS

### Identified Training Needs For General In-Service Audience

| Training Topic | Year Suggested[19] | Notes |
|---|---|---|
| Active Shooter Training | 2014 | In progress; we will continue to hold Advanced Active Shooter trainings as training time allows. |
| Additional Control/Defensive Tactics Training needs / Precinct Control Tactics Training Reinstituted (Quarterly) | 2014 & 2017 | The Training Division is interested in reinstituting a quarterly precinct training that would include multiple disciplines. |
| D.A. Legal updates | 2015 | The Training Division is considering having this delivered by the District Attorney's Office and/or City Attorney's Office. |
| Update on person-encounters-detentions, stops, mere conversations, reasonable suspicion | 2015 | The Training Division is considering having this delivered by the District Attorney's Office and/or City Attorney's Office. |
| Search and seizure update | 2016 | The Training Division is considering having this delivered by the District Attorney's Office and/or City Attorney's Office. |
| Police Vehicle Operations: pursuit driving and management, pursuit directive, utilizing new FIUs | 2017 | The Pursuit Directive is currently being covered in 2017-2 In-service. Pursuit driving and management utilizing the FIU vehicles is scheduled for 2018-1 In-service. |
| Crowd Management / Mobile Field Force: basic terminology, policy regarding force in crowd events, and ability to apply crowd control related techniques | 2017 | The Training Division is currently covering the Crowd Control Directive 635.10 in 2017-2 In-service. A follow-up course with a greater focus on practical application will be considered for 2018. |

---

[19] The Training Division Captain or Lieutenant reviews these training needs and receives new ones from Precinct Command Staff at an Operations Branch Meeting each year. The feedback is vetted through the Training Division sergeants and command staff to determine which concerns are applicable to the general population of patrol officers and the most appropriate venue for delivery.

| | | |
|---|---|---|
| Live tactical firearms training that includes movement | 2017 | Planning for 2018 and 2019 In-services. |
| Domestic Violence: a review of the classification, restraining order services, no contact orders, when specific probation violations are enforceable, victim rights, and custody issues | 2017 | Considering developing a 2018 training video in partnership with the Domestic Violence Reduction Unit. |
| Homelessness / Houselessness:<br><br>How to address and utilize current abatement strategies<br><br>Landlord tenant law, ORS 90.100: including squatter and campers on private property rights, public property, evictions from hotels / shelters | 2017 | Considering for 2018 video legal updates. |
| De-escalation | 2017 | Planning for 2018 In-service. |
| ROADMAP scenarios | 2017 | To be determined. |

**Identified Training Needs For Supervisor's In-Service Audience**

| Training Topic | Year Suggested[20] | Notes |
|---|---|---|
| Pursuit Directive: pertaining to determining the levels of force for intervention strategies such as ramming and PIT | 2017 | Considering for 2018 Supervisors' In-service training. |
| After Actions: update on process, managing minor policy violations and tactical errors, decision point analysis | 2017 | Planning for 2018 Supervisors' In-service training. |
| Officer involved shooting process, Directive 1010.10 | 2017 | Considering for 2018 Supervisors' In-service training. |
| Fiscal Updates: procurement & grant overview, use of data and tracking outcomes, payroll: overtime and UDAR reports, fleet and the replacement cycle, facilities, alarms and recording false alarm responses. | 2017 | Considering a portion being covered during the 2018 Supervisors' In-service and another portion being covered through a training video. |
| Accountability system changes: including the new Supervisor Investigations and responsibilities under 1010.10 (e.g. public safety statements). | 2017 | Planning for 2018 Supervisors' In-service training. |
| EIS: more direction on usage, definitions, different intervention types, and what supervisors must review when transferring reviews. | 2017 | Planning for 2018 Supervisors' In-service training. |

---

[20] The Training Division Captain or Lieutenant receives new training suggestions from Precinct Command Staff via email each year. The feedback is vetted through some of the Training Division Lieutenants and Sergeants to determine which concerns are applicable to the general population of patrol officers and/or supervisors, and the most appropriate venue for delivery.

