**United States v. City of Portland**

**2019 Settlement Agreement Compliance Assessment**

| | |
|---|---|
| III. USE OF FORCE | **Substantial Compliance** |
|   A. Use of Force Policy | **Substantial Compliance** |
|   B. Compliance Audits Related to Use of Force | **Substantial Compliance** |
| IV. TRAINING | **Substantial Compliance** |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | **Substantial Compliance** |
| VI. CRISIS INTERVENTION | **Substantial Compliance** |
|   A. Addictions and Behavioral Health Unit and Advisory Committee | **Substantial Compliance** |
|   B. Continuation of Crisis Intervention (C-I) Program | **Substantial Compliance** |
|   C. Establishing "Memphis Model" Crisis Intervention Team | **Substantial Compliance** |
|   D. Mobile Crisis Prevention Team | **Substantial Compliance** |
|   E. Service Coordination Team | **Substantial Compliance** |
|   F. Bureau of Emergency Communications (BOEC) | **Substantial Compliance** |
| VII. EMPLOYEE INFORMATION SYSTEM (EIS) | **Substantial Compliance** |

| | |
|---|---|
| VIII. OFFICER ACCOUNTABILITY | **Partial Compliance – Substantial Improvement** |
| A. Investigation Timeframe | **Partial Compliance** |
| B. On Scene Public Safety Statements and Interviews | **Substantial Compliance** |
| C. Conduct of IA Investigations | **Substantial Compliance** |
| D. Citizen Review Committee (CRC) Appeals | **Substantial Compliance** |
| E. Discipline | **Substantial Compliance** |
| F. Communication with Complainant and Transparency | **Substantial Compliance** |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING | **Partial Compliance** |

## III. USE OF FORCE

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness: (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied. PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible. In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons, including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function. To achieve these outcomes, PPB shall implement the requirements set out below.

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer[1] that the City has now come into substantial compliance with Section III. *See* Compliance and Outcome Assessment Report, Quarterly Report: All Sections with Remaining Compliance Issues, Draft Report, April 2, 2019 (Remaining Issues Report), p. 14, *available at* https://www.portlandcocl.com/reports/2019/04/02/compliance-and-outcome-assessment-remaining-sections. <br><br> We previously reported that PPB had made significant progress towards compliance with Section III through wholesale revision of its force policies that: set clear guidelines for when and how officers may use force; establish how immediate supervisors investigate force; and direct how chain-of-command supervisors review the work of officers under their command. ECF 158-1. PPB also had begun training to those new policies. *Id.* At the time of our last report, however, that progress was so recent that implementation had not yet demonstrated substantial compliance. *Id.* This has changed. As described in our analysis for each paragraph below, PPB has demonstrated implementation of the force provisions in a substantially compliant manner. |

---

[1] The Settlement Agreement refers to this person as the Compliance Officer Community Liaison (COCL). However, in the amendments to the Settlement Agreement, the parties proposed—and the Court agreed—to divorce the role of assessing compliance from the role of leading the former Community Oversight Advisory Board (COAB). Accordingly, consistent with this more specific role, we refer to this person as the Compliance Officer in this report.

## A. Use of Force Policy

66. PPB shall maintain the following principles in its existing use of force policies:

a. PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer's recent assessment that PPB has completed the steps needed to demonstrate substantial compliance with this provision. *See* Remaining Issues Report, p. 15. |
| | Since August 19, 2017, PPB's revised force policy, Directive 1010.00 – Use of Force, has governed officers' obligations in de-escalation, deciding when force is permissible, reporting uses of force, and investigating force use. *See* Dir. 1010.00 – Use of Force, *available at* https://www.portlandoregon.gov/police/article/647779.  In our prior report, we explained that the Settlement Agreement's definition of "implementation" requires, among other things, that PPB appropriately train sworn members.  ECF 158-1 (citing Settlement Agreement Par. 156 (requiring that PPB implement all provisions of the Settlement Agreement), Par. 33 ("implement" means, *inter alia*, the appropriate training of all relevant personnel)).  As we describe below in the discussion of the Settlement Agreement's training provisions, during this monitoring period PPB has completed that training for all sworn members.  In addition, PPB also has trained supervisors on their responsibilities to investigate force events; critically assess force events in after actions reports; report excessive force allegations; and enter and respond to Employee Information System (EIS) alerts for force events.  We directly observed the 2018 in-service and supervisory training.  The training effectively disseminated consistent directions to all supervisors regarding the use of PPB's automated checklists to assess each criteria and to critique uses of force in after-action reviews; the required response to EIS notifications; and the use of the EIS system for reviews of subordinates. |
| | We also previously stated that "implementation" requires verification that PPB is acting in accordance with the force policy and—consequently—in accordance with the Settlement Agreement and constitutional standards.  ECF 158-1.  In its July 2018 report, the Compliance Officer noted that some supervisors reviewed the moment of force use while others reviewed the entire force interaction.  *See* Quarterly Report: Section III Use of Force, October 2017 to July 2018 (Section III Report), pp. 10-11, *available at* https://static1.squarespace.com/static/5a319f76a9db0901e16c6433/t/5ba9a439f4e1fc2155f249cd/1537844298679/Compliance+and+Outcome+Assessment+Report+-+Use+of+Force+FINAL+with+appendices.pdf. |
| | Since that time, the Compliance Officer reassessed the conditions it placed on PPB to achieve a substantial compliance rating.  Remaining Issues Report, p. 15.  The Compliance Officer reviewed 20 randomly selected reported uses of force.  *Id.* The Compliance Officer found all but one of the uses of force reasonable and, |

4

with respect to that case, the Force Inspector had already sent the case to Training Division for further analysis. *Id.* The Compliance Officer also found that PPB largely evaluates the totality of circumstances in its force reviews and PPB has for the most part resolved conflation of command and control techniques with required attempts at de-escalation. *Id.* In other words, both in use of force events and supervisors' review of those events, PPB demonstrated not merely justified uses of force in nearly all cases—as the Settlement Agreement requires—but attempts to avoid force altogether through de-escalation, when appropriate.

Separate from the Compliance Officer's analysis, we independently reviewed 20% of all reported instances of serious force, as defined in the Settlement Agreement, that did not rise to the level of officer involved shootings or crowd control force events (we reviewed samples of those separately). We found that PPB supervisors routinely applied the decision-point analysis to each step of the interaction. The reports also included reasonable bases for each separate application of force. Where there were issues with evidence collection or a need to record a critical incident, supervisors made EIS entries and responded with corrective action.

Accordingly, both the Compliance Officer's and DOJ's analyses now support that PPB is in substantial compliance with the Settlement Agreement's central requirement to use force only when reasonably necessary under the totality of circumstances to lawfully perform police duties.

b. PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | The Compliance Officer finds that PPB has complied substantially with the totality of Paragraph 66. *See* Remaining Issues Report, p. 16. We agree. |
| | We stated in our prior report that PPB had only partially complied with this provision, in part, because its Directive 315.30 did not incorporate Paragraph 66(b) and, in part, because PPB needed to demonstrate performance with 66(b). ECF 158-1. With input from the Compliance Officer and DOJ, PPB revised Directive 315.30. *See* Dir. 315.30 – Satisfactory Performance, revised Jan. 30, 2018, *available at* https://www.portlandoregon.gov/police/article/674035. The Directive now incorporates the substantive requirements of Paragraph 66(b). *See* Dir. 315.30, Par. 2.7. |
| | PPB also has demonstrated implementation in three important respects. First, as described above, PPB supervisors routinely apply decision-point analysis to an entire transaction to assess officers' actions. In other words, more than just focusing on the instant force was used, supervisors look for the attempts to resolve confrontations without resorting to use of force. Second, as described in the EIS section, below, EIS now effectively tracks and requires supervisory response to complaints of misconduct that may include alleged violations of Directive 315.30. |

| | |
|---|---|
| | Third, as described in the Accountability section below, Independent Police Review (IPR) does not hesitate to frame allegations of misconduct in terms of a violation of Directive 315.30.  In sum, the City's accountability mechanisms enforce the required performance standard. |

67. PPB shall add to its use of force policy and procedures the following use of force principles:

a. Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b. In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

c. The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d. Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer's most recent assessment of Paragraph 67(a) and (d) that the City is now in Substantial Compliance.  *See* Remaining Issues Report, p. 16.  The Compliance Officer had already found that PPB reached substantial compliance with the other provisions of Paragraph 67.  *See* Section III Report, pp. 6, 13.  We agree.  <br><br>We previously found that PPB's Directive 1010.00 incorporates all of Paragraph 67(a)'s mandates.  ECF 158-1 (citing Dir. 1010.00 – Use of Force, Procedure section Par. 1.1 ("Members shall use disengagement and de-escalation techniques, when time and circumstances reasonably permit"); *id.* Par. 1.1.2 ("When practical and appropriate, members shall consult with and/or call specialized units to respond")).  PPB remains in substantial compliance with this policy requirement.  <br><br>***De-escalation*:**  <br><br>The Settlement Agreement does not define de-escalation.  Directive 1010.00, which we approved, defines de-escalation specific to force interactions as "a deliberate attempt to reduce the necessity or intensity of force to resolve confrontation."[2]  *See* Dir. 1010.00, definitions, *available at* https://www.portlandoregon.gov/police/article/647779. |

---

[2] This definition conforms to the term's ordinary use:  "Reduction of the intensity of a conflict or potentially violent situation."  *See, e.g.*, "De-escalation," Oxford Living Dictionary, *available at* https://en.oxforddictionaries.com/definition/de-escalation.

We previously found that PPB's Fall 2017 in-service training was excellent overall, but that de-escalation training would benefit from even further clarity and consistent training.  ECF 158-1.  Since that time, the Compliance Officer has worked closely with PPB to emphasize the need to require further de-escalation training.  We reviewed and approved PPB's in-service lesson plans in advance of training.  We observed 2018 in-service training that addressed de-escalation through instruction on the obligations to de-escalate contained in Directive 1010.00, but also through a separate class on decision-making.  In debriefs following training scenarios, trainers also solicited questions about the need to de-escalate and critiqued participants' use of de-escalation in the scenarios.

Also, we observed in our above-referenced sample of serious force incidents that officers routinely set forth either attempts to de-escalate a situation, or the critical reasons why time did not permit such efforts, e.g., an officer immediately engaged when civilians were already fighting with a subject upon arrival (18-368026).  The Compliance Officer likewise found that PPB now reports in a clearer fashion its efforts at de-escalation.  *See* Remaining Issues Report, p. 16.

***Disengagement, Specialized Units, and Actual or Perceived Mental Illness***:

We previously reported that PPB trained on these topics, specifically teaching, "Disengagement with a Plan," in the Fall of 2017.  ECF 158-1.  *See also* Compliance and Outcome Assessment Report, Dec. 7, 2017 (2017 Compliance Officer Report), at p. 60.  In this monitoring period, a separate sample of force events show PPB used a mental health template that both the Compliance Officer and DOJ approved to record information about their interactions, in addition to using force reports.  As we describe below in the Crisis Intervention section, the City implemented an approved dispatch criteria for Enhanced Crisis Intervention Team (ECIT) calls.  These achievements, coupled with force reviews that show attempts at disengagement and utilization of specialized units, demonstrate that PPB has substantially complied with Paragraph 67.

1. Electronic Control Weapons

68. PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapon System to include the following principles:

a. Prohibition against the use of ECWs for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force;

b. Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their ECW;

c. Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following ECW use;

d. Only one ECW at a time may be used on a subject, intentionally, except where lethal force would be permitted;

e. After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each ECW cycle in their use of force reports;

f. Officers shall make every reasonable effort to attempt handcuffing during and between each ECW cycle. Officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant use;

g. ECWs shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of use of force; and

h. Officers receive annual ECW in service training including proficiency and policy changes, if any.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | In its July 2018 report, the Compliance Officer found substantial compliance with Paragraph 68. *See* Section III Report, pp. 10-11. We agree. |
| | We previously reported that PPB's revised Directive 1010.00 incorporates all of Paragraph 68's mandates. ECF 158-1 (*citing* Dir. 1010.00 – Use of Force, Par. 6.4.4.2). We also reported that PPB had trained on the new policy, but needed to clarify what constitutes one ECW cycle; what should happen after each cycle; and that officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant it. ECF 158-1. PPB has done so. We reviewed and approved PPB's ECW training materials before PPB's 2018 in-service training. PPB's in-service provided annual recertification addressing the policy requirements on the use of ECWs and requiring that each sworn member demonstrate the skills in applying ECW in a manner consistent with policy. |
| | Specifically with respect to Paragraph 68(f)'s direction to avoid more than three ECW cycles absent exigent circumstances, PPB has demonstrated compliance. PPB reports zero cases of four or more ECW cycles in 2018 and four cases of three ECW cycles. |
| | As shown by the graph below, PPB's ECW usage has significantly decreased from the time period of our investigation to the present: |



2. <u>Use of Force Reporting Policy and Use of Force Report</u>

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that:

a. All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

b. All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

c. In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for purposes of paragraphs 70, and 72-77 of this Agreement. (Subparagraph c added by ECF 171.)

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | The Compliance Officer found PPB in compliance with Paragraph 69 in its July 2018 review. *See* Section III Report, p. 19. We agree. Specifically, the Compliance Officer found that officers routinely submit reports prior to the end of their shift and, for lethal uses of force, the administrative investigation serves as a |

way to collect the information normally required in a Force Data Collection Report (FDCR) to facilitate a thorough review of the incident.

We stated in our last report that PPB's revised Directives 1010.00 and 1010.10 meet the Settlement Agreement requirements for reporting uses of force, but that we needed verification that PPB was acting in accordance with these policies in order to show implementation and reach substantial compliance. ECF 158-1. PPB has done so.

PPB's Directive 1010.00 categorizes all types of force, and sets out reporting requirements for each category for both involved and witness officers. Officers who use deadly force do not complete a use of force report or interview with a supervisor; instead, Professional Standards Division (PSD) interviews any officer involved in a deadly use of force "as soon as practicable, but no later than within 48 hours of the event." *See generally* Dir. 1010.10 – Deadly Force and In-Custody Death Reporting and Investigation, Par. 2.2.5.3, *available at* https://www.portlandoregon.gov/police/article/656780. PPB also obtains information necessary to ensure public safety at the scene. Dir. 1010.10, Par. 2.1.3.1.3. We found that the revised Directive 1010.10 is consistent with the Settlement Agreement, as amended, and that the City has developed standard operating procedures to implement the revised Directive, in consultation with the DOJ, Portland Police Association (PPA), and Multnomah County District Attorney's Office. ECF 158-1.

We verified performance is now in substantial compliance with the revised directives. Above, we referenced a sample of serious force cases that we reviewed. These reports comported with the requirements of Paragraph 69.

**Officer Involved Shootings (OIS):**

In addition to our serious force case sample, we reviewed a sample of closed OIS cases available since the last DOJ monitoring report. As we did in our prior report, we randomly selected a sample of two OIS reports to assess for this report. This sample included one fatal and one non-fatal OIS.

**2018-B-0023**. On the day of the OIS, PPB's first contact with the subject occurred in response to a 911 call. An ECIT officer and another officer responded. The officers' presence agitated the subject who, at that time, was not violent toward himself or others. Without need to arrest at that time, officers disengaged and referred the subject for further services. The subject then committed a series of crimes ultimately leading to the force interaction. The OIS occurred at an addiction recovery meeting. The subject held a knife to his throat. Shortly after officers confronted the person, he came toward the officers with the knife in hand. Officers sequentially fired ECWs and less-lethal foam baton rounds, which were ineffective, and then fired lethal weapons to stop his advance. The subject died.

Following the OIS, PPB separated witness and involved officers. Narrative descriptions of the scene describe sequestration of involved and witness officers before formal communication restriction orders (CROs) issued. (PPB provided both the written CROs and corresponding rescinding orders following the

investigation.)  Though PPB did not have the authority to issue a CRO to an involved Multnomah County Sheriff's Office (MCSO) deputy, PPB notes that MCSO issued its own CRO to the involved deputy.  Documentation PPB provided shows MCSO issued a similar CRO and rescinded the CRO after the grand jury returned a no true bill.

