

### Office of the Compliance Officer and Community Liaison (COCL)

**Rosenbaum & Associates, LLP**
Dennis Rosenbaum, Ph.D.
Thomas Christoff, Ph.D.
Geoffrey Alpert, Ph.D.
Heather Daniel, J.D., B.A.
Ashley Heiberger, J.D.
Megan Mohler, M.A.
Amy Ruiz, B.A.

COCL Contact Information:
525 NE Oregon Street, Suite 250
Portland, OR  97232
www.portlandcocl.com
rosenbaumandassociatesllp@gmail.com

March 5, 2019

Transmitted by E-mail to:

The United States Department of Justice
The City of Portland

Re:    **Compliance and Outcome Assessment Report: Section VIII Officer Accountability and Section IX Community Engagement and Creation of Portland Committee on Community Engaged Policing**

Dear U.S. Department of Justice and City of Portland:

On behalf of the entire Compliance Officer and Community Liaison (COCL) team, I am pleased to submit the attached *Compliance and Outcome Assessment Report: Section VIII Officer Accountability and Section IX Community Engagement and Creation of Portland Committee on Community Engaged Policing,* pursuant to the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

We thank community members for taking the time to review and comment on the report. A copy of this report will be posted on the COCL's website, www.portlandcocl.com and sent to the Settlement Agreement Updates email list.

Sincerely,


Dennis P. Rosenbaum, PhD
For Rosenbaum & Associates, LLP
Compliance Officer and Community Liaison, Portland OR


**EXHIBIT A**

# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

# of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

*Quarterly report: Section VIII Officer Accountability and Section IX Community Engagement and Creation of Portland Committee on Community Engaged Policing*

**Prepared By:**
**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**
**October 2017 to December 2018**



# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................................4

**EXECUTIVE SUMMARY** ....................................................................................................5

**SECTION I — Officer Accountability** ........................................................................12

    **Paragraph 121** ......................................................................................................15

    **Paragraph 123** ......................................................................................................15

    **Paragraph 122** ......................................................................................................16

    **Paragraph 124** ......................................................................................................17

    **Paragraph 125** ......................................................................................................17

    **Paragraph 126** ......................................................................................................18

    **Paragraph 127** ......................................................................................................18

    **Paragraph 128** ......................................................................................................19

    **Paragraph 129** ......................................................................................................19

    **Paragraph 130** ......................................................................................................20

    **Paragraph 131** ......................................................................................................21

    **Paragraph 132** ......................................................................................................21

    **Paragraph 133** ......................................................................................................22

    **Paragraph 134** ......................................................................................................22

    **Paragraph 135** ......................................................................................................22

    **Paragraph 136** ......................................................................................................23

    **Paragraph 137** ......................................................................................................23

    **Paragraph 138** ......................................................................................................24

    **Paragraph 139** ......................................................................................................25

    **Paragraph 140** ......................................................................................................25

**SECTION II – Community Engagement and Creation of Portland Committee on Community Engaged Policing** ..........................................................................................26

    **Paragraph 141** ......................................................................................................26

    **Paragraph 142** ......................................................................................................31

    **Paragraph 143** ......................................................................................................35

    **Paragraph 144** ......................................................................................................36

**Paragraph 145** ....................................................................................................................37

**Paragraph 146** ....................................................................................................................42

**Paragraph 147** ....................................................................................................................43

**Paragraph 148** ....................................................................................................................45

**Paragraph 149** ....................................................................................................................46

**Paragraph 150** ....................................................................................................................49

**Paragraph 151** ....................................................................................................................50

**Paragraph 152** ....................................................................................................................51

**SECTION III—Outcome Assessment** ................................................................................52

    **Officer Accountability** ...................................................................................................52

    **Community Engagement** ...............................................................................................82

**LIST OF ABBREVIATIONS** .....................................................................................................86

**LIST OF PERSONNEL** ...........................................................................................................88

**APPENDICES** .......................................................................................................................89

# **INTRODUCTION**

This is the Compliance and Outcome Assessment Report of the Compliance Officer and Community Liaison (COCL), as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (hereafter referred to as "DOJ"). By agreement of the Parties, this report combines the COCL's compliance and outcome assessments into a single document. This report focuses on the City's compliance with Section VII (Officer Accountability) and Section IX (Community Engagement and Creation of Portland Committee on Community Engaged Policing) of the Settlement Agreement. Our assessment of Sections VII and IX include evaluation of associated outcomes related to the City's implementation the Settlement Agreement. For all other sections of the Settlement Agreement, the compliance assessments, recommendations, and technical assistance provided in our prior reports should be considered ongoing. For paragraphs where Substantial Compliance has yet to be achieved the COCL delineates the conditions or steps remaining.

Report Card

As with previous COCL Compliance Reports, this report includes a "Report Card" on the implementation of the Agreement which provides an assessment of each paragraph in the Agreement. For each paragraph where sufficient information is available to render a decision, the Report Card provides an overall judgment on a 4-point scale, ranging from "Non-compliance" to "Substantial Compliance." For some paragraphs, we have given a rating of Substantial Compliance - Conditional. For these paragraphs, we have determined that the City has nearly satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity, and all that remains is a particularized set of conditions that we believe are likely to be accomplished in the near future. In order to inform future reports by DOJ, these instances should be interpreted as, "Should these particular conditions be met, we would recommend Substantial Compliance."

When reviewing the specific paragraphs, we utilize a four-tiered system of evaluation:
- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.
- Non-Compliance: The City/PPB has not made any meaningful progress towards the satisfaction of the provision's requirements.
- Not Yet Assessed: The COCL team has not had the opportunity to fully assess the requirements of the provision and elects to withhold assessment of compliance until a more thorough review has occurred.

# EXECUTIVE SUMMARY

## SECTION VIII (OFFICER ACCOUNTABILITY)

The City and PPB continue to make significant progress toward substantially complying with the paragraphs of Section VIII (Officer Accountability). Through their efforts, we believe the City and PPB have substantially complied with 19 of the 22 paragraphs we assessed related to Officer Accountability. Although we note that additional work is required in the three remaining paragraphs, we believe that steps taken by PPB and the City have demonstrated a positive trend towards compliance.

Perhaps the most significant area of progress we observed was the effort to revise the accountability process to "enable meaningful independent investigation by IPR." This process required mirroring of policies for Internal Affairs (IA) and the Independent Police Review (IPR), conducting joint training, and ensuring a fair and reasonable administrative review regardless of which entity conducted the investigation. Related to this, both IA and IPR now have the investigating entity determine findings, a step we have long argued is more appropriate than having RU Managers determine findings.

We note a couple of areas where the accountability process may be improved regarding full investigations, Supervisor Investigations (SIs), and the overall accountability system. For full investigations, we note that IPR investigators at times experienced difficulty in direct access to confidential information and that, due to IPR not being a law enforcement agency, certain information at times had to be redacted. Additionally, we identify some concerns in Responsible Unit (RU)-Level articulation of findings. For Supervisor Investigations (SIs), we note that individual officers are at times receiving allegations that are better characterized as system complaints rather than any wrong doing on the part of the officer.  Additionally, we identify issues related the volume of SIs, required resources, and contrast to Service Improvement Opportunity (SIOs) (among other issues). Finally, as it relates to the overall accountability system, this report covers how allegations are formed, IPR intake investigations, and other stages within the process.

This report also assesses PPB's and the City's overall ability to resolve full administrative investigations in an expeditious fashion. In comparison to prior reports and prior quarters, the data provided by PPB indicate that overall compliance with timelines has been improving, though more work can be done to ensure that cases are completed within the 180-days identified in Par. 121 of the Settlement Agreement. For instance, in the first quarter of 2018, 23 cases were opened and have since been closed. Of these, 20 were closed within 180 days, resulting in an 87% compliance rate. However, also in the first quarter of 2018, 22 cases were opened and remain open. Of these, 12 (54.5%) have gone past the 180-day timeline threshold. Therefore, of <u>all</u> 45 cases opened in the first quarter of 2018, one-third have exceeded (or

continue to exceed) the 180-day timeframe threshold. While this represents an improvement over prior quarters, we believe there remains room for improvement.

Between IA and IPR, there appear to be differences in the consistency with which each completes full investigations as well as individual stages *within* investigations. For full investigations, IA completes cases within the 180-day timeline with much more regularity than IPR. The same trends are found when examining compliance with due-dates for individual stages. For instance, IA completed individual stages on-time approximately 85.3% of the time while IPR completed individual stages on-time approximately 59.5% of the time. However, IPR has implemented steps to reduce timelines related to stages and, since those steps have been implemented, appreciable progress has been seen in terms of how often they are on-time.

Individual Settlement Agreement paragraphs have also seen progress that have led us to believe that PPB and the City are now in Substantial Compliance with them. For instance, negotiations between PPB, the City, City Council, and the District Attorney's Office (among other participants) have led to revised protocols for compelled statements in Officer Involved Shooting (OIS) events. Based on their discussions, PPB has enacted a revised version of SOP #7 (Deadly Force and In-Custody Death Investigations) and the "wall" needed between administrative and criminal investigations has also been reinforced through SOP #30 (Concurrent Administrative/Criminal Investigations). Through these, we believe that the City and PPB have sufficiently revised its protocols for compelled statements. Also related to this, we believe the City and PPB have substantially complied with all paragraphs related to OIS events (Pars. 124-127), including the requirements to separate witness/involved officers, issue CROs, and request voluntary walk-throughs.

PPB has also enacted a revised version of Directive 338.00 (Discipline Guide) along with a revised version of the Discipline Guide itself. Additionally, COCL observed a command-level training on the use of the Discipline Guide which we found more than satisfactory. Along with our review of the Discipline Guide and the accompanying training, we have reviewed cases wherein officers have had a Sustained finding and believe that the recommended discipline was consistent with the Discipline Guide.

Other paragraphs related to Section VIII of the Settlement Agreement had either been substantially complied with in prior years (and have remained so) or PPB and the City have demonstrated compliance with in the past year. These include paragraphs related to the operation of the Police Review Board (PRB), the Citizen Review Committee (CRC), investigating all force allegations (absent clear and convincing evidence to IPR that the case was without merit), findings of civil liability, and prohibiting retaliation. We refer the reader to these particular paragraphs for our full evaluation.

As it relates to Section VIII overall, we again note that positive steps have been taken by PPB and the City and that such steps have led to near Substantial Compliance for the entire section. Although some areas of improvement remain, we acknowledge PPB and the City's dedication in making the strides we summarize in this report.

**SECTION IX (COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING)**

PCCEP Role in the Settlement Agreement and the City's Support

After a lengthy hiatus in the community engagement component of the Settlement Agreement, the first major task for the City, in consultation with DOJ, was to "*establish a Portland Committee on Community Engaged-Policing ("PCCEP")."* (par. 141). PCCEP Facilitators worked alongside city staff to design and implement a recruitment and selection process, in partnership with the Selection Advisory Committee (SAC)—a group of five, with each SAC member appointed by a member of City Council. The COCL, along with DOJ, observed meetings of the PCCEP selection committee, including selection committee interviews with many of the PCCEP candidates. We also observed the PCCEP training and team building meetings, as well as meetings where PCCEP members had early, informal conversations around organizational structure and bylaws. Based on the work to date, we conclude that the City has substantially complied with the requirements of paragraph 141 by engaging in a thorough, reasonable and fair process of creating the PCCEP.

The Settlement Agreement requires that PCCEP's membership "*come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland."* (Par. 143). From a pool of more than 100 applicants, thirteen people were appointed to PCCEP including 11 adult members and two youth members. Additionally, six alternates were selected (four adults and two youth). Through the selection process, we believe a "reasonably broad spectrum" has been maintained in the PCCEP membership, including persons of color, persons with lived experience with mental illness and disabilities, and persons self-identified as queer. Additionally, PCCEP members come from geographically diverse sections of Portland: Two from North Portland, five from Northeast, two from Southeast, two from Southwest, and two from Northwest. One area in which the PCCEP is imbalanced is gender. Only four of the thirteen members (30%) are female. In future recruitments for PCCEP members, additional attention should be paid to gender balance. No one reported any actual or perceived conflict of interest with the City.

The City is required to "*provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan."* (Par. 144) and "*provide PCCEP members with appropriate training necessary to comply with requirements of City and State law* (Par. 152). To date, the City has made a substantial commitment of time and resources in support of the PCCEP, providing space, administrative staff, independent facilitators, training, and legal consultation. Now that PCCEP has been seated and has identified leadership, the steering committee and/or PCCEP's support team needs to continue working closely to ensure PCCEP's committee structure and meeting agendas allow ample time for achieving compliance with deliverables. Once the full-time project manager position has been (re)filled, along with the community organizing position, the City can be assigned Substantial Compliance with regard to administrative support.

7

The Settlement Agreement gives considerable authority to the PCCEP (Par. 142, a-e). Because PCCEP is a new body, COCL is only able to assign Substantial Compliance – Conditional at this time. The conditions for Substantial Compliance rest heavily on progress that we anticipate will be made by PCCEP and the committee's ability to complete required deliverables in a timely manner. Key tasks (par. 141) include: "*solicit information from the community and PPB about PPB's performance*," "*advise the Chief and the Police Commissioner on strategies to improve community relations,*" and "*contribute to the development and implementation of a PPB Community Engagement Plan*."

PCCEP is allowed to "*meet as needed to accomplish their objectives as set forth in the PCCEP Plan.*" (Par. 151) In addition, PCCEP *"shall hold regular Town Hall meetings which shall be open to the public."* PCCEP currently plans to meet once per month as a full body, with subcommittee meetings likely also taking place. The PCCEP held its first meeting on November 28, 2018 and a second meeting on December 17, 2018. A Steering Committee has been established, and met for the first time on December 13, 2018. PCCEP and COCL have agreed to hold a joint Town Hall for public review of this COCL report on January 30, 2019. PCCEP's initial meetings have followed both the spirit and the letter of Oregon's public meetings law (as required by Par. 151), and based on COCL's observations, PCCEP's members are committed to transparency and public involvement in its work. COCL is assigning Substantial Compliance — Conditional, subject to PCCEP successfully holding several public meetings and holding its first Town Hall meeting.

<u>PPB Role in Public Engagement and Outreach</u>

The Community Engagement component of the Settlement Agreement includes additional requirements for the PPB and the City. PPB is required to "*work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community."* (Par. 145). For more than a year, the PPB has been waiting for the selection of the PCCEP members in order to work collaboratively on the Community Engagement Plan. In the meantime, the PPB has been engaged in a wide range of outreach and engagement activities, which are described in this report and also documented on PPB's website, which has a dedicated "Community" section (https://www.portlandoregon.gov/police/30379). PPB also maintains a number of social media platforms that seek to engage and inform the community of PPB activities and community issues, including NextDoor, Facebook, Twitter, Instagram, and YouTube. As another means of community engagement, PPB regularly invites the community to review and comment on new and revised directives. The review process for more than 100 PPB directives is laid out on the PPB website (https://www.portlandoregon.gov/police/59757). Under the leadership of the new Chief of Police, PPB has begun a strategic planning process that will result in a 5-Year Strategic Plan (https://www.portlandoregon.gov/police/76886). Relevant to Paragraph 145, a significant component of this planning process is seeking community input, especially around community engagement, as described in the present report.

In sum, PPB's community outreach and engagement activities to date have been comprehensive, seeking to engage many of Portland's marginalized and at-risk communities in a variety of ways. Also, a well-conceived 5-year strategic planning process has been able to give voice to the community at large and address their specific concerns. This should contribute to PPB's legitimacy and trust within the Portland community. Furthermore, the strategic planning process should result not only in a 5-year strategic plan but could serve as the foundation for PPB's Community Engagement Plan required by the Settlement Agreement. However, PPB will need to engage the PCCEP soon in this process. The remaining community engagement tasks for PPB to achieve Substantial Compliance under Par. 145 are: (1) to develop a positive, productive and transparent relationship with the PCCEP and (2) to develop a reasonable Community Engagement Plan with input from PCCEP.

The City, in consultation with the PCCEP, is required to "*conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.*" (Par. 146). A citywide community survey has been conducted twice previously (2015 and 2016) by Davis, Hibbitts, & Midghall, Inc. (DMH), a professional survey research group. DMH is currently working with the City and PCCEP to field a similar survey beginning in February of 2019. COCL is satisfied that the draft survey covers the relevant topics, that the survey methodology is valid, and that PCCEP has been consulted and contributed to the survey questions. The tasks remaining to achieve Substantial Compliance are as follows: (1) the survey instrument and recruitment procedures must be finalized; (2) data collection must be completed; (3) the survey data must be analyzed and a report prepared; (4) the results must be used to "inform the work of the PCCEP" and (5) the results must be used to "inform….the development and implementation of the Community Engagement Plan."

The Settlement Agreement requires that PPB "*continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.*" *(Par. 147).* COCL has concluded that PPB collects precinct-level demographic data, as well as data about local problems and concerns, and utilizes this information to provide tailored services to local communities. The one remaining condition for Substantial Compliance would be the delivery of precinct-level demographic data to the PCCEP to "inform its work."

PPB must also "*continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing.*" (Par. 148). Ahead of most law enforcement agencies, PPB has been collecting such demographic data since 2001. PPB's Stops Data Collection Report: 2016 Annual Report, released on June 25th 2018, provides a 5-year analysis of data collected between 2012

and 2016. This report provides a thorough, sophisticated, and transparent analysis of more than 250,000 stops of drivers and pedestrians during this 5-year period, with a focus on 2016. PPB analysts have done an excellent job of establishing relevant benchmarks for assessing disparities. The results of this analysis are summarized in the Outcome section of this report.

Based on this work, as well as PPB's effort to enhance data collection over time, COCL assigned a rating of Substantial Compliance Conditional for paragraph 148. Two remaining conditions are as follows: (1) PPB should provide these reports to PCCEP when PCCEP is prepared to receive them, and (2) As an appendix to the current Stops Data Collection Report, PPB should examine disparities in the stops by age and sex demographics.

The Settlement Agreement requires that the COCL, PPB, and DOJ "*jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.*" We have initiated a dialogue with PPB and DOJ and we offer (in this report) a preliminary list of possible metrics. We have identified several sources and types of information to be reviewed, including the annual community-wide survey, PPB's records on community engagement and outreach, PPB's relationship with PCCEP, and a contact survey. PPB has agreed to partner with the National Police Foundation to field test a new contact survey that will allow community members to evaluate their recent encounters with a PPB officer. The contact survey could measure key aspects of procedurally just behavior by officers, including fairness, respect, compassion, and listening as applied to specific demographic subgroups in the community. The metrics to evaluate community engagement cannot be finalized until the community-wide survey has been completed. The metrics will then be presented to the PCCEP for review.

PPB is required to issue an Annual Report that will include "*a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.*" (Par. 150). Late in 2018 PPB issued a draft of the Annual Report for 2017 and provided this draft to the PCCEP for review. PCCEP has given PPB feedback on this draft report. Consistent with Par. 150, the Annual Report summarizes the Bureau's problem-solving and community policing activities. To receive Substantial Compliance, PPB will need to: (1)release the final version of the 2017 report to the public; (2) hold at least one meeting in each precinct area and at a City Council meeting to discuss the topics delineated in Paragraph 150; and (3) prepare a more timely annual report for 2018 to demonstrate the ability to produce substantive reports "annually."

System Outcome Assessment: Community Engagement

PPB is expected to develop systems of community engagement that increase the probability of sustained success in this domain. A good systemic approach also includes systems of measurement that serve to document and monitor the quantity and quality of its engagement activities, thus providing feedback loops that allow for corrective action to maximize performance. We will revisit this outcome assessment after a set of community engagement metrics (par. 149) have been finalized. In this report, we briefly review some existing metrics and some existing systems that are relevant to community engagement.

The creation of the PCCEP itself is a major step toward the establishment of a system of community engagement that should be sustainable over time. Other systems are expected from PPB's work, including: the 5-year strategic planning process, the community engagement process to be defined in PPB's Community Engagement Plan, and PPB's new app that allows officers to keep records of their community engagement activities. The City's community-wide survey provides another set of metrics to measure community outcomes.

Furthermore, PPB is involved in a series of planned and existing measures of police contact with the public. These include existing records/reports on calls for service, crime incidents, police stops, searches, arrests, citations, and use of force, as well as PPB's planned contact survey to measure the quality of police-community interactions.

PPB's stops dataset is designed to address community concerns about discriminatory policing. PPB's Stops Data Collection report addresses the issue of racial/ethnic disparity in police decision making about stops, searches, contraband hits, and stop outcomes. In this Q4 report, we provide a brief summary of those findings. Arguably, there is considerable good news to report, including the downward trend in the number of driver and pedestrian stops and searches, the improvement in contraband hits, and the absence of racial/ethnic differences in stops. However, the analyses also uncovered some disparities in searches for Black/African American drivers and pedestrians that deserve more attention. Also, the Gang Enforcement Team, while not showing racial/ethnic disparity with stop decisions, did rely on consent searches more with Black/African American stops.

Disparities do not necessarily indicate racial bias, as other factors may be involved, but the transparent reporting of police decision making evident in PPB's report should be the basis for more dialogue and community engagement. As PPB notes, these results "allow for a more informed community-wide discussion about how best to keep the community safe and how to accomplish this in the most equitable manner possible."

# I. OFFICER ACCOUNTABILITY

| | |
|---|---|
| Intro Par. | Partial Compliance |
| Par. 121 | Partial Compliance |
| Par. 122 | Substantial Compliance |
| Par. 123 | Substantial Compliance |
| Par. 124 | Substantial Compliance |
| Par. 125 | Substantial Compliance |
| Par. 126 | Substantial Compliance |
| Par. 127 | Substantial Compliance |
| Par. 128 | Partial Compliance |
| Par. 129 | Substantial Compliance |
| Par. 130 | Substantial Compliance |
| Par. 131 | Substantial Compliance |
| Par. 132 | Substantial Compliance |
| Par. 133 | Substantial Compliance |
| Par. 134 | Substantial Compliance |
| Par. 135 | Substantial Compliance |

| Par. 136 | Substantial Compliance |
| --- | --- |
| Par. 137 | Substantial Compliance |
| Par. 138 | Substantial Compliance |
| Par. 139 | Substantial Compliance |
| Par. 140 | Substantial Compliance |
| Par. 169 | Substantial Compliance |

*Introduction to Section VII: PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.*

*Par. 169: PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.*

The majority of provisions found within the opening paragraph of Section VII (Officer Accountability) are reflective of an accountability system that is both efficient and effective. The opening paragraph speaks to a fair system that is consistent, transparent, expeditious, and global. Therefore, we assess much of the opening paragraph through our System Assessment (see Section II) as well as other paragraphs found within this compliance assessment. In general, our review of case management (i.e. intake investigations, referrals/administrative closures, ease of filing complaints, the provision of information/updates about a complaint, etc.) as well as the actual investigation of allegations (either through Supervisor Investigations (SIs) or full administrative complaints performed by IPR or IA) indicates a system that contains all the necessary parts to be considered efficient and effective.

The system must produce fair and consistent results, so we also evaluate the quality of those necessary parts.  For instance, our review of case files indicates that, barring rare exceptions, findings are consistently supported by a preponderance of the evidence. Furthermore, data from

the Administrative Investigation Management (AIM) database show that the majority of complaints are "fairly addressed," with about half of allegations being administratively closed (compare with 75% in prior years). Additionally, our review of cases indicates that even seemingly frivolous allegations (for instance, complaints about system issues rather than the actions of any particular officer) are investigated, indicating that both IPR and PPB take allegations of misconduct seriously and are willing to engage in a fuller investigation.

There remain some areas where the Accountability system may be strengthened. While we provide a more detailed analysis in our system assessment, we summarize those points here. In order for the accountability system to be effective, the process must be considered "fair" by both community members and PPB members. We note in the system assessment (below) a few issues that impact the perception of fairness, including how allegations are formed and how cases are distinguished between system complaints and complaints of policy violation. Additionally, because IPR investigators are not law enforcement officers, access to data can be at times more difficult due to Records Management System (RMS) and Computer Aided Dispatch (CAD) records needing to be redacted. Finally, for SIs, we note issues with communication with the complainant (particularly with the wording of the final letter to the complainant, which in some cases may undermine an otherwise successful resolution), the volume and effort of SIs, and the perception of SIs being disciplinary despite their classification as non-disciplinary. For all of the issues described above, PPB and the City should consider a plan of action to address these concerns.

Based on our review of SIs and full administrative investigations, we believe that officers are most often held "accountable for complying with PPB policy and procedure" (Par. 169). However, we note a single case that we had referenced in our Use of Force assessment (see our September 2018 report). For that case, we believe the finding related to the officer's use of force contradicts the letter and intent of Par. 169 and the opening paragraph of Section VII. We also expressed concerns about the After Action Report findings for two other cases, though at the time of this report, the administrative investigation for those two had not yet been completed.

As only one of the above cases has gone through findings (and we cannot comment on whether the other two contradict the letter and intent of Par. 169 or the opening paragraph to Section VII) it is unreasonable to say that a single case demonstrates only partial compliance with the terms of these two paragraphs. We also note that PPB has revised Directive 1010.00 to account for unintentional uses of less lethal weapons and that all CEW deployments (regardless if they make contact) will be investigated as uses of force in the future. It therefore appears that these issues have been resolved as they relate to policy implications.

Finally, while officers and community members appear to consistently receive a <u>fair</u> resolution of complaints, a considerable proportion of complaints are not resolved <u>expeditiously.</u> For instance, as seen in our system assessment, only about 55% of full administrative investigations (i.e. IA or IPR full investigation) that were opened between 2017 Q3 and 2018 Q1 were completed within the 180-day timeline, and for IPR, the rate is lower (although IPR handles fewer cases and therefore a single case going beyond 180 days will have a larger impact on their compliance

14

rates). Due to the inconsistency with which cases are completed within the required timeline, we cannot say that this provision has been met.

Overall, we believe that the City and PPB have partially complied with the requirements of the opening paragraph to Section VII. For many provisions found within the paragraph, the City and PPB should be given credit for their efforts. For instance, our review of cases indicate that a high percentage of allegations were forwarded on for investigation (rather than administratively closed), findings are supported by a preponderance of the evidence in all but one case, and officers are held accountable when they have violated PPB directives.

However, the City and PPB's ability to substantially comply with the opening paragraph is diminished primarily by the non-expeditious resolution of community- and Bureau-initiated complaints. Further inhibiting the City and PPB are remaining issues in the execution of full investigations and SIs described above and in the system assessment. Because these issues are critical to the overall function of an effective and efficient system, the City and PPB must rectify these concerns before we are able to say they have substantially complied with the requirements. For Par. 169, although we identified one case where we believe the officer was <u>not</u> held accountable, this does not constitute a substantial deviation from compliance, and we therefore maintain that, overall, PPB and the City have substantially complied.


*121. PPB and the City shall complete all administrative investigations of officer misconduct within one hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.*

*123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.*

Related to our evaluation of the opening paragraph of Section VII, we do not at this time believe that the City and PPB have substantially complied with the requirements of Par. 121. As demonstrated in our system assessment (see below), full administrative complaints are completed within 180-days approximately half of the time. While there has been improvement compared with the 65%-70% failure rate we noted in our prior reports, there is still more work needed for the City and PPB to substantially comply with this paragraph. Both PPB and IPR hold meetings with investigators whose stages are overdue (or are in danger of going overdue) which appears to have had positive outcomes. PPB also uses a systematic approach to resolving consistently overdue stages, a process which has also been recently implemented by IPR. We believe these steps will further raise the compliance rates. While a 100% compliance rate for the 180-day timeline is not reasonable (as some cases may carry special circumstances), we believe the data indicate there remains room for improvement.  However, we also recognize

that some delays may be beyond the control of IA and IPR.  For instance, several cases are impacted by lengthy reviews by the Bureau of Human Resources.  While these cases are rare, they should be kept in mind as contributing factors when assessing IA and IPR's overall timelines.

We maintain that PPB has substantially complied with the requirements of Par. 123 by providing a written review of the IA process, identifying the source of delays, and implementing an action plan for reducing them. This has, in part, led to a reduction in the proportion of cases that exceed the 180-day timeline and, where PPB has the authority to make changes, we recommend they continue to evaluate and make the necessary changes. However, we also recommend IPR continue in their efforts to implement a similar process. While IPR has been holding weekly meetings with individual employees for stages under their direction, they have only recently begun to look at systemic issues to remedy overall timelines. Par. 123 only requires PPB (not IPR) to provide a written review, so substantial compliance for this paragraph is not dependent on IPR, though our suggestion still remains as it might help overall compliance with the timeline requirement of Paragraph 121.


*122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.*

On a quarterly basis, PPB has provided documents related to the start dates and end dates of criminal investigations relative to the start of administrative investigations. In nearly all cases, criminal investigations started on (or near) the same day as administrative investigations. In some instances, the beginning of the criminal investigation was later than the administrative investigation. For instance, in the second quarter of 2018, we noted 3 cases in which the criminal investigation began later than the administrative investigation. Additionally, in the third quarter of 2018, we noted 1 case in which the criminal investigation began later than the administrative investigation. However, for each of these instances, a valid reason for the delay in beginning the criminal investigation was found. In some cases, criminal allegations were discovered as the result of evidence or interviews uncovered during the administrative investigation. In other cases, the IPR Assistant Director referred cases to criminal detectives after receiving and reviewing the completed intake investigation report, thereby explaining the delay. However, in none of those instances were criminal allegations alleged at the onset of the investigation. In our view, these cases do not violate Par. 122 and we believe PPB has substantially complied with the requirements.

*124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.*

PPB's Directive 333.00 (Criminal Investigations of Police Bureau Employees) provides protocols for compelled statements. Particularly under Section 6 of Directive 333.00, the directive includes protocols related to maintaining a "clear line of separation," prohibitions on sharing *Garrity*-protected information from the District Attorney's Office and criminal investigators, securing interview recordings and transcripts, and preparing "a memorandum outlining specific procedures for maintaining the line of separation between the criminal and administrative investigations." Based on Directive 333.00, we believe that these protocols are sufficient with regards to administrative investigations broadly.

Additionally, as we have detailed in our October 2017 report, protocols for compelled statements for Officer Involved Shooting (OIS) events have been revised after lengthy negotiations between PPB, the City, City Council, and the District Attorney's Office. Based on the discussions, PPB has enacted a revised version of SOP #7 (Deadly Force and In-Custody Death Investigations) that outlines the steps required of the Professional Standards Division (PSD) to erect and maintain a wall between administrative investigations and the investigations performed by PPB's criminal investigators. This wall is also reinforced through SOP #30 (Concurrent Administrative/Criminal Investigations), informing IA investigators about the necessity of not sharing information. In our opinion, SOP #7 and SOP #30 substantially comply with the requirements of Par. 124.

*125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communication between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.*

Since our October 2017 report, there were a total of three case files closed for Officer Involved Shooting (OIS) events. We reviewed the case files for all three OIS events. In regards to Par. 125, nearly all witness and involved officers were identified on-scene, separated, and issued a communication restriction order (CRO). In one of the cases, one officer who should have been identified as a witness officer was not identified as such, was not separated, and did not receive

a CRO on-scene. For that case, the officer was identified as a witness officer twenty days after the OIS event when the administrative investigation identified the officer as a witness and provided a CRO upon realizing the officer's role.

While a single case does not negate the substantial compliance we had already assessed PPB to be in, it should provide a rationale for additional training either for the particular first arriving supervisor (who is responsible for identifying the involved/witness officers) or for the Bureau as a whole (in prior reports, we have also noted some minor issues with identifying witness officers). We credit the administrative investigation for rectifying the situation once it identified the witness officer's role. However, additional training may be required to avoid the situation in the future. Although this is not a condition of compliance (as PPB has substantially complied with this paragraph), it is a suggestion for the future improvement of the Bureau.

*126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.*

PPB continues to require OIS witness officers to give on-scene briefings to supervisors and/or members of the Detective Division. For each OIS event case file we reviewed, nearly all witness officers were interviewed by the Detective Division (only the single witness officer described above was not, though that witness officer filed a report on the matter). Additionally, supervisors and (where necessary) witness officers provided on-scene briefings for each of the OIS events. Overall, PPB has continued to substantially comply with the requirements of Par. 126.

*127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.*

PPB continues to request OIS-involved officers to provide a voluntary, on-scene walk-through and interview. For each OIS case file we reviewed, all involved officers declined to provide walk-through and interviews. PPB continues to substantially comply with the requirements of Par. 127.

*128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.*

The ability of the City to "enable meaningful independent investigation by IPR" rested primarily on two steps: revise PPB and IPR policies to mirror one another and provide joint training to ensure a consistent quality of product between IA and IPR. As further detailed in our system assessment (see below), we believe that these two steps have nearly been successfully accomplished. COCL participated in multiple iterations of PPB and IPR policy review sessions designed to ensure a mirrored process. Additionally, COCL observed each of the joint training days provided to IA and IPR. Where additional instruction was necessary, we, along with DOJ and PPB representatives, provided input on how deficiencies might be resolved.

Through discussions with IA and IPR investigators, as well as a review of investigations performed by each entity, we believe that additional work is required before we can say that the City has substantially complied with the requirement of Par. 128 to enable meaningful independent investigations by IPR. We believe that barriers remain, some of which relate directly to IPR while others relate more broadly to IA and IPR (for example, allegation formation and system complaints masquerading as complaints of officer misconduct). These issues are fully explored in our system assessment. While we feel PPB and the City have made commendable steps to ensuring a quality system, these issues must be addressed before we can say that Par. 128 has been satisfied.

*129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.*

In our evaluation of allegations of use of excessive force, we noted a total of 6 allegations of excessive force that were administratively closed prior to a full IA investigation. However, this does not mean that no investigation took place as each allegation received a thorough intake investigation before closure as well as additional investigation by IA. For four of the allegations, neither the event nor the officer could be identified, leaving PPB without an investigative direction to go on. Additionally, one of the allegations was coded as administratively closed due to "Complainant Unavailable." After discussing with PPB, it was determined that the case was opened based on a tort claim, though because the complainant refused to provide IA with additional information, IA was unable to identify the officer or event despite spending

resources trying to locate the activity described by the complainant. PPB indicated that this case could have also been appropriately closed with the closure code "Unidentified Officer" - however, the AIM system only allows a single entry for the reason for closure. Once more information develops through the civil action following the tort claim, we would expect the investigation be re-opened, though PPB's initial decision appears justified.

For the final allegation that was administratively closed by IA prior to a full and complete IA investigation, the language of the complaint as received by IPR indicated that the complainant was alleging excessive force by employees of the Multnomah County Sheriff's Office at the Inverness Jail. After performing an initial investigation, IA determined that officers had used force on the complainant earlier in that day, though that force event was not the subject of the allegation. Based on the language of the complaint indicating MCSO officers were involved, IA administratively closed the allegation with the disposition "No Misconduct" (though IA did re-investigate the force used by PPB members earlier on that day). We agree with PPB's decision here and believe that this also speaks to the overall concerns with allegation formation and IPR's "low barrier for entry" (see our system assessment below). After reviewing the allegations of use of excessive force and the reasons for their administrative closures, we believe that PPB has substantially complied with this paragraph.

Additionally, in our October 2017 report, we noted that some supervisors investigated allegations of excessive force through the After Action review process. As we stated then, such actions did not comply with the language of Par. 129 and we recommended PPB reinforce supervisor responsibilities during the Supervisors In-Service training held in the Spring of 2018. PPB did include supervisory responsibilities in the Spring 2018 Supervisors In-Service as part of the larger instruction on investigating force events. Having observed the training, we believe this issue has been adequately addressed.


*130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.*

In February of 2018, PPB enacted a revised version of Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited). The revised version included comments by DOJ and COCL and is consistent with the intent of Par. 130. Additionally, in response to a recommendation in our October 2017 report, PPB trained officers on retaliation and Human Resources Administrative Rule 2.02 during the Spring 2018 In-Service as part of the broader training on Police Accountability. We therefore believe that the current directive substantially complies with Par. 130 and that officers have been adequately trained on the prohibition of retaliation.

*131. (COCL Summary): Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, the requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, and the requirement for CRC members to recuse themselves from CRC if part of the PRB hearing the case. (For details and exact language, see the Settlement Agreement).*

Presently, PPB Directive 336.00 (Police Review Board) maintains the required elements of Par. 131. Although the Directive is currently under review, we do not anticipate any changes to the Directive that would affect PPB's compliance with this paragraph. City Code 3.20.140 also contains many of the provisions found within Par. 131, though we note that the requirement of Par. 131(a) ("When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members") is still not memorialized in City Code. Rather, a subset is found within City Code 3.20.140 (OIS events, physical injury requiring hospitalization, in-custody deaths, and "out-of-policy" force events).

In practice, the requirement for PRB to draw one of the two citizen member slots from the CRC for all force cases <u>does</u> occur in accordance with Directive 336.00. Therefore, when evaluating compliance with this paragraph from a standpoint of performance, we believe that PPB has complied with all aspects. However, we encourage the City to revise City Code 3.20.140 to mirror the PPB Directive in order to avoid potential future conflict between the two.

*132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.*

PPB reports that PRB has not returned any cases for additional investigation within the past year. Similar to Par. 131, the requirement of Par. 132 has been enshrined in PPB Directive 336.00 (see section 4.7 in that Directive) though not in City Code 3.20.140. However, as with the above paragraph, we note that, in practice, PRB members are made aware of this power in at least two different ways prior to deciding a case (first prior to reviewing a file and again at the PRB hearing itself). As with Par. 131, we believe that the PPB, in practice, has substantially complied with the requirements of Par. 132, though encourage the City revise 3.20.140 to mirror Directive 336.00 so as to avoid potential future conflict between the two.

21

*133. If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall: (1) enter that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units ; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial finding creating a rebuttable presumption that the force used also violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the IA investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.*

The PPB has sustained no findings of liability since September of 2014. However, should a finding of liability occur in the future, PPB continues to have a system in place to ensure the requirements of Par. 133 are met. This is accomplished through SOP #32 and SOP #42, which, as we have previously noted, contain sufficient direction for the provisions of Par. 133. We therefore continue to find that PPB has substantially complied with this paragraph.

*134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.*

The membership of the Citizen Review Committee remains at 11 members (see City Code 3.21.080) and based on our past observation of CRC meetings and review of other relevant documents, we continue to believe that the City is in substantial compliance with this paragraph.

*135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.*

The CRC continues to have the power to find the outcome of an administrative investigation is unreasonable if they believe the findings are not supported by the evidence. Therefore, the City

and PPB remain in substantial compliance with this paragraph. The CRC has made informal and formal requests to have its standard of review changed to that of a "preponderance of evidence" as opposed to its current "reasonable" standard. For this request, we take no side on the appropriateness of changing the standard of review, though we note that should the standard of review be changed, we do not believe it would impact the City and PPB's compliance with Par. 135.

*136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.*

The City continues to memorialize the requirements of Par. 136 within City Code PSF-5.03. Additionally, we identified two cases in our review period where additional investigation was requested by CRC. For neither of those two cases was the additional investigation completed within 10 days. Conversation with IPR indicates that in lieu of providing CRC members a written statement that additional time would be needed, IPR has verbally informed them of this at the time of the request. This is due to the fact that additional investigation information and new findings would require supplemental review by the involved officer's commander, thereby requiring more than 10 days. We believe that this is reasonable since exceeding 10 days appears to be a function of review rather than additional investigation. We therefore believe the City has substantially complied with Par. 136.

*137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.*

In February of 2018, PPB enacted a revised version of Directive 338.00 (Discipline Guide) along with a revised version of the Discipline Guide itself. COCL and DOJ provided comments to these versions of the Directive and Guide and in our last report noted that the guide contained categories of alleged conduct "based on the nature of the allegation" and provided avenues for

mitigating and aggravating factors. We therefore believe Directive 338.00 and corresponding Discipline Guide substantially comply with elements of Par. 137.

Additionally, in July of 2018, we observed a command-level training on the use of the Discipline Guide for all personnel at the ranks of Lieutenant, Captain, and Commander. As noted in our 2018 Q3 report, the training covered a range of topics related to the Discipline Guide, including when and how to use the Discipline Guide, mitigating/aggravating factors, and minor/major deviations from policy (among other topics). Overall, we were impressed with the training, presentation materials, instructors, and student engagement with the training.

Coupled with our assessment that PPB possesses a sufficient Discipline Guide and has provided adequate training for command-level officers, we have also reviewed administrative investigations that have occurred since the training. Out of the cases we reviewed, we identified three cases where an officer had a Sustained finding for an allegation. In all of those cases, the discipline imposed was consistent with the Discipline Guide. Given that PPB has enacted a Discipline Guide that meets the language and intent of Par. 137, has trained command-level supervisors on assessing officer behavior (including mitigating and aggravating factors) in accordance with the Discipline Guide, and has satisfactorily incorporated the Discipline Guide for Sustained allegations since the training, we believe PPB has substantially complied with the requirements of Par. 137.

*138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.*

The City continues to provide complainants the opportunity to file and track complaints of officer misconduct on the IPR website (https://www.portlandoregon.gov/ipr/). In a number of administrative investigations we reviewed (including SIs), the initial complaint was received through the website. The website complaint submission system captures a range of information, including name and contact information for the complainant, the complaint's role in the occurrence, files/videos/other documents that may be used as evidence, location/time of the incident, name and DPSST of involved officers, witness information, and a summary of the complaint. All of this information is qualitatively similar to what one might expect an IPR investigator to collect if the complaint was filed in person or on the phone. Additionally, complainants are able to track their complaints online, giving as little information as only their name, thus contributing to a sense of procedural fairness. By not requiring an overabundance of information, this makes the process relatively smooth on the part of the complainant. Overall, we continue to find that the requirements of Par. 138 have been substantially complied with.

*139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.*

The City and IPR continue to substantially comply with the requirements of Par. 139. By law, IPR and the City are able to share documents provided by the complainant and a transcript of the complainant interview but are not permitted to share documents related to the interview of the accused officer nor investigation material gathered during the course of the investigation. As this is "the extent permitted by law," the City continues to substantially comply with this paragraph.

*140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.*

In January of 2019, we reviewed a stratified random sample of IPR case files to ensure that communication provided by IPR to each complainant included the points of information detailed in Par. 140. Our sample included cases which were administratively closed, forwarded for Supervisory Investigations, and forwarded for a full administrative investigation by IA or IPR. Our review revealed that IPR continues to provide the necessary information found in Par. 140. The City Attorney's Office continues to determine whether corrective action disclosures are required by State law. We maintain the City has substantially complied with the requirements of Par. 140.

# IX. Community Engagement and Creation of Portland Committee on Community Engaged Policing (PCCEP)

| | |
|---|---|
| Par. 141 | Substantial Compliance |
| Par. 142 | Substantial Compliance – Conditional |
| Par. 143 | Substantial Compliance |
| Par. 144 | Substantial Compliance – Conditional |
| Par. 145 | Substantial Compliance – Conditional |
| Par. 146 | Partial Compliance |
| Par. 147 | Partial Compliance |
| Par. 148 | Substantial Compliance – Conditional |
| Par. 149 | Partial Compliance |
| Par. 150 | Substantial Compliance – Conditional |
| Par. 151 | Substantial Compliance – Conditional |
| Par. 152 | Substantial Compliance |

*141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement.*

COCL Assessment: In August of 2017, the City Council adopted the PCCEP Plan in response to the requirements of Par. 141. In our *Compliance and Outcome Assessment Report: January – September 2017* (final report published in December 2017), we provided an assessment of this

26

plan and a side by side comparison of the PCCEP structure to COAB, noting at the time that "in general, we believe the PCCEP and COAB are reflective of each other and the PCCEP proposal is a valid substitute for the original language of the Settlement Agreement." In September of 2018, the PCCEP plan was amended by the City Council (see Appendix A), though we do not believe this changes the overall assessment we provided in our prior report. Most substantively, the changes included adjustments to the required meeting schedule, changes to the requirement that PCCEP host quarterly town hall meetings, and a change in the number of PCCEP members (adding two youth members).

We also indicated in our earlier assessment that "until the DOJ and the City's proposed amendments to the Settlement Agreement are approved and the PCCEP is fully functioning, we cannot find the City or PPB in Substantial Compliance. We are required to base compliance against the paragraphs contained in the current Agreement. When the PCCEP is operational, we will assess compliance based on the existence and success of that group."

While it has been more than a year since writing that assessment, the proposed amendments to the Settlement Agreement are still not approved. As of the October 4, 2018 status conference with Judge Michael Simon, the PCCEP-related Amendments to the Agreement remain under conditional approval and will be reviewed again in June 2019. However, Judge Simon offered guidance in the October 4 hearing that compliance assessments should be based on the conditionally approved amendments.

While the PCCEP is not fully operational—they have not yet met in subcommittees, or begun to substantively tackle the deliverables required of them in the Settlement Agreement—at this stage we are able to assess the selection process, as well as the early work to form a functional body. The PCCEP held their first meeting in late November 2018, following training and team building.

This assessment is informed by observing meetings of the PCCEP selection committee, including selection committee interviews with many of the PCCEP candidates. COCL also observed portions of the PCCEP training and team building meetings (whereas DOJ representatives observed the balance of the meetings), as well as meetings where PCCEP members had early, informal conversations around organizational structure and bylaws. Finally, COCL has observed the PCCEP's first official meeting.


**PCCEP Selection Process**

In April 2018, an evaluation committee selected Training for Transformation and the Brad Taylor Group to co-serve as the PCCEP Facilitators. The PCCEP Facilitators worked alongside city staff to design the recruitment and selection process, in partnership with the Selection Advisory Committee (SAC)—a group of five, with each SAC member appointed by a member of City Council.

The PCCEP application and information for applicants based on the PCCEP Plan was released in late April 2018 (see Appendix B) in six languages, with options for applicants to apply online or on paper. The original application deadline was extended to July 2, 2018 in order to ensure a sufficient number of applications.

The application asked for demographic and contact information, and included open-ended questions regarding: interest in serving on PCCEP; strengths and skills that would serve the work of PCCEP; understanding of issues affecting people with mental health-related conditions, people of color, and people with disabilities; understanding of issues regarding police use of force and accountability; approach to working as a team and ability to problem solve; experience serving on advisory bodies or community boards; views on the relationship between law enforcement and communities of color and people with mental health conditions, views on what healthy police-community relationships look like; and what they hoped to accomplish while serving on PCCEP. Applicants were asked to "share what you feel will help the selection bodies understand your background, your interest in the PCCEP, issues around mental health and police accountability, and the perspective you would bring as a member of this citizen body."

In addition to widely disseminating the PCCEP application, City staff and the facilitation team developed an outreach strategy in consultation with the SAC. Summarizing the recruitment process, a September 5 City document noted the PCCEP outreach strategy "focused on removing barriers to participation for historically marginalized communities and empowering Portlanders with lived experience to take [the] lead in city processes. An emphasis was placed on obtaining quality applications, instead of simply amassing a large number of applicants."

To that end, the outreach strategies included community meeting presentations, targeted and informal conversations with possible candidates, and six informational sessions hosted at sites across the city. COCL attended one of the informational sessions, held in NW Portland, to observe. The meeting was casual but informative, as people interested in PCCEP were able to engage in deep conversation with City staff to learn more about the group and its mission and goals.

Ultimately, more than 100 people applied to serve on PCCEP. After gathering the applications, the five-member SAC met several times with the facilitators to determine selection criteria, formulate interview questions, and rank applicants to select those they wanted to interview. Based on these meetings, the SAC developed the selection criteria and weighting schematic as follows:

- Lived experience as a member of a marginalized community (30%)
- Lived experience with mental or physical health issues (25%)
- Interpersonal skills (15%)
- Experience working within/advocating for marginalized communities (15%)
- Experience utilizing social services and engaging in government processes (15%)

After individually evaluating and scoring applicants against these criteria, the SAC met to deliberate over those scores, and selected 22 adult applicants to interview in person based on the collective scoring. The youth applicants were considered separately in a group interview. In contrast to the abbreviated timeline for COAB appointments (COAB members were not interviewed prior to selection), the decision to interview PCCEP members prior to selection demonstrates lessons learned from the original COAB process.

Interviews of the adult candidates occurred during the week of August 13. So as to not overcrowd the room, COCL and DOJ split the observation of interviews. SAC members rotated asking the same three questions of all applicants during each 20-minute interview, and individually scored candidates based on their responses:

- How would you describe the community's role in improving the work of the police bureau?
- What lived experience and interpersonal skills do you possess that would be helpful to this committee?
- What are ways that you manage stress and practice self-care?

Our impression is that SAC members were fair and consistent in their interviews of applicants. Following each interview, SAC members discussed their impressions of the candidate, and individually scored applicants. SAC members were both evaluating applicants' individual skills, as well as keeping an eye toward creating a balanced collective body. COCL concluded that SAC members were candid, thoughtful, fair and thorough in their observations and deliberations.

The SAC reconvened on August 19 to discuss the applicants and make decisions on which candidates to recommend to the Mayor's office for a follow up interview. Brad Taylor ranked interviewees based on individual SAC members' scores, and facilitated a nearly two-hour deliberation. SAC members weighed individual strengths and weaknesses, while also looking to create a cohesive and productive body.

Ultimately, the SAC recommended 11 potential adult members and 3 potential alternates to the Mayor, as well as 3 "back up alternates," should the Mayor need additional options.

The Mayor conducted follow up interviews of the PCCEP's recommended candidates. The Mayor's Office consulted with Commissioners' offices before the mayoral interviews, and met with the SAC and Council offices to discuss the candidates before making final selections. Each mayoral interview was attended by Nicole Grant (Mayor's Senior Policy Advisor), Jared Hager from the U.S. Attorney's Office, a PCCEP facilitator, and a member of the SAC.

On September 11, Mayor Wheeler largely utilized the SAC recommendations to appoint the PCCEP members (see Appendix C) although with two changes—one SAC-recommended back-up alternate was appointed as a full PCCEP member, and one SAC-recommended PCCEP member was appointed as an alternate, bringing the total number of adult alternates to four.

**PCCEP Onboarding and Training**

Following their appointment, PCCEP members attended two weekends (September 28-29 and October 12-13 — totaling 22 scheduled hours) participating in retreat activities to prepare them for their role as committee members (see Appendix D). COCL and DOJ divided observation of the retreat activities. These activities included establishing group agreements (see Appendix E), participating in various team building activities, and listening to presentations on institutional racism. The members also heard presentations from: a Department of Justice representative; a Mental Health Association of Portland representative; two former COAB members; three Citizens Review Committee members; a City Attorney's office representative; members of PPB; and an AMAC representative.

During the time between the scheduled weekends, PCCEP members were also asked to participate in a four-hour ride-along with a police officer, as well as attend PPB's eight-hour Community Academy. To provide sufficient opportunity for PCCEP members to attend the Community Academy, PPB arranged two options: a two-weeknight session or one weekend day session. PCCEP members were also given the option of arranging for a reasonable accommodation in lieu of either activity. PCCEP members had time to discuss their experiences at those PPB activities when they reconvened for the second retreat weekend on October 12.

The final section of the last retreat day—which was slated to focus on PCCEP's leadership and organizational structure—was postponed, to give PCCEP members a break before discussing those topics.

**PCCEP Organizational and Leadership Structure Development**

Following the retreat and initial training, PCCEP members met on October 27 and October 30 to have an informal discussion of PCCEP's potential organizational and leadership structure—i.e., how to structure any PCCEP steering committee or other subcommittees, as well as how to establish a structure for developing agendas, responding to media inquiries, and fulfilling other routine PCCEP duties.

At the first meeting (October 27), PCCEP members reviewed the group agreements established at the retreat, and facilitator Brad Taylor reviewed the upcoming deliverables outlined in the Settlement Agreement and PCCEP Plan, including reviewing PPB's annual report prior to release, reviewing the City's annual community survey, hosting quarterly community gatherings/town hall meetings, providing input towards a PPB Community Outreach Plan, and submitting a quarterly PCCEP report. PCCEP members had specific questions about a number of these deliverables, though those questions were ultimately deferred until they could be discussed in depth at an official PCCEP meeting or subcommittee meeting.

The facilitator also provided a straw-man proposal for an organizational structure that included a steering committee and several subcommittees to divide the PCCEP's work—including work specifically related to the Settlement Agreement, as well as PCCEP's longer-range work on

community engagement. PCCEP members spent most of the meeting discussing this structure, mostly focused on whether or not to have a steering/executive committee (and if so, what to call it). Some members expressed concern that such a committee would focus too much power in the hands of a few PCCEP members while others worried PCCEP leaders would be targeted in ways similar to what several COAB members experienced. PCCEP members also asked for more information on the support City staff would continue to provide, including social media updates and minute-taking, to determine which duties they needed to account for in their committee structure.

While there was not full consensus, PCCEP members ultimately agreed on the need for a steering committee. Members also provided the facilitator with individual responses on their ability to commit to additional committee meetings and their willingness to serve in a leadership role.

At the follow-up meeting on October 30, the facilitator led PCCEP members through an exercise designed to address organizational structure using a bottom-up approach (i.e. looking at specific PCCEP responsibilities, grouping them together in a way that makes sense to members, and determining what kind of structure would be needed to support those groupings). He also led them through a discussion of the different sections of a template for City advisory committee bylaws, to gather input on how PCCEP would like to structure.

The gathered feedback was incorporated into a Google document shared with all PCCEP members on November 7, who were invited to make edits and comments. The document was brought to the first PCCEP meeting on November 28 for public input, further refinement, and adoption (see Appendix F).

At the November 28 meeting, PCCEP members also elected co-chairs (and one co-chair alternate) and a secretary to serve as the group's steering committee. Finally, they heard a presentation from representatives of DHM Research regarding community surveys (see Par. 146). The meeting was well attended and live-streamed, and members of the public had multiple opportunities to give input.

Summary Par. 141: Based on the work to date, we conclude that the City has substantially complied with the requirements of paragraph 141 by engaging in a thorough, reasonable and fair process of creating the PCCEP.


*142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan;*

*and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.*

COCL Assessment: Because the PCCEP is a relatively new committee, it has had little time to function as a group. However, it has been given the initial authority to function in the manner articulated in paragraph 142. For instance, the PCCEP Plan (see Appendix A) lists a mission for PCCEP that reflects Par. 142(a): "To work with the Mayor/Police Commissioner, Portland Police Bureau, and Portland's diverse constituencies to solicit and exchange information between the community and Portland Police Bureau (PPB) to achieve the desired outcomes of equitable policing which exceeds constitutional requirements, and meaningful community engagement with and trust in PPB." Additionally, both the mayor and the police chief attended the first PCCEP meeting to encourage the body to bring recommendations to their attention.

The Plan also outlines PCCEP's scope of work, which underscores the PCCEP powers outlined in Par. 142(a-c):

*PCCEP will engage with Portland's diverse communities in key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice. PCCEP will contribute to the development of the PPB Community Engagement Plan, as directed by the Settlement Agreement between the City of Portland and the United States.*

*Specifically, PCCEP will be authorized to:*

- *Develop recommendations for PPB systems to engage meaningfully, both short-term and long-term, Portland's diverse communities and improve community relations. Gather and synthesize information from Portland's diverse communities, and make recommendations based on that information in key areas of concern to communicate to the Mayor, PPB, the Office of Equity and Human Rights, the DOJ, and the public at large.*

- *Review and make recommendations on PPB directives touching the DOJ Settlement Agreement and/or key areas of concern. Provide information to the community on these directives, and solicit feedback and recommendations from the community to share with the PPB.*

- *With the Mayor's written approval, and after consultation with the other City Commissioners, PCCEP is authorized to identify for off-schedule review directives not related to the DOJ Settlement Agreement or key areas of concern.1 PCCEP must*

*provide a written explanation for the request, which will be considered by the Mayor and City Commissioners.*

- *Provide information to and solicit feedback from Portland's diverse communities through focused and targeted round tables and town halls, to be held at least quarterly and be open to the public. PPB presence is required at quarterly town halls.*

- *Continue to collaborate with the City on surveys regarding Portland residents' experiences with and perception of PPB's community outreach and accountability efforts. PCCEP will consider survey results in developing recommended strategies.*

- *Provide ongoing feedback to PPB regarding community engagement initiatives already in progress and those added/needed in the future.*

- *During the effective period of the Settlement Agreement, appear before the Court at the annual status conference to describe to the Court its assessment of the City's progress toward achieving the goals of the Settlement Agreement.*

Par. 142(d), related to the Community Engagement Plan, is more specifically outlined in the PCCEP Plan in several places:

**[PAGE 5—City's Responsibilities]** To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes, the PCCEP and the PPB's Equity & Diversity Manager to develop a Community Engagement Plan, which shall be adopted by Council following a public hearing.

**[PAGE 7—Members' Responsibilities]** Provide ongoing feedback to PPB's Office of Community Engagement on its community engagement practices and initiatives, and provide feedback on PPB's Community Engagement Plan.

**[PAGE 7—Deliverable Product]** *PCCEP shall be responsible for producing the following:*

- *Summary reports issued (to the Mayor, PPB, DOJ, and the public at large) contemporaneously with quarterly town halls, providing an overview of community concerns around and any recommendations regarding use of force, interactions with people experiencing mental illness, complaint investigations, and racial justice. Strategies and recommendations developed to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members, to inform PPB's Community Engagement Plan, utilizing the following procedure:*

   *1. PCCEP shall consult with community members and hold at least two (2) public hearings, to be completed within 180 days of PCCEP members being seated (PCCEP's town halls may be utilized for this purpose). To gather public input*

*on PPB's outreach efforts and progress towards eliminating unconstitutional disparate treatment, the hearings shall be held in locations to ensure that PPB receives input from all parts of the Portland community. PCCEP shall review PPB's prior community outreach efforts to contribute strategies to the development of a new Community Engagement Plan.*

2. *PCCEP shall meet at least quarterly with the Director of the City's Office of Equity and Human Rights and PPB's Manager of Equity & Diversity, including a review of PPB's current Racial Equity Plan, and evaluate PPB's ongoing efforts to implement that plan.*

3. *PCCEP shall suggest for inclusion in the Community Engagement Plan strategies to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members. The parties recognize that meaningful public engagement involves the ability of community members to affect policies, practices, and PPB culture, thereby improving outcomes and eliminating unconstitutional actions.*

4. *PCCEP may also provide information to the PPB on other areas related to meaningful community engagement and outreach to contribute to the development of the Community Engagement Plan. The Plan will specify how to integrate community values and problem-oriented policing principles into PPB's management, policies and procedures.*

5. *PCCEP will spend the first year gathering information from the public and compiling recommendations for PPB's Community Engagement Plan. Recommendations shall be submitted to PPB within one year of PCCEP members being seated.*

6. *The Chief's Office shall consult with the PCCEP and shall consider and utilize to the extent practicable PCCEP's recommendations in developing and implementing the Community Engagement Plan. The Chief's Office shall present the final proposed Community Engagement Plan (with implementation timeline) to the PCCEP for its final review and comment within 45 days of receiving PCCEP's recommendations. The recommended Community Engagement Plan shall be considered by the City Council in a public hearing, leading to the Council's adoption of the Plan after review and amendments if indicated.*

While the group has just begun its work, PCCEP devoted significant time at the inaugural meeting to hearing public comments and concerns, per Par. 142(e).

Questions about the composition and selection/replacement process for the PCCEP have been addressed in paragraph 141 above. Amicus AMAC and Intervenor PPA were consulted regarding

amendments to the PCCEP Plan that Council adopted on August 28, 2018, and according to the council resolution to adopt the amendments, they reflect changes requested by AMAC and PPA.

Summary Par. 142: Because PCCEP is a new body that has met once as of this writing, COCL is only able to assign Substantial Compliance – Conditional for Paragraph 142 at this time. The conditions for Substantial Compliance rest heavily on progress that we anticipate will be made in future meetings, including progress toward a Community Engagement Plan. Other items outlined in Par 142 can occur independently of the Community Engagement Plan process (e.g. PCCEP can make recommendations related to PPB policies), but are also tied in to the plan's development. In particular, COCL will be paying close attention to PCCEP's town hall meetings, as they should mark progress toward both soliciting public input and informing recommendations regarding strategies to improve community relations.

*143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.*

COCL Assessment: A total of thirteen people were appointed to PCCEP including 11 adult members and two youth members. Additionally, there are also six identified alternates (four adults, two youth), but for the purpose of this analysis, we are focused on the current seated members.

After selecting PCCEP members, the City posted an analysis of the demographics of the 106 PCCEP applicants (see Appendix G). By all measures, the applicant pool represented a reasonably broad spectrum of the community. Through the selection process, we believe the reasonably broad spectrum has been maintained in the PCCEP membership. Nine of the thirteen members identify as a person of color (biracial, Black, or African American). In their applications, three members stated their lived experience with mental illness while several other members noted familial or occupational relationships with persons experiencing mental illness. Two members noted lived experience with a disability and a third had a child with significant disabilities. One person identified as queer. Additionally, PCCEP members come from geographically diverse sections of Portland: Two from North Portland, five from Northeast, two from Southeast, two from Southwest, and two from Northwest.

One area in which the PCCEP is imbalanced is gender. Only four of the thirteen members (30%) are female. In future recruitments for PCCEP members, additional attention should be paid to gender balance.

While PCCEP applicants were not directly asked if they had an actual or perceived conflict of interest with the City of Portland, this issue has been raised in PCCEP pre-meetings and trainings and no one has identified a conflict.

Summary Par. 143: Based on the demographics and information shared in applications for appointment to PCCEP, for both the applicant pool at large and the appointed members, we believe that members come from a reasonably broad spectrum of the community, and finds substantial compliance with Par. 143.

*144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.*

COCL Assessment: The City has provided strong administrative support through the PCCEP selection and appointment process, as well as for monthly community engagement sessions hosted by the Mayor's office (which have occurred monthly until the PCCEP had its first meeting). The City's support has included project management, meeting space, refreshments, accommodations, audio-video needs, and IT support. PCCEP has a Twitter presence, and a new PCCEP website was recently launched—https://www.portlandoregon.gov/pccep—to replace the COCL-COAB website (the COCL maintains its own site at portlandcocl.com). However, the website has not been widely publicized to date.

PCCEP selection committee meetings, PCCEP interviews, PCCEP trainings and pre-meetings have all occurred in convenient locations for members of the Portland community, located near TriMet lines. The City has provided a Project Manager, and has recently hired a Project Assistant to further support the new PCCEP. The COAB's former office, a permanent office space that is located near light rail, streetcar, and bus stops, has been renamed as PCCEP's office.

The City has made a substantial commitment in support of the PCCEP, by providing independent facilitators—Brad Taylor Group (BTG) and Training for Transformation (T4T)— in early June to lead the recruitment and selection process, with a contract slated to run through May 2019 to provide additional support to the PCCEP.

Since the PCCEP has been selected, BTG has taken the lead in facilitating PCCEP's early work around structure, governance, and bylaws. BTG's Brad Taylor also facilitated early PCCEP meeting; PCCEP members self-facilitated the first steering committee meeting. PCCEP leadership is working with the City to make a longer term plan about meeting facilitation support, seeking to balance PCCEP's independence with having support to run meetings in an orderly manner that respects the dignity and voice of all participants.

To date, much of PCCEP's time has understandably been focused on training, governance, and building a strong committee. This approach has merit with regards to giving PCCEP members time and space needed to create necessary cohesion. However, to date, less PCCEP meeting time has been spent on PCCEP's Settlement Agreement deliverables, or plans to achieve those deliverables; PCCEP's support staff has been working through timelines associated with major deliverables like the Community Engagement Plan, and that work is starting to inform PCCEP's

schedule. Now that PCCEP has been seated and has identified leadership, the steering committee and/or PCCEP's support team needs to continue working closely to ensure PCCEP's committee structure and meeting agendas allow ample time for achieving compliance with deliverables.

It should also be noted that the PCCEP Project Manager went on leave in late November, just prior to PCCEP's first meeting, and more recently notified the City of new employment. Staff from the Office of Equity and Human Rights stepped in to assist the Project Assistant with PCCEP logistics and communications, but this transition inevitably caused a few minor bumps. The City is working to hire a new Project Manager, and also needs to fill a community organizing position that has City Council-approved funding.

Summary Par. 144: At this time, COCL may only assess the City as having conditional substantial compliance with the requirements of Par. 144. While there is city infrastructure and administrative staff in place to support PCCEP's work, that support needs to stabilize for substantial compliance. The Project Manager position is in transition at a critical time, and the City needs to ensure PCCEP's deliverables and responsibilities are well-supported. Additionally, the Mayor's Office plans to fill the community organizer position in 2019, after PCCEP's support team stabilizes.

COCL would also like to evaluate the longer-term decision about meeting facilitation. BTG has demonstrated its ability to facilitate running a PCCEP meeting in a way that balances the group's independence and supports community involvement; COCL believes continued support from a neutral facilitator would be in the best interest of PCCEP's success.

*145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community.*

COCL Assessment: Par. 145 articulates three key goals (constitutional policing, neighborhood problem solving, and increased public confidence in the PPB), but with a focus on the mechanism for achieving these goals, namely, improved community engagement, including working with the new PCCEP.

For more than a year, the PPB has been waiting for the selection of the PCCEP members in order to work collaboratively on the CEO Plan. Regardless, the PPB has been engaged in a wide range of outreach and engagement activities. Here we provide an overview of this work, followed by the latest strategic planning under the leadership of the Chief.

Community Outreach and Engagement

As we have noted in prior reports, PPB is involved in a wide range of community engagement and outreach activities. Many of these are currently documented on PPB's website, which has a dedicated "Community" section (https://www.portlandoregon.gov/police/30379). Precinct-specific activities are also covered in PPB's 2017 Annual Report. These events include public focus groups, Neighborhood Watch, Women Strength and Girls Strength programs, Sunshine Division partnership and food drive, Z-Man Foundation, Police Cadets, Crisis Response Team, and numerous advisory groups and committees.

In addition to these ongoing outreach/engagement programs, PPB organizes or participates in a wide range of events each month. These events are described under the Community Policing Spotlight (https://www.portlandoregon.gov/police/73505). In conjunction, PPB provides a Community Calendar that lists upcoming events, showing the date, time, location, and agenda for each event (https://www.portlandoregon.gov/police/62607). After community meetings and focus groups, such as recent meetings on community engagement, PPB often posts key takeaway points for the public (https://www.portlandoregon.gov/police/article/698543).

The official PPB advisory groups and committees where PPB has played an active role include the African American Advisory Council, the Alliance for Safer Communities, the Muslim Advisory Council, the Precinct Advisory Councils, the Slavic Advisory Council, and the Training Advisory Council. Some of these advisory groups are more active than others. The African American Advisory Council has been less active in 2018, but the African American community has some representation in the Settlement Agreement through the AMAC. The Training Advisory Council is integral to the Settlement Agreement, as well as other groups not listed here, including the Behavioral Health Unit Advisory Committee (BHUAC).

Beginning in 2017, the PPB created the Community Engagement Unit (CEU) to restructure or build new partnerships with advisory groups and address emerging neighborhood problems. Initially, the CEU focused on the City's immigrant and refugee populations (including 150,000 Slavic residents), providing safety-related programs, including youth violence and family health. This work has continued. In 2018, PPB engaged with the new Hispanic Advisory Council (Latinx), the Slavic Advisory Council, and the Muslim Advisory Council.

The CEU and the PPB generally have engaged with the community in a variety of ways, including forums, meetings, workshops, community surveys, media releases, ride-alongs with patrol officers, and other venues. The outreach efforts are directed toward various target audiences, including the general public, specific communities, and specific community organizations. The CEU has developed programs and training curricula that give attention to crime prevention, drug abuse prevention, family health and other topics. Women and families have been supported with programs that focus on children at risk of criminality, child abuse, the rights of single women, the rights of African American youth, and the rights of crime victims in general (including training for law enforcement and prosecutors on victims' rights). By

participating in the Alliance for Safer Communities, PPB is also supporting the rights of sexual minorities in relationship to the criminal justice system. As suggested above, CEU has also worked with the Muslim community to increase safety around mosques. PPB is also working to increase equity in hiring officers and diversity in the workforce through enhancements to the Bureau's outreach and recruitment processes. In response to the City Auditor's Policy Review report (October 2018), Chief Outlaw summarized the PPB' efforts in this area (see Appendix H).

In addition to a well-organized and easy-to-use website that displays PPB's community initiatives and advisory groups, PPB also maintains a number of social media platforms that seek to engage and inform the community of PPB activities and community issues. These include:

- NextDoor**:** PPB uses this neighborhood-based platform to post community engagement events, such as Coffee with a Cop or local neighborhood festivals.
- Facebook: The Bureau has a main Facebook account with 55,000+ followers (PortlandPolice) and several smaller accounts for specialty units, such as K9 and Youth Services. All of PPB's news releases are posted to Facebook.
- Twitter**:** The Bureau has multiple accounts and one main account (@portlandpolice) with more than 180,000 followers. All news releases are posted here as well as breaking news about emergency road closures, SERT callouts, Explosive Disposal Unit call-outs, protests and other public safety news that may affect a large number of people. PPB also posts events, photos, community engagement opportunities, crime prevention tips and other information.
- Instagram**:** PPB uses Instagram photos to illustrate many different types of positive police-community interactions.
- YouTube**:** PPB uses YouTube for a wide range of videos, ranging from a hiring ceremony to a message from the Chief of Police.

As another means of community engagement, PPB regularly invites the community to review and comment on new and revised directives. The review process for more than 100 PPB directives is laid out on the PPB website (https://www.portlandoregon.gov/police/59757). The PPB has established two time periods where community members can participate in the review process. For example, community members were given the month of December 2018 (30 days) for a second opportunity to review and comment on revised Directive 1010.10 (Deadly Force and In-Custody Death Reporting and Investigative Procedures) and Directive 1010.00 (Use of Force) before these directives are implemented in 2019. Some community organizations have made extensive use of this mechanism for comments.

Strategic Plan for Community Engagement

PPB has begun a strategic planning process. This process will result in a 5-Year Strategic Plan that "will be a guiding document that prioritizes the Bureau's goals and objectives, outlines how it will meet its strategic goals and objectives, provides metrics to assess the Bureau's performance, and ensures communication of progress to all stakeholders." (For information, see https://www.portlandoregon.gov/police/76886).

Relevant to Paragraph 145, a significant component of this planning process is seeking community input, especially around community engagement. As the Chief noted regarding the 5-Year Plan, "the process will be inclusive, collaborative and transparent," indicating that the community will be engaged in the development of PPB's strategic plan and PPB will be guided by the pillars of policing delineated by the President's Task Force on 21st Century Policing published in 2015. The Task Force articulated strategies for building trust and legitimacy by strengthening police-community relations.

According to PPB, the strategic planning process will include the following between May of 2018 and June of 2019:

- "An internal assessment to determine the priorities the staff/stakeholders would like to emphasize.
- A community assessment to determine the priorities the community would like to emphasize.
- A robust strategic planning process that will define the mission, vision, values, imperatives, objectives, and initiatives for the Bureau for the next five years.
- An action planning process that will build internal capabilities to move from strategy to implementation."

Here the COCL will only focus on the community engagement components of the planning process as it applies to Paragraph 145. PPB has hired two consulting groups, JLA Public Involvement and the Coraggio Group, to manage the strategic planning process. Community input was sought in three general areas relevant to the Chief's main goals for the PPB: Crime Reduction and Prevention, Community Engagement and Inclusion, and Organizational Excellence.

The methods for engaging the Portland community on these topics were the following:

(1) Community Focus Groups: Fifteen focus groups were conducted to hear voices from different segments of the Portland community who are typically underrepresented in public meetings and could be affected by the Strategic Plan. The "Takeway" messages from two of the focus groups (August 26th and September 6th) have been summarized on PPB's website (see Appendix I).

(2) <u>Paper Comment Cards</u>: Comment cards are made available at all PPB precincts if community members would like to give PPB feedback. Comments are compiled into an Excel workbook.

(3) <u>Community Forums/"Loopbacks"</u>: Two "Community Loopbacks" were held with community members (December 6th and 9th, 2018) to "present the major themes heard from community and bureau staff as part of its Strategic Planning Process." The Community Loopbacks included both a presentation and small group discussions.

(4) <u>Community Survey</u>: An online "Strategic Planning Community Survey" was implemented in October and November of 2018 by Coraggio Group, who is expected to deliver a report on the findings in January of 2019. However, this survey should not be viewed as a replacement for the Community-wide survey to be conducted by DMH (Par. 146).

(5) <u>Steering Committee and Workshops</u>: Roughly half of the 26-member Strategic Planning Steering Committee are community members representing diverse segments of the Portland community, while the other half are PPB members. At the first meeting of the Steering Committee on June 25th, 2018, PPB heard themes that emerged from previous community focus groups and future agenda items suggested by the community (see Appendix J). The Steering Committee will hold several workshops in 2019 to shape the content of the Strategic Plan based on the data collected from the community and from PPB personnel.

The Strategic Planning process is an excellent opportunity for PPB to reach out to the PCCEP and work together on the Community Engagement Plan. Although PPB has been involved in this strategic planning process for some time, the results could serve as building blocks for PPB's Community Engagement Plan. Our understanding is that PPB will be presenting some of the findings from this Strategic Planning process to the PCCEP and seek PCCEP's suggestions regarding other possible engagement strategies or gaps where additional engagement is needed. Chief Outlaw appeared at the first PCCEP meeting and offered to collaborative with them on this issue.

<u>Daily Police-Community Interactions</u>

Community engagement involves not only planned community events and strategic planning, but also day-to-day police officer interactions with community members. Whether these encounters are police-initiated (e.g. traffic or pedestrian stops) or community-initiated (e.g. calls for service, including crime and emergencies), some members of the community in Portland, as well as COCL and DOJ, have expressed concern about the quality of those interactions and fairness in particular. PPB has been responsive by providing new forms of training in equity and procedural justice, and decision-making in potential force encounters, as well as stronger accountability and enhanced responses to mental health crises (see other COCL

reports). COCL recommends that PPB continue these efforts, but also encourage training in foot patrol and problem-oriented policing, as these strategies can strengthen police-community relations and solve neighborhood problems (e.g. learning how to respond appropriately to delinquent youth without making arrests). For every police-community encounter, the PPB must be continually attentive to whether officers are building or undermining community trust. PPB is making a good faith effort to emphasize communication skills in the Training Division. The next step would be to measure officers' behavior on the street (see Par. 149) and reward exemplary police-public interactions.

Summary Par. 145: Regarding Paragraph 145, PPB's community outreach and engagement activities to date have been comprehensive, seeking to engage many of Portland's marginalized and at-risk communities in a variety of ways. Also, a well-conceived 5-year strategic planning process has been able to give voice to the community at large and address their specific concerns. This should contribute to PPB's legitimacy and trust within the Portland community. Furthermore, the strategic planning process should result not only in a 5-year strategic plan but could serve as the foundation for PPB's Community Engagement Plan required by the Settlement Agreement. However, PPB will need to engage the PCCEP soon in this process.

The remaining community engagement tasks for PPB are (1) to develop a positive, productive and transparent relationship with the PCCEP and (2) to develop a reasonable Community Engagement Plan with input from PCCEP. Hence, at this point COCL is assigning Substantial Compliance – Conditional, with these two conditions remaining.

*146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.*

COCL Assessment: A citywide community survey has been conducted twice previously (2015 and 2016) under the Settlement Agreement by Davis, Hibbitts, & Midghall, Inc. (DMH), a professional survey research group. Prior to both iterations, input was sought from the community, as well as DOJ and COCL. With input from PCCEP, the City and DMH should finalize the 2019 survey. While survey questions can be added or deleted, we encourage the PCCEP and the City to follow the same general methodology used in 2016 for the following reasons: (a) to ensure that the 2019 Community-wide survey is a "reliable, comprehensive, and representative survey of members of the Portland community" and (b) to provide an opportunity to measure change over time by using some of the same survey metrics. Of course, there is room for changes to the questions included in the 2016 survey, but COCL is simply recommending that many of questions be retained with the exact wording and response options for the reasons stated. Many of the survey questions have been validated through research done by police and community researchers in other cities. Topics relevant to other paragraphs of the Settlement

42

Agreement are covered in the existing survey. The survey measures public trust and confidence in the Portland Police Bureau, public experiences with the police, constitutional (unbiased) policing, public awareness of recent Settlement-related improvements in PPB (e.g. training, hiring for diversity, investigating complaints and accountability), police performance on various dimensions, and use of force, and community engagement. (see Par. 149 below for details). Many of these survey questions will provide the community and PPB with some standardized measures of progress since 2016 and will help inform the development of the Community Engagement Plan in 2019.

DHM Research representatives attended the November 28, 2018 PCCEP meeting, and gave an overview of the methodology and the two past surveys. PCCEP members gave input during the meeting, particularly around oversampling and whether the survey methodology is sufficient for engaging all Portlanders, particularly houseless individuals who may be unable to receive a mailed survey, and people with mental illnesses. DHM Research noted that they would be happy to work with PCCEP on supplementary research in 2019, to complement the third administration of this survey. Also, the community-wide survey will be supplemented by a contact survey in 2019 that captures direct experiences with the police (see Par. 149).

DHM Research also relayed the City's survey timeline, which strives to put the survey in the field in January 2019. PCCEP members did not give input into the specifics of the instrument during the November 28 meeting though were asked to provide feedback within two weeks to maintain the City's timeline. The PCCEP steering committee met on December 13, 2018 and opted to consolidate individual survey feedback. Feedback from several members of the PCCEP was forwarded to the City and DHM. Some suggested survey questions were incorporated into the draft survey the week of January 7th.

Summary Par. 146: COCL can provide only Partial Compliance for Paragraph 146. For Substantial Compliance, (1) the community-wide survey must be finalized; (2) data collection must be completed; (3) the data must be analyzed and a report prepared; (3) the results must be used to "inform the work of the PCCEP" and (4) the results must be used to "inform….the development and implementation of the Community Engagement Plan."


*147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.*

COCL Assessment: Since the second quarter of 2014, PPB has been collecting demographic data to meet the requirements of Paragraph 147, using U.S. Census data on the population living in each precinct. Beginning in 2015, PPB has periodically enhanced the data collection effort using additional maps, tables, and new datasets. For example, in the 4th quarter of 2017, PPB updated the demographic summary tables using the U.S. Census Bureau's new 2012-2016 American

Community Survey 5-Year Estimates. Since 2015, PPB has consistently examined the geographic context of traffic and pedestrian stops. Also, on a daily basis, PPB collects informal qualitative data about the problems and issues faced in each community when officers respond to calls, patrol the neighborhoods, and attend meetings. Such data reaches beyond Par. 147, but help to tailor PPBs responses.

In accordance with Par. 147, PPB precincts have used the demographic data for "outreach and policing programs specifically tailored to the residents." Each Precinct has programs and activities tailored to the needs of the population they serve. For example, the Central Precinct, which includes the downtown area, must be responsive to a wide range of needs, as the population varies during business hours, entertainment, and special events. The Central Precinct also includes the largest houseless population. In response, the Precinct's Central Neighborhood Response Team has 8 officers and 1 sergeant, with 2 officers entirely dedicated as the houseless outreach team. The Central Precinct also houses the citywide Behavioral Health Unit and the Service Coordination Team, so they can be particularly responsive to the mental health needs of the houseless community downtown. Also, because of the entertainment downtown and across the river, the Central Precinct has an Entertainment Detail that works Wednesday-Saturday in the "bar zones" and interacts with the business community to address emergent problems and maintain order.

The North Precinct seeks to be particularly responsive to people of color, youth, low-income families, the houseless community and people suffering from addiction. The Precinct has relationships with the African American Advisory Council (AAAC), the Interfaith Peace and Action Collaborative (IPAC), the Community Peace Collaborative (CPC), the Miracles Club, Salvation Army, Self Enhancement Incorporated (SEI), and the Public Safety Action Committee (PSAC). The North Precinct's Neighborhood Response Team also does outreach and referrals to the houseless community.

The East Precinct has a large concentration of immigrant communities and persons living below the poverty line, and therefore, PPB has focused much of their outreach on these two groups. Some examples include regular meetings with the Immigrant & Refugee Community Organization (IRCO), the Somali American Council of Oregon (SACOO), the Slavic Advisory Council (SAC), the Rosewood community, the Tongan community and the Muslim community. The Neighborhood Response Team regularly does outreach to the houseless community.

As PCCEP has only just begun its work, PPB has not yet had the opportunity to provide precinct-level demographic data to the PCCEP to "inform its work." PPB informs the COCL that it is ready to share such information when the PCCEP is ready to receive it.

Summary Par. 147: PPB collects precinct-level demographic data, as well as data about local problems and concerns, and utilizes this information to provide tailored services to local communities. Thus, COCL can assign Substantial Compliance – Conditional for Paragraph 147.

The one condition for Substantial Compliance would be the delivery of precinct-level demographic data to the PCCEP to "inform its work."

*148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.*

COCL Assessment: Ahead of most law enforcement agencies, PPB has been collecting such demographic data since 2001. The Strategic Services Division of the PPB prepares the Stops Data Collection report every quarter. Enhancements or changes to data collection have occurred periodically. For example, the Oregon state legislature (HB 2355) mandated certain changes to the collection and reporting of traffic and pedestrian stop data, effective July 1, 2018, including the requirement that agencies include two new race/ethnicity categories (Middle Eastern and Native Hawaiian). In response, the PPB created a new data collection system in the third quarter of 2018. Unfortunately, as a result of these changes, the PPB stop data are not easily comparable to the data collected in previous quarters.

The latest Stops Data Collection report for the third quarter of 2018 provides the racial/ethnic breakdown of both traffic and pedestrian stops, with traffic/driver stops accounting for 97% of all stops. However, the quarterly report does not include any Census demographics or other standardized datasets needed to establish benchmarks to calculate disparities in police decision making by race/ethnicity of the driver or pedestrian -- that information contained in PPB's Annual Stops Data Collection report.

The Annual Stops Data Collection report

PPB began a new Stops Data Collection system in 2012. PPB's Stops Data Collection Report: 2016 Annual Report, released on June 25th 2018, provides a 5-year analysis of data collected between 2012 and 2016. This report provides a thorough, sophisticated, and transparent analysis of more than 250,000 stops of drivers and pedestrians during this 5-year period, with a focus on 2016. The COCL team has experience conducting research on disparities in police discretion regarding decisions to stop, search and take other actions during these encounters. Disparities between racial/ethnic groups may reflect bias or could be due to other factors, but PPB analysts have done an excellent job of establishing relevant benchmarks for assessing disparities. The results of this analysis are summarized in the Outcome section of this report.

Summary Par. 148: The PPB should be credited for its collection of comprehensive stops data, its sophisticated analysis of these data, and its transparent reporting. Based on this work, as

well as PPB's effort to enhance data collection over time, COCL can assign a rating of Substantial Compliance Conditional for paragraph 148. Two conditions should be met: First, PPB should provide these reports to PCCEP when PCCEP is prepared to receive them. Second, PPB should report on any disparities for the other demographics listed in Paragraph 148 where sufficient data are available. PPB is required to collect and report data not only on the race/ethnicity of the driver/pedestrian, but also on the "age, sex, and perceived mental health status of the subject." PPB has collected such data but has not reported on possible disparities in stops and searches of these demographic groups. Reporting on mental health status is difficult because during routine stops, officers are unable to confidently evaluate the mental health status of the community member. As a result, officers have been able to report this information in only 21 instances to date, which is not a large enough sample to draw any valid conclusions. However, COCL expects that PPB will report results on the age and sex of the persons they stop. COCL would be satisfied if these findings were presented in a more concise, tabular format or as an appendix to the existing report.

*149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.*

COCL Assessment: The COCL, PPB, and DOJ have initiated a dialogue regarding the development of metrics to evaluate community engagement and outreach. COCL has suggested several sources of information to be reviewed, including an annual community-wide survey, PPB's records and structure for community engagement and outreach, PPB's relationship with PCCEP, and a contact survey. However, we expect further discussion between COCL, PPB, and DOJ regarding these and other possible metrics.

Community-wide Survey

The community-wide survey is a valuable source of information on PPB's engagement and outreach to the community. There are several types of information that were gathered in the 2016 survey that are being considered as possible metrics. We have categorized these survey questions (see Appendix K). They categories include: informal engagement questions, direct contact questions, general PPB evaluation questions, and disparity of treatment questions. We provided these questions to the City and PCCEP in December for possible retention in the 2019 community-wide survey.

<u>Police Records and Structure for Community Engagement and Outreach</u>

PPB currently maintains a variety of electronic records that document the agency's interactions with the community. As an organization, PPB is also structured to be responsive to the community. These mechanisms are outlined below:

- <u>PPB's Website</u>: As we noted in Paragraph 145, PPB maintains a "Community" section on its website that contains a wide range of community engagement and outreach activities. PPB's website also posts new and revised directives for community input, and the Bureau maintains Facebook and Twitter accounts to interact with the community. The presence of these social media connections, as well as the presence of numerous police-community activities throughout Portland, provide us with metrics that capture the nature and extent of outreach and community engagement by the PPB.

- <u>PPB Reports on Officers' Activities</u>: The PPB has produced an annual report (See Par. 150) that contains information about the Bureau's activities, including contacts with community members and outreach activities. PPB also produces other reports that document the type of police-community interactions, including quarterly reports on use of force. One of the most useful documents is PPB's Annual Stops Data Collection report, which provides a detailed analysis of PPB stops of drivers and pedestrians and examines racial/ethnic disparities in officers' decision making (see Par. 148).

    In the first quarter of 2018, PPB developed and released an app that allows officers to document their community engagement activities. When officers attend meetings or events or interact with individuals or groups, they can pull up the app on their phone and enter information about the location of the event, event name, date, start time and type of event. These data are compiled by PPB's Community Engagement Unit for monthly and quarterly reports (for instance, see Appendix L). PPB expects to share this information with PCCEP and receive feedback on PPB's community engagement activities and whether PCCEP perceives any gaps that could be filled.

    Whether additional data would be helpful will be a topic of discussion among PPB, DOJ and COCL. For example, the Stops Data Collection Mask (the data collection tool used by officers who make stops) includes the age, gender, and mental health status of the driver or pedestrian. Such variables could be examined for possible disparities in police discretionary decisions to stop, search and arrest/ticket individual drivers and pedestrians.

- <u>PPB's Organizational Partnerships</u>: Over the last two years PPB has maintained a list of organizations that have a partnership with the PPB. This list is now being updated with data collected via the new app used by officers, and COCL is awaiting a copy of this list.

- <u>PPB Structure</u>: For community engagement and community policing to be prioritized, agencies typically have an organizational structure that supports and promotes these

47

activities and relationships. As noted earlier, PPB created the Community Engagement Unit in 2017. The unit is listed under the Strategic Services Division in PPB's organizational chart, but we have learned that it reports directly to the Chief of Police and is run by a police officer. Reporting to the Chief is a sign that community engagement is valued, but the value could be enhanced by assigning one command-level employee.

PPB and PCCEP

Clearly, the ability of PCCEP members to work together as a group to achieve its objectives should be a focal point for new metrics. There are several possible areas to consider:

Community Engagement Plan. PPB will develop a Community Engagement Plan, with input from PCCEP, and this plan will likely suggest additional metrics.

PPB-PCCEP Relationship. PPB will inevitably interact with the PCCEP, which itself is a source of metrics about engagement. In general, we would expect that the two entities will develop a cooperative and transparent relationship.

PCCEP Outreach and Engagement Activities. The outreach and community engagement activities of the PCCEP itself should provide another set of metrics. Both the quantity and quality of such activities is worthy of documentation. This would include the ability of the PCCEP to hold public meetings, effectively manage public input at meetings, and cover the items on the agenda.

Contact Survey

A contact survey would provide another set of metrics to measure PPB's engagement with the community. A contact survey asks individual community members to evaluate their recent encounters with a PPB officer. When reviewing the community-wide survey at their first meeting, PCEEP members expressed an interest in a contact survey that would measure the quality of PPB services to the community rather than general impressions of the PPB.

PPB has agreed to partner with the National Police Foundation to field test a new contact survey that would have implications for law enforcement practice nationwide. Police-community interactions due to police-initiated contacts (e.g. traffic stops) or community-initiated contacts (e.g. calls for service to report a crime) are specific types of community engagement. The benefit of the contact survey is that it provides evaluations of police service during specific, recent encounters (less subject to memory distortion than when community members are asked about encounters in the "last year") and the contact survey can measure key aspects of procedurally just behavior by officers, including fairness, respect, compassion, and listening as applied to specific demographic subgroups in the community.

Summary Par. 149: We have developed here a preliminary list of possible metrics for community engagement and outreach. A rating of Partial Compliance is appropriate for Paragraph 149 until the PPB, DOJ and COCL can agree on a set of metrics and present it to the PCCEP for review. We do not expect that the final metrics will include all of the possibilities listed here, as this compilation is primarily for discussion purposes. We do expect, however, that PPB, DOJ and COCL will agree on general categories of metrics that capture important dimensions of community engagement and outreach in Portland, and present these metrics to PCCEP.

*150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.*

COCL Assessment: Late in 2018 PPB issued a draft of the Annual Report for 2017 and provided this draft to the PCCEP for review. PCCEP has given PPB feedback on this draft report. Consistent with Par. 150, the Annual Report summarizes the Bureau's problem-solving and community policing activities. For example, the Neighborhood Involvement Location (NI-Loc) and the Program Holiday Walking Beat Mission are good examples of problem solving and community policing at the neighborhood level. Also, the work of the Behavioral Health Unit, responding to people in crisis and providing referrals to mental health services, constitutes systematic problem solving. These and many other services are described in the PPB Annual report.

The 2017 report, by definition, does not include any PPB activity in 2018, so we look forward to a timelier release of the 2018 report. In recent years, PPB has not consistently issued a "publicly available PPB Annual Report." The report released prior to the 2017 report was for 2015 and covered a few statistics in 9 pages (comprised largely of pictures). No report was issued for 2016. Presentations were made to PPB precincts in the third quarter of 2016, but not City Council, and the data were from 2015.

Summary Par. 150: For Paragraph 150, COCL provides a rating of Partial Compliance. To receive Substantial Compliance, PPB would need to: (1)release the final version of the 2017 report to the public; (2) hold at least one meeting in each precinct area and at a City Council meeting to discuss the topics delineated in Paragraph 150; and (3) prepare a more timely annual report for 2018 to demonstrate the ability to produce substantive reports "annually."  As part of this, we are aware that some community members believe they were not provided notification for prior

49

precinct presentations of the Annual Report. For future notifications, PPB and the City should double-check that notifications are sent through all appropriate channels.

*151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.*

COCL Assessment: PCCEP currently plans to meet once per month as a full body, with possible subcommittee meetings also taking place. The PCCEP held its first meeting on November 28, 2018 and its second meeting on December 17, 2018. A Steering Committee has been established, and met for the first time on December 13, 2018.

COCL and PCCEP have agreed to hold a Town Hall for public review of this report on January 30, 2019, as well as discuss regular PCCEP business. PCCEP is also discussing how it would like to approach regular Town Hall meetings, in terms of frequency, content, or partnerships.

According to PCCEP's bylaws, "Meetings of the full body and subcommittee meetings are open to the public and will be conducted under the provisions of Oregon Public Meetings Law (ORS 192.610-690). The Bureau liaison [PCCEP Project Manager] will provide notice to the public regarding the dates, times, and locations of all meetings" with a minimum of 10 days' notice.

PCCEP's bylaws as approved on November 28, 2018 outline other policies pertaining to Oregon Public Meetings Law and public records, including:

- Advisory body members can participate through telephonic conference calls.
- Requests for any other electronic communication means require approval from the Bureau liaison with City Attorney consultation.
- All records of the Body, including formal documents, discussion drafts, meeting summaries, and exhibits are public records.
- Communications among members related to the subject matter of this Body should not be treated as confidential and may be subject to public records requests. "Communications" refers to all statements and votes made during meetings, memoranda, work projects, records, documents, text messages, pictures, or materials developed to fulfill the charge, including electronic mail correspondence by and among the members.
- The personal notes of individual members taken at public meetings might be considered to be public record to the extent they "relate to the conduct of the public's business," (ORS 192.410(4)).
- Members are not allowed to deliberate towards a decision over e-mail, as public participation needs to be guaranteed through that process.

50

To facilitate ease in keeping public records, all PCCEP members have been assigned a City of Portland email address and account.

PCCEP encountered a challenge with these policies at its first meeting wherein PCCEP planned to vote on its Steering Committee leadership via secret ballot. However, secret ballots lack transparency, and are disallowed under Oregon's public meetings law. After seeking advice from the City Attorney on how to proceed, members briefly debated amending the PCCEP bylaws to allow an exception to following Oregon's public meetings law as it narrowly pertained to electing leadership. Following a discussion of the merits of this idea, PCCEP opted not to amend the newly adopted bylaws and elected leadership with an open vote.

Summary Par. 151: PCCEP's initial meetings have followed both the spirit and the letter of Oregon's public meetings law, and based on COCL's observations, PCCEP's members are committed to transparency and public involvement in its work. COCL is assigning Substantial Compliance — Conditional, subject to PCCEP successfully holding several public meetings and holding its first Town Hall meeting.


*152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.*

COCL Assessment: The City led training regarding requirements of City and State law for PCCEP members during their retreat on October 12, 2018, using a "Guide for Volunteer Boards & Commissions" presentation prepared for all advisory boards, not just PCCEP (see Appendix M). PCCEP members were also provided a hard copy of the presentation in an orientation binder.

The presentation gives an overview on the follow issues and resources:

- A Guide for Public Officials (Oregon Government Ethics Commission – Commission)
- Code of Ethics Explanations and Examples (Portland City Auditor)
- Restrictions on Political Activities (Oregon Secretary of State – Elections Division)
- Attorney General's Public Records and Public Meetings Manual (Oregon Department of Justice)

The PowerPoint presentation is clear and thorough, and builds in opportunities to review the most critical information when participating in person. Thirteen of PCCEP's members were in attendance for the in-person presentation; all received the hard copy.

A representative of the City Attorney's office was present at the first PCCEP meeting, and provided guidance related to public meetings and bylaws as needed.

Summary Par. 152: COCL finds Substantial Compliance with Par. 152. As additional PCCEP members are onboarded, the City will need to ensure any new members receive this training.

# III. Outcome Assessment

**A.  System Outcome Assessment: Officer Accountability**

We now turn our attention to the overall system of Accountability in place in Portland. In determining whether the current system is effective, we analyze data from the Administrative Investigation Management (AIM) system, summarize the training provided to IPR/IA investigators (for full investigations) and sergeants (for SIs), summarize interviews the COCL team had with IPR/IA investigators and sergeants, summarize our review of supervisor investigations (SIs) and IPR/IA administrative investigations, and evaluate the effectiveness of the various stages of an administrative investigation. Throughout this system assessment, we also provide suggestions for improving the overall operation of the accountability system.

Using a variety of data sources, we evaluated the quantitative data associated with the accountability system. We begin by providing overall statistics on the frequency of IPR contacts, frequency of complaints, types of complaints, and outcomes. IPR tracks the frequency and types of contacts they experience with community members by using a Microsoft OneNote file (though are transitioning to IAPro BlueTeam in 2019). These contacts may include community complaints, commendations (i.e. positive comments about police officers or the PPB), policy concerns/feedback, other comments about the police, and other emails/phone calls/contacts that come through IPR. Within the OneNote file, IPR documents the reason for contact, follow-up (if necessary), and other notes related to the contact. Not all (or even the majority of) IPR contacts result in a complaint.

In Table 1 below (provided by IPR), the data indicate that the number of contacts experienced by IPR has been steadily increasing over the past three years. This may be the result of the increase in Portland's overall population or perhaps an improvement in IPR's tracking of contacts in recent years. Overall, for 2018 (through the end of November), IPR has a median of around 5 contacts per day and a monthly median of approximately 120 contacts. Of all the community contacts that IPR has had in the past two years, only about 20% have resulted in an administrative complaint. Additionally, in 2018 (through the end of November), approximately 10% of contacts were to submit a commendation (an increase over 2016 and 2017).

Table 1: Distribution of IPR Contacts

| Year | Community Contacts (Number) | Community Complaints Through IPR* | Commendations |
|------|------|------|------|
| 2016 | 1337 | 376 | 62 |
| 2017 | 1503 | 345 | 116 |
| 2018 (Through end of November) | 1536 | 322 | 166 |

*Numbers may differ from IPR annual reports. Annual reports contain <u>all</u> community-initiated complaints (including IPR-initiated, those which come through PPB, and tort claims), while these numbers only include those that were captured through IPR community contacts.

We now focus on complaints of misconduct, using the Administrative Investigation Management (AIM) system data to inform our analysis. For this analysis, we examine data between September 2017 and September 2018 to look at the number, type, and outcome of complaints filed (both community-initiated and Bureau-initiated). For the data, there were a total of 528 administrative investigation cases opened between September 2017 and September 2018. As seen in Table 2, there are between 123 and 140 administrative investigation files opened every quarter (note that for 2017 Q3 and 2018 Q3, our data request encompassed only partial quarters, thus explaining their lower numbers). As one might expect, the vast majority of cases opened (88.7%) are community-initiated complaints.

Table 2: Administrative Complaints by Quarter

| Quarter | Number of Bureau-Initiated | Number of Community-Initiated | Total Number of Complaints |
|---|---|---|---|
| 2017 Q3 | 2 | 39 | 41 |
| 2017 Q4 | 12 | 113 | 125 |
| 2018 Q1 | 20 | 103 | 123 |
| 2018 Q2 | 23 | 117 | 140 |
| 2018 Q3 | 14 | 85 | 99 |

The types of allegations and their proportion of all allegations found within the data are very similar to findings presented in prior reports (see, for example, COCL's May 2017 Outcome Assessment). As seen in Table 3, Conduct and Procedure make up a large proportion of allegations (71.4% cumulative), while allegations related to Courtesy (16.2%), Force (8.9%) and Disparate Treatment (2.7%) are less common. These trends appear to be consistent across the past two years.

Table 3: Distribution of Allegations

| Type of Allegation | Proportion of Allegations |
|---|---|
| Conduct | 37.2% (N=519) |
| Procedure | 34.2% (N=477) |
| Courtesy | 16.2% (N=226) |
| Force | 8.9% (N=124) |
| Disparate Treatment | 2.7% (N=38) |
| Control | .8% (N=11) |

We also examined whether the allegations were closed or referred for investigation. We noted in our May 2017 Outcome Assessment that approximately 48.4% of allegations were administratively closed in 2016. This overall administrative closure rate is significantly lower than in 2012, wherein 75% of allegations were administratively closed. In the present data, the results indicate that 50.1% of allegations were administratively closed (when combining IA and IPR administrative closures). Additionally, 10.8% were referred for a Supervisor Investigation (SI) (prior to July 2018, these were labeled as Service Improvement Opportunity or SIO) and nearly a quarter were referred for a full investigation (either by IA or IPR). We also note that with the overall lower rate of administrative closure (compared with 2012), more cases are being referred for either SIs or full investigations. The impact of this increased proportion of referred cases will be explored later in this report. However, we note for the moment that we believe the present proportion of administrative closures is reasonable based on our review of allegations which do get referred for additional investigation.

Table 4: Allegation Referrals

| Referred Status | Proportion of Allegations |
|---|---|
| IPR Admin. Closure | 44.7% (N=611) |
| Full Investigation | 23.3% (N=318) |
| Open* | 14.9% (N=204) |
| SI/SIO | 10.8% (N=147) |
| IA Admin. Closure | 5.4% (N=74) |
| Mediation | .6% (N=8) |
| Precinct Referral | .4% (N=5) |

*"Open" may indicate that the allegation is still in the intake investigation stage or is being investigated as a full investigation or SI

Finally, we examined the distribution of determinations when an allegation is forwarded on for a full investigation or SI. For cases that went through a full investigation, Table 5 shows that 47.8% of allegations were "Not Sustained" (sometimes with a debriefing), 20.4% of allegations were "Exonerated" (one case was exonerated with a debriefing), 20.4% of allegations were "Sustained", and 10.7% of allegations were "Unfounded."  Reviewing similar data from prior years, we note that while the distributions of outcomes have changed by year, the distribution of outcomes in this report do not appear to represent a dramatic deviation from prior years. For instance, in 2015 approximately 21.1% of allegations in full investigations led to a finding of Exonerated (with or without a debrief).  In 2016, this proportion decreased to 12.9%.  In the data presented here, the proportion returned to 21.0%.  Likewise, for Not Sustained (with or without a debrief), the proportion of allegations went from 43.0% (in 2015) to 53.4% (in 2016) to 47.8% in this report.  Additionally, proportions for Unfounded and Sustained have remained fairly consistent over the years.

Although not contained within Table 5, we also note that for cases that were referred for SIs (which now include findings), 10.3% were "Substantiated" and 89.7% were "Not Substantiated" (for SIs, these are the only two finding options). As we note later in this system assessment, we believe that the quality of investigations performed by IPR, IA, and supervisors, as well as the findings we reviewed, were generally reasonable and consistent with the work found in other agencies.

Table 5: Findings for Full Investigations

| Finding | Proportion of Findings |
| --- | --- |
| Not Sustained/Not Sustained with Debriefing | 47.8% (N=152) |
| Exonerate/Exonerate with Debriefing | 21.0% (N=67) |
| Sustained | 20.4% (N=65) |
| Unfounded | 10.7% (N=34) |

The above findings fluctuate based on the allegation type. For instance, while an overall 20.4% of allegations are Sustained, 1.5% of Force allegations were sustained. In contrast, 35.5% of Procedure allegations were sustained. For the Force allegations, one potential explanation is

that <u>all</u> force allegations are required to receive a full and complete investigation. Therefore, had force allegations that may have been administratively closed been removed, this proportion would have naturally gone up. This is reflected in the fact that while an overall 10.7% of allegations are Unfounded, 19.4% of Force allegations were Unfounded. Additionally, while the specific use of force may not be Sustained, other aspects of the officer's decisions (e.g. approach) may have been found administratively out of policy. For other allegation types, the findings distribution were similar to the overall trend.

To evaluate the length of time to complete administrative investigations, we utilized the AIM Incident and Assignment database provided by PPB for all cases against sworn members. To calculate timelines, we used a variable provided by PPB that indicated when all steps relevant to the 180-day DOJ timeline had been met and then determined the number of days between the filing of the complaint and the date provided by PPB. For open cases that had not yet completed all steps relevant to the 180-day DOJ timeline, we calculated the number of days between the complaint being filed and the day that the data was pulled from the AIM system (September 18, 2018). We then calculated whether, as of that date, the case was over the 180-day threshold. From these cases, we also removed from the overall length of time stages such as Discipline Stage, Officer Leave of Service (LOS), Appeal Window, and Citizen Review Committee, as these are not counted against the 180-day requirement. Additionally, in some cases, criminal investigations may impact the timeline – however, as these are done concurrent with administrative investigations, it was impossible to determine to what extent they increased the overall timeline. Finally, our analysis for overall timelines focuses on cases which received a full IA or IPR investigation.

When including <u>all</u> ways that a complaint may be handled (i.e. IA or IPR administrative closure, supervisor investigations, mediation, etc.), approximately 95% of all complaints are completed within 180 days. However, because the intent of Par. 121 (and the marker of an efficient and effective system) is to improve the timeliness of full investigations, we look at those cases for our timeline assessment.

In our October 2017 report, we noted that PPB and the City exceeded the 180-day timeline for full investigations between 65%-70% of the time. For the one-year span of data we examined in this report, there appears to be a reduction in the proportion of cases which exceed the 180-day timeline (particularly in the first quarter of 2018), though the results indicate further work is required. For instance, in the data for the third and fourth quarter of 2017, PPB/IPR had opened 30 cases (7 in Q3 and 23 in Q4) which have since been closed. Of these 30 closed cases, 15 (50.0%) exceeded the 180-day timeline. Additionally, a total of 7 cases that were opened during those same two quarters remain open, 6 of which were more than 180 days old as of when the data was provided to us. Therefore, for <u>all</u> 37 cases in the dataset that were opened in these two quarters, 21 (56.8%) exceeded (or continue to exceed) the 180-day timeline. Comparatively, in the first quarter of 2018, 23 cases were opened and have since been closed. Of these, 20 were closed within 180 days, resulting in an 87% compliance rate. However, also in

the first quarter of 2018, 22 cases were opened and remain open. Of these, 12 (54.5%) have gone past the 180-day timeline threshold. Therefore, of <u>all</u> 45 cases opened in the first quarter of 2018, one-third have exceeded (or continue to exceed) the 180-day timeframe threshold. Although this represents an improvement from 2017 Q3 and Q4, the cases that are presently open would need to be closed prior to the 180-day mark to maintain such improvement.

While we believe the proportion of cases which exceeded (or continue to exceed) the 180-day timeline indicates that improvements can be made, we understand that 100% compliance for all cases is highly improbable given the scope and complexity of some cases. For instance, of the 15 cases which exceed the 180-day timeline in the first quarter of 2018, it is quite likely that some of them would have reasonable justification for exceeding the timeline. The data show that, overall, cases are trending towards being completed within the 180-day timeline with more frequency and, should that trend be maintained, we would consider that a marker of an increasingly effective system.

Table 6: Administrative Cases (Open and Closed) by Overdue Status (IA and IPR)

| When Opened | Overdue Status | Number of Cases Closed | Number of Cases Open | Total |
|---|---|---|---|---|
| 2017 Q3 (September Only)* | Not Overdue | 3 | 0 | 3 |
| | Overdue | 4 | 1 | 5 |
| | Total Number of Cases | 7 | 1 | 8 |
| | Compliance Rate | 42.9% | 0% | 37.5% |
| 2017 Q4 | Not Overdue | 12 | 1 | 13 |
| | Overdue | 11 | 5 | 16 |

| | | | | |
|---|---|---|---|---|
| | Total Number of Cases | 23 | 6 | 29 |
| | Compliance Rate | 52.2% | 16.7% | 44.8% |
| **2018 Q1** | Not Overdue | 20 | 10 | 30 |
| | Overdue | 3 | 12 | 15 |
| | Total Number of Cases | 23 | 22 | 45 |
| | Compliance Rate | 87% | 45.5% | 66.7% |
| **2018 Q2**\*\* | Not Overdue | 6 | 40 | 46 |
| | Overdue | 0 | 0 | 0 |
| | Total Number of Cases | 6 | 40 | 46 |
| | Compliance Rate | 100% | 100% | 100% |
| **2018 Q3**\*\* | Not Overdue | 2 | 22 | 24 |
| | Overdue | 0 | 0 | 0 |
| | Total Number of Cases | 2 | 22 | 24 |
| | Compliance Rate | 100% | 100% | 100% |

\*2017 Q3 has comparatively fewer cases due to the data set beginning in September, thereby only containing one month's worth of data for this quarter

**The reader should interpret the 100% compliance rate for these two quarters with caution as, when the data was received, 180 days had not yet passed.

Cases investigated by both IPR and IA have exceeded the 180-day timeline, though we note that IPR appears to be more consistently overdue with cases they fully investigate. For instance, for the 5 cases in the dataset that IPR fully investigated and have since been closed, 4 (80%) exceeded the 180-day timeline. Additionally, IPR currently has 12 open cases, 2 (16.7%) of which have gone above the 180-day timeline. Comparatively, IA investigated and have since closed 56 cases found in the dataset, 14 (25.0%) of which exceeded the 180-day timeline. However, for the 79 open IA investigations, 16 (20.3%) were overdue at the time the data was provided to us. For both IA and IPR though, these numbers are impacted by cases from 2018 Q2 and Q3 (where 180 days had likely not passed when we received the data). We therefore believe that it is much more informative to look at cases opened in the three prior quarters. For those quarters, compliance rates are 50% for IA in 2017 Q3 and Q4 and 68.8% in 2018 Q1. In the same timeframe, IPR did not have an investigation under the 180-day timeline (although IPR did complete one investigation on time in the 2018 Q2).

Table 7: Administrative Cases (Open and Closed) by Overdue Status (IA Only)

| When Opened | Overdue Status | Number of Cases Closed | Number of Cases Open | Total |
|---|---|---|---|---|
| 2017 Q3 (September Only)* | Not Overdue | 3 | 0 | 3 |
| | Overdue | 3 | 0 | 3 |
| | Total Number of Cases | 6 | 0 | 6 |
| | Compliance Rate | 50.0% | N/A% | 50.0% |
| 2017 Q4 | Not Overdue | 12 | 1 | 13 |

|  | | | | |
|---|---|---|---|---|
|  | Overdue | 9 | 4 | 13 |
|  | Total Number of Cases | 21 | 5 | 26 |
|  | Compliance Rate | 57.1% | 20.0% | 50.0% |
| 2018 Q1 | Not Overdue | 20 | 10 | 30 |
|  | Overdue | 2 | 12 | 14 |
|  | Total Number of Cases | 22 | 22 | 44 |
|  | Compliance Rate | 90.9% | 45.5% | 68.8% |
| 2018 Q2** | Not Overdue | 5 | 32 | 37 |
|  | Overdue | 0 | 0 | 0 |
|  | Total Number of Cases | 5 | 32 | 37 |
|  | Compliance Rate | 100% | 100% | 100% |
| 2018 Q3** | Not Overdue | 2 | 20 | 22 |
|  | Overdue | 0 | 0 | 0 |
|  | Total Number of Cases | 2 | 20 | 22 |
|  | Compliance Rate | 100% | 100% | 100% |

*2017 Q3 has comparatively fewer cases due to the data set beginning in September, thereby only containing one month's worth of data for this quarter

**The reader should interpret the 100% compliance rate for these two quarters with caution as, when we received the data, 180 days had likely not yet passed.

Table 8: Administrative Cases (Open and Closed) by Overdue Status (IPR Only)

| When Opened | Overdue Status | Number of Cases Closed | Number of Cases Open | Total |
|---|---|---|---|---|
| 2017 Q3 (September Only)* | Not Overdue | 0 | 0 | 0 |
| | Overdue | 1 | 1 | 2 |
| | Total Number of Cases | 1 | 1 | 2 |
| | Compliance Rate | 0% | 0% | 0% |

| | | | | |
|---|---|---|---|---|
| **2017 Q4** | Not Overdue | 0 | 0 | 0 |
| | Overdue | 2 | 1 | 3 |
| | Total Number of Cases | 2 | 1 | 3 |
| | Compliance Rate | 0% | 0% | 0% |
| **2018 Q1** | Not Overdue | 0 | 0 | 0 |
| | Overdue | 1 | 0 | 1 |
| | Total Number of Cases | 1 | 0 | 1 |
| | Compliance Rate | 0% | N/A | 0% |
| **2018 Q2**** | Not Overdue | 1 | 8 | 9 |
| | Overdue | 0 | 0 | 0 |
| | Total Number of Cases | 1 | 8 | 9 |
| | Compliance Rate | 100% | 100% | 100% |
| **2018 Q3**** | Not Overdue | 0 | 2 | 2 |
| | Overdue | 0 | 0 | 0 |
| | Total Number of Cases | 0 | 2 | 2 |

| | Compliance Rate | N/A | 100% | 100% |
|---|---|---|---|---|

*2017 Q3 has comparatively fewer cases due to the data set beginning in September, thereby only containing one month's worth of data for this quarter

**The reader should interpret the 100% compliance rate for these two quarters with caution as, when we received the data, 180 days had likely not yet passed.

To further breakdown the possible reasons for cases going over the 180-day timeline, we evaluated the various stages that a case may go through. For this analysis, we looked at all stages regardless of how the case was ultimately referred (e.g. administratively closed, SI, full investigation, mediation, etc.). We also focused on stages which are the responsibility of IA and IPR, as stages under these two entities made up 86% of all stages found within the data. As seen in Table 9, stages of investigation that are the responsibility of IA are, on average, completed on or before their due date 85.4% of the time. The stages "IA Assignment" and "IA Investigation" are the stages most likely to be overdue, though this is still fairly rare at roughly 22% for both stages. Conversely, stages that are the responsibility of IPR are, on average, completed on or before their due date 59.4% of the time. Overdue rates are high at the stage of the IPR "Assistant Director" (overdue 61.1% of the time) and "IPR Intake" (overdue 49.0% of the time).

Table 9:  Stages and Overdue Status

| Responsible Party | Stage | Not Overdue | Overdue |
|---|---|---|---|
| IA | IA Assignment | 77.3% (N=198) | 22.7% (N=58) |
| | IA Investigation | 78.1% (N=125) | 21.9% (N=35) |
| | Administrative Processing | 89.8% (N=158) | 10.2% (N=18) |

| | | | |
|---|---|---|---|
| | IA Command Review | 90.3% (N=438) | 9.7% (N=47) |
| | TOTAL | 85.3% (N=919) | 14.7% (N=158) |
| IPR | IPR Intake Investigation | 51.0% (N=224) | 49.0% (N=215) |
| | IPR Expanded Intake | 76.4% (N=42) | 23.6% (N=13) |
| | IPR Investigation | 57.9% (N=11) | 42.1% (N=8) |
| | Mediation | 40% (N=4) | 60% (N=6) |
| | IPR Management Review | 74.2% (N=313) | 25.8% (N=109) |
| | IPR Administrator | 69.2% (N=9) | 30.8% (N=4) |
| | IPR Assistant Director | 36.9% (N=100) | 63.1% (N=171) |
| | IPR Director | 82.6% (N=100) | 17.4% (N=21) |
| | TOTAL | 59.5% (N=803) | 40.5% (N=547) |

Although individual overdue stages may not cause the overall investigation to exceed 180 days, the ability to identify and correct consistently overdue stages (as well as tracking overdue cases) is important for a well-functioning system. In our 2017 report, we noted that IA implemented an ongoing review process. In that process, weekly meetings are held to determine which stages are due (and which have the potential for being overdue) and what steps are needed to ensure that stages are completed in a timely fashion. Additionally, IA provides a written report on a quarterly basis, identifying overdue stages that are the responsibility of IA and providing a summary of why the stage was late as well as a plan for reducing timelines in the future. Through this process, we believe IA has reduced timelines for stages they are responsible for.

We also encouraged IPR to implement a similar process. In response, IPR began holding weekly meetings to review with staff the case stages assigned to them. These meetings began in January or February of 2018 and utilize Corporate Analytical Reporting System printouts (called

66

CARS reports) to inform IPR staff of stages already (or on the brink of being) overdue. Using the data provided to us, we looked to see whether the rate of overdue stages that IPR is responsible for had decreased since the implementation of such meetings. Because the meetings began in January/February of 2018, we used the 2018 Q2 as our break point for comparison. The data indicate that there is indeed a reduction in overall overdue stages that IPR is responsible for, beginning in 2018 Q2. Whereas prior to 2018 Q2, IPR stages were between 44% and 50% overdue, stages in the last two quarters have been around 33% overdue. This is a positive step, though further work is necessary since this still leaves approximately one in three stages overdue. By comparison, IA stages within this same timeline ranged from a high of 17.9% to a low of 12%.

Figure 1: Proportion of Stages Overdue by Quarter (IA and IPR)



In addition to the weekly meetings, we also encourage IPR to continue their process for identifying stages that are consistently overdue in order to identify and implement a system resolution. Similar to how IA holds weekly command meetings, IPR has begun holding executive-level meetings for consistently overdue stages to determine what system resolution would further reduce the proportion of overdue case stages.  However, this has been a fairly recent development.

In our interviews with IPR, some systemic reasons for delays were provided. For instance, IPR is budgeted for 8 full-time investigators, but has not been consistently fully staffed. IPR expresses its core missions as: Complaint Intake; Being the Face of Accountability within the City; Policy Review; and Administrative Investigations. In order to accomplish all four missions efficiently and effectively, a full staff of investigators is needed. Furthermore, while IPR does not perform as many investigations as IA, the <u>types</u> of investigations they perform often require additional

resources. For instance, Crowd Control events (which include a large number of officers and witnesses) are the most time-consuming cases investigated by IPR. All of these reasons help us understand how and why cases are overdue. We encourage IPR to identify and implement an effective resolution, which may include a plan for hiring more investigators or a plan for transferring some cases to IA. As IPR knows their operations best, we leave it to them to determine the best course of action.

We now move to evaluating the main methods for investigating a complaint of misconduct, including Supervisor Investigation (SI) or a full investigation performed by either IPR or IA. In this evaluation, we examine the training received by each group (including perceptions of the training), views of investigations from sergeants and IA/IPR investigators based on extensive interviews, and the overall quality of investigations.

*SUPERVISOR INVESTIGATIONS*

<u>Training for Supervisor Investigations</u>

In the Spring of 2018, PPB held a Supervisor In-Service which contained, in part, an overview of the Accountability system, including supervisor responsibilities during an SI. Overall, we feel the training for SIs was well delivered. Additionally, in our 2018 Q3 report, we noted that supervisors' evaluations of the training "were very positive and [supervisors'] knowledge of the subject matter were high, as indicated by the surveys and knowledge test." In Table 10, we provide supervisors' ratings of the course of various evaluation points on a scale of 1-6.

Table 10: Accountability Class Evaluation Results

| Evaluation Points | Mean Score (Out of 6) |
|---|---|
| Organized (Presenter) | 4.99 |
| Knowledgeable (Presenter) | 5.21 |

| Positive Interaction (Presenter) | 5.15 |
|---|---|
| Good Use of Time (Course) | 4.73 |

Additionally, we performed a stratified random selection of 10 sergeants (between 3 and 4 from each Precinct) and interviewed them on numerous topics, including their perceptions of the training. Consistent with the quantitative feedback on the training, most sergeant believed the training was beneficial and adequately covered the policy requirements for conducting a Supervisor Investigation. Some supervisors, however, believed that the training contained an information flood, particularly when combined with the amount of information found in other sections of the Supervisor In-Service (e.g. After Action Reports, EIS, Deadly Force Requirements, Mental Health Template, and Case Management). Additionally, some felt the training was "dry" and could have benefited from table-top exercises or practice scenarios to better illustrate how to perform a satisfactory SI (as opposed to the mechanical steps involved in an SI). Supplemental to the training, PPB provided sample SI documents to all supervisors (for one example, see Appendix N). The sample SIs included a description of how each section should be filled out as well as mock SIs to illustrate the process. In several interviews we conducted with supervisors, they referred to these example SIs and indicated they were helpful to clarify the process.

A final evaluation of the quality of training is whether supervisors came away with a uniform understanding of the purpose, terms, and approach for Supervisor Investigations. During our interviews with sergeants, we questioned them on their understanding of such things. For instance, we asked each sergeant what they believed was the primary purpose of performing SIs. Two primary responses were provided by the sergeants: (1) Ensuring officers were following policy (accountability) and (2) providing clarification of officer actions to community members (procedural justice). Regardless of which response the sergeant provided, nearly all felt the SI process had value.

Many sergeants also noted their belief that, even if they felt the primary purpose of the SI was to investigate minor policy violations, the SIs served as a way to provide feedback to community members and approached their conversations with community members with that goal in mind. Many sergeants talked about their initial and subsequent conversations with community members to gather their side of the story and to explain the actions of the officer and/or clarify Bureau policy as to why an officer did what they did. This procedural justice approach is in-line with Bureau-wide training that COCL has long argued was needed and that was recently implemented by PPB.

Finally, we queried officers about the mechanical steps they took during an investigation and their understanding of terms such as "preponderance of the evidence." Responses were consistent across the sergeants, indicating that the quality of an investigation would be fairly similar regardless of which sergeant was actually doing the investigation. For instance, nearly all sergeants indicated they used the policy as a checklist to ensure that all required steps had been accomplished (some even indicated they had created their own checklist, providing more clarity). Additionally, nearly all relayed that they try not to take the complainant's criminal history into consideration when investigating, nor take the officer's work history into consideration, instead investigating each case on the merits of the allegation. Responses were also similar when asked about their approach to an uncooperative witness, a "he said, she said" situation, non-credible statements, and the use of open-ended vs. closed-ended questions. There was little variation in supervisors' understanding and approach to performing Supervisor Investigations.

Overall, we believe that supervisors have been sufficiently trained to conduct efficient and meaningful Supervisor Investigations. We base this belief on the training received, the sample SIs provided by PPB, the experience that supervisors already had with Service Improvement Opportunities (which are fairly similar to SIs), and COCL's qualitative interviews about supervisors' perception of training and their approach to conducting investigations. On top of this, we are aware that IA acts as an ongoing resource for supervisors should questions still remain or clarification in specific cases be needed. Taken all together, supervisors appear well positioned to conduct these types of investigations.

<u>Execution of Supervisor Investigations</u>

For this report, we reviewed 20 completed Supervisor Investigations. As Supervisor Investigations did not begin until July of 2018 (prior to that, they were SIOs which were less formal and did not require a finding), the 20 cases we reviewed represented all SIs that had been completed at the time of our review. For each case, we reviewed and assessed the intake investigation, allegation formation, supervisor investigatory actions, findings, and other elements of the investigation. We then performed follow-up interviews with sergeants where additional clarification was necessary.

Overall, we found the vast majority of Supervisor Investigations to be of high quality. Intake investigations performed by IPR were extensive and provided supervisors the necessary information to perform their investigations. Sergeants routinely performed the investigatory tasks necessary to assess and respond to community member allegations (see below for a detailed assessment of how allegations are formed by IPR). Sergeants were also consistent in their attempts to contact community members, gather their side of the story, and provide follow-up contact to explain the outcome of their investigation. As a general assessment, we

believe that the efforts of supervisors to conduct SIs positively contributes to the overall system of accountability within the City.

Although we believe that, overall, supervisors carry out their investigatory responsibilities with a high degree of quality, we did find some individual, case-specific concerns that PPB should evaluate to determine whether a larger trend exists or simply to prevent the emergence of a pattern. For instance, PPB may consider evaluating their efforts at contacting complainants. In one case, because the alleged event occurred around 4:00 in the morning, the assigned supervisor worked the overnight shift. As a result, the 3 contact attempts to the complainant occurred between 3:00 and 4:00 in the morning--during that supervisor's shift. In another case, the three contact attempts to the complainant all occurred within a 30-minute span. As these issues did not regularly occur with investigations, we do not believe them to necessarily be an indication of a failing system. However, we suggest PPB monitor them so that they do not become so common as to undermine the system.


Remaining Issues for Supervisor Investigations

As part of our review of SI cases and our conversations with sergeants, lieutenants, IA, and IPR, we identified systemic issues which remain regarding Supervisor Investigations. Although a number of broader system issues (which we detail later in this report) also apply to Supervisor Investigations, we focus here on remaining issues specific to SIs. These issues appear to partially undermine the perceived fairness and efficacy of Supervisor Investigations and, although PPB and IPR are aware of them and have held discussions to identify potential resolutions, the issues remain. We encourage PPB and IPR to continue holding such conversations and implement solutions in order to strengthen the overall SI process.


*System complaints attributed to a particular officer*

In many cases we reviewed, we found that while the complainant was dissatisfied with their interaction with the officer, the dissatisfaction pertained more to the event that prompted them to call the police or the system of police response rather than any particular action taken by the officer being a violation of policy. When reviewing the cases, we found the lack of officer misconduct was, at times, immediately apparent (e.g. someone was not arrested but even a brief description by the complainant indicates no crime had been committed). At other times, the complainant's system-based concern became clear after a brief investigation by the sergeant (e.g. an allegation that the officer never responded, though the officer's response was simply not witnessed by the complainant). Our case review revealed that oftentimes, a clarifying discussion between the sergeant and complainant satisfactorily resolved the community member's concern.

However, despite the concern being resolved to the satisfaction of all, the sergeant is required to continue with the investigation, meet with the officer, make a finding, and complete a report up the chain. In these instances, the fairness, integrity and confidence in the SI process is undermined as the officer is labeled with an unjust allegation and the process is viewed as suspect. Universally, supervisors stated that the SI process has value and that the conversation with the officer can be valuable—but only when the issue involves the officer's conduct. Discussing system complaints with an officer as if the officer had done something wrong or could have done something differently or better engenders an understandable feeling of being unjustly accused, despite the low-level, "non-disciplinary" nature of SIs (see also below for further discussion of SIs being "non-disciplinary").

Related to this, a number of supervisors discussed their attempts (or attempts by other supervisors known to them) to send such cases back up the chain for closure. Through this process, the supervisors believed that the situation could be (and had been) resolved with the community member while the officer could avoid an allegation being unfairly in their performance record. However, the supervisors report that those attempts were met with refusal, and an admonition to have the conversation with the officer anyway. Some related that they were told courtesy complaints could not be administratively closed based on the Settlement Agreement (though our understanding of the Settlement Agreement and our conversations with IA personnel indicate that this is not accurate).

COCL inquired whether being limited to a binary, "substantiated" or "not substantiated" finding contributed to the discomfort with these situations, since an officer could not clearly be exonerated. Although a few supervisors indicated that additional findings options would be helpful, most felt that the binary option for such low-level complaints was sufficient. The far greater desire was for complaints that are not specific to an officer's conduct be resolved in a different manner. IA members indicated that efforts at better allegation formation and other options for resolving such complaints (e.g. diverting for a sergeant to clarify the officer's actions with the complainant) are likely to be more effective than adding more finding options. We suggest PPB and the City evaluate whether other such options are viable to address the concerns of the supervisors while also maintaining a robust system of accountability.

*Final letter to Complainant*

While concern for officers' perceptions of the fairness and effectiveness of the accountability system should be taken seriously by PPB and the City, the same holds true for community member perceptions as well. In our conversations with supervisors, we noted cases where a sergeant's phone call to the complainant seemingly resolved the allegation and satisfied the

community member. Supervisors relayed that after such calls, complainants better understood the officers' actions and were appreciative of the opportunity to be heard and receive a response. However, in some of these cases, supervisors believed the disposition letter sent to the complainant (stating that the allegations were "Not Substantiated") may have served to counteract the positive interaction. In those cases, the complainant often seemed to feel that the sergeant had misled the complainant about the resolution (e.g. the sergeant would speak to the officer), or that his/her complaint was being dismissed as baseless after the sergeant gave the impression that it was important.

Where a case file indicates a positive interaction between a supervisor and community member, IPR informed us they try to convey this within the final letter to the complainant. However, because IPR has an interest in being transparent (e.g. including the formal outcome of "Not Substantiated") and because City Code and the Settlement Agreement also require a finding, a finding must be included.

To preserve the positive interaction forged by supervisors as well as satisfy IPR's requirements to include a finding in the final letter, we believe that PPB and IPR could work together to revise the language of the final letter. At DOJ's request and with the COCL's full support, two of the sergeants we interviewed agreed to help propose changes to the wording of the final letter to better reflect the actual resolution of the complaint. Because IPR is responsible for sending the final letter to complainants, IPR must approve any recommended changes to the letter to complainants and ensure that the language conforms to City Code and is approved by the Auditor.

*Volume and length of time to complete*

Another issue we identified during our discussions with supervisors was the belief that SIs were time-intensive, requiring sergeants to spend more time in the office and less time on the street (where performance issues could be addressed before they even become problematic). Supervisors consistently reported that SIs take 2 to 4 hours to complete, even as much as 6, depending on the case. Supervisors also related that the number of SIs being assigned to supervisors was significant (one supervisor noted they were "falling like snowflakes").

While 4 hours is a significant amount of time for a supervisor to be off the street, it should be remembered that this amount of time is normally spread out over several shifts (calls to the CO, other investigation, speaking with the officer, finishing the final memo, are not done in a single block of time). In addition, the AIM data provided to COCL includes only 30 cases referred for SIs between the beginning of August to September 18. Each sergeant we spoke with reported having done no more than 2 SIs since the change from SIO. Objectively, that volume does not seem unduly burdensome. If progress is made in ensuring that complaints that are not best treated as SIs are effectively diverted (but not dismissed), the subjective perception of a burdensome volume should also be eased.

One of the additional challenges is that supervisors report feeling obligated to write lengthy and detailed memos to close the SI (e.g. 3-5 pages). One suggestion during the interviews was that supervisors should be encouraged to complete a more "summary" report, consisting of only several paragraphs. However, we note that such a recommendation might be taken as asking the supervisors to "do less" in these cases, which devalues the work and puts supervisors in the untenable position of deciding "how little" is actually enough. Whether it is an internal sense of pride and work ethic or the pressure of perceiving their work to be under careful scrutiny, our review of SIs revealed that supervisors were largely doing thorough and conscientious investigations, even when their personal opinion may have been that the complaint should not have been sent through to the precinct. Discouraging this attention to detail seems counterproductive. A better solution is filtering or diverting the cases that should not be SIs.

*SI versus SIOs*

Finally, we note that the transition to Supervisor Investigations (from the prior Service Improvement Opportunities) carries substantial benefit (e.g. formalized findings). However, PPB members relayed that the benefits also come with some negative consequences. For instance, while most PPB members stated that the SI process was not significantly different or more burdensome than the SIO process, more than one supervisor expressed discomfort with the increased "disciplinary" feel to the SI process compared with SIO's. One supervisor stated the findings felt "very IA" and the process made the conversation with the officer less natural. Taken in the context of the other changes PPB has experienced over the last several years (e.g. increased scrutiny in AARs, EIS alert processing), supervisors expressed the sense that this is "another thing coming at officers…[making them feel] under the microscope for everything." While the Bureau may refer to SIs as "non-disciplinary," many supervisors commented that is not how officers experience it. Overall, there was a general sense that this push-back/negative reaction would be minimized over time as the process became normalized. Additionally, should allegations be appropriately diverted and/or resolved with a simple phone call to the complainant, officers would be less likely to view the SI process as disciplinary. We suggest PPB continue to stress to officers and supervisors that SIs should not be viewed as disciplinary and work to reduce officer concerns about this.

## FULL ADMINISTRATIVE INVESTIGATIONS

As part of the City's plan to "enable meaningful independent investigation by IPR" (see Par. 128), the City embarked on two tasks: First, the City and PPB engaged in policy revision to ensure that both entities involved in performing administrative investigations (IA and IPR) had policies and directives that essentially mirrored each other. By revising policies, the process of

administrative investigations would be the same regardless of which entity actually performed the investigation. Theoretically, this would thereby ensure a fair and uniform system. COCL participated in the policy revision process, reviewing multiple drafts, providing feedback on drafts, and sitting at the table during policy discussions. In the end, we are satisfied that IA and IPR policies are reasonably similar, thus helping to ensure consistent decision making across both groups.

Second, also designed to ensure uniformity and fairness, IA and IPR conducted joint trainings spread out across multiple days. Trainings related to a number of topics over the different training days, including (among other things):

- Investigative planning
- Interview skills
- Allegation formation
- Conducting impartial and objective investigations
- Best practices in administrative investigations
- Unique challenges of police misconduct investigations
- Overview of PPB control tactics training
- Overview of PPB CEW training
- Familiarization with PPB firearms
- Authority and roles of IA and IPR
- Overall Portland accountability system
- Processing complaints
- Interviewing individuals represented by an attorney
- *Garrity v. New Jersey* and effect on administrative investigations
- Standard of "preponderance of the evidence"
- Writing findings

We observed each of the training days. The first two days of training were conducted by members of the OIR group, an outside consulting company, in February of 2018. Overall, we believe this training fell short as a way to help IA and IPR investigators better understand their roles and responsibilities. Upon observing the training, COCL, PPB, and DOJ all recognized that additional training would be necessary to accomplish the goals initially set out for the OIR training. As part of an already planned follow-up training for IA and IPR, some gaps in the OIR training were filled in. Additionally, a new training day was planned for April of 2018 which further clarified the role of IPR and IA and provided the framework for ensuring consistent and high-quality investigations between both entities.

Through the combination of revising policies and providing joint training, the City had set up a system wherein meaningful independent investigations by IPR are enabled and wherein

investigations conducted by IPR should be of similar quality and scope as investigations conducted by IA. After the policies were revised and training was conducted, we looked to see whether these steps achieved that goal.

In October of 2018, we conducted a total of 8 interviews with IA and IPR investigators, including 4 interviews with IPR investigators and 4 interviews with IA investigators. Similar to our interviews with supervisors, we wanted to see how IA and IPR investigators approached investigations and identify issues which may impact the efficiency and effectiveness of the accountability system. Additionally, we also sought to determine whether differences between the two groups existed which would result in disparate investigation quality.

Overall, we found that IA and IPR investigators approached investigations with similar purposes. For instance, when we probed investigators about the primary purpose of performing administrative investigations, most responses related to identifying the "truth" of what happened. Responses included "understanding what happened," "fact-finding," "understand what the employee did in the situation," or other similar statements. Additionally, several investigators stated that a primary purpose was to determine whether an officer complied with directives.

Although fewer IA/IPR investigators than supervisors (above) identified the "voice" dimension of procedural justice as a primary purpose of full investigations, a few did state their desire to address the concerns of community members. On top of this (though not necessarily the "primary purpose"), both IPR and IA investigators acknowledged the need to provide information to community member complainants and PPB members about the investigator's role in the investigation, the steps of the process, and what to expect during the investigation. These procedural justice techniques that COCL has argued should be practiced by street-level officers (as well as maintaining an empathetic and caring demeanor) are appropriate for administrative investigations as well. However, because full investigations are disciplinary in nature (thereby focusing on the officer rather than the elements of the interaction), this may be why a smaller number of investigators place "voice" as a primary purpose.

Additionally, the overall investigative approach taken by IPR and IA investigators was similar. Both IPR and IA investigators discussed steps prior to beginning an investigation, including reviewing the policy that is alleged to have been violated (even if already familiar with it) and reviewing the specific allegation of the violation. Many investigators also noted that when reading available reports, they would identify witnesses and sources of information. One IPR investigator commented on his/her use of case-mapping techniques, in which the investigator lays out the potential path of the investigation.

Finally, IA and IPR investigators were similar in their understanding of key concepts related to performing the investigations. Nearly all indicated their understanding of "preponderance of the evidence" as something akin to "50.1%" or "more likely than not." Similarly, investigators were uniform in their belief that prior criminal history (for the complainant) or prior work

history (for the officer) did not substantially play into their approach to performing investigations and that each allegation should be assessed on its own merit. So too did IA and IPR investigators agree in their tactics of using open-ended questions to begin an interview (to gather the narrative of the interviewee) and close-ended questions to gather clarifying information later in the interview.

One area where we did note differences between IPR and IA investigators was in the use of a checklist to ensure that all investigative responsibilities had been met. IPR investigators informed us that IPR provides a "flow-chart" and each investigator indicated that he or she used that flow-chart as the checklist. However, IA investigators indicated they did not use any type of formal checklist. Two IA investigators indicated that each investigation was different and required different steps. Another indicated the "5 W's" (who, what, when, where, why) drove the investigative steps taken. This difference may be a product of the investigative experience differences between the two groups. For instance, most of the IA investigators have decades of experience conducting criminal investigations, whereas IPR investigators' experience comes from civil or other types of non-criminal investigations (for example, housing and employment discrimination or Title IX investigations). Because of these different sets of background experiences, IA and IPR investigators may track their progress differently.

Execution of Administrative Investigations

As part of our review of the Accountability system, we reviewed thirteen IA case files and four IPR case files (only four IPR cases had been completed at the time of our review). Overall, we believe that the investigative steps taken by both IA and IPR as well as the findings for each allegation were reasonable and that there was no substantial difference between the quality of investigations between IA and IPR investigators. Admittedly, the number of IPR cases (four) is somewhat small and we will therefore need to maintain reviews in the next year. However, we are satisfied for the moment that regardless of whether IA or IPR conducts the full investigation, the quality of investigation will not vary.

Remaining Issues for Administrative Investigations

*IPR Access to Documents*

In interviews with four IPR investigators, each of them raised the challenge of accessing PPB records and other evidentiary documents/media. In some cases, the IPR investigators indicated the process of obtaining records was "burdensome;" in other cases, the investigators noted that information resides within (and therefore must be gathered from) multiple locations.

Related to this, one investigator noted that "IPR does not have direct access to confidential information" which ultimately impedes timely and comprehensive investigations. Subsequent conversations revealed that because IPR investigators are not law enforcement, information on Records Management System (RMS) and Computer Aided Dispatch (CAD) records at times requires redaction. Determining the legality of IPR investigators accessing confidential and/or sensitive documents is best reserved for those with better knowledge of Portland City Code and State law, and we are therefore unaware of whether this issue is one that cannot be avoided or simply requires additional backgrounding of IPR investigators. However, where possible, PPB and the City should work together to resolve outstanding issues related to document access.

*RU-Level Articulation of Findings*

Although investigators at both IPR and IA appear to be adapting successfully to drafting recommended findings, we found that in several instances the RU-level concurrence either cited a basis that was not part of the allegation (e.g. "this allegation should be sustained because of X" where X formed no basis of the allegation) or misstated the burden of proof (e.g. "unfounded because the evidence does not prove by a preponderance that a force event took place" - a statement that is only half of the story and would at best get to a finding of not sustained). The fact that there were several such problems in a small sample size is concerning and speaks to whether the system results in reasonable and fair conclusions in a manner that is defensible upon review. At minimum, additional training for RU managers appears necessary.

Remaining Issues for Accountability System

For the entirety of the Accountability system, there remain issues that PPB and the City will need to resolve in order for it to be an efficient and effective source for evaluating allegations of officer misconduct. A number of these issues relate to fairness concerns for both the officer and the complainant and were found in our review of both IA/IPR full investigations and Supervisor Investigations. As these issues appear to undermine the operation of and confidence in the overall accountability system, we cannot at this point say that PPB and the City's implementation of the Settlement Agreement has led to "competent accountability and oversight systems" (Par. 170 of the Revised Settlement Agreement). At the least, when we discussed the following issues with PPB and the City, they were aware of the issues' existence and, where appropriate, appeared willing to take steps to resolve them (or had already taken such steps).

*Allegation Formation*

At the basis of all administrative investigations and SIs are the allegations of policy violation that an officer is alleged to have committed. The language of allegations is important as it provides due process for the officer to know exactly what is being investigated. However, the formation of allegations from IPR appears to be a concern and has been the topic of on-going discussions between IPR and PPB.

Allegation formation speaks to issues of both fairness (e.g. is an officer being subjected to an investigation based on an actual complaint of misconduct) and effectiveness (e.g. an accountability system is only effective if it is perceived, internally and externally, as legitimate). For example, in one case we reviewed, an officer received an allegation based on his/her contact with an outside police agency. However, there did not appear to be any general fact-finding to determine whether an allegation of misconduct was warranted. This creates the impression that contact with an outside agency cannot be investigated without an allegation being put on an officer. This undermines the integrity of the PPB accountability system and borders on a due process violation. Although this represents a single case, it contributes to our overall concern with allegation formation.

Both IPR and PPB seem to believe that progress is being made in how allegations are formulated, though there appear to be two key challenges remaining:

- Finding the proper balance between specific and broad allegations: If an allegation is too specific, particularly at the outset of an investigation, it might not be possible to sustain that allegation even when the full investigation does reveal some type of misconduct occurred. Alternatively, if an allegation is too broad, it provides no direction for the investigation and is essentially meaningless. (In the latter case, there may also be due process issues such as notice to the accused.)

- The differing foundational philosophies of IPR and PPB: IPR's mission explicitly includes matters of public trust and community engagement. As a result, IPR is focused on giving the complainant a voice and listening to what the complainant is saying. IPR also notes the City's commitment to a "low bar for entry" for complaints – that is, complaints need not meet strict criteria to receive an investigation, even if that means, at minimum, an intake investigation. Alternatively, although PPB is equally concerned with public trust and community engagement, IA specifically is tasked with tying alleged conduct to a violation of a specific policy. There is a belief that these differing approaches sometimes result in a divide over what constitutes a legitimate basis for a misconduct investigation.

As noted, it appears both PPB and IPR agree that a difference in approach exists between the two entities. Both formal and informal conversations have been had to bridge the divide, though there is currently no final resolution. In some cases we reviewed, allegations were revised by PPB and the revised allegations were approved by IPR. The need for such revisions cannot be completely eliminated but solutions should be developed that minimize frequency so that like complaints receive like allegations. We suggest PPB and IPR continue conversations

79

related to coming to a more concrete solution and maintain an open dialogue in the interim when allegations should be revised.

*Questioning During IPR Intake Investigations*

Also related to the issues of allegation formation identified above, our interviews with PPB members indicated their concerns that IPR call-takers seemed to lead callers into allegations that the callers were not originally making. After reviewing audio recordings and transcripts of many calls, PPB members' concerns are understandable though appear to ignore IPR's overarching mission. As stated above, one of IPR's core goals is to be a conduit for community member sentiments to be heard and to channel community member statements into defined allegations of misconduct. Oftentimes, IPR investigators are faced with a complainant who is clearly angry or upset about an encounter, but is not articulating a specific allegation. Sometimes a complainant may just need help articulating what happened, requiring a line of questioning from the investigator that can feel like "leading" questions to PPB members.

However, a complainant at times may just be upset with the result of an encounter that does not involve any actual officer misconduct (e.g. the complainant wanted a person arrested, but there was no probable cause). This puts the IPR investigator in a difficult position. In trying to meet the "low bar for entry," the investigator is trying to "hear" the community member's complaint and structure it in a way that provides IA or supervisors with an allegation that best represents the complainant's dissatisfaction. In such situations, the complaint may actually be an issue with the system of police response (as discussed earlier) rather than the officer's particular actions. What might have been resolved on the street, if the complainant requested a supervisor to the scene, has now become a difficult-to-formulate formal allegation.

Related to this, there also appears to be a gap between IA and IPR as to what purpose SIs serve. Our conversations with IPR indicate they believe SIs to be low-level, quality of service complaints and are therefore less discriminatory in which ones are sent out versus being administratively closed. With the prior SIO system, IPR indicated they were less likely to send those out because they did not receive a finding (and therefore could be seen as accusatory without a resolution). However, because there are now findings associated with SIs, more are sent out which allows community concerns to be addressed while at the same time allowing for the supervisor to determine the merits of the complaint rather than IPR.

To resolve the above issues, we believe that PPB and IPR need to continue their dialogue about how best to distinguish between cases that contain an identifiable policy violation and require a formal investigation or SI and cases that should be diverted as "system complaints" (i.e. "I'm unhappy but the officer did not do anything wrong"). Additionally, PPB and IPR should attempt to bridge the gap as to their views of SIs. By doing so, PPB and IPR may alleviate some of this distrust in how allegations are formed and how cases are assigned as SIs.

*Other Steps in the Process*

The issues identified above are highlighted in order for PPB and IPR to improve in areas where our interviews and case reviews revealed shortcomings. Alternatively, areas for which we provide little comment (or no comment at all) should be considered as functioning as intended. For instance, the information gathering process found within IPR intake investigations appears to be done exceptionally well. Despite our concerns that intake investigations were perhaps excessive given the duplicative efforts during full investigations/SIs, our interviews with PPB members revealed overall satisfaction with the process. PPB members noted that the packet from IPR was normally very thorough, with useful information that gave them "something to go on" (e.g. reports, CAD printouts, audios of interviews). Although PPB members would "duplicate" some of the effort (e.g. interview the complainant themselves), that did not translate into a belief that the original IPR effort had no purpose. Given that the intake process overall appears to be working for IPR and PPB, we do not believe it to be an issue.

Additionally, investigators at both IPR and IA appear to be adapting successfully to drafting recommended findings. Our interviews with, in particular, IA investigators revealed a number of them believe that investigators should be viewed as "fact-finders" and due to that role, should not be responsible for making a determination. Additionally, at least two IA investigators stated that officers who are the subject of complaints are aware that the IA investigator prepares the recommended findings, thereby changing the dynamic of the interviews and making the officer "more guarded" when talking with the investigator. Although the investigators noted these concerns, they also stated their confidence in making findings. Consistent with their confidence and despite such concerns with making a recommended finding, our review of IA cases indicate that investigators were able to make appropriate findings based on the preponderance of the evidence.

81

**B. System Outcome Assessment: Community Engagement**

PPB is expected to develop systems of community engagement that increase the probability of sustained success in this domain. A good systemic approach also includes systems of measurement that serve to document and monitor the quantity and quality of its engagement activities, thus providing feedback loops that allow for corrective action to maximize performance. We will revisit this outcome assessment after a set of community engagement metrics (par. 149) have been finalized. In the meantime, we briefly review some existing metrics and some existing systems that are relevant to community engagement.

As reported in Section II, PPB is in the process of developing a system of community engagement around its 5-year strategic planning process and PPB is preparing to work with the PCCEP to develop a Community Engagement Plan – the last remaining engagement system to be developed under the Settlement Agreement. The Community Engagement Plan, once developed, should articulate a system of engagement that can be sustained and not represent a series of events that exist in isolation.

The creation of the PCCEP itself is a major step toward the establishment of a system of community engagement that should be sustainable over time. Under paragraph 141, we describe in great detail the process of recruiting, selecting, training, and supporting the members of the PCCEP. We conclude that this work was done in a manner that was reasonable, fair, and comprehensive. The only remaining question is whether this system of community engagement, can function effectively and achieve the purpose for which it was created.

In a systematic manner, PPB should be credited with a new initiative to document many of its engagement activities at the individual and group level. Specifically, PPB has created an app that allows officers to keep records of their community engagement activities, which PPB then utilizes to prepare a monthly report. For example, in the month of September 2018, PPB participated in 57 community events across 8 categories: Advisory Council/Board (9), Community event (15), Community/Cultural festivals (6), Faith-based meetings (1), Media events (1), Neighborhood/Community meetings (13), Sport activity (3), and Training/Educational workshops (9). The total community attendance at these 57 events was 37,196 and the PPB attendance was 200, requiring a total of 180.8 hours of PPB time. Thus, although PPB officers did not interact with each and every one of these community participants, PPB has been very active in the community.

Planned and Existing Measures of Police Contacts with the Public

In addition to the 5-year strategic planning process and community event app, other systematic efforts to gain the community's perspective about Portland police officers and about the PPB are slated to occur in 2019. Specifically, the community-wide survey required by the Settlement Agreement will begin early in 2019 (prior surveys were collected in 2015 and 2016), which includes data on community interactions with officers via foot patrol, community meetings, stops and calls for service, as well as general attitudes about the fairness of police services and

public trust in the PPB. There are other systematic ways that police agencies measure the quality and legality of police-community interactions at the individual level. PPB officers routinely respond to calls for service and also initiate stops of individual pedestrians and motor vehicles. Records are kept of traffic stops, citations, searches, arrests, and use of force, among other matters. (For COCL's analysis of PPB's use of force, see our second quarter 2018 report). In addition, in 2019 PPB is planning to introduce a new contact survey that will invite residents with recent police contacts to evaluate their experience in terms of procedural justice and overall satisfaction. . Here, we provide an assessment of PPB's program to document and evaluate both traffic and pedestrian stops by population demographics (par. 148). As with use of force, PPB officers are expected, under certain conditions, to make these stops. The only quality-of-service issue here (for which data are available) is whether the rates of stops and subsequent decision making (e.g. searches) are justified and appropriate given the demographic composition of the neighborhood, crime conditions, and traffic patterns.

Police Stops

The stops dataset is designed to address community concerns about discriminatory policing. Here we provide a summary of those findings, but refer the reader to the complete Stops Data Collection report for details (see Appendix O). The report addresses the issue of racial/ethnic disparity in police decision making about stops, searches, contraband hits, and stop outcomes.

Other law enforcement agencies often report raw numbers or rely on Census data to determine disparities in enforcement, although general population demographics are typically not a good indicator of the driving population or driving patterns. Instead, PPB has employed the 2016 Injury Collision data in Portland as the best benchmark for examining disparities in stops by the Traffic Division, whose enforcement activities focus on Portland's most dangerous streets and intersections. For Non-Traffic officers, including Patrol, the report used Portland's 2016 Crime Victimization data as the benchmark, which includes the demographics of victims of FBI Index Crimes – Homicides, Forcible Sex Offenses, Robberies and Aggravated Assaults. Patrol officers generally focus more on enforcement related to crime and disorder than traffic violations. We consider both of these benchmarks appropriate.

Here is a brief summary of key findings:

Stops: The total number of stops of drivers has dropped 51% over the past five years. This can be viewed as a positive sign. This drop may be due to a decline in police resources or improvements in driving (i.e. reductions in traffic crashes and injuries) that result in less enforcement. This trend is also consistent with national and local pressure to reduce the level of aggressive policing in U.S. cities and only make stops when necessary. If, however, this reflects some degree of "de-policing" in light of local and national criticism of police, then it may be a reason for concern.

Using the benchmarks noted above, there were no significant racial/ethnic disparities in overall driver stop rates during 2016 in Portland. One exception would be the Gang Enforcement

Team, where White and Hispanic subjects were stopped more often than predicted in patrol areas with high levels of gang and gun violence. Blacks/African Americans were stopped at a higher rate, but this was not a disparity given their benchmark.

Over the past 5 years, pedestrian stops in Portland have declined by 78%.

Searches: The rate of searching drivers has dropped significantly since 2012, perhaps reflecting one of the possible causal factors noted above with stops. However, two groups of drivers were searched at higher rates relative to their overall stop rates: American Indian /Alaskan Native drivers (4 times more) and Black/African American drivers (3 times more). Asian drivers were searched less often than predicted using benchmarks. Also, consent searches were more likely among Black/African American drivers than expected, although probable cause searches were lower than expected for this group. Much of the disparity in searches for Black/African American drivers was attributable to the Traffic Division, where probable cause searches were most common.

PPB found that pedestrian stops, although few, are more likely to result in a search (1 in 6) than driver stops (1 in 25). Although the number of searches has declined slightly for all racial/ethnic groups over the years, in 2016 Black/African Americans were searched at three times the expected rate. Also, the Gang Enforcement Team was more likely to use consent searches during Black/African American stops. Caution is warranted because of the very small sample sizes.

Contraband Hit Rates: PPB officers have become better at conducting searches that result in contraband, increasing their hit rate from 34% in 2012 to 42% in 2016. The race/ethnicity of the driver did not predict whether contraband was present, which undermines the rationale for any disparities in searches (i.e. racial/ethnic groups are equally likely to be carrying contraband). This was true for pedestrian searches as well.

Stop Outcomes: Another positive sign is that the race/ethnicity of the drivers did not influence the officers' decisions whether to issue a warning, issue a citation, make an arrest or end the stop without enforcement. This was true for pedestrian stops as well where statistical analyses were possible.

Overall Assessment: PPB has done an excellent job of collecting, analyzing and reporting stops data as required under Paragraph 148. The public can be confident in these results. The quarterly Stops Data Collection report provides basic statistics on the racial/ethnic breakdown of both traffic and pedestrian stops. The annual Stops Data Collection report goes much further to address the issue of racial/ethnic disparity in police decision making about stops, searches, contraband hits, and stop outcomes. PPB has been very transparent in reporting the findings.

Arguably, there is considerable good news to report, including the downward trend in the number of driver and pedestrian stops and searches, the improvement in contraband hits, and the absence of racial/ethnic differences in stops. However, the analyses also uncovered some

84

disparities in searches for Black/African American drivers and pedestrians that deserve more attention. Also, the Gang Enforcement Team, while not showing racial/ethnic disparity (given the benchmarks being used), did rely on consent searches more with Black/African American stops.

Disparities do not necessarily indicate racial bias, as other factors may be involved, but the transparent reporting of police decision making evident in this report should be the basis for more dialogue and community engagement. As PPB notes, these results "allow for a more informed community-wide discussion about how best to keep the community safe and how to accomplish this in the most equitable manner possible."

We remind the public that PPB officers serve critically important roles in law enforcement and traffic enforcement -- functions that ultimately serve to keep the public safe from dangerous vehicular accidents and costly/traumatic criminal victimization. Proactive policing is important in this regard but growing public concern about fair and equitable policing has put a damper on police decisions to stop, question, and search cars and individuals. This may be good but could be problematic if police officers do not make stops and searches when probable cause exists. Consent searches, which comprise nearly half of all PPB searches, must be used conscientiously to avoid bias or loss of public trust, especially when 6 out of 10 searches do not produce any contraband.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**<u>LIST OF PERSONNEL</u>**

Chief of Police: Danielle Outlaw

Deputy Chief of Police: Robert Day

Assistant Chief of Operations: Ryan Lee

Assistant Chief of Services: Chris Davis

Assistant Chief of Investigations: Jami Resch

Acting Commander of Professional Standards Division/Compliance Coordinator: Jeff Bell

Professional Standards Division Principal Management Analyst: Mary Claire Buckley

Inspector: Craig Dobson

Behavioral Health Unit (BHU) Acting Lt.: Casey Hettman

EIS Supervisor: Jay Bates

EIS Administrator: Paul Meyer

Training Captain: Erika Hurley

Auditor: Mary Hull Caballero

IPR Director: Constantin Severe

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

# **APPENDICES**

# **APPENDIX A**

**EXHIBIT 2**


**City of Portland Plan for**
***Portland Committee on Community-Engaged Policing (PCCEP)***


I.      MISSION

To work with the Mayor/Police Commissioner, Portland Police Bureau, and Portland's diverse constituencies to solicit and exchange information between the community and Portland Police Bureau (PPB) to achieve the desired outcomes of equitable policing which exceeds constitutional requirements, and meaningful community engagement with and trust in PPB.


II.     GOALS

PCCEP members will independently assess the Settlement Agreement using the tools outlined in this Plan. PCCEP will work to facilitate positive police/community relationships and promote public safety by assessing PPB's current community engagement processes, and developing recommendations and strategies for systems to increase public outreach and engagement with a broad cross-section of the community, to build confidence and improve outcomes. Additionally, PCCEP members will review and make recommendations on PPB policies touching the DOJ Settlement Agreement and/or key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice.

In order for PPB to effectively build trust with Portland's diverse communities, the communities' concerns must be heard and meaningful action by PPB must be taken.  To facilitate this outcome, PCCEP members will also make recommendations in the key areas of concern for Portland's diverse communities based on the communities' articulated experiences and grievances.

PCCEP's mission and goals will guide the following:

      1.   Scope of work
      2.   Membership
      3.   City's responsibilities
      4.   Available tools and resources
      5.   Members' responsibilities
      6.   Deliverable products

Exhibit 2 – Page 1

SCOPE OF WORK

PCCEP will engage with Portland's diverse communities in key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice. PCCEP will contribute to the development of the PPB Community Engagement Plan, as directed by the Settlement Agreement between the City of Portland and the United States.

Specifically, PCCEP will be authorized to:

- Develop recommendations for PPB systems to engage meaningfully, both short-term and long-term, Portland's diverse communities and improve community relations. Gather and synthesize information from Portland's diverse communities, and make recommendations based on that information in key areas of concern to communicate to the Mayor, PPB, the Office of Equity and Human Rights, the DOJ, and the public at large.

- Review and make recommendations on PPB directives touching the DOJ Settlement Agreement and/or key areas of concern. Provide information to the community on these directives, and solicit feedback and recommendations from the community to share with the PPB.

- With the Mayor's written approval, and after consultation with the other City Commissioners, PCCEP is authorized to identify for off-schedule review directives not related to the DOJ Settlement Agreement or key areas of concern.[1] PCCEP must provide a written explanation for the request, which will be considered by the Mayor and City Commissioners.

- Provide information to and solicit feedback from Portland's diverse communities through focused and targeted round tables and town halls, to be held at least quarterly and be open to the public.  PPB presence is required at quarterly town halls.

- Continue to collaborate with the City on surveys regarding Portland residents' experiences with and perception of PPB's community outreach and accountability efforts. PCCEP will consider survey results in developing recommended strategies.

- Provide ongoing feedback to PPB regarding community engagement initiatives already in progress and those added/needed in the future.

- During the effective period of the Settlement Agreement, appear before the Court at the annual status conference to describe to the Court its assessment of the City's progress toward achieving the goals of the Settlement Agreement.

---

[1] PPB directives are generally scheduled for Bureau review every two years. The City recognizes that the community has an interest in a number of directives, and particularly those that are relevant to current events (e.g., Directive 635.10. Crowd Management, with respect to demonstrations; Directive 810.10, Arrest of Foreign Nationals with respect to Portland's status as a Sanctuary City). This authority is intended to allow PCCEP to be responsive to community concerns when there is a compelling interest to review and revise a Bureau practice.

Exhibit 2 – Page 2

III.    <u>MEMBERSHIP and REPORTING</u>

PCCEP will be comprised of a diverse group of between thirteen mayoral-appointed volunteers, who are committed to improving systems-based police/community relationships and ensuring and exceeding constitutional policing standards. Two of the thirteen seats will be reserved for high school-aged youth. The PCCEP will report directly to the Mayor (Police Commissioner) and consult, separately and at least quarterly with the Director of the Office of Equity and Human Rights.

IV.    <u>SELECTION</u>

The Mayor, in consultation with the other Council offices, shall work with the community selection panel described below to develop selection criteria and public outreach strategies for the PCCEP selection process.  This process may begin before the Fairness Hearing and approval of the revised Settlement Agreement by the Court.  Following the development of the selection criteria, a written, downloadable application will be posted and available on the City's website. Posted alongside the application will be the deadline for submission, selection criteria, selection process and a description of PCCEP member responsibilities.  The City will engage the community in a variety of ways to communicate the application and selection process, criteria and timelines.   Extra effort will be made to invite people who have experienced mental illnesses to apply.

The selection process will adhere to the following framework: (1) Application submission; (2) Initial screening of applicants by mayoral staff and a representative from any Council office who wishes to participate; (3) Review and further screening by the Selection Advisory Committee (a panel consisting of five diverse community members, each chosen by the Mayor and other Commissioners); (4) Candidate interviews with Mayor after soliciting feedback about final candidates from each Council office;  (5) Mayoral appointment and (6) Council confirmation.

In accordance with best practices for youth-adult partnerships, a separate process will be followed for high schoolers: 1) Application submission; 2) Opportunity for recommendations by David Douglas School District, Parkrose School District, and Portland Public Schools (three students per district); 3) Group interviews by Selection Advisory Committee (with AMAC participation); 4) Recommendations by Selection Advisory Committee to the Mayor; 5) Group interviews by the Mayor; 6) Mayoral appointment; and 7) Council confirmation.

Any high school-aged youth who apply through the regular process will be incorporated into the youth selection process. Any high school-aged youth under the age of 18 must obtain permission from a legal guardian (or provide documentation that they are legally emancipated) to apply and serve on the PCCEP.

A minimum of two high school-aged youths will serve on the PCCEP together.

The Mayor will consider the selection criteria and views of the community in appointing volunteers.  City employees may not be appointed to sit on the PCCEP.

Exhibit 2 – Page 3

V.    <u>TERM</u>

Volunteers will serve two-year terms, with the option to re-apply at the end of a term. During the first year of PCCEP's life, volunteers will be appointed on a staggered basis where the majority of the board will serve two-year terms, and the remainder will serve one-year terms. Applicants will be able to indicate on their application forms whether they wish to serve one or two-year terms. Any volunteers who serve one-year terms will have the option of re-applying for the opportunity to serve a full term. In accordance with City policy for advisory boards and commissions, volunteers can serve no more than eight years on the PCCEP.

VI.    <u>REMOVAL</u>

The Mayor, after consultation with the Council, the PCCEP Program Manager and PCCEP chair (absent a conflict of interest) will have sole discretion to determine when PCCEP members are no longer fit to serve on the committee due to misconduct. If a member is removed or resigns, the selection process identified above will be used to recruit, appoint and confirm the new member.

VII.    <u>CITY'S RESPONSIBILITIES</u>[2]

To establish the PCCEP and facilitate its work, the City will seek the services of a facilitator to structure board orientation for PCCEP members. This orientation shall include training on the *United States v. City of Portland* Settlement Agreement. Specifically, as part of this training, the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and mental health advocates will be invited to provide information on the history of the Settlement Agreement.

---

[2] With the amendments to Section IX of the Settlement Agreement and the development of the PCCEP, the City understands there is concern about the role of the Portland community in monitoring the Settlement Agreement, and updating the wider community on the status of terms of the Settlement Agreement.  The City will provide updates to the community on the status of the City's compliance with its obligations under the Settlement Agreement in the following ways:  1) at the annual status conference before the federal district court; 2) through quarterly community meetings with the COCL either separate from or jointly with the PCCEP, and staffed by the City; 3) through reports on the COCL website; and 4) through other means as appropriate.  The United States Department of Justice and the COCL will continue to have responsibility for monitoring the City's compliance with its obligations under the Settlement Agreement during the effective period of the Agreement.   After the City is found to be in compliance with the Settlement Agreement and the Court, DOJ and COCL are no longer involved, PCCEP will provide recommendations to the Mayor/Police Commissioner regarding continued assessments of the City's progress, generally, and community engagement.

Exhibit 2 – Page 4

After PCCEP's board orientation, the City shall continue to provide resources for member training as needed so that members continue to fulfill their obligations.

The City shall make appropriate information available regarding PPB's current community engagement initiatives, directives, and directive review and implementation process.

The PPB, in particular, and in accordance with its directive review schedule, shall meet with PCCEP during a universal review period to brief members on directives related to the DOJ Settlement Agreement and/or key areas of concern, provide information as needed/requested, and solicit PCCEP member feedback. The PPB shall make the adjustments necessary to its current directive review system in order to integrate PCCEP into the PPB's work.

The City shall provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days.

The City shall provide staffing for the PCCEP including a program manager and administrative support.  The City will also provide staff support and funding for community organizing/outreach.

The City shall provide meeting locations, and work with PCCEP to identify neutral locations that are accessible to and appropriate for the community for public meetings.

To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes, the PCCEP and the PPB's Equity & Diversity Manager to develop a Community Engagement Plan, which shall be adopted by Council following a public hearing.

The Mayor's Office shall publish on the City website an annual report, commencing from the date PCCEP begins meeting through the duration of its existence, that will include updates on progress made by the City in key areas of concern and community engagement recommendations.

The Mayor or the Mayor's delegate, and the PPB Chief or the Chief's delegate, shall endeavor to attend all public meetings of PCCEP, unless PCCEP requests otherwise.  Other Commissioners or their delegates are encouraged to attend, unless PCCEP requests otherwise.  The purpose of such attendance is to listen to understand, provide information either at the meeting or as follow-up, and learn from PCCEP members and public testimony.


VIII.    MEMBERS' RESPONSIBILITIES

PCCEP members must engage all participants in a respectful and collegial manner, and be responsible for the following:

- Prior to members' first PCCEP meeting:

Exhibit 2 – Page 5

- o Learn about the history of the *United States v. City of Portland* Settlement Agreement.
- o Attend PPB community academy. If necessary, the City is willing to provide a reasonable accommodation that would instead permit a PCCEP member to observe a session of the community academy and be given a guided tour of the PPB Training Division (with the opportunity to ask detailed questions about the Training Division).
- o Participate in a ride-along with PPB (1 per PCCEP member). If necessary, the City is willing to provide a reasonable accommodation that would instead permit a PCCEP member to participate in a ride-along with a member of the Behavioral Health Unit or a Neighborhood Response Team (in lieu of regular patrol); or participate in a morning walking beat.
- o Review lessons learned from the COAB.
- o Participate in subject matter and board trainings.
- o Learn about:
  - ✦ PPB organizational structure;
  - ✦ Policy development and implementation process;
  - ✦ PPB Racial Equity Plan;
  - ✦ PPB Training Division Plan;
  - ✦ PPB's Office of Community Engagement and current community engagement initiatives, generally; and
  - ✦ PPB advisory bodies.
- On a quarterly basis, gather input from Portlanders regarding experiences with and perceptions of PPB's community outreach. Input will be gathered through culturally responsive and relevant strategies that center the needs of the community. These strategies will include meeting community members where they are physically, mentally, emotionally and spiritually.  Such input will be solicited from (though not limited to) the following groups:
  - o General consultation with Office of Community and Civic Life (Civic Life) and/or District Coalitions, Coalition of Communities of Color, and Civic Life's Diverse Civic Leadership partners
  - o AMAC, The Portland Commission on Disabilities, the Human Rights Commission, and the New Portlander Policy Commission
- Evaluate national best practices regarding police and community engagement leading to bias-free policing and community trust.
- Analyze prior community surveys and consult with the City to conduct additional community surveys.
- Receive public comment from Portlanders at large.
- Review PPB directives and make recommendations to PPB based on public feedback in key areas of concern.

Exhibit 2 – Page 6

- Provide ongoing feedback to PPB's Office of Community Engagement on its community engagement practices and initiatives, and provide feedback on PPB's Community Engagement Plan.

- Hold monthly meetings. Meeting agendas shall be structured in a manner that provides a meaningful opportunity for public comment at the meeting prior to the conclusion of deliberations and voting. PCCEP meetings will generally be open to the public. However, if PCCEP reasonably determines that good cause exists on a particular occasion (for example, to deliberate on sensitive matters, such as matters involving personal medical information, or due to safety concerns), the PCCEP may meet without the public present. Facilitators will ensure that no votes are taken without the public having the opportunity to be present.

- Form subcommittees that may meet at other times during the month. Subcommittee meetings must be open to the public and provide an opportunity for the public to weigh in on the substantive matters being considered.

- PCCEP shall coordinate with the COCL to host open town hall meetings  at which the COCL provides quarterly reports and the COCL and PCCEP receives public comment on compliance assessments and recommendations to facilitate Portlanders' ability to review compliance and make recommendations.[3]

- Agendas and minutes from all PCCEP meetings will be published on the City website within 10 business days after the meeting date.


IX.    DELIVERABLE PRODUCT

PCCEP shall be responsible for producing the following:

- Summary reports issued (to the Mayor, PPB, DOJ, and the public at large) contemporaneously with quarterly town halls, providing an overview of community concerns around and any recommendations regarding use of force, interactions with people experiencing mental illness, complaint investigations, and racial justice. Strategies and recommendations developed to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members, to inform PPB's Community Engagement Plan, utilizing the following procedure:

---

[3] Should COCL decline to combine its quarterly town halls with PCCEP's town halls, the COCL may hold separate town halls for community feedback, with staff support from the City.

Exhibit 2 – Page 7

1. *PCCEP shall consult with community members and hold at least two (2) public hearings, to be completed within 180 days of PCCEP members being seated (PCCEP's town halls may be utilized for this purpose). To gather public input on PPB's outreach efforts and progress towards eliminating unconstitutional disparate treatment, the hearings shall be held in locations to ensure that PPB receives input from all parts of the Portland community. PCCEP shall review PPB's prior community outreach efforts to contribute strategies to the development of a new Community Engagement Plan.*

2. *PCCEP shall meet at least quarterly with the Director of the City's Office of Equity and Human Rights and PPB's Manager of Equity & Diversity, including a review of PPB's current Racial Equity Plan, and evaluate PPB's ongoing efforts to implement that plan.*

3. *PCCEP shall suggest for inclusion in the Community Engagement Plan strategies to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members. The parties recognize that meaningful public engagement involves the ability of community members to affect policies, practices, and PPB culture, thereby improving outcomes and eliminating unconstitutional actions.*

4. *PCCEP may also provide information to the PPB on other areas related to meaningful community engagement and outreach to contribute to the development of the Community Engagement Plan. The Plan will specify how to integrate community values and problem-oriented policing principles into PPB's management, policies and procedures.*

5. *PCCEP will spend the first year gathering information from the public and compiling recommendations for PPB's Community Engagement Plan. Recommendations shall be submitted to PPB within one year of PCCEP members being seated.*

6. *The Chief's Office shall consult with the PCCEP and shall consider and utilize to the extent practicable PCCEP's recommendations in developing and implementing the Community Engagement Plan. The Chief's Office shall present the final proposed Community Engagement Plan (with implementation timeline) to the PCCEP for its final review and comment within 45 days of receiving PCCEP's recommendations. The recommended Community Engagement Plan shall be considered by the City Council in a public hearing, leading to the Council's adoption of the Plan after review and amendments if indicated.*

Exhibit 2 – Page 8

*The PCCEP shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Community and Civic Life Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The PCCEP shall also provide the opportunity for public comment at any town hall and roundtable meetings to keep open lines of communication with the public at- large.  The PCCEP may also invite testimony from other City bodies, including but not limited to PCoD, BHUAC, TAC, HRC, CRC and the citizen members of the PRB.*

Exhibit 2 – Page 9

# **APPENDIX B**

# PORTLAND COMMITTEE ON COMMUNITY-ENGAGED POLICING APPLICATION INFORMATION

**What is the Portland Committee for Community-Engaged Policing?**

The Portland Committee for Community-Engaged Policing (PCCEP) is being formed to independently assess the City of Portland's Settlement Agreement with the U.S. Department of Justice (DOJ) in addition to working with the Portland Police Bureau (PPB) to develop policies and assess community engagement efforts. The Settlement Agreement calls for reform to PPB policies and training, particularly related to use of force and interactions with people who have or are perceived to have a mental health condition.

You can find more information on the PCCEP here:

*https://www.portlandoregon.gov/wheeler/article/681099*

You can find general information on the Settlement Agreement here:

https://www.portlandoregon.gov/police/62613

**What will the PCCEP do?**

The PCCEP will engage with Portland's diverse communities in key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental health conditions, complaint investigations, and racial justice. The PCCEP will also contribute to the development of the PPB Community Engagement Plan, as directed by the Settlement Agreement between the City of Portland and the DOJ.

The PCCEP will be authorized to:

- Provide recommendations in key areas of concern (including but not limited to those listed above) to the Mayor, PPB, the Office of Equity and Human Rights and the DOJ based on information gathered from Portland's diverse communities.
- Review and make recommendations on PPB policies touching the DOJ Settlement Agreement and/or key areas of concern.
- Provide ongoing feedback to PPB regarding community engagement initiatives already in progress and those needed in the future.
- During the effective period of the Settlement Agreement, appear before the Court at the annual status conference and provide an assessment of the City's progress toward achieving the goals of the Settlement Agreement.

**Who can be a PCCEP member?**

- People who are at least 16 years old and live, work, worship, and/or go to school in Portland. (Please note that "worship" is broadly defined to include all religions and areas of worship.)

- PCCEP members cannot be current City employees or have an actual or perceived conflict of interest with the City.

**Who is an ideal PCCEP candidate?**

Individuals who are:
- Open-minded and willing to consider other opinions
- Demonstrate an ability to be impartial and objective
- Possess sound communication and listening skills
- Lead and function well in a group
- Are willing to make a substantial time commitment — including trainings, at least two evening meetings per month (with one open to the public), and workgroup meetings
- Able to listen to community concerns at meetings open to the public

**How will PCCEP members be selected?**

- The Mayor, in consultation with the Selection Advisory Committee and Council Offices, will interview final candidates and select 9 to 11 individuals to sit on the PCCEP. There will be five alternates. The Selection Advisory Committee, a five-member panel with representatives selected by the Mayor and each of the Commissioners, will review applications, conduct initial interviews and provide the Mayor with recommendations for final candidates.

**What are the responsibilities of each PCCEP member?**

- If you are selected, commit to serve either a one or two-year term. (Please note that PCCEP members may, upon the completion of their first term, apply to serve for another. Per City rules, PCCEP members may serve for up to eight years).
- Prior to being seated on the PCCEP, be required to:
  - Learn about the history of the City of Portland's Settlement Agreement with the DOJ;
  - Attend PPB community academy;
  - Participate in a ride-along with PPB; and
  - Participate in subject matter and board trainings.
- The minimum time commitment for PCCEP members will be approximately 8 hours a month, including reading materials before meetings and attending meetings. The committee (with the agreement of its members) may, at its discretion, lengthen the time commitment depending on the work it wishes to conduct.
- Under Oregon state law, a public official is any person serving the State of Oregon, any of the state's political subdivisions, or any other public body as an appointed official. Under City ordinance, a city official includes anyone appointed to a board or commission, or a citizen volunteer authorized to act on behalf of the City of Portland. **PCCEP members will be both public and city officials.** PCCEP members will have certain responsibilities and obligations that are different than those of private citizens. Training will be provided to all members prior to being seated.
- Engage and collaborate with other PCCEP members, law enforcement and the Portland community in a respectful and productive manner.

- Provide information to and solicit feedback from Portland's diverse communities through roundtables and town halls, to be held at least quarterly and open to the public.

---

**To be considered, please complete this application.**

**Please note that PCCEP application submissions are public records subject to disclosure upon request but effort will be made to protect sensitive information in public disclosure and discussion, to the extent allowed by law.**

The City strives to eliminate barriers that may prevent persons with disabilities from participating in City programs, services and activities. If accommodations or translations are needed to submit a PCCEP application, or you have any other questions, please contact Mandi Hood at (503) 319-7736.

In recognition of the importance of the participation of persons with lived experience of a mental health condition in the PCCEP process, accommodations will be provided to ensure a safe environment that supports full participation of all PCCEP members.


**Please return your completed application by Monday, July 2. There are several options for submitting your application:**

FILL OUT AN ONLINE VERSION OF THIS APPLICATION BY JULY 2:

https://www.portlandoregon.gov/wheeler/76741

You can print the application below, pick up a copy at the Mayor's Office, or call Mandi Hood at 503-319-7736 to request a paper copy by mail.

WORD VERSION: https://www.portlandoregon.gov/wheeler/article/681128
PDF VERSION: https://www.portlandoregon.gov/wheeler/article/681126

Application and Instructions in additional languages:
https://www.portlandoregon.gov/wheeler/76745

RETURN THE COMPLETED APPLICATION BY JULY 2:

EMAIL: PCCEPinfo@portlandoregon.gov
MAIL or DROP OFF:
Mandi Hood c/o Nicole Grant
Office of the Mayor
1221 SW 4th Avenue Room 340
Portland, OR 97204

If you have questions regarding the PCCEP or this application, please contact Mandi Hood, PCCEP Project Manager, at (503) 319-7736 or email PCCEPinfo@portlandoregon.gov

*If accommodations or translations are needed to submit a PCCEP application, please contact Mandi Hood at (503) 319-7736 or mandi.hood@portlandoregon.gov.*

ترجمة تحريرية أو شفهية:

Traducción o interpretación:

翻訳または通訳：

Traducere sau Interpretare:

Письменный или устный перевод:

Turjumida ama Fasiraadda:

Письмовий або усний переклад:

Chuyển Ngữ hoặc Phiên Dịch:

翻译或传译：

(503) 319-7736

**NAME:**                                    **ADDRESS:**

**PHONE:**                                   **EMAIL:**

**BEST WAY & TIME TO REACH YOU:**

---

The Mayor, Commissioners, and Selection Advisory Committee are striving to create a PCCEP that represents a reasonably broad spectrum of the Portland community and a variety of perspectives. **When answering the following questions, please share what you feel will help the selection bodies understand your background, your interest in the PCCEP, issues around mental health and police accountability, and the perspective you would bring as a member of this citizen body.** You may use the space provided, attach additional sheets, or send a summary response that addresses the questions below.

**Please mark the boxes that are applicable to you:**

☐  I have reviewed the APPLICATION INFORMATION above, and I understand the role of the PCCEP and a PCCEP member's responsibilities.

☐  I am submitting this application with the understanding that the City will keep it confidential and will only disclose the application if ordered to do so. I would not submit this application without the promise of confidentiality.

☐  I live, work, worship, and/or go to school in Portland. (Please note that "worship" is broadly defined to include all religions and areas of worship.)

☐  I am at least 16 years old.

My preference is to serve:
      ☐  a two-year term
      ☐  a one-year term
      ☐  I have no preference.

[TURN OVER FOR QUESTIONS]

# Portland Committee on Community-Engaged Policing Application

1.   What is your interest in serving on the PCCEP?

2.   What strengths and skills do you have that would serve the work of the PCCEP?

3.  The PCCEP's work will focus on issues of mental health, equity for people experiencing mental health conditions and/or a behavioral health crisis, issues faced by people of color and ethnic minorities, people with disabilities, police use of force and accountability. Please answer the following questions:

    a)  What is your understanding of issues affecting people with mental health-related conditions?

    b)  What is your understanding of issues affecting communities of color?

c)  What is your understanding of issues affecting people with disabilities?

d)  What is your understanding of issues concerning police use of force and accountability?

4.  The PCCEP is assigned with specific tasks in the PCCEP Plan and must routinely meet deadlines. This will require teamwork and collaboration amongst committee members. Please describe your approach to working in a team, including the ability to problem-solve, and respectfully work through conflicts.

5.  Please describe any experience you have serving on advisory bodies or community boards (Note: this may include school, community, cultural, and religious groups). How would you measure the effectiveness of a committee?

6.  Given that the PCCEP's work will be largely self-driven, what do you envision as the PCCEP's role in improving:

   a)  The relationship between law enforcement and communities of color?

b) The relationship between law enforcement and people with mental health conditions?

7. What do healthy police-community relationships look like to you?

8. What do you hope to accomplish while serving on the PCCEP?

[TURN OVER FOR DEMOGRAPHIC QUESTIONNAIRE]

## CONFIDENTIAL DEMOGRAPHIC INFORMATION

The City asks that you voluntarily provide the following information. The City will use this information for statistical purposes, such as tracking the diversity of advisory body appointees. The City strives to cultivate equity, diversity, and inclusion. By providing this information, you will help us ensure that appointments represent a broad cross-section of the community. You are under no legal obligation to provide this information. State and federal law prohibit the use of this information to discriminate against you. The City will treat this information as confidential to the fullest extent allowed by law.

**What is your age?**

☐ Under 18  ☐ 18-25  ☐ 26-39  ☐ 40-55  ☐ 56-70  ☐ Over 70

**Which of the following describes your racial or ethnic identity?** Please check all that apply.

☐ American Indian or Alaska Native

☐ African-American or Black

☐ Asian

☐ Hispanic or Latino

☐ Middle Eastern/North African

☐ Native Hawaiian or Other Pacific Islander

☐ White

☐ Do not wish to disclose

# Portland Committee on Community-Engaged Policing (PCCEP) Application

**Please note that PCCEP application submissions are public records subject to disclosure upon request but effort will be made to protect sensitive information in public disclosure and discussion, to the extent allowed by law.**

**What is your preferred or primary language(s)?**

_____

**Do you identify with having or living with a disability?** ☐ Yes        ☐ No

**If yes, please describe the nature of your disability.** (Please check all that apply)

☐ Mobility          ☐ Visual          ☐ Hearing    ☐ Cognitive/Developmental

☐ Mental Health     ☐ Intellectual    ☐ Hidden     ☐ Do not wish to disclose

☐ Self-identify: _____

**What is your gender?** (Please check all that apply)

☐ Female    ☐ Male    ☐ Gender non-conforming

☐ Trans-gender: you do <u>not</u> identify with the gender assigned to you at birth

☐ Cis-gender: you identify with the gender assigned to you at birth

☐ Self-identify: _____

☐ Do not wish to disclose

**Do you identify with any of the following?** (Please check all that apply)

☐ Heterosexual    ☐ Lesbian    ☐ Gay    ☐ Bisexual    ☐ Queer    ☐ Two Spirit

☐ Self-identify: _____

☐ Do not wish to disclose

**What is your total household income?**

☐ Less than $19,999      ☐ $20,000 to $39,999     ☐ $40,000 to $59,999

☐ $60,000 to $79,999     ☐ $80,000 to $99,999     ☐ $100,000 to $149,999

# Portland Committee on Community-Engaged Policing (PCCEP) Application

☐ $150,000 or more          ☐ Do not wish to disclose

**What geographic area of the City do you live or work?** Check all that apply.

☐ Inner Southwest          ☐ Outer Southwest          ☐ Inner Southeast

☐ Outer Southeast          ☐ Central North          ☐ Upper North

☐ Inner Northwest          ☐ Outer Northwest          ☐ Outer East (East of I-205)

☐ Other:

_____

# APPENDIX C



# Portland Committee on Community-Engaged Policing

# PCCEP Member Bios

Yolanda Clay

Yolanda Clay has lived in Portland since 1991. She graduated from Portland State University with a bachelor's of science in social science. Yolanda became empowered to vocalize and advocate for individuals with mental health issues by completing the Peer Support Specialist training. Her interests lie in learning and cultivating modes for obtaining states of personal and communal well-being.Yolanda has proven herself to be a lifelong learner with a commitment to continuously improving her personal processes. She has gained knowledge about the social effects of poverty and in particular, generational poverty on individuals and families by participating in the Communication Across Barriers' Poverty Institute conference. She has also developed skills to refocus and reframe her visions and goals to ensure her present and future success by completing STARTS, a leadership development program through REACH CDC. A self-described introvert, Yolanda believes in the power of empathy for easing societal ills.

Sebastian Chevalier

Sebastian Chevalier was born in Portland and has lived here all his life. His father is from Haiti and he takes a lot of pride in being Haitian and consider it a big part of who he is. He currently attends Lincoln High School and is a co-president of the brothers of club there. He's also had the amazing opportunity to explore the world with his family, traveling to Chile, Argentina, Haiti, the UK, Germany, Spain, and the Czech Republic. Sebastian temporarily lived in the Netherlands for his freshman year of high school. Because of this global lifestyle, he's developed the ability to step into an objective point of view in everyday situations and be open-minded as possible. His goal for the future is to attend Morehouse college and pursue his passion in either music or film.

Lakayana Drury

Lakayana Drury is the executive director of Word is Bond, a new nonprofit in Portland whose mission is to build positive relationships between young Black men and law enforcement. Lakayana helped found the organization in 2017. Lakayana facilitated nine community listening sessions to an estimated 400 police officers as part of the Portland Police Bureau's implicit bias training this past May. In addition to running the nonprofit, Lakayana teaches social studies at Rosemary Anderson High School. He is the staff lead for the boys to men group, robotics club and the Historically Black College Tour. Prior to moving to Portland, Lakayana taught in Philadelphia and Beijing, China and did community organizing in New Haven, Connecticut and Washington, D.C. Outside of his community engagement work, Lakayana is passionate about reading, traveling, yoga and mixed martial arts. He received a Bachelor of Science in Applied Social Science concentration in History and Politics, from the University of Wisconsin Stout.

LaKeesha Dumas

LaKeesha Dumas is an Office of Consumer Engagement Coordinator for Multnomah County. She comes with a wealth of knowledge and lived life experience; she is in recovery from a substance disorder and mental health issues. LaKeesha is certified by the State as a Community Health Worker, Peer Wellness Specialist, Adult Addictions Peer Support Specialist, Adult Mental Health Peer Support Specialist and a Youth and Young Adult Peer Support Specialist through the Oregon Health Authority. She started off working with systems when she was a part of the WOW Project through Healthshare , Kaiser Permanente , ORCHWA and 5 Community Based Organizations, working on well-child checks and mental health. Through her advocacy for culturally -specific mental health services for those on the OHP, she was the recipient of the Oregon Public Health Association 2014 Emerging Leader Award. After that, she worked with CareOregon for multiple years, providing peer support services to their members with complex health and social needs contracted through the Urban League of Portland and the African American Health Coalition.Born and raised in Portland, she has seen the gentrification, gang violence, drug-epidemic and trauma faced by her community. Since being in recovery she has worked tirelessly reaching back to her community to give them hope and get them the appropriate resources to become healthier, overcome barriers and also recover.LaKeesha is the Chair of The Traditional Health Workers Commission, on the board for Oregon Public Health Institute, the Behavioral Health Advisory Board, Regional Behavioral Health Collaborative, the Board for Portland's Black LGBTQ Community (Newly named Sankofa Collective Northwest),  Healthshare's CAC, Vice President for MAAPPS ( Metro-Plus Association of Addiction Peer Professionals), Peer Delivered Services Core Team through the Oregon Health Authority, Alternatives Planning Committee, Peerpocalypse Planning Committee, and the National Advisory Council for Complex Care and Social Needs.  She also Volunteers with other Organizations such as Unify Portland, Straightway Services, Enough is Enough, and also

Recovery and Healing Groups ranging from anti Human Trafficking, Gang Violence & Domestic Violence to Addiction and Mental Health.Her role helps elevate the way the county provides services to its consumers, bridging the gap between county and community. Helping with technical assistance around the Departments and paving the way for more peers with lived experience to be a part of the County's delivery system and at the tables where decisions are being made about consumers' health and needs.

Bob Dye

Bob Dye is Senior General Manager of Lloyd Center in Portland, Oregon.  A native Hawaiian, a certified Shopping Center Manager, and licensed Oregon Principal Broker, Dye took Lloyd Center's helm on July 1, 2015 and has over thirty-seven years of experience in the management, marketing, leasing and development of shopping centers and mixed use properties. Over the course of his career Bob has worked with numerous municipalities and interacted with law enforcement agencies at multiple levels.  Early in his career, working for a local savings bank and in conjunction with the Honolulu Police Department, Bob introduced the red dye money packs to combat robberies of banks and other financial institutions. Bob has been a student mentor for the Grossmont Union School District (San Diego) as well as the Newberg, Oregon School District.   Prior to sustaining a severe and irreversible injury to his foot and ankle, Bob was an avid road cyclist participating in century rides in multiple states across the U.S. In 2001, Bob helped create and co-chaired the Alpine Challenge Bike Ride benefitting the Kiwanis Club of Alpine, California and providing mentoring and scholarships to at-risk high school students. Since 2001 the Alpine Challenge has raised over $200,000 in scholarships for 33 students.

Sharon Gary-Smith

Sharon Gary-Smith is a native-born Oregonian, the first of the four daughters of a civil rights, educational equity and social justice mother (the late Bobbi L. Gary), and a labor and education justice father (the late Frederick Douglas Gary, Jr., a Tuskegee man).  For five decades, Sharon has been a grassroots activist, agitator and organizer for educational equity, community economic development, and racial and social justice; as a second-generation African American Oregonian, it's in her DNA.  She has held positions in corporate America, community based organizations and national and local philanthropy, most recently she served as the (retired) executive director of the MRG Foundation, Oregon's leading racial, social, environmental and economic justice funder.  Sharon served on numerous local and national boards of directors including board emerita Western States Center, Portland; board emerita Social Justice Fund NW, Seattle; national Planned Parenthood board of directors, national NARAL board of directors, board member, Grantmakers of Oregon & SW Washington.  She has been a consultant to Multnomah County, City of Portland, University of Oregon, Portland Public Schools, and a number of grassroots, community-based organizations. Sharon co-chairs Metro's Committee on Racial Equity (CORE) that is responsible for review, assessment, monitoring and recommendations to METRO's Strategic Equity Plan, and to guide the METRO council in ensuring the organization embeds equitable operational practices throughout the organization.

Andrew Kalloch

Andrew Kalloch is a former Staff Attorney at the New York Civil Liberties Union and led the criminal justice policy efforts for the Manhattan Borough President and the New York City Comptroller. He graduated from Harvard College and Harvard Law School, where he was a member of the Prison Legal Assistance Project and the Harvard Legal Aid Bureau. Mr. Kalloch is now the Americas Policy Manager for Airbnb, and lives in Johns Landing with his wife, Jenna Adams-Kalloch, and their one year old daughter, Selma Abigail Adams-Kalloch.

Michelle Lang

Michelle Lang is Director of Campus Ministries at Warner Pacific University and serves  at Imago Dei (http://www.portlandoregon.gov/x-apple-data-detectors://1) Community Church. She has a long career in urban development & advocacy, specifically in areas related to youth and the African-American community. In 2015, after being shaken by the Michael Brown case in Ferguson, MO, Michelle set out to combine her extensive background in theater and community engagement to create an interactive workshop entitled "the Art of Tough Talks", a multi-media project that utilizes the arts to foster conversation,  education and action on matters of social change and justice.  She is a speaker, workshop facilitator and artist who believes in Art As Activism.  She relocated to Portland in 2013.

Patrick Nolen

Patrick was born in 1970. Due to untreated heath issues including depression and anxiety he was homeless in Portland off and on from 1990 to 2011. Patrick has been both a board member and community organizer at Sisters of the Road Cafe, a board member at Empowerment Initiatives, and an advisory council member for the Mental Health Association of Portland. His ongoing interests include public health care, the housing crisis, homelessness, local politics, reading nonfiction books - especially history, and meeting new people. He's recently moved in with his girlfriend and her 9-year old son.

Sam Sachs

Sam Sachs is a Portland Native. He graduated from Portland State University with a degree in Black Studies. He has worked in public safety for over 20 years, most recently as a Portland Park Ranger. He served as the chair of The Community and Police Relations Committee while serving as a Human Rights Commissioner for the City of Portland. Sam founded a non-profit called The No Hate Zone, focused on ending hate and racism in Portland through education, community engagement and advocacy. Sam enjoys spending time with family and friends and an occasional cigar.

Kalonji Williams

Kalonji Williams is a 16-year old junior attending Rosemary Anderson High School. He is a member of student council and avid reader. He is a member of Word is Bond. Kalonji is From Atlanta, Georgia and moved to Portland at an early age. He's traveled to Jamaica and is a humble young man looking to make a difference in his community with aspirations to attend college.

Aden Hassan

Aden is experienced in conflict resolution, serving as a Peer Mediator for several years. He is also a mentor for disadvantaged youth in Southwest Portland, organizing events to foster a stronger sense of community, promote self-esteem and forge relationships between the youth. Born and raised in Portland, Aden received a Bachelors of Science in Biology from Oregon State University. He provides educational and career guidance to high school aged teens and is devoted to creating support systems to improve achievement and success in higher level education. He considers one of his greatest strengths to be his willingness to listen and understand the perspectives of each and every voice. The years Aden spent working as a healthcare professional with the terminally ill has emphasized the importance of empathy. He believes it is essential to understand the concerns and sentiments of all parties when aiming to resolve any conflict. Aden believes the PCCEP should be focused on developing stronger strategies in conflict resolution regarding individuals with mental health conditions.

# **APPENDIX D**

PCCEP Orientation Process

Session 1                        Friday, September 28th 6pm-9pm            (3 hours)

| A. Welcome "A Mindfulness Moment B. Diversity Welcome | (T4T) | 6:00-6:15 |
| B. Introductions "Establish Group Agreements" | (T4T) | 6:15-6:40 |
| C. Ice Breaker | (BTG) | 6:40-7:10 |
| D. Mandi Orientation | Mandi | 7:10-7:30 |
| E. Break | | 7:30-7:40 |
| F. Activity/Discussion "I am From Poem/Drawing | (T4T) | 7:40-8:25 |
| G. Overview of Agendas/Timelines | (BTG) | 8:25-8:45 |
| H. Closing "Next Steps; Mindful Outro" | (T4T) | 8:45-9:00 |

Session 2                        Saturday, September 29th 9am-5 pm            (8 hours)

| A. Welcome "3 Poems/Drawings" | (BTG) | 9:00-9:15 |
| B. Activity/Discussion "Rope Exercise" | (T4T) | 9:15-9:45 |
| C. Inst. Racism "Exclusion Laws, New Jim Crow, Cointelpo" | (Fac: T4T) | 9:45-10:45 |
| D. Break | | 10:45-11:00 |
| E. Activity | (BTG) | 11:00-11:45 |
| F. Department of Justice | (Fac: BTG) | 11:45-12:30 |
| G. Lunch | (Fac:BTG) | 12:30-1:30 |
| H. "3 Poems/Drawings" | (T4T) | 1:30-1:40 |
| I. Mental Health Perspective "Jason Renaud" | (Fac: BTG) | 1:40-2:45 |
| J. Break | | 2:45-3:00 |
| K. Discussion "Know your Rights Videos; Comm. Insights" | (Fac:T4T) | 3:00-3:45 |
| L. CRC/PCCEP Engagement | (Fac: BTG) | 3:45-4:45 |
| M. Closing | (BTG) | 4:45-5:00 |

Session 3 Community Academy   October 4th-October 11th            (8 hours)

Participants sign up to attend either
-Wednesday October 4th and Wednesday October 11th from 6pm-10pm
-Saturday, October 6th from 8am-5pm
-Or arrange for a reasonable accommodation

Session 4 Schedule Ride Along   October 7th-October 12th            (4 hours)

Participants schedule a 4-hour ride along to occur between October 7th-October 12th or arrange for a reasonable accommodation

Session 5                    October 12th 6pm-9pm                    (3 hours)

| | | |
|---|---|---|
| A. Welcome "3 Poems or Drawings" | (BTG) | 6:00-6:15 |
| B. Debrief Sessions 3, 4 | (T4T) | 6:15-7:00 |
| C. Break | | 7:00-7:10 |
| D. Activity | (BTG) | 7:10-7:30 |
| E. City Attorney | (Fac: BTG) | 7:30-8:20 |
| F. Break | | 8:20-8:30 |
| G. Comm. Oversight "Ex Police Commission/CPRA Oak | (Fac: T4T) | 8:30-8:45 |
| H. Closing | (BTG) | 8:45-9:00 |

Session 6                    October 13th 8am-4pm                    (8 hours)

| | | |
|---|---|---|
| A. Welcome "3 Poems or Drawings" | (T4T) | 9:00-9:10 |
| B. Comm. Oversight "Ex Police Commission/CPRA Oak | (Fac: T4T) | 9:10-9:55 |
| C. PPB Panel Discussion | (Fac: BTG) | 9:55-11:00 |

(BHU, Training, Racial Equity Plan, Organizational Structure, Policy
Development and Implementation Structure, Approaches to Community
Engagement, PPB Advisory Bodies)

| | | |
|---|---|---|
| D. Break | | 11:00-11:15 |
| E. AMAC | (Fac: T4T) | 11:15-12:00 |
| F. Lunch | (Fac:T4T) | 12:00-1:00 |
| G. "3 Poemes/Drawings" | (T4T) | 1:00-1:10 |
| H. COAB Panel Discussion | (Fac: BTG) | 1:00-2:15 |
| I. Break | | 2:15-2:25 |
| J. Group Brainstorm Leadership Plan | (BTG) | 2:25-3:15 |

Develop leadership structure, organizational structure,
plan for developing  mission/vision statement, bylaws)

| | | |
|---|---|---|
| K. Small Groups Discussion of Plan | (BTG) | 3:15-3:45 |
| L. Break | | 3:45-3:55 |
| M. Group Brainstorm Decide plan | (BTG) | 3:55-4:25 |
| N. Reflections | (T4T) | 4:25-4:55 |
| O. Closing | (T4T) | 4:55-5:00 |

# **APPENDIX E**



Portland Committee on Community-Engaged Policing

## PCCEP Group Values

PCCEP Group Values created 9/28/2018

• Trust
• Open-mindedness
• Assume positive intent
• Listen with intent
• Safety to be brave and vulnerable
• Effective communication
• Multiple intelligences — different learning styles
• Don't take things personally, don't make assumptions, do your best, be impeccable to your word
• Feel comfortable clarifying things with questions
• Be free to call out bias
• Step up or Step Back (Up)
• WAIT: BE mindful of your level of contribution
• Passion/compassion
• Compromise
• Comfort with ambiguity
• Integrity
• Perseverance
• Self-care, Community care
• Talk to each other, not about each other
• We as a group take care of one another

# **APPENDIX F**



# PORTLAND COMMITTEE ON COMMUNITY-ENGAGED POLICING (PCCEP)
# BYLAWS

## I.  Creation

PCCEP was created on September 5, 2018, by Council Resolution  37384.

### A.  Purpose

*Mission*
The PCCEP's mission is to work with and give advice to the Mayor/Police Commissioner, Portland Police Bureau (PPB), and Portland's diverse constituencies; to solicit and exchange information between the community and PPB; to achieve the desired outcomes of equitable policing which exceeds constitutional requirements, and meaningful community engagement with and trust in PPB.

*Goals*
PCCEP members will independently assess the implementation of the Settlement Agreement.  PCCEP will work to facilitate positive police/community relationships and promote public safety by assessing PPB's current community engagement processes, and developing recommendations and strategies for systems to increase public outreach and engagement with a broad-cross section of the community, to build confidence and improve outcomes.  Additionally, PCCEP members will review and make recommendations on PPB policies touching the DOJ Settlement Agreement and/or key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice.  PCCEP members will also make recommendations in the key areas of concern for Portland's diverse communities based on the communities' articulated experiences and grievances.

### B.  Sponsoring Office:  Mayor's Office

### C.  Office Liaison: Mayor's Senior Policy Advisor

### D.  Committee Liaison:  PCCEP Project Manager

### E.  Advise to:  Mayor/Police Commissioner, Police Chief, OEHR Director

## II.  City Role

The Mayor's Office will provide a staff person to assist with technical support, substantive expertise, logistical assistance, administrative assistance, and advice to PCCEP ("Project Manager").



The Project Manager will provide public notice of all meetings, post materials to a webpage, and prepare meeting summaries that outline the issues discussed, the areas in which there is agreement, and any remaining issues on which agreement was not reached.

Agendas will be posted a minimum of 10 business days before a PCCEP meeting.

Minutes from all PCCEP meetings will be published on the City website within 10 business days after the meeting date.

## III.    Frequency of Meetings

PCCEP will meet at least one time a month each calendar year and as otherwise necessary to conduct its business.  Meetings will be conducted in accordance with the operating procedures specified herein.

## IV.    Membership and Term

PCCEP members are public officials.  Members should become familiar with rules and responsibilities described at the "Oregon Government Ethics Law - A Guide for Public Officials" (Oregon Government Ethics Commission).

**A.    Total Membership:** 13 seats.

8 adult seats for 2 years;
3 adult seats for 1 year; and
2 youth seats for 9 to 12 months, at their choice.

**B.    Terms:**  Staggered.

**C.    Term Limits:**

Members may serve any number of terms not to exceed eight years of total consecutive service. Completion of an unexpired term does not apply toward the eight-year cumulative.

At the completion of each term, regardless of term length, incumbents are required to complete notice of intent to continue to serve and discuss mutual benefits of continuing on PCCEP with the Project Manager.

Members interested in continuing service beyond eight years must sit out for one term before reapplying to serve on PCCEP.



**D.    Alternates**

PCCEP asks the Mayor's Office to ensure a pool of nine Alternates to fill PCCEP vacancies.

PCCEP asks the Mayor's Office to fill a vacant seat with an Alternate within 30 days.

PCCEP will recommend an Alternate to the Mayor's Office when a seat becomes vacant. Such recommendation will be subject to a vote of the full PCCEP.

Members may not have specific Alternates and all serving members are selected and appointed to full terms.

**E.    Quorum:** Simple majority: 50% plus 1 or greater number of seats (7).

A quorum of voting members is necessary to make decisions that represent the position of the PCCEP and to fulfill any other responsibilities.

PCCEP is not required to have a quorum to deliberate.

**F.    Voting:** Majority of seats per ORS 174.130.

Proxy/absentee voting is not allowed.

Members may participate via teleconference.

PCCEP is not required to administer a formal vote to make recommendations.

**G.    Stipend:** PCCEP members are presently receiving a stipend.  Future stipends are subject to City authorization.

**V.    General Operating Procedures**

**A.    Disclosure of Conflicts of Interest**

PCCEP members must announce the nature of a conflict in writing or orally of interest each time the issue giving rise to the conflict of interest is discussed or acted upon.

The announcement needs to be made on each occasion when the member is met with the conflict of interest, and the member must disclose the nature of the conflict of interest.  For example, the member must make the public announcement one time when met with the conflict of interest, but only one time in each PCCEP meeting. If the matter giving rise to the conflict of interest is raised at another meeting, the disclosure must be made again at that meeting.



The Project Manager will record and keep all conflicts of interest that are announced during each meeting.

If it is found that a member did not disclose a conflict of interest, staff must alert the Mayor's Office and PCCEP members of the instance as soon as the incidence is known.

Any potential or actual conflict of interest noted by staff will be included in the recommendation report provided to the Mayor's Office.

### B.    Facilitation

PCCEP members will decide how their meetings will be facilitated and may use an outside professional Facilitator who operates using culturally informed perspective.

### C.    Decision Making and Public Comment

Meetings will be conducted to foster collaborative decision-making.

Decision-making is subject to quorum and voting requirements.

The public will be given the opportunity to provide comments prior to any vote.

## VI.    Removal of Members and Resignations

### A.    General

All members serve at the pleasure of the Mayor and may be asked to resign or be removed at the Mayor's discretion at any time unless authority (for instance, Code, statute, etc.) requires a different process.

If a member be removed or asked to resign, PCCEP will request a meeting with the Mayor.

### B.    Automatic Removal for Non-Attendance

Any member who misses four or more meetings within a 12-month period will be removed.  There is no distinction between excused and unexcused absences.

If a member misses a meeting, the Project Manager will check in with the member to support them in attending future meetings.

Removal from the PCCEP for attendance reasons does not preclude a person from applying to the PCCEP at a later time.



**C.    Reasons for Removal**

The Mayor, after consultation with the Council, the PCCEP Project Manager and PCCEP Co-Chairs (absent a conflict of interest) has sole discretion to determine when PCCEP members are no longer fit to serve on the Committee due to misconduct. PCCEP asks the Mayor to inform the member in writing that they have been removed from PCCEP.

**D.    Resignation Process**

Members are expected to make a good faith effort to complete their term. In cases where this is not possible, members are expected to provide notice to the Project Manager in writing (preferred) or verbally.  Members are encouraged to complete the Resignation Form and submit to the Project Manager.

**VII.    Officers**

**A.    Positions**

PCCEP may elect the following Officers:
Two Co-Chairs
One Alternate Co-Chair
One Secretary

**B.    Elections**

PCCEP will elect new Officers annually in November.  No member may serve in the same Officer position for more than two years.

**C.    Resignation**

An elected Officer may vacate the position for any reason.  That member will continue to participate as a full PCCEP member.  PCCEP may fill a vacant position by special election.

**D.    Duties**

Officers will be responsible for conducting PCCEP meetings.  Officers remain voting members of PCCEP.  A presiding Officer will be designated at all times.

Officers may request that the Mayor's Office provide a culturally responsive Facilitator to facilitate PCCEP meetings.

Officers will encourage full and safe participation by everyone, assist in the process of building consensus, and ensure all participants abide by PCCEP's operating procedures.



The Co-Chairs, Office Liaison, and Project Manager will serve as liaison between PCCEP members and the City.  In consultation with the Facilitator (if there is one) and Project Manager, Officers will develop meeting agendas, establish subcommittees if needed, and ensure an efficient advisory process.

## VIII.  Subcommittees

PCCEP may divide its members into subcommittees authorized to act on behalf of the full PCCEP for an assigned purpose.

A Steering Committee will be composed of Co-Chairs, Alternate Co-Chair, and Secretary.  The Steering Committee may include chairs and members of subcommittees.

Subcommittee meetings, including Steering Committee meetings, are subject to Oregon Public Meetings Law and must abide by quorum requirements when voting.

While subcommittees may engage non-members, only members may vote to approve reports and recommendations to be forwarded to the full PCCEP.  When voting, the quorum for subcommittee members is the simple majority of the subcommittee (50% plus 1 or greater number of seats).

## IX.  Facilitator Role

The City may contract with an independent and neutral third party whose role is to facilitate meetings, help develop recommendations, and produce approved reports. A Facilitator will not act as an advocate on any issue, any interest group, or any member of the PCCEP.

A Facilitator's responsibilities will be determined by the needs of the Mayor's Office and PCCEP, but may include:
> Ensuring a welcoming meeting environment where all members can participate;
> Ensuring a safe environment for minority opinions;
> Conducting meetings in a manner to foster collaborative decision-making and consensus building;
> Timekeeping; and
> Facilitating public comment.

## X.  Communications

Members agree that transparency is essential to all deliberations.  In that regard, PCCEP members will notify the Project Manager before communicating on behalf of the PCCEP as a whole.

PCCEP will handle media requests in a deliberate way.



## XI.    Public Meetings and Records

Meetings of the PCCEP and subcommittee meetings are open to the public and will be conducted under the provisions of Oregon Public Meetings Law (ORS 192.610-690).

The Project Manager will provide at least 7 days' notice to the public regarding the dates, times, and locations of all PCCEP meetings.  Agendas and minutes from all PCCEP meetings will be published on the City website within10 business days after the meeting date.

Per ORS 192.670(1), PCCEP members can participate through telephonic conference calls.  Requests for any other electronic communication means require approval from the Project Manager with City Attorney consultation.  All PCCEP records, including formal documents, discussion drafts, meeting summaries, and exhibits are public records.

Communications among members related to the subject matter of PCCEP should not be treated as confidential and may be subject to public records requests.  "Communications" refers to all statements and votes made during meetings, memoranda, work projects, records, documents, text messages, pictures, or materials developed to fulfill the charge, including electronic mail correspondence by and among the members.  The personal notes of individual members taken at public meetings might be considered to be public record to the extent they "relate to the conduct of the public's business," (ORS 192.410(4)).  Members are not allowed to deliberate towards a decision over e-mail, as public participation needs to be guaranteed through that process.

## XII.    Amendment of Bylaws

PCCEP may vote to amend these bylaws.  Amendments must be consistent with the PCCEP Plan.

# APPENDIX G

**2018 PCCEP Application Demographics**

| Age | % response |
|---|---|
| under 18 | 7.00% |
| 18-25 | 13.00% |
| 26-39 | 26.00% |
| 40-55 | 27.00% |
| 56-70 | 19.00% |
| 70+ | 6.00% |
| didn't disclose | 2.00% |

| Racial/Ethinic Identity | % response |
|---|---|
| African-American/Black | 26.00% |
| Multiracial (incl Native American and Latino) | 12.00% |
| American Indian/Native Alaskan | 2.00% |
| Asian | 1.00% |
| Hispanic/Latino | 1.00% |
| White | 49.00% |
| didn't disclose | 9.00% |

| Preferred Language | % response |
|---|---|
| English | 92.00% |
| Other languages | 2.00% |
| didn't disclose | 6.00% |

| Gender | % response |
|---|---|
| female | 40.00% |
| male | 49.00% |
| gender non-conforming | 3.00% |
| didn't disclose | 8.00% |

| Sexual Orientation | % response |
|---|---|
| heterosexual | 58.00% |
| LGBTQI | 17.00% |
| didn't disclose | 25.00% |

| Disability | % response |
|---|---|
| Yes | 16.00% |
| No | 76.00% |
| didn't disclose | 8.00% |
| If yes, % responded mental health | 63.00% |

| Household Income | % response |
|---|---|
| less than $19K | 14.00% |
| $20-39,999 | 18.00% |
| $40-59,999 | 14.00% |
| 60-79,999 | 10.00% |

**2018 PCCEP Application Demographics**

| | |
|---|---|
| $80-99,999 | 4.00% |
| $100-149,999 | 7.00% |
| $150K+ | 10.00% |
| didn't disclose | 23.00% |

| **Geographic Area** | **% response** |
|---|---|
| North | 19.00% |
| Northeast | 13.00% |
| Southeast | 13.00% |
| Outer Southeast | 14.00% |
| Outer East | 5.00% |
| Southwest | 19.00% |
| Outer Southwest | 6.00% |
| Northwest | 6.00% |
| Outer Northwest | 4.00% |
| Old Town | 1.00%% |

# **APPENDIX H**

**POLICY REVIEW:**

Portland Police Bureau must obtain and analyze data
to ensure equity in the hiring process

October 2018







**Mary Hull Caballero, City Auditor**
**Constantin Severe, Independent Police Review Director**

**Policy Review Staff**
Rachel Mortimer, Assistant Director
Andrea Damewood, Investigator
KC Jones, Senior Management Analyst

**Cover photo**
David Nguyen



## Policy Review

Portland Police Bureau must collect and analyze data to ensure equity in the hiring process

**Summary**

In a time of heightened discussion regarding relations between police and communities of color, having a Police Bureau that mirrors the demographics of the community it serves is a goal for which most every law enforcement agency across the country strives.

In Portland, increasing diversity within the Police Bureau is a priority, and is included in its Five-Year Racial Equity Plan. This plan devotes significant attention to the recruitment and hiring of candidates of color, with the goal of bringing the number of women and minorities in its ranks in line with the other City Bureaus.

Hiring new police officers is a long, rigorous process that involves multiple steps—including a full background check, a physical aptitude test, oral and written interviews, and a full psychological analysis. This can take approximately six to nine months and is intended to ensure a candidate is physically and mentally prepared for the tremendous power and responsibility of being an officer.

This review found that the Police Bureau was unable to identify barriers to successful completion of the hiring process by individual applicants because it could not access demographic data controlled by the Bureau of Human Resources. Without that information, the Police Bureau is less likely to achieve its goal of a diverse workforce.

Independent Police Review (IPR) recommends the Police Bureau and the Bureau of Human Resources improve communication and collaborate to share data. IPR also recommends the Police Bureau create or obtain a database that allows the Personnel Division to comprehensively track and review candidate progress, allowing the Police Bureau to identify barriers to equity. Additionally, we recommend the Police Bureau survey applicants after the hiring process to identify other possible barriers.

*Policy Review: Equity in Police Hiring*

**Officer demographics do not reflect the community they police**

The Police Bureau has struggled for years to fill vacant positions and recently increased resources devoted to background investigations to bring officers onboard in a more timely manner. Yet as this work has been done, the demographic makeup of the Police Bureau still does not reflect the diversity of the city. From 2008 to 2018, the Police Bureau hired 379 officers. Of these hires, 77 percent (292) were white, and 16 percent (62) were female. White officers are over-represented compared to the population while all other categories are under-represented.

**Sworn officers** compared to **Portland population** at the beginning of 2018



In 2016, the U.S. Department of Justice and the Equal Employment Opportunity Commission published *Advancing Diversity in Law Enforcement*. The report focuses on equity in the areas of recruitment, hiring, and retention and says that a police department with varied races, genders, religion and background is "critical" for community trust and organizational reform. The report also identifies significant barriers and recommends best practices.

Some barriers identified include the length and cost of the hiring process, the lack of trust between communities of color and police, and inadequately tailored entrance exams that may have the unintended consequence of excluding qualified individuals from underrepresented populations.

IPR began a policy review of the Police Bureau's Personnel Division to identify barriers to diversity in the hiring process, intending to use the federal report to inform our findings. However, after reviewing the systems in place, IPR found that the Police Bureau does not track enough data to identify where in its hiring process such barriers exist.

**The Police Bureau has a rigorous hiring process**

Hiring for the Police Bureau is a large undertaking. In 2017, 2,376 people applied to become an officer, and the Bureau hired 83 of them.

While the Police Bureau has taken steps to streamline the application process, it still takes approximately six to nine months to become a Portland officer. The hiring process in managed by the Police Bureau's Personnel Division which is staffed by a mix of officers, non-sworn staff and representatives from the Bureau of Human Resources.

To apply, candidates must meet minimum qualifications (age of 21 or older with high school diploma or GED) plus have an associate's degree or equivalent college hours; or two years' experience in the military or other law-enforcement-related field. Candidates must first take a test via the National Testing Network and then apply through the City's website.

Applicants then go through a series of interviews, a physical aptitude test and a full background investigation, which includes completing a 34-page personal history questionnaire.



*Policy Review: Equity in Police Hiring*

Applicants can be disqualified for many reasons, including having used marijuana in the last year; not demonstrating enough life experience with races outside their own; untruthfulness or omissions; or a demonstrated history of poor judgment.

*Advancing Diversity in Law Enforcement* states that: "[r]esearch and experience have revealed that at every stage of the hiring process, barriers exist that impede the selection of officers reflecting the diversity of the community they seek to serve." The report notes that many of the steps used to screen applicants, including physical ability and cognitive tests, examinations, and background checks, have been shown to have a disproportionate impact on underrepresented populations. The length, complexity, and costs associated with the hiring process can also serve as a deterrent.

| Documentation Required from Applicants | |
|---|---|
| Driver's License | Social Security Card |
| Certified Birth Certificate and birth certificates of spouse and children | College Diploma and Sealed Certified Copies of Transcripts |
| Performance Evaluations from all employers for the past 10 years | Marriage Certificate and/or Divorce Decree |
| Federal and State Tax Returns of the past 4 years | DMV Driving Records and Traffic Accident Reports |
| Color photos of tattoos | All Civil Court actions and Police Reports |

Applicants shared similar concerns during this policy review. One applicant identified the time and cost of obtaining transcripts and other official documentation as a hurdle in completing the process. Another applicant, a first generation American, mentioned that the background documents asked for email addresses for elderly family members living abroad who did not have computers.

The Bureau has invested significant resources in recruitment, hiring a dedicated senior recruitment program manager, and working to bring in applicants from John Jay College of Criminal Justice in New York City and other criminal justice programs with diverse graduate pools.

The Bureau also hired more background investigators in 2016 and 2017 to stem the loss of applicants to agencies who could make a job offer sooner. Currently, the Bureau has 15 background investigators, who check in weekly with applicants to provide updates. Personnel Division managers say this helps retain candidates who feel Portland remains interested in them, despite the time it takes to complete the full process.

**4**

The Bureau's Personnel Division also implemented a monthly workshop, held at the same time as the physical aptitude test, at the training facility in Northeast Portland. This provides a space for prospective applicants to ask questions, speak one-on-one with officers, and get specific guidance on completing the personal history statement.

Along with general best practices, *Advancing Diversity in Law Enforcement* recommends police agencies examine how a physical aptitude test may inadvertently screen out female candidates or how background checks can negatively affect minority candidates.

However, the Police Bureau does not have any systems in place to accurately analyze its hiring process to identify and address significant barriers.

**Better communication needed within the Police Bureau and with the City's Bureau of Human Resources**

The Personnel Division is led by a civilian Bureau of Human Resources employee, who reports to the Director of Human Resources, not the police chief. Two Police Bureau employees, a lieutenant and a sergeant, report to the Personnel Manager.

Despite a blended structure of Police Bureau and Human Resources employees in Personnel, staff identified a lack of communication between Human Resources and the Police Bureau, particularly around sharing demographic information, as a key impediment to tracking and analyzing barriers to diversity in hiring.

Staff said demographic data from the online application—which is administered by Human Resources—is the best way to track each applicant from the start. Yet Police Bureau staff say Human Resources has denied requests to access this data, citing possible legal concerns. A lieutenant said:

> "I don't want [the data] so that I can disqualify women and people of color at a disproportionate rate. I want it, so I can identify if there are unintended consequences of something in our hiring process."

Police staff cited another example where Human Resources contracted with an outside firm, paying $8,000 to create recruitment postcards sent to residents in Portland's most diverse neighborhoods. Each postcard contained a different targeted message with a different website link to each. The purpose was to track how many applications resulted from each postcard to identify which messages resonated.

*Policy Review: Equity in Police Hiring*

The outside consulting firm was to analyze the response rate. However, Human Resources declined to provide the company any demographic information, meaning a City employee had to hand-input data instead. Personnel Division staff was frustrated by the inefficiency and lack of foresight.

Police Bureau employees said it appears that once Human Resources denies a request, nothing is done by the head of the Personnel Division, who works for Human Resources, to find an alternate solution.

*Advancing Diversity in Law Enforcement* also recommends engaging other stakeholders to increase equity. Currently, the Personnel Division has no standing meetings with the Police Bureau's Equity and Diversity Program. The Equity and Diversity Program is tasked with the implementation of the Police Bureau's Racial Equity Plan, and is intended to be subject matter experts in helping different divisions within the Police Bureau hit their equity goals.



*New officers with Chief Outlaw in February 2018.*
*@PortlandPolice on Instagram*

A Police Bureau employee identified a need for an open discussion with Human Resources to get the Police Bureau the demographic data it needs. The employee said:

> "We need everybody at the table to move with a sense of urgency... I feel like we don't have a foundation."

Examples of such cooperation exist. Other City bureaus work with Human Resources on an ad hoc basis to obtain demographic and hiring pool data. The Bureau of Transportation's Equity Manager works with a Human Resources representative to track the demographics of candidates for each job, and then updates hiring managers if further outreach or marketing may be needed to attract a more diverse applicant pool.

**Better data tracking is needed to ensure an equitable hiring process**

Without metrics, the Police Bureau has no way to assess what equity initiatives are working—or which ones are not.

In their joint report, the Department of Justice and Equal Opportunity Employment Commission stressed the need for using data to track trends and act on that information:

> "Law enforcement agencies that have seen success in attracting a diverse workforce have generally paid particular attention to specific trends within their agencies that disproportionately affect applicants who are racial minorities, women, or from other underrepresented populations during the hiring process. Once cognizant of these barriers, these agencies have taken steps to proactively address the problem and ensure that criteria, standards, and benchmarks are job related and consistent with law enforcement needs."

The Police Bureau recognizes a need for this: creating and maintaining a database to track hiring and recruitment trends is a year-one goal in its five-year Equity Plan. The Police Bureau reports that work is "in progress" to create a database to track recruitment and hiring. However, the Police Bureau's 2018-2019 budget does not include any funding for the database.

Currently, data are kept by different Personnel Division staff in different locations and formats. A relatively new staff member said he was "disillusioned" by the lack of data and tracking in the Personnel Division when he arrived. Since that time, he created a spreadsheet that includes data on applicants collected from the National Testing Network's standardized exam and the Bureau's Personal History Questionnaire. However, this information must be hand-culled and keyed in by a staff member.

A supervisor in the Personnel Division also tracked demographic information on a separate spreadsheet based on demographic information provided when applicants are sent for a background investigation. This disparity demonstrates that the Personnel Division needs a comprehensive and complete method of data collection and analysis to ensure the information it has is consistent and accurate.

*Policy Review: Equity in Police Hiring*

A dedicated database would further ensure that processes aren't changed or lost when staff in the Personnel Division change. Like other Police Bureau divisions, sworn members (in this case the lieutenant and sergeant) have their assignments rotated frequently, meaning initiatives begun by one lieutenant may be abandoned with the arrival of new leadership. For example, the most recent lieutenant was in Personnel for 20 months before being reassigned. During this review, a new lieutenant and sergeant were brought into the Personnel Division.



*Basic Academy graduates in June 2018.*
*@PortlandPolice on Instagram*

Personnel Division and Police Bureau Equity staff agreed the best solution would be a database that pulls demographic information directly from the online application. Personnel Division leadership estimate that it will take at least two years to gather enough data to identify trends and then begin the process of revising hiring and recruitment procedures to remove equity barriers. That means if started now, the Police Bureau would not have reliable data to analyze until 2021 at the earliest.

**Recommendations**     The Police Bureau has made strides in improving the efficiency of its hiring process, but additional steps remain to bring the City in line with national best practices for increasing diversity. To achieve these goals, IPR recommends the Police Bureau:

1. Engage with Bureau of Human Resources management and the Police Bureau's Equity and Diversity Program to discuss how applicant data can be provided to bureaus to meet racial equity goals and mandates;

2. Purchase or create a database capable of tracking candidates throughout the hiring process;

3. Create a data-informed review process to regularly review steps of the hiring process through an equity lens; and

4. Survey applicants to identify potential equity-related barriers.

RESPONSE TO THE POLICY REVIEW

 

**CITY OF PORTLAND, OREGON**

**Bureau of Police**
Ted Wheeler, Mayor
Danielle M. Outlaw, Chief of Police
1111 S.W. 2nd Avenue • Portland, OR 97204 • Phone: 503-823-0000

Integrity • Compassion • Accountability • Respect • Excellence • Service

September 27, 2018

Mr. Constantin Severe
IPR Director
1221 SW 4th Ave., Rm. 310
Portland, OR 97204

Re: Response to IPR Recommendations on *Equity in Police Hiring*

Dear Director Severe,

The Police Bureau agrees with the recommendations of the Auditor's policy review, *Equity in Police Hiring.* We agree that there is a need for an effective method of collecting data throughout the hiring process. That data should be used to inform frequent meaningful conversations about equity in hiring within Police Bureau divisions including the Equity Team. Those conversations should include the Bureau of Human Resources (BHR) as it is responsible for recruitment announcements and testing. Applicants should be surveyed during the hiring process to identify potential equity related barriers.

Part of the Police Bureau's 2016-2021 Equity Plan includes strategies to promote focused recruiting and hiring of a more diverse inclusive, and equitable workforce. Our recruiting plan was developed to align with the Equity Plan, and includes specific efforts to recruit and hire new employees from diverse backgrounds. These include a Women's Public Safety Fair at the Training Division scheduled for March 30, 2019 and recruiting efforts already underway at colleges and universities such as John Jay College and the University of Southern Mississippi with diverse student bodies and strong Criminal Justice programs. The Police Bureau has also hosted the community at open-houses at each of the precincts and the Training Division.

Over the last few years the Police Bureau has made advances in data collection and analysis in several areas not related to hiring. Those good methods should prove helpful as the bureau applies them through an equity lens, particularly when recruiting and hiring police officers. Information about barriers should be identified, and those barriers removed whenever possible in order to achieve a more diverse pool of applicants who are eventually hired.

Collecting data and retrieving useful information from it can take time. As that process improves the Police Bureau has already begun a series of initiatives to recruit and hire a diverse, highly qualified pool of applicants and seek ways of removing barriers to candidates. In the summer of 2018 the Police Bureau welcomed six college interns from the southern and eastern United States. Each of them spent thirty days with the Portland Police learning about all aspects of job. This front row seat experience, all at no cost to the students, allowed them to see themselves as

members of the Portland Police bureau and as members of the community it serves. This diverse group of interns shared their experience in real time with their fellow students and visited with Portland recruiters at job fairs in their own neighborhoods this fall. They were able to share their stories with a diverse group of interested college students, which generated tremendous interest in our plans for internships in 2019.

The Personnel Division has scheduled the first ever applicant pool event for later this fall with plans for repeated events quarterly. Interested applicants will have the opportunity to take a walking tour of Portland neighborhoods with Portland Police officers. They will meet community members who will share their own stories and expectations of Portland Police officers. These walking tours will help applicants understand the dynamics of serving as an officer in Portland, emphasize our mission and goals, and highlight timely subjects which have an impact on the livability of our city; homelessness, mental illness, gun violence, gentrification. The community will have a voice in the application process it has never had before.

The Police Bureau is looking for ways to improve its hiring process to make it even more equitable. For example, we hope to offer our oral interview in locations around the country in order to reach a more diverse group of applicants and to remove the barrier created by the expense of having to travel to Portland for a short oral interview. The Personnel Division is reexamining the physical abilities test to be sure it closely matches state requirements and does not place unreasonable expectations on applicants. Unlike other departments in Oregon, the Portland physical abilities test will continue to be offered free of charge.

The Police Bureau will continue recruiting efforts at regional community and four-year colleges, but will remain engaged in existing programs that offer personal non-enforcement contact with the community. Recruiting should be natural and organic. Every moment of the working day of each Portland Police officer should be an opportunity for recruitment. Officers engagement within the community should display the love they have for their profession and dedication they have to everyone they serve in a way that is so attractive it draws people in.

The Police Bureau welcomes the recommendations from the Auditor's office. The ability to gather and use data to achieve greater equity in hiring is a goal everyone should share. The Police Bureau aspires to be a leader among police departments in the 21st Century and can only do so by seeking input from a wide variety of sources. The Police Bureau must be more inclusive and engaged in its day-to-day interactions in the community. It must strive for excellence and continue to build trust in the community; then it will be a more effective partner in helping make Portland the city we all wish it to be and establish itself as an organization that inspires people from all walks of life to join.

**Danielle M. Outlaw**
Chief of Police
Portland Police Bureau

DMO/jb/klm

# **APPENDIX I**

# COMMUNITY FOCUS GROUP TAKEAWAYS

AUGUST 26TH, 2018 – EAST PORTLAND COMMUNITY CENTER

## MAJOR THEMES

Below is a summary of the major themes that appeared across the small group discussions.

**Crime Reduction and Prevention**

<u>Criminal homeless</u> (a segment of the total homeless population), <u>livability crimes</u> (littering, street-level drug dealing, theft), and <u>traffic-related issues</u> were the most mentioned crimes impacting community members that they would like to see more enforcement for. Below are some of the tactics recommended to help address those issues and prevent and reduce other crimes.

<u>Crime Prevention</u>

Ways to improve crime prevention include:
- Increase trust and improve relationship between PPB and community
- Improve communication between PPB and community
- Increase mental health resources and support for police and community
- Address the disparities experienced by communities of color
- Increase visible presence

<u>Crime Reduction</u>

Ways to improve crime reduction and address those issues are:
- Use a balanced, equitable, and adaptable approach
- Address underlying/root causes (e.g. addiction, houselessness) in addition to the symptoms (e.g. drug-use, theft)
- Increase communication and understanding of available resources
- Improve ties with communities
- Increase training for officers
- Establish more partnerships and resources

**Community Engagement and Inclusion**

Communication was the most common theme across discussions on improving community engagement and inclusion. The community shared that the Bureau needs to improve on the frequency, method, and content of what is shared to better allow community members to engage with and be included in Police Bureau efforts.

Other major themes include:

- <u>Demilitarize police</u>, particularly how officers and riot officer looks, to help community members feel safe engaging with police.

- Build more partnerships with crime prevention specialists, peer support specialists, Fire Bureau, Park Rangers, hospitals, mental health community, schools, PTAs.

- Recognize that the Neighborhood Association model is important to include, but it does not represent all communities within Portland.

## Organizational Excellence

This table topic shared major themes across all discussion groups and centered on the areas listed below:

- Training: Officers should be able to respond appropriately to people experiencing mental health crises, and be aware of bias in law enforcement.
- Values: The Bureau needs to align its values with its actions. Many felt that values should come across both in Bureau interactions with the community and within its ranks.
- Community Engagement: How the community can inform and participate in Bureau work. There is a desire to participate and provide input, but need more avenues as well as awareness.
- Communication: Community members want to know about how PPB allocates resources, the types of resources available for them, and would like more general awareness of PPB work.
- Recruitment, Hiring and Staffing: Need for more applicants as well as improvements in the screening process.

## Values

Accountability, Equity, Respect, Trust, Honesty, and Empathy were common values listed across discussions. Additionally, Community as both a value and partner was mentioned often. While most participants were unaware of the values held by PPB (per the Directives Manual), there was consistent overlap. Community members shared that it is critical for the Bureau to demonstrate its values through its interactions with the community and ensure they are applied and upheld.

Other major themes include:

| | | |
|---|---|---|
| - Adaptability | - Compassion | - Relationship-building |
| - Collaboration | - Inclusivity | - Humanization |
| - Communication | - Integrity | |

## Other Topics

This table discussion was a "catch all" for things not mentioned or not asked at other tables. The most common themes across the small groups were:

- Police selectively enforce laws, which leads to community cynicism and mistrust. The Police Bureau should better communicate to the public what they are allowed to enforce and what they are not allowed to enforce.

- Police treat symptoms of systemic issues, they don't fix root problems. Resources should be used on fixing the roots of issues.

- Portlanders want to help but don't know how. The Police Bureau should use better processes to draw community in and communicate with them on how they can help.

## IMPROVEMENTS FOR FOCUS GROUP FORMAT

- Give better directions when people enter the room.

- Allow more time at the tables for discussion.

- Have note-takers and facilitators that are non-Police Bureau employees.

- Have more note takers.

- Have ways for people to share input when they weren't or aren't able to speak at a table.

- Have a way for note takers to demonstrate how weighted concerns are.

- Provide information (phone numbers, programs, etc.) for participants that come to the meeting with specific problems that they'd like addressed.

- Try to get more diversity in the room.

# COMMUNITY FOCUS GROUP TAKEAWAYS

SEPTEMBER 6TH, 2018 –MATT DISHMAN COMMUNITY CENTER

## MAJOR THEMES

Below is a summary of the major themes that appeared across the small group discussions.

**Crime Reduction and Prevention**

Community needs and policing have changed a lot, and the Police Bureau needs to ensure that it is meeting current community needs. To better reduce and prevent crime, the bureau needs to change what crimes we prioritize, how we include community, and who we work with.

- It is important to focus on violent crimes rather than property crimes. At the same time, however, quality of life crimes are negatively impacting community members' lives and sense of safety.

- More community involvement can help reduce and prevent crime. Honest communication, consistent follow-up, and personal relationships will create safer communities for both community members and officers. A large part of this is recognizing which communities are not calling 911 and reaching out to them, increasing officer's cultural competency to limit biases, and creating a police force that reflects the community.

- Peer support is an effective tool and an important perspective to help officers handle or solve human life problems (homelessness, mental health, addiction). Community members would like to see increased partnerships between the Police Bureau and peer support specialists.

**Community Engagement and Inclusion**

The community would like to see the Police Bureau prioritize meaningful and authentic engagement with the community. This means increasing the person-to-person relationships between community members and officers and improving communication between the Bureau and the community.

- Community members want to know the officers that are in their neighborhoods. This means having space within their neighborhood or community to positively engage with police and communicating with officers face-to-face outside of emergency situations.

- Community members want stronger, more effective communication with the Bureau. This means using multiple methods to communicate, sharing the organization's efforts to meet goals, and letting community members know how they can be involved with the Police Bureau's efforts. Cultural-

- Appearance and space are important for fostering relationships. Police officers' appearance and facilities are intimidating. Police facilities should be welcoming spaces that foster positive interactions and support community needs, and police officers should look approachable. This will make it easier for community members to organically engage with the Police Bureau and its officers.

**Organizational Excellence**

Community members would like to see the Police Bureau embrace a culture of service, rather than enforcement. To do this, the Police Bureau needs to look at its organizational structure, trainings, policies, and messaging.

- <u>For examples of organizational excellence, look beyond police institutions.</u> Public Health organizations were commonly mentioned as institutions that have made service-oriented improvements.

- <u>Use data to make policy decisions.</u> It's important to assess current practices and determine whether they are effective and if they use resources wisely.

- <u>Compartmentalization is harmful to the transparency and integrity of the Bureau.</u> Removing siloes can help units work together, improve communication, and help employees feel more connected to the mission of the bureau.

- <u>Training needs to include important soft skills</u> such as non-violent communication, empathy, and reflection. These trainings should be based on the most recent research available and should occur outside of police institutions, when possible.

- <u>Apologizing is an important part of transparency and accountability.</u> A culture and policy that supports officers in recognizing mistakes, apologizing, and improving is essential. It is particularly important that officers involved in a critical incident have a way to recognize how their actions impact community, even if those actions are legally justified.

- <u>The community would like to advocate for officer wellness and self-care,</u> but they don't know how.

## IMPROVEMENTS FOR FOCUS GROUP FORMAT

- Have more note takers to make it easier on the table moderators.

- Make sure the consultants are a part of the Portland community, and are not from out-of-state.

# **APPENDIX J**

## Strategic Plan Steering Committee
### Meeting 1, Minutes
June 25, 4:00-7:00pm

**Additional document:** PPB Steering Committee 1 Deck.pptx

**Members Present:**

- North Precinct Captain
- Patrol Officer
- PPA President
- PPCOA President
- Equity & Diversity Manager
- Records Specialist
- Administrative Supervisor
- Mayor's Office Rep.

- NAACP Rep.
- Latino Network Rep.
- Alliance for Safer Communities Rep.
- Human Rights Commission Rep.
- Youth Rep.
- Youth Rep.
- Momentum Alliance Rep.

| | |
|---|---|
| **4:09pm-4:15pm** | Asst. Chief Chris Davis welcomes and thanks the group, providing a brief introduction of the reason the Bureau is doing the strategic plan project and what he hopes we can get out of it. Davis plays a video prepared by Chief Outlaw on the project's process. |
| **4:16pm-4:22pm** | Michael Kosmala (a facilitator from Coraggio) reviews the meeting's agenda and expectations, and introduces the facilitators. |
| **4:23pm-4:36pm** | Committee members go around the room introducing themselves, the communities they belong to, and what positive outcome they hope to see achieved through the project. The facilitators lead the group in an exercise, identifying the common themes members heard. The facilitators also inform the public attendees that there are comment cards they can fill out or that they can raise their hand for side conversations with facilitators at any time during the meeting. |
| **4:37pm-4:49pm** | Beau Bennett (a facilitator from Coraggio) outlines the guiding principles of the project and the project's timeline. Committee members ask clarifying questions. |
| **4:50pm-5:07pm** | Susan Kerosky (a facilitator from Coraggio) discusses the roles and responsibilities of the steering committee.  Committee members ask clarifying questions. |
| **5:08pm-5:27pm** | Susan leads brainstorm on what is inbounds/out of bounds of the role of the steering committee. |
| **5:28pm-5:45pm** | The committee members develop operating agreements and norms for meeting behavior (see photos at the bottom of the page). |
| **5:45pm-6:00pm** | Break |

Prepared by: Jordan Rooklyn, PPB

**6:00pm-6:15pm**   Susan summarizes the data collection plan for Phase I of the project. This includes how the project will collect data, who it will collect data from, and what topic areas will be covered. Susan also reviews what came out of focus groups that had been piloted prior to the steering committee meeting. The major themes were:

- Groups were thankful to be at the table
- There was confusion around what community policing means
- Language is a large barrier for community members interacting with police
- Changes in leadership have been tough for communities and the bureau.

**6:16pm-6:35pm**   Committee members break out into small groups to discuss:

- What other groups do we need to engage with through the process?
- Are there additional topics that we should discuss in focus groups/surveys?

**6:35pm-7:00pm**   Small groups return to the table to report the recommendations from their conversations:

- Important additional groups to focus on include houseless/homeless population, individuals experience transiency, sexual minorities, refugees/immigrants, individuals directly affected by mental illness, people with disabilities, neighborhood associations, and people on probation/in the criminal justice system.

- The Bureau should attempt to engage with individuals that have experienced or are experiencing certain contexts (houselessness, mental health, incarceration, etc.), instead of engaging with organizations that help with those contexts.

- Instead of prioritizing which groups should be engaged with, try to look at intersectionality within groups.

- Beyond having a survey and comment cards at precincts, also place comment cards at community organizations for those who are not comfortable going to a precinct.

- Have the community surveys translated into other languages.

- Add "communication" questions under the topic area of Organizational Excellence.

- Add "allocation of resources" under the topic area of Organizational Excellence.

- Delineate bureau wellness from officer wellness and define what wellness means.

- Add "transparency" as a topic area.

**7:00pm-7:05pm**   Susan thanks everyone for attending.





# **APPENDIX K**

COCL Feedback into PPB Community-wide Survey

The community-wide survey is a valuable source of information on PPB's engagement and outreach to the community.  There are several types of information that were gathered in the 2016 survey that are being considered as possible metrics.  We have categorized these survey questions here. They categories include: informal engagement questions, direct contact questions, general PPB evaluation questions, and disparity of treatment questions. We provided these questions to the City and PCCEP in December for possible inclusion in the 2019 community-wide survey.

Informal Engagement Questions. The survey contains some questions about informal or indirect community engagement by PPB officers, including various types of police-community interactions that are important for building community trust within a community policing framework:

*How often do you see Portland police on foot patrol in your neighborhood?*

*In the past year, have you had a casual conversation with a Portland police officer that did not involve you being stopped on foot or in a car to be questioned?*

*Do you know the first or last name of any Portland police officer who patrols in your neighborhood now?*

*During the past year, have you attended any meeting in Portland where a Portland police officer introduced him/herself?*

*During the past year, have you attended any meeting in Portland where a Portland police officer explained what the police were doing to address neighborhood problems?*

Direct Contact Questions.  There are two questions about direct contact with a police officer – one about police-initiated contact and one about self-initiated contact – that focus on fairness or procedural justice:

*Did you contact the Portland Police in the past year to report a crime or ask for help? If "yes," were you treated fairly in your most recent interaction? (Treated Fairly, Treated Unfairly); If "yes," taking the whole experience into account, how satisfied are you with the way you were treated by the officer in your most recent interaction?*

*Did a Portland police officer contact you in the past year (ex: warning, traffic stop, citation, arrest)? If "YES," were you treated fairly in your most recent interaction? (Treated Fairly, Treated Unfairly); If "yes," taking the whole experience into account, how*

*satisfied are you with the way you were treated by the officer in your most recent interaction?*

<u>General Evaluation Questions</u>. The quality of community engagement was evaluated in general terms by community members when asked to rate PPB's performance on specific activities (using a 5-point scale from "Very Good" to "Very Poor"). The following activities seem relevant as community engagement metrics:

*Rate the Portland Police Bureau's (PPB) performance <u>over the past year</u> on the following activities.*

*Responding to mental health issues in the community*

*Building trust with the community*

*Working with the community to solve neighborhood problems*

*Being open and honest with the public*

*Listening to community concerns*

<u>Disparity Questions</u>. Throughout the survey respondents are asked, in various ways, about whether the PPB is fair and unbiased in its treatment of various members of the Portland community (although their knowledge of how others are treated may be limited to vicarious reports from family/friends/acquaintances or media coverage). Arguably, evaluating how the PPB treats different segments of the community is another way of looking at community engagement without discussing specific PPB activities.

One series of questions focuses on "people like me" (and the survey includes demographic questions at the end to determine what "people like me" means), using a 5-point scale (from "Strongly Agree" to "Strongly Disagree"):

*Portland Police treat people like me disrespectfully.*

*If I call the Portland Police I would receive the same quality of service as others in Portland.*

*I think I would be treated fairly by Portland Police.*

Another set of disparity questions asked directly about "me" and my fears of being stereotyped (again Agree-Disagree format):

*I worry that Portland Police may stereotype me because of my race or ethnicity.*

*I worry the Portland Police may stereotype me because I have a physical health condition.*

*I worry the Portland Police may stereotype me because I have a mental health condition.*

A third set of disparity questions focuses on disparity/inequality in treatment of specific groups within Portland (Agree-Disagree format):

*The police in Portland use race and ethnicity when deciding whether to stop someone.*

*Portland Police treat people disrespectfully because of their race or ethnicity.*

*Portland Police treat people disrespectfully because of their mental health status.*

*Portland Police treat people disrespectfully because of their gender or sexual orientation.*

# APPENDIX L



# Portland Police Bureau
## Community Engagement Events
### September 2018





| | # of Events | Community Attendance | PPB Attendance | % Additional Language Spoken | PPB Time at Event (hours) |
|---|---|---|---|---|---|
| Advisory Council/Board | 9 | 144 | 21 | 11.1% | 24.0 |
| Community Event | 15 | 32,271 | 77 | 6.7% | 54.0 |
| Community/Cultural Festivals | 6 | 3,550 | 15 | 66.7% | 25.0 |
| Faith based Meetings | 1 | 100 | 1 | 0.0% | 0.5 |
| Media events | 1 | 20 | 1 | 0.0% | 0.3 |
| Neighborhood/Community meetings | 13 | 311 | 30 | 15.4% | 34.0 |
| Sport Activity | 3 | 500 | 24 | 33.3% | 8.0 |
| Training/Educational workshop | 9 | 300 | 31 | 11.1% | 35.0 |
| Grand Total | 57 | 37,196 | 200 | 17.5% | 180.8 |

# Portland Police Bureau Events
## September 2018

| | # of Events | Community Attendance | PPB Attendance | % Additional Language Spoken | PPB Time at Event (hours) |
|---|---|---|---|---|---|
| 8TH ANNUAL ARAB MAHRAJAN FESTIVAL | 1 | 350 | 3 | 100.0% | 3.0 |
| Albertina kerr client outreach | 1 | 2 | 3 | 0.0% | 1.0 |
| Alliance for Safer Communities | 1 | 14 | 5 | 0.0% | 4.0 |
| ARABIC MUSLIM COMMUNITY EVENT | 1 | 200 | 3 | 100.0% | 3.0 |
| Behavioral Health Unit Advisory Committee (BHUAC) | 1 | 8 | 4 | 0.0% | 3.0 |
| BIG TRUCK DAY | 1 | 80 | 2 | 100.0% | 6.0 |
| Big Village Steering Committee Meeting | 1 | 4 | 1 | 0.0% | 3.0 |
| Burlington Tower Safety Meeting | 1 | 20 | 2 | 0.0% | 1.0 |
| Citizen Review Committee (CRC) | 1 | 20 | 3 | 0.0% | 3.0 |
| Condo HOA Meeting | 1 | 20 | 1 | 0.0% | 3.0 |
| Cop Out Assist | 1 | 6 | 1 | 0.0% | 3.0 |
| Cop Out Monologue Screening | 1 | 12 | 2 | 0.0% | 3.0 |
| Crisis Interface Meeting | 1 | 18 | 2 | 0.0% | 1.0 |
| DHS Afternoon at Oaks Park | 1 | 700 | 8 | 0.0% | 6.0 |
| DHS Foster Kids Day at Oaks Park | 1 | 500 | 8 | 0.0% | 3.0 |
| Downtowm  PSAC | 1 | 12 | 3 | 0.0% | 3.0 |
| Downtown Public Safety Action Committee (Downtown PSAC) | 1 | 15 | 2 | 0.0% | 1.0 |
| East precinct cadet meeting | 1 | 15 | 2 | 0.0% | 3.0 |
| FSM Community Day | 1 | 100 | 4 | 0.0% | 6.0 |
| Geocaching Group | 1 | 36 | 2 | 0.0% | 3.0 |
| Hawthorne Blvd Business Association (HBBA) | 1 | 20 | 1 | 0.0% | 1.0 |
| Hillsboro Ir Show | 1 | 2,000 | 2 | 0.0% | 6.0 |
| Homeless Lunch & Learn | 1 | 50 | 1 | 0.0% | 3.0 |

# Portland Police Bureau Events
## September 2018

| | # of Events | Community Attendance | PPB Attendance | % Additional Language Spoken | PPB Time at Event (hours) |
|---|---|---|---|---|---|
| KGW Channel 8 News Interview | 1 | 20 | 1 | 0.0% | 0.3 |
| LETR Executive Council | 1 | 12 | 1 | 0.0% | 3.0 |
| LPSCC - Mental Health and Public Safety Subcommittee | 1 | 32 | 1 | 0.0% | 3.0 |
| Mayor's Public Safety Community Forum | 1 | 15 | 4 | 100.0% | 3.0 |
| MCSO Citizens Academy Demo Night | 1 | 15 | 2 | 0.0% | 6.0 |
| Meeting with New Avenues for Youth | 1 | 2 | 1 | 0.0% | 1.0 |
| mid-autumn festival cultural day | 1 | 200 | 2 | 100.0% | 6.0 |
| National night out | 1 | 100 | 2 | 0.0% | 1.0 |
| North Precinct Public Safety Action Committee Meeting | 1 | 35 | 7 | 0.0% | 4.0 |
| Northwest Down Syndrome Association Buddy Fest 2018 | 1 | 700 | 1 | 100.0% | 1.0 |
| Oregon Harbor of Hope | 1 | 40 | 1 | 0.0% | 3.0 |
| Parkrose Business Alliance | 1 | 20 | 1 | 0.0% | 3.0 |
| Pearl District Block Party | 1 | 300 | 1 | 0.0% | 3.0 |
| Pearl District Neighborhood Association | 1 | 24 | 2 | 0.0% | 3.0 |
| Port of Portland CNAC | 1 | 12 | 1 | 0.0% | 3.0 |
| Portland Grand Prix | 1 | 30,008 | 30 | 0.0% | 8.0 |
| PPB Hiring Workshop | 1 | 40 | 12 | 0.0% | 3.0 |
| Purple Stride Walk | 1 | 300 | 2 | 0.0% | 3.0 |
| Responder life/Montevilla Association | 1 | 100 | 1 | 0.0% | 0.5 |
| Rose City Unit Soccer | 1 | 250 | 20 | 0.0% | 3.0 |
| Safety + Justice Challenge - Peer Integration Presentation/Webinar | 1 | 30 | 1 | 0.0% | 3.0 |
| Safety Training | 2 | 40 | 2 | 0.0% | 2.0 |
| Saved by the Barbell | 1 | 50 | 2 | 0.0% | 2.0 |

# Portland Police Bureau Events
## September 2018

| | # of Events | Community Attendance | PPB Attendance | % Additional Language Spoken | PPB Time at Event (hours) |
|---|---|---|---|---|---|
| Self initiated Community Engagement | 1 | 2 | 3 | 0.0% | 2.0 |
| Slavic Advisory Council (SAC) | 1 | 13 | 2 | 100.0% | 3.0 |
| Somali Police Workshop | 1 | 45 | 1 | 100.0% | 3.0 |
| Speaking to students at University of Portland | 1 | 25 | 1 | 0.0% | 3.0 |
| St. John's walking | 1 | 150 | 2 | 0.0% | 6.0 |
| Strategic Plan Community Focus Group | 1 | 49 | 5 | 100.0% | 3.0 |
| Venue Safety Collaboration | 1 | 15 | 1 | 0.0% | 3.0 |
| Walking while black movie | 1 | 50 | 10 | 0.0% | 3.0 |
| Walking while black showing | 1 | 100 | 10 | 0.0% | 12.0 |
| Youth Outreach - Boxing Tournament | 1 | 200 | 2 | 100.0% | 3.0 |
| Grand Total | 57 | 37,196 | 200 | 17.5% | 180.8 |

# **<u>APPENDIX M</u>**

# GUIDE FOR VOLUNTEER BOARDS & COMMISSIONS

City of Portland, Oregon
Office of the City Attorney

# This presentation includes excerpts from:

- A Guide for Public Officials (Oregon Government Ethics Commission - Commission)

- Code of Ethics Explanations and Examples (Portland City Auditor)

- Restrictions on Political Activities (Oregon Secretary of State - Elections Division)

- Attorney General's Public Records and Public Meetings Manual (Oregon Department of Justice )

2

# I. Who Is A Public Official?

## Introduction

- In 1974, voters approved a statewide ballot measure to create the Oregon Government Ethics Commission (Commission). The laws are contained in Chapter 244 of the Oregon Revised Statutes (ORS).

# PUBLIC OFFICIAL: AN OVERVIEW

- The provisions in ORS 244 restrict some choices, decisions or actions of a public official. The restrictions placed on public officials are different than those placed on private citizens.

- Public officials must know that they are held *personally responsible* for complying with the provisions of ORS 244 . This means that each public official must make a personal judgment in deciding such matters as the use of official position for financial gain, what gifts are appropriate to accept, or when to disclose conflicts of interest.

4

- If a public official fails to comply with the operative statutes, a violation cannot be dismissed by placing the blame on the public official's government employer or the governing body represented by the public official.

- One provision prohibits public officials from *using or attempting to use their official positions or offices to obtain a financial benefit for themselves, relatives or businesses they are associated with* through opportunities that would not otherwise be available but for the position or office held.

- Another provision that frequently applies to public officials when engaged in official actions of their official positions or offices is the requirement to disclose conflicts of interest.

5

## A Public Official

**Are you a public official?**

- A "public official" is any person who is serving the State of Oregon or any of its political subdivisions or any other public body as . . . an *appointed official* . . . irrespective of whether the person is compensated for the services.

6

For purposes of ORS Chapter 244, volunteers are not public officials if they perform such tasks as picking up litter on public lands, participating in a scheduled community cleanup of buildings or grounds, participating in locating and eradicating invasive plants from public lands and other such occasional or seasonal events.

**How are relatives of public officials affected by Oregon Government Ethics law?**

- Public officials must always comply with state law when participating in official actions that could result in personal financial benefits and also when participating in official actions that could result in financial benefits for a relative. Public officials should also know there may be limits and restrictions on gifts their relatives may accept when offered.

8

**Who is a relative?**

Public officials need to know how Oregon Government Ethics law defines who a "relative" is. In everyday conversation the use of "relative" is applied to a broader spectrum of individuals with "family ties" than those defined as relatives in ORS 244.020(15)2. When a provision in ORS Chapter 244 refers to "relative" it means one of the following:

- **Spouse** of a public official or candidate
- **Children** of a public official or candidate
- **Children of the spouse** of a public official or candidate
- **Siblings** of a public official or candidate
- **Siblings of the spouse** of a public official or candidate
- **Spouse of siblings** of a public official or candidate
- **Spouse of siblings of the spouse** of a public official or candidate
- **Parents** of the of public official or candidate
- **Parents of the spouse** of a public official or candidate
- **Person** for whom the public official or candidate has a **legal support obligation**
- **Person benefiting from a public official** when benefits are from the public official's public employment
- **Person who provides benefits to a public official** or candidate when benefits are from the person's employment

For purposes of "relatives" defined by the last two bulleted items, examples of benefits may include, but not be limited to, elements of an official compensation package including benefits such as insurance, tuition or retirement allotments.

6

10

# Section I Review

- Definition of public official

- Who is a relative

11

# II. OBLIGATIONS OF BEING A PUBLIC OFFICIAL

- Leadership
- Use of Position or Office
- Conflicts of Interest (pecuniary)
- Nepotism
- Gifts and exclusions
- Subsequent employment

# LEADERSHIP

- Officials avoid discreditable personal conduct and are personally honest.

## Use of Position or Office

- ORS 244.040(1) prohibits every public official from using or attempting to use the position held as a public official to obtain a financial benefit, if the opportunity for the financial benefit would not otherwise be available but for the position held by the public official. The financial benefit prohibited can be either an opportunity for gain or to avoid an expense.

13

- Public officials often have access to or manage information that is confidential and not available to members of the general public. ORS 244.040(4) **specifically prohibits public officials from attempting to use confidential information** gained because of the position held or by carrying out assigned duties to further the public official's personal gain.

- **ORS 244.040(5) also prohibits a former public official from attempting to use confidential information for personal gain** if that confidential information was obtained while holding the position as a public official, from which access to the confidential information was obtained.

## What is a conflict of interest?

- A public official is met with a conflict of interest when participating in official action which could (potential conflict) or would (actual conflict) result in a financial benefit or detriment to the public official, a relative of the public official or a business with which either is associated.

16

## What do you do when you have a conflict?

Elected officials or board and commission members

- When an elected or appointed public official serving on a board or commission has a **potential** conflict of interest, the official must announce publicly the potential conflict prior to taking any action thereon in the capacity of a public official.

- When an elected or appointed public official serving on a board or commission has an **actual** conflict of interest, the official must announce publicly the nature of the actual conflict and refrain from participating as a public official in any discussion or debate on the issue out of which the actual conflict arises or from voting on the issue. Note that there are special rules for planning commission members.

How do the laws apply to a public official who either owns or is employed by a private business?

ORS 244.020(2) provides the definition of a "business," paraphrased as follows:

A "business" is a legal entity that has been formed for the purpose of producing income.

- Excluded from this definition are not-for-profit and tax exempt under section 501(c) of the Internal Revenue Code, if a public official or a relative of the public official holds membership or an unpaid position as a member of the board of directors.

18

ORS 244.020(3)4 provides the definition of a **"business with which the person is associated,"** paraphrased as follows:

In brief, a public official or the relative of the public official is associated with a business in the following circumstances:

- When, during the preceding calendar year, a public official or relative has held a position as director, officer, owner, employee or agent of a private business or a closely held corporation in which the public official or relative held or currently holds stock, stock options, equity interest or debt instrument over $1,000.

- When, during the preceding calendar year, the public official or relative has owned or currently owns stock, equity interest, stock options or debt instruments of $100,000 or more in a publicly held corporation.

- When the public official or relative is a director or officer of a publicly held corporation.

- When a public official is required by ORS 244.050(5) to file an Annual Verified Statement of Economic Interest form and the business is listed as a source of household income.

19

20

**How is the public announcement of the nature of a conflict of interest recorded?**

↳ The public body that is served by the public official will record the disclosure of the nature of the conflict of interest in the official records (minutes, audio/video recording) of the public body. [ORS 244.130(1)]

**If a public official failed to announce the nature of a conflict of interest and participated in official action, is the official action voided?**

↳ No. Any official action that is taken may not be voided by any court solely by reason of the failure of the public official to disclose an actual or potential conflict of interest [ORS 244.130(2)]. However, the public official faces the potential of personal liability for the violation.

**Is a public official required to make an announcement of the nature of a conflict of interest each time the issue giving rise to the conflict of interest is discussed or acted upon?**

- The announcement needs to be made on each occasion when the public official is met with the conflict of interest. Each time a public official is met with a conflict of interest the nature must be disclosed.

- For example, an elected member of the city council would have to make the public announcement one time when met with the conflict of interest, but only one time in each meeting of the city council. If the matter giving rise to the conflict of interest is raised at another meeting, the disclosure must be made again at that meeting.

- Another example would involve an employee in a city planning department who would have to give a separate written notice before each occasion they encounter a matter that gives rise to a conflict of interest. [ORS 244.120(3)]

## NEPOTISM

- Public official may not appoint, employ or promote a relative or member of household from position with public body that official serves unless official complies with conflict of interests regulations.

- May not participate in interviews, discussion or debate re: appointment, employment or promotion of relative from position with public body unless complies with conflict of interest regulations.

- May not directly supervise relative or member of household.

22

23

## What is a GIFT?

- **Gift: "Something of economic value" given** to a public official, a relative of the public official or a member of the public official's household for which the recipient either makes no payment or makes payment at a discounted price. The opportunity for the gift is one that is **not available to members of the general public**, who are not public officials, **under the same terms and conditions as** those that apply to the gift offered to **the public official**, the relative or a member of the household.

## What items are excluded from the definition of gift?

- Campaign contributions.

- Gifts from relatives/household.

- Engraved plaques, trophies, desk items unless valuable material.

- Admission, food or beverage if representing government at a reception, meal or meeting. This exemption does not authorize private meals.

- Expenses for food, lodging, travel paid by government, membership organization to which City pays dues for attendance at convention, fact finding mission, trip or other meeting if you represent City. **Requires prior written authorization from supervisor.**

- Expenses for food, lodging, travel paid by anyone if fact finding, trade promotion or economic development mission. **Requires prior written authorization from supervisor.**

- Waiver or discount of registration materials/expenses at continuing education event to satisfy professional licensing.

- Expenses provided by another public official for in-state travel (carpool). Not included in City administrative rule, but if travel is for work purposes, City would not consider it a gift to the public official.

- Food or beverage at reception where no cost is placed on food.

- Incidental entertainment.

- Entertainment received by public official or staff where public official appears for ceremonial purposes.

24

## What is a legislative/administrative interest?

- An economic interest, distinct from that of the general public, in any matter subject to the decision or vote of the public official acting in public official's capacity as a public official.

State law

- Regardless of whether or not you are using your official position, you may not accept within one calendar year gifts of more than $50 from a source with a legislative or administrative interest.

Portland City Auditor Guidance

- In general, personal gifts should be refused or returned with a friendly but firm message that City officials are not allowed to receive gifts. A personal gift, lunch, or entertainment gift under $50 in value may be legal, but no amount is too small to be ethically questionable.

25

## SUBSEQUENT EMPLOYMENT

Under State law:

- May not use confidential information gained as public official to further personal gain after leaving public position.

- Public officials who authorized or had significant role in a contract may not have a direct, beneficial, financial interest in the contract for two years after leaving position.

26

# Section II Summary

- Leadership
- Use of position or office
- Conflicts of Interest (pecuniary)
- Nepotism
- Gifts and exclusions
- Subsequent employment

27

# III. Restrictions on Political Activity

<u>POLITICAL ACTIVITIES - ORS 260.432</u>

**Non-elected City volunteers:**

- <u>May</u> express personal political views.

- <u>May</u> engage in political activities outside of work, subject to bureau rules.

- <u>May not</u> spend time on the job promoting or opposing candidates or ballot measures.

- <u>May not</u> spend time on the job promoting or opposing political committees or the gathering of signatures for proposed ballot measures.

- <u>May not</u> require or attempt to require or coerce a City employee or volunteer to engage in political activity of <u>any</u> kind at <u>any</u> time.

- <u>May not</u> use City property, City funds, or City staff to promote or oppose ballot measures, signatures on proposed measures, political committees, or election or recall of officials or candidates.

28

## APPOINTED BOARDS AND COMMISSIONS

- ORS 260.432 applies to appointed board and commission members *when they are acting in their official capacity*. Appointed board or commission members are acting in their official capacity when, for example, they are at a meeting of the board or commission, working on a duty assigned by the board or commission, working on official publications (including website materials) for the board or commission, or when appearing at an event in an official capacity.

29

30

# Section III Summary

- Review restrictions of ORS 260.432

# IV.  Oregon Public Meetings Law

"All meetings of the governing body of a public body shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided [in the Public Meetings Law]."  (ORS 192.630(1))

- "Governing body" - "the members of *any* public body which consists of two or members, *with authority to make decisions for or recommendations to a public body or administration.*"  ORS 192.610(3)

- "Public Body" - "the state, any regional council, county, city or district, or any municipal or public corporation, or any board, department, *commission, council, bureau, committee, or subcommittee, or advisory group or agency thereof.*" ORS 192.610(4)

- "Meeting" – - "the convening of a governing body of a public body for which a *quorum is required in order to make a decision or deliberate toward a decision on any matter.*" ORS 192.610(5)

31

Gatherings Exempt from the Law

- "Meeting" does not include an on-site inspection of a project or program; attendance of members of a governing body at any national, regional or state association to which the public body or the members belong; or gatherings of a quorum of a board or commission where no official business is discussed.

- Purely social gatherings of a public body do not create a public meeting unless there is quorum and it decides to discuss matters relevant to its work. It is best not to discuss business at all during a social gathering. If you have a quorum present, even if the sole purpose of the meeting is to gather information to serve as the basis of future decisions or recommendations, then it is a public meeting.

32

33

## Quorum Requirement

- If a quorum of a public body gets together and deliberates on official business, regardless of the setting, there is a violation of the public meetings law if the required notice was not provided. If gathering is less than a quorum of the body, there is no public meeting.

# What is Required for a Public Meeting

## Notice

- Calculated to give actual notice to interested persons States time and place, lists principle subjects

- Special and emergency meetings have different requirements

## Location

- Meetings of governing bodies of public bodies shall be held within the geographic boundaries of the area over which the public body has jurisdiction, at the public body's administrative offices (if any) or "at the other nearest practical location."

- Must be at a place largest enough to hold the anticipated attendance and must be a place that does not discriminate on the basis of race, color, creed, sex, sexual orientation, national origin, age or disability. Site must be one that people with disabilities can access.

## Public Attendance

- As a general rule, the right to know about and attend a public meeting does not include a right to testify. The public meetings law is a public attendance law, not a public participation law.

## Control

- The presiding officer is authorized to keep order at a meeting and, where there will be public participation, may determine the length of time people may speak and in what order the testimony will be taken.

34

## Voting

- All official action must be by public vote.

- No secret ballots.

- The vote of each member must be recorded unless there are 26 or more members.

- Written ballots are allowed but each ballot must identify the member voting and the vote must be announced.

- As a general rule, no proxy voting.

- No absentee voting. That is, no voting by a member who did not participate whether in person or electronically as by telephone.

## Minutes

- There shall be sound, video, written notes or digital recordings of all meetings. These need not be verbatim but must "give a true reflection of the matters discussed at the meeting and the views of the participants." ORS 192.650(1). There are minimum requirements for the minutes and these include who was present, the substance of discussion and the results of the vote.

35

## Executive Sessions

- An executive session is a meeting or portion of a meeting of a governing body that is closed to the general public. An executive session is not closed to the media. However, the governing body may require that the media not disclose specified information.

- There are limited purposes for an executive session which include employment, employee discipline, labor and real estate negotiations, and consultation with legal counsel regarding current or potential litigation. A governing body may also go into executive session to consider records exempt from public inspection. For example, a governing body may meet in executive session to discuss written legal advice from counsel because the written advice is exempt from public inspection as a privileged document.

- A governing body may not make a final decision in executive session. To make a final decision, the chair must continue the decision to a public meeting or call the executive session into open session. A governing body may not remain in executive session to discuss or deliberate on matters other than the matter for which the session was convened.

36

37

# Section IV Summary

Definitions of:

- Governing body
- Public body
- Meeting
- Executive session
- Public Meeting requirements

# Section V.  Oregon Public Records Law

**What is a public record?**

For the purposes of retention a public record is defined by Oregon Revised Statutes (ORS) 192.005(5):

(5) "Public record"

(a) Means any information that:

(A) Is prepared, owned, used or retained by a state agency or political subdivision;

(B) Relates to an activity, transaction or function of a state agency or political subdivision;

and

(C) Is necessary to satisfy the fiscal, legal, administrative or historical policies, requirements or needs of the state agency or political subdivision.

38

## Public Records Generally

- The Public Records Law applies to every public body, as defined by ORS 192.410(3), and includes the City and "any agency thereof" and that includes the City's boards and commissions.

- Presumption for Disclosure – "Every person has a right to inspect any public record of a public body in this state, except as otherwise provided...." ORS 192.420(1).

- "'Public Record' includes any writing that contains information relating to the conduct of the public's business, ... used or retained by a public body regardless of physical form or characteristics." (ORS 192.410(4)(a)).

- "'Writing' means handwriting, printing, photographing, and every means of recording, including letters, words, pictures, sounds, or symbols, or combination thereof, and all papers, maps, files, facsimiles or electronic recordings." (ORS 192.420(6)).

- Public records may include an email or text message if it discusses the City's business, whether the record is located on City network or equipment or on personal electronic devices. <u>Drafts are also public records.</u>

39

## Retention of Records

- Once a record is created, a public body is responsible for retaining that record according to the retention schedules adopted by the body. The public body's custodian of records is also responsible for making public records available upon request.

- You will be advised of the retention schedule for your public body. A number of schedules may be relevant to your work.

- Always email a copy of all correspondence that relate to City business to the designated City staff person for your body.

40

## Use of Home Computers (and other electronic devices)

- Oregon's public records laws apply to e-mail correspondence about City business even when exchanged solely on City employees' or volunteers' personal computers (or other electronic devices). As a result, employees and volunteers have a responsibility to ensure retention of such e-mails and documents.

- Whether an e-mail or document contains information relating to the conduct of the public's business is case specific. Generally, if an e-mail or document discusses procedural or substantive aspects of your work, it will meet this test. A purely personal e-mail does not become a public record simply because it is sent by a public official. Whether the e-mail or document is prepared, owned, used or retained by a public body is also fact dependent. A document not in the possession of the government still can be a public record by virtue of being used or prepared by a public body.

41

42

- What this means in practice is that if you choose to use private computers to create City related documents or to correspond with one another regarding City business, you may be responsible for retaining the correspondence in accordance with City document retention schedules.  This includes records created on personal devices, such as personal laptop or PC, Blackberry or cell phone with texting capability, or I-Pad.

- Text messages must also be retained.  It is very intrusive to retrieve text messages from your personal phone.  Please be careful.

43

Knowingly destroying public records can constitute a criminal offense.

ORS 162.305.

## Public Records Exemptions

- State law provides that certain public records may be withheld from disclosure if they fall within a statutory exemption. Generally, exemptions do not prohibit disclosure; they allow the public body, through its authorized representative (generally, an elected official, bureau director or designated public body's custodian of records, with guidance from legal staff) to decide whether to release a record. The presumption is in favor of disclosure and a requestor may challenge a public body's decision not to release a record.

44

# Section V. Summary

- What is a public record?
- Retention
- Copy all emails to City staff member
- Text messages count!

45

# General Takeaways

- Familiarize yourself with ethical obligations and abide by them
- Conduct the business of your Board during scheduled public meetings
- Do not deliberate outside of scheduled meetings
- Always copy designated staff person on any correspondence
- Resist communicating by email or texts outside of scheduled meetings
- If you have information to share, send it to the Chair for dissemination

46

47

- You are personally liable, whether criminally or civilly, for individual violations of Oregon ethics, public meeting or public records law.

- The City may neither indemnify nor represent you before the Oregon Government Ethics Commission or a criminal court.



48

QUESTIONS???

# If you have a further question about any of this information . . . .

- ✦ Please direct your inquiry to the Chair of your board.  The Chair will in turn seek guidance from the City Attorney's Office and an opinion will be rendered to the entire board for clarification.

- ✦ The City Attorney's Office does not represent individual board members, but advises the board as a whole on the law.  Each board member is responsible for abiding by State of Oregon and City of Portland laws.

49

50

Thank you for your service to the City of Portland.

# **APPENDIX N**

**CONFIDENTIAL**



| | |
|---|---|
| **DATE:** | Date Written |
| **TO:** | Captain Jeffrey Bell<br>Internal Affairs<br>(Through Channels) |
| **FROM:** | Sergeant Your Name #xxxxx |

Date & Initial _____
Lieutenant _____
RU Manager _____

**SUBJECT:**    **SUPERVISOR INVESTIGATION MEMO**

**IA Case**#:    From the Worksheet

---

Nature of Complaint/Allegations from IA Worksheet:

Take the allegations from the worksheet and add any further explanation as needed.

1st Contact with Complainant:

Try to contact the complainant at least three times. If you are unsuccessful, document your attempts here. Otherwise, clarify any questions you have from the case review and attempt to determine their desired outcome.

Investigation:

Review of CAD, Reports, DIMS, MAV, transcripts, etc., and the fact finding discussions with Civilian Witnesses, Witness Members, and the Involved Member. Address the facts you have found.

Conversation with Employee:

This is the area for the performance discussion. Discuss the policy requirements and any shortcomings and/or positive performance. This section will be more involved than the EIS/PDT entry.

2nd Contact with Complainant:

This section is to explain your attempts to satisfy the complainant's concerns and their response to the resolution.

---

# Findings:

☐ EIS Entry Completed

This is your opportunity to make a conclusion. Address the portion of the directive(s) that apply, the fact that support or refute the claim, and recommend your finding. Each allegation should result in a finding of either Substantiated or Unsubstantiated. Substantiated means that you have determined by a preponderance of the evidence (more likely than not) that the policy or policies were violated. Unsubstantiated means you have determined by a preponderance of the evidence that there was no policy violation. This could mean that the Officer did what was alleged, but it wasn't a violation, or that the allegation is not supported by the facts. Specify which definition of unsubstantiated applies in each case.

# **APPENDIX O**

# PORTLAND POLICE BUREAU
## STRATEGIC SERVICES DIVISION

# STOPS DATA COLLECTION

## 2016 ANNUAL REPORT

### JUNE 25, 2018




TED WHEELER, MAYOR
DANIELLE OUTLAW, CHIEF OF POLICE

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................................ 2

EXECUTIVE SUMMARY ........................................................................................................................... 3

INTRODUCTION ..................................................................................................................................... 6

    Background ..................................................................................................................................... 6

GENERAL DEMOGRAPHICS .................................................................................................................... 7

    City of Portland Residents ............................................................................................................. 7
    Disparity Benchmarks ................................................................................................................... 8

BUREAU-WIDE STOPS OF DRIVERS ....................................................................................................... 9

    Stop Locations ............................................................................................................................... 9
    Stopped Drivers Demographics .................................................................................................. 10
        *Traffic Division* ...................................................................................................................... *10*
        *Non-Traffic Divisions* .............................................................................................................. *11*
    Driver Stop Reasons .................................................................................................................... 12
    Search Rates ................................................................................................................................ 12
    Contraband Hit Rates .................................................................................................................. 14
    Stop Outcomes ............................................................................................................................ 15

BUREAU-WIDE STOPS OF PEDESTRIANS ............................................................................................. 17

    Stop Locations ............................................................................................................................. 17
    Stopped Pedestrian Demographics ............................................................................................ 18
    Pedestrian Stop Reasons ............................................................................................................ 19
    Search Rates ................................................................................................................................ 19
    Contraband Hit Rates .................................................................................................................. 20
    Stop Outcomes ............................................................................................................................ 20

APPENDIX A: STOPS DATA COLLECTION MASK .................................................................................... 22

APPENDIX B: TYPES OF SEARCHES ...................................................................................................... 23

APPENDIX C: DATA AND METHODOLOGY ........................................................................................... 24

    Data Source ................................................................................................................................. 24
    Data Considerations .................................................................................................................... 24
    Analysis Methodology ................................................................................................................ 25
    Results Limitations ...................................................................................................................... 26

APPENDIX D: BIBLIOGRAPHY .............................................................................................................. 27

APPENDIX E: GANG ENFORCEMENT TEAM ANALYSIS ......................................................................... 28

    Stop Locations ............................................................................................................................. 28
    Stopped Subjects Demographics ................................................................................................ 29
    Subject Stop Reasons .................................................................................................................. 30
    Search Rates ................................................................................................................................ 30
    Contraband Hit Rates .................................................................................................................. 31
    Stop Outcomes ............................................................................................................................ 32

## EXECUTIVE SUMMARY

**Introduction**

- The Portland Police Bureau conducts traffic stops of drivers and pedestrians in Portland of residents, commuters, and visitors.  This makes identifying accurate benchmarks that captures the driving population difficult.

- Traffic Division officers enforce traffic laws through the use of driver stops to prevent road injuries and change dangerous driving behaviors.  The Injury Collision Benchmark is used for Traffic Division stops as drivers involved in injury collisions are likely representative of the population of drivers stopped.

- Non-Traffic Division officers (patrol, investigations, and other support divisions) use traffic stops to aid in the response to and prevention of crime.  These officers spend more time patrolling areas with high call volume and higher reported violent crime.  Therefore, individuals driving in these areas are more likely to come into contact with police.  To account for this differential exposure, the Crime Victimization Benchmark is used for Non-Traffic Division stops as these victims are likely to representative of individuals living, working, and recreating in the area.

**Stops of Drivers**

- Portland Police Bureau officers performed 33,311 stops of drivers in 2016. Officers performed the fewest number of stops since data collection began in 2012, declining by 51% over the last five years.

- Traffic Division officers made 19,798 stops of drivers in 2016 and stopped drivers at rates similar to their expected values when compared to the Injury Collision Benchmark.

- Non-Traffic Division officers made 13,513 stops of drivers in 2016. Non-traffic division officers stopped drivers at rates similar to the Crime Victimization Rate.

- The majority of drivers (84.8%) were stopped for Moving Violations. Asian drivers were significantly more likely to be stopped by non-traffic officers for moving violations. No other groups were stopped at significantly different rates.

**Searches of Drivers**

- The search rate for drivers stopped has declined since 2012.  In 2016, 1 in every 25 stops (3.9%) included a discretionary search.  Non-traffic division officers performed the majority (90%) of the searches.

- American Indian /Alaskan Native and Black/African American drivers were searched at significantly higher rates when compared to overall stop rates. Asian drivers were searched significantly less than expected when compared to overall stop rates.

- Consent searches continue to be the most common search type used by Non-Traffic Division officers, though the use of this search types has been decreasing since 2012. Traffic Division officers almost exclusively use probable cause searches.

- Black/African American drivers are significantly more likely to be the subject of a consent search and significantly less likely to be the subject of a probable cause search.

- Officers have become significantly better at detecting contraband during searches with a 42.0% hit rate in 2016 compared to a 34.0% hit rate 2012. The perceived race of the driver is not a significant predictor of whether or not contraband will be found.

**Driver Stop Outcome**

- The majority (58.9%) of driver stops resulted in a citation. Traffic Division officers were significantly more likely to issues a citation than other officers with 86.4% of Traffic Division stops resulting in a citation.

- Non-Traffic Division officers are more significantly more likely to issue a warning, arrest the driver, or end the stop with no enforcement than Traffic Division officers.

- Drivers stopped by non-traffic division officers and found with contraband after a search are twice as likely to be arrested as other drivers. There are no other significant predictors for the outcome of a stop, including race / ethnicity of the driver.

**Stops of Pedestrians**

- Portland Police Bureau officers performed 256 stops of pedestrians in 2016. Officers performed the fewest number of stops since data collection began in 2012, declining by 78% over the last five years.

- The majority of pedestrian stops occurred within Central Precinct which encompasses many high-trafficked pedestrian-friendly areas. The area is also a focus of enhanced foot patrols in the business and entertainment districts.

- The ratio of stopped Black / African American pedestrians has significantly declined over the past five years, while the ratio of Hispanic pedestrians has significantly increased - despite accounting for only 17 stops in 2015 and 2016.

- Non-Traffic officers stopped significantly more Black / African American pedestrians (25) than Traffic officers (10) in 2016 and significantly fewer White pedestrians (84 vs 105).

- Traffic Division officers are significantly more likely to stop a pedestrian for a moving violation while Non-Traffic Division officers are more likely to stop pedestrians for non-moving violations.

- Pedestrians are significantly more likely to be searched (1 in 6) than drivers (1 in 25) with all but one search conducted by non-traffic division officers.  Black / African Americans were searched over three times the expected rate when compared to overall stop rates, even though only 12 individuals were searched.

- Illegal contraband was found on a majority (52.1%) of pedestrians searched.  There were no significant differences in hit rate by search type or the hit rates of White and Black / African American pedestrians.

- Compared to drivers, pedestrians are significantly more likely to have no action taken or be arrested and are significantly less likely to be cited. As with driver stops, pedestrians are more likely to receive a citation from Traffic Division officers and a warning or be arrested by non-traffic division officers.

## Gang Enforcement Team Appendix

- Stops conducted by the Gang Enforcement Team/Gun Task Force (GET /GTF) have decreased 47% since 2012, with only 745 drivers and pedestrians stopped in 2016.

- Gang enforcement focus patrols in areas with high occurrences of gang and gun violence with 90% of stops occurring within a half mile of a recent gang violent incident.  The Gang Crime Victimization Benchmark is used for stops by gang officers because the benchmark is representative of the population gang officers contact as part of the specialized mission of reducing gang and gun violence.

- African American / Black subjects are stopped the most often, but at non-disparate rates when compared to the gang victimization rate. White and Hispanic subjects were stopped at substantially higher-than-expected rates when compared to Gang Crime Victimization Rates and were disparately over-represented in stops enacted by GET / GTF officers.

- GET/GTF officers are significantly more likely to perform a search than officers from other divisions.  The majority (87%) of gang enforcement searches are consent searches and all racial groups were searched at rate similar to their overall stop rate. Officers are more likely to request a consent search from Black/African American subjects.

- Contraband is found in about 1 in every 3 searches, a lower hit rate than other divisions, likely due to the reliance on consent searches which are less likely to result in a hit. There were no significant differences in the contraband recovery rate between subjects of different races.

- The majority (86%) of GET/GFT stops result in a warning.  The gang enforcement officers also have the highest arrest rate in the Bureau with 11% of all stops resulting in an arrest.

# INTRODUCTION

The Portland Police Bureau produces an annual report to increase the transparency of the Bureau's use of stops in contacting members of the community. The data, and subsequent reports, highlight the demographics of people stopped by sworn PPB personnel and how those demographics have changed over time. Additionally, the report examines the discretionary decision making practices of police before, during, and after a stop to identify potential disparities across the bureau and within different operational divisions.

It should be noted that the data contained in this report are not necessarily an accurate proxy to aid in the determination of racial profiling.  Instead, these data allow for an examination of disparities in stops between different demographic groups from an empirical standpoint.  As such they allow for a more informed community-wide discussion about how best to keep the community safe and how to accomplish this in the most equitable manner possible. Through community and police partnerships, we can identify areas of potential concern, find solutions on ways to reduce racial bias and perceptions of racial bias, and develop new strategies for community policing and accountability.

## Background

The Portland Police Bureau has been collecting data on traffic and pedestrian stops since 2001 based on recommendations from the Blue Ribbon Panel on Racial Profiling[1]. From the program's outset, officers were required to log their perceptions of driver/pedestrian race, gender, and general age (minor vs. adult); the reason for the stop; whether a search was conducted, the type of search conducted, and results of the search; and the overall outcome of the stop. The Bureau launched its latest version of the collection system, the Stops Data Collection (SDC) system, in 2012 as a web-based form with an automatic connection to the Bureaus' computer-aided-dispatch (CAD) system and electronic citation system (ECITE) to aid in the accountability of mask completion. An example of the current Stops Data Collection system is provided in Appendix A.

---

[1] https://www.portlandoregon.gov/police/article/32381

# GENERAL DEMOGRAPHICS

## City of Portland Residents

### Table 1. City of Portland Racial and Ethnic Demographics from the 2010 U.S. Census

| Race/Ethnicity | Citywide | | Central Precinct | | East Precinct | | North Precinct | |
|---|---|---|---|---|---|---|---|---|
| | **N** | **%** | **N** | **%** | **N** | **%** | **N** | **%** |
| American Indian/Alaskan | **4,381** | **0.8%** | 1,062 | 0.6% | 1,891 | 0.8% | 1,428 | 0.8% |
| Asian | **41,335** | **7.1%** | 9,435 | 5.2% | 23,757 | 10.6% | 8,140 | 4.6% |
| Black/African American | **35,462** | **6.1%** | 3,995 | 2.2% | 10,684 | 4.7% | 20,777 | 11.7% |
| Hawaiian or Pacific Islander | **2,978** | **0.5%** | 354 | 0.2% | 1,409 | 0.6% | 1,215 | 0.7% |
| Hispanic or Latino | **54,840** | **9.4%** | 8,971 | 5.0% | 26,613 | 11.8% | 19,258 | 10.8% |
| White | **421,773** | **72.2%** | 150,722 | 83.2% | 151,980 | 67.5% | 119,037 | 67.0% |
| Other | **23,007** | **3.9%** | 6,616 | 3.5% | 8,690 | 3.9% | 7,699 | 4.4% |
| **Total** | **583,776** | **100.0%** | **181,155** | **100.0%** | **225,024** | **100.0%** | **177,554** | **100.0%** |

According to the 2010 U.S. Census, the City of Portland has 583,776 residents[2] split among the three administrative precincts of the Portland Police Bureau. However, since then, Portland has experienced an explosive growth in residents, gaining about 50,000 residents over the last six years with an estimated 2016 population of 627,395[3]. Estimates from the U.S. Census Bureau[4] indicate that resident demographics in Multnomah County[5] have shifted in the past few years, as individuals that identify solely as Asian are the fastest growing racial group, with White alone growing the slowest. All other racial groups have grown at normal rates.

Residents of Portland are not the only population subjects in traffic stops, as the laws apply to all road users, including visitors and commuters,

**Figure 1. Portland Precincts and Patrol Districts**



[2] The official decennial census number is used as five-year estimates for smaller geographic areas, such as a city, have a higher margin of error.
[3] Population Research Center. (2016). Certified Populations Estimate 2016. Population Research Center, Portland State University.
[4] U.S. Census Bureau. (2016). Annual Estimates of the Resident Population by Sex, Race, and Hispanic Origin for the United States, States, and Counties: April 1, 2010 to July 1, 2015. U.S. Census Bureau, Population Division.
[5] County is the smallest geographic area in which the U.S. Census Bureau produces mid-decade population estimates. Given the City of Portland makes up about 79 percent of the County's population and about 31 percent of the County's land area, the County estimate is a good proxy for general population trends.

regardless of their residency. About 250,000 people commute into Portland for work[6], swelling the daytime population of the city to more than 860,000 people. White individuals make-up the largest share of the population with full-time jobs in Portland (86.8%) and are also more likely to drive alone to work, with all other racial / ethnic groups utilizing higher levels of carpooling or public transportation[7]. In addition to commuters, 9.1 million people visited the region in 2016, staying for an average of 3.2 nights, boosting the daily population by another 76,000 individuals[8] to a total of about 936,000 people.

## Disparity Benchmarks

Identifying the appropriate benchmarks for an accurate and reliable assessment is one of the biggest challenges in identifying potential bias and disparities in policing. Census data are the most common benchmark used to identify the existence or lack of racially-biased policing – mainly due to its accessibility and availability. However, Census data is not a good indicator of the driving population or their driving patterns within the city. A more accurate and effective measurement of the driving population for the area is the demographics of drivers involved in injury collisions as it provides an indication of both driving frequency and behavior. The 2016 Injury Collision Benchmark summarizes the identified race / ethnicity of involved drivers in injury collisions investigated by Portland Police Bureau officers

**Table 2. 2016 Injury Collision Statistics, by Race of Drivers**

| Race/Ethnicity | 2016 | |
|---|---|---|
| | Count | Percent |
| American Indian/Alaskan | 9 | 0.6% |
| Asian | 106 | 6.9% |
| Black/African American | 144 | 9.4% |
| Hispanic | 138 | 9.0% |
| White | 1,096 | 71.6% |
| Unknown/Other | 38 | 2.5% |
| **Total** | **1,531** | **100.0%** |

When assessing potential officer bias, it is also important to assess how differential exposure to police can affect overall stop patterns. The Portland Police Bureau designates patrol areas and districts based on the number of received calls of service and the number of reported violent crimes in the area; if these measures coincide with areas where subjects live, drive, work, or visit, they may be more likely to be stopped or searched by law enforcement personnel. Crime victimization rates by the race / ethnicity of the victim provides a rough estimate of the demographics of areas exposed to violent crime, and therefore, areas where individuals may be more likely to come in contact with police. Victimization data is preferred to arrest data because it is less vulnerable to police bias as it represents those who call police as opposed to those who are apprehended by police for a given offense. The 2016 Crime Victimization Benchmark summarizes the profiles of victims of FBI Indexed Crimes – Homicides, Forcible Sex Offenses, Robberies and Aggravated Assaults – that occurred in the City of Portland.

**Table 3. 2016 Crime Victimization Benchmark, by Race of Victim**

| Race/Ethnicity | 2016 | |
|---|---|---|
| | Count | Percent |
| American Indian/Alaskan | 34 | 1.1% |
| Asian | 139 | 4.3% |
| Black/African American | 609 | 18.9% |
| Hispanic | 273 | 8.5% |
| White | 2,096 | 65.0% |
| Unknown/Other | 75 | 2.3% |
| **Total** | **3,226** | **100.0%** |

---

[6] U.S. Census Bureau. (2016). LEHD Origin-Destination Employment Statistics Data (2002 – 2015). U.S. Census Bureau, Longitudinal-Employer Household Dynamics Program.

[7] U.S. Census Bureau. (2016). 2011 – 2015 American Community Survey 5-Year Estimates. Table S0804: Means of Transportation to Work by Selected Characteristics for Workplace Geography. U.S. Census Bureau, American Community Survey.

[8] Dean Runyan Associates. (2017). *Economic Impacts of Travel, 2016: Portland, Oregon.* https://www.travelportland.com/wp-content/uploads/2017/09/DeanRunyan_2016Impacts.pdf

## BUREAU-WIDE STOPS OF DRIVERS

Portland Police Bureau officers have significantly reduced the amount of self-initiated activity, including traffic stops, over the past five years. In 2016, Portland Police Bureau officers performed 33,311 stops of drivers across the city – a 51 percent decrease since data collection began in 2012.

Stops from officers assigned to Patrol, investigations, and other support divisions saw the greatest decline over the time period, at 59 percent, while Traffic officers saw a more modest decline of 44 percent. The decline can primarily be attributed to reduced staffing levels over the past five years, coupled with an increase in calls for service due to sustained growth in the City of Portland. Stops for future years, without additional personnel, are projected to decline at similar rates, especially since Traffic Division officers now commit about 25 percent of their work hours detached to the Patrol Division.

**Figure 2. Traffic Division officers conducted more driver stops in 2012 than all units conducted in 2016 combined.**



### Stop Locations

Portland Police Bureau officers typically focus on a distinct geographic area during the shift (such as Patrol officers work a particular patrol district or Traffic officers monitoring a High Crash Corridor), but may respond to incidents and initiate stops anywhere in the state. Of the stops with a valid location[9], the largest plurality of driver and pedestrian stops in 2016 occurred in East Precinct, followed by North Precinct and Central Precinct. The number of stops initiated in Central

**Figure 3. Officers are stopping fewer drivers in Central Precinct than in 2012**

[9] About 11 percent of calls each year cannot have their location verified by the system due to non-standard location entries, such as landmarks or highway ramps, or typographical errors. These stops are excluded from location analyses.

Precinct have significantly declined[10] over the last five years, while both East and North Precincts have seen slight, but non-significant[11], increases in stop rates. Officers have also significantly decreased[12] the number of stops initiated outside of Portland (2.2% in 2012 vs. 1.4% in 2016).

## Stopped Drivers Demographics

Traffic and Non-Traffic officers execute traffic stops of drivers in support of different missions in an overall effort to improve the safety and livability for residents and visitors in Portland. These diverse missions lead officers to concentrate their efforts in different areas of the City, often encountering diverse communities and people during their missions. The differences in missions and the populations encountered make using a single benchmark to discern any potential bias as a Bureau-wide measure difficult; rather different benchmark analyses are used for the broad operation groups of the Portland Police Bureau (Traffic vs. Non-Traffic).

**Table 4. Racial Demographics of Stopped Drivers, since 2012**

| | Race/Ethnicity | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | American Indian/Alaskan | 38 | 0.1% | 28 | 0.1% | 32 | 0.1% | 25 | 0.1% | 25 | 0.1% |
| | Asian | 1,593 | 4.5% | 1,618 | 4.7% | 1,365 | 4.8% | 1,173 | 4.9% | 1,045 | 5.3% |
| | Black/African American | 2,811 | 8.0% | 2,676 | 7.8% | 2,332 | 8.2% | 2,148 | 8.9% | 1,745 | 8.8% |
| | Hispanic | 1,906 | 5.4% | 2,125 | 6.2% | 1,886 | 6.6% | 1,733 | 7.2% | 1,443 | 7.3% |
| | White | 27,882 | 79.4% | 27,080 | 78.8% | 22,057 | 77.5% | 18,184 | 75.3% | 14,433 | 72.9% |
| | Unknown/Other | 903 | 2.6% | 835 | 2.4% | 803 | 2.8% | 875 | 3.6% | 1,107 | 5.6% |
| | **Traffic Total** | **35,133** | **100%** | **34,362** | **100%** | **28,475** | **100%** | **24,138** | **100%** | **19,798** | **100%** |
| | Race/Ethnicity | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
| | | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | American Indian/Alaskan | 122 | 0.4% | 113 | 0.3% | 75 | 0.3% | 87 | 0.5% | 80 | 0.6% |
| | Asian | 1,460 | 4.5% | 1,602 | 4.9% | 1,027 | 4.4% | 764 | 4.4% | 635 | 4.7% |
| | Black/African American | 6,011 | 18.5% | 5,897 | 17.9% | 4,156 | 17.7% | 3,312 | 19.2% | 2,726 | 20.2% |
| | Hispanic | 2,805 | 8.6% | 2,728 | 8.3% | 1,980 | 8.4% | 1,422 | 8.3% | 1,281 | 9.5% |
| | White | 20,691 | 63.5% | 21,128 | 64.3% | 15,156 | 64.6% | 10,677 | 62.0% | 8,255 | 61.1% |
| | Unknown/Other | 1,476 | 4.5% | 1,411 | 4.3% | 1,055 | 4.5% | 971 | 5.6% | 536 | 4.0% |
| | **Non-Traffic Total** | **32,565** | **100%** | **32,879** | **100%** | **23,449** | **100%** | **17,233** | **100%** | **13,513** | **100%** |

TRAFFIC DIVISION

Officers from the Traffic Division are the primary traffic enforcement arm of the Portland Police Bureau. Officers routinely patrol the High Crash Network[13], Portland's most dangerous streets and intersections for road and sidewalk users, to help prevent road injuries and change user behavior. Traffic officers, in conjunction with the Portland Bureau of Transportation, also perform enforcement missions to support the City's Vision Zero Action Plan, whose goal is to eliminate deaths and serious injuries on Portland streets by 2025. Given the intense focus by Traffic officers on driving behavior, the Injury Collision Benchmark (see Table 2) is the best indicator to assess potential biases of officers enforcing traffic laws.

---

[10] $p < .03$, $r^2 = .81$
[11] $p < .07$, $r^2 = .73$ ; $p < .53$, $r^2 = .15$
[12] $p < .04$, $r^2 = .81$
[13] https://www.portlandoregon.gov/transportation/54892

The racial demographics of drivers stopped by PPB Traffic officers has significantly changed over the past five years, with officers stopping significantly fewer White drivers (79.4% vs. 72.9%)[14] and significantly more Asian (4.5% vs. 5.3%)[15] and Hispanic (5.3% vs. 7.3%)[16] drivers. This trend mirrors the overall demographic patterns in the area, with communities of color growing at a faster rate than White residents. Even with the changes in stop rates since 2012, Traffic officers essentially stopped drivers at rates similar to their expected values when compared to the 2016 Injury Collision Benchmark[17], with no group over- or under-represented in the dataset[18].

**Figure 4. No racial group was significantly over-represented in stops by Traffic officers in 2016.**



NON-TRAFFIC DIVISIONS

Officers from Non-Traffic divisions – namely, Patrol, investigations, and other support divisions – focus on preventing and responding to criminal activity in the city. By focusing on crime interdiction, officers are likely to spend more time in communities with higher preponderances of violent crime. The Crime Victimization Benchmark[19] (see Table 3) is used as a proxy measure to account for the individuals that are transiting in the area with vehicles, whether they are residents, commuters, or visitors to the community.

**Figure 5. Non-Traffic officers stopped drivers in-line with the Crime Victimization Benchmark in 2016**

In contrast to the Traffic Division, stops completed by officers from Patrol, investigations, and other support divisions have remained essentially unchanged over the prior five years – no racial group has seen a significant increase or decrease in their representation of stops. Additionally, Non-Traffic officers complete stops at a rate similar to crime victimization rates



---

[14] *p < .006, r² = .94*
[15] *p < .02, r² = .88*
[16] *p < .005, r² = .95*

[17] The Disparity Index compares the proportion of stopped drivers to a benchmark for each racial group. Races with a disparity index greater than 2.0 would indicate a meaningful overrepresentation, while a value below 0.5 would indicate a meaningful underrepresentation of the stopped group.

[18] American Indian / Alaskan Native drivers were excluded from all analyses for Traffic officers as only 25 individuals were stopped in 2016.

[19] The benchmark includes all Portland victims of the FBI Indexed Crimes of Homicide, Forcible Sex Offenses, Robbery, and Aggravated Assault.

in 2016, with no group meaningfully over- or under-represented in stops. The results hold true when stops are analyzed within each precinct, as no racial groups fall outside the expected range in any locale.

## Driver Stop Reasons

Differential stop patterns based on the intersection between the driver's perceived race and the severity of the alleged infraction can highlight biased police behavior; specifically, non-White drivers being stopped at a higher rate for more minor infractions can be an indicator of biased policing. In previous years, the Portland Police Bureau analyzed the differences between Major Moving Violations[20] and all other violations, including Minor Moving Violations and Non-Moving Violations such as Equipment and City Code Violations. Since 2015, the Portland Police Bureau has been a partner in the City of Portland's Vision Zero, a goal to eliminate traffic deaths and serious injuries on Portland roadways by 2025. A key action of Vision Zero centers on curbing dangerous behaviors that contribute to fatal and serious injury crashes (including speed, impairment, and other dangerous behaviors) through traffic enforcement. Since driving behaviors associated with Major and Minor Moving Violations can contribute to fatal and serious injury crashes, Non-Moving Violations represent a greater portion of an officer's discretionary judgement on whether to initiate a traffic stop.



**Figure 6. Traffic Officers are more likely to stop a driver for a Moving Violation than other units**

The overwhelming majority of driver stops (84.8%) initiated by Portland Police Bureau officers are for Moving Violations on Portland roadways. Personnel from Non-Traffic units were significantly more likely[21] to stop a driver for Non-Moving Violations than Traffic personnel; however, they still stopped a majority of drivers for Moving Violations. There were few differences between the stop reasons for different perceived racial groups, as Asian drivers stopped by Non-Traffic officers were the only group stopped significantly more for Moving Violations than drivers of other races. No other racial group was stopped significantly more, or less, for Non-Moving Violations in 2016.

## Search Rates

A common measure for examining bias policing is to examine racial disparities in searches. Police can exercise their discretion in one of two ways during a search—low discretion or high discretion search. In low discretion searches, policy or training dictates the likelihood of a search occurring. For example, if police stop an individual and take custody of them to administer a breathalyzer test, policy would require that the subject be searched for weapons prior to being transported. In high

---

[20] Minor Moving Violations involve all Class C or D violations. Major Moving Violations include all crimes (felony or misdemeanor) and Class A or B violations. Most moving violations are outlined in ORS 811.005 – 811.812.

[21] $x^2 = 2728.872$, $p < .001$

discretion searches, such as consent searches, police officers exercise more judgment in their decision to search. Racial profiling experts maintain that if police overuse high discretion searches on people of color, especially when combined with a lower rate of recovering contraband it could suggest that police are engaged in bias policing.

**Figure 7. Search rates have declined for virtually all racial groups since 2012**



In 2016, approximately 1 out of every 25 stops (3.9% of all stops) performed by Portland Police Bureau on drivers included a discretionary search. Non-Traffic officers perform the bulk of searches associated with driver stops in the Bureau, accounting for about 90 percent of all searches for every year since data collection began in 2012. Overall, the ratio of searches have declined since 2012 – significantly[22] so for officers from Patrol, investigations, and other support divisions. Non-Traffic units patrolling North Precinct were the most likely to conduct a search in 2016 (10.0%), followed by East (8.9%) and Central Precincts (4.1%). Search rates have remained roughly consistent across the different precincts, except for East Precinct where searches have significantly declined[23] by approximately 25 percent since 2012.

Portland Police Bureau officers display differential search rates based on Race / Ethnicity when compared to overall stop patterns. American Indian / Alaskan Native and Black / African American drivers are searched a significantly higher rates than expected, while Asian drivers are searched significantly less than expected. Traffic Division officers account for much of the disparity for Black / African American drivers, searching drivers at more than

**Figure 8. American Indian / Alaskan Native and Black / African American drivers were searched disproportionately when compared to overall stop rates**



_____

[22] $p < .04$, $r^2 = .82$
[23] $p < .001$, $r^2 = .99$

twice their stop rate[24]. Non-Traffic officers searched Black / African American drivers significantly more than expected[25] – but not disparately so.

Consent search has been the most commonly utilized search type[26] used across the Bureau for the last five years (49.9% of all searches and 4.6% of all driver stops in 2016), even though it has seen a meaningful, but non-significant, decline since 2012. Plain View Searches have seen the largest, but non-significant, increase during that time period, although it still remains as the third most utilized search reason behind Probable Cause searches. Traffic officers stand out from the rest of the Bureau, as they conduct fewer overall searches but almost exclusively use Probable Cause as the reason for conducting a search. Search reasons are largely similar between the different racial groups, except Black / African American drivers are significantly more likely to be the subject of a Consent Search and significantly less likely to be the subject of a Probable Cause search than other racial groups[27].

## Contraband Hit Rates

Even though the percentage of drivers searched by PPB officers has declined since 2012, personnel have become significantly better[28] at detecting and uncovering contraband. In 2016, 42.0 percent of all searches ended with a PPB detecting prohibited material, including alcohol, drugs, stolen property, weapons, and other illegal contraband – up from 34.0 percent in 2012. Neither Traffic units nor Non-Traffic units are significantly better at recovering contraband in searches and both operation groups have seen similar increases in successful search rates of the past five years. Probable Cause searches are significantly more likely[29] to discover Contraband, while Plain View and Weapon Pat searches are the least likely to be successful. Consent searches were significantly more likely to be successful than Plain View searches and significantly less likely to uncover contraband than Probable Cause searches.

**Table 5. Probable Cause searches are significantly more likely to discover contraband than other search reasons.**

| Search Type | Total Searches Count | Found Contraband Count | Percent |
|---|---|---|---|
| Plain View | 224 | 62 | 27.7% |
| Consent | 633 | 262 | 41.4% |
| Probable Cause | 368 | 199 | 54.1% |
| Weapon Pat | 44 | 10 | 22.7% |
| **Total** | **1,269** | **533** | **42.0%** |

**Table 6. Illicit drugs are the most commonly uncovered item during driver searches.**

| Race/Ethnicity | Total Searches Count | Found Contraband Count | Percent | Alcohol Count | Percent | Drugs Count | Percent | Weapons Count | Percent | Stolen Property Count | Percent | Other Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Indian/Alaskan | 16 | 8 | 50.0% | 2 | 12.5% | 4 | 25.0% | 2 | 12.5% | 0 | 0.0% | 1 | 6.3% |
| Asian | 32 | 15 | 46.9% | 5 | 15.6% | 4 | 12.5% | 3 | 9.4% | 1 | 3.1% | 3 | 9.4% |
| Black/African American | 405 | 154 | 38.0% | 36 | 8.9% | 78 | 19.3% | 41 | 10.1% | 7 | 1.7% | 25 | 6.2% |
| Hispanic | 123 | 57 | 46.3% | 18 | 14.6% | 30 | 24.4% | 11 | 8.9% | 4 | 3.3% | 7 | 5.7% |
| White | 673 | 292 | 43.4% | 56 | 8.3% | 170 | 25.3% | 39 | 5.8% | 40 | 5.9% | 38 | 5.6% |
| Unknown/Other | 20 | 7 | 35.0% | 2 | 10.0% | 4 | 20.0% | 1 | 5.0% | 1 | 5.0% | 2 | 10.0% |
| **Total** | **1,269** | **533** | **42.0%** | **119** | **9.4%** | **290** | **22.9%** | **97** | **7.6%** | **53** | **4.2%** | **76** | **6.0%** |

[24] Traffic Division officers only searched 2 American Indian / Alaskan Native drivers in 2016 (out of 25 drivers), while Non-Traffic officers only searched 14 (out of 80) American Indian / Alaskan Native drivers. The small search and stop rates for this population make it difficult to discern statistical patterns.

[25] $x^2 = 125.316$, $p < .001$

[26] For a description of search types utilized by Portland Police Bureau officers, refer to Appendix B.

[27] $x^2 = 71.123$, $p < .001$

[28] $p < .005$, $r^2 = .95$

[29] $x^2 = 47.696$, $p < .001$

Each racial group saw a general increase in successful search rates for drivers over the last five years. White drivers, African American / Black drivers, and Hispanic drivers all saw a significant increase[30] in the percentage of searches that produced contraband in the period, with other racial groups showing more modest increases. In general, the perceived race of the driver is not a significant predictor whether or not contraband will be found; for the most recent year, there were no significant differences between the different groups for contraband hit rates[31]. There is also no correlation between a group's overall search rate and hit rate within any given year[32].

## Stop Outcomes

Stop disposition, or the outcome of the stop, is a common method to assess disparities among stops made by law enforcement personnel on different groups of people in a community. More locally, Portland community members have cited equitable stop outcomes as an important goal. In the 2009 plan to address racial profiling, community members raised concerns that traffic stops that result in no enforcement action – meaning drivers received no warning, citation, or were not arrested – can feel like harassment, especially to people of color. Large differences between racial and ethnic groups may imply an unequal impact on a particular race.

The majority (58.9%) of driver stops performed by PPB sworn personnel in 2016 resulted in a citation issued to the vehicle operator. Citations have always been the most common enforcement action and, with the exception of 2015, have always represented a majority of the enforcement actions[33]. Traffic officers were significantly more likely[34] to issue a citation than other unit divisions, while Patrol, investigations, and other support divisions were significantly more likely to issue a warning, arrest the driver, or end the stop with no enforcement action.

**Figure 9. Traffic officers end most of their interactions with a citation, while Non-Traffic officers mainly issue warnings.**



The progressive nature of a stop, and the multiple decision points within the interaction, make it difficult to discern what role, if any, implicit or explicit racial bias plays in stop disposition. Multiple logistic regressions were conducted to statistically determine which predictors were statistically significant to the stop outcome and their relative importance to other factors. There are no significant predictors for how Traffic Division officers decide to take no action[35],

---

[30] White: $p = .96, r^2 < .003$ ; Black: $p = .84, r^2 < .03$ ; White: $p = .90, r^2 = .02$
[31] $x^2 = 5.246, p = .387$
[32] $p = .996, r^2 < .001$
[33] This exception is most likely due to data collection errors from the second half of 2015 that prevented the recording of Stops Data from Traffic Division officers.
[34] $x^2 = 767.880, p < .001$
[35] Omnibus Test: $x^2 = 2.297, p = .999$

issue citations,[36] or arrest[37] drivers, nor when Non-Traffic officers decide to take action versus ending the interaction without any action[38] or when officers issue a citation[39]. However, significant differences do emerge for drivers arrested by Non-Traffic officers[40]; drivers that are found to have contraband during the stop due to a search are more than twice as likely to be arrested when compared to drivers searched but not carrying any contraband[41], even when accounting for race and stop reason.

**Table 7. Non-Traffic officers showed higher arrest and none enforcement rates for nearly all driver racial groups in the last year when compared to Traffic officers.**

|  | Race/Ethnicity | Total Stops | | Enforcement Action | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | None | | Warning | | Citation | | Arrested | |
|  |  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | American Indian/Alaskan | 25 | 0.1% | 1 | 4.0% | 3 | 12.0% | 17 | 68.0% | 4 | 16.0% |
|  | Asian | 1,045 | 5.3% | 5 | 0.5% | 151 | 14.4% | 877 | 83.9% | 12 | 1.1% |
|  | Black/African American | 1,745 | 8.8% | 3 | 0.2% | 244 | 14.0% | 1,442 | 82.6% | 56 | 3.2% |
|  | Hispanic | 1,443 | 7.3% | 6 | 0.4% | 132 | 9.1% | 1,268 | 87.9% | 37 | 2.6% |
|  | White | 14,433 | 72.9% | 43 | 0.3% | 1,724 | 11.9% | 12,483 | 86.5% | 183 | 1.3% |
|  | Unknown/Other | 1,107 | 5.6% | 6 | 0.5% | 75 | 6.8% | 1,013 | 91.5% | 13 | 1.2% |
|  | **Total** | **19,798** | **100.0%** | **64** | **0.3%** | **2,329** | **11.8%** | **17,100** | **86.4%** | **305** | **1.5%** |

|  | Race/Ethnicity | Total Stops | | Enforcement Action | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | None | | Warning | | Citation | | Arrested | |
|  |  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | American Indian/Alaskan | 80 | 0.6% | 2 | 2.5% | 50 | 62.5% | 20 | 25.0% | 8 | 10.0% |
|  | Asian | 635 | 4.7% | 15 | 2.4% | 481 | 75.7% | 120 | 18.9% | 19 | 3.0% |
|  | Black/African American | 2,726 | 20.2% | 64 | 2.3% | 1,996 | 73.2% | 460 | 16.9% | 206 | 7.6% |
|  | Hispanic | 1,281 | 9.5% | 39 | 3.0% | 863 | 67.4% | 295 | 23.0% | 84 | 6.6% |
|  | White | 8,255 | 61.1% | 267 | 3.2% | 5,898 | 71.4% | 1,537 | 18.6% | 553 | 6.7% |
|  | Unknown/Other | 536 | 4.0% | 50 | 9.3% | 379 | 70.7% | 97 | 18.1% | 10 | 1.9% |
|  | **Total** | **13,513** | **100.0%** | **437** | **3.2%** | **9,667** | **71.5%** | **2,529** | **18.7%** | **880** | **6.5%** |

---

[36] Omnibus Test: $x^2 = 6.959$, $p = .325$
[37] Omnibus Test: $x^2 = 13.979$, $p = .730$
[38] Omnibus Test: $x^2 = 24.296$, $p = .388$
[39] Omnibus Test: $x^2 = 25.672$, $p = .219$
[40] Omnibus Test: $x^2 = 123.102$, $p < .001$
[41] $b = .911$, $p < .003$

## BUREAU-WIDE STOPS OF PEDESTRIANS

Similar to driver stops, Portland Police Bureau stopped substantially fewer pedestrians over the last five years. In 2016, officers stopped 256 pedestrians – a decline of 78 percent from 2012 (1,174). Both operational divisions have seen steep declines in the number of pedestrian stops conducted, with Non-Traffic officers experiencing the biggest decline (83.7%), followed closely by Traffic officers (70.7%). Last year was the first year where Traffic officers stopped more pedestrian than Non-Traffic officers, reflecting the overall decline in self-initiated activity among officers. In total, pedestrians accounted for 0.8 percent of all stops in 2016, the lowest rate in the last five years.



Figure 10. Pedestrian stops have declined by 78 percent since the five-year high in 2012.

### Stop Locations

The broad location of where pedestrians are being stopped has remained consistent since data collection began in 2012. Central Precinct has always been the dominant location for pedestrian stops; however, 2016 was the first time it accounted for a majority of the stops. The precinct encompasses a number of highly-trafficked pedestrian-friendly areas, including Downtown, SE Hawthorne Blvd., and NW 23rd St., where sworn personnel are more likely to encounter people walking in the area. Additionally, Central Precinct is the primary operating location of two units, the Entertainment Detail and the Portland Patrol detail, that contact a high number of pedestrians in the district.



Figure 11. Central Precinct has been the primary location for pedestrian stops since 2012

## Stopped Pedestrian Demographics

Portland Police Bureau officers contact pedestrians in support of the broad operational mission for their divisions, namely road safety for Traffic officers and crime response and prevention for Non-Traffic officers. However, it is more difficult to determine the appropriate benchmark for comparison to stop demographic statistics as there is no commonly utilized measure in academic literature. Population demographics from the decennial Census and associated products (such as the American Community Survey) do not account for visitors, commuters, and houseless individuals in the area, which can be especially problematic since people of color are more likely to utilize public transportation or walk to commute to work. The Crime Victimization Benchmark, which was used in prior Stops Data Collection reports, also proves problematic as 2016 was the first year Traffic officers stopped more pedestrians than Non-Traffic officers, meaning officers were more likely to focus on traffic safety as opposed to crime prevention. The small number of pedestrian stops proves problematic as the stopped individuals are not likely to be a random sampling across a city or precinct and be heavily weighted by officers that patrol more pedestrian-friendly districts. Due to these methodological challenges, no disparity analysis was conducted on pedestrian stops.

**Table 8. Non-Traffic officers showed higher arrest and none enforcement rates for nearly all driver racial groups in the last year when compared to Traffic officers**

|  | Race/Ethnicity | 2012 Count | 2012 Percent | 2013 Count | 2013 Percent | 2014 Count | 2014 Percent | 2015 Count | 2015 Percent | 2016 Count | 2016 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Traffic** | American Indian/Alaskan | 2 | 0.5% | 1 | 0.3% | 0 | 0.0% | 1 | 1.1% | 0 | 0.0% |
|  | Asian | 10 | 2.3% | 14 | 4.6% | 7 | 3.3% | 1 | 1.1% | 2 | 1.5% |
|  | Black/African American | 33 | 7.4% | 21 | 6.9% | 11 | 5.2% | 11 | 12.4% | 10 | 7.7% |
|  | Hispanic | 13 | 2.9% | 16 | 5.2% | 10 | 4.7% | 4 | 4.5% | 8 | 6.2% |
|  | White | 376 | 84.7% | 246 | 80.4% | 176 | 83.0% | 69 | 77.5% | 105 | 80.8% |
|  | Unknown/Other | 10 | 2.3% | 8 | 2.6% | 8 | 3.8% | 3 | 3.4% | 5 | 3.8% |
|  | **Traffic Total** | **444** | **100%** | **306** | **100%** | **212** | **100%** | **89** | **100%** | **130** | **100%** |
|  | Race/Ethnicity | 2012 Count | 2012 Percent | 2013 Count | 2013 Percent | 2014 Count | 2014 Percent | 2015 Count | 2015 Percent | 2016 Count | 2016 Percent |
| **Non-Traffic** | American Indian/Alaskan | 9 | 1.2% | 7 | 1.4% | 5 | 1.6% | 6 | 3.1% | 0 | 0.0% |
|  | Asian | 9 | 1.2% | 11 | 2.1% | 5 | 1.6% | 1 | 0.5% | 4 | 3.2% |
|  | Black/African American | 185 | 25.3% | 120 | 23.3% | 64 | 20.3% | 30 | 15.5% | 25 | 19.8% |
|  | Hispanic | 44 | 6.0% | 32 | 6.2% | 20 | 6.3% | 13 | 6.7% | 9 | 7.1% |
|  | White | 462 | 63.3% | 336 | 65.1% | 216 | 68.6% | 134 | 69.1% | 84 | 66.7% |
|  | Unknown/Other | 21 | 2.9% | 10 | 1.9% | 5 | 1.6% | 10 | 5.2% | 4 | 3.2% |
|  | **Non-Traffic Total** | **730** | **100%** | **516** | **100%** | **315** | **100%** | **194** | **100%** | **126** | **100%** |

Across all divisions, there have been subtle changes in the stop demographics of pedestrians. The ratio of stopped Black / African American pedestrians has significantly declined over the past five years[42], while the ratio of Hispanic pedestrians has significantly increased[43] despite only accounting for 17 stops in 2015 and 2016. White pedestrians have shown a slight, but non-significant[44], increase over the period while other racial groups have remained more constant. Non-Traffic officers stopped significantly more[45] Black / African American pedestrians than Traffic officers in 2016 and

---

[42] $p < .03$, $r^2 = .86$

[43] $p < .03$, $r^2 = .84$

[44] $p = .31$, $r^2 = .34$

[45] $x^2 = 8.721$, $p < .02$

significantly fewer White pedestrians. There were no other statistical differences between the two operation groupings for stop demographic patterns[46].

**Pedestrian Stop Reasons**

The identified reason for stopping a pedestrian is highly dependent on the stopping officers' assigned division and mission. Traffic officers are significantly more likely[47] to stop a pedestrian for a Moving Violation, highlighting the division's commitment to Vision Zero enforcement missions.



Figure 12. A majority of pedestrians stopped by Non-Traffic officers are for Non-Moving Violations

90.3% — 92.3%
60.8% — 65.1%
39.2% — 34.9%
9.7% — 7.7%

2012          2016
— Traffic Moving        — Traffic Non-Moving
— Non-Traffic Moving    — Non-Traffic Non-Moving

The inverse is true for officers from Patrol, investigations, and other support divisions, who are primarily concerned with crime reduction, and mainly stop pedestrians for Non-Moving Violations. There have been no significant changes for either division over the past five years, even with the overall decline in total pedestrian stops. There are also no significant differences in the stop patterns between the different racial groups[48], with both divisions[49] stopping drivers of different races for the same reasons.

**Search Rates**

Pedestrians stopped by PPB officers are significantly more likely[50] to be searched than their driver counterparts, as about 1-in-6 (16.0%) of all pedestrian stops ended in a search in 2016. Total pedestrian searches has seen a non-significant downward trend[51] since 2012 when nearly 25 percent of all stops ended in a search. Nearly all searches are conducted by Non-Traffic officers; Traffic officers only searched one pedestrian in 2016 while officers from other divisions searched 40 pedestrians. Individuals were most commonly searched with Probable Cause (56.1%), followed by a Weapon "Pat" (17.1%), Consent (14.6%), and Plain View (12.2%).

Search rates for all racial groups have declined non-significantly since 2012. Black / African American pedestrians stopped by PPB officers were searched significantly more than White pedestrians[52]. Overall, Black /

Figure 13. Black / African American pedestrians were searched disproportionately last year when compared to stop rates



Black — 3.45
White — 0.55

0.0    1.0    2.0    3.0    4.0

---

[46] For all pedestrian analyses involving race, American Indian / Native Alaskan, Asian, and Unknown / Other pedestrians are excluded from the analyses due to sample size issues.
[47] $x^2 = 91.527, p < .001$
[48] $x^2 = 5.148, p = .076$
[49] Traffic: $x^2 = 1.866, p = .393$ ; Non-Traffic: $x^2 = 2.194, p = .334$
[50] $x^2 = 101.060, p < .001$
[51] $p < .10, r^2 = .65$
[52] $x^2 = 9.299, p < .01$ ; Hispanic pedestrians were not included in the analysis as only 2 were searched in 2016

African Americans were searched more than three times than expected when compared to overall pedestrian stop rate – however, only 12 Black / African American pedestrians were searched during the entire year. There were no significant differences[53] in the types of searches performed on White and Black / African American pedestrians, although overall sample size concerns limit the power of the analysis.

## Contraband Hit Rates

Illegal contraband was found on a majority of pedestrians searched by PPB personnel in 2016. Successful search rates have increased at a slight, but non-significant[54] rate since 2012 (53.7%). There are no significant differences[55] in the hit rates of different search types as the Weapon Pat is the only search method with a hit rate below 50 percent. Additionally, there are no significant differences[56] between the hit rates of White and Black / African American pedestrians.

**Table 9. The majority of pedestrian searches result in contraband being found.**

| Search Type | Total Searches Count | Found Contraband Count | Percent |
|---|---|---|---|
| Plain View | 5 | 4 | 80.0% |
| Consent | 6 | 4 | 66.7% |
| Probable Cause | 23 | 13 | 56.5% |
| Weapon Pat | 7 | 1 | 14.3% |
| **Total** | **41** | **22** | **53.7%** |

**Table 10. Drugs are the most commonly recovered contraband in pedestrian searches**

| Race/Ethnicity | Total Searches Count | Found Contraband Count | Percent | Alcohol Count | Percent | Drugs Count | Percent | Weapons Count | Percent | Stolen Property Count | Percent | Other Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Indian/Alaskan | 0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Asian | 1 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Black/African American | 12 | 7 | 58.3% | 1 | 8.3% | 5 | 41.7% | 1 | 8.3% | 1 | 8.3% | 0 | 0.0% |
| Hispanic | 2 | 1 | 50.0% | 0 | 0.0% | 1 | 50.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| White | 26 | 14 | 53.8% | 3 | 11.5% | 9 | 34.6% | 1 | 3.8% | 2 | 7.7% | 1 | 3.8% |
| Unknown/Other | 0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total** | **41** | **22** | **53.7%** | **4** | **9.8%** | **15** | **36.6%** | **2** | **4.9%** | **3** | **7.3%** | **1** | **2.4%** |

## Stop Outcomes

Portland Police Bureau officers end pedestrian stops with significantly different outcomes[57] than driver stops. Pedestrians are significantly more likely to have no action taken[58] or be arrested[59] while being significantly less likely to be cited for their actions[60]. Last year was the first year where citation was the dominant outcome for pedestrian stops – this reflects the increased number of

**Figure 14. Pedestrians stopped by Non-Traffic officers are significantly more likely to be arrested or warned than cited.**



---

[53] $x^2 = 5.768$, $p = .12$
[54] $p < .54$, $r^2 = .14$
[55] $x^2 = 6.489$, $p = .09$
[56] $x^2 = 0.067$, $p = .796$
[57] $x^2 = 148.918$, $p < .001$
[58] $x^2 = 42.728$, $p < .001$
[59] $x^2 = 99.724$, $p < .001$
[60] $x^2 = 12.936$, $p < .001$

pedestrian stops initiated by Traffic officers, and the decrease in pedestrian stops from Non-Traffic officers, as Traffic officers are significantly more likely to issue citations[61] at the expense of warnings[62]. Officers from Patrol, investigations, and other support divisions are also significantly more likely to arrest pedestrians[63], which highlights their heightened involvement in crime reduction and prevention missions.

A full statistical analysis cannot be conducted on Traffic officer pedestrian stops due to the lack of reported searches on stopped pedestrians; however, a model strictly examining the race of the stopped pedestrian reveals no significant differences[64]. A full logistic regression revealed no significant predictors[65] for the arrest[66] of pedestrians, including race, reason for stop, and search outcomes[67]. A proportional analysis also revealed no significant difference[68] in the outcomes of stopped individuals as it relates to race.

**Table 11. Traffic and Non-Traffic officers display no significant differences in pedestrian stop resolution as it relates to race of the stopped subject.**

| | Total Stops | | Enforcement Action | | | | | | | |
| | | | None | | Warning | | Citation | | Arrested | |
| Race/Ethnicity | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| American Indian/Alaskan | 0 | -- | 0 | -- | 0 | -- | 0 | -- | 0 | -- |
| Asian | 10 | 7.7% | 0 | 0.0% | 1 | 10.0% | 9 | 90.0% | 0 | 0.0% |
| Black/African American | 2 | 1.5% | 0 | 0.0% | 2 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Hispanic | 8 | 6.2% | 0 | 0.0% | 2 | 25.0% | 6 | 75.0% | 0 | 0.0% |
| White | 105 | 80.8% | 0 | 0.0% | 15 | 14.3% | 86 | 81.9% | 4 | 3.8% |
| Unknown/Other | 5 | 3.8% | 0 | 0.0% | 0 | 0.0% | 5 | 100.0% | 0 | 0.0% |
| **Total** | **130** | **100.0%** | **0** | **0.0%** | **20** | **15.4%** | **106** | **81.5%** | **4** | **3.1%** |

_Traffic_

| | Total Stops | | Enforcement Action | | | | | | | |
| | | | None | | Warning | | Citation | | Arrested | |
| Race/Ethnicity | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| American Indian/Alaskan | 0 | -- | 0 | -- | 0 | -- | 0 | -- | 0 | -- |
| Asian | 4 | 3.2% | 0 | 0.0% | 2 | 50.0% | 0 | 0.0% | 2 | 50.0% |
| Black/African American | 25 | 19.8% | 3 | 12.0% | 11 | 44.0% | 3 | 12.0% | 8 | 32.0% |
| Hispanic | 9 | 7.1% | 1 | 11.1% | 3 | 33.3% | 2 | 22.2% | 3 | 33.3% |
| White | 84 | 66.7% | 11 | 13.1% | 42 | 50.0% | 9 | 10.7% | 22 | 26.2% |
| Unknown/Other | 4 | 3.2% | 2 | 50.0% | 1 | 25.0% | 0 | 0.0% | 1 | 25.0% |
| **Total** | **126** | **100.0%** | **17** | **13.5%** | **59** | **46.8%** | **14** | **11.1%** | **36** | **28.6%** |

_Non-Traffic_

---

[61] $x^2 = 131.517, p < .001$

[62] $x^2 = 31.509, p < .001$

[63] $x^2 = 32.730, p < .001$

[64] $x^2 = 1.554, p = .817$

[65] $x^2 = 5.778, p = .216$

[66] Lack of stop outcome variability prevented analyses on no enforcement action and citation outcomes

[67] The overall analysis has relatively low power due to small sample sizes

[68] $x^2 = 1.834, p = .934$

## APPENDIX A: STOPS DATA COLLECTION MASK



## APPENDIX B: TYPES OF SEARCHES

Police officers may initiate one of four types of discretionary searches on drivers or pedestrians.

Examples include:

- Consent. Subject to certain limitations, officers request consent from an individual before searching them as part of an investigation or contact. Although officers have probable cause or other legal reasons to search an individual in many cases, officers often ask for consent because it protects the search from being excluded in court.

- Plain View. A plain view search occurs when an officer observes contraband or other evidence prior to or during a stop without conducting an actual search. An example of this may include an officer who observes, from outside of the vehicle, a driver or passenger tucking a weapon underneath a seat in a car.

- Probable Cause. Probable cause searches include searching for additional evidence after an officer has established probable cause for an arrest. An example of this might include searching a subject's pockets for narcotics after an officer observed them selling drugs.

- Weapons Pat Down. In certain circumstances, the courts allow officers to pat a subject down for weapons. While an officer does not need consent to conduct this type of search, the search is limited to areas where an officer might find a weapon. Generally this search consists of "patting" the pockets, waistband, and sleeves and legs of a subject, but prohibits reaching into pockets or searching for small items.

## APPENDIX C: DATA AND METHODOLOGY

### Data Source

The Stops Data Collection (SDC) system is an automated auditing and tracking tool that flags interactions that require a completed "mask", or survey. Interactions are flagged for completion when (1) Traffic officers issue an electronic Warning or Citation through their handheld devices or (2) Non-Traffic officers notify dispatch they are making a formal stop of a driver or pedestrian (using the call codes of "TRASTP" or "77", respectively) when probable cause has been established for a violation or criminal act. The flagged records appear on a list of to-do items for the officer to complete on their Bureau-issued computer and remain there until the officer completes the mask, ideally immediately following the conclusion of the stop or at the end of their shift for motorcycle- or bicycle-based officers. Supervisors throughout the Bureau receive a weekly email highlighting SDC surveys that are outstanding to ensure complete data collection.

Since the launch of the Stops Data Collection system in 2012, law enforcement personnel have completed 294,179 masks related to the contact of a community member. The majority of masks (86.6%) represented completed driver or pedestrian stops, with a smaller number of interactions that were flagged by the system as a formal stop when it was actually another type of interaction (12.7%), including a flag down, mere conversation, or welfare check. Completed stops flagged as passenger stops or stops initiated by officers from other law enforcement agencies were also excluded from all analyses.

**Table 12. About 85 percent of flagged interactions are verified as legitimate stops.**

|  | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| Completed Stops | 68,872 | 89.4% | 68,063 | 89.1% | 52,451 | 85.8% | 31,804 | 79.7% | 33,567 | 84.5% |
| Passenger Stops | 448 | 0.6% | 363 | 0.5% | 308 | 0.5% | 244 | 0.6% | 300 | 0.8% |
| Non-PPB Initiated Stops | 139 | 0.2% | 52 | 0.1% | 64 | 0.1% | 123 | 0.3% | 22 | 0.1% |
| Canceled Stops | 7,598 | 9.9% | 7,923 | 10.4% | 8,309 | 13.6% | 7,712 | 19.3% | 5,817 | 14.7% |
| **Total** | **77,057** | **100%** | **76,401** | **100%** | **61,132** | **100%** | **39,883** | **100%** | **39,706** | **100%** |

In June 2015, PPB made upgrades to the SDC which inadvertently impacted the use of a desktop computer to complete the form. This created an incomplete set of stop records, mainly from Traffic Division officers, between July and December 2015. Therefore, two separate databases were used to extract data from 2015. The SDC system was used to retrieve data conducted by all Non-Traffic units for January 2015 through December 2015 and stops conducted by Traffic Officers from January 2015 through June 2015. The eCite system was used to retrieve missing data on stop location and stop demographics for the second-half of 2015; however, the eCite system does not capture data on stop reasons, searches, search outcomes, and stop disposition at all or in a way that can be translated to the SDC format. These stops were excluded from post-stop statistical analyses, including stop reasons, search rates, hit rates, and stop outcomes.

### Data Considerations

The race / ethnicity questions on the Stops mask are based on officer perceptions of the stopped individual. As with any perception-based field, there is an inherent amount of variance that is expected and creates a nominal degree of error among racial counts and proportions. Community members have also identified the potential for misclassification based on officer experience and

perceptions, such as Native Americans / Alaskan Natives being misclassified as Hispanic or Asian. Finally, there is no uniformity of racial classification options between different PPB systems and databases, leading to potential confusion on the part of PPB officers on how to classify community members. These potential data inconsistencies may artificially inflate the proportion of some racial groups while underestimating for others. To date, the PPB has been unable to identify a way to confirm the race of the stopped individual without asking potentially invasive questions at the time of the stop.

## Analysis Methodology

A variety of descriptive and inferential statistical analysis methodologies were used to investigate the changes of stops over time and potential racial and ethnic disparities throughout stop interactions. All omnibus or overall statistical analyses utilized a standard significance level of .05 to describe trends. The overall number of driver stops in the last five years make any statistical analysis highly sensitive to even small differences or trends, potentially overinflating the meaningfulness of the change. The converse problem happens with pedestrian stops, as the small number of overall stops can obscure even meaningful trends. When appropriate, effect size measures are included for all analysis to aid in the interpretation of analyses. All coefficients and effect sizes are included in the footnotes of each page to enhance the transparency of conclusions and aid additional interpretations or analyses.

Simple linear regressions were utilized to describe overall changes over time in stop behaviors. In instances where there were no identified stops of a specified race / ethnicity or subcategory, the overall trend was not described.

Several different analyses were conducted to investigate differences in operational division behavior and to identify potential racial and ethnic disparities in stops. Initial differences were investigated with Chi-Square Tests for Independence. On tests utilizing race / ethnicity as a category, Unknown / Other individuals were excluded due to methodological, data collection, and interpretation concerns about the category. In cases where the expected count of most cells in a particular subcategory of classification was less than 5, the entire classification was removed to preserve the power of the analysis. This lead to Native American / Alaskan Native entries to be excluded from most driver analyses and Asian, Hispanic, and Native American / Alaskan Native entries to be excluded from most pedestrian analyses. In cases the omnibus test met overall significance, pairwise comparisons were examined with a Bonferroni correction to tease out specific differences. If the omnibus level was non-significant, additional analyses were not conducted.

The second analysis conducted to examine potential racial and ethnic disparities in stops and searches is a relative risk ratio, or Disparity Index. Stop rates for each racial / ethnic group were compared to their population benchmark (see Tables 2 and 3) to determine relative over- or under-representation in stop demographics. For search rates, stop rates for each racial group were used as the comparison benchmark. A Disparity Index value of greater than 1.0 indicates general over-representation while a value of less than 1.0 indicates general under-representation in the group; however, values between 0.75 and 1.5 are considered "benign" due to general error rates in data collection and analysis. Based on prior Bureau practices and research best practices, we focused on values above 2.0 as significant over-representation and values below 0.5 as significant under-representation. Disparity analyses were only conducted when the corresponding Chi-Square Test and pairwise comparisons revealed significant differences.

A series of binary logistic regressions were also performed to determine what factors, including perceived race / ethnicity, may significantly contribute to stop outcomes. Three separate simplified outcomes were analyzed: enforcement action (defined as receiving a warning, citation, or arrest) vs. no enforcement action, citation vs. warning, and arrest vs. non-arrest (warning or citation). The main effects of race, stop reason, and search results were the primary hypothesized predictors, however all possible two-way and three-way interaction effects were also included in the model as co-variates to increase the overall power of the analysis. Individual predictors for stop outcome were only considered with the overall model was statistically significant.

## Results Limitations

All analyses and statistical tests were selected to help identify differences and disparities between racial and ethnic groups in driver and pedestrian stops; however, they should not be used as definitive proof of police bias. The analyses do not account for all legitimate factors that may influence the reason for a stop, search, or disposition of the event, including the circumstances that led to the stop, the location of the stop, and severity of the offense. Additionally, data collection challenges could obscure the reality of interactions with community members and is not capturing all actions associated with a stop. The Portland Police Bureau is committed to improving our analysis and data collection methodologies to accurately assess and understand how bias may or may not affect stops.

## APPENDIX D: BIBLIOGRAPHY

Lamberth, J. C. (2006). *Data Collection and Benchmarking of the Bias Policing Project: Final Report for the Metropolitan Police Department in the District of Columbia.* Washington, D.C.: Lamberth Consulting.

Portland Police Bureau. (2000). *Blue Ribbon Panel on Racial Profiling: Recommendations.* Portland, OR.: Portland Police Bureau. https://www.portlandoregon.gov/police/article/32381

Renauer, B.C. (2012). Neighborhood Variation in Police Stops and Searches: A Test of Consensus and Conflict Perspectives. *Police Quarterly, 15*(3), 219 – 240.

Renauer, B.C., Henning, K., & Covelli, E. (2009). *Benchmarking Portland Police Bureau Traffic Stop and Search Data: Technical Assistance Report.* Portland, OR: Criminal Justice Police Research Institute, Portland State University. https://www.portlandoregon.gov/police/article/305171

Withrow, B. L. (2008). *The Portland Police Bureau's Stop Data, An Independent Analysis.* Portland, OR: Portland Police Association. https://www.ppavigil.org/pdfs/PPA10STDATARPT.pdf

## APPENDIX E: GANG ENFORCEMENT TEAM ANALYSIS

The Gang Enforcement Team / Gun Task Force (GET / GTF) is an investigatory team tasked with responding, reducing, and preventing criminal activity related to street gang violence. In 2016, there were 157 shooting incidents related to gang activity, with 52 individuals shot and two fatalities – a slight decrease from 185 shootings, 73 individuals shot, and 15 fatalities in 2015. The GET / GTF routinely patrol areas with high amounts of gang activity to actively prevent future incidents of gang violence, arrest individuals wanted for other crimes, and seize illegal or prohibited weapons. The team had 28 sworn members in 2016 and were occasionally supplemented by officers from other units and precincts during violence reduction missions.

In 2016, the Gang Enforcement Team / Gun Task Force stopped 745 drivers and pedestrians[69]. Total stops by the unit have decreased 47 percent since 2012. Pedestrian stops account for the steepest decline, as GET / GTF officers stopped about 10 percent as many pedestrians as they did five years ago. Stops by Gang team officers have historically represented about two percent of all stops in the Bureau.

**Figure 15. Stops initiated by GET / GTF officers have declined 47 percent in five years**



### Stop Locations

Gang Enforcement Team officers do not randomly patrol certain area, districts or neighborhoods – rather, they spend the majority of their time in areas where prior Gang violence has occurred and areas with a high potential for additional gang violence based on intelligence and investigations. On average, officers stopped individuals approximately a quarter-of-a-mile from recent gang violence incidents. About 90 percent of all Gang Enforcement Team stops were within a half mile of a gang violence incident (see Figure 16). Almost all stops, about 95 percent, occurred in East and North Precincts.

---

[69] GET / GTF officers had an additional 637 encounters in 2016 that were not official stops. These encounters were mischaracterized as stops in the Stops Data Collection system due to inaccurate coding in the Computer Aided Dispatch (CAD) system.

**Figure 16. About 90 percent of GET / GTF stops occurred within a half-mile of a gang incident**



## Stopped Subjects Demographics

The specialized mission of the Gang Enforcement Team / Gun Task Force makes it even more challenging to select an appropriate benchmark. As discussed previously, Injury Accidents are not an appropriate benchmark as Gang officers are not primarily concerned with traffic enforcement and meeting the City's Vision Zero objectives. The Crime Victimization Rate is similarly broad in that while Gang officers are trying to reduce violent crime, the profiles and characteristics of gang violence is likely to vary from indexed crime as a whole. Gang violence can also be incredibly localized, making any broad-level measurements of residency at the city, precinct, or even neighborhood level misleading. The Victimization Rate for Gang Violence Incidents indicate the subjects that are living, working, or recreating in areas where gang violence has occurred and may be contacted if police are patrolling the area.

**Table 13. 2016 Gang Crime Victimization Rate, by Race**

| Race/Ethnicity | 2016 | |
| --- | --- | --- |
| | Count | Percent |
| American Indian/Alaskan | 1 | 0.4% |
| Asian | 9 | 3.4% |
| Black/African American | 187 | 70.6% |
| Hispanic | 7 | 2.6% |
| White | 26 | 9.8% |
| Unknown/Other | 35 | 13.2% |
| **Total** | **265** | **100.0%** |

Officers from the Gang Enforcement Team / Gun Task Force have seen little change in overall stop demographics since 2012. No perceived racial group has seen a significant increase, or decrease, in stop rates since data collection began. African American / Black subjects have always been the most commonly stopped group – however at non-disparate rates when compared to Gang Victimization Rates. White and Hispanic subjects were stopped at substantially higher-than-expected rates and were disparately over-represented in stops enacted by GET / GTF officers.



Figure 17. White and Hispanic subjects were stopped disparately higher than Gang Victimization Rates

Table 14. The majority of subjects stopped by GET / GTF officers were Black / African American.

| Race/Ethnicity | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| American Indian/Alaskan | 9 | 0.6% | 11 | 1.1% | 1 | 0.1% | 3 | 0.3% | 11 | 1.5% |
| Asian | 33 | 2.3% | 36 | 3.6% | 18 | 2.3% | 22 | 2.4% | 19 | 2.6% |
| Black/African American | 906 | 64.2% | 568 | 57.4% | 455 | 58.9% | 570 | 62.9% | 453 | 60.8% |
| Hispanic | 109 | 7.7% | 107 | 10.8% | 74 | 9.6% | 76 | 8.4% | 66 | 8.9% |
| White | 306 | 21.7% | 236 | 23.8% | 204 | 26.4% | 209 | 23.1% | 172 | 23.1% |
| Unknown/Other | 48 | 3.4% | 32 | 3.2% | 20 | 2.6% | 26 | 2.9% | 24 | 3.2% |
| **Traffic Total** | **1,411** | **100%** | **990** | **100%** | **772** | **100%** | **906** | **100%** | **745** | **100%** |

## Subject Stop Reasons

Gang Enforcement Team / Gun Task Force personnel stop reason patterns largely mirror overall Bureau trends. The majority of subjects since 2012 (84.0%) were stopped for Moving Violations on city roadways, sidewalks, and paths. There has been no significant change in the last five years, with at least 80 percent of any year's subjects stopped for Moving Violations. There are no significant differences[70] in stop patterns among the different racial groups, as at least 80 percent of the subjects for every racial group are stopped for Moving Violations by GET / GTF officers.



Figure 18. Subjects are primarily stopped for Moving Violations by GET / GTF officers

## Search Rates

Officers from the Bureau's Gang Enforcement Team are significantly more likely[71] to perform a discretionary search on stopped subjects than officers from other divisions. Stopped subjects are almost 10 times more likely to be searched when stopped by a GET / GTF officer than if they were

---

[70] $x^2 = 4.704$, $p = .453$
[71] $x^2 = 1521.236$, $p < .001$

stopped by an officer from another unit or division. Gang Enforcement Team officers have gradually reduced the rate of discretionary searches they are conducting, but at a non-significant rate.[72] Consent searches account for the vast majority of completed discretionary searches over the last five years, representing more than 87 percent of the searches conducted by GET / GTF officers.

Gang Enforcement Team / Gun Task Force officers did not display differential search patterns based on the Race / Ethnicity of the stopped individual in 2016. Black / African American (36.9% search rate) subjects are searched significantly more[73] than White subjects (19.2%), but not at a disparate rate. All other racial groups were searched at rates similar to their overall stop rate[74]. Gang officers are significantly more likely[75] to request a consent search from stopped Black / African American individuals, while relying more on probable cause with White subjects, even though Consent searches made up the majority of searches for both groups (Black / African American: 88.6%; White 69.7%).



**Figure 19. Black / African American subjects were searched more than expected, but not at disparate rates**

## Contraband Hit Rates

Despite a higher search rate than other operation divisions within the Portland Police Bureau, the Gang Enforcement Team / Gun Task Force recover contraband at a lower rate. Since 2012, the hit rate for GET / GTF has remained constant, with about 1-out-of-3 searches (32.7%) discovering contraband. A contributing factor to the unit's lower hit rate is the reliance on Consent searches; searches where the officer sought consent (28.1% hit rate in 2016) from the stopped individual are significantly less likely[76] to result in the seizure of alcohol, drugs, weapons, or other contraband compared to probable cause searches (59.3% hit rate in 2016). There were no significant differences in the contraband recovery rate between subjects of different races.

**Table 15. Consent searches by Gang Enforcement Team / Gun Task Force personnel result in significantly fewer hits.**

| Search Type | Total Searches | Found Contraband | |
|---|---|---|---|
| | Count | Count | Percent |
| Plain View | 3 | 3 | 100.0% |
| Consent | 196 | 55 | 28.1% |
| Probable Cause | 27 | 16 | 59.3% |
| Weapon Pat | 4 | 3 | 75.0% |
| **Total** | **230** | **77** | **33.5%** |

---

[72] *p = .18, r² = .50*

[73] *x² = 125.316, p < .001*

[74] The search patterns of American Indian / Alaskan Native (3 total searches) and Asian (2 total searches) individuals were not analyzed due to a limited number of searches.

[75] *x² = 11.298, p < .005*

[76] *x² = 10.643, p < .002*

**Table 16. Weapons were recovered from 11 percent of all searches conducted by GET officers**

| Race/Ethnicity | Total Searches Count | Found Contraband Count | Percent | Alcohol Count | Percent | Drugs Count | Percent | Weapons Count | Percent | Stolen Property Count | Percent | Other Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Indian/Alaskan | 3 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Asian | 2 | 1 | 50.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 50.0% |
| Black/African American | 167 | 58 | 34.7% | 14 | 8.4% | 24 | 14.4% | 25 | 15.0% | 0 | 0.0% | 8 | 4.8% |
| Hispanic | 23 | 9 | 39.1% | 2 | 8.7% | 6 | 26.1% | 0 | 0.0% | 0 | 0.0% | 1 | 4.3% |
| White | 33 | 9 | 27.3% | 1 | 3.0% | 7 | 21.2% | 0 | 0.0% | 1 | 3.0% | 2 | 6.1% |
| Unknown/Other | 2 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **Total** | **230** | **77** | **33.5%** | **17** | **7.4%** | **37** | **16.1%** | **25** | **10.9%** | **1** | **0.4%** | **12** | **5.2%** |

## Stop Outcomes

In 2016, 86 percent of all stops initiated by Gang Enforcement Team / Gun Task Force ended with a warning, written or verbal, at the end of the interaction – the highest in the Bureau. GET / GTF officers also have the highest arrest rate in the Bureau, ending 11 percent of 2016 stops with an arrest. The most recent reporting year was also the highest arrest rate since data collection began in 2012 and the first year above 10 percent of all stops; however, rates for all stop dispositions have remained steady over time. Limited variation and small sample sizes make it impossible to run a more robust statistical analysis on the outcomes of GET / GTF initiated-stops; initial analyses indicate that there are no significant differences between subjects of different racial groups, with White, Black, and Hispanic subjects all equally likely to be arrested.

**Table 17. Most stops initiated by GET / GTF ended with a warning**

| Race/Ethnicity | Total Stops Count | Percent | Enforcement Action None Count | Percent | Warning Count | Percent | Citation Count | Percent | Arrested Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| American Indian/Alaskan | 11 | 1.5% | 1 | 9.1% | 9 | 81.8% | 1 | 9.1% | 0 | 0.0% |
| Asian | 19 | 2.6% | 0 | 0.0% | 18 | 94.7% | 1 | 5.3% | 0 | 0.0% |
| Black/African American | 453 | 60.8% | 4 | 0.9% | 390 | 86.1% | 7 | 1.5% | 52 | 11.5% |
| Hispanic | 66 | 8.9% | 2 | 3.0% | 57 | 86.4% | 2 | 3.0% | 5 | 7.6% |
| White | 172 | 23.1% | 2 | 1.2% | 146 | 84.9% | 3 | 1.7% | 21 | 12.2% |
| Unknown/Other | 24 | 3.2% | 1 | 4.2% | 23 | 95.8% | 0 | 0.0% | 0 | 0.0% |
| **Total** | **745** | **100.0%** | **10** | **1.3%** | **643** | **86.3%** | **14** | **1.9%** | **78** | **10.5%** |