

## Office of the Compliance Officer and Community Liaison (COCL)

**Rosenbaum & Associates, LLP**

Dennis Rosenbaum, Ph.D.
Thomas Christoff, Ph.D.
Geoffrey Alpert, Ph.D.
Heather Daniel, J.D., B.A.
Ashley Heiberger, J.D.
Megan Mohler, M.A.
Amy Ruiz, B.A.

COCL Contact Information:
525 NE Oregon Street, Suite 250
Portland, OR  97232
www.portlandcocl.com
rosenbaumandassociatesllp@gmail.com

May 15, 2019

Transmitted by E-mail to:

The United States Department of Justice
The City of Portland

Re:     **Compliance and Outcome Assessment Report: All Sections with Remaining Compliance Issues**

Dear U.S. Department of Justice and City of Portland:

On behalf of the entire Compliance Officer and Community Liaison (COCL) team, I am pleased to submit the attached *Draft Compliance and Outcome Assessment Report: All Sections with Remaining Compliance Issues,* pursuant to the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

We thank community members for taking the time to review and comment on the report. A copy of this report will be posted on the COCL's website, www.portlandcocl.com and sent to the Settlement Agreement Updates email list.

Sincerely,

Dennis P. Rosenbaum, PhD
For Rosenbaum & Associates, LLP
Compliance Officer and Community Liaison, Portland OR

**Exhibit A**

# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

# of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

*Quarterly report: All Sections with Remaining Compliance Issues*

**Prepared By:**
**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**
**January 2019 to March 2019**

**May 15, 2019**



# TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................................4

**EXECUTIVE SUMMARY**.....................................................................................................5

**SECTION I — Use of Force**...........................................................................................11

    **Introduction Paragraph**...........................................................................................11

    **Paragraph 67a** ........................................................................................................11

    **Paragraph 66a** ........................................................................................................14

    **Paragraph 67d** ........................................................................................................15

    **Paragraph 68f** .........................................................................................................16

    **Paragraph 73a** ........................................................................................................17

    **Paragraph 73b** ........................................................................................................18

    **Paragraph 73d** ........................................................................................................18

    **Paragraph 76** ..........................................................................................................18

    **Paragraph 74** ..........................................................................................................19

    **Paragraph 75** ..........................................................................................................20

    **Paragraph 77** ..........................................................................................................20

**SECTION II — Training** .................................................................................................22

    **Paragraph 81** ..........................................................................................................22

    **Paragraph 84** ..........................................................................................................24

    **Paragraph 85** ..........................................................................................................26

**SECTION III — Crisis Intervention** ...............................................................................29

    **Paragraph 99** ..........................................................................................................29

    **Paragraph 115** ........................................................................................................29

    **Paragraph 105** ........................................................................................................33

**SECTION IV — Employee Intervention System** ...........................................................36

    **Paragraph 116** ........................................................................................................36

    **Paragraph 117** ........................................................................................................43

**SECTION V — Officer Accountability** ...........................................................................46

    **Introduction Paragraph**...........................................................................................46

    **Paragraph 121** ........................................................................................................46

    **Paragraph 128** ........................................................................................................48

**SECTION VI — Community Engagement and Creation of PCCEP** .................................................53

  **Paragraph 142** .........................................................................................................53

  **Paragraph 144** .........................................................................................................55

  **Paragraph 145** .........................................................................................................56

  **Paragraph 146** .........................................................................................................56

  **Paragraph 147** .........................................................................................................58

  **Paragraph 148** .........................................................................................................59

  **Paragraph 149** .........................................................................................................60

  **Paragraph 150** .........................................................................................................61

  **Paragraph 151** .........................................................................................................62

**LIST OF ABBREVIATIONS** .........................................................................................................63

**LIST OF PERSONNEL** .........................................................................................................66

**APPENDICES** .........................................................................................................67

# INTRODUCTION

This is the Compliance and Outcome Assessment Report of the Compliance Officer and Community Liaison (COCL), as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (hereafter referred to as "DOJ"). By agreement of the Parties, this report combines the COCL's compliance and outcome assessments into a single document. This report will focus exclusively on the paragraphs in the Settlement Agreement where the COCL has determined that the City or PPB have not achieved Substantial Compliance. In each of our four 2018 quarterly reports, we delineated a set of conditions that would need to be fulfilled for the COCL to grant the City or PPB Substantial Compliance with each paragraph of concern found in those reports. In the present report, we review these "COCL Conditions" and describe the "Current Status" of these areas where work remains to be done. This report covers progress that we have observed for these specific paragraphs of the Settlement and provides an updated compliance rating for each paragraph.

In general, the City and PPB continue to make noticeable progress on the conditions we have delineated. However, more work is needed in the areas of Force, Training, Mental Health, Accountability, and Community Engagement before we are satisfied that the City has achieved Substantial Compliance with the entire Settlement Agreement.

# EXECUTIVE SUMMARY

I.   <u>USE OF FORCE (Par. 66, 67, 68, 73, 74, 75, 76, and 77)</u>

Since our 2018 Q2 report, PPB has made considerable progress towards compliance with the majority of paragraphs yet to achieve Substantial Compliance.  For instance, PPB has largely resolved our prior concerns with conflating command-and-control tactics ("Get on the ground") and de-escalation.  Documents released by the Inspector in the past year as well as training that focused on distinguishing between these two concepts appears to have been effective.  Most officers are now detailing their use of de-escalation techniques and are refraining from including command-and-control tactics in their descriptions.  While we encourage PPB to continue distinguishing between de-escalation and traditional patrol tactics, there is sometimes overlap between the two and therefore, we do not consider such cases a barrier to compliance.

Our review of force cases for this report (and combined with our review of cases for our 2018 Q2 report) indicate that uses of force are objectively reasonable or, when objectively unreasonable, officers receive corrective action.  Additionally, PPB has revised Directive 1010.00 (Use of Force) to remedy our prior concerns regarding attempted CEW applications not being considered an application of force.

Finally, the Inspector continues reviewing all use of force events for policy, training, equipment, and personnel implications.  While the Inspector has documented and tracked such implications using email and an Excel sheet, the process does not use a formalized feedback loop.  We recommend PPB use the formal feedback loop documentation provided to us as part of our 2018 Q2 report in order to gain substantial compliance with Pars. 74, 75, and 77.

II.   <u>TRAINING (Par. 81, 84, and 85)</u>

Over the past four years, the Settlement Agreement has been the catalyst for significant changes in the focus and quality of training by the PPB for recruits, officers, supervisors and command staff.  Specifically, changes in PPB's Directives regarding use of force, accountability, crisis intervention, and the Early Intervention System (EIS), as well as PPB's increased commitment to treat all human beings with respect and dignity, have resulted in sizeable reforms to the Training Division's curricula and evaluation systems. Consequently, only three paragraphs in the Settlement Agreement regarding training did not receive Substantial Compliance from COCL by the end of the 3rd quarter of 2018.

Par. 81 requires that PPB create an electronic database to capture all training records and that each officer's supervisor review this database at least semi-annually.  This was a massive task,

but COCL can now report that PPB has created a centralized automated data system for tracking, maintaining and reporting on training received by PPB members (Called the Learning Management System or LMS). Furthermore, PPB has done considerable work to enhance the ability of supervisors to review training records. Therefore, COCL has assigned Substantial Compliance for par. 81.

PPB was previously assigned Substantial Compliance for most sections of par. 84, with the exception of 84(a)(i), which requires PPB to increase the use of role-playing scenarios and interactive exercises related to force, ethical decision making, and peer intervention.  We reported progress in 2018 but given the importance of procedurally just actions for preventing the escalation of tensions and for making ethical decisions, COCL continues to ask that PPB's Training Division give members more opportunities to practice the interpersonal skills related to procedural justice. Hence, we continue with our rating of Substantial Compliance – Conditional until PPB is able to design a training scenario where all officers can rehearse the skills needed for respectful, fair, empathic, and effective communication with members of the community and can receive feedback on their performance.

Par. 85 requires that the Inspector audit the training program using seven performance standards.  In our Q3 report, we described the history of interaction between COCL and PPB to improve PPB's planned audit process and its eventual Training Audit Report.  Although the initial Training Audit Report in October of 2017 was comprehensive, we expressed some concerns about the approach taken, including the absence of any assessment of PPB's Learning Management System (LMS).  However, the Follow-up Audit Report in November of 2018 was comprehensive and addressed each of COCL's main concerns. Hence, we can now assign Substantial Compliance for Par. 85.


III.  CRISIS INTERVENTION (Par. 99, 105, and 115)

In December of 2018, PPB and the City provided an updated evaluation of their system of mental health response.  Based on the findings, we believe that PPB and the City have nearly complied with the requirements of Pars. 99 and 115.  However, the findings of PPB and the City's analysis provide justification for supplemental training for BOEC call-takers and dispatchers, focusing on how the concept of "risk of harm to self" might be more broadly defined and how such risk may escalate over time.  Given the delivery of such training, we believe that ECIT officers may be dispatched to a higher proportion of calls that may benefit from a specialized response.

Also, PPB has resolved the data reliability issues associated with Par. 105.  By providing training to supervisors, unifying BOEC and PPB datasets, and performing quality assurance checks on the Mental Health Templates submitted by officers, PPB is now able to accurately document interactions with persons with mental illness.


## IV.  EMPLOYEE INFORMATION SYSTEM (Pars. 116 and 117)

PPB has maintained the system of specific EIS reviews required under Par. 116 by utilizing a notification/reminder system for RU Managers.  Based on this system, PPB has complied with Par. 116(a) over 97% of the time over the past three quarters.  Additionally, compliance with the requirements of Par. 116(b) is now similar to that of 116(a), with at least 98% compliance over the past two quarters.  Furthermore, the inter-unit differences for 116(a) and 116(b) reviews now have largely disappeared, with nearly all units completing the required reviews on-time.

PPB has also enhanced its EIS to "more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116).  Intervention rates for Force-type alerts have increased, suggesting that last year's Supervisor In-service training was making a difference.  Additionally, PPB has instructed supervisors that they may discuss Complaint-type alerts with officers so long as they are discussing a trend and not any individual complaints that are the subject of an open investigation.  For Par. 117, PPB continues to use force audit data to identify groups, units, and supervisors.  Responsive to our prior concerns, PPB revised SOP #47 to formalize the process for identifying outliers, forwarding identified groups to RU Managers, and managing group-level trends.  The formalization now found in SOP #47 has therefore brought PPB into compliance with Par. 117.  Finally, for both 116 and 117, PPB continues to use a risk management approach to further identify potentially problematic officers, supervisors, and groups.  While this risk management approach is not a requirement of the Settlement Agreement, we believe it represents a comprehensive approach to address potentially problematic trends.


## V.  OFFICER ACCOUNTABILITY (Pars. 121 and 128)

Due to our 2018 Q4 report focusing on Officer Accountability, little time has elapsed for PPB and the City to fully address the issues we laid out in that report.  However, that does not mean progress has not occurred.  For instance, although we are unable to provide an update as to whether full administrative investigations meet the 180-day timeline, we are able to evaluate whether individual stages are meeting their timelines with more regularity.  In this respect, our analysis of Administrative Investigation Management (AIM) system data shows that, particularly

for stages under the responsibility of IPR, stages are being completed within their timelines more often.  We believe this is a positive step toward meeting the requirements of Par. 121 though we will need to re-evaluate overall compliance with the 180-day timeline in our next report.

Furthermore, there appears to be progress on the issues we identified in the overall accountability process (allegation formation, system complaints, volume/length of time for Supervisor Investigations, and disciplinary feel of Supervisor Investigations, among other issues).  PPB and IPR have engaged in discussions related to these issues and both entities report overall improvements.  While we will need to verify such changes through further discussions with PPB personnel and IPR investigators, the steps taken appear sufficient to resolve the issues we identified.


VI.  COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP) (Par. 142, 144, 145, 146, 147, 148, 149, 150, and 151)

Since our 2018 Q4 report, PCCEP has continued to develop and move the City toward substantial compliance with this section of the Settlement Agreement. PCCEP has met regularly since their inaugural November meeting, including holding a Town Hall meeting in January of 2019 that included the presentation of COCL findings from Q4 of 2018. More recently, PCCEP has established several subcommittees (focused on Mental Health; Race, Ethnicity, and Other Groups; Youth; and Settlement Agreement & Policy), though two meetings have only had the subcommittee chair present, limiting the ability of subcommittees to make recommendations to PCCEP. Since PPCEP was originally seated, three members have resigned for various reasons; to-date, three alternates have been elevated to fill those seats. PCCEP is operating at full capacity as of this writing, and PCCEP has had discussions about maintaining a robust alternate pool. There is a process in place to name additional alternates to a pool for future consideration.

PCCEP is on track to function as a legitimate body for community engagement and feedback on the performance of the PPB, although the effective functioning of subcommittees has yet to be established. Substantial Compliance for Par. 142 will be assigned if PCCEP continues to hold regular meetings over the next few months, can complete the work required in the PCCEP Plan, and can develop a working relationship with the PPB, including contributing to PPB's Community Engagement Plan. Although the success of the subcommittees has yet to be determined, their performance was not a requirement to achieve Substantial Compliance for Par. 151; Based on what we have observed to date, we are comfortable assigning Substantial Compliance with Par. 151.

On March 18, 2019, the City posted a job opening to fill the PCCEP project director position. The community organizer position was not required by the PCCEP Plan, but the City has committed to providing support as needed after the project director is on board. Once the project director position has been filled, we can assign Substantial Compliance to Par. 144.

At the March PCCEP meeting, substantive steps were taken toward PCCEP's directive to "contribute to the development and implementation of a PPB Community Engagement Plan," with Chief Danielle Outlaw and Officer Natasha Haunsperger presenting the community engagement component of PPB's 5-year Strategic Plan. As we noted, PPB's community engagement work has been extensive, engaging marginalized and at-risk communities through various programs and activities. The remaining community engagement tasks for PPB to achieve Substantial Compliance under Par. 145 are: (1) to develop a working, transparent relationship with the PCCEP and (2) to develop a reasonable Community Engagement Plan with input from PCCEP.

The city-wide survey of community members required in Par. 146 has been developed, reviewed by PCCEP and fielded. COCL can assign Substantial Compliance for Par. 146 when: (1) the data have been analyzed and a report has been prepared (anticipated in late April 2019); (2) the results have been used to "inform the work of the PCCEP" and (3) the results have been used to "inform...the development and implementation of the Community Engagement Plan."

In our 2018 Q4 report, we describe some of the ways that PPB has been using the demographic data required in Par. 147 for "outreach and policing programs specifically tailored to the residents" in each precinct, but noted that PPB needed to deliver precinct-level demographic data to the PCCEP to "inform its work." PPB has now delivered a report to PCCEP containing these precinct-level demographic data from the Census Bureau – data that should be useful to inform the work of the PCCEP.  Hence, PPB has achieved Substantial Compliance with Par. 147.

PPB has made significant progress in the collection, analysis and reporting of demographic data required in Par. 148; in our 2018 Q4 report, two conditions remained to achieve Substantial Compliance with Par. 148: (1) PPB shall provide these reports to PCCEP when PCCEP is prepared to receive them; and (2) PPB should go beyond the analysis of race disparities to report on the age and sex of persons with police encounters. As a result of our request, PPB has prepared an addendum to their latest stops report, Stops Data Collection: 2017 Annual Report (January 18, 2019) that includes breakdowns by age, sex and mental health. This information has been delivered to the PCCEP, and hence, PPB has achieved Substantial Compliance with Par. 148.

Par. 149 requires the PPB, DOJ and COCL must agree on a set of metrics and present them to the PCCEP for review. PPB, DOJ, and COCL have developed indicators of community engagement and outreach around 1) Interactions with the public and general service delivery; 2) Communication

9

with the public; 3) Collective engagement with the community through boards, commissions, committees and other stakeholder forums/groups/meetings; and 4) Regular reporting to the community on PPB activities. Once these metrics are shared with the PCCEP, PPB will be in Substantial Compliance with Par. 149.

To receive Substantial Compliance with Par. 150, pertaining to PPB's annual reports, PPB would need to: (1) release the final version of the 2017 report to the public; (2) hold at least one meeting in each precinct area and at a City Council meeting to discuss the topics delineated in Paragraph 150; and (3) prepare a more timely annual report for 2018 to demonstrate the ability to produce substantive reports "annually." The final version of the 2017 report has been released; COCL can assign PPB Substantial Compliance with Par. 150 when PPB has completed these Precinct presentations and has presented its Annual Report to the City Council.

# USE OF FORCE (Introduction to Section III, Par. 66, 67, 68, 73, 74, 75, 76, and 77)

| Intro Par. | Substantial Compliance |
|---|---|
| Par. 66 | Substantial Compliance |
| Par. 67 | Substantial Compliance |
| Par. 68 | Substantial Compliance |
| Par. 73 | Substantial Compliance |
| Par. 74 | Substantial Compliance - Conditional |
| Par. 75 | Substantial Compliance - Conditional |
| Par. 76 | Substantial Compliance |
| Par. 77 | Substantial Compliance - Conditional |

*Section III Opening Paragraph – PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have a reason to believe are experiencing a mental health crisis.*

*67(a). Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety.*

<u>COCL Conditions</u>

In prior reports, we had noted that officers and supervisors often conflated "non-force and verbal techniques" with command-and-control tactics. For instance, we reviewed many cases in which an officer would give commands to a subject (e.g. "Get on the ground") and label that as de-escalation since they provided "clear instructions." While clear instructions may be considered de-escalation in some instances, context matters and, in the cases we had previously reviewed, officers' and supervisors' descriptions of the context indicated confusion existed as to when something should be labeled de-escalation.

Responsive to our concerns, the Inspector released two documents in early 2018 that provided a clear distinction between de-escalation and command and control tactics. Spring 2018 In-Service training also covered these issues and was well delivered. As the documents and training had only been recently delivered at the time of our last report that covered use of force, we were unable to see their impact and whether officer/supervisor descriptions of de-escalation had become consistent with conventional understandings of the term.

<u>Current Status</u>

For this report, we reviewed 20 use of force cases to examine whether this issue remained. By and large, it appears that officers and supervisors have improved in their ability to distinguish between command and control tactics and de-escalation. While our review of the cases found a few instances where command and control was conflated with de-escalation, the prevalence of such situations has been significantly reduced. Additionally, we reviewed at least two cases where the officer's General Offense Report (GO) included language that had historically been considered de-escalation by PPB (for example, "I spoke in a soft tone voice and told him 'Relax buddy, just place your hands behind your back and stop resisting. Follow my instructions or more force could be used on you'"). In these cases, the officers stated that they did not use de-escalation. We agree with the officers' assessment, as some of their comments are more consistent with command and control tactics.

Even in cases where command and control tactics were necessary for the event, officers and supervisors appeared better able to describe the de-escalation attempts that occurred prior to or after the use of command and control. For instance, in one case we reviewed, a K-9 unit officer described his/her de-escalation as such:

> "I told the suspect in a calm voice that I didn't want him to get bit by the dog and asked for him to announce himself. This was to elicit a voluntary and non-compelled response and was separate from my force warnings which included commands and the threat of a potential dog bite. Pursuing officers backed off to avoid a physical confrontation, called in additional resources, set a perimeter, and

12

> spent approximately 30 minutes loud hailing in an attempt to engage the suspect
> in a dialogue and gain his peaceful surrender prior to my arrival."

The above description indicates that this officer understands how different points in an interaction require different tactics – at times being appropriate for de-escalation and at times being appropriate for command and control.

Additionally, the Inspector continues to review Force Data Collection Reports (FDCR) and After Action Reports (AAR) to identify instances where de-escalation is incorrectly labeled. We noted four cases where the Inspector noted de-escalation was improperly labeled and, after reviewing those cases, agree with the Inspector's position. Thus, we have concluded that the Inspector's review process related to "non-force and verbal techniques" is in place, is functioning adequately, and has led to Bureau-wide correction in the form of the above referenced documents and training. An ongoing operational system of review also ensures that, should additional correction/training be needed in the future, PPB is able to identify that need.

While we believe that PPB has largely resolved the issue with command and control and de-escalation, we suggest PPB consider how de-escalation differs from traditional patrol tactics depending on the context of each interaction. The intersection between de-escalation and traditional patrol tactics grounded in officer safety and risk management often overlap, though it may be beneficial to determine what purpose certain actions serve. For instance, we reviewed one FDCR wherein the description of de-escalation was:

> "[Other officer] and I requested an additional unit and a K9 unit to assist us…[Other officer] and I used concealment by placing ourselves in the dark to each side of the door (out of sight). [Suspect] could not see us when he came outside and [other officer] gave commands to [suspect] from a safe distance. [Other officer] remained at a safe distance away from [suspect] until he was in the most advantageous position for us to take him into custody."

While using time, tactics, concealment, resources, distance, etc. can all be considered de-escalation in the appropriate context, their use here does not appear to fit the purpose of de-escalation. Rather, in this situation, the actions described by the officer would be considered traditional patrol tactics related to controlling the event and ensuring officer safety, but not de-escalation. Again, there exist substantial intersectionality between traditional tactics and de-escalation and may all be rolled into a broader category of "good police work." However, we suggest PPB discourage officers from defining de-escalation in such broad terms that all instances of good tactics can be labeled de-escalation, as this may ultimately hinder PPB's ability to reliably analyze force events that contain de-escalation and compare them with force events that do not.

Overall, however, we are satisfied with the progress made by the PPB administration toward ensuring that officers use "non-force and verbal techniques" whenever possible. Based on the de-escalation/command and control clarification documents promulgated by the Inspector, in-service training (including the prevention of escalation using the principles of procedural justice), observed improvement in officer/supervisor reports, and ongoing review system, we believe that PPB has adequately responded to our concern with distinguishing between command and control tactics and de-escalation. Hence, we conclude that PPB has substantially complied with the opening paragraph of Section III and Par. 67(a). However, PPB should maintain their review system, focusing on distinguishing between traditional tactics and de-escalation, as this would be beneficial for analyzing the impact of de-escalation when determining future potential training needs.

*66(a). PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely.*

<u>COCL Conditions</u>

In the Spring of 2018, PPB held an in-service training that included instruction on decision-point analysis. As noted in our last report, the training touched upon a number of concepts related to the "totality of the circumstances" including gathering information, assessing the situation, identifying options (in light of powers, policies, and obligations), taking action, and re-assessing the situation. We also noted that the Inspector instructed supervisors that "the evaluation of the force event begins at the officer's arrival." Additionally, we found the Inspector's audit (particularly Phase II) was expanded to include an assessment of information gathering, initial response, initial contact with the subject, risk assessment, legal authority, consideration of other options and contingencies, provision of medical aid, post custody actions, and the overall reasonableness of the use of force.

The combination of training and the Inspector's expanded audit was largely expected to alleviate our prior findings of PPB evaluating only the moment of force (rather than the totality of circumstances), but we would still need to review FDCRs and AARs to ensure that the necessary changes had occurred.

<u>Current Status</u>

For our evaluation, we chose 20 random use of force events from the fourth quarter of 2018 and reviewed them for overall reasonableness, including officer actions prior to the force event as well as the reasonableness of the use of force itself.  Our review of the use of force events indicated that PPB now evaluates the totality of circumstances rather than focusing only on the moment of force. In all but one of the twenty cases we reviewed, we found the force event to be

reasonable under the totality of the circumstances and that supervisor evaluations of the force event focused on various decision points encountered by the officer. We discussed one case with the Inspector as to the reasonableness of the force and note that prior to our discussion, the Inspector had sent that event to the Training Division for a review of the force tactics as part of an overall identified trend. As it appears our concern was already being addressed prior to discussing the matter, we do not believe that this single case negates the positive steps taken by PPB and PPB's evaluation of force incidents in general.

Overall, we now believe that PPB has substantially complied with Par. 66(a). Our evaluation is based on the fact that PPB has conducted decision-point analysis training for officers and supervisors, with a particular focus on preparing (for officers) and reviewing (for supervisors) FDCRs. Additionally, the Inspector's audit of force events indicate that cases are accurately reviewed and, when broader trends are identified, cases are forwarded to the appropriate divisions. Finally, our evaluation of force events revealed that the prior training appeared effective, resulting in only a single case out of twenty where we questioned the reasonableness of the use of force. For this case, appropriate steps had already been taken by the Inspector. Additionally, given our evaluation that PPB had substantially complied with the requirements of Par. 66(b) in our 2018 Q2 report, PPB's substantial compliance with 66(a) now means that PPB is in substantial compliance with the the the totality of Par. 66.


*67(d). Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.*

<u>COCL Conditions</u>

In our 2018 Q2 report, we identified cases where the reasonableness of a force event was not evaluated by PPB because a CEW application did not deliver electricity and therefore was not considered a use of force.  As conditions of compliance, we recommended PPB revise Directive 1010.00 to resolve the issue.

<u>Current status</u>

As noted above, our review of cases for this report revealed only a single case wherein the use of force may be seen as unreasonable, though prior to our meeting with the Inspector, the case had been forwarded to the Training Division as part of a larger identified trend.  Our review of all other cases did not reveal any instances wherein we determined a use of force to be unreasonable and we credit PPB with conducting decision-point analysis training for supervisors in 2018 to better review officer actions which may have unreasonably led to a use of force (as opposed to the moment of force analysis we had identified in the past).

Additionally, we noted two CEW force events in our last report that we believed were unreasonable.  However, due to the CEW not delivering a current, the events were not categorized as "force" and therefore were not evaluated by supervisors for their reasonableness. Since then, PPB has revised Directive 1010.00 (though the final version has not been enacted or posted to PPB's website) to include attempted CEW applications as force subject to an evaluation of reasonableness (see Directive 1010.00, 10.4.1.8 "CEW deployment regardless of successful application or member intent").  As this revision to the force directive is directly responsive to our prior concerns about PPB's failure to recognize a potentially unreasonable use of force, we believe that PPB has complied with the conditions delineated in our prior report.

As to Par. 67(d)'s requirement for unreasonable uses to force to receive corrective action, our evaluation of the accountability system as a whole revealed that administrative investigations are fair, comprehensive, and consistent.  As such, we believe that when potentially unreasonable uses of force are identified by the Bureau, they are investigated and, where appropriate, officers receive corrective action and/or discipline.  Coupled with PPB's resolution of our prior concerns related to Directive 1010.00, we believe that PPB has substantially complied with Par. 67(d).


*68(f). Officers shall make every reasonable effort to attempt handcuffing during and between each CEW cycle.  Officers should avoid deployments of more than three CEW cycles unless exigent circumstances warrant use.*

COCL Conditions

In our 2018 Q2 report, substantial compliance with Par. 68(f) was conditioned on two requirements. First, PPB needed to practice handcuffing between CEW cycles on a CEW dummy they had purchased within the last year.  Although Advanced Academy students had the benefit of practicing with the dummy, seasoned officers had yet to experience such training.  Second, we noted a couple of cases in our 2018 Q2 report wherein officers had attempted more than three CEW cycles though, because an electrical current was not delivered, the cases were not reviewed under section 6.4.4.2.1 of Directive 1010.00 ("Members shall avoid the use of more than three CEW applications against the same individual, unless exigent circumstances (immediate and serious bodily harm to a person or persons is about to occur) warrant use").  Similar to Par. 67(d), we recommend PPB revise Directive 1010.00 to include attempted CEW cycles as reviewable under the force policy.

Current Status

In the Fall of 2018, PPB conducted In-Service training that included officers practicing handcuffing under power skills utilizing the CEW dummy.  We reviewed the training material for this portion

of In-Service and observed the training in-person.  Overall, we believe the training was well delivered and satisfied this condition of compliance.

