# Exhibit 3

**PCCEP Orientation Binder**
**Table of Contents**

*PCCEP Orientation Agenda*

*Mental Health Association of Oregon Presentation Documents*

      Suicide by Cop: A Civil rights perspective
      Death by Cop: Who's at risk?
      MHAO list of people assaulted or killed by police
      Someone Has to Do It
      Oregonian Articles

*City Attorney Presentation Documents*

      PCCEP Plan (Exhibit 2)
      Resolution No. 3784
      Bylaw Template for City Advisory Bodies
      Guide for Volunteer Boards and Commissions

*PPB Presentation Documents*

      PPB Organizational Chart
      Current PPB Advisory Boards
      PPB Racial Equity Plan

*COAB*

      COAB recommendations
      COAB Chair's Exit Report (Memo dated 6/26/16)

*Articles*
      Healing Justice Is How We Can Sustain Black Lives
      Can We Really Measure Implicit Bias?

*Settlement Agreement Documents*

      Proposed Amendments to the Settlement Agreement
      Exhibit 1: DOJ Findings
      Exhibit 2: Sam Adams Memo to Council

**EXHIBIT 2**

**City of Portland Plan for**
***Portland Committee on Community-Engaged Policing (PCCEP)***

I.      MISSION

To work with the Mayor/Police Commissioner, Portland Police Bureau, and Portland's diverse constituencies to solicit and exchange information between the community and Portland Police Bureau (PPB) to achieve the desired outcomes of equitable policing which exceeds constitutional requirements, and meaningful community engagement with and trust in PPB.

II.     GOALS

PCCEP members will independently assess the Settlement Agreement using the tools outlined in this Plan. PCCEP will work to facilitate positive police/community relationships and promote public safety by assessing PPB's current community engagement processes, and developing recommendations and strategies for systems to increase public outreach and engagement with a broad cross-section of the community, to build confidence and improve outcomes. Additionally, PCCEP members will review and make recommendations on PPB policies touching the DOJ Settlement Agreement and/or key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice.

In order for PPB to effectively build trust with Portland's diverse communities, the communities' concerns must be heard and meaningful action by PPB must be taken.  To facilitate this outcome, PCCEP members will also make recommendations in the key areas of concern for Portland's diverse communities based on the communities' articulated experiences and grievances.

PCCEP's mission and goals will guide the following:

1. Scope of work
2. Membership
3. City's responsibilities
4. Available tools and resources
5. Members' responsibilities
6. Deliverable products

Exhibit 2 – Page 1

<u>SCOPE OF WORK</u>

PCCEP will engage with Portland's diverse communities in key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice. PCCEP will contribute to the development of the PPB Community Engagement Plan, as directed by the Settlement Agreement between the City of Portland and the United States.

Specifically, PCCEP will be authorized to:

- Develop recommendations for PPB systems to engage meaningfully, both short-term and long-term, Portland's diverse communities and improve community relations. Gather and synthesize information from Portland's diverse communities, and make recommendations based on that information in key areas of concern to communicate to the Mayor, PPB, the Office of Equity and Human Rights, the DOJ, and the public at large.

- Review and make recommendations on PPB directives touching the DOJ Settlement Agreement and/or key areas of concern. Provide information to the community on these directives, and solicit feedback and recommendations from the community to share with the PPB.

- With the Mayor's written approval, and after consultation with the other City Commissioners, PCCEP is authorized to identify for off-schedule review directives not related to the DOJ Settlement Agreement or key areas of concern.[1]  PCCEP must provide a written explanation for the request, which will be considered by the Mayor and City Commissioners.

- Provide information to and solicit feedback from Portland's diverse communities through focused and targeted round tables and town halls, to be held at least quarterly and be open to the public.  PPB presence is required at quarterly town halls.

- Continue to collaborate with the City on surveys regarding Portland residents' experiences with and perception of PPB's community outreach and accountability efforts. PCCEP will consider survey results in developing recommended strategies.

- Provide ongoing feedback to PPB regarding community engagement initiatives already in progress and those added/needed in the future.

- During the effective period of the Settlement Agreement, appear before the Court at the annual status conference to describe to the Court its assessment of the City's progress toward achieving the goals of the Settlement Agreement.

---

[1] PPB directives are generally scheduled for Bureau review every two years. The City recognizes that the community has an interest in a number of directives, and particularly those that are relevant to current events (e.g., Directive 635.10. Crowd Management, with respect to demonstrations; Directive 810.10, Arrest of Foreign Nationals with respect to Portland's status as a Sanctuary City). This authority is intended to allow PCCEP to be responsive to community concerns when there is a compelling interest to review and revise a Bureau practice.

Exhibit 2 – Page 2

III.    MEMBERSHIP and REPORTING

PCCEP will be comprised of a diverse group of between thirteen mayoral-appointed volunteers, who are committed to improving systems-based police/community relationships and ensuring and exceeding constitutional policing standards. Two of the thirteen seats will be reserved for high school-aged youth. The PCCEP will report directly to the Mayor (Police Commissioner) and consult, separately and at least quarterly with the Director of the Office of Equity and Human Rights.

IV.    SELECTION

The Mayor, in consultation with the other Council offices, shall work with the community selection panel described below to develop selection criteria and public outreach strategies for the PCCEP selection process.  This process may begin before the Fairness Hearing and approval of the revised Settlement Agreement by the Court.  Following the development of the selection criteria, a written, downloadable application will be posted and available on the City's website. Posted alongside the application will be the deadline for submission, selection criteria, selection process and a description of PCCEP member responsibilities.  The City will engage the community in a variety of ways to communicate the application and selection process, criteria and timelines.   Extra effort will be made to invite people who have experienced mental illnesses to apply.

The selection process will adhere to the following framework: (1) Application submission; (2) Initial screening of applicants by mayoral staff and a representative from any Council office who wishes to participate; (3) Review and further screening by the Selection Advisory Committee (a panel consisting of five diverse community members, each chosen by the Mayor and other Commissioners); (4) Candidate interviews with Mayor after soliciting feedback about final candidates from each Council office;  (5) Mayoral appointment and (6) Council confirmation.

In accordance with best practices for youth-adult partnerships, a separate process will be followed for high schoolers: 1) Application submission; 2) Opportunity for recommendations by David Douglas School District, Parkrose School District, and Portland Public Schools (three students per district); 3) Group interviews by Selection Advisory Committee (with AMAC participation); 4) Recommendations by Selection Advisory Committee to the Mayor; 5) Group interviews by the Mayor; 6) Mayoral appointment; and 7) Council confirmation.

Any high school-aged youth who apply through the regular process will be incorporated into the youth selection process. Any high school-aged youth under the age of 18 must obtain permission from a legal guardian (or provide documentation that they are legally emancipated) to apply and serve on the PCCEP.

A minimum of two high school-aged youths will serve on the PCCEP together.

The Mayor will consider the selection criteria and views of the community in appointing volunteers.  City employees may not be appointed to sit on the PCCEP.

Exhibit 2 – Page 3

V.    <u>TERM</u>

Volunteers will serve two-year terms, with the option to re-apply at the end of a term. During the first year of PCCEP's life, volunteers will be appointed on a staggered basis where the majority of the board will serve two-year terms, and the remainder will serve one-year terms. Applicants will be able to indicate on their application forms whether they wish to serve one or two-year terms. Any volunteers who serve one-year terms will have the option of re-applying for the opportunity to serve a full term. In accordance with City policy for advisory boards and commissions, volunteers can serve no more than eight years on the PCCEP.

VI.    <u>REMOVAL</u>

The Mayor, after consultation with the Council, the PCCEP Program Manager and PCCEP chair (absent a conflict of interest) will have sole discretion to determine when PCCEP members are no longer fit to serve on the committee due to misconduct. If a member is removed or resigns, the selection process identified above will be used to recruit, appoint and confirm the new member.

VII.    <u>CITY'S RESPONSIBILITIES</u>[2]

To establish the PCCEP and facilitate its work, the City will seek the services of a facilitator to structure board orientation for PCCEP members. This orientation shall include training on the *United States v. City of Portland* Settlement Agreement. Specifically, as part of this training, the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and mental health advocates will be invited to provide information on the history of the Settlement Agreement.

---

[2] With the amendments to Section IX of the Settlement Agreement and the development of the PCCEP, the City understands there is concern about the role of the Portland community in monitoring the Settlement Agreement, and updating the wider community on the status of terms of the Settlement Agreement.  The City will provide updates to the community on the status of the City's compliance with its obligations under the Settlement Agreement in the following ways:  1) at the annual status conference before the federal district court; 2) through quarterly community meetings with the COCL either separate from or jointly with the PCCEP, and staffed by the City; 3) through reports on the COCL website; and 4) through other means as appropriate.  The United States Department of Justice and the COCL will continue to have responsibility for monitoring the City's compliance with its obligations under the Settlement Agreement during the effective period of the Agreement.    After the City is found to be in compliance with the Settlement Agreement and the Court, DOJ and COCL are no longer involved, PCCEP will provide recommendations to the Mayor/Police Commissioner regarding continued assessments of the City's progress, generally, and community engagement.

Exhibit 2 – Page 4

After PCCEP's board orientation, the City shall continue to provide resources for member training as needed so that members continue to fulfill their obligations.

The City shall make appropriate information available regarding PPB's current community engagement initiatives, directives, and directive review and implementation process.

The PPB, in particular, and in accordance with its directive review schedule, shall meet with PCCEP during a universal review period to brief members on directives related to the DOJ Settlement Agreement and/or key areas of concern, provide information as needed/requested, and solicit PCCEP member feedback. The PPB shall make the adjustments necessary to its current directive review system in order to integrate PCCEP into the PPB's work.

The City shall provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days.

The City shall provide staffing for the PCCEP including a program manager and administrative support.  The City will also provide staff support and funding for community organizing/outreach.

The City shall provide meeting locations, and work with PCCEP to identify neutral locations that are accessible to and appropriate for the community for public meetings.

To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes, the PCCEP and the PPB's Equity & Diversity Manager to develop a Community Engagement Plan, which shall be adopted by Council following a public hearing.

The Mayor's Office shall publish on the City website an annual report, commencing from the date PCCEP begins meeting through the duration of its existence, that will include updates on progress made by the City in key areas of concern and community engagement recommendations.

The Mayor or the Mayor's delegate, and the PPB Chief or the Chief's delegate, shall endeavor to attend all public meetings of PCCEP, unless PCCEP requests otherwise.  Other Commissioners or their delegates are encouraged to attend, unless PCCEP requests otherwise.  The purpose of such attendance is to listen to understand, provide information either at the meeting or as follow-up, and learn from PCCEP members and public testimony.


VIII.    MEMBERS' RESPONSIBILITIES

PCCEP members must engage all participants in a respectful and collegial manner, and be responsible for the following:

- Prior to members' first PCCEP meeting:

Exhibit 2 – Page 5

- o Learn about the history of the *United States v. City of Portland* Settlement Agreement.
- o Attend PPB community academy. If necessary, the City is willing to provide a reasonable accommodation that would instead permit a PCCEP member to observe a session of the community academy and be given a guided tour of the PPB Training Division (with the opportunity to ask detailed questions about the Training Division).
- o Participate in a ride-along with PPB (1 per PCCEP member). If necessary, the City is willing to provide a reasonable accommodation that would instead permit a PCCEP member to participate in a ride-along with a member of the Behavioral Health Unit or a Neighborhood Response Team (in lieu of regular patrol); or participate in a morning walking beat.
- o Review lessons learned from the COAB.
- o Participate in subject matter and board trainings.
- o Learn about:
  - ✦ PPB organizational structure;
  - ✦ Policy development and implementation process;
  - ✦ PPB Racial Equity Plan;
  - ✦ PPB Training Division Plan;
  - ✦ PPB's Office of Community Engagement and current community engagement initiatives, generally; and
  - ✦ PPB advisory bodies.
- On a quarterly basis, gather input from Portlanders regarding experiences with and perceptions of PPB's community outreach. Input will be gathered through culturally responsive and relevant strategies that center the needs of the community. These strategies will include meeting community members where they are physically, mentally, emotionally and spiritually.  Such input will be solicited from (though not limited to) the following groups:
  - o General consultation with Office of Community and Civic Life (Civic Life) and/or District Coalitions, Coalition of Communities of Color, and Civic Life's Diverse Civic Leadership partners
  - o AMAC, The Portland Commission on Disabilities, the Human Rights Commission, and the New Portlander Policy Commission
- Evaluate national best practices regarding police and community engagement leading to bias-free policing and community trust.
- Analyze prior community surveys and consult with the City to conduct additional community surveys.
- Receive public comment from Portlanders at large.
- Review PPB directives and make recommendations to PPB based on public feedback in key areas of concern.

Exhibit 2 – Page 6

- Provide ongoing feedback to PPB's Office of Community Engagement on its community engagement practices and initiatives, and provide feedback on PPB's Community Engagement Plan.

- Hold monthly meetings. Meeting agendas shall be structured in a manner that provides a meaningful opportunity for public comment at the meeting prior to the conclusion of deliberations and voting. PCCEP meetings will generally be open to the public. However, if PCCEP reasonably determines that good cause exists on a particular occasion (for example, to deliberate on sensitive matters, such as matters involving personal medical information, or due to safety concerns), the PCCEP may meet without the public present. Facilitators will ensure that no votes are taken without the public having the opportunity to be present.

- Form subcommittees that may meet at other times during the month. Subcommittee meetings must be open to the public and provide an opportunity for the public to weigh in on the substantive matters being considered.

- PCCEP shall coordinate with the COCL to host open town hall meetings  at which the COCL provides quarterly reports and the COCL and PCCEP receives public comment on compliance assessments and recommendations to facilitate Portlanders' ability to review compliance and make recommendations.[3]

- Agendas and minutes from all PCCEP meetings will be published on the City website within 10 business days after the meeting date.

IX.    <u>DELIVERABLE PRODUCT</u>

PCCEP shall be responsible for producing the following:

- Summary reports issued (to the Mayor, PPB, DOJ, and the public at large) contemporaneously with quarterly town halls, providing an overview of community concerns around and any recommendations regarding use of force, interactions with people experiencing mental illness, complaint investigations, and racial justice. Strategies and recommendations developed to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members, to inform PPB's Community Engagement Plan, utilizing the following procedure:

---

[3] Should COCL decline to combine its quarterly town halls with PCCEP's town halls, the COCL may hold separate town halls for community feedback, with staff support from the City.

Exhibit 2 – Page 7

1. *PCCEP shall consult with community members and hold at least two (2) public hearings, to be completed within 180 days of PCCEP members being seated (PCCEP's town halls may be utilized for this purpose).  To gather public input on PPB's outreach efforts and progress towards eliminating unconstitutional disparate treatment, the hearings shall be held in locations to ensure that PPB receives input from all parts of the Portland community. PCCEP shall review PPB's prior community outreach efforts to contribute strategies to the development of a new Community Engagement Plan.*

2. *PCCEP shall meet at least quarterly with the Director of the City's Office of Equity and Human Rights and PPB's Manager of Equity & Diversity, including a review of PPB's current Racial Equity Plan, and evaluate PPB's ongoing efforts to implement that plan.*

3. *PCCEP shall suggest for inclusion in the Community Engagement Plan strategies to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members.  The parties recognize that meaningful public engagement involves the ability of community members to affect policies, practices, and PPB culture, thereby improving outcomes and eliminating unconstitutional actions.*

4. *PCCEP may also provide information to the PPB on other areas related to meaningful community engagement and outreach to contribute to the development of the Community Engagement Plan.  The Plan will specify how to integrate community values and problem-oriented policing principles into PPB's management, policies and procedures.*

5. *PCCEP will spend the first year gathering information from the public and compiling recommendations for PPB's Community Engagement Plan. Recommendations shall be submitted to PPB within one year of PCCEP members being seated.*

6. *The Chief's Office shall consult with the PCCEP and shall consider and utilize to the extent practicable PCCEP's recommendations in developing and implementing the Community Engagement Plan.  The Chief's Office shall present the final proposed Community Engagement Plan (with implementation timeline) to the PCCEP for its final review and comment within 45 days of receiving PCCEP's recommendations.  The recommended Community Engagement Plan shall be considered by the City Council in a public hearing, leading to the Council's adoption of the Plan after review and amendments if indicated.*

Exhibit 2 – Page 8

*The PCCEP shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Community and Civic Life Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The PCCEP shall also provide the opportunity for public comment at any town hall and roundtable meetings to keep open lines of communication with the public at- large.  The PCCEP may also invite testimony from other City bodies, including but not limited to PCoD, BHUAC, TAC, HRC, CRC and the citizen members of the PRB.*

Exhibit 2 – Page 9

**Resolution No.** 3 7 3 8 4 As Amended

Approve changes to Plan for Portland Committee on Community-Engaged Policing and establish Committee (Resolution)

WHEREAS, on November 14, 2012, Council passed Ordinance No. 185736 As Amended (Authorize Mayor to execute an Agreement with the United States Department of Justice Civil Rights Division and the United States Attorney for the District of Oregon regarding changes to policies and procedures in and oversight of the Portland Police Bureau); and

WHEREAS, on August 24, 2017, Council passed Ordinance No. 188570 As Amended (Approve amendments to Settlement Agreement Between the United States and the City of Portland in United States District Court Case No. 3:12-cv-02265-SI, and Plan for the Portland Commission on Community-Engaged Policing); and

WHEREAS, on April 19, 2018, the United States District Court for the District of Oregon held a Fairness Hearing on the amendments to the Settlement Agreement approved by Council on August 24, 2017; and

WHEREAS, on May 15, 2018, the United States District Court entered an order approving the amendments to the Settlement Agreement at paragraphs 69(c), 73(a), 117, 121, 131(d) and 159, and conditionally approving changes to sections IX and X regarding community engagement and oversight (Order and Amended Settlement Agreement attached hereto as Exhibit 1); and

WHEREAS, the City of Portland, through the office of Mayor Ted Wheeler, has been working to take all necessary steps to constitute the Portland Committee on Community Engaged Policing pursuant to the terms of the Amended Settlement Agreement and the Portland Committee on Community-Engaged Policing (PCCEP) Plan attached as an Exhibit to the Amended Settlement Agreement; and

WHEREAS, the City, as part of that work, convened a Community Evaluation Committee comprised of Freda Ceaser, Director of Equity and Inclusion, Central City Concern; Dana Coffee, member, Portland Commission on Disability; Jan Friedman, Attorney, Disability Rights Oregon; Janie Gullickson, Executive Director, Mental Health Association of Oregon; Mandi Hood, PCCEP Project Manager, City of Portland; Kalei Luyben, member, Albina Ministerial Alliance Coalition for Justice and Police Reform; and Daniel Portis-Cathers, member, NAACP; and

WHEREAS, the Community Evaluation Committee selected two facilitators to work together to support the establishment and development of the PCCEP, and announced the selection on April 18, 2018, of the facilitators; and

37384

WHEREAS, one facilitator selected was Training for Transformation, an Oregon State-certified Minority Business Enterprise and Emerging Small Business that specializes in equity-focused community building between law enforcement and the diverse residents they serve. The organization has facilitated Community Conscious Policing workshops with law enforcement, both locally and statewide; and

WHEREAS, the other facilitator selected was the Brad Taylor Group (BTG), an Oregon State Certified Emerging Small Business specializing in developing communication strategies through training seminars, conflict resolution and facilitation services. BTG has trained diverse groups locally and statewide to communicate more effectively and compassionately, and has provided group facilitation focused on identifying and overcoming differences to achieve shared outcomes and goals; and

WHEREAS, the City established a PCCEP Selection Advisory Committee to work with the facilitators and Project Manager to develop the written application and selection criteria for the PCCEP, comprised of a member nominated by each Commissioner as follows:  Dr. Cynthia Fowler (Commissioner Dan Saltzman); Julie Ramos (Commissioner Amanda Fritz); Musse Olol (Commissioner Chloe Eudaly); Bobbin Singh (Commissioner Nick Fish); and Derald Walker, Ph.D. (Mayor Ted Wheeler); and

WHEREAS, the City, Selection Advisory Committee and the facilitators engaged in a broad outreach strategy to reach diverse community members potentially interested in serving on the PCCEP, which included community meetings and forums; informational sessions at geographically diverse locations; broad communication through community partners to promote the application opportunity; volunteer presentations; and direct outreach to community leaders and elders; and

WHEREAS, over 100 diverse community members applied to be considered as PCCEP members; and

WHEREAS, the Selection Advisory Committee has interviewed qualified candidates; and

WEHREAS, the Selection Advisory Committee has recommended candidates for Mayoral interviews; and

WHEREAS, Mayoral interviews will be completed the week of August 27, 2018, and PCCEP members announced shortly thereafter; and

WHEREAS, the facilitators and local community experts have stressed the importance of youth participation on the committee incorporating best-practices for youth-adult interactions; and

WHEREAS, a process for the selection of youth members has been developed and interviews will be conducted the week of August 27, 2018; and

37384

WHEREAS, the facilitators, with community input, have proposed a community-focused and trauma-informed approach to the organization and work of the PCCEP; and

WHEREAS, it is appropriate to provide alternatives for PCCEP members who may require an ADA accommodation in training protocols while still ensuring that PCCEP members receive an adequate understanding of the work and role of law enforcement; and

WHEREAS, it is important to ensure that the workload of the PCCEP does not unreasonably discourage membership, by reducing the required number of meetings from two monthly to one monthly while adding subcommittees to work on specific issues or matters; and

WHEREAS, the facilitators have a robust plan in place for more meaningful community engagement that will build upon the foundational PCCEP Plan and place an emphasis on community gatherings and less traditional forms of engagement, while still allowing the PCCEP to determine its own focus and methodology for community engagement; and

WHEREAS, the structure of PCCEP's work and meetings must provide for public observation and input while also preserving some flexibility for PCCEP to determine its meeting structure and how to protect the safety of PCCEP members; and

WHEREAS, the facilitators, in collaboration with the Mayor's staff and the PCCEP Project Manager, have developed certain limited amendments to the original PCCEP Plan (included in Exhibit 1 hereto) to fulfill these objectives; and

WHEREAS, the proposed amended PCCEP Plan is attached hereto as Exhibit 2 which is red-lined to reflect the amendments; and

WHEREAS, paragraph 141 of the Amended Settlement Agreement requires the City to consult with the Amicus Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and the Intervenor Portland Police Association (PPA) regarding amendments to the PCCEP Plan during the life of the Settlement Agreement; and

WHEREAS, the City has consulted extensively with both AMAC and PPA regarding the proposed amendments to the PCCEP Plan and Exhibit 2 reflects changes requested by AMAC and PPA; and

WHEREAS, during the life of the Settlement Agreement the DOJ has to review and approve any amendments to the PCCEP Plan; and

WHEREAS, the next status conference before the Court to address the community engagement sections of, and the conditionally approved amendments to, the Settlement Agreement is scheduled for October 4, 2018; and

WHEREAS, the PCCEP selection process has been successfully implemented and the PCCEP members will be ready to begin their important work subject to the updates to the PCCEP Plan; and

37384

WHEREAS, the substantial work that has been done to create and seat the PCCEP has revealed that the proposed amendments to the PCCEP Plan (Exhibit 2) reflect desirable refinements to the original PCCEP Plan approved by Council which will further enable the PCCEP's important work of improving the community engagement and oversight process of the Settlement Agreement in an authentic, transparent way that centers the experiences of the people impacted most; and

WHEREAS, the amended PCCEP Plan will provide a robust framework for the PCCEP's work not only during but well beyond the life of the Settlement Agreement.

NOW THEREFORE, BE IT RESOLVED, that the Portland City Council amends the Plan for the Portland Committee on Community-Engaged Policing as shown on Exhibit 2 hereto; and

BE IT FURTHER RESOLVED, that the Portland Committee on Community-Engaged Policing is hereby established pursuant to this amended Plan.

Adopted by the Council:  SEP 0 5 2018

Mayor Ted Wheeler
Prepared by: Tracy Reeve
Date Prepared: August 27, 2018

Mary Hull Caballero
Auditor of the City of Portland
By

                                    Deputy

4

Agenda No.

## RESOLUTION NO. 37384 As Amended
Title

Approve Changes to Plan for Portland Committee on Community-Engaged Policing and Establish Committee Pursuant to Plan as Amended (Resolution)

| INTRODUCED BY<br>Commissioner/Auditor:<br>**Mayor Wheeler** | CLERK USE: DATE FILED ___ AUG 28 2018 |
|---|---|
| **COMMISSIONER APPROVAL** | Mary Hull Caballero<br>Auditor of the City of Portland |
| Mayor—Finance & Administration – Wheeler | |
| Position 1/Utilities - Fritz | By: _Susan Parsons_ |
| Position 2/Works - Fish | Deputy |
| Position 3/Affairs - Saltzman | ACTION TAKEN: |
| Position 4/Safety - Eudaly | |
| **BUREAU APPROVAL** | |
| Bureau: Mayor's Office<br>Bureau Head: Mayor Wheeler | |
| Prepared by: T. Reeve/cj<br>Date Prepared:8/27/18 | |
| Impact Statement<br>Completed ☒    Amends Budget ☐ | |
| Portland Policy Document<br>If "Yes" requires City Policy paragraph stated in document.<br>Yes ☐    No ☒ | |
| **City Auditor Office Approval:**<br>required for Code Ordinances | |
| **City Attorney Approval:**<br>required for contract, code. easement,<br>franchise, charter, Comp Plan | |
| Council Meeting Date    **9/5/18** | |

| AGENDA |
|---|
| **TIME CERTAIN** ☒<br>**Start time: 2:30**<br><br>**Total amount of time needed: 20 min.**<br>(for presentation, testimony and discussion) |
| **CONSENT** ☐ |
| **REGULAR** ☐<br>**Total amount of time needed:** _____<br>(for presentation, testimony and discussion) |

| FOUR-FIFTHS AGENDA | COMMISSIONERS VOTED<br>AS FOLLOWS: | | |
|---|---|---|---|
| | | YEAS | NAYS |
| 1. Fritz | 1. Fritz | ✓ | |
| 2. Fish | 2. Fish | ✓ | |
| 3. Saltzman | 3. Saltzman | ✓ | |
| 4. Eudaly | 4. Eudaly | ✓ | |
| Wheeler | Wheeler | ✓ | |



**BYLAW TEMPLATE FOR CITY ADVISORY BODIES**

**[Name of Body] ("Body")**

**I.   Body created on**_____**, by**
  □  Portland City Code  _____
  □  Council Resolution  _____
  □  Council Ordinance  _____
  □   Bureau_____; by whom _____
  □  Other  _____

  **A.  Purpose**
  [Describe why this Body exists using plain language. What is its subject matter, objectives, goals, timelines and deadlines? Is there a time limit by which its work is expected to be completed? Is this Body perpetual or temporary?]

  **B.  Sponsor Bureau:** _____

  **C.  Bureau liaison/title:** _____

  **D.  Advise to**
    □  City Council
    □  Elected-in-Charge[1]_____
    □  Bureau Director
    □  Designated bureau staff (title) _____

**II.   City Role**
The Bureau will provide a staff person to assist with technical support, substantive expertise, logistical assistance, administrative assistance, and advice to the Body. The Bureau will also provide public notice of all meetings, post materials to a webpage, and prepare meeting summaries that outline the issues discussed, the areas in which there is agreement, and any remaining issues on which agreement was not reached.

_____

[1] The term Elected-in-Charge refers to any of the five elected Commissioners (including the Mayor) plus the City Auditor.

### III.  Frequency of Meetings

The Body shall meet at least_____times each calendar year and as otherwise necessary to conduct its business. Meetings shall be conducted in accordance with the operating procedures specified herein.

### IV.  Membership and Term

Members of advisory bodies are public officials. They should become familiar with rules and responsibilities described at the "Oregon Government Ethics Law - A Guide for Public Officials" (Oregon Government Ethics Commission).

    **A.**  Total membership_____seats
        _____seats for_____years;
        _____seats for_____years;
        _____seats for_____years.

    **B.**  Terms
        □  Staggered
        □  All terms begin/end at the same time

    **C.**  Term Limits
        1.  Members may serve any number of terms not to exceed **eight years of total consecutive service**. Completion of an unexpired term does not apply toward the eight-year cumulative.

        2.  At the completion of each term, regardless of term length, incumbents are required to complete notice of intent to continue to serve and discuss mutual benefits of continuing on the body with the designated bureau staff.

        3.  Members interested in continuing service beyond eight years must sit out for:
            □  two years (if the body does not have set terms)
            □  one term
        before reapplying to serve on the same advisory body.

Members may not have alternates and all serving members are selected and appointed to full terms. Whether a seat is filled for the remainder of the vacated term or anew will be determined by the appointing entity. If there are vacancies, including if a position becomes vacated during a term, normal recruitment processes should follow. The process includes recruitment applications, vetting and selecting members, and appointment by the Elected-in-Charge (for types I and II bodies) or bureau director (for type III bodies).

    **D.**  Quorum
        □  Simple majority: 50% plus 1 or greater number of seats
        □  A specific number_____, per the authority of _____[other law]

(Type III advisory boards advising an individual rather than Council are not required to

have a quorum to deliberate. These bodies may use alternative means to arrive at recommendations.)

    **E.** Voting
- □ Majority of seats per ORS 174.130
- □ Majority of quorum present per the authority of____[other law]

A quorum shall be necessary of voting members to make decisions that represent the position of the Body and to fulfill any other responsibilities. Proxy/absentee voting is not allowed.

(Type III advisory boards advising an individual rather than Council are not required to administer a formal vote to make recommendations.)


**V.   General Operating Procedures**
    **A.** Disclosure of Conflicts of Interest [or other connection]
- A public official is required to make an announcement of the nature of a conflict of interest each time the issue giving rise to the conflict of interest is discussed or acted upon.
- The announcement needs to be made on each occasion when the public official is met with the conflict of interest, and the public official must disclose the nature of the conflict of interest.
- For example, an elected member of the City Council would have to make the public announcement one time when met with the conflict of interest, but only one time in each meeting of the City Council. If the matter giving rise to the conflict of interest is raised at another meeting, the disclosure must be made again at that meeting.
- Bureau liaison and/or staff are obligated to record and keep all conflicts of interest that are announced during each meeting.
- If it is found that a member did not disclose a conflict of interest, staff must alert the Bureau Director of the instance as soon as the incidence is known.
- Any potential or actual conflict of interest noted by staff will be included in the recommendation report provided to City Council or other final decision-making body.

    **B.** Meetings will be conducted to foster collaborative decision-making using either:
- Robert's Rules of Order culminating in a majority vote;
- Consensus Decision Making (including Modified Consensus Decision Making). This still requires a quorum and a final vote.


**VI.   Removal of Members and Resignations**
    **A.** All members serve at the pleasure of the Elected-in-Charge of the Bureau (for types I and II bodies) or Bureau Director (for type III bodies) and may be asked to resign or be removed at the Elected-in-Charge or Director's discretion at any time unless

authority (for instance, Code, statute, etc.) exists requiring a different process.

**B.**  Any member who does not give notice that they intend to be absent from a scheduled meeting for more than 25 percent of the meetings in any 12 months of the service will be removed by the Bureau Director.

**C.**  Process for removal
- For unexcused absences: Bureau liaison keeps attendance and informs Bureau Director of absences, who in turn informs the member in writing that they have been removed as a member of the Body.

- By Elected-in-Charge: Elected informs the member in writing that they have been removed as a member of the Body.

**D.**  Resignation process
Members are expected to make a good faith effort to complete their term. In cases where this is not possible, members are expected to provide notice to the City staff liaison in writing (preferred) or verbally. Members are encouraged to complete the Resignation Form and submit to City staff liaison.


## VII.  Officers and Subcommittees (optional)
The presiding officers of the Body may consist of the following positions in sequential presiding order
- ☐  Chairperson (Chair)
- ☐  _____ Vice-chairperson(s) (Vice-Chair)
- ☐  coordinating committee (or similar)

and will act as designated leadership appointed by:
- ☐  Elected-in-Charge.
- ☐  Bureau Director.
- ☐  Majority vote of members or consensus decision-making.

The designated leadership shall be responsible for conducting the meetings and will be voting members of the advisory body. A presiding officer will be designated at all times. The designated leadership may look to Bureau liaison to facilitate meetings.

The designated leadership will encourage full and safe participation by representatives in all aspects of the process, assist in the process of building consensus, and ensure all participants abide by the Body's operating procedures. The
- ☐  Chair and the Bureau staff liaison
- ☐  Bureau staff liaison
- ☐  Other _____

will also serve as liaison between the members of the Body and the City. In consultation with the Facilitator (if there is one) and Bureau liaison, the designated leadership will develop meeting agendas, establish subcommittees if needed, and ensure an efficient advisory process.

The Body may divide its members into subcommittees authorized to act on behalf of the full Body for an assigned purpose.

Subcommittee meetings are also subject to Oregon Public Meetings Law and must abide by quorum requirements when voting. While subcommittees may engage non-members, only members may vote to approve reports and recommendations to be forwarded to the full Body. When voting, the quorum for subcommittee members is the simple majority of the subcommittee (50% plus 1 or greater number of seats).

## VIII. Facilitator Role (optional)

The City may contract with an independent and neutral third party whose role is to facilitate meetings, help develop recommendations, and produce approved reports. The Facilitator will not act as an advocate on any issue, any interest group, or any member of the Body.

Specific facilitators' responsibilities are determined by the needs of the Bureau and advisory board, but may include:

- Ensure a welcoming meeting environment where all members can participate.
- Ensure a safe environment for minority opinions.
- Conduct meetings in a manner to foster collaborative decision-making and consensus building.

## IX.    Communications

Members agree that transparency is essential to all deliberations. In that regard:

- Advisory body members are required to notify City staff liaison of verbal communications with interest groups and all communications with media. Members are required to copy the City staff liaison and, when appropriate, the Facilitator on all written communications from/to interest groups (other than a group specifically represented by a member) commenting on the Body's deliberations. These communications will be included in the public record as detailed below and copied to the Chair and/or full Body as appropriate.

## X.    Public Meetings and Records

Meetings of the full body and subcommittee meetings are open to the public and will be conducted under the provisions of Oregon Public Meetings Law (ORS 192.610-690). The Bureau liaison will provide notice to the public regarding the dates, times, and locations of all meetings:

- Regular meetings:
  - Best practices: at least one week,
  - Minimum requirement: at least 48 hours,
- Special meetings: at least 24 hours.

Per ORS 192.670(1), advisory body members can participate through telephonic conference calls. Requests for any other electronic communication means require approval from the Bureau liaison with City Attorney consultation. All records of the Body, including formal documents,

discussion drafts, meeting summaries, and exhibits are public records. Communications among members related to the subject matter of this Body should not be treated as confidential and may be subject to public records requests. "Communications" refers to all statements and votes made during meetings, memoranda, work projects, records, documents, text messages, pictures, or materials developed to fulfill the charge, including electronic mail correspondence by and among the members. The personal notes of individual members taken at public meetings might be considered to be public record to the extent they "relate to the conduct of the public's business," (ORS 192.410(4)). Members are not allowed to deliberate towards a decision over e-mail, as public participation needs to be guaranteed through that process.

## XI.   Amendment of Bylaws

The Body may vote to recommend to the Elected-in-Charge (or the Bureau Director, in the case of Type III advisory bodies) amendment or repeal of these Bylaws. The Bureau may also recommend changes to the Elected-in-Charge (or the Bureau Director). The Elected-in- Charge (or the Bureau Director) must sign off on original bylaws and any amendments to the bylaws. Members have no authority to amend bylaws without approval.


Original Bylaws Created by:_____, on_____.
                                              (name/title)                                                              (date)

Approved by:_____, on_____.
                           (Elected/Bureau Director)                                              (date approved)

Amended: _____, on_____.
                          (name, title)                                                                  (date amended)

Approved by:_____, on_____.
                           (Elected/Bureau Director)                                              (date approved)

Amended: _____, on_____.
                          (name, title)                                                                  (date amended)

Approved by:_____, on_____.
                           (Elected/Bureau Director)                                              (date approved)

# GUIDE FOR VOLUNTEER BOARDS & COMMISSIONS

City of Portland, Oregon
Office of the City Attorney

# This presentation includes excerpts from:

- A Guide for Public Officials (Oregon Government Ethics Commission – Commission)

- Code of Ethics Explanations and Examples (Portland City Auditor)

- Restrictions on Political Activities (Oregon Secretary of State – Elections Division)

- Attorney General's Public Records and Public Meetings Manual (Oregon Department of Justice )

# I. Who Is A Public Official?

**Introduction**

- In 1974, voters approved a statewide ballot measure to create the Oregon Government Ethics Commission (Commission). The laws are contained in Chapter 244 of the Oregon Revised Statutes (ORS).

# PUBLIC OFFICIAL: AN OVERVIEW

- The provisions in ORS 244 restrict some choices, decisions or actions of a public official. The restrictions placed on public officials are different than those placed on private citizens.

- Public officials must know that they are held _personally responsible_ for complying with the provisions of ORS 244 . This means that each public official must make a personal judgment in deciding such matters as the use of official position for financial gain, what gifts are appropriate to accept, or when to disclose conflicts of interest.

4

↤ If a public official fails to comply with the operative statutes, a violation cannot be dismissed by placing the blame on the public official's government employer or the governing body represented by the public official.

↤ One provision prohibits public officials from *using or attempting to use their official positions or offices to obtain a financial benefit for themselves, relatives or businesses they are associated with* through opportunities that would not otherwise be available but for the position or office held.

↤ Another provision that frequently applies to public officials when engaged in official actions of their official positions or offices is the requirement to disclose conflicts of interest.

5

## A Public Official

**Are you a public official?**

- A "public official" is any person who is serving the State of Oregon or any of its political subdivisions or any other public body as . . . an *appointed official* . . . irrespective of whether the person is compensated for the services.

- For purposes of ORS Chapter 244, volunteers are not public officials if they perform such tasks as picking up litter on public lands, participating in a scheduled community cleanup of buildings or grounds, participating in locating and eradicating invasive plants from public lands and other such occasional or seasonal events.

**How are relatives of public officials affected by Oregon Government Ethics law?**

- Public officials must always comply with state law when participating in official actions that could result in personal financial benefits and also when participating in official actions that could result in financial benefits for a relative. Public officials should also know there may be limits and restrictions on gifts their relatives may accept when offered.

8

**Who is a relative?**

Public officials need to know how Oregon Government Ethics law defines who a "relative" is. In everyday conversation the use of "relative" is applied to a broader spectrum of individuals with "family ties" than those defined as relatives in ORS 244.020(15)2. When a provision in ORS Chapter 244 refers to "relative" it means one of the following:

- **Spouse** of a public official or candidate
- **Children** of a public official or candidate
- **Children of the spouse** of a public official or candidate
- **Siblings** of a public official or candidate
- **Siblings of the spouse** of a public official or candidate
- **Spouse of siblings** of a public official or candidate
- **Spouse of siblings of the spouse** of a public official or candidate
- **Parents** of the of public official or candidate
- **Parents of the spouse** of a public official or candidate
- **Person** for whom the public official or candidate has a **legal support obligation**
- **Person benefiting from a public official** when benefits are from the public official's public employment
- **Person who provides benefits to a public official** or candidate when benefits are from the person's employment

For purposes of "relatives" defined by the last two bulleted items, examples of benefits may include, but not be limited to, elements of an official compensation package including benefits such as insurance, tuition or retirement allotments.

# Section I Review

- Definition of public official
- Who is a relative

10

# II. OBLIGATIONS OF BEING A PUBLIC OFFICIAL

- Leadership
- Use of Position or Office
- Conflicts of Interest (pecuniary)
- Nepotism
- Gifts and exclusions
- Subsequent employment

11

# LEADERSHIP

- Officials avoid discreditable personal conduct and are personally honest.

**Use of Position or Office**

➨ ORS 244.040(1) **prohibits every public official from using or attempting to use the position held as a public official to obtain a financial benefit, if the opportunity for the financial benefit would not otherwise be available** <u>but for</u> **the position held by the public official.** The financial benefit prohibited can be either an opportunity for gain or to avoid an expense.

13

- Public officials often have access to or manage information that is confidential and not available to members of the general public. ORS 244.040(4) **specifically prohibits public officials from attempting to use confidential information** gained because of the position held or by carrying out assigned duties to further the public official's personal gain.

↞ ORS 244.040(5) **also prohibits a former public official from attempting to use confidential information for personal gain** if that confidential information was obtained while holding the position as a public official, from which access to the confidential information was obtained.

## What is a conflict of interest?

- A public official is met with a conflict of interest when participating in official action which could (potential conflict) or would (actual conflict) result in a financial benefit or detriment to the public official, a relative of the public official or a business with which either is associated.

16

## **What do you do when you have a conflict?**

Elected officials or board and commission members

- When an elected or appointed public official serving on a board or commission has a **potential** conflict of interest, the official must announce publicly the potential conflict prior to taking any action thereon in the capacity of a public official.

- When an elected or appointed public official serving on a board or commission has an **actual** conflict of interest, the official must announce publicly the nature of the actual conflict and refrain from participating as a public official in any discussion or debate on the issue out of which the actual conflict arises or from voting on the issue. Note that there are special rules for planning commission members.

**How do the laws apply to a public official who either owns or is employed by a private business?**

ORS 244.020(2) provides the definition of a "business," paraphrased as follows:

A "business" is a legal entity that has been formed for the purpose of   producing income.

- Excluded from this definition are not-for-profit and tax exempt under section 501(c) of the Internal Revenue Code, if a public official or a relative of the public official holds membership or an unpaid position as a member of the board of directors.

18

ORS 244.020(3)4 provides the definition of a **"business with which the person is associated,"** paraphrased as follows:

In brief, a public official or the relative of the public official is associated with a business in the following circumstances:

- When, during the preceding calendar year, a public official or relative has held a position as director, officer, owner, employee or agent of a private business or a closely held corporation in which the public official or relative held or currently holds stock, stock options, equity interest or debt instrument over $1,000.

- When, during the preceding calendar year, the public official or relative has owned or currently owns stock, equity interest, stock options or debt instruments of $100,000 or more in a publicly held corporation.

- When the public official or relative is a director or officer of a publicly held corporation.

- When a public official is required by ORS 244.050(5) to file an Annual Verified Statement of Economic Interest form and the business is listed as a source of household income.

19

## How is the public announcement of the nature of a conflict of interest recorded?

- The public body that is served by the public official will record the disclosure of the nature of the conflict of interest in the official records (minutes, audio/video recording) of the public body. [ORS 244.130(1)]

## If a public official failed to announce the nature of a conflict of interest and participated in official action, is the official action voided?

- No. Any official action that is taken may not be voided by any court solely by reason of the failure of the public official to disclose an actual or potential conflict of interest [ORS 244.130(2)]. However, the public official faces the potential of personal liability for the violation.

20

**Is a public official required to make an announcement of the nature of a conflict of interest each time the issue giving rise to the conflict of interest is discussed or acted upon?**

- The announcement needs to be made on each occasion when the public official is met with the conflict of interest. Each time a public official is met with a conflict of interest the nature must be disclosed.

- For example, an elected member of the city council would have to make the public announcement one time when met with the conflict of interest, but only one time in each meeting of the city council. If the matter giving rise to the conflict of interest is raised at another meeting, the disclosure must be made again at that meeting.

- Another example would involve an employee in a city planning department who would have to give a separate written notice before each occasion they encounter a matter that gives rise to a conflict of interest. [ORS 244.120(3)]

NEPOTISM
=========

- Public official may not appoint, employ or promote a relative or member of household from position with public body that official serves unless official complies with conflict of interests regulations.

- May not participate in interviews, discussion or debate re: appointment, employment or promotion of relative from position with public body unless complies with conflict of interest regulations.

- May not directly supervise relative or member of household.

22

## <u>What is a GIFT?</u>

↞ **Gift: "Something of economic value" given** to a public official, a relative of the public official or a member of the public official's household for which the recipient either makes no payment or makes payment at a discounted price. The opportunity for the gift is one that is **not available to members of the general public**, who are not public officials, **under the same terms and conditions as** those that apply to the gift offered to **the public official**, the relative or a member of the household.

23

## What items are excluded from the definition of gift?

- Campaign contributions.

- Gifts from relatives/household.

- Engraved plaques, trophies, desk items unless valuable material.

- Admission, food or beverage if representing government at a reception, meal or meeting. This exemption does not authorize private meals.

- Expenses for food, lodging, travel paid by government, membership organization to which City pays dues for attendance or non-profit at convention, fact finding mission, trip or other meeting if you represent City. **Requires prior written authorization from supervisor.**

- Expenses for food, lodging, travel paid by anyone if fact finding, trade promotion or economic development mission. **Requires prior written authorization from supervisor.**

- Waiver or discount of registration materials/expenses at continuing education event to satisfy professional licensing.

- Expenses provided by another public official for in-state travel (carpool). Not included in City administrative rule, but if travel is for work purposes, City would not consider it a gift to the public official.

- Food or beverage at reception where no cost is placed on food.

- Incidental entertainment.

- Entertainment received by public official or staff where public official appears for ceremonial purposes.

24

## What is a legislative/administrative interest?

➤ An economic interest, distinct from that of the general public, in any matter subject to the decision or vote of the public official acting in public official's capacity as a public official.

State law

➤ Regardless of whether or not you are using your official position, you may not accept within one calendar year gifts of more than $50 from a source with a legislative or administrative interest.

Portland City Auditor Guidance

➤ In general, personal gifts should be refused or returned with a friendly but firm message that City officials are not allowed to receive gifts. A personal gift, lunch, or entertainment gift under $50 in value may be legal, but no amount is too small to be ethically questionable.

25

## SUBSEQUENT EMPLOYMENT

Under State law:

* May not use confidential information gained as public official to further personal gain after leaving public position.

* Public officials who authorized or had significant role in a contract may not have a direct, beneficial, financial interest in the contract for two years after leaving position.

# Section II Summary

- Leadership
- Use of position or office
- Conflicts of Interest (pecuniary)
- Nepotism
- Gifts and exclusions
- Subsequent employment

27

# III. Restrictions on Political Activity

## POLITICAL ACTIVITIES – ORS 260.432

**Non-elected City volunteers:**

- <u>May</u> express personal political views.

- <u>May</u> engage in political activities outside of work, subject to bureau rules.

- <u>May not</u> spend time on the job promoting or opposing candidates or ballot measures.

- <u>May not</u> spend time on the job promoting or opposing political committees or the gathering of signatures for proposed ballot measures.

- <u>May not</u> require or attempt to require or coerce a City employee or volunteer to engage in political activity of <u>any</u> kind at <u>any</u> time.

- <u>May not</u> use City property, City funds, or City staff to promote or oppose ballot measures, signatures on proposed measures, political committees, or election or recall of officials or candidates.

28

## APPOINTED BOARDS AND COMMISSIONS

- ORS 260.432 applies to appointed board and commission members *when they are acting in their official capacity*. Appointed board or commission members are acting in their official capacity when, for example, they are at a meeting of the board or commission, working on a duty assigned by the board or commission, working on official publications (including website materials) for the board or commission, or when appearing at an event in an official capacity.

29

# Section III Summary

- Review restrictions of ORS 260.432

30

# IV.   Oregon Public Meetings Law

"All meetings of the governing body of a public body shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided [in the Public Meetings Law]."  (ORS 192.630(1))

- "Governing body" - "the members of *any* public body which consists of two or members, *with authority to make decisions for or recommendations to* a public body or administration."  ORS 192.610(3)

- "Public Body" - "the state, any regional council, county, city or district, or any municipal or public corporation, or any board, department, *commission,* council, bureau, *committee,* or *subcommittee, or advisory group or agency thereof."* ORS 192.610(4)

- "Meeting" -- "the convening of a governing body of a public body *for which* a *quorum* is *required* in order to *make* a *decision or deliberate toward* a decision on any matter." ORS 192.610(5)

31

Gatherings Exempt from the Law

- "Meeting" does not include an on-site inspection of a project or program; attendance of members of a governing body at any national, regional or state association to which the public body or the members belong; or gatherings of a quorum of a board or commission where no official business is discussed.

- Purely social gatherings of a public body do not create a public meeting unless there is quorum and it decides to discuss matters relevant to its work.  It is best not to discuss business at all during a social gathering.  If you have a quorum present, even if the sole purpose of the meeting is to gather information to serve as the basis of future decisions or recommendations, then it is a public meeting.

32

## Quorum Requirement

- If a quorum of a public body gets together and deliberates on official business, regardless of the setting, there is a violation of the public meetings law if the required notice was not provided. If gathering is less than a quorum of the body, there is no public meeting.

# What is Required for a Public Meeting

## Notice

- Calculated to give actual notice to interested persons States time and place, lists principle subjects
- Special and emergency meetings have different requirements

## Location

- Meetings of governing bodies of public bodies shall be held within the geographic boundaries of the area over which the public body has jurisdiction, at the public body's administrative offices (if any) or "at the other nearest practical location."
- Must be at a place largest enough to hold the anticipated attendance and must be a place that does not discriminate on the basis of race, color, creed, sex, sexual orientation, national origin, age or disability. Site must be one that people with disabilities can access.

## Public Attendance

- As a general rule, the right to know about and attend a public meeting does not include a right to testify. The public meetings law is a public attendance law, not a public participation law.

## Control

- The presiding officer is authorized to keep order at a meeting and, where there will be public participation, may determine the length of time people may speak and in what order the testimony will be taken.

34

## Voting

- All official action must be by public vote.

- No secret ballots.

- The vote of each member must be recorded unless there are 26 or more members.

- Written ballots are allowed but each ballot must identify the member voting and the vote must be announced.

- As a general rule, no proxy voting.

- No absentee voting.  That is, no voting by a member who did not participate whether in person or electronically as by telephone.

## Minutes

- There shall be sound, video, written notes or digital recordings of all meetings. These need not be verbatim but must "give a true reflection of the matters discussed at the meeting and the views of the participants."  ORS 192.650(1). There are minimum requirements for the minutes and these include who was present, the substance of discussion and the results of the vote.

## Executive Sessions

- An executive session is a meeting or portion of a meeting of a governing body that is closed to the general public. An executive session is not closed to the media. However, the governing body may require that the media not disclose specified information.

- There are limited purposes for an executive session which include employment, employee discipline, labor and real estate negotiations, and consultation with legal counsel regarding current or potential litigation. A governing body may also go into executive session to consider records exempt from public inspection. For example, a governing body may meet in executive session to discuss written legal advice from counsel because the written advice is exempt from public inspection as a privileged document.

- A governing body may not make a final decision in executive session. To make a final decision, the chair must continue the decision to a public meeting or call the executive session into open session. A governing body may not remain in executive session to discuss or deliberate on matters other than the matter for which the session was convened.

36

# Section IV Summary

Definitions of:

- Governing body
- Public body
- Meeting
- Executive session
- Public Meeting requirements

# Section V.  Oregon Public Records Law

**What is a public record?**

For the purposes of retention a public record is defined by Oregon Revised Statutes (ORS) 192.005(5):

(5) "Public record"

 (a) Means any information that:

(A) Is prepared, owned, used or retained by a state agency or political subdivision;

(B) Relates to an activity, transaction or function of a state agency or political subdivision;

and

(C) Is necessary to satisfy the fiscal, legal, administrative or historical policies, requirements or needs of the state agency or political subdivision.

# Public Records Generally

- The Public Records Law applies to every public body, as defined by ORS 192.410(3), and includes the City and "any agency thereof" and that includes the City's boards and commissions.

- Presumption for Disclosure - "Every person has a right to inspect any public record of a public body in this state, except as otherwise provided...." ORS 192.420(1).

- "'Public Record' includes any writing that contains information relating to the conduct of the public's business, ... used or retained by a public body regardless of physical form or characteristics."  (ORS 192.410(4)(a)).

- "'Writing' means handwriting, printing, photographing, and every means of recording, including letters, words, pictures, sounds, or symbols, or combination thereof, and all papers, maps, files, facsimiles or electronic recordings." (ORS 192.420(6)).

- Public records may include an email or text message if it discusses the City's business, whether the record is located on City network or equipment or on personal electronic devices.  <u>Drafts are also public records.</u>

39

## Retention of Records

- Once a record is created, a public body is responsible for retaining that record according to the retention schedules adopted by the body. The public body's custodian of records is also responsible for making public records available upon request.

- You will be advised of the retention schedule for your public body. A number of schedules may be relevant to your work.

- Always email a copy of all correspondence that relate to City business to the designated City staff person for your body.

40

## Use of Home Computers (and other electronic devices)

↞ Oregon's public records laws apply to e-mail correspondence about City business even when exchanged solely on City employees' or volunteers' personal computers (or other electronic devices). As a result, employees and volunteers have a responsibility to ensure retention of such e-mails and documents.

↞ Whether an e-mail or document contains information relating to the conduct of the public's business is case specific. Generally, if an e-mail or document discusses procedural or substantive aspects of your work, it will meet this test. A purely personal e-mail does not become a public record simply because it is sent by a public official. Whether the e-mail or document is prepared, owned, used or retained by a public body is also fact dependent. A document not in the possession of the government still can be a public record by virtue of being used or prepared by a public body.

41

← What this means in practice is that if you choose to use private computers to create City related documents or to correspond with one another regarding City business, you may be responsible for retaining the correspondence in accordance with City document retention schedules. This includes records created on personal devices, such as personal laptop or PC, Blackberry or cell phone with texting capability, or I-Pad.

← Text messages must also be retained. It is very intrusive to retrieve text messages from your personal phone. Please be careful.

42

Knowingly destroying public records can constitute a criminal offense.

ORS 162.305.

43

## Public Records Exemptions

- State law provides that certain public records may be withheld from disclosure if they fall within a statutory exemption.  Generally, exemptions do not prohibit disclosure; they allow the public body, through its authorized representative (generally, an elected official, bureau director or designated public body's custodian of records, with guidance from legal staff) to decide whether to release a record.  <u>The presumption is in favor of disclosure and a requestor may challenge a public body's decision not to release a record</u>.

44

# Section V. Summary

- What is a public record?
- Retention
- Copy all emails to City staff member
- Text messages count!

# General Takeaways

- Familiarize yourself with ethical obligations and abide by them
- Conduct the business of your Board during scheduled public meetings
- Do not deliberate outside of scheduled meetings
- Always copy designated staff person on any correspondence
- Resist communicating by email or texts outside of scheduled meetings
- If you have information to share, send it to the Chair for dissemination

46

← You are personally liable, whether criminally or civilly, for individual violations of Oregon ethics, public meeting or public records law.

← The City may neither indemnify nor represent you before the Oregon Government Ethics Commission or a criminal court.

47

# QUESTIONS???

# If you have a further question about any of this information . . .

↩ Please direct your inquiry to the Chair of your board.  The Chair will in turn seek guidance from the City Attorney's Office and an opinion will be rendered to the entire board for clarification.

↩ The City Attorney's Office does not represent individual board members, but advises the board as a whole on the law.  Each board member is responsible for abiding by State of Oregon and City of Portland laws.

49

Thank you for your service to the City of Portland.

50

# Portland Police Bureau
# Organizational Chart



**CHIEF OF POLICE**

**PROFESSIONAL STANDARDS**
- POLICY DEVELOPMENT
- INTERNAL AFFAIRS
- INSPECTOR
- EIS/ACCOUNTABILITY
- PR MGMT ANALYST

**DEPUTY CHIEF**

**ADJUTANT**
- COMMUNICATIONS

**CRIMINAL INTELLIGENCE UNIT**

**SERVICES**

- ADMINISTRATIVE SUPERVISOR
- SERVICES/INVEST. SCHEDULER
- OPERATIONS SCHEDULER
- DEPUTY CHIEF SCHEDULER

## OPERATIONS
EXECUTIVE OFFICER

**CENTRAL PRECINCT**
- NEIGHBORHOOD RESPONSE TEAM
- PPI LIAISON
- SPECIAL EVENTS
- BEHAVIORAL HEALTH UNIT
- SERVICE COORDINATION TEAM
- CROWD MANAGEMENT INCIDENT COMMAND
- HONOR GUARD
- HIGHLAND GUARD

**EAST PRECINCT**
- NEIGHBORHOOD RESPONSE TEAM

**YOUTH SERVICES DIVISION**
- SCHOOL POLICE
- G.R.E.A.T.
- CADET
- CRISIS RESPONSE TEAM

**NORTH PRECINCT**
- NEIGHBORHOOD RESPONSE TEAM
- NEW COLUMBIA

**TRAFFIC DIVISION**
- DUII ENFORCEMENT UNIT
- MOTORCYCLES
- TRAFFIC INVESTIGATIONS
- PHOTO RADAR/RED LIGHT CAMARA
- AGGRESSIVE DRIVER ENFORCEMENT
- EMERGENCY MANAGEMENT UNIT

## INVESTIGATIONS
EXECUTIVE OFFICER

**DRUGS & VICE DIVISION**
- NARCOTICS
- ASSET FORFEITURE

**TRANSIT POLICE DIVISION**
- CRITICAL INCIDENT COMMAND

**FAMILY SERVICES DIVISION**
- DOMESTIC VIOLENCE REDUCTION UNIT
- CHILD ABUSE TEAM
- CARES UNIT
- STRENGTH PROGRAMS (WOMENS, GIRLS, BOYS)
- ELDER CRIME PREVENTION
- EMPLOYEE ASSISTANCE PROGRAM
- SUNSHINE DIVISION

**FORENSIC EVIDENCE DIVISION**
- JUVENILE IDENTIFICATION
- HOME SECURITY (LOCKS) PROGRAM

**PROPERTY/EVIDENCE DIVISION**
- VEHICLE STORAGE

**TACTICAL OPERATIONS**
- EXPLOSIVES DISPOSAL UNIT
- SPECIAL EMERGENCY REACTION TEAM
- GANG ENFORCEMENT TEAM
- GUN TASK FORCE
- AIR SUPPORT UNIT
- CRISIS NEGOTIATIONS TEAM
- RAPID RESPONSE TEAM
- CANINE UNIT
- RESERVES

**DETECTIVE DIVISON**
- PERSON CRIMES
- BIAS CRIMES
- DISTRICT ATTORNEY INVESTIGATORS
- FBI VIOLENT ROBBERY TASK FORCE
- US MARSHALS TASK FORCE
- PROPERTY CRIMES
- POLYGRAPH
- COURT COORDINATOR
- VICE
- COMPLAINT SIGNERS
- SPEC PROP INVEST/ BURGLARY TF
- SEX TRAFFICKING

## SERVICES

**RECORDS DIVISION**

**FISCAL SERVICES DIVISION**
- ALARMS
- FLEET MANAGEMENT
- SUPPORT/FACILITIES
- QUARTERMASTER

**TRAINING DIVISION**
- ACADEMY
- CRISIS INTERVENTION

**PERSONNEL DIVISION**
- PENSION/DISABILITY
- RECRUITMENT COORDINATOR
- OPERATIONS SUPPORT UNIT

**INFO TECHNOLOGY DIVISION**
- REGJIN

**STRATEGIC SERVICES DIVISION**
- EQUITY & DIVERSITY
- COMMUNITY ENGAGEMENT
- CRIME ANALYSIS UNIT
- PPB ADVISORY COMMITTEES



Last updated: August 2, 2018/Communications Unit-CHO

CURRENT PPB ADVISORY BOARDS

African American Advisory Council

Alliance for Safer Communities (formerly Sexual Minority Roundtable)

Behavioral Health Unit Advisory Council (BHUAC)

Budget Advisory Council

Muslim Advisory Council

Precinct Advisory Councils (EPIC; SEPAC;

Slavic Advisory Council

Training and Advisory Council (TAC)

**RACIAL EQUITY  PLAN**
**Furthering the Citywide Racial Equity Goals and Strategies**
For the Period July 1, 2016 to June 30, 2021

Bureau: Portland Police Bureau
Director: Chief Mike Marshman/Acting Chief Chris Davis

Action Plan Development Lead(s): Elle Weatheroy, Equity and Diversity Program Manager
Implementation Team Lead(s): Director's Team, Equity Leadership Council, Equity and Diversity Team

Bureau Equity Guiding Statement:  The Portland Police Bureau is committed to racial equity, building trust within our community, encouraging relationships between officers and the people they serve, and making Portland a safer and more livable community.

Years three through five of this plan will be informed by years one and two. The expectation for years one and two include ongoing assessment of the work and prioritization of strategies and actions within each long-term goal.

| Long-term Goal | Five Year Bureau Objective | Strategies and Bureau Actions* | Bureau Performance Measures | | | | | Evaluation Tool | Lead Branch | Lead Personnel/ PM | Stakeholders |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | | | |
| **P r i o r i t i e s** — Center racial equity in all decision making and serve as a leader in citywide efforts to eliminate disparities | Senior leadership will **set priorities**, invest in preparation tools and set clear expectations for implementing the racial equity plan | **Strategy: Operate with urgency and accountability** | | | | | | | | | |
| | | Action(s): PPB 5 year racial equity plan is reviewed, updated and approved annually by senior management utilizing an accountability tool developed by the Racial Equity Review Committee made up of bureau and community members. Community members of the Racial Equity Review Committee will include members of the multi-racial/multi-cultural Advisory Committee. | Set up system for managing progress and review plan (6 mos.) | Conduct baseline survey and convene implementation team | | | | Accountability tool developed by Racial Equity Review Committee | CHO/Equity and Diversity | Chief Marshman or Designee | Review Committee/ Equity Voices |
| | | Action(s): Update mission/vision statements and assure acknowledgement and understanding of direction by all members | A cogent and credible vision, strategy and business case for racial equity has been developed and communicated bureau-wide. | Equity considerations are wholly integrated into the Bureau's operational strategy. | | | | Climate surveys on an array of equity dimensions. | CHO | Chief Marshman or Designee | Review Committee/ Equity Voices |
| | | Action(s): Explore project management programming/training to support continual progress and movement of the plan | Conduct needs assessment to determine project management skill gaps amongst leadership with responsibility for policy implementation. | Design, develop and implement training of leadership with responsibility for policy implementation. | | | | Level 1-5 evaluation | CHO/Equity and Diversity | Chief Marshman or Designee | Review Committee/ Equity Voices |
| | | **Strategy: Implement Racial Equity Lens** | | | | | | | | | |
| | | Action(s): Integrate all bureau strategic plans to assure that equity goals are central | Leadership understands systemic equity and are fully committed to holding themselves responsible and accountable for achieving the goals of the equity plan/strategy. | The equity strategy contributes to specific accomplishments and the Bureau's overall success in identifiable and measurable ways. | | | | Metrics for evaluation to be determined. | CHO/Equity and Diversity | Chief Marshman or Designee | CHO/Equity and Diversity |
| | | Action(s): Integrate equity lens within the policy development and review process | Leaders with specific responsibility for policy development and execution are fully trained to use the equity lens. | Leadership is fully involved in developing equity initiatives and actively communicates the equity strategy. | | | | Metrics for evaluation to be determined. | Services/SSD/Equity and Diversity | Chief Marshman or Designee | Services/SSD/Equity and Diversity |

| Long-term Goal | Five Year Bureau Objective | Strategies and Bureau Actions* | Bureau Performance Measures | | | | | Evaluation Tool | Lead Branch | Lead Personnel/ PM | Stakeholders |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | | | |
| **R e c r u i t m e n t   a n d   H i r i n g** — End disparities in city government hiring and promotions | **Recruiting, Hiring and Retention:** Using a comprehensive equity lens, PPB will strengthen the bureau's practices, policies and procedures to promote focused recruiting and hiring of a more diverse, inclusive and equitable workforce | **Strategy: Implement Racial Equity Lens** | | | | | | | | | |
| | | Document PPB local and national recruitment strategies and marketing strategies focused on recruiting members of color , women from non-traditional fields and academic programs | 10% Increase in applicants of color and women | Continue to increase the percentage of applicants who are POC and women. The percentage increase goal will be established after review of year one. | | | | Annual Analysis report | CHO/ Personnel | Personnel Recruitment PM | Personnel/ Equity and Diversity |
| | | Assess internal support needs of current members of color and women to assess inclusion, utilizing several outreach practices to assess satisfaction rate. | Conduct needs assessment to determine baseline satisfaction of POC and women | 70% of members who identify as women and POC participate in survey/assessment | | | | Survey of members of color and women | Services/Personnel | Vincent Woods | Personnel/Equity and Diversity |
| | | Update officer panel interview questions to assure they align with desired officer competencies | New questions reviewed and approved for implementation | 100% of all perspective officers are interviewed with new questions | | | | Personnel and panel member feedback | Services/Personnel | Vincent Woods | Personnel/Equity and Diversity |
| | | **Strategy: Be data driven** | | | | | | | | | |
| | | Track, measure and report changes in diversity of sworn and non-sworn bureau personnel, | Create database to track and analyze recruitment and hiring efforts and begin to input data | Review and analyze data. Develop report for submission to leadership, council and SSD | | | | Annual Analysis Report | CHO/ Personnel/SSD | Vincent Woods | Personnel/ Equity and Diversity/SSD |
| | | **Strategy: Partner with other institutions and communities** | | | | | | | | | |
| | | Create long term strategies that invest in the development of local talent. Develop partnerships with local organizations that support this development | Contract with local schools and other youth service organizations and college programs to launch an internship program/stipend to develop future qualified candidates from communities of color and women for careers within PPB. | The program is launched with  50% of participants identifying as POC and women | | | | Contracts implemented as well as recorded demographics of participants | CHO/Personnel | Personnel Recruitment PM | Personnel and Equity and Diversity |
| | | **Strategy: Build Organizational Capacity** | | | | | | | | | |
| | | Action(s): Leadership, all HR personnel, and all those serving on interview panels committed to recruiting and screening candidates in a manner that fosters diversity inclusion. | All bureau members receive development toward racial equity core competencies. Performance evaluations include racial equity core competencies. | 100% of bureau members involved in the  hiring process have increased awareness in the areas of racial/gender equity and how bias surfaces in everyday decision making | | | | All members involved in the hiring process able to articulate the impact of their decisions on equity and diversity | CHO/Personnel | Vincent Woods | Personnel/ Equity and Diversity |

L
e
a
d
e
r
s
h
i
p

D
e
v
e
l
o
p
m
e
n
t

| Long-term Goal | Five Year Bureau Objective | Strategies and Bureau Actions | Bureau Performance Measures | | | | | Evaluation Tool | Lead Branch | Lead Personnel/ PM | Stakeholders |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | | | |
| Create a culture of continuous learning and improvement. | **Leadership Development:** We have an inclusive leadership development program and a succession-planning process to identify and develop a core of leaders across the bureau. Leaders and employees throughout PPB receive integrated equity training specific to their area and level, focused on achieving the Bureau's overall goals. | Strategy: Be data-driven | | | | | | | | | |
| | | Action(s): Identify and implement links between leadership and organizational outcomes around equity and inclusion. | Conduct bureau-wide gap analyses and needs assessments to determine the key performance indicators required for leaders to meet Bureau equity outcomes. Utilize these indicators to build a leadership equity assessment tool. This tool is distributed to leadership for self assessment in preparation for application in year two. | Bureau has defined desired leadership attributes and determined methods to identify effectiveness in meeting equity outcomes. Leadership equity assessment tool is applied within all leadership performance evaluations. | | | | Surveys, interviews, focus groups and leadership equity tool | CHO/Equity and Diversity | Training Division Captain, Day | CHO/Equity and Diversity |
| | | Strategy: Implement a Racial Equity Lens | | | | | | | | | |
| | | Action(s): Develop equity leadership platform to embed within executive and sergeant academies as well as for non-sworn managers | All executive leadership will have been trained on diversity, equity and inclusion principles. Executive leadership will have created a clear and cogent message to which all have committed to practice. | All sergeants and non-sworn managers will have been trained on diversity, equity and inclusion principles. Sergeants and non-sworn managers are following a clear and cogent message to which all have committed to practice. | | | | Training records and reports from Personnel | CHO/Equity and Diversity | Training Division Captain, Day | Services/Training and Personnel, CHO/Equity and Diversity |
| | | Strategy: Build Organizational Capacity | | | | | | | | | |
| | | Action(s): Create objective measures of good and effective leadership, integrating equity outcomes. | Conduct assessment of best leadership practice in policing in general and within PPB. Use data to inform performance management policies. Begin to identify and build a leadership succession pool which intentionally includes women and people of color. | Each employee has clear understanding of promotion pathways, the specific requirements to attain each level, and access to training to ensure they are prepared for the next level. Continue to build a leadership succession pool which includes women and people of color. | | | | Statistically significant increase in eligible leadership personnel in general and specifically female leaders and leaders of color. | CHO/Equity and Diversity Services/Personnel | Training Division Captain, Day | CHO/Equity and Diversity and Services/Personnel |
| | | Action(s): Design protocol and Institute tiered leadership development training for all sworn and non-sworn personnel. | Create multi- tiered leadership development training with tiers to include: Situational Leadership, Diversity, Equity and Inclusion, Project Management, Change Management, Management through data, etc. | Complete development of all tiers of leadership development curriculum. All employees have completed at least two Tier 1 modules | | | | Level 1-5 training evaluation | CHO/Equity and Diversity and Services/Training | Training Division Captain, Day | Services/Training and Personnel, CHO/Equity and Diversity |
| | | Action(s): Explore self-guided leadership technology platform that encourages ongoing skill building outside of the in-service structure. | E-learning modules, opportunities for social learning, experiential learning and self-assessments and an accessible library of materials on leadership and equity are researched | E-learning modules and opportunities for social learning, experiential learning and self-assessments are available. Library and database of self-guided materials is established and regularly updated | | | | Level 1-5 training evaluation | CHO/Equity and Diversity and Services/Training | Training Division Captain, Day | Services/Training and Personnel, CHO/Equity and Diversity |
| | | Action(s): Develop and provide opportunities for cross-training as well as multi/cross- agency training collaboration. | Create specific openings for intra-agency on the job experience and inter-agency collaboration on equity in policing. Place women, people of color and members of other under-represented groups in succession pools for promotion, in Specialty Units, and provide them with opportunities for "up the ranks" networking. | Each employee has had the opportunity to complete an aspirational assignment or has been cross-trained in an area of choice and to all established pathways to promotion. Participants host and attend regular cross-agency trainings on equity related issues. | | | | 360-degree feedback, interviews and performance reviews | CHO/Equity and Diversity, Services/Training and Personnel | Training Division Captain, Day | Services/Training and Personnel, CHO/Equity and Diversity |

| Long-term Goal | Five Year Bureau Objective | Strategies and Bureau Actions* | Bureau Performance Measures | | | | | Evaluation Tool | Lead Branch | Lead Personnel/ PM | Stakeholders |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | | | |
| Create a culture of | Through integrated, | Strategy: Build Organizational Capacity | | | | | | | | | |

**Staff Development**

| Long-term Goal | Five Year Bureau Objective | Strategies and Bureau Actions* | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Evaluation Tool | Lead Branch | Lead Personnel/PM | Stakeholders |
|---|---|---|---|---|---|---|---|---|---|---|---|
| continuous learning and improvement. | sequential and ongoing **training**, all employees (sworn and non-sworn) will be equipped to build a diverse, inclusive and equitable workforce | Strengthen training for leadership to build knowledge, attitudes and skills related to equity and inclusion | Strengthen all leaderships understanding of the importance of centering race (LT above?) and embed in all leadership academy structures, promotional processes and accountability structures | 100% of all leadership are trained and have increased awareness of implicit bias | | | | Training records | CHO/Services/Training Division | Training Division Captain, Day | Training Division/Equity and Diversity |
| | | Strengthen the bureau's ongoing in-service equity training programs for sworn and non-sworn employees | Finalize training plan and develop implicit bias training | Embed implicit bias training into the in-service structure | | | | Training records | CHO/Services/Training Division | Training Division Captain, Day | Training Division/Equity and Diversity |
| | | Strengthen the bureau's advanced academy equity training programs for sworn and non-sworn employees | Finalize training plan and develop implicit bias training | Embed into the advanced academy so that all new officers are aware of the role implicit bias plays on everyday interactions | | | | Training records | CHO/Services/Training Division | Training Division Captain, Day | Training Division/Equity and Diversity |
| | | Build capacity of all training staff and training personnel | Utilize consultants to engage all training staff in conversations about race, implicit bias and utilization of equity lens | All training staff have participated in the equity capacity building process | | | | Training staff records | CHO/Services/Training Division | Training Division Captain, Day | Training Division/Equity and Diversity |
| | | Action(s): Normalize Community Engagement | With assistance from outside consultant, define community engagement as it will be understood by the bureau and build training module(s) to inform members of this definition and related expectations. | Institutionalize training on community engagement across the bureau | | | | Training module as approved by the Training Captain | CHO/Services/Training Division | Training Division Captain, Day | Training, Office of Community Engagement, Equity and Diversity, Outside Consultant |
| | | Strategy: Partner with other institutions and communities | | | | | | | | | |
| | | Integrate community expertise into department training programs to serve as advisors to assist in building culturally responsive trainings | Develop community trainer pool and engage community members of the 10 safe harbor languages | embed community trainer project within advanced academy | | | | Training roster and schedule | CHO/Services/Training Division | Training Division Captain, Day | Training Division/Equity and Diversity |

**Communications and Access**

| Long-term Goal | Five Year Bureau Objective | Strategies and Bureau Actions* | Bureau Performance Measures | | | | | Evaluation Tool | Lead Branch | Lead Personnel/PM | Stakeholders |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | | | |
| Change Existing City Services using racial equity best practices to increase access for communities of color and immigrant and refugee communities. Increase internal legitimacy. | **Communications and Access:** We are committed to internal and external transparency and collaboration. We document our compliance with Titles II and VI of the Civil Rights Act. We have developed and maintained open, direct, and multi-faceted lines of communication with all of the communities we serve. | Strategy: Implement a racial equity lens | | | | | | | | | |
| | | Action(s): Develop a proactive external communication strategy to promote equity, diversity and inclusion | Exploration of opportunities for equity communications platform | Completion of proposal for the equity communications platform | | | | Metrics for evaluation of the proposal will be designed when the platform requirements are understood | CHO/Communications and Equity and Diversity | Commander Jones | Communications and Equity and Diversity |
| | | Strategy: Operate with urgency and accountability | | | | | | | | | |
| | | Action(s): Assure that communications meet the needs of the ten safe harbor languages groups and comply with Title VI regulations | Continued engagement of multi-disciplinary team to develop a language access plan in compliance with Title VI in collaboration with OEHR and other City agencies | Implementation of the Language access plan and related policies in compliance with Title VI | | | | To be designed in cooperation with OEHR and the DOJ office of Civil Rights (OCR) to assure compliance with Federal and City law and policy related to language access | Services/SSD - Directives | Equity Diversity Program Manager | Communications, Equity and Diversity, OEHR, City Attorney, DOJ OCR |
| | | Action(s): Assure compliance with the Americans with Disabilities Act, Title II | Establishment of a multi-disciplinary team to develop a Title II informed access plan and related policies | Implementation of the Title II access plan in compliance with applicable law and regulations | | | | To be designed in cooperation with OEHR to assure compliance with Federal and City law and policy related to Title II | Services/SSD - Directives | Title II Coordinator & Equity Diversity Program Manager | Communications, Equity and Diversity, and OEHR |
| | | Strategy: Be data driven | | | | | | | | | |
| | | Action(s): Develop the tools necessary to document compliance with Title II and Title VI related requests and accommodations | Convening of a multi-disciplinary team to develop a description of the data necessary to document Title II and Title VI related requests and accommodations | Convening of a database knowledgeable team to assess the options for documenting Title II and Title VI related accommodation requests and fulfillment | | | | Documentation of compliance plan is found sufficient by OEHR to track and report requests and accommodations as required by federal and local authorities | Services/SSD - Directives and Statistical Support Unit | Title II Coordinator & Equity Diversity Program Manager | SSD-Directives, Equity and Diversity, and OEHR |

| Long-term Goal | Five Year Bureau Objective | Strategies and Bureau Actions | Bureau Performance Measures | | | | | Evaluation Tool | Lead Branch | Lead Personnel/ PM | Stakeholder |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | | | |
| **C o m m u n i t y   E n g a g e m e n t** | Strengthen outreach and public engagement for communities of color, youth, and immigrant and refugee communities. Increase bureau legitimacy in the communities we serve, particularly in communities of color. Improve ratings of police services as measured by the City Auditors Annual Community Surveys. | **Community Engagement:** We are responsive to the needs of the communities we serve. | **Strategy: Partner with other institutions and communities** | | | | | | | | |
| | | | Action(s): Strengthen established Advisory Groups to empower collaborative engagement with bureau leadership | Engagement of all PPB advisory groups in Equity and Diversity discussions and create a process for identifying the needs of the communities represented by these groups | Each PPB advisory group develops an equity and diversity statement for their mission and receives feedback from leadership regarding their identified community needs. | | | | Equity and Diversity statements | CHO/PPB Advisory Committees | CE Office Captain | PPB Advisory Committees, Office of Community Engagement, Equity and Diversity |
| | | | Action(s): Establish and maintain two specific new Advisory Committees to support the bureau's equity initiatives empowered to collaboratively engagement with bureau leadership | Continue development of a youth advisory committee and establish a multi-racial, multi-cultural advisory structure. Identify members from each of these groups to serve on the Racial Equity Review Committee. Create a process for identifying the needs of the communities represented by these groups. | Recognition of both the youth and multi-racial, multicultural advisory groups as full Advisory Committees to bureau leadership. Identified members of the multi-racial, multicultural advisory group are active on the Racial Equity Review Committee. Each group receives feedback from leadership regarding needs identified by their respective communities | | | | To be developed by each of the new groups inclusive of an assessment of their influence on the bureau in areas of their concern | CHO/PPB Advisory Committees | CE Office Captain | PPB Advisory Committees, Office of Community Engagement, Equity and Diversity |
| | | | Action(s): Work with other City structures to continually enhance bureau community engagement | Utilization of the City's Public Involvement Advisory Committee (PIAC) to inform further development of advisory bodies and involvement of community members | Implementation of suggestions from PIAC and/or other community partners | | | | To be developed with PIAC and others to include documentation of either acceptance/impleme ntation or reasons for rejection of each recommendation | CHO/Equity and Diversity | CE Office Captain | Equity and Diversity and PIAC |
| | | | **Strategy: Build organizational capacity** | | | | | | | | |
| | | | Action(s): Reconvene and maintain an internal advisory committee inclusive of sworn and non-sworn members that will inform bureau initiatives inclusive of equity, amplifying voices of members not currently holding command level positions. The expressed desire for this committee is from front line members wishing to be included in bureau wide decision processes. These voices will strengthen both decision making and change management. | Development of the structure and membership needs for this committee inclusive of diverse voices | The committee is regularly providing recommendations to leadership and receiving feedback on those recommendations from leadership. | | | | The internal advisory committee will assess the quality of responsiveness from leadership to their concerns | CHO/Equity and Diversity | CE Office Captain | CHO/Equity and Diversity, Involved bureau members |
| | | | Action(s): Reconvene and maintain a Bureau Equity Committee | The equity committee is engaged in activities to develop their equity and diversity competencies particularly as related to implementing the racial equity plan. The committee also identifies needs for employee resource or affinity groups for protected classes and/or members involved in the equity strategy. This work will include building an internal process for inter group dialogs. A member of the human resources department will be intentionally placed on the BEC to assist with questions and concerns about appropriate interaction. | The committee is regularly providing recommendations to leadership and receiving feedback on those recommendations from leadership. If a need is identified, at least one resource/affinity group has been established. Inter group dialogues have been established and are functioning. | | | | The bureau equity committee will assess the responsiveness of leadership to their concerns. Progress toward resource/affinity groups will be evaluated by the needs identified in year one. | CHO/Equity and Diversity | Equity and Diversity Program Manager | Equity and Diversity, Involved bureau members |
| | | | **Strategy: Be data driven** | | | | | | | | |
| | | | Action(s): Develop the tools necessary to document, analyze, and develop community engagement to inform equity management decisions | Informed by the multi-disciplinary equity data team described in the Data Management section of this plan, develop a description of the data necessary to document and develop bureau wide community engagement, this effort should include an understanding of data gathering, analysis, and use for the development of community engagement and equity management decisions | Convening a database knowledgeable team to assess the options for documenting all types of community engagement including comparative and other anlyses to continually develop community engagement in response to community effort and propose a tool(s) for this documentation, analyses, and development to inform equity managemetn decisions | | | | Proposed tool(s) for documentation, analysis, and development of community engagement | Operations/ SSD - Statistical Support Unit | ED Program Specialist | Operations, SSD Statistical Support Unit, Office of Community Engagement, Equity and Diversity |

| Long-term Goal | Five Year Bureau Objective | Strategies and Bureau Actions* | Bureau Performance Measures | | | | | Evaluation Tool | Lead Branch | Lead Personnel/ PM | Stakeholder |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | | | |
| Provide equitable City services to all residents | **Data management**: We are an empirically driven bureau. We collect and use disaggregated data about all our services to develop and adapt/shape equitable policies, evaluate and improve performance as well as offer transparency and accountability to our community. | Strategy: Be data driven | | | | | | | | | |
| | | Action(s):  Invest in systemic improvements of data collection, analysis, and reporting to inform equity-related management decisions, community engagement, and strengthen data collection systems that document recruitment, hiring, and retention activities related to equity | Convene a multi-disciplinary equity data team inclusive of outside consultants to evaluate what data are needed to inform equity related management decisions including community engagement and recruitment, hiring, and retention inclusive of an analysis of impediments during the hiring process resulting in an equity tool to be used in all recruitment, hiring, and retention evaluations | Establish a process through which data necessary for equity related management decisions including community engagement and documenting recruitment, hiring, and retention outcomes may be accessed and/or collected | | | | Report from committee addressing data needs, access, and collection with recommendations for years three through five of this plan. | CHO/Equity and Diversity, HR, SSD/Statistical Support Unit | ED Data Analyst & ED Program Specialist | Personnel, Outside consultants, and CHO/Equity and Diversity |
| | | Action(s):  Strengthen data collection systems that document training activities related to equity | Utilization of the new learning management system (LMS) to document and inform training activities related to equity | Assessment of the effectiveness and usefulness of the LMS for informing equity training needs | | | | Metrics designed by training staff to evaluate the appropriateness of the LMS as a documentation and assessment tool for equity trainings and equity training needs | Services/Training | ED Data Analyst | Training and Equity and Diversity |
| | | Utilize OEHR's Racial Equity Toolkit to review the stops data to identify racial disparities | Provide analysis of racial impacts of stops data | Develop strategies to address disparties | | | | Include analysis/narrative in annual Stops Data Report | SSD/ Equity and Diversity Office | ED Data Analyst | CHO/SSD/ Equity and Diversity/ OEHR |
| | | Develop implementation plan to identify how management can utilize the stops data reports | Develop data usage tool and training | Develop new policy and practices around equitable stops | | | | Staff Survey, Performance Evaluations | SSD/ Equity and Diversity Office | ED Data Analyst/ Equity and Diversity Office | CHO/SSD/ Equity and Diversity/ OEHR |
| | | Strategy: Build organizational capacity | | | | | | | | | |
| | | Action(s):  Implement an ongoing evaluation of the strategic equity plan | Establishment of an evaluation team for this plan to include bureau leaders, community members, and representation from other bureaus engaged in equity and diversity | Production of a first year evaluation as well as recommendations for years three through five for this plan | | | | Metrics to be developed by the evaluation team to assess their work as well as the plan | CHO/Equity and Diversity | ED Data Analyst | Equity and Diversity |

**D a t a   M a n a g e m e n t**

| Long-term Goal | Five Year Bureau | Strategies and Bureau Actions* | Bureau Performance Measures | | | | | Evaluation Tool | Lead | Lead Personnel/PM | Stakeholders |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | | | |
| **B u d g e t  a n d  C o n t r a c t i n g** | Prioritize equity strategy by allocating funds to facilitate the equity plan and create greater opportunities City government contracting | PPB's budget and **financial equity** strategy is embedded within all practices and has the support to rollout initiatives.  PPB will have a process in creating opportunities for minority and women owned businesses & guidance for future budget decisions | Strategy:  Operate with urgency and accountability | | | | | | | | | |
| | | | Action(s): Assure that the Equity team remains funded (EDPM, EDPS, .5 FTE Analyst) | Recruitment and hiring of staff needed to complete Equity team | Team established and recommends any needed changes to fulfill team mission | | | | Team completion and functioning | CHO/Services/Fiscal, Personnel and Equity and Diversity | CHO Services Branch AC | CHO/Equity and Diversity and Services/Fiscal |
| | | | Action(s): Convene budget advisory council year round in order to strengthen involvement and recommendations to PPB budget | Schedule Budget Advisory Council for the full fiscal year | Budget Advisory Council is meeting regularly and contributing recommendations for budget development | | | | Budget Advisory Council schedule | CHO/Services/Personnel and Equity and Diversity | CHO Services Branch AC | CHO/Equity and Diversity and Services/Fiscal |
| | | | Strategy: Build organizational capacity | | | | | | | | | |
| | | | Action(s): Educate bureau procurement process owners in the importance of racial and gender equity when soliciting quotes from vendors, regardless of total dollar amount. Develop education component for RU Managers to increase awareness of MWESB contracting and general procurement priority. | Identify baseline data points for vendor selection of MWESB vendors & develop training materials | Identify baseline and increase MWESB procurements over baseline data by 10% | | | | MWESB Procurement Reports, SAP reports, PCARD Reports | Services/Fiscal | Business Ops Mgr | CHO/Equity and Diversity and Services/Fiscal |
| | | | Action(s): Develop education component for Sergeant Academy to increase awareness and value of MWESB contracting and procurement priority. | Develop academy specific training materials, conduct training | Identify baseline and increase MWESB procurements over baseline data by 10% | | | | Training Evaluation & measured increase in procurements year over year | Services/Fiscal & Training | Business Ops Mgr | CHO/Equity and Diversity and Services/Fiscal |
| | | | Action(s): Develop education component for Lieutenant Academy to increase awareness and value of MWESB contracting and procurement priority. | Develop academy specific training materials, conduct training | Identify baseline and increase MWESB procurements over baseline data by 10% | | | | Training Evaluation & measured increase in procurements year over year | Services/Fiscal & Training | Business Ops Mgr | CHO/Equity and Diversity and Services/Fiscal |
| | | | Action(s): Develop education component for professional support staff in RU's to educate about the value of the City's MWESB contracting and procurement priority. | Develop procurement support staff specific training materials, conduct training | Identify baseline and increase MWESB procurements over baseline data by 10% | | | | Training Evaluation & measured increase in procurements year over year | Services/Fiscal & Training | Business Ops Mgr | CHO/Equity and Diversity and Services/Fiscal |
| | | | Action(s): Incorporate MWESB procurement goals in the 1:1 fiscal consultation process | Have SOP for conducting Fiscal consultations & 1:1's with RU Managers | Materials are understood by managers, and there are increases in use of MWESB vendors | | | | Annual survey | Services Branch /Fiscal Services Division | Business Ops Mgr | CHO/Equity and Diversity and Services/Fiscal |
| | | | Action(s): Utilize technology to enhance the communication around contracting priorities | Explore options with the training division and begin development process | Finalize development processes and implement new technology options for communicating contracting priorities | | | | Annual Procurement Report, to become more frequent | Services/Fiscal & Training | Business Ops Mgr | CHO/Equity and Diversity and Services/Fiscal |
| | | | Strategy: Be data driven | | | | | | | | | |
| | | | Action(s): Incorporate equity outcome measures around hiring and MWESB procurement and budget development into the PPB's community facing dashboard | Assess baseline data and develop performance measures for contracting at PPB | Collect relevant data to populate on-line fiscal performance dashboard | | | | Procurement and budgetary reports & narrative | Services/Fiscal | Business Ops Mgr and Principal Financial Analyst | CHO/Equity and Diversity and Services/Fiscal |
| | | | Action(s): Utilize procurement data to set contracting & procurement goals | Inventory of current procurement data for contracting & procurement at PPB | evaluate if training of staff on use of MWESB vendors is achieving goals stated above | | | | Procurement and SAP purchasing reports | Services/Fiscal | Business Ops Mgr | CHO/Equity and Diversity and Services/Fiscal |
| | | | Strategy: Partner with other institutions and communities | | | | | | | | | |
| | | | Action(s): Regularly engage with OEHR to assure that the Police Bureau aligns racial and gender focused practices and goals with the citywide efforts for procurement and budget practice | Utilize OEHR assessment of current efforts at PPB | through gap analysis, identify where barriers exist outside of PPB's control | | | | Procurement and budgetary reports & narrative | Services/Fiscal | Principal Financial Analyst | CHO/Equity and Diversity and Services/Fiscal |
| | | | Action(s):  Utilize new practices to identify barriers in the procurement process. | Conduct environmental scan of City Bureau's for shared learning opportunities | through gap analysis, identify where barriers exist outside of PPB's control | | | | Procurement Report | Services/Fiscal | Business Ops Mgr | CHO/Equity and Diversity and Services/Fiscal |

Bureau Director Signature:

_signature_   March 23, 2017
Chief of Police

_signature_   March 29, 2017
Acting Chief of Police

**Recommendation 100815-2**

The PPB should rewrite directive 344.05, bias-based policing/racial profiling prohibited. The amended directive should be identical to or consistent with the Seattle police department's "bias-free policing" policy, including its mission statement, its core principles and its supporting policy statements.

FULL TEXT

THE PPB SHOULD REWRITE DIRECTIVE 344.05, BIAS-BASED POLICING/RACIAL PROFILING PROHIBITED. THE AMENDED DIRECTIVE SHOULD BE IDENTICAL TO OR CONSISTENT WITH THE SEATTLE POLICE DEPARTMENT'S "BIAS-FREE POLICING" POLICY, INCLUDING ITS MISSION STATEMENT, ITS CORE PRINCIPLES AND ITS SUPPORTING POLICY STATEMENTS.

Specifically, PPB Directive 344.05, Bias-Based Policing/Racial Profiling Prohibited, https://www.portlandoregon.gov/police/article/556832, should be rewritten to include all of the introductory mission statement and its nine core principles, with all of the supporting policy statements, found in Section Nos. 1-9 of the Seattle Police Department's bias-free policing policy, 5.140 - Bias-Free Policing, http://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing.

The rewritten PPB policy would adopt and incorporate the SPD policy's introductory mission statement which provides as follows:

"The Seattle Police Department is committed to providing services and enforcing laws in a professional, nondiscriminatory, fair, and equitable manner.

The Department recognizes that bias can occur at both an individual and an institutional level and is committed to eradicating both.

Our objective is to provide equitable police services based upon the needs of the people we encounter.

The intent of this policy is to increase the Department's effectiveness as a law enforcement agency and to build mutual trust and respect with Seattle's diverse groups and communities.

Bias-based policing is the different treatment of any person by officers motivated by any characteristic of protected classes under state, federal and local laws as well as other discernible personal characteristics of an individual. Such 'discernible person characteristics' include, but are not limited to, the following:

- Age

- Disability status

- Economic status

- Familial status

- Gender

- Gender identity

- Homelessness [not included in Directive 344.05] - Mental illness

- National origin

- Political ideology

- Race, ethnicity, or color

- Religion

- Sexual orientation - Veteran status"

The rewritten PPB policy would establish nine core principles by adopting and incorporating all of the SPD's core principles and all of its supporting policy statements which provide, in part:

1.        Every Employee is Responsible for Knowing and Complying With This Policy

The Chief of Police will reinforce that bias-based policing is unacceptable through specific yearly training, regular updates, and such other means as many be appropriate.

Supervisors are responsible for ensuring all personnel in their command are operating in compliance with this policy.

2.        Officers Will Not Engage in Bias-Based Policing

Employees shall not make decisions or take actions that are influenced by bias, prejudice, or discriminatory intent.

Law enforcement and investigation decisions must be based upon observable behavior or specific intelligence.

Officers may not use discernible personal characteristics in determining reasonable suspicion or probable cause, except as part of a suspect description.

Employees shall not express -- verbally, in writing, or by other gesture -- any prejudice or derogatory comments concerning discernible personal characteristics.

No employee shall retaliate against any person who initiates or provides testimony related ... to the Department or Departmental employees ....

Employees who engage in, condone, or ignore bias-based policing will be subject to discipline.

Supervisors and commanders who fail to respond to, document and review allegations of bias-based policing will be subject to discipline.

3.        The Characteristics of an Individual May Be Appropriately Considered in Limited Circumstances

Officers may take into account the discernible personal characteristics of an individual in establishing reasonable suspicion or probably cause only when the characteristic is part of a specific suspect description based on trustworthy and relevant information that links a person to a particular unlawful incident.

Officers must articulate specific facts and circumstances that support their use of such characteristics in establishing reasonable suspicion or probably cause.

Officers are expected to consider relevant personal characteristics of an individual when determining whether to provide services designed for individuals with those characteristics (e.g., behavioral crisis, homelessness, addictions, etc.).

4.      All Employees Share Responsibility for Preventing Bias-Based Policing

Employees who have observed or are aware of others who have engaged in bias-based policing shall specifically report such incidents to a supervisor ....

Supervisors, commanders and civilian managers have an individual obligation to ensure the timely and complete review and documentation of all allegations of violation of this policy.

5.      Employees Will Call a Supervisor in Response to Allegations of Bias-Based Policing

* * *

6.      Employees Will Document All Allegations of Bias-Based Policing

* * *

7.      Supervisors Conduct Preliminary Inquiry into Bias-Based Policing

* * *

8.      An Annual Report Will Be Prepared for the Chief of Police and the Public

* * *

9.      Disparate Impacts

The Seattle Police Department is committed to eliminating policies and practices that have an unwarranted disparate impact on certain protected classes. It is possible that the long term impacts of historical inequality and institutional bias could result in disproportionate enforcement, even in the absence of intentional bias. The Department's policy is to identify ways to protect public safety and public order without engaging in unwarranted or unnecessary disproportionate enforcement.

.... the Department shall periodically analyze data which will assist in identification of SPD practices -- including stops, citations and arrests -- that may have a disparate impact on particular protected classes relative to the general population.

* * * "

**Recommendation 100815-3**

The PPB should create a new directive regarding voluntary contacts, Terry stops and detentions; the new directive should be identical to or consistent with the Seattle Police Department's directives on those topics

**Recommendation 100815-4**

The PPB should prohibit pretext stops.

**Recommendation 100815-5**

If pretext stops are not prohibited, the PPB should collect stops data on pretext stops.

**Recommendation 100815-6**

The PPB should collect stops data by individual officers and specialty units, such as the Gang Enforcement Team and any "hot spots policing" units or teams.

**Recommendation 100815-7**

The PPB should collect stops data on non-custodial, consensual investigatory interviews.

**Recommendation 100815-8**

The PPB should advise any persons subjected to a non-custodial, consensual interview, in writing, that they have the right not to answer questions and the right to leave at any time without being subject to any adverse consequences.

**Recommendation 100815-9**

The PPB should prohibit consent searches. If consent searches are not prohibited, the PPB should require its officers to use written forms for consensual searches, signed by the person being searched in advance of the search, which contains advice to the person about the right to refuse to consent without being subjected to any adverse consequences.

## RECOMMENDATION 102215-1

COMPREHENSIVE EXAMINATION AND REWRITE OF PPB DIRECTIVE 1010.00, USE OF FORCE: Directive 1010.00, Use of Force, should be comprehensively examined and rewritten where needed to ensure that all of the recommendations from the Data Systems, Use of Force, Compliance Subcommittee are embodied in the directive.

**FULL TEXT:**

COMPREHENSIVE EXAMINATION AND REWRITE OF PPB DIRECTIVE 1010.00, USE OF FORCE

Directive 1010.00, Use of Force, should be comprehensively examined and rewritten where needed to ensure that all of the recommendations from the Data Systems, Use of Force, Compliance Subcommittee are embodied in the directive.

The revised directive, unlike the current version, should be entirely self-contained, with no external references to other directives, guidelines, or manual describing policies, principles, guidelines, training, or standard operating procedures. It should be stated explicitly that the entirety of revised Directive 1010.00 is a policy statement, in keeping with the formatting and organization of the DOJ-approved Seattle Police Department use of force policies.

The revised directive also needs to have a set of clear and comprehensive definitions.

While the subcommittee believes that the entire directive needs review, the more specific recommendations, #s 102215-2-102215-8, are focused on the parts found to be most in need of revision.

Approved amendment to 102215-1: on page 5 and 6, move #3 to be #1, acknowledge that PPB respects the value and sanctity of human life; switch #5 to be #2, recognize that use of force impacts member involved

### RECOMMENDATION 102215-2

There should be a set of core principles for when the use of force is authorized, and these principles should be explicitly laid out at the beginning of revised Directive 1010.00, Use of Force.

**FULL TEXT:**

CORE PRINCIPLES

There should be a set of core principles for when the use of force is authorized, and these principles should be explicitly laid out at the beginning of revised Directive 1010.00, Use of Force.

The set of core principles should begin with a strong mission statement that expands upon the one in current Directive 1010.00. [The proposed text for incorporation into the revised directive is set forth below.]

The set of core principles should include at least the following:

a. A comprehensive statement which emphasizes the primacy of de-escalation as a tool to avoid or reduce the need for force;

b. A comprehensive statement that only a level of force which is objectively reasonable, necessary under the the facts and circumstances, and proportionate to the threat or resistance of a subject is authorized [The proposed text for incorporation in the revised directive is set forth below.]; and

c. Objectively unreasonable, unnecessary and/or disproportionate uses of force and/or other violations of the directive shall result in corrective action and/or discipline, up to and including termination.

## RECOMMENDATION 102215-3

DETERMINING THE REASONABLENESS OF FORCE: There should be specific criteria for determining the reasonableness of both the initiation and the continuation of the use of force in any encounter.

**FULL TEXT:**

DETERMINING THE REASONABLENESS OF FORCE

There should be specific criteria for determining the reasonableness of both the initiation and the continuation of the use of force in any encounter. At a minimum, the criteria should include:

a. Officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

b. A broad list of facts and circumstances which must be considered in determining the reasonableness of force;

c. A use of force continuum that emphasizes the requirement that only necessary and proportionate force be used;

d. A requirement that there be a continuing assessment of the encounter, such that changing facts and circumstances be explicitly taken into account in determining what is objectively reasonable, necessary, and proportionate force at any point in time; and

e. Since an officer's own actions may cause a need for force, officers should take reasonable care that their actions -- whether consistent with policy and training or not -- do not precipitate an unnecessary unreasonable, or disproportionate use of force, by placing themselves or others in jeopardy.

## RECOMMENDATION 102215-4

Prohibit the use of deadly force except in very limited, extraordinary circumstances

**FULL TEXT:**

PROHIBIT THE USE OF DEADLY FORCE EXCEPT IN VERY LIMITED, EXTRAORDINARY
CIRCUMSTANCES.

Deadly force should be prohibited except in very limited, extraordinary circumstances.

Deadly force is the application of physical force that under the totality of the facts and
circumstances is readily capable or reasonably likely to cause death or serious physical injury.
Examples include but are not limited to the following:

    a. Shooting a firearm at a person;
    b. Neck holds, choke holds, and carotid holds;
    c. Intentional strikes to the head, neck, throat, spine, groin, and kidney with any
       impact weapon, such as a baton or the officers feet, knees, fists, and elbows;
    d. Pushing or striking a person's head into a hard, fixed object (examples include but
       are not limited to concrete objects or surfaces, or solid metal structures such as bars
       or guardrails;
    e. Shooting a person in the head, neck, throat, spine, groin, and kidney with a beanbag
       shotgun; and
    f. Ramming a vehicle.

Deadly force may only be used in circumstances where the threat of death or serious physical
injury to an officer or others is immediate. A danger is immediate only when an objectively
reasonable officer would believe that:

    a. The suspect has the means or instrumentalities to do so, and
    b. The suspect has the opportunity and ability to use the means or instrumentalities to
       cause death or serious physical injury.

A verbal warning that deadly force will be used should be given to the suspect, if time, safety
and the facts and circumstances permit.

Deadly force may be used to prevent the escape of a fleeing suspect only when an objectively
reasonable officer would believe that it is necessary and that there is probable cause that:

    a. The suspect has committed or is in the process of committing a felony involving the
       infliction or threatened infliction of death or serious physical injury;

b. The escape of the suspect would pose an immediate danger of death or serious physical injury to another person unless the suspect is apprehended without delay; and

c. The officer has given a verbal warning to the suspect, if time, safety and the facts and circumstances permit.

Amendment to 102215-4: Include a definition of neck hold.

RECOMMENDATION 102215-4a

Directive 1010.00, Use of Force: Modifies a portion of Recommendation # 102215-4 to add an intent element to when deadly force may be used.

**FULL TEXT:**

The COAB has approved Recommendation # 102215-4 which contains revisions to PPB Directive 1010.00, Use of Force. The recommendation contains a detailed prohibition against the use of deadly force except in very limited, extraordinary circumstances.

This recommendation would modify a portion of Recommendation # 102215-4 to add an intent element to when deadly force may be used. The modification to the relevant portion of the previously approved recommendation is contained in the addition of paragraph c. as set forth in italics below.

"Deadly force may only be used in circumstances where the threat of death or serious physical injury to an officer or others is immediate. A danger is immediate only when an objectively reasonable officer would believe that:

a. The suspect has the means or instrumentalities to do so;
b. The suspect has the opportunity and ability to use the means or instrumentalities to cause death or serious physical injury; and
c. The suspect is acting or threatening to use the available means or instrumentalities to cause death or serious physical injury.

## RECOMMENDATION 102215-5

Specific Prohibitions on the Use of Force: Prohibitions against the use of specific types of force should be explicitly spelled out, both for absolute prohibitions and prohibitions except in very limited circumstances.

**FULL TEXT:**

SPECIFIC PROHIBITIONS ON THE USE OF FORCE

Prohibitions against the use of specific types of force should be explicitly spelled out, both for absolute prohibitions and prohibitions except in very limited circumstances.  These prohibitions include:

a.  The use of force to punish or retaliate against a person.  This is an absolute prohibition.

b.  The use of force against individuals who only verbally confront officers.  This prohibition is absolute, except when the vocalization impedes a legitimate law enforcement purpose.  Facts and circumstances to support the exception will rarely exist.

c.  The use of force to overcome passive resistance.  This is an absolute prohibition except when physically moving a person is necessary and objectively reasonable.  It should be emphasized that in such instances the minimum force necessary must not be exceeded.

d.  Intentional strikes to the head, neck, throat, heart, kidney, groin and spine with any authorized impact weapon, such as a baton, can be deadly force.  Therefore, such intentional strikes are prohibited, except when under the facts and circumstances deadly force is authorized.

e.  The use of flashlights as impact weapons should not be routine, but used only when there is an immediate need to strike and no more-appropriate object is available for use, such as a Bureau issued police baton.  The use of force report must document the unavailability of no alternatives.

f.  Shooting at or from moving vehicles, except in very limited circumstances.

Officers should not discharge a firearm from or at a moving vehicle unless (a) the occupant(s) of the vehicle are using deadly force, other than the vehicle itself, against the officer or another person, and (b) such action is necessary for self-defense or to protect another person from death or serious physical injury.  Discharging a firearm in this situation is never authorized when it is reasonable to believe that the vehicle may contain an innocent passenger or is reasonably apparent that the vehicle may careen out of control and injure a bystander.

g.  Vehicle pursuits of persons who have not committed a violent felony unless the officer has at least a reasonable suspicion that a fleeing suspect has committed or has attempted to commit a crime of violence and the escape of the suspect would pose an imminent danger of death or serious physical injury to the officer or another person.  Officers must receive supervisory approval prior to initiating the pursuit.  Pursuits for property offenses, misdemeanor offenses, traffic, or civil infractions are absolutely prohibited and will never be approved.

h. The use of neck holds, choke holds, and carotid holds. This is an absolute prohibition.

i. The use of hog ties and allowing a subject to be face down while in a hobble restraint. These are absolute prohibitions.

## RECOMMENDATION 102215-6

Antecedents to the Use of Force: Before any use of force, an officer must, if time, safety, and the facts and circumstances permit, provide a verbal warning of the type of force to be used. If such a verbal warning is issued, the officer must provide the subject with time to comply.

**FULL TEXT:**

ANTECEDENTS TO THE USE OF FORCE

Before any use of force, an officer must, if time, safety, and the facts and circumstances permit, provide a verbal warning of the type of force to be used. If such a verbal warning is issued, the officer must provide the subject with time to comply.

Officers should make specific attempts to determine whether the subject understands the verbal warnings that have been given, taking into account factors such as language, hearing, and cognitive ability.

Officers should attempt to utilize hand signals where there is a language barrier or the subject is deaf or hard of hearing, prior to using force.

In such instances, officers should identify themselves as police officers. Also, if it is not already known by the subject to be detained, arrested, or searched, officers should, if reasonable, make clear their intent to detain, arrest, or search the subject.

## RECOMMENDATION 102215-7

Other Requirements: Each officer present at an encounter where the use of force is possible or underway has the responsibility of making an individual determination regarding the use of force.

**FULL TEXT:**

OTHER REQUIREMENTS

Each officer present at an encounter where the use of force is possible or underway has the responsibility of making an individual determination regarding the use of force. This responsibility is manifested at a minimum in the following ways:

a. Force shall not be used on a subject by an officer solely because another officer is using force. As examples: (i) " dogpiling" is usually unreasonable and should be avoided unless determined objectively reasonable, necessary and proportionate to the threat, if any, posed by the subject, and (ii) intentional strikes with impact weapons, such as batons, or an officer's hands, elbows, knees and feet, just because another officer is making such intentional strikes, is prohibited.

b. An officer has a duty to intercede to prevent the unreasonable use of force by another officer if the officer has reason to know that unreasonable force is being used.

c. If the use of force is being discussed among officers, an officer has a duty to speak out against the use of force if the officer believes it is not objectively reasonable, necessary or proportionate to the threat, if any, posed by the person who force may be used against.

## RECOMMENDATION 102215-8

Miscellaneous.

**FULL TEXT:**

MISCELLANEOUS

Implementing the Data Systems, Use of Force, Compliance Subcommittee's six other recommendations will greatly improve revised Directive 1010.00, Use of Force.

This final recommendation, while not having the weight of the previous ones, is nonetheless important. The revised directive and all other directives on force should:

a. Use the words "facts and circumstances" rather than just " circumstances" when listing the factors to be considered in determining the objective reasonableness of force.

b. Use the word "weapons" for actual weapons, such as firearms, beanbag shotguns, electronic control weapons (tasers), batons, and aerosol restraints (pepper spray). Use the word "tools" for non-weaponry, such handcuffs and de-escalation techniques.

c. Make specific changes to the Procedure Section in the current directive:

i. Section 3.1: change the word "important" to "critical."

ii. Section 9.3: " ... each member who uses physical force will [add word " separately" ] complete a Force Data Collection Report."

iii. Section 11.1.2: "Supervisors shall address deficiencies in reports promptly." This should be clarified to explain what is meant by a deficiency. Supervisors should not tell officers what words to use or how to say something to make the report comply with policy or training

**Accountability Subcommittee recommendations regarding the complaint system, the operation of the Independent Police Review Division and Citizen Review Committee, and a new position of Police Auditor**

A work group[1] for the Accountability Subcommittee ("AS") developed recommendations to streamline the complaint system by:

     a.  moving all community complaints to the purview of the Independent Police Review Division and Citizen Review Committee,

     b.  eliminating unnecessary and duplicative parts of the current process, and

     c.  adding the new position of Police Auditor to oversee the proper functioning of the system.

The recommendations to accomplish these changes and some related recommendations to further the transparency of the accountability systems related to the operation of the Portland Police Bureau are set forth in detail below.

## A.  The Need for a More Comprehensive, Independent Citizen-Based Accountability System for the Portland Police Bureau

Modern day police departments, including the Portland Police Bureau ("PPB"), regard

"citizen complaints as important *management information*, data that are an important part of accountability.  Even complaints that are not sustained in favor of the citizen represent information about officer performance that supervisors need to know about.  The San Jose, California, Independent

---

[1] The work group consisted of Debbie Aiona of the League of Women Voters of Portland, Dan Handleman of Portland Copwatch, COAB member Rochelle Silver, and Accountability Subcommittee member Tom Steenson.

Police Auditor argues that each complaint 'matters.'"[2]  *The New World of Police Accountability*, Walker and Archbold (2nd ed. 2014), p. 104.

"One of the most important themes in the new accountability [of the police] is the focus on organizations rather than individual officers."  *The New World of Police Accountability*, p. 21. As different police experts have commented, "the problem of officer-involved shootings [i]s not a matter of a few bad officers but poor management practices" and "police reform needs to focus on 'rotten barrels' rather than rotten apples."  *Id.*  "'[R]eform efforts have focused too much on notorious incidents and misbehaving individuals,' and not enough on police organizations that sustain a 'police culture that facilitates and rewards violent conduct.'"  *Id.*  Thus, "[c]hanging police organizations, rather than changing single policies or prosecuting individual officers is the focus of 'pattern and practice' by the Civil Rights Division of the U.S. Department of Justice." *Id.*

At the conclusion of its investigation of the Portland police, the Department of Justice made findings regarding a number of causes of the pattern and practice of excessive force being used by the Portland Police Bureau (PPB) against those with actual or perceived mental illness.

"[W]e find reasonable cause to believe that PPB engages in a pattern or practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness.  In this letter, we discuss the need for revised policies, training, supervision, and timely, thorough internal review of use of force in this context."  DOJ letter to Portland Mayor Adams, dated 9/12/12 (Findings), page 1.

"PPB, along with the City, should streamline its investigation and adjudication of complaints of officer misconduct to give greater effect to and faith in the process. Currently, PPB has a number of fragmented processes for review of uses of force, none of which result in timely individual or systemic corrective action.

---

[2] "The complaint process is an important tool because it strives to hold SJPD [San Jose Police Department] officers accountable to the communities that they serve.  While a small minority of offices receive formal discipline as a result of complaints, complainants can influence SJPD policy and practice when they make their concerns known.  Here are some of the reasons why complaints matter, regardless of their outcomes:

• Officers receive Intervention Counseling when their work prompts multiple complaints — even when the complaints are not sustained.
• Some complaints are selected for mediation, an invaluable opportunity for both complainants and the officers to gain deeper understandings of their experiences.
• The IPA [Independent Police Auditor] tracks trends in complaints that often shape our police recommendations to SJPD."

*The New World of Police Accountability*, page 105, Figure 4.1 (Source: San Jose Independent Police Auditor, *2011 Year End Report* (2012), p. 29.

An open, fair, and impartial process for receiving and investigating citizen complaints serves several important purposes.  An appropriate citizen complaint procedure ensures officer accountability and supervision, deters misconduct, and helps maintain good community relations by increasing pubic confidence in and respect for PPB.  Improving the current procedure for handling citizen complaints at PPB would maximize these goals.

PPB and Portland have admirably sought to include civilian and public participation in the complaint intake and review process. * * * However, the efficacy of the system is undercut by the unreasonable delay in reaching an outcome from a complaint.  Additionally, the layers of review have provided escape valves inappropriately eviscerating full administrative investigation and corrective action for some complaints."  *Id.*, pages 26-27.

Finally, the DOJ found that "the force review interactions with the complaint system are so byzantine as to undercut the efficacy of the system."  *Id.*, page 27.

The DOJ's monitoring of the implementation of the Settlement Agreement to bring about organizational change in the PPB and the important roles of the Community Oversight Advisory Board and Compliance Officer Community Liaison in that effort will come to an end some day.  With that in mind and in recognition of the need for continuing citizen oversight of the PPB, the Accountability Subcommittee undertook a review of the existing system(s) for citizen oversight of the PPB with the goal of strengthening and expanding that oversight to ensure that reforms brought about by the Settlement Agreement will not be lost or marginalized over time.  Similarly, the subcommittee wants to ensure that citizens will have an ongoing voice as additional reforms will no doubt prove necessary in the future.

## B.  The Accountability Subcommittee and its Work Group's Review of the Current Citizen-Based Accountability System for the PPB

To begin its review of the existing system for citizen-based oversight of the PPB, over the last several months the AS scheduled and received public presentations from the Independent Police Review Division (IPR), the Citizen Review Committee (CRC), the Portland City Auditor, Portland Copwatch and others.  More recently, the AS has studied and reviewed existing systems for citizen oversight of the police in Denver (see: https://www.denvergov.org/content/denvergov/en/citizen-oversight-board/about-us.html) and San Francisco (see: http://sfgov.org/occ/), the recent report recommending significant reform in police oversight in Chicago (see: https://web.mail.comcast.net/service/home/~/?auth=co&loc=en_US&id=536812&part=2.2), *The New World of Police Accountability,* miscellaneous articles and other information regarding comprehensive, independent citizen-based oversight of the police.

**C.  Recommendations from the Accountability Subcommittee**

The subcommittee believes its recommendations regarding complaints of misconduct by a PPB member involving a member of the public (community complaint) will make it less "byzantine" and help streamline the complaint process for those types of complaints.  As one example, the work group makes a recommendation to eliminate the use of the Internal Affairs Division to investigate community complaints.  Regarding community complaints, the work group also makes a recommendation to eliminate the Commander's review of the investigation and send community cases to a panel of the CRC for recommended findings and discipline rather than using the Police Review Board (PRB).  The attached table provides a comparison of the current complaint process for community complaints and what the work group recommends.

The work group joins in the conclusion reached by commentators and community members in Portland and elsewhere that a critical component for ensuring police accountability and guiding successful police oversight is citizen involvement and input at every possible stage, including hiring and firing of officers, policy making, training, equipment, supervision, early intervention, investigation of misconduct complaints, discipline, and allocation of police resources. To some degree, the AS believes the existing citizen oversight of the PPB can be reshaped to accomplish the oversight of those functions but additional reform and additional funding also is recommended.

The recommendations to accomplish these changes and some related recommendations to further the transparency of the accountability systems related to the operation of the Portland Police Bureau ("PPB") are set forth in detail below.

All of these recommendations were approved by the Accountability Subcommittee with the exception of #s 29 and 30.  Those two recommendations can be considered by the full COAB if it wishes or they can be returned to the subcommittee for further consideration.

1.  The complaint system should be streamlined by moving all community complaints, as defined in Recommendation # 9, below, to the purview of the Independent Police Review Commission ("IPR") and Citizen Review Commission ("CRC"), eliminating unnecessary and duplicative parts of the current process, and adding the new position of Police Auditor to oversee the proper functioning of the system.

**a.  Overall Operation of the IPR and CRC**

2.  The Director of the IPR shall be selected by the CRC in conjunction with the Portland Auditor.  When evaluating the performance of the Director of the IPR, the Portland Auditor shall consult with and seek the input of the CRC.

3.  The IPR should have an annual budget and administrative staff adequate enough to allow it to effectively perform its responsibilities.

4.  The IPR should have a sufficient number of full-time complaint investigators to ensure the timely investigation of complaints against members of the PPB involving the public.

5.  When the Police Auditor ("PA") (see Recommendation #s 24-36, below) determines that the Portland's City Attorney Office may have a conflict in advising or representing the IPR and/or CRC, the IPR and/or CRC should have private, outside legal counsel separate from the Portland City Attorney's Office.

6.  The IPR will provide comprehensive information to the PA for use in annual reports.

7.  The current role of the IPR in auditing and reviewing the overall operation of the PPB should be reduced to the extent the position of PA is created, becomes fully operational and assumes those responsibilities of the IPR.

8.  The CRC should be expanded to at least 15 members.

**b.  Complaints Involving Members of the Public and Investigation Procedures for Those Complaints**

IPR's Role:

9.  The IPR should have jurisdiction and authority over the administrative investigation of all complaints of misconduct by a PPB member involving a member of the public (community complaints), whether made by a community member, a PPB member, or the IPR Director.  There should be no exception for complaints related to officer involved shootings or in-custody deaths. The PPB's Internal Affairs Division should no longer conduct administrative investigations of community complaints.

10.  The IPR should take steps to significantly reduce the number of complaints which it dismisses without an investigation.  To assist the IPR in doing that, the PA should audit the IPR's dismissal of complaints and make recommendations for improving the dismissal rate.

11.  The IPR should conduct on-scene administrative investigations.

12.  During its investigations, the IPR should have the authority to compel the testimony of a sworn PPB member.

13.  The IPR should accept and investigate anonymous complaints of misconduct by a PPB member.

14.  Once a community complaint has been received, the IPR should immediately assign an advocate to assist the complainant in navigating the IPR's investigation process.

15.  The IPR should have the authority to recommend all types and levels of discipline allowed by law and as set forth in the PPB's Discipline Guide.

16.  The IPR should operate a 24 hour tip line for PPB members to report misconduct of a fellow PPB member.

CRC's Role:

17.  Following the IPR's investigation and with input from the Commander of the PPB member who was investigated, 5 members of the CRC will conduct a hearing and make findings on the disposition of individual community complaints.  The community member and his/her advocate, as well as the involved officer, will appear at this hearing.  This hearing will be open to the public and the media.  Police accountability is in the public interest, which under state law means certain personnel matters may be handled openly.

18.  The CRC should also have authority to hear appeals by community members (complainants-appellants) of all complaints of misconduct investigated by the IPR, including those involving officer involved shootings and in-custody deaths.  The CRC members who made the findings will be recused from participating the appeal process.

19.  Complainants shall have 30 days to file an appeal.

20.  Community members should have the option to retain the same advocate from recommendation #14 or to have the IPR assign a new advocate to assist them in formulating an appeal, to navigate the appeal process, and to appear with them at the appeal hearing.

21.  The CRC should have the authority to recommend a reformulation of the allegations and issues being considered at either the initial or appeal stage if the IPR's categorization doesn't properly match the complainant's concern to PPB policies.

22.  The CRC should have the authority to compel the appearance and testimony of a PPB member during an appeal.

23.  The definition of "supported by the evidence" and the standard of review should be changed to "preponderance of the evidence."

24.  The CRC should have the authority to recommend all types and levels of discipline allowed by law and as set forth in the PPB's Discipline Guide.

25.  The PPB's ability to request a conference hearing with the CRC should be eliminated.

26.  The time which the CRC has to complete the appeal process should be expanded from the current 21 days to a more reasonable period consistent with a recommendation to be made by the PA.  Delays caused by further investigation by the IPR or refusal by the PPB to accept recommendations should not count against the CRC as part of the appeal timeline.

Police Review Board's Role:

27.  The Police Review Board ("PRB") should no longer review community complaints, whether made by a community member, a PPB member, or the IPR Director.  This recommendation is not intended to impact the PPB's use of the PRB to review complaints that do not involve a member of the public.

**c.  Policy-related Issues Pertaining to Hiring and Firing of Officers, Policy Making, Training, Equipment, Supervision, Early Intervention, Investigation of Misconduct Complaints, Discipline, Allocation of Police Resources, and Other Issues of Concern to the Community and Other Interested Stakeholders**

28.  The position of Police Auditor (PA) should be created.  The PA should be independent and separate from the PPB.

29.  The PA should be selected by the CRC in conjunction with the Portland City Auditor.  The PA may be removed from office by the Portland City Auditor and only for cause and through a clearly defined removal process.

30.  The Portland City Auditor should develop a list of the qualifications necessary for the PA.  To avoid the appearance of possible bias, the PA should not be a former police officer.

31.  The PA should have an annual budget and adequate staffing to fulfill its responsibilities.

32.  The PA should have the authority and responsibility under the direction of the CRC to carry out audits and reviews and make findings and recommendations regarding policies and practices related to hiring and firing of PPB members, policy making, training, equipment, supervision, early intervention, investigation of misconduct complaints, discipline, firing, allocation of police resources, the operation of the IPR, and other issues of concern to the community and other interested stakeholders regarding the PPB.  In doing so, the PA should have unfettered access to PPB data, records, reports, materials, and personnel, like the IPR is currently authorized.

33.  In conjunction with the PA, the CRC should be responsible for (a) assessing whether the IPR is effectively performing its duties, (b) handling appeals regarding community complaints about PPB misconduct, (c) making recommendations on policies and practices related to hiring and firing of PPB members, policy making, training,  equipment, supervision, early intervention, investigation of misconduct complaints, discipline,  and allocation of police resources, (d) and addressing issues of concern to the community and other interested stakeholders regarding the PPB.

In addition to hearing appeals, the CRC should meet at least quarterly in public with the Commissioner in Charge of the PPB and the Chief of Police and should conduct at least three public forums annually for public comment.  The CRC should also make an annual comprehensive report to the public, Mayor, Commissioner in Charge of the PPB, City Council, Police Chief and PPB and furnish additional public reports as necessary.

34.  The PA should have the authority to examine individual incidents and complaints and raise concerns about the quality and integrity of an investigation generally as well as the quality and integrity of the findings.

35.  The PA should obtain input from members of the public to aid its work.

36.  The PA should have the authority to examine information and data in the aggregate and identify patterns, determine whether the patterns reflect systemic problems, and, if so, make findings and recommendations on how to address them.

37.  The PA should investigate the use of mediation to resolve complaints investigated by the IPR to ensure it is only used in appropriate cases and not in cases involving the use of force, bias and other significant matters of police misconduct.

38.  The PA should investigate the time which the CRC needs to complete the appeal process and make a finding and recommendation to the CRC as to what a reasonable period would be.

39.  The PA will make an annual comprehensive report to the public, Mayor, Commissioner in Charge of the PPB, City Council, Police Chief and PPB and may furnish additional public reports as necessary.  The annual report will include information previously reported by the IPR, with a summary section but also complete with tables,data and analysis similar to the IPR's pre-2009 reports.

40.  When the PA determines that Portland's City Attorney Office may have a conflict in advising or representing the PA, the PA should have private, outside legal counsel separate from the Portland City Attorney's Office.

**d.  Other Recommendations**

41.  The range of possible findings for the resolution of a complaint investigated by the IPR should be restored to "Unfounded, Insufficient Evidence, Sustained, and Exonerated."

42.  The Portland City Council will retain its authority to make the last determination regarding a community member-appellant's appeal of a complaint.  The Council should be authorized to consider new evidence.

43.  In its reporting of officer involved shootings and in-custody deaths, the PPB should include data for all such incidents regardless of what the Medical Examiner may have determined was the cause of death.

44.  The PPB should list all disciplinary actions on its website, including a brief description of the violation(s) of policy or reason(s) for the discipline, officer's name, number of years on the force, gender, and race.  The PPB should also include the age, gender, and race of the community member(s) subjected to the conduct for which the officer was disciplined.

45.  There should be an explicit PPB policy stating that PPB members have a duty to report misconduct by another PPB member and to ensure that the complaint, if it relates to misconduct involving a public member, is made to the IPR.

46.  Meetings held by the IPR, CRC (including appeals by community members), Training Advisory Council, and Behavioral Health Unit Advisory Committee shall be open to the general public.

**Recommendation: Amendment to COAB Bylaws 102716-2**

Amendment to bylaws: If less than 12 currently appointed members, quorum shall consist of a simple majority of the currently appointed membership

**Recommendation: Reorganization of Subcommittees 102716-3**

Consolidation of DSUFCS and AS to form the Accountability Subcommittee
(Data Systems, Use of Force, Compliance)

RECOMMENDATION 111215-1

Directives Related to the Use of Force: All Directives Related to Use of Force... should be revised to be clear, comprehensive and consistent with the COAB's anticipated recommendations regarding Directive 1010.00 (Use of Force) and previous recommendation regarding Directive 1010.10 (Post Deadly Force Procedures).

**FULL TEXT:**

Revise All Directives Related to Use of Force):

All Directives Related to Use of Force, such as Directives 315.30 (Satisfactory Performance), 630.15 (Foot Pursuits), 940.00 (After Action Reports), 1020.00 (Firearms),1030.00 (Baton Use), 1040.00 (Aerosol Restraints), 1050.00 (Less Lethal Weapons and Munitions), 1051 (Electronic Control Weapon System), and 1090.00 (Special Weapon Use) (all attached) should be revised to be clear, comprehensive and consistent with the COAB's anticipated recommendations regarding Directive 1010.00 (Use of Force) and previous recommendation regarding Directive 1010.10 (Post Deadly Force Procedures).

The revision of such directives should include:

a. Merge the "policy" and " procedure" sections by deleting sections on "procedure".

b. Provide clear and comprehensive definitions for words and acronyms, such as " SERT," " RU," " EMS," " DVD," " MCDC," " LOS," and others.

c. Delete references to rescinded directives, such as former Directive 1010.10 (Deadly Physical Force) and 1020.00 (Physical Force).

d. Add correct references to current directives.

## RECOMMENDATION 111215-2

Revise Directive 1030.00, Baton Use, to Clarify When the Use of Police Batons Is Authorized

**FULL TEXT:**

Revise Directive 1030.00, Baton Use, to Clarify When the Use of Police Batons Is Authorized:

Directive 1030.00 should be revised to clarify when the use of police batons is authorized and include at least the following:

The collapsing/telescoping police baton is an impact weapon. The rewrite of Directive 1020.00, Baton Use, should clearly state when the use of the Bureau issued straight collapsing/telescoping police baton is authorized.

Before resorting to the use of a police baton, officers shall use all reasonable de-escalation techniques and tools which are available to them to avoid the use of such force.

Officers shall only use the police baton when objectively reasonable, necessary, and proportionate to the threat or resistance of the subject as defined more fully in Directive 1010.00 and only to overcome aggressive resistance or aggravated resistance. In addition, each use of a police baton must be objectively reasonable, necessary, and proportionate to the threat or resistance encountered, as required by Directive 1010.00.

Police batons are not authorized to overcome only passive resistance or active resistance by an individual.

Unless it would present a danger to the officer or others, officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is deaf or hard of hearing, prior to each strike with a police baton or other impact weapon. Officers shall give the subject sufficient time to comply with the warning before striking the subject. A warning shall be given prior to each strike.

Preferred target areas include arms, legs and torso.

Officers are prohibited from using use the police baton under these facts and circumstances:

a. Officers are prohibited from using a police baton on subjects who are restrained and under control, or complying with police direction.

b. Intentional strikes to the head, neck, throat, heart, kidney, groin and spine with the police baton or any authorized impact weapon can be deadly force. Therefore, such intentional

strikes are prohibited, except when under the facts and circumstances deadly force is authorized.

c. Officers are prohibited from using a police baton as a form of punishment or for retaliation. Recommendation # 111215-2 4

d. Officers are prohibited from using a police baton to prod or jab individuals, to awaken unconscious or intoxicated individuals, or to prevent the destruction of evidence.

Alternative d. Officers are prohibited from using a police baton as an instrument of force on unconscious or intoxicated individuals, or to prevent the destruction of evidence.

Officers shall consider risks to the subject and third parties when determining whether to use the police baton. Officers may only use the police baton on suspects who are visibly pregnant, elderly, apparently pre-adolescent, or visibly frail when there is an exigency or an immediate threat to officers or third parties.

Use of a police baton in the following circumstances is only authorized in situations where there is a risk of death or serious physical injury to the officer or third parties:

a. When the suspect is in an elevated position where a fall is likely to cause substantial injury or death.

b. When the suspect is in a location where the suspect could drown.

c. When the suspect is operating a motor vehicle or motorcycle and the engine is running or is on a bicycle or scooter in motion.

d. When an individual is handcuffed or otherwise restrained.

e. When an individual is fully contained in a police vehicle.

### RECOMMENDATION 111215-4

Revise Directive 1050.00, Less Lethal Weapons and Munitions, to Clarify When the Use of Beanbag Shotguns Is Authorized.

**FULL TEXT:**

Revise Directive 1050.00, Less Lethal Weapons and Munitions, to Clarify When the Use of Beanbag Shotguns Is Authorized):

A beanbag shotgun is a weapon.  Directive 1050.00 should be revised to clarify when the use of the beanbag shotgun is authorized and include at least the following:

The optimal distance for a beanbag shotgun is between 21-50 feet.  Accuracy drops off rapidly after approximately 45 feet and their flight becomes erratic, striking objects to the right, left, or below the target, increasing the risk to innocent bystanders.

Officers are cautioned that beanbag rounds present a significant risk of death or physical injury when fired at less than 21-30 feet at the chest, head, neck, or groin.  Officers should be aware that targeting the chest, head, neck, or groin has on occasion proven deadly when a beanbag round is fired at a close range of 21-30 feet.

Officers are further cautioned that the target area for a beanbag round substantially differs from a deadly force target area.  Instead of aiming for the center mass of the body, beanbag shotguns must be aimed at the lower abdomen (below the belt level), thighs, legs below the knee, or arms below the elbow (forearms).  The chest, head, neck and groin should not be targeted.

Officers shall consider the risk of the beanbag round causing serious harm when determining whether to fire the beanbag shotgun.

Before resorting to the use of a beanbag shotgun, officers shall use all reasonable de-escalation techniques and tools which are available to them to avoid the use of such force.

Beanbag rounds are only authorized when used on an individual engaged in aggressive resistance or aggravated resistance, as defined in Directive 1010.00, Use of Force, and only to prevent immediate physical harm to the officer or another person.   In addition, each firing of a beanbag shotgun must be objectively reasonable, necessary, and proportionate to the threat or resistance encountered, as required by Directive 1010.00.

Use of beanbag rounds in the following circumstances is only authorized in situations where there is a risk of death or serious physical injury to the officer or third parties:

a.  When the suspect is in an elevated position where a fall is likely to cause substantial injury or death.

b.  When the suspect is in a location where the suspect could drown.

c.  When the suspect is operating a motor vehicle or motorcycle and the engine is running or is on a bicycle or scooter in motion.

d.  When an individual is handcuffed or otherwise restrained.

e.  When an individual is fully contained in a police vehicle.

Unless it would present a danger to the officer or others, officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to firing a beanbag shot gun.  Officers shall give the subject sufficient time to comply with the warning before deploying the taser.  A warning shall be given prior to each bean bag round that is fired.

Officers shall not target the chest, head, neck or groin unless deadly force is justified.

Beanbag rounds should not be shot through glass or a chain link fence due to the likelihood of rupturing the beanbags and having the contents injure others.

Officers are prohibited from using beanbag rounds against an individual in a crowd unless the officer has the approval of a supervision and can:

* Target a specific individual who poses an immediate threat of causing physical harm; and

* Reasonably assure that other individuals in the crowd who pose no threat of violence will not be struck by the weapon.

Officers shall summon emergency medical services for all subjects who have been struck by a beanbag round.

The PPB shall enact a policy which ensures that only less lethal beanbag rounds, as opposed to lethal live rounds, can be fired from a beanbag shotgun.

The PPB shall enact a policy which ensures all shotguns, including beanbag shotguns, are included in a secure manner.

Officers shall be certified on the use of beanbag shotguns.  Officers shall receive annual beanbag shotgun in-service training, including proficiency and policy changes, if any.

In addition to these policy provisions, the Subcommittee is concerned about the current use of a shotgun for beanbag rounds that can also be loaded with live rounds. Despite precautions being taken by the PPB to ensure that live rounds are not mistakenly loaded into a shotgun intended for beanbag rounds that is not enough. The PPB should replace its current beanbag shotguns with shotguns that can only fire beanbag rounds.

### RECOMMENDATION 111215-5

Rename and Revise Directive 1051.00, Electronic Control Weapon System, to Clarify When the Use of Conducted Electrical Weapons [Tasers] Is Authorized.

**FULL TEXT:**

Rename and Revise Directive 1051.00, Electronic Control Weapon System, to Clarify When the Use of Conducted Electrical Weapons [Tasers] Is Authorized:

Consistent with the Conducted Electrical Weapon policies of the Seattle Police Department and the New Orleans Police Department, the directive on the use of tasers should be renamed "Conducted Electrical Weapons (CEW)."

The revised directive should include most if not all of the policy provisions found in New Orleans Police Department, Chapter 1.3, Conducted Electrical Weapon (CEW) (attached).

A conducted electrical weapon (CEW), or taser, is a weapon. Directive 1051.00 should be rewritten to clarify when the use of the taser is authorized and include at least the following:

A taser in probe deployment is designed to stimulate a portion of the nervous system with sufficient electrical energy to bring about uncontrolled muscle contractions which override an individual's voluntary motor function. Drive stun mode occurs when the taser makes direct contact with the subject's body and does not override an individual's motor responses. It is intended to cause significant pain. Use of the taser in probe deployment is preferred in some circumstances over use in drive stun mode, which can only be used at close range and may cause marks and scarring.

Before resorting to the use of a taser, officers shall use all reasonable de-escalation techniques and tools which are available to them to avoid the use of such force.

Officers shall use tasers only when such force is necessary to protect the officer, the subject, or another party from physical harm, and other less intrusive means would be ineffective.

Tasers are only authorized to control a subject who is engaged in aggressive resistance or aggravated resistance as defined in Directive 1010.00, Use of Force, and there is a reasonable expectation that it will be unsafe for officers to approach the subject. In addition, each use of a taser must be objectively reasonable, necessary, and proportionate to the threat or resistance encountered, as required by Directive 1010.00.

Subject to Directive 1010.00, tasers are authorized if the subject has committed a crime of violence and is fleeing, and the person presents the potential to harm officers, himself/herself, or others. Mere flight from a pursuing officers, without known facts or

circumstances, is not sufficient cause for the use of a taser.  In addition, the use of a taser on a fleeing subject must be objectively reasonable, necessary, and proportionate to the threat or resistance encountered, as required by Directive 1010.00.

Tasers are not authorized to control a subject who is only passively resistant or actively resistant as defined in Directive 1010.00, Use of Force.

Tasers are intended to control an aggressively resisting individual while minimizing the risk of serious injury.

Officers shall determine the reasonableness of taser use based on all facts or circumstances known to the officer at the time, including but not limited to the subject's age, size, physical condition, and the feasibility of lesser force options.

Use of a taser in the following circumstances is only authorized in situations where there is a risk of death or serious physical injury to the officer or third parties:

a.  When the suspect is in an elevated position where a fall is likely to cause substantial injury or death.

b.  When the suspect is in a location where the suspect could drown.

c.  When the suspect is operating a motor vehicle or motorcycle and the engine is running or is on a bicycle or scooter in motion.

d.  When an individual is handcuffed or otherwise restrained.[1]

e.  When an individual is fully contained in a police vehicle.

Unless it would present a danger to the officer or others, officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is deaf or hard of hearing, prior to deploying a taser.  Officers shall give the subject sufficient time to comply with the warning before deploying the taser.  A warning shall be given prior to each deployment of a taser.

Officers shall not target a subject's head, neck, chest, heart, or genital area.  The center mass of the back to the buttocks is a viable target.  Officers shall target below the ribcage down to the upper thigh, splitting the beltline, if possible.  When encountering subjects wearing heavy or loose clothing on the upper body, the legs should be considered as targets.

---

[1] There is at least one member of the work group and possibly community members that do not favor the taser being used on someone who is in handcuffs or restrained under any circumstances.  The subcommittee expects further discussion on this issue at the DSUFCS meeting on Monday.

The use of tasers for pain compliance against those suffering from mental illness or emotional crisis is prohibited, except when an objectively reasonable person would believe that immediate and serious bodily harm to a person or persons is about to occur, and then only to avoid the use of a higher level of force.

Only one taser at a time may be intentionally used on a subject, except where deadly force is authorized.

After once standard taser cycle (5 seconds), the officer shall reassess the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning.

Officers should evaluate their force options and give consideration to other force options if a taser is not effective after two (2) cycles on the same person.

Officers shall make every reasonable effort to attempt handcuffing during and between each taser cycle. Officers should avoid deployments of more than two taser cycles unless an objectively reasonable person would believe that immediate and serious bodily harm to a person or persons is about to occur, and then only to avoid the use of a higher level of force.

If the taser is not effective after three (3) cycles on the same person, it shall not be used again on that person.

Except where deadly force would be authorized or where the officer has reasonable cause to believe there is an immediate risk of serious physical injury, officers shall not use tasers against:

    a. Visibly pregnant women;
    b. Elderly persons;
    c. Visibly frail persons;
    d. Young children (individuals perceived to be as young as 18);
    e. Individuals with obviously low body mass; and

Except when deadly force would be authorized, tasers shall not be used when deployment may cause serious physical injury or death from situational hazards. This may include falling, drowning, losing control of a motor vehicle, or igniting a potentially explosive or flammable material or substance.

The taser shall not be used in an indiscriminate manner in situations involving a large crowd (e.g., parade assignments or special events).

Officers are required to justify each application of a taser and why less intrusive levels of force were ineffective.

Close quarters deployment (a range closer than three (3) feet) may not provide adequate probe spread (the distance between probes) to allow the taser to function to its full effectiveness and should be avoided.

The taser shall not be used to torment, elicit statements from, or to punish any individual.

Prior to deploying a taser, an officer shall visually and physically confirm it is, in fact, a taser and not a firearm.

Officers should be cognizant of the risk of positional asphyxia following a taser application and avoid using a restraint technique or position that would impair a subject's respiration, such as the subject being on his or her stomach. Once controlled in police custody, the subject should be continually monitored for any signs of distress.

Officers shall summon medical aid whenever a subject has been struck with a taser.

Officers shall not remove taser barbs or probes that are embedded in flesh. Only emergency medical response personnel shall remove taser barbs or probes that are embedded in flesh.

Officers shall be certified on the use of tasers. Officers shall receive annual taser in-service training, including proficiency and policy changes, if any.

**RECOMMENDATION 111215-6**

Revise Directive 1090.00, Special Weapon Use, to Clarify What "Special Weapons" the PPB Has Approved or Is Only Testing, When Their Use Is Authorized and Who Can Use Them.

**FULL TEXT:**

Revise Directive 1090, Special Weapon Use, to Clarify What "Special Weapons" the PPB Has Approved or Is Only Testing, When Their Use Is Authorized and Who Can Use Them.

Directive 1090.00 should be revised to clarify what special weapons the PPB has approved, when their use is authorized, and who can use them, and include at least the following:

A comprehensive list of all of the PPB's approved special weapons should be provided in the Directive.

A comprehensive list of all of the PPB's special weapons, whether approved or only being tested, should be published on its website.

Before resorting to the use of a special weapon, officers shall use all reasonable de-escalation techniques and tools which are available to them to avoid the use of such force.

All uses of special weapons must comply with Directive 1010.00, Use of Force.

Consistent with Directive 1010.00, Use of Force, an explanation of the facts and circumstances which must exist before the use of each special weapon is authorized should be clarified and spelled out.

Who can use special weapons should be clarified and spelled out.

## RECOMMENDATION 111215-7

Revise Directive 630.15 Foot Pursuits… to further clarify when foot pursuits should be initiated or terminated.

**FULL TEXT:**

Revise Directive 630.15, Foot Pursuits.

Directive 630.15 should be revised to further clarify when foot pursuits should be initiated or terminated and include at least the following:

Foot pursuits may precipitate the use of unnecessary force as defined by Directive 1010.00.  For example, take downs, pushes and tackles used to terminate a foot pursuit can pose a risk of serious physical injury and death to the person being pursued.  Take downs, pushes and tackles used to terminate a foot pursuit also pose a risk of injury to the officer employing the technique.  These risks are a primary reason why foot pursuits are not required of officers and are a consideration as to whether a foot pursuit should be initiated or terminated.

Foot pursuits should be terminated when partners split and lose sight of each other.

If the identity of the suspect is known, and the suspect is not posing an immediate threat to others, officers should consider terminating the foot pursuit in favor of later apprehension.

Primary considerations in determining whether to initiate or terminate a foot pursuit is the severity of the crime for which the suspect is being pursued, applicable statutes and PPB use of force policies, and the benefit of the suspect's capture.

Radio communication at the initiation of a foot pursuit is mandatory.

In addition, the directive should be revised to eliminate any potential ambiguity on when armed suspects are to be pursued.

## RECOMMENDATION 111215-8

Revise Directive 315.30, Satisfactory Performance, should be consistent with all of the COAB's recommendations for rewriting Directive 1010.00, Use of Force.

**FULL TEXT:**

Revise Directive 315.30, Satisfactory Performance:

Revised Directive 315.30, Satisfactory Performance, should be consistent with all of the COAB's recommendations for rewriting Directive 1010.00, Use of Force.

The mission statement and some of the core principles from rewritten Directive 1010.00 should be restated in revised Directive 315.30. For example, before resorting to the use of force to manage confrontations, officers shall use all reasonable deescalation techniques and tools which are available to them to avoid the use of force.

A comprehensive, well-functioning system to monitor officers to ensure they are performing satisfactorily should be implemented by the PPB. The system should include the use of the existing Employee Information System, as well as other management tools such as annual performance evaluations.

The Employee Information System and any other management tool used to measure satisfactory performance should have the ability to include instances of positive officer behavior, including but not limited to consistent application of best practices and singling out of exemplary performance that goes beyond enumerated policies and procedures in the service of maintaining positive community relations and engenders public trust in the objectivity and fairness of the PPB.

## RECOMMENDATION 111215-9

Minimize Incidents of Bystander Endangerment: The PPB should revise its policy in current Directive 1010.00, Use of Force, as may be necessary to ensure that the incidence of bystander endangerments when firearms are discharged or potentially discharged is minimized.

**FULL TEXT:**

Minimize Incidents of Bystander Endangerment: The PPB should revise its policy in current Directive 1010.00, Use of Force, as may be necessary to ensure that the incidence of bystander endangerments when firearms are discharged or potentially discharged is minimized. To determine whether bystander endangerments are already being minimized, a review of PPB's relevant training and relevant incidents should be undertaken by the PPB's Inspector and the COCL and reported on to the DOJ and the City.

## RECOMMENDATION 111215-10

Make Explicit and Unequivocal in Any Appropriate Directives and Training Procedures and Practices that Heightened Risk, Not Any Particular Distance Between Subject and Officer, Determines Whether It Is Appropriate to Draw a Weapon

**FULL TEXT:**

Make Explicit and Unequivocal in Any Appropriate Directives and Training Procedures and Practices that Heightened Risk, Not Any Particular Distance Between Subject and Officer, Determines Whether It Is Appropriate to Draw a Weapon

The PPB should enact a policy emphasizing that the so-called "21-foot rule" does not exist and/or that it does not per se justify shooting when the suspect is less than 21 feet away and is never applicable if the officer already has his gun drawn and pointed. To determine whether this has been occurring in the absence of a policy, a review of PPB's relevant training and relevant incidents should be undertaken by the PPB's Inspector and the COCL and reported on to the DOJ and the City.

**EXHIBIT 2**

**City of Portland Plan for**
***Portland Committee on Community-Engaged Policing (PCCEP)***

I.    MISSION

To work with the Mayor/Police Commissioner, Portland Police Bureau, and Portland's diverse constituencies to solicit and exchange information between the community and Portland Police Bureau (PPB) to achieve the desired outcomes of equitable policing which exceeds constitutional requirements, and meaningful community engagement with and trust in PPB.

II.    GOALS

PCCEP members will independently assess the Settlement Agreement using the tools outlined in this Plan. PCCEP will work to facilitate positive police/community relationships and promote public safety by assessing PPB's current community engagement processes, and developing recommendations and strategies for systems to increase public outreach and engagement with a broad cross-section of the community, to build confidence and improve outcomes. Additionally, PCCEP members will review and make recommendations on PPB policies touching the DOJ Settlement Agreement and/or key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice.

In order for PPB to effectively build trust with Portland's diverse communities, the communities' concerns must be heard and meaningful action by PPB must be taken.  To facilitate this outcome, PCCEP members will also make recommendations in the key areas of concern for Portland's diverse communities based on the communities' articulated experiences and grievances.

PCCEP's mission and goals will guide the following:

1. Scope of work
2. Membership
3. City's responsibilities
4. Available tools and resources
5. Members' responsibilities
6. Deliverable products

Exhibit 2 – Page 1

<u>SCOPE OF WORK</u>

PCCEP will engage with Portland's diverse communities in key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice. PCCEP will contribute to the development of the PPB Community Engagement Plan, as directed by the Settlement Agreement between the City of Portland and the United States.

Specifically, PCCEP will be authorized to:

- Develop recommendations for PPB systems to engage meaningfully, both short-term and long-term, Portland's diverse communities and improve community relations. Gather and synthesize information from Portland's diverse communities, and make recommendations based on that information in key areas of concern to communicate to the Mayor, PPB, the Office of Equity and Human Rights, the DOJ, and the public at large.

- Review and make recommendations on PPB directives touching the DOJ Settlement Agreement and/or key areas of concern. Provide information to the community on these directives, and solicit feedback and recommendations from the community to share with the PPB.

- With the Mayor's written approval, and after consultation with the other City Commissioners, PCCEP is authorized to identify for off-schedule review directives not related to the DOJ Settlement Agreement or key areas of concern.[1]  PCCEP must provide a written explanation for the request, which will be considered by the Mayor and City Commissioners.

- Provide information to and solicit feedback from Portland's diverse communities through focused and targeted round tables and town halls, to be held at least quarterly and be open to the public.  PPB presence is required at quarterly town halls.

- Continue to collaborate with the City on surveys regarding Portland residents' experiences with and perception of PPB's community outreach and accountability efforts. PCCEP will consider survey results in developing recommended strategies.

- Provide ongoing feedback to PPB regarding community engagement initiatives already in progress and those added/needed in the future.

- During the effective period of the Settlement Agreement, appear before the Court at the annual status conference to describe to the Court its assessment of the City's progress toward achieving the goals of the Settlement Agreement.

---

[1] PPB directives are generally scheduled for Bureau review every two years. The City recognizes that the community has an interest in a number of directives, and particularly those that are relevant to current events (e.g., Directive 635.10. Crowd Management, with respect to demonstrations; Directive 810.10, Arrest of Foreign Nationals with respect to Portland's status as a Sanctuary City). This authority is intended to allow PCCEP to be responsive to community concerns when there is a compelling interest to review and revise a Bureau practice.

Exhibit 2 – Page 2

III.    MEMBERSHIP and REPORTING

PCCEP will be comprised of a diverse group of between thirteen mayoral-appointed volunteers, who are committed to improving systems-based police/community relationships and ensuring and exceeding constitutional policing standards. Two of the thirteen seats will be reserved for high school-aged youth. The PCCEP will report directly to the Mayor (Police Commissioner) and consult, separately and at least quarterly with the Director of the Office of Equity and Human Rights.

IV.    SELECTION

The Mayor, in consultation with the other Council offices, shall work with the community selection panel described below to develop selection criteria and public outreach strategies for the PCCEP selection process.  This process may begin before the Fairness Hearing and approval of the revised Settlement Agreement by the Court.  Following the development of the selection criteria, a written, downloadable application will be posted and available on the City's website. Posted alongside the application will be the deadline for submission, selection criteria, selection process and a description of PCCEP member responsibilities.  The City will engage the community in a variety of ways to communicate the application and selection process, criteria and timelines.   Extra effort will be made to invite people who have experienced mental illnesses to apply.

The selection process will adhere to the following framework: (1) Application submission; (2) Initial screening of applicants by mayoral staff and a representative from any Council office who wishes to participate; (3) Review and further screening by the Selection Advisory Committee (a panel consisting of five diverse community members, each chosen by the Mayor and other Commissioners); (4) Candidate interviews with Mayor after soliciting feedback about final candidates from each Council office;  (5) Mayoral appointment and (6) Council confirmation.

In accordance with best practices for youth-adult partnerships, a separate process will be followed for high schoolers: 1) Application submission; 2) Opportunity for recommendations by David Douglas School District, Parkrose School District, and Portland Public Schools (three students per district); 3) Group interviews by Selection Advisory Committee (with AMAC participation); 4) Recommendations by Selection Advisory Committee to the Mayor; 5) Group interviews by the Mayor; 6) Mayoral appointment; and 7) Council confirmation.

Any high school-aged youth who apply through the regular process will be incorporated into the youth selection process. Any high school-aged youth under the age of 18 must obtain permission from a legal guardian (or provide documentation that they are legally emancipated) to apply and serve on the PCCEP.

A minimum of two high school-aged youths will serve on the PCCEP together.

The Mayor will consider the selection criteria and views of the community in appointing volunteers.  City employees may not be appointed to sit on the PCCEP.

Exhibit 2 – Page 3

V.    TERM

Volunteers will serve two-year terms, with the option to re-apply at the end of a term. During the first year of PCCEP's life, volunteers will be appointed on a staggered basis where the majority of the board will serve two-year terms, and the remainder will serve one-year terms. Applicants will be able to indicate on their application forms whether they wish to serve one or two-year terms. Any volunteers who serve one-year terms will have the option of re-applying for the opportunity to serve a full term. In accordance with City policy for advisory boards and commissions, volunteers can serve no more than eight years on the PCCEP.

VI.    REMOVAL

The Mayor, after consultation with the Council, the PCCEP Program Manager and PCCEP chair (absent a conflict of interest) will have sole discretion to determine when PCCEP members are no longer fit to serve on the committee due to misconduct. If a member is removed or resigns, the selection process identified above will be used to recruit, appoint and confirm the new member.

VII.    CITY'S RESPONSIBILITIES[2]

To establish the PCCEP and facilitate its work, the City will seek the services of a facilitator to structure board orientation for PCCEP members. This orientation shall include training on the *United States v. City of Portland* Settlement Agreement. Specifically, as part of this training, the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and mental health advocates will be invited to provide information on the history of the Settlement Agreement.

---

[2] With the amendments to Section IX of the Settlement Agreement and the development of the PCCEP, the City understands there is concern about the role of the Portland community in monitoring the Settlement Agreement, and updating the wider community on the status of terms of the Settlement Agreement.  The City will provide updates to the community on the status of the City's compliance with its obligations under the Settlement Agreement in the following ways:  1) at the annual status conference before the federal district court; 2) through quarterly community meetings with the COCL either separate from or jointly with the PCCEP, and staffed by the City; 3) through reports on the COCL website; and 4) through other means as appropriate.  The United States Department of Justice and the COCL will continue to have responsibility for monitoring the City's compliance with its obligations under the Settlement Agreement during the effective period of the Agreement.   After the City is found to be in compliance with the Settlement Agreement and the Court, DOJ and COCL are no longer involved, PCCEP will provide recommendations to the Mayor/Police Commissioner regarding continued assessments of the City's progress, generally, and community engagement.

Exhibit 2 – Page 4

After PCCEP's board orientation, the City shall continue to provide resources for member training as needed so that members continue to fulfill their obligations.

The City shall make appropriate information available regarding PPB's current community engagement initiatives, directives, and directive review and implementation process.

The PPB, in particular, and in accordance with its directive review schedule, shall meet with PCCEP during a universal review period to brief members on directives related to the DOJ Settlement Agreement and/or key areas of concern, provide information as needed/requested, and solicit PCCEP member feedback. The PPB shall make the adjustments necessary to its current directive review system in order to integrate PCCEP into the PPB's work.

The City shall provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days.

The City shall provide staffing for the PCCEP including a program manager and administrative support.  The City will also provide staff support and funding for community organizing/outreach.

The City shall provide meeting locations, and work with PCCEP to identify neutral locations that are accessible to and appropriate for the community for public meetings.

To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes, the PCCEP and the PPB's Equity & Diversity Manager to develop a Community Engagement Plan, which shall be adopted by Council following a public hearing.

The Mayor's Office shall publish on the City website an annual report, commencing from the date PCCEP begins meeting through the duration of its existence, that will include updates on progress made by the City in key areas of concern and community engagement recommendations.

The Mayor or the Mayor's delegate, and the PPB Chief or the Chief's delegate, shall endeavor to attend all public meetings of PCCEP, unless PCCEP requests otherwise.  Other Commissioners or their delegates are encouraged to attend, unless PCCEP requests otherwise.  The purpose of such attendance is to listen to understand, provide information either at the meeting or as follow-up, and learn from PCCEP members and public testimony.


VIII.    MEMBERS' RESPONSIBILITIES

PCCEP members must engage all participants in a respectful and collegial manner, and be responsible for the following:

- Prior to members' first PCCEP meeting:

Exhibit 2 – Page 5

- o Learn about the history of the *United States v. City of Portland* Settlement Agreement.
- o Attend PPB community academy. If necessary, the City is willing to provide a reasonable accommodation that would instead permit a PCCEP member to observe a session of the community academy and be given a guided tour of the PPB Training Division (with the opportunity to ask detailed questions about the Training Division).
- o Participate in a ride-along with PPB (1 per PCCEP member). If necessary, the City is willing to provide a reasonable accommodation that would instead permit a PCCEP member to participate in a ride-along with a member of the Behavioral Health Unit or a Neighborhood Response Team (in lieu of regular patrol); or participate in a morning walking beat.
- o Review lessons learned from the COAB.
- o Participate in subject matter and board trainings.
- o Learn about:
    - ✦ PPB organizational structure;
    - ✦ Policy development and implementation process;
    - ✦ PPB Racial Equity Plan;
    - ✦ PPB Training Division Plan;
    - ✦ PPB's Office of Community Engagement and current community engagement initiatives, generally; and
    - ✦ PPB advisory bodies.
- On a quarterly basis, gather input from Portlanders regarding experiences with and perceptions of PPB's community outreach. Input will be gathered through culturally responsive and relevant strategies that center the needs of the community. These strategies will include meeting community members where they are physically, mentally, emotionally and spiritually.  Such input will be solicited from (though not limited to) the following groups:
    - o General consultation with Office of Community and Civic Life (Civic Life) and/or District Coalitions, Coalition of Communities of Color, and Civic Life's Diverse Civic Leadership partners
    - o AMAC, The Portland Commission on Disabilities, the Human Rights Commission, and the New Portlander Policy Commission
- Evaluate national best practices regarding police and community engagement leading to bias-free policing and community trust.
- Analyze prior community surveys and consult with the City to conduct additional community surveys.
- Receive public comment from Portlanders at large.
- Review PPB directives and make recommendations to PPB based on public feedback in key areas of concern.

Exhibit 2 – Page 6

- Provide ongoing feedback to PPB's Office of Community Engagement on its community engagement practices and initiatives, and provide feedback on PPB's Community Engagement Plan.

- Hold monthly meetings. Meeting agendas shall be structured in a manner that provides a meaningful opportunity for public comment at the meeting prior to the conclusion of deliberations and voting. PCCEP meetings will generally be open to the public. However, if PCCEP reasonably determines that good cause exists on a particular occasion (for example, to deliberate on sensitive matters, such as matters involving personal medical information, or due to safety concerns), the PCCEP may meet without the public present. Facilitators will ensure that no votes are taken without the public having the opportunity to be present.

- Form subcommittees that may meet at other times during the month. Subcommittee meetings must be open to the public and provide an opportunity for the public to weigh in on the substantive matters being considered.

- PCCEP shall coordinate with the COCL to host open town hall meetings  at which the COCL provides quarterly reports and the COCL and PCCEP receives public comment on compliance assessments and recommendations to facilitate Portlanders' ability to review compliance and make recommendations.[3]

- Agendas and minutes from all PCCEP meetings will be published on the City website within 10 business days after the meeting date.

IX.     <u>DELIVERABLE PRODUCT</u>

PCCEP shall be responsible for producing the following:

- Summary reports issued (to the Mayor, PPB, DOJ, and the public at large) contemporaneously with quarterly town halls, providing an overview of community concerns around and any recommendations regarding use of force, interactions with people experiencing mental illness, complaint investigations, and racial justice. Strategies and recommendations developed to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members, to inform PPB's Community Engagement Plan, utilizing the following procedure:

---

[3] Should COCL decline to combine its quarterly town halls with PCCEP's town halls, the COCL may hold separate town halls for community feedback, with staff support from the City.

Exhibit 2 – Page 7

1.  *PCCEP shall consult with community members and hold at least two (2) public hearings, to be completed within 180 days of PCCEP members being seated (PCCEP's town halls may be utilized for this purpose). To gather public input on PPB's outreach efforts and progress towards eliminating unconstitutional disparate treatment, the hearings shall be held in locations to ensure that PPB receives input from all parts of the Portland community. PCCEP shall review PPB's prior community outreach efforts to contribute strategies to the development of a new Community Engagement Plan.*

2.  *PCCEP shall meet at least quarterly with the Director of the City's Office of Equity and Human Rights and PPB's Manager of Equity & Diversity, including a review of PPB's current Racial Equity Plan, and evaluate PPB's ongoing efforts to implement that plan.*

3.  *PCCEP shall suggest for inclusion in the Community Engagement Plan strategies to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members. The parties recognize that meaningful public engagement involves the ability of community members to affect policies, practices, and PPB culture, thereby improving outcomes and eliminating unconstitutional actions.*

4.  *PCCEP may also provide information to the PPB on other areas related to meaningful community engagement and outreach to contribute to the development of the Community Engagement Plan. The Plan will specify how to integrate community values and problem-oriented policing principles into PPB's management, policies and procedures.*

5.  *PCCEP will spend the first year gathering information from the public and compiling recommendations for PPB's Community Engagement Plan. Recommendations shall be submitted to PPB within one year of PCCEP members being seated.*

6.  *The Chief's Office shall consult with the PCCEP and shall consider and utilize to the extent practicable PCCEP's recommendations in developing and implementing the Community Engagement Plan. The Chief's Office shall present the final proposed Community Engagement Plan (with implementation timeline) to the PCCEP for its final review and comment within 45 days of receiving PCCEP's recommendations. The recommended Community Engagement Plan shall be considered by the City Council in a public hearing, leading to the Council's adoption of the Plan after review and amendments if indicated.*

Exhibit 2 – Page 8

*The PCCEP shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Community and Civic Life Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The PCCEP shall also provide the opportunity for public comment at any town hall and roundtable meetings to keep open lines of communication with the public at- large.  The PCCEP may also invite testimony from other City bodies, including but not limited to PCoD, BHUAC, TAC, HRC, CRC and the citizen members of the PRB.*

Exhibit 2 – Page 9

## RECOMMENDATION 031016-1

Revise Directive 870.20, Custody and Transportation of Subjects to contain only policy statements, to eliminate references to "maximum restraint", to change "might present an immediate threat" to "is presenting an immediate threat", and to eliminate the use of terms such as "deranged", "bizarre", and "excited delirium" from its directives and training

**FULL TEXT:**

Directive 870.20, Custody and Transportation of Subjects, should be revised as follows:

1. The directive should contain only policy statements. Since such policy statements apply to all members of the PPB, extraneous and confusing section titles, such as "PROCEDURE" and " Member Responsibilities," should be eliminated.

2. The PPB prohibited the use of "maximum restraint" in its Tips and Techniques, No. 2015-2, dated April 12, 2015 - " A violent subject's legs may be secured together at the knees or ankles such as in the straight leg restraint, but the subject's legs will not be pulled behind the body and fastened to the handcuffs, belt. etc." Current Directive 870.20 states that maximum restraints are authorized. The directive should be amended to eliminate any reference to the use of maximum restraints and to specifically state that the use of maximum restraints is prohibited.

3. The words "might present" should be replaced by "is presenting." This change would result in a current statement in the directive reading as follows: "A reasonable suspicion based on articulable facts that the person is presenting an immediate threat of serious injury to the member or others present if not restrained (per Oregon and Federal law).

The PPB should eliminate the use of terms such as "deranged," "bizarre," and "excited delirium" from its directives and training.

**RECOMMENDATION 032416-1**

Directive 630.50, Emergency Medical Aid, should include an explanation of what kind of First Aid/CPR training is required and offered.

**FULL TEXT:**

Clarify training required and courses offered – is it CPR and First AID or both?
All are all PPB officers required to take both CPR and First AID?

**RECOMMENDATION 032416-2**

Directive 870.20, Custody and Transportation of Subjects, should include a description of training required and offered.

**FULL TEXT:**

Under Handcuffing, 2.1, Change "when possible" to "In the event that handcuffs are cutting off circulation…."

Remove "might" in every space

Define "reasonable suspicion"

Clarify the distinction and definitions of when people are in custody versus non custody

Spell out and define "detoxification holds"

Define "DPSST"

## RECOMMENDATION 032416-3

Directive 630.45, Emergency Custody Transports—should be revised

**FULL TEXT:**

Directive 630.45, Emergency Medical Custody Transports, should be revised as follows:

1.    The directive should contain only policy statements.  Since such policy statements apply to all members of the PPB, extraneous and confusing section titles, such as "Policy," "Procedure" and "Member Responsibilities," should be eliminated.

2.    The directive should be clarified and revised so that persons who are seriously injured, seriously ill, unconscious, having difficult breathing or having other serious medical problems are not transported by anyone other that Emergency Medical Services (EMS).

3.    Current paragraph 1.1 of the current section titled "Policy" in the directive should be revised to eliminate the term "excited delirium" and to read:  "Appears to be agitated, over stimulated, paranoid, disoriented, or extremely restless or to be having involuntary twitching of small muscles or hallucinations."

4.    Current paragraph 1.3 of the current section titled "Policy" in the directive should be revised to read:  "Displays respiratory difficulty (per witness statements or self-proclamation) including, but not limited to, shortness of breath or extreme wheezing."

5.    Current paragraph 1.1.3 of the current section titled "Procedure" in the directive shall be revised to read: "EMS personnel at a scene will determine whether an in-custody person is seriously injured, seriously ill, unconscious, having difficult breathing or for any other reason requires medical treatment or further medical evaluation and, if so, only EMS, unless unable to transport, will transport the person to a hospital."

6.    Current paragraph 1.1.4 of the current section titled "Procedure" in the directive should be revised to read:  "The PPB values human life and needs to ensure the health and safety of persons is not jeopardized by members transporting persons who have serious medical problems.  Members must notify EMS personnel of the custody status of the person (e.g., arrested with criminal charges, police hold, etc.) as well as full disclosure of the following:

       a.   the type and amount of any force used against the person including, but not limited to:

              i.   whether the person was struck by an officer or another person and, if so, with what (e.g., fist, elbow, knee, foot, baton, flashlight, or bean bag), how many times was the person struck, and what reaction person appeared to have to being struck;

ii.   whether the person was pushed, tackled or taken down, or for any reason struck a hard surface (e.g., iron railing, brick wall, pavement, or sidewalk) and what reaction the person appeared to have to that event;

iii.   any use of the taser on the person, how many times was the person tasered, and what reaction the person appeared to have to each use of the taser; and

iv.   any use of pepper spray on the person and what reaction the person appeared to have to being pepper sprayed.

b.   either prior to (per witness statements or self-proclamation) or during police contact, did the person appear to have had or to be:

i.   agitated, over stimulated, paranoid, disoriented, extremely restless involuntary twitching of small muscles, or hallucinations;

ii.   any seizure;

iii.   any respiratory difficulty including, but not limited to, shortness or breath or extreme wheezing;

iv.   obvious signs of head trauma or loss of consciousness;

v.   signs of extreme intoxication and/or under the influence of drugs in conjunction with any of the above symptoms and has been involved in a prolonged physical altercation;

vi.   admits to being under the influence of cocaine or amphetamine substances and has been involved in a prolonged physical altercation.

c.   any complaints by the person regarding his medical condition including, but not limited to:

i.   pain;

ii.   difficulty breathing; or

iii. a need for the person's prescribed medication.

7.   Current paragraph 1.3.2 of the current section titled "Procedure" in the directive should be revised to read: "If the medical staff at the Multnomah County Detention Center, another jail or a holding facility refuses to admit a person transported by a member of the PPB to the location, EMS will be called. Persons who are seriously injured, seriously ill, unconscious, having difficult breathing or having other serious medical problems will not be transported to the hospital by anyone other than EMS.

### RECOMMENDATION 032416-5

Directive 630.15, Foot Pursuits—should clarify which kinds of foot pursuits should be initiated or terminated

**FULL TEXT:**

Revise Directive 630.15, Foot Pursuits, with regard to solo foot pursuits.

Directive 630.15 should be revised to clarify when solo foot pursuits should be initiated or terminated and include at least the following:

Officers shall not engage in or continue a foot pursuit while acting alone unless the delay in the apprehension of the suspect would present an immediate threat of death or serious physical injury to the officer or civilians. Even if that level of threat exists, the officer acting alone has the discretion to not engage or continue a foot pursuit. If exigent circumstances exist, the lone officer shall keep the suspect in sight from a safe distance and help coordinate containment.

**Recommendation 042816-1**
**Approved by the Community Oversight Advisory Board on April 28, 2016**

The Community Oversight Advisory Board urgently advises Mayor Hales and Chief O'Dea to immediately remove the 48-hour rule from PPB policies, procedures, and the Portland Police Association Collective Bargaining Agreement:

As a range of Portland social justice, religious and non-affiliated community leaders and partners have shown and the OIR Group (herein, OIR) and the Police Assessment Resource Center (herein, PARC), organizations have reported, the well known "48 Hour Rule," has repeatedly shown to be antithetical to good community policing.

The impact of the 48-hour rule on the Portland community has had a historical trajectory of confusion, mistrust and skepticism about the Portland Police Bureau (herein, PPB), and, because the 48-hour rule is situated within the Collective Bargaining Agreement, the Portland Police Association (herein PPA), itself. Since the role of the PPA is to act on behalf of the members of the Portland Police Bureau and not on behalf of the inhabitants of Portland, this places the members of the Portland Police Bureau in a most precarious position; against the very community they are charged to keep and maintain safety. Continuing with this philosophy demonstrates an ethos which is diametrically opposed to the very community for which they have the responsibility for public safety.

Further, since the City Council is a signatory on the PPA and likewise, a representative body of Portland citizens, maintaining the 48-hour rule within the PPA Collective Bargaining Agreement puts the City Council representatives in direct opposition to the very citizens who elected them to The Council. To maintain the 48-Hour Rule, or to require concessions on unrelated matters in return for abandoning such a rule, speaks against the very missions of both the PPB and the PPA.

Therefore, the Community Oversight Advisory Board, as per paragraph 141 of the Settlement Agreement, urgently advises Mayor Hales and Chief O'Dea to take immediate steps to remove the 48-hour rule from PPB policies, procedures, and the Portland Police Association Collective Bargaining Agreement, in acknowledgment that the rule is contrary to good policing.

In addition, COAB respectfully requests that the Mayor and the Chief provide COAB with a high-level plan for achieving this objective, including a certain time when the City will report to the COAB on its compliance to paragraphs 124 and 127 of the Settlement Agreement (compelled statements and in-scene interviews, which were assessed as non-compliant and partially compliant in DOJ's last report, respectively).

**Recommendation 071416-1**

COAB should be allowed to select its own chair from its own membership.

**Recommendation 071416-2**

The COCL should be replaced, in whole or in part, by a court-appointed monitor with duties and responsibilities similar to the court-appointed monitors in cases brought by the DOJ against other cities such as Seattle and New Orleans. To the extent that implementation of this recommendation would require a change or modification to the Settlement Agreement, the COAB recommends that the DOJ and the City agree to do so. This recommendation specifically means that the COAB will continue to exist in its current role and will continue to be the voice of the community. Nothing about this recommendation is intended to reduce the COAB's role in any way and the COAB will remain as viable now as it is now with a court-appointed monitor.

DATE:        June 26, 2016

TO:          Dennis Rosenbaum, Amy Watson: Rosenbaum & Watson
             Charles Hales: Mayor of Portland
             Mike Marshman, Acting PPB Chief
             Adrian Brown: US Department of Justice, Portland Office
             Jonas Geissler: US Department of Justice, Washington DC
             Rev. T. Allen Bethel Co-Chair AMAC
             Rev. Leroy Haynes: Co-Chair AMAC

FROM:        Kathleen Saadat, Chair, Portland COAB (6/1/2015-6/24/2016)

RE:          COAB Chair's Exit Report

I leave with you this compendium of my thoughts and recommendations related to my experiences as Chair of the COAB for the past year. I hope this digest proves of value in envisioning the work to be done in the continuing efforts to involve Portland communities in reform of the Portland Police Bureau.

**CHAPTER I:  THE DEAD HORSE** (The Ghosts ride with us, still)  🐴

Members of COAB, the PPB, COCL and the public expressed to me concern that the lack of an adequate selection process and lack of an orientation and training for new COAB members is the root cause of current problems. I agree that the consequences of these omissions still have an impact on the functioning of COAB over a year later. Failing to adequately: 1) determine the viability of candidates; 2) insure candidates understood the COAB mission and structure; 3) insure candidates understood the status, role and responsibilities of COAB members; 4) facilitate a team building effort; 5) facilitate the setting of direction and priorities by the COAB made operation of this Board much more difficult than if information had been provided up front. Following are issues I believe to be the consequences of not providing that information and training.

   a.  *Lack of clarity regarding the COAB role and mission resulted in members of the COAB expressing frustration at being unable to steer the board in the direction they believed it should go, e.g., to hear complaints and bring them to the PPB for resolution; to hold individual PPB officers accountable for questionable behaviors; to investigate complaints from PDX residents*
   b.  *Lack of clarity regarding process resulted in the seating of members not interested in reading volumes of material. This in turn resulted in the seating of at least one individual who, six months into the process had not read the settlement agreement*
   c.  *Lack of clarity regarding role, mission and process meant members were seated who did not understand/accept they would be working **with** the PPB. This was at the heart of many conflicts between voting and non-voting board members, especially in subcommittees*
   d.  *Lack of clarity regarding COAB's role and responsibilities resulted in the **public's** misunderstanding of the role of the COAB in the process of police reform, generating poorly informed and painful complaints and criticisms of the Board*

> e.  *Lack of clarity regarding the structure of the COCL/COAB, and its relationship to the Parties, added to public cynicism, distrust and negative feelings directed towards the COCL, the City and the COAB itself.*

June 1, 2015, I started work as COAB Chair and the distress created by the of the lack of clarity/training was palpable. Expressions of anger, frustration, cynicism and distrust overshadowed the recognition of talent, passion and commitment of those serving on the Board.  It has taken a year to provide the information and the support the Board members need in order to work together and to operate as a public body.

A year later, the relationships between/among members of the Board remain fragile, but for the most part are greatly improved. Individual talents and commitments have greater visibility to members of the Board and to the public. This recognition combined with the bonding that occurred at the COAB retreat (private) resulted in a board that operates in a manner more consistent with expectations of a public body. Members of the Board and members of the public noticed the change and expressed their pleasure with it.

To disregard the origins of problems associated with establishing the Board is to (unintentionally) place responsibility for those difficulties on the COAB. Obfuscation is not a way to build community support or improve relationships between the PPB and Portland communities.  Board members did not know what they did not know.

## CHAPTER 2:  THE MUDDY TRACK: (Hurdles)

**Board Selection**
- The COCL office started work on the selection process for Community Board members in October of 2015.  Efforts have been stalled by confusion about roles and responsibilities regarding management and implementation of a selection process for alternates and new Board members
- **The process needs decisions to be made to establish:**
  - Which entity is in charge/responsible for insuring the development and implementation of the selection process now and in the future
- Another selection process to be developed is that of deciding which of the Current Board Members will be invited to serve for another year.  My recommendation follows:
  - *Establish criteria, use documents: <u>Guidelines for Establishing Common Ground</u> and <u>What We Expect From A COAB Member,</u>  and assessment of past performance*
  - *Ask every Board member to submit their resignation indicating  whether they would like to serve another year*
    - a.  *Tell interested people the selection committee will review their information and make selections based on the established criteria*
    - b.  *Using the established criteria rank order those selected*
    - c.  *Reappoint at least one third of 15 (5) if possible (fill vacancies in ranked order)*
  - *Swear them in as public officials.  (This is an important ritual, even the POTUS has to do it.)*
  - *The newly formed Board will benefit  from a closed (gasp!) retreat where returning members model and  pass on the positive aspects of the Board culture formed over the last two years.*

2

**PPB Advisors**
- Some members of the PPB, do not appear to have accepted the reality of the Settlement Agreement.  I have spoken with several who do not seem to understand that while the inappropriate behaviors may not be their own, as members of PPB, they are responsible to help shape a PPB with improved relationships to Portland residents.
- PPB officers assigned to COAB should attend the two-hour COAB informational session and the COAB orientation session
- PPB representatives on the COAB need **regular, focused institutional support**.  They do not appear to have ongoing inspirational leadership that encourages them. PPB advisors are asked to work with a Board that challenges the policies and operations of the institution of which they are a part, which must present a challenge for them. They need ongoing institutional support from high level officials to help give them direction and the confidence that will allow them to be creative thinkers as they work with the voting members of the Board.

**Institutional Barriers**

    The organizational/administrative processes for the City of Portland and the PPB, are meant to support the governance of the City and/or the operation of the PPB. Often those processes do not permit a timely response to requests that support the flexibility frequently required to meet the needs of the COAB.  When institutional barriers are encountered, the resolution can take days, weeks, sometimes compromising the ability of the Board to conduct its business. One example; procurement procedures designed to serve Bureaus do not allow COAB to readily select meeting sites congruent with the need to engage community. One solution (recommended by the COCL Project Manager) is for the City to provide a Grant to fund COCL/COAB and annually audit expenditures.
- The Portland COAB began amid a chorus of cries that it "would not work", was "designed to fail" etc.  We insure continuation of that perception if we allow people to serve on the Board who are actively organizing against the existence of the Board, or who disregard Board agreements.  Settlement Agreement requirements for the COCL to consult with DOJ prior to dismissal of a person from the Board is a problem. The arrangement does not allow for timely response to Board members whose behaviors undermine COAB goals and the morale of other Board members. Perceptions that neither the City nor the COCL can protect Board members from verbal assault and disrespect, undermines the credibility of the Board. Perhaps the COCL and the DOJ can agree upon behaviors that define ***misconduct*** (to be shared with all COAB members and the public). This definition would be used when considering whether to sanction and/or dismiss members who engage in clearly defined misconduct. By providing a foundation for a consultative discussion between COCL and DOJ, decisions are clearer and the establishment of criteria conveys a concrete idea of the seriousness of the business of the Board.

3

**Overall Decision Making/Authority – Who is in charge?**
- The admirable goal of collaborative decision making is not always attained. This means there needs to be clarity about how disagreements are to be resolved, who resolves which type of problem, and by what authority
- I highly recommend regular quarterly meetings of ALL involved parties to insure the identification and resolution of issues, especially those stemming from institutional imbroglio's
- I highly recommend a position in the Mayor's office and the PPB, be empowered to make decisions that will facilitate timely resolution of COAB needs/requests

**CHAPTER 3: THE JOCKEY** (Chair on a Rocking Horse)

As COAB Chair for the past year, I feel as if I have been trying to win the Derby while riding a three legged horse in a Missouri thunderstorm without reins or saddle. The position of Chair has lots of responsibility but little authority. The Chair is the person who on a regular basis interacts with representatives of the City, the DOJ, the PPB, the AMAC and the public.  This position works to engage community leaders, groups and agencies in providing support and feedback to the board.  Again, identifying a person in both the Mayor's office and the PPB who is **responsible for helping to insure the success of the COAB,** will lend institutional support to the COAB Chair and reduce the amount of time spent resolving issues. (Deanna Wesson-Mitchel, in the Mayor's office has been wonderful support in this regard but is not designated as the COAB connection.)  This connection must remain a-political, insuring the COAB's independence from the influence of elected officials.

The COAB is large. To keep it engaged, a board this size needs lots of one on one attention to the members and lot's of administrative support.  It is important to recognize that much of this Chair's time was spent talking with board members and attending subcommittee meetings as a means to establish necessary relationships to help build a foundation of trust.  The new Chair may find a need to spend time doing the same.

Stipends remain a topic of discussion and as Chair, I encourage consideration of providing stipends for people who have a need for financial support in order to stay on the board.  In the past year there were at least two Board members who might have used such resources had they been available.

In May of 2016 in a memo to COCL, I listed Leadership and Structural issues that need to be addressed if the the COAB is to succeed, see following pages 5, 6, 7.

4

SOME OF WHAT IS IN THE WAY OF SUCCESS
(May 2016)

1.  *LEADERSHIP ISSUES:*

a.  There is no apparent leadership group/person in charge of the overall work of driving the initiatives into the institution(s) being reformed
b.  There is no identifiable person or entity at the City level for providing the support the COAB needs
   i.  needs are negotiated as though COAB is a City Bureau
   ii. there is no structure internal to the City where final process decisions are made unless it is a legal issue
c.  There is no inspirational leadership (by definition a consistently visible advocate) at City Hall, championing police reform
d.  There does not appear to be inspirational leadership at the PPB (by definition a consistently visible advocate)
e.  PPB does not appear to have the skill set to facilitate the art/science of institutional transformation
f.  The manifestation of commitment to the success of COAB is not evident in the behaviors of the responsible entities i.e. The City and PPB.
   i.  Advisor attendance at COAB meetings continues to decrease
   ii. City Council, the body ultimately responsible for successful implementation of the SA, is barely visible on the issue of the work and success of the COAB
g.  Communication between/among all concerned is often focused on the elements of the big picture rather than the big picture itself.  There does not appear to be active leadership to build and guide a coordinated effort to discuss and set objectives for the superordinate goal of Portland police reform.  (COAB should be involved.)

2.  *STRUCTURAL ISSUES*

a.  The dependent relationship between the COAB and the slow moving, established institutions which influence, fund and/or direct some aspects of the COAB, results in an inability for the COAB to be agile, timely and creative in response to the challenges of doing the work of public engagement.
b.  The COAB is influenced by institutions that affect changes in COAB direction or operation but upon which the COAB has little/no impact and cannot rely upon timely responses to requests

c.  The role and responsibility of the City and AMAC in COCL/COAB administrative issues needs clarification

d.  In this structure, the City Attorney's office serves two masters a reality that does not engender trust of either the PPB or the City

e.  The COCL and COAB Chair lack the authority to make decisions that would allow for the operation of an efficient and effective COAB, i.e. timely removal of Board members.

f.  There does not appear to be a formal mechanism that regularly (and predictably) brings together the institutional players to make coordinated decisions and set objectives for the attainment of the **superordinate goal of Portland police reform**.  (COAB should be involved.)

The drawing below is an attempt to add a visual to the idea of how the entities that surround and affect COAB seem disconnected. It is not intended to be an accurate representation; I would need more arrows.  ⊠⊠

The issues I have raised in no way imply malice or incompetence by anyone involved. Nor do I indict anyone in this report.  I think we are not focused on one of the "real" jobs, i.e., figuring out how to work outside of our respective silos so that reform can indeed happen and has meaning for the people most vulnerable to unconstitutional practices.

The upshot of all this is that a powerful opportunity to manifest expression of basic democratic principles by insuring community input and involvement, is slipping from our grasp along with the hope that "this time it will be different".

6





## CHAPTER 4: SEABISCUIT WINS! (Making it better) 🎉

Over the past year a majority of the Portland COAB members gained a sense of their mission and an understanding of the Board's focus.  The strength of the Board will continue to improve as long as there is meaningful work to do and institutional support that 1) allows the Board to be able to do the work; 2) respects and acknowledges the work being done by the Board members.

The Board is still in the "forming" stage.  While not all members are in concert, those that do not support the existence and goals of the COAB are now in the minority.  There are several Board vacancies to be filled by designated persons or organizations.  There are no remaining alternates should another community vacancy occur.  While selection and replacement needs might still be met in time, given the number of people involved on the selection committee and difficulties with meeting schedules etc., the time is rapidly passing and the COAB will be confronted with the need to quickly select replacements/new members at the risk of repeating the Dead Horse Experience. My suggestions are:

- *Expedite contact of selection committee members to determine interest*
- *Expedite meeting of the selection body*
- *Identify Process issues to be decided upon at initial meeting*
  - *Solicitation of applications for membership on the Board*
  - *Review and ranking of applicants*
  - *Interview questions and process*
  - *Final determination of how members will be selected*

**Informed Participation on The COAB:**
To support the success of the COAB it is important to provide new COAB members a realistic view of their roles and responsibilities.  Below is an outline of information recommended to be given to potential applicants BEFORE they complete/submit an application.  The information session is intended to support self selection of candidates. The following outline was submitted to the parties in March of 2016 for inclusion as part of the the selection process.

8

RE: TWO HOUR INFORMATION SESSION
Draft submitted 3/7/16

Below is an outline for a two-hour information session to be given to applicants to the COAB.  It is written knowing that it is most efficient to have applicants self-select, based on the congruence (or incongruence) of their skills and expectations with realistic information about the COAB.  Attendance at an information session Is a required part of the application process.  If we have fewer applicants than one might expect, it means to me that we have done a good job of being clear that COAB work is hard and carries great responsibility.  We are looking for people who are willing to be responsible and are also committed to hard work.

The outline below addresses three significant areas in which, in my experience as COAB Chair, COAB members seemed to have the greatest problems adjusting to being on the Board.
   1. ***Reading/understanding/agreeing with the Settlement Agreement***
   2. ***Understanding role of the COAB and relationship to other parties***
   3. ***Understanding Public Meeting/Public Records Law***

I propose that:
   • The COAB Chair act as overall facilitator for the session
   • #1 THE SETTELEMENT AGREEMENT information, **be presented by DOJ**
   • #2 THE COMMUNITY OVERSIGHT ADVISORY BOARD information, be **presented by COAB Chair**
   • #3 OREGON LAW AS IT RELATES TO COAB MEMBERS information, be **presented by City Attorney's Office**

Printed materials would be sent to each applicant prior to the session. The session would be evaluated by the attendees as to its helpfulness in making a decision regarding participation on COAB.

The last page in this packet lists a few questions I believe will be helpful to ask when interviewing potential COAB members.

Please keep in mind that we don't need for all members of the COAB to have college degrees or be employed at a professional level. We want to keep the spectrum of voices and experience that will help make things better for the greatest number of people in our City.

Kathleen S.
3/7/2016

9

**COAB APPLICANT INFORMATION SESSION**
(ESTIMATE **TWO HOURS** DELIVERY TIME)

---

**PURPOSE:  TO ENSURE APPLICANTS TO THE COMMUNITY OVERSIGHT ADVISORY BOARD UNDERSTAND ROLES, RELATIONSHIPS AND RESPONSIBILITIES THAT INFLUENCE THE WORK OF A COAB MEMBER**

---

1.  THE SETTLEMENT AGREEMENT   **40 MINUTES**
    a.  THE DOJ INVESTIGATION/FINDINGS
    b.  REVIEW SETTLEMENT AGREEMENT FOCUS ON SECTION IX
        i.  COAB
        ii.  ADVISORY NATURE OF BOARD
        iii.  DOJ ROLE RE THE COAB
    c.  Q & A

2.  THE COMMUNITY OVERSIGHT ADVISORY BOARD -**30 MINUTES**
    a.  STRUCTURE
        i.  COAB BY-LAWS (attached)
        ii.  GROUND RULES (attached)
        iii.  WHAT IS EXPECTED OF COAB MEMBERS (attached)
    b.  ROLES OF VOTING MEMBERS/NON-VOTING MEMBERS

3.   OREGON LAW/AS IT RELATES TO COAB MEMBERS – **40 MINUTES**
    a.  PUBLIC OFFICIAL
    b.  PUBLIC MEETING LAW
        i.  REQUIREMENTS SURROUNDING PUBLIC MEETINGS
        ii.  AVOIDING EMAIL DISCUSSIONS OF COAB BUSINESS?
    c.  PUBLIC RECORDS LAW
        i.  MANAGING COAB INFORMATION ON YOUR PERSONAL COMPUTER

4.  FINAL QUESTION AND ANSWER SESSION **10 MINUTES**

INTERVIEWS: There were no interviews conducted for those selected from the Community to serve on the COAB. The following interview questions were developed to help determine an applicant's eligibility to serve on the BOARD.  These are not intended to be an exhaustive list of questions:


SUGGESTED INTERVIEW QUESTIONS (for both Voting and non-voting members)

1.  Have you read the Settlement agreement?
    a.  If the answer is no, ask if about circumstances that prevented reading it
    b.  Consider the answer to this as it relates to doing the work, e.g. will COAB be able to make a reasonable accommodation?

2. Do you have any questions about section IX in the SA related to the COAB?
    a. Do you have strong disagreements with anything you read in the Settlement Agreement? (if the answer is "yes" ask question (b) below)
    b. If selected to serve on COAB, how will you handle your disagreements?

3. It is important that COAB members work with members of the Portland Police Bureau/Community at large, in order to create relevant and durable recommendations, please tell us how you will help this effort.

4. What is your approach to working as a peer with groups of people?  Please tell us how you worked with Community Groups, Advisory Boards, Ad hoc committees or other groups with which you have worked.

5. How do you understand the work of this Board as it relates to the overall goals of police reform?

6. What are your reasons for wanting to serve on the COAB?

While the PPB Advisors are non-voting, every effort should be made to include them in orientation and training as possible to help them feel and be considered members of the Board.

**CHAPTER 5: THE TRIPLE CROWN:** (We Are The Champions!)

Intelligent, creative, committed and passionate volunteers are waiting to be used in the service of PPB police reform.  **One of the perhaps unacknowledged (unexplored?) realities is that associated parties and institutions will also have to change if community engagement is to be a success**. Most governments are not designed to optimize involvement of the public. Some bureaus/agencies without intention, discourage involvement by  use of jargon/alphabet soup and "red tape" processes that make the public feel unwelcome. Once engaged, there should be institutional efforts made to keep Portland residents involved in working with the PPB.

Following are additional ideas/observations for consideration.

**TO KEEP:**
- COAB should remain unattached to any particular City body or commissioner, but the City must find ways to smooth the bureaucratic pathways so the COAB (and the PPB) can be more responsive as they engage the community
- Subcommittees: keep them, they allow for greater community involvement and discussion: require each subcommittee to submit a mission statement and a work plan: COAB Chair should meet with committee Chair to review
- 2-year commitment for volunteers with the option of an additional year, anything less does not allow enough time for new members to fully engage.  Institutional memory and cultural carryover are important.
- Police Advisors keep and clarify their role; the full COAB should have some input into this clarification but above all, the Advisors need to know they have institutional backing.  There was talk of having advisors attend meetings "on demand" which I oppose (see attachment page 19)
- Public Comment period: The structure of public comment period is not the problem, structure can be changed to fit the circumstances as when the COCL asks for public comment on individual recommendations in addition to general comment time or extends time for some comments

**TO DISCUSS - REFINE – DECIDE UPON**
- Chair's position in relation to COCL
    - If relationship discontinued, need for COAB champions in Mayor's and PPB offices more critical,
        - may politicize selection and work of the Chair
        - If disconnected, to whom does Chair report and still remain free influence of elected officials?
    - If retained in COCL, clarify relationship to local entities involved in reform
        - Mayor's office
        - PPB Chief
        - PPB Advisors
        - AMAC
        - DOJ
- Chair responsibility and authority to establish timelines and design processes

and procedures for those things that impact the COAB operation, including design of selection process. (Community may have input into design and ***must*** be part of the process. Committee makes final selection using a process and operating on a timeline established by the COCL-COAB)
- Semi-Annual Facilitated, Closed Retreats for Board
  - o   One to two days, twice a year
  - o   Closed meeting unless COAB decides otherwise
  - o   City Attorney in attendance
- Quarterly meetings of involved Parties to discuss what is/is not working regarding institutional interfaces and make recommendations for resolution. Should include members of the COAB Executive Committee if that committee is retained in reorg.
- Resolve City problems with other committees (e.g. HRC, CRC) that have an impact on COAB as per the Settlement Agreement. COAB is dependent upon them for appointments to the board and information exchange (or remove references from SA which I think would be a mistake)

**TO ADD:**
- Visible, audible and ongoing support by City Council members for the COAB. Increase visibility by having COAB chair and COAB Executive Committee Chair give quarterly update at Council meetings (20 minutes)
- Commissioners coordinate sending reps to Full COAB meetings where they announce presence and thank COAB.
- Professional support to develop plan for COAB dissemination of Information to the Public re: status of implementation of settlement agreement.  COAB needs office support dedicated to development of content/copy for dissemination of information to the public via print and social media etc.
- Empowered contact/troubleshooting person both in **Mayors office and in PPB** who is dedicated to success of COAB and facilitates responses, fills requests etc.
- **Hire an Organizational Transformation expert to work with City and PPB to develop organizational structures and plans that facilitate the institutional change being sought. The COAB should also be educated on the complexities and processes involved in organizational transformation (this is where Cultural Change starts)**

**CHAPTER 6: Cooling Down** (Slow walk around the track avoiding the Dead Horse)

Suspension of COAB meetings for a time is an excellent idea. After a year of extremely hard work and recent traumatizing incidents, there is a need to reflect and consider next steps for the COAB.  **Recent Disruptions** cannot be resolved by the COAB. To the extent COCL and the City continue to try and solve the disruption problem by adjusting the format and processes of the COAB, the public will tend to see the problem as one belonging to COAB.  This will make recruitment of committed Board members even more difficult.

# ATTACHMENTS

**1.** **Guidelines for Establishing Common Ground**   **p 15**
**2.** **What is Expected of a COAB member**   **p 16**
**3.** **Exit Letter to AMAC Co-Chairs**   **p 17**
**4.** **Letter re role of PPB Advisors on COAB**   **p 19**
**5.** **Links to articles on Organizational Transition**   **p 21**

## PORTLAND COMMUNITY OVERSIGHT ADVISORY BOARD

**Guidelines for Maintaining Common Ground** Approved September 10, 2015

As COAB members we assume responsibility for the quality of our work together, during meetings, discussions and all other communications. We agree to:

- Abide by these ground rules
- Critique ideas, not people
- Work toward shared understanding
- Speak from personal experience, without generalizing, use "I"  statements. Speak to all with the utmost respect.
- Avoid "cross talk," listen respectfully when others are speaking
- Listen actively and attentively, seek to understand
- Share the air, refrain from monopolizing discussions and encourage  participation by everyone
- Challenge ideas in a respectful manner, avoid put-downs (even  humorous ones) or other attacks on individuals
- Ask for clarification when unsure or confused
- Exit meetings in a way that is non-disruptive to the group dynamic
- Recognize the legitimacy of people's feelings and support COAB  members in expressing their feelings in ways appropriate to the setting.
- Hold one another accountable to keep agenda times and focus
- Support the Chair in managing meetings
- Turn cell phones off or to vibrate and make no calls or texts during  meetings except in case of an emergency
- During meetings use laptops only for meeting business (note-taking,  assigned tasks)
- Use the Parking Lot for thoughts and ideas not relevant to current  conversation

**PREPARED FOR CITY'S ADA CONTACT REGARDING A COAB MEMBER**
**DOCUMENT NOT YET RELEASED TO COAB BUT SHOULD BE DISCUSSED ALSO USED FOR ORIENTATION**

# WHAT WE EXPECT FROM A COAB MEMBER

Created by the 2012 Settlement Agreement (SA) between the City Of Portland and the United States Department of Justice The Community Oversight Advisory Board (COAB) was is authorized to:"(a) independently assess the implementation of the Agreement; (b) make recommendations to the Parties and the COCL on additional actions; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) provide the community with information on the Agreement and its implementation; (e) contribute to the development and implementation of a PPB Community Engagement and Outreach Plan ("CEO Plan"); and (f) receive public comments and concerns. The SA also stipulates: The COAB shall report to the COCL. The COCL will chair the COAB, preside over COAB meetings, take and count votes, and perform such other activities as are necessary for the efficient operation of the COAB."

Ultimately the COAB serves as a trusted advisor to The COCL, The City of Portland, the Portland Police Bureau and the US Department of Justice.
The COAB reviews and analyzes reports, directives and processes and makes policy recommendations on same.  COAB is involved in the work of Community Outreach.  Community Outreach is essential if Portland residents are to become engaged in the development of the Portland Police Bureau's Community Outreach Plan, and give feedback on what does and does not work. COAB members must:

- Agree with the purpose and intent of the COAB, actively support the mission of COAB
- Understand and accept the stipulations set forth in the Settlement Agreement
  - Understand the structure created by the Settlement Agreement
  - Work collaboratively with the COCL team
  - Understand the role of the COAB Chair
  - Work directly with the Chair of the COAB
- Understand the COAB BY-LAWS
  - Work within the COAB bylaws
  - Defer to Chair for resolution of ambiguities
- Accept the responsibilities of being a Public Official
- Work cooperatively with both Voting and non Voting COAB board members
  - Abide by COAB GUIDEINES FOR MAINTAINING COMMON GROUND
  - Build positive relationships with other COAB board members
  - Willing to work with members of the Portland Police Bureau and COAB's Police Advisers
  - Attend Trainings that provide information related to the work of the COAB
- Interact with members of the Portland community at meetings
- Demonstrate accountability
  - Complete assignments in a timely manner
  - Participate in and contribute to the work of a subcommittee
  - Attend scheduled meetings, using telephone or other options if you can't be there in person
  - Keep appointments and let others know as soon as possible if you will be absent or need to reschedule
  - Contribute to the efficient and effective operation of the COAB
- Help establish a positive group rapport where COAB and its subcommittees can work
- Respond promptly to communication email, text and/or phone, that comes from
  - COCL Team (including the Chair), Project Manager, Administrative Support)
  - COAB members/Subcommittee members

16

June 7, 2016

TO:            Dr. Bethel & Dr. Haynes, AMAC Co-Chairs

FROM:        Kathleen Saadat, Chair COAB

RE:          Exit notes: (not exhaustive)

**6/1/2015**
1. The difficulties of start up including the need for training, orientation and induction as public officials reverberated within the COAB and manifest as fragile relationships upon the board and continuing questions about roles and relationships, a lack of cohesion and focus for the Board
2. A lack of clear goals for COAB, absence of both authoritative leadership and definitions of terms created confusion among board members and the public
3. A lack of structures to enable effective processes lead to confusion as to how the Board would accomplish and document its work

**6/1/2016**
1. Board members have received training in those areas directly related to their roles as COAB Members. Roles are clearer and while relationships have improved, they remain fragile.  The Board works better as a unit and has passed over 50 recommendations on to the DOJ.
2. Goals and focus of the COAB have been clarified and posted and progress will be discussed by full COAB June 9, 2016.
3. Structures for processes have established and are regularly used by the COAB to accomplish and document its work

In the past, most of the focus of the AMAC has been on a critical analysis of the particulars of the COAB with the goal of improving its function. To enhance that effort, it would be helpful to have leadership acknowledge the accomplishments of the COAB.  The COAB needs to be inspired; AMAC leadership can provide that inspiration.

Recommended Focus for AMAC

1. Publicly support the work of the COAB
   a. Using AMAC influence and connections to increase attendance and participation in:
      i. THREE BIG QUESTIONS Community input sessions
      ii. Attendance and public comment at regular COAB meetings

2. Support the COAB Chair
   a. Regular check-in
   b. Discuss AMAC concerns and try to reach resolution in private

    c.  Discuss needs for AMAC intervention/support

    d.  Ask the COAB Chair about the interactions between the Bureaucratic entities involved in the reform and their impact on the ability of the COAB to do its work

3. Ask what methods are being used by the PPB to insure institutional transformation including a change in the culture?
   a. What systems are in place to drive initiatives into the organization?
   b. Within the PPB who are the persons (or positions) responsible for managing the implementation and what authority do they have

4. Make recommendations for any substantive changes to the Settlement Agreement

January 27, 2016

To:          Dennis Rosenbaum, Rosenbaum and Watson
             Amy Watson, Rosenbaum and Watson

From:        Kathleen D. Saadat, COCL Liaison/COAB Chair

RE:          Role of PPB Advisors on Community Oversight Advisory Board

I am concerned at the prospect of changing the Portland Police Bureau Advisors relationship to the Community Oversight Advisory Board by having PPB attend subcommittee meetings only when requested.  The impact of such a change would have a negative effect on the functioning of the COAB, the viability of the work of the COAB and the credibility of the PPB.

***IMPACT ON FUNCTIONING OF THE COAB***:
The role of the Portland Police Bureau COAB members is that of advisors to the voting members of the COAB.  The COAB work of making recommendations on policy, is dependent upon work done in subcommittees. This is the primary reason to have PPB Advisors involved at the subcommittee level.  It is in subcommittees that information is presented, discussed by both the voting and non-voting members of the COAB, and the public. Proposals are then voted upon by voting COAB members and if passed, forwarded to the full COAB for discussion and vote. In this process, issues and questions that may arise, cannot always be pre-determined. Issues or questions may occur "in the moment" and need a timely response from a PPB Advisor. Further, PPB Advisors often have background information and/or opinions that are also helpful to the group as it explores options.  In the midst of a dynamic discussion regarding policy, it would be disruptive and cumbersome to have to postpone a discussion and/or decision until an Advisor could come to the (next) meeting.  To manage the COAB this way will confuse and slow the process and will fail to create a milieu within which the voting and non-voting members begin to build (in this microcosm) the trust the public and the PPB hope to build in the macrocosm of the broader Portland community.

***IMPACT ON VIABILITY OF COAB WORK PRODUCT:***
In order for the work of the COAB to have legitimacy with Portland Police Officers, there must be a sense that the COAB has worked **with** the PPB in the development of recommendations. To have credibility with the public, there must be a sense that PPB has worked willingly with the COAB. The presence of Advisors helps convey that sense. The COAB as a body, received little or no direction on how to implement the expectation that voting and non-voting members work together on this board. Some members believed the COAB's role was to investigate incidents and make recommendations for discipline, others regardless of the side with which they identify, simply have not trusted the "other" group. Input from PPB Advisors, voting COAB members and the public, help subcommittees engage in creative exploration and consideration of ways to improve the way PPB carries out it's mission and understand the impact of policy on communities and officers. Without this mix, this effort will fail.  Neither the PPB nor the Portland Community will have faith in recommended changes.  The Community Engagement Plan, a required product of the SA will have little meaning if representatives of PPB and PDX communities are not visibly engaged in the process at all levels.

***IMPACT ON CREDIBILITY OF THE PPB***
The Portland Police Bureau, a public institution, expressed commitment to change the ways it does business, especially the ways in which it interacted with Portland residents experiencing mental health issues.  Portland residents also raised issues of how PPB officers interact with people from other marginalized groups, with race as another category of public concern. The City of Portland Settlement Agreement with the DOJ, codifies the City's roadmap to insuring changes in the PPB. The Settlement Agreement outlines many of the steps to be taken in the process of change, one element of which is the establishment of the COAB with PPB Advisors. COAB members represent a

19

spectrum of experience and knowledge. Working with these community representatives, PPB officers get to play the role of both teachers and students. This interaction, in and of itself serves as a model for working together.

To change the relationship of the PPB Advisors to the COAB as described, makes it appear that PPB has "left the room". Such a move suggests that PPB finds it too hard to work with the people they are sworn to serve and protect. This image creates a public relations problem for the Portland Police Bureau.  It will appear as though PPB is not prepared to engage in the difficult conversations necessary for public involvement in institutional change to occur.  It raises the question of PPB's ability to work with members of the larger community, especially those who often prove more difficult than the people that sit around the COAB table.  It suggests that PPB has no commitment to changing the PPB.  If PPB representatives cannot work with COAB, what would make the public believe that PPB can work effectively with the broader community?

### ***THOUGHTS/OBERVATIONS:***
There are still role clarification and communication issues in this **new** endeavor. The "Storming, Forming, Norming" processes described in studies of group dynamics, are real and can take months to resolve themselves. The COAB was allowed to "storm" for over six months without being given a clear understanding of the roles and responsibilities of all involved. As late as June of 2015, there were few policies or procedures developed to help guide the processes of the Board. These issues are being addressed and there is steady improvement in the functioning of the Board and the interaction between voting and non-voting members of the COAB. There is a concomitant increase in the frequency of requests by voting COAB members to hear opinions and suggestions from Advisors.  Providing the Board information on roles and responsibilities, developing organizational structures, and encouraging COAB members to recognize themselves as doing important work, combined with a recent successful retreat, have helped improve the overall dynamic.

PPB Advisors need help in understanding how to separate the call for institutional reform from their sense of being judged as individuals. They need a better understanding of the history of policing in the US/Portland.  They should be helped to understand what they represent when they walk into a room in a uniform, and how to effectively respond to the reality of being stereotyped. COAB members need to learn that many of them are in fact, stereotyping the PPB, how that is wrong and how that defeats the purpose of their work on the COAB.

This experiment in involving a community in the process of institutional change serves as a model for how PPB and Portland residents can work together for the betterment of our City. This is not something from which the PPB can withdraw (this would appear to be withdrawal) without consequences, the most immediate of which will be further loss of credibility with the public. Both PPB officers and COAB members need to understand the magnitude of the task and their great responsibility to the public.  Meanwhile, we must all do what is necessary to help the PPB Advisors stay in the room and contribute to a successful outcome.

Cc      Ellen Osoniach
        Mike Marshall
        Jared Hager
        Portland COCL office

ARTICLES ON ORGANIZATIONAL TRANSITION
COMPILED 1/22/2016

http://managementconsultingnews.com/interview-william-bridges/

https://www.mindtools.com/pages/article/bridges-transition-model.htm

http://www.moravian.org/wp-content/uploads/2013/06/Bridges_Transition_Model.pdf

http://www.c4npr.org/clientuploads/Managing%20Up/CompassPoint%20Presentation%20-%20Leading%20Organizational%20Change.pdf

http://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1235&context=cahrswp

One of these articles refers to the Ten Poems to Change Your Life.  Here is the list of those ten poems.  I have not read them all…. Don't want things to change too fast.   😄

"The Journey" by Mary Oliver
"Last Night as I Was Sleeping" by Antonio Machado
"Song of Myself" by Walt Whitman
"Zero Circle" by Rumi
"The Time Before Death" by Kabir
"Ode to My Socks" by Pablo Neruda
"Last Gods" by Galway Kinnell
"For the Anniversary of My Death" by W. S. Merwin
"Love After Love" by Derek Walcott
"The Dark Night" by St. John of the Cross



**|HUFFPOST|**

EDITION

AdChoices 



**Prentis Hemphill, Contributor**
Director of Healing Justice at Black Lives Matter

# Healing Justice Is How We Can Sustain Black Lives

We are literally — not figuratively — in a fight for our lives.

02/07/2017 10:54 am ET





DAMON DAVIS

Artwork by Damon Davis

Right now, those of us most vulnerable and least protected are under attack and whole communities—Black, Muslim, disabled, queer, trans, and women-identified folks are being targeted in the streets and in legislative halls. The threats are real and calculated. And the attempts to shore up the institutional correlation between the right to live and able-bodied, white, monied maleness is dangerous and deadly for the rest of us. We can't overstate the impact that the outright plunder of hard-won rights has on our lives and the lives of those around us.

As this new political and material reality is unfolding, many of us are struggling with our own well being and witnessing the same struggles with wellness in our communities and in our organizations.  It's trauma, both historical and present, that grips us and impacts our ability to be present, grounded, connected in this moment, when it's so crucial. We may then

understand implicitly why healing our individual and collective trauma is necessary in order to face what is coming. We are literally — not figuratively — in a fight for our lives, and we need all of ourselves for that fight. Yet healing in the midst of ongoing trauma to ourselves and our communities is no small task.

**For all these reasons, we have a multi-front battle ahead of us. We are challenged with growing and building Black movements that can push back the onslaught. How we protect and care for each other along the way, how we come through connected and stronger on the other end, are possibly the most critical and meaningful questions we face**.

Healing justice offers some guidance here. Healing justice is the how of our movements — it's the texture, the experience and the vision that guides us. It's our effort towards transforming ourselves, our ways of building relationship and our institutions to support and sustain Black aliveness that has carried us forward.



# Healing justice is active intervention in which we transform the lived experience of Blackness in our world.

Cara Page and Kindred Southern Healing Justice Collective cleared a path and told us that "healing justice…identifies how we can holistically respond to and intervene on generational trauma and violence, and to bring collective practices that can impact and transform the consequences of oppression on our bodies, hearts and minds."





A broad and intersectional vision of liberation work requires that we continue to recall this vision of healing and healing justice into the center of our organizing. We have been inundated with public images of Black death and the flagrant violence of oppressive systems that obstruct justice. Our current systems promise complex, compounded and nearly constant trauma for Black people and ensure that we have little resources, space, time or energy to heal and little agency to protect ourselves and our loved ones from facing the same.

Healing justice is active intervention in which we transform the lived experience of Blackness in our world. And in order to actively intervene and transform the experience of Black life, on every level, our movements and our organizations have to understand and value the wisdom of healing justice.

- Healing justice means that we make central to our work listening to those who are imagining transformative justice responses to harm, responses essentially that seek to meet harm in ways other than feeding Black incarceration.

- Healing justice means that we develop and honor practitioners of many different disciplines and modalities with capacities and skills to be with trauma, who know themselves well enough to navigate the complex terrain of emotion and guide others towards change.

- Healing justice means that we identify the institutions that interrupt and undermine our individual and collective abilities to heal. And in those places we organize towards change and interrupt our dependence, be it against the apparatus of the medical industrial complex or against harmful and life-depleting food systems.

- Healing justice means that we begin to value care, emotional labor and resilience, not as add-ons but as central components of sustainability that restore us to life.

- Healing justice means that we realize that care and accountability are at the root of healing justice practice and are some of the most difficult and direct actions we can take. Care and accountability require us to reveal, to center and more than anything, to change.

- Healing justice means that these interventions, and so many more not yet imagined, can no longer be pushed to the margins of our work, but must be central and given our attention and time.

> **We heal so that we can act and organize.**

Healing is being reclaimed from the mouths of those who use it without interest in true transformation, from those who mimic our ancestral practices to accumulate wealth. We are re-infusing the art and practice of healing with our souls, listening to our bodies and to our ancestors, and remembering that we don't heal only for the sake of feeling good. We heal so that we can act and organize. We heal so that we can use the lessons gained through the wounds of our trauma to make necessary change in our world.

There are risks ahead in our resistance and in our organizing, but the more we risk in our practice of healing justice, the stronger our ground becomes and the more defined our vision. And from that place we carry on. We carry on to transform, not just ourselves, but our

world.

*This post is part of the Black Futures Month blog series brought to you by The Huffington Post and the [Black Lives Matter Network](). Each day in February, look for a new post exploring cultural and political issues affecting the Black community and examining the impact it will have going forward. For more Black History Month content, check out Black Voices' '[We, Too, Are America]()' coverage.*

**MORE:**

Racism    Health And Medicine    Aids    Black History Month    Black Future Month

# MOST SHARED



**Fatima Ali From 'Top Chef' Says She Has A Year To Live**



**'Real Housewives Of New Jersey' Star Joe Giudice To Be Deported After Prison Time**



**Rand Paul Says Toxic Politics Is Going To Kill Someone. It Already Has.**



**Jimmy Kimmel Shreds Sean Hannity Over Double Standard On Trump And Kanye West**

# WHAT'S HOT



**'Buckle Up Buttercup': Michael Avenatti Tells Donald Trump Jr. To Get Ready For Prison**



**Melania Trump On Me Too: We Should Support Men, 'Not Just Women'**



**Miley Cyrus Flips The Bird At Jimmy Kimmel's Latest Mean Tweets**



**Pope Francis Says Getting An Abortion Is Like 'Hiring A Hitman'**



**Brett Kavanaugh Didn't Buy His URL. It's Now A Resource For Sexual Assault Survivors.**



**Joe Biden: Any Dem Presidential Candidate Would Handle Foreign Policy Better Than Trump**

*HUFFPOST*

ABOUT US

ADVERTISE

About Our Ad...

RSS

FAQ

Careers

User Agreement

Privacy Policy

Comment Policy

**HuffPost's new, no-BS guide to modern life.**



Read more about our mission and check out the site.

×

Can We Really Measure Implicit Bias? Maybe Not - The Chronicle of Higher Education

Case 3:12-cv-02265-SI    Document 200-3    Filed 06/03/19    Page 180 of 309    10/10/18, 3:24 PM

# THE CHRONICLE OF HIGHER EDUCATION

NEWS    **OPINION**    ADVICE    STORE    JOBS    **LOG IN**    SUBSCRIBE

SUBSCRIBE TODAY FOR 🔒 PREMIUM ACCESS

≡ SECTIONS       THE CHRONICLE REVIEW:   CAN WE REALLY MEASURE IMPLICIT BIAS? MAYBE NOT

**THE CHRONICLE REVIEW**

# Can We Really Measure Implicit Bias? Maybe Not

*By Tom Bartlett*   |   JANUARY 05, 2017



Jordin Isip for The Chronicle Review

I harbor a moderate preference for white faces. You probably do, too: About 70 percent of people who take the race version of the Implicit Association Test show the same tendency — that is, they prefer faces with typically European-American features over those with African-American features. Since it first went online in 1998, millions have visited Harvard's Project Implicit website, and the results have been cited in thousands of peer-reviewed papers. No other measure has been as influential in the conversation about unconscious bias.

That influence extends well beyond the academy. The findings come up often in discussions of police shootings of black men, and the concept of implicit bias circulated widely after Hillary Clinton mentioned it during the presidential campaign . The test provides scientific grounding for the idea that unacknowledged prejudice often lurks just below society's surface. "When we relax our active efforts to be egalitarian, our implicit biases can lead to discriminatory behavior," according to the Project Implicit website, "so it is critical to be mindful of this possibility if we want to avoid prejudice and discrimination."

In other words, beware your inner bigot.

But the link between unconscious bias, as measured by the test, and biased behavior has long been debated among scholars, and a new analysis casts doubt on the supposed connection.

Researchers from the University of Wisconsin at Madison, Harvard, and the University of Virginia examined 499 studies over 20 years involving 80,859 participants that used the IAT and other, similar measures. They discovered two things: One is that the correlation between implicit bias and discriminatory behavior appears weaker than previously thought. They also conclude that there is very little evidence that changes in implicit bias have anything to do with changes in a person's behavior. These findings, they write, "produce a challenge for this area of research."

That's putting it mildly. "When you actually look at the evidence we collected, there's not necessarily strong evidence for the conclusions people have drawn," says Patrick Forscher, a co-author of the paper, which is currently under review at *Psychological Bulletin*. The finding that changes in implicit bias don't lead to changes in behavior, Forscher says, "should be stunning."

Hart Blanton was not stunned. For the last decade, Blanton, a professor of psychology at the University of Connecticut, has been arguing that the Implicit Association Test isn't all it's cracked up to be. In a 2013 meta-analysis of papers, Blanton and his co-authors declared that, despite its frequent characterization as a window into the unconscious, "the IAT provides little insight into who will discriminate against whom, and provides no more insight than explicit measures of bias." (By "explicit measures" they mean simply asking people if they are biased against a particular group.)

The test works by measuring how quickly people can, for instance, associate African-American faces with positive words versus European American faces with those same positive words. In one round of the test, you're instructed to press a particular key if a positive word like "pleasure" or "wonderful" flashes on the screen and to press that same key if a white face appears. Then, in another round, the program will tell you

## The link between unconscious bias and biased behavior has long been debated by scholars.

to press the same key for darker faces and positive words. It tracks how many mistakes you make and measures how quickly you press those keys, right down to fractions of a second. The site also offers tests that measure bias against other groups, including obese people, the disabled, and the elderly, though it's the race results that tend to dominate the discussion. It generally takes people longer to associate a positive word with an African-American face than a European-American face. What's uncanny is that the test usually works even on people who, like me, know what's being measured ahead of time and are doing their best to answer at the same speed so as not to be deemed biased.

But those results, Blanton has been saying in paper after paper, year after year, don't tell us much, if anything.

For the record, Blanton is a 49-year-old white guy who considers himself a liberal and became a psychologist because of an early interest in social justice. A journalist once referred to him as a "conservative intellectual," which Blanton jokes is wrong on both counts.

Over coffee recently, he sketched out an analogy in his notebook. He drew a graph illustrating how high IQ scores tend to predict achievement, a claim backed up by reams of data. In contrast, the IAT — a sort of IQ test for bias — doesn't reveal whether a person will tend to act in a biased manner, nor are the scores on the test consistent over time. It's possible to be labeled "moderately biased" on your first test and "slightly biased" on the

Case 3:12-cv-02265-SI   Document 200-3   Filed 06/03/19   Page 182 of 309

10/10/18, 3:24 PM

next. And even within those categories the numbers fluctuate in a way that, Blanton contends, undermines the test's value. "The IAT isn't even predicting the IAT two weeks later," Blanton says. "How can a test predict behavior if it can't even predict itself?"

Anthony G. Greenwald doesn't think much of Blanton's critique — or, it seems, of Blanton himself. He is the co-author, along with Mahzarin R. Banaji, of the 2013 best seller *Blind Spot: Hidden Biases of Good People* (Delacorte), a book that's based on the IAT, a test the two helped create. Greenwald, a psychology professor at the University of Washington, points to errors he found in a recent paper of Blanton's as proof that his results are not to be trusted. Blanton, for his part, says that the mistakes were the result of a copy-editing error and that they didn't affect the thrust of the article. The two engaged in a cordial email back-and-forth about the errors, though neither is impressed by the other's rigor. "He's not a great scientist," Greenwald says.

Greenwald also raised the possibility that Blanton and other critics of the IAT, which Greenwald has overseen for two decades, are motivated by the paid work they do as consultants in legal cases involving discrimination and implicit bias. Blanton said he's worked as an expert consultant on two IAT-related legal cases over the years, and maintains that "the idea I started doing this in 2003 because I thought there would be some payoff is ludicrous." (Greenwald has taken consulting gigs as well, working on 20 or so such cases, he says.)

Banaji, a professor of psychology at Harvard, doesn't question Blanton's motives. She does, however, point to the multitude of papers that have made use of the implicit-bias measure, and the relatively few that have questioned its accuracy. In an email, she likened IAT doubters to climate-change deniers. "I'm sure Hart Blanton believes himself to be saving humanity from the dangers of the IAT," she wrote, noting that Blanton has "dedicated so many precious years of his career to improving our work."

You might forgive Banaji and Greenwald for sounding annoyed by Blanton's quibbles and broadsides. They have been responding to them in peer-reviewed journals and with reporters since George W. Bush was in the White House. And, in fairness, Blanton has been known to toss off some barbed remarks about the test to which they've dedicated so many precious years of their own careers. When we met, Blanton compared the IAT to a Facebook quiz that tells you which Disney princess you're most like — "though that at least has some marketing data behind it."

"It makes us feel important to say, Aha, we have these measures that can tell us what the problem is, and, not only that, we can tell them how

What's striking, though, is how, in some respects, their conclusions about the IAT don't seem all that far apart. Greenwald acknowledges that a person's score can vary significantly, depending on when the test is taken, and he doesn't think it's reliable enough to be used to, say, select bias-free juries. "We do not regard the IAT as

## to fix the problem."

diagnosing something that inevitably results in racist or prejudicial behavior," he says.

Everyone agrees that the statistical effect linking bias to behavior is slight. They only disagree about how slight. Blanton's 2013 meta-analysis found less of a link than a 2009 meta-analysis by Banaji and Greenwald. Blanton sees the correlation as so small as to be trivial. Banaji and Greenwald, in a 2015 paper, argue that "statistically small effects" can have "societally large effects."

The new analysis seems to bolster Blanton's less-sanguine take. It found that the correlation between implicit bias and behavior was even smaller than what Blanton had reported. That came as a surprise, the researchers write.

Another surprise is that one of the co-authors of the paper is Brian Nosek, who is — along with Greenwald and Banaji — one of the three founders of the IAT. Nosek, best known these days as the director of the Center for Open Science and an advocate for better research practices, is well aware that this paper will provide aid and comfort to critics of the test he helped create. "It sometimes shocks people when I say that the two people I have disagreed with most in my career are Mahzarin and Tony," Nosek wrote in an email.

He does defend the IAT, noting that it's engaged millions of people in a conversation about the science of bias. He points to the test's successes, like experiments that show how it can predict who someone would favor in a presidential election by tracking their associations. But what he calls the "very weak overall" connection between implicit bias and discriminatory behavior should, he believes, put researchers on notice. "You would think that if you change the associations, and the associations predict behavior, then the behavior would change too," Nosek says. "But the evidence is really limited on it."

Patrick Forscher, who shares the title of first author of the paper with Calvin Lai, a Harvard postdoc, thinks that there's been pressure on researchers over the years to make the science of implicit bias sound more definitive and relevant than the evidence justifies. "A lot of people want to know, How do we tackle these disparities?" says Forscher, a postdoc at the University of Wisconsin at Madison. "It makes us feel important to say, Aha, we have these measures that can tell us what the problem is, and, not only that, we can tell them how to fix the problem."

That's essentially Blanton's argument as well. Public discussion about implicit bias has been based largely on the results from one particular test, and that test, in his view, has been falsely sold as solid science. "They have engaged the public in a way that has wrapped the feeling of science and weight around a lot of 'cans' and 'maybes,'" Blanton says. "Most of your score on this test is noise, and what signal there is, we don't know what it is or what it means."

Blanton is not saying there's no such thing as unconscious bias, nor is he arguing that racial discrimination isn't a deep and abiding problem in American life (though at least one white-supremacist-friendly website has mentioned his research in an attempt to make that case —

illustrating how such discussions can be misconstrued). He just thinks that scientists don't know how to measure implicit bias with any confidence and that they shouldn't pretend otherwise. "It is such an important problem that it deserves a stronger science," he says.

Forscher hopes the discussion will move beyond the long-running, sometimes caustic back-and-forth over the IAT. He wants to focus on understanding the root causes of discrimination in order to combat its pernicious effects. As part of that mission, he's for several years helped train police officers in Madison about bias. He intends to continue that work while also trying to figure out how best to go about it.

"I see implicit bias as a potential means to an end, something that tells us what to do and some possible remedies for what we see in the world," Forscher says. "So if there's little evidence to show that changing implicit bias is a useful way of changing those behaviors, my next question is 'What should we do?'"

*Tom Bartlett is a senior writer at* The Chronicle.

*A version of this article appeared in the* January 27, 2017 issue.

1255 Twenty-Third St., N.W.
Washington, D.C. 20037

Copyright © 2018 The Chronicle of Higher Education

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

**UNITED STATES OF AMERICA,**

            **Plaintiff,**

      **v.**

**CITY OF PORTLAND,**

            **Defendant.**

**Case No. 3:12-cv-02265-SI**

**[PROPOSED AMENDED]**
**SETTLEMENT AGREEMENT**
**PURSUANT TO FED. R. CIV. P.**
**41(a)(2)**

## <u>INTRODUCTION</u>

      The United States and the City of Portland ("City") (collectively "the Parties") recognize that the vast majority of the City's police officers are honorable law enforcement professionals who risk their physical safety and well-being for the public good. The Parties enter into this Agreement with the goal of ensuring that the Portland Police Bureau ("PPB") delivers police services to the people of Portland in a manner that effectively supports officer and public safety, and complies with the Constitution and laws of the United States.  Specifically, this Agreement is targeted to strengthen initiatives already begun by PPB to ensure that encounters between police and persons with perceived or actual mental illness, or experiencing a mental health crisis, do not result in unnecessary or excessive force.

      The Parties recognize there has been an accelerating movement toward a model of police management that relies on both existing and still-developing management and

Page 3 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
              *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 1 of 78

Page 3 - Attachment 1

monitoring tools and systems. This model requires both vision and fiscal commitment, and is necessary to legitimate policing. The United States recognizes that PPB has endeavored to adopt components of modern management despite being a lean organization, and greatly appreciates the City's commitment, in this agreement, to provide PPB the fiscal support necessary to rapidly and fully implement a complete state-of-the-art management and accountability system. The Parties further recognize that the ability of police officers to protect themselves and the community they serve is largely dependent on the quality of the relationship they have with that community. Public and officer safety, constitutional policing, and the community's trust in its police force are, thus, interdependent.  The full and sustained implementation of this Agreement is intended to protect the constitutional rights of all members of the community, continuously improve the safety and security of the people of Portland, keep PPB employees safe, and increase public confidence in PPB, all in a cost-effective, timely, and collaborative manner. The United States commends the City for the steps it already has taken to implement measures to effectuate these goals.

To fully achieve these goals, this Agreement requires the City and PPB to further revise or, where needed, adopt new policies, training, supervision, and practices in the following areas: the use of force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement.

This Agreement further requires that the City and PPB put in place more effective systems of oversight and self-correction that will identify and correct problems before

Page 4 –     SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 2 of 78                                                      Page 4 - Attachment 1

they develop into patterns or practices of unconstitutional conduct and/or erode community trust.

This Agreement further identifies measures, to be met within fixed periods of time, that will assist the Parties and the community in determining whether: (1) the City has changed its procedures and taken the actions listed in this agreement; (2) community trust in PPB has increased; and (3) the improvements will be sustainable.

For these reasons, and noting the general principle that settlements are to be encouraged, particularly settlements between government entities, the Parties agree to implement this Agreement under the following terms and conditions.

## I.    <u>GENERAL PROVISIONS</u>

1.    The United States has filed a complaint in the Federal District Court for the District of Oregon in Portland, Oregon asserting that the City has engaged in a pattern and practice of constitutional violations pursuant to the authority granted to United States Department of Justice ("DOJ") under 42 U.S.C. § 14141 to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law. The City expressly denies that the allegations of the complaint are true.

2.    The Parties agree that nothing in this Agreement shall be construed as an admission of wrongdoing by the City or evidence of liability under any federal, state, or municipal law. Upon execution of this Agreement by both Parties, the United States agrees to conditionally dismiss the complaint it filed with prejudice, subject to the Court retaining jurisdiction to enforce the Agreement, followed by final dismissal with prejudice upon performance of this Agreement.

Exhibit 4
Pg. 3 of 78

Page 5 - Attachment 1

3.      This Agreement shall constitute the entire integrated agreement of the Parties. No prior drafts or prior or contemporaneous communications, oral or written, shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding. If, in the course of interpreting this Agreement, there is an ambiguity that cannot be resolved by the Parties or in mediation, evidence including the Parties' course of dealing and parol evidence may be used.

4.      This Agreement is binding upon all Parties hereto, by and through their officials, agents, employees, and successors. If the City establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, or otherwise reviewing the operations of PPB or any aspect thereof, the City agrees to ensure these functions and entities are consistent with the terms of this Agreement and shall incorporate the terms of this Agreement into the oversight, regulatory, accreditation, investigation, or review functions of the government agency or entity as necessary to ensure consistency.

5.      This Agreement is enforceable only by the Parties. No person or entity is, or is intended to be, a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. The Parties agree to defend the terms of this Agreement should they be challenged in this or any other forum.

6.      This Agreement is not intended to impair or expand the right of any person or organization seeking relief against the City, PPB, or any officer or employee thereof, for their conduct or the conduct of PPB officers; accordingly, it does not alter

Page 6 —      SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
              *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 4 of 78                                                      Page 6 - Attachment 1

legal standards governing any such claims by third parties, including those arising from city, state, or federal law. This Agreement does not expand, nor will it be construed to expand access to any City, PPB, or DOJ document, except as expressly provided by this Agreement, by persons or entities other than DOJ, the City, and PPB. All federal and state laws governing the confidentiality or public access to such documents are unaffected by the terms of this Agreement.

7.      The City shall be responsible for providing necessary support and resources to enable PPB to fulfill its obligations under this Agreement. The improvements outlined in this Agreement will require the dedication of additional funds and personnel.

8.      The purpose of this Agreement is to ensure that the City and PPB, by and through their officials, agents, employees, and successors, undertake the actions required by the Agreement, which in turn will resolve the concerns expressed by the United States in its complaint. The United States greatly appreciates the effort and expertise the current PPB leadership team has contributed to the investigation, agreement, and ongoing reform processes. The United States feels that continuity of management and effort is essential for timely compliance with the terms of this Agreement.

## II.      __DEFINITIONS__

Unless otherwise noted, the following terms and definitions shall apply to this Agreement:

9.      "Chief" means the Chief of Police of the Portland Police Bureau or his or her authorized designee.

Page 7 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 5 of 78                                                    Page 7 - Attachment 1

10.     "City" means the City of Portland, including its agents, officers, and employees in their official capacity.

11.     "C-I-Team" stands for Crisis Intervention Team.

12.     "C-I-Training" stands for Crisis Intervention Training, which is training on how to respond to persons in behavioral or mental health crisis, including persons under the influence of drugs or alcohol. Officers who receive such training are "C-I-Trained."

13.     "City Auditor" is the City Auditor, whose duties regarding independent police oversight are governed by Portland City Code Chapter 3.21.

14.     "COCL" refers to the Compliance Officer Community Liaison, discussed in detail in Section X.

15.     "Complainant" means any person, including a PPB officer or employee, who makes a complaint against PPB or a sworn officer.

16.     "Complaint" means any complaint made to the City by a member of the public, a PPB officer, or a civilian PPB employee of alleged misconduct by a sworn PPB employee.

17.     Computer-Assisted Dispatch ("CAD") is a computerized method of dispatching police officers on a service call. It can also be used to send messages to the dispatcher and store and retrieve data (i.e., radio logs, field interviews, schedules, etc.). PPB Manual 612.00.

18.     "CRC" is the Citizen Review Committee, whose duties are governed by Portland City Code Section 3.21.080.

Page 8 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 6 of 78                                                      Page 8 - Attachment 1

19.     "Critical firearm discharge" means each discharge of a firearm by a PPB officer. This term includes discharges at persons where no one is struck. This term is not intended to include discharges at the range or in training or negligent discharges not intended as an application of force, which are still subject to administrative investigation.

20.     "Day" means a calendar day.

21.     "Demographic category" means to the extent such information is currently collected by PPB, age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, source of income, or gender identity.

22.     "Discipline" means a personnel action for violation of an established law, regulation, rule, or PPB policy, including written reprimand, suspension, demotion, or dismissal.

23.     "DOJ" refers jointly to the Civil Rights Division of the United States Department of Justice and the United States Attorney's Office for the District of Oregon.

24.     "ECW" means Electronic Control Weapon, a weapon, including Tasers, designed primarily to discharge electrical charges into a subject that will cause involuntary muscle contractions and overrides the subject's voluntary motor responses.

25.     "ECW application" means the contact and delivery of electrical impulse to a subject with an ECW.

26.     "Effective Date" means the date this Agreement is entered by the Court.

27.     "EIS" means the Employee Information System as provided in PPB Manual 345.00.

28.     "Ensure" means that the City and PPB are using objectively good faith efforts to achieve the outcome desired.

Page 9 —     SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 7 of 78                                                                    Page 9 - Attachment 1

29.     "Exigent circumstances" means circumstances in which a reasonable person would believe that imminent and serious bodily harm to a person or persons is about to occur.

30.     "Firearm" is any instrument capable of discharging ammunition as defined in PPB Manual 1020.00.

31.     "Force" means any physical coercion used to effect, influence or persuade an individual to comply with an order from an officer. The term shall not include the ordinary handcuffing of an individual who does not resist.

32.     "IA" means the Internal Affairs unit of PPB's Professional Standards Division ("PSD").

33.      "Implement" or "implementation" means the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice through the regular use of audit tools.

34.     "Including" means "including, but not limited to."

35.     "Inspector" is a command position in the PSD responsible for reviewing all uses of force and making recommendations regarding improvements to systems of accountability in relation to force management.

36.     "IPR" means the Independent Police Review Division, an independent, impartial office, readily available to the public, responsible to the City Auditor, empowered to act on complaints against sworn PPB members for alleged misconduct, and recommend appropriate changes of PPB policies and procedures toward the goals of safeguarding the rights of persons and of promoting higher standards of competency,

Page 10 —     SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
                    *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 8 of 78                                                                    Page 10 - Attachment 1

efficiency, and justice in the provision of community policing services, governed by
Portland City Code Chapter 3.21.

37.     "Less-lethal" force means a force application that is not intended or
expected to cause death or serious injury and that is commonly understood to have less
potential for causing death or serious injury than conventional, more lethal police tactics.
Nonetheless, use of less-lethal force can result in death or serious injury.

38.     "Lethal force" means any use of force likely to cause death or serious
physical injury, including the use of a firearm, carotid neck hold, or strike to the head,
neck, or throat with a hard object.

39.     "Line Investigation" or "Directive 940.00 Investigation" means the use of
force investigation conducted pursuant to PPB Directive 940.00.

40.     "Mental Health Crisis" means an incident in which someone with an
actual or perceived mental illness is experiencing intense feelings of personal distress
(e.g., anxiety, depression, anger, fear, panic, hopelessness), obvious changes in
functioning (e.g., neglect of personal hygiene, unusual behavior) and/or catastrophic life
events (e.g., disruptions in personal relationships, support systems or living
arrangements; loss of autonomy or parental rights; victimization or natural disasters),
which may, but not necessarily, result in an upward trajectory of intensity culminating in
thoughts or acts that are dangerous to self and/or others.

41.     "Mental Illness" is a medical condition that disrupts an individual's
thinking, perception, mood, and/or ability to relate to others such that daily functioning
and coping with the ordinary demands of life are diminished. Mental illness includes, but
is not limited to, serious mental illnesses such as major depression, schizophrenia, bipolar

Page 11 –     SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
                    *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 9 of 78                                                    Page 11 - Attachment 1

disorder, obsessive compulsive disorder ("OCD"), panic disorder, posttraumatic stress disorder ("PTSD"), and borderline personality disorder. Mental illness includes individuals with dual diagnosis of mental illness and another condition, such as drug and/or alcohol addiction.

42.     "Misconduct" means conduct by a sworn officer that violates PPB regulations or orders, or other standards of conduct required of City employees.

43.     "Misconduct complaint" means any allegation of improper conduct by a sworn officer, whether the complaint alleges corruption or other criminal misconduct; a violation of law; or a violation of PPB policy, procedure, regulations, orders, or other standards of conduct required of City employees including, but not limited to, the improper use of force. This definition is not intended to create a right of appeal to the CRC for lethal force or in-custody death cases.

44.     "Mobile Crisis Prevention Team" (formerly Mobile Crisis Unit) means the team of a PPB patrol officer and mental health case worker who are specifically detailed to conduct outreach and response to persons with known mental illness or experiencing an actual or perceived mental health crisis, with the goal of intervening with individuals before a crisis exists and to link the individual with community mental health services.

45.      "Non-disciplinary corrective action" refers to action other than discipline taken by a PPB supervisor to enable or encourage an officer to improve his or her performance.

46.     "Passive resistance" means non-compliance with officer commands that is non-violent and does not pose an immediate threat to the officer or the public.

47.     "Personnel" means PPB officers and employees.

Page 12 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 10 of 78                                                      Page 12 - Attachment 1

48.     "Police officer" or "officer" means any law enforcement agent employed by or volunteering for PPB, including supervisors, reserve officers, and cadets.

49.     Police Review Board ("PRB") is an advisory body to the Chief governed by Portland City Code § 3.20.140. The PRB makes recommendations as to findings and proposed officer discipline to the Chief.

50.     "Policies and procedures" means regulations or directives, regardless of the name, describing the duties, functions, and obligations of PPB officers and/or employees, and providing specific direction in how to fulfill those duties, functions, or obligations.

51.     "PPB Manual" refers to PPB's Policy and Procedure Manual, revised January 2009, and includes the most current edition and supplements thereto.

52.     "PPB unit" or "unit" means any designated organization of officers within PPB, including precincts and specialized units.

53.     Portland Police Data System ("PPDS") is PPB's records management system that integrates officers' access to other agency systems such as LEDS, NCIC/III, DMV, DA-Crimes, ESWIS and OJIN.  *See, e.g.*, PPB Manual 1226.00.

54.      "Precinct" refers to one of the service areas of PPB, which together cover the entire geographic area of the City of Portland. Each precinct is led by a precinct commander.

55.     "Probable cause" means that there is a substantial objective basis for believing that, more likely than not, an offense has been committed and a person to be arrested has committed it.

Page 13 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
              *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 11 of 78                                                        Page 13 - Attachment 1

56.    "PSD" means the Professional Standards Division, the PPB unit charged with, among other tasks, conducting or overseeing all internal and administrative investigations of PPB officers, agents, and employees arising from complaints, whose current duties are governed by PPB Manual 330.00.

57.    "Qualified Mental Health Professional" means an individual who has, at a minimum, a masters-level education and training in psychiatry, psychology, counseling, social work, or psychiatric nursing, and is currently licensed by the State of Oregon to deliver those mental health services he or she has undertaken to provide.

58.    "Serious Use of Force" means: (1) all uses of force by a PPB officer that reasonably appear to create or do create a substantial risk of death, serious disfigurement, disability, or impairment of the functioning of any body part or organ; (2) all critical firearm discharges by a PPB officer; (3) all uses of force by a PPB officer resulting in a significant injury, including a broken bone, an injury requiring hospitalization, or an injury deemed to be serious by an officer's supervisor; (4) all head, neck, and throat strikes with an object or carotid neck holds; (5) force used upon juveniles known or reasonably assumed to be under 15 and females known or reasonably assumed to be pregnant; (6) all uses of force by a PPB officer resulting in a loss of consciousness; (7) more than two applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the application, regardless of whether the applications are by the same or different officers, and regardless of whether the ECW application is longer than 15 seconds, whether continuous or consecutive; (8) any strike, blow, kick, ECW application, or similar use of force against a handcuffed, otherwise

Page 14 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 12 of 78                                                          Page 14 - Attachment 1

restrained, under control, or in custody subject with or without injury; and (9) any use of force referred by an officer's supervisor to IA that IA deems serious.

59.     "Shall" means a mandatory duty.

60.      "Supervisor" means a sworn PPB employee at the rank of sergeant or above (or anyone acting in those capacities) and non-sworn personnel with oversight responsibility for other officers.

61.     "Supported by evidence" means the standard of proof applied in CRC appeals pursuant to Portland City Code Section 3.21.160. A finding regarding a complaint is "supported by the evidence" when a reasonable person could make the finding regarding a complaint in light of the evidence, whether or not the reviewing body agrees with the finding.  The CRC decides whether the recommended finding is supported by the evidence using a reasonable person standard, that is, the CRC decides whether City decision makers could have reached the conclusion they reached based on the evidence developed by the investigation.

62.     "Training" means any adult-learning methods that incorporate role-playing scenarios and interactive exercises that instruct officers about how to exercise their discretion at an administrative level, as well as traditional lecture formats.  Training also includes testing and/or writings that indicate that the officer comprehends the material taught.

63.     "Use of Force" means any physical coercion used to effect, influence, or persuade an individual to comply with an order from an officer, above unresisted handcuffing, including actively pointing a firearm at a person.

Page 15 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 13 of 78                                                    Page 15 - Attachment 1

64.     "Use of force that could result in criminal charges" means that use of force that a reasonable and trained supervisor could conclude would result in criminal charges due to the apparent circumstances, such as: (a) the level of force used as compared to the offense committed or resistance encountered; (b) material discrepancies between the force actually used and the use of force as described by the officer; or (c) the nature of the injuries.

65.     "Welfare Check" means a response by PPB to a call for service that is unrelated to an allegation of criminal conduct, but is instead to determine whether a person requires assistance for a medical or mental health crisis.

## III.        <u>USE OF FORCE</u>

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness:  (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied. PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible.  In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons,

Page 16 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 14 of 78                                                    Page 16 - Attachment 1

including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function. To achieve these outcomes, PPB shall implement the requirements set out below.

**A.      Use of Force Policy**

66.      PPB shall maintain the following principles in its existing use of force policies:

a.      PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and

b.      PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67.      PPB shall add to its use of force policy and procedures the following use of force principles:

a.      Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b.      In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and

Page 17 –      SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 15 of 78                                                                            Page 17 - Attachment 1

known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

c.    The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d.    Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

1.    **Electronic Control Weapons**

68.    PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapon System to include the following principles:

a.    Prohibition against the use of ECWs for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force;

b.    Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their ECW;

c.    Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following ECW use;

Page 18 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 16 of 78                                                                 Page 18 - Attachment 1

     d.     Only one ECW at a time may be used on a subject, intentionally, except where lethal force would be permitted;

     e.     After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each ECW cycle in their use of force reports;

     f.     Officers shall make every reasonable effort to attempt handcuffing during and between each ECW cycle. Officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant use;

     g.     ECWs shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of use of force; and

     h.     Officers receive annual ECW in service training including proficiency and policy changes, if any.

**2.  Use of Force Reporting Policy and Use of Force Report**

69.     PPB shall revise its policies related to use of force reporting, as necessary, to require that:

Page 19 –   SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
                 *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

a.    All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

b.    All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

b.c.    In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, and in order to comply with ORS 146.095(1) and ORS 146.100(1), PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised.  This will take the place of Directive 940.00 reports for purposes of paragraphs 70, and 72-77 of this Agreement.

**3.   Use of Force Supervisory Investigations and Reports**

70.    PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

a.    Complete After Action Reports within 72 hours of the force event;

b.    Immediately notify his or her shift supervisor and PSD regarding all officer's Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective

Exhibit 4
Pg. 18 of 78                                                          Page 20 - Attachment 1

Division. Where there is no misconduct, supervisors also shall

determine whether additional training or counseling is warranted.

PPB shall then provide such counseling or training consistent with

this Agreement;

Page 20 —   SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
              *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 19 of 78                                                    Page 20 - Attachment 1

      c.      Where necessary, ensure that the subject receives medical attention

from an appropriate medical provider; and

      d.      Interview officers individually and not in groups.

71.      PPB shall maintain adequate patrol supervision staffing, which at a

minimum, means that PPB and the City shall maintain its current sergeant staffing level,

including the September 2012 addition of 15 sergeants.

72.      PPB shall develop a supervisor investigation checklist to ensure that

supervisors carry out these force investigation responsibilities. PPB shall review and

revise the adequacy of this checklist regularly, at least annually.

73.      PPB shall revise its policies concerning chain of command reviews of

After Action Reports, as necessary, to require that:

      a.      EIS tracks all Directive 940.00 ~~comments~~, material

findings and corrections;

      b.      All supervisors in the chain of command are subject to and receive

corrective action or discipline for the accuracy and completeness

of After Action Reports completed by supervisors under their

command;

      c.      All supervisors in the chain of command are accountable for

inadequate reports and analysis;

      d.      A supervisor receives the appropriate corrective action, including

training, demotion, and/or removal from a supervisory position

when he or she repeatedly conducts deficient investigations.

Where a shift commander, or precinct commander, repeatedly

Page 21 —   SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
          *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 20 of 78                                    Page 21 - Attachment 1

permits deficient investigations, the shift commander, or precinct

commander, receives the appropriate corrective action, including

training, demotion, and/or removal from a supervisory position;

e.    When, after investigation, a use of force is found to be out of

policy, PPB shall take appropriate corrective action consistent with

the Accountability provisions of this Agreement;

f.    Where the use of force indicates policy, training, tactical, or

equipment concerns, the immediate supervisor shall notify the

Inspector and the Chief, who shall ensure that PPB timely conducts

necessary training and that PPB timely resolves policy, tactical, or

equipment concerns; and

g.    The Chief or designee, as well as PSD, has discretion to re-assign a

use of force investigation to the Detective Division or any PPB

supervisor.

**B.    Compliance Audits Related to Use of Force**

74.    In consultation with the COCL, the Inspector, as part of PPB's quarterly

review of force, will audit force reports and Directive 940.00 Investigation Reports to

ensure that:

a.    With respect to use of force generally:

i.    reports describe the mental health information available to officers

and the role of that information in their decision making;

ii.    officers do not use force against people who engage in passive

resistance that does not impede a lawful objective;

Page 22 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 21 of 78                                              **Page 22 - Attachment 1**

iii.    when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

iv.    officers call in specialty units in accordance with procedure;

v.    officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

vi.    officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

b.    With respect to ECW usages:

i.    ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits.  Discrepancies within the audit should be appropriately investigated and addressed;

ii.    officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

iii.    officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

iv.    officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing

Page 23 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 22 of 78

Page 23 - Attachment 1

so is reasonably calculated to prevent the use of a higher level of force.

c.      With respect to use of force reporting, the reports:

   i.   are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

   ii.  include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

   iii. include a decision point description of the force decision making;

   iv.  include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

   v.   include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

   vi.  include the reason for the initial police presence;

   vii. include a description of the level of resistance encountered by each officer that led to each separate use of force and, if applicable, injury;

   viii. include a description of why de-escalation techniques were not used or whether they were effective;

Page 24 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 23 of 78                                              Page 24 - Attachment 1

    ix.   include whether the individual was known by the officer to be

        mentally ill or in mental health crisis;

    x.   include a general description of force an officer observes another

        officer apply; and

    xi.   demonstrate that officers consistently make diligent efforts to

        document witness observations and explain when circumstances

        prevent them from identifying witnesses or obtaining contact

        information. Reports will include all available identifying

        information for anyone who refuses to provide a statement.

75.     In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

    a.   Complete a Supervisor's After Action Report within 72 hours of

        notification;

    b.   Review all use of force reports to ensure they include the

        information required by this Agreement and PPB policy;

    c.   Evaluate the weight of the evidence;

    d.   Use a "decision-point" approach to analyze each use of force;

    e.   Determine whether the officer's actions appear consistent  with

        PPB policy, this Agreement, and best practices;

    f.   Determine whether there was legal justification for the original

        stop and/or detention;

Page 25 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 24 of 78                              Page 25 - Attachment 1

g.     Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;

h.     Determine whether additional training or counseling is warranted;

i.     Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

j.     Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

k.     Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

l.     Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

76.     In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

a.     Determine if significant trends exist;

b.     Determine if there is variation in force practice away from PPB policy in any unit;

c.     Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the

Page 26 –     SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
               *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 25 of 78                                                           Page 26 - Attachment 1

reason for any difference and correct or duplicate elsewhere, as appropriate;

    d.    Identify and correct deficiencies revealed by the analysis; and

    e.    Document the Inspector's findings in an annual public report.

77.    In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that all supervisors in the chain of command:

    a.  Review Directive 940.00 findings using a preponderance of the evidence standard;

    b.  Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

    c.  Modify findings as appropriate and document modifications;

    d.  Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

    e.  Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

    f.  Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division

Page 27 –   SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
         *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 26 of 78

Page 27 - Attachment 1

commander finds evidence of apparent criminal conduct by a PPB

officer; and

g.   Reports a matter to PSD for review and investigation whenever an

investigating supervisor, shift commander or precinct commander

finds evidence of apparent misconduct by a PPB officer or

employee.

## IV.        TRAINING

78.    All aspects of PPB training shall reflect and instill agency expectations

that officers are committed to the constitutional rights of the individuals who have or are

perceived to have mental illness whom they encounter, and employ strategies to build

community partnerships to effectively increase public trust and safety. To achieve these

outcomes, PPB shall implement the requirements below.

79.    The Training Division shall review and update PPB's training plan

annually. To inform these revisions, the Training Division shall conduct a needs

assessment and modify this assessment annually, taking into consideration: (a) trends in

hazards officers are encountering in performing their duties; (b) analysis of officer safety

issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members

at all levels of PPB; (f) input from the community; (g) concerns reflected in court

decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends;

(j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB

policy.

80.    Within 180 days of the Effective Date, PPB shall develop and implement a

process that provides for the collection, analysis, and review of data regarding the

Page 28 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 27 of 78                                    Page 28 - Attachment 1

effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

81.     PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

82.     PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

83.     PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

84.     All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

Page 29 —     SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
                *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 28 of 78                                                        Page 29 - Attachment 1

a.   With respect to patrol officers, PPB shall:

i.   increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

ii.   emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

iii.   continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

iv.   continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

v.   describe situations in which a force event could lead to potential civil or criminal liability; and

vi.   continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently

Page 30 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 29 of 78

appropriate for person-center communication, such as the term

"mentals," in all work-related settings and communications, as

well as when interacting with the public.

    b.    With respect to supervisors, provide additional training on how to:

        i.    conduct use of force investigations, including the supervisory

investigatory responsibilities identified in **Section III.A.3**;

        ii.    evaluate officer performance as part of PPB's annual performance

evaluation system; and

        iii.    foster positive career development and impose appropriate

disciplinary sanctions and non-disciplinary corrective action.

85.    In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

    a.    Conducts a comprehensive needs assessment annually;

    b.    Creates a Training Strategic Plan annually;

    c.    Within 180 days of the Effective Date, develops and implements a

process for evaluation of the effectiveness of training;

    d.    Maintains accurate records of Training delivered, including

substance and attendance;

    e.    Makes Training Records accessible to the Director of Services,

Assistant Chief of Operations, and DOJ;

    f.    Trains Officers, Supervisors, and Commanders on areas specific to

their responsibilities; and

Page 31 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 30 of 78                                      Page 31 - Attachment 1

g.    Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

86.    In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council.  The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented.  The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

87.    Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

## V.    COMMUNITY-BASED MENTAL HEALTH SERVICES

88.    The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to

Page 32 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 31 of 78                                                                    Page 32 - Attachment 1

address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

89.     The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs.  All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

90.     The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU"), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff.  These

Page 33 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
              *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 32 of 78                                                      Page 33 - Attachment 1

committees will pursue immediate and long-term improvements to the behavioral health care system.  Initial improvements include:

a.    Increased sharing of information, subject to lawful disclosure, between agencies and organizations including BOEC, Multnomah County, and health care providers to create an information exchange among first responders and providers to better serve those suffering from mental illness;

b.    Creation of rapid-access clinics so those in crisis have access to timely medication management appointments;

c.    Enhancing access to primary care providers to shift low-to-moderate acuity patients to primary care programs creating more capacity for acute patients in existing outpatient crisis mental health systems;

d.    Expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders;

e.    Addressing issues of unmet needs identified by Safer PDX and its community partners;

f.    Expanding and strengthening networks of Peer-Mediated services to:

i.    develop a referral guide delineating these services and locations and assist with accessing information;

Page 34 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 33 of 78                                                                     Page 34 - Attachment 1

ii.  better educate the community of the viability of these services as alternative first engagement sites/programs for those having difficulty engaging with "professional driven" services;

iii.  expand peer services connected to peer supports in the community for inpatient psychiatric units (including Emergency Departments) and in the community;

iv.  add peer guides to work alongside Emergency Department guides for those patients with behavioral health issues entering the Emergency Department; and

v.  evaluate opportunities to expand use of peers to coordinate with PPB ABHU (as described herein) and function as a link with impacted individuals; and

g.  pursue tele-psychiatry (a provision of mental health care by video conferencing) as a way for first responders to take advantage of existing IT infrastructure to provide direct care or provider-evaluation supporting the provision of appropriate services to an individual in crisis.

## VI.    <u>CRISIS INTERVENTION</u>

The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises. The PPB will add new capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis as required by this Agreement.  Despite the

Page 35 —   SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 34 of 78                                                    Page 35 - Attachment 1

critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force.

**A.      Addictions and Behavioral Health Unit and Advisory Committee**

91.      In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

92.      ABHU will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

93.      ABHU shall track outcome data generated through the C-I Team, MCPT, and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

94.      Within 90 days of the Effective Date, PPB shall also establish an ABHU Advisory Committee. The ABHU Advisory Committee shall include representation from:  PPB command leadership, CIT, MCPT, and SCT; BOEC; civilian leadership of

Page 36 –      SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
               *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 35 of 78                                                    Page 36 - Attachment 1

the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

95.     The ABHU Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of C-I Team, MCPT, SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The ABHU Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The ABHU Advisory Committee shall report its recommendations to the ABHU Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

96.     Within 240 days of the Effective Date of this Agreement, the ABHU Advisory Committee will provide status reports on the implementation of the ABHU and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

**B.     Continuation of C-I Program**

97.     PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.

Page 37 –     SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
              *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 36 of 78                                                    Page 37 - Attachment 1

98.     PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with ABHU Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

**C.    Establishing "Memphis Model" Crisis Intervention Team**

99.     Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").

100.    PPB's C-I Team shall be comprised of officers who volunteer for assignment to the C-I Team. The number of C-I Team members will be driven by the demand for C-I Team services, with an initial goal of 60-80 volunteer, qualified officers.

101.    No officers may participate in C-I Team if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of C-I Team service, or during C-I Team service. PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the C-I Team.

102.    PPB shall specially train each C-I Team member before such member may be utilized for C-I Team operations. PPB, with the advice of the ABHU Advisory Committee, shall develop such training for C-I Team members consistent with the Memphis Model.

Page 38 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 37 of 78                                                    Page 38 - Attachment 1

103.     C-I Team members will retain their normal duties until dispatched for use as a C-I Team. BOEC or PPB may dispatch C-I Team members to the scene of a crisis event.

104.     PPB will highlight the work of the C-I Team to increase awareness of the effectiveness of its work.

105.     For each crisis event to which a C-I Team is dispatched, the C-I Team member shall gather data that ABHU shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis.  These data shall include:

  a. Date, time, and location of the incident;

  b. Subject's name, age, gender, and address;

  c. Whether the subject was armed, and the type of weapon;

  d. Whether the subject is a U.S. military veteran;

  e. Complainant's name and address;

  f. Name and DPSST number of the officer on the scene;

  g. Whether a supervisor responded to the scene;

  h. Techniques or equipment used;

  i. Any injuries to officers, subject, or others;

  j. Disposition;

  k. Whether a mental health professional responded to the scene;

  l. Whether a mental health professional contacted the subject as a result of the call; and

Page 39 – SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
   *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

m.    A brief narrative of the event (if not included in any other

document).

**D.    Mobile Crisis Prevention Team**

106.    PPB currently has an MCPT comprised of a two-person team, one sworn

officer and one contractor who is a qualified mental health professional. Within 120 days

of the Effective Date, City shall expand MCPT to provide one MCPT car per PPB

precinct.

107.    Each MCPT car shall be staffed by one sworn PPB officer and one

qualified mental health professional. MCPT shall be the fulltime assignment of each

such officer.

108.    No officers may participate in MCPT if they have been subject to

disciplinary action based upon use of force or mistreatment of people with mental illness

within the three years preceding the start of MCPT service, or during MCPT service.

PPB, with the advice of the ABHU Advisory Committee, shall define criteria for

qualification, selection, and ongoing participation of officers in the MCPT.

109.    PPB shall specially train each MCPT member before such member may be

utilized for MCPT operations. PPB, with the advice of the ABHU Advisory Committee,

shall develop such training for MCPT members.

110.    MCPT shall utilize C-I Team data to proactively address mental health

service, in part, by connecting service recipients with service providers.

111.    Within 180 days of the Effective Date, PPB, with the advice of the ABHU

Advisory Committee, shall develop policies and procedures for the transfer of custody or

voluntary referral of individuals between PPB, receiving facilities, and local mental

Page 40 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 39 of 78                                                    Page 40 - Attachment 1

health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of MCPT officers in the process.

**E.      Service Coordination Team**

112.      The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.

**F.      BOEC**

113.      Within 120 days of the Effective Date, BOEC and PPB, with the advice of the ABHU Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB ABHU or directly to NGOs or community-based mental health professionals.

114.      Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the ABHU Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

115.      Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

**VII.      <u>EMPLOYEE INFORMATION SYSTEM</u>**

116.      PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively

Page 41 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
                   *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 40 of 78                                                              Page 41 - Attachment 1

identify at-risk employees, supervisors and teams to address potentially problematic

trends in a timely fashion.  Accordingly, within 90 days of the Effective Date, PPB shall:

a.      Require that commanders and supervisors conduct prompt reviews

of EIS records of employees under their supervision and document

the review has occurred in the EIS performance tracker;

b.      Require that commanders and supervisors promptly conduct

reviews of EIS for officers new to their command and document

the review has occurred in the EIS performance tracker; and

c.      Require that EIS staff regularly conduct data analysis of units and

supervisors to identify and compare patterns of activity.

117.    PPB agrees to use force audit data collect data necessary to

conduct similar these analyses at supervisor- and team-levels.

118.    PPB shall continue to use existing thresholds, and specifically continue to

include the following thresholds to trigger case management reviews:

a.      Any officer who has used force in 20% of his or her arrests in the

past six months; and

b.      Any officer who has used force three times more than the average

number of uses of force compared with other officers on the same

shift.

119.    Within 90 days of the Effective Date, PPB shall add one additional

threshold to trigger case management review any officer who has three uses of force in a

one-month period.

Page 42 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
        *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 41 of 78                                                          Page 42 - Attachment 1

120.     Within 90 days of the Effective Date, PPB shall PPB identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

## VIII.   **OFFICER ACCOUNTABILITY**

PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.

## A.     **Investigation Timeframe**

121.     PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, ~~including~~ excluding appeals, if any, to CRC.  Appeals to CRC sh~~all~~ould be resolved within ~~21~~ 90 days.

122.     PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a

Page 43 –     SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
              *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 42 of 78                                                          Page 43 - Attachment 1

concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

123.      If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

**B.      On Scene Public Safety Statements and Interviews**

124.      Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

125.      Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

126.      PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and

Page 44 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
              *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 43 of 78                                                    **Page 44 - Attachment 1**

provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

127.     In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

## C.     Conduct of IA Investigations

128.     Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

129.     The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

130.     The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

131.     The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below:

Page 45 —     SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
               *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 44 of 78                                              Page 45 - Attachment 1

a.   Currently, seven voting members of the PRB review use of force incidents, including two citizen members. When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members.

b.   The CRC slot on the PRB in use of force cases will rotate among the CRC membership so that different CRC members participate on the PRB. Within 60 days of the Effective Date, the Auditor shall develop a membership rotation protocol.

c.   All members participating in the PRB must maintain confidentiality and be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions and "just cause" requirements set forth in Portland City Charter, City rules, and labor agreements.

d.   All community members and CRC members must meet the following qualifications to participate on the PRB:

   i.   Pass a background check performed by the Bureau.

   ii.   Participate in Bureau training to become familiar with police training and policies, including the PRB process.

   iii.   Sign a confidentiality agreement.

   iv.   Participate in ride-alongs to maintain sufficient knowledge of police patrol procedures.

Page 46 —   SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 45 of 78                                        Page 46 - Attachment 1

e.   Current city code provides that the City Auditor and the Chief have authority to recommend to City Council the removal of citizen members from the PRB pool. Likewise, the City Auditor or Chief shall have authority to recommend to City Council removal of a CRC member from serving on the PRB. The Chief or the City Auditor may recommend that City Council remove a community member or member of the CRC from the pool for the following reasons:

  i. Failure to attend training;

  ii. Failure to read Case Files;

  iii. Objective demonstration of disrespectful or unprofessional conduct;

  iv. Repeated unavailability for service when requested;

  v. Breach of confidentiality;

  vi. Objective demonstration of bias for or against the police; or

  vii. Objective demonstration of conflict of interest.

f.   Removal from participation in the PRB shall not affect CRC membership.

g.   Like current PRB citizen members, CRC members serving on the PRB may serve in that capacity for no more than three (3) years.

h.   A CRC member who participates in a PRB review shall recuse himself/herself during any later appeal of the same allegation(s) to the CRC.

h.i.   Cases in which the member elects, with the concurrence of the Chief and the Police Commissioner, to accept the investigative

findings and recommended discipline. This option will only be available to a member following implementation of code language which shall require at a minimum a full investigation of the alleged misconduct, issuance of the investigative findings, and concurrence with the findings by the Independent Police Review, the Professional Standards Division and the member's Branch Chief. The scope of cases eligible for stipulated discipline shall be identified in the authorizing code, and cases involving alleged use of excessive force, cases involving alleged discrimination, disparate treatment or retaliation, reviews of officer involved shootings and in-custody deaths, and cases in which the Chief or the Police Commissioner does not agree to accept the member's proposed stipulation to findings and recommended discipline shall not be eligible for stipulated findings and recommended discipline.

Page 47 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 47 of 78

Page 47 - Attachment 1

132.    By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

133.    If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall: (1) enter that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units ; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial finding creating a rebuttable presumption that the force used also violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the IA investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.

Page 48 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 48 of 78                                             Page 48 - Attachment 1

**D.    CRC Appeals**

134.    The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.

135.    The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136.    In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

**E.    Discipline**

137.    Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

Page 49 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 49 of 78                                    Page 49 - Attachment 1

F.    **Communication with Complainant and Transparency**

138.    Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139.    Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140.    The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

IX.    COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMISSION ON COMMUNITY ENGAGED POLICINGUNITY OVERSIGHT ADVISORY BOARD

There is significant community and City interest in improving PPB's community relationships.  The community is a critical resource.  Redefining and restructuring existing Soliciting community input regarding PPB's performance, mechanisms to provide for independent oversight of the Agreement, while also enhancing PPB's current community outreach efforts, will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety. To achieve this outcome, at a minimum, PPB shall implement the requirements below.

Exhibit 4
Pg. 50 of 78                                                          Page 50 - Attachment 1

141.     To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Portland Commission on Community Engaged Policing ("PCCEP")unity Oversight Advisory Board ("COAB"), within 90 days of the Effective Date of the relevant amendments to this Agreement.

141.142.  The PCCEPBOAB shall be authorized to:  (a) solicit information from the community and PPB about PPB's performance, particularly with regard to constitutional policing; independently assess the implementation of this Agreement; (b) make recommendations to the Chief, Police Commissioner and community and, during the effective period of this Agreement, to DOJ; Parties and the COCL on additional actions; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) provide the community with information on the Agreement and its implementation; (e) contribute to the development and implementation of a PPB Community Engagement and Outreach Plan ("CEO Plan"); and (ef) receive public comments and concerns.  The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Commission on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement.  Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.

142.     Membership of the COAB shall be comprised of fifteen (15) voting members, five (5) advisory members, and the COCL.

a.     The 15 voting members and the five advisory members shall be selected as follows:

i.     Each member of City Council will select one representative to serve on the COAB, for a total of five voting

Exhibit 4
Pg. 51 of 78                                                    Page 51 - Attachment 1

representatives;

ii.        The chair of the Human Rights Commission shall designate

one Human Rights Commissioner to serve on the COAB;

iii.        The chair of the Portland Commission on Disability shall

designate one Commissioner on Disability to serve on the

COAB;

iv.        The chair of the Human Rights Commission and the chair

of the Portland Commission on Disability shall jointly

Exhibit 4
Pg. 52 of 78

select three community members to serve as representatives

of the mental health community on the COAB, after

soliciting and reviewing applications from the public.

These three COAB members will possess demonstrated

expertise in the field of mental health in the form of either:

(a) certification as a Qualified Mental Health Professional;

or (b) no less than ten (10) years of demonstrated service to

persons with mental illness. These three selections shall be

completed within 60 days of the COCL selection.

v.    The community-at-large will select five voting

representatives directly from the community. The process

used for this selection is discussed in paragraph 145 herein;

and,

vi.    The Chief will select a diverse group of five sworn officers

within various ranks to serve as advisors and non-voting

members of the COAB, and may consider whether the

officer resides in Portland ("Advisory Members").

b.    The COAB's membership will come from a reasonably

broad spectrum of the community, such as: areas of

expertise, advocacy experience, community involvement,

profession, education, race, ethnicity, gender, gender

identity, sexual orientation, national origin, age, religion,

mental or physical disability and geographic identification.

COAB members, including Advisory Members,

i.    Page 52    SETTLEMENT AGREEMENT PURSUANT TO

Exhibit 4
Pg. 53 of 78

Page 52 - Attachment 1

iii. ~~

iv. ~~

v. ~~

vi. ~~

~~vii.~~i.    ~~must live, work, worship, or attend school in the City of Portland. COAB members shall not have an actual or perceived conflict of interest with the City of Portland.~~

143.    PCCEP's membership will come from a reasonably broad spectrum of the community.  PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.

~~143.~~144.  ~~The 15 voting members of COAB are independent of the City and PPB and shall not be currently employed by the City. Members must agree to serve for a minimum of a two-year term, and may be reappointed for one additional year. The COAB may create an executive committee or other subcommittees, as appropriate, to accomplish the tasks designated to it under this Agreement.~~ The City shall provide administrative support so that the ~~C~~PCCEP ~~OAB~~ can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.

~~144.    The COAB shall report to the COCL. The COCL will chair the COAB, preside over COAB meetings, take and count votes, and perform such other activities as are necessary for the efficient operation of the COAB. If the COCL determines that a COAB member is no longer fit to serve on account of misconduct, the COCL shall consult with DOJ prior to removing such member. Following the removal of a COAB member, an alternative shall be selected from the same pool of applicants as the removed COAB member.~~

~~145.    Selection of the five (5) community voting members shall be made as follows:~~

~~a.    Each neighborhood coalition in Portland may propose a candidate~~

Exhibit 4
Pg. 54 of 78

Page 53 - Attachment 1

for membership on the Committee. Any other non-profit

organization within the City may also propose a candidate for

membership.  Any other person who lives, works, or is enrolled in

Page 53 - SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 55 of 78

Page 53 - Attachment 1

school in Portland and is over the age of 15 may be considered provided they provide the City with the names of 50 verified residents over the age of 15 of the City of Portland who support his or her nomination;

b.      The City shall widely advertise and hold a public meeting where previously nominated candidates will be selected. Any Portland resident is welcome to attend and participate in the selection process. The City will publicize the meeting throughout all the various communities of Portland;

c.      At the public meeting, candidates will be given an opportunity to speak and ask for support. In their statements, candidates must indicate whether they live, work, worship, and/or attend school within the City of Portland;

d.      Attendees at the public meeting and will be asked to select their choice of candidates;

i.      If there are ten or fewer candidates, then the attendees present will select the top five candidates receiving the most votes;

ii.     If there are more than ten candidates, a preliminary vote will be taken and the top ten candidates receiving the most votes will be selected and a second vote will be taken to reduce the number to the five persons that will serve on the COAB;

Page 54      SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 56 of 78                                                    Page 54 - Attachment 1

iii.    ~~The next two candidates who receive the most votes shall be identified as potential alternates, should a COAB member be removed or incapacitated; and,~~

iv.    ~~Because the number of persons who may be interested in participating in this process is unknown, the City may adopt other procedures necessary to conduct the meeting and to carry out the intent of these provisions.~~

e.    ~~This process of selecting the five community members shall be completed within 60 days of the COCL selection.~~

145. ____

~~146.~~ To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to develop and finalize a ~~CEO~~Community Engagement Plan.  ~~:~~

146.    Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.

a.    ~~Within 90 days of the COAB selection, the City, in consultation with COAB, will conduct a reliable, comprehensive, and representative survey of members of the Portland community, including civilians and PPB officers, regarding their experiences~~

Exhibit 4
Pg. 57 of 78                                    Page 55 - Attachment 1

with and perceptions of PPB's prior community outreach efforts

and accountability efforts and where those efforts could be

improved, to inform the development and implementation of the

CEO Plan;

b.      COAB, in conjunction with PPB, shall consult with community

members (not only through PPB Advisory Councils and

Page 55 -   SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 58 of 78

Page 55 - Attachment 1

Roundtables) and hold at least two (2) public hearings, completed within 90 days of the COAB selection, in addition to the representative survey described above, to gather public input on PPB's outreach efforts; the hearings shall be held in locations to ensure that PPB receives input from all parts of the Portland community;

c.    COAB shall review PPB's prior community outreach efforts to contribute to the development of a new CEO Plan;

d.    COAB shall solicit and consider input from the Human Rights Commission's Community Police Relations Committee ("CPRC"), including its work to implement the 2009 PPB "Plan to Address Racial Profiling";

e.    Within 60 days of the anticipated due date for survey results, the COAB and PPB, in consultation with the appropriate City resources knowledgeable about public outreach and survey analysis, shall review and analyze the results of the survey and other public comments discussed above;

f.    The CEO Plan shall include strategies to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members. The Plan shall also identify gaps in available resources to achieve its goals.

Page 56    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2); *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 59 of 78                                                        Page 56 - Attachment 1

g. The COAB may also provide information to the PPB on other areas related to community engagement and outreach to contribute to the development of the CEO Plan, including:

 i. integration of community and problem-oriented policing principles into PPB's management, policies and procedures;

 ii. recruitment, selection, training, promotion, and personnel evaluations;

 iii. tactics and deployment of resources; and

 iv. systems of accountability.

g. COAB shall submit its recommended CEO Plan to the Chief, in writing, within 90 days of the COAB's completion of survey analysis.

h. The Chief's Office, in consultation with the five PPB advisory members of the COAB shall utilize the COAB's recommendations in developing and implementing the CEO Plan.  The Chief's Office shall present the final proposed CEO (with implementation timeline) to the COAB for a vote of approval within 240 days of the effective date of this Agreement.

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, ~~together with the COAB,~~ considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts.  The data shall also be provided to PCCEP to inform its work.

Page 57 – SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
Exhibit 4   *United States v. City of Portland,* Case No. 3:12-cv-02265-SI
Pg. 60 of 78    Page 57 - Attachment 1

148.     PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such provide such information publicly available to the CPRC to contribute to their analysis of community concerns regarding discriminatory policing. In consultation with the COAB and CPRC, PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

149.     The COAB, COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest metrics additional metrics to DOJ and PPB.

150.     Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to reviewed by the CPCCEPOAB for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

151.     The COAB may make recommendations approved by a majority of its membership regarding implementation of the terms of this Agreement.

152.     The COAB, shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess

Exhibit 4
Pg. 61 of 78                                                                    Page 58 - Attachment 1

and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The COAB shall also provide the opportunity for public comment at each of its meetings to keep open lines of communication with the public at large.

153.    A representative of the Oregon U.S. Attorney's Office shall be invited to attend all COAB meetings.

154.151.  CPCCEP OAB shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan.  is Agreement. All CPCCEP shall hold regular Town Hall meetings which shall be open to the public.  OAB meetings shall be open to the public.  In addition, COAB shall attend quarterly meetings with the COCL as provided in Par 16.3. To the extent that CPCCEP OAB meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the CPCCEPOCL to ensure compliance with those laws and agrees to represent CPCCEP OCL in any challenges regarding compliance with those laws.

155.152.  The City shall provide CPCCEPOAB members with appropriate training necessary to comply with requirements of City and State law.

### X.  AGREEMENT IMPLEMENTATION AND ENFORCEMENT

156.153.  PPB shall implement immediately all provisions of this Agreement which involve the continuation of current policies, procedures, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. Except where otherwise specifically indicated, PPB shall implement all other provisions of this Agreement no later than within 180 days of the Effective Date.

Exhibit 4
Pg. 62 of 78                                                                 Page 59 - Attachment 1

157.154.  With regard to any provision that provides for DOJ's review and approval, including review of all policies that must be revised, approval will be granted in a timely fashion provided that the PPB's action reasonably satisfies the requirements and standards set forth in the relevant provision(s).

158.155.  All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations.  Audits and reports shall be posted on PPB's website.

159.156.  PPB shall collect and maintain all data and records necessary to facilitate and ensure transparency and wide public access to information related to PPB decision making and activities, and compliance with this Agreement, in accordance with the Oregon Public Records Law.

A.      **Compliance Officer/Community Liaison**

160.157.  Within 60 days from the Effective Date, the City shall publicly identify three potential candidates with expertise in police practices, community engagement, and crisis intervention methods, to serve as a Compliance Officer and Community Liaison ("COCL"). Following a 30-day public comment period, the City Council shall select a COCL, who shall be responsible for synthesizing data related to PPB's use of force, reporting to the City Council, DOJ, and the public and gathering input from the public related to PPB's compliance with this Agreement.  The COCL shall not be attached to any one City office, shall be wholly independent of PPB, and shall be responsive to the entire City Council, the public, and DOJ.  The City shall provide administrative support so that the COCL can perform the duties and responsibilities identified in this Agreement.

Page 60 –      SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
               *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 63 of 78                                                    Page 60 - Attachment 1

161.158.  In order to collect data and report on PPB's implementation of each substantive provision of this Agreement, the COCL shall conduct the reviews specified in paragraph 173 of this Agreement and such additional reviews regarding the implementation of this Agreement as the COCL, the City, or DOJ deems appropriate. Based on the COCL's reviews and community input, the COCL shall make recommendations to the City regarding measures necessary to ensure full and timely implementation of this Agreement.

162.159.  The COCL shall prepare quarterly, written, public reports detailing PPB's compliance with, and implementation of, each substantive provision of this Agreement. The reports shall specify: (a) the methodology and monitoring activities employed; (b) the COCL's assessment of compliance for each paragraph; and (c) the COCL's recommendations regarding necessary steps to achieve compliance, as warranted. The COCL shall substantiate his or her compliance assessments and recommendations. The COCL's reports shall be written with due regard for the privacy interests of individual officers and the subjects involved in the use of force interactions, and the interest of PPB in protecting against disclosure of non-public information.

163.    The COCL shall provide a copy of all reports to the Parties and the COAB in draft form and allow the Parties and the COAB 30 days to informally comment on the reports. The COCL shall also hold open town hall meetings on a quarterly basis where he/she will present his/her draft compliance report to the public COAB, and receive public comment on his/her assessments of compliance and recommendations. The COAB will be responsible for drafting comments to the COCL's report, and shall incorporate any comments or concerns from the public-at-large related to PPB's compliance with the

164.    Page 61    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P.

Exhibit 4
Pg. 64 of 78                                                    Page 61 - Attachment 1

166.

167.

168.

169.

170.160.  Agreement into its comments.  The public shall have the opportunity to raise comments or concerns at the open town hall meeting or via online and/or electronic mail submissions. The COCL and COAB and the City, in consultation with the PCCEP, shall jointly ensure that the time and location of these quarterly town hall meetings are well publicized with sufficient advance notice and that significant efforts are made to procure attendance of a community body broadly representative of the many and diverse communities in Portland, including persons with mental illness, mental health providers, faith communities, minority, ethnic, and other community organizations, and student or youth organizations. These quarterly meetings shall facilitate the sharing of information on the Agreement and its implementation with the broad community body and permit the COCL and the COAB to receive comments and concerns.

171.161.  The COCL shall consider the Parties' responses and COAB's response to its draft report and make appropriate changes, if any, before issuing a final version of the report. The COCL shall issue the final report to the Parties and make all final reports publicly available through posting on the City's website. The Parties' responses and COAB's response to the COCL's draft report shall also be published on the City's website. The Parties may submit any COCL reports to the Court if questions arise concerning compliance with this Agreement. The Parties agree that COCL reports may be used to evidence compliance or non-compliance with this Agreement, subject to the weight afforded to such reports by the Court.

**B.      PPB Compliance Coordinator**

172.162.  PPB will hire or retain an employee familiar with the operations of PPB for the duration of this Agreement, to serve as a PPB Compliance Coordinator.  The

Exhibit 4
Pg. 65 of 78                                                    Page 62 - Attachment 1

Compliance Coordinator will serve as a liaison between PPB and both the COCL and

DOJ and will assist with PPB's compliance with this Agreement. At a minimum, the

Compliance Coordinator will:

a.  Coordinate PPB's compliance and implementation activities;

b.  Facilitate the provision of data, documents, materials, and access to PPB personnel to the COCL and DOJ, as needed;

c.  Ensure that all documents and records are maintained as provided in this Agreement;

d.  Assist in assigning compliance tasks to PPB personnel, as directed by the Chief of Police or the Chief's designee; and

e.  Take primary responsibility for collecting the information the COCL requires to carry out his/her assigned duties.

## C.    Access to People and Documents

173.163.   The COCL shall have full and direct access to all PPB and City staff,

employees, facilities, and documents that the COCL reasonably deems necessary to carry

out his/her duties. If a document requested by the COCL is a privileged attorney-client

communication, the COCL shall not disclose the document in a manner that destroys that

privilege without the approval of the City Attorney. The COCL shall cooperate with PPB

and the City to access people, facilities, and documents in a reasonable manner that

minimizes, to the extent possible, interference with daily operations.    In order to report

on PPB's implementation of this Agreement, the COCL shall regularly conduct reviews

to ensure that PPB implements and continues to implement all measures required by this

Page 63 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 66 of 78                                                      Page 63 - Attachment 1

Agreement. The COCL may conduct on-site reviews without prior notice to PPB or the City.

174.164.  For the purpose of monitoring this Agreement, DOJ and its consultative experts and agents shall have full and direct access to all PPB and City staff, employees, facilities, and documents, that DOJ reasonably deems necessary to carry out the enforcement and monitoring provisions of this Agreement to the extent permitted by law. DOJ and its consultative experts and agents shall cooperate with PPB and the City to access involved personnel, facilities, and documents in a reasonable manner that minimizes interference with daily operations; however, DOJ may conduct on-site reviews without prior notice to PPB or the City. DOJ shall provide PPB or the City with reasonable notice of a request for copies of documents. Upon such request, PPB or the City shall provide DOJ with copies (electronic, where readily available) of any documents that DOJ is entitled to access under this Agreement, except any documents protected by the attorney-client privilege.  Should PPB decline to provide DOJ with access to a document based on attorney-client privilege, PPB promptly shall provide DOJ with a log describing the document, including its author, recipients, date of production, and general topic.

175.165.  All non-public information provided to the COCL or DOJ by PPB or the City shall be maintained in a confidential manner. Nothing in this Agreement requires the City to disclose documents protected from disclosure by the Oregon Public Records Law to third parties.

Page 64 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 67 of 78                                                    Page 64 - Attachment 1

D.      **Review of Policies and Investigations**

176.166. Within 180 days of the Effective Date, PPB shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. PPB shall revise and/or develop as necessary other written documents such as handbooks, manuals, and forms, to effectuate the provisions of this Agreement.  PPB shall send new or revised policies, procedures, protocols, and training curricula regarding use of force, interactions with persons in mental health crisis and systems of accountability to DOJ as they are promulgated, with a copy to the COCL. DOJ and the COCL will provide comments within 45 days and will not unreasonably withhold recommendations about policies, procedures, protocols, and training curricula. The COCL shall seek the timely input of the relevant members of the Training Division and patrol officers, as well members of the community. If the City disagrees with DOJ's comments, the City shall, within 14 days of being informed of the DOJ's comments, inform the Parties in writing of the disagreement. Within 14 days thereafter, the Parties shall meet and confer on the disagreement at a mutually agreeable time. Upon approval by the Parties, policies, procedures, training curricula, and manuals shall be implemented within 30 days of agreement or the Court's decision. PPB shall provide initial and in-service training to all officers and supervisors with respect to newly implemented or revised policies and procedures. PPB shall document employee review of and training in new or revised policies and procedures.

Exhibit 4
Pg. 68 of 78                                                                    Page 65 - Attachment 1

177.167.  The Chief shall post on PPB's website final drafts of all new or revised policies that are proposed specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement, to allow the public an opportunity for notice and comment, prior to finalizing such policies.

178.168.  The Chief's Office shall coordinate a review of each policy or procedure required by this Agreement 180 days after such policy or procedure is implemented, and annually thereafter (on a regularly published schedule), to ensure that such policy or procedure provides effective direction to PPB personnel and remains consistent with the purpose and requirements of this Agreement.

179.169.  PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

180.170.  In addition to compliance reviews, the COCL shall lead semi-annual qualitative and quantitative outcome assessments to measure whether the City and PPB's implementation of this Agreement has created: (1) capable systems and resources for responding to persons in mental health crisis; (2) competent accountability and oversight systems; (3) effective training for police officers that increases the knowledge, skills and abilities necessary for effective and successful delivery of service to persons in mental health crisis; (4) proper management of the use of force to meet constitutional standards; and (5) robust systems of community engagement. These outcome assessments shall be informed by the following:

Page 66 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 69 of 78                                                      Page 66 - Attachment 1

a.    Use of Force Data:

    i.    the number of police interactions where force was used on individuals with actual or perceived mental illness, including the type of force used; the reason for the interaction, i.e., suspected criminal conduct or a well-being check; the threat to public safety, including whether the person was armed and if so, with what; a description of the type of resistance offered, if any; and a description of any attempts at strategic disengagement;

    ii.    the rate of force used per arrest by PPB; force implement used; geographic area (i.e., street address, neighborhood, or police precinct or district); type of arrest; and demographic category;

    iii.    the rate of force complaints that are sustained, overall and by force type; source of complaint (internal or external); type of arrest; type of force complained of; demographic category;

    iv.    uses of force that were found to violate policy overall and by force type; type of arrest; demographic category; force implement used; and number of officers involved;

    v.    the number and rate of use of force administrative investigations/reviews in which each finding is supported by a preponderance of the evidence;

Page 67 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 70 of 78

Page 67 - Attachment 1

vi.     the number of officers who frequently or repeatedly use force, or have more than one instance of force found to violate policy;

vii.    the rate at which ECW usage decreases or increases compared to the use of force overall and by weapon; and

viii.   the rate at which officer and subject injuries decrease or increase overall and by severity of injury.

b.    Mental health interaction data on:

i.     MCPT dispositions;

ii.    the flow of people in mental health crisis through PPB, the County jail, emergency receiving facilities, and community agencies;

iii.   officer and agency staff satisfaction with the transfer process;

iv.   the rate of repeat calls for service involving individuals in mental health crisis;

v.    the use of the mental health commitment law; and

vi.    the availability of appropriate treatment options;

c.    Training data, including:

i.     officer evaluation of adequacy of training; and

ii.    the Training Division's assessment of incidents involving officer or civilian injury.

d.    Performance data, including:

Page 68 –   SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 71 of 78

Page 68 - Attachment 1

      i.      uses of force found to be unreasonable, complaints sustained and not sustained, and other performance related indicators for supervisors/commanders promoted pursuant to the requirements of this Agreement, and for the units these supervisors/commanders command; and

      ii.     initial identification of officer violations and performance problems by supervisors, and effectiveness of supervisory response.

   e.    Accountability data, including:

      i.      the number of complaints (broken out by type of complaint), with a qualitative assessment of whether any increase or decrease appears related to access to the complaint process;

      ii.     rate of sustained, not sustained, exonerated complaints;

      iii.    the number and rate of complaints in which the finding for each allegation is supported by a preponderance of the evidence;

      iv.    the number of officers who are subjects of repeated complaints, or have repeated instances of sustained complaints; and

      v.     the number, nature, and settlement amount of civil suits against PPB officers regardless of whether the City is a defendant in the litigation.

Page 69 —   SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

181.171.  In conducting these outcome assessments, the COCL may use any relevant data collected and maintained by PPB, provided that it has determined, and the Parties agree, that this data is reasonably reliable and complete. Additionally, the COCL shall solicit input from community groups or initiatives that have relevant experience conducting statistical analyses. The COCL will contribute to and review the Annual Community Survey.

182.172.  Two years after the Effective Date, DOJ shall conduct a comprehensive assessment to determine whether and to what extent the outcomes intended by the Agreement have been achieved. DOJ will further examine whether any modifications to the Agreement are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the Agreement's requirements. This assessment also shall address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies for accelerating full and effective compliance. Based upon this comprehensive assessment, DOJ may recommend modifications to the Agreement that are necessary to achieve and sustain intended outcomes.  Where the City agrees with DOJ's recommendations, the Parties shall stipulate to modify the Agreement accordingly.  Nothing in this assessment shall empower DOJ to unilaterally modify the terms of this Agreement.

**E.    City Reports and Records**

183.173.  Beginning with the COCL's first quarterly report, as set forth in paragraph 166 of this Agreement, PPB shall prepare a status report no later than 45 days before the COCL's quarterly report is due.  The PPB Compliance Coordinator shall lead the effort in preparing this status report and shall provide copies to the COCL, DOJ, and the public.

Page 70 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
                *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 73 of 78                                                        Page 70 - Attachment 1

PPB's report shall delineate the steps taken by PPB during the reporting period to comply with each provision of this Agreement.

184.174. PPB shall maintain all records, as applicable, necessary to document their compliance with the terms of this Agreement and all documents expressly required by this Agreement.

**F.    Enforcement**

185.175. The Parties agree jointly to file this Agreement with the United States District Court for the District of Oregon, in a matter to be captioned *United States* v. *City of Portland*, Civil Action No. --CV--. The joint motion shall request that the Court enter the Agreement pursuant to Federal Rule of Civil Procedure 41(a)(2), and conditionally dismiss the complaint in this action with prejudice, while retaining jurisdiction to enforce the Agreement. If the Court does not retain jurisdiction to enforce the Agreement, the Agreement shall be void.

a.    The Parties anticipate that the City will have substantially complied with all provisions of the Agreement by October 12, 2017. Substantial compliance is achieved if any violations of the Agreement are minor or occasional and are not systemic.

b.    The Court shall retain jurisdiction of this action for all purposes until the City has substantially complied with all provisions of this Agreement and maintain substantial compliance with all provisions for one year.

c.    The Parties may agree to jointly ask the Court to terminate the Agreement before the end of the five year term, provided the City

Page 71 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
             *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 74 of 78                                                    Page 71 - Attachment 1

has substantially complied with all provisions of the Agreement and maintained substantial compliance with all provisions for one year. If the case has not yet been dismissed, the Parties agree to ask the Court for a non-evidentiary hearing on the status of compliance on or near October 12, 2017. If the Parties agree that there is non-compliance, or if there is a dispute about compliance, the Parties will so inform the Court, and the Court may set additional hearing dates as appropriate. The Parties may agree jointly at any time to allow for additional time to resolve compliance issues.

186.176.  The United States acknowledges the good faith of PPB and the City in trying to address the remedial measures that are needed to promote police integrity and ensure constitutional policing in the City. The United States, however, reserves its right to seek enforcement of the provisions of this Agreement if it determines that PPB or the City have failed to fully comply with any provision of this Agreement.

187.177.  The United States understands that many portions of this Agreement will take time to implement and that implementation may require changes to, among other things, collective bargaining agreements, the city code, and current city policies and will likely require additional revenue resources that have not yet been identified at the time this Agreement is executed.

188.178.  If the United States reasonably believes the City has failed to implement the terms of the Agreement, it shall promptly notify the City in writing and identify with specificity the portion or portions of the Agreement about which it has concerns.

Page 72 —    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
            *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 75 of 78

Page 72 - Attachment 1

Similarly, if the City believes that DOJ has misinterpreted a provision of this Agreement it may promptly notify DOJ of its concerns, noting the specific portions of the Agreement that it believes has been misinterpreted.

189.179.  Notices provided by the United States or by the City shall be in writing and provided by mail to the following persons:

| | |
|---|---|
| Chief of Police | City Attorney |
| 1111 SW Second | 1221 SW 4th Avenue, Suite #430 |
| Portland, Oregon  97204 | Portland, Oregon  97204 |
| | |
| Section Chief | U.S. Attorney |
| Special Litigation Section | District of Oregon |
| 950 Pennsylvania Ave., N.W. | 1000 S.W. Third Ave., Suite 600 |
| Washington, D.C.  20530 | Portland, OR  97204 |

190.180.  Following receipt by mail of any written Notice, the City or DOJ shall respond in writing within 30 days to the concerns raised by the other Party.  Depending on the nature and number of the concerns the City or DOJ may request additional time to respond, and such a request shall not be unreasonably denied. The Notice and the Party's Response thereto shall be considered to be in the nature of settlement discussions between the Parties and subject to Federal Rule of Procedure 408.

191.181.  If the Response fails to resolve the other Party's concerns, the Parties agree to meet as soon thereafter as is mutually convenient to discuss the City's compliance with the portion(s) of the Agreement identified in the Notice or the interpretation of the Agreement by DOJ. Persons attending the meeting shall have authority to resolve the concerns, unless resolution of the concern requires adoption of an ordinance or resolution by City Council or by the Assistant Attorney General in Charge of the DOJ Civil Rights Division.

Page 73 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
              *United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 76 of 78                                                    Page 73 - Attachment 1

192.182.  If a meeting between the Parties fails to resolve the concerns, the Parties agree to participate in mediation conducted by a neutral third party mutually agreeable to the Parties. If the Parties cannot agree upon the selection of a mediator, the Parties shall submit three names of potential mediators to each other. Each Party may then strike two of the three names provided by the other Party. The remaining two names shall be given to the Chief Judge of the U.S. District Court for the District of Oregon and the Chief Judge shall appoint the mediator from one of the names provided.

193.183.  If mediation fails to resolve the concerns, the United States or the City may file a Motion in the Federal District Court for the District of Oregon, located in Portland, Oregon, to enforce compliance with the terms of this Agreement or to seek a Declaration of the meaning of this agreement.  The Motion or request for Declaration shall only allege concerns raised by the Parties which were the subject of mediation. The Parties shall then meet with the court to schedule a date on which the Motion or Declaration shall be heard or will otherwise comply with the court's preferred procedure. The Parties agree the Judge hearing the Motion shall determine whether or not the Agreement has been breached and may interpret the meaning of the Agreement and has the power to issue an appropriate remedy, if any. If, for any reason, the Judge finds the City is not in compliance with the Agreement, but that noncompliance was beyond the reasonable control of the City, the City shall not be in breach of this Agreement. However, in the event of noncompliance beyond the reasonable control of the City, the Parties agree that the Court may exercise its equitable powers to devise an appropriate remedy or modification of this Agreement to accomplish the same result as that intended

Page 74 –    SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2);
*United States v. City of Portland,* Case No. 3:12-cv-02265-SI

Exhibit 4
Pg. 77 of 78                                                         Page 74 - Attachment 1

by the portion of the Agreement with which noncompliance was found, provided the Parties cannot reach agreement on the remedy or modification.

194.184.  Nothing prohibits the Parties from engaging in any informal or formal discussions regarding this Agreement or the City's compliance with this Agreement.  The Parties may jointly stipulate to make changes, modifications, and amendments to this Agreement, which shall be effective, absent further action from the Court, 45 days after a joint motion has been filed with the Court. Any modification of this Agreement by the City of Portland must be approved by the City Council of the City by written ordinance.

195.185.  The Parties agree to defend the provisions of this Agreement. The Parties shall notify each other of any court or administrative challenge to this Agreement. In the event any provision of this Agreement is challenged in any City, county, or state court, removal to a federal court shall be sought by the Parties.

196.186.  The PPB and the City agree to promptly notify DOJ if any term of this Agreement becomes subject to collective bargaining. The City agrees to keep DOJ apprised of the status of the resulting negotiations.

197.187.  All PPB officers and persons related to the implementation of this Agreement shall sign a statement indicating that they have read and understand this Agreement within 90 days of the effective date of this Agreement. Such statement shall be retained by PPB. PPB shall require compliance with this Agreement by their respective officers, employees, agencies, assigns, or successors.

RESPECTFULLY SUBMITTED this _____ day of _____, 2017.



**U.S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                     _Washington, D.C. 20530_

SEP 1 2 2012

The Honorable Sam Adams
Mayor
City of Portland
1221 SW 4th Ave # 340
Portland, OR 97204-1900

   RE: <u>Investigation of the Portland Police Bureau</u>

Dear Mayor Adams:

   This letter reports the findings of the United States Department of Justice Civil Rights Division's and United States Attorney's Office for the District of Oregon's (collectively "DOJ") joint investigation of the Portland (Oregon) Police Bureau ("PPB"). We opened our investigation to consider whether PPB officers engage in a pattern or practice of using excessive force, with a particular focus on the use of force against people with mental illness or in mental health crisis. Our investigation was brought pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"). Section 14141 authorizes the United States to file a legal action when it has reasonable cause to believe that a law enforcement agency is engaging in activities that amount to a pattern or practice of violating the Constitution or laws of the United States.

   While most uses of force we reviewed were constitutional, we find reasonable cause to believe that PPB engages in a pattern or practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness. In this letter, we discuss the need for revised policies, training, supervision, and timely, thorough internal review of use of force in this context.

   In making these findings, we recognize the challenges that police officers in Portland and elsewhere confront in addressing the needs of people with mental illness. Our findings take place against a backdrop of a mental health infrastructure that has a number of key deficiencies.

Exhibit 1
Pg. 1 of 42

The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Despite the critical gaps in the mental health system, police agencies must be equipped to interact with people in mental health crisis without resulting to unnecessary or excessive force. As Oregon's main population center, Portland police officers encounter people with actual or perceived mental illness with increasing frequency. We are working separately with State officials in a constructive, collaborative manner to address the gaps in the mental health infrastructure. We are confident that the state-wide implementation of an improved holistic, effective community-based mental health infrastructure will be of enormous benefit to law enforcement agencies across the State, as well as to people with mental illness. Implementing these reforms will enhance public safety and officer safety.

We thank the City and PPB, in particular you, Mayor Adams, and Police Chief Michael Reese, for their cooperation throughout our investigation, and for initially inviting us into Portland to conduct this investigation. We acknowledge the professionalism of all of the City officials and counsel involved. In particular, we appreciate the openness and flexibility of the City and PPB personnel during our two site visits, as well as their diligence in providing requested information, including voluminous responsive documents in a timely fashion. Further, we are encouraged by PPB's eagerness to improve its processes, as evident by the steps that PPB has already taken to address concerns raised during our investigation. PPB has not waited for our formal findings to begin the process of addressing the deficiencies that are outlined in this letter. We also commend PPB's willingness to seek outside evaluation and consultation in numerous instances before our investigation. This leaves us optimistic that we will continue our collaborative relationship to craft sustainable remedies that address the deficiencies identified in this letter.

## I.  SUMMARY OF FINDINGS

The use of force is an essential part of law enforcement; however, it must be guided by policy and limited by the protections of the United States Constitution. While most force used by officers in Portland is appropriate, we find reasonable cause to believe that PPB is engaging in a pattern or practice of using excessive force in encounters involving people with actual or perceived mental illness. The pattern or practice is manifested in the following ways:

(1)    Encounters between PPB officers and persons with mental illness too frequently result in a use of force when force is unnecessary or in the use of a higher level of force than necessary or appropriate, up to and including deadly force. We found instances that support a pattern of dangerous uses of force against persons who posed little or no threat and who could not, as a result of their mental illness, comply with officers' commands. We also found that PPB employs practices that escalate the use of force where there were clear earlier junctures when the force could have been avoided or minimized. As described in greater detail below, examples of this use of excessive force include a December 2010 incident when

2

Exhibit 1
Pg. 2 of 42

multiple officers resorted to repeated closed-fist punches and repeated shocking of a subject who was to be placed on a mental health hold.

(2)    In particular, we found that PPB officers use electronic control weapons ("ECWs" (commonly referred to as "Tasers")) in circumstances when ECW use is not justified or use ECWs multiple times when only a single use is justified in encounters with people with actual or perceived mental illness.  We found instances that support a pattern of officers using multiple cycles of shock without waiting between cycles to allow the suspect to comply, or officers failing to utilize control tactics during ECW cycles to properly affect handcuffing without having to resort to repeated ECW shocks.  Examples detailed below include an August 2010 incident when an officer repeatedly shocked an unarmed, naked subject who, as it turned out, was experiencing a diabetic emergency.

(3)    In effectuating an arrest, officers are permitted to use only the level of force reasonably necessary to accomplish a legitimate government objective; however, we found that PPB officers use more force than necessary in effectuating arrests for low level offenses involving people who are or appear to be in mental health crisis.  As detailed below, this includes, for instance, a May 2011 incident in which an officer punched an unarmed subject at least seven times in the face when responding to a call to check on the man's well-being.

We conclude that this pattern or practice results from deficiencies in policy, training, and supervision.  We recognize that many of the systemic deficiencies discussed in this letter originated prior to the current PPB administration, which has been aggressive in pursuing reform.  Notably, throughout the course of this investigation, Chief Reese and his command staff have been proactive in instituting policy reforms to address our concerns and have already begun the process of correcting many of the issues raised in this report.  By building on that initiative, and through strengthening of training, reducing the complexity and duration of the review and discipline processes and other measures, PPB can prevent unnecessary or unreasonable uses of force or self-identify incidents or patterns and undertake self-correcting action.  We believe strongly that in addition to protecting constitutional rights, addressing this problem will increase officer safety.  Officers need to be as prepared as possible for the situations that they face.

Our formal findings address use of force against people with actual or perceived mental illness.  In addition, we also examined allegations that there is a failure to provide adequate and timely access to medical care in the aftermath of certain uses of force, and looked carefully at concerns flowing from apparent tensions between PPB and certain communities in Portland.  We do not make any formal findings in these areas; however, our examination identified concerns regarding the failure to provide adequate and timely access to medical care and the need to strengthen community policing.  These concerns, including issues of significance involving the relationship between PPB and the African American community, are discussed in Section VII of this letter.

3

Exhibit 1
Pg. 3 of 42

Constitutional policing leads to increased public confidence, which in turns leads to greater public safety.  Addressing the deficiencies identified in this letter will help ensure that PPB provides police services in a constitutional manner and increases its efficacy in protecting the community.

## II.     DOJ INVESTIGATION

On June 6, 2011, we notified you by letter that we were opening an investigation of PPB, pursuant to Section 14141, to determine whether PPB was engaged in a pattern or practice of unconstitutionally using excessive force, particularly against people with mental illness.  Our investigation was prompted in part by the high number of officer involved shootings that involved people with mental illness.[1]

Our investigation has been exhaustive.  We reviewed a large volume of documents from PPB, interviewed police and City of Portland officials, and met with diverse members of the Portland community.  We also met with mental health services providers and officials from Multnomah County regarding the public mental health system's role in PPB interventions for people in mental health crisis.

In reaching our findings, we relied on highly respected consultants who have extensive experience in the delivery of police services, including expertise in officer accountability measures and police interactions with people with mental illness.  Accompanied by a veteran police chief, a psychiatrist who was instrumental in developing the Crisis Intervention Team ("CIT") model, and an expert in police internal affairs, DOJ conducted two tours of PPB, as well as in-person and telephonic interviews of witnesses and organizations that work with PPB.  The combined experience and knowledge of these nationally recognized law enforcement professionals have helped inform our findings.  These professionals conducted independent analyses of certain PPB policies, uses of force, and other data.

During our tours, we met with PPB command staff, representatives from both of the officers' unions, leadership from Internal Affairs, the Professional Standards Division, and the Training Department, among others.  In addition to meeting with you, we met with several agencies and organizations outside of PPB that are critical to PPB's mission, including the Bureau of Emergency Communications ("BOEC"), various local mental health providers, the City Auditor, representatives from the Independent Police Review ("IPR"), the Citizens Review Committee ("CRC"), and representatives from Multnomah County.  Additionally, we heard from hundreds of community members through a multitude of platforms including in-person interviews, our toll free hotline and dedicated email address, and at an open-invitation town hall meeting.

---

[1]     In the last three years, PPB officers have used deadly force 12 times, nine of which involved people affected by mental illness.  We do not reach a separate finding regarding PPB uses of deadly force, specifically.  We note, however, that our review of these uses of force contributed to our findings.

4

Exhibit 1
Pg. 4 of 42

The City and PPB have provided full and open cooperation in the investigation.  They provided us with prompt and complete access to documents, information, and personnel. Consistent with our commitment to conduct the investigation in a transparent manner, we have provided technical assistance and advice to PPB during our investigation.  We were gratified that PPB immediately undertook steps to address many of the concerns raised during those meetings. While we recommend additional reform, the efforts of PPB and its Chief thus far provide a solid foundation for sustainable measures that address our findings.

## III.     <u>BACKGROUND</u>

### A.     Portland, Oregon

According to recent Census data, Portland has an estimated population of 583,776, making it the 29th most populous city in the United States.[2]  Portland is Oregon's most populous city and the second most populous city in the Pacific Northwest region, after Seattle, Washington.  Approximately 9.4% of Portland's population is Hispanic or Latino (of any race), 7.1% is Asian, and 6.3% is African-American.[3]

Oregon has one of the highest rates of homelessness in the United States, with a large percentage of the homeless population concentrated in Portland.[4]  According to the U.S. Department of Housing and Urban Development, 34.7% of sheltered homeless adults nationwide have substance abuse disorders, and 26.2 % have serious mental illness.[5]

### B.     Portland Police Bureau

Currently, PPB is a police force of approximately 1,200 employees, with approximately 980 sworn officers and 240 non-sworn staff.[6]  PPB currently divides Portland into three precincts (North, East, and Central), with each precinct led by a commander and divided into as many as 20 districts.[7]

For over a decade, the City of Portland has periodically faced accusations that PPB uses excessive force against civilians.  Portland has paid out approximately $6 million in the last twenty years to settle lawsuits related to alleged police misconduct.  On multiple occasions, the

---

[2]     Profile of General Population and Housing Characteristics: 2010, U.S. CENSUS BUREAU, *available at* http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml (follow "Geographies" hyperlink; then follow "Places within State" and "Portland city, Oregon") (last visited Sep. 7, 2012).

[3]     *Id.*

[4]     Housing and Urban Development, *The 2010 Annual Homeless Assessment Report* at 22, www.hudhre.info/documents/2010HomelessAssessmentReport.pdf (last visited Apr. 2, 2012).

[5]     *Id.* at 18.

[6]     CITY OF PORTLAND, OREGON, FY 2011-2012 Budget in Brief, *available at* http://www.portlandonline.com/omf/index.cfm?c=55389&a=358662.

[7]     *See* Portland Police Bureau Precinct Map, http://www.portlandonline.com/police/index.cfm?c=43598& (last visited Apr. 2, 2012).

Exhibit 1
Pg. 5 of 42

City has attempted to study and address these issues. For instance, in 2003, Portland commissioned the Police Assessment Resource Center ("PARC") to conduct an annual review of officer-involved shootings and deaths in police custody. PARC provided recommendations on measures PPB should take to reduce the occurrence of these events, issued an initial report in August 2003, with follow-up reports in December 2006 and February 2009. [8] Portland also convened a Use of Force Task Force ("Task Force") to analyze statistics and trends in the use of force and deadly force, and retained the OIR Group to conduct an analysis of PPB's officer-involved shootings.

PPB has sought partnerships with various entities to improve its response to individuals with mental illness. For example, PPB has a relationship with Cascadia Behavioral Healthcare and can access their mobile mental health crisis response team, Project Respond, to provide PPB officers with assistance in certain mental health crisis situations. Due to resource limitations, Project Respond is unable to respond to many crises in a timely fashion, particularly after regular business hours, when such crises are more likely to occur. PPB also has developed a Mobile Crisis Unit, which helps connect individuals with mental illness with available mental health services. This unit is comprised of one police officer and a Project Respond worker. The program's benefits are limited, however, because the Mobile Crisis Unit is not intended to be called in an actual crisis situation and only works during regular business hours. Despite PPB's efforts to address concerns regarding officers' use of force, the overall record and prevalence of troubling incidents indicate that a problem persists.

## C.    Serious Deficiencies in the Mental Health System

On November 11, 2010, DOJ began a separate but related investigation to examine the State's compliance with Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, as interpreted in *Olmstead* v. *L.C.*, 527 U.S. 581 (1999), with respect to the services the State provides to individuals with mental illness.[9] Our state-wide investigation focuses on the needs of individuals with serious mental illness who enter high levels of care in acute in-patient psychiatric facilities, emergency rooms, jails, and prisons, largely because there are insufficient options for adequate community-based mental health services. Through our investigation, we assessed gaps in the State's mental health system, which lead to an increase in police encounters with people with mental illness, including people who are in crisis. As one high-level officer told us, over his career, encounters with people in crisis have gone from a couple of times a

---

[8]      *The Portland Police Bureau: Officer-Involved Shootings and In-Custody Deaths*, from the 2003 PARC Report, *available at* www.vera.org/download?file=667/363.209795pa_2.pdf.

[9]      During this investigation, DOJ met with more than 50 mental health stakeholders across Oregon, including consumers, advocacy groups, providers, and law enforcement. DOJ also met with State mental health leadership, including Governor John Kitzhaber, Oregon Health Authority Director Bruce Goldberg, and former Addictions and Mental Health Director Richard Harris. In addition, DOJ reviewed numerous reports, studies, and documents pertaining to Oregon's mental health system, many of them provided by the State. While we have not made formal findings in our ADA investigation, the State has undertaken a close collaboration with the Civil Rights Division to leverage health care reform to address gaps in services.

Exhibit 1
Pg. 6 of 42

month to a couple of times a day.  This is an especially significant problem in Portland, the urban center for the State, with its large homeless population.

The State is engaged in a health care transformation process that will be designed to address many of these gaps.  In the meantime, the current system places a large and increasing burden on law enforcement.  Among the most significant issues are:

- A lack of an adequate support system to help people avoid a mental health crisis, including adequate community-based intensive services, supported housing, and early intervention.  Many individuals receive services through only an emergency room or a jail.

- A lack of an adequate crisis response system to provide services to and help stabilize people in crisis.  People in crisis are more likely to encounter the criminal justice system than the mental health system.

The Addictions & Mental Health Division ("AMH") has a longstanding practice of delegating service delivery and decision making.  Consequently, Oregon lacks a coordinated, statewide community mental health system.  Individuals enrolled in the Oregon Health Plan are served through one of nine regional Mental Health Organizations, while non-Medicaid individuals are served through one of Oregon's 36 county mental health programs.  Services vary somewhat across Mental Health Organizations and vary drastically across counties.  Generally, non-Medicaid individuals receive no intensive community-based services at all and, although Medicaid individuals receive some community-based services, the services that they receive fall far short of the necessary array.  A very high number of these individuals live in Portland.

While some crisis services exist in Portland, due to the lack of a comprehensive state-wide crisis system, there is an overreliance on local law enforcement, jails, and emergency rooms.  Accordingly, when individuals experience a mental health crisis, there is inadequate capacity of mobile crisis teams, crisis walk-in/drop-off centers, and crisis apartments to help people remain in integrated, community-based settings.  Instead, law enforcement often is the first responder to a crisis, and the officers have few if any options other than to take the individual in crisis to a jail, emergency room or institution, causing a rotating door in and out of the criminal justice system.

The State also lacks adequate capacity of community-based supports and services to keep individuals out of crisis.  Adequate resources, such as sufficient numbers of Assertive Community Treatment teams, Intensive Case Management, peer support, and supported employment, are limited,[10] while Intensive Case Management is being piloted only in Multnomah County.[11]  Consequently, individuals unnecessarily enter into, are at risk of entering

---

[10]     DHS Community Services Workgroup Report at 15, 18, 27 (March 2007).
[11]     Team listening tour meeting with Karl Brimner, Mental Health Director for Multnomah County (Dec. 16, 2010).

Exhibit 1
Pg. 7 of 42

into, and cycle through jails, emergency rooms, hospitals, and institutions to receive treatment for their mental illness.

For a number of months, DOJ has been working collaboratively with State officials to resolve many of these outstanding issues. The gaps in the mental health system increase the encounters between PPB and persons with mental illness. PPB is often the first and sometimes the only responder to a crisis. This places both a burden and a responsibility on the Police Bureau to require that PPB policy, training, and supervision ensure that force be used against persons with mental illness only to the extent permitted by the Constitution.

## IV.    APPLICABLE LEGAL STANDARD

### A.    Pattern or Practice

Pursuant to Section 14141, the Attorney General, acting on behalf of the United States, is authorized to initiate a civil action against a state or local government for equitable and declaratory relief when there is reasonable cause to believe that law enforcement officers are engaged in a pattern or practice of conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or federal law. A pattern or practice may be found by examples representing typical conduct, as opposed to isolated instances. *Int'l Bhd. of Teamsters* v. *United States*, 431 U.S. 324, 336 n.16 (1977) (noting that the phrase "pattern or practice" "was not intended as a term of art," but should be interpreted according to its usual meaning "consistent with the understanding of the identical words" used in other federal civil rights statutes); *United States* v. *Big D. Enters.*, 184 F.3d 924, 930 (8th Cir. 1999) (applying Title VII definition of pattern or practice to Fair Housing Act claim). This understanding is consistent with the usual meaning of the words "pattern or practice." *See Webster's Third New Int'l Dictionary* 1657, 1780 (Philip Babcock Grove, ed., 2002) (defining "pattern" as "a representative instance: a typical example" and "practice" as "performance or application habitually engaged in").

Consistent with this definition, courts interpreting the term in similar statutes have established that anecdotal evidence is sufficient; statistical evidence is not required. *Catlett* v. *Mo. Highway & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987) (interpreting "pattern or practice" in the Title VII context and citing *Hazelwood Sch. Dist.* v. *United States*, 433 U.S. 299, 307-08, 97 S. Ct. 2736, 2741 (1977) (for statistical evidence) and *Briggs* v. *Anderson*, 796 F.2d 1009, 1019 (8th Cir. 1986) (noting that "statistical evidence is not essential in proving" pattern or practice Title VII claim," and anecdotal evidence may be relied upon)). For a court to find a pattern or practice, it does not need to find a set number of incidents or acts. *See United States* v. *W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("The number of [violations] . . . is not determinative . . . . In any event, no mathematical formula is workable, nor was any intended. Each case must turn on its own facts").

8

Exhibit 1
Pg. 8 of 42

B.    **Excessive Force**

Excessive force claims in the context of an investigatory stop, arrest, or other "seizure" of a free individual are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham* v. *Connor*, 490 U.S. 386, 394-95 (1989); *see also Davis* v. *City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (considering the "quantum of force" used relative to the availability of less severe alternatives).  To determine whether the force used is reasonable, the nature and quality of the intrusion on the individual's Fourth Amendment interests are balanced against the legitimate governmental interests at stake.  *Graham*, 490 U.S. at 396; *see also Blankenhorn* v. *City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (same).

In making this determination, courts consider the totality of the circumstances, including: (a) the severity of the crime at issue; (b) whether the subject poses an immediate threat to the safety of the officers or others; (c) whether the subject is actively resisting or attempting to evade arrest; and (d) whether law enforcement could have used other methods to accomplish its purpose. [12]  *Graham*, 490 U.S. at 396; *Davis*, 478 F.3d at 1054-56.  The "most important" factor under *Graham* is whether the suspect posed an "immediate threat to the safety of the officers or others."  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).  "A simple statement by an officer that he fears for his safety or the safety others is not enough; there must be objective factors to justify such a concern."  *Deorle* v. *Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).  These factors, however, are not exclusive.  Courts also consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*, including "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."  *Glenn* v. *Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).  Notably, "[e]ven when an emotionally disturbed individual is 'acting out and inviting officers to use deadly force,' the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."  *Id.* at 876.

---

[12]       PPB's policy on physical force requires that officers "use only the force reasonably necessary under the totality of the circumstances to perform their duties and resolve confrontations effectively and safely."  PPB Manual of Policy and Procedure ("PPB Manual") § 1010.20 (Jan. 2009).  When determining if a member has used only the force reasonably necessary to perform their duties, PPB states that it will consider the totality of circumstances, including:  the severity of the crime; the impact of the persons behavior on the public; the immediate threat to the safety of officers, self, or others; the extent to which the person actively resisted efforts at control; whether the person attempted to avoid control by flight; and the time, tactics, and resources available.  *Id.*  According to the PPB Manual, force is only permissible to prevent or terminate the commission or attempted commission of an offense; lawfully take a person into custody, make an arrest, or prevent an escape; prevent a suicide or serious self-inflicted injury; defend the officer or another person from the use of physical force; and accomplish some official purpose or duty that is authorized by law or judicial decree.  *Id.*  Officers are expected to display, over the course of their career, the ability to regularly resolve confrontations without resorting to the higher levels of allowable force.  *Id.*

Exhibit 1
Pg. 9 of 42

Using a focused "decision-point" approach (also known as segmentation) to analyze each use of force incident, we considered each point when an officer made a decision that may have an effect on subsequent events, as opposed to focusing solely on the final decision to use force. The decision-point process allows the police supervisor to conduct more intensive and comprehensive reviews of the reasonableness of a particular use of force incident and to identify and address any flawed tactical decisions and training opportunities. According to the Ninth Circuit, "police tactic[s] that needlessly or unreasonably create a dangerous situation necessitating an escalation in the use of force" are "a course of action this circuit has expressly refused to endorse." *Deorle*, 272 F.3d at 1282 n. 20 (citing *Cunningham* v. *Gates*, 229 F.3d 1271, 1291 n.23 (9th Cir. 2000)). Other courts have similarly denounced unnecessary escalation of force and have held that each individual use of force should be evaluated independently for reasonableness. *See, e.g.*, *Plakas* v. *Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994) ("[W]e carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage"); *Livermore* v. *Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (noting that "the proper approach under Sixth Circuit precedent is to view excessive force claims in segments"); *Wiegel* v. *Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) ("There is evidence that for three minutes the troopers subjected [subject] to force that they knew was unnecessary to restrain him . . .").

## V.    FINDINGS

We conducted an exhaustive investigation, in which we reviewed over 700 incident reports over an 18-month period, including Force Data Collection Reports ("FDCRs") and supervisory After Action Reports ("AARs"),[13] PPB's policies and procedures, training materials, internal affairs files, and various other documents related to PPB's use of force, as well as numerous interviews with current and former PPB officers and community members across the range of race, age and socio-economic status. As noted above, most uses of force we reviewed during this investigation were constitutional; however, we find reasonable cause to believe that PPB is engaged in a pattern or practice of unnecessary or unreasonable force against people with actual or perceived mental illness. This pattern or practice is manifest through the excessive and inappropriate use of ECWs and by using more force than necessary to effectuate arrests for low-level offenses. Below, we describe specific incidents which have been culled from a larger group of problematic cases, to illustrate this pattern.

### A.    Excessive Force against People Experiencing a Mental Health Crisis Generally

A significant percentage of encounters between individuals and police involve persons with mental illness. These encounters emerge in a range of contexts from responses to calls to

---

[13]    PPB Policy requires officers to fill out a FDCR anytime that they cause a physical injury or take a person to the ground by applying force and requires supervisors to fill out an AAR whenever officers use certain types of force, e.g., ECW deployment and canine use. PPB Manual §§ 940.00, 1010.20. Notably, the documents we reviewed largely reflect only the officer's account of what happened, but nevertheless reveal concerning patterns of excessive force.

10

Exhibit 1
Pg. 10 of 42

check on a person's well-being to arrests for criminal behavior.  We recognize the challenges that people with mental illness, especially people in a mental health crisis, pose to the delivery of police services.  It is critical that PPB's practices adequately take into account the populations that PPB encounters and serves.  PPB must also take into account behaviors that are the product of mental illness in all encounters.

Police encounters with individuals who are mentally ill can quickly escalate.  Practices and strategies to de-escalate these incidents to protect the safety of both the individual and the officer are required.  There are systems law enforcement agencies can put in place to ensure that its officers can effectively de-escalate such encounters; minimize the risk of danger; and reduce the level of force needed to handle interactions with people in mental health crisis.  It is critical that officers are adept at using these non-force policing tools, not only to protect themselves and others, but because individuals who suffer from mental illness are among the most vulnerable in our society, and neither they, nor their families, should be afraid to turn to the police for help.  Properly applied, de-escalation begins long before the officer is faced with the choice of using force and will often make that decision unnecessary.

The law recognizes that police response to persons in mental health crisis requires special consideration.  When dealing with someone with a mental illness, officers must take into account the subject's mental and emotional state before using force.  *Deorle*, 272 F.3d at 1282; *Glenn*, 673 F.3d at 871-80 (reversing a grant of summary judgment for the defendant police department when the police responded to a welfare call and within four minutes of their arrival shot with a beanbag gun a suicidal teenager armed with a pocketknife and then fatally shot him with a rifle).  This is because "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Deorle*, 272 F.3d at 1282-83.

Even "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Id.* at 1283.  The same reasoning applies to intermediate levels of force.  *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010).  As the Ninth Circuit poignantly stated:

> A mentally ill individual is in need of a doctor, not a jail cell, and in the usual case – where such an individual is neither a threat to himself nor to anyone else – the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal.  Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him.  The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force

11

Exhibit 1
Pg. 11 of 42

that would be justified against a person who has committed a crime or who poses a threat to the community.

*Id*.

We found that PPB officers often do not adequately consider a person's mental state before using force and that there is instead a pattern of responding inappropriately to persons in mental health crisis, resulting in a practice of excessive use of force, including deadly force, against them. Further, our review of incident reports and interviews with officers and community members shows little or no indication that the officers considered, or were even aware of, the many tools available to them to resolve interactions with individuals in mental health crisis using less force. We recognize that such tools cannot guarantee a positive outcome with minimal use of force in every instance. Moreover, not every encounter we reviewed was mishandled. Many officers handled difficult interactions with mentally ill persons in an exemplary manner. Nevertheless, we found that in many other instances officers escalate conflict despite the opportunity to de-escalate; rush in when they have the option of holding back; and continue to use force once the need for force has dissipated. The following examples illustrate the pattern or practice:

- In May 2011, officers were called to the home of a subject with a history of mental illness who had allegedly assaulted his mother and was reportedly in possession of a sword. When the officers arrived, the subject was in his bedroom and ignored the officers' orders to come downstairs. Several officers approached the subject's bedroom, opened the door, and commanded the subject to stand up and place his hands above his head. The subject stood up, but refused to place his hands on his head and walked towards the door. An officer shot the subject with a beanbag shotgun round to his leg. Another officer deployed his ECW on the subject's back. This occurred despite the fact that the subject's hands were visible, and the officers never observed a sword, or any other weapon, in the subject's possession.

  The intrusion on the individual's Fourth Amendment rights is substantial, i.e., being shot with a bean bag gun and shocked with an ECW in the back. The government interest in using this level of force to execute this arrest is, at best, moderate: (1) The subject had allegedly assaulted his mother, which is a serious offense. (2) While the subject reportedly had a sword, the officers did not report seeing a sword, or any other weapon, nor being threatened with one. The officers did not report any aggressive behavior from the subject. Accordingly, any perceived threat to the officer based on the initial report of a sword was mitigated by the lack of any present threat at the time they applied force. (3) The suspect was neither evading arrest nor actively resisting arrest. Other relevant factors include that the officers were aware the person had a history of mental illness, but did not appear to take that into account. Also, there were less intrusive alternatives available than shooting the suspect with a bean bag gun and using an ECW on him, including keeping him confined to his room while waiting for a crisis intervention specialist to help communicate with him. The

12

Exhibit 1
Pg. 12 of 42

totality of the circumstances indicates that the intrusion into the subject's Fourth Amendment rights outweighed the legitimate government interest.

- In December 2010, two officers responded to a call to help Project Respond contact a subject that they wanted to evaluate for mental health purposes. The subject complied with the officers' requests to come out of his room, place his hands on top of his head, and take a seat in the hallway. The officers searched him for weapons and did not find anything dangerous in his possession. Once seated, the subject began making incoherent statements, prompting the Project Respond workers to request that officers detain the subject on a mental health hold. When the officers went to grab the subject by his arms, he tensed up and began to pull away. The officers attempted to take the subject to the ground, but the subject rolled forward onto his back. The officers turned the subject onto his stomach, at which point the subject trapped his arms underneath his body. One officer drew his ECW and told the subject to "give us your hands or you'll be tased," and then applied it in drive stun mode to the subject's back.[14] The subject continued to pull away, and the officer applied his ECW "several" more times. Then one officer hit the subject up to six times with closed fist punches to the rib area. Another officer delivered a focused blow with his closed fist to the back of the subject's neck/shoulder area. The officers remained unable to handcuff the subject and deployed another six ECW cycles in probe mode. The officers then handcuffed and transported the subject to a mental health hospital for evaluation.

  The intrusion on the individual's Fourth Amendment rights – being shocked with an ECW multiple times, in both probe and drive stun mode, and hit multiple times – is substantial. The government interest in using force to detain this individual pursuant to a mental health hold is moderate, at best: (1) the person was unarmed and did not engage in threatening conduct towards the officers or others at the time of arrest; (2) the officers were there to perform a welfare check, not to arrest someone for committing a crime; and (3) the subject offered passive resistance by pulling away from officers and not allowing himself to be handcuffed. Also relevant is the fact that the officers knew they were responding to a call to assist Project Respond make contact with a mentally ill subject, and thus should have been aware of the increased likelihood that the subject's ability to understand or follow the officers' commands is impaired. On balance, the intrusion into the subject's Fourth Amendment rights outweighed the legitimate government interest.

---

[14]      A drive stun is the use of an ECW by direct contact to a subject, rather than by deploying wire probes common to Taser models of ECWs, like those used by PPB. Use of the wire probes creates a circuit intended to cause neuromuscular incapacitation. While a subject is incapacitated, an officer can handcuff the subject. In contrast, drive stun when not used with probes spread across the subject's body, is not intended to cause incapacitation. It only causes pain to compel compliance. Drive stun, therefore, is a pain compliance method without the benefit of intended incapacitation.

Exhibit 1
Pg. 13 of 42

PPB's current policies do not require officers to take into account the effect that a
person's mental illness may have on their ability to understand commands or the consequences
of their actions.  PPB policies also fall short in specifying how to de-escalate situations involving
people in mental health crisis.  For example, PPB policy 870.20 currently requires all individuals
to be handcuffed prior to entering a custodial, detoxification, or hospital facility.  PPB policy
provides officers leeway to use alternative means of securing an individual if the individual has
"an injury or other condition that would be further exacerbated by handcuffing."  PPB Policy
870.20.  In practice, though, PPB does not treat mental illness as a condition that would further
exacerbate the individual's condition.  The PPB officers we interviewed provided a uniform
consensus that it is standard PPB policy to handcuff a suicidal individual for transport to the
crisis center.  As discussed with mental health professionals, this practice may indeed escalate a
suicidal individual's mental state, causing a physical and emotional reaction from the individual.
*See Deorle*, 272 F.3d at 1282 (finding that when dealing with a disturbed individual escalating
force may "exacerbate the situation.").  When officer safety is not implicated, officers should
have the discretion to consider mental health as a condition permitting alternative means of
securing the individual.

B.    **Excessive Use of ECWs Against Persons in, or Perceived to Be in a Mental Health
       Crisis**[15]

       Through our review of use of force reports and interviews with the public, we
encountered numerous incidents where PPB officers deployed ECWs in a manner that was
contrary to PPB policy and generally acceptable ECW practices.  For instance, PPB officers are
engaged in a pattern of using ECWs without warning, using multiple ECW discharges on a
single subject (sometimes by multiple officers), and failing to reevaluate the appropriateness of
the ECW between cycles.  These practices engender fear and distrust in the Portland community,
which ultimately impacts PPB's ability to police effectively.

       Courts recognize that use of an ECW constitutes an "intermediate or medium, though not
insignificant, quantum of force," as the pain is intense, is felt throughout the body, and is
administered by effectively commandeering the victim's muscles and nerves.  *Bryan*, 630 F.3d at
824-25.  Beyond the experience of pain, ECWs can result in "immobilization, disorientation, loss
of balance, and weakness," even after the electrical current has ended.  *Matta–Ballesteros* v.
*Henman*, 896 F.2d 255, 256 n.2 (7th Cir.1990); *see also Beaver* v. *City of Federal Way*, 507
F.Supp.2d 1137, 1144 (W.D. Wash. 2007) ("[A]fter being tased, a suspect may be dazed,
disoriented, and experience vertigo").  The use of an ECW on a person could result in serious
injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall.
*Bryan*, 630 F.3d at 824-25.  And, ECW use can result in death.[16]

---

[15]     While we make a finding that the inappropriate use of ECWs is part of a pattern or practice of excessive
force against persons with mental illness, we do have concerns about ECW use generally and identified incidents
when they were used inappropriately against persons who were not in apparent crisis.

[16]     NATIONAL INSTITUTE OF JUSTICE UNITED STATES, NIJ SPECIAL REPORT: STUDY OF DEATHS FOLLOWING
ELECTRO MUSCULAR DISRUPTION (2011), *available at* https://www.ncjrs.gov/pdffiles1/nij/233432.pdf.

Exhibit 1
Pg. 14 of 42

Pursuant to the PPB Manual, an officer is authorized to use an ECW when "a person engages in or displays the intent to engage in" physical or aggressive physical resistance to a lawful police action or suicidal behavior.  PPB Manual § 1051.00.  PPB officers are required to provide a warning to the subject, if feasible, before using the ECW.  *Id*.  By policy, PPB officers are also prohibited from using ECWs on people who are engaged in passive resistance, rather than active resistance, and on people who are in handcuffs, except for in limited circumstances, and only after seeking supervisory approval.[17]  *Id*.  The following example, in addition to those above, is illustrative of PPB's inappropriate ECW usage, all of which were approved by the chain of command, despite describing ECW usage that is against policy.

- In August 2010, three officers responded to a complaint about a person screaming inside their apartment.  The officers obtained a key from the front desk and entered the apartment after announcing their entry.  They encountered an unarmed, naked man laying on the floor of his apartment screaming for help.  The person leapt up when he saw the officers and ran towards them.  The officer immediately, without warning, deployed his ECW at the subject's chest.  The subject fell to the ground, but when he attempted to get back up, the officer deployed his ECW for three additional five-second cycles.  It turned out the suspect was diabetic and experiencing a medical emergency.

  The intrusion on the individual's Fourth Amendment rights, being shocked with an ECW four times without warning while experiencing a medical crisis, is substantial.  The government interest in using force to execute this arrest is slight:  (1) though the officers may have felt threatened when the individual ran towards them, this threat is mitigated, at least in part, by the presence of three PPB officers facing a naked, unarmed individual; (2) the officers were present to conduct a check on the man's well-being; there was no suspicion of criminality; and (3) the subject was not under arrest and neither evaded nor resisted arrest.  On balance, the intrusion into the individual's Fourth Amendment rights outweighs the legitimate government interest.  If any ECW usage was necessary, the officers should have approached the subject and attempted to effectuate the arrest using their hands during the first ECW cycle.

Ambiguities within PPB's ECW policy contribute to an excessive use of force with ECWs.  For instance, the directive that officers may use an ECW when a subject "displays the intent to engage in" aggressive or physical resistance, places the officer in the difficult position

---

[17]    Similarly, the joint Police Executive Research Forum's ("PERF") and Community Oriented Policing Services ("COPS") 2011 Electronic Control Weapon Guidelines, states that:  "ECWs should be used only against subjects who are exhibiting active aggression or who are actively resisting in a manner that, in the officer's judgment, is likely to result in injuries to themselves or others.  ECWs should not be used against a passive subject."  2011 ELECTRONIC CONTROL WEAPON GUIDELINES, *available at* www.policeforum.org/library/use-of-force/ECWguidelines2011.pdf.

Exhibit 1
Pg. 15 of 42

of determining when such an intent is manifested.  Also, PPB defines "physical resistance" as "actions that prevent or attempt to prevent an officer's attempt to control a subject, but do not involve attempts to harm the officer."  PPB Manual § 635.10.  This definition could easily include incidents where the subject is passively resisting arrest and poses no harm to the officer.  Further, PPB's policy does not provide any guidance regarding the maximum number of ECW cycles an officer may deploy or limit how many officers can deploy their ECW at a single subject, absent exigent circumstances.

The lack of clarity with respect to PPB's ECW policy was apparent at a January 2012 Use of Force Peer Review meeting, where we observed general confusion amongst the officers in attendance regarding the appropriateness of ECW usage in several of the cases up for discussion.  For instance, officers questioned whether PPB's ECW policy permitted the deployment of an ECW against an individual who failed to comply with an officer's relatively simple command, i.e., to stop walking away from the scene of a traffic stop or open a car door, but otherwise did not act in a threatening manner.  Further, the group struggled to reconcile PPB's ECW policy, which allows ECW usage even when the subject is not engaging in threatening conduct, with recent Ninth Circuit case law.  In several instances, the officers noted that the officer in question resorted to the use of an ECW, which is known to "escalate" situations, before attempting any "desescalation techniques."  It is not surprising to us, then, that officers are using ECWs excessively and inappropriately, given the state of confusion amongst those responsible for reviewing uses of force.

## C.    Unnecessary Escalation of Force Against Persons in Actual or Perceived Mental Health Crisis

Our review of PPB's use of force reports reveals circumstances in which officers use unnecessary or unreasonable amounts force against persons who are or appear to be in mental health crisis when encounters escalate as a result of behavior that are the product of mental illness.  These encounters are often unrelated to a criminal violation or are for low level violations.  Sometimes these encounters begin as "mere conversations,"[18] but escalate to unnecessary power struggles between the subject and the police officer.  The pattern we observed sometimes includes the unnecessary use of ECWs and beanbag guns, as well as instances where an officer hit a subject with multiple fist strikes to the head, after any threat had abated.  In each case, it appears that a lesser use of force was appropriate, or force could have been avoided altogether, had de-escalation techniques been employed at an earlier stage.  De-escalation techniques are an important tool for officers to employ in order to avoid unnecessary and potentially excessive uses of force.

---

[18]    Oregon courts define "mere conversation" as "noncoercive encounters that are not 'seizures,'" recognizing that the primary distinction between the two is that the latter involves "the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty."  *State* v. *Ashbaugh*, 244 P.3d 360, 366 (Or. 2010).

Exhibit 1
Pg. 16 of 42

The Ninth Circuit identifies uses of force as excessive when the underlying offense is low level and/or the subject posed little threat of harm. *See, e.g.*, *Davis*, 478 F.3d at 1055 (holding that repeatedly throwing a handcuffed plaintiff up against a wall and on the ground, ultimately breaking his neck, was unreasonable when the plaintiff was detained for loitering in a nonpublic area of a casino and posed no threat to officers); *Winterrowd* v. *Nelson*, 480 F.3d 1181, 1186 (9th Cir. 2007) (holding that officer's manual manipulation of plaintiff's injured shoulder during pat down was objectively unreasonable for non-threatening suspect detained during ordinary traffic stop); *Blankenhorn*, 485 F.3d at 478 (misdemeanor trespass not sufficiently severe to warrant gang tackling plaintiff); *Drummond* v. *City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) (recognizing that force was excessive, particularly considering that police were there to perform a public safety check and medical transport; noting there was no underlying crime at issue); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (use of force was excessive where evidence of an underlying crime was "minimal and purely speculative" and plaintiff posed no threat).

Both ECWs and beanbag guns are less-lethal weapons that officers are permitted to use *only* when there is a strong government interest at stake. *Glenn*, 673 F.3d at 871-72. Similarly, fist strikes to the face are considered to be a severe degree of force that also require a strong government interest to justify use. *Benas* v. *Baca*, 2005 WL 3397401, at *1 (9th Cir. Dec. 12, 2005) (holding that officer's "use of force in the form of a closed-fist punch to [subject's] face was so severe that it precludes summary judgment" on citizen's 42 U.S.C. § 1983 claim). Our review of FDCRs revealed numerous examples in which officers used ECWs, beanbag guns, and multiple fists strikes beyond what was necessary to effectuate the arrest and a failure to consider less intrusive alternatives.[19] The following examples are illustrative of the pattern:

- In May 2011, an officer was called to check on an unarmed man who had been standing in the rain for over an hour. The officer was unable to speak to the subject because of a language barrier and returned to his car to call for assistance from a Spanish speaking officer. When the officer stepped out of his car, the subject approached the officer and kicked at the officer, but did not make contact. The officer caught the subject by the leg and threw the subject to the ground. The subject rolled onto his back and the officer proceeded to punch him 7-10 times in the face, while the subject grabbed at the officer's hands to try and stop the blows.

    The intrusion on the individual's Fourth Amendment rights is substantial, i.e., being punched 7-10 times in face. The government interest in using this level of force to

---

[19]    While attending a training session on less-lethal weapons, the Department observed the Training Department showcase as exemplary an FDCR that resulted from the controversial use of a beanbag gun on an unarmed, 12-year-old girl based on the charge of trespassing and resisting arrest. Whether or not the officers' conduct in that situation was ultimately deemed appropriate, few would argue that that the use of a beanbag gun in that circumstance was ideal and worthy of emulation. We informed PPB of our observations at the training and our belief that the Training Department was conveying a callous attitude toward officer violence in using that incident as a positive example. Thereafter, Chief Reese forbade training officers from using that incident as a model of the appropriate use of a less-lethal weapon. We applaud this corrective action.

Exhibit 1
Pg. 17 of 42

execute this arrest is moderate: (1) the subject did not display a weapon, but he did unsuccessfully attempt to kick at the officer before being taken to the ground. Whatever threat the officer perceived was largely mitigated once he forced the subject to the ground, before he repeatedly punched the subject in the face. (2) While there was no initial offense – standing in the rain is not a crime – assaulting an officer is a serious offense. (3) The subject did not evade or resist arrest, but attempted to grab the officer's hands in self-defense, while being punched in the face. Other relevant factors include whether the officer considered if the subject had an emotional or mental illness, given that he had been standing in the rain for over an hour and behaved erratically. Also, there were less intrusive alternatives available than punching the subject in the face 7-10 times. The officer made no attempt to explain in his FDCR why so many punches to the head were necessary to control the subject. On balance, considering the totality of the circumstances, the intrusion into the subject's Fourth Amendment rights outweighed the legitimate government interest.

- In May 2010, officers were called to investigate a complaint that someone was spitting on cars. Noting that the subject appeared to be suffering from a mental breakdown, the officer reported that the subject raised his fists to the officer's face in an effort to show the officer his hospital identification bracelet. That officer ordered the subject to back up, but he did not and instead took what the officer described as a "fighting stance." The officer pepper sprayed the subject, who then reacted by walking backwards towards the street. The officer warned the subject that if he did not sit down, the officer would deploy his ECW on him. The subject did not sit down, and the officer deployed his ECW four times in succession before placing the subject in handcuffs. The officer claimed that he deployed his ECW multiple times because the subject had curled into a "turtle position" and would not extend his arms, as ordered, to be handcuffed. Two other officers were on the scene during this incident.

The intrusion on the individual's Fourth Amendment rights, which includes being pepper spayed in the face and then shocked with an ECW four times, is substantial. The government interest in using force to execute this arrest is slight: (1) the subject neither displayed a weapon nor made any aggressive movements towards the officer, and thus it is unlikely a reasonable officer would believe that the subject posed an immediate threat to the safety of the officers or others. The only threatening conduct the officer identified was that the subject raised his fist to the officer's face and took a "fighting stance," but the officer had previously attributed the raising of the fist as the subject's attempt to show the officer his hospital bracelet. (2) Spitting on passing cars is a low-level offense, if an offense at all and does not warrant this degree of force. (3) The suspect made no attempt to evade arrest by flight nor did he actively resist arrest. Also relevant is the officer's initial observation that the person appeared to be experiencing a mental breakdown, but no efforts were made to account for this. On balance, we find that the intrusion on the individual's Fourth Amendment rights outweighs the legitimate governmental interests at stake. Nonetheless, the supervisor who completed the AAR on this incident found the

18

Exhibit 1
Pg. 18 of 42

use of force to be within policy and no attempt to even counsel the officer on better tactics was even offered.

This pattern or practice of excessive force is the result of deficient policy and training, as well as inadequate supervision. Officers are required to consider the severity of the crime, the threat posed, whether there are less intrusive alternatives available, as well as a subject's mental state, before using force, but these examples reflect a failure to properly take these factors into account. *Glenn*, 2011 WL 6760348, at *6. Further, PPB's failure to identify these excessive uses of force as being out of policy, results in a missed opportunity to take corrective action. These incidents, among others we reviewed, raise concerns about PPB's ability to manage uses of force to ensure they are proportionate to the threat posed and the severity of the crime at issue.

## VI.   SYSTEMIC CONTRIBUTING DEFICIENCIES

Systemic deficiencies contribute to PPB's pattern or practice of excessive force, including: (1) deficiencies in responding to persons with mental illness or in mental health crisis; (2) inadequate reviews of officers' use of force; and (3) inadequate investigations of officer misconduct.

### 1.   Deficiencies in Responding to Persons with Mental Illness or in Mental Health Crisis

Our investigation revealed two systemic deficiencies contributing to unconstitutional uses of force against people in mental health crisis: (1) the absence of officers specially trained in and proficient at responding to mental health crisis; and (2) the lack of strategic disengagement protocols involving mental health providers. [20] As Chief Reese has expressed, police officers are often the first responders to an incident involving a person in mental health crisis. There is no doubt that the City suffers from the significant gaps in the statewide mental health system. While DOJ is working with the State in a related statewide investigation to address the gaps in the system for persons in mental health crisis, police involvement will continue to be tethered to the State's mental health service delivery system. PPB therefore needs tools to handle these incidents in a constitutional and safe manner, though we appreciate that no process is an absolute guarantee against all poor outcomes.

#### a.   Lack of Officers Specially Trained in and Proficient at Responding to Mental Health Crisis

PPB provides all of its officers with an initial 40 hours of crisis intervention training and dedicates a portion of its annual in-service training to this topic. PPB does not, however, have a specialized CIT team that consists of officers who have expressed a desire to specialize in crisis

---

[20]    Two other recommendations address agencies outside the scope of our investigation: (1) assist the BOEC to allow referrals of Mental Health Crisis calls within Project Respond's limited infrastructure; and (2) coordinate with State and County on Revision of the Civil Commitment Process.

Exhibit 1
Pg. 19 of 42

intervention and have demonstrated a proficiency at responding to individuals in mental health crisis.[21] While we commend PPB for training all officers on crisis matters, this approach assumes incorrectly that all PPB officers are equally capable of safely handling crisis situations and fails to build greater capacity among qualified officers. Certainly circumstances will arise when a specialized crisis intervention officer is not immediately available, or when despite the training and experience, a specialized crisis intervention officer is unable to de-escalate a situation sufficiently to prevent the need of a significant use of force. However, there is growing evidence that a crisis team response is likely to result in a better outcome and reinforce public confidence in policing.

First, not every officer is well suited to effectively deal with people with mental illness. For example, during our investigation a patrol officer stated that his job was "to put people in jail, not to provide social services." This officer would not be the appropriate officer to conduct a welfare check on person with mental illness. A team of crisis intervention officers reduces the likelihood of encounters of such officers with people in mental illness crisis. Crisis intervention training done with experienced patrol officers and the leadership of a dedicated police-based crisis intervention coordinator also creates a culture change among officers, which often then permeates an agency.

Second, departments cannot rely on academy crisis intervention training to develop officer expertise in working with individuals with mental illness. New recruits in a basic police academy are not generally ready to receive, absorb and implement critical information about how mental illness calls need a different response than the more common police calls. Trainees at that level are overwhelmed with information and generally lack the maturity that experience brings them on the street. Although basic mental health training should be provided to all officers as part of the academy, it is not the optimal time to provide extensive crisis intervention training.

In addition, the 40-hour crisis intervention training curriculum is not what makes a specialized crisis intervention officer an expert in handling mental illness calls. Expertise requires vast field experience developed by CIT officers as they are dispatched to mental illness crisis calls. If 25% of patrol officers are ultimately trained as CIT officers and those officers are dispatched to as many of the mental illness calls as possible, that translates to those officers handling four times as many calls as would be the case if the calls were evenly distributed across the patrol force.

Although PPB previously had a specialized crisis intervention unit, it was not successful because PPB personnel generally perceived it as low in professional status. It was staffed only by volunteers; many officers in the weeklong training course did not view the curriculum as relevant; and the officers generally viewed membership negatively. Crisis intervention officers

---

[21]    PPB does have a dedicated "Crisis Response Unit," which PPB call their "Mobile Crisis Unit," but it consists of only a single Central Precinct patrol car in which one PPB officer is paired with a Cascadia mental health worker four days a week between the hours of noon and 10 PM.

Exhibit 1
Pg. 20 of 42

did not receive a special status like PPB's SERT trained officers.  Instead, PPB officers viewed the original crisis intervention officers as just providing transport to people in crisis without extra pay or prestige.  PPB has many officers and leaders who are committed to providing care to people with mental illness and will assure good outcomes in their encounters with people with mental illness.  Just like an officer trained to negotiate a hostage situation or a SERT officer specially trained for tactical situation, officers with skills to negotiate with a person in a mental health crisis are essential for PPB's success in protecting the public.

Crisis intervention training as currently delivered by PPB is a police based training lacking important community collaboration.  It appears that the curriculum is developed by PPB and that the training is opaque to the community at large.[22]  This is problematic for PPB's ability to understand the community it must serve and protect.  There does not appear to be good reason to deny reasonable access to a crisis intervention course to consumers, family members, advocates, or mental health workers.  Also absent from the current PPB crisis intervention training is live exposure to consumers and family members.  One of the most effective ways to address the stigma of mental illness is to increase direct exposure to people with mental illness.  The opportunity for officers to now see people, who may have been violent offenders when ill, as stable contributors in a crisis intervention class is a powerful game changer in crisis intervention training programs.  Indeed, our investigation revealed that officers harbor fear around the dangerousness of persons experiencing mental health crisis, or those with mental illness.  While DOJ does not minimize the potential danger involved, the level of concern generally within PPB is higher than our expert has seen within other agencies.  By including persons in recovery in a crisis intervention class, PPB will not only involve the community, but it may also lower the level of fear, and lead to less fear-based unintended consequences.

Furthermore, the current training in the basic and advanced academies involves training modules scattered over multiple days.  The impact of a weeklong crisis intervention training experience is lost.  Our investigation also found that PPB abandoned live role playing, replacing role plays with discussions of scenarios.  Discussions of given scenarios cannot replace role-playing realistic scenarios in front of peers.  Role-playing is generally viewed as a key element to a successful police training in general and a crisis intervention program in particular.

In the training PPB currently provides its officers, there is a clear acceptance of the "crisis cycle," the need to identify people in crisis, and application of the skills, including interpersonal communication skills, to help people through a crisis.  However, many PPB officers fail to recognize that persons with mental illness need to be dealt with *differently*, and may react very differently to police assistance, than an average citizen.  Officers must have the tools to identify when a person in crisis has a mental illness in order to appropriately adjust their approach and response.  The usual command and control approach does not work effectively with people in a mental illness crisis.  For example, a paranoid person may act in a threatening

---

[22]    During our investigation, we spoke with advocates who desired greater inclusion, but were refused access to the curriculum and were not allowed to attend training sessions.

Exhibit 1
Pg. 21 of 42

manner because he/she is frightened.  If the response is to reassure the individual of safety, there may be a de-escalation.  But, if the response is "command and control," it may increase the level of fear and result in an escalation.  Additionally, not all police contacts with people with mental illness are with people in "crisis."  Often times, individuals with mental illness may not be in a crisis, but instead will demonstrate signs and symptoms of their illness, which can be perceived as criminal behavior.  Accordingly, training must include police interactions with people who are symptomatic, but not in crisis, to avoid criminalizing mental illness.

### b.    Lack of Strategic Disengagement Protocols Involving Mental Health Providers

PPB informed us that they have begun employing strategic disengagement – a practice of withdrawing from a situation to avoid use of force when a subject does not appear in imminent danger of harm to self or others and has not committed an arrestable offense.  We also observed strategic disengagement in practice while on-site.  However, for individuals who are perceived as not being dangerous to others, but are at risk of harm to self, officers should only practice strategic disengagement in consultation with a mental health professional and should attempt to develop a plan for when and how to hand off responsibility.  Due to the existence of Project Respond, Portland, unlike many communities, can make informed decisions based on collaboration between law enforcement and mental health experts in these very challenging and potentially dangerous situations.  Unfortunately, Project Respond's limited availability reduces the opportunity for this type of collaboration to happen consistently and successfully.

Furthermore, PPB and the City should give careful consideration to Project Respond's capacity to handle non-law-enforcement emergency calls diverted from BOEC.  We received comments from the advocacy community for people with mental illness that people with mental illness or in mental health crisis may fear interactions with PPB.[23]  Advocates informed us that people with mental illness and their families would often prefer interactions with mental health professionals, rather than law enforcement, for welfare checks.  Likewise, PPB officers informed us that they spend an inordinate amount of their law enforcement time on calls that are principally related to mental health needs.  The City should consider where resources are best dedicated to address the need for welfare checks.  Although services are limited, the City could better inform mental health care consumers and their families about available resources, including the crisis hotline and Project Respond.  While Project Respond is not currently staffed to handle the large number of calls received by PPB regarding persons with mental health issues, Project Respond could be utilized to address mental health crisis calls that do not involve a risk to community safety.

The City should consider encouraging direct calls to Project Respond and permitting Project Respond to decide which calls to take and which to refer to the police.  Currently, the

---

[23]    We also received comment from the advocacy community that they were offended by PPB's pejorative reference to people with mental illness as "mentals."  In fact, we observed the term "mentals" used as a descriptor during a roll call presentation.  We recommend that PPB immediately stop using this term.

22

Exhibit 1
Pg. 22 of 42

community does not appear to have broad awareness of the use of Project Respond as a resource. Most calls for service appear to originate through BOEC or the crisis line. At this point, BOEC is not equipped in time or expertise to triage mental healthcare calls to make a determination about public safety and which calls should go to Project Respond. While the public should not hesitate to call 911 – i.e., BOEC – in emergent situations, Project Respond may be better equipped to triage mental healthcare calls that go directly to it in non-emergent situations.

Before implementing direct calls to Project Respond and an increased role for Project Respond in welfare checks, the City should carefully consider appropriate protocol and staffing. The City should also have an evaluation plan to test the efficacy of Project Respond's responses to service calls. Lastly, the City should have a backup plan should calls come in that Project Respond does not have the capacity to address.

PPB officers also frequently commented on the lack of a 24/7 drop-off facility for persons in mental health crisis, in lieu of taking the individual to jail or the emergency room. The City previously operated a facility at which PPB officers could drop off individuals placed on temporary mental health holds for assessment and temporary treatment. During the investigation, officers and mental health providers explained that the Crisis Assessment and Treatment Center ("CATC"), a 15-bed, sub-acute, secure facility, does not fill the void of a temporary, accessible acute care facility. At CATC, a nurse practitioner or doctor is only available from 12 PM to 5 PM. Also, CATC does not permit PPB to drop off people unless authorized by Multnomah County. Significantly, while Multnomah County reported that it established a separate phone line for PPB to seek authorized use of CATC, PPB officers reported that they cannot get authorization from Multnomah to use CATC. Accordingly, officers reported that in most instances they do not try to get authorization. Ironically – and tragically – a number of officers told us that they were not even aware of the separate telephone line for CATC authorization.

Additionally, the Cascadia Urgent Walk-in clinic does not fill the gap for a crisis triage center because individuals who are not enrolled in the State's Medicaid plan are not eligible for service unless they have a life threatening condition. Cascadia and others reported to us that the lack of enrollment or eligibility to enroll is a frequent barrier to the provision of mental health services to these individuals. The absence of an accessible crisis triage center make PPBs need for specialized crisis intervention officers more acute. A secure 24/7 crisis triage center within the City would allow officers the ability to hand over an individual in crisis to a mental health professional quickly and without authorization from the county or otherwise.

## 2.    Inadequate Supervisory Review of Officers' Use of Force

PPB's current practice concerning supervisory review of incidents in which officers used force is insufficient to identify and correct patterns of excessive force in a timely fashion. We recognize that Portland has a unique Commission-based governing style, which removes certain elements of the police accountability apparatus from PPB's direct control. While acknowledging deficiencies in the existing system of officer accountability, PPB needs to do more to effectively

Exhibit 1
Pg. 23 of 42

supervise officers and reduce instances of officer misconduct.

Following a use of force, supervisors should be on the scene to ensure that a full inquiry of the circumstances of the force used by officers is conducted, including:

- Ensuring medical attention is provided;
- Identifying, separating, and interviewing all involved and witness officers;
- Interviewing those subjected to force;
- Canvassing for witnesses and taking statements from all witnesses;
- Collecting evidence (e.g., hospital reports, photos of all injuries to all involved persons, physical evidence, Taser downloads consistent with the incident, diagrams);
- Conducting a documented review of officers' reports of the incident for completeness, accuracy, and quality; and
- Assessing whether further investigation is needed to determine the appropriateness of the use of force and whether the incident creates a need for retraining.

This was not occurring at PPB until recently, when Chief Reese changed the policy.[24] Supervisors are now required to go to the scene of use of force incidents and conduct an investigation. It is essential that supervisors be required to gather evidence necessary to resolve material discrepancies and consider whether the description of the force used is consistent with the sustained injuries or hospital reports. PPB should further revise its policy to require the AAR process to include collecting forensic evidence, taking photographs, or audio and electronic reception of evidence. PPB should also consider whether its current AAR policy, which suggests that a short one or two paragraph narrative is sufficient to describe the significant facts of the event, should be revised to require supervisors to provide more details.

PPB should revise its AAR policy to include a strong and effective monitoring system to ensure AARs are being timely completed and contain sufficient data for supervisors to adequately analyze uses of force. This analysis should include:

- Was the original stop, detention or subsequent arrest lawful?
- Was the type and amount of force used objectively reasonable and proportional to the resistance encountered?
- Was the type and amount of force related to a legitimate law enforcement objective the officer or the department was trying to achieve?
- Were efforts made to deescalate the situation without using force?
- Was the force reasonably decreased as resistance subsided?
- Was the force used consistent with generally accepted police tactics?

---

[24] Executive Order RE: DIR 940.00 After Action Reports and Operation Orders, *available at* www.portlandonline.com/police/index.cfm?a=380055&c=29867.

Exhibit 1
Pg. 24 of 42

- Was the force used consistent with PPB training programs?

Even if the current AAR policy were sufficient, PPB's practice regarding AARs is not. Many of the cases that we reviewed where officers engaged in a substantial amount of force did not have a corresponding AAR. For the cases that did have AARs, these reports did not contain sufficient investigative findings to constitute an adequate review. PPB supervisors nonetheless sign off on FDCRs without ensuring that thorough AARs are completed according to policy. By tolerating supervisors' failures to investigate and complete uses of force investigation and reviews, PPB misses a crucial opportunity to correct officer behavior. Instead, PPB sends the message that there is little institutional oversight or concern about officers' use of force.

Our analysis and review of hundreds of police reports revealed that rarely was the use of force found to be out of policy, even when the force used was clearly excessive. When PPB officers cause physical injury or take someone to the ground using force, they are required to fill out a FDCR, which includes a description of the totality of the circumstances that existed, including the subject's behavior and a justification for why the force used. PPB Manual § 1010.20. Supervisors are required to fill out an AAR, which includes a narrative that describes the police action and an assessment of its effectiveness through critique and evaluation using required criteria, when officers use certain types of force. PPB Manual § 940.00. In addition to force reports, uses of deadly force require direct on-scene investigation, PPB Manual § 1010.10, and a subsequent review by a Force Review Board, PPB Manual § 335.00.

Throughout our investigation, numerous cases that we reviewed lacked even the fundamental elements to collect even basic acceptable force investigative data to allow management to adequately critique force incidents. Some examples of persistent deficiencies in the reports include:

- Use of pattern or conclusive language, such as stating that the subject was "combative," "confrontational," "struggling," "got off the floor aggressively;"
- No statements taken from on-scene independent witnesses;
- Not all officers on scene who used force wrote reports;
- No statement taken from the person against whom force was used;
- A subordinate officer investigates the force used by a supervisor;
- A supervising officer approves his own use of force;
- A sergeant orders force to be used and neither writes a force report of his actions nor an AAR;
- No pictures of injuries taken;
- Force report written weeks after the incident;
- Discrepancies between involved officers' statements and reports not addressed or resolved; and
- No analysis for whether there was reasonable suspicion or probable cause for original stop and detention.

Force investigations and reviews are designed to audit and ensure that those practices are

25

Exhibit 1
Pg. 25 of 42

being followed.  Further, they should instill public confidence and faith in those sworn to protect the law and also serve to protect the officers and their agency from frivolous complaints. Supervisors' failure to intercede and actively manage incidents results in a weak and ineffective force management system.  PPB's current policy does not require supervisors to investigate all uses of force on scene.  In practice, supervisors' review of FDCRs has failed to identify uses of force as excessive, as we describe in the examples above.  Further, PPB has not ensured that supervisors always complete AARs when required.  Nor have supervisors rejected the AARs we reviewed that failed to provide sufficient detail to enable supervisors to adequately assess uses of force.  These policy deficiencies and practice failures have a profound impact on PPB and community they serve.  Significantly, these gaps present lost opportunities to ensure accountability and rectify behavior, thereby failing to prevent further unconstitutional uses of force.

PPB also has failed to timely identify use of force trends.  Prior to this investigation, PPB reviewed officers' overall use-of-force trends on six-month intervals during Force Review Board meetings consisting of supervisors at each precinct reviewing force events.  Six months is far too long for PPB to wait before becoming aware of systemic problems related to officers' use of force.  Based on our technical assistance, PPB recently created a new "use of force auditor" position.  This person will be responsible for evaluating FDCRs and other documents on a regular basis to identify trends.  Critical to the use of force auditor's effectiveness will be PPB's ability to develop a responsive training regime that is targeted to address systemic patterns of undesirable conduct.  If this auditor is the day-to-day monitor of individual officers' use-of-force trends, PPB can reduce unacceptably long delays in identifying use of force trends.

### 3.    Failure to Implement Timely Corrective Action following Investigations of Officer Misconduct

PPB, along with the City, should streamline its investigation and adjudication of complaints of officer misconduct to give greater effect to and faith in the process.  Currently, PPB has a number of fragmented processes for review of uses of force, none of which result in timely individual or systemic corrective action.

An open, fair, and impartial process of receiving and investigating citizen complaints serves several important purposes.  An appropriate citizen complaint procedure ensures officer accountability and supervision, deters misconduct, and helps maintain good community relations by increasing public confidence in and respect for PPB.  Improving the current procedure for handling citizen complaints at PPB would maximize these goals.

PPB and Portland have admirably sought to include civilian and public participation in the complaint intake and review process.  PPB apparently has implemented this participatory process to encourage public faith in PPB's complaint investigation and disciplinary systems. The participatory systems are the outgrowth of responses to high profile incidents and frequent revisions to PPB's accountability systems.  The apparent goal of transparent and "fair" systems has added layers of review, appeal, and re-reviews.  However, the established systems have

26

Exhibit 1
Pg. 26 of 42

become so complex and so time consuming that the objectives – officer accountability and public confidence – have been lost.  The efficacy of the system is undercut by the unreasonable delay in reaching an outcome from a complaint.  Additionally, the layers of review have provided escape valves inappropriately eviscerating full administrative investigation and corrective action for some complaints.

### a.    Self Defeating Accountability System

We met with many citizens who were concerned about their ability to effectively raise concerns regarding PPB officers' uses of force.  As with other cities, there is a close association between the administrative complaint review processes and the force review processes in PPB.  PPB's force review process, however, is so complex that the progress of any given complaint through the stages of review is both difficult to follow and needlessly lengthy.  Like the complaint process, as described below, the force review interactions with the complaint system are so byzantine as to undercut the efficacy of the system.  In this case, PPB's own force review chart speaks volumes about this problem.  *See* Figure 1, PPB's force review flow chart.



*Figure 1.  PPB's force review flow chart*

Exhibit 1
Pg. 27 of 42

### b. Complaint Intake

Complaints originate either internally within PPB or from the community. PPB does not receive the initial community complaints. Rather, complainants submit their complaints to an entity within the City's government. Portland separately elects a City Auditor. Within the City Auditor's Office, is the Office of the Independent Police Review ("IPR"), which receives citizen complaints. IPR performs an initial investigation of the complaints.[25] IPR then determines which complaints merit a full Internal Affairs ("I.A.") investigation. IPR may decline to have a complaint fully investigated for multiple reasons, including a determination that: "it is more likely than not that no misconduct occurred and additional investigation would not reach a different conclusion." *See* IPR Annual Report 2010, May 11, 2012. This is a qualitative determination often based on incomplete information. All allegations which, if true, would amount to a violation of policy should be investigated. However, the IPR is asked to opine of the merit of complaint before a full investigation yields determination on the credibility of the complaint. Accordingly, by design, the intake process becomes a qualitative analysis without the benefit of the information necessary to make a valid determination about which complaints deserve a full IA investigation.

IPR's intake process permits the diversion of complaints of officer misconduct without the benefit of full investigation. IPR declined 66% of the complaints it received in 2010. *Id.* IPR may refer some of these declined complaints to the subject officer's chain of command for informal resolution -- avoiding a full IA investigation -- if IPR determines that the complaint does not merit a full IA investigation. IPR refers to IA only those complaints that survive IPR's vetting process.

Currently, IPR has a backlog of complaints awaiting an initial investigation. We recommend that PPB, the City Attorney, and IPR work collaboratively to expedite the handling of this backlog. We also recommend clearer criteria for IPR declination that does not permit judgments based on incomplete information, particularly when IPR does not refer the complaint to any other entity for investigation.

### c. IA Investigations

After IA receives complaints of officer misconduct, either internally from within PPB or through IPR, IA codes those complaints and makes determinations of whether they believe the complaint merits a full investigation. PPB policy permits IA to decline to investigate complaints where the complaint alleges no misconduct; the complaint involves a minor or de minimis allegations in IA's determination; IA determines it has no jurisdiction; the complaint involves a claim currently under judicial review; IA is unable to identify the subject employee; the complaint previously has been adjudicated; IA determines the complaint lacks merit; or IA's commander determines IA does not have sufficient resources. IA's ability to decline complaints for this broad swath of reasons presents another potential escape valve for meritorious

---

[25]    IPR is comprised of a handful of civilian employees, some of whom are attorneys.

Exhibit 1
Pg. 28 of 42

complaints.  In the past five years, IA has declined between 15% and 26% of the complaints IPR has referred to it, i.e., complaints from civilians.  *See* IPR Annual Report 2011, at p. 8, June 27, 2012.  By contrast, IPR reports that with "few exceptions" PPB has completed full administrative investigations of all complaints initiated internally by PPB.  *Ibid.* at p. 10.

If IA does not decline the complaint, a full investigation does not necessarily follow.  IA determines some complaints are minor complaints of poor service.  PPB refers to these complaints as "service improvement opportunities" or "SIOs."  IA assigns to each subject officer's chain of command his or her SIOs for resolution.  PPB considers SIOs non-disciplinary, and they are not subject to a full investigation.  PPB Manual § 330.00.  PPB has resolved between 51% and 60% of its IA complaints through SIOs in each of the past five years.  *See* IPR Annual Report 2011, at p. 8, June 27, 2012.  The large number of complaints resolved through SIOs diverts meritorious complaints from receiving more extensive review.

Significantly, as each SIO goes out to each chain of command, that SIO stops at the email inbox or hard copy mail box at each level of the chains from top down on the way to the subject officer's Sergeant.  After resolution, the record of the SIO reverses course and stops at each level of the chain of command on the way back up to IA.  This is a taxing use of managerial time that PPB could more efficiently use by simultaneous broadcast of the SIOs from IA down the chain of command to the Sergeant, and the Sergeant's concomitant response directly to IA, with copy to the chain of command.

Also, instead of a full complaint, IA may permit some complaints to be resolved by mediation.  PPB policy does not contain objective criteria to determine which complaints are appropriate for mediation.  Rather, policy requires only that IA make a subjective determination that mediation would "meet the needs of" PPB and the community.  If IA so determines, the subject officer and complainant agree, and the officer's chain of command does not object, then the complaint can be resolved through mediation.  Significantly, mediation does not reach a finding nor can discipline be imposed from mediation.  As a general proposition, mediation can be an effective tool for a police department to efficiently resolve minor complaints and engender a sense of participatory justice among aggrieved community members.  However, we note two issues with PPB's current mediation policy and practice.

First, PPB's mediation policy should contain objective criteria to determine which matters are appropriate for mediation.  Complaints of excessive force should always be subject to investigation and a finding.  PPB has an interest in making sure its officers comply with use of force policies and training.  Permitting mediation in those cases would fail to result in a finding to correct any improper uses of force, if any, and compromise Department-wide statistics regarding uses of excessive force.

Exhibit 1
Pg. 29 of 42

Second, we note that mediation, as the name suggests, should be used to reach mutual agreement.  PPB, IPR, and others report that mediation is not frequently used.[26]  Not surprisingly, then, we received few accounts concerning mediation in practice.  One community member with whom we spoke, however, recollected that officers threatened to charge her with a crime in the course of mediation if she would not agree to their resolution of her complaint.  She reported having been arrested and released without charge.  The gravamen of her complaint was an allegation of false arrest and forced handcuffing.  She reported that, during the course of mediation, the officers involved threatened to re-arrest her for the same charge if she would not drop her complaint.  This account, which appeared credible, speaks to the potential abuse of mediation rather than its use as an effective conciliatory tool.  PPB should ensure that mediation is only used based on objective criteria and that the parties fully understand how mediation will be conducted and the potential outcomes.

For those complaints that result in full IA investigations, we found the investigations to be thorough.  IA investigations, however, currently span an inordinately long period of time, e.g., several months.  Both PPB and IPR are often unable ensure that IA investigations are completed within ten weeks, PPB's goal for a deadline to complete IA investigations.

There is also a conflict in the information Portland provides the public about the possible outcomes of IA complaints.  PPB's IA Policy provides for five possible findings:  unproven; unproven with a debriefing – i.e., a critique of the complaint with the subject officer; exonerated; exonerated with a debriefing; and sustained.  PPB's standard operating procedure ("SOP") contains additional possible findings.  The City Auditor's public website lists only two possible findings:  not sustained and sustained.  We recommend that PPB and IPR adopt uniform standards on the possible outcomes for IA complaints.  We also recommend that PPB add one additional finding:  unfounded.  Unfounded requires an affirmative proof that the allegation presented is false.  This is a significantly different finding than unproven or exonerated.  When evidence from investigation of an IA complaint proves that the complainant was untruthful, an unfounded finding completely clears the officer of any alleged violation.

### d.    Criminal Investigation of PPB Officers

PPB refers allegations of potentially criminal conduct by PPB officers from IA to PPB's criminal investigations section.  *See* PPB Manual §§ 330.00, 344.00.  We have been informed that the Multnomah County District Attorney previously requested that PPB not conduct IA investigations of officer-involved shootings until after the completion of the DA's investigation and/or criminal prosecution.  This request was based, among other things, on the concern that an officer's compelled statement in an administrative investigation could potentially taint evidence planned to be used in a criminal indictment.  *See, e.g.*, *Garrity* v. *New Jersey*, 385 U.S. 493 (1967); *Kalkines* v. *United State*s, 473 F.2d 1391 (1973).  The DA has presented certain

---

[26]    In the past five years, PPB has resolved 1% to 4% of community complaints through mediation.  IPR Annual Report 2011, at p. 5, June 27, 2012.

Exhibit 1
Pg. 30 of 42

allegations of officer misconduct in the use of force to grand jury for consideration, but the grand jury has endorsed a charge on only one such occasion.

IA has informed us that they are now conducting concurrent administrative and criminal investigations. We commend this effort. PPB has an interest in preserving administrative accountability and public safety expeditiously through its IA process. This should not be delayed by a parallel, bifurcated criminal investigation. We note that PPB's policy still permits IA to decline an investigation if the claim is in judicial review, PPB Manual § 330.00, and this policy runs counter to the announced practice of concurrent investigations. PPB should make clear in its policy that administrative and criminal investigation shall run concurrently. PPB should consult with the DA, FBI, and/or United States Attorney's Office at the outset and throughout this bifurcated process and prior to compelling statements.[27] PPB should also clearly set forth in policy that though IA may use criminal investigation material in appropriate circumstances, all administrative interviews compelling statements, if any, of the subject officer and all information flowing from those interviews must be bifurcated from the criminal investigation in order to avoid contamination of the evidentiary record in the criminal case.

PPB informs us that, by contract, officers involved in shootings or in-custody deaths are permitted to wait 48 hours before they are subject to questioning. This delay in questioning the subject officer is a function of PPB's contract with the officers' union. Portland's City Attorney has also informed us that the DA, or his or her designee, is in command of the scene at an officer-involved shooting or in-custody death, pursuant to State law. The DA is a county employee. Provided the DA is not bound by the City's contract and its 48-hour waiting provision, the DA may consider questioning the officer, subject to his or her ability to exercise rights to counsel and remain silent, as soon as the DA sees fit. This should expedite the accurate resolution of the criminal investigation. If a civilian is involved at the scene of a potential crime, it is difficult to conceive of PPB officers permitting that civilian 48 hours before asking him or her questions about the incident. PPB should not hinder investigation of a potentially criminal action with this officer-specific delay.

Additionally, this 48-hour waiting period has enabled officers to refuse to timely provide complete use of force reports, i.e., FDCRs and public safety statements. In a recent PPB officer-involved shooting, not only did the shooting officer decline to give a statement at the scene, but so did two other officers who used less lethal force. Also, like the shooting officer, the other officers did not provide a narrative on the incident reporting forms, as required, but instead referred to interviews they would later give to detectives. As this incident demonstrates, PPB's waiting period for officers' statements concerning uses of force defeats the purposes of contemporary, accurate data collection through FDCRs. In many jurisdictions, standard use of force reports are not considered *Garrity* and officers are expected to fill them out immediately after an incident.

---

[27] These policy changes should make clear that only compelled statements made in the face of the reasonable prospect of criminal prosecution are entitled to *Garrity* protection.

Exhibit 1
Pg. 31 of 42

Separately, we also note that PPB does not have an established policy for handing over to criminal defendants potentially exculpatory evidence contained in IA files. *See Brady* v. *Maryland*, 373 U.S. 83 (Ct. Cl. 1963). Whether a criminal defendant is an involved officer or a civilian, PPB should have a policy in place to transmit potentially exculpatory material to criminal defendants. We recommend that PPB, the City Attorney and the DA work collaboratively to establish a methodology for the handling of exculpatory material, mindful of the bifurcated administrative and criminal investigations in cases involving officers as defendants. PPB should memorialize in policy or procedures this agreed-upon methodology.

### e.  The Police Review Board

In addition to the internal affairs complaint investigation process, PPB has developed a Police Review Board ("PRB"). *See* PORTLAND CITY CODE§ 3.20.140. PRB reviews certain PPB incidents with the stated goal of making recommendations to the Chief regarding findings on those incidents and proposed discipline. *Id.* It has no ultimate decision making authority.

PRB reviews only certain incidents. Notably, an aggrieved civilian involved in an incident cannot force a PRB review. There are only three routes to a PRB review. (1) PRB presumptively reviews all incidents of a certain severity – i.e., in-custody death, officer involved shootings, and uses of force that result in hospitalization. (2) PRB reviews all incidents that result in recommended discipline of a day or more.[28] (3) PRB receives internal referrals from PPB chain of command or the IPR director. PPB calls some of these referrals a "controverted" finding or "controverted" recommended disciplinary action. In other words, if an investigation of an officer's conduct yields a finding with which the IPR Director or the subject officer's chain of command disagrees, they have the power to force a PRB review. If an aggrieved civilian disagrees with the investigative finding or recommended discipline – or disagrees with the declination to investigate his or her complaint at all – the civilian cannot compel a PRB review.

PRB is comprised of five members in non-use-of-force incident reviews: a citizen,[29] a peer of the subject officer,[30] the PPB Assistant Chief over the subject officer, the PPB Captain or Commander over the subject officer, and the IPR Director (or his/her designee). A paid civilian facilitator presides over PRB proceedings. The subject officer and a representative from his or her bargaining unit may attend PPB's presentation of an incident to PRB. In certain use of force

---

[28]     An alternative disciplinary route exists for certain violations of the City's Human Resources Administrative Rules regarding complaints of discrimination. For the sake of this letter, however, those are inapposite.
[29]     There is an additional system established for the appointment of these volunteers. City codes tasks PPB and IPR with developing criteria for selection of the citizen volunteers. The City Auditor vets the volunteers and submits their names to City Council for approval or disapproval. City Council appoints the volunteers for three-year terms. Code limits these volunteers to one full term and one partial term, if they are filling a vacancy. Code also permits the City Auditor or Chief to recommend that the City Council act to remove of a citizen from the available pool of volunteers.
[30]     Here, too, there is an additional system in place for selection of the potential PRB members. Peers are of the same rank and classification as the subject officer. The Chief must have a pool of pre-approved "peer" officers at the ready.

Exhibit 1
Pg. 32 of 42

cases, PRB's also includes one more citizen volunteer and one more peer. Accordingly, the composition of PRB aims to include evaluators both internal and external to PPB. However, PRB has a host of non-voting advisory members, taken mainly from PPB, that further complicate the composition of PRB. Curiously, a complaining civilian, if one is involved in the incident being reviewed, is not permitted to attend PPB's presentation.

The PRB process is long. PPB is required to give an involved officer 14 days' notice prior to the presentation of his or her case at a PRB meeting. PRB meets only twice a month and usually can consider only two cases each meeting. PRB's civilian facilitator has 14 days after the completion of PRB's review of a case to produce written proposed findings. At the completion of its process, PRB presents a public proposed finding, but not its record. The subject officer or the aggrieved civilian may appeal PRB's recommendation to Portland's Citizen Review Committee ("CRC"), the next step on the long journey to resolve an officer-accountability incident.

Despite the good intentions of using PRB as an accountability tool, the current process is not comprehensive and, when conducted, has significant delays in the ultimate resolution of an officer accountability incident.

### f.    Citizen Review Committee

CRC is comprised of nine civilian volunteer members.[31] *See* PORTLAND CITY CODE § 3.21.080. CRC has multiple, broadly defined missions that can be distilled to three categories: (1) hearing appeals of officer accountability complaints; (2) community outreach; and (3) recommending policy changes. CRC members with whom we spoke advised us that they spent the majority of their time in community outreach.

CRC meets just once a month, resulting in additional delays. In order for CRC to consider an appeal, the record of appeal must be completed and CRC members must have an opportunity to review the record prior to the appeal. CRC members reported to us that each appeal usually involves two CRC meetings, each a month apart. At the first meeting, CRC conducts a case file review to certify that the matter is ready for appeal. At the second meeting, CRC conducts an open, public appeal hearing. If the record is incomplete, this two-meeting process is further delayed.

At the appeal, CRC considers only the recommended finding on the officer accountability incident. CRC does not consider and does not receive information on the recommended disciplinary action, if any. CRC has limited authority to reach findings. CRC representatives have informed us that they have been counseled that they may only send a complaint back to PPB for further information or to determine whether a prior finding is "irrational." In fact, the

---

[31]      Like PRB, CRC has another layer of involved processes for soliciting volunteers, screening candidates, nomination by the City Auditor, and appointment by City Council.

33

Exhibit 1
Pg. 33 of 42

City Code permits CRC to find that the prior finding is either supported or unsupported by the evidence in the record. *Id.* This support-or-unsupported standard is a lower threshold than a requirement that CRC affirmatively declare the prior finding "irrational." To the extent that Portland retains this current system, Portland should ensure that CRC applies only the proper standard for findings.

CRC can accept testimony and written statements, and consider the record. Paradoxically, even though CRC may consider any new evidence that develops in its hearing, it is prohibited from using this new evidence to find that the prior record does not support the finding from below. *See* PORTLAND CITY CODE § 3.21.160. This policy appears to be an effort to require CRC's remand of those complaints to IA for further development of the evidentiary record for an incident.[32] However, the policy's direction to CRC asks them to opine on the propriety of a prior finding without consideration of all the evidence before them. This is untenable. Evidence developed by CRC – inculpatory or exculpatory – should be included in the record of the incident, even if remand to IA is then required to fully develop the evidence.

There exists no apparent prohibition on CRC's consideration of officer accountability incidents involving in-custody deaths or officer-related deaths. CRC members inform us that, as a practical matter, though, parties pursue those matters through formal judicial means rather than appeal to CRC.

If CRC reaches a finding that the record of the officer accountability incident does not support the prior recommended finding, CRC may present that incident to the City Council for appeal. *Id.* This is yet another step on the long process toward final resolution of an officer accountability incident. At the Council level, too, there may be a hearing with witnesses. The Council, then, will decide the ultimate administrative finding on the complaint. It does not appear that this step has been utilized before.

### g.    Administrative Determination

After the subject officer or complainant exhausts administrative appeals to CRC, if any, and if CRC does not call upon the City Council to make a final finding, the authority to reach an administrative finding returns to PPB. The Chief makes a finding and recommends discipline. However, the Police Commissioner, i.e., usually the Mayor, has the ultimate authority to make the final determination on serious levels of disciplinary action.

### h.    Appeal of Discipline

If PPB and the Police Commissioner determine that the subject officer's actions require disciplinary action, the officer's collective bargaining agreement then starts the next phase on the

---

[32]    We note that IA has not been required to provide information to CRC by further supplementing IA's investigation of a complaint. In a recent use-of-force investigation, IA refused CRC's request that IA interview a witness to the use of force. Thus, Portland's methodology of requiring CRC to only rely upon an IA record is frustrated by PPB's refusal to fill gaps CRC identifies in that record.

34

Exhibit 1
Pg. 34 of 42

long road to the imposition of corrective action.  The subject officer may initiate a union grievance.  If an officer's union will not accept a grievance – which reportedly occurred only once – the officer may appeal a disciplinary action to a state labor board.  In most cases, the subject officer's union will grieve the imposition of discipline on his or her behalf.  After the subject officer meets certain procedural requirements, a state employee relations board will name potential arbitrators to arbitrate the grievance.  Counsel for the City and the subject officer may strike proposed arbitrators from the list leaving a selected arbitrator to hear the arbitration of the aggrieved disciplinary action.  As the City Attorney's Office has characterized this process to us, there are no set rules in arbitration and Portland bears the burden of proof to justify its actions.  This cumbersome process – which reportedly cost Portland $500,000.00 for a single recent arbitration – usually results in an arbitration finding 60 to 90 days after the proceeding.

As happened in that recent costly arbitration, the arbitrator may overrule the imposition of discipline.  Portland can refuse to implement an arbitrator's finding if Portland determines the finding is a violation of public policy.  This refusal would force the subject officer's union to file an unfair labor practices complaint.  If this is resolved favorably for PPB or the arbitrator has upheld PPB's action, the imposed discipline stands.

At long last, if a civilian's initial complaint is meritorious, proven, and survives this grueling process without being overturned, then PPB can impose corrective action.  This process is so lengthy and attenuated, however, that the efficacy of corrective action is invariably undermined.

### i.    Lack of Clarity and Timeliness in PPB's Early Intervention System

PPB recently brought on line its Early Intervention System ("EIS").  PPB had a paper-based EIS previously.  PPB began building the current system in 2004-05.  The prototype went on line in July 2011.  EIS became fully operational in December 2011.  Because PPB's EIS has only recently become operational, there is little data on which to assess the efficacy of the system.

PPB's stated goal for its EIS is to keep officers productive by offering officers interventions when PPB identifies behavior, medical issues, or psychological problems that adversely affect PPB's goals.  *See* PPB Manual § 345.00.  An effective EIS is a powerful tool that should enable PPB to identify officers whose at-risk behaviors exceed department guidelines, even if direct supervision of use of force incidents fail or are found to be within policy.

PPB demonstrated its EIS for us and our consultant.  The EIS is a database that records various domains of officer behavior, e.g., uses of force, complaints, tort claims, allegations of domestic violence, etc.  PPB has established various thresholds at which the EIS will identify an officer.  When the EIS identifies an officer, PPB intervenes by referring the triggered information to the subject officer's chain of command.  PPB policy memorializes some EIS triggers.  *Id.*  For example, EIS is triggered by any three IA complaints against an officer within

35

Exhibit 1
Pg. 35 of 42

six months, or two IA complaints of the same category within six months.  *Id.*  Some triggers about which PPB informed us, however, are not contained in the policy.  The EIS reportedly currently triggers with an officer who has used force in 20% of his or her arrests in the past six months, or who uses force three times more than the average number of uses of force compared with other officers on the same shift.  Since these triggers are not specifically enumerated in the policy, we recommend that PPB memorialize in its policy the Professional Standards Division's discretion to develop additional EIS triggers.  Additionally, while these proportional-use-of-force triggers are helpful, we recommend that PPB add definitive triggers to its EIS for uses of force, e.g., three uses of force in a month.  In order to be effective as an early intervention, the EIS needs to be able to identify officers with more sudden changes than a six-month look back would indicate.  Accordingly, a sudden uptick in uses of force within a shorter period of time should trigger the EIS.

As reported to us, PPB currently waits for IA to review a complaint against an officer before referring the triggered officer to his chain of command for an EIS intervention.  PPB has informed us that this is their practice because they are concerned that the subject officer would argue an issue cannot be handled by IA since it was already addressed through EIS.  This defeats the purpose of the EIS.  By policy, EIS is non-disciplinary.  Accordingly, no officer should reasonably rely on EIS intervention to avoid IA investigation and the imposition of discipline for sustained wrongdoing.  If there is any doubt on this point, we recommend that PPB immediately clarify by issuing an informative directive.  Given the inordinately long IA process, as described in this letter, waiting for an internal affairs complaint to reach resolution before utilizing an EIS trigger defeats the point of an "early" intervention system.

Currently the EIS tracks individual officers' data.  We recommend that as the system matures, PPB revise it EIS to trigger supervisors whose units collectively use force disproportionately more than other units.  These are data present in the system but not synthesized for use on the unit level or supervisory level.

We also note that there is a single individual within PPB who runs EIS and is vested with the discretion to decline to send EIS triggered notifications to chains of command.  Unless the triggers are redundant, i.e., the EIS returns the same triggered information for the same officer repeatedly, the declination to send the information to the chain of command is a potential escape valve that undermines the effectiveness and credibility of the EIS.  We recommend that triggered information, unless redundant, automatically go to the chains of command.

Because there is only one PPB member fully conversant in the use of the EIS, we also recommend that PPB train other members to be proficient in the use of EIS.  If the one person now charged with operational responsibility leaves, institutional memory invariably will leave with him.

Exhibit 1
Pg. 36 of 42

### j.    Performance Evaluations

It is our understanding that PPB plans to implement quarterly performance reviews.  We support this effort and encourage PPB to conduct assessments of employee performance at every level of the organization.  Direct supervisors should evaluate their subordinates at least annually.  Prior to the evaluations, supervisors should explain the evaluation process and the expectations to their subordinates.  Supervisors should also utilize EIS data in preparation for evaluations.  In conducting evaluations, supervisors should meet with their subordinates to discuss positive aspects of their police work, their complaint history, if any, and to discuss any problems or concerns officers may have concerning the department.  The direct supervisors should memorialize evaluations, including any discussions in face-to-face meetings.  Supervisor should then pass written evaluations through the chain of command, affording the opportunity for superiors to add comments.  The written evaluations should be stored in the employee's training or personnel file.  PPB should tie these evaluations into its promotion process, to the extent permitted by law and PPB's collective bargaining agreements.

## VII.    ADDITIONAL COMMUNITY CONCERNS

During the course of our investigation, we heard consistent concerns from members of the community.  While we do not make a finding that there is a pattern or practice violation in connection with these issues, they implicate community confidence in PPB and warrant further consideration by City officials.  First, there is a deep-seated concern  that PPB does not provide timely access to medical care following the use of deadly force.  Second, segments of the community harbor distrust towards PPB and desire more community policing and outreach.

### 1.    Access to Medical Care

There have been numerous incidents over the years that have prompted community outrage regarding whether PPB officers procured medical attention in a timely fashion following a use of force.  PARC identified this as a problem in its study of PPB's uses of force.  The Due Process Clause of the Fourteenth Amendment guarantees a pretrial detainee the right to receive adequate medical care, and that right is violated if officials are deliberately indifferent to the detainee's serious medical needs.  *Clouthier* v. *County of Contra Costa*, 591 F.3d 1232, 1242-43 (9th Cir. 2010).  According to PPB policy, officers "will immediately call EMS if they have any concerns or questions regarding a subject's medical status during an incident or custody situation.  EMS will respond and evaluate and assess the subject's medical condition."  PPB Manual § 630.45.  Although we do not currently find reasonable cause to believe that PPB is engaged in a pattern or practice of deliberate indifference to detainees' serious medical needs, we are concerned that PPB's policy leaves too much discretion to officers to determine when medical attention is needed.  Instead, there should be a bright line rule that whenever an injury occurs or whenever a subject complains of an injury, EMS is summoned.  PPB should review its data to determine if officers are routinely procuring medical care at the earliest opportunity and, if not, revise its policies and training accordingly.

37

Exhibit 1
Pg. 37 of 42

2.      **Community Policing**

Throughout our investigation, we had the opportunity to speak with members of PPB and the community who raised issues that affect the community's confidence in PPB and, in turn, public safety.  We heard concerns from community members in a number of areas, including PPB's response to organized protests and perceived tensions between PPB and communities of color.  Following numerous exchanges with a multitude of community members through various forums, including discussions with retired PPB officers, it became apparent that a trust divide exists between PPB and certain segments of the Portland community that should be bridged.  We do not make any finding of a pattern or practice violation in this area.  However, it is important to discuss the most prevalent concern identified in the course of our investigation – the often tense relationship between PPB and the African American community.

In the beginning of our investigation, Mayor Adams made clear that one of his reasons to call for our investigation of PPB was PPB's relationships with communities of color.  At the conclusion of our investigation, it was clear that PPB could benefit from building additional bridges with minority communities, including but not limited to the African American community.  While the scope of this investigation did not include an analysis of whether PPB engages in a pattern or practice of bias-based policing, we found that some community members perceive this practice.  We are aware that Chief Reese regularly engages community representatives in meetings to discuss their concerns.  We recommend that PPB continue to address this issue directly with the community and seek to expand opportunities for community engagement.  One community activist succinctly stated that "the problem in not addressing the racial profiling is that it's creating an atmosphere of youths distrusting the cops."  Both African American leaders of the community and average citizens told us that they believed they had been victims of racial profiling during traffic stops.  One citizen stated in his community interview that he got his windows tinted, so that officers would no longer know that he was black, in an effort not to be pulled over.  And he exclaimed to us:  "It works!"  Another community member told us his belief that "they protect the white folk and police the black folk."

Unfortunately, these comments provided during our investigation are similar to comments that were provided to the City during a series of five community listening sessions in 2006 with community-based organizations and PPB.  PPB should consider reviewing the implementation of its 2009 PPB Plan to Address Racial Profiling.  One of the recommendations that came out of the listening sessions included more stringent collection of stop data, but PPB had concerns regarding public release of officer names.  Data provided to us by a local watch group indicated that PPB disproportionately stops African Americans.  The data indicate that 12-24% of PPB's traffic and pedestrian stops are of African Americans.  However, only 6.4% of the City's overall percentage is African American.  Continuing to collect and track stop data would give PPB a better sense of whether a perception of biased policing might be a problem that PBB needs to address.  Engaging with the public concerning such data would help assure the public that PPB is committed to ongoing analysis and remedial efforts to address allegations of biased policing.

Exhibit 1
Pg. 38 of 42

Portland's own workgroup on biased policing noted in 2010 that disparate treatment complaints are difficult to prove and that among the complaints that they reviewed, the same officers were repeatedly named.[33]  PPB should consider utilizing its EIS system to track complaints that officers and/or units engage in racially discriminatory policing.  Many of the recommendations in this letter focus on actions that PPB and the City of Portland should take.  In addition, for those people who believe they were victims of racial profiling, it is incumbent upon them to file a formal complaint on every occasion and include as much specific information about the interaction as possible.  The data created by these complaints and resulting investigations will better enable PPB to make informed judgments about these serious allegations of biased policing.  Armed with accurate data and comprehensive investigations of complaints, PPB and the City should be able to better address allegations of biased policing.

As noted above, a number of community members expressed their belief that racism exists within the police force, recounting incidents over a 20-year time span which informed their perception.  A respected local civil rights leader recently publicly stated that there are good officers in PPB.  At the same time, however, he questioned whether officers were held to the same standards as citizens, and whether there is an "us against them" mentality among PPB officers.  It is incumbent on PPB officers, not just the executives, to appreciate the far reaching implications of the actions individual officers can have on the organization and the perceived us-against-them mentality.[34]  One precinct commander relayed that part of the problem with the community's lack of trust is PPB's failure to reach out to the general public enough.  PPB has positive stories to share about its individual officers.  And, while PPB has some regular meetings with community groups, we recommend that PPB provide a broader and more frequent opportunity to listen and respond to the community's concerns.

We received comments that community members feel they are "under siege" because officers who frequently do not live in the community are doing the policing.  PPB can cultivate community trust by providing incentives for its officers to maintain residency in the city they police.  Having more officers live in the community they police may help develop trust and rapport with the community, which will strengthen community policing ideals.  Ensuring that PPB reflects the diversity of the communities being served would also help to improve the effectiveness of PPB.  Under Chief Reese's leadership, PPB has undertaken a comprehensive recruiting program designed to ensure that PPB attracts a diverse pool of qualified applicants.

Based on concerns we heard regarding difficulties that a number of people of color face in integrating into PPB at the recruitment and promotion stages, PPB may also consider conducting a department-wide intensive cultural sensitivity and competency training, including members of the community.  We recognize that PPB has established a Community Partner

---

[33]    "Disparate Treatment Complaints, A Complaint Handling and Case File Review Conducted by the Bias-Based Policing Workgroup of the Citizen Review Committee," March 2010, at 6.

[34]    Following a controversial beanbag shooting of an unarmed 12-year old African American girl, many PPB officers donned t-shirts in support of the officer who shot the girl.  To the community, this was a divisive action that affected their perception of the entire PPB police force.

Exhibit 1
Pg. 39 of 42

Program for recruits PPB has hired, but who have not yet attended academy training. It is our understanding that the recruits volunteer at local service juvenile assistance organizations. Perhaps this can be expanded beyond juvenile assistance organizations.

Another persistent perception among many community members is that "mere conversations" frequently transition into unlawful pretext stops, and this perception breeds distrust.[35] While it appears PPB has policies prohibiting discrimination (§ 344.00) and bias based policing (§344.05), a policy on how and when an officer initiates contacts with citizens is missing. Based on our investigation, including talking with citizens as well as patrol officers, we found that officers tend to blend the distinction between initiating a "mere conversation" and a *Terry* stop.[36] As PPB is aware, a "mere conversation" is contingent upon an individual's consent. A person may refuse to converse voluntarily with PPB, but this refusal does not, in and of itself, create a basis for performing a *Terry* stop. In order for a mere conversation to turn into a *Terry* stop, an officer must have "reasonable suspicion" based upon "objective, articulable facts" that the person is involved in a crime. *Terry*, 392 U.S. 1 (1968). A *Terry* stop must be based on an officer's analysis for multiple factors which he or she must be able to objectively articulate. *Id.* And, even if the officer does determine there are objective, articulable facts that a person is involved in a crime, there is no right to frisk an individual for weapons unless and until the officer has reasons to believe that the individual has weapons upon his or her person, or poses a threat to the safety of the officer. *Id.* Revising this practice will go a long way towards increasing rapport and trust with the community and reducing perceptions of bias-based policing.

The aforementioned concerns and tensions expressed by community members appear to date back many years and will require persistent continuing commitment to inclusion and transparency, as well as effective structures to facilitate continuing dialogue.

## VIII.   REMEDIAL MEASURES

Our investigation reveals reasonable cause to believe that PPB engages in a pattern or practice of using excessive force in violation of the Fourteenth Amendment to the United States Constitution and in violation of federal law. PPB should implement the following remedial measures to correct the constitutional and statutory deficiencies identified above.

1.  In addition to exposing all officers to crisis intervention training, have a specialized unit of crisis intervention officers who are selected based on their temperament, experience and desire to interact with individuals with mental illness or in mental health crisis

---

[35]     *See supra*, n.18.

[36]     A *Terry* stop refers to the common police practice of briefly detain a person who police reasonably suspect is involved in criminal activity, but not requiring a showing of probable cause. *Terry* v. *Ohio*, 392 U.S. 1 (1968).

Exhibit 1
Pg. 40 of 42

2.  Revise policies to place greater emphasis on de-escalation techniques and require officers to consider less intrusive alternatives before employing force.

3.  Implement scenario-based training to ensure officers do not use excessive force and only use force justified to meet the government interest.

4.  Train officers to go hands on following the first application of less-lethal force, when feasible, to effectuate the arrest, and to use as few cycles of the ECW as possible.

5.  Train and require officers to avoid using more intrusive forms of force, such as beanbag guns and ECWs, on individuals who do not pose a threat to the safety of officers and others or who are suspected of committing minor offenses.

6.  Train and require officers to give warnings, where feasible, before using force.

7.  Monitor all uses of force to ensure practice consistent with these standards and affirmatively enforce these standards when force is used in an inconsistent manner.

8.  Conduct on-site supervisory investigations of all uses of force, including contemporaneous public safety and investigatory statements subject to constitutional protections against self incrimination.

9.  Require that PPB officers document each citizen contact, including the reason they stopped the subject, whether the subject consented to the conversation, whether the officer informed the subject that he/she had the right to decline consent, whether the mere conversation escalated further, and demographical information about the subject.  Require that supervisors conduct timely reviews of this data.

10. Adopt policies and practices to streamline the investigation of all allegations of officer misconduct to increase efficacy of corrective action.  This should include a mandate to address investigative inadequacies identified by CRC.  PPB should also keep complainants actively informed and involved of the process.

11. Require PPB to develop a community engagement and outreach plan, with the goal of creating robust community relationships and sustainable dialogue with Portland's diverse communities.

Exhibit 1
Pg. 41 of 42

## IX.    CONCLUSION

We hope to continue working with PPB in an amicable and cooperative fashion to resolve our outstanding concerns, as set forth in this letter.  Please note that this findings letter is a public document and will be posted on the Civil Rights Division's website.  The DOJ attorneys assigned to this investigation will be contacting the City's attorneys to discuss this matter in further detail.  If you have any questions regarding this letter, please contact Jonathan Smith, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-5393.

Sincerely,

Thomas E. Perez
Assistant Attorney General
Civil Rights Division

Amanda Marshall
United States Attorney
District of Oregon

cc:     Chief Michael Reese
        Portland Police Bureau

        Jim Van Dyke
        Portland City Attorney

42

Exhibit 1
Pg. 42 of 42

October 26, 2012

**To:** City Council

**From:** Mayor Sam Adams

**Subject:** Overview of Settlement Agreement between the United States, the City of Portland, and the Portland Police Bureau

In February, 2009, Commissioner Dan Saltzman and I stood with community leaders to request an investigation by the United States Department of Justice Civil Rights Division to review the Portland Police Bureau for bias, regardless of whether or not it is intentional, unconscious or institutional. At the conclusion of that initial investigation, the United States found "insufficient evidence to pursue federal criminal civil rights charges against Portland Police Bureau officers" involved in the January 29, 2010 fatal shooting of Aaron Campbell. However, days later, the United States announced a federal investigation into Portland Police officers' use of force, to examine whether there is a pattern or practice of excessive force used by PPB officers, particularly against people living with mental illness.

When the Department of Justice announced its investigation, I said that I welcomed the inquiry and noted that we had even asked for a best practices evaluation. What I said then holds true today: "We are humble in the knowledge that we don't have it all figured out."

On September 13, 2012, the United States Department of Justice (DOJ) found that most uses of force by the Portland Police Bureau (PPB) were within constitutional limits.  However, it did find reasonable cause to believe that there was a pattern or practice of unnecessary or excessive use of force in certain encounters between police officers and persons who had, or were perceived to have, mental illness.

Although the City does not agree with that legal finding, it did agree that PPB, as an organization committed to continuous improvement, could build on work in progress and pursue additional improvements.  As a result, the City and DOJ have developed a proposed settlement agreement to resolve the areas of concern.  Resolution of these issues will require all of our community – our citizens, our police force, our City leadership, and our mental health partners – to work together and engage in meaningful dialogue and decision-making.  Some issues will require the expenditure of funds and others will require labor negotiations with our employee labor organizations.  Those decisions will require council consideration in the future.

The Agreement is separated into several parts, which are summarized here:

1.  <u>Use of Force</u>:   PPB will retain its current force policies, which emphasize the use of less force than the maximum permitted by law.  In addition, PPB will revise its force policies

Exhibit 2
Pg. 1 of 4

to emphasize de-escalation techniques and the use of information known about the person encountered (if available).

In addition, new policies reflecting best practices will be instituted regarding Electronic Control Weapons (ECWs), such as TASERs.  Such policies generally will require verbal warnings, restrict the use of ECWs on people suffering from mental illness, and prohibit their use on handcuffed suspects.  Exceptions exist because of the dangers that police officers and citizens may face, such as when ECWs are necessary to prevent bodily harm to a person.

The agreement requires revisions to PPB policies regarding force reports, to ensure they are timely, complete and candid. New protocols will require review of force reports by supervisors and continue to require on-scene investigations by supervisors when a force event occurs.   All supervisors in the chain of command are subject to discipline for the accuracy and completeness of force reports and investigations.

The use of force will also be subject to quarterly reviews and audits through an Inspector.  Such reviews will look at a variety of factors, including the mental health information known to officers and how that played into their decision making.  ECW reports will also be reviewed and audited.   Supervisor actions will also be reviewed to ensure that they are appropriately reviewing and analyzing the use of force used by PPB officers.   The Inspector has a myriad of other tasks, including whether significant trends exist and to identify and correct deficiencies revealed by this analysis.

2.  <u>Training:</u>  Training will be required on all force policies, both current and revised.   The Training Division will revise and update PPB's Training plan annually to take into account problematic uses of force, input from the community, the latest in law enforcement trends and other factors.

PPB must also collect data for the purpose of improving future instruction and curriculum, including the extent to which PPB officers are applying the knowledge they have learned.

PPB must also train officers on the requirements of the settlement agreement.  The Inspector will audit the training program using a list of performance standards that PPB must meet.

3.  <u>Community Based Mental Health Services</u>  DOJ recognizes that there are other participants in the mental health infrastructure besides the City that control the quality of mental health care, including the State of Oregon, Multnomah County, Community Care Organizations (CCOs), community mental health providers, health care and emergency department providers, private insurers, and many others.   DOJ expects that these partners will assist the City to remedy lack of community-based addiction and mental health services to Medicaid and uninsured residents.

It is anticipated that CCOs will begin to implement recommendations of its mental health and addictions-focused work groups, which will include City of Portland representation, by mid-2013. These recommendations will include opportunities for first responders, such as PPB, to better interact with the health care system when a person who has encountered the police is having a mental health crisis and needs assistance.

4.  <u>Crisis Intervention:</u>  PPB has agreed to develop an Addictions and Behavioral Health Unit (ABHU) within 60 days of the agreement's effective date.  That unit will manage and share data subject to lawful disclosure between government entities.  It will also oversee PPB's Crisis Intervention Team, a Mobile Crisis Prevention Team and a Service Coordination Team.

Exhibit 2
Pg. 2 of 4

An ABHU Advisory Committee comprised of individuals from across various government entities and mental health services providers (among others) will be established to assist the City as it provides services.

PPB will continue to provide Crisis Intervention training to all its officers.  In addition, the City will establish a "Memphis Model Crisis Intervention Team" and recruit volunteer officers to serve on that team.   Such members will receive additional specialized training and will be dispatched if a crisis event occurs involving someone with a real or perceived mental illness.

PPB will continue to have a Mobile Crisis Prevention Team (formerly known as a Mobile Crisis Unit) and expand that team to one car per PPB Precinct.  The car shall be staffed by one sworn PPB officer and a mental health professional and shall be a full time assignment.

The Bureau of Emergency Management's 9-1-1 dispatchers will be trained so they can triage calls related to mental health issues to the appropriate first responder resource.  The City will work with partners to identify opportunities for dispatchers to direct calls to mental health professional instead of police officers if and when appropriate.

5. <u>Employee Information System:</u>   The City has an employee information system to gather data and assist issues affecting employees.  This will be enhanced to more effectively identify at-risk employees so that proper training can occur.

6. <u>Officer Accountability</u>:   The City will continue its system for review of officer misconduct, but will reduce the timeline for all administrative investigations to 180 days from the receipt of a complaint.  This timeline includes appeals to the Citizens Review Committee.

   The City will also revise its protocols for "compelled statements" from officers involved in force incidents to ensure that the law is followed while still obtaining timely information.  The City must submit this protocol for DOJ approval

   PPB's Police Review Board, which advises the Chief on administrative reviews and recommendations for discipline, will include a member from the Citizen Review Committee in cases where use of force is being reviewed. The Citizens Review Committee will be expanded to 11 members.

7. <u>Community Outreach</u>:   There are a number of changes concerning community outreach.   The Community and Police Relations Committee is part of the Portland Human Rights commission, and its function is to bring together members of Portland's diverse communities to improve community and police relations.   The committee will be renamed the Community Oversight Advisory Board (COAB) and its functions and membership will change.  Its new functions include assessing the implementation of the Settlement Agreement, providing information to the community about the Agreement and its implementation and to contribute to the development of a PPB Community Engagement and Outreach Plan.

   The 20 member COAB, which includes 15 voting members and 5 advisory members, will be chaired by a Compliance Officer and Community Liaison (COCL).   Voting members of the Board include the five Human Rights Commission members, five members chosen by City Council members and five members chosen by the community.

8. <u>Implementation:</u>   The City will hire a COCL within approximately 90 days.  The duties of the COCL including preparing quarterly public reports regarding PPB's compliance with the agreement hold quarterly town hall meetings and providing recommendations to ensure PPB is in compliance with the agreement.

Exhibit 2
Pg. 3 of 4

In addition, PPB will designate a Compliance Coordinator to serve as a liaison between PPB, the COCL and DOJ.   The Compliance Coordinator will coordinate PPB's compliance activities, provide data to DOJ and collection information for the COCL.

9.  <u>Enforcement:</u>   To permit federal court oversight, DOJ will file a complaint against the City and will file this settlement agreement at the same time.  If disputes arise regarding PPB's compliance with the agreement, there is a dispute mechanism that favors discussions and mediation before court action.

We have worked toward an agreement that effects positive change in the way that the Portland Police Bureau provides service to the community.  Thank you for your thoughtful review of this agreement.  I look forward to your and the public's consideration of this item on November 1, 2012.


Respectfully submitted,



Mayor Sam Adams
City of Portland

Exhibit 2
Pg. 4 of 4