

## Office of the Compliance Officer and Community Liaison (COCL)

**Rosenbaum & Associates, LLP**

Dennis Rosenbaum, Ph.D.
Thomas Christoff, Ph.D.
Geoffrey Alpert, Ph.D.
Ashley Heiberger, J.D.
Megan Mohler, M.A.
Amy Ruiz, B.A.

COCL Contact Information:
525 NE Oregon Street, Suite 250
Portland, OR  97232
www.portlandcocl.com
rosenbaumandassociatesllp@gmail.com

August 22, 2019

Transmitted by E-mail to:

The United States Department of Justice
The City of Portland

Re:       **Compliance and Outcome Assessment Report: All Sections with Remaining Compliance Issues**

Dear U.S. Department of Justice and City of Portland:

On behalf of the entire Compliance Officer and Community Liaison (COCL) team, I am pleased to submit the attached *Compliance and Outcome Assessment Report: All Sections with Remaining Compliance Issues,* pursuant to the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon.

We thank community members for taking the time to review and comment on the report. A copy of this report will be posted on the COCL's website, www.portlandcocl.com and sent to the Settlement Agreement Updates email list.

Sincerely,

Dennis P. Rosenbaum, PhD
For Rosenbaum & Associates, LLP
Compliance Officer and Community Liaison, Portland OR

Exhibit A

# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

# of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

*Quarterly report: All Sections with Remaining Compliance Issues*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**April 2019 to June 2019**

**August 22, 2019**



# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................................................2

**EXECUTIVE SUMMARY** ........................................................................................................3

**SECTION I — Use of Force** ...................................................................................................7

    **Paragraph 74** ......................................................................................................................7

    **Paragraph 75** ......................................................................................................................7

    **Paragraph 77** ......................................................................................................................8

**SECTION II — Training** .......................................................................................................10

    **Paragraph 84***(a)(i)* ...........................................................................................................10

**SECTION III — Crisis Intervention** ..................................................................................13

    **Paragraph 99** ....................................................................................................................13

    **Paragraph 115** ..................................................................................................................13

**SECTION IV — Officer Accountability** .............................................................................15

    **Paragraph 121** ..................................................................................................................15

    **Paragraph 128** ..................................................................................................................17

**SECTION V — Community Engagement and Creation of PCCEP** ..................................20

    **Paragraph 142** ..................................................................................................................20

    **Paragraph 144** ..................................................................................................................22

    **Paragraph 145** ..................................................................................................................22

    **Paragraph 146** ..................................................................................................................23

    **Paragraph 149** ..................................................................................................................24

    **Paragraph 150** ..................................................................................................................25

**LIST OF ABBREVIATIONS** ................................................................................................28

**LIST OF PERSONNEL** .........................................................................................................30

**APPENDIX** ............................................................................................................................31

## <u>INTRODUCTION</u>

This is the Compliance and Outcome Assessment Report of the Compliance Officer and Community Liaison (COCL), as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (hereafter referred to as "DOJ"). By agreement of the Parties, this report combines the COCL's compliance and outcome assessments into a single document.

This second quarter report focuses exclusively on the paragraphs in the Settlement Agreement where the COCL has determined that the City or PPB had not achieved Substantial Compliance by the end of the first quarter of 2019. We describe the progress we have observed and provide an updated compliance rating in the remaining areas: Use of Force, Training, Crisis Intervention, Officer Accountability, and Community Engagement.

# EXECUTIVE SUMMARY

## I.   USE OF FORCE (Pars. 74, 75, and 77)

During the second quarter of 2019, PPB satisfied the remaining issues related to the Use of Force Audit conducted by the Inspector. Briefly, PPB and the Inspector have maintained their Force Audit system which ensures that officer Force Data Collection Reports (FDCRs) and After Action Reports by supervisors were comprehensive and that force used was objectively reasonable. However, where the Force Inspector's review found a policy, training, equipment, or personnel concern, we noted that the system of informing appropriate individuals and receiving updates on actions taken had not been formalized. We recommended the Inspector begin utilizing the Audit Action Item Report form to formally capture policy, training, equipment, or personnel concerns so that the information would be easily reviewable and consistently documented. Beginning in late 2019 Q1, the Inspector began utilizing the Audit Action Item Report and provided evidence of such use to COCL. Given this consistent documentation, PPB has substantially complied with the remaining issues related to Pars. 74, 75, and 77.

## II.   TRAINING (Par. 84)

By the start of the second quarter of 2019 the only remaining training requirement was contained in Paragraph 84, which requires the PPB to increase its use of "role-playing scenarios and interactive exercises." While PPB has utilized some of these training techniques in the past, we have continually emphasized the need to adopt a procedural justice framework for this work to prevent the escalation of tensions and therefore, preempt the need to use force in many cases. Hence, Substantial Compliance with par. 84(a)(i) is contingent upon PPB's ability to "design and implement a carefully planned scenario where all officers are given the opportunity to practice such behaviors and receive individual feedback during a debriefing session." (COCL Q1 report, 2019).

To date, PPB has taken important steps toward developing a robust scenario that requires officers to rehearse procedural justice and communication skills in a realistic setting. The COCL team has reviewed the draft Lesson Plan for the Procedural Justice scenario, which is scheduled for implementation as part of PPB's 2019 Fall In-service training. Success of the scenario training will depend, in part, on the realism exhibited by the person who role plays the community member, and the pedagogical skills of the evaluators who run the debriefing sessions and provide tailored feedback to each officer regarding his/her performance. COCL will observe the training prior to evaluating compliance with Par. 84(a)(i).

3

### III.  CRISIS INTERVENTION (Pars. 99 and 115)

In the second quarter of 2019, BOEC satisfied the remaining issues related to Pars. 99 and 115 by providing training to all BOEC call-takers and dispatchers. In our 2019 Q1 evaluation we recommended that BOEC provide supplemental training to call-takers and dispatchers to more broadly define the concept of "risk" as it relates to the ECIT dispatch criteria "subject's behavior is escalating the risk of harm to self or others." In response, BOEC provided lesson plans and presentation materials for their April 2019 training, for which COCL and DOJ provided comments. In April of 2019, members of the COCL team and DOJ observed the BOEC in-service and found it to be responsive to the concerns COCL had laid out in our 2019 Q1 report.

In particular, we were impressed by BOEC's concerted effort to reinforce to call-takers and dispatchers that they have the expertise and intuition to know when a call may benefit from an ECIT officer response. During the presentation, the concept of "When in doubt, send them out" was raised numerous times. Given this training, we believe that PPB and BOEC have substantially complied with the remaining issues related to Crisis Intervention.

