# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

# of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

### *Quarterly Report:*

### *All Sections with Remaining Compliance Issues and 2019 Updates on Other Sections*

**Prepared By:**
**ROSENBAUM & ASSOCIATES, LLP**
**For the City of Portland, Oregon**
**July 2019 to October 2, 2019**

**November 21, 2019**



Exhibit A

# **TABLE OF CONTENTS**

**INTRODUCTION** ......................................................................................... 4

**EXECUTIVE SUMMARY** .............................................................................. 5

**SECTION I — Use of Force** ....................................................................... 10

    **Paragraph 69** .................................................................................... 10

    **Paragraph 70** .................................................................................... 13

    **Paragraph 71** .................................................................................... 14

**SECTION II — Training** ............................................................................ 15

    **Paragraph 84***(a)(i)* ......................................................................... 15

**SECTION III – Community-based Mental Health Services** ................. 18

    **Paragraph 88** .................................................................................... 18

    **Paragraph 89** .................................................................................... 19

    **Paragraph 90** .................................................................................... 19

**SECTION III — Crisis Intervention** ......................................................... 21

    **Paragraph 91** .................................................................................... 21

    **Paragraph 92** .................................................................................... 21

    **Paragraph 93** .................................................................................... 22

    **Paragraph 94** .................................................................................... 23

    **Paragraph 95** .................................................................................... 24

    **Paragraph 96** .................................................................................... 24

    **Paragraph 97** .................................................................................... 25

    **Paragraph 98** .................................................................................... 25

    **Paragraph 100** .................................................................................. 26

    **Paragraph 101** .................................................................................. 26

    **Paragraph 102** .................................................................................. 27

    **Paragraph 103** .................................................................................. 28

    **Paragraph 104** .................................................................................. 29

    **Paragraph 106** .................................................................................. 29

    **Paragraph 107** .................................................................................. 29

**Paragraph 108** ....................................................................................................30

**Paragraph 109** ....................................................................................................30

**Paragraph 110** ....................................................................................................31

**Paragraph 111** ....................................................................................................31

**Paragraph 112** ....................................................................................................31

**Paragraph 113** ....................................................................................................32

**Paragraph 114** ....................................................................................................33

**SECTION IV — Employee Information System** ....................................................35

**Paragraph 118** ....................................................................................................35

**Paragraph 119** ....................................................................................................35

**Paragraph 120** ....................................................................................................36

**SECTION V — Officer Accountability** .................................................................37

**Paragraph 121** ....................................................................................................37

**SECTION VI — Community Engagement and Creation of PCCEP** .......................43

**Paragraph 142** ....................................................................................................43

**Paragraph 145** ....................................................................................................43

**Paragraph 146** ....................................................................................................45

**Paragraph 150** ....................................................................................................46

**LIST OF ABBREVIATIONS** ..................................................................................48

**LIST OF PERSONNEL** .........................................................................................50

## **INTRODUCTION**

This is the Compliance and Outcome Assessment Report of the Compliance Officer and Community Liaison (COCL), as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (hereafter referred to as "DOJ"). This third quarter report seeks to achieve two objectives. First, the COCL team provides a status report on the few paragraphs in the Settlement Agreement where the City/PPB had yet to achieve Substantial Compliance by the end of the second quarter of 2019. This includes paragraphs in the areas of Training, Accountability, and Community Engagement.

Second, this report begins the process of reviewing areas where the City/PPB achieved Substantial Compliance prior to 2019, but had yet to be revisited by the COCL in 2019. For instance, in our first two reports of 2019, we focused on paragraphs in the Settlement Agreement that had not yet reached Substantial Compliance so that we might provide a more detailed road-map for PPB and the City to achieve compliance in those paragraphs. In this report, we focus on the other paragraphs in select sections to provide an update and to assess whether PPB and the City had maintained compliance in those paragraphs. In this report, we review the areas of Force, Community-based Health Services, Crisis Intervention, and Employee Information Services. In our next report (fourth quarter), we will review Training, Accountability, and Community Engagement to ensure that compliance was maintained during 2019.

# EXECUTIVE SUMMARY

With this report COCL is able to conclude that, based on our assessment, the City of Portland and the Portland Police Bureau (PPB) have achieved Substantial Compliance with all paragraphs contained in the Settlement Agreement, Case No. 3:12-cv-02265-SI, filed 12/17/12 between the United States Department of Justice and the City of Portland, Oregon. The Department of Justice (DOJ) is the monitor of the Settlement Agreement. Though DOJ may rely on our assessment, the period of sustained substantial compliance does not begin until after DOJ has also determined that the City has substantially complied with all material provisions of the Settlement Agreement.

Achieving Substantial Compliance does not mean that there is no room for improvement within the organization. Indeed, there are always ways that a police organization can strengthen its performance. In the current context, COCL has focused on whether the City and PPB completed the reforms required by each paragraph of the Settlement Agreement and "if any violations of the Agreement are minor or occasional and are not systemic." (Par. 178(a)).

Substantial Compliance also means that the City and PPB have implemented systems of review that facilitate self-assessment, feedback, and organizational change to address problematic trends. Over the past five years, PPB and the Independent Police Review (IPR) have been restructured to include new approaches to auditing, accountability, and training that have improved their handling of force and mental health incidents as well as the timeliness of investigations. New measurement systems have been created and introduced to provide rapid feedback and adjustments, changes that are indicative of a true learning organization. With feedback from the Portland Committee on Community-Engaged Policing (PCCEP) and a new Strategic Plan, PPB's approach to community engagement has a fresh look and new potential. These reforms, along with new and dedicated leadership in middle and upper management positions within PPB, provide a reason to be optimistic.

However, the Settlement Agreement was designed to reassure the public and the Court that the changes made in Portland will be sustained. Paragraph 178(b) of Settlement Agreement indicates that "The Court shall retain jurisdiction of this action for all purposes until the City has substantially complied with all provisions of this Agreement and *maintain substantial compliance with all provisions for one year.*" (emphasis added). Thus, the COCL and DOJ will assess the City/PPB's compliance with the terms of the Settlement Agreement during the one-year maintenance period. COCL will conduct rigorous quarterly compliance reviews to ensure that PPB continues to maintain policies and systems that function effectively and provide durable remedies to the problems DOJ identified. If the City falls out of compliance, COCL will report this, allowing DOJ and the Court to take appropriate action.

The remainder of this executive summary is devoted to COCL's findings during the third quarter of 2019 and our review of progress in selected areas throughout 2019 (as described above). Given the unusual circumstances we faced, where Substantial Compliance was expected on October 2, we decided to extend the Quarter 3 review period until this date to capture these events and bring closure to the standard review process.

**USE OF FORCE (Pars. 69, 70 and 71)**

In this report, we evaluate each of the paragraphs in the Settlement Agreement related to Use of Force that we had found in substantial compliance prior to 2019 (Pars. 69, 70, and 71). For each of these, we find that PPB has maintained substantial compliance. For instance, PPB continues to enforce Directive 1010.00 and 1010.10 (related to Pars. 69 and 70) which contain the responsibilities of officers and supervisors prior to, during, and following a use of force incident. As part of our assessment, we reviewed a sample of use of force events to ensure that the requirements of 1010.00 were found in associated use of force events and validated the findings of the force audit. Additionally, we continue to find that PPB has substantially complied with the supervisory staffing levels described in Par. 71 and that PPB has maintained an adequate span of control ratio.

**TRAINING (Par. 84)**

In our first and second quarter reports of 2019 we noted that PPB's only remaining requirement to achieve Substantial Compliance in Training falls under Paragraph 84, which requires PPB to increase its use of "role-playing scenarios and interactive exercises." From the start of the Settlement Agreement, the COCL has urged the PPB to follow best practices and evidence-based policing to utilize a procedural justice framework in training, which should help to prevent the escalation of tensions and reduce the need to use force to gain compliance. Hence, Substantial Compliance with par. 84(a)(i) was contingent upon PPB's ability to "design and implement a carefully planned scenario where all officers are given the opportunity to practice such behaviors and receive individual feedback during a debriefing session." (COCL Q1 report, 2019).

As part of its Fall In-Service Training for all officers, PPB introduced a training scenario that allowed all officers to practice their procedural justice and communications skills. We observed this training and have concluded that it fully satisfies the requirements of 84(a)(i). The Training Division has developed and implemented a strong curriculum. A realistic scenario includes a set of circumstances that allows officers to test their interpersonal communication skills, receive individualized feedback from instructors on their performance, and learn more about procedural justice and de-escalation. Hence, PPB has achieved Substantial Compliance with all paragraphs in the Training section of the Settlement Agreement. Furthermore, PPB has decided to institutionalize procedural justice as a core component of its training program.

**COMMUNITY-BASED MENTAL HEALTH SERVICES (Pars. 88, 89, and 90)**

With respect to Community-Based Mental Health Services, PPB continues to engage State and local community based mental health service partners. Specifically, the Behavioral Health Unit Advisory Committee (BHUAC) contains a number of State, County, and local representatives and service providers, as does the Behavioral Health Coordination Team. PPB also maintains representation on the Unity Center Transportation Subcommittee and had presented at Transitions of Care committee meetings. Overall, we continue to find that PPB has been an active partner in improving overall community-based mental health service delivery.

