**Juan C. Chavez**, OSB #136428
Email: jchavez@ojrc.info
**Franz Bruggemeier**, OSB # 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

Attorneys for *Amicus Curiae* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF PORTLAND,<br><br>Defendant. | Case No. 3:12-cv-02265-SI<br><br>FEBRUARY 2020 STATUS REPORT FROM THE MENTAL HEALTH ALLIANCE |

COMES NOW, by and through their attorneys, Juan C. Chavez and Franz Bruggemeier, the Mental Health Alliance, *amicus curiae* in the above-captioned case, provide this brief to aid the Court in its assessment of the proposed amendments to the Settlement Agreement. This brief is supported by the Declaration of Counsel, Declaration of Mark Leymon, and the referenced exhibits and testimony. Based on our assessment of the present state of the settlement agreement, we respectfully ask that the Court further defer entry of the PCCEP amendments until PCCEP has achieved substantial compliance for a period of one (1) year. We further request that the

Court acknowledge that the City is not in substantial compliance with the proposed settlement agreement and should continue to submit status reports to the Court until such compliance has been reached to the Court's and the Public's satisfaction. Lastly, we request that the Court set a separate status conference to take comment and testimony from the parties and the community regarding the City's compliance or non-compliance with the community mental health services component of the settlement agreement.

## I. Introduction

For the February 25, 2020, status hearing, MHA intends to present on six topics:

**1)** PCCEP member attrition;

**2)** The City's lack of meaningful engagement with PCCEP;

**3)** The disbandment of PCCEP's mental health subcommittee;

**4)** "Community engagement" and public meeting law mandate an open and public BHUAC;

**5)** The City has not been in substantial compliance with ¶¶ 88-89 of the proposed settlement agreement; and

**6)** Since 2015, data collected by PPB of use of force against persons experiencing mental illness does not indicate a decrease in such incidents.

The first four topics related to PCCEP speak to the City's obligations under § IX of the Proposed Settlement Agreement, the "Community Engagement" section. *U.S. v. City of Portland*, USDC Case No 3:12-cv-02265-SI, Document 157-2 (D. Or. 2012). The fifth point speaks to § V, the "Community-Based Mental Health Services" section. *Id.* And the last speaks to the *raison d'etre* of the settlement agreement, as laid out in its "Introduction," to ensure that

PPB delivers services that "complies with the Constitution and laws of the United States," *i.e.*, end the unconstitutional pattern and practice of violence against persons experiencing mental illness or who have a perceived mental illnesses. *Id.* at p. 3. The Plaintiff outlined its compliance indicators, listing, "(1) the City has changed its procedures and taken the actions listed in this agreement; (2) community trust in PPB has increased; and (3) the improvements will be sustainable." *Id.* at p. 5. The City may have had successes on the first metric, but the last two cannot be dismissed. So long as the violence against persons experiencing mental illness continues or rises, community trust in PPB will decrease and any improvements made will be lost.

## II. Procedural History: June 8, 2019, Hearing

At issue at the June 6, 2018, hearing were the conditionally approved amendments to the Settlement Agreement—particularly, the amendments added to bring the City back into compliance with the community oversight component of their agreement with the United States. The United States and City of Portland proposed an amendment that created the Portland Committee on Community-Engaged Policing (PCCEP) to fill the gap left by the Community Oversight Advisory Board's (COAB) disbandment.

While the process of drafting, adopting, and filling PCCEP had been underway for some months prior to the preceding hearing held on October 4, 2018, PCCEP had yet to hold its first meeting, and questions loomed as to whether it could fulfill its community oversight function. By the time of the June 8, 2019, hearing, PCCEP had held its inaugural, well-attended and facilitated meeting, followed by smaller, unfacilitated meetings. As MHA reported to the Court, PCCEP's trainer had quit, leaving PCCEP members to wade through its work on its own. There

were other issues occurring at the time that were not reported to the Court but that our brief will discuss below.

At the October 4, 2018, hearing, the Court asked the parties to consider what quantitative and qualitative metrics the Court should consider in adjudging whether the PCCEP amendment should be adopted. Our colleagues at the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) developed metrics, which we believed were adequate for adjudging PCCEP's implementation; however, MHA argued then that because PCCEP had yet to fully convene, assessing metrics for the fairness and adequacy of the amendment would be premature.

MHA brought other concerns to the Court, including the following: our argument that the Community Engagement clauses in the settlement agreement, and Oregon Public Meetings Law, required the Behavioral Health Unit Advisory Committee (BHUAC) of the Portland Police Bureau should be open to the public; the City's non-compliance with ¶¶ 88-89 of the proposed settlement agreement (the walk-in/drop-off center clauses); and the unabated trend of deadly force incidents against persons experiencing mental illness.

**III. Our Analysis and Recommendations**

**A. § IX Community Engagement: PCCEP, SPMI, and BHUAC**

<u>1. PCCEP cannot retain members or recruit and train new ones to keep pace with attrition.</u>

One of the central metrics given to us by this Court at the June 8, 2019, hearing was that it wants "to see that it has been in substantial compliance for an appropriate amount of time." *Status Conf. Trans.* 176:22-23. The Court then announced that the appropriate amount of time is "six months." *Id.* at 177:18. Two hundred sixty-four (264) days, or 8 months and 19 days, have passed since the date of that order, and PCCEP has seen its membership fluctuate in the face of

resignations or irregular attendance. PCCEP has been unable to keep up with the pace of hiring and training new members, meaning that PCCEP has not been running at full capacity.

Until last week, Portlanders did not have a public resource that identified who was or is a member of PCCEP. Even with an accurate list, Portlanders cannot directly contact either PCCEP members or an identifiable member of PCCEP's staff. To contact PCCEP, its website suggests the following email: PCCEPInfo@portlandoregon.gov.

While perhaps that is more indicative of a different kind of problem—one of community engagement—we state this at the outset because providing the Court an accurate count of who or who isn't a member of PCCEP required our own tracking and observation of the group. (Our attrition roster is attached as Exhibit 1 to this memorandum. Members who have left PCCEP are marked in red.) What we do know is that, of the original thirteen members of PCCEP, eleven of the original thirteen have left PCCEP (one of the co-chairs has not attended a general meeting in several months). That gives PCCEP an 85% change of membership from its inaugural group. By comparison, PCCEP has fared worse than the Community Oversight & Advisory Board (COAB) that preceded it: of the original 20 COAB members, only four remained (80% attrition). With PCCEP, as with COAB, new members replace the old, but each new member stalls the group's oversight capacity.

The City has sought to fill those empty PCCEP seats with alternates chosen by the Mayor's Office. Of the first set of six alternates chosen by the Mayor, three are currently listed as PCCEP members. A second set of nine alternates were also chosen by the Mayor's Office. This second set of PCCEP alternates fared less well: of the nine chosen in the Spring of 2019, four are serving on PCCEP. It appears most had quit before becoming PCCEP members.

Between each new set of PCCEP alternates, the training differed. We do not know what the current state of training for PCCEP members is. As the Court will hear from one of the ex-members of PCCEP, Patrick Nolen, the trainings given to the first members of PCCEP did not convey the fundamentals about the settlement agreement—particularly, about mental illness and policing. Mental Health Alliance member Jason Renaud had provided some training on policing and mental illness to PCCEP. Mr. Renaud left the training with the impression that PCCEP were not focused or interested in mental illness and policing. Many PCCEP members remained focused on excessive use of force on persons of color—a considerable topic, but one taken up at the expense of discussing the pronounced systemic issues presented at the intersection of policing and mental illness.

We do know that two new PCCEP members were added in January of 2020 without training. The addition of these two members rounds out PCCEP membership back to thirteen members. Of the current slate, only one of the thirteen (8%) self-identifies as a person with a lived experience of mental illness. Eight percent does not proportionally represent persons experiencing a mental illness in Portland, Oregon. This lack of representation impacts the very community whose lives were, and still are to an increasing degree (*see infra*), at risk at the time of this case's initiation and fails to satisfy the community engagement charge of the proposed settlement agreement. We join AMAC's demand for the hiring of community organizers—especially to engage people with mental illness and addiction.

Fundamentally, if the rate of turnover for PCCEP remains as it has been, MHA cannot be confident that PCCEP can achieve either the work product output a police oversight body would need to make a substantial impact or be a consistent public body that the community can engage

with. MHA believes that PCCEP, both in structure and implementation, bears too many hallmarks of the collapsed COAB and should not be approved.

MHA makes the following recommendations: within a year, PCCEP must meet the following outcomes:

> **1)** Retain at least 50% of its members for a full year.
> **2)** Maintain at least two persons with lived experience of mental illness on the PCCEP.
> **3)** Provide staff support with either professional or lived experience for those persons.
> **4)** Create a comprehensive governance for all parts of the PCCEP.
> **5)** Invest in community organizers to engage people with mental illness and/or addiction

2. The PCCEP plan provides little obligation for the City to participate in meaningful community engagement

Given the above, it would be a formidable challenge for PCCEP to meet its charge of providing an avenue for community engagement with the Portland Police Bureau. But, as currently conceived, PPB has little obligation to respond to or "engage" with PCCEP or the community. The current PCCEP plan provides that the City shall "provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days."[1] But the PCCEP plan does not define the manner, quality, or transparency of such "thorough and timely" responses. Nor does the plan require that the City affirmatively *engage* PCCEP. While the Mayor and Chief of police (or their delegates) are supposed to "endeavor to attend all public meetings of PCCEP, unless PCCEP requests otherwise," the purpose of that attendance is loosely defined: They are "to listen," "to provide information" and "learn from PCEP members and public testimony."[2] Without such structure, this "engagement" is

---

[1] City of Portland Plan for Portland Committee on Community-Engaged Policing (PCCEP), § VII, available at https://www.portlandoregon.gov/pccep/article/749650
[2] *Id.*

likely to seem illusory or pointless. And with illusory feedback, disillusion follows. As the testimony of members of the Sub-Committee for People with Mental Illness (SPMI) will illustrate for the Court, this disillusionment drives member attrition.

While no current U.S.D.O.J. consent decree has solved the issue of community engagement between police forces and the community, other jurisdictions have implemented considerably more durable engagement requirements. In Albuquerque, NM,[3] Los Angeles, CA,[4] and New Orleans, LA,[5] the consent decrees contain some provision requiring police department leadership *and* officers attend community meetings. In Ferguson, MO, each Ferguson Police Department officer is required to "participate in at least one series of meetings, with each series consisting of at least three structured, facilitated dialogues between the same set of officers and community members."[6] Not only must FPD officers attend these dialogues, the officers' discussion "will make up at least one-third and up to one-half of each dialogue group."[7]

Without a meaningful requirement to engage PCCEP—such as, (1) including attendance requirements for PPB officers and leadership; and (2) requiring some form of timely and public engagement with PPCEP recommendations such as a public community meeting and/or publicly posted written responses to recommendations—we do not believe PCCEP will meet substantial compliance with the settlement agreement paragraphs regarding community engagement.

<u>3. The Sub-Committee for People with Mental Illness (SPMI) has disbanded</u>

---

[3] https://perma.cc/4HHZ-C67Q at 81.
[4] https://perma.cc/3AVM-6USX at 20.
[5] https://perma.cc/T5FZ-XXPB at 107.
[6] https://perma.cc/AXP6-DMFG at 3.
[7] *Id.*

The Mental Health Alliance has maintained a close working relationship with PCCEP's sole subcommittee that dealt with the issues addressed in the settlement agreement: the health, safety, and well-being of people with mental illness and/or addiction while interacting with the Portland Police Bureau. SPMI had monthly meetings, a membership that included both PCCEP members and community members, and attendance from members of MHA, the City, and the Police Bureau. Unfortunately, PCCEP's lack of engagement, and the City's lack of engagement *vis-à-vis* PCCEP, left SPMI's well-considered, well-researched, and well-constructed recommendations unexamined and unadopted. In large part, this can be attributed to PCCEP meetings that were poorly managed and facilitated, leaving all but 10 minutes for the important recommendations made by SPMI, and an unwillingness for the City to meaningfully engage with the issues presented by SPMI's recommendations.

As mentioned above, SPMI members will be testifying on those points. For the purposes of this briefing, MHA notes that the cumulative effect of the above-referenced issues have downstream, intra-committee effects. As of February 2020, SPMI has disbanded, leaving PCCEP with no sub-committee studying PPB's interaction with people with mental illness.

<u>4. Community engagement and the BHUAC</u>

As MHA testified at the previous hearing, MHA has engaged the City regarding PPB's Behavioral Health Unit Advisory Committee (BHUAC) non-compliance with the Oregon Public Meeting Law (OPML). The BHUAC does not allow members of the public to attend its meetings. BHUAC meeting times, dates, and locations are not made public. After these engagements, both with the City and directly with BHUAC, the Committee has ultimately decided to not open their meetings in compliance with OPML.

We believe that the BHUAC is subject to the OPML, which sets the floor for community engagement. In addition to requiring meeting times, dates, and locations be made public, the BHUAC should also publish its committee meeting minutes or recordings within a reasonable time after meetings occur. The committee meetings should be held open to the public. Members of the public should be invited to attend and observe BHUAC meetings, but they would not be guaranteed the right to vote or participate in BHUAC meetings. Committee meetings should be held in a space that complies with the Americans with Disabilities Act.

We appreciate that the BHUAC has outlined a plan to increase community engagement—after approximately 8 years of the BHUAC functioning. But the effort to engender trust with the community should be complete compliance with OPML. People from the community do not know about the BHU, and the BHUAC does not get the benefit of hearing individual's concerns, ideas, and potential commendations.

**B. The City Has Not Achieved Substantial Compliance**

<u>A. Current Portland mental health care services cannot meet the volume and acuity of need</u>

Paragraphs 88 and 89 of the proposed settlement agreement require that the City of Portland invest in or ensure that there is a facility or facilities that provides a "walk-in" and "drop-off" service. As outlined by Dr. Jeffrey Eisen of Cascadia Behavioral Health, a walk-in and drop-off would provide a variety of services that an emergency psychiatric emergency facility would not. *Exh.* 2. In Portland, OR, no such facility exists. Our efforts to have the City contribute to the building and operating costs for such a facility were unsuccessful.

In discussion with representatives from the Unity Center for Behavioral Health, it would appear that the acuity and volume of Portlanders with mental health issues has increased while

the availability of services has decreased. The Oregon State Hospital's capacity has been strained for decades, and punitive settings like jails and prisons are neither humane nor adequate to address the health needs of people with mental illness. As the settlement agreement identifies, unless mental health care addresses the needs of Portlanders, more people will come into contact with the police, with increasingly dangerous results. *See infra*.

The MHA believes that the Court would be better informed on this topic with a complete status hearing regarding the adequacy of the City's efforts to fulfill its community health care obligations under the settlement agreement. We propose and recommend that this status conference call in service providers, like those from Unity and Multnomah County, members of the Police Bureau, the parties, the amici, and the public to provide testimony on this topic.

### B. Data collected by PPB of use of force against persons experiencing mental illness does not indicate a decrease in such incidents.

In 2019 the Portland Police Bureau killed five people—all of whom were in mental health crisis. During the same time period in New York City, a municipality with ten times the population, police killed ten people—none of whom, according to publicly available data,[8] were in a mental health crisis. MHA member Michael Hopcroft, in collaboration with Portland State University professor Dr. Mark Leymon, studied the publicly available data collected by PPB, has determined that reported use-of-force against persons in a mental health crisis has remained static or increased even after implementations of structural changes to PPB following initiation of this lawsuit. While this data remains inconclusive because of collection and recordation issues, it does not indicate a decrease in such incidents and should cause alarm.

---

[8] "Fatal Force - 1004 people have been shot and killed by police in 2019," Washington Post
https://www.washingtonpost.com/graphics/2019/national/police-shootings-2019/

The data demonstrating static or increased use-of-force incidents may be attributable to a number of existing factors, whether growth in both in population and decreases in services provided to people with serious and persistent mental illness and addiction. But PPB has not grown to meet this challenge, causing great harm to people in these circumstances. As we have highlighted *supra*, and as the settlement agreement mandates, one of the clearest solutions to this crisis requires a substantial investment from the City into adequate mental health care and addiction services.

While we are confident in our conclusions, and as Dr. Leymon attests to in his declaration we present it within 95% confidence ranges, PPB's data remains inconsistent in both collection and metrics. First, the data is not available in a raw form. What we have is the work of several PPB data analysts. Access to the raw data for outside analysis is necessary for any independent or critical review of police use of force and prevents different conclusions from being made. Second, the data is collected by the police officers themselves, leading to potentially unreliable self-reporting. Lastly, PPB muddles the data by dividing the use-of-force victims into three categories: Mental Health Crisis, Drug/Alcohol, and "Transient" (presumably those perceived to be homeless at the time). These categories are not mutually exclusive, yet the data available to us does not indicate which incidents involve a person in multiple categories. It is likely, given the realities of homelessness, addiction, and mental illness, that incidents will involve single subjects that fit into two or all of these categories. Without knowing about these combinations, the data becomes less clear and less reliable.

What is clear from what is available is that the City cannot claim a decrease in use-of-force against persons experiencing mental illness. Based on what we do know, it appears irrefutable that a person with mental illness in the City of Portland coming into contact with its

police force still faces too high of a risk of harm than should be tolerable either constitutionally or morally. Until the City can improve these statistics, we ask that the Court retain oversight of the Settlement Agreement's implementation.

### IV. Conclusion

We humbly request that the Court consider our testimony, as well as the testimony of community members with lived experience of mental illness and addiction, regarding the proposed settlement agreement amendments. Per our recommendation, we request that the Court continue to conditionally approve the PCCEP amendment and require that a separate status conference be held regarding the adequacy of the City's efforts to create community mental health care services. We are happy to be of any assistance to the Court.

DATED: February 24, 2020.

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
*LEAD ATTORNEY*