**Juan C. Chavez**, OSB #136428
Oregon Justice Resource Center
Email: jchavez@ojrc.info
PO Box 5748
Portland, OR 97208
Telephone: 503-944-2270 ext. 212
Facsimile: 971-275-1839

Attorney for *Amicus Curiae* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF PORTLAND,<br><br>Defendant. | Case No. 3:12-cv-02265-SI<br><br>DECLARATION OF JUAN C. CHAVEZ |

I, Juan C. Chavez, submit the following declaration:

I am the counsel of record for the Mental Health Alliance, and I make this declaration in support of the Mental Health Alliance's February 2020 Status Report for the purpose of identifying exhibits. My statements are true to the best of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

1. **Exhibit 1** is a compilation of data created by Jason Renaud, member of the Mental Health Alliance, depicting the membership and composition of PCCEP as of February 24, 2020.

2. **Exhibit 2** is a true and correct copy of a letter drafted by Dr. Jeffrey Eisen of Cascadia Behavioral Health.

3. **Exhibit 3** is a true and correct copy of the testimony of Michael Hopcraft, and accompanied data compilations and charts. Mr. Hopcraft's testimony is supported by the Declaration of Dr. Mark Leymon.

**I hereby declare that above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: February 24, 2020.

> */s/ Juan C. Chavez*
> Juan C. Chavez, OSB #136428
> *LEAD ATTORNEY*

## PCCEP Member Attrition
November 2018 - February 2020

Over fourteen months eleven out of thirteen members resigned / ceased to participate, 85%

| First | Last | Role | Start | End |
|---|---|---|---|---|
| Yolanda | Clay | member | 11 2018 | 1 2019 |
| Lakayna | Drury | member | 11 2018 | current |
| LaKeesha | Dumas | member | 11 2018 | 1 2020 |
| Robert | Dye | member | 11 2018 | 5 2019 |
| Sharon | Gary-Smith | member | 11 2018 | 4 2019 |
| Aden | Hassan | member | 11 2018 | 4 2019 |
| Andrew | Kalloch | member | 11 2018 | current |
| Michelle | Lang | member | 11 2018 | 8 2019 |
| Patrick | Nolen | member | 11 2018 | 2 2020 |
| Sam | Sachs | member | 11 2018 | 10 2019 |
| Zachary | Thornhill | member | 11 2018 | 12 2018 |
| Kalonji | Williams | member | 11 2018 | 1 2019 |
| Sebastian | Chevalier | member | 11 2018 | NA |
| Yolanda | Salguiero | alternate1 | 12 2018 | current |
| Rachel | Benjamin | alternate1 | 1 2019 | 4 2019 |
| Britt | Masback | alternate1 | 1 2019 | current |
| Steven | Trujillo | alternate1 | 5 2019 | current |
| Vadim | Mozyrsky | alternate2 | 5 2019 | current |
| Marcia | Perez | alternate2 | 5 2019 | current |
| Amy | Anderson | alternate2 | 9 2019 | current |
| Elliott | Young | alternate2 | 9 2019 | current |
| Taji | Chesmit | alternateX | 1 2020 | current |
| Ja'Mari | Etherly | alternateX | 1 2020 | current |

CASCADIA BEHAVIORAL HEALTHCARE
WHOLE HEALTH CARE

CASCADIA ADMINISTRATIVE SERVICES
847 NE 19th Ave., Suite 100
Portland, OR 97207
PHONE: 503.238.0769, FAX: 503.764.9059 | CASCADIABHC.ORG

From:   Cascadia Behavioral Healthcare – Derald Walker, PhD, Chief Executive Officer; Jeffrey Eisen, MD, Chief Medical Officer – on behalf of Mental Health Alliance of Portland

Date:   February 14, 2019

Re:     Community-Based Mental Health Services, Item 88, as outlined in *United States of America v. City of Portland*, Case No. 3:12-cv-02265-SI (2012)

As part of the Department of Justice (DOJ) Settlement as outlined in *United Sates of America v. City of Portland*, Case No. 3:12-cv-02265-SI (2012), Item 88 documents the establishment of drop-off and walk-in center(s) for individuals with behavioral health or substance use disorder concerns. This reads as follows:

*ITEM 88. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus on plans on appropriate discharge and community based treatment options, include assertive community treatment teams, rather than unnecessary hospitalization.*

As one of the largest providers of behavioral health and substance use disorder treatment services in the state of Oregon, Cascadia Behavioral Healthcare has clinical and operational expertise with regard to such programs and treatment modalities. As such, this letter serves to provide advisement on the development of the drop off/walk in model described in Item 88.

In conducting research for this guidance, we additionally gathered data from HealthShare of Oregon and the Multnomah County Mental Health and Substance Abuse Division (MHASD).

An effective and efficient drop off / walk in services is designed to provide:
- *Client-centered, trauma-informed care* that is based upon the urgent or emergent concern identified at the time of arrival to such location;
- *Resources for follow-up care and support* in the community, including geographic *proximity to a mental health shelter* or other service that might immediately meet client needs;
- *Peer support* – individuals with mental health and/or substance use disorder lived experiences who are trained to provide engagement and assistance – as well as *access to mental health and substance use providers* for matters of greater acuity and emergency;
- *Culturally relevant and specific* support and resources reflective of those that utilize the service;
- Opportunities to address *basic living needs* at the time of visit, including such services as restrooms, showers, laundry, light meal/food, and phone chargers.
- *Diversion* from emergency departments and the criminal justice system, including jails;
- Support for *police drop-off and individual or referred walk-in* methods of arrival;
- *24 hours per day, 7 days per week* operations to meet the needs of the community at any time;
- *Access* regardless of insurance or ability to pay, with a funding source *not dependent upon Medicaid* alone.

**CASCADIA** BEHAVIORAL HEALTHCARE
WHOLE HEALTH CARE™

CASCADIA ADMINISTRATIVE SERVICES
847 NE 19th Ave., Suite 100
Portland, OR 97207
PHONE: 503.238.0769, FAX: 503.764.9059 | CASCADIABHC.ORG

This type of service has the potential to provide great support to individuals with behavioral health and and/or substance use disorder concerns, as well as to the broader community. We offer continued advisement to the City of Portland as plans related to Item 88 develop further.

Respectfully submitted,

*[signature]*
Derald Walker, PhD
Chief Executive Officer

*[signature]*
Jeffrey Eisen, MD
Chief Medical Officer

Public Testimony
By Michael Hopcroft
Board member of the Mental Health Association of Portland, member organization of the Mental Health Alliance

Status Conference for *US DOJ v City of Portland*
February 25, 2020


My name is Michael Hopcroft. I'm a member of the board of the Mental Health Association of Portland, which is a member of the Mental Health Alliance.

I'm going to speak in response to the claim of success of this settlement agreement.

All we asked was that you *not kill us*.

In 2019 the Portland Police Bureau killed five people - all people in mental health crisis. At the same time in New York City - with ten times the population - police killed ten people. According to the Washington Post's "Fatal Force" database, none were in a mental health crisis.

To bring attention to excessive use of force by Portland Police, the Mental Health Association of Portland highlighted a single case of use of force to explain the complexity and lack of regulation. In October 2006 James Chasse was brutally killed by three Portland Police officers, and the organization used advocacy tools to raise awareness about his life and death, and the inability of the Portland Police Bureau or City of Portland to hold individual officers accountable for actions which are abhorrent to community values. This advocacy included public testimony and private meetings with city, county and police leadership, extensive education of journalists and thought leaders, collaboration with racial justice and police accountability advocates, organizing a memorial and various community meetings, educating community mental health leaders, and making an award-winning documentary film in 2014.

The organization focused on police use of force as a durable indicator - a canary in the coalmine - of a dangerous multi-jurisdictional service system for people with mental illness. The hypothesis was as acuity - the number of persons with *acute*, or *actively symptomatic* severe and persistent mental illness engaging with public services - increases or decreases, police use of force would also increase or decrease. Because the use of force data was not collected and not made available to the public, because

the PPB had no internal process to review the use of force, and no external oversight agency had access to data, the organization could only track the *lethal* use of force.

In the duration 2012-2019, there were overall reductions in services available to people with severe and persistent mental illness in the Portland area - and this increased acuity. This affected people of all races and economic classes. Inpatient treatment, both public and private, were reduced. Outpatient services became largely reliant on medication with services such as individual therapy, group therapy, case management, and crisis intervention becoming less available. Medicaid payments did not match inflation or healthcare costs. Peer-based services went under-managed by the state and under-utilized by service providers. The availability and potency of legal and illegal drugs increased, including very potent forms of marijuana, legal kratom, and inexpensive methamphetamine. There is more alcohol and lower prices from more businesses than ever before. Prevention and treatment services for addiction and alcoholism were reduced, placing Oregon in the top ten states for addiction and last for access to addiction services. Equally, services for people with mental illness in Oregon counties were reduced, forcing people requiring services to migrate to Portland. All these factors increased acuity.

Because even fewer treatment resources are available for persons of color, use of force against persons of color are higher than against white people. This is all outrageous and unacceptable.

Then in 2014 the US Department of Justice issued their surprising findings statement, which resulted in this settlement agreement, which in part requires the PPB to collect and express data about the use of force against people with mental illness. That data, beginning in the Third Quarter of 2015, is available online.

The reported data has many problems that reduce its usefulness, both as a mechanism of transparency and accounting of activity.

1. The data is entirely collected by the police officers themselves - meaning they are required to both enforce their own behavior and report their own violations.

2. The data is not available in a raw form. What we have is the work of several PPB data analysts. Access to the raw data for outside analysis is necessary for any independent or critical review of police use of force and prevents different conclusions from being made. There is a link to the raw data online - it does not

    work.

3. There are three categories of cases we examined in our evaluation of these reports -- Mental Health Crisis, Drug/Alcohol, and "Transient" (presumably those perceived to be homeless at the time). These categories are not mutually exclusive, yet the data available to us does not indicate which incidents involve a person in multiple categories. It is likely, given the realities of homelessness, addiction, and mental illness, that incidents will involve single subjects that fit into two or all of these categories. Without knowing about these combinations the data becomes less clear and less reliable.

4. How the data has been collected has changed over the duration of collection.
    a. The use of force data collection began in 2012 after initial intervention by US DOJ.
    b. The use of force data reports began to be posted online in 2015.
    c. In 2016 the PPB made a change to data collection and began using a "mental health mask" to prompt officers to include information about mental illness. This affected the data so prior data should be calibrated to match the new method. It's unknown / unclear if that was done. The effect in the illustrations below is substantial.
    d. More types of force began to be collected in 2Q 2017 resulting in an increase in incident numbers that may or may not reflect changes in police action but obscures the frequency of force being used over time. This also makes it difficult to directly compare results in 2019 to results when online reporting began in 2015.

5. The data does not qualify instances of use of force. Some instances of use of force may be justified and some may not. Some instances of use of force may follow PPB policy, and some may not. Because PPB does not routinely release an internal administrative review of instances of use of force, the only qualification metric the public can access comes from the District Attorney's release of investigations prior to their decision to not file charges in cases of lethal use of force. The lethal uses of force are a small percentage of use of force, and likely not representative of the whole. The DA's decision is a metric of crime, not policy, and since the criteria for a criminal conviction of a police officer for use of force in Oregon law is so high, no officer has been prosecuted for lethal use of force in Multnomah County since 1969.

6. We note from public record and discussion with surviving family members that all cases of lethal use of force by members of the Portland Police Bureau since the Settlement Agreement have been against people in some sort of mental health crisis. The term "mental health crisis" has grown over the past few years to be inclusive of persons with severe and persistent mental illness, as well as persons acutely affected by drugs and or alcohol.

7. The PPB has recently again upgraded the online "dashboard" which might be used to segment use of force data. We've visited this website several times over several months using different computers and different browsers each with the same result - the dashboard doesn't work. The illustrations below come from the quarterly force data reports, posted by the Portland Police Bureau and available online.  As we see in illustrations 1, 2, 3 use of force against the three categories of persons has, while fluctuating wildly, not decreased consistently over the reporting period. The data does not adequately explain these fluctuations. Note that these illustrations do not show deadly force per se, as that data is not included by the data sources.

In conclusion, the data as produced by the police bureau is insufficient to claim a reduction in use of force against people with mental illness, in a crisis with alcohol and or drugs, or who are categorized as "transient."


Sources:

Portland Police Bureau - Force Data Summary Quarterly Reports
https://www.portlandoregon.gov/police/62708

"Portland Police Bureau to Begin New Method of Reviewing Officers Use of Force - 1 2012"
http://www.mentalhealthportland.org/portland-police-bureau-to-begin-new-method-of-reviewing-officers-use-of-force/

"Racial and Ethnic Disparities in Multnomah County W. Haywood Burns Institute for Justice Fairness and Equity November 2019"
https://multco.us/file/84525/download

"Fatal Force - 1004 people have been shot and killed by police in 2019," Washington Post
https://www.washingtonpost.com/graphics/2019/national/police-shootings-2019/

*Testimony of Michael Hopcroft*
*February 25, 2020*                                                                                                          4

As you can see from Illustration 1, despite the decline in 2016 likely caused by a change in collection, use of force against persons designated as "Mental Health Crisis" had no change from 2015 to 2019.



*Illustration 1 - use of force against persons designated as "Mental Health Crisis" 2015-2019*

Data illustrations by Mark (Harmon) Leymon, Ph.D.
Associate Professor, Criminology & Criminal Justice, Portland State University

Dr. Leymon's affidavit is attached to this testimony

*Testimony of Michael Hopcroft*
*February 25, 2020*                                                                                       5

Illustration 2 shows a substantial increase of use of force by Portland Police against persons categorized as "transient."



*Illustration 2 - use of force against persons designated as "Transient" 2015-2019*

Data illustrations by Mark (Harmon) Leymon, Ph.D.
Associate Professor, Criminology & Criminal Justice, Portland State University

Dr. Leymon's affidavit is attached to this testimony

*Testimony of Michael Hopcroft*
*February 25, 2020*                                                                 6

Illustration 3 shows another increase in use of force, this time against persons categorized by the PPB as "drugs / alcohol."



*Illustration 3 - use of force against persons designated as "Drug/Alcohol" 2015-2019*

Data illustrations by Mark (Harmon) Leymon, Ph.D.
Associate Professor, Criminology & Criminal Justice, Portland State University

Dr. Leymon's affidavit is attached to this testimony

*Testimony of Michael Hopcroft*
*February 25, 2020*                                                                                                     7