1                IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF OREGON

3                          PORTLAND DIVISION

4
    UNITED STATES OF AMERICA,        )
5                                     )
                         Plaintiff,  )  Case No. 3:12-cv-02265-SI
6                                     )
                    v.               )
7                                     )  February 25, 2020
    THE CITY OF PORTLAND,            )
8                                     )
                         Defendant.  )  Portland, Oregon
9   _____ )

10

11

12

13                        STATUS CONFERENCE

14                    TRANSCRIPT OF PROCEEDINGS

15            BEFORE THE HONORABLE MICHAEL H. SIMON

16            UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

1                            APPEARANCES

2    FOR THE PLAINTIFF:
                            BILLY J. WILLIAMS
3                           U.S. Attorney's Office
                            1000 SW Third Avenue
4                           Suite 600
                            Portland, OR 97204
5
     FOR THE PLAINTIFF:
6                           JARED HAGER
                            U.S. Attorney's Office
7                           1000 SW Third Avenue
                            Suite 600
8                           Portland, OR 97204

9    FOR THE PLAINTIFF:
                            R. JONAS ALEXANDER GEISSLER
10                          U.S. Department of Justice Civil Rights
                            Division
11                          950 Pennsylvania Avenue, N.W.
                            Washington, DC 20530
12

13   FOR THE PLAINTIFF:
                            RENATA GOWIE
14                          U.S. Attorney's Office
                            1000 SW Third Avenue
15                          Suite 600
                            Portland, OR 97204
16
     FOR DEFENDANT CITY OF PORTLAND:
17                          DENIS M. VANNIER
                            City Attorney's Office
18                          1221 SW Fourth Avenue
                            Room 430
19                          Portland, OR 97204

20
     FOR DEFENDANT CITY OF PORTLAND:
21                          TRACY POOL REEVE
                            City Attorney's Office
22                          City of Portland
                            1221 SW Fourth Avenue
23                          Suite 430
                            Portland, OR 97204
24

25

```
 1                          APPEARANCES

 2                          (Continued)

 3

    FOR INTERVENOR DEFENDANT PORTLAND POLICE ASSOCIATION:
 4                          ANIL KARIA
                            Public Safety Labor Group
 5                          3021 NE Broadway
                            Portland, OR 97232
 6
    FOR AMICUS ALBINA MINISTERIAL ALLIANCE COALITION FOR JUSTICE
 7  AND POLICE REFORM:
                            KRISTEN A. CHAMBERS
 8                          Wyse Kadish LLP
                            900 SW Fifth Avenue
 9                          Suite 2000
                            Portland, OR 97204
10
    FOR AMICUS ALBINA MINISTERIAL ALLIANCE COALITION FOR JUSTICE
11  AND POLICE REFORM:
                            JESSICA ASHLEE ALBIES
12                          Albies & Stark, LLC
                            210 SW Morrison Street
13                          Suite 400
                            Portland, OR 97204
14
    FOR AMICUS MENTAL HEALTH ALLIANCE:
15                          JUAN C. CHAVEZ
                            Attorney at Law
16                          PO Box 5248
                            Portland, OR 97208
17

18

19

20  COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                       United States District Courthouse
21                     1000 SW Third Avenue, Room 301
                       Portland, OR 97204
22                     (503)326-8191

23

24                          *   *   *

25
```

TRANSCRIPT OF PROCEEDINGS

(February 25, 2020)

(In open court:)

DEPUTY COURTROOM CLERK:  Your Honor, this is the time set for status conference in Civil Case 12-02265-SI, United States of America v. City of Portland.

Can I have counsel, beginning with the government, please identify yourself for the record.

MR. GEISSLER:  Good morning, Your Honor. Jonas Geissler of DOJ Civil Rights Division for the United States.

THE COURT:  Good morning.

MR. HAGER:  Jared Hager, U.S. Attorney's Office, for the United States.

THE COURT:  Good morning.

MS. GOWIE:  Renata Gowie.

THE COURT:  Good morning.

MS. GOWIE:  Civil chief of the U.S. Attorney's Office.

THE COURT:  Good morning.

MR. WILLIAMS:  Good morning, Your Honor. Bill Williams, U.S. Attorney.

THE COURT:  Good morning, sir.

MS. ALBIES:  Ashlee Albies for Albina Ministerial Alliance Coalition for Justice and Police Reform.

1          THE COURT:  Good morning.

2          MS. CHAMBERS:  And Kristen Chambers for AMAC as well.

3          THE COURT:  Good morning.

4          MR. CHAVEZ:  Good morning, Your Honor.  Juan Chavez

5     for the Mental Health Alliance.

6          THE COURT:  Good morning.

7          DR. HAYNES:  Dr. LeRoy Haynes, Jr., for the AMAC

8     Coalition.

9          THE COURT:  Good morning, sir.

10         MR. KARIA:  Good morning, Your Honor.  Anil Karia for

11    the Portland Police Association.

12         THE COURT:  Good morning.

13         MS. REEVE:  Good morning, Your Honor.  Tracy Reeve

14    for the City of Portland.

15         THE COURT:  Good morning.

16         MR. VANNIER:  Good morning, Your Honor.

17    Denis Vannier for the City of Portland.

18         THE COURT:  Good morning.  Welcome to you all.

19     I want to do something a little bit differently at this

20    status conference.  As you all know, there are primarily two

21    sections of the settlement agreement that still are under

22    active review and have generated some controversy from the

23    original settlement agreement, the accountability section,

24    Section 8, and the community engagement and creation of the --

25    now called the Portland Committee on Community-Engaged

Policing, the PCCEP, from Section 9.

As amended, as of our last status conference, which we held on June 6, 2019, I think everyone was in agreement that the City of Portland was not yet in substantial compliance with those two sections of the settlement agreement. At that conference on June 6th, I stated that I wanted to see substantial compliance with the proposed amendments -- at least many of the proposed amendments were approved unconditionally. I had only given conditional approval on two amendments, and I wanted to see substantial compliance with those proposed amendments, for which I had only given conditional approval, for at least six months before granting final approval.

Now, in preparation for today's status conference, I have received and read submissions from a number of organizations and people. Let me summarize some of the key points for you because I think this will frame our discussion this morning. And, also, if you do not hear your name mentioned or your organization mentioned and you have submitted written comments, that means that I have not seen them. So please let's fix that. But let me tell you what I have seen.

I'm going to start by acknowledging that I have received the report from the plaintiff, United States, as represented by the U.S. Department of Justice, and at the beginning of that report, the plaintiff, United States, states, quote, "As detailed in this report, the United States now finds that the

1   City has achieved substantial compliance with all components of

2   these two sections as of January 10, 2020."  Two weeks ago.

3        That's from Docket 212 at page 2.

4        I have also received and read submissions from the City of

5   Portland.  And in the City of Portland's third memorandum,

6   updating the status of the Portland Committee on

7   Community-Engaged Policing, the PCCEP, in support of the final

8   approval of the settlement agreement amendments to sections 9

9   and 10, the City stated, quote, "The compliance officer and the

10  Department of Justice have now found that the City is in

11  substantial compliance with these sections and has been for a

12  number of months."

13       That's from Docket 214 at pages 1 to 2, and the City was

14  referring to and citing the report from the COCL.  Basically

15  the report titled Compliance and Outcome Assessment Report of

16  the Compliance Officer and Community Liaison, the C-O-C-L, the

17  COCL, dated November 21, 2019.

18       And that can be found at Docket 211-1.

19       I have also received and read the submission, the recent

20  submission, from the Albina Ministerial Alliance for Justice

21  and Police Reform, and in their February 2020 status report of

22  the Albina Ministerial Alliance for Justice and Police Reform,

23  the AMA Coalition stated, quote, "The City has made some

24  progress with the PCCEP, including training, holding meetings,

25  and replacing members.  In addition, most of the PCCEP members

1   seem to be well-qualified and dedicated to making the committee

2   a success.  However, the AMA Coalition still has serious

3   concerns about the PCCEP.  The AMA Coalition's current

4   evaluation of the PCCEP's effectiveness based on the

5   qualitative and quantitative measurements presented to the

6   Court prior to the June 2019 hearing is as follows."  And then

7   they have identified -- that's the end of the quote.

8        Then they have identified 17 specific issues under the

9   heading Quantitative Measures and an additional seven issues

10  under the heading Qualitative Measures.

11       And The AMA Coalition notes that the City should not be

12  found by the Court to be in substantial compliance with the

13  community oversight and engagement and mental health crises

14  sections of the settlement agreement.  And The AMA Coalition

15  further recommends, quote, "that the Court should schedule

16  another hearing in six months, and order a local person to

17  serve as independent court monitor to evaluate the City's

18  progress in meeting the qualitative and quantitative measures

19  identified by The AMA Coalition," closed quote.

20       The AMA Coalition added that it agrees to advocate for the

21  implementation of the settlement agreement and PCCEP reforms

22  that The AMA Coalition supports and will oppose any attempts to

23  weaken or dilute the settlement agreement and the PCCEP reforms

24  that The AMA Coalition supports, but The AMA Coalition

25  concludes that the Court should, quote, "not rush through the

1   settlement agreement, particularly when it comes to community

2   oversight and engagement, and to allow more time for the City

3   to demonstrate its plan will be effective," closed quote.

4   　　　That's from Docket 220.

5   　　　I've also received and read the submission from the Mental

6   Health Alliance.  In the submission by the Mental Health

7   Alliance, that organization states, quote, "We respectfully ask

8   that the Court further defer entry of the PCCEP amendments

9   until PCCEP has achieved substantial compliance for a period of

10  one year.  We further request that the Court acknowledge that

11  the City is not in substantial compliance with the proposed

12  settlement agreement and should continue to submit status

13  reports to the Court until such compliance has been reached to

14  the Court's and the public's satisfaction.  Lastly, we request

15  that the Court set a separate status conference to take comment

16  and testimony from the parties and the community regarding the

17  City's compliance or non-compliance with the community mental

18  health service's component of the settlement agreement," closed

19  quote.

20  　　　That's from Docket 217.

21  　　　I have also received a number of separate communications

22  that have not been filed in the court docket.  If anyone wants

23  copies or needs copies of that, please see my courtroom deputy.

24  But let me identify for you what I have received so that you

25  all know.  And I assume that the United States and the City and

1   the various amici have received copies of this; but, if not,

2   let my courtroom deputy know.

3        First of all, I have received the Portland -- the PCCEP,

4   the Portland Committee on Community-Engaged Policing, interim

5   compliance assessment report.  I think that was submitted this

6   morning, and I read it this morning.

7        I have also received -- that was not yet filed.  That's

8   not been filed, and I think it should be filed in the court

9   docket.

10       I have also received a number of separate comments -- five

11  specifically -- that I have received and read, and so if yours

12  is not among these, please know I have not received it, and if

13  you want to submit a hard copy, please do.  But I have received

14  a report from Ms. Amanda J. Marshall, the co-chair of the PCCEP

15  Subcommittee for People with Mental Illness, the SPMI.  I have

16  also received and read a report from Patrick Nolen, also a

17  co-chair of the PCCEP Subcommittee for People with Mental

18  Illness.  I have received and read written testimony from

19  Meredith Mathis, who is a member of the SPMI.  I have received

20  and read a report from Portland Copwatch.  And, finally, I have

21  received and read a report from the League of Women Voters of

22  Portland.

23       So, again, if you submitted something, I have not received

24  it.  So please make sure my courtroom deputy gets a copy of

25  that.

1           Based upon all of my reading, from the United States

2     reports to the City's reports to the COCL's reports to the

3     amici's reports, as well as the public reports, it appears to

4     me that there is a serious disagreement over whether or not the

5     City is in substantial compliance.

6           So rather than handling the status conference the way

7     we've done in the past, where I hear from the United States, I

8     hear from the City, I hear from the amici -- and, by the way, I

9     have -- Mr. Karia, I have not received anything in writing from

10    the Portland Police Association.  I usually don't, but if you

11    have submitted something in writing, I didn't get it.

12           MR. KARIA:  I did not submit anything in writing.

13           THE COURT:  Thank you, sir.

14           So rather than handling things the way I have done it in

15    the past, where we hear from the United States, the City, the

16    Portland Police Association as intervenor, the amici, and then

17    members of the public, it would be more helpful to me to

18    understand the dispute and the potentially correct resolution

19    to the dispute over whether the City is or is not in

20    substantial compliance to hear first from some of the

21    organizations and people who contend that the City is not in

22    substantial compliance, and then I will ask the United States,

23    the City, the COCL, any other persons or organizations that

24    want to address that issue, to respond specifically to the

25    objections and the contentions that are made for why the

1    City -- or in what respect the City is not currently in

2    substantial compliance.

3        I think that will help bring the issue together so that

4    the answers will be clearer, and then I think at some point,

5    whether as part of those discussions or afterwards, we need to

6    have some discussion, and I would like some input from you all

7    as to what do we do next.  Because as I read the settlement

8    agreement, there are a couple of pieces that may be at odds or

9    intention.  For example, I don't think I have the authority to

10    order any remedial provisions, absent a motion from the United

11    States.  If that's correct, well, then that's correct.  I

12    follow the law.  We believe in the rule of law in this

13    building.

14        And so what does that mean?

15        Similarly, the settlement agreement provides that it does

16    not end or terminate until at least one year after substantial

17    compliance.  So if the finding of the Court is that there's no

18    substantial compliance -- and that sentence, of course, begins

19    with an "if."  If that's the finding of the Court, then the

20    settlement agreement continues.

21        I'm not quite sure what the benefit is of a settlement

22    agreement continuing, absent the ability of the Court to

23    provide any remedial relief absent a motion by the United

24    States, and if the United States is of the opinion that there

25    is substantial compliance, then one can reasonably assume that

1    there will not be such a motion to enforce.  But I don't know,

2    and I look forward to comments about that.

3        Similarly, there was a comment by one or more of the amici

4    and other commentators that I appoint a court monitor.  To the

5    extent it makes sense, I will be glad to consider the

6    appointment of someone, though, who can monitor things and then

7    report back to us all -- report back to me and to you all.  But

8    as I said, given the nature and the structure of this

9    particular settlement agreement, which is not a consent decree,

10   I don't think I have any authority to order any legal relief,

11   at least absent motion by the United States.  And so your input

12   on that issue is invited and welcome as well.

13       And then -- I think I'll end it there.  I do have a few

14   more observations I want to make.  I may reserve those until a

15   little bit later.

16       It does seem to me to make sense now, if you are all

17   ready -- and I apologize for not giving you more advanced

18   notice, but these thoughts did not really emerge clearly to me

19   until I had completed all of the readings of the submissions,

20   which I had only fairly recently done.  So I think it makes the

21   most sense to me to hear first, if they're ready, from

22   representatives of the Albina Ministerial -- you know what?

23   I'll put a footnote there.  I have heard that at least one

24   person has a medical issue and would like to address the Court

25   first.  I'm going to allow him to do that.

1   If there's anyone else who would like, for legitimate

2 needs, to speak first -- legitimate physical or other medical

3 needs, to speak first, let my courtroom deputy know, and I'll

4 be glad to accommodate whatever is reasonable.

5   So I'm going to let that one person speak first.  After

6 that person, I would like to hear from the Albina Ministerial

7 Alliance for Justice and Police Reform, followed by the Mental

8 Health Alliance, followed by probably -- I don't feel strongly

9 about this order but Ms. Marshall, Mr. Nolen, Meredith Mathis,

10 Portland Copwatch, League of Women Voters, and then I think

11 there's one or two other people who have signed up.

12   And after that, we'll take a little recess, and then I

13 would invite either the United States or the City or the

14 Portland Police Association -- whatever order you think is

15 best -- to give some specific comments in response.

16   And, Ms. Albies, you have risen, but I wanted to call on

17 that other person first.  Is there something you want to say?

18 Is that acceptable to AMA?

19   MS. ALBIES:  We would appreciate a couple of minutes

20 to caucus, mostly because, as you know, my clients are the ones

21 who present the information, and I just want -- would

22 appreciate a moment to --

23   THE COURT:  That's fine.  And if you prefer, I would

24 be glad to call on the Mental Health Alliance first if they

25 don't need the time to caucus.

1          MR. GEISSLER:  Pardon me.  For the United States, two

2     issues, if you please.

3          THE COURT:  Please.

4          MR. GEISSLER:  May I take it, then, in Your Honor's

5     review of the reports, there's not an issue with respect to the

6     accountability section, Section 8?

7          THE COURT:  I did not see one.  And so if I missed

8     it, I hope someone will call that to my attention, but I did

9     not see one.

10          MR. GEISSLER:  Thank you, Your Honor.

11      And with respect to the soliloquy between witnesses and

12     the Court today, may I take it, Your Honor, that this is going

13     to be in the same informal, non-sworn fashion as in the past?

14          THE COURT:  Yes.  And that's one of the issues that I

15     think I would like to hear some people's opinions on, but

16     not -- I mean, I don't want to have an evidentiary hearing

17     today.  But if there really is a serious question remaining on

18     whether or not the City is in substantial compliance, then,

19     procedurally, what's the right way for the Court to resolve

20     that?  Because I don't think that I can terminate the

21     litigation and conclude the settlement unless I make a finding

22     there has been substantial compliance for at least one year.

23     How do I go about reaching that conclusion if there is

24     disagreement, including among the amici as well as among the

25     public, with the representations of the plaintiff and the

1   defendant?

2       Should there be a -- an evidentiary hearing at some point

3   in which witnesses are called and witnesses are cross-examined?

4   So you are correct in your assumption.  It is not my

5   expectation today to swear in anyone or to have an evidentiary

6   hearing, but I am curious as to if we leave the hearing today

7   concerned that there may be a serious evidentiary question,

8   if -- you know, if it's not an evidentiary question, if

9   everyone agrees on what the facts are but can dispute what

10  legal conclusions remain, that's more like a summary judgment

11  argument.  We can have oral argument.  But if there are

12  evidentiary matters in dispute that will inform whether or not

13  the City is in substantial compliance, what's the best way to

14  resolve those evidentiary disputes?

15      And I would very much appreciate both the United States'

16  and the City's, as well as anyone else's counsel and positions

17  on that question.

18      Does that answer your question?

19          MR. GEISSLER:  It does, Your Honor.  I'll accept your

20  initial invitation to not answer that question at this point in

21  time.  Rather, the United States, I believe, would like to

22  caucus, discuss that among ourselves, and rely upon the past

23  practice in similar cases.

24      With respect to the testimony today, if Your Honor is

25  amenable, we would like to preserve on the record our

1    objections to anything based upon hearsay or other objections,

2    given that I believe some of these reports may not have the

3    evidentiary strength that one would normally anticipate in

4    testimony, nor the practice of providing expert reports on

5    which to rely and the opportunity to depose the witnesses.

6            THE COURT:  Sure.  You certainly, obviously, have

7    that objection noted, but I'll tell you I -- you have it, and

8    it's preserved, but I don't think it's needed because I don't

9    think this is the right vehicle or structure for the Court to

10   receive evidence and to make evidentiary findings on disputed

11   issues for exactly the reason, among others, that you have

12   identified.  But I think if there are material pieces of

13   evidence that are in dispute, we need to resolve those in a way

14   that is either governed by the Federal Rules of Evidence or

15   make an explicit finding that the Federal Rules of Evidence

16   don't apply.  And I'm not quite sure what the argument would be

17   there, but I would give everyone an opportunity -- everyone

18   appropriate an opportunity to address that point.  But if the

19   Federal Rules of Evidence do apply, I think we need to apply

20   them.

21       In addition, to the extent that a material dispute of

22   evidence needs to be resolved by the Court and some type of

23   prehearing discovery is appropriate, I would want to give

24   everyone an opportunity to -- a reasonable opportunity to

25   obtain that discovery beforehand.  So I don't really disagree

1   with the sentiment of your objection.

2        So to that extent, your objection is preserved, but I also

3   don't think it's necessary because I don't plan on making

4   evidentiary rulings based upon what we hear this morning.

5            MR. GEISSLER:  I take it, then, that the testimony is

6   not of record and Your Honor does not anticipate

7   cross-examination today.

8            THE COURT:  I do not -- for that reason, do not

9   anticipate cross-examination.

10       If, however, any of the parties or amici would like me to

11  ask a follow-up question to anyone that has submitted testimony

12  or information, submit it in writing to my courtroom deputy,

13  and I will certainly consider asking any appropriate follow-up

14  questions.  But you are correct in your assumption that I do

15  not anticipate that anyone will be invited to cross-examine

16  anyone who speaks in the hearing.

17           MR. GEISSLER:  Thank you, Your Honor.

18           THE COURT:  Thank you.

19       All right.  And, Ms. Albies, have you now had enough time

20  to confer, or do you -- or should we be going first to the

21  person who's asked for special allocation and then to the

22  Mental Health Alliance?

23           MS. ALBIES:  I apologize.  Your Honor, I didn't

24  interpret that as I should speak to my clients while the Court

25  was still talking, so I apologize about that.

```
 1              THE COURT:  That's fine.  Let me ask --
 2              MS. ALBIES:  May I take a moment?
 3              THE COURT:  Let me ask Mr. Chavez.  Would the Mental
 4    Health Alliance be prepared to proceed after our -- I take our
 5    first public member?
 6              MR. CHAVEZ:  We would, Your Honor.
 7              THE COURT:  Okay.  So if I'm correct, and I don't
 8    mean to say anything inappropriate, Mr. Walsh, I do know I've
 9    received a request from you, sir, that because of medical
10    issues, you would prefer to address the Court first this
11    morning.  You're welcome to do so.
12        If I misinterpreted something, then I apologize.
13              MR. WALSH:  No, Your Honor.
14              THE COURT:  All right.  Then if you'll come forward,
15    I look forward to your comments.
16        Please identify yourself for the record whenever you're
17    ready.
18              MR. WALSH:  My name is Joe Walsh.  I represent
19    Individuals for Justice.  My voice, as when I testified the
20    last time, has not improved.  It's gotten worse.  So I wrote
21    out what I'm going to say, and I can give that to you, and that
22    way it would make sense.
23              THE COURT:  Please.  That will be -- that will be
24    good.
25              MR. WALSH:  So good morning, Your Honor.  I want to
```

1    thank you for allowing me to come before you so soon in these

2    proceedings.   I represent Individuals for Justice, and we take

3    the position that we need you to watch over this settlement

4    agreement longer.

5        We say to the DOJ and the City the results of your efforts

6    have not produced anything near substantial compliance with the

7    2014 settlement agreement.

8        When we all started this effort, because we had human

9    beings being shot, in too many cases killed on our streets by

10   the police.   There was sufficient evidence of excessive force

11   that the DOJ started an investigation somewhere around 2011.

12   That's almost nine years ago.

13       Last December our police shot and killed a man known to

14   them to be mentally disabled.   One officer who arrived at

15   the -- at the scene shot a non-lethal weapon, but the other

16   officer opened fire and killed Mr. Koben with an AR-15 with

17   three shots.   One witness said they fired almost immediately

18   and there was little or no conversation.   No de-escalation.

19       I think that was the fourth killing.

20       But I was corrected this morning.   It was the fifth.

21       So how should we look to see if the City and the police

22   are stepping up or just hiding their contempt for the people of

23   Portland?

24       One of the action items that we submitted a number of

25   times is the fact that the majority of police do not even live

1    in this city.  They act as an occupying force coming into the

2    city.

3        So when you have cops that live here, they are part of the

4    community.  When you have cops coming into a city, it's an

5    occupation force.  It's the worst possible scenario, but we do

6    nothing about it.  For years, nothing.

7        There used to be a movie called *The Ghostbusters*, and

8    there was a great line in that movie:  "Who you gonna call?"

9    Think about that.  "Who you gonna call?"  The Department of

10   Justice is being run by Attorney General Barr, who has made the

11   statement he wants out of these settlements.  He doesn't want

12   to do these anymore.  He wants to prop up the police, protect

13   them.  So where is the Department of Justice in that?  They are

14   our champions, or they were.  There's only two principals in

15   this, and I know there are other people involved.  If one is

16   corrupted and the City lies, so who do we call?

17       We ask that you stay with us.  I wear this tie to honor

18   you, Judge Michael Simon.  I trust you.  There's nobody else in

19   this room I trust.  Some of them I like; some of them I don't

20   like.  But I trust you.  You have to stay involved, whatever

21   authority you have.  And I know it's complex, and I know that

22   the Department of Justice is not going to ask you to get more

23   involved.

24       So do what you can, and we will honor you and we will

25   praise you.

1    We live in terrible times right now.  Not for me.  I'm 77

2  and I'm dying.  Not for me.  But for my grandchildren and my

3  children, this republic is at stake, and it is here, too, when

4  people lie.  And we say we are in compliance and we blew this

5  guy away, and they knew.  They sent him to the hospital prior.

6  They knew he was in trouble.  And his family don't understand.

7  They just -- if we call 9-1-1, they will send the police.  They

8  will not send mental health people because there's a clause in

9  the instruction that says they can't respond if there's any

10  type of violence.

11    If you have somebody standing in the middle of a street

12  screaming, is that violence?  Sure it is.  The cops are going

13  to come.

14    We lost 92 people on the streets of Portland last year to

15  homelessness or, as one of my friends calls them, "the

16  evicted."  I like that word because it's an ugly word.  It's an

17  ugly word being out on the street.  That's where they come

18  from.  That's where this man came from -- in the suburb.  He

19  came from the streets.  He was mentally ill.  Everybody knew

20  it.  Nobody did anything that was significant, and we all stand

21  around and say, well, we're in compliance.  In compliance for

22  what?

23    Now I'm going to shut up and listen to some people.

24    Thank you for your patience.

25    I think I went off script.

```
 1              THE COURT:  Mr. Walsh, thank you very much for making
 2   the effort to come here with your medical issues.  Thank you,
 3   sir.
 4              MR. WALSH:  Should I give it to you?
 5              THE COURT:  Just give it to Mary.  Give it to Mary,
 6   and we'll give it to the court reporter later.
 7              MR. WALSH:  Later?
 8              THE COURT:  You can give it to Mary now, and I'll
 9   make sure the court reporter gets it later.  Thank you.
10              MR. WALSH:  I'm out of here.
11              THE COURT:  Oh, you've got extra copies.  Okay.
12       All right.  I would like to hear next from the amicus
13   curiae, Mental Health Alliance.
14       Mr. Chavez, or anyone else that you wish to designate.
15              MR. CHAVEZ:  Good morning, Your Honor.  If it's okay
16   with the Court, I would like to address the Court from my seat.
17              THE COURT:  Of course.  Wherever you wish.
18              MR. CHAVEZ:  I, too, like *Ghostbusters* and that
19   phrase "Who you gonna call?"  I think it's absolutely pertinent
20   to what it is that we submitted to the Court earlier yesterday.
21   Because as it stands, and this is a piece of "Who you gonna
22   call," the police are going to show up.  Who are you going to
23   call in the community to oversee the City's compliance with the
24   settlement agreement?  And currently we have PCCEP.
25       Now, PCCEP, as we brief in our materials, unfortunately,
```

 1  has not had enough static support from within itself, so enough

 2  people staying there and providing -- providing suggestions to

 3  the City to then comment back, nor do we think has there been

 4  other avenues for people to engage with their city on these

 5  topics.

 6      I should say that while we briefed six different topics in

 7  our materials, some of those will be spoken to by members of

 8  the public, particularly members from the SPMI, who you noted

 9  earlier.

10      As well, we have a component in our brief regarding use of

11  force and some of the inadequate statistics that are involved

12  there, as well as what we can glean from that, the trend line

13  support that there has not been a decrease.  That will be --

14  that portion will be spoken to by a member of Mental Health

15  Alliance, Mr. Michael Hopcroft.

16      Currently, he -- we were planning on having him speak

17  during this portion of the testimony; however, if it's all

18  right with the Court, we might move him to the public testimony

19  section.

20      Okay.  So as the Court has identified, there is

21  disagreement as far as what substantial compliance looks like.

22  Particularly, since the Court had asked about PCCEP, we'll

23  focus on PCCEP.

24      We, as a number of members in this room, are volunteers,

25  and we volunteer for things because we believe in the mission

1    of that -- of whatever it is we're giving our time and the

2    resources and energy to, in the hopes that we would be heard

3    and that we would have an opportunity to be heard and that

4    something would be done about that.

5        Now, part of volunteering your time is perhaps -- perhaps

6    some bit of delusion that maybe there might be a response.  But

7    we don't think we should be deluded.  We think we should

8    actually have an opportunity to get feedback from the City, as

9    we outlined in our -- in our briefing.  Currently, the City has

10   to provide, within 60 days, a response to PCCEP proposals.

11       We don't think that goes far enough to adequately show

12   that the City is engaging with the public.  So we don't believe

13   that the PCCEP amendment to the settlement agreement is fair or

14   adequate on at least that ground.

15       But, again, to speak to attrition, the attrition rate for

16   PCCEP, at least from its initial members, is 85 percent.

17   Comparing to COAB, that's an even worse metric to judge PCCEP

18   by and, we think, speaks to the larger problem present, that

19   PCCEP is not a seaworthy vessel, as it stands, to get us to

20   wherever it is that we need to go regarding police

21   accountability, monitoring, and providing community --

22   community input on policing in this City.

23       Now, the -- the plaintiff and the defendant in this case

24   could, and rightfully, say that that's not entirely what we

25   envision with the settlement agreement.  What we wanted was a

 1   process to have a group like PCCEP.  What we wanted was people

 2   to step up and volunteer their time, not indefinitely, but for

 3   there to be some vessel that's in place.

 4        If the people who are on this vessel are constantly

 5   bailing out water or jumping ship, how are we to say that this

 6   ship will go anywhere?  We think that we need to have some

 7   metric and something from the Court informing the parties that

 8   to meet substantial compliance -- and I'll read our five

 9   recommendations -- that PCCEP needs to retain at least

10   50 percent of its membership for a full year.  It needs to

11   maintain at least two persons with lived experience of mental

12   illness on its group.  It needs to provide staff support for --

13   with either professional or lived experience for those persons

14   with mental illness.  It needs to create a comprehensive

15   governance for all of PCCEP, and it needs to invest in

16   community organizers, which we join AMAC in the call for, to

17   engage people with mental illness and addiction, which we

18   certainly differentiate those as two different communities who

19   would need a different type of engagement and different kind of

20   organizer to speak to.

21             THE COURT:  And I note just for -- I think the

22   parties already know this, but just to be clear, I mean, you're

23   identifying those five specific recommendations that appear on

24   page 7 of your filing, which is Docket 217.

25             MR. CHAVEZ:  Yes.  Thank you, Your Honor.

1        We, as well, provided recommendations regarding community

2   engagement, including attendance requirements for PPB officers,

3   as well as leadership, and requiring some type of public and

4   timely response to PCCEP proposals so the public can know

5   what's the work of PCCEP and what's -- what is the City working

6   on and taking seriously.

7        And of a similar ilk, that was our comment regarding

8   BHUAC, as you might recall from the previous status hearing, we

9   think BHUAC is doing fine work.  We also think the public

10  should be aware of the work they're doing.  We think the public

11  should have input on the work that they're doing in that PPB

12  would benefit from that type of community engagement.

13       Now, the other section that won't be spoken to -- or

14  perhaps won't be spoken to by public testimony is -- we bill it

15  as the Unity issue, but, fundamentally, it's the Community

16  Mental Health portion of the settlement agreement, and we do

17  think, after conversations with representatives from Unity,

18  that the Court would benefit from hearing from them, and there

19  might be some willingness from them to provide that kind of

20  testimony.

21       As well, the amici can provide subject matter experts who

22  can inform the Court about issues regarding mental health

23  delivery services, delivery of services, and, as well,

24  obviously, the parties should be able to provide some

25  commentary regarding that as well as the public.

1        And if it's okay with Your Honor, I would then remit the
2   remaining -- remainder of my time to Mr. Hopcroft whenever he's
3   going to testify.
4            THE COURT:  Very good.
5        And, Mr. Hopcroft, do you want to speak now or later?  I
6   don't recognize you.  Oh, there you are, sir.
7            MR. HOPCROFT:  I'll speak now.
8            THE COURT:  Would you like to speak now?
9            MR. CHAVEZ:  He'll speak now.
10           THE COURT:  Very good.  Come on up.
11       Mr. Chavez, you might want to give him your chair and your
12  microphone.
13           MR. CHAVEZ:  Yes.
14           THE COURT:  Good morning, sir.  And if you could just
15  identify yourself and spell your last name, please.
16       One second.  Thank you.
17       All right.  Go ahead, sir.  Your name, sir.
18           MR. HOPCROFT:  Michael Patrick Hopcroft.
19           THE COURT:  And spell your last name, sir.
20           MR. HOPCROFT:  H-o-p-c-r-o-f-t.
21           THE COURT:  Please.
22           MR. HOPCROFT:  I'm a board member of the Mental
23  Health Association of Portland, which is a member of the Mental
24  Health Alliance.
25       I'm going to speak in response to the claim of success of

1   this settlement agreement.

2        All we asked was that you not kill us.

3        In 2019 the Portland Police Bureau killed five people.

4   All people in mental health crisis.  At the same time in

5   New York City, with ten times population, police killed 10

6   people.  According to *The Washington Post* Fatal Force database,

7   none were in a mental health crisis.

8        To bring attention to excessive use of force by Portland

9   Police, Mental Health Association of Portland highlighted a

10  single case of use of force to explain the complexity and lack

11  of regulation.

12       In October 2006 James Chasse was brutally killed by three

13  Portland police officers, and the organization used advocacy

14  tools to raise awareness about his life and death and the

15  inability of the Portland Police Bureau or City of Portland to

16  hold individual officers accountable for actions which are

17  abhorrent to community values.  This advocacy included public

18  testimony and private meetings with city, county, and police

19  leadership, extensive education of journalists and thought

20  leaders, collaboration with racial justice and police

21  accountability advocates, organizing a memorial and various

22  community meetings, educating community mental health leaders,

23  and making an award-winning documentary film in 2014.

24       The organization focused on police use of force as a

25  durable indicator -- a canary in a coalmine -- of a dangerous

1   multi-jurisdictional service system for people with mental

2   illness.  The hypothesis was as acuity -- the number of persons

3   with acute or actively symptomatic severe or persistent mental

4   illness engaging in public services -- increases or decreases,

5   police use of force would also increase or decrease.  Because

6   the use-of-force data was not collected and not made available

7   to the public, because the PPB had no internal process to

8   review the use of force and no external oversight agency had

9   access to data, the organization could only track the lethal

10  use of force.

11      In the duration for 2012 to 2019, there were overall

12  reductions in services available to people with severe and

13  persistent mental illness in the Portland area, and this

14  increased acuity.  This affected people of all races and

15  economic classes.  Inpatient treatment, both public and

16  private, were reduced.  Outpatient services became largely

17  reliant on medication with services such as individual therapy,

18  group therapy, case management, and crisis intervention

19  becoming less available.

20      Medicaid payments did not match inflation or healthcare

21  costs.  Peer-based services under-managed by the state and

22  under-utilized by service providers.  The availability and

23  potency of legal and illegal drugs increased, including very

24  potent forms of marijuana, legal kratom, and inexpensive

25  methamphetamine.  There is more alcohol and lower prices for

1   more businesses than ever before.  Prevention and treatment

2   services for addiction and alcoholism were reduced, placing

3   Oregon in the top ten states for addiction and last for access

4   to addiction services.

5        Equally, services for people with mental illness in Oregon

6   counties reduced, forcing people requiring services to migrate

7   to Portland.  All these factors increased security.

8        Because even fewer treatment resources are available for

9   persons of color, use of force against persons of color are

10  higher than against white people.  This is all outrageous and

11  unacceptable.

12       Then in 2014 the U.S. Department of Justice issued their

13  surprising findings statement, which resulted in this

14  settlement agreement, which in part requires the PPB to collect

15  and express data about the use of force against people with

16  mental illness.  That data, beginning in the third quarter of

17  2015, is available online.

18       The reported data has many problems to reduce its

19  usefulness, both as a mechanism of transparency and accounting

20  of activity.

21       First, the data is entirely collected by the police

22  officers themselves, meaning they're required to both enforce

23  their own behavior and report their own violations.

24       Second, the data is not available in a raw form.  What we

25  have is the work of several Portland Police Bureau data

1    analysts.  Access to the raw data for outside analysis is

2    necessary for any independent or critical review of police use

3    of force and prevents different conclusions from being made.

4    There is a link to the raw data online at present, but it does

5    not work.

6        Third, there are three case -- categories of cases we

7    examined in our evaluation of these reports.  Mental health

8    crisis, drug and alcohol, and transient, which presumably means

9    those perceived to be homeless at the time.  These categories

10   are not mutually exclusive, yet the data available to us does

11   not indicate which incidents involve the person in multiple

12   categories.  It is likely, given the realities of homelessness,

13   addiction, and mental illness, that incidents will involve

14   single subjects that fit into two or all three of these

15   categories.  With -- without knowing about these combinations,

16   the data becomes less clear and less reliable.

17       Fourth, how the data has been collected has changed over

18   the duration of collection.

19       First, use-of-force data collection began in 2012 after

20   the initial intervention by the U.S. Department of Justice.

21       Secondly, the use-of-force data reports began to be posted

22   online in the second quarter of 2015.

23       In 2016 the Portland Police Bureau made a change to data

24   collection and began using a mental health mask to prompt

25   officers to include information about mental illness.  This

1    affected the data so prior data should be calibrated to match

2    the new method.  It's unknown or unclear if this were done.

3    The effect in the illustrations attached to my testimony is

4    substantial.

5        Fourthly, more types of force began to be collected in the

6    second quarter of 2017, resulting in an increase in incident

7    numbers that may or may not reflect changes in police action

8    but obscures the frequency of force being used over time.  This

9    makes it also difficult to directly compare results in 2019 to

10   results when online reporting began in 2015.

11       Fifth, the data does not quantify -- qualify incidents of

12   use of force.  Obviously, some instances of use of force may be

13   justified and some may not.  Because the Portland Police Bureau

14   does not routinely release an internal administrative review of

15   instances of use of force, the only qualification metric the

16   public can access comes from the district attorney's release of

17   investigations prior to the decision to not file charges in

18   cases of lethal use of force.

19       The lethal use of force are a small percentage of use of

20   force and likely not representative of the whole.  The DA's

21   decision is a metric of crime, not policy, and since the

22   criteria for a criminal conviction of a police officer for use

23   of force in Oregon law is so high, no officer has been

24   prosecuted for lethal use of force in Multnomah County since

25   1969.

1        Sixth, we note from the public record and discussion with

2   surviving family members that all cases of lethal use of force

3   by members of the Portland Police Bureau since the settlement

4   agreement have been against people in some sort of mental

5   health crisis.  The term "mental health crisis" has grown over

6   the years -- past few years to be inclusive of persons with

7   severe and persistent mental illness, as well as persons

8   acutely affected by drugs or alcohol.

9        Seventh, the Portland Police Bureau has recently again

10  upgraded the online dashboard which might be used to segment

11  use-of-force data.  We visited this website several times over

12  several months using different computers and different

13  browsers, each with the same result -- the dashboard does not

14  work.  The illustrations included in my testimony come from the

15  quarterly force data reports posted by the Portland Police

16  Bureau and available online.

17       As we see in illustrations one, two, and three attached to

18  the report, use of force against the three categories of

19  persons has, while fluctuating wildly, not decreased

20  consistently over the reporting period.  The data does not

21  adequately explain the fluctuations.  Note also that these

22  illustrations do not show deadly force per se, as that data is

23  not included in the data sources.

24       In conclusion, the data produced by the police bureau is

25  insufficient to claim a reduction in use of force against

1  people with mental illness, in a crisis with alcohol or drugs,

2  or who are categorized as transient.

3       We have attached references and direct illustrations to

4  the written portion of my testimony, which I'm happy to share

5  with the Court.

6       And I thank you, Your Honor, for your time.

7            THE COURT:  Thank you, Mr. Hopcroft.

8       And we will take, sir, any written testimony that you wish

9  to submit.  And give it to my courtroom deputy.  She'll come

10  and retrieve it from you.

11            MR. HOPCROFT:  Thank you, Your Honor.

12       Thank you, Mr. Hopcroft.

13       Mr. Chavez, is there anyone else from the Mental Health

14  Alliance that you would like to invite to speak or anything --

15  any further comments from you at this time?

16            MR. CHAVEZ:  Only that Mr. Hopcroft's testimony is

17  also available as Exhibit 2 to the declaration that we

18  submitted and that we acknowledge and based part of our

19  briefing, again, on the feedback we received from members of

20  the SPMI, the Subcommittee for People with Mental Illness,

21  under PCCEP.

22       So we do just ask that the Court consider their testimony.

23            THE COURT:  I have, and I've read it.

24       I will tell you in addition to the AM -- the Mental Health

25  Alliance's report, Docket 217, I have received and read the

1    declaration of Dr. Mark Leymon, Docket 219.  Your declaration,

2    Mr. Chavez, at Docket 218, along with its various exhibits,

3    Exhibit 1, which is basically the list of PCCEP member

4    attritions.  It's pretty serious looking.  Your Exhibit 2,

5    which is basically the submission of Dr. Walker and Dr. Eisen.

6    I have read Exhibit 3, which is the written version of

7    Mr. Hopcroft's testimony, and then the related illustrations

8    related to exhibits attached to that.  So I have received all

9    of that and read it.

10            MR. CHAVEZ:  Thank you, Your Honor.

11            THE COURT:  Thank you, Mr. Chavez.

12       Ms. Alibies, would The AMA Coalition like to go now or

13    later?  Your choice.

14            MS. ALBIES:  We'll go now, Your Honor.

15            THE COURT:  Very good.

16            MS. ALBIES:  We'll be hearing from Dr. Haynes first.

17            THE COURT:  Welcome, Dr. Haynes.

18            DR. HAYNES:  May I stay seated?

19            THE COURT:  Of course, absolutely.

20            DR. HAYNES:  Thank you, sir, so very much.

21       I'm going to be focusing on qualitative emphasis and a few

22    quantitative, and then Dr. T. Allen Bethel will focus on more

23    quantitative.

24       To The Honorable Judge Michael H. Simon, the distinguished

25    parties of this settlement agreement between the City of

1   Portland and the U.S. Department of Justice,

2   Honorable Judge Simon, on September the 13, 2012, the U.S.

3   Department of Justice issued its letter of finding after

4   conducting an audit of the patterns and practices of the

5   Portland Police Bureau stating and quoting from the document

6   that patterns and practices of the excessive force is used

7   against people with mental illness or perceived to be mentally

8   ill.

9       In November 2012 the City Council passed an amended

10  settlement agreement.

11      In January 2013 this Court added the Portland Police

12  Association to be a part of the lawsuit filed by the Department

13  of Justice, and they, the Albina Ministerial Alliance

14  Coalition, the status of enhanced-amicus curiae.

15      In July 2013 Portland City Council accepted The AMA

16  Coalition collaborative agreement outlining the AMA

17  participation in the settlement agreement.

18      Honorable Judge Simon, I submit to you today that we have

19  come a long way, but we still have a long way to go.  We have

20  made some substantial quantitative progress since 2013, but we

21  are far from achieving the intent of the settlement agreement

22  stated in the preamble of the settlement agreement, and I would

23  like to quote from that preamble and reference to the

24  qualitative.

25      The parties further recognize that the ability of police

1    emphasis to protect themselves and the community that this --

2    is largely independent on the relationship they have with the

3    community public and officer safety.  Constitutional policing

4    and community trust in the police force are thus

5    interdependent.

6         Furthermore, it states that to fully achieve these goals,

7    this agreement required that the City and PPB further revise

8    when needed, adopt new policies, training, supervision, and

9    practices in the following areas:  The use-of-force training,

10   community-based mental health service, crisis intervention,

11   employee information system, officers' accountability, and

12   community engagement.

13        This agreement further required that the City and Portland

14   Police Bureau put in place a more effective system of oversight

15   and self-correction that will identify and correct problems

16   before they develop.

17        We acknowledge substantial progressive growth and

18   development of the PCCEP in key areas, but there is still a

19   great need for stability and keeping tenure in the members of

20   the board and creating a more efficient recruitment, training,

21   and rotation of new board members.

22        Furthermore, it needs improvement and engagement,

23   community participation, due to use of a

24   designated/undesignated community staff organizer.

25        Now, I have been an organizer, sir, for 40 years in the

1    civil rights movement.  I can say, very clearly, on the base of

2    traditional community organizing and experience on community

3    or -- what PCCEP does is not community organizing.  We

4    acknowledge the substantial increase in development.  In the

5    area of independent police review, there's a great need to make

6    it stronger and center on serving the community.

7        We need, sir, a 21st century community policing plan that

8    is based upon the proposition that you cannot arrest your way

9    out of crime, that you cannot solve problems in the community

10   without community trust.  It was in 2019 *The Oregonian* reported

11   a poll that was taken throughout the city, in particular with

12   community of colors, and found that there still is an

13   overwhelming high number of community of colors that do not

14   have trust in the Portland Police Bureau.

15       A trusted police force is essential to getting people in

16   their community participating.  There cannot be a confidence in

17   the police bureau until this issue of mistrust begins to be

18   irradicated chip by chip.

19       Now, in some areas of PCCEP, it has real committed,

20   dedicated members, and I'm deeply honored to know many of them,

21   and they're very knowledgeable members.

22       At the same time, stability is critically important.

23   AMA's participation of training -- and we'll continue to

24   participate in the training, but community trust of police is a

25   major qualitative issue.

1          The quantitative issue, we need a decrease in police

2    violence.  We need to improve the perception of police, and we

3    need, also, sir, the big jaunt and -- and the big elephant in

4    this of how we relate to the mentally ill.

5          We have been questioning for some time, back in the other

6    hearings we had, on the issues of de-escalation.  We have great

7    training and continuously improve in training.  The job and

8    policies our directors have continued to move, but when it

9    comes to taking those policies and training and putting it into

10   the practice has a big gap, that is this and de-escalation.

11   And it has to get beyond the command staff.  It has to get down

12   where sergeants and corporals and others are holding officers

13   accountable when they do not follow the policy and the training

14   of the Bureau.

15         Thank you so very much, sir.

16              THE COURT:  Thank you, Dr. Haynes.  I appreciate

17   that.

18         Ms. Albies, is there anyone else from The AMA Coalition

19   that would like to speak?

20              MS. ALBIES:  Yes, Your Honor.  Dr. Bethel.

21              THE COURT:  Good morning, Dr. Bethel.

22         We can get a microphone for you.

23         Mary, do you want to get Dr. Bethel a handheld --

24              MR. WOLFE:  Your Honor, I was wondering if I could

25   also add priority to be able to speak.  I'm using interpreters.

1            THE COURT:  And your name, please?

2            MR. WOLFE:  Philip Wolfe.

3            THE COURT:  All right.  We'll hear from Philip Wolfe

4    after the AMA.

5            MR. WOLFE:  Thank you, Your Honor.

6            DR. BETHEL:  Good morning, Judge Simon.  And thank

7    you for the opportunity to be able to share a few moments.  I'm

8    Dr. T. Allen Bethel.  I serve as the president of the Albina

9    Ministerial Alliance and co-chair of the Albina Ministerial

10   Alliance Coalition.  Good morning to all of you.

11       I want to address just a few issues.  I will not try to

12   reiterate those things we have already submitted in writing,

13   but in addressing some of the issues that we're talking about

14   when we talk about qualitative measures and the request of the

15   judge this morning, what should be some of those things we

16   should be looking at that brings up concerns as to why

17   particularly this part of the PCCEP is not in full compliance.

18       Number one, I can start with saying that if we're going to

19   talk about being in substantial compliance, one of the things

20   that we must notice, we must talk about sustainability.  And

21   PCCEP has not been able to sustain itself.  We have

22   continuously, during these last six months, seen members

23   falling off of PCCEP and the need to try to bring more members

24   on and to train more members to be able to fill those vacated

25   seats.

1          At this time PCCEP is not operating in full compliance

2     with the number of members needed to carry PCCEP forward and

3     trying to, at this point, to find more members to be trained

4     and put on PCCEP in order to create sustainability.

5          If PCCEP has not been able to sustain itself, and it has

6     not in these last six months, how is it going to do it for one

7     year to be completely in compliance?  We need to work on that

8     and bring about some transparency as to how we're going to

9     continue to make that happen.

10         The other part that we need to look at is that -- and the

11    whole need of needing -- I'm searching for my words now.

12    Pardon me, Your Honor, for taking this momentarily lapse of

13    thought.

14              THE COURT:  Take all the time --

15              DR. BETHEL:  As we have looked and seen that the

16    number has not been reduced when dealing with persons of mental

17    health crises of the use of force, the use of force continues

18    to rise.  We're seeing not a reduction of persons being harmed

19    or life being lost because of use of force by the Portland

20    Police Bureau, but it seems to be increasing, and we need to

21    find ways in which we are going to bring about a reduction in

22    the use of force between those persons of color, those who were

23    in mental health crises, if we're going to say -- we're

24    reaching full or some type of substantial compliance in terms

25    of dealing with this issue of mental health issues.

1         What we really need to do, and though we will

2    admonition -- not admonish -- we will acknowledge that we have

3    made strides.  We have made some progress, but we still have

4    this "us versus them" mentality that is still continuing, and

5    we need to move away from that and come together in a direction

6    or collaboration for successful community engagement.

7         We're not going to get that with each party still holding

8    "This is mine; this is yours.  This is us; this is you," and

9    those types of statements or actions.

10        We have got to come together and work together in a full

11   collaboration of coming together and saying, "Here is what

12   we're going to do to make this sustainable for both the City,

13   for those who are being involved, as well as for the Department

14   of Justice -- Department of Justice."

15        We need the community organizing person.  I cannot fail to

16   underscore that more.  We need that organizing person.

17   Regardless of how one views it, we need an organizer or

18   organizers to do that.

19        We also need a facilitator, not just someone who is liked

20   by everyone, but someone who's going to be and help hold PCCEP

21   and the City and all parties accountable for those things that

22   the agreements have been put forth for PCCEP.  We need someone

23   that's going to look back at PCCEP and say, "Here is point

24   number one of what we agreed to do.  How are we going to get

25   that done?  What are the steps we're going to do and what are

1   going to be the metrices for coming back and evaluating it has

2   been done and not just leaving it just to be talked about?"

3       One of those agreements that we have set forth in the

4   settlement agreement, those collaborative agreements that were

5   agreed upon, who is watching those?  Who is going to make them

6   work?  It's not going to be an internal -- a person from the

7   Portland Police Bureau.  Because if the internal person from

8   the Portland Police Bureau was able to do this, why have we

9   spent the last five-plus years here?  I know why we're here,

10  but we need to change that so that we can move forward.

11      Stability must be looked at.  The drop-in center for

12  persons being able to be dropped off so that they can receive

13  the help that they need when they're in the middle of a crisis

14  and not face a gun, not face escalated power of force, must be

15  looked at if PCCEP is going to work and the agreement is coming

16  to full compliance.

17      I must agree and must state that we must move forward.

18  We're not in full compliance or substantial compliance at this

19  point, and we do need another six months to a year to look at

20  that.  But I would hope that we can put in place some

21  agreements as to what we will say full compliance or

22  substantial compliance is and agree on those.  And once we

23  reach those things, then I think we all would come out and say

24  we're moving in the right direction.

25      Thank you, Judge.  I thank the Court.

1           THE COURT:  Thank you very much, Dr. Bethel.  I
2     appreciate hearing from you and those ideas.
3        Ms. Albies?
4           MS. ALBIES:  Yes, Your Honor.  I just want to make
5     one additional point and that is that throughout this process
6     the -- first the Community Oversight Advisory Board, the COAB,
7     and now the PCCEP, was intended to be something that outlasts
8     the settlement agreement.  And so this goes back to the
9     question of the stability and durability of the PCCEP plan, and
10    that is why it's critical that this be set up in a way that is
11    effective and that will outlast this agreement.  And until we
12    see that durability and the feasibility of PCCEP outlasting the
13    settlement agreement, especially because it's my understanding,
14    based on conversations with both the City and the Department of
15    Justice, that PCCEP will be part of this ongoing monitoring of
16    whether these -- the implement -- the implementation of the
17    settlement agreement after it's over is still ongoing and the
18    purposes are met, and so that's an additional reason why it's
19    important.
20       Let me follow up on that and -- go ahead, Doctor.  Did you
21    want to say something else?
22           DR. BETHEL:  No.  Go ahead.  No, I'm done.
23           THE COURT:  I wanted to follow up on something that
24    Dr. Bethel said and go back to something Dr. Haynes said.  One
25    of the things that Dr. Bethel just said and what Ms. Alibies

1   also just alluded to is it might be helpful for the parties --

2   that would mean the United States, the City of Portland, the

3   amici, the AMA Coalition, the Mental Health Association, the

4   Portland Police Association -- to confer and to see if you can

5   come up with an additional agreement of what substantial

6   compliance would look like if I were to conclude that there's

7   not substantial compliance right now, and then we could have a

8   metric perhaps, and I understand that the AMA's comments talk

9   about both quantitative issues and qualitative issues.  There

10  may not be a metric for the qualitative issues, but there may

11  be for the quantitative issues so we can see if there's going

12  to be a metric or set of metrics that can indicate what

13  substantial compliance looks like so we can all know when we

14  have achieved it and then we can have the beginning of our

15  one-year countdown, to assuming we continue to achieve it, then

16  the litigation can come to an end.  The PCCEP will continue in

17  the role that is envisioned under the settlement agreement

18  under the proposed amendment.  And I think rather than trying

19  to put pressure on folks right now to answer that question, it

20  might be appropriate after the hearing for the now five parties

21  to this matter to confer and see if you can come up with an

22  agreement on that.

23       That's just one response that I had to what Dr. Bethel and

24  Ms. Alibies just said.

25       I also want to go back to a point of what Dr. Haynes just

1   said.

2       Dr. Haynes, you stated in the beginning of your comments,

3   that we have come a long way, but we have, still, a long way to

4   go.

5       I do want to recognize both pieces, especially the first,

6   to begin right now.  I do recognize -- first of all, I commend

7   the United States Department of Justice and the U.S. Attorney's

8   Office for the District of Oregon for bringing this lawsuit

9   Under Title 42 of the United States Code § 14141.  I think it

10  was a very valuable addition and contribution that the United

11  States Department of Justice has made to helping make things

12  better in the City of Portland.  I do recognize and commend the

13  U.S. Department of Justice and the U.S. Attorney's Office for

14  bringing this lawsuit and continuing with your efforts.

15      I also recognize and commend the City of Portland.

16  Because this lawsuit, when it was brought, wasn't brought to be

17  immediately followed by a vigorous fight, as I sometimes see in

18  this courtroom in other cases, but the City of Portland

19  recognized that it had a problem.  It recognized the pathway to

20  a solution.  Some may be a little bit more -- some of the

21  pathway might have a few detours in it, but I think that the

22  City of Portland gets an awful lot of credit for very promptly

23  reaching a settlement agreement of this dispute and making

24  serious efforts to try to make things better.

25      I also very much appreciate the contributions of the

1    Portland Police Association, as an intervenor here, and of

2    course the longtime contributions of the AMA Coalition as a

3    friend of the Court, amicus curiae, and the more recent

4    contributions of the Mental Health Alliance as the amicus

5    curiae here.

6        And I agree with Dr. Haynes that we have come a long way.

7    Things are moving in a very positive direction.  That is

8    partially evidenced by the fact that with a 10-plus section

9    agreement there really is only a dispute now about whether or

10   not there's substantial compliance with one of the sections.

11   We have substantial compliance with about 90 percent of the

12   agreement.  But this last piece, which is, as Dr. Bethel

13   pointed out, intended to remain when this litigation concludes,

14   is a very, very important piece.  And so to that extent, I echo

15   Dr. Haynes' concerns, without making any factual findings at

16   this time, but I agree with the sentiment we still have a ways

17   to go.

18       How we get there and what we do and how -- what's the

19   right path to take to get there, I look forward to more

20   comments from the parties and from the public.

21       Dr. Bethel, was there something else that you wanted to

22   say, or Ms. Albies?

23               DR. BETHEL:  No, I'm done.

24               THE COURT:  Anyone else from the AMA at this time?

25               MS. ALBIES:  No, Your Honor.

1          THE COURT:  All right.  We will be taking a

2  mid-morning recess in a little bit, but I do now want to

3  recognize -- and this may be a good segue -- going back to one

4  of the paths that may not have worked out as well, the COAB,

5  the Community Oversight Advisory Board.  I would welcome any

6  public comments from Philip Wolfe about where we are and where

7  we should be going.

8      Philip Wolfe.

9      It's probably most important to get our interpreter to

10  have -- the interpreter to the microphone or whoever is going

11  to be using it.

12          MR. WOLFE:  Hello.  My name is Philip J. Wolfe,

13  Your Honor.  Thank you for giving me the opportunity to speak

14  here today.  And it's good to see you again.  Thank you.

15      And I know you mean well, but I do want to emphasize that

16  for anybody in here in this room today who believes that things

17  are getting better and will get better, that's -- they're being

18  naive.  First, to review just some history, in 2014 the

19  Department of Justice sued the City of Portland because they

20  saw what was happening to people in the mental health community

21  and the deaths that were happening, and instead of the City

22  taking accountability in that lawsuit, they negotiated the

23  settlement.  And from that settlement, we have COAB, the

24  Community Oversight Action Board, and that has been in

25  existence since then.

1        And the Department of Justice has destroyed COAB.  It has

2   fallen apart.  I was the chair of COAB.  Before the deadline,

3   before the last deadline, as we were negotiating with

4   Ted Wheeler, our mayor here, and we were asking -- pleading for

5   more time to do our work because we felt like we were just

6   getting on our feet and just finally getting to the point where

7   we could do anything with community involvement, and they said,

8   no, they wanted an end to COAB.

9        And so PCCEP was put in place, and I have been involved

10  with PCCEP, going to those meetings and watching it, over the

11  last year.  And I wanted to tell you right now that PCCEP is

12  still just in its infancy.  Even though we're at the one-year

13  mark, it's still in its infancy in what it can do.

14       And, again, the appointments were made by Ted Wheeler,

15  meaning it wasn't an independent process.

16       So from 2010 until today, 20 people have been killed by

17  Portland police officers.  Last year there were five people

18  killed by Portland police officers, all who had mental health

19  conditions and who were suffering from those conditions.

20       52 percent of arrests are of people who are homeless, and

21  there's a connection between homelessness and mental health

22  issues.  And the police are targeting this population, this

23  vulnerable population.  And that's still a huge concern, and

24  it's obviously not getting better, which means PCCEP is

25  failing.

1          In going to the meeting, the PCCEP meetings for the last

2     year, I've seen the attrition and how the meetings get smaller

3     and smaller.  And it's just City people at this point.

4          Community members number?  Maybe one or two, and that's

5     it, because there's no trust.  That's been -- the trust is gone

6     because of what the -- the Portland police are doing with --

7     against the citizens to this point.

8          So as I wrap up, in my view, police reform is something

9     that still needs to continue to happen.  We haven't arrived.

10    We'll have this conversation for the next 40 years.  And so how

11    can the City take responsibility for this?  It's time for them

12    to recognize that what has been happening isn't working and the

13    end of policing.

14         It's time to change that frame.  The way that policing is

15    done.  And the way that we've thought about this, with hopes

16    and dreams that things can do -- but we've been going and going

17    going and arguing and negotiating and coming to these meetings

18    and these hearings and how much tax money has been spent on

19    this whole effort in these last years to -- for reform, and

20    it's not happening.  It's not about us versus them.  That's not

21    what I'm saying.  It's that we're scared of the police, and we

22    don't trust the police.  We don't want to be anywhere near

23    police officers.

24         So, you know, how do you resolve something like that?  We

25    can keep running PCCEP for PR purposes.  We can have nice

1    photos in *The Oregonian* of everybody there, but that's the

2    people who are there and not the people who are scared to come

3    and scared of the police.  The community is not showing up.

4         So, I mean, there's -- there is no community engagement at

5    all, and so my recommendation, Judge Simon, Your Honor, is that

6    I would appreciate it if you continue to retain oversight and

7    recognize that PCCEP is no longer functioning and running.

8    It's time to consider something else, some other change, and

9    it's time for PCCEP to just go away because it's been a waste

10   of our time, a waste of our tax money, the waste of people who

11   are going, their effort.

12        So I don't know if there's -- what drawbacks you're

13   seeing, but just as -- in my experience, as I've seen this

14   issue going for these last several years, it's not working.  So

15   I just ask that you realize -- recognize that it's not

16   functioning; that it is dysfunctional.

17             THE COURT:  Mr. Wolfe, let me ask you a question, if

18   I may.

19             MR. WOLFE:  Yes, Your Honor.

20             THE COURT:  I appreciate you being here and I

21   appreciate your comments and your insight and all the work that

22   you've previously done -- COAB, the work that you were doing

23   with PCCEP -- and here is my question:  I'll preface it by

24   saying my -- my understanding is that the City of Portland

25   would like to be out from under continual court supervision,

1    and that is not going to happen in -- under the agreement until

2    we have 12 months of substantial compliance.  I accept what

3    you're saying, but when you say that there has to be some other

4    change, when you say COAB didn't work -- although I understand

5    you're saying it wasn't given enough time.  I hear what you're

6    saying about PCCEP.  Can you give me some more specifics of

7    what constructively would be that other change?  What should

8    the parties to this litigation consider doing?

9              MR. WOLFE:  Sure, Your Honor.  I'm happy to answer

10    that question.  It's a very important question.  Thank you for

11    asking.

12        Well, I have a few ideas.  First of all, hold the City

13    accountable.  Have the City pay for its -- this lawsuit, the --

14    the DOJ has brought.  Have them be -- make them financially

15    responsible.  I think that would be what I would say first.

16        And then, number two, have a real truly independent

17    oversight committee, an independent COAB, that can breathe life

18    into this process, because that is where -- I still have hope

19    in something like COAB and not something like PCCEP.  So that's

20    what I would say.

21              THE COURT:  Thank you very much, Mr. Wolfe.  Thank

22    you.

23        Jill, are you doing okay?  Can we take a few more?

24              THE COURT REPORTER:  Yes, I'm fine.

25              THE COURT:  We can turn back to some of the issues

1    that the Mental Health Alliance was talking about, including

2    the issues relating to the subcommittee for people with mental

3    health.

4        Ms. Marshall, are you here?  Amanda Marshall?

5            MS. MARSHALL:  Thank you, Your Honor.  The three of

6    us would like to address the Court as a group.

7            THE COURT:  Very good.

8            MS. MARSHALL:  Our testimony plays off of each other.

9            THE COURT:  Very good.  Come on up and just identify

10   who will be speaking.

11           MR. NOLEN:  Sorry.  I'm a bit nervous.

12           THE COURT:  Identify your name first, please.

13           MR. NOLEN:  My name is Patrick Nolen.

14           THE COURT:  And please spell your last name.

15           MR. NOLEN:  N-o-l-e-n.

16           THE COURT:  Thank you.  Welcome, Mr. Nolen.

17           MR. NOLEN:  My name is Patrick Nolen.  I'm a person

18   with lived experience of homelessness and mental illness.  I

19   recently resigned from Portland Committee on Community-Engaged

20   Policing and as the co-chair of the PCCEP Subcommittee for

21   People with Mental Illness.

22       Since 2018 I have spent the majority of days attending

23   meetings, in trainings and discussions, reading, responding to

24   emails and telephone calls, speaking with friends and

25   colleagues about how Portland's police can reduce its use of

1  force against people with mental illness on behalf of the PCCEP

2  and the subcommittee.  That time and effort has been -- has not

3  been fruitful.  I would like to tell you why.

4      One criticism of COAB was that the members did not receive

5  training.  PCCEP members had little or no experience addressing

6  issues of police conductiveness and accountability.  The City

7  hired two separate training organizations for PCCEP, which

8  arranged for four days of startup training -- sorry.  I'm --

9  I'm -- this is the first time I've spoken in --

10          THE COURT:  You're doing just fine.

11          MR. NOLEN:  Okay.

12          THE COURT:  Speaking in public is one of the scariest

13  things people can do, but you're doing just fine.

14          MR. NOLEN:  Okay.  Great.

15          THE COURT:  Would you like a cup of water?

16          MR. NOLEN:  No, thank you.

17      Some of the content was about police issues, but much of

18  the training concern was PCCEP members getting to know each

19  other better.  We made art collages and watched a dance

20  performance and read poetry.  There was no training on such --

21  as such, focused on mental illness.

22      A disagreement with a PCCEP trainer that -- about

23  scheduling led to an allegation of racism against me, which I

24  feel is not resolved.  I asked for help from the City to

25  resolve this conflict.  I was -- it was decided that PCCEP

1   would have a one-day retreat about the accusation of racism

2   against me.  The facilitator of that retreat spoke to all the

3   members of the PCCEP except for me.

4       During the retreat, the accusation of racism was repeated

5   by other PCCEP members.  For me, this issue was not resolved.

6   Disagreements and delays in the PCCEP meetings were constant.

7   There was no education or training about facilitation.  The

8   solution provided by staff was that the PCCEP would have

9   additional private meetings.  There was no call -- these were

10  called retreats to discuss how we could get along better.

11      There were two additional retreats of PCCEP to improve the

12  relationship between members of the PCCEP in relation to race

13  and other things.  For me, there continues to be a lack of

14  trust in the group stemming from the lack of resolution about

15  the initial accusation against me.

16      I wanted to form a PCCEP subcommittee, which would look at

17  how the police could reduce use of force against people with

18  mental illnesses.  I wrote a proposal and brought it to that

19  first general meeting of the PCCEP.  That was the beginning of

20  a several-month struggle to get the Subcommittee of People with

21  Mental Illness chartered by the PCCEP.  It took presenting the

22  same basic proposal four different times over three months to

23  get that done.

24      The first full PCCEP meeting, I made an initial proposal

25  in that PCCEP would -- the PCCEP wouldn't vote yes or no.  I

1    was advised that the concerns of people with mental illness

2    should be the subset of an outreach committee -- committee.  An

3    outreach committee has never been formed.

4        I went to the Steering Committee.  Members referred the

5    proposal back to the full committee.  Reviewing the proposal,

6    an audience member testified that the proposal was -- as

7    written, was what we were looking for in a subcommittee.

8        Second, I went to another full -- another full PCCEP

9    meeting.  Again, the PCCEP declined to vote on the proposal,

10   asking that it be rewritten.  No specific directions as to how

11   it was rewritten was given.

12       The third full PCCEP meeting, the PCCEP voted to allow the

13   subcommittee.  At that time, the first and only subcommittee

14   for the PCCEP.

15       Since then, the PCCEP has done no outreach to communities

16   with persons of -- with mental illnesses, addiction, or with --

17   who are homeless.  Simply posting a social media message does

18   not qualify as outreach.  Providing -- catering dinners for

19   PCCEP members is not outreach, and the results showed that.

20       PCCEP meetings are poorly attended.  Subcommittee meetings

21   are poorly attended.  But members of the subcommittee continue

22   to work.  We met monthly, and then they asked for us to bring

23   recommendations to reduce use of force.

24       In October of 2009 the subcommittee presented its first

25   recommendation, which my co-chair, Amanda Marshall, will speak

1    about.

2        I was disheartened by the disinterest on the part of PCCEP

3    work of the Subcommittee for People with Mental Illness.  Other

4    than a co-chair attending one meeting, the 15 or so members of

5    the committee did not attend any of the 12 meetings of the

6    SPMI.

7        I have attached a roster of the members and a list of

8    experts who spoke to us about reducing police use of force.

9        I felt that a constant fight to get the interest of people

10   with mental illness addiction and alcohol -- addiction,

11   alcoholism, and trauma to be considered to be -- by the use of

12   force by PCCEP.  Those are persons routinely harmed by the

13   police, arrested, jailed, as -- as much or more so than any

14   other demographic group.

15       To be designated as a subset of a -- and not a subject,

16   set the PCCEP in the wrong direction.  Thank you.

17            THE COURT:  Thank you, Mr. Nolen.  I also appreciate

18   your written comments to that effect, including the attachment.

19   So thank you very much.

20       Who will be speaking next?

21            MS. MATHIS:  My name is Meredith Mathis.

22            THE COURT:  And I also thank you in advance for your

23   written submission, which I have read, but I look forward to

24   anything else you may wish to say, or if you want to read it.

25            MS. MATHIS:  Okay.  My name is Meredith Mathis.  I'm

1    currently a support staff member at Metropolitan Public

2    Defender, and I will be attending law school this fall.  I was

3    invited to be a member of the Subcommittee for People with

4    Mental Illness, SPMI, a subcommittee of Portland's Committee

5    of -- on Community-Engaged Policing.  I had spent the years

6    prior, following local issues of policing and mental illness,

7    and familiarizing myself with the DOJ lawsuit filed against the

8    City of Portland.  I work professionally in a field where the

9    nexus between policing and mental illness is particularity

10   pronounced.  I am also a consumer of mental health services in

11   Portland.

12        In my experience as a subcommittee member, PCCEP served as

13   a barrier to community engagement.

14        THE COURT:  Ms. Mathis, I'll interrupt you for just a

15   moment.  I know you're reading, and I appreciate that, and

16   that's totally fine, but please read a bit more slowly for the

17   benefit of our court reporter.

18        MS. MATHIS:  Okay.  SPMI co-chair, Amanda Marshall,

19   presented our first recommendation.  She will describe the

20   frustrations involved with this in more detail, including the

21   inefficiency that required her to present the same

22   recommendation twice, ultimately to no effect.

23        Months later, I presented our second and third

24   recommendations to the committee.  One of our recommendations

25   passed and the other had support from some sitting members of

1   PCCEP, but the meeting ran over three hours long, and I had to

2   wait almost three hours to present two recommendations as

3   quickly as I possibly could.  I was encouraged by the chair of

4   the PCCEP to speed read.

5       Being forced to rush through a very time-sensitive

6   proposal, it dismissed the importance of the work as well as

7   the level of detail in the recommendation.  The time and effort

8   SPMI put into this recommendation seemed unconsidered.

9       We all reviewed relevant items of the settlement agreement

10  independently and a group multiple times.  We consulted with

11  and incorporated the work of Dr. Derald Walker and

12  Dr. Jeffrey Eisen with Cascadia Behavioral Health --

13  Healthcare.

14      We considered and shared reports made by DHHS and the

15  Oregon Health Authority about Unity Center for Behavioral

16  Health Deficiencies.  We considered and shared many relevant

17  news articles and reports.

18      SPMI members discussed how deficiencies affect our

19  clients.  We considered what we have witnessed and the nature

20  of what our clients have shared with us.  We brought in as much

21  expertise and perspective as we could.  We spent hours crafting

22  and editing our work.

23      Despite having sent the materials out to PCCEP members

24  prior to the COCL town hall, we had received no feedback from

25  PCCEP members by the time I presented, at which time multiple

1    members of the PCCEP abstained from voting due to a stated lack

2    of information.

3        We attempted to amplify many different forms of community

4    input with little support and no regard for our efforts.  I was

5    left wondering if we were able to gather this much information

6    and volunteer the amount of hours we did and we were not

7    substantively responded to, how could community members with

8    less time or less access to comprehensive expertise be

9    considered?

10       Tracy Reeve, a city attorney, also waited, through this

11   very long disorganized meeting, to say that our third

12   recommendation, that the City help fund a developing walk-in

13   center, in line with item 89 of the settlement agreement, was

14   actually not the City's responsibility.

15       My perception was that some PCCEP members took for granted

16   who the city attorney speaks on behalf of and privileged her

17   very brief point over any engagement with the weeks of work the

18   subcommittee had put in prior to that night.

19       In the context of the lawsuit and the settlement

20   agreement, the City's interests are accounted for.  They have

21   attorneys who are working in the best interest of their client.

22   The Portland police's interests are accounted for.  They have

23   their union and attorneys who work in the best interest of

24   their client.

25       What PCCEP did not seem to understand is that the DOJ,

1    stepping in on behalf of the people of Portland, means that the

2    negotiated structure of the settlement agreement was meant to

3    account for the constituents of Portland who are not previously

4    being protected from unconstitutional policing.  In order to

5    properly amplify community input, this basic understanding

6    would have needed to be reckoned with.

7        Instead, many PCCEP members ignored terms of the

8    settlement agreement and some tended to default to who they

9    perceived to have authority when issues related to the argument

10   or agreement came up.  For example, the city attorney, the

11   police union, or the compliance officer.

12       This has not only failed to improve community

13   relationships between constituents and the Portland Police

14   Bureau, but this also generated a general distrust in the PCCEP

15   itself.  As a member of the SPMI, I collaborated with fellow

16   members in the hopes that it would result in at least marginal

17   improvement in the lives of those experiencing mental illness

18   and beyond.

19       Ultimately, if somehow we could bring back all of the

20   lives lost due to police use of force last year or the year

21   prior or the year prior, situations where someone had a real or

22   perceived mental illness, someone likely experiencing crisis,

23   are the systemic conditions that led to their premature deaths

24   truly different now?  Is there a system in place that would be

25   less likely to kill them now?  Is the City of Portland honestly

1   on its way towards that level of change, and is it a priority?

2       I can't say, with confidence, that I believe any of that

3   to be presently true.  I don't believe PCCEP served as a

4   community-led group that could collaborate with Portland

5   constituents to independently review the settlement agreement

6   and work towards that end, nor did they improve community

7   relations, integrate community input, or respect the

8   volunteered labor of all of those who attempted to contribute.

9   People who showed up to poorly publicized, disorganized,

10  three-hour-long PCCEP meetings were volunteering their time,

11  and this did not ultimately feel respected.

12      I left that PCCEP meeting, where I presented our second

13  and third recommendations, feeling disheartened that the labor

14  of SPMI and the time of the experts, professionals, and people

15  with lived experience who attended our meetings, meant little

16  to the PCCEP and to the larger project of evaluating the

17  Portland Police Bureau and the City of Portland's compliance

18  with the settlement agreement.

19      Thank you.

20          THE COURT:  Thank you, Ms. Mathis.

21      Anyone else from the subcommittee?

22          MS. MARSHALL:  Good morning, Your Honor.  My name is

23  Amanda J. Marshall, and I'm a practicing attorney in the state

24  of Oregon.  I'm not often in a position to address the federal

25  court, so thank you for that opportunity.

1          Today I address the Court as the co-chair of the

2     Subcommittee for People with Mental Illness under the PCCEP, as

3     a resident of Portland, where there have been too many tragic

4     encounters between the police and civilians with mental health

5     and addiction problems, and as a person who has struggled with

6     mental health issues and the legal system.

7          In early June 2019 I was invited to be a member of the

8     SPMI.  I was excited to be considered for a subcommittee whose

9     members had connections with mental illness, both personally

10    and professionally.  As I had only been in private practice for

11    three months, I had to make a difficult decision about how open

12    I wanted to be to the public in regard to my own mental health

13    struggles.  Few lawyers disclose to the legal community that

14    they have ever struggled with mental illness.

15         I decided that the goal I set during recovery of using my

16    lived experience to help others navigate the mental health

17    system outweighed my fear of the impact my disclosure might

18    make on my business.  With that, I joined SPMI, became a

19    co-chair of the subcommittee, formally presented SPMI's first

20    substantive recommendation to PCCEP, and observed the community

21    response to PCCEP's decision not to pass along that

22    recommendation.

23         SPMI made three formal recommendations to the PCCEP, which

24    have been provided to the Court.

25         PCCEP voted to accept recommendation number two, requiring

1    reassessment of compliance with Item 89 of the settlement

2    agreement, but voted against recommendations one and three.  It

3    wasn't the final decisions of the PCCEP that had the greatest

4    impact but rather the process that left myself and other

5    members of SPMI feeling marginalized, misunderstood, and

6    ultimately dismissed.

7        Unfortunately, these feelings parallel the experience of

8    those with mental illness.

9        I presented SPMI's first recommendation regarding

10   condolences to the PCCEP both at the July 2019 meeting and then

11   again at the August 2019 meeting.  In my presentation, I wanted

12   to convey the nuances we carefully wove into the language of

13   our recommendation to address every concern raised at our

14   meetings.

15       One of our subcommittee's biggest concerns, which did turn

16   out to be all too true, was that PCCEP would continue to table

17   the recommendation, taking no action, and dissipating the

18   forward momentum the recommendation had gained.

19       In July, due to poor time management by PCCEP, I was given

20   less than ten minutes to present the recommendation our

21   subcommittee had worked on for months.  Members of PCCEP

22   expressed wanting to take more time to allow for a full airing

23   of our recommendation and decided to table the vote until the

24   next meeting.

25       In August, I again assured that my afternoon schedule was

1    free of client meetings and court appearances so that I could

2    present our recommendation on condolences for the second time.

3        PCCEP's agenda allotted an hour for our presentation,

4    PCCEP discussion, and public comment before a vote.  It was

5    apparent that PCCEP did not use the time between our meetings

6    to consider our recommendation.  PCCEP's discussion and the

7    response to our presentation and the community members' sharing

8    their deeply emotional experiences of loss of loved ones during

9    interactions with the police was insensitive, ill-informed, and

10   disrespectful.

11       At the PCCEP meeting, two member positions were vacant and

12   two members were not present to vote, leaving the total present

13   to vote at nine of the 13 member positions.  All nine members

14   present expressed the support for the recommendation and, yet,

15   the recommendation did not pass.  Two members abstained,

16   leaving the vote one short of passing.  The only reasons given

17   for abstention were, one, the recommendation could be stronger,

18   meaning that they agreed with it; and, two, that the current

19   policy from the City and the Portland Police Association were

20   needed to see if the recommendation was even possible.  No

21   further explanation was provided.

22       Starkly absent from the entire discussion was any attempt

23   by members of the PCCEP to determine what went into the

24   formation of the recommendation.  We were not asked what

25   research we performed, who we consulted, what issues we

1  considered and addressed in the writing of the recommendation,

2  or why we felt so strongly about our exact language.

3      In forming our recommendation, SPMI consulted with the

4  community, discussed the recommendation at multiple meetings,

5  circulated numerous drafts of the recommendation with

6  invitations to edit among its members, invited public comment,

7  and reached the final version forwarded to the PCCEP with

8  unanimous support.

9      The questions raised at the PCCEP meeting had been heard,

10 considered, and addressed in SPMI meetings and discussions.  As

11 Mr. Nolen stated earlier, PCCEP members rarely came to our

12 meetings.

13     Subcommittee members left the August PCCEP meeting feeling

14 shut out by the forum that is supposed to be about raising the

15 concerns of the community to city leaders.  On September 3,

16 2019, I sent a letter composed by the members of SPMI to the

17 PCCEP, withdrawing our recommendation from their consideration.

18 We asked for a clearly defined process before making additional

19 recommendations.

20     Simultaneously, SPMI sent a cover letter and our

21 recommendation directly to Mayor Ted Wheeler and then to

22 Chief Danielle Outlaw.  Both letters have been provided to the

23 Court.  I received several emails from members of the PCCEP

24 with words of support and encouragement.

25     SPMI made repeated requests to PCCEP to formulate

1  processes, not only for recommendations, but for governance

2  addressing operations of the subcommittee.

3      In response, PCCEP eventually proposed a template for

4  recommendations from subcommittees that contained a prompt

5  addressing how the recommendation redressed barriers to racial

6  equity but contained no solid inquiry, nor any inquiry

7  whatsoever about mental health.

8      In response to our request for governance surrounding

9  operations, such as conducting meetings, getting new members,

10  and voting, we were told there was no governance for

11  subcommittees and were provided with no further response for

12  guidance.

13      The members of SPMI were disheartened by the responses to

14  our outwork.  We volunteer our time and expertise out of our

15  passion for mental health advocacy.  The PCCEP did not

16  meaningfully consider our ideas or make efforts to understand

17  their importance.  Serving as co-chair of this incredible group

18  of individuals has given me hope that one day the cries for

19  help from the mental health community will be heard and

20  addressed by local leaders; however, our interactions with the

21  PCCEP have shown that our talents and efforts would be more

22  effective and appreciated in a different forum.

23      As such, all of the members of the SPMI have decided to

24  withdraw from the subcommittee and will not be planning or

25  attending a March meeting.

1    We would ask that the Court take into consideration the

2    experiences of the members of the people -- the Subcommittee

3    for People with Mental Illness before making a decision on

4    whether the defendant has substantially complied with the terms

5    of the settlement agreement.

6    Thank you, Your Honor.

7    THE COURT:  Thank you, Ms. Marshall.  I appreciate

8    you being here, your oral comments and written comments, which

9    I have read.  Thank you.

10    MS. MARSHALL:  Thank you, Your Honor.

11    THE COURT:  In a few moments we'll take a mid-morning

12    recess.  And when we come back, I'll be pleased to hear from

13    Ann Brayfield, Elizabeth -- I can't -- Reetz or Peetz?  I'm

14    sorry.  Then Barry Joe Stull.  Then Linda and then Tony,

15    followed by members of Portland Copwatch.  And if anyone wanted

16    to present brief testimony but has not yet heard their name

17    mentioned, let my courtroom deputy know during our recess.

18    We'll do that.

19    Then what I would like to do is maybe we can do this right

20    now at the beginning of this short recess.  I would like our

21    court reporter to speak with the counsel primarily for the

22    United States, Portland Police Association, and the City, and

23    discuss among yourselves how much time, if you -- if at all,

24    you want for a midday break.  It doesn't matter to me whether

25    you want a full lunch break, a part lunch break, or just

1  another short recess after a little while.  But as long as the

2  three sets of counsel can agree and our court reporter is

3  willing, whatever you want is fine with me.  Just let me know.

4  And then also I invite all five of the parties here to consult

5  with each other at the appropriate time.  And let me know your

6  thoughts about moving forward and next steps.

7        I still, of course, do very much look forward to hearing

8  anything that the United States, the Portland Police

9  Association, and the City of Portland have to say and in

10 whatever order you wish to say it.  I know that you probably

11 had some prepared remarks.  As I said, I will listen to

12 anything and everything that you all wish to say, but I also

13 know that as -- the excellent trial lawyers that you all are,

14 you're sometimes prepared to rearrange things and do things a

15 little differently.

16       So among the things that I'm most interested in hearing is

17 your reactions and responses to many of the written comments

18 that we have already received, including from the Mental Health

19 Alliance and from the AMA Coalition, your responses to many of

20 the oral comments that we've heard this morning, and your views

21 in terms of where things go next.

22       I think you recognize a realistic possibility that I'm not

23 prepared to say today that there is substantial compliance with

24 all aspects of the settlement agreement.  And if that's going

25 to be the result of today, what do we do next?  And what do you

all recommend?  And I think the five of you should confer

mostly about process issues.  You don't have to give me the

substance of that right now; although, as I said, anything that

you all wish to say is most welcome.  But I think you should

spend some of the time before you speak to say that.

So, Jill, is 10 minutes sufficient break for you right

now, or do you want more?

THE COURT REPORTER:  10 is fine.

THE COURT:  10 is fine.

When we come back, let me know what the counsel and the

court reporter would like to do in terms of the next break

after that.

Ms. Reeve?

MS. REEVE:  Yes, Your Honor.  Thank you.  There are

the -- one of the PCCEP co-chairs is here and a number of the

members of the PCCEP, and when would the Court like to hear

from them?

THE COURT:  I would say whenever the parties

recommend and/or want after I complete with the public

testimony that I have just identified.  I know they're public

too.  So whenever you recommend, whenever they want, but I

think what I would like to do in the next order is

Ms. Brayfield, Ms. Peetz, Barry Joe Stull, Linda, Tony, and

representatives from Portland Copwatch, and then I'll be glad

to hear -- if you recommend that they go next or the parties

1   recommend they go next, that's fine.  If you recommend that

2   they go after some presentations from the parties and from the

3   COCL -- whatever you recommend is fine with me.

4           MS. REEVE:  Thank you, Your Honor.

5           THE COURT:  Thank you, all.

6       Ten-minute recess.

7                       (Recess taken.)

8           MR. GEISSLER:  If it please the Court, Your Honor,

9   one half hour for lunch would be appropriate.  And as to how we

10  proceed down the road, I believe that discussion will take

11  place during the lunch break and after consideration of

12  whatever other statements are offered to the Court.

13          THE COURT:  That sounds perfect.

14          MR. GEISSLER:  Thank you, Your Honor.

15          THE COURT:  So certainly before we get to that lunch

16  break, I do want to complete the public testimony, and I think

17  we're on schedule for doing that.

18      So let's proceed to Ms. Ann Brayfield, followed by -- a

19  slight change -- Andrew Kalloch, I think Vadim Mozyrsky, and

20  then we'll go back to Barry Joe Stull, Linda, Tony, and then do

21  the Portland Copwatch participants, and then Nancy Newell,

22  Debbie Aiona from the League of Women Voters, and

23  Shawn Campbell.

24      All right.  Ms. Brayfield.

25          MS. BRAYFIELD:  Good morning, Your Honor.

1          THE COURT:  Good morning .

2          MS. BRAYFIELD:  Thank you very much for this

3    opportunity to speak with you again today.  I have been here

4    many times, I believe, over the last eight years.

5          THE COURT:  Welcome.

6          MS. BRAYFIELD:  Thank you.

7       I have two things I would like to address.  One is

8    Section 9.  And as I looked over Section 9 in the PCCEP's

9    interim report, I put together what I saw, from my perspective,

10   and I shared that in a letter to the PCCEP, which I also gave a

11   copy to the Department of Justice and spoke to the PCCEP last

12   night.

13       I think I agreed with some of their findings of

14   substantial compliance.  I disagreed with others.  And I think

15   the reason -- and primarily I disagreed with paragraph 145 and

16   147, 148, and 149.  And my disagreement was when I looked at

17   each of those paragraphs and what was asked in each of those

18   paragraphs, I was looking at whether or not, if things were in

19   substantial compliance, would the PCCEP be able to do the job

20   that was being asked of them and that the community would want

21   from them, and I didn't feel like these were adequately

22   addressed, particularly when they said we would assign

23   substantial compliance with one caveat. And I said as soon as

24   you do a caveat, I feel like we're talking about partial

25   compliance and there's still an issue to be addressed.  So that

1    is what I spoke about last night.

2        And my largest concern with finding that whole section in

3    compliance is I think that it isn't going to serve the PCCEP

4    when they don't yet know whether the data that they're looking

5    for to do their job is being provided to them on -- in a timely

6    and consistent basis.  And I think if you read through their

7    report, you'll see some of the inconsistencies and some of the

8    things that at least I wouldn't feel, if I were a member of

9    that body, that I could really see I could depend on and that

10   we were really working.

11       And that isn't to say that the City hasn't done a

12   considerable amount of work because I believe that they have.

13   I mean, I believe where we are now is not where we were back,

14   but I also believe we still have a ways to go and that the

15   community oversight is key because that is what's going to

16   serve the community after the agreement goes away.

17       And so my biggest concern is that that is going to

18   function and function well and be able to serve the community

19   going forward, so I will leave a copy of this.

20            THE COURT:  Excellent.  Please do.

21            MS. BRAYFIELD:  And my other concern goes beyond

22   Section 9.  And that is, if I look at the whole picture, and --

23   to think that we're on the road, down that one year, I would

24   have to say in 2019 I felt like, oh, in terms of people

25   interacting with officers and they were in crisis, and they

1  ended up dead.

2      I looked at 2010, which is where I came into this as a

3  community member, as a parent, and as someone who is familiar

4  with young people with learning differences who might not

5  respond to an officer in a way that they would end up being

6  alive at the end of that because they don't understand,

7  necessarily, socially in the same way that other neuro-typical

8  people do.

9      So I went to the Department of Justice, as you know, in

10  2011 and presented some materials to them and said, "I think

11  you need to come in.  I think we need your help in this

12  community."  Well, that came to pass.

13      But when I looked at 2019 and I saw that five people lost

14  their lives in a deadly force kind of situation, I said, "Oh, I

15  feel like I'm back in 2010."  I know I'm not.  I know a lot of

16  work has been done, but what kept coming to me was all of these

17  things have been put in place -- you know, policy, practices

18  and so on -- but do we have the outcome?  And I have been told

19  this isn't about outcomes.  It's about, you know, have we

20  crossed all our T's and dotted all our I's and done those

21  things that the agreement says that we need to do?

22          THE COURT:  Well, they're related, aren't they, in

23  that --

24          MS. BRAYFIELD:  Yes.

25          THE COURT:  -- to dot our I's and cross our T's, one

1    would hope that over time there would be an outcome that is

2    better?

3              MS. BRAYFIELD:  Yes.  Exactly.  And that's what

4    disturbs me.

5         And what I kind of took away from what happened in 2019

6    was I looked at the different cases where things turned out

7    well and where they didn't turn out so well, and I said what

8    can we learn from those cases where things turned out well and

9    everybody went home safe or got the help that they needed?

10        So I looked at those, and I said -- and then I looked at

11   the ones where they didn't, and I said can't we look and

12   publicly talk about and train to and work through what went

13   well on the street so that when we talk about de-escalation --

14   and I know there's been a lot of de-escalation training.  Well,

15   how was it that de-escalation happened in some of these cases

16   and didn't happen in some of these other cases, and what can we

17   learn from those cases where it worked?  And can't we have a

18   public analysis and speak about what works?  I don't see that

19   as happening.

20        And I think what really brought up my distress was what

21   happened in December with Koben Henriksen, and he had an

22   interaction with two officers and de-escalation worked, and he

23   got talked down, and he got taken for some help.

24        A couple of weeks later, one of the same officers who was

25   involved in that earlier encounter arrived on the scene with

1   another officer, and in 20 seconds, or so, Mr. Henriksen was

2   dead.  And the behavior, at least everything I have been able

3   to read in the case, the first encounter and second encounter

4   was very similar.  He was in a similar kind of state.  He had

5   these two little knives.  He was in the same intersection.

6   What happened?  Why did he walk away alive one day and he was

7   dead the next?  And that is what I think we have to learn from.

8        And if we -- I don't know, you know, in all the legalities

9   and all the agreements in the world, how you accomplish that.

10  But that is what I look at and that's what I say.  We have

11  something to learn.  We have a ways to go.  We can't be done.

12  And I guess that's why I really come to you and I ask you, as I

13  know you do, to consider these things in all ways to Sunday and

14  to help us find a way that we're not done when we're not done.

15       Thank you.

16            THE COURT:  Thank you, Ms. Brayfield.  Thank you for

17  those comments.

18       Mary, would you take Ms. Brayfield's written comments?

19       Thank you.

20       I believe now for scheduling issues and other

21  accommodations -- and I apologize if I'm mispronouncing your

22  names.  Mr. Vadim Mozyrsky or Andrew Kalloch.

23       Please state your full name, spell your last, and I

24  apologize for any mispronunciation.

25            MR. KALLOCH:  Andrew Kalloch, K-a-l-l-o-c-h.  I'm a

1   co-chair of the Portland Committee on Community-Engaged

2   Policing.  Thank you very much, Your Honor, for the time this

3   morning, and thank you to all the parties, the amici, and all

4   the members of the public who have testified this morning.  One

5   of our core values that we established as a PCCEP way back when

6   we first started meeting in, I guess, September of 2018 was to

7   assume positive intent.  And I have been thinking about that as

8   I have -- as I have been sitting in the second row, because

9   it's not easy, as the leader of an organization, volunteering

10  your time, to hear words like "failure," to hear words like --

11  you know, like -- like being "insensitive" or "ill-informed" or

12  "disrespectful."  To say the least, that is never the intent of

13  any of the volunteers, and I just want to reiterate to the

14  Court that I personally ascribe positive intent to everyone who

15  has testified and honor their testimony.

16      I do want to take just two minutes to give you an overview

17  of what PCCEP decided last night at our board meeting as our

18  statement, which you read this morning, as well as address a

19  couple, though certainly not all, of the concerns that have

20  been raised more broadly.

21      First, I want to note that while PCCEP has submitted a

22  document that states that we believe the City to be in

23  compliance with Section 9, the section governing our body, we

24  by no means believe that PCCEP is a final product.  We are a

25  work in progress.  We are better now, in my opinion, than we

1  were six months ago.  We were better six months ago than we

2  were a year ago.  In particular, we have a continued need to

3  build on our foundation of trust by expanding outreach to all

4  corners of the city.

5       It's not always seen how we engage with the community, but

6  one of the things that we mentioned at our meeting last night

7  and in other commerce is that the members of our committee,

8  which is a broad, sort of, cross-section of the community, have

9  individual meetings with people in their network.  They have

10  meetings with institutions and organizations outside the

11  structure of our public meeting process in an effort to bring

12  those folks into the work that we are doing and not just to

13  bring them in so that they sit at their meeting and, you know,

14  increase our numbers.  That is not our goal.  Our goal is to

15  leverage their wisdom and to actually learn from them.  Because

16  while there are 13 of us on the committee, you know, there are

17  700,000-odd of us here in the city, and our goal is to learn

18  and reflect back the community's knowledge of what it needs.

19       Now I want to address a couple of the specific concerns.

20  We'll start with attrition.

21       So I was glad that one of our members last night mentioned

22  that while it has been said that there are only two members of

23  the original committee that are still on, really the number is

24  closer to four because the two alternates that started way back

25  in September of 2018 are now sitting on the committee along

1    with two of the folks who started.

2         That doesn't mean that that number is terrific.  But when

3    we're talking about a fully volunteer committee and the type of

4    commitment that we are making over an 18-month period, it's not

5    surprising to see attrition, and that attrition has been seen

6    for a wide variety of reasons.  If you ask the folks who have

7    left, they will give you a lot of reasons.

8         Our two youth members, for instance, moved on to college.

9    That's a good thing.  We wouldn't expect them, necessarily, to

10   stay on.  We have had other members move for opportunity -- job

11   opportunities, and we have had some members, assuredly, who

12   have left because they have been disappointed with their

13   experience -- each of which seems to me a reasonable ground for

14   leaving.  But I -- I would caution against this idea that we

15   haven't been, sort of, fully staffed.

16        We had another meeting last night in which we approved

17   recommendation -- or we had three terrific alternates, two of

18   which will be seated upon recommendation by the mayor, and we

19   will once again be a full body, and it goes in waves.  And so

20   we're happy to continue to work to fill that alternate pool as

21   needed and to make the experience as positive as it can be.

22   Again, not only for the PCCEP members themselves, but on behalf

23   of the community that we're seeking to serve.

24             THE COURT:  Let me ask you something and follow up on

25   this.

1          MR. KALLOCH:  Sure.

2          THE COURT:  I have, over the course of my adult life,

3     sat on many different committees and boards.  And over a long

4     enough period of time, there's plenty of just natural and

5     perfectly ordinary reasonable attrition.  I totally get what

6     you're saying about the youth members going off to college.

7     I'm glad for them.  But for those members who have been serving

8     for less than 12 months, who have left because of either

9     disappointment or feelings that the committee was not serving

10    the purposes for which they were hoping it would serve, what's

11    your response or view to that?  How can we make it better and

12    have fewer of those instances going forward?

13         MR. KALLOCH:  I'm truly not sure, Your Honor, to be

14    blunt, but I do think that some of the processes -- and

15    "process" was mentioned a couple of times, and I think it's

16    important to hone in on that -- that have been established in

17    recent months, can help to ensure that even when the ultimate

18    outcome of a PCCEP meeting is not what the person wants, that

19    the process that we took in considering a given recommendation

20    or outreaching to a community in a given way is respected, and

21    therefore people believe that their service is something that

22    is honored.

23         So the way I am focusing on it, as one of the leaders of

24    the group, is to focus on process rather than product, in terms

25    of attrition, to make sure that people understand how

 1  something -- how a bill becomes a law, PCCEP version, and --
 2  and recognize that they are going to get a fair airing of their
 3  idea at the subcommittee level and then, as necessary, at the
 4  full committee level.  It doesn't mean that they're always
 5  going to be agreed upon.
 6      Vadim and I were outvoted by our committee members just
 7  last night, and as a leader, I recognize that that's probably a
 8  good thing from time to time because, Lord knows, I'm not right
 9  all the time.
10      So I think, again, process over product at this stage is
11  important for us, but also to not lose sight of the fact that
12  we have created work product.  And I was grateful for the City
13  in reviewing last night at our meeting all the recommendations
14  that we have given and the responses, or in certain cases, lack
15  thereof, that we have received from the City.
16      We have had stumbles here and there, in terms of making
17  sure that we efficiently transmit our recommendations to the
18  City, so that they can decide how and whether to act on them;
19  but I think, in the aggregate, we have seen the City respond in
20  a meaningful way to many of our recommendations, albeit not
21  all, and we look forward to continuing that process moving
22  forward.
23      Thank you, Your Honor.
24          THE COURT:  I didn't mean to cut you off with my
25  question.  Are there other comments you wanted to make?

1          MR. KALLOCH:  Just one last thing, because it's been

2    mentioned a number of times, community organizing.  So folks

3    mentioned the need for, you know, full-time community

4    organizing and that PCCEP doesn't do community organizing.

5    Again, I'll reiterate that we tried.  The members of the

6    committee try outreach on a weekly basis.  We have dozens and

7    dozens of meetings that go beyond the formal, sort of, public

8    open meetings that we have, in an effort to draw people in.  Is

9    that enough?  No, of course not.  We would love to have this as

10   our full-time job, but I'm going to run out of here, as is many

11   others, back to their full-time jobs.

12        So would be -- having a community organizer be a great

13   addition?  Of course it would.  Two or three while you're at

14   it.  But I think what is important for us, in lieu of that

15   additional resource, is to continue to have a board that is

16   motivated to do the work that is broadly representative of the

17   community and that can specifically work with every corner of

18   the community to bring them into the work.  It doesn't mean

19   bring them to our meetings.  It means bring them into the work

20   in a substantive way and get their input on what we're trying

21   to achieve.  Because the 13 of us are not going to do this

22   alone.  We need a buy-in, and that's why we're doing the

23   outreach to try to secure that.

24          THE COURT:  Speaking of which, has PCCEP had

25   sufficient or do they envision more collaboration and

1    discussion with two of our amici here -- AMA Coalition and the

2    Mental Health Alliance -- to see what ideas and/or

3    contributions they can make, either for community outreach,

4    including such things -- and I'm not going to micromanage

5    this -- but such things as the concerns of where the meetings

6    take place, the advance notice of the meetings, things like

7    that?

8         Has there been enough of that collaboration, do you think,

9    or do you envision more collaboration going forward?

10           MR. KALLOCH:  We would always love more

11   collaboration.  If anything, it's on us, as leaders, to reach

12   out to MHA and AMAC and others who have been involved in this

13   process.  As we noted in our submission to the Court, we

14   realize that we stand on their shoulders; that we are the

15   leaders of this little piece, but that they have been doing

16   this in the community for decades, if not generations.

17        Both of those groups have attended our meetings loyally.

18   They have provided feedback on a variety of the recommendations

19   that we have brought up, and we appreciate that, and I look

20   forward to doing more with them.  And I'll -- I'll take it upon

21   myself, as a member of our Steering Committee, to try to

22   strengthen those bonds even further.

23           THE COURT:  Thank you, Mr. Kalloch, I appreciate your

24   comments here.

25           MR. KARIA:  Thank you, Your Honor.

1          THE COURT:  And I appreciate your work on the PCCEP.

2          MR. KALLOCH:  I appreciate that.  Thank you.

3          THE COURT:  Mr. Mozyrsky.

4          MR. MOZYRSKY:  Thank you, Your Honor.

5          THE COURT:  Am I pronouncing it even close to --

6          MR. MOZYRSKY:  Perfectly.  Perfectly.  Both first and

7    last names.  Thank you for your time, Your Honor.  I appreciate

8    you hearing me out.  My name is Vadim Mozyrsky,

9    M-o-z-y-r-s-k-y.  I am the secretary of PCCEP.  And Andrew, the

10   co-chair, has done an admirable job of explaining the general

11   circumstances as to why we voted yesterday that PCCEP -- we

12   feel that PCCEP is in compliance with the -- the City is in

13   compliance with the settlement agreement with respect to

14   Section 9 of PCCEP.  And the vote was almost unanimous.  I

15   ought to say that I support the statement.  I voted against it

16   because of an amendment, but I was the only dissenting vote.

17   So including Patrick Nolen, who was here today saying PCCEP was

18   not working, he, likewise, voted that PCCEP was in compliance

19   and the City is in compliance with Section 9.  So including

20   myself, it would have been a unanimous vote.

21       I strongly feel that the "process versus product" argument

22   that is being produced today is -- is really what we should

23   focus on.  The process is working.  People can disagree on the

24   product, people can disagree on how the Portland Police Bureau

25   might handle individual situations, but PCCEP, the process, is

1   working.  People are applying to be on PCCEP.  The mayor is

2   appointing membership to PCCEP.  We have had a quorum every

3   single meeting of PCCEP.  We've had votes.  We've made

4   recommendations to the City.  The City has accepted those

5   recommendation.  And, in fact, yesterday made a presentation on

6   all the recommendations we've made, their statuses, and how

7   they have been incorporated, both by the City and the police

8   bureau.  So it is working.

9       It was said that we're not a seaworthy vessel, and I have

10  to say that working on PCCEP day in and day out on the

11  subcommittees and on the main committee, all hands are on deck.

12  We have an admirable group of individuals, who I am proud to

13  work with, and we're all doing our best.

14      The standard should not be are we all community activists?

15  Are we all policy wonks?  Are we all experts on police

16  procedure?  Do we all have unlimited time to donate to this

17  committee?  That seems to be what some people are recommending

18  for the PCCEP standard.  The standard is is the City supporting

19  us with our needs and are we doing our best to receive the

20  comments from the general public, incorporate those comments,

21  and present them to the police bureau, the police chief, and

22  the City?  And we are doing that.

23      There's been some discussion about our subcommittee on

24  mental illness and on people with mental illness.  To set the

25  facts straight, we did vote for one of the recommendations.

1    Another recommendation that was discussed here today, that

2    people made it seem like it was not considered, the fact is

3    that that recommendation was considered.  A couple of people

4    wanted to make minor amendments in order to -- what they feel

5    deal with some of the legal issues presented in their

6    recommendation.  That recommendation was withdrawn because

7    people did not want amendments to be heard.

8         And I think it is an inconvenient truth that PCCEP did not

9    vote down that amendment.  It was withdrawn by the people who

10   posed for it.  And it would have passed.  We had six people

11   that voted for it, a couple of people that wanted to have

12   amendments.  Unfortunately, we didn't have that opportunity.

13   So let that not be a threshold as to whether the City is in

14   compliance or, for that matter, whether the PCCEP people are

15   doing their job.

16        As I mentioned, I think everybody is doing an admirable

17   job, in my opinion, working with these.  We're getting support

18   from the City.  A community activist?  That would be great.

19   But we're reaching out.  I went to neighborhood associations,

20   as well as secure -- or safety committees, told them about the

21   work PCCEP was doing.

22        A couple meetings ago, they showed up to our meetings.  We

23   do have substantial community attendance at these meetings.

24   You've heard that we have one or two people.  That could be

25   farthest from the truth.  We have people that speak out and

1    make their piece known.  Different people come at different

2    times.  Some people come at every meeting.  We do have

3    community support and community interest and community

4    feedback.

5         So with respect to that, I just want to say that there

6    might be disagreement on outcomes, and that is between the

7    Justice Department, the City, and with yourself as the

8    oversight, as to what all that means.  But if you -- if the

9    word of PCCEP has any meaning in today's hearing, it's that we

10    feel that we're being supported by the City.  We're being given

11    the resources that we're requesting.  We're given the data that

12    we're requesting.  We have meetings every single month that's

13    attended by city officials, by police bureau officials, by the

14    community members, and we are making recommendations.  They are

15    being heard.  We are doing our job.

16         Thank you.

17              THE COURT:  Thank you, Mr. Mozyrsky.  I appreciate

18    you being here and your work on PCCEP as well.  Thank you.

19         All right.  May I hear next from Mr. Barry Joe Stull,

20    followed by Linda and then Tony.

21         Good morning, Mr. Stull.

22              MR. STULL:  Good morning, Your Honor.  Thanks for

23    this opportunity.  I'm appearing here today because I want to

24    clarify that there are people, myself included, that are

25    perceived as persons with a mental illness.  My disease is

1    called central pain syndrome.  It's a neurological disorder,

2    and it's a product of a car accident in 1976.  And by the time

3    I had surgery in 1980, I already had permanent nerve damage.

4    And what's happened in the passage of time is that a nerve has

5    grown in and stimulates the pain relay which was designed at

6    birth to report pain for the site that now can't do that.

7        So now this is being triggered by something that is either

8    muscle, skin, or connective tissue.  It doesn't really matter.

9    Since I stood up from sitting back there, I actually turned

10   that on just by that motion.

11       Okay.  Well, the reason I'm sharing that is because I have

12   this condition and thanks to the expertise of my neurologist,

13   Dr. Robert J. Grimm, who passed away in 2011, he operated a

14   brain research lab in -- starting in, I guess, the 1960s, and

15   he had actually recommended my back surgery in 1980.  And he

16   was treating me for basically ten years -- from 2000 on to

17   about 2010.  And I think what is important, as a person who is

18   basically living in the middle of a triangle of three deaths of

19   persons with mental health crises -- most recently 103rd and

20   Washington, which is five blocks from my house -- bullets go

21   much further than that, so there's a concern that even citizens

22   could be victims of these ongoing police shootings.

23       And what I want to express is as a person who has my

24   disability, central pain syndrome, as part of my difficulty,

25   most exemplified by my encounter in City Council with the

Portland police, which is the number one video response for
typing my name into a search engine, and what it shows is that
although I had identified that I had been triggered and I
needed an ambulance to return to Emanuel Hospital, where I had
been twice prior in that same week, that event, through this
filter, where once the Portland police were involved, the staff
on duty at city hall could not call an ambulance, and once an
ambulance was belatedly dispatched, I never had encounters with
the EMT.  A product most obviously by the culture -- evidenced
by the culture, but important to me is the responding sergeant,
who was the head of that event, was an EMT, and he didn't
recognize that I had my disease, and he didn't recognize that I
was experiencing pain.  And he didn't recognize that I had any
need to have an encounter other than what I have been through,
with a trial and reversal on appeal and another trial they're
telling me.  They want to have a do-over.  Even though I
prevailed on appeal in April of 2019, they want to have another
trial on this.  And the issue is -- what happened in that
situation is one that is going to repeat itself with other
persons.

      And I'm sharing this with you this morning, Your Honor, to
let you know that what happens with me and with others is once
our fight-or-flight is triggered, then that really takes us out
of our frontal lobe higher reasoning and puts us into what I'll
just refer to as our lizard brain.  It's the limbic.  It's the

1   fight-or-flight response.  And once somebody is triggered into

2   that situation, it could actually be months, depending on

3   what -- a mother might have seen her child get run over by a

4   car.  It could be months before her body is even recovered to

5   that normal level from that event.

6       So these are things that happen, and I think that what

7   really speaks to the difference between the new Portland and

8   the old Portland is -- there was a now-gone restaurant called

9   The Overlook, after it was Devlin's for years, up by Interstate

10  and Skidmore, and my buddy and I were having breakfast about

11  ten years ago and talking about ongoing issues, like the

12  James Chasse Jr.'s story -- it kind of is known for starting

13  this whole process -- and the gentleman cut in, and he

14  surprised us, because he was an elderly black gentleman who was

15  a police officer, and he said, "We used to talk to people.  Now

16  they just shoot them."  And that's really the issue.

17      If somebody is in that limbic fight-or-flight response,

18  myself included, I -- I can watch my IQ points just drop by 40

19  right there -- 50 right there.  I can lose my ability to

20  vocalize.

21      So the kind of things we have to understand, Your Honor,

22  is we have to allow people to have the opportunity to center

23  themselves and to calm themselves down -- as you see me do

24  here, and I'm doing now -- and to really address the root of

25  the issue is that once people are set into that particular what

1    we're going to interpret as a mental health crisis, my -- maybe

2    it was a mental health crisis once I needed an ambulance and

3    people didn't take me serious that I actually had a

4    life-threatening condition -- yeah, that -- that can drive you

5    crazy.  Right?

6         And the police officer that responded had his nametag

7    blocked by a Taser.  And one of my triggers is if I see a

8    police officer and I can't read his nametag, because he's

9    blocking it with his microphone or collection of pens, I

10   immediately say, "That's a bad cop," because he is not letting

11   people know his name because he's going to do something dirty.

12        And the thing of it is, Your Honor, what part of this

13   limbic response is, is when we -- myself included -- and you

14   would, too, I suppose -- once we're put into that state of

15   mind, then ambig -- this goes for the police officers --

16   ambiguous information becomes threatening, and the things that

17   we hear -- we can selectively just pick out the threatening

18   words out of a sentence.  When you say, "No one is going to

19   hurt you," or, you know, something, is the "no" word will just

20   disappear, because "Someone is going to hurt you" would be --

21   would be identified as -- the body as a threat.

22        So what I'm suggesting is that we all cool out.  We stop

23   letting police officers block their nametags as the first sign

24   of respect.  I can't believe they entered as evidence this

25   gargantuan thug blocking his nametag with a -- with a Taser,

and his supervisor said perhaps at another angle he could have
read that.  No.  When I can't read his nametag and he's
blocking it by a Taser, it's because he's a thug that gets away
with everything he did, Your Honor.

I was shocked to read a couple of things, and I'm going to
let you go with this:  I read the transcript, because they went
for a new trial, so I had to revisit these things, and this was
what the State said, quote, "Fuck you.  Fuck you.  I have a
disability."  And that was attributed to me, Your Honor.  And I
never ever said that.  So we're talking about a big, big
cultural problem.

And the police that bent my wrist all the way from the
council chambers down out to the car did that in full
compliance with the use of force.  They're allowed to make me
scream out in pain all the way, waiting for the elevator, down
the elevator, all the way out to the sidewalk, where -- oh, how
does that make me feel?  There's my ambulance that I don't get
to get in.  I get in the police car.  And then I respond by
breaking it because at that point my fight-or-flight is
internalized, and I'm either going to vent it or I'm going to
recover.

Fortunately, Your Honor, I have enough togetherness that
when I was across the street over here -- I'll let you go with
this:  In 2012 I was arrested with what we now know is a serial
arrest of people violating the trespass exclusion policy at

1   Portland City Hall.  I was on the agenda, and I was crossing

2   the plaza where they came out, and it was Sergeant Bacciagalupe

3   (phonetic) and it was Stuart Palmiter, both big guys.  They

4   arrested me.  They put me in the police car.  I screamed my

5   whole -- my full head off because my lizard brain was

6   triggered.  We drove a couple of blocks.  I was outside the

7   precinct, and I asked the officer to turn down his car stereo,

8   which was behind my head and was making me ill because of my

9   central pain syndrome, and -- and it's a horrible disease,

10  Your Honor.  It's terrible.  Anyhow, the point is, is he not

11  only refused my request once I invoked ADA, he turned up his

12  radio and he got out, and I got out, and he started laughing at

13  me with the then Chief of Police/now Sheriff Reese.  From the

14  time I decided -- I tried to do throat singing.  I tried to do

15  whistling.  What can I do to center myself?  I decided I was

16  going to tear that police car apart.  And within a minute, the

17  radio was off.  And by the time they got me down to the bottom

18  of the ramp, it was over $500 worth of damage, and the

19  headliner was torn down with my feet, and I had handcuffs

20  behind by back.

21       I don't want to be the Incredible Hulk because people just

22  don't have manners, because people don't have the opportunity

23  to center themselves and allow people to calm down.  And we

24  really have to do something about police accountability, and I

25  suggest a good place to start is uncovering the nametags.

1          THE COURT:  I want to ask you some follow-up, if I

2   may.

3          MR. STULL:  Yes.  Right.

4          THE COURT:  Right now, as you explain it, it's very

5   clear.  It's very understandable.  I appreciate that

6   enlightenment.  I take it, then, that when your limbic system

7   gets triggered or a situation -- a person in your situation

8   gets triggered, you're unable to explain, with the same degree

9   of calmness and rationality of what you've just said to me of

10  what is going on, to the police officer; right?

11         MR. STULL:  It's something that we lose our

12  ability -- a couple of things happen.  We get tunnel vision.

13  We -- you know, we might have some, you know, just trouble

14  hearing -- interacting with other people.  So one thing that's

15  really important -- I shouldn't overlook this.  It's really

16  important that people interact with one person.  Even if

17  there's a group of people, that one person is the spokes-model,

18  we'll say that speaks for the group.  And in my condition,

19  because -- because it's a damage in the central nervous system,

20  I actually lose my ability to vocalize, and things will come

21  out that are a product of the lizard brain.

22         Part of my experience at City Council was I said I killed

23  Amanda Fritz's husband.  Well, I certainly knew that that is

24  not true, but I think what I was doing, Your Honor, how I was

25  responding, is that she's retired as a psychiatric nurse, and I

1    didn't know -- it's history's prank on us -- that that

2    particular agenda item was the mental health

3    something-or-other, but I was signed up about the partnership

4    with street musicians and the free music zone at Waterfront

5    Park and complaining about vacant affordable housing at

6    4066 Northeast Grand Avenue and all of these things were on my

7    agenda when I went into this environment where they mistook me

8    for somebody having a mental health crisis rather than somebody

9    that had a neurological disease that was really receptive to

10   fight-or-flight.

11        So to answer your question, the -- the lid comes off, the

12   top of the brain, when you have the fight-or-flight.  And what

13   people with traumatic brain injuries, or, you know -- I don't

14   know what consequences I might have because I've got a couple

15   of lumps on my noggin, but these are the things that we have to

16   really get to the root of.  Why are these people in these

17   particular moments of crisis, that result in -- in this --

18   how -- how do I end up with a Portland police officer touching

19   me in city hall?  He had -- you know, there had to be something

20   with the space.  There was a point where they were across the

21   room and there wasn't any issue.  So that closing of the space

22   and all these things can be threatening.  And having multiple

23   people giving you conflicting orders -- somebody says, "Don't

24   move."  Somebody says, "Show me your hands."

25             THE COURT:  Am I correct in hearing you say that what

1   would be a better response is for people who are trained to

2   understand what people like you are going through at that time,

3   there would be de-escalation techniques?  They should

4   understand that.  It requires better training, and then things

5   would not escalate to the level that you've described.  Am I

6   hearing you correctly?

7            MR. STULL:  Yes, Your Honor.  But I want -- thank you

8   so much for understanding that, but I want to flip the coin

9   over and say what it is -- and I'm going to pick on

10  Officer Engstrom because he did use his force on me all the

11  way; although, he apparently didn't have to.  It wasn't what he

12  was allowed to, and he did, and it hurt.  You know, I was in

13  pain for months afterwards.  But the point of it is, is that

14  there's something in his system where he could be very much

15  addicted to that adrenaline feed.

16       I know people -- myself, I -- I've got a piece of gravel

17  because I wrecked coming down on Highway 26 on my bicycle, down

18  on the other side of the tunnel.  So people do things that are

19  really exciting, and that could be very much part of the --

20  part of the --

21           THE COURT:  That's an issue of both recruitment and

22  training.

23           MR. STULL:  And understanding that they could very

24  well be falling prey to these things, like I said, like the

25  ambiguous information being determined negatively and feeling

```
1    it a threat.
2            THE COURT:  Understood.
3            MR. STULL:  All right.  Thank you, Your Honor.  Any
4    other --
5            THE COURT:  Thank you.  I very much appreciate you
6    being here and sharing this with us.
7            MR. STULL:  And, now, I'm here with the benefit of my
8    bicycle, endorphins, and canvas therapeutics.
9            THE COURT:  Thank you.  I appreciate it.
10        Is there either a Linda or a Tony that signed up to speak?
11        Come on up and identify yourself, please.  If you want to
12    state your last name, you're welcome to; if you don't, you
13    don't have to.
14            LINDA:  Is it still morning, Your Honor?
15            THE COURT:  Yes.  For 11 more minutes.  Good morning.
16            LINDA:  Good morning.  I won't state my last time, as
17    the last time I was here I was accosted by someone that left
18    here and they used my first and last name to draw my attention.
19    So my name is Linda.  We'll just leave it there.
20            THE COURT:  That's fine.
21            LINDA:  I'm a bit nervous.  Sorry.  I'm here for
22    two -- two reasons this morning.  One is to extend an
23    invitation to Your Honor to come to where I spend my days and
24    time organizing as a community organizer for Sisters of the
25    Road.  I am not here in their capacity, but I am their current
```

1   acting in-term executive director at the time being, and I

2   also, prior, hold the position of the board president.  Excuse

3   me for my nerves.

4       The other thing I'm here to offer is a poem.  You have

5   been offered here today many -- a bounty of truth, so I don't

6   want to reiterate that.  I want to offer you a poem.

7       My name is Homelessness.  I survive on the streets of the

8   city.  I may look like I am in crisis, but if you knew me, you

9   would know a part of my crisis is that I have little or no

10  access to safe sleep, human interaction with the police,

11  nonviolent abuse or abuse from service providers, and food.

12  There are a gamut of other events that could support a crisis.

13  Those are just a few.  My name is Homelessness.  I don't want

14  to go to Wapato.  I want humanization.  I want support from

15  this -- my community -- and I want those systems to do the

16  work, the true work of support.

17      That's all I have.  And I'll leave my card with --

18          THE COURT:  Yes, I was going to say if you can give

19  us some contact information for you.  I do know Sisters of the

20  Road.  I think very highly of that organization.  We'll be in

21  touch.

22          LINDA:  Thank you, Your Honor.

23          THE COURT:  Thank you, Linda.

24      Tony, if I have that -- reading that correctly.

25          TONY:  Good pre-afternoon, Your Honor.  My name is

1  Tony.  I'll decline from using my last name at this time.

2      I was not actually aware of this proceeding until

3  yesterday, when I was invited by Linda to come here.  I didn't

4  prepare anything.  I came in here with the intention of an open

5  heart, an open mind.  The feelings I'm getting is like a really

6  bad divorce right now.  It's like people feel betrayed.  I feel

7  betrayed.  I grew up thinking cops were helpful protectors.

8  You know, if you're in danger, you call a cop.  I tell people

9  now, "Don't ever fucking call a cop on me.  If I'm in crisis,

10  do not call a police officer."

11      I volunteered with American Red Cross for four years.  I

12  worked alongside first responders.  I worked alongside cops.  I

13  have never seen the behavior anywhere across the country,

14  anywhere I worked, other than this department.  It's -- they

15  should be ashamed.  I don't know where the disconnect is in

16  this department and the humanity, but it's there.  It's there,

17  sir, and it needs to be found, and it needs to be analyzed, and

18  it needs to be fixed.  Just like any other kind of sick, toxic

19  relationship, we can't divorce each other.  We have to work

20  together.  But we can't keep hurting each other.  You can't

21  keep killing us.  You really can't keep killing us and hurting

22  us and oppressing us and calling us shit names and harassing us

23  on the daily.  You can't.  Not unless -- not if you want us to

24  help you keep us safe.  Because we can help each other to keep

25  everybody safe.  We're not sheep; you're not dogs.  We're not

1    animals.  We don't need to be put down for our protection or

2    for yours.  We're human beings just like you.

3        That's all I've got to say.

4            THE COURT:  Thank you, Tony.  I appreciate you being

5    here.

6        Before our lunch break, let's hear from representatives

7    from Portland Copwatch, Nancy Newell, Debbie Aiona,

8    Shawn Campbell, I believe, and then we'll take our break.

9        Good morning, almost afternoon, Mr. Handelman.

10            MR. HANDELMAN:  Can we all approach at the same time?

11            THE COURT:  Of course.  That's fine.

12        Mr. Handelman, I have read the two emails that you've

13    provided.  They were lengthy, so I don't think there's a need

14    to read verbatim everything in those two emails, but I look

15    forward to you summarizing some of the key highlights or points

16    that you want me to take away from all of this.

17            MR. HANDELMAN:  I appreciate that, Your Honor.

18        What we did is we took the first email, which was an

19    analysis of both the DOJ and COCL's reports, and merged them

20    into the testimony we're going to give you this morning.

21            THE COURT:  Very good.  Just remember speak slowly,

22    please.

23            MR. HANDELMAN:  Yes.  I promised Mr. Apodaca I would

24    do that.

25            THE COURT:  Well, but now we have a different

1   reporter here.

2           MR. HANDELMAN:  I see that.

3           THE COURT:  Mr. Apodaca may have -- no.  I was going

4   to make an inappropriate joke about he knew you were coming,

5   but --

6           MR. HANDELMAN:  Yeah, he told me that on his way out.

7       So, Judge Simon, I'm Dan Handelman.  I'm with Portland

8   Copwatch.  Earlier this month, we sent in our written comments,

9   analyzing those two documents I talked about.  The main

10  objective of today's status conference is to focus on whether

11  the agreements outlined for the Portland Committee on

12  Community-Engaged Policing is fair, adequate, and reasonable.

13  But our testimony addresses our disagreements with the analyses

14  that Portland is in substantial compliance with the agreement's

15  terms.

16      We're focusing mostly on deadly force, oversight,

17  community engagement and training, but also have concerns about

18  the status of other provisions.

19      As in the past, these are based on our observations of

20  public information and not being made on behalf of the AMA

21  Coalition for Justice and Police Reform.

22      Apparently, January 10 is the date that DOJ stopped

23  collecting data for this report.  It sets in motion the

24  one-year period during which the City has to maintain

25  compliance to end the scrutiny of the federal government and

1    Your Honor.

2        Somebody mentioned this, but I'll point out the elephant

3    in the room.  This agreement was signed and started under a

4    different presidency.  January 10 next year will still be the

5    current president.  So the DOJ that will be in place at that

6    time will still be in place at that point.  So we would

7    appreciate a delay of the finding of the full compliance

8    until --

9            THE COURT:  And let me just say right there what my

10   tentative thinking is, but I'll hear from the parties after

11   lunch, is at the minimum, I want to hear how things have been

12   going about 12 months from now, the latter part of February or

13   sometime in March of 2021.  What I haven't yet decided is

14   whether we need to have some interim -- maybe six months from

15   now -- additional meetings.  But in terms of basically looking

16   to see how things have been going for 12 months from today to

17   the future, I would be looking at scheduling a hearing, subject

18   to everybody's calendar and convenience, the later part of

19   February; sometime in March.

20       Go ahead.

21           MR. HANDELMAN:  Thank you.  Copwatch has been

22   tracking the agreement's progress since it was approved in

23   2012.  We find both the reviewing entities are too generous.

24   The reports look at the question of whether the City has met

25   the basic mechanics outlined in the agreement rather than the

1    substantive transformation of the agency and its relationship

2    to the people of Portland.

3        The preface to the agreement that Dr. Haynes mentioned

4    talks about how the outcomes of the changes should build trust

5    with the community.  We would argue that has not happened.

6        In October, COCL told the PCCEP that because there are no

7    specific metrics in the agreement, the Bureau does not have to

8    change its behavior to attain substantial compliance.

9        Key evidence of the lack of substantial compliance include

10   three major issues:  Continue the use of deadly force against

11   people, especially those in mental health crisis; shortcomings

12   of the oversight system; and ongoing disproportionate police

13   actions against African-American Portlanders.

14       The promise of the agreement is for the Portland Police

15   Bureau to stop using excessive force against people in mental

16   health crisis.

17       As you've heard, the PPB shot and killed at least three

18   people in crisis in 2019, with numbers seemingly going up after

19   the agreement went into effect.

20       From 2005 to '09 only 15 people were subjected to deadly

21   force by on-duty officers.

22           THE INTERPRETER:  Excuse me, Your Honor.  The

23   interpreter just would ask that the speaker just slows down.

24       Thank you.

25           THE COURT:  Please do your best, Mr. Handelman.

1    Speak a little more slowly.

2          MR. HANDELMAN:  From 2010 to 2014, while the DOJ

3    investigation was initiated and the agreement was being

4    finalized, the number went from 15 to 23 people in a year, in

5    the five-year period; a 53 percent increase.  And then the last

6    five years, from 2015 to '19, there were 27 deadly force

7    incidents, which was a total increase of 80 percent since

8    2000s -- the late 2000s.

9       One of the reasons the number of shootings keeps rising

10   could be the attitude of the DOJ, COCL, and the city officials

11   then we shrug and tell the community that these things just

12   happen sometimes.  That attitude is essentially a green light

13   to use deadly force.

14      As mentioned in our June 4 letter to the Court, community

15   members in Portland who have witnessed or read about various

16   deadly force incidents take a note of the PPB's over-policing

17   of houseless persons and/or attended demonstrations attacked by

18   police do not have the same feeling of progress as these two

19   reviewing bodies.

20      In addition to failing to answer questions about whether

21   the PPB, checking the boxes on the report, has led to

22   improvement in community trust, the two reports barely contain

23   any statistics.  The only chart in the DOJ's 23-page report

24   shows a decrease in the number of days it takes to investigate

25   misconduct cases.

1      The COCL's 38-page report does not contain a single chart,

2   graph, or table, despite the consultants wrapping up an average

3   of $303,000 a year since being hired in 2014.  Enough to fund

4   our group for over 30 years.

5      Despite the inadequate attention to outcomes, the DOJ and

6   COCL have occasionally prompted corrections to the Bureau.  An

7   important question:  Once they're gone, who will be able to do

8   this?

9      Institutionally, the police cannot be left to police

10  themselves.  Otherwise, it would not have taken, as Dr. Bethel

11  said, over five years to reach this so-called substantial

12  compliance.

13     The new reports reveal both entities stop the Bureau from

14  training officers to use knives as a defensive tactic because

15  no policy existed guiding their use.  Also, the DOJ found a

16  use-of-force investigation that was dismissed, even though

17  there was not clear and convincing evidence that no force was

18  used.  The incident occurred in 2016, and the complainant

19  appealed the findings to the Citizen Review Committee in

20  January of this year.  That case was previously reviewed, both

21  by -- internally and by the Independent Police Review, but

22  dismissed when they could not figure out which of the 17

23  officers involved handcuffed the complainant.

24     The voluntary members of PCCEP do not have the time or

25  bandwidth to continue such work.  Preferably -- sorry.  The --

the -- someone on their staff must be given authority to
continue such work, preferably someone with actual ties to the
Portland community who will press the Bureau, not just on these
overt violations, but also the deeper problems addressing
force, bias, and other issues.

The issue which precipitated DOJ's involvement, which were
community concerns about racial profiling, was handled simply
by the PPB delivering statistics about traffic and pedestrian
stop data of the PCCEP.  While that group and Section 9 of the
agreement focus on community engagement, the City seems
unwilling to engage in difficult discussions, preferring
instead to tell the community their perspective and run away
from controversy.

Because the two reports only focus on accountability and
community engagement, there's no discussion of other ways in
which the City's supposed substantial compliance does not serve
to build trust with the community.  One example is despite
seven years of urging a change -- people like me urging a
change, the Behavioral Heath Advisory Committee still does not
hold meetings that are open to the public.  And I just want to
add, also, that PCCEP made recommendations about the Portland
Police Association contract, which is currently being
negotiated and has a very deep impact on all these issues, and
they did not get a response 60 days after they voted on that.

Last night, former Captain King reported that he -- that

 1   the mayor had received them, but he had not promised a response

 2   to those recommendations.

 3       And when the members of the PCCEP came up and told you

 4   about the vote that they took last night about their statement,

 5   they failed to read the amendment that was made where they

 6   raise the same concerns that you have been hearing from other

 7   members of the community that there's a long way to go before

 8   we meet the -- the spirit of the agreement.

 9            THE COURT:  Thank you very much, Mr. Handelman.  I

10   appreciate that.

11       Ms. Hannon.

12            MS. HANNON:  I'm Regina Hannon, a member of Portland

13   Copwatch, and I'm going to speak about oversight and

14   accountability.  Key to the agreement's success is a functional

15   system to hold officers accountable when they violate Bureau

16   policies.  While the IPR has expanded in size and scope since

17   the agreement was implemented, there has been no uptick in

18   holding officers accountable.  IPR's dismissal rates have gone

19   down from about 70 percent of all complaints to only

20   50 percent, but that is mostly because IPR is now required to

21   investigate every use-of-force case.

22       In the case noted previously, the DOJ required the City to

23   conduct further investigation because there was no dispute

24   force was used.  IPR's new guidelines for deciding when there

25   is clear and convincing evidence that no investigation is

necessary would supposedly prevent such problems in the future, but that remains to be seen.

In a handful of complaints appealed to the Citizen Review Committee, they have made inroads into accountability by challenging Bureau findings.  They have sparingly used the power granted to them by the agreement which lets them require the Bureau to conduct more investigation, but neither the COCL nor the DOJ look for patterns in the actions taken by CRC.

Portland Copwatch wants the Court to take note of a few cases where, as described by the agreement, CRC found some of the Bureau's proposed outcomes unreasonable.  Chief Outlaw agreed when CRC found an officer was untruthful for telling a citizen he could be arrested for video recording police.

In early 2019 the chief changed the allegation to be about performance rather than truthfulness, which meant the officer's discipline was minor, as opposed to termination.  Copwatch only learned about this by reading the December Police Review Board report.  This bait-and-switch discipline is a systemic problem which allows the chief to undermine the trust of the community.

In May 2019 CRC made history.  They brought a case about retaliation to City Council for final disposition, having suggested, unsuccessfully, that the chief attach a sustained finding.  The appellant in that case took photos and made a face at an officer driving an armored vehicle.  Rather than engaging the appellant in dialogue, the officer had a

1    lieutenant issue her a jaywalking ticket.  Based on the

2    officer's testimony, CRC found this was retaliation.  Council

3    agreed to find the officer out of policy.

4        While the DOJ agreement requires the Bureau to prohibit

5    retaliation against people who file misconduct complaints, it

6    is unfortunate that neither report mentions this case.

7        In quarter four 2019, the time frame for COCL's report,

8    CRC heard a case in which they recommended a sustained finding

9    that an officer failed to do his duty when a woman tried to

10   report that her car was stolen.

11       Also, CRC sent a case back in December 2018 --

12   September 2018 for more investigation, and it came back in

13   February 2019.  This case was involved -- involving the use of

14   force against a person in a 2017 protest and led the CRC to

15   recommend a debriefing because the force was in policy but was

16   not necessary.

17       Certainly, a table could have been generated to show how

18   many times CRC suggested findings were unreasonable, what the

19   outcomes were, how often they sent the cases back for

20   investigation, and whether that led to change findings.

21       Other places that Portland Copwatch finds the analysis

22   lacking include the once mandatory deadline of 180 days to

23   investigate misconduct was only met by Internal Affairs

24   94 percent of the time and 85 percent of the time by the

25   Independent Police Review.

1        To be fair, we agree that speed should not outweigh

2   accuracy; however, the question of whether the outcomes of the

3   cases are appropriate or build community trust is not

4   addressed.  In fact, neither reviewing body appears to have

5   spoken with a single complainant about their experience.

6        It is not clear why the DOJ did not reference the case

7   called out by the COCL where a supervisor failed to properly

8   apply the discipline guide.  COCL reports the supervisor

9   disagreed with a sustained finding and used that as a

10  mitigating factor in applying discipline.  There is no mention

11  about whether that supervisor was held to account.

12       The DOJ report outlines a few cases that ran over the

13  180-day deadline, including one which sat in the chief's office

14  for 47 days.  The DOJ claims that one anomaly -- anomaly is not

15  indicative of a larger problem; however, a string of them

16  across various requirements indicate the Bureau is not able to

17  live up to its obligations.

18       In terms of transparency, the COCL's report reveals that

19  presumably over the course of 2019 there were 42 concurrent

20  criminal and administrative investigations of officers.  Even

21  if that includes all 13 deadly force incidents from the last

22  two years, an alarming 29 or more involved officers suspected

23  of criminal activity.

24       The public deserves to know more about these

25  investigations.  The agreement empowers the Police Review Board

1  to send cases back for mandatory further investigation.  The

2  COCL correctly points out this requirement is in policy but not

3  in city code, even though Council updated the code last August.

4  Codifying the change will prevent administrative changes

5  without Council oversight.

6      One final note about accountability.  We noted in 2019

7  only 1 percent of force allegations have been sustained since

8  IPR began functioning in 2002.

9      Thank you.

10         THE COURT:  Thank you, Ms. Hannon.

11         MS. HANNON:  Yeah.

12         THE COURT:  Mr. Parks, welcome.

13         MR. PARKS:  Yes.  My name is Peter Parks.  I'm a

14 member of Portland Copwatch.  I also work with a number of

15 houseless support organizations; although, I'm not representing

16 them here today.

17     So I'm speaking on community engagement and racial

18 profiling.  The reports both give substantial compliance to the

19 Portland Community -- Committee on Community-Engaged Policing,

20 PCCEP, and its work; however, Portland Copwatch disagrees that

21 PCCEP has met or can meet the expectations outlined for them.

22     For example, the only real power they were given was to

23 pull forward policy reviews out of sequence if they feel they

24 need immediate attention.  Not only has this never happened,

25 but PCCEP has rarely, if ever, commented on the policies

1    presented for public review.  Moreover, this power is tempered

2    by the requirement the mayor and council have to approve the

3    PCCEP's review any -- any directors not related to the

4    agreement.

5         With regard to the stop data, the COCL claims the data

6    are, quote, designed to address concerns about discriminatory

7    policing, unquote.

8         What the COCL means is that the Bureau addresses concerns

9    by bending the data to claim that no discrimination is going

10   on.  The COCL goes so far as to claim there is a, quote,

11   absence of racial ethnic differences in stops, unquote, even

12   though the data show 17 percent of traffic stops are of

13   African-Americans in a city that is 6 percent black.

14        The State of Oregon released a report showing the

15   disparity in Portland was the worst of all the jurisdictions

16   collecting data.  I would like to repeat that.  The COCL goes

17   so far as to claim there is an absence of the racial ethnic

18   differences in stops, even though the data shows 17 percent of

19   traffic stops are of African-Americans in a city that is

20   6 percent black.

21        The COCL again praises the Bureau for their supposed

22   in-depth analysis, which compares crime victimization rates to

23   traffic stops, as if being a victim of crime makes it more

24   likely that you are committing a traffic infraction.

25        The Bureau has no explanation why 17 percent of pedestrian

1  stops are also African-Americans.  Even if one uses the

2  Bureau's benchmark of traffic accident data, which shows

3  13 percent of people in car crashes are African-American,

4  there's no explanation for the fact that there are 1.3 times as

5  many stops as crashes.

6      The COCL acknowledges, quote, disparities in searches for

7  black African-American drivers and pedestrians deserve more

8  attention.  The only guidance they give for solutions are to

9  hope that the Bureau will explore reasons beyond the surface

10  and to use training to, quote, make officers more sensitive of

11  issues of bias and stereotyping, unquote.  They can also say

12  stop over-searching people of color.  They should do better to

13  halt this blatant racist profiling.

14      About community engagement, the COCL notes that they have

15  held town halls quarterly with PCCEP, which is true; but the,

16  quote, town hall to discuss this new report occurred at

17  4:30 p.m. on a Wednesday afternoon, during a PCCEP subcommittee

18  meeting, which does not make it easy for people working regular

19  hours to participate or to attend.  Only about six community

20  members attended, and the Q and A period lasted less than

21  15 minutes.

22      As stated earlier, the preface to the agreement talks

23  about how the outcomes of the changes should build trust with

24  the community.  We would argue that has not happened.

25  Regardless of whether all parties agree that the City is in

 1  full compliance with the settlement agreement, the Portland

 2  community demands a police force they can trust, as Dr. Haynes

 3  said so clearly.

 4      Part of that trust could come from true community

 5  engagement through a body like the Portland Committee on

 6  Community-Engaged Policing.  At this juncture, the settlement

 7  agreement has not done what it promised, and Portland has a

 8  long ways to go to build trust, especially with the

 9  African-American community.

10      As a community member, I would like to add that Portland

11  residents are concerned with outcomes.  That has been mentioned

12  before today.  Some examples are fair and impartial treatment,

13  accountability, trust, and minimal use of force.  The

14  settlement agreement does not guarantee outcomes like these.

15  Our work has just begun.

16          THE COURT:  Thank you, Mr. Parks.

17      Ms. McAuley, welcome.

18          MS. McAULEY:  Hello, Your Honor.  My name is

19  Jocelyn McAuley.  I'm a participant with Portland Copwatch.  I

20  have the final comments from Portland Copwatch here.  I'll

21  address other public engagement and training.  COCL claims that

22  PCCEP, quote, has the authority to hold PPB accountable for

23  tactics and strategies linked to public trust, end quote.  The

24  COCL's report also, quote, trusts that PCCEP will ensure the

25  community engagement plan meets the expected outcomes of public

1   involvement communication, access to police services and

2   training; however, it is not clear how this alleged authority

3   will work.

4        We wish to note that PCCEP is required to put out

5   quarterly reports, but the COCL only mentioned two being

6   prepared in 2019.  In March and July.

7        Additionally, only three will -- corrected today, only two

8   of the original 13 members, as has been noted, of the PCCEP

9   remain on the committee.  In addition to those resignations by

10  full members, a fair number of alternatives have also removed

11  themselves from this process before they were even seated.

12       Portland Copwatch wants to highlight our concern that the

13  role of a PCCEP staff community organizer has not been filled,

14  and according to the COCL report, which is in contrast to what

15  has been stated here today, the report states that the PCCEP is

16  not sure that they want one.  Given that the group is all

17  volunteer, we hope that they will push for a community

18  organizer, as was stated today.  This will help with outreach

19  engagement, plus beneficial would be a person with statistical

20  know-how to continue compliance checks.

21       As an additional note, with regard to the community

22  engagement plan, Copwatch points out that the word

23  "accountability" itself does not appear anywhere in the plan,

24  and the plan hadn't been changed to include this.

25       The DOJ notes that precinct demographic data are available

on the PCCEP website, but the Bureau sharing those data with

PCCEP is meaningless if there's no discussion of what that data

means.

Copwatch wants to reemphasize that officers should not

make stops or hand out tickets as their form of community

engagement.  Rather, the Bureau should be clear that when law

enforcement actions occur, the behavior of the officer matters

in the same way it does during nonenforcement encounters.

Both the DOJ and the COCL credit the Bureau for getting

the 2018 annual report drafted by July of 2019, then holding

required meetings in each of the city's three precincts and at

City Council.  However, there was no public announcement of the

first meeting.  There was only one day's notice for the second

meeting, and there was eight days' notice for both the

Central Precinct and Council meetings.

A community member who attended one precinct event had

reported a low turnout and the police only wanting to talk

about what affected their area.

Also because of Mayor Wheeler's blanket policy against

taking public testimony on reports, the public was only able to

comment on the annual report at Council because it was heard

along with the community engagement plan.  We find it is not in

the spirit of the agreement to hold meetings where the public

isn't invited or isn't invited to provide feedback.

On the topic of training, the COCL claims that finding out

1   how officers apply their training on the streets can be

2   revealed through auditing force incidents but acknowledges that

3   more information is needed.  They use, as an example, the

4   Bureau's contact survey, which found that, quote, "Officers

5   were respectful, fair, and compassionate," end quote.  However,

6   we wish to highlight that the survey was only for reported

7   crime victims.  This was not people who were pulled over or

8   cited or arrested.  Therefore, those results are not

9   comprehensive.

10      With regard to the Training Advisory Council, TAC, the

11  COCL reports that the Bureau has accepted TAC's recommendation,

12  that the PPB must respond to their recommendations within

13  60 days.  They do not note, however, that one suggestion, which

14  took over six months to prompt a reply, asked for demographic

15  data to be included in quarterly force reports.  This was to

16  contrast who was having force used on them versus who lives in

17  Portland.

18      As has been stated earlier, this refers to the 25 to

19  31 percent of people subjected to force being African-American

20  in a city that is 6 percent black.

21      The Bureau ultimately refused to adopt the TAC's

22  recommendation, even if the reports were to ask people to

23  compare the ratio of force used to persons taken into custody.

24  That disclaimer would raise the question of why so many

25  African-Americans are taken into custody by police.

1       In conclusion, the DOJ's report seems to sputter out with
2   no real conclusion, despite the issues at stake, and finding
3   the City in substantial compliance.  Perhaps the DOJ recognizes
4   that they're leaving the city of Portland in only slightly
5   better shape than nearly nine years ago when they began their
6   pattern and practice investigation.
7       Portland Copwatch remains deeply concerned that the focus
8   of the people managing the agreement is whether or not the PPB
9   has in place training policies and data-tracking practices, not
10  whether there's trust that is built in the institution which
11  purportedly protects and serves the community.
12      As you have heard today, there's still a lot of
13  Portlanders, especially our black Portlanders, our communities
14  of color, and our neighbors with mental health issues, who
15  hesitate before calling the police, as they fear the outcome
16  would be someone getting killed rather than helped.
17      Thank you for your time.
18          THE COURT:  Thank you, Ms. McAuley, and thank
19  Portland Copwatch for its contributions.
20          MS. McAULEY:  Thank you.
21          THE COURT:  Before we take our lunch break, I would
22  like to hear from Nancy Newell, Debbie Aiona, and
23  Shawn Campbell.
24          MS. NEWELL:  Wow.
25          THE COURT:  Now it's good afternoon.

1           MS. NEWELL:  Okay.  It's a long walk when you're an

2    antinuclear activist.  And in this town, I could put in jail

3    every elected public official because they're required, by a

4    public vote 13 years ago, to close that old nuclear plant that

5    causes mental illness.  And if you eat the fish, forget about

6    it.  You're going to get cancer, so you'll die young.  Our

7    children don't have a chance to learn in schools.  I mean,

8    people in very important positions overlook a -- some of the

9    main serious causes of things that are trying to be dealt with

10   by yourself, by the police.  Some are really good people and

11   trying to do their work; but yet we are overwhelmed with the

12   technology that Chancellor Merkel, when she came into office --

13   she's a nuclear scientist -- closed four nuclear plants like

14   this plant, and it's required to be closed by the public for 13

15   years here.

16        So who is mentally ill?  What do we mean by "mental

17   illness"?  My mother was a city treasurer of our town for

18   16 years.  Popular elected.  And the male city manager took her

19   job away.  And she said, "He's going to steal a million dollars

20   in a year," and he did.  They had paid her, with six children,

21   $75 a month throughout her whole career.  They gave her $75 to

22   come back and fix the books and never gave her back her

23   position.  He blended the position, but they got rid of that

24   guy.

25        But what I'm trying to point out is that it's so difficult

1   for the public.  And I have been through that nuclear power

2   accident, and I have seen how there's this response of a lack

3   of credibility of the horror of our responsibility, as dropping

4   nuclear weapons and not stopping the plants that produce the

5   waste for these nuclear weapons, or reduce these nuclear

6   weapons, and at the same time we expect our public to be

7   mentally balanced.  It doesn't make sense to me because that

8   radiation causes mental illness.

9        So let's get to the point where we openly talk about all

10  the different aspects.  That's what I would like to see in

11  these discussions.

12       And I really plan to arrest the elected officials.  I'm

13  looking for a lawyer to do so.  It's called a citizen's arrest.

14  I have every right to do that.  I've been labeled a communist.

15  I've been labeled all kinds of things throughout this state,

16  and I'm going to continue with the different variety of efforts

17  to close these plants.  And the mental health will, I guarantee

18  you, improve dramatically.

19       Thank you.

20            THE COURT:  Ms. Newell, before you leave, I -- I'm

21  reluctant to give you legal advise, so I'm not going to give

22  you legal advice --

23            MS. NEWELL:  Yes.

24            THE COURT:  -- but I'll share with you a personal

25  story.

1          A couple of weeks ago some people came to this building to

2     make a citizen's arrest of me, not to do with this case, as far

3     as I can tell.  The marshals went down and spoke with them.  So

4     did, I believe, the lead representatives from the U.S.

5     Attorney's Office.  Before you do anything like that, speak to

6     a licensed lawyer and find out what are your rights but also

7     what are your obligations.

8              MS. NEWELL:  Yes.

9              THE COURT:  It is not necessarily a smart move --

10             MS. NEWELL:  Right.

11             THE COURT:  -- to make a citizen's arrest of a public

12    official.

13             MS. NEWELL:  Well, I've been trying to find a lawyer,

14    and that's a tough one.

15             THE COURT:  Well, keep -- keep looking for good legal

16    advice before you take anything --

17             MS. NEWELL:  And I'm still going to all the testimony

18    and putting it in a legal record.

19             THE COURT:  Okay.  Thank you for your appearance

20    here.

21         Ms. Aiona and then Mr. Campbell or Ms. Campbell.  I'm

22    sorry.  Debbie Aiona and Shawn Campbell.

23         I will tell Ms. Aiona I have received and read the letter

24    from you and Ms. Kaye from the League of Women Voters of

25    Portland, and I thank you for that.

1          MS. AIONA:  Thank you, Your Honor.  Thanks.  I'm

2    Debbie Aiona, representing the League of Women Voters of

3    Portland.  The League has actively monitored the City's Police

4    Bureau for decades, with the focus on public participation,

5    transparency, policy development, and accountability.  We

6    regularly attend PCCEP meetings and appreciate the committee's

7    focus on issues of importance to the community.

8          We recognize that the compliance officer and DOJ have

9    found the City to be in substantial compliance with the

10   agreement.  We are encouraged, however, to hear that you are

11   open to continuing your oversight.  We have questions,

12   concerns, and suggestions to share with you.  The PCCEP and

13   public benefit from the presence and participation of key

14   police bureau leaders and city staff at the monthly meetings.

15   They also benefit from hearing the committee's and public's

16   concerns and ideas for improvement.  We appreciate the Mayor's

17   stated commitment to maintain and support the PCCEP over the

18   long-term but wonder if PPB and city staff will continue to

19   participate once the DOJ is out of the picture.

20         The League thinks the PPB and community will benefit from

21   the continuation of the oversight function in a different

22   forum.  We suggest the City consider creating a compliance

23   officer position based in the PCCEP office.  This individual

24   could provide analysis and oversight, recommend improvements,

25   and with its base at the PCCEP office, have a close connection

1    to the public.

2         The years of consistent involvement from the compliance

3    officer and DOJ have been valuable.  They brought a level of

4    transparency, public interaction, and critical

5    behind-the-scenes oversight never seen before.  We would like

6    to know how the Bureau and City plan to follow up on that

7    progress and work towards the transformation the public

8    desires.

9         As indicated by the substantial compliance ratings, the

10   settlement agreement resulted in improved training, new systems

11   to track data and progress and updated policies.  Many

12   community members expected that DOJ oversight and involvement

13   would lead to a transformation of our police bureau.  Although

14   some progress has been made, more needs to be done.

15        As an example, the Bureau tracks and regularly reports on

16   evidence of disparate treatment of communities of color.

17   Thanks in part to the DOJ presence, we have more information

18   about the problem, but have yet to see a plan to remedy it.

19        The compliance officer and DOJ did not devote a lot of

20   attention to the IPR Citizen Review Committee.  It is a

21   critical safeguard for community members experiencing possible

22   police misconduct.  Regular observers, including the League,

23   have become increasingly concerned about its ability to

24   function effectively.

25        Recently, two well-respected members, including the chair,

1    resigned in frustration.  The League believes the CRC is key to

2    the success of our civilian oversight system and deserves to

3    have the City address its concerns.

4         The Community Engagement section of the agreement requires

5    the Bureau to present its annual report in each of the three

6    precincts and before City Council.  I joined a handful of

7    community members at the East Precinct meeting.  The commander

8    provided highlights specific to that precinct and responded to

9    questions.

10        In our view, this was a missed opportunity.  Bureau

11   leaders should use the annual report to describe

12   accomplishments and challenges, evaluate performance, share

13   plans for the future, and, most importantly, hear from the

14   public.  Because public testimony on reports is generally not

15   allowed at City Council, the precinct meetings are the public's

16   only avenue for responding to this report.

17        Engaged community discussions are crucial for a

18   functioning democracy and an accountable police bureau.  Unless

19   the public receives better notice of the precinct meetings, the

20   presentations are improved to include a citywide overview and

21   incorporate opportunity for community feedback.  We do not see

22   how the City could be found in this compliance with this

23   paragraph.

24        Finally, the League's concerns are a strong indication of

25   our apprehension over what to expect once the DOJ is no longer

1  monitoring and offering guidance to the PPB.

2      We believe creation of a position for a locally based

3  compliance officer located in the PCCEP office and your

4  continued oversight will provide some level of reassurance that

5  the transformation initiated by the agreement may some day be

6  realized.

7      Thank you.

8          THE COURT:  Thank you, Ms. Aiona.  Thank you for all

9  the work that the League of Women Voters of Portland does.

10          MS. AIONA:  Oh, thanks.

11          THE COURT:  Our final public commenter and our final

12  speaker before our lunch break is Shawn Campbell.

13      Welcome, Mr. Campbell.

14          MR. CAMPBELL:  Thank you.  The fun of being the guy

15  right before lunch.

16      My name is Shawn Campbell, and I'm the chair of the

17  Training Advisory Council for the Portland Police Bureau.  I am

18  not here speaking on behalf of the TAC.  We do not have an

19  official position on this hearing.

20      The TAC has been around since 2012, and during that time

21  we have regularly continued to do our mission.  I kind of

22  consider us kind of a model of success as far as a group that

23  is mandated by the City to deal with the police.

24      Overall, I would like to start by saying I think we have a

25  very good relationship with the training division.  We have a

 1   lot of mutual respect, and I think that the world we see --
 2   live in today is very different than what we lived in ten years
 3   ago, and the police force we see ten years from now is going to
 4   be very different.  We're very long-term thinkers in training.

 5       As we approach the end of this settlement agreement,
 6   whether it's extended now or whatever happens, I think one of
 7   the concerns that's repeated by the community again and again
 8   is what happens afterwards.  Are a lot of these things going to
 9   stick around, or are they going to disappear?

10       And I guess one of the concerns that I have as a leader of
11   a group was dealing with some recommendations that we had that
12   went unanswered for a long period of time.

13       In March of last year, we made some recommendations
14   about -- including demographic data.  I don't need to go into
15   the details of, it because it's not germane to this situation,
16   but let's just leave that it was contentious between us and the
17   Bureau about whether or not to include it.

18       We did not hear anything back from the Bureau for over six
19   months.  During that time, every time we had a meeting, we were
20   told that it was at the chief's office and things were going to
21   happen.  It never did.

22       Finally, it came down to after our September meeting, I
23   finally went to a PCCEP meeting on October 23rd, where
24   afterwards I spoke to the head of COCL about it.  The next day
25   we got a call from the chief, and we got the details that we

1    had been waiting for.

2        When we looked at the documents, the responses had

3    actually been written in mid-August, and the cover letter to

4    those documents had been written in mid-September, but yet we

5    didn't receive it until mid-October.

6        Reasonably, I don't know -- you know, I'm not privy to

7    what happens within the Bureau or the thought processes, but

8    personally I don't think we would have gotten an answer if I

9    hadn't talked to COCL, which kind of brings up the issue of

10   once this is gone and COCL is gone and the DOJ is gone, who are

11   we supposed to talk to when we -- this gets ignored?

12       Now, at this time the Bureau has -- we changed our bylaws,

13   and the Bureau has shown -- has told us this isn't going to be

14   an issue again, but until we actually have proof of that,

15   because I'm a person that believes in actions over words, I'm a

16   little hesitant to believe anything until action actually

17   happens.

18       One of the things that kind of strikes me, listening to

19   everybody, because I didn't initially plan on talking today,

20   was that there is a general feeling of -- that this needs to

21   get done.  It's obvious that the City wants this to get done.

22   It's obvious the Bureau wants to get this done, and I think

23   even the DOJ wants to get this done.

24       However, I think, just looking at it that way, kind of

25   ignores some of the issues PCCEP has, just because it's such a

1  new organization.  I think realistically we have to remember

2  that COAB, the initial plan of what this was supposed to be,

3  collapsed.  And as a result, we had to create PCCEP just -- and

4  it's only about a year old at this point.

5      So looking at our own history at TAC -- we were created in

6  2012 -- we didn't even make a formal written recommendation

7  until 2015 because it took that long to build our structure, to

8  build how we were going to do things so that when we did things

9  there was actually a structure and a process to it.

10     So I guess one of the things I would kind of leave with is

11  maybe it's one of those things where we need to slow down a

12  little bit and give PCCEP the time to actually do what it needs

13  to do instead of just rushing this because we want to get it

14  done.

15     Thank you.

16         THE COURT:  Don't go away yet.  I appreciate very

17  much your comments, Mr. Campbell, and your insights.  One of

18  the comments that you made was that policing ten years ago

19  looked very different from the way it looks now, and then you

20  said policing ten years from now will likely look very

21  differently than it does today.  In what way?

22         MR. CAMPBELL:  Well, I think, some of the big things

23  we're seeing today that we're initially starting in training

24  are things such as implicit bias training.  Emotional

25  intelligence training is at its infancy right now.  The ideas

1   of procedural justice where how do we communicate with members

2   of the public, as far as Bureau officers, and just in general,

3   even starting wellness programs.  All these things that kind of

4   attack different segments of these problems.  The thing is,

5   though, these are long-term solutions.  You're not going to

6   start a wellness program and everything is going to be

7   hunky-dory the next year.  You have to go through the entire

8   changeover.

9        It actually probably takes a bit of older officers

10  retiring and newer officers who were trained in this kind of

11  stuff in the beginning come in.  That's when we actually get

12  change.  It's a big ship we're turning, and to expect it to

13  turn immediately I don't think is reasonable.

14          THE COURT:  Thank you, Mr. Campbell.  I appreciate

15  your insights and your expertise.  Thank you, sir.

16          MR. CAMPBELL:  Thank you.

17          THE COURT:  Mr. Geissler and Ms. Reeve, am I correct

18  that you all want about 30 minutes for a recess?  More or less?

19  What's your preference?

20          MR. GEISSLER:  I'm sensitive -- excuse me,

21  Your Honor.  I'm sensitive to the needs of the public that

22  might come back through security as well.  Is half an hour

23  sufficient for them to get back in?

24          THE COURT:  If you're asking me, the answer is "I

25  don't know."

1          MS. REEVE:  I agree with Mr. Geissler, Your Honor.  I

2    think we would be fine with 30 minutes, but I do want to be

3    sensitive to people who are attending and may want to get

4    something to eat.

5          MR. GEISSLER:  45 minutes, please, Your Honor.

6          THE COURT:  Done.  That will be fine.  45-minute

7    recess.

8       And then you can tell me, when we get back, in what order

9    you all wish to make presentations.  I will defer to you

10   whatever form you all want.  45-minute recess.

11                    (Lunch recess taken.)

12         THE COURT:  Good afternoon.  During the lunch break,

13   I did receive additional written testimony.  This was from

14   Mr. Elliott Young, a PCCEP member, and I thank him for

15   submitting that testimony.

16      All right.  Mr. Geissler or Ms. Reeve, or anyone else?

17   Who's going?  Mr. Hager?

18         MR. HAGER:  Thank you, Your Honor.  Jared Hager, with

19   my colleague, Jonas Geissler, for the United States.

20      At the outset, I need to remind the Court and the public

21   that the day-to-day work on this case is managed for the United

22   States by the career attorneys of the Department of Justice.

23   We aren't driven by personal creed or political ideology.  Like

24   Your Honor, we have taken an oath to uphold the rule of law,

25   and we're committed to faithfully monitoring the City's

1    compliance with the settlement agreement.

2         Our compliance ratings reflect thousands upon thousands of

3    hours of work put in by us, our colleagues, and our expert

4    consultants.

5         This afternoon I think we would like to address two

6    issues.  First, we would renew the joint motion to amend the

7    settlement agreement by substituting the Portland Committee on

8    Community-Engaged Policing, or PCCEP, for the Community

9    Oversight Advisory Board, COAB; second, we'll summarize our

10   interim compliance reports on Section 8 and Section 9 of the

11   agreement.  That's accountability and community engagement.

12        Mr. Geissler will address Section 8 in a moment, as well

13   as next steps.

14        I'll start with Section 9 and the PCCEP amendment, which

15   the Court conditionally approved, pending further assessment of

16   its adequacy.  First, some important aspects of the agreement

17   are often overlooked in bare mention.  First, the agreement

18   didn't envision the federal government permanently overseeing

19   the City of Portland or its police bureau.  In fact, it

20   anticipated the agreement lasting five years, and that's

21   paragraph 175A.

22        Second, the agreement binds the City, its bureaus, and its

23   employees, not private hospitals, not the State or County, not

24   other police departments, and certainly not the PCCEP or its

25   members.  For example, where the agreement requires the City to

1    provide the PCCEP with certain authority and certain data, the

2    City's compliance doesn't necessarily turn, in our view, on

3    what the PCCEP does with that.

4         And I would reference paragraph 147 and 148 where there's

5    been some community concern over how the PCCEP has conducted

6    its business.

7         Third, the agreement represents a floor, a foundation, and

8    not a ceiling.  It doesn't demand perfection; although, that's

9    its aspirational aim.

10        In fact, the agreement defines substantial compliance and

11   what substantial compliance looks like, and that is that it

12   allows minor or occasional deviations that aren't systemic.

13   And I'll reference paragraph 175A.

14        Fourth, the agreement provides that the United States is

15   the monitor and decides when and whether the City is in

16   substantial compliance.  We appreciate and acknowledge the

17   concerns of the community and Your Honor's concern of whether

18   or not substantial compliance is something you agree with, but

19   the agreement, which the Court has already deemed fair,

20   adequate, and reasonable, makes the United States the monitor.

21   And I'll reference paragraphs 164, 175, and 176.

22            THE COURT:  I think you're correct, but I also note

23   that the United States has previously expressed the position

24   that back when we had the COAB provisions before us, that the

25   City was not in compliance with those COAB provisions.

1              MR. HAGER:  That's correct, Your Honor.  And the

2       agreement also provides that when the United States sees that

3       there's a non-compliance, it provides a very detailed process

4       of mediation and conferral with the City to try to overcome

5       issues of non-compliance.  In this case, that's exactly what

6       the parties did in coming up with PCCEP provisions as a way to

7       get around unforeseen obstacles.

8              THE COURT:  I totally understand, and I think we're

9       on the same page.

10         As you know, though, I have not yet determined that that

11      proposed amendment is fair, reasonable, and adequate; but I

12      think we're on the same page.

13             MR. HAGER:  Understood.  And I think if Your Honor

14      rejected the PCCEP amendment, it would put us back in that

15      mediation process to try to figure out a new solution to

16      overcome those obstacles.  It would be a very costly decision

17      and one at this point we would think inequitable and

18      disproportionate to perceived shortcomings in the PCCEP

19      process, given the substantial amount of energy, time, and

20      money that the City, the Department, and the volunteers have

21      invested into the PCCEP process.

22             THE COURT:  I understand.

23             MR. HAGER:  If it's broke, it's not that we don't

24      want you to adopt the amendment.  We would want to fix the

25      broken parts.

1          Now back to the PCCEP amendment.

2          We ask that the Court grant final approval for three

3     reasons.  First, the amendment is fair, adequate, and

4     reasonable on its face; second, the PCCEP has demonstrated its

5     adequacy and practice; and, third, the City is substantially

6     complying with the terms of the PCCEP amendment in sustaining

7     such compliance.

8          First, and we previously stressed this at every status

9     conference on this amendment, the PCCEP amendment is a facially

10    adequate substitute for the original COAB requirements, and we

11    believe that's the proper standard.  The PCCEP retains the

12    COAB's defining characteristics of authority, independence, and

13    City support and improves on the COAB by separating the body's

14    existence from the settlement agreement's limited lifespan and

15    the compliance officers' attenuated control.

16         The PCCEP, thus, provides the greatest chance of a lasting

17    framework for community-involved policing.

18         The Court's conditional approval and its direction to

19    implement the PCCEP as if it had final approval, demonstrates

20    the facial adequacy of the stipulated amendment.  For two years

21    now, Your Honor has acknowledged the PCCEP's promise and

22    encouraged the City to continue materially supporting the

23    PCCEP.  This shows, in our view, that the amendment absolutely

24    cannot be facially inadequate, facially unreasonable, or

25    facially unfair.

 1          Quite the opposite.  This history tells us that at this

 2     stage, with the City fully invested in the PCCEP's success,

 3     with volunteers having devoted substantial time and energy to

 4     fulfill the PCCEP's mission, granting final approval of the

 5     amendment is warranted.

 6          Second, the PCCEP has demonstrated its adequacy in

 7     practice.  Before the last status conference, the

 8     enhanced-amicus, Albina Ministerial Alliance Coalition for

 9     Justice and Police Reform, offered an alternative measure of

10     adequacy.  One based not on the terms of the amendment, but on

11     the PCCEP's performance of them in practice.  This measure has

12     been met too.

13          As outlined in our compliance reports, the PCCEP continues

14     to hold regularly scheduled three-hour long monthly public

15     meetings.  Meetings are scheduled for the fourth Tuesday of

16     every month at accessible locations across Portland, and we

17     invite everyone to come and participate.

18          The PCCEP's five subcommittees have collectively held

19     dozens of open public meetings, and community members can join

20     any subcommittee where recommendations take shape.

21          I'll note that we acknowledge a lot of the concerns that

22     have been raised by the League of Women Voters, the amici

23     groups, and other members of the public.  Many of these go to

24     what the PCCEP is doing.  And, Your Honor, if everyone brings

25     their concerns to you in the first instance, instead of taking

1    them to PCCEP -- for example, the Mental Health Alliance is

2    upset that they don't have a full roster and they don't have

3    members' email addresses.  That's a simple request to city

4    staff, and it's fixed like that.

5        As long as Your Honor retains oversight, problems are

6    going to be told to you first instead of the PCCEP.  We see

7    that as hampering the effectiveness of the PCCEP mission.

8            THE COURT:  At the end of this -- at the end of your

9    comments and the City's comments, I will give an opportunity,

10   of course, to Mental Health Alliance and to AMA to offer any

11   additional comments they wish, but I am -- I'll let them know

12   now, I'm curious to what your response is to that last comment.

13   But we'll get there when we get there.

14           MR. HAGER:  As another example, the League of Women

15   Voters is concerned about the annual report and the precinct

16   meetings.  The annual report was discussed at three separate

17   PCCEP meetings, full public meetings where the city staff and

18   police officers and command staff were present, and those

19   concerns could be raised there.  The PCCEP has always been

20   willing to take recommendations from the community and pass

21   those along and get the response that's necessary.

22       Each of these meetings has public comment and further

23   advances the PCCEP's mission, and the City continues to give

24   the authority, the independence, and the material support

25   necessary for the PCCEP to bridge divide between law

1    enforcement and the community and enhance trust.

2         The PCCEP has a direct line of access to city leaders

3    within the Mayor's office, the police bureau, and the Office of

4    Equity and Human Rights.  They engage relevant groups, but

5    meetings are two-way streets.  If the amici don't come to the

6    meetings, I just hesitate to put that on the PCCEP members.

7         The PCCEP acts deliberately in crafting recommendations

8    for policing.  They serve as a conduit for community concerns

9    as it relates to compliance with the settlement and policing

10   more generally.  The PCCEP and its subcommittees continue to do

11   good work on behalf of all Portlanders, and they've earned the

12   Court's final approval.

13        Third, the City has demonstrated its commitment to PCCEP

14   by substantially complying with the terms of the amendment,

15   notwithstanding the very real possibility of rejection, which

16   is a very costly possibility.

17        At the last status conference, the Court indicated its

18   measure of final approval equates adequacy with substantial

19   compliance for some period of time.  And, again, I remind the

20   Court that the agreement provides that the United States is the

21   monitor.

22        This measure has also been met.

23        In May of 2019 the United States reported that the City

24   was in substantial compliance with nine of the 12 provisions of

25   Section 9.  By October, the City had substantially complied

1    with all 12 paragraphs and they're continuing to substantially

2    comply.  The City's endowed the committee with the broad

3    mandate, the flexibility to set its own agenda, and a life

4    beyond the settlement agreement.  There's a lot of push and

5    pull in some of the community concerns.  We have heard it's too

6    expensive, but we want it to keep going -- the settlement

7    agreement.  The settlement agreement -- the PCCEP is too

8    focused on racial issues.  We want them to focus on mental

9    health issues.  But then they're not focusing on the stops data

10   in developing recommendations to resolve biased policing.

11        This push and pull is very difficult for a volunteer group

12   of members to come to grips with.  It's difficult for me to

13   come to grips with which -- which way to give technical

14   assistance for the PCCEP to engage properly with all of the

15   concerns that have been raised.

16        Again, they're volunteer members, and anyone is welcome to

17   join a subcommittee to help the mission.  And I would encourage

18   everyone here who has a concern to join a subcommittee and help

19   craft recommendations.

20        The City's invested hundreds of thousands of dollars and

21   thousands of hours of labor to support the PCCEP, including

22   dedicated administrative staff, contractor services, training,

23   technical assistance, office and meeting space, catering, and

24   monthly stipends for members.

25        Again, I remind the Court and the public that we evaluate

1    the City's compliance, not the PCCEP's individual members'

2    compliance.  I think Your Honor is aware of the Supreme Court

3    case law that says consent decrees that bind nonparties are

4    void.  So we're not trying to, you know, determine compliance

5    based on volunteer members, 50 percent remaining engaged for a

6    year.  That's not a workable process.

7              THE COURT:  I also note, too, that this is not a

8    consent decree.  Right?  It's a settlement agreement.

9              MR. HAGER:  That's true.

10             THE COURT:  I think one, among many things, that we

11   should learn from this experience is probably a settlement

12   agreement is not the best way to proceed in these types of

13   problems.  But I do recognize it's a settlement agreement, not

14   a consent decree; so what you just said about a consent decree

15   only has sort of limited applicability to a settlement

16   agreement.

17             MR. HAGER:  Courts have interpreted them similarly.

18             THE COURT:  But there are some significant

19   differences too.

20             MR. HAGER:  For sure.  And we acknowledge that.

21       We also knowledge the concerns raised by the community

22   members and that PCCEP is not perfect, that there's definitely

23   room for improvement, but it continues to build capacity and

24   progress toward the substantive goals.  And we believe the

25   trust, like hope, should not be viewed in a binary fashion, but

1    on a continuum, and we continue to believe that the PCCEP is

2    moving the needle in the right direction.

3         In sum, the PCCEP amendment is fair, reasonable, and

4    adequate on its face.  In practice, the PCCEP is capably

5    exercising its authority and independence, and we respectfully

6    ask the Court to approve the amendment.

7         And with that, I'll turn it over to Mr. Geissler.

8              THE COURT:  Good afternoon, Mr. Geissler.

9              MR. GEISSLER:  Good afternoon, Your Honor.  May I?

10             THE COURT:  Wherever you wish.

11             MR. GEISSLER:  If it please the Court, Your Honor, I

12   would like to address briefly Section 8, with respect to

13   accountability, not because it was part of the prepared

14   remarks, but rather some of this morning's comments had to do

15   with it.  Then I would like to address the Court's question of

16   next steps going forward.

17             THE COURT:  Excellent.

18             MR. GEISSLER:  The United States released a report

19   that stated as of January 10, 2020, the City had come into

20   substantial compliance with Section 8, then formally the entire

21   settlement agreement.  This is a substantial milestone for the

22   Portland Police Bureau and the City's progress, but it is

23   continual progress.

24        The City must still maintain that substantial compliance

25   for a year.  And as we have told this Court before, the reason

1 that the United States requires periods of sustained

2 substantial compliance in our consent decrees and settlement

3 agreements is so that we can ensure the remedy is durable.  The

4 remedy must be durable when we leave.

5      With respect to Section 8, the accountability, Your Honor

6 will recall that the City had come close to substantial

7 compliance when we had submitted our May 2019 report and had

8 our June 2019 status conference.  There were two areas for

9 which the City had not yet achieved substantial compliance in

10 Section 8.

11      PPB and IPR had implemented long-term -- long-planned

12 changes to the accountability system with respect to policies

13 and dual training for both IPR and Internal Affairs, or IA,

14 investigators, such that wherever an accountability

15 investigation was conducted, one would expect a similar outcome

16 where appropriate.  The systems mirrored one another.  The

17 state investigative processes were followed, and the same

18 standards of evidence applied and the same burden applied to

19 the findings that resulted.

20      This should result in a more fair end reception of

21 procedural justice, both inside and outside the organization,

22 for members of the police bureau that are subject to the

23 complaints and members of the public that submit the

24 complaints.

25      The two areas that kept the City from reaching substantial

1    compliance were, one, the timeliness of administrative

2    investigations; and, second, the incomplete administrative

3    investigations that were involved with the Bureau of Human

4    Resources, BHR.  Part of City but a different agency than the

5    police bureau.

6         As to the first issue in this assessment period, the City

7    did achieve substantial compliance with the 180-day deadline

8    for completion of accountability investigations, whether or not

9    they began and were connected with IPR or with IA.  But we

10   assessed not just timeliness.  We also assessed the quality of

11   investigations to ensure that the City did not sacrifice

12   efficacy on the altar of expediency.

13        PPB and IPR continue to complete investigations that we

14   found from our sampling of all the investigations -- complete

15   the investigations to meet a preponderance of evidence

16   standard.  The City continued to seek on-scene public safety

17   statements when necessary and to have officers provide

18   on-scene -- witness officers provide on-scene walk-throughs at

19   critical-force incidents, and that's before PPB issued

20   communication restriction orders.  The other areas of the

21   accountability section did not backslide in the name of

22   expediency either.

23        There was one small area where we had issued technical

24   assistance.  The community -- excuse me -- the system review

25   committee, the CRC, didn't have members on all of the PRBs that

1    would be in force during this compliance period.  Even though

2    we didn't find them noncompliant, the City met that technical

3    assistance and amended their city code to ensure the their CRC

4    members are on all force incidents were reviewed by PRBs.

5        On the second issue, we also assessed the BHR

6    investigations that had previously been incomplete.  In

7    completing their investigations, demonstrate that the City is

8    still substantially compliant with the anti-retaliation

9    provisions of paragraph 130.  That's accountability, and it

10   addresses, in part, the concerns of the accountability system

11   overall.

12       But Your Honor asked specifically what should we do for

13   next steps, and, Your Honor, the most pressing next step is

14   approval of the PCCEP amendment, not because of all the factual

15   and legal arguments that Mr. Hager, my colleague, has set

16   forth, but because, ultimately, it's self-defeating to ask the

17   volunteers to come forward and to work when they do not know if

18   the rug will be pulled out from underneath them and there will

19   no longer be a PCCEP.

20       It is self-defeating with respect to attrition, and we

21   need to make sure that that amendment is carried through.

22            THE COURT:  Do you have any evidence at all that any

23   of the attrition that we have seen on the PCCEP is due to the

24   fact that I've not given final approval?

25            MR. GEISSLER:  No, Your Honor.  That's an important

1    distinction on the evidence and really is where I was headed

2    next.

3         We heard statements today from the SPMI members who said

4    that they had felt demoralized.  I'd commend Your Honor to

5    their statements, but I won't call them testimony and I won't

6    call them evidence.  Your Honor, I commend to your attention

7    one of my section's prior cases.  United States v. Tennessee

8    Western District of Tennessee, 92-2062.  In that case, a

9    25-year case, we came up with situations like this where we

10   needed to overcome problems in an original remedial order.  We

11   reached immediate settlement agreement, had a fairness hearing,

12   and Her Honor, in that case, accepted letters from outside of

13   the Court into evidence to consider where -- whether or not the

14   immediate settlement agreement was fair, reasonable, and

15   adequate.

16        The Sixth Circuit overturned her on it because it is not

17   evidence and it is not of record to allow individuals to make

18   the Court's -- persuade the Court as to fairness,

19   reasonableness, and adequacy.

20        We have set forth, on record, the fairness,

21   reasonableness, and adequacy, both on its face in assistance

22   and in argument.  That should lead the Court's determination on

23   the next step.

24             THE COURT:  I understand what you're saying.  And

25   maybe I wasn't clear in my question because I'm not accepting

1    anything that was said as evidence, per se, but I will tell you

2    that I am skeptical that my only giving conditional approval

3    and not final approval to the PCCEP amendments would in any way

4    contribute to any attrition problems, to any demoralization

5    feelings, anything at all like that.  I'm skeptical.

6        I'm also sufficiently humble that I don't necessarily

7    agree that my skepticism is absolutely going to be the correct

8    answer.  So would you like an invitation to submit, in an

9    evidentiary -- evidentiary appropriate fashion, any evidence

10   that will inform that question one way or the other, mainly

11   whether or not only having conditional approval, rather than

12   final approval, is somehow interfering with the success of the

13   PCCEP?

14       Would you like that opportunity?  If so, I will give it to

15   you.

16            MR. GEISSLER:  I believe the United States has

17   presented its basis for the motion already and that the motion

18   should carry based upon the record established thus far.

19            THE COURT:  I'll take that as a, no, thank you; but

20   okay.

21            MR. GEISSLER:  I will take my own humility as well.

22            MR. HAGER:  Your Honor, I would just like to direct

23   you to the comments I had just mentioned where the amici and

24   the members of the public continue to raise issues as first

25   impression to this Court instead of taking them to PCCEP.

1          We believe that that is evidence that the PCCEP's trust

2     and legitimacy in the community is impacted.  Your Honor is the

3     person of first resort, not the PCCEP.

4               THE COURT:  All right.  That's a fair point.  So I

5     look forward to hearing from the Mental Health Alliance and the

6     AMA Coalition whether they have taken or refrained from taking

7     any actions because the PCCEP has not received final approval

8     but only conditional approval.

9          So we'll get to the bottom of that.  Thank you.

10              MR. GEISSLER:  Your Honor, if I may round out for the

11    next steps thereafter.  Your Honor had mention the possibility

12    of a further status conference within six months.  We believe

13    that the status conference in six months would be acceptable;

14    however, Your Honor, in response to a question from -- or a

15    comment, rather, from Mr. Handelman, he alluded to a political

16    situation:  The inauguration date in January.  We have, on

17    record, a compliance report that states compliance based upon

18    facts.  January 10, 2020, was the date of the last piece of

19    evidence.  That was the date with which we found compliance.

20    We are honest brokers.  We are career staff.  We are not

21    political appointees.  The facts dictate when this case should

22    be over.  And as Mr. Hager pointed out in paragraph 176, once

23    the City has maintained substantial compliance for one year,

24    this case should be done.  That would come January 10, 2021, if

25    the facts dictate that they had maintained substantial

1   compliance.

2        THE COURT:  Well, you raise -- two questions about

3   that.  First is you raised this issue, and so did Mr. Hager,

4   about political influence.  Can you represent to me that there

5   has been absolutely no input or influence by any Schedule C

6   appointee into the direction and position that should be taken

7   by the U.S. Department of Justice in this matter?

8        MR. GEISSLER:  I would hesitate to try to give away

9   any internal deliberative information with regard --

10        THE COURT:  And you're welcome to decline to answer.

11   But if you want to tell me that there's been no Schedule C

12   input, you're welcome to tell me that; or you're welcome to

13   tell me because of the internal deliberations of the

14   department, you decline to answer.  I'll accept the latter.

15   I'll accept either.

16        MR. GEISSLER:  I will decline to speak to whatever

17   happens above my pay grade.  What I can say is with respect to

18   the compliance report that is before Your Honor, we wrote that

19   based upon the facts.  That was written at the trial attorney

20   and Assistant U.S. Attorney level and is based upon the facts

21   established in the documents provided by the City, the

22   individual interviews that we conducted, and the work we did

23   with our non-testifying expert consultant.

24        MR. HAGER:  I would like to represent that no

25   compliance rating that I have suggested has been turned over or

1   rejected by any Schedule C appointee.

2   　　　　THE COURT:  The second point that I was going to say

3   is this:  Assuming that you're right, and you very well may be,

4   that given the plaintiff's statement that as of 14 days ago,

5   January 10, 2020, the plaintiff believes that there's full

6   compliance with the PCCEP amendment, I would be very interested

7   in finding out if that continues for 12 months from January 10,

8   2020.  And so if we hit the anniversary mark of January 10,

9   2021, and you still report to me at some point thereafter that

10   in plaintiff counsel's position there is substantial compliance

11   with all aspects of the settlement agreement, understanding

12   that the PCCEP amendment amends, at least conditionally, the

13   COAB, I would be very interested in hearing that, and I want to

14   hear that.

15   　　I assume you don't want to be in this case forever.  It

16   wasn't the plan in the original settlement agreement.  I get

17   that.  That's fine with me.  I will tell you we will probably

18   be scheduling the hearing in late February or sometime in early

19   March, but if what you want to report to me at that time is

20   that in the opinion of the United States Department of Justice

21   there has been substantial compliance from January 10, 2020,

22   through January 10, 2021, I look forward to hearing that one

23   way or the other -- whatever you choose to report -- but the

24   hearing will be late February, early March.

25   　　　　MR. GEISSLER:  Understood, Your Honor.  That's

1    precisely why we have the one-year substantial compliance, is

2    so that we can have that same assurance that the systems are

3    working during the sustained compliance period, that -- that --

4    I'll leave it at that, Your Honor.

5              THE COURT:  Okay.

6         Any other comments or -- I didn't mean to cut you off, but

7    I wanted to follow up with those questions from what you said.

8    Was there anything else you wanted to say, Mr. Geissler?

9              MR. GEISSLER:  No.  I believe you covered the next

10   steps, Your Honor.  But if you have any further questions on

11   the process or procedure going forward, I'm interested to make

12   sure that we address those today.  We have very few dates

13   during which we actually see one another in this courtroom and

14   are able to discuss this case.  I do not want this Court to

15   walk away with a sense that we're trying to obfuscate or hide

16   anything here.  We're trying to understand the process going

17   forward as Your Honor would like it.

18        There is a process that the parties have agreed to in the

19   settlement agreement and we believe the standard is not

20   performance of the PCCEP amendments for approval.  It is

21   fairness, adequacy, and reasonableness, and would hate to

22   establish, as any sort of acceptable precedent, that we have to

23   demonstrate compliance in order to receive acceptance.  That

24   would be harmful on a programmatic level to our other cases.

25             THE COURT:  Understood.  We'll speak again after I

1    hear from the City, from the Portland Police Association, from

2    The AMA Coalition, and from the Mental Health Alliance.

3            MR. GEISSLER:  Thank you, Your Honor.

4            THE COURT:  Thank you, Mr. Geissler.

5        Mr. Karia or Ms. Reeve or Mr. Vannier, who wishes to speak

6    next?

7            MS. REEVE:  Your Honor, Tracy Reeve for the City.

8    Before we move to the speeches -- speechifying of the lawyers,

9    I would like to allow -- the two PCCEP staff wanted to briefly

10   address the Court.

11           THE COURT:  Absolutely.

12           MS. REEVE:  So Judith Mowry, who's with the Office of

13   Equity and Human Rights and who has been supporting the PCCEP

14   work from the Office of Equity and Human Rights and who served

15   as the interim PCCEP program manager for a period of time, and

16   Theo Latta, who's now the PCCEP program manager, are here to

17   speak.

18           THE COURT:  Wonderful.  And welcome.

19           MS. MOWRY:  Thank you so much and thank you for this

20   opportunity.

21           THE COURT:  Would you like to sit down?  Would you

22   like a chair?  There's a chair right behind you.  You can bring

23   up one of those if you're more comfortable.  It's totally up to

24   you.  I don't mean to put pressure on you one way or the other.

25           MS. MOWRY:  I do appreciate it.  Are you going to be

1    able to hear me?

2            THE COURT:  Yes.  Move over so I can see you.

3            MS. MOWRY:  I have a big voice.  Okay.  Great.  Thank

4    you for giving us the opportunity.

5            THE COURT:  Mary is going to give you a microphone.

6            MS. MOWRY:  So thank you so much for your time today,

7    Judge Simon, and I really appreciate your thoughtful questions

8    and the way in which you're hearing from so many people.  I

9    want to thank all the amici and others for coming and

10   expressing their experience.  I think there's a lot of valuable

11   lessons to be learned here.

12       I have 30 years of experience facilitating and working

13   with groups.  Groups are challenging, as everyone knows who's

14   ever been in one.  And also, in this day and age, I think it's

15   even harder for us to come together sometimes.  And in this

16   experience, where we're trying to address a lot of different

17   issues with a lot of different lived experience that has also

18   been challenging to build group cohesion, I feel like the PCCEP

19   has worked very hard.  I appreciate that the SPMI came and

20   testified as to their experience.  I share a concern that it's

21   been very difficult to sort of figure out how to balance the

22   different interests and also how to create the time for the

23   volunteers to be able to learn more about what is it like to

24   live with a mental illness in Portland.  How does that affect

25   you?  How do we listen to each other and figure out how we can

1    best serve each other in terms of how we engage with the

2    police?  So I think that's a challenge.

3        And the -- a couple of other things.  It was very

4    important, when the PCCEP plan was developed and with the COCL,

5    that they have independence.  And so, like, to the matter --

6    some people have said a need for a facilitator.  The -- the

7    PCCEP did not want a facilitator.  We offered one repeatedly.

8        I think one of the things that the PCCEP has offered is an

9    opportunity for some of its members to learn more to build

10   their skills.  It hasn't all been pretty.  It's all been in

11   public.  Sometimes there's some problems.  But I honestly think

12   that being able to -- that independence, in terms of being able

13   to grow -- and we have some younger members, and I think that

14   it's a really great opportunity for them to learn how to do

15   this work.  So that is that issue of independence.

16       I also wanted to say something about it would be so much

17   better if we could all be a team.  I come from mediation, so if

18   all of us -- the AMA, the Mental Health Association,

19   everybody -- could sit down together to do some of this

20   problem-solving -- there's been a lot of call for a community

21   organizer.  A community organizer is an answer to a question.

22   My question is what are our metrics in terms of how we have

23   engaged the community?  What are we organizing toward?  My

24   understanding is we want the community and the police to engage

25   better.  Right?  So what are we talking about when we say we

1   want to organize communities to come to meetings?  It's unclear

2   to me.

3       So I think if together, collectively, we could identify

4   some outcomes -- and I've heard that a lot -- and identify what

5   some metrics are for that, we could then talk about how do we

6   reach that outcome.

7       You know, we -- we are trying staying in the same

8   neighborhood for three months at a time, doing four different

9   parts of town, because one of our thoughts is that perhaps the

10  fact that we move every month keeps people from being able to

11  get really engaged and stay engaged with the process.  So we

12  are at NARA for a few months.  We're hoping to really engage

13  communities that, you know, either use NARA services or are in

14  that area, and then hopefully that will -- you know, people get

15  engaged enough that they will then want to follow along and be

16  part of us when we're moving every month.

17      So it's not like this is thoughtless on our part about

18  what we're trying to do.

19      The other thing -- so, again, I think if we could all work

20  together to solve some of these problems, some of the things,

21  like notices being posted, you know, some of the -- some of the

22  subcommittees, they're just, you know, not that great about

23  getting back to us about what their agenda is two weeks before.

24  It's not like we don't try.

25      So I think sometimes it's a matter of, again, respecting

```
 1   the volunteers, working with them in appropriate ways.  And so
 2   I guess those are the biggest things that I really wanted to
 3   make sure that were understood.  And, again, the idea that we
 4   could work together toward these outcomes, I think, would be
 5   fantastic.  I would love to have us all sit down in a room and
 6   say, "What does success look like?"  And because it seems to me
 7   this is the only avenue that people have around the settlement
 8   agreement, about all that stuff, so everybody comes into the
 9   same space.
10          THE COURT:  Let me ask you, because what you're
11   saying makes an awful lot of sense -- it's very, very wise --
12   why hasn't that happened in the past six months?
13          MS. MOWRY:  I am not -- I -- I have to say I -- I
14   don't know.  I don't -- I feel -- I know staff has reached out,
15   often unsuccessfully, to some of the amici, in terms of wanting
16   to have those kind of relationships.  There's not a lot of
17   attendance at the Steering Committee meeting, which would be a
18   great place to talk about some of this.
19      Again, I just don't think we have been very -- I don't
20   think we have been very clear about what the outcomes we want
21   are.
22      I know that I believe we can get them if we know what they
23   are.
24          THE COURT:  Why -- why haven't we seen that clarity?
25          MS. MOWRY:  Well, I think that's a good question.  I
```

1   don't think the clarity is written into the PCCEP plan

2   necessarily, so I think that makes it challenging.  I think a

3   lot of people read a lot of different things into that plan

4   and, using the volunteers, you know, people come in and they

5   have their own ideas of what should happen with stuff and

6   things like meeting with all the people that are listed in that

7   plan to meet -- some of which really aren't going to be that

8   helpful or that good a use of time.  I think we have to be

9   careful not to just check boxes, but to see are we growing?

10  Are we able to better meet the expectations?  That really is

11  our desire.

12       And I'll just say one other thing about a community

13  organizer is -- being a city employee is -- the experience is

14  so sometimes startling to me about how othered we are just

15  simply because of where we work.

16       You know, I have been out in the community and for the

17  same issues for decades, and I have my integrity question

18  regularly on whether or not I'm willing to tell the truth or

19  whether I'm willing to push back against authority because I

20  work at the City.  I think that, unfortunately, hiring a

21  community organizer is -- you know, "I'm from the City."  End

22  of conversation.  So we really want to think creatively about

23  that.  Right?

24       So I do just -- I think that's a good question.  I hope we

25  are all going to go back and think about these things.  We have

1    had great feedback today.  I'm really anxious to go back and

2    say this is clearly something that people -- we feel strongly

3    about, that we can do something about.  Perhaps the thing we

4    need to do is go back and invite everybody to come into the

5    same room, as long as it's okay under the legal -- no offense

6    to the lawyers, but if we can just get in there and say, "What

7    is it we need to accomplish, and how can we do that together?"

8            THE COURT:  I appreciate your advice, your insights,

9    your wisdom on this point.  I frankly agree with most of, if

10   not everything of what you just said.  I also observed that

11   what you have just said goes right to the heart of the question

12   of whether or not the stipulated amendment is facially

13   adequate, and I see -- I'm glad you agree.

14           MS. MOWRY:  Uh-huh.

15           THE COURT:  Thank you.

16           MS. MOWRY:  Thank you so much.

17           THE COURT:  State your full name for the record.

18           MR. LATTA:  My name is Theodore Latta.  Last name is

19   L-a-t-t-a.  I just took some notes.  Well, I have a soft voice,

20   so I'll try to get close to the mic.  I'm PCCEP staff.  My

21   title is PCCEP Project Director.  I understand why folks are

22   compelled to ask for a community organizer.  One of the big

23   knocks as a researcher of research is scientists will go into

24   communities and extrapolate data for publications or to get

25   attention and bring awareness, oftentimes well-intentioned

1    individuals, but they leave the community with nothing or no

2    benefits, and PCCEP is not that way.  The recommendations are

3    guided by community input, but I understand.

4        To speak to Judith's point a little bit, I understand why

5    folks are compelled to ask for a community organizer.  I just

6    think that when one considers the diversity of stakeholders, it

7    seems the subcommittees with financial and programmatic

8    assistance from PCCEP staff and the City are better equipped to

9    engage such diversity.  We have native folks, black folks,

10   folks on the spectrum, folks who are houseless, folks with

11   mental illness, Latinesque folks, LGBTQ-plus folks, and many

12   other communities, and they may not be engaged by another city

13   employee, as Judith had alluded to.  So I think subcommittees

14   with financial assistance and with guidance from the City would

15   be better equipped to engage in these communities.

16       And one of the most important things, I think, is PCCEP is

17   still young and it does take time to engage diverse

18   constituencies, especially when there's such a level of

19   distrust in the community.  And as a researcher, this is what

20   we know.  That's why community-based participatory acts and

21   research was founded to engage communities who didn't want to

22   be engaged by scientists, let alone authority figures, like the

23   police and folks like that.

24       There was a reference to statistical know-how.  PCCEP has

25   statistical know-how.  I assure you we have every confidence

1    that we can collect data in a comparable way that COCL does.

2        And to speak to Mr. Handelman's point a little bit, when

3    COCL gets out of town, then I think that PCCEP is well-poised,

4    if granted the same level of access and collaboration, to step

5    into a research role and to work in that kind of venue.  That

6    would also help to mitigate concerns of outside sourcing and

7    increase trust by acting as a vessel of information sharing

8    that is contextual.

9        Contextual information is one of the most important pieces

10   of this because people care so much and because the community

11   is -- plays such a prominent role in guiding the

12   recommendations.  Because the PCCEP members are here because

13   they care, as Your Honor must have heard by community testimony

14   among the PCCEP members.

15       Anyway, that's all I've got.

16           THE COURT:  Mr. Latta, thank you very much for your

17   comments.

18       Let me ask you, sir, your perspective, as a researcher and

19   quantitative analysis -- analyst on this, do you have any

20   understanding or opinions as to the basis of the attrition that

21   we have seen on PCCEP over the past six months or more?

22           MR. LATTA:  Yeah.  So we were just thinking about

23   that, and to my knowledge, only one individual has expressed

24   that they were leaving -- one full committee member has

25   expressed that they were leaving because they felt hampered and

1    they felt disrespected.  The majority of people leave because

2    of college, leave because of relocation or mental health.

3    Because being in front of the public is often hard, especially

4    when folks come just to heckle other folks who are PCCEP

5    members, and that happens at some meetings.

6        I also wanted to -- sorry.  That was loud.  I also wanted

7    to mention, in terms of people showing up at meetings, I know

8    that was -- it's not necessarily a barometer of community

9    engagement, but hundreds and hundreds of people are watching it

10   on YouTube.  We have hundreds of views on YouTube for the

11   live-streamed version of this.  But back to your point about

12   attrition, I think that people give their time and passion to

13   things that are important to them while they can.  And because

14   these are volunteers, they can't always do it, and I think

15   that --

16            THE COURT:  I'm sorry.  I understand your point about

17   attrition.  But then having the lack of continuity can't

18   possibly be a good thing, and so is there anything that you can

19   see that can be done that could diminish or decrease the level

20   of attrition we've been seeing?

21            MR. LATTA:  As I said earlier, PCCEP is still

22   relatively young, so we're still working out the kinks of being

23   support; but PCCEP staff has spent hours and hours and hours on

24   the phone trying to help people through frustrations with other

25   committee members as a team.  Right?  So teams have issues.

1     But I -- I don't think that PCCEP has been hampered by

2  that.  I think that the work -- I don't think the work has

3  suffered.  I think it -- continuity is incredibly important.  I

4  really don't think the work has suffered as a result of

5  attrition.

6          THE COURT:  Thank you, Mr. Latta.  I appreciate your

7  comments.

8          MR. LATTA:  Thank you.

9          THE COURT:  Back to you, Ms. Reeve.  I think you

10  wanted to do some speechifying.

11          MS. REEVE:  Speechifying, Your Honor.

12     So I'll be brief, Your Honor.  First of all, the City of

13  Portland would join in the comments and positions taken by the

14  United States Department of Justice.

15     Second, I wanted to address a question that was asked by

16  Mr. Walsh at the very outset of our time together today, and he

17  said, "Well, we're in compliance.  In compliance with what?"

18  And I think that's a really important question to keep in mind.

19  And the "what" is a settlement agreement between the United

20  States, the City, and the PPA, with amici participating.

21     That settlement agreement, as amended, sets forth 187

22  paragraphs and very specific standards for compliance.  And

23  that is what substantial compliance is measured against:  Those

24  obligations that the City agreed to undertake to try to address

25  specific circumstances that the Department of Justice found in

1    its investigation after the -- that was called for, and we are

2    grateful, by a community who, as has been expressed here today,

3    have been involved for decades in trying to improve policing in

4    Portland.  That was also called for by the City's own elected

5    officials and the Department of Justice, under the Obama White

6    House, noted the City's cooperation with that investigation

7    from the outset.  That settlement agreement was negotiated and

8    agreed to before this lawsuit was even filed.

9         So that is the answer, I believe, to what -- compliance

10   with what.

11        I think part of what we're hearing today, as I sat and

12   tried to take a few notes, and even as I reviewed the briefings

13   submitted by the amici, most of the issues that people are

14   raising and most of the concerns that are being expressed and

15   most of the arguments that are being made are not that the City

16   is not in substantial compliance with the specific 187

17   paragraphs of the settlement agreement.  It is that there

18   continues to be a trust deficit.  There continues to be

19   concerns, and that tells us that there continues to be work to

20   be done.  But that does not mean that the settlement agreement,

21   the contractural arrangement between the City of Portland, the

22   United States Department of Justice, and the Portland Police

23   Association is the solution to all of those problems, and we

24   would submit that it is not.  And we continue to have a lot of

25   work to do, and we know that.

1          Chief Resch, I've heard, since she became chief, has been

2     speaking to that and to the importance of building trust

3     bridges so that that can be developed, and individual officers

4     don't have to redo that every single time because they have

5     that trust with the community.

6          Today, in speaking with Mayor Wheeler, when the subject

7     was raised about more collaboration, about more discussion, he

8     suggested that we have a quarterly meeting, hosted by the

9     Mayor's office, with the police bureau.  Chief Resch has

10    indicated she would be happy -- or she or her command staff

11    would participate in that; that the amici, we would hope, would

12    be willing to participate.  We could have PCCEP co-chairs staff

13    participate, as appropriate, so that we can begin to address,

14    in a collaborative way, on a quarterly basis, how we can

15    address some of these other issues that frankly aren't directly

16    within the purview of the settlement agreement.

17         So we hear the community.  We understand that there

18    continue to be concerns, but I think it's -- what we have here

19    is a little bit of a -- when people have a hammer, everything

20    looks like a nail.  And because this is the tool that people

21    feel that they have to address whatever concerns they have

22    about the police bureau, they're bringing them to Your Honor

23    whether or not they're actually within the four corners of that

24    settlement agreement.

25         And moving on to that, the City would, with the Department

1   of Justice, renew the stipulated motion for entry of the final

2   amendments to the settlement agreement.

3       Your Honor asked -- I'll slow down.  Your Honor asked the

4   question of whether there is any credence to the suggestion

5   that the lack of final approval has an impact on PCCEP

6   participation, and I certainly don't claim to have any actual

7   evidence for that, but I can tell you I have attended almost

8   every meeting of the PCCEP.  I believe I may have missed one.

9   But it comes up regularly.

10      And last night when the PCCEP was discussing their

11  submission to Your Honor, and they took some time to go back

12  and forth -- there was a robust discussion.  There were

13  differences of opinion.  But one thing that came up was a

14  concern of, you know, we need to let the judge know that we are

15  in substantial compliance under the settlement agreement so

16  that we can continue to exist and do this work.  And so I think

17  they're very acutely aware that they -- that there is not final

18  approval for the structure.

19      Speaking on behalf of the City, as the City's attorney,

20  it's extremely challenging to continue to work to build

21  substantial compliance, to maintain substantial compliance, to

22  build these relationships under a structure which has not been

23  finally approved.  This is the fourth time that the Court has

24  considered these amendments, and I'll be honest, it feels like

25  a bit like a moving target because at the initial hearing, the

1  discussion was, "Yes, PCCEP members have been appointed.  The

2  training is occurring, but they haven't had a meeting yet.

3  Let's give it six months."

4      We came back, and PCCEP had been meeting for six months.

5  We submitted quite a bit of information about the work they

6  were doing.

7      We're now six months further down the road.  Last night

8  PCCEP held its, I believe, 16th regularly scheduled monthly

9  meeting.  They have been submitting very substantive

10  suggestions and proposals to the City.  There has been robust

11  discussion.  There is not always agreement.  We heard some of

12  that with regard to the Subcommittee for People with Mental

13  Illness.  And I think we're going to expect that.

14      So I think having a robust community engagement body is

15  not always going to be smooth sailing, but the City believes it

16  would be extremely beneficial to have that structure approved

17  as fair, adequate, and reasonable, even as we continue to work

18  to improve and maintain substantial compliance with the

19  structure.

20      It's -- it's a bit circular to try to substantially comply

21  with something to demonstrate that it's fair, adequate, and

22  reasonable, and feels sometimes a little bit like an endless

23  loop.

24      So the City would renew its request that the -- that the

25  Court grant final approval of the settlement agreement

amendments and then we well understand that substantial

compliance needs to be -- continue to be demonstrated for a

further year.

So I think those are the major points that I wanted to

make, Your Honor.  And I just want to represent on behalf of

the City and its elected officials, the chief of police, that

the City is committed to continuing the work of improving the

Portland Police Bureau of addressing some of these large

structural issues.  We're aware that we, in Portland, like

many, many, many, if not most, if not all cities in the United

States, have issues around racial disparities in our criminal

justice system.  We are aware that we have a lot of work to do

to continue to rebuild trust.  We were aware that we haven't

solved the problem of how to avoid uses of deadly force against

people who are either in -- suffering a mental health crisis or

suffering from mental illness or suffering from drug addiction

that creates those symptoms.  So all of that work, you know,

remains to be done.

But to say that there haven't been substantive

improvements or that the City hasn't complied with the 187

paragraphs that it agreed to comply with, we think that the

evidence is to the contrary to that.

We appreciate the work that the United States Department

of Justice and the compliance officer have done in monitoring

that performance.  I can tell you that when you're on this side

1    of the table and responding to the information requests and

2    going back and forth and working on the policy revisions and

3    all of the work that we have done with our partners over the

4    many, many years, it certainly feels like vigorous oversight.

5         So I'll end on that note and just say that we would look

6    forward to -- as I say, the mayor would -- would look forward

7    to hosting some quarterly meetings where we can talk about some

8    of these issues that -- and it doesn't have to be purely in the

9    context of the settlement agreement because many of those

10   issues are outside the scope of the settlement agreement.

11        Thank you.

12             THE COURT:  Any insight on why those haven't been

13   done previously?  I mean, it sounds like a great idea.

14             MS. REEVE:  I will say that one thing that has

15   occurred to me, as I have worked with the City on these issues,

16   is, I think, to some extent, the settlement agreement and all

17   of this work has been extremely beneficial, and now those

18   systems are in place.  They need to be maintained.  We need to

19   keep looking at them.  We need to keep working on them.  I

20   don't mean that, you know, once we do achieve that substantial

21   compliance and enter the maintenance period, that won't occur,

22   because I do think that those systems are in place and will be

23   maintained.

24        It sucks a lot of the oxygen in the room to have as much

25   focus as there is on specific legal compliance with the

1    settlement agreement terms, and I know that one thing that we

2    have talked about frequently at the City, at the police bureau,

3    is that as we move beyond substantial compliance or into

4    maintenance of substantial compliance, that there is, perhaps,

5    a little more room to tackle some of these other issues.

6            THE COURT:  The term I would use is sustained

7    substantial compliance.  I think that's what Mr. Geissler

8    referred to as well.  I would expect, though, that we would

9    have sustained substantial compliance during the period that

10    we're looking to see whether we have sustained substantial

11    compliance.  So I encourage you to keep up with those good

12    ideas.

13        I do think it's a very good idea -- the quarterly meetings

14    that you and the mayor are proposing.  It's still not really

15    clear on why they haven't been done, but I can't -- we can't

16    change history.  We can only change the future, so I encourage

17    you to do it.

18            MS. REEVE:  And I will say, Your Honor, that at

19    different times there have been significant periods of time

20    where we were meeting very regularly with certainly the

21    Albina Ministerial -- Albina Ministerial Alliance Coalition for

22    Justice and Police Reform, and so that has not been happening

23    as regularly recently, but there were certainly periods of time

24    during this process where we were meeting regularly at the

25    level with our elected officials, Dr. Haynes, Dr. Bethel,

1    counsel, other esteemed members.

2       So thank you.

3          THE COURT:  Ms. Reeve, would you like to call on the

4    compliance officer to make any presentation now or should we go

5    to Mr. Karia?  What do you recommend?

6          MS. REEVE:  The compliance officer would like to

7    present, and so if now is a good time?

8          THE COURT:  It's up to you and Mr. Karia.  Mr. Karia,

9    you're a party.  Do you want to make any statements now, or do

10   you want to make any statements after the compliance officer?

11   Your preference.

12         MR. KARIA:  I will save my incredibly brief comment

13   until after the compliance officer.

14         THE COURT:  Very good.  Welcome.

15         DR. ROSENBAUM:  Thank you, Your Honor.  I'm

16   Dennis Rosenbaum, the compliance officer.

17         THE COURT REPORTER:  Sir, could you speak up a little

18   bit?

19         THE COURT:  The reporter is asking you to speak a bit

20   more loudly into the microphone or --

21      Mary, can we adjust the microphone?

22         DR. ROSENBAUM:  I can move up a little bit.  Thank

23   you.

24      Before I give my presentation, which shouldn't take that

25   long, I do want to respond to some of the things said today.

1   You know, I -- first, I just want to say -- again, remind

2   people we're not a party to this agreement.  We are

3   independent.  And over the years our record reflects that we

4   have called out the City and the Portland Police Bureau many

5   times, asked them, and insisted that they change their

6   behavior, and they've been responsive most of the time.  Some

7   of it took more persistence than others in the first couple of

8   years, but generally -- and also, you know -- so I just want to

9   say we're all about telling the truth and let the facts be what

10  they may, and, you know, this issue today of exploring and

11  trying to define what substantial compliance is, I -- I would

12  have to -- I think DOJ has made it clear, and the City, that --

13  and I want to confirm that -- that the settlement agreement, to

14  me, is pretty clear that if you do these things that are listed

15  under these 180-some paragraphs and you do them well -- you

16  don't just do them -- we were pretty insistent on that -- that

17  that is the clear indication of compliance, and I think it's

18  summarized nicely in paragraph 170, which talks about the

19  importance of creating these systems of review and

20  accountability and feedback loops and all of that, and we have

21  worked really hard over the last five, six years to help the

22  City create those systems and implement them well and see what

23  the results are.

24       So, you know, internally, for example, the force review

25  process and the force audits and the EIS, employee information

1   systems, to keep an eye on individual employees and their

2   behavior and the training, the needs assessment, to go in and

3   make sure that the training is really responsive to what the

4   city needs, the community needs, the police need, and the

5   evaluations of training, we work really hard to get the

6   Portland Police Bureau to implement a very comprehensive set of

7   training evaluations, more so than I have seen now in any other

8   city in the country.

9        There's all -- I give the Department credit for creating

10  this internal inspector general that does lots of different

11  audits.  Police departments need to be audited internally and

12  externally.

13       Externally, PCCEP, one of those, you know, big, important

14  systems that I want to talk about just today, and Independent

15  Police Review in Portland and the Citizen Review Committee and

16  the Training Advisory Council, you've heard from a lot of them.

17  I think they all serve an important role.

18       This idea of evidence, I just want to -- I don't know what

19  the Federal Rules of Evidence are.  You alluded to that.  I'm

20  not an attorney; but, you know, as a social scientist, we use a

21  very scientific approach to evidence, and I -- you know, I

22  spent over 30 years teaching Ph.D. students how -- how do we

23  generate knowledge and what kind of methods would we use to

24  distinguish the truth from fiction?  And I do have to say I

25  discourage them from being distracted by small numbers because

they don't -- and -- but, again, I mean, the tragedy associated
with a police shooting, the family's tragedy, the trauma, I in
no way want to underestimate that, but I also want us to back
away and see if we're making any headway on the bigger issue.
And, you know, there's -- there's, like -- you know, I was
looking at data where there's 11,000-plus calls for service
involving the Portland Police Bureau with a mental health
component to those calls, and force was used in less than one
half of one percent.

So we have to also -- that's the bigger picture.  Within
that, there's -- the most common use of force is the less
serious force; but there are these tragedies, and they need to
be studied, and they need to be investigated, and they need to
be -- people need to be held accountable, if necessary, and we
don't disagree with any of that.  I'm just saying evidence is
a -- is a bigger issue for us.

And the idea that we don't look at statistics -- I know
that Dan Handelman from Portland Copwatch has said that a
number of times -- that's just completely absurd.  You need to
read our reports.  We have examined all kind of systems
repeatedly, including everything from the time it takes to
investigate complaints against the police to ECIT, Enhanced
Crisis Intervention Response, to mental health calls.  We have
reported good news and bad news, that -- you know, on survey
findings for example, we report there's significant

1   improvements in public satisfaction with police encounters

2   between 2016 and 2019 with 86 percent of the people satisfied

3   in 2019.

4        But, again, you know, I'll also point out that

5   African-Americans and some other groups were not nearly as

6   satisfied, and that's an issue that still needs to be

7   addressed.

8        Traffic stops?  Yes, I did praise them for having certain

9   benchmarks.  Much more so than other law enforcement agencies

10   that I looked at.  But we also acknowledge the disparities in

11   searches.  They are searching African-Americans more.

12        So we want the police to focus their energy on changing

13   these biases, and we stress that in training on procedural

14   justice and implicit bias and emotional intelligence -- I

15   talked to you about that before -- how important -- I spent a

16   lot of my career looking at procedural justice, and I have been

17   pressing very hard in Portland, and I think they have some good

18   training scenarios in place now.

19        So I think the focus should be on Section 9, on community

20   engagement, so I just want to quickly read my testimony here.

21   And based on extensive review of documents and observations and

22   of meetings and involvement with experts that we have also on

23   our team and review of data, we would argue that the amendment

24   is fair, adequate, and reasonable.  So let me just quickly turn

25   to my presentation.  And I have a copy of this for you,

1    Your Honor.

2        I do want to say that based on our work that on

3    October 2nd of 2019 we reached the conclusion that the City of

4    Portland had achieved substantial compliance with each section

5    of the settlement agreement, including Section 9; and, as you

6    know, DOJ has reached a similar conclusion recently, on

7    January 10th.

8        Again, the City has to maintain compliance for at least a

9    year, and we'll be reporting each quarter, as we have done, on

10   whether these established remedies are, in fact, durable.

11       To me, the sort of fundamental question is whether the

12   Portland Police Bureau and the City have maintained these

13   systems of review and feedback and corrective action.  They

14   should not be eliminated, diminished, or circumvented in any

15   way.  This includes the systems of community engagement.

16       So, you know, we argue that the Portland Committee on

17   Community-Engaged Policing, or PCCEP, serves a critical role in

18   maintaining and improving upon the reforms that have been

19   implemented over the past six years; and, believe me, there is

20   always room for improvement.

21       The settlement agreement requires PCCEP to do certain

22   things.  It requires the City and the police bureau to do

23   certain things under the community engagement section.

24       Paragraph 141 clearly says that PCCEP was created to

25   leverage the ideas, talent, experience, and expertise of the

1   community.  We followed PCCEP from its inception, and with few

2   exceptions, really, this group has consistently functioned as

3   an independent legitimate mechanism of engagement, as expected

4   by paragraph 141 and 151.  And as many people said today, this

5   type of work is very difficult.  So this relatively young group

6   of community members, I think, deserves a lot of credit for

7   weathering a politically stressful job with sometimes very

8   divergent perspectives, and we saw some of that last night at

9   their meeting.

10      They have created the structure and leadership to function

11  effectively, as they have their five subcommittees that meet

12  regularly and provide reports and recommendations to the full

13  PCCEP.  They have bylaws and protocols that are needed to

14  select new officers, add new members, streamline

15  recommendations, and take other actions.

16      So, you know, while the membership does change, I think

17  the group also represents a pretty broad spectrum of the

18  community.  They meet regularly, as a whole, and with the

19  subcommittees, and this has provided multiple opportunities for

20  input on police-community relations, including the town hall

21  meeting they have held, where we have also presented our

22  findings.

23      They've maintained a solid working relationship with the

24  City and PPB.  And if we felt they hadn't, I would quickly

25  report that.  I have no interest in not doing that.

1          And with other organizations, including AMAC and the

2     Portland Police Association, they have continued to do work

3     that is required in the PCCEP plan and provided numerous

4     recommendations to the City and PPB, including feedback to the

5     PPB on its community engagement plan, its annual reports, and

6     these are specific paragraphs that they're required to do in

7     the settlement agreement:  142, 146, 150.  As well as giving

8     recommendations to the City related to alternates and if

9     someone does resign.  Attention to police union negotiations.

10    I don't know.  Maybe you want to talk about that.  And then

11    giving us meaningful feedback actually on our quarterly report,

12    so we appreciate that.

13         So, in sum, we feel that PCCEP has met and exceeded the

14    expectations created by the settlement agreement.  As we have

15    said before, looking at everything, we believe they have the

16    skills and resilience to survive and adapt to its environment.

17         Now, turning, just quickly, to the City's role in PPB,

18    they have continued to maintain their obligations under this

19    section.  They have -- the City continues to provide training

20    and administrative support to PCCEP.  Paragraph 144.  Hiring a

21    project director, working with PCCEP on the process of

22    replacing members who resign, training new members, providing

23    IT and website support, providing ADA access, and offering

24    other services.

25         My understanding was that the training, although I have

1    heard some people complain about the training today, that the

2    people we interviewed were satisfied with the training.  So,

3    again, you're really getting mixed stories on some of this

4    stuff.

5        PCCEP and the City have done considerable work to research

6    the underlying issues of police-community relations and police

7    services, through data collection, analysis, and reporting,

8    including providing demographic data at the precinct level.

9    That's paragraph 147.  Conducting city-wide survey.  Paragraph

10   146.  And recently conducting a contact survey with victims who

11   have called the police for help.

12       They drafted a community engagement plan, three different

13   paragraphs, based on data from the city-wide survey on their

14   strategic process, their strategic planning process, and input

15   from PCCEP.  And that plan was approved by the City Council in

16   October of 2019.

17       The PPB has engaged the community and PCCEP in a variety

18   of ways.  Paragraph 145.  They have an office of community

19   engagement, and we have spent time with them, and they have

20   held many meetings with diverse community groups around the

21   City and to develop better relationships and to better

22   understand the problems they face.  The woman who runs that

23   office is very impressive.

24       PPB has also maintained a working relationship with PCCEP.

25   They continue to send high-level employees to these meetings

1    and subcommittee meetings, as does the City's legal department.

2        PPB has worked with PCCEP on the city-wide survey, the

3    community engagement plan, their annual report, and has

4    accepted many of the recommendations from PCCEP and continues

5    to work with them in 2020.  I know the new chief has the

6    commitment, at least as expressed to us and to others and the

7    partners, to do that.

8        PPB has released its annual report in a more timely

9    manner, as requested by PCCEP.  Paragraph 150.  Presented the

10   results at precincts and City Council.

11       So, in summary, the PPB continues to comply with the

12   community engagement requirements of the settlement agreement.

13       In closing, Your Honor, I would like to underscore one

14   point.  The settlement agreement does not require the City or

15   PPB to prevent or solve every public safety problem it faces.

16   Rather, it requires that the PPB strengthen its capacity as a

17   learning organization and establish durable remedies to

18   emergent problems.

19       Specifically, the City and PPB are required to create

20   these systems that can be used to identify problems or trends

21   and intervene to correct and sometimes prevent them.

22       Such systems are now in place from their mental health

23   response to officer training to accountability to use-of-force

24   reviews, et cetera, as I have discussed earlier.

25       One of these new systems, really, is the community

1    engagement, as reflected in the work of PCCEP.

2         Now, if Portland is to sustain the progress it has made

3    over the past six years, well beyond the departure of DOJ and

4    the COCL, we strongly encourage the City and the Portland

5    community to continue supporting the PCCEP in its current form

6    and function.

7         Thank you, Your Honor.

8              THE COURT:  Thank you, Dr. Rosenbaum.

9         Dr. Rosenbaum, you mentioned in your comments something

10   about the ongoing negotiations with the Portland Police

11   Association contract.  Are there any particular issues that may

12   bear on the implementation of the settlement agreement that you

13   can share with us?

14             DR. ROSENBAUM:  No.  I think that's an area where

15   they're getting into -- you know, they're feeling the freedom

16   to talk about the issues facing the union, including, as I

17   list -- I was going to list here civilian oversight system, the

18   arbitration system, officer accountability, use-of-force

19   policies.  I mean, they wanted to talk about a lot of stuff.  I

20   don't know to what extent they have, actually, with you.  I

21   have not observed those interactions, so I'm not in the best

22   position.  Maybe they can.  But some of that is beyond the

23   scope of the settlement agreement.

24             THE COURT:  Let me ask you this because we talked

25   about this a couple of years ago and we talk about it

1    periodically.  I know that there's differences of opinions on

2    this.  Is there any progress or any development in the area of

3    body cameras?

4              DR. ROSENBAUM:  To my knowledge, there -- the City

5    can address this better.  I believe there is a pilot program

6    being explored.  I don't know that City Council has approved

7    it.  My understanding in Portland is there's differences in

8    City Council about this issue.

9              THE COURT:  I recall that.

10             DR. ROSENBAUM:  Yeah.  I will state my opinion again

11   that body cameras are a good thing, that they make both the

12   police and the community members act in a more orderly manner,

13   and they also are outstanding for accountability so you can

14   actually find out what transpired, as opposed to two people

15   disagreeing, and it's also an enormous training tool.

16       In the future, we're going to see a lot of police training

17   around it.  I mean, every training academy, including Portland,

18   uses videos from other cities during their training.  So

19   there's a lot of potential benefit.  And the downside is

20   they're kind of expensive right now because one company kind of

21   has a monopoly on charging for things, but --

22             THE COURT:  Everything you just said is entirely

23   consistent with my understanding, but I'm just one person.  I

24   appreciate your insights on that, and that's consistent with

25   everything I've always understood too.

1           DR. ROSENBAUM:  Great.

2           THE COURT:  Thank you.

3        All right.  Mr. Karia.

4           MR. KARIA:  Thank you, Your Honor.  For the record,

5    the Portland Police Association joins in the renewed joint

6    motion to enter the amended settlement agreement.  It also

7    joins in the legal positions taken by the City and the United

8    States, in that regard, to the -- just the discussion that just

9    occurred as it relates to collective bargaining negotiations,

10   the parties have just started bargaining.  I do want to be

11   mindful of our state law obligations to bargain in the correct

12   forum, which is at the bargaining table.

13       Because we are so early in the process, I couldn't --

14   could not and would be reluctant to report --

15          THE COURT:  Fair enough.

16          MR. KARIA:  -- in the interest of good faith

17   bargaining, about what is being discussed at the bargaining

18   table, but just know that the parties are gearing up for more

19   substantive discussions.

20          THE COURT:  Consistent with those obligations, can

21   you share with me anything at all about a timetable or an

22   anticipated timetable?

23          MR. KARIA:  I can tell you that as of February 7th

24   the parties agree, consistent with state law, that the minimum

25   150 days of collective bargaining at the open bargaining

1   table -- and I use the phrase "open bargaining table" to

2   describe the face-to-face interactions of collective

3   bargaining -- has started.   The parties stipulated to that.

4        There's no obligation to bargain only 150 days.   That's

5   just the minimum amount of time that the parties mutually have

6   to engage in that process.   State law thereafter sets forth a

7   mediation process and a dispute resolution process.

8        So when I say we're early on in the process, we are very

9   much so early on in the process.

10            THE COURT:   Understood.

11            MR. KARIA:   Okay.

12            THE COURT:   Thank you, sir.   Anything else you wanted

13   to say?

14            MR. KARIA:   No.

15            THE COURT:   Thank you, sir.

16        All right.   Let's go -- you tell me who wants to go next,

17   as between Mr. Chavez, Ms. Albies, or anybody else, but some of

18   the things I'm curious about -- or Dr. Haynes or anyone else --

19   the comments that we have heard I think need to reflect the

20   fact that I need to figure out is the proposed stipulated

21   amendment that brings us PCCEP to replace COAB, is it facially

22   adequate?

23        I thought that the COAB was facially adequate.   That's why

24   I approved it years ago.   And it turned out that it was not

25   adequate.   And we have everybody in agreement, including the

1    City, conceding, and the United States, as the plaintiff,

2    taking a position, that there was not substantial compliance

3    with the settlement agreement because, among other things, and

4    maybe primarily, the COAB problem.

5        So then the parties get together, and they have proposed

6    this stipulated amendment that brings us the PCCEP.  I have

7    given it only conditional approval because I -- I don't know if

8    it's facially adequate.  And part of my desire to learn whether

9    it's facially adequate depends upon how it's working.  That may

10   be a little bit of a chicken-and-egg problem.  I get that.  But

11   if something is not working, it may not be facially adequate.

12   If something is working, that may confirm that it is facially

13   adequate.  So that's why I have deferred.

14       I will look forward to your comments on that point.

15       I'm also sensitive to the point made by the attorneys for

16   the plaintiff, the United States, that this settlement

17   agreement was not anticipated to go on forever.  It did have an

18   anticipated five-year lifespan.  We have gone beyond that for a

19   number of reasons, but it's not anticipated that it will go on

20   forever, and so I don't know whether I'm doing any good or

21   doing any harm by having our periodic status conferences.

22   Hopefully, they're somewhat helpful, but they can't go on

23   forever.

24       At some point what needs to happen is we need to end this

25   lawsuit.  Hopefully, what has been built positively will

1   continue.  The progress that has been developed, in terms of

2   constant and continual improvements, will continue even without

3   Court supervision.  I suppose there certainly is always the

4   possibility that if people fall back or there's other problems,

5   other type of systemic type of litigation may arise in the

6   future, whether it be a new lawsuit by the Department of

7   Justice under 42 U.S.C. § 14141, whether there is some type of

8   other systemic litigation, brought by somebody else, with

9   standing.  There's always those possibilities in the future.

10  But this lawsuit, with its periodic status conferences, can't

11  go on forever.

12      I also hear the comment from the United States that, in

13  their opinion, as the plaintiff, they believe substantial

14  compliance has been achieved as of January 10th of this year.

15  About two -- January 10th or February 10th?  January 10th;

16  right?

17             MR. GEISSLER:  January 10th, Your Honor.

18             THE COURT:  Yeah.  January 10th.  And that would

19  start the 12-month clock for whether or not there's sustained

20  substantial compliance.  Footnote, putting aside the problem of

21  what to do about the PCCEP amendments, because, as the

22  settlement agreement currently stands, there is not substantial

23  compliance because of the COAB, but that's a very tricky legal

24  issue that we'll only get to if we have to get to.

25      But I think they have triggered the -- what they believe

1   is the 12-month clock, and we'll see where things progress and

2   how things have progressed when we get back together.  Because

3   of my scheduling, it will be at the end of February or early

4   March of next year.

5        And then we have also heard some of the comments that the

6   amici, the AMA Coalition and the Mental Health Alliance, should

7   be actively interacting with the City, with the PCCEP, to some

8   extent the plaintiffs, and not waiting until our periodic court

9   conferences to share concerns.  I'm interested in your

10  responses to that.

11       So those are some of the things that I'm interested in

12  hearing responses to; but, that said, you are welcome to talk

13  about anything and everything that you wish.

14       Dr. Haynes.

15          DR. HAYNES:  Yes, Honorable Judge Michael Simon.  I

16  can give you AMAC's perspective on some of those things.

17       First of all, I wanted to start off with the premise that

18  we are not a PCCEP adversary.  We helped create PCCEP.  We

19  helped create the COAB.  We helped create the settlement

20  agreement.  We helped create our PR.  We helped create the CRC.

21  We helped create the 48 rule.  And you can go down the list for

22  the last 20 years that AMAC has been engaged.  Before there was

23  a COAB, before there was a settlement, AMAC was providing the

24  City with the reflections from the diverse community about the

25  concern and issues of police, and AMAC has many times been one

1   to stop the city from rioting and burning up.  It's because of

2   the interaction that takes place with AMAC with the city.

3        Now, what we are concerned about is, like we were with

4   COAB, as well as with PCCEP, is that we want to get this right

5   as much as possible, and there are opportunities that open up

6   that we can take leaps with police-community relations and

7   build a trust foundation in the community, which is truly

8   enlightening right now, particularly in communities of color,

9   and so we are dealing with -- to us, it's not just a band-aid

10  that you put on something.  It's life and death.  People are

11  dying.  Mentally ill, communities of color, people are dying

12  every day, and so it's a life-and-death situation.

13       You know, we have to go back to the premise that this is

14  an experiment.  It started off with DOJ as an experiment.  Just

15  like there's an experiment on democracy.  It's an experiment

16  where we have to mold and shape and amend and whatever is

17  needed to get a -- the best product and the best structure that

18  we needed.

19       And so we want to affirm the structure itself but at the

20  same time make sure, as we drive and move towards the filing in

21  of this lawsuit that came into being of a settlement agreement,

22  that we have the best that we can for our city that we love and

23  that we, who are going to be the constituents of this city,

24  have to live here and want to bring the best in the

25  relationship between the police and our community.

1     And so that -- that is our basic foundation.  I know some

2  consider us to be adversaries, but -- just like some consider

3  Martin Luther King to be an adversary.  I don't mind taking

4  that mantle if it meant to make a better America.  We want to

5  make a better Portland.

6     I think that we are making progress and AMAC believes we

7  are making progress with that, but every now and then we see

8  things that need fine-tuning in that process to -- to make sure

9  that when we formalize everything that it is adequate and that

10  it is fair and that it would be a structure.  Because it is an

11  experiment, we don't know that, no.  But we're willing to walk

12  in faith as well as in terms of what our reason to say -- to

13  say that this is the best that we can get.

14     Now, our concern with community engagement, as -- as I

15  said previously, as one who has 40 years of experience, that's

16  been dealing with police-community relationships, was marching

17  with Dr. King and fought for civil rights, I clearly understand

18  that things don't come overnight.  It is a process, but it is a

19  development process and -- but we try to do and achieve the

20  best we can.

21     And I think you have an -- a great structure and a

22  framework with PCCEP.  You have some of the -- some great

23  people on the PCCEP board, you know, but there are areas that

24  we have highlighted that are concerning.

25     As we go into the future in our beloved city, that we will

1  have a structure that we can amend, adjust, and then to help us

2  foster that, that trust in community relationship with the

3  Portland Police Bureau and to make a better city that is

4  peaceful for the whole community and the diversity of our

5  community.  So I wanted to get that out first as apparent.

6      The other thing, in terms of the long-term effect, we

7  never went into this thinking that the DOJ would be here

8  forever, but we went into it thinking in terms as one of the

9  major initiatives for bringing the Department of Justice into

10  this, whereas that we can create a -- a structure, an

11  infrastructure, that will enhance the development of our

12  community-police relationship that will bring justice to the

13  people who have not -- who don't believe that they've received

14  any justice with use of police violence.  And so all of this

15  coming together, we know that there's a term.  We know that

16  it's going to fall back on the City, and the City Commissioner.

17  And, you know, of course, you have a great transition and

18  there's going to be an even greater transition in City Council

19  that is coming up in this development and this position on many

20  of these issues, and so we -- we want to forge that kind of

21  relationship with the City and with the Portland Police Bureau

22  and all of the entities that are working together to produce a

23  greater city.

24      But at times that means a democracy, and we are a

25  democratic republic, even though some think we're not.  In

1   democracy, there is push and take.  There's compromise.

2   There's amendments that takes place in a democratic process.

3       The other part of that is that there's an intent.  The

4   settlement agreement has an intent and a spirit, just like the

5   preamble to our Constitution has a declaration clause of

6   independence.  It has intention and it has -- in terms of

7   purpose, and the intent and the purpose of the settlement

8   agreement was basically, Judge, to -- to what? -- to be

9   reasonable, adequate, and fair in creating a structure that

10  will help forge us closer and closer to what Dr. King called

11  the beloved community.

12      So we have -- you know, some say it's just numbers.  It's

13  stats and meeting processes.  But it's more than a process.

14  Human beings are not material products.  We're human beings,

15  you know.  We have a spirit, a soul, and a body, you know, and

16  so you're dealing with people.  You're dealing with people who

17  want to have justice and fairness.  And just like any other

18  people, whether they live in big homes in the southwest or

19  whether they live in the north or northeast or southeast, they

20  want to have the same rights of justice and be respected by the

21  police that we pay, that work for the City and the public.

22  They want to have that same respect and adequateness that takes

23  place.

24      And so that's why we're here at the table.  And amicus,

25  AMAC, has been here even before DOJ was here, you know, and

1  before many of the people -- that the lawyers were here, you

2  know.  We were here at this table forging that type of

3  community, in a sense, for the city of Portland.

4      Now, there were -- I'm trying to -- you had quite a few

5  questions there, but I do think that we are moving in the right

6  direction, and we -- certainly, we would have wanted more to

7  happen out of this settlement agreement, and I think you made

8  it clear there's a difference between a decree and a settlement

9  agreement, you know, and my -- honorable counsel is here.  We

10  know that it's very clear, in the political sense, that under

11  U.S. Attorney Sessions and U.S. Attorney Barr that there's an

12  attempt to eliminate all decrees in the federal courts, and

13  so -- but I understand there are good professional people that

14  are professional and believe in their job, and I give respect

15  to them on that particular point.

16      But I want to say, finally, I don't know if I answered all

17  your questions, but I think with a certain amount of tweaking

18  colloquially, that we can have PCCEP move forward and be ready

19  to release DOJ to go do some other things and -- and at this

20  time -- and I think that that can take place.

21      We have done it before.  We were in rooms for weeks and

22  days and months in putting together this settlement agreement,

23  and I -- I think it can -- it can happen, and there's a

24  willingness of AMAC.  But we want to always put the people, the

25  citizens of Portland, first; that they be responded with a

1    structure that is adequate, fair, and -- and just at the same

2    time.

3         I just want to make a statement in terms of the difference

4    between a community organizer and research.  A community

5    organizer, many people have an old concept of that, back in the

6    '60s type of thing, but Washington, D.C. government and city

7    government has community organizers working for the City.

8    Dallas, Texas, has community organizers working for the City.

9    Atlanta, Georgia, has community organizers.  There are morals

10   throughout the country of how community organizers -- not just

11   in terms of to bring people to the meeting, but also it can do

12   a variety of identifying leadership in the community,

13   disseminate information in the community.

14        You can't do everything by Facebook or necessarily by

15   Twitter, but people have to be touched and people have to

16   receive the information.  They have to be engaged to, in turn,

17   become a part of the process.

18        Thank you very much, sir.

19             THE COURT:  Thank you.  I agree there's an awful lot

20   that can be accomplished when people of good faith sit in the

21   same room face to face with each other that just can't be

22   accomplished, at least as effectively, if at all, by pure

23   electronic meetings.

24        I get that.

25        Thank you very much, Dr. Haynes.

1          Ms. Albies, anything further?  And I'll go to Mr. Chavez

2     or vice versa.

3               MS. ALBIES:  Thank you, Your Honor.  I just want to

4     respond to one point about the comments and feedback that the

5     AMAC has included in their brief to the Court or their status

6     update to the Court.  I don't believe there's anything in there

7     that has not already been shared with the City.  It's possible

8     that we haven't shared it with the DOJ, but we have sent

9     letters to the City about some of these concerns.  You know,

10    even just thinking about over the years we've met with the

11    mayor.  We have met with various police chiefs on an ongoing

12    basis.  That hasn't -- Ms. Reeve is correct.  That hasn't

13    happened in the past couple of years or at least a year or so.

14    I don't know why.

15         The AMAC is certainly willing to do that.  But issues of

16    bias in police stops, that's been something that AMAC has

17    raised for years.  There's the Blue Panel -- Blue Ribbon Panel,

18    under Chief Sizer, which was many decades ago.  So these issues

19    are ongoing.

20         While the Albina Ministerial Alliance and many community

21    members are committed to having these discussions, it's also

22    very difficult, as volunteers, to continue to raise points and

23    feel like it is ignored.

24         So I think that is something we've heard from folks

25    feeling that they have not -- issues have not been addressed,

1   and I know that my clients have continued and I also am

2   continuing to be committed to working on these issues, but that

3   plays a part in how -- the City asks a lot of volunteers that

4   engage with -- on these really weighty issues, and I think

5   that's part of the discussion that we need to be having.

6          THE COURT:  One of the things I'm encouraged about

7   hearing from Ms. Reeve, the offer from her and the mayor to

8   have quarterly meetings, and I think that will be very helpful.

9          MS. ALBIES:  I agree.

10          THE COURT:  Mr. Chavez?

11          MR. CHAVEZ:  Thank you, Your Honor.  And just a pick

12   from the variety of things that have been spoken since we

13   returned from lunch, much as we do enjoy coming to see you,

14   Your Honor, frankly, if we had to wait every eight or six

15   months to come see you to address these concerns, we -- MHA

16   would be functionally useless.  I mean, we are engaging --

17   PCCEP -- we are engaging the City on multiple occasions.  More

18   than just in these hearings.  So I wanted to start just there,

19   at a -- of a 10,000-foot view.

20      Closer in, there was some comments from the PCCEP support

21   staff that I thought are worth highlighting because they go to

22   whether or not the settlement -- proposed settlement agreement

23   terms are fair, adequate, and reasonable.

24      I think I heard a comment from the head of the project.  I

25   apologize for blanking on the name, but there was the mention

1    that they have spent hundreds of hours trying to work through

2    issues.  I don't think that's entirely, you know, dispositive

3    on the issue of whether or not it's facially adequate, but I

4    think it does speak to some issues being present in PCCEP and

5    the structure that is involved there.

6        There's a comment that some folks might have left PCCEP,

7    speaking to the attrition rate, because it is -- if you have a

8    perceived mental illness or you do suffer or have personal

9    experience in mental illness, it's hard being in public.  That

10   goes directly to one of the recommendations that we provided in

11   our briefing, that if we indeed -- indeed, the City is mandated

12   to have folks in the -- per the settlement agreement, to

13   leverage the towns and to have a membership that will come from

14   a reasonable proportion of the community.  I believe that's

15   paragraph 143 of the proposed settlement agreement.  We need to

16   have at least two folks on PCCEP who have lived experience with

17   mental illness, and those people need to be supported, and

18   those people need to have structure in place that will support

19   them.  And that is not apparent from the proposed settlement

20   agreement, either on its face or in its practice.

21       I think it's somewhat telling that the DOJ wants to

22   criticize the evidentiary basis -- Your Honor has already

23   stated that he's not taking evidence in this hearing.  But

24   without the community testifying in this circumstance, you

25   know, what the DOJ is then telling you is that only their

1  authority is meant to be trusted or assumed by the Court as

2  what -- as is the basis for you to make a decision today

3  regarding the conditional acceptance of the proposed

4  amendments.

5      We're happy to have an evidentiary hearing and, indeed, I

6  think we suggested just as much for the terms regarding

7  community mental health.  Perhaps that would be of value;

8  although, DOJ obviously has mentioned that they believe that

9  any kind of additional resources spent on this case would

10  likely not be warranted or needed by the plaintiff.

11      So just looking at the totality of the settlement

12  agreement itself, parts of which, yes, have been approved by

13  the Court and has been deemed fair, reasonable, and adequate --

14  but I think in its totality, it all speaks to whether the PCCEP

15  amendment itself is fair, reasonable, and adequate.  I think

16  just at the very outset of the settlement agreement there's

17  metrics that talk about trust from the community and -- I just

18  had it in front of me.  Well, trust in the community.  And I

19  think we have heard a significant amount of testimony today

20  regarding that crucial, crucial aspect of this.

21      And, right, and the last -- the last metric is that the

22  improvements should be sustainable.  I think that's important

23  because, as we have heard much about -- we've heard the phrase

24  a durable remedy -- much about that today -- this is a durable

25  problem.  And I'm not convinced and I don't think that many of

1  the folks who testified today are convinced that PCCEP is a

2  durable remedy.  And I suppose "remedy" even presumes that

3  there's something substantive there and not merely the process

4  or the structure that is being presented as the sole criterion

5  that is being judged on today.

6      I agree that this isn't -- that we shouldn't bifurcate

7  substance and process.  It exists somewhat on a spectrum.  And

8  because of that, we do need to look to outcomes to adjudge

9  whether or not the process is, indeed, fair and adequate.

10      Again, I think the critiques we bring are, of course, made

11  in good faith and not to disrupt the needed change that needs

12  to come to this city and was promoted by the DOJ coming in and

13  bringing this lawsuit and the advocacy from the various parties

14  to this lawsuit because, somewhat piggybacking on

15  Ms. Marshall's testimony earlier today, I, too, have sometimes

16  severe depression or anxiety.  This is a very personal issue

17  for a lot of folks in the community, in our profession.  And at

18  this point, without there having been enough trust built

19  between the parties, I, too, would fear, if things got

20  terrible, of ever calling the police in such a circumstance.

21      So for those reasons we still stand by our briefing.

22          THE COURT:  All right.  I appreciate those comments

23  and your briefing.

24      Let me ask you, Mr. Chavez and/or Ms. Albies, or both of

25  you, the following legal question:  If the United States, as

1    the plaintiff in this case, continues to be of the opinion that

2    there's substantial compliance with the settlement agreement

3    and do not make any type of enforcement motion, what options or

4    authority or alternatives would the Court have?

5            MS. ALBIES:  So I think the Court has inherent

6    authority to have ongoing status conferences and to request

7    information as from the outset of this case.  It's not an

8    evidentiary hearing.  It's information-sharing.  And I would

9    posit that the information-sharing throughout this process at

10   every hearing that we have had has been really helpful to

11   helping the parties identify issues and concerns, having

12   community engagement with the settlement agreement, with the

13   problems that have been identified.  Even for folks that come

14   and testify here, and maybe their testimony is not precisely on

15   point to the issues that are in front of the Court, they're

16   still given a forum and being listened to and heard and

17   affirmed in a certain way they don't feel in other spaces, and

18   I think that's very important for a lot of people.  And I think

19   we all learn from those experiences of hearing people being

20   able to articulate some of their concerns.

21       And I think when we invite the community to testify -- and

22   I think Your Honor does a good job of modeling how to engage in

23   respectful communications with people -- I think that there are

24   a lot of really wonderful ideas that come from the community

25   that aren't borne out of people with training or education but

1    are, nonetheless, really important and valuable and creative

2    and that that can spark really important discussions, and I

3    think this forum allows that to continue.

4        So I do think the Court has inherent authority to allow

5    these ongoing hearings, and the conditional approval is a

6    vehicle by which those hearings can continue.

7            THE COURT:  I will tell you that this concept of

8    inherent authority of the Court is an ill-defined and probably

9    overstated authority, but it is definitely ill-defined in the

10   case law.

11       All right.  I broach that as a hypothetical.  Let me tell

12   you what I'm tentatively thinking now and give you all an

13   opportunity to comment on it briefly, and then I think we need

14   to close for the day.

15       I still am not prepared to find that the stipulated

16   amendment creating the PCCEP is facially adequate.  I think

17   it's been some -- it's been very positive.  It's going in a

18   good direction; although not without some hiccups and not

19   without, frankly, some problems.  I occasionally use the

20   analogy of three steps forward, two steps back, but that's

21   still progress.  Where is the line between progress and facial

22   adequacy?  That's not that clear to me.  But given the number

23   of problems we've heard, I don't feel comfortable right now

24   concluding that it's facially adequate, nor am I prepared to

25   say that it's facially inadequate.

1        So although I know that some of the parties here won't

2    like this result, I am going to defer again ruling on the

3    proposed amendment with respect to PCCEP.  It is conditionally

4    approved, but I'm not yet ready to give it final approval.

5        I will also say that I have not heard anything at all

6    today that gives me -- that I find at all plausible that the

7    fact that I only made a conditional approval and not a final

8    approval in any way contributes to some of the problems or

9    inadequacies or the steps backward that we have heard about

10   PCCEP and nor am I convinced if I were to say I give it final

11   approval, as opposed to conditional approval, that that will

12   make all of those problems go away and solve all of the issues

13   going forward.

14       If anybody disagrees, you're welcome to file a petition

15   for an evidentiary hearing, and I'll take evidence on that, but

16   I've given several of the counsel that opportunity, at least so

17   far today, and nobody has taken me up on that.  I don't think

18   the fact that I have only given it conditional and not final

19   approval in any way contributes to the problems we have heard

20   about or interferes with its ability to move forward and be

21   even more successful.

22       I do think there's been a lot of success to the PCCEP.

23   It's not perfect, but it's going in a very good direction, I

24   think.

25       So I'm deferring ruling.  I'm not rejecting it, but I'm

1    not approving it with final approval.  I'm deferring approval.

2         I think, and this is what I really mainly want everyone's

3    input on, I don't see a benefit to convening another status

4    conference in about six months.  If you all really think that

5    there is, tell me, but I don't think that there's a whole lot

6    of benefit of doing that.  So what I would be tentatively

7    inclined to do is to schedule another status conference for

8    about 12 months from now.  As I said, I'd be looking at the end

9    of February, early March.  My calendar in those periods are

10   reasonably open, so I'll be glad to accommodate travel

11   schedules, especially people from -- with out-of-town travel

12   needs or other scheduling needs.  I'll be glad to accommodate

13   that.  I'm relatively open last portion of February, early

14   portion of March.

15        And what I would anticipate happening at that conference,

16   much like we have had today and in previous conferences, taking

17   public comments, hearing from the parties, including the amici,

18   and then the question that I would be looking for and obviously

19   we don't have the answer now because nobody can see in the

20   future -- what's that old Yogi Berra line?  Making predictions

21   is very difficult, especially about the future.  So we can't

22   predict the future.

23        But one possibility -- frankly, I can see two different

24   possible scenarios.  One possibility is when we come together

25   in about 12 months from now, the plaintiff, the United States,

1    will say to me and say in its filings that we believe that

2    substantial compliance was achieved as of January 10, 2020, and

3    we believe that there's been sustained substantial compliance

4    for a period of 12 months since then, and so the plaintiff, the

5    United States, moves to essentially terminate this proceeding.

6    That is certainly one possibility.

7         And if the government -- if the United States were to make

8    that motion and make that statement and if any of the amici --

9    I assume the City would probably not disagree with that motion.

10   If the amici disagrees with it, then I also anticipate not only

11   hearing factually and substantively why you disagree, but,

12   perhaps, even more importantly, legally, what, if anything, can

13   be done about it?  That is not an easy legal question to solve.

14        So if we go that direction, if that's the position of the

15   United States and if the amici were to disagree, I would look

16   to the parties to give me their respective positions on what,

17   if any, legal authority the Court has to deal with that.

18        Now, of course, there is a possibility that the amici will

19   agree that the position of the United States is that there's

20   been sustained substantial compliance.  I think we all agree,

21   as, frankly Dr. Haynes eloquently expressed, substantial

22   compliance does not mean perfection.  This is a process.  It is

23   envisioned and it was envisioned by the settlement agreement

24   that the City would continue to make substantial progress going

25   forward, even after this lawsuit is over, working with people

1   like AMAC, with MHS, with the PCCEP, because that, as I

2   understand the proposed amendment, is planned to go beyond the

3   life of the settlement agreement and the lawsuit, and so that

4   perhaps the amici may agree -- if that's the United States'

5   position a year from now -- that we have made progress.  Maybe

6   not -- it may not be perfect; that there may still be things to

7   do.  There probably will be.  But we're ready to move onto the

8   next phase of the relationships, and that is the phase without

9   the continued oversight of the United States and without the

10  continued involvement of the federal court.

11        That may be the amici's position a year from now.

12        That's another possibility.

13        Still another possibility is that the United States will

14  take the position that, no, there has not been sustained

15  substantial compliance.  I assume the City may or probably

16  would disagree, but they may not, and then we talk about, well,

17  now what do we do, and what happens next under the framework of

18  the settlement agreement?

19        There may be a fourth possibility that I can't think of

20  right now, but those are the three possibilities that come to

21  mind.  And I believe none of us can predict which one of those

22  three possibilities, or some other possibility, will be present

23  before us in 12 months, but we'll find out what things look

24  like in 12 months.  But I don't see a benefit, unless somebody

25  wants to try to talk me out of it, of meeting between now and

then.  So what I think we should do is schedule our next

hearing approximately 12 months from now.

     Does anybody want to be heard on anything I just said or

anything else?

     Ms. Albies?

          MS. ALBIES:  Your Honor, Dr. Bethel had a suggestion

that I think is a good one, that the parties would agree to

meet at least every two months and work on the definition of

success for PCCEP and provide a written report to the court in

six months.  I did not confer with the DOJ or the City on this.

I'm just floating it now.  But I think, given the testimony we

heard, it might be a good path forward in the interim.

          THE COURT:  Well, as a friend of the Court, I will

say that I think that sounds like a great idea.  I don't

think -- I'm not ordering it.  I don't think I have the

authority to order it, but I leave it to the parties to

discuss, and whatever you send me, I will read.

     Ms. Reeve?

          MS. REEVE:  Your Honor, I think -- we would be happy

to meet.  We would be happy to talk about how the PCCEP can be

successful.  We also feel strongly that it's important that we

have legal criteria for the success of the PCCEP.  And so my

only objection, if you will, to the proposed schedule of not

getting back together again until February or March of next

year is that that does not give the City certainty as to what

1   it is substantially complying with.

2       And so, again, we would request that the Court now grant

3   final approval as to the settlement agreement amendments, and

4   we would have, then, no objection to coming back at that time

5   to discuss our substantial compliance, or lack thereof, with

6   those.  But to invest another 14 months in attempting to

7   achieve substantial compliance with goalposts that may move is

8   a difficult and, we would submit, untenable legal position to

9   put, certainly, the City -- that's the party trying to be in

10  and trying to maintain substantial compliance -- in.

11          THE COURT:  As I said, because I believe that my

12  giving the PCCEP structure only conditional approval and not

13  final approval has created absolutely no problem at all for the

14  PCCEP.  It doesn't contribute to the problems that have been

15  identified.  It doesn't inhibit it from moving forward in a

16  positive direction.  I'm rejecting your motion.

17      That said, if you want to schedule an evidentiary hearing

18  where evidence will be presented, let me know whether the

19  parties want discovery, where there will be cross-examination,

20  I will be glad to revisit that question, and then just contact

21  my courtroom deputy when you want to schedule a hearing.

22          MS. REEVE:  I'm sorry, Your Honor.  I may not be

23  articulating clearly my concern.  My concern is not that the

24  lack of certainty is impeding the functioning of the City's

25  ability to comply with the conditionally approved amendments.

1  My concern is that we may invest another 14 months in complying

2  with conditionally approved amendments that may then -- I

3  assume the only reason they're only conditionally approved is

4  that Your Honor is essentially reserving the right to find

5  they're not fair, adequate, and reasonable.  And if

6  Your Honor -- if that is the outcome, we would like to know

7  that so that we can work towards something that would be fair,

8  adequate, and reasonable.

9      So that's my concern, is that it's another 14 months

10 without knowing that what we are substantially complying with

11 is, in fact, the legal obligation that we have.

12          THE COURT:  That's a fair question, and I would say

13 this:  Confer with each other.  If the City; the intervenor,

14 Portland Police Association; the amicus curie, Mental Health

15 Alliance; the amicus curie, AMAC; and the United States -- if

16 those five parties all agree on either how to define what are

17 the requirements or the metrics to find the proposed amendment,

18 fair, adequate, and reasonable, I really cannot imagine

19 disagreeing with the five of you.

20     If you all agree that -- even if you can't agree on those

21 metrics and the definition, if you all agree that sustained

22 substantial compliance has been achieved, it would be my

23 expectation and anticipation that I would then give final

24 approval both to the amendment and to any motion to terminate

25 the litigation if you all agree.

1        That is scenario one.

2        Under scenario two, if there's disagreement, then whoever

3    disagrees -- I mean, assuming that the United States makes the

4    motion that there's been sustained substantial compliance and

5    that the -- if the amendments should be given final approval

6    and the litigation dismissed, I think the burden will then be

7    on anybody objecting to that to give me the legal basis for

8    what, if anything, I should do and how I should do it and what

9    would be the right answer.  And whether or not there's facts in

10   dispute, we, then, would probably have to schedule an

11   evidentiary hearing.  If there's no facts in dispute but just

12   legal consequences, that would probably be handled summary

13   judgment style.  But that's as good as I can get it right now.

14       So you raise a fair question, but raise it with the amici,

15   with the intervenor, and with the United States, to see if you

16   can all agree on what sustained substantial compliance,

17   including with the proposed amendments, would look like.

18       That's as good as it's going to get.

19       Anyone else wish to say anything?

20       All right.  Oh, okay.  Then any preferences for when in

21   the latter part of February, early part of March, you would

22   like to have a hearing?

23           MR. GEISSLER:  Your Honor, I'd really request, as

24   before, it not be a Monday or a Friday so the United States can

25   avoid travel.

```
 1                THE COURT:  I remembered that.  That's fine.

 2         Mary, any suggestions or requests or days or weeks to

 3    avoid?

 4                DEPUTY COURTROOM CLERK:  We can set it for the 25th

 5    of February at 9:00 a.m., which is a Thursday, if that --

 6                THE COURT:  One moment.  Will that work for you all?

 7    February 25th?  We'll call it one year to the day?

 8                MR. GEISSLER:  Yes, Your Honor.

 9                MS. REEVE:  Yes, Your Honor.  Thank you.

10                THE COURT:  Next status conference is Thursday,

11    February 25, 2021, 9:00 a.m. in this courtroom.

12         Thank you, all.  I appreciate everyone's contributions.

13                             (Hearing concluded.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1                       C E R T I F I C A T E

2

3            United States of America v. City of Portland

4                          3:12-cv-02265-SI

5                          Status Conference

6                          February 25, 2020

7

8            I certify, by signing below, that the foregoing is a

9     true and correct transcript of the record, taken by

10    stenographic means, of the proceedings in the above-entitled

11    cause.  A transcript without an original signature, conformed

12    signature, or digitally signed signature is not certified.

13

14    /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
      _____
15
      Official Court Reporter       Signature Date: 4/16/2020
16    Oregon CSR No. 98-0346         CSR Expiration Date:  9/30/2020

17

18

19

20

21

22

23

24

25