# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

# of the

# COMPLIANCE OFFICER AND COMMUNITY LIAISON

## *Quarterly Report:*

## *2019 Updates and Quarter 4 Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**October 2, 2019 to December 31, 2019**

**March 24, 2020**



# **TABLE OF CONTENTS**

**INTRODUCTION**.................................................................................................................3

**EXECUTIVE SUMMARY**......................................................................................................4

**SECTION I — Training**.....................................................................................................8

**SECTION II – Officer Accountability**.........................................................................19

**SECTION III — Community Engagement and Creation of PCCEP**.................................27

**LIST OF ABBREVIATIONS**.............................................................................................41

**LIST OF PERSONNEL**....................................................................................................43

Exhibit A
Pg. 2 of 43

# **INTRODUCTION**

This is the Compliance and Outcome Assessment Report of the Compliance Officer/Community Liaison (COCL), as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (hereafter referred to as "DOJ"), Case No. 3:12-cv-02265-SI, filed 12/17/12. In our third quarter report of 2019 we reviewed the areas of Force, Community-Based Mental Health Services, Crisis Intervention, and Employee Information Services. In this fourth quarter report we review Training, Accountability, and Community Engagement. As part of this review, we will provide an update on paragraphs in which the City/PPB achieved Substantial Compliance prior to 2019 but have yet to be revisited by the COCL in 2019.

Our third quarter report concluded that the City of Portland and the Portland Police Bureau (PPB) had achieved Substantial Compliance with all paragraphs contained in the Settlement Agreement. We are awaiting the release of DOJ's report to learn whether they agree with this assessment. In the meantime, this 2019 fourth quarter report includes an assessment of whether the City and PPB have remained in Substantial Compliance by COCL's standards for the above-named sections of the Settlement Agreement.

Drawing on the framework established in our prior reports and the Settlement Agreement (Par. 173), our analysis gives considerable attention to whether the City and PPB have been able to maintain systems of data analysis and review that facilitate self-assessment, feedback, and organizational change needed to address problematic trends. As we noted in Q3, PPB and the Independent Police Review (IPR) have been restructured to include new approaches to auditing, accountability, and training that have improved their handling of force and mental health incidents as well as the timeliness of investigations. New measurement systems have been created and introduced to provide rapid feedback and adjustments in these areas. New approaches to community engagement have also been introduced. However, these systems must be maintained and properly staffed to ensure continued compliance.

# EXECUTIVE SUMMARY

## TRAINING

An effective training system is one where PPB has the capacity to: (1) identify areas where officers require training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public. In our Q3 2019 report, we found that PPB had achieved Substantial Compliance with each of the paragraphs in the Settlement Agreement relevant to these key elements of a comprehensive training system. In the fourth quarter, COCL continued to review all relevant training documents and to observe the delivery of training to ensure that PPB has remained in compliance through December of 2019.

PPB has conducted a comprehensive training needs assessment and incorporated many of these identified needs into the latest Training Plan (Par. 79). PPB also maintained and enhanced its system of training evaluation methods (Par. 80). We reviewed the methods of evaluation (i.e. surveys, quizzes, knowledge tests, scenario assessments, and police records), observed the implementation of data collection, and reviewed tables and reports produced from these data. PPB's evaluation system has been used effectively to assess the content and style of instruction, as well as its impact on officers in the classroom, in role play scenarios, and on the streets. This includes a system of feedback loops to instructors and Training administrators where evaluation data are used to improve future training. Also, PPB prepares a full annual report that is available to the public.

PPB's data-driven systems used to assess training needs and evaluate training delivery are vitally important to the continued improvement of PPB's training, but they require a significant commitment of personnel with strong research skills. We will continue to review whether this unit has sufficient personnel needed to perform these critical functions.

PPB's relatively new Learning Management System (LMS) is able to record electronically and track training PPB records in a "*central, commonly-accessible, and organized file system*" (Par. 81) that is easily reviewed by supervisors for performance evaluations and allows the Training Division to identify officers who have yet to receive specific training. The previously noted difficulty of populating LMS with the "historic data load" (i.e. a sizeable body of past training records) has been resolved.

As we have reported in the past, the quality of PPB training for recruits, officers, supervisors and command staff has steadily improved over the past five years (Par. 84). In 2019, we conducted a thorough assessment of PPB's Supervisor In-Service training for all sworn supervisors (Spring 2019) and In-Service training for all sworn members (Fall 2019). On the

whole, these trainings were professionally planned and executed. One class on Control Tactics was introduced without the support of a corresponding policy (i.e. the use of Knifes) but the problem was immediately corrected. Given the level of performance in all other In-service classes, we conclude that PPB has maintained Substantial Compliance in the delivery of training.

PPB continues to be responsive to other key requirements in the Training Section. For example, per Par. 86, the Inspector's office continues to gather force data, conduct analyses looking for patterns and trends, and present the findings to the Chief, the PPB Training Division, and the Training Advisory Council (TAC). Although there have been some communication issues between PPB and TAC, this problem has been addressed.

In summary, PPB continues to maintain a high level of In-Service Training for sworn personnel and supervisors. Importantly, PPB has maintained systems of review and evaluation that allow for the immediate detection and resolution of problems. Thus, COCL continues to find PPB in Substantial Compliance with the requirements of Section IV of the Settlement Agreement on Training. To maintain this status, in addition to the general requirements articulated here, we expect that PPB will continue its commitment to provide skill exercises in communication, procedural justice, and de-escalation, as these skills apply to the vast majority of PPB encounters with the public.

## OFFICER ACCOUNTABILITY

As part of an overall effective system of accountability, PPB has continued to implement the requirements of Section VIII of the Settlement Agreement (Officer Accountability). In the fourth quarter of 2019, we performed case reviews, interviews with IA and IPR personnel, and observations to evaluate paragraphs previously found to have been in substantial compliance prior to 2019. For all paragraphs we evaluated, we find ongoing evidence of sustained Substantial Compliance with the requirements of the Settlement Agreement.

Both PPB and IPR continue to conduct administrative investigations concurrently with criminal investigations with a high rate of regularity. Additionally, when cases go over the 180-day timeline, PPB continues to provide a written review of the IA process. These reviews are accompanied by remedies and recommendations for reducing delays in the future and are provided to the Chief's Office.

We also see continued Substantial Compliance for paragraphs related to officer-involved shootings (Pars. 124 through 127). The City and PPB continue to enforce policies and SOPs related to compelled statements and maintaining a clear wall of separation between administrative and criminal investigations. Additionally, after each of the OIS events we reviewed, PPB consistently issued Communication Restriction Orders for all involved and

witness members within hours of the event, conducted witness member walk-through/debriefings, and requested involved officers provide an on-scene walk-through.

Administrative investigations are also performed in accordance with the Settlement Agreement. For instance, IPR continues to facilitate community members' ability to file complaints against officers. Our evaluation of a sample of administrative closures, supervisor investigations, and full administrative investigations demonstrate that findings/dispositions are reasonable and supported by a preponderance of the evidence. Additionally, PRB and CRC operate within the requirements of their respective paragraphs. Finally, while we identified inconsistency in IPR's definition of the terms "clear and convincing evidence" and "no basis in fact" as related to Par. 129, IPR has created a durable remedy to this issue by memorializing satisfactory definitions in their operating procedures.

An overall effective system of accountability requires ongoing monitoring, evaluation, and self-correction when appropriate. Through each stage of the accountability system, we have seen instances of PPB/IPR conducting each of these steps to ensure the system operates in an efficient and effective fashion. We continue to find Substantial Compliance related to each of the paragraphs found within Section VIII.

## COMMUNITY ENGAGEMENT AND CREATION OF PCCEP

PPB is expected to develop systems of community engagement that increase the probability of sustained success, including systems of measurement that serve to document and monitor the quantity and quality of its engagement activities.

The creation of the PCCEP itself was a major step toward the establishment of a system of community engagement that should be sustainable over time (Par. 141, 142). COCL found Substantial Compliance with Par. 141 in the Q4 2018 report, but did not find full Substantial Compliance with Par. 142 until our last report, in Q3 2019. A year ago, COCL concluded that while PCCEP had the authority to perform the functions listed in Par. 142, it was important to take the time to observe progress toward soliciting public input and informing recommendations that seek to improve PPB-community relations.

In Q3 2019, COCL found that the PCCEP is functioning as a legitimate body for community engagement, engaging effectively with the community and PPB, and has the authority to hold PPB accountable for tactics and strategies linked to public trust. COCL has continued to observe PCCEP throughout Q4 of 2019, and Substantial Compliance with both Pars. 141 and 142 have been maintained.

COCL found Substantial Compliance with Par. 143—regarding PCCEP membership coming from a reasonably broad spectrum of the community—in Q4 2018, though noted a gender imbalance

on PCCEP. While that imbalance persists, on other measures PCCEP members come from a reasonably broad spectrum of the community, and therefore, the City has maintained Substantial Compliance with the terms of Par. 143.

In Q2 of 2019 COCL found Substantial Compliance with Par. 151, regarding PCCEP meeting as needed to accomplish its objectives. This Substantial Compliance has continued, with PCCEP and COCL jointly hosting quarterly Town Halls to review and discuss draft COCL reports, PCCEP regularly hosting community listening sessions and presentations on topics of community interest, and the City Attorney continuing to be available to advise PCCEP as necessary to ensure compliance with public meetings law.

The City has also maintained Substantial Compliance with Par. 152 by continuing to train incoming PCCEP members on the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

Substantial Compliance with Par. 144—related to the City's administrative support of PCCEP— was achieved in Q3 2019, following the appointment of a new PCCEP Project Director. PCCEP members have confirmed and COCL has observed that the City has continued to provide administrative support so that PCCEP can perform its duties and responsibilities, maintaining Substantial Compliance with this paragraph.

Other systems of community outreach and engagement were expected from PPB's planning, including: a 5-year strategic planning process (Par. 145) and community-wide survey (Par. 146) that led to PPB's Community Engagement Plan (Par. 146). In addition, PPB continued to collect precinct-level demographic data for planning purposes (Par. 147). These actions were successfully completed in 2019.

PPB is also involved in a series of traditional and innovative measures of police contact with the public. These include existing records/reports on calls for service, crime incidents, police stops, searches, arrests, citations, and use of force, as well as PPB's planned contact survey to measure the quality of police-community interactions and public trust.

PPB's stops dataset is designed to address community concerns about discriminatory policing (Par. 148). PPB's *Stops Data Collection* report continues to provide a rigorous analysis of possible disparities in police decision making about stops, searches, contraband hits, and stop outcomes, thus maintaining Substantial Compliance with Par. 148. In this Q4 report, we provide a brief summary of PPB's findings. There is considerable good news to report, including the downward trend in the number of driver and pedestrian stops and searches, the improvement in contraband hits, and the absence of racial/ethnic differences in stops. However, the analyses also uncovered some disparities in searches for Black/African American drivers and pedestrians that deserve more attention.

# TRAINING

In the fourth quarter of 2019 the COCL team continued to review and critique training documents (including Training Needs Assessment reports, Training Plans, lesson plans, PowerPoint presentations, training exercises, scenarios and evaluation tools) to assess whether officers are being properly prepared to protect the constitutional rights of individuals who have or are perceived to have mental illness (Par. 78) and other members of the public.

Our evaluation of PPB's compliance with the Training requirements of the Settlement Agreement is based on whether PPB has continued to maintain systems of police training that "…increases the knowledge, skills and abilities necessary for effective and successful delivery of services to persons in mental health crisis" and that contributes to the "proper management of the use of force to meet constitutional standards" (Par. 173). As we noted in our 2018 analysis of Training, an effective training system is one where PPB has the capacity to: (1) identify areas where officers require training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public. Here we summarize the current status of training for each of these areas. Settlement Agreement Paragraphs that were not reviewed in 2019 are listed here, while others are summarized as needed.

Identifying Training Needs

*79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy*

We have interviewed members of the Training Division regarding the background work specified in Par. 79, reviewed relevant correspondence, and examined the products of this work, including the 2018 and 2019 Training Needs Assessments, as well as the 2019 Training Plan and Training Evaluation Reports. Based on our review and analysis, we find that PPB has successfully identified the training needs of its officers using a comprehensive process and these needs have, to a large extent, been incorporated into the Training Plan.

To examine problematic trends in force, the Training Division has met with the Force Inspector and Force Audit team. They have reviewed force reports and force audit reports and have met with Internal Affairs to discuss force issues. The Training Division has also reviewed officer injury statistics provided by the PPB's Fire and Police Disability liaisons. Precinct and Unit managers, PPB's policy team, and lead training instructors also provided input on future training needs and priorities. Community input was obtained from the Training Advisory Council. Needs related to recent court and legislative decisions were obtained from the City Attorney's Office and the Oregon State Bar. Literature on latest trends in law enforcement and best practices in training was also reviewed. Also, the Training Division has met with the Behavioral Health Unit (BHU) staff several times in 2019 to gain more insight into PPB's response to perceived mental health crises. Given that PCCEP is now actively engaged with the community, the Training Division might want to obtain their input regarding other community perspectives (e.g. youth). Also, misconduct complaints would be another good source of community information for training needs. Overall, COCL concludes that the needs assessment continues to be comprehensive.

COCL has observed that the Needs Assessment, Training Evaluation data, and the Training Plan have become more integrated over time. The Training Division is able to develop a more sophisticated approach to delivering training throw various modalities (in-class, online, at roll-calls, within units) depending on the training needs. For example, they are able to move some refresher classes to the online format (via LMS) to free up In-Service class time for topics that require more immediate attention within an interactive, adult-education setting.

COCL has one suggestion regarding the stated "Purpose of In-Service Training" as found in the PPB's Needs Assessment reports. The focus is on how "Law enforcement on patrol face a particular challenge pertaining to skill perishability as they are forced to make split-second decisions in circumstances that are tense, uncertain, and rapidly evolving." While these events do happen and deserve considerable training time, they represent a very small percentage of the encounters that officers face on a daily basis. Hence, this "Purpose" statement does not give sufficient attention to the importance of training on perishable interpersonal skills that are needed for de-escalation and for respectful treatment people during challenging circumstances – a much more common occurrence that carries its own set of risks for safety and police legitimacy.


Develop Valid and Useful System of Training Evaluation

*80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These*

*evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.*

The COCL team continues to review the content and methods of PPB's training evaluations (including surveys, quizzes, knowledge tests, scenario assessments, and police records), observe the implementation of data collection, and review tables and reports produced from these data. In our previous reports, we have documented the progression of PPB's training evaluation methods and our feedback to them over the past 5 years. The improvements required by paragraph 80 have been dramatic, standardized, and have remained in place during 2019.

The Training Division continues to use a variety of methods to assess the overall quality of training, including: in-class quizzes to engage the students and test their understanding of the material; anonymous class evaluation surveys to assess the quality and content of instruction; knowledge tests to grade students' learning in the classroom; and scenario evaluations to measure officers' proficiency and skill level during role playing as well as to give instructors a framework for conducting post-scenario debriefings. The scenario evaluations were also recently modified to include communication skills/procedural justice as a new component of future training. The procedural justice scenario implemented in the Fall 2019 In-Service is a good example of the utility of the evaluation system. For this scenario, officers' interactions with a driver (role player) during a traffic stop were evaluated on a 3-point scale for each of four procedural justice dimensions, allowing the Training Division observer to provide standardized feedback to officers about their performance. During our observation of these scenarios, we found that our assessments of the officers' performance were largely similar to the feedback given by the observer, thereby validating the evaluation form as well as demonstrating the observer's understanding of procedural justice concepts. PPB also has introduced introduced evaluations when scenarios involve teams of officers rather than single-officer scenarios (for instance, Active Shooter scenario). COCL has long maintained that this type of realistic practice and immediate feedback (for both individuals and small groups) is essential for retention of classroom material.

In 2018 PPB created and field tested a new system of Feedback Loops where evaluation data are used to improve future training. PPB's system included Level One feedback loops (i.e. immediate feedback to Training administrators and instructors so that corrective action can be taken if necessary before additional officers are trained) and Level Two feedback (i.e. feedback at the conclusion of the training sessions, when the final data can be compiled and fully analyzed for future training implications). The Training analyst produces both informal and formal feedback for general In-Service and Supervisory In-Service. Informal feedback can

include emails and meetings to review preliminary results shortly after the start of instruction. This is particularly important for new instructors and new class offerings. The In-Service training Lieutenant and/or Sergeant will follow up with the lead instructors, administrative staff, and Curriculum Development Unit to provide additional feedback and discuss areas where improvement is needed. More formal feedback includes sizable data-based reports available to the public, such as the *2019 In-Service Supervisory Training* report (October 2019). This report, for example, includes the students' (supervisors') evaluation of the instructor and class content for classes on Special Emergency Response Team (SERT) vehicle ballistics, Active Shooter Incident Management, Crowd Management, and Procedural Justice/Leadership. Feedback loops are also institutionalized for general In-Service, Enhanced Crisis Intervention Training, and Advanced Academy (recruit training). Comprehensive reports are done annually for general In-Service and Supervisory In-Service and periodically for other types of training. COCL has examined PPB's feedback systems and training evaluation reports in 2019 and found them to be an effective tool for improving instruction and informing both the PPB and the public about PPB's training program.

Paragraph 80 also requires that the evaluation system measure the extent to which "*graduates are applying the knowledge and skills acquired in training to their jobs.*" To some extent, the success of street-level tactics by PPB officers is captured through PPB's audit of force incidents. While these audits are important, pursuing additional measures of on-the-job performance will provide supplemental insight into how training is being applied to real-life officer interactions. For instance, in 2019 PPB worked with the National Police Foundation to introduce a contact survey that will capture officers' communication skills during contacts with the public. COCL has previously recommended such a contact survey because it will measure the level of procedural justice exhibited by PPB officers, including their level of respectful, fair, and compassionate communication with members of the Portland community. Research has shown that these interpersonal skills build public trust in law enforcement, increase cooperation with police officers and reduce the need to use force. Contact surveys can also be used to measure how PPB officers are interacting with persons experiencing mental health crises and other subgroups within the Portland community.

In sum, PPB has created and implemented a comprehensive system of training evaluation that is capable of assessing the content and style of instruction, as well as its impact on officers in the classroom, in role play scenarios, and on the streets of Portland. PPB has effectively utilized surveys, tests, class observations to provide timely feedback to lead instructors and administrators and to provide guidance for future training plans. These data systems, as well as data systems on use of force and contact surveys, continue to function effectively. The internal needs assessment and training evaluation systems constitute a massive effort, run largely by

one or two individuals. Additional staff for this work should be considered by PPB management to ensure that all levels of training receive this type of evaluation in a timely manner.

<u>Documenting Training Delivered and Received</u>

We have reported previously that PPB has introduced and is utilizing a Learning Management System (LMS) to electronically record and track training PPB records in a "*central, commonly-accessible, and organized file system*" that is easily reviewed by supervisors (par. 81). This system has been maintained and expanded since its introduction. In 2019, the Training staff added records on: sworn member In-Service, professional staff In-Service, Range Qualifications, Legal Updates, Force Inspector Updates, training videos, and Tips & Techniques. With LMS, the Training Division has been able to notify RU Managers regarding officers who need specific training to maintain their State certification.

In prior reports, COCL has noted the difficulty of adding the "historic data load" (a sizeable body of past training records) to LMS. This large task has been completed. Also, supervisors can use LMS to check on their officers' training records and run reports as needed. Supervisors are required to perform this check as part of the performance evaluation reports they complete for each officer.

*82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.*

On July 17, 2019 PPB's Semi-Annual Training Report was delivered to the Deputy Chief and Assistant Chief who oversee Operations, thus showing continued Substantial Compliance with par. 82. The Training Report continues to include training attendance records, and COCL continues to recommend that this report be expanded to include a more complete review of the work done by the Training Division.

*83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgement has been rendered against the City in the last five (5) years based on the officer's use of force.*

In 2019 PPB selected several sworn personnel to serve as instructors, including for classes on 40mm Less Lethal Basic Operator, AR-15 Instructor, and Patrol Procedures. In each case, PPB

has reviewed the work histories of applicants to ensure that they meet the hiring restrictions established in par. 83 and in SOP 1-19. These Work History Review Sheets have also been made available to COCL for review. To date, we have not received any cases where a trainer is involved in a civil judgment within the last five years based on their use of force and PPB has elected to retain the instructor and explain why the civil judgment is not a disqualifying factor. Thus, PPB continues to be in Substantial Compliance with Par. 83.

<u>Deliver Appropriate and High-Quality Training</u>

*84. (<u>COCL Summary</u>) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. It begins by stating that "All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled." The subsections of Par. 84 relate to the types of training required for patrol officers, including increasing scenarios for use of force events, de-escalation techniques, procuring medical care, proactive problem solving, civil or criminal liability, and positive communication skills without derogatory language. Particular attention is given to police interactions with individuals who have, or are perceived to have, mental illness. The subsections also refer to supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions.*

The quality of training for recruits, officers, supervisors and command staff has dramatically improved over the past five years as a result of the Settlement Agreement and other factors. COCL has observed and evaluated these training enhancements in our 2018 and 2019 reports (see Par. 84 of those reports) and therefore, we will not repeat the details here. During 2019, two major trainings were delivered by PPB and observed by COCL: Supervisor In-Service training for all sworn supervisors (Spring 2019) and In-Service training for all sworn members (Fall 2019). For each of these trainings, we conducted an extensive review of PPB's documents prior to them implementing the training, including a review of curricula and lesson plans; in-person observations of training for both content and delivery; interviews with key personnel in the Training Division and elsewhere; and a review of PPB's training evaluation measures and methods.

For the Supervisor training, PPB has continued to integrate policy and procedure changes. Importantly, the Training Division has expanded supervisory training to include classes on internal Procedural Justice, Legitimacy and Leadership.  In the spring of 2019, this one-day class included good input from participants on how to build a leadership curriculum and the need for procedural justice inside the organization. In the fall, a senior administrator spoke more generally about issues of trust and working together to achieve organizational goals.

The Fall In-Service training for officers lasted 3 days. Active Threat Response training was the main focal point, including classroom lectures on Day 1 regarding new ways of understanding and responding to such threats, and skills training on Day 2 for team tasks such as breeching locked doors, room entry, transition from one area of the building to another, and force-on-force encounters. This training was well planned and executed. Day 1 classroom training also included: Conducted Electronic Weapons (Taser), Legal Updates (case law on stop and frisk and confessions/interrogations), Crisis Intervention, Leadership, and Officer Wellness. Day 2 skills training included: Firearms, Conducted Electronic Weapons, Police Vehicle Operations, Control Tactics and Scenarios; Day 3 was devoted to Active Shooters.

In general, these classes were well executed. Directly responsive to the Settlement Agreement, the Sergeants from the Behavioral Health Unit (BHU) did a very good job of reviewing methods for responding to calls involving persons in mental health crisis in order to maximize the likelihood of a safe and effective outcome. The instructors reviewed directive 850.20 as well as other topics, including: the criteria for dispatching ECIT officers, ways to avoid the escalation of tension, de-escalation techniques (both verbal and nonverbal), disengagement planning, referrals to BHU, report writing, and other subjects.

The fall In-Service Training also included a realistic scenario that allowed officers to practice their procedural justice and communications skills during a traffic stop. As noted in our last report, this training was well designed and executed. Importantly, each officer was observed, evaluated on a 3-point scale for each of the four pillars of procedural justice (voice, neutrality, respect, and trustworthiness), and given feedback by the instructor, who asked officers to describe when and how they demonstrated their procedural justice skills.

For future training, some areas could be strengthened, but are not required by the Settlement Agreement. Officer Wellness training is very important in today's stressful police environment (and can affect how police officers interact with members of the community), so we encourage PPB to consider ways to enhance this component of the In-Service Training for all sworn officers. The Leadership training in the Fall sought to promote a collaborative, respectful and trusting internal police culture, but this is a difficult task requiring multiple strategies with officer input and engagement at different levels of the organization. These topics deserve more time on the training agenda (Internal procedural justice, for example, could be a separate class that helps achieve this leadership objective).

<u>Problematic Training in Control Tactics</u>

Finally, the Control Tactics class involved hands-on training in defending oneself against a knife and how to use a knife in a deadly force encounter.  However, PPB introduced this training without having a corresponding policy to guide officers as to when knives would be an

authorized force option, what kinds of knives officers were authorized to carry, and what constitutes proficiency. Paragraph 84 of the Settlement Agreement states that "All training that PPB provides shall conform to PPB's current policies at the time of training."
However, the Control Tactics training did not have a corresponding policy that addressed the use of knives as a weapon of force. Typically, knives are allowed as a utility tool but not included as part of an officer's suite of force tools.

Upon observing the delivery of the training, both COCL and DOJ alerted PPB to this concern and PPB immediately halted delivery of the training in order to take corrective action (most officers had yet to receive the training). After stopping the training, the PPB administration clarified its force policy and SOP as they relate to knives, including what types of knives officers are allowed to carry (i.e. folding knife) and where they can be carried (i.e. not on the outer vest carrier). PPB will issue knives to achieve uniformity, but they cannot be used as a deadly force weapon, unless the officer is facing a life-or-death situation with no other options (i.e. a force of last resort). Otherwise, knives can only be used as a utility tool (e.g. a tool for cutting a seatbelt). We have reviewed the new force policy and find it to be responsive to our initial concerns.

PPB has also taken steps to remediate the prior training received by officers. We have received and reviewed lesson plans and training materials for the 2020 in-service that clarifies current PPB policy and corrects the prior miscommunication that occurred during the fall In-service training.  During the 2020 Control Tactics class, PPB officers will <u>not</u> be trained on how to use knifes, but rather on the restrictions placed on carrying knives, how to disarm a suspect welding a knife, and what objectively reasonable force may be used in these situations.  Finally, PPB has taken additional steps to ensure that such errors do not occur in the future, including the requirement that PPB's Policy Team review training lesson plans prior to implementation. This type of oversight is essential.

PPB's remedial actions have resolved our concern and we therefore find that PPB has maintained Substantial Compliance in the delivery of training in general as required by Paragraph 84.


<u>Audit</u> <u>the Training Program</u>

*85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief*

15

*of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.*

PPB's Training Audit Reports have been carefully conducted and, after feedback from COCL, have been fully responsive to the seven audit criteria delineated in Par. 85. COCL's concerns in 2018 were later addressed. Specifically, the Follow-up Audit Report provided a complete summary on the status of LMS implementation, evaluated the adequacy of the 2018 Needs Assessment in relation to the 2019 Training Plan and the Strategic Training Plan, and provided a general description of the process used by the Curriculum Development Unit to evaluate the effectiveness of training and evaluation tools. Hence, in our 2019 Q1 report we were able to assign Substantial Compliance for Par. 85.

<u>Analysis and Reporting of Force Data</u>

*86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.*

The Inspector's office continues to gather force data, conduct analyses looking for patterns and trends, and present the findings to the Chief, the PPB Training Division, and the Training Advisory Council (TAC). For example, based on an analysis of Force reports and After Action reports, the Inspector recently identifies four cases for review by the Training Division. The issues included: (1) making sure that PPB's User Agreement with Taser is fully consistent with PPB's CEW Policy; (2) specifying how and when the Hobble restraint can be used to ensure effective and reasonable applications; and (3) determining how officers can prevent subjects from receiving self-inflicted head injuries by issuing padded helmets for supervisory vehicles (and then training supervisors in their deployment). These identified problems have resulted in a healthy dialogue between the Inspector, the Policy Team, and the Training Division.

After observing meetings of the Training Advisory Council (TAC) and reviewing meeting transcripts, we find that the Training Division and the TAC also have a good working relationship and TAC has found the Needs Assessment and Training Plans informative. Their joint work on emotional intelligence training is a good example.

The Inspector's team and the Office of the Inspector General (OIG) have made regular presentations to the TAC in 2019. The Inspector's team presented the 2018 4th Quarter Force Report to the TAC on March 13, 2019. The 2019 1st Quarter Force Report was presented on July 10th. In addition, analysts from the OAG's office presented the Training Division Audits from 2017 and 2019 on September 11th, at the request of TAC.

In prior reports, we have noted that TAC has been slow to approve and submit recommendations for training to the Chief of Police, holding them until the end of the year for a one-time submission (although TAC was providing informal feedback to the Training Division along the way). However, in 2019, the reverse was true. Under new leadership, TAC has submitted recommendations when they emerge, but the Chief's office has been slow to respond. (Apparently, miscommunication between the Training Division and the Chief's Office contributed to this delay). When made aware of this problem, the Chief took immediate action and responded to TAC's recommendations. To avoid delays in the future, the TAC is considering an addendum to their by-laws that creates the expectation that PPB will provide feedback to TAC no later than 60 days after recommendations are received.

TAC has requested that PPB include demographic information in its analysis of force incidents to allow for an examination of possible disparities, but PPB has rejected this recommendation. PPB has argued that Census data are not the best metrics for establishing benchmarks, as described in the methods section of their traffic stops data report, but this will require additional discussion with the TAC.

Community representation at TAC meetings and on the TAC itself is critical. Attendance at meetings has been low, but the TAC members represent diverse perspectives from the community.

Overall, we believe that PPB's Training Division and TAC, despite some miscommunication over recommendations, continue to work together and exhibit a two-way flow of information. Hence, we find that they have maintained Substantial Compliance with the requirements of Par. 86. However, we recommend that PPB: (1) remedy any problems with internal communication as it relates to the TAC; and (2) continue the dialogue with TAC over the best way to present demographic information relevant to use of force.

*87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.*

17

We continue to find that the Training Advisory Council meetings are open to the public and no meetings have been closed based on the confidentiality/public safety exemptions allowed under Par. 87. Furthermore, prior to the TAC meetings, PPB routinely sends out reminder emails with the meeting agenda to the public email distribution list. Also, transcripts from past meetings are posted on the PPB Website for public consumption. Thus, we find that PPB and TAC have maintained Substantial Compliance with the requirements of Par. 87.

Summary of PPB's Training System

PPB continues to maintain a high level of In-Service Training for sworn personnel and supervisors. Importantly, PPB has maintained systems of review and evaluation that allow for the immediate detection and resolution of problems. Thus, COCL continues to find PPB in Substantial Compliance with the requirements of Section IV of the Settlement Agreement on Training. To maintain this status, in addition to the general requirements articulated here, we expect that PPB will continue its commitment to provide skill exercises in communication, procedural justice, and de-escalation, as these skills apply to the vast majority of PPB encounters with the public, including responses to persons experiencing a mental health crisis, persons who are intoxicated, angry, or scared, persons who are houseless, and many others.

The key to maintaining compliance in Training is PPB's ability to sustain the systems of review and evaluation that have been created. These systems include the Training Needs Assessment (including force audits and analysis of force trends), the Learning Management System to document training completions and deficiencies, and the systematic evaluation of training processes and outcomes using knowledge tests, surveys, scenario scoring, and contact surveys with community members -- all supported by periodic audits of these systems by PPB's Inspector General. We have reviewed these Training support systems in 2019 and find them to be legitimate and valid methods of self-monitoring that is indicative of a true learning organization. In other words, these systems have built-in feedback loops that allow PPB to make small or large adjustments in policy and training that are responsive to emergent trends and issues.

## OFFICER ACCOUNTABILITY

*122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.*

Since our last report, PPB has continued to conduct administrative investigations concurrently with criminal investigations. At times, the criminal nature of certain allegations has not been immediately known, thereby causing the criminal investigation to be opened later. There have also been a few rare instances wherein there has been a communication breakdown between the Detectives Division, IA, and/or IPR – however, in the 42 instances where there has been a concurrent investigation, communication breakdowns have only been responsible for delays in two such occurrences. Where a criminal allegation is known from the onset of the administrative investigation, both investigations are conducted concurrently with a high rate of regularity. As such, we continue to find that PPB and the City have substantially complied with the requirements of Par. 122. However, where communication breakdowns allow for an improvement in process, PPB and IPR should make such improvements.


*123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of delays and implement an action plan for reducing them.*

PPB continues to provide a written review of the IA process when a case goes over the 180-day timeline. The review adheres to Par. 123 by "identify[ing] the source of delays and implement[ing] an action plan for reducing" such delays. In addition to COCL and DOJ receiving a printout of each case's reasons for going over the timeline, the Chief of Police also receives a summary report for each case and the reasons for going over the timeline. This summary report also includes remedies and recommendations. Because this review process has been consistently implemented and because we have seen overall reductions in case timelines, we continue to find that PPB has substantially complied with the requirements of Par. 123.


*124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967). The City will submit the revised protocol for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.*

The City and PPB continue to enforce Directive 333.00 (Criminal Investigations of Police Bureau Employees) as well as SOP #7 (Deadly Force and In-Custody Death Investigations) and SOP #6 (Concurrent Administrative/Criminal Investigations – previously SOP #30). Combined, the Directive and SOPs provide protocols related to maintaining a clear wall of separation between administrative and criminal investigations and allow for compelled statements by officers after Officer Involved Shooting and In-Custody Death events while not jeopardizing the prosecutorial abilities of the District Attorney. Additionally, both SOP's were reviewed/updated in August of 2019. Based on the continued enactment and enforcement of the Directive and SOPs, we maintain that PPB and the City have substantially complied with the requirements of Par. 124.

*125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigations of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communication between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.*

After each OIS event in the past year, witness and involved officers have been separated and provided CROs. PPB has provided us with copies of the CROs which demonstrate that the CROs were issued to all relevant personnel within 3-4 hours of each other (accounting for time to conduct administrative interviews). However, in one occurrence, we noted that a witness member was not immediately provided a CRO because they were not immediately identified as a witness. In that instance, the member was commanding the Crisis Negotiation Team (CNT) but was not an eye-witness to the deadly force. Out of an abundance of caution, the witness member asked whether they should be provided a CRO the next day and PPB issued one. As the member and PPB corrected this immediately, this does not constitute a violation of Par. 125, although PPB may consider including this instance as an example for supervisors and on-scene investigators when identifying all persons who should be considered a witness member.

*126. PPB shall continue to require witness officers to lethal force events to given an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.*

For all OIS events in the past year, witness members submitted to on-scene briefings and interviews by the Detective Division. Additionally, at least one member provided an on-scene walkthrough at the request of detectives. As PPB has maintained this practice for all OIS events, we continue to find that they have substantially complied with the requirements of Par. 126.

*127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.*

For each lethal force/in-custody death event in the past year, the Detective Division requested involved officers to provide an on-scene walk-through and interview. In each case, the involved officer declined based on the advice of their attorney. As PPB continues to request such walk-throughs and interviews, we continue to find that they have substantially complied with the requirements of Par. 127.

*129. The City and PPB shall ensure that all allegations of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.*

In the past year, IPR had nine use of force allegations that were not forwarded on for a full and completed IA investigation resulting in findings. However, a review of those cases indicated inconsistency in IPR's definitions of the terms "clear and convincing evidence" and "no basis in fact." For instance, we have been told in the past that one example of an administrative closure in line with Par. 129 would be a situation where the alleged officer was not on-duty and was demonstrably nowhere near the incident. Additionally, we noted in our past report that IPR administratively closed some force allegations when "neither the event nor the officer could be identified."

For this report, we identified administrative closures that do not appear to meet the threshold of Par. 129. For instance, one administrative closure was made despite the officer's report largely confirming the officer/complainant interaction (though at dispute was the actual use of force). Since both the complainant and officer agreed that the interaction occurred, the question surrounding whether force was actually used should have gone forward for a full administrative complaint. Additionally, we noted multiple cases where the officer could not be identified yet IPR was able to identify an event which would (generally) match the complainant's description of the event. Because IPR was unable to identify the officer, the case was administratively closed. Cases where IPR is able to identify an event should be forwarded on for full review so that a fuller IA investigation might be able to identify the alleged officer.

The inconsistency by which cases have been administratively closed in accordance with Par. 129 is, in part, due to IPR not having a clear definition of "clear and convincing evidence" and "no basis of fact" as well as no consistent criterion for determining whether to forward a case for full investigation when IPR is unable to identify the alleged officer. As a result of our discussion with IPR, they have now memorialized satisfactory definitions and criteria into their operating procedures, thereby creating a durable remedy. During the maintenance period, we will continue to check to ensure that administrative closures on force allegations are performed in line with IPR's written operating procedures.

*130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.*

PPB continues enforcement of Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited) which had been previously reviewed by DOJ and COCL and found to be substantially compliant with Par. 130. Near the time of the Directive's enactment, PPB had also provided all officers updated training on retaliation and Human Resources Administrative Rule 2.02 as part of PPB's Spring 2018 In-Service training. As of the publication of this reported, an updated version of Directive 310.20 will be enacted in the near future.

*131. (COCL Summary): Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, and the requirement for CRC members to recuse themselves from CRC if part of the PRB hearing the case. (For details and exact language, see the Settlement Agreement).*

PPB Directive 336.00 (Police Review Board) continues to contain all requirements of Par. 131 and has recently been reviewed as part of PPB's regular review of directives. Additionally, City Code 3.20.140 was recently revised to reflect Par. 131(a)'s requirement that when a PRB hearing involves any use of force, at least one of the community member slots must be filled by a CRC member. While this has been occurring in practice, the recent revision to City Code 3.20.140 codified this requirement. We therefore conclude that the City and PPB have substantially complied with the requirements of Par. 131.

*132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional investigation within 10 business days or provide a written statement to the PRB explaining why additional time is needed.*

The PRB did not request additional investigations in the past year, although their ability to do so remains enshrined in PPB Directive 336.00 (Police Review Board). However, while the City resolved the issue related to PRB membership in 131(a), detailed above, when revising City Code 3.20.140, it did not include this criterion in those revisions. PRB members are informed of their ability to request an additional investigation at two different points during each case review (prior to reviewing a file and again at the PRB hearing itself) and we therefore maintain that the City and PPB have substantially complied based on this practice. However, we continue to suggest that the City incorporate the provision of Par. 132 into City Code 3.20.140 so that City Code and PPB policies are reflective of one another.

*133. If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall: (1) enter that civil liability finding in EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial findings creating a rebuttable presumption that the force used also violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of the evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the opening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained findings, and no new evidence from the civil trial justifies reopening the IA investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.*

PPB continues to utilize SOP #32 (Civil Liability and Tort Claims) and SOP #42 (Evaluation of Members Fitness to Participate in All Current and Prospective Specialized Units when the Use of Force Results in a Findings of Liability in a Civil Trial) to ensure compliance with Par. 133 in the event of an officer's use of force leading to a finding of liability in a civil trial. However, no such finding of liability has not occurred since September of 2014. As PPB maintains a system for ensuring the required actions are taken, we continue to find that they have substantially complied with the requirements of Par. 133.

*134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.*

The CRC membership level of Par. 134 continues to be enshrined in City Code 3.21.080 and CRC currently includes 11 members. In our observation of CRC meetings in this and prior quarters, we continue to find that the CRC contains a diverse membership of individuals whose actions do not appear to reflect bias or lack of neutrality. Accordingly, we maintain that the City is in substantial compliance with Par. 134.

*135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.*

CRC retains the authority to find the outcome of an administrative investigation is unreasonable if the committee determines the findings are not supported by the evidence. City Code 3.21.020 defines "supported by the evidence" as "when a reasonable person could make the finding in light of the evidence, whether or not the reviewing body agrees with the finding." As CRC continues to retain this authority, the City and PPB remain in substantial compliance with Par. 135.

*136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.*

The ability of CRC to make requests for an additional investigation or information continues to be memorialized in IPR Protocol PSF-5.03. In 2019, the CRC did not make any requests for additional investigation. When prior requests have been made by CRC, IPR has provided a verbal notice at the time of request that the additional investigation would require more than 10 days since this would also require supplemental review by the involved officer's commander. As we have noted previously, this delay is a function of review rather than the additional

investigation taking more than 10 days and we therefore continue to believe that the City has substantially complied with the requirements of Par. 136.

*137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.*

PPB provided Corrective Action Recommendation Memorandums for all sustained allegations of misconduct within the past year. When reviewing the documents, we note each memorandum indicates that the supervisor had referred to the Discipline Guide when making their recommendations. Additionally, supervisors often identified the category of violation and detailed whether the recommendation was influenced by mitigating/aggravating factors or was presumptive (i.e. no mitigating or aggravating factors). However, in one instance we reviewed, the supervisor indicated his/her disagreement with the sustained finding constituted a mitigating factor in determining the appropriate level of discipline. Agreement with the finding does not fit into the mitigating factors detailed in the Discipline Guide. Because this was a single instance, it does not constitute a systemic violation of Par. 137. However, PPB should be aware that discipline recommendations which frame a sustained finding as inaccurate may ultimately undermine the integrity of the system. As such, we suggest PPB review this recommendation and take appropriate steps to ensure this singular instance does not lead to a broader trend.

*138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.*

The City and IPR continue to provide an electronic online submission avenue for complainants to file and track a complaint (https://www.portlandoregon.gov/ipr/52031). The complaint submission site solicits information that is similar to what an IPR investigator may ask about if a community member filed a complaint over the phone or in-person (e.g. including name and contact information for the complainant, the complaint's role in the occurrence, files/videos/other documents that may be used as evidence, location/time of the incident, name and DPSST of involved officers, witness information, and a summary of the complaint. Additionally, the IPR website allows community members to track their complaint by submitting a status request (https://www.portlandoregon.gov/ipr/64452). For these reasons, we find that the City has continued to substantially comply with the requirements of Par. 138.

*139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.*

The City continues to provide an avenue for sharing information with complainants. One example is the IPR website (https://www.portlandoregon.gov/ipr/64452) where complainants can submit a request. The City and IPR continue to be constrained by law in the types of documents they are able to share and may only share documents provided by the complainant and a transcript of the complainant interview. Given that the City's process for providing requested documents has remained consistent, we continue to find that they have substantially complied with the requirements of Par. 139.

*140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.*

At each stage of the investigation, IPR or IA continue to provide complaints information on their case. For instance, upon filing a complaint, community members are provided an initial letter informing them of their complaint's classification and whether it was assigned as a full investigation, SI, Precinct Referral, or was administratively closed. Upon the conclusion of the investigation, community members are provided the outcome of the investigation and, should they desire to appeal to the CRC, the process for doing so is described. We performed a random audit of IPR files and found that in each case, corresponding letters for each stage were provided in writing. Additionally, the City Attorney's Office continues to determine when corrective action should be disclosed in accordance with State law. Based on our audit of administrative investigations and the corresponding documents we reviewed, we continue to find that PPB has substantially complied with the requirements of Par. 140.

*169. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.*

THIS PARAGRAPH WILL BE ASSESSED IN THE NEAR FUTURE.

# COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

PCCEP Role in the Settlement Agreement and the City's Support

*141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement.*

*142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.*

Pars. 141 and 142 both establish PCCEP and outline the body's authority to perform critical functions. Here, we provide an update on the two together.

COCL found Substantial Compliance with Par. 141 in the Q4 2018 report, based on adoption of a PCCEP Plan in response to the requirements of Par. 141, as well as the successful completion of the PCCEP selection process, early work to form a functional body, including a retreat and training, and observation of a first PCCEP meeting in November 2018.

At a hearing in June 2019, Judge Michael Simon continued the conditional approval of the PCCEP-related Amendments to the Settlement Agreement—including Par. 141 —noting that PCCEP held "tremendous promise," but called for another hearing in late February to look for a "record of positive performance."

For reasons that parallel Judge Simon's comments, COCL did not find full Substantial Compliance with Par. 142 until our last report, in Q3 2019. A year ago, COCL found Substantial Compliance—Conditional with Par. 142, noting that while PCCEP had the authority to perform the functions listed in Par. 142, it was important to take the time to observe "progress that we anticipate will be made in future meetings, including progress toward a Community Engagement Plan... In particular, COCL will be paying close attention to PCCEP's town hall

meetings, as they should mark progress toward both soliciting public input and informing recommendations regarding strategies to improve community relations."

As noted in Q3 2019, COCL has found that "the PCCEP is functioning as a legitimate body for community engagement. The committee has offered thoughtful analysis and recommendations to improve police-community relations and members are not afraid to express their concerns about identified problems. In sum, we believe this group is engaging effectively with the community and PPB and has the authority to hold the PPB accountable for tactics and strategies linked to public trust."

COCL has continued to observe PCCEP throughout Q4 of 2019, and Substantial Compliance with both Pars. 141 and 142 have been maintained. Specific observations in Q4 that underscore PCCEP's continued function as a legitimate body for community engagement include:

- The November election of PCCEP officers, including re-election of two previous PCCEP officers, and the addition of two other PCCEP members to the leadership team.

- In November, PCCEP hosted a community listening session related to the upcoming police union contract negotiations, which included a presentation from union president Daryl Turner. Following the listening session, in December the full PCCEP considered recommendations related to those negotiations, regarding strengthening Portland's civilian oversight system, improving the arbitration system, officer accountability and use-of-force policies.

- In November, the City Auditor also presented a report on the 2019 Police Overtime Audit to the full PCCEP, and PCCEP members and members of the public provided input on this issue.

- Ongoing recommendations to the Mayor regarding appointments of alternates as full members.

- Sustained substantial work in several subcommittees that meet regularly and provide reports and recommendations to the full PCCEP: Steering; Youth; Settlement Agreement and Policy; Race, Ethnicity and Other; People with Mental Illness.

- These subcommittees have recently produced recommendations on significant issues, including the upcoming Police Union contract negotiations, body cameras, and written letters of condolence to families, community members, and/or victims after a death or serious injury resulting from an officer use of force.

- While not all of these recommendations have been adopted by PCCEP as of this writing, at a minimum all have prompted in-depth discussion related to the overarching goal of improving police-community engagement.

28

- As it relates to both paragraphs—and further detailed in previous quarterly reports— COCL has observed a record of positive PCCEP performance throughout 2019, including:

- Development and utilization of a recommendation process, including a process for consideration of recommendations submitted by members of the community, and updates to the PCCEP Bylaws.

- Incorporation of intentional moments of silence, words of welcome, and readings of the PCCEP values into meeting agendas.

- Recommendations into the PPB's Annual Report and Community Engagement Plan— including recommending the creation of a Truth and Reconciliation model—both of which were approved by Portland City Council in August 2019. PCCEP also made recommendations into PPB metrics for community engagement.

- Review of the results of the annual community survey.

- Feedback into all Compliance Officer and Community Liaison quarterly reports, during co-hosted quarterly Town Halls where COCL presents draft reports.

- Preparation and approval of PCCEP's own quarterly reports to the Mayor, PPB, DOJ, and the public at large in March and July.

To date, PCCEP has largely avoided the challenges that beset the Community Oversight Advisory Board (COAB), including disrupted meetings, member attrition without replacement, and concerns related to the body's independence and how the body was chaired.

Where PCCEP has had challenges, COCL has observed a collaborative and productive approach to identifying and implementing solutions. For example, forthcoming amendments to the PCCEP Plan scheduled for Portland City Council consideration on December 18 (amendments AMAC and PPA were consulted on, and DOJ reviewed and approved, as required in Par. 142) seek to improve the process for identifying and appointing youth members, maintaining a pool of alternate members, and training them in advance of membership when possible. The proposed amendments also allow members to be seated prior to the required completion the PPB Citizen Academy (a lengthy training offered every few months). These proposed amendments should make it easier for PCCEP to consistently operate at full membership.

PCCEP members and officers have also identified ideas to further enable and enhance their work in 2020, including a need for a PCCEP strategic plan to guide and tie together work happening in subcommittees, and another retreat to discuss strengthening their work together.

PCCEP leadership and members have continued to discuss ways to not only increase community members' attendance at PCCEP meetings but are also looking at broader ways to enhance community participation without requiring members of the public to attend lengthy monthly

meetings—for example, through a survey developed by the Youth Subcommittee. The Community Organizer position has not yet been filled, and PCCEP is discussing whether this position is the best use of resources given the desire to draw more people into PCCEP's work, or if technical assistance in the form of a legal advisor would be preferred if resources are limited.

One year following COCL's determination of Substantial Compliance with Par. 141, we are able to conclude that the City has continued to achieve Substantial Compliance with the terms of Paragraph 141. Substantial Compliance with Par. 142 has also been maintained since last quarter.


*143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.*

In our Q4 2018 report, COCL found Substantial Compliance with Par. 143, based on an analysis of the demographics and information shared in applications for appointment to PCCEP for both the applicant pool at large and the appointed members, which found that members come from a reasonably broad spectrum of the community.

There has been considerable turnover in PCCEP membership since the Mayor announced the original appointees in September 2018. Of the original 13 members (11 adults and 2 youth), four adult members are still serving, and two of those four serve as co-chairs of PCCEP. Seven of the current members have been appointed over the past year. PCCEP membership currently stands at 11 of 13 members, with one of the two youth seats currently filled.

In our previous assessment, COCL called out one area in which the PCCEP is imbalanced— gender. As of the fourth quarter of 2018, four of the thirteen members (30%) identify as female, and COCL advised that in future recruitments for PCCEP members, additional attention should be paid to gender balance. As of December 2019, the number of PCCEP members who identify as female remains four, though they comprise a larger proportion of PCCEP with two seats vacant. All four PCCEP leaders chosen by the full PCCEP in November identify as male.

In other ways, PCCEP continues to represent a "reasonably broad spectrum of the community," with six members identifying as either a person of color and/or an immigrant, at least three with experience as peer support specialists or other personal, lived and/or professional experience with mental health issues. Many of PCCEP's current members also volunteer with other community groups or nonprofit boards related to mental health, the justice system, or underrepresented communities, bringing in additional perspectives to PCCEP's work.

To date, COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

While there remains an opportunity to add more members who identify as female—as well as elevate female members to positions of leadership, a concern the current leadership team shared in an interview with the COCL team—the City has continued to achieve Substantial Compliance with the terms of Paragraph 141.


*151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.*

COCL did not find Substantial Compliance with Par. 151 until Q2 2019, waiting until PCCEP held several regular meetings and at least one required quarterly Town Hall meeting to remove a Conditional finding.

Substantial Compliance with Par. 151 has continued, with PCCEP and COCL jointly hosting quarterly Town Halls to review and discuss draft COCL reports. Additionally, PCCEP regularly hosts community listening sessions and invites presentations on topics of community interest during its regular monthly meetings, in additional to conducting regular business related to subcommittee reports and PCCEP recommendations.

A representative of the City Attorney's office attends PCCEP meetings and continues to advise the PCCEP as necessary to ensure compliance with public meetings law.


*152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.*

In our Q4 2018 report, COCL found Substantial Compliance with Par 152, based on the "Guide for Volunteer Boards & Commissions" presentation prepared for all advisory boards, not just PCCEP, which covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

This training was delivered when PCCEP's original members were initially onboarded, and throughout 2019, new PCCEP appointees have received this training. Additionally, a representative of the City Attorney's office attends PCCEP meetings and is available to provide guidance related to public meetings and bylaws as needed.

31

COCL continues to find Substantial Compliance with Par. 152.

PPB Role in Public Engagement and Outreach

In addition to the work of the PCCEP, Section IX of the Settlement Agreement requires that PPB seek to enhance its community engagement activities with the PCCEP and other resources (Par. 145) and that the City conduct a citywide community survey to assist the PCCEP and lead to the development of a Community Engagement Plan (Par. 146). Here we briefly summarize these efforts.

*144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.*

COCL found Substantial Compliance with Par. 144 in Q3 2019, following appointment of a new PCCEP Project Director, who started on July 1 and continues to serve. Prior to and since this hire, COCL noted that the City had otherwise provided strong administrative support to the PCCEP by maintaining PCCEP's office and website, setting up and noticing all meetings, providing ADA accommodations and IT support, and posting reports and timely meeting minutes. And prior to the start of the full time PCCEP Project Director, the City provided interim support through personnel from the Office of Equity and Human Rights.

PCCEP members confirm and COCL has observed that the City has continued to provide administrative support so that PCCEP can perform its duties and responsibilities. As noted above, PCCEP is discussing whether additional support via a Community Organizer and/or Legal Advisor would further the group's work, an issue COCL will continue to track into 2020.

*145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community.*

PPB continues to be engaged in a wide range of outreach and engagement activities, which are described on PPB's website (https://www.portlandoregon.gov/police/30379). PPB also continues to maintain several social media platforms that seek to engage and inform the community, including NextDoor, Facebook, Twitter, Instagram, and YouTube. PPB continues to invite community members to review and comment on new and revised directives (https://www.portlandoregon.gov/police/59757).

We want to emphasize that PPB's community engagement work is not "PR" and image management. COCL has spent considerable time with PPB's Office of Community Engagement (OCE), which is pursuing an innovative and nontraditional approach to police-community relations. The officer working in OCE is very committed to going beyond superficial approaches (e.g. posting pictures of positive interactions between police officers and kids) to engaging community members and listening to the real problems they face, whether it be housing, domestic violence, limited English proficiency or some other problem. OCE is pursuing a long-term strategy of building "organic trust" by learning about and responding in a genuine manner to real community concerns. The OCE vision is to recognize and respond appropriately to the diversity of communities and problems represented in Portland, including the Muslim community, Slavic community, and Latinx community that are sizeable but receive limited attention. OCE has already developed targeted educational and crime prevention messages both inside and outside the PPB. From the COCL's perspective, the only problem with this model is that the officer leading the way is only one person. As a multiplier, this officer is seeking to engage other precinct officers with various skill sets who are willing to voluntarily engage with different ethnic and religious communities across Portland. However, PPB will need to make a larger investment of resources in the Office of Community Engagement if it expects to see sizeable and sustained benefits. But this is not a requirement of the Settlement Agreement, only a recommendation from COCL.

In addition to PPB's many ongoing community engagement activities, in 2019 the Bureau completed a year-long strategic planning process, involving community meetings, focus groups and surveys, which resulted in a 5-year strategic plan and information that helped shape PPB's Community Engagement Plan (par. 146 below).

PPB has continued to maintain a working relationship with PCCEP throughout 2019. High ranking PPB personnel have attended nearly all PCCEP meetings and subcommittee meetings and have answered questions as needed. In addition, PPB has presented findings from its Strategic Planning process and its proposed Community Engagement Plan. In December, we interviewed PCCEP co-chairs and other members of PCCEP about their relationship with PPB and the feedback was generally positive. PCCEP and PPB have maintained a functional, transparent, and working relationship, while at the same time, maintaining their independence. As a result, we are able to conclude that PPB has continued to achieve Substantial Compliance with the terms of Paragraph 145.


*146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where*

*those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.*

As part of the Settlement Agreement, citywide community surveys were conducted in 2015, 2016 and 2019 by Davis, Hibbitts, & Midghall, Inc. (DMH), a professional survey research group. In previous reports, COCL has examined this survey and concluded that the survey methods are valid. Also, PCCEP was consulted and contributed to the survey questions in 2019. The survey was successfully conducted and PCCEP received a presentation of the findings in July of 2019 that was used to "inform the work of the PCCEP and the development and implementation of the Community Engagement Plan."

Based on input from the survey, PCCEP input, multiple public forums (for the PPB Strategic Planning process), PPB's Equity and Inclusion Plan, and the work of the Community Engagement Unit, PPB drafted the Community Engagement Plan, which was approved by the Chief in August of 2019. In September, members of PPB's Community Engagement team presented the Community Engagement Plan at the full meeting of the PCCEP and accepted feedback. PCCEP reviewed and approved three recommended changes to the Community Engagement Plan, which PPB incorporated into the revised Plan. The final Community Engagement Plan was adopted by the Portland City Council in October of 2019, with the understanding that PCCEP and PPB would continue to work on refinements of the Plan during 2020. Thus, the City, PPB, and PCCEP have remained in Substantial Compliance with the terms of Paragraph 146.

Collection and Analysis of Demographic Data

*147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.*

COCL has revisited Paragraph 147 in 2019 and has found that PPB continues to collect precinct-level demographic data that can be useful to understanding and responding to local conditions. PPB uses the U.S. Census Bureau's American Community Survey 5-Year Estimates to produce local demographic information and continues to provide tables and maps to Precinct Commanders that for planning purposes. PPB precincts have used the demographic data for local programming as noted in Par. 145. Each precinct faces different issues (e.g. houselessness, mental health, refugees, nightlife) and thus programs have been tailored accordingly. The demographic data prepared by PPB analysts was also used to assist the City in conducting the community-wide survey on police-community relations (Par. 146).

In addition to the requirements of par. 147, PPB officers collect informal qualitative data about the problems and issues faced in each community when they respond to calls, patrol the neighborhoods, and attend local meetings. This information is discussed with their sergeants, at roll call meetings, and at community meetings. The quantitative demographic data compiled each quarter by analysts is also used for PPB's analysis of traffic and pedestrian stops (see Par. 148). Finally, during the first quarter of 2019 PPB shared the precinct-level demographic information with the PCCEP to "inform its work."

*148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such* 59 *information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.*

As we have noted in the past, PPB has been gathering this type of demographic data since 2001 and recent reports generated by PPB analysts are more sophisticated than what we have found in other police agencies. In 2018 PPB produced the <u>Stops Data Collection Report</u> that offered a comprehensive analysis of more than 250,000 stops of drivers and pedestrians during a 5-year period (ending in 2016), including relevant benchmarks to assess disparities in police decision making for different demographic groups. To achieve compliance with Par. 148, COCL recommended that PPB include an analysis of disparities in the stops by age and sex demographics (not contained in the 2018 report) and deliver these findings to the PCCEP. In November of 2019 PPB produced its annual Stops Data Collection Report that was responsive to our recommendation. It also produces quarterly reports that are posted on PPB's website (See the Outcome section below for COCL's review of recent findings). Given PPB's continued analysis of the police stops data, the inclusion of all relevant demographics in their 2019 report, and the presentation of these findings to the PCCEP, PPB continues to remain in Substantial Compliance with Paragraph 148.

*149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.*

In 2019, PPB, DOJ, and COCL jointly developed a framework and general set of metrics to evaluate community engagement and outreach by the PPB that covered four domains: 1) *Interactions with the public and general service delivery*, with the expectation that PPB will build public trust by

engaging with diverse community members in a manner that is fair (unbiased), respectful, and helpful; 2) *Communication with the public*, with the expectation that PPB will establish conduits of information to encourage the bi-directional flow of information between the community and the PPB; 3) *Collective engagement with the community through boards, commissions, committees and other stakeholder forums/groups/meetings* for purposes of accountability, transparency, and public education; and 4) *Regular reporting to the community on PPB activities* to achieve these same objectives. These engagement and outreach activities can be measured through PPB's website, social media outlets, attendance at meetings and events, and police-community contact surveys, among other methods. These metrics were shared with the PCCEP and approved by PCCEP in June of 2019. To date, PPB continues to use this framework for self-assessment with respect to its Community Engagement Plan. Hence, PPB remains in Substantial Compliance with Par. 149.

<u>PPB Annual Report</u>

*150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.*

Historically, PPB has been slow to release its Annual Report, and this was noted by the PCCEP when it reviewed a draft of PPB's 2017 Annual Report near the end of 2018. Since then, PPB has made a concerted effort to expedite the production and review process for the 2018 Annual Report. PPB gathered information from managers in January of 2019 and provided a draft to PCCEP by the end of June. Consistent with Par. 150, the 2018 Annual Report summarizes the Bureau's problem-solving and community policing activities and PCCEP provided PPB with feedback and recommendations in July. Some recommendations were incorporated into the final version and others (that could require major changes) are under consideration for the 2020 production of the 2019 Annual Report. Finally, as we noted in our Q3 report, PPB has met the conditions of holding at least one meeting in each precinct (August 2019) and with the City Council (October 2019) to discuss the topics required in Par. 150. Thus, PPB achieved Substantial Compliance in October for Par. 150.

System Outcome Assessment: Community Engagement

PPB is expected to develop systems of community engagement that increase the probability of sustained success in this domain. A good systemic approach also includes systems of measurement that serve to document and monitor the quantity and quality of its engagement activities, thus providing feedback loops that allow for corrective action to maximize performance. We will revisit this outcome assessment after a set of community engagement metrics (par. 149) have been finalized. In this report, we briefly review some existing metrics and some existing systems that are relevant to community engagement.

The creation of the PCCEP itself is a major step toward the establishment of a system of community engagement that should be sustainable over time. Other systems are expected from PPB's work, including: the 5-year strategic planning process, the community engagement process to be defined in PPB's Community Engagement Plan, and PPB's new app that allows officers to keep records of their community engagement activities. The City's community-wide survey provides another set of metrics to measure community outcomes.

Furthermore, PPB is involved in a series of planned and existing measures of police contact with the public. These include existing records/reports on calls for service, crime incidents, police stops, searches, arrests, citations, and use of force, as well as PPB's planned contact survey to measure the quality of police-community interactions.

PPB's stops dataset is designed to address community concerns about discriminatory policing. PPB's Stops Data Collection report addresses the issue of racial/ethnic disparity in police decision making about stops, searches, contraband hits, and stop outcomes. In this Q4 report, we provide a brief summary of those findings. Arguably, there is considerable good news to report, including the downward trend in the number of driver and pedestrian stops and searches, the improvement in contraband hits, and the absence of racial/ethnic differences in stops. However, the analyses also uncovered some disparities in searches for Black/African American drivers and pedestrians that deserve more attention. Also, the Gang Enforcement Team, while not showing racial/ethnic disparity with stop decisions, did rely on consent searches more with Black/African American stops.

Disparities do not necessarily indicate racial bias, as other factors may be involved, but the transparent reporting of police decision making evident in PPB's report should be the basis for more dialogue and community engagement. As PPB notes, these results "allow for a more informed community-wide discussion about how best to keep the community safe and how to accomplish this in the most equitable manner possible."

For an extended period of time PPB has been engaged with the community to develop a 5-year Strategic Plan and in particular, the Community Engagement Plan required by the Settlement Agreement.  The Community Engagement Plan provides a general framework of strategies for

engaging the community that fall into four categories as outlined by the Chief of Police: (1) increased opportunities for public involvement; (2) improved communication with the public; (3) increased accessibility of police services to all communities including those with limited English proficiency and physical disabilities; and (4) enhanced training for the police and the public to better serve diverse communities. Because this Plan is in the very early stages of implementation and is envisioned by the Chief as a "living document that will be review and revised over time," it is too early to review the outcomes expected from this work. However, we trust that PCCEP will continue to work with PPB and ensure that the expected work is implemented, and the expected outcomes have been achieved as some level.

Aside from the Community Engagement Plan, there is much work that is ongoing and should be recognized. PCCEP is engaging the community in a variety of ways that we have noted above and as we have emphasized in the past, PCCEP itself represents a method of tracking community engagement around police-community relations. As one example, we commend PCCEP and the Youth Subcommittee for planning a survey of youth to better understand their relationship with School Resource Officers. This survey, when completed, should provide useful information about ways to improve police-youth relations.

As noted earlier, PPB is currently engaged in hundreds of community outreach activities and officers have an app to keep track of their community engagement activities (For a list of events, see PPB's website or Exhibit B of Chief's City Council presentation on the Community Engagement Plan). Some of the more recent strategic work is commendable, such as efforts by the Office of Community Engagement Unit's to listen to at-risk groups that are historically difficult to reach, such as the houseless community. But again, it is too early to expect any outcomes.

COCL is most impressed when the PPB creates systems of measurement that allow the organization to monitor its ongoing performance, receive feedback, and make adjustments that will improve performance over time. The system established to evaluate PPB training is a good example, especially when it focuses on the quality of police-community interactions. PPB is able to improve instruction quickly with this feedback system in place. Another structural, systemic example that affects the quality of police service is PPB's force auditing system used to evaluate whether force used against community members is within policy, constitutional, and reflects good policing. We have reviewed these audits on many occasions and find the system to be effective at identifying and responding to force problems (Note: The Chief has recently expanded PPB's system of audits by creating the Office of the Inspector General).

Other systems provide direct feedback about police-community interactions. The city-wide community survey (completed three times) provided useful information about how the general public views the PPB and identified some areas where policing can be improved (see past COCL reports). However, we have greater hope that PPB will continue the most cost-effective Contact

Survey that it initiated in partnership with the National Police Foundation. The Contact survey allows community members to evaluate a recent contact they had with a PPB officer in terms of fairness, respectfulness, and other aspects of the encounter. If sustained, the results of this contact survey can be used annually to monitor PPB's performance on measures that matter to the community and make adjustments to policy, training, supervisor, accountability, and performance evaluations as needed to improve service delivery.

Finally, we acknowledge PPB's sizeable program to document and evaluate both traffic and pedestrian stops by population demographics (par. 148). The quality-of-service issue is whether the rates of stops and subsequent decision making (e.g. searches, arrests) are justified and appropriate given the demographic composition of the neighborhood, crime conditions, and traffic patterns. Because PPB released a new <u>Stops Data Collection</u> report in November for all stops in 2018 with some 5-year comparisons, we provide a brief overview here. (The report can be found on PPB's website).

### Disparities in Traffic Stops

When seeking to determine whether there are racial and other disparities in police stops, analysts must establish "benchmarks" i.e., comparison information that would describe the demographics of people who would be stopped by the police <u>assuming no bias</u> in police decision making. This is a difficult challenge (given that no benchmark is perfect), and we commend PPB for drawing on available research by policing scholars to produce reasonable benchmarks. PPB does not rely on the U.S. Census data (general population demographics) to establish benchmarks (given multiple known limitations of this benchmark), but instead uses Injury Collision statistics to assess disparities for Traffic Division officers and Crime Victimization Rates for Non-Traffic officers, including Patrol (Justifications are contained in PPB's *Stops Data Collection* report).  We highlight some findings from the data on traffic stops, since pedestrian stops compromise a small percentage of the total PPB stops.

<u>Stops</u>: Although the total number of stops of drivers increased by 32% between 2017 and 2018, the 5-year trend still shows a decline of 46%. Hence, there are sizeable swings in the number of stops by the PPB that may require further analysis or explanation. More importantly, both Traffic Division and Non-Traffic Division officers made stops at rates similar to what would be expected from their respective benchmarks, so no racial/ethnic disparities are noteworthy.

<u>Searches</u>: Once a driver has been stopped, however, PPB officers exhibited some racial/ethnic disparities in who they searched. When compared to stop rates, Black/African American drivers were searched at significantly higher rates than expected in 2016, 2017, and 2018 (with 2018 higher than 2017). Black/African Americans and Native Hawaiian and Other Pacific

Islanders were consent searched about twice as often as other groups. This growing trend deserves a closer look.

Outcomes: Warnings, citations, arrests, or the discovery of contraband after a traffic stop were not related to the race/ethnicity of the driver.

Other Demographics: PPB has been responsive to our request to add analyses of gender, age and mental health to this year's analysis of disparities, as required by the Settlement Agreement:

Gender: Using the Injury Collision benchmark for all driver stops, PPB officers stopped all perceived gender groups at expected rates.

Age: The 2018 Injury Accident Benchmark was used for all driver stops conducted by all Bureau officers since there is no research-supported benchmark that solely focuses on the perceived age of the driver. Compared to the benchmark, drivers are stopped similar to expected rates. However, younger drivers ages 16 to 24 were more likely than older drivers to receive enforcement action, including being searched and given a citation. This trend also deserves a closer look.

Mental health: Because PPB does not collect data on the perceived mental health status for auto injury accidents, there is no good benchmark that can be used for disparity analyses. Also, the mental health numbers are very small – only 98 of the 29,382 stops in 2018 involved a perceived mental health condition – thus making statistical comparisons very difficult. The results show that perceived mental health status did not affect the likelihood of being searched or experience other enforcement outcomes.

Summary: Again, we credit PPB with conducting a thorough analysis of vehicle stop data and being transparent with the results. Although PPB does not appear to exhibit bias in the decision to stop drivers, the decision to conduct more searches of Black/African American and Native Hawaiian and Other Pacific Islanders is concerning and deserves closer examination. We are encouraged that PPB has plans to make adjustments to its new Stops app to collect additional data about traffic and pedestrian stops and standardize existing data collection. PPB should explore the reasons why officers are conducting different types of discretionary searches with different groups, i.e., consent, plain view, probably cause, reasonable suspicion, or weapons pat or frisk. Also, PPB should explore the training implications of the current findings to make officers more sensitive to issues of bias and stereotyping. Findings in Portland and other cities clearly indicate that searching people of color is not more likely to yield contraband as some officers might expect. Finally, we note that this report does not break out data on stops by the Gun Violence Reduction Team, which will appear in a supplemental report yet to be published.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# LIST OF PERSONNEL

Chief of Police: Danielle Outlaw

Deputy Chief of Police: Jami Resch

Assistant Chief of Operations: Chris Davis

Assistant Chief of Services: Ryan Lee

Assistant Chief of Investigations: Andrew Shearer

Commander of Professional Standards Division/Compliance Coordinator: Bryan Parman

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Jeff Niiya

Behavioral Health Unit (BHU) Lt.: Casey Hettman

EIS Supervisor: Nathan Sheppard

EIS Administrator: Dan Spiegel

Training Captain: Erika Hurley

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne