# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

# of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

### *Quarterly Report:*

### *Quarter 1 Updates & Analysis*

**Prepared By:**
**ROSENBAUM & ASSOCIATES, LLP**
**For the City of Portland, Oregon**
**January 1 to March 31, 2020**

**June 2, 2020**



# **TABLE OF CONTENTS**

**INTRODUCTION**..................................................................................................3

**EXECUTIVE SUMMARY**.......................................................................................4

**SECTION III — Use of Force**...........................................................................10

**SECTION IV — Training**..................................................................................16

**SECTION V — Community-based Mental Health Services**.............................22

**SECTION VI — Crisis Intervention**..................................................................24

**SECTION VII — Employee Information System**................................................30

**SECTION VIII — Officer Accountability**...........................................................35

**SECTION IX — Community Engagement and Creation of PCCEP**....................40

**LIST OF ABBREVIATIONS**...............................................................................47

**LIST OF PERSONNEL**.....................................................................................49

# INTRODUCTION

This is the Compliance and Outcome Assessment Report of the Compliance Officer/Community Liaison (COCL), as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, filed 12/17/12.

On January 10, 2020 the DOJ, drawing upon COCL's most recent reports, reached the conclusion that the City of Portland had achieved Substantial Compliance with all the terms of the Settlement Agreement. Paragraph 175(b) of the revised Settlement Agreement indicates that the City must "maintain substantial compliance with all provisions for one year." Hence, in 2020 the COCL's reports will evaluate whether the City and PPB have maintained compliance. To remain in Substantial Compliance, any violations of the Agreement must be "minor or occasional and are not systemic." (Par. 175(a)).

During the maintenance year COCL will continue to conduct quarterly compliance assessments. This is our first quarterly report in the maintenance year. In these reports, we will document PPB's and the City's systems for responding to mental health crises, holding officers accountable, providing evidence-based training, ensuring that the use of force meets constitutional standards, and establishing robust community engagement (Par. 170). We will assess whether the operation and maintenance of these systems has continued in accordance with the requirements of the Settlement Agreement. In addition to encouraging evidence-based policing, these systems are designed to identify problematic trends and stimulate corrective action. Hence, these systems provide the framework for COCL's compliance assessments during the maintenance year.

The City and PPB continue to provide us with the documents, data and analyses associated with these systems. We will continue to review, evaluate and reference these documents and data elements in our quarterly maintenance reports as well as conduct audits of the information produced. As a result, we will verify that the City and PPB continue to maintain the reforms required in the Settlement Agreement.

We also recognize here that Substantial Compliance with the Settlement Agreement will not lead to a perfect police bureau. Although critical analysis by the COCL team over the past five years has contributed to many new systems of self-assessment and self-improvement within the PPB, we also acknowledge that police-community relations remain strained in some communities. Real organizational reforms in policy, training, and accountability are unlikely to immediately remedy historical distrust issues within communities of color, persons with mental illness, youth, the houseless, and other marginalized groups who may fear the police. However, the current police leadership seems committed to improving PPB's relationship with all segments of Portland's population and working in partnership with them to improve police services.

# EXECUTIVE SUMMARY

### Section III: Use of Force

A primary goal of PPB's reform efforts related to use of force has been to ensure systems are in place to properly manage use of force to meet constitutional standards (see Par. 170). In order to do this, we look to see whether the system contains adequate policies and training, whether the data and information related to force is sufficient to allow proper assessment and management, and whether PPB uses that data to identify system gaps and areas for organizational improvement. Additionally, we reviewed a sample of force cases to audit PPB's process as well as ensure force used by PPB meets constitutional standards.

After a use of force event, PPB officers continue to complete a Force Data Collection Report (FDCR) which captures the circumstances surrounding the force event and provides a narrative of the actions taken by the community member and officer. Additionally, supervisors continue to complete After Action Reports (AAR) for all investigations of officer use of force incidents. Between officers, supervisors, and the chain-of-command review, deficiencies in report writing remain relatively rare, providing evidence that force cases are reliably documented. PPB is then able to take force data, conduct relevant analyses, and make both the data and analyses publicly available.

PPB utilizes FDCRs and AARs (and the associated data) in a variety of ways. Using the analysis of force data, the Force Inspector conducts quarterly meetings with RU Managers to discuss potential issues and trends in reporting deficiencies, officers using force at a higher rate than others, and Precinct trends in use of force. During these discussions, the Force Inspector also discusses unit trends with the RU Manager. Additionally, the Force Inspector reviews cases to identify trends and implications for policy, training, equipment, or personnel.

Finally, our evaluation provides a summary of force data and demonstrates that overall force to custody rates have consistently been around 3%. Additionally, our evaluation of calls which meet ECIT type criteria revealed that, out of 1,398 calls which met these criteria, there were only 46 instances of force being used, most of which was Category IV, the least serious use of force. In addition to the aggregate statistics we evaluated, we also reviewed a sample of force cases which included CEW uses, Category II, Category III, and Category IV force types, including several force events involving a person in mental health crisis. Our review supports the general findings of PPB – when force is used, it is comprehensively documented by officers, reviewed by supervisors, and corrective action (formal and informal) is taken when necessary. This was also true for the cases we reviewed wherein a person was identified as being in mental health crisis. In all, PPB has maintained a system for properly managing use of force to meet constitutional standards.

### Section IV: Training

COCL continues to evaluate PPB's compliance with the Training requirements of the Settlement Agreement in terms of their ability to maintain systems of police training that can increase "the knowledge, skills and abilities necessary for effective and successful delivery of services to persons in mental health crisis" and that can contribute to the "proper management of the use of force to meet

4

constitutional standards" (Par. 173). Based on our review of training materials and observations of the 2020 In-service training, we find that PPB continues to perform at a high level in terms of: (1) identifying areas where officers require training, (2) developing and delivering appropriate and high-quality training; (3) developing and implementing a valid and useful system of training evaluation both in the short term and long term; and (4) documenting and reporting training delivered and received. PPB has a particularly strong system for evaluating the quality of the training being delivered and its effects on PPB members using knowledge tests, officer surveys, scenario scoring, force reports, and surveys of community members.

With the support of these training systems, instructors covered important topics, were well organized, were knowledgeable, were engaged with students, and exhibited strong pedagogical skills. In accordance with COCL's recommendations, PPB continues to infuse In-service training with scenarios and exercises that give attention to interpersonal communication, procedural justice, and de-escalation skills, especially for persons experiencing a mental health crisis.

In sum, these systems of training meet the requirements of the Settlement Agreement and ensure that officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness. Given that PPB has maintained a strong In-service training program, COCL continues to find PPB in Substantial Compliance with the requirements of Section IV of the Settlement Agreement.

In March of 2020, the COVID-19 pandemic had a significant impact on the City of Portland and the PPB. The In-service training with large classes was suspended, although PPB was quick to move much of the in-class training to an online format using its Learning Management System (LMS). Also, PPB has continued skills exercises with smaller groups to maintain adequate social distance. We will continue to monitor the impact of this virus on PPB's training and other PPB functions.


## Section V: Community-Based Mental Health Services

Our system assessment for community-based mental health services hinges on the recognition that PPB and the City do not bear primary responsibility for delivering community-based mental health services. The Settlement Agreement does not legally bind the City's community partners. Therefore, we have historically measured PPB and the City's activity in terms of what may reasonably be expected of PPB and the City. For instance, PPB either oversees or participates in a number of committees and workgroups, including the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Advisory Council, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. Additionally, PPB currently acts as part of the Transportation Subcommittee for the Unity Center, a drop-off center for first responders to transport a person experiencing a mental health crisis. In this report, we provide a historical context for drop-off centers in general and note that, while some members of the community have some concerns regarding the overall operation of the Unity Center, it functions in accordance with the concept of a drop-off center. While the local CCOs are ultimately responsible for the Unity Center, we believe that PPB continues to act in accordance with its role in the overall system.

**Section VI: Crisis Intervention**

Section VI of the Settlement Agreement (Crisis Intervention) is designed to facilitate PPB and the City's implementation of "systems and resources for responding to persons in mental health crisis" (see Par. 170). Historically, we have approached evaluating PPB and the City's resources in two ways: (1) Primary Response (including Enhanced Crisis Intervention Team (ECIT) officers); and (2) Secondary Response (including BHRT and SCT). For this report, we maintain this same approach. For primary response, we evaluate the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC) for PPB response. For instance, we note that BOEC policies, pre-service training, and in-service training are consistent with Basic CIT courses in other agencies. Additionally, BOEC continues to stress the importance of an ECIT response through regular communication with BOEC employees and conducts audits to ensure that telecommunicators are making correct decisions as to whether or not to send an ECIT officer to a call. The results of the most recent audit indicate 97.1% accuracy in this respect.

In evaluating PPB's role in the City's system for responding to persons in mental health crisis, we find that PPB has continued their enforcement of crisis response policies, which receive regular review by the BHUAC. Also, PPB ensures that all officers receive a minimum of 40 hours Crisis Intervention training and a select group of officers receive an additional 40 hours of training to become Enhanced Crisis Intervention Team (ECIT) officers. Furthermore, PPB continues to require a Mental Health Template when an officer completes a report for interactions involving a person in mental health crisis. Data from this Template are used by PPB to evaluate their system for mental health response. For instance, over an 18-month period, PPB has conducted evaluations for ECIT-type calls, finding (among other things) that the large majority of ECIT-type calls receive an ECIT response.

For secondary response options, we provide an assessment of the Behavioral Health Response Team (BHRT) and the Service Coordination Team (SCT). For the BHRT, we discuss PPB's expansion to five teams as well as the underlying reasons for the expansion. We also discuss PPB's ability to identify trends and determine whether those trends indicate additional action should be taken. For instance, we note that proportion of BHRT interventions wherein the community member refused services has also demonstrated a generally steady increase over time. PPB had already recognized this trend and noted this was likely to be the result of the BHRT team dedicated to the houseless population (who may face additional systemic barriers to accept or engage in resource connection). This ability to critically evaluate the reason for trends and determine their cause is wholly in-line with a positively functioning learning organization. Additionally, the SCT continues to operate in the same positive fashion that we have noted before and the Supportive Transitions and Stabilization program (which operates under the umbrella of SCT) continues to provide a direct housing resource for BHRT clients in need.

Finally, we evaluate the Behavioral Health Unit Advisory Committee (BHUAC) which guides the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT components. During the monitoring period, the BHUAC continued to provide input on policy, training, and SOPs as well as received presentations and held discussions on current practices of other partner agencies and entities. For the fourth quarter of 2019, BHUAC topics included BHU/BHRT updates, ECIT training, Portland Street Response pilot program, BHRT/ECIT case studies, and developing a plan for increasing BHUAC community engagement.

**Section VII: Employee Information System**

In this report, we evaluate the Employee Information System (EIS) from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on receiving alerts. On a nightly basis, data from force events and traumatic incidents (captured in Regional Justice Information Network (RegJIN)) as well as complaints and commendations (captured in Administrative Investigations Management (AIM)) are uploaded into the EIS database. Using that data and established thresholds for identifying potentially problematic behavior, PPB will create alerts and determine whether an EIS alert warrants further review by an officer's supervisor. Over the course of the past year, we note that while the proportion of alerts that are sent on for supervisor review has decreased, the proportion of alerts that were sent for review and do receive some type of intervention has increased. A likely explanation is that as EIS administrators and RU managers have gained ongoing experience with the system, they have become more discerning as to which alerts are indicative of a need for intervention and which are not. It also may indicate that the alerts that are getting through are more substantive and warrant additional attention.

PPB also continues to conduct analysis of supervisor review of officers as part of officers performance evaluation and upon transfer of an officer to a new command. Through their quarterly analysis, PPB has consistently found high rates of compliance with the required reviews. When rates have decreased, PPB has been able to identify the causes for the decrease and remedy them immediately. For instance, in the 4th quarter of 2019, PPB was able to identify a potential issue with the reviews required of the Chief's Office and remedy the issue prior to COCL inquiries, thereby demonstrating a functional system.

**Section VIII: Officer Accountability**

Our evaluation of the City's accountability system focuses on a number of foundational elements, including access, transparency, expediency, consistency, and multiple checks and balances. For instance, as it relates to access, PPB and the City have a number of ways to file a misconduct complaint through both the Independent Police Review (IPR) and PPB and we note a steady decrease in administrative closures over time. Additionally, the system is transparent in the sense that community members and officers can track the investigation over time and that CRC hearings, PRB hearing summaries, and overall accountability data are accessible to the public on the PPB's and/or IPR's respective websites.

In past reports, we have noted that the issue of expediency in resolving administrative investigations within a timely manner was one of the last remaining constraints to achieving substantial compliance with Section VIII. In those reports, we noted that PPB and IPR had taken steps to ensure that overall case timelines (as well as individual stage timelines) were adequately managed, thus allowing for a swifter resolution to complaints. These improvements have been maintained and both IPR and IA continue to conduct evaluations of data to ensure overall expediency.

Investigations continue to be conducted in a consistent fashion as IA and IPR policies remain consistent with each other and training was conducted in a joint fashion. During this monitoring period, we also reviewed cases that follow different investigative paths. We requested a list of all administrative investigations that were completed in the fourth quarter of 2019. From those, we selected a stratified sample of 20 cases for review to ensure an adequate representation of different types of investigations.

Exhibit B
Pg. 7 of 49

For instance, we reviewed administrative closures, supervisory investigations, precinct referrals, IPR full administrative investigations, and IA full administrative investigations. The cases we reviewed indicated that, regardless of which route a complaint might take, findings and decisions are reasonable and supported by a preponderance of the evidence. Finally, when an administrative investigation results in a sustained finding, PPB continues to use a discipline guide to ensure that discipline is defined and consistent.

We also assess whether there is an inherent system of checks and balances built into the accountability system to ensure a fair resolution for all involved. Through a review of IA and IPR policies and corresponding supporting documents, we see evidence of checks and balances occurring at each stage of the process. These include the ability of IPR, IA, and the Chief's Office to controvert findings, the Citizen Review Committee (CRC), Police Review Board (PRB), and the City Council. Between the roles of IPR, the CRC, City Council, and the PRB, we believe that the overall accountability system includes an extensive system of codified checks and balances.

Finally, PPB's accountability system has particular requirements after the occurrence of lethal force and in-custody death events. These include mechanisms for safeguarding the integrity of such investigations, including separation of witness/involved officers, conducting interviews individually (rather than as a group), ensuring proper notifications are made, on-scene walkthroughs, Communication Restriction Orders (CROs), and compelled statements in accordance with *Garrity v. New Jersey*. Our review of documents related to each of these mechanisms indicates PPB and the City have maintained their compliance with these requirements.

## Section IX. Community Engagement and Creation of PCCEP

### *PCCEP Role and the City's Support*

Section IX of the Settlement Agreement requires that the City establish a Portland Committee on Community Engaged Policing (PCCEP). PCCEP is authorized to perform a variety of functions, including gathering information from the community about PPB's performance, making recommendations, contributing to a Community Engagement Plan, and advising the Chief of Police and Police Commissioner on strategies to improve community relations. In the first quarter of 2020, the PCCEP continued to fulfill its mission, supporting multiple subcommittees, seeking input from a wide range of stakeholders, and generating ideas to improve police-community relations. The Mayor and the new Police Chief addressed the group's January meeting, with the Mayor expressing the City's commitment to the group's work continuing beyond the Settlement Agreement, and the Chief building on those remarks with specific thoughts on trust-building and reiterating PPB's commitment to working with PCCEP.

The City continues to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions. As required by the Settlement Agreement, PCCEP continues to represent a "reasonably broad spectrum of the community," without any actual or perceived conflict of interest with the City of Portland. A representative of the City Attorney's office continues to attend PCCEP

8

meetings and advise the PCCEP as necessary to ensure compliance with public meetings law, and the City continues to train new PCCEP appointees.

PCCEP was not without challenges in Q1 2020 including resignations by several members of the Subcommittee for People with Mental Illness (SPMI) and questions about turnover among PCCEP members. The PCCEP moved swiftly to reconstitute a subcommittee devoted to behavioral health issues, with two members volunteering to jointly lead the subcommittee going forward. At the end of March, Mayor Ted Wheeler appointed two members to PCCEP from the alternate pool, bringing it to full membership, with 13 members seated, including both youth seats filled.

Through February of 2020, the PCCEP continued to hold regular meetings and subcommittee meetings, hosting town halls, listening sessions, and conducting regular business meetings. However, the COVID-19 pandemic resulted in the cancellation of the general meeting in March and moved subcommittee meetings to teleconferences.

At the February 25 Status Conference, both the COCL and the Department of Justice reported to Judge Simon that the City (including PCCEP) has achieved Substantial Compliance with Section IX of the Settlement Agreement on Community Engagement for reasons stated here and in previous reports. PCCEP leaders also provided a statement defending its functionality and legitimacy. However, the Judge declined to remove the conditionally-approved designation on the PCCEP-related amendment to the Settlement Agreement.

_PPB's Role_

PPB, with support from the City, is required to expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. At the end of the first quarter, PPB has completed the necessary tasks and has continued to maintain the required systems of engagement. Specifically, they have conducted a citywide community survey that informed the work of the PCCEP and contributed to the development of a Community Engagement Plan. PPB also worked with DOJ and COCL to develop a general set of metrics to evaluate community engagement and outreach. They continue to collect demographic data about the community in each precinct to assist the Precinct Commanders and PCCEP with their community engagement plans. To measure possible discriminatory policing, PPB officers continue to collect data on race, age, sex, and perceived mental health status of persons they stop and share this information with the PCCEP and the public. Finally, PPB issued its Annual Report (including the required contents), had the report reviewed by the PCCEP, and presented it to the public at Precinct meetings and before the City Council. Thus, PPB and the City continue to meet the requirements in Section IX of the Settlement Agreement.

# SECTION III – USE OF FORCE

A primary goal of PPB's reform efforts related to use of force has been to ensure systems are in place to properly manage use of force to meet constitutional standards (see Par. 170). In order to do this, we looked to see whether the system contains adequate policies and training, whether the data and information related to force is sufficient to allow proper assessment and management, and whether PPB uses that data to identify system gaps and areas for organizational improvement. Additionally, we reviewed a sample of force cases to audit PPB's process as well as ensure force used by PPB meets constitutional standards. As evidenced below, we find that PPB has maintained their system for managing force through ongoing compliance with the paragraph requirements in Section III (Use of Force).

PPB's policy related to the use of force, reporting force, and supervisor review of force (Directive 1010.00 – Use of Force) continues to be in effect. Directive 1010.00 is presently being revised, but as long as the revisions continue to comply with the law and the Settlement Agreement, we do not require the directive to remain static during the maintenance year. This directive provides officers clear guidance on which situations they are authorized to use force (as well as the circumstances which may justify particular types and levels of force) as well as their responsibilities after a use of force event occurs (including rendering medical aid, if necessary). Additionally, Directive 1010.10 (Deadly Force and In-Custody Death Reporting and Investigation Procedures) provides clear guidance when an officer's use of force is "likely to cause death or serious physical injury." Between these two policies, we continue to find that the requirements of Pars. 67 (force in general), 68 (CEW principles), 69 (reporting force), 70 (supervisor review of force), and 73 (chain of command review) continue to be memorialized in PPB directives. While we discuss training more broadly in Section IV (see below), we also note that both officers and supervisors have received training on the provisions and responsibilities within Directives 1010.00 and 1010.10.

After a use of force event, PPB officers are required to complete a Force Data Collection Report (FDCR) which captures the circumstances surrounding the force event and provides a narrative of the actions taken by the community member and officer. Additionally, supervisors are required to respond to the scene of force events and complete an After Action Report (AAR) (unless the incident involves lethal force). The AAR acts as a investigation checklist (see Par. 72) and requires supervisors to conduct a comprehensive investigation into the use of force and make a determination as to whether the officer acted within policy.

Both the FDCR and AAR are instrumental in PPB's system of force management. Without dependable data on the frequency of force and the circumstances leading up to force events, PPB would not be able to draw reliable conclusions in order to determine implications for policy, training, equipment, and personnel decisions. As part of their system, PPB conducts audits of FDCR and AAR content to ensure that required information is present.

PPB provides quarterly reports on the comprehensiveness and adequacy of information found in FDCRs and AARs. On an annual basis, the data for the quarterly reports are aggregated, providing a year-long summary of force patterns. Additionally, the underlying data is used by the Inspector to inform conversations with Precinct Commanders (see below for further discussion of these conversations). For this report, we reviewed the findings of the force audit and note that both officers and supervisors

10

routinely include a comprehensive account of the force event. For instance, the table below (Table 1) demonstrates that out of 723 FDCRs audited in 2019, PPB found only 158 reporting deficiencies (0.22 deficiencies per FDCR audited). For context, there are approximately 38 information points for each FDCR that officers are required to complete, meaning that for nearly every 5 FDCRs completed, on average only a single mistake is made in completing the forms. Deficiencies were most likely to be found within the categories "Mental Health and Injuries" and "Witness" – however, a single deficiency does not mean that no information at all was present. For instance, the "Mental Health and Injuries" category contains 6 points of review for each FDCR. This means that in 2019, there were 4,338 potential deficiencies for this category (723 FDCRs audited multiplied by 6 points of review for each FDCR). In the entire year, there were 67 actual deficiencies found, thus indicating that the reporting accuracy of PPB officers is 98.5%.

**Officer Reporting Deficiencies by RU - Q1-Q4 2019**

| Total FDCRs Audited | | | | Total Reporting Deficiencies | | | | Precinct/Division | Mental Health and Injuries | | | | Force and Resistance | | | | De-Escalation and Decision Point Analysis | | | | Witness | | | | CEW | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| 73 | 94 | 78 | 54 | 23 | 11 | 5 | 4 | CENTRAL | 12 | 2 | 1 | 3 | 2 | 4 | 4 | 0 | 0 | 1 | 0 | 0 | 8 | 1 | 0 | 1 | 1 | 3 | 0 | 0 |
| 0 | 0 | 0 | 0 | * | * | * | * | CHIEFS OFFICE | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * |
| 0 | 2 | 2 | 5 | * | 0 | 5 | 1 | DETECTIVE | * | 0 | 1 | 1 | * | 0 | 2 | 0 | * | 0 | 0 | 0 | * | 0 | 2 | 0 | * | 0 | 0 | 0 |
| 39 | 51 | 62 | 61 | 7 | 9 | 6 | 16 | EAST | 4 | 7 | 0 | 4 | 1 | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 4 | 10 | 0 | 0 | 1 | 2 |
| 1 | 1 | 0 | 0 | 1 | 0 | * | * | FAMILY SERVICES | * | 0 | * | * | 0 | 0 | * | * | 0 | 0 | * | * | 0 | 0 | * | * | 0 | 0 | * | * |
| 33 | 32 | 31 | 35 | 19 | 10 | 6 | 6 | NORTH | 13 | 2 | 0 | 2 | 2 | 0 | 4 | 0 | 2 | 2 | 0 | 0 | 2 | 2 | 0 | 4 | 0 | 4 | 2 | 0 |
| 2 | 1 | 1 | 1 | 3 | 0 | 0 | 0 | PERSONNEL | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 10 | 5 | 6 | 4 | 2 | 4 | 2 | TACTICAL OPERATIONS | 2 | 2 | 2 | 2 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | 3 | 3 | 0 | 2 | 1 | 1 | * | TRAFFIC | 2 | 0 | 1 | * | 0 | 1 | 0 | * | 0 | 0 | 0 | * | 0 | 0 | 0 | * | 0 | 0 | 0 | * |
| 4 | 0 | 1 | 0 | 0 | * | 0 | * | TRAINING | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * | 0 | * |
| 2 | 11 | 3 | 3 | 2 | 3 | 2 | 3 | TRANSIT | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 3 | 1 | 2 | 0 | 0 | 0 | 0 |
| 0 | 1 | 0 | 0 | * | 0 | * | * | YOUTH SERVICES | * | 0 | * | * | 0 | 0 | * | * | 0 | * | * | * | * | 0 | * | * | * | 0 | * | * |
| 166 | 206 | 186 | 165 | 61 | 36 | 29 | 32 | QUARTER TOTAL | 36 | 13 | 6 | 12 | 7 | 7 | 13 | 0 | 4 | 3 | 0 | 1 | 13 | 6 | 7 | 17 | 1 | 7 | 3 | 2 |
| 723 | | | | 158 | | | | YEAR TOTAL | 67 | | | | 27 | | | | 8 | | | | 43 | | | | 13 | | | |

Table 1 – Officer Reporting Deficiencies 2019 (Provided by PPB)

Supervisor reviews demonstrate a higher raw number of deficiencies per report, though this is because supervisors are held accountable for deficiencies within FDCRs as well as within their AARs, pursuant to Par. 73(b) and 73(c). Consequently, there are approximately 54 points of evaluation for Sergeant reviews. As seen in Table 2 below, between FDCRs and AARs, Sergeants have on average 0.80 deficiencies per case audited. Command staff reviews have approximately 1.5 deficiencies per FDCR audited (which is the total number of deficiencies from Lieutenants, RU Managers, and the Chief's Office reviews combined). However, when considering that there are approximately 254 points of evaluation by the time a case leaves the Chief's Office, an average of 1.5 deficiencies per FDCR is not a cause for concern about the reliability of the overall data. Although we believe that PPB's deficiencies for all ranks are within an acceptable range, the Force Inspector should continue to stress the importance of accurate and complete reports to maintain the low rate of deficiencies and seek the best performance possible.

| | |
|---|---|
| Force Cases Audited | 324 |
| Involved Officers | 561 |
| Officer Reporting Deficiencies | 158 |
| Sergeant Reporting Deficiencies | 258 |
| Command Review Deficiencies | 472 |

Table 2 – 2019 FDCR and AAR Deficiencies (Table provided by PPB)

As the audit evaluates: (1) whether the necessary information is found within FDCRs and AARs; and (2) whether the information is accurate based on the officer's narrative, we believe PPB has implemented a consistent system component for ensuring that the evaluation conducted by the Force Inspector is predicated on reliable data. We now turn to how the Force Inspector uses such information to inform RU Managers and the community at large of trends related to the use of force.

Using the data from FDCRs, PPB is able to provide a Use of Force dashboard on its website (https://www.portland-oregon.gov/police/76875), allowing community members to view aggregate data trends as well as download the data to review force cases at the incident-level (while the quarterly data reports provided by PPB separately identify force events which occur during a crowd control event, the aggregated online data does not). Additionally, the analysts working with the Force Inspector create quarterly and aggregate annual reports on PPB uses of force. These reports are publicly available on PPB's website and are also provided to the Training Advisory Committee (TAC) to inform their work (see Training section of this report). Whereas the Force Inspector conducts quarterly analysis in accordance with Par. 76 (see below), the Use of Force dashboard and force reports allow community members to conduct their own analyses before engaging with PPB.

Using the analysis of force data, the Force Inspector conducts quarterly meetings with RU Managers to discuss overall trends in reporting deficiencies (discussed above), officers using force at a higher rate than others, and Precinct trends in use of force. During these discussions, the Force Inspector also discusses unit trends (see our discussion of this in the EIS section, below). After discussion, the RU Manager is required to provide a response to each recommendation given by the Force Inspector, thereby closing the loop on the Force Inspector's findings. PPB has provided us documentation related to the meetings between the Force Inspector and RU Managers and we have observed these meetings in prior quarters. We continue to find that such meetings provide valuable insight for RU Managers to manage officer uses of force.

Finally, as part of the force audit, the Force Inspector reviews cases to identify trends and implications for policy, training, equipment, or personnel. For instance, in 2019 Q4, the Force Inspector referred two potential training issues related to suspect safety in patrol vehicles with regards to seatbelts and training on ensuring tasers are appropriately drawn. After identifying the issues, the Force Inspector notified the Training Division, which is now considering the training implications. Additionally, the Force Inspector identified one case which required referral to IA related to an allegation of excessive force (as well as

five potential administrative violations, mainly involving force warnings). For all identified issues related to individual officers, groups of officers, and larger trends, the Force Inspector maintains a tracking datasheet to ensure that each identified issue receives a response. We find this process to be consistent with the overall system approach being taken by PPB. In addition to the Inspector identifying trends, Precinct Commanders have also proactively identified trends and implemented remedial action. For instance, the Central Precinct commander provided instruction for all roll calls that, in order to decrease the risk of injury to both officers and community members, officers should refrain from calling-off incoming cover officers. We believe that such actions are in-line with identifying trends though would suggest PPB determine whether this should become Bureau-wide guidance.

While the above system approaches taken by PPB demonstrate a comprehensive system for evaluating force, we also acknowledge the community's interest in understanding overall force trends. We urge interested community members to review the use of force data dashboard to conduct their own analyses. Here we provide some use of force data of interest, particularly given the origins of the Settlement Agreement. As seen in Figure 1, the number of individual community members who were the subject of a PPB use of force has been between 185 and 219 per quarter for the past year and a half. While the raw numbers give some sense of PPB's use of force, a more informative metric is the force-to-custody rate (represented in Figure 1 as the orange line). This shows that in the past year and a half, PPB had between 2.98% and 3.53% force-to-custody rate. Given the wide range of officer actions that are considered force, we believe the overall force rate has been stabilized.



Figure 1

Additionally, as the impetus for the Settlement Agreement was force used on persons in mental health crisis, we looked at trends in the use of force against this population. In 2019, there were 21,451 calls for service where an officer noted there was a mental health component associated with the call. Of those, 1,398 calls met (Enhanced Crisis Intervention Team (ECIT) criteria and had an associated Mental Health Template (MHT) completed. Of those calls, there were a total of 46 uses of force. When considering force incidents for ECIT type calls (representing higher-risk calls involving persons in mental health crisis), this equates to an approximate 3.3% force rate, though we acknowledge this is not an "apples to apples" comparison of the force to custody rate reported above. For instance, a primary component of ECIT calls is to avoid arrest as an outcome and therefore evaluating force to custody rates for ECIT calls would be misleading. Additionally, comparisons across agencies is not possible due to PPB's unique system and historical comparison of PPB data is not possible given that the MHT has only been reliable for a couple of years. To assess force for ECIT calls, we evaluate the numbers on their face with appropriate considerations. For instance, of the 46 uses of force during ECIT calls, approximately 63% of the force used was Category IV force type, which are the least serious force options and are not likely to cause injury. Furthermore, we note that in all of 2019, there were only 8 instances wherein PPB officers used a CEW on a person in mental health crisis. These data do not indicate a cause for concern, particularly given the raw number of force events for ECIT calls in relation to all ECIT calls and given the types of force used in these instances.



Figure 2

Given the overall force rates as well as force for persons in mental health crisis, we find that the aggregate statistics demonstrate PPB continues to manage use of force consistent with the Settlement Agreement.

Finally, we reviewed a sample of force cases which included CEW uses, Category II, Category III, and Category IV force types, including several force events involving a person in mental health crisis. Our review supports the general findings of PPB – when force is used, it is comprehensively documented by officers, reviewed by supervisors, and corrective action (formal and informal) is taken when necessary.

We found no incidents wherein we felt the reviews conducted by PPB were materially deficient and the force that was used was unreasonable under the totality of the circumstances.

In all, we believe that PPB has maintained a system for properly managing use of force to meet constitutional standards. Officers regularly complete FDCRs with sufficient information for supervisors to investigate the use of force and complete AARs to document their investigation. Chain of command reviews are also comprehensive as evidenced by PPB's relatively low number of deficiencies in the reporting scheme. The Force Inspector continues to evaluate force events and trends to inform RU Managers of potential concerns. Finally, the publicly available data put out by PPB demonstrates a generally low rate of force to custodies overall as well low numbers and levels of force against persons perceived to be in mental health crisis. Because of the above, we maintain that PPB has remained substantially compliant with Section III of the Settlement Agreement.

# <u>SECTION IV - TRAINING</u>

<u>Overview of Training Systems</u>

COCL continues to evaluate PPB's compliance with the Training requirements of the Settlement Agreement in terms of their ability to maintain systems of police training that can increase "the knowledge, skills and abilities necessary for effective and successful delivery of services to persons in mental health crisis" and that can contribute to the "proper management of the use of force to meet constitutional standards" (Par. 173). Thus, we have consistently evaluated the extent to which PPB's training systems: (1) identify areas where officers require training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

<u>Overview of Methods</u>

The COCL team continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL team also continues to observe classroom training, scenario training, and skills training and interview training staff. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness. We also provide immediate feedback on site (technical assistance) to the Training Division regarding the content and delivery of training.

<u>Assess Training Needs</u>

PPB is required to conduct a needs assessment and use this information to update its training plan annually (Par. 79). PPB has successfully executed these tasks as they pertain to the 2020 In-service training. A large proportion of this work was performed in 2019. The Training Division has relied on multiple sources to conduct a comprehensive *2019* Annual Needs Assessment (https://www.portlandoregon.gov/police/article/756185) and many of these findings have been incorporated into PPB's 2020 training plan and In-service training.

For its Needs Assessment, the Training Division has received input from many sources, including the Force Inspector, Force Audit Team, Internal Affairs, Behavioral Health Unit (BHU), Fire and Police Disability liaisons, Employee Assistance Program, PPB's Policy Team, Precinct and Unit Managers, the City Attorney's Office, and others. They have also received direct input from PPB officers (via classroom surveys), the community (via the Training Advisory Council, PCCEP, and community survey respondents) and subject matter experts (e.g. OIR Group's analysis of PPB's officer-involved shootings).

This information was gathered by the Training Division to learn about potential trends (or cases) regarding use of force (including responses to possible mental health crises), officer or community injuries, and complaints. In addition, they have collected information about officer and community needs, changes in policy and law, and best practices. For example, the national trends in officer suicides and chronic stress (which can influence officers' decision making on the street) have led to new training on officer wellness. Local and national protests have led to additional officer training on crowd management. Also, PPB's own analysis of police data has identified some disparities in police responses

Exhibit B
Pg. 16 of 49

to communities of color and thus In-service training continues to include components designed to increase trust and legitimacy. We recommend PPB continue to emphasize training on procedural justice and implicit bias so that future PPB interactions with people of color are more likely to build public trust in the Bureau.

PCCEP is working on a youth survey, and if implemented, we encourage PPB to incorporate these findings into the 2020 Needs Assessment for 2021 Training. In Q4 2019, we also recommended that the "Purpose of In-Service Training" in the 2019 Needs Assessment report be reconsidered for the 2020 report in order to give more attention to interpersonal skills that characterize the most common types of police interactions. We will evaluate PPB's 2020 Needs Assessment and Training Plan near the end of 2020 after new information has been gathered and reported by the Training Division.

<u>Evaluate Training</u>

For its training evaluation system, PPB is required to "develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum." (Par. 80). The COCL team continues to assess the content, methods, and utility of PPB's training evaluations in 2020.

After observing the 2020 In-service training in February, we found that PPB continues to employ the following methods: in-class quizzes to engage the students and test their understanding of the material; anonymous class evaluation surveys to assess the quality and content of instruction; knowledge tests to grade students' learning in the classroom; and scenario evaluations to measure officers' proficiency and skill level during role playing and to provide the data needed for post-scenario debriefings.

In addition to the scenario evaluation of procedural justice and communication skills introduced during the 2019 In-service training, PPB expanded these evaluations in 2020 to include teams of officers (rather than single-officers) as they respond to scenarios involving mental health issues, victims, and suspects. Thus, PPB has continued the process of debriefing and grading individual officers and groups of officers in select scenarios, giving systematic attention to procedural justice, de-escalation, and emergency rescue skills. From these scenarios, the Training Division is learning more about where additional training might be needed when officers respond to victims and suspects in an emergency situation (To avoid interfering with this ongoing training, we cannot reveal at this time what has been learned).

In 2020 PPB continued its two-phase process of giving feedback to instructors and administrators within the Training Division to improve current and future training. As noted previously, PPB's system includes (1) immediate feedback to Training administrators and instructors so that corrective action can be taken with classes in progress and (2) formalized feedback (for future training implications) at the conclusion of the training sessions after the final data have been compiled and fully analyzed. The immediate informal feedback has continued with the 2020 In-service training via emails and meetings. The early feedback to instructors is based on both survey findings and classroom observations. Such data have led to additional classroom observations by Training administrators and meetings with instructors. COCL interviews with Training personnel indicate that the internal process of observations, meetings, and feedback to instructors is a dynamic process at the heart of the evaluation system. The formal evaluation reports occur after this process is complete, but are needed for accountability, transparency and future training. A good example is the evaluation report prepared for the Spring 2019 Supervisors In-Service Training (https://www.portlandoregon.gov/police/article/756187). The evaluation report on

the Fall 2019 In-Service will be available later in 2020 and will be reviewed by COCL. We continue to find that PPB's feedback systems are functioning as effective tools for improving current and future instruction.

PPB's evaluation system is also expected to measure whether "graduates are applying the knowledge and skills acquired in training to their jobs." (Par. 80). There is no single method for measuring on-the-job performance. PPB's has continued to audit use of force incidents to ensure that officers' decision making is within policy and constitutional, and the Audit team provides feedback to the Training Division as needed. Community surveys reveal significant improvement in overall public satisfaction with PPB encounters between 2016 and 2019, but satisfaction among the African American community remained relatively low. As a result, PPB continues to work on building public trust with all segments of the Portland community.

The quality of police-public interactions is best measured through contact surveys. In 2019 the National Police Foundation completed a contact survey in Portland with recent victims of property crime. Overall, PPB officers were given positive ratings by community members on procedural justice (e.g. respectful 76% of the time; fair 84% of the time), and overall satisfaction (81%). Such procedural Justice ratings of officers did not differ by the race, gender or precinct of the property crime victims. However, younger victims rated PPB officers lower than older victims, and many residents complained about the lack of PPB follow up when the incident was reported online. PPB should continue to explore new ways to address these concerns.

Overall, PPB continues to maintain a comprehensive and effective system for assessing the content and style of instruction, as well as its impact on officers in the classroom, in role play scenarios, and on the streets of Portland.

<u>Document Training Delivered and Received</u>

The Settlement Agreement requires that PPB create, and that supervisors use, a "central, commonly-accessible, and organized file system" for training records (Par. 81). PPB continues to use and update its electronic Learning Management System (LMS) for this purpose. The number and type of training records, videos and documents kept in LMS continues to expand. The Training Division continues to use LMS to notify RU Managers when officers need specific training to maintain their State certification. LMS has also been used effectively to announce other training opportunities, track attendance for both PPB records and external reporting to DPSST and streamline the lesson plan review and approval process.

As supervisors are required to conduct annual reviews and "new to command" reviews of PPB members, each supervisor has experience using the LMS to check training records. As officer start dates vary (and therefore so do their annual review dates), supervisors regularly use the LMS to complete their evaluations. Each month notifications are sent to supervisors indicating which members they are required to review. Q4 2019 data indicate that all supervisors are submitting their evaluation on time, which can be attributed, in part, to the email reminders they receive. Also, the system is designed to ensure that supervisors review officers' training records during these performance evaluations, as they are physically unable to submit an evaluation unless they have checked the box indicating "Training Reviewed" and "EIS Checked." COCL interviews with supervisors indicate that LMS is helpful to them for conducting these reviews, although they would like the system to provide direct reminders to officers rather than rely on supervisors to send emails to them.

There are two additional requirements regarding training records that COCL will review for compliance later in 2020: (1) that the Training Division has submitted its Semi-Annual Training Report to the Deputy Chief and Assistant Chief who oversees Operations (Par. 82); and (2) that PPB has reviewed the work histories of applicants to be instructors to ensure that they meet the hiring restrictions defined in the Settlement Agreement (Par. 83), including use of force patterns and civil judgements against the City. The requirements for the Semi-Annual Training Report will be evaluated later in 2020. To assess compliance with hiring requirements, COCL has reviewed the Training Division's Work History Review Sheet and found no evidence that any of the applicants have violated the hiring restrictions.

<u>Deliver Appropriate and High-Quality Training</u>

The Training Division is expected to develop and implement a high-quality system of training for officers and supervisors (Par. 84). This training must be consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness.

The COCL team has observed the delivery of PPB's 2020 In-service training. This 4-day training focused on the topics required by the Settlement Agreement and other topics that emerged from PPB's needs assessment and training plan, as noted earlier (Par. 79). Students attended classes for several hours, completed knowledge tests, and then split into 4 squads of approximately 12 students each to practice specific skills and engage in scenarios.

Training specific to supervisors was scheduled for the fall of 2020, although this may be delayed because of the Coronavirus. In any event, all sworn personnel are required to take the current In-service training as well. Recruit training (Advanced Academy) will be reviewed by COCL during the second or third quarter after we can determine the impact of the Coronavirus.

Prior to the start of In-service training, the COCL team and DOJ provided feedback on all training plans and materials. On site, we interviewed Training Division personnel and after observing training, we provided immediate feedback to administrators about the content and delivery of specific classes.

This year, PPB's In-service training covered refresher classes, including the use of conducted electrical weapons (commonly known as Taser), firearms, patrol procedures, and control tactics, with updated information in each area. New attention was given to emergency entry to rescue victims, leadership and ethics, crowd management, and interacting with youth in a school setting. PPB also provided new instruction on the nature of extreme ideology and the appropriate PPB response to everything from protected speech to mass hate crime. The class successfully drew on information from outside experts, including the Southern Poverty Law Center.

Considerable attention was given to officer wellness, covering everything from diet and exercise to stress management. In our last report, we encouraged PPB to strengthen its wellness training given that police work can be very stressful and officers suffering from chronic stress run the risk of making poor decisions about the use of force and other interactions with members of the public. That has been achieved through four classes with expert outside instructors.

Two emergency entry and rescue scenarios allowed PPB to give particular attention to mental health crises, including decision making, de-escalation, and interpersonal communication skills within a procedural justice framework. (The "Youth Educating Police" school scenario, delivered in collaboration with two PCCEP youth members, also emphasized these skills). As a secondary benefit, the emergency rescue settings allowed the Training Division to expand its formal evaluation/debriefing system from individual trainees to groups of trainees and test the robustness of this feedback system.

The Control Tactics class immediately addressed a problem that occurred in the 2019 training (i.e. training on the use of knives without a corresponding policy). The class began with a video from the new Chief of Police summarizing the problem that occurred during the last In-service, and describing what steps were taken by the PPB to correct the problem. She also explained the restrictions on carrying and using knives. The video was well received by officers in the classes we observed. As a precautionary measure, PPB's Policy Team now reviews all training lesson plans prior to implementation to assess their correspondence with existing policy.

Audit the Training Program

One component of PPB's overall training system is its audit function. In 2018, PPB conducted a comprehensive audit of its training programs to ensure that the Training Division had met the seven performance standards outlined in Par. 85 of the Settlement Agreement.

In 2019 PPB expanded its auditing function by creating the Office of the Inspector General, responsible for conducting audits of key PPB units, programs, and services. The Inspector General's Office is currently completing several audits, and therefore, is not planning to re-audit its Training programs in 2020. The Settlement Agreement only requires a single audit of Training, although PPB plans to conduct future audits as needed.

Analysis and Reporting of Force Data

Another training-related system is the quarterly analysis and reporting of data on officers' use of force (Par. 86) to look for trends that have training or policy implications. Force trends must be reported to the Chief, Training Division, and Training Advisory Council (TAC). In addition to a quarterly report, the force inspector is required to "identify problematic use of force patterns and training deficiencies." The Chief is expected to receive and respond in a timely manner to recommendations from TAC or the Training Division regarding training, policy, or evaluation. During this quarter we have observed TAC meetings and interviewed both PPB and TAC members.

The Force Inspector presented findings from the Q2 Force Report at the TAC meeting in November 2019 and findings from the Q3 Force Report in January of 2020. The Q4 Force Report was made available in February and the presentation will be done in the spring.

In 2020, the Force Inspector and his team continue to gather force data and look for patterns and trends. During the first quarter, the Inspector has not identified any problematic force patterns with training implications. However, he has held meetings with the Precinct commanders to review Q4 force trends and issues. In the second quarter of 2020 the Inspector is expected to present findings to the Chief, the PPB Training Division, and the Training Advisory Council (TAC) on Force Reports for Q4 2019

and Q1 2020. TAC has not made any training recommendations to PPB during the first quarter of 2020, but instead, has focused on developing their plan for the year ahead.

Historically, the TAC has been slow to submit training recommendations to the Chief of Police and the Chief's office has been slow to respond. These problems were corrected in the fourth quarter of 2019 and we have not witnessed any similar issues so far in 2020. Recently, the Chief agreed to respond no later than 60 days after a TAC recommendation has been received.

Finally, the Settlement Agreement requires that all TAC meetings are open to the public (Par. 87). We have found no evidence to the contrary in 2020. PPB continues to send out reminders of upcoming TAC meetings using a public email list and continues to post the agendas and transcripts from meetings on the PPB Website for public review (http://www.portlandoregon.gov/police/61449).

Summary of PPB's Training System

The quality of In-service training remained high during the first quarter of the maintenance year. On the whole, the instructors were well organized, knowledgeable, engaged with students, and exhibited strong pedagogical skills, as reflected in preliminary survey findings.

PPB has maintained systems of review and evaluation that have identified training needs and have resulted in training improvements as needed. These systems include the training needs assessment, force audits and analysis of force trends, LMS to document training completions and deficiencies, and the rigorous evaluation of training processes and outcomes using knowledge tests, officer surveys, scenario scoring, force reports and surveys of community members.

Consistent with the COCL's recommendations and the requirements of the Settlement Agreement, PPB continues to infuse In-service training with scenarios and exercises that give attention to interpersonal communication, procedural justice, and de-escalation skills in response to calls that involve persons with actual or perceived mental illness or persons facing other types of psychological distress or disorientation.

Given that PPB has maintained a strong In-service training program, supported by a comprehensive set of training systems, COCL continues to find PPB in Substantial Compliance with the requirements of Section IV of the Settlement Agreement.

In March of 2020, the Coronavirus pandemic had a significant impact on the City of Portland and the PPB. The In-service training was suspended, although PPB was quick to move much of the in-class training to an online format using LMS. Clearly, this change to PPB's training system occurred as a result of forces beyond their control. However, COCL would like to note that the classroom and in-person training exercises described herein were not received by many PPB members as a result of this public health crisis. Furthermore, other PPB trainings scheduled for 2020 may be delayed or cancelled. We will continue to monitor the impact of this virus on PPB's training and other PPB functions.

21

# SECTION V – COMMUNITY-BASED MENTAL HEALTH SERVICES

Before we assess PPB and the City's activity pertaining to Section V of the Settlement Agreement, we should emphasize one fact -- the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Whereas we discuss PPB and the City's system for responding to calls for service involving persons with mental illness, the Settlement Agreement defines Section V (Community-Based Mental Health Services) as a broader system of which PPB and the City are only one component. In Section V, Par. 88 identifies the City's partners in providing community-based addiction and mental health services: "the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders." However, the Settlement Agreement does not legally bind these entities and we therefore have historically measured PPB and the City's activity in terms of what may reasonably be expected of PPB and the City.

The City and PPB have taken proactive steps to work with community partners in improving mental health response. For instance, PPB either oversees or participates in a number of committees and workgroups, including the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. Additionally, PPB acted as part of a CCO subcommittee though that subcommittee disbanded. The work of PPB and the various committees and workgroups have addressed some of the initial improvements identified within Par. 90, particularly with respect to increasing the sharing of information between agencies in the work of the BHCT. While we cannot say at this point that all the aspirational goals identified in Par. 90 have been accomplished, we reiterate that these initiatives would not be appropriately led by PPB or the City – rather, PPB and the City would act in a supporting role. When PPB and the City have had the opportunity to contribute to such discussions, we have seen them act accordingly.

Finally, Section V holds the expectation that local CCOs will establish a drop-off center for first responders to transport a person experiencing a mental health crisis. Presently, the Unity Center acts as the drop-off center when PPB members are able to persuade a person to admit themselves voluntarily or when PPB members determine that a person should be placed on a mental health hold. For their part, PPB currently acts as part of the Transportation Subcommittee for Unity. Because the expectation is that the CCOs are responsible for the Unity Center and because PPB has acted in accordance with their role in the system, we continue to find that PPB and the City have substantially complied with Par. 89.

We acknowledge concern from some members of the community regarding the overall operation of the Unity Center. However, we agree with DOJ that "Unity is not a party to this litigation" and is not within the purview of our assessment of compliance with the Settlement Agreement (see DOJ's May 2019 status report). As with other sections in this report, we take a systems approach to looking at the Unity Center as it relates to PPB's response to persons in mental health crisis.

Historically, evaluations of police agencies' mental health response had found that officers transporting a person in mental health crisis often had to wait many hours for that person to be admitted into a hospital in order to receive services. The long wait times often acted as a deterrent to taking the person

to get psychiatric help and instead officers would choose to arrest the person. In a Memphis Model CIT Program, a drop-off center acts as an alternative, allowing the person to receive necessary services without overburdening police and limiting the number of street resources available to respond to calls for service. In this broad sense, the Unity Center functions in accordance with the concept of a drop-off center (as well as a walk-in center for individuals not coming into contact with law enforcement).

Additionally, PPB has gone a step further in response to public concerns about criminalizing mental illness. Rather than police conducting transports to Unity, PPB has worked with AMR to transport individuals so as to avoid placing persons in mental health crisis into handcuffs. In addition to reducing stigma regarding mental illness, this also increases the availability of police resources and more quickly connects the person to necessary medical services. Finally, PPB has participated in AMR training with respect to transportation of persons in mental health crisis as part of AMR's larger training. This cross-agency training is a best practice and demonstrates a commitment on the part of PPB to resolve issues that may arise as a result of hand-offs to AMR. As a result, we continue to find with respect to a system approach to transporting persons in mental health crisis to a drop-off center, PPB continues to act in accordance with the intent of the Settlement Agreement, the desires of the community, and the conceptual framework of a drop-off center.

As evidenced above, we continue to find that the City and PPB have maintained compliance with Section V of the Settlement Agreement. Where able, PPB and the City have worked with City partners to improve community-wide delivery of mental health services. Through self-initiated committees as well as contributing to external committees and working groups, PPB and the City continue to do what can reasonably be expected of them. The Unity Center continues to operate as a walk-in/drop-off center as envisioned by the Settlement Agreement and PPB continues to play their part in ensuring compassionate transportation. While we encourage PPB to continue to seek avenues for supporting entities who provide community-based mental health services, we do so from the position that what has been accomplished so far is in-line with their responsibilities in the Settlement Agreement.

# SECTION VI – CRISIS INTERVENTION

Section VI of the Settlement Agreement (Crisis Intervention) is designed to facilitate PPB and the City's implementation of "systems and resources for responding to persons in mental health crisis" (see Par. 170). Historically, we have approached evaluating PPB and the City's resources in two ways: (1) Primary Response (including ECIT officers); and (2) Secondary Response (including BHRT and SCT). We maintain that approach here. We evaluate the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC) and receives a PPB response. We also examine what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. As evidenced by our evaluation below, we believe PPB and the City have maintained their system for responding to mental health crises in accordance with the requirements of the Settlement Agreement.

Most often, the entry point for PPB contact with persons in mental health crisis is through BOEC, the call-taking and dispatch center for Portland. We therefore begin our evaluation by reviewing the policies and training conducted by BOEC as well as the audits conducted to verify performance. For policies, BOEC maintains their Mental Health and ECIT Dispatch Protocol SOP which contains seven call characteristics that would trigger an ECIT dispatch. These include whether a weapon is present, when the subject is violent, when the call is at a mental health facility, when the caller is threatening suicide (and has the means to carry it out), at the request of a community member, at the request of another officer, or when the subject represents an escalating risk of harm to self or others. As in the past, we believe this SOP satisfies the requirements of Par. 113 for BOEC to revise policies for dispatch as well as for assigning calls to MCCL (see below).

In addition, we have observed BOEC's 16-hour CIT training for telecommunicators as well as their in-service training, both of which are required by Par. 114. Last year, we noted that BOEC was stressing the concept of "when in doubt, send ECIT out" as a catch-all for when telecommunicators were unsure if a call did or did not meet ECIT dispatch criteria. While the current pandemic has caused BOEC to delay in-service for 2020, they have continued to reinforce the concept through the use of email reminders as well as flyers posted throughout BOEC.

BOEC also conducts an audit of calls where PPB officers indicated a mental health component but BOEC did not dispatch an ECIT officer. The results of the most recent audit (which looked at 680 calls over a 6-month period) indicate that in 97.1% of calls, BOEC telecommunicators made the correct decision as to whether or not to send an ECIT officer based on the information they had at the time.

Additionally, when BOEC receives a call involving a person with suicidal threats, feelings, or intent but the caller does not have the direct means to carry out the suicide, does not need immediate medical attention, and is not threatening to jump from a bridge/structure or to block vehicle traffic, BOEC has a protocol for assigning the call to the Multnomah County Crisis Call Center (MCCL), who has the resources to connect community members to service providers. We have reviewed both BOEC protocol and have observed training related to this practice in the past and maintain this process positively contributes to BOEC's system. Additionally, when a call is re-routed back to BOEC from MCCL for dispatch, BOEC reviews the call to determine whether the original information supported the decision to send the call to MCCL or whether the telecommunicator should have originally dispatched an officer. Between January and February of 2020, a total of 68 calls were routed to MCCL, only two of which were

sent back to BOEC for dispatch. For both those calls, the reason for sending the call back to BOEC for dispatch was because MCCL could not create a safety plan with the subject. The reviews conducted by BOEC are designed to ensure the "fully operational" triage system of BOEC in accordance with Par. 115. In sum, we find that BOEC's role in the City's system of response to mental health crisis continues to function well as evidenced by their policies, training, and audits.

To evaluate PPB's role in the City's system for responding to persons in mental health crisis, we first evaluate PPB's current policies, the training received by PPB officers, the enhanced training received by ECIT officers, and finally data collection tools and associated data related to PPB response. PPB continues their enforcement of a number of directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). The present directives retain the revisions over the past years which brought them into compliance with the Settlement Agreement. Additionally, these directives have been reviewed by the Behavioral Health Unit Advisory Committee (BHUAC) in accordance with Par. 95 (see also our broader assessment of the BHUAC below).

PPB continues to ensure that all officers receive a minimum of 40 hours Crisis Intervention training prior to graduating the Advanced Academy (see Pars. 97 and 98), thereby demonstrating that Crisis Intervention skills remain a core element of PPB's operation. Our observations of prior Advanced Academy training revealed that the Crisis Intervention portions of training were consistent with Basic CIT training in other agencies and includes instruction on identifying signs and symptoms of mental illness and techniques for de-escalation. Additionally, each In-Service training we have observed has contained a Crisis Intervention component and de-escalation is stressed in these situations. In the In-Service we recently observed, PPB raised the issue that a mental health crisis does not necessarily require an accompanying mental illness – high stress situations regardless of mental illness may require a specialized response. We appreciate this clarification and believe it demonstrates an ongoing commitment by the Training Division to improve overall crisis response. The training requirements of Pars. 97 and 98 therefore continue to be met, though we also refer the reader to the Training Section of this report for information regarding identifying training needs, training evaluation, etc.

While all officers receive 40 hours of Crisis Intervention training, a select group of officers receive an additional 40 hours of training to become Enhanced Crisis Intervention Team (ECIT) officers (see Pars. 99 and 102). We have observed the ECIT training in the past and continue to receive updates related to new classes of ECIT officers. We continue to find that the ECIT training is a valuable supplement to the 40-hour training received by all officers. Additionally, as required by the Settlement Agreement, ECIT officers are volunteer officers (Par. 100) who retain normal duties until dispatched as an ECIT officer (Par. 103). PPB maintains selection and retention criteria which received input from BHUAC consistent with Par. 101. As part of their system, PPB reviews the work history for all prospective ECIT officers prior to selection to ensure adherence to selection criteria. Additionally, BHU personnel are notified by PSD whenever an ECIT officer receives a complaint based upon use of force or mistreatment of persons with mental illness, thereby ensuring adherence to criteria.

In evaluating the effectiveness of ECIT response to mental health crisis calls, a number of elements should be considered. First is whether an ECIT officer actually responds to the scene. PPB has conducted regular evaluations of the ECIT program over the past 18 months and found that ECIT-type calls have

received an ECIT response between 70% and 75% of the time. While the response decreased by approximately 5% in Time 3 (see Figure 3 below), the total number of ECIT calls increased by approximately 25% with no corresponding increase in the number of ECIT officers. In November of 2019, PPB conducted an ECIT training for approximately 20 new members.

| | Apr 18 - Sep 18 Time 1 | | Oct 18 - Mar 19 Time 2 | | Percentage Point Change (T1 to T2) | Apr 19 - Sep 19 Time 3 | | Percentage Point Change (T2 to T3) |
|---|---|---|---|---|---|---|---|---|
| **ECIT Officer On Scene** | 1,410 | 75.1% | 1,328 | 75.4% | **0.2%** | 1,539 | 70.0% | **-5.4%** |
| On Scene per CAD[1] | 1,379 | 97.8% | 1,288 | 97.0% | -0.8% | 1,501 | 97.5% | 0.5% |
| On Scene per Reporting other than CAD | 1 | 0.1% | 3 | 0.2% | 0.2% | 4 | 0.3% | 0.0% |
| Related/Duplicate Call with ECIT Officer On Scene | 30 | 2.1% | 37 | 2.8% | 0.7% | 34 | 2.2% | -0.6% |
| **Not On Scene** | 467 | 24.9% | 434 | 24.6% | **-0.2%** | 661 | 30.0% | **5.4%** |
| Dispatched and Cleared (or Resolved) Prior to Arrival | 337 | 72.2% | 312 | 71.9% | -0.3% | 415 | 62.8% | -9.1% |
| Not Dispatched | 52 | 11.1% | 50 | 11.5% | 0.4% | 80 | 12.1% | 0.6% |
| Not Available | 28 | 6.0% | 13 | 3.0% | -3.0% | 40 | 6.1% | 3.1% |
| Other | 50 | 10.7% | 59 | 13.6% | 2.9% | 126 | 19.1% | 5.5% |
| **Total** | 1,877 | 100.0% | 1,762 | 100.0% | -- | 2,200 | 100.0% | -- |

[1]ECIT calls with an ECIT officer on scene as indicated in CAD are not included in the audit.

Figure 3 - Quality Assurance Audit: ECIT Officer Not on Scene of ECIT Call, by Reporting Period (Table provided by PPB)

After interactions involving a person with mental illness, officers (ECIT and non-ECIT) are required to complete a Mental Health Template (MHT) if also completing any other type of report (and ECIT officers are required to complete an MHT whenever they utilize their crisis intervention skills, regardless if another report is completed). This requirement and the MHT itself conform to the requirements of Par. 105 and a PPB self-audit revealed that officers are generally accurate in determining whether a call involves a person suffering from an actual or perceived mental illness.

PPB also uses the MHT data to evaluate various aspects of its ECIT program, including ECIT type call distributions, response rates (see above), as well as arrest, hospital transports, and force differences between ECIT and non-ECIT officers. For instance, since ECIT criteria have expanded to include individuals who present an elevated risk of harm to themselves or other (and since BOEC began reinforcing the mantra "when in doubt, send ECIT out"), PPB has seen a decrease in the hospital transport disparity between ECIT and non-ECIT officers. One explanation for this decrease may be that BOEC and PPB are better at distinguishing between which calls would and would not require a specialized response. While the presence of a disparity indicates the need to continue emphasizing BOEC's mantra, "when in doubt, send ECIT out," the smaller disparity provides some evidence that the model continues to show improvement.

In addition to the primary response system for persons in mental health crisis, we also touch upon the supplemental/secondary response systems being used by PPB. The first system is the Behavioral Health Response Team (BHRT). The BHRT consists of five pairings of a PPB officer and a mental health professional. When a person is referred to BHRT through the Behavioral Health Unit Electronic Referral System (BERS), the person is evaluated to determine whether they meet criteria for BHRT intervention. The criteria include whether the person is demonstrating escalating behavior, has had frequent contacts with PPB, is considered a risk to self or others, or whose case-specific information indicates a potential

Exhibit B
Pg. 26 of 49

need for BHRT intervention. Also, when a person is the subject of three MHTs in a 30-day period, an automatic BERS referral is made for that person (unless a previous referral exists), thereby satisfying the requirements of Par. 110. If a person meets the criteria for BHRT intervention, a plan of action is discussed among members of the Behavioral Health Unit Coordination Team (BHUCT) which is comprised of law enforcement, court, service provider, and hospital stakeholders (among other relevant stakeholders).

PPB members of the BHRT teams are provided the 40-hour enhanced crisis intervention training and receive specialized training when available (see Par. 109). The selection and retention criteria are consistent with the criteria for ECIT officers. Also, the same process by which PSD notifies BHU whenever an ECIT officer has a complaint of force or mistreatment against a person with mental illness is applied to BHRT officers as well (see Par. 108).

In addition to the three BHRT teams that PPB has historically maintained (see Par. 106), PPB has expanded BHRT to include two additional teams. First, the BHU analyst observed a trend indicating that following a 60-day period after BHRT intervention, BHRT clients demonstrated a slight increase in PPB contacts (though overall contacts with this group remained lower than prior to BHRT intervention). PPB now has a BHRT team dedicated to providing follow-up to BHRT clients during this timeframe. Second, BHRT now has a new team whose primary responsibility is acting as a city-wide team for Portland's houseless population. These two teams were created based on prior PPB data analysis and needs assessments, demonstrating a review/react system that is characteristic of a learning organization.

On a quarterly basis, PPB conducts analysis of BHRT operations to identify potential trends as well as ensure ongoing system function. For example, during 2019 Q4, PPB received a total of 249 BERS referrals, of which 135 (54%) were assigned to the BHRT caseload. For those not assigned (a total of 114), the most common reasons were that the individual had infrequent contacts with PPB or was already receiving services from somewhere else (both reasons represent approximately 38% of all individuals not assigned - see Figure 4 below). For those who are assigned to the BHRT caseload, most were assigned as a result of them demonstrating escalating behavior (41% of persons assigned to caseload) or having frequent contacts with PPB (28% of persons assigned to caseload) (see Figure 5). For both evaluations (assigned and not assigned), the data found in 2019 Q4 was similar to the data found in prior quarters.



Figure 4 - Reason for Not Assigning to BHRT, 2019 Q4 (Figure provided by PPB)



Figure 5 - Reason for Assigning to BHRT, 2019 Q4 (Figure provided by PPB)

Once BHRT has contacted an individual, a number of outcomes are possible. Here, we focus on the most common outcomes related to BHRT intervention as well as trends that PPB is currently monitoring. For instance, the proportion of BHRT interventions which result in "Coordinated Services" has shown a steady decrease from 2014 whereas "Systems Coordination" has shown a relative increase since 2014. When discussing these trends with PPB, they noted that this may be a function of better defining which outcome label should be used given the degree of coordination. Relatedly, the proportion of BHRT interventions wherein the community member refused services has also demonstrated a generally steady increase over time. PPB has also recognized this trend and noted this was likely the result of the addition of the BHRT team dedicated to the houseless population (who may face additional systemic barriers to accept or engage in resource connection). As with other system assessments, we find that PPB continues to evaluate BHRT trends, identify potential reasons for the trend, and implement remedial action where necessary.



Figure 6 - BHRT Outcomes - Percent Coordinated Services (Figure provided by PPB)



Figure 7 - BHRT Outcomes - Percent Systems Coordination (Figure provided by PPB)

28



Figure 8 - BHRT Outcomes - Percent Refused Services (Figure provided by PPB)

The other secondary response system that PPB operates is the Service Coordination Team. This program continues to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system (see Par. 112). In prior evaluations we conducted, we noted that individuals who participate in SCT (regardless of whether or not they completed the program) saw a significant decrease in the number of police contacts after participating in the program. Additionally, those who graduated from SCT saw a significant increase in employment after participating in the program. The positive elements of SCT are also found in an annual Capstone Study class conducted at Portland State University. Finally, as part of SCT operation, the Supportive Transitions and Stabilization (STS) program provides a direct housing resource for BHRT clients. PPB's most recent evaluation of the STS indicates that in the past year and a half, between 12 and 18 people per quarter were referred for STS services, most of which were accepted into the program. As evidenced by the above, we continue to find that the Service Coordination Team acts as a positive element of PPB's overall system of mental health response.

As an overarching system, the Behavioral Health Unit (BHU) oversees and coordinates the ECIT, BHRT, and SCT programs (see Par. 91). BHU utilizes data from a variety of sources to evaluate its operation, including data from the MHT as well as data collected from BHRT and SCT (see Par. 93). Additionally, in accordance with Par. 92, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, MCCL, BOEC, and BHUAC (see also below). We have met with the Lieutenant who oversees BHU on multiple occasions and are confident that all aspects of BHU (ECIT, BHRT, and SCT) are operating as a comprehensive system rather than individual programs.

As another overarching system for BHU, we evaluate the BHUAC which acts as an advisory body to guide the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT factions. The current BHUAC membership consists of individuals from PPB, BOEC, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, Central City Concern, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, and the Unity Center for Behavioral Health (see Par. 94). The BHUAC continues to provide input on policy, training, and SOPs (see Par. 95), as well as receives presentations and holds discussions on current practices of other mental health system partners. For the fourth quarter of 2019, BHUAC topics included BHU/BHRT updates, ECIT training, Portland Street Response pilot program, and BHRT/ECIT case studies. Additionally, in December of 2019, the BHUAC developed a plan for increasing its community engagement including, among other things, scheduling regular meetings with community members to provide information about the committee's work and seek community feedback.

29

# SECTION VII – EMPLOYEE INFORMATION SYSTEM

The PPB's use of the Employee Information System (EIS) is intended to identify potentially problematic members and "design assistance strategies to address specific issues affecting the employee" (Par. 116). As such, our maintenance year evaluations look at the EIS system from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on receiving alerts. As evidenced below, we find that PPB has maintained substantial compliance in Section VII (Employee Information System) during this quarter.

On a nightly basis, data from force events and traumatic incidents (captured in Regional Justice Information Network (RegJIN)) as well as complaints and commendations (captured in Administrative Investigations Management (AIM)) are uploaded into the EIS database. Using that data, PPB has established thresholds for identifying potentially problematic behavior in accordance with Pars. 118 and 119. The thresholds for creating EIS alerts remain:

- Shift Force Ratio: A sworn member's force ratio is greater than or equal to three times their shift's average ratio in the preceding six months
- Force Ratio: A sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six months
- Force Count: A sworn member uses force three or more times in the preceding thirty days
- Criminal Complaint: A member receives a complaint with an allegation of criminal misconduct
- Complaint in Same Category: A member receives two or more complaints with at least one allegation in each complaint being in the same category such as two complaints that both have conduct allegations for events in the preceding six months
- Complaint Count: A member receives three or more complaints for events in the preceding six months
- Traumatic Incidents: A member experiences three or more traumatic incidents in the preceding thirty days
- Commendations: A member receives two or more commendations for events in the preceding six months

PPB has continued to evaluate the quality of the data and conduct explanatory analysis when results appear inconsistent to assure the high-quality of data needed to drive the EIS system. For example, PPB was able to identify a computer/downloading error for Traumatic Incidents that may have impacted a small portion of 2019 Q4 alerts (leading to less alerts being generated than should have been). Additionally, a backlog of commendations was put into the AIM system during the second and third quarters of 2019, causing a spike in alerts related to commendations. At issue for the maintenance year is whether PPB is able to conduct such evaluations, identify inconsistent results, perform additional analyses, and conduct remedial action, if necessary. Based on the above information, we believe this aspect of EIS is operating in accordance with a system approach.

When the data are imported into the EIS application, alerts are created whenever a threshold (above) is broken. Once an alert is created, EIS Administrators evaluate the alerts and make a determination as to whether the alert should be forwarded to the RU Manager of the employee. PPB employs two EIS administrators who were trained via a comprehensive operations manual in accordance with Par. 120, thereby preserving institutional memory and ensuring that future EIS administrators will conduct their

review in a manner consistent with the current administrators. Upon the creation of the alert and the decision to forward it on to the RU Manager, the EIS administrators then track the alert. At each stage of an alert's path, a predetermined timeline dictates how long the alert may stay at each stage. EIS administrators are responsible for ensuring the alert adheres to the timeline (thereby preserving the ability for an "early intervention") as well as act as a system for checks and balances should the RU Manager or supervisor determine no intervention is necessary.

In the fourth quarter of 2019, EIS administrators reviewed a total of 244 alerts and sent 119 (48.8%) on for RU Manager review (see Figure 9). When an alert is forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or may be sent on to the officer's supervisor for either closure or an intervention (coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For all alerts closed in the fourth quarter of 2019, there were 138[1] alerts sent to the RU Manager and for 54 (39.1%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the fourth quarter of 2019, a substantial majority (85.2%) of those resulted in some type of intervention for the officer.

Over the course of the past year, some general trends in the data have been observed. First, the proportion of alerts sent to the RU Managers has decreased (when excluding the second and third quarter of 2019, which were impacted by the above described data imputation issues). Next, the proportion of alerts sent to RU Managers that were ultimately sent on for further supervisor review has decreased. Additionally, the proportion of alerts sent to the RU Manager that received some type of intervention has also decreased. Finally, the proportion of alerts sent to a supervisor for further review that received some type of intervention has increased.

Because intervention rates have increased over the past four quarters, a likely explanation is that as EIS administrators and RU managers have gained ongoing experience with the system, they have become more discerning as to which alerts are and are not indicative of a need for intervention. It also indicates that the ones that are getting through are more substantive and warrant additional attention. The results indicate that the "white noise" associated with EIS may be being better managed by EIS Administrators and RU Managers by more consistently forwarding those which require an actual intervention. As part of their ongoing operation of the EIS system, PPB should continue to conduct analyses to determine where further white noise might be removed from the system.

---

[1] The 138 cases represent all alerts <u>closed</u> in this quarter, which could also include alerts generated prior to the 4th quarter.



Figure 9 – EIS Alerts and Alerts Sent to RU Manager (Provided by PPB)

|  | 2019 Q1 | 2019 Q2 | 2019 Q3 | 2019 Q4 |
|---|---|---|---|---|
| Alerts Sent to RU | 161 | 232 | 338 | 138 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 101 (62.7%) | 116 (50%) | 145 (42.9%) | 54 (39.1%) |
| Interventions (Percent of Alerts Sent to RU) | 71 (44.1%) | 86 (37.1%) | 122 (36.1%) | 46 (33.3%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 71 (70.3%) | 86 (74.1%) | 122 (84.1%) | 46 (85.2%) |

Table 3 – Outcome of Alerts Sent to RU Manager

In order to identify potentially problematic trends at the supervisor and team levels, the Force Inspector and analysts within the Office of Inspector General continue to utilize Use of Force data to identify groups that are using force at higher rates compared with others (Par. 117). On a quarterly basis, the Force Inspector meets with Precinct Commanders to discuss findings related to the force audit overall (see Pars. 74, 75, and 77) and groups which demonstrate higher rates of force. We have personally observed debriefing sessions between the Inspector and Precinct Commanders and PPB continues to provide written communication from the Inspector to the Precinct Commander to inform such

conversations. After discussing the trends with the RU Manager, an EIS alert is manually created thereby requiring the RU Manager to respond to each of the issues raised by the Inspector. In the fourth quarter of 2019, we reviewed documents demonstrating group level data for precincts, shifts, and days off. The data did not indicate any group trends for force though in conversations with PPB Command staff, we were informed that group trends at times may be masked with the inclusion of Category IV force types. As part of being a learning organization, PPB may consider performing an exploratory analysis to determine whether trends would be more apparent with the exclusion of Category IV force types.

In addition to the Alert Management System (AMS) for thresholds and the Force Inspector's review of aggregate data, supervisory interventions may be accomplished through the routine review of officers' EIS data (Par. 116). PPB Directive 345.00 (and, where relevant, Directive 215.00) requires supervisors to evaluate EIS and Performance Discussion Tracker (PDT) information (1) annually as part of an officer's performance evaluation and (2) upon transfer of an officer to a new command. PPB performs quarterly audits of reviews required by Directive 345.00 and has consistently found high rates of compliance with the required reviews (see Figure 10). Additionally, PPB has incorporated an email notification system through which they are able to alert supervisors to upcoming and missed review timelines. We credit this approach with increasing overall review compliance with Directive 345.00 reviews.

Whereas PPB enjoyed nearly 100% compliance with both required reviews from 2018 Q3 until 2019 Q3 (a span of five quarters), "new to command" reviews decreased to 86% in the fourth quarter of 2019. This is largely explained by "new to command" reviews required of the Chief's Office during this quarter which were completed within the required review timeframe less than 50% of the time (5/11) – all other reviews were completed within the required review timeframe 94.3% of the time (50/53). PPB also noted this trend and addressed it by identifying the reason (there was a miscommunication between EIS and the Chief's Office) and providing email documentation of the issue's resolution. The issue was identified and resolved prior to COCL inquiries, thereby demonstrating a functional system.



Figure 10 – Compliance with Reviews Directive 345.00 Reviews

The above approaches by PPB demonstrate an overall functioning system whereby potentially problematic officers are evaluated through a number of processes: supervisor review of EIS, EIS alerts, and Inspector analyses. When appropriate, PPB has demonstrated an ability to implement an intervention in order to address supervisor concerns. Elements of the system which contain the potential for human error (or failure to perform duties) are buoyed by a multi-level system of checks and balances, ensuring that, where necessary, corrective action can be taken. We have seen such instances and find that PPB has implemented components which safeguard the integrity of the system. While the impact of PPB's current work will take many years to be realized, the system operates in accordance with sound supervisory theory. We therefore find PPB has maintained compliance for Section VII (Employee Information System) during this quarter.

# SECTION VIII – OFFICER ACCOUNTABILITY

A functional accountability system is an important component for any police agency. Because accountability is often a critical measure used by community members, the system must contain a number of foundational elements. These include access, transparency, expediency, consistency, and multiple checks and balances in order for community members to find the accountability system legitimate. The Settlement Agreement contains requirements for each of these elements and in this section, we assess whether PPB has maintained the systems created over the past five years as required by the Agreement. As evidenced by our overall evaluation below, we find that PPB has maintained those systems.

The most public-facing element of Portland's accountability system are complaints of police misconduct. Complaints can originate in a number of ways, including community members complaints to the Independent Police Review (IPR), community member complaints to PPB, IPR initiated complaints, and PPB initiated complaints. Community members can file a complaint by phone, online, or in-person (either to PPB or IPR). For most complaints, the Independent Police Review (IPR) conducts an intake investigation and determines whether to initiate additional investigation proceedings or not.

IPR maintains specific criteria for administratively closing an allegation of misconduct (see City Code 3.21.120 (C) (4)), thereby systemizing the process. For force events, IPR must have "clear and convincing evidence…that the allegation has no basis in fact" (Par. 129). Recently, IPR has revised their SOPs to better define the terms "clear and convincing evidence" and "no basis in fact" in order to more consistently determine whether a force allegation should be forwarded for additional investigation. IPR administrative closures in 2018 were 56% of all misconduct complaints though overall closures have been steadily declining over the past five years (see Figure 11 below).



Figure 11 – IPR Administrative Closure Rate Over Time (Figure provided by IPR)

Another important element of a comprehensive accountability system is transparency in the system. Here too, we find Portland has ensured that this element is incorporated through much of its accountability process. For instance, after filing a complaint, community members can track the complaint's progress (see Par. 138) and IPR provides updates in writing at each stage of the investigation

35

(see Par. 140), including a community member's ability to appeal findings. Findings letters provided to community members clearly state the finding as well as the rationale for the finding. Not only are updates and information for appeals provided for community members but they are also provided for officers. Appeal hearings conducted by the Citizen Review Committee are also open to the public and minutes of appeal hearings are available on the IPR website (see below for further discussion related to CRC operation). Additionally, redacted summaries of Police Review Board (PRB) hearings are provided on the PPB website. Finally, community members are able to view data on misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths by going to IPR's website (https://www.portlandoregon.gov/ipr/76848). Overall, the accountability system remains largely transparent for both individuals filing complaints as well as the public at large.

As a matter of procedural justice, expediency in resolving administrative investigations is an important element to facilitate trust in the system. In the past, we have noted the steps taken by PPB and IPR to ensure that overall case timelines (as well as individual stage timelines) are adequately managed in order to provide a swift resolution to complaints. In our 2019 Q3 report, we demonstrated that overall case timelines had improved to an approximate rate of 94% compliance with the 180-day timeline between IA and IPR administrative investigations. Additionally, in September of 2019, IPR provided a memo to IPR Managers and Analysts, Internal Affairs Command, and the Commander of Professional Standards Division, laying the groundwork for a quarterly analysis related to Quarterly Reports (see, e.g. https://www.portlandoregon.gov/ipr/article/751149), public dashboards (see, e.g. https://www.portlandoregon.gov/ipr/76848), and timeliness analyses provided to IPR and IA management.

In February of 2020, IPR analysts provided IA and IPR management an assessment of case stage timelines, noting "The median case times at each stage remain below the goals set for each stage, with several stages falling days below the goal." However, the analysis identified two stages that, while remaining below the goal timeline, showed increases in recent quarters. This includes IPR Investigations and Supervisory Investigations. Upon identification of the increases, the IPR analysts asked IA and IPR management to "further research the circumstances of the cases to determine if any action is necessary to ensure those stages remain on track."



Figure 12 – IPR Investigation Stage Timelines Over Time (Figure provided by IPR)



Figure 13 – Supervisory Investigation Stage Timelines Over Time (Figure provided by IPR)

For overall timelines, IPR's Quarterly Report provides evidence that investigations continue to adhere to the 180-day timeline (see Par. 121). For instance, for two of the three months captured in the most recent Quarterly Report, the <u>oldest</u> case that was open was near the 180-day timeline. For December of 2019, the oldest case (225 days) was closed before January. Overall, this provides some evidence that for this three month span, investigations were continually evaluated and managed.

|  | 11/4/19 | 12/2/19 | 1/7/19 |
|---|---|---|---|
| Cases under investigation at Internal Affairs | 31 <br><br> (20 Community, 11 Bureau) | 31 <br><br> (19 Community, 12 Bureau) | 31 (55 days) <br><br> (19 Community, 12 Bureau) |
| Median Age | 46 days | 55 days | 61 days |
| Oldest Case (non-OIS) | 196 days | 225 days | 181 days |
| Cases awaiting assignment at Internal Affairs | 0 | 0 | 0 |
| Median Age | - | - | - |
| Oldest Case | - | - | - |
| Ongoing Supervisory Investigations | 4 | 5 | 5 |
| Median Age | 47.5 days | 42 days | 25 days |
| Oldest Case | 104 days | 150 days | 42 days |

Table 4 – Overall Case Timelines (Table provided by IPR)

As a result of the implementation of the Settlement Agreement, administrative investigations have been conducted in a more expedient fashion. Overall timelines remain within the 180-day limit established by the Settlement Agreement and individual stage data regularly stay within their target timeframes. Additionally, both IA and IPR have implemented case management strategies to ensure timeframes are met as analysts conduct quarterly evaluations and provide the data to IA and IPR management. Given these steps, we continue to find that the steps taken maintain an expeditious process while also maintaining the integrity of investigations (see below for our analysis regarding consistency).

37

An accountability system that is consistent, both in its approaches and outcomes, is important for maintaining trust in the system by both officers and community members. Here too, we find evidence that PPB and the City have implemented a system that has consistency so that a complainant or an officer will know exactly what to expect during the administrative investigation process. In recent years, we have credited IA and IPR for seeking to mirror their policies and SOPs, conduct joint training, and confer when issues arise to ensure consistent processes. Through this process, IPR has been enabled to conduct meaningful independent investigations (see Par. 128),

During this monitoring period, we also reviewed cases that follow different investigative paths. We requested a list of all administrative investigations that were completed in the fourth quarter of 2019 and from those, selected a total of 20 cases, stratifying our selection to ensure an adequate representation of administrative closures, supervisory investigations, precinct referrals, IPR full administrative investigations, and IA full administrative investigations. The cases we reviewed indicated that, regardless of which route a complaint might take, findings and decisions are reasonable and supported by a preponderance of the evidence.

Finally, when a complaint against an officer is sustained, PPB utilizes a discipline guide to ensure that discipline is defined and consistent. The discipline guide contains the potential for mitigating and aggravating factors and supervisors are required to consult the guide when making disciplinary decisions. We reviewed the Corrective Action Recommendation Memorandums from the 2019 Q4 and found that within each memo, supervisors confirmed that they consulted the discipline guide, discussed both mitigating and aggravating factors, and indicated how the proposed discipline was in-line with the guide. From these documents (as well as prior discipline recommendation memos we have reviewed in the past), we believe that discipline is consistent and in-line with a functional accountability system.

We also assess whether there is an inherent system of checks and balances built into the accountability system to ensure a fair resolution for all involved. Through a review of IA and IPR policies and corresponding supporting documents, we see evidence of checks and balances occurring at each stage of the process. For instance, prior to an RU Manager's findings on an allegation, IPR reviews the investigation report and can request additional investigation or a rewrite of the investigative report. Additionally, after an RU Manager makes findings, IPR reviews those findings and has the ability to controvert the findings, thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination.

Should a community member or an officer wish to appeal findings, they are able to appeal the case to the Citizen Review Committee (CRC), an eleven member review board that "hear[s] appeals from complainants and officers and publicly report[s] its findings" (among other functions – see https://www.portlandoregon.gov/ipr/53654). In 2019, there were a total of 4 appeal hearings, one of which we observed in-person while for the other three, we reviewed the minutes. Our observations of CRC meetings in the fourth quarter and in the past, as well as our ongoing review of their public reports, leads us to find that they conduct their hearings in a fair and impartial manner (see Par. 134). As part of their operation, the CRC is able to request an additional investigation or information (see Par. 136) and may challenge the findings of an administrative investigation and recommend a different finding (see Par. 135). Should CRC challenge a finding and no resolution can be reached with PPB, the City Council then acts as another system of checks and balances and makes a final determination. In 2019, one of the four CRC cases heard had previously been sent back for additional investigation and one of the cases

was referred to the City Council, thereby showing that the requirements of Pars. 135 and 136 have been put into action by the committee.

While the CRC's operation above meets the letter of the Settlement Agreement as well as contributes to the overall system, CRC members and IPR both recognize some issues in their relationship. For instance, there remains differences in opinion on the CRC standard of review ("reasonable person" standard vs. "preponderance of the evidence" standard) as well as CRC member concerns with the degree of collaboration between IPR and CRC when making decisions on CRC operations. We have discussed these issues with CRC members as well as IPR representatives and believe that both sides are interested in working together to find resolutions where feasible. Given that CRC has five new incoming members and IPR has new staff in the roles of IPR Director and Deputy Director, both sides appear optimistic. New training for new CRC members has been provided and refresher training is being considered. As part of a functioning system, we encourage the CRC and IPR to continue working together in good-faith to identify issues, recognize steps taken to-date, and find common ground in creating solutions to present and future problems.

A final system of checks and balances can be found in the Police Review Board. When there is a sustained finding that will lead to discipline of suspension or greater, or when there is a controverted finding, the Police Review Board acts as a review board who may take the RU Managers proposed findings (see above) and either adopts the proposed findings or provides their own proposed findings and corrective action to the Chief. PRB procedures are consistent with Par. 131 of the Settlement Agreement. Our observation of PRB proceedings, as well as our review of documents related to PRB proceedings, demonstrates an overall functioning review board.

Between the roles of IPR, the CRC, City Council, and the PRB, we believe that the overall accountability system includes an extensive system of codified checks and balances.

Finally, PPB's accountability system has particular requirements after the occurence of lethal force and in-custody death events. Because of the sensitive nature of such events, PPB safeguards the integrity of such investigations through a number of actions. For instance, first responding supervisors separate all witness officers and involved officers (see Par. 125), conduct initial interviews individually (rather than as a group), and have a phone-tree to ensure all necessary notifications are made. Detectives conduct on-scene walk-throughs and interviews with select witness officers (see Par. 126) as well as request walk-throughs and interviews with involved officers (though involved officers have historically invoked their right to decline) (see Par. 127).

After conducting their on-scene investigation, investigators interview all witness officers and then provide them with Communication Restriction Orders (CROs) to prohibit direct or indirect communication with anyone involved with the event until a grand jury has been convened, at which point the CROs are rescinded (see Par. 125). Involved officers are then required to participate in an interview with IA investigators within 48 hours of the event (unless a voluntary statement was already given on-scene) in order to inform the IA investigation. Pursuant to *Garrity v. New Jersey*, the administrative and criminal investigations are walled off from one another (see Par. 124), thereby maintaining the rights officers have against self-incrimination (see Directive 1010.10). For each of the incidents involving lethal force in the past year, we have reviewed CROs and details regarding the investigation. Based on our review and the lethal force investigation system operating within PPB and the City, we find that this aspect of the system continues to function properly.

# SECTION IX – COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

PCCEP Role in the Settlement Agreement and the City's Support

System Overview

Section IX of the Settlement Agreement requires that the City establish a Portland Committee on Community Engaged-Policing (PCCEP, Par. 141), which is authorized to: (a) solicit information from the community and the PPB about the PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns (Par. 142), with other specific duties set forth in a separate Plan for Portland Committee on Community-Engaged Policing.

PCCEP's membership is designed to come from a reasonably broad spectrum of the community, and members shall not have an actual or perceived conflict of interest with the City of Portland (Par. 143). PCCEP shall meet as needed to accomplish their objectives and hold regular Town Hall meetings that are open to the public. The City shall give advice on Oregon's Public Meetings Laws and similar requirements as necessary (Par. 151) and shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law (Par. 152).

PCCEP's Role

Pars. 141 and 142 both establish PCCEP and outline the body's authority to perform critical functions. Here, we provide an update on both paragraphs together. COCL found full Substantial Compliance with Par. 142 in Q3 2019, after observing early on that PCCEP had the authority to perform the functions listed in Par. 142, but not until seeing "progress that we anticipate will be made in future meetings, including progress toward a Community Engagement Plan… [and] toward both soliciting public input and informing recommendations regarding strategies to improve community relations."

PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations. However, the first quarter of 2020 brought an unanticipated challenge—the COVID-19 pandemic—which resulted in the cancellation of the general meeting in March and moved subcommittee meetings to teleconferences.

Specific observations in Q1 that underscore PCCEP's continued function as a legitimate body for community engagement include:

- In January, two members of PCCEP's Steering Committee spoke to the group's community engagement efforts on OPB's Think Out Loud radio program.
- Mayor Ted Wheeler and new Police Chief Jami Resch addressed the group's January meeting, with the Mayor noting the City's commitment to the group's work continuing beyond the Settlement Agreement, and the Chief building on those remarks with specific thoughts on trust-building and reiterating PPB's commitment to working with PCCEP.
- In January and February, PCCEP members drafted and had a robust discussion on a PCCEP statement delivered during the February 25 Status Conference with Judge Michael Simon.
- During the February full PCCEP meeting, DOJ representatives presented their report and findings of Substantial Compliance with the Settlement Agreement and engaged in a discussion with PCCEP members and members of the public.
- PCCEP welcomed new members, including two youth members and several alternates.
- PCCEP approved several recommendations, including input on "Community-based Expectations and Concerns" related to any future policy on body cameras, and a framework for a procedural justice policy. The group also commented on a widely reported case of racial discrimination involving the West Linn Police Department though they did not make any formal recommendations related to this incident.
- PCCEP hosted a Town Hall with COCL during the February 12 Settlement Agreement and Policy Subcommittee meeting, to present and take feedback on the draft Q4 COCL report.
- The PCCEP as a whole—and subcommittees including the Racial Equity and Settlement Agreement and Policy Subcommittees—worked on longer-term strategic plans, including outreach plans.
- The Youth Subcommittee advanced its work on a survey for Portland Public Schools high school students
- The Settlement Agreement and Policy Subcommittee hosted a January Town Hall on Facial Recognition Technology with Commissioner Jo Ann Hardesty and several invited speakers.

PCCEP was not without challenges in Q1 2020. In February, several members of the Subcommittee for People with Mental Illness (SPMI) —including one PCCEP member—resigned. While COCL was not present at the subcommittee meeting where members voiced their concerns, follow up conversations and interviews indicated several SPMI members were frustrated that past subcommittee recommendations had not been adopted by the full PCCEP—including a recommendation that the City of Portland provide 25% of the operating cost for up to five years for a new Multnomah County resource center for people who are experiencing a mental health crisis, and a recommendation that the Chief of Police send a specifically-worded letter of condolence to a family following a lethal use of force.

This resignation prompted a discussion at the February PCCEP meeting and during the Status Hearing, regarding concerns with turnover among PCCEP's volunteer members. While it is true that only four of PCCEP's original members (including two original alternates who were elevated to full membership) are still serving, all but one of PCCEP's resignations were due to volunteers' personal obligations or

circumstances, according to their resignation letters, emails, or comments during meetings—for example, because of work or family commitments, or moving to another city. One member resigned in February from both the SPMI and full body, citing concerns with PCCEP; another member was removed after missing multiple meetings and not responding to staff attempts to connect. The PCCEP moved swiftly to reconstitute a subcommittee devoted to behavioral health issues, with two members volunteering to jointly lead the subcommittee going forward. City staff supported the new subcommittee leadership at a planning meeting in March, with the aim of holding regular meetings on the first Tuesday of the month going forward.

At the end of March, Mayor Ted Wheeler appointed two members to PCCEP from the alternate pool, based on PCCEP's recommendations. While council has not confirmed the two newest appointees as of this report date, the appointees are participating and bring PCCEP to its full membership of 13, including both youth seats filled.

At the February 25 Status Conference, both the COCL and the Department of Justice reported to Judge Simon that the City (including PCCEP) has achieved Substantial Compliance with Section IX of the Settlement Agreement on Community Engagement for reasons stated here and in previous reports. PCCEP leaders also provided a statement defending its functionality and legitimacy. However, the Judge declined to remove the conditionally-approved designation on the PCCEP-related amendment to the Settlement Agreement.

### City's Support

The City continues to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions.

In our previous assessments, COCL has called out one area in which the PCCEP was imbalanced—gender. As of March 2020, the number of PCCEP members who identify as female is three, and all four PCCEP leaders chosen by the full PCCEP in November identify as male. However, three subcommittees are chaired by PCCEP members who identify as female.

In other ways, PCCEP continues to represent a "reasonably broad spectrum of the community," with seven members identifying as either a person of color and/or an immigrant, though representation of people with experience as peer support specialists or other personal, lived and/or professional experience with mental health issues has decreased from the three noted in Q4 2019. However, many of PCCEP's current members volunteer with other community groups or nonprofit boards related to mental health, the justice system, or underrepresented communities, bringing in additional perspectives to PCCEP's work.

To date, COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

There remains an opportunity to add more members who identify as female—as well as elevate female members to positions of leadership. We encourage the PCCEP to explore these options. Aside from this concern, PPCEP's overall functioning remains consistent with the expectations and requirements of Paragraph 141.

Substantial Compliance with Par. 151 has also continued, with PCCEP and COCL jointly hosting quarterly Town Halls to review and discuss draft COCL reports. Additionally, PCCEP regularly hosts community listening sessions and invites presentations on topics of community interest during its regular monthly meetings and subcommittee meetings—including the Settlement and Policy Subcommittee hosting a forum on Facial Recognition Technology in Q1 2020—in addition to conducting regular business related to subcommittee reports and PCCEP recommendations.

A representative of the City Attorney's office attends PCCEP meetings and continues to advise the PCCEP as necessary to ensure compliance with public meetings law, and the City continues to train new PCCEP appointees based on the "Guide for Volunteer Boards & Commissions" presentation prepared for all advisory boards, not just PCCEP. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

<u>Portland Police Bureau's Role in Public Engagement and Outreach</u>

<u>System Overview</u>

Section IX of the Settlement Agreement requires that PPB introduce or expand its systems of community engagement, both with the PCCEP and other resources (Par. 145). This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. Specifically, PPB was required to conduct a citywide community survey that would assist the PCCEP and lead to the development of a Community Engagement Plan by PPB (Par. 146). PPB was also required to collect demographic data about the community in each precinct to assist the Precinct Commanders and PCCEP with their community engagement plans (Par. 147). To help measure possible discriminatory policing, PPB officers were required to continue collecting data on race, age, sex, and perceived mental health status of persons they stop and share this information with the PCCEP and the public (Par. 148). PPB is also required to work with DOJ and COCL to develop a general set of metrics to evaluate community engagement and outreach by the PPB (Par. 149). Finally, PPB must issue an Annual Report (with certain contents), with a draft reviewed by PCCEP, and then present a revised report to the public at Precinct meetings and before the City Council (Par. 150).

PPB's Community Engagement Actions

The COCL team has interviewed key personnel, observed meetings, and reviewed websites and documents to reach conclusions about the current status of PPB's community engagement activity.

PPB completed a year-long strategic planning process in 2019, involving community meetings, focus groups and surveys, which resulted in a 5-year strategic plan that helped shape PPB's Community Engagement Plan, as required by Par. 145. In 2020 PPB continued to be engaged in numerous outreach and engagement activities via patrol officers, its Office of Community Engagement and various PPB advisory councils (https://www.portlandoregon.gov/police/30379). PPB's advisory groups include: The Training Advisory Council, the Behavioral Health Unit Advisory Committee, the African-American Advisory Council, the Alliance for Safer Communities, the Slavic Advisory Council, the Muslim Advisory Council, the Equity and Inclusion Office Advisory Committee, and the Precinct Advisory Councils. PPB also continues to maintain social media platforms that seek to engage and inform the community, including NextDoor, Facebook, Twitter, Instagram, and YouTube. PPB continues to invite community members to review and comment on new and revised directives (https://www.portlandoregon.gov/police/59757). COCL will continue to document any new community outreach actions in 2020, including plans to engage the Latinx community.

PPB continues to work with PCCEP during the first quarter of 2020. PPB personnel have attended PCCEP meetings and subcommittee meetings and have responded to PCCEP or community questions as needed. We expected increased interaction between PPB and PCCEP in 2020 as they work on evaluating, refining, and continuing to implement the Community Engagement Plan.

In 2019, the City, PPB and PCCEP contributed to a citywide community survey that provided information for PCCEP's planning and helped to inform PPB's Community Engagement Plan (Par. 146). This survey has been conducted three times since 2015 but was only required once by the Settlement Agreement. It will not be repeated in 2020. The final Community Engagement Plan was adopted by the Portland City Council in October of 2019. PPB has begun work on implementing the Community Engagement Plan in 2020. They will report back to the PCCEP regarding their progress toward achieving the goals as described in the Plan and any recommendations for refining the Plan.

Data Collection, Analysis, and Reporting

In the absence of new data from the U.S. Census Bureau surveys, the precinct-level demographic data on local residents remains the same in 2020 (Par. 147). However, Precinct Commanders, PCCEP, and the community at large can turn to PPB's "Open Data" portal for extensive Precinct and neighborhood level maps and statistics on calls for service, crime, traffic accidents, police stops, officer-involved shootings, and more (https://www.portlandoregon.gov/police/71673). These interactive dashboards, prepared by PPB analysts, are updated regularly and reflect the cutting edge of police information management. In

addition, Precinct commanders and supervisors receive informal feedback regarding local problems as officers from Patrol, the Detective Division, and other units continue to gather information in the field.

PPB continues to collect demographic data from individuals who are stopped by the PPB (Par. 148), using a "Stops mask" or template that requires officers to report specific information about each stop. Some enhancements to the system have been reported in the previous years and additional data points for the Stops mask have been identified. After review by the City Attorney's Office for compliance with a new state law on stops data, PPB was given a "green light" to revise their Stops mask. Revisions are underway, which will be followed by officer training prior to implementation. COCL will report on this later in 2020.

In the meantime, PPB's Strategic Services Division continues to generate quarterly Stops Data Collection reports, with the most recent report covering the 4th quarter of 2019. This report was released on January 28, 2020 and PCCEP was notified of its availability on PPB's website (https://www.portlandoregon.gov/police/67433). PPB's annual report on stops typically includes an analysis of data on race, age and sex of the community member stopped, thus contributing to "the analysis of community concerns regarding discriminatory policing" (Par. 148). The 2019 annual report has yet to be released.

Previously we reported that PPB, DOJ, and COCL jointly developed a framework and general set of metrics to evaluate community engagement (Par. 149) that covered four domains: 1) Interactions with the public and general service delivery, 2) Communication with the public, 3) Collective engagement with the community through boards, commissions, committees and other stakeholder forums/groups/meetings, and 4) Regular reporting to the community on PPB activities to achieve these community engagement objectives. PCCEP recommended a fifth domain, accepted by PPB, regarding PPB learning about best practices from other organizations.

Metrics relevant to this framework are reflected in many of PPB's current public activities, as described on PPB's website, which is updated regularly. Also, in the first quarter many PPB divisions and units have been working to operationalize the Community Engagement Plan and relevant performance metrics. Holding bi-monthly meetings, PPB is planning to complete this work by October 1 and present it to the PCCEP for review.

Finally, in the months ahead COCL will assess whether the PPB has remained in compliance with the requirement to "issue a publicly available PPB Annual Report" with specific requirements (Par. 150). COCL will evaluate whether the 2019 draft report (yet to be released) was prepared in a timely manner, was reviewed by PCCEP, contains the required information on problem-solving and community policing activities, and is responsive to PCCEP recommendations. COCL will also document whether PPB held meetings in each precinct and with the City Council to present the Annual Report.

<u>Maintaining Measures of Community Contact and Engagement</u>

Clearly, PPB has developed systems of community engagement, but it has also created systems of measurement to monitor the quantity and quality of its engagement activities. These systems, as described above, increase transparency with the public and provide feedback loops to enhance performance.

As we have documented, PPB has many systems in place, including a monthly geographic analysis and mapping of dispatched calls, crime statistics, traffic stops, traffic fatalities and serious injuries, and stolen vehicles. PPB also provides special reports on traffic stops and use of force with breakdowns by race and gender. Overall, PPB's data analysis and reporting of encounters between the police and the community are well above the standard in the law enforcement field.

We will not report the results from these systems, as they are available to the public on PPB's website (https://www.portlandoregon.gov/police/). We encourage the public and all advisory groups or stakeholders to review these findings, engage in a thoughtful analysis, and consider any implications for PPB policies, training, or field operations. If any new data systems result from the implementation of PPB's Community Engagement Plan or the work of PCCEP in the months ahead (e.g. a youth survey), we will mention these in future reports.

In sum, PPB remains in Substantial Compliance with the terms of the Settlement Agreement in Section IX on Community Engagement.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

47

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# **LIST OF PERSONNEL**

Chief of Police: Jami Resch

Deputy Chief of Police: Chris Davis

Assistant Chief of Operations: Mike Frome

Assistant Chief of Services: Ryan Lee

Assistant Chief of Investigations: Andrew Shearer

Commander of Professional Standards Division/Compliance Coordinator: Bryan Parman

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Jeff Niiya

Behavioral Health Unit (BHU) Lt.: Casey Hettman

EIS Supervisor: Nathan Sheppard

EIS Administrator: Dan Spiegel

Training Captain: Craig Dobson

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne