# COMPLIANCE AND OUTCOME ASSESSMENT REPORT

## of the

## COMPLIANCE OFFICER AND COMMUNITY LIAISON

### *Quarterly Report:*

### *Quarter 2 Updates & Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**April 1, 2020 to June 30, 2020**

**August 24, 2020**



# TABLE OF CONTENTS

**INTRODUCTION** ....................................................................................................................................3

**EXECUTIVE SUMMARY** .........................................................................................................................5

**SECTION III — Use of Force** ..............................................................................................................10

**SECTION IV — Training** .....................................................................................................................16

**SECTION V — Community-based Mental Health Services** ..............................................................24

**SECTION VI — Crisis Intervention** ...................................................................................................25

**SECTION VII — Employee Information System** ...............................................................................32

**SECTION VIII — Officer Accountability** ...........................................................................................37

**SECTION IX — Community Engagement and Creation of PCCEP** ..................................................44

**LIST OF ABBREVIATIONS** .................................................................................................................52

**LIST OF PERSONNEL** .........................................................................................................................54

# INTRODUCTION

This is the second quarterly report in 2020 of the Compliance Officer/Community Liaison (COCL), as required by the Settlement Agreement (Agreement) between the City of Portland and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, filed 12/17/12. This report covers the three-month period from April 1, 2020, to June 30, 2020.

The City of Portland achieved Substantial Compliance with the entire Settlement Agreement on January 10, 2020. Paragraph 175(b) of the revised Settlement Agreement indicates that the City must "maintain substantial compliance with all provisions for one year." In this second quarterly report, the COCL continues to evaluate whether the City and PPB have maintained compliance. To remain in Substantial Compliance, violations of the Agreement must be "minor or occasional and are not systemic." (Par. 175(a)).

In these quarterly reports, we focus on PPB's and the City's systems for responding to mental health crises, holding officers accountable, providing evidence-based training, ensuring that the use of force complies with constitutional standards, and establishing robust community engagement (Par. 170). Specifically, we assess whether the operation and maintenance of these systems has continued in accordance with the requirements of the Settlement Agreement. In addition to encouraging evidence-based policing, these systems were designed to identify problematic trends and produce corrective action. Hence, these systems provide the framework for COCL's compliance assessments during the maintenance year.

The second quarter of 2020 was defined by dramatic events that significantly affected the operation of the Portland Police Bureau (PPB) and police departments nationwide.

First, the COVID-19 pandemic escalated in late March and stringent measures were introduced by the government to slow the spread of the virus. Social distancing and stay-at-home orders changed PPB's response to non-emergency calls for service (handling more calls by phone) and changed PPB's approach to managing and training police officers (as discussed in this report).

Second, after the in-custody death of George Floyd on May 25 at the hands of a Minneapolis police officer,[1] daily protests began in Portland and cities across the nation, calling for police reforms to end racial injustice. As a result, the PPB has concentrated many of its resources on policing demonstrations, most of which are nonviolent, though there has been property damage (fires, broken windows, and graffiti) and looting associated with some demonstrations. This has impacted the agency's ability to perform other administrative functions.

Despite these enormous challenges, the City and PPB have continued to hold conference calls with the COCL team and provide us with the documents, data, and analyses associated with these systems. We continue to review, evaluate, and reference this information in this report, and have conducted our own audits of the information provided. The emergence of COVID-19 and the continuous demonstrations have impacted our work to some extent (i.e., we have been unable to directly observe certain events in Portland), but we have relied on conference calls, videos, PPB documents, media coverage, and Zoom meetings to gather information about ongoing activities in Portland. The impact on PPB's work as it pertains to the Settlement Agreement is briefly discussed in various sections of this report.

---

[1] As of June 22, 2020, two autopsies have found Floyd died by homicide; Officer Derek Chauvin, who kneeled on Floyd's neck, has been charged with second- and third-degree murder and second-degree manslaughter; three other officers at the scene have been charged with aiding and abetting second-degree murder. All four officers have been fired by the Minneapolis Police Department.

Finally, there is the question of how PPB responded to the demonstrations and public unrest that occurred in Portland and whether their actions were within policy, constitutional, and properly reviewed and addressed by PPB's management systems. At the time of this report, it is too early for us to evaluate PPB's responses, as the protests and allegations of misconduct and criminal behavior associated with some protests are ongoing and many of the official reports (e.g., use of force, supervisors' after-action reports, and investigations of community complaints of misconduct) are not yet available. Thus, we intend to provide an assessment on PPB's response in our third quarterly report. To this point, we want to acknowledge the seriousness and protracted nature of these events. Many community members have complained about police misconduct during the demonstrations, reporting that both the number and scope of PPB uses of force have been excessive. Conversely, PPB has reported many instances of officers being assaulted, public safety being threatened, and property being destroyed. The Settlement Agreement does not authorize the COCL to act as the judge or jury for each of these encounters.

Rather, the COCL's role with respect to PPB's responses to protests and public unrest is similar to COCL's ongoing role throughout the Settlement Agreement: to evaluate compliance with the terms of the Agreement. We will continue to assess whether PPB is able to effectively collect, manage, and respond to information about officers' conduct. So long as the COCL receives adequate data to evaluate these points, we will assess whether the necessary force review and accountability systems have been appropriately triggered and effectively implemented, and whether the operation of those systems is done consistent with the Settlement Agreement.

# EXECUTIVE SUMMARY

## Section III: Use of Force

PPB's reform efforts continue to be centered around ensuring systems of force management are in place and utilized in order to ensure use of force meets constitutional standards (see Par. 170). In order to assess PPB's systems, we continue to see whether the system contains adequate policies and training, whether data and information related to force is accurate and sufficient to allow proper assessment and management, and whether PPB uses that data to identify system gaps and areas for organizational improvement. Additionally, we reviewed a sample of force cases to audit PPB's process as well as ensure force used by PPB meets constitutional standards.

PPB officers continue to complete Force Data Collection Reports (FDCR) which capture the circumstances surrounding force events and provides a narrative of the actions taken by the community member and officer. Additionally, supervisors continue to review FDCRs and complete After Action Reports (AAR) for all uses of force. Consistent with our prior report, deficiencies in report writing remain relatively rare, providing evidence that force cases are reliably documented. PPB then uses the force data to conduct relevant analyses and make such analyses (and data) publicly available.

The Inspector continues to review force cases (and trends in force data) to conduct quarterly meetings with RU Managers and identify trends and implications for policy, training, equipment, and personnel. Overall, PPB trends demonstrate that overall force-to-custody rates have remained around 3%. Uses of force against persons in mental health crisis also remain low. Finally, our review of a sample of FDCRs and AARs demonstrate that when force is used, it is comprehensively documented by officers, reviewed by supervisors, and corrective action (formal and informal) is taken when necessary. Overall, we believe that PPB has maintained a system for properly managing force.

## Section IV: Training

PPB's training schedule, content, and methods of delivery have been significantly modified as a result of the COVID-19 pandemic and the public protests stemming from the death of George Floyd. Within this context, COCL continues to apply the same standards to assess training that we have used in prior reports, focusing on the adequacy of PPB's systems for assessing training needs, delivering training, evaluating training, and documenting and reporting on training completed. PPB has remained in Substantial Compliance with Section IV during the second quarter.

PPB continues to conduct an annual needs assessment and training plan (Par. 79) and the 2020 In-service training was built upon this work. A new assessment is underway to plan for training in 2021. Given the recent protests against excessive force and racial bias in policing, we encourage the PPB to give special attention to the views and experiences of the Portland community (Par.79f) when identifying training needs for 2021, including PPB's response to public protests.

The training evaluation system has been reduced in scope due to the rapid conversion to online training that occurred after the virus and protests, but it remains satisfactory to meet the immediate needs of the Training Division. The reporting of quarterly force data to the TAC is behind schedule due to the pandemic, but we expect that PPB will be up to date after the July 8th TAC meeting.

In terms of training delivery, COVID-19 has had a significant impact on PPB's training model. We credit the Training Division for moving quickly to convert most of their in-class training to an online format

using their Learning Management System (LMS). The online training relied on videos taken during the first quarter to give the post-COVID-19 cohort knowledge of the topics covered in pre-COVID-19 classes. These videos, because they represent in-class instruction that was well delivered in February (confirmed by survey results and COCL observations), satisfy the minimum requirement for these topics.

LMS will become increasingly important as PPB looks to the future for new approaches to education and training. With pressure to engage in social distancing and new budgetary restrictions, PPB will need to continue to expand its online training platform. Such training is currently adequate to strengthen officers' knowledge on particular subjects, but officers still need to practice certain skills. Due to the virus and protests, classroom In-service training was suspended and the skills exercises were not received by many PPB's members. Furthermore, other training scheduled for 2020, including recruit and supervisor training, has been delayed. To remain in Substantial Compliance with Section IV of the Settlement Agreement, , PPB will need to give their officers the opportunity to practice critical perishable skills, including communication and de-escalation in general, appropriate use of force during protests, and responding to persons facing a perceived or actual mental health crisis. Some of this training may be achievable with virtual scenarios using cutting-edge software, and but others will require in-person interactions.

When planning future training, we encourage PPB to consider the new reality of demonstrations and the underlying concerns about racial injustice. Facing budget cuts, the City and PPB must avoid the traditional temptation experienced by organizations to "return to basics" and cut training that is new or considered marginal to "core" law enforcement skills. During the Settlement Agreement, PPB has given increased attention to developing officers' interpersonal skills related to de-escalation, procedural justice, and implicit bias. These skills are essential for minimizing use of force, treating all humans with dignity and respect, and building community trust. Any movement away from this trend would be a mistake. Also, use of force training and crowd control training will need to include continued emphasis on the appropriate use of batons, pepper spray, flash bangs, rubber pellets, tear gas, 40-millimeter Less-Lethal Launchers, and other munitions.

Because PPB officers have been working long hours under very stressful conditions, we have expressed concern about their health and the impact of this stress on their decision making. Research has shown that sleep deprivation can adversely affect officers' on-the-job performance. Also, we are concerned about the impact of these protests on community members who are affected by police use of force, are fearful of injury during protests, or are victims of crime who may need to wait longer for services after calling the police. Thus, in this new reality, we encourage PPB to continuously revisit and finetune their training programs while seeking input from community members. PPB should continue to emphasize training on officer wellness and procedural justice, and we recommend adding a peer intervention program that trains officers to intervene with peers to prevent or stop harmful actions.

## Section V: Community-Based Mental Health Services

Our system assessment for community-based mental health services continues to hinge on the recognition that PPB and the City do not bear primary responsibility for delivering community-based mental health services. As in the past, we measure PPB and the City's compliance with this section based on what may reasonably be expected of them. PPB continues to oversee or participate in a number of committees and workgroups including the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Center Advisory Council, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. Additionally, PPB currently acts as

part of the Transportation Subcommittee for the Unity Center. As in the past, we conclude that PPB and the City continue to act in accordance with their role in the overall system.

## Section VI: Crisis Intervention

Our evaluation of Section VI has two components: (1) PPB's primary response system (including Enhanced Crisis Intervention Team (ECIT) officers; and (2) PPB's secondary response system (including the BHRT and SCT). As it relates to the primary response system, BOEC continues to enforce policies which dictate when telecommunicators are required to dispatch an ECIT officer. While the COVID-19 pandemic has kept them from delivering in-service training, they have taken proactive steps to provide reminders of telecommunicator responsibilities as a temporary solution. Additionally, audits of BOEC decision-making have continued to demonstrate telecommunicators are accurate in their determination of whether a call meets ECIT criteria.

PPB has continued their practices related to Crisis Intervention, including training all officers in 40 hours of crisis intervention and providing ECIT officers with an additional 40 hours of training. These trainings are re-enforced through annual in-service training and PPB is going to be delivering an ECIT in-service in the near future. Furthermore, PPB continues to require a Mental Health Template (MHT) when an officer completes a report for interactions involving a person in mental health crisis. PPB then uses the data from the MHTs to conduct a wide range of analyses, including an ongoing 6-month analysis of the data. The findings from these analyses indicate a well-functioning system.

For secondary response models, we continue to find that the Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT) operate within the requirements of the Settlement Agreement. For instance, the BHRT continues to operate 5 teams of PPB officers and mental health professionals. Outcome data associated with BHRT show increased caseloads as well as increased time on caseloads. PPB has reviewed the outcome data and identified reasons for the trends as well as made determinations as to whether the trends indicate a need for operational change. This continues to be in-line with a positively functioning learning organization. Similarly, the SCT continues to operate in the same positive fashion that we have noted before, including the work done by the Supportive Transitions and Stabilization program.

Finally, we continue to evaluate the BHUAC, noting their guidance for the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT components. BHUAC continues to provide input on policy, training, and SOPs as well as receive presentations and hold discussions on current practices of other partner agencies and entities.

## Section VII: Employee Information System

We continue to evaluate the Employee Information System (EIS) from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on receiving alerts. The EIS system continues to import data related to force events, traumatic incidents, complaints, and commendations on a nightly basis. The data are then used to identify potentially problematic behavior for which alerts are created and, where appropriate, forwarded to officers' respective RU Manager for review.

Additionally, PPB has continued to conduct analysis of supervisor review of officers as part of officers' performance evaluations and upon transfer of an officer to a new command. Through their quarterly analysis, PPB has consistently found high rates of compliance with the required reviews. PPB has

continued to identify units which have shown comparatively lower rates of compliance and implement remedial action. For instance, in this quarter, PPB was able to identify the cause for lower rates of compliance with the Training Division and improve their review system to avoid issues in the future.

## Section VIII: Officer Accountability

Our evaluation of the City's accountability system in this report continues to focus on foundational issues such as access, transparency, expediency, consistency, and multiple checks and balances. PPB and the City continue to provide multiple avenues for filing misconduct complaints through the Independent Police Review (IPR) and PPB. Consistent with our last report, the rate of administrative closures has decreased over time and this remains true even when removing use of force complaints (which require a full administrative investigation). The system also allows community members and officers to track investigations over time and the Citizen Review Committee (CRC) hearings, Police Review Board (PRB) hearing summaries, and overall accountability data remain accessible to the public.

As it relates to expediency, both PPB and IPR have continued to resolve administrative investigations in a timely manner. Both entities continue to work together to manage overall case timelines (as well as individual stage timeless), thereby allowing for a swift resolution to complaints. More important than expediency, we continue to find that administrative investigations are done comprehensively. As in our last report, we reviewed 20 cases (representing each pathway an administrative complaint might take) and found that regardless of which route a complaint might take, findings and decisions continue to be reasonable and supported by a preponderance of the evidence. After a sustained finding, our review of discipline decisions indicates that supervisor decisions are consistent with the Discipline Guide. Throughout the administrative investigation system, we continue to find multiple systems of checks and balances, including, the CRC, the PRB, the City Council, and the ability of IPR, Internal Affairs (IA), and the Chief's Office to controvert findings.

Finally, PPB's accountability system has retained it requirements for officers, supervisors, and investigators/detectives after an occurrence of lethal force and in-custody deaths. While an officer involved shooting occurred at the very end of our reporting period, this was the first to occur since early December of 2019. Therefore, our review of these requirements for this report relied on our historical evaluations of policy and practice.

## Section IX. Community Engagement and Creation of PCCEP

### PCCEP Role and the City's Support

PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations, and resuming monthly meetings on a virtual platform.

Since George Floyd's late May death at the hands of Minneapolis Police officers, PCCEP has stepped into an increasingly central role regarding community engagement, police violence, and systemic racism. PCCEP hosted several highly-attended listening sessions, passed multiple recommendations related to police accountability, crowd control tools like tear gas, the police budget, restorative justice, and other engagement and accountability topics.

The City continues to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions. The City remains in Substantial Compliance with the terms of the Settlement Agreement in Section IX on Community Engagement.

### PPB's Role

Despite the COVID-19 virus and demonstrations, PPB has made a good faith effort to maintain and, in some cases expand its systems of community engagement and measurement. These systems, as described in this report and elsewhere, increase transparency, and give the community a voice in policing, which should strengthen police-community relations over time. However, this is a very challenging time for the PPB to respond to community demands, so we encourage PPB and the City to continue to think creatively about ways to build trust and increase accountability. Along these lines, we are pleased to see that the City and PPB have agreed to participate in a Truth and Reconciliation initiative and that PCCEP will play an important role in this process.

PPB currently provides quarterly and annual reports on traffic stops and use of force with breakdowns by race and gender. Statistics from these data systems are available to the public on PPB's website (https://www.portlandoregon.gov/police/). We encourage the public and all advisory groups or stakeholders to review these findings, engage in a thoughtful analysis, and consider any implications for PPB policies, training, or field operations. The PCCEP, for example, has begun to review the use of force data and stops data in this manner.

In sum, PPB remains in Substantial Compliance with the terms of the Settlement Agreement in Section IX on Community Engagement.

# SECTION III – USE OF FORCE

We note from the outset that the present report has been drafted at a time of great unrest in the City of Portland and that PPB has used force in response to the unrest. While we have begun collecting information about PPB actions, we are reserving our full assessment of force used during protests until we have an opportunity to review a complete record of the force events. Given the number of force incidents and complaints registered and the continuation of the demonstrations, we do not want to rush our assessment in order to meet reporting timelines. In our next report, we will provide an assessment of PPB's response to the protests as it pertains to the requirements of the Settlement Agreement.

A primary goal of PPB's reform efforts continues to be ensuring systems are in place to properly manage use of force to meet constitutional standards (see Par. 170). In order to do this, our maintenance year reviews look to see whether the system contains adequate policies and training, whether the data and information related to force is sufficient to allow for proper assessment and management, and whether PPB uses that data to identify system gaps and areas for organizational improvement. Additionally, we reviewed a sample of force cases to audit PPB's processes as well as ensure force used by PPB meets constitutional standards and policy. As evidenced below, we find that PPB has maintained their system for managing force through ongoing compliance with the paragraph requirements in Section III (Use of Force).

PPB's policy related to the use of force, reporting force, and supervisor review of force (Directive 1010.00 – Use of Force) continues to be in effect. Directive 1010.00 is presently being revised, but as long as the revisions continue to comply with the law and the Settlement Agreement, we do not require the directive to remain static during the maintenance year. This directive provides officers overall clear guidance on which situations they are authorized to use force (as well as the circumstances which may justify particular types and levels of force) as well as their responsibilities after a use of force event occurs (including rendering medical aid, if necessary). Additionally, Directive 1010.10 (Deadly Force and In-Custody Death Reporting and Investigation Procedures) provides clear guidance when an officer's use of force is "likely to cause death or serious physical injury." Between these two policies, we continue to find that the requirements of Pars. 67 (force in general), 68 (CEW principles), 69 (reporting force), 70 (supervisor review of force), and 73 (chain of command review) continue to be memorialized in PPB directives (though see below for further discussion on PPB's force reporting requirements). While we discuss training more broadly in Section IV (see below), training has also reinforced the responsibilities within Directives 1010.00 and 1010.10.

After a use of force event, PPB officers are required to complete a Force Data Collection Report (FDCR) which captures the circumstances surrounding the force event and provides a narrative of the actions taken by the community member and officer. Additionally, supervisors are required to respond to the scene of force events and complete an After Action Report (AAR) (unless the incident involves lethal force). The AAR acts as an investigation checklist (see Par. 72) and requires supervisors to conduct a comprehensive investigation into the use of force and make a determination as to whether the officer acted within policy.

Both the FDCR and AAR are instrumental in PPB's system of force management. Without dependable data on the frequency of force and the circumstances leading up to force events, PPB would not be able to draw reliable conclusions in order to determine implications for policy, training, equipment, and

personnel decisions. As part of their system, PPB has continued to conduct audits of FDCR and AAR content to ensure that required information is present.

PPB provides quarterly reports on the comprehensiveness and adequacy of information found in FDCRs and AARs. On an annual basis, the data for the quarterly reports are aggregated, providing a year-long summary of force patterns. Additionally, the underlying data are used by the Inspector to inform meetings with Precinct Commanders (see below for further discussion of these meetings). For this report, we reviewed the findings of the most recent quarter's force audit and note that both officers and supervisors have continued to routinely include a comprehensive account of the force event. For instance, the table below (Table 1) demonstrates that in the first quarter of 2020, non-sworn civilian auditors in PPB audited 144 FDCRs. Of these, PPB found 21 reporting deficiencies from officers (0.15 deficiencies per FDCR audited). This represents a decrease from the deficiencies found for all of 2019 (0.22 deficiencies per FDCR audited). For context, there are approximately 38 information points for each FDCR that officers are required to complete, meaning that for nearly every 7 FDCRs completed, only a single mistake is, on average, made in completing the forms. Reporting accuracy of officers overall was 99.6% compared with the 98.5% reporting accuracy for all of 2019.

Deficiencies were most likely to be found within the categories "Witness" and "Mental Health and Injuries" – however, a single deficiency does not mean that no information at all was present. For instance, the "Mental Health and Injuries" category contains 6 points of review for each FDCR. This means that there were 864 potential deficiencies for this category in the first quarter of 2020 (144 FDCRs audited multiplied by 6 points of review for each FDCR). Given the total of 4 actual deficiencies in this category for 2020 Q1 reports, this indicates 99.5% reporting accuracy for this category. Additionally, the number of deficiencies in this category has dropped since 2019 Q4, going from 12 to 4. Finally, in response to these two categories consistently having more deficiencies compared with other categories of review, the Force Inspector updated the FDCR to better automate the form and prompt officers to complete the items within these categories.

| Officer Reporting Deficiencies by RU - Q1 2020 | | | | | | |
|---|---|---|---|---|---|---|
| Precinct/Division | Total Reporting Deficiencies | Mental Health and Injuries | Force and Resistance | De-escalation and Decision Point Analysis | Witness | CEW |
| CENTRAL | 2 | 1 | 0 | 0 | 1 | 0 |
| DETECTIVE | 1 | 0 | 0 | 0 | 1 | 0 |
| EAST | 5 | 1 | 0 | 0 | 4 | 0 |
| NORTH | 13 | 2 | 1 | 0 | 10 | 0 |
| TOD | 0 | 0 | 0 | 0 | 0 | 0 |
| TRAFFIC | 0 | 0 | 0 | 0 | 0 | 0 |
| TRAINING | 0 | 0 | 0 | 0 | 0 | 0 |
| TRANSIT | 0 | 0 | 0 | 0 | 0 | 0 |
| YOUTH SERVICES | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 21 | 4 | 1 | 0 | 16 | 0 |

Table 1 – Officer Reporting Deficiencies Q1 2020 (Provided by PPB)

Supervisor reviews demonstrate a comparatively higher raw number of deficiencies per report, though this is because supervisors are held accountable for deficiencies within FDCRs as well as within their AARs, pursuant to Par. 73(b) and 73(c). Consequently, there are approximately 54 points of evaluation for Sergeant reviews. As seen in Table 2 below, between FDCRs and AARs, Sergeants had, on average, 0.51 deficiencies per case audited in the first quarter of 2020 – this represents a decrease from 2019 (.80 deficiencies per case audited). Command staff reviews had approximately 0.55 deficiencies per case audited (which is the total number of deficiencies from Lieutenants, RU Managers, and the Chief's Office reviews combined). This too represents a decrease from 2019 (1.5 deficiencies per case audited). When considering that there are approximately 254 points of evaluation by the time a case leaves the Chief's Office, an average of 0.55 deficiencies per case audited is commendable. Based on the increasing accuracy of the reports compared with 2019, we are confident PPB takes seriously their responsibility to gather complete information on use of force cases.

| | |
|---|---|
| Force Cases Audited | 72 |
| Involved Officers | 112 |
| Officer Reporting Deficiencies | 21 |
| Sergeant Reporting Deficiencies | 37 |
| Command Review Deficiencies | 79 |

Table 2 – 2020 Q1 FDCR and AAR Deficiencies (Table provided by PPB)

As the audit evaluates: (1) whether the necessary information is found within FDCRs and AARs; and (2) whether the information is accurate based on the officer's narrative, we believe PPB has implemented a consistent system component for ensuring that the evaluation conducted by the Force Inspector is predicated on reliable data. We now turn to how the Force Inspector uses such information to inform RU Managers and the community at large of trends related to the use of force.

Using the data from FDCRs, PPB is able to provide a Use of Force dashboard on its website (https://www.portlandoregon.gov/police/76875), allowing community members to view aggregate data trends as well as download the data to review force cases at the incident-level. The quarterly data reports provided by PPB separately identify force events which occur during a crowd control event, although the aggregated online data does not. Additionally, the analysts working with the Force Inspector create quarterly and aggregate annual reports on PPB uses of force. These reports are publicly available on PPB's website and are also provided to the Training Advisory Council (TAC) to inform their work (see Training section of this report). Whereas the Force Inspector conducts quarterly analysis in accordance with Par. 76 (see below), the Use of Force dashboard and force reports allow community members to conduct their own analyses.

Using PPB's analysis of force data, the Force Inspector conducts quarterly meetings with RU Managers to discuss overall trends in reporting deficiencies (discussed above), officers using force at a higher rate than others, and Precinct trends in use of force. During these discussions, the Force Inspector also discusses unit trends (see our discussion of this in the EIS section, below). After discussion, the RU Manager is required to provide a response to each recommendation given by the Force Inspector,

thereby closing the loop on the Force Inspector's findings. PPB has provided documentation related to the meetings between the Force Inspector and RU Managers and we continue to find that such meetings provide valuable insight for RU Managers to manage officer uses of force.

Finally, as part of the force audit, the Force Inspector reviews cases to identify trends and implications for policy, training, equipment, or personnel. PPB provided us the Force Inspector Feedback Forms for the first quarter of 2020. In reviewing them, we noted the Force Inspector identified issues across different areas of review. This includes referrals to clarify instances of verbal de-escalation, force warnings, takedowns, and officer/suspect safety. In reviewing the Feedback Forms, we note that the Force Inspector takes the time to clearly identify each issue and a recommendation for resolution.

Many of the issues identified by the Force Inspector were sent directly to the RU Manager in order for officers to be debriefed on the issue. However, others were sent to the Training Division and Policy Review team. For instance, in the first quarter of 2020, the Force Inspector referred five cases to the Training Division for issues related to: pursuits, transitioning from weapons, CEW size, suspect safety, and officer safety. Additionally, one issue was sent to the Policy Review Team related to officer safety. For all identified issues related to individual officers, groups of officers, and larger trends, the Force Inspector maintains a tracking datasheet to ensure that each identified issue receives a response. We find this process to be consistent with the overall systemic approach being taken by PPB.

While the above systemic approaches taken by PPB demonstrate a comprehensive system for evaluating force, we also continue to track and assess overall force trends. In this regard, we continue to urge interested community members to review the use of force data dashboard to conduct their own analyses. As in our last maintenance year monitoring report, we provide some use of force data of interest. As seen in Figure 1, the number of individual community members who were the subject of a PPB use of force during the first quarter of 2020 was the lowest number of individuals found in at least the last two years of data (170). While the raw numbers give some sense of PPB's use of force, a more informative metric is the force-to-custody rate (represented in Figure 1 as the orange line). This shows that in nearly every quarter for the past 2 years, there was between 2.98% and 3.53% force-to-custody rate. Given the wide range of officer actions that are considered force, we believe the overall force rate remains stable.



Figure 1 – Use of Force – Individuals and Force-to-Custody Rate

Additionally, as the impetus for the Settlement Agreement was force used on persons in mental health crisis, we looked at trends in the use of force against this population. In the first quarter of 2020, there were 4,814 calls for service in which an officer noted there was a mental health component associated with the call. Of those, 314 calls met Enhanced Crisis Intervention Team (ECIT) criteria and had an associated Mental Health Template (MHT) completed. Of those calls, there were a total of 10 uses of force. When considering force incidents for all ECIT type calls (representing higher-risk calls involving persons in mental health crisis), this equates to an approximate 3.2% force rate, though we acknowledge this is not an "apples to apples" comparison of the force-to-custody rate reported above. For instance, a primary component of ECIT calls is to avoid arrest as an outcome and therefore evaluating force-to-custody rates for ECIT calls would be misleading. Additionally, comparisons across agencies is not possible due to PPB's unique system and historical comparison of PPB data is not possible given that the MHT has only been consistent for a couple of years.

Looking further into the data, we also note that of the 10 uses of force during ECIT calls, 6 of them were Category IV force type, which are the least serious force options and the least likely to result in injury. Furthermore, there were 2 instances of PPB officers using a CEW on a person in mental health crisis during the first quarter of 2020, which is proportional with the number of instances for the entirety of 2019 (8 over four quarters). Given the overall number of ECIT calls and the relatively small number of force events related to them, we maintain that there does not appear to be a cause for concern with these figures.

Given the overall force rates as well as force for persons in mental health crisis, we find that the aggregate statistics demonstrate PPB continues to manage use of force consistent with the Settlement Agreement.

Finally, similar to our last maintenance year report, we reviewed a sample of force cases which included CEW uses, Category II, Category III, and Category IV force types, including several force events involving a person in mental health crisis. Our review supports the general findings of PPB – when force is used, it is comprehensively documented by officers, reviewed by supervisors, and corrective action (formal and informal) is taken when necessary. We found one case wherein we question the conclusions of the review. In that instance, the reviewing lieutenant noted that officers' use of a 40mm launcher to break the window of a vehicle was not a reportable use of force since the officers did not point the weapon at the subject and the subject was not injured. While we felt the action was reasonable under the circumstances, we believe it would nonetheless constitute a reportable use of force. We have raised this issue with PPB and will discuss it with them further but note that a single issue with one review meets the "occasional" and "not systemic" threshold of Par. 175(a). For all cases, we found that the force used was reasonable under the totality of the circumstances.

In all, we believe that PPB has maintained a system for properly managing use of force to meet constitutional standards. Officers regularly complete FDCRs with sufficient information for supervisors to investigate uses of force and complete AARs to document their investigation. Chain of command reviews are also comprehensive as evidenced by PPB's relatively low number of deficiencies in the reporting scheme. The Force Inspector continues to evaluate force events and trends to inform RU Managers of potential concerns. Finally, the publicly available data put out by PPB demonstrates a generally low rate of force to custodies overall as well low numbers and levels of force against persons perceived to be in mental health crisis. Because of the above, we maintain that PPB has remained substantially compliant with Section III of the Settlement Agreement.

# SECTION IV - TRAINING

The COVID-19 pandemic and the public protests after the death of George Floyd have had a significant impact on PPB's training schedule, content, and methods of delivery. We will discuss this impact under Par. 84, but also mention it as it pertains to other paragraphs in Section IV.

Overview of Training Systems

COCL's framework for assessing compliance with Section IV will remain the same throughout the maintenance year. PPB is being judged by its ability to maintain systems of police training that can increase "the knowledge, skills and abilities necessary for effective and successful delivery of services to persons in mental health crisis" and that can contribute to the "proper management of the use of force to meet constitutional standards" (Par. 173). Thus, we have consistently evaluated the extent to which PPB's training systems: (1) identify areas where officers require training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

Overview of Methods

The COCL team continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL team also continues to observe training (by Zoom or through videos) and interview training staff[2]. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness. In the second quarter, we have provided PPB with technical assistance by reviewing the content of lesson plans and PowerPoint presentations in advance of training.

Assess Training Needs

PPB is required to conduct a needs assessment and use this information to update its training plan annually (Par. 79). As we noted in our first quarterly report, PPB was able to do this for the 2020 In-service training. The Training Plan was reviewed by the TAC and then posted on PPB's website. For the 2021 training plan, PPB has already started a new needs assessment. The Training Division continues to rely on diverse sources of information both inside and outside the PPB to identify gaps between PPB's organizational goals and the skills and knowledge of its officers. COCL will wait until the fourth quarter, after the Needs Assessment report has been completed, to give a final compliance assessment for Par. 79.

In the meantime, COCL is satisfied that PPB is gathering a wide range of viewpoints, experiences, and scientific knowledge for this needs assessment. In light of the nationwide protests against excessive

---

[2] In February we observed, in person, the 4-day In-service training and use this information as the basis for evaluating post-COVID-19 training methods.

force and racial bias in policing, we encourage the PPB to give special attention to the views and experiences of the Portland community (Par.79f) when identifying gaps in training, including community organizations, community leaders, and community councils and committees, including the Portland Committee on Community Engaged Policing (PCCEP). Listening to the voices of the community has never been more important and we encourage PPB to engage the community at each step of the process (for instance, PPB may consider sharing lesson plans and learning objectives with community members or involving community members in the training itself as scenario actors or as an outside perspective). In 2019, PPB's In-service training covered police responses to large demonstrations and crowd management, and we encourage PPB to continue to make this a priority.

<u>Deliver Appropriate and High-Quality Training</u>

As defined in Par. 84, PPB is expected to develop and implement a high-quality system of training for officers and supervisors. As we have stated previously, this training must be consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness.

<u>In-Service Training</u>

As noted in our first quarterly report, the COCL team observed the delivery of PPB's 2020 In-service training for all officers in February. This 4-day training focused on the topics required by the Settlement Agreement and other topics that emerged from PPB's needs assessment and training plan (for details, see COCL's Q1 report). From January to mid-March, members attended classes, completed knowledge tests, and then split into four squads of approximately 12 students each to practice specific skills and engage in scenarios. COCL reviewed and approved the training materials in advance and provided on-site feedback about training methods and techniques.

However, the onset of the COVID-19 pandemic had an enormous impact on the Training Division's ability to continue training as usual. The 2020 In-service training, which began in January, was suspended in March to maintain social distancing as defined by the governor. Roughly half of PPB's officers (more than 500) had yet to complete the In-service training. We credit PPB for responding quickly to this crisis. Fortunately, PPB had videotaped the classroom portion of the In-service training in February. Within one week of stopping the classroom training, the Training staff was able to convert these videos into 13 manageable blocks for online training. PPB's Learning Management System (LMS), designed to accommodate online training, was used as the vehicle to give officers access to these videos and to provide accountability for training. The videos were posted on PPB's internal SharePoint, accessible through LMS.

Officers were required to watch 13 separate videos of the In-service classroom training before May 31 – the day that the original In-service training was scheduled to be completed[3]. All officers in this target group were given a 14-day and 7-day reminder prior to this deadline.

---

[3] A 14th video was added later, and officers were given more time to complete it.

Certainly, watching a video is not the same as in-person or virtual interactions with the instructor and other students. Nevertheless, we have observed selected videos and have reached the conclusion that they provide a standard knowledge base on key topics in this post-COVID-19 cohort.

Of course, these videos are unable to replace the In-service skills training received by the original cohort of officers who completed their training in January and February, prior to the onset of the virus epidemic. When the classroom In-service training ended in March, so did the skills and scenario training. As a result, COCL will not provide any evaluation of this component of training. The State may waive these requirements under the circumstances, but at present, the provision of such training is beyond the control of the PPB; If so, PPB is hoping to repeat the skills training in 2021, with new scenarios. However, because of anticipated budget cuts to the PPB, no specific training can be guaranteed at this time. At a minimum, PPB is hoping to continue to offer additional scenarios to strengthen officers' skills when trying to keep public order during demonstrations.

Recruit Training

COVID-19 had a huge impact on the training of new police recruits. Recruits typically receive a two-phase training program. They first attend basic training provided by the state's Department of Public Safety Standards and Training (DPSST), and then receive PPB's Advanced Academy (AA) training. However, DPSST closed its doors at the start of the pandemic, leaving PPB with recruits who were stuck in limbo. To mitigate the impact of this closure and PPB's own social distancing restrictions, the Training Division responded quickly by building a Zoom Academy that covered some of the recruits' Advanced Academy in-class training needs. Different groups of recruits received different classes depending on how far they had progressed with their DPSST training when it came to a halt. They were assigned to precincts and required to complete the ZOOM classes as part of their job. The coordination of DPSST training and PPB training for recruits was made difficult by COVID-19. Recruits will be required by DPSST to make up the classes they cancelled in order to achieve state certification.

From late April to early June, recruits were in the process of receiving a mixture of online training (via Zoom) and in-person classroom training to achieve the total number of hours required by the PPB, including the standard 40 hours of Crisis Intervention training. Given that PPB's classroom In-service training was cancelled in March, recruits were allowed to use the large classroom with 6 feet of social distancing for AA training. The Zoom portion of their training has been completed.

When the demonstrations on racial injustice began in Portland, the PPB felt compelled to stop all classes and place "all hands on deck" to respond to the demonstrations and criminal behavior. Prior to the closure of the Training Division on June 4th, however, recruits were given some additional training on how to maintain public order and then deployed to perform site security at some of Portland's least vulnerable buildings to release more seasoned officers to cover the main protest areas. PPB reopened the Advanced Academy in early June and COCL expects to observe training for a new cohort of recruits in the fall.

Sergeants Training

Training for new sergeants is planned for 2020, but the timetable for implementation will depend on when the Training Division will reopen for classes. COCL has reviewed PPB's lesson plans and training materials for the Sergeants Academy 2020 and has provided feedback. In general, the training plans are appropriate and consistent with the training requirements of the Settlement Agreement. PPB is planning 12 days of training over three weeks, covering a wide range of topics, including the basic responsibilities

of supervisors to review and evaluate their employees in the context of current PPB reporting requirements, software applications, and labor and employment laws. Three days are devoted to defining the supervisor's role in critical incident management. Importantly, the sergeants training classes are delivered within two complementary frameworks – a decision making model (i.e., critical thinking about risk and benefits of each decision) and a communications model (i.e., procedural justice and crisis intervention/negotiation skills to prevent or de-escalate conflict and build public trust). The promotion of officer wellness is emphasized, as it should be, to improve performance and morale. Half of one day is devoted to teaching new sergeants how to supervise a Mobile Field Force during demonstrations or protests. Given the current level of public unrest and protests, supervisory training around crowd management will likely need to be expanded, along with scenarios where sergeants are given the opportunity to practice decision making in response to various types of protest actions.

<u>Evaluate Training</u>

PPB is required to "develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum." (Par. 80). The COCL team continues to assess the content, methods, and utility of PPB's training evaluations in 2020.

As we reported in our first quarterly report, PPB started the year using the same set of COCL-approved methods used in 2019 to evaluate the 2020 In-service training, namely, in-class quizzes to engage the students and test their understanding of the material; anonymous class evaluation surveys to assess the quality and content of instruction; knowledge tests to grade students' learning in the classroom; and consistent rubrics for scenario evaluations to measure officers' proficiency and skill level during role playing and to provide the data needed for post-scenario debriefings.

However, PPB's system of evaluation had to be adjusted when the In-service training was suspended in March due to coronavirus and the State imposed social distancing restrictions. The introduction of online training with videos, which started almost immediately, created challenges for the existing evaluation system. For example, PPB was unable to continue the anonymous surveys used to evaluate the classes. The original survey was designed to cover all classes taken on a given day, but the online training allowed each officer to take each class (i.e., video) at different times. PPB did not have the resources immediately available to make these quick adjustments to the online surveys. Instead, the evaluation analysts focused on developing a knowledge test for each class, which was the highest priority for accountability purposes. On the whole, officers scored very high on the knowledge test, and there was very little difference between the responses from the classroom sample (pre-COVID-19 cohort) and the video sample (post-COVID-19 cohort), thus lending credibility to the metrics being used.

Analysts in the Training Division, relying largely on survey data collected from the pre-COVID-19 cohort, have continued to provide feedback to instructors and administrators to improve current and future training. COCL has reviewed the preliminary findings, which indicate that trainers in general continued to receive very high marks from the students. Trainers are viewed as very organized, knowledgeable, and having positive interactions with the students. The students left the classroom feeling more knowledgeable and efficacious in their ability to respond appropriately to different encounters.

Also, data collected during the last procedural justice scenario have been used to shape the planned training of new sergeants as they learn how best to interview victims, witnesses, and officers to prepare After Action reports. Historically, the focus of procedural justice has been on how officers interact with suspects, but this new approach gives more attention to the needs of victims and witnesses to be heard, respected, and shown empathy.

We will wait to receive formal evaluation reports on the 2020 training. The pre-COVID-19 evaluations look very strong, but the pandemic and the protests have resulted in rapid changes to the methods of training. In turn, these changes have limited PPB's ability to gather a complete set of evaluation data during this transition period. Also, COCL maintains that the Training Division's research and evaluation team is understaffed. The current team is very skilled and works extremely hard, but they need additional support to maintain a comprehensive system of data collection and analysis. We acknowledge that staffing will be particularly difficult in light of sizeable cuts to PPB's budget in FY20-21 and the impact of COVID-19 on personnel deployment.

Finally, PPB is expected to determine whether "graduates are applying the knowledge and skills acquired in training to their jobs." (Par. 80). PPB continues to audit use of force incidents to ensure that officers' decision making is within policy and constitutional, and the Audit team continues to provide feedback to the Training Division when patterns are identified. As we have noted many times, the quality of police-public interactions is best measured through contact surveys. In the past, PPB has been involved in several contact surveys and we encourage their continued use in the future. In the meantime, we acknowledge that PPB has been responsive to findings from the last contact survey and is using these data to help guide new training on how best to respond to crime victims and witnesses.


<u>Document Training Delivered and Received</u>

The Settlement Agreement requires that PPB create, and that supervisors use, a "central, commonly-accessible, and organized file system" for training records (Par. 81). In the second quarter, we found that PPB continues to use and update its electronic Learning Management System (LMS) for this purpose. In fact, LMS has taken on a much larger role as a result of COVID-19 as more and more education and training are delivered online. LMS continues to be used effectively to announce training opportunities, track attendance for both PPB records and external reporting to DPSST, and streamline the lesson plan review and approval process. LMS continues to be used to notify RU Managers when officers need specific training to maintain their State certification.

LMS is much more than a record keeping system and in fact, it has become a primary vehicle for PPB training. LMS continues to provide officers with legal updates, directives, and "Tips & Techniques." As noted earlier, when the Training Division was shut down, LMS became the home for In-service training, offering a total of 14 videos that all sworn personnel were required to observe within 30 days. The LMS Manager has been running daily reports on video completion rates. The online knowledge test for In-service training is required within three days of completing all of the videos and most officers completed the test within one day. By May 31st, more than 99% of the officers had completed the entire set of online classes and the final knowledge test (only one officer was delinquent). When an officer is 21 days past the due date, the LMS Manager will send a non-compliance memo to the Chief's office. The supervisor and RU Manager for any delinquent individual(s) are notified and the member is expected to complete the classes immediately.

Supervisors continue to use LMS to review the training records of officers under their command. They receive reminders each month if an employee needs to be reviewed, and they are informed when officers have training deficiencies.

Finally, we have confirmed that PPB has checked the work histories of applicants to be instructors to ensure that they meet the hiring restrictions defined in the Settlement Agreement (Par. 83). The COCL team has reviewed the Training Division's Work History Review Sheet and found no evidence that any of the applicants have violated the hiring restrictions. In our third quarterly report, we will check that PPB

has submitted its Semi-Annual Training Report to the Deputy Chief and Assistant Chief who oversees Operations (Par. 82).

Audit the Training Program

As we noted in our first quarterly report, the PPB's Inspector General's Office is not planning to audit PPB's Training programs in 2020. A comprehensive audit was conducted in 2018.

Analyze and Report Force Data

The analysis and reporting of force data by PPB's Force Inspector is another training-related system required by the Settlement Agreement (Par. 86). The Inspector is required to "identify problematic use of force patterns and training deficiencies" and report force trends on a quarterly basis to the Chief, Training Division, and Training Advisory Council (TAC). In turn, the Chief is expected to receive and respond in a timely manner to recommendations from TAC or the Training Division regarding training, policy, and/or evaluation.

As noted in our assessment of Section III (Use of Force), the Force Inspector continues to gather force data and look for patterns and trends. During the first quarter of 2020, the Force Inspector referred five cases to the Training Division for issues related to: pursuits, transitioning from weapons, CEW size, suspect safety and officer safety. The Force Inspector has also held meetings with the Precinct commanders to review Q4 2019 and Q1 2020 force trends and issues.

In the second quarter, PPB did not present any quarterly force reports to the TAC. The TAC meets only every other month. In January, the Inspector presented the 2019 Q3 force report. PPB was not on TAC's March agenda and the May meeting was cancelled due to spread of COVID-19 and the lack of Zoom capability in place to conduct a virtual meeting. Thus, PPB is planning to present the force findings from Q4 2019 and Q1 2020 at TAC's virtual meeting in July, using Zoom.

The TAC meeting on March 11th was open to the public as required by the Settlement Agreement (Par. 87), although at the time of this report, PPB had yet to post the minutes from this meeting on the PPB Website (http://www.portlandoregon.gov/police/61449).

Summary and Conclusions about PPB's Training System

Most of the Settlement Agreement requirements for Training (as delineated in Section IV) continue to be met, although we will await additional progress on the delivery of In-service training. We are satisfied with the systems for assessing training needs, evaluating training programs, documenting training received, and analyzing and reporting force data. The reporting of quarterly force data to the TAC is behind schedule, but we expect to hear a report at the July 8th TAC meeting, which will be held by Zoom (see (https://www.portlandoregon.gov/police/61449). The training evaluation system has been reduced in scope due to the rapid conversion to online training that occurred after the virus and protests, but it remains satisfactory to meet the immediate needs of the Training Division. However, in the bigger picture of training evaluation, we encourage PPB and the City to devote more staff and resources to the research and evaluation functions of the Training Division. These analysts have proven themselves to be invaluable. Essentially, their work allows the PPB to function as a learning organization that makes evidence-based changes to training before, during, and after delivery. This included feedback to Inspector General's office, which we encourage them to continue.

For training delivery, our first quarter observations led to the conclusion that the quality of In-service training remained high at the start of the maintenance year (See COCL 2020 Q1 report). In the second quarter, COVID-19 had a significant impact on PPB's training model. We credit the Training Division for moving quickly to convert most of their in-class training to an online format using LMS. Clearly, this change to PPB's training system occurred as a result of forces beyond their control. The online training relied on videos taken during the first quarter to give the post-COVID-19 cohort knowledge of the topics covered in class. These videos, because they represent in-class instruction that was well delivered in February (confirmed by survey results), satisfy the minimum requirement for these topics.

LMS will become increasingly important as PPB looks to the future for new approaches to education and training. With pressure to engage in social distancing and new budgetary restrictions, PPB will need to continue to expand its online training models. Throughout our work, we have conceptualized good education and training as having four basic stages: (1) *Knowledge Acquisition* (students learning the important concepts and why they are important); (2) *Knowledge Translation* (students observing others translating this knowledge into practice so they can see what the behavioral skills look like on the job); (3) *Practice* (students practicing these skills themselves); and (4) *Feedback* (students being individually evaluated on their skills performance). LMS is structured in a manner that it could easily satisfy the first two stages of education and training for nearly all topics relevant to police work. LMS also allows for PPB to monitor accountability with training requirements and evaluate both training delivery and outcomes via links to required surveys and knowledge tests. We can assume that LMS will continue to play a critical role in the future of the PPB's Training Division.

Unfortunately, due to the virus and protests, stages 3 and 4 of this training model have yet to be actualized in much of PPB's 2020 training. For In-service, the interactive classroom training and skills exercises were not delivered to more than half of PPB's members as a result of these unexpected crises. Furthermore, other PPB training scheduled for 2020, including recruit and supervisor training, have been delayed. Importantly, COCL will wait and see whether PPB is able to provide skills training in 2020, and then determine whether the content of such training covers the critical perishable skills, including communication and de-escalation in general, appropriate use of force during protests, and responding to persons facing a perceived or actual mental health crisis.

When planning future training, we encourage PPB to consider the new reality of demonstrations and the underlying concerns about racial injustice. Facing budget cuts, the City and PPB must avoid the traditional temptation to "return to basics" and cut training that is new or considered marginal to PPB's core law enforcement skills. After five years of monitoring, we have witnessed PPB's Training Division move in a positive, evidence-based direction – one that gives priority to developing officers' interpersonal skills related to de-escalation, procedural justice, and implicit bias. These skills are essential for minimizing use of force, treating all humans with dignity and respect, and building community trust. Any movement away from this trend would be an enormous mistake.

Given local and national experiences over the past two months, PPB must ensure that its policies on force and crowd control reflect this new experience; that its training matches policy; and that the actions observed on the street, including supervision, are consistent with both policy and training. For example, use of force training and crowd control training will need to include continued emphasis on the appropriate use of batons, pepper spray, flash bangs, rubber pellets, tear gas, and 40-millimeter Less-Lethal Launchers. Officers will need continuous training on the circumstances that justify the deployment of these weapons and the proper manner of deployment to minimize injury. For example, tear gas is considered a less-lethal chemical weapon, but its use is often painful to recipients and can cause health problems for the same groups who are vulnerable to COVID-19. Consequently, policy and training must be designed so that officers (1) use it only after other communication has failed; (2) give

verbal warnings and allow the crowd a chance to disperse (with clear exists) prior to using tear gas; (3) use it in an open space on the ground and not directed at people where it can cause harm; and (4) pay attention to whether people have been injured, and if so, ensure that they receive decontamination care.

In this new reality, training must continue to give attention to the health and welfare of police officers. Since the start of the protests, PPB officers have faced extreme circumstances. Thousands of community members have participated in peaceful protests during the daytime, although their messages were personal to officers and painful to hear. In the evenings, some attendees engaged in destructive criminal behavior, setting fires, damaging store front windows, stealing or vandalizing property and/or throwing projectiles at the police. Responding quickly and appropriately to these events can be very challenging and stressful for PPB officers. Also, officers are working exceptionally long hours for many weeks without any time off. Research has shown that lack of sleep can increase the risk of making mistakes on the job. Therefore, we strongly encourage PPB administrators and supervisors to be mindful of this stress, to continue the officer wellness training, and make every effort to relieve this stress whenever possible through scheduling, good supervision, food and supplies, and strong leadership.

Also, we encourage PPB to introduce a peer intervention program that encourages officers to intervene with peers to prevent or stop harmful actions. At present, PPB's Directive 1010.00 (section 5.4.2) requires that "Members have a duty to reasonably intercede to prevent the use of unlawful force by another member" but a complete training program has not been introduced by PPB – and one that addresses inappropriate behavior more generally. A good example is the EPIC program developed by the New Orleans Police Department in collaboration with community partners (http://epic.nola.gov/home/). This type of program is consistent with a new Oregon law on police reform (HB 4025) that requires officers to "intervene to prevent or stop" certain misconduct by other officers.

# SECTION V – COMMUNITY-BASED MENTAL HEALTH SERVICES

In evaluating this section, we continue to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. Par. 88 identifies the City's partners in providing community-based addiction and mental health services: "the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders." As the Settlement Agreement holds no authority over the City's partners, prior reports have only evaluated what the City and PPB can reasonably accomplish. We maintain that evaluative approach in this report.

As part of the broader community-based mental health service response system, the City and PPB have maintained their roles in overseeing or participating in committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services. As we noted in prior reports, we lack the necessary non-party information and the particular expertise in public health care systems to assess whether all of the goals listed in Par. 90 have comprehensively been met – however, we can say that where City and PPB input is necessary for an improved system, we continue to find City and PPB actions have been satisfactory.

As part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in our last report, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Related to this, PPB has continued to participate in AMR training in transporting persons in mental health crisis, as the handoff between PPB and AMR is a critical point in time and cross-agency training serves to improve this process. Taking a systems perspective regarding the transport of persons in mental health crisis to a drop-off center, we continue to find that PPB is acting in accordance with the intent of the Settlement Agreement and the conceptual framework of a drop-off center.

As evidenced above, we continue to find that the City and PPB have maintained compliance with Section V of the Settlement Agreement. Where able, PPB and the City have worked with City partners to improve community-wide delivery of mental health services. Through self-initiated committees as well as contributing to external committees and working groups, PPB and the City continue to do what can reasonably be expected of them. The Unity Center continues to operate as a walk-in/drop-off center as envisioned by the Settlement Agreement and PPB continues to play their part in ensuring compassionate transportation. While we encourage PPB to continue to seek avenues for supporting entities who provide community-based mental health services, we do so acknowledging what has been accomplished so far is in-line with their responsibilities in the Settlement Agreement.

# SECTION VI – CRISIS INTERVENTION

Section VI of the Settlement Agreement (Crisis Intervention) is designed to facilitate PPB and the City's implementation of "systems and resources for responding to persons in mental health crisis" (see Par. 170). As we have done in the past, we evaluate PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers); and (2) Secondary Response (including BHRT and SCT). In accordance with our maintenance year plan, we evaluate the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC) and receives a PPB response. We also examine what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. As evidenced by our evaluation below, we believe PPB and the City have maintained their system for responding to mental health crises during this monitoring period.

Most often, the entry point for PPB contact with persons in mental health crisis is through BOEC, the call-taking and dispatch center for Portland. During this monitoring period, BOEC has maintained their Mental Health and ECIT Dispatch Protocol SOP which continues to identify seven call characteristics where an ECIT response is needed (these include when there is a mental health component AND: a weapon is present, the subject is violent, the call is at a mental health facility, the caller is threatening suicide and has the means to carry it out, at the request of a community member, at the request of another officer, or when the subject represents an escalating risk of harm to self or others). Hence, this SOP satisfies the requirements of Par. 113 for BOEC to revise policies for dispatch as well as for assigning calls to MCCL (see below).

In addition, we have previously observed BOEC's 16-hour CIT training for telecommunicators as well as their In-service training, both of which are required by Par. 114. Last year, we noted that BOEC was stressing the concept of "when in doubt, send ECIT out" as a catch-all for when telecommunicators were unsure if a call did or did not meet ECIT dispatch criteria. While we expected to be able to provide an update on BOEC's training for this report, the current pandemic has caused BOEC to delay In-service for 2020 until at least the Fall. In the interim, they have continued to reinforce the concept through the use of email reminders as well as flyers posted throughout BOEC. We have been provided copies of the training flyers and find these daily reminder efforts are sufficient to supplement the delayed annual in-service training.

BOEC also conducts an audit of calls where PPB officers indicated a mental health component but BOEC did not dispatch an ECIT officer. The results of the most recent audit (which looked at 702 calls over a 6-month period) indicate that in 97.7% of calls, BOEC telecommunicators made the correct decision to send or not send an ECIT officer based on the information they had at the time. This is consistent with the prior evaluation conducted by BOEC (see our 2020 Q1 report).

Additionally, when BOEC receives a call involving a person with suicidal threats, feelings, or intent but the caller does not have the direct means to carry out the suicide, does not need immediate medical attention, and is not threatening to jump from a bridge/structure or to block vehicle traffic, BOEC has a protocol for assigning the call to the Multnomah County Crisis Call Center (MCCL), which has the resources to connect community members to service providers. We have reviewed BOEC protocol and have observed training related to this practice in the past and maintain that this process positively contributes to BOEC's system. Additionally, when a call is routed back to BOEC from MCCL for dispatch

BOEC reviews the call to determine whether the original information supported the decision to send the call to MCCL or whether the telecommunicator should have originally dispatched an officer. Between March and May of 2020, a total of 113 calls were routed to MCCL, only five of which were sent back to BOEC for dispatch. The reviews conducted by BOEC are designed to ensure the "fully operational" triage system of BOEC in accordance with Par. 115. In sum, we find that BOEC's role in the City's system of response to mental health crisis continues to function well as evidenced by their policies, training, and audits.

To evaluate PPB's role in the City's system for responding to persons in mental health crisis, we first evaluate PPB's current policies, the training received by PPB officers, the enhanced training received by ECIT officers, and finally data collection tools and associated data related to PPB response. PPB continues to enforce directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). For each of these directives, we have concluded that they substantially comply with the requirements of the Settlement Agreement and were properly reviewed by the Behavioral Health Unit Advisory Committee (BHUAC) prior to enactment (see Par. 95). While the policies remain in compliance with the Settlement Agreement, ongoing review by the BHUAC is an important element of a system driven by self-improvement. During the maintenance year, BHUAC may consider reviewing the directives to ensure that they remain reflective of best practices while also remaining compliant with the requirements of the Settlement Agreement.

Comprehensive training on crisis response remains a core competency in PPB and all officers are required to receive a minimum of 40 hours Crisis Intervention training prior to graduating the Advanced Academy (see Pars. 97 and 98). The COVID-19 pandemic has limited our ability to observe in-person the Advanced Academy training currently occurring though, where possible, we will personally observe upcoming classes related to crisis intervention and will provide an update in our next maintenance year monitoring report. Should we be unable to personally observe future classes, we will work with PPB to agree on alternative arrangements. Additionally, we are planning to observe (either in-person or virtually) an upcoming Supervisors Academy which contains classes related to crisis intervention and we will report our assessment in future reports. In our last report, we also discussed how PPB In-Service training has continued to include classes and/or scenarios involving persons in mental health crisis. Additionally, the mental health training components were reviewed by the BHUAC prior to the training being conducted.

As part of PPB's specialized response system, a select group of officers receive 40 additional hours of training to become Enhanced Crisis Intervention Team (ECIT) officers (see Pars. 99 and 102). In November of 2019, a new class of 20 ECIT officers was trained, bringing PPB's total number of ECIT officers to 131. In October of 2019 (prior to the November training), BHUAC members were given a presentation on the upcoming training and were given an opportunity to comment and make suggestions for improvement. Given our prior assessment of the training as well as the ongoing review by BHUAC, we continue to find that the ECIT training is a valuable supplement to the 40-hour training received by all officers. Additionally, as required by the Settlement Agreement, ECIT officers are volunteer officers (Par. 100) who retain normal duties until dispatched as an ECIT officer (Par. 103). PPB has maintained selection and retention criteria that are consistent with Par. 101 and which have been reviewed by BHUAC. As part of their system, PPB reviews the work history for all prospective ECIT officers prior to selection to ensure adherence to selection criteria. Additionally, BHU personnel are notified by PSD whenever an ECIT officer receives a complaint based upon use of force or mistreatment

of persons with mental illness, thereby ensuring adherence to criteria. Each of these elements demonstrates a comprehensive system with built-in oversight mechanisms.

As in our last report, we evaluate the effectiveness of ECIT response to mental health crisis calls as it relates to various elements, including ECIT officer response to ECIT calls. In May of 2020, PPB provided us with its fourth semi-annual evaluation of the ECIT program. While the prior report indicated an approximate 5% reduction in ECIT officer response rate (going from 75.4% response rate to 70.0%), the recent report (covering the period 10/1/2019 to 3/31/2020) indicates a 73% response rate for the reporting period. While minor fluctuations are expected, we note that over the past two years (and even prior), PPB has generally had a response rate at or near 75% which we have found to be well within the range of reasonable. Additionally, when an ECIT officer is not on scene, the most common two reasons are either the ECIT officer was cleared or the call was resolved prior to the ECIT officer arriving.

| CAD Calls Initial Call Type as ECIT<br>If ECIT Officer was On Scene<br>10/01/2019 - 03/31/2020 | | |
|---|---|---|
| | Number | % of Total |
| No | 514 | 27% |
| Yes | 1,359 | 73% |
| Grand Total | 1,873 | 100% |

Table 3 – ECIT Officer Response (Table provided by PPB)



Figure 2 – Reason For ECIT Not On Scene (Figure provided by PPB)

After interactions involving a person with mental illness, non-ECIT officers continue to complete a Mental Health Template (MHT) if also completing any other type of report. In contrast, ECIT officers are required to complete an MHT whenever they utilize their crisis intervention skills, regardless of whether another report is completed. Officers also appear to be consistently accurate in determining whether a MHT is required, as a PPB audit found that when an officer determines a subject was not suffering from an actual or perceived mental illness, they were correct in this assessment 97% of the time. Based on this, PPB has maintained compliance related to completing a MHT in accordance with Par. 105.

PPB has also maintained their use of MHT data to evaluate various aspects of its ECIT program, including ECIT type call distributions, response rates (see above), as well as arrest, hospital transports, and force differences between ECIT and non-ECIT officers. The most recent 6-month evaluation provided by PPB continues to show that for mental health calls which do not meet ECIT criteria, there is no difference between ECIT and non-ECIT officers in whether a subject is transported to jail. While differences exist between ECIT and non-ECIT officer in whether a person is transported to the hospital, the report indicates a narrowing gap between the two groups, with non-ECIT officers showing increasingly higher probabilities of transporting persons in crisis to hospitals. These data are based on a total of 1,780 calls.

Probability of Transport to Hospital (Mental Health)/Unity Center if ECIT-Trained Officer On Scene of Non-ECIT Calls:

| | ECIT-Trained Officer On Scene | Non-ECIT-Trained Officer On Scene |
|---|---|---|
| 04/01/18 - 09/30/18 | 16.6% | 9.4% |
| 10/01/18 - 03/31/19 | 21.2% | 12.4% |
| 04/01/19 - 09/30/19 | 19.0% | 14.1% |
| 10/01/19 – 03/31/20 | 24.8% | 18.4% |

Table 4 – ECIT and Non-ECIT Transport to Hospital

As in past reports, we also assess supplemental/secondary response systems being used by PPB, including the Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT). The BHRT continues to consist of five pairings of a PPB officer and a mental health professional. When a person is referred to BHRT through the Behavioral Health Unit Electronic Referral System (BERS), the person is evaluated to determine whether they meet criteria for BHRT intervention. The criteria include whether the person is demonstrating escalating behavior, has had frequent contacts with PPB, is considered a risk to self or others, or whose case-specific information indicates a potential need for BHRT intervention. Also, when a person is the subject of three MHTs in a 30-day period, an automatic BERS referral is made for that person (unless a previous referral exists), thereby satisfying the requirements of Par. 110. If a person meets the criteria for BHRT intervention, a plan of action is discussed among members of the Behavioral Health Unit Coordination Team (BHUCT) which includes law enforcement, court, service provider, and hospital personnel, among other relevant stakeholders.

PPB members of the BHRT teams are provided the 40-hour enhanced crisis intervention training and receive specialized training when available (see Par. 109). The selection and retention criteria are consistent with the criteria for ECIT officers. Also, the same process by which PSD notifies BHU whenever an ECIT officer has a complaint of force or mistreatment against a person with mental illness is applied to BHRT officers as well (see Par. 108).

In addition to the BHRT teams in each Precinct, two other BHRT teams operate to provide intervention to persons meeting BHRT criteria. The first is a BHRT team dedicated to providing follow-up to BHRT clients around 60-days after the initial intervention. The second is a BHRT team whose primary responsibility is acting as a city-wide team for Portland's houseless population. Both of these teams were created based on prior PPB data analysis and needs assessments, demonstrating an evidence-based review/react system.

PPB continues to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the first quarter of 2020, a total of 252 referrals were made through the BERS system. Of those, 114 (45%) were assigned to the BHRT caseload. Over the past two years, acceptance rates have generally been between 45% and 55%. Over the past 6 years, the BHRT caseload has varied, though in the last two years, there has been a noticeable increase in its average weekly caseload. PPB notes this is most likely linked to the expansion in the number of BHRT teams (from 3 to 5) which occurred in the fourth quarter of 2018. In that same time period, cases experienced an increase in the average number of days they remained on the BHRT caseload. In discussing this trend with PPB, they noted that, in the past, houseless persons referred to BHRT would oftentimes be inactivated due to the person being unable to locate. However, with the addition of the BHRT team which focuses on houseless individuals and the relationships that BHRT team has built with entities that serve these individuals, more time can be taken in finding the individual and connecting them with the appropriate resources. While this has added to the average number of days on the BHRT caseload (as well as other potentially contributing factors), it also means that BHRT is able to connect more individuals to services.



Figure 3 – BHRT Average Weekly Caseload (Figure provided by PPB)



Figure 4 – Time on BHRT Caseload (Figure provided by PPB)

The other secondary response system that PPB operates is the Service Coordination Team. This program continues to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system (see Par. 112). While we are awaiting the final draft of the annual Capstone Study class conducted at Portland State University (which conducts an annual assessment of SCT), we note PPB conducts quarterly review of SCT data as part of its system assessment of BHU groups. In the first quarter of 2020, PPB provided data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people the SCT has served. In the past year, the SCT has accepted nearly 50% of all persons referred.



Figure 5 – SCT Individuals Referred (Figure provided by PPB)



Figure 6 – SCT Referral Status (Figure provided by PPB)

Finally, as part of SCT operation, the Supportive Transitions and Stabilization (STS) program provides a direct housing resource for BHRT clients. The STS program has accepted over 90% of referrals they have received and in the past four quarters, their acceptance rate has been 96.2%. As evidenced by the above, we continue to find that the Service Coordination Team acts as a positive element of PPB's overall system of mental health response and has continued to comply with Par. 112.



Figure 7 – STS Referral Status (Figure provided by PPB)

As an overarching system, the Behavioral Health Unit (BHU) continues to oversee and coordinate the ECIT, BHRT, and SCT programs (see Par. 91). BHU utilizes data from a variety of sources to evaluate its operation, including data from the MHT as well as data collected from BHRT and SCT (see Par. 93). Additionally, in accordance with Par. 92, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, MCCL, BOEC, and BHUAC (see also below). We have met with the Lieutenant who oversees BHU on multiple occasions and are confident that all aspects of BHU (ECIT, BHRT, and SCT) are operating as a comprehensive system rather than individual programs.

Additionally, the BHUAC continues to act as an advisory body to guide the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT factions. The current BHUAC membership consists of individuals from PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, the Public Defender's Office, and the Unity Center for Behavioral Health (see Par. 94). Presently, two spots related to Central City Concern and AMR are vacant and the BHUAC should fill those as soon as possible. The BHUAC continues to provide input on policy, training, and SOPs (see Par. 95), as well as receives presentations and holds discussions on current practices of other mental health system partners. In the first quarter of 2020, BHUAC only met once and discussed issues related to PPB changes in personnel, the BHUAC Community Engagement Plan, BHUAC goals for 2020, and a presentation from Multnomah County Local Public Safety Coordinating Council. Additionally, the COCL sat in on the May meeting of the BHUAC and heard discussion related to finalizing the community engagement plan and discussing learning objects in the development of an ECIT refresher training course (among other topics). Related to this, BHUAC committee members have participated in the PCCEP Behavioral Health Subcommittee meetings, providing responses and insight to community member questions.

# SECTION VII – EMPLOYEE INFORMATION SYSTEM

During the first quarter of 2020, PPB continued to use the Employee Information System (EIS) as their primary system for identifying potentially problematic members and "design[ing] assistance strategies to address specific issues affecting the employee" (Par. 116). As with our last maintenance year monitoring report, we evaluate the EIS system from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on receiving alerts. As evidenced below, we find that PPB has maintained substantial compliance in Section VII (Employee Information System) during this quarter.

PPB continues to collate data from a variety of various data sources, including data from force events and traumatic incidents (captured in Regional Justice Information Network (RegJIN)) as well as complaints and commendations (captured in Administrative Investigations Management (AIM)). These data are then used to identify potentially problematic behavior in the form of predetermined thresholds, some of which the Settlement Agreement defines, including when:

- Shift Force Ratio: A sworn member's force ratio is greater than or equal to three times their shift's average ratio in the preceding six months

- Force Ratio: A sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six months

- Force Count: A sworn member uses force three or more times in the preceding thirty days

- Criminal Complaint: A member receives a complaint with an allegation of criminal misconduct

- Complaint in Same Category: A member receives two or more complaints with at least one allegation in each complaint being in the same category such as two complaints that both have conduct allegations for events in the preceding six months

- Complaint Count: A member receives three or more complaints for events in the preceding six months

- Traumatic Incidents: A member experiences three or more traumatic incidents in the preceding thirty days (traumatic incidents are events related to child abuse, deadly force, homicide, officer being assaulted, suicide, and/or traffic fatality)

- Commendations: A member receives two or more commendations for events in the preceding six months

In our last report, we noted that PPB evaluates the quality of EIS data and identifies instances in which the data indicate a potential concern with reliability. Through this process, PPB was able to identify issues related to computer/downloading errors and a backlog of commendations and, in both of these instances, PPB was able to remedy the issues. For this present report, no such issues were identified. For the remainder of the maintenance year, PPB should remain vigilant in evaluating data reliability and correcting issues as they arise.

PPB continues to employ two trained EIS administrators to evaluate alerts created by the EIS and determine whether the alerts should be forwarded on for RU review. The EIS administrators were

trained via a comprehensive operations manual—including SOPs for the handling of EIS alerts, entries, and responses—in accordance with Par. 120, which also allows future EIS administrators to operate in a consistent fashion. EIS administrators track alerts and monitor alerts to ensure that identified issues are resolved in a timely manner. Finally, the EIS administrators act as a system of checks and balances should the RU Manager or supervisor determine no intervention is necessary.

In the first quarter of 2020, EIS administrators reviewed a total of 267 alerts and sent 150 (56.2%) on for RU Manager review (see Figure 8). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or may be sent on to the officer's supervisor for either closure or an intervention (coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts <u>closed</u> in the first quarter of 2020 (which may also include cases opened in the fourth quarter of 2019), there were 129 alerts sent to the RU Manager and for 60 (46.5%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the first quarter of 2020, a substantial majority (80%) of those resulted in some type of intervention for the officer.

In our last report, we noted some general trends related to the proportion of cases which were forwarded to supervisors and received some type of intervention. In that report, we noted that while the proportion of EIS alerts which were forwarded a supervisor had been declining, the proportion of alerts which received some type of intervention from the supervisor had been increasing. For this quarter, both of these reversed course, with a slight increase in the proportion of cases sent to supervisors and a slight decrease in the proportion which received an intervention from the supervisor.

When reviewing trends prior to 2020 Q1, we noted a likely explanation is that EIS administrators and RU managers had become more discerning as to which alerts represented a true need for intervention and which alerts were the result of statistical "noise." While the reversal in this single quarter does not constitute a trend and the 2020 Q1 data still represent a year-over-year improvement over 2019 Q1, PPB should ensure that such statistical noise is not being re-introduced into the system, particularly if next quarter's data follows a similar pattern.

During the public-comment period for our last report, some community members noted that more alerts being sent to supervisors (regardless of whether they result in interventions) is a good thing as it allows more scrutiny of officers. We don't necessarily disagree though we remain concerned that if too many insignificant alerts are forwarded, the system will be undermined if officers and supervisors lose trust in its ability to identify meaningful triggers.



Figure 8 – EIS Alerts and Alerts Sent to RU Manager (Figure provided by PPB)

|  | 2019 Q1 | 2019 Q2 | 2019 Q3 | 2019 Q4 | 2020 Q1 |
|---|---|---|---|---|---|
| Alerts Sent to RU | 161 | 232 | 338 | 138 | 129 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 101 (62.7%) | 116 (50%) | 145 (42.9%) | 54 (39.1%) | 60 (46.5%) |
| Interventions (Percent of Alerts Sent to RU) | 71 (44.1%) | 86 (37.1%) | 122 (36.1%) | 46 (33.3%) | 48 (37.2%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 71 (70.3%) | 86 (74.1%) | 122 (84.1%) | 46 (85.2%) | 48 (80%) |

Table 5 – EIS Alerts and Interventions

In order to identify potentially problematic trends at the supervisor and team levels, the Force Inspector and analysts within the Office of Inspector General (OIG) continue to utilize Use of Force data to identify groups that are using force at higher rates compared with others (Par. 117). On a quarterly basis, the Force Inspector meets with Precinct Commanders to discuss findings related to the force audit overall (see Pars. 74, 75, and 77) and groups which demonstrate higher rates of force. In the past, we had personally observed debriefing sessions between the Inspector and Precinct Commanders and PPB continues to provide written communication from the Inspector to the Precinct Commander to inform

such conversations. For the first quarter of 2020, the Force Inspector identified trends in report writing for three sergeants. In response, a manual EIS alert was created for each sergeant and each sergeant was debriefed on their report writing requirements. Although an EIS alert was created and each sergeant was the recipient of a debriefing, a corresponding PDT entry was not made to document the debriefing (see PPB Directive 345.00). In discussing this issue, PPB acknowledged that each sergeant should have received a PDT entry and that one would be made (though the protests related to the George Floyd's death have temporarily caused a delay in resolving this issue). We believe this to be a relatively minor issue considering that the debriefing was conducted and documented in the EIS alert closure. However, PPB will still need to make the necessary PDT entries and we suggest a reminder email to all RU Managers informing them of the requirements to document such discussions in the PDT. In our 2020 Q3 report, we will provide an update on this issue.

In the first quarter of 2020, we reviewed documents demonstrating group level data for precincts, shifts, and days off. Similar to our last report, the data did not indicate any group trends in the use of force. Previously, PPB Command staff had informed us that group trends at times may be masked with the inclusion of Category IV force types, which are more frequent and less serious. Given the lack of identifiable group trends in this quarter as well, PPB may consider additional analyses to determine whether group trends are, in fact, absent or whether they are masked by Category IV force types.

In accordance with Par. 116, PPB Directive 345.00, and PPB Directive 215.00, supervisors continue to evaluate officers' EIS and Performance Discussion Tracker (PDT) information: (1) annually as part of an officer's performance evaluation, and (2) upon transfer of an officer to a new command. Consistent with our reporting last quarter, PPB's quarterly audits of reviews required by Directive 345.00 has consistently found overall high rates of compliance with the required reviews (see Figure 9). When supervisors do not conduct the reviews as required, PPB has continued to utilize their email notification system to alert tardy supervisors to missed review timelines. For this report, we requested a sample of EIS entries from North Precinct related to both annual reviews and new to command transfers. Our review indicates that EIS entries are indeed being made, though note that some supervisors provide minimal information. Others were much more descriptive, noting aspects of members' work performance such as use of force, training, and overall character. Where possible, PPB should seek to reinforce the importance of more descriptive EIS entries as this will ultimately be more helpful than the minimal information, whether the information is considered positive or negative.

In our last report, we noted that while all other Precincts and Units conducted required reviews in a timely fashion nearly all of the time, the Chief's Office lagged far behind for "new to command" reviews (see Par. 116b), completing those reviews in a timely fashion less than 50% of the time. For the present quarter, the Chief's Office increased to levels consistent with other Precincts and Units for both types of reviews. However, the Training Division decreased to 42.9% for "new to command" reviews required in this quarter. The decrease was related to a Personnel Action Form (PAF) not being sent to the EIS administrators. In turn, a reminder email was not sent to the Training Division informing them of their requirement to complete the 116b reviews. This matter was resolved and PPB has since implemented a process wherein a transfer list will be attached to the Uniform Daily Assignment Roster which is available for all Bureau members. PPB notes that this will act as another mechanism for providing reminders to supervisors of when transfer reviews are required.

Even when including the Training Division, PPB still demonstrates appreciably high rates of reviews, both for annual reviews and "new to command" reviews (see Figure 9). As such, we do not believe the Training Division's required reviews to be emblematic of the entire bureau. However, this represents the

second quarter where a unit has shown decreased review compliance. In addition to the steps already taken, PPB may consider putting out a bureau-wide reminder that supervisors are responsible for completing "new to command" reviews as well as reviews for current members under their command.



Figure 9 – Compliance with Reviews Directive 345.00 Reviews (Figure provided by PPB)

*System Assessment*

The above approaches by PPB demonstrate an overall functioning system whereby potentially problematic officers are evaluated through a number of processes: supervisor review of EIS, EIS alerts, and Inspector analyses. When appropriate, PPB has demonstrated an ability to implement an intervention in order to address supervisor concerns. Elements of the system which contain the potential for human error (or negligence) are buoyed by a multi-level system of checks and balances, ensuring that, where necessary, corrective action can be taken. We have seen such instances and find that PPB has implemented components which safeguard the integrity of the system. While the impact of PPB's current reviews may take many years to be realized, the system operates in accordance with sound supervisory theory. We therefore find PPB has maintained compliance for Section VII (Employee Information System) during this quarter.

# SECTION VIII – OFFICER ACCOUNTABILITY

We note from the outset that the present report has been drafted at a time of great unrest in the City of Portland and that the City's accountability system must be responsive to complaints made as a result of such unrest. However, we are reserving our assessment of accountability related to the protests until our next report. Given the number of incidents and the diligence which would be expected of the Compliance Officer to determine whether PPB has maintained compliance with the Settlement Agreement during this time, we would be remiss if we were to rush our assessment in order to meet our reporting timelines.

As we laid out in our last report, a functional accountability system is marked by a number of foundational elements, including access, transparency, expediency, consistency, and a set of checks and balances. Therefore, we continue to evaluate Section VIII against these elements, describing how various Settlement Agreement paragraphs enhance such elements and how the City has maintained compliance with such paragraphs.

Portland's accountability system continues to remain largely accessible to community members, allowing complaints to be filed in a multitude of ways. These include community members' complaints to the Independent Police Review (IPR), community members' complaints to PPB, IPR initiated complaints, and PPB initiated complaints. Community members can file a complaint by phone, online, or in-person (either to PPB or IPR). For most complaints, IPR continues to conduct intake investigations and determine whether to initiate additional investigation proceedings or not.

IPR has maintained their criteria for administratively closing an allegation of misconduct (see City Code 3.21.120 (C) (4)), thereby maintaining a systemized approach to when a complaint will be administratively closed. To administratively close a complaint involving force, IPR must have "clear and convincing evidence…that the allegation has no basis in fact" (Par. 129). As of the middle of May, IPR had administratively closed three allegations of force. We reviewed the circumstances for each of the cases and agree with IPR's determination that the allegation had no basis in fact. In one of the complaints (opened as the result of a tort claim), video evidence coupled with police reports demonstrated the complaint had no basis in fact. In another, a review of all DPSST showed that involved officers came from another agency and no reports written by the other agency's officers mentions any PPB officers being present. In the third instance, IPR received second-hand information of a potential policy violation but could not reach the subject of the complaint. Additionally, IPR investigators spoke with a friend who was with the subject at the time of the interaction. The friend refuted any wrong-doing and submitted a commendation based on the officers' actions.

Overall IPR administrative closures continue to show declines over the years. In 2019, IPR administratively closed 38% of administrative complaints filed by community members, the lowest administrative closure rate in the past six years. Additionally, in the public comment period for our last report, a community member raised the issue that IPR's requirement to fully investigate all force allegations would naturally lead to lower administrative closure rates. In order to be responsive to community member questions, we removed from the statistical comparison all complaints which involved an allegation of excessive force. When doing so, we find consistent declines over the last three years in administrative closures from IPR. A number of factors may be contributing to this decline, including enhanced capacity on the part of IPR and IA as well as an increase in the number of complaints

that are sent on for Supervisory Investigation or Precinct Referrals (whereas in the past, those complaints would have not been investigated).



Figure 10 – IPR Administrative Closures by Year



Figure 11 – IPR Administrative Closures Last Three Years – Non-Force



Figure 12 – Precinct Referrals and Supervisory Investigations – Non-Force

As the next element of a functioning accountability system, we also find that Portland's approach remains largely transparent. Community members remain able to track the progress of their complaint (see Par. 138) and IPR continues to provide updates in writing at each stage of the investigation (see Par. 140), including a community member's ability to appeal findings. Findings letters provided to community members clearly state the finding as well as the rationale for the finding. Not only are updates and information for appeals provided for community members but they are also provided for officers.

Citizen Review Committee (CRC) appeal hearings remain open to the public with accompanying minutes posted to the IPR website. In recent months, due to the COVID-19 pandemic, CRC hearings have happened over Zoom. As with many things during the COVID-19 pandemic (including training, PCCEP meetings, etc.), the pivot towards virtual meeting space was necessary and, in some instances, allows for broader community observation and input, thereby enhancing transparency. Additionally, redacted summaries of Police Review Board (PRB) hearings continue to be provided on the PPB website. Finally, IPR analytical reports and online data related to misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths remain available on the IPR website (https://www.portlandoregon.gov/ipr/76848), allowing interested parties to learn the facts and conduct their own analysis. As a suggestion for improving overall transparency, IPR may consider tracking administrative complaints where the complainant was experiencing a mental health crisis at the time of the interaction. In doing so, IPR will need to account for the privacy of community members – however an aggregated analysis might be appropriate. Overall though, we maintain that the combination of these efforts points to an accountability system that is largely transparent.



As a matter of procedural justice, expediency in resolving administrative investigations remains an important element to facilitate trust in the system. In order to maintain oversight of case timelines, IPR analysts continue to conduct a quarterly analysis of the data. The most recent analysis for which 180 days could have passed for all cases (2019 Q3) indicates that full administrative investigations are resolved within the 180-day timeline approximately 90% of the time, thereby sustaining the improvement we had noted in prior reports.

|  | 2018 Q1 | | 2018 Q2 | | 2018 Q3 | | 2018 Q4 | | 2019 Q1 | | 2019 Q2 | | 2019 Q3 | | 2019 Q4 | | 2020 Q1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Full Investigations** | 46 | | 50 | | 31 | | 33 | | 30 | | 32 | | 43 | | 17 | | 3 | |
| Less than 180 | 36 | 78% | 37 | 74% | 20 | 65% | 29 | 88% | 28 | 93% | 28 | 88% | 39 | 91% | 16 | 94% | 3 | 100% |
| Over 180 | 10 | 22% | 13 | 26% | 11 | 35% | 4 | 12% | 2 | 7% | 4 | 13% | 4 | 9% | 1 | 6% | 0 | 0% |

Table 6 – Percent of Full Investigations Completed in Less Than 180 Days (Figure provided by IPR)

Additionally, the IPR analysts have continued to evaluate case stage timelines. In the most recent analysis, the data indicate that the time taken at the IPR Investigation stage has continued to increase – however, due to the small number of cases IPR investigates (a total of 3 in the most recent quarter), firm conclusions cannot be drawn. IPR should evaluate whether the increase in the number of days taken at this stage is due to case characteristics (i.e. did the three cases have a high number of allegations, a high number of witnesses, delays in obtaining evidence, or some combination of these and other factors?) or due to other causal factors. IPR has, in fact, already begun this process and we look forward to reviewing the results of this assessment.

In February of 2020, IPR analysts provided IA and IPR management an assessment of case stage timelines, noting "The median case times at each stage remain below the goals set for each stage, with several stages falling days below the goal." However, the analysis identified two stages that, while remaining below the goal timeline, showed increases in recent quarters. This includes IPR Investigations and Supervisory Investigations. Upon identification of the increases, the IPR analysts asked IA and IPR management to "further research the circumstances of the cases to determine if any action is necessary to ensure those stages remain on track." Actions taken as a result of this process will be reviewed in our next report.



Figure 13 – IPR Independent Investigations – Median Days (Figure provided by IPR)

Finally, both IA and IPR continue to engage in weekly meetings regarding all case timelines, with a specific focus on cases which have exceeded or which are approaching the 180-day timeline. Due to the COVID-19 pandemic, these weekly meetings have occurred via Zoom, thus allowing members of the COCL to observe them first-hand. Based on our observations, we find these meetings helpful in tracking cases, ensuring that no single case can approach or exceed the 180-day timeline without being discussed as to its status.

We also continue to evaluate whether the Portland accountability system can be considered consistent, both in its approaches and outcomes. As we noted in our prior report, consistency is important for

maintaining trust in the system by both officers and community members. During the maintenance year, both IPR and IA have retained their mirrored policies, joint training, and lines of communication for when issues have arisen. Through this process, both complainants and officers know exactly what to expect during the administrative investigation process. This has led to continued compliance with Par. 128 which enabled IPR to conduct meaningful independent investigations (though we acknowledge there are some differences driven by collective bargaining agreements - for instance, IPR is required to compel officer testimony through IA and IPR is prohibited from conducting deadly force investigations).

During this monitoring period, we also conducted our quarterly review of administrative investigations, ensuring that an adequate sample of each investigative pathway is reviewed. We requested a list of all administrative complaint investigations that were completed in the first quarter of 2020 and from those, selected a total of 20 cases, stratifying our selection to ensure an adequate representation of administrative closures, supervisory investigations, precinct referrals, IPR full administrative investigations, and IA full administrative investigations. The cases we reviewed indicated that, regardless of which route a complaint might take, findings and decisions continue to be reasonable and supported by a preponderance of the evidence.

Finally, PPB continues to utilize a discipline guide whenever a complaint against an officer is sustained to ensure that discipline is defined and consistent. The discipline guide contains the potential for mitigating and aggravating factors and supervisors are required to consult the guide when making disciplinary decisions. We reviewed the Corrective Action Recommendation Memorandums from the first quarter of 2020 and found that within each memo, supervisors confirmed that they consulted the discipline guide. In all but one, supervisors discussed the elements of the complaint as well as both mitigating and aggravating factors, and indicated how the proposed discipline was in-line with the guide. From these documents (as well as prior discipline recommendation memos we have reviewed in the past), we believe that discipline is consistent and in-line with a functional accountability system, though suggest PPB ensure all supervisors include a description of the mitigating and aggravating factors when determining discipline.

As with the last report, we also assess whether there is an inherent system of checks and balances built into the accountability system to ensure a fair resolution for all involved. Through a review of IA and IPR policies and corresponding supporting documents, we continue to see evidence of checks and balances occurring at each stage of the process. For instance, prior to an RU Manager's findings on an allegation, IPR continues to have the ability to review the investigation report and can request additional investigation or a rewrite of the investigative report. Additionally, after an RU Manager makes findings, IPR reviews those findings and has the ability to controvert the findings, thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination. During the first quarter of 2020, IPR did not need to request additional investigation, a rewrite of the investigative report, or controvert an RU Manager's findings.

Community members and officers continue to be able to appeal administrative investigation findings to the Citizen Review Committee (CRC), an eleven member review board that "hear[s] appeals from complainants and officers and publicly report[s] its findings" (among other functions – see https://www.portlandoregon.gov/ipr/53654). In 2020, there was one appeal hearing for which we were able to listen to the recording. In that hearing, the CRC requested additional investigation and interviews and postponed the hearing until a time when such information could be included in the review. This is consistent with their authority under Par. 136. Coupled with our observations of CRC meetings in the

past, as well as our ongoing review of their public reports, we maintain that the CRC conducts their hearings in a fair and impartial manner (see Par. 134).

As part of their operation, the CRC is also able to challenge the findings of an administrative investigation and recommend a different finding (see Par. 135). Should CRC challenge a finding and no resolution can be reached with PPB, the City Council then acts as another system of checks and balances and makes a final determination. In the first quarter of 2020, no case required a challenge to findings and no cases were sent to City Council.

The CRC's operation continues to meet the letter of the Settlement Agreement and contributes to the overall accountability system. In our last report, we noted some issues in the relationship between IPR and CRC for which both entities expressed optimism for resolutions. These include differences in opinion on the CRC standard of review ("reasonable person" standard vs. "preponderance of the evidence" standard) as well as CRC member concerns with the degree of collaboration between IPR and CRC when making decisions on CRC operations. For this report, we asked IPR and the CRC Acting Chair whether any progress had been made in improving the relationship and both responded affirmatively. For instance, both commented on the renewed energy of CRC, particularly with new CRC members. IPR reported that new member training was largely successful and has prepared the incoming CRC members. In correspondence with the CRC Acting Chair, we were informed that new ways to enhance authority and communicate with the Auditor's Office are currently being brainstormed and that with the national push for police reform, citizen police review is as important as ever. We agree with this sentiment and are encouraged that dialogue and collaboration has continued in the past quarter, particularly given the COVID-19 restrictions on in-person meetings.

A final system of checks and balances can be found in the Police Review Board. When there is a sustained finding that will lead to discipline of suspension or greater, or when there is a controverted finding, the Police Review Board acts as a review board who may take the RU Managers proposed findings (see above) and either adopts the proposed findings or provides their own proposed findings and corrective action to the Chief. PRB procedures are consistent with Par. 131 of the Settlement Agreement. We were unable to review any PRB meetings in the first quarter of 2020 in order to verify that PRB procedures were carried out though plan to observe PRB meetings that occur in the near future via online format. Upon doing so, we will update this section regarding PPB's maintenance of compliance.

Finally, PPB's accountability system has particular requirements after the occurrence of lethal force and in-custody death events. Because of the sensitive nature of such events, PPB safeguards the integrity of such investigations through a number of actions. For instance, first responding supervisors separate all witness officers and involved officers (see Par. 125), conduct initial interviews individually (rather than as a group), and have a phone-tree to ensure all necessary notifications are made. Detectives conduct on-scene walk-throughs and interviews with select witness officers (see Par. 126) as well as request walk-throughs and interviews with involved officers (though involved officers have historically invoked their right to decline) (see Par. 127).

After conducting their on-scene investigation, investigators interview all witness officers and then provide them with Communication Restriction Orders (CROs) to prohibit direct or indirect communication with anyone involved with the event until a grand jury has been convened, at which point the CROs are rescinded (see Par. 125). Involved officers are then required to participate in an interview with IA investigators within 48 hours of the event (unless a voluntary statement was already

given on-scene or the member is incapacitated) in order to inform the IA investigation. Pursuant to *Garrity v. New Jersey*, the administrative and criminal investigations are walled off from one another (see Par. 124), thereby maintaining the 5th Amendment rights officers have against self-incrimination.

In the past we noted that each element of the OIS/In-Custody Death investigation requirements have been followed. For this report, no OIS or In-Custody Death occurred during the first quarter and, while an OIS occurred late in the second quarter of 2020, it is still an open investigation. We will assess whether the investigation requirements were carried out for the most recent OIS in our next report. As the most recent OIS was the first to occur since early December 2019, we must rely on current PPB policy and our historical reviews for this report to conclude that PPB and the City remain in compliance with these paragraphs.

Finally, the recent national protests have brought with them renewed focus on systems for ensuring police accountability. While our assessment of compliance above pertains to the systems required by the Settlement Agreement, we have stated from the beginning that the Settlement Agreement represents a floor and not a ceiling. Nationally, police accountability systems can always be improved and proposals to enhance accountability should be given serious consideration. Where changes to Portland's accountability system may occur, we only look to see whether they maintain compliance with the terms of the Settlement Agreement. So long as they do, we would support any evidence-based improvements in Portland's accountability system.

# SECTION IX – COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

PCCEP Role in the Settlement Agreement and the City's Support

System Overview

Section IX of the Settlement Agreement requires that the City establish a Portland Committee on Community Engaged-Policing (PCCEP, Par. 141), which is authorized to: (a) solicit information from the community and the PPB about the PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns (Par. 142), with other specific duties set forth in a separate Plan for Portland Committee on Community-Engaged Policing.

PCCEP's membership is designed to come from a reasonably broad spectrum of the community, and members shall not have an actual or perceived conflict of interest with the City of Portland (Par. 143). PCCEP shall meet as needed to accomplish their objectives and hold regular Town Hall meetings that are open to the public. The City shall give advice on Oregon's Public Meetings Laws and similar requirements as necessary (Par. 151) and shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law (Par. 152).

PCCEP's Role

Pars. 141 and 142 both establish PCCEP and outline the body's authority to perform critical functions. Here, we provide an update on both paragraphs together. COCL found Substantial Compliance with Par. 142 in Q3 2019, after observing early on that PCCEP had the authority to perform the functions listed in Par. 142. This rating of Substantial Compliance was only given after seeing "progress that we anticipate will be made in future meetings, including progress toward a Community Engagement Plan... [and] toward both soliciting public input and informing recommendations regarding strategies to improve community relations."

PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations.

In the second quarter of 2020, PCCEP re-established monthly general meetings via Zoom—and continued virtual subcommittee meetings—after a brief hiatus due to the initial onset of the COVID-19 pandemic. More than 50 people attended the April virtual meeting, including PCCEP members.

The death of George Floyd at the hands of Minneapolis Police officers also occurred in the second quarter, on May 25. PCCEP's monthly meeting was scheduled for May 26, as protests in Minneapolis were erupting. Co-chair Lakayana Drury called for a moment of silence in honor of Floyd and Ahmaud Arbery, another black man whose violent death by three white men in Georgia was captured on video.

Over the next few weeks, PCCEP played an increasingly central role in Portland's surge of community outrage in response to these and other acts of police violence against black people. PCCEP held a series of listening sessions on successive Sundays—May 31, June 7, and June 14—to hear speakers and public comment from the black community. Hundreds of Portlanders participated in these events—including 320 in the first session alone—and shared their own personal experiences with systemic racism and police violence. Many local leaders attended these listening sessions—including State Senator Lew Frederick, Mayor Ted Wheeler, Commissioner Jo Ann Hardesty, and Urban League CEO Nkenge Harmon Johnson, among many others—and PCCEP's work generated press interest, which will further enhance the group's outreach and engagement efforts.

Concurrent with the first listening session, PCCEP issued a statement in response to Floyd's death, noting their outrage at "the disregard for his life and the lack of a coherent response from elected leadership from the federal government down to local municipalities to redress white supremacy and police violence." The statement continued, calling on local elected leaders and law enforcement officials to "stand against white supremacy and police violence," and take meaningful actions to "change the outcomes of policing, reducing incidents of violence, and the targeting of communities of color and other marginalized groups. We believe that it should be a priority for the new police contract to hold officers who violate policy accountable." PCCEP also called on the Mayor and Chief of Police to work with PCCEP "and the communities of Portland to create policy change within the police bureau in order to minimize the use of force, deaths and build trust within our community."

PCCEP also made a series of recommendations regarding police accountability, many on issues or policies that saw significant change in the weeks following their recommendations and related community demands. These second quarter recommendations included:

- Recommended Mayor Wheeler "initiate dialogue with Oregon's Congressional Members in the United States House of Representatives, and request that they begin the work of crafting and passing legislation that would change the legal doctrine of qualified immunity to create liability for officials whose actions were "reasonably foreseeable" violations of law with "no requirement of clearly established past case precedent."

    - The Mayor included this as an action item in his June 9 Police Reform Action Plan.

- Recommended a ban on the use of chemical weapons, aerial distraction devices, and noise devices against demonstrators.

    - On June 6, Mayor Wheeler directed the Police Chief to limit the use of tear gas, but did not ban the use; the order said "gas should not be used unless there is a serious and immediate threat to life safety, and there is no other viable alternative for dispersal." Three days later, a federal judge issued a 14-day order with similar restrictions; the use of these chemical incapacitants and other crowd control devices has continued.

- Recommended the City "defund the police and refund our communities" by reducing the Police Bureau budget. "We furthermore ask that the city develop culturally specific alternative services that can address the needs of the houseless and those suffering from mental health crises and drug and alcohol addiction."

    - In an unprecedented move, the Portland City Council made significant changes to the approved budget just prior to formal adoption—a point in the process typically used only for minor technical adjustments—moving an additional $15 million out of the Police Bureau Budget and toward community services, particularly services that directly impact black and brown communities. Hundreds of Portlanders testified, and tens of

thousands weighed in via email and petitions in support of reductions to the police budget.

- Recommended the City support a state legislative bill related to arbitration and police discipline, including urging "the mayor to work with legislators to close loopholes in the bill that would allow police to avoid discipline in serious cases including deadly force incidents where the arbitrator does not agree with the findings."

  - This bill, SB 1604, restricts an arbitrator "from ordering disciplinary action that differs from disciplinary action imposed by law enforcement agency if arbitrator makes finding that misconduct occurred consistent with agency's finding of misconduct." It passed both chambers during a special legislative session on June 26, and the Governor is expected to sign it into law. The Mayor and Commissioners submitted a letter in support of this and other police accountability bills that also passed.

- Recommended Accelerating "the City's plan to launch a Truth and Reconciliation Commission"

- Recommended supporting a "cultural shift by strengthening policy" regarding officers' duty to intervene, and implementing training to support such a policy.

- Recommended amending PPB's foot pursuit policy to "further limit use of force to situations that pose a threat of serious bodily harm to officers or the public."

- Recommended the City "evaluate all current restorative justice practices within the PPB and other related city departments and update said practices to promote additional restorative outcomes and alternatives means of public safety," and take a youth-informed approach (this recommendation originated with the PCCEP Youth Subcommittee, in partnership with the Multnomah Youth Commission Youth Against Violence Subcommittee).

The group also discussed Mayor Wheeler's June 9 Police Reform Action Plan during their June 14 listening session. As it relates to PCCEP, the Mayor's plan calls for a "community-led review and re-envisioning of core patrol services, convened by the Portland Committee on Community-Engaged Policing," and the creation of "local legislation enshrining the Portland Committee on Community-Engaged Policing in Portland City Code, making it a permanent community oversight body."

In addition to the significant leadership role PCCEP and its members played in Portland's community response to Floyd's death and the broader Black Lives Matter movement, specific observations in Q2 underscored PCCEP's continued function as a legitimate body for community engagement:

- Three members of the PCCEP racial equity subcommittee published an op-ed in the Oregonian in support of defunding the police and beginning "to think about transforming policing as we know it."

- Co-chair Drury spoke about the police reform demonstrations, and police accountability on OPB's Think Out Loud in early June and through other media opportunities.

- In April, during the PCCEP monthly meeting and COCL's presentation of the Q1 report, PCCEP co-chair Drury pushed back on COCL's assessment and disagreed with our findings regarding Substantial Compliance.

- In May, PCCEP leadership participated in a meeting with the Albina Ministerial Alliance and the Mental Health Alliance and parties to the Settlement Agreement, to discuss the AMA and MHA's

recommendations regarding PCCEP; PCCEP leadership asked that future similar meetings be made public, and plan to discuss the recommendations during PCCEP subcommittee meetings.

- In June, newly-appointed Chief Chuck Lovell spoke during PCCEP's full monthly meeting.

  - Of note, PCCEP was not asked for input on the selection of the new police chief; Chief Lovell's appointment was unexpected, following former Chief Jami Resch's resignation from the position.

- The Settlement Agreement and Policy Subcommittee reviewed PPB's plans for "virtual beats" as a way to engage the community, and reviewed stops data and hosted a public discussion of the data.

- The Behavioral Health Subcommittee re-formed in the second quarter, following earlier resignation of members. With additional outreach, the subcommittee has increased community member attendance at monthly meetings. This quarter, the subcommittee reviewed the PCCEP Community Engagement plan, and met with a PPB Behavioral Health Unit representative to discuss community engagement.

- The Youth Subcommittee also discussed the PCCEP Community Engagement plan, and developed a restorative justice recommendation.

- The Racial Equity Subcommittee hosted continued discussions of defunding police, as well as provided space for black female voices to share their experiences. They also discussed black women representation on PCCEP.

- Two PCCEP members resigned in late June 2020—one due to work commitments and the other because his family is relocating to Southern Oregon. PCCEP will vote on recommended alternates to replace these members as soon as late July.


At the February 25 Status Conference, both the COCL and the Department of Justice reported to Judge Simon that the City (including PCCEP) has achieved Substantial Compliance with Section IX of the Settlement Agreement on Community Engagement for reasons stated here and in previous reports. PCCEP leaders also provided a statement defending its functionality and legitimacy. We continue to believe the City continues to substantially comply with Section IX.


City's Support

The City continues to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions.

In our previous assessments, COCL has called out one area in which the PCCEP was imbalanced—gender, and in June, PCCEP's Racial Equity Subcommittee furthered this conversation by specifically discussing the lack of black female representation on the Committee.

In other ways, PCCEP continues to represent a "reasonably broad spectrum of the community," with seven members identifying as either a person of color and/or an immigrant, though representation of people with experience as peer support specialists or other personal, lived and/or professional experience with mental health issues has decreased from the three noted in Q4 2019. However, many of PCCEP's current members volunteer with other community groups or nonprofit boards related to

mental health, the justice system, or underrepresented communities, bringing in additional perspectives to PCCEP's work.

COCL has not previously identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland. However, during the June 23 PCCEP meeting, it is worth nothing that a proposed recommendation related to restorative justice prompted a PCCEP discussion about "an actual or perceived conflict of interest with the City of Portland." The recommendation called for the City to work with "the community partners listed in this recommendation," a list that included a non-profit led by a PCCEP member. PCCEP amended the proposed recommendation to remove the member-affiliated non-profit, and approved the amended recommendation.

PPCEP's overall functioning remains consistent with the expectations and requirements of Paragraph 141.

Substantial Compliance with Par. 151 has also continued, with PCCEP and COCL jointly hosting quarterly Town Halls to review and discuss draft COCL reports. Additionally, as discussed in depth above, PCCEP hosted multiple and well-attended community listening sessions and presentations on topics of community interest during its regular monthly meetings and subcommittee meetings in addition to conducting regular business related to subcommittee reports and PCCEP recommendations.

A representative of the City Attorney's office attends PCCEP meetings and continues to advise the PCCEP as necessary to ensure compliance with public meetings law, and the City continues to train new PCCEP appointees based on the "Guide for Volunteer Boards & Commissions" presentation prepared for all advisory boards, not just PCCEP. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

Portland Police Bureau's Role in Public Engagement and Outreach

System Overview

Section IX of the Settlement Agreement requires that PPB introduce or expand its systems of community engagement, both with the PCCEP and other resources (Par. 145). This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. Specifically, PPB was required to conduct a citywide community survey that would assist the PCCEP and lead to the development of a Community Engagement Plan by PPB (Par. 146). PPB was also required to collect demographic data about the community in each precinct to assist the Precinct Commanders and PCCEP with their community engagement plans (Par. 147). To help measure possible discriminatory policing, PPB officers were required to continue collecting data on race, age, sex, and perceived mental health status of persons they stop and share this information with the PCCEP and the public (Par. 148). PPB is also required to work with DOJ and COCL to develop a general set of metrics to evaluate community engagement and outreach by the PPB (Par. 149). Finally, PPB must issue an Annual Report (with certain content), with a draft reviewed by PCCEP, and then present a revised report to the public at Precinct meetings and before the City Council (Par. 150).

PPB's Community Engagement Actions

At the start of 2020, PPB continued to engage the Portland community through dozens of events and activities relevant to Par. 145 (https://www.portlandoregon.gov/police/30379), and did considerable work with PPB's Muslim Advisory Council, the Slavic Advisory Council, and the Catholic Charities Partnership. However, community engagement activities in general were changed in the second quarter due to COVID-19. Certain engagement opportunities remain constant, such as the invitation to review and comment on new and revised directives (https://www.portlandoregon.gov/police/59757). PPB also continues to work with PCCEP by participating in PCCEP's meetings and subcommittee meetings and responding to questions raised by PCCEP or community members. In addition, some PPB advisory councils have continued to hold virtual meetings during this period of social distancing.

In the second quarter, PPB has focused on adding more substance to the four areas outlined in the Community Engagement Plan (Par. 146): Public involvement, Communications, Access, and Training. PPB has created working groups within the PPB to further develop the Community Engagement Plan.

For the Public Involvement component, in addition to the many existing advisory groups (see https://www.portlandoregon.gov/police/30476), PPB has established an external Equity Council to provide a multi-racial, multicultural advisory structure. PPB has also established a Latinx Advisory Council to hear the voices from this community. PPB has created an Inclusive Advisory Council composed of representatives from each of the existing councils, which has met with the Chief of Police and PPB's Community Engagement Team.

PPB was asked to develop a Truth and Reconciliation Program and has expressed a willing to participate. Under the Mayor's leadership, PPB has recommended that PCCEP take the lead, arguing that these initiatives are more successful when they are community based with police involvement. Given the recent demonstrations on racial injustice, we are pleased to see that PCCEP recommended (on June 23rd) that the timeline for this program be accelerated.

In terms of the Communication component, PPB has used multiple social media outlets as described in previous COCL reports and is now working on a plan to notify Portland residents of various methods to get in touch with the PPB. Currently, however, the City is changing the format of its Website and PPB will be required to transfer to this new format once it is operational. Thus, PPB is waiting on the format change before notifying the public of communication options.

In terms of Access to PPB services, PPB is working on a plan to improve access for those with limited English proficiency (LEP). PPB has prepared a list of multi-linguistic officers, including the precincts and shifts to which they are currently assigned and the languages they speak, so that these officers can serve as a resource to the LEP community when needed. PPB is also working on developing a community-based interpreters program, composed of community members who can serve as interpreters for the LEP community. PPB intends to pursue grants and public donations to support this program.

In terms of Training on police interactions with diverse communities, PPB intends to train officers about the availability and use of LEP services after these programs have been fully developed. In addition, PPB has indicated that it will continue to provide training in procedural justice and implicit bias to reduce any disparities in treatment. Also, PPB is planning to add modules for cultural competency and related educational programs. Importantly, PPB is planning to engage more community members to assist in these training programs. The Equity Office has identified community members who are willing to help,

but facing the current crises, PPB does not have the resources to develop or enhance these programs. We will await further developments in the fall.

PPB is planning to report on the Community Engagement Plan by October 1 and present it to the PCCEP for review.

Data Collection, Analysis, and Reporting

As noted in our first quarter report, the precinct-level demographic data on local residents will remain the same until the 2020 Census has been completed and the results have been released (Par. 147). In the meantime, anyone can go to PPB's "Open Data" portal for Precinct and neighborhood level maps and monthly statistics on calls for service, crime, traffic accidents, traffic fatalities and injuries, police stops, officer-involved shootings, and more (https://www.portlandoregon.gov/police/71673). Again, these interactive dashboards are more extensive than what is available on the websites of nearly all police agencies.

PPB continues to collect demographic data from individuals who are stopped by the PPB (Par. 148), using a "Stops mask" or template that requires officers to report specific information about each stop. After community complaints about racial profiling, PPB has created a new set of questions for the Stops mask that will require officers to provide more details about the reason or justification for the stop. Training materials are currently being developed, with help from the City Attorney's Office, to guide officers when using the drop-down boxes with this software. The next step is to have a videographer prepare the online training video. PPB will then post the video on LMS. PPB has been working on this for several months, but these changes to the Stops mask are especially important now because of the demonstrations about police bias. We note, however, that the traffic stops of greatest concern were conducted by the Gun Violence Reduction Team, which was dissolved by the Mayor in June.

PPB's Strategic Services Division continues to generate quarterly Stops Data Collection reports, and on May 4th, released the report covering the 1st quarter of 2020. The report can be found on PPB's website (https://www.portlandoregon.gov/police/article/760977). PPB's 2019 annual report on stops has yet to be released, but we can expect that it will include data on race, age and sex of the community member stopped, thus contributing to "the analysis of community concerns regarding discriminatory policing" (Par. 148). The 1st quarterly report for 2020 provides a breakdown by race. Based on PPB's analysis of 19,901 traffic stops during this period, African Americans continue to be over-represented (16.8%). The African American community represented 11.6% of stops by the Traffic Division and 21.5% of the stop by all non-Traffic units. The latter figure showing the largest disparity includes stops by the now defunct Gun Violence Reduction Team.

In 2019 the City, DOJ and COCL agreed on a set of metrics to evaluate community engagement (Par. 149). PCCEP also provided input and recommendations regarding metrics and on March 5th, the Chief responded favorably to several of these suggestions. Relevant to community engagement metrics, a meeting was held on May 21st between the City, AMAC, MHA, PPA, and DOJ, along with some PCCEP members, to review and discuss metrics for PCCEP's success and how the City can support PCCEP after the Settlement Agreement has concluded. The six metrics focused on: diversity, public access, community involvement, member retention, and monitoring PPB after the Settlement Agreement.

In the third quarter, COCL will assess whether the PPB has issued a "publicly available PPB Annual Report" with specific requirements (Par. 150). Specifically, we will evaluate whether the 2019 draft report was prepared in a timely manner, was reviewed by PCCEP, contains the required information on problem-solving and community policing activities, and is responsive to PCCEP recommendations. COCL will also document whether PPB held meetings in each precinct and with the City Council to present the Annual Report.

Summary of PPB's Community Engagement

Despite the COVID-19 virus and demonstrations, PPB has made a good faith effort to maintain and, in some cases expand its systems of community engagement and measurement. These systems, as described above, increase transparency, and give the community a voice in policing, which in turn, is expected to strengthen police-community relations over time. However, this is a very challenging time for the PPB to respond to community demands, so we encourage PPB and the City to continue to think creatively about ways to build trust and increase accountability, including some type of Truth and Reconciliation initiative.

PPB currently provides quarterly and annual reports on traffic stops and use of force with breakdowns by race and gender. In our maintenance reports, we provide very few statistical results from these systems, as they are available to the public on PPB's website (https://www.portlandoregon.gov/police/). We encourage the public and all advisory groups or stakeholders to review these findings, engage in a thoughtful analysis, and consider any implications for PPB policies, training, or field operations. The full PCCEP looked at the use of force data at its May 26th meeting.

In sum, PPB remains in Substantial Compliance with the terms of the Settlement Agreement in Section IX on Community Engagement.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# <u>LIST OF PERSONNEL</u>

Chief of Police: Jami Resch, followed by Chuck Lovell

Deputy Chief of Police: Chris Davis

Assistant Chief of Operations: Mike Frome

Assistant Chief of Services: Ryan Lee

Assistant Chief of Investigations: Andrew Shearer

Commander of Professional Standards Division/Compliance Coordinator: Bryan Parman

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Jeff Niiya

Behavioral Health Unit (BHU) Lt.: Casey Hettman

EIS Supervisor: Nathan Sheppard

EIS Administrator: Dan Spiegel

Training Captain: Craig Dobson

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne