# COMPLIANCE OFFICER AND COMMUNITY LIAISON

## *Quarterly Report:*

## *Quarter 3 Updates & Analysis*

**Prepared By:**
**ROSENBAUM & ASSOCIATES, LLP**
**For the City of Portland, Oregon**
**July 1, 2020 to September 30, 2020**

**November 23, 2020**



# TABLE OF CONTENTS

**INTRODUCTION**     **3**

**EXECUTIVE SUMMARY**     **6**

**SECTION III: USE OF FORCE**     **11**

**SECTION IV - TRAINING**     **19**

**SECTION V – COMMUNITY-BASED MENTAL HEALTH SERVICES**     **29**

**SECTION VI – CRISIS INTERVENTION**     **30**

**SECTION VII – EMPLOYEE INFORMATION SYSTEM**     **36**

**SECTION VIII – OFFICER ACCOUNTABILITY**     **40**

**SECTION IX – COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING**     **47**

**REFERENCES**     **56**

**LIST OF ABBREVIATIONS**     **57**

**LIST OF PERSONNEL**     **59**

# INTRODUCTION

This is the third quarterly report in 2020 of the Compliance Officer/Community Liaison (COCL), as required by the Settlement Agreement between the City of Portland and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, filed December 17, 2012. This report covers the three-month period from July 1, 2020, to September 30, 2020 but also includes updates on activities from the second quarter that were not available to COCL at the time of our last report.

DOJ determined that the City of Portland had achieved substantial compliance with the entire Settlement Agreement on January 10, 2020. The City is required to *"maintain substantial compliance with all provisions for one year."* (Par. 175(b)). Thus, COCL continues to evaluate whether the City and the Portland Police Bureau (PPB) are in substantial compliance with the terms of the Agreement.

In our second quarterly report, we acknowledged that the City of Portland was heavily impacted by the COVID-19 pandemic beginning in March and then by the daily protests against racial injustice and police violence beginning in late May. However, we did not address PPB's response to the protests and unrest, as it was too early for us to assess whether these events affected the City's ability to fulfill its obligations under the Settlement Agreement.

Although we still do not have all of the information needed, at this time, we feel compelled to comment on the protests and unrest in Portland and assess the impact of these events on the City's ability to maintain substantial compliance with the Settlement Agreement. Clearly, our nation is entering an important moment in history, where the systemic racial injustice that has occurred over the past 400 years throughout our nation is being called out and the public is demanding corrective action. Long-standing racial injustice in our country's criminal justice system is being exposed, including discrimination and excessive force by the police against people of color. Let us be absolutely clear about our position: The nonviolent protests in Portland and elsewhere around the country, demanding social justice, are an extension of the civil rights movement that has been the cornerstone of our democracy for many decades. Civil disobedience and public demonstrations are designed to be painful and uncomfortable to those who embody the status quo and fail to recognize the problem or the need for change. When John Lewis revisited the Edmund Pettus Bridge in Selma, Alabama on March 1, 2020, he advised those who care about racial equality to *"Get in good trouble, necessary trouble, and help redeem the soul of America."*

The COCL team fully supports the First Amendment rights being exercised in Portland, but we must also condemn the use of violence to achieve any end, and we expect the Portland police to both help prevent such violence and respond to violence and other serious criminality when it occurs. The enforcement of laws is essential if we intend to live by the "social contract" and maintain an orderly society. The police are expected to protect protesters, the public, and themselves during these events. Violence, regardless of the political, social, or organizational affiliations of those who engage in it, is unacceptable. Throughout the protests there have been arrests, applications of force, injuries to both community members and officers, and questionable actions by both community members and officers alike. As a result, community members have felt that there has been an increase in PPB uses of force and certainly as a raw number, uses of force have increased. We do not dispute this fact though we are

tasked with evaluating such increases in the context of the situation in which PPB and community members find themselves.

We wish to acknowledge the extraordinary circumstances that the PPB has faced in 2020 as it sought to meet the requirements of the Settlement Agreement. These circumstances include the COVID-19 pandemic, more than four months of continuous protests, budget cuts, and problematic interagency coordination with federal law enforcement. However, the job of the COCL within the framework of the Settlement Agreement is to evaluate whether the systems designed to ensure constitutional policing continued to function effectively during the maintenance year. Unfortunately, COCL has concluded that PPB has not maintained substantial compliance with Section III of the Settlement Agreement (Use of Force) and Section IV (Training). This report provides the details to support our findings. In the fourth quarter, we will continue to look for remedies and corrective actions taken by the PPB and the City to ensure that the systems introduced can be adjusted in response to unexpected crises.

No doubt, the failure to maintain substantial compliance can be attributed, in part, to the unprecedented burden placed on the PPB by the unexpected public health crisis and social justice movement. For example, with thousands of protesters and hundreds of criminal incidents, the volume of police force reports and complaints from community members quickly overwhelmed the systems created in Portland to help reform the PPB. PPB and the City have sought to take corrective actions in some areas, but the response has been slower than expected in some components of the Settlement Agreement. We maintain that additional administrative actions could have been taken to minimize the impact of these unexpected events on the systems of training and force review.

Some would argue that budget constraints played a role in PPB's inability to maintain substantial compliance in 2020. Certainly PPB's budget is proportionately smaller than other big cities in the United States (Sullivan & Baranauckas, 2020). However, this did not keep PPB from achieving substantial compliance in 2019 with respect to Training and Use of Force. In FY20-21, PPB did experience a 5% cut, followed by another cut of $15 million, which may have affected compliance.

We have no interest in challenging those who are asking Portland to rethink the role of police and "defund the police." At this moment in time, the COCL's job is to determine whether the City and PPB have delivered the services that were required in 2020 under the Settlement Agreement. Paragraph 7 of the Settlement Agreement states that *"The City shall be responsible for providing necessary support and resources to enable PPB to fulfill its obligations under this Agreement. The improvements outlined in this Agreement will require the dedication of additional funds and personnel."*

Despite these challenges, our hope is that Portland will continue on the pathway of reform. We have no doubt that the Settlement Agreement has resulted in significant improvements within the PPB organization over the past five years, similar to what has been documented in other cities under consent decrees. As a result, we believe Portland is ahead of the curve when it comes to the current national dialogue about changes that are needed to police policies and training. However, we emphasize that there is still room for significant improvement in the PPB and the City's oversight systems.

We hope the Portland community recognizes that the Settlement Agreement can bring the PPB only so far toward the goal of achieving racial justice. The legal terms of this Settlement Agreement were

established in 2012 and focus primarily on the use of force against persons who have actual or perceived mental illness. Consequently, COCL has focused its attention on whether PPB has created and maintained systems for responding to mental health crises, holding officers accountable, providing evidence-based training, ensuring that the use of force complies with constitutional standards, and establishing robust community engagement (Par. 170). However, these critical systems were introduced to achieve evidence-based, best practices in policing, including the ability to identify problematic trends in use of force and take corrective action in a timely manner. Thus, we believe these systems will be useful in the future to monitor police actions in general, including decisions that affect racial equity.

# EXECUTIVE SUMMARY

**Section III. Use of Force**

Although PPB and the City provided documents and data to demonstrate sustained compliance with some paragraphs in Section III, they did not provide sufficient documentation to assess compliance with a number of other paragraphs, including Pars. 66-69, 70, 73-75, and 77, specifically as these paragraphs relate to protest-force events. In particular, we were not provided sufficient FDCRs and AARs for protest-force which occurred since the protests began in late May. Without such documentation, we cannot say that PPB has maintained substantial compliance. In addition to specific paragraphs in Section III, the COCL is tasked with determining whether the implementation of the Settlement Agreement has led to adequate systems for managing PPB use of force (Par. 170). Based on conversations with PPB and the review of documents, we find that PPB was not able to demonstrate management of use of force consistently throughout the protest and civil unrest timeline. Primarily, this determination was informed by PPB's inability to identify all uses of force on a given day, their inability to track FDCRs and AARs through the force management process, and their inability to conduct timely and comprehensive after-action reviews of force. Also, community members have reported to us that excessive force was used during the protests, but this can only be verified by reviewing reports and through other sources.

Considerable research has shown that the passage of time has an adverse effect on an individual's ability to recall information accurately. One of the key factors that is confounded with the passage of time is the introduction of <u>new information</u> after the event but before recall. Accurate recall can be particularly problematic for officers who are not interviewed shortly after an event and experience multiple similar events in the days and weeks that follow. If PPB is unable to immediately gather complete and accurate information about what transpired, then it is less likely to be able to reliably manage force and hold officers accountable.

**Section IV. Training**

During the second and third quarters of 2020, PPB's Training was dramatically affected by the COVID-19 pandemic, the long-term protests against racial injustice, and administrative decision making within the Bureau and the City. These factors have altered PPB's training schedule, content, methods of delivery, and evaluation metrics as discussed in this section. Although many of PPB's training systems were adversely affected by these unexpected crises, most have continued to function and meet the minimum standards of the Settlement Agreement. However, the actual delivery of training in 2020 has been problematic.

PPB's annual In-service training is the primary mechanism for educating and training all of PPB's sworn personnel, but only nine of 19 sessions were completed when the training was halted. PPB introduced online videos to cover the classroom portion for all officers, but 55% of the sworn personnel were left without the skills portion of the In-service training. In particular, the majority of PPB's officers have not received any recent skills training in crowd management, de-escalation, procedural justice, crisis

intervention, or other critical skills for preventing or minimizing the use of force. A total of 485 officers did not receive the required 8 hours of Use of Force training for state certification.

COCL has concluded that the sizable loss of training and failure to fill this gap with an adequate plan in 2020 constitutes non-compliance with the Settlement Agreement. Skills training stopped in March, but PPB did not prepare a make-up plan to fill these training gaps until late August. COCL would need to see a more detailed training plan to ensure that PPB has a clear roadmap to correct this training deficiency. Our concern reaches beyond questions regarding the quantity and timing of training to questions of quality. CPD should be credited with quickly transitioning to online training via its Learning Management System (LMS), but posting videos online to fill the gap is insufficient, as they do not allow the interaction between students and instructors that is essential for acquiring and retaining specific knowledge and skill sets. Virtual learning must also include interactive platforms, such as Zoom or Microsoft Teams, as reflected in the requirements of the Settlement Agreement (e.g. Par. 62). PPB recognizes this deficiency and is moving in the right direction. Along these lines, the training problem in PPB should not be attributed entirely to the COVID-19 virus or the protests. Budgeting and funding decisions are also implicated. The Training Division has relied heavily on its overtime budget to continue operations, and the overtime budget has been slashed, along with other cuts to PPB's overall budget. As we noted earlier, PPB's proportional budget is very low in comparison to other large police agencies in the United States.

Notwithstanding the emerging debate about ways to re-envision the functions of municipal police, the City is currently responsible for ensuring that critical services relevant to the Settlement Agreement are not in jeopardy (see Par. 7). This responsibility includes guaranteeing that all officers have the appropriate training for crowd management, de-escalation of conflict, and use of force. In light of the videotaped examples of police use of force that potentially violate policy and give rise to the need for accountability investigations, the proper funding of PPB's Training Division should be one of the City's highest priorities.

## Section V. Community-based Mental Health Services

Our system assessment for community-based mental health services continues to be based on the recognition that PPB and the City do not bear primary responsibility for delivering community-based mental health services. The Settlement Agreement does not legally bind the City's community partners. Therefore, we have historically measured PPB and the City's activity in terms of what may reasonably be expected of PPB and the City. For instance, PPB either oversees or participates in a number of committees and workgroups, including the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Advisory Council, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. Additionally, PPB currently acts as part of the Transportation Subcommittee for the Unity Center, a drop-off center for first responders to transport a person experiencing a mental health crisis. In addition, we continue to find that the Unity Center functions in accordance with the concept of a drop-off center as envisioned by the Settlement Agreement. We therefore continue to find PPB and the City have maintained substantial compliance with the entirety of Section V.

**Section VI. Crisis Intervention**

Our evaluation of Section VI has two components: (1) PPB's primary response system (including Enhanced Crisis Intervention Team (ECIT) officers; and (2) PPB's secondary response system (including the BHRT and SCT). For all paragraphs within these two components, we continue to find PPB and the City have maintained substantial compliance.

As it relates to the primary response system, BOEC continues to enforce policies which dictate when telecommunicators are required to dispatch an ECIT officer. While the COVID-19 pandemic has continued to prevent BOEC from delivering in-service training, they have continued to take proactive steps to provide reminders regarding telecommunicator responsibilities as a temporary solution.

PPB has continued their practices related to Crisis Intervention, including training all officers in 40 hours of crisis intervention and providing ECIT officers with an additional 40 hours of training. These trainings are re-enforced through annual in-service training and PPB has recently delivered an ECIT in-service for current ECIT officers. Furthermore, PPB continues to require a Mental Health Template (MHT) when an officer completes a report for interactions involving a person in mental health crisis. PPB has continued to use the data from the MHTs to conduct a wide range of analyses.

For secondary response models, we continue to find that the Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT) operate within the requirements of the Settlement Agreement. For instance, the BHRT continues to operate five teams of PPB officers and mental health professionals, and outcome data associated with BHRT is reviewed by PPB on an ongoing basis. The overall operation of BHRT continues to be in line with a positively functioning learning organization. Similarly, the SCT continues to operate in the same positive fashion that we have noted before, including the work done by the Supportive Transitions and Stabilization program.

Finally, we continue to evaluate the BHUAC, noting their guidance for the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT components. BHUAC continues to provide input on policy, training, and SOPs as well as receive presentations and hold discussions on current practices of other partner agencies and entities.

**Section VII. Employee Information System**

We continue to evaluate the Employee Information System (EIS) from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on alerts they receive. The EIS system continues to import data related to force events, traumatic incidents, complaints, and commendations on a nightly basis. The data are then used to identify potentially problematic behavior for which alerts are created and, where appropriate, forwarded to officers' respective RU Manager for review.

Additionally, PPB has continued to conduct analyses of supervisor reviews of officers as part of officers' performance evaluations and upon transfer of an officer to a new command. In this quarter, corresponding with a high number of personnel movements in PPB (particularly in the Chief's Office and

Family Services Division), we note a reduction in compliance rates with Par. 116b (70%). However, we also note that PPB recognized this issue and sent a Bureau-wide memo reminding members of their responsibilities related to Par. 116b late in the quarter. As PPB has historically found consistently high rates of compliance with the required reviews in prior quarters, we will look to see whether compliance rates show an increase in the coming quarters.

## Section VIII. Officer Accountability

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, expediency, consistency, transparency, and a set of checks and balances. As might be expected, the protests have resulted in a substantial increase in the number of overall contacts with IPR and the number of complaints filed. This has resulted in an appreciable strain on the resources of the accountability system. Conducting a full investigation can take up to 180 days (not including tolling for criminal investigations or Leave of Service time), and therefore, the COCL team will not be able to _fully_ assess accountability measures related to the protests until these cases are completed. However, preliminary data create a cause for concern, particularly with the ability of IPR to meet investigative stage timelines and overall resources.

Aside from the timelines (falling within the expediency element), we find that steps related to access, consistency, transparency, and the system of checks and balances remain consistent with prior quarters. Community members are able to file complaints, the investigation process is consistent between IA and IPR, the accountability process remains transparent by being open to the public, and the CRC and PRB continue to adhere to City Code. The timeline problem is largely due to a substantial increase in the number of complaints filed, particularly in the months of June and July. Going forward, we will need to evaluate whether the increase in stage timelines has impacted PPB's and IPR's ability to reasonably meet the 180-day timeline.

## Section IX. Community Engagement and Creation of PCCEP

### _PCCEP's Role and the City's Support_

During the third quarter, the Portland Committee on Community Engaged-Policing (PCCEP) continued to function as a legitimate body for community engagement. PCCEP supports multiple subcommittees that have sought input from community members, government officials, and community leaders and has generated ideas to improve police-community relations. PCCEP meets monthly on a virtual platform.

PCCEP continued to host community listening sessions, including on a proposed policy accountability system ballot measure, and on PPB's budget. The group passed multiple recommendations, including recommendations related to officer identification in crowd control situations, officers' use of force during protests, and recommending a review of PPB's community advisory groups.

The City continues to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee, and providing technical assistance with meetings and other functions, though there is room for improvement in the timeliness of administrative duties like posting videos and minutes from PCCEP's various meetings, and completing a tracker of PCCEP recommendations.

However, the City remains in Substantial Compliance with the terms of the Settlement Agreement in Section IX on Community Engagement.

*PPB's Role*

Without question, PPB's community engagement strategies have been altered because of the COVID-19 pandemic and the nightly protests. However, PPB (especially its Community Engagement Division) has continued to creatively engage many communities throughout the city. Moving to a virtual platform, PPB has established partnerships with organizations representing very diverse segments of Portland and has shared information about the PPB and its performance statistics. PPB has maintained and supported its relationship with a half dozen advisory councils, including PCCEP and the Training Advisory Council (TAC). PPB has been fully transparent in the provision of quarterly and annual reports on traffic stops and use of force with breakdowns by race and gender. It has made force data available to the TAC to perform its own analyses and reports on use of force trends. As described in this report, PPB has made significant progress toward implementing the four components of the Community Engagement Plan - Public involvement, Communications, Access, and Training. This includes the Hispanic/Latinx Council, Equity Council, and Inclusive Advisory Council. For these reasons and others described in this section, COCL finds that PPB and the City have maintained substantial compliance with Section IX of Settlement Agreement on Community Engagement.

However, we do not wish to paint a picture of community engagement that is overly sanguine. At this time in history, the relationship between the police and the community in Portland is currently being tested. Clearly, there have been challenges on both sides of the fence when it comes to building trust. Inside the PPB, officers are exhausted and demoralized by the protests directed at them. On the outside, the protestors have expressed their distrust of the police and their frustration with City government. Consistent community-oriented leadership within the Bureau is essential to build strong and lasting partnerships, yet PPB has experienced six police chiefs over the past six years. We encourage the City to make a concerted effort to stabilize the administration of the PPB. Despite these constraints, we are impressed with the many partnerships and advisory councils that have been created over the past few years and the willingness of community members to volunteer their time and be part of this reform movement, even in the face of uncertainty about where it will all end up or how they will get there.

## Conclusion

At this point in the maintenance year, PPB and the City have maintained substantial compliance with most sections of the Settlement Agreement. For Sections III (Use of Force) and IV (Training), our conversations with PPB indicate that they have concrete plans for returning to substantial compliance in the near future. As part of the process for returning to substantial compliance, we would expect that PPB will repair and strengthen the systems and procedures of force review and training so they are better prepared to weather protests and other emergencies that may develop in the future. Given our conversations with PPB and their plans for remediating the issues with Sections III and IV, we believe this can happen soon, though we will need to review these plans once finalized.

# SECTION III: USE OF FORCE

Protests and civil unrest have been a constant occurrence in Portland for many months. Portland Police Bureau (PPB) officers have frequently used force in response to protests. As we noted in our last report, the COCL's role is to evaluate whether PPB has effectively documented, managed, and responded to uses of force and officers' conduct. As we have stressed in the past (and as is required by Par. 170), we investigate whether PPB's implementation of the Settlement Agreement has led to adequate systems for managing force and ensuring officer accountability. In reviewing PPB's management of uses of force during the protests beginning in late May and continuing even to this day, we must conclude that they have no longer maintained compliance with the Settlement Agreement with respect to Pars. 66-69, 70, 73-75, and 77. In our last report we noted that we would need to wait for all associated reports and documents before being able to comment on PPB's process. However, in this report we note that PPB has not produced sufficient representation of After Action Reports (AAR) and Force Data Collection Reports (FDCR) to maintain substantial compliance. Below we describe the primary ways in which PPB has not complied with the Settlement Agreement and, where necessary, provide technical assistance to bring them back into compliance.

Whereas we lay out our concerns for many Section III paragraphs below, we begin this assessment by noting the paragraphs that have remained in compliance during this reporting period. For instance, PPB continues to provide quarterly analysis of force as required by Par. 76 and, while these do not contain protest-related force since they are difficult to compare with non-protest force, they continue to provide insight into how PPB is using force in normal, non-protest contexts. As seen in the figure below, the raw number of individuals subjected to use of force by PPB remains overall consistent with 2020 Q1 and is the lowest number over the past two years. However, the total number of PPB interactions has decreased (likely due to COVID and the corresponding stay-at-home order), thereby leading to an increase in the force-to-custody rate. Given that the raw numbers of individuals subjected to force has remained overall consistent, we do not believe the rate increase to be of concern. Additionally, we have provided data in our previous reports related to uses of force involving persons with mental illness, though some community members have commented on PPB use of deadly force against persons in mental health crisis. When such events occur, we conduct case studies to evaluate officers' overall decision-making during the event. However, our prior evaluations continue to demonstrate that force used against persons in mental health crisis remains relatively infrequent. In our next report, we will provide updated data as part of our assessment.



PPB has also maintained compliance with the requirement to develop a supervisor's checklist when responding to an officer's use of force (Par. 72). Presently, the AAR acts as such a checklist and while we note our concerns with regards to protest AARs above, the form does continue to act as the checklist and is regularly updated when necessary. Additionally, in the non-protest cases we reviewed, we continue to see evidence of the form's use as a checklist.

PPB has maintained adequate patrol supervision staffing level (Par. 71). We have repeatedly said that span of control rate is a better metric than the raw number of supervisors and in our 2019 Q3 report, we noted that PPB had, on average, 5.21 officers for every supervisor. For this assessment, PPB reports that there are, on average, 4.84 officers for every supervisor across the three main precincts. This continues to remain within a reasonable span of control though the downward trajectory is consistent with the argument that PPB may need more street-level officers.

Finally, as we have done for past reports, we reviewed a sample of 20 non-protest force cases which included CEW uses, Category II, Category III, Category III, and Category IV force types, including several force events involving a person in mental health crisis. Our review of these force events is consistent with findings from prior reports – when non-protest force is used, it is comprehensively documented by officers, reviewed by supervisors, and corrective action (formal and informal) is taken when necessary. For all non-protest force cases we reviewed, we found that the evaluations were comprehensive and the force used was reasonable under the totality of the circumstances. As we discuss further below, the Settlement Agreement does not distinguish protest force and non-protest force. However, the fact that PPB has maintained their degree of force reporting and evaluation for non-protest force is a positive sign.

**Pars. 66-69**

In the Settlement Agreement, Pars. 66-69 have certain policy requirements for PPB's use of force as well as for drafting *"timely use of force reports that include sufficient information to facilitate a thorough review of the incident."* While our past reports have noted that the requirements found in these paragraphs have consistently occurred, for this report we lack sufficient documentation to find

sustained compliance. Although non-protest force events continue to comply with these paragraphs (see above), the Settlement Agreement does not distinguish between protest force and the broader force requirements and therefore our compliance finding must reflect the lack of documentation for force occurring during the protests.

As part of gathering documents for this report, the COCL team requested Force Data Collection Reports (FDCRs) and After Action Reports (AARs) for protest-related force events in order to evaluate operational compliance with these paragraphs. In early August, the COCL team received a response from PPB and the City that no protest-related FDCRs and AARs have gone through the full review process (i.e. chain-of-command review and audit process) – as a result, no force documents relevant to the protests would be provided. We learned that PPB provided some non-finalized force reports to the Independent Police Review (IPR), which we then requested. However, after a review of these documents, COCL determined that these too were insufficient to demonstrate compliance. Only a single AAR was included in the production and, while approximately 550 FDCRs were included, the materials provided did not include information for each day of protests nor a sufficient representation of all days of protests. Therefore, the sample we received at that time was insufficient for evaluating compliance. Additionally, in mid-September, PPB provided us FDCRs and AARs for the dates July 14th through July 19th. While these records were more comprehensive in terms of FDCRs and AARs, they too are insufficient documentation to demonstrate compliance for the entirety of the protests.

We are also unable to determine from the provided documents that FDCRs were drafted in a "timely" fashion as required by Par. 69. PPB policy requires that FDCRs be completed prior to the completion of the members' shift. On the form, officers capture the date/time of the force event (not the date/time of submission). The forms are then sent via email to the supervisor who assesses whether officers have complied with the timeliness requirement and who makes the appropriate notation on the AAR. Therefore, we cannot determine timeliness solely through the FDCR forms and, because we do not have a representative sample of AARs, we have insufficient documentation that PPB has complied with this requirement of Par. 69.

In order to return to compliance, PPB will need to provide evidence that all or nearly all FDCRs are completed in a timely fashion, contain sufficient information, and, where deficiencies are found, supervisors are able to reliably receive additional information to facilitate a thorough review. In large part, PPB's ability to do this relates to the broader discussion of force management below.

Finally, COCL has reviewed a number of videos from the protests and we are particularly concerned with the categorization of force in one of the incidents we reviewed. As it relates to Par. 69c, a video of this incident (https://twitter.com/Johnnthelefty/status/1295965796426891265), shows an officer striking a community member in the head with a baton, which is a "*hard object*" (see Directive 1010.00, section 10.2.1.5). PPB notes that the officer using force stated in the FDCR that the strike to the head was not intentional, a requirement of 10.2.1.5 for an action to be considered lethal force. IPR too could have identified the force as a lethal force event but has indicated they view the baton use as a "*push*." However, a review of the video does not support either of these contentions and an investigation consistent with Directive 1010.10 should have resulted. Given the dynamic protest situation, it is unlikely that 1010.10 could have been followed to the letter (e.g., responding detectives, separation of witness/involved officers, securing the incident scene, etc.). However, other elements of 1010.10 should

have been implemented, including issuing of Communications Restriction Orders (CROs) in a reasonable time, an immediate and concurrent administrative and criminal investigation, and interviews of witness/involved officers. As of early September, PPB informed us that no uses of force during the protests had a corresponding 1010.10 investigation as required by Par. 69c. Although the protests have certainly strained PPB's resources, the requirement to follow Directives 1010.00 and 1010.10 remain and PPB should open investigations consistent with Bureau policy.

### Pars. 70 and 73

In the Settlement Agreement, Pars. 70 and 73 requires supervisors to complete an AAR which details their administrative review of use of force events and the timeline for doing so. While our past reports have noted this has consistently occurred, we lack sufficient documentation for this report to find sustained compliance for protest-related cases. Although non-protest AARs continue to comply with this paragraph, the Settlement Agreement does not distinguish protest force from the broader force requirements and therefore our compliance finding must reflect the lack of documentation for AARs during the protests.

As noted above, the COCL team requested FDCRs and AARs for protest-related force events in order to evaluate operational compliance with these paragraphs. In early August, the COCL team received a response from PPB and the City that no FDCRs and AARs have gone through the full review process – as a result, no force documents relevant to the protests would be provided. We learned that PPB provided non-finalized force reports to IPR, which we then requested. However, after a review of these documents, COCL determined that these too are insufficient to demonstrate compliance. Only a single AAR was included in the production. Additionally, in mid-September, PPB provided us AARs for the dates July 14th through July 19th. While these records were more comprehensive in terms of the number of AARs (a total of 13), they too are insufficient documentation to demonstrate compliance for the entirety of the protests.

While a more representative sample of AARs is needed, discussions with PPB have revealed two issues that have implications for supervisors' ability to conduct a reliable administrative review. First, PPB reports that some of the earlier protest-related AARs contain over 100 associated FDCRs, meaning that a single sergeant was responsible for conducting a thorough review of more than 100 force events which occurred in a single evening. This sheer volume creates a substantial task likely to impact the sergeant's ability to conduct an adequate review. Additionally, due to safety concerns and the ongoing nature of protest events, it may be impractical for a supervisor to respond to the scene of a use of force event, requiring the supervisor to conduct such AAR reviews based on the statements of the officers (we note here that we do not find this to be a violation of Par. 70 given such safety concerns with immediate response). Second, we have been informed that a significant portion of AARs at the beginning of the protests were not completed within the 72 hours required by policy. This is concerning as delays in conducting the AAR investigation carry substantial implications for officers' ability to recall these events and for PPB's ability to hold officers accountable for force decisions.

For decades, scientific research has documented the fallibility of eyewitness memory and recall of events (Haber & Haber, 2000). "*Transience*" is the term used to describe the deterioration of a memory over time. A host of factors undermine our ability to effectively encode and accurately recall events,

including the level of stress and the passage of time. With high levels of stress, the amygdala releases stress hormones that lead to the consolidation of emotional memories (McGaugh, 2004). In general, the release of adrenal steroids impairs both short-term and working memory processes (Lupien & McEwen, 1997).

Most importantly, as it relates to protest related force, research shows that the passage of time has an adverse effect on an individual's ability to recall information (Read & Connolly, 2007). As one example, recall of auditory information is significantly less accurate after a four-day delay (Porter et al., 2018; Campos & Alonso-Quecuty, 2006).

One of the key factors that is confounded with the passage of time is the introduction of new information after the event but before recall. Memory is biased by what researchers call "*retroactive interference,*" where new information (e.g. more recent force incidents in protests) interferes with the mental retrieval of old information. New information can disrupt recall of older memories or replace it entirely (Chan et al, 2009). A related problem is considerable evidence of the Loftus "*misinformation effect*" where a person's memory is altered by incorrect information, such as leading questions by an interviewer (see Zaragoza et al., 2007).

Clearly, human memory is very malleable and can be influenced by subsequent events, hence, the sooner the recall, the better. These memory processes can be particularly problematic for officers who are not immediately interviewed after an event and experience multiple similar events in the days and weeks that follow. PPB is then unable to understand completely and accurately what transpired and therefore, unable to hold officers accountable or manage future force events through proper training and supervision.

Since we do not have sufficient documentation of AARs and the anecdotal evidence we have received from PPB is that AARs in the first couple of weeks contained a large number of FDCRs and were not being completed on time, we must find that PPB has not remained in compliance with the requirements of paragraphs 70 and 73. In order to return to compliance, PPB will need to provide comprehensive evidence that AARs are being completed in a timely fashion and that the AARs represent a comprehensive review of the force events. In large part, PPB's ability to do this relates to the broader discussion of force management below.

**Pars. 74, 75, and 77**

The requirements of Pars. 74, 75, and 77 relate to PPB's force audit, which consists of two phases – a first phase of reviewing FDCRs and AARs to ensure that they are comprehensive and a second phase wherein the Inspector reviews force events to identify potential policy violations or other policy, training, equipment, or personnel issues. PPB notes that their desire to conduct thorough reviews has caused delays in providing protest-related documents to the COCL team since the audit team has been responsible for identifying missing FDCRs and AARs and assessing the comprehensiveness of all reports. While we have faith that the audit team is working diligently and expeditiously given the circumstances, we were informed that no force events had gone through the entire audit process as of late August, including events which occurred in early June.

PPB has also informed us that in order to ensure that a full accounting will be available for the third quarter, they have temporarily skipped the audit process for protest force events that occurred in June. Once they are able to catch up on protest force events occurring July onward, they plan to return to June protest force events. Obviously, this is a clear violation of the Settlement Agreement's requirements and brings PPB out of substantial compliance for these paragraphs. As a practical matter, this decision also has a negative effect on the Force Inspector's ability to identify trends in protest force. While command staff and others surely have reviewed the use of force by officers, the Force Inspector is charged with the systematic review of force and the audit, by design, is such a systematic review. By skipping the month of June, PPB may impede their ability to identify the most recent trends in force and respond in a timely manner that would allow corrective action. In order for PPB to bring themselves back into compliance, they will need to conduct audits for protest-related force which occurred in June of 2020.

**Management of Use of Force**

In addition to the above specific paragraphs, the COCL is tasked with determining whether the implementation of the Settlement Agreement has led to adequate systems for managing PPB use of force (Par. 170). Based on conversations with PPB and the review of documents, we find that PPB was not able to demonstrate management of use of force consistently throughout the protest and civil unrest timeline. Primarily, this determination is informed by PPB's inability to identify all uses of force on a given day, their inability to track FDCRs and AARs through the force management process, and their inability to conduct timely and comprehensive after-action reviews of force.

In the first few days of protests, the totality of the protests overwhelmed PPB's ability to identify all force events which occurred. Even with some approaches introduced after the first few days to resolve the issues (see below), there were still instances where PPB was unable to identify all force events that occurred on a specific day. For instance, in late August, we were informed by PPB that FDCRs from late May/early June were still being found as the result of reviewing other general offense reports, arrest reports, and other documents. Thus, when we asked for an accounting of use of force by day, we were informed that no reliable count could be provided until a full audit of all documents and reports were reviewed for that day – a task which has been (and continues to be) burdensome. Additionally, when we requested all FDCRs and AARs related to use of force during the protests, even limiting our request to the first two weeks of protests, we were informed that our request could not reliably be fulfilled.

In order to help alleviate this (at least partially), PPB initiated a system wherein each day of protests received a Key Case Number, allowing all reports for that day's actions to utilize a common identifier. However, this did not occur until after the first four days (which contained a significant portion of protest-related force events) and even after initiation, the Key Case Number was not consistently applied. PPB notes that different systems require different numbers. For instance, Detective Division forms are different than other reporting forms, thereby leading to different numbers. Additionally, when a member of an RRT squad uses force during an arrest, all reports (including FDCRs) use the arrest number rather than the Key Case Number. While possible, linking these numbers required additional steps.

PPB has also had some difficulty in initially tracking force through the review process. For instance, the audit team had found AARs that mentioned an FDCR, but no corresponding FDCR was found in the supporting documents. This required the audit team to go back to the AAR author to find the original FDCR. PPB also contends there are likely FDCRs that were sent to a supervisor but were not included in any AAR. As PPB continues to go through their review of other documents and such force is referenced, PPB will locate the FDCR and subject it to an AAR, which inevitably creates problems for officers' recall of events. In addition, PPB has noted cases where AARs were not forwarded to the auditing team, thereby not allowing for their review and tracking until they were located. In all, we were informed that no AAR associated with protest force had gone through the entire review process (including the audit process) as of late August. As PPB cannot give a reliable count of protest force until the full audit process is complete and given that no AAR has been through the full process, there is reason to be concerned about the broader management of force incidents and the timeliness of the review process.

Additionally, as noted above in our assessment of particular paragraphs, we are unable to say that FDCRs and AARs have been completed in a timely or comprehensive fashion due to a lack of sufficient documentation. While PPB was able to give us some FDCRs and AARs, we carry significant concern about officers' ability to recall events when they are being asked about them weeks later. In the typical process of force reporting, a deficient FDCR will be returned to an officer for additional detail. Normally, this does not present an issue as the circumstances of the force will likely be unique and the officer can, to some degree, provide reliable detail within the 72 hours required to complete the AAR). However, there is anecdotal evidence that AARs were not being completed within 72 hours and any request for additional information from officers will likely occur much later and focus on events that are similar to those that occur between the event and the recall time. Additionally, we are aware that some AARs contained reviews of over 100 FDCRs – an amount that is likely to impact supervisors' ability to conduct a comprehensive review of each force application.

Finally, steps taken by PPB to collect and review videos showing potentially problematic use of force can be enhanced. We were informed by PPB that publicly available videos found online are not sought or reviewed by PPB unless they are sent to PPB (or city council). The COCL conducted a cursory search of online videos and was able to find four videos which were not immediately familiar to IA. As technical assistance, PPB may consider assigning an individual for future special events to conduct searches of publicly available videos and ensure that they have a corresponding FDCR and AAR (see below for further discussion about such an assignment). Although PPB has been restricted by court order and Oregon law from livestreaming protests (https://www.oregonlaws.org/ors/181A.250), this should not prohibit them from accessing and reviewing publicly available videos recorded by members of the public.

If the identity of an officer from a video is not immediately known, PPB could take steps to assist in the identification process, requesting that supervisors identify officers they are familiar with or even circulating the videos of unidentified officers in roll-call and requiring officers to identify themselves. With regards to this step, PPB already does this to some extent. For instance, in one case with an unidentified officer, PPB showed the video to the RRT sergeants and was informed of the officer's identity.

In conclusion, we cannot say that PPB has comprehensively managed their use of force during the protests as it does not appear that PPB can give a full accounting of uses of force. While Incident Commanders report on a macro-level each day on the force events and arrests that occurred the night before, these macro reports do not contain justifications for the force used or the identities of officers and are not a substitute for the FDCRs and AARs that the Settlement Agreement requires for the management of force. No doubt, the stressful circumstances faced by the PPB were highly unusual and would be difficult for any agency to manage. The number of consecutive nights by which PPB has faced protests has put significant resource strains on PPB which have had real consequences for consistency in reporting. However, our role is to evaluate compliance with the requirements of the Settlement Agreement, regardless of caveats. We therefore must not only find that PPB has fallen out of substantial compliance with specific paragraphs of Section III but also with the broader ability of PPB to manage force.

While we find PPB has not maintained substantial compliance with certain paragraphs, we also recognize that PPB has already taken steps toward better management of protest-based force events. As noted above, PPB began using a Key Case Number that was designed to link all reports regarding protests on a given day. This is a positive step though additional training and data fields on FDCRs and AARs would have ensured more success with this approach. For instance, the FDCR and AAR templates only allow for a single code to be entered. In some cases, during the protests, the arrest number superseded the Key Case Number. In other cases, the Detective Division's forms did not use the Key Case Number. By adding a data field on the forms for special events, PPB would have been able to track the protest force more reliably – a step PPB is already contemplating. Additionally (or alternatively), PPB's routing process for FDCRs may include a centralized hub during special events such as protests. Currently, FDCRs are provided by email to reviewing sergeants. For protests or other similar events, such emails might copy a designated recipient who can categorize force by date for future reference.

PPB also switched at one point from having a single sergeant review all AARs occurring in a night to having a reviewing sergeant for each squad. This was done in tandem with the addition of a dedicated After Action team consisting of lieutenants and sergeants who were separate from the operational command. Most likely, these additional supervisors have helped to alleviate the burden on the single sergeants reviewing AARs. This too was a positive step and for future events, PPB should consider implementing this step early in the process.

Additionally, we have also seen instances where PPB has taken steps to place officers who have used potentially problematic uses of force on administrative duty even prior to a formal investigation of the officer's conduct. In other instances, PPB has removed officers from protest duty. These actions are in-line with community expectations and best practices.

Finally, we take this opportunity to note that many recommendations above will not be necessary in everyday situations for PPB. Many of those involved have commented that nothing could have prepared PPB for more than four months of continuous protests and civil unrest and that, as a result, the Bureau simply became overwhelmed. PPB was not able to adjust adequately to maintain the quality of work being done in the past to collect, review, and manage use of force events. However, such adjustments require resources. For instance, we recommended that for protest-related use of force, PPB might consider assigning an individual to find online videos which show potentially problematic use of force

and ensure that proper steps have been taken to document such force, assess it, and if necessary, take immediate corrective action with involved officers. This is not a full-time job and PPB would need to pivot a person into that role when necessary. This would then require another person to backfill the role left vacant. Similar pivots would be necessary when creating a centralized hub for all FDCRs and organizing those reports to provide real-time figures to command staff. However, to ensure this level of flexibility to manage their use of force, PPB must be sufficiently funded.

# <u>SECTION IV - TRAINING</u>

During the third quarter of 2020, PPB's Training has been dramatically affected by the COVID-19 pandemic, the long-term protests against racial injustice, and administrative decision making within the Bureau and the City. These factors have altered PPB's training schedule, content, and methods of delivery, as discussed in this section.

## <u>Overview of Training Systems</u>

COCL's framework for assessing compliance with Section IV during the maintenance year remains unchanged. PPB is being judged by its ability to maintain systems of police training that can increase "*the knowledge, skills and abilities necessary for effective and successful delivery of services to persons in mental health crisis*" and that can contribute to the "*proper management of the use of force to meet constitutional standards*" (Par. 173). Thus, we have consistently evaluated the extent to which PPB's training systems: (1) identify areas where officers require training, (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

## <u>Overview of Methods</u>

The COCL team continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL team also continues to observe training (either in-person or online) and interview PPB staff. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness.

## <u>Assess Training Needs</u>

Paragraph 79 of the Settlement Agreement requires that PPB conduct a needs assessment and use this information to update its training plan annually. In September of 2019, PPB published its annual needs assessment report and COCL gave it a positive review. PPB's 2020 Annual Training Plan was then published in March of 2020 and, from our perspective, the plan adequately reflected the earlier needs assessment.

However, since then, the COVID-19 pandemic and daily protests have caused PPB to dramatically alter its training plans. As we will discuss below (Par. 84), the 2020 in-service training at the Training facility – the main source of training for all sworn personnel – was suspended in March due to the pandemic and orders from the governor to limit meeting size. However, with the start of protests, PPB canceled its plan to restart the classroom portion of In-service training.

The needs assessment and training plan for 2021 (Par. 79) will be completed in the fourth quarter but has been affected by these unexpected crises. On August 25, PPB described various topics it intends to cover when In-service is restarted in 2021 (See Par. 84). PPB indicated there will be limited changes to

Case 3:12-cv-02265-SI    Document 226-2    Filed 12/08/20    Page 21 of 61

the Training Plan topics because of the need to provide training that was <u>not</u> provided in 2020, with the exception of revised scenarios. Roughly 55% of PPB's sworn personnel did not receive the skills portion of the 2020 In-service training due to the closure of the Training facility.

On July 20th, PPB informed us that the next needs assessment will be completed soon and will rely on multiple sources including the community. We note that PPB has been working closely with the Training Advisory Council (TAC) to consider various training needs related to equity (see Par. 84). Also, we expect that PPB's needs assessment will incorporate the training recommendations from PRB. After PPB has completed the Needs Assessment report in the 4th quarter, and translated these findings into its Training Plan, COCL will evaluate compliance with Par. 79.

**Deliver Appropriate and High-Quality Training**

PPB is expected to develop and implement a high-quality system of training for officers and supervisors (see Par. 84). The training must be consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness, including *"role playing scenarios and interactive exercises that illustrate proper use of force decision making"* (Par. 84.a).

**In-Service Training**

PPB's In-service training is the primary mechanism for educating and training all of PPB's sworn personnel in the fundamentals of policing. The four-day 2020 In-service training began in January. The COCL team was satisfied that this training, including both classroom and skills-based scenarios, met the requirements of the Settlement Agreement, as described in our first and second quarter reports. However, as a result of the COVID-19 virus and the governor's orders, PPB was required to discontinue the In-service training in March. Only nine of 19 sessions were completed when the training was halted (covering about 300 officers), leaving nearly 500 members without this fundamental training. As noted in our last report, PPB moved quickly to create online training using its Learning Management System (LMS). However, the LMS training only provided videos of the February classroom training and only initially covered 14 of 36 hours of In-service or 39% of the total content. The bulk of the training that was lost involved the hands-on scenarios where officers practice specific skills, ask questions, and are debriefed on their performance. This includes use of force training, where 485 officers did not receive the state-required amount of annual training[1]. LMS is simply not able to replace this interactive skills training.

We are particularly concerned about the absence of skills training related to officers' response to protests. In February, the classroom Mobile Field Force Refresher was well-planned and followed by field exercises. At the most basic level, the exercises gave attention to the use of respirators, batons and various line formations. The absence of this training may cause confusion and stress in the field when responding to unpredictable crowd events. PPB's Scenario Debriefing metrics for the Mobile Field Force

---

[1] However, because of the pandemic, the Oregon Department of Safety Standards and Training (DPSST) did not suspend anyone's certification in Oregon for not receiving the required 8 hours of firearms/use of force training.

Page 21 of 61

Refresher scenarios focused on critical crowd management skills involving communication (e.g., direction and control, de-escalation, professionalism), situational awareness (especially safety), and appropriate use of force (including force reporting). Practicing these skills is essential and helps to link training directly to policy (e.g., directives 635.10, 635.20, and 1010.10). The protest events over the past four months underscore the importance and urgency of skills training.

We acknowledge that for the summer, PPB was planning to restart in-person training with smaller groups (meeting social distancing requirements), but after the onset of the protests, PPB decided to reallocate its training resources to the protests. We also acknowledge that PPB has developed a "*make up*" plan that seeks to remediate this training deficiency and is scheduled for implementation in 2021 (described below). However, the Settlement Agreement requires annual In-service training for all of its officers around specific topics, including crisis intervention (Par. 98).

**Recruit Training**

The Advanced Academy for the training of new recruits was seriously impacted by the COVID-19, as we described in Q2. Although the virus caused a delay in training for two groups of students, their classroom training was completed via Zoom. When the Training Division reopened in August, all recruits were able to complete their training in-person, including the scenarios and scenario debriefings. For some students, the time lag between the "classroom" training and the scenarios was sizable, but we are satisfied that everyone will complete their training in 2020, including the skills training and required hours of Crisis Intervention training.

**Supervisor Training**

In-person training for all supervisors was scheduled in 2020 but because of the pandemic and protests, an 8-hour online training is being planned for November in place of the in-person training. For newly promoted sergeants, PPB had scheduled three in-person sessions of the Sergeant's Academy, with 10 or fewer sergeants in each session. This training will follow the original curriculum reviewed by COCL. However, PPB decided to cancel the first session because of the protests. After rescheduling, the first Sergeant's Academy began on September 21, 2020 and will last three weeks. Three sessions will be combined into two. This training is intended to help new sergeants learn their roles and responsibilities. Three days will be devoted to critical incident management, including supervising a Mobile Field Force. COCL will observe this training in the fourth quarter.

**Remedial Training Plans for 2021**

As noted above, PPB's training plan for 2020 was significantly reduced due to the pandemic, daily protests, and cuts to PPB's budget. In-service training is the backbone of PPB's annual training, so we are particularly concerned about the sizable gaps in this training. In August, PPB developed a "*make-up plan*" to fill these training gaps in 2021 and remain compliant with state standards. For consistency, the skills portion of the 2021 In-service will remain largely the same as what was started in 2020, but the scenarios will be changed and upgraded. However, the skills portion will not be matched closely to the online training, as it was early in 2020. The online training will increase to 20 hours and comprise roughly half of the total in-service hours.

PPB has yet to decide firmly which classes are best delivered online and which are best delivered in-person, but the In-service Make-Up Plan indicates that "*the following online trainings have already been identified.*" CPR, Control tactics (this will also be covered in-person), Use of Interpreters, Officer Wellness, Community-based Training, Duty to Intervene, Procedural Justice, Response to Nuclear Sites, and Taser User Update. Certainly, most of the 20 hours of <u>in-person</u> instruction will involve hands-on scenarios and skills training that were missed in 2020 by the majority of officers. Also, with the addition of online education, PPB is able to reduce the in-person class sizes from 48 to 24, which should help to stimulate instructor-student interaction in the classroom. However, nearly all of this proposed in-person training in 2021 will be devoted to use of force (because of the enormous gap in this training created in 2020), leaving little time for other topics. COCL will wait to receive PPB's final Training Plan and Needs Assessment in the fourth quarter before making a final assessment. We acknowledge PPB's effort to create a training remediation plan for 2021, but unfortunately, PPB has been unable to deliver the required annual training in 2020.

Recognizing the growing importance of online training, the Manager of LMS has received additional training in how to build online programs. Also, PPB has requested a videographer position to facilitate the development of online training videos. Clearly, building a strong online program will require the City to invest more in training. For example, LMS is not designed to allow interaction with students. Hence, PPB has purchased a software program that can be linked to LMS and requires students to interact periodically to stay engaged when watching videos. However, programming this software is extremely time consuming and costly (taking several days to prepare every 10 minutes of video, and PPB is expecting 20 hours of online videos). Clearly, the one person who manages LMS cannot possibly handle the growing demand to transition a significant portion of PPB's training to an online format. The City has approved the videographer position, but we remain concerned that this may not be sufficient as the demand for interactive virtual training increases over time.

COCL has recommended previously that PPB explore additional ways to incorporate the community into police training. PPB mentioned "*community-based training videos*" as part of its 2021 training plan, although no details were provided. Community engagement was done successfully in 2020 with the Youth Educating Police (YEP) class. Historically, PPB has found it difficult to maintain the involvement of voluntary community members every week for more than 20 weeks. Future online training, in contrast, requires less time commitment from community members who appear in videos.

The Training Advisory Council (TAC), along with PPB's Equity and Inclusion Office (EIO), has recommended that PPB build more equity training that involves the community. PPB's Training Division is moving ahead in this area. The online training will allow this, without community members with lived experience having to repeat these experiences numerous times in front of police officers over several weeks. TAC members felt that community members should not be required to "*wound themselves*" in person 20 times in a classroom setting to educate a large number of officers about ways to improve their response to people of color, people having a mental health crisis, people with disabilities, houseless people, and others who have had traumatic encounters with the PPB. Working with the EIO, the Training Division is planning to introduce equity-related videos in 2020 with the help of community members. Consistent with this, PPB is planning new anti-racism training for all officers in near the end of 2020, although we have not seen these plans.

Previously, COCL recommended that PPB add a peer intervention program to train officers in how to speak up and intervene with peers to prevent or stop harmful actions such as excessive force. Chief Lovell announced on September 9th that PPB is planning a new training initiative that will serve this purpose and will help keep officers from violating policy or acting inappropriately. PPB will introduce the 8-hour Active Bystander for Law Enforcement Training (ABLE). The ABLE project builds upon the work of the Ethical Policing is Courageous (EPIC) peer intervention program in New Orleans. ABLE is administered by the Georgetown Law School (2020).

COCL has previously recommended that PPB give more attention to developing interpersonal skills needed to reduce tensions, especially procedural justice. PPB has included such training in the past, but skills training around procedural justice is not part of the in-person training plan for 2021. It is planned only for online training and COCL has cautioned PPB about the limitations of online training for building these types of communication skills. However, we are hopeful that procedural justice will be incorporated into the curriculum for PPB's new VirTra De-Escalation and Use of Force Simulation Trainer, as well as other trainings, as has been done in the past.

Finally, the supervisor training is scheduled for the fourth quarter with an online format, although we have yet to see the lesson plans. For lieutenants, this training is expected to include a total of 12 hours, including four hours on equity. Sergeants are expected to receive eight hours of training online, and PPB will upgrade this training to make it consistent with the new Sergeants Academy. Key classes will be borrowed from the 3-week in-person Sergeants Academy and delivered to all sergeants online.

**Evaluate Training**

Paragraph 80 requires that PPB *"develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum."* The COCL team continues to assess the content, methods, and utility of PPB's training evaluations in 2020.

PPB started the 2020 In-service using the same set of COCL-approved methods used in 2019 to evaluate In-service training, namely, in-class quizzes to engage the students and test their understanding of the material; anonymous class evaluation surveys to assess the quality and content of instruction; knowledge tests to grade students' learning in the classroom; and consistent rubrics for scenario evaluations to measure officers' proficiency and skill level during role playing and to provide the data needed for post-scenario debriefings. But as we noted in our second quarterly report, the training evaluation system was truncated in the spring when COVID-19 hit, and the Training Division felt compelled to transfer a large portion of its In-service training to LMS.

Specifically, because of limited personnel and a new online platform for In-service training, PPB was able to administer only the knowledge tests and did not have the capacity to administer online surveys or quizzes given the lack of built-in interactivity. In many of our prior reports, we have emphasized the importance of post-class surveys to allow students the opportunity to evaluate the instructor's knowledge and style of teaching as well as the content of the class. PPB was able to continue the on-line surveys with recruits in their Advanced Academy and ECIT classes (both in-person), and those data are

currently being analyzed. PPB also administered some surveys from the original In-service classes in January and February and is using that data to provide a limited picture of In-service training.

PPB is currently seeking to determine which In-service classes can be successfully delivered online and which are best suited for in-person training. Unfortunately, PPB has no survey data from the online classes, so it cannot rely on students to provide evaluations of these videos. We recommend that the obstacles to administering online surveys be addressed in the near future, especially since PPB is planning to move more classes online. Again, COCL will remind the City that part of the training evaluation problem is the insufficient number of civilian researchers, analysts, and the Information Technology staff assigned to the Training Division (although the current staff are excellent). If properly staffed, PPB could collect and analyze a more complete set of evaluation data, continue to provide immediate feedback to management, and recommend improvements regarding specific classes and instructors. In the fourth quarter, we expect to receive some evaluation reports based on the data that are currently available. In 2021, PPB is hoping to restart the class evaluation surveys in segments (after several hours of on-line training) and have the 20 hours of training spread out over a six-month period.

**Document Training Delivered and Received**

Paragraph 81 of the Settlement Agreement requires that PPB create, and that supervisors use, a *"central, commonly-accessible, and organized file system"* for training records. PPB continues to use and update its electronic Learning Management System (LMS) for this purpose. COCL has confirmed that LMS is being used to record which PPB members have completed the 2020 In-service, the 2020 Sergeants Academy, and the 2020 ECIT In-service. LMS also serves to announce training opportunities, notify RU Managers when officers need specific training to maintain their State certification, and report completed trainings to the state DPSST.

Annually, supervisors continue to use LMS to review the training records of officers under their command. Members are given 30 days to complete training and are sent email reminders at 7 and 14 days after training is posted. When a member is late on training, the RU manager receives an email at 1, 5, and 21 days past the due date. When an officer has failed to complete an online class in this time period, the LMS Manager sends a non-compliance memo to the Chief's office. The supervisor and RU Manager for any delinquent individual are notified and the member is expected to complete the classes immediately. For July and August of 2020, COCL confirmed that only three non-compliance memos were sent to the Chief's office and these were largely due to a leave of absence, medical leave, or military leave. These officers are not allowed to return to the streets until they have completed the required training.

As required by Paragraph 82 of the Settlement Agreement, COCL confirmed that on July 9th, the Training Division submitted its Semi-Annual Training Report to the Deputy Chief and Assistant Chief who oversees Operations.

According to Paragraph 83 of the Settlement Agreement, PPB *"shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness"* with specific limitations in their work histories over the past five years. Because no new

instructors were added in the third quarter, COCL did not need to review the Training Division's Work History Review Sheet to ensure that applicants who applied to be instructors met these requirements.

Finally, LMS has become the primary source for a wide array of trainings to officers. As noted earlier, when the Training Division was shut down, LMS became the home for In-service training, offering a total of 14 videos and online knowledge tests. In addition, COCL has confirmed that the following legal updates, directives, training videos, and "*Tips and Techniques*" have been uploaded and assigned as of September 1st: Directive 720.00, Special Emergency Reaction Team (SERT) and Crisis Negotiation Team (CNT) Use; 2020-2 City Attorney's Office Legal Updates for February 2020; 2020-5 Tips & Techniques Drug Packaging and Crime Lab Submission; 2020-3 City Attorney's Office Legal Updates for March 2020; 2020 CIU NTR Alarm Response Training - Reed Research Nuclear Reactor; and Directive 700.00, Bureau Response to All-Hazards Using the National Incident Management Systems (NIMS) (effective 10/02/2020). PPB members are registered or register themselves for these trainings and their progress is monitored via LMS as noted above.

**Audit the Training Program**

No formal audit of PPB's Training programs will be conducted in 2020. A comprehensive audit was conducted in 2018. However, PPB effectively conducts an informal audit each year by engaging the Inspector General's office and the Chief's office in a close review of the training needs assessment, the training plan and the evaluation reports produced by the Training Division. COCL has noticed that, in recent years, the Chief's Office has provided greater oversight of the Training Division's activities and training plans. Regular meetings are held between the Director of the Training Division and the Chief's office to discuss these matters.

**Analyze and Report Force Data**

Paragraph 86 of the Settlement Agreement requires that PPB's Force Inspector *"gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council…"* including "*problematic use of force patterns and training deficiencies*." In turn, the Chief is expected to receive and respond in a timely manner to recommendations from TAC or the Training Division regarding training, policy, and/or evaluation.

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). However, because of COVID-19 and a busy bi-monthly TAC meeting agenda, the Inspector was not asked to present the findings to the TAC until July 8th. COCL observed this virtual meeting where the Inspector presented force results from two quarters – Q4 2019 and Q1 2020. General findings were presented that look at force patterns. This led to a healthy discussion about improvements in force patterns over time, but concern about continued racial disparities in force-to-custody ratios and the number of deadly force incidents in past years. TAC has shown an interest in drilling deeper into the force data. Using PPB's Open Data portal, TAC has conducted its own analysis and reports on use of force (Available on the PPB website). TAC mentioned the need for more PPB analysts who could perform this type of work.

TAC has produced numerous recommendations to the Chief. Based on observations and interviews, COCL can conclude that PPB has significantly improved its responsiveness to the TAC's recommendations. On September 4th, the Chief of Police and Acting Captain/Director of the Training Division responded to a range of recommendations by TAC regarding the collection of use of force data. They agreed with some recommendations, such as capturing whether the use of force incident was the result of an officer-initiated or dispatch (citizens)-initiated call, but other recommendations were judged not possible due to structural, legal, or resource constraints. However, at the present time, we can report that the Training Division and the Chief's office have a strong, working relationship with the TAC and training has been positively affected as a result. As one example, the Training Division and EIO are introducing equity (anti-racism) training in 2020. TAC has created three task forces (Leadership, Education, and Public Safety Support Specialists) that have been meeting frequently and will provide additional recommendations in the future.

Force data are shared with Precinct Commanders via quarterly force reports but also through PPB's Employee Information System (EIS). PPB has continued to use EIS as a risk management tool to identify officers who exhibit problematic trends in force and other behaviors.

Finally, Paragraph 87 requires that TAC meetings be open to the public. COCL's observations indicate that TAC meetings have been open to the public and have allowed for public comment. In fact, TAC's virtual meetings via Zoom have been more accessible to the public than in-person meetings, as community members can now participate from home. The minutes from the March 11th meeting have been posted on the PPB website, but not the meeting from July 8th. This delay has been attributed to the elimination of a position within the Training Division.

**Training Summary and Conclusions**

COCL has been forced to address some difficult questions about training. First, was the reduction in training sufficiently large that it constitutes non-compliance with the Settlement Agreement? Second, was the loss of training in 2020 preventable and what did the City do to remediate the problem in a timely manner?

In response to the first question about non-compliance, PPB is required to provide in-service training annually to achieve various objectives consistent with the Settlement Agreement, and arguably, certain skills training has never been more important in light of the severe challenges that officers are facing on the street. At the time of this report, PPB has informed us that it is unable to complete the skills portion of In-service training for approximately 55% of the Bureau's force at this time. In particular, the majority of PPB's officers have not received any recent skills training in crowd management, de-escalation, procedural justice, crisis intervention, or other critical skills for preventing or minimizing the use of force. Furthermore, a total of 485 officers did not receive the required 8 hours of Use of Force training for state certification.

Training in most of these areas is required by the Settlement Agreement. Par. 84 states that *"PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled."* For all officers, this includes *"the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to*

*have mental illness..*" as well as *"use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force."* In response to the second question about whether this was preventable, there is little doubt that PPB has faced highly unusual circumstances with a "perfect storm" of COVID-19, nightly protests for four months, poorly timed reductions in PPB's budget, and other factors. However, questions remain about PPB's and the City's preparedness for such emergencies and the management of such events. First, there are questions about the deployment of sworn personnel. One could ask whether it was necessary that PPB quickly remove nearly all of its instructors and its management team from the Training Division in early June, reassign them to the protests downtown, and thus stop various training programs. Certainly, PPB was facing a true public safety crisis during the early weeks of the demonstrations – a crisis that required the assignment of additional officers to the downtown area.

Although this decision may be justified, we must still ask the question of whether PPB had a sufficient plan to get the Training Division back on track after the first few weeks. Certainly, the long hours worked by most officers assigned to the protests gave them little time off to attend training classes. But what plans were underway to restart various training programs? Without a complete management team, the Training Division was limited in what it could accomplish. As noted earlier, after the start of the pandemic in March, PPB did begin moving classes online, but that still left significant gaps in the total quantity and quality of training. A plan to restart small in-service classes (in-person) was scrapped after the start of the protests.

Unfortunately, it wasn't until August 25th that the Training Division outlined a plan for remediating this training problem. We credit PPB for taking some action and proposing in-service training for 2021. However, this plan is relatively vague, lacking details about the topics to be covered and the methods of instruction. COCL needs to be confident that PPB's final training plan will reasonably address the In-service training deficiencies that occurred in 2020.

Finally, we have sought to better understand the origins of PPB's current training problem to provide some context for this dilemma. Some have argued that the COVID-19 virus (and the required social distancing) was the main problem that prevented additional training during the summer. However, PPB did continue in-person training for recruits and for new sergeants during this time. Some have argued it was the lack of students who were too busy with the protests. Again, this begs the question of whether any In-service skills training should be planned or whether everyone is needed on the front lines of the protests. Some have argued that the problem was caused by inadequate funding. The Training Division has relied heavily on the overtime budget to backfill positions for students and instructors who are taking time off from other assignments, but the Division's overtime budget has been cut. (Although many instructors have recently returned, the Division is still short one captain, one lieutenant, and a number of instructors for special classes). However, PPB's reliance on overtime pay to properly staff the Training division does not appear to be a sound model of management. Furthermore, as we noted in the introduction to this report, PPB has one of the smallest budgets among the 50 largest police agencies in the United States and has experienced significant cuts this year, which therefore requires careful prioritizing.

Regardless of the causes of this problem, PPB is still required to deliver the training services defined in the Settlement Agreement. Notwithstanding the forthcoming debates about ways to re-envision the

role of municipal police, the City is currently responsible for ensuring that critical services relevant to the Settlement Agreement are not in jeopardy (see Par. 7). This responsibility includes guaranteeing that all officers have the appropriate training for crowd management, de-escalation of conflict, and use of force. In light of the videotaped examples of police use of force that potentially violate policy and give rise to the need for accountability investigations, the proper funding of PPB's Training Division should be one of the City's highest priorities and it should not depend on the status of PPB's overtime budget.

In sum: (1) given that PPB has been unable to delivery significant portions of its in-service training to more than half of its sworn officers on topics required by the Settlement Agreement; and (2) given that PPB's remediation plan is relative vague, COCL concludes that the City is no longer in substantial compliance with the Training requirements of the Settlement Agreement as defined in Section IV. In order to remediate these issues, PPB must demonstrate that, despite the training restraints caused by COVID and the protests, the Bureau has a specific plan to provide the lapsed training to officers and that the training will be consistent in content and quality with the training that was seen in the original training schedule.

Finally, we recognize and support the transition to virtual training, but need to underscore several points. Our concern reaches beyond questions regarding the quantity and timing of training (as emphasized above) to questions of quality. First, posting videos alone is insufficient, not only because PPB is currently unable to ensure that officers are watching the videos in their entirety (although they are required to state that they did), but because static videos do not allow the type of interaction between students and instructors that is essential for acquiring and retaining certain types of knowledge and skill. Virtual learning must also include interactive platforms, such as Zoom or Microsoft Teams. This would be consistent with the requirements of the Settlement Agreement, where training is defined as *"any adult-learning methods that incorporate role-playing scenarios and interactive exercises that instruct officers about how to exercise their discretion at an administrative level, as well as traditional lecture formats. Training also includes testing and/or writings that indicate that the officer comprehends the material taught."*(Par. 62).

We credit PPB with beginning to move in this direction and seeking to correct its reliance on videos, as described earlier, but we emphasize that this transition will not succeed without the proper funding for IT staff, instructors, software, and equipment. Instructors must be available <u>and</u> specially trained to deliver online training. Second, PPB must look beyond virtual learning, and recognize that there is no substitute for in-person skills training in specific areas. PPB has acknowledged this reality for force training (e.g., use of firearms, control tactics for physical confrontations), but training for de-escalation and crisis response also require these "hands-on" settings, as demonstrated in past PPB training sessions. With advanced virtual training modules, some of this can be handled online. Regardless of the platform, individualized feedback on performance is essential so officers can learn from their mistakes. Hence, we encourage PPB to continue the work it has started to achieve this goal and to carefully evaluate what can be done virtually and what requires in-person instruction and practice.

# <u>SECTION V – COMMUNITY-BASED MENTAL HEALTH SERVICES</u>

In evaluating this section, we continue to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. Par. 88 identifies the City's partners in providing community-based addiction and mental health services: *"the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders."* As the Settlement Agreement holds no authority over the City's partners, prior reports have only evaluated what the City and PPB can reasonably accomplish. We maintain that evaluative approach in this report.

As part of the broader community-based mental health service response system, the City and PPB have maintained their roles in overseeing or participating in committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services. As we noted in prior reports, we lack the necessary non-party information in public health care systems to assess whether all of the goals listed in Par. 90 have comprehensively been met – however, we can say that where City and PPB input is necessary for an improved system, we continue to find City and PPB actions have been satisfactory.

As part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Related to this, PPB has continued to participate in AMR training in transporting persons in mental health crisis, as the handoff between PPB and AMR is a critical point in time and cross-agency training serves to improve this process. Taking a systems perspective regarding the transport of persons in mental health crisis to a drop-off center, we continue to find that PPB is acting in accordance with the intent of the Settlement Agreement and the conceptual framework of a drop-off center.

As evidenced above, we continue to find that the City and PPB have maintained compliance with Section V of the Settlement Agreement. Where able, PPB and the City have worked with City partners to improve community-wide delivery of mental health services. Through self-initiated committees, as well as contributing to external committees and working groups, PPB and the City continue to do what can reasonably be expected of them. The Unity Center continues to operate as a walk-in/drop-off center as envisioned by the Settlement Agreement and PPB continues to play their part in ensuring compassionate transportation. While we encourage PPB to continue to seek avenues for supporting entities who provide community-based mental health services, we acknowledge that what has been accomplished so far satisfies their responsibilities in the Settlement Agreement.

# SECTION VI – CRISIS INTERVENTION

Section VI of the Settlement Agreement (Crisis Intervention) is designed to facilitate PPB and the City's implementation of "*systems and resources for responding to persons in mental health crisis*" (see Par. 170). As we have done in the past, we evaluate PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers); and (2) Secondary Response (including BHRT and SCT). In accordance with our maintenance year plan, we evaluate the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC) and receives a PPB response. We also examine what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. Consistent with prior reports, we continue to find PPB and the City have maintained their system for responding to mental health crises during this monitoring period.

**BOEC**

Most often, the entry point for PPB contact with persons in mental health crisis is through BOEC, the call-taking and dispatch center for Portland. During this monitoring period, BOEC has maintained their Mental Health and ECIT Dispatch Protocol SOP which continues to identify seven call characteristics where an ECIT response is needed (these include when there is a mental health component AND: a weapon is present, the subject is violent, the call is at a mental health facility, the caller is threatening suicide and has the means to carry it out, at the request of a community member, at the request of another officer, or when the subject represents an escalating risk of harm to self or others). Hence, this SOP satisfies the requirements of Par. 113 for BOEC to revise policies for dispatch as well as for assigning calls to MCCL (see below).

In addition, we have previously observed BOEC's 16-hour CIT training for telecommunicators as well as their In-service training, both of which are required by Par. 114. Due to COVID and resource issues as the result of the protests, BOEC has yet to provide a full in-service training to telecommunicators in 2020 though they have recently provided some roll-call training and training newsletters. While the Settlement Agreement does not require an annual training we believe they have continued to reinforce the training concepts through the use of roll-call trainings, email reminders, and flyers posted throughout the agency. Once full in-service trainings are began again, we will evaluate them in comparison to the quality of in-service we have seen in the past. Additionally, BOEC has recently provided the 16-hour training for four newly certified call takers. This was the same 16-hour CIT training we have observed in the past.

BOEC has a protocol for assigning calls to the Multnomah County Crisis Call Center (MCCL) when the call involves the following conditions: a person with suicidal threats, feelings, or intent but the caller does not appear to have the direct means to carry out the suicide, does not need immediate medical attention, and is not threatening to jump from a bridge/structure or to block vehicle traffic. MCCL has the resources to connect community members to service providers. We continue to find that BOEC protocols and training have prepared telecommunicators to refer individuals to MCCL and continue to find that this process positively contributes to BOEC's system. We also find that BOEC telecommunicators are appropriately forwarding calls to the MCCL since data provided by BOEC indicates that out of 132 calls forwarded to MCCL between June and August, only 12 were routed back

to BOEC for emergency dispatch. Additionally, when a call is routed back to BOEC from MCCL for dispatch, BOEC reviews the call to determine whether the original information supported the decision to send the call to MCCL or whether the telecommunicator should have originally dispatched an officer. The reviews conducted by BOEC are designed to ensure the "*fully operational*" triage system of BOEC in accordance with Par. 115. In sum, we find that BOEC's role in the City's system of response to mental health crisis continues to function properly as indicated by their policies, training, and audits.

**Primary Response Systems**

To evaluate PPB's role in the City's system for responding to persons in mental health crisis, we evaluate PPB's current policies, the training received by PPB officers, the enhanced training received by ECIT officers, and finally data collection tools and associated data related to PPB response. PPB continues to enforce directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). For each of these directives, we have concluded that they continue to substantially comply with the requirements of the Settlement Agreement and were properly reviewed by the Behavioral Health Unit Advisory Committee (BHUAC) prior to enactment (see Par. 95).

Comprehensive training on crisis response remains a core competency in PPB and all officers are required to receive a minimum of 40 hours Crisis Intervention training prior to graduating the Advanced Academy (see Pars. 97 and 98). We have confirmed that new recruits are receiving the entirety of the 40-hour training. Many Advanced Academy classes were conducted via Zoom and, when the Training Division reopened in August, all recruits were able to complete their full training in person, including scenarios and debriefings. We believe this is an acceptable adjustment in response to the pandemic. Additionally, we are planning to observe portions of an upcoming Supervisors Academy, including modules related to ECIT as a street-level resource for supervisors.

As part of PPB's specialized response system, a select group of officers receive 40 additional hours of training to become Enhanced Crisis Intervention Team (ECIT) officers (see Pars. 99 and 102). The training has been reviewed by BHUAC members, who last reviewed and commented on the training in October 2019. No new training has occurred since November 2019 and the number of operational ECIT officers remains at 131. Given our prior assessment of the training as well as the ongoing review by BHUAC, we continue to find that the ECIT training is a valuable supplement to the 40-hour training received by all officers. Additionally, PPB recently provided ECIT officers with an ECIT in-service training. The 10-hour training was provided to all ECIT officers in September. We reviewed the content of the training and provided comments. We believe the training is sufficient overall as an ECIT refresher course.

In addition to the training provided, the ECIT program continues to comply with the Settlement Agreement in other ways. For instance, ECIT officers retain normal duties until dispatched as an ECIT officer (Par. 103). PPB has maintained selection and retention criteria that are consistent with Par. 101 and which have been reviewed by BHUAC. As part of their system, PPB reviews the work history for all prospective ECIT officers prior to selection to ensure adherence to selection criteria. Additionally, BHU personnel are notified by PSD whenever an ECIT officer receives a complaint based upon use of force or

mistreatment of persons with mental illness, thereby ensuring adherence to the retention criteria. Each of these elements demonstrates a comprehensive system with built-in oversight mechanisms.

In our last report, we summarized evaluations conducted by PPB as part of their semi-annual assessment of the ECIT program. These evaluations utilize data collected from the Mental Health Template (MHT) that is completed by both ECIT and non-ECIT officers when interacting with persons in mental health crisis (see Par. 105). PPB has also maintained their use of MHT data to evaluate various aspects of its ECIT program, including ECIT type call distributions, response rates, as well as arrest, hospital transports, and force differences between ECIT and non-ECIT officers. As evaluations of these data are conducted every six months, we look forward to receiving an updated analysis in the next quarter.

As we await additional quantitative evaluations, we review in this report some qualitative outcomes as described by PPB. While many are aware of the officer involved shooting involving Koben Henrikson, people may be less aware that between April 15th and May 7th, PPB officers had three different interactions with persons in mental health crises holding knives. In two of the situations, the person was holding a knife in each hand, similar to the situation involving Mr. Henrikson. However, in all three of these situations, PPB officers were able to talk to the person in crisis and resolve the situation without major incident. While the COCL team does not view an individual case (or, in this instance, 3 cases) as sufficient evidence that the system is functioning effectively, we want to make reference to them here to give the reader a balanced perspective. PPB is required to highlight the work of the CIT to increase awareness of the effectiveness of its work (Par. 104) and we see that one of these situations was included in their last BHU Newsletter (https://www.portlandoregon.gov/police/article/760486).

**Secondary Response Systems**

As in past reports, we also assess supplemental/secondary response systems being used by PPB, including the Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT). The BHRT continues to consist of five pairings of a PPB officer and a mental health professional. When a person is referred to BHRT through the Behavioral Health Unit Electronic Referral System (BERS), the person is evaluated to determine whether they meet the criteria for BHRT intervention. The criteria include whether the person is demonstrating escalating behavior, has had frequent contacts with PPB, is considered a risk to self or others, or whose case-specific information indicates a potential need for BHRT intervention. Also, when a person is the subject of three MHTs in a 30-day period, an automatic BERS referral is made for that person (unless a previous referral exists), thereby satisfying the requirements of Par. 110. If a person meets the criteria for BHRT intervention, a plan of action is discussed among members of the Behavioral Health Unit Coordination Team (BHUCT) which includes law enforcement, court, service provider, and hospital personnel, among other relevant stakeholders.

PPB members of the BHRT teams are provided the 40-hour enhanced crisis intervention training and receive specialized training when available (see Par. 109). The selection and retention criteria are consistent with the criteria for ECIT officers. Also, the same process by which PSD notifies BHU whenever an ECIT officer has a complaint of force or mistreatment against a person with mental illness is applied to BHRT officers as well (see Par. 108).

In addition to the BHRT teams in each Precinct, two other BHRT teams operate to provide intervention to persons meeting BHRT criteria. The first is a BHRT team dedicated to providing follow-up to BHRT clients around 60-days after the initial intervention. The second is a BHRT team whose primary responsibility is acting as a city-wide team for Portland's houseless population. Both of these teams were created based on prior PPB data analysis and needs assessments, demonstrating an evidence-based review/react system.

PPB continues to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the second quarter of 2020, a total of 280 referrals were made through the BERS system. Of those, 112 (40%) were assigned to the BHRT caseload. Over the past two years, acceptance rates have generally been between 45% and 55%, though we note a slight decline for this quarter. However, as we have noted in the past, a single quarter does not represent a trend.



The other secondary response system that PPB operates is the Service Coordination Team. This program continues to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system (see Par. 112). While we continue to await the final draft of the annual Capstone Study class conducted at Portland State University (which conducts an annual assessment of SCT), we note PPB conducts quarterly review of SCT data as part of its system assessment of BHU groups. PPB continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people the SCT has served. However, in the second quarter of 2020, the number of referrals significantly decreased. This is the result of the pandemic wherein PPB reported that interactions with potential referrals were put on hold and/or limited and treatment providers discontinued individual and group meetings. This directly impacts the number of persons who may have been referred to the SCT. Still, despite the drop in referrals, we note that SCT continued to accept nearly 50% of all persons referred even in Q2.



Figure x SCT Individuals Referred (Figure provided by PPB)



Figure x – SCT Referral Status (Figure provided by PPB)

Finally, as part of SCT operation, the Supportive Transitions and Stabilization (STS) program continues to provide a direct housing resource for BHRT clients. The STS program has consistently accepted over 90% of referrals they have received and in the past four quarters, their acceptance rate has been 93.8%. As evidenced by the above, we continue to find that the Service Coordination Team acts as a positive element of PPB's overall system of mental health response and has continued to comply with Par. 112.



Figure x – STS Referral Status (Figure provided by PPB)

## **BHUAC**

As an overarching system, the Behavioral Health Unit (BHU) continues to oversee and coordinate the ECIT, BHRT, and SCT programs (see Par. 91). BHU utilizes data from a variety of sources to evaluate its operation, including data from the MHT as well as data collected from BHRT and SCT (see Par. 93). Additionally, in accordance with Par. 92, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, MCCL, BOEC, and BHUAC (see also below). We have met with the Lieutenant who oversees BHU on multiple occasions and are confident that all aspects of BHU (ECIT, BHRT, and SCT) are operating as a comprehensive system rather than individual programs.

Additionally, the BHUAC continues to act as an advisory body to guide the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT factions. The current BHUAC membership consists of individuals from PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, the Public Defender's Office, and the Unity Center for Behavioral Health (see Par. 94). Presently, two spots on the BHUAC remain vacant and, although we noted in our last report that these two spots should be filled as soon as possible, we are also aware that the current pandemic may be affecting their ability to do so.

The BHUAC continues to provide input on policy, training, and SOPs (see Par. 95), as well as receives presentations and holds discussions on current practices of other mental health system partners. In the second quarter of 2020, BHUAC met three times and discussed issues related to the status of the Settlement Agreement, BHU data, a finalized BHUAC Community Engagement Plan, goals for 2020, COVID-19 updates, PCCEP updates, 2020 ECIT training, and reviewing the BHUAC bylaws. Additionally, members of the BHUAC have participated in the PCCEP's Behavioral Health Subcommittee. We continue to receive updates on BHUAC recommendations, meeting agendas, and meeting minutes. Overall, we maintain that the BHUAC continues to act in compliance with the Settlement Agreement.

# <u>SECTION VII – EMPLOYEE INFORMATION SYSTEM</u>

During the second quarter of 2020, PPB continued to use the Employee Information System (EIS) as their primary system for identifying potentially problematic members and "*design[ing] assistance strategies to address specific issues affecting the employee*" (Par. 116). As with our prior reports, we evaluate the EIS system from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on receiving alerts. As evidenced below, we find that PPB has maintained substantial compliance in Section VII (Employee Information System) during this quarter.

PPB continues to collate data from a variety of data sources, including data from force events and traumatic incidents (captured in Regional Justice Information Network (RegJIN)) as well as complaints and commendations (captured in Administrative Investigations Management (AIM)). These data are then used to identify potentially problematic behavior in the form of predetermined thresholds, some of which the Settlement Agreement defines, including when:

- Shift Force Ratio: A sworn member's force ratio is greater than or equal to three times their shift's average ratio in the preceding six months
- Force Ratio: A sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six months
- Force Count: A sworn member uses force three or more times in the preceding thirty days
- Criminal Complaint: A member receives a complaint with an allegation of criminal misconduct
- Complaint in Same Category: A member receives two or more complaints with at least one allegation in each complaint being in the same category such as two complaints that both have conduct allegations for events in the preceding six months
- Complaint Count: A member receives three or more complaints for events in the preceding six months
- Traumatic Incidents: A member experiences three or more traumatic incidents in the preceding thirty days (traumatic incidents are events related to child abuse, deadly force, homicide, officer being assaulted, suicide, and/or traffic fatality)
- Commendations: A member receives two or more commendations for events in the preceding six months

While we provide our assessment of EIS below, we note here that future evaluations of EIS will likely be impacted by the recent protests. For instance, it is plausible that RRT members will receive multiple flags for Traumatic Incidents given that "officer being assaulted" is one of the examples of a traumatic incident. Additionally, whether officers are completing FDCRs on-time has implications for the early warning purpose of EIS with respect to the Shift Force Ratio, Force Ratio, and Force Count thresholds. Finally, the totality of the protests and the impact on force, complaints, traumatic incidents, and commendations may introduce an increased volume of alerts. In the next quarter, we will look to see how PPB handled these with respect to the overall system.

PPB continues to employ two trained EIS administrators to evaluate alerts created by the EIS and determine whether the alerts should be forwarded on for RU review. The EIS administrators were trained via a comprehensive operations manual—including SOPs for the handling of EIS alerts, entries, and responses—in accordance with Par. 120, which also allows future EIS administrators to operate in a

consistent fashion. EIS administrators track alerts and monitor alerts to ensure that identified issues are resolved in a timely manner. Finally, the EIS administrators act as a system of checks and balances should the RU Manager or supervisor determine no intervention is necessary.

In the second quarter of 2020, EIS administrators reviewed a total of 291 alerts and sent 193 (66.3%) on for RU Manager review (see Figure 8). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts closed in the second quarter of 2020 (which may also include cases opened in the fourth quarter of 2019), there were 186 alerts sent to the RU Manager and for 85 (45.7%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the second quarter of 2020, a substantial majority (89.4%) resulted in some type of intervention for the officer. The rate of alerts sent to RU Managers and to supervisors that received an intervention is the highest rate of the last five quarters.



Figure x – EIS Alerts and Alerts Sent to RU Manager (Figure provided by PPB)

|  | 2019 Q2 | 2019 Q3 | 2019 Q4 | 2020 Q1 | 2020 Q2 |
|---|---|---|---|---|---|
| Alerts Sent to RU | 232 | 338 | 138 | 129 | 186 |

| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 116 (50%) | 145 (42.9%) | 54 (39.1%) | 60 (46.5%) | 85 (45.7%) |
|---|---|---|---|---|---|
| Interventions (Percent of Alerts Sent to RU) | 86 (37.1%) | 122 (36.1%) | 46 (33.3%) | 48 (37.2%) | 76 (40.9%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 86 (74.1%) | 122 (84.1%) | 46 (85.2%) | 48 (80%) | 76 (89.4%) |

In order to identify potentially problematic trends at the supervisor and team levels, the Force Inspector and analysts within the Office of Inspector General (OIG) continue to utilize Use of Force data to identify groups that are using force at higher rates compared with others (Par. 117). On a quarterly basis, the Force Inspector meets with Precinct Commanders to discuss findings related to the force audit overall (see Pars. 74, 75, and 77) and groups which demonstrate higher rates of force. PPB continues to provide written communication from the Inspector to the Precinct Commander to inform such conversations. For the second quarter of 2020, the Force Inspector identified trends in report writing for thirteen sergeants, though most of these appeared to be related to only a single deficient AAR review. A review of documentation for six of these sergeants revealed that PDT entries were made regarding the deficiencies. We were also provided an update to our prior report's finding that a PDT entry had not been entered for sergeants who demonstrated a trend in deficiencies over multiple quarters. For this report, we were provided evidence that PDT entries were made, thereby closing the loop.

In the second quarter of 2020, we reviewed documents containing group-level data for precincts, shifts, and days off. Similar to our prior reports, the data did not indicate any group trends in the use of force when accounting for days off. Previously, PPB Command staff had informed us that group trends at times may be masked with the inclusion of Category IV force types, which are more frequent and less serious. We have suggested for the past two quarters that Category IV force types be removed in order for PPB to determine whether group trends are, in fact, being masked. We maintain that suggestion for this report as well.

In accordance with Par. 116, PPB Directive 345.00, and PPB Directive 215.00, supervisors continue to evaluate officers' EIS and Performance Discussion Tracker (PDT) information (1) annually as part of an officer's performance evaluation, and (2) upon transfer of an officer to a new command. Consistent with our prior reports, PPB's quarterly audits of reviews required by Directive 345.00 has consistently found overall high rates of compliance with the required reviews (see Figure 9). When supervisors do not

conduct the reviews as required, PPB has continued to utilize their email notification system to alert tardy supervisors to missed review timelines.

For the past two quarters, we have noted individual divisions which demonstrated reduced compliance rates for Par. 116b (Chief's Office in our 2020 Q1 report and the Training Division in our 2020 Q2 report). For this quarter, the Family Services Division held a 28.6% compliance rate (2 of 7 required reviews were completed on-time) and the Chief's Office held a 40% compliance rate (4 of 10 required reviews were completed on-time) for the reviews required under Par. 116b. This has also brought down the Bureau's rate of compliance with Par. 116b to 70% (28 of 40 required reviews were completed on-time).

While PPB still demonstrates relatively high compliance rates for annual reviews (116a), the reduced compliance rate for 116b reviews is concerning, particularly as two of the last three quarters have shown overall reduced compliance whereas the five quarters prior demonstrated consistent compliance near 99% for both 116a and 116b reviews. However, in anticipating a substantial number of transfers late in Q2 and after observing that rates of compliance with 116b were low for Q2, PPB provided a department-wide memo reminding transferring personnel of their requirement to conduct the 116b reviews. This is in-line with our previous recommendations and we will evaluate the impact of this memo on transfers which occurred in July in our next report.



Figure x – Compliance with Reviews Directive 345.00 Reviews (Figure provided by PPB)

# SECTION VIII – OFFICER ACCOUNTABILITY

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, expediency, consistency, transparency, and a set of checks and balances. As might be expected, the protests have resulted in a substantial increase in the number of overall contacts with IPR and the number of complaints filed. This has resulted in an appreciable strain on the resources of the accountability system. As conducting a full investigation can take up to 180 days (not including tolling for criminal investigations or Leave of Service time), the COCL team will not be able to <u>fully</u> assess accountability measures related to the protests until these cases are completed. However, preliminary data create a cause for concern, particularly with the ability of IPR to meet investigative stage timelines and overall resources.

## Access

Portland's accountability system continues to remain largely accessible to community members, allowing complaints to be filed in a multitude of ways. These include community members' complaints to the Independent Police Review (IPR), community members' complaints to PPB, IPR initiated complaints, and PPB initiated complaints. Community members can file a complaint by phone, online, or in-person (either to PPB or IPR). For most complaints, IPR continues to conduct intake investigations and determine whether to initiate additional investigation proceedings or not.

As evidence of this, the response to the protests by PPB (and other agencies) has nearly doubled the number of "*contacts*" that IPR has received, most of which do not relate to a specific allegation of misconduct. For instance, in the months of June and July IPR received a total of 336 contacts. Of those, contacts related to the protests constituted 165 of all contacts – nearly half (49.1%). This means that the typical number of contacts that IPR would have received was doubled due to the protests, causing IPR to spend resources reviewing, categorizing, and triaging a much larger number of contacts than normal. The contacts specifically related to the protests are generally similar in outcomes as other, non-protest related contacts. Contacts from the protests led to a case assignment 24.1% of the time whereas non-protest related contacts resulted in case assignment 21.2% of the time. Protest related contacts resulted in commendations 23.5% of the time compared to 28.8% for non-protest related contacts. IPR also received a number of General Information contacts – however, protest contacts were more likely to be broad feedback under this category (e.g., "PPB is too militarized") rather than specific feedback (e.g., "I saw this video and thought it was bad."). Overall, while the volume of contacts has nearly doubled, the contents of such contacts (commendations, general information, allegations of misconduct) have remained largely the same.

Consistent with the above, the number of administrative investigations that have been opened in recent months has also markedly increased. For instance, in June 2020 there were 77 administrative investigations opened which is far above the average number of administrative investigations opened in other months since May of 2019 (35.6 cases per month average). Of the 77 opened in June, 40 were related to the protests. Additionally, more than a third of administrative investigations opened in July (34.2%) were related to the protests.

Overall, there is a clear pattern that the volume of complaints coming into IPR over the past few months has overwhelmed the system. For instance, the IPR Monthly Report for September 2019 (https://www.portlandoregon.gov/ipr/article/748833) shows that on September 4, 2019, IPR had a total of 21 open intake investigations and a total of 6 open independent investigations. Comparing that with the current year's report (https://www.portlandoregon.gov/ipr/article/765657) for the beginning of September, IPR has nearly doubled the number of open intake investigations (40) and more than doubled the number of open independent investigations (14). Information from IPR indicates that two of IPR's investigators are handling the same volume of cases as the entire group of IPR investigators handled one year ago.

**<u>Expediency</u>**

The above information on access also provides context for the expediency of the process. Overall, we have seen a diminished ability of IPR to meet their timeline responsibilities for various stages. Over the course of the protests, the ability of IPR to meet their timelines has decreased each month. For instance, looking at all stages under the direction of IPR and IA, the data indicate that while IA stages have been completed on-time generally 90% of the time since January 2020, IPR began decreasing in June (79.3% on-time) and July (66.1%) on-time. In part, this decrease has been driven by IPR's tardiness on intake investigations. Whereas in April and May of 2020, IPR completed intake investigations on-time at a rate of 88.3% and 100% (respectively), intake investigations were completed on time 73.7% of the time in June and 44.4% of the time in July. Not only have intake investigations been tardy in their completion, a substantial proportion of intake investigations for protest complaints had yet to even be completed by the beginning of September. For protest-related cases opened in June, nearly one-fourth of complaints had not yet been assigned an investigative path (i.e., administrative closure, IA/IPR investigation, Supervisory Investigation, or Precinct Referral) by September 9th (when we received an update). For protest-related cases opened in July, half have not yet received an investigative path by September 9th.

IA has not seen similar decreases in on-time stage completion that IPR has despite experiencing a similar increase in the number of full investigations. On its face, this may indicate a concern with case management. However, as discussed further below, it appears IPR has taken reasonable steps to enhance management during this time. Rather, the impact on IPR may be more related to the fact that not only have the number of full investigations doubled, IPR has also experienced a doubling in contacts as well as intake investigations. While IA and IPR have a similar number of investigators (8 for IA and 6 for IPR) the increase in workload appears to fall more on IPR.



**Protest-Related Complaints**

|  | June 2020 (N=40) | July 2020 (N=12) |
|---|---|---|
| Administrative Closure | 25.0% (N=10) | 8.3% (N=1) |
| Investigation (IA or IPR) | 47.5% (N=19) | 33.3% (N=4) |
| Supervisory Investigation or Precinct Referral | 5% (N=2) | 8.3% (N=1) |
| No Determination | 22.5% (N=9) | 50% (N=6) |

Because the requirements for Par. 121 only make reference to the <u>overall</u> timeline for completing an administrative investigation (180 days), we cannot say that the overdue stage timelines take the City out of compliance with the Settlement Agreement. However, the large volume of cases that are missing the stage timelines and the volume of cases that have yet to complete the intake investigation phase do create a cause for concern. IPR has also taken a large number of protest force cases for full investigation – 10 of the 13 cases being investigated by IPR on September 1, 2020 were protest related. The fact that IPR is taking on additional contacts, additional intake investigations, and additional full investigations

may result in further timeline delays. Additionally, as PPB is dependent on IPR's expeditious handling in order to meet PPB's standards, both entities may be impacted.

Aside from the sheer number of complaints, there are other reasons why cases are being delayed. IPR has informed us that complainants do not always engage with IPR after filing the initial complaint. A community member may tweet a video or submit an online complaint, believing that will be the end of their involvement and not wanting to participate further. However, IPR will still attempt to contact the complainant, to identify the officer, and conduct a preliminary investigation to determine whether further investigation is warranted. When the allegation relates to use of force, a full and complete investigation must be opened unless there is clear and convincing evidence that the allegation has no basis in fact (Par. 129). However, when IPR lacks cooperation, confirming or refuting the basis in fact may be difficult. As of early September, IPR had administratively closed four force cases resulting from the protests. For each of these, the totality of the information provided was insufficient to establish a fact pattern, identify an officer, and/or determine that the force was used by a PPB officer. Therefore, while timeliness is impacted by these (IPR took time to attempt to identify the circumstances), access to the accountability system in this respect has not been hindered.

Another issue facing IPR is incidents where the identity of the officer is unknown and where the information provided by the complainant is not sufficient to make a positive ID. Of the fifteen protest-related intake investigations that were overdue on September 1, twelve of them indicated the identity of the officer was unknown. IPR notes that these are most often uses of less lethal weapons in situations where multiple officers are deploying such weapons. Parsing through the evidence in search of the officer to whom the complainant is referring can be difficult if not impossible and takes considerable time. The time and resources spent by IPR attempting to identify the officer impacts their ability to focus on other matters. Both PPB and IPR are taking steps to resolve this issue. For instance, PPB has requested RRT supervisors assist in identifying officers. Additionally, IPR reports that PPB is planning to set up a brief meeting with officers (for instance, all RRT grenadiers) in order for previously unidentified officers who are the subject of complaints to self-identify. Once identified, they will then stop the discussion with that officer and give them notice that they will be interviewed as the involved officer at a later date.

IPR has taken a number of steps in order to maintain compliance with the Settlement Agreement. First, while the sheer volume of additional work resulting from the protests has certainly impacted IPR's ability to meet timelines, they have taken remedial steps to limit the damage. For instance, IPR has a "*Person of the Day*" (POD) who is responsible for taking in all contacts, categorizing contacts (complaints, commendations, feedback), and coordinating the appropriate action to be taken. In the past, this role has alternated between IPR employees. However, given the volume of contacts, IPR found it more efficient to keep the POD as the same person, thereby maintaining a consistent knowledge base. For instance, 20 separate contacts might pertain to the same incident. Having the POD as the same person reduced redundancy when determining whether action needed to be taken on a specific contact.

Another step that IPR has taken is to assign a single point of contact for requesting and receiving documents from PPB. Discussions with IPR indicate that this has helped streamline requests on PPB's end. Rather than PPB receiving requests from multiple IPR investigators, the single point of contact at IPR and PPB can more efficiently track requests for information.

Although administrative investigations related to protest events are typically handled by IPR, they have referred a number of cases to IA in order to better manage their caseload and their investigative priorities (see IPR Standard Operating Procedures, Section 4.II). Since June 1st, IPR had referred 11 cases to IA all of which related to uses of force (which IA typically has responsibility for investigating). This is approximately a quarter of all complaints that received a full investigation.

Other remedial actions by IPR relate to better management of case assignments in order to reduce overall timelines. These include grouping intakes by date/location for more streamlined investigation, near daily Managing Team meetings, and rotation adjustments. For instance, in the past IPR assigned cases on a strict rotation. Given the increase in cases, however, a more methodical approach was taken by assigning intakes to investigators with fewer or no full investigations. Additionally, investigators who have more overdue assignments are not being given intakes. While IPR reports these steps have been helpful, they feel they have "reached a saturation point" where present efforts are unable to yield additional benefits.

Missing timelines remains a concern, but as described above, IPR has taken a number of steps to provide a level of investigation consistent with their efforts prior to the protests. On a normal caseload, such diligence would likely not push stage timelines back. However, due to the protests, IPR notes that their employees are "working harder, on more cases, with people who don't want to talk with us." Given the overall circumstances, we discuss the above efforts as mitigating factors in evaluating compliance.

**Transparency**

Overall, the transparency of Portland's accountability system has remained largely consistent since our last report. Community members remain able to track the progress of their complaint (see Par. 138) and IPR continues to provide updates in writing at each stage of the investigation (see Par. 140), including a community member's ability to appeal findings. Findings letters provided to community members clearly state the finding as well as the rationale for the finding. Not only are updates and information for appeals provided for community members but they are also provided for officers.

Citizen Review Committee (CRC) appeal hearings and other CRC functions remain open to the public with accompanying minutes posted to the IPR website. Meetings continue to be held over Zoom as a result of the pandemic and we continue to find that such a pivot towards virtual meeting space appears to have allowed for broader community observation and input, thereby enhancing transparency. Additionally, redacted summaries of Police Review Board (PRB) hearings continue to be provided on the PPB website. Finally, IPR analytical reports and online data related to misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths remain available on the IPR website (https://www.portlandoregon.gov/ipr/76848), allowing interested parties to learn the facts and conduct their own analysis. Overall, we maintain that the combination of these efforts points to an accountability system that is largely transparent.

**System of Checks and Balances**

The accountability system in Portland continues to contain a system of built-in checks and balances to ensure a fair resolution for all involved. For instance, prior to an RU Manager's findings on an allegation,

IPR continues to have the ability to review the investigation report and can request additional investigation or a rewrite of the investigative report. Additionally, after an RU Manager makes findings, IPR reviews those findings and has the ability to controvert the findings, thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination. During the second quarter of 2020, IPR did not need to request additional investigation, a rewrite of the investigative report, or controvert an RU Manager's findings.

Community members and officers continue to be able to appeal administrative investigation findings to the Citizen Review Committee (CRC), an eleven member review board that "*hear[s] appeals from complainants and officers and publicly report[s] its findings*" (among other functions – see https://www.portlandoregon.gov/ipr/53654). The CRC did not have any appeal hearings between January and August though the ability for community members and officers to appeal findings remains, thereby satisfying the Settlement Agreement. Consistent with the requirements of Par. 136, CRC members continue to hold the ability to request additional investigation and interviews and postpone the hearing until a time when such information could be included in the review. Coupled with our observations of CRC meetings in the past, as well as our ongoing review of their public reports, we maintain that the CRC conducts their hearings in a fair and impartial manner (see Par. 134).

As part of their operation, the CRC is also able to challenge the findings of an administrative investigation and recommend a different finding (see Par. 135). Should CRC challenge a finding and no resolution can be reached with PPB, the City Council then acts as another system of checks and balances and makes a final determination. In the second quarter of 2020, no cases required a challenge to findings and no cases were sent to City Council (though this is due to no appeal hearing being held between January and August). However, in August and again in September, the CRC voted to challenge findings on two different cases. In both instances, PPB is in the process of determining whether to accept the CRC's proposed finding or send the case to City Council.

While we believe the CRC has continued to operate in compliance with City Code (and thereby with the Settlement Agreement), we have noted some instances whereby member decisions do not always line up with the CRC's standard of review. To be sure, in some instances CRC members specifically state the threshold in their arguments (e.g., "I vote for this finding because I do not believe a reasonable person could come to another finding"). However, others have made comments such as "I'm on the fence" appearing to indicate that both sides of an argument have merit. Still others have discussed the persuasiveness of various pieces of evidence in the case file. While CRC members should strive to be sure about their decision, they should also be reminded that "reasonable" people may come to different conclusions and that they need not agree with the finding in order to uphold it. The CRC – as the committee is presently established – is an appellate body (not an investigative body) and is structured instead to confirm or disconfirm the reasonableness of the RU Managers findings based on the evidence the RU Manager has at the time. We have noted in the past that changing CRC's standard of review to "*preponderance of the evidence*" would not impact compliance with the Settlement Agreement. However, until such a change, the CRC should be assured that they are abiding by the current standard.

The CRC has also experienced resignations in early September. In our last report, we noted that new appointments had infused "renewed energy" in the CRC and that there was an improved relationship between the CRC and IPR/Auditor's Office. It's unclear how these recent resignations (as well as overall

46

recent events) may impact such progress, though we encourage the CRC and IPR/Auditor's Office to maintain the steps they had been taking prior to the resignations.

A final system of checks and balances can be found in the Police Review Board. When there is a sustained finding that will lead to discipline involving suspension or greater, when there is an officer involved shooting or in-custody death, or when there is a controverted finding, the Police Review Board takes the RU Manager's proposed findings and either adopt the proposed findings or provide their own proposed findings and corrective action to the Chief. PRB procedures are consistent with Par. 131 of the Settlement Agreement. In September, we virtually observed a PRB hearing. Apart from a few minor suggestions provided to PPB related to training recommendations and terminology, we found the hearing to be in-line with the requirements of the Settlement Agreement.

### Lethal Force/In-Custody Death

Finally, PPB's accountability system has particular requirements after the occurrence of lethal force and in-custody death events. Because of the sensitive nature of such events, PPB safeguards the integrity of such investigations through a number of actions. For instance, first responding supervisors separate all witness officers and involved officers (see Par. 125), conduct initial interviews individually (rather than as a group), and have a phone-tree to ensure all necessary notifications are made. Detectives conduct on-scene walk-throughs and interviews with select witness officers (see Par. 126) as well as request walk-throughs and interviews with involved officers (though involved officers have historically invoked their right to decline) (see Par. 127).

After conducting their on-scene investigation, investigators interview all witness officers and then provide them with Communication Restriction Orders (CROs) to prohibit direct or indirect communication with anyone involved with the event until a grand jury has been convened, at which point the CROs are rescinded (see Par. 125). Involved officers are then required to participate in an interview with IA investigators within 48 hours of the event (unless a voluntary statement was already given on-scene or the member is incapacitated) in order to inform the IA investigation. Pursuant to *Garrity v. New Jersey*, the administrative and criminal investigations are walled off from one another (see Par. 124), thereby maintaining the 5th Amendment rights officers have against self-incrimination.

There was one Officer Involved Shooting (OIS) event that occurred in the second quarter of 2020. For that event, we reviewed documentation demonstrating that witness and involved officers were issued CROs, that a witness officer provided an on-scene walkthrough, and that detectives requested the involved officer provide an on-scene walk-through and interview (this request was denied by the involved officer). The involved officer was interviewed by detectives in accordance with PPB directives and *Garrity v. New Jersey*.

### Accountability System Ballot Measure

A ballot measure to amend the City's charter to establish a new police oversight board will be voted on by Portland residents in November. While the COCL team looks forward to additional details regarding the board, we take no position on the measure so long as the final construction of the board is in line with the Settlement Agreement (see Par. 4). We anticipate finalizing details will likely require

Exhibit B
Page 47 of 61

reconciliation with current collective bargaining agreements and state law. However, this will likely take time and we look forward to receiving updates on progress so that we might be able to provide technical assistance where necessary to maintain compliance.

# SECTION IX – COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

**PCCEP's Role in the Settlement Agreement and the City's Support**

*System Overview*

Section IX of the Settlement Agreement requires that the City establish a Portland Committee on Community Engaged-Policing (PCCEP, Par. 141), which is authorized to: (a) solicit information from the community and the PPB about the PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns (Par. 142), with other specific duties set forth in a separate Plan for Portland Committee on Community-Engaged Policing.

PCCEP's membership is designed to come from a reasonably broad spectrum of the community, and members shall not have an actual or perceived conflict of interest with the City of Portland (Par. 143). PCCEP shall meet as needed to accomplish their objectives and hold regular Town Hall meetings that are open to the public. The City shall give advice on Oregon's Public Meetings Laws and similar requirements as necessary (Par. 151) and shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law (Par. 152).

Per Pars. 141 and 142, PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations.

In the third quarter of 2020, PCCEP continued monthly general meetings and subcommittee meetings via Zoom. In early July, PCCEP hosted a Town Hall focused on police oversight, with guest speakers that included the City Auditor, and CRC, IPR, and TAC representatives; the guests provided an overview of their group's role in police oversight, and strengths and weaknesses of the current Portland police oversight system. Commissioner Jo Ann Hardesty also presented on a proposed ballot measure that would create a new, independent police oversight board if approved by voters in November. At the end of September, PCCEP hosted a community listening event focused on the Police Bureau Budget; Mayor Wheeler attended the session.

PCCEP voted in a replacement co-chair (replacing the prior co-chair, who resigned from PCCEP when his family moved out of Portland), and a new alternate co-chair. In addition, in September PCCEP voted to recommend new PCCEP candidates to the Mayor for appointment to PCCEP, to fill three vacancies. Two of the recommended candidates are women of color, which has been a recent gap in representation on PCCEP.

PCCEP continued to make recommendations throughout the third quarter of 2020, approving several, including:

- Recommended PPB "conduct a thorough review of each advisory group that seeks to inform the PPB and build community connections" and "develop a uniform standard of operations for advisory councils." This recommendation originated in the Racial Equity subcommittee.
- A statement "Condemning the Excessive Use of Force Against Peaceful Protestors" and "denouncing the unwarranted excessive use of force by the Portland police."
- A recommendation that the Mayor "update current officer identification standards to ensure instances of misconduct are properly identified."

The group also spent time at several meetings discussing a proposal to codify PCCEP, in line with the Mayor's Police Reform Action Plan that calls for the creation of "local legislation enshrining the Portland Committee on Community-Engaged Policing in Portland City Code, making it a permanent community oversight body." PCCEP has developed a framework for a codification structure, including elements such as selecting its own members; meeting with new officers; having a role in hiring top command staff; having a seat at PPA negotiation table; embedding in the universal review process for police directives; improving the PPB/City response to recommendations; and increasing the stipend for PCCEP participation. The proposal is in draft form, and will be voted on by PCCEP following additional community input in Q4.

The Steering Committee and full PCCEP also discussed metrics proposed by the Albina Ministerial Alliance Coalition (AMAC) and Mental Health Association (MHA) on issues that include recruitment and retention of PCCEP members, community engagement, and monitoring PCCEP after the COCL's work is complete. The full PCCEP declined to vote on the metrics document, opting instead to incorporate some of the proposed metrics into their codification work.

PCCEP members met with the Mayor in mid-September to discuss various issues, including responses to their earlier recommendations—the group has approved five since the protests began, many following community listening sessions, but had not received responses to any of them. The Mayor pledged a response to the recommendations, and asked his policy advisor to follow up. PCCEP members also discussed their work on a Truth and Reconciliation Committee—led by the Settlement Agreement and Policy Subcommittee—and the codification proposal. Going forward, the Mayor and PCCEP agreed to quarterly meetings to maintain a dialogue and ensure there are updates regarding PCCEP's recommendations.

_City's Support_

The City continues to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions.

It is worth noting that posting of PCCEP meeting videos and minutes have been delayed for several of this quarters' meetings; the PCCEP Plan calls for minutes to be posted within ten business days of a meeting. Video of the August steering committee was not posted for more than a month, and the associated meeting minutes were not posted as of October 5. July's approved recommendations were posted in a timely manner, but as of October 5 the most recent full PCCEP meeting minutes are from June's meeting; listening sessions videos from June and July were posted in mid-September.

Also, PCCEP's project manager is working to consolidate PCCEP recommendations into a tracking document that includes a status of each recommendation; at the September 22 PCCEP meeting, members asked for an update on this project, noting it has been in progress for several months. The project manager did not have a firm date for completion of this resource.

In general, we find that PCCEP continues to represent a "_reasonably broad spectrum of the community_," (Par. 143) with at least eight of 13 current members (including newly recommended members) identifying as a person of color and/or an immigrant; representation of people with experience as peer support specialists or other personal, lived and/or professional experience with mental health issues is less clear, based on publicly shared information. However, many of PCCEP's current members volunteer with other community groups or nonprofit boards related to mental health, the justice system, or underrepresented communities, bringing in additional perspectives to PCCEP's work. Our one concern (and a concern expressed by others) is that two groups that provide youth services appear to be over-represented, with nearly half of the PCCEP membership (six members) affiliated with the two organizations. There is the risk that voting blocks will be created that do not represent the views of the entire Portland community. Therefore, we encourage the Mayor and PCCEP to take this matter seriously when considering future PCCEP applicants.

In this quarter, COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland. The youth groups representatives on the PCCEP were advised about potential conflicts when recommending funding, but such conflicts have been avoided to date. Thus, PPCEP's overall functioning remains consistent with the expectations and requirements of Paragraph 143..

Substantial Compliance with Par. 151 has also continued, with PCCEP and COCL jointly hosting quarterly Town Halls to review and discuss draft COCL reports; the town hall this quarter was scheduled as part of the PCCEP Behavioral Health Subcommittee.

51

A representative of the City Attorney's office attends PCCEP meetings and continues to advise the PCCEP as necessary to ensure compliance with public meetings law, and the City continues to train new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all advisory boards, not just PCCEP. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

## Portland Police Bureau's Role in Public Engagement and Outreach

### *System Overview*

As described in Paragraph 145, PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. Specifically, PPB was required to conduct a citywide community survey that would assist the PCCEP and lead to the development of a Community Engagement Plan by PPB (Par. 146). PPB was also required to collect demographic data about the community in each precinct to assist the Precinct Commanders and PCCEP with their community engagement plans (Par. 147). To help measure possible discriminatory policing, PPB officers were required to continue collecting data on race, age, sex, and perceived mental health status of persons they stop and share this information with the PCCEP and the public (Par. 148). PPB is also required to work with DOJ and COCL to develop a general set of metrics to evaluate community engagement and outreach by the PPB (Par. 149). Finally, PPB must issue an Annual Report (with certain content), with a draft reviewed by PCCEP, and then present a revised report to the public at Precinct meetings and before the City Council (Par. 150). Progress in each of these areas is summarized below.

### *PPB's Community Engagement Actions*

Consistent with the requirements of Par. 145, COCL's prior reports have included detailed descriptions of PPB's multi-faceted efforts to engage the community through councils, advisory groups, and community events (For advisory councils, see hhttps://www.portlandoregon.gov/police/30476). While these mechanisms remain in place, the arrival of COVID-19 changed the platform to virtual meetings and the subsequent protests altered the agendas for many of these meetings. COCL's summary of PPB's community engagement activities for the third quarter will focus on the implementation of the Community Engagement Plan.

## The Community Engagement Plan

Paragraph 146 requires that PPB develop a Community Engagement Plan (CEP) with input from PCCEP (Par. 142). The Plan was adopted by the Portland City Council in October of 2019, and PPB is expected to

report on progress on October 1, 2020. Through at least one PCCEP subcommittee, PPB has reported on its community engagement efforts. Through internal working groups, PPB has sought to implement the four main components of the Plan: Public involvement, Communications, Access, and Training. Here we provide an update regarding progress with each of these areas.

### Public Involvement

The CEP specifies three goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

PPB has remained very active with various communities by holding virtual meetings. Existing agendas of PPB's councils were placed on hold as the communities wanted to discuss police reform in the current context of racial injustice. Because of the protests, the second goal ("*shared understanding*") became more central, as local organizations wanted to discuss and fully understand the significance of the social justice movement. Given different histories, as well as cultural or language differences, groups brought their own experience with racial injustice, but sought to better understand and be mindful of the historical and current patterns of discrimination against Blacks in the United States. Many groups wanted to be heard and learn more about PPB's use of force policy and officer accountability systems.

PPB has continued to engage with the community using its advisory bodies as listening sessions. Since July, PPB has held monthly, and sometimes bi-weekly or weekly meetings with groups wanting to express their views about the social justice movement, the protests, police misconduct, discipline, and officer training around use of force, mental health, and procedural justice. In addition to these two-way discussions, some groups have been very active by making recommendations for improvements to policy, training, and police-community relations. In particular, PCCEP and TAC have produced a wide range of recommendations to the PPB and Mayor (See reviews elsewhere in this report).

PPB has created a multi-racial, multi-cultural advisory group called the Equity Council as specified in the CEP. PPB was also expected to "*explore the creation of a Truth and Reconciliation Program.*" The Mayor has asked PCCEP to take a leadership role in this initiative, and PCCEP's Settlement Agreement Subcommittee has accepted this responsibility and is in the process of developing recommendations for establishing this committee.

The CEP calls on PPB to create a Youth Advisory Council. School Resource Officers (SROs) in the Youth Services Division were planning a pilot program at David Douglas High School, the most diverse school in Portland (with over 80 languages). But with the COVID-19 virus, SROs found it very difficult to locate students. More importantly, the SRO program was abolished by the City. Consequently, one PPB sergeant is seeking input from those who created the successful Youth Educating Police (YEP) training program for input on ways to give youth a meaningful voice in policing.

The CEP calls on PPB to identify partners who could help create a Latinx Advisory Council. After considerable recruitment, PPB created this Council. The 15-member Council is very diverse, including Hispanic/Latinx faith-based organizations, businesses, and non-profit organizations. It also represents immigrants from many Hispanic/Latinx countries, including Mexico, Venezuela, Guatemala, Brazil, and El Salvador. Active since May, the group is currently building an internal infrastructure and roadmap for inclusion in the work of PPB and the City. After addressing past problems in police-Latinx relations, they are now moving ahead to address various Latinx issues, including social justice and police responses to undocumented residents.

The CEP calls on PPB to establish an Inclusive Advisory Council with a representative from each standing and new advisory council who meet directly with the Chief on a semi-annual basis. As we have noted previously, this council has been created and has met with the Chief. The group meets monthly and is attended by 8 advisory councils. The Inclusive Advisory Council sets its own agenda and seeks to connect different segments of the community and share information. The Council has given serious attention to issues of race and inequality in Portland but has yet to receive the full engagement of the Black community or the Black Lives Matter (BLM) movement at this point.

We should note that PCCEP is reaching out to all of PPB's advisory councils to see if they can work together and avoid duplication. TAC has also reached out to PCCEP and CRC to share common goals and support one another.

### _Communication_

The CEP specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. For several years, PPB has used multiple social media outlets to communicate with the public. PPB is working to identify additional messaging platforms to reach underrepresented populations but has found this task extremely challenging and for good reason. For example, there is no complete listing of the houseless population or persons with mental illness. The Community Engagement Team is asking relevant stakeholders for input, but ultimately, PPB may resort to distributing paper copies of flyers in multiple languages. In the meantime, the Chief of Police has turned to YouTube to communicate important messages.

PPB is creating inclusive email lists of relevant agencies to whom they can distribute information digitally. This method may also serve as a vehicle for encouraging the public to sign up for PPB media alerts or use the Trackit system for complaints and compliments. (Trackit is an online system of City forms that allows community members to track the status of their request for services or complaints). PPB has received many complaints since the protest started, so the Trackit system is working, and those complaints are being reviewed by the Communications unit and forwarded to the appropriate units.

PPB intends to educate the public on how to navigate the PPB website, but the City is still in the process of reformatting its website platform, so PPB is waiting for this work to be completed. Delays in completing this work have been attributed to COVID-19.

*Access*

The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

Last quarter we reported that PPB is working on a plan to improve language access for those with Limited English proficiency (LEP). In addition to preparing a list of multilingual officers who can serve as a resource to the LEP community, PPB has provided training to 32 bilingual officers, instructing them on how to provide efficient translations when responding to critical incidents or helping detectives with follow-up interviews. The first tier of training was provided by federally-trained interpreters from the Baltimore Police Department, while the second tier is being completed using Zoom. PPB hopes to deliver online training to all officers as part of the 2021 In-service training, helping them to understand the barriers to language proficiency and how to better provide services on the street and at the front desk.

In terms of advising the communities of this resource, PPB is planning to partner with its advisory councils to make sure that the LEP community understands that they have a right to language access. After creating an initial video, PPB plans to engage the community more deeply in policy review and training. However, PPB wants to ensure that all officers have some LEP training before informing the community of this service. The officer training has been delayed by COVID-19 and other factors. Currently, PPB has convened an internal working group (Training Division, Community Engagement, and the Inspector General) to finalize the LEP directive that will serve as the basis for 2021 In-service training.

*Training*

The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members. Certainly, the development of LEP training for all officers is an important goal, but implementation has taken longer than originally expected. PPB's Community Engagement Office and its Equity and Inclusion Office have plans to work with their community partners to develop training videos that address implicit bias, procedural justice, and cultural competency (OEI's work on equity training was mentioned earlier). They will need to work with the LMS manager to develop and post these videos, but as we have documented, LMS is understaffed at the present time.

In sum, PPB has made significant progress on the Community Engagement Plan through internal working groups and partnerships with community organizations and advisory boards. Unfortunately, progress in some areas, such as training, has been slow because of resource constraints within the Training Division, especially around virtual learning and LMS. PPB is expected to report on the CEP in October and present their progress to the PCCEP for review.

**Data Collection, Analysis, and Reporting**

PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par 147-150). PPB has reported precinct-level demographic data on local residents to precinct commanders (Par. 147). Also, PPB provides extensive data for public review on its "Open Data" portal. These interactive dashboards provide precinct and neighborhood level maps and monthly statistics on calls for service, crime, traffic accidents, traffic fatalities and injuries, police stops, officer-involved shootings, and more (https://www.portlandoregon.gov/police/71673). Also, these data have been downloaded by TAC to provide additional analyses of force data.

PPB continues to collect demographic data from individuals who are stopped by the PPB (Par. 148), using a "Stops mask" or template that requires officers to report specific information about each stop. For many months, PPB has planned to add new questions to the Stops mask software that will require officers to provide more details about the reason for the stop. This change is to ensure that the stop was not motivated by any type of police bias. The Training material has been developed to instruct officers in how to complete the new template. However, in the midst of this change, the Mayor released a 19-point plan for reform that has implications for the stops template. If an officer conducts a consent search during a stop, the Mayor's plan requires that the officer ask the subject to sign a release form indicating that they consented to the search. This paper-based plan introduces new technical and operational problems, so PPB is currently working on a response to the Mayor. In the meantime, the implementation and training has been delayed.

PPB's Strategic Services Division continues to generate quarterly Stops Data Collection reports, and on August 1st, released the report covering the second quarter of 2020. The report can be found on PPB's website (https://www.portlandoregon.gov/police/article/765015). These reports continue to provide a breakdown by race. When COCL compared Q1 and Q2 of 2020, we found that Black drivers continue to be over-represented in PPB traffic stops and the numbers have increasing from 16.8% of the total number in Q1 to 18.4% in Q2 (Blacks make up 5.8% of Portland population). This increase in Black traffic stops occurred in both the Traffic Division (11.6% to 15.3%) and in the non-Traffic units, such as Patrol and Investigations (21.5% to 24.5%). The Gun Violence Reduction Team, accused of discriminatory stops in the past, was not dissolved until June, so any impact on racial disparities in PPB's traffic stops may not appear until later in the year.

PPB's 2019 annual report on stops has been drafted and is being reviewed by the Chief's office prior to release. One reason the report took longer this year is the recommendation by COCL that it include data on race, age and sex of the community member stopped to examine disparities in treatment by the PPB. We expect the plan will be released in October.

As we have noted previously, the City has completed the requirement to develop a set of metrics to evaluate community engagement (Par. 149). Going further, in May the City met with various stakeholders in the Settlement Agreement (AMAC, MHA, PPA, DOJ, and PCCEP) to discuss metrics for PCCEP's success and how the City can support PCCEP after the Settlement Agreement has concluded.

The six metrics focused on: diversity, public access, community involvement, member retention, and monitoring PPB after the Settlement Agreement. Finally, PPB's Community Engagement Plan provides a framework for measuring progress in this domain.

PPB has yet to issue a "*publicly available PPB Annual Report*" with specific requirements (Par. 150). Last year, PPB was able to correct the problem of timeliness, but this year, the problem has re-emerged. The delay in publishing PPB's 2019 Annual Report is attributed to the competing work associated with the protests and the added burden of telecommuting. When completed, the 2019 report will still need to be reviewed by PCCEP, revised, and then presented at one City Council meeting and presented to community members in each Precinct. PPB hopes to have the annual report available in October.

**Summary of PPB's Community Engagement**

Without question, PPB's community engagement strategies have been altered because of the COVID-19 pandemic and the nightly protests. Under these extreme circumstances, PPB's Community Engagement Division has been thinking creatively about ways to engage the community and build trust. Moving to a virtual platform, PPB has continued to build partnerships with organizations representing very diverse segments of the Portland community and share information about the PPB and its performance statistics. It has maintained and supported its relationship with a half dozen advisory councils, including PCCEP and TAC. PPB has been fully transparent in the provision of quarterly and annual reports on traffic stops and use of force with breakdowns by race and gender. It has made force data available to the TAC to perform its own analyses and reports analyzing force trends. It has made significant progress in the implementation of the Community Engagement Plan. For these reasons and others described in this section, COCL finds that PPB has remained in substantial compliance during the third quarter with the terms of the Settlement Agreement in Section IX on Community Engagement.

However, we would be naïve to think that everything is moving ahead smoothly. PPB has been unable to complete some tasks in a timely manner, and during this time of continuous protest and unrest about police injustice, the relationship between the police and the community in Portland is being tested. Clearly, there have been challenges on both sides of the fence when it comes to community engagement and trust. Inside the PPB, obtaining "buy in" for community policing is difficult for officers who feel under continuous attack on the streets. To elevate community policing to the level it deserves would require strong and consistent leadership, but the turnover in administrative positions at PPB has been extremely high. For example, PPB has experienced six police chiefs over the past six years, each with different agendas. On the outside, the protests have contributed to growing distrust of the police and frustration with City government, and have strengthened efforts to defund the police. All of these factors have made it more difficult to implement a robust Community Engagement Plan and restore public trust in the PPB. Despite these constraints, we are impressed with the many partnerships and advisory councils that have been created in Portland and the community's willingness to volunteer their time and be part of this change movement, even in the face of uncertainty about where it will all end up or how they will get there.

# **REFERENCES**

Campos, Laura; Alonso-Quecuty, María (January 2006). "Remembering a criminal conversation: Beyond eyewitness testimony". *Memory*. **14** (1): 27–36. doi:10.1080/09658210444000476. PMID 16423739. S2CID 386308.

Chan, J. C. K.; Thomas, A. K.; Bulevich, J. B. (2009). "Recalling a witness increases eyewitness suggestibility". *Psychological Science*. **20** (1): 66–72. doi:10.1111/j.1467-9280.2008.02245.x. PMID 19037905. S2CID 4833910.

Georgetown Law (2020). "Active Bystandership for Law Enforcement (ABLE) Project." https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/

Haber, R. N., & Haber, L. (2000). "Experiencing, remembering and reporting events." *Psychology, Public Policy, and Law, 6*(4), 1057–1097. https://doi.org/10.1037/1076-8971.6.4.1057

Lupien SJ, McEwen BS. 1997. "The acute effects of corticosteroids on cognition: integration of animal and human model studies." *Brain Research Reviews.* **24**:1–27

McGaugh, J (2004). "The amygdala modulates the consolidation of memories of emotionally arousing experiences". *Annual Review of Neuroscience*. **27**: 1–28. doi:10.1146/annurev.neuro.27.070203.144157. PMID 15217324. S2CID 17502659.

Read, J. D., & Connolly, D. A. (2007). *The effects of delay on long-term memory for witnessed events.* In M. P. Toglia, J. D. Read, D. F. Ross, & R. C. L. Lindsay (Eds.), *The handbook of eyewitness psychology, Vol. 1. Memory for events* (p. 117–155). Lawrence Erlbaum Associates Publishers.

Sullivan, C., & Baranauckas, C. (2020). "Here's how much money goes to police departments in largest cities across the U.S." *24/7 Wall Street USA Today* June 26. https://www.usatoday.com/story/money/2020/06/26/how-much-money-goes-to-police-departments-in-americas-largest-cities/112004904/

Zaragoza, M. S., Belli, R., & Payment, K. E., (2007). *Misinformation effects and the suggestibility of eyewitness memory*. In M. Garry & H. Hayne (Eds.), *Do Justice and Let the Sky Fall: Elizabeth F. Loftus and Her Contributions to Science, Law, and Academic Freedom* (pp. 35–63). Mahwah, NJ: Lawrence Erlbaum Associates.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# <u>LIST OF PERSONNEL</u>

Chief of Police: Chuck Lovell

Deputy Chief of Police: Chris Davis

Assistant Chief of Operations: Michael Leasure

Assistant Chief of Services: Mike Frome

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Bryan Parman

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Jeff Niiya

Behavioral Health Unit (BHU) Lt.: Casey Hettman

EIS Supervisor: Nathan Sheppard

EIS Administrator: Dan Spiegel

Training Captain: Craig Dobson

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne