**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
**RENATA A. GOWIE, OSB #175273**
Civil Division Chief
**JARED D. HAGER, WSB #38961**
Assistant United States Attorney
U.S. Attorney's Office for the District of Oregon
1000 SW Third Ave., Suite 600
Portland, Oregon 97204-2902
Phone: 503.727.1120
Email: jared.hager@usdoj.gov

**PAMELA S. KARLAN**
Principal Deputy Assistant Attorney General
Civil Rights Division
**STEVEN H. ROSENBAUM**
Chief
**LAURA L. COWALL**
Deputy Chief
**R. JONAS GEISSLER**
Trial Attorney
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
Phone: 202.514.6255
Fax:    202.514.4883
    Attorneys for Plaintiff United States

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:12-cv-02265-SI |
| Plaintiff, | |
| v. | PLAINTIFF'S NOTICE OF FIFTH PERIODIC COMPLIANCE ASSESSMENT REPORT |
| **THE CITY OF PORTLAND,** | |
| Defendant. | |

Page 1     Plaintiff's Notice of Fifth Periodic Compliance Assessment Report

Plaintiff United States of America submits this Fifth Periodic Compliance Assessment Report. This Report, which covers the period of January 10, 2020 to January 10, 2021, addresses the Amended Settlement Agreement's seven substantive sections—Use of Force (Section III); Training (Section IV); Community-Based Mental Health Services (Section V); Crisis Intervention (Section VI); Employee Information System (EIS) (Section VII); Accountability (Section VIII); and Community Engagement and Creation of Portland Committee on Community Engaged Policing (PCCEP) (Section IX).

The Department of Justice (DOJ) found in prior compliance assessment reports that the City had achieved substantial compliance with all components of these seven sections as of January 10, 2020.  *See* ECF 212, DOJ's Notice of Interim Compliance Assessment Report; ECF 195, DOJ's Notice of 4th Periodic Compliance Assessment Report.  Pursuant to the Agreement, the City must maintain substantial compliance for one year before the Agreement may be terminated.  *See* ECF 171, Am. Settlement Agreement, Par. 175.

In this Report, DOJ finds that the City has not maintained substantial compliance with each provision in four sections—Use of Force, Training, Accountability, and Community Engagement – and therefore the standard for termination of the Agreement has not been met.  Our findings largely are consistent with the Compliance Officer's findings during this period.  *See* COCL Q4 2020 Report (draft), *available at* https://www.portlandcocl.com/reports/01/2021/draft-quarterly-report-quarter-4-updates-analysis.

In the Use of Force section, DOJ finds that some of the force used by PPB in crowd-control situations deviated from force policy, and that supervisors frequently validated uses of force without conducting first-line investigations to determine whether the force was indeed reasonable.  With respect to training, DOJ finds that over half of PPB's members did not receive complete in-service training.  In the Accountability section, DOJ finds that the Office of Independent Police Review (IPR) did not complete many of its administrative investigations within 180 day, affecting accountability.  In

the Community Engagement section, DOJ finds that the City has not maintained substantial compliance with Paragraph 150 because PPB did not present its 2019 Annual Report, as required.

Of these four sections, we anticipate the City will expeditiously meet the Community Engagement and Training requirements based on representations the City has already made. For the Use of Force requirements, the City should (a) complete PPB's expected master after action review of crowd-control events, including critical assessment of supervisory force investigations and command reviews; (b) identify and investigate force events that still require administrative investigation; (c) develop and implement a method to investigate uses of force in chaotic crowd-control events; (d) implement additional crowd-control training; and (e) fully implement approved force use and reporting policies going forward. With respect to Accountability requirements, the City should take concrete steps for reducing timelines for administrative investigations while ensuring efficacy and mitigating potential attrition of key personnel. While working to reach substantial compliance with these sections, the City must maintain substantial compliance with the others. DOJ will continue to report periodically on the City's progress.

The change in compliance status occurs against the backdrop of substantial challenges to the City and PPB: the COVID-19 pandemic; near-nightly protests starting on May 29 and lasting several months, often involving a criminal element in the crowd; a rise in violent crime citywide; a reduction in City revenue and PPB funding; and an anticipated overhaul to the City's oversight of PPB and its accountability systems leading to a pause in recruiting Citizen Review Committee members and in filling investigator positions at the Office of Independent Police Review. These challenges may have made it more difficult for the City to maintain substantial compliance with all of the Agreement's provisions. They do not, however, eliminate the City's obligations under the Agreement. DOJ will monitor the City's remediation in 2021.

Despite many challenges in 2020, the City was successful in some areas of the Agreement. Our assessment determined that the City maintained substantial compliance with dozens of paragraphs. PPB's Behavioral Health Unit (BHU) and the Bureau of Emergency Communications (BOEC) continue to enhance the City's response to those in crisis. Significantly, the overall rate of force remains consistent, with force used in about 1 out of every 100 calls involving a mental health component. The magnitude of force also remains consistent, with the highest level of force used in such encounters most often being Category 4, defined as not reasonably likely to result in physical injury, such as handcuffing against resistance. PPB officers within the BHU and elsewhere have saved lives in other crisis encounters.

In addition, aside from crowd-control events involving uses of force, PPB remains compliant with the Agreement's standards on the uses of force, including the use of electronic control weapons. No deaths resulted from PPB uses of force in 2020. Also, though the pandemic affected delivery of PPB's classroom and skills training to many of its members, PPB was able to change tack. PPB remotely delivered the approved classroom portions of training via its Learning Management System. Finally, the City continued to materially support the Portland Committee on Community Engaged Policing (PCCEP). The PCCEP seized on the opportunities presented by 2020's challenges to advance its mission, using Zoom to quickly and safely bring people together to share experiences and ideas.

DOJ anticipates filing an interim compliance assessment report once the City provides data demonstrating that it has once again achieved substantial compliance.

Our executive summary of this Report, by section, is as follows:

**Use of Force (Section III):**

The Agreement's requirements for force usage, reporting, investigation, and review apply to all uses of force, including those performed when PPB responded to the protests between May 29 and

November 15, 2020. *See* Dir. 1010.00. During these crowd-control events, PPB reports that its officers used force more than 6,000 times. Some of this force deviated from force policy, and supervisors frequently validated individual uses of force with little or no discussion of reasonableness of the force used. (Pars. 66-67, 69-70, 73). Command-level de-escalation strategies did not necessarily equate to less forceful interactions at the chaotic street level. The Agreement is designed to ensure constitutional and effective policing in Portland. To meet its burden of demonstrating implementation of force policies enacted under the Agreement, the City and its leaders must adhere to policy—both in performance and accountability.

Aside from last year's crowd-control events, the City maintained substantial compliance with the remaining Agreement provisions concerning force.

**Training (Section IV):**

Although PPB continues to place a high value on training, the pandemic, crowd control events, and the City-imposed budget cuts hindered the City's ability to maintain substantial compliance with the Agreement's training requirements. (Par. 84). For example, PPB did not provide complete in-service training to over half of its members in 2020. (Par. 78). PPB was able to maintain substantial compliance with some of the Agreement's training requirements, however. PPB completed a comprehensive training plan based on a needs assessment. (Par. 79). PPB collected data on the efficacy of training. (Pars. 80, 85(g)). PPB continued to track and report employees' training (Pars. 81-82) and screen for qualified trainers. (Par. 83). Lastly, PPB continued to report to the Training Advisory Council at its open public meetings. (Pars. 86-87).

**Community Based Mental Health Services (Section V):**

The City remains in substantial compliance with the community-based mental health provisions of the Agreement. The City continues to engage with local partners to improve its role in the community response to those with mental illness. The City's Bureau of Emergency

Communications (BOEC) and PPB's Behavioral Health Unit (BHU) work closely with community partners and service providers in multiple ways, including through the BHU Advisory Committee. (Pars. 88-90).

**Crisis Intervention (Section VI):**

The City's multifaceted approach to crisis intervention continues to substantially comply with the Agreement. PPB provides all patrol officers with 40 hours of initial crisis intervention training as well as annual refresher training. (Pars. 97-98). PPB provides a volunteer group of specially qualified officers with enhanced crisis intervention training (ECIT), developed with the advice of an advisory committee comprised of community members, service providers, advocacy groups, and people with lived experience. (Pars. 94-96, 99-103). BOEC provides high-quality crisis intervention training to 911 operators who dispatch ECIT officers directly to 911 calls that involve a mental health crisis and pose substantial risk of harm, and triage other calls, including by referral for non-police response when appropriate. (Pars. 99, 113-115). When PPB responds to crisis calls, they do so subject to PPB's Directive 850.20 – Police Response to Mental Health Crisis, which emphasizes de-escalation, disengagement, when appropriate, and connecting people with services such as transport by ambulance to a hospital as opposed to transport by police cruiser to jail. (Par. 99).

PPB's Behavioral Health Unit (BHU) continues to obtain positive results. (Par. 91). Patrol-based ECIT officers and proactive follow-up teams (SCT and BHRT) are achieving successful outcomes for many people who have frequent law enforcement contacts and who need mental health or addiction services. (Pars. 99, 101, 106-112). In several cases, ECIT officers saved lives. (Par. 104). The BHU and BOEC use reliable data to refine and improve the City's approach to crisis triage. (Pars. 92-93, 105, 110, 112).

**Employee Information System (EIS) (Section VI):**

PPB has maintained substantial compliance with the use of EIS for employee's annual assessments and assessments on transfers or changes in supervisors. (Par. 116). PPB also demonstrated use of its group-and-supervisor-level force data to identify outliers compared with peer groups and supervisors. (Par. 117). PPB has maintained its required EIS thresholds. (Pars. 118-119). And, PPB continues to staff the administration of EIS as required. (Par. 120).

**Accountability (Section VIII):**

We applied the same criteria to assess compliance with Section VIII that we previously applied: (1) all investigative findings are supported by a preponderance of the evidence; (2) all findings are documented in writing; (3) officers and complainants receive a fair and expeditious resolution of complaints; and (4) all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. *See* ECF 212, DOJ's Interim Compliance Assessment Report, at 7; ECF 195-1, DOJ's 4th Periodic Compliance Assessment Report, at 54. The Office of Independent Police Review (IPR) did not meet investigative timeframes. (Pars. 121, 123). And the absence of supervisory investigations of uses of force during crowd-control events has deprived the accountability system of data needed if allegations of misconduct arise. (Par. 169). Accordingly, the City did not maintain substantial compliance with Section VIII-Accountability.

The City continued to implement other Agreement provisions related to accountability. PPB continued to seek on-scene public safety statements when necessary and had witness officers provide on-scene walk-throughs. (Pars. 124, 126-127). PPB issued Communication Restriction Orders when required. (Par. 125). The City continued to conduct concurrent criminal and administrative investigations, tolling administrative timelines where necessary. (Par. 122). IPR continued to exercise its authority to conduct independent investigations. (Par. 128). PPB enacted a revised policy against retaliation. (Par. 130). The City continued to use—and enhance where necessary—its existing PRB

procedures (Pars. 131-132) and its appeal procedures (Pars. 134-136). The discipline guide and systems for complainant communication remain in place. (Pars. 137-140).

**Community Engagement and the Creation of the PCCEP (Section IX):**

The PCCEP has operated successfully for 26 months. (Pars. 141, 151). The City continues to provide substantial support for the PCCEP's mission, including designated staff, technical assistance to hold meetings remotely on Zoom during the pandemic, and access to relevant City personnel. (Pars. 144, 146, 151-152). The PCCEP has maintained positive, productive relationships with the Mayor's Office, PPB, and other relevant City entities, including the Auditor's Office, the City Attorney's Office, and the Office of Equity and Human Rights. (Pars. 142, 145). The PCCEP has also established good relationships with non-City entities, including the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), the Mental Health Alliance (MHA), the Compliance Officer, and DOJ. During this reporting period, the PCCEP members have continued to represent diverse interests and engage Portland's communities on issues of police reform. (Pars. 142-143). In the wake of George Floyd's homicide, the PCCEP held several listening sessions and town hall forums to hear from community members and local leaders, which resulted in several recommendations responsive to community input. (Par. 151). After providing meaningful input into PPB's Community Engagement Plan in 2019, the PCCEP followed through by reviewing progress on implementation of the plan in 2020. (Pars. 142, 146). The PCCEP also continues to independently assess implementation of the Agreement, including by hosting town hall events with the Compliance Officer and DOJ. (Pars. 142, 151). In sum, despite the many challenges of 2020, PCCEP members appropriately exercised their independent authority.

However, in this reporting period, the City was unable to meet the obligation set forth in Paragraph 150 to "hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community

policing, in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters." (Par. 150). The City cited to unforeseeable obstacles to holding an East Precinct meeting in 2020, including staffing issues caused by the ongoing pandemic and the months-long, nightly protests for racial justice. Given the City's demonstrated proficiency holding meetings remotely during the pandemic, we expect the City to correct course quickly in 2021 by releasing a timely 2020 Annual Report and, thereafter, presenting the report in each PPB precinct and at a City Council meeting, as required.

*    *    *

Our Report uses the following color-coded compliance status levels to indicate our assessment of the City's progress in complying with each term of the Agreement. As with previous reports, we provided some additional information to compliance status levels that did not change. The color coding is as follows:

- Green: substantial compliance with an ongoing obligation. This level indicates that the City has implemented the specific provision as required by the Agreement, and that the City has an ongoing obligation to continue such action to achieve sustained substantial compliance.

- Yellow: partial compliance with an ongoing obligation. This level indicates that while there has been progress made with implementation, specific areas need further attention in order to reach substantial compliance.

- Red: non-compliance. This level indicates that we have recognized barriers to achieving implementation of the provision that must be addressed to achieve substantial compliance.

DATED this 10th day of February, 2021.

Respectfully submitted,

| | |
|---|---|
| BILLY J. WILLIAMS<br>United States Attorney<br>District of Oregon<br><br>RENATA A. GOWIE<br>Civil Division Chief<br><br>/s/ Jared D. Hager<br>JARED D. HAGER<br>Assistant U.S. Attorney | PAMELA S. KARLAN<br>Principal Deputy Assistant Attorney General<br>Civil Rights Division<br><br>STEVEN H. ROSENBAUM<br>Special Litigation Section Chief<br><br>/s/ Laura L. Cowall<br>LAURA L. COWALL<br>Deputy Chief<br><br>/s/ R. Jonas Geissler<br>R. JONAS GEISSLER<br>Trial Attorney |