# United States v. City of Portland
## DOJ's Fifth Periodic Compliance Assessment Report

| | |
|---|---|
| III. USE OF FORCE | **Partial Compliance** |
| IV. TRAINING | **Partial Compliance** |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | **Substantial Compliance** |
| VI. CRISIS INTERVENTION | **Substantial Compliance** |
| A. Addictions and Behavioral Health Unit and Advisory Committee | **Substantial Compliance** |
| B. Continuation of Crisis Intervention (C-I) Program | **Substantial Compliance** |
| C. Establishing "Memphis Model" Crisis Intervention Team | **Substantial Compliance** |
| D. Mobile Crisis Prevention Team | **Substantial Compliance** |
| E. Service Coordination Team | **Substantial Compliance** |
| F. Bureau of Emergency Communications (BOEC) | **Substantial Compliance** |
| VII. EMPLOYEE INFORMATION SYSTEM (EIS) | **Substantial Compliance** |
| VIII. OFFICER ACCOUNTABILITY | **Partial Compliance** |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING | **Partial Compliance** |

## III.    USE OF FORCE

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness:  (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied.  PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible. In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons, including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function.  To achieve these outcomes, PPB shall implement the requirements set out below.

| Status | Partial Compliance |
|---|---|

Portland experienced near nightly crowd control events between May 29 and November 15, 2020. The use of force and crowd control policies—previously approved by the Compliance Officer and DOJ as part of this Agreement—should have guided all actions.  Policy-required Force Data Collection Reports (FDCRs) and force-related After Action Reviews (AARs) showed a varied level of critical analysis of force decision making.  Some supervisors validated uses of force with little or no critical assessment—even uses of force that were captured on video and replayed on new media, or later became subject to complaints.  Validation of individual uses of force with little or no discussion of reasonableness of the force used or of de-escalation attempts, stands in contrast to PPB's policy requirements for force investigations and PPB's expressed organizational goals.  *See* Dir.    1010.00,    effective    Jan.    19,    2020,    *available    at* https://www.portlandoregon.gov/police/article/751998.

At the organizational level, PPB's usual incident commander reported frequent re-assessment and changes in tactics to avoid engagement and to de-escalate.  *See* Jan. 14, 2021 DOJ interviews of AC Jami Resch and CMDR Craig Dobson (Jan. 14, 2021 PPB interview).  This was consistent with the in-person observations of DOJ's consultant during crowd-control events on July 3-5, 2020.  Our consultant reviewed the planning and execution process at the command center and street level.  At the command center, an orderly command briefing covered an Incident Action Plan (IAP) assigning missions and setting arrest protocols.  But, later, on the street, our consultant observed that skirmish line movements were chaotic and could have been executed better—the same conclusion the street-level supervisor reached in a debrief of Mobile Field Force members.

Among this chaos, were two groups.  First, there were peaceful demonstrators who sought lawful expression of grievances.  *See Gregory* v. *City of Chicago*, 394 U.S. 111 (1969) (finding a peaceful and orderly demonstration falls well within the sphere of conduct protected by the First Amendment (internal citations omitted)).  Second, there were violent demonstrators who employed arson, lasers, strobe lights, projectiles, incendiary devices (fireworks, Molotov cocktails, and chemical accelerants), and makeshift weapons, which is not speech protected by the First Amendment.  The second group injured several people—both civilians and first responders.  Property destruction

affected houses of worship and livelihoods.  *See* Doris, Peter, "Rioters damage church, shops in downtown Portland," KGW8, Nov, 5, 2020, *available at* https://www.kgw.com/article/news/local/protests/rioters-smash-up-church-shops-in-downtown-portland/283-018d64a4-97fd-4654-9b89-fbe5d453a849.  PPB perceived these two groups, too.  *See* Jan. 14, 2021 PPB interview.

PPB saw that among the crowd of protestors was a criminal element whose objective was to engage police.  *Id.*  This assertion was consistent with our consultant's limited observations.  Our consultant found during one night's observation that, after many peaceful individuals had left, others remained and constructed a barricade and then threw rocks at a building's windows.  When PPB did not engage, members of this group brought a park bench to the courthouse, poured accelerants on it, and lit it on fire.  On another night, crowd members launched fireworks at the federal courthouse.  PPB declared an unlawful assembly and directed the crowd to leave, but PPB did not declare a riot until after some crowd members launched five mortar-style fireworks and numerous projectiles *at* a PPB squad.  PPB communicated its desire to avoid using force and the difficulty of arresting these violent individuals.  *See, e.g.,* "Deputy Chief talks about crowd management," Aug. 19. 2020, *available at*  https://www.youtube.com/watch?v=rnW7h4dHhGg.

A few months into the regular crowd control events, the Police Commissioner restricted PPB's use of CS gas.  *See* "Mayor Wheeler Directive on the Use of CS Gas," Sept. 10, 2020, *available at* https://www.portland.gov/wheeler/news/2020/9/10/mayor-wheeler-directive-use-cs-gas; *cf.* Email from Mayor Wheeler to Chief Lovell, Sept. 25, 2020 (setting forth new criteria for CS gas use after DOJ inquiry).  Though the City asserted that this was not a change in policy, it materially changed conditions for PPB's use of force.  We repeatedly pushed for clarification from PPB, yet PPB did not produce specific guidance for implementation until January 13, 2021.  *See* Email from M. Buckley to J. Geissler, Jan 13, 2021, 6:24 pm EST, attaching Special Order to All Bureau Members Regarding CS Gas Usage, Nov. 30, 2020 (providing written direction 81 days after the press release and characterizing the order retroactively as "*nunc pro tunc* September 25, 2020").  *Compare* Dir. 1010.00 – Use of Force, effective Jan 19, 2020, *available at* https://www.portlandoregon.gov/police/article/751998; Dir. 635.10 – Crowd Management/Crowd Control, effective Aug. 30, 2017, *available at* https://www.portlandoregon.gov/police/article/649358.  Having received unsatisfactory responses to our many requests, we now base our compliance assessment, in part, on the City's failure to seek and receive approval from the Department of Justice for what amounts to a change in force policy.  *See* Agreement Par. 166.

PPB repeatedly has asserted that certain impactful events—COVID 19, national political turmoil, and a wildfire season—were beyond its control.  True though that may be, those events do not eliminate the City's obligations under this Agreement and the Constitution.  PPB members used force, some beyond policy.  Supervisors approved that force, some without required critical assessment.  PPB, as a whole, did not timely assess the crowd control events.

We have frequently stated that "implementation" requires verification that PPB consistently is acting in accordance with the force policy and—consequently—in accordance with the Agreement and constitutional standards. ECF 158-1, 195-1.  In order to come back into substantial compliance, the City must now engage in the difficult task of acknowledging deficiencies, identifying successes, and rebuilding both community and organizational trust in systems based on constitutional policies carried into execution.

Specifically, PPB should:

(a) Complete the City's planned comprehensive master after action review of crowd-control events from May 29 to November 15, including a critical assessment of supervisory force investigations and command reviews of FDCRs and AARs;

(b) Identify force events that require administrative investigation, but have not yet had investigations opened, including, where appropriate, referral for investigation consistent with Section VIII-Accountability;

(c) Develop and implement a method to investigate uses of force in chaotic crowd-control events;

(d) Implement additional crowd-control training for both Rapid Response Team (RRT) and Mobile Field Force, including analysis of need for additional members of these and supporting groups in order to meet handle crowd control without overreliance on a small group of individuals; and

(e) Fully implement approved force use and reporting policies going forward.

## A. Use of Force Policy

66. PPB shall maintain the following principles in its existing use of force policies:

a. PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and

b. PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. PPB shall add to its use of force policy and procedures the following use of force principles:

a. Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b. In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

c. The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d. Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

## 2. <u>Use of Force Reporting Policy and Use of Force Report</u>

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that:

a. All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

b. All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

c. In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for purposes of paragraphs 70, and 72-77 of this Agreement. (Subparagraph c added by ECF 171.)

### 3. Use of Force Supervisory Investigations and Reports

70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

a. Complete After Action Reports within 72 hours of the force event;

b. Immediately notify his or her shift supervisor and PSD regarding all officers['] Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement;

c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

d. Interview officers individually and not in groups.

73. PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

a. EIS tracks all Directive 940.00 comments, findings and corrections (amended by ECF 171);

b. All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

c. All supervisors in the chain of command are accountable for inadequate reports and analysis;

d. A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations. Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

e. When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

f. Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

g. The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor.

| Status | Partial Compliance |
|--------|--------------------|

**Crowd-Control Uses of Force:**

We agree with the Compliance Officer that based on crowd-control events, PPB has failed to maintain substantial compliance with the Agreement's force-policy requirements.  *See* COCL Q4 2020 Report (draft), at 4-5, 14-17, *available at* https://www.portlandcocl.com/reports/01/2021/draft-quarterly-report-quarter-4-updates-analysis.  ECF 171, Am. Settlement Agreement, Pars. 66, 67, 69, 70, 73.  Based on our review of PPB's force reporting and review documents, we found many of PPB's records were insufficient to show implementation of policies governing use of force, reporting, and investigation.

**Force Data Collection Reports (FDCRs) for Crowd-Control Events:**

Our independent assessment of a large sample FDCRs that were attached to crowd-control event After Action Reports (AARs) revealed frequent lack of investigation and analysis by first-line supervisors of their subordinates' force use.  In general, there was a lack of analysis of officers' force by supervisors.  *Compare* Dir., 1010.00, Par. 5.  For example, one of the Master After Action Reports indicative of the lack of analysis stated:  "*Meets Graham Standard:  Yes.  In or Out of Policy:  In Policy,*" without any further analysis or comment.  ("*Graham*" is a reference to the Supreme Court case establishing the constitutional standard for assessing a use of force.  *Graham* v. *Connor*, 490 U.S. 386 (1989).)  Many FDCRs were unsigned by first-line supervisors.  Many did not note what, if any, video or photos or other evidence the supervisors used.  Many did not include any witness interviews or officer interviews.  Many FDCRs contained similar or identical, i.e., cut-and-paste, language.

Based solely on members' own descriptions, the force described in most FDCRs would appear reasonable in response to the threat, severity, and resistance offered.  *See Graham* v. *Connor*, 490 U.S. 386 (1989).  But a member's narrative is not the whole picture of a use of force needed to complete that constitutional analysis.  Approved policy requires that first-line supervisors investigate use of force.  *See* Dir. 1010.00, Par. 12.3; *see also* ECF 171, Am. Settlement Agreement, Par. 70.  Understandably, supervisors could not always respond to the scenes of force because of the continued crowd-control situations.  In addition, some supervisors were not even there to supervise:  "I am also not always on duty during RRT deployments and therefore have to rely on the nightly log."  *See* 20-681564 and 20-681565; *see also* AAR package 0918-0919.  An absent supervisor could not complete the force policy's requirements to ensure subjects receive medical attention, interview witnesses, and make immediate notifications of potential policy violations.  *See* Dir, 1010.00, Pars. 12.2, 12.5, and 12.8.  While the policy anticipates this inability to respond (*see* Dir. 1010.00, Par. 12.1), neither PPB policy nor the Agreement excuses the lack of first-line supervisory investigation.

The Agreement requires that supervisors assess their members' uses of force to include separately interviewing officers, ensuring subjects receive medical attention, and conducting an administrative review and investigation of the use of force, documenting their findings in an AAR within 72 hours.  An FDCR may assert a reason for use of force, but further supervisory investigation may call that justification into question.  *See, e.g.*, AAR package 0606-0607, at 68-71, 490-504 (justifying a use of force based on an officer's description, alone); *compare* TVAyyyy, Twitter.com, Jun. 7, 2020, *available at* https://twitter.com/i/status/1269526590456643584 (showing additional facts in the same use of force that substantially affect the justification for use).

**Force-Related After Action Reviews (AARs) for Crowd-Control Events:**

The policy-required AARs for force events during crowd-control situations varied in quality. Some were quite thorough under the circumstances. Several were blanket affirmations of force with no investigation or analysis. *See, e.g.*, AAR package 0529-0530 (finding supervisor-level review thorough and complete even though, absent any analysis, the supervisor had marked all uses of force within policy). In many respects, the varying quality of force-related AARs is explainable: by design AARs build off of FDCRs and force investigations by first-line supervisors. Given the poor quality of first-line investigations of FDCRs, described above, the foundational information for all that followed was lacking. *See, e.g.*, AAR package 0610-0611 (acknowledging that the AAR is based on FDCRs not interviews). Thus, even when PPB admitted its compliance with force-reporting and after-action policies was deficient, PPB still found that its use of force was within policy. *See, e.g.,* AAR package 0529-0530. Approved policy requires reporting, interviews, and gathering of evidence in order to make the within-policy determination. *See* Dir. 1010.00, Secs. 12 and 13. These steps frequently did not occur in many of the force packages we reviewed.

Despite the incomplete record in many AARs, there were some other very good examples of AARs, particularly toward the end of the event period. One AAR was particularly thorough in assessing the bases for force used and applying policies. *See* AAR package 0809-0810. Another included the required reconciliation between differences in FDCRs. *See* AAR package 0926-0927. In another AAR, the PPB Commander who was the third step in the review chain applied the standards set by a temporary restraining order (TRO) that had issued and applied to the force used. *See* AAR package 0625-0626. Policy requires that officers comply with such orders. Dir. 315.00, Par. 2, effective May 15, 2020, *available at* https://www.portlandoregon.gov/police/article/761002. And the entire chain of command is accountable for the adequacy and analysis of AARs, including policy compliance. Agreement Par. 70(c). These good examples demonstrate that PPB could have done AARs well.

Though PPB demonstrated the ability to properly apply force policies and the standards of an applicable TRO, there was also a troubling failure to apply a TRO standard in a much later AAR review. In the matter of *Don't Shoot Portland* v. *City of Portland*, No. 3:20-cv-00917, U.S. District Court Chief Judge Marco Hernández entered a Stipulated Additional Restraining Order on June 26, 2020. *See Don't Shoot Portland,* Dkt. 43. On June 30 to July 1, PPB assisted Oregon State Police in response to a riot at the Portland Police Association (PPA) headquarters. Actions that night later gave rise to plaintiff's Amended Motion for Order to Show Cause in that matter. *See id.* Dkt. 145. Following an evidentiary hearing on October 21 and 22, 2020, Judge Hernández issued an order on November 27 finding the City in contempt based on certain uses of force during the riot at PPA. *See id.* at Dkt. 204 (applying a "clear and convincing" standard). PPB had misplaced the AAR for that night's crowd-control event reportedly because a PPB supervisor had retired. *See* AAR package 0630-0701. When the AAR came for review at the Chief's Office on December 3, 2020—three days after PPB was held in contempt for violating its own policy—PPB nonetheless approved the AAR (and, all uses of force covered by the AAR). *See id.*

PPB's own statements evidence that it was not meeting Agreement and policy requirements with its crowd-control AARs:

> The reality is that crowd control force has never been documented or reviewed in the same manner that patrol force was, but the DOJ has mandated that we begin reviewing it using the same process. I want to stress that the AAR team is <u>not</u> seeing issues with the actual force being used, they just need for the Team to make sure it is articulated properly and

documented consistently in order to maintain compliance with the DOJ settlement agreement.

*See* PPB email, 76_Emails-DOJ_2020Q3.PDF, pg. 157/158, Aug. 8, 2020 (underline in original). We do not share the conclusion that the problem was simply one of inadequate documentation. The inadequate documentation prevented PPB from identifying and addressing potentially problematic uses of force or to seek alternatives.

Overall, our review of AARs found some consistent themes:

- **Failure to Make Required Critiques and Recommendations:**

PPB frequently did not engage in the required assessment under Agreement Paragraphs 70 and 73 and Directive 1010.00, Par. 13.4.10. The policy provision requires that AARs "address any applicable directives, whether or not members complied with such directives and any recommendations or actions taken to address issues encountered on-scene or during the reporting process." *See* Dir. 1010.00, Par. 13.4 Effective, Jan. 19, 2020, *available at* https://www.portlandoregon.gov/police/article/751998. At the immediate supervisor level, this includes documenting "any non-disciplinary corrective action, training deficiencies, policy deficiencies or poor tactical decisions and ensure that they discuss poor tactical decisions with the member and that the discussion is documented in the Employee Information System (EIS)." *Id.* at 13.4.10.1.7. At the chain-of-command review level, this includes assessing "the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or less force options." *Id.* at Par. 13.4.10.2.4. In most crowd-control AARs that we reviewed, PPB critiqued whether boxes should be checked in a fashion similar to a data audit. Some assessed the force based on the limited information presented in FDCRs.

The lack of critical analysis left unanswered—for PPB as well as for us—why there was a disparity in the number of uses of force by members on the same squad during the same night. *See, e.g.,* AAR package 0801-0802. Similarly, supervisors did not attempt to reconcile different force uses, e.g., why some members of the same squad used OC, but other members stated that they considered using OC and decided against it due to the risk to others. *Id.* These analyses would seem to be appropriate given the mandate of Directive 1010.00, Paragraph 13.4.10.2.4, which requires assessment of the incident for "tactical and training implications." Moreover, Directive 1010.00 requires members to use de-escalation. The disparity in numbers between the officers and the alternatives to OC could be indicative of successful de-escalation, as well as failure to de-escalate. PPB should have analyzed these facts and what lessons might be learned.

- **Misuse of the term "Active Aggression"**

In the FDCRs that we reviewed, officers described resistance in terms of actions of the crowd as a whole that night or prior nights. By this reasoning, subjects against whom PPB used force must be involved in "active aggression" because they were present at an unlawful assembly. However, not all who were present were engaged in active aggression. Some were. But some were not even close to the locus of the crowd-control event. The Compliance Officer found: "We disagree that being part of a crowd, even when members of that crowd are participating in criminal activity would justify considering all members of the crowd as being actively aggressive." *See* COCL Q4 2020 Report (draft), at 15. We concur.

In one force incident that we reviewed, a member justified the use of a less-lethal impact munition against an unknown subject because the subject was engaged in "furtive conversation" and ran away. The member claimed this amounted to active aggression because he believed others at the

Justice Center were engaged in active aggression. *Compare* 1010.00, definitions and par. 6.4.1.1.1. However, the subject he shot was half a mile from the Justice Center and unarmed. There was no aggression. Upon review, the officer's senior supervisors affirmed that justification.

At least one PPB Lieutenant, however, properly admonished against this type of generalized justification for the use of force in a review of an AAR:

> As is the case here, at times officers have a tendency to generalize behavior of "the crowd" and speak of it as a homogeneous entity. . . . Officers should take caution in appearing to paint a broad brush in regard to the actions of 150-200 individuals. While it is entirely possible that an entire group is engaging in a certain activity at a certain moment, it is certainly rare. Most importantly, when assessing use of force applications, articulation needs to have a specific emphasis, or to as high a degree as possible.

*See* AAR package 0809-0810; AAR package 0918-0919.

- **Conflation of active and passive resistance**

On several occasions, officers justified using force based on asserted physical resistance to members when reports describe only slow walking. *See, e.g.*, 20-680859. Absent pushing back, descriptions of slow walking indicate only passive resistance. *See* Dir. 1010.00, definitions (Passive Resistance: A person's non-cooperation with an officer that does not involve violence or other active conduct by the individual). Similarly, failing to disperse, absent other resistance, is not tantamount to active aggression. *See* AAR package 0606-0607.

- **Reliance on sound truck for de-escalation or warnings:**

Many FDCRs listed the announcements by PPB Long Range Acoustical Device (LRAD) as a de-escalation technique. And, supervisors repeatedly affirmed this in AARs. Policy requires de-escalation to include warnings before using force where feasible. *See* Dir. 1010.00, Par. 1.1.1. LRAD announcements may be valid warnings to the crowd generally, but as one reviewer aptly recognized in an AAR, members should not assume that subjects heard the LRAD. *See* AAR package 0625-0626.

- **Lack of connection with Incident Action Plan:**

The IAP met professional standards, but most of the reports we reviewed do not show an application of the IAP to an analysis of force use. We found that reports are generally absent of descriptors regarding command, direction, or team/squad cohesiveness raising the question whether officers may have been acting as individuals rather than in concert with the team/squad given instances where officers appear to have broken ranks to engage with demonstrators.

- **Witness Interviews:**

Almost uniformly, arrestees asserted their *Miranda* rights, declining to speak with PPB without attorneys. With one exception that we identified, PPB honored the requests and did not interview the arrestees. The result, however, were initial force investigations missing information from the very people against whom PPB used force. This was not PPB's doing, of course, and PPB aptly noted the *Miranda* assertions in narrative reports attached to AARs.

Many of PPB's AARs did not indicate any effort to attempt to locate other witnesses. *See, e.g.*, AAR package 0703-0704.

**Timeliness of Reporting and Reviews:**

The City admitted its non-compliance with force reporting and after-action reviews of crowd-control-related uses of force, indicating that PPB had not been able to complete AARs from May and into June in a timely fashion.  *See* email from T. Reeve to L. Cowall, Sept. 25, 2020, 8:51 p.m. EST.  The City also indicated that PPB completed FDCRs by the end of officers' shifts since early June, i.e., they had not always done so in the early crowd-control events.  *Id.*  The City also has conceded that many after-action analyses have been delayed.  *Id.*  Indeed, the City admitted in its September 25 letter that it had not cleared its backlog of after-action reviews as of that date:  "At this point the system is timely for the ongoing protests, with the goal of catching up the after-actions from late May and June as soon as possible."  *Id.*

At least one AAR we reviewed noted that timeliness affected the integrity of the force reporting:  "I agree with [the Lieutenant] that since this AAR covers a protest night from over four months ago, it is unreasonable to edit any existing FDCR's now."  *See* AAR package 0630-0701.  And, we agree with the Compliance Officer that "the inability to complete AARs in a timely fashion has serious implications for a member's recall, particularly if the member experiences similar events over a sustained time period."  *See* COCL Q4 2020 Report (draft), at 16.

**Other Sources of Crowd-Control Event Force Monitoring:**

Aside from PPB's own documentation, and our consultant's on-site observations, we frequently monitored live and recorded video from social media and traditional news media sources throughout the May through November events.  Some uses of force we discovered appeared to require further administrative investigation.  We raised these with PPB.  The response did not always evidence compliance with force-use-and-reporting policy.

For example, when video surfaced of a head-strike event that indicated a use of force may be out of policy, PPB asserted it was not "lethal" because the officer had not intended to strike the subject's head according to the officer's FDCR.  *Compare* 1010.00., definitions and par. 6.4.1.2.1; ECF 171, Am. Settlement Agreement, Par. 38.  Yet PPB had not conducted the supervisory investigation required by the Agreement.  PPB did not address this breakdown in the force review process for several weeks.  Commendably, PPB later reconsidered and commenced a more fulsome investigation.  By that point, however, PPB's prejudgment that the force was not "lethal" under policy prejudiced the ability to hold the officer accountable, as mentioned in Section VIII, below.

In another example, we discussed with PPB a publicly posted video with a questionable force response by an officer appearing to wear PPB insignia and who a news reporter identified as part of PPB.  *See* "Portland reporter shoved by officer during downtown protest", KATU2, Jun. 14, 2020, *available at*  https://katu.com/news/local/portland-reporter-shoved-by-officer-during-downtown-protest.  PPB was unable to identify the officer involved or locate an FDCR.

To PPB's credit, when we raised two other instances with PPB, PPB reported to us the reassignment of some members to non-crowd-control duties.  These uses of force demonstrate the need for timely reporting and supervisory investigation, as the Agreement and policy require.

**Force Policy:**

We previously found that since August 19, 2017, PPB's revised force policy, Directive 1010.00 – Use of Force, has governed officers' obligations in de-escalation, deciding when force is permissible, reporting uses of force, and investigating force use.  *See* ECF 195-1, at 4.  Since that time, PPB revised its use-of-force policy.  *See* Dir. 1010.00 – Use of Force, *available at*

https://www.portlandoregon.gov/police/article/751998, effective Jan. 19, 2020. The policy remains compliant with the Agreement when executed with fidelity to the approved terms.

The City, however, modified the written policy without sufficient direction to PPB or the members tasked with performing and reviewing performance under the policy. On September 10, 2020, the Police Commissioner issued a press release effectively modifying Directive 1010.00 and Directive 635.10 – Crowd Management/Crowd Control, *available at* https://www.portlandoregon.gov/police/article/649358. The Police commissioner stated in operative part:

> That's why, as Police Commissioner, **effective immediately and until further notice, I am directing the Portland Police to end the use of CS gas for crowd control**. . . . During the last hundred days Portland, Multnomah County and State Police have all relied on CS gas **where there is a threat to life safety**. **We need something different**. We need it now.

*See* "Mayor Wheeler Directive on the Use of CS Gas," Sept. 10, 2020, *available at* https://www.portland.gov/wheeler/news/2020/9/10/mayor-wheeler-directive-use-cs-gas (emphases added). Multiple people within PPB contacted us and advised that PPB received no direction from the Police Commissioner other than the public press release. We contacted the City about this order and interviewed the Police Commissioner on September 14, 2020. He confirmed that there was no additional written guidance to PPB. He informed us that PPB may use CS gas where there is a threat to life safety and no other less forceful way to resolve the threat, and he or his designee approves the use. This contradicted the press release.

We continued to express concern about the lack of guidance and the confusion between the press release and answers during our interview. Accordingly, after further investigation and deliberation, on September 24, 2020, we, again, contacted the City. *See* Letter from L. Cowall to T. Reeve, Sept. 24, 2020. We reminded the City of its obligation to provide any revisions to force policies to the Department of Justice for our review. *Id.* (citing Settlement Agreement Par. 166). We made clear that the Police Commissioner's order potentially changed the criteria for deployment of riot control agents currently set forth PPB's directive 635.10 – Crowd Management/Crowd Control, paragraphs 6.2 and 9.2, and lacked direction on what information officers throughout the command chain must provide to the Mayor to request use of CS gas, what criteria must exist to justify CS gas use, and what actions the incident commander must take to secure authorization. *Id.* We informed the City that it needed to address the scope and duration of the CS gas order, and provide guidance to PPB subject to the Settlement Agreement's policy-review process. *Id.* In response, the City provided us its justification for why the Police Commissioner had the authority to modify 635.10 and added only this written direction on the operative modification:

> IC [(the Incident Commander)] must first call the Mayor (or designee) and provide a description of "facts showing an immediate risk of death or serious physical injury which cannot otherwise be safely addressed without a greater application of force."

*See* email from T. Reeve to L. Cowall, Sept. 25, 2020, 8:51 p.m. EST. That day, the Police Commissioner then forwarded this email as the written direction to Chief Charles Lovell. We continued to request copies of any additional guidance to members. There was no further direction to PPB members until PPB produced an Executive Order dated November 30, 2020—long after the major crowd control events ended. *See* Executive Order from Chief Charles Lovell, Nov. 30, 2020. PPB added to the end of the date line in that order "*nunc pro tunc* September 25, 2020." *Id.* In its entirety, the text of the order reads:

> Effective September 25, 2020, the Bureau may only use CS gas upon Mayor Ted Wheeler's (or his designee's) express authorization as Police Commissioner. The standard for the use of CS that the Mayor will apply is "an immediate risk of death or serious physical injury which cannot otherwise be safely addressed without a greater application of force."
>
> Prior to authorizing the use of CS gas, the Incident Commander must first call Mayor Wheeler (or his designee) and provide a description of the facts showing "an immediate risk of death or serious physical injury which cannot otherwise safely be addressed without a greater application of force." Mayor Wheeler commits to being available directly, or to have a designee available, at all times to take such a call.

*Id.* The City's press release calling for "something different," is vague and not sufficiently directive to guide a member's actions, nor to hold a member accountable for failing to act in conformance with the order. And while the press release was open to the public and all PPB members, the September 25 email was not. The relevant order did not come until two months later, after the majority of the protests had ended. The vague announcement, lacking in specific written direction or retraining, provided insufficient guidance to comply with Paragraphs 66 and 67. The substantive modification of force policy also should have been subject to Compliance Officer and DOJ review. *See* Agreement Par. 166.

### Change in Force Reporting:

PPB also changed its force reporting requirements without informing or seeking approval from the Compliance Officer or DOJ. At some point during the crowd-control events, PPB recategorized two-handed uses of batons from a strike to a control against resistance:

> And for reporting accuracy the use of the baton with a two handed grip to push people was classified as CONTROL AGAINST RESISTENCE (sic). It was also determined that if a push resulted in the subject falling down, even if it was not the intention of the officer pushing or could not be articulated to some other event, the push would be classified as a takedown

*See* 0630-0701 AAR package. The Compliance Officer and DOJ did not review or approve this change. If PPB seeks a substantive change to force policy or reporting requirements, PPB is obliged to subject these changes to Compliance Officer and DOJ review. *See* Agreement Par. 166.

### Non-Crowd-Control Event Uses of Force:

We agree with the Compliance Officer that, based on the written information in PPB's own reports, in non-crowd-control uses of force, PPB continues to demonstrate substantial compliance with the Agreement. *See* COCL Q4 2020 Report (draft), at 13. PPB, for example, gave notice to its Professional Standards Division for uses of force involving individuals experiencing mental health crises. *See* Required PSD Notification List. In the third quarter of 2020, one of these was categorized a serious use of force. *See* 20-235445. That event included nearly an hour's attempt at de-escalation. *Id.* There were two serious uses of force involving a person in mental health crisis in the second quarter of 2020, and one in the first quarter of 2020. *See* 20-132543; 20-155785; 20-69748. And, as the Compliance Officer found, in a 30-month period from April 1, 2018 to September 30, 2020, PPB used force against persons with actual or perceived mental illness only 400 times (0.74%) of calls for service. *See* COCL Q4 2020 Report (draft), at 12. A majority of these force events were Category IV, the lowest level of force categorized by PPB. *Id.* Category II and Category III force types (which include the use of CEWs) were only used in 144 of the interactions (0.27%) of calls for service. *Id.*

## 1. Electronic Control Weapons

68. PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapon System to include the following principles:

a. Prohibition against the use of ECWs for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force;

b. Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their ECW;

c. Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following ECW use;

d. Only one ECW at a time may be used on a subject, intentionally, except where lethal force would be permitted;

e. After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each ECW cycle in their use of force reports;

f. Officers shall make every reasonable effort to attempt handcuffing during and between each ECW cycle. Officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant use;

g. ECWs shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of use of force; and

h. Officers receive annual ECW in service training including proficiency and policy changes, if any.

| Status | Substantial Compliance |
|---|---|

We agree with the Compliance Officer that, based on the written information in PPB's own reports, PPB continues to demonstrate substantial compliance with Paragraph 68.  *See* COCL Q4 2020 Report (draft), at 13.  The crowd-control events in our sample did not involve uses of ECW.  Some crowd-control reports that we reviewed mentioned a restriction against using ECW in crowd-control response teams.  Accordingly, PPB's crowd-control responses did not affect PPB's prior substantial compliance rating.

The Compliance Officer's assessment of a sample of ECW uses in the last quarter also shows each CEW cycle was justified and that officers provided sufficient warning prior to using the CEW.  *Id.* PPB also utilized its ambulance service, AMR, to remove probes.  *See id.*  Accordingly, applications of CEW continue to comply substantially with Paragraph 68.

We previously reported that PPB's revised Directive 1010.00 incorporates all of Paragraph 68's mandates.  ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report, at 8 (*citing* Dir. 1010.00 – Use of Force, Par. 6.4.4.2).  As before, we assessed the in-service training regarding ECW.  We reviewed and approved PPB's ECW training materials before PPB's 2020 in-service training.  Based on our in-person assessment of in-service training, PPB's in-service provided annual recertification

> and effectively addressed the policy requirements on the use of ECWs.  However, as we note in our assessment of Section IV-Training, below, officers who did not complete the practicum requirements for in-service training, which includes ECW, must do so in the 2021 in-service training.

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that PPB continues to demonstrate substantial compliance with Paragraph 71.  *See* COCL Q4 2020 Report (draft), at 12.

In the first quarter of 2020, PPB promoted 20 Officers to Sergeant.  *See* Department of Justice Tasks/Quarterly Update Report, at 14, Nov. 13, 2020.  PPB reported a sustained, overall 4.1-to-1 staffing level for Sergeants to Officers in 2020.  *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13. 2020, at 38.  Including Acting Sergeants, precinct level staffing varied from 4.7 for 4.9-to-1.  *See* Sergeant staffing level by Precinct as of September 30, 2020.

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities.  PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that PPB continues to demonstrate substantial compliance with Paragraph 72.  *See* COCL Q4 2020 Report (draft), at 12.  As we previously reported, PPB's revised Directive 1010.00 designates the After Action Report form as the checklist to ensure supervisors carry out force investigation responsibilities. ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 14 (*citing* Dir. 1010.00 – Use of Force, Par. 13.2, *available at* https://www.portlandoregon.gov/police/article/647779).  We note, however, that while PPB employed the checklists that are now part of the FDCR electronic form, this did not result in critical analysis of nor demonstrate that supervisors conducted fulsome investigations of uses of force in crowd-control events.  Accordingly, the mere presence of the checklists does not change our analysis in the foregoing discussion of Paragraphs 66, 67, 69, 70, and 73.

## B. Compliance Audits Related to Use of Force

74. In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports to ensure that:

a. With respect to use of force generally:

i. reports describe the mental health information available to officers and the role of that information in their decision making;

ii. officers do not use force against people who engage in passive resistance that does not impede a lawful objective;

iii. when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

iv. officers call in specialty units in accordance with procedure;

v. officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

vi. officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

b. With respect to ECW usages:

i. ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits. Discrepancies within the audit should be appropriately investigated and addressed;

ii. officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

iii. officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

iv. officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing so is reasonably calculated to prevent the use of a higher level of force.

c. With respect to use of force reporting, the reports:

i. are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

ii. include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

iii. include a decision point description of the force decision making;

iv. include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

v. include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

vi. include the reason for the initial police presence;

vii. include a description of the level of resistance encountered by each officer that led to each separate use of force and, if applicable, injury;

viii. include a description of why de-escalation techniques were not used or whether they were effective;

ix. include whether the individual was known by the officer to be mentally ill or in mental health crisis;

x. include a general description of force an officer observes another officer apply; and

xi. demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement.

75. In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

a. Complete a Supervisor's After Action Report within 72 hours of notification;

b. Review all use of force reports to ensure they include the information required by this Agreement and PPB policy;

c. Evaluate the weight of the evidence;

d. Use a "decision-point" approach to analyze each use of force;

e. Determine whether the officer's actions appear consistent with PPB policy, this Agreement, and best practices;

f. Determine whether there was legal justification for the original stop and/or detention;

g. Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;

h. Determine whether additional training or counseling is warranted;

i. Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

j. Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

k. Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

l. Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

a. Determine if significant trends exist;

b. Determine if there is variation in force practice away from PPB policy in any unit;

c. Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate;

d. Identify and correct deficiencies revealed by the analysis; and

e. Document the Inspector's findings in an annual public report.

77. In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that all supervisors in the chain of command:

a. Review Directive 940.00 findings using a preponderance of the evidence standard;

b. Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

c. Modify findings as appropriate and document modifications;

d. Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

e. Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

f. Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer; and

g. Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that PPB demonstrated substantial compliance with Paragraphs 74, 75, 76, and 77, *see* COCL Q4 2020 Report (draft), at 11, 13, but the lack of prompt supervisory force investigations of crowd-control events is likely to deprive the upcoming force inspector's audit of necessary data. We will assess the sufficiency of that audit in a future compliance assessment report.

In part, substantial compliance with each of these paragraphs turns on whether PPB properly conducts audits of force use and after action reports, including the tracking of corrective actions. This was a challenge to PPB in this monitoring period. PPB was behind in its auditing for force related to crowd-control events. In the second quarter of 2020, PPB produced to DOJ a report acknowledging that PPB had fallen behind on its auditing: "Force was used during crowd control events in Q2 2020. However, due to the ongoing nature and complexity of crowd control events that occurred in Q2 2020, information on force used will be released at a later date in a separate report." PPB Force Analysis Summary Report 2020 Q2, at 11, Aug. 2020. However, later PPB updated this portion of the report and published it to its website. *See* PPB Force Analysis Summary Report 2020 Q2, at 11, Amended Nov. 2020, *available at* https://www.portlandoregon.gov/police/article/765016. The portion of these PPB reports addressing crowd-control-related uses of force are merely raw numbers of applications. In PPB's usual quarterly reports, it does not address the detailed analysis of demographics and comparisons to prior years with respect to crowd-control-related uses of force. As the Compliance Officer notes, PPB analyzes crowd-control-related uses of force on an annual basis. *See* COCL Q4 2020 Report (draft), at 13. As the Compliance Officer plans to do, DOJ will scrutinize the annual report for

crowd-control-related force events, when produced, including rates of reporting deficiencies and the Inspector's communication with RU Managers regarding trends found during the audit. *See id.*

For non-crowd-control-related force events, as before, PPB continued to post complete force audit reports on its website. *See* Force Data Summary Reports, *available at* https://www.portlandoregon.gov/police/64544.

In our prior monitoring report, we noted that PPB records the corrective actions in EIS or through the Force Inspector's master tracking sheet, i.e., the "Audit Action Item Report." *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 19. We noted that PPB reported having adopted a common form for tracking corrective action, not dependent on whether or not the Force Inspector is absent. *Id.* In this monitoring period, PPB produced samples of the tracking items. These covered a myriad of items for follow-up from equipment needs to individual members' performance. These demonstrate substantial compliance.

PPB quarterly reports showed meeting dates for quarterly meetings between the Force Inspector and managers for each of the three precincts. *See* Department of Justice Tasks/Quarterly Update Report, at 25, Nov. 13, 2020. As before, the Force Inspector used the EIS system to provide managers with findings and action items from the force reports and PPB's force audit. *Id.* These, too, continue to demonstrate substantial compliance.

## IV.    TRAINING

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.

| Status | Partial Compliance |
|--------|--------------------|

PPB acknowledges that it did not provide complete in-service training to over half of its officers in 2020. In our prior reports, we explained that the Agreement's definition of "implementation" requires, among other things, that PPB appropriately train sworn members. *See* ECF 158-1 (citing to Paragraph 156 (requiring that PPB implement all provisions of the Agreement), and Paragraph 33 ("implement" means, *inter alia*, the appropriate training of all relevant personnel)). The magnitude of the training gap means that the lack of compliance has not been minor or occasional. *See* ECF 171, Am. Settlement Agreement Par. 175(a). This is not to say that PPB's lapse in compliance is without reason. As described in our assessment of Paragraph 84, below, the pandemic, crowd control events, and the City-imposed budget cuts, hindered PPB's maintenance of substantial compliance with the Agreement's training requirements.

Even with the challenges PPB faced, it maintained many aspects of training that we previously found substantially compliant. As before, throughout this monitoring period, PPB provided the Compliance Officer and DOJ with requested lesson plans and training materials for in-service training and supervisory training. We reviewed and commented on those materials. Though we did not always reach complete agreement, PPB's lesson plans nonetheless substantially complied with the requirements of Section IV. As we have in prior years, in early 2020, the Compliance Officer and DOJ observed in person a complete session of the in-service training intended for all officers. The Compliance Officer observed a portion of new supervisors training in Fall 2020. We provided constructive feedback where appropriate. Largely, though, we confirmed that both the

> substance and the delivery of training comported with approved policies and the Agreement. We also assessed the Learning Management System (LMS), and Training Advisory Council (TAC) minutes to assess PPB's compliance with those provisions of Section IV, as we describe below. Based on PPB's 2021 Training Plan, we anticipate remediation to bring all of Section IV back to substantial compliance, as we previously found. *See* ECF 195-1, at 20.

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that PPB has maintained substantial compliance with the Agreement requirements for PPB's Training Plan, based on PPB's comprehensive needs assessment. *See* COCL Q4 2020 Report (draft), at 20-21 (assessing the 2021 Training Plan); Quarterly Report; ECF 226-2, COCL Q3 2020 Report, at 4 (assessing the 2020 Training Plan).

As the Agreement intends, PPB gathered broad information to inform its Training Needs Assessment, which underpins the Training Plan. PPB obtained feedback from the Force Inspector, Force Audit Team, Internal Affairs, and from precinct and unit managers regarding their perceptions of training needs; reviewed literature pertaining to best practices and law enforcement training trends; obtained updates to Oregon law; considered recommendations from external stakeholders such as OIR Group; consulted the Community Engagement Plan and the 2019 Independent Police Review (IPR) Annual Report; gathered directive changes from the PPB policy team; meet with lead instructors; and obtained feedback from the Behavioral Health Unit for crisis-response-related training needs. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13. 2020, at 38. And, as the Compliance Officer points out, PPB has been responsive to the Compliance Officer's recommendation to expand community engagement in the assessment process. *See* COCL Q4 2020 Report (draft), at 20. The assessment also addresses specific areas identified in the Agreement: procedural justice, problem solving, and communication skills relevant to minimizing the use of force and to appropriately responding to individuals facing a mental health crisis. *See id.* at 21. Accordingly, the needs assessment process and outcome remain substantially compliant with the Agreement.

As it has in prior years, PPB applied its needs assessments to craft compliant training plans. PPB finalized its 2020 Training Plan in March 2020 based on a September 2019 needs assessment. *See* PPB Training Division, 2020 Annual Training Plan, Mar. 2020, *available at* https://www.portlandoregon.gov/police/article/763790; Evaluation Report, 2019 Annual Training Needs Assessment, Sept. 2019, *available at* https://www.portlandoregon.gov/police/article/756185. For 2021, PPB provided a near-final version of its 2021 Training Plan in December 2021. *See* Email from M. Buckley, Dec. 14, 2020. The Compliance Officer found that the 2021 Training Plan provided a strong overview of the training topics to be covered, the purpose of the training, the dates, and the estimated training hours, and that it responded to gaps in 2020 in-service training. *See* COCL Q4 2020 Report (draft), at 21.

We independently assessed the 2021 Training Plan and agree with the Compliance Officer's assessment.  And, though the 2021 Training Plan is sufficient for substantial compliance, there are still items that the Training Plan does not, but should address:

- First, PPB should enhance its virtual training if PPB intends to shift significant portions of training online.  We conducted an interview with the sole PPB staff professional in charge of LMS (who recently announced their upcoming departure).  While PPB ably used the LMS capabilities to pivot in 2020 and deliver videos of class room instruction to those who could not attend after the start of the pandemic, this was only a temporary fix.  LMS delivery, thus far, has not been interactive.  In order to incorporate adult and problem-based learning for effective training, PPB should identify the necessary resources for delivery of interactive training via LMS.  Indeed, the Agreement Paragraph 84(a) requires "interactive exercises."  The 2021 training plan aptly specifies which courses PPB will convert to on-line instruction, but it is not clear how PPB will manage to deliver such training in an interactive fashion.  PPB should revise its Training Plan to specify how PPB will deliver on-line training in 2021 in an effective manner.

- Second, PPB announced its intention to implement Active Bystandership for Law Enforcement (ABLE) Training.  "Portland police to receive new training on how to intervene when a colleague acts unlawfully or against policy," OregonLive, Sept. 9, 2020, *available at* https://www.oregonlive.com/news/2020/09/portland-police-to-receive-new-training-on-how-to-intervene-when-a-colleague-acts-unlawfully-or-against-policy.html.
DOJ is familiar with this training and its progenitor, the EPIC program in New Orleans that has yielded effective outcomes.  *See* Ethical Policing is Courageous, *available at* http://epic.nola.gov/home/.  PPB has reported that two teams attended train-the-trainer ABLE events.  Like the Compliance Officer (*see* COCL Q4 2020 Report (draft), at 25), we encourage PPB to follow through on its intended dispersion of ABLE training to all its sworn members.  But, as PPB discussed in the November 2020 Training Advisory Council meeting, PPB was then only "beginning work" on planning for such training.  *See* Training Advisory Council Minutes, Nov. 11, 2020, *available at* https://www.portlandoregon.gov/police/article/779916; *see also* Training Needs Assessment, Oct. 2020, at 7.  Currently, ABLE training is absent from the published 2021 Training Plan (though there is a reference to pre-ABLE training for supervisors' in-service training, *see* Training Plan at 5).  The Agreement does not require ABLE training, but it does require a comprehensive annual plan.  *See* ECF 171, Am. Settlement Agreement, Par. 79.  Accordingly, PPB should revise its 2021 Training Plan to incorporate the ABLE component for all officers.

- Third, the Training Plan should specifically address mitigating poor outcomes in crowd control events.  PPB updated its training needs assessment in the third quarter of 2020 to include court decisions since the Training Division's 2019 needs assessment.  *See* "DOJ: Training Division Status Update Training Needs Assessment and Planning 2020 Q3," Oct. 20, 2020.  However, this update predates and therefore does not speak to the recent federal court decision in private litigation that found the City in contempt for conduct during crowd control response in June 2020. *See Don't Shoot Portland* v. *City of Portland*, No. 3:20-cv-00917-HZ, Dkt. 204, Order (D. Or. Nov. 27, 2020).  That order did not specify remedies. *See id.*  However, training to ensure compliance ought to be included.  Accordingly, PPB should

> revise further its Training Plan to address lessons learned from crowd-control events and to mitigate liabilities that arose from those interactions.

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that PPB has maintained substantial compliance with the Agreement requirements that PPB gather and analyze training data, though the pandemic affected the quality of the analysis. As we witnessed during the in-person, in-service training before the pandemic, for each in-service class, PPB continued the process of data gathering that we had previous found compliant. ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 23. PPB's training included competency-based evaluations, namely: knowledge checks (i.e., quizzes on directives), in-class responsive quizzes (using clickers to respond to questions presented to the group); knowledge tests (examinations via links PPB sent to each student's Bureau-issued iPhone); demonstrated skills and oral examination (officers had to show proficiency in first aid skills, weapons use, and defensive tactics); and scenario evaluations (officers had to explain their reasoning for choices after acting through scenarios). Also, as discussed in previous reports, PPB adopted the Kirkpatrick Model, forming a feedback loop to assess the efficacy of training and adapt training, where necessary, to improve its effectiveness. This continues to be the case. *See* "DOJ: Training Division Status Update, Training Program Evaluation, 2020 Q3," Oct. 20, 2020. In a previous report we commented that the Training Division applied a feedback model to shape future training. ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 23. This feedback loop was the intended purpose of Paragraph 80. *See id.* And PPB's utilization of feedback shows PPB's internalization of the remedy. *See id.* The same continues to be true. For example, PPB surveys of its first 2020 advanced academy class showed an eagerness to use the same type of police vehicle throughout training; PPB made this change for the second advanced academy class in 2020. *See* Advanced Academy 2020-1: PVO, at 1. PPB effectively used student surveys in these advanced academy classes.

As the Compliance Officer correctly points out, though, PPB truncated its class evaluations in the spring of 2020 when PPB moved that training online. *See* COCL Q4 2020 Report (draft), at 26. PPB was able to continue knowledge tests through the online platform—another source of data collection for analysis. *See id.* Also, PPB reported that it continued to conduct the class surveys in the second and third quarters of 2020 for advanced academy classes and Enhanced Crisis Intervention Team (ECIT) in-service training. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 44. Despite the truncated data gathering following the onset of the pandemic, we find that PPB's efforts in 2020 were sufficient to maintain compliance with Paragraph 80.

The Compliance Officer reports that PPB plans surveys and knowledge tests for 2021 in-service training. *See* COCL Q4 2020 Report (draft), at 26. This is helpful in understanding PPB's

> remediation to develop data that PPB had difficulty gathering during the pandemic-led shift to online in-service training. However, PPB's plan is not yet implemented. It speaks to future compliance.

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Status | Substantial Compliance |
|---|---|

We agree with the Compliance Officer's most recent assessment that the City has maintained substantial compliance with Paragraph 81. *See* COCL Q4 2020 Report (draft), at 27. As we have in the past, during this monitoring period, we interviewed the LMS administrator and reviewed LMS data provided. PPB reports that it continued to use LMS to assign and track training throughout 2020. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 56. Supervisors are able to reviews their subordinate's training records. *Id.* The Compliance Officer's review of these data, on which we rely, show training records contain employees' completion data. *See* COCL Q4 2020 Report (draft), at 27. As before, PPB continues to use LMS to track training and to issue notices to employees returning from leaves of service. *Id.* When there is noncompliance, PPB provides notice to its Chief's Office and restricts the affected employee until they remedy training deficiencies. *Id.; see also* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 56. PPB also utilizes the State of Oregon's Department of Public Safety Standards and Training (DPSST) tracking of firearm and use-of-force qualification hours to identify those at risk of basic certification suspension if they do not meet minimum required training hours. *See* OREGON DEPARTMENT OF PUBLIC SAFETY STANDARDS AND TRAINING, Annual 2019, SPECIAL POLICE Only Maintenance Training, Jan. 17, 2020. Accordingly, PPB has met our prior technical assistance regarding completion of mandatory trainings following leaves of service. Based on our direct assessment of data and the Compliance Officer's independent audits, PPB continues to substantially comply with Paragraph 81.

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Status | Substantial Compliance |
|---|---|

We agree with the Compliance Officer's most recent assessment that the City has maintained substantial compliance with Paragraph 82. *See* COCL Q4 2020 Report (draft), at 27. PPB provided its Chief's Office with the required reports of both internal and external training for the first half of 2020. *See* PPB, Courses Attended Summary Report, 2020 Courses Attended - External Courses, Jan. 1, 2020 to June 30, 2020; PPB, Courses Attended Summary Report, 2020 Courses Attendance - Internal Courses, Jan. 1, 2020 to June 30, 2020. As before, these reports include a list of course titles, hours per course, and number of attendees. *Id.* As the Compliance Officer indicated, the next semi-annual report will issue in January 2021. *See* COCL Q4 2020 Report (draft), at 27.

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force.  The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer's most recent assessment that the City has maintained substantial compliance with Paragraph 83.  *See* COCL Q4 2020 Report (draft), at 27.  As described in our prior compliance assessment reports, PPB added necessary trainer-selection criteria to its SOP 1-19. ECF 124-1, DOJ 2nd Periodic Compliance Assessment Report; ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report.  We also previously reported that PPB incorporated Paragraph 83's restrictions on the selection of trainers into revised Directive 1500.00, which PPB has since further revised in other sections.    *See* Dir.  1500.00, Par.  12, effective  December  30, 2018, *available at* https://www.portlandoregon.gov/police/article/707656.    We approved further revisions to Directive 1500.00 on October 28, 2020, but PPB has not yet posted this version.  The revised directive retains the operative section concerning trainer selection.

PPB provided a record of having applied SOP 1-19 to clear two trainers for the ABLE program, assuring that neither had a civil judgement based on force in the last five years nor was subject to discipline for use of force against a person with perceived mental illness in the past three years or twice in the past five years.  *See* Training Division Work History Review Sheet, for 2020 Q3, undated.  PPB likewise applied SOP-19 to the selection of trainers and field training officers in the first quarter of 2020.  *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13. 2020, at 61.  PPB reported adding no trainers in the second and third quarter of 2020.  *Id.*

84. All training that PPB provides shall conform to PPB's current policies at the time of training.  PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

a. With respect to patrol officers, PPB shall:

i. increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

ii. emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

iii. continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

iv. continue to train on proactive problem solving and to utilize, when appropriate, disengagement,  area  containment,  surveillance,  waiting  out  a  subject,  summoning

23

reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

v. describe situations in which a force event could lead to potential civil or criminal liability; and

vi. continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-center communication, such as the term "mentals," in all work-related settings and communications, as well as when interacting with the public.

b. With respect to supervisors, provide additional training on how to:

i. conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3;

ii. evaluate officer performance as part of PPB's annual performance evaluation system; and

iii. foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action.

| Status | Partial Compliance |
|--------|--------------------|

As has been the case in prior years, the Compliance Officer and DOJ reviewed and approved in-service lesson plans for the 2020 in-service training. We directly observed an early iteration of the 2020 in-service training. Both the substance and delivery of the training substantially complied with Paragraph 84. Like earlier trainings, nearly all 2020 in-service lessons included scenarios of some sort, sometimes acted out in PPB's scenario village and sometimes conducted in the classroom either by participants or through students analyzing and commenting on video-recorded scenarios. This training substantially complied with the Agreement.

However, implementation changed. Challenges in 2020—the pandemic, crowd control events, and the City-imposed budget cuts—prevented PPB from completing training. PPB, itself, described the disruption to delivery of training and plans for correction as follows:

The 2020 Inservice suffered serious disruptions, first due to the COVID 19 pandemic and later due to staffing challenges resulting from civil unrest. This resulted in over 400 members not receiving the full 2020 Inservice Training. All members received classroom training either in person or via online videos. More than half of the membership did not receive the skills trainings. To rectify this the Training Division plans on covering the following topics during In-service: emergency entries, conducted electronic weapons, control tactics, scenarios focusing on crisis intervention, firearms, and police vehicle operations. These training will use the same learning objectives as the 2020 Inservice. Scenarios and some aspects of the training will be revised so that the training will serve as a refresher training for those who attended the 2020 Inservice but allow those who did not attend to be brought up to speed with the rest of the PPB.

*See* 2021 Training Plan, Dec. 2020, at 2.

And it was not just the pandemic and staffing shortages from crowd control events that prevented PPB from maintaining compliance with the Agreement's training requirements. The City—the defendant in this civil action—made a conscious decision to cut $15 million from PPB's budget, on top of a prior 5% cut. ECF 226-2, COCL Q3 2020 Report, at 4. PPB had relied upon overtime

funding to cover the duties of personnel attending or teaching training. *See id.* at 5. The budget cuts resulted in reducing this previously relied upon overtime budget. *See id.* at 7. PPB had planned to—and had informed DOJ and the Compliance Officer that it would—bring small groups to the Training Division to complete the in-person components of in-service training notwithstanding the pandemic's restrictions on large groups. *See id.* at 28. But, with reduced resources allocated to PPB and demand for personnel to respond to crowd control events, PPB canceled its plans to restore in-service training in 2020. *See id.*

The cumulative result on training has been a compliance deficiency with the Agreement's training requirements in this compliance review period. As the Compliance Officer found in its Third Quarter report:

> Only nine of 19 [in-service training] sessions were completed when the training was halted (covering about 300 officers), leaving nearly 500 members without this fundamental training. As noted in our last report, PPB moved quickly to create online training using its Learning Management System (LMS). However, the LMS training only provided videos of the February classroom training and only initially covered 14 of 36 hours of In-service or 39% of the total content. The bulk of the training that was lost involved the hands-on scenarios where officers practice specific skills, ask questions, and are debriefed on their performance.

*Id.* at 21. And though in-service training is the primary mechanism for training all officers, *id.* at 6, the 2020 challenges affected other areas of training as well. At the onset of the pandemic, PPB also canceled plans for a weekend-long crowd control training. The Compliance Officer and DOJ had been scheduled to observe this training. And while the pandemic affected trainings, to PPB's credit, it managed to complete new supervisors and advanced academy trainings in 2020. *See* COCL Q4 2020 Report (draft), at 21. The Compliance Officer and DOJ reviewed and approved lesson plans for PPB's new sergeants' academy. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 65. The Compliance Officer observed a portion that training in October 2020. *See* COCL Q4 2020 Report (draft), at 21. The Compliance Officer found that training sufficiently covered supervisors' roles and responsibilities in different settings—including crowd management, elements of good decision making, procedural justice, and public legitimacy. *Id.* Thus, PPB was able to plan around its challenges in 2020 and execute portions of its usual non-in-service trainings.

PPB now has a plan to remedy its acknowledged in-service training deficiencies in the upcoming 2021 training. The Compliance Officer opines that the plan is sufficient. *See* COCL Q4 2020 Report (draft), at 21. At this point, though, it is only a plan. Plans must be implemented to reach substantial compliance. Accordingly, PPB has not maintained substantial compliance with the requirements of Paragraph 84 during this monitoring period. And, this lack of compliance has not been minor or occasional and has affected the entire training system. *See* ECF 171, Am. Settlement Agreement, Par. 175(a).

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

a. Conducts a comprehensive needs assessment annually;

b. Creates a Training Strategic Plan annually;

c. Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training;

d. Maintains accurate records of Training delivered, including substance and attendance;

e. Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ;

f. Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and

g. Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Status | Substantial Compliance |
|--------|------------------------|

PPB previously completed the required audit of training. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 28. PPB did not schedule an additional training audit during this compliance period. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 71. PPB's auditing team, instead, has focused on internal affairs. *Id.* The team plans audits of Employee Information System and Behavioral Health Unit thereafter. *Id.* Given the relative recency of the prior training audit, the absence of a redundant audit is acceptable. PPB's established system for a training audit remains in compliance.

PPB continued to apply a directives-tracking tool in compliance with Paragraph 85(g). As we previously described, the tool showed when PPB assigns newly revised directives for sworn members' review and when the reviews are due. ECF 195-1 at 28. For the second quarter of 2020, PPB produced a report listing the compliance rate for members' review of recently enacted directives. *See* 85g_DOJ Directives Acknowledgment_2020Q2.pdf. Members reviewed these directives within 30 days in 96.3% to 99.2% of occasions. *Id.* The remainder also completed their reviews, but outside the 30-day window. *Id.* Thus, 100% of members reviewed all new or revised directives. *Id.*

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Status | Substantial Compliance |
|--------|------------------------|

PPB has substantially complied with Paragraph 86. The Compliance Officer found substantial compliance too. *See* COCL Q4 2020 Report (draft), at 28.

The Force Inspector presented to TAC January 8, 2020, reporting on data from the third quarter of 2019, and on July 8, 2020, reporting on data from the fourth quarter of 2019 and first quarter of 2020. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 77. TAC did

not meet as usually scheduled in the second quarter because of the pandemic. *Id.* Accordingly, PPB presented both quarters' force data at the following TAC meeting. *Id.*

Significant in relation to the genesis of this case, in non-crowd control uses of force, the force instances against persons in perceived mental health crisis showed a continued downward trend and low rate. *See* Portland Police Force Audit Team, June 30, 2020. In the first quarter of 2020, PPB used force against 23 subjects in a perceived mental health crisis, out of 89,015 calls for service and 166 force events. *Id.* at slides 4, 5. Overall, PPB's data indicate that 3.5% of custodies in the first quarter of 2020 involved a force incident. *Id.* at slides 2, 4.

## Changes in Force Applications

| Force Type | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 |
|---|---|---|---|---|
| Control Against Resistance | 301 | 287 | 296 | 213 |
| Resisted Handcuffing | 228 | 228 | 166 | 160 |
| Takedown | 107 | 102 | 83 | 62 |
| Takedown - Controlled | 64 | 48 | 26 | 45 |
| Strikes / Kicks | 31 | 39 | 51 | 45 |
| CEW | 22 | 31 | 14 | 23 |
| Pointing of a Firearm | 37 | 31 | 21 | 21 |
| Box-in | 7 | 17 | 8 | 27 |
| Hobble Restraint | 15 | 11 | 13 | 6 |
| Aerosol Restraint | 0 | 8 | 3 | 5 |
| K-9 Bite | 2 | 8 | 4 | 3 |
| Less Lethal | 7 | 4 | 4 | 10 |
| Baton - Nonstrike | 0 | 1 | 1 | 0 |
| Holds with Injury | 1 | 1 | 0 | 1 |
| P.I.T. | 4 | 1 | 4 | 4 |
| Firearm - Animal (suffering) | 3 | 0 | 2 | 5 |
| Firearm - Animal (aggressive) | 0 | 0 | 0 | 0 |
| Impact Weapon - Strike | 1 | 0 | 0 | 0 |
| Vehicle Ramming | 1 | 0 | 1 | 2 |
| **Total** | **831** | **817** | **697** | **632** |

TAC issued a series of recommendations in 2020. *See* Training Advisory Council, recommendations, *available at* https://www.portlandoregon.gov/police/71096. Consistent with our prior technical assistance, PPB has responded to TAC recommendations in writing. *See, e.g.,* Memorandum from Chief C. Lovell to TAC, *TAC Support for Prioritizing Equity Staffing and Advisory Group Evaluation*, Nov. 2, 2020, *available at* https://www.portlandoregon.gov/police/article/765710.

TAC revised, again, its self-governing bylaws. *See* TAC Bylaws, adopted Jan. 29, 2020, *available at* https://www.portlandoregon.gov/police/article/763118.

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Status | Substantial Compliance |
|---|---|

PPB has substantially complied with Paragraph 87. The Compliance Officer found substantial compliance too. *See* COCL Q4 2020 Report (draft), at 28. As before, TAC meetings remain open

to the public, even during the pandemic. TAC has met virtually via Zoom since its July 8, 2020 meeting. *See, e.g.*, TAC Meeting Minutes, July 8, 2020, *available at* https://www.portlandoregon.gov/police/article/766197. TAC's website advertises planned agendas in advance of meetings. *See* TAC 2021 Agendas, *available at* https://www.portlandoregon.gov/police/78362. PPB reports having emailed to its TAC public distribution list reminders of the meetings and agendas. Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at pp, 85-86. TAC's meeting minutes reveal community members who have availed themselves of the public access to TAC meetings and made public comments. *See* TAC 2020 Minutes, *available at* https://www.portlandoregon.gov/police/80998. Accordingly, PPB remains in substantial compliance with this Paragraph.

## V.    COMMUNITY-BASED MENTAL HEALTH SERVICES

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 88.

PPB continues to engage community partners in an effort to bridge various gaps in Oregon's statewide mental health infrastructure, including by interfacing with community-based addiction and mental health service providers. PPB's Behavioral Health Unit (BHU) regularly collaborates with state and county partners, area CCOs, community-based mental health service providers, the PCCEP's Behavioral Health Subcommittee, and other relevant stakeholders. *See* BHU, *available at* https://www.portlandoregon.gov/police/62135. The BHU Advisory Committee (BHUAC), the Service Coordination Team (SCT), and PPB's multiple Behavioral Health Response Teams (BHRTs) have cultivated positive relationships with governmental and non-governmental partner organizations, including the Behavioral Health Coordination Team, the Unity Center Advisory Council, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. The SCT, in particular, has for years partnered successfully with Central City Concern to provide a direct housing resource for BHRT clients through the Supportive Transition & Stabilization Program. *See* ECF 224-2, COCL Q1 2020 Report, at 29; ECF 226-1, COCL Q2 2020 Report, at 30; ECF 226-2, COCL Q3 2020 Report, at 35; COCL Q4 2020 Report (draft), at 36-38; *see also* BHU Newsletter, Jan. 2016, *available at* https://www.portlandoregon.gov/police/article/561475 (announcing program). The BHU

regularly publicizes its efforts in flash alerts distributed to an extensive mailing list and in newsletters, which are available on the City's external website.  *See* BHU Newsletters, *available at* https://www.portlandoregon.gov/police/68896.

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs.  All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 89.

PPB continues to work with the Unity Center (Unity) and its Transportation Subcommittee to facilitate transfer of individuals by ambulance to Unity and local hospital emergency rooms.  PPB directives provide for such transfer and transport.  *See* Dir. 630.45, *available at* https://www.portlandoregon.gov/police/article/526144;  Dir. 850.20, *available at* https://www.portlandoregon.gov/police/article/701129.  The City also provided material financial support to assist Unity's establishment.

The United States has repeatedly deemed Unity to meet the expectation laid out in Paragraph 89 that local CCOs establish a walk-in/drop-off center for individuals with addiction and/or behavioral health service needs.  *See, e.g.*, ECF 158, DOJ 3rd Periodic Compliance Assessment Report at 37; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report at 31.  The Compliance Officer has similarly considered Unity to fulfill this expectation.  *See* ECF 226-1, COCL Q2 2020 Report, at 24; ECF 226-2, COCL Q3 2020 Report, at 7, 30; COCL Q4 2020 Report (draft), at 30.  However, three additional points bear mention.

First, in response to community member concerns and the Court's questions, on October 2, 2018, DOJ filed a status report addressing the number of people arrested at the Unity Center.  ECF 191.  Between January 31, 2017 and April 30, 2018, there were 30 arrests, of which 10 were current Unity patients, 5 were not patients, and 15 were discharged patients.  Over that period, Unity served 8,821 individuals across 14,970 encounters, yielding an arrest rate of about 1 in every 500 encounters.  *Id.* at 3-4.  DOJ provided updated arrest statistics in 2019.  Between May 1, 2018 and February 28, 2019, there were 16 arrests, of which 2 were not patients and 14 were discharged patients.  Over that period, Unity served 6,149 individuals across 9,844 encounters, yielding an arrest rate of about 1 in every 615 encounters.  ECF 195-1 at 31.  Between March 1, 2019 and November 30, 2020, there were 28 arrests, of which 3 were not patients and 24 were discharged patients.  Over that period, Unity served 8,767 individuals across 18,042 encounters, yielding an arrest rate of about 1 in every 645 encounters.[1]

---

[1] Unity voluntarily provided statistical information to DOJ for us to respond to the Court's inquiry and provide updates in periodic compliance assessment reports.  Unity is not a party to this litigation, however, and DOJ has not rigorously evaluated and does not opine here on the quality of care that Unity has provided to its clients and staff.

Second, in 2017 and 2018, Unity confronted serious, well-publicized challenges with respect to safe operations for clients and employees, which in turn jeopardized Unity's funding. *See, e.g.,* The Lund Report, *Feds, State Fault Unity Center – Again – Following Complaints, Failure to Protect Patients*, Sept. 29, 2020, *available at* https://www.thelundreport.org/content/feds-state-fault-unity-center-again-following-complaints-failure-protect-patients. Between October 2019 and April 2020, the Oregon Health Authority conducted another survey that found more problems, leading the Centers for Medicare & Medicaid Services to issue another formal statement of deficiencies. *See id.*; *see also* Unity Center, Recent Updates, *available at* https://www.unityfacts.org/recent-updates. Unity implemented corrective actions. *See* Unity Center, Plan of Correction, *available at* https://www.unityfacts.org/wp-content/uploads/2020/09/ucbh-poc-9.03.20-.pdf. In December 2020, Unity was deemed to have successfully eliminated the identified deficiencies. *See* DHHS, Centers for Medicare & Medicaid Services, Compliance Report Cover Letter, Dec. 4, 2020, *available at* https://assets.documentcloud.org/documents/20457491/cms-dec-2020-survey-letter.pdf. Unity remains subject to the supervision of appropriate state and federal health authorities. The City continues to collaborate with Unity and other partners to help remedy the lack of community-based addiction and mental health services, including in relation to a new proposed, expanded sobering center that would also provide intake, triage, and assessment services. *See* OregonLive, Jan. 15, 2020, *available at* https://www.oregonlive.com/portland/2021/01/portland-city-officials-healthcare-providers-consider-broader-replacement-for-shuttered-sobering-station.html.

Third, in December 2019, the PCCEP recommended that the Compliance Officer reevaluate its compliance finding for Paragraph 89 because the Unity Center had a documented record of performance deficiencies and the PCCEP determined that the Unity Center "is not a 'walk-in center' as defined by field experts." *See* PCCEP, Subcommittee for People with Mental Illness, Recommendation, *available at* https://www.portlandoregon.gov/pccep/article/744153 (referencing a February 2019 memo from Derald Walker and Jeffrey Eisen of Cascadia Behavioral Healthcare to Judge Simon ("February 2019 Cascadia memo"), which purportedly "defines the qualities of a walk in and drop off facility as significantly different than a hospital-level psychiatric emergency service," like the Unity Center).

DOJ regularly reevaluates its assessment of the City's compliance with the terms of the Amended Settlement Agreement in each periodic report that we file. We have carefully considered the information relied on by the PCCEP. The February 2019 Cascadia memo opines on the characteristics that make for an "effective and efficient" drop off / walk in center,[2] but neither addresses whether Unity lacks those characteristics nor asserts that, as a result, Unity cannot qualify as a drop off / walk in center. ECF 218, Declaration of Juan Chavez, at 4-5 (attaching the February 2019 Cascadia memo). Regardless, for the reasons stated above, we reaffirm our view that the City is in substantial compliance with Paragraph 89.

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU"), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include:

---

[2] DOJ takes no position in this case on what constitutes best practices for operating a drop off / walk in facility.

a. Increased sharing of information, subject to lawful disclosure, between agencies and organizations including BOEC, Multnomah County, and health care providers to create an information exchange among first responders and providers to better serve those suffering from mental illness;

b. Creation of rapid-access clinics so those in crisis have access to timely medication management appointments;

c. Enhancing access to primary care providers to shift low-to moderate acuity patients to primary care programs creating more capacity for acute patients in existing outpatient crisis mental health systems;

d. Expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders;

e. Addressing issues of unmet needs identified by Safer PDX and its community partners;

f. Expanding and strengthening networks of Peer-Mediated services to:

    i. develop a referral guide delineating these services and locations and assist with accessing information;

    ii. better educate the community of the viability of these services as alternative first engagement sites/programs for those having difficulty engaging with "professional driven" services;

    iii. expand peer services connected to peer supports in the community for inpatient psychiatric units (including Emergency Departments) and in the community;

    iv. add peer guides to work alongside Emergency Department guides for those patients with behavioral health issues entering the Emergency Department; and

    v. evaluate opportunities to expand use of peers to coordinate with PPB ABHU (as described herein) and function as a link with impacted individuals; and

g. pursue tele-psychiatry (a provision of mental health care by video conferencing) as a way for first responders to take advantage of existing IT infrastructure to provide direct care or provider evaluation supporting the provision of appropriate services to an individual in crisis.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 90.

Within PPB, the BHU continues to contribute to local, regional, and statewide efforts, including data-sharing initiatives, outreach programs, and a variety of ad hoc efforts with service system partners.  As one example, BHU officers participate in a weekly call with partners across the spectrum of the criminal justice and behavioral health systems, including Central City Concern, Department of Community Justice, District Attorney Offices, Transition Project Inc., Urban League, and Multnomah County Sheriff's Office.

Outside PPB, BOEC continues to take meaningful steps to expand its capacity and to divert 911 calls from police response when proper.  BOEC's quality assurance program ensures that 911 operators triage calls appropriately, including by diverting certain calls for service from armed police response.  *See* ECF 224-2, COCL Q1 2020 Report, at 24-25; ECF 226-1, COCL Q2 2020 Report, at 25-26, 31; ECF 226-2, COCL Q3 2020 Report, at 31-32; COCL Q4 2020 Report (draft), at 32-33.  For example, BOEC trains its dispatchers on when and how to transfer calls to non-emergency

information lines, including the Multnomah County Crisis Line. BOEC dispatchers continue to do this effectively. *See infra*, Paragraph 115. In addition, BOEC and Portland Fire & Rescue are participating in a pilot program that provides a non-police response to certain calls for service involving the unhoused or people experiencing a behavioral or mental health crisis. *See* Street Response, *available at* https://www.portland.gov/streetresponse.

The City's efforts to share information subject to lawful disclosure and to expand the pool of available first responders to calls that are likely to involve a mental health component exceed the City's obligations under Paragraph 90.

## VI.    CRISIS INTERVENTION

The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises. The PPB will add new capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis as required by this Agreement. Despite the critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force.

### A. Addictions and Behavioral Health Unit and Advisory Committee

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 91.

PPB has established and maintained the units, the staffing, and the command structure set forth in the Agreement, though PPB uses slightly different names for most of the units. Specifically, in this Agreement, the following entities and acronyms refer to the following PPB entities:

- Addictions and Behavioral Health Unit = PPB's Behavioral Health Unit (BHU).

The BHU exemplifies the City's effort to coordinate law enforcement activity with the broader behavioral health system to aid people in crisis resulting from known or suspected mental illness and/or addiction. *See* BHU, *available at* https://www.portlandoregon.gov/police/62135. The BHU assists the Training Division in providing high-quality crisis intervention training and enhanced crisis intervention training. Lieutenant Casey Hettman currently manages the BHU, participating in the BHU Advisory Committee, ensuring ECIT and BHRT officers maintain qualifications, and screening ECIT applicants to confirm they meet criteria.

- Crisis Intervention Team = PPB's Enhanced Crisis Intervention Team (ECIT).

ECIT officers are a volunteer group of specially trained, primary responders to calls for service that involve a mental health crisis and a heightened risk of harm. *See, e.g.*, PPB Training Division, *2018*

*ECIT Evaluation Report*, Feb. 2019, *available at* https://www.portlandoregon.gov/police/article/759082.

- Mobile Crisis Prevention Team = PPB's Behavioral Health Response Team (BHRT).

PPB has four BHRT units. Each BHRT unit consists of a sworn officer and a licensed clinician from Cascadia's Project Respond. A BHRT unit follows up with a person who has repeated contacts with law enforcement while in a mental health crisis to help that person avoid future involuntary contacts with law enforcement. *See* BHRT, *available at* https://www.portlandoregon.gov/police/article/458966; Project Respond, *available at* https://www.cascadiabhc.org/services/crisis-intervention/#_ProjectRespond.

- Service Coordination Team = PPB's Service Coordination Team (SCT).

The SCT coordinates treatment and other wrap-around services to reduce recidivism among frequent drug and property crime offenders. Portland State University has a Capstone Class that reports annually on the SCT program and analyzes its effectiveness. *See, e.g.*, PSU Capstone Class, *Study of the Service Coordination Team and its influence on chronic offenders*, 2018 Report, *available at* https://capstone.unst.pdx.edu/sites/default/files/2018%20Capstone%20final%20report%20%28final%20draft%29.pdf.

The City reports that it has moved administration of the contracts underlying the SCT program away from PPB to another bureau. However, the BHU presently continues to oversee and coordinate the SCT's operations along with BHRT units and ECIT officers. In addition, DOJ is not yet aware of any negative operational effect caused by this restructuring. *See* COCL Q4 2020 Report (draft), at 38. Because Paragraph 91 creates an ongoing obligation, we will monitor the BHU's interaction with the SCT for the duration of this Agreement, as well as the SCT's operations, to ensure compliance with the ongoing obligation set forth in Paragraph 112.

92. ABHU will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 92.

The BHU continues to use and share data to minimize PPB interactions with and potential use of force against consumers of mental health services. The BHU does this in three primary ways: (1) weekly reports to the Multnomah County Crisis Line from the BHU Electronic Referral System (BERS), which monitors individuals referred for BHRT follow-up; (2) Behavioral Health Coordination Team meetings to identify and reach individuals with frequent police contact to ensure against future contacts; and (3) regular meetings between SCT and service system partners to coordinate services. The BHU also shares outcome data from ECIT officers, BHRT units, and the SCT with the BHU Advisory Committee for their consideration and guidance. We continue to agree with the Compliance Officer's assessments that these efforts minimize the frequency and improve the outcome of police contacts with consumers of mental health services. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 34; *see also* ECF 224-2, COCL Q1 2020

Report, at 29; ECF 226-1, COCL Q2 2020 Report, at 31; ECF 226-2, COCL Q3 2020 Report, at 33-36; COCL Q4 2020 Report (draft), at 6-7.

In addition to the BHU's ongoing efforts, the City has endeavored to decrease law enforcement contacts and mitigate potential uses of force against consumers of mental health services through Portland Fire & Rescue's Community Healthcare Assessment Team (CHAT) program and the Portland Street Response pilot program.  *See generally* Cogglevation – The Life and Times of PF&R's Strategic Plan, *Getting Chatty with Tremaine Clayton, the Bureau's Community Health Outreach Worker*, *available at* https://www.portlandoregon.gov/fire/article/685590;  Portland Street Response, *available at* https://www.portland.gov/streetresponse.

93. ABHU shall track outcome data generated through the C-I Team, MCPT, and SCT, to:  (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 93.

PPB officers and data analysts regularly collect and analyze outcome data from qualifying mental health encounters.  In April 2020, the BHU data analyst presented a report to the BHU Advisory Committee on outcomes from the four layers of PPB's mental health response system, including patrol officers, ECIT officers, BHRT units, and the SCT.  *See* BHU Advisory Committee, Meeting Minutes, Apr. 22, 2020, *available at* https://www.portlandoregon.gov/police/article/779908.  We continue to agree with the Compliance Officer's assessments that the BHU successfully informs its work with that data, as well as data from the BHRT and SCT programs.  *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 35; *see also* ECF 224-2, COCL Q1 2020 Report, at 24-29; ECF 226-1, COCL Q2 2020 Report, at 25-31; ECF 226-2, COCL Q3 2020 Report, at 31-36; COCL Q4 2020 Report (draft), at 38.

Through the BHU Advisory Committee and the Unity Transportation Committee, the BHU Advisory Committee has identified training needs and solutions to issues to ensure appropriate response to people in crisis.  As one example, when a BHU data analyst identified a trend of individuals having repeat law enforcement contacts around 18 months after an initial contact, the BHU assigned a BHRT unit to follow-up proactively with such individuals before their next police encounter.  The BHU's "Frequent Contact Referral" process also continues to function effectively to link individuals with three or more ECIT-designated calls to mental health services.

The BHU regularly highlights its operations and officer performance, including commendations for successfully resolving calls involving a mental health component. *See* BHU Newsletters, *available at* https://www.portlandoregon.gov/police/63093.  BHU Advisory Committee meetings typically begin by recounting officer success stories in cases involving subjects experiencing a mental health crisis, as reflected in the publicly reported in meeting minutes.  *See* BHU Advisory Committee, Meeting Minutes, *available at* https://www.portlandoregon.gov/police/68755.

94. Within 90 days of the Effective Date, PPB shall also establish an ABHU Advisory Committee. The ABHU Advisory Committee shall include representation from:  PPB command leadership, CIT,

MCPT, and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 94.

The BHU Advisory Committee has met regularly since 2013. Its current membership includes representation from the required entities. *See* BHU Advisory Committee, Roster, *available at* https://www.portlandoregon.gov/police/article/545177. DOJ and the Compliance Officer have periodically observed meetings. The COVID-19 pandemic had some impact on the Committee's schedule, with the March meeting canceled. The Committee has held several meetings remotely and canceled two meetings (February and August) for other reasons. BHU Advisory Committee members continue to offer diverse perspectives and thoughtful guidance to advance the BHU's mission.

Some community members have asked the BHU Advisory Committee to open its meetings to the public or alternatively, as the Court has mentioned, *see* ECF 175, Hearing Transcript, at 157:25 – 158:3, open some part of its meetings. The City Attorney's Office has opined that the Committee has discretion to decide the issue for itself because Oregon public meetings laws dictate no particular outcome. DOJ does not view the City's compliance with either Paragraph 94 or Paragraph 95, or any other term of this Agreement, to turn on how the Committee exercises its discretion on this issue.

The Committee has repeatedly declined to open any part of its meetings to the public, and instead published its reports and meeting minutes. *See* BHU Advisory Committee, Meeting Minutes, *available at* https://www.portlandoregon.gov/police/68755; BHU Monthly Reports, *available at* https://www.portlandoregon.gov/police/70713; BHU Status Reports, *available at* https://www.portlandoregon.gov/police/69679; BHU Additional Reports, *available at* https://www.portlandoregon.gov/police/70726. In addition, Committee members have expressed their willingness to speak with community members individually on request and followed through. The BHU and its Advisory Committee members have often attended and presented information to the PCCEP's Behavioral Health Subcommittee. *See, e.g.*, BHU Presentation to PCCEP, June 2, 2020, *available at* https://www.portlandoregon.gov/pccep/article/761724.

In December 2019, the Advisory Committee began formulating a community engagement plan, soliciting feedback from Committee members, amicus curiae Mental Health Alliance, and the PCCEP.[3] The Committee considered a draft plan at its January 2020 meeting. *See* BHU Advisory Committee, Meeting Minutes, Jan. 22, 2020, *available at* https://www.portlandoregon.gov/police/article/760063; The Committee approved the plan at its May 2020 meeting. *See* BHU Advisory Committee, Meeting Minutes, May 27, 2020, *available at* https://www.portlandoregon.gov/police/article/764706. The plan is publicly available on the PCCEP's website. *See* BHU Community Engagement Plan, *available at* https://www.portlandoregon.gov/pccep/article/761723.

---

[3] The Mental Health Alliance did not respond to the BHU Advisory Committee's letter soliciting input.

95. The ABHU Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of C-I Team, MCPT, SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The ABHU Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The ABHU Advisory Committee shall report its recommendations to the ABHU Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 95.

The BHU Advisory Committee continues to provide informed guidance as required by this Agreement. The Committee's efforts are reflected in the reports and meeting minutes referenced in our assessment of Paragraph 94.

In 2020, the Committee developed and approved a BHU community engagement plan, coordinated with other PPB advisory councils, and reviewed data reports about calls for service involving a mental health component. The report analyzed trends and detailed outcomes for consumers of mental health services in encounters with patrol officers, ECIT officers, BHRT units, and the SCT. The Committee also interfaced with PPB's training division, PPB's Equity and Inclusion Office, PPB's Homeless Community Liaison, and the PCCEP. The Committee continues to monitor the circumstances surrounding the Unity Center's status and any implication for ECIT officers or transporting individuals in crisis.

96. Within 240 days of the Effective Date of this Agreement, the ABHU Advisory Committee will provide status reports on the implementation of the ABHU and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 96.

The BHU Advisory Committee continues to review policies, procedures, training, and data to identify recommendations for improvement. The Committee's members have relevant professional expertise across the spectrum of the criminal justice and mental health service systems and include those with lived experience at the intersection of mental illness and police encounters. Committee members have also attended multiple PCCEP Behavioral Health Subcommittee meetings, exchanging information and ideas with community members that way, too. In 2020, the Committee did not identify any recommendations to improve crisis triage, but made recommendations about other procedures, which were adopted. *See* BHU Advisory Committee, Meeting Minutes, Sept. 23, 2020, *available at* https://www.portlandoregon.gov/police/article/768228.

## B. Continuation of C-I Program

97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City.  PPB shall continue to train all officers on C-I.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 97.

PPB continues to provide all officers with crisis intervention training, though some training went on-line in 2020 due to the COVID-19 pandemic and statewide restrictions on in-person gatherings. *See* ECF 226-1, COCL Q2 2020 Report, at 26; ECF 226-2, COCL Q3 2020 Report, at 32; COCL Q4 2020 Report (draft), at 33.  DOJ and its expert continue to share the Compliance Officer's assessments that PPB's crisis intervention training reflects the value that the organization places on this core competency.  *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 37; *see also* ECF 224-2, COCL Q1 2020 Report, at 25; COCL Q4 2020 Report (draft), at 33.

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call response duties.  Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with ABHU Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 98.

PPB developed its crisis intervention training in consultation with the BHU Advisory Committee. DOJ, its expert, and the Compliance Officer have reviewed lesson plans and training.  We continue to view PPB's crisis intervention training to be high quality.

## C. Establishing "Memphis Model" Crisis Intervention Team

99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 99.

The core features of the Memphis Model are law enforcement partnerships with advocacy groups and mental health service providers; local ownership; a volunteer group of specially trained officers comprising around 25% of the patrol division; and protocols and training for 911 call dispatchers to ensure specially trained officers respond as primary officers to pre-identified calls involving a mental health crisis.  *See* University of Memphis, *Crisis Intervention Team Core Elements*, *available at* http://www.cit.memphis.edu/information_files/CoreElements.pdf.

PPB has established an Enhanced Crisis Intervention Team (ECIT), which consists of a volunteer group of officers who receive an additional 40 hours of crisis intervention training on top of the 40 hours that PPB provides to all patrol officers.  By the end of 2020, ECIT officers comprised about

37

35% of PPB's patrol force.  The ECIT team operates as part of the BHU, though ECIT officers are not relieved of regular patrol duties.  The BHU maintains a web of interrelated partnerships with advocacy groups and mental health service providers.  These characteristics are consistent with the Memphis Model's core feature.  PPB has made available online an overview of the ECIT program and an evaluation of the ECIT training.  *See* Evaluation Report, Feb. 2019, *available at* https://www.portlandoregon.gov/police/article/557965.

PPB's BHU varies from the classic Memphis Model by adopting a dispatch protocol that triages mental health crisis calls, sending ECIT officers to calls that pose a relatively greater risk of harm to the subject or others.  BOEC trains its 911 call takers to recognize the signs and symptoms of a mental health crisis, and BOEC protocol requires dispatching ECIT officers when a call involves both a mental health crisis and one of seven plus-factors:

(1) The subject is violent toward others (physically combative, threatening violence, assaulting);

(2) The subject has a weapon;

(3) The subject is threatening or attempting suicide;

(4) The call is at a mental health facility;

(5) Upon request of the caller;

(6) Upon request of a responding officer; or

(7) The subject's behavior indicates an escalating risk of harm of self or others.

For calls that fall outside these categories, BOEC dispatches a nearby available patrol officer, of which about 35% are ECIT and 65% are not.  As noted in Paragraph 97, non-ECIT officers receive 40 hours of basic crisis intervention training.  The City adopted this approach for important local historical reasons, including the 1992 officer-involved shooting death of Nathan Thomas and the 2006 in-custody death of James Chasse.  Those tragic outcomes led to community demands for all officers to receive crisis intervention training so that all officers would be prepared to identify the signs and symptoms of crisis, de-escalate encounters, and resolve calls safely and lawfully.  In this regard, to the extent Portland's variation on the Memphis Model arises from local ownership and partnerships with local advocacy groups and mental health service providers, the BHU's approach to mental health crisis response is substantially compliant with this Paragraph's requirement to establish a Memphis Model crisis intervention team.

In addition, the City has laid out legitimate reasons for its approach.  For one, training all patrol officers to handle calls involving a mental health crisis prepares those officers to resolve such calls.  Dispatching all patrol officers to lower risk calls involving a mental health crisis gain gives those experience to resolve such calls safely.  The City's ECIT program incorporates the informed view of the BHU Advisory Committee and builds off a foundation of community support.  PPB and BOEC quality assurance measures have functioned as an effective feedback loop to identify issues, enhance training, and further develop the City's particularized law enforcement response to mental health crises.  In sum, though the BHU's triage approach varies slightly from the Memphis Model, the City has justified the variance based on local needs with input from community partners.

The City has demonstrated the effectiveness of its approach.  In December 2018, the City reported the first six months of ECIT program data under the current dispatch criteria.  BOEC reported an increase in ECIT dispatches, receiving 1,877 calls meeting ECIT criteria (1) through (7).  PPB also reported generally positive outcomes in terms of reduced use-of-force probability in calls involving a mental health component and increased likelihood of transport to a hospital rather than to jail.

Over the six-month period from April 1 to September 30, 2018, PPB reported 28 uses of force over 13,559 service encounters involving a mental health component, which is about one-fifth of one percent, or 1 in every 500 encounters.[4]

After reviewing the City's 2018 report, and in consultation with expert consultants, DOJ approved PPB's directives relating to mental health crisis intervention, including Directive 850.10 – Police Response to Mental Health Crisis on March 4, 2019. *See* Dir. 850.20, *available at* https://www.portlandoregon.gov/police/article/778534. The policy emphasizes de-escalation and disengagement, when appropriate, and connecting people with services such as transport by ambulance to hospital as opposed to by police cruiser to jail.

Since 2018, the City has provided six-month data reports four times. Outcomes remain generally positive and reflect a crisis intervention approach that substantially complies with this Agreement. Most of the data sets continue to show that both ECIT and non-ECIT officers are getting people to the hospital by ambulance rather than taking them to jail in a police cruiser. However, the most recent data set shows an unexpected slight increase in jail transports among ECIT officers in calls that do not meet ECIT-dispatch criteria. *See* COCL Q4 2020 Report (draft), at 35. The cause of the statistical anomaly is not yet clear. We will continue to monitor along with the Compliance Officer.

Force remains low in relation to encounters involving an actual or perceived mental health component. In the most recent six-month set of data, PPB officers responded to 8,880 calls involving a mental health component, as indicated by a gatekeeping data point. Force was used in 76 encounters, or 0.9 percent of the calls. This is consistent with aggregate data from PPB's Mental Health Template. Over the 30-month period from April 1, 2018 to September 30, 2020, PPB officers responded to more than 54,000 calls involving a mental health component. Force was used in less than 1 percent of the calls. Most often this was Category 4 force (256 cases), the lowest level of force, defined as not reasonably likely to result in physical injury. Category 2 and 3 force, which includes the use of ECWs or Tasers, was used in just one-fourth of one percent of encounters (144 cases).

In assessing the City's compliance with this Paragraph, we assess the totality of the City's crisis intervention approach, including policy, training, aggregate data about outcomes, and community partnerships. We continue to find that the City is in substantial compliance with the terms of this Paragraph and this Section. Our determination is not meant to minimize the serious trauma associated with even a single deadly force event, but instead acknowledges that the City has implemented a crisis intervention approach, as required.

100. PPB's C-I Team shall be comprised of officers who volunteer for assignment to the C-I Team. The number of C-I Team members will be driven by the demand for C-I Team services, with an initial goal of 60-80 volunteer, qualified officers.

---

[4] For reference, over the five-month period from April 25 to September 30, 2017, PPB reported using force in 22 of 8,939 calls for service involving a mental health component, or about one-fourth of one percent of encounters.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 100.

PPB exceeds the initial goal of 60-80 volunteer members.  As of November 13, 2020, PPB reports 153 sworn members with active ECIT certification, of which 124 are operational uniformed officers appropriately spread out across shifts and precincts.  BHU data analysis shows that ECIT officers are arriving at between 70 and 75 percent of calls to which BOEC directly dispatches them, which is consistent with expectations based on prior data analyses and within the range of reasonable.  *See* ECF 226-1, COCL Q2 2020 Report, at 27.  When an ECIT officer does not arrive on scene, the predominant reason is that another officer arrived first and called off the ECIT officer after resolving the situation.  *See* ECF 224-2, COCL Q1 2020 Report, at 25-26; ECF 226-1, COCL Q2 2020 Report, at 27; COCL Q4 2020 Report (draft), at 34.

101. No officers may participate in C-I Team if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of C-I Team service, or during C-I Team service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the C-I Team.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 101.

With the advice of the BHU Advisory Committee, PPB adopted standard operating procedures that appropriately define criteria for qualification, selection, and ongoing participation as an ECIT officer.  The BHU Lieutenant enforces these rules by monitoring EIS alerts for ECIT officers, reviewing BHU data analyses, and interfacing with the Professional Standards Division.  To date, no ECIT officer has been subject to discipline based on using force or mistreating people with mental illness.

102. PPB shall specially train each C-I Team member before such member may be utilized for C-I Team operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for C-I Team members consistent with the Memphis Model.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 102.

PPB provides specialized training to new ECIT team members, which consists of 40 hours of enhanced crisis intervention training in addition to the 40 hours of introductory crisis intervention training that all patrol officers receive.  The BHU develops the training in collaboration with the Training Division and the BHU Advisory Committee.  ECIT training emphasizes de-escalation and communication, and how to recognize the signs and symptoms of a mental health crisis.  Additional detail about the ECIT training program is available online.  *See* 2014 ECIT Training Evaluation, *available at* https://www.portlandoregon.gov/police/article/557965; 2015 ECIT Training Evaluation, *available at* https://www.portlandoregon.gov/police/article/635138; 2018 ECIT

Evaluation Report of Mental Health Partnership Effectiveness, *available at* https://www.portlandoregon.gov/police/article/686016; 2018 ECIT Training Evaluation, *available at* https://www.portlandoregon.gov/police/article/756181.    The ECIT training program is consistent with the Memphis Model.

In November 2019, 20 new ECIT officers completed their 40-hour training course, which included sessions led by local psychiatric professionals, mental health providers, family advocates, and mental health consumers, as well as BHU staff.  In August and September 2020, PPB provided one-day ECIT refresher courses on ten occasions, which included sessions on strategic communication, data collection, and the BHU's secondary response systems (BHRT units and the SCT).  DOJ, its expert consultants, and the Compliance Officer have consistently found the ECIT training program to be high quality in form and content.  *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 42; ECF 224-2, COCL Q1 2020 Report, at 25; ECF 226-1, COCL Q2 2020 Report, at 26; COCL Q4 2020 Report (draft), at 21.

103. C-I Team members will retain their normal duties until dispatched for use as a C-I Team.  BOEC or PPB may dispatch C-I Team members to the scene of a crisis event.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 103.

ECIT officers retain their normal duties, as required, until BOEC sends them to a call that meets ECIT-dispatch criteria.  As described in Paragraph 99, BOEC operators dispatch ECIT officers to the scene of a call that involves a mental health crisis and one of seven "plus-factors," i.e., criteria the City deems a proxy for relative risk of harm.  The dispatch criteria include calls in which either the 911 caller or a PPB officer asks for an ECIT officer, thus satisfying this Paragraph's requirement that both BOEC and PPB be able to dispatch ECIT officers to the scene of a crisis event.  BOEC protocols and training emphasize that BOEC dispatchers should err on the side of sending out ECIT officers to a call that arguably meets one of the plus factors, such as presenting an escalating risk of harm.  In addition, PPB policy and training empower officers to request an ECIT officer be dispatched to assist in resolving a call involving a mental health component or crisis event.  *See* Dir. 850.20, Paragraph 4.1, *available at* https://www.portlandoregon.gov/police/article/778534.

104. PPB will highlight the work of the C-I Team to increase awareness of the effectiveness of its work.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 104.

PPB highlights the work of ECIT officers, as well as the BHU more broadly, in newsletters, in meeting minutes, by flash alert e-mails, and on social media.  *See* BHU Newsletters, *available at* https://www.portlandoregon.gov/police/63093;    BHU    Minutes,    *available    at* https://www.portlandoregon.gov/police/68755;    PPB    Flash    Alerts,    *available    at* https://www.flashalert.net/id/portlandpolice;    PPB    Social    Networking,    *available    at* https://www.portlandoregon.gov/police/50422.  The BHU also has a designated web page where it publicizes BHU activities and catalogs information about the various BHU components and links

to mental health resources. *See* BHU, *available at* https://www.portlandoregon.gov/police/62135. Even so, some members of the community report either not knowing or misunderstanding the BHU's primary and secondary response systems for calls involving a mental health crisis, and the positive outcomes that the BHU has ensured. The BHU Advisory Committee's community engagement plan and the BHU's continued success in advancing its mission should help to highlight the positive work of ECIT officers.

ECIT officers have achieved outcomes that merit commendation. They have saved dozens of lives, from averting suicide attempts, *see, e.g.*, BHU Newsletter, Jan. - Mar. 2020, at 2, *available at* https://www.portlandoregon.gov/police/article/760486, to deescalating encounters with armed citizens who were in the midst of an apparent mental health crisis, *see, e.g.*, BHU Newsletter, Spring - Fall 2020, at 4, *available at* https://www.portlandoregon.gov/police/article/779284. As one example, in August 2019, ECIT officers responded to multiple calls identifying a 38-year-old Black man who had broken into a church in northwest Portland. When confronted, the man began swinging a chain and chasing people. The man also swung at ECIT officers, then ran. A block later, the man produced a knife, grabbed a female passerby, and threatened her. Officers used de-escalation tactics to convince the man to drop the knife, and safely took the man into custody without serious injury. As another example, on December 30, 2020, ECIT officers responded to calls of a knife attack in downtown Portland. The suspect, a 32-year old Black woman, barricaded herself in the victim's apartment. ECIT officers, along with officers from the Crisis Negotiation Team, communicated with the woman for more than two hours, after which she agreed to voluntarily exit the building and was safely taken into custody. These are just two of many recent encounters that display the good work of crisis-trained PPB officers.

105. For each crisis event to which a C-I Team is dispatched, the C-I Team member shall gather data that ABHU shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include:

a. Date, time, and location of the incident;

b. Subject's name, age, gender, and address;

c. Whether the subject was armed, and the type of weapon;

d. Whether the subject is a U.S. military veteran;

e. Complainant's name and address;

f. Name and DPSST number of the officer on the scene;

g. Whether a supervisor responded to the scene;

h. Techniques or equipment used;

i. Any injuries to officers, subject, or others;

j. Disposition;

k. Whether a mental health professional responded to the scene;

l. Whether a mental health professional contacted the subject as a result of the call; and

m. A brief narrative of the event (if not included in any other document).

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 105.

PPB's Mental Health Template captures the enumerated data points. PPB policy directs officers to collect the required data. *See* Dir. 850.20, Paragraph 1.2, *available at* https://www.portlandoregon.gov/police/article/778534. PPB training reinforces the importance of data collection. The BHU uses the data to aggregate outcomes, evaluate trends, report to the BHU Advisory Committee, and identify changing program needs. We continue to share the Compliance Officer's assessment that the Mental Health Template reliably collects data to facilitate organizational improvement. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 44; *see also* ECF 224-2, COCL Q1 2020 Report, at 26-27; ECF 226-1, COCL Q2 2020 Report, at 28; COCL Q4 2020 Report (draft), at 34.

### D. Mobile Crisis Prevention Team

106. PPB currently has an MCPT comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand MCPT to provide one MCPT car per PPB precinct.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 106.

PPB has a Behavioral Health Response Team (BHRT) unit in each of the City's three police precincts. A BHRT unit consists of one ECIT officer and one qualified mental health professional from Cascadia's Project Respond. *See* Project Respond, *available at* https://www.cascadiabhc.org/services/crisis-intervention/#_ProjectRespond. In 2018, the City funded two additional BHRT units for a total of five. Unfortunately, due to budgetary restraints and staffing issues, by the end of 2020, PPB reports that it reduced the BHRT to four units and may reduce the BHRT further in 2021 due to budget cuts.

107. Each MCPT car shall be staffed by one sworn PPB officer and one qualified mental health professional. MCPT shall be the fulltime assignment of each such officer.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 107.

PPB continues to staff BHRT units as required. Additional information about the BHRT is available at: https://www.portlandoregon.gov/police/article/458966.

108. No officers may participate in MCPT if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of MCPT service, or during MCPT service. PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the MCPT.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 108.

With the advice of the BHU Advisory Committee, PPB adopted standard operating procedures that appropriately define criteria for qualification, selection, and ongoing participation as a BHRT officer. The BHU Lieutenant and Sergeants ensure these requirements are enforced. To date, no BHRT officer has been subject to discipline based on using force or mistreating people with mental illness.

109. PPB shall specially train each MCPT member before such member may be utilized for MCPT operations. PPB, with the advice of the ABHU Advisory Committee, shall develop such training for MCPT members.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 109.

BHRT officers receive ECIT training, and other specialized trainings on crisis intervention, assessment, and mental health. In 2020, the COVID-19 pandemic constrained some opportunities, yet BHRT members received training on suicide prevention, threat assessment, and crisis response. In addition, BHRT members attended NAMI's Ask the Expert Webinar: Impact of Racism and Trauma on Black Mental Health, and an OHSU course titled Suicide: Cultural Considerations When Working With Indigenous Populations.

110. MCPT shall utilize C-I Team data to proactively address mental health service, in part, by connecting service recipients with service providers.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 110.

The Mental Health Template has now captured 43 months of data, covering tens of thousands of calls for service that involve a mental health component. BHRT units continue to use this data to connect frequent police contacts to service providers, as required.

In addition, BHU analysts mine Mental Health Template data to evaluate trends, identify repeat contacts, and track referrals. In 2020, BHU officers participated in a variety of regular meetings with service providers, including weekly meetings with Cascadia supervisors to discuss clients, bi-weekly BHU Coordination Team meetings with partner organizations, and monthly Community Coordination Council meetings for the Multnomah Behavioral Health Treatment Court SAMHSA grant. These efforts enhance the BHRT's ability to connect clients with service providers.

111. Within 180 days of the Effective Date, PPB, with the advice of the ABHU Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies

and procedures shall clearly describe the roles and responsibilities of these entities and of MCPT officers in the process.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 111.

In 2017, PPB enacted the required policies, including Directive 850.21 – Peace Officer Custody (Civil), *available at* https://www.portlandoregon.gov/police/article/778533; Directive 850.22 – Police Response to Mental Health Director Holds and Elopement, *available at* https://www.portlandoregon.gov/police/article/778532; and Directive 850.25 – Police Response to Mental Health Facilities, *available at* https://www.portlandoregon.gov/police/article/778531. In 2019, DOJ approved Directive 850.20 – Police Response to Mental Health Crisis, which provides for officers to seek non-criminal resolution for a person with a mental illness or in a mental health crisis, including, inter alia, by referring the person to a community-based mental health provider, or by requesting AMR ambulance transport to a mental health or medical facility for voluntary care. *See* Directive 850.20, Section 3 – Disposition, *available at* https://www.portlandoregon.gov/police/article/778534. PPB continues to maintain these policies and related procedures, in collaboration with the BHU Advisory Committee.

## E. Service Coordination Team

112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 112.

The SCT continues to serve its designated population, providing access to supportive housing, intensive case management, medical care, addiction and mental health treatment services. PPB reports that the COVID-19 pandemic impacted SCT operations in 2020 by constraining the ability to conduct in-person outreach and networking and reducing referrals. However, the SCT was able to make efforts internally to disseminate program information, strengthen partnerships, and increase referrals.

The Compliance Officer previously conducted a qualitative and quantitative assessment showing that the SCT has effectively reduced the arrests, and increased levels of employment and housing for its clientele. *See* ECF 182-2, COCL Q1 2018 Report, at 26, 45-50. In addition, Portland State University has conducted research and reported annually on the SCT since 2003. *See* PSU Capstone Class, *Study of the Service Coordination Team and its influence on chronic offenders*, 2018 Report, *available at* https://capstone.unst.pdx.edu/sites/default/files/2018%20Capstone%20final%20report%20%28 final%20draft%29.pdf. The 2019 Report was released in the second half of 2020, finding that the SCT program process reduces police contacts with enormous value for the community. *See* PSU Capstone Class, *Study of the Service Coordination Team and its influence on chronic offenders*, 2019 Report, at 24, on file with DOJ (concluding that "every $1 dollar the program spends has a corresponding $20.61 in avoided cost for the community"). The 2019 Report also validates the SCT's Supportive

> Transitions and Stabilization (STS) program, finding that completion of the program is associated with a 66% reduction in arrests. *See id.* at 30.
>
> DOJ shares the view that the SCT effectively facilitates the provision of services to individuals who interact with PPB and who also have a criminal record, addictions, and highly acute mental or physical health service needs. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 47; *see also* COCL Q4 2020 Report (draft), at 36-38.

## F. BOEC

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the ABHU Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB ABHU or directly to NGOs or community-based mental health professionals.

| Status | Substantial compliance |
|---|---|

The City remains in substantial compliance with Paragraph 113.

The City's Bureau of Emergency Communications (BOEC) is responsible for 911 call operations. *See* 911 Bureau of Emergency Communications, *available at* https://www.portlandoregon.gov/911/.

In early 2014, BOEC enacted protocols to triage calls involving a mental health component. The BHU Advisory Committee has advised BOEC on triage and reviewed protocols for assigning calls to ECIT officers and to the Multnomah County Crisis Line (MCCL). *See* Multnomah County, Mental Health Crisis Intervention, *available at* https://multco.us/mhas/mental-health-crisis-intervention. MCCL fields crisis-related calls directly from officers and can call Cascadia's mobile crisis team to the scene of a crisis event. *See* Project Respond, *available at* https://www.cascadiabhc.org/services/crisis-intervention/#_ProjectRespond. The system for transferring calls to the MCCL continues to function as intended. *See* COCL Q4 2020 Report (draft), at 7, 32-33.. The BHU Advisory Committee has also provided advice to PPB on related policies that address crisis intervention. *See* Dirs. 800 – Arrest / Detentions / Court, *available at* https://www.portlandoregon.gov/police/67859.

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the ABHU Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 114.

In coordination with PPB and BHU Advisory Committee, BOEC has designed a 16-hour crisis intervention training program, which it provides to all call takers. BOEC's training has been recognized regionally and nationally as a best practice. A 2018 presentation summarizing BOEC's dispatcher-focused crisis intervention training curriculum is available at http://www.citinternational.org/resources/Documents/It%20all%20begins%20at%209-1-

1;%20Developing%20Dispatcher-Focused%20CIT%20Training%20in%20Portland,%20OR.pptx.

BOEC also provides training to refresh basic content and reflect updates to policies and protocols related to crisis triage. BOEC regularly delivers this training to call takers and dispatchers. DOJ, its expert consultant, and the Compliance Officer have reviewed BOEC's training materials and observed BOEC's annual in-service training in 2018 and 2019. *See* ECF 211-1, COCL Q3 2019 Report, at 33-34; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 48-49. However, due to statewide requirements to maintain physical distancing during the COVID-19 pandemic, BOEC's in-service training was waylaid in 2020. As a stopgap, BOEC used e-mail reminders and posted flyers regarding crisis triage principles. BOEC is tentatively planning to hold another in-service training in the Fall of 2021. We agree with the Compliance Officer that these efforts, in tandem with previously developed and delivered training, are sufficient to sustain substantial compliance with the City's ongoing obligation to develop training for BOEC dispatchers. *See* ECF 226-2, COCL Q3 2020 Report, at 31; COCL Q4 2020 Report (draft), at 32.

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 115.

In 2019, DOJ found that the City's approach to crisis triage was fully operational, established in applicable policies, governed by applicable procedures, and implemented by appropriately trained staff. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 49. The City continues to make substantial efforts, in tandem with community partners, to better the service provided to people experiencing a mental health crisis. BOEC is effectively transferring appropriate calls to the MCCL and sending ECIT officers to calls meeting the dispatch criteria. BOEC's quality assurance procedures regularly audit calls to learn from the experience of its call takers and dispatchers. BOEC personnel continue to receive comprehensive training, in coordination with the BHU Advisory Committee, to ensure the success of the City's approach to crisis triage.

In addition to BOEC, PPB has effectively operationalized the City's crisis triage approach through ECIT officers, BHRT units, and the SCT. PPB has reduced the number of force cases in calls involving a mental health component and increased the number of people it connects with services. Portland Fire & Rescue is further operationalizing the City's crisis triage approach, in partnership with BOEC, through the Portland Street Response pilot program. *See* Portland Street Response, *available at* https://www.portland.gov/streetresponse.

## VII.    EMPLOYEE INFORMATION SYSTEM

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall:

a. Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;

b. Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and

c. Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that PPB has maintained substantial compliance with the Agreement's EIS provisions, and that the crowd control response has had a profound impact on the threshold alerts EIS has generated. *See* COCL Q4 2020 Report (draft), at 40 (noting an increase from 291 alerts in the second quarter of 2020 to 525 alerts in the third quarter of 2020). We previously found that PPB had achieved compliance with Paragraph 116 and had incorporated its requirements into PPB directives. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 49-50; Dir. 345.00, Par. 2.2, *available at* https://www.portlandoregon.gov/police/article/731768; Dir. 215.00, Par. 2.1, *available at* https://www.portlandoregon.gov/police/article/759103.

Paragraphs 116(a) and (b) speak to the individual reviews. Previously, PPB had reached near 100% compliance for these individual reviews in an appropriate and timely fashion. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 50. During this monitoring period, PPB maintained a 98.1-100% compliance rate in supervisors' assessment of members EIS entries required by Paragraph 116(a), i.e., annual performance reviews. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020 at 225-226. However, PPB saw a significant drop in the second quarter of 2020, alone, for compliance with Paragraph 116(b), which requires review of officers new to a supervisor's command, i.e., transfer reviews. *Id.* at 225. PPB self-reported that supervisors performed 28 of 40 applicable transfer reviews within the required timeframe and with proper recording in the performance data tracker, which equates to 70% compliance in the second quarter. *Id.* PPB appropriately identified the sources of the missing entries, namely changes in two supervisors in the organization, and corrected the problem. *Id.* With prompting, the supervisors completed the required reviews and made the appropriate entries after the deadline. *Id.* By the next quarter, PPB had returned to 96.8% compliance with Paragraph 116(b). *Id.* at 226.

117. PPB agrees to *use force audit data* collect data necessary to conduct *similar* these analyses at supervisor- and team-levels." (Amended by ECF 171.)

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that PPB has maintained substantial compliance with the Agreement's EIS requirement for using force audit data to assess risk at the supervisor and team levels. *See* COCL Q4 2020 Report (draft), at 42.

PPB opened two precinct-level alerts in the first quarter of 2020, four precinct-level alerts in the second quarter of 2020, and three precinct-level alerts in the third quarter of 2020. Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 225-26. We reviewed the alert memos from the Force Inspector to the responsible unit managers. *See, e.g.,* Central Precinct Force Audit

Alerts from January 10, 2020 to November 18, 2020; Tactical Operations Division (TOD) Precinct Force Audit Alerts from January 10, 2020 to November 18, 2020. These memoranda demonstrated the use of the force audit to identify trends in reporting deficiencies, which were usually less than one percent, if any deficiencies existed. *Id.* The inspector identified types of reporting deficiencies at the precinct level and identified the supervisors with the most deficiencies. *Id.* The memoranda demonstrate that PPB has continued to implement SOP 47, which provides for the use of the Force Inspector's data to identify outliers as compared with peer supervisors and groups. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 52.

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews:

a. Any officer who has used force in 20% of his or her arrests in the past six months; and

b. Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.

| Status | Substantial Compliance – Continued Technical Assistance |
|---|---|

We agree with the Compliance Officer that PPB has maintained substantial compliance with the Agreement's requirements for EIS thresholds. *See* COCL Q4 2020 Report (draft), at 40. PPB continues to include all of the Agreement's specific thresholds for review in policy:

- Shift Force Ratio: a sworn member's force ratio is greater than or equal to three (3) times their shift's average ratio in the preceding six (6) months;

- Force Ratio: a sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six (6) months;

- Force Count: a sworn member uses force three (3) or more times in the preceding thirty (30) days;

- Criminal Complaint: a member receives a complaint with an allegation of criminal misconduct;

- Complaint in Same Category: a member receives two (2) or more complaints with at least one (1) allegation in each complaint being in the same category such as two (2) complaints that both have conduct allegations) for events in the preceding six months;

- Complaint Count: a member receives three (3) or more complaints for events in the preceding six (6) months;

- Traumatic Incidents: a member experiences three (3) or more traumatic incidents in the preceding thirty (30) days;

- Commendations: a member receives two (2) or more commendations for events in the preceding six (6) months.

*See* Dir. 345.00, *available at* https://www.portlandoregon.gov/police/article/731768;.

We previously have reported that merely having the threshold did not equate to using the system effectively. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 52. To achieve substantial compliance, PPB had trained its supervisors on EIS use, resulting in increased processing of alerts from the EIS administrator to supervisors. *See id.* During this compliance period, as the Compliance Officer reports, PPB maintained a relatively stable rate of referral of alerts to responsible unit managers for their action. *See* COCL Q4 2020 Report (draft), at 41. The Compliance Officer also found that EIS administrators tracked and monitored alerts to ensure that identified issues were resolved in a timely manner and that the EIS administrators evaluated supervisors' determinations that no intervention was necessary. *See id.*. Thus, the Agreement-required thresholds remained in place, and PPB actively ensured responses to threshold alerts requiring supervisor intervention.

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that PPB has maintained substantial compliance with the Agreement's requirements for EIS administrators. *See* COCL Q4 2020 Report (draft), at 40-41. PPB continued to employ two trained EIS administrators to evaluate alerts created by the EIS. *Id.* One administrator was primary and one was secondary. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 241. There has been a changeover in the secondary position in this monitoring period. *Id.* Such staff changes demonstrated the necessity for a standardized process for utilizing EIS and for institutional memory. We agree with the Compliance Officer that the Compliance-Officer-and-DOJ-approved SOPs for the handling of EIS alerts, entries, and responses allow future EIS administrators to operate in a consistent fashion. *See* COCL Q4 2020 Report (draft), at 41. Also, PPB has retained its prior EIS administrators as "detached administrators" should PPB need to fill a vacancy in the primary or secondary position. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 241. Accordingly, PPB remains in substantial compliance with Paragraph 120.

## VIII.   OFFICER ACCOUNTABILITY

"PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement." Settlement Agreement Section IX Preamble, ECF 171, at p. 35.

169 (formerly 172). PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure. (Amended by ECF 171.)

| Status | **Partial Compliance** |
|---|---|

We agree with the Compliance Officer that the City has maintained substantial compliance with many of the Agreement's accountability paragraphs but has not maintained substantial compliance with the Agreement's investigative-timeframe requirements, which brings Section VIII – Accountability out of substantial compliance. *See* COCL Q4 2020 Report (draft), at 45-47. As we stated in our prior compliance assessment reports, Section VIII requires that the City's accountability system meet four criteria: (1) all investigative findings are supported by a preponderance of the evidence; (2) all findings are documented in writing; (3) officers and complainants receive a fair and expeditious resolution of complaints; and (4) all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. *See* ECF 212, DOJ Interim Compliance Assessment Report, at 7; 195-1, DOJ 4th Periodic Compliance Assessment Report, at 54. When we previously found that the City had reached substantial compliance with Section VIII (ECF 212, at 7-8), PPB's Internal Affairs (IA) and the Independent Police Review (IPR) had fully staffed their allocated positions and dedicated resources necessary to overcome one of the last remaining hurdles: timeliness. Now, the demands of greatly increased numbers of complaints concerning the crowd-control events has driven investigative timeframes well beyond the Agreement's required timeframe and IPR does not have a full complement of investigators to handle the burden with the required expedience.

Additionally, similar to the Compliance Officer, we have concerns with whether PPB continues to hold officers accountable for misconduct. Even though the proposed findings from the investigative agencies meet the requirements of Section VIII, other deficiencies have undercut the efficacy of the accountability system. In particular, as we described above, in crowd-control events, PPB has affirmed uses of force frequently without the required supervisory investigation. The absence of supervisory investigations deprives the accountability system of data needed if allegations of misconduct arise, such as witness interviews. And, there already have been many allegations of misconduct. Investigations are ongoing and the results of the lack of data may become apparent as the investigations resolve. Going forward, we will assess the impact on accountability caused by the lack of supervisory force investigations from crowd-control events. In this monitoring period, that concern did not remove the City from compliance with Section VIII and Paragraph 169. Rather, in the end, timeliness, again, presented the main hurdle to compliance with Section VIII and Paragraph 169.

We also have concerns with officer accountability in two specific uses of force that we reviewed.

- First, as we also described above in Section III – Use of Force, the City took the position that a PPB officer's use of a baton in contact with a person's head could not be "lethal" force under policy because the officer's FDCR stated that the strike was unintentional. The City had *not* investigated that claim before reaching that conclusion. We informed the City that it needed to investigate the veracity of a claim of lack of intent before reaching a conclusion. Ultimately, after several weeks, the City commenced a more fulsome investigation. The City also began negotiations with the Compliance Officer and DOJ to memorialize in policy a requirement to subject all intentionality assertions under force policies to an objective reasonableness standard.

- Second, the City did not assess whether a supervisor in a critical use of force appropriately performed the supervisory role in the events leading up to that force, as required by Directive 315.30, Paragraph 3. Just as we had in a prior critical force incident, we critiqued this failure.

In a written response, the City admitted: "PPB did not investigate whether [the supervisor] satisfactorily performed his duties in terms of operational planning and supervision." *See* City Attorney Memo July 29, 2020. But the City asserted double jeopardy and untimeliness would bar the consideration of an administrative review of Directive 315.30 relating to the supervisor's actions before and during incident because the City had investigated the supervisor's response *after* the critical use of force pursuant to that same directive. This was not the first time that the City did not investigate a supervisor and then asserted a double-jeopardy bar after having investigated a different policy aspect.

Finally, we note that there is a potential for significant change to the police accountability structure in Portland. The City has enacted a charter amendment that would establish a board for PPB oversight that, among other things, may displace IPR's role. *See* Ballotpedia, Portland, Oregon, Measure 26-217, Police Oversight Board Charter Amendment (November 2020), *available at* https://ballotpedia.org/Portland, Oregon, Measure 26-217, Police Oversight Board Charter Amendment (November 2020). It is unclear when and in what shape this reorganization would occur. Even if the City changes the governmental structures for police accountability, the City is obligated to have any new governmental structure act in compliance with the Agreement. *See* ECF 171, Am. Settlement Agreement, Par. 4. And, if the City continues on its present path to reorganize its accountability system, as called for by the recent charter amendments, we suggest that the City plan for the transition, including mitigating the potential attrition of key personnel in IPR and IA.

## A. Investigation Timeframe

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, including excluding appeals, if any, to CRC. Appeals to CRC shall be resolved within 2190 days. (Amended by ECF 171.)

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Status | Partial Compliance |
|--------|--------------------|

We agree with the Compliance Officer that the City has not maintained substantial compliance with the Agreement's investigative-timeframe requirements. *See* COCL Q4 2020 Report (draft), at 45-48. There are two investigative agencies for administrative investigations: IA and IPR. Both must comply with the Agreement. Only one neared compliance. In 88.6% of investigations closed in the fourth quarter of 2019 through the second quarter of 2020, IA completed the investigations within 180 days. *See id.* at 47. However, IPR has completed only 33% of their own independent investigations within the 180-day deadline during the same timeframe. *See id.*

A significant increase in civilian complaints submitted to IPR in June 2020 continued to affect the workload and timeliness of administrative investigations. *See id.* at 45 (charting a jump in the number of complaints submitted to IPR in June 2020 and a regression toward the mean through November 2020). Though both IA and IPR may conduct full administrative investigations, most investigations

entail the use of an intake investigation by IPR to gather sufficient data to frame case-handling decisions. Accordingly, IPR's intake investigations affected timeliness on both organizations' final product.

In interviews and weekly IPR investigator meetings, which we frequently monitor remotely, IPR expressed that remote working due to COVID-19, speed of access to information from PPB, and the volume of cases it received this year all affected IPR's pace of investigation. IPR expressed to the Compliance Officer and DOJ its desire to maintain quality in its investigations, rather than sacrifice it for expediency. As with PPB's force reporting and force investigations, discussed above in Section III, the reasons for the delays are understandable, but the Agreement does not excuse either late or ineffective investigations.

PPB-provided data spoke to the rate of case closures in each quarter. Up through the third quarter of 2020, the latest quarter's data PPB produced, the City reported that PPB's and IPR's investigations complied with the Agreement's timeliness requirements. *See* Department of Justice Tasks/Quarterly Update Report, at 248-49, 260. IA's report indicated late investigations generally were due to tolling for criminal investigations. *See* PPB Administrative Investigations Report. Agreement Paragraph 122 permits this tolling. But, the City's closed-cases measure obscured still-open cases that have exceeded the 180-day deadline and the still-open cases that were so far beyond their internal deadlines that they could not realistically met the 180-day deadline.

We received from IPR its weekly reports on the status of open investigations. Since shortly after the beginning of crowd-control events in Portland, the number of open investigations in IPR that were overdue on internal timelines increased and only recently leveled off. As of the most recent weekly report available at the time of this report, IPR held 19 independent investigations (full investigations that IPR completes, rather than sending to IA after the intake). IPR marked 14 of 19 independent investigations overdue. Eleven of those 14 overdue investigations are already over 180 days old. Accordingly, IPR currently has 78.6% of its independent investigations beyond the Agreement's 180-day deadline.

Given the numerous open investigations that have or invariably will exceed 180 days, the City has not maintained substantial compliance with Paragraph 121. *See* ECF 171, Am. Settlement Agreement, Par. 175(a) ("Substantial compliance is achieved if any violations of the Agreement are minor or occasional and are not systemic"). The City has not fully staffed positions with IPR and has not presented a plan to remediate the timeliness of IPR's independent investigations. Accordingly, the City has not maintained substantial compliance with Paragraph 123.

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Status | Substantial Compliance |
| --- | --- |
| Consistent with our prior compliance assessments, we continue to find that the City substantially has complied with the requirement to bring concurrent criminal and administrative investigations, subject to tolling. *See* ECF 212, DOJ Interim Compliance Assessment Report, at 10; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 57-58; PPB SOP 39 – Criminal Internal | |

Investigations, effective Dec. 5, 2018; PPB SOP 6 – Criminal Case Review, effective June 5, 2017. The Compliance Officer's most recent report does not speak to this Paragraph.

Each quarter, PPB identified to the Compliance Officer and DOJ concurrently investigative criminal and administrative cases. *See* Department of Justice Tasks/Quarterly Update Report, Nov. 13, 2020, at 256-257. There was one set of overlapping administrative and criminal investigations that PPB identified in the third quarter of 2020 that were not concurrent. *Id.* In that matter, IPR had already begun its preliminary investigation before PPB discovered the criminal allegation. *Id.* This temporary incongruity does not remove the City from sustained substantial compliance with this Paragraph.

## B. On Scene Public Safety Statements and Interviews

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Status | Substantial Compliance |
|--------|------------------------|
| Consistent with our prior compliance assessments and the Compliance Officer's assessment, we continue to find that the City substantially has complied with the requirement for an appropriate protocol for compelled statements. *See* ECF 212, DOJ Interim Compliance Assessment Report, at 10-11; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 58; COCL Q4 2020 Report (draft), at 52. We previously pointed to PPB's enactment and application of Directive 1010.10 – Deadly Force and In-Custody Death Reporting and Investigation Procedures; SOP 7 – Deadly Force; In-Custody Death Investigations; and SOP 30 – Concurrent Administrative/Criminal Investigations, as evidence of PPB's substantial compliance with Paragraph 124. ECF 212, DOJ Interim Compliance Assessment Report, at 10-11. PPB continued to implement these policies and procedures. *See* Department of Justice Tasks/Quarterly Update Report, at 262; *see also* 2020-B-0039 (demonstrating implementation of the *Garrity* notice provisions in a lethal force investigation). | |

125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witnesses and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| Status | Substantial Compliance |
|---|---|

Consistent with our prior compliance assessments and the Compliance Officer's assessment, we continue to find that the City substantially has complied with the requirements of Paragraphs 125-127.  *See* ECF 212, DOJ Interim Compliance Assessment Report, at 11-12; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 60; COCL Q4 2020 Report (draft), at 51-52.

During this monitoring period, PPB members were involved in two separate lethal-force level shootings; both were misses.  PPB did not have any fatal uses of force.

On June 28, 2020, officers responded to a call of a potential squatter in a vacant home.  *See* 2020-B-0039.  PPB members identified themselves.  A subject in that home was hiding in a closet.  When an officer "sliced the pie," a practice of carefully scanning to enter a room, the subject leveled a realistic looking pistol replica at the officer.  The officer retreated and fired.  The shots missed.  PPB deployed specialty units and negotiated the subject's peaceful surrender.  PPB had medical personnel assess the subject.

During the event, the involved officer gave a public safety statement for information that the responding supervisor found PPB needed.  The involved officer also provided follow-up information.  A witness officer provided similar information at the scene.

In conformance with the Agreement's requirements, PPB separated the involved and witness officers.  PPB directed that the officers do not communicate with one another and then timely issued CROs.  Usually, PPB would leave the CROs in place until after the Multnomah County District Attorney presented the shooting event to a grand jury and the grand jury completed its deliberation.  In this instance, the District Attorney declined to present the event to a grand jury.  After that determination, on August 7, 2020, PPB appropriately rescinded the CROs in writing.

The second shooting of this reporting period occurred on December 24, 2020.  It is still an ongoing investigation.  PPB timely issued CROs in that instance.  Those CROs are still in place as of this report.

## C. Conduct of IA Investigations

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA.  Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Status | Substantial Compliance |
|---|---|

Consistent with our prior compliance assessments, we continue to find that the City substantially has complied with the requirement to enable meaningful, independent IPR investigations.  *See* ECF 212, DOJ Interim Compliance Assessment Report, at 12; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 60.

Throughout 2020, IPR has provided us weekly lists of the independent investigations it has open.  IPR also retains professional capability to complete these investigations.  According to information shared in weekly IPR investigator meetings, which we frequently attend, IPR continued to utilize

> PPB's Learning Management System (LMS) for ongoing joint training. *See also* PPB SOP 52, effective Sept, 19, 2019 (establishing use of LMS for IPR personnel and notifications for current training needs). Notwithstanding that IPR has the authority and expertise to conduct independent investigations, IPR frequently has not met deadlines to complete them. The City's failure to fill IPR investigator positions has affected IPR's capacity to conduct independent investigations even if the City has otherwise maintained substantial compliance with this paragraph, thus far.

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Status | Substantial Compliance |
|--------|------------------------|

Consistent with our prior compliance assessments and the Compliance Officer's assessments, we continue to find that the City substantially has complied with the requirement to investigate fully all excessive force allegations, unless IPR determines that the allegation has no basis in fact. *See* ECF 212, DOJ Interim Compliance Assessment Report, at 7-8; 195-1, DOJ 4th Periodic Compliance Assessment Report, at 61; *see also* IPR SOP, Sec. 2.3, revised Jan. 10, 2020 (clarifying clear and convincing evidence required to close force allegations).

This provision does not allow PPB to administratively close investigations of allegations regarding use of excessive force without a full investigation. IPR may do so, but only when IPR's intake investigation shows by clear and convincing evidence that the allegation has no basis in fact. Consistent with the Agreement, PPB did not administratively close any force-allegation investigations in the first two quarters of 2020. *See* Department of Justice Tasks/Quarterly Update Report, at 274, Nov. 13, 2020. The City also reported that in the third quarter that there were no closed excessive force allegations. *Id.* The Compliance Officer, however, reported that IPR closed four excessive force allegations in which "the totality of the information provided was insufficient to establish a fact pattern, identify an officer, and/or determine that the force was used by a PPB officer." ECF 226-2, COCL Q3 2020 Report, at 43. If an allegation does not relate to a PPB member, IPR need not investigate it. Accordingly, absent data that a closed allegation involved a PPB member, the City remains in compliance with this paragraph.

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Status | Substantial Compliance |
|--------|------------------------|

Consistent with our prior compliance assessments and the Compliance Officer's assessments, we continue to find that the City has substantially complied with the requirement to prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. *See* ECF 212, DOJ Interim Compliance Assessment Report, at 8. In this monitoring period, PPB revised Directive 310.20 – Discrimination, Harassment, and

> Retaliation Prohibited, effective May 15, 2020, *available at* https://www.portlandoregon.gov/police/article/760883, consistent with this requirement.

131. The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below:

   a. Currently, seven voting members of the PRB review use of force incidents, including two citizen members. When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members.

   b. The CRC slot on the PRB in use of force cases will rotate among the CRC membership so that different CRC members participate on the PRB. Within 60 days of the Effective Date, the Auditor shall develop a membership rotation protocol.

   c. All members participating in the PRB must maintain confidentiality and be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions and "just cause" requirements set forth in Portland City Charter, City rules, and labor agreements.

   d. Cases in which the member elects, with the concurrence of the Chief and the Police Commissioner, to accept the investigative findings and recommended discipline. This option will only be available to a member following implementation of code language which shall require at a minimum a full investigation of the alleged misconduct, issuance of the investigative findings, and concurrence with the findings by the Independent Police Review, the Professional Standards Division and the member's Branch Chief.  The scope of cases eligible for stipulated discipline shall be identified in the authorizing code, and cases involving alleged used of excessive force, cases involving alleged discrimination, disparate treatment or retaliation, reviews of officer involved shootings and in-custody deaths, and cases in which the Chief or the Police Commissioner does not agree to accept the member's proposed stipulation to findings and recommended discipline shall not be eligible for stipulated findings and recommended discipline. (Added by ECF 171.)

   e. All community members and CRC members must meet the following qualifications to participate on the PRB:

   i. Pass a background check performed by the Bureau.

   ii. Participate in Bureau training to become familiar with police training and policies, including the PRB process.

   iii. Sign a confidentiality agreement.

   iv. Participate in ride-alongs to maintain sufficient knowledge of police patrol procedures.

   f. Current city code provides that the City Auditor and the Chief have authority to recommend to City Council the removal of citizen members from the PRB pool.  Likewise, the City Auditor or Chief shall have authority to recommend to City Council removal of a CRC member from serving on the PRB.  The Chief or the City Auditor may recommend that City Council remove a community member or member of the CRC from the pool for the following reasons:

   i. Failure to attend training;

ii. Failure to read Case Files;

iii. Objective demonstration of disrespectful or unprofessional conduct;

iv. Repeated unavailability for service when requested;

v. Breach of confidentiality;

vi. Objective demonstration of bias for or against the police; or

vii. Objective demonstration of conflict of interest.

g. Removal from participation in the PRB shall not affect CRC membership.

h. Like current PRB citizen members, CRC members serving on the PRB may serve in that capacity for no more than three (3) years.

i. A CRC member who participates in a PRB review shall recuse himself/herself during any later appeal of the same allegation(s) to the CRC.

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Status | Substantial Compliance |
| --- | --- |

Consistent with our prior compliance assessments and the Compliance Officer's assessment, we continue to find that the City substantially has complied with the Agreement's requirements for PRBs. *See* ECF 212, DOJ Interim Compliance Assessment Report, at 16-17; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 62.

We previously observed that PPB had incorporated Paragraph 131's and 132's requirements in PPB Directive 336.00 – Police Review Board. *See* ECF 212, DOJ Interim Compliance Assessment Report, at 16-17; 195-1, DOJ 4th Periodic Compliance Assessment Report, at 65. On March 6, 2020, we approved a series of revisions to PPB accountability policies, including: 336.00 – Police Review Board and 337.00 – Police Review Board Personnel Selection. We have remotely observed PRBs in 2020 and each has had its required CRC members in attendance. The Compliance Officer also found the City compliant with Paragraph 131, but offered technical assistance on PRB operations. *See* COCL Q4 2020 Report (draft), at 50-51. We agree with the Compliance Officer that the City should improve the availability of CRC members to alleviate delays due to difficulty in scheduling PRBs with CRC volunteers. *See id.* at 9. IPR reports to us that the difficulty in reviewing case files continues to limit the availability of CRC volunteers. The City should address this logistical challenge, which affects compliance with both Paragraphs 131 and 132, and the presently non-compliant Paragraphs 121 and 123, for overall timeliness in the accountability system.

133. If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall: (1) enter that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units ; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial finding creating a rebuttable presumption that the force used also

violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the IA investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.

| Status | Substantial Compliance |
|--------|------------------------|
| As with our last report, we note that PPB had no civil liability findings during this compliance period that would have triggered the application of this provision.  *See* ECF 212, DOJ Interim Compliance Assessment Report, at 17; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 65. We agree with the Compliance Officer that the City is in substantial compliance with this provision through implementation of PPB SOPs 32 and 42, which incorporate the requirements of Paragraph 133.  *See* ECF 224-1, COCL Q4 2019 Report, at 23. | |

## D. CRC Appeals

134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed.  The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted.  The additional request be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Status | Substantial Compliance |
|--------|------------------------|
| Consistent with our prior compliance assessments and the Compliance Officer's assessment, we continue to find that the City substantially has complied with the required composition of CRC members, CRC's quorum, evidentiary standards, and requests for additional information.  *See* ECF 212, DOJ Interim Compliance Assessment Report, at 11-12; 195-1, DOJ 4th Periodic Compliance Assessment Report, at 65; COCL Q4 2020 Report (draft), at 50. | |

CRC is currently composed of 8 members, though there are three open seats, for a total of 11 positions as Paragraph 134 requires.  *See* CRC, *available at* https://www.portlandoregon.gov/ipr/53654.  The City appointed two of these members in 2020. *See id.*  CRC had three recent resignations in September 2020.  We agree with the Compliance Officer

that the City must bring CRC to its full complement to ensure the ability of CRC to meet the requirements of these paragraphs and for CRC to meet its role on PRBs.  *See* COCL Q4 2020 Report (draft), at 50.

CRC conducted case appeals in this monitoring period consistent with approved ordinances.  *See, e.g.*,  CRC  Meeting  Minutes,  Sept.  2,  2020,  *available  at* https://www.portlandoregon.gov/ipr/article/767891 (in an appeal, recommending a change of recommended finding from unfounded to not sustained).  PPB members attended CRC appeals and provided information at the meetings.  *Id.*  PPB members also attended and provided information to CRC working group meetings.  We attended two of the CRC appeal hearings and several of the working group meetings during this monitoring period.   Based on our observations, CRC continued to meet its role under the Agreement.

We previously reported that CRC's governing regulations reflect the requirements of Paragraphs 135 and 136.  *See* ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report; 195-1, DOJ 4th Periodic Compliance Assessment Report.

## E. Discipline

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| Status | Substantial Compliance |
| --- | --- |

Consistent with our prior compliance assessments and the Compliance Officer's assessment, we continue to find that the City substantially has complied with the required discipline guide.  *See* ECF 212, DOJ Interim Compliance Assessment Report, at 18; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 67; ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report, at 71-72.  As before, PPB continued to give effect to the Discipline Guide through Directive 338, which PPB revised this monitoring period.  *See* Dir. 338.00 – Discipline Guide, effective Apr. 25, 2020, *available at* https://www.portlandoregon.gov/police/article/759448.  A review of corrective action memoranda showed consistent application of the guide.  The Compliance Officer also found discipline consistent with the discipline guide in the monitoring period.  *See* ECF 226-1, COCL Q2 2020 Report, at 8.

## F. Communication with Complainant and Transparency

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail, email/text, or

fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Status | Substantial Compliance |
|--------|------------------------|
| Consistent with our prior compliance assessments and the Compliance Officer's assessment, we continue to find that the City substantially has complied with the Agreement's required communication and transparency for complainants. *See* ECF 212, DOJ Interim Compliance Assessment Report, at 19; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 67; COCL Q4 2020 Report (draft), at 49. The same IPR website on which we previously reported continues to allow complainants to check the status of their complaints by entering their complaint number or the complainant's identifying information. *See* IPR Complaint Status Request Form, *available at* https://www.portlandoregon.gov/ipr/64452. | |

## IX.    COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED-POLICING

"There is significant community and City interest in improving PPB's community relationships. The community is a critical resource. Soliciting community input regarding PPB's performance, while also enhancing PPB's current community outreach efforts, will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety."    Settlement Agreement Section IX Preamble, ECF 171, at pp. 45-46.

141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Portland Committee on Community Engaged-Policing (PCCEP), within 90 days of the Effective Date of the relevant amendments to this Agreement.

| Status | Substantial Compliance[5] |
|--------|---------------------------|
| The City remains in substantial compliance with Paragraph 141. | |

On August 24, 2017, the City unanimously passed Ordinance 188570 As Amended, which established the PCCEP as a body designed to work with the Mayor/Police Commissioner, PPB, and the City's diverse constituencies to achieve equitable policing and meaningful community engagement with PPB. *See* ECF 169-4, Ordinance. At the same time, the Ordinance set forth a plan to guide the PCCEP's work. *See* ECF 169-9, PCCEP Plan. The Ordinance followed numerous discussions among the parties, including the enhanced amicus AMAC, and with community members; several Ninth Circuit mediation sessions; three City Council hearings; and multiple amendments.

On September 26, 2018, the City confirmed the PCCEP's inaugural members after engaging in an exhaustive recruitment, selection, interview, and orientation process designed to ensure equity and

---

[5] At the October 4, 2018 Status Conference, the Court indicated that the United States and the Compliance Officer should evaluate the City's compliance with Section IX as if the Court had entered final approval of the stipulated proposed Section IX amendments. *See* ECF 176, Hearing Transcript, at 128:19 – 129:11.

inclusion. *See* ECF 200, Declaration of Nicole Grant, ¶¶ 3-7 & Exs. 1-3. Since then, the City has ensured that the PCCEP has an adequate membership roster, staff support, and budget to perform its functions.

On November 28, 2018, the PCCEP held its first monthly public meeting. Since then, the PCCEP has held 26 consecutive monthly public meetings, generally on the fourth Tuesday from 5:00 to 8:00 p.m. *See* PCCEP, Full Board Agendas / Meeting Minutes / Transcripts, *available at* https://www.portlandoregon.gov/pccep/78093.

The PCCEP has organized into five committees: (1) Steering Committee; (2) Behavioral Health Subcommittee; (3) Racial Equity Subcommittee; (4) Settlement Agreement and Policy Subcommittee; and (5) Youth Subcommittee. The PCCEP formed these committees with input from the public, including members of the amici groups, the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and the Mental Health Alliance (MHA). Since being formed, the subcommittees have each met just about every month. *See* PCCEP, Steering Committee, *available at* https://www.portlandoregon.gov/pccep/79067; PCCEP, Subcommittees, *available at* https://www.portlandoregon.gov/pccep/78723. The PCCEP has recently created a sixth, ad hoc committee to assist in planning a truth and reconciliation commission for the City. *See* Truth + Reconciliation Planning Subcommittee, Agenda, Jan. 18, 2021, *available at* https://www.portlandoregon.gov/pccep/article/780164.

The City continues to provide substantial support, including by providing designated administrative support, meeting locations, an adequate pool of qualified alternates, and access to City leadership and PPB personnel. The City hosts a website for the Committee with links to relevant documents and other information. *See* PCCEP, *available at* https://www.portlandoregon.gov/pccep. The PCCEP also has a YouTube channel that hosts videos of meetings and town halls. *See* YouTube, PCCEP Videos, *available at* https://www.youtube.com/channel/UC0W1oX39iMCY-0O-qeqLTxg, and uses other social media platforms, such as Facebook and Twitter.

142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.

| Status | Substantial Compliance |
|---|---|
| The City remains in substantial compliance with Paragraph 142. | |
| The City has authorized the PCCEP to perform the five tasks listed here. *See* Amended PCCEP Plan, *available at* https://www.portlandoregon.gov/pccep/article/703060. | |
| The PCCEP is independent and self-directed, setting its own agenda with community input. To date, PCCEP and its subcommittees have performed the five listed tasks, though to varying degrees. | |

The PCCEP has appropriately taken on other work as well, typically related to and driven by recent events. For example, throughout the extended nightly protests for racial justice in Portland, the PCCEP hosted several town halls, attended by hundreds, to hear from community leaders and diverse community members. *See, e.g.*, PCCEP, Listening Session, May 31, 2020, *available at* https://www.portlandoregon.gov/pccep/article/762231. These meetings resulted in PCCEP approving a handful of statements and recommendations that the City adopted, including in relation to a truth and reconciliation commission, restorative justice, qualified immunity, and PPB's foot pursuit policy. *See id.*

The PCCEP is capably exercising its authority. It regularly solicits information from the community and the City about PPB's performance, including at a handful Committee and subcommittee meetings held each month. The PCCEP also regularly formulates, discusses, and votes on recommendations with input from the community. To date, the City has adopted several of the PCCEP's recommendations. *See* PCCEP, Approved Recommendations, *available at* https://www.portlandoregon.gov/pccep/81352. The PCCEP has also contributed to the creation of PPB's community engagement plan, which the City formally adopted on October 2, 2019, following a public hearing that included a presentation by PPB, testimony by PCCEP members, and additional public comment. *See* City Council Resolution 37452, *available at* https://efiles.portlandoregon.gov/Record/13297449. In 2020, the PCCEP adequately contributed to the implementation of the community engagement plan, as described in the Compliance Officer's most recent quarterly report. *See* COCL Q4 2020 Report (draft), at 9, 53-54.

The PCCEP is also authorized to independently assess the City's compliance with the Settlement Agreement, which it has done via reports from the City, the Compliance Officer, and DOJ. The PCCEP has considered compliance at several public meetings, including in 2020 as host to all four Compliance Officer quarterly town hall events (February 12, April 28, August 3, and October 14), and as host to DOJ (February 24) in relation to our last compliance assessment report. *See* PCCEP, Meeting Minutes, *available at* https://www.portlandoregon.gov/pccep/78093; YouTube, PCCEP Videos, *available at* https://www.youtube.com/channel/UC0W1oX39iMCY-0O-qeqLTxg.

Some have been critical of the PCCEP for not investing enough time and effort into particular tasks, or for focusing on the wrong issues. DOJ acknowledges the concerns of the amicus groups and others, but we do not share the criticism for three reasons. First, DOJ evaluates the City's compliance with the obligations set forth in this Agreement. The City's compliance turns on actions it can control, not on how PCCEP members choose to discharge their duty. Second, the PCCEP is, by design, an independent, self-directed group. PCCEP members may properly decide for themselves how to allocate the scarce resource of their volunteer efforts. Third, to the extent community members have concerns, the PCCEP, its subcommittees, its members, and its staff are open to feedback and ideas for improvement. The PCCEP and its subcommittees consistently set agendas only after considering public comment.

The City has maintained the PCCEP's composition, selection process, and specific duties in the PCCEP Plan. The City includes citizen participation in a workable and fair selection/replacement process for new PCCEP members and alternates. The City has adequately filled vacancies by drawing on new applicants and existing alternates in collaboration with the PCCEP. When the pool of alternate members has run dry, the City has acted with deliberate speed to recruit, select, and train new alternates. The PCCEP routinely recommends replacement members to fill vacancies. To date, the City, acting through the Mayor's Office, has accepted the PCCEP's recommendations for replacement candidates.

The City has complied with the requirements for amending the PCCEP Plan, which it has done twice. The amendments have improved the PCCEP, including by ensuring seats for youth members and creating a more flexible on-boarding process. *See* City Council Resolution 37470, Dec. 18, 2019, *available at* https://efiles.portlandoregon.gov/Record/13438255; City Council Ordinance 27284, Sept. 5, 2018, *available at* https://efiles.portlandoregon.gov/Record/12278614.

The City and the PCCEP have recently considered codifying the PCCEP to ensure its continuity as a body through changes in City leadership. To the extent any such codification materially modifies the PCCEP Plan and occurs during the pendency of this Agreement, the City must continue to comply with this Paragraph by consulting with the AMAC and the PPA, and by obtaining DOJ's review and approval.

143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 143.

PCCEP members come from a broad spectrum of the community. *See* PCCEP Member Bios, *available at* https://www.portlandoregon.gov/pccep/article/705718. Members have a diverse cross-section of relevant lived experiences, offer a wide range of ideas, skillsets, and interests, and are dedicated to improving police-community relations. Members have posted contact information online. *See* PCCEP, Contact, *available at* https://www.portlandoregon.gov/pccep/78082. In 2020, PCCEP staff were deliberate in recruiting candidates from historically underrepresented groups. PCCEP staff also conducted a handful of exit interviews with former PCCEP members to understand how to better recruit, retain, and promote diverse candidates.

In addition, PCCEP subcommittees are open to the public for all to participate. People with various lived experiences representing different communities regularly contribute to the PCCEP's work through its subcommittees. PCCEP members consistently invite public comment during general meetings and subcommittee meetings. To get involved, a community member just needs to attend any regularly scheduled meeting, all of which have been held online via Zoom recently. *See* PCCEP, How To Get Involved, *available at* https://www.portlandoregon.gov/pccep/78081; *see also* PCCEP, Calendar, *available at* https://www.portlandoregon.gov/pccep/78080.

The City has trained PCCEP members on applicable conflict-of-interest rules and PCCEP members have adhered to the rules. If any PCCEP member or community member has concerns about potential conflicts of interest, they may alert the PCCEP staff, the City Attorney's Office, or during the pendency of this Agreement, DOJ. The determination of whether a conflict of interest exists is a question of local law for the City Attorney's Office initially to consider.

144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 144.

The City continues to invest substantial resources to support the PCCEP.  Administrative staff support includes two full-time, devoted employees, Theo Latta (PCCEP Project Director) and Claudia Claudio (PCCEP Project Assistant).  Judith Mowry, a Senior Policy Advisor in the City's Office of Equity and Human Rights, regularly offers guidance and support to the PCCEP despite relinquishing her role as Acting Project Director.  The relationship between City staff and the PCCEP's members is professional and productive.

The City provides the PCCEP with enabling logistical support, including access to City leaders and office space apart from other City facilities; technical assistance, including the ability to host 60-, 90-, and 180-minute meetings remotely via Zoom; designated e-mail addresses for PCCEP members; and, before the onset of the COVID-19 pandemic, meeting spaces across Portland along with food and beverages for attendees at full monthly meetings and town hall events.  The City has also paid PCCEP members monthly stipends.  In 2020, the City allocated money to each PCCEP subcommittee for outreach activities.

The City has offered to provide contract facilitation services, which the PCCEP has accepted at times.  Most of the time, the PCCEP has chosen to self-facilitate, which PCCEP members have done capably.  Before the pandemic, the City livestreamed meetings, which aired live and were replayed on local access television.  During the pandemic, the City provided a Zoom account to enable the PCCEP to hold meetings remotely.  Meetings have been recorded and are posted online.  *See* YouTube, PCCEP Videos, *available at* https://www.youtube.com/channel/UC0W1oX39iMCY-0O-qeqLTxg.

The City hosts a dedicated web page for the PCCEP, which contains links to documents that memorialize the PCCEP's work and the COAB's work before it.  *See* PCCEP, *available at* https://www.portlandoregon.gov/pccep/ (organizing pages by tabs, including among others "Subcommittees," "Steering Committee," "Library," "Approved Recommendations," "Full Board Agendas / Meeting Minutes / Transcripts," and "COAB").  PCCEP staff have been responsive to community ideas about what should be linked on the PCCEP website.  Contact information for PCCEP staff is available online at https://www.portlandoregon.gov/pccep/78082.

Some have called for the City to provide additional resources to the PCCEP or to allocate differently the resources the City is providing.  There are many permutations that would enable to the PCCEP to perform its functions to many varying albeit sufficient degrees.  DOJ continues to share the Compliance Officer's assessment that the City is adequately supporting the PCCEP to be in substantial compliance with this Paragraph.  *See* ECF 212, DOJ Interim Compliance Assessment Report, at 16-17; COCL Q4 2020 Report (draft), at 10, 54-55.

145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 145.

PPB continues to work with City resources, community partners, and the PCCEP to improve its efforts to engage with the community and to increase community confidence.  PPB regularly engages the community through faith-based meetings, training and educational workshops, neighborhood meetings, advisory councils and boards, cultural events, sporting activities, charitable

giving, immigrant outreach, and media events.  PPB catalogs its engagement efforts online.  *See* PPB, Community, *available at* https://www.portlandoregon.gov/police/30379.

In 2019, the City adopted a community engagement plan for PPB, with the PCCEP's input.  The plan identifies several goals in the areas of public involvement, communication, access, and training, and is designed to evolve over time with PCCEP's continuing input.  *See* PPB, Community Engagement Plan, *available at* https://www.portlandoregon.gov/police/article/744534.  PPB and the PCCEP have established a productive working relationship sufficient to enable an ongoing collaboration.  PPB command staff and members of the Office of Community Engagement have attended each of the PCCEP's monthly meetings and many of the subcommittee meetings.  PPB has provided appropriate responses to the PCCEP's requests for knowledgeable personnel and information relevant to the PCCEP's work.

We continue to agree with the Compliance Officer's assessments that these efforts substantially comply with the terms of this Paragraph.  *See* ECF 212, DOJ Interim Compliance Assessment Report, at 17-18; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 70-71; *see also* ECF 224-2, COCL Q1 2020 Report, at 43-44; ECF 226-1, COCL Q2 2020 Report, at 48-49; ECF 226-2, COCL Q3 2020 Report, at 52-55; COCL Q4 2020 Report (draft), at 55-56.

146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.

| Status | Substantial Compliance |
| --- | --- |
| The City remains in substantial compliance with Paragraph 146. | |
| In 2018, the City contracted with DHM Research, a professional survey research organization that the City had engaged for similar surveys in 2013, 2015, and 2016.  *See* DHM Research, *available at* https://www.dhmresearch.com.  In 2019, DHM conducted another reliable, comprehensive, and representative survey of the Portland community, as required by this Paragraph.  In February 2019, DHM prepared a report and analysis.  *See* DHM Research, *City of Portland Community Policing – Mail Survey*, February 2019, *available at* https://www.portlandoregon.gov/pccep/article/734466.  DHM presented its findings to the public at a monthly PCCEP meeting  *See* YouTube, PCCEP Videos, July 23, 2019, *available at* https://www.youtube.com/watch?v=N3N6666BHck. | |

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts.  The data shall also be provided to PCCEP to inform its work.

| Status | Substantial Compliance |
| --- | --- |
| The City remains in substantial compliance with Paragraph 147. | |

PPB collects the required demographic data from the U.S. Census Bureau's American Community Survey. *See generally* U.S. Census Bureau, *available at* https://www.census.gov. Prior data from the Survey is published on the PCCEP's website. *See* PPB Precinct Demographics Report, Dec. 2018, *available at* https://www.portlandoregon.gov/pccep/article/745563; Raw Data, *available at* https://www.portlandoregon.gov/pccep/article/745564. The Compliance Officer has previously detailed how precinct commanders use this data to tailor outreach efforts. *See* ECF 196-1, COCL Q4 2019 Report, at 45.

As the Compliance Officer reports, new local data from the 2020 census will be available soon and, in December 2020, the Census Bureau scheduled the release of a new American Community Survey 5-Year Estimate for 2015–2019). *See* COCL Q4 2020 Report (draft), at 58-59; *see also* U.S. Census Bureau, *2019 Data Release Schedule*, updated Mar. 3, 2020, *available at* https://www.census.gov/programs-surveys/acs/news/data-releases/2019/release-schedule.html. The City reports that new precinct-level data is typically available around February 15 of each year, at which time the data is shared with precinct commanders and the PCCEP.

The City has authorized the PCCEP to review, evaluate, and recommend improvements to PPB's community engagement plan on an annual basis. In performing this work, the PCCEP can consider relevant precinct demographic data to inform its analysis and recommendations. We continue to share the Compliance Officer's assessment that the City is substantially complying with this obligation. *See* ECF 212, DOJ Interim Compliance Assessment Report, at 25; COCL Q4 2020 Report (draft), at 62.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 148.

PPB requires officers to collect the demographic data required by this Paragraph. *See* Stops Data Collection, *available at* https://www.portlandoregon.gov/police/65520. PPB reports this data quarterly each year, typically on February 15, May 15, August 15, and November 15. Data through the third quarter of 2020 has been publicly reported and is available on the City's website. *See* Stops Data Collection Quarterly Reports, *available at* https://www.portlandoregon.gov/police/67433. PPB publishes a yearly report with greater analyses of the stops data. *See* Stops Data Collection Annual Reports, *available at* https://www.portlandoregon.gov/police/72040. The PCCEP has been provided this data.

PPB's Open Data Portal is another significant ongoing effort to enhance data collection and public reporting. The Portal publicly catalogs a broad array of PPB-related information, including lethal force events, general use-of-force statistics, reports of bias-related crimes, and general crime statistics. *See* PPB Open Data, *available at* https://www.portlandoregon.gov/police/71673. The searchable database is updated regularly with new data relevant to community concerns.

149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 149.

In 2019, the Compliance Officer, PPB, and DOJ jointly developed a list of metrics to evaluate community engagement and outreach. The metrics define "community engagement and outreach" as PPB actions involving community contact, whether individually or collectively, to provide services, establish relationships and build public trust in the police as public servants." *See* ECF 197-1, COCL Q1 2019 Report, at 61. The initial metrics covered four categories, including: (1) interactions with the public and general service delivery; (2) communication with the public; (3) collective engagement with the community through boards, commissions, committees and other stakeholder groups, and (4) regular reporting to the community on PPB activities. *See id.* at 61-62.

PCCEP reviewed the metrics and recommended some modifications, which PPB accepted. *See* ECF 212, DOJ Interim Compliance Report, at 26-27. The five revised metrics are:

*1. Survey data detailing public trust and confidence in PPB. PPB is expected to continue to engage with diverse community members in a manner that is fair (unbiased), respectful, and helpful. Public perceptions of the PPB and the performance of its officers are considered important metrics, as they affect public trust and confidence in the police. These can be measured through community and/or contact surveys.*

*2. Communication with the public. The PPB is expected to maintain and continue to establish conduits of information to encourage the bi-directional flow of information between the community and the PPB. These can be measured through the presence, quality, and quantity of information available on PPB's website and social media outlets.*

*3. Collective engagement with the community through boards, commissions, committees, and other stakeholder forums/groups/meetings. PPB is expected to continue to participate in a wide range of public events and groups for purposes of accountability, transparency, and public education. This participation could be measured through the presence, quality, and quantity of PPB participation in these collective events. PPB is expected to report on strategies used to engage with communities that have historically been difficult to reach, including but not limited to, people with mental illness and houseless individuals.*

*4. Regular reporting to the community on PPB activities. In the interest of transparency and public education, PPB is expected to continue to report regularly to the community regarding its activities and events in the realm of community engagement (including #3 above). These can be measured through the presence, quality, and quantity of information contained in PPB's reports, website and social media outlets. PPB reports should note situations in which Bureau members engage with the community in an official capacity, but out of their patrol uniform. In addition, reports should note significant changes year over year, including number and type of contacts, to allow for historical comparison.*

*5. Integrating best practices from police departments across the country and around the world. PPB is expected to report on efforts made to identify learnings from other departments and integrate those learnings into the Bureau's community engagement work. This metric includes, but is not limited to, attendance at conferences outside of Portland, training by personnel from outside of Portland, and changes to policies and practices inspired by learnings from other jurisdictions.*

PPB's Community Engagement Plan addresses these metrics in several ways, including by aiming to ensure data-driven assessment and refinement, implementing strategies for engaging with historically

difficult to reach communities, and improving communications with the public. *See* PPB, Community Engagement Plan, 2019, *available at* https://www.portlandoregon.gov/police/article/744534. The PCCEP is tasked with holding PPB accountable to its community engagement strategies, and PPB has pledged to continue working with the PCCEP to evaluate the Plan in action. In 2020, PPB provided the PCCEP its first annual update, reporting challenges due to COVID-19, areas of progress, and needs for improvement. We share the Compliance Officer's assessment that "PPB has made significant progress on its Community Engagement Plan through internal working groups and through partnerships with community organizations and advisory boards." *See* COCL Q4 2020 Report (draft), at 58.

The amicus group MHA and enhanced amicus group AMAC have proposed an additional set of metrics for determining whether the PCCEP is successful. The metrics touch on diversity, public access, community involvement, member retention, governance, and work product. *See* Amicus Metrics for PCCEP Success, *available at* https://www.portlandoregon.gov/pccep/article/766385. In 2020, the City and amici met a couple of times, along with DOJ and the Compliance Officer, to discuss the metrics. Because many of the metrics turn on how the PCCEP exercises its independent authority to set its own agenda, the City preferred to put the amici's proposed metrics to the PCCEP. The PCCEP discussed the metrics at a public meeting but declined to adopt them by vote, preferring instead to treat the proposed metrics as aspirational goals. *See* PCCEP, Meeting Transcript, at 33-52, Sept. 22, 2020, *available at* https://www.portlandoregon.gov/pccep/article/779929.

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing, in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| Status | Partial Compliance |
|--------|--------------------|

The City has not maintained substantial compliance with Paragraph 150.

In December 2018, PPB released a 2017 Annual Report after providing a draft to the PCCEP for review and comment, but did not present the report at precinct meetings or to City Council. *See* PPB, 2017 Annual Report, *available at* https://www.portlandoregon.gov/police/article/711973. The PCCEP provided comments and recommendations, including to release the report earlier in the year and to present the 2017 and 2018 reports in each precinct area and at a City Council hearing, as required by this Paragraph. *See* PCCEP, Recommendations for Annual Report, Feb. 26, 2019, *available at* https://www.portlandoregon.gov/pccep/article/727017. PPB accepted the PCCEP's recommendations.

In July 2019, PPB released a 2018 Annual Report after soliciting the PCCEP's review and comment. *See* PPB 2018 Annual Report, *available at* https://www.portlandoregon.gov/pccep/article/735524. The PCCEP gave comments and several recommendations. *See* PCCEP, Recommendations for Annual Report, July 2019, *available at* https://www.portlandoregon.gov/pccep/article/737446. PPB accepted the recommendations. PPB's three precincts each held public meetings to discuss the 2018

Report, on August 14 (North), August 21 (East), and August 28 (Central), respectively.  On October 2, 2019, Chief Outlaw presented the report at the afternoon session of City Council.  *See* YouTube, Portland City Council Sessions, *available at* https://www.youtube.com/watch?v=ND1I8HAAV0g.

In December 2020, PPB released a 2019 Annual Report, after providing a draft to the PCCEP for review and comment, as required.  *See* PPB 2019 Annual Report, *available at* https://www.portlandoregon.gov/police/article/778697.  PPB acknowledged the relatively limited utility of releasing the 2019 Report so late in the year, especially considering the various challenges that arose in 2020.  *See id.* at 2.  On December 16, 2020, Chief Lovell presented the 2019 Annual Report at the morning session of City Council, where the Mayor acknowledged PPB's pledge to prepare and release the 2020 Annual Report in a timelier manner.  *See* YouTube, Portland City Council Sessions, *available at*  https://www.youtube.com/watch?v=1iHgUGSkLNE (Item 1004, remarks begin around 5:15:00).  The Mayor, in turn, offered necessary administrative support for PPB to release a 2020 Annual Report "much earlier" in 2021 so that the City can use the effort to learn from the seminal events of 2020.  *Id.*

However, in 2020, PPB did not hold all three of the requisite precinct meetings.  The City cited to unforeseeable obstacles to holding an East Precinct meeting, including COVID-19 and the months-long, nightly protests for racial justice.  Given the City's demonstrated proficiency holding meetings remotely during the pandemic, PPB should be able to correct course in 2021 by releasing a timely 2020 Annual Report and by holding a public meeting in each PPB precinct "to present its Annual Report and to educate the community about its efforts in community policing, in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters."  ECF 171, Am. Settlement Agreement, ¶ 150.  While we appreciate the logistical difficulties caused by the pandemic and nightly protests, we disagree with the Compliance Officer that those difficulties warrant a substantial compliance finding.  *See* COCL Q4 2020 Report (draft), at 61-62.  Rather, this Paragraph speaks to objective obligations that are readily achievable with the assistance of remote meeting technology.

151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

| Status | Substantial Compliance |
| --- | --- |
| The City remains in substantial compliance with Paragraph 151. | |

The City remains in substantial compliance with Paragraph 151.

Since November 2018, the PCCEP has consistently held monthly public meetings to accomplish the objectives set forth in the PCCEP Plan.  The PCCEP currently meets as a full group on the fourth Tuesday of every month from 5:00 to 8:00 p.m.  *See* PCCEP, Full Board Agendas / Meeting Minutes / Transcripts, *available at*  https://www.portlandoregon.gov/pccep/78093;  YouTube, PCCEP Videos, *available at* https://www.youtube.com/channel/UC0W1oX39iMCY-0O-qeqLTxg.  The full group continues to address governance issues, receive presentations on police issues, take public

comment, make statements on policing issues of public concern, and develop, discuss, and vote on recommendations to improve police-community interactions.

The PCCEP has also hosted regular, town-hall-style meetings to take public comment, including by hosting DOJ's presentation of its Interim Compliance Assessment Report in February 2020, and by hosting the Compliance Officer's quarterly report presentations in February, April, August, and October 2020. *See* PCCEP, Reports, *available at* https://www.portlandoregon.gov/pccep/80478. In the wake of George Floyd's homicide, the PCCEP also held several town-hall-style meetings to hear community views on a variety of racial justice issues and to craft responsive statements and recommendations. The PCCEP has also formed ad hoc committees to address particular issues, including exploring the formation of a truth and reconciliation commission and reimagining core patrol services.

Since January 2019, the PCCEP has five standing committees that have met, in one form or another, nearly every month. The Youth Subcommittee typically meets on the first Monday of the month from 4:00 to 5:15 p.m. The Behavioral Health Subcommittee typically meets on the first Tuesday from 6:30 to 8:00 p.m.[6] The Steering Committee typically meets on the second Tuesday from 5:30 to 7:00 p.m. The Settlement Agreement and Policy Subcommittee typically meets on the second Wednesday from 5:30 to 6:30 p.m. The Racial Equity Subcommittee typically meets on the third Thursday from 5:30 to 7:00 p.m. *See* PCCEP, Steering Committee, *available at* https://www.portlandoregon.gov/pccep/79067; PCCEP, Subcommittees, *available at* https://www.portlandoregon.gov/pccep/78723.

The PCCEP has made substantial efforts to accomplish its objectives. Notable committee achievements in 2020 include:

- The Racial Equity Subcommittee created a recommendation for PPB to adopt a procedural justice policy, which is now in draft form being considered by the Subcommittee, *see* PCCEP, Recommendation, Jan. 28, 2020, *available at* https://www.portlandoregon.gov/pccep/article/751850, and held a "Say Her Name, Hear Her Voice" forum, with the assistance of Joyce Harris of the enhanced amicus group AMAC, *see* YouTube, PCCEP Video, Aug. 21, 2020, *available at* https://www.youtube.com/watch?v=T_ryfetuPlk.

- The Settlement Agreement & Policy Subcommittee hosted a town hall forum on facial recognition, *see* Subcommittee Minutes, Jan. 8, 2020, *available at* https://www.portlandoregon.gov/pccep/article/751176, and created a recommendation for the City to accelerate the creation of a Truth and Reconciliation Commission to acknowledge the City's history of discrimination, *see* PCCEP, Recommendation, June 23, 2020, *available at* https://www.portlandoregon.gov/pccep/article/762478.

---

[6] In February 2020, the Subcommittee for People with Mental Illness disbanded in part due to discord with other PCCEP members and the PCCEP process that left some Subcommittee members "feeling marginalized, misunderstood, and ultimately dismissed." *See* ECF 223, Hearing Transcript, at 54:5 – 69:5 (testimony of Patrick Nolen, Meredith Mathis, and Amanda J. Marshall). Many of the Subcommittee members now affiliate with the amicus group MHA. In April 2020, other PCCEP members formed a Behavioral Health Subcommittee, which has met monthly since then. Members of the MHA often attend and contribute to the Behavioral Health Subcommittee's work and the PCCEP's monthly meetings.

- The Youth Subcommittee created recommendations for PPB to incorporate restorative justice into its policies, *see* PCCEP, Recommendation, June 23, 2020, *available at* https://www.portlandoregon.gov/pccep/article/762709, and for PPB to "build transparency and trust by updating the policy directive, increasing uniform identification requirements, and barring the obfuscation of identification," *see* PCCEP, Recommendation, Sept. 22, 2020, *available at* https://www.portlandoregon.gov/pccep/article/766384.

- The Behavioral Health Subcommittee formed, *see* PCCEP, Subcommittees, *available at* https://www.portlandoregon.gov/pccep/78725, held multiple learning sessions with the BHU Advisory Committee, BHRT units, and ECIT officers, *see, e.g.*, YouTube, PCCEP Videos, Dec. 6, 2020, *available at* https://www.youtube.com/watch?v=jL3KF1NuK5Q, and partnered with the Racial Equity Subcommittee to hold a joint forum to learn about the roles of BOEC and the Trauma Intervention Program in the aftermath of a lethal force event, *see* Subcommittee Transcript, Nov. 19, 2020, *available at* https://www.portlandoregon.gov/pccep/article/779969.

- The Steering Committee swiftly organized a series of impactful town halls and listening sessions in the wake of George Floyd's homicide and ensuing national and local protests for racial justice, *see, e.g.*, YouTube, PCCEP Videos, June 14, 2020, *available at* https://www.youtube.com/watch?v=r3iKfYoitmU, and held forum on the PPB budget, *see* YouTube, PCCEP Videos, Sept. 29, 2020, *available at* https://www.youtube.com/watch?v=KsmebsJQ8NI.

The PCCEP recently prepared its annual self-assessment to the City, listing accomplishments and challenges, and other relevant information. *See* PCCEP, Annual Report (draft), Jan. 21, 2021, *available at* https://www.portlandoregon.gov/pccep/article/780491.   A primary challenge noted by the PCCEP is receiving the City's response to recommendations in a timely fashion.  We will continue to monitor timeliness.

In sum, DOJ continues to share the Compliance Officer's assessment that the City continues to be in substantial compliance with this Paragraph.  *See* COCL Q4 2020 Report (draft), at 55.

152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

| Status | **Substantial Compliance** |
| --- | --- |

The City remains in substantial compliance with Paragraph 152.

The City Attorney's Office has repeatedly provided in-person training on the requirements of local law.  The City and amici have also provided background materials for PCCEP members and alternates.  City staff generally provide timely written and verbal responses to PCCEP member questions.  The City continues to be responsive to the PCCEP's requests for training and teambuilding opportunities, including PCCEP member retreats that are not open to the public.

The PCCEP sets its own agenda, without direction from City staff.  At times, this independence has come into conflict with the guidance set forth in the PCCEP Plan to post public meeting agendas far enough in advance so that the public can be informed about the upcoming work of the PCCEP and its subcommittees.  In some cases, the PCCEP responded to significant recent events

by quickly scheduling town hall events and listening sessions, such that only a few days' notice could be given to the public. It is unclear what, if any, impact is caused by delayed notice. However, PCCEP members and staff are aware of the issue and working to improve.