# COMPLIANCE OFFICER AND COMMUNITY LIAISON

## *Quarterly Report:*

## *Quarter 4 Updates & Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**October 1, 2020 to December 31, 2020**

**March 16, 2021**



# TABLE OF CONTENTS

**INTRODUCTION**                                                                                    **3**

**EXECUTIVE SUMMARY**                                                                    5

**SECTION III: USE OF FORCE**                                                            13

**SECTION IV: TRAINING**                                                                  22

**SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES**           32

**SECTION VI: CRISIS INTERVENTION**                                                34

**SECTION VII: EMPLOYEE INFORMATION SYSTEM**                            42

**SECTION VIII: OFFICER ACCOUNTABILITY**                                     46

**SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING**                                                                  55

**LIST OF ABBREVIATIONS**                                                               66

**LIST OF PERSONNEL**                                                                      68

# INTRODUCTION

This is the Compliance Officer/Community Liaison's (COCL) fourth quarterly report for 2020, as required by the Amended Settlement Agreement between the City of Portland and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered May 15, 2018. This report covers the three-month period from October 1, 2020, to December 31, 2020 but also includes updates on activities from the third quarter that were not available to COCL at the time of our last report.

In 2020 the Portland Police Bureau (PPB) and the City of Portland faced extreme and unexpected challenges, including the COVID-19 pandemic, continuous protests and disorder, budget cuts, wildfires, and problematic interagency coordination with federal law enforcement. We have expressed (and continue to express) our sincere empathy for those seeking to address these problematic events and understand how these extreme situations have impacted the operations of the City and PPB. While we provide context for how these events affected the City and PPB, the role of the COCL within the framework of the Settlement Agreement is to evaluate whether the systems designed to ensure constitutional policing in Portland have continued to function effectively. Specifically, in addition to engaging the community to receive feedback and build trust, PPB is expected to train, evaluate, investigate (if necessary) and supervise PPB officers in a manner that ensures appropriate responses to the community, including minimum use of force and procedurally just actions. COCL's job is to serve as a detached, independent evaluator who gathers and presents the facts similar to an Umpire in a baseball game calling balls and strikes. Nevertheless, in this report we endeavor to describe the constraints under which the PPB and the City are working, so that others can evaluate whether the failure to substantially comply with the Settlement Agreement was "beyond the reasonable control of the City" (Par. 183).

 As we reported in our 3rd quarter report, PPB was unable to maintain substantial compliance with the terms of the Settlement Agreement as the systems were overwhelmed. As part of this fourth quarter report, we continue to examine these systems and evaluate whether the remedies introduced by the PPB and the City in response to these crises represent reasonable corrective actions.

Feedback on a draft of this report from members of the Portland Committee on Community Engaged-Policing (PCCEP) included a call for more attention to racial inequity or race bias in PPB's actions. We emphasize again that the Department of Justice's original investigation in 2012, which served as the basis for this Settlement Agreement, did <u>not</u> conclude that PPB was engaged in racially biased policing. Instead, DOJ's findings letter states the following conclusion: "we find reasonable cause to believe that PPB engages in a pattern or practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness." (https://www.portlandoregon.gov/police/article/469399). Hence, the Settlement Agreement, which governs the actions of the COCL, gives only occasional attention to racially impartial policing. For example, PPB is required to document and share data on the race, age, sex, and perceived mental health status of persons with whom PPB officers have interacted "to contribute to the analysis of community concerns regarding discriminatory policing." (Par. 148). Thus, we have ensured that such data are being properly collected and we have gone further to summarize these findings in our reports, highlight any evidence of racial disparities in policing, and require PPB to engage in a dialogue with the community on this issue (Par. 150). Notwithstanding the recent national and local attention to racial inequality, COCL is

only authorized to assess the substantive requirements of the Settlement Agreement and not the broader operations of the PPB. But consistent with the call for racial justice, we have continuously recommended that the PPB provide high-fidelity training on implicit bias and procedural justice, monitor and hold officers accountable for the use of force against all constitutionally protected classes, and engage with the community on strategies to build public trust with marginalized communities.

# EXECUTIVE SUMMARY

**Section III: Use of Force**

In the third quarter of 2020, the protests and civil unrest continued in Portland, with Portland Police Bureau (PPB) officers responding with uses of force. In our last report, we noted that PPB had not produced sufficient representation of After Action Reports (AAR) and Force Data Collection Reports (FDCR) for us to conduct a reliable assessment. As a result, PPB was unable to demonstrate that it had maintained substantial compliance with Section III of the Settlement Agreement on Use of Force. Since then, PPB has provided to COCL a sufficient representation of documents for us to assess compliance, including a representative sample of FDCRs and AARs. However, after a review of these documents, we find that PPB is not substantially compliant with several paragraphs of the Settlement Agreement.

While our review looks at compliance with provisions of the Settlement Agreement, the events over the summer of 2020 were certainly sizable and hectic. During the summer, PPB was confronted with large numbers of peaceful protesters, agitators, and rioters. Between July and September, PPB officers had 3,739 applications of force during protest events. By comparison, there were 626 applications of force during non-protest events. Between the start of the protests in late May and the end of June, there were 2,412 protest-related applications of force – approximately four times the number of non-protest force applications occurring in the entire next quarter. Over the course of the protests, there were more than 600 officer injuries reported, including broken bones, lacerations, contusions, fractures, and other injuries. In addition, we assume that a similar number of community member were injured, though specific data regarding community member injuries was not available.

In following up with our last report, PPB returned to Substantial Compliance for a number of paragraphs that we were previously unable to assess due to a lack of documentation. For Par. 68 (related to use of CEWs), we found that each CEW cycle was justified and that officers provided sufficient warning prior to using the CEW. After the use of CEWs, AMR was used to remove the probes in accordance with policy. We did not review any protest events where CEWs were used. For Pars. 74, 75, and 77, we noted that PPB had previously skipped their count of protest force events and the inspector review of those events due to the large volume of events needing review. As of October 2020, the Inspector's team, under the leadership of the Office of Inspector General (OIG), has now caught up in their review of force applications.

There are several paragraphs within the Use of Force section which we find to remain out of substantial compliance. For Pars. 66, 67, and 69, we note that while PPB officers continue to demonstrate compliance with many of the subsections, we identified trends in reporting which insufficiently address other subsections of these paragraphs. We found that FDCRs were at times completed in a way that makes it difficult to evaluate whether the force was reasonable under the totality of the circumstances standard. Additionally, some of the FDCRs and AARs we reviewed did not demonstrate that PPB officers displayed the skills needed to regularly resolve confrontations without resorting to force or to use the least amount of appropriate force. Furthermore, a number of members indicated that a subject was engaged in active aggression but were unable to accurately describe the particular actions of the subject which met the threshold for active aggression.

Pars. 70 and 73 relate to After Action reviews of officers' uses of force and here too, we find elements of the paragraphs where PPB did not achieve compliance. As the summer protests went on, supervisors were more consistent in completing their AARs in the timeframe required by the Settlement Agreement. However, this did not occur uniformly and we found instances in the late months of the protests where supervisors still were unable to complete the reports in a timely fashion. The inability to complete AARs in a timely fashion has serious implications for a member's recall, particularly if the member experiences similar events over a sustained time period prior to being asked to remember details about the incident in question.

When looking at the totality of the summer protests, we believe that PPB's force management system became overwhelmed. Under more normal circumstances, we believe that FDCRs and AARs would be more thoroughly prepared, events more comprehensively reviewed, and force more appropriately managed. The overall failure appears connected to a system that was not designed for such prolonged and intensive events. As a resolution, PPB should take steps to ensure that its system can adapt should the future bring more unrest. Given that protests over elections, racial injustice, and other issues are likely to continue in the near future, such adjustments should serve PPB well.

**Section IV: Training**

In the third quarter, COCL concluded that PPB had fallen out of compliance in Section IV due to the inability to provide the required In-service training to roughly half of its members. COCL recommended that PPB prepare a detailed remediation plan to correct this training deficiency, and they have done so. In addition to a feasible remediation plan, PPB has completed a comprehensive Training Needs Assessment and prepared a 2021 Training Plan that specifically addresses this training gap. The In-service training in 2021 is designed to ensure that all members received the training required by law and by the Settlement Agreement. Using a mixture of online and in-person training formats, PPB is on schedule to complete the training that was missed in 2020 and supplement it with new classes identified in the needs assessment and strategic planning. Because PPB will reintroduce the same skills training that was observed and approved by COCL in 2020 prior to COVID-19, we do not feel obligated to observe it again prior to our compliance rating. However, COCL plans to observe the In-service training in 2021 to ensure high fidelity of implementation.

Furthermore, PPB has continued to follow many of COCL's past recommendations for adult learning, including interactive role-playing scenarios, individualized feedback, and training in communication skills for de-escalation and procedural justice that are integrated across the board.

Facing a "perfect storm" with the convergence of the COVID-19 pandemic, long-term protests, and PPB budget cuts, the Training Division was forced to move many of its classes to a virtual platform – a transition that does not occur without major challenges. PPB has carefully assessed which topics are best covered online and which require in-person training. In response to our concern about using asynchronous videos for online training, PPB has continued to build its capacity to create a more interactive online training environment with specialized training, new IT personnel and new software. At the same time, the Training Division recognizes that certain skills are best taught in person, such as use of force and control tactics.

COCL recommends additional Crowd Control training in light of the persistent protests and complaints about use of force in 2020. We encourage PPB to review any lessons learned from this experience and to incorporate de-escalation principles and techniques into this training.

Finally, PPB has done an impressive job of restoring its evaluation systems so that officers, class content, and instructors can be quickly evaluated, and evidence-based adjustments can be made. PPB has the evaluation methods and metrics in place for both online and in-person formats.

In sum, COCL is satisfied with the training remedies that PPB has introduced and therefore, reinstates the rating of Substantial Compliance for Section IV of the Settlement Agreement.


**Section V: Community-Based Mental Health Services**

In evaluating this section, we continue to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system.

As part of the broader community-based mental health service response system, the City and PPB have maintained their roles in overseeing or participating in committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

Additionally, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Related to this, PPB has continued to participate in AMR training in transporting persons in mental health crisis, as the handoff between PPB and AMR is a critical point in time and cross-agency training serves to improve this process. Based on these facts, we continue to find that the City and PPB have maintained compliance with Section V of the Settlement Agreement.


**Section VI: Crisis Intervention**

As we have done in the past, we evaluate PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers); and (2) Secondary Response (including BHRT and SCT). In accordance with our maintenance year plan, we evaluate the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC) and receives a PPB response. We also examine what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. Consistent with prior reports, we continue to find

PPB and the City have maintained their system for responding to mental health crises during this monitoring period.

During this monitoring period, BOEC has maintained their Mental Health and ECIT Dispatch Protocol SOP, has recently trained four new telecommunicators, and despite not being able to hold in-service for 2020, has reinforced the importance of ECIT through training newsletters, email reminders, and flyers. Additionally, BOEC telecommunicators are appropriately forwarding calls to the MCCL since data provided by BOEC indicates that, out of 130 calls forwarded to MCCL between October and December, only 13 were routed back to BOEC for emergency dispatch.

Comprehensive training on crisis response remains a core competency in PPB and all officers are required to receive a minimum of 40 hours Crisis Intervention training prior to graduating from the Advanced Academy. Additionally, PPB provided a video training session as a CIT refresher for all officers. Finally, in October of 2020, a member of the COCL team observed the Supervisors Academy which contained a module on ECIT officers as a resource for calls with a mental health component.

As part of PPB's specialized response system, a select group of officers receive 40 additional hours of training to become Enhanced Crisis Intervention Team (ECIT) officers. In November of 2020, PPB provided us with its fifth semi-annual evaluation of the ECIT program. As part of this, PPB reports that ECIT officers are consistently on-scene for a crisis call. PPB also found a statistically significant difference between ECIT and non-ECIT officers in whether a person is transported to the hospital and whether a person is transported to jail.

We also assess supplemental/secondary response systems being used by PPB, including the Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT). In the past, the BHRT consisted of five pairings of a PPB officer and a mental health professional (one in each Precinct, one dedicated to the houseless population, and one acting as a follow-up team for prior clients). In the third quarter of 2020, the ECIT Coordinator retired and the role was filled by one of the BHRT officers. However, due to budget constraints, the vacant BHRT slot (related to the follow-up team) has not been filled and there does not appear to be a plan to fill it in the near future. While the Settlement Agreement only requires a BHRT team for each Precinct, the fifth BHRT team was important and we urge the City to provide resources to fill the vacancy.

The other secondary response system that PPB operates is the Service Coordination Team (SCT). This program continues to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. We continue to be impressed with the work of SCT. Our own evaluations as well as annual evaluations conducted by Portland State University have demonstrated the positive impact of the SCT on the clients it serves.

As an overarching system, the Behavioral Health Unit (BHU) continues to oversee and coordinate the ECIT, BHRT, and SCT programs. BHU utilizes data from a variety of sources to evaluate its operation, including data from the Mental Health Template (MHT) as well as data collected from BHRT and SCT. Additionally, the BHUAC continues to act as an advisory body to guide the development of the overall

BHU, including the BOEC, ECIT, BHRT, and SCT components. The BHUAC continues to provide input on policy, training, and SOP, as well as receive presentations and hold discussions on current practices of other mental health system partners.

### Section VII: Employee Information System

In the third quarter of 2020, EIS administrators reviewed a total of 525 alerts which represents an increase from prior quarters. However, for the alerts that were sent on for supervisor review, a substantial majority resulted in some type of intervention for the officer. Supervisors also continued to evaluate officers' EIS and Performance Discussion Tracker (PDT) information (1) annually as part of an officer's performance evaluation, and (2) upon transfer of an officer to a new command. PPB's quarterly audits of reviews required by Directive 345.00 continue to find high rates of compliance with the required reviews. When supervisors do not conduct the reviews as required, PPB has continued to utilize their email notification system to alert tardy supervisors to missed review timelines.

### Section VIII: Officer Accountability

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, expediency, consistency, transparency, and a system of checks and balances.

Portland's accountability system continues to remain largely accessible to community members, allowing complaints to be filed in a multitude of ways. These include community members' complaints to the Independent Police Review (IPR), community members' complaints to PPB, IPR initiated complaints, and PPB initiated complaints. Community members can file a complaint by phone, online, or in-person (either to PPB or IPR). As a result of the protests, the number of administrative investigations has substantially increased, leading to a backlog within IPR. This is particularly true for intake investigations, which have suffered low rates of being completed on-time. This is due to officer and community members being unidentifiable, incomplete fact patterns during intake, and IPR operating without a full staff.

The impact of the protests can be seen on the overall timelines for administrative investigations. Par. 121 requires full administrative investigations to be completed within 180 days of being opened. Particularly as it relates to administrative investigations conducted by IPR, we can no longer say that this requirement is being met. For cases opened in the past year and a half, IPR has completed their full administrative investigations within the 180-day timeline approximately half the time on average.

Overall, the transparency of Portland's accountability system has remained largely consistent. Community members remain able to track the progress of their complaint and IPR continues to provide updates in writing at each stage of the investigation, including a community member's ability to appeal findings. Citizen Review Committee (CRC) appeal hearings and other CRC functions remain open to the public with accompanying minutes posted to the IPR website. Additionally, redacted summaries of Police Review Board (PRB) hearings continue to be provided on the PPB website. Finally, IPR analytical

reports and online data related to misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths remain available on the IPR website.

The accountability system in Portland continues to contain a system of built-in checks and balances to ensure a fair resolution for all involved. For instance, prior to an RU Manager's findings on an allegation, IPR continues to have the ability to review the investigation report and can request an additional investigation or a rewrite of the investigative report. Additionally, after an RU Manager makes findings, IPR reviews those findings and has the ability to controvert the findings, thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination.

Community members and officers continue to be able to appeal administrative investigation findings to the Citizen Review Committee (CRC), an eleven-member review board that hears appeals. In the 4th quarter of 2020, the CRC held one appeal related to discrimination and retaliation as well as failure to follow protocols for complaint processing. In reviewing the minutes from the appeal hearing, we believe that CRC gave thoughtful consideration to the matter and voted in accordance with their standard of review. We also note that the CRC has been operating shorthanded, though relief appears to be near as IPR is presently interviewing 25 people to fill the open CRC slots.

A final system of checks and balances can be found in the Police Review Board. When there is a sustained finding that will lead to discipline involving suspension or greater, when there is an officer involved shooting or in-custody death, or when there is a controverted finding, the Police Review Board takes the RU Manager's proposed findings and either adopts the proposed findings or provides their own proposed findings and corrective action to the Chief. In this report, we identify issues related to the operation of the PRB as it relates to scheduling CRC community board members as well as concerns related to the recommended findings from two PRB hearings. Because PPB has demonstrated evidence that Chief is willing to overrule the findings of PRBs in order to hold officers accountable, we do not believe this reflects a systemic issue.

### Section IX: Community Engagement and Creation of Portland Committee on Community Engaged Policing

*PCCEP's Role*

The Portland Committee on Community Engaged-Policing (PCCEP) continues to support multiple subcommittees and solicit input from community members, government officials, and community leaders using a virtual platform. It has sought input on issues of mental health, use of force, community engagement, and other topics.

In the fourth quarter, PCCEP reviewed and discussed PPB directives, the Community Engagement Plan, PPB's Force Report and other topics. They also hosted a community forum regarding behavioral health, BIPOC communities, and PPB's use of force. In addition, PCCEP cohosted a Town Hall with COCL to review the third quarter findings.

PCCEP generated a number of recommendations in the fourth quarter. Noteworthy, the Mayor accepted PCCEP's recommendation to create a Truth and Reconciliation Commission and directed PCCEP to form a subcommittee charged with planning its development.

The City continues to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee, and providing technical assistance. A representative of the City Attorney's office attended PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings law. PPB's Inspector General also attended PCCEP meetings to answer any questions about PPB that may arise. PCCEP's membership remains fairly representative of the larger community and COCL did not identify any conflicts of interest. In sum, PCCEP continues to function as a legitimate body for community engagement in policing.

_PPB's Role_

In the face of extreme circumstances in 2020, with both internal and external obstacles, PPB has continued to sustain and even expand its systems of community engagement. The Community Services Division, the Office of Community Engagement, and the Office of Equity and Inclusion, working in a new virtual world, have managed to build partnerships with many different segments of the Portland community through existing and new advisory councils. The Coalition of Advisory Groups, represents all existing community advisory councils, is also off to a good start. In a nutshell, the Community Engagement Plan required by the Settlement Agreement is coming to fruition.

PPB has continued to meet and exceed the requirement to collect, analyze, and report information about its performance on a variety of dimensions. PPB continues to produce quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. PPB's interactive dashboards, which include a wide range of performance statistics and maps, are exemplary in the policing field. PPB's collection, analysis and reporting of stops data is commendable because of its rigorousness and transparency. In doing so, PPB has revealed disparities in consent searches that suggest discrimination against Black/African American drivers. Fortunately, PPB has taken action during 2020 to address and begin to correct this problem by introducing a new Stops Data Collection App that forces officers to think about the reason for the stop and search, and new training of officers on this subject. We encourage continued dialogue with the community about racial/ethnic disparities in policing, alternative strategies for responding to violent crime, and effective mechanisms to strengthen public trust in the PPB.

Unfortunately, PPB did not maintain Substantial Compliance with Par. 150 regarding the production, distribution, and discussion of its annual report. While PPB produced the 2019 annual report, sought input from PCCEP, and presented the report to the City Council, it did not fulfill its obligation to engage the community at the Precinct level. PPB's virtual precinct presentations: (1) were not broadly announced to the public in advance; (2) did not occur in the East precinct, which is home to many people of color who have contact with the PPB, and (3) lacked evidence that the full range of topics required by Par. 150 were covered. To build trust, we encourage the PPB to take advantage of these precinct meetings to share their plans and challenges and discuss race-sensitive issues around "pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters." (Par. 150). Also, given that PPB did not incorporate many of PCCEP's

recommendations regarding the draft report, we encourage them to provide additional clarity around PCCEP's role in the review of each year's draft. Furthermore, we encourage the City Council to receive PPB's annual report <u>after</u> the precinct meetings have been held and robust community input has been sought.

COCL' primary job is to determine whether PPB has responded adequately to the specific requirements of the Amended Settlement Agreement. To a large extent, we find that PPB has created the systems of community engagement and performance measurement required by Section IX. Furthermore, they have responded to problematic outcomes that emerged with reasonable remedies. For these reasons, COCL finds that PPB has remained in substantial compliance with the requirements of Section IX on Community Engagement, with the exception of Par. 150, where we have assigned Partial Compliance.

# SECTION III: USE OF FORCE

In the third quarter of 2020, the protests and civil unrest continued in Portland, with Portland Police Bureau (PPB) officers responding with uses of force. In our last report, we noted that PPB had not produced sufficient representation of After Action Reports (AAR) and Force Data Collection Reports (FDCR) for us to conduct a reliable assessment. As a result, PPB was unable to demonstrate that it had maintained substantial compliance with Section III of the Settlement Agreement on Use of Force. Since then, PPB has provided to COCL a sufficient representation of documents for us to assess compliance, including a representative sample of FDCRs and AARs. However, after a review of these documents, we find that PPB is not substantially compliant with several paragraphs of the Settlement Agreement. We will provide our assessment of these paragraphs below. We begin this assessment by noting the paragraphs that have remained in compliance during this reporting period, followed by a discussion of paragraphs that we previously found out of compliance but have now returned to compliance, and, lastly, we reach the non-compliant provisions.

We also provide some context to our review. While our review looks at compliance with provisions of the Settlement Agreement, the events over the summer of 2020 were certainly sizable and hectic. During the summer, PPB was confronted with large numbers of peaceful protesters, agitators, and rioters. Between July and September, PPB officers had 3,739 applications of force during protests. By comparison, there were 626 applications of force during non-protest events. Between the start of the protests in late May and the end of June, there were 2,412 protest-related applications of force – approximately four times the number of non-protest force applications occurring in the entire next quarter. Over the course of the protests, there were more than 600 officer injuries reported, including broken bones, lacerations, contusions, fractures, and other injuries. In addition, there was a likely corresponding number of community member injuries, though specific data regarding community member injuries was not available. At times, the PPB as an organization was constrained in their actions without clear guidance. For instance, in September of 2020, the Mayor issued a statement banning the use of CS gas, but this caused confusion in the absence of any corresponding revision to PPB directives to operationalize the ban (a Special Order providing some guidance was released by the Chief on November 30). While we find PPB and the City to be out of substantial compliance for some of the paragraphs below, we urge the reader to take the events PPB was facing into consideration.

**Maintained Compliance**

As required by Par. 76, PPB continues to provide a quarterly analysis of force though we note that protest and non-protest force are separated out since it is difficult to merge the two. When looking at non-protest force (Figure 1), the raw number of individuals subjected to use of force by PPB has consistently decreased since the second quarter of 2019, though the overall force-to-custody rate has increased. Because the raw number has decreased, this means that the number of custodies that PPB makes has also decreased albeit at a slower pace. PPB has confirmed this, noting in their quarterly report that between the last two quarters, "total calls for service dropped from 82,269 to 69,020 (-

16.10%), officer initiated calls dropped from 22,980 to 10,883 (-52.64%), custodies dropped from 4,135 to 3,070 (-25.75%), and subjects upon whom force was used dropped from 169 to 142 (-15.97%)". Although force and contacts/custodies have not decreased proportionately, this is likely a result of the types of contacts that have decreased. For instance, if petty contacts (ones that are less likely to contain force) decreased but more serious contacts (ones that are more likely to contain force) did not decrease, then we would not expect to see a proportionate decrease in force. Because the increase in force rate appears to be more reflective of an overall decrease in contacts, custodies, and individuals subjected to force, we are not overall concerned with the increase in rates.



Figure 1: Use of Force – Individuals and Force to Custody Rate

In addition to evaluating PPB's overall use of force, we also assess their use of force on persons who have an actual or perceived mental illness. In the past, we have reviewed ECIT events and found consistently low raw numbers of force and low force-to-interaction rates for these event types. However, PPB recently conducted an assessment using all calls involving persons with actual or perceived mental illness. This assessment was conducted using data for a 30-month period (April 1, 2018 to September 30, 2020). In that period, PPB officers responded to over 54,000 calls for service involving persons with actual or perceived mental illness. Of those, use of force was only used 400 times (0.74%). A majority of these force events were Category IV, the lowest level of force categorized by PPB. Category II and Category III force types (which include the use of CEWs) were only used in 144 of the interactions (0.27%).

PPB has also maintained compliance with the requirement to develop a supervisor's checklist when responding to an officer's use of force (Par. 72). Presently, the AAR acts as a checklist. While we note our concerns with the comprehensiveness of protest AARs below, the form does continue to serve as the checklist and is updated when necessary. Additionally, in the non-protest cases we reviewed, we continue to see evidence of the form's use as a checklist.

PPB has maintained an adequate patrol supervision staffing level (Par. 71). We have repeatedly said that span of control rate is a better metric than the raw number of supervisors. As of September 30, 2020, there are, on average, 4.8 officers for every supervisor across the three main precincts. This continues to remain a reasonable span of control.

Finally, as we have done for past reports, we reviewed a sample of 20 non-protest force cases including CEW uses, Category II, Category III, and Category IV force types, with several force events involving a person in mental health crisis. Our review of these force events is consistent with findings from prior reports. Specifically, when non-protest force is used, it is comprehensively documented by officers, reviewed by supervisors, and corrective action (formal and informal) taken when necessary. For all non-protest force cases we reviewed, we found that the evaluations were comprehensive and the force used was reasonable under the totality of the circumstances based on the information presented in the written reports.

**Returned to Substantial Compliance**

*Paragraph 68*

In our last report, we were unable to assess Par. 68 due to a lack of documentation relating to all force events, including protest force events. For this report, we received a sufficient sample of force event documentation to assess this paragraph. In the CEW force events we reviewed, we found that each CEW cycle was justified and that officers provided sufficient warning prior to using the CEW. After the use of CEWs, AMR was used to remove the probes in accordance with policy. We did not review any protest events where CEWs were used and therefore our evaluation of this paragraph comes from our review of non-protest force events, the ongoing CEW training provided by PPB, as well as our historical evaluations. As we now have a reliable set of documents to evaluate, we find that PPB has returned to substantial compliance with the requirements of this paragraph.

*Paragraphs 74, 75, and 77*

In our last report, we noted that, for the month of June, the Force Inspector and auditing team had momentarily skipped their count of protest force events and the inspector review of those events due to the large volume of events needing review. As a result, we found PPB to be out of compliance with the requirements of Par. 74, 75, and 77. However, as of October 2020, the Inspector's team, under the leadership of the Office of Inspector General (OIG), has completed their review of force applications occurring in June. Additionally, as June was the only month that had been skipped, all other months were audited within their normal timeframe.

Additionally, we review on a quarterly basis the Inspector's audit findings for each Precinct as well as the corresponding communication between RU Managers and the Inspector about the audits findings. These findings reports continue to show that officers and supervisors complete their FDCRs and AARs in a comprehensive and accurate fashion. However, the quarterly audit findings reports do not contain protest use of force incidents, for which a separate annual report is completed. Upon receipt and review

of the annual report for protest events, we will evaluate the overall rates of reporting deficiencies and the Inspector's communication with RU Managers regarding trends found during the audit.

In addition to trends in evaluating the comprehensiveness and accuracy of FDCRs and AARs, the Inspector reviews use of force events to find emerging issues, concerning occurrences, and department-wide trends. We have reviewed the spreadsheet utilized by the Inspector to document and categorize the issues found as well as the correspondence the Inspector has with various RUs, the Training Division, and the Policy Team. The correspondence demonstrates thoughtful evaluation of the force events and concrete recommendations for remediation of the issue. The responses provided by the RUs, Training Division, and Policy Team provide evidence that the Inspectors recommendations are taken seriously and adopted where appropriate.

Based on the evidence demonstrating that the Force Inspector and Audit team have now completed counts and reviews of all uses of force, audits of non-protest force (with protest force being audited at the end of the year), and the findings reports we have reviewed each quarter, we conclude that PPB has returned to substantial compliance with the requirements of Pars. 74, 75, and 77.

**Paragraphs Remaining Out of Compliance**

*Paragraphs 66, 67, 69*

In the Settlement Agreement, Pars. 66, 67, and 69 have certain policy requirements for PPB's use of force and use of force reporting. In our review of the protest force reports, we note that while PPB officers continue to demonstrate compliance with many of the subsections of Pars. 66, 67, and 69 , we identified trends in reporting which insufficiently address other subsections of these paragraphs.

For instance, with regards to Par. 66, a number of FDCRs were completed in a way that makes it difficult to evaluate whether the force was reasonable under the totality of the circumstances standard. For instance, we reviewed FDCRs where the actions of the crowd were used to describe the circumstances justifying the use of force without providing sufficient detail of the action of the force recipient(s). In one case, the member noted that after deploying an inert rubber ball distraction device, the crowd "continued to move northbound" though it is not clear why force was reasonably necessary if the crowd was already moving.

Additionally, specific to Par. 66b, some of the FDCRs and AARs we reviewed do not demonstrate that PPB officers displayed the skills needed to regularly resolve confrontations without resorting to force or to use the least amount of appropriate force. We maintain that this is due, in large part, to PPB's failure to conduct an event-wide After Action Review. The PPB is working on this review, but the protests subsided in November and the review has not yet been completed. Not conducting broader After Action reviews while the protests were occurring prevented PPB members from receiving additional guidance on force-avoidance techniques. Although PPB command staff were made aware of the types of force occurring each night, they did not receive specific counts of force, including the number of deployed less-lethal munitions. With such information, PPB could have better evaluated the complete picture

regarding the totality of force applications and potentially made different strategic decisions that could have prevented problematic encounters in the days ahead.

With regards to Par. 67, many of the reports we reviewed did not demonstrate how members attempted to de-escalate events that resulted in force or where de-escalation was discussed. Instead, de-escalation was often assumed to be connected to the sound truck providing force warnings to the broader crowd. While we agree that verbal warning can be considered de-escalation in some instances, it should not be relied upon as the sole or primary de-escalation technique. In many of the FDCRs, the sound truck was included as the only de-escalation technique and a variant of the phrase "The sound truck provided multiple use of force warnings prior to any force being used."

We acknowledge that the protests often placed PPB officers in extremely difficult circumstances where split second decisions were sometimes required. We further acknowledge that PPB officers were often placed in a "damned if you do and damned if you don't" situation with respect to force decisions. We also note here that many officers indicated in their FDCR that they attempted to wait out those who were committing certain criminal acts. We consider this a positive de-escalation tactic though one that, while no fault of PPB, was at times destined to be unsuccessful given the intent of some extremists to cause destruction. In other instances, officers described in great detail their efforts to de-escalate community members. Our critique should not be viewed as indicating that PPB members have unilaterally failed to sufficiently employ or document de-escalation attempts. We instead are identifying trends across a number of FDCRs which were not corrected during the After Action Review process.

With respect to Par. 69, our review of use of force reports from the protest events do not demonstrate that officers have drafted timely use of force reports that include sufficient information to facilitate a thorough review of the incident. As we note above, many reports did not provide sufficient detail about particular subjects' actions nor provide sufficient information about their attempts to de-escalate the situation. For instance, we reviewed one AAR where the supervisors stated "In reading [the member's] reports, I find that greater description and articulation should take place when grenadiers or RRT sergeants deploy OC at individuals who are approaching the line, as to the immediacy, and why this was the best tool, particularly when RRT officers could use batons to push members of the crowd." We feel that the supervisor here made a valid critique and that the critique was reflective of many of the reports we reviewed.

Also, a number of members indicated that a subject was engaged in active aggression but were unable to accurately describe the particular actions of the subject which met the threshold for active aggression. In one instance, a member wrote "All subject [sic] involved in this disturbance had at least been complicit in the criminal activity taken place, and had therefore participated in active aggression." We disagree that being part of a crowd, even when members of that crowd are participating in criminal activity, would justify considering all members of the crowd as being actively aggressive. As a result of the lack of information about subjects' particular actions and members' de-escalation techniques during protest events, as well the inconsistency in defining active aggression, we do not believe PPB has maintained compliance with this paragraph.

With respect to Par. 69(c) (related to the reporting and review requirements for use of lethal force), we reported last quarter on a use of force incident in which an officer struck a person in the head with a baton. We noted then that PPB did not initially consider it a lethal use of force at the time since the officer reported that it was not intentional despite the force event containing all other elements found in policy (we have been informed the use of force in this incident is now being investigated as a lethal force application). As a partial remedy, the COCL team, DOJ, PPB, and the City engaged in numerous discussions of Directive 1010.00 as it relates to determining intent using a reasonable person standard (as opposed to relying solely on the officer's report). Upon final revision of the Directive, we look forward to PPB enacting it. We also look forward to reviewing the administrative investigation report for this incident and will provide updates in the Accountability section of future reports.

Finally, as it relates to timely reporting, a review of the AAR sample demonstrated that, while FDCRs were often completed prior to the end of the shift, other relevant reports were not completed in a timely fashion. For instance, we reviewed one AAR in which a chain-of-command reviewer noted the Sergeant "acknowledged the AAR was not completed within 72 hours. He explained the reason for that was because he was unable to receive all the reports associated with this incident in a timely manner. I do not fault [Sergeant] for this AAR being late and I agree with him that the operational tempo and related effects of that tempo for the RRT officers involved makes it very difficult for them to get reports completed in the required time." We acknowledge that the protests impacted officers' ability to complete reports on time. However, we believe this problem could be moderated in the future if such long-term protest events reoccur. We offer a more in-depth discussion of this issue in our assessment of overall force management (see below).

### _Paragraphs 70 and 73_

In the Settlement Agreement, Pars. 70 and 73 require supervisors to complete an After Action Report (AAR) which details their administrative review of use of force events and the timeline for doing so. In our review of the AARs associated with force used during the protests, we note that while supervisors continue to demonstrate compliance with many of the subsections of Pars. 70 and 73, we identified trends in AARs which were insufficiently responsive to other subsections of these paragraphs.

As noted above, there are some exceptions to supervisors completing the AARs within 72 hours as required by 70(a). PPB concedes that in the early days of the protests, supervisors were unable to consistently complete their AARs within the 72-hour deadline. As the protests continued, supervisors were more consistent in completing their AARs in 72 hours. However, this did not occur uniformly and we found instances in the late months of the protests where supervisors still were unable to complete the reports in a timely fashion. One supervisor noted that the 72-hour requirement "is simply unreasonable when there are large scale riots involving multiple officers using multiple types of force at multiple locations for over 90 nights in a row."

As we noted in our last report, the inability to complete AARs in a timely fashion has serious implications for a member's recall, particularly if the member experiences similar events over a sustained time period prior to being asked to remember details about the incident in question. For instance, one

supervisor stated, "Due to the overwhelming amount of hours endured, members had to recall information to write reports in a chaotic and on-going event that lasted weeks." No doubt, supervisors have been under pressure to stay abreast of very complex and fast-moving events. COCL is simply maintaining that, in the future, PPB should ensure that systems and resources are enhanced to conduct force investigations in a timelier fashion to ensure that the events which transpired are captured as accurately as possible. We discuss this in more depth in our assessment of overall force management (see below).

We also have concerns that some supervisors appear to be more interested in expediency than quality of reporting. For instance, we reviewed some AARs where associated reports were submitted by officers after the supervisor completed their AAR. Not having the associated force reports may impact supervisors' ability to conduct a full review of the incident. In other instances, videos and/or pictures related to the use of force were not loaded into DIMS until after the AAR was completed. One supervisor indicated in their AAR, "I know FED may have video however, I did not locate specific incidents due to the sheer volume of data and time limitations." This may be resolved by PPB being afforded additional resources when facing future instances of prolonged protest events, an issue we discuss in more depth in our assessment of overall force management.

Another trend we noted in our assessment of AARs was inconsistency in supervisors' decisions to interview members who used force rather than relying solely on the member's report. In approximately half of the AARs we reviewed (including in months that came later in the protests), the supervisor either did not interview the member or did not document the interview sufficiently. Given that some members did not include a complete description of the force event in their FDCR (as noted above), supervisors should not be relying on the FDCR as the only source of information. While the subject of police force may not always be able to be interviewed, the involved and witness members might be able to aid supervisors in their assessment.

Based on our findings above, we also believe that PPB has not maintained substantial compliance with the requirements of Par. 73, particularly with regards to subsections (b) (supervisors in the chain of command are subject to corrective action for the accuracy and completeness of AARs), (c) (supervisors in the chain of command are accountable for inadequate reports and analysis), and (e) (when a use of force is found to be out of policy, PPB takes actions consistent with the Accountability section).

For subsections (b) and (c), we refer to our discussion of FDCRs and AARs which do not provide sufficient information about the particular subject actions which justified the use of force, inaccurate descriptions of resistance levels, inadequate descriptions of de-escalation, AARs being completed without the benefit of all associated reports and/or videos/pictures, insufficient documentation of officer interviews, and related concerns. For many of these, the chain-of-command reviews did not return the reports for correction before final approval nor were they sufficiently critical when such issues were present. For subsection (e), the pattern of officers not adequately describing subject actions, using an inaccurate description of active aggression to justify their level of force, and not providing adequate descriptions of their de-escalation tactics should have been reviewed as potential policy violations. However, since

AARs did not address these issues, officers were not held accountable in accordance with the Accountability section of the Settlement Agreement.

**Management of Use of Force**

As noted above, we find that PPB has not maintained substantial compliance with a number of paragraphs based on the evidence provided. To this point we have primarily evaluated each Use of Force paragraph in isolation. Here, we provide a general assessment of PPB's force management system. As we noted in our past report, the totality of the summer protests overwhelmed PPB's force management system. Despite taking concrete steps towards reinforcing their systems of reporting, reviewing, and responding to members' use of force, these systems were not created to be responsive to such events. As one supervisor noted in an AAR, "The frequency of incidents requiring Bureau members to use force, combined with the lack of down time between events, has overwhelmed the system designed to capture information and investigate force at every level of review."

We recognize that what members of PPB experienced on a nightly basis over the summer was extreme. We do not believe that anyone from the COCL team or the Department of Justice has ever experienced similar nightly protests and disorder for such an extended period. Therefore, we have no reason to disregard the raw statements about system failures described by the chain of command reviewers. Under more normal circumstances, we believe that FDCRs and AARs would be more thoroughly prepared, events more comprehensively reviewed, and force more appropriately managed. Indeed, we have observed and approved of PPB's response to non-protest force events for a number of years now.

However, we cannot find that force was appropriately managed throughout the summer protests. We believe that such failure is connected to a system that was not designed for such prolonged and intensive events. As a resolution, PPB should take steps to ensure that its system can adapt should the future bring more unrest. Given that protests over elections, racial injustice, and other issues are likely to continue in the near future, such adjustments should serve PPB well.

The intermediate steps PPB took over the course of the protests were a commendable beginning. In our last report, we noted that PPB began using a Key Case Number to better track a day's events, assigning an AAR sergeant for each squad (as opposed to a single person being responsible for all FDCRs in a single day), assigning a dedicated After Action team, and removing members from protest duty or placing them on administrative leave while under administrative investigation. PPB reports that these steps relieved some of the pressure on the system. However, these steps were implemented on an emergency basis and may potentially be enhanced if PPB had been afforded the time to contemplate a broader implementation plan.

PPB is already in the process of conducting a broader After Action review of the summer events. While this review is important to document events and "lessons learned," this will be an after-the-fact evaluation. PPB reports that they tried different tactics over different nights based on the daily update of the protest activities and the force types used, but we have not been provided a comprehensive

evaluation of the crowd management approach while the protests were occurring. Although we recognize the importance of command staff continuing to monitor the daily events, of equal importance is the evaluation of whether PPB's strategic response was effective and appropriate under the circumstances. When an individual is destroying property or assaulting police officers, forceful intervention is certainly appropriate. However, our review of FDCRs and AARs indicated that, at times, no distinction was made between persons engaging in serious criminal acts and those who, while unlawfully remaining in an exclusion zone, posed no threat and offered no resistance. This failure to differentiate between types of actors could have been identified and resolved early on through a broader After Action review, though the documents we reviewed indicate that it continued throughout the summer.

A broader After Action review should also examine whether adequate resources are available to review FDCRs and evaluate uses of force. Even in the later summer months, we reviewed many AARs that were each linked to numerous FDCRs - so many FDCRs that they could not be reviewed in a comprehensive manner by a single sergeant. As one supervisor noted, "Although sergeants have been assigned to review the force events, these are not being properly conducted for ongoing protests. Interviews with officers are not being conducted, and videos are not being submitted or reviewed." As we noted in our last report, PPB needs to identify and further assign additional resources in the event of sizable future protests. While this did occur to some extent (including re-deploying members to the protests and assigning several additional members to review AARs), other methods could have also been used, including having personnel to review videos, assist the audit team, review force events, or assist with ongoing reviews of tactics and strategies.

Once PPB has completed their review of the summer protests, the findings should be memorialized into some type of operational contingency plan. Given frequent changes in assignments and retirements, PPB personnel should have particular documents to which they can refer should this type of prolonged event occur again. Whether this comes in the form of new or revised directives, SOPs, or an "in case of emergency, break glass" guide, PPB will have a direct reference for avoiding the problems that resulted from the 2020 protests. Such a guide would be instrumental in helping officers complete their reports in a timely fashion, reduce the number of FDCRs associated with each AAR, ensure immediate officer recall during the AAR process, and allow for ongoing assessment of operational strategies and tactics. As noted above and by many members of PPB, the system was not built for the protests that occurred. Therefore, PPB needs to update the system so that it can accommodate such events in the future. Such events can be "unprecedented" only once.

# <u>SECTION IV: TRAINING</u>

In our Q3 report we described how PPB's training schedule and methods of delivery were significantly altered because of the COVID-19 pandemic, the persistent protests against racial injustice, and administrative decision making by PPB and the City. In this section, we describe the adjustments that PPB made in the fourth quarter and assess whether these changes to PPB's training plans return PPB to substantial compliance with Section IV of the Settlement Agreement.

### <u>Overview of Training Systems</u>

COCL's framework for assessing compliance with Section IV remains unchanged. PPB is being judged by its ability to maintain systems of police training that can increase "*the knowledge, skills and abilities necessary for effective and successful delivery of services to persons in mental health crisis*" and that can contribute to the "*proper management of the use of force to meet constitutional standards*" (Par. 173). Thus, we have consistently evaluated the extent to which PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

### <u>Overview of Methods</u>

The COCL team continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL team also continues to observe training (either in-person or online) and interview PPB staff. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness.

### <u>Assess Training Needs</u>

Paragraph 79 of the Settlement Agreement requires that PPB conduct a needs assessment and use this information to update its training plan annually. Since our last report, PPB has published its 2020 Needs Assessment. We credit the Training Division for basing the needs assessment on a comprehensive set of resources and feedback from knowledgeable individuals. Internally, input was obtained from the Force Inspector, the Force Audit Team, Internal Affairs, precinct and unit managers, the PPB policy team, the Behavioral Health Unit, and lead instructors. Externally, PPB has been responsive to COCL's recommendation to expand community engagement, and has sought input from PCCEP, the TAC, IPR, BHUAC, and community advisory boards. The Training Division also reviewed a wide range of documents, including community survey results, changes in Oregon law, changes in PPB policies, the IPR annual report, the OIR report on force, the Community Engagement Plan, and research on trends and best practices. Thus, COCL is satisfied with PPB's Needs Assessment.

The Annual Needs Assessment covers many categories where gaps can occur in officers' actions that can affect the safety of the public and officers, the provision of needed services, and the public's overall trust and confidence in the PPB. The assessment continues to be responsive to areas identified in the Settlement Agreement, including procedural justice, problem solving, and communication skills relevant to minimizing the use of force and appropriate responses to individuals facing a mental health crisis.

In December (2020), based on the Needs Assessment and other factors, the Training Division finalized the Bureau's 2021 Training Plan. COCL has reviewed this Training Plan and we find that it (1) provides a strong overview of the training topics to be covered, the purpose of the training, the dates, and the estimated training hours; and (2) is responsive to the needs identified in the Needs Assessment. As discussed in Par. 84 below, this Training Plan also responds to the gap in 2020 In-service training, including a new section for online training.

In sum, COCL finds that PPB has complied with the requirements of Par. 79 by providing a comprehensive needs assessment and training plan for 2021.

### Deliver Appropriate and High-Quality Training

PPB is expected to develop and implement a high-quality system of training for officers and supervisors (see Par. 84). The training must be consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness, including *"role playing scenarios and interactive exercises that illustrate proper use of force decision making"* (Par. 84.a).

In Q3 of 2020, COCL concluded that PPB failed to maintain substantial compliance because it was unable to complete the In-service training for approximately half of its members. Hence, our evaluation of training in this Q4 report will focus on PPB's remedial actions and whether these plans for In-service training in 2021 are satisfactory.

We have no objection to the supervisory training, both online and in-person, which we have reviewed. We observed the supervisory training for new sergeants in October of 2020 and found it more than satisfactory. Supervisors were instructed on their roles and responsibilities in different settings, including crowd management, and the elements of good decision making. The importance of procedural justice and public legitimacy were covered. We were also satisfied with the recruit training as described in prior COCL reports in 2020.

### Plans to Remediate In-Service Training

In-service training is PPB's main vehicle for ensuring that all of its members have the knowledge and skills needed to perform their jobs in a safe and professional manner. The four-day 2020 In-service training began in January. As described in our Q1 and Q2 reports, COCL was satisfied with this training, including both classroom and skills-based scenarios. Unfortunately, PPB's In-service training was

discontinued in March due to the COVID-19 pandemic, followed by daily protests, and cuts to PPB's budget, leaving nearly half of its members without this training.

In Q3, we acknowledged PPB's quick response to the training crisis, as it transitioned to online training using its Learning Management System (LMS). The immediate goal was to ensure that officers who missed the in-person classes would be able to make them up with online training, so videos of the February classroom training were posted on LMS and officers watched them over the next two months. This was a serious attempt to replace the classroom training, but it did not provide the skills training to the 485 officers who were unable to participate in the hands-on scenarios, including use of force, where they would practice specific skills, ask questions, and be debriefed on their performance. PPB has developed a plan to correct this deficiency.

Thus, COCL's current analysis of compliance for Section IV rests heavily on whether PPB has been able to construct a sound remedy to fill these gaps in skills training for their 2021 In-service. PPB initially responded with a "Make-up Plan" in August. However, in Q3, COCL was critical of this Make-up Plan for lacking details about specific training classes, including which classes would be provided online or in-person, and the justification for these decisions. PPB has since addressed our questions, and many of these details are reflected in their needs assessment and 2021 Annual Training Plan which became available in the fourth quarter. We summarize these remedies below.

_Online vs. In-person classes_

PPB has clarified which classes will be provided online and which will be delivered in-person and the criteria used to make these decisions. (Lists were provided in PPB's draft 2021 Training Plan, December 2020). For the in-person, skills-based classes, PPB will repeat those taught during the pre-pandemic period so that all officers are included – classes that were observed and approved by COCL. However, the scenarios have been changed so that the pre-pandemic cohort will be exposed to new material. Also, because of the one-year lag time between classroom and skills training, all members will receive an in-person summary/refresher on concepts covered in the classroom portion of the 2020 In-service immediately prior to the skills training.

Use of Force is the focal point for the 2021 in-person training, covering everything from emergency entries to legal updates. We credit PPB with introducing new scenarios for Patrol Procedures to strengthen decision-making and communication skills when responding to a person in crisis. Communication skills in critical incidents continue to emphasize de-escalation and procedural justice. PPB has made a commitment to integrate procedural justice into all In-service classes. We recognize that this integration can be more difficult for some tasks than others, such as making an arrest. Whether it is "talking someone into handcuffs" or ensuring afterwards that the person in custody does not have any immediate needs, there are always opportunities to practice this style of respectful policing.

There is no doubt that PPB needed to expand its online training, but COCL asked for clarity about the decision to move some classes online and keep others in-person. When making these decisions, PPB turned to its Needs Assessment and the learning objectives of each class to determine whether it could be successfully delivered with an online format. The Needs Assessment identified many training needs and topics that could be covered easily online. PPB decided that some classes have content that should

be covered in both the online <u>and</u> in-person formats. Legal updates, for example, would include online material about legislative changes, but the nuances of certain legal changes are best covered in-person to allow students to ask questions and seek clarifications (e.g., Oregon House Bill 4201 on use of "choke holds").

*New Online Training*

As the result of the pandemic and budget cuts, PPB has dramatically expanded its online training plans for 2021, including training videos and "Tips and Techniques'' bulletins. The 20 hours of online training on LMS is entirely new and the subject matter continues to expand (See list of classes in PPB's Training Plan). In addition to videos illustrating how incidents were resolved in other cities, PPB is planning to post original videos on a range of important topics. For example, PPB has expanded their efforts to engage the community in police training, consistent with COCL recommendations. In Q3 we reported that the Training Advisory Council (TAC), along with PPB's Equity and Inclusion Office (EIO), had recommended more equity training that involves the community. In response, the Police Equity committee is producing a series of videos on equity issues that allow officers to learn more about racism and white supremacy and hear directly from community members. PPB is also producing 5 monthly videos on language access so that officers are prepared to interact with individuals who have limited English proficiency.

PPB continues to engage PPB members in the development of some unique videos for online training. For example, PPB has interviewed members of various ranks about their views and experiences with both internal and external procedural justice. The idea is that PPB members from different positions in the chain of command will serve as role models for other supervisors and officers when they talk about the importance of fair and respectful treatment of both community members and PPB officers.

**Resources Needed to Enhance Virtual Training**

Virtual training can be complex and requires significant resources to be implemented successfully and effectively. COCL has expressed concerns about PPB's reliance on asynchronous online videos and asked to see plans to increase the quality of online training and further engage students in the learning process. PPB has been working on this issue, but COCL recommended that more resources be assigned to this work.

First, PPB has sought more resources and provided additional training to current staff involved in PPB' online training initiatives. PPB has added the position of Motion Graphic Designer/Videographer to the Video Production Unit. Furthermore, the LMS Manager and Multimedia Specialist attended the 2020 Adobe MAX conference classes and the ATD-Cascadia Fundamentals of Training to learn more about online learning techniques, including ways to create more interactivity. PPB's current LMS/Video Production Unit team is very skilled, but PPB may need to add more staff in the future to make a full and effective transition to virtual platforms.[1]

---

[1] PPB has been able to fill two vacant sergeant positions in the Training Division, which should provide additional support as needed, but one is already vacant.

*COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2020 to December 31, 2020*      25

Second, PPB has pursued several avenues for increasing interactivity in online training. Because LMS alone does not allow for student interactivity, PPB has purchased Adobe Captivate software that is being linked to LMS and requires students to interact periodically when watching videos. PPB is now able to add quizzes, videos and other tools that require students to watch, listen, read, and/or respond to questions before continuing on to the next slide. However, programming this software is very labor intensive (i.e., estimated 40 hours to create a 1-hour video).

PPB will be using three types of videos in 2021: (1) Online Lecture Video, where a presenter gives a brief presentation to the students; (2) Roll Call Style Video, where a few minutes of scripted information is shared with officers; and (3) Storytelling Video, where PPB members, community members or experts tell a story or share their knowledge and experience with the officers. The first and third style of videos may involve interaction where students are required to complete activities or answer questions. Questions and quizzes are analogous to the traditional "clickers" used during in-person training, which not only keep students engaged but also help to reinforce the concepts being taught. In sum, we are confident that PPB is on track to engage students with tools that stop and start videos, provide knowledge checks, and require interactivity to complete the training.

The alternative model for engaging students is to utilize existing technology to create live interactions with instructors, such as Zoom and Microsoft Meetings. PPB has used Zoom extensively (e.g., Advanced Academy, Equity Lens Training for Command staff, HR 2.02 for Managers/Supervisors), but it imposes significant demands on PPB's/City's limited resources. For example, PPB points out that when the City Attorney's Office provides the Legal Updates via Zoom, the training for 850 members requires 35 Zoom sessions with 24 participants each and many sessions need to occur during non-normal business hours for officers on afternoon and evening shifts.[2] However, despite this strain on personnel, we encourage PPB to continue this style of virtual training for select classes where live interaction with the instructor is critical for student learning.

Finally, we note that PPB, with a futuristic perspective, is planning training modalities where students are more engaged in virtual reality without the aid of live role players. PPB is moving ahead with plans to provide use of force training with their newly acquired Virtra De-escalation and Judgmental Use of Force Simulation Trainer. The 2021 In-service training will introduce officers to this software, which is designed to help strengthen their skills in de-escalation, procedural justice, and use of force, including incidents involving mental health crises. COCL has long recommended training that involves repeated practice and feedback to officers regarding their performance, which PPB is currently doing with group scenarios. Virtra should provide more opportunities for feedback at the individual level. As PPB gives increased attention to virtual training, this type of software should allow the Training Division to introduce both effective and efficient training on a wide range of related topics. Instructors will be available to provide guidance and debriefings. Determining the appropriate dosage of virtual skills training needed to achieve competency for particular skill sets can be assessed over time.

---

[2] Members need to take these classes during their shift hours because PPB is no longer able to pay for overtime when members complete in-service training. Also, a class size larger than 24 was considered inappropriate when frequent interaction is needed between the instructor and students.

**Crowd Control Training**

COCL had recommended additional Crowd Control training ("Mobile Field Force") in light of the persistent protests and complaints about use of force in 2020. PPB responded that all officers received crowd control training early in 2020 either in the classroom or online. For the nearly 500 officers who did not receive the in-person skills portion of this crowd control training, PPB maintains that they received hundreds of hours of "on-the-job training" during the protests, so any additional training would be redundant. While this argument has some merit (e.g., no need to review basic crowd control formations), presumably PPB has learned many lessons from the protest experience, and indeed, they have agreed to prepare a public report after conducting a comprehensive after-action review of these events. Hence, at a minimum, we expect that PPB's 2021 training will include a class or video in which PPB leadership provides a debrief for all officers (not just commanders) on crowd management based on a critical analysis of what transpired in Portland in 2020 and best practices. Certainly, there are things that PPB would do differently, both tactically and strategically, if they faced similar protests and/or destructive actions today. After-action reports (associated with protests) can be a useful tool for such training. We encourage PPB to incorporate de-escalation principles and techniques into this training.

**Supervisory and Related Trainings**

Although PPB did not plan for a crowd control refresher training in 2021, supervision under these conditions is absolutely critical, and PPB should be credited for giving significantly more attention to supervisory training in 2020 and 2021. The following trainings are noteworthy and have been reviewed by COCL: (1) New Sergeants Academy with attention to supervisory responsibilities during critical incidents; (2) Command training (lieutenants and above) with attention to equity issues; and (3) All Supervisor In-service with attention to leadership roles and responsibilities, including attention to PPB legitimacy.

**Peer Intervention**

We bring attention here to PPB's new peer intervention program because it trains officers in how to speak up and intervene with peers to prevent or stop harmful actions such as excessive force. COCL has strongly recommended such a program in the past. PPB recently hired two instructors for this class and during the 4th quarter of 2020, four instructors went through a Train-the-Trainers class. After policy adjustments have been made, PPB members will receive the 8-hour Active Bystander for Law Enforcement Training (ABLE). We are familiar with this program and give it high marks. ABLE should help to create a culture within PPB where there is peer pressure to do the right thing, keeping officers from violating policy or acting inappropriately with members of the community. (For more information, see https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/).

**Evaluate Training**

Paragraph 80 requires that PPB "develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum." The COCL team continues to assess the content, methods, and utility of PPB's training evaluations in 2020.

In past reports, the COCL has been very complimentary of PPB's diverse set of training evaluation methods, including in-class quizzes, anonymous class evaluation surveys to assess the quality and content of instruction, knowledge tests, and scenario forms that measure officers' proficiency during role playing and allow for post-scenario debriefings. But PPB's evaluation system was significantly truncated in the spring when PPB quickly moved a large portion of its In-service training to its online platform, LMS. PPB was able to administer only the knowledge tests when In-service training was moved to the online format.

We can report that PPB has made significant progress in restoring its evaluation system. For the online 2021 In-service training, the evaluation will include both a survey and a knowledge test. Students will take a knowledge test immediately after completing each training session, followed by the survey to evaluate the quality and content of instruction. (As noted above, PPB is also working on systems that will keep students engaged during specific online training events, such as periodic knowledge checks). In terms of feedback loops, the test data will be analyzed weekly and the survey data will be analyzed monthly to provide students and management with timely information.

For the in-person 2021 In-service training, the evaluation will also include a survey and a knowledge test. In addition, data will be collected to evaluate the quality of a scenario and the scenario debrief with lead instructors and program managers. The knowledge test data will be analyzed after each class (often within 24 hours) to provide quick feedback for students. Survey data will be analyzed and reported to management and lead instructors after the first week and then every three weeks thereafter. Scenario data will be analyzed following a similar pattern.

This system of evaluation is very similar to what PPB currently uses for the online Supervisors In-service, the online ECIT In-service, and Advanced Academy (recruit) training. Thus, PPB is prepared to restore a thorough system of evaluation for its core training programs.

COCL has also reviewed the analysis and reporting of data. The reports prepared by researchers in the Training Division are clear, concise, and accurate. We have acquired and reanalyzed portions of the 2020 test and survey data. Using the Statistical Package for the Social Sciences (SPSS) software, we find that the tables and reports generated by PPB accurately reflect the underlying raw data being collected. Furthermore, in terms of results, the students are scoring well on the knowledge tests and in general, are giving high ratings to the instructors and the class content. We note that these are anonymous evaluations, so students are free to be open and honest.

In sum, the Training Division has made significant progress toward restoring its complete evaluation system and has a realistic plan for evaluating the 2021 In-service training programs, both online and in-person formats. However, we continue to encourage PPB to be vigilant about the number of civilian

researchers, analysts, and the Information Technology staff assigned to the Training Division. People without any research experience tend to underestimate the amount of work required to collect, clean, analyze and report on multiple datasets in a timely manner. This is also true for IT work. Yet this work is absolutely essential for evidence-based learning organizations that seek to continuously monitor and adjust their performance in real time using reliable metrics to maximize effectiveness.

**Document Training Delivered and Received**

Paragraph 81 of the Settlement Agreement requires that PPB create, and that supervisors use, a *"central, commonly-accessible, and organized file system"* for training records. COCL can confirm that the Training Division continues to use and update its electronic Learning Management System (LMS) for this purpose. Members register themselves or are registered by others for specific classes. We have reviewed the LMS attendance records for 2020 and find that they contain information on completion status for each employee for each required training class during 2020.

We can confirm that LMS is used by supervisors and command staff to ensure that PPB members, Internal Affairs Investigators, and Public Safety Support Specialists who are not on leave are completing their required training. The review and compliance process remains the same: These individuals are given 30 days to complete training and are sent email reminders at 7 and 14 days after training is posted. The RU manager for this individual receives an email at 1, 5, and 21 days past the due date. When the person has failed to complete an online class in this time period, the Training Division sends a non-compliance memo to the Chief's office. The supervisor and RU Manager for any delinquent individual are notified and the member is expected to complete the class immediately. Since September, COCL has confirmed that 7 non-compliance memos were sent to the Chief's office indicating that a particular segment of training was missed by specific individuals.

The Training Division submitted its Semi-Annual Training Report to the Chief's office in July, as required by Paragraph 82 of the Settlement Agreement. The next semi-annual report is not expected until January.

To ensure high quality trainers, PPB continues to follow guidelines that prohibit the selection of trainers *"who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness,"* with specific limitations in their work histories over the past five years (Par. 83, Settlement Agreement). As noted earlier, two new ABLE instructors were added in the fourth quarter. COCL's review of their Training Division's Work History Review Sheets confirmed that the instructors met these requirements.

**Audit the Training Program**

As we noted in our Q3 report, no formal audit of PPB's Training programs will be conducted in 2020. Nevertheless, in the fourth quarter, the Inspector General's office and the Chief's office reviewed the training needs assessment, the training plan and the training evaluation reports produced by the Training Division. Regular meetings are held between the Director of the Training Division and the Chief's office to discuss these products and any current operational issues that may have training

implications. However, COCL encourages PPB to conduct another formal audit of the Training Division in 2022 given the large number of changes that will have occurred in training recently.

### Analyze and Report Force Data

Paragraph 86 of the Settlement Agreement requires that PPB's Force Inspector "gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council…" including "problematic use of force patterns and training deficiencies." In turn, the Chief is expected to receive and respond in a timely manner to recommendations from TAC or the Training Division regarding training, policy, and/or evaluation pertaining to use of force patterns.

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). As noted in our Q3 report, the Force Inspector presented quarterly force findings to the TAC on July 8 covering two quarters – Q4 2019 and Q1 2020. In addition, TAC has conducted its own analysis and reports on use of force.

As we noted in Q2, PPB was slow to respond to TAC's recommendations, but in Q3 we reported that PPB has improved significantly in its responsiveness to TAC recommendations, including the introduction of equity training to reduce biased policing. TAC's three task forces -- Leadership, Education, and Public Safety Support Specialists – have continued to meet and are expected to provide additional recommendations in the near future regarding crowd control and use of deadly force. On November 11, TAC submitted a series of training recommendations pertaining to PPB's Public Safety Support Specialist program and a few have implications for use of force. PPB is currently reviewing this set of recommendations. TAC has reached far beyond police training to recommend long-term reforms in Portland (see *Portland Public Safety Structural Reform Vision*), but we do not consider this work within the scope of Section IV, and therefore, will not comment here.

Through quarterly force reports and the Employee Information System (EIS), PPB continues to share force data with Precinct Commanders. PPB continues to use EIS as a risk management tool to identify officers who exhibit problematic trends in force and other behaviors, as noted in Section VII.

Finally, the TAC meetings remain open to the public as required by Paragraph 87. COCL has observed these meetings, now held via Zoom, and the public has been allowed to listen and make comments. PPB continues to use a public email distribution list to send reminders of the meetings to the public, and the meeting agendas are posted on PPB's website (http://www.portlandoregon.gov/police/61449). PPB has also posted transcripts of the TAC meetings.

### Training Summary and Conclusions

In the third quarter, COCL concluded that PPB had fallen out of compliance in Section IV due to the inability to provide the required In-service training to roughly half of its members. COCL recommended that PPB prepare a detailed remediation plan to correct this training deficiency, and they have done so. In addition to a feasible remediation plan, PPB has completed a comprehensive Training Needs

Exhibit A
Page 30 of 68

Assessment and prepared a 2021 Training Plan that specifically addresses this training gap. The In-service training in 2021 is designed to ensure that all members received the training required by law and by the Settlement Agreement. Using a mixture of online and in-person training formats, PPB is on schedule to complete the training that was missed in 2020 and supplement it with new classes identified in the needs assessment and strategic planning. Because PPB will reintroduce the same skills training that was observed and approved by COCL in 2020 prior to COVID-19, we do not feel obligated to observe it again prior to our compliance rating.

Furthermore, PPB has continued to follow many of COCL's past recommendations for adult learning, including interactive role-playing scenarios, individualized feedback, and training in communication skills for de-escalation and procedural justice that are integrated across the board.

Facing a "perfect storm" with the convergence of the COVID-19 pandemic, long-term protests, and PPB budget cuts, the Training Division was forced to move many of its classes to a virtual platform – a transition that does not occur without major challenges. PPB has carefully assessed which topics are best covered online and which require in-person training. In response to our concern about using asynchronous videos for online training, PPB has continued to build its capacity to create a more interactive online training environment with specialized training, new IT personnel and new software. At the same time, the Training Division recognizes that certain skills are best taught in person, such as use of force and control tactics.

Finally, PPB has done an impressive job of restoring its evaluation systems so that officers, class content, and instructors can be quickly evaluated, and evidence-based adjustments can be made. PPB has the evaluation methods and metrics in place for both online and in-person formats.

In sum, COCL is satisfied with the training remedies that PPB has introduced and therefore, reinstates the rating of Substantial Compliance for Section IV of the Settlement Agreement.

# SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES

In evaluating this section, we continue to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. Par. 88 identifies the City's partners in providing community-based addiction and mental health services: *"the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders."* As the Settlement Agreement holds no authority over the City's partners, prior reports have evaluated only what the City and PPB can reasonably accomplish. We maintain that evaluative approach in this report.

As part of the broader community-based mental health service response system, the City and PPB have maintained their roles in overseeing or participating in committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services. As we noted in prior reports, we lack the necessary non-party information in public health care systems to assess whether all of the goals listed in Par. 90 have been met comprehensively. However, we can say that where City and PPB input is necessary for an improved system, we continue to find City and PPB actions have been satisfactory.

As part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Related to this, PPB has continued to participate in AMR training in transporting persons in mental health crisis, as the handoff between PPB and AMR is a critical point in time and cross-agency training serves to improve this process. Taking a systems perspective regarding the transport of persons in mental health crisis to a drop-off center, we continue to find that PPB is acting in accordance with the intent of the Settlement Agreement and the conceptual framework of a drop-off center.

As evidenced above, we continue to find that the City and PPB have maintained compliance with Section V of the Settlement Agreement. Where able, PPB and the City have worked with City partners to improve community-wide delivery of mental health services. Through self-initiated committees, as well as contributing to external committees and working groups, PPB and the City continue to do what can reasonably be expected of them. The Unity Center continues to operate as a walk-in/drop-off center as envisioned by the Settlement Agreement and PPB continues to play their part in ensuring compassionate transportation. While we encourage PPB to continue to seek avenues for supporting entities who provide community-based mental health services, we acknowledge that what has been

accomplished so far satisfies their responsibilities in the Settlement Agreement with an ongoing obligation to continue such efforts.

# SECTION VI: CRISIS INTERVENTION

Section VI of the Settlement Agreement (Crisis Intervention) is designed to facilitate PPB and the City's implementation of "*systems and resources for responding to persons in mental health crisis*" (see Par. 170). As we have done in the past, we evaluate PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers); and (2) Secondary Response (including BHRT and SCT). In accordance with our maintenance year plan, we evaluate the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC) and receives a PPB response. We also examine what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. Consistent with prior reports, we continue to find PPB and the City have maintained their system for responding to mental health crises during this monitoring period.

## BOEC

Most often, the entry point for PPB contact with persons in mental health crisis is through BOEC, the call-taking and dispatch center for Portland. During this monitoring period, BOEC has maintained their Mental Health and ECIT Dispatch Protocol SOP which continues to identify seven call characteristics where an ECIT response is needed (these include when there is a mental health component <u>and</u>: a weapon is present, the subject is violent, the call is at a mental health facility, the caller is threatening suicide and has the means to carry it out, at the request of a community member, at the request of another officer, or when the subject represents an escalating risk of harm to self or others). Hence, this SOP satisfies the requirements of Par. 113 for BOEC to revise policies for dispatch as well as for assigning calls to MCCL (see below).

While we have observed BOEC's 16-hour CIT Training and In-Service trainings in prior years, the pandemic has impacted BOEC's ability to conduct training and the COCL Team's ability to observe training. For instance, BOEC was able to provide the 16-hour training to four new telecommunicators in October but was unable to provide In-Service for the entire year of 2020. While the Settlement Agreement does not hold any annual training requirement for BOEC, past practices from the bureau indicate an understanding of the importance of refresher training. For instance, BOEC has put out training newsletters, email reminders, and flyers reinforcing the importance of a specialized response. Additionally, BOEC has conducted roll-call training for telecommunicators. However, should BOEC determine that a fuller in-person refresher training is not possible in the near future, they should consider preparing a video training similar to that prepared by PPB (see below). The video training could be used to combine elements from the stopgap training they have used so that all mental health refresher information can be contained in a centralized training.

BOEC has a protocol for assigning calls to the Multnomah County Crisis Call Center (MCCL) when the call involves the following conditions: a person with suicidal threats, feelings, or intent but the caller does not appear to have the direct means to carry out the suicide, does not need immediate medical attention, and is not threatening to jump from a bridge/structure or to block vehicle traffic. MCCL has the resources to connect community members to service providers. We continue to find that BOEC protocols and training have prepared telecommunicators to refer individuals to MCCL, which

Exhibit A
Page 34 of 68

contributes positively to BOEC's system. We also find that BOEC telecommunicators are appropriately forwarding calls to the MCCL since data provided by BOEC indicates that out of 130 calls forwarded to MCCL between October and December, only 13 were routed back to BOEC for emergency dispatch. In our last report, we noted that 12 of the 132 calls forwarded to MCCL between June and August of 2020 were routed back to BOEC for emergency dispatch.

Additionally, when a call is routed back to BOEC from MCCL for dispatch, BOEC reviews the call to determine whether the original information supported the decision to send the call to MCCL or whether the telecommunicator should have originally dispatched an officer. The reviews conducted by BOEC are designed to ensure the "*fully operational*" triage system of BOEC in accordance with Par. 115. In sum, we find that BOEC's role in the City's system of response to mental health crisis continues to function properly as indicated by their policies, training, and audits.

**Primary Response Systems**

To evaluate PPB's role in the City's system for responding to persons in mental health crisis, we evaluate PPB's current policies, the training received by PPB officers, the enhanced training received by ECIT officers, and finally data collection tools and associated data related to PPB response. PPB continues to enforce directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). For each of these directives, we have concluded that they continue to substantially comply with the requirements of the Settlement Agreement and were properly reviewed by the Behavioral Health Unit Advisory Committee (BHUAC) prior to enactment (see Par. 95[TC4] ).

Comprehensive training on crisis response remains a core competency in PPB and all officers are required to receive a minimum of 40 hours Crisis Intervention training prior to graduating from the Advanced Academy (see Pars. 97 and 98). As we noted in our last report, new recruits have continued to receive the entirety of the 40-hour training despite the impact of COVID on the Training Division. Additionally, PPB provided a video training session as a CIT refresher for all officers (see Par. 98). The refresher training included refresher information on the BHU, ECIT dispatch criteria, the roles of the ECIT officer, non-ECIT officer, and supervisor on a call with a mental health component, and reporting requirements for completing a Mental Health Template. Finally, in October of 2020, a member of the COCL team observed the Supervisors Academy which contained a module on ECIT officers as a resource for calls with a mental health component. Given the training provided to all PPB members as well as the refresher training and Supervisors Academy, we continue to believe that crisis response training remains a core competency.

As part of PPB's specialized response system, a select group of officers receive 40 additional hours of training to become Enhanced Crisis Intervention Team (ECIT) officers (see Pars. 99 and 102). The training has been reviewed by BHUAC members, who last reviewed and commented on the training in October 2019. No new ECIT officers have been trained since November 2019; however, PPB reports that due to multiple retirements, the number of operational ECIT members has decreased from 131 to 124. PPB regularly evaluates whether the number of ECIT officers is sufficient given the demand for services and

should continue to do so given the decrease. Should PPB determine that additional officers are needed, we expect they will conduct a 40-hour ECIT training seminar for officers.

In addition to the training provided, the ECIT program continues to comply with the Settlement Agreement in other ways. For instance, ECIT officers retain normal duties until dispatched as an ECIT officer (Par. 103). PPB has maintained selection and retention criteria that are consistent with Par. 101 and which have been reviewed by BHUAC. As part of their system, PPB reviews the work history for all prospective ECIT officers prior to selection to ensure adherence to selection criteria. Additionally, BHU personnel are notified by the Professional Standards Division (PSD) whenever an ECIT officer receives a complaint based upon use of force or mistreatment of persons with mental illness, thereby ensuring adherence to the retention criteria. Each of these elements demonstrates a comprehensive system with built-in oversight mechanisms.

In November of 2020, PPB provided us with its fifth semi-annual evaluation of the ECIT program. As part of this, PPB reports that ECIT officers are on-scene for approximately 70% of calls which meet ECIT criteria, a slight decrease from the prior report (73% response rate) though consistent with the report prior (70%). Given the resource limitations of PPB over the course of the summer protests, the reduction to 70% is not necessarily a cause for concern and we are aware that PPB is continuing to monitor response rates. However, should future evaluations indicate a drop below 70%, PPB may consider taking steps necessary to increase response rates. Similar to prior evaluations conducted by PPB, the most common reason for an ECIT officer not being on the scene of an ECIT call is that they were called off or cleared before they could arrive (55%).

The analysis also shows that non-ECIT officers have continued to complete a Mental Health Template when required to do so. PPB members have continued to be consistently accurate when determining whether a Mental Health Template is required. For instance, the evaluation indicated that when an officer determines a subject was not suffering from an actual or perceived mental illness, they were correct in their assessment 97% of the time – consistent with the findings of the previous 6-month evaluation conducted by PPB. We continue to see this as evidence that the Mental Health Template reporting requirements of Par. 105 are being met as PPB members appear capable of knowing when to complete the MHT.

Finally, PPB continues to use the MHT data to evaluate various aspects of its ECIT program, including a look at any differences between ECIT and non-ECIT officers when responding to non-ECIT calls (the ability of non-ECIT officers to handle low risk calls with a mental health component in a qualitatively similar fashion is a pillar of Portland's modified Memphis Model approach). One aspect of this is whether a person living with mental illness is transported to the hospital at the same rate regardless of whether the responding officer is ECIT or not. In the past, we have noted a disparity between non-ECIT and ECIT officers (ECIT officers are more likely to transport to the hospital) but the gap between the two groups had been consistently narrowing. For their most recent evaluation, PPB has found similar results, indicating that if an ECIT officer arrived on scene, there was a 32.3% probability of the subject being transported to the hospital compared with a 25.4% probability if a non-ECIT officer responded to the scene. Odds ratio calculations conducted by PPB continue to show that while a significant difference exists between the two groups, the difference continues to become smaller and less significant.

**Probability of Transport to Hospital (Mental Health)/Unity Center if ECIT-Trained Officer On Scene of Non-ECIT Calls:**

|  | ECIT-Trained Officer On Scene | Non-ECIT-Trained Officer On Scene |
|---|---|---|
| 04/01/18 - 09/30/18 | 16.6% | 9.4% |
| 10/01/18 - 03/31/19 | 21.2% | 12.4% |
| 04/01/19 - 09/30/19 | 19.0% | 14.1% |
| 10/01/19 – 03/31/20 | 24.8% | 18.4% |
| 04/01/20 – 09/30/20 | 32.3% | 25.4% |

Table 1: Probability of Transport to Hospital (Table provided by PPB)

In past evaluations, PPB had found no statistically significant difference between ECIT and non-ECIT officers in terms of whether the event resulted in a transportation to jail (i.e., arrest). However, for the most recent evaluation, a statistically significant difference was found between the groups with ECIT officers having a higher probability of transporting a subject to jail than non-ECIT officers. Although the probability of transportation to jail was relatively low (8.7% for ECIT officers and 5.3% for non-ECIT officers), the finding of a statistical difference is noteworthy. A single evaluation is not a cause for concern given that the four prior evaluations found no statistical differences. However, PPB has indicated they will continue to monitor this outcome and if future evaluations show continued differences, determine the potential cause and implement remedial actions.

**Secondary Response Systems**

As in past reports, we also assess supplemental/secondary response systems being used by PPB, including the Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT).

When a person is referred to BHRT through the Behavioral Health Unit Electronic Referral System (BERS), the person is evaluated to determine whether they meet the criteria for BHRT intervention. The criteria include whether the person is demonstrating escalating behavior, has had frequent contacts with PPB, is considered a risk to self or others, or whose case-specific information indicates a potential need for BHRT intervention. Also, when a person is the subject of three MHTs in a 30-day period, an automatic BERS referral is made for that person (unless a previous referral exists), thereby satisfying the requirements of Par. 110. If a person meets the criteria for BHRT intervention, a plan of action is discussed among members of the Behavioral Health Unit Coordination Team (BHUCT) which includes law enforcement, court, service provider, and hospital personnel, among other relevant stakeholders.

PPB members of the BHRT teams are provided the 40-hour enhanced crisis intervention training and receive specialized training when available (see Par. 109). The selection and retention criteria are consistent with the criteria for ECIT officers. Also, the same process by which PSD notifies BHU

whenever an ECIT officer receives a complaint of force or mistreatment against a person with mental illness is applied to BHRT officers as well (see Par. 108).

In the past, the BHRT consisted of five pairings of a PPB officer and a mental health professional (one in each Precinct, one dedicated to the houseless population, and one acting as a follow-up team for prior clients). In the third quarter of 2020, the ECIT Coordinator retired and the role was filled by one of the BHRT officers. However, due to budget constraints, the vacant BHRT slot (related to the follow-up team) has not been filled and there does not appear to be a plan to fill it in the near future. While the Settlement Agreement only requires a BHRT team for each Precinct, we note that the fifth BHRT team was created as the result of PPB's own internal data review demonstrating that prior BHRT clients experienced a slight increase in contacts near the 18-month mark after initial intervention. PPB's ability to act as a self-evaluative and self-learning organization was reflected in the decision to create this follow-up BHRT team. Where possible, we encourage the City and PPB to work together to identify funds to maintain this team, provided PPB evaluations continue to show a need for its operation.

PPB continues to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the third quarter of 2020, a total of 207 referrals were made through the BERS system, a decrease from prior quarters. However, given the pandemic (when there were fewer overall PPB contacts), this decrease is not necessarily surprising. Of the 207 referrals, 93 (44.9%) were assigned to the BHRT caseload - an increase in the percentage of referrals assigned to the BHRT caseload from the prior quarter. Over the past two years, acceptance rates have generally been between 45% and 55%



Figure 2: BERS Referrals Assigned to BHRT Caseload (Figure provided by PPB)

The other secondary response system that PPB operates is the Service Coordination Team (SCT). This program continues to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system (see Par. 112). We have long been impressed with the work of SCT and our own evaluations as well as annual evaluations conducted by Portland State University have demonstrated the positive impact of the SCT on the clients it serves. For instance, the most recent PSU evaluation found that of those who had completed the SCT program, 87% had "reductions in post-program arrests'' while the remaining 12.1% had no change in the number of arrests after completing the program compared with prior to completing the program. These

findings also mean that "*no one who completed the program had increased arrests post program*." The evaluation also concluded that "*every $1 the program spends has a corresponding $20.61 in avoided cost for the community*" in terms of criminal justice system costs.

PPB also continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people the SCT has served. As we noted in our last report, the number of referrals significantly decreased between the first and second quarters of 2020. For this quarter, the number of SCT individuals referred increased though it still has not returned to the number of referrals found earlier in 2020 (and the two years prior). We continue to believe this is the result of the pandemic as PPB has indicated that interactions with potential referrals had been put on hold and/or limited and treatment providers discontinued individual and group meetings. This directly impacted the number of persons who may have been referred to the SCT. In spite of this, the SCT has continued to accept nearly 50% of all persons referred, a trend that has continued over the past two quarters.



Figure 3: SCT Individuals Referred (Figure provided by PPB)



Figure 4: SCT Referral Status (Figure provided by PPB)

As part of SCT operation, the Supportive Transitions and Stabilization (STS) program continues to provide a direct housing resource for BHRT clients. The STS program has consistently accepted over 90% of referrals they have received and in the past four quarters, their acceptance rate has been 93.6%. As evidenced by the above, we continue to find that the Service Coordination Team acts as a positive element of PPB's overall system of mental health response and has continued to comply with Par. 112.



Figure 5: STS Referral Status (Figure provided by PPB)

## BHU AND BHUAC

As an overarching system, the Behavioral Health Unit (BHU) continues to oversee and coordinate the ECIT, BHRT, and SCT programs (see Par. 91). BHU utilizes data from a variety of sources to evaluate its operation, including data from the MHT as well as data collected from BHRT and SCT (see Par. 93). Additionally, in accordance with Par. 92, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, MCCL, BOEC, and BHUAC (see also below). We have met with the Lieutenant who oversees BHU on multiple occasions and are confident that all aspects of BHU (ECIT, BHRT, and SCT) are operating as a comprehensive system rather than individual programs.

As it relates to the BHU, we note that there is a proposal to shift the management of the SCT contract with Central City Concern away from the SCT and into another City Bureau. Although we have been informed that altering the contract management arrangement will have no impact on SCT operations, we also note that the Settlement Agreement states that the BHU "shall oversee and coordinate…Service Coordination Team" (Par. 91). Should outside management of the contract have an impact on SCT's overall decision-making ability (thereby leading BHU to believe they are no longer overseeing and coordinating the provision of services in a manner consistent with years prior), this may impact the City's compliance with Par. 91.

Additionally, the BHUAC continues to act as an advisory body to guide the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT components. The current BHUAC membership consists of individuals from PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, the Public Defender's Office, CareOregon, and the Unity Center for Behavioral Health (see Par. 94). The two spots on the BHUAC that have been vacant (AMR and Central City Concern) remain vacant. The BHUAC should ensure that these two spots are filled as soon as possible, though we continue to understand the impact of the pandemic may be affecting their ability to do so.

The BHUAC continues to provide input on policy, training, and SOPs (see Par. 95), as well as receives presentations and holds discussions on current practices of other mental health system partners. In the third quarter of 2020, BHUAC met twice (July and September) and discussed issues related to the BHUAC bylaws, PPB SOPs, membership makeup, national/local events. The BHUAC also received a presentation on the Coalition of PPB Advisory Councils, in which BHUAC is represented by one of its members. Additionally, members of the BHUAC have participated in the PCCEP's Behavioral Health Subcommittee. We continue to receive updates on BHUAC recommendations, meeting agendas, and meeting minutes. Overall, we maintain that the BHUAC continues to act in compliance with the Settlement Agreement.

# SECTION VII: EMPLOYEE INFORMATION SYSTEM

During the third quarter of 2020, PPB continued to use the Employee Information System (EIS) as their primary system for identifying potentially problematic members and "*design[ing] assistance strategies to address specific issues affecting the employee*" (Par. 116). As with our prior reports, we evaluate the EIS system from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on receiving alerts. As evidenced below, we find that PPB has maintained substantial compliance with Section VII (Employee Information System) during this quarter.

PPB continues to collate data from a variety of data sources, including data from force events and traumatic incidents (captured in Regional Justice Information Network (RegJIN)) as well as complaints and commendations (captured in Administrative Investigations Management (AIM)). These data are then used to identify potentially problematic behavior in the form of predetermined thresholds, some of which the Settlement Agreement defines, including when:

- Shift Force Ratio: A sworn member's force ratio is greater than or equal to three times their shift's average ratio in the preceding six months
- Force Ratio: A sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six months
- Force Count: A sworn member uses force three or more times in the preceding thirty days
- Criminal Complaint: A member receives a complaint with an allegation of criminal misconduct
- Complaint in Same Category: A member receives two or more complaints with at least one allegation in each complaint being in the same category such as two complaints that both have conduct allegations for events in the preceding six months
- Complaint Count: A member receives three or more complaints for events in the preceding six months
- Traumatic Incidents: A member experiences three or more traumatic incidents in the preceding thirty days (traumatic incidents are events related to child abuse, deadly force, homicide, officer being assaulted, suicide, and/or traffic fatality)
- Commendations: A member receives two or more commendations for events in the preceding six months

While we provide our assessment of EIS below, we note here that the present EIS analyses have likely been impacted by the protests beginning in May and continuing into the third quarter. For instance, while over the past few quarters the rate of EIS alerts related to force was approximately 60%, the rate for the third quarter was 77%. Additionally, the number of alerts for Traumatic Incidents has increased as a result of the protests since "officer being assaulted" is one of the triggers for a Traumatic Incident alert type. Finally, the totality of the protests and the impact on force, complaints, traumatic incidents, and commendations has introduced an increased volume of alerts, with alerts increasing over 80% from 2020 Q2 (291 alerts) to 2020 Q3 (525 alerts). Thus, our assessment here will take the unique nature of 2020 Q3 EIS alerts into consideration.

PPB continues to employ two trained EIS administrators to evaluate alerts created by the EIS and determine whether the alerts should be forwarded on for RU review. The EIS administrators were

trained via a comprehensive operations manual—including SOPs for the handling of EIS alerts, entries, and responses—in accordance with Par. 120, which also allows future EIS administrators to operate in a consistent fashion. EIS administrators track and monitor alerts to ensure that identified issues are resolved in a timely manner. Finally, the EIS administrators act as a system of checks and balances should the RU Manager or supervisor determine no intervention is necessary.

In the third quarter of 2020, EIS administrators reviewed a total of 525 alerts and sent 340 (64.8%) on for RU Manager review (see Figure 6). Compared with the prior quarter (193 alerts sent to RU Managers), this represents a 76.2% increase in the third quarter. So, while the raw number of alerts for the third quarter of 2020 increased, the proportion of them that were sent to RU Managers remained relatively stable.

When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts closed in the third quarter of 2020 (which may also include cases opened in the second quarter of 2020), there were 338 alerts sent to the RU Manager and for 108 (32%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the third quarter of 2020, a substantial majority (77.7%) resulted in some type of intervention for the officer. The information provided by PPB indicates that most of the interventions involved a debriefing though one officer was placed on a monitoring plan.



Figure 6: EIS Alerts and Alerts Sent to RU Manager (Figure provided by PPB)

|  | 2019 Q3 | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 |
|---|---|---|---|---|---|
| Alerts Sent to RU | 338 | 138 | 129 | 186 | 338 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 145 (42.9%) | 54 (39.1%) | 60 (46.5%) | 85 (45.7%) | 108 (32%) |
| Interventions (Percent of Alerts Sent to RU) | 122 (36.1%) | 46 (33.3%) | 48 (37.2%) | 76 (40.9%) | 84 (24.9%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 122 (84.1%) | 46 (85.2%) | 48 (80%) | 76 (89.4%) | 84 (77.7%) |

Table 2 – EIS Alerts and Interventions

In order to identify potentially problematic trends at the supervisor and team levels, the Force Inspector and analysts within the Office of Inspector General (OIG) continue to utilize Use of Force data to identify groups that are using force at higher rates when compared with others (Par. 117). On a quarterly basis, the Force Inspector meets with Precinct Commanders to discuss findings related to the force audit overall (see Pars. 74, 75, and 77) and groups which demonstrate higher rates of force. PPB continues to provide written communication from the Inspector to the Precinct Commander to inform such conversations. The Inspector has found trends for both officers and supervisors. For instance, in the 3rd Quarter of 2020, the Inspector noted that the four officers with the highest force ratio in East Precinct all had 3 years or less tenure. The Inspector recommended that the RU Manager review the officers' applications of force and conduct a decision point analysis to identify potential trends. PPB provided evidence that the reviews occurred, though no broader concerns were identified by the reviewing supervisor.

Additionally, for the third quarter of 2020, the Force Inspector identified trends in report writing for nine sergeants. For each of these sergeants, the trends related to only a single deficient AAR review. A review of documentation for five of these sergeants (covering eight cases with deficiencies) revealed that while discussions with the sergeants appeared to have occurred, no PDT entries were found for three of the five sergeants. PPB should reinforce the importance of tracking discussions about performance in the Performance Discussion Tracker app. That way, should the sergeants continue to show the same deficiencies when reviewing officers' use of force, there is a clear record of the prior conversations.

In accordance with Par. 116, PPB Directive 345.00, and PPB Directive 215.00, supervisors continue to evaluate officers' EIS and Performance Discussion Tracker (PDT) information (1) annually as part of an officer's performance evaluation, and (2) upon transfer of an officer to a new command. PPB's quarterly

Exhibit A
Page 44 of 68

audits of reviews required by Directive 345.00 continue to find overall high rates of compliance with the required reviews (see Figure 7). When supervisors do not conduct the reviews as required, PPB has continued to utilize their email notification system to alert tardy supervisors to missed review timelines.

On the whole, PPB compliance with conducting the 116a and 116b reviews returned to the high levels we had seen in previous quarters. While some RUs have room for improvement (for instance, North Precinct had a 72% compliance rate for 116b reviews), the aggregate rate of compliance for PPB reviews under Par. 116a and 116b was 97.3%. Given the number of personnel shifts recently, Par. 116b rates could have been as low as 2020 Q2 reviews. However, PPB put out department-wide memos in June and then again in August reminding supervisors of their responsibilities to conduct the 116b reviews.



Figure 7: Compliance with Reviews Directive 345.00 Reviews (Figure provided by PPB)

# SECTION VIII: OFFICER ACCOUNTABILITY

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, expediency, consistency, transparency, and a system of checks and balances.

### Access

Portland's accountability system continues to remain largely accessible to community members, allowing complaints to be filed in a multitude of ways. These include community members' complaints to the Independent Police Review (IPR), community members' complaints to PPB, IPR initiated complaints, and PPB initiated complaints. Community members can file a complaint by phone, online, or in-person (either to PPB or IPR). For most complaints, IPR continues to conduct intake investigations and determine whether to initiate additional investigation proceedings or not.

In our past report, we noted that the number of IPR contacts had substantially increased as a result of the protests occurring in Portland. For instance, in June and July of 2020, IPR received 227 and 108 contacts, respectively. The number of contacts has steadily decreased since then, with IPR receiving 26 contacts in October. In addition to the raw number of overall contacts decreasing, the proportion of contacts related to protests has also decreased. For instance, in October of 2020, only 7 of the 26 contacts were related to the protests, compared to approximately 50% of the contacts in June and July. Overall, it appears the influx of contacts to IPR has subsided, though we note that the residual impact on timelines has continued (see our assessment below).

We further noted in our last report that, in addition to the influx of contacts, the accountability system saw a significant increase in the number of administrative investigations that were opened. For instance, in June of 2020, there were 82 administrative investigations opened.[3] Compared to prior months which saw an average of approximately 35 cases per month, this increase was impactful on both IA and IPR operations. Since June of 2020, the number of cases opened per month has largely returned to the mean: 35 in July, 33 in August, 42 in September, 19 in October, and 10 in November (For October and November, it is possible that a few additional cases may be opened based on case-handling decisions by IA and IPR).

---

[3] Our last report indicated 77 cases were opened in June, but since then, five additional administrative investigations have been opened.



Figure 8: Administrative Investigations by Month

In total, the evidence indicates that the accountability system remains largely accessible and that community members are willing to utilize it. We will continue to monitor the outcomes of administrative investigations, but overall, the accessibility of the system remains consistent with the Settlement Agreement.

**Expediency**

Concurrent with the reduction in total number of contacts, we have seen a corresponding improvement in overall stage timelines, particularly with regards to IPR. Whereas IPR was completing their stages on-time only about half of the time in June and July (80.7% and 64.8% of the time, respectively), recent months indicate stage timelines have improved. For instance, IPR stage timelines were met 80.2% of the time in August, 79.6% of the time in September, 83.3% of the time in October, and 90.2% of the time in November. This is consistent with on-time rates we had noted near the beginning of the year, prior to the protests. Throughout the entire year, stage timelines for IA remained consistently high, demonstrating an approximate 90% on-time rate in recent months after dropping near 80% in July and August.

In the case of IPR, the intake investigation stage continues to suffer overall low rates of being completed on-time. For instance, in July and August of 2020 intake investigations (including expanded intakes) were completed on-time only about half of the time (50.9% and 53.6%, respectively). While on-time completion rates showed some improvement in September (57.7%), October (68%) and November (62.5%), this still means that about one-third of intake investigations are not completed on-time. Particularly in June and July when intakes investigations and expanded intake investigations constituted approximately half of all stages under the responsibility of IPR, this has implications for IPR meeting its overall timelines. In November, intakes constituted only about 14.5% of all IPR stages, providing context for the higher overall stage on-time completion statistic. Below, we provide further discussion for some of the operational reasons that intake investigations have exceeded their timelines.

In addition to the analysis above, the total number of days to complete an intake investigation also increased, particularly during the third quarter of 2020. In the months of July, August, and September, IPR had 21 intake investigations extend beyond 70 days (which is 5X the allotted number of days for intakes). IPR had 8 intake investigations open for 100 days or more. While intake timelines appear to be returning to normal (average of 16.2 days to complete an intake investigation in November), it is clear that the influx of contacts and complaints over the course of the summer had an impact.



Figure 9: IPR Stages (Percent On-Time)



Figure 10: All Stages (Pecent On-Time)

Finally, the impact of the protests can be seen on the overall timelines for administrative investigations. Par. 121 requires full administrative investigations to be completed within 180 days of them being opened. Particularly as it relates to administrative investigations conducted by IPR, we can no longer say that this requirement is being met. For cases opened in the past year and a half, IPR has completed their full administrative investigations within the 180-day timeline approximately half the time on average. However, for cases opened in the second quarter of 2020 (the last quarter for which 180 days could have passed), only 3 of the 15 cases investigated were completed in the 180-day timeline (20%). The reader should note that this includes open cases as well and therefore the percentages in the table below may decrease should the case remain open past the 180-day timeline. While IPR has certainly been impacted, IA has closed their administrative investigations within the 180-day timeline approximately 90% of the time. Although IA has not had to deal with the same issues regarding intake investigations to the extent IPR has, the 180-day completion rate remains commendable.

| | | IA | IPR | TOTAL |
|---|---|---|---|---|
| **2019 Q2** | Not Overdue | 15 | 2 | 17 |
| | Overdue | 3 | 1 | 4 |
| | Total Number of Cases | 18 | 3 | 21 |
| | Compliance Rate | 83.3% | 66.7% | 81% |
| **2019 Q3** | Not Overdue | 38 | 4 | 42 |
| | Overdue | 5 | 4 | 9 |
| | Total Number of Cases | 43 | 8 | 51 |
| | Compliance Rate | 88.4% | 50.0% | 82.4% |
| **2019 Q4** | Not Overdue | 27 | 3 | 30 |
| | Overdue | 5 | 2 | 7 |
| | Total Number of Cases | 32 | 5 | 37 |
| | Compliance Rate | 84.4% | 60.0% | 81.1% |
| **2020 Q1** | Not Overdue | 32 | 2 | 34 |
| | Overdue | 3 | 2 | 5 |
| | Total Number of Cases | 35 | 4 | 39 |
| | Compliance Rate | 91.4% | 50.0% | 87.2% |
| **2020 Q2** | Not Overdue | 42 | 3 | 45 |
| | Overdue | 5 | 12 | 17 |
| | Total Number of Cases | 47 | 15 | 62 |
| | Compliance Rate | 89.4% | 20.0% | 72.6% |

Table 3: Full Investigations (Percent 180-days or less)

We noted in our last report a number of operational decisions made by IPR to mitigate the influx of contacts, intake investigations, and full administrative investigations. These included appointing a single individual to receive contacts, streamlining document requests through a single individual, referring cases to IA that would typically fall under IPR review, and enhancing case management strategies. IPR has determined that some of these actions are no longer necessary due to the reduction in community-member contacts. For instance, the Person of the Day who receives contacts has now switched back to a rotation-based approach. For others (e.g., the case management strategies), the increased number of

intake and full investigations have required IPR to maintain the approaches implemented as a result of the protests. Additionally, other corrective actions remain outstanding, including having direct access to PPB records, having other City staff provide assistance, and ensuring a full IPR staff.

However, IPR continues to experience limitations on their ability to conduct timely intake investigations and full administrative investigations. For instance, while the number of contacts has decreased in recent months, IPR currently has between 18 and 20 open full investigations. Intake investigations have also placed strain on IPR resources as the depth of information provided by community members is, in some cases, minimal. For instance, IPR may receive a video without any indication of who the complainant is, when the event happened, or who the officer is. IPR has spent a considerable amount of time on the front end trying to identify the complainant, officer, or corresponding FDCR, which results in massive delays in moving the case past the Intake stage. Therefore, the inability of IPR to expediently gather facts as part of the intake investigations appears to often be due to facts that they do not have direct control over (particularly when there is a lack of complainant and officer video).

Additionally, IPR is currently operating without a full staff as they have indicated that they are down one investigator and one administrative professional. IPR has also noted that even in ordinary times, getting a good pool of applicants was difficult and that the process for hiring within city government is very protracted. Although IPR is no longer under a hiring freeze, reaching their full budgeted staff will be difficult in the near future. IPR has indicated to the COCL team that if any further investigators resign (a possibility given the pending status of the accountability ballot measure passed by voters in November), it would have a devastating impact on their ability to operate in the same capacity as they have operated over the past few years. While we cannot say that having a full cadre of employees would have completely mitigated the protests' impact on IPR's timelines, being short-staffed has likely added to the issue.

IPR has recognized that timelines associated with their work have been improving as the number of contacts coming in have been reduced. However, they presently estimate that it will take three to four months before they are fully caught up (assuming they experience no further attrition). Should the City want to accelerate this timeline, we suggest they provide IPR with additional investigation support, either through using temporary investigators from other City bureaus or temporary investigators from a third-party firm. Temporary assignments within the City would be less time consuming and would require less training than hiring an outside company. Additionally, in order to ensure IPR timelines are achieved in the future, the City should ensure that IPR has the necessary resources to manage its workload. While the City awaits the full implementation of the recently passed ballot measure, its current obligations to the accountability system must be maintained.

In considering the above, we do not find that the requirements of Par. 121 have been maintained by the City. In particular, IPR's ability to complete full administrative investigations within a 180-day timeline has been significantly reduced for a number of reasons including the influx of contacts as a result of the summer protests as well as IPR not operating at full capacity. To come back into compliance, IPR will need to improve the timelines for completing full administrative investigations. One way to ensure cases are expeditiously handled is to continue to focus on improving the particular stages which consistently go over their allotted time.

We anticipate that the current trend toward a reduced number of contacts from community members will relieve some of the burden on the accountability system in Portland. However, as noted in our assessment of the Use of Force section above, the City will want to ensure that the accountability system has built-in mechanisms to be more responsive to future civil unrest similar to what occurred in 2020. This may require revisions to policies, SOPs, and training.

Finally, we note here that while timelines remain an issue, we maintain that the quality of an investigation is of more importance. To measure this, we conducted a review of administrative investigations, ensuring that a sample of each investigative pathway is reviewed. We requested a list of all administrative complaint investigations that were completed in the third quarter of 2020 and from those selected a total of 20 cases, stratifying our selection to ensure an adequate representation of administrative closures, supervisory investigations, precinct referrals, IPR full administrative investigations, and IA full administrative investigations. The cases we reviewed indicated that, regardless of which route a complaint might take, findings and decisions continue to be reasonable and supported by a preponderance of the evidence. While we have concerns that the PRB has undercut the findings of the investigations in some situations (see below), the underlying investigations have remained solid.

### Transparency

Overall, the transparency of Portland's accountability system has remained largely consistent since our last report. Community members remain able to track the progress of their complaint (see Par. 138) and IPR continues to provide updates in writing at each stage of the investigation (see Par. 140), including a community member's ability to appeal findings. Findings letters provided to community members clearly state the finding as well as the rationale for the finding. Updates and information for appeals are provided for both community members and officers.

Citizen Review Committee (CRC) appeal hearings and other CRC functions remain open to the public with accompanying minutes posted to the IPR website. Meetings continue to be held over Zoom as a result of the pandemic and we continue to find that the pivot towards virtual meeting space appears to have allowed for broader community observation and input, thereby enhancing transparency. Additionally, redacted summaries of Police Review Board (PRB) hearings continue to be provided on the PPB website. Finally, IPR analytical reports and online data related to misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths remain available on the IPR website (https://www.portlandoregon.gov/ipr/76848), allowing interested parties to learn the facts and conduct their own assessment. Overall, we maintain that the combination of these efforts points to an accountability system that is largely transparent.

### System of Checks and Balances

The accountability system in Portland continues to contain a system of built-in checks and balances to ensure a fair resolution for all involved. For instance, prior to an RU Manager's findings on an allegation, IPR (as well as Assistant Chief's and IA) continues to have the ability to review the investigation report and can request an additional investigation or a rewrite of the investigative report. Additionally, after an RU Manager makes findings, IPR reviews those findings and has the ability to controvert the findings,

thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination. During the second quarter of 2020, IPR did not need to request any additional investigations, rewrites of investigative reports, or controvert an RU Manager's findings.

Community members and officers continue to be able to appeal administrative investigation findings to the Citizen Review Committee (CRC), an eleven member review board that "*hear[s] appeals from complainants and officers and publicly report[s] its findings*" (among other functions – see https://www.portlandoregon.gov/ipr/53654). In the 4th quarter of 2020, the CRC held one appeal related to discrimination and retaliation as well as failure to follow protocols for complaint processing. The CRC voted to uphold the RU Manager's findings for one allegation, challenge the findings for two allegations (in accordance with their authority under Par. 135), and send one allegation back for further investigation. In reviewing the minutes from the appeal hearing, we believe that CRC gave thoughtful consideration to the matter and voted in accordance with their standard of review.

Consistent with the requirements of Par. 136, CRC members continue to hold the ability to request additional investigations and interviews and postpone the hearing until a time when such information could be included in the review. Coupled with our observations of CRC meetings in the past, as well as our ongoing review of their public reports, we maintain that the CRC conducts their hearings in a fair and impartial manner (see Par. 134).

The CRC has continued to operate shorthanded, as all member's slots have not been filled since the resignations which occurred in September. Although the resignations occurred in September, the member slots were still vacant in December as IPR had held off on attempting to fill them until the results of the November accountability ballot measure were known. Although understandable that IPR would wait until the results of the ballot measure, the open slots on the CRC have implications for the appeals process, the advisory work that CRC does, and the ability to have a full selection pool for CRC participation on PRBs. IPR is presently interviewing 25 candidates to fill the open slots, which IPR believes should be filled in late January or early February. After training, the new CRC members should be fully integrated sometime in March. We will provide an update to the CRC membership in our next report.

A final system of checks and balances can be found in the Police Review Board. When there is a sustained finding that will lead to discipline involving suspension or greater, when there is an officer involved shooting or in-custody death, or when there is a controverted finding, the Police Review Board takes the RU Manager's proposed findings and either adopts the proposed findings or provides their own proposed findings and corrective action to the Chief.

While the PRB procedures continue to be consistent with Par. 131 of the Settlement Agreement, the operation of the PRB has experienced some issues. For instance, PRB meetings related to use of force are required to have two community board members, one of which must be selected from the CRC. Recently, a number of PRB's have needed to be rescheduled due to either CRC members being unable to remotely access case files or being unavailable to attend the PRB. For instance, to review case files under the current process, community board members are required to physically enter Central Precinct and review the case in person. Given the COVID-19 pandemic, CRC members have been hesitant to do so, whereas PPB has been hesitant to provide remote access to case materials in order to protect the

confidentiality of the discipline process. Recently, IPR and PPB have agreed to pilot an approach which will allow CRC members and other community board members on the CRC to view case documents through Office 365. A Non-Disclosure Agreement has been signed by CRC members and PPB's community members as part of this. While there appears to have been compromise between PPB and IPR in terms of allowing remote viewing of case files, it is not clear whether this will be long-term solution. Because cancellations of PRB meetings further delays the resolution of the administrative investigation process, we believe a long-term solution needs to be agreed upon between PPB and IPR. We suggest PPB, the Auditor's Office, IPR, and CRC evaluate the pilot approach, ensure it is satisfactory to all involved, and (if so) move forward with implementing it as a long-term solution in order to ensure that there is always at least one CRC member available to participate in force-based PRB meetings. If virtual access does not resolve the larger issue with CRC member participation on PRBs, then other solutions should be explored to ensure adequate coverage.

We also have some concerns with the conclusions drawn by PRB members in a couple of cases. Specifically, we observed one PRB regarding a members' use of force where the member used a 40mm launcher on an individual but was unable to articulate how the subject's actions were consistent with the definition of active aggression found within Directive 1010.00. Despite the inability to articulate particular actions to justify the force, after considerable discussion the PRB voted 4-3 to recommend the supervisor be found in-policy for the use of force. In another incident which we reviewed, the recommended findings from each member in the chain of command (including the Chief's Office) was to sustain an out-of-policy pursuit by a PPB member. However, again after considerable discussion between members, the PRB voted 5-0 that the officer's actions did not constitute a pursuit despite the officer reaching speeds of 88 MPH in an attempt to catch up to the vehicle. The Chief's Office subsequently agreed with the PRB recommendation and the member was only found out-of-policy for driving without due regard.

In both of these recent incidents, we disagree with the findings of the PRB and do not believe they reflect PPB's broader efforts to hold officers accountable. However, we are also aware that the PRB is not the final say in the accountability system and that, ultimately, discipline lies at the feet of the Chief. For the case involving the pursuit, we do not agree with the Chief's final determination. For the other case, the Chief has not rendered a final decision. Despite our disagreement for this one instance, we are also aware of other instances where the Chief has imposed discipline even when the PRB recommends a not sustained finding. PPB reports that in recent years, there have been at least four cases related to force where this has happened. Because PPB has demonstrated an ability to overrule the findings of PRBs in order to hold officers accountable, we do not believe this reflects a systemic issue.

**Lethal Force/In-Custody Death**

Finally, PPB's accountability system has particular requirements after the occurrence of lethal force and in-custody death events. Because of the sensitive nature of such events, PPB safeguards the integrity of such investigations through a number of actions. For instance, first responding supervisors separate all witness officers and involved officers (see Par. 125), conduct initial interviews individually (rather than as a group), and have a phone-tree to ensure all necessary notifications are made. Detectives conduct on-scene walk-throughs and interviews with select witness officers (see Par. 126) as well as request

walk-throughs and interviews with involved officers (though involved officers have historically invoked their right to decline) (see Par. 127).

After conducting their on-scene investigation, investigators interview all witness officers and then provide them with Communication Restriction Orders (CROs) to prohibit direct or indirect communication with anyone involved with the event until a grand jury has been convened, at which point the CROs are rescinded (see Par. 125). Involved officers are then required to participate in an interview with IA investigators within 48 hours of the event (unless a voluntary statement was already given on-scene or the member is incapacitated) in order to inform the IA investigation. Pursuant to *Garrity v. New Jersey*, the administrative and criminal investigations are walled off from one another (see Par. 124), thereby maintaining the 5th Amendment rights officers have against self-incrimination. The administrative and criminal investigations are conducted concurrently in accordance with Par. 122 (as they are done for all administrative investigations with a corresponding criminal investigation).

PPB had a lethal force event in the fourth quarter of 2020 for which we reviewed the CROs. While the officer was not interviewed within 48-hours of the occurrence, this is due to the officer being incapacitated as a result of the event. PPB reports that all involved and witness officers were separated and interviewed and that witness officers provided an on-scene walkthrough. As this event occurred late in the fourth quarter, we have been unable to review the case file (aside from the CROs that were issued). We will provide updates once we have been able to review the full case file.

**Accountability System Ballot Measure**

The COCL team continues to receive updates about the implementation of the ballot measure passed by Portland residents in November. The COCL team continues to take no position on the measure so long as no actions are taken that are inconsistent with the terms of the Settlement Agreement (see Par. 4). However, full implementation of the ballot measure will take time and in the interim, the City must provide the resources necessary to comply with the requirements of the Settlement Agreement. In particular, as IPR is awaiting the new accountability board to be established, they must still be able to do their work. The City should consider all potential avenues for ensuring that IPR may do so while the new accountability board goes through its development phase.

# SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

**PCCEP's Role in the Settlement Agreement and the City's Support**

*System Overview*

Section IX of the Settlement Agreement requires that the City establish a Portland Committee on Community Engaged-Policing (PCCEP, Par. 141), which is authorized to: (a) solicit information from the community and the PPB about the PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns (Par. 142), with other specific duties set forth in a separate Plan for Portland Committee on Community-Engaged Policing.

PCCEP's membership is designed to come from a reasonably broad spectrum of the community, and members shall not have an actual or perceived conflict of interest with the City of Portland (Par. 143). PCCEP shall meet as needed to accomplish their objectives and hold regular Town Hall meetings that are open to the public. The City shall give advice on Oregon's Public Meetings Laws and similar requirements as necessary (Par. 151) and shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law (Par. 152).

Per Pars. 141 and 142, PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations.

In the fourth quarter of 2020, PCCEP continued monthly general meetings and subcommittee meetings via Zoom. In October, PCCEP hosted a presentation on the Portland Street Response program, and discussed several PPB directives up for review. In November, PCCEP discussed its Community Engagement Plan, and PPB's Force Report as a full board, and the Behavioral Health & Racial Equity Subcommittees jointly hosted a community forum regarding behavioral health, BIPOC communities, and PPB's use of force. This subcommittee meeting included presentations on the use of force report and guest speakers from Trauma Intervention Program Northwest and the Bureau of Emergency Communications. In December, PCCEP hosted a presentation on PPB's Core Patrol Services.

In October, the Mayor accepted PCCEP's recommendation regarding a Truth and Reconciliation Commission, and directed PCCEP to form a subcommittee charged with "spearhead[ing] the planning process for the Commission, working with staff in the Mayor's Office, other Commissioner offices, and the Portland Police Bureau to see the Commission to fruition." PCCEP created the subcommittee late in the fourth quarter, and it was slated to begin meeting in January 2021.

PCCEP voted in new officers in November (with the secretary position finalized in December; November's vote resulted in a tie). New members previously recommended by PCCEP were affirmed by the Mayor and Portland City Council.

PCCEP did not make any formal policy recommendations during the fourth quarter of 2020. However, many of PCCEP's prior recommendations received formal responses from Mayor Wheeler in the fourth quarter, with the Mayor adopting many recommendations in full or in part, including:

- A July PCCEP Statement Condemning the Excessive Use of Force Against Peaceful Protestors
- A June recommendation that the City "defund the police and refund our communities"; The Mayor detailed reductions to PPB's budget and reallocation of those funds to programs such as Portland Street Response and a Black Youth Leadership Development initiative
- A June recommendation to "support a cultural shift by strengthening policy requiring officers to intervene and adopting intervention training"
- A June recommendation to "Ban the Use of Chemical Weapons, Aerial Distraction Devices, and Noise devices against Demonstrators in Portland"; The Mayor adopted this recommendation in part, noting, for example, that the use of Long Range Acoustic Devices is allowed to share information with the public (but not as a sonic warning).
- A detailed June recommendation from the Youth Subcommittee to evaluate all current restorative justice practices with PPB and other related City departments, and "update said practices to promote additional restorative outcomes and alternative means of public policy." The Mayor adopted the recommendation in part, noting that his office does not have authority to implement recommendations specific to the Independent Police Review.

The group also continued discussion of a proposal to codify PCCEP, in line with the Mayor's Police Reform Action Plan that calls for the creation of "local legislation enshrining the Portland Committee on Community-Engaged Policing in Portland City Code, making it a permanent community oversight body."

*City's Support*

The City continues to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions.

Timely posting of PCCEP meeting videos improved this quarter, and transcripts of meeting videos are serving as minutes. However, subcommittee meeting transcripts are not posted with the subcommittees' agendas, making them difficult to locate on PCCEP's website.

In general, we find that PCCEP continues to represent a "*reasonably broad spectrum of the community*," (Par. 143) with at least eight of 13 current members identifying as a person of color and/or an immigrant; representation of people with experience as peer support specialists or other personal, lived and/or professional experience with mental health issues is less clear, based on publicly shared information. However, many of PCCEP's current members volunteer with other community groups or nonprofit boards related to mental health, the justice system, or underrepresented communities, bringing in additional perspectives to PCCEP's work.

In this quarter, COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland. PPCEP's overall functioning remains consistent with the expectations and requirements of Paragraph 143.

Substantial Compliance with Par. 151 has also continued, with PCCEP and COCL jointly hosting quarterly Town Halls to review and discuss draft COCL reports; the town hall this quarter was scheduled as a standalone meeting on October 14.

A representative of the City Attorney's office attends PCCEP meetings and continues to advise the PCCEP as necessary to ensure compliance with public meetings law, and the City continues to train new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all City advisory boards. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.


**Portland Police Bureau's Role in Public Engagement and Outreach**

*System Overview*

As described in Paragraph 145, PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. Specifically, PPB was required to conduct a citywide community survey that would assist the PCCEP and lead to the development of a Community Engagement Plan by PPB (Par. 146). PPB is also required to collect demographic data about the community in each precinct to assist the Precinct Commanders and PCCEP with their community engagement plans (Par. 147). To help measure possible discriminatory policing, PPB officers are required to continue collecting data on race, age, sex, and perceived mental health status of persons they stop and share this information with the PCCEP and the public (Par. 148). PPB also worked with DOJ and COCL to develop a general set of metrics to evaluate community engagement and outreach by the PPB (Par. 149). Finally, PPB must issue an Annual Report (with certain content), with a draft reviewed by PCCEP, and then present a revised report to the public at Precinct meetings and before the City Council (Par. 150).


**The Community Engagement Plan**

Paragraph 146 requires that PPB develop a Community Engagement Plan with input from PCCEP (Par. 142). In the third and fourth quarters of 2020, the Community Engagement Plan has become the focal point when defining PPB's community engagement under the Settlement Agreement. Here we provide a brief status report on the Plan's four components: Public involvement, Communications, Access, and Training.

*Public Involvement*

The Community Engagement Plan specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

Despite COVID-19, PPB has continued to maintain and develop a wide range of community engagement activities and relationships (Par. 145). These include community events, training/educational workshops, neighborhood/community meetings, advisory councils/boards, community/cultural events, sporting activities, charitable giving, immigrant outreach, faith-based meetings, and media events (See PPB website for details: https://www.portlandoregon.gov/police/30379). Importantly, PPB has maintained and supported its advisory groups, including the African American Advisory Council, Alliance for Safer Communities, Muslim Advisory Council, Police Equity Advisory Council, Precinct Advisory Councils, Slavic Advisory Council, and Training Advisory Council. PPB has continued to hold virtual meetings with these advisory councils, typically on a monthly basis, and has not been reluctant to have an open exchange about challenges facing the PPB.

To enhance existing opportunities for community/PPB partnerships, PPB created the "Equity and Inclusion Office Advisory Committee," a multi-racial, multi-cultural advisory group, which remains operational and works with PPB's Office of Equity and Inclusion (OEI). PPB was also expected to "*explore the creation of a Truth and Reconciliation Program.*" Previously, we reported that the Mayor asked PCCEP to take a leadership role in this initiative. In December, they agreed to create a separate Truth and Reconciliation Commission and that PCCEP would create a subcommittee to facilitate this process. They also agreed that the Commission would focus on PPB rather than social injustice at large. PCCEP's new subcommittee held its first meeting on January 4th, 2021, so any progress will be reported in COCL's next quarterly report.

PPB was delayed in creating a Youth Advisory Council as part of the Community Engagement Plan due to the closure of high schools and the discontinuation of PPB's Youth Services Division and PPB's School Resource Officers program. However, PPB is now seeking assistance from its existing advisory councils who are being asked to recommend youth from their respective communities. This recruitment initiative is expected to generate a diverse pool of youth who would be qualified to sit on the Youth Advisory Council.

As we noted in the third quarter, PPB has created the Latino Advisory Council representing many Hispanic/Latino countries and cultures as well as different types of organizations within the City. This 15-member Council continues to hold regular monthly meetings with the PPB. The Council has been very active, meeting with different divisions of the PPB and seeking to learn more about the functions of each division and how these services affect their communities.

The Community Engagement Plan calls on PPB to establish an Inclusive Advisory Council with a representative from each standing and new advisory council. This group is expected to meet directly with the Chief on a semi-annual basis. Renamed the Coalition of Advisory Groups (CAG), this group represents all existing community advisory councils and has been meeting bi-weekly since June. CAG

members have been able to share with PPB what is transpiring within their separate councils and, on a monthly basis, the Chief or Assistant Chief has been able to share with CAG the issues and concerns that exist within the PPB. The CAG also meets regularly with the Mayor's office to discuss police reform and accountability. The group is working to create bylaws and policy that will formalize the CAG's establishment. The COCL views the CAG as a healthy mechanism for broad community engagement with the PPB.

_Communication_

The Community Engagement Plan specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. While PPB has used social media outlets for many years to communicate with the public, they are now seeking to expand their communication strategies to achieve these goals. First, going beyond press releases, PPB has created a "distribution" email list where it circulates public safety information to interested stakeholders (e.g., police services, COVID-19, protests, use of City's TrackIt system). Second, PPB has developed a relationship with Latinx/Spanish-speaking media outlets, and consequently, Spanish-speaking officers have appeared on these networks to share information about public safety and answer questions posed by the community. Third, PPB has produced a monthly brochure with public safety information and has distributed hard copies to various stakeholders, including homeless shelters, immigrant/refugee organizations, advisory councils, churches, and others. Fourth, PPB has partnered with the Slavic Media house to publish information about public safety, including interviews with PPB chiefs. COCL has reviewed many of these materials.

PPB has not completed its transition to the City's new website platform (https://www.portland.gov/). When that upgrade is complete, PPB plans to develop and distribute educational materials on how the public can navigate PPB's new website.

_Access_

The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

PPB continues to implement its strategy to improve language access for those with Limited English proficiency (LEP). The Office of Community Engagement and the Strategic Services Division have conducted an internal survey of bilingual PPB members to determine their language proficiency and identify training needs. PPB has also identified and trained bilingual officers in how to respond to police calls in LEP communities.

As discussed below under Training, PPB is currently working closely with community members to develop training modules with videos that can be used to educate all PPB members in how to respond appropriately to individuals needing language access services (including requests for PPB bilingual officers or other interpreters). A new LEP directive is still in the development phase, as PPB finalizes procedures for certifying PPB members who report bilingual proficiency. When the LEP policy and

_COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2020 to December 31, 2020_

training have been completed, PPB will advise communities of this resource. PPB is already working with advisory councils to determine the best way to notify their communities regarding these LEP services/resources and empower them to gain access.

*Training*

The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

As noted earlier, bilingual officers have been trained, so they represent an important tool to address language access problems. Beyond LEP issues, PPB is turning to its advisory councils as another resource to help address the unique problems faced by different communities as they interact with the police. Several members of different councils have agreed to work with the Office of Community Engagement, Office of Equity and Inclusion, and the Training Division to assist in the training of PPB officers on cultural issues to minimize bias and discrimination.

We commend PPB for engaging the community in PPB training – something COCL has emphasized. As planned, community members with lived experience and advocates will be allowed to share their stories on video. This will allow PPB officers to better understand different cultures and their perceptions of the police. Community members have already agreed to provide cultural education to officers on a variety of critical topics, including the historical relationship of the police with the Black/African American community and the challenges faced by the immigrant and refugee communities. Issues of fear, distrust, and police bias will be discussed. Hearing community voices should help to strengthen officers' cultural competency, empathy, and procedural justice during encounters with members of Portland's diverse communities and help to ensure nondiscrimination on the basis of national origin, as required by the U.S. Constitution.

The expectation is that PPB's cultural training (and LEP training) will be rolled out as part of PPB's online training in 2021. Thus, the videos and training materials will be uploaded to LMS. As noted earlier, the 20 hours of online LMS training will be spread out between January and May, with an estimated two LMS trainings per month, to avoid overburdening the students.

In sum, despite delays due to COVID-19, we continue to find that PPB has made significant progress on its Community Engagement Plan through internal working groups and through partnerships with community organizations and advisory boards.

*Data Collection, Analysis, and Reporting*

PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par 147-150). Precinct-level demographic data are released by PPB annually to Precinct Commanders and PCCEP (Par. 147), based on

data from the American Community Survey.[4] In the meantime, PPB continues to provide a wide range of data on police services for public review on its "Open Data" portal. These interactive dashboards include precinct and neighborhood level maps and monthly statistics on calls for service, crime, traffic accidents, traffic fatalities and injuries, police stops, officer-involved shootings, and more (https://www.portlandoregon.gov/police/71673).

PPB continues to collect demographic data from individuals who are stopped by the PPB (Par. 148), using a "Stops mask" or template that requires officers to report specific information about each stop. PPB updated its Stops Data Collection Application, effective January 1, 2021, to collect additional data points. Officers are required to list the reason for the stop (whether it was based on probable cause or reasonable suspicion), whether a consent search was requested and achieved, additional search criteria (e.g., incident to arrest), search findings, stop disposition, mental health status, and other data. Initial training on this new template and on LMS reporting requirements was conducted in November of 2020, although more training is planned for 2021.

As we noted in our Q3 report, implementation of the new Stops Data Collection App was delayed because of problems documenting consent searches. The Mayor wanted officers to ask the subject to sign a release form indicating that they consented to the search. The PPB and the Mayor have reached an agreement that requires officers to distribute a card published in five major languages that explains the desire to search and the community member's right to refuse. The transaction will be recorded with a new app on the officer's phone. PPB is currently revising its policy on searches to reflect these changes and is also in the process of producing the cards. Additional LMS training on the policy and use of the recording app is expected in 2021.

In terms of data analysis and reporting requirements, PPB's Strategic Services Division continues to generate quarterly Stops Data Collection reports. Their third quarter report was released on October 15th and given to PCCEP on November 13th (https://www.portlandoregon.gov/police/article/778377). While racial disparities in traffic stops widened in early 2020, they narrowed later in the year. In our last report, we noted that the percentage of traffic stops citywide involving Black/African American drivers had increased from 16.8% in Q1 to 18.4% in Q2.[5] In contrast, the percentage has dropped to 15.3% in Q3. The decrease in stopping Black/African American drivers occurred in both the Traffic Division and the non-Traffic units, although the rate of stopping Black/African American drivers in Non-traffic divisions (Patrol, Investigations, and others) remains relatively high at 21.1% of the total. Only 1% of the individuals contacted by the PPB were perceived to have a mental health issue. Most striking in the 2020 Q3 stops data is the dramatic decline in the <u>total number of stops</u> of drivers and pedestrians from 10,986 in Q2 to 2,280 in Q3 – a 79% drop in total stops.[6]

---

[4] New data on precinct demographics are not available annually. In December, the U.S. Census Bureau released its New American Community Survey 5-Year Estimates (2015-2019). In 2021, we assume that PPB will use these survey data to check for any changes in precinct-level demographics. The American Community Survey is the best source for population and housing statistics in the U.S.

[5] Pedestrian stops are too few in number to be analyzed by race or other demographic variables.

[6] This decline could be due, in part, to a conscious effort by officers to avoid racial profiling, but other contributing factors could be the eliminating of the Gun Violence Reduction Team in June, budget reductions in the number of

In addition to its quarterly reports on stop patterns, PPB continues to prepare an annual report on this subject. On November 19, PPB released its 2019 annual report on stops. The total number of stops in 2019 increased 12% over 2018 (largely in the East Precinct), but as we noted above, these numbers reversed direction in 2020. PPB researchers should be credited with not simply relying on Census data to calculate appropriate benchmarks to determine whether or not existing disparities in stops are justified or reflect race bias. Given the limitations of Census population statistics as a benchmark (e.g., failure to count drivers in Portland who are outside commuters), we do not object to PPB's use of the Injury Collision Benchmark (i.e., race of drivers involved in injury collisions) to evaluate stop decisions by Traffic officers. We also accept, but with less enthusiasm, PPB's use of the Crime Victimization Benchmark (i.e., the race of victims of serious crime) to evaluate the stop decisions of Non-Traffic units.[7]

Using these benchmarks for 2019 data, PPB found that all racial/ethnic groups were stopped at similar rates. However, a deeper dive shows that for searches – the place where racial bias in policing is easier to detect - Black/African Americans were asked to consent to a search nearly twice as often as all other racial/ethnic groups. Furthermore, search refusal rates were significantly lower for Black/African Americans (12.4%) and Hispanics/Latinos (11.2%) than for whites (22.4%). Also, drivers in the East Precinct, where many Black/African American families reside, are 5 times more likely to be searched when stopped by a PPB officer than drivers in other precincts. Certainly, the Gun Violence Reduction Team, which did most of its work in the East Precinct, contributed to these statistics, with Black/African Americans accounting for 52.1% of their stops in 2019. Given that consent searches make up 70.4% of all PPB searches citywide, and given these notable disparities, PPB's new Stops Data Collection App is critically important. Also, to help officers better understand these disparities and to ensure impartial policing, PPB is training its officers to be specific in documenting their reasons for stopping and searching someone, consistent with the 4th Amendment.

We note that PPB also examined racial disparities in stop outcomes, including arrests. The vast majority of stops are resolved in other ways (e.g. warning or citation), but looking at PPB's data, Black/African Americans stopped by Traffic officers were arrested at rates higher than the average person (3.7% vs. 1.6% average), although the picture is complex because of other variables. We encourage PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns as well as appropriate benchmarks.

Finally, the COCL credits PPB with including gender and age in their analysis of traffic stops for the first time. Researchers have yet to establish good benchmarks for gender and age, and the interaction between race, age, and gender can produce complex results, but we appreciate PPB's transparency in running these analyses. The stop figures for age and gender have been relatively stable since 2015. As expected, male drivers are much more likely to be stopped, but they are also much more likely to be

---

officers on the streets, the reassignment of officers from Traffic and Patrol duties to the protests, and/or de-policing due to heavy criticism of the PPB.

[7] However, Crime Victimization benchmarks tend to justify "hot spots policing" whereby larger numbers of officers are assigned to patrol hot spots of crime, which are often lower income neighborhoods with higher proportions of Blacks/African Americans. This deployment strategy can be effective at reducing crime, but it also guarantees higher rates of stops and searches in these neighborhoods. See Rosenbaum (2019) for a critique of this approach to policing.

involved in injury collisions. Younger and older drivers are stopped less frequently than the injury collision benchmark would suggest.

For Paragraph 149, the City has completed the requirement to develop a set of metrics to evaluate community engagement. As noted above, PPB is currently focused on outcomes associated with the community engagement plan, which is designed to strengthen police-community relations.

Par. 150 requires PPB to "issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities." The Settlement Agreement requires PPB to provide a draft of the annual report to PCCEP "for review and comment before the report is finalized and released to the public." Once the report is released, Par. 150 calls for PPB to "hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters."

This quarter PPB produced a draft[8] and then final[9] 2019 Annual Report. In October, the draft report was sent to all PCCEP members, and in November, PPB presented the draft to PCCEP's Settlement Agreement and Policy Subcommittee (SAPS) for review and comment—noting that substantive feedback would not be incorporated into the current draft, but would be considered for the following year's report. Similarly to last year, at least one PCCEP member expressed concern with this approach—asking "what are the comments for, if nothing changes?"—and suggested PPB be clearer with PCCEP and the public up front that comments may be reflected in subsequent reports.

PCCEP made nine recommendations in July 2019, intended to be reflected in future PPB annual reports, including specific suggestions to, for example, provide details of officer discipline, provide greater detail about PPB's employee wellness program, and improve comprehensiveness of the report by adding graphs and charts, a glossary of key terms, and be made available in multiple languages.

While the Settlement Agreement does not require PPB to incorporate PCCEP's feedback on the annual report, Chief Lovell noted in a December 16 presentation to City Council that PPB reviewed PCCEP's prior feedback when drafting this year's report. Some of PCCEP's prior recommendations were reflected in the 2019 Annual Report, either directly or with a link to additional information on the City's website, but several were not.

PPB presented the report to the Portland City Council on December 16, and the final report was posted to PPB's website. However, some community members and organizations expressed concern that the City Council did not provide an opportunity for public testimony on the annual report. Thus, the precinct meetings are especially important for community input.

---

[8] https://www.portlandoregon.gov/pccep/article/767814
[9] https://www.portlandoregon.gov/police/article/778697

Two of three precinct meetings were held on December 28 (North) and December 29 (Central); However, the East Precinct's meeting did not occur because of "staffing issues related to COVID illness" and PPB informed us that it will not be rescheduled.

While the two precinct meeting details were shared with local organizations within each precinct, and the North Precinct meeting was advertised in a Facebook post on December 17, other tools to fully invite the public were not utilized—including PPB's news release feed or the Settlement Agreements (PCCEP) email list. Community members noticed an announcement of one precinct meeting in December on PPB's website but the announcement did not include a date or link to the virtual meeting. COCL was not informed of, or invited to, the precinct meetings and the meetings were not recorded. According to PPB, community members were informed by the Commander or Captain of precinct-level activities by PPB and of partnerships with the community, and then given the opportunity to ask questions or make comments. On several occasions, the League of Women Voters has expressed concern about the process used to share this report with the public, viewing it as "an opportunity for the police bureau to share an overview of the services it provides, its accomplishments, and the challenges it faces."[10] More specifically, COCL has little reason to believe that these precinct meetings were used "to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters." (Par. 150).

In sum, PPB has not fulfilled the basic requirements of Par. 150, so COCL has lowered its assessment from Full to Partial Compliance in the 4th quarter. While PPB produced the 2019 Annual report, sought input from PCCEP, and presented the report to the City Council, it did not fulfill its obligation with regard to community engagement at the Precinct level. The precinct presentations were (1) not broadly announced to the public in advance; (2) did not occur in the East precinct, which includes BIPOC communities with strained police-community relations, and (3) did not provide evidence that the full range of topics required by Par. 150 were covered. With the transition to virtual meetings, PPB has a unique opportunity to enhance community engagement in this annual summative process. We encourage PPB to maximize the number and diversity of communities that participate using its social media outlets and email lists from its many advisory groups.

We encourage City Council to receive PPB's annual report after the precinct meetings have been held and robust community input has been completed. Finally, we recommend that PPB provide additional clarity around PCCEP's role in the review of each year's draft and consider presenting the draft to the full PCCEP rather than to a subcommittee.

*Summary of PPB's Community Engagement*

In the face of extreme circumstances in 2020, with both internal and external obstacles, PPB has continued to sustain and even expand its systems of community engagement. The Community Services Division, the Office of Community Engagement, and the Office of Equity and Inclusion, working in a new virtual world, have managed to build partnerships with many different segments of the Portland

---

[10] See League of Women Voters of Portland letter to Portland City Council "Portland Police Bureau 2019 Annual Report (Agenda item #1004)" December 15, 2020.

community through existing and new advisory councils. The Coalition of Advisory Groups, represents all existing community advisory councils, is also off to a good start. In a nutshell, the Community Engagement Plan required by the Settlement Agreement is coming to fruition.

PPB has continued to meet and exceed the requirement to collect, analyze, and share information about its performance on a variety of dimensions. For the Annual Report, PPB should explain to PCCEP why certain changes are not feasible using this format and should keep everyone informed about precinct events where the report is discussed.

PPB continues to produce quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. PPB's interactive dashboards, which include a wide range of performance statistics and maps, are exemplary in the policing field. PPB's collection, analysis and reporting of stops data is commendable because of its rigorousness and transparency. In doing so, PPB has revealed disparities in consent searches that suggest discrimination against Black/African American drivers. Fortunately, PPB has taken action during 2020 to address and begin to correct this problem by introducing a new Stops Data Collection App that forces officers to think about the reason for the stop and search, and by providing officers with new training on this subject. We encourage continued dialogue with the community about racial/ethnic disparities in policing, alternative strategies for responding to violent crime, and effective mechanisms to strengthen public trust in the PPB.

COCL' primary job is to determine whether PPB has responded adequately to the specific requirements of the amended Settlement Agreement. We find that PPB has created and maintained the systems of community engagement and performance measurement required by Pars. 147 through 150. Furthermore, they have responded to problematic outcomes that emerged with reasonable remedies. For these reasons, COCL finds that PPB has remained in substantial compliance during the fourth quarter with the terms of the amended Settlement Agreement in Section IX on Community Engagement.

**References**

Rosenbaum, D. P. (2019). "The Limits of Hot Spots Policing." In D. Weisburd & A. A. Braga (eds.), *Police Innovation: Contrasting Perspectives*. 2nd Edition. pp. 314-344. Cambridge: Cambridge University Press.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PS3:** Public Safety Support Specialist

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# LIST OF PERSONNEL

Chief of Police: Chuck Lovell

Deputy Chief of Police: Chris Davis

Assistant Chief of Operations: Michael Leasure

Assistant Chief of Services: Mike Frome

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Bryan Parman

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: John Sapper

Behavioral Health Unit (BHU) Lt. Casey Hettman

EIS Supervisor: Nathan Sheppard

EIS Administrator: Dan Spiegel

Training Acting Captain: Gregory Stewart

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne