**Juan C. Chavez**, OSB #136428
Email: jchavez@ojrc.info
**Franz Bruggemeier**, OSB # 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

      Attorneys for *Amicus Curiae* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:12-cv-02265-SI |
| Plaintiff, | |
| vs. | AUGUST 2021 STATUS REPORT FROM THE MENTAL HEALTH ALLIANCE |
| CITY OF PORTLAND, | |
| Defendant. | |

COMES NOW, by and through their attorneys, Juan C. Chavez and Franz Bruggemeier,

the Mental Health Alliance, *amicus curiae* in the above-captioned case, provide this brief to aid

the Court in its assessment of the Defendant City of Portland's continued non-compliance with

the settlement agreement in this matter, the proposed remedies to cure that non-compliance, and

the proposed amendments to the Community Engagement portion of the settlement agreement.

This brief is supported by the Declaration of Counsel, and the referenced exhibits and testimony.

Based on our assessment of the present state of the settlement agreement, we respectfully ask

that the Court to again further defer entry of the PCCEP amendments. We further request that the Court acknowledge that the City is not in substantial compliance with the proposed settlement agreement, and the City should continue to submit to the Court until such compliance has been reached to the Court and the Public's satisfaction.

## I. INTRODUCTION

The parties to this case have been litigating this matter for close to nine years. In that time the Portland Police Bureau have continued to use force against persons with mental illness. Many indications point to that trend continuing. The Mental Health Alliance can only conclude that the terms of this settlement agreement are either not fair, adequate, or reasonable for the purposes of lessening use of force against people with mental illness, or are have been so deficiently administered that the parties need to consider alternatives to the terms of the current slate of remedies proposed to bring the City into compliance.

Our status brief will cover five primary topics regarding the settlement agreement:

1) Non-compliance with the officer accountability provision (¶ 169, Dkt. 157-1)

2) Non-compliance with the Community Engagement provisions (PCCEP and BHUAC)

3) Non-compliance with the use of force provisions (¶ 66, 67, Dkt. 157-1)

4) Comments, objections, and alternatives to the Plaintiff's proposed remedies for non-compliance.

5) Non-compliance with the community mental health provisions (¶¶ 89, 90, Dkt. 157-1)

While the parties will undoubtedly speak of the progress made by the Defendant City, as a community of people who work with people with mental illness or addiction, have lived experience with mental illness or addiction, or both, that "progress" or non-compliance has resulted in the deaths or injuries of too many people. That measurement of progress, the actual

AUGUST 2021 STATUS REPORT FROM THE MENTAL HEALTH ALLIANCE
Page 2 of 28

safety of people with Portland mental illness or addiction when the police are called, can and should be the only criterion to which the parties are held. We are, unfortunately, too far from that point.

## II. ABOUT THE MENTAL HEALTH ALLIANCE

The Mental Health Alliance was formed in the summer of 2018 to join the present case as an *amicus curiae*. The Court granted us that status on October 1, 2018. Dkt. 188.

The Mental Health Alliance is composed of both persons with lived experience of mental illness and organizations that represent the interests of people with mental illness and have long participated in efforts to reduce police use of force used against people with mental illness, including Disability Rights Oregon, the Oregon Justice Resource Center, the Portland Interfaith Clergy, and the Mental Health Association of Portland.

Members of the Mental Health Alliance Work Group meet weekly to develop position statements and provide support to policy discussions and court hearings, and are informed through routine meetings with community leaders, policy designers, and subject experts.

Since our entry into the present case, we have provided the Court status reports (Dkts. 203, 217) on the remaining settlement agreement provisions that have yet to be adopted as fair, adequate, and reasonable, and other areas where the City has yet to meet full compliance. We have held events for the community and the parties to the case. And we have regularly attended PCCEP meetings as well as their subcommittee meetings.

Active members of the Mental Health Alliance Work Group include:

- Rochelle Silver PhD, spent her career treating patients at the Oregon State Hospital

- Patrick Nolen is an advocate for people who are homeless

- Meredith Mathis is a second year law student at Lewis & Clark Law School

- Amanda J. Marshall JD, is a family attorney in Clackamas County

- Rabbi Ariel Stone leads Congregation Shir Tikvah

- Jan Friedman JD, is a staff attorney at Disability Rights Oregon

- Jason Renaud is a non-profit consultant

- Mark Schorr LPC NPS CADCI, is a counselor, therapist, teacher, and author

- Michael Hopcroft is a games designer and novelist

- Sandra Chisholm MPA, is President of the Mental Health Association of Portland

- Mary-Margaret Wheeler-Weber works for Multnomah County

- Maggie Powers is a third year law student at Lewis & Clark Law School

- Mark Chasse JD, is an attorney and advocate

- Liz Reetz JD, is a staff attorney at Disability Rights Oregon

- Javonnie Shearn is chair of the Oregon State Hospital Advisory Committee

- Tara Candela JD PMHNP-BC RN, is a nurse at Portland's psychiatric hospital

- KC Lewis JD, is managing attorney at Disability Rights Oregon's Mental Health Rights Project

- Julia Baker is a yoga trainer for teens with mental illness

- Susan Hoffman JD PNP, is a retired attorney and psychiatric nurse

- Juan C. Chavez and Franz H. Bruggemeier, attorneys with the Oregon Justice Resource Center and legal representatives of the Mental Health Alliance

Our group has done our best to educate not only the Court, but ourselves and the public about the issues presented in this case. We care deeply about our city, and the people whose fortunes are at issue in this case, those who live with, experience, or have symptoms of mental

illness and addiction. They are our friends, they are our family, they are our neighbors and colleagues, they are us.

### III. Procedural Facts: February 2020 Status Conference

When the parties last convened for a status conference in this Court, the Plaintiff United States had pronounced the City was in substantial compliance with the settlement agreement, including the conditionally accepted amendments to the settlement agreement regarding the PCCEP. The City would have to maintain substantial compliance with the settlement agreement for a period of one year. If they did so, then the United States would likely dismiss the case. The Court had continued to only conditionally accept the PCCEP amendments.

In doing so, the Court opined two scenarios in which the parties might find themselves at the next status conference, to be held in February 2021: 1) The parties convene and discuss metrics to assess metrics to determine whether PCCEP is fair, adequate, and reasonable as a community engagement alternative to COAB; or 2) The parties never come to agreement about metrics, but the Plaintiff United States nonetheless deems the City in substantial compliance. If the latter scenario came to pass, then the Court expected the Amici to explain to the Court why the case should remain open.

The Court also announced its expectation that the parties convene at regular intervals to discuss the PCCEP metrics developed by the Amici.

### IV. Discussion

The parties to this case might not have anticipated a global pandemic to have intervened in between the February 2020 status conference and the 2021 one. The initial effects of the COVID-19 pandemic led to fewer police interactions, and fewer notable incidents of serious use of force—until May 25, 2020.

## A. Historic Civil Rights Movement

After Minneapolis Police murdered George Floyd on May 25, 2020, people across the United States rose to protest state sanctioned violence. For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with empty platitudes and ineffective "reforms," millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

Police in Portland, and elsewhere, responded with violence toward people protesting police violence. These protests took place likely in hundreds of places in Portland—street corners, parks, driveways, parkways, highways, streets, and government buildings. The first 100 nights since George Floyd's murder had Portlanders of all kinds out in the street demanding justice not only for Mr. Floyd, but for the injustices committed upon them by their own City. The Plaintiff in this case released a report in February 2021 revealing that Portland Police Bureau used force against protesters in 2020 more than 6,000 times.[1] Each of those 100 nights or those uses of force deserve their own briefing, their own hearing, their own memorial—beyond which this *amicus* could provide the Court here in this report.

For the purposes of our report to the Court, we will touch on the circumstances leading to and following the District Court of Oregon ordering a temporary injunction against the Defendant City of Portland to temper its police's use of unlawful use of force against protesters,

---

[1] Jonathan Levinson, *After Portland police used force 6,000 times, federal attorneys crack down*, Oregon Public Broadcasting (March 26, 2021), available at https://www.opb.org/article/2021/03/26/portland-police-use-of-force-department-of-justice/.

the finding of contempt against the City, and the remedies ordered, as they have bearing on the status hearing.

### 1. *Don't Shoot Portland, et. al. v. City of Portland*

The night of May 29, 2020 was the first major night of PPB use of force against mass crowds of protestors during the post-Floyd protests. That evening, a few individuals had broken store front windows, and set a small fire on a desk in the Multnomah County Justice Center. Instead of targeting these few individuals, PPB used tear gas and stun grenades to break up crowds. Mayor Wheeler praised the police "restraint" after they used indiscriminate force against mass crowds of protestors.[2]

That weekend, more police violence followed, escalating tensions between the police and the Portland community. By Tuesday June 2, 2020, the Portland Police Bureau were driving by random groups of people downtown dropping tear gas cannisters.[3] Peaceful protesters were tear gassed outside the Multnomah County Courthouse.[4] The press was injured. The public was injured. The police had chosen violence.

On June 5, 2020, after arguing in this District Court that the Defendant City of Portland should be enjoined from using tear gas indiscriminately, Plaintiff Don't Shoot Portland succeeded. *Don't Shoot Portland, et. al. v. City of Portland*, USDC of D. Or. Case No. 3:20-cv-00917-HZ (D. Or. 2020), Dkt. 29 ("Order"). The Court found that:

> "Plaintiffs offer evidence that tear gas was used indiscriminately in other instances throughout the city. In some of these instances, there is no evidence of any provocation. In others, individuals appear to have shaken fences and thrown water bottles and

---

[2] Molly Harbarger, *Riot erupts in downtown Portland after peaceful protest of George Floyd killing*, The Oregonian (May 30, 2020), available at https://www.oregonlive.com/portland/2020/05/protest-escalates-at-downtown-portland-justice-center.html.
[3] Alex Zielinski (@alex_zee), Twitter (June 3, 2020 at 12:00 pm), available at https://twitter.com/alex_zee/status/1268075047660347392.
[4] The Oregonian (@Oregonian), Twitter (June 2, 2020 at 11:38 pm), available at https://twitter.com/Oregonian/status/1268069409442000896?s=20.

> fireworks at the police. Either way, there is no dispute that
> Plaintiffs engaged only in peaceful and non-destructive protest.
> There is no record of criminal activity on the part of Plaintiffs. To
> the contrary, there is even evidence that some protesters were
> confronted with tear gas while trying to follow police orders and
> leave the demonstrations."

*Id.* at p. 5.

The Court then ordered the following:

> "PPB be restricted from using tear gas or its equivalent except as
> provided by its own rules generally. In addition, tear gas use shall
> be limited to situations in which the lives or safety of the public or
> the police are at risk. This includes the lives and safety of those
> housed at the Justice Center. Tear gas shall not be used to disperse
> crowds where there is no or little risk of injury."

*Id.* at pp. 9-10.

The City later stipulated to an expanded order meant to cover other "less-lethal" weaponry.
PPB were found to have violated these orders on June 30, 2020, twenty-five days later. During the
hearing on contempt, members of the Bureau argued that they considered the Constitution every
time they pulled the trigger on their weapons. One officer testified he pulled that trigger 40 plus
times. The latter officer was found to have violated the Court's order on three separate occasions
that evening. The Court ordered remedies that included further training on the contours of its
rulings. The Compliance Officer and Community Liaison ("COCL") for the present case believed
that the City was "dismissive" of the District Court's Order.[5]

///

///

///

---

[5] Tess Riski, *Draft Report Describes "Dismissive" Attitude During Training for Portland Police's Now-Dissolved Riot Squad*, Willamette Week (July 13, 2021), available at https://www.wweek.com/news/city/2021/07/13/draft-report-describes-dismissive-attitude-during-training-for-portland-polices-now-dissolved-riot-squad/.

2. Officer Accountability

Officer Taylor, the officer whom the District Court found violated the injunction on three occasions, was cleared of wrongdoing by PPB Internal Affairs Division and the Independent Police review.[6]

More lawsuits emerged from the public, but the City and State remained silent or defensive. So far as the public and this *amicus* is aware, no PPB officer has faced serious consequences for serially abusing the public in the streets of Portland during the 2020 protests—not until the prosecution of Corey Budworth.

Officer Budworth assaulted a protester named Teri Jacobs. Ms. Jacobs had sued the City of Portland and received a settlement in February 2021.[7] Following settlement with the City, the District Attorney announced charges against Officer Budworth.[8] Officer Budworth was caught on video chasing Ms. Jacobs. He battered in the back of her head with his baton. She fell to the ground. She flipped over onto her back and tried to crab walk backwards away from Officer Budworth. She reached for her press badge. Officer Budworth waited for her to raise her head. When she did, Budworth again battered her in the face with his baton. After doing this, he abruptly changed directions and marched with his fellow officers. He performed these acts in full view of other officers. No one intervened. No one admonished him. No one arrested him.

PPA President Daryl Turner called the prosecution political. He defended Officer Budworth, saying, "Everybody at his supervisory level, including the person who was the lead

---

[6] Tess Riski, *Are Protest Banners Weapons? Sometimes, Say Portland Police*, Willamette Week (July 21, 2021), available at https://www.wweek.com/news/city/2021/07/21/are-protest-banners-weapons-sometimes-say-portland-police/.

[7] Wright Gazaway, *Photographer shoved, hit by Portland police officer announces settlement with city*, KATU News (April 6, 2021), available at https://katu.com/news/on-your-side/photographer-shoved-hit-by-portland-police-officer-announces-settlement-with-city.

[8] Tess Riski, *The Indictment of One Portland Riot Cop May Be Just the Start*, Willamette Week (https://www.wweek.com/news/courts/2021/06/23/the-indictment-of-one-portland-riot-cop-may-be-just-the-start/.

trainer in baton training—the long baton training—said he was in policy and within the parameters of the use of force to do what he did and to use force the way that he did it."

Following this prosecution, members of the Rapid Response Team, who were responsible for the mass police violence over the summer of 2020, resigned in solidarity with Officer Budworth.[9]

The Portland Police Bureau has expressed remorselessness about their conduct since the parties last met. Members of the Bureau doxed the District Attorney of Multnomah County,[10] having claimed he belonged to "Antifa."[11] PPA President accused the District Attorney of being backed by George Soros, a not-thinly veiled right wing and antisemitic accusation.[12] Members of PPB and, seemingly, the then-President of PPA Brian Huntzeker engaged in a smear campaign of Portland City Commissioner Jo Ann Hardesty, and attempted to have her "perp walked."[13] They made a mockery of their Court-ordered training, and they resigned from RRT duty because one of their own is being criminally prosecuted for assaulting a member of the public, as described above.

Paragraph 169 of the Settlement Agreement provides the following: "PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure." Dkt. 157-1, ¶ 169. Any casual observer of the City of Portland would understand that this has not happened.

---

[9] Michael Levenson, *50 Police Officers Step Down From a Crowd Control Unit in Portland*, The New York Times (June 17, 2021), available at https://www.nytimes.com/2021/06/17/us/portland-police-resign-protesters.html.
[10] Noelle Crombie, *Portland protests shape District Attorney Mike Schmidt's young tenure: Now what?*, The Oregonian (January 30, 2021), available at https://www.oregonlive.com/news/2021/01/portland-protests-shape-district-attorney-mike-schmidts-young-tenure-now-what.html
[11] Jonathan Levinson, *Discord over leadership, morale and discipline besets a Portland Police Bureau in transition*, Oregon Public Broadcasting (June 25, 2021), available at https://www.opb.org/article/2021/06/25/leadership-morale-discipline-issues-beset-portland-police-bureau/.
[12] *Id.*
[13] Tess Riski, *City Commissioner Jo Ann Hardesty Intends to Sue Portland Over the Police Leak of a False Allegation Against Her*, Willamette Week (August 4, 2021), available at https://www.wweek.com/news/city/2021/08/04/city-commissioner-jo-ann-hardesty-intends-to-sue-portland-over-the-police-leak-of-a-false-allegation-against-her/.

**B. Community Engagement**

1. PCCEP

a. Metrics

At the end of the February 2020 status conference, the Court took the late Reverend Bethel's suggestion and gave instruction to the parties and to the amicus. The instruction, on page 205 of the conference transcript, was for the parties and *amici* to confer to find a set of metrics by which the PCCEP could be determined to be functional or not functional.

To fulfill this instruction, the AMAC and MHA sent a draft of measurable objectives ("Metrics") to the parties in early April and which is in the hands of the court now.

The metrics created by the amici ask for considerable additional effort on the part of PCCEP staff to actively communicate with organizations which represent people of color and people with mental illness in the Portland area. It asks for additional community surveys, that meeting notices be posted in a timely way, that attendees reflect the community and not be dominated by PPB staff, that there be a training curriculum for new members, a retention plan for continuing members, and an exit interview for members who leave. There are other items as well. But all to be accomplished by staff, not PCCEP members.

The City Attorney's office could not meet to discuss the metrics until July 21, 2020. The *amici*, the parties, members of the PCCEP, and PCCEP staff met via Zoom on July 21 to review the proposed metrics document. At the meeting the city attorney and PCCEP staff and members seemed unfamiliar with the document created by the *amici* sent to them in April, and unfamiliar with the court's instruction from February 2020.

AMAC and MHA then posed questions to the city attorney by email message, which Ms. Reeve briefly responded via email on July 31. The City declined to support hiring additional staff members for the PCCEP, and declined to support the metrics document as proposed.

No additional meetings were held or offered with the city about the PCCEP metrics.

Seeking adoption by vote from the PCCEP members, AMAC and MHA together met with PCCEP members twice in August to review the metrics document. Three PCCEP members were not willing to meet with the *amici*.

PCCEP co-chair Elliott Young worked individually with several PCCEP members to make minor modifications to the metrics documents, which the AMAC and MHA quickly agreed to. Mr. Young presented the metrics document to the PCCEP at their general meeting in late August.

PCCEP members did not vote to accept or reject the metrics as presented by Young, but instead voted to not vote on whether to accept or reject the metrics. They did not discuss objective measurement again, and today there are no objective measurements for the PCCEP, and no plans to discuss are scheduled.

The AMAC and MHA reached out and had a meeting with the PCCEP staff. Staff said they could not "make" the PCCEP members do anything, such as read the settlement agreement or have objective measurements. Feeling this instruction was unheard or fundamentally misunderstood by the PCCEP staff, members of the MHA tried to meet with the Mayor's liaison to the PCCEP.  She declined our invitation to meet saying she was unprepared to talk about the PCCEP and would need her attorney present to talk with us. We were then told that Dr. Markisha Smith is the supervisor of the PCCEP staff. We were able to meet with her in May 2021, and she listened to the problem but told us she planned to delegate supervision of the PCCEP staff to a

deputy who we then could not contact because he lives in Africa. We wrote to Dr. Smith's supervisor who seemed to not read our inquiry but forwarded it to the PCCEP staff.

On August 9, 2021, members of the MHA met with Sam Adams of the mayor's office who identified that he had been newly tasked with managing the PCCEP. We are unable to discover who actually supervises the PCCEP staff, and frankly, we believe that they have been without an engaged supervisor for at least a couple of years.

The Mental Health Alliance suggests that amending the settlement agreement at this time to include the PCCEP is premature. Instead, the City should set a firm schedule to amend the PCCEP Plan to include satisfactory outcome measures to both parties and the Court, and have engaged and capable supervision for PCCEP staff prior to re-considering an amendment to the agreement.

b. PCCEP in action.

MHA member Rochelle Silver attended nearly every PCCEP meeting held during the COVID-19 pandemic. During this period, PCCEP has been holding their six monthly committee meetings and any additional meetings virtually. That makes it relatively easy to attend, yet their meetings are not well attended by the community. Those that attend regularly scheduled PCCEP meetings are usually City employees, employees of the Portland Police Bureau (PPB), employees of the U.S Department of Justice and a few community activists and "copwatchers." Members of the PCCEP seem lost as how to go about encouraging more participation by the community and, to date, we have seen little effort on their part or on the part of their staff, to accomplish this. Therefore, we have not seen PCCEP "engaging" the community in conversation about the police.

The PCCEP does make recommendations for change. Unfortunately, it pays little attention to what happens to those recommendations. Only recently did a staff member assigned to work with the PCCEP create a graph which is color coded to be able to follow the recommendations. Like recommendations made by most PPB advisory groups, the recommendations made by the PCCEP go nowhere. Recent commentary from one of PCCEPs' current co-chairs indicates in their two years of existence, the PCCEP had made little progress if any.

There is no doubt that the leadership of the PCCEP puts in many hours, attends many committee meetings and other meetings not open to the public. Unfortunately, the leadership appears to be directionally challenged with each leader moving in a different direction, none of which is a focus on the Settlement Agreement between the United States and the City of Portland in the present case. In fact, it has been made clear that several members of the PCCEP are not at all familiar with the content of the Settlement Agreement and that PCCEP's formation stems from this Agreement.

In a public committee meeting in November 2020, the Chair of one PCCEP committee suggested that the findings of the DOJ investigation were that the PPB was found to use excessive force with the mentally ill or perceived mentally ill *and* people of color. This was repeated by a PCCEP staff member just two weeks ago. Perhaps, because of that lack of understanding, recent police events throughout the U.S. and the desires of the PCCEP leadership, their almost exclusive focus has been on racial justice issues excluding any interest on police involvement with people with or perceived with mental illness. During 2021, there were several officer involved shootings by the PPB resulting in the death of mentally ill individuals in Portland and there was no mention of this in subsequent PCCEP meetings.

In short, PCCEP has failed to meet its stated goal of providing community engagement with the Police Bureau regarding this settlement agreement.

2. BHUAC

The PPB's Behavioral Health Unit Advisory Committee (BHUAC) has failed to allow community engagement. A fundamental tenet of this Settlement Agreement is the inter-dependency of community trust with safety and constitutional policing. In particular, the parties to the Settlement Agreement made clear that:

> *The Parties further recognize that the ability of police officers to protect themselves and the community they serve is largely dependent on the quality of the relationship they have with that community. Public and officer safety, constitutional policing, and the community's trust in its police force are, thus, interdependent.[14]*

A primary goal for BHUAC is to facilitate PPB's successful interactions with mental health consumers.[15] The BHUAC has failed to adhere to "Nothing about us without us" in terms of people with or perceived with mental illness. Presently, the BHUAC posts its Agendas and Minutes for meetings.[16]  Recently, they have hosted one public informational meeting as part of BHUAC's transparency and community engagement plan.[17] We laud the efforts of the BHUAC, but note that these public meetings are separate from the BHUAC meetings and, therefore, do not allow any listening or being listened to on the present BHUAC topics.  Moreover, the first out of a total of 2 such meetings thus far appeared to not welcome or even entertain the public's request to be allowed to participate in the regular BHUAC meetings. The community interest in

---

[14] Settlement Agreement Introduction, p. 4.
[15] See Settlement Agreement, paragraph #91, in part "In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB.
[16] DRO successfully advocated for this posting, as the BHUAC was not doing this in the 1st months.
[17] See as Exhibit #1, Letter from BHUAC to MHA (12/27/19).

having BHUAC open to the public was not taken seriously—no real dialogue was allowed. For meaningful community engagement, there must be allowance for listening and being heard. The second such meeting adhered to this same approach of BHUAC being the speaker and anyone else being solely listeners.

The Behavioral Health Unit (BHU) appears to be doing effective work in its interactions with people with or perceived with mental illness; this strengthens the need for communication with the community. Given that this is relevant work that appears effective, the community should be able to find out about what's happening. The BHU could be strengthened through input by people in the community who are not represented by any Member of the BHUAC. By not allowing inclusion, the BHUAC does not add to community trust and resiliency.

**C. Lethal Force: Robert Delgado, Michael Townsend, and Joshua Merritt**

On the morning of April 16th, 2021, a Portland Police officer shot and killed Robert Delgado in Lents Park.[18] According to witnesses and video of the incident, the officer who shot Mr. Delgado was standing 90 feet away, concealed behind a tree. Officers waited six minutes after the shooting to approach Mr. Delgado and confirm his death, and are reported to have shot him at least once with a nonlethal round approximately four minutes after the initial shooting as he lay on the ground either dying or dead.[19] The Portland Police Bureau responded to protesters who gathered at the site of the shooting with riot police.[20]

---

[18] Jason Wilson, *Portland police killed a homeless man. Now the city faces tough questions*, The Guardian (April 24, 2021), available at www.theguardian.com/us-news/2021/apr/24/portland-police-killing-homeless-man-robert-delgado.

[19] Suzette Smith and Justin Yau, *David Hernandez Filmed Portland Police Fatally Shoot Robert Delgado in Lents Park: "It Was Horrifying"*, Willamette Week (April 18, 2021), available at https://www.wweek.com/news/courts/2021/04/19/david-hernandez-filmed-portland-police-fatally-shoot-robert-delgado-in-lents-park-it-was-horrifying/.

[20] Maxine Bernstein, *Portland police fatally shoot man in Lents Park*, The Oregonian (April 17, 2021), available at https://www.oregonlive.com/portland/2021/04/officers-responding-to-police-shooting-in-se-portland-park.html.

On the evening of June 24th, 2021, a Portland Police officer shot and killed Michael Townsend in the Lloyd District. It has been reported that the shooting was the result of a welfare check initiated by Mr. Townsend himself, who called 911 for help when he was feeling suicidal.[21] The Portland Police Bureau responded to protesters who gathered at the site of the shooting with riot police.[22]

It has since been reported that both Mr. Delgado and Mr. Townsend had sought mental health services in the time leading up to their deaths.[23] It is worth repeating that: of the people who have been killed by the Portland Police Bureau in 2021, one hundred percent of them were people with mental illness who were reported to be in an active mental health crisis at the time that they were shot and killed.

In another incident, Joshua Lyle Merritt, another man who was reported to be in a mental health crisis, was shot and injured on July 20th.[24] The officer who shot him, Craig Lehman, had previously been pulled from the city's now-defunct crowd control unit after allegedly violating a federal injunction around use of force.[25] It is clear that the same police force that so overwhelmingly failed to monitor and regulate its own use of force during the 2020 protests is similarly ill-equipped to handle individual interactions with citizens in mental health crisis.

**D. Portland Street Response**

---

[21] Jonathan Levinson, *Man killed by Portland police called 911 himself, seeking mental health care*, Oregon Public Broadcasting (June 28, 2021), available at https://www.opb.org/article/2021/06/28/man-killed-by-portland-police-called-911-himself-seeking-mental-health-care/.

[22] Justin Yau and Sophie Peel, *Police Shoot and Kill Man in Lloyd District Thursday Night, Police and Protestors Spar in Aftermath*, Willamette Week (June 25, 2021), available at https://www.wweek.com/news/city/2021/06/25/police-shoot-and-kill-man-in-lloyd-district-thursday-night-police-and-protestors-spar-in-aftermath/.

[23] Levinson, *Man killed by Portland police called 911 himself, seeking mental health care*, Oregon Public Broadcasting (June 28, 2021).

[24] Jonathan Levinson, *Portland police officer shoots, injures man north of downtown*, Oregon Public Broadcasting (July 21, 2021), available at https://www.opb.org/article/2021/07/21/portland-police-officer-shoots-man/.

[25] Rebecca Ellis, *Portland agrees to remove 2 officers from public-facing policing duty*, Oregon Public Broadcasting (December 9, 2020), available at https://www.opb.org/article/2020/12/09/portland-agrees-to-remove-two-officers-from-public-facing-policing-duty/.

While the City lauds its own efforts to create an alternative to the Portland Police Bureau, this belies that the City council has refused to adequately fund it.[26] The Portland Police continue to respond to people in day-to-day mental health crisis with force, often deadly force.

What people with mental illness do need when they are in crisis is a program like Portland Street Response.[27] It has become clear that the city is either unable or unwilling to commit on its own to a plan to give people with mental illness a more compassionate and appropriate response.

We therefore ask that the court and the Department of Justice require as part of this agreement a concrete plan and budgetary commitment from the city to expand the Portland Street Response to a citywide, 24/7 crisis response program. If the city wants to convince us that PSR is the solution to their failings in this settlement agreement, we want to see dates and numbers, and we want to know that the city is going to be held to them.

**E. Remedies to Bring the City Back into Compliance**

On July 13, 2021, the DOJ met with city officials, city attorneys, and PPB leadership to present nine suggested remedies for the City's non-compliance with the settlement agreement. On July 15, 2021, parties and the members of the public discussed these remedies at a Portland Committee on Community Engaged Policing meeting--MHA members were present at this meeting.

MHA offers suggestions and our availability to participate in further developing these remedies and defining metrics for adequate compliance. Below are the remedies we endorse, as

---

[26] Rebecca Ellis, *$5.7 billion city budget does not fully fund Portland Street Response*, Oregon Public Broadcasting (May 13, 2021), available at https://www.opb.org/article/2021/05/13/portland-street-response-city-budget-funding/.
[27] The original settlement agreement recognized the necessity of a robust crisis response program, stating in section VI "The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises… Despite critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force."

well as additional comments and suggestions. Some subject headings contain the entire substance of MHA's comment. Others include more.

**1. MHA agrees that the City should revise Force Data Collection Report (FDCR) and After-Action Review (AAR) forms to better capture information to show required timeliness of completion and review.**

**2. MHA Does Not Oppose an Independent Assessment from a Qualified Outside Entity**

The DOJ proposed that the City contract with a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report that includes recommendations to which the City will publicly respond. MHA does not oppose an independent assessment, but asks that parties consider that there is already an abundance of documentation from the PPB's own records, community accounts, and news media. If money is invested in this kind of project, parties should avoid inefficiency and redundancy, and ensure that clear guidelines are established for how the City is to respond to the findings and recommendations in the report.

There were thousands of people injured by PPB in 2020, including those who are homeless and unsheltered living in the downtown area. Those present at the protests, either as participants, observers, or simply due to proximity to the justice center, were frequently subjected to chemical agents, projectiles, and other uses of force. Those not directly injured often had to witness heightened, sometimes indiscriminate, uses of force. This text could survey various communities to assess how the police response to protests impacted their trust and willingness to call the police and other emergency services when in need, and how police use of force impacted their health.

Parties should take care to establish clear guidelines for how the City is to respond to the findings and recommendations in this report. The DOJ suggested that the City create a "needs

assessment" for crowd control training that "adequately addresses" problems identified by the report. We ask that parties clearly define adequacy. We ask that the parties confer and collaborate with amici to establish definitions and metrics to most effectively measure compliance with this remedy.

### 3. MHA agrees that the City should not rely on overtime to pay for required annual training

The Portland Police Bureau should ensure planning and organization for required annual training such that no over-time is triggered. The Portland Police Bureau has dozens of ancillary programs included in their budget. Funds to add new programming should be used to fund required annual training rather than additionally taxing citizens.

### 4. MHA agrees that the PPB's Training Division Needs to Make Significant Changes to Better Ensure their Vital Role in PPB Field Performance

MHA agrees that improving the dissemination, supervision and oversight from PPB training is essential to better outcomes.  Hiring a civilian trainer, such as long-term PPB non-officer employer Liesbeth Gerritsen, is a valid idea so long as that person has the authority to criticize and reprimand non-compliant officers. MHA wants information as to how this new civilian hire is anticipated to provide any different results from that of Dr. Gerritsen, who has spearheaded the Crisis Intervention Team training for PPB. What will be different in terms of their authority, ability to discipline officers, role?

Whether the head of the Training division comes from a law enforcement background or is a civilian is not as important as implementing research-driven strategies to ensure officers receive effective education. Officers should be evaluated and tested throughout training in order to pass. It is also imperative that officers diligently participate in the training and face consequences for violating policies after they have been trained. Consequences should be

proportionate to the non-compliance; this can range from required re-training, other HR

consequences, to criminal prosecution.

**5. MHA Agrees that the City should Identify and Hold Accountable Rapid Response Lieutenants and Above who Approved Force without Adequate Justification During the 2020 Protests**

If inappropriately approved force resulted in assault, prosecution should be considered.

We also recommend that review not be limited to RRT lieutenants.

**6. MHA Agrees that if the City's Proposal for Addressing Timeliness and Quality of Investigations and Effective Discipline is the Implementation of the New Voter-approved Community Police Oversight Board, the City should Propose Amendments to the Agreement within 90 days and Formulate a Plan for an Orderly Transition to and Full Implementation of the Board.**

The court should maintain jurisdiction to ensure that any plan is implemented.

**7. MHA agrees that the City should issue its 2020 annual report and hold the required meetings before the end of summer 2021, and do the same in 2022 and any future years during which the Agreement is still in effect.**

**8. Body Worn Cameras**

If parties agree to implement a Body Worn Cameras (BWC) program as a remedy for the

City's lack of substantial compliance, or if this Court were to order the implementation of BWC

as a remedy, MHA has recommendations for the implementation that include, but are not limited

to, those below. A BWC program should not be implemented unless and until the crucial policies

and directives can be fully vetted so that the implementation is aimed solely at decreasing

unconstitutional use of force and increasing accountability and transparency, and, thus,

increasing community trust in, engagement with, and safety from the police. The success of a

BWC program to depends on the policies implemented and the enforcement of those policies.

Especially where the implementation is a remedy for ongoing policing problems, the policies of

a BWC program must be aimed solely at increasing police oversight, accountability, and

transparency and not as an implementation to aid PPB in law enforcement investigations against members of the public.

Because the aim is to remedy PPB failures in accountability and use of force, the BWC footage must remain in the custody of the developing police oversight body or a contracted and neutral third party and must remain outside the possession of PPB. If cameras are implemented prior to the oversight body, footage must remain in custody of an independent body. A body camera recording of an incident should not be available for review by anyone prior to an initial police report being filed. Reports can be amended but the initial report should remain as a finished report. Neither officers, commanders, nor administrative PPB staff should have administrative access to the recordings except to review use of force reports and complaints against PPB members. All access to recordings for force and complaint review must be tracked and evaluated for proper review compliance. All other access must require written requests by PPB to the independent recording-controlling body.

Moreover, there must be clear policies regarding when BWC must be activated to record police interactions with members of the public. And those policies must be strictly and consistently enforced, or the program cannot be effective. Widespread failures of BWC programs across the country are often the result of officers not having their cameras on when they should and not being held accountable for not having them on.[28] For example, the Atlanta Police

---

[28] The following are just a few of the many stories of BWC failures across the country: *See e.g.*, NBC 5 Chicago, *Chicago Police Officers Who Turns Off Body Camera or Cover Badge Will be Stripped of Powers: Lightfoot*, June 5, 2020, available at https://www.nbcchicago.com/news/local/chicago-police-officers-who-turn-off-body-camera-or-cover-badge-will-be-stripped-of-powers-lightfoot/2285375/; Jeff Coltin, *How NYPD officers are blocking accountability. Covered badge numbers, body cameras turned off and a state law to impede transparency*, City & State New York (June 5, 2020), available at https://www.cityandstateny.com/articles/policy/criminal-justice/how-nypd-officers-are-blocking-accountability.html; Chad Marlow, *Is Your City Destined To Be The Next Charlotte? A Hard Lesson In Police Body Camera Policies*, American Civil Liberties Union (October 4, 2016), available at https://www.aclu.org/blog/privacy-technology/surveillance-technologies/your-city-destined-be-next-charlotte-hard-lesson/; Jay Stanley, *Police Body Cameras: The Lessons of Albuquerque*, American Civil Liberties Union (March 24, 2015), available at https://www.aclu.org/blog/police-body-cameras-lessons-albuquerque.

Department implemented body-worn cameras in part to improve the transparency and accountability of interactions between citizens and law enforcement. The City Auditor's Office did an audit to assess whether officers were using the BWC in line with department policy. The report was released in 2018, showing that officers only captured video for 33% of officer-dispatched calls, and that officers delayed activation or prematurely deactivated their BWC in many interactions. Furthermore, the report found that compliance staff were not reviewing videos as required to monitor compliance with policy and proper management of videos. As a result of this study, the Atlanta Auditor's office offered recommendations, including that the BWC policy be clarified, and that supervisors review audit trails to ensure involved officers have not accessed videos of use-of-force incidents.

Because most people arrested by the Portland Police Bureau are persons with a history of mental illness, addiction, and/or alcoholism, the Mental Health Alliance has a great interest in their civil rights, privacy, and dignity. The use of BWC raises many serious privacy concerns, particularly regarding recording people during non-criminal police interactions. Restricting police access to recordings and use to review use of force reports and complaints against officers would ease many of those concerns. Additionally, policies must not allow, and likely cannot allow under state law, police to be able to film and store BWC footage at protests, for example, for use to find criminal activity later. Again, BWC will not be implemented in Portland as a law enforcement tool; it would be a program to remedy City failures to police constitutionally. PPB must not have the discretion to release body camera footage. Clear policies must regulate the release of recordings, and that duty must be one carried out by the new police oversight body or other body external to PPB and the PPB command. Any BWC policy must remain focused on a

program aimed at being an accountability tool and must not allow for the footage to be used as propaganda for PPB to show the public what it chooses to show the public.

**F. Additional Remedies**

In addition to the above remedies, MHA presents recommendations specific to reducing use of force against people with mental illness.

**1. Preventing Harm: Strategies to Reduce Use of Force against People with Mental Illnesses**

**a. The City must take adequate measures to reduce contact between the police and people with mental illness**

The most certain way to prevent adverse interactions between the police and those with mental illnesses is to avoid the interactions altogether. The most recent fatal police shooting in Portland resulted from a welfare check. It has long been recognized by people who are frequently policed, by advocates and professionals, and by city officials, that we need robust alternatives to the police to prevent unnecessary arrest, injury, or death to those needing and seeking care.

Police training and specialized divisions have long been discussed and implemented, but we have yet to see adequate improvement and still face complicated questions as to how to improve and measure the efficacy of training programs.

The City has historically been greatly resistant to the idea that they are at all responsible for improving available mental health and addictions services and resources. However, the goal of reducing unconstitutional use of force against people with mental illnesses and developing community trust in law enforcement requires the development of these services and alternatives to policing.

We recommend that the City—not CareOregon—should aggressively pursue the re-opening of the sobering center. Additionally, the City would expand the Portland Street Response (PSR) so that it serves the entire city at a level comparable to CAHOOTS in Eugene.

The City Council recently adopted a $5.7 billion dollar budget that does not fully fund the PSR. City Council has recognized the need for alternative emergency response for mental health calls. The community has shown overwhelming support for PSR. This is a straightforward, community-supported, and likely life-saving solution.

In addition to expanding PSR, the City should create an integrated alternatives-to-policing plan that incorporates the work of Portland Street Medicine, Project Respond, and other currently operating programs

**b. The City and PPB should take measures to include people with mental illness in policy discussions and program development**
"Nothing about us without us" is a modality that not only allows for self-determination for people with mental illness but also informs the discussion in a meaningful way.

**c. The City and PPB should develop a recruitment plan so that PPB better represents and serves historically overpoliced communities**
PPB should recruit new officers from college and university programs that teach strong social and communication skills with a pledge to hire 18 months prior to graduation. The City and PPB must ensure that hiring policies for the police force heavily weights and matches community cultures and values.

**d. The City must fully fund one or more drop-off/walk-in centers such as the recently defunded sobering center or help fund the Multnomah County center already in development**
This proposal asks that the City truly comply with items 89 and 90 in the settlement agreement, discussed in the next section.

**G. Commitments Never Fulfilled: Community Mental Health Care**

After the 2012 hearing in this court, after the document was introduced to the citizens of Portland as fair, reasonable and adequate, the US attorney for Oregon began to refer to Paragraph 89 of this Settlement Agreement as "aspirational"—in other words, not intended for enforcement. Other attorneys attached to this agreement—such the former city attorney— recognizing the Plaintiff did not intend to enforce this item, also started to refer to this paragraph as aspirational.

The word "aspirational" does not appear in the settlement agreement. There are no other "aspirational" items in the agreement. No alternative or amendment has been proposed by either party. The parties are just not going to fulfill this item of the agreement and will assume the court will overlook it.

As this group has presented to the Court in previous status hearings, as of August 2021 no work has been done on Paragraph 89.

The parties to this agreement continue to assert that there is a walk-in/drop-off center operating in Portland, and that center is Unity Center for Behavioral Health. Unity Center is a psychiatric emergency hospital—not a walk-in and drop-off center. In the past, we have given the Court a letter from Dr. Jeffrey Eisen of Cascadia Behavioral Healthcare defining walk in and drop off centers. We are now also giving the Court a letter from Melissa Eckstein, the administrator of Unity describing what Unity is and does.

A couple of months ago our group had a chance to talk with one of the authors of the agreement. She told us that as the document was signed, her impression and that of her colleagues was that the city would negotiate a contract with the CCO to provide the service. We did a public records search for all correspondence between the city and either CareOregon or Healthshare and there is no record of any correspondence about the settlement agreement or

development of a walk in and drop off center. We spoke with the behavioral health administrator of CareOregon last week and she affirmed no discussion on this—or any other item in the SA— has occurred between the city and the CCO organizations.

Our recommendation is if the parties insist black is white the court should intervene and defend the original agreement to be implemented as intended by the authors and as presented to the court. Paragraph 89 should be implemented in full before this agreement is closed, or the parties should offer an equal alternative to take its place.

Paragraph 90 is also complex, expensive and impactful. Like Paragraph 89, no work has been done to achieve sub-items B, C, E, F or G. No one has described item 90 as "aspirational" but the same evasion has occurred. Again, this item was presented in the first hearing on this agreement as part of compensation for the pattern and practice of harm against people with mental illness by the PPB, and the Court has accepted that it has been complied with by the city. We disagree. There has been no substantial effort by the City to complete item 90. Again, as with Paragraph 89, the *amicus* recommend to the Court that it benefits the City, and people with mental illness, and our sense of justice, that the parties be ordered to comply with these paragraphs.

## V. CONCLUSION

We are grateful for the Court's time and consideration of these issues. For the Portland community—and certainly for the constituents of the Mental Health Alliance—we ask that this Court continues to monitor and where appropriate order the Defendant to cure its pattern and practice of excessive force against person experiencing mental illness.

Lastly, MHA would like to acknowledge and honor the memory of Dr. T. Allen Bethel, of the Albina Ministerial Alliance Coalition, who passed away since our last hearing. We will miss his vigorous advocacy for Portlanders. May he Rest in Power.

Dated this 23rd day of August, 2021.

Respectfully submitted,

_s/       Juan Chavez_
**Juan C. Chavez**, OSB No. 136428
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center
**Attorneys for Amicus Mental Health Alliance**