**Juan C. Chavez**, OSB #136428
**Franz H. Bruggemeier**, OSB #163533
Oregon Justice Resource Center
Email: jchavez@ojrc.info
PO Box 5748
Portland, OR 97208
Telephone: 503-944-2270 ext. 212
Facsimile: 971-275-1839

Attorney for *Amicus Curiae* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF PORTLAND,<br><br>Defendant. | Case No. 3:12-cv-02265-SI<br><br>DECLARATION OF JUAN C. CHAVEZ |

I, Juan C. Chavez, submit the following declaration:

I am the counsel of record for the Mental Health Alliance, and I make this declaration in support of the Mental Health Alliance's August 2021 Status Report for the purpose of identifying exhibits. My statements are true to the best of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

1. **Exhibit 1** is the written testimony of Jason Renaud.

2. **Exhibit 2** is a letter drafted by Dr. Jeffrey Eisen, of Cascadia Behavioral Health.

3. **Exhibit 3** is a compilation of email correspondence between Jason Renaud and City Attorney Tracy Reeve regarding PCCEP metrics.

4. **Exhibit 4** is a compilation of notes taken by Jason Renaud for the purposes of chronicling MHA's attempts at working with the City regarding the PCCEP metrics.

5. **Exhibit 5** is a letter from Melissa Eckstein, President of the Unity Center for Behavioral Health.

6. **Exhibit 6** is the written testimony of Rochelle Silver, MHA member.

7. **Exhibit 7** is the written testimony of Jan Friedman, staff attorney with Disability Rights Oregon, regarding the BHUAC.

**I hereby declare that above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: August 23, 2021.

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
*LEAD ATTORNEY*

# Statement by Jason Renaud

Mental Health Alliance
August 24, 2021

**PCCEP**

- Evidence - Measurable Objectives created by the AMAC and the MHA

I am Jason Renaud. I am here representing the consensus of the 18 active members and four organizations of the Mental Health Alliance.

At the end of the February 2020 status conference the court took the late Reverend Bethel's suggestion and gave instruction to the parties and to the amicus. The instruction, on page 205 of the conference transcript, was for the parties and amici to confer to find a set of metrics by which the PCCEP could be determined to be functional or not functional.

To fulfill this instruction, the AMAC and MHA sent a draft of measurable objectives - metrics - to the parties in early April and which is in the hands of the court now.

The metrics created by the amici ask for considerable additional effort on the part of PCCEP staff to actively communicate with organizations which represent people of color and people with mental illness. It asks for additional community surveys, that meeting notices be posted in a timely way, that attendees reflect the community and not be dominated by PPB staff, that there be a training curriculum for new members, a retention plan for continuing members, and an exit interview for members who leave. There are other items as well - to be accomplished by staff, not PCCEP members.

The parties, the amici, members of the PCCEP, and PCCEP staff met July 21 to review the proposed metrics document. The city attorney seemed unfamiliar with the court's instruction from February and with the document created by the amici sent to them in April and declined to support the metrics document.

Seeking adoption by vote from the PCCEP members, AMAC and MHA met with PCCEP members twice in August to review the metrics document.

PCCEP co-chair Elliott Young worked individually with several PCCEP members to make modifications to the metrics document, which he presented at their general meeting.

PCCEP members did not vote to accept or reject the metrics as presented by Young, but instead **voted to not vote** on whether to accept or reject the metrics. And today there are no objective measurements for the PCCEP, and no plans to discuss them.

The AMAC and MHA reached out and had a meeting with the PCCEP staff. Staff said they could not "make" the PCCEP members do anything, such as read the settlement agreement or

have objective measurements. Feeling the court's instruction was unheard or misunderstood by the PCCEP staff, the MHA tried to meet with the mayor's liaison to the PCCEP. She declined to meet saying she was unprepared to talk about the PCCEP and would want her attorney present to talk with us. We were then told that Dr. Markisha Smith is the supervisor of the PCCEP staff. We met with her this Spring and she listened to the problem but told us she planned to delegate supervision of the PCCEP staff to a deputy who we then could not contact because he lives in Africa.

On August 9 the MHA met with Sam Adams of the mayor's office who identified that he was newly tasked with managing the PCCEP. He was not aware of the need for objective measurement and had not yet met with members of the PCCEP, attended a meeting, or met with PCCEP staff.

So we are unable to discover who supervises the PCCEP staff, and frankly we think they have been without an engaged supervisor for at least a couple of years. In short 16 months after this court asked for objective measures for the PCCEP to be defined by the City, no measures are in place and we cannot determine if the committee is functional.

The Mental Health Alliance suggests that amending the settlement agreement at this time to include the PCCEP is premature. Instead the city should set a firm schedule to amend the PCCEP Plan to include satisfactory outcome measures to both parties and the court, and have engaged and capable supervision for PCCEP staff prior to re-considering an amendment to the agreement.

**Items 89 & 90**

Evidence - Letter from Jeffrey Eisen, MD of Cascadia Behavioral Healthcare
Evidence - Letter from Melissa Eckstein of the Unity Center

I am here today to talk about two items in the settlement agreement, to talk about their characterization and their current developmental status, and to recommend a future course of action for the parties and for the court.

Item 89 of the agreement called for the immediate development - in mid-2013 - of walk in drop off centers. These sorts of facilities are common all over the country, operated by nonprofit agencies but paid for by cities and counties which have an accumulation of people in crisis and the foresight to provide a non-medical low barrier sanctuary as somewhere for people to go, or be taken, as an alternative to arrest and jail or an emergency room.

There is urgency to item 89. The intention of the agreement was these facilities would be opened by the middle of 2013. This is one of the few - perhaps the only - item in the agreement which demanded immediate action. Parties first met about this agreement in this court in 2012, and an agreement signed by city council in November 2013. Those of us who were listening then understood the parties agreed to accomplish item 89 quickly - not slowly, and certainly not to do nothing.

2

After the 2012 hearing in this court, after the document was introduced to the citizens of Portland as fair, reasonable and adequate, the US attorney for Oregon began to refer to Item 89 as "aspirational" by which she meant she did not intend to enforce the item. Other attorneys attached to this agreement - such the former city attorney - recognizing the US DOJ did not intend to enforce this item, also started to refer to item 89 as aspirational. They said things like, "oh we don't have to discuss this because it's aspirational - we're not going to do it."

The word "aspirational" does not appear in the settlement agreement. There are no other "aspirational" items in the agreement. No alternative or amendment has been proposed by either party. The parties are just not going to fulfill this item of the agreement and will assume the court will overlook it.

I've brought to the court's attention in prior years the fact that no development has been made on item 89, perhaps the most expensive and complex and impactful item in the agreement. But I bring it to the court's attention again. As of August 2021 no work has been done on item 89.

The COCL makes two mistakes in their comment on item 89. The first is that Unity Center is a walk in / drop off center. It's not. The second is to imply the PPB is party to this agreement and not the city, and that all the PPB can do is follow the direction of an agency which is not a party to the agreement. That allows the city to evade its responsibility. The city maintains hundreds of negotiated contracts to meet political, legal, and contractual obligations. Item 89 should be one of those contracts.

Unity Center is a psychiatric emergency hospital, not a walk in and drop off center. We've given the court a letter from Dr. Jeffrey Eisen of Cascadia Behavioral Healthcare defining walk in and drop off centers. We've also given the court a letter from Melissa Eckstein, the administrator of Unity describing what Unity is and does. Since this agreement was signed, Clark County, Clackamas and Washington counties have each opened their own walk in and drop off centers.

A couple of months ago our group had a chance to talk with one of the authors of the agreement. She told us that as the document was signed, her impression and that of her colleagues was that the city would negotiate a contract with the CCO to provide the service. We did a public records search for all correspondence between the city and either CareOregon or Healthshare and there is no record of any correspondence about the settlement agreement or development of a walk in and drop off center. I spoke with the behavioral health administrator of CareOregon last week and she affirmed no discussion on this - or any other item in the SA - has occurred between the city and the CCO organizations.

Our recommendation is if the parties insist black is white the court should intervene and defend the original agreement to be implemented as intended by the authors and as presented to the court. Item 89 should be implemented in full before this agreement is closed, or the parties should offer an equal alternative to take its place. My colleague KC Lewis of Disability Rights

Oregon will discuss an example of an equal alternative - full implementation of Portland Street Response.

Now briefly - Item 90 is also complex, expensive and impactful, and like item 89 no work has been done to achieve sub-items B, C, E, F or G. The COCL again asserts that the PPB is the party to the agreement and not the city and fails to hold the city responsible for work on the several parts and pieces to this item. No one has described item 90 as "aspirational" but the same evasion has occurred. Again this item was presented in the first hearing on this agreement as part of compensation for the pattern and practice of harm against people with mental illness by the PPB, and the court has accepted that it has been complied with by the city. We disagree. There has been no substantial effort by the city to complete item 90. Again, as with Item 89, the amici recommend to the court that it benefits the city, and people with mental illness, and our sense of justice, that if the parties somehow come to an agree that black is white that the court give instruction to the parties to implement item 90 or provide an equal alternative as an amendment to the agreement.

**CASCADIA BEHAVIORAL HEALTHCARE**
**WHOLE HEALTH CARE™**

CASCADIA ADMINISTRATIVE SERVICES
847 NE 19th Ave., Suite 100
Portland, OR 97207
PHONE: 503.238.0769, FAX: 503.764.9059 | CASCADIABHC.ORG

From:   Cascadia Behavioral Healthcare – Derald Walker, PhD, Chief Executive Officer; Jeffrey Eisen, MD, Chief Medical Officer – on behalf of Mental Health Alliance of Portland

Date:   February 14, 2019

Re:     Community-Based Mental Health Services, Item 88, as outlined in *United States of America v. City of Portland*, Case No. 3:12-cv-02265-SI (2012)

As part of the Department of Justice (DOJ) Settlement as outlined in *United Sates of America v. City of Portland*, Case No. 3:12-cv-02265-SI (2012), Item 88 documents the establishment of drop-off and walk-in center(s) for individuals with behavioral health or substance use disorder concerns. This reads as follows:

*ITEM 88. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus on plans on appropriate discharge and community based treatment options, include assertive community treatment teams, rather than unnecessary hospitalization.*

As one of the largest providers of behavioral health and substance use disorder treatment services in the state of Oregon, Cascadia Behavioral Healthcare has clinical and operational expertise with regard to such programs and treatment modalities. As such, this letter serves to provide advisement on the development of the drop off/walk in model described in Item 88.

In conducting research for this guidance, we additionally gathered data from HealthShare of Oregon and the Multnomah County Mental Health and Substance Abuse Division (MHASD).

An effective and efficient drop off / walk in services is designed to provide:
- *Client-centered, trauma-informed care* that is based upon the urgent or emergent concern identified at the time of arrival to such location;
- *Resources for follow-up care and support* in the community, including geographic *proximity to a mental health shelter* or other service that might immediately meet client needs;
- *Peer support* – individuals with mental health and/or substance use disorder lived experiences who are trained to provide engagement and assistance – as well as *access to mental health and substance use providers* for matters of greater acuity and emergency;
- *Culturally relevant and specific* support and resources reflective of those that utilize the service;
- Opportunities to address *basic living needs* at the time of visit, including such services as restrooms, showers, laundry, light meal/food, and phone chargers.
- *Diversion* from emergency departments and the criminal justice system, including jails;
- Support for *police drop-off and individual or referred walk-in* methods of arrival;
- *24 hours per day, 7 days per week* operations to meet the needs of the community at any time;
- *Access* regardless of insurance or ability to pay, with a funding source *not dependent upon Medicaid* alone.

**CASCADIA** BEHAVIORAL HEALTHCARE
WHOLE HEALTH CARE™

CASCADIA ADMINISTRATIVE SERVICES
847 NE 19th Ave., Suite 100
Portland, OR 97207
PHONE: 503.238.0769, FAX: 503.764.9059 | CASCADIABHC.ORG

This type of service has the potential to provide great support to individuals with behavioral health and and/or substance use disorder concerns, as well as to the broader community. We offer continued advisement to the City of Portland as plans related to Item 88 develop further.

Respectfully submitted,

Derald Walker, PhD
Chief Executive Officer

Jeffrey Eisen, MD
Chief Medical Officer

**Correspondence about the Objective Measurements of the PCCEP
Between city attorney Tracy Reeve and AMAC and MHA**

July 31 email from Tracy Reeve, city attorney

Thank you for your email, and thank you to all the amici for organizing our call this past Monday.  We appreciate the continued engagement and we were under the impression that we made good progress on our call, which we understood to be a forum for a back and forth discussion.

Accordingly, I was extremely surprised by the following statement:

> "Based on what we heard, the amici have deep concerns regarding the City's reluctance to move forward on staffing for community outreach, the lack of a comprehensive plan for exit interviews of PCCEP members, and the failure to follow up on the baseline community surveys annually to measure progress. Further, we have concerns about the lack of commitment to finalize PCCEP metrics that will show whether the settlement agreement is fair, adequate and reasonable."

I believe the City demonstrated its willingness to engage on all of these topics and to continue to actively work to reach agreement on them.  I disagree that the City displayed "reluctance" about a community organizer.  In fact, the City did not reject ANY options but did note that given the current budgetary constraints that the City is facing (a $75 million shortfall) and the fact that the PCCEP budget (unlike almost all other City budgets), was held harmless and left fully intact for the 20-21 fiscal year, it is simply not feasible to add an additional staff member to do community organizing at this particular moment.  In addition, right now PCCEP is meeting by Zoom and the City intends to continue teleworking/virtual meetings through 2020 so it does not appear to be a practical time to add a community organizer.  In any event, the City remains very open to considering the addition of a community organizer when it is economically feasible to do so and when PCCEP believes it would be useful.

The City is also very willing to conducting exit interviews (or, willing to have the AMAC conduct them, as was suggested).  We were not under the impression that there was supposed to be a comprehensive plan at this juncture - for this or any of the proposals.

With regard to community surveys, it is not the the City's position that they should not be undertaken.  Rather, we believe PCCEP should determine whether and when it is worthwhile to conduct future surveys. My recollection is that there was considerable frustration over the last DHM survey and the fact that PCCEP did not have much ability

to affect the methodology, since it was a series of surveys that needed to maintain consistency.  It also appeared to have low utility for PCCEP in terms of gaining actionable information.  We did not intend to communicate an unwillingness to conduct surveys, but we do feel strongly that PCCEP should be the ones to determine when it would be necessary, appropriate or useful to conduct further surveys.

I also want to note that the amici specifically requested that the PCCEP members not attend the last meeting.  The City had felt it appropriate to involve PCCEP members in these meetings so that the membership, as the involved body, could more directly respond to these requests and assert their intentions as to the work they intend to do and the methodology they intend to apply.  We were pleased to honor amici's request that the last call be limited to the parties and amici, and we are very eager to finalize the PCCEP metrics.  Having said that, we strongly believe that PCCEP has to be engaged in the conversation to reach any conclusions since they are the ones doing the bulk of the work. The conversation is incomplete without them and the City cannot finalize any metrics without them.

We will accordingly be working with PCCEP directly to develop our written response to the proposed metrics.  Accordingly, we cannot commit to an August 14 deadline for our response, as we want to ensure that PCCEP can consider and respond to the recommendations and we can incorporate that into the City response.  We commit to doing that as soon as possible, and in any event by the end of August.

Finally, as you know, it is the City's position that the proposed metrics fall outside of the scope of Section IX of the Settlement Agreement, and go to the long term functioning of the PCCEP beyond the life of the Settlement Agreement.  Accordingly, it is the City's legal position that, while important to the future functioning of PCCEP, they are not relevant to the determination of whether the terms of the SA are fair, adequate, and reasonable.

Again, thank you to AMAC, MHA and their counsel for a productive meeting.  We are extremely grateful for the collaboration, historical expertise and dedication of the amici as we all work toward a more just, community centered public safety system that meets the needs of all community members.  We believe all of the work done to date to achieve substantial compliance with the Settlement Agreement provides a better foundation for the very substantial additional work now underway to begin to reckon with and finally address our country's, state's and city's history of systemic racism.

Warm regards,

+++++

From the February 2020 Status Hearing Transcript, page 205
http://www.mentalhealthalliance.org/wp-content/uploads/2020/04/20200225-Hearing-Transcript.pdf

THE COURT: That's a fair question, and I would say this: Confer with each other. If the City; the intervenor,Portland Police Association; the amicus curie, Mental HealthAlliance; the amicus curie, AMAC; and the United States -- if those five parties all agree on either how to define what are the requirements or the metrics to find the proposed amendment,fair, adequate, and reasonable, I really cannot imagine disagreeing with the five of you.If you all agree that -- even if you can't agree on those metrics and the definition, if you all agree that sustained substantial compliance has been achieved, it would be my expectation and anticipation that I would then give final approval both to the amendment and to any motion to terminate the litigation if you all agree. That is scenario one.Under scenario two, if there's disagreement, then whoever disagrees -- I mean, assuming that the United States makes the motion that there's been sustained substantial compliance and that the -- if the amendments should be given final approval and the litigation dismissed, I think the burden will then be on anybody objecting to that to give me the legal basis for what, if anything, I should do and how I should do it and what would be the right answer. And whether or not there's facts indispute, we, then, would probably have to schedule an evidentiary hearing. If there's no facts in dispute but just legal consequences, that would probably be handled summary judgment style. But that's as good as I can get it right now.So you raise a fair question, but raise it with the amici,with the intervenor, and with the United States, to see if you can all agree on what sustained substantial compliance,including with the proposed amendments, would look like.That's as good as it's going to get.

**Describing the Metrics Process**
**Mental Health Alliance**
**As of August 12 2021**

At the end of the February 2020 status conference on *US DOJ v City of Portland* Judge Simon took Reverend Bethel's suggestion and gave some instruction to the parties and to the amicus. The instruction, on page 205 of the status conference transcript (see excerpt below), was the parties and amici confer to find a set of metric by which the PCCEP could be determined to be function or not function.

To fulfill this instruction, the AMAC and MHA worked independently on metrics for the PCCEP and then met in March to consolidate their thinking, which produced a "metrics" document (attached), which was sent to the parties in early April.

The metrics created by the amici ask for considerable additional effort on the part of PCCEP staff to aggressively communicate with organizations which represent people of color and people with mental illness and addiction in the Portland area. It asks for additional community surveys, that meeting notices be posted in a timely way, that attendees reflect the community and not be dominated by PPB staff, that there be a training curriculum for new members, a retention plan for continuing members, and an exit interview for members who leave. There are other items as well - but all to be accomplished by staff, not PCCEP members.

The city attorney's office could not meet to discuss until July 21. The amici, parties, members of the PPCEP, and PCCEP staff met via Zoom on July 21 to review the proposed metrics document. At the meeting city and PPCEP seemed unfamiliar with the document created by the amici, and with your instruction in February.

The AMAC and MHA met again July 22, and then posed some questions to the city attorney by email message, which Ms. Reeve briefly responded via email (see below) on July 31. The city attorney declined to support hiring additional staff members for the PCCEP, and the metrics document as proposed.

No additional meetings were held with the city attorney or offered about the PCCEP metrics.

Seeking adoption by vote of the PCCEP, members of AMAC and MHA together met with PCCEP members on August 14 and members of the MHA met with additional PCCEP members about two weeks later to review the metrics document. Three PCCEP members were not willing to meet with the AMAC and the MHA.

In August PCCEP co-chair Elliott Young worked individually with several PCCEP members to make minor modifications to the metrics documents, which the AMAC and MHA quickly agreed to. Young presented the metrics document to the PCCEP at their general meeting in August.

After a lengthy group discussion the PCCEP did not vote to accept or reject the metrics as presented by the amici and modified by the PCCEP members, but instead **voted to not vote** on whether to accept or reject the metrics. They did not discuss objective measurement of success again, and at this point there are no agreed upon objective measurements for the PCCEP, and no plans to discuss are scheduled.

The AMAC and MHA reached out and had a meeting with the PCCEP staff. They essentially said they could not "make" the PCCEP members do anything, such as read the settlement agreement or have objective measurements. Feeling this instruction was unheard or fundamentally misunderstood by the PCCEP staff members of the MHA tried to meet with Asena Lawrence of the mayor's office. She declined our invitation to meet saying she was unprepared to talk about the PCCEP and would need her attorney present. We met with Dr. Markisha Smith who listened to the problem but planned to delegate supervision of the PCCEP staff to a deputy who we could not contact because he lives in Africa. We wrote to Dr. Smith's supervisor Michael Montoya who seemed to not read our inquiry but forwarded it to the PCCEP staff.

On August 9 members of the MHA met with Sam Adams of the mayor's office who identified that he had been tasked with PCCEP. He was unaware of the need for objective measurement and had not met with members of the PCCEP, attended a meeting, or met with PCCEP staff. He seemed uncertain about who supervised the PCCEP staff.

We are unable to discover who supervises the PCCEP staff, and frankly we think they have been without an engaged supervisor for at least a couple of years.

We agree with both the COCL and the US DOJ's concerns about the management of the staff of the PCCEP. Staff appear to be at odds with each other on a regular basis, or in conflict with PCCEP members. As a result of no supervision PCCEP staff have done no community outreach, provide no minutes for meetings, have created a jumbled website, have created no training curriculum for new members. For some PCCEP members there was no training at all. There is no new member recruitment or application process, and no exit interviews. In a meeting on July 27, PCCEP staff admitted losing three applications and then proceeded to berate a PCCEP member for speaking about it.

The net result is most members seem disengaged or routinely speak off-topic, and the recommendations made by the PCCEP are weak or outside of the scope of the committee. A year after Judge Simon asked for objective measures for the PCCEP to be defined by the City, no measures are in place.

We suggest amending the settlement agreement at this time to include the PCCEP is premature and not adequate. Instead the city should set an aggressive schedule to amend the PCCEP Plan to include satisfactory outcome measures to both parties and the court, and have engaged and capable supervision for PCCEP staff prior to considering amending the agreement.



Unity Center for Behavioral Health
1225 NE 2nd Avenue
Portland, OR 97232
Tel: 503 944 8000
Fax: 503 944-8001
unityhealthcenter.org

February 19, 2021

To whom it may concern,

Unity Center for Behavioral Health is a psychiatric hospital in Portland, Ore. that provides acute care to people experiencing a behavioral health crisis. The facility provides immediate triage and access to behavioral health specialty care to stabilize patients in crisis through our psychiatric emergency services (PES). For patients who need longer term care to stabilize and recover, Unity Center offers inpatient care for both adults and adolescents.

In its four years of operation, Unity Center has received more than 43,000 visits from people seeking care. The dedicated staff of behavioral health professionals at Unity take seriously their responsibility for providing safe, compassionate care to the people in our community with the most acute behavioral health conditions.

While Unity Center has made a major impact by enabling faster access to psychiatric care to help people in crisis begin stabilizing immediately, it is not the solution for everyone. There are people in our community who need more than traditional outpatient therapy but don't require the level of acute care that Unity provides. Moreover, many patients who are discharged from Unity Center because they no longer need treatment in an acute care environment would benefit from the opportunity to receive stepdown care to continue in their recovery.

The escalating homelessness crisis in Portland is both a cause and effect of the growing number of people with serious behavioral health conditions. Houselessness is a common condition among patients we care for at Unity Center. Lack of stable housing makes it challenging for people to access the follow up care that they need after they are discharged, increasing the likelihood that they will return to Unity in crisis again. More housing alternatives are needed for people with housing and behavioral health needs, including supported housing, mental health-focused shelter beds, and secure residential beds, along with more services to support behavioral health care for the homeless population.

Substance abuse is another issue influencing behavioral health care needs in Portland. Since the sobering station operated by Central City Concern closed in January 2020, aside from overburdened hospitals, there is nowhere to bring people who need a safe place to sober up from substance intoxication but don't otherwise need medical care. There is also a need for more substance abuse treatment services in Portland, including residential and outpatient treatment, to support people who need care for behavioral health conditions and substance abuse disorders.

The team at Unity Center remains focused on providing acute level care for the people seeking treatment at our facility. We will continue to partner with other behavioral health services organizations to help our patients get the best possible care when they leave Unity Center. However, it is clear the people we serve would benefit from greater availability of sub-acute services in our community.

Sincerely,
Melissa Eckstein, MSSW, MBA, LCSW
President, Unity Center for Behavioral Health

U.S. District Judge Michael H. Simon                              Date:
Mark O. Hatfield U. S. Courthouse
Room 1527
100 S.W. 3rd St.
Portland, Oregon 97204-2944                              re:  thoughts and impressions
                                                                              of the PCCEP

Dear Judge Simon:

As a member of the Mental Health Alliance (MHA), Amicus in the U.S. Department of Justice vs. the City of Portland case, I am writing to share with you my thoughts and impressions of the PCCEP after having attended most all of their meetings for over a year.  To further introduce myself, I am a retired psychologist having served as Chief Psychologist at Dammasch State Hospital and The Oregon State Hospital for over 25 years.  Additionally, I served two terms on the Citizen Review Committee (CRC) and was a member of the Community Oversight Advisory Board) for the two years of its existence.

During the Covid-19 time, PCCEP has been holding their six monthly committee meetings and any additional meetings virtually.  That makes it relatively easy to attend yet their meetings are not well attended by the community.  Those that attend regularly scheduled PCCEP meetings are usually City employees, employees of the Portland Police Bureau (PPB), employees of the U.S Department of Justice and a few community activists and copwatchers.  Members of the PCCEP seem lost as how to go about encouraging more participation by the community and, to date, I have seen little effort on their part or on the part of their staff, to accomplish this.  Therefore, they are not "engaging" the community in conversation about the police; they are not representing the community, except for themselves, in bringing forth recommendations for change.

The PCCEP does make recommendations for change. Unfortunately, they pay little attention to what happens to those recommendations.  Only recently did a staff member assigned to work with the PCCEP create a graph which is color coded to be able to follow the recommendations.  It is unclear that all PCCEP members have been made aware of this graph and how to use it.  And, certainly, the community has not been informed of its existence or instructed on how to read it.  Like recommendations made by most PPB advisory groups, the recommendations made by the PCCEP go nowhere.  Recent commentary from one of PCCEPs' current co-chairs indicates in their two years of existence, the PCCEP had made little progress  if any.

There is no doubt that the leadership of the PCCEP puts in many hours, attends many committee meetings and other meetings not open to the public.  Unfortunately, the leadership appears to be directionally challenged with each leader moving in a different direction, none of which is a focus on the Settlement Agreement between the U.S. DOJ and the City of Portland. In fact, it has been made clear that several members of the PCCEP  are not at all familiar with the content of the Settlement Agreement and that their existence stems from this Agreement.  In a public committee meeting in November, the Chair of one PCCEP committee suggested that the findings of the DOJ investigation were that the PPB was found to use excessive force with the mentally ill or perceived mentally ill AND people of color. This was repeated by a PCCEP staff member just two weeks ago.  Perhaps, because of that lack of understanding, recent police events throughout the U.S. and the desires of the PCCEP leadership, their almost exclusive focus has been on racial issues excluding any interest on police involvement with the mentally ill.  During 2021 there were several officer involved shootings by the PPB resulting in the death of mentally ill individuals in Portland and there was no mention of this in subsequent PCCEP meetings.

All of the above occurs in clear view of the City yet there appears to be no direction coming forth from the City, perhaps, just a pat on the head to the PCCEP leadership and "attagroup" comments.  There are a couple members of the PCCEP leadership that are aware of this and wonder if they just exist to have the City check a box – and, perhaps, they do.  The City created failure for the COAB and appears to be doing the same for the PCCEP.

Overall, it appears that the PCCEP is not living up to its' mandate.  Should they continue, the City, the PPB, the DOJ and, most importantly, members of the community will get more of the same.  Should the Settlement Agreement continue, changes need to be made to the functioning of the PCCEP.  The community deserves better.

Thank you for allowing me to express myself.  I hope you find my thoughts and impressions helpful.

Sincerely,

Rochelle L. Silver, Ph.D.

Mental Health Alliance Written Testimony
August 24, 2021 Court Appearance before Judge Simon

August 24, 2021

Re: BHUAC's Lacks of Allowed Community Engagement is Not in Compliance with the Settlement Agreement

Dear Judge Simon,

An organizational member of the Mental Health Alliance (MHA)--Disability Rights Oregon (DRO)--has been a Member of the Portland Police Bureau (PPB) Crisis Intervention Team (CIT) Advisory Committees for the past 22 years and has been a Member of the Behavioral Health Unit Advisory Committee (BHUAC) from its inception.
Further, DRO staff provided trainings as part of former CIT curriculum as well as for current Portland Committee on Community Engaged Policing (PCCEP) Members. We strive to ensure that people with or perceived to be with mental illness, the named victims in this US DOJ investigation, are not subject to continued unnecessary or excessive uses of force.

The PPB's Behavioral Health Unit Advisory Committee (BHUAC) has failed to allow community engagement. A fundamental tenet of this Settlement Agreement is the inter-dependency of community trust with safety and constitutional policing. In particular, the parties to the Settlement Agreement made clear that:

> *The Parties further recognize that the ability of police officers to protect themselves and the community they serve is largely dependent on the quality of the relationship they have with that community. Public and officer safety, constitutional policing, and the community's trust in its police force are, thus, interdependent[1].*

A primary goal for BHUAC is to facilitate PPB's successful interactions with mental health consumers.[2] The BHUAC has failed to adhere to "Nothing about us without us" in terms of people with or perceived with mental illness. Presently, the BHUAC posts its Agendas and Minutes for meetings[3]. Recently, they have hosted one public informational meeting as part of BHUAC's transparency and community engagement plan.[4] We laud the efforts of the BHUAC, but note that these public meetings are separate from the BHUAC meetings and, therefore, do not allow any listening or

---

[1] Settlement Agreement Introduction, p. 4
[2] See Settlement Agreement, paragraph #91, in part "In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB.
[3] DRO successfully advocated for this posting, as the BHUAC was not doing this in the 1st months.
[4] See as Exhibit #1, Letter from BHUAC to MHA (12/27/19)

Mental Health Alliance Written Testimony
August 24, 2021 Court Appearance before Judge Simon

being listened to on the present BHUAC topics.  Moreover, the 1st out of a total of 2 such meetings thus far appeared to not welcome or even entertain the public's request to be allowed to participate in the regular BHUAC meetings. The community interest in having BHUAC open to the public was not taken seriously—no real dialogue was allowed. For meaningful community engagement, there must be allowance for listening and being heard. The 2nd such meeting adhered to this same approach of BHU/AC being the speaker and anyone else being solely listeners.

The Behavioral Health Unit (BHU) appears to be doing effective work in its interactions with people with or perceived with mental illness; this strengthens the need for communication with the community. Given that this is relevant work that appears effective, the community should be able to find out about what's happening. BHU's website outlines the areas of service, including a now expanded Mental Health Response Team (5 units).  This Division is critical and its work should be widely known.  Additionally, the BHU could be strengthened through input by people in the community who are not represented by any Member of the BHUAC.  By not allowing inclusion, the BHUAC does not add to community trust and resiliency.

As you are aware, the Mental Health Alliance (MHA) was granted amicus status to ensure that the rights, interests and voices of people with mental illness were heard in this matter.  Given that the BHU is a PPB division specifically designed to serve people with or perceived with mental illness, inviting and welcoming people with mental illness to engage with the BHUAC is fundamental to creating a stronger and more resilient community. Members of the BHUAC cannot represent all the voices of people with or perceived with mental illness.  Anyone who has spent time in the mental health community readily recognizes that individual voices are critical and that the generalized voice can be ineffective.

The MHA has advocated for inclusion and transparency in the BHUAC, including to the BHUAC Members as well as to the Mayor.[4] There are inadequate opportunities for the BHU/ BHUAC to learn from community members as to the relevant policies. This point highlights an enormous concern about the BHUAC--huge missed opportunities to learn from the community.  Without communication and without inclusion, it is impossible to build trust.  When the voice of those with lived experience is not heard—true understanding and remedies are missed.  With little to no engagement of the community, the overall community does not grow stronger.

Despite on-going efforts to have the BHUAC meetings open to the public, they are not.  We have advocated for open meetings/ community engagement as a Member of the BHUAC to the BHUAC[5]; as Members of the MHA to the Mayor, the City Council, the PCCEP.  Also, we have made this argument previously before you,

---

[4] *See* Exhibits #'2 to #5.
[5] See Exhibits #6 and #7.

Mental Health Alliance Written Testimony
August 24, 2021 Court Appearance before Judge Simon

Your Honor[6].  We continue to advocate for inclusion of people with mental illness to be able to participate in the BHUAC, the PPB Division designed to serve as assist people with mental illness.  Without being required to include the community that has been identified as being harmed in this Settlement Agreement, the PPB foregoes a critical opportunity for community trust building. Why is the door shut on the potential victims?

You have heard the arguments for and against coverage of the BHUAC under the Oregon Public Meeting Laws (OPML). I believe that it does and MHA has made this argument.  However, even if somehow due to a technical exception, the BHUAC is not subject to the OPML—they still can do more than what the basement of the state law requires.  Given the mandates of the Settlement Agreement before us today, to have PPB work to build trust with the community, the BHUAC should choose to do the right thing and open its doors to increased information exchanges. The BHUAC appears to be resorting to an alleged technical exception to the OPML as a defensive measure instead of focusing on the core tenet of the Settlement Agreement—building community trust and making opportunities to build bridges with the community.

The BHUAC meetings should be open to the public and allow more transparent community engagement because:

- Quality relationships and community trust are integral to safety and constitutional policing.
- Community members having their voices Included is key for service and outcomes that are stronger and improved.
- BHU Division is designed for people with mental illness and "Nothing about us without us" is important.
- BHU appears to be doing good work and this should be public to optimize;
- The Settlement Agreement's key underpinning is the need to foster trust between PPB and people with mental illness--this is in accord with this intent;
- Generally, members of the community who are invited to be part of the solution and whose ideas are heard, considered and acted upon feel they are being empowered and respected.
- The burden of each member of the BHUAC somehow being the voice for all interested persons is unrealistic.  Some individuals choose to be their own voice.
- The community as a whole—PPB and others—will be strengthened and more resilient.

---

[6] *See* Exhibit #8

Mental Health Alliance Written Testimony
August 24, 2021 Court Appearance before Judge Simon

- This comports with the Oregon Public Meeting Laws.  Even if there is some technical exception, PPB should comply given the spirit of the Settlement Agreement to increase community trust.

Your Honor, we acknowledge that It may be messier and harder to have BHUAC meetings that are open to the public.  However, this is analogous to not allowing victims to appear at sentencing hearings in criminal justice court matters because it may produce some level of acrimony. Exclusion cannot be justified. People with and perceived with mental illness continue to be victims of the PPB shootings. Their voice is key for positive change.

MHA's remedy that we are requesting is that BHUAC be required to have open meetings to accord with the goals of the Settlement Agreement for gaining transparency and community trust.  People with or perceived with mental illness must be included and be part of the process of positive change.  The door to the BHUAC meetings is entirely shut to the community voices and we are asking you to open this door as a critical remedy to reduce the unconstitutional use of force by PPB against people with or perceived with mental illness.  Also, please recognize that if you deem the BHUAC in compliance with the Settlement Agreement, then this lack of community engagement and transparency is an on-going agent for eroding community trust.

Thank you for your consideration.