# COMPLIANCE OFFICER AND COMMUNITY LIAISON

## *Quarterly Report: Quarter 1 Updates & Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**January 1, 2021 to March 31, 2021**

**August 23, 2021**



# TABLE OF CONTENTS

**TABLE OF CONTENTS**    **2**

**INTRODUCTION**    **3**

**EXECUTIVE SUMMARY**    **5**

**SECTION III: USE OF FORCE**    **15**

**SECTION IV: TRAINING**    **21**

**SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES**    **36**

**SECTION VI: CRISIS INTERVENTION**    **38**

**SECTION VII: EMPLOYEE INFORMATION SYSTEM**    **45**

**SECTION VIII: OFFICER ACCOUNTABILITY**    **50**

**SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING**    **56**

**LIST OF ABBREVIATIONS**    **68**

**LIST OF PERSONNEL**    **70**

**APPENDIX A**    **71**

**APPENDIX B**    **77**

# INTRODUCTION

This is the Compliance Officer/Community Liaison's (COCL) first quarterly report for 2021, as required by the Amended Settlement Agreement between the City of Portland and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered May 15, 2018. This report covers the three-month period from January 1, 2021, to March 31, 2021.

The Portland Police Bureau (PPB) and the City of Portland are still recovering from the lengthy demonstrations, pandemic, and financial strains experienced in 2020, to say nothing of the recent spike in violent crime. In the third quarter of 2020, COCL reported that PPB/City were unable to maintain substantial compliance in several areas of the Settlement Agreement. At the conclusion of the fourth quarter, PPB/City continued to have problems achieving compliance with Use of Force, Officer Accountability, and Community Engagement. Unfortunately, these issues were not resolved in the first quarter of 2021.

The COCL continues to evaluate whether the systems required by the Settlement Agreement can be restored or modified to ensure constitutional policing in Portland and gain the trust and cooperation of the community. During the first quarter of 2021, tensions between PPB and community activists remained high, as the case of Officer Derek Chauvin for the death of George Floyd was underway. The City and PPB have also delayed taking remedial steps to bring themselves back into compliance with the Settlement Agreement. For instance, after the conclusion of the protests (November 15, 2020, according to PPB), on multiple occasions the COCL and DOJ have requested the City's Master After Action review and remediation plan. On March 29, 2021, PPB provided these documents, but we consider them insufficient (see Appendix A for our response). Additionally, little progress has been made in developing and transitioning to Portland's new form of civilian oversight, which could create a sizeable gap in the City's ability to hold officers accountable. Furthermore, the City's support for the Portland Committee on Community Engaged-Policing (PCCEP) has been inconsistent. Overall, while the City has remained in substantial compliance with the majority of the paragraphs of the Settlement Agreement, the COCL remains concerned about the City's ability to find acceptable and durable remedies to some of the problems reported.

In the context of local and national attention to the problem of racial bias in policing, we continue to monitor PPB's ability to fully review and justify all use of force incidents (Par. 74, 75, 77), provide training on equity and procedural justice (Par. 84), collect, analyze, and report disparities in police contacts (Par. 148), and engage the community in a dialogue around discriminatory policing (Par. 150). Our assessment of PPB's work in these areas continues to be covered in these quarterly reports.

Because of concerns about whether PPB can accurately and thoroughly evaluate and document what transpires during force incidents and disparities in treatment, we continue to recommend that the City of Portland introduce body-worn cameras to ensure the collection of better evidence and public transparency. Police accountability in Portland is very difficult to achieve when the facts regarding what actually occurred are in dispute. Furthermore, the best scientific evidence indicates that body-worn cameras result in fewer complaints and fewer uses of force. In light of this research in many cities, we are surprised that PPB is the only remaining larger police department in the United State without body-

worn cameras.[1] Body-worn cameras are one of the best ways for PPB and the community to be assured that reforms have become institutionalized and that behavioral outcomes have improved.

---

[1] Although some in Portland claim that body-worn cameras are ineffective (citing the Washington DC study, where researchers experienced serious methodological problems), most scientifically valid studies have shown reductions in official complaints against the police and many studies have shown reductions in use of force after the introduction of body-worn cameras. To learn more about the evaluations, visit: https://bwctta.com/impact-bwcs-citizen-complaints-directory-outcomes and https://bwctta.com/impacts-bwcs-use-force-directory-outcomes; Also, for cities like Portland that may be interested in technical assistance regarding the technology, legal issues, training, funding, and other matters, visit: https://bwctta.com/resources/bwc-resources.

# EXECUTIVE SUMMARY

**Section III: Use of Force**

During the first quarter of 2021, PPB did not come back into compliance with Section III (Use of Force). As we noted in our last report, documentation of uses of force during the 2020 summer protests was unreliable. In sum, the overall standard that PPB has developed in recent years was not consistently followed and we did not feel that the Bureau was responsive to the concerning issues that were apparent across several uses of force. To remedy these deficiencies, we suggested PPB conduct a comprehensive After Action Review (AAR)—as required by PPB's own policies and the Settlement Agreement—of the summer protests, evaluating the effectiveness of their strategic response, officers' application of force in relationship to policy (e.g., properly describing subjects' level of resistance), PPB resources (and the effectiveness of PPB's efforts to mitigate resource deficiencies), and overall system failures which impacted PPB's ability to provide Constitutionally-based policing.

During the first quarter of 2021, PPB provided the COCL team with three documents which, in the aggregate, were designed to constitute a comprehensive After Action Review. A review of these documents revealed that PPB's assessment was not comprehensive in fact or in scope. The COCL team provided a response to PPB identifying deficiencies in the PPB's analysis though no remediation of the Master AAR has occurred since then.

While PPB maintained compliance with several paragraphs of the Settlement Agreement (Pars. 68, 71, and 72), they remained out of compliance with several others (Pars. 66, 67, 69, 70, and 73). These relate to reporting and investigating uses of force and the lack of a comprehensive Master AAR. Additionally, PPB fell out of compliance with several paragraphs (Pars. 74-77) as a result of failing to provide a force audit related to the 2020 protest events and failure to identify and correct deficiencies revealed by the quarterly force analysis.

In large part, PPB remains out of compliance due to their failure to conduct a comprehensive assessment of the 2020 protests and institute remedial training. As noted throughout the report, PPB has been provided with guiding principles on conducting such an assessment, but to date, we have seen no evidence that PPB plans to do so. PPB will need to conduct a thorough assessment of the 2020 protests to achieve compliance with the requirements of Section III.

**Section IV: Training**

COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

*Training Needs Assessment and Training Plan*: While COCL did not object to PPB's original 2020 needs assessment and continues to assign Substantial Compliance for Par. 79, to be clear, this report lacks a discussion of training needs that would be identified by a complete and thorough analysis of the problems associated with crowd control. The absence of a detailed analysis of 6600 force applications during the 2020 protests has compelled the COCL to ask PPB to revisit its Needs Assessment and Training Plans for 2021. DOJ and COCL have recommended that PPB's administration provide a more exhaustive assessment of force applications during protests and the implications for policy and training. That did not occur in the first quarter. If this assessment does not occur in the second quarter, COCL will assign Partial Compliance for Par. 79.

*High-quality Training*: The first quarter of 2021 was PPB's opportunity to begin addressing the large gap in skills training created by the pandemic, budget cuts, and PPB's response to protracted protests in 2020. In the fourth quarter we concluded that PPB's remedial training plans were sufficiently comprehensive to justify a return to Substantial Compliance with Section IV, but that the scheduled training, both in person and online, would need to be well executed. Using a mixture of online and in-person training formats, PPB started the In-service skills training in January that was missed in 2020 by more than half of the police force. PPB also introduced new classes identified in the needs assessment and strategic planning using online formats.

Our review of PPB's new online training indicates that PPB has been responsive to our earlier caution to avoid overreliance on asynchronous videos and has sought to create a more interactive online training environment. However, online training, which comprises half of all In-service training, is limited in its capacity to provide skills training. We remind PPB that it is required to "increase the use of role-playing scenarios and interactive exercises" (Par. 84.a.i.), and as such, the Training Division should be continuously cognizant of the danger of becoming too reliant on videos at the expense of dynamic in-person training. PPB is experimenting with new interactive software and COCL will review it in the second quarter. Also, we acknowledge that virtual training will be the centerpiece of police training in the future, and therefore PPB must continue to invest in this domain. This work is more complex and resource intensive than expected.

Our observations of the in-person training occurred in the second quarter of 2021, so we will suspend judgment on the quality of that training for now. However, both COCL and DOJ have continued to stress the importance of crowd control training. Therefore, if PPB is unable to implement good remedial crowd control training in the second quarter, we will assign Partial Compliance for Par. 84 because of the urgency of these actions in light of the 2020 shortcomings and the approaching summer.

Also, we should reasonably expect that before the end of 2021, PPB will deliver Command-level and Supervisory in-service training around crowd control, along with peer intervention training. The rationale for these trainings has been articulated in this report. In the final analysis, first-line supervisors and incident commanders are responsible for the actions of officers they are supervising and for properly documenting force events for public transparency and officer accountability. But PPB officers can also be trained to accept some responsibility. COCL and DOJ have consistently recommended peer intervention training which seeks to create a police culture where officers speak up and intervene when peers are engaging in, or about to engage in, harmful actions. PPB is preparing for these trainings, but they have been delayed.

*Training Evaluation System*: The Training Division continues to make progress toward restoring its complete evaluation system. Similar to classroom learning, PPB has incorporated knowledge tests, quizzes, and surveys into most of the online classes. However online surveys were not administered in the equity classes, and for other online classes, the survey response rates were unusually low. We have recommended that PPB take corrective action to address these two problems.

We continue to push for more civilian analysts and the information technology staff for the Training Division. A limited staff is burdened with a massive amount of new programming, as well as data cleaning, analysis, and reporting across multiple training programs, including In-service, Supervisors, Advanced Academy, ECIT, and many others, including both online and in-person formats. Evaluation research and information technology are the primary mechanisms for PPB to establish itself as an evidence-based learning organization.

*Document and Report Training*: COCL can confirm that the Training Division continues to use the Cornerstone Learning Management System (LMS) to create a *"central, commonly-accessible, and organized file system"* for training records (Par. 81). LMS attendance records have been updated in the first quarter to include all in-person and online In-service trainings noted earlier, as well as the range qualifications, legal updates, directives, and other training videos and notices. Records of external trainings are also maintained. LMS is still used by supervisors and command staff to run transcript reports and ensure that PPB employees who are not on leave are completing their required training.

*Audit the Training Program: No* formal audit of PPB's Training programs has been conducted since 2018. In 2020 COCL recommended that PPB plan to conduct another formal audit of the Training Division during 2022. Over the past three years, many changes have occurred in the planning and delivery of training, and they deserve a careful review and assessment. To remain in Substantial Compliance with Par. 80, we expect that PPB will submit a Training Audit plan for review and approval by DOJ and COCL before the end of the 2021.

Finally, under Par. 86, PPB's Force Inspector is required to "*gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council…*" including "*problematic use of force patterns and training deficiencies.*" In turn, the Chief is expected to receive and respond in a timely manner to recommendations from Training Advisory Council (TAC) or the Training Division regarding training, policy, and/or evaluation pertaining to use of force patterns. COCL can report that the Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends. However, to remain in Substantial Compliance, we expect that the Inspectors' analysis and presentation of force incidents will be more consistent and will include patterns identified in crowd control applications of force. Also, if the After Action reports by supervisors do not sufficiently identify problematic force applications during protests (as noted in Section III), then the Force Inspector does not have a complete set of force data to examine trends and discuss them in the quarterly force reports. Again, supervisor training to help remediate this problem is critical.

Overall, the relationship between the TAC and the PPB Training Division is functioning smoothly. TAC has been receiving quicker responses to their recommendations by the Chief's Office and the new Captain in charge of Training has been fully engaged with the TAC. The TAC has been able to recommend some

long-term reforms in PPB but has had limited involvement in reviewing specific training plans or observing training. A fundamental problem for TAC (as well as PCCEP) is the lack of resources to perform specific functions, such as data analysis. TAC members would like to do more, but they are volunteers and volunteers can only do so much.

The TAC meetings remain open to the public as required by Paragraph 87. COCL has observed these meetings, held via Zoom, and the public has been allowed to listen and make comments. PPB continues to use a public email distribution list to send reminders of the meetings to the public and continues to post the TAC meeting agendas and minutes on PPB's website.

### Section V: Community-Based Mental Health Services

In evaluating this section, we continue to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. However, during the first quarter, we noted developments in ""*expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders*" (see Par. 90d). In the first quarter of 2021, the Bureau of Emergency Communication's (BOEC's) options were expanded through the Portland Street Response pilot program which operated out of the Lents Neighborhood. However, we are unable to determine at this moment whether the quality of implementation is reflective of the goals of the Settlement Agreement. For instance, BOEC telecommunicators have yet to receive any training on the program outside of being informed of the basic triage criteria. Additionally, some of the data on the public-facing dashboard raise questions about reporting or dispatching.

For all other requirements within Section V, PPB and the City continue to accomplish what can reasonably be expected of them given that they do not bear primary responsibility for delivering community-based mental health services. For instances, the City and PPB have maintained their roles in overseeing or participating in committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Workgroup, and the Legacy ED Community Outreach Group. Through self-initiated committees, as well as contributing to external committees and working groups, PPB and the City continue to do what can reasonably be expected of them. The Unity Center continues to operate as a walk-in/drop-off center as envisioned by the Settlement Agreement and PPB continues to play their part in ensuring compassionate transportation. While we encourage PPB to continue to seek ways to support organizations that provide community-based mental health services, we acknowledge that what has been accomplished to date satisfies their responsibilities in the Settlement Agreement with an ongoing obligation to continue such efforts.

**Section VI: Crisis Intervention**

In the first quarter of 2021, the City and PPB maintained compliance with the requirements of Section VI. However, moving forward, BOEC will need to take particular steps to maintain compliance. For instance, BOEC has not delivered formal in-service training since 2019 due to the pandemic. However, restrictions within Oregon and Portland have begun to ease and BOEC will need to begin planning for an upcoming in-service consistent with current state and city restrictions. As part of this, we recommend BOEC begin reaching out to BHUAC now in order to gather their input on "*develop[ing] ongoing training for BOEC dispatchers*." Additionally, BOEC will need to develop policies and training related to Portland Street Response which is operating as a pilot but will be expanded in the future. The policies and training will also need to be reviewed by the BHUAC which has not reviewed BOEC training or policies in over two years.

In order to remain in compliance with the requirements of Pars. 113-115, BOEC will need to consult with the BHUAC for the new triage approach and ongoing CIT processes. Additionally, BOEC should request BHUAC input on current ECIT dispatch policies and current CIT training given the time that has passed since the last BHUAC review. Finally, as Portland Street Response is still in its pilot phase, we do not consider the program to be a "final product" as it will likely be assessed and modified before the program is expanded citywide. We therefore recommend BOEC take the present opportunity to request input by the BHUAC regarding policies and training before implementing the program in all areas of Portland.

PPB has also maintained compliance with paragraphs within Section VI that are related to their primary response system (i.e., Enhanced Crisis Intervention Team, ECIT) and secondary response systems (i.e., Behavioral Health Response Team, BHRT and Service Coordination Team, SCT). All PPB officers receive the 40-hour Basic CIT training and PPB maintains a specialized group of officers (ECIT officers) to respond to higher-risk calls for service involving a mental health component. PPB also continues to utilize data from the Mental Health Template (MHT) in order to assess operations. Related to this, PPB has continued to conduct analysis on a semi-annual basis, althoughPPB has been unable to conduct quantitative analysis on uses of force due to the small number of cases. This is a testament to PPB's overall low number of force incidents against persons in mental health crisis, but limits our ability to draw conclusion about PPB's response to persons with mental health conditions. Since the force numbers are low on a quarterly basis, we asked PPB to combine data from each semi-annual evaluation to create a sufficient sample size of force events to make statistical inferences. Only a preliminary assessment has been possible to date, so additional discussion with PPB and more analyses will be necessary before we share these findings. . We will provide an update in our next report.

**Section VII:  Employee Information System**

In the first quarter of 2021, the PPB fell out of compliance with the majority of Section VII on the Employee Information System.  Whereas the process of EIS remained the same, the underlying data which creates EIS alerts was compromised by PPB's deficient documentation of force during the 2020 protests.  These deficiencies reduced the completeness of information found within the PDT as well as officer data such as the average number of force applications per force event.  Because supervisors did

not have this information to guide their review during the first quarter of 2021, the system as a whole was limited.

Additionally, PPB could not comply with Par. 117 which requires PPB to identify problematic use of force trends at the supervisor and team level.  Two issues lead us to find PPB out of compliance with the requirements of Par. 117.  The first is that one of the force-rate analyses conducted by PPB is officers' average number of force applications per force event.  As PPB members did not consistently document all applications of force, the analysis conducted by PPB is therefore unreliable.  The second issue pertains to the EIS entries by the Force Inspector.  In reviewing the memos to RU Managers regarding first quarter data, the Inspector found trends for both officers and supervisors, requesting that the RU Manager review the individuals identified. However, for each Precinct, the Force Inspector only noted EIS entries related to the supervisors and no supervisors noted any review of officers.  This in part may be due to the language of the alerts which may have influenced supervisors' decisions to further review the officer.


### Section VIII: Officer Accountability

During the first quarter of 2021, PPB and the City remained in compliance with some Accountability paragraphs and remained out of compliance with others. The new accountability system passed by voters in November of 2020 will be important for future compliance and we note from the outset of this section that during the first quarter, we were not provided any formal transition plan and no meaningful steps were taken towards seating the new community oversight board. Additionally, there was concern within IPR that staff will leave their positions because they were provided no assurance of future employment. In short, the details around this transition to the new community oversight board do not appear to have been given much thought and, at the time of this report, there is no clear indication when the group who will coordinate the development of the new oversight board will be seated. In order for Section VIII to be in compliance as a whole, we will need to verify that the new community oversight board incorporates the remedies found in the Settlement Agreement.

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, timeliness, consistency, transparency, and a system of checks and balances. For instance, we find that Portland's accountability system continues to remain largely accessible to community members, allowing complaints to be filed in a multitude of ways. These include community members' complaints to the Independent Police Review (IPR), community members' complaints to PPB, IPR initiated complaints, and PPB-initiated complaints. Community members can file a complaint by phone, online, or in-person (either to PPB or IPR). For most complaints, IPR continues to conduct intake investigations and determine whether to initiate additional investigation proceedings or not. However, one paragraph related to access is the requirement that all allegations of use of excessive force are "*subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact*" (Par. 129). Related to this requirement, we found one case in the first quarter of 2021 where a community member made an allegation of improper force, but upon arriving, a supervisor determined that the officer did not use force and did not forward the complaint. We would expect to see corrective action through the chain-of-command related to this incident.

For the element of timeliness, we continue to find that overall case timelines were not met and that the issues identified in prior reports have not been resolved. A quarterly analysis conducted by IPR revealed 32% of full investigations opened in the third quarter of 2020 (the last quarter for which 180-days could have passed) exceeded the 180-day timeline, including 18% of IA full investigations and 83% of IPR full investigations. This finding is consistent with cases opened in the prior quarter for which 14% of IA full investigations and 86% of IPR full investigations exceeded the 180-day timeline. The excessive timelines also apply to investigative paths other than full investigations. For instance, 13% of IPR Administrative Closures in the third quarter of 2020 exceeded 180-days.

In the first quarter of 2021, the IPR provided us with a plan to improve timelines, including particular steps to be taken. For instance, IPR planned to re-assign "Person of the Day" duties to a Deputy Ombudsman, reassign cases to allow IPR investigators to focus on a single element (e.g., focusing solely on intake investigations or focusing solely on full investigations), and relieved a backlog of Supervisory Investigations and Precinct Referrals. However, we found that some cases referred for Precinct Referrals did not fit the definition of Precinct Referrals and would have been more appropriately investigated as SIs, or administratively closed. This may be resolved by reviewing and, if appropriate, revising policy definitions, though this would also require consultation with COCL and DOJ.

For the element of consistency, we selected a total of 20 cases, stratifying our selection to ensure an adequate representation of administrative closures, supervisory investigations, precinct referrals, IPR full administrative investigations, and IA full administrative investigations. The cases we reviewed indicated that, regardless of which route a complaint might take, findings and decisions were reasonable and supported by a preponderance of the evidence. However, while the 20 random cases we reviewed did not reveal any issues, DOJ provided the City a March 23, 2021 letter that identified PRB cases in which the underlying investigations were incomplete or otherwise problematic. Additionally, the letter described inconsistencies in PRB hearings related to interpretation of policies, applicability of policies, and application of findings (among other things).We broadly concur with the issues raised by DOJ in their letter and maintain that such issues will need to be remedied in order to restore the consistency we had seen previously in the accountability system (see Par. 169).

For the element of transparency, we find consistent compliance with the Settlement Agreement's requirements related to community members' ability to track the progress of their complaint, updates at each stage or the investigation, findings letters, and information about CRC and PRB hearings. Additionally, IPR analytical reports and online data related to misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths remain available on the IPR website (https://www.portlandoregon.gov/ipr/76848), allowing interested parties to learn the facts and conduct their own assessment. Overall, we maintain that the combination of these efforts points to an accountability system that is largely transparent.

The accountability system also contains a system of built-in checks and balances to ensure a fair resolution for all involved. For instance, prior to an RU Manager's findings on an allegation, IPR (as well as Assistant Chiefs and IA) continues to have the ability to review the investigation report and can request an additional investigation or a rewrite of the investigative report. Additionally, after an RU Manager makes findings, IPR reviews those findings and has the ability to controvert the findings, thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination.

The CRC also continues to meet and hear appeals of administrative investigations and does so consistent with the requirements of Par. 136.In the 1st quarter of 2021, the CRC did not hold any appeal hearings. However, one case was presented to the City Council after the PPB and CRC could not resolve their difference of opinion on the findings of the investigation. Per City Code (PSF-5.16), the City Council is responsible for hearing such cases in order to provide a final resolution. However, during the appeal, two of the five members of council stated they had not reviewed the casefile prior to the hearing. The language of SPF-5.16 requires a two-week timeline which indicates that there is an expectation that Council members will have reviewed the casefile before the hearing. This does not appear to have happened in this case and the City should be aware that the legitimacy of the process is called into question if the City Council hearing is not done in-line with policy.

A final system of checks and balances can be found in the Police Review Board. When there is a sustained finding that will lead to discipline involving suspension or greater, when there is an officer involved shooting or in-custody death, or when there is a controverted finding, the Police Review Board takes the RU Manager's proposed findings and either adopts the proposed findings or provides their own proposed findings and corrective action to the Chief.

For PRB operations, we carry two main concerns which prevent us from finding the City and PPB in compliance with this section. The first is that the pool of CRC members who have gone through the necessary PPB training and ride-alongs is limited. Second, the DOJ provided a Police Review Board Written Critique to the City, identifying areas of concern related to PRBs with which we broadly concur. These issues will need to be resolved prior to compliance.

Finally, PPB's accountability system has particular requirements after the occurrence of lethal force and in-custody death events. PPB did not have a lethal force event (though had one event that was later classified as an in-custody death event) in the first quarter of 2021. We therefore rely on the historical process that PPB has followed and find that they remain in substantial compliance with the lethal force investigation requirements.


### Section IX: Community Engagement and Creation of Portland Committee on Community Engaged Policing

#### *PCCEP's Role*

The Portland Committee on Community Engaged-Policing (PCCEP) continues to support multiple subcommittees and solicit input from community members, government officials, and community leaders using a virtual platform. It has sought input on issues of mental health, use of force, community engagement, and other topics.

In the first quarter, PCCEP adopted their 2020 annual report, created an ad hoc Core Patrol Services committee and hosted three special meetings related to a community-led review and re-envisioning of PPB's Core Patrol Services, co-hosted a town hall on COCL's 2020 Q4 report, heard an update from the Training Advisory Council, hosted a presentation and discussion of DOJ's Settlement Agreement report, and discussed revisions to PCCEP's bylaws and group values.

PCCEP generated three recommendations in the first quarter, and as of the end of the first quarter, the Mayor had formally responded and accepted one of the three.

*City's Support*

The City continues to support the PCCEP by ensuring adequate membership, providing training to members, and providing technical assistance. However, the City's committee staffing support has been inadequate during the first quarter in terms of posting information about PCCEP meetings for the benefit of the public: In the first quarter of 2021, no meeting minutes were posted, and the only transcript posted was for the January 2021 full PCCEP meeting. While recorded videos are not specifically called out in the Amended PCCEP Plan, they have in some ways served as a substitute for minutes or transcripts; unfortunately, more than half of PCCEP's non-livestreamed meetings were not posted within the 10 business day timeframe required for minutes, making it difficult for the public to follow PCCEP's work.

PCCEP members have also called for stronger staff support through resources such as a member handbook, and a clearer understanding of PCCEP staff roles, but those requests have not been fulfilled as of the end of the first quarter. Thus, for Par. 144, COCL has lowered the compliance rating to Partial Compliance.

A representative of the City Attorney's office attended PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings law. PPB's Inspector General also attended PCCEP meetings to answer any questions about PPB that may arise. PCCEP's membership remains fairly representative of the larger community and COCL did not identify any conflicts of interest.

In sum, PCCEP continues to function as a legitimate body for community engagement in policing, but City support needs to be enhanced.

*PPB's Role*:

PPB has sustained and expanded its systems of community engagement as it implements its Community Engagement Plan. The Office of Community Engagement continues to partner with different segments of the Portland community through existing and new advisory councils. PPB's Coalition of Advisory Groups (CAG) has experienced some conflict among different advisory groups and committees, both inside and outside the CAG, as might be expected when many different perspectives on policing come together. While the diversity of community viewpoints is desired, COCL expects that PPB leadership and City leadership will step up to resolve these conflicts. In addition to the resolution of interpersonal tensions, more work is needed to build an infrastructure for community engagement that establishes guidelines and bylaws for the operation of all advisory groups.

PPB continues to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. However, PPB has yet to meet the requirement to share and properly discuss its annual report with community members in each precinct, thus remaining at Partial Compliance for Par. 150.

PPB continues to produce quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. The traffic stop data for Q4 2020 show racial disparities citywide and in each precinct, indicating that Black/African American drivers are stopped at rates higher than their representation in the population. Furthermore, as COCL noted in Q4, the annual stops data shows that consent searches are also higher for Black/African American drivers. These disparities could be a topic of discussion at the Precinct meetings when the annual report is discussed.

In Q4 2020 COCL expressed the hope that PPB's new Stops Data Collection App and related protocols (i.e., distributing cards about the subject's rights, recording the transaction on their phone) would help address the racial disparity problem in 2021 by requiring officers to think about the reason for the stop and search. PPB introduced the new app ("mask") in January, but failed to change the policy, distribute the explanatory cards to those stopped, or provide additional training to officers on this new protocol. We are surprised by PPB's lack of action to update their protocol regarding police stops and searches, but this is not a compliance issue.

# SECTION III: USE OF FORCE

Beginning in the summer of 2020, no set of events weighed more on PPB's compliance with the Settlement Agreement than PPB's response to the protests stemming from the murder of George Floyd. In response to near nightly protests, PPB officers used over 6,600 applications of force, and PPB admits that this figure is likely an underestimate[2]. However, documentation of force across the entire protest events was unreliable; in some reports (though not all), members conflated levels of resistance, reports were incomplete, supervisor reviews were deficient, and members were not subject to the accountability process for concerning uses of force and substandard reporting. To their credit, many officers provided comprehensive detail in their reports justifying their use of force. Additionally, there are several current investigations regarding members' uses of force. However, the overall standard that PPB has developed in recent years was not consistently followed and we did not feel that the Bureau was responsive to the concerning issues that were apparent across several uses of force. To remedy these deficiencies, we suggested PPB conduct a comprehensive After Action Review—as required by PPB's own policies and the Settlement Agreement—of the summer protests, evaluating the effectiveness of their strategic response, officers' application of force in relationship to policy (e.g., properly describing subjects' level of resistance), PPB resources (and the effectiveness of PPB's efforts to mitigate resource deficiencies), and overall system failures which impacted PPB's ability to provide Constitutionally-based policing.

In response, PPB provided the COCL team with three documents which, in the aggregate, were designed to constitute a comprehensive After Action Review. A review of these documents revealed that PPB's assessment was not comprehensive in fact or in scope. For instance, PPB's assessment failed to provide measurements of force used, either in the aggregate or by force type. Furthermore, the assessment was silent on whether members were consistent (and accurate) in their definitions of active aggression. The assessment did not discuss PPB's failure in force documentation, focusing instead on technology for reporting rather than member actions or operational decisions. The assessment also did not discuss failures in holding officers accountable for force reports that conflicted with policy. These issues combined ultimately led us to question whether PPB was sufficiently self-critical in reviewing their response to the 2020 protests. We provide our full review of PPB's After Action Review in Appendix A. This review, although submitted to the PPB on April 14, 2021, is responsive to PPB's work during the first quarter or earlier, including their After Action Review, and therefore, is included here.

In our review, we provide a concept map for PPB to improve their assessment. For instance, we note that a comprehensive review would include:

1. A clear, well-researched and accurate definition of the problems
2. A comprehensive evaluation of the extent of such problems
3. Proposed solutions to the problems that are feasible and compelling, i.e., a remediation plan

---

[2] See, Force Inspector's Q3 2020 Report, page 11: https://www.portlandoregon.gov/police/article/778387

4.  The high-fidelity implementation of the remediation plan
5.  Built-in mechanisms to assess the effectiveness of the plan in addressing the problems.

As we did not feel PPB's assessment accomplished these goals, we advised PPB to:

1.  Create a single-document assessment
2.  Cover all issues relevant to the Settlement Agreement, including uses of force and accountability
3.  Identify articulable and plausible solutions
4.  Propose a timetable to implement the solutions with fidelity
5.  Offer a plan to measure implementation effectiveness

To date, the City and PPB have not reported any further work on the After Action Review, leaving the three documents as the only broad-based assessment of PPB's protest response. Therefore, the deficiencies of the assessment have not been remedied and the assessment stands in contrast to the requirements of the Settlement Agreement as discussed later in this section. As PPB is already planning a training related to the 2020 protests, we do not believe any further evaluation will occur in the near future. To be clear, the 2020 protests demonstrated significant weak points in PPB's system for use of force. Without a comprehensive assessment exploring those weak points and implementing remedial action, PPB cannot return to Substantial Compliance with the terms of the Settlement Agreement for Section III on Use of Force.

For the remainder of this section, we assess each paragraph within Section III, separating them into those which have remained in compliance and paragraphs which have fallen out of compliance (or remained out of compliance).

### **Maintained Compliance – Pars. 68, 71, and 72**

As part of our review of a random stratified sample of force cases (see below), we reviewed several cases involving the use of a CEW. In the CEW force events we reviewed, we found that each CEW cycle was justified and that officers provided sufficient warning prior to using the CEW. After the use of CEWs, AMR was used to remove the probes in accordance with policy. In none of the protest events we reviewed was a CEW used and therefore our evaluation of this paragraph comes from our review of non-protest force events, the ongoing CEW training provided by PPB, as well as our historical evaluations. We therefore find PPB has maintained substantial compliance with the requirements of Par. 68.

PPB has also maintained an adequate patrol supervision staffing level in accordance with Par. 71. As noted in prior reports, the span of control rate is a better metric than the raw number of supervisors. In the first quarter of 2021, PPB reported a staffing ratio of 5.0 officers for every supervisor across the three main precincts. This continues to remain a reasonable span of control.

Par. 72 requires PPB to develop a supervisor's checklist when responding to an officer's use of force. Presently, the AAR acts as the checklist and, although we note our concerns with the

comprehensiveness of protest AARs below, the form itself continues to serve as a sufficient checklist. We therefore do not find any issue with the form itself and believe PPB remains compliant with the requirements of Par. 72. However, the deficiencies in completing the AAR and the preceding investigation will need to be resolved as discussed in the next section.

**Fell Out of Compliance - Paragraphs 74, 75, 76 and 77**

Our two previous reports indicate that PPB had fallen out of compliance with Pars. 74, 75, and 77 based on PPB pausing their count of protest force events, and then returned to compliance based on PPB resuming that count. However, we stated in our last report that we would need to review PPB's annual report for protest events, looking for overall rates of reporting deficiencies and the Force Inspector's communication with RU Managers regarding trends found during the audit. During the first quarter of 2021, no annual force audit report was provided. Given that Portland's protest event ceased in November of 2020, and given that PPB is already planning training on protest reporting deficiencies, we believe the protest force audit report should have been completed by now. As reporting deficiencies constituted a significant portion of the COCL's (and DOJ's) concerns with PPB's response to the protest events, the City/PPB cannot return to compliance with these paragraphs until we receive a sufficient force audit report and PPB members are trained on the totality of the findings.

In contrast to the above concerns regarding a protest force audit, we find that PPB's quarterly force audit reports and discussions with RU Managers for non-protest force continue to fulfill the intent of Pars. 74, 75, and 77. These reports continue to show that officers and supervisors complete their FDCRs and AARs in a comprehensive and accurate fashion. In addition to trends in evaluating the comprehensiveness and accuracy of FDCRs and AARs, the Inspector reviews use of force events to find emerging issues, concerning occurrences, and department-wide trends.  This includes recommendations for the improvement of AARs, clarifications on force warnings, and actions following CEW deployment (among other topics).  We have reviewed the spreadsheet utilized by the Inspector to document and categorize the issues found as well as the correspondence the Inspector has with various RUs, the Training Division, and the Policy Team. The correspondence demonstrates thoughtful evaluation of the force events and concrete recommendations for remediation of emergent issues. The responses provided by the RUs, Training Division, and Policy Team provide evidence that the Inspector's recommendations are taken seriously and adopted where appropriate.

As required by Par. 76, PPB continues to provide a quarterly analysis of force, though we note that protest and non-protest force incidents have historically been separated out since it is difficult to merge the two. In our last report, we noted that while the overall force to custody rate had been increasing, the overall number of force events had been decreasing. However, PPB's two most recent quarterly force analyses show increases not only for use of force rates but also for the raw number of force events. For instance, the 2020 Q4 report states, "*When compared to Q3 2020, the number of force cases increased by 21%, there was no change in calls for service, and custodies decreased by 8% in Q4 2020.*" There is no discussion of this finding, the potential reasons for the sizeable increase, and no recommendations. Similarly, there is no discussion in the Q1 2021's quarterly report, which saw an 8%

increase in use of force from Q4 2020. We therefore find that PPB has not maintained compliance with Par. 76, particularly with subsection (d) which requires the Force Inspector to "*identify and correct deficiencies revealed by the analysis.*"



Figure 1: Use of Force – Individuals and Force to Custody Rate

**Paragraphs Remaining Out of Compliance – Paragraphs 66, 67, 69**

In the Settlement Agreement, Pars. 66, 67, and 69 have certain policy requirements for PPB's use of force and use of force reporting. In our last report, we identified several areas where PPB uses of force and PPB documentation of that force was not compliant with these paragraphs with respect to protests. These included describing the actions of the crowd to justify force (rather than the actions of the force recipient), misuse of the term "active aggression," the inability to demonstrate force avoidance skills, inconsistent and/or absent attempts at de-escalation, a lack of timely reporting, and inconsistent application of policy.

As PPB has yet to conduct a comprehensive After Action Review or force audit related to these paragraphs and subsequently has yet to revise any policy, we find that these issues remain unresolved. Nevertheless, PPB is planning to conduct training to resolve reporting deficiencies. While PPB can certainly identify the most glaring deficiencies based on anecdotal evidence or reports by COCL/DOJ, they will need to conduct a comprehensive empirical review of reporting deficiencies to provide updated training to members.

While the above issues remain from the 2020 protest force events, we note that PPB members have maintained proper force documentation and demonstrated sound decision making in the first quarter. As we do each quarter, the COCL team randomly selected 20 cases which we stratified across different event characteristics including Precinct, level of force, whether a CEW was involved, and whether the

force was used as part of crowd control. For both the non-protest force as well as the protest force, the reports were completed in a manner that allowed for a fulsome review by supervisors and were consistent with prior recommendations we have made to PPB.[3]

For instance, the FDCRs we received demonstrated that members used force that was reasonably necessary under the totality of the circumstances and that members were attempting to resolve the confrontation without force. Furthermore, the FDCRs demonstrated various de-escalation tactics such as using communication, time, distance, and barriers to avoid physical confrontations. As resistance decreased, we observed a corresponding decrease in the category and amount of force being used. Members appeared to take into account a person's mental health information when using force and were able to articulate how such information played into their overall force decision making. For all uses of force, members described the actions of the subject rather than justifying the use of force based on the actions of others, a primary concern we had with force used during the 2020 protests. Finally, all FDCRs were completed in a timely manner and provided sufficient information to conduct a comprehensive chain-of-command review of the event.

Based on these findings, we believe that the most recent uses of force would be compliant with Pars. 66, 67, and 69. However, as noted above, the system failures of PPB related to force and force reporting have not been durably remedied. Once PPB conducts a comprehensive assessment and corresponding training (and provided that future FDCRs follow the trend found in this quarter), we will assess outcomes to determine whether PPB has substantially complied with these paragraphs. As the issues have yet to be resolved, we find that PPB has not returned to compliance with these paragraphs.

**Paragraphs 70 and 73**

In the Settlement Agreement, Pars. 70 and 73 require supervisors to complete an After Action Report (AAR) which details their administrative review of use of force events and the timeline for doing so. In our prior report, we noted several issues with AARs resulting from protest force. These included a failure of supervisors to complete AARs in a timely fashion, supervisors completing AARs without having sufficient evidence (including not interviewing members and not reviewing supplemental reports or videos prior to completing the AAR), and supervisors not returning deficient FDCRs for further information. As a result, we noted that supervisors did not hold officers accountable for deficient reporting, supervisors did not forward FDCRs for administrative investigation when appropriate, and all supervisors in the chain-of-command were not held accountable for deficient reports. As discussed above, these issues must be resolved through a comprehensive force audit and, where implicated, revisions to policy and supplemental training.

Our random review of AARs for force events in the first quarter did not reveal the same issues we had found from the 2020 protests. For instance, supervisors routinely completed AARs on time, made

---

[3] We caution that this conclusion is based on a small sample of protest cases, so we will want to confirm this pattern in Q2.

notifications as required, ensured medical attention was provided when necessary, and conducted individual rather than group interviews following uses of force. Additionally, supervisors of all ranks ensured corrective action was taken when needed during the FDCR and AAR process. The reviewed material did not reveal any out-of-policy force incidents or any significant policy, training, tactical, or equipment concerns in the first quarter of 2021.[4]

**Management of Use of Force**

PPB remains out of compliance with several paragraphs in Section III. In large part, the inability to return to compliance is based not on current uses of force, but rather PPB's failure to conduct a comprehensive assessment of the 2020 protests and institute remedial training. As noted above, we have provided PPB with guiding principles on conducting a comprehensive assessment, but to date, we have seen no evidence that PPB plans to update their assessment.

The City and PPB were unable to manage use of force in 2020. However, in prior reports we warned that unprecedented events could not be blamed in perpetuity if insufficient effort was spent evaluating the protests and identifying a path forward to prevent or minimize future problems. We will continue to maintain this position until a time when PPB conducts such an evaluation. While we will work with PPB to plan trainings on crowd management in preparation for possible future protests, we do so with the understanding that PPB will need to conduct a thorough assessment of the 2020 protests to achieve compliance.

---

[4] Again, we caution that this conclusion is based on a small sample of protest cases, so we will want to confirm this pattern in Q2

# SECTION IV: TRAINING

In our last two reports, we described the many adjustments to training, due to the COVID-19 pandemic and the extended protests in 2020, that resulted in non-compliance with the training requirements of the Settlement Agreement. In the fourth quarter we concluded that PPB's remedial training plans were sufficiently comprehensive to justify a return to substantial compliance with Section IV, but that the scheduled training, both in person and online, would need to be well executed. Our observations of the training occurred in the second quarter, so we will suspend judgment on the training for now. However, if PPB is unable to implement good remedial crowd control training in the second quarter, we will assign Partial Compliance because of the urgency of these actions in light of the 2020 shortcomings and the approaching summer. Here, we will describe the training that occurred in the first quarter for both online and in-person formats and, where appropriate, the implementation issues that arose. We will also analyze the other requirements of Section IV.

## Overview of Training Systems

COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

## Overview of Methods

The COCL team continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL team also continues to observe training (either in-person or online) and interview PPB staff. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness.

## Assess Training Needs

Paragraph 79 of the Settlement Agreement requires that PPB conduct a needs assessment and use this information to update its training plan annually. As previously noted, PPB published its 2020 Needs Assessment in the fourth quarter and the Training Division utilized the resources required in Paragraph 79 (a-k) to produce that report, including community and PPB members. The Annual Needs Assessment was largely responsive to the areas identified in the Settlement Agreement, including procedural justice, problem solving, and communication skills relevant to minimizing the use of force and appropriate responses to individuals facing a mental health crisis. However, the Needs Assessment and Training Plan gave little attention to an important set of skills emphasized by COCL and DOJ, namely, the ability to

intervene when peers are engaging in, or are about to engage in, harmful actions. This is particularly relevant to crowd control situations where officers work side by side. In the absence of a full accounting of mistakes made during the 2020 protests, COCL hereby reminds PPB of the importance of this training need. PPB's Needs Assessment simply lists the "duty to intervene" as an "identified DOJ Agreement related training need" and reports that PPB is "working on establishing the ABLE Program." (See "Peer Intervention Training" below for more details).

While COCL does not object to PPB's 2020 needs assessment and continues to assign Substantial Compliance for Par. 79 for now, to be clear, this report lacks a discussion of training needs that would be identified by a complete and thorough analysis of the problems associated with crowd management. Granted, the Training Division staff has looked at After Action reports, Force Audit reports, and the 2020 Force Summary to complete its 2020 Needs Assessment (Par. 79 requires PPB's Needs Assessment to consider "*problematic uses of force*"), but how this information was used to influence training needs is unclear. In fact, PPB reported that no minutes were taken at any meetings held to discuss topics and possible instructors for future crowd control In-service training. The Plan does propose crowd control training for the Rapid Response Team (RRT) but only new members. In any event, DOJ and COCL have recommended that PPB's administration (not the Training Division) provide a more exhaustive assessment of force applications during protests and the implications for policy and training. That did not occur in the first quarter. If this assessment does not occur in the second quarter, COCL will assign Partial Compliance for Par. 79.

The Training Division completed PPB's 2021 Training Plan in December of 2020. As noted in our 2020 Q4 report, the COCL team reviewed this Training Plan and was satisfied that it addressed most of the needs identified in the Needs Assessment, especially the proposal to remediate the training deficiencies that occurred in 2020 (for more details, see Par. 84 below). However, as noted above, the Training plan is only a plan and must be implemented. In our Q4 2020 report, we recommended that PPB provide additional crowd control training in 2021. If such training does not occur in the second quarter, given the urgency of this problem, COCL will assign Partial Compliance for Par. 84.[5]

**Deliver Appropriate and High-Quality Training**

PPB is expected to develop and implement a high-quality system of training for officers and supervisors (see Par. 84). The training must be consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness, including *"role playing scenarios and interactive exercises that illustrate proper use of force decision making"* (Par. 84.a).

As noted in prior reports, PPB failed to maintain substantial compliance because it was unable to complete the In-service training for approximately half of its members. In the fourth quarter of 2020, COCL concluded that PPB's 2021 Training Plan provided a satisfactory roadmap for remedial training in

---

[5]To date, PPB has not committed to updating its Annual Needs Assessment or Training Plan to adequately reflect the problems with crowd control. Our understanding is that PPB plans to continue its traditional annual reports.

2021 if properly implemented. During the first quarter, PPB initiated the In-service training, both online and in-person, as described below. However, crowd control training, as recommended by COCL, was not developed in the first quarter. We will return to this problem below.

*Special Trainings*

Supervisor In-service. Although PPB was able to deliver several supervisor trainings in the fourth quarter of 2020 (i.e., Supervisor In-service, New Sergeants Academy, Equity Lens training for command-level personnel), either online or in-person, no supervisor trainings, per se, were conducted in the first quarter of 2021. Supervisors did have a role in one bureau-wide In-service scenario, which will be covered in COCL's second quarter report.

In retrospect, past supervisor training has covered the basic requirements of the Settlement Agreement. Although some attention has been given to supervising protests and working with the Mobile Field Force (MFF), the coverage has been introductory (e.g., proper squad formations). Critical incident management has not extended to protests, but instead has focused more on traditional single-subject events such as hostage situations, barricaded subject, potential suicide, or domestic violence. We look forward to seeing better supervisor training on crowd control in the near future. Given that supervisors failed to adequately complete AARs and proceeded to approve use of force incidents without applying the parameters of Directive 1010, as required by policy and the Settlement Agreement, training to remediate these problems is critical and urgent.

Command-Level In-service. PPB had scheduled a Command In-service training in 2020 but that was delayed, and the 2021 plans are also on hold. PPB did provide online "Equity Lens" training for command-level personnel in the fourth quarter of 2020 (see below). For the 2021 in-person Command In-service, the plan was to hold semi-annual training (led by outside experts) that would focus on "*organizational change strategies, strategic planning, leadership, internal procedural justice, and organizational health*." (2021 Training Plan). That training did not happen in the first quarter but is critically important and we recommend that the plan be modified to incorporate strategies for managing protests.

Advanced Academy (Recruit Training). No Advanced Academy training for new hires was conducted during the first quarter because PPB did not have any new recruits. It is scheduled to begin in the second quarter. In the meantime, recent recruits who have not been fully trained are not allowed to work the streets alone and must be accompanied by a coach. Preparatory work for the Advanced Academy was done in the first quarter, including analysis of prior Advanced Academy evaluation results and dissemination of these findings to management and lead instructors. The DPSST's Basic Academy curriculum was also reviewed by PPB to ensure that PPB's training will cover the required content.

Crowd Control Training. After the 2020 protests, COCL recommended that PPB provide additional training in crowd control for all officers and for special units. We pointed out that "*Certainly, there are things that PPB would do differently, both tactically and strategically, if they faced similar protests and/or destructive actions today. After-action reports (associated with protests) can be a useful tool for such training. We encourage PPB to incorporate de-escalation principles and techniques into this training*." (COCL, 2020 Q4 report). Although many months have passed since the nightly protests ended

in the fall of 2020, no additional bureau-wide training was developed in the first quarter. PPB began working on crowd control training, but the process was slow, and the sequence of actions was not acceptable to COCL and DOJ. Concerns were raised about the absence of a proper needs assessment and lesson plans prior to the start of training. Both COCL and DOJ communicated that good crowd control training should be based on a complete and accurate analysis of the problems that occurred during the 2020 demonstrations, and that PPB's self-assessment was inadequate with regard to the management of force and the review of force applications. Both COCL and DOJ have encouraged PPB to make this a priority and implement remedial training as expeditiously as possible. Crowd control training was not fully planned or reviewed by the end of the first quarter, so COCL will provide additional information in our Q2 report. For now, we will discuss the training for PPB's special units that are deployed for protest events.

PPB has two units that provide assistance in crowd control – the Rapid Response Team (RRT) and the Mobile Field Force (MFF). Through the first quarter of 2021, the RRT was an "all-hazard" unit that responded to "*manmade/natural disasters and other emergency management situations which include, but are not limited to, the management and control of crowds through various tactics and techniques*." (Directive 635.10). RRT training by PPB instructors typically occurred twice a year, but it did not occur in the first quarter. PPB was planning to allow RRT training to begin without any lesson plans until DOJ insisted on lesson plans. In March of 2021 COCL and DOJ provided PPB with feedback on the lesson plans for RRT. We expressed concern that the training focused largely on *how* to perform certain force-related tasks (e.g., how to use a baton, or particular munitions), with little or no attention to *why* or *when* such force would be appropriate. Often, problems with the use of force are more likely to stem from the officer's judgment about when to use it and why to use it rather than how to use it. Realizing the RRT lesson plans were deficient, PPB cancelled the training.

The only RRT training in the first quarter was provided by the City's Legal office on March 24th in response to an order from Chief Judge Hernández regarding the violations of a temporary restraining order. We observed this training and found it to be overall disappointing. The instructor did not communicate the importance of this training and at times appeared dismissive of the Judge's ruling. Consistent with this tone (or perhaps as a response to the tone), RRT members did not seem to take the training seriously (e.g., none of the attendees turned on their video cameras and one freely admitted to "multi-tasking"). Videos were presented in a way that offered little educational value, and the instructor failed to clarify the difference between physical resistance and active aggression. After providing comments to the City, we were informed that these issues were resolved, but the same training was reintroduced with a different instructor.[6]

PPB's Mobile Field Force (MFF) is a unit of "*sworn members who are trained in basic crowd control tactics and techniques, organized into a squad and deployed to assist in the management of a crowd*." (Directive 635.10). PPB has become interested in having all PPB members knowledgeable about MFF's work in the event that they are needed in this capacity. Thus, the bureau-wide training on Crowd Control was planned and is expected to incorporate MFF roles. Unfortunately, the crowd control

---

[6] Unrelated to this training, the RRT members collectively resigned from this voluntary unit in the second quarter of 2021, so COCL will discuss this issue further in our Q2 report.

training was delayed for a month then suspended in the second quarter due to several factors including the resignation of RRT members. In any event, we underscore the fact that this crowd control training was proposed by the City as a key remedy to address the problem of non-compliance with force management and reporting (Section III of the Settlement Agreement). Neither the training nor the SOP on which it should be based were delivered in the first quarter.

Equity Training. Given the local and national attention to police racial equity, we consider it appropriate to give attention to the equity training that is currently underway and evolving in Portland. PPB's Equity and Inclusion Office (EIO), with input from PPB's Equity Advisory Council and the Training Advisory Council, has been working on a series of equity trainings and some have already started. COCL will briefly comment on these below. But first, we want to acknowledge that the EIO is embarking on important long-term work to not only integrate equity considerations into all aspects of training, but to introduce equity into all aspects of PPB's organization. We are impressed with the leadership in this office and the 40-page Racial Equity Plan that guides their work[7]. Also, this quarter, PPB was able to hire an Equity Training Specialist within EIO to implement new training programs.

### Equity Lens Training

A version of "Equity Lens" training was first delivered to PPB lieutenants in 2019 by the City's Office of Equity and Human Rights and PPB's Equity and Inclusion Office. The "Equity Lens" training has since evolved into a four-hour class for all command-level personnel (lieutenants and above), both sworn and civilian managers, beginning in the fourth quarter of 2020. The goal was to give employees an "equity tool" to help them be more cognizant of equity issues in the workplace by viewing work through an equity lens. Ultimately, this training seeks to create a culture where managers are in the habit of asking questions about equity and seeking to monitor the impact of decisions with data on disparities. The training material prepared by PPB's Equity and Inclusion Office defines a "formal equity lens" as a tool that:

- *Promotes active and explicit consideration of components of identity (e.g., race, gender, sexual orientation, and disability).*
- *Seeks to recognize past and existing harm while mitigating potential negative disparate impacts to achieve proportionate outcomes across groups.*
- *By considering data, history, and community input, an equity lens promotes critical thinking and questioning such as "how could this policy unintentionally burden marginalized communities?"*
- *A frame of thinking that embeds these same considerations throughout daily practice, without completion of a formal tool.*

The training familiarized managers with key concepts relevant to this lens, such as equity, inclusion, racism, community engagement, and intersectionality. Managers are also introduced to the idea of using data to assess needs, evaluate progress and prepare reports. This training was delivered using both in-person and Zoom formats. Feedback from instructors indicates that the two in-person classes worked much better than the three Zoom classes. With the Zoom format, only names appeared on the

---

[7] To read PPB's *Racial Equity Plan: Progress Report (April)*, go to:
https://www.portlandoregon.gov/police/article/784015

screen, and instructors found it difficult to know whether students were present because their cameras were turned off. If possible, the Equity Lens training should be delivered in person, or change the requirements for the Zoom format, with videos on and some type of periodic interaction required.

*In-Service Equity Training*

Beginning in the first quarter of 2021, PPB has started to develop and post a series of brief (approximately 15 minute) online equity trainings for all PPB personnel. COCL reviewed and provided feedback on the lesson plans for the first video, "*Equity Training Series – Preparation*." Based on Singleton and Linton's (2006) book, *Courageous Conversations about Race*, the first video posted in January covers the four basic agreements needed to engage in such conversations, seeking to prepare PPB members mentally for what lies ahead in race-related training[8]. In March, PPB posted a second video, "*Equity Training – Preparation*" – which seeks to prepare members for uncomfortable conversations around race and not take the problem of racism too personally. Videos 3 and 4, which were not released in the first quarter, will continue the dialogue around race.

Other online equity training videos are being planned for 2021 that will reach beyond race/ethnicity to many other identities that have been marginalized, including gender identity, sexual orientation, houselessness, limited English proficiency, and disability. COCL will monitor the quality of these videos when we are provided copies.

Unfortunately, surveys were not administered to students after the equity trainings, so we do not have a complete picture of their reactions. However, according to people familiar with the racial equity trainings to date, PPB has received mixed feedback from student members, as might be expected in the current politically polarized environment when sensitive topics are being discussed. Some members accepted the training and saw it as an opportunity to learn more about racism, sexism, and other types of bias that may affect their work, while others have responded defensively. Students have been asked not to take any of this training too personally but to learn from it.

COCL recommends that PPB begin to evaluate the equity trainings with surveys similar to other classes. COCL also recommends that the Training Division continue to support the OEI plans to find avenues to integrate the concepts of equity, bias, and procedural justice into all trainings. From COCL's perspective, this means not simply teaching about these ideas at the conceptual level but giving students opportunities to practice the communication skills associated with these concepts - skills that are needed for nearly every police-community interaction. This would require a continued reshaping of the way that training is done and a new definition of what constitutes "hard skills." Communication skills are traditionally defined as "soft skills" and, therefore, do not receive nearly as much attention and very little "hands-on" training compared to the "hard skills" such as procedures for making arrests, driving cars, using weapons, etc.

*Language and Cultural Awareness Training*

---

[8] The four agreements of *Courageous Conversations* are: Stay engaged; Expect to experience discomfort; Speak your truth; and Expect and accept a lack of closure.

*COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2021 to March 31, 2021*          26

Related to equity training, COCL brings attention to PPB's plans to deliver a series of online language and cultural awareness videos. The Office of Community Engagement, working with various PPB advisory councils (starting with Latino, Muslim, Slavic, and AAPI) is preparing educational videos to enhance cultural competency within PPB. The objective is "*to identify culturally respectful responses and develop various tools to help guide both police and marginalized communities to work together toward fostering a thriving and safe city.*" In theory, introducing a cultural/linguistic lens for PPB members should enhance procedural justice and equity during encounters between the police and these communities. The first round of videos, which engage community members as participants, should be posted in the second quarter, so COCL will report more at that time.

*Peer Intervention Training*

Continuing on the theme of improving police-community encounters, COCL and DOJ have consistently recommended that PPB introduce peer intervention training which seeks to create a police culture where officers speak up and intervene when peers are engaging in, or about to engage in, harmful actions. This type of training has the potential to reduce misapplications of force and other mistakes that may adversely affect public trust and officer wellness. We initially recommended the New Orleans Police Department's EPIC training ("Ethical Policing Is Courageous") and later recommended the related ABLE training ("Active Bystandership for Law Enforcement") by Georgetown University's Law Center.[9] In fact, Peer intervention training for PPB is not option – it is required by the Settlement Agreement and must be delivered with role-playing scenarios and interactive exercises (Par. 84.a.i).

PPB has taken preliminary actions to adopt the 8-hour ABLE training. Four PPB instructors received special training from ABLE staff in 2020 to deliver this training via Zoom to all PPB members. However, the introduction of ABLE training was delayed in order to finish developing an ABLE directive and make room for crowd control training in 2021. Thus, at the time of this Q1 report, ABLE was scheduled for the Fall of 2021. We urge PPB to make this required training a priority.

*General In-Service Training: In-Person and Online*

As described in COCL's 2020 Q3 and Q4 reports, PPB's annual In-service training for all officers was not completed because of the COVID-19 pandemic and the protests, leaving nearly half of its members without this training. As part of its remediation plan, PPB transferred the classroom portion of the training to an online format using its Learning Management System (LMS). However, this transition did not solve the problem that a majority of PPB members were unable to participate in the hands-on scenarios, including possible use of force settings, where they would practice specific skills, ask questions, and be debriefed on their performance. To fill this gap, PPB's 2021 Training Plan proposed that PPB members receive the hands-on skills training as part of the 2021 In-service training, while they continue to expand their online classes. COCL approved this Training Plan but needed to observe the In-service training to ensure high-quality delivery and adequate coverage of key topics. COCL observed the In-service training during the second quarter of 2021, so we will report more in our Q2 report. In the meantime, we will describe what PPB has completed in the first quarter for in-person and online classes.

---

[9] For more information about EPIC, go to: http://epic.nola.gov/home/ For more information about ABLE, go to: https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/

While the emergence of online classes opens the door to new possibilities, we note that the repetition of 2020 in-person classes in 2021 has opportunity costs in terms of time and budget. With limited time and resources for in-person training, PPB is very restricted in its ability to cover new skill sets in 2021 because of the remedial training that is required.

### In-Service Training: In-Person

In-person classes for the 2021 In-service training began in January. After reviewing the training calendar and interviewing PPB staff, COCL has confirmed that the core areas of skills training delivered by PPB are those missed in the 2020 training. With the exception of new scenarios and legal topics, no new material was covered during the In-service training administered in person. Over two days, PPB covered: Firearms, Control Tactics, Patrol Vehicle Operations (PVO), Patrol Procedures, Taser, and Legislative Updates. In addition, members participated in Patrol Procedure scenarios and a virtual scenario (Virtra software). Each of these trainings received roughly two hours of time, with the exception of Legislative Updates (30 minutes) and Firearms (4 hours). Our observations and assessment of training delivery will be reported in Q2, including our assessment of the scenarios and the integration of communication skills and procedural justice. For now, we can report that the preliminary survey results from the in-person training are positive, meaning that students reported positive assessments of the instructors, the content, and what they learned from the class.

### In-Service Training: Online

As we noted previously, the COVID-19 pandemic and budget cuts have caused PPB to expand its online training plans for 2021, and roughly half of the In-service training (20 hours) are delivered using a virtual format. On the positive side, this format has created opportunities to provide additional training on new subjects, including subjects where PPB has sought to engage community members (e.g., language access). On the negative side, engaging PPB members in a virtual discussion and holding them accountable for remaining engaged is generally more difficult with online training, and other problems can emerge in this virtual environment, as noted below.

During the first quarter of 2021, PPB offered several online (LMS) trainings. In January, members were required to take: PVO (box-in refresher), Axon Taser Update, Tactical Emergency Casualty Care (TECC or use of First Aid Kits), and Equity Training Series Introduction. In February, members took: Wellness (Part 1 – Resilience) and Nuclear Reactor Response (required by the State). In March, members took: Wellness (Part 2 – Mindful movement), CPR/First Aid (American Red Cross), Equity (Preparation), and the Chicago Case Study (responding to someone armed with a non-firearm dangerous weapon).

On several occasions, COCL requested access to the online training, but was denied. PPB claimed that neither COCL nor DOJ can review the online training because we are not members of PPB and therefore, do not have access to LMS. We did not accept this response.[10] Ultimately, we requested and received videos for review. COCL reviewed five videos - the two equity videos, two wellness videos, and one

---

[10] Paragraph 162(b) requires PPB to "*Facilitate the provision of data, documents, materials, and access to PPB personnel to the COCL and DOJ, as needed,*" and Par. 163 stipulates that "*The COCL shall have full and direct access to all PPB and City staff, employees, facilities, and documents that the COCL reasonably deems necessary to carry out his/her duties.*"

video showing techniques for responding to an individual armed with a dangerous or deadly weapon. We are satisfied with the quality and content of these videos. The wellness videos used outside experts to give officers guidance on exercise, yoga movements and other techniques to reduce stress and increase mental and physical health, including officer's cognitive functions. The videos ranged in length from 4 minutes to more than an hour. The only major limitation is that these were all asynchronous videos with no opportunity for student engagement, which we discuss more below.

COCL has also looked at PPB's online training through the lens of survey results and through interviews with PPB employees knowledgeable about these formats. Overall, the Training Division survey data, using a limited sample, suggests that most students were positive about the classes and learned something from these videos. However, as noted above, online training can present a range of challenges for the Training Division. To be clear, we consider the virtual format essential to the future of police training, and we expected that PPB would experience some hurdles with this transition.

One of the big challenges is keeping students engaged. If students are allowed to disengage (not turn on their videos for Zoom or not take quizzes or not answer questions when watching asynchronous videos without live instructors), then the online format will have limited utility. Techniques to elicit the highest degree of student attention and participation must be given priority, and students should be required to complete requested surveys in order to receive credit for the class.

Another issue is the appropriateness of certain topics for online training and PPB has worked hard to achieve the right balance. PPB has converted certain trainings to the online format that some students would prefer to receive in-person. This happens more often for trainings that involve particular skills and tactics, such as PVO. This feeling is understandable. Many topics could benefit from the combination of online and in-person formats, where the online portion replaces the traditional classroom presentation prior to the tactical "hands-on" training. We encourage PPB to continue working on this challenge to achieve the optimal balance for particular subjects. For subjects such as equity and wellness, students need opportunities to express their feelings and practice their skills. Some online "classroom" training will need to be live to engage the students.

As we noted in Q4 2020, virtual training can be complex and requires significant resources to be implemented successfully and effectively. In 2020, COCL expressed concerns about PPB's reliance on asynchronous online videos and encouraged PPB to directly confront the issue of interactive training and devote more resources to this issue. Since then, PPB has supported outside training for the LMS manager and hired a videographer/motion graphic designer in late 2020. The Training Division is in the process of hiring a second videographer. Also, PPB has effectively utilized Adobe Captivate software so that students are required to interact periodically when watching videos. For some videos, PPB has added quizzes or questions and students are not allowed to continue on to the next slide without providing an accurate response. If they give an inaccurate response, they must return to the slide where that material was originally covered.

However, programming this software is very labor intensive. From COCL's viewpoint, expecting a couple of IT staff at the Training Division to convert <u>half</u> of PPB's entire In-service training program to online videos in the first five months of 2021 is overly ambitious. For every video, staff must program the

software to have some interactive components, which is extremely time consuming (up to 40 hours per video)

Also, the Training Division must be sensitive to the needs of the students. PPB members can be busy on the streets and sometimes find it difficult to stop for an extended period to participate in online training. As we noted previously, PPB is using three types of videos in 2021: (1) Lecture Video, where a presenter gives a presentation to the students; (2) Roll Call Style Video, where a few minutes of scripted information is shared with officers; and (3) Storytelling Video, where PPB members, community members or experts tell a story or share their knowledge and experience with the officers. Based on 2021 experience, PPB has learned that the asynchronous videos should be short (typically 5 to 15 minutes) and easy for students to consume on the job. However, the other videos must be carefully designed to engage the students for longer, but still limited time periods. For example, one hour of lecturing can work in-person, but not online. Instructors have been advised to divide the lecture into shorter segments with natural break points for students to respond to something in the lecture. Storytelling videos must have similar breaks. Thus, PPB has learned that with limited staff and with PPB members who are busy on the streets, the videos should be rolled out slowly with some order.

Also, for long-term planning, PPB should give more attention to how on-line and in-person training will be linked. Previously, these were viewed largely as separate, stand-alone trainings, but in reality, students need to first understand key concepts of policing and then be allowed to observe and practice the skills associated with these concepts. If the time lag between learning concepts and translating them into practice is too long, the skills may not be properly learned or may perish sooner.

In sum, we are confident that PPB is on track to engage students with tools that stop and start videos, provide knowledge checks, and require interactivity to complete the training. However, we are concerned that PPB members could be overburdened with too much online training delivered in a compressed schedule and the training may not being properly linked to in-person training. In general, online training, with the exception of scripted roll call videos, should not be viewed as a stand-alone platform. Online training is best as an introduction to ideas or a refresher course that can be connected to skills practice, although some standalone videos are self-sufficient.

Someday, we hope that online training can incorporate the necessary skills training in virtual reality. Along these lines, PPB introduced the Virtra De-escalation and Judgmental Use of Force Simulation Trainer in January. We will report on this three-dimensional software program in the second quarter and determine whether it can live up to the expectations of strengthening skills in de-escalation, procedural justice, and the proper use of force. This is a promising field for training, but the use of this software is only in the infancy stage and is currently being delivered in-person.

Finally, online training at PPB includes live interactions between students and instructors using software such as Zoom and Microsoft Meetings. As we noted previously, PPB has used Zoom extensively in training. The Equity training was done in both Zoom and in-person formats, with more positive experiences from the in-person training. Also, Zoom requires as much time from instructors as in-person classes and does not allow for much in the way of skills training. Nevertheless, Zoom is much more interactive than online videos if students are paying attention. We recommend that PPB have a rule that

requires members to have their videos turned on and respond to certain questions in order to receive credit for the course.

**Evaluate Training**

Paragraph 80 requires that PPB "*develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum.*" The COCL team continues to assess the content, methods, and utility of PPB's training evaluations in 2020.

PPB's training evaluator continues to perform beyond expectations despite the significant challenges associated with the transition to online training and lacking adequate resources. PPB continues to employ a diverse set of methods to evaluate in-person training, including in-class quizzes, anonymous class evaluation surveys to assess the quality and content of instruction, knowledge tests, and scenario forms that measure officers' proficiency during role playing.

As we noted previously, PPB's evaluation system for online training began with only post-class knowledge tests but the evaluator has been able to add post-class surveys to evaluate the content and quality of online instruction in 2021, with the exception of equity classes. For some online classes, quizzes were included to keep students engaged. The evaluator continues to generate numerous internal reports that are fed back to students, instructors and managers weekly and monthly.

COCL found that most of the in-person and online classes were subject to tests and surveys. One exception were the Equity classes, which are structured differently (e.g., some parts online and other parts in-person). COCL is uncertain why these classes have not been formally evaluated, especially since the informal feedback has been mixed, arguably due to the need for uncomfortable conversations about racism in policing. One reason could be staffing. PPB's evaluator is exceptionally talented, but she cannot be expected to perform dozens of evaluation projects on her own.

COCL has reviewed the analysis and reporting of data relevant to the In-service training that occurred during the first quarter. The internal draft reports are clear, concise, and accurate. The students continue to score well on the knowledge tests and in general, give high ratings to the instructors and the class content.

The online training continues to present some challenges for the evaluator. First, the survey response rates for students taking the online classes are much lower than the response rates achieved during in-person training. Although the data are preliminary at the time of this report, only 1 in 5 students completed the surveys during the first quarter of 2021. Second, some members expressed frustration with difficult quizzes, not realizing these were not tests, but aids in learning. This second problem can be corrected with introductory material prior to the start of training.

The response rate issue is concerning, and we know PPB is working on it. When there is not an instructor standing nearby and asking students to pick up their cell phones and take the survey now, students can easily skip the voluntary survey. COCL maintains that the quality of online training is dependent on students who are able to identify problems with the content of training or the way it is delivered.

*COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2021 to March 31, 2021*          31

Without feedback from a majority of the class, the results can be misleading (unrepresentative) and PPB's efforts to improve training can be compromised. In the past, COCL has recommended that surveys, like knowledge tests, be required of students, not optional. But we understand that it is difficult to protect confidentiality when officers are required to complete the survey to get credit for the class. Hence, we recommend that PPB make a stronger effort to encourage voluntary participation in the surveys by having a respected member of the Bureau make a strong appeal at the right time, emphasizing (1) how completing the survey will help improve future classes and (2) your responses are confidential, and you cannot be identified, so be open and honest.

In sum, the Training Division continues to make progress toward restoring its complete evaluation system. Similar to classroom learning, PPB has incorporated knowledge tests, quizzes, and surveys into most of the online classes. We encourage the Training Division and the Equity and Inclusion Office to work together to develop a similar evaluation plan for the new Equity classes. We also encourage the Training Division to take corrective action to increase the survey response rate associated with online classes.

Finally, we continue to push for more civilian analysts and the information technology staff assigned to the Training Division. A limited staff is burdened with a massive amount of new programming, as well as data cleaning, analysis, and reporting across multiple training programs, including In-service, Supervisors, Advanced Academy, ECIT, and many others, including both online and in-person formats. Evaluation research and Information Technology are the primary mechanisms for PPB to establish itself as an evidence-based learning organization. While we can debate whether PPB needs certain units in the field, there is little room to debate whether the organization should continuously monitor its performance in training, evaluate effectiveness, and make rapid adjustments as needed.

### Document Training Delivered and Received

Paragraph 81 of the Settlement Agreement requires that PPB create, and that supervisors use, a *"central, commonly-accessible, and organized file system"* for training records. COCL can confirm that the Training Division continues to use the Cornerstone Learning Management System (LMS) for this purpose. LMS attendance records have been updated in the first quarter to include all in-person and online In-service trainings noted earlier, as well as the range qualifications, legal updates, directives, and other training videos and notices. Records of external trainings are also maintained.

LMS is still used by supervisors and command staff to run transcript reports and ensure that PPB employees who are not on leave are completing their required training. The review and compliance process has not changed, with individuals given 30 days to complete training and sent email reminders at 7 and 14 days after training is posted. Their RU manager is sent emails regarding training delinquencies at 1, 5, and 21 days past the due date. When the person has failed to complete an online class in this time period, the Training Division sends a non-compliance memo to the Chief's office. During the first quarter, 16 non-compliance memos were sent to the Chief's office for 16 different classes indicating whether each training was missed by specific PPB employees. However, COCL has found that for most classes, only 1 or 2 employees failed to complete the class. For classes with higher levels of delinquency, explanations will be sought as well as consequences.

Per Paragraph 83 and SOP 1-19, PPB continues to follow guidelines that prohibit the selection of trainers *"who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness,"* with specific limitations in their work histories over the past five years. COCL's examination of PPB's Training Division's Work History Review Sheets revealed that only one instructor was assigned to the Training Division in the first quarter and this individual did not have the prohibited history.

**Audit the Training Program**

No formal audit of PPB's Training programs has been conducted since 2018. We acknowledge that the Office of the Inspector General and the Chief of Police's office continue to review the annual training needs assessment, the training plan and the training evaluation reports produced by the Training Division. However, COCL recommended in 2020 that PPB plan to conduct another formal audit of the Training Division during 2022. Over the past three years, many changes have occurred in the planning and delivery of training, and they deserve a careful review and assessment. To remain in Substantial Compliance with Par. 80, we expect that PPB will submit a Training Audit plan for review and approval by DOJ and COCL before the end of the 2021.

**Analyze and Report Force Data**

Paragraph 86 of the Settlement Agreement requires that PPB's Force Inspector *"gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council…"* including *"problematic use of force patterns and training deficiencies."* In turn, the Chief is expected to receive and respond in a timely manner to recommendations from TAC or the Training Division regarding training, policy, and/or evaluation pertaining to use of force patterns.

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). Unfortunately, the presentations of force quarterly reports to the TAC have been somewhat inconsistent[11]. Also, while statistics on protest-related force are now included at the end of the quarterly report, they have not been part of the Force Inspector's presentation to TAC. To remain in Substantial Compliance, we expect that the Inspectors' analysis and presentation of force incidents will be more consistent over the next two quarters and will include patterns identified in crowd control applications of force.

Aside from these hiccups, the relationship between the TAC and the PPB Training Division is functioning smoothly. TAC has been receiving quicker responses to their recommendations by the Chief's Office and the new Captain in charge of Training has been fully engaged with the TAC. The TAC has been able to recommend some long-term reforms in PPB but has had limited involvement in in reviewing specific training plans or observing training. During the March meeting, one TAC member asked to observe

---

[11] Sometimes, quarterly force reports are presented for two quarters at the same TAC meeting (e.g., TAC meetings in July 2020 and March 2021) and sometimes they are missed. TAC only meets bi-monthly, so proper scheduling requires planning.

training, but did not receive a clear response. Our understanding is that TAC will be more involved in the review and critique of training plans around crowd control in the second quarter. Another TAC member proposed that someone evaluate the impact of training on officers' actual behavior on the job. We encourage PPB to continue to explore ways to measure these training outcomes using existing methods and new methods (e.g., randomized control trials and contact surveys).

The TAC meetings remain open to the public as required by Paragraph 87. COCL has observed these meetings, held via Zoom, and the public has been allowed to listen and make comments. PPB continues to use a public email distribution list to send reminders of the meetings to the public. PPB also continues to post the TAC meeting agendas and minutes on PPB's website (http://www.portlandoregon.gov/police/61449).

A fundamental problem for TAC (as well as PCCEP) is the lack of resources to perform specific functions, such as data analysis. TAC members would like to do more, but they are volunteers and volunteers can only do so much.

Through quarterly force reports, audits, and the Employee Information System (EIS), PPB continues to share force data with Precinct Commanders. PPB continues to use EIS as a risk management tool to identify officers who exhibit problematic trends in force and other behaviors during routine police work, as noted in our assessment of Section VII. However, we are concerned about the inadequate analysis of force applications that occurred during the protests, which we discuss in Sections III and VII. If the After Action reports by supervisors do not sufficiently identify problematic force applications during protests, then the Force Inspector does not have a complete set of force data to examine trends and discuss them in the quarterly force reports. Again, supervisor training to help remediate this problem is critical.


**Training Summary and Conclusions**

The beginning of 2021 was PPB's opportunity to begin addressing the large gap in skills training created by the pandemic, budget cuts, and PPB's response to protracted protests in 2020. Using a mixture of online and in-person training formats, PPB started the In-service skills training in January that was missed in 2020 by more than half of the police force. PPB has also introduced new classes identified in the needs assessment and strategic planning using online formats. COCL's observation of the in-service training occurred during the second quarter, so we will report on the quality of the skills training in our next report.

COCL continues to be satisfied that PPB has reached beyond asynchronous videos to create a more interactive online training environment. However, we encourage PPB to be thoughtful when rolling out the online training and coordinate this delivery with the delivery of in-person training. Currently, online training, despite comprising half of all In-service training, is limited in its capacity to provide skills training, so it should be used to explain, justify, and contextualize in-person training involving physical and verbal interactions with the public. We also remind PPB that it is required to "increase the use of role-playing scenarios and interactive exercises" (Par. 84.a.i.), and as such, the Training Division should be continuously cognizant of the danger of becoming too reliant on videos at the expense of in-person training.

Despite these cautions, PPB must continue to invest more resources in virtual training. Online training will be the centerpiece of future training, but it is more complex, multi-faceted, and resource intensive at the front end than many had expected.

PPB continues to maintain a strong training evaluation system that includes the collection, analysis, and reporting of data on instructors, class content, and student knowledge acquisition. The online surveys will require additional attention to determine methods for increasing response rates. We look forward to seeing improvements here, as well as the introduction of surveys for the equity trainings.

This quarter we are pleased to see that the Training Division, with the support of other units, has started to implement the remedies needed to address training deficiencies in 2020. However, we remain concerned about PPB's overall response to training needs around protests and crowd control. The absence of a detailed analysis of 6600 force applications during the protests has compelled the COCL to ask PPB to revisit its Needs Assessment and Training Plans for 2021. In a nutshell, COCL's Substantial Compliance ratings for Paragraphs 79 and 84 are at risk because of PPB's problematic response to crowd control. COCL will wait until the completion of the second quarter to allow PPB to complete an assessment of protest-related force issues, extract the training implications, and deliver a sound training program for crowd control. In the meantime, COCL will not change the rating of Substantial Compliance for these paragraphs in the Settlement Agreement. However, to maintain Substantial Compliance, PPB will need to implement high-quality crowd control training in the second quarter of 2021.

Also, we should reasonably expect that, before the end of 2021, PPB will deliver Command-level and Supervisory in-service training around crowd control, along with the ABLE peer intervention training. The rationale for these trainings has been articulated in this report. In the final analysis, first-line supervisors and incident commanders are responsible for the actions of officers they are supervising and for properly documenting force events for transparency and accountability.

# SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES

In evaluating this section, we continue to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. Par. 88 identifies the City's partners in providing community-based addiction and mental health services: *"the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders."* As the Settlement Agreement holds no authority over the City's partners, prior reports have evaluated only what the City and PPB can reasonably accomplish. We maintain that evaluative approach in this report.

As part of the broader community-based mental health service response system, the City and PPB have maintained their roles in overseeing or participating in committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

As we noted in prior reports, we lack the necessary non-party information in public health care systems to assess whether all of the goals listed in Par. 90 have been met comprehensively. However, we can say that where City and PPB input is necessary for an improved system, we continue to find City and PPB actions have been satisfactory. One recent development for Par. 90 relates to subsection (d) which discusses "*expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders.*" In the first quarter of 2021, BOEC's options were expanded through the Portland Street Response pilot program which operated out of the Lents Neighborhood. During the first quarter, project team members responded to 54 calls (though the pilot began near the middle of the quarter) and an online Tableau dashboard tracks other related data (https://public.tableau.com/app/profile/pdxstreetresponse/viz/PSRAnalyticsCurrent/PSRDashboard).

Although not borne out of a CCO as anticipated by the Settlement Agreement, Portland Street Response is responsive to the requirements of Par. 90(d). However, we are unable to determine at this moment whether the quality of implementation is reflective of the goals of the Settlement Agreement. For instance, BOEC telecommunicators have yet to receive a comprehensive training on the program outside of being informed of the basic triage criteria (see https://www.portland.gov/streetresponse/psr-faq for the triage criteria). Additionally, some of the data on the public-facing dashboard raise questions about reporting or dispatching. For instance, for 83.8% of Portland Street Response calls, it was unknown whether the call was mental health related or not. Before expanding the pilot citywide, we suggest these issues be resolved.

As part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis

Model of mental health crisis response. Related to this, PPB has continued to participate in AMR training in transporting persons in mental health crisis. Additionally, PPB continues to participate in the Transportation Workgroup. Topics discussed in the first quarterly meeting related to communicating the circumstances of a hold from PPB members to Unity personnel via AMR personnel, changes to AMR policy, Project Respond staffing, and transfers from Unity to Oregon State Hospital.

As evidenced above, we continue to find that the City and PPB have maintained compliance with Section V of the Settlement Agreement. While we believe that some improvements may be made to Portland Street Response as related to Par. 90(d), overall, PPB and the City have continued to work with City partners to improve community-wide delivery of mental health services. Through self-initiated committees, as well as contributing to external committees and working groups, PPB and the City continue to do what can reasonably be expected of them. The Unity Center continues to operate as a walk-in/drop-off center as envisioned by the Settlement Agreement and PPB continues to play their part in ensuring compassionate transportation. While we encourage PPB to continue to seek ways to support organizations that provide community-based mental health services, we acknowledge that what has been accomplished to date satisfies their responsibilities in the Settlement Agreement with an ongoing obligation to continue such efforts.

# SECTION VI: CRISIS INTERVENTION

Section VI of the Settlement Agreement (Crisis Intervention) is designed to facilitate PPB and the City's implementation of "*systems and resources for responding to persons in mental health crisis*" (see Par. 170). As we have done in the past, we evaluate PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers and Portland Street Response); and (2) Secondary Response (including BHRT and SCT). In accordance with our maintenance year plan, we evaluate the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC). We then assess PPB's response to such calls when received. Finally, we examine what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. Consistent with prior reports, we continue to find PPB and the City have maintained their system for responding to mental health crises during this monitoring period.

## BOEC

Most often, the entry point for PPB contact with persons in mental health crisis is through BOEC, the call-taking and dispatch center for Portland. During this monitoring period, BOEC has maintained their Mental Health and ECIT Dispatch Protocol SOP which continues to identify seven call characteristics where an ECIT response is needed (these include when there is a mental health component <u>and</u>: a weapon is present, the subject is violent, the call is at a mental health facility, the caller is threatening suicide and has the means to carry it out, at the request of a community member, at the request of another officer, or when the subject represents an escalating risk of harm to self or others).

The SOP satisfies the requirements of Par. 113 for BOEC to revise policies for CIT dispatch. However, the requirements of Par. 113 also apply to all "*policies and procedures to triage calls related to mental health issues.*" For instance, the requirements apply to Portland Street Response since BOEC, with the advice of the BHUAC, is required to add "*new or revised policies and procedures to assign calls to…community-based mental health professionals.*" During the first quarter, we were not provided any policies related to Portland Street Response pilot and the BHUAC did not provide input on policies related to Portland Street Response pilot.

For training (see Par. 114), we note that BOEC has not delivered formal in-service training since 2019 due to the pandemic. However, restrictions within Oregon and Portland have begun to ease and BOEC will need to begin planning for an upcoming in-service consistent with current state and city restrictions. As part of this, we recommend BOEC begin reaching out to BHUAC now in order to gather their input on "*develop[ing] ongoing training for BOEC dispatchers.*" Presently, BOEC is preparing for a training regarding transfer of calls to MCCL which will incorporate elements of ECIT when comparing the two protocols. However, this training has not been reviewed by BHUAC as required by Par. 114.

Also related to Par. 114, we are not aware of any formal telecommunicator training related to the Portland Street Response pilot. While BOEC informed us that telecommunicators received training on the triage criteria, other elements of the model have not been included in a formal training. For instance, in the 16-hour training provided to telecommunicators on Crisis Intervention Team, BOEC provides a history of CIT, including the origin and theory behind the model. While telecommunicators

need to be trained on the technical elements of the model, having a grounded understanding of the model's origin and expected benefits would likely result in using Portland Street Response more effectively.

To summarize, during the first quarter of 2021, BOEC incorporated new triage options in the form of Portland Street Response without the requisite input from the BHUAC. Additionally, BOEC has not provided corresponding formal training for this new triage approach nor has formal in-service training been provided since 2019. Similar to BOEC policies, there has been no updated review of BOEC training by the BHUAC for some time (the last time BHUAC reviewed anything of BOEC's appears to be 2018 Q3). All of this combined has implications for BOEC's ability to "*ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed…and operation by trained staff*" (see Par. 115).

In order to remain in compliance with the requirements of Pars. 113-115, BOEC will need to consult with the BHUAC for the new triage approach and ongoing CIT processes. Additionally, BOEC should request BHUAC input on current ECIT dispatch policies and current CIT training given the time that has passed since the last BHUAC review. Finally, as Portland Street Response is still in its pilot phase, we do not consider the program to be a "final product" as it will likely be assessed and modified before the program is expanded citywide. We therefore recommend BOEC take the present opportunity to request input by the BHUAC regarding policies and training before implementing the program in all areas of Portland. We will provide updates to these steps in future reports.

### Primary Response Systems

To evaluate PPB's role in the City's system for responding to persons in mental health crisis, we evaluate PPB's current policies, the training received by PPB officers, the enhanced training received by ECIT officers, and the data collection tools and associated data related to PPB's response. PPB continues to enforce directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). For each of these directives, we have concluded that they continue to substantially comply with the requirements of the Settlement Agreement and were properly reviewed by the Behavioral Health Unit Advisory Committee (BHUAC) prior to enactment (see Par. 95).

Comprehensive training on crisis response remains a core competency in PPB and all officers are required to receive a minimum of 40 hours Crisis Intervention training prior to graduating from the Advanced Academy (see Pars. 97 and 98). New recruits will receive the entirety of the 40-hour training, although no Advanced Academy occurred in the first quarter of 2021. PPB has resumed the in-service make up from last year that includes a crisis situation (see Par. 98). In light of the training provided to all PPB members as well as the refresher training and Supervisors Academy (see our prior report), crisis response training continues to be a core competency within the PPB.

As part of PPB's specialized response system, a select group of officers receive 40 additional hours of training to become Enhanced Crisis Intervention Team (ECIT) officers (see Pars. 99 and 102). The training

has been reviewed by BHUAC members, who last reviewed and commented on the training in October 2019. No new ECIT officers have been trained since November 2019; however, PPB reports that due to multiple retirements, the number of operational ECIT members has continued to decrease, ending the first quarter of 2021 with 118. PPB regularly evaluates whether the number of ECIT officers is sufficient given the demand for services and should continue to do so given the continued decrease. Should PPB determine that additional officers are needed, we expect they will conduct a 40-hour ECIT training seminar for officers.

In addition to the training provided, the ECIT program continues to comply with the Settlement Agreement in other ways. For instance, ECIT officers retain normal duties until dispatched as an ECIT officer (Par. 103). PPB has maintained selection and retention criteria that are consistent with Par. 101 and which have been reviewed by BHUAC. As part of their system, PPB reviews the work history for all prospective ECIT officers prior to selection to ensure adherence to selection criteria. Additionally, BHU personnel are notified by the Professional Standards Division (PSD) whenever an ECIT officer receives a complaint based upon use of force or mistreatment of persons with mental illness, thereby ensuring adherence to the retention criteria. Each of these elements demonstrates a comprehensive system with built-in oversight mechanisms.

For nearly three years, PPB has provided the COCL team with semi-annual evaluations of the ECIT program, which evaluates data related to: the proportion of calls for service which have a mental health component, the proportion of calls with a mental health component which meets ECIT criteria, ECIT response rates, and differences in outcomes between ECIT and non-ECIT officers (including the proportion of calls which result in arrest and the proportion of calls which result in the subject being transported to the hospital). For each of the semi-annual evaluations, PPB has been unable to conduct quantitative analysis on uses of force due to the small number of cases, a testament to PPB's overall low number of force incidents against persons in mental health crisis. Using the same case-selection criteria that is used to evaluate differences in arrests and transports[12], we requested that PPB conduct a longer-term evaluation of force. Since the force numbers are low on a quarterly basis, we asked PPB to combine data from each semi-annual evaluation to create a sufficient sample size of force events to make statistical inferences. The review is only a preliminary assessment, so additional discussion with PPB will be necessary regarding further exploration of the data. We will provide updates on the analysis in our next report.

**Secondary Response Systems**

As in past reports, we also assess supplemental/secondary response systems being used by PPB, including the Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT).

---

[12] Because of the specialized nature of ECIT and because the ECIT dispatch criteria is based on calls involving a higher risk of harm, comparisons between ECIT and non-ECIT cannot be made using data on all calls for service as this would not result in an apples-to-apples comparison. PPB therefore limited the scope of the assessment to non-ECIT calls. Given PPB's position that all officers would be able to handle these types of mental health calls in a consistent fashion, non-ECIT calls provide a natural comparative backdrop.

When a person is referred to BHRT through the Behavioral Health Unit Electronic Referral System (BERS), the person is evaluated to determine whether they meet the criteria for BHRT intervention. The criteria include whether the person is demonstrating escalating behavior, has had frequent contacts with PPB, is considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. Also, when a person is the subject of three MHTs in a 30-day period, an automatic BERS referral is made for that person (unless a previous referral exists), thereby satisfying the requirements of Par. 110. If a person meets the criteria for BHRT intervention, a plan of action is discussed among members of the Behavioral Health Unit Coordination Team (BHUCT) which includes law enforcement, court, service provider, and hospital personnel, among other relevant stakeholders.

PPB members of the BHRT teams are provided the 40-hour enhanced crisis intervention training and receive specialized training when available (see Par. 109). The selection and retention criteria are consistent with the criteria for ECIT officers. Also, the same process by which PSD notifies BHU whenever an ECIT officer receives a complaint of force or mistreatment against a person with mental illness is applied to BHRT officers as well (see Par. 108).

PPB continues to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the first quarter of 2021, a total of 262 referrals were made through the BERS system, a slight increase from prior quarters. However, given that the pandemic in 2020, resulted in fewer overall PPB contacts, this increase resembles a return to pre-pandemic numbers. Of the 262 referrals, 93 (35.5%) were assigned to the BHRT caseload - a decrease in the percentage of referrals assigned to the BHRT caseload from prior years for which acceptance rates have generally been between 45% and 55%.



Figure 2: BERS Referrals Assigned to BHRT Caseload (Figure provided by PPB)

In the first quarter of 2021, 96 individuals transitioned to inactive status with BHRT. Of those 96, 42 (44%) had previously been on the BHRT caseload. Additionally, this quarter saw that the most common reason for a referral to be assigned was for Escalating Behavior (40%), closely followed by Frequent Contacts (39%). When looking at the outcomes of referral for inactive cases in Q1, the most common outcome was Coordinated Services (25%), closely followed by Concern Mitigated (23%).

The other secondary response system that PPB operates is the Service Coordination Team (SCT). This program continues to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system (see Par. 112). We have long been impressed with the work of SCT and ongoing evaluations have demonstrated the positive impact of the SCT on the clients it serves.

PPB also continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people the SCT has served. As we noted in our last report, the number of referrals significantly decreased between the first and second quarters of 2020 and began to increase slightly in the final quarter of 2020. For the first quarter of 2021, the number of SCT individuals referred stayed roughly the same as the final quarter of 2020 and still has not returned to the number of referrals found earlier in 2020 (and the two years prior). We continue to believe this is the result of the pandemic as PPB has indicated that interactions with potential referrals had been put on hold and/or limited and treatment providers discontinued individual and group meetings. This directly impacted the number of persons who may have been referred to the SCT. In spite of this, the SCT accepted nearly 60% of referrals in quarter one of 2021.



Figure 3: SCT Individuals Referred (Figure provided by PPB)



Figure 4: SCT Referral Status (Figure provided by PPB)

As part of SCT operation, the Supportive Transitions and Stabilization (STS) program continues to provide a direct housing resource for BHRT clients. The STS program has consistently accepted a high percentage of referrals they have received and in 2020, their acceptance rate was 90%. The first quarter of 2021 saw a slight decrease in this acceptance rate with 12 out of 16 referrals being accepted (75%). As evidenced by the above, we continue to find that the Service Coordination Team acts as a positive element of PPB's overall system of mental health response and has continued to comply with Par. 112.



Figure 5: STS Referral Status (Figure provided by PPB)

**BHU AND BHUAC**

As an overarching system, the Behavioral Health Unit (BHU) continues to oversee and coordinate the ECIT, BHRT, and SCT programs (see Par. 91). BHU utilizes data from a variety of sources to evaluate its operation, including data from the MHT as well as data collected from BHRT and SCT (see Par. 93). Additionally, in accordance with Par. 92, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, MCCL, BOEC, and BHUAC (see also below). We have met with the Lieutenant who oversees BHU on multiple occasions and are confident that all aspects of BHU (ECIT, BHRT, and SCT) are operating as a comprehensive system rather than individual programs.

The BHUAC continues to act as an advisory body to guide the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT components. The current BHUAC membership consists of individuals from PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, the Public Defender's Office, CareOregon, AMR, Central City Concern, and the Unity Center for Behavioral Health (see Par. 94).

The BHUAC continues to provide input on policy, training, and SOPs (see Par. 95), as well as receives presentations and holds discussions on current practices of other mental health system partners. In the first quarter of 2021, BHUAC met three times (though once without a quorum) and discussed issues related to the Service Coordination Team, the committee's Community Engagement Plan, Coalition of Advisory Groups, BHU SOPs, and BHUAC bylaws. Additionally, the BHUAC held one public community engagement meeting. Although public comments at that meeting urged the BHUAC to open all meetings to the public, we believe that their current open meeting schedule is a reasonable compromise given prior discussion of the topic.  We continue to receive updates on BHUAC recommendations, meeting agendas, and meeting minutes. Overall, we maintain that the BHUAC continues to act in compliance with the Settlement Agreement. However, as discussed in our report section related to BOEC, the time that has passed since the committee has reviewed anything related to BOEC is somewhat concerning and we recommend the BHUAC coordinate with BOEC regarding the policies and training referenced in that section.

# SECTION VII: EMPLOYEE INFORMATION SYSTEM

The PPB continues to use the Employee Information System (EIS) as their primary system for identifying potentially problematic members and "*design[ing] assistance strategies to address specific issues affecting the employee*" (Par. 116). As with our prior reports, we evaluate the EIS system from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on receiving alerts. Although PPB's process has largely remained the same as in prior quarters, we find that PPB has fallen out of compliance with Section VII (Employee Information System) as they have not remedied issues of deficient reporting and investigation of force discussed in Section III of this report. Below, we detail the areas of EIS which are impacted by the Section III deficiencies.

**Maintained Compliance – Par. 120**

PPB continues to employ two trained EIS administrators to evaluate alerts created by the EIS and determine whether the alerts should be forwarded on for RU review. The EIS administrators were trained via a comprehensive operations manual—including SOPs for the handling of EIS alerts, entries, and responses—in accordance with Par. 120, which also allows future EIS administrators to operate in a consistent fashion. EIS administrators track and monitor alerts to ensure that identified issues are resolved in a timely manner. Finally, the EIS administrators act as a system of checks and balances should the RU Manager or supervisor determine no intervention is necessary.

**Fell Out of Compliance – Pars. 116, 117, 118, 119**

PPB continues to collate data from a variety of data sources, including data from force events and traumatic incidents (captured in Regional Justice Information Network (RegJIN)) as well as complaints and commendations (captured in Administrative Investigations Management (AIM)). These data are then used to identify potentially problematic behavior in the form of predetermined thresholds, some of which the Settlement Agreement defines, including when:

- Shift Force Ratio: A sworn member's force ratio is greater than or equal to three times their shift's average ratio in the preceding six months
- Force Ratio: A sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six months
- Force Count: A sworn member uses force three or more times in the preceding thirty days
- Criminal Complaint: A member receives a complaint with an allegation of criminal misconduct
- Complaint in Same Category: A member receives two or more complaints with at least one allegation in each complaint being in the same category such as two complaints that both have conduct allegations for events in the preceding six months
- Complaint Count: A member receives three or more complaints for events in the preceding six months
- Traumatic Incidents: A member experiences three or more traumatic incidents in the preceding thirty days (traumatic incidents are events related to child abuse, deadly force, homicide, officer being assaulted, suicide, and/or traffic fatality)

- Commendations: A member receives two or more commendations for events in the preceding six months

In the first quarter of 2021, EIS administrators reviewed a total of 423 alerts and sent 226 (53.4%) on for RU Manager review (see Figure 6). Compared with the prior quarter (267 alerts sent to RU Managers), this represents a 15.4% decrease in the first quarter of 2021. However, while the raw number of alerts for the first quarter of 2021 decreased from the previous two quarters, the proportion of them that were sent to RU Managers remained relatively stable. Additionally, the decrease in the number of alerts can be associated with a trend related to the protest activity that began in May 2020. As protest activity begins to subdue, we are seeing a slight decrease in the alerts. While the number of alerts are beginning to resemble pre-protest levels, 2021 quarter one alerts still represent a 50% increase in alerts when compared with quarter one of 2020.

When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts closed in the first quarter of 2021 (which may also include cases opened in the fourth quarter of 2020), there were 215 alerts sent to the RU Manager and for 142 (66%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the first quarter of 2021, a substantial majority (75%) resulted in some type of intervention for the officer. The information provided by PPB indicates that most of the interventions involved a debriefing though one officer was placed on a monitoring plan.



Figure 6: EIS Alerts and Alerts Sent to RU Manager (Figure provided by PPB)

|  | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 |
|---|---|---|---|---|---|
| Alerts Sent to RU | 129 | 186 | 338 | 277 | 237 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 60 (46.5%) | 85 (45.7%) | 108 (32%) | 80 (28.8%) | 142 (59.9%) |
| Interventions (Percent of Alerts Sent to RU) | 48 (37.2%) | 76 (40.9%) | 84 (24.9%) | 70 (25.3%) | 106 (44.7%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 48 (80%) | 76 (89.4%) | 84 (77.7%) | 70 (87.5%) | 106 (74.6%) |

Table 1 – EIS Alerts and Interventions

In accordance with Par. 116, PPB Directive 345.00, and PPB Directive 215.00, supervisors also continue to evaluate officers' EIS and Performance Discussion Tracker (PDT) information (1) annually as part of an officer's performance evaluation, and (2) upon transfer of an officer to a new command. PPB's quarterly audits of reviews required by Directive 345.00 continue to find overall high rates of compliance with the required reviews (see Figure 7). When supervisors do not conduct the reviews as required, PPB has continued to utilize their email notification system to alert tardy supervisors to missed review timelines.



Figure 7: Compliance with Reviews Directive 345.00 Reviews (Figure provided by PPB)

For alerts that are sent by the EIS administrators as well as for the semi-annual/new-to-command reviews, supervisors review particular events, comments in the Performance Discussion Tracker (PDT), and other data associated with the officer. However, as discussed in Section III, there were times during the 2020 protests where member actions were not sufficiently reported or investigated by supervisors. These deficiencies reduce the completeness of information found within the PDT as well as officer data such as the average number of force applications per force event. Because supervisors did not have this information to guide their review during the first quarter of 2021, the system as a whole continues to be negatively impacted. Although we find in this report that present FDCRs and AARs have improved, the deficiencies found in Section III have not been resolved and impact compliance related to Pars. 116, 118 and 119.

As related to Par. 117, in order to identify potentially problematic trends at the supervisor and team levels, the Force Inspector and analysts within the Office of Inspector General (OIG) continue to utilize Use of Force data to identify groups that are using force at higher rates when compared with others. On a quarterly basis, the Force Inspector meets with Precinct Commanders to discuss findings related to the force audit overall (see Pars. 74, 75, and 77) and groups which demonstrate higher rates of force. PPB continues to provide written communication from the Inspector to the Precinct Commander to inform such conversations.

However, two issues lead us to find PPB out of compliance with the requirements of Par. 117. The first is that one of the force-rate analyses conducted by PPB is officers' average number of force applications per force event. As PPB members did not consistently document all applications of force, the analysis

conducted by PPB is therefore unreliable. The second issue pertains to the EIS entries by the Force Inspector. In reviewing the memos to RU Managers regarding first quarter data, the Inspector found trends for both officers and supervisors, requesting that the RU Manager review the individuals identified. However, for each Precinct, the Force Inspector only noted EIS entries related to the supervisors and no supervisors noted any review of officers. Therefore, the record is left unclear as to whether the officer trends were addressed. This may be due, in part, to the language used by the Force Inspector when alerting RU Managers to officer trends. For instance, many alerts included the phrase "It is not uncommon for officers to have multiple force applications during one event" without any comment as to whether that was in reference to the identified officer. While providing context to RU Managers for the alert is important, the Force Inspector should make sure the language of the alert does not bias the decision to further review the identified officer.

# SECTION VIII: OFFICER ACCOUNTABILITY

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, timeliness, consistency, transparency, and a system of checks and balances.

We feel it necessary to state from the outset of this section that during the first quarter of 2021, there was considerable debate in Portland regarding the future of civilian oversight as the City began the process of phasing out IPR and phasing in the new community oversight board. However, during this quarter we were not provided any formal transition plan and no meaningful steps were taken towards seating the new community oversight board. Additionally, there was concern within IPR that staff will leave their positions because they were provided no assurance of future employment. In short, the details around this transition to the new community oversight board do not appear to have been given much thought and, at the time of this report, there is no clear indication when the group who will coordinate the development of the new oversight board will be seated. Most agree that the new community oversight board is unlikely to be fully functional for 18-months _after_ the development group begins their work. If so, the City may not have a new accountability system operating for nearly two years. In order for Section VIII to be in compliance as a whole, we will need to verify that the new community oversight board incorporates the remedies found in the Settlement Agreement. Therefore, we recommend the City develop a transition plan that can address these issues while taking meaningful steps towards starting the work of the new community oversight board.

## Access

Portland's accountability system continues to remain largely accessible to community members, allowing complaints to be filed in a multitude of ways. These include community members' complaints to the Independent Police Review (IPR), community members' complaints to PPB, IPR initiated complaints, and PPB-initiated complaints. Community members can file a complaint by phone, online, or in-person (either to PPB or IPR). For most complaints, IPR continues to conduct intake investigations and determine whether to initiate additional investigation proceedings or not.

As we noted in prior reports, the accountability system saw a significant increase in the number of administrative investigations that were opened during the 2020 protests. However, the number of cases opened has largely returned to levels seen prior to the protests. For instance, in June of 2020, there were 82 administrative investigations opened compared with prior averages of 35 cases per month. Since then, the number of cases per month has fallen and during the first quarter of 2021, an average of 21.3 cases were opened per month.

In total, the evidence indicates that the accountability system remains largely accessible and that community members are willing to utilize it. However, one paragraph related to access is the requirement that all allegations of use of excessive force are "_subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact_" (Par. 129). Related to this requirement, we found one case in the first quarter of 2021 where a community member made an allegation of improper force, but upon arriving, a

supervisor determined that the officer did not use force and did not forward the complaint. In our October 2017 report, we noted this had been an issue and PPB included a reminder of supervisor responsibilities as part of the Spring 2018 Supervisors In-Service. For the case in the first quarter of 2021, the supervisor's decision was reviewed by each person in the chain-of-command and no correction was made despite the requirement being memorialized in policy and supervisors having received training on the requirement. While we do not believe that a single incident demonstrates a practice, we would expect to see corrective action through the chain-of-command related to this incident.

**Timeliness**

In our prior reports, we noted issues related to cases being completed within a 180-day timeline as well as concerns related to the intake investigation stage of the accountability process. As of the first quarter of 2021, these issues have not been resolved and in some cases have worsened. As evidenced below, we continue to find that the City is not in compliance with the requirements of Par. 121.

On a weekly basis, members of IA and IPR meet to discuss the status of open cases and discuss issues impacting overall case timelines and stage timelines. However, during the first quarter of 2021, the tracking documents which inform these meetings showed substantial tardiness on cases, particularly as they relate to cases under the responsibility of IPR. For instance, while a quarterly analysis done by IPR indicated that the median number of days to complete an intake investigation had returned to 14-days (the allotted number of days), the case-tracking document shows individual cases which far exceeded the 14-day window. Additionally, the tracking documents indicate many IPR full investigations which exceed the investigation stage timeline (70 days). For these, the whole-case timeline had already exceeded 180-days for some investigations, with some cases already open for more than 250 days even when tolling for criminal investigations and officer leave.

In all, the quarterly analysis conducted by IPR indicates that 32% of full investigations opened in the third quarter of 2020 (the last quarter for which 180-days could have passed) exceeded the 180-day timeline, including 18% of IA full investigations and 83% of IPR full investigations. This finding is consistent with cases opened in the prior quarter for which 14% of IA full investigations and 86% of IPR full investigations exceeded the 180-day timeline. The excessive timelines also apply to investigative paths other than full investigations. For instance, 13% of IPR Administrative Closures in the third quarter of 2020 exceeded 180-days.

In the first quarter of 2021, the IPR provided us with a plan to improve timelines, including particular steps to be taken. For instance, one step listed in the plan is to re-assign "Person of the Day" duties to a Deputy Ombudsman in order to "*reduce disruption to investigators' caseloads and frontload cases with improved information to begin the intake investigation.*" IPR notes that the solution will reduce timelines by "*approximately one day per case per investigator.*"

Additionally, the IPR Timelines Plan involves several proposals related to re-assigning cases that are currently overdue and allowing IPR investigators to focus on a single element (e.g., focusing solely on

intake investigations or focusing solely on full investigations). Although compartmentalizing may better focus investigators, the primary issue with IPR is one of resources and not necessarily management.

Finally, one step taken by IPR was to relieve a backlog of Supervisor Investigations and Precinct Referrals by assigning those cases to the appropriate PPB personnel. However, we found that some cases referred for Precinct Referrals did not fit the definition of Precinct Referrals and would have been more appropriately investigated as SIs, or administratively closed. Precinct Referrals are for complaints that do not involve misconduct though some of the cases referred for Precinct Referrals allege misconduct. For instance, one case involved an individual who complained about the courtesy of officers when investigating a robbery at her place of business. For another case, a community member alleged an officer was rude and would not allow her to record the encounter with an officer. In another case, a complainant identified an officer who allegedly used profanity and refused to provide a business card.

IPR stated that after conducting intake investigations for these incidents, they believed that no further evidence would be available based on the refusal of the complainant to cooperate, the inability to identify a date of occurrence, or some other factor. In determining that further evidence would not become available, IPR instead sent the cases as Precinct Referrals. IPR chose not to send these cases as an SI as they believed it may serve to undermine the value of Supervisory Investigations if supervisors come to view them as consistent dead-end investigations. Additionally, IPR chose not to administratively close them, rather choosing to send them as Precinct Referrals in order for RU Managers to be made aware of them if they represent a broader trend. While these reasons are understandable, the decision to send them as Precinct Referrals remains counter to current policy. We recommend IPR re-evaluate these cases to determine their path as required by policy. Additionally, if IPR and PPB believe that the policy needs to be revised to account for these situations, we recommend they consult with COCL and DOJ on how that might be accomplished.

At present, IPR estimates the above described steps will allow them to achieve compliance with timelines for cases beginning near the end of the first quarter of 2021. While we are pleased to hear this outlook, we also note that the case tracking document at the end of the first quarter still indicated a substantial number of cases that were overdue. While future case timelines may be compliant, the current backlog of cases needs to be cleared. We will continue to update progress on case timelines in subsequent reports.

### Consistency

As part of our quarterly assessment, we conducted a review of administrative investigations, ensuring that a sample of each investigative pathway is reviewed. We requested a list of all administrative complaint investigations that were completed in the third quarter of 2020 and from those selected a total of 20 cases, stratifying our selection to ensure an adequate representation of administrative closures, supervisory investigations, precinct referrals, IPR full administrative investigations, and IA full administrative investigations. The cases we reviewed indicated that, regardless of which route a complaint might take, findings and decisions were reasonable and supported by a preponderance of the evidence.

However, while the 20 random cases we selected did not reveal any issues, DOJ provided the City a March 23, 2021 letter[13] which identified PRB cases in which the underlying investigations were incomplete or otherwise problematic. Additionally, the letter described inconsistencies in PRB hearings related to interpretation of policies, applicability of policies, and application of findings (among other things). We broadly concur with the issues raised by DOJ in their letter and maintain that such issues will need to be remedied in order to restore the consistency we had seen previously in the accountability system (see Par. 169).


**Transparency**

Overall, the transparency of Portland's accountability system has remained consistent since our last report. Community members remain able to track the progress of their complaint (see Par. 138) and IPR continues to provide updates in writing at each stage of the investigation (see Par. 140), including a community member's ability to appeal findings. The Findings letters provided to community members clearly state the finding as well as the rationale for the finding. Updates and information for appeals are provided for both community members and officers.

Citizen Review Committee (CRC) appeal hearings and other CRC functions remain open to the public with accompanying minutes posted to the IPR website. Meetings continue to be held over Zoom as a result of the pandemic and we continue to find that the transition to virtual meeting space appears to have allowed for broader community observation and input, thereby enhancing transparency. Additionally, redacted summaries of Police Review Board (PRB) hearings continue to be provided on the PPB website. Finally, IPR analytical reports and online data related to misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths remain available on the IPR website (https://www.portlandoregon.gov/ipr/76848), allowing interested parties to learn the facts and conduct their own assessment. Overall, we maintain that the combination of these efforts points to an accountability system that is largely transparent.


**System of Checks and Balances**

The accountability system in Portland continues to contain a system of built-in checks and balances to ensure a fair resolution for all involved. For instance, prior to an RU Manager's findings on an allegation, IPR (as well as Assistant Chiefs and IA) continues to have the ability to review the investigation report and can request an additional investigation or a rewrite of the investigative report. Additionally, after an RU Manager makes findings, IPR reviews those findings and has the ability to controvert the findings, thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination.

Community members and officers continue to be able to appeal administrative investigation findings to the Citizen Review Committee (CRC), an eleven member review board that "*hear[s] appeals from complainants and officers and publicly report[s] its findings*" (among other functions – see https://www.portlandoregon.gov/ipr/53654). Consistent with the requirements of Par. 136, CRC members continue to hold the ability to request additional investigations and interviews and postpone

---

[13] https://www.portlandmercury.com/images/blogimages/2021/04/05/1617680427-ppb_letter_3-23-21_final.pdf

the hearing until a time when such information could be included in the review. Coupled with our observations of CRC meetings in the past, as well as our ongoing review of their public reports, we maintain that the CRC conducts their hearings in a fair and impartial manner (see Par. 134). Additionally, in the first quarter of 2021, the CRC filled all member slots vacated by the prior resignations in September of 2020 (though see below for discussion regarding CRC members' ability to serve on PRBs).

In the 1st quarter of 2021, the CRC did not hold any appeal hearings. However, one case was presented to the City Council after the PPB and CRC could not resolve their difference of opinion on the findings for Case 2019-X-0003. Per City Code (PSF-5.16), the City Council is responsible for hearing such cases in order to provide a final resolution. However, during the appeal, one of the members of council stated they had not reviewed the casefile prior to the hearing and another appeared to be unaware of the hearing protocols. The language of PSF-5.16 requires IPR to submit the casefile and all associated statements to the City Council two weeks in advance. That the language of SPF-5.16 requires a two-week timeline indicates that there is an expectation that Council members will have reviewed the casefile before the hearing. This does not appear to have happened for at least one member. Since CRC continues to hold the ability to find the outcome of an investigation is unreasonable, we find that the requirements of Par. 135 have been maintained. However, as a practical matter, the City should be aware that the legitimacy of the process is called into question if the City Council hearing is not done in-line with PSF-5.16.

A final system of checks and balances can be found in the Police Review Board. When there is a sustained finding that will lead to discipline involving suspension or greater, when there is an officer involved shooting or in-custody death, or when there is a controverted finding, the Police Review Board takes the RU Manager's proposed findings and either adopts the proposed findings or provides their own proposed findings and corrective action to the Chief.

In our last report, we noted issues with operational aspects of the PRB, notably the limitations to casefile access for CRC community board members. For some cases, the hesitancy of PPB to grant remote access to documents and the hesitancy of community members to go into Central Precinct caused delays in conducting the PRB. Office 365 has been introduced to allow easy access to documents needed to participate in PRBs. A CRC member reviewed the software for access issues and found that the system was sufficient. We therefore find that this issue has been resolved though request updates by IPR and IA should other issues arise.

However, other issues remained in the first quarter of 2021. For instance, the resignations of three CRC members in September of 2020 has implications for the operation of the PRB based on the requirement of CRC members to "*participate in Bureau training*" and "*participate in ride alongs*" (see Par. 131(e)). As a result of the State of Emergency restrictions ordered by the Oregon Governor related to COVID, there are presently 4 or 5 CRC members who have not been able to receive training or participate in ride alongs. Therefore, the pool of CRC members who can be selected remains somewhat limited. This issue was not resolved in the first quarter of 2021. While the emergency order is understandable, there cannot be compliance with this paragraph until more members are trained and have conducted a ride-along in order to expand the selection pool for PRBs. Should the City attempt to provide alternatives to these requirements (for instance, providing online training or conducting walk-alongs), we would consider this a reasonable compromise.

Furthermore, in our last report, we noted issues with the conclusions drawn by the PRB in two cases. In the first quarter of 2021, we observed one PRB. Overall, we felt the PRB in the first quarter was consistent with the language and tone of the Settlement Agreement. However, as noted above, the DOJ provided a Police Review Board Written Critique to the City, identifying areas of concern related to PRBs with which we broadly concur. These issues will need to be resolved prior to compliance. Additionally, as this matter appears likely to require mediation, we will provide updates upon a final agreement between the two Parties.

**Lethal Force/In-Custody Death**

Finally, PPB's accountability system has particular requirements after the occurrence of lethal force and in-custody death events. PPB did not have a lethal force event in the first quarter of 2021 (though one case was later classified as an in-custody death). We therefore rely on the historical process that PPB has followed and find that they remain in substantial compliance with the lethal force investigation requirements.

Because of the sensitive nature of such events, PPB safeguards the integrity of such investigations through a number of actions. For instance, first responding supervisors separate all witness officers and involved officers (see Par. 125), conduct initial interviews individually (rather than as a group), and have a phone-tree to ensure all necessary notifications are made. Detectives conduct on-scene walk-throughs and interviews with select witness officers (see Par. 126) as well as request walk-throughs and interviews with involved officers (though involved officers have historically invoked their right to decline) (see Par. 127).

After conducting their on-scene investigation, investigators interview all witness officers and then provide them with Communication Restriction Orders (CROs) to prohibit direct or indirect communication with anyone involved with the event until a grand jury has been convened, at which point the CROs are rescinded (see Par. 125). Involved officers are then required to participate in an interview with IA investigators within 48 hours of the event (unless a voluntary statement was already given on-scene or the member is incapacitated) in order to inform the IA investigation. Pursuant to *Garrity v. New Jersey*, the administrative and criminal investigations are walled off from one another (see Par. 124), thereby maintaining the 5th Amendment rights officers have against self-incrimination. The administrative and criminal investigations are conducted concurrently in accordance with Par. 122 (as they are done for all administrative investigations with a corresponding criminal investigation).

# SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

**PCCEP's Role in the Settlement Agreement and the City's Support**

*System Overview*

Section IX of the Settlement Agreement requires that the City establish a Portland Committee on Community Engaged-Policing (PCCEP, Par. 141), which is authorized to: (a) solicit information from the community and PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns (Par. 142), with other specific duties set forth in a separate Plan for Portland Committee on Community-Engaged Policing.

PCCEP's membership is designed to come from a reasonably broad spectrum of the community, and members shall not have an actual or perceived conflict of interest with the City of Portland (Par. 143). PCCEP shall meet as needed to accomplish their objectives and hold regular Town Hall meetings that are open to the public. The City shall give advice on Oregon's Public Meetings Laws and similar requirements as necessary (Par. 151) and shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law (Par. 152).

Per Pars. 141 and 142, PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations.

In the first quarter of 2021, PCCEP continued monthly general meetings and subcommittee meetings via Zoom, with full meetings averaging 65 attendees. Highlights of PCCEP's work as a full committee in the first quarter include adoption of their 2020 annual report, creation of an ad hoc Core Patrol Services[14] committee, a town hall on COCL's 2020 Q4 report, an update from the Training Advisory Council, a presentation and discussion of DOJ's Settlement Agreement report, and discussion of revisions to PCCEP's bylaws and group values.

As a body, PCCEP also made several formal recommendations in the first quarter of 2021. Per the Amended PCCEP Plan, "*The City shall provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days.*"

---

[14] From a PCCEP survey, describing the Core Patrol Services project: "*As part of the Mayor's 19-point police reform action plan, PCCEP has been carrying out a review and re-envisioning of the core patrol services provided by the Portland Police Bureau. These patrol services include day-to-day responses to emergency and non-emergency calls for police service as well as ongoing areas such as traffic enforcement.*"

- On January 26, PCCEP recommended that "*PPB send a formal letter within 7-10 business days (Or Less) acknowledging the passing of an individual who has been involved in a lethal force event, expressing to the family the remorse for their loss by the City. We also recommend that a follow up visit be done, by trained staff to provide the family to support services for their loss if they so choose.*"
  - Mayor Ted Wheeler adopted this recommendation on March 29.
- On January 26, PCCEP recommended "*Portland Police Bureau (PPB) develop and implement a process whereby all PPB officers will be trained to request the Trauma Intervention Program (TIP) through the Bureau of Emergency Communications (BOEC) for all lethal force incidents.*"
  - As of the end of Q1, the City had not taken formal action on this recommendation.
- On February 19, PCCEP voted on a recommendation to "codify" PCCEP by adding the group to City Code.
  - Mayor Ted Wheeler adopted this recommendation on February 22.
- On February 23, PCCEP voted to support a Training Advisory Council recommendation to expand the Public Safety Support Specialist (PS3) program.
  - As of the end of Q1, the City had not taken formal action on this recommendation.

In the first quarter, PCCEP also hosted three special meetings related to a community-led review and re-envisioning of PPB's Core Patrol Services. As part of this work, PCCEP solicited comments from Portlanders, and began work to draft recommendations for further public input.

PCCEP's subcommittees focus on Youth, Behavioral Health, Racial Equity, and Settlement Agreement and Policy, with a temporary committee focused on Truth and Reconciliation. In addition, a PCCEP steering committee meets monthly.

In the first quarter, the Behavioral Health Subcommittee hosted a presentation from the Enhanced Crisis Intervention Team, and also discussed possible recommendations related to the Behavioral Health Unit. The Youth Subcommittee hosted a presentation from a PPB sergeant regarding the Youth Services Division and discussed a new recommendation regarding PPB interactions with youth and persons under the age of 24. The Racial Equity Subcommittee hosted "Community Voices" sessions on Latino/a experiences and gun violence, and also hosted a presentation from PPB's Office of Community Engagement. The Settlement Agreement and Policy Subcommittee discussed the PCCEP's role in the review of PPB directives and focused on several policies up for universal review—including Use of Force, Deadly Force, Weapons Administration, and Foot Pursuits—and discussed PCCEP's PS3 recommendation.

The Steering Committee discussed two of PCCEP's special focus projects—the Truth & Reconciliation Commission, and Core Patrol Services. The group also focused on revisions to PCCEP's bylaws.

PCCEP planned to hold a virtual retreat in February, but a major power outage forced a reschedule; the retreat was further postponed to Q2.

**City's Support**

The City's role is to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions. Paragraph 144 states that "*The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan*." Unfortunately, that support has been inadequate during the first quarter in terms of posting information about PCCEP meetings for the benefit of the public.

In the previous quarter, timely posting of PCCEP meeting videos improved, and transcripts of full PCCEP meeting videos served as minutes. However, in the first quarter of 2021, no minutes were posted; the only transcript posted was for the January 2021 full PCCEP meeting. And problems with timely posting of PCCEP meeting videos continued, and in many cases worsened.

The Amended PCCEP Plan says, "*Agendas and minutes from all PCCEP meetings will be published on the City website within 10 business days after the meeting date*."

Posted videos, while not specifically called out in the Amended PCCEP Plan, have in some ways served as a substitute for minutes and transcripts (though PCCEP leadership correctly points out that these are not a useful tool for PCCEP or community members who need a quick reference on the PCCEP's meeting actions). But for more than half of the PCCEP's non-livestreamed meetings in the first quarter of 2021, the video was not posted within the 10 business day timeframe.

Full PCCEP meetings are livestreamed on PCCEP's YouTube channel, and the video posts automatically for later viewing. For subcommittee meetings, PCCEP staff must download the recorded Zoom meeting and manually publish these files to YouTube. In the first quarter, of the 21 subcommittee and other non-full PCCEP meetings (for example, a Core Patrol Services work session):

- It took an average of more than 30 business days to post subcommittee meeting videos; this average includes the videos that were not posted until the second quarter, with some January PCCEP subcommittee meetings posting in early May, more than 80 business days (and 100 calendar days) after the meetings were held.
- Only nine were posted within 10 business days, with six of those posted in the first week and three of those on the next business day.
- The ten meeting videos from the first quarter of 2021 that were not posted until Q2 averaged 74 business days to post. Several were not posted until COCL inquired about their status.

In addition to the issues with timely uploading of documents such as minutes, transcripts, or videos, PCCEP leadership has also flagged other deficiencies with City support, including timely response to PCCEP's recommendations. This is an area where the City has improved but is still not consistently meeting the response turnaround time outlined in the Amended PCCEP Plan, which says the City "*shall endeavor to do so within 60 days*." PCCEP members have also called for stronger support through resources such as a member handbook, and a clearer understanding of PCCEP staff roles, but those requests have not been fulfilled as of the end of the first quarter.

In general, we find that PCCEP continues to represent a "*reasonably broad spectrum of the community*," (Par. 143) with at least eight of 12 current members identifying as a person of color and/or an immigrant; representation of people with experience as peer support specialists or other personal, lived

and/or professional experience with mental health issues is less clear, based on publicly shared information. However, many of PCCEP's current members volunteer with other community groups or nonprofit boards related to mental health, the justice system, or underrepresented communities, bringing in additional perspectives to PCCEP's work.

One PCCEP member—who also chaired the Truth and Reconciliation Planning Committee—resigned in February, noting that their "*professional and personal demands coupled with the demands of this role have created an atmosphere where I am unable to healthfully commit*," and also noting they had enjoyed their time serving PCCEP.

At the end of Q1, PCCEP's pool of alternates was empty—three people on the list did not respond to outreach or asked to be removed from the pool. PCCEP has flagged this as an area that needs additional City outreach and process support.

In this quarter, COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland. PPCEP's overall functioning remains consistent with the expectations and requirements of Paragraph 143.

Substantial Compliance with Par. 151 has also continued, with PCCEP and COCL jointly hosting quarterly Town Halls to review and discuss draft COCL reports; the town hall this quarter was scheduled as part of the February full PCCEP meeting.

A representative of the City Attorney's office attends PCCEP meetings and continues to advise the PCCEP as necessary to ensure compliance with public meetings law, and the City continues to train new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all City advisory boards. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

In summary, PCCEP continues to function well overall, and the City remains in Substantial Compliance in relation to PCCEP, with the exception of Par. 144, where COCL has lowered the rating to Partial Compliance. We recommend that the City take seriously the need to post information about PCCEP's work in a timelier manner so that the public is kept informed about these community engagement opportunities and productions, and that the City fulfill PCCEP's additional requests for support so this body can continue to function well.

### Portland Police Bureau's Role in Public Engagement and Outreach

*System Overview*

As described in Paragraph 145, PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. Specifically, PPB was required to conduct a citywide community survey that would assist the PCCEP and lead to the development of a Community Engagement Plan by PPB (Par.

146). PPB is also required to collect demographic data about the community in each precinct to assist the Precinct Commanders and PCCEP with their community engagement plans (Par. 147). To help measure possible discriminatory policing, PPB officers are required to continue collecting data on race, age, sex, and perceived mental health status of persons they stop and share this information with the PCCEP and the public (Par. 148). PPB also worked with DOJ and COCL to develop a general set of metrics to evaluate community engagement and outreach by PPB (Par. 149) and many of these are reflected in PPB's Community Engagement Plan. Finally, PPB must issue an Annual Report (with certain content), with a draft reviewed by PCCEP, and then present a revised report to the public at Precinct meetings and before the City Council (Par. 150).

*The Community Engagement Plan*

Paragraph 146 requires that PPB develop a Community Engagement Plan with input from PCCEP (Par. 142). COCL continues to use the Community Engagement Plan as a framework for discussing PPB's progress on community engagement under the Settlement Agreement. Below is a status report on the Plan's four components: Public involvement, Communications, Access, and Training.

Public Involvement. The Community Engagement Plan specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

In the first quarter, PPB continued many of its prior activities and relationships with the community (Par. 145), including participation in community and cultural events and outreach to select communities facing emerging issues such as hate crime (See PPB website for details: https://www.portlandoregon.gov/police/30379).

At the core of PPB's community engagement efforts is its relationship with many advisory groups. In addition to its regular engagement with PCCEP, TAC, and BHUAC (described in other sections of this report), during the first quarter, PPB held virtual meetings with the Slavic Advisory Council (SAC), the Muslim Advisory Council (MAC), the Latino Advisory Council (LAC), the African American Advisory Council (AAAC), the Alliance for Safer Communities (ASC), and the Police Equity Advisory Council (PEAC). However, not all these meetings and their minutes are posted on PPB's website for public consumption, so we encourage these updates.

We understand that PPB's African American Advisory Council (AAAC) has been in existence for two decades and represents a particular segment of the Black community. The Albina Ministerial Alliance Coalition for Justice and Police Reform also represents the Black community and has been active in the Settlement Agreement with Enhanced Amicus status. In light of the protests on racial injustice, we encourage the Chief to remain engaged with these and other groups to address the present-day concerns regarding mistreatment by the police and efforts to re-envision policing for the future. Our understanding is that the Chief has made efforts to revitalize the AAAC with new members. The expected Youth Advisory Council was never created apparently due to the pandemic's impact on schools, but PPB is working to involve youth in some of the existing advisory councils. We will look for progress in the months ahead.

We note that the number of advisory groups to PPB continues to expand. After the Atlanta hate crime shootings in March of 2021, the Asian American Pacific Islander Advisory Council (AAPIAC) met with PPB, and they decided to create the AAIP Advisory Council to PPB.

The work of the existing advisory groups has varied greatly this quarter. For example, the Muslim Advisory Council has focused on criminal investigations/prosecutions of Muslim community members by the District Attorney's office. The Latino Advisory Council has focused on creating an internal Council Charter to further establish its legitimacy and longevity. The Police Equity Advisory Council has given considerable attention to police training on equity issues (as discussed herein). For the MAC and LAC meetings, PPB has sought to have at least one assistant chief attend and provide updates on public safety issues, PPB budget issues, and other challenges.

When reviewing the "public involvement" component of the Community Engagement Plan, there is little doubt that PPB has "expanded opportunities" for community engagement, but this has come at a price. With so many different advisory councils (and the number continuing to grow), PPB is being spread very thin and pulled in multiple directions, as budgets and total personnel continue to decline. The councils have been given freedom to set their own agendas and pursue different goals. To provide a forum where each group could share their concerns with the Chief and learn what other groups are doing, PPB created the Coalition of Advisory Groups (CAG) in 2020, with representatives from PPB's advisory councils.

This seemed like a reasonable strategy and COCL gave the CAG high marks in our last report. However, CAG has begun to encounter problems between the members and other organizations around issues of inclusiveness and agenda priorities. To give some historical perspective, as community engagement continued to expand after the protests started in 2020, three groups created by the City— PCCEP, TAC and CRC—did not feel their voices were included in discussions of police reform, and expressed that view to the Mayor and City Council. They also wanted to ensure that the Portland community retained an independent, critical voice on policing issues[15]. Concerned that PPB's advisory councils might not fulfill this role, PCCEP asked the Mayor to conduct an inventory of the advisory groups to assess the contribution of each group to the City—a move that was not well received by some groups within the CAG.[16] Furthermore, there have been some tensions within the CAG, as members of one advisory group has experienced conflict with members of two other advisory groups. Conflict reached the point where people expected apologies that were not forthcoming. Thus, at the close of the first quarter, COCL and others recommend that the Chief of Police and Mayor intervene to resolve these problems.

We should expect that conflicts might erupt when you bring together people from very different backgrounds and cultures with different priorities. Nevertheless, PPB and the City should seek to present a more coherent picture of the role of advisory groups and especially the CAG. At present, PPB does not even list CAG as an advisory group on its website (https://www.portlandoregon.gov/police/30476). Some type of structure and charter would be helpful.

---

[15] PCCEP and CRC are linked to the Mayor's office and the Auditor's office, respectively, and are not under the umbrella of the PPB like the CAG members. TAC, however, is a CAG member.

[16] We note that under Par. 142 of the Settlement Agreement, PCCEP has broad authority to solicit input about PPB's performance, make recommendations to the Mayor and others, and contribute to the development and implementation of PPB's Community Engagement Plan.

At this point, there is no one person at PPB who oversees the CAG, as the advisory groups work with different divisions within PPB and different agencies in the City with completely different agendas. Also, at some point, the burden (in time and resources) to staff dozens of advisory groups may become excessive for City government.

Communication. The Community Engagement Plan specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. PPB continues to use social media to communicate with the public and uses other mechanisms such as press releases, emails, brochures, and presentations to reach specific populations, ranging from advisory councils to cultural and service organizations. PPB has yet to distribute information educating the public on how to navigate PPB's website on the City's new platform.

Access. The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

PPB's language access plan is on hold because the City has decided to create a city-wide process for recruiting bilingual employees and giving them a stipend for work as interpreters.[17] These Resolutions have been approved by the City Council and must now be implemented. Consequently, PPB's language access directive and training have not been finalized. However, PPB has completed a Language survey of its employees to assess their level of interest in being interpreters and their level of proficiency in other languages. The survey results show that ninety five (95) PPB employees report some level of proficiency with a second language (including 72 sworn members), and a majority expressed interest in the program. Also, as noted under Training (below), PPB continues to work with community members to develop videos that can be used to educate all PPB members in how to respond appropriately to individuals needing language access services.

Training. The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

PPB has made significant headway toward achieving these training goals. The tools and resources to address the concerns of unique communities are being organized and utilized. Some bilingual officers were trained in 2020 to address language access problems and PPB expects to train others in 2021. Also, PPB is utilizing its advisory councils as another resource to assist with police training. The cultural awareness training started in January as part of PPB's online training delivered via LMS. The language access training videos are being developed.

We are pleased that PPB's Office of Community Engagement is engaging community members with different cultural backgrounds in the development of training videos that should help PPB officers gain

---

[17] The City has institutionalized language access and equity with the Language Access Policy Resolution (November, 2020) and the Language Pay Differential Policy Resolution (December, 2020).

more insight and empathy toward different communities. During the first quarter, PPB is beginning with the perspectives of Latino, Muslim, Slavic, and Native American/Pacific Islanders, covering the challenges faced by immigrant and refugee communities. Most importantly, PPB will need to share the perspectives of African Americans, including the history of discriminatory treatment by the police in the United States and in Portland that provide the basis for fear and distrust. The Equity training is a good first step toward having these difficult conversations.

In sum, we continue to find that PPB has made significant progress on its Community Engagement Plan by building partnerships with community organizations and advisory councils and engaging them in new forms of cultural and equity training of the police. We encourage PPB leadership to resolve any conflicts between different segments of the CAG and reach out to advocates and activists in the Black community who have grave concerns about policing today.

*Data Collection, Analysis, and Reporting*

PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par 147-150). PPB continues to collect demographic data pertinent to each precinct and release it annually to Precinct Commanders and PCCEP (Par. 147). Drawing on the Census Bureau's 2015-2019 American Community Survey 5-Year Estimates, PPB constructed new summary tables with community demographics and posted them on their website (https://www.portlandoregon.gov/Police/article/780347). For the public and research community, PPB continues to provide a wide range of data and interactive dashboards on its website. These include precinct and neighborhood level maps and monthly statistics on calls for service, crime, traffic accidents, traffic fatalities and injuries, police stops, officer-involved shootings, and more (https://www.portlandoregon.gov/police/71673).

PPB continues to collect demographic data from individuals who are stopped by PPB (Par. 148). PPB updated its Stops Data Collection Application ("mask") to begin collecting additional data points on January 1st (See Appendix B). Officers are required to list the perceived demographics of the subject, the reason for the stop (whether it was based on probable cause or reasonable suspicion), whether a consent search was requested and achieved, additional search criteria (e.g., incident to arrest), search findings, stop disposition, mental health status, and other data. Online training on this new stop mask was conducted in November of 2020. COCL was provided a copy of the questions on the mask but was told the training could not be observed because it was delivered via LMS.

As we noted in our Q4 report, the Mayor and PPB agreed that officers would distribute a card published in five major languages that explains the desire to search and the community member's right to refuse. The transaction was to be recorded with a new app on the officer's phone. In Q4, PPB also informed us that they would make changes to their search policy or SOP to reflect these changes in the required search protocol and provide additional training. During the first quarter of 2021, none of these actions occurred – no card, no changes to policy, and no training on the policy or use of the card or the app used to record the transaction. PPB informed us that they are awaiting guidance and approval from the Mayor's office.

In terms of data analysis and reporting requirements, PPB's Strategic Services Division continues to generate quarterly Stops Data Collection reports.[18] Their fourth quarter report was released and posted on January 25th (https://www.portlandoregon.gov/police/article/781203).

Here we provide a brief summary of traffic stops (not pedestrian stops) since they account for 99% of all stops in Portland. PPB continues to show racial disparities in traffic stops. While Black/African American drivers make up only 6.7% of Portland's population, they account for 17.8% percentage of PPB's traffic stops citywide during Q4, an increase of 3 percentage points over Q3. The rate of stopping Black/African American drivers in Non-traffic divisions (Patrol, Investigations, and Support units) remains noticeably higher than the rate for the Traffic Division ( 21.3% vs. 14.0%). The total number of stops citywide, after dropping 79% between Q2 and Q3, increased by 55% in Q4. The number of individuals stopped who were perceived by PPB to have a mental health issue remained steady at 1%.

A breakdown of stops by police precinct shows that racial disparities are consistent across precincts. When we compared population demographics with traffic stops (see Table 2), Black/African Americans are stopped at a rate substantially higher than their representation in the precinct population. However, we caution that Census population statistics are only one benchmark for assessing racial disparities in enforcement.[19]

We encourage PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns as well as appropriate benchmarks. We hope that PPB's new requirement to better document the reasons for stopping and searching a driver will help to reduce any disparities that reflect bias.

| Precinct | Percentage of Population that is Black/African American[20] | Percentage of Stops with Black/African American Drivers[21] |
|---|---|---|
| Central | 2.9% | 14.7% |
| East | 5.6% | 19.4% |

---

[18] Quarterly stops reports, however, do not include search data, which can be found in the annual stops report.

[19] Given the limitations of Census population statistics as a benchmark (e.g., failure to count drivers in Portland who are outside commuters), we have not objected to PPB's use of the Injury Collision Benchmark (i.e., race of drivers involved in injury collisions) to evaluate stop decisions by Traffic officers in their annual report. However, all racial disparities deserve careful scrutiny.

[20] Source: PPB's demographic report using Census data, https://www.portlandoregon.gov/Police/article/780347

[21] Source: PPB's Q4 2020 Stops Data Collection report, https://www.portlandoregon.gov/police/article/781203

| North | 8.8% | 19.0% |
|---|---|---|

Table 2. Racial Disparities in Traffic Stops by Precinct, Q4 2020

For Paragraph 149, the City has completed the requirement to develop a set of metrics to evaluate community engagement. In the future, we encourage PPB to re-establish and institutionalize a contact survey that will measure the level of procedural justice experienced by community members during all types of police encounters. This metric is the hallmark of a learning organization and, like body-worn cameras, will provide consistent data on the level of police performance on the streets of Portland that affects public trust and confidence. Also, in the future, the community's view of the encounter could be compared to body-worn camera footage to better understand why the public is left with certain impressions.

Par. 150 requires PPB to "*issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities.*" PPB is required to provide a draft of the annual report to PCCEP "*for review and comment before the report is finalized and released to the public.*" Once the report is released, Par. 150 calls for PPB to "*hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.*"

During the first quarter, PPB did considerable work to prepare the 2020 Annual report, including asking all RU managers to submit relevant information regarding their units to headquarters in February, where it was compiled, organized and edited for inclusion in the annual report. The draft report was released for review by PCCEP during the second quarter, so we will comment on it at that time.

COCL will be attentive to specific issues when the 2020 Annual Report is released because of concerns associated with the last report that resulted in a downgrading from full to partial compliance. With the 2019 Annual Report, PPB experienced several problems meeting the requirements and expectations associated with Par. 150, as described in COCL's Q4 report. First, PCCEP was disappointed that their comments on the 2019 draft report were not incorporated into the final version. PPB clarified that some comments were considered, but others were too substantial for immediate change and may be reflected in subsequent annual reports. COCL will check to see whether PPB has responded to PCCEP's recommendations when its 2020 Annual Report is released. We recommend that PPB be very clear about its response to each of PCCEP's comments, indicating if and how prior or current feedback was taken into consideration when finalizing the reports.

Second, PPB failed to hold a meeting in one of its three precincts after the release of the 2019 report, apparently because of the pandemic, although other major cities continued to hold community meetings via Zoom during the pandemic. Furthermore, the two meetings that were held were very poorly announced to the public, and the turnout was poor as would be expected. Third, and perhaps most importantly, attendees reported that the meetings did not cover the topics required by Par. 150, i.e. "*…the use of force, and…PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.*" In

addition to reporting use of force and stops data, this would be an opportunity for PPB to discuss its new policy and training regarding voluntary searches, along with the new Stops Data Collection App. COCL will check on PPB's efforts to properly advertise the precinct meetings in advance (with enough time and specific details about location, agenda and virtual invitation) and will observe to ensure that the relevant topics are fully covered. The precinct meetings, if taken seriously, could be a good opportunity for PPB to show transparency regarding data and practices and consequently, build trust with the community.

In sum, for Par. 150, PPB remains at partial compliance until COCL is able to assess how PPB handles the content and release of its 2020 annual report. Evidence of remediation was not available during this reporting period. The expectation is that PPB will be more responsive to PCCEP's comments on the draft report, will broadly announce the precinct meetings in advance, and will cover the full range of topics required by Par. 150 during these meetings, and will present the findings to City Council. Finally, we again suggest that the City Council receive PPB's annual report <u>after</u> the precinct meetings have been held and robust community input has been completed.

### Summary of PPB's Community Engagement

PPB has sustained and expanded its systems of community engagement as it implements the Community Engagement Plan. The Office of Community Engagement continues to partner with different segments of the Portland community through existing and new advisory councils. PPB's Coalition of Advisory Groups (CAG) has experienced some conflict between different advisory groups, as might be expected when many different perspectives on policing come together. While the diversity of viewpoints is desired, more work is needed to build an infrastructure for community engagement that establishes guidelines and bylaws for the operation of all advisory groups. Also, given the importance of racial equity in policing, we encourage PPB to continue to explore new ways of engaging the African American community.

PPB continues to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. However, PPB has yet to meet the requirement to share and properly discuss its annual report with community members in each precinct, thus remaining at Partial Compliance for Par. 150.

PPB continues to produce quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. The traffic stop data for Q4 2020 show racial disparities citywide and in each precinct, indicating that Black/African American drivers are stopped at rates higher than their representation in the population. Furthermore, as noted in Q4, the annual stops data shows that consent searches are also higher for Black/African American drivers.

In Q4 2020 COCL expressed the hope that PPB's new Stops Data Collection App and related protocols (i.e. distributing cards about the subject's rights, recording the transaction on their phone) would help address the racial disparity problem in 2021 by requiring officers to think about the reason for the stop and search. PPB introduced the new app ("mask") in January, but failed to change the policy, distribute the explanatory cards to those stopped, or provide additional training to officers on this new protocol.

We are surprised by PPB's lack of action to update their protocol regarding police stops and searches, but this is not a compliance issue.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**AS:** Accountability Subcommittee (COAB)

**BHRT:** Behavioral Health Response Team

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COAB:** Community Oversight and Advisory Board

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**MHCRS:** Mental Health Crisis Response Subcommittee (COAB)

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PS3:** Public Safety Support Specialist

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# <u>LIST OF PERSONNEL</u>

Chief of Police: Chuck Lovell

Deputy Chief of Police: Chris Davis

Assistant Chief of Operations: Michael Leasure

Assistant Chief of Services: Michael Frome

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Capt. Jay Bates

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: John Sapper

Behavioral Health Unit (BHU) Lt. Casey Hettman

EIS Supervisor: Nathan Sheppard

EIS Administrator: Dan Spiegel

Training Acting Captain: Gregory Stewart

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

### APPENDIX A

# COMPLIANCE OFFICER AND COMMUNITY LIAISON

## *Feedback on PPB's Crowd Control and Force Management Documents*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**April 14, 2021**



**Introduction and Overview**

On March 29th, 2021, the City and PPB provided the COCL and DOJ with the following documents: "2020 Portland civil Unrest After action and recommendations formal versi...(FINAL)"; "Challenge and Solution analysis 2020 final"; and "2020_Civil_Unrest_AAR dobson".  The COCL has reviewed these documents and provide the following formal feedback.

We acknowledge that PPB has made an initial effort to analyze the organizational problems associated with the management of force during the protests and civil unrest that occurred in 2020.  However, from our perspective, these documents are not sufficiently responsive to the technical assistance provided by the COCL in our 2020 Q4 Compliance Report.  In that report, we noted that the failure of PPB to appropriately manage force throughout the summer protests was "connected to a system that was not designed for such prolonged and intensive events.  As a resolution, PPB should take steps to ensure that its system can adapt should the future bring more unrest."  In reviewing the assessment documents, we are not satisfied that such steps have been taken and do not believe the reports adequately address the relevant compliance issues.  We appreciate that PPB recognized and immediately corrected some command and control problems during the protest period (e.g. too many Incident Commanders), but that does not address the larger management issues around staffing, training, and documentation of events.

As an initial comment, we noted the informal language and structure of the assessment reports provided by PPB, calling into question whether these documents were to be considered an official Bureau document or whether they were prepared solely for the benefit of COCL and DOJ.   The reports are not formally formatted and appear to be in draft form despite being designated "final." Additionally, with the exception of the Master After Action document, the documents are anonymous, leading us to wonder whether they represent an official Bureau position or the opinion of the individual author.  Assuming these are recommendations to the Chief of Police, the Police Commissioner, or the City Council, we see no evidence that the recommendations have been reviewed and approved.  This would be a necessary step for compliance, particularly given that PPB is planning (in a few months) for In-Service Training and Crowd Control Training for all sworn personnel, and RRT training -- all with topics relevant to the 2020 protests.  We wonder how PPB will inform members of any changes to policy or operations based on these reports or whether members will walk away with the understanding that, while deficiencies in crowd control were identified, PPB has not changed any managerial or street-level operations relevant to the use of force.

In executing a sound approach to problem solving, we look to see whether the assessments included (1) a clear, well-researched and accurate definition of the problems; (2) a comprehensive evaluation of the extent of such problems; (3) proposed solutions to the problems that are feasible and compelling, i.e., a remediation plan; (4) the high-fidelity implementation of the remediation plan; and (5) built-in mechanisms to assess the effectiveness of the plan in addressing the problems.  In each of these areas, we either found deficiencies in the assessment or note a complete absence of assessment.

While PPB identified some large-scale contextual problems that contributed to poor performance (e.g., the number of operational periods, the scale of the protests, staffing issues, or the actions of Bureau

partners), the assessment does not identify or fully admit to specific problems with applications of force, review of force, command and control, accountability, or the documentation and effectiveness of PPB's response on a night-by-night basis (among other topical omissions).

In other areas, PPB identifies problems by making causal statements without any empirical evidence. For instance, the master After Action begins by assuming that the COVID-19 restrictions on the freedoms of Portland residents was a primary driver of the animosity towards PPB, in contrast to alternative explanations provided by community members and experts (not withstanding PPB's own lack of expertise to make such causal statements regarding the COVID-19 restrictions). Other instances of causal statements without proof were found throughout the assessment, leading the COCL to question the rigor with which PPB conducted the reviews, particularly given the failure to include more relevant assessments where PPB can claim expertise, such as uses of force. Also, placing the blame on external factors, from the governor to the pandemic, draws attention away of the actions of PPB members and changes needed to manage events of this nature in the future. PPB should focus on the factors they can control (e.g. front-line supervision and the monitoring of munitions used per night) and not on factors they cannot control, such as the psychology of the pandemic.

We now discuss particular topics and recommendations where PPB's assessment (and corresponding recommendations) is problematic or outright absent.

**Missing Assessments**

Command and control of large events is critically important, particularly given the events of 2020. However, there is no analysis of PPB's leadership and supervision throughout the protest events. For instance, we saw no evaluation of the IC's decision-making or evaluation of how the IC's tactics changed across different nights and circumstances. On a smaller scale, we saw no evaluation regarding supervisory control of officers in the field nor any evaluation of supervisory directions given to officers. Related to this, we saw no evaluation of how supervisors modeled behavior for officers, particularly as it relates to the importance of using and reporting Constitutional force.

Additionally, we saw no real evaluation of the force used by PPB members throughout the protest events. For example, despite being the subject of a legal ruling as well as DOJ and COCL admonishments, the assessments remain surprisingly silent on whether members were consistent (and accurate) in their definitions of active aggression. Additionally, the assessments do not provide any evaluation of the types and number of force applications used or their effectiveness in achieving a lawful objective. The fact that the evaluations was overall silent on whether PPB's use of force was constitutional and effective is of great concern given the presumed goal of the review.

Related to this, PPB does not provide any assessment of their successes/failures in holding officers accountable as a result of unconstitutional force or administrative responsibilities in reporting and reviewing force. Accountability is at the heart of police reform and is a significant component of the Settlement Agreement; however, based on a reading of the evaluation, one might come to the conclusion that PPB experienced no issues in holding officers accountable. At a minimum, we would expect to see an exploration of the accountability issues resulting from the protests.

As another area where a careful assessment was lacking is documentation of force events and accountability for documentation. PPB has admitted that throughout the protests, documentation of force events was consistently problematic.  In the absence of strong supervision, PPB was unable to document the number and types of force applications, leading to an inability to account for all force events.  Yet despite this being known, no evaluation of the scope of the problem was conducted and no pre-deployment suggestions were made to remedy the issue.  For example, if PPB counted the total number of munitions possessed by officers at the <u>start</u> of any shift, they should then be able to determine the number of munitions used during the shift by conducting a count at the <u>end</u> of the shift.

Finally, although de-escalation is required by the Settlement Agreement, and has been emphasized by COCL and DOJ for years as the primary mechanism to avoid or minimize the use of force,  there is no evaluation of the de-escalation tactics used by PPB members nor their effectiveness.  For instance, while a small portion of the report touches upon attempts at communication with peaceful protestors, no discussion is found about the failures of communication with others in the crowd.  Similarly, there is no discussion about the effectiveness of other de-escalation tactics, including the use of warnings by individuals, verbal and non-verbal communication (including stance and militaristic dress), or attempts to create rapport (among other tactics).  While some of these may be inappropriate during combative engagement, other opportunities existed during natural cooling-off periods and PPB should have evaluated whether officers took advantage of these opportunities and the level of success achieved.

**Insufficient Assessments**

*Too Many Reports:* PPB defines the problem as too many After Action Reports (AAR) and Force Data Collection Reports (FDCR).  The main solution taken in 2020 was to assign two sergeants to assist.  While perhaps a short-term solution related solely to timelines, we note that this did not solve the actual problem of critical review, particularly given PPB's admission that "the sergeants doing the AARs for RRT were not present during the events and therefore relied on reports rather than interviews to analyze force events."  PPB also suggests "longer timelines" for review though this has serious implications for member recall and more so if protests occur repeatedly on a nightly basis.

*Video that couldn't be used:* PPB admitted that during the AAR process,  they received external video evidence "that was not used to analyze force events because there is currently no system in place to link the video to an AAR." As a result, PPB may "look for ways" to incorporate such video evidence into existing AARs but provided no specific recommendations. The proper review of force is all about the availability of good evidence, and it appears to be short supply in Portland.  Since 2016, COCL and others have recommended body worn cameras (BWCs) to address this and other evidentiary problems.  Of the largest 75 municipal police agencies in the U.S., Portland is the only city without body worn cameras. This report recommends BWCs but does not include any current plans to request funding.

*Missing, incomplete, or incorrectly numbered FDCRs and AARs:*  The proposed solution here is using SharePoint Enterprise to track force-related reports.  While this tool would be a good start, it not responsive to the actual problem which is one of accountability.  No amount of technology will solve this problem without concurrent organizational will.  Therefore, suggestions related to ensuring officers and supervisors write FCDRs and AARs in a complete, accurate and timely manner are more appropriate.

While software might ultimately help to accurately track force reports after the fact,  members will need to do the work upfront.

*AAR and FDCR forms don't allow for accurate documentation of crowd control:*  PPB's solution is to redesign the forms for this purpose, but specific changes were not proposed. In any event, we are not convinced that the issue at hand is the form as officers have always had the opportunity to provide the details about force applications in the narrative section of the current forms.  The issue at hand is that in 2020, that task was poorly done in many cases.

*Reporting requirements of Force directives:* PPB provides an insufficient definition of this problem by simply referring to: "Reporting requirements in Directive 1010.00 Use of Force, 635.10 Crowd Management/Crowd Control, 905.00 Non-Force After Action Reporting, and 900.00 General Reporting Guidelines." The proposed solution was also insufficient: "Review of all above listed Directives for possible amendments for large-scale and/or long-term crowd management events."  The COCL team is left wondering what the detailed plan is – what is the problem that requires revision of the directives? What does PPB plan to change about these directives that will resolve the problem with reporting requirements?  Some changes might be needed, but in the current context, we hope that revisiting the directives will not be used to justify current crowd control tactics or be more permissive in these settings, but rather to improve them.  We believe such changes to directives are less important than ensuring that officers follow the current directives when responding to protests – policies that have been revised by PPB and approved by DOJ and COCL during this Settlement Agreement.

*Shortage of Communication staff:* PPB has added two members and would like backups. Although staffing is important, the content of the messages are equally important. The Chief's office must take control of the messaging, and the PIO must be able to release factual information about protests in a timely manner. However, if the PIO does not have complete and accurate information about what is happening, where it is happening, and why it is happening, then PPB's communications agenda is compromised. Collecting and disseminating complete and accurate information is essential to demonstrate transparency.

*Justifying Use of Force:* As we note above, PPB needs to better justify the use of force against a crowd or individual.  Where PPB does propose solutions, they propose training, Sharepoint, and video data.  We do not object to any of these ideas, but they should not be presented as complete solutions, and PPB should begin with clearer problem definitions.  Additionally, while we believe that training is critical, PPB has yet to develop any lesson plans for proposed crowd control training, nearly seven months after the protests ended and more months when considering that some of these issues were immediately identifiable in June and July of 2020.  Furthermore, training only goes so far when subsequent steps are inconsistently applied.  After officers have been trained on policy, there must be consistent supervision, intervention, and discipline for those who violate policy – critical issues not covered in PPB's report.

Other solutions require a major investment of additional resources and personnel and, while we do not object to PPB's conclusion that additional resources may be needed, we do not believe that additional resources represent the <u>only</u> viable solution.

To be clear, we do not want to be dismissive of PPB's resource concerns if they have a direct impact on their ability to meet the terms the Settlement Agreement.  Several of the current problems, as defined by PPB, are indeed beyond their control, and therefore, require intervention beyond the walls of the organization. But as we noted in our 2020 Q3 report,  the Settlement Agreement (Par. 7)  is unambiguous:  *"The City shall be responsible for providing necessary support and resources to enable PPB to fulfill its obligations under this Agreement. The improvements outlined in this Agreement will require the dedication of additional funds and personnel."* A complete remediation plan should specify the exact request for assistance and the timeframe. Additionally, PPB must ensure that the City agrees with the remediation being sought. If the City refuses to provide the resources, then other solutions must be developed and implemented.

Finally, we see little discussion of metrics for implementing the remediation plan or ensuring the effectiveness of solutions.  As noted above, the major recommendations have not been approved and we are unaware of any concrete plans for policy revisions or corresponding training.  When the Bureau goes to approve such recommendations, a solid implementation/evaluation plan will be beneficial in making such determinations.

## **Closing Comments**

COCL's analysis does not examine all of the "challenges" and "solutions" presented in these documents but should communicate to PPB and the City our main concerns with this self-assessment. Unfortunately, the evaluations do not leave us assured that PPB was sufficiently self-critical in reviewing their response the 2020 protests.  The Addendum to the After Action begins by stating that the PPB "did an excellent job handling the nightly protests," a potentially tone-deaf position given the sentiments of various community members, City representatives, courts, and COCL/DOJ.

Furthermore, the evaluation does not provide sufficient evidence to make such a claim, leaving absent evaluations related to force, force avoidance, force documentation, and accountability.  Where issues are explored in the evaluation, many proposed solutions either are overly vague or require actions by external actors.  This does not provide evidence of PPB being self-critical.

In all, the assessments appear largely inconsistent with the technical assistance provided by COCL and DOJ, as well as the expectations created heretofore with respect to problem-solving approaches necessary to comply with the Settlement Agreement.  We are open to further discussion of our concerns; however, we recommend that PPB take our comments and revise these assessments to create a (1) single assessment which (2) covers all issues relevant to the Settlement Agreement, including uses of force and accountability, in order to (3) identify articulable and plausible solutions, (4) propose a timetable to implement these solutions with fidelity, and (5) offer a plan to measure their effectiveness. We note that this will likely require significant new training (including supervisors), as well as the implementation of Sharepoint Enterprise software to properly track all crowd control incidents, followed by the proper analysis of force incidents.  We continue to strongly recommend that PPB request body worn cameras to demonstrate evidence-based policing, improve training and supervision, and dramatically increase accountability to the public.  We are willing to working with PPB to discuss remediation plans and provide additional technical assistance as needed.

**APPENDIX B**

Event ID: * Required

Cancel Reason:

Duplicate
Not a stop

**Nature of Stop:** * Required

- ○ Driver
- ○ Bicycle
- ○ Pedestrian
- ○ Passenger

**Perceived Race/Ethnicity:** * Required

- ○ American Indian or Alaskan Native
- ○ Asian
- ○ Black or African American
- ○ Hispanic or Latino
- ○ Middle Eastern
- ○ Native Hawaiian or Other Pacific Islander
- ○ White

**Perceived Age:** * Required

**Perceived Sex:** * Required

- ○ F (Female)
- ○ M (Male)
- ○ X (Non-Binary)

**Reason for Stop:** * Required

- ☐ Probable Cause of a Traffic Crime or Violation
- ☐ Probable Cause of Other Crime
- ☐ Reasonable Suspicion of Other Crime

**Probable Cause of a Traffic Crime or Violation:** * Required

**Probable Cause of Other Crime:** * Required

**Reasonable Suspicion of Other Crime:** * Required

**Consent search:** * Required

- ○ No consent search requested
- ○ Consent search requested but denied
- ○ Consent search completed

**Other Search Criteria (select all that apply):** * Required

- ☐ None
- ☐ Field Sobriety Test
- ☐ Search Warrant
- ☐ Warrant Exception: Emergency Aid Doctrine / Community Caretaking
- ☐ Warrant Exception: Exigent Circumstances / Automobile (Motor Vehicle) / Hot Pursuit
- ☐ Warrant Exception: Incident to Arrest
- ☐ Warrant Exception: Inevitable Discovery
- ☐ Warrant Exception: Inventory
- ☐ Warrant Exception: Open Fields / Abandoned or Lost Property

**Search Findings (select all that apply):** * Required

- ☐ Nothing Found
- ☐ Alcohol
- ☐ Drugs
- ☐ Stolen Property
- ☐ Other Evidence
- ☐ Weapon(s) - Firearm
- ☐ Weapon(s) - Other

**Stop Disposition:** * Required

- ○ No Action Taken
- ○ Warning (Verbal or Written)
- ○ Citation
- ○ Cite-in-Lieu
- ○ Juvenile Summons
- ○ Arrest

**Was this a mandatory arrest related to a warrant, restraining order violation, or domestic violence incident?:** * Required

- ○ Yes
- ○ No

**Traffic Safety Class Offered:** * Required

- ○ Yes
- ○ No

**Equipment Voucher Provided:** * Required

- ○ Yes
- ○ No

**Did the subject of the stop have a perceived mental health issue?:** * Required

- ○ Yes
- ○ No
- ○ Unknown

[Submit] [Cancel]