# COMPLIANCE OFFICER AND COMMUNITY LIAISON

## *Quarterly Report:  Quarter 2*

## *Updates & Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**April 1, 2021 to June 30, 2021**

**November 24, 2021**



# TABLE OF CONTENTS

**INTRODUCTION**                                                                      **3**

**EXECUTIVE SUMMARY**                                                            **4**

**SECTION III: USE OF FORCE**                                                     **13**

**SECTION IV: TRAINING**                                                           **21**

**SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES**           **39**

**SECTION VI: CRISIS INTERVENTION**                                           **41**

**SECTION VII: EMPLOYEE INFORMATION SYSTEM**                         **48**

**SECTION VIII: OFFICER ACCOUNTABILITY**                                   **52**

**SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON
COMMUNITY ENGAGED POLICING**                                            **60**

**LIST OF ABBREVIATIONS**                                                         **68**

**LIST OF PERSONNEL**                                                              **70**

**APPENDIX A**                                                                         **71**

**APPENDIX B**                                                                         **79**

**APPENDIX C**                                                                         **81**

# INTRODUCTION

This is the Compliance Officer/Community Liaison's (COCL) second quarter report for 2021, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered May 15, 2018. This report covers the three-month period from April 1, 2021, to June 30, 2021.

In this second quarter, the Portland Police Bureau (PPB) and the City of Portland were unable to return to Substantial Compliance for: Use of Force, Officer Accountability, and Community Engagement. In addition, the City has lost Substantial Compliance for Training.

The COCL continues to evaluate whether the systems required by the Settlement Agreement can be sustained or restored to ensure constitutional policing in Portland. During the second quarter of 2021, while most systems remained intact, PPB was unable to produce a self-critical assessment of force applications that occurred during the 2020 protests or an adequate remediation plan for the systems that were adversely affected. Additionally, little progress was made in developing and transitioning to Portland's new form of civilian oversight.

Because all of the systems under review depend on good data to make good decisions, we continue to recommend that the City introduce body-worn cameras to ensure the collection of better evidence regarding police-public interactions. We also continue to recommend that the City institutionalize a contact survey to measure the level of procedural justice that occurs during most police-public encounters and to encourage respectful, equitable, and empathetic interactions with the public.

We acknowledge that this is a very difficult time for the PPB. Members of the PPB feel attacked from all sides. With external calls to "defund the police" and a perceived lack of internal support from the City and PPB leaders, many PPB members have resigned and for those who remain, morale seems to have declined significantly. However, we remain optimistic that Portland will recover from these difficult times. This is also an opportunity for the City to work with community organizations to re-envision public safety.

In the months ahead, the City also has the opportunity to make real progress in the Settlement Agreement. In April, DOJ issued a formal Notice of Noncompliance to the City, indicating that it remains out of compliance with the Settlement Agreement, and in July, DOJ proposed nine remedies that the City would need to implement. The City and DOJ began to negotiate these remedies in the third quarter, so we will provide an update in subsequent reports. These specific remedies are not the focus of this second quarterly report, although they are the result of noncompliance with paragraphs of the Settlement Agreement discussed herein.

# EXECUTIVE SUMMARY

## SECTION III: USE OF FORCE

The ability of PPB and the City to comply with the Settlement Agreement continued to be impacted by a failure to be responsive to the deficiencies in reporting and investigating uses of force during the 2020 protests. In the second quarter of 2021, the COCL was not provided with an updated master After Action Review, was not provided with any updated policies, and was not provided with a Force Audit Report for force used in crowd control events. Without these products from PPB and the City, we are unable to find compliance with several paragraphs within Section III since we cannot be assured that the same failures won't reoccur should Portland face the extent of civil unrest they did last year.

Additionally, recent changes to the staffing of the Force Inspector role has limited PPB's ability to transfer institutional knowledge from Inspector to Inspector. For instance, the current Inspector has not consistently used the feedback form when identifying trends, leading to a documentation failure. Furthermore, issues remain regarding the Force Inspector's identification of outliers in the force data -- a problem further explored in the EIS section of this report. The Force Inspector's role has a corresponding training manual and PPB will need to ensure that all future Inspectors have thoroughly reviewed the training manual before taking over the role.

PPB will also need to address the rising numbers and rates of uses of force that have occurred over the past three quarters. The PPB's use of force data indicates that the overall number of force incidents have steadily increased, whereas the number of custodies have remained relatively stable. In looking at other elements of the data, officers on average use about 1.75 applications of force per subject, though this number varies slightly by quarter. Additionally, in approximately half of all force events, the highest level of force used is Category IV which is the lowest level of force. For persons in mental health crisis, Category IV force is the highest level of force for nearly two-thirds of the events.

## SECTION IV: TRAINING

COCL continues to assess the extent to which PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

***Assess Training Needs***: Because PPB has chosen not to update its original 2020 Needs Assessment in light of the 2020 protests and because PPB has yet to complete a comprehensive assessment of these force applications, with identified training needs, we have assigned Partial Compliance for Par. 79. Both COCL and DOJ have requested this type of After Action review, but it was not conducted in the second quarter.

***Deliver High-quality Training***: PPB's training in the second quarter continued to be affected by the need to introduce remedial training missed in 2020. On a positive note, during the first six months of 2021 PPB was able to make up for much of the lost training in 2020. This quarter we gave particular attention to the remedial In-service training that was provided, offering both supportive and critical assessments

of the online and in-person classes that we observed. Because PPB focused on In-service training during the first and second quarters of 2021, it did not attempt to develop and implement crowd control training, which has resulted in the City's return to Partial Compliance for Training.

Furthermore, PPB is required to develop and implement a high-quality system of training for officers and supervisors, but in the absence of a well-conceived and well executed crowd control training, along with several other factors, COCL has assigned Partial Compliance for Par. 84. Crowd control training continued as a topic of discussion with the City, PPB, DOJ, and COCL, but was not implemented in the second quarter because of deficiencies in the training materials.

The in-person component of the 2021 In-service training was completed by the end of the second quarter. With the exception of new scenarios and legal topics, no new material was covered in order to allow time for the training missed in 2020. The focal point of the 2021 scenarios -- the urgent entry into an apartment with "*the immediate threat of serious harm*" -- was not conducive to procedural justice training, de-escalation training, or even the use of less-lethal weapons. Using a CEW (rather than a firearm) would likely have resulted in a negative outcome, as the situation unfolded so rapidly and the suspect was showing active aggression. Instructors in PPB's Training Division had mixed feelings about the use of CEWs. With expertise in this area, we have provided an analysis of CEWs.

In the second quarter, PPB continued to expand its online training. COCL reviewed 40 videos covering 15 distinct topics and we gave particular attention to those we felt had the most relevance to constitutional policing in the future: Equity, Crime Victims' Rights, Officer Wellness, Language and Cultural Awareness, and Procedural Justice.

The expansion of virtual learning has created both opportunities and challenges for PPB. The Training Division should be credited with producing high-quality videos that were not too long, but on the other hand, a few were too short for the large amount of content covered. We also commend PPB for creating several interactive videos that required students to take quizzes and answer questions, but the majority of PPB training videos were asynchronous, thus not allowing for any exchange between the student and the software program, and allowing some students to disengage. COCL continues to underscore the importance of the City devoting more staff and resources to producing interactive online classes.

For the Procedural Justice training, we recommend that future training gives attention to external procedural justice for community members (the current focus is on internal procedural justice for employees) and engage community members in the development and delivery of such training. PPB has covered external procedural justice in the past, but this component should be revisited and linked to a Procedural Justice directive (yet to be finalized).

Finally, we note that PPB did not deliver Command-level and Supervisory in-service training in the second quarter, but we continue to stress the importance of their roles in crowd control settings, where they are expected to make sound strategic decisions, supervise their teams, and later ensure that any force events are properly documented and reviewed for compliance with policy and law.

***Evaluate Training:*** PPB has maintained a strong training evaluation system that includes the collection, analysis, and reporting of data on instructors, class content, and student knowledge acquisition. The evaluator/analyst is very skilled, but the evaluation work, including regular reports for instructors, Training managers, and the public, is too much to expect of one employee.

Last quarter, we reported low survey response rates for officers taking the online classes and recommended that PPB take corrective action. In the second quarter, the Training Division began taking steps to address this issue, so we will summarize their progress in future reports.

COCL will continue to recommend the hiring of more civilian analysts and information technology staff for the Training Division. The limited staff is burdened with a massive amount of new virtual programming, the annual needs assessment, as well as survey data cleaning, analysis, and reporting across multiple training programs, including In-service, Supervisors, Advanced Academy, ECIT, and many others, including both online and in-person formats. To improve performance, PPB must be able to develop evidence-based training and evaluate its effectiveness.

***Document Training Delivered***: The Settlement Agreement requires that PPB create, and that supervisors use, a "*central, commonly-accessible, and organized file system*" for training records (Par. 81). COCL can confirm that the Training Division continued to use the Cornerstone Learning Management System (LMS) for this purpose. LMS attendance records were updated in the second quarter to include all in-person and online In-service trainings noted earlier, as well as the range qualifications, legal updates, directives, and other training videos and notices. Records of external training continue to be maintained. LMS is still used by supervisors and command staff to ensure that PPB employees are completing their required training within 30 days, and delinquency rates are relatively low.

***Audit the Training Program:*** PPB has not conducted a formal audit of their Training programs (Par. 85) since 2018. As we noted in the first quarter, there have been many changes in the planning and delivery of PPB's training over the past three years, and DOJ is proposing remedial action that could have a significant impact on the Training Division's operation in the future. Thus, to substantially comply with Par. 85, we have requested that PPB develop an audit plan for 2022 that can be reviewed and approved by DOJ and COCL.

***Analyze and Report Force Data:*** PPB's Force Inspector is required to "*gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council…*" including "*problematic use of force patterns and training deficiencies*." (Par. 86). In turn, the Chief is expected to receive and respond in a timely manner to recommendations from TAC or the Training Division regarding training, policy, and/or evaluation pertaining to use of forces patterns.

The Force Inspector continued to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). Protest-related force statistics are included at the end of PPB's quarterly reports and on PPB's Open Data Portal, which lists the number and types of crowd control force incidents.

For various reasons, PPB has fallen behind in presenting quarterly force reports at TAC meetings. TAC only meets bi-monthly and often has a full agenda. However, the Force Inspector is planning to eliminate the backlog in the third quarter by presenting findings from Q4 2020, Q1 2021, and Q2 2021 at the July TAC meeting.

While the Force Inspector continued to prepare quarterly force reports and share them both internally and externally, until we see a comprehensive After Action report on the 2020 crowd control, we will continue to express our concern about the analysis of force applications during protests. The Force Inspector will not have a complete set of data needed for quarterly force reports if the After Action

reports submitted by supervisors do not sufficiently identify problematic force applications during protests.


## SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES

In evaluating this section, we continue to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. However, as noted in our last report, the City has recently taken steps to independently achieve the goals of Par. 90(d) which involves diverting mental health crisis calls away from a law enforcement response through the use of mental health providers as first responders. In the second quarter of 2021, the Portland Street Response (PSR) pilot program expanded to the entirety of the Lents Neighborhood, though it only operated between 10:00 am and 6:00 pm. Additionally, BOEC telecommunicators received training on the pilot protocols during the quarter. We reviewed the triage protocol as well as the corresponding BOEC training and consider them sufficient for the pilot. However, several problems remain: neither were reviewed by the BHUAC during the second quarter, BOEC does not have a written policy regarding PSR (only the protocol itself), and PPB similarly does not have a policy for requesting PSR or responding to calls where PSR is already on-scene. Because PPB will inevitably interact with PSR responders, we would expect PPB to create a policy or SOP incorporating the lessons learned from the pilot prior to full scale implementation.

For all other requirements within Section V, PPB and the City continue to accomplish what can reasonably be expected of them given that they do not bear primary responsibility for delivering community-based mental health services. For instance, the City and PPB have maintained their roles in overseeing or participating in committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Workgroup, and the Legacy ED Community Outreach Group. Through self-initiated committees, as well as contributing to external committees and working groups, PPB and the City continue to do what can reasonably be expected of them. The Unity Center continued to operate as a walk-in/drop-off center as envisioned by the Settlement Agreement and PPB continued to play their part in ensuring compassionate transportation. While we encourage PPB to continue to seek ways to support organizations that provide community-based mental health services, we acknowledge that what has been accomplished to date satisfies their responsibilities in the Settlement Agreement with an ongoing obligation to continue such efforts.


## SECTION VI: CRISIS INTERVENTION

During the second quarter of 2021, the City and PPB maintained compliance with the requirements of Section VI. As we have done in the past, we evaluate PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers and the new Portland Street Response); and (2) Secondary Response (including BHRT and SCT). As the entry point for crisis response, BOEC continued to maintain their Mental Health and ECIT Dispatch Protocol SOP, though they have also updated protocols for forwarding calls to the Behavioral Health Call Center as well as protocols related to Portland Street Response (however, they will need to create formal policies related to PSR). Furthermore, while BOEC training was not delivered in this quarter, training related to the BHCC is to be

reviewed by BHUAC in the next quarter, a portion of which incorporates an ECIT refresher. We also reviewed BOEC training related to PSR triage during this quarter and find it to be sufficient, with a few suggested modifications.

PPB has also maintained compliance with paragraphs in Section VI that are related to their primary response system (i.e., Enhanced Crisis Intervention Team, ECIT) and secondary response systems (i.e., Behavioral Health Response Team, BHRT and Service Coordination Team, SCT). All PPB officers receive the 40-hour Basic CIT training and PPB maintains a specialized group of officers (ECIT officers) to respond to higher-risk calls for service involving a mental health component. PPB also continued to utilize data from the Mental Health Template (MHT) to assess operations.

The PPB also provided us with an updated semi-annual assessment of calls involving a mental health component but which do not rise to the level of requiring an ECIT response. For these calls, PPB looked at differences between calls that received an ECIT response and those that did not. The assessment found no differences between the groups in the decision to transport to a mental health hospital (e.g., the Unity Center) as well as no differences in decision to transport an individual to jail, a return to normality after the prior reporting period found differences for the first time in any of the assessments.

The assessment also included an analysis of force as it relates to calls involving a person with mental illness. The results of the assessment indicated that for calls where an ECIT officer responded, there were higher rates of force compared with calls where only non-ECIT officers responded. However, the analysis is at the event level and therefore does not account for who actually used force. A subsequent analysis revealed that in 13% of calls involving force where an ECIT responded, the ECIT officer was the only officer that used force. For other calls involving an ECIT response and force, a non-ECIT was the only member who used force in 42% of the events while both ECIT and non-ECIT officers used force in 45% of the events. Furthermore, PPB found that the number of officers on-scene was a greater predictor of use of force. This may be due to the fact that calls requiring a greater number of responding officers are, on average, higher risk calls and therefore have a greater risk of force (including Category IV force such as Pointing of a Firearm). Similarly, as the number of officers increases, the likelihood that one of them will be ECIT also increases.

The results of the assessment warrant further review by PPB and might indicate a need to reassess the ECIT dispatch protocol if certain call types routinely require a larger number of officers to respond (i.e., representing higher risk calls). In addition to the relative risk of the call, there could be other peer dynamics at play. Data from other law enforcement agencies confirms the pattern observed in Portland, namely, as the number of officers on the scene increases, the probability of using force increases. Thus, supervisors and officers should carefully observe the dynamics of these higher-response calls, identify the characteristics associated with them, and determine if the pattern has any implications for the ECIT triage protocol.

Finally, the BHUAC continued to act as an advisory body to guide the development of the overall BHU. However, two of the BHUAC's meetings in the second quarter of 2021 did not have quorum and therefore no formal guidance was provided to the City and PPB. When considering that one meeting during the first quarter also did not have a quorum, this means that half of the BHUAC meetings in the first half of 2021 did not have a quorum. This also affected BHUAC's ability to publicly post prior meetings' minutes, undercutting the BHUAC's efforts to engage the community. Additionally, one of the meetings that did not have a quorum was supposed to review the City's PSR program, leaving the

program without the necessary input from BHUAC. We recommend the BHUAC address this issue in the coming quarters so as to allow for consistent formal feedback to be given to PPB and the City.

## SECTION VII: EMPLOYEE INFORMATION SYSTEM

The PPB continued to use the Employee Information System (EIS) as their primary system for identifying potentially problematic members and "*design[ing] assistance strategies to address specific issues affecting the employee*" (Par. 116). As with our prior reports, we evaluate the EIS system from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on receiving alerts.

We continue to find that PPB conducts the necessary performance evaluations and new-to-command reviews required by the EIS section. COCL's review of a random sample of EIS entries indicates that supervisors conduct the reviews and sufficiently document them within EIS. However, the Bureau remains out of compliance with Section VII (Employee Information System) for two primary reasons. First, the PPB had not remedied issues of deficient reporting and investigation of use of force stemming from the 2020 protests, thereby leaving a potential for the EIS system to be starved of necessary data if future protest force events suffer from the same deficiencies as the 2020 protests. Additionally, the reviews conducted by the Force Inspector identified PPB members who were outliers with regards to force but for most of these officers, a supervisor review was not documented in EIS. As both of these issues remained in 2021 Q2, we find the PPB continued to be out of compliance with this section.

We also note that Par. 116 requires PPB to "*enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion.*" When having preliminary discussions related to measuring effectiveness of EIS, the COCL, DOJ, and PPB agreed that several years of data would need to be collected to gather a large enough sample so that comparative analysis could be made. At this point, PPB has EIS data dating back to at least 2017. Therefore, they have at least three years of alert data as well as at least one year of follow-up data for all EIS alerts since 2017. PPB now possesses a sufficiently large dataset to conduct an initial test of EIS's effectiveness and we recommend PPB engage in a quantitative analysis to measure the system's effectiveness. We are happy to work with PPB on this assessment and provide technical assistance on a methodology as necessary.

## SECTION VIII: OFFICER ACCOUNTABILITY

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, timeliness, consistency, transparency, and a system of checks and balances. While we assess these individual components below, there remains an overall concern with PPB's accountability system given the inconsistency in force reporting and force justification found from the 2020 protests. Many of these issues have also surfaced in the administrative investigation process since investigators have been required to rely on deficient reporting in making their findings. These issues have also impacted PRBs which, as described below, have inconsistently operated during the crowd control hearings we have observed. Ultimately, we remain concerned with PPB's ability to hold officers accountable for violations of policy, as required by Par. 169. The City and PPB will need to resolve these issues through remediation of the crowd-control deficiencies as well as safeguard against these issues with the new oversight board being developed.

The Portland accountability system remains largely accessible for community members to file a complaint against an officer, allowing complaints to be filed in a multitude of ways. These include community members' complaints to the Independent Police Review (IPR), community members' complaints to PPB, IPR initiated complaints, and PPB-initiated complaints. Despite the influx of complaints stemming from the 2020 protests, we note that the overall number of administrative complaints is the lowest since at least 2011, the earliest year found in IPR's dashboard.

The ability of PPB and IPR to complete administrative investigations within 180 days continued to fall short of substantial compliance with the requirements of Par. 121. This trend has continued in more recent quarters and there appears to be an increasing trend in the percentage of IA full investigations that exceed the 180-day timeline. For instance, between the second quarter of 2020 and the fourth quarter of 2020 (the last quarter for which 180 days could have passed), IA full investigations have exceeded 180 days between 14% and 19% of the time. In the three prior quarters, IA investigations exceeded the timeline only 3%-4% of the time. Additionally, the majority of IPR cases between the second and fourth quarter of 2020 exceeded the 180-day timeline and while 50% of IPR full investigations opened in the fourth quarter of 2020 exceeded the 180-day timeline (compared with 86% and 83% in the two prior quarters), this data also includes open cases. Therefore, we will need to review updated numbers in coming quarters to see if the improved compliance has remained.

As it relates to consistency, we have yet to receive a formal transition plan to the new community oversight board, though members of the City Council took significant steps to identifying 20 community representatives who would serve on the planning commission. We continue to ask the City to consider the potential for attrition from the current Independent Police Review (IPR) and create an interim plan in the event that IPR resources become increasingly strained. However, we commend the City for beginning the process and look forward to reviewing the work of the commission in the near future.

Also related to consistency, we observed two Police Review Boards (PRBs) involving use of force cases and we find that issues continue to remain with the Board's operation. For instance, we continue to have concerns related to mitigating factors being offered as justification for the use of force (rather than mitigation for discipline), confusion regarding the "totality of the circumstances," a misunderstanding of the term "active aggression," irrelevant information being introduced during the hearing, and the use of general crowd behavior being offered as justification for using force against an individual. These issues will need to be resolved in the near future in order for PRB to maintain legitimacy as a component of the accountability system.

We continue to find the City's accountability system to remain largely transparent. Citizen Review Committee (CRC) appeal hearings and other CRC functions remain open to the public with accompanying minutes posted to the IPR website. Meetings continue to be held over Zoom as a result of the pandemic and we continue to find that the transition to virtual meeting space appears to have allowed for broader community observation and input, thereby enhancing transparency. Additionally, redacted summaries of Police Review Board (PRB) hearings continue to be provided on the PPB website. Finally, IPR analytical reports and online data related to misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths remain available on the IPR website.

We also continue to find that the accountability system has built-in checks and balances to ensure a fair resolution for all involved. For instance, prior to an RU Manager's findings on an allegation, IPR (as well as Assistant Chiefs and IA) continued to have the ability to review the investigation report and can request an additional investigation or a rewrite of the investigative report. Additionally, after an RU

Manager makes findings, IPR reviews those findings and has the ability to controvert the findings (as do IA and the Assistant Chiefs), thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination. The accountability system also has an appeals function through the CRC.

## SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

### *PCCEP's Role*

Per Pars. 141 and 142, the Portland Committee on Community Engaged-Policing (PCCEP) has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations.

In the second quarter of 2021, PCCEP continued monthly general meetings and subcommittee meetings via Zoom. Highlights of PCCEP's work as a full committee in the second quarter include the adoption of recommendations regarding Core Patrol Services, hosting a series of Truth and Reconciliation Webinars, discussing PPB's 2020 protests After Action Report and DOJ's response, and hearing presentations from the City's Community Safety Transition Director and on PPB's 2020 Annual report. PCCEP also hosted a member team-building retreat, and voted three new members onto the Commission.

PCCEP's subcommittees focus on Youth, Behavioral Health, Racial Equity, and Settlement Agreement and Policy, with a temporary committee focused on Truth and Reconciliation. In addition, a PCCEP steering committee meets monthly.

### *City's Support*

The City's role is to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions. (Par. 144). For some of these responsibilities, the City has continued to provide adequate support to the PCCEP. In the first quarter, support was inadequate in terms of posting information about PCCEP meetings for the benefit of the public, but with a few exceptions, record keeping and timely posting improved significantly in the second quarter. However, written meeting minutes continue to be difficult to locate on PCCEP's website, and minutes for PCCEP's subcommittees are far less consistent.

In the second quarter, PCCEP leadership continued to underscore the need for more robust City support and met with City staff several times to discuss outstanding concerns. Specifically, PCCEP asked for more timely posting of substantial minutes and other supplemental documents, more clarity on PCCEP staff's roles and responsibilities, help setting up a better system to maintain a pool of alternates, and in general, better follow up on tasks assigned to PCCEP staff. In mid-June, PCCEP staff's supervision changed within the Office of Equity and Human Rights, with the Equity and Operations Manager assuming the supervision role.

A representative of the City Attorney's office attended PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings law, and the City continued to train new

PCCEP appointees as needed. PPB's Inspector General also attended PCCEP meetings to answer any questions about PPB that may arise.

In general, we find that PCCEP continued to represent a "*reasonably broad spectrum of the community*," (Par. 143). Also, during the second quarter, COCL did not identify, nor were we notified of any actual or perceived conflict of interest with a PCCEP member and the City of Portland.

In summary, PCCEP continued to function well overall, and the City remains in Substantial Compliance in relation to PCCEP, with the exception of Par. 144, where the City remains at Partial Compliance. We recommend that the City continue to show improvement in the timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. We also recommend that the City fulfill PCCEP's additional requests for support so this body can continue to function well.

*PPB's Role*

Clearly, PPB has expanded its systems of community engagement as it implements the Community Engagement Plan. The Office of Community Engagement continued to partner with diverse communities through existing and new advisory councils. PPB's "Operational Councils" (such as the Behavioral Health Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council) met regularly and have current postings on the PPB website. However, many of PPB's advisory groups ("Community and Culturally Specific Councils") do not have current postings of minutes, notes or agendas. We have been advised that CPD's advisory groups are not subject to the Oregon Public Meetings Law, and therefore, are not required to produce minutes. However, we encourage PPB, in collaboration with its advisory councils, to update its community website so the public can be kept informed of the topics being discussed with the PPB. Also, in the absence of a Youth Services Division, we encourage PPB to continue efforts to create a youth advisory council in collaboration with local schools.

PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. However, at the completion of the second quarter, PPB did not meet the requirement to share and properly discuss its annual report with community members in each precinct and the City Council, thus remaining at Partial Compliance for Par. 150. Such meetings were planned for the third quarter.

PPB continued to produce quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. The traffic stop data for Q1 2021 continued to show racial disparities citywide and in each precinct, indicating that Black/African American drivers are stopped at rates higher than their representation in the population. Again, we encourage PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns.

Along these lines, PPB introduced the new Stops Data Collection app in January, 2021 and provided officers with some online training regarding the need to collect additional data points. Although this is not a compliance issue, PPB has yet to distribute cards in five major languages that explain PPB's desire to conduct a search and the community member's right to refuse. When these cards are ready, PPB will need to provide additional training to officers based on a new search protocol.

# SECTION III: USE OF FORCE

At the end of the second quarter of 2021, the COCL team continued to have concerns that the failure of PPB to manage use of force during the 2020 summer protests has remained unaddressed. During the quarter, the COCL team was not provided any updated master After Action Review[1], was not provided any updated policies, and was not provided with a Force Audit Report for force used in the crowd control setting. Although PPB began to develop training related to crowd control, the shortcomings highlighted during the 2020 protests remain and in the past three quarters (2020 Q4, 2021 Q1, and 2021 Q2), we have not seen a consistent level of urgency given the need to be prepared for a possible repeat of similar protests in the future. In all, the PPB must conduct the necessary analyses, revise policy accordingly, and train members on the new policy before they will be able to return to compliance with Section III of the Settlement Agreement.

For the remainder of this section, we assess each paragraph within Section III, separating them into those which have remained in compliance and paragraphs which have fallen out of compliance or remained out of compliance.

## Maintained Compliance – Paragraphs 68, 71, and 72

PPB continues to use CEWs in accordance with the Settlement Agreement (Par. 68). For instance, PPB policy requires independent justification for each individual CEW cycle, the provision of a verbal warning before deploying when safe, and paramedics to be tasked with removing CEW probes. Our past reviews of force cases involving a CEW have indicated that each of these elements is present. In our next report, we will conduct additional case reviews, though for this report, refer the reader to our quantitative assessment of force (below) with respect to CEW use. If PPB's CEW policy changes (see "The CEW Issue" below under Section IV Training), then we would expect CEW training to change accordingly.

PPB has also maintained an adequate patrol-supervision staffing level in accordance with Par. 71. As noted in prior reports, the span of control rate is a better metric than the raw number of supervisors. In the second quarter of 2021, PPB reported a staffing ratio of 4.95 officers for every supervisor across the three main precincts. This continues to remain a reasonable span of control.

Par. 72 requires PPB to develop a supervisor's checklist when responding to an officer's use of force. Presently, the After Action Report (AAR) form contains the checklist and, although we have noted our concerns with the comprehensiveness and accuracy of protest AARs, we do not find any issue with the form itself and believe PPB remains compliant with the requirements of Par. 72.

## Paragraphs Remaining Out of Compliance - Paragraphs 66, 67, 69

In the Settlement Agreement, Pars. 66, 67, and 69 have certain policy requirements for PPB's use of force and use of force reporting. Although reviews of force cases discussed in our prior reports have indicated that officers continue to adhere to the use of force and reporting requirements for non-

---

[1] Recently, the DOJ provided the City and PPB with a list of 9 remedies to come back into compliance with the Settlement Agreement, one of them being to hire an independent firm to assess the City's response to crowd control events in 2020.

protest events, the reporting failures from the 2020 protests continue to cause PPB and the City to remain out of compliance with these paragraphs. Specifically, the PPB will need to complete their Protest Force Audit Report, complete a comprehensive After Action Review of the 2020 protests (including officer reporting deficiencies), and incorporate the findings into revised policies and revised training. This is consistent with the technical assistance we have provided in our last two reports.

**Paragraphs 74, 75, 76 and 77**

In prior reporting periods, we had reviewed case files for non-protest force as well as for more recent protests to assess compliance with Pars. 74-77. For those, we did not find deficiencies nearly to the extent that were present for the 2020 summer protests. For this reporting period, we focused on conducting expanded quantitative analyses as opposed to qualitative assessments of force events. We therefore do not comment this quarter on the comprehensiveness of FDCRs or AARs by PPB officers and supervisors. In the next reporting period, we will resume qualitative review of force events.

As noted in our prior reports, there has not yet been a force audit completed of members' use of force during the 2020 protests. While PPB provides force audit reports annually for protest uses of force, they have already begun planning a training in the third quarter that includes a module on use of force reporting in the protest context. Therefore, officers will receive remedial training on issues where the Bureau has yet to release a formal report, even internally. Although we trust PPB has already identified the main areas of concern, the precise extent of reporting problems had not been determined prior to the development of this training. The protest force audit will need to be released for PPB to return to compliance with Pars. 74, 75, & 76 and we recommend that PPB incorporate the audit findings into the broader After Action Review discussed above. Upon completion of the report and subsequent review, we recommend PPB re-train all officers on the findings of the audit as part of a broader training stemming from the After Action Review.

In contrast to the above concerns regarding a protest force audit, we find that PPB's quarterly force audit reports and discussions with RU Managers for <u>non-protest</u> force continue to fulfill the intent of Pars. 74, 75, and 77. These reports continue to show that officers and supervisors complete their FDCRs and AARs in a comprehensive and accurate fashion. In addition to trends in evaluating the comprehensiveness and accuracy of FDCRs and AARs, the Inspector reviews use of force events to find emerging issues, concerning occurrences, and department-wide trends in report writing. This includes recommendations for the improvement of AARs, clarifications on force warnings, and actions following CEW deployment (among other topics).

As it relates to ensuring timeliness of FDCRs, there is no field on the FDCR for officers to identify the date/time that they submitted the force report. Historically, supervisors have been responsible for ensuring timely reporting based on when the officer submitted the FDCR via email. Therefore, the ability of PPB's audit team to verify timeliness via the audit is impacted though PPB has recognized this issue and is currently working on a remedy.

We have reviewed the spreadsheet utilized by the Inspector to document and categorize the issues found as well as the correspondence the Inspector has with various RUs, the Training Division, and the Policy Team. The correspondence demonstrates thoughtful evaluation of the force events and concrete recommendations for remediation of emergent issues. The responses provided by the RUs, Training Division, and Policy Team provide evidence that the Inspector's recommendations are taken seriously

and adopted where appropriate. However, the current inspector has not consistently used the feedback form for these findings, leading to a documentation failure. While PPB has a training manual for Force Inspectors, there have been several Force Inspectors in the past two years which has limited PPB's ability to transfer institutional knowledge from Inspector to Inspector. We recommend the Force Inspector review the training manual and we recommend PPB ensure that all Force Inspectors have reviewed the manual as a matter of practice.

As required by Par. 76, PPB continues to provide a quarterly analysis of force, though we note that protest and non-protest force incidents have historically been separated out since it is difficult to merge the two. In our last report, we discussed the lack of any commentary by the Force Inspector about increases in use of force (both as a raw number as well as the force-to-custody rate) over the prior two quarters. However, the 2021 Q2 Quarterly Force Summary Report shows further increases in force without a discussion by the Force Inspector. In the second quarter of 2021, the "*number of force cases increased by 15%...and custodies did not change.*" As evidenced in **FIGURE 3.1**, these increases cannot be attributed to seasonality as they have been occurring since 2020 Q3. No commentary or further analyses on these trends was conducted by PPB in the second quarter of 2020 though PPB reports that further analyses did occur during the third quarter. We will therefore provide an update in our next report.


## Paragraphs 70 and 73

In prior reporting periods, we had reviewed case files for non-protest force as well as for more recent protests to assess compliance with Pars. 70 and 73. For those, we did not find deficiencies nearly to the extent that were present for the 2020 summer protests. For this reporting period, we focused on conducting expanded quantitative analyses as opposed to qualitative assessments of force events. We therefore do not comment this quarter on the comprehensiveness of AARs by PPB supervisors. In the next reporting period, we will resume qualitative review of force events.

The reporting failures from the 2020 protests have still not been sufficiently addressed. Specifically, the PPB will need to complete their Protest Force Audit Report, complete a comprehensive After Action review of the 2020 protests (including supervisor review and reporting requirements), and incorporate the findings into revised policies and revised training. This is consistent with the technical assistance we have provided in our last two reports. These steps will need to occur in order for PPB to return to compliance with Pars. 70 and 73.


## Management of Use of Force

PPB continues to be out of compliance with several paragraphs in Section III. In part, the PPB's ability to manage force has been impacted by turnover in the Force Inspector position. In speaking with the current Force Inspector, we learned that he had not reviewed the training manual for the position and was not utilizing feedback forms consistent with prior Force Inspectors. We were also informed that the previous Force Inspector had not been in his role long enough to fully learn the position and therefore there has been an impact on passing down institutional knowledge. The PPB must ensure that the force review system that has been set up is clearly explained to all future Force Inspectors and that they ensure all future Force Inspectors review the training manual prior to beginning their work.

To a larger extent, compliance has been impacted by an ongoing failure to conduct a comprehensive assessment of what went right and what went wrong during the 2020 protests. During the second quarter, we did not receive an updated version of the documents and we do not anticipate receiving an updated document for quite some time. Until the assessment is completed, there will remain questions about PPB's ability to manage force if faced with protests similar to 2020. As a result, we continue to believe that PPB has not adequately managed their use of force given a failure to perform the analytical review and operational changes necessary to be responsive to prior failures.

## Additional Data Analysis

As part of this report, we conducted additional data analyses that provide additional insight into the PPB's use of force. These data have implications for the overall management of use of force and we recommend PPB and the City continue to evaluate these trends.

### *Force Frequency*

As we have reported elsewhere, the number of individuals on whom PPB used force has steadily increased in the past year, going from a low of 142 in 2020 Q3 to 213 in 2021 Q1, a 50% increase. Additionally, the 213 individuals represent the highest number of individuals in nearly two years (in 2019 Q2 there were 219 individuals on whom force was used). However, we note one limitation of the data is that the impact of the 2020 protests is not reflected. During Q2 and Q3 of 2020, the data indicates that use of force had declined (169 and 142 individuals had force used on them during these quarters, respectively). However, we also know that the 2020 protests took significant resources away from routine interactions, which provide the primary source of force data measured here. We therefore question whether the lower numbers in these quarters indicate officers were using less force as a matter of practice or that less non-protest force was used because there were simply fewer officers conducting routine patrol (and therefore could have engaged in non-protest force).

At least in some part, the increase in uses of force broadly appears to be related to increases in use of force on persons in mental health crisis specifically. Whereas the raw number of individuals who were the subject of a force event increased by a total of 71 between the third quarter of 2020 and the second quarter of 2021, approximately 28.2% of this increase was persons who were in a mental health crisis at the time. However, over the entire dataset, persons in mental health crisis represent 16% of the persons who have force used against them. We recommend the Inspector review this trend in light of the broader trend and consult BHU where necessary in conducting the analysis.

We also looked to see whether the ratio of force-to-custody has increased over the years. This is a simple analysis, taking the number of people that PPB used force against in a given quarter and dividing by the number PPB custodies during that quarter. As indicated by the orange line in **FIGURE 3.1**, the force-to-custody rate has shown a sharp but consistent increase since the first quarter of 2020. This is, in part, due to a decrease in the number of custodies (see **FIGURE 3.2**) meaning that the increase in force rate does not necessarily mean there is an increase in force. However, this only holds true for the first two quarters of 2020. Since then, the number of custodies has held fairly steady whereas the number of individuals subjected to force has increased. As we note in our discussion of Par. 76, the Force Inspector will need to further explore the potential reasons for this.

**FIGURE 3.1**



**FIGURE 3.2**



*Applications per Person per Event*

In looking at the number of force applications an officer uses against an individual, we note that the majority of time (59%), an officer uses only a single application of force. In 24.3% of events, two

applications of force were used and 11.3% of the events involved three applications. Therefore, nearly 95% of force events contained three or fewer applications of force, most of which are Category IV force events (see next section). These trends have generally held consistent across time as seen in **FIGURE 3.3** where, aside from a few deviating quarters, the majority of quarters saw approximately 1.75 force applications per officer and per suspect.

_Force Categories_

Overall, a majority of force applications have been within Category IV, the lowest level of force available to PPB. While a larger gap is seen in 2018 (approximately 65% Category IV uses of force), from the fourth quarter of 2018 to the present, approximately 50% of use of force events have Category IV as the highest force category used (on average). Additionally, Category III is the highest use of force in approximately 40% of force events, with Category II making up the remaining approximate 10%.

**FIGURE 3.3**



**FIGURE 3.4**



When looking at whether the same trends can be seen for persons in mental health crisis, we see a wider gap between Category IV and Category III levels. For persons in mental health crisis, Category IV is the highest use of force, used in approximately 65% of events, whereas Category III events represent 20% of the events. Mental health crisis events involve a Category II use of force as the highest category in approximately 15% of events compared with approximately 10% for persons not in mental health crisis. While PPB should examine this minor over-representation more closely, the fact remains that when PPB officers use force against persons in mental health crisis, they do so using overall lower levels of force.

**TABLE 3.1**

|  | No Mental Health Crisis | Mental Health Crisis |
|---|---|---|
| **Category II** | 11.5% | 14.9% |
| **Category III** | 37.8% | 20.0% |
| **Category IV** | 50.6% | 65.1% |

19

**FIGURE 3.5**



## Use of CEW

In reviewing the data, PPB officers appear to use CEW's sparingly given the overall force numbers across the dataset. For instance, in the entire dataset, there were a total of 6,435 events wherein an officer used force on an individual. Of these, the PPB officer used a CEW (at least one application) in 220 of these events or 3.42% of events. Additionally, there is little difference between those who were perceived to be suffering from a mental health crisis and those who were not. CEWs were used in 3.5% of force events where no mental health crisis was known, compared with 3.2% of force events where it was known the person had a mental health crisis. Furthermore, in only 8 of the 41 events was the person in mental health crisis unarmed, indicating that for the majority of those events, officers are not using CEW against unarmed individuals. In all, the data indicate that PPB officers use CEWs infrequently (some of the reasons are discussed in Section IV Training).

**TABLE 3.2**

|  | Force Events with CEW | Force Events with No CEW |
|---|---|---|
| **MH Crisis** | 41 (3.2%) | 1,231 (96.8%) |
| **No MH Crisis** | 179 (3.5%) | 4,984 (96.5%) |

# SECTION IV: TRAINING

PPB's training in the second quarter continued to be affected by the need to introduce remedial training missed in 2020. On a positive note, during the first six months of 2021 PPB was able to make up for much of the lost training in 2020. This quarter we will give particular attention to the remedial In-service training that was provided, offering both supportive and critical assessments of the online and in-person classes. On a less positive note, because PPB focused on In-service training during the first and second quarters of 2021, it did not attempt to develop and implement crowd control training, which has resulted in the City's return to Partial Compliance for Training.

## Overview of Training Systems

COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

## Overview of Methods

The COCL team continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL team also continues to observe training (either in-person or online) and interview PPB staff. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness.

## Assess Training Needs

Paragraph 79 of the Settlement Agreement requires that PPB conduct a needs assessment and use this information to update its training plan annually. PPB published its 2020 Needs Assessment in the fourth quarter and the 2021 Needs Assessment and Training Plan are not expected until late in 2021.

However, we were clear in our first quarter report that PPB's 2020 Needs Assessment, published after the 2020 protests, lacked a discussion of training needs that would be identified by a complete and thorough analysis of the problems associated with crowd management[2]. PPB has indicated it has no intention of updating the 2020 Needs Assessment (for 2021 training), even though it was quickly outdated. Furthermore, the Training Plan, although updated, gave almost no attention to Crowd Control, with the exception of training new members of the Rapid Response Team (RRT). PPB has yet to meet the request of the DOJ and COCL to provide a more exhaustive assessment of force applications during protests and the implications for policy and training. For this reason, we have

---

[2] PPB points out that the Needs Assessment is an annual task and that the protests occurred too late in 2020 for them to update the 2020 report. In any event, the implication is that proper training will not occur until 2022.

assigned Partial Compliance for Par. 79. Our assessment will change only when this deficiency is addressed either through the 2021 Needs Assessment or through separate reports on the protests. We acknowledge the PPB has prepared three "after action" reports to explain their actions during the protests, but this quarter, both COCL (April 14th) and DOJ (May 5th) have provided written critiques that underscore the lack of detailed analysis and critical self-assessment by PPB (See DOJ report in Appendix A; COCL report was attached to first quarterly report).

## Deliver Appropriate and High-Quality Training

PPB is expected to develop and implement a high-quality system of training for officers and supervisors (see Par. 84). The training must be consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention (Par. 84.a).

Beginning in 2021, PPB began to implement the standard In-service training for all officers that was missed in 2020. COCL approved the Training Plan but needed to observe the online and in-person training to evaluate the quality of delivery and the breadth of coverage.[3] COCL was able to observe both types of In-service training during the second quarter of 2021, so we will report on them here. First, however, we begin with a review of several special trainings that occurred or were expected to occur during this time period, with a status report on the latter.

### *Special Trainings*

**Supervisor and Command In-service Training.** No supervisor or command training was conducted in the second quarter. Supervisors did have a role in one bureau-wide In-service scenario, which we will discuss under the in-person Patrol Procedures training below. Supervisory training is expected before the end of 2021.

COCL will be looking to see if PPB can provide supervisory training on how to: "*(i) conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3; (ii) evaluate officer performance as part of PPB's annual performance evaluation system; and (iii) foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action*" (Par. 84(b)). This year, we expect that these topics will be covered in the context of supervisory training on crowd control management. We look forward to seeing better supervisor training on crowd control in 2021 and directive 315.30, "Supervisor Performance During Critical Incidents." Given that supervisors failed to adequately complete AARs and proceeded to approve use of force incidents without applying the parameters of Directive 1010, as required by policy and the Settlement Agreement, training to remediate these problems is critical.

For the 2021 in-person Command In-service, the plan was to hold semi-annual training (led by outside experts) that would focus on "*organizational change strategies, strategic planning, leadership, internal procedural justice, and organizational health*." (2021 Training Plan). That training did not happen in the

---

[3] The in-person training was expected to be largely the same as 2020, with the exception of new scenarios.

second quarter. Our understanding is that PPB is planning to combine supervisor and command training later in 2021 and when that occurs, we continue to recommend that the supervisor/command training incorporate strategies for managing protests. However, training should include clarity about accountability for actions. As the DOJ noted in their May 5th letter, "*PPB also needs to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification*."

**Advanced Academy (Recruit Training).** The Training Division provided Advanced Academy training to one class of new recruits in the second quarter. Instructors ensured that the recruit training covered the content of PPB's prior trainings as well as the Basic Academy curriculum required for all new sworn officers by Oregon's Department of Public Safety Standards and Training (DPSST). The classes covered are listed in Appendix B. COCL did not observe this particular training, but overall, we are satisfied with the range of classes offered.

**Crowd Control Training.** After the 2020 protests, COCL recommended that PPB provide additional training in crowd control for all officers and for special units, but first, conduct a thorough After Action review to identify problematic behaviors and procedures. For both the first and second quarters, PPB worked on crowd control training, but the results were not acceptable to COCL and DOJ, and policy changes must precede training. Also, policies must be based on legal mandates, including both Oregon law and court orders, which are evolving.

Crowd control training continued as a topic of discussion with the City, PPB, DOJ, and COCL during the second quarter, but was not implemented because of deficiencies in the training materials. After reviewing the lesson plans in May of 2021, the feedback from COCL and DOJ underscored the need for greater use of adult learning techniques, more attention to the role of squad supervisors in crowd control, more integration of procedural justice and de-escalation techniques, and a narrower focus on using force against those engaged in criminal behavior. Importantly, we asked for more attention to the distinction between different types of resistance and active aggression by community members that may justify the use of force by PPB. This would require a review of the "Graham Standard"[4] and PPB's Force Policy 1010. This would also require more attention to the proper reporting of force by involved officers and the proper review of force by supervisors. Finally, we asked PPB to give less attention to the factors that were beyond their control, more attention to the mistakes that were made, and less attention to an "us vs. them" mentality. The first crowd control training for all PPB officers is scheduled for the third quarter, so COCL will review it in our next report.

PPB has two groups that provide assistance in crowd control – the Rapid Response Team (RRT) and the Mobile Field Force (MFF). RRT training by PPB instructors typically occurred twice a year, but because PPB was not prepared to fix deficiencies in the crowd control lesson plans, no such training occurred during the first six months of 2021.

The only RRT training in the first quarter was provided by the City Attorney's Office on March 24th in response to an order from Chief Judge Hernández regarding the violations of a temporary restraining order against using less-lethal weapons for crowd control without proper training and without "active aggression." We observed this training and in our first quarterly report expressed our disappointment in the tone and substance. In the second quarter, the City Attorney's Office reported being responsive to

---

[4] The Graham Standard established by the courts states that officers can only use force that is "objectively reasonable under the totality of the circumstances."

our feedback and informed us of the changes made to the training, including greater clarity about the importance of the Judge's order, requiring Zoom cameras to remain on to reduce multitasking by officers, and using a 2-instructor format.

However, the RRT members collectively resigned from this voluntary unit in the second quarter. In a memo to Chief Lovell dated June 17th, the RRT listed numerous reasons for resigning, including injuries suffered, a hazardous work environment, conflicting guidance from policies and training, perceived inconsistent and unfair investigations of misconduct, lack of body worn cameras, and a perceived lack of support from the leadership of the City and PPB. One statement in the letter seemed to summarize their feelings: "*Team members were subjected to extreme violence nearly every night of the demonstrations, and that was rarely discussed both externally and internally. Instead, the focus of the vast majority of discussion surrounding crowd control, was focused on the officer's actions only.*"

There is no question that months of nightly confrontations had a physical and mental toll on PPB's officers and RRT members. However, COCL questions why participation in crowd control units is voluntary and why the resignation of an entire group was considered acceptable conduct by PPB's administration. Certainly, PPB leaders have the authority to assign sworn officers to specific events at any time under any circumstances, as they do with MFF squads. This will need to be worked out and the role of special crowd control squads should be included in PPB's future training.

PPB's Mobile Field Force (MFF) is a group of assigned "*sworn members who are trained in basic crowd control tactics and techniques, organized into a squad and deployed to assist in the management of a crowd.*" (Directive 635.10). In the absence of RRT, the MFF has become a key vehicle for PPB's crowd control efforts. Historically, PPB relied on MFF squads from each precinct when needed for crowd control and PPB has returned to that model for now. However, questions remain about whether another RRT unit is needed. In any event, the City has proposed crowd control training as a key remedy to address DOJ's and COCL's assessment of non-compliance with force management and reporting (Section III of the Settlement Agreement). No such training was delivered in the second quarter. It is currently scheduled for the third quarter.

In the absence of body-worn camera data, the COCL recommends that future crowd control training include the effective use of videos produced by community members in Portland and other cities. This will help to illustrate proper and improper decision making and how to define force-relevant events. When such videos include teachable moments regarding the use of force, they should be played several times and stopped at critical moments to identify specific actions that may be difficult to capture in chaotic situations[5]. Of course, videos involving PPB officers should not be used until all administrative procedures have been exhausted and should not focus on individual PPB officers, but actions of an entire squad. Individual actions can be illustrated with videos from other police agencies.

**Peer Intervention Training.** Peer intervention training, required by Par. 84, encourages officers to intervene when their peers are engaging in, or about to engage in, harmful actions, such as the use of force against passively resistant protesters. As noted in our last report, the 8-hour ABLE training ("Active Bystandership for Law Enforcement"), developed by Georgetown University's Law Center[6], was delayed

---

[5] This can be done with the cursor or by using more sophisticated methods. Some companies specialize in creating visual tools to enhance presentations.

[6] For more information about ABLE, go to: https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/ . To give full credit, this ABLE training was originally based on the peer intervention training developed by the New Orleans Police Department.

in order to facilitate the scheduling of crowd control training in 2021. With directive 305.00 on peer intervention approved and promulgated in the third quarter, we expect that ABLE will be introduced in the fourth quarter using a Zoom format with live interactions. We will then assess the quality of the training and role-playing scenarios.

*In-service Online Videos*

In 2020, PPB was scheduled to deliver 40 hours of In-service training using classroom lectures and skills training, but due largely to COVID, this training was discontinued. To compensate for the loss of in-service training in 2020, PPB moved many of its classes to an online platform using its Learning Management System (LMS) and included them as part of the 2021 In-service training. PPB has been using virtual platforms for some time, but this interruption provided an opportunity for them to re-envision training and consider which classes can be delivered virtually and which would require in-person skills training. A decision was made that 20 hours of In-service would be in-person and at least 20 hours would be delivered online. Moving forward, PPB plans to continue a sizable online training program. Thus, COCL will give particular attention to PPB's virtual training program in this section. This quarter COCL was given access to 40 videos covering 15 separate topics. Here we will review videos we did not cover in our last report and that we consider relevant to constitutional policing.

**Equity Training**. In 2021, PPB's Equity and Inclusion Office (EIO) began developing and posting a series of online equity trainings for all PPB personnel. In the first quarter, we reviewed the first two videos which sought to prepare officers for difficult conversation about racism. In the second quarter, PPB introduced two additional videos summarized here.

The third equity video (Racism Part 1) is a simple and inviting introduction to this topic, with the Equity Training Specialist setting the stage. The video does a fine job of defining systemic racism, explaining how it has been maintained from slavery and Jim Crow laws to modern practices of redlining and predatory lending, and describing the adverse impact on education, employment, wealth, incarceration, and other outcomes associated with race. However, the video only hints at systemic solutions such as criminal justice reform, as we would expect from an introductory training. In the final analysis, we expect that such reform will be driven by leaders and policy makers.

The fourth equity video (Racism Part 2) focuses on the three major forms of racism – interpersonal, institutional, and structural (systemic). Different city officials provide presentations to explain these types of discrimination and offer examples. PPB policies that prohibit bias and discrimination were also mentioned (Directives 344.05 and 310.20).[7] The video notes that "race" is a social construct used by whites to maintain power and describes how interpersonal and institutional racism are a product of structural/systemic racism. Few solutions were offered here because of time and because this is an introductory video designed to educate and create a work environment that is conducive to change. However, PPB officers were encouraged to participate in the policy review process to ensure that the directives and protocols are just and equitable. The video also mentioned that PPB is helping immigrants with driver's education (in their primary language) to address a traffic safety problem.

As noted previously, future EIO equity training videos will reach beyond race/ethnicity to many other identities that have been marginalized, including gender identity, sexual orientation, and houselessness. Creating an "equity lens" for all organizational decisions is the long-term goal. COCL recommends that

---

[7] This included a video from the National Center for Civil and Human Rights and the Auschwitz Institute.

the Training Division continue to support EIO's plan to integrate the concepts of equity, bias, and procedural justice into all of PPB's trainings.

**Crime Victims' Rights.** This is a well-designed 5-minute video explaining victims' rights, including "*the right to be treated with dignity and respect, to reasonable protection from the offender, to fair and impartial treatment, and to a meaningful role in the justice process.*" Officers are encouraged to carry copies of the guidebook on Crime Victims' Rights[8] and distribute them to crime victims. In a separate one-minute video officers are shown how to use their PPB iPhone to share a QR code that allows victims to access this Crime Victims' Rights guide online in different languages. Given that victims have regular contact with the police and are critical to the success of the criminal justice system, this video is helpful. But it remains unknown whether PPB officers are, indeed, distributing copies of the guide or sharing this app with victims. Down the road, we encourage PPB to evaluate whether this training and other trainings are effective at changing officers' behavior on the job by asking community members with whom PPB officers have contact.

**Officer Wellness, Interoception and Mindful Movement.** Officer wellness is given considerable attention in PPB's online in-service training videos, similar to the in-person class offered pre-COVID. The same licensed mental health clinician offered mental wellness training across three sections (6 videos roughly 65 minutes total). The instructor reviews challenges faced lately (e.g., COVID, protests and riots, resignations, and other factors) and how they might have affected officers' personal and professional lives (e.g., stress of anti-law enforcement sentiment and "institutional betrayal" internally). The second section covered the nature of trauma and how it can affect officers and their families. The third covered "skills, tips and tricks" to deal with these stressors and develop resistance to stress and build wellness. These include how to support family members, engage in yoga and progressive relaxation, feeling gratitude, and other strategies. This training covered some important psychological concepts, such as "institutional betrayal" and the importance of establishing internal procedural justice ("institutional courage") to address this problem. Officers are given guidance on how to respond to these stressors and move forward rather than be trapped with anxiety, depression, feelings of helplessness, feelings of "moral injury," and disengagement. Each section ends with a single question directed to the class, but we don't see where the students are required to answer the question or interact with the instructor in any way. With static videos, presumably there is no interaction.

Officer Wellness also covered "Interoception and Mindful movement" videos (roughly 40 minutes total), where a retired PPB sergeant and his colleague discuss police stress and mental consequences. They offer "focused attention and breathing exercises," from yoga to mindful meditation to help minimize the adverse effects of stress and improve performance. This class provides practical exercises where officers can focus on their breathing and link it to mindful movement, including "Car Yoga" (that can be done while in the squad car) and "Office Yoga" (that can be done at your desk). These wellness videos give very practical exercises, but the question remains whether it can be linked with in-person training. We don't know whether officers practiced using these skills during the training and continued using them on the job.

**Language and Cultural Awareness.** To date, PPB's Office of Community Engagement, in collaboration with some of PPB's advisory councils, has produced five strong videos that introduce officers to some of the cultural and language barriers experienced by Portland residents who are immigrants with Limited English Proficiency (LEP) and those who are hard of hearing. The videos explain different types of

---

[8] Prepared by the Oregon Department of Justice's Crime Victim and Survivor Services Division.

interpretation (vs translation), the role of bilingual police officers and certified interpreters, and best practices when interacting with LEP individuals. Videos include both language experts and community members. This is important introductory training because of the growth of immigrant communities in Portland (representing more than 39 spoken languages) and the importance of providing them with full access to police services. The videos seek to enhance cultural competency within the PPB, which should result in more procedural justice and equitable treatment for all segments of the Portland community.

One video explains how the LanguageLine's *Insight app* works to help LEP individuals. Officers can use this app on their phone to quickly access audio interpreters in 240 languages and video interpreters in the 35 most requested languages, including American sign language. Officers are shown the steps for one-time authentication, how to request audio or video interpreters, how to manage the conversation, and how to seek technical assistance. LanguageLine has developed a very professional video that should help officers assist diverse communities that face language barriers, improve productivity and build public trust. However, additional data and follow-up would be required to determine whether PPB officers are using the Insight app more after seeing this video.

**Procedural Justice.** From the beginning, COCL has maintained that procedural justice training is critical for de-escalating intense interactions with the community, reducing unnecessary use of force, and building public trust and police legitimacy. PPB developed three procedural justice videos (roughly 37 minutes in total). Using the storytelling mode, the first video exposed officers to the voices of five PPB members at different ranks (officer, sergeant, lieutenant, commander, and deputy chief) who answered the question, "*Procedural Justice, what does that mean to you in your current role?*" The second video focused on examples of procedural justice in decision making, and the third on the relationship between policy legitimacy and procedural justice.

These five individuals discussed both internal and external procedural justice, hoping officers would gain some insights and apply them to their own work. Their descriptions of internal procedural justice (or what we call "organizational justice") were compelling, but with the exception of the School Resource Officer program (which has been discontinued), their views of external procedural justice were not well developed. In the video, one presenter suggested that procedural justice with the community is simply "good police work" but this provides little guidance to officers. Another suggested that procedural justice "goes out the window" when dealing with anti-police groups. We understand this sentiment when dealing with individuals who are engaged in violent actions or are destroying property, but we encourage procedural justice even when dealing with troublemakers. Sometimes, it is easy to practice being fair and respectful, but at other times, it is extremely challenging, such as when making arrests or applying force.

There are other limitations to this training. First, no community voices were heard – people who can talk about their experiences with the PPB, whether good or bad. This video was meant to give voice to PPB members, but future videos should give voice to community members. Second, this training should be linked to a Procedural Justice policy. PCCEP recommended such a policy on January 28, 2020 and PPB later responded with a draft directive, but to date, it has not been finalized. PPB has been waiting for PCCEP feedback for many months, so we encourage PCCEP to make this a priority. Third, and most importantly, these procedural justice videos are not linked to specific procedural justice skills (some of which are described in the draft directive), whether they be internal or external skills. Similar to learning how to use firearms, officers need to observe and practice procedural justice skills (both verbal and behavioral) during hands-on scenarios, followed by constructive feedback from instructors to individual

officers. Again, we acknowledge that these are introductory videos designed to set the tone, and thus future work is needed to achieve these larger goals.

**Traffic Stop App Training.** One of PPB's online videos is the "Stops App Update Training," which describes and justifies the collection of additional stops data. To explain changes to the Stops Data Collection app, the Deputy Chief introduces the training by describing how the State of Oregon's annual report (beginning in 2019) identified PPB as the only agency with multiple racial disparities in searches and arrests linked to traffic stops. PPB's subsequent analyses show disparities in consent searches for investigative and patrol units. This online training explains that officers need to report the legal reasons for the stop (e.g., probable cause of a traffic crime or violation, reasonable suspicion of another crime) and calls for accurate reporting. On a positive note, this interactive video requires officers to take quizzes and obtain the correct answer before moving on to the next topic. This video gives very little attention to consent searches except to describe when they are allowed, but that was not the intent of this initial training. Consent searches will be covered at a later date when PPB is prepared to distribute cards in different languages that explain the driver's right to decline a consent search.

**CEW (Taser) Training.** Axon (makers of Taser) provided PPB with this "2021 Online In-service Annual Conducted Energy Weapon (CEW) User Update." This use-of-force training provides a description (and illustrations) of the "preferred target zones" where CEW probes are most effective, tactical considerations, acceptable levels of exposure to CEW, and problems that can occur. Some attention is given to the use of force standards (e.g., Graham v. Connor and "objective reasonableness"), and cautions officers against using CEW on high-risk populations. However, the training is designed by Axon to avoid liability for their product (thus focusing heavily on risks) and makes little effort to ensure that officers are engaged in this training by providing quizzes or exams. We encourage PPB to ensure that policy is integrated into training on CEWs. Most importantly, this training, which is required by Axon, needs to be supplemented with hands-on skills training with the CEW, as PPB has done.

**Response to Calls involving Youth.** Because PPB's Youth Services Division has been disbanded, PPB has produced three short videos to educate patrol officers about responding to calls involving youth and how to navigate local school environments. Part 1 discusses call management, understanding school rules, external partners and diversion options. Part 2 covers responding to threats of violence, bias crimes, and other significant events. This includes 1 minute and 40 seconds of training on how to use PPB's school critical incident response map which shows maps, contact information, and floor plans, with suggested street closures, staging areas, incident command sites, and adjacent lockout locations. Part 3 covered response to child abuse and sexting in 1 minute and 30 seconds. Clearly, far too much information was communicated in these short videos. PPB should expand this training.

_Overall Assessment of Online Training_

The PPB Training Division has gone through major changes over the past two quarters, as it moved half of its In-service training to a virtual format. This transition to virtual learning creates many opportunities and many challenges as we described in our first quarterly report. On the positive side, most of the videos we observed this quarter were not too long (a common mistake in this field) and, with a few exceptions, provided a basic level of knowledge for the topics missed during the 2020 In-service and considered necessary for compliance with Par. 84. However, on the negative side, some of the videos were too short (for the large amount of content covered) and most were asynchronous, thus not allowing for any interaction with the video, other students or an instructor. Asynchronous videos also provide opportunities for students to disengage and not take the training seriously.

COCL has expressed concern about this problem in the past and the importance of devoting more staff and resources to producing more interactive online classes. PPB has been responsive by providing interactivity with required questions/quizzes for some videos such as the Box-In Refresher[9] and the Traffic Stop App, but not for most online training. PPB has also hired a second videographer this quarter who can help address this problem, but at the same time, the program manager for LMS resigned at the end of June. This is very unfortunate at a time when virtual training at PPB needs to address the many challenges that lie ahead. A search process to replace the LMS manager is underway and is likely to take several months.

We are also concerned about the growing volume of online videos and whether officers are able to effectively manage this new demand on their time, in contrast to traditional in-person training where they were "off duty." Certainly, patrol officers have expressed concern about having enough dedicated time to complete this training during their shift. Hence, more PPB guidance and support will be needed to ensure that officers have a desire to take this training seriously, are not trying to complete all of the videos at one time, and are motivated to complete the post-training surveys.

The Training Division has been required to make difficult decisions about which classes should be moved online and which classes should remain in-person. For many of these decisions, we have no objection. However, COCL has argued that certain topics would benefit from a combination of online and in-person formats, where the online portion replaces the traditional classroom presentation prior to the tactical "hands-on" training. We have seen PPB take this approach with classes such as CEW but by and large, the online training involves standalone classes. Students need to: (1) first understand key concepts being discussed in PowerPoints, (2) observe how other officers have translated these concepts into the desired behaviors, (3) be allowed to practice the skills themselves and (4) receive feedback on their individual performance. Most of PPB's current videos are able to achieve the first objective, but often lack the second step, and certainly are unable to achieve the third and fourth objectives.

After reviewing the current online training, we feel strongly that the Procedural Justice training must be extended to in-person skills training to substantially comply with Par. 84 and cover these four objectives. In the past, PPB has provided procedural justice scenarios (e.g., traffic stop scenario) and related crisis intervention scenarios that were able to effectively achieve this goal. However, the in-service skills training for 2021 fell short of this mark (see below).

Furthermore, for a few other online classes, we encourage PPB to continue efforts to move from asynchronous videos to interactive videos or live interactions via Zoom-type formats. For subjects such as equity and wellness, students need opportunities to express their feelings about racism, interact with experts, and practice their wellness skills.

In sum, while PPB's online videos have been helpful to remediate some of the training gaps created in 2020, and many are of high quality, some are more essential for restoring public trust, such as Procedural Justice, and thus require additional attention. The online Procedural Justice training should be upgraded to include community input as well as a set of specific "dos" and "don'ts" when interacting with the public, in preparation for procedural justice skills training. Also, PPB's virtual training must be properly staffed to reach the next level of student engagement and interactivity, where students are required to answer questions, take quizzes, and in some cases, interact live with other students and the

---

[9] We also note that the Box-In refresher video included an excellent illustration of a real live box-in that was properly executed, allowing officers to see what good practice looks like on the job (step 2).

instructor. Reaching the next level will require an investment by PPB and the City, as this work is very resource intensive.[10]

### In-Service Training: In-Person

In-person classes for the 2021 In-service training began in January with a focus on the skills training missed in the 2020 training. Similar to virtual training, COCL approved the Training Plan and lesson plans but needed to observe the training to ensure the quality of delivery and adequate coverage of key topics. These observations occurred in May, 2021 and are reported here. In-service training was completed by the end of the second quarter.

As noted previously, with the exception of new scenarios and legal topics, no new material was covered during the In-service training administered in person. Nor did this In-service include any crowd control training (PPB decided to develop a separate training on crowd control later in the year). Clearly, there are opportunity costs associated with repeating classes from 2020 instead of offering new classes that might emerge from a needs assessment.

Over two days (10 hours per day), PPB covered: Firearms, Control Tactics, Patrol Vehicle Operations (PVO), Patrol Procedures, Taser, and Legislative Updates. In addition, members participated in Patrol Procedure scenarios and a virtual scenario (VirTra software). Each of these trainings received roughly two hours of time, with the exception of Legislative Updates (30 minutes) and Firearms (4 hours). Our assessment of this training is provided below, including our evaluation of the required scenarios and the integration of procedural justice communication skill.

Our observations and analysis are limited to skills classes where new scenarios were introduced. One exception was the 30-minute Legislative Update on Day 1. Using Zoom, the City Attorney's Office focused on House Bill 4301, which restricts officers' use of neck holds. PPB's 1010.00 directive already prohibits the use of neck holds, but the state law more broadly addresses holds that restrict breathing. The instructor's message was that the new law does not effectively change the force restrictions on PPB officers, arguing that the use of force must be objectively reasonable under the totality of the circumstances. In any event, PPB's force policy should be updated to reflect this new law.

**Control Tactics Training.** The Control Tactics class was designed primarily to teach skills to gain control during physical encounters with noncompliant subjects, but because the COVID-19 virus was still present in May of 2021, students were not allowed to engage in any physical contact. Thus, the class was limited to one hour of lectures, videos, and role playing by instructors, followed by one hour of firearms practice against cardboard figures. One fourth of the students were in the 2020 class.

This class focused largely on the use of weapons during close, physical confrontations. The instructors reviewed key elements of PPB's force policy that define when deadly force can be used and the need for verbal warnings if possible. They discussed the use of CEWs, batons, and knives when interacting with a subject at close range. Students were instructed to disregard what they learned in their 2019 in-service training about knives because PPB does not have a policy on carrying or using knives, and knives should not be used as a secondary deadly force option. Instructors received some pushback from officers who have been carrying knives for years as a defensive tool. Certain knives can be carried, but we have not seen a revised uniform policy.

---

[10] Upgrading a one-hour video can take up to 40 hours of staff time.

Students observed videos from other cities that illustrate the dangers of the traditional approach to suspects who are ready to fight, whereby officers are taught the traditional approach of seeking distance between themselves and the suspect. The main message from instructors is that you can fall or have your weapon(s) taken from you during these physical confrontations. The new approach being taught is to eliminate space (stay close to the suspect, not at arm's length), use positioning and strikes to retain control of the individual and your firearm, and, if necessary, use your firearm in a way that minimizes the risk of collateral damage. Some statistics were cited to support this approach: 45% of officers are killed within a short distance and half of those are killed with their own firearms. However, whether this new approach of close confrontation (vs keeping distance) will lead to better or worse outcomes is unknown.

The second hour was devoted to practicing the use of firearms within close range using training rounds (rather than live fire). Traditionally, PPB firearm training at the live range involved shooting at cardboard figures from a distance. After watching videos, officers were given the opportunity to stand close to cardboard figures who represented the threat, and practice close-range shooting using a different technique – the "Thumb Pectoral Index."[11] Students used training rounds during these practice sessions.

Because of COVID, PPB did not allow any physical interactions. Instead, the instructors showed a video of recruits engaged in the new training where attempted custody has gone bad. Rather than seeking distance, two recruits were allowed to engage in a fight, where one recruit (playing the role of the subject) did everything possible to take the officer's weapon.

In sum, this is the direction that PPB's Control Tactics training is headed, namely, hand-to-hand combat, less reliance on CEWs, and the close use of firearms if deadly force is needed. De-escalation was not a topic, as the class focused on those situations where the suspect is ready to fight. In any event, we question whether two hours of control tactics training per year is sufficient and provides enough time to cover all options. We are also uncertain about the efficacy of this new approach.[12]

The Control Tactics instructors clearly communicated their primary concern about officers losing control of their own weapons, whether it be firearms or CEWs. Outside of the classroom, this concern reached the point where the Control Tactics instructors prepared a memo to the Chief's office, asking that PPB's Directive 1020.00 be changed so that officers are not required to carry CEWs on them but instead, leave them in the squad car. This memo was never submitted to the Chief's office, as the Captain of Training did not approve it. (Because of these mixed reactions to CEWs, COCL prepared Appendix C on this subject).

**Patrol Services Training.** Two hours of classroom lectures/discussion on the first day was followed by two hours of scenarios/skills training on the second day. The Patrol Services training focused entirely on how to execute an "emergency entry," defined by PPB as "*The entry into a structure to prevent or end an immediate threat of serious harm to people inside; or to render emergency medical aid to someone*

---

[11] The instructors talked about the "Thumb Pectoral Index" shooting position. Officers were discouraged from firing their weapon from the hip or rib cage as traditionally taught and were shown how to keep the gun close to their chest (to avoid having it taken or redirected) and pointed downward (to avoid hitting bystanders) while maintaining a fighting stance.

[12] PPB reports to us that similar training is provided to new recruits as part of Oregon DPSST's required Basic Academy curriculum.

*believed to be injured or in the process of being injured.*" [13] The classroom lecture covered Entry Team roles, including the Team Leader, Breacher, and Clearing Officers. Training also covered the circumstances that would affect the decision to enter or not enter the building. The skills training on the second day continued to focus on warrantless entry in the training village. Entry teams were created and given opportunities to enter different apartments with different suspects and/or victims inside. While the lecture and scenarios were effective for skills training on warrantless entry, there were opportunity costs associated with this training (See Patrol Procedures Scenarios below for additional comments on this skills training).

**CEW Training.** The CEW (Taser) class began with an in-class refresher by a trained CEW instructor, followed by practice sessions. The instructor did a good job of reviewing the decision making process involving the deployment of the CEW, including the situations justifying deployment, warnings, and the factors that can contribute to, or limit success of this weapon (roughly 50% effective). He stressed the need to use them only when necessary (e.g., proper distance) and when appropriate (e.g., to stop active aggression, prevent suicide, prevent escape, avoid higher levels of force). He underscored the need for warnings when possible and having the proper distance. Videos were shown where officers had made mistakes using CEWs in other cities. These videos can be informative, but they can also create hesitancy among PPB officers about when to use CEWs and the things that can go wrong. More examples of successful deployment might increase officers' confidence in this less-lethal option.

During the hands-on skills training, officers deployed at least two live CEW cartridges into specified targets. During the training, the officers participated in several scenarios in groups of four to practice proper handling, manipulation, and targeting of the CEW to qualify.

**Patrol Procedures Scenarios and Skills Training.** The 2-hour skills training scenarios on the second day were built around the warrantless emergency entry and the classroom material covered under the Patrol Services class and to a lesser extent, the CEW class. In these scenarios Patrol officers had to quickly decide whether to use deadly force (firearm), a less lethal weapon (CEW) and/or de-escalation techniques. These settings were not well suited to practice procedural justice or de-escalation skills and were not reviewed by COCL in advance.

The scenarios we observed involved a very agitated individual with a knife who was shot with a firearm within seconds of the Team's entry into the apartment. Officers were given the option of using their non-lethal CEW, but during the debriefing, we learned that, after several months of in-service, roughly 75% of the time the officers elected to use their firearm. The message from instructors was clear that CEWs are effective only within a certain range (10-15 feet), are effective only half the time, and require a lot of paperwork afterwards (See Appendix C). Scenarios are needed where CEW is a realistic first option and where lethal cover is available in the event of CEW failure.

In terms of procedural justice and de-escalation, no classroom refresher was provided on Day 1 in advance of the scenarios on Day 2, as was done for CEWs and emergency entry. The situation was complex and required the evaluation of an entire unit of officers (Entry Team) rather than one individual officer. During the 2020 In-service (with a very similar scenario), instructors reported to us that this setting was difficult to score and provide a debriefing on procedural justice, but that they would use the 2020 scenario as a pilot to develop a better procedural justice debriefing for 2021, including a good

---

[13] The legal authority for this type of entry without a search warrant is covered in Directive 631.10 and ORS 133.033.

scorecard. However, in our judgment, the 2021 scenario provided limited opportunities to practice procedural justice and de-escalation and the debriefing gave little attention to these issues.

The focus of the 2021 scenarios was on planning and executing the emergency entry and ensuring proper role assignments, communication, and coordination. The debriefings were strong on these issues, pointing to occasions where someone failed to coordinate or communicate with other officers on scene. The debriefing also covered communication with the suspect and the victim. The debriefings complimented the team leader for seeking to develop a conversation with the suspect and attempting to de-escalate the situation. We credit the PPB with practicing de-escalation during these phone calls with the suspect, although there was little time for de-escalation practice for those who entered the apartment. Furthermore, the debriefer failed to acknowledge deficiencies in the communication with the victims. The victims were asked a few brief questions about the suspect, but no compassion or sympathy was communicated by the person assigned to her in this traumatic situation, and this was not acknowledged during the debriefing. In 2020, the Training Division instructors acknowledged that procedurally just treatment of victims was a shortcoming in the 2019 training that would be corrected this time, and COCL underscored the importance of showing empathy, but that did not happen with the 2021 In-service. PPB maintains that the urgency inherent in the warrantless emergency entry scenario does not allow the officers to spend time with the victim, although many officers are on scene and one is specifically assigned to the victim.

We are not opposed to using this type of scenario for practicing emergency entry skills, but this creates other problems. First, emergency entry would typically be handled by special units, not patrol officers. Second, the opportunity costs of using these scenarios are significant, as they reduce the opportunity to fully practice procedural justice and de-escalation skills demanded by the community and to practice them in a variety of situations that are much more common for Patrol officers. Unfortunately, this type of unit training, with a singular focus on the urgent entry to an apartment with "*the immediate threat of serious harm*" is not conducive to practicing interpersonal communication skills or even the use of less-lethal weapons. In contrast, the lesson plan indicates that "*…containment and de-escalation should be a primary consideration when responding to critical incidents*." PPB should also consider other emergency entry scenarios where the suspect does not immediately lunge at the officers with a knife and they are able to buy more time to communicate with the person.

Third, the training for supervisors was very limited in this context and gave them no experience with crowd management. In prior trainings, critical incident management had not extended to protests, but instead focused more on traditional single-subject events such as hostage situations, barricaded subject, potential suicide, or domestic violence. PPB has continued that practice here.

Finally, one message communicated to the officers during the debriefing is that it would have been a mistake to use a CEW (rather than a firearm), as the situation unfolded so rapidly, and the suspect was showing active aggression. Instructors also noted that CEWs require a lot of paperwork, so the messaging in the classroom and the scenario training provided a disincentive to the use of CEWs.

**VirTra De-escalation and Judgmental Use of Force Simulator Training**. PPB is beginning to experiment with 3-D simulation to strengthen officers' skills in de-escalation and use of force decisions. For the last two hours of the In-service training, officers were given the opportunity to try out the VirTra[14] simulator. Officers found themselves walking through a high school searching for an active shooter. Equipped with

---

[14] Virtra.com

CEWs and guns, they faced five different scenes. These "shoot-don't shoot" scenarios may help officers make decisions within a narrow set of circumstances and teach them how to avoid shooting students and staff. The VirTra program recorded the number of shots taken (which ranged between 6 and 14 shots per officer during our observations) and the timing of the shots (often taken within a few seconds of each other).

The VirTra simulator was new to PPB at the time of our observations, but it did not receive high marks from the instructors. They were disappointed in the frequency of system crashes and the level of effort required to keep the system running. Also, PPB will need to ensure that the strategies and tactics encouraged by these virtual scenarios match PPB policy and Oregon state law, which is not always the case.

The VirTra simulator apparently has the ability to go beyond the "shoot-don't shoot" school scenarios, and COCL supports PPB's plan to explore these options. VirTra has more than 100 scenarios and PPB would be allowed to create their own scenarios. As one example, there is a scenario where officers are asked to interact with a houseless person in front of a business. The VirTra controller is able to escalate the level of tension by controlling the houseless person's level of cooperation. This verbal exchange would be a good opportunity for PPB officers to practice their procedural justice and de-escalation skills (and receive individual-level feedback on their performance), especially since PPB has been criticized for the volume of arrests within the houseless population. To fully exploit the features of VirTra, at least one PPB instructor will need to attend a five-day instructor training program in Arizona. We encourage PPB to continue down this path and prepare for the 2022 In-service despite the early bumps in the road.

### Evaluate Training

Paragraph 80 requires that PPB "*develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum.*" The COCL team continues to assess the content, methods, and utility of PPB's training evaluations in 2021.

Our assessment of PPB's training evaluation systems remains unchanged. The Training evaluator/analyst continues to do an exceptional job with very little staff support. PPB continues to employ a diverse set of methods to evaluate in-person training, including in-class quizzes, anonymous class evaluation surveys to assess the quality and content of instruction, and knowledge tests. Scenario debriefings were informal for this training and because these were group role playing events, most officers were not provided with individual-level feedback. PPB's evaluation system for online training includes post-class surveys and knowledge tests to evaluate the content and quality of online instruction in 2021. However, as noted earlier, quizzes to keep students engaged were very rare with static videos and knowledge tests were only used for select online classes.

The evaluator continues to generate internal reports that are fed back to instructors and managers, as well as students when they do not pass a knowledge test . We have reviewed preliminary data from the In-service training which shows that officers continue to score well on the knowledge tests and give high ratings to the instructors. A major concern expressed by PPB officers, especially Patrol, is finding enough dedicated time to complete the online training classes. The number of such classes continues to grow. Consistent with our impression, some officers felt that certain classes are better taught in person, such

as Tactical Emergency Casualty Care (TECC), where officers learn to apply tourniquets to stop the bleeding.

In terms of improvements, last quarter COCL recommended that online surveys be added to PPB's equity classes. Apparently, the evaluation function for equity classes will be the responsibility of PPB's Equity and Inclusion Office (EIO) rather than the Training Division, and EIO will be developing a survey.

Last quarter, we also reported the low survey response rates for officers taking the online classes, which could lead to false conclusions about the classes due to sample bias. We recommended that PPB take corrective action to achieve a higher rate of voluntary participation in the surveys. In the second quarter, the Training Division began taking steps to address this issue. They have sent an email to all PPB members acknowledging their survey feedback and how their concerns have been addressed. At some point, the Training Division is planning to send out a reminder email for the online training surveys.

COCL will continue to recommend the hiring of more civilian analysts and information technology staff for the Training Division. The limited staff is burdened with a massive amount of new programming, as well as data cleaning, analysis, and reporting across multiple training programs, including In-service, Supervisors, Advanced Academy, ECIT, and many others, including both online and in-person formats. To improve performance, PPB must be able to develop evidence-based training and evaluate its effectiveness.


### Document Training Delivered and Received

Paragraph 81 of the Settlement Agreement requires that PPB create, and that supervisors use, a "*central, commonly-accessible, and organized file system*" for training records. COCL can confirm that the Training Division continues to use the Cornerstone Learning Management System (LMS) for this purpose. LMS attendance records were updated in the second quarter to include all in-person and online In-service trainings noted earlier, as well as the range qualifications, legal updates, directives, and other training videos and notices. Records of external trainings continue to be maintained.

LMS is still used by supervisors and command staff to run transcript reports and ensure that PPB employees who are not on leave are completing their required training. The review and compliance process has not changed, with individuals given 30 days to complete training and sent email reminders at 7 and 14 days after training is posted. Their RU manager is sent emails regarding training delinquencies at 1, 5, and 21 days past the due date. The member is sent email reminders at 1, 7 and 14 days past the due date. When the person has failed to complete an online class in this time period, the Training Division sends a non-compliance memo to the Chief's office. During the second quarter, a total of 33 non-compliance memos were sent to the Chief's office for 9 different classes indicating whether each training was missed by specific PPB employees.[15] On average, only 2.5 PPB members failed to complete each of 8 specialty online classes. However, for the Online In-service training that occurred in February and March, an average of 6.5 members missed each class.[16]

---

[15] Three of these classes were due in the first quarter, but non-compliance memos were not sent until the second quarter, as would be expected since members had until the end of the March to complete classes due in the first quarter.

[16] Non-compliance memos for In-service training that occurred in the second quarter were not available at this time.

Per Paragraph 83 and SOP 1-19, PPB is prohibited from selecting trainers "*who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness,*" with specific limitations in their work histories over the past five years. PPB did not report hiring any new instructors in the second quarter, so no review by COCL was needed.

## Audit the Training Program

PPB has not conducted a formal audit of their Training programs (Par. 85) since 2018. Because of some ambiguity in the timing of these audits, COCL has not requested another audit over the past three years. However, as we noted in the first quarter, there have been many changes in the planning and delivery of PPB's training over the past three years, and the Training Division has been under the leadership of a half dozen different individuals during this time. Also, as we will discuss in our third quarter report, DOJ is proposing remedial action that could have a significant impact on the Training Division's operation in the future. Thus, to substantially comply with Par. 85, we have requested that PPB develop an audit plan for 2022 that can be reviewed and approved by DOJ and COCL.

## Analyze and Report Force Data

Paragraph 86 of the Settlement Agreement requires that PPB's Force Inspector "*gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council…*" including "*problematic use of force patterns and training deficiencies.*" In turn, the Chief is expected to receive and respond in a timely manner to recommendations from TAC or the Training Division regarding training, policy, and/or evaluation pertaining to use of force patterns.

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). Protest-related force statistics are included at the end of the quarterly reports and on PPB's Open Data Portal, which lists the number and types of crowd control force incidents. Demographic data for crowd control force incidents are not available.

For various reasons, PPB has fallen behind in presenting quarterly force reports at TAC meetings. TAC meets only once every other month and often has a full agenda. Also, because of miscommunication from an observer, one presentation by the Force Inspector was stopped in the first quarter. In the second quarter, the only TAC meeting was held on May 12, 2021. At this meeting, the Force Inspector was expecting to present two quarterly reports (Q3 and Q4 of 2020), but only enough time was available for one report. The Force Inspector is planning to cover Q4 2020, Q1 2021, and Q2 2021 at the next meeting in July, at which point PPB will be caught up. Also, to avoid backlogs, PPB has since asked that, going forward, the Force Inspector be included on every TAC agenda following the issuance of PPB's quarterly force report.

The relationship between the TAC and the PPB Training Division remains strong overall. Last quarter we expressed concern that TAC was not involved in reviewing specific training plans or observing training. In the second quarter, this has changed. In May, TAC reviewed and provided written comments on PPB's

original crowd control training scenarios.[17] In June, TAC observed "dry runs" of crowd control training and again provided PPB with written feedback.[18]

The TAC meetings remain open to the public as required by Paragraph 87. COCL has observed these Zoom meetings and the public has been allowed to listen and make comments. PPB continues to use a public email distribution list to send reminders of the meetings to the public. PPB also continues to post the TAC meeting agendas and minutes on PPB's website.[19]

Through force audits, quarterly force reports and the Employee Information System (EIS), PPB continues to share force data with Precinct Commanders. PPB continues to use EIS to identify officers who exhibit problematic trends in force and other behaviors during routine police work, as noted in our assessment of Section VII. However, until we see a comprehensive after action report on the 2020 crowd control, we will continue to express our concern about the analysis of force applications during protests. The Force Inspector will not have a complete set of data needed for quarterly force reports if the After Action reports submitted by supervisors do not sufficiently identify problematic force applications during protests.


## Training Summary and Conclusions

PPB's 2021 In-service training was completed by the end of the second quarter using a combination of online and in-person training formats. To a large extent, the in-person component was geared toward completing the 2020 In-service skills training that was missed in 2020 by more than half of the police force. During the second quarter, COCL observed this two-day in-person training at PPB's training facility and later reviewed dozens of online training videos.

We credit PPB with making a concerted and intensive effort to remediate the training deficiencies during the first six months of 2021. Also, PPB has maintained a strong training evaluation system that includes the collection, analysis, and reporting of data on instructors, class content, and student knowledge acquisition.

However, because PPB was unable to provide a more complete and self-critical assessment of force applications that occurred during the 2020 protests and articulate the implications for policy and training, as requested by DOJ and COCL, we have assigned Partial Compliance for Par. 79 pertaining to the training needs assessment. Furthermore, PPB is required to develop and implement a high-quality system of training for officers and supervisors, but in the absence of a well-conceived and well executed crowd control training, along with several other factors, COCL has assigned Partial Compliance for Par. 84. Crowd control training was not implemented in the second quarter but is expected in the third quarter.

The focal point of the 2021 scenarios -- the urgent entry into an apartment with "*the immediate threat of serious harm*" -- was not conducive to procedural justice training, de-escalation training, or even the use of less-lethal weapons.

---

[17] https://www.portlandoregon.gov/police/article/784891
[18] https://www.portlandoregon.gov/police/article/7848890
[19] http://www.portlandoregon.gov/police/61449

The 3-D "shoot-don't shoot" scenarios in a school environment (the VirTra simulator) were disappointing to PPB because of the frequency of system crashes. However, this software goes beyond "shoot-don't shoot" settings to encounters with noncompliant or hostile subjects, thus allowing officers to practice their procedural justice and de-escalation skills and potentially receive individual-level feedback on their performance. Thus, we hope that PPB will continue to explore the options available.

COCL reviewed 40 videos covering 15 distinct topics and we gave particular attention to those we felt had the most relevance to constitutional policing in the future. The Training Division should be credited with producing high-quality videos and for creating several interactive videos that required students to take quizzes and answer questions. However, the majority of PPB training videos were asynchronous, thus not allowing for any exchange between the student and the software program. The City should devote more staff and resources to producing interactive online classes.

Clearly, online training is limited in its capacity to provide skills training, but it can be used to explain, justify, and contextualize in-person skills training. Thus, we encourage PPB to directly link certain online classes, such as Procedural Justice, to skills training involving physical and verbal interactions with the public. De-escalation and procedural justice are not simply guiding principles – they are skill sets that should be built into role-playing scenarios and interactive exercises (Par. 84.a.i.).

Finally, we note that PPB did not deliver Command-level and Supervisory in-service training in the second quarter, but we continue to stress the importance of their roles in crowd control settings, where they are expected to make sound strategic decisions, supervise their teams, and later ensure that any force events are properly documented and reviewed for compliance with policy and law.

# SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES

In evaluating this section, we continue to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. Par. 88 identifies the City's partners in providing community-based addiction and mental health services: "the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders." As the Settlement Agreement holds no authority over the City's partners, prior reports have evaluated only what the City and PPB can reasonably accomplish. We maintain that evaluative approach in this report.

During the second quarter of 2021, the City and PPB continued to participate in the broader community-based mental health service response system through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

As we noted in prior reports, we lack the necessary non-party information in the Oregon public health care system to assess whether all of the goals listed in Par. 90 have been met comprehensively. However, as noted in our last report, the City has recently taken steps to independently achieve the goals of Par. 90(d) which discusses diverting mental health crisis calls away from a law enforcement response through the use of mental health providers as first responders. In the second quarter of 2021, the Portland Street Response (PSR) pilot program expanded to the entirety of the Lents Neighborhood though it maintained the 9:00 - 5:00 work schedule. Additionally, BOEC telecommunicators received training on the pilot protocols during the quarter. We reviewed the triage protocol as well as the corresponding BOEC training and believe them to be sufficient for the pilot. However, several problems remain: neither were reviewed by the BHUAC during the second quarter, BOEC does not have a written policy regarding PSR (only the protocol itself), and PPB similarly does not have a policy for requesting PSR or responding to calls where PSR is already on-scene or arrives on-scene after PPB. Because PPB will inevitably interact with PSR responders, we would expect PPB to create a policy or SOP incorporating the lessons learned from the pilot prior to full scale implementation.

Prior to expanding PSR city-wide (if the City chooses to do so), we recommend BHUAC review and consider recommendations to refine BOEC's and PPB's policies, procedures, training, and operations related to PSR. We also recommend BHUAC review the findings from an analysis being conducted by Portland State University on the success of the PSR program in order to make recommendations for improvement. Finally, we recommend the City not limit the range of mental health call types which qualify to receive a PSR response. Presently, PSR is restricted from going to any suicide call based on the City's purported belief that this would violate the Settlement Agreement[20]. The COCL team does not believe this to be the case and would not object to expanding the PSR response options for suicide calls

---

[20] https://www.oregonlive.com/opinion/2021/08/editorial-the-blunder-limiting-portland-street-response.html

specifically or other mental health crisis calls broadly. Certainly, there should be consideration for the presence of weapons and the risk of violence, in which case police response may be needed. However, a blanket prohibition is not supported by either the Settlement Agreement or the Memphis Model of mental health crisis response.

As part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Related to this, PPB has continued to participate in AMR training in transporting persons in mental health crisis. Additionally, PPB continues to participate in the Transportation Workgroup. Topics discussed in the second quarterly meeting related to updates from systems partners and a report from the Unity Center on the impacts of the Oregon State Hospital's inability to admit civilly committed patients.

As evidenced above, we continue to find that the City and PPB have maintained compliance with Section V of the Settlement Agreement. Although we recommend that both PPB and BOEC produce additional policies and/or training, discussions are still in their initial stages and further conversation will be necessary about expanding PSR call types. We will continue to provide updates in future reports.

# SECTION VI: CRISIS INTERVENTION

Section VI of the Settlement Agreement (Crisis Intervention) is designed to facilitate PPB's and the City's implementation of "*systems and resources for responding to persons in mental health crisis*" (see Par. 170). As we have done in the past, we evaluate PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers and Portland Street Response); and (2) Secondary Response (including BHRT and SCT). We also evaluate the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC). We then assess PPB's response to such calls when received. Finally, we examine what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. Consistent with prior reports, we find PPB and the City have maintained their system for responding to mental health crises during this monitoring period.

## BOEC

Most often, the entry point for PPB contact with persons in mental health crisis is through BOEC, the call-taking and dispatch center for Portland. During this monitoring period, BOEC has maintained their Mental Health and ECIT Dispatch Protocol SOP which continues to identify seven call characteristics where an ECIT response is needed (these include when there is a mental health component <u>and</u>: a weapon is present, the subject is violent, the call is at a mental health facility, the caller is threatening suicide and has the means to carry it out, at the request of a community member, at the request of another officer, or when the subject represents an escalating risk of harm to self or others).

Currently, BOEC's criteria for ECIT dispatch continue to satisfy the requirements for crisis triage found in Par. 113. BOEC has also recently updated protocols for forwarding calls to the Behavioral Health Call Center (BHCC).[21] Although not approved by the BHUAC during the second quarter, we note they were on a BHUAC agenda for July of 2021 and we will provide an update in our next report. Therefore, we find sustained compliance with this paragraph though note future compliance will require BOEC to create a policy related to PSR and have that policy reviewed by BHUAC (see Section V).

During the second quarter, BOEC did not deliver any formal in-service training though we note that the updated training for forwarding calls to the BHCC was on the BHUAC agenda for the third quarter. As part of this, BOEC incorporated an ECIT refresher into that training and we will therefore provide an update in our next report. Additionally, BOEC provided us with the training for PSR triage during the second quarter. In reviewing the training, we find that it provides sufficient guidance for telecommunicators to refer calls to PSR, but suggest that it be updated to provide more background on the history of the CAHOOTS program (which PSR is modeled after) and the expected benefits of the program. As this training has not yet been approved by BHUAC, this can be a point of review when consulting the advisory committee. The training was supposed to be reviewed by BHUAC in June of 2021 though due to a lack of quorum, no presentation was made and no make-up date has been set. We discuss this more in our assessment of the BHUAC (see below).

As noted in our last report, BOEC has not provided in-service training since 2018 and the BHUAC has not reviewed BOEC triage policies since 2018. As a BHUAC review of both procedures and training was on the agenda for the third quarter of 2021, we believe that these issues will be resolved in the near future.

---

[21] Previously called the Multnomah County Call Line (MCCL)

However, ongoing compliance will require additional review of the PSR protocol and training and we look forward to receiving an update as to when this will occur.

## Primary Response Systems

To evaluate PPB's role in the City's system for responding to persons in mental health crisis, we evaluate PPB's current policies, the training received by PPB officers, the enhanced training received by ECIT officers, and the data collection tools and associated data related to PPB's response. PPB continued to enforce directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). For each of these directives as well as relevant SOPs, we have concluded that they continue to substantially comply with the requirements of the Settlement Agreement and have been properly reviewed by the Behavioral Health Unit Advisory Committee (BHUAC) (see Par. 95). Furthermore, while no formal recommendations were made during the second quarter of 2021, the BHUAC has begun reviewing PPB SOPs related to the operation of the BHU. For instance, in May of 2021, the BHUAC reviewed SOP #2-1 (*Behavioral Health Unit Electronic Referral System (BERS)*), though requested further information before voting on any recommendations.

Comprehensive training on crisis response remains a core competency in PPB and all officers are required to receive a minimum of 40 hours of Crisis Intervention training prior to graduating from the Advanced Academy (see Pars. 97 and 98). In the second quarter of 2021, the PPB held an Advanced Academy for new recruits which included the necessary crisis intervention training. Additionally, as we noted in our prior report, the PPB included a subject in mental health crisis as part of their in-service training delivered earlier this year. In light of the training provided to all PPB members, as well as the refresher training, we find PPB has maintained compliance with these paragraphs.

As part of PPB's specialized response system, a select group of officers receive 40 additional hours of training to become Enhanced Crisis Intervention Team (ECIT) officers (see Pars. 99 and 102). The training has been reviewed by BHUAC members, who last reviewed and commented on the training in October 2019. No new ECIT officers have been trained since November 2019; however, PPB reports a 40-hour ECIT class is scheduled for November of this year. As PPB experienced a decrease of three operational ECIT officers by the end of the second quarter (bringing the total to 115), a new cohort will be welcome. PPB's most recent semi-annual evaluation of ECIT response rates indicated that 69% of ECIT calls receive an ECIT response, which is consistent with the 70% found in the prior review period though which continues to represent a decrease from 75% in March of 2018. We look forward to seeing whether an increase in the number of ECIT officers in November will result in a corresponding increase in the ECIT response rate.

In addition to the training provided, the ECIT program continued to comply with the Settlement Agreement in other ways. For instance, ECIT officers retain normal duties until dispatched as an ECIT officer (Par. 103). PPB has maintained selection and retention criteria that are consistent with Par. 101, and which have been reviewed by BHUAC. As part of their system, PPB reviews the work history for all prospective ECIT officers prior to selection to ensure adherence to selection criteria. Additionally, BHU personnel are notified by the Professional Standards Division (PSD) whenever an ECIT officer receives a complaint based upon use of force or mistreatment of persons with mental illness, thereby ensuring adherence to the retention criteria. Each of these elements demonstrates a comprehensive system with built-in oversight mechanisms.

For the past three years, PPB has provided the COCL team with semi-annual evaluations of the ECIT program, which evaluates data related to: the proportion of calls for service which have a mental health component, the proportion of calls with a mental health component which meets ECIT criteria, ECIT response rates, and differences in outcomes based on whether or not an ECIT officer was on-scene. For the most recent semi-annual evaluation, the results indicate potential shifts in the outcomes - specifically, a reduced gap in outcomes between calls involving ECIT and non-ECIT officers. For instance, the most recent assessment found for the first time no differences between the groups in the decision to transport to a mental health hospital (e.g., the Unity Center). While this finding represents only a single assessment period, we note that the gap was being consistently reduced over the past six assessment periods. The probability that calls with an ECIT response will result in a transport to the hospital has increased over time; however, this probability has increased at a greater rate for calls with only non-ECIT officers responding. For instance, in PPB's first evaluation (April through September, 2018), mental health calls where only non-ECIT officers responded had a 9.4% probability of being transported to the hospital/Unity. In the most recent evaluation, that probability increased to 26.2%, a nearly 3X increase since the first evaluation. Furthermore, no differences were found between the two groups in their decision to transport an individual to jail, a return to normality after the prior reporting period found differences for the first time in any of the assessments.

While transportation to jail and transportation to the hospital have been outcome measures for each of the past six assessments, PPB has never had enough cases to conduct quantitative analysis on differences in use of force. Using the same case-selection criteria that is used to evaluate differences in arrests and transports,[22] we requested that PPB conduct a longer-term evaluation of force.

In the second quarter, PPB provided us with the results which indicated that for calls where an ECIT officer responded, there were higher rates of force compared with calls where only non-ECIT officers responded. However, the analysis is at the event level and therefore does not account for who actually used force. A subsequent analysis revealed that in 13% of calls involving force where an ECIT responded, the ECIT officer was the only officer that used force. For other calls involving an ECIT response and force, a non-ECIT was the only member who used force in 42% of the events while both ECIT and non-ECIT officers used force in 45% of the events. Furthermore, PPB found that the number of officers on-scene was a greater predictor of use of force. This may be due to the fact that calls requiring a greater number of responding officers are, on average, higher risk calls and therefore have a greater risk of force (including Category IV force such as Pointing of a Firearm). Similarly, as the number of officers increases, the likelihood that one of them will be ECIT also increases.

We encourage PPB, and supervisors in particular, to keep an eye on these calls involving larger police responses and continue to seek an understanding why this is occurring. In part, this might indicate a need to re-assess the types of calls that ECIT officers are dispatched to if PPB can identify trends within call types that lead to a larger number of officers on-scene (i.e., is a higher risk call). In addition to the relative risk of the call, there could be other peer dynamics at play. Data from other law enforcement agencies confirms the pattern in Portland, namely, as the number of officers on the scene increases, the probability of using force increases.[23] Thus, supervisors and officers should carefully observe the

---

[22] Because of the specialized nature of ECIT and because the ECIT dispatch criteria is based on calls involving a higher risk of harm, comparisons between ECIT and non-ECIT cannot be made using data on all calls for service as this would not result in an apples-to-apples comparison. PPB therefore limited the scope of the assessment to non-ECIT calls. Given PPB's position that all officers would be able to handle these types of mental health calls in a consistent fashion, non-ECIT calls provide a natural comparative backdrop.

[23] Stoughton, S., J. Noble, and G. Alpert. Evaluating Police Uses of Force. New York University Press (2020).

dynamics of these higher-response calls, identify the characteristics associated with them, and determine if the pattern has any implications for ECIT triage protocol.

## Secondary Response Systems

As in past reports, we also assess supplemental/secondary response systems being used by PPB, including the Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT).

When a person is referred to BHRT through the Behavioral Health Unit Electronic Referral System (BERS), the person is evaluated to determine whether they meet the criteria for BHRT intervention. The criteria include whether the person is demonstrating escalating behavior, has had frequent contacts with PPB, is considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. Also, when a person is the subject of three MHTs in a 30-day period, an automatic BERS referral is made for that person (unless a previous referral exists), thereby satisfying the requirements of Par. 110. If a person meets the criteria for BHRT intervention, a plan of action is discussed among members of the Behavioral Health Unit Coordination Team (BHUCT) which includes law enforcement, court, service provider, and hospital personnel, among other relevant stakeholders.

PPB members of the BHRT teams are provided the 40-hour enhanced crisis intervention training and receive specialized training when available (see Par. 109). The selection and retention criteria are consistent with the criteria for ECIT officers. Also, the same process by which PSD notifies BHU whenever an ECIT officer receives a complaint of force or mistreatment against a person with mental illness is applied to BHRT officers as well (see Par. 108).

PPB continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the second quarter of 2021, a total of 248 referrals were made through the BERS system. Of the 248 referrals, 109 (44%) were assigned to the BHRT caseload - an increase in the percentage of referrals assigned to the BHRT caseload from the prior quarter and a return to being consistent with the historical acceptance rates which have generally been between 45% and 55%.

**FIGURE 6.1: BERS Referrals Assigned to BHRT Caseload (Figure provided by PPB)**



In the second quarter of 2021, 102 individuals transitioned to inactive status with BHRT. Of those 35 (34%), had previously been on the BHRT caseload. Additionally, this quarter saw that the most common reason for a referral to be assigned was for Escalating Behavior (52%), closely followed by Frequent Contacts (31%). When looking at the outcomes of referral for inactive cases in Q1, the most common outcome was Coordinated Services (22%), closely followed by Concern Mitigated (20%).

The other secondary response system that PPB operates is the Service Coordination Team (SCT). This program continued to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system (see Par. 112). We have long been impressed with the work of SCT and ongoing evaluations have demonstrated the positive impact of the SCT on the clients it serves.

PPB also continued to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people the SCT has served. As we noted in prior reports, the number of referrals significantly decreased between the first and second quarters of 2020 and began to increase slightly in the final quarter of 2020. For the second quarter of 2021, there continued to be increases in the number of SCT individuals referred, though the number still has not returned to the number of referrals found earlier in 2020 (and the two years prior). We continue to believe this is the result of the pandemic as PPB has indicated that interactions with potential referrals had been put on hold and/or limited and treatment providers discontinued individual and group meetings. This directly impacted the number of persons who may have been referred to the SCT. In spite of this, the SCT accepted 56% of referrals in the second quarter of 2021.

**FIGURE 6.2: SCT Individuals Referred (Figure provided by PPB)**



COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2021 to June 30, 2021

**FIGURE 6.3: SCT Referral Status (Figure provided by PPB)**



As part of SCT operation, the Supportive Transitions and Stabilization (STS) program continued to provide a direct housing resource for BHRT clients. The second quarter of 2021 saw an increase in the acceptance rate with 19 out of 24 referrals being accepted (79%) compared with 75% in the prior quarter. While this is still below the historical rate of approximately 90%, these are often low N's (e.g., the second quarter had 24 referrals) and we therefore are not too concerned with the prior two quarters though recommend PPB continue to monitor the trends related to SCT.

**FIGURE 6.4: STS Referral Status (Figure provided by PPB)**



**BHU AND BHUAC**

As an overarching system, the Behavioral Health Unit (BHU) continued to oversee and coordinate the ECIT, BHRT, and SCT programs (see Par. 91). BHU utilizes data from a variety of sources to evaluate its operation, including data from the MHT as well as data collected from BHRT and SCT (see Par. 93). Additionally, in accordance with Par. 92, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, MCCL, BOEC, and BHUAC (see also below). We have met with the Lieutenant who oversees BHU on multiple occasions and are confident that all aspects of BHU (ECIT, BHRT, and SCT) are operating as a comprehensive system rather than individual programs.

The BHUAC continued to act as an advisory body to guide the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT components. The current BHUAC membership consists of individuals from PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, the Public Defender's Office, CareOregon, AMR, Central City Concern, and the Unity Center for Behavioral Health (see Par. 94).

The BHUAC is required to "*provide guidance to assist the City and PPB in the development and expansion of [CIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services*" (Par. 95). However, two of the BHUAC's meetings in the second quarter of 2021 did not have quorum and therefore no formal guidance was provided to the City and PPB. When considering that one meeting during the first quarter also did not have a quorum, this means that half of the BHUAC meetings in the first half of 2021 did not have a quorum. This also impacted the BHUAC's ability to publicly post prior meetings' minutes, undercutting the BHUAC's prior efforts to engage the community. Additionally, as discussed above, one of the meetings that did not have a quorum was supposed to review the City's PSR program, leaving the program without the necessary input by BHUAC. We recommend the BHUAC address this issue in the coming quarters so as to allow for consistent formal feedback to be given to PPB and the City. We will continue to monitor this issue and provide updates in our next report.

# SECTION VII: EMPLOYEE INFORMATION SYSTEM

The PPB continued to use the Employee Information System (EIS) as their primary system for identifying potentially problematic members and "*design[ing] assistance strategies to address specific issues affecting the employee*" (Par. 116). As with our prior reports, we evaluate the EIS system from the perspective of the data coming into the system, EIS administrator review of data, and supervisory decisions based on receiving alerts.

In our prior report, we found that PPB had fallen out of compliance with Section VII (Employee Information System) for two primary reasons. First, the PPB had not remedied issues of deficient reporting and investigation of use of force stemming from the 2020 protests, thereby leaving a potential for the EIS system to be starved of necessary data if future protest force events suffer from the same deficiencies as the 2020 protests. Additionally, the reviews conducted by the Force Inspector identified PPB members who were outliers with regards to force but for most of these officers, a supervisor review was not documented in EIS. As both of these issues remained in 2021 Q2, we find the PPB continued to be out of compliance with this section.

We also note that Par. 116 requires PPB to "*enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion.*" Use of force research has clearly established that a small percentage of officers are responsible for a disproportionate amount of force.[24] This is also true for a small percentage of officers who are responsible for a disproportionate number of complaints. Therefore, the early identification of these individuals and intervention is important and PPB will need to ensure its system is effective at achieving these goals. When having preliminary discussions related to measuring effectiveness of EIS, the COCL, DOJ, and PPB agreed that several years of data would need to be collected to gather a large enough sample so that comparative analysis could be made. At this point, PPB has EIS data dating back to at least 2017. Therefore, they have at least three years of alert data as well as at least one year of follow-up data for all EIS alerts since 2017. PPB now possesses a sufficiently large dataset to conduct an initial test of effectiveness and we recommend PPB engage in a quantitative analysis to measure the EIS system's effectiveness. We are happy to work with PPB on this assessment and provide technical assistance on a methodology as necessary.

## Maintained Compliance – Par. 120

PPB continued to employ two trained EIS administrators to evaluate alerts created by the EIS and determine whether the alerts should be forwarded on for RU review. The EIS administrators were trained via a comprehensive operations manual—including SOPs for the handling of EIS alerts, entries, and responses—in accordance with Par. 120, which also allows future EIS administrators to operate in a consistent fashion. EIS administrators track and monitor alerts to ensure that identified issues are resolved in a timely manner. Finally, the EIS administrators act as a system of checks and balances should the RU Manager or supervisor determine no intervention is necessary.

---

[24] Stoughton, S., J. Noble, and G. Alpert. *Evaluating Police Uses of Force.* New York University Press (2020). Noble, J. and G. Alpert. *Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight.* Prospect Heights, IL: Waveland Press (2009).

**Remaining Out of Compliance – Pars. 116, 117, 118, 119**

As noted above, the PPB remains out of compliance with Pars. 116-119 as a result of two underlying reasons. The first reason is that the force data feeding into the EIS algorithm was fundamentally flawed, an issue that remains and which we discuss further in Section III of this report. Once PPB conducts a comprehensive review and implements remedial actions, we believe this issue will be resolved and will no longer impact compliance.

The second reason was that most members identified by the Force Inspector as being outliers in their use of force did not have any supervisor review documented in the EIS despite the manual alert. This issue also remained in the second quarter of 2021 as we were only able to find one EIS response from supervisors for these manual alerts. For instance, during the quarter, one officer had four arrests, four uses of force, and an average of 3.5 applications per force event. Despite being flagged by the Inspector, there is no corresponding EIS entry by the supervisor indicating a review of the officer. Furthermore, the same exculpatory language from the Force Inspector that we raised in our last report continued during this quarter. For all supervisors flagged, the Inspector stated, "*Sergeants do not normally respond to calls for service, so it is not uncommon for them to have high [force rates], as they generally do not use force in their day to day duties.*" For other flagged members, the Inspector outright stated, "*I do not find anything of concern.*" The determination of whether a concern exists should be made at the supervisor level and we maintain our position that the Force Inspector should make sure that the language of the alert does not bias the decision to further review the identified member.

For the remainder of this section, we discuss data and outcomes related to EIS thresholds, alerts, and associated outcomes. PPB continued to collate data from a variety of sources, including force events and traumatic incidents (captured in Regional Justice Information Network (RegJIN)) as well as complaints and commendations (captured in Administrative Investigations Management (AIM)). These data are then used to identify potentially problematic behavior in the form of predetermined thresholds, some of which the Settlement Agreement defines, including when:

- **Shift Force Ratio:** A sworn member's force ratio is greater than or equal to three times their shift's average ratio in the preceding six months
- **Force Ratio:** A sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six months
- **Force Count:** A sworn member uses force three or more times in the preceding thirty days
- **Criminal Complaint:** A member receives a complaint with an allegation of criminal misconduct
- **Complaint in Same Category:** A member receives two or more complaints with at least one allegation in each complaint being in the same category such as two complaints that both have conduct allegations for events in the preceding six months
- **Complaint Count:** A member receives three or more complaints for events in the preceding six months
- **Traumatic Incidents:** A member experiences three or more traumatic incidents in the preceding thirty days (traumatic incidents are events related to child abuse, deadly force, homicide, officer being assaulted, suicide, and/or traffic fatality)
- **Commendations:** A member receives two or more commendations for events in the preceding six months

In the first quarter of 2021, EIS administrators reviewed a total of 462 alerts and sent 261 (56.5%) on for RU Manager review (see Figure 7.1). Compared with the prior quarter (226 alerts sent to RU Managers), this represents a 15.5% increase in the second quarter of 2021. However, the proportion of alerts sent to RU Managers continued to remain relatively stable.

When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts <u>closed</u> in the second quarter of 2021 (which may also include cases opened in the first quarter of 2021), there were 180 alerts sent to the RU Manager and for 137 (76%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the second quarter of 2021, a substantial majority (73%) resulted in some type of intervention for the officer. The information provided by PPB indicates that most of the interventions involved a debriefing though one officer was placed on a monitoring plan. As discussed above, the PPB now has sufficient data to evaluate the EIS' effectiveness in identifying members as well as the effectiveness of the interventions PPB has conducted to-date. As the majority of interventions PPB has utilized have been debriefs with the member, PPB will need to ensure that the debriefs have been effective. We will work with PPB in the coming quarters to design an appropriate evaluation approach.

**FIGURE 7.1: EIS Alerts and Alerts Sent to RU Manager (Figure provided by PPB)**



**TABLE 7.1 – EIS Alerts and Interventions**

|  | **2020 Q2** | **2020 Q3** | **2020 Q4** | **2021 Q1** | **2021 Q2** |
|---|---|---|---|---|---|
| **Alerts Sent to RU** | 186 | 338 | 277 | 237 | 209 |
| **Alerts Sent to Supervisor (Percent of Alerts Sent to RU)** | 85 (45.7%) | 108 (32%) | 80 (28.8%) | 142 (59.9%) | 137 (65.6%) |
| **Interventions (Percent of Alerts Sent to RU)** | 76 (40.9%) | 84 (24.9%) | 70 (25.3%) | 106 (44.7%) | 100 (50.7%) |
| **Interventions (Percent of Alerts Sent to Supervisor)** | 76 (89.4%) | 84 (77.7%) | 70 (87.5%) | 106 (74.6%) | 100 (73.0%) |

In accordance with Par. 116, PPB Directive 345.00, and PPB Directive 215.00, supervisors also continue to evaluate officers' EIS and Performance Discussion Tracker (PDT) information (1) annually as part of an officer's performance evaluation, and (2) upon transfer of an officer to a new command. PPB's quarterly audits of reviews required by Directive 345.00 continue to find overall high rates of compliance with the required reviews (see **FIGURE 7.2**). When supervisors do not conduct the reviews as required, PPB has continued to utilize their email notification system to alert tardy supervisors to missed review timelines. The COCL team recently conducted a spot check of PDT entries related to Par. 116 to ensure supervisors conducted a meaningful review. Overall, we found entries were sufficient in detail and we did not identify any areas of concern.

**FIGURE 7.2: Compliance with Reviews Directive 345.00 Reviews (Figure provided by PPB[25])**



---

[25] In the chart provided by PPB, they use Settlement Agreement paragraph numbers as the key. For clarity, Par. 116a relates to the regular review of subordinates, 116b relates to "new to command" reviews, and 116c relates to the combined reviews.

## SECTION VIII: OFFICER ACCOUNTABILITY

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, timeliness, consistency, transparency, and a system of checks and balances. While we assess these individual components below, there remains an overall concern with PPB's accountability system given the inconsistency in force reporting and force justification found from the 2020 protests. Many of these issues have also surfaced in the administrative investigation process since investigators have been required to rely on deficient reporting in making their findings. These issues have also impacted PRBs which, as described below, have inconsistently operated during the crowd control hearings we have observed. Ultimately, we remain concerned with PPB's ability to hold officers accountable for violations of policy, as required by Par. 169. The City and PPB will need to resolve these issues through remediation of the crowd-control deficiencies as well as safeguard against these issues with the new oversight board being developed.

### Access

Portland's accountability system continued to remain largely accessible to community members, allowing complaints to be filed in a multitude of ways. These include community members' complaints to the Independent Police Review (IPR), community members' complaints to PPB, IPR initiated complaints, and PPB-initiated complaints. Community members can file a complaint by phone, online, or in-person (either to PPB or IPR).[26] For most complaints, IPR continued to conduct intake investigations and determine whether to initiate additional investigation proceedings or not.

Despite the increase in the number of administrative complaints received during the second and third quarters of 2020 due to the racial justice protests, the overall number of administrative complaints remained the lowest since 2011 (the earliest year in IPR's dashboard - see **FIGURE 8.1**). As seen in **TABLE 8.1**, the largest quarterly number of complaints was by far the second and third quarter of 2020 when the protests were at their peak. During these quarters, the number of administrative complaints initiated averaged 125.5 complaints whereas all other quarters had an average of 69.5 complaints. For 2020 Q2 (when the protests began) until 2020 Q4 (when the protests largely ended), administrative complaints related to the racial justice protests represented a full one-third of all administrative complaints.

However, despite this, there were a total of 402 complaints received in 2020 whereas in the nine years prior, there was a yearly average of 457 complaints. If one were to remove complaints related to racial justice protests, 2020 would have seen 280 administrative complaints or 61% of the prior years' average. Additionally, the number of protests-related complaints filed in 2021 during the first and second quarter total 127, including 12 complaints coded as a racial justice related protest event. This would put administrative complaints on a path to be the fewest complaints since 2011 by a wide margin.

---

[26] Although the IPR cannot currently take in-person complaints due to COVID restrictions, the ability to file an in-person complaint remains a codified option for community members. We therefore maintain that in-person complaints represent one manner of access into the accountability system.

**TABLE 8.1**

| Quarter | Community-Initiated | Bureau-Initiated | Total |
|---------|---------------------|------------------|-------|
| **2020 Q1** | 67 | 16 | 83 |
| **2020 Q2** | 116 | 24 | 140 |
| **2020 Q3** | 98 | 13 | 111 |
| **2020 Q4** | 55 | 13 | 68 |
| **2021 Q1** | 51 | 14 | 65 |
| **2021 Q2** | 56 | 6 | 62 |

**FIGURE 8.1**



In total, the evidence indicates that the accountability system remains largely accessible and that community members are willing to utilize it. However, our prior report discussed one instance wherein a community member alleged an officer used excessive force but where no IA investigation was initiated in violation of Par. 129. This issue was not adequately addressed in the second quarter of 2020. In response to COCL (and DOJ) inquiries on the matter, we were informed that EIS entries were made for each person in the chain of command, admonishing them that the statement made by the suspect was an allegation of force (rather than a complaint of injury) and that they should have forwarded the allegation to IA. However, this is insufficient as (1) there was still not an allegation of excessive force opened during the second quarter and (2) EIS is, by its nature and by policy, non-disciplinary and therefore PPB had not held the chain-of-command accountable for their failure to open an administrative investigation. In later discussions with PPB and the City, we were informed that a formal investigation had later been opened and we will therefore provide updates in our next report.

**Timeliness**

The ability of PPB and IPR to complete administrative investigations within 180 days continued to fall short of substantial compliance with the requirements of Par. 121. This trend has continued in more

recent quarters and there appears to be an increasing trend in the percentage of IA full investigations that exceed the 180-day timeline (see **TABLE 8.2**). For instance, between the second quarter of 2020 and the fourth quarter of 2020 (the last quarter for which 180 days could have passed), IA full investigations have exceeded 180 days between 14% and 19% of the time. In the three prior quarters, IA investigations exceeded the timeline only 3%-4% of the time. Additionally, the majority of IPR cases between the second and fourth quarter of 2020 exceeded the 180-day timeline, and while 50% of IPR full investigations opened in the fourth quarter of 2020 exceeded the 180-day timeline (compared with 86% and 83% in the two prior quarters), this data also includes open cases. Therefore, we will need to review updated numbers in coming quarters to see if the improved compliance has remained.

**TABLE 8.2 (Table provided by IPR)**

| Percent of Cases Over 180 Days (Tolled for Criminal Investigations Only) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 Q1 | 2019 Q2 | 2019 Q3 | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 |
| IA Admin Closures | 0% | 0% | 0% | 25% | 0% | 0% | 0% | 0% | 0% |
| IA Investigations | 7% | 14% | 3% | 4% | 3% | 14% | 18% | 19% | 5% |
| IPR Admin Closures | 0% | 0% | 0% | 0% | 0% | 2% | 16% | 0% | 0% |
| IPR Investigations | 0% | 0% | 43% | 40% | 50% | 86% | 83% | 50% | 0% |

## Consistency

In prior reports, we have audited administrative investigation case files and generally found them to be of consistent high quality. However, our last report included two concerns that impact whether the City's accountability system can be considered "consistent." The first of which is the new community oversight board being developed by the City. To maintain consistency in accountability, there must be a smooth transition between IPR and the new board. However, in our prior report, we noted there was "*[no] formal transition plan and no meaningful steps were taken towards seating the new community oversight board.*" During the second quarter of 2021, the transition plan that was requested by COCL and DOJ was not provided. However, members of the City Council took significant steps to identifying 20 community representatives who would serve on the planning commission. These individuals represent four groups:

- Members of historically overpoliced communities
- Organizations providing support to over-policed communities
- Community justice organizations
- Small business owners

The appointment of the individuals occurred early in the third quarter, and we will therefore provide an update in our next report. We continue to ask the City to consider the potential for IPR attrition and create an interim plan in the event IPR resources become increasingly strained. However, we commend the City for beginning the process and look forward to reviewing the work of the commission in the near future.

The second concern related to the operation of the Police Review Board, particularly as it related to use of force events. During the second quarter of 2021, we observed two PRBs related to use of force and we find that issues continue to remain with the Board's operation. For instance, we continue to have

concerns related to mitigating factors being offered as justification for the use of force (rather than mitigation for discipline), confusion regarding the "totality of the circumstances," a misunderstanding of the term "active aggression," irrelevant information being introduced during the hearing, and the use of general crowd behavior being offered as justification for using force against an individual. These issues will need to be resolved in the near future in order for PRB to maintain legitimacy as a component of the accountability system.

## Transparency

Overall, the transparency of Portland's accountability system has remained consistent since our last report. Community members remain able to track the progress of their complaint (see Par. 138) and IPR continued to provide updates in writing at each stage of the investigation (see Par. 140), including a community member's ability to appeal findings. The Findings letters provided to community members clearly state the finding as well as the rationale for the finding. Updates and information for appeals are provided for both community members and officers.

Citizen Review Committee (CRC) appeal hearings and other CRC functions remain open to the public with accompanying minutes posted to the IPR website. Meetings continue to be held over Zoom as a result of the pandemic and we continue to find that the transition to virtual meeting space appears to have allowed for broader community observation and input, thereby enhancing transparency. Additionally, redacted summaries of Police Review Board (PRB) hearings continue to be provided on the PPB website. Finally, IPR analytical reports and online data related to misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths remain available on the IPR website,[27] allowing interested parties to learn the facts and conduct their own assessment. Overall, we maintain that the combination of these efforts points to an accountability system that is largely transparent.

## System of Checks and Balances

The accountability system in Portland continued to contain a system of built-in checks and balances to ensure a fair resolution for all involved. For instance, prior to an RU Manager's findings on an allegation, IPR (as well as Assistant Chiefs and IA) continued to have the ability to review the investigation report and can request an additional investigation or a rewrite of the investigative report. Additionally, after an RU Manager makes findings, IPR reviews those findings and has the ability to controvert the findings (as do IA and the Assistant Chiefs), thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination.

Community members and officers continue to be able to appeal administrative investigation findings to the Citizen Review Committee (CRC), an eleven member review board that "*hear[s] appeals from complainants and officers and publicly report[s] its findings*".[28] Consistent with the requirements of Par. 136, CRC members continue to hold the ability to request additional investigations and interviews and postpone the hearing until a time when such information could be included in the review. Coupled with our observations of CRC meetings in the past, as well as our ongoing review of their public reports, we maintain that the CRC conducts their hearings in a fair and impartial manner (see Par. 134). Additionally,

---

[27] IPR Website: https://www.portlandoregon.gov/ipr/76848
[28] Among other functions – see: https://www.portlandoregon.gov/ipr/53654

in the first quarter of 2021, the CRC filled all member slots vacated by the prior resignations in September of 2020 (though see below for discussion regarding CRC members' ability to serve on PRBs).

In the second quarter of 2021, the CRC heard one appeal related to allegations that officers inappropriately arrested a woman, used inappropriate force, wrote an inaccurate report (one officer), and that the arrest was racially motivated. During the hearing, the CRC voted in agreement with the PPB that the arrest was in-policy and that there was insufficient evidence with regards to the racial motivation of the arrest (i.e., Not Sustained). However, the CRC did not believe that a reasonable person could have found the officers' use of force to be "Exonerated," instead recommending a finding of Not Sustained in that there was insufficient evidence to make a determination. Additionally, the CRC voted that one officer wrote an insufficient report, challenging the initial finding of "Unfounded" and recommending a finding of "Sustained." We note here that "Unfounded" and "Sustained" are polar opposites of each other given that "Unfounded" means the allegation was false or devoid of fact and "Sustained" means the preponderance of evidence proves there was a violation of policy. We therefore look at this as a credit to the work CRC is doing since the evidence presented during the hearing clearly indicated that, at the very least, the allegation was not devoid of fact.

A final system of checks and balances can be found in the Police Review Board. When there is a sustained finding that will lead to discipline involving suspension or greater, when there is an officer involved shooting or in-custody death, or when there is a controverted finding, the PRB takes the RU Manager's proposed findings and either adopts the proposed findings or provides their own proposed findings and corrective action to the Chief. We document our concerns with the PRB operation above and recommend PPB and the City resolve these issues immediately.

In our last report, we noted that all CRC members had not been provided the Bureau training necessary to participate in PRBs. During the second quarter, all CRC members were provided the necessary Bureau training though the requirement to participate in ride-alongs was temporarily waived due to the pandemic. As the Settlement Agreement still requires members to conduct a ride-along, we maintain that there can be no compliance until a ride-along occurs or another method of learning about police work has been implemented. For instance, in the absence of a ride-along, a walk-along would allow for CRC members to gain such an understanding while still maintaining social-distancing guidelines. Alternatively, the City may temporarily allow for CRC members to do case reviews with officers to better learn about their decision-making process (though this would require methodological considerations for case selection). Regardless of the alternative method employed, CRC members must acquire a solid understanding of police work in order to perform effectively on the PRB (as well as the CRC in general).

## Additional Data Analysis

As part of this report, we conducted additional data analyses that provide additional insight into the accountability system. For our analysis, we reviewed data on all complaints opened since January 1, 2020. We perform these analyses as they have implications for the overall management of the accountability system and we recommend PPB and the City continue to evaluate these trends.

### *What are the most common allegations?*

For the past year and a half, there were four allegation categories which were most represented in the dataset provided by IPR. These include allegations related to Conduct (29.3% of the dataset), Procedure (27.2%), Force (24.2%), and Courtesy (12.5%). The other allegation types found in the data include Disparate Treatment (3.8%), Control (1.9%), and "Police Issue" (1.1%). However, there do appear to be

some trends in regards to the relative proportion of the whole for each of these allegation types (See **TABLE 8.3**). Consistent with the analysis above, the raw number of instances where each allegation type was made shows a decrease since the second quarter of 2020. However, no allegation type has demonstrated a decrease so much as Force. For instance, in the fourth quarter of 2020, Force constituted approximately 35% of new allegations, the highest of any allegation type. In the second quarter of 2021, the proportion had dropped to approximately 15%. Alternatively, allegations related to Courtesy have increased as this allegation type had represented less than 15% of allegations in all quarters other than 2021 Q2 when it represented nearly 25% of allegations. This recent increase should be further explored.

**TABLE 8.3**

|  | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 | 2021 Q2 |
|---|---|---|---|---|---|---|
| **Conduct** | 41 (21.7%) | 81 (26.2%) | 78 (33.9%) | 35 (26.5%) | 53 (39.8%) | 42 (31.8%) |
| **Courtesy** | 27 (14.3%) | 34 (11.0%) | 23 (10.0%) | 9 (6.8%) | 16 (12.0%) | 32 (24.2%) |
| **Force** | 49 (25.9%) | 77 (24.9%) | 58 (25.2%) | 45 (34.1%) | 24 (18.0%) | 19 (14.4%) |
| **Procedure** | 61 (32.3%) | 89 (28.8%) | 58 (25.2%) | 35 (26.5%) | 29 (21.8%) | 34 (25.8%) |

_What are the most common outcomes?_

Allegations can take a number of paths, the first of which is an intake investigation conducted by either IA or IPR. A substantial number of allegations end here, as 40.1% of the allegations in the dataset were administratively closed by IPR or IA for one of the following reasons:

- Clear and Convincing Evidence
- Complainant Unavailable
- Judicial Remedy
- Lack of Investigative Merit
- No Jurisdiction
- No Misconduct
- Third Party Complainant
- Trivial/Lack of Good Faith
- Unidentified Employee
- Other Remedy

However, an equal number of allegations (40.2%) are referred for full investigation, with the remaining allegations having other outcomes, such as Supervisory Investigations, as shown in **TABLE 8.4**.

**TABLE 8.4: Outcome of Investigations**

|  | Number of Cases | Percent of Cases |
|---|---|---|
| **Full Investigation** | 451 | 40.2% |
| **IA Administratively Closed** | 74 | 6.6% |
| **IPR Administratively Closed** | 375 | 33.5% |
| **Supervisory Investigation** | 113 | 10.1% |
| **Precinct Referral** | 68 | 6.1% |

| | | |
|---|---|---|
| **Pending Finding** | 37 | 3.3% |
| **Mediation** | 3 | 0.3% |

While the overall rate by which allegations receive a full investigation stands at 40.2%, there are large differences between 2020 and 2021. In 2020, allegations received a full investigation 45.1% of the time whereas in 2021, the rate dropped to 29.6%. There is some indication that this is the result of protests, as those receive a full investigation for 63.7% of allegations compared with 33.2% of non-protest allegations. Given the number of allegations which stemmed from the racial justice protests (292 which is 25.4% of the dataset), this has likely impacted the outcome.

Additionally, there are differences across allegation types, most notably allegations of Use of Force which is only administratively closed for 21.6% of allegations and which receive a full investigation for 77.9% of allegations.[29] Alternatively, Courtesy allegations are least likely to receive a full investigation, doing so for only 5% of allegations. This is because Courtesy allegations, even if proven to be true, are not likely to result in discipline – thus, they represent the largest proportion of Supervisory Investigations/Precinct Referrals (44.3%).

**TABLE 8.5***

| | Administratively Closed | Supervisory Investigation or Precinct Referral | Full Investigation | Number of Cases |
|---|---|---|---|---|
| **Conduct** | 40.6% | 8.2% | 47.4% | 293 |
| **Control** | 52.4% | 19.0% | 28.6% | 21 |
| **Courtesy** | 50.0% | 44.3% | 5.0% | 139 |
| **Disparate Treatment** | 55.8% | 5.0% | 32.5% | 39 |
| **Force** | 21.6% | 0.0% | 77.9% | 262 |
| **Policy Issue** | 0.0% | 100% | 0.0% | 12 |
| **Procedure** | 49.8% | 25.0% | 25.0% | 304 |

*Numbers may not add up to 100% based on other possible outcomes, including Pending Finding which may be related to either a Supervisory Investigation or Full Investigation.

*Who Are Complaints Made Against?*

In looking at trends related to who complaints are made against, the data indicate that 35.8% of all complaints are against PPB members in East Precinct,[30] which is noticeably more than the Central Precinct (23.4%) or the North Precinct (20.2%). Stated differently, officers from East Precinct had 53%

---

[29] Per Par. 129 of the Settlement Agreement, all force must receive a full investigation unless there is clear and convincing evidence that the allegation has no basis in fact.

[30] For this analysis, we removed protest events as, for those, the Precinct of the event leading up to the complaint is not necessarily the Precinct the officer is from.

more complaints than officers from Central and 77% more complaints than officers from North Precinct.

Additionally, some officers were responsible for a higher relative proportion of complaints than others. Of the 387 officers who received complaints during the 18 months captured by the data, 25 officers had four or more complaints, representing 20.5% of all complaints. Within these officers, 8 officers had five complaints, 5 officers had six complaints, 1 officer had seven complaints, 1 officer had eight complaints, and 1 officer had nine complaints. For 63.8% of officers with complaints, there was only a single complaint against them in the 18-month period. While those officers with six or more complaints would likely be captured by the EIS system, the fact that a small percentage of the police force is responsible for a large percentage of the complaints reinforces the need for an effective EIS system. We discuss the need to evaluate the effectiveness of the EIS in our assessment of Par. 116.

## Lethal Force/In-Custody Death

Finally, PPB's accountability system has particular requirements after the occurrence of lethal force and in-custody death events. Because of the sensitive nature of such events, PPB is required to safeguard the integrity of such investigations through a number of actions. For instance, first responding supervisors separate all witness officers and involved officers (see Par. 125), conduct initial interviews individually (rather than as a group), and have a phone-tree to ensure all necessary notifications are made. Detectives conduct on-scene walk-throughs and interviews with select witness officers (see Par. 126) as well as request walk-throughs and interviews with involved officers (though involved officers have historically invoked their right to decline) (see Par. 127).

After conducting their on-scene investigation, investigators interview all witness officers and then provide them with Communication Restriction Orders (CROs) to prohibit direct or indirect communication with anyone involved with the event until a grand jury has been convened, at which point the CROs are rescinded (see Par. 125). Involved officers are then required to participate in an interview with IA investigators within 48 hours of the event (unless a voluntary statement was already given on-scene, or the member is incapacitated) in order to inform the IA investigation. Pursuant to *Garrity v. New Jersey*, the administrative and criminal investigations are walled off from one another (see Par. 124), thereby maintaining the 5th Amendment rights officers have against self-incrimination. The administrative and criminal investigations are conducted concurrently in accordance with Par. 122 (though, where appropriate, cases are often tolled).

During the second quarter of 2021, there were three lethal force events and in each, the protocols above were followed. In the supporting documents for all three, PPB provided the CROs, attempted to elicit an on-scene walkthrough and statement from the involved officer (who historically have declined based on 5th Amendment rights), and completed witness officer walk-throughs of the scene. Additionally, involved officers were interviewed within 48-hours of the incident. While we have not had the opportunity to review the full case file for these events, we find that the steps required after an OIS have been fulfilled.

# SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

## PCCEP's Role in the Settlement Agreement and the City's Support

### *System Overview*

Section IX of the Settlement Agreement requires that the City establish a Portland Committee on Community Engaged-Policing (PCCEP, Par. 141), which is authorized to: (a) solicit information from the community and PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns (Par. 142), with other specific duties set forth in a separate Plan for PCCEP.

PCCEP's membership is designed to come from a reasonably broad spectrum of the community, and members shall not have an actual or perceived conflict of interest with the City of Portland (Par. 143). PCCEP shall meet as needed to accomplish their objectives and hold regular Town Hall meetings that are open to the public. The City shall give advice on Oregon's Public Meetings Laws and similar requirements as necessary (Par. 151) and shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law (Par. 152).

Per Pars. 141 and 142, PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations.

In the second quarter of 2021, PCCEP continued monthly general meetings and subcommittee meetings via Zoom. Highlights of PCCEP's work as a full committee in the second quarter include adoption of Core Patrol Services[31] recommendations, hosting a series of Truth and Reconciliation Webinars, discussing PPB's 2020 protests After Action Report and DOJ's response, and hearing presentations from the City's Community Safety Transition Director Mike Myers and on PPB's 2020 Annual report. PCCEP also hosted a member team-building retreat, and voted three new members onto the Committee.

The robust set of Core Patrol Services recommendations[32] were the only formal PCCEP recommendations in the second quarter, adopted unanimously on May 25, 2021. Per the Amended PCCEP Plan, "*The City shall provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days.*" These recommendations were slated to be presented in a City Council work session in July. On June 23, the Mayor adopted one of

---

[31] From a PCCEP survey, describing the Core Patrol Services project: *"As part of the Mayor's 19-point police reform action plan, PCCEP has been carrying out a review and re-envisioning of the core patrol services provided by the Portland Police Bureau. These patrol services include day-to-day responses to emergency and non-emergency calls for police service as well as ongoing areas such as traffic enforcement."*

[32] Core Patrol Services recommendations: https://www.portland.gov/sites/default/files/2021/pccep-core-patrol-services-recommendations.pdf

PCCEP's Q1 recommendations, in support of the Training Advisory Council's recommendation to expand the Public Safety Support Specialist (PS3) program.

PCCEP's subcommittees focus on Youth, Behavioral Health, Racial Equity, and Settlement Agreement and Policy, with a temporary committee focused on Truth and Reconciliation. In addition, a PCCEP steering committee meets monthly.

In the second quarter, the Behavioral Health Subcommittee hosted a panel discussion with police officers to explore "a day in the life of a Portland police officer." The Youth Subcommittee focused on strategy and planning in the second quarter, with the goal of engaging more youth. The Racial Equity Subcommittee discussed a transition in leadership of the subcommittee. The Settlement Agreement and Policy Subcommittee hosted a community listening session focusing on the DOJ finding the City of Portland in non-compliance. The Steering Committee met with representatives of the Coalition of Advisory Groups (CAG), and discussed recruitment of new members and the codification process.

PCCEP also held a team-building retreat in the second quarter, facilitated by the Director of the Office of Equity and Human Rights.

### City's Support

The City's role is to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions. Paragraph 144 states that "*The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.*"

As noted in our first quarter report, support was inadequate in terms of posting information about PCCEP meetings for the benefit of the public—including timely posting of PCCEP meeting videos, and a lack of recorded and posted meeting minutes. The Amended PCCEP Plan says, "*Agendas and minutes from all PCCEP meetings will be published on the City website within 10 business days after the meeting date.*"

Record keeping and timely posting improved significantly in the second quarter. With two exceptions, videos of PCCEP's non-livestreamed meetings were posted within 10 business days after the meeting date; including the two meetings that took significantly longer to post, the average time to post a meeting video was just over 9 business days.

Written meeting minutes continue to be difficult to locate on PCCEP's website, which has not been migrated to the City's new web format, but minutes for the full PCCEP meetings in the second quarter are posted and linked in PCCEP's own second quarter report.[33] Minutes for PCCEP's subcommittees are far less consistent; They are posted only for May's Settlement Agreement and Policy Subcommittee, and June's Behavioral Health Subcommittee. None are posted for the Racial Equity or Youth Subcommittees, or the Steering Committee.

In the second quarter, PCCEP leadership continued to highlight a need for more robust City support and met with City staff several times to discuss outstanding concerns. Specifically, PCCEP asked for more timely posting of substantial minutes and other supplemental documents, more clarity on PCCEP staff's

---

[33] https://www.portlandoregon.gov/pccep/article/795825

roles and responsibilities, help setting up a better system to maintain a pool of alternates, and in general, better follow up on tasks assigned to PCCEP staff.

In mid-June, PCCEP staff's supervision changed within the Office of Equity and Human Rights, with the Equity and Operations Manager assuming the supervision role. COCL will discuss this change in supervisors in the next quarterly report.

In general, we find that PCCEP continued to represent a "*reasonably broad spectrum of the community*," (Par. 143) with at least five of 10 members who served in the second quarter identifying as a person of color and/or an immigrant; four of 10 identify as female or non-binary. Representation of people with experience as peer support specialists or other personal, lived and/or professional experience with mental health issues is less clear, based on publicly shared information. However, many of PCCEP's current members volunteer with other community groups or nonprofit boards related to mental health, the justice system, or underrepresented communities, bringing in additional perspectives to PCCEP's work.

In this quarter, COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland. PCCEP's overall functioning remains consistent with the expectations and requirements of Paragraph 143.

A representative of the City Attorney's office attends PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings law, and the City continued to train new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all City advisory boards. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

In summary, PCCEP continued to function well overall, and the City remains in Substantial Compliance in relation to PCCEP, with the exception of Par. 144, where the City remains at Partial Compliance. We recommend that the City continue to show improvement in the timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions, and that the City fulfill PCCEP's additional requests for support so this body can continue to function well.


## Portland Police Bureau's Role in Public Engagement and Outreach

### *System Overview*

As described in Paragraph 145, PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. Specifically, PPB was required to conduct a citywide community survey that would assist the PCCEP and lead to the development of a Community Engagement Plan by PPB (Par. 146). PPB is also required to collect demographic data about the community in each precinct to assist the Precinct Commanders and PCCEP with their community engagement plans (Par. 147). To help measure possible discriminatory policing, PPB officers are required to continue collecting data on race, age, sex, and perceived mental health status of persons they stop and share this information with the PCCEP and the public (Par. 148). PPB was also required to work with DOJ and COCL to develop a general set of metrics to evaluate community engagement and outreach by PPB (Par. 149) and many of these

are reflected in PPB's Community Engagement Plan. Finally, PPB must issue an Annual Report (with certain content), with a draft reviewed by PCCEP, and then present a revised report to the public at Precinct meetings and before the City Council (Par. 150).

*The Community Engagement Plan*

Paragraph 146 requires that PPB develop a Community Engagement Plan with input from PCCEP (Par. 142). COCL continues to use the Community Engagement Plan as a framework for assessing PPB's progress on community engagement under the Settlement Agreement. Below is a status report on the Plan's four components: Public involvement, Communications, Access, and Training.

**Public Involvement.** The Community Engagement Plan specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

In the second quarter, PPB maintained its relationship with several advisory groups. PPB has six "*Community and Culturally Specific Councils*" and five "*Operational Councils*".[34] Two Culturally Specific Councils -- the Latino Advisory Council and the Asian Pacific Islander American Advisory Council – met regularly during the second quarter, although only the latter has current minutes from meetings on the website. We could find nothing posted for the Latino Advisory Council. Other groups, such as the Slavic Advisory Council and the Muslim Advisory Council have no meeting agendas or minutes posted since 2019. The African American Advisory Council and the Alliance for Safer Communities (representing LGBTQ+) have no records of past meetings.[35] However, we have been advised that CPD's advisory groups are not subject to the Oregon Public Meetings Law, according to the Office of the City Attorney and therefore, are not required to produce minutes.

PPB's Operational Councils such as the Behavioral Health Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council meet regularly and have current postings on the PPB website. These groups have been productive. The only Operational Councils without postings are the Precinct Advisory Councils and the Police Bureau-wide Advisory Council.[36] Also, in the absence of a Youth Services Division, we encourage PPB to continue efforts to create a youth advisory council in collaboration with local schools.

As part of their Community Engagement Plan, PPB decided to "*establish an Inclusive Advisory Council with a representative from each standing and new advisory council who meet directly with the Chief on a semi-annual basis.*" This plan was similar to a community-based initiative, and thus, after the first meeting, these efforts converged to create the Coalition of Advisory Groups (CAG) -- with the mission "*to strengthen understanding through communication, support, and— where applicable—collaboration among duly recognized police advisory groups.*" The CAG, with representatives from PPB's advisory councils, continues to meet with the Chief's office. Although meeting agendas or minutes are not posted or required, we encourage the CAG to provide periodic summaries of their meetings for the benefit of

---

[34] See PPB website for details: https://www.portlandoregon.gov/police/30379

[35] For some advisory groups, PPB was able to show us a list of scheduled meetings hidden under the "DOJ" section of PPB's website (https://www.portlandoregon.gov/police/62607), but links to most of these meetings or documentation of past meetings could not be located.

[36] The "Police Bureau-wide Advisory Council" is unknown to the COCL.

*COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2021 to June 30, 2021*    **Exhibit A**

the public. Also, we encourage the advisory councils represented on the CAG to consider posting summaries of their work to the extent that they feel comfortable and safe doing so.

**Communication.** The Community Engagement Plan specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. As we have noted previously, PPB continued to use social media to communicate with the public and uses other mechanisms such as press releases, emails, brochures, and presentations to reach the public. Again, PPB could do a better job of updating its current website with the agendas for public meetings held by advisory groups and should not wait for the City to build a new website. From our perspective, the public has the right to know how PPB, a public government agency, is working with these advisory groups, and PPB's website is still active.

**Access.** The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

PPB's language access plan, directive, and training were not developed in the second quarter because PPB is still waiting for the City to implement a city-wide process of recruiting bilingual employees as interpreters. However, PPB continued to work with community members to develop videos that can be used to educate all PPB members in how to respond appropriately to individuals needing language access services (See Training section for details about these videos).

**Training.** The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

PPB has made significant headway toward achieving these training goals. Some tools and resources to address the concerns of unique communities are being organized and utilized. Bilingual officers have been identified and in the second quarter, all officers received some online training in how to access certified interpreters through LanguageLine (See Training section for details).

PPB's Office of Community Engagement continued to engage community members and PPB's advisory councils with different cultural backgrounds in the development of training videos to help PPB officers gain more insight and empathy toward different communities. To address historical issues around racism, during the second quarter the Equity Inclusion Office expanded the In-service Equity training for all officers (See Training section for details).

In sum, PPB continued to implement its Community Engagement Plan by building partnerships with community organizations and advisory councils and engaging them in new forms of cultural and equity training of the police. However, in the absence of information on PPB's website, we are uncertain how the PPB is benefiting from its relationship with certain advisory groups and what issues they are discussing.

### *Data Collection, Analysis, and Reporting*

PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par. 147-150). For precinct

commanders and PCCEP, the PPB continued to report demographic data pertinent to each precinct (Par. 147) and post them on their website.[37] For the public and research community, the PPB continued to provide a wide range of data, maps, and interactive dashboards on its website.[38]

PPB continued to collect demographic data from individuals who are stopped by PPB (Par. 148). As noted in our first quarter report, PPB updated its Stops Data Collection Application to begin collecting additional data points on January 1st to better understand the racial disparities that are present in the stops and searches. (See our first quarter report for details).

Although additional data are being collected, including information on consent searches, PPB has yet to complete the following tasks: (1) develop and distribute cards in five major languages that explain the desire to conduct a search and the community member's right to refuse; (2) change their search policy or SOP to reflect these changes; (3) train officers in how to document the search process in the field. During the second quarter, PPB should be credited with developing and posting an online video on the Stops app that emphasized the importance of documenting the reasons for the stop with check boxes. However, training on consent searches must wait until the language cards are finalized. PPB has engaged its advisory groups to help with this task and they expressed some concerns about the initial translations of the consent search cards. Thus, PPB is having the cards revised.

In terms of data analysis and reporting requirements, PPB's Strategic Services Division continued to generate quarterly Stops Data Collection reports.[39] Their fourth quarter report for 2020 was posted on January 25th[40] and discussed in our last report. PPB's first quarterly report for 2021 (covering January 1 to March 31, 2021) was posted on April 23, 2021[41] and is briefly discussed here.

We continue to focus on traffic stops (not pedestrian stops) since they account for 99% of all stops in Portland. The total number of traffic stops in the first quarter of 2021 increased 38% over the previous quarter, although the number of individuals stopped who were perceived by PPB to have a mental health issue remained steady around 1% of the total. However, the 2021 data continue to show racial disparities. Black/African American drivers make up only 6.7% of Portland's population, but they accounted for 18.9% percentage of PPB's traffic stops citywide (up from 17.8% in Q4 of 2020). The rate of stopping Black/African American drivers in non-traffic divisions (Patrol, Investigations, and Support units) remains noticeably higher than the rate for the Traffic Division (21.5% vs. 12.8%), and the non-traffic units account for roughly 70% of all traffic stops citywide.

A breakdown of stops by police precinct shows that racial disparities continue across all three precincts. When we compared population demographics with traffic stops (see **TABLE 9.1**), Black/African Americans are stopped at a rate substantially higher than their representation in the precinct population. For all three precincts, these disparities increased slightly between the fourth quarter of 2020 and the first quarter of 2021. Again, we encourage PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns as well as appropriate benchmarks.

---

[37] https://www.portlandoregon.gov/Police/article/780347

[38] https://www.portlandoregon.gov/police/71673

[39] Quarterly stops reports, however, do not include search data, which can be found in the annual stops report.

[40] https://www.portlandoregon.gov/police/article/781203

[41] https://www.portlandoregon.gov/police/article/783756

**TABLE 9.1 Racial Disparities in Traffic Stops by Precinct, Q1 2021**

| Precinct | Percentage of Population that is Black/African American[42] | Percentage of Stops with Black/African American Drivers[43] |
|---|---|---|
| Central | 2.9% | 15.9% |
| East | 5.6% | 20.2% |
| North | 8.8% | 20.2% |

For Paragraph 149, the City has completed the requirement to develop a set of metrics to evaluate community engagement. To measure the quality of police-community interactions for all encounters, we continue to encourage the City to adopt body-worn cameras and reintroduce contact surveys to provide convergent validation of information contained in police reports, community complaints, and other data sources. With these new datasets in hand, systems of data analysis, review and feedback to supervisors and officers can be introduced to encourage PPB members to interact with the public in a manner that is positive, fair, effective, within policy, and consistent with training.

Par. 150 requires PPB to "*issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities.*" PPB is required to provide a draft of the annual report to PCCEP "*for review and comment before the report is finalized and released to the public.*" Once the report is released, Par. 150 calls for PPB to "*hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.*"

PPB's 2020 Annual report was drafted during the first quarter and released for review by PCCEP during the second quarter. On June 10, it was discussed at PCCEP's Settlement Agreement and Policy subcommittee. PPB presented the draft report to the full PCCEP on June 22, and members shared feedback with PPB. PPB has sought to incorporate PCCEP's prior recommendations where feasible. Based on the feedback received from PCCEP, PPB made edits to the draft report and then posted it on its website for public comment. However, PPB will remain in Partial Compliance with Par. 150 until it can: (1) broadly announce the three precinct meetings where it will discuss the 2020 annual report, (2) facilitate these meetings, including a discussion of the full range of topics required by Par. 150, and (3) present the findings from the 2020 annual report to the City Council. These events did not occur in the second quarter, but are expected in the third quarter.

## Summary of PPB's Community Engagement

Clearly, PPB has expanded its systems of community engagement as it implements the Community Engagement Plan. The Office of Community Engagement continued to partner with diverse communities through existing and new advisory councils. PPB's Operational Councils (such as the Behavioral Health

---

[42] Source: PPB's demographic report using Census data, https://www.portlandoregon.gov/Police/article/780347
[43] Source: PPB's Q1 2021 Stops Data Collection report, https://www.portlandoregon.gov/police/article/783756

Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council) meet regularly and have current postings on the PPB website. However, many of PPB's advisory groups (Community and Culturally Specific Councils) do not have current postings of minutes, notes or agendas. Although not required by law, we encourage PPB, in collaboration with its advisory councils, to periodically update its community website so the public can be kept informed of the issues being discussed at these meetings. Also, in the absence of a Youth Services Division, we encourage PPB to continue efforts to create a youth advisory council in collaboration with local schools. In general, police have the most difficulty with youth and young adults, so we encourage PPB to prevent and minimize such problems through ongoing dialogue.

PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. However, at the completion of the second quarter, PPB did not meet the requirement to share and properly discuss its annual report with community members in each precinct and the City Council, thus remaining at Partial Compliance for Par. 150.

PPB continued to produce quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. The traffic stop data for Q1 2021 continued to show racial disparities citywide and in each precinct, indicating that Black/African American drivers are stopped at rates higher than their representation in the population. Again, we encourage PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns.

Along these lines, PPB introduced the new Stops Data Collection app in January, 2021 and provided officers with some online training regarding the need to collect additional data points. However, they have yet to distribute cards in five major languages that explain PPB's desire to conduct a search and the community member's right to refuse. When these cards are ready, and PPB's search policy or SOP has been updated, they will need to provide additional training to officers based on this new search protocol.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**BHRT:** Behavioral Health Response Team

**BHCC:** Behavioral Health Call Center

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CAG:** Coalition of Advisory Groups

**CCO:** Coordinated Care Organization

**CEOPS:** Community Engagement and Outreach Subcommittee (COAB)

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COCL:** Compliance Officer and Community Liaison

**CPRC:** Community Police Relations Committee

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**DSUFCS:** Data Systems, Use of Force, and Compliance Subcommittee (COAB)

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**PCCEP**: Portland Committee on Community Engaged-Policing

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PS3:** Public Safety Support Specialist

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# **LIST OF PERSONNEL**

Chief of Police: Chuck Lovell

Deputy Chief of Police: Chris Davis

Assistant Chief of Operations: Michael Leasure

Assistant Chief of Services: Michael Frome

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Cmdr. Bryan Parman

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Chris Lindsay

Behavioral Health Unit (BHU) Lt. Casey Hettman

EIS Supervisor: Nathan Sheppard

EIS Administrator: Dan Spiegel

Training Captain: Dave Abrahamson

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

# APPENDIX A

## DOJ's Report on PPB's 2020 Crowd Control After Action Review



**U.S. Department of Justice**

Civil Rights Division

SHR:LLC:RJG:JDH
DJ 207-61-1

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

May 5, 2021
*Via mail and email*

Robert Taylor, City Attorney
Office of the City Attorney
City of Portland, Oregon
1221 SW 4th Avenue, Suite #430
Portland, OR 97204
*email: Robert.Taylor@portlandoregon.gov*

Charles Lovell, Chief of Police
Portland Police Bureau
City of Portland, Oregon
1111 SW Second
Portland, OR 97204
*email: Charles.Lovell@portlandoregon.gov*

RE:    *United States v. City of Portland*, 3:12-cv-02265-SI
PPB's 2020 Crowd Control After Action Review and Recommendations

Dear Mr. Taylor and Chief Lovell:

On March 29, 2021, the Portland Police Bureau (PPB) emailed us three documents that it described as its Master After Action, Commander Dobson's narrative, and Assistant Chief Resch's challenge and solution analysis for the protest events spanning from May 29 to November 15, 2020.  Specifically, PPB provided us:

1. A special event After Action Report ("AAR") from Sergeant Schell, dated November 20, 2020, with review from Sergeant McDaniel on December 4, 2020, from Lieutenant Hughes on January 12, 2021, from Commander Dobson on January 15, 2021, and from Assistant Chief Resch on March 24, 2021.  We refer to this as the Special Event AAR.

2. A 21-page undated and unsigned document titled "2020 Portland Civil Unrest After Action and Recommendations," which PPB has advised is Commander Dobson's narrative.  We refer to this as the 2020 Protest After Action and Recommendations.

3. A 13-page undated and unsigned document titled "Challenge and Solution analysis 2020 final," which PPB has advised is Assistant Chief Resch's proposal for remedial actions that "PPB and/or the City should take to be better prepared if such a large-

scale event should occur again." We refer to this as the 2020 Protest Challenge and Solution Analysis.

On April 12, 2021, PPB emailed us a fourth document:

4. A one-page undated and unsigned document titled "Crowd Control FDCR Update Recommendations," which contains a description of changes to PPB's electronic Force Data Collection Report. PPB advised that it was "anxious to make some of the changes identified in AC Resch's crowd control assessment" and already "signed off on" the changes but wanted DOJ's approval before programming the changes.

We thank PPB for providing these four documents, which we refer to collectively as PPB's Master After Action Report. We and our expert consultants have reviewed the documents as well as the Compliance Officer's written feedback, dated April 14, 2021. We find that PPB's Master After Action Report is not sufficiently comprehensive and lacks critical self-assessment. We write in our role as monitors of the Amended Settlement Agreement, ECF 171, to provide our assessment, offer technical assistance, and seek further data and analysis. At the outset, three high-level points bear emphasis.

First, on April 2, 2021, DOJ issued a notice pursuant to Paragraph 178 that identified the terms of the Agreement we believe the City has failed to implement, as specified in the Fifth Periodic Compliance Assessment Report, dated February 10, 2021, ECF 236-1, and a letter critiquing the Police Review Board (PRB), dated March 23, 2021. Central among our concerns are (1) force management during crowd control events, including timely reporting, reviewing, and assessment of whether such force is justified under the Constitution and PPB policy, and (2) enforcement of force and performance policies and related accountability for misconduct.

PPB's Master After Action Report does not substantially address those fundamental issues and does not resolve DOJ's concerns. *See* ECF 171, Paras. 178-183. Most importantly, PPB's self-assessment insufficiently analyzes its management of force, its members' justifications for force, and the organization's plan to enforce compliance with policy and training. Instead, PPB focuses primarily on external factors beyond its control while over-relying on training and software to address the few faults it is willing to own. Consequently, PPB has not yet identified a satisfactory remedy to ensure full compliance with the Agreement's force reporting and review requirements.

Second, PPB has informed us that upcoming crowd control training will be based in part on the Master After Action Report. Using PPB's incomplete and inadequate self-assessment as a "needs assessment" for essential crowd control training raises serious concerns.[1] We agree that PPB should train its crowd control response teams as expeditiously as possible to address issues

---

[1] Some concerns have already manifested. PPB initially scheduled Rapid Response Team (RRT) training for April 10-11, 2021, without any planning or needs assessment. On March 15, PPB presented to us a series of "lesson plans," some of which had been created only after we requested copies. The lesson plans were inadequate, as detailed in a March 23 email from the Compliance Officer. On March 24, PPB decided to postpone the RRT training indefinitely because it lacked time to address the Compliance Officer's concerns. At PPB's request, we listed our many concerns with the lesson plans in an email dated March 25, 2021. As of the date of this letter, PPB has not replied to DOJ or the Compliance Officer's feedback and has not scheduled a date for the RRT training.

2

identified in DOJ's compliance assessment report. But PPB must do so in a fashion consistent with the Agreement, approved PPB policies, and the Constitution. Accordingly, any such training that relates to the application of force in crowd control settings should fully incorporate the requirements of de-escalation, warnings, individual justification for each application, PPB's critical decision-making model, and reporting and investigation requirements.

Third, PPB's Master After Action Report continues a pattern of untimely and incomplete documentation related to the City's forceful response to the 2020 protests. Beginning in early June 2020, we regularly asked the City for data about PPB's crowd control response. We wanted to know specifically what daily information PPB executives were receiving and how they were using it to manage use of force. Among our many inquiries, we sought information on the type and amount of force being used each day. We also sought the AARs required by the Agreement and PPB policy. Finally, in late August 2020, the City produced a set of incomplete FDCRs and, in early September 2020, the City produced a set of informal daily summaries of crowd control events with limited content. PPB did not produce—and apparently did not track—an inventory of munitions or a daily count of the type and amount of force used against individuals. The Master After Action Report also contains no information on the type or amount of force used by PPB officers. In December 2020, PPB produced a sample of AARs that covered various day-long periods during which force was used. As described in DOJ's Fifth Periodic Compliance Assessment Report, those AARs were procedurally and substantively deficient. ECF 236-1 at 6-12. Finally, on March 29, 2021—134 days after PPB marked the end of the 2020 crowd control events on November 15, 2020—the City produced PPB's Master After Action Report. But this report continues to omit any assessment of whether officers violated PPB policies related to using force, reporting force, and reviewing force reports. Communication also continues to be inconsistent. PPB recently informed DOJ that it would conduct an internal meeting to debrief the 2020 crowd control events, and we asked to observe. PPB either did not have that meeting or had it without inviting us. This pattern of providing deficient information related to the 2020 protests reflects larger failures of supervision and accountability at all levels.

What follows is our general assessment of the documents that comprise PPB's Master After Action Report as they relate to the City's compliance with the Settlement Agreement.

### (1) Special Event AAR

The Special Event AAR is untimely, incomplete, and inaccurate in some respects. The document indicates a first-level review date of November 20, 2020, with command-level review dates of January 15 and March 24, 2021. The "review date" is vague, however, because it does not capture the dates on which an after-action review is started, edited, or complete. PPB's FDCRs also fail to capture definite times when a force report is started, edited, complete, and reviewed. PPB's unclear records negatively impact the City's ability to demonstrate compliance with the Settlement Agreement.

Also, the narrative refers to attached documents "[f]or additional Crit[i]que and recommendations," which is an apparent reference to the 2020 Protest After Action and Recommendations and the 2020 Protest Challenge and Solution Analysis. AAR at 4. But the Special Event check box section does not indicate any attachments were reviewed. AAR at 2.

3

Moreover, PPB advised that the referenced documents were not in final form until months later, in March 2021. In fact, the City advised us that it could not produce the Special Event AAR, as we requested in advance of filing DOJ's Fifth Periodic Compliance Assessment Report in February 2021. If the Special Event AAR is referencing different documents than what we received in March, we ask the City to produce them to us.[2]

Even if the Special Event AAR were timely, it is nevertheless deficient in terms of content. PPB policy defines an AAR as "[a] written report that describes a police action and assesses its adherence to policy through critique and evaluation using required criteria." *See* PPB Dir. 1010.00, Definitions; PPB Dir. 905.00, Definitions. However, the Special Event AAR omits any discussion of policy, except to note that PPB could not "provide a comprehensive and transparent review" within "the timelines outlined in PPB's directives." AAR at 4. In fact, the Special Event AAR disclaims a role in being critical in any comprehensive fashion: "This AAR is not meant [to] evaluate use of force or other situations that required separate AAR's." AAR at 1. By design, then, the Special Event AAR limits its utility by deliberately declining to assess, critique, or in any way evaluate the high-profile, high-volume use-of-force events.

The Special Event AAR includes review by PPB command staff. AAR at 6. However, they endorse the myopic approach of the first-line supervisory review, omitting any assessment of compliance with PPB's policies. The City must acknowledge the importance of PPB members complying with constitutional standards, adhering to approved policies, and enforcing policy violations. For example, rather than address the efficacy of policy-required warnings before using force, PPB incorrectly suggests that a sound truck provided all necessary warnings for PPB members to use force against individuals. *See* AAR at 5. While a sound truck may have provided sufficient warning in some cases, in other cases it may not have. PPB confirmed that members heard the sound truck, but not subjects. AAR at 5. Video we saw suggests that direct warnings to individuals immediately prior to an officer's use of force could have been feasible in many situations. PPB's reliance on a blanket announcement that may or may not have been heard is inconsistent with established requirements. PPB policy and the Constitution require adequate justification and feasible warnings for each use of force. PPB Dir. 1010.00, Procedure, Sections 3 and 5; PPB Dir. 635.10, Procedure, Section 1 ("Directive 1010.00, Use of Force, governs all uses of force, including in crowd management and crowd control situations."). Similarly, PPB policy requires that officers attempt to de-escalate to avoid employing force. PPB Dir. 1010.00. As we described in our compliance assessment report, PPB repeatedly validated uses of force with little or no discussion of de-escalation. ECF 236-1, Section III. The Special Event AAR is silent on de-escalation. PPB's policy requirements are not suspended by a riot declaration.

The Special Event AAR does not identify any "possible policy violations" associated with the 2020 protests. AAR at 5. It also incorrectly asserts that "[a]ll force reports are attached to appropriate AARs." AAR at 6. As described in DOJ's Fifth Periodic Compliance Assessment Report, those AARs were often not appropriate. *See* ECF 236-1 at 6-12. PPB does not acknowledge, much less resolve, critical failures with multiple force-related AARs from the

---

[2] The command-level portions of the Special Event AAR also reference attached documents with additional critique and recommendations. Commander Dobson's review was forwarded on January 15, 2021, and Assistant Chief Resch's was complete on March 24, 2021. AAR at 5-6.

4

2020 protest and the FDCRs on which those AARs rely. For example, RRT members sometimes did not complete FDCRs by the end of shift. Similarly, PPB did not complete AARs for the month of June 2020, pushing them off to catch up on other documentation and finishing them months after the underlying incidents.

### (2) 2020 Protest After Action and Recommendations

This 21-page document catalogs a series of informative observations, especially at the incident command level. However, it mainly represents an advocacy piece to justify what PPB did, blame shortcomings on other entities and circumstances beyond PPB's control, and seek additional funds for new equipment, training, and personnel. Indeed, PPB lauds its performance: "The Portland Police Bureau, a medium-sized policing agency, did an *excellent* job handling the nightly protest." After Action and Recommendations at 1 (emphasis added). There is very little analysis of what PPB could have done better with the resources and knowledge it had.

PPB emphasizes what was unique, unprecedented, and uncontrollable about 2020. After Action and Recommendations at 1-3. Yet, in the days and weeks after the protest started on May 29, the repetitious crowd control events could no longer be fairly characterized as unexpected. PPB accepts that as the days passed, "events began to have a more defined pattern," allowing PPB to shut down the incident command day shift.[3] We accept that the pandemic and the decisions of elected leaders impacted PPB, but an effective self-assessment should focus critically on PPB's actions and prioritize solutions within PPB's control.

PPB addresses various legitimate challenges at the incident command level, including the lack of mutual aid and trained staff to work incident command. After Action and Recommendations at 3-13. However, the report lacks a critical assessment of supervisory performance at the street level in relation to use of force. PPB command broadly portrays all force as justified: "force was used as dictated by the situation." After Action and Recommendations at 14. Based on limited video evidence we have seen, we disagree that this was always the case. In our view, there is evidence that some PPB members used force against individuals and prepared incomplete FDCRs in violation of Directive 1010.00, Sections 3, 4, 5, 6, and 11, and Directive 900.00, Section 1. In addition, we reviewed some supervisory investigations of force events that did not comport with Directive 1010.00, Sections 12 and 13, and Directive 900.00, Section 2.

PPB policy makes clear that the Incident Commander is responsible for ensuring uniform compliance with Directives 900.00 and 1010.00 during crowd control events. PPB Dir. 635.10, Procedure, Section 13. PPB admits this did not occur for two reasons: (1) the "sheer volume in the number of reports," and (2) fatigue among members negatively affecting "the quality of the narrative and the ability to remember all uses of force" for FDCRs and AARs. After Action and Recommendations at 15. When an abnormally high amount of force is used, strict adherence to managerial controls is even more important.

---

[3] While PPB may administratively frame the 2020 crowd control event as a continuous period running from May 29 to November 15, it was not literally continuous. Demonstrations rarely occurred between 4:00 a.m. and 8:00 p.m., and ceased for more than a week in mid-September when wildfires caused Portland to have very poor air quality.

5

### (3) 2020 Protest Challenge and Solution Analysis

This 13-page document primarily restates information provided in the Special Event AAR and the 2020 Protest After Action and Recommendations document. Where it builds on those documents, it does so with mixed results.

For example, PPB does not address whether a particular use of force was justified, focusing instead on *the articulation of* the justifications reported in FDCRs. Thus, PPB found that "articulation used by officers to justify force was too general and not consistent with the articulation officers use to justify force events outside of crowd management incidents." Challenge and Solution Analysis at 7. That distinction ignores the possibility that a generalized justification may mask the lack of a specific justification consistent with the Constitution and PPB policy. That possibility is made more acute by PPB's silence on several concerns we have raised, including PPB's pattern of misusing the phrase "active aggression" to justify force against individuals who engaged in passive resistance or merely failed to disperse, and misapplying Directive 635.10 to justify force that does not comply with Directive 1010.00. *See* ECF 236-1, DOJ's Fifth Periodic Compliance Assessment Report at 8-9; DOJ's Letter Critiquing the PRB, Mar. 23, 2021, at 2-3, 6.

This document also claims other reasons for improper FDCRs and AARs. In addition to the volume of force and fatigue, PPB explains that crowd control unit supervisors were directly involved in using force and unrelated supervisors who PPB assigned to complete AARs had "little to no crowd management training." Challenge and Solution Analysis at 1-2. PPB suggests that policies should be more lenient by allowing "longer timelines" for reporting and reviewing force during crowd control events and "other methods of critique" for reviewing such force. *Id.* A viable force reporting system must provide data to executives in a timely fashion to influence decision making. Lengthening reporting timelines would undermine not improve PPB's force management. As the Compliance Officer explained, memories fade and become distorted over time. ECF 226-2, COCL Q3 2020 Report, at 14-15. Shorter timelines enable quicker identification of problematic force and quicker corrective action. But timeliness cannot take priority over accuracy and thoroughness. Timeliness is not a standalone goal, but a means to ensure accuracy and facilitate accountability for out-of-policy force violations.

PPB also asserts that by dedicating two Sergeants to AARs midway through the protests, PPB ensured that "FDCRs and AARs were completed in a timely fashion." Challenge and Solution Analysis at 2. We cannot agree because FDCRs and AARs were untimely or incomplete in some cases. Substantively deficient reports are not *complete* in any meaningful sense. Plus, PPB acknowledged that AARs did not assess available video evidence "because there is currently no system in place to link the video to an AAR." Challenge and Solution Analysis at 3.

PPB's proposed solutions focus on training on report. While additional training may help, it cannot be the only solution. Every sworn member already has received extensive training on the requirements of Directive 900.00 and Directive 1010.00. PPB also needs to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification. PPB's Master After Action Report does not

6

consider that approach. In addition to training officers on proper reporting, the City should implement solutions that ensure PPB enforces its existing policies and training.

PPB also identifies body worn cameras (BWCs) as a solution to capturing information about crowd control events. Challenge and Solution Analysis at 6, 8. We agree with the rationale for BWCs that the Compliance Officer included in its recent analysis of PPB's Master After Action Report:

> The proper review of force is all about the availability of good evidence, and it appears to be short supply in Portland. Since 2016, [the Compliance Officer] and others have recommended [BWCs] to address this and other evidentiary problems. Of the largest 75 municipal police agencies in the U.S., Portland is the only city without body worn cameras.

*See* Compliance Officer Memo, *Feedback on PPB's Crowd Control and Force Management Documents*, Apr. 14, 2021, at 3. In our review of force events that occurred during the 2020 protests, we, too, found video evidence to be extraordinarily useful to preparing an informed assessment of compliance. The City should consider the consistently high-quality evidence that BWCs can supply investigations of misconduct allegations across the spectrum, from rudeness to bias to force. In any event, the City must assure that supervisors at all levels of PPB require adherence to policy and, where necessary, discipline those who violate policy.

### (4) Crowd Control FDCR Update Recommendations

This one-page document lists proposed changes to the check boxes on the current FDCR form. Two of the three previous documents endorsed the view that "Current AAR and FDCR forms do not allow for accurate documentation of crowd management incidents." Challenge and Solution Analysis at 3; *see also* After Action and Recommendations at 15.[4]

We disagree that current forms did not "allow for accurate documentation of crowd management incidents" as required by PPB policy and the Settlement Agreement. The current FDCR form contains an open narrative field sufficient to enable officers to explain events and justify uses of force. The forms were not a primary driver of inaccurate documentation.

However, we agree that there can always be refinements to improve forms. In order to understand how PPB proposes to change the FDCR form, we need to see a draft. Accordingly, please provide us a mockup of the changed form.

* * *

Finally, PPB's Master After Action Report sets forth many recommendations but does not address whether the recommendations have been adopted or for the adopted recommendations, the status of their implementation. Going forward, we request that the City track the recommendations and provide DOJ with a record of any response.

---

[4] The Special Event AAR, by contrast, asserted "All force reports are attached to appropriate AARs." AAR at 6.

7

We hope this written feedback is useful to the City and PPB.  Please contact us if you would like to discuss these issues further.

Sincerely,

/s/ Jonas Geissler                 /s/ Jared D. Hager

R. Jonas Geissler                 Jared D. Hager
Senior Trial Attorney          Assistant U.S. Attorney
Civil Rights Division            District of Oregon
Department of Justice

cc:

Robert King, Senior Policy Advisor, *Robert.King@portlandoregon.gov*

Heidi Brown, Chief Deputy City Attorney, *Heidi.Brown@portlandoregon.gov*

Bridget Donegan, General Counsel, Portland City Auditor's Office
*Bridget.Donegan@portlandoregon.gov*

Mary Claire Buckley, Inspector General, Portland Police Bureau,
*MaryClaire.Buckley@portlandoregon.gov*

Dennis Rosenbaum, Compliance Officer, *dennisrosenbaum3@gmail.com*

Anil Karia, Counsel for Defendant-Intervenor, Portland Police Association,
*anil@pslglawyers.com*

Kristen Chambers, Counsel for Enhanced Amicus, AMAC, *kristen@prism-legal.com*

Ashlee Albies, Counsel for Enhanced Amicus, AMAC, *ashlee@albiesstark.com*

Juan C. Chavez, Counsel for Amicus, Mental Health Alliance, *jchavez@ojrc.info*

Franz H. Bruggemeier, Counsel for Amicus, Mental Health Alliance,
*fbruggemeier@ojrc.info*

*via email only*

8

# APPENDIX B

**2021 Advanced Academy Training for New Recruits**

**List of Classes**

Leadership

Equity – "Lift Every Voice"

LE Bike Training (2 weeks)

Community Policing / Community Engagement (2 weeks)

Patrol Procedures – Mindset

Patrol Procedures – Fundamentals / Principles

Firearms (57.5 hours over 18 sessions)

PVO – Policy

Control Tactics skills (51 hours over 16 sessions)

Control Tactics – Policy and Report Writing

Control Tactics – Scenarios

CEW refresher

Patrol Procedures – Critical Incident

Patrol Procedures – TECC

Patrol Procedures – Building clears (2 sessions – 6 hours)

Patrol Procedures – traffic stops

Patrol Procedures – person encounters / foot pursuits

Patrol Procedures – High Risk Traffic Stops (2 sessions – 6 hours)

Patrol Procedures – Rescues

Patrol Procedures – Deadly Force Encounters

Patrol Procedures – Emergency Entry

Patrol Procedures – Medium Risk Traffic Stops

Patrol Procedures – Scenarios (6 sessions)

Patrol Procedures – Active Threat (3 sessions – 13.5 hours)

PVO skills (20 hours over 7 sessions)

PVO Shelton trip (scenarios, high speed driving, PIT)

Law (24 hours over 8 sessions)

Mindfulness

Mental Wellness / Police Identity

CIT (14.5 hours over 4 sessions)

Crisis Communication

EAP

Asset Forfeiture

Crowd Control (6 hours over two sessions)

K-9 Overview

Air Support Overview

Sleep, Alcohol and Meditation

ECST / Portland Gang info

Stress / Resilience

Crime Scene Investigation

Trauma Informed Interviewing

# APPENDIX C

## The CEW Issue

Some members of the Training Division feel that PPB should change its policy on CEWs, removing the requirement that all patrol officers carry a CEW and instead, have one available in their squad car. This would be a significant change in policy and practice. The argument made by the Control Tactics instructors is that "…*it's dangerous and often ineffective to deploy the CEW as a spontaneous reaction to a physical attack. In those situations, officers need both hands available so they can concentrate on physical control.*" However, other experts in the PPB feel that officers should have the CEW available if they need it, and that storing it in the squad car would make it unavailable when situations quickly escalate.

COCL has expertise on this topic and therefore, we have decided to offer a few comments. COCL is also willing to provide PPB with technical assistance on this subject moving forward.[44] In the larger picture, we acknowledge that CEWs have not achieved all that was expected of them when introduced and that these PPB instructors are reflecting a growing national concern about CEW usage.[45] COCL provides the following facts: First, most CEWs are less effective than originally hoped either because the prongs miss the target or they do not penetrate the subject's clothing (This is especially true in northern, cold areas where people wear more clothing).[46] Second, the target area on the body keeps getting smaller and smaller as the chest area has been removed by the manufacturer for safety reasons. Third, a Fourth Circuit Court of Appeals case re-defined CEW deployment as a serious use of force.[47] This case has been cited as persuasive authority in other federal circuits, and courts have required a high level of resistance or threat to justify CEW use for "less serious offenses." Also, given the number of civil suits for uses of force with CEWs, agencies are expected to explain their use to the public.

However, research shows that when used properly the CEW is a good tool. To a large extent, the problem seems to be the failure (by many agencies) to train and inform officers of its limited uses and convince them it can be a helpful tool if used properly. There are too many examples of officers turning to the CEW too early and too often. Past research suggests that while CEWs do not reduce the number of deadly force incidents, they can reduce injuries to officers and suspects in most cases. However, we acknowledge that when CEW applications are ineffective, tensions can escalate as the subject may become angry or seek to escape, and the risk to both parties can increase if lethal force is used.

The problems around the use of less-lethal weapons caused the Police Executive Research Forum (PERF) to organize a national conference on this subject in 2019 with more than 200 law enforcement

---

[44] COCL team members have provided guidance to other agencies. For example, see Alpert, Geoffrey P. (2016). *Use of Electronic Control Devices 2014-2015 Montgomery County, Maryland Police Department*. University of South Carolina.

[45] See Police Executive Research Forum (2021). *Redefining the Role of Less-Lethal Technologies: Critical Thinking, Communications, and Tactics are Essential in Defusing Critical Incidents.* Also, PERF held earlier conferences on electronic control weapons that resulted in publications in 2006 and 2011.

[46] Nationwide, CEWs appear to be effective about two-thirds of the time, but only about half of the time in Portland.

[47] Estate of Ronald Armstrong v. The Village of Pinehurst, No. 15-1191 (4th Cir. 2016).

executives.[48] They raised an important question that reaches far beyond the technology: "*Has policing become overly dependent on less-lethal technologies, at the expense of communication skills, strategies, and tactics that have worked in the past but are not as prevalent today?*" They note that police recruits receive much more training in weapons than in de-escalation and communication skills. This can be problematic when responding to calls involving unarmed persons with mental illness, drug addiction or other factors that contribute to erratic behavior. One of the main conclusions from the PERF conference was that officers need to slow the situation down: "*Officers' Plan A for responding to these calls should focus on critical thinking and communications first, not less-lethal weapons, because success is more likely to be achieved through voluntary compliance.*" National data collected by the *Washington Post* since 2015 indicate that roughly 4 in 10 fatal officer-involved shootings involve subjects who were not carrying a gun and roughly 2 in 10 fatal shootings involve persons with mental illness.[49]

While police officers should not become dependent on CEW to solve escalating situations, COCL feels that CEWs should not be left in the squad car, as they can be needed at a moment's notice. When officers do not have sufficient non-lethal tools available to them, they may resort to deadly force (which is the main focus of PPB's In-service training on control tactics). We are not troubled by the national decline in CEW usage or the increase in hands-on takedowns, but we are concerned about the potential absence of CEWs from tense moments involving non-compliant subjects and those with sharp objects, which could increase the risks to all parties by relying on deadly force.[50]

Thus, the CEW issue is complex, but we hope that PPB can have a robust internal discussion and resolve any differences, since PPB is currently field testing the new Taser 7, which has two cartridges and appears to be more effective than prior models.

---

[48] PERF (2020) defines "Less-lethal weapons" as "types of 'pepper spray' or chemical agents; Electronic Control Weapons (ECWs) such as Tasers; devices that propel soft projec-tiles such as bean bags; officers' batons; and other devices…"

[49] "Fatal Force." The Washington Post. https://www.washingtonpost.com/graphics/investigations/police-shootings-database/

[50] The decline in CEW usage in Portland seems rather dramatic, from 301 applications in 2010 and 55 in 2020.