# COMPLIANCE OFFICER AND COMMUNITY LIAISON

## *Quarterly Report: Quarter 3*

## *Updates & Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**July 1, 2021 to September 30, 2021**

**February 28, 2022**



1

# TABLE OF CONTENTS

| | |
|---|---|
| **TABLE OF CONTENTS** | **2** |
| **INTRODUCTION** | **3** |
| **EXECUTIVE SUMMARY** | **6** |
| **SECTION III: USE OF FORCE** | **13** |
| **SECTION IV: TRAINING** | **24** |
| **SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES** | **39** |
| **SECTION VI: CRISIS INTERVENTION** | **41** |
| **SECTION VII: EMPLOYEE INFORMATION SYSTEM** | **47** |
| **SECTION VIII: OFFICER ACCOUNTABILITY** | **52** |
| **SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING** | **63** |
| **LIST OF ABBREVIATIONS** | **74** |
| **LIST OF PERSONNEL** | **76** |
| **APPENDIX A** | **77** |
| **APPENDIX B** | **78** |

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

# INTRODUCTION

This is the Compliance Officer/Community Liaison's (COCL) third quarter report for 2021, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered September 23, 2021. This report covers the three-month period from July 1, 2021, to September 30, 2021.

In this third quarter, the Portland Police Bureau (PPB) and the City of Portland were unable to return to Substantial Compliance for: Use of Force (Pars. 66, 67, 69, 70, 73-77), Training (Pars. 79, 84), Employee Information System (Pars. 116. 117, 118, 119) Officer Accountability (Pars. 121, 128, 129), and Community Engagement (Par. 144). In addition, the City and PPB have not yet returned to Substantial Compliance for Par. 169 under Section X because they have been unable to hold officers accountable for violations of policy during the protests.

The COCL continues to evaluate whether the systems required by the Settlement Agreement can be sustained or restored to ensure constitutional policing in Portland. For the third quarter, most systems remained intact, but some did not produce the desired outcomes. To a large extent, this can be attributed to the City not producing an internal or external assessment of force applications that occurred during the 2020 protests or adopting a remediation plan for the systems that were adversely affected.

We have been informed by the City Attorney's Office and DOJ that they are making good progress toward agreeing on a set of remedies, although implementation will take time. Because the mediation process was in full swing during the third quarter, below we provide the reader with a list of remedies proposed by the DOJ that are being negotiated. We have been informed that the City Attorney's Office and DOJ have reached agreement on many of these remedies, although the details were not available to the public or COCL during this reporting period. Some of these terms must be bargained with the PPB union - the Portland Police Association (PPA) - and the overall plan must be approved by the City Council.

## Proposed Remedies to Achieve Compliance

On April 2, 2021, DOJ issued a formal "notice of noncompliance" to the City (Par. 178), maintaining that the City has failed to achieve the requirements of the Settlement Agreement in Sections III (Use of Force), IV (Training), VIII (Officer Accountability), and IX (Community Engagement). Because initial communication between DOJ and the City regarding this notice did not resolve their differences (Par. 180, 181), they were required to participate in a mediation process facilitated by a neutral party (Par. 182). Thus, during the third quarter, mediation meetings before a United States Magistrate Judge were held on September 8th and 24th, followed by three additional meetings in the fourth quarter (Oct. 6th, 13th, and 20th).

DOJ proposed nine remedies that served as the agenda items for these mediation meetings between DOJ, the City, and others.[1] To keep the public informed, we list here the original remedies as they pertain to different sections of the Settlement Agreement:

*FORCE*

1. The City should implement body-worn cameras (BWCs) for all officers (this remedy also relates to Accountability).

2. The City should revise Force Data Collection Report (FDCR) and After-Action Review (AAR) forms to better capture information to show required timeliness of completion and review.

3. The City should contract with a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report that includes recommendations to which the City will publicly respond.

*TRAINING*

4. The City should create a "needs assessment" for crowd control training that adequately addresses issues with PPB's response to the 2020 protests. We propose this to be part of the crowd control assessment we just discussed.

5. The City should ensure PPB's budget covers officers' annual required training without relying on overtime.

6. The City should appoint a qualified civilian head over PPB's Training Division to ensure consistent and appropriate training based on problem-based learning and other generally accepted adult-learning techniques.

*ACCOUNTABILITY*

7. The City should identify and hold accountable RRT [Rapid Response Team] Lieutenants and above who approved force without adequate justification during the 2020 protests.

8. If the City's proposal for addressing timeliness and quality of investigations and effective discipline is the implementation of the new voter-approved Community Police Oversight Board, the City should propose amendments to the Agreement within 90 days and formulate a plan for an orderly transition to and full implementation of the Board.

*COMMUNITY ENGAGEMENT*

---

[1] In addition to the Magistrate Judge who facilitated these meetings, others present included: Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

9. The City should issue its 2020 annual report and hold the required meetings before the end of summer 2021, and do the same in 2022 and any future years during which the Agreement is still in effect.

In the fourth quarter, DOJ and the City filed a "Joint Status Report" in the U.S. District Court (Par. 182), summarizing the mediation results and the specific remedies on which the parties agreed in principle[2]. COCL will provide an update in our fourth quarter report, including the proposed addendum to the Settlement Agreement that incorporates these remedies. In 2022, the COCL will continue to assess all relevant paragraphs of the Settlement Agreement but will give increased attention to these remedies as they are implemented.

### Revelation of Troubling Training Material

After this report was drafted, on January 14th 2022 the COCL and the DOJ were made aware of some disturbing training material prepared for the PPB's Rapid Response Team (RRT) training in 2018. This training included one slide showing a "Prayer of the Alt Knight'' meme, making reference to a pro-violence wing of the Proud Boys, and suggesting that police violence against protestors is somehow justified. Other problems in the slide deck were apparent. COCL was dismayed by this offensive training material, which raises many questions about who produced it, how it was allowed to happen, why it was not reported sooner, and why force-related training was not shared with COCL or the DOJ as required by paragraph 166 of the Settlement Agreement. More generally, we are concerned about PPB's internal process for reviewing and approving training curricula and materials for special units. The City of Portland has promised to investigate this matter and both COCL and DOJ have requested information and asked to be kept informed. COCL will keep an eye on the investigation as it unfolds and assess the implications for compliance with the terms of the Settlement Agreement. We place a very high value on integrity, transparency, and accountability on the part of the City and PPB as the foundation for building public trust.

---

[2] The remedies require a formal vote by the City Council.

5

# EXECUTIVE SUMMARY

## SECTION III: USE OF FORCE

During the third quarter of 2021, the PPB did not return to substantial compliance with Section III as a result of not resolving the issues surrounding the Bureau's failure to manage force during the 2020 summer protests. PPB did maintain compliance for several paragraphs and our review of recent force events (including protest events) indicates that reporting and investigation of force has improved. Additionally, PPB began the process of soliciting vendors to conduct a critical incident assessment of the protests. However, there have been no revisions to policies, and the training that was delivered was insufficient to return to compliance. Furthermore, PPB is no longer planning to conduct an audit of protest force events in the same way that they audit non-protest events, leaving PPB without a full empirical understanding of the reporting deficiencies that occurred in 2020. Finally, PPB experienced process failures related to the Force Inspector's review of force events in that deficiencies in force reporting and investigations were not adequately addressed by the appropriate RU Managers and an identified trend was not forwarded to the policy team or Training Division. Moving forward, the PPB will need to address these issues and implement durable remedies, particularly for officer responses to protest events and corresponding force documentation.

Our assessment of Section III also contains tables and figures related to overall force trends. For instance, we report on an assessment that PPB conducted to examine recent increases in use of force. In their assessment, the PPB noted that 2020 was different from other years due to the combination of the pandemic and protests. The PPB further noted that, although raw numbers had increased compared with 2020, they were consistent with (and actually lower than) 2019 force events. Additionally, the audit team evaluated trends in call priority and call type. For call priority, the audit team found that while the number of low- and medium-priority calls had decreased, the number of high-priority calls remained relatively consistent, resulting in a greater proportion of calls being high-priority. Additionally, many of the high-priority call types which showed increases in frequency since 2019 are also associated with events that are likely to lead to use of force, including "Shots Fired," "Disturbance," "Threat," "Assault," "Harassment," and "Domestic Violence." In total, we found the analysis conducted by the Force Inspector's team to have been thorough and covered a range of relevant topics related to the increases in force seen in 2021.

## SECTION IV: TRAINING

During the third quarter, PPB was able to deliver Advanced Academy Training, In-service Training on Crowd Control, and peer intervention training (ABLE), along with a series of online videos. COCL continues to assess the extent to which PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short term and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

The PPB remains in Substantial Compliance for all paragraphs in Section IV (Training), with the exception of Par. 79 (training needs assessment) and 84 (training delivered). PPB's response to demonstrations remains a central problem in the City's efforts to achieve Substantial Compliance with the Settlement

6

Agreement. We acknowledge that the Training Division has begun a comprehensive review of training needs related to crowd management. We also acknowledge that the City intends to outsource an independent assessment of crowd control that would have clear implications for future training. However, PPB will remain in Partial Compliance on Par. 79 until these assessments have been completed and specific training needs have been identified.

By and large, the 5-hour In-service training on crowd control was well executed. The City and PPB sought to be responsive to the concerns articulated by COCL and DOJ, offering good coverage of restrictions on the use of force and weapons during protests, force reporting, and the role of the Mobile Field Force (MFF). The coverage of internal and external procedural justice was less praiseworthy and potentially problematic. Overall, the crowd control training was not sufficient to move from Partial to Substantial Compliance for Paragraph 84.

We have three primary concerns with the Crowd Control training. First, a large amount of material was covered in a limited time period, making it difficult for officers to fully comprehend the implications for their actions on the street. Second, this training provided no opportunities for officers to translate these concepts and legal restrictions into practice, either with classroom exercises or hand-to-hand interactions, as required by Paragraph 84 of the Settlement Agreement. Third, this crowd control training was planned and executed in advance of any comprehensive internal or external assessment of the evidence regarding what actually transpired during the Portland demonstrations of 2020. Also, the training preceded the finalization of PPB's force directive 1010.00 regarding the role of MFF and grenadiers. As a result, PPB will remain in Partial Compliance with Par. 84 until such assessments, policy changes, and scenario-based training are provided.

Also, given that special units are a central component of PPB's crowd control strategy, we must caution that the January 2022 revelation about offensive RRT training in the past may affect COCL's future assessment of training if the DOJ proposes additional remedies to address this problem. COCL's job is to assess compliance with the terms of the Settlement Agreement, and those terms may be revised.

PPB continues to maintain and expand a series of online trainings with varying degrees of interactivity. We encourage PPB to continue its efforts to address the limitations of video training and not overload officers with too many videos. They should consider new ways of (1) offering patrol officers dedicated training time; (2) evaluating what they have learned from these trainings; and (3) linking certain online trainings to scenario-based training, either virtual or in-person scenarios. Also, we look forward to learning whether PPB is able to exploit the capabilities of the 3-D VirTra simulator and allow officers to practice their de-escalation and procedural justice skills with noncompliant or antagonistic individuals rather than resort to force.

Although we remain satisfied with the work of the Training Divisions analyst and the evaluation systems she has created, we continue to recommend that the City hire more civilians with research and technology skills. The evaluation systems and online training systems are far too important to be dependent on one or two individuals.

## SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES

For Section V, the COCL team continues to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain

part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. As for the City's and PPB's role, both continued to participate in the broader community-based mental health service response system through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

Also during the third quarter, BOEC maintained Portland Street Response (PSR) dispatch protocols and training for telecommunicators, both of which were reviewed by the BHUAC during the quarter. Furthermore, the BHUAC heard from a representative of PSR, leading to a robust discussion as well as thoughtful comments and suggestions from BHUAC members. However, the minutes also reflect some real concerns on the part of BHUAC members and there was a decision to re-invite the PSR representative to a future meeting (this is currently scheduled to occur in January 2022).

Also as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Related to this, PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crisis. Additionally, PPB continues to participate in the Transportation Workgroup.

## SECTION VI: CRISIS INTERVENTION

During the third quarter of 2021, the PPB and City maintained compliance with Section VI. As we have done in the past, we evaluated PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers and Portland Street Response); and (2) Secondary Response (including BHRT and SCT). We also evaluated the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC). We then assess PPB's response to such calls when received. Finally, we examined what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB.

This quarter, BOEC maintained their policies and training for telecommunicators on dispatching officers to calls involving a mental health component. They continued to use seven call characteristics to determine whether a specialized EICT officer should be dispatched. These characteristics include when there is a mental health component and: a weapon is present, the subject is violent, the call is at a mental health facility, the caller is threatening suicide and has the means to carry it out, at the request of a community member, at the request of another officer, or when the subject represents an escalating risk of harm to self or others.

For their part, the PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). Additionally, the PPB continued to provide training to new officers (through an Advanced Academy class that concluded in the third quarter) as well as current officers (through annual In-service training). Additionally, PPB maintained their specialized response approach through the use of ECIT officers.

8

The PPB has maintained the use of the Behavioral Health Response Team (BHRT) to assist individuals who represent an escalating risk of harm. The PPB has also maintained the Service Coordination Team (SCT) to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. For both of these programs, we provide ongoing operational statistics, including statistics related to decision-making and outcome.

Finally, the BHUAC continued to meet during the third quarter of 2021, utilizing the expertise of individuals at PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, the Public Defender's Office, CareOregon, AMR, Central City Concern, and the Unity Center for Behavioral Health. During the quarter, the advisory committee discussed topics related to BOEC dispatch and PSR, among other topics.

## SECTION VII: EMPLOYEE INFORMATION SYSTEM

The PPB continues to be out of compliance with Section VII as PPB has not yet conducted a comprehensive critical incident assessment to explore and remediate the deficiencies in reporting and investigating uses of force stemming from the 2020 protests, thereby leaving a potential for the EIS system to be starved of necessary data if future protest force events suffer from the same deficiencies. Additionally, the Inspector's notifications to supervisors concerning officers with outlying use of force statistics continue to include language that may bias the reviewing supervisor. Furthermore, there remains a lack of follow-up on the part of RU Managers regarding those officers.

We maintain our position from prior reports that future compliance may be impacted by PPB's ability to ensure that the EIS is "more effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116). Presently, the PPB uses a single-item threshold model based on the requirements of the Settlement Agreement. However, such models come with limitations that PPB will need to consider when evaluating whether the current system is capable of effectively identifying at-risk personnel.

## SECTION VIII: ACCOUNTABILITY

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, timeliness, consistency, transparency, and a system of checks and balances. While we assess these individual components, there remains an overall concern with PPB's accountability system given the inconsistency in force reporting and force justification found from the 2020 protests. Many of these issues have also surfaced in the administrative investigation process since investigators have had to rely on deficient reporting in making their findings. These issues have also impacted Police Review Boards (PRBs) which have operated with varying degrees of effectiveness during the crowd control hearings we have observed. Ultimately, we remain concerned with PPB's ability to hold officers accountable for violations of policy, as required by Par. 169. The City and PPB will need to resolve these issues through remediation of the crowd-control deficiencies as well as safeguard against these issues with the new oversight board being developed.

For some areas of Accountability, the City is in compliance with the terms of the Settlement Agreement whereas in other areas, they remain out of compliance. For instance, the accountability system remains

accessible for community members to submit complaints of misconduct. However, we found instances where the accountability system was not appropriately utilized by PPB and the City, particularly as it relates to accountability for supervisors who failed to open a full investigation for an allegation of excessive force as well as supervisors who approved deficient force reporting. As it relates to timeliness, the City (primarily IPR) continued to fall short of Par. 121's requirement to complete full administrative investigations within a 180-day timeline. Also, while we have found consistency in the appropriate disposition of recent administrative investigations, issues with the proceedings from the Police Review Board continued during the third quarter where we found instances in which incorrect standards were applied, the actions of the crowd were used as justification for force against an individual, and PPB members were not held to the standards of PPB policy. In reviewing the City's accountability system, we also find it to remain largely transparent and that PPB has, by policy, an adequate system of checks and balances. However, those checks and balances can be bolstered through improving the understanding of police work for CRC members serving on the PRB, as well as through resolving the aforementioned PRB issues.

Finally, Section VIII has requirements for actions to be taken after the occurrence of lethal force and in-custody death events. Because of the sensitive nature of such events, PPB is required to safeguard the integrity of such investigations through a number of actions. During the third quarter of 2021, there were three Officer-involved shooting (OIS) events and in two of them, all of the required steps were followed. However, during one OIS event this quarter, the sole witness officer did not provide an on-scene walk-through and interview due to the officer asserting emotional trauma from the event. In communications between the City, PPB, DOJ, and COCL, we were informed that the trauma being exhibited by the officer was not something the detectives had seen before and the detectives on scene made the decision to delay interviewing the officer until the officer was in a more stable mindset. We accepted these arguments and therefore, concluded that this was a singular occurrence and did not warrant a reduction in compliance status. However, we recommend the PPB and the City create updated policies and standards when current policies and standards do not provide sufficient clarity. For example, while the decision of the detectives may be understandable, there is no protocol for assessing when the officers' actions or statements should lead detectives to consider the officer "injured" in the context of the officer's mental health (see section 2.2.2.1 of Directive 1010.10). Furthermore, policy would also need to be updated with a documentation requirement for similar situations.

## SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

### *PCCEP's Role*

The PCCEP has continued to function as a legitimate body for community engagement (Par. 141, 142), supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations. PCCEP has maintained subcommittees that focus on Youth, Behavioral Health, Racial Equity, and the Settlement Agreement and Policy, as well as a steering committee.

In the third quarter of 2021, PCCEP continued monthly general meetings and subcommittee meetings via Zoom. Highlights of PCCEP's work as a full committee in the third quarter include approving a response to Judge Simon regarding the status of the Settlement Agreement, approving three

recommendations, co-hosting a town hall on COCL's Q2 report, and discussing the development of a three-year strategic plan for PCCEP, including updated metrics and goals for PCCEP's work.

Per the Amended PCCEP Plan, "The City shall provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days." At the close of the third quarter, the City had not formally responded to these recommendations. These delays were due to turnover and changes in staffing within the Mayor's Office.

*City's Support*

The City's role is to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions. Paragraph 144 states that "*The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan*."

In each of our quarterly reports for 2021 we have noted the inconsistent City support in posting information about PCCEP meetings for the benefit of the public—including timely posting of PCCEP meeting videos, recordings, and meeting minutes. The Amended PCCEP Plan says, "*Agendas and minutes from all PCCEP meetings will be published on the City website within 10 business days after the meeting date*." Although record keeping and timely posting have improved, written meeting minutes continue to be difficult to locate on PCCEP's website, with three sets posted for the entirety of the third quarter (two youth subcommittees, and one full PCCEP meeting).

The PCCEP members, who are volunteers, are shouldering a large workload, and some have decided to leave the committee. During the third quarter, the challenge of PCCEP recruitment has become more salient. Unfortunately, staffing changes within the Office of Equity and Human Rights and the Mayor's office have impacted the support and supervision of PCCEP's staff.

In summary, PCCEP continued to function well overall, and the City remains in Substantial Compliance in relation to PCCEP, with the exception of Par. 144, where the City remains at Partial Compliance. We recommend that the City continue to show improvement in the timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. Furthermore, the City will need to make a concerted effort to bolster recruitment for PCCEP membership, which represents a persistent challenge. The functionality of the PCCEP is in jeopardy if the City is unable to provide more consistent support.

*PPB's Role*

PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources, and it has done so. The Office of Community Engagement continued to partner with diverse communities through existing and new advisory councils. PPB's Operational Councils (such as the Behavioral Health Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council) meet regularly and have current postings on the PPB website. Although not required by law, we encourage PPB's advisory groups (Community and Culturally Specific Councils) to keep the public informed of the issues being discussed.

PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. During the third quarter, PPB was able to meet the requirement to share and

11

properly discuss its annual report with community members in each precinct and the City Council, thus returning to Substantial Compliance for Par. 150.

PPB continued to produce quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. COCL examined traffic stop data on Black/African American drivers for Q1, Q2 and Q3 of 2021. Although we found a slight improvement in disparities over time, the East Precinct continues to exhibit the largest disparity. Looking at stops of Hispanic/Latino drivers for the first time, we see disparities, but much smaller than for Black/African American, with the largest disparity in the Central District. Again, we encourage PPB and the community to continue monitoring these enforcement actions, discuss any concerning patterns, and explore solutions.

Although PPB has experienced some delays and challenges with community engagement, their overall plan has been implemented with fidelity. Similarly, PCCEP has continued to function fairly well despite various challenges. However, per Paragraph 144, PCCEP members and PCCEP staff need more consistent support from the City to ensure that meeting minutes are posted in a timely manner and that PCCEP is able to maintain full membership in the face of vacancies. With this support, we expect that the City will return to Substantial Compliance for all paragraphs in Section IX of the Settlement Agreement.

# SECTION III: USE OF FORCE

At the end of the third quarter of 2021, the COCL team continued to have concerns that the failure of PPB to manage use of force during the 2020 summer protests has yet to be fully resolved. During the quarter, the PPB began the process of soliciting vendors to conduct a critical incident assessment of the protests. However, there were no revisions to policies resulting from the protests and, although the PPB did deliver crowd control training this quarter, the COCL did not find that the training was sufficient to return to Substantial Compliance (see Section IV for details). Furthermore, we were informed this quarter that the PPB has abandoned its plans to conduct an audit of reporting and investigation deficiencies stemming from the protests. We also note that while there have been some steps taken towards resolving the issues identified in our prior reports, the City and PPB have not responded to many of our comments and recommendations. In all, the PPB will need to be responsive to our concerns to return to Substantial Compliance in Section III, something that seems unlikely until the independent third-party assessment is completed.

For the remainder of this section, we assess each paragraph within Section III, separating them into those which have remained in compliance and paragraphs which have fallen out of compliance or remained out of compliance.

## Maintained Compliance – Paragraphs 68, 71, and 72

PPB continues to use CEWs in accordance with the Settlement Agreement (Par. 68). For instance, PPB policy requires independent justification for each individual CEW cycle, the provision of a verbal warning before deploying when safe, and paramedics to be tasked with removing CEW probes. In our review, we found that nearly all CEW instances contained these elements. In situations where lapses were found, such lapses were noted and addressed by either the investigating supervisor or through the chain-of-command reviews.

PPB has also maintained an adequate patrol-supervision staffing level in accordance with Par. 71. As noted in prior reports, the rate of officers to supervisors is a better metric than the raw number of supervisors. In the third quarter of 2021, PPB reported a staffing ratio of 5.39 officers for every supervisor across the three main precincts which is the highest ratio in the past five quarters. The ratio continues to be reasonable and we therefore find maintained compliance with Par. 71.

Par. 72 requires PPB to develop a supervisor's checklist when responding to an officer's use of force. Presently, the After Action Report (AAR) form contains the checklist and therefore we find the PPB has remained compliance with the requirements of Par. 72.

## Out of Compliance – Paragraphs 66, 67, 69

In the Settlement Agreement, Pars. 66, 67, and 69 have certain policy requirements for PPB's use of force and use of force reporting. In reviewing use of force events for this quarterly report, we note that each of the policy requirements was adhered to in a consistent fashion.

For this report, we also reviewed a sample of use of force events to evaluate operational compliance with the requirements of Pars. 66, 67, and 69. The force events selected represent a cross section of use

of force, ensuring that the COCL team reviewed cases from each Precinct and level of force, as well as ensuring that we reviewed events involving persons in mental health crisis, events involving the use of CEWs, and events stemming from protests. As it relates to Pars. 66, 67, and 69, our review indicated that for events during this quarter, officers consistently documented the totality of circumstances, utilized sufficient de-escalation/disengagement skills, called in ECIT officers when practical, and reduced force concurrent with reduced resistance.

However, while we find recent force events to evidence compliance with the requirements of Pars. 66, 67, and 69, we continue to find PPB and the City out of compliance for these paragraphs until a comprehensive Critical Incident Assessment of the 2020 protests is conducted and organizational changes in accordance with the assessment's findings are made. We note that this is one of the nine remedies put forth by the DOJ since key elements of the Bureau's use of force policy were severely tested during the protests. While present force reports demonstrate the policy's ability to regulate officer force in less strenuous circumstances, we know that when faced with ongoing nightly protests, the policy was not abided by. In part, these limitations are being addressed through recent reviews of Directive 1010.00 between the City, PPB, DOJ, PPA , and COCL team. However, a comprehensive assessment is necessary to identify the full scope of the issues.

We note that the nightly protests from 2020 have never been experienced by local law enforcement before and may never be experienced in Portland again. However, a learning organization should still conduct a comprehensive evaluation of the event, identify areas needing improvement, and incorporate safeguards against similar future events. Preventing confusion in already confusing circumstances is of critical importance for officer and community safety, thereby underlining the need to conduct such an assessment. Despite this, and despite it being six months after the COCL and DOJ critiqued PPB's initial after action review effort, no supplemental assessment has been completed and the Bureau had only begun to identify third-party vendors by the end of the third quarter. While we are aware of concrete steps taken during the fourth quarter (and will therefore provide updates in our next report), we also note that there has been a lost opportunity to immediately address the majority of known deficiencies. Additionally, given the time that has passed, the ability of the third party vendor to interview officers and supervisors will likely be impacted by issues with recall.

### Out of Compliance – Paragraphs 74, 75, 76 and 77

Paragraphs 74-77 require the PPB to conduct reviews of use of force events, either as a function of assessing use of force trends (Par. 76) or as a function of auditing the force events to ensure that they conform to reporting, investigation, and chain-of-command review standards (Pars. 74, 75, and 77). On a quarterly basis, the PPB provides force audit reports and force summary reports which describe the results of their reviews. For the most part, we have seen this process be of benefit to the Bureau. For instance, the Force Inspector and audit team have compiled quarterly force audit reports which continue to show that, overall, officers and supervisors complete their FDCRs and AARs in a comprehensive and accurate fashion. In addition to trends in evaluating the comprehensiveness and accuracy of FDCRs and AARs, the Inspector reviews use of force events to find emerging issues, concerning occurrences, and department-wide trends in report writing. Similarly, the Force Inspector and audit team provide quarterly information about use of force events, applications, officers, subjects of force, types of force used, and other important factors. This information is also available on the PPB's website in the form of a downloadable, report-level dataset.

14

In our prior report, we noted that the Force Inspector had not consistently used the feedback form for forwarding findings from reviews of force, thereby leading to a documentation failure. While this appears to have been resolved based on the supporting documents for the third quarter, we noted two instances of process failure during the quarter. In one instance, the Force Inspector identified a force event wherein the FDCR, AAR, and chain-of-command review process was consistently flawed. For instance, the sergeant in the case did not recognize (or did not document) that officers were incorrectly marking the wrong use of force type (five instances), did not describe the force warning used (two instances), and did not describe when resistance and officers' force stopped. Additionally, the sergeant in the case did not create EIS entries for two of the officers and did not address abrasions found on the arm of the subject which were seen in PPB photos. These issues were also not remedied through the chain-of-command review process. Furthermore, it was only after the COCL team noted a lack of follow-up by the RU Manager that resolutions to the Inspector's identified deficiencies were memorialized in EIS. Given the number and range of deficiencies in this event, particularly on the part of the reporting sergeant, we recommend this case be referred for a formal review as part of the accountability process.

Another process failure noted in this quarter was a finding contained within the Quarterly Force Audit Report. In that report, the Inspector stated, "Based on Command review deficiencies, there is a need for attention to ... Command (Lt. - CHO) review of reporting requirements and the necessary corrective action." However, despite this need being identified, we were not provided evidence that it was forwarded to either the policy or training divisions. These two issues require resolution.

As it relates to evaluating the completeness and accuracy of protest-related FDCRs and AARs, we were recently informed that PPB had abandoned its plans to evaluate, from an empirical standpoint, the extent of reporting and investigation deficiencies. The PPB only recently informed us of this decision, citing issues with the resources necessary to review uses of force from the 2020 protests. However, the PPB did not attempt to provide a sampling methodology that could have mitigated the resource issue, despite the COCL noting that sampling would be an acceptable approach. The PPB now plans for the assessment to be included in the forthcoming Critical Incident Assessment required by DOJ in their nine new remedies though this delays fulfillment of Settlement Agreement requirements that should have been fulfilled in prior quarters.

In our prior report, we had noted that PPB was planning to begin training officers on FDCR reporting deficiencies during the third quarter, despite not having a complete understanding of the full nature and extent of these deficiencies. For instance, both the COCL and DOJ noted consistent themes in deficiencies related to descriptions of resistance, use of de-escalation, and sound decision-making (i.e., decision point analysis), among others. Each of these categories of review is found in non-protest quarterly audits and knowledge of specific problems in each of these areas could have informed PPB's training needs. However, the first phase of FDCR and AAR training was completed in September (see Section IV, Training "Crowd Control") without a full empirical understanding of the reporting deficiencies. Therefore, we do not find that the training provided could be considered "appropriate training" (see Par. 33) and subsequently cannot say that these paragraphs have been implemented by PPB. Given the amount of time between the end of the protests and the delivery of the training in which the PPB could have conducted a critical self-assessment, it is disappointing that they chose not to perform the assessment.

15

**Out of Compliance – Paragraphs 70 and 73**

As discussed above, we reviewed After Action Reports from supervisors as part of our normal sampling of force events. In our review, we found consistent compliance with the requirements of Pars. 70 and 73. However, as discussed above, the deficiencies in supervisor reporting and investigation of protest force from 2020 have not yet been empirically identified by the PPB. Of particular interest for AARs would have been an assessment of deficiencies in the categories of Officer Reporting, Legal Justification, and EIS. We look forward to reviewing an assessment of these elements as part of the independent third-party Critical Incident Assessment being planned.

For this report, we also reviewed a sample of use of force events to evaluate operational compliance with the requirements of Pars. 70 and 73. The force events selected represent a cross section of use of force, ensuring that the COCL team reviewed cases from each Precinct and level of force, as well as ensuring that we reviewed events involving persons in mental health crisis, events involving the use of CEWs, and events stemming from protests. As it relates to Pars. 70 and 73, our review indicated that for events during this quarter, supervisors consistently documented a full and candid account from all witness officers, submitted AARs within 72 hours, and made sound judgements regarding whether a case should be referred to Internal Affairs.

**Additional Data Analysis**

We also conducted additional data analyses that provide more insight into the PPB's use of force. These data have implications for the overall management of use of force and we recommend PPB and the City continue to evaluate these trends. We also note that the analyses here do not contain crowd-control uses of force.

*Force Frequency*

In our prior report, we noted that the number of individuals on whom PPB used force was steadily increasing since 2020 Q3, with a low of 142 to a high of 205 in 2021 Q2. Additionally, as indicated by the orange line in **FIGURE 3.1**, the force-to-custody rate had shown a sharp but consistent increase since the first quarter of 2020 up, in part due to a decrease in the number of custodies during the first and second quarters of 2020 (see **FIGURE 3.2**). Since then, there has been a 7% decline in the number of individuals who experienced force by PPB (from 205 to 191), though this still represents a 35% increase from a year ago. Additionally, there was a decrease in the force-to-custody rate compared to the second quarter of 2021, though the rate is still high compared with prior quarters. Furthermore, the number of individuals who were experiencing a mental health crisis when PPB used force decreased from 52 to 36 from Q2 to Q3 of 2021 (a 30% decrease). However, as a proportion, persons in mental health crisis represented 19% of individuals who experienced a use of force event in the third quarter of 2021. This is fairly consistent with all force data from 2017, wherein persons in mental health crisis represent 17% of the individuals who have force used against them. We continue to suggest the Force Inspector consult BHU as necessary to determine ways to decrease the proportion of force events attributed to persons in mental health crisis regardless of the level of force used (see also **TABLE 3.2**).

In response to the prior increases in both force events and force-to-custody rates, the Inspector and audit team looked for potential reasons. In performing their analysis, the unit determined that although raw numbers had been increasing compared with 2020, they were consistent with (and actually lower

than) 2019 force events (see **FIGURE 3.3**). Additionally, the audit team evaluated trends in call priority and call type. For call priority, the audit team identified that while the number of low- and medium-priority calls had decreased, the number of high-priority calls remained relatively consistent, resulting in a greater proportion of calls being high-priority. Furthermore, many of the high-priority call types which showed increases in frequency since 2019 are also associated with events that are likely to lead to use of force, including "Shots Fired," "Disturbance," "Threat," "Assault," "Harassment," and "Domestic Violence." Finally, the analysis commented on why custodies have remained relatively low in the past year, noting "While it is difficult to find any exact reason why custodies went down during 2020 and have stayed low, it should be noted that MCDC changed their booking policies so that only felonies and person misdemeanor crimes are accepted. This could also be impacted by the earlier noted drop in self-initiated calls and the impacts of Covid lockdowns on people's outdoor activity."

In total, we find the analysis conducted by the Force Inspector's team was thorough, covering several topics in addition to the ones here. Additionally, the PPB was transparent with their analysis, providing a summary to TAC members during a Q3 meeting. We point to the process as an example of a positive demonstration of the Force Inspector's role, including the role of identifying trends in use of force, exploring the data further to identify potential reasons, and providing a public summary. While we recommend PPB continue to monitor the situation going into 2022 to ensure that force trends don't begin exceeding 2019 rates, we commend PPB for their execution of this analysis. If not done already, we recommend the PPB forward this report to both the training and policy teams so as to help inform PPB operations, particularly if specific call types have been identified as driving the increases in force events.



FIGURE 3.1



COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

**FIGURE 3.2**



**FIGURE 3.3 (Figure Provided by PPB)**



COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

**Exhibit A**
**Page 18 of 79**

**FIGURE 3.4 (Figure Provided by PPB)**



| | 2019 Q1 | 2019 Q2 | 2019 Q3 | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 | 2021 Q2 |
|---|---|---|---|---|---|---|---|---|---|---|
| High | 29% | 29% | 29% | 29% | 30% | 33% | 36% | 33% | 33% | 35% |
| Medium | 29% | 27% | 27% | 28% | 28% | 26% | 24% | 27% | 27% | 27% |
| Low | 43% | 44% | 44% | 43% | 43% | 42% | 41% | 40% | 40% | 38% |

**TABLE 3.1 (Data provided by PPB)**

| Call Category | Change from 2019 Q1 | % High Priority |
|---|---|---|
| Welfare Check | +1,945 | 46.4% |
| Shots Fired | +661 | 94.7% |
| Suspicious | +580 | 30.9% |
| Disturbance | +419 | 78.0% |
| Vandalism | +378 | 35.5% |
| Threat | +359 | 45.8% |
| Assault | +280 | 59.7% |
| Stolen Vehicle | +257 | 4.3% |
| Harassment | +250 | 10.5% |
| Domestic Violence | +165 | 72.0% |

*Applications per Person per Event*

A single force event can contain multiple applications of force and it is therefore important to not only look at the raw number of events but also how many times officers are using force within a single event (i.e., the number of applications). Since 2017, an officer has used only a single application of force 60% of the time, two applications 23.9% of the time, and three applications of force 11.3% of the time. Therefore, nearly 95% of force events contained three or fewer applications of force, most of which are Category IV force events (see next section). These trends have generally held consistent across time as seen in **FIGURE 3.6** where, aside from a few deviating quarters, the majority of quarters saw approximately 1.66 force applications per officer and per suspect.



FIGURE 3.6



## *Force Categories*

Overall, a majority of force applications have been within Category IV, the lowest level of force available to PPB. While a larger gap is seen in 2018 (approximately 65% Category IV uses of force), from the fourth quarter of 2018 to the present, approximately 50% of use of force events have Category IV as the highest force category used (on average). Additionally, Category III is the highest use of force in approximately 40% of force events, with Category II making up the remaining approximate 10%. As seen in **FIGURE 3.7** over the past three years use of force events where Category IV is the highest use of force have been decreasing and instances where Category III is the highest have been increasing. In the third quarter of 2021 there was only a 4% difference in instances where Category IV was the highest use of force used (42%) and where Category III was the highest use of force used (46%).

20

FIGURE 3.7



When looking at whether the same trends can be seen for persons in mental health crisis, we see a wider gap between Category IV and Category III levels. For persons in mental health crisis over the whole dataset, Category IV is the highest use of force used in approximately 65% of events, whereas Category III events represent 20% of the events. Mental health crisis events involve a Category II use of force as the highest category in approximately 16% of events compared with approximately 11% for persons not in mental health crisis. Therefore, the data is clear that when PPB officers use force against persons in mental health crisis, they do so oftentimes using notably overall lower levels of force. This may be due to a number of factors, including the emphasis on mental health crises over the course of the Settlement Agreement. However, we suggest the PPB examine this phenomenon more closely in coordination with the BHU in order to see whether it is possible to further widen the divide between Category IV and other force categories.

21

**TABLE 3.2**

|  | No Mental Health Crisis | Mental Health Crisis |
|---|---|---|
| Category II | 11.1% | 15.5% |
| Category III | 37.4% | 19.7% |
| Category IV | 49.9% | 64.9% |

**FIGURE 3.8**



### Use of CEW

In reviewing the data, PPB officers appear to use CEW's sparingly given the overall force numbers across the dataset. For instance, in the entire dataset, there were a total of 7,255 events wherein an officer used force on an individual. Of these, the PPB officer used a CEW (at least one application) in 368 of these events or 5.1% of events. Additionally, there was little difference in CEW usage in cases where the individual was perceived to be suffering from a mental health crisis (CEW used in 4.5%) versus cases

22

where they were not (CEW used in 4.2%). Furthermore, in 15 of the 64 events was the person in mental health crisis unarmed, indicating that for the majority of those events, officers are not using CEW against unarmed individuals. In all, the data indicate that PPB officers use CEWs infrequently, although an upward trend was noted related to the number of CEW applications per officer.

**Figure 3.9** displays the number of officers who have used CEWs as well as the number of applications of CEWs in each quarter for the past four years. Since 2017, the average rate of CEW application per officer has been increasing. The average rate has increased from 1.4 in 2018 and 1.43 in 2019 to 1.52 for the first three quarters of 2021. This increasing rate indicates the number of officers using CEWs has remained fairly consistent over time, but the number of applications per officer has been increasing. This increase is found even when excluding 2020. In the first three quarters of 2019 there were a total of 71 applications of CEWs. In the first three quarters of 2021 there were a total of 77 CEW applications, an 8.5% increase.

TABLE 3.3

|  | Force Events with CEW | Force Events with No CEW |
|---|---|---|
| MH Crisis | 64 (4.5%) | 1,374 (95.5%) |
| No MH Crisis | 304 (4.2%) | 5,449 (94.7%) |

FIGURE 3.9



COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

# SECTION IV: TRAINING

During the first two quarters of 2021, PPB did not implement crowd control training as a remedial response to the 2020 protest concerns, which resulted in our reducing the assessment of the City's compliance from Substantial to Partial Compliance for Training. During the third quarter, PPB was able to provide crowd control training to nearly all of its officers, and hence, this training is the primary focus of COCL's assessment of Section IV in this report. Unfortunately, PPB was unable to return to Substantial Compliance as discussed below.

## Overview of Training Systems

COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

## Overview of Methods

The COCL team continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL team also continues to observe training (either in-person or online) and interview PPB staff. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness.

## Assess Training Needs

Paragraph 79 of the Settlement Agreement requires that PPB conduct a needs assessment and use this information to update its training plan annually. We acknowledge that during the third quarter, the Training Division continued to review a wide range of documents, including changes to the law and best practices elsewhere, that might affect PPB's training needs. The 2021 annual Training Needs Assessment was completed in the fourth quarter of 2021, so COCL will comment further in our Q4 report.

COCL assigned Partial Compliance for Par. 79 in our second quarter report because PPB did not update its Training Plan (designed for 2021 training) to reflect the training needs associated with crowd control. Also, the City had yet to outsource an independent assessment of crowd control that would have clear implications for future training. For the third quarter, we credit the Training Division with initiating an internal needs assessment related to crowd control by examining certain PPB data that were available and reports from the Independent Police Review (IPR), Internal Affairs (IA), and the Incident Command System, as well as external reports on protests and/or crowd control from DOJ, COCL, the Training Advisory Council, the Citizen Review Committee, and Homeland Security. PPB also conducted some community interviews and surveyed PPB officers about future crowd control needs. We look forward to reading PPB's assessment of crowd control training needs based on this background work. However, this

assessment was not completed prior to the delivery of crowd control training, as the latter was completed during the month of September, 2021. Thus, PPB remains only in Partial Compliance on Par. 79 until this assessment, along with the external assessment of crowd control, have been completed and successfully applied to the training plan.

## Deliver Appropriate and High-Quality Training

PPB is expected to develop and implement a high-quality system of training for officers and supervisors (see Par. 84). The training must be consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention (Par. 84.a).

PPB was able to produce its Semi-Annual Training Reports in July of 2021, but these reports only cover the trainings delivered in the first and second quarters of 2021. Reports on training delivered in the third and fourth quarters will be completed in January of 2022.

The main focus of this third quarter report is PPB's Crowd Control Training delivered in the third quarter. However, we begin with a brief overview of other trainings that also occurred during the third quarter or developed in the third quarter but scheduled for delivery in the fourth quarter.

**Advanced Academy and Crisis Intervention (Recruit Training).** The Advanced Academy that began in the second quarter was completed in the third quarter (The classes covered were listed in COCL's Q2 report). Of the 29 enrollees, 28 successfully graduated. Importantly, this training included 17 hours of Crisis Intervention Training to supplement the 28 hours they had received from the State's DPSST Basic Academy training – exceeding PPB's 40 hour requirement.

We note that training of new recruits and the retraining of current PPB members will become increasingly important because of the growing number of PPB officers who are retiring or resigning from the Bureau. The loss of institutional knowledge is significant, but it also introduces new opportunities to influence the police culture among new officers. The new civilian leadership position ("Dean") to be created within the Training Division should play a critical role in re-envisioning police training in Portland in the years to come.

**Supervisor and Command In-service Training.** No supervisor or command training was conducted in the third quarter. Supervisory/Command training was implemented in the fourth quarter and will be reported by COCL in the next report. This is important training, not only because these individuals are expected to provide leadership and manage the entire organization, but in crowd control settings in particular, they are expected to make sound strategic decisions, supervise their teams, and later ensure that any force events are properly documented and reviewed for compliance with policy and the law.

**Peer Intervention Training.** Peer intervention training, required by Par. 84, encourages officers to intervene when their peers are engaging in, or about to engage in, harmful actions, such as the use of force against passively resistant protesters. After directive 305.00 on peer intervention was approved and promulgated in the third quarter, PPB introduced the 8-hour ABLE training ("Active Bystandership

for Law Enforcement"), developed by Georgetown University's Law Center.[3] COCL and DOJ have requested a video copy of this Zoom-based training, but PPB did not provide it in time for this report. Hence, we will assess the ABLE training in our fourth quarter report.

*In-service: Online Training*

In the third quarter, PPB continued to provide a range of classes online using its Learning Management System (LMS). A total of 13 classes were delivered virtually (See Appendix A for a list). Some of these were "Tips and Techniques," covering specific topics ranging from ballot measures to utility knives. Others were a continuation of online training from the previous quarter, such as Language Access services or a "recap" of the in-person training on how to perform Emergency Entries (See COCL Q2 for details). Here we provide a quick update on select classes relevant to building community trust.

**Equity Training**. In 2021, PPB's Equity and Inclusion Office (EIO) began developing and posting a series of online equity trainings for all PPB personnel. (We reviewed and summarized several videos produced in our Q1 and Q2 reports). During the third quarter, there were no new equity trainings posted online or conducted in person. However, EIO started the foundational work to develop the next series of LMS equity trainings. EIO equity training videos will reach beyond race/ethnicity to many other identities that have been marginalized, including gender identity, sexual orientation, and houselessness. In fact, the next trainings will be focused on preparing officers to discuss issues specific to the LGBTQIA+ community. To build out this training EIO has been meeting with community members, internal and external workgroups, advisory councils, and non-profit organizations.

In addition to preparing to expand the equity trainings, EIO continued working towards their long-term goal of creating an "equity lens" for all organizational decisions. To that end, EIO has been reviewing training materials as well as attending trainings to ensure they are being delivered with an equity lens. The work to build out the new training series as well as fulfilling the overarching goal of creating an equity lens for all organizational decisions has continued into the fourth quarter. COCL recommends that the Training Division continue to support EIO's plan to integrate the concepts of equity, bias, and procedural justice into all of PPB's trainings.

**Language and Cultural Awareness.** As discussed in the second quarter report, PPB's Office of Community Engagement, in collaboration with some of PPB's advisory councils, produced a number of videos related to interacting with residents that have limited English Proficiency (LEP). While the previously discussed videos cover the more technical aspects of providing interpretation services this video focuses more on the impact of interpretations services. The video focuses on a Somalian refugee and her changing perception of police officers through PPB's outreach programs such as "Shop with a Cop" and the ability to communicate with Bureau members with the assistance of an interpreter. The woman in the video is speaking Somali throughout with an interpreter repeating her words in English, showing the power of interpretation in action. The video concludes with a member of PPB from the Office of Community Engagement stating that PPB members should engage an interpreter in

---

[3] For more information about ABLE, go to: https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/. To give full credit, this ABLE training was originally based on the peer intervention training developed by the New Orleans Police Department.

interactions where there is a language barrier, especially if the interaction will impact an individual's legal rights.

A second video assigned to officers in the third quarter discusses how LanguageLine's *Insight app* works to help LEP individuals. This video was available in the second quarter as well. Officers can use this app on their phone to quickly access audio interpreters in 240 languages and video interpreters in the 35 most requested languages, including American sign language. Officers are shown the steps for one-time authentication, how to request audio or video interpreters, how to manage the conversation, and how to seek technical assistance. LanguageLine has developed a very professional video that should help officers assist diverse communities that face language barriers, improve productivity and build public trust. We encourage PPB to request data from LanguageLine on how often PPB officers are using the Insight app and for what languages. This data will help the PPB determine the supply and demand for specific interpreters, given that LanguageLine is intended as a support system, not the primary response to those with limited English proficiency.

**Traffic Stop App Training.** As noted in prior reports, PPB posted an online video called the "Stops App Update Training," explaining how officers use the app to report various information, including the legal reasons for the stop (e.g., probable cause of a traffic crime or violation, reasonable suspicion of another crime). However, this video does not focus on consent searches and the need to distribute cards (in the appropriate language) explaining the driver's (and passenger's) right to decline a consent search. Such training cannot be introduced until PPB finalizes the policy and prints the cards. COCL will continue to report on this because the traffic stops data collection will not be complete without it.

**Response to Calls Involving Youth.** In the third quarter PPB re-assigned a three-part series of videos that specifically discuss responding to calls involving school aged children at school. This is the same training referenced in the second quarter report, but we clarify the content here because of its importance. As stated in the previous report, PPB covers a lot of information in a very short amount of time and should expand this training.

*Part One.* The first 5-minute video shares that the Youth Services Division has been disbanded and how patrol officers should respond to calls. The video covers three topics. The first is how to manage and mitigate calls at schools including when calls can be resolved over the phone and non-criminal, low-level, incidents that should be handled by school administration. The second topic is a brief discussion on school system-initiated rules on interactions between officers and students. The third topic discussed are the options available to divert calls from the police to other resources such as in-school restorative justice and juvenile justice and the ALBA Collaborative. Related to the topic of diversion the video concludes by discussing how officers can access the ALBA Collaborative which has taken over, from Janus, as the youth related services partner for PPB.

*Part Two.* The second video, which is less than five minutes long, covers how officers should deal with cases of threats, bias crimes, and other significant events. The video discusses what information should be collected about a threat, and what additional steps should be taken if the threat was made digitally, and when an Office of Community Engagement (OCE) sergeant should be contacted in relation to a threat. The video also instructs officers to contact bias detectives, in addition to OCE sergeants, in the case of bias crimes. The video concludes by cutting to a video from 2020 on how officers can access school critical incident plan maps and contact information in response to significant events. It shows officers how to access these important pieces of information through the officer's Mobile Data Terminal (MDT), PPB issued phones, and online.

***Part Three.*** The third video discusses the process for collecting information related to cases of child abuse and when officers should investigate cases of school aged children sharing sexually explicit images with their peers. The video also instructs officers on what types of information should be collected from the victims, how that information should be collected, and how to go about obtaining a warrant in these cases. The video also lets officers know who to contact if they have questions about these procedures and how to report online predatory behavior that does not yet reach the level of a crime. This is all done in one-and-a-half minutes.

### *Overall Assessment of Online Training*

As noted previously, the Training Division has moved nearly half of its In-service training to a virtual format, which underscores the need to ensure that such training is of high quality. The videos we have reviewed are informative and generally the right length. However, the videos on "Response to Calls involving Youth" are densely packed with critical information for officers that should be delivered more slowly. One big challenge ahead is to offer a mixture of virtual trainings that include asynchronous videos, interactive videos (with "click through" questions and quizzes), and live interactions with instructors. The more interactive the videos, the more effective they are at engaging students, but the greater the cost to develop and deliver them. PPB has made a good faith effort to increase interactivity in 2021.

As the body of online trainings continues to grow within the PPB, another problem for students is finding the time to complete the classes and ensure that each video is taken seriously. Officers continue to express concern about the lack of dedicated time to complete these videos during their shift, so additional guidance would be helpful.

Finally, COCL will repeat our claim that certain topics would benefit from a <u>combination</u> of online and in-person formats, where the online portion replaces the traditional in-class PowerPoint presentation prior to the tactical "hands-on" training. PPB has acknowledged agreement with this goal and has initiated some training that is consistent with this philosophy. For deep learning that is stored in memory, students need to: (1) first understand key concepts being discussed in PowerPoints, (2) observe how other officers have translated these concepts into the desired behaviors, (3) be allowed to practice the skills themselves and (4) receive feedback on their individual performance. Most of PPB's current videos are able to achieve the first objective, but often lack the second step, and certainly are unable to achieve the third and fourth objectives. Again, procedural justice and de-escalation training are examples where a combination of online and in-person training would be beneficial. Also, "difficult conversations'' around equity topics would benefit from some real-life conversation beyond factual presentations on videos.

To reach the next level of virtual training, where an elevated level of student engagement and learning is achieved across most online classes, PPB must continue to hire individuals with exceptional technical expertise. During the third quarter, PPB made some progress toward filling the LMS manager position, who could oversee such staffing, but the position was not yet filled.

**VirTra De-escalation and Judgmental Use of Force Simulator Training**. For the last two hours of the In-service training in the spring, officers were given the opportunity to try out the VirTra[4] 3-D simulator to help strengthen officers skills in use of force and possibly de-escalation. As we noted in our Q2 report,

---

[4] [Virtra.com](Virtra.com)

the instructors were disappointed in the frequency of system crashes and the level of effort required to keep the system running. In the third quarter, however, they reported becoming more adept at fixing the electrical and mechanical bugs. They also reviewed the batch of existing scenarios and selected some that align with PPB policy and Oregon state law for possible use in the future.

As we noted in our last report, the VirTra simulator has the ability to go beyond the "shoot-don't shoot" school scenario that was used by PPB during the 2021 In-Service training. COCL has encouraged PPB to identify or develop scenarios that allow officers to practice their de-escalation and procedural justice skills. We have been informed that the Training Division intends to build its own scenarios involving de-escalation for future In-service training, but the timing is unknown, and this is a very labor-intensive task. To achieve this goal, PPB will need to send two instructors to the five-day instructor training program where they would learn to create their own scenarios. However, that has not happened to date. In the meantime, we encourage PPB to consider some of the existing VirTra scenarios that involve de-escalation skills. Although VirTra, per se, is not required for compliance with Par. 84, this type of training could serve to achieve compliance with the requirement for role-playing scenarios and interactive exercises (Par. 84.a.i), as well as the requirement for integrated de-escalation techniques (Par. 84.a.ii).


### Crowd Control Training

In several areas of the Settlement Agreement, the loss of Substantial Compliance has been attributed to PPB's use of force, force reporting, and force review during the 2020 protests. Both COCL and DOJ have been critical of PPB's overall management of crowd control events. Hence, this 5-hour in-person training on crowd control was considered a significant step toward correcting these problems. The components of this training are summarized here, followed by a brief critique.

#### *Chief's Message*

The Crowd Control training began with a video from the Chief of Police. He apologized to the officers for the way they were treated during the 2020 protests and acknowledged that management could have done a better job of providing them with support and being on the front lines with them. He admitted the PPB officers were not trained adequately to distinguish between passive resistance and active aggression when applying force, and that the current training would help to clarify Oregon law, PPB directives, and Temporary Restraining Orders (TROs) from the Courts. The Chief asserts that no other city experienced anything similar to the protests and violence experienced in Portland, but that PPB officers are professionals who must adapt to changing circumstances.

COCL notes that this In-service training is based, in large part, on a memo from the Chief to all PPB members on July 21, 2021 "to clarify the Police Bureau's plans for an event requiring a crowd control response in the immediate future." This memo, with references to specific directives, provides an overview of PPB's roles and responsibilities and seeks to fill a major gap in PPB's crowd control plans after the abrupt resignation of the entire Rapid Response Team (RRT) (See Chief's memo in Appendix B).

#### *Officer Questions and Comments*

Before the training could begin, officers were given the chance to ask questions or make comments. Some officers used this opportunity to express their pent-up frustration and anger about how they have

been treated over the past year. They felt everyone who has any authority or influence over PPB has sided with the protestors and not the officers. They feel their hands have been tied when responding to protests or they have received mixed messages about how to respond. Clearly, morale was low and this was an opportunity for them to have a voice. The facilitator stated that hopefully, this training will help provide some clarity.

### Mobile Field Force Process

The Chief's memo on July 21 specified that, with the resignation of the entire RRT, patrol officers from the precincts will now be called upon to participate in the Mobile Field Force (MFF). Although not part of the original lesson plans for this crowd control training, PPB felt a need to provide some information to PPB members on the revised role of MFF, since patrol officers are likely to be assigned to a MFF unit when needed.[5] While the City Attorney's Office provided some crowd control training to RRT members earlier in the year, as required by Judge Hernández, DOJ and COCL were critical of that training.

Only 30 minutes was allotted for this video-taped session with one of PPB's most experienced Incident Commanders, who covered a wide range of information, including how to define different events (which require different responses), the mission of MFF, and the roles of officers and sergeants in the MFF. Important distinctions were made between planned and spontaneous events, civil disobedience vs. civil disturbance vs. riot, and crowd management and crowd control.[6]

Officers will be called to action as MFF members when events are planned or spontaneous, and will be briefed on the objectives, priorities, constraints, and critical information. MFF priorities can reach beyond life safety and protecting free speech to preserving property and critical infrastructure and managing information. Supervisor responsibilities are many, including receiving and sharing critical information, executing the mission, seeking help when needed, holding officers accountable for force applications, debriefing their squad, and writing appropriate reports (squad reports and After Action reports in force incidents).

A vast amount of essential information was covered in 30 minutes. From COCL's perspective, PPB attempted to cover far too much material in a short timeframe, and because of the video format, students had no opportunity to ask the instructor questions or seek clarification. For example, the training did not address a prior DOJ concern over who would be reviewing force applications by MFF members drawn from other precincts. Also, PPB's decision about whether to have a visible presence at planned protest events remains unclear. We acknowledge that a variety of factors can influence this decision, but because this has been a source of tension in Portland, some of these factors should be discussed. Arguably, this topic is best reserved for supervisor and command-level training, but a set of criteria should be established rather than expressing PPB's current position that it will be decided on a "case-by-case basis" by the Incident Commander.

---

[5] Previously, MFF was used for small crowd control events, while RRT handled larger events.

[6] Crowd management involves planning prior to and during events to keep things under control, including working with event organizers if possible, encouraging self-policing, setting up barriers, etc. Crowd control involves dispersing crowds, trying to de-escalate tensions, and making arrests when activities of individuals have escalated.

Also, we note that this MFF-related training preceded the finalization of PPB's force directive 1010.00 regarding the role of MFF and grenadiers. In general, policy changes should precede training, and as such, additional training will be needed.

Finally, given that special units are a central component of PPB's crowd control strategy, we must caution that the January 2022 revelation about offensive RRT training in the past may affect COCL's future assessment of training if the DOJ proposes additional remedies to address this problem.

*Procedural Justice*

The objective of this 45-minute class, according to the instructor, was to show how procedural justice could be aligned with crowd control. He claimed that PPB has spent too much time teaching <u>external</u> procedural justice (i.e., how the community is treated by officers) at the expense of <u>internal</u> procedural justice (i.e., how officers are treated by the PPB). Therefore, the main focus of the class was giving officers a chance to vent (giving them voice) and then validating their concerns. Officers broke into smaller groups to discuss challenges they faced at work and at home as a result of extended protests and disorder. In the discussions that followed, some described how they felt professionally delegitimized, felt a lack of support from those in positions of authority (inside and outside the PPB), and expressed concern for the safety of their peers and their families.

COCL fully appreciates that Internal procedural justice (also called "organizational justice") is critically important to the effective functioning of organizations and individual officers, as our own research has shown in 88 large American cities[7]. Yet making this the focal point could be problematic in this setting, as some officers in Portland likely experienced psychological trauma as a result of their protracted exposure to verbal and physical assaults during the 2020 protests. That begs the question of whether this class might trigger any PTSD without the proper supports. The instructor asked them to focus on these sensitive issues but did not take it to the next level by discussing where they can receive counseling or even how the administration might have handled the situation differently in terms of internal procedural justice. Furthermore, rather than let officers fully vent, many of the "challenges" were first offered by the instructor, who listed many ways that officers might have been traumatized by these events and be unable to meet their personal or family needs. While the intent was to show empathy to officers, this type of exposure to potentially triggering events deserves a more professional response. No attention was given to mental health counseling or therapy. Officers should be reassured that such counseling is normal, can be effective, and will not jeopardize their employment. We acknowledge that PPB has offered classes previously that discuss employee assistance programs, but it was not covered in this class.[8]

The training eventually turned to external procedural justice (i.e., giving the public voice, respect, and fairness, and building trust), but the central argument put forth by the instructor was that external procedural justice would be particularly challenging, if not impossible, to achieve when facing such negative public perceptions of the police. Considerable time was spent discussing all the challenges to procedural justice (citing research on human bias and media bias) rather than focus on the behaviors

---

[7] Rosenbaum, D.P., & McCarty, W.P. (2017). "Organizational justice and officer "buy in" in American policing", *Policing: An International Journal*, Vol. 40 No. 1, pp. 71-85. https://doi.org/10.1108/PIJPSM-07-2016-0114

[8] Later we were told by PPB that someone was watching the class to see if anyone left the room and may need assistance. Someone was available to intervene if necessary.

needed to achieve it. A distinction was appropriately made between individuals expressing their First Amendment rights and individuals engaged in criminal conduct. But procedural justice should be applied even when arresting someone for criminal conduct. This training did not include any exercises or scenarios to illustrate how procedural justice might be displayed during crowd control environments. Regardless, more attention should have been given to having officers maintain a professional demeanor and intervene with peers who are not acting in a procedurally just manner. The important concepts of de-escalation and avoidance of unnecessary arguments with the crowd were mentioned near the end of the class.

### Crowd Control Policy, TROs and State Law

In this nearly two-hour class, the City Attorney's Office provided a detailed look at PPB's directives on Use of Force and Crowd Control (1010 and 635.10), as well as restrictions on weapons that can be used in crowd control settings, which were imposed by the Mayor, the Courts, and the Oregon legislature (HB 2928). The deputy City attorney did a very good job of navigating a complex and sometimes ambiguous set of restrictions on police actions in crowd control settings.

Directive 1010 on Use of Force is consistent with the Supreme Court's Graham Standard[9] which requires officers to consider a host of factors prior to the use of force, including whether the subject is actively resisting or evading the PPB. The instructor made important distinctions between "passive resistance," "physical resistance," and "active aggression." The instructor gave examples of passive resistance where force is not allowed, such as sitting or standing in place, locking arms, holding a sign, or "slow walking" that ignores a police order. Running or walking away when ordered to stop, or any active or violent attempt to prevent an officer from performing lawful duties, is not passive resistance, and can result in force if "necessary and objectively reasonable."

Officers were also reminded that PPB's Use of Force directive 1010.00 requires "active aggression" before they are allowed to use impact weapons (batons) or impact munitions (FN303 or 40MM), while "physical resistance" is sufficient to use aerosol restraints (OC spray). The training also covered how these devices should be used to minimize harm to the person or those nearby (e.g., no indiscriminate use of impact munitions or aerosol restraints into a crowd). Prohibited crowd control tactics include fire hoses, canines, and conducted electrical weapons (CEWs).

This training also covered the new, but confusing, Oregon law (HB 2928) that severely restricts the use of chemical weapons in crowd control setting to riotous behavior and effectively prohibits the use of kinetic impact munitions. The City had to update their lesson plans (and directives) to incorporate this new law. Rather than focus on the "active aggression" standard for using impact munitions, the City decided to follow a strict interpretation of the new law to avoid officers being charged with criminal conduct, advising that, for now, impact munitions cannot be used in crowd control.

The deputy City attorney also covered chemical weapons and restraints imposed by the Mayor and the federal district court in June of 2020, essentially limiting their use to life-threatening situations and not

---

[9] In **Graham v. Connor**, 490 U.S. 386 (1989), the U.S. Supreme Court established the "objective reasonableness test" known as the "Graham Standard" which dictates that law enforcement officers shall only use force that a reasonably trained officer would use under the "totality of the circumstances." Prior to using force, the officer must assess these circumstances, giving special attention to the severity of the crime, the immediacy of the safety threat to officers or others, and whether the individual is actively resisting or evading arrest.

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

to disperse crowds where there is little or no risk of injury. The instructor gave considerable attention to the temporary restraining order (TRO) issued by District Judge Hernández and subsequent Contempt Order based on TRO violations. These documents address the use of FN303s, 40MM, Rubber Ball Distraction Devices, Aerosol Restraints (handheld aerosol or "pepper spray") and Long Range Acoustical Devices in crowd control settings, as well as dispersal of the press. The instructor integrated and compared the TRO restrictions with directive 1010.00 and provided videos of TRO violations in Portland and videos of force used elsewhere that would have violated the TROs. Consequently, the Chief of Police has prohibited officers from using chemical weapons and impact munitions when engaged in crowd control. However, we note that PPB has yet to revise directive 1010.10 or give written clarity in advance of this crowd control training. In general, training should follow policy, not the other way around.

The "takeaways" from this class were clear. In addition to severe restrictions on the weapons that can be used for crowd control, when considering the use of force in this setting, PPB members must fully understand the distinctions between different forms of resistance and aggression; they cannot use force against passive resistance; force must be based on the behavior of an individual not a group of people; the behavior must be observed rather than predicted or based on speculation, and each application of force must be justified.

Unfortunately, this class - at the heart of the training - is based on problems identified by COCL, DOJ and city officials, not on a thorough internal needs assessment or external critical incident assessment of the evidence regarding what actually transpired during the Portland demonstrations of 2020. The frequency and severity of different problematic applications of force remained largely unknown at the time of this training, thus leaving the instructor without the ability to place emphasis on particular PPB actions that need to be corrected. Also, PPB failed to produce any written standards for the use of grenadiers or MFF members prior to this training. In general, policy should precede training. The instructor should be credited with providing very good coverage of recent court cases and changes in the law, but in the absence of a thorough analysis of the crowd control problems in 2020, was unable to be more specific.

### *Force Reporting for Crowd Control*

This nearly two-hour class covered many of the same topics as the prior class by the City Attorney's Office, such as levels of resistance, the Graham Standard for using force, various levels of resistance, and prohibitions against using certain weapons during crowd control events. We were not concerned about the redundancy because of the complexity of these issues and the need to reinforce this level of critical decision making. Taking it a step further, three tabletop exercises were used with videos to stimulate a discussion about levels of resistance and de-escalation. The videos from Spain and the UK show good and bad police responses to passive resistance. The Portland video – showing a protestor attacking a US Marshal with a hammer – does not require a robust discussion of whether this application of force is reasonable, since the circumstances are extreme.

With a focus on force reporting, attention was given to the importance of describing the actions of the individual (not the group) that justified the use the force, as well as any efforts to de-escalate the situation and provide warnings in advance of the force application. The instructor provided some examples of de-escalation options (e.g., engaging the crowd in a positive manner).

This class also covered After Action reports by supervisors (guided by directives 900.00 and 1010.00), and the responsibilities of supervisors to gather the necessary information on site in a timely manner if possible. Such information would include interviews of officers, subjects, and witnesses, as well as any

videos, photographs, and weapons used. This evidence is needed to prepare a complete and accurate After Action report. PPB members were also informed that supervisors are required to conduct a debriefing at the end of the event (directive 635.13). However, without knowing the true frequency and severity of different problems associated with officers' written force reports (FDCRs) or supervisors' After Action Reviews (due to the absence of a comprehensive internal or external assessment of the demonstrations), no one is able to determine whether the instructor covered the full range of problems in report writing that occurred in this setting.

The class finished with a nod to the principles of procedural justice by emphasizing the need to hear from those against whom force was used ("Voice"), the need for balanced and accurate reporting ("Neutrality") and the need to provide transparent documentation of the details of what transpired ("Trustworthy motives").

## *Conclusions about Crowd Control Training*

PPB and the City provided a densely-packed 5 hours of In-service training on crowd control. The coverage of restrictions on the use of force and weapons during protests was comprehensive and well delivered, and the coverage of force reporting served as a good supplement to this lecture. The coverage of MFF was also strong but forced into a 30-minute video. The coverage of internal procedural justice, designed to acknowledge the harm to officers, was well-intended but ran the risk of creating PTSD experiences without professional support. Furthermore, this training continued to reinforce the belief promoted by several PPB instructors that external procedural justice is nearly impossible in protest settings.

When assessing this training, we find three noteworthy limitations. First, a large amount of material was covered in a limited time period, making it difficult for officers to fully comprehend the implications for their actions on the street. Whether or not officers were able to absorb most of this material is unknown.

Second, and more important, officers did not have any opportunities to translate these concepts and legal restrictions into practice, either with classroom exercises or hand-to-hand interactions with role players, as required by paragraph 84 of the Settlement Agreement. The original plan for this In-service training called for scenarios centered around RRT and how PPB members would provide back-up support to them. However, when the RRT members resigned en masse, PPB had to respond to this challenge very quickly, as the In-service was about to begin. The MFF model was introduced as PPB's exclusive response to fill in the gap, but without any scenario-based training or written guidance on MFF or supervision. Importantly, policy should precede training and PPB failed to provide any written standards for grenadiers or MFF members in advance of this training.

Third, and importantly, this crowd control training was planned and executed in advance of any comprehensive internal or external assessment of the evidence regarding what actually transpired during the Portland demonstrations of 2020. Thus, trainers did not know the true frequency and severity of different problematic applications of force, incomplete force reports (FDCRs) or After Action Reviews by supervisors. As a result, instructors had to rely on general observations by City officials, DOJ, and COCL, rather than particular patterns of problematic behavior that occurred before, during, or after the demonstrations.

Hence, PPB will remain in Partial Compliance until these issues are addressed in future trainings. The City has expressed its intentions to provide scenario-based training after the completion of its internal force audit and training needs assessment, so that any implications for training can be incorporated. The independent critical incident assessment will also result in training recommendations. In any event, for the next round of training, we encourage PPB to include scenarios that distinguish between levels of resistance by protesters and active aggression, as well as provide officers with opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest. We also recommend that PPB train to policy, including policy on the use of grenadiers and MFF units.

Finally, the offensive RRT training in 2018 may affect COCL's future assessment of training if the DOJ proposes additional remedies to address this problem. COCL's job is to assess compliance with the terms of the Settlement Agreement, and those terms may be revised.

**Evaluate Training**

Paragraph 80 requires that PPB "develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum." The COCL team continues to assess the content, methods, and utility of PPB's training evaluations in 2021.

PPB's training evaluation system continues to rely on multiple methods of data collection, analysis and reporting and COCL's assessment of these methods continues to be positive. The Training Division manages to administer in-class quizzes/surveys, anonymous post-class evaluation surveys, knowledge tests, scenario skills tests, and classroom observations. We have reviewed these instruments and methods at various times and have provided PPB with feedback from a scientific, research perspective. Overall, we are satisfied with the methods and measures employed by PPB in 2021.

During the third quarter, the evaluator within the Training Division managed to collect and/or analyze evaluation data for 2021 In-service training, Advanced Academy training, Crowd Control training, and Online training. The evaluator continues to generate internal reports for instructors and managers to help them make adjustments as needed.

COCL has reviewed the evaluation reports and results from the online In-Service training delivered during the first six months of 2021. Overall, PPB members continue to give mixed, but positive ratings to these trainings, ranging from Legal Updates to Officer Wellness. The ratings for trainings in June -- Language Access and Cultural Awareness and Procedural Justice -- were less positive than other online trainings completed earlier in the year. The reasons are unknown. Clearly, with the passage of time, officers expressed growing frustration with the volume of online training in the absence of supervisors offering them dedicated training time, so this sentiment may spill over into the evaluations of more recent classes. For procedural justice, some officers are tired of hearing the basics and want to learn more about how it can be applied to their work, with interactive exercises. These comments are consistent with COCL's recommendations that such classes should be complemented with in-person training scenarios.

Previously we also recommended that online surveys be added to PPB's equity classes. In response, the City's Office of Equity and Human Rights is planning to hire an analyst to perform this function. That has yet to happen, but the position has been posted. In response to our recommendation that PPB take

action to improve the response rates for their online surveys (currently in the 10-20% range), PPB plans to share the survey results with PPB members and for future online training surveys, send out a reminder by email to complete the survey. These actions were not yet taken in the third quarter.

While we are pleased with the work of the Training Divisions analyst, we continue to recommend the hiring of more civilian analysts and information technology staff for the Training Division. We have learned that two individuals have been assigned to help out, but they are only temporary employees.

## Document Training Delivered and Received

Paragraph 81 of the Settlement Agreement requires that PPB create, and that supervisors use, a "*central, commonly-accessible, and organized file system*" for training records. The Training Division continues to use the Cornerstone Learning Management System (LMS) for this purpose. LMS attendance records were updated in the third quarter to include all in-person and online In-service trainings noted earlier, as well as the range qualifications, legal updates, directives, and other online training videos and notices. Records of external trainings continue to be maintained. By reviewing LMS training hours, the Training Division is able to ensure that PPB members remain in compliance with Oregon state standards and have received the training required by PPB.

LMS is used by supervisors and command staff to run transcript reports and ensure that PPB employees who are not on leave are completing their required training. The review and compliance process has not changed, with individuals given 30 days to complete training and sent email reminders at 7 and 14 days after training is posted. Their RU manager is sent emails regarding training delinquencies at 1, 5, and 21 days past the due date. The member is sent email reminders at 1, 7 and 14 days past the due date.

When someone has failed to complete online training in this time period, the Training Division sends a non-compliance memo to the Chief's office. COCL reviewed the non-compliance memos sent during the third quarter and found the following: a total of 56 non-compliance memos (54 sworn and 2 nonsworn) were sent to the Chief's office for 9 different classes. The majority of classes had non-compliance in the 4 to 6 range (with an average of 6.2 employees), with the exception of Bias Crime Reporting class, which had 11 absences. We have asked PPB to provide information on the actions taken by the Chief's office for unexcused absences.

<u>Trainer Qualifications</u>. Per Paragraph 83 and SOP 1-19, PPB is prohibited from selecting trainers "*who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness*," with specific limitations in their work histories over the past five years. PPB did not report hiring any new instructors in the third quarter, so no review by COCL was needed. However, to ensure the delivery of high-quality training in the future, COCL will inquire further about the process of selecting and training instructors. Teaching involves both art and science, with success dependent on having both current knowledge of evidence-based practice and specific pedagogical skills to engage and motivate the students.

## Audit the Training Program

PPB's last formal audit of its training programs (Par. 85) was completed in 2018 – nearly four years ago. COCL continues to recommend that PPB undertake another audit in the near future because of changes that have occurred since 2018 and because of the bigger changes that are planned. As described earlier,

the City and DOJ have tentatively agreed to resolve DOJ's notice of non-compliance in Training by hiring a "*qualified civilian head over PPB's Training Division*." This will have significant implications for the development and delivery of training within the PPB and this individual could benefit from an internal status report on PPB's Training programs and methods of training. The Office of the Inspector General (OIG), who is responsible for these audits, has been extremely busy in 2021 conducting an analysis of force incidents stemming from the 2020 demonstrations. Fortunately, OIG was able to post three job openings in the third quarter, and once those are filled, the OIG office can return to conducting regular audits. COCL's position is that routine audits of PPB's training programs are required by the Settlement Agreement. Hence, to remain in Substantial Compliance with Par. 85, COCL is asking PPB to produce an audit plan by the end of the first quarter of 2022 that can be reviewed and approved by DOJ and COCL.

## Analyze and Report Force Data

Paragraph 86 of the Settlement Agreement requires that PPB's Force Inspector "gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council…" including "problematic use of force patterns and training deficiencies." In turn, the Chief is expected to receive and respond in a timely manner to recommendations from TAC or the Training Division regarding training, policy, and/or evaluation pertaining to use of force patterns.

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). Protest-related force statistics are included at the end of the quarterly reports and on PPB's Open Data Portal, which lists the number and types of crowd control force incidents.

We noted in our last report that PPB was unable to stay current in terms of presenting quarterly force reports at TAC meetings. However, on September 8th, 2021, the Force Inspector was able to catch up by presenting force reports for Q4 2020, Q1 2021, and Q2 2021.

The TAC and the PPB Training Division continue to have a productive relationship. TAC did not observe PPB trainings in the third quarter but did observe the "dry run" for ABLE training and In-service training in the fourth quarter. The Chief's office continues to respond to TAC recommendations in a timely manner.

The two TAC meetings held in the third quarter (July 14th and September 8th) were open to the public as required by Paragraph 87. COCL continues to observe these Zoom meetings and the public has been allowed to listen and make comments. PPB continues to use a public email distribution list to send reminders of the meetings to the public. PPB also continues to post the TAC meeting agendas and minutes on PPB's website[10].

---

[10] http://www.portlandoregon.gov/police/61449

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

**Training Summary and Conclusions**

During the third quarter, PPB was able to deliver Advanced Academy Training, In-service Training on Crowd Control, and Peer intervention training (ABLE), along with a series of online videos. Supervisor Command In-service training did not occur until the fourth quarter of 2021.

The PPB remains in Substantial Compliance for all paragraphs in Section IV (Training), with the exception of Par. 79 (training needs assessment) and 84 (training delivered). Because PPB's response to demonstrations remains a central problem in the City's efforts to achieve Substantial Compliance with the Settlement Agreement, the question remains whether PPB's Training Division has given sufficient attention to crowd control issues as previously defined by COCL and DOJ. We acknowledge that the Training Division has begun a comprehensive review of training needs related to crowd management. We also acknowledge that the City intends to outsource an independent assessment of crowd control that would have clear implications for future training. However, PPB will remain in Partial Compliance on Par. 79 until these assessments have been completed.

By and large, the 5-hour In-service training on crowd control was well executed. The City and PPB sought to be responsive to the concerns articulated by COCL and DOJ, offering good coverage of restrictions on the use of force and weapons during protests, force reporting, and the role of MFF. The coverage of internal and external procedural justice was less praiseworthy and potentially problematic. Overall, the crowd control training was not sufficient to move from Partial to Substantial Compliance for Paragraph 84.

As noted earlier, we have three primary concerns with the Crowd Control training. First, a large amount of material was covered in a limited time period, making it difficult for officers to fully comprehend the implications for their actions on the street. Second, this training provided no opportunities for officers to translate these concepts and legal restrictions into practice, either with classroom exercises or hand-to-hand interactions, as required by Paragraph 84 of the Settlement Agreement. Third, this crowd control training was planned and executed in advance of any comprehensive internal or external assessment of the evidence regarding what actually transpired during the Portland demonstrations of 2020. Also, the training preceded the finalization of PPB's force directive 1010.00 regarding the role of MFF and grenadiers. As a result, PPB will remain in Partial Compliance with Par. 84 until such assessments, policy changes, and scenario-based training are provided.

PPB continues to maintain and expand a series of online trainings with varying degrees of interactivity. We encourage PPB to continue its efforts to address the limitations of video training and not overload officers with too many videos. Consider new ways of (1) offering patrol officers dedicated training time; (2) evaluating what they have learned from these trainings; and (3) linking certain online trainings to scenario-based training, either virtually or in-person. Also, we look forward to learning whether PPB is able to exploit the capabilities of the 3-D VirTra simulator and allow officers to practice their de-escalation and procedural justice skills with noncompliant or antagonistic individuals.

# SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES

In evaluating this section, we continue to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. Par. 88 identifies the City's partners in providing community-based addiction and mental health services: "the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders." As the Settlement Agreement holds no authority over the City's partners, prior reports have evaluated only what the City and PPB can reasonably accomplish. We maintain that evaluative approach in this report.

During the third quarter of 2021, the City and PPB continued to participate in the broader community-based mental health service response system through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

In our last report, we noted the City's steps taken to divert mental health crises away from law enforcement and towards the Portland Street Response (PSR) program. During the third quarter of 2021, the PSR program remained solely in the Lents neighborhood as part of an ongoing pilot test. As part of the program, BOEC maintained their dispatch protocol and, as noted in our prior report, has provided telecommunicators with corresponding training. During the third quarter of 2021, the BHUAC reviewed the new dispatch process and relevant training and did not have any formal recommendations. Additionally, a representative from PSR presented to the BHUAC in August of 2021. The minutes from the BHUAC capture a robust discussion as well as thoughtful comments and suggestions from BHUAC members. However, the minutes also reflect some real concerns on the part of BHUAC members and there was a decision to re-invite the PSR representative to a future meeting (this is currently scheduled to occur in January 2022).

The PSR program is a major development in the City of Portland's response to persons in mental health crisis. As such, the BHUAC can and should play a role in the conception and execution of the program, including the deployment of PSR resources (i.e., BOEC) as well as the actual delivery of the services until such a point that a permanent PSR oversight body can be put together. We therefore maintain our recommendation that prior to expanding the PSR program citywide, the BHUAC take the time to review PSR, BOEC, and PPB policies and training, as well as an October 2021 Portland State University six-month evaluation report on the program's performance and outcomes[11] (because the report was released in the fourth quarter, we will provide a summary of the report in our next compliance assessment). We are aware that the City is also evaluating the current dispatch protocols to determine whether they should change prior to expanding citywide. Where the BHUAC's expertise might be of benefit to the City in this

---

[11] https://www.portland.gov/sites/default/files/2021/psu-portland-street-response-six-month-evaluation-final.pdf

regard, we recommend the City take advantage of such knowledge. We further recommend that the City develop a more permanent PSR oversight body that is not under the umbrella of the PPB's BHU.

Also as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Related to this, PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crisis. Additionally, PPB continues to participate in the Transportation Workgroup. Topics discussed in the third quarterly meeting continued to be related to constraints in diversion from Unity Center due to the State Hospital's inability to admit civilly committed patients. The Workgroup also discussed vaccination efforts of Unity and the County as well as staffing issues with system partners.

40

# SECTION VI: CRISIS INTERVENTION

Section VI of the Settlement Agreement (Crisis Intervention) is designed to facilitate PPB's and the City's implementation of "*systems and resources for responding to persons in mental health crisis*" (see Par. 170). As we have done in the past, we evaluate PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers and Portland Street Response); and (2) Secondary Response (including BHRT and SCT). We also evaluate the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC). We then assess PPB's response to such calls when received. Finally, we examine what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. Consistent with prior reports, we find PPB and the City have maintained their system for responding to mental health crises during this monitoring period.

## BOEC

Most often, the entry point for PPB contact with persons in mental health crisis is through BOEC, the call-taking and dispatch center for Portland. During this monitoring period, BOEC has maintained their Mental Health and ECIT Dispatch Protocol SOP which continues to identify seven call characteristics where an ECIT officer will be dispatched. These characteristics include when there is a mental health component <u>and</u>: a weapon is present, the subject is violent, the call is at a mental health facility, the caller is threatening suicide and has the means to carry it out, at the request of a community member, at the request of another officer, or when the subject represents an escalating risk of harm to self or others.

Currently, BOEC's criteria for ECIT dispatch continue to satisfy the requirements for crisis triage found in Par. 113. BOEC has also recently updated protocols for forwarding calls to the Behavioral Health Call Center (BHCC).[12] No changes to policy were made during the third quarter of 2021 though minutes from the July 2021 meeting indicate that revisions to policy may be occurring in the near future and we will provide updates once we have had a chance to review the draft revisions. We therefore continue to find sustained compliance with this paragraph.

During the third quarter, BOEC provided in-service training for all staff and trainees, including refresher training on ECIT dispatch protocols, PSR dispatch protocols, referring calls to the BHCC, and other topics. Additionally, CIT training for new telecommunicators is scheduled to be delivered in the first quarter of 2022 and we will provide an update in future reports. The July BHUAC minutes indicate that BOEC training was discussed with the advisory committee, thereby allowing some degree of review. However, it does not appear the training material was sent to the BHUAC prior to the meeting, an issue we have also identified with PPB's ECIT training and which we will further discuss in our next report.

The COCL team also reviewed data related to the operation of BOEC, not only in the context of PPB's crisis response but also in the context of other triage options, including transferring calls to the BCCC and dispatching PSR to calls that meet the necessary criteria. Within the third quarter of 2021, BOEC audited a total of 360 calls with a mental health component but that did not receive an ECIT dispatch. In

---

[12] Previously called the Multnomah County Call Line (MCCL)

only 8 of those calls (2.2%) did BOEC's audit later find that sufficient information existed at the time of call to warrant it being dispatched as ECIT. BOEC also assessed accuracy for calls transferred to the BCCC, with 9 out of 106 calls being kicked back to BOEC for ECIT dispatch (we note this may not indicate fault with the telecommunicators decision since BCCC operators may learn additional information warranting emergency response). Finally, BOEC dispatched a total of 179 calls to PSR during the third quarter. In our next report, we will discuss the findings of a Portland State University six-month evaluation report on PSR's performance and outcomes.

## Primary Response Systems

To evaluate PPB's role in the City's system for responding to persons in mental health crisis, we evaluate PPB's current policies, the training received by PPB officers, the enhanced training received by ECIT officers, and the data collection tools and associated data related to PPB's response. PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). For each of these directives as well as relevant SOPs, we have concluded that they continue to substantially comply with the requirements of the Settlement Agreement and have been properly reviewed by the Behavioral Health Unit Advisory Committee (BHUAC). Furthermore, the BHUAC continued their review of PPB SOPs #2-1 and #3-1 related to the operation of the BHU and received requested additional information during the third quarter (though were unable to formally vote on the SOPs).

Comprehensive training on crisis response remains a core competency in PPB and all officers are required to receive a minimum of 40 hours of crisis intervention training prior to graduating from the Advanced Academy (see Pars. 97 and 98). In the third quarter of 2021, the PPB did not begin any new Advanced Academies for new recruits though completed one that began during the second quarter. That Advanced Academy included the necessary crisis intervention training. Additionally, the PPB plans to incorporate crisis response in their 2022 in-service training consistent with their practice in prior years. In light of the training provided to all PPB members, we continue to find PPB has maintained compliance with these paragraphs.

As part of PPB's specialized response system, a select group of officers receive 40 additional hours of training to become Enhanced Crisis Intervention Team (ECIT) officers (see Pars. 99 and 102). The training was slated to be reviewed by BHUAC members in the fourth quarter of 2021 and we will therefore provide an update in our next report. Additionally, the PPB continued their plans for a 40-hour ECIT class scheduled for November, for which we will also provide an update in our next report.

In addition to the training provided, the ECIT program continued to comply with the Settlement Agreement in other ways. For instance, ECIT officers retain normal duties until dispatched as an ECIT officer (Par. 103). PPB has maintained selection and retention criteria that are consistent with Par. 101, and which have been reviewed by BHUAC. As part of their system, PPB reviews the work history for all prospective ECIT officers prior to selection to ensure adherence to selection criteria. Additionally, BHU personnel are notified by the Professional Standards Division (PSD) whenever an ECIT officer receives a complaint based upon use of force or mistreatment of persons with mental illness, thereby ensuring adherence to the retention criteria. Each of these elements demonstrates a comprehensive system with built-in oversight mechanisms.

## Secondary Response Systems

As in past reports, we also assess supplemental/secondary response systems being used by PPB, including the Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT).

When a person is referred to BHRT through the Behavioral Health Unit Electronic Referral System (BERS), the person is evaluated to determine whether they meet the criteria for BHRT intervention. The criteria include whether the person is demonstrating escalating behavior, has had frequent contacts with PPB, is considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. Also, when a person is the subject of three Mental Health Templates (MHTs) in a 30-day period, an automatic Behavioral Health Unit Electronic Referral System (BERS) referral is made for that person (unless a previous referral exists), thereby satisfying the requirements of Par. 110. If a person meets the criteria for BHRT intervention, a plan of action is discussed among members of the Behavioral Health Unit Coordination Team (BHUCT) which includes law enforcement, court, service provider, and hospital personnel, among other relevant stakeholders.

PPB members of the BHRT teams are provided the 40-hour enhanced crisis intervention training and receive specialized training when available (see Par. 109). The selection and retention criteria are consistent with the criteria for ECIT officers. Also, the same process by which PSD notifies BHU whenever an ECIT officer receives a complaint of force or mistreatment against a person with mental illness is applied to BHRT officers as well (see Par. 108).

PPB continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the third quarter of 2021, a total of 215 referrals were made through the BERS system. Of the 215 referrals, 88 (41%) were assigned to the BHRT caseload - a decrease in the percentage of referrals assigned to the BHRT caseload from the prior quarter and slightly below the historical acceptance rates which have generally been between 45% and 55%.

**FIGURE 6.1: BERS Referrals Assigned to BHRT Caseload (Figure provided by PPB)**



BERS Referrals Assigned to BHRT Caseload

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

In the third quarter of 2021, 83 individuals transitioned to inactive status with BHRT. Of those 42 (51%), had previously been on the BHRT caseload. Additionally, this quarter saw that the most common reason for a referral to be assigned was for Escalating Behavior (47%), closely followed by Frequent Contacts (32%). When looking at the outcomes of referral for inactive cases in Q3, the most common outcome was Coordinated Services (22%), closely followed by Concern Mitigated (18%).

The other secondary response system that PPB operates is the Service Coordination Team (SCT). This program continued to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system (see Par. 112). We have long been impressed with the work of SCT and ongoing evaluations have demonstrated the positive impact of the SCT on the clients it serves.

PPB also continued to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people the SCT has served. As we noted in prior reports, the number of referrals significantly decreased between the first and second quarters of 2020 and began to increase slightly in the final quarter of 2020 and continues to increase. For the third quarter of 2021, the increase was much more pronounced (307 individuals) and is now consistent with the number of referrals found prior to the second quarter of 2020 (see **Figure 6.2**). Additionally, the SCT accepted 73% of referrals in the third quarter of 2021 **(Figure 6.3)** which represents a significant increase compared with all other prior quarters. PPB indicates this is the result of a concerted effort by SCT members to reach out and identify individuals who would benefit from SCT services. Therefore, the increase is purposeful for this quarter of data.

**FIGURE 6.2: SCT Individuals Referred (Figure provided by PPB)**



COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

**FIGURE 6.3: SCT Referral Status (Figure provided by PPB)**



As part of SCT operation, the Supportive Transitions and Stabilization (STS) program continued to provide a direct housing resource for BHRT clients. The third quarter of 2021 saw an increase in the acceptance rate with 13 out of 16 referrals being accepted (81%) compared with 79% in the prior quarter. While this is still below the historical rate of approximately 90%, these are small total numbers (e.g., the second quarter had 16 referrals) and we therefore are not too concerned with the prior two quarters. However, we recommend PPB continue to monitor the trends related to SCT and the STS.

**FIGURE 6.4: STS Referral Status (Figure provided by PPB)**



**BHU AND BHUAC**

As an overarching system, the Behavioral Health Unit (BHU) continued to oversee and coordinate the ECIT, BHRT, and SCT programs (see Par. 91). BHU utilizes data from a variety of sources to evaluate its operation, including data from the MHT as well as data collected from BHRT and SCT (see Par. 93). Additionally, in accordance with Par. 92, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, MCCL, BOEC, and BHUAC (see also below). We have met with the Lieutenant who oversees BHU on multiple occasions and are confident that all aspects of BHU (ECIT, BHRT, and SCT) are operating as a comprehensive system rather than individual programs.

The BHUAC continued to act as an advisory body to guide the development of the overall BHU, including the BOEC, ECIT, BHRT, and SCT components. The current BHUAC membership consists of individuals from PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, the Public Defender's Office, CareOregon, AMR, Central City Concern, and the Unity Center for Behavioral Health (see Par. 94).

The BHUAC is required to "provide guidance to assist the City and PPB in the development and expansion of [CIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services" (Par. 95). In the third quarter of 2021, the BHUAC held meetings in July and August, though lost quorum during the second half of the August meeting. Additionally, the September meeting was canceled though this was understandable due to an unforeseen family emergency with one of the committee's critical members. During the third quarter, the BHUAC was able to discuss and approve the Bureau of Emergency Communication (BOEC) plan to train staff on, and implement, the triaging of calls with a suicide nexus within the new ProQA dispatching system. The BHUAC also discussed Portland Street Response (PSR) and the need for an overarching and comprehensive approach to responding to mental health crises. Concerns were also raised by BHUAC members about the need for revisiting PSR's original mission and vision to ensure they are being met.

# SECTION VII: EMPLOYEE INFORMATION SYSTEM

The PPB continued to use the Employee Information System (EIS) as their primary system for identifying potentially problematic members and "*design[ing] assistance strategies to address specific issues affecting the employee*" (Par. 116). However, the PPB continues to be out of compliance with Section VII as PPB has not yet conducted a comprehensive critical incident assessment to explore and remediate the deficiencies in reporting and investigating uses of force stemming from the 2020 protests, thereby leaving a potential for the EIS system to be starved of necessary data if future protest force events suffer from the same deficiencies. Additionally, the Inspector's notifications to supervisors concerning officers with outlying use of force statistics continue to include language that may bias the reviewing supervisor. Furthermore, there remains a lack of follow-up on the part of RU Managers regarding those officers.

We also maintain our position from prior reports that future compliance may be impacted by PPB's ability to ensure that the EIS is "*more effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion*" (Par. 116). Presently, the PPB uses a single-item threshold model based on the requirements of the Settlement Agreement. However, such models come with limitations that PPB will need to consider when evaluating whether the current system is capable of <u>effectively</u> identifying at-risk personnel. For example, depending on patrol areas and shift times, some officers are likely to have more arrests and, as a result, more use of force events. This can cause the EIS to create false positive alerts (i.e., identifying officers who will not actually go on to have an adverse event). When the EIS has a high rate of false positives, it has the potential to undermine the system and challenge the legitimacy of the process (Helsby, *et. al*, 2018).

To protect against false-positives, the PPB incorporates manual safeguards through the EIS Administrators and the supervisor review. Using the assignment and shift example above, several EIS alerts are closed by supervisors without any intervention based on the officer working weekend shifts in the entertainment district, an area that is associated with higher levels of force due to higher levels of disorderly conduct. Although we refer the reader to our assessment of Section III with regards to evaluating the reasonableness of force, the fact remains that supervisors must necessarily take assignment and shift into consideration when determining whether the alert represents a legitimate reason for concern. While we have found that such supervisory decisions have historically been reasonable, the system is still based on subjectivity and is therefore vulnerable to human error.

Relatedly, we note that EIS systems have evolved over time and that the present approach used by PPB is considered antiquated compared with current standards. More recent systems automate the comparison process, either through controlling for similarities in units, shifts, and patrol areas or through weighting variables as part of regression analysis (*see* Gullion & King, 2020). These models have built-in statistical controls for assignment and shift, thereby removing the potential for human error (assuming valid data).

We therefore recommend the PPB evaluate whether its current EIS system is, in fact, more effective than the Bureau's prior approach. However, we note that the thresholds being used in the present EIS are required by the Settlement Agreement. Should the results of a system evaluation indicate the need for shifting models, PPB would not be penalized by COCL for making such changes. Rather, if PPB decided to shift approaches, and the changes are consistent with evidence-based policing, we would recognize this move as a good-faith effort to improve the PPB as a learning organization. We expect such

47

considerations will be included as part of a planned 2022 Q1 initial meeting between PPB, the City, DOJ, and COCL regarding our recommended assessment of the current EIS.


## Maintained Compliance – Par. 120

Paragraph 120 requires that PPB "*identify and train a second EIS administrator.*" During the third quarter of 2021, the Bureau eliminated the PSD Lieutenant position which included the responsibilities of the second EIS administrator. While the EIS continues to have had the same primary administrator and analyst for the past several years (thereby maintaining institutional knowledge), the elimination of the PSD Lieutenant position required the Force Inspector to step in and act as the second administrator. PPB acknowledges this is not a long-term solution though stated the Force Inspector received the necessary training to act as the second administrator in an interim capacity. As we have previously reported, this training is conducted via a comprehensive operations manual—including SOPs for the handling of EIS alerts, entries, and responses—in accordance with Par. 120. We therefore find that PPB has maintained compliance with Par. 120 though recommend they continue seeking to implement a longer-term solution.


## Remaining Out of Compliance – Pars. 116, 117, 118, 119

As noted above, the PPB remains out of compliance with the core EIS paragraphs (116-119) for two underlying reasons. The first reason is that the force data feeding into the EIS algorithm was fundamentally flawed, an issue that remains potential for future events and which we discuss further in Section III of this report. Once PPB conducts a comprehensive review and implements remedial actions, we believe this issue will be resolved and will no longer impact compliance.

The second reason was that most members identified by the Force Inspector as being outliers in their use of force did not have any supervisor review documented in the EIS despite the manual alert. This continued to remain in the third quarter of 2021. There continued to be a lack of information about what happened to these officers after the notification as the RU Manager responses did not contain any information about possible interventions that were implemented as a result of manual alerts. For instance, one officer had eleven FDCRs in the second quarter[13] while having 35 arrests, resulting in a force-to-arrest ratio of 31.4%. Additionally, the PPB's quarterly force summary report indicates a total of 475 uses of force Bureau-wide for the second quarter, meaning one officer was responsible for 2.3% of the entire Bureau's uses of force for the quarter. Despite this, the Force Inspector appeared to dismiss the risk, stating, "I have examined [Officer's] force numbers going back to Q2 2020 and have found nothing to indicate this is a trend and I do not have concerns regarding [their] use of force at this time."

This type of exculpatory language continues to be an issue and negates the very purpose of an EIS system. An officer who does not appear to have a history of high force rates but is suddenly responsible for 2.3% of the entire Bureau's use of force is exactly the type of situation that warrants closer review to determine if personal or work stressors are leading to potentially problematic behavior. However, the reviewing RU Manager was informed by the Force Inspector that there is no need for concern and the RU Manager did not address the issue in the response back to the Force Inspector (indicating no action was taken with the officer). This operational failure renders the manual alert process essentially

[13] The data analysis was conducted in the third quarter on second quarter data

meaningless if determinations of validity have been made even prior to going to the RU Manager. We recommend the Force Inspector sends alerts without commentary or, if the manual alert process is so regularly invalid, create a new approach. We anticipate this will also be part of upcoming meetings between COCL and the Parties during the first quarter of 2022.

For the remainder of this section, we discuss data and outcomes related to EIS thresholds, alerts, and associated outcomes. PPB continued to collate data from a variety of sources, including force events and traumatic incidents (captured in Regional Justice Information Network (RegJIN)) as well as complaints and commendations (captured in Administrative Investigations Management (AIM)). These data are then used to identify potentially problematic behavior in the form of predetermined thresholds, some of which the Settlement Agreement defines, including when:

- <u>Shift Force Ratio</u>**:** A sworn member's force ratio is greater than or equal to three times their shift's average ratio in the preceding six months
- <u>Force Ratio</u>**:** A sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six months
- <u>Force Count</u>**:** A sworn member uses force three or more times in the preceding thirty days
- <u>Criminal Complaint</u>**:** A member receives a complaint with an allegation of criminal misconduct
- <u>Complaint in Same Category</u>**:** A member receives two or more complaints with at least one allegation in each complaint being in the same category such as two complaints that both have conduct allegations for events in the preceding six months
- <u>Complaint Count</u>**:** A member receives three or more complaints for events in the preceding six months
- <u>Traumatic Incidents</u>**:** A member experiences three or more traumatic incidents in the preceding thirty days (traumatic incidents are events related to child abuse, deadly force, homicide, officer being assaulted, suicide, and/or traffic fatality)
- <u>Commendations</u>**:** A member receives two or more commendations for events in the preceding six months

In the third quarter of 2021, EIS Administrators reviewed a total of 403 alerts and sent 229 (56.8%) on for RU Manager review (see Figure 7.1). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts <u>closed</u> in the third quarter of 2021 (which may also include cases opened in prior quarters), there were 246 alerts sent to the RU Manager and for 210 (79.8%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the third quarter of 2021, a substantial majority (76.2%) resulted in some type of intervention for the officer. The information provided by PPB indicates that most of the interventions involved a debriefing though one officer was placed on a monitoring plan. As discussed above, the PPB now has sufficient data to evaluate the EIS's effectiveness in identifying members as well as the effectiveness of the interventions PPB has conducted to-date. As the majority of interventions PPB has utilized have been debriefs with the member, PPB will need to ensure that the debriefs have been effective. We will work with PPB in the coming quarters to design an appropriate evaluation approach.

**FIGURE 7.1: EIS Alerts and Alerts Sent to RU Manager (Figure provided by PPB)**



**TABLE 7.1 – EIS Alerts and Interventions**

|  | 2020 Q3 | 2020 Q4 | 2021 Q1 | 2021 Q2 | 2021 Q3 |
|---|---|---|---|---|---|
| Alerts Sent to RU | 338 | 277 | 237 | 209 | 263 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 108 (32%) | 80 (28.8%) | 142 (59.9%) | 137 (65.6%) | 210 (79.8%) |
| Interventions (Percent of Alerts Sent to RU) | 84 (24.9%) | 70 (25.3%) | 106 (44.7%) | 100 (50.7%) | 160 (60.8%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 84 (77.7%) | 70 (87.5%) | 106 (74.6%) | 100 (73%) | 160 (76.2%) |

In accordance with Par. 116, PPB Directive 345.00, and PPB Directive 215.00, supervisors also continue to evaluate officers' EIS and Performance Discussion Tracker (PDT) information (1) annually as part of an officer's performance evaluation, and (2) upon transfer of an officer to a new command. PPB's quarterly audits of reviews for this quarter (as required by Directive 345.00) indicated an overall decline in

50

compliance with the required reviews (see **FIGURE 7.2**). PPB indicates this is likely due to a disruption in the email reminder system resulting from the elimination of the PSD Lieutenant position. While understandable, we note that the decline in compliance is not equally shared across RU Managers. For instance, the Chief's Office completed 10 out of 18 required reviews (55.6% compliance), the lowest compliance rate out of any of the RU Managers. Although the email reminder system is a good practice for straggling reviewers, the requirement to conduct the reviews is still codified in PPB policy and therefore where large-scale non-compliance is found, remedial action should be taken. For prior quarters with reduced compliance, we note that PPB has historically taken steps to return to high compliance rates by the next reporting period. We anticipate this will be the situation here, though will provide an update in our next report.

**FIGURE 7.2: Compliance with Reviews Directive 345.00 Reviews (Figure provided by PPB[14])**





---

[14] In the chart provided by PPB, they use Settlement Agreement paragraph numbers as the key. For clarity, Par. 116a relates to the regular review of subordinates, 116b relates to "new to command" reviews, and 116c relates to the combined reviews.

# SECTION VIII: OFFICER ACCOUNTABILITY

We continue to measure Section VIII (Officer Accountability) through the lens of five elements of a functional accountability system: access, timeliness, consistency, transparency, and a system of checks and balances. While we assess these individual components below, there remains an overall concern with PPB's accountability system given the inconsistency in force reporting and force justification found from the 2020 protests. Many of these issues have also surfaced in the administrative investigation process since investigators have had to rely on deficient reporting in making their findings. These issues have also impacted Police Review Boards (PRBs) which, as described below, have operated with varying degrees of effectiveness during the crowd control hearings we have observed. Ultimately, we remain concerned with PPB's ability to hold officers accountable for violations of policy, as required by Par. 169. The City and PPB will need to resolve these issues through remediation of the crowd-control deficiencies as well as safeguard against these issues with the new oversight board being developed.

## Access

Portland's accountability system continued to remain largely accessible to community members, allowing complaints to be filed in a multitude of ways. These include community members' complaints to the Independent Police Review (IPR), community members' complaints to PPB, IPR initiated complaints, and PPB-initiated complaints. Community members can file a complaint by phone, online, or in-person (either to PPB or IPR).[15] For most complaints, IPR continued to conduct intake investigations and determine whether to initiate additional investigation proceedings or not.

Despite the increase in the number of administrative complaints received during the second and third quarters of 2020 associated with the racial justice protests, the overall number of administrative complaints has continued to be the lowest since 2011 (the earliest year in IPR's dashboard - see **FIGURE 8.1**). As seen in **TABLE 8.1**, the largest quarterly number of complaints was by far the second and third quarter of 2020 when the protests were at their peak. However, since then, the number of complaints has significantly declined, leading to 153 complaints through three quarters of 2021 despite prior years having nearly 400 complaints.

**TABLE 8.1**

---

[15] Although the IPR cannot currently take in-person complaints due to COVID restrictions, the ability to file an in-person complaint remains a codified option for community members. We therefore maintain that in-person complaints represent one manner of access into the accountability system.

52

| Quarter | Community-Initiated | Bureau-Initiated | Total |
|---|---|---|---|
| 2020 Q1 | 67 | 16 | 83 |
| 2020 Q2 | 116 | 24 | 140 |
| 2020 Q3 | 98 | 13 | 111 |
| 2020 Q4 | 55 | 13 | 68 |
| 2021 Q1 | 51 | 14 | 65 |
| 2021 Q2 | 56 | 6 | 62 |
| 2021 Q3 | 46 | 7 | 53 |

**FIGURE 8.1**

**Total Complaints Received**



COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

**Exhibit A**
**Page 53 of 79**

In total, the evidence indicates that the accountability system remains largely accessible for community members and that community members are willing to utilize it. The accountability system must also be utilized by PPB and IPR when allegations of misconduct require investigation. For instance, as it relates to Par. 129, we reviewed allegations of excessive force which were administratively closed during the third quarter to ensure that the allegations had no basis in fact as required by Par. 129. In the third quarter, there were seven allegations of excessive force administratively closed though we note three of them had been previously closed. These three were re-opened in hopes that additional information about the officer or event became available during criminal review of the officer. For six of the seven administratively closed cases, the information available to IPR was insufficient to begin an investigation. While IPR SOP 2.3 (Section III) says that a force allegation will not be administratively closed solely because the officer cannot be identified, a lack of other information can be used to justify administrative closure. The remaining force allegation that did not receive a full investigation was closed out due to a lack of investigative merit based on video evidence demonstrating the allegation had not basis in fact.

However, we find there are times when PPB and the City have not utilized the accountability system as required, particularly for low-level infractions that would still require formal review. For instance, in our last two reports we have discussed an event wherein a community member alleged excessive force but the allegation was not forwarded to IA for investigation because the responding supervisors believed the subject was making an allegation of injury (which was then reviewed and addressed by the chain-of-command). Although we were informed that an investigation of the force has now since occurred, PPB has not opened any investigation on the supervisors who failed to correct the deficiency during their review of the event, despite supervisors having received refresher training on the issues in the Spring of 2018. As noted in our last report, each supervisor in the chain-of-command was given an EIS entry for the technical violation, despite EIS being non-disciplinary by policy as well as the overall nature of EIS systems. This issue is also discussed in our assessment of the Use of Force section above, and was present in chain-of-command reviews of FDCRs and AARs from the 2020 protests. While we find in general, PPB and IPR continue to utilize the accountability system for incidents that may lead to formal discipline, low-level infractions are not consistently subjected to the system.

## Timeliness

The ability of PPB and IPR to complete administrative investigations within 180 days continued to fall short of substantial compliance with the requirements of Par. 121. This trend has continued in the most recent quarter though primarily for IPR. Previously there had been an increasing trend in the percentage of IA full investigations that exceed the 180-day timeline (see **TABLE 8.2**) though overdue cases for IA were only at 5% in the first quarter of 2021 (the last quarter for which 180 days could have passed). This is a positive shift and is consistent with quarters prior to the protests. However, we will need to continue to monitor this to ensure it remains a low percentage in upcoming quarters. Alternatively, IPR had each of their two cases opened in the first quarter of 2021 go over the 180-day timeline. In discussing with IPR, they informed us that they have been able to clear out their backlog and are on track for all newly opened cases to be completed within the 180-day timeline though barriers continued to remain during the third quarter of 2021. In conversations with IPR, we heard that several barriers had impacted their ability to complete cases within 180 days. These include delays in being able to interview officers (due to protected leave) and IPR staffing shortages. Despite these barriers IPR feels confident in their ability to investigate cases in a timely manner though we will need to see this reflected in the data.

**TABLE 8.2 (Table provided by IPR)**

### Percent of Cases Over 180 Days (Tolled for Criminal Investigations Only)

|  | 2019 Q1 | 2019 Q2 | 2019 Q3 | 2019 Q4 | 2020 Q1 | 2020 Q2 | 2020 Q3 | 2020 Q4 | 2021 Q1 |
|---|---|---|---|---|---|---|---|---|---|
| IA Admin Closures | 0% | 0% | 0% | 25% | 0% | 0% | 0% | 0% | 0% |
| IA Investigations | 7% | 14% | 3% | 4% | 3% | 14% | 20% | 19% | 4% |
| IPR Admin Closures | 0% | 0% | 0% | 0% | 0% | 4% | 16% | 0% | 0% |
| IPR Investigations | 0% | 0% | 43% | 40% | 50% | 92% | 82% | 50% | 100% |

## Consistency

For this report, we evaluated twenty administrative complaints to ensure that whichever investigative path the complaint took, the complaint was investigated fairly, timely, comprehensively, and that findings were supported by a preponderance of the evidence. We conducted this analysis using cases that were either administratively closed, referred for a supervisory investigation, referred to the precinct, or received a full investigation. Overall, the cases we reviewed achieved the standards laid out in the Settlement Agreement.

However, we continue to hold an eye towards the future as it relates to the consistency of Portland's accountability system. In our prior report, we commended the City for identifying 20 community representatives who would serve on the planning commission for the new board and would influence the transition between IPR and the new board. In July of 2021, the members were selected, representing four groups:

- Members of historically overpoliced communities
- Organizations providing support to over-policed communities
- Community justice organizations
- Small business owners

Despite being selected in July, the members did not meet for the rest of the quarter and therefore no progress was actually made in developing a new accountability system during the third quarter. We note that the charter amendment which began this process was passed in November of 2020 and that since then, very little progress has been made aside from selecting who would be on the committee and hiring a staffer to oversee the committee[16]. At the same time, IPR informs us that they have lost employees due to attrition and the potential for future losses remains. We have recommended the City create an interim plan to account for such attrition and the potential for IPR resources to become overly strained. No interim plan has been provided either and there has been no effective resolution to the issue. We continue to recommend an interim plan be developed so that the City does not find itself in a situation where the PPB becomes the sole avenue for handling administrative complaints.

One thing which we look forward to observing is how the planning committee discusses what the future iteration of the Police Review Board (PRB) may look like given the issues we have identified in the past

---

[16] See https://www.rethinkportland.com/police-oversight

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

and which continued during the third quarter of 2021. In PRBs we observed during this quarter, there were instances in which incorrect standards were applied, the actions of the crowd were used as justification for force against an individual, and PPB members were not held to the standards of PPB policy. We have also observed that fact that there is seemingly no "official narrative" despite there being a completed investigation into the matter. Therefore, the hearings will often spend considerable time on details that have already been investigated. Rather than using a set of facts and determining whether those set of facts violate a written policy, the hearings become a separate investigative process unto themselves. As discussed above, this at times leads some PRB participants to ignore actual policy and instead use mitigating circumstances not only in determining discipline but also as vehicle to vindicating the officer altogether (i.e., recommending findings of not-sustained). We recommend that the new planning committee address this concern in deciding how discipline is imposed and what types of information is allowed to be considered when making a disciplinary recommendation.

## Transparency

Overall, the transparency of Portland's accountability system has remained consistent since our last report. Community members remain able to track the progress of their complaints (see Par. 138) and IPR continued to provide updates in writing at each stage of the investigation (see Par. 140), including a community member's ability to appeal findings. The Findings letters provided to community members clearly state the finding as well as the rationale for the finding. Updates and information for appeals are provided for both community members and officers.

Citizen Review Committee (CRC) appeal hearings and other CRC functions remain open to the public with accompanying minutes posted to the IPR website. Meetings continue to be held over Zoom as a result of the pandemic and we continue to find that the transition to virtual meeting space appears to have allowed for broader community observation and input, thereby enhancing transparency. Additionally, redacted summaries of Police Review Board (PRB) hearings continue to be provided on the PPB website. Finally, IPR analytical reports and online data related to misconduct complaints, individual allegations, houseless arrests, and officer-involved shootings/in-custody deaths remain available on the IPR website,[17] allowing interested parties to learn the facts and conduct their own assessment. Overall, we maintain that the combination of these efforts points to an accountability system that is largely transparent.

## System of Checks and Balances

The accountability system in Portland continued to contain a system of built-in checks and balances to facilitate a fair resolution for all involved. For instance, prior to an RU Manager's findings on an allegation, IPR (as well as the IA Captain) continues to have the ability to review the investigation report and can request an additional investigation or a rewrite of the investigative report (Assistant Chiefs also have this ability after the RU Manager provides findings). Additionally, after an RU Manager makes findings, IPR reviews those findings and has the ability to controvert the findings (as do IA and the Assistant Chiefs), thereby sending the case to the Police Review Board (PRB) for a vote on a recommended determination.

---

[17] IPR Website: https://www.portlandoregon.gov/ipr/76848

Community members and officers continue to be able to appeal administrative investigation findings to the Citizen Review Committee (CRC), an eleven member review board that "*hear[s] appeals from complainants and officers and publicly report[s] its findings*".[18] Consistent with the requirements of Par. 136, CRC members continue to hold the ability to request additional investigations and interviews and postpone the hearing until a time when such information could be included in the review. Coupled with our observations of CRC meetings in the past, as well as our ongoing review of their public reports, we maintain that the CRC conducts their hearings in a fair and impartial manner (see Par. 134). There were no CRC appeal hearings during the third quarter of 2021.

An additional system of checks and balances can be found in the Police Review Board. When there is a sustained finding that will lead to discipline involving suspension or greater, when there is an officer involved shooting or in-custody death, or when there is a controverted finding, the PRB takes the RU Manager's proposed findings and either adopts the proposed findings or provides their own proposed findings and corrective action to the Chief (who makes the final decision on findings and corrective action). We document our concerns with the PRB operation in our discussion of "consistency" and recommend PPB and the City resolve these issues immediately.

We continue to note that not all CRC members have conducted a ride-along with PPB officers as required by the Settlement Agreement to serve on the PRB. We therefore maintain our recommendation that all members should conduct a ride-along or the City should implement another method of learning about police work. Particularly given that CRC members serving on the PRB are making decisions about an officer's career, a solid understanding of police work is necessary. For instance, in one of the PRBs we observed in this quarter, the CRC representative indicated a lack of understanding of *Graham v. Connor*, the constitutional basis for evaluating use of force. Ride-alongs (which we also suggest being incorporated as a required refresher component at regular intervals) would offer an opportunity for officers to provide clarification for non-sworn community members on this issue as well as other common issues they are likely to face in the course of participating in disciplinary proceedings.

## Additional Data Analysis

As part of this report, we conducted additional data analyses that provide additional insight into the accountability system. For our analysis, we reviewed data on all complaints opened since January 1, 2020. We perform these analyses as they have implications for the overall management of the accountability system and we recommend PPB and the City continue to evaluate these trends.

### *What are the most common allegations?*

As shown in **Figure 8.2**, for the past seven quarters four allegation categories have been the most represented in the dataset provided by IPR. These include allegations related to Conduct (30% of the dataset), Procedure (26.6%), Force (24.4%), and Courtesy (12.5%). The other allegation types found in the data include Disparate Treatment (3.7%), Control (1.9%), and "Policy Issue" (1.0%). Nearly all allegation types showed a decline during the third quarter except Force, which increased from 19 allegations in the second quarter to 28 allegations in the third quarter.

---

[18] Among other functions – see: https://www.portlandoregon.gov/ipr/53654

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

**FIGURE 8.2**



_What are the most common outcomes?_

Allegations can take a number of paths, the first of which is an intake investigation conducted by either IA or IPR. A substantial number of allegations end here, as 40.2% of the allegations in the dataset were administratively closed by IPR or IA for one of the following reasons:

- Clear and Convincing Evidence
- Complainant Unavailable
- Judicial Remedy
- Lack of Investigative Merit
- No Jurisdiction
- No Misconduct
- Third Party Complainant
- Trivial/Lack of Good Faith
- Unidentified Employee
- Other Remedy

However, a slightly greater proportion of allegations (41.8%) were referred for full investigation, with the remaining allegations having other outcomes, such as Supervisory Investigations, Precinct Referrals, or Mediation, as shown in TABLE 8.4.

**TABLE 8.4: Outcome of Investigations**

|  | Number of Cases (Q3) | Percent of Cases (Q3) |
|---|---|---|
| Full Investigation | 483 (43) | 41.8% (43.9%) |
| IA Administratively Closed | 83 (12) | 7.2% (12.2%) |
| IPR Administratively Closed | 381 (28) | 33.0% (28.6%) |
| Supervisory Investigation | 118 (7) | 10.2% (7.1%) |
| Precinct Referral | 55 (4) | 4.8% (4.1%) |
| Pending Finding | 30 (4) | 2.6% (4.1%) |
| Mediation | 6 (0) | 0.3% (0%) |

As shown in Table 8.5, the rate by which allegations receive a full investigation has fluctuated over the past seven quarters, with the highest proportion receiving a full investigation being 48.8% in the fourth quarter of 2020 and the lowest proportion being 25.4% just two quarters later in 2021. As we have noted in our prior report, some of this fluctuation stems from protest-related complaints, which received full investigations over 60% of the time. While it's potentially concerning that only one in four allegations in the second quarter of 2021 received a full investigation, we note that this percentage increased to 43.9% the next quarter.

**TABLE 8.5**

|  | Full Investigation | Other Outcome | Total |
|---|---|---|---|
| 2020 Q1 | 86 (48.3%) | 92 (51.7%) | 178 |
| 2020 Q2 | 116 (40.7%) | 169 (59.3%) | 285 |
| 2020 Q3 | 98 (45.6%) | 117 (53.9%) | 215 |
| 2020 Q4 | 62 (48.8%) | 65 (51.2%) | 127 |
| 2021 Q1 | 45 (36.6%) | 78 (63.4%) | 123 |
| 2021 Q2 | 33 (25.4%) | 97 (74.6%) | 130 |
| 2021 Q3 | 43 (43.9%) | 55 (56.1%) | 98 |

As shown in Table 8.6, differences across outcomes based on allegation types also continue to show in the data. For instance, force continues to be administratively closed at a low rate due to Par. 129 of the Settlement Agreement allowing administratively closure only in situations where the allegation has no basis in fact. Additionally, Courtesy allegations remained the least likely to receive a full investigation, doing so for only 5% of allegations. This is because Courtesy allegations, even if proven to be true, are not likely to result in discipline – thus, they represent the largest proportion of Supervisory Investigations/Precinct Referrals (44.3%).

TABLE 8.6

|  | Administratively Closed (Q3) | Supervisory Investigation or Precinct Referral (Q3) | Full Investigation (Q3) | Number of Cases (Q3) |
|---|---|---|---|---|
| Conduct | 40.9% | 7.5% | 45.7% | 372 |
| Courtesy | 49.1% | 43.2% | 4.6% | 153 |
| Force | 22.6% | 0.0% | 75.2% | 302 |
| Procedure | 51.4% | 24.0% | 24.0% | 329 |

*Numbers may not add up to 100% based on other possible outcomes, including Pending Finding which may be related to either a Supervisory Investigation or Full Investigation.

**Lethal Force/In-Custody Death**

Finally, PPB's accountability system has particular requirements for after the occurrence of lethal force and in-custody death events. Because of the sensitive nature of such events, PPB is required to safeguard the integrity of such investigations through a number of actions. For instance, first responding supervisors separate all witness officers and involved officers (see Par. 125), conduct initial interviews individually (rather than as a group), and have a phone-tree to ensure all necessary notifications are made. Detectives conduct on-scene walk-throughs and interviews with select witness officers (see Par. 126) as well as request walk-throughs and interviews with involved officers (though involved officers have historically invoked their right to decline) (see Par. 127).

After conducting their on-scene investigation, investigators interview all witness officers and then provide them with Communication Restriction Orders (CROs) to prohibit direct or indirect communication with anyone involved with the event until a grand jury has been convened, at which point the CROs are rescinded (see Par. 125). Involved officers are then required to participate in an interview with IA investigators within 48 hours of the event (unless a voluntary statement was already given on-scene, or the member is incapacitated) in order to inform the IA investigation. Pursuant to *Garrity v. New Jersey*, the administrative and criminal investigations are walled off from one another (see Par. 124), thereby maintaining the Fifth Amendment rights officers have against self-incrimination. The administrative and criminal investigations are also conducted concurrently in accordance with Par. 122.

During the third quarter, there were three OIS events and in two of them, all of the above steps were followed. However, during one officer-involved shooting event during this quarter, the sole witness

officer did not provide an on-scene walk-through and interview due to the officer asserting emotional trauma from the event. Citing officer incapacitation, the homicide detectives waited to interview the officer until the next day, with IA investigators then interviewing the officer a week later. In communications between the City, PPB, DOJ, and COCL, we were informed that the trauma being exhibited by the officer as a result of the OIS was not something the detectives had seen before and the detectives on scene made the decision to delay interviewing the officer until they were in a more stable mindset.

The interview of the witness officer did not occur as required by policy (see Directive 1010.10, Sections 2.1.7.1.2., 2.1.2.4, 2.2.2.1, and 2.2.2.2). However, the actions of the criminal detectives and PSD investigators may be understandable given their on-scene assessment of the officer and their assessment that an interview was not immediately necessary due to the availability of other evidence (including a civilian witness). Additionally, there is the potential for Section 2.2.2.1 of Directive 1010.10 to be interpreted as applying to mental health though we recommend PPB clarify this in policy (see also the next paragraph regarding protocols for assessing this). Furthermore, we note that this situation is not one that had occurred prior to this event nor in any of the OIS's since the event, thereby making it a singular occurrence. We therefore do not believe the PPB is out of compliance with the requirements of the Settlement Agreement.

However, this does not mean PPB will not need to account for this possibility in the future. As with all other things, we recommend the PPB and the City create updated policies and standards when current policies and standards do not provide sufficient clarity. For example, while the decision of the detectives may be understandable, there is no protocol for assessing when the officers' actions or statements should lead detectives to consider the officer "injured" in the context of the officer's mental health (see section 2.2.2.1 of Directive 1010.10). Furthermore, policy would also need to be updated with a documentation requirement for similar situations.

Finally, we note that the officer's legal counsel argued that if the officer was compelled to speak with detectives given their emotional state, it could be a violation of the officer's 5th Amendment rights. We do not comment on the firmness of this legal position though recommend the City Attorney's Office provide guidance to the Bureau on this issue. Again, although this appears to potentially be an isolated event, the City and PPB must now be prepared should it occur in the future.

# SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

## PCCEP's Role in the Settlement Agreement and the City's Support

### System Overview

Section IX of the Settlement Agreement requires that the City establish a Portland Committee on Community Engaged-Policing (PCCEP, Par. 141), which is authorized to: (a) solicit information from the community and PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns (Par. 142), with other specific duties set forth in a separate Plan for PCCEP.

PCCEP's membership must come from a reasonably broad spectrum of the community, and members shall not have an actual or perceived conflict of interest with the City of Portland (Par. 143). PCCEP shall meet as needed to accomplish their objectives and hold regular Town Hall meetings that are open to the public. The City shall give advice on Oregon's Public Meetings Laws and similar requirements as necessary (Par. 151) and shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law (Par. 152).

Per Pars. 141 and 142, PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations.

In the third quarter of 2021, PCCEP continued monthly general meetings and subcommittee meetings via Zoom. Highlights of PCCEP's work as a full committee in the third quarter include approving a response to Judge Simon regarding the status of the Settlement Agreement, approving three recommendations, co-hosting a town hall on COCL's Q1 report, and discussing development of a three-year strategic plan for PCCEP, including updated metrics and goals for PCCEP's work.

PCCEP adopted three recommendations in the third quarter: A recommendation regarding data transparency (specifically, public release of all FDCRs)—developed jointly with the Citizen Review Committee and the Training Advisory Council and approved at the July PCCEP meeting; recommendations related to codification of PCCEP approved at the August PCCEP meeting; and elevating the recommendations of the Citizen Review Committee regarding 2020 protests at the September PCCEP meeting. Per the Amended PCCEP Plan, "*The City shall provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days.*" At the close of the third quarter, the City had not formally responded to these recommendations. These delays were due to turnover and changes in staffing within the Mayor's Office.

63

In July, Portland City Council held a work session on PCCEP's second quarter recommendations regarding core patrol services; PCCEP's co-chairs engaged with all five Council members in a discussion of the recommendations. Commissioners expressed general support for the recommendations; PCCEP's co-chairs asked to return to City Council later in 2021 to secure formal approval of the recommendations—or a subset of the recommendations—and advance them to implementation, a request agreed to by the Mayor.

PCCEP's subcommittees focus on Youth, Behavioral Health, Racial Equity, and Settlement Agreement and Policy. In addition, a PCCEP steering committee meets monthly. In the third quarter, the Behavioral Health Subcommittee hosted a discussion with police officers regarding PCCEP's Core Patrol Services recommendations, reviewed five PPB directives, and brainstormed future topics for the subcommittee's work. The Youth Subcommittee heard a presentation on youth-related work within the Portland Police Bureau and discussed reviewing PPB directives as they relate to youth. The subcommittee also discussed additional outreach and recruitment to bolster the subcommittee's membership. The Racial Equity Subcommittee discussed outreach to Portland's communities, and committee leaders worked to line up a presentation on PPB's stops data, planned for the fourth quarter. The Settlement Agreement and Policy Subcommittee also reviewed several police directives and discussed the City's compliance with the Settlement Agreement and related mediation. The Steering Committee continued to set agendas for the full PCCEP meetings, and also discussed topics such as PCCEP's strategic planning and metrics. The committee also discussed restructuring as a committee comprised of the chairs of PCCEP's other subcommittees.

## City's Support

The City's role is to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions. Paragraph 144 states that "*The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.*"

As noted in our first two quarterly reports this year, support in posting information about PCCEP meetings for the benefit of the public—including timely posting of PCCEP meeting videos, recordings, and meeting minutes—has been inconsistent. The Amended PCCEP Plan says, "*Agendas and minutes from all PCCEP meetings will be published on the City website within 10 business days after the meeting date.*"

Record keeping and timely posting improved significantly in the second quarter, and that improvement continued into the third quarter, with videos posted to PCCEP's YouTube channel within days of the meeting's date. However, several PCCEP meeting records were posted to another YouTube channel (not linked to PCCEP's webpage), and on a delayed timeline; COCL has provided technical assistance, urging PCCEP staff to ensure everyone has access to PCCEP's YouTube channel for posting, and suggesting all recording be consolidated on PCCEP's YouTube channel, for ease of public access. Written meeting minutes continue to be difficult to locate on PCCEP's website, with three sets posted for the entirety of the third quarter (two youth subcommittees, and one full PCCEP meeting).

In the third quarter, PCCEP highlighted challenges with the workload the committee's volunteers are shouldering, as well as challenges with PCCEP recruitment. One of PCCEP's co-chairs rotated off in the

third quarter, as did a second member, both citing personal obligations and time constraints. A remaining alternate declined to become a PCCEP member, citing time constraints. Going forward, PCCEP and its staff need support from the Mayor's office and City Commissioners to bolster recruitment for this important body.

Staff changes in the Office of Equity and Human Rights also impacted supervision of PCCEP's staff, with the office's Equity and Operations Manager taking on other duties, and a previous supervisor with significant institutional knowledge of PCCEP's work resuming her role of supporting the PCCEP staff team.

PCCEP support from the Mayor's office also underwent changes during the third quarter. COCL met with the Mayor's Director of Strategic Innovations during the third quarter to discuss their office's PCCEP liaison duties. A senior adviser for community safety joined the Mayor's team on September 1, and attended many of PCCEP's meetings that month. A policy advisor who had led the Core Patrol Services project with PCCEP transitioned out of that role with PCCEP, with the community safety advisor leaving the Mayor's office as well. The Mayor's Director reiterated the Mayor's commitment to PCCEP and noted the value the group provides in weighing in on significant issues like Core Patrol Services. The Mayor's office aspires to coordinate a work plan with PCCEP that outlines key upcoming decisions with enough lead time for PCCEP to meaningfully engage as desired. As noted above, COCL also urges the Mayor's office to take a lead role in bolstering recruitment for PCCEP, to maintain the body's functionality. However, the staffing changes in the Mayor's office and the Office of Equity and Human Rights may impact PCCEP's functionality in the next quarter.

In general, we find that PCCEP continued to represent a "*reasonably broad spectrum of the community*," (Par. 143) with at least six of 12 members who served in the third quarter identifying as a person of color and/or an immigrant; five of 10 identify as female or non-binary. Representation of people with experience as peer support specialists or other personal, lived and/or professional experience with mental health issues is less clear, based on publicly shared information. However, many of PCCEP's current members volunteer with other community groups or nonprofit boards related to mental health, the justice system, or underrepresented communities, bringing in additional perspectives to PCCEP's work.

In this quarter, COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland. PCCEP's overall functioning remains consistent with the expectations and requirements of Paragraph 143.

At least one representative of the City Attorney's Office attends PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings law, and the City continued to train new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all City advisory boards. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

In summary, PCCEP continued to function well overall, and the City remains in Substantial Compliance in relation to PCCEP, with the exception of Par. 144, where the City remains at Partial Compliance. We recommend that the City continue to show improvement in the timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. Furthermore, the City will need to make a concerted effort to bolster recruitment for

65

PCCEP membership, which represents a persistent challenge. The functionality of the PCCEP is in jeopardy if the City continues this pattern of providing inconsistent support due to staff turnover.

## Portland Police Bureau's Role in Public Engagement and Outreach

### System Overview

As described in Paragraph 145, PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. In addition to a one-time community survey, PPB is required to develop and implement a Community Engagement Plan (Par. 146). PPB is also required to collect demographic data about the community in each precinct to assist the Precinct Commanders and PCCEP with their community engagement plans (Par. 147). To help measure possible discriminatory policing, PPB officers are required to continue collecting data on race, age, sex, and perceived mental health status of persons they stop and share this information with the PCCEP and the public (Par. 148). In cooperation with COCL and DOJ, PPB has completed the one-time requirement to develop a general set of metrics to evaluate community engagement and outreach by PPB (Par. 149). Finally, PPB must issue an Annual Report (with certain content), with a draft reviewed by PCCEP, and then present a revised report to the public at Precinct meetings and before the City Council (Par. 150).

### The Community Engagement Plan

Paragraph 146 requires that PPB develop a Community Engagement Plan (CEP) with input from PCCEP (Par. 142). COCL continues to use the CEP as a framework for assessing PPB's progress on community engagement under the Settlement Agreement. Below is a brief status report on the Plan's four components: Public involvement, Communications, Access, and Training.

**Public Involvement.** The CEP specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

In the third quarter, PPB worked with specific advisory groups, including its "Community and Culturally Specific Councils" and its "Operational Councils."[19] The Coalition of Advisory Groups (CAG) held bi-weekly meetings with the Chief's office during this period, and the Latino Advisory Council met monthly. Minutes for most meetings are not publicly available[20], but as we noted in our last report, PPB's advisory groups are not subject to the Oregon Public Meetings Law, and therefore, are not required to produce minutes. Nevertheless, we have met with the co-chairs of the CAG, listened to their concerns, and have suggested that the CAG or their member advisory groups provide periodic summaries of their meetings for the benefit of the public. PPB's Operational Councils, such as the Behavioral Health Unit Advisory

---

[19] See PPB website for details: https://www.portlandoregon.gov/police/30379

[20] For some advisory groups, PPB was able to show us a list of scheduled meetings hidden under the "DOJ" section of PPB's website (https://www.portlandoregon.gov/police/62607), but links to most of these meetings or documentation of past meetings could not be located.

Committee, the Equity Advisory Council, and the Training Advisory Council, continued to meet regularly and post their meeting results on the PPB website.

**Communication.** The CEP specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. In the third quarter, PPB continued to use social media to communicate with the public and used other mechanisms such as press releases, emails, brochures, and presentations to reach the public. With the transition to the new City website expected in the fourth quarter, we hope that PPB will provide regular updates about the topics/issues discussed by specific advisory groups. Although minutes of advisory meetings are not consistently posted, we commend the PPB for generating a monthly list of "Community Engagement Events" that includes the type and number of events, the number of community and police attendees, and the names of any organizations involved.

**Access.** The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

We continue to report that PPB's language access plan, directive, and training were not developed in this quarter because PPB is still waiting for the City to implement a city-wide process of recruiting bilingual employees as interpreters. However, PPB has worked with community members to develop videos to educate all PPB members on how to respond appropriately to individuals needing language access services.

**Training.** The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

PPB continues to make progress toward achieving these goals. State-of-the-art LanguageLine software is being used by officers to communicate with anyone who has limited English proficiency. As noted earlier, bilingual officers have been identified and all officers received some online training in how to access certified interpreters through LanguageLine.

PPB's Office of Community Engagement continued to engage community members with diverse cultural backgrounds and one training video was developed in the third quarter. Similarly, the Equity and Inclusion Office continued to work on new equity trainings, although none were released in the third quarter.

In sum, during the third quarter PPB continued to implement its Community Engagement Plan by maintaining partnerships with community organizations and advisory councils and seeking their help with various forms of cultural training for PPB.

*Data Collection, Analysis, and Reporting*

PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par. 147-150). The PPB continued to report demographic data pertinent to each precinct (Par. 147) and post them on their

website.[21] For the public and research community, the PPB continued to provide a wide range of data, maps, and interactive dashboards on its website.[22] We continue to give PPB high marks for its data analytics and transparency around reporting.

PPB continued to collect demographic data from individuals who are stopped by PPB (Par. 148) using its Stops Data Collection Application. While PPB has begun to collect additional data to better understand the racial disparities that are present in stops and searches, including information on consent searches, PPB is still working to complete the following tasks: (1) distribute cards in five major languages that explain the desire to conduct a search and the community member's right to refuse; (2) change their search policy or SOP to reflect these changes; and (3) train officers in how to document the search process in the field. With the help of advisory groups from diverse communities, PPB was able to finalize the content of the search cards during the third quarter and improve the original translations in five languages. The next steps are to make relevant policy revisions and train officers on the consent searches.

In terms of data analysis and reporting requirements, PPB's Strategic Services Division continued to produce the quarterly Stops Data Collection reports. The first three quarterly reports were released prior to this publication and are briefly summarized here to examine trends.

First, although the total number of stops increased significantly in the first quarter, PPB has since recorded a dramatic decrease each quarter from 4,871 in Q1 to 3,537 in Q2 to 2,285 in Q3. This trend is consistent with PPB's desire to focus traffic enforcement on life safety issues (e.g., speeding) rather than minor vehicle issues (e.g., broken taillight). Furthermore, the number of individuals stopped who were perceived by PPB to have a mental health issue remained steady around 1% of the total in the second and third quarters.

However, the 2021 data continue to show racial disparities in traffic stops.[23] **Table 9.1** shows three quarters of data for Black/African American drivers. Black/African American drivers make up only 5.8% of Portland's population but continue to be stopped at nearly three times this rate. On a positive note, there has been a slight improvement over the past two quarters (1 percentage point drop). These improvements occurred in the North and Central precincts during the third quarter (although disparities still exist), and among Traffic Division officers. In contrast, the East precinct remains consistently high. Not only are Black/African American drivers stopped well above their rate in the population (20.6% of stops vs 5.6% of the population), the East precinct accounts for 59% of all stops citywide yet makes up only 37% of the city's population.

This quarter we decided to include a brief analysis of stops involving Hispanic/Latino drivers, since they comprise nearly 10 percent of Portland's population. As shown in **Table 9.2**, the disparities are much smaller here. Hispanic/Latinos make up 9.7% of the population and 11.8% of all stops in the third quarter. Only the Central precinct exhibited a noticeable disparity, with only 6.2% of the population being Hispanic/Latino, yet accounting for more than 11% of the stops in the second and third quarters. Similar to the data on Black/African Americans, Traffic Division officers are showing improvement, while

---

[21] https://www.portlandoregon.gov/Police/article/780347

[22] https://www.portlandoregon.gov/police/71673

[23] We continue to focus on traffic stops (not pedestrian stops) since they account for 99% of all stops in Portland.

the Non-Traffic Division officers (who account for the vast majority of stops) are showing no gains, and in fact, are showing greater disparities over time with the Hispanic/Latino population.

Again, we encourage PPB and the community to continue monitoring these enforcement actions, discuss any concerning patterns, and explore solutions.

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

**TABLE 9.1 Traffic Stops by Precinct and Division: Black/African American Drivers**

| Precinct | Percentage of Population that is Black/African American[24] | Percentage of Stops with Black/African American Drivers[25] | | |
|---|---|---|---|---|
| | | Q1 2021 | Q2 2021 | Q3 2021 |
| Central | 2.9% | 15.9% | 14.4% | 13.6% |
| East | 5.6% | 20.2% | 20.4% | 20.6% |
| North | 8.8% | 20.2% | 18.1% | 12.8% |
| Traffic Officers | NA | 12.8% | 12.8% | 9.7% |
| Non-Traffic Officers | NA | 21.5% | 20.6% | 19.9% |
| Citywide | 5.8% | 18.9% | 18.3% | 17.7% |

---

[24] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB report at https://www.portlandoregon.gov/Police/article/780347

[25] Source: PPB's 2021 Stops Data Collection reports at https://www.portlandoregon.gov/police/article/783756, https://www.portlandoregon.gov/police/article/785651, https://www.portlandoregon.gov/police/article/797190

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

**TABLE 9.2 Traffic Stops by Precinct and Division: Hispanic/Latino Drivers**

| Precinct | Percentage of Population that Hispanic/Latino[26] | Percentage of Stops with Hispanic/Latino Drivers[27] | | |
|---|---|---|---|---|
| | | Q1 2021 | Q2 2021 | Q3 2021 |
| Central | 6.2% | 9.9% | 11.4% | 11.2% |
| East | 12.0% | 11.2% | 11.1% | 11.9% |
| North | 10.2% | 13.5% | 10.8% | 11.9% |
| Traffic Officers | NA | 12.1% | 13.1% | 9.9% |
| Non-Traffic Officers | NA | 10.9% | 10.6% | 12.4% |
| Citywide | 9.7% | 11.2% | 11.3% | 11.8% |

For Paragraph 149, the City has completed the requirement to develop a set of metrics to evaluate community engagement. While these general metrics have been used to guide community engagement efforts, they do not provide specific data on policing outcomes. To measure the quality of police-community interactions for all encounters, body-worn cameras will be helpful if the City can acquire innovative software that is able to scan for problematic patterns in audio and video data and generate reports for supervisory review. Also, we continue to recommend that PPB reintroduce contact surveys

[26] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB report at https://www.portlandoregon.gov/Police/article/780347

[27] Source: PPB's 2021 Stops Data Collection reports at https://www.portlandoregon.gov/police/article/783756, https://www.portlandoregon.gov/police/article/785651, https://www.portlandoregon.gov/police/article/797190

71

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

to give the community a voice as the City seeks to determine the level of procedural justice exhibited by PPB officers during police-community interactions. These two data sets provide a foundation for futuristic, evidence-based police agencies.

Par. 150 requires PPB to "issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities." PPB is required to provide a draft of the annual report to PCCEP "for review and comment before the report is finalized and released to the public." Once the report is released, Par. 150 calls for PPB to "hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters."

During the first half of 2021, PPB's 2020 Annual report was drafted, reviewed by PCCEP, edited, and posted for public comment. To complete the requirements of Par. 150, PPB needed to: (1) broadly announce the three precinct meetings where it discussed the 2020 annual report, (2) facilitate these meetings, including a discussion of the full range of topics required by Par. 150, and (3) present the findings from the 2020 annual report to the City Council. These remaining events occurred in the third quarter. First, unlike the 2019 Annual report, precinct meetings were announced through a variety of outlets—PPB shared the report event announcements through a media release on August 4, Facebook posts on August 3 and 16, and Twitter posts. The social media announcements were also shared by community organizations like League of Women Voters, and neighborhood groups. The meetings were held via zoom on August 17, 18, and 19, and PPB shared the recordings[28] and a link to the Chief's presentation deck on August 20 via Facebook.

Second, the Chief of Police and a local precinct Commander facilitated the meetings with the community, and the Chief adequately covered the range of topics required by Par. 150. He used this opportunity to discuss PPB's recent accomplishments around community engagement (new units and training on equity), but also the many challenges that PPB faced in 2020[29], including the protests and PPB's problematic use of force and problematic review of 6,000-plus applications of force (as documented by COCL and DOJ). In terms of bias, the Chief acknowledged disparities in stops and highlighted improvements in training (on implicit bias and equity) and street-level enforcement (encouraging officers to focus on dangerous driving habits rather than less serious offenses, such as minor equipment violations). In terms of "*a civilian's responsibilities and freedoms in such encounters*" (Par. 150), the Chief noted that civilians do not have to consent to a search and that cards will be distributed in five languages explaining this right. In each precinct, the Commander or representative described some of the local challenges they are facing (e.g., street racing, gun violence), and listened to concerns of local residents (from houseless camps to the diversity and residency of PPB members). Using questions in the "Chat," some good exchanges occurred.

---

[28] PPB's YouTube recordings of Annual Report precinct meetings:
https://www.youtube.com/playlist?list=PLLaHQOlhmiRqsVE0b-bt3lgzGuPXTsSLY

[29] Beyond the protests and civil unrest, these challenges included budget cuts, staff shortages, resignations, elimination of special units, cancellations of trainings, increases in homicide and gun violence, and slower response times to calls for service.

Third, the Chief presented the annual report to the City Council. This occurred on August 18th, after one precinct meeting, but before the other two meetings. Community members have asked on several occasions that the City Council presentation be delayed until the PPB has received feedback on the report from each of the precincts. Although this request is not a requirement of the Settlement Agreement, we encourage the PPB to heed this recommendation in the future. Alternatively, we encourage the City Council to allow for public comment after PPB's presentation.

In sum, we are satisfied that PPB has met the requirements of Par. 150, and therefore, has returned to Substantial Compliance.

## Summary of PPB's Community Engagement

PPB has maintained its systems of community engagement as it continues to implement its Community Engagement Plan. The Office of Community Engagement continued to partner with diverse communities through existing and new advisory councils. PPB's Operational Councils (such as the Behavioral Health Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council) meet regularly and have current postings on the PPB website. Although not required by law, we encourage PPB's advisory groups (Community and Culturally Specific Councils) to keep the public informed of the issues being discussed.

PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. During the third quarter, PPB was able to meet the requirement to share and properly discuss its annual report with community members in each precinct and the City Council, thus returning to Substantial Compliance for Par. 150.

PPB continued to produce quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. The traffic stop data for Q1, Q2 and Q3 2021 were examined for Black/African American, and while showing a slight reduction, the East Precinct continues to exhibit the largest disparity. Looking at stops of Hispanic/Latino drivers for the first time, we see disparities, but much smaller than for Black/African American, with the largest disparity in the Central District. Again, we encourage PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns.

To address these concerns, PPB introduced the new Stops Data Collection app at the start of year to collect additional data about stops, and provided some preliminary training to officers, but the full program has yet to be implemented. Nearly all of 2021 was spent translating the consent search cards into five languages. We look forward to the completion of the full program, including revisions to policy, training on search protocols, and implementation.

## Overall Assessment of Section IX

Although PPB has experienced some delays and challenges with community engagement, their overall plan has been implemented with fidelity. Similarly, PCCEP has continued to function fairly well despite certain obstacles. However, per Paragraph 144, PCCEP members and PCCEP staff need more consistent support from the City to ensure that meeting minutes are posted in a timely manner and that PCCEP is able to maintain full membership in the face of vacancies. With this support, we expect that the City will return to Substantial Compliance for all paragraphs in Section IX of the Settlement Agreement.

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**BHRT:** Behavioral Health Response Team

**BHCC:** Behavioral Health Call Center

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CAG:** Coalition of Advisory Groups

**CCO:** Coordinated Care Organization

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COCL:** Compliance Officer and Community Liaison

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DHM:** Davis, Hibbitts, & Midghall, Inc. Research

**DOJ:** Department of Justice

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**PCCEP**: Portland Committee on Community Engaged-Policing

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PS3:** Public Safety Support Specialist

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**YSD:** Youth Services Division

# <u>LIST OF PERSONNEL</u>

Chief of Police: Chuck Lovell

Deputy Chief of Police: Michael Frome

Assistant Chief of Operations: Brian Ossenkop

Assistant Chief of Services: Michael Leasure

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Jeff Bell

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Chris Lindsay

Behavioral Health Unit (BHU): Casey Hettman

EIS Supervisor: Ron Mason

EIS Administrator: Dan Spiegel

Training Captain: Christopher Gjovic

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

COCL Quarterly Report: Quarter 3 Updates & Analysis, July 1, 2021 to September 30, 2021

# APPENDIX A

## LMS Online Training Quarter 3

Training provided July 1, 2021 to September 30, 2021

2021 Online In-Service Language Access - LanguageLine

2021-8 Tips and Techniques Ballot Measure 110 - Update

Directive 0640.80, Bias Crime Reporting (effective 09/02/2021)

2021 Training Emergency Entry Recap Video

2021 PIO Twitter Basics

Directive 0414.00, Pregnancy and Lactation Accommodations (effective 07/31/2021)

2021 City of Portland Bloodborne Pathogens Link - www.portlandoregon.gov/sf

2021-7 Tips and Techniques Bureau Issued Utility Knives

2021 Online In-Service Directive 870.25 Holding Rooms

Directive 750.00, Bureau Cooperation with the Federal Bureau of Investigation's Joint Terrorism Task Force

2021-9 Tips and Techniques Protecting Workers from the Dangers of High and Extreme Heat

2021 Training Response to Calls Involving Youth

2021 Online In-Service Language Access - LEP Testimonial

# APPENDIX B

## Memo from Chief Lovell to PPB Personnel

**From:** Lovell, Charles <Charles.Lovell@portlandoregon.gov>

**Sent:** Wednesday, July 21, 2021 5:12 PM

**To:** AllPPBUsers <AllPPBUsers@portlandoregon.gov>

**Subject:** PPB Response to Crowd Control Events

In the absence of the Rapid Response Team, the Police Bureau continues to explore various options for addressing crowds moving forward. In the meantime, we want to clarify the Police Bureau's plans for an event requiring a crowd control response in the immediate future.

If there is a need for police resources to address a crowd, traditional Mobile Field Forces from the patrol precincts will be designated to respond. The precinct of occurrence shall designate an incident commander, pursuant to Directive 635.10. CMIC resources remain available if necessitated by the scale of the crowd event and the police response.

Any members who use force or take action requiring a police report shall submit those reports to a home precinct supervisor that has been designated as the crowd control after action supervisor for the shift. Those supervisors will in turn draft the use of force after action. The force after actions will be routed through the normal precinct chain of command to the Force Inspector or Chief's Office, pursuant to Directive 1010.00.

The incident commander will draft an overall after action report addressing the incident, pursuant to Directive 635.10, section 13.1. This after action is intended to address the overall police response to the incident, rather than evaluating the individual uses of force.

Members should re-familiarize themselves with Directive 635.10 and 1010.00 prior to responding to assist in a Mobile Field Force capacity. Below are highlighted several vitally important sections of the directives:

Directive 635.10

Section 1 - Directive 1010.00, Use of Force, governs all uses of force, including in crowd management and crowd control situations.

Section 5.3.1. When police action is necessary, members should endeavor to distinguish between individuals engaged in criminal behavior and demonstration or event participants who are peacefully and lawfully demonstrating.

Section 12.3. To effect arrests, members must be able to articulate the individualized probable cause for the arrest of each person.

Section 13.4.1. Members who use force, or witness force by another member during the incident, shall document such actions in an appropriate police report, in accordance with Directive 1010.00, Use of Force.

Directive 1010.00

Section 4.1. Members shall not use force against people who engage in passive resistance that does not impede a lawful objective.

Section 11.1.1. Members shall immediately notify a supervisor regarding any use of force…

Section 11.1.4. All members involved in a Category II through IV use of force shall submit use of force reports in a timely manner, which include a candid and detailed account of the event, to facilitate a thorough review of the incident in question by supervisory members. Involved members shall submit use of force reports prior to the conclusion of the shift, unless incapacitated. Involved members shall report all uses of force whether or not the subject is struck or affected by any weapon.

Section 11.1.6. All members who witness any use of force shall provide a candid and detailed verbal account of the event at the scene. Members who witness a Category I through III use of force shall also submit appropriate reports in a timely manner, which include a candid and detailed account of the event, to facilitate a thorough review of the incident in question by supervisory members. Witness members shall submit reports prior to the conclusion of the shift, unless incapacitated. Witness members shall report all uses of force whether or not the subject is struck or affected by any weapon.

Members should also closely review the entirety of section 6 of Directive 1010.00, which spells out the authorized and restricted uses of each type of force.

We recognize that there has been a great deal of conversation about the use of force in crowd control environments. Beginning in September, Training Division will be conducting refresher crowd control training for all members of the organization. As part of that training, the City Attorney's Office will help to clarify any lingering questions or confusion surrounding the directives, case law, or the various temporary restraining orders currently in effect.

Thank you all for your flexibility and dedication as we work through these challenging times.

Chuck