**Juan C. Chavez**, OSB #136428
Email: jchavez@ojrc.info
**Franz Bruggemeier**, OSB # 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

        Attorneys for *Amicus Curiae* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        Plaintiff,<br><br>    vs.<br><br>CITY OF PORTLAND,<br><br>        Defendant. | Case No. 3:12-cv-02265-SI<br><br><br>MEMORANDUM IN RESPONSE TO PLAINTIFF'S MOTION FOR ORDER APPROVING AMENDMENTS TO THE SETTLEMENT AGREEMENT |

## I. INTRODUCTION

As stated in the Plaintiff's Motion, Dkt. 276, *amicus curiae* Mental Health Alliance

("MHA") joined the other parties in not opposing the addition of the remedies announced in

Plaintiff's Exhibit 1, save for two provisions. MHA took no position on Paragraphs 191 and 194,

and requested that the Court only conditionally approve these paragraphs pending further

developments of policy and implementation. MHA provides this briefing for the following purposes:

1. Comment on Section XI and the Settlement Agreement as a whole;

2. Explain why only conditional approval is appropriate for:

> a. Paragraph 191: the "Training Dean" provision; and

> b. Paragraph 194: the "Body Worn Cameras" provision;

3. Respond to the Court's suggestion for the appointment of a special master or court monitor.

## II. PROCEDURAL AND SUBSTANTIVE FACTS

In August 2021, the Plaintiff presented to the Court a plan to address the City's non-compliance with the settlement agreement. Plaintiff proposed an outline of remedies that could be negotiated over the course of several mediation dates with the Honorable Magistrate Judge Stacie Beckerman. The Court also suggested the parties consider the appropriateness of appointing a special master in the case.

At this hearing, MHA presented their initial impressions of the Plaintiff's proposed remedies. MHA supported many of the proposals but expressed hesitance to endorse them without more details. MHA also expressed that Paragraphs 89 and 90 of the Settlement Agreement had yet to be complied with and addressing those would also be an adequate remedy for the City to come back into compliance.

The parties spent the next two months negotiating "Section XI" of the Settlement Agreement with Judge Beckerman. We returned to the Court in November 2021 to report on our progress. Plaintiff and Defendant agreed on the then-proposed Section XI but the *amici* expressed skepticism.

Enhanced-*amicus curiae* Albina Ministerial Alliance Coalition for Justice and Police Reform ("AMAC") and MHA both explained that the absence of expectations for a Body Worn Camera policy undermined the purpose of Section XI, which was reducing unconstitutional uses of force and ensuring accountability to those officers using excessive force. AMAC expressed concern about the "accountability" component of Section XI, Paragraph 192, which appeared to neglect a mandate to investigate and hold accountable line officers who violated the constitutional rights of protesters during the 2020 uprising for Black lives and the sergeants who failed to provide proper use of force training, authorized unlawful force, or failed to correct unlawful uses of force. MHA joined in AMAC's concern on that regard.

MHA also raised their belief that the provisions of Section XI did not effectively hold the City accountable for its civil rights violations in 2020 and did not advance the rights of persons living with mental illness in Portland. On the latter point, MHA expressed deep concern that Section XI would be used to leverage more funding for police instead of pro-social community programs like Portland Street Response.

The *amici* reconvened with the Plaintiff for an additional session of mediation and added an additional line regarding IPR's continued obligation to investigate and discipline officers whom violate the law and PPB's directives.

In January 2022, the public and many of the parties became aware that since September 2021 the City was in possession of and aware of a slide deck that contained incorrect, unlawful, and biased training materials for rapid response teams across the State of Oregon. In a letter to Defendant City of Portland, the Plaintiff stated that the Defendant had withheld this slide deck contrary to its agreement with the United States. Those slide decks were directly relevant to the relief sought in mediation.

City Council voted to adopt Section XI on February 9, 2022. Plaintiff moved to amend the Settlement Agreement on February 25, 2022.

### III. DISCUSSION

**A. The Proposed Section XI is Fair and Reasonable but Needs More to Be Adequate.**

As MHA in their briefing for the August 2021 hearing, many of the proposals made in Section XI make sense and we support them. Specifically, MHA wrote the following about the proposals, save for Paragraphs 191 and 194:

> Paragraph 188: "MHA agrees that the City should revise Force Data Collection Report (FDCR) and After-Action Review (AAR) forms to better capture information to show required timeliness of completion and review."

> Paragraph 189: "MHA does not oppose an independent assessment from a qualified outside entity." MHA added that the City should "survey various communities to assess how the police response to protests impacted their trust and willingness to call the police and other emergency services when in need, and how police use of force impacted their health."

> Paragraph 190: "MHA agrees that the City should not rely on overtime to pay for required annual training."

> Paragraph 192: "MHA agrees that the City should identify and hold accountable rapid response lieutenants and above who approved force without adequate justification during the 2020 protests." MHA added that "prosecution should be considered. We also recommend that review not be limited to RRT lieutenants."

> Paragraph 193: "MHA agrees that the City should issue its 2020 annual report and hold the required meetings before the end of summer 2021, and do the same in 2022 and any future years during which the Agreement is still in effect."

> Paragraph 195: "MHA agrees that if the City's proposal for addressing timeliness and quality of investigations and effective discipline is the implementation of the new voter-approved community police oversight board, the city should propose amendments to the agreement within 90 days and formulate a plan for an orderly transition to and full implementation of the board."

> MHA added that "[t]he court should maintain jurisdiction to ensure that any plan is implemented." As of today's filing, MHA has concerns that the City will not meet their obligation under this provision nor the voter's demand. MHA additionally believes that, for the board to be created effectively and timely, the City must provide sufficient staff and resources to the Police Accountability Commission to be actively engaged with a wide community of concerned citizens, to review and understand comparable police accountability agencies, to create a future board that is largely independent of political influence and capable of holding police officers administratively accountable for actions which are out of city policy.

These opinions highlight the reasonableness and fairness of the proposals. They are long due, and they correspond with the points of non-compliance noted in Plaintiff's briefing. But they remain inadequate to solve the central problem in this case: the City of Portland's Police Bureau maintains a pattern and practice of excessive force against persons experiencing a mental health crisis. To achieve that end, to end that pattern and practice, the City and the Plaintiff must endeavor to address the City's disengagement with mental health services and police alternatives, such as Portland Street Response.

MHA would be remiss to not discuss the City's non-disclosure of the slide deck to the Plaintiff or the *amici*.[1] The City was aware that the Plaintiff did not know about the existence of the slide deck while negotiating Section XI. This purposeful or otherwise omission casts into doubt the adequacy of Section XI as a whole. It would be incumbent upon the Defendant City of Portland to offer more than has been put on the table for remedies to cure this omission.

///

///

///

---

[1] In due candor, both counsels for MHA and AMAC were privy to the slide deck as they are counsels to the plaintiffs in the underlying case that discovered the slide deck, but were bound by the parties' Stipulated Protective Order. *See Don't Shoot PDX, et. al. v. City of Portland*, Case No. 3:20-cv-00917-HZ.

MEMORANDUM IN RESPONSE TO PLAINTIFF'S MOTION FOR ORDER APPROVING AMENDMENTS TO THE SETTLEMENT AGREEMENT

**B. This Court Should Only Conditionally Approve Paragraphs 191 and 194.**

1. Civilian "Dean" of Police Training

The civilian "dean" of police training does hold promise in concept as written in Section

XI. But MHA remains cautious. Our initial skepticism followed reading the details of the

Plaintiff and Defendant's proposals for the position. *See* Dkt. 275-1, p. 8. Both parties intend the

training dean to work in conjunction with the captain of the training division. That may be

prudent given the internal hierarchy of the Bureau, but it does little to advance the Settlement

Agreement purpose of regaining public trust in the institution and poses obvious problems for

future remediation.

As currently proposed, MHA fears that the role of training dean will just result in

continued deference to the Bureau on matters of training and discipline. If the training dean does

not have the independent authority to both create the training content and gauge retention of that

training (e.g., through testing, field metrics, discipline if necessary) then Paragraph 191 will be

an expensive remedy that bears little fruit.

This is not an errant anxiety. MHA spoke with the person holding the similar position

with the Los Angeles Police Department ("LAPD"). The civilian trainer in Los Angeles told

MHA that she had worked within the LAPD for 15 years prior to being in her current role. She

explained that she needed that long of time with the LAPD to gain their trust. She also explained

the roadblocks she faced with creating metrics through which she could understand whether her

training had made an impact on the department members. LAPD simply would not allow its

training dean to measure compliance with her trainings, despite a decade of attempts by the dean

who has the rank of commander.

MHA will also be speaking with the training dean with the New Orleans Police Department the week after this document's submission. At the Fairness hearing we will inform the Court of what we learned.

Instructors need to be able to be frank, honest, and transparent with feedback. That is crucial in most educational settings. But in the City of Portland, the proposed training dean may not have authority to be critical of an officer trainee if they must defer to the training captain and PPB's hierarchy for that criticism. This follows a general pattern and practice of the Bureau doing everything they can to not embarrass or criticize its own members, even to the point of having that be an explicit term in the City's collective bargaining agreement with the Portland Police Association.

In MHA's experience and observation, the training of officers is primarily scenario-based but with examples of problems that are almost never taken from Portland itself but from Beaverton, Gresham, Seattle, or any other jurisdiction. This means that Portland police officers cannot learn from their own mistakes. When an officer trainee role plays in a scenario-based training event, the usual feedback is "awesome" whether the trainee did a good job or not. The trainees are not given honest feedback nor an opportunity to learn and correct mistakes because not embarrassing them is held as a higher value than having them learn. The LAPD dean told MHA that in her role, she can effectively work with and provide further training to officers who are struggling to understand and apply the law or tactics, but if an officer is not on board with the training and ideas, that officer must go because they will not be able to police in the way that the law and community require.

If officers need to have a civilian trainer, then they need to be able to face criticism or discipline from that trainer. Otherwise, we fear they will not know how to interact with the community in the streets in real time facing far harsher criticism from the public.

Lastly, MHA would note that whatever occurs with training for PPB, the Bureau will need to incorporate additional training related to interaction with people with mental illness and those in the throes of a mental health crisis.

For these reasons, MHA requests that the Court at most only conditionally approve this paragraph of the settlement agreement. Defendant City of Portland have yet to announce the hiring of a training dean or codify a scope of work for the dean. It would be premature to adopt this paragraph in full until the parties, and, more importantly, this Court can assess how the details of the position will or will not support and further the purposes of the Settlement Agreement.

### 2. Body Worn Cameras

Similarly, the details of a Body Worn Camera ("BWC") policy can make all the difference between advancing the aims of the Settlement Agreement or harming or preventing those aims. Only once a BWC policy exists can the Court determine if the Settlement Agreement with proposed Paragraph 194 is fair, adequate, and reasonable to further the aims of the agreement. Currently, at least some of the details of a BWC policy are being negotiated by the Defendant City and the Portland Police Association. Additionally, Plaintiff United States has provided a November 15, 2021, letter to Defendant City outlining the BWC policies Plaintiff believes must exist to provide a remedy for the noncompliance and further the aims of the Settlement Agreement. Those policies were the same or similar to those discussed by MHA and others at the August 2021 status conference. Plaintiff has also reserved its rights under the

Settlement Agreement to review and approve PPB policies and to enforce the notice of noncompliance. *See* Dkt. 269-1, Paragraph 194(d). With the future of all BWC policies still unknown this Court cannot determine the effects on the Settlement Agreement of a BWC program until the specifics of the BWC policies and directives have been decided upon. Consequently, MHA requests that the Court only conditionally approve Paragraph 194 as an amendment to the Settlement Agreement.

The Complaint that resulted in this Settlement Agreement alleged that PPB lacked adequate policies, training, supervision, and accountability measures necessary to ensure that officers cease the pattern and practice of using excessive force against people who have or are perceived to have mental illness and comply with the constitutional rights of people in mental health crisis and that there were serious systemic deficiencies within PPB that contributed to that pattern and practice. *See e.g.*, Dkt. 1, Complaint at 2; 4 ¶ 10; 5 ¶ 14; 6 ¶ 17.

The Settlement Agreement aims to protect the constitutional rights of all members of the community, continuously improve the safety and security of the people of Portland and increase public confidence in PPB. Dkt. 262-1, Settlement Agreement at 2. To achieve those goals, the Agreement requires the City and PPB to revise or adopt new policies, training, supervision, and practices related to the areas of use of force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. *Id*. The Agreement further requires that the City and PPB put in place more effective systems of oversight and self-correction that will identify and correct problems before they develop into patterns or practices of unconstitutional conduct and/or erode community trust. *Id*.

There are many specific policy decisions that will determine if a BWC program furthers or harms the goals of the Settlement Agreement. Those issues include, but are not limited to, the following: limiting officer discretion as to when to record; privacy of those members of the

MEMORANDUM IN RESPONSE TO PLAINTIFF'S MOTION FOR ORDER APPROVING AMENDMENTS TO THE SETTLEMENT AGREEMENT

public who appear in recordings; access to recordings from complainants and the public release of recordings; when officers can review recordings before writing use of force reports; retention of footage; and the protection against unauthorized access, tampering, or misuse of footage and the auditing of access.

An enormous range of current and common BWC policies and practices exist that would harm the goals of the Settlement Agreement. Implementation of policies must be aimed solely, or at least primarily, at decreasing unconstitutional use of force and increasing accountability and transparency, and, thus, increasing community trust in, engagement with, and safety from the police. The success of a BWC program to further the goals of the Settlement Agreement depends on the specific policies implemented and the enforcement of those policies.

For example, a policy that allows for too much discretion on when to turn the recordings on and off and a failure to discipline officers for failing to record will do great harm to the purpose of a BWC program to reduce use of excessive force, provide accountability for that unlawful force, and increase trust in PPB. There must be clear policies regarding when a BWC must be activated to record police interactions with members of the public; and those policies must be strictly and consistently enforced, or the program cannot adequately further the Agreement.

Widespread failures of BWC programs across the country are often the result of officers not having their cameras on when they should and not being held accountable for not having them on.[2] MHA again points to the example discussed in its August 2021 status report of the

---

[2] The following are just a few of the many stories of BWC failures across the country: *See e.g.*, NBC 5 Chicago, *Chicago Police Officers Who Turns Off Body Camera or Cover Badge Will be Stripped of Powers: Lightfoot*, June 5, 2020, available at https://www.nbcchicago.com/news/local/chicago-police-officers-who-turn-off-body-camera-or-cover-badge-will-be-stripped-of-powers-lightfoot/2285375/; Jeff Coltin, *How NYPD officers are blocking accountability. Covered badge numbers, body cameras turned off and a state law to impede transparency*, City &

Atlanta Police Department implementing body-worn cameras in part to improve the transparency and accountability of interactions between citizens and law enforcement. The City Auditor's Office report released in 2018 showed that officers only captured video for 33% of officer-dispatched calls, and that officers delayed activation or prematurely deactivated their BWC in many interactions. The report also found that compliance staff were not reviewing videos as required to monitor compliance with policy and proper management of videos. Additionally, there must be policies that prevent PPB members from attempting to render the footage less useable by repeatedly knocking the camera off, knowingly placing an object in front of the camera, or preventing the video from being able to be made public. For example, in the past few years, we have seen of far too many officers playing copyrighted music during recordings made by members of the public during interactions with police to prevent the videos from being shared on social media.[3]

Whether officers can view recordings before writing use of force reports can also greatly affect whether the goals of Settlement Agreement are supported or diminished. A BWC program as a remedy in the Settlement Agreement must be aimed at reducing force, increasing officer accountability, and generally putting into place an effective system of oversight and self-correction to identify and correct problems before they become ingrained patterns of

---

State New York (June 5, 2020), available at https://www.cityandstateny.com/articles/policy/criminal-justice/how-nypd-officers-are-blocking-accountability.html; Chad Marlow, *Is Your City Destined To Be The Next Charlotte? A Hard Lesson In Police Body Camera Policies*, American Civil Liberties Union (October 4, 2016), available at https://www.aclu.org/blog/privacy-technology/surveillance-technologies/your-city-destined-be-next-charlotte-hard-lesson/; Jay Stanley, *Police Body Cameras: The Lessons of Albuquerque*, American Civil Liberties Union (March 24, 2015), available at https://www.aclu.org/blog/police-body-cameras-lessons-albuquerque.

[3] For the latest example, *see* Nathan Solis, *Santa Ana police officers who blasted Disney songs to thwart video recording are under investigation*, Los Angeles Times, April 15, 2022, available at https://www.latimes.com/california/story/2022-04-15/police-blast-disney-songs-in-attempt-to-prevent-resident-from-filming-them.

unconstitutional conduct. A policy that provides for footage review before a use of force report is written allows for the circumvention of the review of the use of force under the constitutional standard requiring the officer using reasonable force under the circumstances as they were known to the officer at the time the force was used. It also may make supervisor review of the report and footage more rote rather than the careful undertaking that the Agreement requires and that Plaintiff has already found PPB to be in non-compliance. An effective policy under the Agreement must require officers to write use of force reports prior to reviewing the footage and then allow them to make a separate supplemental report after viewing the footage. A policy that requires that sequence of writing and then review will better allow for the Bureau to identify and correct the failures in training and practice before they become ingrained. Prohibiting preview would also increase the trust of the public more than allowing preview. There is already strong public belief that a BWC program will do nothing to change police practice because of policies that do not hold officers to high transparency and accountability standards. Prohibiting preview will allow for reports to better reflect the views of the officer at the time force was used and that real supervisory oversight will occur.

The Agreement's purpose of increasing community trust in PPB would be harmed by some BWC policies and could be furthered by others. Relatively simple policy decisions—such as mandating all interactions be recorded from start to finish with very few exceptions, preventing PPB employees from viewing the recordings when they are not supposed to, preventing tampering with the recordings, preventing them from making copies or otherwise recording and distributing the recordings for personal use, auditing the review of the recordings, and preventing the release of footage in a way that harms members of the public—can have large effects on public trust of PPB.

The aim of Section XI is to remedy PPB's ongoing and long-standing failures to use force constitutionally and appropriately, to provide proper accountability for improper use of force, and provide proper training and oversight that have existed both before and under the Settlement Agreement. Defendant-Intervenor Portland Police Association has already made their sentiments known to the public about how they would formulate a BWC camera: they want BWCs to be another law enforcement "tool" rather than an accountability measure. The constitutional rights of Portlanders with mental illness cannot be up for bargaining. They are sacred, self-evident, and non-negotiable. Any BWC policy must remain focused on a program aimed at being a tool to reduce unconstitutional force and increase accountability and public trust. As MHA member Jonathan Brown will explain to the Court at the Fairness hearing, PPB's data on use of force indicates that use of force against persons with mental illness has gone up, not down, since at least 2017. *See Dec. of Chavez*, Exhibit 1 – Testimony of Jonathan Brown. BWCs need to be implemented in a manner that protects our community, not further surveil them.

Because BWC policies can be implemented that would either harm or further the Settlement Agreement, MHA asks the Court to approve Paragraph 194 only conditionally until a BWC policy has been completed and allow for the Court's review as to its effects on the purposes of the Settlement Agreement.

## C. Special Master

During our August 2021 status conference, the Court suggested that the parties consider motioning for appointment of a special master to oversee the case. The parties came to no agreement on this idea during mediation. MHA does see the value in the appointment of a special master in this case and would support that request. MHA would request that the special

master have the ability to subpoena and inspect records, make unannounced inspections of facilities, and be able to ask and receive answers about matters pertaining to this lawsuit. MHA would also request that the special master have knowledge of or experience with persons with mental illness.

## CONCLUSION

For the reasons above, MHA requests that the Court conditionally approve Section XI's Paragraphs 191 and 194 and approve the rest of Section XI as fair, adequate, and reasonable.

DATED April 15, 2022.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Of Attorneys for *Amicus Curiae*
Mental Health Alliance

/s/ *Franz H. Bruggemeier*
Franz H. Bruggemeier, OSB #163533
Of Attorneys for *Amicus Curiae*
Mental Health Alliance