**U.S. Department of Justice**

Civil Rights Division

---

SHR:LLC:RJG:JDH
DJ 207-61-1

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

May 5, 2021
*Via mail and email*

Robert Taylor, City Attorney
Office of the City Attorney
City of Portland, Oregon
1221 SW 4th Avenue, Suite #430
Portland, OR 97204
email: Robert.Taylor@portlandoregon.gov

Charles Lovell, Chief of Police
Portland Police Bureau
City of Portland, Oregon
1111 SW Second
Portland, OR 97204
email: Charles.Lovell@portlandoregon.gov

RE: *United States v. City of Portland*, 3:12-cv-02265-SI
PPB's 2020 Crowd Control After Action Review and Recommendations

Dear Mr. Taylor and Chief Lovell:

On March 29, 2021, the Portland Police Bureau (PPB) emailed us three documents that it described as its Master After Action, Commander Dobson's narrative, and Assistant Chief Resch's challenge and solution analysis for the protest events spanning from May 29 to November 15, 2020. Specifically, PPB provided us:

1. A special event After Action Report ("AAR") from Sergeant Schell, dated November 20, 2020, with review from Sergeant McDaniel on December 4, 2020, from Lieutenant Hughes on January 12, 2021, from Commander Dobson on January 15, 2021, and from Assistant Chief Resch on March 24, 2021. We refer to this as the Special Event AAR.

2. A 21-page undated and unsigned document titled "2020 Portland Civil Unrest After Action and Recommendations," which PPB has advised is Commander Dobson's narrative. We refer to this as the 2020 Protest After Action and Recommendations.

3. A 13-page undated and unsigned document titled "Challenge and Solution analysis 2020 final," which PPB has advised is Assistant Chief Resch's proposal for remedial actions that "PPB and/or the City should take to be better prepared if such a large-

scale event should occur again." We refer to this as the 2020 Protest Challenge and Solution Analysis.

On April 12, 2021, PPB emailed us a fourth document:

4. A one-page undated and unsigned document titled "Crowd Control FDCR Update Recommendations," which contains a description of changes to PPB's electronic Force Data Collection Report. PPB advised that it was "anxious to make some of the changes identified in AC Resch's crowd control assessment" and already "signed off on" the changes but wanted DOJ's approval before programming the changes.

We thank PPB for providing these four documents, which we refer to collectively as PPB's Master After Action Report. We and our expert consultants have reviewed the documents as well as the Compliance Officer's written feedback, dated April 14, 2021. We find that PPB's Master After Action Report is not sufficiently comprehensive and lacks critical self-assessment. We write in our role as monitors of the Amended Settlement Agreement, ECF 171, to provide our assessment, offer technical assistance, and seek further data and analysis. At the outset, three high-level points bear emphasis.

First, on April 2, 2021, DOJ issued a notice pursuant to Paragraph 178 that identified the terms of the Agreement we believe the City has failed to implement, as specified in the Fifth Periodic Compliance Assessment Report, dated February 10, 2021, ECF 236-1, and a letter critiquing the Police Review Board (PRB), dated March 23, 2021. Central among our concerns are (1) force management during crowd control events, including timely reporting, reviewing, and assessment of whether such force is justified under the Constitution and PPB policy, and (2) enforcement of force and performance policies and related accountability for misconduct.

PPB's Master After Action Report does not substantially address those fundamental issues and does not resolve DOJ's concerns. *See* ECF 171, Paras. 178-183. Most importantly, PPB's self-assessment insufficiently analyzes its management of force, its members' justifications for force, and the organization's plan to enforce compliance with policy and training. Instead, PPB focuses primarily on external factors beyond its control while over-relying on training and software to address the few faults it is willing to own. Consequently, PPB has not yet identified a satisfactory remedy to ensure full compliance with the Agreement's force reporting and review requirements.

Second, PPB has informed us that upcoming crowd control training will be based in part on the Master After Action Report. Using PPB's incomplete and inadequate self-assessment as a "needs assessment" for essential crowd control training raises serious concerns.[1] We agree that PPB should train its crowd control response teams as expeditiously as possible to address issues

---

[1] Some concerns have already manifested. PPB initially scheduled Rapid Response Team (RRT) training for April 10-11, 2021, without any planning or needs assessment. On March 15, PPB presented to us a series of "lesson plans," some of which had been created only after we requested copies. The lesson plans were inadequate, as detailed in a March 23 email from the Compliance Officer. On March 24, PPB decided to postpone the RRT training indefinitely because it lacked time to address the Compliance Officer's concerns. At PPB's request, we listed our many concerns with the lesson plans in an email dated March 25, 2021. As of the date of this letter, PPB has not replied to DOJ or the Compliance Officer's feedback and has not scheduled a date for the RRT training.

identified in DOJ's compliance assessment report.  But PPB must do so in a fashion consistent with the Agreement, approved PPB policies, and the Constitution.  Accordingly, any such training that relates to the application of force in crowd control settings should fully incorporate the requirements of de-escalation, warnings, individual justification for each application, PPB's critical decision-making model, and reporting and investigation requirements.

Third, PPB's Master After Action Report continues a pattern of untimely and incomplete documentation related to the City's forceful response to the 2020 protests.  Beginning in early June 2020, we regularly asked the City for data about PPB's crowd control response.  We wanted to know specifically what daily information PPB executives were receiving and how they were using it to manage use of force.  Among our many inquiries, we sought information on the type and amount of force being used each day.  We also sought the AARs required by the Agreement and PPB policy.  Finally, in late August 2020, the City produced a set of incomplete FDCRs and, in early September 2020, the City produced a set of informal daily summaries of crowd control events with limited content.  PPB did not produce—and apparently did not track—an inventory of munitions or a daily count of the type and amount of force used against individuals.  The Master After Action Report also contains no information on the type or amount of force used by PPB officers.  In December 2020, PPB produced a sample of AARs that covered various day-long periods during which force was used.  As described in DOJ's Fifth Periodic Compliance Assessment Report, those AARs were procedurally and substantively deficient.  ECF 236-1 at 6-12.  Finally, on March 29, 2021—134 days after PPB marked the end of the 2020 crowd control events on November 15, 2020—the City produced PPB's Master After Action Report.  But this report continues to omit any assessment of whether officers violated PPB policies related to using force, reporting force, and reviewing force reports.  Communication also continues to be inconsistent.  PPB recently informed DOJ that it would conduct an internal meeting to debrief the 2020 crowd control events, and we asked to observe.  PPB either did not have that meeting or had it without inviting us.  This pattern of providing deficient information related to the 2020 protests reflects larger failures of supervision and accountability at all levels.

What follows is our general assessment of the documents that comprise PPB's Master After Action Report as they relate to the City's compliance with the Settlement Agreement.

**(1) Special Event AAR**

The Special Event AAR is untimely, incomplete, and inaccurate in some respects.  The document indicates a first-level review date of November 20, 2020, with command-level review dates of January 15 and March 24, 2021.  The "review date" is vague, however, because it does not capture the dates on which an after-action review is started, edited, or complete.  PPB's FDCRs also fail to capture definite times when a force report is started, edited, complete, and reviewed.  PPB's unclear records negatively impact the City's ability to demonstrate compliance with the Settlement Agreement.

Also, the narrative refers to attached documents "[f]or additional Crit[i]que and recommendations," which is an apparent reference to the 2020 Protest After Action and Recommendations and the 2020 Protest Challenge and Solution Analysis.  AAR at 4.  But the Special Event check box section does not indicate any attachments were reviewed.  AAR at 2.

Moreover, PPB advised that the referenced documents were not in final form until months later, in March 2021. In fact, the City advised us that it could not produce the Special Event AAR, as we requested in advance of filing DOJ's Fifth Periodic Compliance Assessment Report in February 2021. If the Special Event AAR is referencing different documents than what we received in March, we ask the City to produce them to us.[2]

Even if the Special Event AAR were timely, it is nevertheless deficient in terms of content. PPB policy defines an AAR as "[a] written report that describes a police action and assesses its adherence to policy through critique and evaluation using required criteria." *See* PPB Dir. 1010.00, Definitions; PPB Dir. 905.00, Definitions. However, the Special Event AAR omits any discussion of policy, except to note that PPB could not "provide a comprehensive and transparent review" within "the timelines outlined in PPB's directives." AAR at 4. In fact, the Special Event AAR disclaims a role in being critical in any comprehensive fashion: "This AAR is not meant [to] evaluate use of force or other situations that required separate AAR's." AAR at 1. By design, then, the Special Event AAR limits its utility by deliberately declining to assess, critique, or in any way evaluate the high-profile, high-volume use-of-force events.

The Special Event AAR includes review by PPB command staff. AAR at 6. However, they endorse the myopic approach of the first-line supervisory review, omitting any assessment of compliance with PPB's policies. The City must acknowledge the importance of PPB members complying with constitutional standards, adhering to approved policies, and enforcing policy violations. For example, rather than address the efficacy of policy-required warnings before using force, PPB incorrectly suggests that a sound truck provided all necessary warnings for PPB members to use force against individuals. *See* AAR at 5. While a sound truck may have provided sufficient warning in some cases, in other cases it may not have. PPB confirmed that members heard the sound truck, but not subjects. AAR at 5. Video we saw suggests that direct warnings to individuals immediately prior to an officer's use of force could have been feasible in many situations. PPB's reliance on a blanket announcement that may or may not have been heard is inconsistent with established requirements. PPB policy and the Constitution require adequate justification and feasible warnings for each use of force. PPB Dir. 1010.00, Procedure, Sections 3 and 5; PPB Dir. 635.10, Procedure, Section 1 ("Directive 1010.00, Use of Force, governs all uses of force, including in crowd management and crowd control situations."). Similarly, PPB policy requires that officers attempt to de-escalate to avoid employing force. PPB Dir. 1010.00. As we described in our compliance assessment report, PPB repeatedly validated uses of force with little or no discussion of de-escalation. ECF 236-1, Section III. The Special Event AAR is silent on de-escalation. PPB's policy requirements are not suspended by a riot declaration.

The Special Event AAR does not identify any "possible policy violations" associated with the 2020 protests. AAR at 5. It also incorrectly asserts that "[a]ll force reports are attached to appropriate AARs." AAR at 6. As described in DOJ's Fifth Periodic Compliance Assessment Report, those AARs were often not appropriate. *See* ECF 236-1 at 6-12. PPB does not acknowledge, much less resolve, critical failures with multiple force-related AARs from the

---

[2] The command-level portions of the Special Event AAR also reference attached documents with additional critique and recommendations. Commander Dobson's review was forwarded on January 15, 2021, and Assistant Chief Resch's was complete on March 24, 2021. AAR at 5-6.

4

2020 protest and the FDCRs on which those AARs rely.  For example, RRT members sometimes did not complete FDCRs by the end of shift.  Similarly, PPB did not complete AARs for the month of June 2020, pushing them off to catch up on other documentation and finishing them months after the underlying incidents.

### (2) 2020 Protest After Action and Recommendations

This 21-page document catalogs a series of informative observations, especially at the incident command level.  However, it mainly represents an advocacy piece to justify what PPB did, blame shortcomings on other entities and circumstances beyond PPB's control, and seek additional funds for new equipment, training, and personnel.  Indeed, PPB lauds its performance: "The Portland Police Bureau, a medium-sized policing agency, did an *excellent* job handling the nightly protest."  After Action and Recommendations at 1 (emphasis added).  There is very little analysis of what PPB could have done better with the resources and knowledge it had.

PPB emphasizes what was unique, unprecedented, and uncontrollable about 2020.  After Action and Recommendations at 1-3.  Yet, in the days and weeks after the protest started on May 29, the repetitious crowd control events could no longer be fairly characterized as unexpected.  PPB accepts that as the days passed, "events began to have a more defined pattern," allowing PPB to shut down the incident command day shift.[3]  We accept that the pandemic and the decisions of elected leaders impacted PPB, but an effective self-assessment should focus critically on PPB's actions and prioritize solutions within PPB's control.

PPB addresses various legitimate challenges at the incident command level, including the lack of mutual aid and trained staff to work incident command.  After Action and Recommendations at 3-13.  However, the report lacks a critical assessment of supervisory performance at the street level in relation to use of force.  PPB command broadly portrays all force as justified:  "force was used as dictated by the situation."  After Action and Recommendations at 14.  Based on limited video evidence we have seen, we disagree that this was always the case.  In our view, there is evidence that some PPB members used force against individuals and prepared incomplete FDCRs in violation of Directive 1010.00, Sections 3, 4, 5, 6, and 11, and Directive 900.00, Section 1.  In addition, we reviewed some supervisory investigations of force events that did not comport with Directive 1010.00, Sections 12 and 13, and Directive 900.00, Section 2.

PPB policy makes clear that the Incident Commander is responsible for ensuring uniform compliance with Directives 900.00 and 1010.00 during crowd control events.  PPB Dir. 635.10, Procedure, Section 13.  PPB admits this did not occur for two reasons: (1) the "sheer volume in the number of reports," and (2) fatigue among members negatively affecting "the quality of the narrative and the ability to remember all uses of force" for FDCRs and AARs.  After Action and Recommendations at 15.  When an abnormally high amount of force is used, strict adherence to managerial controls is even more important.

---

[3] While PPB may administratively frame the 2020 crowd control event as a continuous period running from May 29 to November 15, it was not literally continuous.  Demonstrations rarely occurred between 4:00 a.m. and 8:00 p.m., and ceased for more than a week in mid-September when wildfires caused Portland to have very poor air quality.

### (3) 2020 Protest Challenge and Solution Analysis

This 13-page document primarily restates information provided in the Special Event AAR and the 2020 Protest After Action and Recommendations document. Where it builds on those documents, it does so with mixed results.

For example, PPB does not address whether a particular use of force was justified, focusing instead on *the articulation of* the justifications reported in FDCRs. Thus, PPB found that "articulation used by officers to justify force was too general and not consistent with the articulation officers use to justify force events outside of crowd management incidents." Challenge and Solution Analysis at 7. That distinction ignores the possibility that a generalized justification may mask the lack of a specific justification consistent with the Constitution and PPB policy. That possibility is made more acute by PPB's silence on several concerns we have raised, including PPB's pattern of misusing the phrase "active aggression" to justify force against individuals who engaged in passive resistance or merely failed to disperse, and misapplying Directive 635.10 to justify force that does not comply with Directive 1010.00. *See* ECF 236-1, DOJ's Fifth Periodic Compliance Assessment Report at 8-9; DOJ's Letter Critiquing the PRB, Mar. 23, 2021, at 2-3, 6.

This document also claims other reasons for improper FDCRs and AARs. In addition to the volume of force and fatigue, PPB explains that crowd control unit supervisors were directly involved in using force and unrelated supervisors who PPB assigned to complete AARs had "little to no crowd management training." Challenge and Solution Analysis at 1-2. PPB suggests that policies should be more lenient by allowing "longer timelines" for reporting and reviewing force during crowd control events and "other methods of critique" for reviewing such force. *Id.* A viable force reporting system must provide data to executives in a timely fashion to influence decision making. Lengthening reporting timelines would undermine not improve PPB's force management. As the Compliance Officer explained, memories fade and become distorted over time. ECF 226-2, COCL Q3 2020 Report, at 14-15. Shorter timelines enable quicker identification of problematic force and quicker corrective action. But timeliness cannot take priority over accuracy and thoroughness. Timeliness is not a standalone goal, but a means to ensure accuracy and facilitate accountability for out-of-policy force violations.

PPB also asserts that by dedicating two Sergeants to AARs midway through the protests, PPB ensured that "FDCRs and AARs were completed in a timely fashion." Challenge and Solution Analysis at 2. We cannot agree because FDCRs and AARs were untimely or incomplete in some cases. Substantively deficient reports are not *complete* in any meaningful sense. Plus, PPB acknowledged that AARs did not assess available video evidence "because there is currently no system in place to link the video to an AAR." Challenge and Solution Analysis at 3.

PPB's proposed solutions focus on training on report. While additional training may help, it cannot be the only solution. Every sworn member already has received extensive training on the requirements of Directive 900.00 and Directive 1010.00. PPB also needs to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification. PPB's Master After Action Report does not

consider that approach.  In addition to training officers on proper reporting, the City should implement solutions that ensure PPB enforces its existing policies and training.

PPB also identifies body worn cameras (BWCs) as a solution to capturing information about crowd control events.  Challenge and Solution Analysis at 6, 8.  We agree with the rationale for BWCs that the Compliance Officer included in its recent analysis of PPB's Master After Action Report:

> The proper review of force is all about the availability of good evidence, and it appears to be short supply in Portland.  Since 2016, [the Compliance Officer] and others have recommended [BWCs] to address this and other evidentiary problems.  Of the largest 75 municipal police agencies in the U.S., Portland is the only city without body worn cameras.

See Compliance Officer Memo, *Feedback on PPB's Crowd Control and Force Management Documents*, Apr. 14, 2021, at 3.  In our review of force events that occurred during the 2020 protests, we, too, found video evidence to be extraordinarily useful to preparing an informed assessment of compliance.  The City should consider the consistently high-quality evidence that BWCs can supply investigations of misconduct allegations across the spectrum, from rudeness to bias to force. In any event, the City must assure that supervisors at all levels of PPB require adherence to policy and, where necessary, discipline those who violate policy.

### (4) Crowd Control FDCR Update Recommendations

This one-page document lists proposed changes to the check boxes on the current FDCR form.  Two of the three previous documents endorsed the view that "Current AAR and FDCR forms do not allow for accurate documentation of crowd management incidents."  Challenge and Solution Analysis at 3; *see also* After Action and Recommendations at 15.[4]

We disagree that current forms did not "allow for accurate documentation of crowd management incidents" as required by PPB policy and the Settlement Agreement.  The current FDCR form contains an open narrative field sufficient to enable officers to explain events and justify uses of force.  The forms were not a primary driver of inaccurate documentation.

However, we agree that there can always be refinements to improve forms.  In order to understand how PPB proposes to change the FDCR form, we need to see a draft.  Accordingly, please provide us a mockup of the changed form.

\* \* \*

Finally, PPB's Master After Action Report sets forth many recommendations but does not address whether the recommendations have been adopted or for the adopted recommendations, the status of their implementation.  Going forward, we request that the City track the recommendations and provide DOJ with a record of any response.

---

[4] The Special Event AAR, by contrast, asserted "All force reports are attached to appropriate AARs."  AAR at 6.

We hope this written feedback is useful to the City and PPB. Please contact us if you would like to discuss these issues further.

Sincerely,

/s/ Jonas Geissler        /s/ Jared D. Hager

R. Jonas Geissler             Jared D. Hager
Senior Trial Attorney         Assistant U.S. Attorney
Civil Rights Division         District of Oregon
Department of Justice

cc:

Robert King, Senior Policy Advisor, *Robert.King@portlandoregon.gov*

Heidi Brown, Chief Deputy City Attorney, *Heidi.Brown@portlandoregon.gov*

Bridget Donegan, General Counsel, Portland City Auditor's Office
*Bridget.Donegan@portlandoregon.gov*

Mary Claire Buckley, Inspector General, Portland Police Bureau,
*MaryClaire.Buckley@portlandoregon.gov*

Dennis Rosenbaum, Compliance Officer, *dennisrosenbaum3@gmail.com*

Anil Karia, Counsel for Defendant-Intervenor, Portland Police Association,
*anil@pslglawyers.com*

Kristen Chambers, Counsel for Enhanced Amicus, AMAC, *kristen@prism-legal.com*

Ashlee Albies, Counsel for Enhanced Amicus, AMAC, *ashlee@albiesstark.com*

Juan C. Chavez, Counsel for Amicus, Mental Health Alliance, *jchavez@ojrc.info*

Franz H. Bruggemeier, Counsel for Amicus, Mental Health Alliance,
*fbruggemeier@ojrc.info*

*via email only*