**U.S. Department of Justice**

Civil Rights Division

SHR:LLC:RJG:JDH
DJ 207-61-1

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

March 23, 2021
*Via mail and email*

Robert Taylor, City Attorney
Office of the City Attorney
City of Portland, Oregon
1221 SW 4th Avenue, Suite #430
Portland, OR 97204
*email:  Robert.Taylor@portlandoregon.gov*

Charles Lovell, Chief of Police
Portland Police Bureau
City of Portland, Oregon
1111 SW Second
Portland, OR 97204
*email:  Charles.Lovell@portlandoregon.gov*

> RE:    *United States v. City of Portland*, 3:12-cv-02265-SI
>           Requested Police Review Board Written Critique

Dear Mr. Taylor and Chief Lovell:

As monitors of the Settlement Agreement in the above-referenced case, we and our expert consultant have observed several Police Review Board (PRB) meetings in 2020 and 2021 and provided verbal feedback to the Portland Police Bureau (PPB) on our observations.  The City Attorney's Office and PPB have requested that we provide comprehensive written feedback on the PRBs.  This letter serves that purpose and addresses and expands upon the issues we already addressed through conversations with PPB.

On May 1, 2020, we provided the City extensive technical assistance and critical review of the complete administrative investigation record and PRB regarding 2019-B-0047.  We followed up with proposed action items on May 13, 2020.  These were:

1. Assess management of this force event prior to the shooting, including availability and efficacy of response from enhanced crisis intervention trained officers and direction to use less lethal force.
2. Act on PPB's own training and internal affairs recommendations.  Document consideration of the recommendations and, where the Chief agrees with the recommendations, provide evidence of implementation.
3. Determine appropriate accountability for investigators' characterization of interviewee statements.

4. Explain the change in PRB training analysis in this instance.  Going forward, complete PRB analyses as required by the Settlement Agreement and Directive 336.00 for all future PRBs.
5. Document PPB's assessment of the efficacy of 40 mm rounds.
6. Determine whether to apply the force inspector's checklist of de-escalation techniques to PRB's officer-involved shooting force-policy determinations.

We acknowledge that PPB has appropriately implemented a significant change in the sequence of presentation at the PRBs, as set forth in the fourth action item.  PPB previously had moved the presentation of the complete training analysis to after the PRB votes on findings regarding the subject officer(s).  PPB's more recent PRBs now show a bifurcation of the training analysis.  The Training Division's assessment of whether a subject officer's use of force complies with training now occurs before the PRB votes on a finding.  PPB's force directive requires this training assessment be a part of accountability determinations.  *See* Dir. 1010.00 – Use of Force, Policy Par. 7 ("When force is used, the Bureau is dedicated to reviewing, reporting and investigating member actions to determine if the force used was in accordance with Bureau **training** and policy." (emphasis added)).  The Training Division's assessment of the incident for systemic training and equipment recommendations—i.e., not concerning the subject officer's accountability—now occurs after the PRB finding vote.

Even though PPB improved the sequence of the training presentation, PPB has not sufficiently demonstrated implementation of the remaining action items.

## 2020-C-0150

As mentioned in our compliance assessment report, this administrative investigation concerned a Sergeant's use of a 40 mm less lethal impact munition striking one of two unknown subjects who were engaged in a "furtive" conversation half a mile from the Justice Center.  The subjects were in a closed area.  PPB announced their intent to arrest them.  They ran.  The involved Sergeant fired his 40 mm launcher at one fleeing subject, he thinks hitting him in the legs.  The involved Sergeant gave no warning.  The subject did not have any weapons in view.  PPB had no knowledge of any crime other than being in the exclusions area.  The purported justification for the force was a presumption that the two subjects would run to the event PPB had declared an unlawful assembly at the Justice Center where *others* were violent.  That justification does not comport with PPB policy or the Constitution.  PPB's approved force directive makes clear:  "Mere flight from an officer is not sufficient cause for the use of the impact munitions."  *See* 1010.00 – Use of Force, Par. 6.4.2.1.4.

### - Lack of Lawful Justification

The entire chain of command from Sergeant through Commander approved this use of force, undercutting the explicit requirements of PPB policies approved under the Settlement Agreement.  As Acting Captain James Quackenbush wrote in his findings, the chain of command justified the force by presuming that the subjects would join the riot half a mile away and by underscoring the context that PPB has been responding to riots for 11 days.[1]  Even though the

---

[1] At the close of his findings, after dedicating five of eleven pages to the conduct of the crowd, Acting Captain Quackenbush correctly pointed out that the subject officer had incorrectly asserted independent authority to use

Internal Affairs investigator explicitly described the subject officer's misapplication of crowd control and force policies, it was not until the findings reached Assistant Chief Leasure—and he controverted the findings—that the chain of command applied PPB's force and crowd control policies as written and approved.[2]

The IA investigator recommended force policy and crowd control policy violations. In operative part, the investigator's memo quoted from the subject Sergeant's own statements:

> [T]hey were walking in what I would describe - not to, you know, overuse the term, but in - in a furtive way like they were planning something, walking back towards the area where the riot was happening, where it had been closed, and where they had been ordered to disperse from.
> . . . everybody that's involved in the riot is perceived to be armed
> . . . everybody who's involved in the riot and in the closed area continue to participate in that riot that's involved in active aggression
> . . . So, under 635, Section 9, once the IC orders a crowd to disperse and they don't heed the warnings, impact munitions can be deployed to prevent violence, injury, or property damage avoiding a greater application of force. So, I believe that by doing so, by using impact munitions to disperse a crowd before they continue to use additional force that's what we're doing is we're predicting their behavior, but based on the - on the behavior that we've seen up to that point . . .
> I can deploy the 40mm solely to disperse somebody without applying any of the 1010. However, I think in this case I think the 6.4.2.1.1, In Response to Active Aggression, applies. . . .
> I believe they were engaging in active aggression. And two, I don't believe under 635 that I need to articulate that they were engaging in active aggression. I think the IC has already determined this whole riot - this riotous group was engaging in active aggression. So, that's already been in - that - that has been determined utilizing a City Attorney, a District Attorney, and our IC command, anybody who's involved in this riot has already risen to the level of active aggression which is why they've ordered the dispersal.

Investigator's memo pp. 6-10.

The investigator made clear that the involved Sergeant did not believe that there was anyone else in the park when he fired the less-lethal round and he did not see anything in either of the subject's hands. There also was no indication that the two subjects were involved with anyone else that was walking around. The involved Sergeant did not state that he saw either of the two subjects at the Justice Center before or after using force.

---

force pursuant to PPB's Directive 635.10, which actually requires that force comply with Directive 1010.00 – Use of Force.

[2] IPR Assistant Director Dana Walton-Macauly initially concurred with the findings, adding a debrief, but then joined Assistant Chief Leasure to controvert the not-sustained finding and recommend a sustained finding.

The subjects were not in the riot at the time the involved Sergeant used force. They were half a mile away.  They did not fail to disperse; they fled.  None of the facts presented meet the PPB policy definition of active aggression:  "Active Aggression:  A threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is about to happen, unless intervention occurs."  *See* Dir. 1010.00 – Use of Force, Definitions.

At the PRB, PPB dismissed the Internal Affairs investigator without seeking any presentation of the case from her.  Commander Brian Ossenkop then proceeded to provide the same justification for the use of force—that others were rioting half a mile away—that the investigator had recommended violated policy.  There was no discussion to correct the misapplication of policy.  Ultimately, the majority of PRB voting members recommended a not sustained finding in accord with Commander Ossenkop's misinterpretation of basic force principles.

We understand that PRB's are a deliberative process.  That process, though, is bounded by rules.  *See, e.g.*, Dir. 336.00 – Police Review Board.  PRBs must properly apply policy and evidentiary standards.  This is akin to a jury, which must abide by jury instructions and properly apply standards of evidence to the charges presented.

- **Conflating mitigation and category of discipline**

The PRB members who voted to sustain the involved Sergeant in this PRB also voted on a recommended level of discipline.  The Settlement Agreement and PPB's approved policy require that PPB apply the PPB's discipline guide.  *See* Dir. 338.00 – Discipline Guide; see also www.portlandoregon.gov/police/article/482707.  The PRB discussed the recommended discipline and the demands of the crowd-control situations.  Ultimately, Assistant Chief Leasure recommended using the crowd-control situation to mitigate the *category* of discipline (i.e., the horizontal row on guide) rather than the level of punishment (i.e., the vertical column on the discipline guide).  This improperly misconstrues the effect of mitigation, as described in the guide.  Mitigation may affect the level of discipline, but not the category of discipline.  The category of the charged misconduct determines the discipline category.

## 2020-B-0039

This administrative investigation concerned an officer-involved shooting on June 28, 2020.  The shooting did not result in injury.

- **Conflicting directions on knife issue**

In 2019, we observed an in-service defensive tactics training course that included direction on using knives in a stab-stab-shoot, close-quarters scenario.  Instructors also encouraged class members to try a selection of potential knives which they could purchase individually.  These included t-handled and gut-hook knives intended to be used as weapons, not utility tools.  PPB had not presented this change in the defensive tactics lesson plan to us prior to

the class.  Numerous PPB members had already received this knife class before PPB informed us of it.  PPB did not have then and does not have now any approved policy on use of knives as force tools.  We immediately notified PPB of the problem of giving direction on use of a force tool without an approved policy.  PPB discontinued the class.

PPB assured us that it would remediate the problematic knife training in two ways.  First, PPB was to remediate the training through a Chief's message in the 2020 in-service defensive tactics class.  We observed such a message in February 2020.  Shortly after our observation, though, PPB ended subsequent sessions of that 2020 in-service defensive tactics class because of the global pandemic.  PPB now reports that it distributed a video-recorded version of that Chief's message to all Bureau members, which they were required to watch by March 4, 2020.

Second, PPB issued uniform guidance that permitted officers to carry only bureau-issued knives.  Such knives were for utility and could be used only in a last-resort scenario as a weapon.  We have not seen any evidence that this restriction has been implemented.  To the contrary, the written record provided for this PRB revealed that PPB has not restricted the knives officers may carry.  In fact, the record indicates that PPB issued contradictory email guidance that undercuts the restriction on carrying knives such that officer may still carry any knife of their choosing:



The responses to three of these recommendations, a single notification for sergeants to use in Officer-Involved Shootings, crime scene management training and the public safety statement are currently in the process of being developed.  Howevera third, related to developing guidelines on the use of knives remains outstanding.  In addition to this, the current uniform guide calls for officers to only carry Bureau issued knives (although email guidance

35

exists that indicates officers can continue to carry personal knives until issued a Bureau knife).  Addressing this outstanding requirement will be dealt with in the recommendation section.

'

PPB should issue promised guidance on the use of knives and eliminate the carrying of personal knives.

**2020-C-0229**

This administrative investigation concerned an officer's self-reported use of three less lethal FN303 rounds,[3] one of which missed its intended target and struck another person.  The uses of force occurred within a larger crowd control event.  The officer was targeting a person

---

[3] An FN303 round is a small plastic projectile, similar to a paintball, fired by a compressed-air powered launcher. See, e.g., "FN 3030," available at https://en.wikipedia.org/wiki/FN_303.  Each round is spherical in its front and contains granulated bismuth.  *Id.*  The rounds vary in a "payload" of paint or chemical irritants in the rear of the round.  *Id.*

who was throwing eggs at the PPB line.  The involved officer reported that another person moved her arm into the areas of his shot, thus he struck that unintended person.  The involved officer moved his position to better target the subsequent rounds.

- **Misapplication of force policy standards**

In a September 15 email that was part of the file, IA investigator Stacey Rovinelli stated: "In 635.10 the behavior does not need to rise to the level of active aggression.  Can we change it to unreasonable force?  Thoughts?"  The affirmative assertion that Directive 635.10 does not require active aggression, prior to the request to change the charge, represents a basic misunderstanding of the explicit requirements of PPB policy.  Directive 635.10 – Crowd Management/Crowd Control requires that all uses of forced in crowd control incidents are subject to PPB's force policy.  *See* 635.10 – Par. 9.3. ("Force shall only be used in accordance with Directive 1010.00, Use of Force").  We found this misunderstanding repeated in other investigations as we describe herein.

- **Interference with administrative investigation**

The transcripts of the Investigator Rovinelli's interview of another officer from the same crowd-control incident showed interference with the interview.  *See* interview of Brent Taylor at pp. 17-21.  The officer's union representative for *Weingarten* representation was permitted to interject and question the officer.  *Id.*  In pertinent part, the union representative equated the act of dragging items into a street with assault and active aggression in PPB's force directive.  *Id.* The collective bargaining agreement between the Portland Police Association and the City does not permit a union representative to participate in an interview.  *See* Labor Agreement between the Portland Police Association and the City of Portland, November 11, 2016 to June 30, 2020, Sec. 61.2.2.3, available at https://www.ppavigil.org/wp-content/uploads/2017/04/PPA-CBA-Nov-16-June-20-searchable.pdf ("The officer may have an Association representative present to witness the interview provided the representative does not participate in the interview").[4]  Thus, PPB permitted a violation of its collective bargaining agreement to interfere with its accountability process.

- **Precedent for excusing accidental shooting targets**

PPB incorrectly interpreted Directive 1010.00 – Use of Force to not prohibit force on an unintended subject.  That error potentially justifies future unintended uses of force.  Captain Anthony Passadore's findings memo and Assistant Chief Jami Resch's concurrence memo are both based on a conclusion that 1010.00 does not prohibit force against an unintended target. (Acting Assistant Chief Jay Bates also endorsed the findings for the reasons Captain Passadore stated, but did not detail what those reasons were.)  The precedent established—i.e., that officers are not accountable under 1010.00 for rounds hitting unintended targets—is concerning, especially if applied to more serious uses of force.

---

[4] The City extended this contract for one year.  *See* Ellis, Rebecca, "Portland Extends Contract With Police Union For 1 Year," OPB, July 1, 2020, available at https://www.opb.org/news/article/portland-police-contract-extend-negotiations-street-response/.

- **Excluding administrative charges**

PPB's directive 315.30 – Satisfactory Performance requires, among other things, that officers "use sound tactics and good decision-making during a confrontation" (Par. 2.1) and "make confrontation management decisions based on available options reasonably calculated to resolve the confrontation safely and effectively" (Par. 2.5). PPB did not apply this directive, in violation of Settlement Agreement Section VIII, which requires effective enforcement of all directives. In fact, the file provided to us contained two different, undated controvert memos[5] from IPR Director Ross Caldwell. In the first, Director Caldwell points out that the involved officer's missed shot could be sustained under 315.30. But the City did not restart the investigation. The record contains a second IPR controvert memo that removes this 315.30 language.

The failure to enforce 315.30, as the Settlement Agreement and PPB's own policies require, is a repeated problem. The same failure occurred with respect to the role of the acting Sergeant in the administrative investigation we reviewed for 2019-B-0047. These repeated failures demonstrate a systemic inadequacy in the City's accountability structure. The errors impact the City's ability to hold officers to account for violating PPB policy. As the City has asserted in the past, the failure to investigate a policy violation allegation as part of the same incident leads to an assertion of double jeopardy if there were a subsequent effort to investigate the policy violation allegation.

- **Administrative investigation lack of required supervisor force investigation**

PPB policy and the Settlement Agreement require after action reports (AARs) for uses of force. A Sergeant who was not on duty at the time of the underlying force event and was not connected to the event was assigned to complete the AAR. The AAR does not show interviews of officers, as policy requires. The AAR is substantively deficient, failing to even mention, much less review, the involved officer's errant shot. It was a Lieutenant's later review of the AAR that identified the errant shot based on the involved officer's statement in his FDCR. By that point, though, PPB had completed the AAR without the required interviews of involved or witness officers in proximity to the event. Unrelated supervisors completed AARs without adequate investigation for uses of force in crowd control events numerous times in 2020. As we stated in our compliance assessment report, the failure to appropriately complete the AAR deprives the administrative investigation of contemporary data essential to hold officers accountable for violating training or policy.

## 2020-C-0210

This administrative investigation concerned an interaction in a crowd control event captured on this video:
https://www.reddit.com/r/Portland/comments/hrao6x/portland_police_officer_rips_off_the_mask

---

[5] A controvert memo is a written disagreement with the recommended finding from the responsible unit manager of the accused officer. *See* Dir. 335.00, Discipline Process, Par. 2.5.1 ("If a proposed finding or recommended discipline of the RU Manager is controverted by the supervising Assistant Chief, the IPR Director, or the IA Captain, the case will be heard by the PRB in accordance with Directive 336.00, Police Review Board").

_of_a/.  The video shows an officer pull up the face mask of a person officers are confronting, and then shows the officer target the person's face with O.C. spray.  The video shows the person retreat after the use of force, and the same officer then deploy a second burst of O.C. spray toward the direction where the person retreated.

-   **Lack of Justification**

Like other PRBs, on this occasion, PPB pointed to the actions of other persons in the crowd to provide a justification for use of force against the person against whom PPB used force. In this instance, Commander Art Nakamura justified the first, video-recorded use of O.C. spray based on the violence of the "overall incident."  Further, he justified the involved officer's use of force based on the officer having been hit by a glass bottle before the interaction and by a paint balloon after the interaction.  Commander Nakamura does not state—and the record would not support—that the subject of the use of force was identified as the bottle or balloon thrower.  *Cf.* Dir. 1010.00, Par. 6.4.3.1.1 (requiring physical resistance or indication of intent to engage in physical resistance).

Commander Nakamura—the PPB executive charged with the responsibility of reaching the recommended finding in this case—stated that "force has to be used."[6]  This is a fundamentally flawed understanding of the constitutional and policy standard for use of force. His flawed supposition was tacitly accepted by every member present at the PRB.  The City's legal counsel did not correct the error, nor did the IPR Representative.  Commander Nakamura's superiors have not corrected the error.  This basic misunderstanding of constitutional limits on force reflects a failure of the City's accountability structure.

-   **Failure to Identify Collateral Misconduct**

As described above, the video shows two uses of O.C. spray.  The second use came after the subject backed away from the police line.  As we discussed with PPB on March 8, 2021, the PRB did not discuss the second use of O.C. spray.  Assistant Chief Resch informed us then that she did not see misconduct in the second use of O.C. spray based on her review of the whole video.  There should have been an investigation and finding to determine whether the second use violated policy.  Dir. 1010.00, Par., 5.4.1 ("Members must individually justify each independent application of force").

-   **Exonerated vs. Not Sustained**

PPB's accountability policies depend on the proper application of definitions and evidentiary standards for findings.  *See* Dir. 332.00 – Administrative Investigations, Definitions. The findings to which PPB and IPR agreed are:

---

[6] Commander Nakamura initially characterized the complaint as based on the officer's pulling up the subject's mask, not the use of O.C. spray.  Only after confronted by the PRB's community volunteer did CMDR Nakamura concede that the use of the O.C. spray was the allegation and the directive at issue.  He explained that his characterization was based on his "reading into" the "tone of the complaint."  Aside from the community member, no other PRB member corrected the mischaracterization of the allegation.

-   *Sustained: The preponderance of evidence proves a violation of policy or procedure.*
-   *Not Sustained: The evidence was insufficient to prove a violation of policy or procedure.*
-   *Exonerated: The preponderance of evidence proves the member's conduct was lawful and within policy.*
-   *Unfounded: The preponderance of evidence proves the allegation was false or devoid of fact or there was not a credible basis for a possible violation of policy or procedure.*

In this PRB, voting members, including PPB executives, recommended an "exonerated" finding. The facts presented did not support a preponderance of evidence that the member's conduct was lawful and within policy. Specifically, there was inconsistency between the video and the member's justification. The member's force data collection report and internal affairs interview indicated that the unidentified subject was pushing an officer and grabbing a police baton. The video does not show the subject pushing another officer or grabbing an officer's baton. Rather, the video shows the 11 seconds immediately preceding the member's first use of O.C. spray. In those 11 seconds before the first O.C. use, the video shows the subject with her hands up and does not show her push anyone or grab anything. The subject remains passive even after another officer pushes her back with a hand. After the involved officer pulls up her face mask to spray her, the video shows the subject remains with her hands up. The subject ran off and, absent identification, there is no interview of her.

In the face of 11 seconds of video that do not support the member's justification, and no earlier recording to determine whether or not the officer's reported perception was accurate in a prior timeframe, the evidence does not show that it is more likely than not that the member's actions were within policy. In fact, since PPB's force policy requires de-escalation and 11 seconds prior to the first application of O.C. spray the subject does not indicate any intent to engage in physical resistance, the evidence supports a sustained finding for violation of the force policy's de-escalation requirement.

-   **Misdirection on the Evidentiary Standard**

During the PRB, the City's legal counsel and PRB administrator each gave direction to the participating community member—a volunteer who is not expected to be an expert on PPB policy or legal standards, but votes on an outcome—but failed to correct his erroneous misapplication of PPB's policy. Specifically, the volunteer asserted that 1010.00 – Use of Force is not applicable when 635.10 – Crowd Management/Crowd Control "does not require restraint." In fact, 635.10 specifically requires that all uses of force in crowd control events are subject to PPB's force policy. *See* 635.10 – Par. 9.3. ("Force shall be used in accordance with Directive 1010.00, Use of Force"). The volunteer expressed his desire to reach two different findings on the different directives. The City's counsel directed the volunteer that he could not have different findings for different directives, but had to reach a single finding for both. The City's PRB administrator informed the volunteer that giving more weight to one directive than another is the application of the preponderance of evidence standard. (This was an incorrect assertion of the evidentiary standard.) But neither corrected the fundamental misapplication of

the pertinent policy.  In fact, in response to a later question, the volunteer made clear that he based his vote on giving more weight to 635.10 and did not apply 1010.00.  No one—not PPB executives or IPR's representative—corrected this use of 635.10 to justify force without the required application of 1010.00.

* * *

We hope this written feedback is useful to the City and PPB.  Please contact us if you would like to discuss these issues further.

Sincerely,

/s/ Jonas Geissler                    /s/ Jared D. Hager

R. Jonas Geissler                     Jared D. Hager
Senior Trial Attorney                 Assistant U.S. Attorney
Civil Rights Division                 District of Oregon
Department of Justice

cc:    Robert King, Senior Policy Advisor, *Robert.King@portlandoregon.gov*
       Brown, Heidi, Assistant City Attorney, *Heidi.Brown@portlandoregon.gov*
       Bridget Donegan, Esq., General Counsel, Portland City Auditor's Office
       *Bridget.Donegan@portlandoregon.gov*
       Mary Claire Buckley, Inspector General, Portland Police Bureau,
       *MaryClaire.Buckley@portlandoregon.gov*
       Dennis Rosenbaum, Compliance Officer, *dennisrosenbaum3@gmail.com*
       *via email only*