## RESEARCH REFLECTING BEST PRACTICES AND LATEST IN LAW ENFORCEMENT TRENDS

For many years the Training Division has sent staff to trainings, conferences, and agencies, in order to gain information on training trends and new innovations in law enforcement training. In 2014, the Training Division implemented a system to begin tracking information obtained from these events. The Training Division has also developed a system for reviewing and tracking literature findings pertaining to law enforcement training research, equipment, and trends. This information is utilized for identifying training needs, developing curriculum content, advancing training methods, and enhancing training related research.

### Staff Trainings and Conferences, and Agency Visits

From August 2016 to November 2017, the Training Division staff continued to attend trainings and conferences, and visits to other agencies. However, this information was not fully tracked and prepared for this document, as the position assigned to tracking this information (the Training Division's Audit Sergeant position) was vacant during the time period this information would normally be compiled.

### Literature Research Pertaining to Law Enforcement Training

The Training Division has formalized its review of literature and research on law enforcement training. The sources for information include, but are not limited to, peer-reviewed research journal articles, the International Law Enforcement Educators and Trainers, the Criminal Justice Abstracts and PsycINFO databases, the Community Oriented Policing Services, the Police Executive Research Forum, policing journals, recommendations from the COCL team, reports from other police agencies, and web searches.

The focus of these searches and reviews are on the following topics:

- Crisis Intervention
- Defensive Tactics
- Electronic Control Equipment
- Firearms
- Patrol Tactics
- Police Legitimacy
- Police Vehicle Operations
- Procedural Justice
- Racial Equity
- Use of Force

Within these topic areas, some of the categories of information gathered are:

- Best methods for delivery of particular training topics
- Retention rates & other information pertaining to the perishability of the skill
- Training/curriculum models
- Related teaching methods to increase learning
- Suggestions for related key learning objectives, training components, and exercises
- Trends in the number of training hours provided
- Training for performance under stress
- New training technologies

To date, the Training Division focused its literature research on the topics of use of force, active shooter training, police legitimacy and procedural justice, training retention and perishability of skills, police vehicle operations, and crisis intervention / mental health response training. A listing and brief summaries of the articles reviewed on these topics since the 2016 needs assessment can be found in Appendix C.

The Training Division is continuing to review articles pertaining to these and the other topics above. To date, the current considerations that may warrant some follow-up pertaining to future training topic areas:

*In-Service*

The Portland Police Bureau's Advanced Active Shooter curriculum is consistent with the current research findings pertaining to training needs. The research supports it would be beneficial to get all PPB members trained with this curriculum, particularly given the seriousness and the increasing volume of these events.

The Portland Police Bureau's officer-level training covers the main components of Police Legitimacy and Procedural Justice, although it is not always named this way outside of the Advanced Academy. However, given this is one of the themes pertaining to misconduct complaints, additional emphasis on explaining actions may be warranted.

*Supervisor's In-Service*

The research supports the need to develop command-level active shooter training. The research to date suggests this training should cover the response necessary to immediately take control of an active shooter or mass casualty scene, as well as the elements required for a long-term, successful response. This includes tasks such as establishing a family reunification center, managing outside resources, utilizing proper investigatory procedures, and providing support via trauma-informed care resources to victims, witnesses, and first responders alike. This training would benefit supervisors in the event of an active shooter incident, and its principles are also applicable to any large scale incident requiring a high level of police presence (e.g. terrorist attack, or a natural disaster such as an earthquake).

The research on use of force supports the needs for reducing organizational/bureaucratic stressors and factors that lead to officer burn out.

The Police Legitimacy and Procedural Justice literature supports supervisor and command-level training pertaining to ensuring fairness in discipline and general employee treatment, an understanding of what environmental factors enhance an officer's ability to convey procedural justice characteristics, factors besides officer interactions that impact the public's views pertaining to police legitimacy and procedural justice, and general organizational health strategies. The Training Division will continue to explore this area to determine related training needs.

---

**APPENDIX A: DOJ AGREEMENT, SECTION III.A.3**

---

Section III.A.3: Use of Force Supervisory Investigations and Reports

70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

 a. Complete After Action Reports within 72 hours of the force event;

 b. Immediately notify his or her shift supervisor and PSD regarding all officer's Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement;

 c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

 d. Interview officers individually and not in groups.

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

73. PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

 a. EIS tracks all Directives 940.00 comments, findings and corrections;

b.  All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

c.  All supervisors in the chain of command are accountable for inadequate reports and analysis;

d.  A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations. Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

e.  When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

f.  Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

g.  The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor.

## APPENDIX B: MENTAL HEALTH RESPONSE RELATED TRAINING NEEDS

In-Service Considerations

- Increase the level of difficulty for the crisis communication training. For example, crisis communication skills/rapport building with someone with less common mental health symptoms. Utilizing examples that do not involve suicide for the 2018 In-service trainings may be helpful.
- Critical incident response components during more serious, complex, and/or unusual calls, such as ensuring all teams are set up prior to making contact, conducting a tactical retreat after disengaging from a call, assessing scene risk, setting up perimeters, developing and communicating tactical plans. Consider another all-play scenario.
- Some officers are deferring too quickly to disengagement now. Incorporating something pertaining to challenging this or helping officers distinguish when or when not to disengage (and why) into a scenario may be beneficial.
- Some officers are demonstrating severe hesitation to utilize any kind of force, particularly among people with mental illness.

Supervisor's In-Service Considerations

- General strong active leadership skills for managing critical incident scenes.
- Clarification on the general role of ECIT officers, as well as more familiarity with the multiple roles of the ECIT officers (coach, intel, communication).

ECIT In-Service Considerations

- More training practice in the "coach" role, as well as reinforcing the importance of timely and ongoing communication to the rest of the team.
- Utilizing more videos.
- More training on communication strategies that may be more effective given a person's mental health condition.
- Updates on resources and how to utilize them.
- More work with community partners/resources.
- More scenarios and hands-on training, including more comprehensive scenarios and multiple officers to make it more realistic.
- Policy and legal updates (including liability issues).
- Barricaded subjects involving CNT callout.
- Effectively handling calls involving a person who is both violent and has a mental health issue.
- Review of actual ECIT calls, especially unique or challenging ones. (analyze/debrief, what worked, what did not work, how officers used resources outside of the box).

---

### APPENDIX C: RETENTION RATES

---

**Conducted Electronic Weapon: Retention Rates**

| Topic / Skill Area | Current Estimated Timeframe for Refresher/Updated Training |
|---|---|
| Refresher on Basic Operations | 1 to 2 times per year |
| CEW Manipulation | 1 to 2 times per year |
| Deploying within Preferred Target Zones | 2 or more times per year |
| CEW Decision Making | Once per year |
| Weapon Transitions | Once per year |
| CEW Policy | Once a year (at least on selected portions) |

**Control / Defensive Tactics: Retention Rates**

| Topic / Skill Area | Current Estimated Timeframe for Refresher/Updated Training |
|---|---|
| Handcuffing | Every 5 years |
| Searches | Every 5 years |
| Standing Self-Defense | 3 to 5 times per year |
| Range Drill | 1 to 3 times per year |
| Ground Control | 3 to 5 times per year |
| Takedowns | 3 to 5 times per year |
| Weapon Retention | 1 to 3 times per year |
| Vehicle Tactics | Every 3 years |

**Firearms: Retention Rates**

| Topic / Skill Area | Current Estimated Timeframe for Refresher/Updated Training |
|---|---|
| Firearm Safety Fundamentals | Integrate into every firearms training |
| Handgun Fundamentals (e.g. reloads) | Once per month |
| Handgun Marksmanship: Strong Hand | Once per month |
| Handgun Marksmanship: Support Hand | Once per month |
| Handgun Malfunction Drills | Once per month |
| Positional Shooting | 2 to 3 times per year |
| Moving Targets | 2 to 3 times per year |
| Moving and Shooting | 2 to 3 times per year |
| Weapon Transitions | 1 to 2 times per year |
| Shoot / Don't Shoot | Once per year |
| Flashlight and/or Firearm Light | 3 times per year |
| Low-light Conditions | Once per year |
| Shotgun Fundamentals; e.g. reloads, BEES & function check | 2 to 3 times per year |
| Shotgun Marksmanship | 2 to 3 times per year |
| Shotgun Malfunction Drills | 2 to 3 times per year |
| Deadly Force Policy / ORS 161.209 State Statute | Refresher/reminder every 2 years or as needed with updated policies/statutes |

**Patrol Tactics: Retention Rates**

| Topic / Skill Area | Current Estimated Timeframe for Refresher/Updated Training |
|---|---|
| Building Searches | Once a year |
| Active Shooter | 2.5 hours/year |
| Ambush Response | Once a year |
| Critical Incident Response | Every other year |
| High Risk Vehicle Stops | Every three years |
| Tactical Emergency Casualty Care | Once a year |
| Officer/Citizen Rescue | Once a year |
| Post-Shooting / Shield | Once a year |
| Foot Pursuits | Once a year |

**Police Vehicle Operations: Retention Rates**

| Topic / Skill Area | Current Estimated Timeframe for Refresher/Updated Training |
| --- | --- |
| PIT | Every 1 to 2 years |
| Post-PIT | Every 2 years |
| Box-in | Every 2 years |
| Pursuit Policy | Yearly refresher/reminder |
| SKID Car Training | Every 2 years for a couple iterations and then every 3-4 years |
| 5 Fundamentals (e.g. SLALOM, eyes up, smooth steering inputs, smooth pedal inputs, maintain stable platform) | Yearly refresher/reminder |
| Backing | Every 2 years |
| Pursuit Driving (Higher Speed Driving) | Every 2 years |
| Pursuit Training (Scenario-Based) | Every 2 years |
| Collision Avoidance | Every 3 years |
| ABS Braking | Every 3 years |
| Radio Communication | Every 3 years |
| Spike Strips | Every 3 years |

As a part of the Training Division's research on best practices and latest trends, the Training Division has a formal process for reviewing literature and research on law enforcement training. Below are the names and a brief description of the articles reviewed since the 2016 needs assessment.[21] The Training Division is continuing to review articles pertaining to these and other topics.

## Active Shooter Response

Drysdale, D., Modzeleski, W., and Simons, A. (2010). *Campus Attacks: Targeted Violence Affecting Institutions of Higher Education*. U.S. Secret Service, U.S. Department of Homeland Security, Office of Safe and Drug-Free Schools, U.S. Department of Education, and Federal Bureau of Investigation, U.S. Department of Justice. Washington, D.C., 2010.

In response to the Virginia Tech shooting, this report provides an overview of violent incidents at institutions of higher education (IHE), as well as the involved subjects. Additionally, this report discusses initial observations regarding behaviors of the subjects, and offers preliminary considerations regarding the data that may have relevance to threat assessment. It was found that incidents of targeted violence on or around campus are a year-round issue, which indicates that campus safety resources may be required throughout the calendar year, not just during the academic year. Additionally, the authors found that only 3% of the attackers moved between buildings on campus, which may have tactical implications for first responders during one of these incidents.

## Mental Health Response

Franz, S., & Borum, R. (2010). Crisis Intervention Teams May Prevent Arrests of People with Mental Illnesses. *Police Practice and Research, 12*(3), 265-272

Police calls involving persons with mental illnesses pose a significant challenge for law enforcement nationwide. In this article, the author studies the effectiveness of CIT programs in reducing the number of discretionary arrests of people with mental illnesses. To study this, the author tries to estimate the number of arrests deterred by CIT programs. Findings show a determent rate between 10% and 23% per year for the years 2001 – 2005. The author says that this would suggest that CIT programs are effective in reducing the number of discretionary arrests.

---

[21] The Training Division creates more extensive literature reviews for internal use. However, it would be most prudent for readers to refer to the original article if a full and comprehensive understanding of these articles is desired.

Liebowitz, S., Eliasberg, P. J., Burnim, I. A., & Read, E. B. (2014). *A Way Forward: Diverting People with Mental Illness from Inhumane and Expensive Jails into Community-Based Treatment that Works* (Rep.). ACLU.

This report analyzes data such as incarceration rates and use of force regarding people with mental illness, specifically looking at police departments and jails in the state of California. The authors analyzed this data with the intent of improving the way the police and deputies handle people with mental illness, both in jail and on the streets. The authors found that large-scale incarceration of people with mental illness has been a failure, as it is expensive and does not improve public safety. Los Angeles County alone spends $10 million per year on psychiatric medication for inmates with mental illness, and the study also found that people with mental illness more frequently experience use of force from deputies and officers. Diversion programs, where people with mental illness are diverted into the mental health system instead of the criminal justice system, are a more cost effective solution to this problem, and it is better for public safety and the people with mental illness.

Paterson, C., & Best, D. (2015). Policing Vulnerability Through Building Community Connections

This article explores the networks of support available to vulnerable populations, and how they relate to community capacity and self-policing. The authors study other literature on addictions and recovery to better understand how to improve police interactions with vulnerable populations. They suggest using a community capacity and assets-based model as an alternative / in addition to the current CIT programs. The underlying aim of these models is to explore how far there is capacity within the community to generate assets that can be drawn on to improve the health and well-being of local people, specifically people with mental health problems that come into contact with the police.

Scott, R. L. (2000). Evaluation of a Mobile Crisis Program: Effectiveness, Efficiency, and Consumer Satisfaction. *Psychiatric Services, 51*(9), 1153-1156.

This article studied the effectiveness and efficiency of mobile crisis programs in handling 911 calls identified as psychiatric emergencies. In addition to this, the author studied the overall level of satisfaction with the programs of both consumers and police officers. They discovered as a result of this study that emergencies handled by the mobile crisis teams were less likely to result in psychiatric hospitalizations; however, they did not find a significant difference between the arrest rates. Overall the mobile crisis teams were rated positively by both police officers and police consumers.

Teplin, L. A. (2000). Keeping the Peace: Police Discretion and Mentally Ill Persons. *National Institute of Justice Journal,* 8-15.

This article discusses the role of police officers in handling mentally ill persons, and how systemic factors influence officer decision making in situations involving the mentally ill. The author did a small study, where she collected data (the source of this data was not clear) on police encounters that may or may not have resulted in arrests, and how that relates to whether or not the individual

suffers from mental illness. Findings show that approximately 16% of police encounters involving people with mental illness result in arrest. Additionally, they found that the rate of arrest for people with mental illness is greater than that of people without mental illness. The author suggests encouraging officers to prioritize alternative options of conflict resolution before resorting to arrest for people with mental illness.

Thompson, L., & Borum, R. (2006). Crisis Intervention Teams (CIT): Considerations for Knowledge Transfer. *Mental Health Law and Policy.* Paper 548.

This article examines Crisis Intervention Team (CIT) programs and describes key factors that contribute to the success or failure of implementing such programs. Findings indicated that CIT have improved relationships with the community, as well as the safety of officers and civilians. For these reasons, the author suggests CIT programs as an alternative to the generalized training officers receive on behavioral health issues. The author claims that successful CIT programs require constant feedback and evaluation, both internally and externally, to be successful.

Williams Deane, M., Steadman, H. J., Borum, R., Veysey, B. M., & Morrissey, J. P. (1999). Emerging Partnerships Between Mental Health and Law Enforcement. *Psychiatric Services, 50*(1), 99-101.

In this article, the authors surveyed police departments in 194 cities across the United States (in the year 1999) to identify strategies used to obtain input from the mental health system about dealing with mentally ill persons. The surveys requested information about interactions between the police and mental health professionals, specifically whether the police department had any policies or procedures designed to divert into treatment or provide crisis assistance to persons thought to be mentally ill who might otherwise be arrested. Also requested was information about the availability to all line officers of departmental training in managing mentally ill persons and whether the department employed specially trained mental health officers or deputies. The author concludes that the majority of U.S. cities do not have a specialized strategy to respond to persons in crisis who may have a mental illness. [22]

**Police Vehicle Operations**

Tortorell, P., & Giovengo, R. D. (2017). *Electronic Stability Control and the Precision Immobilization Technique* (Rep.). Federal Law Enforcement Training Centers' Applied Research Branch.

This article studies Electronic Stability Control systems (ESC) and how they impact the Precision Immobilization Technique (PIT). To study this, they designed an experiment where they did trial runs of the PIT maneuver. The types of cars used for this study were two Dodge Chargers (with ESC), one Ford Police Interceptor (also ESC), and one Ford Crown Victoria (non-ESC). Findings show that the driver of a PIT vehicle will have to increase steering input, acceleration, and braking to successfully PIT a target vehicle equipped with ESC versus a Non-ESC vehicle. Further, the PIT

---

[22] These results may be outdated as the article was published in 1999.

vehicle driver will have to recognize that the target vehicle will also respond differently by not spinning out as far and could cause a secondary impact versus a target that does not have ESC.

Zhou, J., Lu, J., & Peng, H. (2008). Vehicle Dynamics in Response to the Maneuver of Precision Immobilization.

This article investigates the behavior of vehicles involved in Precision Immobilization Technique (PIT) maneuvers and develops dynamics models for the pre-impact, impact, and post-impact stages. Simulation results provide guidelines for the effective execution of the maneuver. The main finding in this article is that Electronic Stability Control systems reduce the effectiveness of mild PIT maneuvers, but for more severe PIT maneuvers, they do not appear to have as much of an affect.


**Retention and Perishability**

*RCMP Skill Retention and Perishability Literature Review* (Rep.). (2010). Wolfville, NS: Centre for Organizational Research and Development, Acadia University.

The purpose of this study was to examine relevant skills perishability research and enhance the understanding of affective, cognitive and motor skills; inform the development of an evidence-based recertification strategy; and support the development of national standards for skills training / maintenance which meet law enforcement and policing needs. The areas of particular interest are

- First Aid

- Physical Abilities Requirement Evaluation (PARE)

- PC4 Gas Mask

- Carotid Hold

- OC Spray

- Baton

- Conducted Energy Weapon (CEW)

- Immediate Action Rapid Deployment (IARD)

- Firearms

The above skills were all found to deteriorate quickly; however, some deteriorate faster than others and need to be refreshed more frequently. Not all of the results from this study were conclusive; however, it was suggested that first aide, CEW, IARD, and PCG gas mask be refreshed annually, and firearms refreshed and recertified every 6 months.

53

**Use of Force**

Angel, H., Adams, B. D., Browns, A., Flear, C., Mangan, B., Morten, A., & Stre-Croix, C. (2012). Review of the Skills Perishability of Police "Use of Force" Skills. *Humansystems Incorporated*.

This study was conducted to help inform evidence-based recertification strategies for use of force training in Canada. The ultimate goal is to establish national standards for skill maintenance that meet the operational policing needs. This study included both literature review and surveys about use of force in Canada. Searches for empirical evidence that quantifies use of force skill perishability yielded very little information; however, the authors were able to determine that characteristics of the individual, the nature of the task, and the quality / amount of training are all significant factors that influence retention rates. Suggestions for improving the quality of use of force training include maximizing the use of scenarios, adding an environmental aspect to training, and using simulation technologies to assist with training.

Klinger, D. A. (n.d.). Police Training As An Instrument Of Accountability. Saint Louis University School of Law.

For training to reduce the frequency and level of forceful police actions, it must address the reason or reasons why officers sometimes use excessive force. This article identifies four distinct reasons why police officers might use more force than needed during interactions with citizens, outlines how training can be directed at each of these potential sources of abuse, and discusses the prospects for success that each of these approaches have for controlling police violence. While most of the evidence provided in this article is rooted in social theory as opposed to empirical evidence, the author suggests that there is reason to believe that training directed at each of these four potential sources of abuse would help to reduce the frequency of police misuse of force.

Kop, N., & Euwema, M. (2001). Occupational Stress and the Use of Force by Dutch Police Officers. *Utrecht University*.

This study addresses three issues. First, stressful aspects of police work are identified and described. Second, the levels of burnout of police officers are assessed in terms of emotional exhaustion, depersonalization, and personal accomplishment. Lastly, the relationship between burnout and use of force is explored. Data was collected through participant observation and a questionnaire. Observations were made for 61 days in two regional police forces (122 days). There were 769 reports, and 342 conflicts were observed involving 151 officers. The questionnaire was completed by 358 police officers active in the patrol service (response rate of 76%) of the two forces. This study attempted to test the following hypothesis:

1.  Organizational aspects are more often mentioned as stressors than specific police tasks.

2.  Police officers will score (a) lower on emotional exhaustion and (b) higher on depersonalization than a normative group of human services professionals.

3.  Burnout among police officers is related to (a) a negative attitude toward civilians, (b) a negative attitude toward the use of social skills as a means of solving problems, (c) a positive attitude toward the use of force, and (d) use of force toward civilians.

The results from this study confirm all of the hypotheses above, with the exception of hypothesis (3c).

PORTLAND POLICE BUREAU
**TRAINING DIVISION**

14912 NE Airport Way • Portland OR 97230

www.portlandpolice.com