PPB asked all the involved members if they would be willing to provide a voluntary statement to detectives; all declined.  A supervisor at the scene provided an on-scene briefing; the supervisor also submitted to a detective's interview the night of the incident.  PPB meticulously photographed officers, their weapons, and the unexpended rounds.  Within the timeframes permitted, PPB interviewed the involved officers, witness officers, and numerous civilian witnesses from the OIS and from the related incidents that preceded the OIS.  PPB also coordinated with other law enforcement agencies in the area, where appropriate, to contribute to the investigation of the OIS and to ensure the safety of individuals reported to be in danger.  Accordingly, PPB complied with Directive 1010.10, and the Settlement Agreement's provisions to protect the integrity of an OIS investigation.

We also observed the Police Review Board (PRB) presentation of this OIS.  We had notified PPB ahead of time that our expert consultant asked what PPB's plan was before entering the populated room and during the force encounter.  The PRB failed to give a sufficiently clear answer to that question during the PRB, and the Training Division did not speak to the efficacy of the less lethal rounds deployed in the interaction.  We found the PRB review otherwise thorough.  The Commander presented a complete narrative of the OIS event.  PPB members of the PRB willingly accepted and answered questions from non-PPB members, *i.e.*, IPR and civilian representatives.

Though the PRB failed fully to address immediate planning before the OIS, PPB addressed the issue through the administrative investigation, i.e., IA's investigation for the after-action review of the OIS.  Ultimately, PPB found the OIS within policy.  Even so, PPB recommended de-briefing the immediate supervisor of that incident, to instruct him on his role to coordinate members' responses when time permits.

The Training Division's written assessment of the OIS, like its presentation at the PRB, did not address efficacy of the less-lethal round used.  The less-lethal operator officers in their interviews noted that the rounds did not have effect, and training noted that the rounds did not change the subject's behavior.  Yet the Training Division did not address whether the PPB's newly chosen less-lethal system works as intended.  We recommend that Training Division conduct such an analysis in future reviews.

Overall, IA's self-critical analysis meets the requirements of the Settlement Agreement's after-action investigation requirements.

We also reviewed **2018-B-0014**.  In this incident, a person stood behind a door and pointed a gun at officers, revealing the person's hand and gun, but concealing the person's body behind a structure.  The IA investigation of the incident shows a deliberate effort to determine whether or not each shot fired was within policy.

Even while the incident was still unfolding, after the first officer fired at the subject, the supervisor removed and sequestered that officer, i.e., beginning the CRO process before the incident was even complete. PPB called in specialized units, namely Special Emergency Reaction Team (SERT) and Crisis Negotiation Team (CNT). Before their arrival, the subject fired the gun at police; police returned fire and struck the subject's hand and leg. Importantly, PPB staged individual first aid kits—referred to as IFAKs, readied a field stretcher, employed the use of a tool open a gate open for paramedics, and deployed a medic with SERT. Each of these steps—before the subject was even in custody—demonstrate an internalized value in rendering immediate aid to subjects against whom PPB uses force.

In this incident, PPB's use of lethal force, *i.e.*, firearms, did not result in fatality. Rather, after the subject was injured, SERT relieved the patrol officers. PPB successfully resolved the incident by arrest without further force and provided medical aid on the scene with paramedics. This incident also demonstrated the effective use of specialized units—SERT and CNT—to resolve safely the situation without using further force.

**Crowd control:**

We reviewed several crowd-control incidents involving uses of force. Our review included not only PPB records, but also online video posted from non-PPB sources. A review of the documents showed appropriate reporting of force, supervisory review of force, and justification for the use of force.

In three crowd-control incidents we reviewed during this rating period, PPB officers who used force appropriately documented the force used. Supervisors critiqued the force reports and justifications. Where there was room for improvement in reporting, even though compliant with policy, the supervisors pointed out these opportunities. The records provided also showed that PPB located and arrested or cited suspects both during and after the crowd control incidents. Where officers had failed adequately to document warnings or de-escalation, supervisors identified those deficiencies as well. PPB recorded those failures to adequately document as oversights and corrected them.

In a fourth crowd control event we reviewed this monitoring period, PPB attempted to talk with protestors to calm them after protestors unsuccessfully tried to pull an arrestee back from PPB custody. Ultimately, after protestors threw items at PPB officers, PPB employed the use of oleoresin capsicum (OC) spray—rather than batons, ECWs, or other less-lethal weapons—on four protestors. In that incident, the officers were able to articulate policy-compliant bases for the uses of force, excepting one strike and one mistaken use of OC spray based on the misimpression that that subject had struck another officer. We found the force used in the chaotic situation measured in this instance.

The City is in substantial compliance with Paragraph 69.

| Technical Assistance | We recommend PPB apply its training review template to assess efficacy of the tools PPB uses with the objective of improving PPB's responses in future situations. |
|---|---|

### 3. Use of Force Supervisory Investigations and Reports

70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

> a. Complete After Action Reports within 72 hours of the force event;

> b. Immediately notify his or her shift supervisor and PSD regarding all officers['] Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement;

> c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

> d. Interview officers individually and not in groups.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | The Compliance Officer found PPB in compliance with Paragraph 70 in its July 2018 review. *See* Section III Report, pp. 20-21. We agree. |
| | We previously found that PPB's revised Directive 1010.00 includes the required immediate supervisory notification about any use of force. ECF 158-1 (*citing* Dir. 1010.00 – Use of Force, Par. 11.1.1, *available at* https://www.portlandoregon.gov/police/article/647779). In addition, consistent with amended Paragraph 69(c) of the Settlement Agreement, for all uses of force except deadly force the supervisor must conduct an administrative review and investigation, document the findings in an After Action Report within 72 hours and forward the report through the chain of command. *Id.,* Pars. 12.3, 13.1, 13.3. As we also previously reported, Directive 1010.10 governs the administrative review of deadly force events, including interviewing any officer who uses deadly force, conducted by PSD. *Id.*, Par 6.3. |
| | Our review of the above-described OIS events indicates that these administrative reviews occur concurrently with a criminal investigation, including interviewing the involved officer(s) within 48 hours, as required by the approved Directive. *Id.* Par. 3.1 and 6.1. |

|  | In this monitoring period, PPB trained its supervisors on the requirements of after action reviews and reporting to PSD for OIS cases.  In the samples we reviewed, supervisors completed these tasks as intended. |
|  | In the fourth quarter of 2018, PPB had recorded 55 serious uses of force.  Fifty-three of those, or 96.36%, had notifications to PSD. |
|  | PPB has demonstrated substantial compliance with Paragraph 70. |

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Status | **Substantial Compliance** |
|---|---|
| Analysis | The Compliance Officer found PPB in compliance with Paragraph 71 in its July 2018 review.  *See* Section III Report, p. 21.  We agree and had previously found substantial compliance, too. |
|  | PPB continues to maintain substantial compliance with Paragraph 71.  For patrol level staffing, PPB's current ratios are 4.8 in Central Precinct (including Behavioral Health Unit (BHU)), 4.7 in East Precinct, and 4.2 in North Precinct. |

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities.  PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| Status | **Substantial Compliance** |
|---|---|
| Analysis | The Compliance Officer found PPB in compliance with Paragraph 72 in its July 2018 review.  *See* Section III Report, p. 21.  We agree. |
|  | As we previously reported, PPB's revised Directive 1010.00 designates the After Action Report form as the checklist to ensure supervisors carry out force investigation responsibilities. ECF 158-1 (*citing* Dir. 1010.00 – Use of Force, Par. 13.2, *available at* https://www.portlandoregon.gov/police/article/647779). |
|  | In the force incidents we reviewed, described above, PPB electronically employed these force reporting forms, including the checklists incorporated into the forms. |

73. PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

    a. EIS tracks all Directive 940.00 ~~comments,~~ findings and corrections (amended by ECF 171);

14

b. All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

c. All supervisors in the chain of command are accountable for inadequate reports and analysis;

d. A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations.  Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

e. When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

f. Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

g. The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor.

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer's most recent assessment that the City has completed the necessary steps to come into substantial compliance.  *See* Remaining Issues Report, p. 19. |
| | As we previously reported, PPB's revised Directive 1010.00 incorporated the required elements of Paragraph 73. ECF 158-1 (*citing* Dir. 1010.00, Par. 13). |
| | During this monitoring period, PPB revised Directive 345.00, though PPB has not yet enacted that revised version.  Nonetheless, the currently enacted version and SOP 49 require that supervisors use EIS to track findings and corrections from after action reviews.  Our review of force incidents in this monitoring period indicated this occurred.  For example, there was a record of an EIS entry for a firearm discharge not resulting in use of force against a person.  The Compliance Officer's recent report supports that PPB is holding officers and supervisors accountable for uses of force and after action reviews.  Likewise, we found corrections and interventions by way of training and counseling.  In this reporting period, we also met directly with the Force Inspector and Compliance Commander to discuss a means of tracking needed corrections for policy, tactical, or equipment concerns pursuant to Paragraph 73(f).  This resulted in the development of the feedback loop that the Compliance Officer discussed in his July 2018 report.  *See* Section III Report, p. 23, appendix 3.  PPB has continued to use this tool for |

|  | systemic issues, as well as Performance Data Tracker (PDT) entries in the EIS system to follow up on issues with individual officers and supervisors. |
|---|---|

**B. Compliance Audits Related to Use of Force**

74. In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports to ensure that:

    a. With respect to use of force generally:

        i. reports describe the mental health information available to officers and the role of that information in their decision making;

        ii. officers do not use force against people who engage in passive resistance that does not impede a lawful objective;

        iii. when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

        iv. officers call in specialty units in accordance with procedure;

        v. officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

        vi. officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

    b. With respect to ECW usages:

        i. ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits. Discrepancies within the audit should be appropriately investigated and addressed;

        ii. officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

        iii. officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

        iv. officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing so is reasonably calculated to prevent the use of a higher level of force.

    c. With respect to use of force reporting, the reports:

        i. are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

        ii. include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

        iii. include a decision point description of the force decision making;

iv. include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

v. include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

vi. include the reason for the initial police presence;

vii. include a description of the level of resistance encountered by each officer that led to each separate use of force and, if applicable, injury;

viii. include a description of why de-escalation techniques were not used or whether they were effective;

ix. include whether the individual was known by the officer to be mentally ill or in mental health crisis;

x. include a general description of force an officer observes another officer apply; and

xi. demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement.

75. In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

a. Complete a Supervisor's After Action Report within 72 hours of notification;

b. Review all use of force reports to ensure they include the information required by this Agreement and PPB policy;

c. Evaluate the weight of the evidence;

d. Use a "decision-point" approach to analyze each use of force;

e. Determine whether the officer's actions appear consistent with PPB policy, this Agreement, and best practices;

f. Determine whether there was legal justification for the original stop and/or detention;

g. Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;

h. Determine whether additional training or counseling is warranted;

i. Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

j. Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

k. Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

l. Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

77. In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that all supervisors in the chain of command:

a. Review Directive 940.00 findings using a preponderance of the evidence standard;

b. Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

c. Modify findings as appropriate and document modifications;

d. Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

e. Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

f. Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer; and

g. Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

| Status | Substantial Compliance |
|---|---|
| Analysis | Like the Compliance Officer's most recent report, we group together the assessment of Paragraphs 74, 75, and 77.  *See* Remaining Issues Report, p. 21. Substantial compliance with each of these paragraphs turns on whether PPB properly conducts audits of force use and after action reports, including the tracking of corrective actions, i.e., the feedback loop to which we referred in the analysis of Paragraph 73.  We find PPB has reached substantial compliance with this significant analytical undertaking.<br><br>PPB's revised Directive 1010.00 requires the Inspector to conduct routine audits of force reports and force-related after action reports, and incorporates the line-item requirements of Paragraphs 74, 75, and 77. ECF 158-1 (*citing* Dir. 1010.00, Pars. 13.00, 4.1, 13.4.10.1, 13.4.10.2).  PPB's Force Inspector has created a reliable method for examining force reports for required data.  ECF 158-1.<br><br>We previously expressed concern that PPB had not provided officers with one coherent model for decision-point analysis.  ECF 158-1.  *Accord* 2017 |

| | |
|---|---|
| | Compliance Officer Report at 17 ("PPB currently evaluates the 'moment of force' but does not adequately review all circumstances which may contribute to the presence of force in a situation.").  In this monitoring period, PPB addressed that specific issue with a separate in-service class instructing on a consistent decision-making model.  The Compliance Officer and DOJ reviewed and approved the lesson plan in advance of that training.  The Compliance Officer and DOJ then observed the training and provided PPB feedback based on these observations.  PPB has met prior DOJ concern with having a consistent model for decision-making analysis.<br><br>Since our last report to the Court, PPB has posted a complete force audit report covering 2017.  *See* Memorandum from Force Inspector to Chief of Police, Jan. 1, 2018, *available at* https://www.portlandoregon.gov/police/article/682976.  Importantly, PPB has continued to mature the force tracking and auditing to cover the definitions of force in the revised 1010.00.  PPB has posted force data summaries for all four quarters of 2018.  *See* Force Data Summary Reports, *available at* https://www.portlandoregon.gov/police/76976.<br><br>In its most recent draft report, the Compliance Officer found that PPB could not provide a complete record of responses to audit action items.  Remaining Issues Report, p. 21.  This difficulty was not a function of PPB failing to complete the work, but rather verifying the work during the planned absence of the regular Force Inspector.  *Id.*  We interviewed the Force Inspector during this absence.  PPB records the corrective actions in EIS or through the Force Inspector's master tracking sheet, i.e., the "Audit Action Item Report."  In addition, PPB now has adopted a common form for tracking corrective action, not dependent on whether or not the Force Inspector is absent. |
| **Technical Assistance** | PPB should include its new corrective action tracking form in its SOPs. |

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

  a. Determine if significant trends exist;

  b. Determine if there is variation in force practice away from PPB policy in any unit;

  c. Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate;

  d. Identify and correct deficiencies revealed by the analysis; and

  e. Document the Inspector's findings in an annual public report.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | The Compliance Officer grouped together its assessment of Paragraph 76 with Paragraphs 73(b) and (d).  *See* Remaining Issues Report, p. 19.  We agree with |

<table>
<tr><td></td><td>COCL's most recent assessment that the City has completed the necessary steps to come into substantial compliance with Paragraph 76. *Id.*

We previously reported that PPB's much-improved Force Audit Reports describe patterns in individual officers' use of force in much more revealing ways than in the past, and identify deficiencies in reporting by rank and unit. ECF 158-1.

PPB has posted force data summaries for all four quarters of 2018, utilizing the definitions of force in the revised 1010.00. *See* Force Data Summary Reports, *available at* https://www.portlandoregon.gov/police/76976. The quarterly reports discuss trends as the Settlement Agreement intends. PPB's most recent force data analysis reports that PPB employed force in 3.3% of custodies.[3] *See* PPB Force Analysis Summary Report, Q4 2018, October 01 - December 31, 2018, *available at* https://www.portlandoregon.gov/police/article/712692. PPB has reduced its use of force. For example, PPB used force in 226 cases in the fourth quarter of 2017 compared to 177 cases in the fourth quarter of 2018, a decrease of 22%. *Id.*</td></tr>
</table>

## IV. TRAINING

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.

| Status | Substantial Compliance |
|---|---|
| Analysis | The Compliance Officer found PPB in compliance with Paragraph 78 in its October 2018 review. Quarterly Report: Section IV Training and Section VII Employee Information System, October 2017 to October 2018 (Sections IV and VII Report), p. 10, *available at* https://static1.squarespace.com/static/5a319f76a9db0901e16c6433/t/5bef2ee24fa51ab54d7bd6a7/1542401771089/Compliance+and+Outcome+Assessment+Report+-+Training+and+EIS+ FINAL+ with+appendices.pdf. The Compliance Officer has lauded much of PPB's training and the Compliance Officer has constructively worked with PPB, IPR, and BOEC to improve training.

We previously found that though PPB had advanced training consistent with agency expectations for constitutional policing and community relationships. PPB now has achieved substantial compliance with all of Section IV. |

---

[3] PPB defines "custodies" to include:  arrests (felony, misdemeanor, citation in lieu of arrests, and juvenile); transportations to detoxification facilities; transportations to hospitals; transportations to mental health facilities; and protective custodies (e.g., removing children from an unsafe environment).

Throughout this monitoring period, PPB provided the Compliance Officer and DOJ with requested lesson plans and training materials for in-service training and supervisory training. We reviewed and commented on those materials. Though we did not always reach complete agreement, PPB's lesson plans nonetheless substantially complied with the requirements of Section IV. The Compliance Officer and DOJ also observed in-service training for all officers in both the Spring and Fall of 2018, and supervisory in-service training in Fall 2018. We provided constructive feedback where appropriate. Largely, though, we confirmed that both the substance and the delivery of training comported with approved policies and the Settlement Agreement. As described in the Accountability section below, the Compliance Officer and DOJ also reviewed and observed the joint PPB IA and IPR training concerning administrative investigations and the revised accountability policies. We also assessed the Learning Management System (LMS), Training Advisory Council (TAC) minutes, and the training audit to assure that PPB has reached substantial compliance with those provisions of Section IV, as we describe below.

In addition to the classroom-based training, range exercises, and scenario-based training, we also observed a sample of field training. The Field Training Evaluation Program (FTEP) is PPB's version of a field-training program. Recruits advance through phases while completing PPB's advanced academy. PPB has revised its FTEP manual consistent with approved policies and the Settlement Agreement. *See* PPB FTEP Recruit Officer Field Training Manual, revised August 2018. Importantly, PPB's FTEP program requires assessment of skills performance, including performance within approved policies. *Id.* We observed recruits at different phases of the program and various precincts. Trainers, or "coaches," instilled programmatic knowledge and conferred more responsibility on trainees as they advanced through the phases. Trainees' interactions that we observed included participating in two separate ECIT calls that successfully resolved with voluntary compliance. One particularly successful trainer debriefed and quizzed the recruit at the end of each interaction. The FTEP program supports PPB's compliance with its training obligations under the Settlement Agreement.

Overall, we find that PPB's complement of training substantially complies with Paragraph 78.

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB continues to maintain substantial compliance with Paragraph 79. ECF 158-1. The Compliance Officer also found substantial compliance in its October 2018 review. *See* Sections IV and VII Report, p. 12.

This provision has two aspects:  a training needs assessment and a training plan.

PPB's Training Division finalized its most recent comprehensive training needs assessment in August 2018.  *See* Training Division, 2018 Annual Training Needs Assessment, Aug. 2018, *available at* https://www.portlandoregon.gov/police/article/725855.  Like prior needs assessments, the current one included a series of recommendations for potential future training.  TAC recommendations, PPB training audit (designed with input from the Compliance Officer), class surveys, force and other audits, and changes in law all feed into the training needs assessment.

PPB finalized its 2019 Annual Training Plan December 2018.  *See* Training Division, 2019 Annual Training Plan, December 2018.  PPB responded to our prior recommendation and its new comprehensive training plan covers all major trainings, not just in-service training.  We reviewed the plan together with the TAC recommendations and the training needs assessment.  TAC's formal training recommendations predominantly centered on self-paced instruction.  *See* 2017 Training and Use of Force Report Recommendations, June 24, 2017, p. 3-4.  PPB's 2019 Training Plan addresses this need with direction to deliver through online training videos and training bulletins as TAC recommended.  *See* Training Division, 2019 Annual Training Plan, December 2018, p. 3.  Specifically this will include legal updates and bloodborne pathogen training, as well as unanticipated supplements that cannot be delivered through in-service training.  *Id.*  We agree with the Compliance Officer's assessment of the training plan from the Compliance Officer's recent reassessment of Paragraph 84(a)(i).  *See* Remaining Issues, p. 6.  The 2019 Training Plan is responsive to the 2018 Needs Assessment, specifically in its incorporation of equity, procedural justice, use-of-force decision making, and de-escalation. |
| Technical Assistance | As we recommended previously, PPB could inform its training plan by outcomes of the Community Engagement and Outreach Plan (CEO Plan), once it is completed.  *See* Comments to Paragraphs 141, 146. |

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum.  These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs.  This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Status | Substantial Compliance |
|---|---|
| Analysis | The Compliance Officer found that PPB is in substantial compliance with Paragraph 80. *See* Sections IV and VII Report, p. 17.  COCL carefully outlines the steps PPB has taken—and we, too, have observed—to do so. *Id.*  We agree with the Compliance Officer's assessment.<br><br>In 2018, the Training Division provided an extensive, separate analysis of data concerning ECIT training. *See* Evaluation Report:  2018 Enhanced Crisis Intervention Training, Training usefulness, on-the-job applications, and reinforcing training objectives, February 2019.  The Training Division assessed survey data showing broad officer support for the 2018 ECIT training.<br><br>The survey data also showed a dramatic increase in the proportion of officers who strongly agree that their supervisors are very supportive of the ECIT program, reaching 64.3% in 2018, compared to only 14.3% in 2015:<br><br><br><br>Figure 7: My supervisor(s) are very supportive of the ECIT program.<br><br>The Training Division analyzed the survey results of the police vehicle operator training and supervisory in-service training, as well.  These analyses were helpful in understanding attendees' impressions of training and its application to their jobs, though the analyses did not reach as far as the ECIT's analysis of post-training on-the-job assessment.  In all three training analyses, Training Division applied a feedback model to shape future training.  This feedback loop was the intended purpose of Paragraph 80.  PPB's utilization of feedback shows PPB's internalization of the remedy.<br><br>We reviewed surveys of Advanced Academy attendees, as well.  Attendees were overwhelmingly positive in response to the content of most classes.  Though most respondents agreed on the positive aspects of keeping the selected course in the curriculum, a handful of attendees chose options like "redundant" and "slightly disagree," indicating that the survey tools could be used for critical assessment and not merely PPB self-validation. |

| | We directly observed PPB training and evaluations since our last report.  PPB provided training materials to the Compliance Officer and DOJ in advance of training.  Where either identified issues, PPB worked through those issues and honed its materials.  As Paragraph 80 requires, PPB's training included competency-based evaluations, namely:  knowledge checks (i.e., quizzes on directives), in-class responsive quizzes (using clickers to respond to questions presented to the group); knowledge tests (examinations via links PPB sent to each student's Bureau-issued iPhone); demonstrated skills and oral examination (officers had to show proficiency in first aid skills, weapons use, and defensive tactics); and scenario evaluations (officers had to explain their reasoning for choices after acting through scenarios).  These were the same sort of competency-based evaluations we commended in our last report.  In this monitoring period, PPB applied the same type of evaluations to supervisory-level training as well as in-service training for all sworn members. |
| :-- | :-- |
| | PPB successfully has used the surveys, testing, and the training audit. |

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| **Status** | **Substantial Compliance** |
| :-- | :-- |
| **Analysis** | We agree with the Compliance Officer's most recent assessment that the City has completed the necessary steps to come into substantial compliance with Paragraph 81.  *See* Remaining Issues Report, p. 6. |
| | We previously reported that PPB had acquired LMS and filled the LMS administrator position, but was working to develop full training records of all members.  ECF 158-1.  During this monitoring period, we interviewed the administrator and reviewed the LMS data provided.  PPB had added training records and was, at that time, working on providing direct access for supervisors to their subordinates' training records for review.  Since that interview, PPB provided for supervisors' direct access to LMS.  Supervisory personnel reviews, as we discuss with respect to EIS in our evaluation of Paragraph 116, have now reached substantial compliance. |
| | Separately, the Compliance Officer audited current LMS data.  In its most recent review, the Compliance Officer found PPB had resolved a data migration issue and was able to use LMS to record all trainings.  *See* Remaining Issues Report, p. 22.  PPB members have to report training provided outside of the organization to the Training Division to ensure its recordation in LMS.  This is an acceptable means of gathering these data given that the individual members, rather than the LMS administrator, are aware of the outside trainings that they attend. |

| | |
|---|---|
| | As the Compliance Officer noted, LMS does not contain exam results and class evaluations.  We have reviewed class-evaluation data PPB provided in connection with Paragraph 80.  PPB has kept these data in an organized and usable fashion as Paragraph 81 requires.<br><br>Accordingly, our direct observations and the Compliance Officer's independent audits support that PPB substantially complies with Paragraph 81. |
| Technical Assistance | In order to make sure all sworn members receive credit in their personnel evaluations for outside training, PPB should give explicit, bureau-wide direction that members must report their records of all trainings outside of those tracked at the Training Division.<br><br>PPB's second quarter data showed a small group of officers had not yet completed state-mandated maintenance training.  PPB should use the LMS data to assure that officers who return from leave promptly complete mandatory training. |

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Status | Substantial Compliance |
|---|---|
| Analysis | DOJ agrees with the Compliance Officer that PPB has maintained substantial compliance with this provision.  *See* Sections IV and VII Report, p. 20.<br><br>PPB reported delivery of 3342.75 hours of external training and an additional 15,403 hours of internal training in the second half of 2018.  *See* Course Attendance Summary Report, 2018 Course Attendance – External Courses July – December 2018; Course Attendance Summary Report, 2018 Course Attendance – Internal Courses July – December 2018.  These records include a list of course titles, hours per course, and number of attendees. |

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force.  The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Status | Substantial Compliance |
|---|---|
| Analysis | DOJ agrees with the Compliance Officer that PPB has maintained substantial compliance with this provision.  *See* Sections IV and VII Report, p. 20. |

> As described in our last two compliance assessment reports, PPB added necessary trainer selection criteria to its SOP 1-19. ECF 124-1; ECF 158-1. We also previously reported that PPB incorporated Paragraph 83's restrictions on the selection of trainers into revised Directive 1500.00. *See* Dir. 1500.00, Par. 12, revised Nov. 29, 2016, *available at* https://www.portlandoregon.gov/police/article/526474. We reviewed Training Division Work History Review Sheets and found that none of the reviewed new instructors, including field training officers (or "coaches"), had adverse administrative findings for use of force or civil judgments based on uses of force.

84. All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

    a. With respect to patrol officers, PPB shall:

        i. increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

        ii. emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

        iii. continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

        iv. continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

        v. describe situations in which a force event could lead to potential civil or criminal liability; and

        vi. continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-center communication, such as the term "mentals," in all work-related settings and communications, as well as when interacting with the public.

    b. With respect to supervisors, provide additional training on how to:

        i. conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3;

        ii. evaluate officer performance as part of PPB's annual performance evaluation system; and

iii. foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action.

| Status | Substantial Compliance |
|--------|------------------------|
| Analysis | We previously found that PPB substantially complied with Paragraph 84(a), but only partially complied with subparagraph (b). ECF 158-1. With respect to subparagraph (b), we stated that PPB needed to conduct supervisory training once PPB enacted revised directives for force investigations, employee evaluations, and accountability systems. PPB enacted the revised directives in 2017-2018. *See* Dir. 1010.00 – Use of Force, effective Aug. 19, 2017; Dir. 1010.10 – Deadly Force and In-Custody Death Reporting and Investigation Procedures, effective September 27, 2017; Dir. 215.00 – Member Performance Evaluations, effective Feb. 28, 2018; Dir. 331.00 – Supervisory Investigations; Internal Affairs, Complaint Intake and Processing , effective Mar. 3, 2018. PPB developed lesson plans and teaching materials on the revised directives, which the Compliance Officer and DOJ reviewed and approved. The Force Inspector delivered training concerning supervisors' force reporting and investigation obligations. The EIS administrator instructed on the use of EIS, including for employee evaluations. We observed both the 2018 and 2019 supervisory trainings, and both the substance and delivery of the trainings substantially complied with Paragraph 84.<br><br>PPB's in-service training for all patrol officers continues to comport with the requirements of Paragraph 84(a). Nearly all lessons included scenarios of some sort, sometimes acted out in PPB's scenario village and sometimes conducted in the classroom either by participants or through students analyzing and commenting on video-recorded scenarios. In-service training included classes covering: Tactical Emergency Casualty Care; Critical Decision Making; Control Tactics; Procedural Justice and Implicit Bias; and Electronic Control Weapons. |

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

a. Conducts a comprehensive needs assessment annually;

b. Creates a Training Strategic Plan annually;

c. Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training;

d. Maintains accurate records of Training delivered, including substance and attendance;

e. Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ;

f. Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and

g. Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they

have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer's recent assessment that PPB has demonstrated substantial compliance with this provision. *See* Remaining Issues Report, pp. 27-28.<br><br>We previously reported that PPB has worked with the Compliance Officer to develop an appropriate training audit to satisfy Paragraph 85, but PPB had not yet implemented the tool by the time of our last report. ECF 158-1. In this monitoring period, PPB completed the initial training audit, then, with feedback from the Compliance Officer, completed a follow-up report to that audit in November 2018. *See* Follow-Up Audit Report, PPB Training Division, Nov. 2018. A review of that report shows that the audit assessed and reported on each provision of Paragraph 85. The Compliance Officer found that this follow-up audit report addressed its previous concerns with LMS implementation (discussed above); with adequacy of the 2018 Needs Assessment (which we found substantially compliant, above); and with curriculum development using surveys.<br><br>Consistent with our prior technical assistance for Paragraph 85(g), PPB also implemented a directives tracking tool. The tool shows when PPB assigns newly revised directives for sworn members' review and when the reviews are due. PPB recently enacted a revised series of directives concerning interactions with people in mental health crisis. The tracking data show over 99% of sworn members responded by the deadline acknowledging the new directives. |
| Technical Assistance | PPB's next training audit should address the status of the three recommendations that the November 2018 Follow-Up Audit Report states are in progress: reallocating analysts; quality assurance of training records; and tracking expiring certifications. |

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Status | Substantial Compliance |
|---|---|
| Analysis | We continue to find PPB has substantially complied with Paragraph 86.  The Compliance Officer found substantial compliance too.  *See* Sections IV and VII Report, pp. 38-39.

In this monitoring period, PPB has presented TAC with force analysis reports.  *See, e.g.*, Use of Force Overview for Quarter 4 2018, *available at* https://www.portlandoregon.gov/police/article/712692 (presented at the March 13, 2019 TAC meeting).  PPB has also distilled such data into useful presentations.  *See, e.g.*, Force Audit Team Nov. 14, 2018 presentation.  This included analysis of force trends: |



**Applications of Force Trends**

| Applications of Force Trends (Force Types with 10 or More Applications in Q3 2018) # of Applications (% of Total Applications of Force) | | | | | |
|---|---|---|---|---|---|
| | Q4 2017 | Q1 2018 | Q2 2018 | Q3 2018 | Q2-Q3 % Change |
| Box-in | 23 (3%) | 46 (5%) | 19 (2%) | 11 (2%) | -42% |
| CEW | 26 (4%) | 16 (2%) | 16 (2%) | 21 (4%) | 31% |
| Control Against Resistance | 244 (32%) | 407 (42%) | 337 (39%) | 200 (36%) | -41% |
| Pointing of a Firearm | 88 (12%) | 73 (8%) | 95 (11%) | 28 (5%) | -71% |
| Resisted Handcuffing | 223 (30%) | 220 (23%) | 227 (26%) | 184 (33%) | -19% |
| Strikes / Kicks | 37 (5%) | 36 (4%) | 24 (3%) | 12 (2%) | -50% |
| Takedown | 68 (9%) | 82 (9%) | 76 (9%) | 52 (9%) | -32% |
| Takedown - Controlled | 45 (6%) | 78 (8%) | 76 (9%) | 55 (10%) | -28% |

In May 2018, TAC issued a new list of recommendations regarding implicit bias training.  *See* TAC Coursework Comments and Suggestions Introduction to Implicit Bias Training, May 12, 2018, *available at* https://www.portlandoregon.gov/police/article/699311.

Similarly, in December 2018, TAC issued recommendations specific to Procedural Justice Training.  *See* TAC Coursework Comments and Suggestions Procedural Justice Training, December 11, 2018, *available at* https://www.portlandoregon.gov/police/article/709399.

TAC revised its self-governing bylaws in 2018.  *See* TAC Bylaws, adopted Sept. 12, 2018, *available at* https://www.portlandoregon.gov/police/article/698835.

TAC has not yet addressed PPB's updated training audit.  *See* 2019 Agendas, *available at* https://www.portlandoregon.gov/police/78362.

Though meeting minutes show frequent interaction between TAC members and PPB, the records provided do not show a formal response to the newest TAC

| | recommendations.  A written response would assist in showing the Chief's assessment of TAC recommendations and changes, if any, made in response. |
|---|---|
| **Technical Assistance** | TAC should review PPB's updated audit report and recommendations. We suggest that PPB respond in writing to TAC's recommendations. |

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | As we previously found, PPB's Training Division and Strategic Services Division have supported TAC's mission.  ECF 158-1.  Officers from each division continued to attend TAC meetings too.  *See* TAC Meeting Minutes 2018-2019. Meeting minutes reveal a cadre of community members who have availed themselves of the public access to TAC meetings.  PPB remains in substantial compliance with this provision.  *Id.*  The Compliance Officer, likewise, found substantial compliance with this provision.  *See* Sections IV and VII Report, p. 39. |

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis.  Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure.  The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness.  The United States acknowledges that this Agreement only legally binds the City to take action.  Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents.  The City's partners in the provision of community-based addiction and mental health services include:  the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | PPB is in substantial compliance with Paragraph 88.  It continues to engage community partners in the effort to bridge gaps in community-based mental health services.  Through its BHU, PPB works closely in collaboration with State and County partner entities, CCOs, and community-based mental health service providers.  *See* BHU, *available at* https://www.portlandoregon.gov/police/62135. The Behavioral Health Unit Advisory Committee (BHUAC), the Service |

|  | Coordination Team (SCT), and the Behavioral Health Response Team (BHRT) have developed and maintained positive relationships with partner organizations. The BHU regularly publicizes its efforts in quarterly newsletters. *See* BHU Past Newsletters, *available at* https://www.portlandoregon.gov/police/68896. |

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Status | Substantial Compliance |
|--------|------------------------|
| Analysis | PPB is in substantial compliance with Paragraph 89. It has continued to work closely with the Unity Center (Unity) and its Transportation Subcommittee to facilitate transfer of individuals by ambulance to Unity and local hospital emergency rooms. PPB directives provide for such transfer and transport. *See* Dir. 630.45, *available at* https://www.portlandoregon.gov/police/article/526144; Dir. 850.20, *available at* https://www.portlandoregon.gov/police/article/701129.

The United States has considered Unity to meet the expectation laid out in Paragraph 89 that local CCOs establish a walk-in/drop-off center for individuals with addiction and/or behavioral health service needs. *See, e.g.*, ECF 158 at 37. The Compliance Officer similarly considers Unity to fulfill this expectation. ECF 182-2 at 8.

Unity was not accepting new drop-off patients for part of 2018. During that time, the BHU ensured officers continued to transfer people in mental health crisis to ambulances for transport to other local hospitals. Unity confronted other serious, well-publicized challenges with respect to safe operations for clients and employees that jeopardized its funding. *See* Unity Center, *Updates, Statements of Deficiency Reports, and Plan of Correction*, *available at* https://www.unityfacts.org/.

In response to community member concerns and the Court's questions, on October 2, 2018, the United States filed a status report addressing the number of people arrested at the Unity Center. ECF 191. Between January 31, 2017, and April 30, 2018, there were 30 arrests, of which 10 were current Unity patients, 5 were not patients, and 15 were discharged patients. Over that period, Unity served 8,821 individuals across 14,970 encounters, yielding an arrest rate of 0.0034. *Id.* at 3-4. We asked for, and PPB provided, updated arrest statistics. Between May 1, 2018, and February 28, 2019, there were 16 arrests, of which 2 were not patients and 14 were discharged patients. Over that period, Unity served 6,149 individuals across 9,844 encounters, yielding an arrest rate of 0.0026. |

|  | Unity voluntarily provided the information the United States needed to respond to the Court's inquiry. However, Unity is not a party to this litigation and DOJ has not evaluated the quality of service or level of care provided. |
|---|---|

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU"), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include:

a. Increased sharing of information, subject to lawful disclosure, between agencies and organizations including BOEC, Multnomah County, and health care providers to create an information exchange among first responders and providers to better serve those suffering from mental illness;

b. Creation of rapid-access clinics so those in crisis have access to timely medication management appointments;

c. Enhancing access to primary care providers to shift low-to moderate acuity patients to primary care programs creating more capacity for acute patients in existing outpatient crisis mental health systems;

d. Expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders;

e. Addressing issues of unmet needs identified by Safer PDX and its community partners;

f. Expanding and strengthening networks of Peer-Mediated services to:

i. develop a referral guide delineating these services and locations and assist with accessing information;

ii. better educate the community of the viability of these services as alternative first engagement sites/programs for those having difficulty engaging with "professional driven" services;

iii. expand peer services connected to peer supports in the community for inpatient psychiatric units (including Emergency Departments) and in the community;

iv. add peer guides to work alongside Emergency Department guides for those patients with behavioral health issues entering the Emergency Department; and

v. evaluate opportunities to expand use of peers to coordinate with PPB ABHU (as described herein) and function as a link with impacted individuals; and

g. pursue tele-psychiatry (a provision of mental health care by video conferencing) as a way for first responders to take advantage of existing IT infrastructure to provide direct care or provider evaluation supporting the provision of appropriate services to an individual in crisis.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB is in substantial compliance with Paragraph 90.  The BHU continues to participate in local, regional, and statewide efforts, including data-sharing initiatives and a variety of ad hoc efforts with service system partners.  As discussed in Section VI, BOEC has implemented a quality assurance program that has enhanced the capacity of BOEC operators to triage calls appropriately.  In 2018, BOEC participated in a pilot program that assigned a PPB Sergeant to provide real-time support and guidance to BOEC Operators.  These efforts expand BOEC capacity to divert 911 calls away from police response as appropriate. |

## VI. CRISIS INTERVENTION

The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises.  The PPB will add new capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis as required by this Agreement.  Despite the critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force.

### A. Addictions and Behavioral Health Unit and Advisory Committee

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB.  PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU.  ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB has established and maintained a Behavioral Health Unit (the BHU is the equivalent of the "ABHU" referenced in the Settlement Agreement).  The BHU oversees and coordinates Enhanced Crisis Intervention Trained officers (ECIT officers are the equivalent of the "C-I Team" referenced in the Settlement Agreement), the Behavioral Health Response Teams (BHRT, the equivalent of the "MCPT" referenced in the Settlement Agreement), and the SCT, which coordinates treatment and other wrap-around services to reduce recidivism among frequent drug and property crime offenders.  More information about the BHU's operation is available on the City's website: https://www.portlandoregon.gov/police/62135.

The BHU continues to include mobile crisis prevention teams, BHRTs, which consist of a sworn officer and a licensed mental health professional from Cascadia's Project Respond.  *See* Project Respond, *available at* https://www.cascadiabhc.org/services/crisis-intervention/#_ProjectRespond. |

| | |
|---|---|
| | BHRT successes resulted in community calls to expand the program, which the City did in 2018, funding PPB to add two new teams for a total of five teams.  The BHU also includes a Coordinator for PPB's 100-plus ECIT officers, a crime analyst, and the SCT program.  In addition to managing these programs, the BHU has assisted PPB's Training Division in providing high-quality Crisis-Intervention Training and Enhanced-Crisis-Intervention Training.<br><br>To manage the BHU, PPB continues to assign a Lieutenant responsible for coordinating the BHU's teams, participating in the BHUAC, ensuring ECIT and BHRT officers maintain qualifications, and screening applicants to confirm they meet ECIT criteria. |

92. ABHU will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor.  PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | This assessment has improved since DOJ's last compliance report due to the demonstrated reliability over time of PPB's data collection.<br><br>The BHU uses and shares data, to the extent allowable by law, to minimize law enforcement interactions and potential use of force against mental health service consumers.  The BHU shares data in many ways, including:  (1) by weekly reports to the Multnomah County Crisis Line from the BHU Electronic Referral System (BERS), which monitors individuals referred to BHRTs; (2) Behavioral Health Coordination Team meetings to help individuals who have frequent police contact; and (3) regular meetings between SCT and service system partners to coordinate services.  As the Compliance Officer's analysis demonstrates, these efforts have successfully minimized the frequency and improved the outcome of police contacts to the benefit of community members.  ECF 182-2 at 13-15, 27, 31-32, 41-50.  BHU has recently begun auditing referrals and collaborating with Portland Fire and Rescue's CHAT (Community Healthcare Assessment Team) to develop mutual strategies for responding to citizens with frequent contacts with fire and police personnel.<br><br>PPB's Mental Health Template for collecting data on officer encounters with community members perceived to have mental illness or experiencing mental health crisis has proven reliable over time in light of additional training and experience, and quality assurance mechanisms.  We address these efforts below in Paragraph 105 and Paragraph 115. |

93. ABHU shall track outcome data generated through the C-I Team, MCPT, and SCT, to:
(a) develop new response strategies for repeat calls for service; (b) identify training needs;
identify and propose solutions to systemic issues that impede PPB's ability to provide an

appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Status | Substantial Compliance |
|--------|------------------------|
| Analysis | This assessment has improved since DOJ's last compliance report due to PPB demonstrating reliability of its data collection efforts over time.<br><br>PPB has successfully institutionalized the Mental Health Template, which aims to collect reliable data from each qualifying mental health encounter to analyze over time. PPB's data analysts and patrol officers report that the Template is consistently being completed and generating reliable data. PPB's Training Division dedicated several in-service training sessions to resolving questions about the Template, with instructors providing clearer, simplified guidance. PPB continues to measure outcomes as required by this Paragraph.<br><br>The BHU continues to inform its work via multiple methods of internal data review, as discussed in the Compliance Officer's quarterly report on Mental Health Response. ECF 182-2 at 15-16. One notable effort is a "Frequent Contact Referral" process aimed at proactively linking with mental health services an individual who is the subject of three or more ECIT-designated calls. The BHU has also created a feedback loop between itself, Training Division, and Professional Standards Division, auditing cases involving use of force against a subject with mental illness. This process should increasingly allow PPB's internal subject matter experts to identify relevant training and policy improvements from evaluating its own officers' experiences.<br><br>As discussed in Paragraph 104, PPB has engaged its social media platforms, flash alert list serve groups, and press release outlets to commend officers for successfully resolving calls involving a mental health component. BHU newsletters also highlight BHU operations and individual officer performance. *See* BHU Newsletters, *available at* https://www.portlandoregon.gov/police/63093. The BHUAC routinely begins meetings with success stories involving ECIT officers responding to subjects experiencing a mental health crisis, which it reports publicly in meeting minutes. *See* BHUAC Meeting Minutes, *available at* https://www.portlandoregon.gov/police/68755. |

94. Within 90 days of the Effective Date, PPB shall also establish an ABHU Advisory Committee. The ABHU Advisory Committee shall include representation from: PPB command leadership, CIT, MCPT, and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Status | Substantial Compliance |
|---|---|
| Analysis | A BHUAC roster list shows that its membership includes the organizations listed in Paragraph 94, as well as additional partners.  *See* BHU Advisory Committee Members, *available at* https://www.portlandoregon.gov/police/article/545177. The Compliance Officer and DOJ have observed BHUAC meetings throughout the year.  BHUAC committee members continue to offer diverse perspectives and thoughtful guidance to advance the BHU's mission. |
| | Some members of the community have asked the BHUAC to open its meetings, or some part of its meetings, to the public.  At the April 19, 2018 Status Conference, the Court echoed the inquiry.  *See* ECF 175*,* Hearing Transcript, at 157:4 – 158:6. The City Attorney's Office has advised the BHUAC that the Committee has discretion to decide the issue for itself because Oregon public meetings laws do not dictate a particular outcome for entities like the BHUAC.  The BHUAC previously voted to close its meetings to the public and release public reports and minutes, but is revisiting the issue.  BHUAC members have also indicated a willingness to meet with interested members of the public on a regular basis to share information and hear concerns outside of BHUAC meetings.  At the BHUAC's March 2019, the MHA made a pitch for open meetings, and the Committee will vote on the issue at its next meeting. |

95. The ABHU Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of C-I Team, MCPT, SCT, BOEC Crisis Triage, and utilization of community-based mental health services.  The ABHU Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters.  The ABHU Advisory Committee shall report its recommendations to the ABHU Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Status | Substantial Compliance |
|---|---|
| Analysis | The BHUAC continues to provide informed advice to PPB.  The BHUAC meeting minutes and BHUAC reports reflect the Committee's work on issues contemplated by Paragraph 95.  *See* BHU Minutes, *available at* https://www.portlandoregon.gov/police/68755; BHU Reports, *available at* https://www.portlandoregon.gov/police/68666.  The Committee issued a summary status report in April 2018 that details recent efforts.  *See* Portland Police Bureau Behavioral Health Unit Advisory Committee Status Report April 2018, *available at* https://www.portlandoregon.gov/police/article/687529. |
| | Of note, in 2018, the BHUAC discussed systemic issues in providing mental health services and particular aspects of PPB's mental health response model. The BHUAC addressed BOEC's crisis triage operations, assisting in its quality assurance efforts related to ECIT dispatch.  The BHUAC also monitored the |

| | circumstances surrounding safety concerns at the Unity Center and Unity's inability to take new patients arriving by ambulance in July 2018. During that time, the BHUAC helped PPB ensure that ECIT and other officers continued to transfer individuals in mental health crisis to a different area hospital for services. |
|---|---|

96. Within 240 days of the Effective Date of this Agreement, the ABHU Advisory Committee will provide status reports on the implementation of the ABHU and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| Status | Substantial Compliance |
|---|---|
| Analysis | The BHUAC continues to review policies, procedures, and training methods, and make recommendations for improvements to PPB and BOEC. In 2018, BHUAC made crisis triage recommendations, assisted in quality assurance measures for BOEC's ECIT dispatch protocol, received a presentation on BHU data collection efforts, and reviewed the BHU's standard operating procedures. |

## B. Continuation of C-I Program

97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB has maintained auditable records of providing its crisis intervention training to all officers. This training underpins Portland's variation on the Memphis Model, discussed in Paragraph 99. |
| | DOJ and its expert have joined the Compliance Officer in observing PPB's annual Advanced Academy and In-Service Crisis Intervention Training. PPB relied on community members and mental health professionals to present learning scenarios with positive effect in conveying how to recognize the signs and symptoms of a mental health crisis, and the importance of doing so. |

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with ABHU Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB developed its crisis intervention training in consultation with the BHUAC. The Compliance Officer and DOJ observed the Fall 2018 in-service refresher training, which included procedural justice and implicit bias modules, and a scenario involving de-escalation techniques.  We found the training to be high quality. |

## C. Establishing "Memphis Model" Crisis Intervention Team

99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").

| Status | Substantial Compliance |
|---|---|
| Analysis | This assessment has improved since DOJ's last compliance report due to the City demonstrating the overall effectiveness of its variation on the Memphis Model.<br><br>As the Compliance Officer notes, the Memphis Model is characterized by several core competencies.  Among the core features are law enforcement partnerships with advocacy groups and mental health service providers; local ownership; a volunteer group of specially trained officers comprising around 25% of the patrol division; and protocols and training for 911 call dispatchers to ensure specially trained officers respond to all pre-identified calls involving a mental health crisis.  ECF 182-2 at 18; Compliance Officer 2019 First Quarter Report at 24; *see also* University of Memphis, *Crisis Intervention Team Core Elements*, *available at* http://www.cit.memphis.edu/information_files/CoreElements.pdf.<br><br>PPB has established an ECIT team, which consists of a volunteer group of specially trained officers comprising about 35% of PPB's patrol force.  The ECIT team operates as part of the BHU.  The BHU maintains a web of interrelated partnerships with advocacy groups and mental health service providers.  These characteristics are consistent with the Memphis Model's core competencies.  For a broad overview of PPB's ECIT Program, see https://www.portlandoregon.gov/police/article/557965.<br><br>PPB's BHU varies from the classic Memphis Model by adopting a dispatch protocol that triages mental health crisis calls, and sends ECIT officers to calls that pose a relatively greater risk of harm to the subject or others.  BOEC trains its 911 call takers to recognize the signs and symptoms of a mental health crisis, and BOEC protocol requires dispatching ECIT officers when a call involves both a mental health crisis and one of seven plus-factors:<br><br>(1) The subject is violent toward others (physically combative, threatening violence, assaulting);<br><br>(2) The subject has a weapon;<br><br>(3) The subject is threatening or attempting suicide; |

(4) The call is at a mental health facility;

(5) Upon request of the caller;

(6) Upon request of a responding officer; or

(7) The subject's behavior indicates an escalating risk of harm of self or others.

For calls that do not meet these criteria, BOEC dispatches a standard patrol officer, of which about 35% are ECIT. As noted in Paragraph 97, non-ECIT officers receive 40 hours of basic crisis intervention training. The City reports that it adopted this approach for important local historical reasons, in particular the 1992 officer involved shooting death of Nathan Thomas and the 2006 in-custody death of James Chasse. In this regard, to the extent Portland's variation on the Memphis Model arises from local ownership and PPB's partnership with advocacy groups and mental health service providers, the BHU's approach to mental health crisis response is substantially compliant with this Paragraph's requirement to establish a Memphis Model crisis intervention team. We expect categories (5) and (6) to increase dispatch frequency over time. Similarly, we expect Portland's other variation on the Memphis Model—the requirement that all officers receive 40 hours of basic crisis intervention training—to minimize adverse outcomes over time, as all PPB officers gain experience resolving calls with a mental health component. The City has laid out legitimate historical reasons for training all PPB officers to handle calls involving a mental health crisis. Among other things, these officers gain experience resolving such calls, including by direct dispatch to lower level mental health calls. The ECIT program incorporates the informed view of the BHUAC and builds off a foundation of community support. In sum, the City has justified the BHU's triage approach based on local needs and with input from community partners.

In response to guidance from DOJ (*see* Technical Assistance Letter and Provisional Approval of Directive 850.20 Letter, *available at* https://www.justice.gov/crt/file/847046/download; ECF 182-2 at 59-62) and the Compliance Officer (ECF 182-2 at 18-20), and in an attempt to increase the number of mental health-related calls to which ECIT officers directly dispatch, PPB and BOEC revised BOEC's dispatch protocol a second time in April 2018, adding category (7). At that time, the Compliance Officer and DOJ shared the view that ECIT officers would gain additional valuable expertise by handling a higher volume of calls involving a mental health crisis. In a March 2018 report, the City responded to DOJ's provisional approval of Directive 850.20, analyzing Mental Health Template data to show the effectiveness of Portland's crisis response model. The report covered a five-month period and showed positive outcomes, particularly as to reduced use-of-force incidents. The data also showed BOEC received 1,159 calls that met ECIT-dispatch criteria (1) through (6). The Compliance Officer and DOJ shared the view that the City should broaden its triage criteria to capture more calls involving a mental health crisis, which it did by adding ECIT-dispatch category (7) in collaboration with PPB and BOEC, and

| | |
|---|---|
| | input from BHUAC.  *See* BHUAC Report, Mar. 28, 2018, *available at* https://www.portlandoregon.gov/police/article/684347. |
| | In April 2018, BOEC trained its personnel on the meaning and purpose of the new dispatch category.  Over the ensuing months, PPB collected and analyzed data.  PPB and BOEC also implemented effective quality assurance measures to audit the ECIT program. |
| | In December 2018, the City supplemented the March 2018 report, with six months of new ECIT program data under the expanded dispatch criteria.  The City reported an increase in ECIT dispatches, with BOEC receiving 1,877 calls that met ECIT-dispatch criteria (1) through (7).  The City also reported generally positive outcomes in terms of reduced use-of-force incidents, without regard to whether the responding officer was ECIT trained.  PPB also compared ECIT and non-ECIT patrol officer mental health call outcomes to measure the sufficiency of its triage approach to ECIT dispatch.  It specifically examined outcomes in calls for service with a mental health component that do not meet ECIT criteria, evaluating whether ECIT officers obtained better results than did non-ECIT officers.  The data showed no statistically significant difference in terms of transport to jail.  Notably the use of force numbers were so low as to preclude meaningful statistical analysis.  Over the six-month period from April 1 to September 30, 2018, PPB reports 13,559 service encounters involving a mental health component and 28 uses of force among them, or about one-fifth of one percent of the cases.  For comparison, over the five-month period from April 25 to September 30, 2017, PPB reported 22 uses of force over 8,939 calls for service involving a mental health component.  A descriptive analysis of the force cases has shown overall appropriate interactions and no material difference in outcome.  Finally, PPB and BOEC quality assurance mechanisms have demonstrated the availability of feedback mechanisms to identify issues, enhance training, and further develop the Portland Model of law enforcement response to mental health crises. |
| | In response to the City's 2018 report, and in consultation with expert consultants, DOJ approved Directive 850.10 – Police Response to Mental Health Crisis.  *See* Dir. 850.20, *available at* https://www.portlandoregon.gov/police/article/701129.  The policy emphasizes de-escalation and disengagement, when appropriate, and connecting people with services such as transport by ambulance to hospital as opposed to by police cruiser to jail. |
| **Technical Assistance** | *The City, through BOEC and PPB, should continue to implement quality assurance mechanisms based on periodic analyses of the efficacy of the dispatch criteria and relevant training, including with respect to outcomes such as force.* |

100. PPB's C-I Team shall be comprised of officers who volunteer for assignment to the C-I Team.  The number of C-I Team members will be driven by the demand for C-I Team services, with an initial goal of 60-80 volunteer, qualified officers.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB's ECIT team of volunteer officers exceeds the initial goal of 60-80 volunteer members.  As of December 2018, PPB had 146 officers with active ECIT certification, of which 130 are uniformed officers.  ECIT patrol officers cover the range of shifts and precincts.

Data from the Mental Health Template show ECIT officers are arriving at 73 percent of calls to which BOEC directly dispatches them.  Most calls in which an ECIT officer was not on scene are explained by the officer being called off or cleared before they could arrive on scene (68%), e.g., because the situation resolved due to medical transport.

PPB has implemented ongoing quality assurance mechanisms to ensure the demand for ECIT services aligns with the number of trained ECIT officers.  In August 2018, PPB trained and certified 16 new officers as volunteer members of the ECIT team.  The consistent interest of new recruits in the ECIT program is a testament to PPB highlighting its effective work. |

101. No officers may participate in C-I Team if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of C-I Team service, or during C-I Team service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the C-I Team.

| Status | Substantial Compliance |
|---|---|
| Analysis | This assessment has improved since DOJ's last compliance report due to revisions PPB made to its standard operating procedures that define ECIT officer qualifications.

PPB continues to assign a Lieutenant to manage the BHU, including the team of ECIT volunteers.  The BHU Lieutenant sits on the BHUAC, which has advised PPB on ECIT team qualifications.  *See* BHUAC Meeting Minutes, Jan. 24, 2018, *available at* https://www.portlandoregon.gov/police/article/677674.  The BHU Lieutenant solicits feedback from supervisors on all applicants for the ECIT program, and receives notice of EIS flags or internal investigations for all ECIT officers.

The BHU has now fully implemented Standard Operating Procedure #3-2 to enforce qualification, selection, and ongoing participation requirements for the ECIT team, as required by this Paragraph.  SOP #3-2 makes clear that an officer may not participate in the ECIT program if the officer has been subject to disciplinary action based on a sustained allegation of force or misconduct against a person with mental illness in the previous three years.  To date, no ECIT officer has become ineligible to participate in the program for this reason. |

102. PPB shall specially train each C-I Team member before such member may be utilized for C-I Team operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for C-I Team members consistent with the Memphis Model.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB continues to provide special training for new ECIT team members.  *See* Covelli, Emma, *et al.*, "2014 Enhanced Crisis Intervention Training, Training Usefulness, Implementation and Monitoring of Training Objectives, and Future Training Needs," available at https://www.portlandoregon.gov/police/article/557965.  All ECIT officers continue to receive annual refresher training.  PPB's Training Division continues to publish reports evaluating its enhanced crisis intervention training.  *See* Training Division Evaluation Reports, *available at* https://www.portlandoregon.gov/police/73428.  The 2018 evaluation report is online (see Enhanced Crisis Intervention Team Evaluation Report, Mental Health Partnership Effectiveness, February 2018, *available at* https://www.portlandoregon.gov/police/article/686016); the 2018 Evaluation Report has been published and provided to DOJ, but was not online as of March 31, 2019.  These Reports lay out the ECIT training curriculum, which emphasizes de-escalation and communication and incorporates input from mental health professionals and consumers of mental health services.  PPB's ECIT training is consistent with the Memphis Model and substantially complies with this Paragraph.<br><br>The BHU continues to demonstrate its commitment to effective, engaging training.  In February 2018, DOJ joined the Compliance Officer in observing a one-day refresher training for ECIT officers.  Of note, this training addressed various concerns about the Mental Health Template and included an effective presentation on individuals living with autism.  In August 2018, DOJ observed part of the BHU's weeklong ECIT certification training for 16 new officers.  The training was interactive and effective.  It included local psychiatric professionals, mental health providers, family advocates, mental health consumers, and BHU staff.  Officers engaged in scenarios and tabletop group work, as well as lectures. |

103. C-I Team members will retain their normal duties until dispatched for use as a C-I Team. BOEC or PPB may dispatch C-I Team members to the scene of a crisis event.

| Status | Substantial Compliance |
|---|---|
| Analysis | ECIT officers continue to retain their normal duties until BOEC sends them to a call that meets ECIT-dispatch criteria.  As described in Paragraph 99, BOEC's dispatch protocol sends ECIT officers to the scene of a call that involves a mental health crisis and one of seven "plus-factors," criteria the City has determined is a rough proxy for relative risk of harm. |

| | BOEC's dispatch criteria include whenever the caller or another PPB officer requests an ECIT officer at the scene, satisfying this Paragraph's requirement that both BOEC and PPB be able to dispatch ECIT members to the scene of a crisis event.  PPB trains all of its officers on the ECIT program's existence and purpose, as well as the ability to call on an ECIT officer to assist in resolving a call involving a mental health component. |

104. PPB will highlight the work of the C-I Team to increase awareness of the effectiveness of its work.

| Status | Substantial Compliance |
|--------|------------------------|
| Analysis | PPB has reported various efforts to highlight the work of ECIT officers.  BHU members participate in numerous outreach events and programs, which it publicizes in a regular BHU newsletter.  *See* BHU Newsletter, *available at* https://www.portlandoregon.gov/police/63093.   BHUAC meeting minutes reflect PPB's deliberate effort to promote BHU success stories with community advocates and service providers that sit on the Committee.  *See* BHU Minutes, *available at* https://www.portlandoregon.gov/police/68755.  The BHU website also publicizes BHU activities, including information on BHU components and links to mental health resources.  *See* BHU, *available at* https://www.portlandoregon.gov/police/62135. |
| | As reported in BHUAC Minutes and BHU Newsletters, BHU officers have intervened to save multiple lives this year, and dozens since being formed, from depressed and suicidal citizens to armed citizens experiencing a mental health crisis.  *See, e.g.*, BHU Newsletter, at 1-3 (Mar. 2019), *available at* https://www.portlandoregon.gov/police/article/727781.  BHU officers deserve commendation for their successful outcomes. |

105. For each crisis event to which a C-I Team is dispatched, the C-I Team member shall gather data that ABHU shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include:

   a. Date, time, and location of the incident;

   b. Subject's name, age, gender, and address;

   c. Whether the subject was armed, and the type of weapon;

   d. Whether the subject is a U.S. military veteran;

   e. Complainant's name and address;

   f. Name and DPSST number of the officer on the scene;

   g. Whether a supervisor responded to the scene;

   h. Techniques or equipment used;

i. Any injuries to officers, subject, or others;

j. Disposition;

k. Whether a mental health professional responded to the scene;

l. Whether a mental health professional contacted the subject as a result of the call; and

m. A brief narrative of the event (if not included in any other document).

| Status | **Substantial Compliance** |
|---|---|
| Analysis | This assessment has improved since DOJ's last compliance report due to the demonstrated reliability over time of PPB's data collection efforts. |
| | PPB's Mental Health Template captures the enumerated criteria. Officers have used the Template to collect data for 23 months, since April 2017. PPB analysts can use this data to identify BHU trends and adapt to changing community needs and circumstances. The data has proven reliable, and quality assurance mechanisms have verified reliability over time. We share the Compliance Officer's assessment that PPB has substantially complied with this Paragraph. ECF 182-2 at 23-24; Compliance Officer 2019 First Quarter Report at 25-26. |
| | The rollout of the Mental Health Template faced technical difficulties and user interface issues. Supervisor in-service training and ECIT refresher training resolved many concerns, illustrating the type of positive feedback loop between training and operations that can increasingly improve the BHU. Template issues also confirmed the benefit of having systematic quality assurance mechanisms in place to identify and address issues that arise in the field. |
| | PPB leadership have repeatedly emphasized the importance of data collection efforts to broader organizational goals, including during training, at roll-call presentations, and in discussions with supervisory chains of command. As a result, Mental Health Template responses have been more consistently producing reliable data. From August 2017 (23.6%) to January 2018 (12.8%) the error rate for Template responses halved. For the 12-month period between March 2018 and February 2019, the error rate noticeably shrunk (average ~3.7%), reflecting the efforts of PPB's leadership. *See* Compliance Officer 2019 First Quarter Report at 26. |

## D. Mobile Crisis Prevention Team

106. PPB currently has an MCPT comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand MCPT to provide one MCPT car per PPB precinct.

| Status | **Substantial Compliance** |
|---|---|
| Analysis | Each PPB precinct continues to have a MCPT, now BHRT. A BHRT is comprised of a sworn ECIT officer and a Cascadia Project Respond staff member. |

| | |
|---|---|
| | *See* Project Respond, *available at* https://www.cascadiabhc.org/services/crisis-intervention/#_ProjectRespond.<br><br>BHRT successes resulted in increased community demand, and City Council agreed to increase the budget to expand from three to five BHRTs.  PPB filled the two new positions in the latter half of 2018.  Additional information about the BHRT program is available on the City's website: https://www.portlandoregon.gov/police/article/458966. |

107. Each MCPT car shall be staffed by one sworn PPB officer and one qualified mental health professional. MCPT shall be the fulltime assignment of each such officer.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | PPB staffs every BHRT with one sworn PPB officer and one mental health professional, a clinician from Cascadia's Project Respond.  *See* Project Respond, *available at* https://www.cascadiabhc.org/services/crisis-intervention/#_ProjectRespond.  The PPB-Cascadia collaboration merits the national recognition it has received.  It has filled some gaps in the mental health system by connecting individuals with community partners and necessary services. |

108. No officers may participate in MCPT if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of MCPT service, or during MCPT service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the MCPT.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | This assessment has improved since DOJ's last compliance report due to revisions PPB made to its standard operating procedures that define ECIT officer qualifications.<br><br>The BHU has fully implemented Standard Operating Procedure #3-2.  The BHU Lieutenant and Sergeants enforce the qualification, selection, and ongoing participation requirements for BHRT officers, as required by this Paragraph.  SOP #3-2 makes clear that an officer may not participate in the BHRT program if the officer has been subject to disciplinary action based on a sustained allegation of force or misconduct against a person with mental illness in the previous three years.  To date, no BHRT officer has become ineligible to participate in the program for this reason. |

109. PPB shall specially train each MCPT member before such member may be utilized for MCPT operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for MCPT members.

| Status | Substantial Compliance |
|--------|------------------------|
| Analysis | PPB reports that BHRT officers attended ECIT training, as well as external training in the local area and greater region.  BHRT members attended Applied Suicide Intervention Skills Training ("ASIST"), threat assessment training, the CIT International Conference, and Mental Health Investigation and Examiner Training.  New BHRT officers have completed training previously recommended by the BHUAC. |

110. MCPT shall utilize C-I Team data to proactively address mental health service, in part, by connecting service recipients with service providers.

| Status | Substantial Compliance |
|--------|------------------------|
| Analysis | This assessment has improved since DOJ's last compliance report due to the demonstrated reliability over time of PPB's data collection efforts.<br><br>PPB can now draw on 23 months of data from the Mental Health Template, covering tens of thousands of police encounters with a call for service involving a mental health component.  PPB reports that the BHU is running queries on Mental Health Template data to identify repeat contacts, audit BERS referrals, connect repeat homeless contacts with services, and follow up with past referrals.  BHU also continues to monitor trends in calls for service at mental health treatment facilities in order to identify needs.<br><br>As the Compliance Officer reports, a qualitative and quantitative assessment of BHRT operations shows it has reduced the number of arrests among community members accepted for BHRT intervention.  Moreover, the BHRT is using Mental Health Template data to connect frequent police contacts to service providers.  ECF 182-2 at 26, 41-45 (concluding that the "BHRT is operating as intended under Par. 110 and positively contributes to the City's system of mental health response"). |

111. Within 180 days of the Effective Date, PPB, with the advice of the ABHU Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies.  These policies and procedures shall clearly describe the roles and responsibilities of these entities and of MCPT officers in the process.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB has maintained the relevant policies, originally enacted in 2017, including Directives 850.21 – Peace Officer Custody (Civil) (*available at* https://www.portlandoregon.gov/police/article/701141); 850.22 – Police Response to Mental Health Director Holds and Elopement (*available at* https://www.portlandoregon.gov/police/article/701145); and 850.25 – Police Response to Mental Health Facilities (*available at* https://www.portlandoregon.gov/police/article/701147). Additionally, DOJ approved Directive 850.20 – Police Response to Mental Health Crisis, which provides for officers to use AMR ambulances to transport individuals to hospitals where appropriate in response to mental health needs. *See* Dir. 850.20, *available at* https://www.portlandoregon.gov/police/article/701129. |

## E. Service Coordination Team

112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB reports that the SCT program continues to serve its designated population, providing access to supportive housing, intensive case management, medical care, addiction and mental health treatment.  The SCT has collaborated with Central City Concern, the Law Enforcement Assisted Diversion (LEAD) program, the Community Peace Collaborative, the Downtown Public Safety Action Committee, the JOINT Officer of Homeless Services, PPB's Neighborhood Response Teams, and Cascadia.   The SCT has received national recognition for its successes, including at the 2018 Police Executive Research Forum.  The SCT also presented at the 2018 CIT International Conference. |
|  | As the Compliance Officer reports, a qualitative and quantitative assessment shows the SCT has reduced the number of arrests among community members accepted for SCT participation, as well as increased levels of employment and housing.  ECF 182-2 at 26, 45-50 (concluding that the "SCT is a valuable component of the City's overall response to mental health" that "reduced arrests/custodies, improved employment, and improved housing," such that "SCT is operating in accordance with the letter and the intent of the Settlement Agreement). |

## F. BOEC

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the ABHU Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call

Center, and adding new or revised policies and protocols to assign calls to the PPB ABHU or directly to NGOs or community-based mental health professionals.

| Status | Substantial Compliance |
|---|---|
| Analysis | BOEC is the City's 911 emergency call dispatch entity. *See* 911 Bureau of Emergency Communications, *available at* https://www.portlandoregon.gov/911/. The BHUAC has advised BOEC on triaging calls involving mental health issues, and has reviewed BOEC protocols for assigning calls to BHU officers and the Multnomah County Crisis Line (MCCL). *See* Mental Health Crisis Intervention, *available at* https://multco.us/mhas/mental-health-crisis-intervention. MCCL also fields calls from PPB officers, and has the ability to call Cascadia's Project Respond to the scene of a crisis event. *See* Project Respond, *available at* https://www.cascadiabhc.org/services/crisis-intervention/#_ProjectRespond. |
|  | BOEC enacted relevant protocols in early 2014, and has revised them slightly over time, particularly with respect to ECIT dispatch. BOEC reports that the system for transferring calls to the MCCL continues to function as intended. |
|  | The BHUAC has also advised PPB on its Directive 850 series of policies. *See* Dirs. 800 – Arrest/Detentions/Court, *available at* https://www.portlandoregon.gov/police/67859. |

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the ABHU Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| Status | Substantial Compliance |
|---|---|
| Analysis | In coordination with PPB and BHUAC, BOEC has designed training to refresh basic content and reflect updates to BOEC protocols. BOEC regularly trains its call takers and dispatchers on policies and procedures, including crisis triage. BOEC developed a 16-hour crisis intervention training specifically for call takers and dispatchers, and presented its curriculum at the 2018 CIT International Conference in Kansas City, Missouri. *See* "It All Begins at 9-1-1," available at http://www.citinternational.org/resources/Documents/It%20all%20begins%20at%209-1-1;%20Developing%20Dispatcher-Focused%20CIT%20Training%20in%20Portland,%20OR.pptx. BOEC delivered its in-service training in April 2018 and again in April 2019. The Compliance Officer and DOJ reviewed training lesson plans and materials, and provided feedback, which BOEC has incorporated. The Compliance Officer and DOJ also observed the most recent BOEC in-service training on April 10, 2019. Among other things, topics included application of the updated ECIT dispatch protocol, defining mental health crisis, and risks of escalating harm. We found the training effective, emphasizing the importance of dispatching ECIT officers to mental health crisis calls that involve a serious risk of harm to self or others. Overall, |

|  | BOEC training has been of good quality.  Students and instructors have shown motivation to learn and commitment to improve. |
|  | BOEC's efforts merit commendation.  BOEC personnel have adapted to protocol changes, trained and retrained on new and changing concepts, and discharged their mission-critical role effectively. |

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Status | Substantial Compliance |
|--------|------------------------|
| Analysis | This assessment has improved since DOJ's last compliance report due to the demonstrated reliability over time of PPB's data collection efforts. |
|  | BOEC continues to successfully transfer appropriate calls to the MCCL, and send ECIT officers to calls meeting the dispatch criteria.  BOEC has implemented quality assurance procedures to learn from the experience of its call takers and dispatchers.  BOEC's quality assurance efforts have drawn on the expertise of PPB analysts and the BHUAC in auditing calls involving a mental health crisis.  BOEC also continues to provide its personnel with regular, comprehensive training, in coordination with the BHUAC. |
|  | We agree with the Compliance Officer's assessment that PPB's data collection efforts substantially comply with the Settlement Agreement given PPB's "continued use of the Mental Health Template, their implementation of Supervisor In-service training related to the [Template], PPB and BOEC's use of a unified dataset, and PPB's implemented system for evaluating unanswered mental health indicators."  *See* Compliance Officer 2019 First Quarter Report at 27. The Mental Health Template continues to collect increasingly useful data. |
|  | PPB's BHU continues to implement the City's approach to crisis triage through ECIT officers, BHRTs that pair an ECIT officer with a mental health clinician to connect people with frequent law enforcement contacts to services, and the SCT, which addresses the intersection of addiction, unemployment, homelessness, and law enforcement contacts. |
|  | Together, BOEC and PPB have worked diligently, with City and community partners, to increase the level of service provided to people experiencing a mental health crisis.  PPB has reduced the number of force cases and increased the number of people it has connected with services. |

## VII. EMPLOYEE INFORMATION SYSTEM

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee.  *See* PPB Manual 345.00.  PPB agrees to enhance its EIS to more effectively identify at-risk employees,

supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall:

> a. Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;

> b. Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and

> c. Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB achieved substantial compliance with Paragraph 116 during this monitoring period.  The requirements had been enshrined in policy, but that had not ensured compliance.  *See* Dir. 345.00 – Employee Information System, Par. 2.2; Dir. 215.00 – Member Performance Evaluation, Par. 2.1; *cf.* ECF 158-1.  With clear direction in the 2018 supervisory in-service training, however, PPB directed supervisors to conduct EIS reviews of their subordinates.  PPB now reports nearly 100% compliance with timely reviews of EIS records of subordinates, supervisors, and units as required by Paragraphs 116(a)-(c): |



Item 116c - PPB Compliance % Over Time

As the Compliance Officer points out, though, credit also goes to the EIS administrator who now distributes monthly reminders to supervisors whose subordinates require an EIS review.   *See* Sections IV and VII Report, p. 47.

Paragraph 166(a) and (b) speak to the individual reviews.  PPB now has conducted these individual reviews at close to 100% of the opportunities to perform appropriate and timely reviews.  Paragraph 116(c) speaks to supervisory and unit-level reviews.  While PPB completed these with the same these level of success— nearly 100% of the opportunities to appropriately and timely perform—how they did those reviews is the topic of our analysis of Paragraph 117, below.

As the Compliance Officer points out, and we agree, Paragraph 116 requires not only that PPB review the triggers but that PPB use EIS to "more effectively identify at-risk employees."  PPB's threshold closure rate dropped from 94% in 2015, fourth quarter to 37% in 2018, second quarter.  *See* Remaining Issues Report, p. 40.  The threshold closure rate refers to how often the EIS system reaches a threshold—such as an officer who has used force in 20% of his or her arrests in the past six months—but PPB determines not to send an alert to the officer's supervisor.  This could be for legitimate reasons, like a redundant alert for the exact same threshold throughout a six-month period.  However, the reasons were sometimes not so clear, like PPB's prior decision to close alerts based on complaints.  PPB has now overruled this prior decision, leading in part to this lower closure rate. This 94%-to-37% decrease is significant.  PPB has maintained since the second quarter of 2018 a consistent use of the threshold triggers to advance the information to the Responsible Units for their use.

The Compliance Officer conducted a very helpful analysis to assess whether the supervisory in-service training affected the rate at which supervisors processed rather than declined EIS alerts.  *See* Remaining Issues Report, p. 41.  The Compliance Officer's analysis found a greater than 50% increase in coded intervention rates—the rate of supervisors using the EIS alerts to speak with officers—following the training (19.6% (for the time period 2017 Q3 to 2018 Q2) to 33.7% (for 2018 Q3 and Q4)).  *Id.*  We agree with the Compliance Officer that the training encouraging use of and de-stigmatizing EIS likely contributed to the increase.  *Id.*  This change also makes the EIS system "more effective" as Paragraph 116 intends.

Based on the significant and consistent improvement, we agree with the Compliance Officer's most recent assessment that PPB has reached substantial compliance with Paragraph 116.  *See* Remaining Issues Report, p. 43.

117. PPB agrees to *use force audit data* ~~collect data necessary~~ to conduct *similar* ~~these~~ analyses at supervisor- and team-levels." (Amended by ECF 171.)

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | At the time of our last report, the parties had only recently agreed to a change in the Settlement Agreement, which the Court later approved. ECF 171.  Because |

| | |
|---|---|
| | this change substantively affected what the Settlement Agreement required that we monitor, we rated Paragraph 117 "pending" in anticipation of PPB producing new data for the revised provision.  ECF 158-1.<br><br>Since our last report, for supervisory and unit-level reviews, PPB implemented an approved SOP that provides for the use of the Force Inspector's data to identify outliers as compared with peer supervisors and groups.  *See* SOP 47.  PPB worked closely with the Compliance Officer and DOJ to develop the revised SOP.  In this reporting period, PPB has shown implementation of the SOP.  The above-described supervisory in-service training instructed on the use of EIS as a whole.  PPB began the supervisor and unit-level reviews in Fall 2018.  PPB produced a series of memoranda from the EIS administrator memorializing direct meetings between the Force Inspector and patrol commanders.  Among other things, the Inspector identified the shifts with the highest levels of force in the precincts, and the Sergeants and Lieutenants with the largest number of deficiencies identified in their reviews of uses of force.  The Force Inspector went further than analysis of force reports; he identified deficiencies in compliance with PPB's pursuit policy, where those existed.  For each issue the Force Inspector identified, he also recommended corrective actions.  Accordingly, PPB has reached agreement on how to implement Paragraph 116's requirements for supervisor and unit-level reviews, promulgated SOP 47 to do so, and executed on that plan with self-critical analysis.  We agree with the Compliance Officer that PPB has achieved substantial compliance with Paragraph 117.  *See* Remaining Issues Report, p. 45. |

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews:

> a. Any officer who has used force in 20% of his or her arrests in the past six months; and

> b. Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | PPB remains in substantial compliance with Paragraphs 118 and 119. ECF 158-1.  The Compliance Officer likewise found that PPB continues substantial compliance with these paragraphs.  *See* Sections IV and VII Report, p. 51.<br><br>Early during the Settlement Agreement implementation, PPB implemented the thresholds required by these paragraphs.  Now, PPB uses the EIS more effectively.  PPB has trained supervisors on EIS use and PPB has increased the frequency with which the EIS administrator sends alerts to supervisors and with which supervisors record substantive responses to those alerts.  With the increased use of EIS, the |

thresholds added pursuant to the Settlement Agreement should be more meaningful over time to identify at-risk officers.

PPB also produced graphs that distill EIS threshold alert and processing data, one of which we show below. These data show two things with respect to Paragraphs 118 and 119. First, the data show that PPB's EIS administrator, in fact, has generated alerts based on the added force thresholds that are built into the system. Second, the data show reduction in "white noise" since adopting a modified threshold for level IV uses of force. There was a discernable spike in force threshold alerts as PPB implemented Directive 1010.00 with a definition of force level IV—the lowest level, resisted handcuffing in many cases—consistent with the Settlement Agreement. We heard the concern that this threshold change caused "white noise" in the system, i.e., EIS generated so many alerts based on low-level events that those alerts drowned out the more significant alerts coming through the system. Accordingly, we reached agreement that PPB continue counting all those level IV uses of force in EIS, but count level IV uses as .5 compared with other uses of force. This made the system more effective—consistent with Paragraph 116's mandate—by focusing on significant threshold breaks, but still tracking the frequency of level IV uses of force.



| Technical Assistance | Consistent with our past monitoring reports, PPB should continue to identify triggers that are more effective as it hones its analytical abilities and determines which data become the best predictors of behavior that places officers or civilians at risk of adverse actions. |
| --- | --- |

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer that PPB has reached substantial compliance with Paragraph 120.  *See* Sections IV and VII Report, pp. 51-52.  We previously expressed concern that PPB's EIS staff needed the ability to conduct analysis to be effective.  ECF 158-1.  PPB now has met this need, as the Compliance Officer reported, by utilizing analysts from the Professional Standards Division.  *Id.*  The work product now produced by the EIS staff—supplemented by the Force Inspector with respect to supervisor and unit-level reviews— demonstrates PPB has embraced a self-critical analysis to identify risky behavior as an early intervention system should be able to do to avert, where possible, poor outcomes.  PPB has also finalized an extensive handbook detailing how an administrator should use EIS and describing the system's functional capabilities. *See* PPB, Employee Information System, EIS Administrator Handbook, undated. This, too, is significant because it preserves the institutional memory instructing future EIS administrators how to operate the system. |

## VIII. OFFICER ACCOUNTABILITY

PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent.  The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.

169 (formerly 172). PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.  (Amended by ECF 171.)

| Status | Partial Compliance |
|---|---|
| Analysis | Section VIII requires that the City's accountability system meet four criteria: (1) all investigative findings are supported by a preponderance of the evidence; (2) all findings are documented in writing; (3) officers and complainants receive a fair and expeditious resolution of complaints; and (4) all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent.  ECF 158-1.  Paragraph 169 (formerly 172) addresses the fourth criterion.  *Id.*  Similar to the Compliance Officer's findings over 2018 and into 2019, we now find that timeliness still hinders the City's ability to reach substantial compliance with Section VIII. |
|  | In its March 2019 report, the Compliance Officer found that: "our review of case files indicates that, barring rare exceptions, findings are consistently supported by a preponderance of the evidence. Furthermore, data from the Administrative Investigation Management (AIM) database show that the majority of complaints are "fairly addressed" . . . [and] both IPR and PPB take allegations of |

misconduct seriously and are willing to engage in a fuller investigation." *See* Compliance and Outcome Assessment Report:  Section VIII Officer Accountability and Section IX Community Engagement and Creation of Portland Committee on Community Engaged Policing, p. 13-14 (Sections VIII and Section IX Report), *available at* https://static1.squarespace.com/static/5a319f76a9db0901e16c6433/t/5c7e1ebd24 a694d3df701e32/1551769321244/Compliance+and+Outcome+Assessment+Rep ort+- +Accountability+and+Community+Engagement+FINAL+with+appendices.pdf.

The Compliance Officer also found:  "Based on our review of [Supervisors Investigations (SIs)] and full administrative investigations, we believe that officers are most often held 'accountable for complying with PPB policy and procedure' (Par. 169)." *Id.* at 14.  We independently assessed a sample of full administrative investigations and SIs.  Based on or review, we agree with both of the Compliance Officer's conclusions.

However, the Compliance Officer also found that the City's and PPB's ability to substantially comply with the broad accountability requirements set forth in Section VIII "is diminished primarily by the non-expeditious resolution of community- and Bureau-initiated complaints." *Id.* at 15.  We agree.

As described with respect to Paragraph 123, below, the City has implemented action plans to address failures to meet the 180-day deadline for completion of administrative investigation findings.  Nonetheless, the City has not yet come into compliance with Paragraph 121's 180-day deadline requirement.  As of the fourth quarter of 2018, PPB completed 77% of its IA investigations within 180 days.  Some of its investigations, however, were substantially overdue—two of them by more than 100 days.  Some of the City's changes to meet the deadline— specifically pertaining to Bureau of Human Resources (BHR)—are so recent that there is not sufficient data to assess the adequacy of the City's effort.  We find that City has neared substantial compliance with the timeliness requirement, but cannot demonstrate substantial compliance, yet.

That is not to say that the City failed to make substantial progress complying with Section VIII in this monitoring period.  As outlined below, the City has implemented approved accountability policies.  These address both:  (a) administrative investigation of allegations of wrongdoing, and (b) administrative assessments of serious uses of force.  The City has embraced a self-critical analysis to improve the accountability system.  For example, during this monitoring period, there was an administrative investigation in which a PPB member retired before IPR interviewed the member.  IA 2018-B-0022.  The member's absence from the interview undercut IPR's ability to investigate an underlying complaint.  However, IPR and PPB could not find sufficient evidence to support that the member had received affirmative notice of the interview.  *Id.* This led to a not sustained finding.  *Id.*  In a helpful and self-critical fashion, though, the PPB finding in that case included a recommendation that, in the future, IPR and IA provide personal, i.e., face-to-face, notifications to PPB

| | |
|---|---|
| | members to secure their interviews before separating from PPB. *Id.* We recommend that PPB and IPR implement that recommendation. |
| **Technical Assistance** | We recommend that PPB and IPR implement the recommendation that IPR and IA provide personal, i.e., face-to-face, notifications, if subjects or witnesses for an administrative investigation may become unavailable. |

## A. Investigation Timeframe

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, ~~including~~ excluding appeals, if any, to CRC. Appeals to CRC shall be resolved within ~~21~~90 days. (Amended by ECF 171.)

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Status | **Partial Compliance** |
|---|---|
| **Analysis** | Like the Compliance Officer, we continue to find the City in partial compliance with administrative-investigation-timeframe requirements. *See* Sections VIII and Section IX Report, p. 15-16.

We also agree with the Compliance Officer that PPB has substantially complied with providing action plans to reduce the timeframes for administrative investigations as required by Paragraph 123. *See* Sections VIII and Section IX Report, p. 16. As the Compliance Officer points out, Paragraph 123 applies only to PPB, not IPR or BHR. *Id.* However, if IPR or BHR do not meet their investigative deadlines, they then delay the PPB's ability to timely complete administrative investigations as required. Accordingly, we have directly monitored IPR and BHR timeliness during this monitoring period. We attended in person or telephonically several weekly meetings IPR conducted with its investigative staff. In these meetings, among other things, IPR addressed the need for timely completion of IPR's steps in the investigative process, including review by intermediate supervisors. We also monitored the lack of timeliness of BHR complaints. The City recently provided the United States information concerning BHR's outstanding investigations and action plans intended to expedite future BHR investigations. Previously, BHR would issue a report and findings on the alleged violation of Human Resources Administrative Rule (HRAR) 2.02, while IA or PPB's RU Manager would issue a separate report and findings on any alleged violation of Bureau directives. Given past delays with the BHR portion of those investigations, going forward IA will write the findings report in consultation with BHR. This will eliminate the need for two separate reports. The City intends this to shorten administrative investigation timeframes for the handful |

| | |
|---|---|
| | of cases each year that concern HRAR 2.02.  It is too soon to determine if this plan will be effective.<br><br>Even though IA and IPR have improved the timeliness of the early administrative steps of investigations opened in 2018, *See* Remaining Issues Report, pp. 47-48, investigative timeframes have suffered from a backlog of a handful of older cases that continue to consume administrative resources.  Among the administrative investigations that we assessed, we found that IA, IPR, and BHR have continued to work on cases for a year or more.  For example, BHR had a case open for over 800 days before recently reaching a finding that there was no basis to support a potential violation of HRAR 2.02.  In another case, PPB reached findings in August 2017 stemming from a 2016 complaint, and then did not impose discipline until January 2018.  The City's ability to comply with Paragraph 121's 180-day deadline is improving, but the need to catch up on these old cases has hindered the City's ability to comply.  As the City clears these older cases, the decreased backlog should help the City come closer to substantial compliance.<br><br>PSD has reported to PPB's Chief that some of the late administrative investigation in 2018 were due to:  concurrent criminal investigations; access to emails necessary for investigations; and scheduling of or attendance at Police Review Boards.  *See* Memo from CMDR Jeff Bell to Chief Daniel Outlaw, Jan. 22, 2019. These types of issues will reoccur and require planning to comply the Settlement Agreement's 180-day deadline. |
| **Technical Assistance** | The City must address specific, surmountable problems PSD has identified, e.g., coordination with concurrent criminal investigations, access to information technology records, and scheduling of members for Police Review Boards, which are hindering compliance with the 180-day deadline.  We look forward to continuing to work with the City and the Compliance Officer to develop strategies for investigative timeliness. |

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident.  All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | Like the Compliance Officer, we agree that PPB has substantially complied with the requirement to bring concurrent criminal and administrative investigations, subject to tolling.  *See* Sections VIII and Section IX Report, p. 16.<br><br>As with prior monitoring periods, PPB reports on the specific internal affairs investigations it initiates and the corresponding dates of any parallel criminal investigation.  *See* PPB Quarterly Update Report, Par. 122, Jan. 6, 2019.  The City consistently initiated administrative investigations concurrently with criminal |

| | investigations. *Id.* Even when conducting an administrative investigation involving a senior PPB member, PPB simultaneously investigated a criminal allegation of missing property. 2018-B-0017. |
|---|---|
| | We note, though, that PPB identified the tolling necessary for some criminal investigations as the cause of those investigations exceeding the 180-day deadline. *See* Memo from CMDR Jeff Bell to Chief Daniel Outlaw, Jan. 22, 2019. In order to permit Paragraph 122's tolling provision to be effective, we have determined that PPB may exclude from the calculation of its timeliness those small number of administrative investigations for which PPB has appropriately documented a legitimate law enforcement need to toll the administrative investigation. |

## B. On Scene Public Safety Statements and Interviews

124.    Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Status | Substantial Compliance |
|---|---|
| Analysis | Like the Compliance Officer, we find that PPB has substantially complied with Paragraph 124. Sections VIII and Section IX Report, p. 17. Directive 1010.10 and SOP 7 – Deadly Force and In-Custody Death Investigations and SOP 30 – Concurrent Administrative/Criminal Investigations, as now implemented, substantially comply with Paragraph 124. |
| | At the time of our last monitoring report, PPB had only recently enacted Directive 1010.10, and the City had only recently reached agreement on the SOPs for investigating OISs with the District Attorney. *See* ECF 158-1. As we described in the training section, above, during this monitoring period, PPB implemented Directive 1010.10 through supervisory-specific in-service training. And, as described in the force section, above, in our review of a sample of closed officer-involved-shooting files from this monitoring period (2018-B-0023, 2018-B-0014), we have found that PPB implemented Directive 1010.10 with fidelity to the approved policy and Paragraph 124. |

125.    Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witnesses and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer's assessment that the one incident of failing to timely identify a witness officer does not remove PPB from substantial compliance with Paragraph 125, particularly since PPB caught and remedied the mistake.  Sections VIII and Section IX Report, pp. 17-18 (noting that PPB issued CRO to that previously unidentified witness officer 20 days after the OIS event when the administrative investigation identified the officer as a witness. |
|  | As we described in the force section, above, in our review of a sample of officer-involved-shooting cases from this monitoring period, we found that PPB complied with the requirement to issue CROs.  In incident 2018-B-0023, narrative descriptions of the scene describe sequestration of involved and witness officers before formal CROs issued.  Among the documents PPB provided are both the written CROs and corresponding rescinding orders following the investigation.  Though PPB did not have the authority to issue a CRO to an involved MCSO deputy, PPB notes that MCSO issued its own CRO to the involved deputy.  Documentation PPB provided shows MCSO issued a similar CRO and rescinded the CRO only after the grand jury returned a no true bill.  Accordingly, PPB complied with the Settlement Agreement obligations to abide by Directive 1010.10 and the Settlement Agreement's provisions to protect the integrity of an officer-involved-shooting investigation.  In incident 2018-B-0014, while the incident was still unfolding, after the first officer fired at the subject, the supervisor removed and sequestered that officer, i.e., beginning the CRO process.  Subsequent written CROs, in that incident, likewise complied with Paragraph 125. |

126.    PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer that PPB has continued the required practice of directing witness officers to provide on-scene briefings.  *See* Sections VIII and Section IX Report, p. 17.  The anomalous failure to identify a lone witness officer in one event, referenced in our analysis of Paragraph 125, also does not remove PPB from substantial compliance with Paragraph 126.  *Id.* at 16-17.  PPB caught the mistake and self-corrected by issuing a CRO when PPB identified the witness.  *Id.* |
|  | Similar to the officer-involved-shooting incidents we reviewed in our last monitoring report, in both officer-involved-shooting events we reviewed during this monitoring period, a witness officer provided an on-scene briefing sufficient to ensure the safe resolution of the events.  *See* 2018-B-0014, 2018-B-0023.  *Cf.* |

| | ECF 148-1. And like the last monitoring period, PPB's voluminous files for these incidents, identify victims, suspects, and witnesses, and catalogue relevant evidence. *Id.* |
|---|---|

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | Like the Compliance Officer, we find PPB has continued to seek walk-throughs and interviews from involved officers at lethal force events. *See* Sections VIII and Section IX Report, p. 18. In the two, officer-involved-shooting events that we reviewed, PPB asked the involved officers to provide voluntary on-scene walk-throughs and interviews, and the officers declined. *See* 2018-B-0014, 2018-B-0023. |

### C. Conduct of IA Investigations

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | Based on the effective implementation of independent investigations, the City has reached substantial compliance with Paragraph 128. Since our last monitoring report, IPR and PPB have implemented directives that largely mirror one another. DOJ, along with the Compliance Officer, reviewed and provided substantive feedback to curriculum for joint IPR/IA training to implement these directives. DOJ, like the Compliance Officer, attended the joint training sessions and provided timely feedback to both IPR and PPB to encourage interactions between investigators from both agencies during the training. PPB also ensured that investigators with each agency who began their employment following the joint training session received the same training by video. Thus, there is continuity of training among all investigators from both agencies on the proper implementation of approved policies and procedures. Whether a PPB member is subject to investigation by IPR or IA, the accused members and the complainant should have confidence that either independent investigations by IPR or internal investigations by IA should result in the same credible findings. Both agencies should employ similar investigative skill and |

60

| | process, and any findings should result from application of the same standards of proof, i.e., a finding supported by a preponderance of evidence. |
| --- | --- |
| | During this monitoring period, we reviewed a sample of completed IPR investigations reports, including investigations of senior PPB staff.  Our review showed that IPR implemented its protocols that now enable IPR to conduct fulsome independent investigations and reach recommended findings. |
| | In its April 2, 2019 draft report, the Compliance Officer noted improvements in IPR's and PPB's formation of allegations and the resources consumed by supervisory investigations, but still assigned a conditional substantial compliance rating to this provision.  *See* Remaining Issues Report, pp. 50-52.  The Compliance Officer criticized what it called systemic complaints masquerading as individual complaints.  *See* Sections VIII and Section IX Report, p. 19.  By "systematic," the Compliance Officer was referring to complaints about how PPB does its law enforcement work, generally, and for which individual officers do not exercise discretion.  Complainants may better address systemic complaints to PPB administration or other City agencies.  IPR and PPB could increase their efficiencies, reduce the time spent investigating such systemic issues, and increase public confidence in the accountability systems, if—as the Compliance Officer suggests—IPR and IA could better funnel such systemic issues to the City agencies capable of providing a remedy to systemic issues.  Notwithstanding this opportunity for further improvement, our above-described assessment shows IPR and IA have effectively implemented independent investigations. |
| **Technical Assistance** | In order to make investigations more meaningful and reduce unnecessary time spent on complaints for which the administrative investigation process cannot offer an adequate remedy, the City should consider diverting system complaints to the City agencies capable of addressing such issues, e.g., to City Council for complaints about resources or to PPB's executives for consideration of law enforcement priorities. |

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Status | **Substantial Compliance** |
| --- | --- |
| **Analysis** | We agree with the Compliance Officer that the City is in substantial compliance with this provision.  *See* Sections VIII and Section IX Report, pp. 19-20.  We also agree with the Compliance Officer that PPB adequately addressed through training that supervisors' after action reviews do not take the place of full administrative investigations if there is an allegation of excessive force.  *Id.* at 20. |

|  | We separately reviewed a sample of completed administrative investigations involving allegations of use of excessive force.  In the cases we sampled, a preponderance of the evidence contained in the complete administrative record supported the administrative finding for the force allegations where IA or IPR reached a sustained, exonerated, or unfounded finding.  Where the record did not indicate a preponderance of evidence, IA or IPR appropriately reached a not sustained finding.  None of our sample revealed that PPB had encouraged IPR to reduce or eliminate force allegations. |

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Status | Partial Compliance |
|---|---|
| Analysis | We do not yet have sufficient data to show that the City has substantially complied with the requirements of Paragraph 130.  Although PPB and IPR have revised the relevant directive, 310.20, and trained personnel on its enforcement, the City has not yet demonstrated that it conducts timely and effective investigations of alleged retaliation.  As we discussed with respect to Paragraphs 121 and 123, BHR has failed to complete timely investigations, including those involving retaliation.  The City closed older investigations and, for new investigations, now requires IA to write the findings report in consultation with BHR.  The City has not produced completed BHR investigations under its newly enacted protocol for joint IA/BHR investigations.  Given the recent changes to BHR and the recently closed investigations that involved BHR, we do not yet have data to demonstrate implementation of Directive 310.20 and thus cannot yet support substantial compliance with Paragraph 130. |
| Technical Assistance | The City should produce complete records of closed BHR investigations and of new IA/BHR investigations completed under the City's revised scheme of IA drafting investigative reports with BHR's participation. |

131. The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below:

a. Currently, seven voting members of the PRB review use of force incidents, including two citizen members. When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members.

b. The CRC slot on the PRB in use of force cases will rotate among the CRC membership so that different CRC members participate on the PRB. Within 60 days of the Effective Date, the Auditor shall develop a membership rotation protocol.

c. All members participating in the PRB must maintain confidentiality and be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions and "just cause" requirements set forth in Portland City Charter, City rules, and labor agreements.

d. Cases in which the member elects, with the concurrence of the Chief and the Police Commissioner, to accept the investigative findings and recommended discipline. This option will only be available to a member following implementation of code language which shall require at a minimum a full investigation of the alleged misconduct, issuance of the investigative findings, and concurrence with the findings by the Independent Police Review, the Professional Standards Division and the member's Branch Chief.  The scope of cases eligible for stipulated discipline shall be identified in the authorizing code, and cases involving alleged used of excessive force, cases involving alleged discrimination, disparate treatment or retaliation, reviews of officer involved shootings and in-custody deaths, and cases in which the Chief or the Police Commissioner does not agree to accept the member's proposed stipulation to findings and recommended discipline shall not be eligible for stipulated findings and recommended discipline. (Added by ECF 171.)

e. All community members and CRC members must meet the following qualifications to participate on the PRB:

> i. Pass a background check performed by the Bureau.

> ii. Participate in Bureau training to become familiar with police training and policies, including the PRB process.

> iii. Sign a confidentiality agreement.

> iv. Participate in ride-alongs to maintain sufficient knowledge of police patrol procedures.

f. Current city code provides that the City Auditor and the Chief have authority to recommend to City Council the removal of citizen members from the PRB pool. Likewise, the City Auditor or Chief shall have authority to recommend to City Council removal of a CRC member from serving on the PRB.  The Chief or the City Auditor may recommend that City Council remove a community member or member of the CRC from the pool for the following reasons:

> i. Failure to attend training;

> ii. Failure to read Case Files;

> iii. Objective demonstration of disrespectful or unprofessional conduct;

> iv. Repeated unavailability for service when requested;

> v. Breach of confidentiality;

> vi. Objective demonstration of bias for or against the police; or

> vii. Objective demonstration of conflict of interest.

g. Removal from participation in the PRB shall not affect CRC membership.

h. Like current PRB citizen members, CRC members serving on the PRB may serve in that capacity for no more than three (3) years.

i. A CRC member who participates in a PRB review shall recuse himself/herself during any later appeal of the same allegation(s) to the CRC.

| Status | Substantial Compliance |
|---|---|
| **Analysis** | We agree with the Compliance Officer that the City has moved from partial to substantial compliance with Paragraph 131. *See* Sections VIII and Section IX Report, p. 21. Both the Compliance Officer and DOJ previously reported that the City memorialized the substantial requirements of Paragraph 131 in PPB Directive 336.00 – Police Review Board, which PPB has since revised. *See* Dir. 336.00, *available at* https://www.portlandoregon.gov/police/article/674632 (currently under periodic review); City Code 3.20.140, *available at* https://www.portlandoregon.gov/citycode/article/707196.<br><br>As the Compliance Officer points out, however, Portland's City Code 3.20.140 still does not contain the explicit requirement of Paragraph 131(a): "When PRB reviews uses of force case[s], one of the two citizen member slots shall be drawn from the Citizen Review Committee members." *Id.* Instead, the revised City Code only places a CRC member on a PRB in these force cases: officer involved shootings, physical injury caused by an officer that requires hospitalization, in custody deaths, and any use of force where the recommended finding is "out of policy." *See* 3.20.140 Police Review Board, Sec. (C)(2), *available at* https://www.portlandoregon.gov/citycode/article/707196. Yet a PRB may be convened based on (a) "controverted" findings or discipline, or (b) Chief, Branch Chief, or IPR Director discretion. *See* 3.20.140, Sec. (B)(1). The City should close this loophole. Because a PRB is unlikely to convene under these circumstances, however, we do not remove the City from substantial compliance.<br><br>Like the Compliance Officer, we observed PRBs over the course of the implementation of the Settlement Agreement. This past year, as before, in our observation, the composition of PRB included two community members, one of whom was also a CRC member. |
| **Technical Assistance** | We agree with the Compliance Officer that, even with a substantial compliance rating based on compliant practice, the City should conform City Code 3.20.140 to Paragraph 131(a) without limitation to type of force. |

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer that the City is in substantial compliance with this provision. *See* Sections VIII and Section IX Report, p. 21. We also agree with the Compliance Officer that PPB has incorporated Paragraph 132's requirement in PPB Directive 336.00 – Police Review Board, section 4.7, and PPB has put this requirement into practice. |

133. If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall: (1) enter that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units ; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial finding creating a rebuttable presumption that the force used also violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the IA investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB had no civil liability findings during the past year that would have triggered the application of this provision. We agree with the Compliance Officer that the City is in substantial compliance with this provision through implementation of SOPs 32 and 42, which incorporate the requirements of Paragraph 133. *See* Sections VIII and Section IX Report, p. 22. |

## D. CRC Appeals

134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.

| Status | Substantial Compliance |
|---|---|
| Analysis | The City memorialized CRC membership expansion as required by Paragraph 134 in City Code 3.21.080, *available at* https://www.portlandoregon.gov/citycode/article/479665. We agree with the Compliance Officer that the City still is in substantial compliance with this provision. *See* Sections VIII and Section IX Report, p. 22. |

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed.  The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted.  The additional request be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Status | Substantial Compliance |
|---|---|
| Analysis | CRC's governing regulations reflect the requirements of Paragraphs 135 and 136.  *See* ECF 158-1.  We agree with the Compliance Officer that the City is in substantial compliance with these provisions.  *See* Sections VIII and Section IX Report, p. 23.  The revised CRC regulations, which we previously cited for compliance with these paragraphs, have not changed since November 20, 2015.  *See* PSFD 5.03, revised Nov. 20, 2015, *available at* https://www.portlandoregon.gov/citycode/?c=27455&a=9030.  The regulations provide that CRC "may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence." The City has long established substantial compliance with these provisions.  In this monitoring period, CRC returned an administrative investigation for further investigation.  PPB completed that further investigation, albeit pushing the timeframe beyond the 180-day deadline. |

**E. Discipline**

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| Status | Substantial Compliance |
|---|---|
| Analysis | We agree with the Compliance Officer that the City is in substantial compliance with this provision.  *See* Sections VIII and Section IX Report, pp. 23-24.  In prior reports, we pointed out that PPB has given effect to current Directive 338.00, which implements PPB's Discipline Guide (*available at* http://www.portlandoregon.gov/police/article/488981?*).  ECF 158-1.  As the |

| | Compliance Officer reported, PPB revised the Discipline Guide in February 2018. And, like the Compliance Officer, we observed PPB's July 2018 supervisory in-service training in which PPB instructed on the use of the Discipline Guide. |
| --- | --- |
| | Our independent review of PPB's disciplinary recommendation memos shows consistent consultation with the Discipline Guide. Supervisors' recommended actions in those memos also are consistent with the levels of discipline outlined in the Discipline Guide. |

## F. Communication with Complainant and Transparency

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Status | Substantial Compliance |
| --- | --- |
| Analysis | We agree with the Compliance Officer that IPR continues to substantially comply with the communication requirements of Paragraphs 138-140. *See* ECF 158-1; Sections VIII and Section IX Report, pp. 24-25. |
| | In our review of administrative investigations that closed over the past year, each investigative file in our sample included letters to the complainant explaining the results of the investigation and the appeal process. The same IPR website on which we previously reported continues to allow complainants to check the status of their complaints by entering their complaint number or the complainant's identifying information. *See* IPR Complaint Status Request Form, *available at* http://www.portlandonline.com/auditor/index.cfm?c=64452. |

## IX.    COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED-POLICING

There is significant community and City interest in improving PPB's community relationships. The community is a critical resource. Soliciting community input regarding PPB's performance, while also enhancing PPB's current community outreach efforts, will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety.

141.    To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Portland Committee on Community Engaged-Policing (PCCEP), within 90 days of the Effective Date of the relevant amendments to this Agreement.

| Status | Substantial Compliance[4] |
|---|---|
| Analysis | After it became apparent that the Community Oversight Advisory Board (COAB) framework was not achieving the goals of the Settlement Agreement, the City developed and implemented a new framework for community engagement: the Portland Committee on Community-Engaged Policing (PCCEP). |
| | The PCCEP improves on COAB's structure while maintaining its defining characteristics.  It has authority to "independently assess the Settlement Agreement," and created a subcommittee for that express purpose.  *See* PCCEP Plan, Sec. II, *available at* https://www.portlandoregon.gov/wheeler/article/698091. PCCEP has organized into five committees:  (1) a steering committee; (2) a settlement agreement and policy subcommittee; (3) a subcommittee for people with mental illness; (4) a youth subcommittee; and (5) a subcommittee addressing race, ethnicity, and other groups.  *See* PCCEP Subcommittees, *available at* https://www.portlandoregon.gov/pccep/78723.  PCCEP formed these subcommittees after input from the public, including members of the amici groups, the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and the Mental Health Alliance (MHA). |
| | PCCEP's members have demonstrated ideas, talent, experience, and expertise in community-police relations.  PCCEP meetings have included listening sessions, learning sessions, and committee business.  The PCCEP has generally met quorum requirements, consistently performed work required by the PCCEP Plan and the Settlement Agreement, and accomplished tasks it has set out for itself. |
| | To date, the PCCEP has drafted, discussed, and adopted four recommendations, to which the City has timely responded in writing.  PCCEP recommendations have a designated tab on its website, as do PCCEP meeting agendas and minutes, and a PCCEP library with other relevant documents, including presentations received by the PCCEP.  *See* PCCEP Reports and Recommendations, *available at* https://www.portlandoregon.gov/pccep/78991; PCCEP Meeting Minutes/Agendas, *available at* https://www.portlandoregon.gov/pccep/78093; PCCEP Library, *available at* https://www.portlandoregon.gov/pccep/78095. |
| | The PCCEP's experience has not been without challenges, as noted in its first quarterly report.  *See* PCCEP Quarterly Report, Number 001, Approved March 26, 2019, *available at* https://www.portlandoregon.gov/pccep/article/727535. However, PCCEP members, in collaboration with City staff, have willingly and |

_____

[4] At the October 4, 2018 Status Conference, the Court suggested that the United States and the Compliance Officer should evaluate the City's compliance with Section IX as if the Court had given final approval of the stipulated proposed Section IX amendments, *see* ECF 157.  ECF 176, Hearing Transcript, at 128:19 - 129:11.

|  | capably resolved difficult issues to date and we are confident that they will continue to do so. |
|---|---|

142.    The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.

| Status | Substantial Compliance |
|---|---|
| Analysis | The PCCEP Plan provides the PCCEP with authority to perform each of the enumerated tasks.  *See* PCCEP Plan, *available at* https://www.portlandoregon.gov/wheeler/article/698091. |
|  | In September 2018, the City amended the Plan, consulting with Amicus AMAC and Intervenor Portland Police Association (PPA) as required.  The particular changes to the Plan responded to concerns voiced by these entities and the broader community.  DOJ approved the amendments as required.  Of note, the changes reserved seats for two high school-aged youth and allowed for Subcommittees that hold public meetings. |
|  | The PCCEP has begun to discharge these tasks, soliciting information from the community and PPB about PPB's performance at monthly PCCEP meetings, recommending concrete actions to City leaders, and receiving public comment and concern during several open Committee and Subcommittee meetings.  The PCCEP has met with PPB's Chief, Office of Equity and Human Rights' Director, and PPB's Office of Equity and Diversity. |
|  | Through its subcommittees, the PCCEP is beginning to contribute to the development and implementation of PPB's Community Engagement Plan.  *See* PCCEP Subcommittees, *available at* https://www.portlandoregon.gov/pccep/78723.  PPB's leadership is engaging the PCCEP in this task. |
|  | The PCCEP's replacement process has worked to date, with three members (two adult and one youth) being replaced promptly after they resigned from the PCCEP for various personal reasons. |

143.    PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.

| Status | Substantial Compliance |
|---|---|
| Analysis | As the Compliance Officer recounts in detail at pp. 27-30 of its Fourth Quarter Report on Section IX of the Settlement Agreement, the PCCEP selection process incorporated deliberate and effective measures to ensure a diverse, experienced, and committed group applied, interviewed, and were selected to be PCCEP members. This process was fair and produced a diverse slate of qualified members and alternates. The PCCEP website catalogs member biographies. *See* PCCEP Member Bios, *available at* https://www.portlandoregon.gov/pccep/article/705718.<br><br>Since the October onboarding process, the PCCEP has had two adult members and one youth member resign for personal reasons. The City timely appointed replacement members from the initial alternate pool as required by the Plan. The Mayor's Office appointed alternates in line with PCCEP's recommendations. *See, e.g.*, PCCEP Recommendation Number 001, Dec. 17, 2018, *available at* https://www.portlandoregon.gov/pccep/article/727014. |

144.    The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.

| Status | Substantial Compliance |
|---|---|
| Analysis | The City has invested substantial resources to support the PCCEP, including a devoted staff assistant, contract facilitation services, and meeting locations. The City has provided operational and logistical support, office space, multimedia and technical services, and secretarial support. The PCCEP website reflects the effort of PCCEP members and administrative support staff. *See* Portland Committee on Community-Engaged Policing, *available at* https://www.portlandoregon.gov/pccep/. The relationship between City staff and the PCCEP has been professional and productive. |

145.    To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB has engaged the community independently and through relevant City resources knowledgeable about public outreach. As catalogued by the Compliance Officer at pp. 37-42 of its Fourth Quarter Report on Section IX of |

the Settlement Agreement, PPB is involved in an impressive array of engagement and outreach activities.  PPB's recently created Office of Community Engagement has outlined current efforts in a presentation to PCCEP. *See* Portland Police Bureau, "Community Engagement and Inclusion Available," *available at* https://www.portlandoregon.gov/pccep/article/726822   PPB has laid out its goals and justifications for community engagement in a dedicated section its 5-year Strategic Plan.  *Id.*

PPB's work with the PCCEP has just begun.  To date, the relationship has been collaborative and productive.  PPB leadership has attended each PCCEP meeting, presenting and answering questions at many.  As the PCCEP develops recommendations for PPB's Community Engagement Plan, engages PPB's universal review process for directives, *see* Overview: Directives Review and Development Process, *available at* https://www.portlandoregon.gov/police/59757, and otherwise discharges its responsibilities under the Plan, PPB must continue to work with the PCCEP to improve its engagement with the community.  *S*

146.    Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.

| Status | Partial Compliance |
|---|---|
| Analysis | The City engaged the same professional survey research group that conducted the 2015 and 2016 surveys, DHM, to conduct a representative survey in 2019, with input from PCCEP.

The survey was finalized in January 2019.  Data collection is complete.  Survey data analysis and the final report are expected to be available in May. |

147.    PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts.  The data shall also be provided to PCCEP to inform its work.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB has collected the demographic data required by this Paragraph.  As detailed by the Compliance Officer at pp. 43-45 of its Fourth Quarter Report on Section IX of the Settlement Agreement, PPB's Precinct Commanders use this demographic data to tailor outreach efforts.  PPB provided this information to the PCCEP on March 20, 2019. |

148.    PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| Status | Substantial Compliance |
|---|---|
| Analysis | PPB has collected and made publicly available on its website the demographic data required by this Paragraph.  *See* Stops Data Collection, *available at* https://www.portlandoregon.gov/police/65520.  PPB has provided this information to the PCCEP.  PPB continues to report quarterly to DOJ on its data collection enhancement efforts. |

149.    The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.

| Status | Partial Compliance |
|---|---|
| Analysis | Over the course of meetings in January and February 2019, the Compliance Officer, PPB, and DOJ jointly developed a preliminary list of metrics to evaluate community engagement and outreach.  That list was provided to the PCCEP Steering Committee in early April.  The PCCEP is considering how to develop recommendations for additional metrics. |
| Technical Assistance | PPB will need to consider PCCEP's feedback in collaboration with the Compliance Officer and DOJ, and finalize metrics to evaluate community engagement and outreach. |

150.    Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing, in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| Status | Partial Compliance |
|---|---|
| Analysis | PPB released its 2017 Annual Report in December 2018, after providing a draft to the PCCEP for review and comment.  *See* PPB 2017 Annual Report Summary of Accomplishments, *available at* |

| | https://www.portlandoregon.gov/police/article/711973.  The PCCEP provided comments and made formal recommendations for PPB's 2018 Annual Report, including to release it in a more timely fashion and to hold the requisite meetings for 2017 and 2018 together.  *See* PCCEP Recommendation Number 004, Feb. 26, 2019, *available at* https://www.portlandoregon.gov/pccep/article/727017.  PPB has accepted the PCCEP's recommendation and will release its 2018 Annual Report before PCCEP's recommended date of June 2019.  PPB reports it will schedule precinct meetings as soon as it released the Report, and then seek time on City Council's agenda. |
|---|---|

151.    PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | Beginning in November 2018, the PCCEP has held monthly three-hour open public meetings during which the Committee has resolved governance issues, received presentations on various educational topics, and deliberated and voted on recommendations.  The Steering Committee has held monthly 90-minute open public meetings since December 2018, and other subcommittees have met regularly following their formation in January.<br><br>PCCEP held town hall-style meetings in concert with the Compliance Officer's presentation of its Quarterly Reports in January and April 2019. |
| **Technical Assistance** | The PCCEP must continue to meet regularly to accomplish the objectives set forth in the PCCEP Plan. |

152.    The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

| Status | **Substantial Compliance** |
|---|---|
| **Analysis** | The City Attorney's Office provided in-person training and background written materials during an on-boarding orientation session held on October 12, 2018.  City representatives, including from the City Attorney's Office and Mayor's Office, have attended PCCEP meetings and provided real time guidance on city and state law, when needed. |