Additionally, Directive 1010.00 has been revised to state that CEW deployments are to be investigated as a use of force "regardless of successful application or member intent."  Due to this policy revision, we believe our second condition of substantial compliance has been adequately addressed.

Overall, we believe that PPB has substantially complied with the requirements of Par. 68(f).  PPB policies include the language of this paragraph, officers have been trained on the policy, officers have been provided an opportunity to practice their skills of handcuffing between cycles, and our review of force events in the past demonstrate that officers using more than three CEW cycles has only occurred when exigent circumstances have been present.  Additionally, where we have noted instances where more than three cycles should have been reviewed (regardless of the actual delivery of an electrical current), PPB has revised Directive 1010.00 to account for this potential.  In all, we believe these efforts support substantial compliance.


*73(a). EIS tracks all Directive 940.00 comments, findings, and corrections*

<u>COCL Conditions</u>

In our 2018 Q2 report we noted that while supervisors regularly made Performance Discussion Tracker (PDT) entries for uses of force and that such entries included whether the force was in or out of policy, other "comments, findings, and corrections" were inconsistently included.  In short, PPB did not ensure supervisors were regularly commenting on the elements that are identified in Directive 345.00 (Employee Information System), including:

- The case number of the incident
- The nature of the incident and, if applicable, the type of force used
- Whether the incident was within policy
- Any positive performance, and
- Any training deficiencies, policy deficiencies, or poor tactical decisions identified as well as any non-disciplinary corrective action taken to remedy them

<u>Current Status</u>

To address this, the Inspector sent out an email in January of 2019 informing supervisors that the above topics were required by Directive 345.00 for PDT entries.  Additionally, PPB created SOP #49 which tasks the Inspector with reviewing PDT entries for the topics required by Directive 345.00.  We believe SOP #49 contains a sufficient process for reviewing the information that should be contained in PDT entries.  While the degree of detail each supervisor puts into each

PDT entry may fluctuate, our primary concern in past reports related to fluctuations in the range of topics that were being included by supervisors.  Through Directive 345.00, PPB has materially defined what "comments, findings, and corrections" need to be tracked in EIS and through SOP #49, PPB has put in place an oversight system to ensure compliance with Directive 345.00.  Based on this, we therefore conclude that PPB has substantially complied with the requirements of Par. 73(a).

*73(b).  All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command*

*73(d).  A supervisor received the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations.  Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, received the appropriate corrective action, including training, demotion, and/or removal from a supervisory position.*

*76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report.*

<u>COCL Conditions</u>

In our last report related to these paragraphs, we noted that PPB had implemented a system wherein the Inspector identified individual officers or those within the chain of command (e.g. sergeants, lieutenants, commanders, and Chief's Office) that were deficient in their creation/review of Force Data Collection Reports (FDCRs) and After Action Reports (AARs). Where such individuals were identified, discussions with RU managers would ensue, thereby creating a feedback and resolution system in order to improve future report writing and review. Thus, PPB's system was substantially compliant with the requirements of 73(b), 73(d), and 76. However, we noted that the system had only recently been implemented at the time of our 2018 Q2 report and therefore, without being able to see the system consistently be utilized, we were unable to say that PPB had substantially complied with these paragraphs.

Current Status

In the nine months since our 2018 Q2 report was released, PPB has continued to utilize their system for identifying officers and supervisors who have deficiencies in the reports and/or report review.  Additionally, the Inspector continues to hold meetings with RU Managers to go over the findings of deficiencies, identify officers and supervisors who (during respective quarters) demonstrated higher rates of deficiencies, and initiate a resolution where necessary.  The process therefore continues to comply with the requirements of these paragraphs.

As it relates to the progressive discipline contemplated in the language of Pars. 73(b) and 73(d), PPB states they have not seen any single supervisor consistently being identified as an outlier across multiple quarters.  Because supervisors who demonstrate deficiencies in their creation or review of After Action Reports receive coaching, that intervention appears sufficient to deter future deficiencies.  As PPB should not be forced to wait for a situation where a supervisor is consistently deficient across quarters in order for them to be able to demonstrate progressive discipline, we believe that the system they have currently set up substantially complies with the requirements of 73(b) and 73(d).

On the whole, PPB's system for reviewing officer and supervisor deficiencies in force reporting appears to be operating in a fashion that indicates substantial compliance with these three paragraphs.  In our past report, we noted other conditions that we believed would be important to substantial compliance, particularly relating to Par. 76, including alterations to PPB's methodology for identifying officers, units, and supervisors.  Through more comprehensive discussions with the Inspector, we now accept PPB's current methodology as it appears more organizationally informative for their purposes.  Because we have seen PPB utilize their systematic approach, have seen evidence of discussions with RU managers, and have seen evidence of interventions with officers and RUs, we believe that PPB has substantially complied with the remaining issues related to these three paragraphs.


*74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately.  In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the*

*subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)*

*75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; to perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)*

*77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement)*

<u>COCL Conditions</u>

For each of these three paragraphs, the only missing piece that we believe held PPB back from substantial compliance was the use of a formal feedback form when issues (training, equipment, policy, personnel, etc.) were identified by the Inspector.

<u>Current Status</u>

In our prior reports, we have detailed at great length the progress made by PPB as it relates to the above three paragraphs and the overall force audit.  Briefly, the force audit accomplishes a number of tasks, including evaluating officer and supervisor reports to ensure they contain sufficient detail and independently evaluating the reasonableness of force and identify training, equipment, policy, and/or personnel issues beyond those identified during the chain of command

review.  For past reports, we have also undertaken an independent assessment (an audit of the audit) and found large-scale agreement with the analysts' and Inspector's coding.  The force audit remains "an area of significant progress, initiative, and creativity within the sections of the Settlement Agreement" (COCL 2018 Q2 report).

We therefore focus here on the feedback system that was required for substantial compliance with this paragraph.  In the past year, the Inspector has utilized an informal tracking method wherein when an issue was identified, the Inspector sent an email to the appropriate individual. When a response was provided, the response was documented as "complete" on an Excel sheet tracking Phase II elements.  However, because the feedback loop is email and Excel based, it is not a formalized process and therefore, may at times require others within PPB to access the Inspector's email to review the communication process.

As part of our 2018 Q2 report, PPB provided an "Audit Action Item Report" form that was to be used by the Inspector when issues were identified.  In order for PPB to substantially comply with the requirements of 74, 75, and 77, this form should be utilized and kept in a centralized location that is accessible to others, including future Inspectors.  As this will formalize the overall process and minimize the likelihood for issues to fall through the cracks, we believe this is an important piece to the audit process.  Through discussions with PPB, we are of the understanding that utilization of the form has recently begun.  However, without being able to see a sustained utilization of the form, we continue to find that PPB has only conditionally complied with the requirements of these three paragraphs.  Upon observing the formalized feedback system being utilized for a sustained period of time, we will then re-assess compliance with these paragraphs.

# TRAINING (Par. 81, 84, and 85)

| | |
|---|---|
| Par. 81 | Substantial Compliance |
| Par. 84 | Substantial Compliance - Conditional |
| Par. 85 | Substantial Compliance |

*81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.*

<u>COCL Conditions</u>

By the time of our Q3 report, PPB had made significant progress in keeping accurate electronic records of training. PPB was beginning to use their new Learning Management System (LMS) to store training records, but was challenged by the time-consuming tasks associated with the "Historic Data Load;" (i.e. uploading past training records into LMS). Once all training records had been uploaded, we needed to confirm that this system could serve as a "central, commonly accessible, and organized file system" for use by the Training Division and by supervisors. Thus, as a condition for achieving Substantial Compliance, PPB would need to complete the task of uploading all past training records and ensure that such records were accessible to the Training Division and used by supervisors.

<u>Current Status</u>

When we reviewed the LMS system in January of 2019, the data migration problem had been solved and PPB was able to upload all past training records in the new LMS system. We were provided a demonstration of the system's capability. For individual officers, we were able to see an organized display of past trainings, including details such as the type of training, the instructor, the date and time, the number of hours, and other information.

Supervisors can access training records for individual employees. Furthermore, PPB can document that supervisors have, indeed, reviewed these training records at least semi-annually. Specifically, PPB has required that supervisors confirm their review of training records by checking a box, electronically, when conducting each officer's performance evaluation.

Although supervisors are required to review training records semi-annually, PPB has gone even further to create a system in LMS that makes it easier for supervisors to conduct more frequent reviews. In the past, supervisors had to access records individually, which can be laborious. Now, the LMS Manager has created a compliance report specifically for supervisors that shows all officers under their supervision and can be used to remind officers of any current or past-due trainings. For all employees under a particular supervisor, this report indicates whether the officer has completed the training-related requirements, including, for example, watching a video, reading a directive or legal update, or qualifying on the range with firearms. With this new electronic report, which is updated in real time, supervisors can easily determine whether the member is registered to complete the training, the training is in-progress, the training is past due, or the member has completed the training

The development and rollout of this supervisory report was a sizeable undertaking. The LMS Manager has built multiple reports, shift by shift, one for every Sergeant's shift, Lieutenant's shift, and every precinct or unit assigned to Captains and Commanders. As part of this process, the LMS Manager is now field testing the report and seeking input from users. After completing this work, security rules will be assigned to each supervisor, giving them permission to run a particular report for individuals under their supervision but <u>not</u> other officers. The security system is being designed to accommodate the transfer of supervisors from one shift to another. When this new system has been field tested and is fully operational, supervisors will be able to easily run reports on training without involving staff from the Training Division or searching for individual employees in LMS. Supervisors can quickly flag training issues for particular officers and reach out to them at roll call or electronically before receiving a notice from their RU manager.

Two additional questions were raised by COCL about whether all training records are maintained "in a central, commonly-accessible, and organized file system." First, the LMS system does not include class evaluations and knowledge tests from students, but we are now satisfied that these data are stored on a separate server at the Training Division to maintain student anonymity and thus encourage students' candidness when evaluating classes. Importantly, the Training Division's administration has access to reports provided by the analysts, which is sufficient to evaluate students' performance as well as the delivery and impact of each class. The Training Manager and Training Lieutenants are regularly briefed by the analysts on these data. For classes that run for several days, the Training Manager and Training Division managers are typically briefed after the first day on whether students have passed the exam. Within a few days, they are briefed on the instructor's performance. If the analyst detects a problem early on as reflected

23

in student exams or class evaluations, she will immediately alert the Training Manager, who will take corrective action if necessary. The Training Manager also receives a formal report on each class when the class has been completed and a larger report that incorporates findings from the entire training program. COCL has reviewed copies of these reports and we are satisfied with the content. This process is indicative of a learning organization that is immediately responsive to feedback. However, the evaluation work has expanded to include all major training programs, but only two analysts are employed at the present time.  We believe the Training Division will need at least one more analyst to sustain this important work.

Second, we raised the question of whether PPB can use LMS to keep track of <u>external</u> training and certifications received by officers, when the system seems to focus on internal training. Upon further investigation, COCL has concluded that the burden is on the individual officer to complete the application for external training, receive approval from the RU manager, and, after completing the training, submit the evidence of training to the RU manager (including any certification). The RU manager will then forward this information to the Training Division, where staff will enter the training into LMS. Hence, COCL has concluded that the system in place to report external training is acceptable.

In sum, COCL finds that the Training Division has created a centralized automated data system that is useful for tracking, maintaining and reporting on training received by PPB members. PPB has gone further to enhance the ability of supervisors to review training records. We are satisfied that the Training Division maintains a separate database for exam results and class evaluations and that such data have been very useful to the Training Manager and other Training Division administrators. Hence, COCL has assigned Substantial Compliance for par. 81. However, we encourage the City to provide additional personnel to collect, analyze, and report the evaluation data being generated by the Training Division.


*84(a)(i). With respect to patrol officers, PPB shall: increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention.*

<u>COCL Conditions</u>

In our 2018 Q3 report, we acknowledge and document the dramatic improvements by PPB in the development, delivery, and evaluation of training for recruits, officers, supervisors and commanders. The only area where we retained any concern was "PPB's capacity to give officers ample opportunities to identify and rehearse the interpersonal skills necessary for respectful, fair, empathic, and effective communication with members of the community."

24

Current Status

PPB has taken action in two areas that address our concern.

First, PPB's 2019 Annual Training Plan is responsive to the 2018 Needs Assessment and has been revised to incorporate training that gives attention to leadership, equity, procedural justice, use of force decision making, and de-escalation. Procedural justice in particular is mentioned repeatedly in the Training Plan. Although not necessary for compliance, we have suggested to PPB that procedural justice principles be added to specialty training for the Traffic Division and Transit Division, since these units have extensive contact with the public during their routine activities.  The Training Division Manager has informed us that these skills will be incorporated into all of the lesson plans for In-service training and both Traffic and Transit will be exposed to this training. Whether the lesson plans can be delivered in a manner that allows all students to identify and practice the relevant interpersonal skills remains to be seen.

Second, PPB has created three new positions in the Training Division with the objective of strengthening training in three areas: leadership, ethics and procedural justice, and officer wellness and stress. Since our Q3 report, PPB has filled all three positions. These officers are expected to become subject matter experts, drawing on best practices and research conducted worldwide, and incorporate this knowledge into PPB's training curricula.

The recent challenge for PPB's In-service training has been to figure out ways to incorporate interpersonal communication skills and practice opportunities into training that is designed around critical incidents, such as ambush attacks (2018 training focus) and active shooters (2019 training focus). PPB was able to do this creatively in 2018, but communication and de-escalation training is much easier when the live scenarios involve more routine incidents with interpersonal tension and possible force applications, whether it is responding to a mental health call or making a difficult traffic stop. Also, PPB has many opportunities for education beyond In-service training, including roll call training and special unit training. For example, PPB plans to incorporate procedural justice into the Command Leadership training, and has already done so with the Crisis Negotiation Team, Special Emergency Response Team, and Rapid Response Team. We trust that the new positions at PPB will yield additional training ideas, thus helping to build a training culture that values community-oriented policing and de-escalation skills among PPB officers and supervisors. The first large training in 2019 was the Supervisors In-service. In advance, COCL reviewed and provided PPB with feedback on their lesson plans and other materials. In March of 2019 we observed the delivery of this training. The Training Division Instructors were able to incorporate procedural justice and legitimacy concepts into the Crowd Management training by emphasizing the constitutionally guaranteed right to free speech and assembly and the relevant requirements of Directive 635.10, including maintaining a "diplomatic presence." Also, the instructor was able to incorporate the importance of neutrality as PPB is expected to avoid taking

sides during protests. Other classes focused on procedural justice <u>inside</u> the PPB, based on the idea that when employees are treated with respect and dignity by management, they will be more likely to treat the public in a procedurally just manner. This was the focal point of the Procedural Justice class, where the instructor utilized Table Top exercises to encourage a dialogue about ways to improve supervision and management decision making with the guidance of these principles. The Leadership training also incorporated procedural justice by focusing on the benefits of "transformational" leadership styles instead of "transactional" leadership styles and by encouraging a robust dialogue about ways to enhance procedural justice within the Bureau.

These innovations in PPB's Supervisors In-service training are laudable. However, they do not substitute for opportunities to practice communication skills related to the principles of procedural justice, i.e., giving voice, being respectful, maintaining neutrality, and demonstrating trustworthiness through empathy, helpfulness and other actions. Substantial Compliance with par. 84(a)(i) will be achieved when PBB is able to design and implement a carefully planned scenario where all officers are given the opportunity to practice such behaviors and receive individual feedback during a debriefing session. Some of this work was achieved with a scenario used during the 2018 In-service and PPB is planning to introduce a procedural justice-specific scenario during the 2019 In-service.  If COCL is satisfied with these lesson plans and materials, we will grant PPB Substantial Compliance for par. 84(a)(i).

*85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.*

<u>COCL Conditions</u>

In our Q3 report, we describe the long history of interaction between COCL and PPB to improve PPB's planned audit process and its eventual Training Audit Report. PPB's initial report was completed in October of 2017, and after feedback from COCL and the submission of the Training Division's Action Plan, a Follow-up Audit Report was completed in November of 2018. As we

noted in our Q3 report, the initial Training Audit Report was responsive to the seven audit criteria delineated in Par. 85. The report was well structured and well written.

Nevertheless, we expressed concern in several areas and established the following conditions as necessary to achieve Substantial Compliance with Par. 85: (1) review the status of LMS [Learning Management System] implementation and identify any remaining obstacles to full-scale implementation; (2) review the adequacy of the 2017 Needs Assessment and determine the extent to which it was used by the Training Division to develop a Training Plan for 2018; (3) describe the methods used by the Training Division to evaluate training so as to memorialize this work and make it available to future training evaluations at PPB; and (4) when describing findings and conclusions, the audit reports need to clearly separate the views of the auditors from the views of training instructors and supervisors interviewed.

<u>Current Status</u>

Since our last report, the Professional Standards Division of the PPB has completed a Follow-up Audit Report. The primary purpose of the follow-up report is to ensure that "the action plan developed by the PPB Training Division to address the recommendations identified in the initial audit was effectively implemented." (p. 1). However, we also expected that the Follow-up report would address COCL's concerns with the original audit (noted above). Based on the content of PPB's follow-up report and our meetings with PPB officials, we are satisfied that PPB has met the conditions needed to achieve Substantial Compliance with Par. 85 of the Settlement Agreement.

Specifically, the Follow-up Audit Report is comprehensive and addresses each of the Training Division's responses submitted in June of 2018 and is responsive to the important concerns expressed by COCL. First, the audit team has provided a full description of the status of LMS implementation at the time of the follow-up audit (October, 2018) and who has access to what training records. The audit team also discussed the remaining obstacles to full-scale implementation of LMS, including the migration of historical records from Skills Manager to LMS and the ability of LMS to track training certifications.

Second, the Follow-up Audit Report examines the adequacy of the 2018 Needs Assessment and reports on the extent to which it was used by the Training Division to develop the 2019 Training Plan. Although we had originally asked PPB to look at the 2017 Needs Assessment, we approved their use of the 2018 Needs Assessment instead, as it provided a more recent source of information. The audit team identified more than 100 training topics from the Needs Assessment and compared these to the topics found in the Strategic Training Plan and 2019 Training Plan. The level of correspondence is consistent with the expectations delineated in Directive 1500.00 and satisfies COCL's request.

Third, in the Follow-up Audit Report the audit team has provided a general description of the process used by the Curriculum Development Unit of the Training Division to evaluate the effectiveness of training and evaluation tools (Par. 85c). The auditors describe how survey questions are developed and reviewed in-house. They also note that learning assessment surveys are administered during classes and that training evaluation surveys are completed after most trainings. Although we are satisfied that this COCL condition has been met by auditors, we encourage the Training Division to develop a single document that (1) describes the specific procedures used to collect, process, and analyze training evaluation data and (2) includes the specific measures used in the surveys and exams. This document will memorialize this evaluation work, serve to train future PPB evaluators/analysts, and establish consistency in training measurements over time.

Parenthetically, we note that PPB should be credited with expanding its evaluation work over the past few years to include their major training programs – Advanced Academy, In-service, Supervisor In-service, and ECIT – as well as some specialty trainings. However, this evaluation work is labor intensive and to achieve consistent and high-quality analysis and reporting of survey results, the Training Division will require additional personnel, as they have requested.

The final COCL condition was that the Follow-up Audit Report "clearly separate the views of the auditors from the views of training instructors and supervisors interviewed." We find evidence of this independence in the auditors' extensive comparison of the Needs Assessment with the Training Division's Strategic Training Plan and its 2019 Annual Training Plan. The auditors were not reluctant to identify gaps between the Needs Assessment and these Training Division plans. Also, in this latest audit report, they avoided any language that would devalue the views of experts not working in the Training Division.  In sum, PPB has met the conditions needed to achieve Substantial Compliance with Par. 85.

# CRISIS INTERVENTION (Par. 99, 105, and 115)

| Par. 99 | Substantial Compliance - Conditional |
|---------|--------------------------------------|
| Par. 105 | Substantial Compliance |
| Par. 115 | Substantial Compliance - Conditional |

*99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").*

*115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to [Par. 114] and operation by trained staff.*

<u>COCL Conditions</u>

Our prior assessment for both of these paragraphs determined that substantial compliance was conditioned upon revising the criteria that would require BOEC call takers and dispatchers to send an ECIT officer to a mental health crisis call.

<u>Current Status</u>

In order to assess these paragraphs for this report, we provide a summary of PPB and BOEC's analyses of the City's mental health response system performed in March of 2018, our conditions for substantial compliance based on those analyses, the updated report provided by the City in December of 2018, and the implications for achieving substantial compliance.

In March of 2018, the City provided a comprehensive evaluation of their mental health response system, including the proportion of calls for service that contained a mental health component, the proportion of calls for service that met the criteria for ECIT dispatch, distributions of ECIT calls (precinct, shift, etc.), ECIT response rate, and outcomes related to force, arrests, and transports to hospitals (among other system analyses). Some differential outcomes were reported for ECIT and non-ECIT officers and COCL interpreted this as justification for sending ECIT officers to a higher proportion of mental health calls. Also, COCL concluded that the ECIT program had the capacity for such an expansion. Additionally, the analyses (and our prior discussions with PPB and City personnel) indicated that data quality might be enhanced through regular audits by PPB and

29

BOEC. Based on the results, the Parties agreed that the City would expand the criteria for ECIT dispatch, introduce quality assurance audits, and evaluate the impact of such measures after a six-month window.

Since then, the City has taken responsive steps, the first of which was to expand the dispatch criteria that would require an ECIT response to mental health calls. Previously, ECIT officers were dispatched to a call when there was an identified mental health component and one of the following elements:

- Subject is violent
- Subject has a weapon
- Subject is threatening or attempting suicide
- Subject is threatening to jump from a bridge/structure
- Subject is threatening to obstruct vehicle traffic
- Call is at a residential mental health facility
- Community member requests ECIT response
- Officer requests ECIT response

In April of 2018, the City expanded the criteria to include situations where "the subject's behavior is escalating the risk of harm to self or others." Accordingly, BOEC provided call takers and dispatchers with supplemental training, including examples of calls that might fit the expanded criteria. In addition, PPB revised Directive 850.20 (Police Response to Mental Health Crisis) to require that ECIT officers respond to any call to which they are dispatched, thereby relying on BOEC operators to determine which calls meet ECIT dispatch criteria.

After six months of using the expanded dispatch criteria, the City again performed data analyses of calls involving a mental health component. Prior to performing the analyses, we consulted with PPB about the types of analyses we felt were most important in determining whether the expanded criteria led to larger-scale utilization of ECIT officers, improved outcomes, and effective audit processes. In December of 2018, the City provided their updated evaluation.

The expanded ECIT dispatch criteria plan was implemented on April 1, 2018 and therefore the City's analysis extended from April to September of 2018 (six-month timeframe) and compared the findings to the prior timeframe of April to September of 2017. The analysis revealed that in 2018 (after the expanded criteria had been implemented), the number of ECIT calls increased from 1,159 in 2017 to 1,877 in 2018.  This represents a 62% increase in the raw number of ECIT calls between the two years.  However, the overall number of calls for service increased at this same time, as well as the overall number of calls with a mental health component. Due to this, looking at ECIT calls as a proportion of all calls with a mental health component gives a more accurate picture of the expanded criteria's impact on getting ECIT officers to more mental health calls. In this regard, ECIT calls represented approximately 12% of calls with a mental health

component in 2017 and 14% of such calls in 2018. The increase from 12% to 14% therefore represents a 17% increase between the two years.

PPB also performed analyses on outcomes associated with ECIT status for calls that did not meet ECIT criteria to determine whether differences existed between those with enhanced CIT training and those without. Similar to the findings of the March 2018 report, the updated analyses indicated that there were no differences between the two groups as to whether an interaction with a person with mental illness led to an arrest, though there were differences in whether the person was transported to the hospital or Unity Center (ECIT officers were 1.92 times more likely to transport a person in mental health crisis to the Unity Center). That is, calls with an ECIT officer on-scene were statistically more likely to lead to a person with mental illness being transported to a hospital/Unity Center compared with calls where an ECIT officer was not on-scene. Additionally, our independent analysis found that for cases where the subject was transported to the hospital/Unity Center, the subject was more likely to go to the hospital/Unity Center voluntarily (as opposed to using a Police Officer's Hold) when an ECIT officer was on-scene compared to when an ECIT officer was not on-scene (calls with an ECIT officer on-scene were 39.3% less likely to have a POH utilized when transporting a person in crisis to the hospital/Unity Center).

Finally, between PPB and BOEC, three separate quality assurance audit methodologies were implemented during the study timeframe. The first was a BOEC Quality Assurance Audit, evaluating whether BOEC call-takers and dispatchers were accurately recognizing when a call met ECIT dispatch criteria and sending out ECIT officers. The findings of the audit indicated that BOEC personnel were compliant with the dispatch protocol 92.8% of the time. The second quality assurance methodology examined reasons why an ECIT officer may not have been on-scene when a call met ECIT dispatch criteria. The findings of that audit found that the most common reason for an officer not being on-scene related to the ECIT officer being cleared or the call being resolved prior to arrival (68%). Third, PPB implemented an audit to evaluate the accuracy of officers in cases where the officer indicated the call did not have a mental health component. According to the City's December 2018 report, "officers were correct in their assessment that a call for service did not have a mental health component" 97% of the time.

Given the above information, we note that PPB and the City (including BOEC) have accomplished many of the conditions we laid out in our 2018 Q1 report. However, the ongoing differences in outcomes as well as the limited increase in the proportion of mental health calls assigned to ECIT officers lead us to believe that additional training for BOEC call-takers and dispatchers is needed for the City to achieve Substantial Compliance with Pars. 99 and 115.

Although the dispatch criteria were expanded to include a risk component, we believe that BOEC's April 2018 training could have defined "risk" more broadly by including concepts of self-

31

harm that are less immediate and less violent.   Additionally, we recommend BOEC refresh call-takers and dispatchers on how the risk of harm may escalate over time and how that might indicate the call may benefit from a specialized response.

Given the outcome differences regarding the likelihood of the subject being transported to the hospital, and well as differences in the voluntariness of such transports, we believe this supplemental training will result in ECIT officers being dispatched to more calls where persons in mental health crisis may need to be connected to services. While a mental health component may not always be known to BOEC call-takers (and may only be found out later by the responding officer), instances where the mental health component is known prior to dispatching an officer might be appropriate for sending an ECIT officer given the additional training.  Prior to delivering such training, we would expect BOEC to provide us with lesson plans and training materials so that we may review them. Additionally, we would expect the training to be informed by individuals who have expertise on the range of risk that might be present with persons with mental illness.

Additionally, we suggest PPB provide classroom in-service training to all officers regarding crisis response (though we don't believe this is necessarily a condition of compliance with Par. 99). While ECIT officers received an ECIT refresher training in the last two years and all PPB officers annually go through a few training scenarios involving persons in mental health crisis, PPB may consider having additional training that focuses on connecting community members to services via transport to the Unity Center. A defining characteristic of the PPB model is that it relies heavily on non-ECIT officers responding to the vast majority of mental health calls. Hence, refresher training for non-ECIT officers is important for the integrity of the model.

We note here that there are many elements of the Portland Model that conform with the Memphis Model. ECIT officers are volunteers, have received extensive training, and are recognized for their status (both by BOEC and internally). Additionally, the ECIT program was created utilizing community stakeholder input and there is local community ownership of the program in accordance with Memphis Model core elements.

Where the Portland Model varies from the Memphis Model is in the decision to send ECIT officers only to a subset of calls with a mental health component (whereas the Memphis Model strives to send a specialized response to all calls with a mental health component). DOJ's approval letter of Directive 850.20 (Police Response to Mental Health Crisis) recognizes that Portland's model is distinct from the Memphis model, but is accepting of the PPB model:

"While Portland's triage approach to ECIT-dispatch is a variation of the Memphis Model, referenced in Paragraph 99 of the Amended Settlement Agreement, it reflects local community ownership and we believe it represents a good faith, successful effort in response to the concerns that brought on this litigation."

As the "concerns that brought on this litigation" are noted in DOJ's Findings Letter as "a pattern or practice of using excessive force in encounters involving people with actual or perceived mental illness" (particularly through the use of CEWs) and the "lack of officers specially trained in and proficient at responding to mental health crisis" (i.e. the "train-all model"), we agree with DOJ that PPB, the City, and BOEC have largely responded to the original concerns that led to this litigation.

Outside of the ECIT response alone, we also note that PPB and the City have an excellent overall system of mental health response. When considering the Behavioral Health Response Team (BHRT) and the Service Coordination Team (SCT) working in conjunction with the ECIT program, we believe this further shows that the original concerns of DOJ have largely been mitigated. We therefore believe that the City and PPB, if able to provide the additional BOEC training note above, will have complied with the intent of Par. 99 and by proxy, the language and intent of Par. 115.

*105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event.*

<u>COCL Conditions</u>

Pursuant to Par. 105, PPB continues to utilize a Mental Health Template (MHT) to document calls which contain a mental health component. Officers are required to complete a MHT when a call meets ECIT criteria, when a call contains a mental health component and a non-ECIT officer completes an associated report, or when an ECIT officer utilizes their crisis intervention skills when responding to a call with a mental health component. The template utilized by PPB contains the required elements of Par. 105, including event characteristics, subject characteristics, and relevant outcomes.

The remaining concerns related to PPB's compliance with Par. 105 dealt largely with data reliability issues, including some lingering confusion as to when/how to complete a MHT, at-times contradictory data between PPB and BOEC regarding subject interactions, and incomplete MHT data.

<u>Current Status</u>

Since our 2018 Q1 report, we believe that these concerns have been mitigated.  For instance, we noted in our last report that some confusion remained as to when and how a MHT was to be

completed and recommended PPB provide further clarity in this regard. In the Spring of 2018, PPB conducted a Supervisor's In-service training and included a presentation on the Mental Health Template, reporting requirements, and PPB's use of a MHT audit tool to ensure that officers are completing the MHT as required. Prior to the training, we reviewed the lesson plans and PowerPoint presentation, and then observed the delivery of this training. Overall, we conclude that the training for supervisors was well delivered and addressed the confusion we had noted in the past.

Additionally, we had previously found that data related to the disposition of a call (i.e. arrest, transport, report written, etc.) varied between BOEC datasets and PPB datasets. This was due to both entities keeping separate datasets that did not communicate with each other. Although only started around the time of our last report, PPB and BOEC are now utilizing a shared dataset related to mental health component calls that should better ensure consistency between the two bureaus.

Finally, PPB created a system for ensuring officers accurately completed mental health indicators. We noted in our last report that in October of 2017, nearly a fourth of PPB's call close-outs did not provide an indication of the subject's mental health status. In January of 2018, this proportion had fallen to 12.78%, though we maintained that more should be done in this regard and that we would continue to monitor instances where officers did not indicate a subject's mental health status. To address the issue, PPB implemented a review system for identifying unanswered indicators of mental health status, identifying individual officers who demonstrated a pattern of leaving indicators unanswered, and providing emails to supervisors to intervene. Since that system was put into place, the proportion of unanswered indicators further decreased to a low of 2.4 in April of 2018 (see "Unanswered" in Figure 1).

Figure 1 - Portland Yes/No Mental Health CAD Response



Due to the fact that this system is pattern-based at the individual level and that patterns are difficult to establish with such a low proportion of missing data, PPB has discontinued the monthly notification process, though will continue to monitor the numbers over time. We agree with their decision, provided that such monitoring continues and the notification process is reinstated should unanswered indicators become a higher proportion. For instance, since April of 2018, unanswered indicators on MHT has increased from 2.4% to 5.1% in February of 2019. While this means that 95% of MHTs have the indicator question answered, PPB should ensure that unanswered rates do not continue to increase unabated.

Finally, we have previously recommended a Signs and Symptoms of Mental Illness refresher training for officers. Although we believe that the Supervisor In-Service training has alleviated many of our concerns about data reliability for the MHT form, we still believe that refresher training on Signs and Symptoms for all officers will further ensure data reliability by reminding PPB members of the various ways that mental illness might present itself. As we are already suggesting classroom training for officers in regards to Par. 99, the Signs and Symptoms training we suggest here may be done in tandem.

We have concluded that PPB has substantially complied with the requirements of Par. 105 as a result of their continued use of the Mental Health Template, their implementation of Supervisor In-service training related to the MHT, PPB and BOEC's use of a unified dataset, and PPB's implemented system for evaluating unanswered mental health indicators. While not necessarily a condition of compliance for this report, we continue to suggest PPB provide a Signs and Symptoms of Mental Illness refresher course for all officers to maintain their present level of compliance in the future.

# EMPLOYEE INFORMATION SYSTEM (Par. 116 and 117)

| Par. 116 | Substantial Compliance |
|----------|------------------------|
| Par. 117 | Substantial Compliance |

*116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. See PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall:*

*a.     Require that commanders and supervisors conduct prompt review of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;*

*b.     Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and*

*c.     Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity*

<u>COCL Conditions</u>

In on our 2018 Q3 report, we identified 5 areas for Par. 116 where PPB required additional work or demonstration of the effectiveness of prior efforts. These conditions for Substantial Compliance were:

- Demonstrate effectiveness of RU Manager notification/reminder system for required EIS reviews
- Demonstrate continued higher compliance rates for required EIS reviews
- Demonstrate impact of training on intervention rates for Force-type alerts
- Implement a system for increasing review/intervention rates for Complaint-type alerts focusing on trends
- Maintain risk-management approach

<u>Current Status</u>

Our evaluation of Par. 116 has historically broken out the paragraph into two main parts: (1) the specific EIS reviews required in subsections (a) and (b), as well as the combined unit/supervisor analysis described in (c) and; (2) the requirement of PPB to "enhance its EIS to <u>more effectively</u> identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (emphasis added). Here, we continue to provide such a breakdown.

<b>Specific EIS Reviews</b>

PPB continues to memorialize the requirements of Par. 116 in policy, specifically by having Directive 345.00 (Employee Information System – Section 2.2) and 215.00 (Member Performance Evaluation – Section 2.1) reflect the requirements of subsection (a) and 345.00 (Section 2.1) reflect the requirements of subsection (b). We maintain that the responsibility of supervisors is enshrined in policy and we have commented on the sufficiency of supervisor training in past reports.

Our 2018 Q3 report noted that PPB had implemented a system wherein RU Managers would receive an initial email at the beginning of each month detailing which officers required a review under subsections (a) or (b), a second email during the middle of each month if the officer had not yet been reviewed, and a third email at the end of the month. Should an officer's EIS not be reviewed 30 days after the third email, the RU Manager would receive a PDT entry. To date, no RU Manager has required a PDT entry due to neglecting their responsibilities related to subsections (a) or (b).

Partly as a result of the email notification system put forth by PPB, compliance rates with subsections (a) and (b) appear to have appreciably increased since the first quarter of 2018. Our 2018 Q3 report noted that in the second quarter of 2018, reviews required for subsection (a) were completed on-time for approximately 97% of the reviews. For subsection (b), required reviews were completed on-time for approximately 79% of the reviews. We noted in that report the increases in on-time reviews were commendable (particularly for subsection (a) reviews) but that a single quarter's worth of data was not sufficient to demonstrate ongoing compliance with Par. 116. However, in the third and fourth quarter of 2018, PPB has maintained impressive on-time review rates for both subsections (a) and (b).

As seen in the chart below (Figure 2), reviews required under both sections (a) and (b) of Par. 116 were completed 99% of the time during the fourth quarter of 2018. Additionally, the third quarter of 2018 showed required reviews were completed 98.5% of the time. Taken together, over the past three quarters for which data were available, PPB supervisors have completed timely subsection (a) and (b) reviews at a 94% rate (884/940). Therefore, not only has PPB raised their

on-time compliance rates but they have also maintained them for the past three quarters. This indicates that the training supervisors have received (in accordance with PPB Directives) and the email notification process implemented by PPB appear to have led to an organizationally ingrained system for performing the reviews required under subsections (a) and (b).

Figure 2 – PPB Compliance Percentage Over Time



Additionally, in our 2018 Q3 report, we noted inter-unit differences in the rates for which subsection (a) and (b) reviews were completed. For instance, while all units generally showed improvement in the second quarter of 2018, units such as Training and Youth Services Division had historically low rates of compliance compared with other units. Such difference between units has largely vanished between the second and fourth quarter of 2018 and particularly in the third and fourth quarter. As seen in the table below (Table 1), the lowest compliance rate for any unit in the third and fourth quarter of 2018 was the Chief's Office at 83.3% - however, this is due to only a single review out of six not being completed on time. Thus, the requirement of Par. 116 subsection (c) for PPB to compare units and supervisors for patterns of activity appears to have, in part, led to universal improvement in compliance rates.

Table 1 - Total Opportunities for Compliance by Unit and Quarter

| UNIT | 2018 Q2 | 2018 Q3 | 2018 Q4 | TOTAL |
|---|---|---|---|---|
| Central | 60/72 (83.3%) | 97/98 (99.0%) | 53/54 (98.1%) | 210/224 (93.8%) |
| Chief's Office | 15/21 (71.4%) | 5/6 (83.3%) | 4/4 (100%) | 24/31 (77.4%) |
| Detectives Division | 24/28 (85.7%) | 32/33 (97.0%) | 14/14 (100%) | 70/75 (92.1%) |
| DVD | 6/7 (85.7%) | 5/5 (100%) | 6/6 (100%) | 17/18 (94.4%) |
| East | 73/82 (89.0%) | 58/58 (100%) | 44/44 (100%) | 175/184 (95.1%) |
| FED | 2/3 (66.7%) | 9/9 (100%) | 4/4 (100%) | 15/16 (93.8%) |
| Fiscal | 0/0 (NA) | 1/1 (100%) | 0/0 (NA) | 1/1 (100%) |
| FSD | 5/5 (100%) | 10/10 (100%) | 6/6 (100%) | 21/21 (100%) |
| North | 57/66 (86.4%) | 44/45 (97.8%) | 33/34 (97.1%) | 134/145 (92.4%) |
| PED | 0/0 (NA) | 0/0 (NA) | 0/0 (NA) | 0/0 (NA) |
| Personnel | 9/12 (75.0%) | 23/24 (95.8%) | 9/9 (100%) | 41/45 (91.1%) |
| PSD | 1/1 (100%) | 4/4 (100%) | 2/2 (100%) | 7/7 (100%) |
| Records/RegJIN | 1/1 (100%) | 1/1 (100%) | 0/0 (NA) | 2/2 (100%) |
| SSD/CIU | 2/2 (100%) | 0/0 (NA) | 0/0 (NA) | 2/2 (100%) |
| TOD | 34/40 (85.0%) | 23/23 (100%) | 28/28 (100%) | 85/91 (93.4%) |
| Traffic | 13/14 (92.9%) | 11/11 (100%) | 6/6 (100%) | 30/31 (96.8%) |
| Training | 10/15 (66.7%) | 7/7 (100%) | 10/10 (100%) | 27/32 (84.4%) |
| Transit | 7/7 (100%) | 6/6 (100%) | 1/1 (100%) | 14/14 (100%) |
| YSD | 4/6 (66.7%) | 3/3 (100%) | 2/2 (100%) | 9/11 (81.8%) |

To summarize, through a combination of PPB Directives and an email notification system, supervisors continue to be made aware of when EIS reviews are required (or still need to be completed). Additionally, PPB has provided training to supervisors as to how an EIS review should be completed and our prior assessments indicate that EIS entries after review are comprehensive and informative, thereby going beyond a "check-the-box" approach. PPB also has an

accountability mechanism in place for supervisors who do not complete required reviews as well as for units who demonstrate consistently low levels of compliance (though PPB has not yet had to trigger the accountability process). Finally, compliance rates for reviews required under subsections (a) and (b) have remained impressively high for the past three quarters of data, with 100% of reviews completed on-time in the fourth quarter of 2018. Similarly, units that had historically demonstrated comparatively lower rates of compliance have improved. Taken together, we now believe that PPB has substantially complied with the specific review requirements of Par. 116 and subsections (a) through (c).

### Enhanced EIS

In addition to the specific requirements of Par. 116, we also evaluate whether PPB has complied with Par. 116's requirement to "enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion." In our 2018 Q3 report, we noted that PPB had taken positive steps to enhance the EIS process although a few remaining issues still required attention. Notably, these issues related to the overall number and intervention rates of particular EIS alert types (mainly force alerts), perceptions of EIS, the lack of any intervention when supervisors were confronted with alerts resulting from complaints, and PPB's implementation of a multi-variate risk management system.

As it relates to <u>initial</u> reviews of EIS alerts, PPB has continued to employ a list of identified, delineated closure criteria (single use of force related to the alert, duplicate alert with no new use of force incident, system error, employee not subject to review, and exceptional closure with PSD Lieutenant approval). Should an EIS alert meet one of these criteria, it is closed instead of being forwarded to the officer's RU Manager. Our 2018 Q2 report demonstrated that approximately 37% of all alerts were closed instead of being forwarded to an RU. However, compared with the approximate 94% closure rate in the fourth quarter of 2015, we noted our opinion that PPB had made laudable strides in allowing supervisors with direct knowledge of an officer (i.e. RU Managers and precinct/unit supervisors) to determine how EIS alerts are managed, rather than relying on administrative personnel. This progress has largely been maintained since our 2018 Q2 report, with 58.6% of all EIS alerts (639/1,042) being forwarded for RU Manager review between Q3 and Q4 of 2018. Furthermore, the forwarding rate for EIS alerts, which could still be interpreted as somewhat low, is heavily impacted by Force-type alerts that are not forwarded because the alert is not triggered by a new use of force (see PPB SOP #44 for exclusion criteria "arrest data falling out of the look back period, duplicate FDCR entry, or new allegation added to an already open complaint"). When this closure criteria was not met, Force-type alerts were forwarded to RU Managers 85.8% of the time during the studied timeframe. This rate of forwarding is more similar to the forwarding rates for the other alert types.

| EIS Alert Type | Forwarded to RU | |
| --- | --- | --- |
| | **Yes** | **No** |
| Commendations (N=25) | 96.0% (N=24) | 4.0% (N=1) |
| Complaint (N=53) | 98.1% (N=52) | 1.9%% (N=1) |
| Criminal Complaint (N=48) | 100% (N=48) | 0.0% (N=0) |
| Force (N=360) | 29.2% (N=105) | 70.8% (N=255) |
| Precinct Alert (N=11) | 90.9% (N=10) | 9.1% (N=1) |
| PSD Risk Assessment Alert (N=2) | 100% (N=2) | 0.0% (N=0) |
| Traumatic Incident (N=128) | 99.2% (N=127) | .8% (N=1) |

In addition to the proportion of EIS alerts that are forwarded to the RU Manager, we noted in our prior report that many Force-type alerts did not result in any type of discussion with the officer. In June of 2018, PPB conducted a Supervisors In-service training, part of which contained instruction on EIS and how supervisors should code their interactions with officers. As we noted in the past, supervisors often had a conversation with officers but would not code those conversations as "Interventions" due to the negative stigma of the term and some distrust in EIS as a whole. We therefore looked to determine whether that training impacted the proportion of Force-type alerts which received an intervention. The results found in Table 2 indicate the training likely had an impact as intervention rates for force increased from 19.6% (for the time period 2017 Q3 to 2018 Q2) to 33.7% (for 2018 Q3 and Q4). Additionally, the proportion of alerts that were "RU Review Only" stayed constant between the two time frames, indicating that the increase in "Interventions" is the result of supervisors actually having those discussions and coding them as such.

In our 2018 Q2 report, we also noted that Complaint-type alerts rarely went beyond being reviewed by an RU Manager. Only 4.6% of all Complaint-type alerts were reviewed by the officer's supervisor and in only 2.8% of Complaint-type alerts did the officer receive an intervention. This is due to the fact that PPB and Portland Police Association (PPA) believed that any discussion of an open complaint might be considered Command Counseling, thereby prohibiting future discipline for that complaint. We suggested PPB reinforce that an EIS alert was based on a trend, not a single incident.

In response, PPB revised SOP #44 to require Complaint-type alerts inform the supervisor that "The member has one or more open complaints that are pending review. The open complaints can be used for your reference and supervision; however, do not discuss the open complaints with the member or use them as part of your written EIS Alert response." In the past, supervisors generally were informed not to discuss Complaint-type alerts. However, with the above language, supervisors have been provided direction as to how they should approach discussing trends in complaints rather than being advised against discussing Complaint-type alerts at all.

PPB's efforts in this regard appear to have led to an increase in interventions for Complaint-type alerts. In our last report, we noted that 2.8% of Complaint-type alerts led to an intervention while in the data we reviewed for this report, 11.4% of Complaint-type alerts led to an intervention (see Table 2). While the raw numbers in the dataset are relatively small, our last report covered a full year's worth of data while this report covers two-quarter's worth of data. Ultimately, we would hope to see the proportion of Complaint-type alerts which receive an intervention continue to increase – however, having a fourfold increase in the proportion of Complaint-type alerts which receive an intervention is commendable.

Table 2 – Alert Type by Outcome

| Alert Type | RU Review – Not Forwarded to Supervisor | Supervisor Review – No Further Action | Intervention |
|---|---|---|---|
| Commendations (N=23) | 39.1% (N=9) | 13.0% (N=3) | 47.8% (N=11) |
| Complaint (N=44) | 81.8% (N=36) | 6.8% (N=3) | 11.4% (N=5) |
| Criminal Complaint (N=40) | 100% (N=40) | 0.0% (N=0) | 0.0% (N=0) |
| Force (N=98) | 30.6% (N=30) | 35.7% (N=35) | 33.7% (N=33) |
| Traumatic Incident (N=121) | 26.4% (N=32) | 1.7% (N=2) | 71.9% (N=87) |

Finally, PPB continues to utilize a risk-management approach to "more effectively identify" potentially problematic individuals and groups. While this approach had not been required specifically by the Settlement Agreement, we believe it carries potential beyond that of the single-threshold alerts that are required by Pars. 118 and 119. In this process, PPB identifies individual officers who uniquely exceed the average rates of force, complaints, sick time, and secondary employment (among other metrics). Officers/groups that are above the mean on multiple metrics are identified and discussed with RU Managers who then further review the

officer/group and determine whether an intervention is necessary. Since our last report, PPB has maintained this approach in addition to the single-threshold alerts required in Pars. 118 and 119 and we have observed a meeting between the EIS Administrator and an RU Manager pertaining to this. We are satisfied that this represents a sound approach to enhancing the current EIS and is consistent with prior research on patterns of behavior among police officers.

<u>Summary</u>

As evidenced by our findings above, we believe that PPB has satisfied the outstanding issues related to Par. 116. The notification/reminder system for EIS reviews required under Par. 116 have led, in part, to nearly 100% compliance in the past six months. Additionally, intervention rates for Force-type alerts (that did not meet one of the pre-identified closure criteria) have increased to 33.7%, suggesting that the training provided by PPB during the Spring 2018 Supervisor In-Service has been impactful. PPB has also implemented a system for increasing review/intervention rates for Complaint-type alerts, informing supervisors that while they may not discuss individual open complaints, complaint trends can be discussed with officers. This has also led to an increase in interventions for Complaint-type alerts. Finally, as a way of more effectively identifying potentially problematic officers, groups, and supervisors, PPB has continued to utilize a risk-management approach. Through quarterly meetings with supervisors not related to single-threshold EIS alerts, PPB is able to identify at-risk individuals/groups and appropriately intervene. Through the combination of the above, we believe that PPB has substantially complied with the totality of Par. 116.


*117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.*

<u>COCL Conditions</u>

Similar to our assessment of Par. 116, PPB has implemented a process to identify problematic groups, units, and supervisors. Utilizing COCL and DOJ input, PPB revised SOP #47 (Force Data Analysis at the Group and Supervisor Level) to detail the steps of analyzing force by supervisors and teams. Our past critiques of SOP #47 were:

- PPB had not sufficiently memorialized the steps to be taken once an outlier had been identified
- Criteria had not been defined for when an outlying group should be forwarded for RU Manager review
- PPB had not sufficiently memorialized how alerts were to proceed with an identified group-level trend

Current Status

Through their revision of SOP #47, we believe that each of these prior concerns has been resolved. For instance, SOP #47 memorializes each step to identify outliers and how to proceed when such outliers have been determined. PPB begins the process by selecting all officers who "collectively used at least 70% of the total applications of force" in the past year. Then, PPB measures those officers on seven metrics, identifying officers who are three or four standard deviations above the mean on any of those seven (the standard deviation threshold may be lowered based on the situation)[1]. Upon identifying individual officers, PPB analysts rank those officers based on the number of metrics where they are three or more standard deviations above the mean and then group those officers based on peer groups (for instance, working the same Precinct, same shift, and having similar days off). Through that process, conversations with RU Managers are held, utilizing other data (e.g. call volume, arrests, specific assignment) to inform and contextualize the trends but ultimately leaving it up to the RU Manager and Inspector to determine a course of action. Taken as a whole, SOP #47 now clearly memorializes the steps to be taken.

Additionally, our prior concerns related to when an identified trend would be forwarded to an RU have largely been resolved. In an initial draft of SOP #47, a trend was determined to be significant if further analyses could not provide a "sufficient, logical explanation as to why the performance of an individual, detail, shift, or RU deviates from their peers." As we noted in our 2018 Q3 report, this was not a defined criterion and, given the potential range of other explanations, could potentially have led to a minimal number of cases being forwarded. However, the revisions to SOP #47 now allow for those other explanations to be included in the discussion instead of precluding the discussion altogether. Rather, in the memorandums to RU Managers that we have reviewed, the decision is left up to the supervisor to determine potential reasons. The memorandums to RU Managers often read "Recommendation – review the detail to try to identify why they are using more force more frequently than their peers on the same shift (This could include changes in assignment, district, personnel, call load, community related or other non-force reasons)." By allowing the RU Manager to determine potential reasons for differences in force (and requiring justification should an RU Manager determine no action needs to be taken), we believe this is in-line with the premise that supervisors know their officers better than EIS Administrators or the Inspector.

Finally, the prior version of SOP #47 lacked sufficient direction as to how EIS alerts were to proceed given group-level trends. However, the revised version of SOP #47 provides specific direction for the Inspector (create an internal memorandum, forward finalized memorandum to

---

[1] Standard deviations are a statistical method for identifying data that deviate from the average in a meaningful way.  This is done by calculating a mean and determining how far away from the mean other data are distributed.

EIS Administrators which includes the trend/recommendation/timeline, review/concur/dispute RU Manager actions taken), the RU Manager (review memorandum with Inspector, determine actions to be taken, take actions), and EIS Administrators (open manual alert, manage alert, notify Inspector of RU Manager responses, close alert).  It also provides an avenue for disputes between the Inspector and RU Manager to be handled through the Chief's Office. Overall, we believe that each stage of the process is clearly defined.

Along with the changes to SOP #47, we have reviewed the memoranda created by the Inspector related to group-level trends in uses of force. Consistent with SOP #47, the memoranda identify such trends (along with other individual and group level trends), provide a recommendation for each trend (which may include reaffirming positive work performed by individuals or groups), and provide a timeline for response. We also reviewed RU Manager responses to these memoranda and believe they indicate RU Managers take a serious approach to responding to the trends identified by the Inspector.  For instance, we reviewed some responses where the RU Manager requested additional analysis to better understand the nature of the trend.  In other instances, we noted the RU Manager discussed the trends with the appropriate supervisor. Overall, we believe the actions taken have been appropriate and that PPB will continue to improve as RU Managers and supervisors become familiarized with the system.

Although not required for compliance with this particular paragraph, PPB has also begun expanding the risk-management model described under Par. 116 (above) to now include identifying group-level trends. For instance, while PPB continues to identify groups of officers who utilize force at a comparatively higher rate, they now also include things such as complaints, sick time, and secondary employment hours (among other things) in their analysis in order to determine group trends on a wider set of metrics. This is a work in progress and once PPB is content with the reliability of the process, they will memorialize the approach in an SOP. Again, while this is not required by the Settlement Agreement, we encourage PPB to continue with this approach as a general practice and see it as a sign that PPB is committed to using EIS as an effective management tool into the future.

Based on the revisions to SOP #47 noted above, our review of Inspector memoranda outlining the trends and recommended resolutions, our review of RU Manager responses to identified trends, and PPB's course of evaluating non-force group trends as part of an overall risk-assessment approach, we believe that PPB has substantially complied with Par. 117.

# OFFICER ACCOUNTABILITY (Introduction to Section VII, Pars. 121 and 128)

| Intro Par. | Partial Compliance |
|---|---|
| Par. 121 | Partial Compliance |
| Par. 128 | Substantial Compliance - Conditional |

*Introduction to Section VII: PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.*

In our 2018 Q4 report, we noted that the introduction to Section VII of the Settlement Agreement reflected an accountability system that is both efficient and effective. Thus, we evaluated how various paragraphs within Section VII contributed to such a system and where additional work was necessary to ensure the language and intent of the introduction would be met. Primarily, we believed that PPB and the City had not yet complied with the concept of "officers and complainants receive a fair and expeditious resolution", noting the 180-day timeline (Par. 121) and remaining issues in the overall accountability system (Par. 128). We provide a more detailed examination of these two paragraphs below, though continue to find partial compliance for the Introduction to Section VII paragraph. Once the remaining issues with Pars. 121 and 128 are resolved, we believe PPB and the City will have complied with the introduction to Section VII.

*121. PPB and the City shall complete all administrative investigations of officer misconduct within one hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.*

COCL Conditions

In our 2018 Q4 report, we noted that PPB and the City had demonstrated improvement in the proportion of full administrative investigations that were completed within 180 days (going from approximately 30% compliance to approximately 50% compliance).  However, as approximately half of full administrative investigations exceed the 180-day timeline, we noted that further work was required before COCL could find the City and PPB have substantially complied with the requirements of Par. 121.

Current Status

As our 2018 Q4 report was released in January of 2019, not enough time has passed for us to evaluate whether sufficient progress has been made to justify substantial compliance.  We therefore cannot assess whether PPB and the City have made progress as to the 180-day timeframe for this report and continue to find they have only partially complied with Par. 121. Our 2019 Q2 report should allow a sufficient amount of time to have passed in order to reassess this paragraph.

However, while we cannot determine whether cases on the whole have complied with the 180-day timeline, we can examine whether there has been improvement in the extent to which particular stages of the investigations have met their due date.  Briefly, both PPB and IPR have established due-dates for certain stages of the administrative investigation process.  The combined stage timelines are designed to ensure that, should each stage's timeline be met, the sum of the parts will not exceed 180 days.  Thus, while adhering to stage timelines is not necessarily required by the Settlement Agreement, it is an indication of how the overall system is operating, where improvements have occurred and where more attention may be needed.

In our 2018 Q4 report, we provided an analysis of each stage and the frequency for which each stage had been overdue between September of 2017 and September of 2018.  Particularly for the stages "IPR Intake Investigation" and "IPR Assistant Director" we noted that a fairly large proportion of these stages were consistently overdue (49.0% and 63.1%, respectively).  However, we also demonstrated how IPR's implementation of weekly meetings with IPR personnel appeared to reap positive benefits, lowering the proportion of all stages overdue to approximately 33% for both the second and third quarter of 2018 (compared to 45%-50% for the fourth quarter of 2017 and the first quarter of 2018).

Consistent with the recent trend, we note that the proportion of overdue IPR stages has continued to decrease, with 26.7% of stages being overdue between October of 2018 and February of 2019.  Compared to the 49.6% of stages overdue in the fourth quarter of 2017, we believe this is an appreciable improvement.  Additionally, the particular stages we expressed concern with have also demonstrated improvement.   As seen in Table 3, "IPR Intake Investigation" and "IPR Assistant Director" show reductions in the proportion that are overdue, particularly for the stage "IPR Assistant Director" (decreasing from 63.1% to 37.3%).

Table 3 - Stages and Overdue Status

| Responsible Party | Stage | Prior Report (September 2017 through September 2018) | | Present Report (October 2018 through February 2019) | |
|---|---|---|---|---|---|
| | | Not Overdue | Overdue | Not Overdue | Overdue |
| IA | IA Assignment | 77.3% (N=198) | 22.7% (N=58) | 79.3% (N=73) | 20.7% (N=19) |
| | IA Investigation | 78.1% (N=125) | 21.9% (N=35) | 73.0% (N=46) | 27.0% (N=17) |
| | Administrative Processing | 89.8% (N=158) | 10.2% (N=18) | 84.4% (N=92) | 15.6% (N=17) |
| | IA Command Review | 90.3% (N=438) | 9.7% (N=47) | 89.2% (N=264) | 10.8% (N=32) |
| IPR | IPR Intake Investigation | 51.0% (N=224) | 49.0% (N=215) | 69.4% (N=100) | 30.6% (N=44) |
| | IPR Expanded Intake | 76.4% (N=42) | 23.6% (N=13) | 77.3% (N=17) | 22.7% (N=5) |
| | IPR Investigation | 57.9% (N=11) | 42.1% (N=8) | 54.5% (N=12) | 45.5% (N=10) |
| | Mediation | 40.0% (N=4) | 60.0% (N=6) | 100% (N=3) | 0% (N=0) |
| | IPR Management Review | 74.2% (N=313) | 25.8% (N=109) | 77.5% (N=220) | 22.5% (N=64) |
| | IPR Administrator | 69.2% (N=9) | 30.8% (N=4) | 100% (N=3) | 0% (N=0) |
| | IPR Assistant Director | 36.9% (N=100) | 63.1% (N=171) | 62.7% (N=64) | 37.3% (N=38) |
| | IPR Director | 82.6% (N=100) | 17.4% (N=21) | 87.8% (N=36) | 12.2% (N=5) |

While a longer time period between our last evaluation of the 180-day timeline and our next would be helpful, the current data indicate that particular stage timelines have been improving. We recommend PPB and IPR continue to conduct their weekly meetings with their respective personnel to ensure that such improvements are maintained.  Clearly, there have been improvements in the stages and, therefore, we would expect such improvements to be reflected when we evaluate compliance with the 180-day timeline in the second quarter of 2019. However, we continue to emphasize that the 180-day timeline will be an unreasonable expectation for some cases because of the nature of the complaints, the volume of investigatory work required for such cases, and the desire of the City to carefully gather and evaluate enough information to achieve a fair and reasonable finding.  Therefore, our focus for evaluating the 180-day timeline continues to be trend-based rather than on individual cases.

*128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA.  Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.*

COCL Conditions

In the past, we noted that the ability of the City to "enable meaningful independent investigation by IPR" rested on PPB and IPR mirroring their policies and providing joint training to ensure

consistent quality of investigations between the two entities.  Our participation in the policy revision process has led us to believe that IA and IPR policies mirror each other and our observation of the overall IA/IPR joint training indicate that it was well delivered.  Additionally, we noted in our last report that our review of full IPR administrative investigations were done in a comprehensive fashion and yielded credible and reliable findings based on a preponderance of the evidence.  However, our system assessment of the administrative investigation process revealed some remaining issues that we felt needed to be resolved before we could conclude that the City had achieved "meaningful independent investigation by IPR."

Current Status

Since the release of our 2018 Q4 report, we have spoken with representatives from both IA and IPR about these remaining issues.  Both entities acknowledged that these issues existed at the time of our last report but that measures had already been taken and continue to be taken to resolve them.  Here, we discuss the issues we identified in our last report as well as provide an update on the steps IA and IPR have taken to address them.


System Complaints and Allegation Formation

Through our review of cases as well as interviews with sergeants, we found a number of instances wherein complainants were dissatisfied with their experience, but that dissatisfaction pertained more to the event that prompted them to call the police or a lack of knowledge about police procedures (system) rather than any particular action taken by the officer being a violation of policy.  For such instances, we labeled this an instance of a "system complaint being attributed to a particular officer."  Additionally, we noted concerns with how allegations were crafted – either too broadly, too specific, or not including an actual alleged violation of policy.

For both of these identified issues, IA and IPR have coordinated on identifying differences in approach and ensuring allegations are crafted in a manner that is fair to both the community member and officer.  One of the ways this has been accomplished is by ensuring that when allegations are formed, language from the policy that is alleged to have been violated should be reflected in the language of the allegation.  Additionally, for system complaints, conversations between IA and IPR have led to an understanding that allegations should be able to indicate that the officer should have (as opposed to the less articulate "could" have) done something differently.  Interviews with IA personnel indicated that these issues came to the forefront as a key difference in the way the two groups were handling cases.  We also learned that the issues discussed between the two entities are relayed to IPR investigators in order to limit future instances of system complaints and inconsistent allegation formation.  The coordination between IA and IPR in this respect appears to have made a difference, as IA informs us that there have been no instances of a supervisor attempting to return an SI for system complaints/inadequate allegation formation since the beginning of the year.  However, we will need to confirm this in the coming months.

Volume and Length of Time to Complete Supervisor Investigations

During our interviews with supervisors, we also heard from many supervisors their belief that SIs were time-intensive and that they were experiencing a significant number of SIs.  However, IA personnel indicate that these issues have largely been mitigated.  The meetings between IA and IPR (discussed above) have resulted in a reduced number of system-complaint allegations that are sent as SIs and instead are re-routed as Precinct Referrals or administratively closed.  Precinct Referrals ultimately attain the same effective outcome as SIs – namely, informing community members of why PPB officers might take certain actions and forging a better understanding in the community of why officers took the actions they did.

For instance, we reviewed one SI for our last report where a community member was upset that an officer parked his/her patrol vehicle on the wrong side of the road.  When performing the investigation, the supervisor learned that the officer was responding to a person reported to have a weapon.  In order to avoid the car being seen, the officer parked on the wrong side of the road to gain a tactical advantage.  This conforms to the concept (noted earlier) that an allegation should relate to something the officer should have done differently – in this case, the officer received an allegation despite taking the correct approach.  By re-routing system complaints such as this to a Precinct Referral, the community member will still be contacted and receive an explanation of the officer's actions.  However, the officer will not receive an allegation that will be viewed as unfair.

Due to the discussions, we have seen the number of SIs decrease from 37 (July to September, 2018) to 18 (October to December, 2018) to 9 (January to March 14, 2019).  Similarly, IPR informs us they are formalizing the process for sending cases out as Precinct Referrals and have developed a process and procedure document to better categorize cases that should be sent as SIs, sent as Precinct Referrals, or administratively closed (though the document has not yet been finalized).  The understandings between IA and IPR as to what constitutes a system complaint also appear to have been relayed to IPR investigators as IPR informs us that investigators now are better able to distinguish when a complaint would be best handled as a Precinct Referral.

Regarding the length of time for SIs, PPB notes that at the time of our last report, the SI process was fairly new (started in  July of 2018) and that, like all new processes, supervisors have become more familiar with the process.  For instance, we were informed that when the new After Action Report process was implemented, supervisors noted similar concerns (length of time, confusion about how to complete the form, etc.).  However, those problems have largely dissipated as supervisors and the chain of command have become more familiar with completing After Action Reports. That process of acculturation appears to be happening with SIs as well.

Supervisor Investigations versus Service Improvement Opportunities

As a comparison between the Supervisor Investigation (SI) process versus the Service Improvement Opportunity (SIO) process, we heard numerous PPB supervisors note that the SI (particularly the determination of findings) felt "very IA" and that officers felt the SI process was disciplinary.  Conversations with IA personnel confirm that this is a legitimate perception since SIs are a gateway to discipline.  For instance, if an officer has a Substantiated SI they are ineligible for having a future allegation of the same nature investigated as an SI;  instead, the case must be sent to IA (which was not the case for SIOs).  As this is a reality of the SI process, PPB efforts have focused on better explaining the process and addressing supervisors during staff meetings, roll calls, and RU Manager meetings.  Such discussions also focus on a host of other topics, including trends in complaints, refresher of relevant policies, and broader discussions of the SI process in general.  Presently, a total of five staff meetings and roll call meetings have occurred and PPB plans such discussions to be ongoing for the next couple of months.  We are also informed such discussions will be an ongoing occurrence in the future to keep officers and supervisors informed on topics of interest or concern.  We would recommend, as part of these discussions, that PPB clarify the range of findings for RU Managers, as we noted that RU Managers were inconsistent in their understanding of the definitions of findings.


Other Issues and Resolutions

Other issues we identified in our 2018 Q4 report may not have an immediate resolution, though PPB and IPR appear to be aware of them.  For instance, we noted that IPR investigators do not have unfettered access to PPB documents since IPR is not a law-enforcement agency.  Presently, IPR is given priority when requesting redacted information and it appears that, absent some change in law or the IPR backgrounding process, little else can be done to minimize the impact of this issue.

Additionally, we note that the final letter to the complainant in the past has left some community members feeling that a positive interaction between themselves and an investigating sergeant (for SIs) was diminished when they received a disposition letter noting their allegation was Not Substantiated.  Several sergeants informed us that community members felt the finding label was dismissive of their original complaints.  However, according to IPR, when the case file indicates a positive interaction between sergeants and community members, the final letter is crafted in a way to reflect this.   This appears to be a reasonable attempt to resolve the issue, so we suggest that IPR continue this practice.

Finally, some PPB supervisors reported that IPR investigators appear to lead complainants into allegations that were not originally being made.  This belief is the result of IPR investigators oftentimes dealing with complainants who are upset but perhaps not articulating a specific allegation of policy violation.  Again, there is no easy resolution to this matter.  For this issue (as well as some of the other issues discussed above), the solution may come in the form of IPR

personnel being available to provide PPB members insight into IPR's operation.  During the 2018 In-Service, PPB provided an overview of the entire accountability process, although PPB members did not hear IPR's perspective.  We are well aware of the strong desire to maintain IPR's independence from IA (as has been expressed by the community, IA, and IPR).  However, where reasonable, the City should seek new ways to communicate to officers the perspective of IPR and the processes and procedures employed by IPR so as to instill greater trust and legitimacy in the system.

Summary

In sum, our discussions with both IA and IPR representatives indicate that resolutions to the majority of the issues we identified in our 2018 Q4 have been put into place.  However, these actions have been implemented fairly recently, so we will need to interview officers and supervisors to determine the extent to which these issues have been resolved.  Although the steps taken by IA and IPR appear to be reasonable solutions to the problems at hand, this still needs to be confirmed.  As such, we believe that PPB and the City have conditionally substantially complied with the requirements of Par. 128, with compliance conditioned on confirming outcomes in the coming months.

# COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP) (Par. 142, 144, 145, 146, 147, 148, 149, 150, and 151)

| | |
|---|---|
| Par. 142 | Substantial Compliance - Conditional |
| Par. 144 | Substantial Compliance - Conditional |
| Par. 145 | Substantial Compliance - Conditional |
| Par. 146 | Substantial Compliance - Conditional |
| Par. 147 | Substantial Compliance |
| Par. 148 | Substantial Compliance |
| Par. 149 | Substantial Compliance - Conditional |
| Par. 150 | Substantial Compliance - Conditional |
| Par. 151 | Substantial Compliance |

*142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and*

*specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.*

COCL Conditions

PCCEP has been authorized in the PCCEP Plan to perform the functions outlined in Par. 142 (a-e). Substantial Compliance will rest on progress made in future PCCEP meetings. While PCCEP is authorized to perform these functions, it is not required to engage in all of them to achieve Substantial Compliance with Par. 142. However, COCL is particularly interested in whether PCCEP can hold productive meetings, including the full committee and subcommittees and can develop a working relationship with PPB.

Current Status

PCCEP has met regularly since their inaugural November meeting, including holding a Town Hall meeting in January of 2019 that included the presentation of COCL findings from Q4 of 2018. More recently, PCCEP has established several subcommittees (focused on Mental Health; Race, Ethnicity, and Other Groups; Youth; Settlement Agreement & Policy). Early subcommittee meetings have included discussions of how to reach out to various organizations and associations in Portland to establish relationships and share information. In February, the OEHR Director and PPB's Equity & Diversity Officer presented to PCCEP on the PPB Racial Equity Plan, and heard feedback from the PCCEP and members of the public. At the same February meeting, PCCEP voted to make several recommendations to the Chief to inform the content and timing of the next PPB Annual Report (See par. 150 below)

On March 12, 2019, we attended meetings of the PCCEP Steering Committee and the Race Subcommittee, and on March 13, the Settlement Agreement and Policy subcommittee. Unfortunately for both committees, only the Chairs were present. With only one member in attendance, the committees did not have a quorum to conduct business. Chairs shared information with, and received input, from community attendees, but no decisions were possible. At the March PCCEP meeting, substantive steps were taken toward PCCEP's directive to "contribute to the development and implementation of a PPB Community Engagement Plan." Chief Danielle Outlaw and Officer Natasha Haunsperger presented the community engagement component of PPB's 5-year Strategic Plan (and Mayor Ted Wheeler attended part of the meeting), and exchanged feedback with PCCEP members. Members of the public also had an opportunity to comment on PPB's work to-date.

Members of the public have shared public comments and concerns at every PCCEP meeting to-date and PCCEP has held meetings every month since starting in November of 2018. Since PPCEP was originally seated, three members have resigned for various reasons; to-date, three alternates have been elevated to fill those seats. PCCEP is operating at full capacity as of this writing, and PCCEP has had discussions about maintaining a robust alternate pool. There is a process in place to name additional alternates to a pool for future consideration.

In sum, PCCEP is on track to function as a legitimate body for community engagement and feedback on the performance of the PPB, although the effective functioning of subcommittees has yet to be established. Substantial Compliance will be assigned if PCCEP continues to hold regular meetings over the next few months, can complete the work required in the PCCEP Plan, and can develop a working relationship with the PPB, including contributing to PPB's Community Engagement Plan. As we noted in our Q4 2018 report, a few key tasks that require additional work include: "*solicit information from the community and PPB about PPB's performance,*" "*advise the Chief and the Police Commissioner on strategies to improve community relations,*" and "*contribute to the development and implementation of a PPB Community Engagement Plan.*" (Par. 142).


*144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.*

COCL Conditions

As we noted in our Q4 report, the City has provided strong administrative support to the PCCEP. After conducting a thorough selection and training process, the City has provided support in terms of project management, meeting facilitation, accommodations, space, IT support, etc. Unfortunately, the PCCEP Project Director left in November and the community organizing position was not filled. The City has provided temporary support with personnel from the Office of Equity and Human Rights. This individual is very competent, but has other responsibilities.

Current Status

On March 18, 2019, the City posted a job opening to fill the project director position. The community organizer position was not required by the PCCEP Plan, but the City has committed to providing support as needed after the project director is on board. Once the project director position has been filled, we can assign Substantial Compliance to Par. 144.

*145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community.*

<u>COCL Conditions</u>

In our Q4 2018 report, we described PPB's efforts at community outreach and engagement while waiting for PCCEP members to be selected, trained, and begin meeting. As we noted, PPB's work has been extensive, engaging marginalized and at-risk communities through various programs and activities. Also, PPB's well-conceived 5-year strategic planning process, which involved input from community members in diverse neighborhoods, will result in a 5-year Strategic Plan. The remaining community engagement tasks for PPB to achieve Substantial Compliance under Par. 145 are: (1) to develop a working, transparent relationship with the PCCEP and (2) to develop a reasonable Community Engagement Plan with input from PCCEP.

<u>Current Status</u>

PPB has taken initial steps to engage with the PCCEP that are consistent with satisfying these two remaining conditions. First, the Chief of Police introduced herself at the first PCCEP meeting, extended a welcome, and expressed a desire to work cooperatively with the PCCEP. Along these lines, PPB has plans for executive-level personnel to attend, listen to, and if called upon, participate in PCCEP steering committee meetings and town halls. This will usually involve two Assistant Chiefs and two senior officials from PPB's Office of Professional Standards, who have responsibility for PPB's compliance with the Settlement Agreement.

Second, PPB has expressed a desire to use its strategic planning process as the springboard for creating the Community Engagement Plan with input from PCCEP. The strategic planning process includes a significant community engagement component (e.g. multiple focus groups with community members) where PPB has learned (and continues to learn) about concerns and expectations from the community's perspective. In addition, the Chief has invited one PCCEP member to join PPB's steering committee and during its March meeting, the PCCEP voted on its representative. Furthermore, the City is expecting that PCCEP members will play an important role in defining the relationship between PPB and the PCCEP.

The Chief of Police has asked that PPB be placed on PCCEP's March agenda to discuss the link between portions of PPB's 5-year Strategic Plan and the Community Engagement Plan to be developed. The expectation is that PCCEP will provide PPB with feedback on the Community Engagement section of PPB's Strategic Plan. PPB will then incorporate this feedback into the Community Engagement Plan required by the Settlement Agreement.

In sum, a solid path toward Substantial Compliance has been created by initiating and resourcing a PPB-PCCEP relationship and by providing a framework for drafting a Community Engagement Plan. We look forward to seeing this relationship develop in the months ahead. With feedback from PCCEP, the PPB is expecting to develop the Community Engagement Plan by June of 2019. Substantial Compliance with Par. 145 will be achieved when a working relationship has been established and the Community Engagement Plan has been finalized.

*146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.*

<u>COCL Conditions</u>

In our Q4 2018 report, we identified six tasks that needed to be completed for the City to achieve Substantial Compliance with Par. 146: (1) the communitywide survey instrument must be reviewed by PCCEP, (2) the survey must be finalized; (3) data collection must be completed; (4) the data must be analyzed and a report prepared; (5) the results must be used to "inform the work of the PCCEP" and (6) the results must be used to "inform....the development and implementation of the Community Engagement Plan."

<u>Current Status</u>

Significant progress has been made on this requirement. A professional survey research company (DHM) has been working with the City and PCCEP to draft and field this city-wide survey, which is a continuation of previous community surveys conducted under the Settlement Agreement. DHM gave a presentation to PCCEP on November 28, 2018. Feedback on the survey draft was consolidated by the PCCEP steering committee on December 13th and submitted to the City and DHM. COCL was able to observe this process and confirm that survey questions suggested by PCCEP members were given serious consideration and most were incorporated into the draft survey. COCL is satisfied that the draft survey covered the relevant topics, that the survey methodology is valid, and that PCCEP has been consulted and contributed to the survey questions. Importantly, the City was able to retain many of the questions asked in previous surveys, thus allowing for an analysis of changes in public perceptions of the PPB over time. The first mailing of the survey occurred in late January of 2019. By mid-March data collection was complete and quality checks on the data were being performed in preparation for data analysis. The data collection process was successful, yielding a good response rate and adequate sample

size to yield reliable results regarding Portland residents' perceptions of the PPB. A report on the findings is expected by the end of April, 2019.

In sum, the city-wide survey of community members has been developed, reviewed by PCCEP and fielded. COCL can assign Substantial Compliance - Conditional for Par. 146. Substantial Compliance will be achieved when: (1) the data have been analyzed and a report has been prepared; (2) the results have been used to "inform the work of the PCCEP" and (3) the results have been used to "inform...the development and implementation of the Community Engagement Plan."

*147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.*

<u>COCL Conditions</u>

PPB has collected appropriate demographic data for each precinct and provided it to the Commanders. At the time of our 2018 Q4 report, the one remaining condition for PPB to achieve Substantial Compliance with Par. 147 was the delivery of precinct-level demographic data to the PCCEP to "inform its work."

<u>Current Status</u>

Since 2014, PPB has been collecting data on the demographic composition of the population living in each precinct, as well as gathering demographic data from daily police work. For Par. 147, PPB has relied primarily on the 5-year estimates from the American Community Survey from the U.S. Census Bureau ( https://www.census.gov/programs-surveys/acs/), looking at data such as race, ethnicity, age, sex, education, household income, disability characteristics, and language spoken at home. (See sample of reports in Appendix A). In our 2018 Q4 report, we describe some of the ways that PPB has been using these demographic data for "outreach and policing programs specifically tailored to the residents" in each precinct.

PPB has now delivered a report to PCCEP containing these precinct-level demographic data from the Census Bureau – data that should be useful to inform the work of the PCCEP. Hence, PPB has achieved Substantial Compliance with Par. 147.

*148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.*

<u>COCL Conditions</u>

PPB has made significant progress in the collection, analysis and reporting of demographic data that could be used to shed light on the possibility of discriminatory policing in Portland. Two conditions remain to achieve Substantial Compliance with Par. 148: (1) PPB shall provide these reports to PCCEP when PCCEP is prepared to receive them; and (2) PPB should go beyond the analysis of race disparities to report on the age and sex of persons with police encounters.

<u>Current Status</u>

PPB has been collecting such data for many years. The Strategic Services Division of the PPB prepares the <u>Stops Data Collection</u> report every quarter, with periodic enhancements. As we note in our 2018 Q4 report, this quarterly report includes breakdowns by race/ethnicity, but does not include any established benchmarks to calculate disparities in police decision making. However, such information is contained in PPB's <u>Stops Data Collection: 2016 Annual Report (June 25, 2018)</u>, a report that provides a detailed analysis of more than 250,000 stops of drivers and pedestrians during a 5-year period (2012 to 2016).

While the annual Stops Data Collection report provides a thorough analysis of race/ethnicity, PPB is also required in Par. 148 to collect and report on the "age, sex, and perceived mental health status of the subject." As we have noted previously, reporting on mental health status is difficult because during routine stops, officers are unable to confidently evaluate the mental health status of the community member. However, in 2017, PPB was able to collect a sufficient sample to report the findings.

As a result of our request, PPB has prepared an addendum to their latest stops report, <u>Stops Data Collection: 2017 Annual Report </u>(January 18, 2019) that includes breakdowns by age, sex and mental health. (PPB's report can be found in Appendix B. Within the report, see Appendices F, G, and H for these particular analyses) This information has been delivered to the PCCEP, and hence, PPB has achieved Substantial Compliance with Par. 148.

*149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.*

<u>COCL Conditions</u>

To complete this task, the PPB, DOJ and COCL must agree on a set of metrics and present them to the PCCEP for review.

<u>Current Status</u>

COCL provided an initial list of ideas for possible metrics to evaluate community engagement and outreach. The PPB, DOJ, and COCL held a lengthy meeting in January of 2019 to discuss these and other possibilities. From that meeting and follow-up discussions, the group jointly arrived at a definition and three sets of metrics as described here.

Because "community engagement and outreach" is the focal point of par. 149, we begin with a definition:

*Community engagement and outreach are here defined as actions on the part of the Portland Police Bureau that involve reaching out to members of the community, whether individually or collectively, to provide services, establish relationships and build public trust in the police as public servants.*

Within this framework, PPB, DOJ, and COCL have developed the following indicators of community engagement and outreach:

***Interactions with the public and general service delivery***. PPB is expected to engage with diverse community members in a manner that is fair (unbiased), respectful, and helpful. Public perceptions of the PPB and the performance of its officers are considered important metrics, as they affect public trust and confidence in the police. These can be measured through community and/or contact surveys.

***Communication with the public***. The PPB is expected to establish conduits of information to encourage the bi-directional flow of information between the community and the PPB. These can be measured through the presence, quality, and quantity of information available on PPB's website and social media outlets.

***Collective engagement with the community through boards, commissions, committees and other stakeholder forums/groups/meetings***. PPB is expected to participate in a wide range of public events and groups for purposes of accountability, transparency, and public education. This participation could be measured through the presence, quality, and quantity of PPB participation in these collective events.

***Regular reporting to the community on PPB activities***. In the interest of transparency and public education, PPB is expected to report regularly to the community regarding its activities and events in the realm of community engagement (including #3 above). These can be measured through the presence, quality, and quantity of information contained in PPB's reports, website and social media outlets.

In sum, DOJ, PPB and COCL have jointly developed a framework and general set of metrics to evaluate community engagement and outreach by the PPB. Once these metrics are shared with the PCCEP, PPB will be in Substantial Compliance with Par. 149.


*150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.*

<u>COCL Conditions</u>

To receive Substantial Compliance with Par. 150, PPB would need to: (1)release the final version of the 2017 report to the public; (2) hold at least one meeting in each precinct area and at a City Council meeting to discuss the topics delineated in Paragraph 150; and (3) prepare a more timely annual report for 2018 to demonstrate the ability to produce substantive reports "annually."

<u>Current Status</u>

In our 2018 Q4 report we note that PPB has issued a draft of the Annual Report for 2017 and it included a summary of PPB's problem-solving and community policing activities, per Par. 150. This draft has since been delivered to PCCEP for review and PCCEP has provided feedback. PPB is planning to incorporate many of the comments into their 2018 report.

At their February 2019 meeting, PCCEP voted to make several recommendations to the Chief to inform the content and timing of the next PPB Annual Report—including producing a draft by June 2019 to allow time for PCCEP feedback and a public draft posted by September 2019. PCCEP also recommended the annual report "clearly list PPB's annual goals and priorities, and include PPB's self-assessment of progress toward meeting them," and "include self-critical information on annual failures and areas of improvement."

We note that PPB has not consistently issued a "publicly available PPB Annual Report" as required by Par. 150. Also, the 2017 report was issued late in 2018 (https://www.portlandoregon.gov/police/29863), so we are expecting a timelier release of the 2018 report. We will also await the presentation of the Annual Report in each precinct and before the City council. PCCEP also reiterated the need for these presentations in their February meeting, including both 2017 and 2018 reports. PPB has informed us that it is working to accelerate the completion of the 2018 Annual Report. When that report is completed (scheduled for May), PPB is planning to present the 2017 and 2018 reports together in each Precinct. COCL can assign PPB Substantial Compliance with Par. 150 when PPB has completed these Precinct presentations and has presented its Annual Report to the City Council.

*151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.*

<u>COCL Conditions</u>

Previously, we noted that PCCEP is off to a good start, with meetings that have followed both the spirit and the letter of Oregon's public meetings law. The only condition for Substantial Compliance, as specified in our Q4 2018 report, is being able to continue on this path by holding several public meetings and its first Town Hall meeting.

<u>Current Status</u>

PCCEP held its first meeting as a full body on November 28, 2018 and has continued to meet every month since, including a town hall meeting with COCL in January of 2019. PCCEP has created a Steering Committee and multiple subcommittees as noted earlier. Although the success of the subcommittees has yet to be determined, their performance was not a requirement to achieve Substantial Compliance for this paragraph. Based on what we have observed to date, we are comfortable assigning Substantial Compliance with par. 151.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# **LIST OF PERSONNEL**

Chief of Police: Danielle Outlaw

Deputy Chief of Police: Robert Day

Assistant Chief of Operations: Ryan Lee

Assistant Chief of Services: Chris Davis

Assistant Chief of Investigations: Jami Resch

Acting Commander of Professional Standards Division/Compliance Coordinator: Jeff Bell

Professional Standards Division Principal Management Analyst: Mary Claire Buckley

Inspector: Craig Dobson

Behavioral Health Unit (BHU) Acting Lt.: Casey Hettman

EIS Supervisor: Jay Bates

EIS Administrator: Paul Meyer

Training Captain: Erika Hurley

Auditor: Mary Hull Caballero

IPR Director: Constantin Severe

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

# **APPENDICES**

# APPENDIX A

# **APPENDIX B**

# PORTLAND POLICE BUREAU
# STRATEGIC SERVICES DIVISION

# STOPS DATA COLLECTION

## 2017 ANNUAL REPORT

### JANUARY 18, 2019




TED WHEELER, MAYOR
DANIELLE OUTLAW, CHIEF OF POLICE

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................................. 2

EXECUTIVE SUMMARY .............................................................................................................................. 4

INTRODUCTION ........................................................................................................................................ 9

    BACKGROUND ........................................................................................................................................ 9

GENERAL DEMOGRAPHICS ..................................................................................................................... 10

    CITY OF PORTLAND POPULATION STATISTICS ................................................................................................ 10

    DISPARITY BENCHMARKS ........................................................................................................................ 11

BUREAU-WIDE STOPS OF DRIVERS ......................................................................................................... 12

    STOP LOCATIONS .................................................................................................................................. 12

    STOPPED DRIVERS DEMOGRAPHICS .......................................................................................................... 13

        *Traffic Division* ............................................................................................................................. *13*

        *Non-Traffic Divisions* .................................................................................................................... *14*

    DRIVER STOP REASONS .......................................................................................................................... 15

    SEARCH RATES ..................................................................................................................................... 16

    CONTRABAND HIT RATES ........................................................................................................................ 18

    STOP OUTCOMES .................................................................................................................................. 18

BUREAU-WIDE STOPS OF PEDESTRIANS .................................................................................................. 21

    STOP LOCATIONS .................................................................................................................................. 21

    STOPPED PEDESTRIAN DEMOGRAPHICS ...................................................................................................... 21

    PEDESTRIAN STOP REASONS .................................................................................................................... 23

    SEARCH RATES ..................................................................................................................................... 23

    CONTRABAND HIT RATES ........................................................................................................................ 24

    STOP OUTCOMES .................................................................................................................................. 24

APPENDIX A: STOPS DATA COLLECTION MASK ........................................................................................ 26

APPENDIX B: TYPES OF SEARCHES ......................................................................................................... 27

APPENDIX C: DATA AND METHODOLOGY ............................................................................................... 28

    DATA SOURCE ..................................................................................................................................... 28

    DATA CONSIDERATIONS .......................................................................................................................... 28

    ANALYSIS METHODOLOGY ....................................................................................................................... 29

    RESULTS LIMITATIONS ............................................................................................................................ 30

APPENDIX D: BIBLIOGRAPHY ................................................................................................................. 31

APPENDIX E: GANG ENFORCEMENT TEAM ANALYSIS .............................................................................. 32

    STOP LOCATIONS .................................................................................................................................. 32

    STOPPED SUBJECTS DEMOGRAPHICS .......................................................................................................... 33

    SUBJECT STOP REASONS ......................................................................................................................... 34

    SEARCH RATES ..................................................................................................................................... 35

    CONTRABAND HIT RATES ........................................................................................................................ 35

    STOP OUTCOMES .................................................................................................................................. 36

APPENDIX F: PERCEIVED GENDER ANALYSIS ........................................................................................... 37

    SEARCH RATES BY GENDER ...................................................................................................................... 38

    CONTRABAND HIT RATES ........................................................................................................................ 39

STOP OUTCOMES ................................................................................................................................ 39

**APPENDIX G: PERCEIVED AGE ANALYSIS** ............................................................................................ **41**

SEARCH RATES BY AGE GROUP ............................................................................................................ 42
CONTRABAND HIT RATES ................................................................................................................... 43
STOP OUTCOMES ................................................................................................................................ 43

**APPENDIX H: PERCEIVED MENTAL HEALTH STATUS ANALYSIS** .......................................................... **45**

SEARCH RATES BY PERCEIVED MENTAL HEALTH STATUS ........................................................................ 46
CONTRABAND HIT RATES ................................................................................................................... 46
STOP OUTCOMES ................................................................................................................................ 46

## EXECUTIVE SUMMARY

**Introduction**

- The Portland Police Bureau conducts traffic stops in Portland. The drivers and pedestrians stopped are residents, commuters, and visitors. Identifying benchmarks that accurately captures the driver or pedestrian population is difficult.

- Traffic Division officers enforce traffic laws through the use of driver stops to prevent road injuries and change dangerous driving behaviors. The Injury Collision Benchmark is used for Traffic Division stops as drivers involved in injury collisions are likely representative of the population of drivers stopped.

- Non-Traffic Division officers (patrol, investigations, and other support divisions) use traffic stops to aid in the response to and prevention of crime. These officers spend more time patrolling areas with high call volume and higher reported violent crime. Therefore, individuals driving in these areas are more likely to come into contact with police. To account for this differential exposure, the Crime Victimization Benchmark is used for Non-Traffic Division stops as these victims are likely to representative of individuals living, working, and recreating in the area.

**Stops of Drivers**

- Portland Police Bureau officers performed 22,488 stops of drivers in 2017. Driver stops have declined by 69% over the last five years.

- The largest number of driver stops occurred in North Precinct (35.9%). The number of stops completed in Central Precinct have significantly declined since 2013.

- Traffic Division officers made 10,713 stops of drivers in 2017 and stopped drivers at rates similar to their expected values when compared to the Injury Collision Benchmark.

- Non-Traffic Division officers made 11,775 stops of drivers in 2017. Non-traffic division officers stopped drivers at rates similar to the Crime Victimization Rate.

- The majority of drivers (82.4%) were stopped for Moving Violations. Asian drivers were significantly more likely to be stopped by non-traffic officers for moving violations. No other groups were stopped at significantly different rates.

**Searches of Drivers**

- In 2017, 1 in every 16 stops (6.2%) included a discretionary search. Non-traffic division officers performed the majority (90%) of the searches.

- In 2017, American Indian /Alaskan Native and Black/African American drivers were searched at significantly higher rates when compared to overall stop rates. The search disparity rates for these two groups declined from 2016.

- Asian drivers were searched significantly less than expected when compared to overall stop rates. There was no change in search under-representation from 2016.

- Consent searches continue to be the most common search type used by Non-Traffic Division officers, though the use of this search type has been decreasing since 2013.  Traffic Division officers almost exclusively use probable cause searches.

- Black/African American drivers are significantly more likely to be searched by Non-Traffic officers with consent and significantly less likely to be searched with probable cause.

- Officers have become better at detecting contraband during searches with a 40.0% hit rate in 2017 compared to a 36.8% hit rate 2013.  The perceived race of the driver is not a significant predictor of whether or not contraband will be found.

**Driver Stop Outcome**

- Citations were the most common (47.7%) outcome of driver stops in 2017. Traffic Division officers were significantly more likely to issues a citation than other officers with 83.1% of Traffic Division stops resulting in a citation.

- Non-Traffic Division officers are more significantly more likely to issue a warning, arrest the driver, or end the stop with no enforcement than Traffic Division officers.

- Drivers stopped by non-traffic division officers and found with contraband after a search are almost twice as likely to be arrested as other drivers. There are no other significant predictors for the outcome of a stop, including race / ethnicity of the driver.

**Stops of Pedestrians**

- Portland Police Bureau officers performed 192 stops of pedestrians in 2017. Pedestrian stop declined by 78% over the last five years.

- The majority of pedestrian stops occurred within Central Precinct which encompasses many high-trafficked pedestrian-friendly areas. The area is also a focus of enhanced foot patrols in the business and entertainment districts.

- The perceived racial demographics of stopped pedestrians has remained stabled over the past five years with no group showing a significant increase or decrease.

- Non-Traffic officers stopped a significantly higher percentage of Black / African American pedestrians (28) than Traffic officers (6) in 2017.

- Traffic Division officers are significantly more likely to stop a pedestrian for a moving violation while Non-Traffic Division officers are more likely to stop pedestrians for non-moving violations.

- Pedestrians are significantly more likely to be searched (22.9%) than drivers. Black / African Americans were searched significantly more than stopped White pedestrians – but not disparately so. This is an improvement from 2016 where Black / African American pedestrians were searched at a disparate rate.

- Illegal contraband was found on a majority (63.6%) of pedestrians searched. There were no significant differences in hit rate by search type or the hit rates of White and Black / African American pedestrians.

- Compared to drivers, pedestrians are significantly more likely to have no action taken or be arrested and are significantly less likely to be cited. As with driver stops, pedestrians are more likely to receive a citation from Traffic Division officers and a warning or be arrested by non-traffic division officers.

## Gang Enforcement Team Appendix

- Stops conducted by the Gang Enforcement Team/Gun Task Force (GET /GTF) have decreased 39% since 2013, with only 602 drivers and pedestrians stopped in 2016.

- Gang enforcement focus patrols in areas with high occurrences of gang and gun violence with 80% of stops occurring within a half mile of a recent gang violent incident.  The Gang Crime Victimization Benchmark is used for stops by gang officers because the benchmark is representative of the population gang officers contact as part of the specialized mission of reducing gang and gun violence.

- African American / Black subjects are stopped the most often, but at non-disparate rates when compared to the gang victimization rate. Asian, Hispanic, and White were stopped at substantially higher-than-expected rates when compared to Gang Crime Victimization Rates and were disparately over-represented in stops enacted by GET / GTF officers.

- GET/GTF officers are significantly more likely to perform a search than officers from other divisions.  The majority (89%) of gang enforcement searches are consent searches and all racial groups were searched at rate similar to their overall stop rate. Officers are more likely to request a consent search from Black/African American subjects.

- Contraband is found in about 1 in every 3 searches, a lower hit rate than other divisions, likely due to the reliance on consent searches which are less likely to result in a hit. There were no significant differences in the contraband recovery rate between subjects of different races.

- The majority (87%) of GET/GFT stops result in a warning.  The gang enforcement officers also have the highest arrest rate in the Bureau with 10% of all stops resulting in an arrest.

## Gender Appendix

- The majority of 2017 subject stops by Portland Police Bureau officers (69.5% in 2017) were conducted on individuals that were perceived to be male.

- There is no research-supported benchmark for gender demographics in driver stops; therefore, the 2017 Injury Accident Benchmark was used for driver stops made by all Traffic and Non-Traffic officers. Compared to the benchmark, drivers of all perceived genders are stopped similar to expected rates.

- A majority of searches conducted on male subjects (52.0% in 2017) were consent based, followed by Probable Cause (24.9%), Plain View (19.9%), and Weapons Pat Downs (3.2%). Females were searched significantly different than men, although most searches were still based on Consent (38.7%), followed by Plain View (33.7%), Probable Cause (25.9%), and Weapons Pat Downs (1.7%). Males were searched significantly more than females, but not disparately so.

- Male subjects were significantly more likely to be arrested in 2017, while Female subjects were significantly more likely to receive a warning at the end of the stop.

## Age Appendix

- PPB officers indicate the perceived age of stopped subjects in four broad categories: Under 16, 16 to 24, 25 or Over, and Unknown. Since 2013, the vast majority (78.9%) of subject stops have been of individuals perceived to be 25 or Over.

- The 2017 Injury Accident Benchmark was used for all driver stops conducted by all Bureau officers since there is no research-supported benchmark that solely focuses on the perceived age of the driver. Compared to the benchmark, drivers are stopped similar to expected rates.

- Drivers perceived to be under 16 were the most searched group in 2017 (34.8%); however, only 8 total searches were conducted on subjects perceived to be that age. Young subjects aged 16 to 24 were the next searched group (7.2%), followed by 25 or Over subjects (6.1%). Young subjects were significantly more likely to be searched with Consent, while 25 or Over subjects were more likely to be searched using Plain View or Probable Cause. 25 or Over subjects were searched significantly more than young Subjects, but not disparately so.

- Subjects between the ages of 16 to 24 were arrested significantly less than other age categories in 2017. There were no other significant differences between the age groups.

## Mental Health Status Appendix

- The Portland Police Bureau began collecting officers' perceptions on the stopped subject's mental health status in October 1, 2014. Since that date, less than 1 percent of all subjects stopped by PPB officers were perceived to have a mental health issue.

- Non-Traffic Officers were significantly more likely to indicate in 2017 that they stopped a subject with a perceived mental health issue when compared to Traffic Officers.

- Subjects that were perceived to have a mental health issue were searched almost twice as often as people that were not perceived to have a mental health issue. Since 2014, Consent Searches (39.3%) were the most common search type utilized for people that were perceived to have a mental health issue, followed by Probable Cause (34.4%), Plain View (21.3%), and Weapons Pat Down (4.9%).

- The stop outcomes vary significantly based on the officer's perception of their mental health status. Subjects perceived to have a mental health issue were significantly less likely to receive a citation in 2017; however, this could possibly be best explained by stop differences in the different operation groups of the PPB.

# INTRODUCTION

The Portland Police Bureau produces an annual report to increase the transparency of the Bureau's use of stops in contacting members of the community. The data, and subsequent reports, highlight the demographics of people stopped by sworn PPB personnel and how those demographics have changed over time. Additionally, the report examines the discretionary decision making practices of police before, during, and after a stop to identify potential disparities across the bureau and within different operational divisions.

It should be noted that the data contained in this report are not necessarily an accurate proxy to aid in the determination of racial profiling. Instead, these data allow for an examination of disparities in stops between different demographic groups from an empirical standpoint. As such they allow for a more informed community-wide discussion about how best to keep the community safe and how to accomplish this in the most equitable manner possible. Through community and police partnerships, we can identify areas of potential concern, find solutions on ways to reduce racial bias and perceptions of racial bias, and develop new strategies for community policing and accountability.

## Background

The Portland Police Bureau has been collecting data on traffic and pedestrian stops since 2001 based on recommendations from the Blue Ribbon Panel on Racial Profiling[1]. From the program's outset, officers were required to log their perceptions of driver/pedestrian race, gender, and general age (minor vs. adult); the reason for the stop; whether a search was conducted, the type of search conducted, and results of the search; and the overall outcome of the stop. The Bureau launched its latest version of the collection system, the Stops Data Collection (SDC) system, in 2012 as a web-based form with an automatic connection to the Bureaus' computer-aided-dispatch (CAD) system and electronic citation system (ECITE) to aid in the accountability of mask completion. An example of the current Stops Data Collection system is provided in Appendix A.

---

[1] https://www.portlandoregon.gov/police/article/32381

# GENERAL DEMOGRAPHICS

## City of Portland Population Statistics

### Table 1. City of Portland Racial and Ethnic Demographics from the 2010 U.S. Census

| Race/Ethnicity | Citywide | | Central Precinct | | East Precinct | | North Precinct | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % |
| American Indian/Alaskan | **4,381** | **0.8%** | 1,062 | 0.6% | 1,891 | 0.8% | 1,428 | 0.8% |
| Asian | **41,335** | **7.1%** | 9,435 | 5.2% | 23,757 | 10.6% | 8,140 | 4.6% |
| Black/African American | **35,462** | **6.1%** | 3,995 | 2.2% | 10,684 | 4.7% | 20,777 | 11.7% |
| Hawaiian or Pacific Islander | **2,978** | **0.5%** | 354 | 0.2% | 1,409 | 0.6% | 1,215 | 0.7% |
| Hispanic or Latino | **54,840** | **9.4%** | 8,971 | 5.0% | 26,613 | 11.8% | 19,258 | 10.8% |
| White | **421,773** | **72.2%** | 150,722 | 83.2% | 151,980 | 67.5% | 119,037 | 67.0% |
| Other | **23,007** | **3.9%** | 6,616 | 3.5% | 8,690 | 3.9% | 7,699 | 4.4% |
| **Total** | **583,776** | **100.0%** | **181,155** | **100.0%** | **225,024** | **100.0%** | **177,554** | **100.0%** |

According to the 2010 U.S. Census, the City of Portland has 583,776 residents[2] split among the three administrative precincts of the Portland Police Bureau. However, since then, Portland has experienced an explosive growth in residents, gaining about 65,000 residents over the last six years with an estimated 2017 population of 639,100[3]. Estimates from the U.S. Census Bureau[4] indicate that resident demographics in Multnomah County[5] have shifted in the past few years, as individuals that identify solely as Asian are the fastest growing racial group, with White alone growing the slowest. All other racial groups have grown at normal rates.

Residents of Portland are not the only population subjects in traffic stops, as the laws apply to all road users, including visitors and commuters,

**Figure 1. Portland Precincts and Patrol Districts**



[2] The official decennial census number is used as five-year estimates for smaller geographic areas, such as a city, have a higher margin of error.

[3] Population Research Center. (2017). Certified Populations Estimate 2017. Population Research Center, Portland State University.

[4] U.S. Census Bureau. (2016). Annual Estimates of the Resident Population by Sex, Race, and Hispanic Origin for the United States, States, and Counties: April 1, 2010 to July 1, 2015. U.S. Census Bureau, Population Division.

[5] County is the smallest geographic area in which the U.S. Census Bureau produces mid-decade population estimates. Given the City of Portland makes up about 79 percent of the County's population and about 31 percent of the County's land area, the County estimate is a good proxy for general population trends.

regardless of their residency. About 250,000 people commute into Portland for work[6], swelling the daytime population of the city to more than 860,000 people. White individuals make-up the largest share of the population with full-time jobs in Portland (86.8%) and are also more likely to drive alone to work, with all other racial / ethnic groups utilizing higher levels of carpooling or public transportation[7]. In addition to commuters, 8.6 million people visited the region in 2016, staying for an average of 3.1 nights, boosting the daily population by another 73,000 individuals[8] to a total of about 933,000 people.

## Disparity Benchmarks

Identifying the appropriate benchmarks for an accurate and reliable assessment is one of the biggest challenges in identifying potential bias and disparities in policing. Census data are the most common benchmark used to identify the existence or lack of racially-biased policing – mainly due to its accessibility and availability. However, Census data is not a good indicator of the driving population or their driving patterns within the city. A more accurate and effective measurement of the driving population for the area is the demographics of drivers involved in injury collisions as it provides an indication of both driving frequency and behavior. The 2017 Injury Collision Benchmark summarizes the identified race / ethnicity of involved drivers in injury collisions investigated by Portland Police Bureau officers

**Table 2. 2017 Injury Collision Statistics, by Race of Drivers**

| Race/Ethnicity | 2017 | |
| --- | --- | --- |
| | Count | Percent |
| American Indian/Alaskan | 6 | 0.4% |
| Asian | 91 | 6.5% |
| Black/African American | 150 | 10.7% |
| Hispanic | 126 | 9.0% |
| White | 991 | 70.8% |
| Unknown/Other | 36 | 2.6% |
| **Total** | **1,400** | **100.0%** |

When assessing potential officer bias, it is also important to assess how differential exposure to police can affect overall stop patterns. The Portland Police Bureau designates patrol areas and districts based on the number of received calls of service and the number of reported violent crimes in the area; if these measures coincide with areas where subjects live, drive, work, or visit, they may be more likely to be stopped or searched by law enforcement personnel. Crime victimization rates by the race / ethnicity of the victim provides a rough estimate of the demographics of areas exposed to violent crime, and therefore, areas where individuals may be more likely to come in contact with police. Victimization data is preferred to arrest data because it is less vulnerable to police bias as it represents those who call police as opposed to those who are apprehended by police for a given offense. The 2016 Crime Victimization Benchmark summarizes the profiles of victims of FBI Indexed Crimes – Homicides, Forcible Sex Offenses, Robberies and Aggravated Assaults – that occurred in the City of Portland.

**Table 3. 2017 Crime Victimization Benchmark, by Race of Victim**

| Race/Ethnicity | 2017 | |
| --- | --- | --- |
| | Count | Percent |
| American Indian/Alaskan | 47 | 1.4% |
| Asian | 143 | 4.3% |
| Black/African American | 547 | 16.4% |
| Hispanic | 310 | 9.3% |
| White | 2,207 | 66.3% |
| Unknown/Other | 74 | 2.2% |
| **Total** | **3,328** | **100.0%** |

[6] U.S. Census Bureau. (2016). LEHD Origin-Destination Employment Statistics Data (2002 – 2015). U.S. Census Bureau, Longitudinal-Employer Household Dynamics Program.
[7] U.S. Census Bureau. (2017). 2012 – 2016 American Community Survey 5-Year Estimates. Table S0804: Means of Transportation to Work by Selected Characteristics for Workplace Geography. U.S. Census Bureau, American Community Survey.
[8] Dean Runyan Associates. (2017). *Oregon Travel Impacts: Statewide Estimates, 1992 – 2017p.* http://deanrunyan.com/doc_library/ORImp.pdf.

## BUREAU-WIDE STOPS OF DRIVERS

Portland Police Bureau officers have significantly reduced the amount of self-initiated activity, including traffic stops, over the past five years. In 2017, Portland Police Bureau officers performed 22,488 stops of drivers across the city – a 67 percent decrease since 2013. The Traffic Division stopped 69 percent fewer drivers than they did five years ago – the largest decline in the Bureau. For the first time since data collection began in 2012, Traffic officers stopped fewer drivers than Patrol, investigative, and support unit officers, even though Non-Traffic units experienced a similar decline of 64 percent over the same time period. The decline can primarily be attributed to reduced staffing levels over the past six years, coupled with an increase in calls for service due to sustained growth in the City of Portland. Traffic Division officers also spend approximately 25 percent of their time detached to the Patrol Division to provide rotational support, contributing to the decline in stops from that division. Stops for upcoming years are projected to remain at rates similar to 2017 due to additional patrol support from various investigations and support units and Council-approved funding for 49 new sworn officers.



**Figure 2. Non-Traffic officers stopped more drivers than Traffic Officers for the first time since data collection began in 2012**

### Stop Locations

Portland Police Bureau officers typically focus on a distinct geographic area during the shift (such as Patrol officers work a particular patrol district or Traffic officers monitoring a High Crash Corridor), but may respond to incidents and initiate stops anywhere in the state. Of the stops



**Figure 3. More stops occurred in North Precinct than any other area for the first time in 2017**

with a valid location[9], the largest plurality of driver and pedestrian stops in 2017 occurred in North Precinct, followed by East Precinct and Central Precinct. The number of stops initiated in Central Precinct have significantly declined[10] over the last five years, while both East and North Precincts have seen gradual, but non-significant[11], increases in stop rates. Officers have also significantly decreased[12] the number of stops initiated outside of Portland (1.7% in 2013 vs. 1.2% in 2017).

## Stopped Drivers Demographics

Traffic and Non-Traffic officers execute traffic stops of drivers in support of different missions in an overall effort to improve the safety and livability for residents and visitors in Portland. These diverse missions lead officers to concentrate their efforts in different areas of the City, often encountering diverse communities and people during their missions. The differences in missions and the populations encountered make using a single benchmark to discern any potential bias as a Bureau-wide measure difficult; rather different benchmark analyses are used for the broad operation groups of the Portland Police Bureau (Traffic vs. Non-Traffic).

**Table 4. Racial Demographics of Stopped Drivers, since 2013**

| | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Race/Ethnicity | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | American Indian/Alaskan | 28 | 0.1% | 32 | 0.1% | 25 | 0.1% | 25 | 0.1% | 10 | 0.1% |
| | Asian | 1,618 | 4.7% | 1,365 | 4.8% | 1,173 | 4.9% | 1,045 | 5.3% | 531 | 5.0% |
| | Black/African American | 2,676 | 7.8% | 2,332 | 8.2% | 2,148 | 8.9% | 1,745 | 8.8% | 1,168 | 10.9% |
| | Hispanic | 2,125 | 6.2% | 1,886 | 6.6% | 1,733 | 7.2% | 1,443 | 7.3% | 797 | 7.4% |
| | White | 27,080 | 78.8% | 22,057 | 77.5% | 18,184 | 75.3% | 14,433 | 72.9% | 7,695 | 71.8% |
| | Unknown/Other | 835 | 2.4% | 803 | 2.8% | 875 | 3.6% | 1,107 | 5.6% | 512 | 4.8% |
| | **Traffic Total** | **34,362** | **100%** | **28,475** | **100%** | **24,138** | **100%** | **19,798** | **100%** | **10,713** | **100%** |
| | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
| | Race/Ethnicity | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | American Indian/Alaskan | 113 | 0.3% | 75 | 0.3% | 87 | 0.5% | 80 | 0.6% | 68 | 0.6% |
| | Asian | 1,602 | 4.9% | 1,027 | 4.4% | 764 | 4.4% | 635 | 4.7% | 481 | 4.1% |
| | Black/African American | 5,897 | 17.9% | 4,156 | 17.7% | 3,312 | 19.2% | 2,726 | 20.2% | 2,553 | 21.7% |
| | Hispanic | 2,728 | 8.3% | 1,980 | 8.4% | 1,422 | 8.3% | 1,281 | 9.5% | 1,064 | 9.0% |
| | White | 21,128 | 64.3% | 15,156 | 64.6% | 10,677 | 62.0% | 8,255 | 61.1% | 7,173 | 60.9% |
| | Unknown/Other | 1,411 | 4.3% | 1,055 | 4.5% | 971 | 5.6% | 536 | 4.0% | 436 | 3.7% |
| | **Non-Traffic Total** | **32,879** | **100%** | **23,449** | **100%** | **17,233** | **100%** | **13,513** | **100%** | **11,775** | **100%** |

## TRAFFIC DIVISION

Officers from the Traffic Division are the primary traffic enforcement arm of the Portland Police Bureau. Officers routinely patrol the High Crash Network[13], Portland's most dangerous streets and intersections for road and sidewalk users, to help prevent road injuries and change user behavior. Traffic officers, in conjunction with the Portland Bureau of Transportation, also perform enforcement missions to support the City's Vision Zero Action Plan, whose goal is to eliminate deaths and serious injuries on Portland streets by 2025. Given the intense focus by Traffic officers

---

[9] About 12 percent of calls each year cannot have their location verified by the system due to non-standard location entries, such as landmarks or highway ramps, or typographical errors. These stops are excluded from location analyses.

[10] $p < .03$, $r^2 = .87$

[11] $p < .24$, $r^2 = .43$ ; $p < .26$, $r^2 = .40$

[12] $p < .03$, $r^2 = .85$

[13] https://www.portlandoregon.gov/transportation/54892

on driving behavior, the Injury Collision Benchmark (see Table 2) is the best indicator to assess potential biases of officers enforcing traffic laws.

The racial demographics of drivers stopped by PPB Traffic officers has significantly changed over the past five years, with officers stopping significantly fewer White drivers (78.8% vs. 71.8%)[14] and significantly more Hispanic (6.2% vs. 7.4%)[15] and Black / African American (7.8% vs. 10.9%)[16] drivers. This trend mirrors the overall demographic patterns in the area, with communities of



**Figure 4. No racial group was significantly over-represented in stops by Traffic officers in 2017.**

color growing at a faster rate than White residents. Even with the changes in stop rates since 2013, Traffic officers essentially stopped drivers at rates similar to their expected values when compared to the 2017 Injury Collision Benchmark[17], with no group over- or under-represented in the dataset[18].

NON-TRAFFIC DIVISIONS

Officers from Non-Traffic divisions – namely, Patrol, investigations, and other support divisions – focus on preventing and responding to criminal activity in the city. By focusing on crime interdiction, officers are likely to spend more time in communities with higher preponderances of violent crime. The Crime Victimization Benchmark[19] (see Table 3) is used as a proxy measure to account for the individuals that are transiting in



**Figure 5. Non-Traffic officers stopped drivers in-line with the Crime Victimization Benchmark in 2017**

the area with vehicles, whether they are residents, commuters, or visitors to the community.

---

[14] $p < .001$, $r^2 = .99$
[15] $p < .02$, $r^2 = .92$
[16] $p < .04$, $r^2 = .82$
[17] The Disparity Index compares the proportion of stopped drivers to a benchmark for each racial group. Races with a disparity index greater than 2.0 would indicate a meaningful overrepresentation, while a value below 0.5 would indicate a meaningful underrepresentation of the stopped group.
[18] American Indian / Alaskan Native drivers were excluded from all analyses for Traffic officers as only 10 individuals were stopped in 2017.
[19] The benchmark includes all Portland victims of the FBI Indexed Crimes of Homicide, Forcible Sex Offenses, Robbery, and Aggravated Assault.

Non-Traffic divisions have seen changes in demographic stop rates similar to the Traffic Division. Significantly fewer White drivers[20] (64.3% vs. 60.9%) were stopped in 2017 compared to 2013 while Black / African American drivers were stopped significantly more[21] (17.9% vs. 21.7%). Despite the significant changes, neither drivers perceived as White or Black / African American were meaningfully over- or under-represented in stops when compared to 2017 Crime Victimization Rates. Each precinct's stop rates roughly mirrored victimization rates in their respective precincts, with no group meaningfully over- or under-represented in stops.

The significant changes cannot be solely attributed to demographic trends, as White and Black individuals are increasing at similar rates in the region. The changes may be more easily explained by changes in patrol patterns, as North Precinct now makes up for the greatest share of stop locations in the Bureau while accounting for the largest number of African American and smallest number of White residents in the Bureau. Central Precinct, which has the largest percentage of White individuals and the smallest percentage of African American residents, now accounts for the lowest amount of stops in the City.

### Driver Stop Reasons

Differential stop patterns based on the intersection between the driver's perceived race and the severity of the alleged infraction can highlight biased police behavior; specifically, non-White drivers being stopped at a higher rate for more minor infractions can be an indicator of biased policing. In previous years, the Portland Police Bureau analyzed the differences between Major Moving Violations[22] and all other violations, including Minor Moving Violations and Non-Moving Violations such as Equipment and City Code Violations. Since 2015, the Portland Police Bureau has been a partner in the City of Portland's Vision Zero, a goal to eliminate traffic deaths and serious injuries on Portland roadways by 2025. A key action of Vision Zero centers on curbing dangerous behaviors that contribute to fatal and serious injury crashes (including speed, impairment, and other dangerous behaviors) through traffic enforcement. Since driving behaviors associated with Major and Minor Moving Violations can contribute to fatal and serious injury crashes, Non-Moving Violations represent a greater portion of an officer's discretionary judgement on whether to initiate a traffic stop.

**Figure 6. Traffic Officers are more likely to stop a driver for a Moving Violation than other units**



---

[20] $p < .03$, $r^2 = .84$

[21] $p < .02$, $r^2 = .92$

[22] Minor Moving Violations involve all Class C or D violations. Major Moving Violations include all crimes (felony or misdemeanor) and Class A or B violations. Most moving violations are outlined in ORS 811.005 – 811.812.

The overwhelming majority of driver stops (82.4%) initiated by Portland Police Bureau officers are for Moving Violations on Portland roadways. Personnel from Non-Traffic units were significantly more likely[23] to stop a driver for Non-Moving Violations than Traffic personnel; however, they still stopped a majority of drivers for Moving Violations. There were few differences between the stop reasons for different perceived racial groups, as Asian drivers stopped by Non-Traffic officers were the only group stopped significantly more for Moving Violations than drivers of other races.

## Search Rates

A common measure for examining bias policing is to examine racial disparities in searches. Police can exercise their discretion in one of two ways during a search—low discretion or high discretion search. In low discretion searches, policy or training dictates the likelihood of a search occurring. For example, if police stop an individual and take custody of them to administer a breathalyzer test, policy would require that the subject be searched for weapons prior to being transported. In high discretion searches, such as consent searches, police officers exercise more judgment in their decision to search. Racial profiling experts maintain that if police overuse high discretion searches on people of color, especially when combined with a lower rate of recovering contraband it could suggest that police are engaged in bias policing.

**Figure 7. Search rates have remained stable for most racial groups since 2013**



In 2017, approximately 1 out of every 16 stops (6.2% of all stops) performed by Portland Police Bureau on drivers included a discretionary search. Non-Traffic officers perform the bulk of searches associated with driver stops in the Bureau, accounting for about 90 percent of all searches for every year since data collection began in 2012. Bureau members are searching roughly the same percentage of drivers they did five years ago, with no significant change for either Traffic[24] or Non-Traffic[25] divisions. Drivers stopped in Central Precinct (4.1% searched in 2017) are significantly less likely[26] to be searched than those stopped in East (8.1%) or North Precinct (7.8%). Search rates have remained roughly consistent across the different precincts, with no significant changes[27] over the past five years.

---

[23] $x^2 = 1317.535, p < .001$

[24] $p < .54, r^2 = .14$

[25] $p < .38, r^2 = .27$

[26] $x^2 = 158.347, p < .001$

[27] Central: $p < .24, r^2 = .42$ ; East: $p < .69, r^2 = .06$ ; North: $p < .39, r^2 = .25$

Portland Police Bureau officers display differential search rates based on Race / Ethnicity when compared to overall stop patterns. In both 2016 and 2017, American Indian / Alaskan Native[28] and Black / African American[29] drivers were searched at significantly higher rates than expected – however, both groups were searched at less disparate rates than last year[30] as rates were closer to expected when compared to overall stop rates.  Asian drivers were searched significantly less

**Figure 8. American Indian / Alaskan Native and Black / African American drivers were searched disproportionately when compared to overall stop rates**



than expected[31], as with 2016, with no change from last year's proportional rate.  Traffic Division officers account for much of the disparity for Black / African American drivers[32], searching drivers almost twice as often as expected when compared to their stop rates[33]. Non-Traffic officers searched Black / African American drivers significantly more than expected[34] – but not disparately so.

Consent search has been the most commonly utilized search type[35] used across the Bureau for the last five years (49.3% of all searches and 3.0% of all driver stops in 2017), even though it has seen a meaningful, but non-significant[36], decline since 2013. Plain View Searches have seen the largest, but non-significant[37], increase during that time period, although it still remains as the third most utilized search reason behind Probable Cause searches. The two operational groups are significantly different in how they search stopped drivers[38]; Traffic Division officers are significantly more likely to use Probable Cause and Weapons Pat Down searches while Non-Traffic officers utilize Consent Searches. The only difference in search patterns between different perceived racial groups occur in Non-Traffic units as they are significantly more likely to utilize Consent Searches on Black / African American drivers than other racial groups[39].

---

28 $x^2 = 14.953$, $p < .001$
29 $x^2 = 180.188$, $p < .001$
30 https://www.portlandoregon.gov/police/article/689285
31 $x^2 = 17.570$, $p < .001$
32 $x^2 = 11.590$, $p < .001$
33 Traffic Division officers searched 0 American Indian / Alaskan Native drivers in 2017 (out of 10 drivers), while Non-Traffic officers only searched 13 (out of 55) American Indian / Alaskan Native drivers. The small search and stop rates for this population make it difficult to discern statistical patterns.
34 $x^2 = 60.125$, $p < .001$
35 For a description of search types utilized by Portland Police Bureau officers, refer to Appendix B.
36 $p < .11$, $r^2 = .65$
37 $p < .16$, $r^2 = .55$
38 $x^2 = 54.291$, $p < .001$
39 $x^2 = 62.824$, $p < .001$

## Contraband Hit Rates

Portland Police Bureau personnel has become gradually, but non-significantly[40] better, at uncovering contraband over the past five years. In 2017, 40.1 percent of all searches ended with a PPB detecting prohibited material, including alcohol, drugs, stolen property, weapons, and other illegal contraband – up from 36.8 percent in 2013. Both

**Table 5. Probable Cause searches are significantly more likely to discover contraband than other search reasons.**

| Search Type | Total Searches Count | Found Contraband Count | Percent |
|---|---|---|---|
| Plain View | 315 | 81 | 25.7% |
| Consent | 683 | 271 | 39.7% |
| Probable Cause | 346 | 193 | 55.8% |
| Weapon Pat | 41 | 11 | 26.8% |
| **Total** | **1,385** | **556** | **40.1%** |

operation groups have seen similar increases in successful search rates of the past five years and are equally likely to uncover contraband. Probable Cause searches are significantly more likely[41] to discover contraband, while Plain View and Weapon Pat Down searches are the least likely to be successful. Consent searches were significantly more likely to be successful than Weapon Pat Down searches and significantly less successful than Probable Cause searches.

**Table 6. Illicit drugs are the most commonly uncovered item during driver searches.**

| Race/Ethnicity | Total Searches Count | Found Contraband Count | Percent | Alcohol Count | Percent | Drugs Count | Percent | Weapons Count | Percent | Stolen Property Count | Percent | Other Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Indian/Alaskan | 13 | 8 | 61.5% | 1 | 7.7% | 6 | 46.2% | 2 | 15.4% | 1 | 7.7% | 2 | 15.4% |
| Asian | 31 | 10 | 32.3% | 2 | 6.5% | 6 | 19.4% | 1 | 3.2% | 2 | 6.5% | 1 | 3.2% |
| Black/African American | 409 | 161 | 39.4% | 32 | 7.8% | 88 | 21.5% | 32 | 7.8% | 12 | 2.9% | 18 | 4.4% |
| Hispanic | 133 | 53 | 39.8% | 17 | 12.8% | 27 | 20.3% | 5 | 3.8% | 5 | 3.8% | 7 | 5.3% |
| White | 787 | 322 | 40.9% | 53 | 6.7% | 181 | 23.0% | 56 | 7.1% | 42 | 5.3% | 40 | 5.1% |
| Unknown/Other | 12 | 2 | 16.7% | 1 | 8.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 8.3% |
| **Total** | **1,385** | **556** | **40.1%** | **106** | **7.7%** | **308** | **22.2%** | **96** | **6.9%** | **62** | **4.5%** | **69** | **5.0%** |

Each racial group saw a general increase in successful search rates for drivers over the last five years, however African American / Black drivers were the only group that saw a significant increase during the time period[42]. The perceived race of the driver is not a significant predictor whether or not contraband will be found as there were no significant differences between the different groups for contraband hit rates[43]. There is also no correlation between a group's overall search rate and hit rate within any given year[44].

## Stop Outcomes

Stop disposition, or the outcome of the stop, is a common method to assess disparities among stops made by law enforcement personnel on different groups of people in a community. More locally, Portland community members have cited equitable stop outcomes as an important goal. In the 2009 plan to address racial profiling, community

**Figure 9. Traffic officers end most of their interactions with a citation, while Non-Traffic officers mainly issue warnings.**



---

[40] $p < .18$, $r^2 = .51$
[41] $x^2 = 65.589$, $p < .001$
[42] $p < .02$, $r^2 = .89$
[43] $x^2 = 5.552$, $p = .470$
[44] $p < .06$, $r^2 = .12$

members raised concerns that traffic stops that result in no enforcement action – meaning drivers received no warning, citation, or were not arrested – can feel like harassment, especially to people of color. Large differences between racial and ethnic groups may imply an unequal impact on a particular race.

Most driver stops performed by PPB sworn personnel in 2017 (47.7%) resulted in a citation issued to the vehicle operator. Citations have always been the most common enforcement action; however, over the last five years, they have been trending downward as Traffic officers, who are significantly more likely to issue a Citation[45], have executed a decreasing share of stops each year. Officers from patrol, investigations, and other support divisions are also issuing significantly fewer[46] citations than before. Over the same period arrests have become significantly more likely across the Bureau[47].

**Table 7. Non-Traffic officers showed higher arrest and none enforcement rates for nearly all driver racial groups in the last year when compared to Traffic officers.**

|  | | Total Stops | | Enforcement Action | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | | | | None | | Warning | | Citation | | Arrested | |
|  | Race/Ethnicity | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| Traffic | American Indian/Alaskan | 10 | 0.1% | 0 | 0.0% | 1 | 10.0% | 8 | 80.0% | 1 | 10.0% |
| | Asian | 531 | 5.0% | 0 | 0.0% | 97 | 18.3% | 424 | 79.8% | 10 | 1.9% |
| | Black/African American | 1,168 | 10.9% | 1 | 0.1% | 203 | 17.4% | 936 | 80.1% | 28 | 2.4% |
| | Hispanic | 797 | 7.4% | 0 | 0.0% | 94 | 11.8% | 681 | 85.4% | 22 | 2.8% |
| | White | 7,695 | 71.8% | 8 | 0.1% | 1,156 | 15.0% | 6,403 | 83.2% | 128 | 1.7% |
| | Unknown/Other | 512 | 4.8% | 1 | 0.2% | 56 | 10.9% | 449 | 87.7% | 6 | 1.2% |
| | **Total** | **10,713** | **100.0%** | **10** | **0.1%** | **1,607** | **15.0%** | **8,901** | **83.1%** | **195** | **1.8%** |

|  | | Total Stops | | Enforcement Action | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | | | | None | | Warning | | Citation | | Arrested | |
|  | Race/Ethnicity | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| Non-Traffic | American Indian/Alaskan | 68 | 0.6% | 1 | 1.5% | 44 | 64.7% | 5 | 7.4% | 18 | 26.5% |
| | Asian | 481 | 4.1% | 10 | 2.1% | 376 | 78.2% | 77 | 16.0% | 18 | 3.7% |
| | Black/African American | 2,553 | 21.7% | 72 | 2.8% | 1,910 | 74.8% | 357 | 14.0% | 214 | 8.4% |
| | Hispanic | 1,064 | 9.0% | 29 | 2.7% | 778 | 73.1% | 183 | 17.2% | 74 | 7.0% |
| | White | 7,173 | 60.9% | 208 | 2.9% | 5,300 | 73.9% | 1,136 | 15.8% | 529 | 7.4% |
| | Unknown/Other | 436 | 3.7% | 35 | 8.0% | 333 | 76.4% | 64 | 14.7% | 4 | 0.9% |
| | **Total** | **11,775** | **100.0%** | **355** | **3.0%** | **8,741** | **74.2%** | **1,822** | **15.5%** | **857** | **7.3%** |

The progressive nature of a stop, and the multiple decision points within the interaction, make it difficult to discern what role, if any, implicit or explicit racial bias plays in stop disposition. Multiple logistic regressions were conducted to statistically determine which predictors were statistically significant to the stop outcome and their relative importance to other factors. There are no significant predictors[48] for how Traffic Division officers decide to issue citations[49] or arrest[50] drivers, nor when Non-Traffic officers decide to take action versus ending the interaction without any action[51]. Perceived race of the driver, stop reason, and search outcomes are significant predictors[52]

---

[45] $x^2 = 103074.094$, $p < .001$
[46] $p < .03$, $r^2 = .83$
[47] $p < .05$, $r^2 = .78$
[48] The Traffic Division ended only 10 stops ended with No Enforcement Actions in 2017, precluding any statistical analysis.
[49] Omnibus Test: $x^2 = 5.980$, $p = .542$
[50] Omnibus Test: $x^2 = 15.604$, $p = .271$
[51] Omnibus Test: $x^2 = 15.275$, $p = .850$
[52] Omnibus Test: $x^2 = 31.518$, $p = .035$

of whether a citation was issued by Non-Traffic officers; however, no individual predictor or interaction were statistically significant. Drivers found carrying contraband are significantly more likely[53] to be arrested[54], even when accounting for race and stop reason.

---

[53] $b = 1.802, p < .001$
[54] Omnibus Test: $x^2 = 223.937, p < .001$

## BUREAU-WIDE STOPS OF PEDESTRIANS

Similar to driver stops, Portland Police Bureau stopped substantially fewer pedestrians over the last five years. In 2017, officers stopped 192 pedestrians – a decline of 78 percent from 2013 (882). Both operational divisions have seen steep declines in the number of pedestrian stops conducted over the last five years, with both victims declining by approximately the same amount. Excluding 2016, Non-Traffic officers routinely initiate more stops on pedestrians over the course of the year. In total, pedestrians accounted for 0.8 percent of all stops in 2017.



Figure 10. Pedestrian stops have declined by 78 percent over the last five years.

### Stop Locations

The broad location of where pedestrians are being stopped has remained consistent since data collection began in 2013. Central Precinct has always been the dominant location for pedestrian stops and it has accounted for a majority of the pedestrian stops over the last two years. The precinct encompasses a number of highly-trafficked pedestrian-friendly areas, including Downtown, SE Hawthorne Blvd., and NW 23rd St., where sworn personnel are more likely to encounter people walking in the area. Additionally, Central Precinct is the primary operating location of two units, the Entertainment Detail and the Portland Patrol detail, that contact a high number of pedestrians in the district.



Figure 11. Central Precinct has been the primary location for pedestrian stops over the past five years

### Stopped Pedestrian Demographics

Portland Police Bureau officers contact pedestrians in support of the broad operational mission for their divisions, namely road safety for Traffic officers and crime response and prevention for Non-Traffic officers. However, it is more difficult to determine the appropriate benchmark for

comparison to stop demographic statistics as there is no commonly utilized measure in academic literature. Population demographics from the decennial Census and associated products (such as the American Community Survey) do not account for visitors, commuters, and houseless individuals in the area, which can be especially problematic since people of color are more likely to utilize public transportation or walk to commute to work. The Crime Victimization Benchmark, which was used in prior Stops Data Collection reports, also proves problematic as Traffic officers stop a high percentage of pedestrians, meaning officers were often likely to focus on traffic safety as opposed to crime prevention. The small number of pedestrian stops also proves problematic as the stopped individuals are not likely to be a random sampling across a city or precinct and be heavily weighted by officers that patrol more pedestrian-friendly districts. Due to these methodological challenges, no disparity analysis was conducted on pedestrian stops.

**Table 8. Pedestrian stop rates for perceived racial / ethnic groups has remained steady over the last five years.**

|  | Race/Ethnicity | 2013 Count | 2013 Percent | 2014 Count | 2014 Percent | 2015 Count | 2015 Percent | 2016 Count | 2016 Percent | 2017 Count | 2017 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Traffic** | American Indian/Alaskan | 1 | 0.3% | 0 | 0.0% | 1 | 1.1% | 0 | 0.0% | 0 | 0.0% |
|  | Asian | 14 | 4.6% | 7 | 3.3% | 1 | 1.1% | 2 | 1.5% | 3 | 4.3% |
|  | Black/African American | 21 | 6.9% | 11 | 5.2% | 11 | 12.4% | 10 | 7.7% | 6 | 8.7% |
|  | Hispanic | 16 | 5.2% | 10 | 4.7% | 4 | 4.5% | 8 | 6.2% | 3 | 4.3% |
|  | White | 246 | 80.4% | 176 | 83.0% | 69 | 77.5% | 105 | 80.8% | 54 | 78.3% |
|  | Unknown/Other | 8 | 2.6% | 8 | 3.8% | 3 | 3.4% | 5 | 3.8% | 3 | 4.3% |
|  | **Traffic Total** | **306** | **100%** | **212** | **100%** | **89** | **100%** | **130** | **100%** | **69** | **100%** |
|  | Race/Ethnicity | 2013 Count | 2013 Percent | 2014 Count | 2014 Percent | 2015 Count | 2015 Percent | 2016 Count | 2016 Percent | 2017 Count | 2017 Percent |
| **Non-Traffic** | American Indian/Alaskan | 7 | 1.4% | 5 | 1.6% | 6 | 3.1% | 0 | 0.0% | 1 | 0.8% |
|  | Asian | 11 | 2.1% | 5 | 1.6% | 1 | 0.5% | 4 | 3.2% | 2 | 1.6% |
|  | Black/African American | 120 | 23.3% | 64 | 20.3% | 30 | 15.5% | 25 | 19.8% | 28 | 22.8% |
|  | Hispanic | 32 | 6.2% | 20 | 6.3% | 13 | 6.7% | 9 | 7.1% | 6 | 4.9% |
|  | White | 336 | 65.1% | 216 | 68.6% | 134 | 69.1% | 84 | 66.7% | 84 | 68.3% |
|  | Unknown/Other | 10 | 1.9% | 5 | 1.6% | 10 | 5.2% | 4 | 3.2% | 2 | 1.6% |
|  | **Non-Traffic Total** | **516** | **100%** | **315** | **100%** | **194** | **100%** | **126** | **100%** | **123** | **100%** |

Across all divisions, there have been virtually no changes in the stop demographics of pedestrians over the last five years. White pedestrians were the most stopped group (71.9%) in 2017, followed by Black / African Americans (17.7%), Hispanic (4.7%), Asian (2.6%), Unknown / Other (2.6%), and American Indian / Native American (0.5%) pedestrians. Officers from patrol, investigative, and support divisions are significantly more likely to stop Black / African American pedestrians[55] than Traffic Division officers[56].

---

[55] Due to small pedestrian stop rates, subjects with a perceived race of American Indian / Native American, Asian, and Unknown / Other are excluded from all race-based analyses. Hispanic pedestrians are excluded from analyses comparing the two operational divisions.

[56] $x^2 = 5.543$, $p < .02$

## Pedestrian Stop Reasons

The identified reason for stopping a pedestrian is highly dependent on the stopping officers' assigned division and mission. Traffic officers are significantly more likely[57] to stop a pedestrian for



**Figure 12. A majority of pedestrians stopped by Non-Traffic officers are for Non-Moving Violations**

93.8%                                          95.7%

62.8%                                          66.7%

37.2%                                          33.3%

6.2%                                           4.4%

**2013**                                      **2017**

— Traffic Moving        ⋯ Traffic Non-Moving
— Non-Traffic Moving    ⋯ Non-Traffic Non-Moving

a Moving Violation, highlighting the division's commitment to Vision Zero enforcement missions. The inverse is true for officers from Patrol, investigations, and other support divisions, who are primarily concerned with crime reduction, and mainly stop pedestrians for Non-Moving Violations. There have been no significant changes for either division over the past five years, even with the overall decline in total pedestrian stops. There are also no significant differences in the stop patterns between White and Black / African American pedestrians[58].

## Search Rates

Pedestrians stopped by PPB officers are significantly more likely[59] to be searched than their driver counterparts, as 22.9 percent of all pedestrian stops ended in a search in 2017. Total pedestrian searches have not changed significantly since 2013[60] since 2013 when 24 percent of all stops ended in a search. Nearly all searches are conducted by Non-Traffic officers; Traffic officers only searched three pedestrians in 2017 while officers from other divisions searched 41 pedestrians. Individuals were most commonly searched with Probable Cause (50.0%), followed by Consent (31.8%), Plain View (15.9%), and a Weapons Pat Down (2.3%). Search types have not significantly changed since 2013.

Search rates for all racial groups have declined non-significantly, or remained steady, since 2013. Black / African American pedestrians stopped by PPB officers were searched significantly more than White pedestrians[61] - but not disparately when compared to

**Figure 13. Pedestrians were searched similar to 2017 stop rates**



2017 stop rates. This is an improvement over 2016 when Black / African American pedestrians were disparately searched. With only 13 Black / African American searched during the entire year, no analyses were performed to examine potential significant differences in types of searches between White and Black / African American pedestrians.

---

[57] $x^2 = 69.581, p < .001$
[58] $x^2 = 1.314, p = .252$
[59] $x^2 = 90.801, p < .001$
[60] $p < .82, r^2 = .02$
[61] $x^2 = 4.839, p < .03$

PAGE 23

## Contraband Hit Rates

Illegal contraband was found on a majority of pedestrians searched by PPB personnel in 2016. Successful search rates have increased at a slight, but non-significant[62], rate since 2013 (45.2%). Small sample sizes precluded any in-depth statistical analysis of differences between the different search types or the perceived race / ethnicity of stopped pedestrians.

**Table 9. The majority of pedestrian searches result in contraband being found.**

| Search Type | Total Searches | Found Contraband | |
|---|---|---|---|
| | Count | Count | Percent |
| Plain View | 7 | 6 | 85.7% |
| Consent | 14 | 9 | 64.3% |
| Probable Cause | 22 | 13 | 59.1% |
| Weapon Pat | 1 | 0 | 0.0% |
| **Total** | **44** | **28** | **63.6%** |

**Table 10. Drugs are the most commonly recovered contraband in pedestrian searches**

| Race/Ethnicity | Total Searches | Found Contraband | | Alcohol | | Drugs | | Weapons | | Stolen Property | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| American Indian/Alaskan | 1 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Asian | 0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Black/African American | 13 | 9 | 69.2% | 3 | 23.1% | 5 | 38.5% | 2 | 15.4% | 1 | 7.7% | 0 | 0.0% |
| Hispanic | 1 | 1 | 100.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| White | 28 | 17 | 60.7% | 4 | 14.3% | 10 | 35.7% | 3 | 10.7% | 1 | 3.6% | 2 | 7.1% |
| Unknown/Other | 1 | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 100.0% | 0 | 0.0% |
| **Total** | **44** | **28** | **63.6%** | **8** | **18.2%** | **15** | **34.1%** | **5** | **11.4%** | **3** | **6.8%** | **2** | **4.5%** |

## Stop Outcomes

Portland Police Bureau officers end pedestrian stops with significantly different outcomes[63] than driver stops. Pedestrians are significantly more likely to have no action taken or be arrested while being significantly less likely to be cited for their actions. There have been no significant changes in pedestrian stop outcomes over the past five years. Traffic officers are significantly more likely to issue citations, while officers from Patrol, investigations, and other support divisions are significantly more likely to arrest pedestrians[64], which highlights their heightened involvement in crime reduction and prevention missions.

**Figure 14. Pedestrians stopped by Non-Traffic officers are significantly more likely to be arrested or warned than cited.**



No analyses could be conducted on difference between the different operational groups and the perceived race of the stopped pedestrian due to small stop rates. However, across all Bureau personnel, Black / African American and White pedestrians receive significantly different outcomes[65]; however, no specific differences were significant once a Bonferroni correction is applied, even though not a single Black / African American pedestrians received a citation[66]. A full

---

[62] $p < .47$, $r^2 = .19$
[63] $x^2 = 202.450$, $p < .001$
[64] $x^2 = 72.052$, $p < .001$
[65] $x^2 = 11.643$, $p < .01$
[66] Statistical tests, specifically the chi square, have difficult assessing situations when the observed count is zero. The difference would have likely been significant with an adequate sample size.

logistic regression revealed no significant predictors[67] for any enforcement action[68], including the arrest[69] of pedestrians, including race, reason for stop, and search outcomes[70].

**Table 11. Bureau personnel are more likely to warn Black / African American pedestrians while issuing citation to stopped White pedestrians.**

| | Race/Ethnicity | Total Stops | | Enforcement Action | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | None | | Warning | | Citation | | Arrested | |
| | | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | American Indian/Alaskan | 0 | -- | 0 | -- | 0 | -- | 0 | -- | 0 | -- |
| | Asian | 3 | 4.3% | 0 | 0.0% | 0 | 0.0% | 3 | 100.0% | 0 | 0.0% |
| | Black/African American | 6 | 8.7% | 0 | 0.0% | 6 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| | Hispanic | 3 | 4.3% | 0 | 0.0% | 0 | 0.0% | 3 | 100.0% | 0 | 0.0% |
| | White | 54 | 78.3% | 0 | 0.0% | 22 | 40.7% | 30 | 55.6% | 2 | 3.7% |
| | Unknown/Other | 3 | 4.3% | 0 | 0.0% | 0 | 0.0% | 3 | 100.0% | 0 | 0.0% |
| | **Total** | **69** | **100.0%** | **0** | **0.0%** | **28** | **40.6%** | **39** | **56.5%** | **2** | **2.9%** |

| | Race/Ethnicity | Total Stops | | Enforcement Action | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | None | | Warning | | Citation | | Arrested | |
| | | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | American Indian/Alaskan | 1 | 0.8% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| | Asian | 2 | 1.6% | 0 | 0.0% | 2 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| | Black/African American | 28 | 22.8% | 5 | 17.9% | 15 | 53.6% | 0 | 0.0% | 8 | 28.6% |
| | Hispanic | 6 | 4.9% | 0 | 0.0% | 3 | 50.0% | 1 | 16.7% | 2 | 33.3% |
| | White | 84 | 68.3% | 15 | 17.9% | 39 | 46.4% | 7 | 8.3% | 23 | 27.4% |
| | Unknown/Other | 2 | 1.6% | 1 | 50.0% | 1 | 50.0% | 0 | 0.0% | 0 | 0.0% |
| | **Total** | **123** | **100.0%** | **22** | **17.9%** | **60** | **48.8%** | **8** | **6.5%** | **33** | **26.8%** |

---

[67] Lack of stop outcome variability prevented analyses on citation outcomes

[68] Omnibus Test: $x^2 = 0.816$, $p = .846$

[69] Omnibus Test: $x^2 = 3.278$, $p = .351$

[70] The overall analyses has relatively low power due to small sample sizes

## APPENDIX A: STOPS DATA COLLECTION MASK



## APPENDIX B: TYPES OF SEARCHES

Police officers may initiate one of four types of discretionary searches on drivers or pedestrians.

Examples include:

- Consent. Subject to certain limitations, officers request consent from an individual before searching them as part of an investigation or contact. Although officers have probable cause or other legal reasons to search an individual in many cases, officers often ask for consent because it protects the search from being excluded in court.

- Plain View. A plain view search occurs when an officer observes contraband or other evidence prior to or during a stop without conducting an actual search. An example of this may include an officer who observes, from outside of the vehicle, a driver or passenger tucking a weapon underneath a seat in a car.

- Probable Cause. Probable cause searches include searching for additional evidence after an officer has established probable cause for an arrest. An example of this might include searching a subject's pockets for narcotics after an officer observed them selling drugs.

- Weapons Pat Down. In certain circumstances, the courts allow officers to pat a subject down for weapons. While an officer does not need consent to conduct this type of search, the search is limited to areas where an officer might find a weapon. Generally this search consists of "patting" the pockets, waistband, and sleeves and legs of a subject, but prohibits reaching into pockets or searching for small items.

## APPENDIX C: DATA AND METHODOLOGY

### Data Source

The Stops Data Collection (SDC) system is an automated auditing and tracking tool that flags interactions that require a completed "mask", or survey. Interactions are flagged for completion when (1) Traffic officers issue an electronic Warning or Citation through their handheld devices or (2) Non-Traffic officers notify dispatch they are making a formal stop of a driver or pedestrian (using the call codes of "TRASTP" or "77", respectively) when probable cause has been established for a violation or criminal act. The flagged records appear on a list of to-do items for the officer to complete on their Bureau-issued computer and remain there until the officer completes the mask, ideally immediately following the conclusion of the stop or at the end of their shift for motorcycle- or bicycle-based officers. Supervisors throughout the Bureau receive a weekly email highlighting SDC surveys that are outstanding to ensure complete data collection.

Since the launch of the Stops Data Collection system in 2012, law enforcement personnel have completed 321,356 masks related to the contact of a community member. The majority of masks (86.3%) represented completed driver or pedestrian stops, with a smaller number of interactions that were flagged by the system as a formal stop when it was actually another type of interaction (13.0%), including a flag down, mere conversation, or welfare check. Completed stops flagged as passenger stops or stops initiated by officers from other law enforcement agencies were also excluded from all analyses.

**Table 12. About 85 percent of flagged interactions are verified as legitimate stops.**

|  | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| Completed Stops | 68,872 | 89.4% | 68,063 | 89.1% | 52,451 | 85.8% | 31,804 | 79.7% | 33,567 | 84.5% | 22,680 | 83.5% |
| Passenger Stops | 448 | 0.6% | 363 | 0.5% | 308 | 0.5% | 244 | 0.6% | 300 | 0.8% | 198 | 0.7% |
| Non-PPB Initiated Stops | 139 | 0.2% | 52 | 0.1% | 64 | 0.1% | 123 | 0.3% | 22 | 0.1% | 15 | 0.1% |
| Canceled Stops | 7,598 | 9.9% | 7,923 | 10.4% | 8,309 | 13.6% | 7,712 | 19.3% | 5,817 | 14.7% | 4,284 | 15.8% |
| **Total** | **77,057** | **100%** | **76,401** | **100%** | **61,132** | **100%** | **39,883** | **100%** | **39,706** | **100%** | **27,177** | **100%** |

In June 2015, PPB made upgrades to the SDC which inadvertently impacted the use of a desktop computer to complete the form. This created an incomplete set of stop records, mainly from Traffic Division officers, between July and December 2015. Therefore, two separate databases were used to extract data from 2015. The SDC system was used to retrieve data conducted by all Non-Traffic units for January 2015 through December 2015 and stops conducted by Traffic Officers from January 2015 through June 2015. The eCite system was used to retrieve missing data on stop location and stop demographics for the second-half of 2015; however, the eCite system does not capture data on stop reasons, searches, search outcomes, and stop disposition at all or in a way that can be translated to the SDC format. These stops were excluded from post-stop statistical analyses, including stop reasons, search rates, hit rates, and stop outcomes.

### Data Considerations

The race / ethnicity questions on the Stops mask are based on officer perceptions of the stopped individual. As with any perception-based field, there is an inherent amount of variance that is expected and creates a nominal degree of error among racial counts and proportions. Community members have also identified the potential for misclassification based on officer experience and

perceptions, such as Native Americans / Alaskan Natives being misclassified as Hispanic or Asian. Finally, there is no uniformity of racial classification options between different PPB systems and databases, leading to potential confusion on the part of PPB officers on how to classify community members. These potential data inconsistencies may artificially inflate the proportion of some racial groups while underestimating for others. To date, the PPB has been unable to identify a way to confirm the race of the stopped individual without asking potentially invasive questions at the time of the stop.

## Analysis Methodology

A variety of descriptive and inferential statistical analysis methodologies were used to investigate the changes of stops over time and potential racial and ethnic disparities throughout stop interactions. All omnibus or overall statistical analyses utilized a standard significance level of .05 to describe trends. The overall number of driver stops in the last five years make any statistical analysis highly sensitive to even small differences or trends, potentially overinflating the meaningfulness of the change. The converse problem happens with pedestrian stops, as the small number of overall stops can obscure even meaningful trends. When appropriate, effect size measures are included for all analysis to aid in the interpretation of analyses. All coefficients and effect sizes are included in the footnotes of each page to enhance the transparency of conclusions and aid additional interpretations or analyses.

Simple linear regressions were utilized to describe overall changes over time in stop behaviors. In instances where there were no identified stops of a specified race / ethnicity or subcategory, the overall trend was not described.

Several different analyses were conducted to investigate differences in operational division behavior and to identify potential racial and ethnic disparities in stops. Initial differences were investigated with Chi-Square Tests for Independence. On tests utilizing race / ethnicity as a category, Unknown / Other individuals were excluded due to methodological, data collection, and interpretation concerns about the category. In cases where the expected count of most cells in a particular subcategory of classification was less than 5, the entire classification was removed to preserve the power of the analysis. This lead to Native American / Alaskan Native entries to be excluded from most driver analyses and Asian, Hispanic, and Native American / Alaskan Native entries to be excluded from most pedestrian analyses. In cases the omnibus test met overall significance, pairwise comparisons were examined with a Bonferroni correction to tease out specific differences. If the omnibus level was non-significant, additional analyses were not conducted.

The second analysis conducted to examine potential racial and ethnic disparities in stops and searches is a relative risk ratio, or Disparity Index. Stop rates for each racial / ethnic group were compared to their population benchmark (see Tables 2 and 3) to determine relative over- or under-representation in stop demographics. For search rates, stop rates for each racial group were used as the comparison benchmark. A Disparity Index value of greater than 1.0 indicates general over-representation while a value of less than 1.0 indicates general under-representation in the group; however, values between 0.75 and 1.5 are considered "benign" due to general error rates in data collection and analysis. Based on prior Bureau practices and research best practices, we focused on values above 2.0 as significant over-representation and values below 0.5 as significant under-representation. Disparity analyses were only conducted when the corresponding Chi-Square Test and pairwise comparisons revealed significant differences.

A series of binary logistic regressions were also performed to determine what factors, including perceived race / ethnicity, may significantly contribute to stop outcomes. Three separate simplified outcomes were analyzed: enforcement action (defined as receiving a warning, citation, or arrest) vs. no enforcement action, citation vs. warning, and arrest vs. non-arrest (warning or citation). The main effects of race, stop reason, and search results were the primary hypothesized predictors, however all possible two-way and three-way interaction effects were also included in the model as co-variates to increase the overall power of the analysis. Individual predictors for stop outcome were only considered with the overall model was statistically significant.

## Results Limitations

All analyses and statistical tests were selected to help identify differences and disparities between racial and ethnic groups in driver and pedestrian stops; however, they should not be used as definitive proof of police bias. The analyses do not account for all legitimate factors that may influence the reason for a stop, search, or disposition of the event, including the circumstances that led to the stop, the location of the stop, and severity of the offense. Additionally, data collection challenges could obscure the reality of interactions with community members and is not capturing all actions associated with a stop. The Portland Police Bureau is committed to improving our analysis and data collection methodologies to accurately assess and understand how bias may or may not affect stops.

## APPENDIX D: BIBLIOGRAPHY

Lamberth, J. C. (2006). *Data Collection and Benchmarking of the Bias Policing Project: Final Report for the Metropolitan Police Department in the District of Columbia.* Washington, D.C.: Lamberth Consulting.

Portland Police Bureau. (2000). *Blue Ribbon Panel on Racial Profiling: Recommendations.* Portland, OR.: Portland Police Bureau. https://www.portlandoregon.gov/police/article/32381

Renauer, B.C. (2012). Neighborhood Variation in Police Stops and Searches: A Test of Consensus and Conflict Perspectives. *Police Quarterly, 15*(3), 219 – 240.

Renauer, B.C., Henning, K., & Covelli, E. (2009). *Benchmarking Portland Police Bureau Traffic Stop and Search Data: Technical Assistance Report.* Portland, OR: Criminal Justice Police Research Institute, Portland State University. https://www.portlandoregon.gov/police/article/305171

Withrow, B. L. (2008). *The Portland Police Bureau's Stop Data, An Independent Analysis.* Portland, OR: Portland Police Association. https://www.ppavigil.org/pdfs/PPA10STDATARPT.pdf

## APPENDIX E: GANG ENFORCEMENT TEAM ANALYSIS

The Gang Enforcement Team / Gun Task Force (GET / GTF) is an investigatory team tasked with responding, reducing, and preventing criminal activity related to street gang violence. In 2017, there were 121 shooting incidents, and 1 stabbing incident, related to gang activity, with 38 injuries and one fatality – a slight decrease from 157 incidents, 73 injuries, and 2 fatalities in 2016. The GET / GTF routinely patrol areas with high amounts of gang activity to actively prevent future incidents of gang violence, arrest individuals wanted for other crimes, and seize illegal or prohibited weapons. The team had 28 sworn members in 2017 and were occasionally supplemented by officers from other units and precincts during violence reduction missions.

In 2017, the Gang Enforcement Team / Gun Task Force stopped 602 drivers and pedestrians[71]. Total stops by the unit have decreased 39 percent since 2013. Pedestrian stops account for the steepest decline, as GET / GTF officers stopped about 10 percent as many pedestrians as they did five years ago. Stops by Gang team officers have historically represented about two percent of all stops in the Bureau.



**Figure 15. Stops initiated by GET / GTF officers have declined 39 percent in five years**

### Stop Locations

Gang Enforcement Team officers do not randomly patrol certain area, districts or neighborhoods – rather, they spend the majority of their time in areas where prior Gang violence has occurred and areas with a high potential for additional gang violence based on intelligence and investigations. On average, officers stopped individuals approximately a quarter-of-a-mile from recent gang violence incidents. About 80 percent of all Gang Enforcement Team stops were within a half mile of a gang violence incident (see Figure 16). Almost all stops, about 91 percent, occurred in East and North Precincts.

---

[71] GET / GTF officers had an additional 191 encounters in 2017 that were not official driver or pedestrian stops. These encounters were mischaracterized as stops in the Stops Data Collection system due to inaccurate coding in the Computer Aided Dispatch (CAD) system.

**Figure 16. About 80 percent of GET / GTF stops occurred within a half-mile of a gang incident**



## Stopped Subjects Demographics

The specialized mission of the Gang Enforcement Team / Gun Task Force makes it even more challenging to select an appropriate benchmark. As discussed previously, Injury Accidents are not an appropriate benchmark as Gang officers are not primarily concerned with traffic enforcement and meeting the City's Vision Zero objectives. The Crime Victimization Rate is similarly broad in that while Gang officers are trying to reduce violent crime, the profiles and characteristics of gang violence is likely to vary from indexed crime as a whole. Gang violence can also be incredibly localized, making any broad-level measurements of residency at the city, precinct, or even neighborhood level misleading. The Victimization Rate for Gang Violence Incidents indicate the subjects that are living, working, or recreating in areas where gang violence has occurred and may be contacted if police are patrolling the area.

**Table 13. 2017 Gang Crime Victimization Rate, by Race**

| Race/Ethnicity | 2017 | |
|---|---|---|
| | Count | Percent |
| American Indian/Alaskan | 0 | 0.0% |
| Asian | 2 | 1.2% |
| Black/African American | 108 | 63.2% |
| Hispanic | 6 | 3.5% |
| White | 19 | 11.1% |
| Unknown/Other | 36 | 21.1% |
| **Total** | **171** | **100.0%** |

Officers from the Gang Enforcement Team / Gun Task Force have seen little change in overall stop demographics since 2013. Subjects perceived to be Hispanic have been stopped significantly less[72] over the last five years, while no other perceived racial group has seen a significant increase, or decrease, in stop rates since data collection began. African American / Black subjects have always been the most commonly stopped group – however at non-disparate rates when compared to Gang Victimization Rates. Asian, Hispanic, and White subjects were stopped at substantially higher-



**Figure 17. Asian, Hispanic, and White subjects were stopped disparately higher than 2017 Gang Victimization Rates**

than-expected rates and were disparately over-represented in stops enacted by GET / GTF officers. Hispanic subjects saw an improvement over 2016 disparity values, while Asian[73] and White subjects were stopped at a higher disparity rate than the previous year.

**Table 14. The majority of subjects stopped by GET / GTF officers were Black / African American.**

| Race/Ethnicity | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| American Indian/Alaskan | 11 | 1.1% | 1 | 0.1% | 3 | 0.3% | 11 | 1.5% | 5 | 0.8% |
| Asian | 36 | 3.6% | 18 | 2.3% | 22 | 2.4% | 19 | 2.6% | 20 | 3.3% |
| Black/African American | 568 | 57.4% | 455 | 58.9% | 570 | 62.9% | 453 | 60.8% | 335 | 55.6% |
| Hispanic | 107 | 10.8% | 74 | 9.6% | 76 | 8.4% | 66 | 8.9% | 42 | 7.0% |
| White | 236 | 23.8% | 204 | 26.4% | 209 | 23.1% | 172 | 23.1% | 179 | 29.7% |
| Unknown/Other | 32 | 3.2% | 20 | 2.6% | 26 | 2.9% | 24 | 3.2% | 21 | 3.5% |
| **Traffic Total** | **990** | **100%** | **772** | **100%** | **906** | **100%** | **745** | **100%** | **602** | **100%** |

## Subject Stop Reasons

Gang Enforcement Team / Gun Task Force personnel stop reason patterns largely mirror overall Bureau trends. The majority of subjects since 2013 (83.1%) were stopped for Moving Violations on city roadways, sidewalks, and paths. There has been no significant change in the last five years, with at least 80 percent of any year's subjects stopped for Moving Violations. There are no significant differences[74] in stop patterns among the different racial groups, as at least 80 percent of the subjects for every racial group are stopped for Moving Violations by GET / GTF officers.

**Figure 18. Subjects are primarily stopped for Moving Violations by GET / GTF officers**



---

[72] $p < .03$, $r^2 = .87$

[73] Asian disparity rates are volatile in part due to large changes in small samples. In 2016, for instance, 9 gang violence victims were Asian while only 2 Asian individuals were victims in 2017.

[74] $x^2 = 6.370$, $p = .173$

## Search Rates

Officers from the Bureau's Gang Enforcement Team are significantly more likely[75] to perform a discretionary search on stopped subjects than officers from other divisions. Stopped subjects are about 6 times more likely to be searched when stopped by a GET / GTF officer than if they were stopped by an officer from another unit or division. Gang Enforcement Team officers have gradually reduced the rate of discretionary searches they are conducting, but at a non-significant rate.[76] Consent searches account for the vast majority of completed discretionary searches over the last five years, representing 89 percent of the searches conducted by GET / GTF officers.

Gang Enforcement Team / Gun Task Force officers did not display differential search patterns based on the Race / Ethnicity of the stopped individual in 2017 – similar to 2016. Black / African American (34.9% search rate) subjects were more likely to be searched than any other perceived racial group, but not at a disparate rate. All other racial groups were searched at rates similar to their overall stop rate[77]. Gang officers are significantly more likely[78] to request a consent search from stopped Black / African American individuals, while relying more on probable cause with White subjects, even though Consent searches made up the majority of searches for both groups (Black / African American: 94.0%; White 78.0%).



**Figure 19. Black / African American subjects were searched more than expected, but not at disparate rates**

Asian 0.65
Black 1.41
Hispanic 0.77
White 0.89

## Contraband Hit Rates

Despite a higher search rate than other operation divisions within the Portland Police Bureau, the Gang Enforcement Team / Gun Task Force recover contraband at a lower rate than other units. Since 2013, the hit rate for GET / GTF has remained constant, with about 1-out-of-3 searches (33.4%) discovering contraband. A contributing factor to the unit's lower hit rate is the reliance on Consent searches; searches where the officer sought consent (36.0% hit rate in 2017) from the stopped individual are significantly less likely[79] to result in the seizure of alcohol, drugs, weapons, or other contraband compared to probable cause searches (63.2% hit rate in 2017). There were no significant differences in the contraband recovery rate between subjects of different races[80].

**Table 15. Consent searches by Gang Enforcement Team / Gun Task Force personnel result in significantly fewer hits.**

| Search Type | Total Searches Count | Found Contraband Count | Found Contraband Percent |
|---|---|---|---|
| Plain View | 1 | 1 | 100.0% |
| Consent | 161 | 58 | 36.0% |
| Probable Cause | 19 | 12 | 63.2% |
| Weapon Pat | 2 | 0 | 0.0% |
| **Total** | **183** | **71** | **38.8%** |

---

[75] $x^2 = 525.829, p < .001$

[76] $p < .43, r^2 = .23$

[77] The search patterns of American Indian / Alaskan Native (5 total searches) individuals were not analyzed due to a limited number of searches.

[78] $x^2 = 10.763, p < .001$

[79] $x^2 = 5.265, p < .03$

[80] $x^2 = 4.806, p < .10$

**Table 16. Weapons were recovered from 9 percent of all searches conducted by GET officers**

| Race/Ethnicity | Total Searches Count | Found Contraband Count | Percent | Alcohol Count | Percent | Drugs Count | Percent | Weapons Count | Percent | Stolen Property Count | Percent | Other Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Indian/Alaskan | 1 | 1 | 100.0% | 0 | 0.0% | 1 | 100.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Asian | 4 | 1 | 25.0% | 0 | 0.0% | 1 | 25.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Black/African American | 117 | 49 | 41.9% | 12 | 10.3% | 20 | 17.1% | 13 | 11.1% | 1 | 0.9% | 7 | 6.0% |
| Hispanic | 10 | 6 | 60.0% | 4 | 40.0% | 2 | 20.0% | 0 | 0.0% | 1 | 10.0% | 0 | 0.0% |
| White | 50 | 14 | 28.0% | 2 | 4.0% | 8 | 16.0% | 3 | 6.0% | 1 | 2.0% | 0 | 0.0% |
| Unknown/Other | 1 | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **Total** | **183** | **71** | **38.8%** | **18** | **9.8%** | **32** | **17.5%** | **17** | **9.3%** | **3** | **1.6%** | **7** | **3.8%** |

## Stop Outcomes

In 2017, 87 percent of all stops initiated by Gang Enforcement Team / Gun Task Force ended with a warning, written or verbal, at the end of the interaction – the highest in the Bureau. GET / GTF officers also have the highest arrest rate in the Bureau, ending 10 percent of 2017 stops with an arrest. Arrest rates have gradually increased over the past five years (6.6% of subjects were arrested in 2013); however, rates for all stop dispositions have not significantly changed over time. Limited variation and small sample sizes make it impossible to run a more robust statistical analysis on the outcomes of GET / GTF initiated-stops; initial analyses indicate that there are no significant differences between subjects of different racial groups, with White, Black, and Hispanic subjects all equally likely to be arrested[81].

**Table 17. Most stops initiated by GET / GTF ended with a warning**

| Race/Ethnicity | Total Stops Count | Percent | Enforcement Action None Count | Percent | Warning Count | Percent | Citation Count | Percent | Arrested Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| American Indian/Alaskan | 5 | 0.8% | 0 | 0.0% | 3 | 60.0% | 0 | 0.0% | 2 | 40.0% |
| Asian | 20 | 3.3% | 0 | 0.0% | 20 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Black/African American | 335 | 55.6% | 12 | 3.6% | 292 | 87.2% | 1 | 0.3% | 30 | 9.0% |
| Hispanic | 42 | 7.0% | 0 | 0.0% | 35 | 83.3% | 2 | 4.8% | 5 | 11.9% |
| White | 179 | 29.7% | 4 | 2.2% | 151 | 84.4% | 1 | 0.6% | 23 | 12.8% |
| Unknown/Other | 21 | 3.5% | 0 | 0.0% | 20 | 95.2% | 1 | 4.8% | 0 | 0.0% |
| **Total** | **602** | **100.0%** | **16** | **2.7%** | **521** | **86.5%** | **5** | **0.8%** | **60** | **10.0%** |

---

[81] $x^2 = 0.569, p < .76$

## APPENDIX F: PERCEIVED GENDER ANALYSIS

The Portland Police Bureau collects data on officer perception of the race, gender, and age of all stopped drivers and pedestrians. Across the Bureau, officers are stopping an increasingly higher percentage of male drivers (65.9% in 2013 vs. 69.4% in 2017), with Non-Traffic officers stopping males at a significantly increased pace[82]. Pedestrian subjects perceived as female were stopped at a higher rate than they were five years ago (22.9% in 2013 vs. 25.0% in 2017) – mainly due to a consistent, but non-significant change from Non-Traffic personnel[83]. Traffic personnel stopped significantly fewer male drivers than the Non-Traffic personnel[84], with no significant differences between the divisions for pedestrian stop rates[85].

**Table 18. Both operational divisions of the Bureau stop male drivers at similar rates.**

| | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gender | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | Female | 12,269 | 35.7% | 10,292 | 36.1% | 8,670 | 36.1% | 6,610 | 33.4% | 3,504 | 32.7% |
| | Male | 22,088 | 64.3% | 18,087 | 63.5% | 15,321 | 63.7% | 13,005 | 65.7% | 7,203 | 67.2% |
| | Unknown | 5 | 0.0% | 96 | 0.3% | 50 | 0.2% | 183 | 0.9% | 6 | 0.1% |
| | **Traffic Total** | 34,362 | 100% | 28,475 | 100% | 24,041 | 100% | 19,798 | 100% | 10,713 | 100% |
| | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
| | Gender | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | Female | 10,022 | 30.5% | 7,162 | 30.5% | 4,954 | 28.7% | 3,872 | 28.7% | 3,230 | 27.4% |
| | Male | 22,192 | 67.5% | 15,788 | 67.3% | 11,751 | 68.2% | 9,484 | 70.2% | 8,408 | 71.4% |
| | Unknown | 665 | 2.0% | 499 | 2.1% | 528 | 3.1% | 157 | 1.2% | 137 | 1.2% |
| | **Non-Traffic Total** | 32,879 | 100% | 23,449 | 100% | 17,233 | 100% | 13,513 | 100% | 11,775 | 100% |

**Table 19. Traffic and Non-Traffic officers stopped male pedestrians at a 3-to-1 ratio over females**

| | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gender | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | Female | 84 | 27.5% | 59 | 27.8% | 20 | 23.3% | 36 | 27.7% | 17 | 24.6% |
| | Male | 222 | 72.5% | 153 | 72.2% | 66 | 76.7% | 93 | 71.5% | 52 | 75.4% |
| | Unknown | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.8% | 0 | 0.0% |
| | **Traffic Total** | 306 | 100% | 212 | 100% | 86 | 100% | 130 | 100% | 69 | 100% |
| | | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
| | Gender | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | Female | 104 | 20.2% | 62 | 19.7% | 38 | 19.6% | 30 | 23.8% | 31 | 25.2% |
| | Male | 407 | 78.9% | 249 | 79.0% | 149 | 76.8% | 92 | 73.0% | 90 | 73.2% |
| | Unknown | 5 | 1.0% | 4 | 1.3% | 7 | 3.6% | 4 | 3.2% | 2 | 1.6% |
| | **Non-Traffic Total** | 516 | 100% | 315 | 100% | 194 | 100% | 126 | 100% | 123 | 100% |

When analyzing stops data for disparities by race, PPB utilizes two different benchmarks that are tailored to the differing mission of Traffic Division and the Non-Traffic divisions.  The use of the Crime Victimization benchmark as a proxy for subjects that may be working, living, recreating, or transiting in an area is supported by the literature.  However, the literature shows that no single measure explains potential gender differences by geographic

**Table 20. 2017 Injury Collision Statistics, by Gender of Drivers**

| | 2017 | |
|---|---|---|
| Gender | Count | Percent |
| Female | 521 | 37.2% |
| Male | 879 | 62.8% |
| Total | 1,400 | 100.0% |

---

[82] $p < .02$, $r^2 = .89$

[83] $p < .07$, $r^2 = .73$

[84] $x^2 = 152.695$, $p < .001$

[85] $x^2 = 0.034$, $p < .86$

location, with age and physical activity[86], economic factors[87], and sexual preference[88] all contributing to locale-based gender differences. Furthermore, women are also more likely to report being victims of violent crimes[89]. Without comprehensive research on how these known and unknown factors contribute to geographic place-making in Portland, it is improper to use crime victimization as a proxy for potential police contact by gender.

Instead, the reported gender of drivers involved in injury collisions in 2017 was used as a benchmark for driver stops by all divisions. In the analysis of driver's race, this benchmark is used for stops by Traffic officers only. Based on the reported gender of individuals involved in injury collisions, drivers are stopped similar to expected rates. No comparable benchmark exists for pedestrian stops, so no analysis was conducted.



**Figure 20. Drivers are stopped at rates similar to the 2017 Injury Accident Benchmark**

Female — 1.35
Male — 0.72

0.0    1.0    2.0

### Search Rates by Gender

Search rates, based on perceived gender, have changed little over the last five years. Males and females were both searched more than they were five years ago, but the increase for both groups was non-significant[90]. Consent search was the most common search type in 2017 for both males



**Figure 21. Search rates have remained statistically stable for gender groups since 2013**

Female: 3.0% (2013), 4.3% (2017)
Male: 6.3% (2013), 7.2% (2017)

■ 2013  ■ 2017

(52.0% of all searches) and females (38.7%), although it has declined from years past (significantly[91] so for females). The second and third most common search types for females were plain view (33.7%) and probable cause (25.9%) searches, while the reverse was true for males (Probable Cause: 24.9%; Plain View: 19.9%). Overall, females were searched significantly different than their male counterparts by PPB officers[92].

---

[86] Pollard, T.M. & Wagnild, J.M. (2017). Gender differences in walking (for leisure, transport, and in total) across adult life: a systematic review. *BMC Public Health, 17.*

[87] Chetty, R., Hendren, N., Lin, F., Majerovitz, J., & Scuderi, B. (2016). *Childhood environment and gender gaps in adulthood (Working Paper No. 21936).* Cambridge, MA: National Bureau of Economic Research.

[88] Diehm, J. (2018, June). Men are from Chelsea, Women are from Park Slope: How "gayborhoods" in 15 major American cities are divided by gender. Retrieved from https://pudding.cool/2018/06/gayborhoods/.

[89] Morgan, R.E., & Truman, J.L. (2018). *Criminal Victimization, 2017* (NCJ 252472). Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice.

[90] Female: $p < .37$, $r^2 = .28$ ; Male: $p < .79$, $r^2 = .03$

[91] $p < .05$, $r^2 = .79$

[92] $x^2 = 28.383$, $p < .001$

Portland Police officers displayed differential search patterns for stopped drivers based on the subject's perceived gender – but not disparately so. Male drivers were searched significantly more than their female counterparts[93], mainly due to the searching practices of Non-Traffic officers who searched Males significantly more than expected[94] whereas Traffic officers showed no significant differences. Despite the significant differences, PPB officers did not search Males at a disparate rate when compared to overall stop rates.

**Figure 22. Subjects of different perceived genders were not searched at disparate rates when compared to stop rates**



## Contraband Hit Rates

Even though Male subjects were searched at significantly higher rates than Females, their hit rates were statistically similar[95]. In 2017, Males were found with contraband in 42.0% of searches, while Females were found with contraband in 36.0% of searches. Drugs were the most commonly found items for both groups, followed by Alcohol, Weapons, Stolen Property, and Other Contraband.

**Table 21. Illicit drugs are the most commonly uncovered item during subject searches.**

| Gender | Total Searches | Found Contraband | | Alcohol | | Drugs | | Weapons | | Stolen Property | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| Female | 289 | 104 | 36.0% | 25 | 8.7% | 56 | 19.4% | 11 | 3.8% | 10 | 3.5% | 19 | 6.6% |
| Male | 1,133 | 476 | 42.0% | 89 | 7.9% | 266 | 23.5% | 90 | 7.9% | 54 | 4.8% | 50 | 4.4% |
| Unknown | 7 | 4 | 57.1% | 0 | 0.0% | 1 | 14.3% | 0 | 0.0% | 1 | 14.3% | 2 | 28.6% |
| **Total** | **1,429** | **584** | **40.9%** | **114** | **8.0%** | **323** | **22.6%** | **101** | **7.1%** | **65** | **4.5%** | **71** | **5.0%** |

## Stop Outcomes

Male and Female subjects had significantly different stop dispositions when stopped by a Portland Police Bureau officer. Male subjects were significantly more likely to be arrested[96] than Female subjects, with Female subjects significantly more likely to receive a warning[97]. The progressive nature of a stop, and the multiple decision points within the interaction, make it difficult to discern what role, if any, gender bias plays in stop disposition. Most of the differential occurred in stops made by Non-Traffic officers, with Traffic officers demonstrating little variation between Male and Female subjects.

---

[93] $x^2 = 61.272, p < .001$
[94] $x^2 = 48.687, p < .001$
[95] $x^2 = 2.412, p < .30$
[96] $x^2 = 52.947, p < .001$
[97] $x^2 = 30.230, p < .001$

**Table 22. Male subjects, especially those stopped by Non-Traffic officers, were significantly more likely to be arrested.**

|  | Gender | Total Stops | | Enforcement Action | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | | | None | | Warning | | Citation | | Arrested | |
|  |  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | Female | 3,521 | 32.7% | 4 | 0.1% | 540 | 15.3% | 2,925 | 83.1% | 52 | 1.5% |
|  | Male | 7,255 | 67.3% | 5 | 0.1% | 1,094 | 15.1% | 6,011 | 82.9% | 145 | 2.0% |
|  | Unknown | 6 | 0.1% | 1 | 16.7% | 1 | 16.7% | 4 | 66.7% | 0 | 0.0% |
|  | **Total** | **10,782** | **100.0%** | **10** | **0.1%** | **1,635** | **15.2%** | **8,940** | **82.9%** | **197** | **1.8%** |

|  | Gender | Total Stops | | Enforcement Action | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | | | None | | Warning | | Citation | | Arrested | |
|  |  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | Female | 3,261 | 27.4% | 98 | 3.0% | 2,513 | 77.1% | 482 | 14.8% | 168 | 5.2% |
|  | Male | 8,498 | 71.4% | 257 | 3.0% | 6,184 | 72.8% | 1,337 | 15.7% | 720 | 8.5% |
|  | Unknown | 139 | 1.2% | 22 | 15.8% | 104 | 74.8% | 11 | 7.9% | 2 | 1.4% |
|  | **Total** | **11,898** | **100.0%** | **377** | **3.2%** | **8,801** | **74.0%** | **1,830** | **15.4%** | **890** | **7.5%** |

## APPENDIX G: PERCEIVED AGE ANALYSIS

The Portland Police Bureau indicate the stopped subject's perceived age in four broad categories: Under 16, 16 to 24, 25 or Over, and Unknown.  Since 2013, the 25 or Over driver group has always been the most stopped group, representing 78.9 percent of all stops, followed by 16 to 24 (19.6%), unknown (1.3%), and Under 16 (0.1%). Stop rates for drivers have remained essentially unchanged for each age group, varying by one to two percentage points each year. Pedestrian stop rates have changed the most over the last five years, with 25 or Over accounting for about 10% more stops than they did in 2013; however, the changes are non-significant[98]. Traffic officers were significantly more likely[99] to stop 25 or Over drivers than 16-24 age group in 2017, with Non-Traffic officers more likely to report a subject's age as "unknown". There were no significant differences[100] between the operation groups for pedestrian stops.

**Table 23. Adults aged 25 or Older are the most commonly stopped group of drivers.**

|  | Age | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | Under 16 | 9 | 0.0% | 16 | 0.1% | 11 | 0.0% | 7 | 0.0% | 6 | 0.1% |
|  | 16 to 24 | 6,110 | 17.8% | 5,188 | 18.2% | 4,593 | 19.1% | 3,644 | 18.4% | 1,982 | 18.5% |
|  | 25 or Over | 28,235 | 82.2% | 23,175 | 81.4% | 19,388 | 80.6% | 15,879 | 80.2% | 8,679 | 81.0% |
|  | Unknown | 8 | 0.0% | 96 | 0.3% | 49 | 0.2% | 268 | 1.4% | 46 | 0.4% |
|  | **Traffic Total** | **34,362** | **100%** | **28,475** | **100%** | **24,041** | **100%** | **19,798** | **100%** | **10,713** | **100%** |
|  | Age | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|  |  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | Under 16 | 47 | 0.1% | 50 | 0.2% | 51 | 0.3% | 37 | 0.3% | 16 | 0.1% |
|  | 16 to 24 | 6,875 | 20.9% | 4,861 | 20.7% | 3,746 | 21.7% | 2,912 | 21.5% | 2,515 | 21.4% |
|  | 25 or Over | 25,114 | 76.4% | 17,954 | 76.6% | 12,828 | 74.4% | 10,352 | 76.6% | 9,076 | 77.1% |
|  | Unknown | 843 | 2.6% | 584 | 2.5% | 608 | 3.5% | 212 | 1.6% | 168 | 1.4% |
|  | **Non-Traffic Total** | **32,879** | **100%** | **23,449** | **100%** | **17,233** | **100%** | **13,513** | **100%** | **11,775** | **100%** |

**Table 24. Traffic and Non-Traffic officers stopped different ages of pedestrians at similar rates.**

|  | Age | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | Under 16 | 3 | 1.0% | 2 | 0.9% | 0 | 0.0% | 1 | 0.8% | 0 | 0.0% |
|  | 16 to 24 | 81 | 26.5% | 45 | 21.2% | 17 | 19.8% | 28 | 21.5% | 10 | 14.5% |
|  | 25 or Over | 222 | 72.5% | 165 | 77.8% | 69 | 80.2% | 100 | 76.9% | 59 | 85.5% |
|  | Unknown | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.8% | 0 | 0.0% |
|  | **Traffic Total** | **306** | **100%** | **212** | **100%** | **86** | **100%** | **130** | **100%** | **69** | **100%** |
|  | Age | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|  |  | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | Under 16 | 4 | 0.8% | 4 | 1.3% | 2 | 1.0% | 1 | 0.8% | 1 | 0.8% |
|  | 16 to 24 | 122 | 23.6% | 59 | 18.7% | 44 | 22.7% | 25 | 19.8% | 18 | 14.6% |
|  | 25 or Over | 381 | 73.8% | 248 | 78.7% | 142 | 73.2% | 95 | 75.4% | 102 | 82.9% |
|  | Unknown | 9 | 1.7% | 4 | 1.3% | 6 | 3.1% | 5 | 4.0% | 2 | 1.6% |
|  | **Non-Traffic Total** | **516** | **100%** | **315** | **100%** | **194** | **100%** | **126** | **100%** | **123** | **100%** |

Similar to gender analyses, there are no research-supported benchmarks assessing whether officers potentially display bias when choosing to stop a driver based on their perceived age. It's further

---

[98] $p < .16$, $r^2 = .54$
[99] $x^2 = 137.522$, $p < .001$
[100] $x^2 = 1.713$, $p < .64$

complicated by the fact that age is not a protected class when it comes to insurance risk analyses[101], with the State explicitly allowing differential rates[102] for drivers under 25 and over 55 (without an authorized prevention course) due to their risk of being involve in a motor vehicle collision. If officers are making stops based on dangerous driving behaviors, there is a likelihood that a greater number of young drivers (and those 55 or over) would be stopped when compared to their population rate. Nationally, there are also significant differences when it comes to crime victimization based on the victim's age, making any victimization benchmark problematic[103].

**Table 25. 2017 Injury Collision Statistics, by Age of Drivers**

| Age | 2017 | |
|---|---|---|
| | Count | Percent |
| Under 16 | 9 | 0.6% |
| 16 to 24 | 196 | 14.0% |
| 25 or Over | 1,194 | 85.3% |
| **Total** | **1,399** | **100.0%** |

Accounting for the factors discussed above, the Injury Collision Benchmark (based on the age of involved drivers) was used for all operational groups of the Bureau. Based on the reported perceived age of stopped drivers involved in injury collisions, drivers are stopped similar to expected rates across the Bureau. No comparable benchmark exists for pedestrian stops, so no analysis was conducted.

**Figure 23. Drivers are stopped at rates similar to the 2017 Injury Accident Benchmark**



## Search Rates by Age Group

PPB officers have not significantly[104] changed their search patterns for stopped subjects over the past five years. The Under 16 group have been searched at the highest rate each year; however, only 8 subjects were searched in 2017 (vs. 5 in 2013), making it impossible to draw any conclusions from the group. All groups were searched most often by consent in 2017 (49.3%), followed by Probable Cause (25.0%), Plain View (22.7%), and Weapons Pat Down (3.0%). There are slight statistical differences[105] between the stop patterns for the 16 to 24 group and the 25 or Over group[106], the 16 to 24 group being significantly more likely to be searched with Consent, while the 25 or Over group were more likely to be searched using Plain View or Probable Cause.

**Figure 24. Search rates have remained statistically stable for all age groups since 2013**



---

[101] OAR 836-080-0055

[102] ORS 742.490

[103] Morgan, R.E., & Truman, J.L. (2018). *Criminal Victimization, 2017* (NCJ 252472). Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice.

[104] 25 or Over: $p < .63$, $r^2 = .09$ ; 16 to 24: $p < .64$, $r^2 = .08$ ; Under 16: $p < .21$, $r^2 = .46$

[105] $x^2 = 17.963$, $p < .001$

[106] Minors were not analyzed due to small stop rates

Portland Police officers displayed differential search patterns for stopped subjects based on the subject's perceived age – but not disparately so. The 25 or Over subjects were searched significantly[107] more than the 16 to 24 group, but neither group was substantially outside of their expected search rates based on their 2017 stop rates. Under 16 and drivers with an Unknown age could not be compared in the disparity analysis due to small stop rates; however, they were not searched significantly different than expected.



**Figure 25. Subjects of different perceived age groups were not searched at disparate rates when compared to stop rates**

## Contraband Hit Rates

Subjects across multiple age groups that were stopped and searched by Portland Police Bureau officers were nearly statistically equal[108] in their found contraband hit rates. The 16 to 24 group were most likely to have been discovered with Contraband (41.9% in 2017), slightly ahead of the hit rate for the 25 or Over group (40.7%). Drugs were the most found contraband for both groups, followed by Alcohol, Weapons, Other, and Stolen Property.

**Table 26. Illicit drugs are the most commonly uncovered item during subject searches.**

| Age | Total Searches Count | Found Contraband Count | Percent | Alcohol Count | Percent | Drugs Count | Percent | Weapons Count | Percent | Stolen Property Count | Percent | Other Count | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Under 16 | 8 | 2 | 25.0% | 0 | 0.0% | 1 | 12.5% | 2 | 25.0% | 0 | 0.0% | | |
| 16 to 24 | 327 | 137 | 41.9% | 41 | 12.5% | 67 | 20.5% | 28 | 8.6% | 11 | 3.4% | 14 | 4.3% |
| 25 or Over | 1,085 | 442 | 40.7% | 73 | 6.7% | 255 | 23.5% | 72 | 6.6% | 52 | 4.8% | 55 | 5.1% |
| Unknown | 9 | 3 | 33.3% | 0 | 0.0% | 1 | 11.1% | 0 | 0.0% | 0 | 0.0% | 2 | 22.2% |
| **Total** | **1,429** | **584** | **40.9%** | **114** | **8.0%** | **323** | **22.6%** | **101** | **7.1%** | **65** | **4.5%** | **71** | **5.0%** |

## Stop Outcomes

Stopped subjects that were perceived to be 16 to 24 experienced significantly different stop outcomes[109] than subjects perceived to be 25 or over[110]. The 16 to 24 group were significantly less likely[111] to be arrested than expected, with the outcome rates for all other categories as expected. The progressive nature of a stop, and the multiple decision points within the interaction, make it difficult to discern what role, if any, perceived age plays in stop disposition.

---

[107] $x^2 = 39.022, p < .001$

[108] $x^2 = 0.801, p < .85$

[109] $x^2 = 10.693, p < .02$

[110] Statistical comparisons were not conducted for Minors and subjects identified as Unknown due to small sample sizes

[111] $x^2 = 6.740, p < .05$

**Table 27. The 16 to 24 group were significantly less likely to be arrested than expected.**

**Traffic**

| Age | Total Stops | | Enforcement Action | | | | | | | |
| | | | None | | Warning | | Citation | | Arrested | |
| | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
|-----|-------|---------|-------|---------|-------|---------|-------|---------|-------|---------|
| Under 16 | 6 | 0.1% | 0 | 0.0% | 1 | 16.7% | 5 | 83.3% | 0 | 0.0% |
| 16 to 24 | 1,992 | 18.5% | 1 | 0.1% | 233 | 11.7% | 1,728 | 86.7% | 30 | 1.5% |
| 25 or Over | 8,738 | 81.0% | 9 | 0.1% | 1,396 | 16.0% | 7,166 | 82.0% | 167 | 1.9% |
| Unknown | 46 | 0.4% | 0 | 0.0% | 5 | 10.9% | 41 | 89.1% | 0 | 0.0% |
| **Total** | **10,782** | **100.0%** | **10** | **0.1%** | **1,635** | **15.2%** | **8,940** | **82.9%** | **197** | **1.8%** |

**Non-Traffic**

| Age | Total Stops | | Enforcement Action | | | | | | | |
| | | | None | | Warning | | Citation | | Arrested | |
| | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
|-----|-------|---------|-------|---------|-------|---------|-------|---------|-------|---------|
| Under 16 | 17 | 0.1% | 0 | 0.0% | 8 | 47.1% | 7 | 41.2% | 2 | 11.8% |
| 16 to 24 | 2,533 | 21.3% | 81 | 3.2% | 1,877 | 74.1% | 425 | 16.8% | 150 | 5.9% |
| 25 or Over | 9,178 | 77.1% | 269 | 2.9% | 6,789 | 74.0% | 1,384 | 15.1% | 736 | 8.0% |
| Unknown | 170 | 1.4% | 27 | 15.9% | 127 | 74.7% | 14 | 8.2% | 2 | 1.2% |
| **Total** | **11,898** | **100.0%** | **377** | **3.2%** | **8,801** | **74.0%** | **1,830** | **15.4%** | **890** | **7.5%** |

## APPENDIX H: PERCEIVED MENTAL HEALTH STATUS ANALYSIS

The Portland Police Bureau began collecting officers' perceptions on the stopped subject's mental health status on October 1, 2014 as a component of the City's settlement with the United States Department of Justice[112]. Officers are mandated to indicate whether they perceive if the subject has a mental health issue by using one of three options: Yes, No, or Unknown. Since the last quarter of 2014, officers have submitted their perceptions on subject's mental health status for 95,982 stopped drivers and pedestrians[113]. Over that timeframe, fewer subjects are being classified as Unknown (17.7% in 2014 vs. 9.8% in 2017) with a significant decrease[114] in the percentage of subjects that were perceived to have a mental health issue (1.0% in 2014 vs. 0.4% in 2017).

**Table 28. Traffic Officers indicated that they could not assess the stopped subjects' mental health status at a higher rate than Non-Traffic Officers.**

|  | Mental Health Status | 2014 Count | 2014 Percent | 2015 Count | 2015 Percent | 2016 Count | 2016 Percent | 2017 Count | 2017 Percent |
|---|---|---|---|---|---|---|---|---|---|
| **Traffic** | No Perceived Mental Health Issue | 3,366 | 76.3% | 10,431 | 73.3% | 17,153 | 86.7% | 9,432 | 88.1% |
|  | Perceived Mental Health Issue | 30 | 0.7% | 38 | 0.3% | 51 | 0.3% | 19 | 0.2% |
|  | Unknown Mental Health Issue | 1,013 | 23.0% | 3,758 | 26.4% | 2,573 | 13.0% | 1,255 | 11.7% |
|  | **Traffic Total** | **4,409** | **100%** | **14,227** | **100%** | **19,777** | **100%** | **10,706** | **100%** |
| **Non-Traffic** | No Perceived Mental Health Issue | 3,092 | 87.7% | 14,714 | 85.4% | 12,220 | 90.4% | 10,759 | 91.4% |
|  | Perceived Mental Health Issue | 41 | 1.2% | 156 | 0.9% | 86 | 0.6% | 58 | 0.5% |
|  | Unknown Mental Health Issue | 394 | 11.2% | 2,363 | 13.7% | 1,207 | 8.9% | 958 | 8.1% |
|  | **Non-Traffic Total** | **3,527** | **100%** | **17,233** | **100%** | **13,513** | **100%** | **11,775** | **100%** |

**Table 29. Pedestrians were more likely to be perceived to be having a mental health issue.**

|  | Mental Health Status | 2014 Count | 2014 Percent | 2015 Count | 2015 Percent | 2016 Count | 2016 Percent | 2017 Count | 2017 Percent |
|---|---|---|---|---|---|---|---|---|---|
| **Traffic** | No Perceived Mental Health Issue | 26 | 81.3% | 47 | 79.7% | 117 | 90.0% | 63 | 91.3% |
|  | Perceived Mental Health Issue | 0 | 0.0% | 3 | 5.1% | 2 | 1.5% | 2 | 2.9% |
|  | Unknown Mental Health Issue | 6 | 18.8% | 9 | 15.3% | 11 | 8.5% | 4 | 5.8% |
|  | **Traffic Total** | **32** | **100%** | **59** | **100%** | **130** | **100%** | **69** | **100%** |
| **Non-Traffic** | No Perceived Mental Health Issue | 64 | 78.0% | 157 | 80.9% | 104 | 82.5% | 111 | 89.5% |
|  | Perceived Mental Health Issue | 11 | 13.4% | 11 | 5.7% | 4 | 3.2% | 5 | 4.0% |
|  | Unknown Mental Health Issue | 7 | 8.5% | 26 | 13.4% | 18 | 14.3% | 8 | 6.5% |
|  | **Non-Traffic Total** | **82** | **100%** | **194** | **100%** | **126** | **100%** | **124** | **100%** |

---

[112] United States of America v. City of Portland, No. 3:12-cv-02265-SI (D. Ore. 2012).

[113] The reports of the perceived mental health status of stopped subjects is lower than the reported number of stops due to two separate technical errors. The first, from June 2015 through December 2015, prevented officers from accessing the Traffic Division from accessing the Stops Data Collection system, and led to under-reporting on several demographic categories, including mental health status for 9,750 driver and pedestrian stops (for more information, see Appendix A.) An additional 188 records from 2014 through 2017 were missing the mental health status due to old computer hardware.

[114] $p < .05$, $r^2 = .91$

In 2017, Traffic Officers were significantly more likely[115] to indicate that the mental health status of the stopped subject was Unknown. Additionally, Non-Traffic Officers were significantly more likely[116] to indicate that they perceived the stopped subject had mental health issues. The PPB does not collect the perceived mental health status for individuals involved in injury collision accidents, so there is no research-supported benchmark to compare to for disparity analyses.

### Search Rates by Perceived Mental Health Status

Search rates for all perceived groups of subject's mental health status have remained steady over time[117]. Subjects that were perceived to have a mental health issue were searched almost twice as



**Figure 26. Subjects perceived to have a mental health issue are searched at higher rates than other subjects**

much as people that were not perceived to have a mental health issue[118] a significant difference when compared to overall stop rates. For people that were perceived to have a mental health issue, Consent Searches have been the most likely search type since 2014 (39.3%), followed by Probable Cause (34.4%), Plain View (21.3%), and Weapons Pat Down (4.9%).

### Contraband Hit Rates

Subjects that were perceived to have a mental health issue had the highest hit rate in 2017 at 60 percent. However, there were only 10 total searches for that group, which is too small of a sample for any robust statistical analysis. Drugs were the most commonly found contraband for all groups.

**Table 30. Illicit drugs are the most commonly uncovered item during subject searches.**

| | Total Searches | Found Contraband | | Alcohol | | Drugs | | Weapons | | Stolen Property | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mental Health Status | Count | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| No Perceived Mental Health Issue | 1,305 | 529 | 40.5% | 101 | 7.7% | 298 | 22.8% | 89 | 6.8% | 62 | 4.8% | 63 | 4.8% |
| Perceived Mental Health Issue | 10 | 6 | 60.0% | 1 | 10.0% | 2 | 20.0% | 1 | 10.0% | 0 | 0.0% | 2 | 20.0% |
| Unknown Mental Health Issue | 114 | 49 | 43.0% | 12 | 10.5% | 23 | 20.2% | 11 | 9.6% | 3 | 2.6% | 6 | 5.3% |
| **Total** | **1,429** | **584** | **40.9%** | **114** | **8.0%** | **323** | **22.6%** | **101** | **7.1%** | **65** | **4.5%** | **71** | **5.0%** |

### Stop Outcomes

The stop outcomes for stopped subjects based on the officer's perception of their mental health status are significantly different among the three groups[119]; however, much of this may be explained by the stop patterns of the different operational divisions of the PPB. Subjects perceived to have a mental health issue are significantly less likely[120] to receive a citation than other groups. Conversely, stopped subjects categorized as "unknown" on the mental health status question were significantly

---

[115] $x^2 = 38.46, p < .001$
[116] $x^2 = 8.12, p < .03$
[117] Yes: $p < .87, r^2 = .02$ ; No: $p < .87, r^2 = .02$ ; Unknown: $p < .22, r^2 = .62$
[118] $x^2 = 4.289, p < .04$
[119] $x^2 = 154.155, p < .001$
[120] $x^2 = 8.020, p < .03$

less likely to receive a warning[121] and significantly more likely[122] to receive a citation. Since Traffic Officers were more likely to define a subject as "unknown", with Non-Traffic Officers more likely to encounter a person with a perceived mental health issue, the results are most efficiently explained by the general stop patterns discussed in the primary section of the Annual Report. A comprehensive logistic regression analysis, that incorporated the perceived mental health status of the subject, would provide an accurate assessment of the role mental health status plays in stop disposition.

**Table 31. Subjects perceived to have a mental health issue were arrested less than other subjects in 2017, but this may be more sufficiently explained by the stop and disposition patterns of PPB officers**

|  | | Total Stops | | Enforcement Action | | | | | | | |
|  |  | | | None | | Warning | | Citation | | Arrested | |
|  | Mental Health Status | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Traffic** | No Perceived Mental Health Status | 9,495 | 88.1% | 8 | 0.1% | 1,506 | 15.9% | 7,805 | 82.2% | 176 | 1.9% |
|  | Perceived Mental Health Status | 21 | 0.2% | 0 | 0.0% | 4 | 19.0% | 15 | 71.4% | 2 | 9.5% |
|  | Unknown Mental Health Status | 1,259 | 11.7% | 2 | 0.2% | 124 | 9.8% | 1,115 | 88.6% | 18 | 1.4% |
|  | **Total** | **10,775** | **100.0%** | **10** | **0.1%** | **1,634** | **15.2%** | **8,935** | **82.9%** | **196** | **1.8%** |

|  | | Total Stops | | Enforcement Action | | | | | | | |
|  |  | | | None | | Warning | | Citation | | Arrested | |
|  | Mental Health Status | Count | Percent | Count | Percent | Count | Percent | Count | Percent | Count | Percent |
| **Non-Traffic** | No Perceived Mental Health Status | 10,869 | 91.4% | 315 | 2.9% | 8,092 | 74.5% | 1,654 | 15.2% | 808 | 7.4% |
|  | Perceived Mental Health Status | 63 | 0.5% | 6 | 9.5% | 46 | 73.0% | 7 | 11.1% | 4 | 6.3% |
|  | Unknown Mental Health Status | 966 | 8.1% | 56 | 5.8% | 663 | 68.6% | 169 | 17.5% | 78 | 8.1% |
|  | **Total** | **11,898** | **100.0%** | **377** | **3.2%** | **8,801** | **74.0%** | **1,830** | **15.4%** | **890** | **7.5%** |

---

[121] $x^2 = 54.870$, $p < .001$
[122] $x^2 = 49.030$, $p < .001$