### IV.  OFFICER ACCOUNTABILITY (Pars. 121 and 128)

PPB and IPR made improvements in specific stage timelines during the first and second quarter of 2019, but overall case timelines continued to exceed the 180-days allotted in Par. 121 of the Settlement Agreement. Both PPB and IPR plan to implement steps to reduce timelines in coming months (including IPR case management strategies and IA strategies for using shared drives and performing concurrent reviews) and we expect such efforts should lead to more cases being completed within the 180-day timeline. Additionally, PPB and IPR have recently met to discuss how the different stages of a case contribute to the overall length of the investigation and whether the time allotted to each stage can be adjusted to reduce the overall timeline. However, at this point we continue to find only partial compliance with the requirements of Par. 121.

In our 2018 Q4 report as well as our 2019 Q1 report, we noted other issues related to both PPB and IPR's accountability system, specifically the concern of system complaints being investigated as allegations against PPB officers and issues with allegation formation. Both PPB and IPR have taken steps to resolve such issues, including IA providing roll-call presentations and offering tips and techniques for avoiding instances which may lead to a system complaint. Additionally, IPR continues their training and management efforts related to allegation formation, supervisor investigations, precinct referrals, and other process related issues. Finally, both PPB and IPR continue to hold joint meetings with regards to such issues.

4

Although some issues remain, both PPB and IPR have taken serious steps that should lead to the resolution of the remaining concerns. Given such steps, we now believe that the City has substantially complied with the requirements of Par. 128, though note both have an ongoing obligation to monitor whether issues re-emerge in the future. As part of this, we expect IPR to memorialize their efforts in SOP's as part of maintaining Substantial Compliance.

## V.   COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP) (Par. 142, 144, 145, 146, 149, and 150)

Since our 2019 Q1 report, PCCEP has continued to develop and move the City toward Substantial Compliance with this section of the Settlement Agreement. PCCEP has met regularly, including holding a Town Hall meeting in April of 2019 that included the presentation of COCL findings from Q1 of 2019. PCCEP is operating at full capacity as of this writing, and PCCEP has had discussions about maintaining a robust alternate pool. There is a process in place to name additional alternates to a pool for future consideration.

On June 24, the City announced a hire for the PCCEP project director position, Theodore Latta. Latta attended the June 25 PCCEP meeting, and began full time on July 1. The community organizer position was not required by the PCCEP Plan, but the City has committed to providing support as needed after the project director is on board. With the project director on board, we can assign Substantial Compliance to Par. 144.

PCCEP is on track to function as a legitimate body for community engagement and feedback on the performance of the PPB. Substantial Compliance for Par. 142 will be assigned if PCCEP continues to hold regular meetings over the next few months, can complete the work required in the PCCEP Plan, and can develop a working relationship with the PPB, including contributing to PPB's Community Engagement Plan; several recommendations toward the plan were adopted at PCCEP's June 25 meeting, but there are other recommendations still pending. The remaining community engagement tasks for PPB to achieve Substantial Compliance under Par. 145 are: (1) to develop a working, transparent relationship with the PCCEP and (2) to develop a reasonable Community Engagement Plan with input from PCCEP.

The city-wide survey of community members required in Par. 146 has been developed, reviewed by PCCEP and fielded. The survey has been completed and a report has been prepared. COCL can assign Substantial Compliance for Par. 146 when: (1) the results have been used to "inform the work of the PCCEP" and (2) the results have been used to "inform...the development and implementation of the Community Engagement Plan." The group has not yet had a presentation on the Community Survey to inform this work (the presentation was scheduled in June and

5

postponed due to illness). For COCL's comments and cautions regarding key survey findings, the read is referred to Appendix A.

Par. 149 requires the PPB, DOJ and COCL must agree on a set of metrics and present them to the PCCEP for review. PPB, DOJ, and COCL have developed indicators of community engagement and outreach around 1) Interactions with the public and general service delivery; 2) Communication with the public; 3) Collective engagement with the community through boards, commissions, committees and other stakeholder forums/groups/meetings; and 4) Regular reporting to the community on PPB activities. These metrics were shared with the PCCEP at the May 28 meeting; hence, we find PPB in Substantial Compliance with Par. 149.

To receive Substantial Compliance with Par. 150, pertaining to PPB's annual reports, PPB would need to: (1) release the final version of the 2017 report to the public; (2) hold at least one meeting in each precinct area and at a City Council meeting to discuss the topics delineated in Paragraph 150; and (3) prepare a more timely annual report for 2018 to demonstrate the ability to produce substantive reports "annually." The final version of the 2017 report has been released, and can be found on PPB's website.

PPB provided the Draft 2018 Annual Report to PCCEP on June 24, and the draft is responsive to nearly all of PCCEP's recommendations made earlier this year in response to the 2017 Draft. Notably, PPB was responsive to PCCEP's recommendation to be more self-critical, including a section in its Annual report on "Challenges" that covers nine different areas, including creating a diverse workforce, use of deadly force, and accountability/trust.

PCCEP will provide recommendations on the 2018 Draft Annual Report following its July meeting; COCL can assign PPB Substantial Compliance with Par. 150 when PPB has incorporated this feedback from PCCEP, released the final 2018 report, completed the Precinct presentations and has presented its report to the City Council.

## USE OF FORCE (Pars. 74, 75 and 77)

| Par. 74 | Substantial Compliance |
|---------|------------------------|
| Par. 75 | Substantial Compliance |
| Par. 77 | Substantial Compliance |

74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECWs are used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement Agreement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report (AAR) within 72 hours of being notified of the incident; to perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report;

7

*notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)*

*77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all AAR (940) Reports using the appropriate legal and administrative performance standards and taking appropriate action. The reviewers of AARs should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should speak with the original investigator, order additional investigations, modify findings that do not seem justified, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement)*

<u>Current Status</u>

In our 2019 Q1 report, we noted that PPB had maintained their Force Audit system which ensures that officer Force Data Collection Reports (FDCRs) and After Action Reports by supervisors were comprehensive and that force used was objectively reasonable. However, where the Force Inspector's review found a policy, training, equipment, or personnel concern, we noted that the system of informing appropriate individuals and receiving updates on actions taken had not been formalized. What was needed was a uniform template and a centralized filing location. In turn, we recommended PPB utilize the Audit Action Item Report form that PPB had developed, as this would alleviate our identified issues with formalizing the process. Beginning late in the first quarter of 2019 (and continuing to the present), PPB began using the Audit Action Item Report form and has provided COCL with evidence of its use. After a review of the uses of the form to date, we believe that the forms contain sufficient information regarding: (1) the issue(s) identified; (2) the appropriate individual(s) to assess/remedy the issue(s); and (3) detailed responses regarding what steps were taken or why steps were not taken. Hence, we now believe PPB has substantially complied with the requirements of Pars. 74, 75, and 77.

To support our overall finding of Substantial Compliance, we summarize the efforts of PPB and the Force Inspector to implement a comprehensive force audit system. When a use of force event occurs, officers complete an FDCR. Additionally, supervisors complete an AAR that summarizes the use of force and provides an evaluation of whether the force (and the actions leading up to the force event) are in policy or out of policy. These forms are then reviewed up the chain of command. After such review, the Force Inspector and analysts review a sample of FDCRs and AARs, evaluating the documents on two main points. The first is whether the FDCRs

and AARs contain information required by PPB policy (presence of a weapon, subject level of resistance, attempts at de-escalation, decision-point analysis, injuries, mental health status, among many others). The Force Inspector and analysts then code that information to assess accuracy and completeness and identify both topical trends and officer/group trends. Second, the Inspector provides an independent assessment of the reasonableness of the force used as well as any policy, training, equipment, or personnel concerns. When such concerns are found, the Inspector notifies appropriate individuals and requests written feedback (which now uses the formal document described above).

In the past, we have noted that the Force Audit is a point of great progress within the PPB. FDCRs and AARs are filled out comprehensively on a consistent basis and where trends have been identified, the Inspector has taken appropriate remedial steps. For instance, in 2018, officers completed FDCRs with a reporting accuracy rate of 98.8%, an improvement over the 96.0% rate in 2017 (see PPB's 2018 Force Audit Report). Additionally, sergeants demonstrated a 97.7% reporting accuracy rate, up from 96.6% in 2017. Command Review (Lieutenants and RU Managers) were also over 97%. The 2018 Force Audit Report also identifies categories with the greatest number of deficiencies, providing a roadmap for future improvement. Finally, the report breaks out deficiencies by Precinct or Unit, allowing for targeted focus where needed (for example, North Precinct showed higher deficiencies in 2017, but a targeted campaign improved overall deficiency rates in 2018).

We have also maintained an ongoing review of the Inspector's evaluation of the reasonableness of force and the identification of potential issues. Through our independent reviews of use of force cases, we have found near universal agreement with the Inspector's identification of policy, training, equipment, or personnel concerns. That is to say, the Inspector has maintained a reliable method for evaluating decision points in a use of force event and has proven capable of independently identifying policy violations missed by the chain of command review. Coupled with our assessment of the Audit Action Item Reports used by the Inspector, we believe that the entire audit process has been designed and implemented in a manner that substantially complies with the letter and intent of Pars. 74, 75, and 77.

9

# TRAINING (Par. 84(a)(i))

| Par. 84*(a)(i)* | Substantial Compliance - Conditional |
|---|---|

*84(a)(i). With respect to patrol officers, PPB shall: increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention.*

<u>COCL Conditions</u>

In previous reports we have acknowledged and documented PPB's noticeable improvement in the delivery and evaluation of training at all levels of the organization (see COCL's Q3 report in 2018). These improvements were responsive to nearly all sections of Paragraph 84. The only area where COCL expressed any reservation was section 84(a)(i). While PPB has employed "role-playing scenarios and interactive exercises" involving force decision making and mental health situations, we have continually emphasized the need to adopt a procedural justice framework for this work that will help prevent the escalation of tensions and therefore, preempt the need to use force in many cases. Hence, Substantial Compliance with par. 84(a)(i) will be achieved "when PBB is able to design and implement a carefully planned scenario where all officers are given the opportunity to practice such behaviors and receive individual feedback during a debriefing session." (COCL Q1 report, 2019). Specifically, we have recommended that PPB "give officers ample opportunities to identify and rehearse the interpersonal skills necessary for respectful, fair, empathic, and effective communication with members of the community" (COCL Q3 report, 2018), and provide each officer with feedback on their performance.

<u>Current Status</u>

PPB went to great lengths to incorporate the concepts of procedural justice into their 2019 Annual Training Plan and into their 2019 supervisor training, which we observed in March of 2019. The Training Division Manager has also committed to incorporating these principles into the lesson plans for the 2019 in-service training of all officers this year.

These are noteworthy enhancements to PPB's training portfolio and should increase general knowledge of procedurally just behaviors and their contribution to successful, non-confrontational, police-community interactions. However, PPB faces the traditional problem

10

of discussing these concepts in the classroom (lecture mode) but giving students few opportunities to practice the relevant skills. Knowledge must be translated into practice, as PPB now does with its training in firearms, CEW, and self-defense. Recent in-service training has focused on topics such as ambush attacks (2018) and active shooters (2019). While communication with the subject, the public and fellow officers was one of the teaching objectives, the life-threatening nature of these incidents made it difficult to incorporate procedural justice communication into these training scenarios.

Therefore, to achieve Substantial Compliance with Par. 84(a)(i), the Training Division will need to create an entirely new scenario where officers can practice procedural justice and de-escalation skills. The training scenarios should be based on common situations, such as interacting with people in mental health crisis or an agitated driver on a traffic stop, which may escalate to force events if the officer communicates inappropriately or makes other poor decisions. In essence, officers need to practice communication skills related to the principles of procedural justice, i.e., giving voice, being respectful, maintaining neutrality, and demonstrating trustworthiness through empathy, helpfulness and other actions.

PPB has committed to developing a robust scenario that requires officers to practice these communication skills and be given feedback on their individual performances. The Training Division has filled a position that focuses specifically on Procedural Justice and has assigned a Lieutenant to oversee this project. The COCL has met with these individuals and has reviewed their initial plans. They have shown considerable expertise in this area and are drawing on best practices to develop the lesson plan and curriculum.

The COCL team has reviewed the draft Lesson Plan for the Procedural Justice scenario, which is scheduled for implementation as part of PPB's 2019 Fall In-service training. The scenario contains realistic elements that should capture the attention of the officers and engage them in serious role playing to solve emergent problems. Officers will be given the opportunity to utilize various procedural justice skills and then will be given feedback on their performance during a Debrief session with the instructor.

Although we do not have all the details for the planned In-service training, at this time we can offer a few general comments and suggestions to PPB regarding the elements of effective procedural justice training.

According to the lesson plan, "this scenario is designed to transition from concepts of Procedural Justice taught in the classroom to real-life practical implementation." This transition is critical and can only be successfully achieved if several components are in place. First, the classroom training must be strong to the point that students: (1) learn and understand the core principles of procedural justice; (2) are given examples of behaviors that could be used to apply these principles in real policing encounters; and (3) have been convinced that these behaviors are

11

effective and should be adopted. This classroom training was provided by PPB in previous In-service trainings. Second, the person who role-plays the community member must be able to incite the students to a degree that requires the officers' use of good procedural justice skills. Third, to complete an effective scenario, the debriefing session following the scenario must be done by instructors/evaluators who: (1) have been well trained in procedural justice theory and practice; (2) have the pedagogical skills to recognize deficiencies in role-play performance; and (3) can provide constructive, targeted feedback to each student. The COCL team will observe and evaluate the delivery of scenario training prior to making a final compliance assessment for Par. 84 (a)(i).

# CRISIS INTERVENTION (Pars. 99 and 115)

| Par. 99 | Substantial Compliance |
|---------|------------------------|
| Par. 115 | Substantial Compliance |

*99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").*

*115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to [Par. 114] and operation by trained staff.*

For Pars. 99 and 115, our 2019 Q1 evaluation recommended BOEC provide supplemental training to call-takers and dispatchers to more broadly define the concept of "risk" as it relates to the ECIT dispatch criteria "subject's behavior is escalating the risk of harm to self or others." This recommendation stemmed from two places: (1) our observation of prior BOEC training that characterized risk as immediate and violent; and (2) the City's evaluation of PPB and BOEC data indicating different outcomes for ECIT and non-ECIT trained officers. Given that BOEC call-takers and dispatchers are well trained compared with other agencies, COCL recommended that they be given more latitude to determine when a call might benefit from an ECIT response and, therefore, should not be constrained by a narrow definition of "risk."

In the first quarter of 2019, COCL and DOJ reviewed BOEC's lesson plans and presentation materials for the April 2019 BOEC in-service training. Where appropriate, both COCL and DOJ provided input which was subsequently incorporated into the overall training. In April, members of the COCL team and DOJ jointly observed the training and found it to be responsive to the concerns COCL had laid out in our 2019 Q1 report. The 2019 BOEC in-service training related to mental health response focused on a number of topics, including:

- ECIT success stories, demonstrating the positive impact of having an ECIT response to persons in mental health crisis

- ECIT dispatch numbers, including highlighting the impact of reminder emails that describe the types of calls that meet ECIT dispatch criteria

- Elements of a mental health crisis

- Classroom discussion of real-world examples and whether they would meet ECIT criteria

- Call-taker, dispatcher, and supervisor roles and responsibilities for ECIT type calls

- Compliance audit results and subsequent re-training on identified issues

In addition to the above topics, there was a concerted effort to reinforce to call-takers and dispatchers that they have the expertise and intuition to know when a call may benefit from an ECIT officer response. During the presentation, the concept of "When in doubt, send them out" was raised numerous times (e.g., the phrase received its own slide four separate times and was verbally repeated many times).

Given the above, we have concluded that PPB's mental health triage system substantially complies with the intent of Par. 99 while remaining a variation of the Memphis Model. As DOJ details in their Fourth Assessment Report (filed May 4, 2019), the historical and community-based justifications for triaging specialized mental health response are reasonable and PPB/BOEC continue to incorporate ongoing systems of self-assessment/self-improvement. As BOEC's compliance with Par. 115 (fully operational crisis triage) was contingent upon establishing compliance with Par. 99, we also find that BOEC has now substantially complied with the requirements of Par. 115.

# OFFICER ACCOUNTABILITY (Pars. 121 and 128)

| Par. 121 | Partial Compliance |
|----------|--------------------|
| Par. 128 | Substantial Compliance |

*121. PPB and the City shall complete all administrative investigations of officer misconduct within one hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.*

Both PPB and IPR continue to struggle to complete all full administrative investigations within the 180-day timeline required by the Settlement Agreement. This issue represents perhaps the largest barrier to compliance with the entire Accountability section and is the one remaining issue still outstanding in this section. Both PPB and IPR concede that despite measurable improvements in various stage timelines within the administrative investigation process, a number of cases continue to exceed 180 days.

Related to this, the COCL maintains that a time limit of 180 days is appropriate to facilitate the expeditious resolution of administrative complaints, both for the benefit of the complainant as well as the officer who is alleged to have committed misconduct. However, particularly for the purposes of conducting a comprehensive investigation free from the pressures of a ticking clock, the 180-day timeline may not always be feasible nor beneficial to either the complainant or the alleged officer.

There are a number of factors that COCL's policing experts have identified that may reasonably cause a case to exceed the 180-day timeline, including (but not limited to):

-   The number of officers and witnesses to be interviewed

-   The number of allegations

-   The nature of allegations (e.g., officer-involved shootings)

-   The need for forensic evidence testing

Particularly when more than one of the above factors are present in an administrative investigation, it may be reasonable that the case goes beyond 180 days without violating the spirit of Par. 121. However, even when considering potential reasons for cases taking over 180 days, we maintain that PPB and IPR still need to take additional steps to substantially comply with Par. 121. For instance, between January of 2018 and May of 2019, there were a total of 130 full administrative investigations between IA and IPR. Of these, 25% exceeded the 180-day timeline, though IPR's percentages were lower than IA's (53% completed within 180-days compared with 78% for IA). Additionally, these cases only represent cases that were closed, meaning that additional cases may also currently be exceeding the 180-day timeline but remain open.

Recognizing the extent of the problem, IPR provided a cause-and-solution analysis when we met in early June. Their analysis identified three main issues which act as impediments to completing full administrative investigations within the required timelines and provides data-driven solutions designed to address the core of each issue. The three main issues concern delays in IPR independent investigations, intake investigations that go over the allotted 14-day timeline, and structural impediments.

As a primary solution, IPR has proposed initiating a more involved case management strategy as a method of: (1) avoiding heavy caseloads by restricting the number of independent investigations any single investigator can carry at one time; (2) providing more hands-on management of investigations from the start (as opposed to relying on near-end-of-investigation review); (3) providing greater coordination of case assignment; (4) enhancing strategies for streamlining investigation and reporting processes; and (5) ensuring improved coaching for investigators.

In addition to the above case management solution, IPR has also proposed a risk-based approach to guide the reporting process for intake investigations. IPR notes in their proposal that in the risk-based approach, the term "risk" refers to "the risk that the process will fail to identify, investigate, or substantiate officer misconduct. The risk is related to the investigative process, not the severity of the alleged misconduct."  With this approach, cases that are likely to receive a full administrative investigation will have a streamlined reporting process compared with cases likely to be administratively closed. For example, when IPR believes that a case will proceed to a full investigation (thereby reducing the risk that misconduct will go unidentified), they can reduce the time taken at the intake investigation stage (since a full, comprehensive investigation will be conducted by either IPR or IA).  However, when IPR believes a case will not proceed to a full investigation, the intake investigation acts as a mechanism to ensure that no misconduct goes unidentified.

The document provided by IPR includes other proposed solutions as well, however, we believe the above two (case management and risk-based approach to intake investigations) represent the primary strategies for reducing overall case timelines for IPR full administrative investigations. Related to this, we also applaud IPR in taking on such additional analyses in furtherance of the steps we reported on in 2019 Q1. In that report, we noted that IPR was holding weekly case management meetings to identify stages of investigation that were overdue (or nearing overdue) in order to enforce stage timelines. In our 2019 Q1 report, we also noted that such stage-management appeared to be effectuating positive results. The case management process described above goes beyond that of stage management and takes a whole-case approach. Although we cannot find substantial compliance with the 180-day timeline for IPR cases at this moment, we do expect the steps proposed by IPR to be impactful.

Although PPB is experiencing a higher compliance rate with the 180-day timeline than IPR, PPB has not yet achieved substantial compliance, but it has also proposed steps to reduce overall timelines. For instance, PPB plans to install shared computer drives for each RU Manager so that they may begin reviewing case materials prior to the IA investigator making a proposed finding. Such materials would include the allegations for each officer as well as interview transcripts so that the RU Manager may perform a concurrent review, thereby saving time. Additionally, PPB has proposed a system for "re-allocating time" should one stage of an investigation go over the number of allotted days. For example, should the investigation stage go over the allotted timeline, the RU Manager would be expected to review the case in a shorter time frame, thereby negating the prior delay. We would expect these steps to bring PPB closer to compliance with their investigative requirements.

IPR and PPB expect that the proposed changes will reduce the number of days a full administrative investigation takes. Additionally, PPB and IPR have recently met to discuss case stages in regards to counting them towards the overall timeline. However, because these steps are recent developments, we will need to see them implemented and assess their impact. Accordingly, we continue to find PPB and the City in Partial Compliance with the requirements of Par. 121 though give them credit for developing sensible data-driven, whole-case solutions to identified issues.


*128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.*

In prior reports, we noted several remaining issues we believed hindered compliance with Par. 128, notably IPR's ability to discern system complaints from policy violations, adequate allegation formation, and issues related to PPB supervisory investigations. These issues taken together speak to an overall system of accountability, thereby extending the concept of "meaningful independent investigation" beyond IPR. Since their identification, both PPB and IPR have taken steps to mitigate such issues.

IA has taken numerous steps to address the concept of system complaints, including identifying trends in types of system complaints (i.e., officers not adequately communicating PPB policy to community members) and tips and techniques for officers to avoid such complaints. Between February 19 and May 29 of 2019, PPB held six roll call meetings to discuss such issues, with two more occurring in June and one Precinct Staff Meeting pending scheduling. During such roll call meetings, PPB personnel also have stressed the importance of supervisory investigations and received feedback from both supervisors and officers.

For its part, IPR has continued training and management related to allegation formation, supervisor investigations, precinct referrals, and other process related issues. Additionally, IPR has a special case handling process to address issues related to community members who have a history of non-meritorious complaints. As explained by IPR, the individual is provided an initial and final letter (if non-meritorious complaints continue) indicating their placement on the special handling list.  However, we confirmed with IPR that each allegation receives some investigation to ensure that allegations with merit are not dismissed merely because of the individual who made the complaint.  Additionally, community members are not placed on the special handling list for filing multiple complaints but rather only if they have a history of filing complaints that are without merit.   Through such a process, IPR can resolve issues without a formal complaint against an officer being made.

Additionally, both PPB and IPR hold weekly meetings, including ongoing discussion of issues related to Supervisory Investigations and full administrative investigations. Due to recent turnover with IPR staff, particularly those in management positions, a learning curve is to be expected. However, joint meetings between IA, IPR, DOJ, and COCL in June of 2019 indicate that there is a path forward to address any remaining concerns. In fact, the new faces at IPR have provided a fresh look at the investigative process and bring a strong data analytic and systems perspective to the table.

Finally, we spoke with several sergeants as part of a follow-up to interviews we conducted for our 2018 Q4 report. Most of the sergeants confirmed that IA personnel had come to roll calls to discuss the identified issues and provide trends and tips/techniques to avoid system complaints. There still appears to be some concern about system complaints coming through based on our discussions with sergeants. For instance, one sergeant stated there was

"confusion as to what we're actually investigating" based on his experience with system complaints being referred as a supervisor investigation. While that same sergeant also noted IA being very open and available to respond to questions and provide guidance, PPB should continue their efforts to address such sentiments.

Although some issues remain, both PPB and IPR have taken steps that should lead to the resolution of the remaining concerns. Both investigative bodies appear to be jointly committed to ensuring a positive relationship while maintaining their independence from each other. For its part, IPR has committed to sending a greater number of allegations (where appropriate) for precinct referrals or to other City entities, an alternative process for the resolution of system complaints. As shown in the table below, the number of such referrals has doubled in 2019 compared to the last six months of 2018 (and at the time we received the data, the second quarter of 2019 had not yet come to an end). PPB and IA continue to maintain open lines of communication when an allegation is overly broad, overly specific, or inconsistent with a policy violation. Additionally, the new management at IPR appear to be very capable, bolstering our confidence that remaining/future issues can be identified and jointly resolved.

We, therefore, find that PPB and IPR have substantially complied with the requirements of Par. 128. However, PPB and IPR have an ongoing obligation to monitor whether the issues discussed in this assessment (or issues like the ones discussed here) re-emerge in the future. One mechanism for doing this is for IPR to memorialize their efforts related to diverting system complaints (either as precinct referrals or referrals to other City agencies), handling repeat allegations from the same person despite no basis in fact, and other efforts. We would expect such SOPs to be completed for substantial compliance to be maintained.

|  | 2018 Q3 | 2018 Q4 | 2019 Q1 | 2019 Q2 |
|---|---|---|---|---|
| IPR Admin Closures | 44 | 51 | 47 | 17 |
| Referred for SI | 29 | 18 | 18 | 13 |
| Precinct Referral | 5 | 4 | 10 | 8 |

# COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP) (Par. 142, 144, 145, 146, 149, and 150)

| | |
|---|---|
| Par. 142 | Substantial Compliance - Conditional |
| Par. 144 | Substantial Compliance |
| Par. 145 | Substantial Compliance - Conditional |
| Par. 146 | Substantial Compliance - Conditional |
| Par. 149 | Substantial Compliance |
| Par. 150 | Substantial Compliance - Conditional |

*142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.*

COCL Conditions

PCCEP has been authorized in the PCCEP Plan to perform the functions outlined in Par. 142 (a-e). Substantial Compliance will rest on progress made in future PCCEP meetings. While PCCEP is authorized to perform these functions, it is not required to engage in all of them to achieve Substantial Compliance with Par. 142. However, COCL is particularly interested in whether PCCEP can hold productive meetings, including the full committee and subcommittees and can develop a working relationship with PPB.

Current Status

The City invested considerable time and resources in recruiting, training, and supporting members of the PCCEP. Since then, PCCEP has continued to function as a new body that seeks community input and makes recommendations about ways to improve police-community relations. PCCEP has met regularly since their inaugural November meeting, including holding Town Hall meetings in January and April of 2019 to review our compliance findings, and members of the public have shared comments and concerns at every meeting. PCCEP has established four subcommittees of its own choosing (Mental Health; Race, Ethnicity, and Other Groups; Youth; and Settlement Agreement & Policy), though attendance at these meetings has been sparse. Since PPCEP was originally seated, several members have resigned, for several reasons but alternates have been elevated to fill those seats. More importantly, there are a number of people in the pool of alternates, and City staff are finalizing a process to ensure this alternate pool is repopulated as needed.

Our overall assessment remains the same — that PCCEP is on track to function as a legitimate body for community engagement and feedback on the performance of the Bureau. The members are very talented, thoughtful and motivated to make a difference in police-community relations. They have not been reluctant to express criticism of the police, as we would expect from an independent body. In sum, we believe this group, if supported by the City and endorsed by other stakeholders in Portland, has the capacity to engage effectively with the PPB and the authority to hold them accountable for strategies linked to public trust.

Substantial Compliance for Par. 142 will be assigned by COCL if PCCEP can complete the work required in the PCCEP Plan, and can develop a working relationship with the Bureau, including contributing to the Bureau's Community Engagement Plan.

*144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.*

COCL Conditions

As we noted in our previous reports, the City has provided strong administrative support to the PCCEP. After conducting a thorough selection and training process, the City has provided support in terms of project management, meeting facilitation, accommodations, space, IT support, etc. Unfortunately, the PCCEP Project Director left in November and the community organizing position has not been filled. The City has provided interim support with personnel from the Office of Equity and Human Rights. This individual is very competent but has other responsibilities.

Current Status

On March 18, 2019, the City posted a job opening to fill the project director position, and a finalist was selected in early June. On June 24, Theodore Latta was named as the PCCEP project director, and he attended the PCCEP meeting the following evening. He started full time July 1; accordingly, the COCL can assign Substantial Compliance for Par. 144. The community organizer position was not required by the PCCEP Plan, but the City has committed to providing support as needed—either through a hired position or with grant-based capacity—after the project director is on board.

*145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community.*

COCL Conditions

In our Q4 2018 report, we described PPB's efforts at community outreach and engagement while waiting for PCCEP members to be selected, trained, and begin meeting. As we noted, PPB's work has been extensive, engaging marginalized and at-risk communities through various programs and activities. Also, PPB's well-conceived five-year strategic planning process, which involved input from community members in diverse neighborhoods, will result in a five-year Strategic Plan. The remaining community engagement tasks for PPB to achieve Substantial Compliance under Par. 145 are: (1) to develop a working, transparent relationship with the PCCEP; and (2) to develop a reasonable Community Engagement Plan with input from PCCEP.

<u>Current Status</u>

PPB has engaged with the PCCEP in several ways that are relevant to these conditions. PPB leadership regularly attend PCCEP meetings and have briefed PCCEP on the Bureau's strategic planning process and how the Community Engagement Plan will be embedded in PPB's strategic plan. In addition, the Chief has invited one PCCEP member to join PPB's steering committee and during its March meeting, the PCCEP voted on its representative. Furthermore, the City is expecting that PCCEP members will play an important role in defining the relationship between PPB and the PCCEP.

PCCEP is slated to provide PPB with feedback on the Community Engagement section of PPB's Strategic Plan; the group reviewed and approved several Community Engagement Plan recommendations at its June 25 meeting, and at least one PCCEP subcommittee has additional recommendations pending. PPB will then incorporate this feedback into the Community Engagement Plan as required by the Settlement Agreement.

In sum, a solid path toward Substantial Compliance has been created by initiating and resourcing a PPB-PCCEP relationship and by providing a framework for drafting a Community Engagement Plan. We look forward to seeing this relationship develop in the months ahead and inform the Community Engagement Plan. Substantial Compliance with Par. 145 will be achieved when a working relationship has been established and the Community Engagement Plan has been <u>finalized</u>.

*146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.*

<u>COCL Conditions</u>

In our Q4 2018 report, we identified six tasks that needed to be completed for the City to achieve Substantial Compliance with Par. 146: (1) the communitywide survey instrument must be reviewed by PCCEP; (2) the survey must be finalized; (3) data collection must be completed; (4) the data must be analyzed and a report prepared; (5) the results must be used to "inform the work of the PCCEP;" and (6) the results must be used to "inform … the development and implementation of the Community Engagement Plan."

Current Status

To date, the first four tasks listed by COCL have been completed. The survey, designed with input from PCCEP, has been completed. A report by DMH has been prepared and released to the public and PCCEP; The PCCEP was slated to hear a presentation on the survey results at their June 25 meeting, but the presentation was postponed due to illness. Substantial Compliance will be achieved when the survey results have been used to "inform the work of the PCCEP" and to "inform ... the development and implementation of the Community Engagement Plan." To assist in this process, we have decided to offer a summary of, and commentary on, key findings from the communitywide survey. We have conducted these types of surveys in the past and feel that some caution is needed when interpreting the results. COCL's analysis can be found in Appendix A.

*149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.*

COCL Conditions

To achieve Substantial Compliance, the PPB, DOJ and COCL must agree on a set of metrics and present them to the PCCEP for review.

Current Status

As noted in our Q1 2019 report, COCL, DOJ and the PPB have agreed on four categories to measure community engagement and outreach by the PPB:

- *Interactions with the public and general service delivery.* PPB is expected to continue to engage with diverse community members in a manner that is fair (unbiased), respectful, and helpful. Public perceptions of the PPB and the performance of its officers are considered important metrics, as they affect public trust and confidence in the police. These can be measured through community and/or contact surveys.
- *Communication with the public.* The PPB is expected to establish conduits of information to encourage the bi-directional flow of information between the community and the PPB. These can be measured through the presence, quality, and quantity of information available on PPB's website and social media outlets.
- *Collective engagement with the community through boards, commissions, committees and other stakeholder forums/groups/meetings.* PPB is expected to participate in a wide range of public events and groups for purposes of accountability, transparency, and public education. This participation could be measured through the presence, quality, and quantity of PPB participation in these collective events.

- *Regular reporting to the community on PPB activities*. In the interest of transparency and public education, PPB is expected to report regularly to the community regarding its activities and events in the realm of community engagement (including #3 above). These can be measured through the presence, quality, and quantity of information contained in PPB's reports, website and social media outlets.

The only remaining task was for PCCEP to review these metrics, which occurred at their May 28 meeting. During that meeting, PCCEP also adopted a recommendation to modify a metric to read: "Integrating best practices from police departments from across the country and around the world. An addition to innovating techniques that serve the needs of the Portland community. The Portland Police Bureau is expected to report on efforts made to identify learnings from other departments and integrate those learnings into the Bureau's community engagement work." Following this review and feedback, we can assign Substantial Compliance for Par. 149.


*150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.*

COCL Conditions

To receive Substantial Compliance with Par. 150, PPB would need to: (1) release the final version of the 2017 report to the public; (2) hold at least one meeting in each precinct area and at a City Council meeting to discuss the topics delineated in Paragraph 150; and (3) prepare a more timely annual report for 2018 to demonstrate the ability to produce substantive reports "annually."

Current Status

As noted previously, PPB released a draft of its 2017 Annual Report with much of the required content. PCCEP reviewed the draft and in February, voted to make several recommendations to the Chief to inform the content and timing of the next PPB Annual Report.

PPB has sought to be responsive to the PCCEP's feedback; below are PCCEP's recommendations, as well as COCL's summary of how PPB has responded to those recommendations:

25

- PCCEP Recommendation: We recommend PPB prepare a first draft of its 2018 Annual Report no later than June 2019, to allow PCCEP to review and comment in time for PPB to post the Report publicly no later than September 2019.
  - PPB Response: Draft of 2018 Annual Report was submitted to PCCEP on June 24, 2019.
- PCCEP Recommendation: We recommend the 2018 Annual Report clearly list PPB's annual goals and priorities, and include PPB's self-assessment of progress toward meeting them.
  - PPB Response: The Draft 2018 Annual Report includes both the bureau's goals and priorities, and updates on progress. The Chief's letter in the report clearly states her three goals – crime prevention and reduction, community engagement and inclusion, and organizational excellence.  Information about each is provided in the report.
- PCCEP Recommendation:  We recommend the 2018 Annual Report include self-critical information on annual failures and areas of improvement.
  - PPB Response: In the draft 2018 report, PPB was also responsive to PCCEP's recommendation to be more self-critical. PPB has included a sizeable section on "Challenges" within each of the three main goals.  The organizational challenges, for example, include creating a diverse workforce, use of deadly force, and accountability/trust.
- PCCEP Recommendation: We recommend the 2018 Annual Report include hyperlinks to applicable information found elsewhere on PPB's website, including statistical data and analysis, new and revised directives, critical event information, and relevant external reports, e.g., OIR Group's Review of Officer Involved Shootings and the Auditor's Report on Gang Enforcement Patrol.
  - PPB Response: The report contains multiple hyperlinks to deeper information.
- PCCEP Recommendation: We recommend that PPB present the 2017 and 2018 Annual Reports in each precinct area and at a City Council meeting a required by Paragraph 150 of the Amended Settlement Agreement in United States v. City of Portland, No. 3:12-cv-02265-SI.
  - PPB Response: PPB has informed us that it fully intends to make these presentations after the receipt of PCCEP's comments and preparation of the final version of the report. PPB anticipates a community meeting in each Precinct during August.  The timing of the City Council presentation will depend on the Council's schedule.

PCCEP will review the draft report and vote on any additional recommendations at its next meeting in July.

After PPB receives feedback from PCCEP and makes appropriate changes, the 2018 Annual Report will be published and PPB will make the required presentations, currently scheduled for August 14, 21, and 28. COCL can assign PPB Substantial Compliance with Par. 150 when PPB has presented its Annual Report to the City Council and has presented it to each Precinct.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# **LIST OF PERSONNEL**

Chief of Police: Danielle Outlaw

Deputy Chief of Police: Robert Day (through May 2); Jami Resch (from May 23)

Assistant Chief of Operations: Chris Davis

Assistant Chief of Services: Ryan Lee

Assistant Chief of Investigations: Andrew Shearer

Commander of Professional Standards Division/Compliance Coordinator: Bryan Parman

Professional Standards Division Principal Management Analyst: Mary Claire Buckley

Inspector: Craig Dobson (through April 18); Jeff Niiya (from April 18)

Behavioral Health Unit (BHU) Acting Lt.: Casey Hettman

EIS Supervisor: Jay Bates

EIS Administrator: Dan Spiegel

Training Captain: Erika Hurley

Auditor: Mary Hull Caballero

IPR Director: Constantin Severe (through April 5); Amanda Lamb (interim)

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

# APPENDIX A

**Community Engagement Outcomes: Results from the Community-wide Survey**

The Settlement Agreement is designed to encourage systemic changes within the Portland Police Bureau, including new community engagement strategies that will "promote community confidence in PPB and facilitate police/community relationships." (Section IX Introduction). Increased public trust and confidence in the Bureau should result from improvements in service delivery to Portland residents, especially services to persons with mental illness. Here we review and comment on a few key findings from the citywide community survey (see Par. 146) relevant to these issues, particularly the distinctions between perceptions held by the general public and perceptions held by those who have had personal experiences with the police. We encourage the PCCEP and members of the community to read the full report from DHM as well as PPB's voluntary response[1] to the survey recommendations, and engage in a dialogue with the PPB, especially any implications these findings might have for the Community Engagement Plan.

Legitimacy and trust. Regarding police legitimacy and public trust, Portland residents (taking together residents who had personal experience with PPB and those that did not) remain positive toward the PPB and these views have remained roughly the same between 2016 and 2019 (3.4 on a 5.0 rating scale). For example, 56% view the PPB as trustworthy, versus 17% who disagree (27% neutral). However, public trust is lower among historically marginalized groups. On a 5-point scale, White respondents gave PPB a rating of 3.4 on legitimacy and trust in police, whereas ratings were lower for African Americans (3.1 rating), Latinos (3.1 rating), persons with mental health issues (3.1 rating), Native Americans (2.9 rating). , and those who identify as LGBTQIA+ (2.8 rating). They hold more negative views of the PPB in general, from management to street-level service. These differences in perceptions of the police represent a long-term challenge that can be addressed through consistent community engagement and continuous refinement of service delivery. Research shows that one of the key determinants of police legitimacy and public trust is the level of procedural justice exhibited by officers during encounters with the public. PPB has introduced specific training to enhance procedural justice and reduce implicit bias in policing. Not only should PPB continue this work, but we encourage them to incentivize this type of interaction through performance evaluations, awards, and other forms of recognition.

Quality and Fairness of PPB Services. The community survey queried the public (again, taking together residents who had personal experience with PPB and those that did not) regarding their perceptions of how PPB officers respond to various groups on dimensions such as fairness, respectfulness, and use of force. In general, most people believe they would be treated fairly and respectfully, but there is some concern that the police will not give the same treatment to persons of color or those with mental illness.

Concern that the police might stereotype certain groups was not present for three-quarters of Portland residents, but was very apparent among some of the groups that are stereotyped in society. Concern about being racially or ethnically stereotyped by the police was very high among Native Americans (85%) and Black/African Americans (74%). Concern about being stereotyped was present but was less of a concern (relative to other populations in the survey) among persons who reported a mental health condition (26% vs. 11% other) or a physical disability (27% vs. 6% other). In any event, PPB will need to be sensitive to these groups. Again, procedural justice and implicit bias training should help to alleviate these fears if the training is repeated over time.

---

[1] https://www.portlandoregon.gov/police/news/read.cfm?id=229980

Also, a sizeable percentage of Portland residents felt that the PPB "used more physical force than necessary" when dealing with racial or ethnic populations (47%) and people experiencing a mental health crisis (48%). Similarly, 42% rated the PPB's performance in responding to mental health calls as "poor" or "very poor" – a lower rating than in 2016.

<u>Real Contact with the Police</u>

No doubt the concerns and opinions described above are real and should be addressed in some way. However, an important distinction must be made between perceptions held by the general public and perceptions held by those who have had personal experiences with the police. To a large extent, the survey respondents' perceptions of the PPB are not based on recent direct experience, as more than two-thirds of the citywide sample in Portland did not have any direct contact with PPB officers in the past year. The average community member learns about the police in other ways, such as media coverage or through social communication, which provides only select coverage of events. A large percentage of the public is willing to admit that they simply don't know how people are treated by the police, as they frequently selected the option "Neither Agree nor Disagree" when asked to evaluate how the PPB treated various groups.

The bottom line is that we can learn much more about the quality of police service by asking community residents who have had real contacts with the PPB.[2] For this group (roughly one-third of the sample), the results of the survey are quite different. DHM reports the following:

> *Respondents who had contact with the police were asked how satisfied they were with their treatment by the officer in their most recent interaction (voluntary and involuntary contacts) or the overall experience (mental health crisis). Respondents who contacted the police to report a crime or ask for help were most satisfied (86%), followed by those who had been contacted by the police (76%). Of those who had called for assistance for someone experiencing a mental health crisis, 69% were satisfied. Satisfaction rose in all three areas compared to 2016. In the case of involuntary contact, where police officers contacted the respondent, satisfaction rose 17 percentage points. This increase is notable and suggestive of meaningful improvements.*

So overall, regardless of whether the contact was initiated by the community member or by the police (including stops), the ratings were positive for more than three-quarters of Portland residents and satisfaction with direct contact with the PPB increased substantially between 2016 and 2019, especially for involuntary contact. This change is consistent with what we would expect from the many reforms that have been introduced by the PPB since 2016, including new training in procedural justice, bias, and decision making.

In addition to overall satisfaction with the encounter, community members were asked about <u>fairness of treatment</u>. The vast majority of persons who called the police or were stopped by the police felt they were treated fairly. For 88% of the community-initiated contacts and 78% of the police-initiated contacts, the community members reported being treated fairly by the PPB. Again, these are positive outcomes that would be expected from the reforms.

---

[2] COCL has long advocated for use of a contact survey to capture police behavior from the perspective of community members with a recent police contact. As of this writing, PPB is working with the National Police Foundation to field test such a survey.

But we must be careful to qualify these general conclusions. While <u>most</u> demographic groups within the sample felt they were treated fairly, this was not the case for Black/African Americans when they reported a crime or ask for help from the PPB (only 35% felt treated fairly). Also, for involuntary police-initiated contact, less than a majority of Native Americans (31%) and persons with physical disabilities (45%) felt they were treated fairly. The sample sizes are small, but assuming these findings are reliable, the reasons for these less-positive evaluations should be explored in the future.

<u>Outreach to Community</u>

The PPB keeps a wide range of statistics on its outreach efforts. The number and type of meetings attended by PPB officers have been reported recently by the PPB and COCL and will not be repeated here. However, the community-wide survey offers a new perspective on PPB's outreach efforts, namely that of the community members. Four types of community contacts with a PPB officer were captured through the eyes of the community. Most frequently, community members had a "casual conversation" with a PPB officer (33%). Fewer attended a meeting where an officer introduced themselves (11%), and ever fewer attended a meeting where an officer explained what the police were doing to address neighborhood problems (7%). Some of these low numbers may simply indicate a lack of community interest in these venues. However, one indirect measure of whether officers engaging in proactive contact with local residents (e.g. foot patrol) is whether the community member knew the first or last name of any Portland police officer who patrols in their neighborhood. This figure is only 6% and has not changed between 2016 and 2019. Hence, there is still room to increase the number of one-on-one interactions that can lead to increased knowledge and a better understanding of each other at the neighborhood level.

<u>Police Reforms and Lack of Knowledge</u>

Finally, the community-wide survey provides evidence that the residents of Portland could be more knowledgeable about the work of the PPB and recent systemic efforts to enhance the performance of the organization and its officers. Survey respondents were asked about six things the PPB was doing to improve services, from training to accountability. Only about one-third of the city is aware of the changes being made by the PPB and about half of the city admits that they "Don't know." Some portion of these responses may reflect distrust ("I've been told they are doing these things, but I'm not sure if they really are"). Whether it is a genuine lack of knowledge or distrust of the PPB, more work is needed to educate the public and increase their confidence that these reforms are real and substantial.