**CRISIS INTERVENTION (Pars. 91-115)**

The Behavioral Health Unit (BHU) in general as well as the specific teams within the BHU continue to comply with the requirements of the Settlement Agreement. For instance, the BHU's leadership structure conforms to Par. 91 as does the manner in which BHU collects, utilizes, and shares data and information (see Pars. 92, 93, 95, 104, and 110). The BHUAC continues to meet regularly to provide recommendations to PPB and its members include representatives from all areas of mental health response. Crisis intervention remains a core competency of PPB officers, with all officers receiving a minimum of 40 hours of pre-service training and annual in-service training. Additionally, Enhanced Crisis Intervention Team (ECIT) officers continue to receive an addition 40 hours of training prior to becoming an ECIT officer. Behavioral Health Response Team (BHRT) officers are also required to attend the ECIT training. Both ECIT and BHRT have policies which include the disqualification criteria associated with Pars. 101 and 108 as well as a system for ensuring ongoing qualification. Finally, the Service Coordination Team (SCT) continues to serve those with high criminality and addiction. Overall, we maintain that the paragraphs within the Crisis Intervention section substantially comply with the Settlement Agreement.

**EMPLOYEE INFORMATION SYSTEM (Pars. 118, 119, and 120)**

The Employee Information System (EIS) paragraphs covered in this report deal with the requirements of PPB to maintain EIS thresholds, add an additional force trigger, and employ a second EIS administrator. Regarding thresholds, PPB has maintained the thresholds required in the Settlement Agreement. In our analysis of those paragraphs, we also provide an assessment of alerts forwarded for supervisory review finding that PPB had appears to be managing alerts in a manner that did not overwhelm supervisors and undermine trust in the EIS system. PPB also continues to utilize a risk-management approach to identifying potentially problematic officers. Finally, PPB employs two EIS administrators and have created a manual for training future administrators.

**OFFICER ACCOUNTABILITY (Par. 121)**

In Section V (Officer Accountability) we assess the lone paragraph that we had not yet found to be in substantial compliance (Par. 121). This paragraph requires all administrative investigations to be completed within a 180-day timeline. In the past, we had noted that both IA and IPR had struggled with completing cases within such a timeline – however, using data beginning in the second quarter of 2018, we note that there has been substantial improvement in overall stage and case timelines. For instance, in past reports we noted that IPR had not completed <u>any</u> of their investigations within the required 180-day timeline. However, from the fourth quarter of 2018 onwards, IPR completed 8 full administrative investigations within the timeline and only a single investigation went beyond the timeline. Additionally, for 2018 Q4 and 2019 Q1 (the last two quarters for which 180 days could have passed), IPR and IA's joint compliance rate was 85.4% and 94.4%, respectively. This is a commendable improvement over the second and third quarter of 2018 where joint compliance was near 70% (and is a commendable improvement over the approximate 50% compliance rate we reported in our 2018 Q4 report). In addition to overall case timelines, individual stage timelines have also shown consistent improvement over the past 15 months. Finally, both IA and IPR have memorialized the managerial and procedural changes they have made in their respective SOP's. As a result of these efforts, we now can find the City in substantial compliance with this paragraph.

**COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP) (Pars. 142, 145, 146, and 150)**

COCL has monitored the formation and functioning of the PCCEP since mid-2018. Since its first meeting in November of 2018, the PCCEP has met regularly, providing multiple opportunities for community input on police-community relations. The Committee held Town Hall meetings in January, April, and July of 2019 to review our compliance findings and receive public comments. PCCEP has created four subcommittees and is engaging community members through both listening sessions and a PCCEP-developed policy recommendation process. The full group has provided input into the Settlement Agreement metrics as well as the PPB annual report and the PPB Community Engagement Plan, and is continuing to streamline the recommendations process to make it more accessible and transparent.

PCCEP has been authorized in the PCCEP Plan to perform the functions outlined in Par. 142 (a-e) but is not required to implement all of them for the City to achieve Substantial Compliance. COCL expects that PCCEP will continue to hold productive meetings and continue a working relationship with PPB, particularly around the Community Engagement Plan's goal to "develop a shared understanding of what community engagement means." Overall, the COCL has concluded that the PCCEP is functioning as a legitimate body for community engagement, and can assign Substantial Compliance for Par. 142.

In Q2 of 2019, we concluded that "The remaining community engagement tasks for PPB to achieve Substantial Compliance under Par. 145 are: (1) to develop a working, transparent relationship with the PCCEP; and (2) to develop a reasonable Community Engagement Plan with input from PCCEP." As noted in several recent quarterly reports, and continuing into Q3 of 2019, PPB continues to engage with the PCCEP in ways relevant to Par. 145; on September 24, members of PPB's Community Engagement team within the Community Services Division attended the full PCCEP meeting, presented the proposed Community Engagement Plan, and addressed feedback and questions.

PCCEP has reviewed and approved several Community Engagement Plan recommendations, which PPB incorporated into the proposed Community Engagement Plan as required by the Settlement Agreement. PCCEP facilitated additional review and community input to the plan in August and September, and the Community Engagement Plan was adopted by the Portland City Council on October 2, 2019. The City has achieved Substantial Compliance with the terms of Paragraph 145.

In our Q4 2018 report, we identified six tasks that needed to be completed for the City to achieve Substantial Compliance with Par. 146, related to the annual community survey: (1) the communitywide survey instrument must be reviewed by PCCEP; (2) the survey must be finalized; (3) data collection must be completed; (4) the data must be analyzed and a report prepared; (5) the results must be used to "inform the work of the PCCEP;" and (6) the results must be used to "inform … the development and implementation of the Community Engagement Plan." As we noted in Q2, the first four tasks listed above have been completed. Since then, the PCCEP has heard a presentation on the survey results at their July 23 meeting, and has utilized the survey results to "inform the work of the PCCEP" and to "inform ... the development and implementation of the Community Engagement Plan." Thus, COCL can grant Substantial Compliance with the terms of Paragraph 146.

As we noted in our Q2 report, to receive Substantial Compliance with Par. 150, related to the PPB annual report, PPB would need to: "(1) release the final version of the 2017 report to the public; (2) hold at least one meeting in each precinct area and at a City Council meeting to discuss the topics delineated in Paragraph 150; and (3) prepare a more timely annual report for 2018 to demonstrate the ability to produce substantive reports 'annually.'" As of Q3 2019, the outstanding tasks were the precinct meetings and City Council meeting on the 2019 Annual Report. The precinct meetings occurred in August of 2019, and the Portland City Council heard a presentation by the Chief of Police on the 2018 Annual Report on October 2, 2019. COCL can now assign PPB Substantial Compliance with Par. 150.

# USE OF FORCE (Pars. 69, 70 and 71)

| Par. 69-71 | Substantial Compliance |
|---|---|

*69. PPB shall revise its policies related to use of force reporting, as necessary, to require that:*

   *a. All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and*

   *b. All officers involved or witnesses to a use of force provide a full and candid account to supervisors.*

   *c. In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in Directive 1010.10, as revised. This will take place of Directive 940.00 reports for purposes of paragraphs 70, and 72-77 of this Agreement.*

PPB continues to enforce Directive 1010.00 and Directive 1010.10 for required force reporting. Section 11 of Directive 1010.00 requires officers involved in the use of force to notify a supervisor and complete a force report for Category II through IV uses of force that include "a candid and detailed account of the event, to facilitate a thorough review of the incident in question by supervisory members" (Directive 1010.00, Section 11.1.4). We continue to regularly review Force Data Collection Reports (FDCRs) and have found that the completed forms extensively capture the type and range of information that substantially comply with Par. 69(a)'s requirement for "sufficient information" to facilitate such a review. Additionally, when involved in a use of force, officers regularly submit FDCR's prior to the end of their shift, satisfying the "timely" aspect of Par. 69(a).

Upon receiving a notification of a use of force, supervisors respond to the scene and interview involved and witness officers, soliciting a "full and candid account" (Par. 69(b)). These interviews are then summarized in the supervisor's After Action Report and used, in part, to determine whether the officer's use of force was within policy or not. PPB Directive 1010.00 (Section 11.1.6) mandates that witness officers provide such interviews and we have seen no instances in which a witness officer has refused to provide an interview. PPB Directive 1010.00 (Section 11.1.3) mandates involved officers to provide such interviews when involved in a Category II through IV use of force and we have seen no instances where an involved officer has refused to provide an interview.

For Category I uses of force (lethal force), a complete administrative investigation conducted by the Professional Standards Division (PSD) acts to fulfill the "reporting and review requirements" detailed in subsections (a) and (b) of Par. 69. For instance, Section 3.1 of Directive 1010.10 notes that "the administrative review conducted by PSD is intended to capture all information required in a use of force report." Section 3.3 of Directive 1010.10 notes that for Category I uses of force, "a force After Action report is not required because the administrative review serves this function."

We also conducted force trends analysis to determine the force rates over an extended period of time. Using data beginning in the second quarter of 2015 up to the second quarter of 2019, our analysis demonstrates that PPB's force-to-custody rate has remained fairly low in the past 17 months. Despite a slight increase in force-to-custody rate following change in Directive 1010.00 (which expanded the list of actions which required officers to complete a force report, including actions such as resisted handcuffing), the force-to-custody rate has consistently been near 3%. In other words, about 3% of all custodies result in the application of force (please note that the term "custodies" includes incidents related to arrests, protective custodies, juvenile detentions, cite-in-lieu, and juvenile/non-competent persons returned to their parent/guardian/facility).



Another way to measure use of force over time is what is known as a moving average. A moving average is an average of three-quarter sections. Moving averages are good for examining trends as they "smooth" quarter-to-quarter fluctuation seen in the first figure. Figure 2 shows

such a moving average for the use-of-force incidents. Each time point shown in the graph is an average of the previous three quarters, which is why it begins at Q4 of 2015 rather than Q2 (i.e., the first available three-quarter average covers 2015 Q2 through Q4). Due to the Directive 1010.00 change (which expanded the way that force is measured and reported by the PPB), the chart shows an immediate increase beginning in the fourth quarter of 2017. However, the three-quarter averages begin declining after the second quarter of 2018. Even after expanding the types of actions which require a force report, PPB now uses force with approximately the same frequency as in quarters prior to the revision of 1010.00. As a result of definitional changes with some force types (particularly takedowns), it is not possible to empirically assess whether force types used prior to the 1010.10 revision have declined in the past year. However, this is the likely outcome given the expansion of force types after the 1010.00 revision and yet we see a return to an approximate 3% force-to-custody ratio in the past four quarters.



PPB has continued to enforce revised Directives 1010.00 and 1010.10 and our review of force cases has confirmed adherence to those directives for reporting and review requirements required by Par. 69. Additionally, as shown above, our analysis of force-trend data indicates relatively stable force rates, particularly given the expanded types of actions that require a force report brought on by the changes to Directive 1010.00. Hence, we continue to find PPB has substantially complied with the requirements of Par. 69.

*70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:*

*a. Complete After Action Reports within 72 hours of the force event;*

*b. Immediately notify his or her shift supervisor and PSD regarding all officer's Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement;*

*c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and*

*d. Interview officers individually and not in groups.*

Directive 1010.00 continues to contain the requirements of Par. 70 for non-lethal force events, whereas for lethal force events, Directive 1010.10 delegates the After Action Report process to the administrative investigation conducted by the Professional Standards Division (see Par. 69(c)). For non-lethal force events, supervisors interview involved and witness officers individually, interview witnesses, and detail their investigation in an After Action Report. In cases we have reviewed, we have consistently seen supervisors submit After Action Reports within the 72 hours prescribed by the Settlement Agreement. Additionally, PPB's Force Audit indicates that sergeant timelines are met in 98.9% of cases (1 out of 94 cases audited showed a supervisor timeline deficiency).

Directive 1010.00, Section 12.8 requires supervisors to notify their shift supervisor and PSD when the supervisor identifies a "Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct." Our review of force cases demonstrate that this is consistently done when appropriate, a finding that is also supported by PPB's Force Audit data which zero instances where a notification should have been made but was not.

Overall, we find that PPB's current force policy contains the requirements of Par. 70. Our independent review of cases indicates that appropriate reporting and notifications are done in a timely manner and PPB's Force Audit finds consistent adherence to policy. Given the above considerations, PPB has remained in Substantial Compliance with the requirements of Par. 70.

*71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.*

PPB has maintained the sergeant staffing level required by Par. 71 and currently has a total of 69 sergeants. Additionally, we have noted in previous reports that a sergeant-to-officer ratio is a more informative indicator of span of control than the absolute number of sergeants. In this respect, PPB presently has an approximate 5.2:1 sergeant to officer ratio across the three Precincts which remains within the range of an acceptable span of control. As a result of PPB's current sergeant staffing levels and their span of control ratio, we continue to find that PPB has substantially complied with the requirements of Par. 71.

# **TRAINING (Par. 84(a)(i))**

| Par. 84*(a)(i)* | Substantial Compliance |
|---|---|

*84(a)(i). With respect to patrol officers, PPB shall: increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention.*

To date, PPB has achieved Substantial Compliance ratings from COCL in all aspects of training delivery and evaluation, except for Paragraph 84(a)(I) listed above. In our 2018 Q3 report, we recommended that PPB "give officers ample opportunities to identify and rehearse the interpersonal skills necessary for respectful, fair, empathic, and effective communication with members of the community." In our 2019 Q1 report, we explained that Substantial Compliance will be achieved "when PBB is able to design and implement a carefully planned scenario where all officers are given the opportunity to practice such behaviors and receive individual feedback during a debriefing session."

These behaviors or skill sets embody the core principles of Procedural Justice theory, which the COCL has strongly recommended to achieve successful, non-forceful interactions with the public. We have credited PPB with incorporating procedural justice principles into their 2019 Annual Training Plan and into their 2019 supervisor training, which we observed in March of 2019. However, as we noted in our 2019 Q2 report, "PPB faces the traditional problem of discussing these concepts in the classroom (lecture mode) but giving students few opportunities to practice the relevant skills. Knowledge must be translated into practice, as PPB now does with its training in firearms, CEW, and self-defense." Thus, to achieve Substantial Compliance with Paragraph 84(a)(i), the Training Division needed to design a scenario in which officers could practice procedural justice skills that help to prevent the escalation of tension or help to de-escalate existing conflict. These skills include giving voice to the community member, being respectful, maintaining neutrality (fairness), and demonstrating trustworthiness through expressions of concern, empathy, and helpfulness.

<u>Implementation</u>

As part of PPB's Fall In-Service Training for all officers, a scenario was introduced that allowed all officers to practice their procedural justice and communications skills. As we noted in our last report, considerable time and effort were devoted to the development of this training, including asking COCL and DOJ for feedback on the original conception. We observed this training on September 10th and reached the following conclusions.

First, the scenario was well conceived and provided officers with ample opportunities to demonstrate their procedural justice and de-escalation skills. The situation involved a realistic encounter that could easily escalate if not handled properly. The individuals who role played the community member did an excellent job (COCL will not discuss the details here to avoid influencing officers who have yet to participate in this training).

Second, the training was designed so that officers would be carefully observed by an instructor and their performance evaluated. A standardized rating system was used that captured whether the officer was able to demonstrate the desired skills and describe how they responded.

We observed numerous officers across all three instructors. Our independent assessment was highly consistent with the evaluations done by the instructors. Thus, we have good reason to believe that the instructors were rating officers in a consistent manner using standardized criteria with three levels of success (and the option of failure clearly defined).. Importantly, we found considerable variation in task performance across officers (some struggled, and others performed very well). These differences help to validate the metrics used, as they were able to capture these differences. Also, this variation between officers indicates that the scenario task, as defined, was not too difficult or too easy, but rather was challenging for many officers.

Third, the scenarios were followed by a debriefing session, where each officer would receive feedback from instructors about their performance. We found that all three instructors did an excellent job of debriefing the officers, demonstrating their ability to recognize specific deficiencies in role-play performance and providing constructive feedback. The instructors were not only good at asking relevant questions that would stimulate officers' recall of their interaction with the community member but provided helpful suggestions about how to improve their skills in the future without being overly critical or disparaging. The instructors also used this opportunity to provide officers with a general refresher on the basic pillars of procedural justice.

We had one minor concern about how the procedural justice skills were described by the instructors during the debriefing session, and we provided them with immediate feedback, but this did not distract from the integrity of the training overall. This issue was not of the magnitude that would require any remediation or retraining for officers who had completed the scenario prior to this feedback.

Summary

Following best practices in the policing field, PPB has designed and successfully implemented a training curriculum that should strengthen officers' procedural justice skills, especially during encounters that run the risk of escalating to force applications. The scenario was realistic and engaging for officers and activated opportunities to practice these skills. Students were also given individualized constructive feedback at the conclusion of the scenario. Hence, COCL can assign Substantial Compliance for Paragraph 84(a)(i). With this assessment, PPB has achieved Substantial Compliance with all paragraphs in the Training section of the Settlement Agreement, according to the COCL.

Going beyond the scope of the Settlement Agreement, PPB has decided to institutionalize procedural justice as a core component of its training program. This commitment is reflected in the decision to fill a position in the Training Division devoted to procedural justice training and assign a Lieutenant to oversee this important work. PPB has started down the path of integrating procedural justice into many other classes and topic areas, from crowd management to leadership. We encourage them to continue on this pathway.

# COMMUNITY-BASED MENTAL HEALTH SERVICES (Pars. 88, 89, and 90)

| Pars. 88-90 | Substantial Compliance |
|---|---|

*Par. 88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.*

The crux of Par. 88 remains tied to the concept that the primary responsibility for a comprehensive mental health system falls under the purview of State officials and community-based mental health service providers. However, as oftentimes first responders to individuals in mental health crisis, the City and PPB are expected to act as partners in the mental health system. We have therefore historically evaluated the City's and PPB's efforts in maintaining their partnership with State officials and community-based mental health service providers when assessing compliance with Par. 88. In this respect, the City and PPB continue to approach their partnership roles in substantial compliance with Par. 88.

Specifically, the Behavioral Health Unit (BHU) Advisory Committee continues to include State, County, and local representatives and service providers, as does the Behavioral Health Coordination Team. Additionally, in 2018, PPB partnered with Portland State University (PSU) to evaluate PPB's partnership with community-based mental health service delivery partners. The results showed improvements in the collaboration between PPB and local mental health

partners, but also identified areas for improvement (for instance, addressing discrepancies between law enforcement and service provider policies and procedures). Due to PPB and the City's ongoing efforts to remain a partner in the delivery of mental health services, we continue to find they have substantially complied with the requirements of Par. 88.

*Par. 89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.*

As with our assessment of Par. 88, the onus of Par. 89 lies with an entity separate from the City and PPB and we therefore focus our compliance assessment on factors within the power of the City and PPB. Representatives from PPB continue to attend and participate in quarterly meetings of the Unity Center's Transportation Subcommittee. Representatives from the BHU also presented at bi-monthly Transitions of Care committee meetings, which is facilitated by Unity Center and contains representatives from local hospitals and Community Care Organizations (CCOs). While Unity Center continues to implement its Plan of Correction related to safe operations (see https://www.unityfacts.org/), PPB has continued to act as a partner. We therefore continue to find PPB and the City have substantially comply with Par. 89.

*Par. 90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ["BHU"], the [BHU] Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators to divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursuing tele-psychiatry.*

Like above paragraphs, our assessment of Par. 90 focuses on what may reasonably be expected of PPB in response to a paragraph that puts the onus of reform on an entity not under the authority of the Settlement Agreement. Although PPB has participated on a mental health-focused subcommittee in the past, there has not been sustained opportunity for PPB to

participate in such subcommittees. However, PPB's committees (including BHUAC and BHCT) include representatives from the entities described in Par. 90, demonstrating a proactive approach from PPB to collaboratively work with mental health system partners. While all improvements identified in Par. 90 have not come to fruition, the responsibility for such improvements cannot be reasonably expected to fall primarily on PPB. Where improvements can continue to be made, we would expect PPB to remain an active participant. PPB's current involvement, however, indicates substantial compliance with the requirements of Par. 90.

# CRISIS INTERVENTION (Pars. 91-115)

| Pars. 91-115 | Substantial Compliance |
|---|---|

*Par. 91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an [Behavioral Health Unit] ["BHU"] within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the [BHU]. [BHU] shall oversee and coordinate PPB's [Enhanced] Crisis Intervention Team ["ECIT"], [Behavioral Health Response Team] ["BHRT"], and Service Coordination Team ("SCT"), as set forth in this Agreement.*

PPB's Behavioral Health Unit (BHU) continues to conform to the structure and leadership requirements of Par. 91. A PPB lieutenant oversees the unit and all three teams listed within Par. 91 remain under the umbrella of the Behavioral Health Unit. We will discuss each team (ECIT, BHRT, and SCT) in more detail in their corresponding paragraphs below, but here we note that all are operating in accordance with the Settlement Agreement, thereby legitimizing PPB's management of the BHU. Accordingly, we continue to find PPB has substantially complied with the requirements of Par. 91.

*Par. 92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.*

PPB and BHU have maintained their data-sharing efforts since we last assessed Par. 92. Specifically, the Behavioral Health Coordination Team (BHCT) continues to meet on a biweekly basis to identify individuals with repeat PPB contact and/or who represent an escalating concern. The BHCT includes county partners as well as other city agencies and programs. Additionally, the BHU has maintained their relationship with the Multnomah County Crisis Line (MCCL) and continue to share information on persons who are the subjects of Behavioral Health Electronic Referral System (BERS) referrals with MCCL. BHU also works with MCCL when choosing to delay engagement or disengage with a subject who is in mental health crisis by contacting MCCL and having MCCL provide internal follow-up through their operation of

outreach and service linkage. Finally, the Service Coordination Team continues to work with County partners (in addition to its other City and State partners) to facilitate housing and mental health/addiction treatment for individuals with higher rates of criminality and addiction.

As part of their self-monitoring process, a PPB analyst now conducts an array of auditing activities related to the BHU and its goal of decreasing law enforcement interactions with persons with mental illness. For instance, the analyst was able to identify a trend in BHRT clients demonstrating an increase in PPB contact after a 60-day period (although overall contacts remained lower than prior to BHRT intervention). Through this audit, PPB was able to utilize a BHRT team devoted to follow-up with BHRT clients prior to the 60-day time period, thereby theoretically preventing future contacts near the 60-day period. We look forward to follow-up analyses related to this effort, but, in the meantime, applaud PPB for instituting a regular audit function and utilizing data to inform future efforts. Other audit efforts include an audit of calls where no mental health indicator was identified (to ensure accuracy), audit of ECIT calls where no ECIT was on-scene, audit procedure to identify BHRT clients who have had a recent interaction with PPB, and an audit procedure for identifying PPB designated mental health residential facilities who are having multiple police contacts (in addition to other audits). As a result of PPB's self-monitoring process as well as their continued sharing and utilization of data to work with County partners, and BHU's self-monitoring process and various audits, we maintain that PPB has substantially complied with the requirements of Par. 92.


*Par. 93. [BHU] shall track outcome data generated through [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.*

Consistent with our last assessment of Par. 93, PPB has continued to employ their data tracking initiatives to accomplish the goals of Par. 93. For instance, PPB continues to collect information on officer interactions with persons in mental health crisis by utilizing the Mental Health Template and identifying response strategies based on trends within that data collection tool. Related to this, PPB continues to maintain the "Frequent Contact Referrals" process, by which community members are referred to BHRT if they were the subject of three Mental Health Template reports within a 30-day period. In the past three months, PPB has referred 66 individuals to BHRT through this process. Additionally, the BHU has continued to distribute informational bulletins to roll calls on BHRT clients when attempting to locate them or pass information on to patrol officers. Through such bulletins, PPB can provide follow-up,

assessment, and service linkage to such individuals. The BHU has also continued their BERS referral audit, reviewing police reports to determine instances where officers indicate their intention to refer an individual to BHRT and then ensuring that such referrals were in fact made. Furthermore, as detailed above, a PPB analyst evaluates data to identify new response strategies and bolster the work of the BHRT. To identify officer performance warranting correction, PPB has maintained their process of forwarding all use of force cases involving persons with mental illness to both the Professional Standards Division as well as the Training Division. Through this process, officer actions are reviewed for both policy implications as well as tactical/training implications. Also related to identifying officer performance warranting correction, the BHU continues to perform BERS referral audits to ensure that officers are making referrals if indicated on their reports. Where an issue is found during the BERS referral audit, officers receive appropriate correction. Finally, the BHU continues to distribute their quarterly BHU Newsletter to highlight officer performance and provide updates on BHU operations. As evidenced by the above efforts, we maintain that PPB has substantially complied with the requirements of Par. 93.

*94. Within 90 days of the Effective Date, PPB shall also establish an [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services*

PPB and the BHU have maintained their Behavioral Health Unit Advisory Committee (BHUAC) as well as the committee's representation by entities required by Par. 94 of the Settlement Agreement. As part of their supporting documents for their quarterly reports, PPB has provided us BHUAC rosters for each quarter, demonstrating compliance with each required and recommended entity.

Although not required by the Settlement Agreement, discussions with and within the BHUAC regarding opening their meetings to the public continue although no recent formal vote has occurred (prior votes have maintained the closed-door practice of BHUAC). In March, an in-depth discussion with a representative from the Mental Health Association focused on this topic (see https://www.portlandoregon.gov/police/article/734720 for meeting minutes). As with past reports, we note that community participation in all government meetings is laudable though understand how certain members of BHUAC may be less open given a public audience.

As open meetings are not required by the Settlement Agreement and as the BHUAC has taken this discussion seriously in the past couple years, we do not tie compliance to BHUAC meetings being open, though suggest BHUAC continue to seek avenues for additional community member participation. We therefore continue to find PPB and the BHU have substantially complied with the requirements of Par. 94.


*Par. 95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.*

The BHUAC continues to discuss, consider, and vote on topics related to the development, expansion, and overall improvement of the City's mental health response system (including PPB, BHU, and BOEC) as evidenced by BHUAC meeting minutes. For instance, in the second quarter of 2019, the BHUAC discussed topics related to open meetings, Service Coordination Team (SCT) standard operating procedures, Body Worn Cameras (BWC), alternative mental health crisis response models, interaction survey results and community engagement efforts, and future direction of BHUAC. Where BHUAC recommendations are made, we continue to receive documentation demonstrating PPB provides a response to BHUAC regarding which recommendations are accepted or, if not accepted, a reason for not accepting the recommendation. While we were provided the meeting minutes in PPB's supporting documents, we note that they do not appear on the BHUAC website. We suggest PPB continue to upload non-confidential meeting minutes as soon as they are available in order for the community to review their actions. However, based on the meeting minutes provided to COCL and our discussions with BHU representatives, we maintain PPB and BHU have continued to substantially comply with the requirements of Par. 95.


*Par. 96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.*

We continue to receive and review BHUAC status reports on the operations of BHU, BOEC, and identified recommendations for improvement. Where necessary, we have also reviewed the response to each recommendation by BHU's Lieutenant, continuing the feedback loop process we have used to justify assessments of substantial compliance. As the topics discussed in our assessment of Par. 95 (above) directly relate to the improvement of the City's mental health response system and as we have seen evidence of BHU reviewing and responding to BHUAC recommendations, we continue to find the City, PPB, and BHU have substantially complied with the requirements of Par. 96.

*97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.*

*98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.*

Between the State academy and PPB's Advanced Academy training, all officers receive 40-hours of Crisis Intervention training prior to assuming call-response duties. The curriculum for the academy remains largely consistent with prior training we have reviewed and deemed was consistent with 40-hour training found in other agencies. As also required by Par. 98, PPB has continued to include elements of crisis response refresher training in all annual in-service training. For some years, this has equated to scenarios involving persons in mental health crisis; in other years, PPB has taken a more directed refresher training approach (for instance, last year involved supervisor in-service training about the mental health template. For Fall 2019 In-Service, PPB conducted a comprehensive refresher course on mental health crisis response for all officers, including relevant directives, de-escalation, disengagement, in-class scenarios, BERS referrals, and the overall operation of the BHU.

As required by the Settlement Agreement, the BHUAC reviewed the in-service training (as well as ECIT training – see Par. 102). Following the delivery of mental health response training for all officers, PPB evaluates the impact of training received as part of their comprehensive training evaluation process. Given the ongoing delivery of mental health response training, the coordination with BHUAC on such training, and the evaluation of training, we maintain crisis response continues to be considered a core competency of PPB officers and that PPB continues to substantially comply with the requirements of Pars. 97 and 98.

*Par. 100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers.*

PPB has maintained a roster of ECIT officers in excess of the "initial goal of 60-80 volunteer, qualified officers" and now has approximately 130 operational ECIT officers (and approximately 146 ECIT certified members in total). While these numbers are laudable, we continue to believe that "the demand for ECIT services" is the more important goal. As it relates to demand for services, PPB reported in April of 2019 that calls which met ECIT criteria received an ECIT officer response approximately 75% of the time, which we have noted is consistent with other agencies with a specialized response approach. When ECIT officers do not respond to a call that meets ECIT criteria, it is rarely due to an ECIT officer not being available (coding of "no ECIT officer available" accounts for only 6% of events <u>where an ECIT officer does not respond</u> and 1.5% of <u>all calls</u> which meet ECIT criteria). Other reasons for why an ECIT officer may not respond include the call being resolved prior to the ECIT officer arriving on-scene, the ECIT officer is on a higher priority call, or the ECIT officer being called off by a Sgt. Additionally, PPB has scheduled a November 5-8, 2019 training for a new class of ECIT officers. We therefore continue to find that PPB and BHU have substantially complied with the requirements of Par. 100.

*Par. 101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT].*

PPB continues enforcement of SOP #3-3 (Enhanced Crisis Intervention Team) which includes the requirement of Par. 101 as an explicit disqualifier for ECIT officers. Additionally, PPB maintains a system for ensuring that all new administrative investigations involving discipline based on use of force or mistreatment of persons with mental illness would be forwarded to BHU for removal of the officer from ECIT service (see SOP #43). To date, however, there have been no instances in which there has been a need to put this system into effect. The qualifications of ECIT were reviewed by the BHUAC again in October of 2018 and they voted to approve the SOP with no changes at the December 5, 2018 meeting. As SOP #3-3 and SOP #43 maintain the elements of Par. 101, we continue to find PPB and BHU have substantially complied with this paragraph.

*Par. 102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model.*

Prior to becoming an ECIT officer and being able to respond to ECIT type calls, officers are required to attend the ECIT training which consists of 40 hours of training beyond the 40 hours received through the State Academy and PPB's Advanced Academy and must also pass a competency-based exam at the end of the training. The upcoming ECIT training in November will be reviewed by BHUAC prior to delivery although the training was previously reviewed by BHUAC in 2018. Our prior evaluations of the training found that it substantially complies with the "specially train" requirement of Par. 102. Only minor changes have occurred to the ECIT training have occurred since we last reviewed the curriculum and no new classes have occurred since the third quarter of 2018.

As part their ongoing self-analysis process, PPB has conducted in-depth analyses of the ECIT training, soliciting officer input on each aspect of the training immediately following the training as well as conducting a four-month follow-up survey with officers to identify training topics most relevant to their on-the-job activities. Additionally, the follow-up survey questioned the officers about their perceptions of non-ECIT officers understanding of ECIT and perceptions of the specialized mental health response system. We note here that PPB's self-assessment does not appear to be a symbolic gesture—rather, the evaluation was methodologically sound, and conclusions were supported by the data. For instance, one item in the four-month follow-up survey examined ECIT officer agreement with the statement: "When I attend a call as an ECIT officer, there is confusion as to whether I or the primary officer should lead the call." Responses were varied, with a nearly equal distribution of responses across the agree/disagree spectrum. In their discussion of the findings, PPB noted that:

> more variability was seen on responses pertaining to confusion when an ECIT officer attends a call, as to whether the ECIT officer or other officer should lead the call. Taken together, these results indicate a potential need for clarification on ECIT officers' purpose to non-ECIT officers. Agreement on these items was still an improvement over previous years, indicating recent efforts to clarify the role of ECIT officers are having a positive impact. The continuing efforts of ECIT coordinators in this area may provide additional clarification.

The findings and corresponding discussion in the report read like a scientific journal article, with built-in self-criticism, and are indicative of an organization conducting a serious examination of its training and on-the-street application. This work is also

consistent with the Kirkpatrick Model employed by PPB as an evaluation system. As part of the 2019 In-Service course on mental health response (and particularly related to the topic of "managing the scene"), this finding resulted in PPB clarifying the roles of ECIT officers and who is responsible for acting as the primary officer.

Finally, as it relates to Par. 102, PPB reported to us an instance in which an officer undergoing ECIT training was called out of training and therefore missed a half day of training. Although the officer had not completed the entire 40-hours, the officer was still listed as ECIT certified for the purposes of responding to calls. We stress that this is a singular instance and does not constitute a pattern of non-compliance with the requirements of Par. 102. However, we use this as an example of PPB's on-going self-improvement process. Upon identifying this instance, PPB now ensures the list of ECIT certified officers provided to BOEC only includes those officers who have completed all training sessions and not just the officers who have completed the final exam. We applaud PPB for identifying the issue which led to this situation and implementing a durable remedy.

We continue to find that PPB has substantially complied with the requirements of Par. 102. However, we suggest PPB continue to act as a learning organization by following up on the findings of the ECIT training evaluation and performing regular evaluations of officer training/certification. Such efforts would indicate a maintenance of substantial compliance.


*Par. 103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event.*

PPB's model of mental health response continues to conform to the requirements of Par. 103. ECIT officers are assigned to their normal patrol duties unless dispatched as an ECIT officer. PPB and BOEC have maintained the following defined criteria for ECIT dispatch when there is a mental health component:

- The subject is violent toward others (physically combative, threatening violence, assaulting)
- The subject has a weapon
- The subject is threatening or attempting suicide
- The call is at a mental health facility
- Upon request of the caller
- Upon request of a responding officer

- The subject's behavior indicates an escalating risk of harm of self or others

As indicated in our 2019 Q2 report, we have assessed BOEC's training regarding these criteria and BOEC call-taker's and dispatcher's abilities to dispatch an ECIT officer to be in substantial compliance. As the PPB model continues to maintain regular patrol duties for ECIT officers, we continue to find they have substantially complied with the requirements of Par. 103.


*Par. 104. PPB will highlight the work of [ECIT] to increase awareness of the effectiveness of its work.*

PPB continues to release their quarterly newsletters (see https://www.portlandoregon.gov/police/63093), highlighting the work of the entire BHU, including the work of ECIT. Aside from these efforts, PPB has maintained external efforts to increase awareness of the BHU, including presentations to subcommittees of the Police Committee on Community-Engaged Policing (PCCEP), and Transitions of Care, as well as BHU/County/Cascadia joint presentations, CIT Regional Conference, CIT International Conference, and interviews with media when requested. BHU also continues to participate in broader PPB community engagement events, including "Coffee with a Cop" and "Shop with a Cop." On-the-street interactions with positive outcomes are documented by PPB, providing real-world examples of how PPB intervention was impactful. Overall, we maintain that PPB and BHU have substantially complied with the requirements of Par. 104.


*Par. 106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.*

*Par. 107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer.*

Consistent with Pars. 106 and 107, PPB has maintained three BHRT teams (one in each PPB Precinct) comprised of an ECIT-trained officer and a qualified mental health professional. For PPB officers, BHRT is their fulltime assignment. In addition to the Precinct BHRT teams, PPB has added two additional teams. The first team's primary responsibility is acting as a follow-up to prior BHRT clients. As noted in our assessment of Par. 92, BHU had identified a trend in BHRT clients experiencing an increase in PPB contacts near the 60-day mark after BHRT disposition. In order to proactively address the identified trend, this new BHRT team performs follow-up by

contacting BHRT clients and assessing whether additional service referral may be necessary. The second new BHRT team's primary responsibility is acting as a city-wide team for Portland's houseless population. For all Precincts, BHU consolidated houseless clients under this BHRT team. This may lead to increased trust within the houseless population because of the BHRT's specialization. Through the addition of the two BHRT teams, we believe that PPB is appropriately utilizing resources based on identified needs. We therefore continue to find that PPB and BHU have substantially complied with the requirements of Pars. 106 and 107.

*Par. 108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].*

PPB and BHU have maintained the requirements of Par. 108 in SOP #3-2 (Behavioral Health Response Team) which requires a review of BHRT officers' disciplinary history prior to BHRT assignment. Additionally, the process outlined in SOP #43 ensures that should an administrative investigation result in discipline for use of force or mistreatment of people with mental illness, BHU would be notified and the BHRT officer would be removed. As with SOP #3-3, the BHUAC reviewed SOP #3-2 during their October 2018 meeting and approved the SOP without changes at the December 5, 2018 meeting. As such, we continue to find they have substantially complied with the requirements of Par. 108.

*Par. 109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members.*

PPB has maintained the practice of requiring all BHRT officers to be ECIT trained as well as ensuring specific trainings in accordance with BHUAC recommendations. In the past year, BHRT officers have attended trainings related to threat assessment and mental health investigations as well as have attended numerous conferences through CIT International, Regional CIT, and the Idaho Threat Assessment Conference. At the Regional CIT Conference, members of PPB presented on the topic "Thoughtful Approaches to Reduce Incarceration for Persons Experiencing Behavioral Health Crisis". PPB has provided us documentation related to each of the external trainings attended by BHUAC officers. We continue to find that PPB and BHU have substantially complied with the requirements of Par. 109.

*Par. 110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers.*

PPB continues to utilize ECIT data to identify individuals who may benefit from BHRT intervention. For example, a BHU analysts continues to identify individuals who, in a 30-day span, have been the subject of two or more ECIT-type calls for which a General Offense (GO) report was written and/or was the subject of three or more calls which resulted in a Mental Health Template MHT. A BERS referral is then made for those individuals in order for consideration for BHRT intervention. PPB reports that between June and August of 2019, a total of 66 individuals have been referred to BHRT through this process. Additionally, although not necessarily related to ECIT data (and more broadly related to PPB data), a BHU analyst reviews police reports to identify whether current or past BHRT clients have had recent contact with the police and, if so, whether reassignment to the BHRT is appropriate. When identifying a person who meets criteria for BHRT intervention, BHU continues to coordinate services as a primary outcome. For example, in the second quarter of 2019, the most prevalent outcome for BHRT clientele was Coordinated Services at 26%. For the above reasons, we continue to find that BHU and PPB have substantially complied with the requirements of Par. 110.

*Par. 111. Within 180 days of the Effective Date, PPB, with the advice of the [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process*

PPB has maintained revised Directives 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody (Civil)), 850.22 (Police Response to Mental Health Director's Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). These directives were reviewed by BHUAC and provide clear guidance to PPB officers as to the process for transferring individuals to Unity Center or other hospitals via AMR ambulance service. We therefore continue to find that PPB has substantially complied with the requirements of Par. 111.

*Par. 112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.*

31

The SCT continues to operate in accordance with Par. 112 of the Settlement Agreement by facilitating service to individuals with high rates of addiction and contacts with PPB. In coordination with the Service Coordination Team, the Supportive Transitions and Stabilization (STS) provides a direct housing resource for community members who require additional stabilization prior to entering the low-barrier portion of the SCT program. In 2019, the STS doubled the number of beds available for use by community members. Additionally, in the second quarter of 2019, the Portland City Council extended SCT funding for three years, allowing for continuity of operations for the foreseeable near future.

Evaluation of the SCT continues to demonstrate tangible positive impact of the program. Aside from analyses we have done in past reports (for instance, see our analysis in our 2018 Q2 report), Portland State University continues to perform an annual evaluation as part of its Capstone Study course. Although findings of the 2019 Capstone Study evaluation were not available at the time of this report, prior evaluations have shown positive impact of SCT. Additionally, as part of their internal self-monitoring process, PPB regularly evaluates measures of SCT and STS programs such as referral rates, acceptance rates, decline rates and reason for decline. Additionally, PPB plans on evaluating outcome measures of SCT participation (i.e., employment and criminality) as part of a rotating audit related to the entire BHU. We continue to find SCT is an important aspect of the BHU and that it continues to substantially comply with the requirements of Par. 112.


*Par. 113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB [BHU] or directly to NGOs or community based mental health professionals.*

BOEC has maintained their policies and procedures to triage mental health crisis calls by determining whether the call meets the criteria for ECIT dispatch or is appropriate for forwarding to the Multnomah County Crisis Line (MCCL). For both triage options, there have been no substantial changes to the policies since we have last reviewed them and therefore maintain that BOEC has substantially complied with the requirements of Par. 113. Additionally, the requirement to assign calls directly to the BHU or community based mental health professionals is accomplished through BOEC's relationship with MCCL, which has the resources to provide immediate counseling as well as service linkage and care coordination.

*Par. 114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers.*

As reported in our 2019 Q2 report, BOEC revised their training to reinforce the notion of "when in doubt, send them out" thereby encouraging call-takers and dispatchers to utilize their expertise and training when determining whether a call with a mental health component might benefit from the presence of an ECIT officer. We observed this training and found it to be of high quality (see our 2019 Q2 report). This revised training was provided to all current call-takers and dispatchers as part of BOEC's annual in-service training and is also used in training for all incoming BOEC call-takers and dispatchers. The revised training was also reviewed by the BHUAC.

As part of their training for all new call-takers and dispatchers, BOEC analyzed participant reaction to the training. Across the various training topics, call-takers and dispatchers appear to have reacted positively to the information, presenters, objectives, and contribution to the participants understanding of the topic. Additionally, BOEC evaluates incoming call-takers and dispatchers on various metrics related to mental health stigma. Such analysis is performed using a pre-/post-test methodology. Routinely, scores across incoming cohorts for all metrics showed an increase in positive attitudes towards persons with mental illness, and in particular improvements in measures of empathy.

Going beyond training evaluations, there are operational metrics which indicate BOEC's policies and training are being applied in the field. For instance, when transferring calls to MCCL, we look to see whether BOEC call-takers are forwarding appropriate calls. One metric for evaluating this is whether the calls are returned to BOEC for officer dispatch. Should a significant proportion of calls be returned, this may be an indication that additional training would be warranted. However, data provided by BOEC does not indicate this to be the case. For 2019 Q1, a total of 5 calls out of 138 (3.6%) were returned to BOEC for officer dispatch. In 2019 Q2, a total of 9 calls out of 109 (8.2%) were returned. Although this is an increase quarter over quarter, the numbers are too small to indicate a need for corrective action. However, we suggest BOEC continue to monitor such data and should they identify an ongoing trend, provide appropriate refresher training.

Similarly, we use the number of ECIT request for dispatches as a proportion of calls for service and calls with a mental health component to determine whether training has led to an increased proportion of calls. Comparing the months of April through August for years 2018 and 2019, we observe an overall increase in the raw number of ECIT calls (1,578 in 2018 to 1,891 in 2019) as well as an increase in the proportion of ECIT calls to calls for service (1.3% in 2018 to

1.6% in 2019). Although this increase seems small, the reader should remember that this is a proportion involving calls for service (114,418 in 2018 and 115,507 in 2019). When analyzing ECIT as a proportion of calls with a mental health component ("MH Yes" on the Mental Health Template), we again see an increase. Between April and August of 2018, ECIT calls constituted approximately 12.8% of "MH Yes" calls. Between April and August of 2019, ECIT calls constituted 19.0% of "MH Yes" calls, indicating that BOEC training has led to an increase in the proportion of mental health calls receiving an ECIT officer.

Additionally, as it relates to reinforcing training, BOEC maintains a system for evaluating calls which receive an ECIT dispatch and ensuring that when the number of ECIT calls show a non-seasonal related decrease, call-takers and dispatchers are sent an email reminding them of the notion of "when in doubt, send them out." At each time when BOEC has sent such an email, the subsequent months show an increase in ECIT dispatches. This further validates BOEC's system for ongoing review.

In accordance with the above findings, we maintain that the training provided by BOEC has been well developed and delivered. This contention is further evidenced by the operational analyses (related to the increase in the raw number of calls as well as the increase in ECIT proportions) that demonstrate the training has led to on-the-job impacts for BOEC call-takers and dispatchers. We therefore maintain that BOEC has substantially complied with the requirements of Par. 114.

# EMPLOYEE INFORMATION SYSTEM (Pars. 118, 119, and 120)

| Par. 118-120 | Substantial Compliance |
|---|---|

*Par. 118. PPB shall continue to use existing thresholds, and specifically continue to use the following thresholds to trigger case management reviews: (a). Any officer who has used force in 20% of his or her arrests in the past six months; and (b). Any officer who has used force three times more than the average number uses of force compared with other officers on the same shift.*

*Par. 119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.*

Overall, PPB has continued to utilize 8 events which trigger an EIS alert:

- Commendations: Member received 2 commendations in a 6-month period
- Complaint Count: Member receives 3 complaints in a 6-month period
- Complaint Category: Member receives 2 complaints with an allegation in the same category in a 6-month period
- Criminal Complaint: Member receives any complaint that includes an allegation of criminal misconduct
- Traumatic Incident: Member experiences 3 traumatic incidents in a 30-day period
- Force Ratio: Member's force rate is 20% (1 FDCR to 5 arrests) or higher in a 6-month period
- Relative Force Ratio: Member's force ratio is 3X or more than that of their shift's average ratio
- Force Count: Member files 3 FDCRs in a 30-day period

As the last three thresholds utilized by PPB are explicitly required by Pars. 118 and 119 of the Settlement Agreement, we continue to find the City and PPB have substantially complied with these requirements. Additionally, PPB provides data analyses of the alerts in their quarterly document production, demonstrating the frequency of alerts and the rate for which they are closed during the administrative review process or forwarded on for RU Manager review.

In our 2018 Q3 report, we noted that PPB forwarded force-type alerts on for RU Manager review in approximately 45% of alerts. In the fourth quarter of 2018 and the first quarter of 2019, this ratio dropped to approximately 21%, however this drop also coincided with PPB implementing a modified review approach when force alerts contain a Category IV force event (and counting them as .5 compared with other force events). In their 4th Periodic Compliance Report, DOJ noted this constituted a reduction in "white noise" or alerts that were based primarily on low-level events and "drowned out the more significant alerts coming through the system." We agree with this interpretation. We also note that in the second quarter of 2019, the ratio increased to 38.7% of force alerts being forwarded to the RU Manager. This increase coincided with the introduction of new EIS administrators who were still learning the system. While we do not deride alerts being sent to supervisor, we suggest PPB ensure that such "white noise" is not being re-introduced to the system to such an extent that it overwhelms supervisors and ultimately undermines trust in the EIS system.

In addition to the single-threshold alerts noted above, PPB also continues to utilize comprehensive force data to identify other officers who may benefit from supervisor review and intervention. Using a standard deviation metric, PPB identifies officers using more force (overall) or more types of force relative to other similarly situated officers. These officers (as well as groups/units – see our 2019 Q1 assessment of Par. 117) are discussed with RU Managers and a manual EIS alert is created for supervisors to review and make a determination as to whether an intervention is necessary. We maintain that this type of risk management approach is an important supplement to the overall EIS system, particularly as a supplement to the force thresholds identified in Pars. 118 and 119. PPB remains in Substantial Compliance with the requirements of Pars. 118 and 119.

*Par. 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.*

In accordance with the requirement of Par. 120, PPB continues to employ two EIS Administrators as well as an analyst who documents and tracks compliance with EIS-related reviews. Since our last assessment of Par. 120, a new individual has filled the role of primary EIS Administrator and was trained accordingly. As part of ensuring consistent training across all EIS Administrators, PPB continues to maintain an EIS manual that describes in detail the purpose of EIS, EIS access, how supervisors may utilize EIS, how to process alerts, Performance Discussion Tracker, and other EIS functions. Additionally, the sections of the EIS manual pertaining to how supervisors may benefit from utilizing EIS has been posted to the PPB intranet, completing a process we noted in our last assessment of Par. 120. We therefore continue to find PPB and the City have substantially complied with the requirements of Par. 120.

# OFFICER ACCOUNTABILITY (Par. 121)



| Par. 121 | Substantial Compliance |
|----------|------------------------|

*121. PPB and the City shall complete all administrative investigations of officer misconduct within one hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.*

In the past year, there has been significant improvement in the rate by which full administrative investigations are completed within the 180-day timeline, particularly with respect to investigations completed by the Independent Police Review (IPR). In our assessment here, we provide analysis of case and stage data and review the newly implemented strategies for managing the 180-day timeline. We also comment on the new Standard Operating Procedures (SOP's) developed by IA and IPR to memorialize these management changes.

We note here that we reported in our January - September 2017 report that IA and IPR completed full administrative investigations within 180 days between 30% and 35% of the time. In our 2018 Q4 report (focusing on Section VIII and IX of the Settlement Agreement), we noted that full administrative investigations were completed within 180 days at an approximate 50% rate, but also that IPR had not completed a single investigation within the 180-day timeline. We stated that while there had been improvement in the proportion of cases meeting the 180-day timeline, "the results indicate further work is required." In our 2019 Q1 report, we noted that new case management strategies (such as weekly meetings) appeared to have a positive impact on stage timelines and speculated that these changes should ultimately lead to improved overall case timelines. In that report we described the cause-and-solution analyses performed by IPR, which delineate concrete steps which could be taken to reduce stage and overall case timelines. Additionally, we reported steps proposed by PPB that would theoretically accomplish similar results.

The combined effect of the improvements detailed in prior reports has led to large-scale improvement in case timelines. Consistent with the analysis in our 2018 Q4 report, we evaluate whether cases have been completed within 180 days or, if a case remains open, whether it has passed the 180-day threshold. For our analysis here, we use data from the Administrative Investigation Maintenance (AIM) system for cases opened from April 1, 2018 to August 19, 2019. However, we requested the data be pulled on September 2, 2019 in order to allot time for an intake investigation to be completed, thereby allowing us to assess cases that would have at least gone through an intake investigation (intake investigations are generally afforded

a 14-day window to be completed). For analysis of the overall case timeline, we utilized the variable in AIM labeled "Disposition Date" which does not count time delays due to criminal investigations and officer Leave of Service towards the overall case timeline. For open cases that did not have an associated Disposition Date, we used the day the data was pulled (9/2/19) to calculate the age of the case.

Examining the table below (Table 1), the result which is most notable is the compliance rate with which IPR has completed full administrative investigations. The reader should be aware that in our 2018 Q4 report, we noted that IPR had not completed <u>any</u> of their investigations within the required 180-day timeline. However, particularly from the fourth quarter of 2018 onwards, IPR has completed 8 full administrative investigations within the timeline and only a single investigation went beyond the timeline. Additionally, of the three investigations that were opened in the second quarter of 2019 and remain open, all three appear on track to be completed within 180 days (although one has been approved for an extended investigation stage timeframe, it still appears likely that it will be completed within 180 days). We further note that for the first quarter of 2019, IPR completed both cases it opened in that quarter.

We also note that for 2018 Q4 and 2019 Q1 (the last two quarters for which 180 days could have passed), IPR and IA's joint compliance rate was 85.4% and 94.4%, respectively. This is a commendable improvement over the second and third quarter of 2018 where joint compliance was near 70% (and is a commendable improvement over the approximate 50% compliance rate we reported in our 2018 Q4 report). While these percentages may decrease based on whether the open cases are completed on time, it is still a dramatic improvement when compared to results produced with the same analysis and methodology used previously.

Table 1 – IA, IPR, and Combined Compliance Rates for 180-Day Timeline by Quarter

| Quarter | Metric | IA – Closed | IA – Open | IA – TOTAL | IPR – Closed | IPR – Open | IPR – TOTAL | ALL FULL INVESTIGATIONS – Closed | ALL FULL INVESTIGATIONS – Open | ALL FULL INVESTIGATIONS – TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 2018 Q2 | Not Overdue | 32 | 0 | 32 | 7 | 0 | 7 | 39 | 0 | 39 |
| 2018 Q2 | Overdue | 7 | 6 | 13 | 4 | 0 | 4 | 11 | 6 | 17 |
| 2018 Q2 | Total Number of Cases | 39 | 6 | 45 | 11 | 0 | 11 | 50 | 6 | 56 |
| 2018 Q2 | Compliance Rate | 82.1% | 0% | 71.1% | 63.6% | N/A | 63.6% | 78.0% | 0% | 69.6% |
| 2018 Q3 | Not Overdue | 23 | 1 | 24 | 1 | 0 | 1 | 24 | 1 | 25 |
| 2018 Q3 | Overdue | 7 | 0 | 7 | 5 | 0 | 5 | 12 | 0 | 12 |
| 2018 Q3 | Total Number of Cases | 30 | 1 | 31 | 6 | 0 | 6 | 36 | 1 | 37 |
| 2018 Q3 | Compliance Rate | 76.7% | 100% | 77.4% | 16.7% | N/A | 16.7% | 66.7% | 100% | 67.6% |
| 2018 Q4 | Not Overdue | 25 | 5 | 30 | 5 | 0 | 5 | 30 | 5 | 35 |
| 2018 Q4 | Overdue | 3 | 1 | 4 | 1 | 1 | 2 | 4 | 2 | 6 |
| 2018 Q4 | Total Number of Cases | 28 | 6 | 34 | 6 | 1 | 7 | 34 | 7 | 41 |
| 2018 Q4 | Compliance Rate | 89.3% | 83.3% | 88.2% | 83.3% | 0% | 71.4% | 88.2% | 71.4% | 85.4% |
| 2019 Q1 | Not Overdue | 26 | 6 | 32 | 2 | 0 | 2 | 28 | 6 | 34 |
| 2019 Q1 | Overdue | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 2 | 2 |
| 2019 Q1 | Total Number of Cases | 26 | 8 | 34 | 2 | 0 | 2 | 28 | 8 | 36 |
| 2019 Q1 | Compliance Rate | 100% | 75.0% | 94.1% | 100% | N/A | 100% | 100% | 75.0% | 94.4% |
| 2019 Q2 | Not Overdue | 6 | 23 | 29 | 1 | 3 | 4 | 7 | 26 | 33 |
| 2019 Q2 | Overdue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2019 Q2 | Total Number of Cases | 6 | 23 | 29 | 1 | 3 | 4 | 7 | 26 | 33 |
| 2019 Q2 | Compliance Rate | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 2019 Q3 | Not Overdue | 0 | 24 | 24 | 0 | 4 | 4 | 0 | 28 | 28 |
| 2019 Q3 | Overdue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2019 Q3 | Total Number of Cases | 0 | 24 | 24 | 0 | 4 | 4 | 0 | 28 | 28 |
| 2019 Q3 | Compliance Rate | N/A | 100% | 100% | N/A | 100% | 100% | N/A | 100% | 100% |

In addition to overall case timelines indicating improved efficiency, we also note that individual stages show increasing adherence to their associated timelines. For each case in the AIM data, we evaluated the various stages to determine whether they were completed within their allotted time. Using the "Due Date" associated with each stage, we calculated whether the "Completion Date" for that stage was before or after the due date and coded each stage as "on-time" or "overdue." As seen in the charts below (Figures 3 through 6), there has been a consistent decrease in the overall number of stages that were overdue (both IA and IPR stages) as well as the select IPR stages we identified in our 2018 Q4 report as being regularly overdue. For instance, the proportion of all stages (both IA and IPR stages) that were "overdue" was as high as 37.6% in June of 2018 – however, in August of 2019 only 8.5% of stages were overdue. Additionally, the proportion of "IPR Intake" stages that have been overdue has decreased from a high of 51.2% in August of 2018 to the current level of 5.9% in August of 2019. Similarly, both the "IPR Management Review" stage and the "IPR Assistant Director" stage show large-scale decreases in the proportion of instances where the stage is overdue. Specifically, the "IPR Assistant Director" stage has not been overdue on a stage in the past three months, spanning a total of 63 times in which a case was in that stage. Although not shown in the charts, we also note that in the past four months, IA demonstrated a 100% "on-time" rate (total of 86 cases).

for the stage "IA Assignment" (In contrast, our 2018 Q4 report indicated a 77.3% "on-time" rate during that reporting period).



Figure 3



Figure 4



Figure 5

*April data not available. May data only contained 4 cases, all were completed on time



Figure 6

In addition to the quantitative improvements in stage and case timelines, IA and IPR have taken steps to memorialize the strategies they have implemented in recent months in SOPs. In September, IA provided us with SOPs #29 ("Case Management and Investigative Timelines"), #52 ("Providing Police Bureau Records to Independent Police Review (IPR)"), #22 ("Equal Employment Opportunity (EEO) Investigations"), and #53 ("Electronic Case File Packet Distribution Within PPB"). These SOPs include clear direction regarding several operations that affect investigative efficiency:

- case management, timelines, timeline adjustments and overdue case review (SOP #29)
- a shared mailbox between IA and IPR to request and share PPB records and a two-business-day timeline to provide a response to requests (SOP #52)
- working in coordination with the Bureau of Human Resources (BHR) when an allegation involves workplace harassment, discrimination, and/or retaliation (SOP #22)
- utilizing a shared IA administrative inbox, a shared electronic folder between IA and RU Managers, providing advanced copies of case materials to RU Managers, and distributing findings/receiving notification of completed reviews via shared folders and thumb drives (SOP #53).

Additionally, IPR has provided an updated SOP for administrative investigations which largely mirrors the SOPs developed by IA. For instance, as a companion to IA's SOP #29, Section 1.3 of IPR's SOP provides direction related to case management, timelines, and overdue case review. Additionally, the shared mailbox described in IA's SOP #52 is reflected in Section 4.3, II of IPR's SOP. The BHR guidelines found in IA's SOP #22 are reflected in Section 2.3, IV of IPR's SOP. These similarities between the two units are important to ensure that cases move consistently through the investigative process regardless of which entity is doing the investigation.

Both IA and IPR have implemented a series of changes in practice that have clearly impacted stage and case timelines and have memorialized these practices in SOPs so that such improvements can be maintained. As a result of the above SOPs and the evidence showing improvement in overall case and stage timelines, we find the City and PPB to have substantially complied with the requirements of Par. 121.

# COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

# (Pars. 142, 145, 146, and 150)

| Par. 142 | Substantial Compliance |
|----------|------------------------|
| Par. 145 | Substantial Compliance |
| Par. 146 | Substantial Compliance |
| Par. 150 | Substantial Compliance |

*142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.*

<u>COCL Conditions</u>

PCCEP has been authorized in the PCCEP Plan to perform the functions outlined in Par. 142 (a-e) but is not required to implement all of them for the City to achieve Substantial Compliance with Par. 142. However, COCL expects that PCCEP can hold productive meetings, including the full committee and subcommittees, and can develop a working relationship with PPB.

Current Status

In our Q2 report, we noted that the City did a very good job of recruiting, training, and supporting members of the PCCEP. Since its first meeting in November of 2018, the PCCEP has met regularly, proving multiple opportunities for community input on police-community relations. The Committee held Town Hall meetings in January, April, and July of 2019 to review our compliance findings and receive public comments.

PCCEP has continued to meet regularly and productively as a full Committee and in subcommittees. Four subcommittees were created by PCCEP (Mental Health; Race, Ethnicity, and Other Groups; Youth; and Settlement Agreement & Policy). Attendance at these meetings has been sparse, but PCCEP members have continued to address key issues and make recommendations and further community engagement through the subcommittees. Subcommittees have advanced policy recommendations to the full group, held listening sessions, and have worked to reach into specific communities to enhance engagement.

The full group has provided input into the Settlement Agreement metrics as well as the PPB annual report and early input into the PPB Community Engagement Plan, and is continuing to streamline the recommendations process to make it more accessible and transparent. PCCEP reviewed the proposed PPB Community Engagement Plan at meetings of the Steering Committee, Youth subcommittee, Settlement Agreement and Policy subcommittee and at the September 24 full PCCEP meeting. The committee continues to hear public comment at all meetings and includes community members in subcommittee work.

Some PCCEP resignations have occurred, but this transition has had little impact on PCCEP's functioning, as alternates have replaced those leaving. Furthermore, the pool of alternates is large enough to address future resignations.

Overall, the COCL has concluded that the PCCEP is functioning as a legitimate body for community engagement. The committee has offered thoughtful analysis and recommendations to improve police-community relations and members are not afraid to express their concerns about identified problems. In sum, we believe this group is engaging effectively with the community and PPB and has the authority to hold the PPB accountable for tactics and strategies linked to public trust. Thus, COCL can assign Substantial Compliance for Par. 142.


*145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community.*

COCL Conditions

We have previously described PPB's extensive community engagement work that preceded the existence of PCCEP (COCL Q4, 2018). We also noted PPB's five-year strategic planning process, which involved input from community members in diverse neighborhoods, designed to produce a five-year Strategic Plan. In Q2 of 2019, we concluded that "The remaining community engagement tasks for PPB to achieve Substantial Compliance under Par. 145 are: (1) to develop a working, transparent relationship with the PCCEP; and (2) to develop a reasonable Community Engagement Plan with input from PCCEP."

Current Status

PPB continues to engage with the PCCEP in ways relevant to Par. 145. These actions include: PPB leadership attending PCCEP meetings; briefing PCCEP on how the Community Engagement Plan will be embedded in PPB's Strategic Plan; and inviting one PCCEP member to join PPB's steering committee.

PCCEP has reviewed and approved several Community Engagement Plan recommendations, which PPB incorporated into the Community Engagement Plan as required by the Settlement Agreement.

PCCEP was provided the proposed Community Engagement Plan in late August and discussed the plan at several subcommittee meetings and at the September 24, 2019 full meeting. Several community members commented on the proposed plan, and PCCEP provided additional input—for example, questioning whether PPB needs a full year to "establish an Hispanic/Latinx Advisory Council to strengthen relation[s]," an action item with a proposed due date of 10/1/20.

Pursuant to the PCCEP Plan, the Community Engagement Plan "shall be adopted by Council following a public hearing." Portland City Council held a hearing on the plan on October 2; Commissioners provided feedback before adopting the plan, including a suggestion to prioritize engagement efforts based on what will benefit the community most. With the plan's adoption, PPB has achieved Substantial Compliance with the terms of Paragraph 145.


*146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.*

COCL Conditions

In our Q4 2018 report, we identified six tasks that needed to be completed for the City to achieve Substantial Compliance with Par. 146: (1) the communitywide survey instrument must be reviewed by PCCEP; (2) the survey must be finalized; (3) data collection must be completed; (4) the data must be analyzed and a report prepared; (5) the results must be used to "inform the work of the PCCEP;" and (6) the results must be used to "inform … the development and implementation of the Community Engagement Plan."

Current Status

As we noted in Q2, the first four tasks listed above have been completed. Since then, the PCCEP has heard a presentation on the survey results at their July 23 meeting, and has utilized the survey results to "inform the work of the PCCEP." Additionally, the City has used the results of the survey to "inform ... the development and implementation of the Community Engagement Plan." Thus, COCL can grant Substantial Compliance with the terms of Paragraph 146.


*150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.*

COCL Conditions

As we noted in our Q2 report, to receive Substantial Compliance with Par. 150, PPB would need to: "(1) release the final version of the 2017 report to the public; (2) hold at least one meeting in each precinct area and at a City Council meeting to discuss the topics delineated in Paragraph 150; and (3) prepare a more timely annual report for 2018 to demonstrate the ability to produce substantive reports 'annually.'"

Current Status

As we noted in Q4 of 2018, PPB released a draft of its 2017 Annual Report with much of the required content. PCCEP reviewed the draft and in February of 2019, voted to make several recommendations to the Chief to inform the content and timing of the next PPB Annual Report.

PCCEP reviewed the 2018 Annual Report at its July 23, 2019 meeting, and continued to push PPB to make the annual report longer, in more accessible formats, and to include visual aids such as graphics.

PPB posted the 2018 Annual Report on June 24, 2018, and made the required precinct presentations on August 14, 21, and 28 of 2019. COCL observed the Central Precinct presentation on August 28; though lightly attended, the content was robust, and community members asked questions about policing tactics and made observations about policing in their communities. PPB presented the annual report to the Portland City Council on October 2; Accordingly, COCL can assign PPB Substantial Compliance with Par. 150.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

## <u>LIST OF PERSONNEL</u>

Chief of Police: Danielle Outlaw

Deputy Chief of Police: Jami Resch

Assistant Chief of Operations: Chris Davis

Assistant Chief of Services: Ryan Lee

Assistant Chief of Investigations: Andrew Shearer

Commander of Professional Standards Division/Compliance Coordinator: Bryan Parman

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Jeff Niiya

Behavioral Health Unit (BHU) Lt.: Casey Hettman

EIS Supervisor: Nathan Sheppard

EIS Administrator: Dan Spiegel

Training Captain: Erika Hurley

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne