# COMPLIANCE OFFICER AND COMMUNITY LIAISON

# *Quarterly Report: Quarter 4*

# *Updates and Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**October 1, 2021 to December 31, 2021**

**May 27, 2022**



**Exhibit A**

# TABLE OF CONTENTS

**TABLE OF CONTENTS**                                                                    **1**

**INTRODUCTION**                                                                          **2**

**REPORT CARD**                                                                           **3**

**EXECUTIVE SUMMARY**                                                                    **12**

**III. USE OF FORCE**                                                                    **23**

**IV: TRAINING**                                                                         **37**

**V. COMMUNITY-BASED MENTAL HEALTH SERVICES**                                            **70**

**VI. CRISIS INTERVENTION**                                                              **76**

**VII. EMPLOYEE INFORMATION SYSTEM**                                                    **103**

**VIII. OFFICER ACCOUNTABILITY**                                                        **109**

**IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY
ENGAGED POLICING**                                                                     **125**

**XI. ADDITIONAL REMEDIES**                                                             **141**

**LIST OF ABBREVIATIONS**                                                               **144**

**LIST OF PERSONNEL**                                                                   **147**

**APPENDIX A**                                                                          **148**

**APPENDIX B**                                                                          **152**

**APPENDIX C**                                                                          **163**

**Exhibit A**

# <u>INTRODUCTION</u>

This is the Compliance Officer/Community Liaison's (COCL) fourth quarter report for 2021, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered September 23, 2021. This report covers the three-month period from October 1, 2021, to December 31, 2021.

COCL continues to evaluate whether the systems required by the Settlement Agreement have been sustained or restored to ensure constitutional policing in Portland. For the fourth quarter, most systems remained intact, but some have not been repaired and thus are unable to produce the desired outcomes. To a large extent, this can be attributed to the City not yet introducing remedies for the systems that were adversely affected (e.g. Critical Incident Assessment of crowd control in 2020).

**Exhibit A**

# **REPORT CARD**

This report includes a "Report Card" that provides a separate assessment of each paragraph in the Agreement. We have returned to this format because it gives the City additional clarity about what is needed to achieve Substantial Compliance. All paragraphs are reviewed and evaluated using the following standards:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.
- Non-Compliance: The City/PPB has not made any meaningful progress towards the satisfaction of the provision's requirements.
- Not Yet Assessed: COCL has not had the opportunity to fully assess the requirements of the provision and elects to withhold assessment of compliance until a more thorough review has occurred.

In this fourth quarter, the Portland Police Bureau (PPB) and the City of Portland remained in Substantial Compliance for the majority of the paragraphs in the Settlement Agreement. However, they were unable to return to Substantial Compliance for the following paragraphs regarding Use of Force (Pars. 66, 67, 69, 70, 73-77), Training (Pars. 78, 79, 84), Employee Information System (Pars. 116, 117) Officer Accountability (Pars. 128, 131), and Community Engagement (Par. 144). The table below summarizes the compliance status and recommendations for all paragraphs reviewed by COCL.

3

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **III. USE OF FORCE** | | |
| Par. 66 | Partial Compliance | • To achieve substantial compliance, conduct a Critical Incident Assessment<br>• To achieve substantial compliance, revise Directive 1010.00 as necessary |
| Par. 67 | Partial Compliance | • To achieve substantial compliance, conduct a Critical Incident Assessment<br>• To achieve substantial compliance, revise Directive 1010.00 as necessary |
| Par. 68 | Substantial Compliance | • Consider reminding officers during In-service training to visually confirm the weapon they are holding is a CEW and not a firearm. |
| Par. 69 | Partial Compliance | • To achieve substantial compliance, conduct a Critical Incident Assessment<br>• To achieve substantial compliance, revise Directive 1010.00 as necessary |
| Par. 70 | Partial Compliance | • To achieve substantial compliance, conduct a Critical Incident Assessment<br>• To achieve substantial compliance, revise Directive 1010.00 as necessary<br>• To achieve substantial compliance, clearly distinguish conducted that requires formal review from that which can be corrected by informal counseling |
| Par. 71 | Substantial Compliance | • Continue monitoring and reporting ratio of officers to sergeants |
| Par. 72 | Substantial Compliance | • Continue regular reviews of AAR form |
| Par. 73 | Partial Compliance | • To achieve substantial compliance, conduct a Critical Incident Assessment<br>• To achieve substantial compliance, revise Directive 1010.00 as necessary<br>• To achieve substantial compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 74 | Partial Compliance | • To achieve substantial compliance, ensure identified trends are forwarded to Policy and Training personnel as necessary |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | Partial Compliance | • To achieve substantial compliance, ensure completed process for each issue identified by the Force Inspector |
| Par. 75 | Partial Compliance | • To achieve substantial compliance, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>• To achieve substantial compliance, ensure completed process for each issue identified by the Force Inspector |
| Par. 76 | Partial Compliance | • To achieve substantial compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere<br>• To achieve substantial compliance, enhance follow-up processes<br>• To achieve substantial compliance, resume practice of the Force Inspector identifying potentially problematic officers |
| Par. 77 | Partial Compliance | • To achieve substantial compliance, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>• To achieve substantial compliance, ensure completed process for each issue identified by the Force Inspector |
| **IV. TRAINING** | | |
| Par. 78 | Partial Compliance | • To achieve substantial compliance, PPB must substantially comply with all paragraphs within Section IV |
| Par. 79 | Partial Compliance | • To achieve substantial compliance, hire an independent organization to complete a Critical Incident Assessment of crowd control during the 2020 protests, including implications for PPB training<br>• Explain how the FEMA training on Incident Command is responsive to PPB's crowd control issues. Clarify which PPB specialty units will be responding to demonstrations |
| Par. 80 | Substantial Compliance | • Hire more civilian analysts and information technology staff for the Training Division<br>• Consider redesigning knowledge tests to simplify the format and make them easier for students to complete<br>• Work with local university researchers to conduct more scientific evaluations of training on-the-job outcomes, including contact surveys to measure the impact of training on police-community interactions and procedural justice |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  | | • To ensure evidence-based training, PPB should take very seriously the findings and recommendations produced by the training analyst and others producing these reports |
| Par. 81 | Substantial Compliance | • No recommendations at this time |
| Par. 82 | Substantial Compliance | • No recommendations at this time |
| Par. 83 | Substantial Compliance | • No recommendations at this time |
| Par. 84 | Partial Compliance | • To achieve substantial compliance, incorporate findings from PPB's Needs Assessment on demonstrations as well as the findings from the future external Critical Incident Assessment on demonstrations.<br>• To achieve substantial compliance, develop and deliver training with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" (Par. 84) including crowd control settings. This should include opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest.<br>• To achieve substantial compliance, develop a policy or refine existing policy to clarify the roles and responsibilities of street-level incident command, and incorporate recent changes to PPB's force directive 1010.00.<br>• To achieve substantial compliance, strengthen your system to review and approve all specialty unit trainings to avoid inappropriate or harmful training and regain public trust<br>• Continue to explore the use of the VirTra 3-D simulator or other methods to identify or develop scenarios that allow officers to practice their de-escalation and procedural justice skills<br>• Continue to support the development of sophisticated online training that allows for interactivity<br>• Avoid overloading PPB members with too much online training during any one month, and keep them up to date on changes in the law<br>• Provide refresher training on first amendment rights and bias-free policing that can address any PPB bias against peaceful protestors |
| Par. 85 | Substantial Compliance | • To remain in substantial compliance, PPB must submit a Training Division audit plan by the end of the third quarter of |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | Substantial Compliance | 2022, with timelines for completing the next audit and the report |
| Par. 86 | Substantial Compliance | ● No recommendations at this time |
| Par. 87 | Substantial Compliance | ● No recommendations at this time |
| **V. COMMUNITY-BASED MENTAL HEALTH SERVICES** | | |
| Par. 88 | Substantial Compliance | ● No recommendations at this time |
| Par. 89 | Substantial Compliance | ● No recommendations at this time |
| Par. 90 | Substantial Compliance | ● Make changes to PSR as necessary in accordance with the findings of PSU |
| **VI. CRISIS INTERVENTION** | | |
| Par. 91 | Substantial Compliance | ● Continue to update COCL and DOJ on changes to personnel when applicable |
| Par. 92 | Substantial Compliance | ● Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 93 | Substantial Compliance | ● Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 94 | Substantial Compliance | ● Emphasize regular attendance to make maintain quorum being met |
| Par. 95 | Substantial Compliance | ● To remain in substantial compliance, ensure BHUAC has timely and complete access to future training presentation material<br>● Continue to engage COCL in conversation regarding the content of COCL's TA Statement |
| Par. 96 | Substantial Compliance | ● Emphasize documenting formal recommendations |
| Par. 97 | Substantial Compliance | ● No recommendations at this time |
| Par. 98 | Substantial Compliance | ● Allow BHUAC to review the training before the next In-service training |
| Par. 99 | Substantial Compliance | ● Continue monitoring ECIT data for trends |
| Par. 100 | Substantial Compliance | ● Continue utilizing existing data to assess demand for ECIT services |
| Par. 101 | Substantial Compliance | ● Re-engage the BHUAC regarding ECIT participation criteria |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 102 | Substantial Compliance | ● Seek out recommendations from the BHUAC on ECIT training |
| Par. 102 | Substantial Compliance | ● No recommendations at this time |
| Par. 103 | Substantial Compliance | ● No recommendations at this time |
| Par. 104 | Substantial Compliance | ● Continue to highlight all aspects of BHU's work |
| Par. 105 | Substantial Compliance | ● No recommendations at this time |
| Par. 106 | Substantial Compliance | ● No recommendations at this time |
| Par. 107 | Substantial Compliance | ● No recommendations at this time |
| Par. 108 | Substantial Compliance | ● No recommendations at this time |
| Par. 109 | Substantial Compliance | ● No recommendations at this time |
| Par. 110 | Substantial Compliance | ● Continue to collect data and create reports on mental health services |
| Par. 111 | Substantial Compliance | ● No recommendations at this time |
| Par. 112 | Substantial Compliance | ● No recommendations at this time |
| Par. 113 | Substantial Compliance | ● Create BOEC PSR policy |
| Par. 114 | Substantial Compliance | ● Develop focused training for PSR |
| Par. 115 | Substantial Compliance | ● Utilize quality assurance audits to inform PSR policies and training |
| **VII. EMPLOYEE INFORMATION SYSTEM** | | |
| Par. 116 | Partial Compliance | ● To achieve substantial compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br>● Continue contributing to the development of the EIS evaluation. |
| Par. 117 | Partial Compliance | ● To achieve substantial compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br>● Continue contributing to the development of the EIS evaluation. |
| Par. 118 | Substantial Compliance | ● No recommendations at this time |
| Par. 119 | Substantial Compliance | ● No recommendations at this time |
| Par. 120 | Substantial Compliance | ● Determine a long-term solution for responsibilities of second EIS administrator |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **VIII. OFFICER ACCOUNTABILITY** | | |
| Par. 121 | Substantial Compliance | ● No recommendations at this time |
| Par. 122 | Substantial Compliance | ● No recommendations at this time |
| Par. 123 | Substantial Compliance | ● Maintain self-improvement loop for stages even if case does exceed timelines |
| Par. 124 | Substantial Compliance | ● Maintain self-improvement loop for stages even if case does exceed timelines |
| Par. 124 | Substantial Compliance | ● No recommendations at this time |
| Par. 125 | Substantial Compliance | ● No recommendations at this time |
| Par. 126 | Substantial Compliance | ● No recommendations at this time |
| Par. 127 | Substantial Compliance | ● No recommendations at this time |
| Par. 128 | Partial Compliance | ● To achieve substantial compliance, provide accountability system transition plan<br>● To achieve substantial compliance, provide COCL an update on Records Division Backlog<br>● Show continued progress with Police Accountability Commission |
| Par. 129 | Substantial Compliance | ● Re-open allegation, perform an investigation, and provide a reasonable finding |
| Par. 130 | Substantial Compliance | ● No recommendations at this time |
| Par. 131 | Partial Compliance | ● To achieve substantial compliance, resolve the ongoing issues of PRB operation<br>● To achieve substantial compliance, ensure PRB members are clear that assignment is not an exonerating or mitigating factor |
| Par. 132 | Substantial Compliance | ● No recommendations at this time |
| Par. 133 | Substantial Compliance | ● No recommendations at this time |
| Par. 134 | Substantial Compliance | ● No recommendations at this time |
| Par. 135 | Substantial Compliance | ● No recommendations at this time |
| Par. 136 | Substantial Compliance | ● No recommendations at this time |
| Par. 137 | Substantial Compliance | ● No recommendations at this time |
| Par. 138 | Substantial Compliance | ● No recommendations at this time |
| Par. 139 | Substantial Compliance | ● No recommendations at this time |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 140 | Substantial Compliance | • No recommendations at this time |
| **IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING** | | |
| Par. 141 | Substantial Compliance | • No recommendations at this time |
| Par. 142 | Substantial Compliance | • To remain in substantial compliance, the City should respond to PCCEP's third quarter recommendations |
| Par. 143 | Substantial Compliance | • To remain in substantial compliance, the City should create a work plan, as promised, that outlines a strategy and timeline to identify and recruit sufficient PCCEP members to maintain a full body |
| Par. 144 | Partial Compliance | • To achieve substantial compliance, provide adequate staffing so that the minutes to PCCEP meetings are posted within 10 business days after a PCCEP meeting, in accordance with the Amended PCCEP Plan |
| Par. 145 | Substantial Compliance | • No recommendations at this time |
| Par. 146 | Substantial Compliance | • No recommendations at this time |
| Par. 147 | Substantial Compliance | • PPB should continue its dialogue with community members around racial disparities and pay particular attention to disparities in the Central district for both Blacks/African Americans and Hispanic/Latinos<br>• Prepare for additional training on stops and searches<br>• Consider refresher training on bias-free, impartial policing |
| Par. 148 | Substantial Compliance | • PPB should continue its dialogue with community members around racial disparities and pay particular attention to disparities in the Central district for both Blacks/African Americans and Hispanic/Latinos<br>• Prepare for additional training on stops and searches<br>• Consider refresher training on bias-free, impartial policing |
| Par. 149 | Substantial Compliance | • Implement a contact survey to measure the level of procedural justice in police-public interactions<br>• Implement internal surveys of PPB members to measure organizational justice, employee satisfaction, wellness, and police culture<br>• Acquire and use software to analyze body worn camera data |
| Par. 151 | Substantial Compliance | • PPB should present the Annual Report to the City Council after receiving feedback from the community at Precinct meetings |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|-----------|------------------|----------------------|
| Par. 151 | Substantial Compliance | ●   No recommendations at this time |
| Par. 152 | Substantial Compliance | ●   No recommendations at this time |

**Remedies for Non-Compliance**

After five mediation meetings (three taking place in the fourth quarter), the City and DOJ have reached agreement on a set of remedies to achieve compliance with the terms of the Settlement Agreement.[1] On November 8, 2021, DOJ and the City filed a "Joint Status Report" in the U.S. District Court (Par. 182), summarizing the mediation results and the specific remedies on which the parties agreed in principle. The Court was provided an update the following day. Essentially, the parties have agreed to add a new section to the Settlement Agreement - Section XI - that contains eight new paragraphs 188 to 195 (See Appendix A for the list of remedies). The City Council approved these remedies in February of 2022. A formal joint motion to amend the Agreement will be filed with the Court in 2022, and a fairness hearing is expected in April of 2022 to determine whether Section XI is "fair, adequate, and reasonable."

In the meantime, the City is working hard to lay the groundwork for these remedies and the City Council has approved funding for certain remedies. COCL will assess all relevant paragraphs of the Settlement Agreement but will give increased attention to these remedies as they are critical for achieving Substantial Compliance. In preparation, we have added Section XI to the current report ("Additional Remedies"), and have provided a brief summary of three critical remedies where work is underway, namely, hiring a civilian to lead the Training Division (Par. 191), introducing body-worn cameras for PPB officers (Par. 194) and creating a Community Police Oversight Board (Par. 195). Once approved by the Court, the work of COCL will expand significantly as we begin to conduct a formal compliance review for all paragraphs within Section XI.

---

[1] These meetings included the Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

# EXECUTIVE SUMMARY

## SECTION III: USE OF FORCE

During the fourth quarter of 2021, the PPB did not return to substantial compliance with Section III. However, for several elements of Section III, we find that PPB's efforts are consistent with prior quarters wherein we had found substantial compliance. These include areas of Conducted Electrical Weapon (CEW) use (Par. 68), the After Action Report (AAR) form (Par. 72), sergeant staffing (Par. 71), and our review of a sample of force cases (including CEWs, force against persons perceived to be in mental health crisis, and protest force events).

However, as with prior quarters, the failure to return to substantial compliance was, in large part, due to PPB not completing a comprehensive Critical Incident Assessment of the Bureau's response to the 2020 protests. Although our review of force events from the fourth quarter did not reveal deficiencies, the PPB will need to complete the external Critical Incident Assessment to understand the full extent of problems associated with force applications, force reporting, and force investigation (issues we identified in prior reports) and to implement durable remedies based on the finding of the assessment. During the fourth quarter, the City released a Scope of Work for this assessment; however, the COCL was not provided an opportunity to weigh in on the Scope of Work before it went to potential vendors. While we believe the City's request for proposals is sufficient to describe the purpose and scope of the work required, we will still need to ensure that the assessment adequately covers the areas of concern given the importance of the assessment.

We also find Section III to be out of Substantial Compliance based on the audit process used by the Force Inspector (Pars. 74-77). While we found the Force Inspector was able to identify policy, training, equipment, and personnel concerns, there was a lack of documented follow-up to verify that responsive actions were being taken. We found this to be true as it relates to specific issues found by the Force Inspector as well as larger, longer-term trends. Furthermore, as it relates to identifying trends, we found the Force Inspector did not proactively identify any individual officers, units, or groups, but instead forwarded the entire analysis document to RU Managers. We also provide a range of analyses that could be conducted by the Force Inspector and analysts, though we discuss these in the context of current PPB resources and they will not impact compliance.

## SECTION IV: TRAINING

The PPB has remained in substantial compliance with seven paragraphs in Section IV. Specifically, the PPB has continued to: maintain a robust system of data collection and analysis

to evaluate their training programs (Par. 80), electronically track their training records (Par. 81), report training delivered and received semi-annually to the Assistant Chief of Operations (Par. 82), ensure that officers selected to serve as trainers do not have a history of using excessive force (Par. 83), make plans to audit the training program (Par. 85), gather and present data quarterly on use of force to the Chief, the PPB Training Division, and to the Training Advisory Council (Par. 86), and keep meetings of the Training Advisory Council open to the public (Par. 87).

However, the PPB remains in partial compliance on two key paragraphs in Training: Par. 79 and Par. 84 as described below.

_Training Needs Assessment and Training Plan: Par. 79_

During the 4th quarter the Training Division worked on updating its training needs assessment to include crowd control, as requested by COCL. Most notably, we credit them with preparing their own report on crowd control in December – _2021 Training Needs Assessment: Law Enforcement Response to Mass Demonstrations_. The Training Division also completed its _2022 Annual Training Plan_ in the fourth quarter. However, the PPB remains in Partial Compliance with Par. 79 for the reasons stated below.

The Training Needs Assessment around mass demonstrations is lengthy and seeks to review the crowd management events between January of 2020 and June of 2021. The authors admit that "_The Bureau as a whole was not prepared for or trained for responding to events of this duration_." (i.e., 170 days). The report contains an extensive list of training recommendations on crowd management (15 pages), but there is no sense of prioritization (Are some recommendations more important than others?) and the resources to implement such training are clearly lacking. Sorting out these recommendations and developing an implementation plan is not the responsibility of the analysts who prepared this report, so we will await decisions by the PPB's management. Furthermore, as technical assistance, COCL continues to emphasize that good training is more than sharing ideas about crowd management - it should involve developing and strengthening specific skills through practice sessions.

PPB's Annual Training Plan for 2022 was released in December of 2021 and reviewed by COCL. The Training Plan includes training for the main groups relevant to the Settlement Agreement: all sworn members, all sworn supervisors, the Enhanced Crisis Intervention Team (ECIT) and the Behavioral Health Unit, using both in-person and online methods of training. New training in 2022 will also cover the force restrictions found in the new Oregon law (HB 2513), as well as PPB's revised directives on Use of Force (1010.00) and Crowd Management (635.10). However, these trainings were not finalized or scheduled by the end of the fourth quarter because the policies were still being revised.

In their 2022 Training Plan, the PPB should be credited with a good-faith effort to be responsive to earlier critical analyses by COCL and DOJ of their crowd control responses. For example, the Supervisors In-Service training for 2022 is expected to (1) expand the 2021 Critical Incident Management class to include practice scenarios and critical incident command and (2) expand supervisors' knowledge of how to conduct a use of force investigation for After Action reports and how to conduct investigations of community complaints.

The Training Plan also proposes a separate training on Crowd Management. Sworn members, Sergeants, Lieutenants, and other command-level personnel will all have roles to play in the Crowd Management Incident Command training. However, it is unknown whether this standardized training, drawn from a national agency (the Federal Emergency Management Agency, FEMA) will be fully responsive to the specific crowd control problems faced by the PPB in 2020.

Briefly, to achieve substantial compliance for par. 79, the City will need to hire an independent organization to complete a Critical Incident Assessment of crowd control during the 2020 protests, which should include an assessment of PPB's training needs. Without this external evaluation, we cannot be confident that any current plans for training PPB's members are complete and responsive to the problems that emerged with use of force.

As technical assistance, we encourage the PPB to explain how the national training on Incident Command from FEMA is responsive to PPB's crowd control issues. Also, in preparation for the next protest, the PPB should prepare training plans for any specialty unit deployment and any weapons that will be allowed, based on undated policies.

*Training Content and Delivery: Par. 84*

During the fourth quarter, PPB provided two important trainings required by paragraph 84 – Supervisor Training and peer intervention training for all officers. COCL observed both of these trainings and in this fourth quarter report we provide a description and assessment of each. In addition, we provide an overview of the online trainings delivered by PPB during the fourth quarter.

**Supervisor In-service Training**

Supervisor training is critically important in many ways. Not only do supervisors play a significant role in nurturing the culture within the organization, but they are also expected to make difficult decisions in stressful situations, and when force is used, ensure that these events are properly documented and reviewed for compliance with PPB policy.

This 8-hour training covered supervision from several perspectives, including procedural justice, intervening with problematic employees, employee wellness, and critical incident management. The class was well executed and students were engaged, but COCL identified several areas

where improvement is possible, so we offer technical assistance on this subject. We have several recommendations pertaining to the Critical Incident Management training. First, this training was not based on any PPB policy, so revisions to relevant policies should be a priority. Second, this training included an extensive list of supervisory roles in incident command (e.g., 4 types of plans and 4 guiding principles) as well as supervisory roles in de-escalation but provided no time or opportunity to engage in scenarios so that supervisors could practice these skills. Third, the examples used in this critical incident training were exclusively about potential suicide and included no examples of how to de-escalate potential use of force situations with aroused individuals, crowds, or demonstrations.

**ABLE Peer Intervention Training**

In-service peer intervention training, required by Par. 84, encouraged officers to intervene when their peers are engaging in, or about to engage in, harmful actions, such as the use of force against passively resistant protesters. After the approval of directive 305.00 on peer intervention in the third quarter, PPB introduced the 8-hour ABLE training ("Active Bystandership for Law Enforcement''), developed by Georgetown University's Law Center. The training sessions were led by PPB members who were trained and certified through ABLE's "train-the-trainer" process. COCL reviewed the training, delivered via Zoom, and felt that it was well executed by PPB personnel. Although Zoom can create some barriers to interactivity and practice, the role-plays were mostly well-done and the trainers were able to engage the quieter participants in the full group discussions. Similar to our review, the national Lead Training Instructor for the ABLE program concluded that the PPB instructors "did an outstanding job."[2]

**Specialty Unit Training**

The crisis of public trust caused by the 2018 RRT training slides is well known at this point. COCL began to report on the deficiencies in RRT training in 2021 but had no idea of the existence of disturbing training material until January of 2022. To be clear, The Training Division is required to review and approve all training material used to train PPB personnel, per directive 1500.00 and SOP 1021, but PPB apparently did not enforce this directive. PPB has taken some action to correct this problem going forward, and COCL will provide an update in our 2022 first quarter report. PPB has dozens of specialty units (from the Canine Unit to the Air Support Unit), but the quality of training for many of these is not relevant to the Settlement Agreement. However,

---

[2] This individual has trained instructors in more than 180 agencies across the country.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

COCL will keep track of training for specialty units when use of force becomes an issue in the context of the Settlement Agreement.

**Conclusions about Training Content and Delivery**

Although the Supervisory and ABLE trainings were well executed, and the Training Division continues to provide a variety of good online trainings, the PPB did not return to Substantial Compliance during the fourth quarter because they have yet to provide crowd control training that incorporates changes to the use of force policy (directive 1010.00), incorporates both internal and external assessments of training needs, and provides scenarios or exercises to practice appropriate skills relevant to use of force decision making, including de-escalation and procedural justice. Furthermore, these trainings cannot be delivered until the policies on use of force and crowd control have been revised and approved. Many revisions have been made, but the review process was still ongoing at the conclusion of the fourth quarter. Also, PPB needs to strengthen its system of review and approval for all specialty unit trainings to avoid inappropriate or harmful training and to regain public trust.

Beyond compliance issues, COCL continues to provide recommendations to improve training. Specifically, the PPB should: continue to explore virtual simulators that can provide scenarios wherein officers can practice their de-escalation and procedural justice skills; continue to support the development of sophisticated online training that allows for interactivity; avoid overloading PPB members with too much online training during any one month; keep PPB members up to date on changes in the law; and provide refresher training on first amendment rights and bias-free policing that can address potential PPB biases against peaceful protestors.

## SECTION V: COMMUNITY-BASED MENTAL HEALTH SERVICES

For Section V, COCL continues to emphasize the fact that the Settlement Agreement recognizes that PPB and the City do not bear primary responsibility for delivering community-based mental health services. Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. As for the City's and PPB's role, both continued to participate in the broader community-based mental health service response system through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

**Exhibit A**

Also during the fourth quarter, the Bureau of Emergency Communication (BOEC) maintained Portland Street Response (PSR) dispatch protocols and training for telecommunicators, both of which were previously reviewed by the BHUAC. Portland State University (PSU) released a report evaluating the first six months of PSR's operation. Our report provides a summary of this report on PSR as it pertains to Par. 90 of the Settlement Agreement. In general, PSR seems to be capable of providing some relief in response to mental health calls but is currently restricted in the call types for which they are allowed to respond. Furthermore, while training during the pilot program has been adequate, PSU recommends that BOEC adopt a formal training program regarding PSR calls that builds upon the information they have collected during the pilot program. As PSR expands citywide, it is important that PPB and the city continue to advertise and promote this option.

Also as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Related to this, PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crises. Additionally, PPB continues to participate in the Transportation Workgroup.

## SECTION VI: CRISIS INTERVENTION

During the fourth quarter of 2021, the PPB and the City maintained compliance with Section VI. As we have done in the past, we evaluated PPB and the City's system of mental health response in two ways: (1) Primary Response (including ECIT officers and Portland Street Response); and (2) Secondary Response (including BHRT and SCT). We also evaluated the steps taken once a call is received by BOEC involving a person in mental health crisis. We then assess PPB's response to such calls when received. Finally, we examined what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB.

This quarter, BOEC maintained their policies and training for telecommunicators on dispatching officers to calls involving a mental health component. They continued to use seven call characteristics to determine whether a specialized EICT officer should be dispatched. In a meeting with BOEC personnel, we were assured of the protocols they have in place for utilizing PSR, but there remains a need to adopt official policies and training for PSR. BOEC will be working on these in 2022 and they are currently auditing calls and collecting information to help inform PSR policies and training.

For their part, the PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22

**Exhibit A**

(Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). Additionally, the PPB continued to provide training to new officers as well as current officers (through annual In-service training). Additionally, PPB maintained their specialized response approach through the use of ECIT officers. In the fourth quarter of 2021, PPB completed the training of a new class of ECIT officers, bringing the total operational roster from 100 to 128. Our report reviews the data collected by PPB on ECIT in the fourth quarter.

The PPB has maintained the use of the Behavioral Health Response Team (BHRT) to assist individuals who represent an escalating risk of harm. While the settlement agreement only requires three teams for each precinct, PPB has plans to return to five BHRTs in the near future. The PPB has also maintained the Service Coordination Team (SCT) to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. For both of these programs, we provide ongoing operational statistics, including statistics related to decision-making and outcome.

Finally, the BHUAC continued to meet during the fourth quarter of 2021, utilizing the expertise of individuals at PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, the Public Defender's Office, CareOregon, AMR, Central City Concern, and the Unity Center for Behavioral Health. During the quarter, the advisory committee discussed topics related to ECIT training and public meetings.

COCL has issued a Technical Assistant (TA) statement regarding the operation of the BHUAC in the review of training and the review of critical incidents. COCL points out that BHUAC did not have adequate time to review and provide recommendations for the November 2021 ECIT training. The TA statement in full can be found at the end of this report (Appendix C). While we believe the BHUAC is still operating in a manner that complies with the Settlement Agreement, we urge PPB and the city to re-evaluate and better utilize the BHUAC so that its advisory function can be maximized.

## SECTION VII: EMPLOYEE INFORMATION SYSTEM

For the fourth quarter of 2021 PPB was in substantial compliance with a portion of Section VII (Pars. 118 – 120), as the current EIS thresholds to identify potentially problematic behavior are technically adequate to meet the requirements of the Settlement Agreement. However, PPB has only met partial compliance for Pars. 116 and 117 due to the process by which officers with outlying use of force statistics are identified and documented in EIS. Instead of identifying "at-risk employees, supervisors [or] teams" the Force Inspector forwarded results to RU Managers

for review. Consequently, there was a lack of documentation of the decision making process in EIS. In order to reach substantial compliance the Force Inspector needs to conduct the Type III alert process in accordance with Directive 345.00. Furthermore, while the PPB is currently in substantial compliance with Par. 120 due to the Force Inspector acting as the second EIS administrator on an interim basis, we recommend PPB find a long-term solution for the responsibilities of the second EIS administrator.

We also maintain our position from prior reports that PPB should seek to ensure that the EIS is "more effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116). Although no discussions regarding this evaluation were held in the fourth quarter of 2021, initial meetings occurred in the first quarter of 2022 and COCL began discussing the evaluation process. We will provide updates in our next report.


**SECTION VIII: ACCOUNTABILITY**

During the fourth quarter of 2021, PPB did not return to substantial compliance with Section VIII. We note several paragraphs within Section VIII where PPB and the City have maintained substantial compliance, including paragraphs related to OIS investigation procedures, IPR documentation/notification requirements, and CRC operations. Furthermore, the City and PPB returned to substantial compliance for all paragraphs related to timely investigations. This includes the requirement to complete administrative investigations within 180 days, a continually improving metric since 2020 and one which has now returned to levels which had warranted prior substantial compliance.

However, for other paragraphs, we find persistent issues that prevent PPB from gaining substantial compliance (Par. 128 and 131). For instance, we continue to find deficiencies in Police Review Board operations, including using mitigating factors to justify the use of force rather than as a consideration for the extent of discipline. Additionally, during one PRB, we noted some PRB members expressed concern that the officer's assignment could be impacted by a sustained finding of excessive force. This is problematic as PRB members should not be predicating their decisions to any degree on how it might affect the officer's assignment. Because this would not justify misconduct nor would it be considered a mitigating factor, PRB members should avoid considering the officer's current/future assignment in their deliberations.

We also found hindrances to meaningful, independent investigation by IPR remained, including the tenuous position IPR finds itself in given the forthcoming civilian-led accountability system. There is also the backlog of more than 50,000 documents in the Records Division that has impacted IPR's trust that they have access to all documents necessary to conduct an

**Exhibit A**

investigation. While PPB and the City inform us that the vast majority of documents in the backlog are likely inconsequential to administrative investigations, we have yet to receive an update as to the current size of the backlog, the impact of the backlog, or the City's efforts to reduce the backlog.

## SECTION IX: COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

To achieve greater community input and engagement with the PPB and to strengthen police-community relations, Section IX requires that the City create and support the PCCEP, and that the PPB enhance its community outreach efforts. At the end of the fourth quarter, the City was in substantial compliance with 11 of 12 paragraphs in this section, although there are areas of growing concern. Here we provide a brief overview of PCCEP's role, the City's role, and the PPB's role in this community engagement process.

### *PCCEP's Role*

Per Pars. 141 and 142, PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations. However, by the end of the fourth quarter, the COCL has growing concern that this legitimacy is in jeopardy.

While PCCEP members remain very active and should be credited for their contributions, given the level of attrition, we are concerned about whether PCCEP still represents a "reasonably broad spectrum of the community," as required by Paragraph 143. There is diverse gender and racial representation among the seven PCCEP members still seated at the end of the fourth quarter, but many seats are vacant. COCL is concerned with the attrition of PCCEP members, and lack of urgency on the part of the City to identify and recruit new PCCEP members to maintain a full 13-member body. No new members have been appointed since August of 2021. Attrition and the lack of re-appointment of new members was a major factor in the dissolution of PCCEP's preceding body, the Community Oversight Advisory Board. COCL will watch this issue closely in the first quarter of 2022 and will reduce the compliance rating if swift action is not taken. To remain in substantial compliance, the City should create a work plan, as promised, that outlines a strategy and timeline to identify and recruit sufficient PCCEP members to maintain a full body. The City will also need to respond to PCCEP's third quarter recommendations.

### *City's Support*

Paragraph 144 states that "The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan." The City's role is to support the PCCEP by ensuring adequate membership, providing training to members, staffing the committee with competent individuals, and providing technical assistance with meetings and other functions. Although the City has been supportive in some ways (e.g. someone from the City Attorney's Office and the PPB attend PCCEP meetings to answer questions), the City remains at Partial Compliance with Par. 144 because the staffing problems identified by COCL in each quarter of 2021 have not been addressed.

During the fourth quarter, written minutes for PCCEP meetings continue to be difficult to locate on PCCEP's website. To achieve substantial compliance, the City will need to provide adequate staffing within the Mayor's office or the Office of Equity and Human Rights so that the minutes from PCCEP meetings are posted within ten business days after a PCCEP meeting, in accordance with the Amended PCCEP Plan. The public must be kept informed about these community engagement opportunities and productions. For the fourth quarter, the City's level of support for PCCEP was insufficient to return to Substantial Compliance for Par. 144.

*PPB's Role*

During the fourth quarter the PPB continued to implement its Community Engagement Plan by maintaining partnerships with community organizations and advisory councils and seeking their help with various forms of training for PPB members on cultural awareness and Limited English Proficiency (LEP). Thus, PPB remains in substantial compliance for Pars. 145 and 146.

PPB remains in Substantial Compliance with Par. 147 because they have reported demographic data pertinent to each precinct and posted these data on their website. PPB remains in Substantial Compliance with Par. 148 because they continue to collect, analyze, and report demographic data from individuals who are stopped by PPB.

The number of individuals stopped who were perceived by PPB to have a mental health issue remained steady at around 1% of the total traffic stops. In this fourth quarter report, COCL produced tables showing the traffic stops rates for Black/African Americans and Hispanic/Latino drivers for each quarter of 2021, broken down by precinct. The fourth quarter data for 2021 continues to show racial disparities in traffic stops, mostly for Black/African American drivers. COCL recommends that PPB should continue its dialogue with community members around racial disparities and pay particular attention to disparities in the Central district for both Blacks/African American and Hispanic/Latino drivers.

We are still waiting for policy changes and new training on consent searches. PPB has held off because Oregon state legislators have yet to finalize a bill on consent searches.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

The City has completed the requirement in Par. 149 to develop a set of metrics to evaluate community engagement, and therefore, they remain in Substantial Compliance. However, as technical assistance, COCL continues to encourage the City and PPB to gather more specific outcome data relevant to police-community interactions, which can be used to track and enhance organizational performance. To measure the quality of police-community interactions for all encounters, body-worn camera data will be helpful if the City can acquire innovative software that is able to scan for problematic patterns in audio and video data and generate reports for supervisory review. Also, we continue to recommend that PPB reintroduce contact surveys to give community members a voice and reintroduce officer surveys to give PPB members a voice on this subject.

The PPB has remained in substantial compliance with Par. 150, which requires them to issue a publicly available PPB Annual Report and discuss it with community members in each Precinct and with the City Council. As technical assistance, we recommend that PPB present the Annual Report to the City Council <u>after</u> receiving feedback from the community at Precinct meetings.

# III. USE OF FORCE

## A. Use of Force Policy

---

**Settlement Agreement Paragraph**

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. <u>COCL Summary</u>: Paragraph 67 establishes that the PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the subject, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| **Compliance Label** | Par. 66 Partial Compliance |
| --- | --- |
| | Par. 67 Partial Compliance |
| **Methodology** | Review force case sample |

Compliance Assessment

As part of our regular review of PPB force events, we reviewed 20 cases which represent a cross-section of PPB use of force, including force from different Categories, from different Precincts, involving the use of a CEW, against persons in mental health crisis, and protest force events. We find that the force we reviewed for this quarter was consistent with the letter and intent of Pars. 66 and 67.

However, we continue to find PPB and the City out of compliance for Pars. 66 and 67 until a comprehensive Critical Incident Assessment of the 2020 protests is conducted to resolve the deficiencies of the 2020 protest response by PPB and safeguard against similar deficiencies occurring should PPB face protests of similar extent and use similar force. Although not in the fourth quarter of 2021, we participated in discussions regarding revisions to 1010.00 in the first

| | |
|---|---|
| | quarter of 2022 that we believe will ultimately remedy many of these issues even prior to the assessment. We will provide an update in our next report. |
| **COCL Recommendations** | ● To achieve substantial compliance, conduct a Critical Incident Assessment<br>● To achieve substantial compliance, revise Directive 1010.00 as necessary |
| **Assessment Based On** | ● Lack of Critical Incident Assessment<br>● COCL review of force sample |

## 1. Electronic Control Weapons

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 68. <u>COCL Summary</u>: The PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement). | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review force case sample |
| Compliance Assessment<br><br>Based on our review of PPB force events, we find that PPB officers continue to use CEWs in accordance with the Settlement Agreement (Par. 68). Directive 1010.00 includes a section directing officers on when they may and may not employ a CEW and the requirements of officers before, during, and after the use of a CEW. For instance, PPB policy requires independent justification for each individual CEW cycle, the provision of a verbal warning | |

before deploying when safe, and paramedics to be tasked with removing CEW probes. In our review, we found that all CEW instances contained these elements.

Although not required by the Settlement Agreement, we suggest PPB provide updated training to their officers on visually confirming that the weapon they are holding is a CEW rather than a firearm, in light of mistakes made in other cities.[3] We have seen this emphasized in training previously, though given the recent case in Minneapolis, additional reminders could be beneficial.

| | |
|---|---|
| **COCL Recommendations** | ● Consider reminding officers during In-service training to visually confirm the weapon they are holding is a CEW and not a firearm. |
| **Assessment Based On** | ● COCL review of CEW cases |

## 2. Use of Force Reporting Policy and Use of Force Report

| **Settlement Agreement Paragraph** |
|---|
| 69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors. |

| Compliance Label | <mark>Partial Compliance</mark> |
|---|---|
| Methodology | Review force case sample |
| **Compliance Assessment** | |

---

[3] See https://www.nytimes.com/2021/12/23/us/kim-potter-gun-taser.html

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

As part of our regular review of PPB force events, we reviewed 20 cases which represent a cross-section of PPB use of force, including force from different Categories, from different Precincts, involving the use of a CEW, against persons in mental health crisis, and protest force events. We find that the force we reviewed for this quarter was consistent with the letter and intent of Par. 69.

However, we continue to find PPB and the City out of compliance for Par. 69 until a comprehensive Critical Incident Assessment of the 2020 protests is conducted to resolve the deficiencies of the 2020 protest response by PPB and safeguard against similar deficiencies occurring should PPB face protests of similar extent and use similar force. Although not in the fourth quarter of 2021, we participated in discussions regarding revisions to 1010.00 in the first quarter of 2022 that we believe will ultimately remedy many of these issues even prior to the assessment. We will provide an update in our next report.

| | |
|---|---|
| **COCL Recommendations** | • To achieve substantial compliance, conduct a Critical Incident Assessment<br>• To achieve substantial compliance, revise Directive 1010.00 as necessary |
| **Assessment Based On** | • Lack of Critical Incident Assessment<br>• COCL review of force sample |

### 3. Use of Force Supervisory Investigations and Reports

**Settlement Agreement Paragraph**

70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00[4], which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph

---

[4] The sections of Directive 940.00 that dealt with supervisory responsibilities following a force event were previously combined with Directive 1010.00 as PPB desired to have 1010.00 cover all policies related to force. Thus, the requirements of Par. 70 have been housed within Directive 1010.00 since 2017.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review force case sample |

**Compliance Assessment**

As part of our regular review of PPB force events, we reviewed 20 cases which represent a cross-section of PPB use of force, including force from different Categories, from different Precincts, involving the use of a CEW, against persons in mental health crisis, and protest force events. We find that the AARs we reviewed for this quarter were consistent with the letter and intent of Par. 70.

However, we continue to find PPB and the City out of compliance for Par. 70 until a comprehensive Critical Incident Assessment of the 2020 protests is conducted to resolve the deficiencies of the 2020 protest response by PPB and safeguard against similar deficiencies occurring should PPB face protests of similar extent and use similar force. Although not in the fourth quarter of 2021, we participated in discussions regarding revisions to 1010.00 in the first quarter of 2022 that we believe will ultimately remedy many of these issues even prior to the assessment. We will provide an update in our next report.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To achieve substantial compliance, conduct a Critical Incident Assessment</li><li>To achieve substantial compliance, revise Directive 1010.00 as necessary</li></ul> |
| **Assessment Based On** | <ul><li>Lack of Critical Incident Assessment</li><li>COCL review of force sample</li><li>Lack of clarity in conduct that requires formal review</li></ul> |

**Settlement Agreement Paragraph**

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review rate of officers to supervisors |

**Compliance Assessment**

PPB has maintained an adequate patrol-supervision staffing level in accordance with Par. 71. As noted in prior reports, the rate of officers to sergeants is a better metric than the raw number of sergeants. In the fourth quarter of 2021, PPB reported a staffing ratio of 5.5 officers for every sergeant (including Acting Sergeants) across the three main precincts. This is the highest ratio in the past six quarters and PPB currently is operating seven sergeants under their authorized amount (68 sergeants for 75 authorized positions). However, the ratio continues to be reasonable and we therefore find that PPB has maintained compliance with Par. 71.

| COCL Recommendations | ● Continue monitoring and reporting ratio of officers to sergeants |
|---|---|
| Assessment Based On | ● COCL review of ratio of officers to sergeants |

---

**Settlement Agreement Paragraph**

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review current AAR form; Review upcoming web form |

**Compliance Assessment**

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

Presently, the After Action Report (AAR) form contains the checklist and therefore we find the PPB has remained in substantial compliance with the requirements of Par. 72. PPB is currently in the process of piloting the current AAR form into a SharePoint web form which will allow for a more streamlined process of documenting crowd control events through updated dropdown menus. We find that several of the updated sections are useful. For example, as part of the administrative checklist, a box for "PSD notified" and "shift supervisor notified" were added. Under the command review section a checkbox to "return to lower level for correction" was added. Also, an "other" description textbox was added for both the de-escalation and other policies sections. Additionally, the SharePoint form should allow for more effective tracking of After Actions through timestamps, access to previous drafts, and automatic email notifications. Once the pilot project is complete, PPB plans to roll out the SharePoint version of the form bureau-wide. While we wait for the findings of the Critical Incident Assessment, we note that the current changes should address several of the issues we have raised in the past (see, for instance, our 2020 Q4 report[5]) and we credit PPB with undertaking this process. We look forward to reviewing the findings of the pilot test, though we also suggest PPB conduct a follow-up review after a large protest event to ensure supervisors indeed found the updated form beneficial.

| **COCL Recommendations** | ● Continue regular reviews of AAR form |
|---|---|
| **Assessment Based On** | ● COCL review of AAR form |

---

**Settlement Agreement Paragraph**

73. <u>COCL Summary:</u> Paragraph 73 directs the PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate

---

[5] https://static1.squarespace.com/static/5a319f76a9db0901e16c6433/t/60538cfd2ea4bc128284886d/1616088321426/Q4+2020+COCL+Compliance+and+Outcome+Assessment+Quarterly+Report+FINAL+03182021.pdf

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review force case sample |

### Compliance Assessment

As part of our regular review of PPB force events, we reviewed 20 cases which represent a cross-section of PPB use of force, including force from different Categories, from different Precincts, involving the use of a CEW, against persons in mental health crisis, and protest force events. We find that the AARs we reviewed for this quarter were consistent with the letter and intent of Par. 73.

However, we continue to find PPB and the City out of compliance for Par. 73 until a comprehensive Critical Incident Assessment of the 2020 protests is conducted to resolve the deficiencies of the 2020 protest response by PPB and safeguard against similar deficiencies occurring should PPB face protests of similar extent and use similar force. Although not in the fourth quarter of 2021, we participated in discussions regarding revisions to 1010.00 in the first quarter of 2022 that we believe will ultimately remedy many of these issues even prior to the assessment. We will provide an update in our next report. Additionally, should Section XI of the Settlement Agreement be approved, Par. 188 (which would require new reporting procedures) would need to be incorporated into policy or included in an SOP.

As a follow-up to an issue raised in prior reports, we remain unclear as to how PPB distinguishes between conduct that is best corrected by informal counseling and conduct that requires formal review. In our prior reports, we noted a supervisor who conducted a deficient AAR which was then approved through the chain-of-command. While we agree that not everything requires formal discipline, we are concerned that the EIS system (where such informal conversations are documented) is being used as a substitute for the accountability system.

This is due, in part, to there being no clear distinction between what may be appropriately handled through an EIS entry as a teaching opportunity and what requires a more formal review. In PPB Directive 0331.00 (Supervisory Investigations), there is a clear definition of what receives a Supervisory Investigation ("if substantiated, [the rule violation] would not result in corrective action greater than command counseling"). However, no such definition exists for EIS entries and Supervisory Investigations. PPB should better clarify how this is distinguished so

| | as to ensure EIS is not being used for disciplinary purposes (see PPB Directive 345.00 - Employee Information System). |
|---|---|
| **COCL Recommendations** | <ul><li>To achieve substantial compliance, conduct a Critical Incident Assessment</li><li>To achieve substantial compliance, revise Directive 1010.00 as necessary</li><li>To achieve substantial compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling</li></ul> |
| **Assessment Based On** | <ul><li>Lack of Critical Incident Assessment</li><li>COCL review of force sample</li><li>Lack of clarity in conduct that requires formal review</li></ul> |

**B. Compliance Audits Related to Use of Force**

---

**Settlement Agreement Paragraph**

74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors

---

consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement.)

| Compliance Label | Par. 74 Partial Compliance |
|---|---|
| | Par. 75 Partial Compliance |
| | Par. 77 Partial Compliance |
| Methodology | Review Quarterly Force Audit Report; Review Force Inspector Memos; Review Force Inspector Phase II Spreadsheet |

### Compliance Assessment

As with prior PPB reports, it was noted that EIS "has continued to generate a large proportion of deficiencies every quarter in 2021". The report also noted that "there is a need for attention to: Command (Lt.-CHO) ensuring that reporting and/or supervisor reviewing deficiencies are addressed during the command review process." We note that this same "need for attention" was found in the supporting documents for Q3 and in our last report, we noted that this should

also be forwarded to the policy team and training division. While the issue was once again forwarded to each RU Manager, the Force Inspector again did not appear to send it for training review, despite it being identified for the second quarter in a row.

In addition to ensuring reporting compliance, the Force Inspector reviews force events to find broader issues related to policy, training, equipment, or personnel concerns. In the fourth quarter of 2021, we saw evidence that the Force Inspector was sending these issues to the appropriate personnel (including RU Managers and the Policy Team) using a standardized feedback form. However, we also noted a lack of documented follow-up to verify that responsive actions were taken. COCL recognizes there may be some instances in which the identified issue is resolved by the RU Manager via an informal mechanism but, in order to ensure consistency and continuity between personnel, all actions should be documented in the feedback form. For instance, in late December of 2021, the Force Inspector requested a discussion with the Policy Team to receive clarification on the term "hospital treatment." Although the Force Inspector asked to have such a discussion after the holidays, as of 2/9/22 (when the supporting document was retrieved), the notification was still considered "Active" and no resolution was documented. In other instances, the response contained minimal information, including one case where the RU Manager indicated they forwarded the information to the direct supervisor though no follow-up information was provided.

In order to return to Substantial Compliance with the requirements of these paragraphs, there must be a completed process for each issue that the Force Inspector identifies. In instances where there are potential policy or training implications, the relevant teams must be informed. For other implications, the loop must be closed and associated documentation returned to the Force Inspector.

| | |
|---|---|
| **COCL Recommendations** | ● To achieve substantial compliance, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>● To achieve substantial compliance, ensure completed process for each issue identified by the Force Inspector |
| **Assessment Based On** | ● Review of Force Audit Report<br>● Review of Feedback forms |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

**Settlement Agreement Paragraph**

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Quarterly Force Reports |

**Compliance Assessment**

For each of the subsections of Par. 76, PPB possesses a tool or process to achieve substantial compliance. For instance, in addressing subsection (a), PPB continues to produce quarterly and annual force reports including several important data points and comparisons to prior quarters. Subsection (a) is also addressed, in part, through the Phase II review wherein the Force Inspector identifies organizational trends. For subsections (b) and (c), the Force Inspector reviews the findings of a comparative analysis of each officer, unit, and group (as defined by common days off), identifying differences and discussing the analysis with each patrol RU Manager. For subsection (d), the Force Inspector either provides a memo to the RU Manager or creates a manual EIS alert (see also Par. 117). Finally, for subsection (e), the Force Inspector memorializes findings of the reviews in annual reports, including the Annual Force Summary Report and Annual Force Audit Summary Report.

These processes often provide important information regarding use of force trends. For instance, the Q4 Force Summary Report indicates that Central Precinct's cases involving force decreased 20%, East Precinct's decreased 15%, and North Precinct's decreased 28% from the prior quarter. PPB also produced their yearly Force Analysis Summary Report comparing data points from the quarterly reports across the whole year. Additionally, the quarterly comparative analysis provides an immensely important and detailed comparison of several organizational levels, including by officer, assignment, unit, RU Manager, and days off.

However, PPB's execution of each process has suffered from limitations. For instance, PPB's process for reviewing force trends is consistent with Par. 76, including reviewing raw force

data, conducting the Phase II analysis, and reviewing comparative force trends. However, there remain deficiencies in follow-up components of such processes, thereby limiting our ability to find substantial compliance.

For instance, while the Force Inspector has in the past identified individual officers with higher comparative levels of force (76c), recent quarters have appeared to justify the force rates before even being reviewed by the RU Manager (see also our assessment of Par. 117). Furthermore, in the fourth quarter the Force Inspector did not proactively identify any "officer, PPB unit, or group of officers", instead forwarding the results document to the RU Manager for their review (compare with the process for groups and supervisors as found in PPB SOP #47, "Force Data Analysis at the Group and Supervisor Level"). As a result, there was a lack of documentation as to the decision-making process for outliers since no officers, units, or groups received an EIS entry as a result of the Inspector's analysis.

Furthermore, while overall compliant with Par. 76, the range of analyses PPB conducts with the force data might be occasionally expanded to include periodic deeper dives (which we have seen done in the past at the request of COCL and TAC). We provide potential examples in Appendix B. However, we also note that this may be a function of resources rather than a conscious decision by PPB. Presently, the Force Inspector and Force Analysts review each FDCR and AAR, prepare reports, and provide regular presentations to RU Managers and TAC (see Par. 86). As a result, the force team may lack the bandwidth to expand beyond what they have historically and consistently done.

In part, this is also due to the terms of the Settlement Agreement. For instance, the audit to ensure the comprehensiveness of FDCRs and AARs takes a considerable amount of time given its extent, despite the fact that reporting compliance has been approximately 99% for several years now. Based on the force team's review of data that we discussed in our last report (regarding increases in force rate), we are confident they have the analytic ability to conduct deeper analyses in other areas of force reporting. However, additional resources may be necessary to allow for the team to identify areas of interest, develop a rigorous methodology, and provide a comprehensive review in addition to the team's current requirements.

In Appendix B, we provide examples of additional analyses that could be conducted by PPB and indeed could be explored even more than presented here. We use PPB force data found in the publicly available downloadable force dataset provided by PPB covering between the second quarter of 2017 to the present. We provide these in accordance with COCL's requirement to conduct outcome assessments (see Par. 170) and we offer them as technical assistance. PPB is not required to conduct these analyses to achieve compliance with Par. 76. As indicated above, these analyses may be the subject of periodic reviews rather than quarterly assessments and

| | |
|---|---|
| should be based on initial trends identified through the Force Inspectors regular review of events and data. | |
| **COCL Recommendations** | <ul><li>To achieve substantial compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere</li><li>To achieve substantial compliance, enhance follow-up processes</li><li>To achieve substantial compliance, resume practice of the Force Inspector identifying potentially problematic officers</li></ul> |
| **Assessment Based On** | <ul><li>COCL review of quarterly Force Data Summary Reports</li><li>COCL review of spreadsheet comparing force rates across individuals, shift, days off, and assignment</li></ul> |

# IV: TRAINING

## Overview of Training Systems

COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

## Overview of Methods

COCL continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. COCL also continues to observe training (either in-person or online), observe TAC meetings, and conduct interviews with PPB, TAC members and others as needed. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness.

## Assessment of Compliance

| Settlement Agreement Paragraph | |
|---|---|
| 78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | This is a summative judgment that is contingent upon satisfying all paragraphs in Section IV |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

**Compliance Assessment**

PPB has achieved only Partial Compliance with paragraph 78 because Substantial Compliance requires PPB to "implement the requirements below." Thus, because this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, Training.

We will continue to focus on the primary training for all officers and supervisors: In-Service Training, Supervisor In-Service, Advanced Academy (for new officers), and special mental health trainings for ECIT, as these are the trainings most central to the Settlement Agreement. However, given the problems that occurred with PPB's crowd management during the 2020 protests, COCL added this subject to our training evaluation agenda beginning in 2021.

We will continue to evaluate training progress in terms of the fidelity of implementation and whether these trainings are likely to achieve the desired outcomes listed in Par. 78.

| | |
|---|---|
| **COCL Recommendations** | ● To achieve substantial compliance, PPB must substantially comply with all paragraphs within Section IV |
| **Assessment Based On** | ● Summative and contingent upon satisfying all paragraphs of Section IV |

**Assess Training Needs**

**Settlement Agreement Paragraph**

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

**Exhibit A**

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | COCL assessed the quality of PPB's *2021 Training Needs Assessment: Law Enforcement Response to Mass Demonstrations* and PPB's *2022 Annual Training Plan*.<br><br>When available, COCL will assess the quality of the independent Critical Incident Assessment of 2020 crowd control, with particular attention to training needs around crowd management and use of force. |

### Compliance Assessment

During the 4th quarter the Training Division worked on updating its training needs assessment to include crowd control, as requested by COCL, and prepared its own report in December – *2021 Training Needs Assessment: Law Enforcement Response to Mass Demonstrations*. The Training Division also completed its *2022 Annual Training Plan* in the fourth quarter. However, the PPB remains in Partial Compliance because the City has yet to outsource and complete an independent Critical Incident Assessment of force applications and crowd control during the 2020 protests.

The reports completed by the PPB required extensive background work by the analysts and others at the Training Division. The Training Division was able to employ the methods and sources of information required in Paragraph 79. To prepare these reports in particular, the Training Division examined audit results on use of force from the OIG, complaint findings from IPR and PPB's Professional Standards Division (PSD), changes in Oregon and federal law, court decisions, trends in hazards and officer safety issues, use of de-escalation, research on best practices, community input (via TAC, complaints, press coverage), and PPB member input through training surveys. However, the information available to the analysts is still incomplete regarding protests, as the force incidents have not been fully investigated. In any event, COCL has reviewed these reports and provides a brief overview and assessment here.

*Training Needs Assessment for Crowd Control.* The Training Needs Assessment around mass demonstrations is fairly comprehensive and seeks to review the crowd management events between January of 2020 and June of 2021, with the aim of "*understanding of contextual factors, local, state, and federal-level decisions pertaining to how the events would be managed, the characteristics of the protests, the law enforcement response to the events,*

*public perceptions of the protesting events and law enforcement response, the impacts of the events, and national best practices for responding to crowd events. Additional focus is spent on areas of particular concern to the community and/or government stakeholders (e.g., use of force, de-escalation, crime, and public perspectives)."* (p. 3). The report does a thorough job of covering the many contextual factors that were beyond the control of the PPB that may have contributed to 170 days of intense protests in 2020, and concludes that "*The Bureau as a whole was not prepared for or trained for responding to events of this duration.*" However, more work is needed for compliance with Par. 79, as noted below.

A survey of 315 PPB officers found that the vast majority are open to training on most topics pertaining to crowd control, ranging from how to manage aggressive protestors to de-escalation tactics, and would find this training helpful. When asked to list additional training topics, the main themes were (1) practical skills and scenario training and (2) more clarity on laws and policies. COCL has repeatedly emphasized the requirement of practical skills training and the PPB has provided it in some areas.

The report provides a description of use of force by PPB during different protest events and, citing the OIG's *2020 Crowd Control Audit Results* report, notes that only 5 of 142 completed investigations concluded that PPB's use of force was out of policy. However, COCL will await the independent Critical Incident Assessment before drawing any conclusions.

The report provides a list of more than 20 de-escalation strategies and tactics used by the PPB and the community to encourage peaceful protesting but admits that we know little about which approaches are effective. However, the PPB has expressed a commitment to continue to study this issue, and gives credit to community leaders for helping out. COCL expects more training on de-escalation and crowd control methods, and we acknowledge the challenge faced by officers when interacting with individuals engaged in violent behavior in the midst of peaceful protestors. Such training is on hold until the PPB's crowd control directive has been revised.

This report does not include a comprehensive analysis of the management and force reporting problems that occurred[6], but in terms of Par. 79, it does address the training implications that stem from this internal evaluation and prior PPB reports.[7] Furthermore, PPB

---

[6] The PPB informs COCL that this was never the intended focus of the report. However, this type of analysis is still needed.

[7] These PPB reports include: *2020 Portland Civil Unrest After Action and Recommendations* report, *2020 Challenge and Solution Analysis* report, *2020 Crowd Control Audit* report.

40

**Exhibit A**

should be credited with reviewing research and best practices in the field and incorporating these into the training needs assessment.

An extensive list of training recommendations on crowd management are contained in this report, covering training for all PPB members, all PPB supervisors, Incident Management Teams, PPB specialty units, and non-sworn personnel. Much of this training, if introduced, would be consistent with the National Incident Management System and training by the Federal Emergency Management Agency (FEMA), and would train officers for specific roles within the Incident Command System. This massive list of recommendations (14 single-spaced pages) is overwhelming in that (1) there is no sense of prioritization (Are any recommendations more important than others?) and (2) the resources to implement such training are clearly lacking. Sorting out these recommendations and developing an implementation plan is not the responsibility of the analysts, so we will await decisions by the PPB's management. Furthermore, COCL continues to emphasize that training is more than sharing ideas about crowd management - it should involve developing and strengthening specific skills.

The Training Division admits that "Accomplishing these tasks will be a massive undertaking." The report calls for at least one full-time instructor with expertise in crowd management and Incident Command System. We think that may be an underestimate. We look forward to comparing these recommendations with those produced by an outside organization. We also look forward to civilian leadership in the Training Division who can help assess staffing needs and ensure that PPB follows evidence-based practice in training.

*2022 Annual Training Plan.* PPB's Annual Training Plan for 2022 was released in December of 2021 and reviewed by COCL. Although this is standard practice for the PPB, by producing the report so late in the year the training calendar is delayed and both COCL and DOJ have limited time to review the lesson plans.

The Training Plan does include training for the main groups relevant to the Settlement Agreement: all sworn members, all sworn supervisors, the Enhanced Crisis Intervention Team (ECIT) and the Behavioral Health Unit. The In-Service training will continue to cover firearm skills, legal updates, patrol procedures, and bystander intervention (See ABLE described in this report). The Patrol Procedures scenario component is expected to cover critical incident response, procedural justice, crisis communication, and de-escalation, although details are not included. New training in 2022 will cover the new Oregon law (HB 2513) on airway/circulatory anatomy (regarding neck holds), PPB's revised directives on Use of Force (1010.00) and Crowd Management (635.10). However, the latter trainings were not finalized or scheduled by the end of the fourth quarter because the policies were still being revised.

The 2022 training plan includes extensive training for many specialty units, such as the Crisis Negotiation Team (CNT) and the Special Emergency Response Team (SERT). In response to gun violence, PPB is also planning to offer more than 60 hours of training to the new Focused Intervention Team (FIT). We assume that the Training Division, by listing these trainings, is responsible for their content and methods of delivery. Clearly, the Training Division can and should receive help from specialty units with special subject matter expertise. However, in some cases, these specialty units have been allowed to train themselves and directive 1500 (requiring prior approval from the Training Division) has not been enforced.

The 2022 training online will include more than a dozen subjects, typically 15 minute videos. Noteworthy is a series of new trainings on Language and Culture (focused on how officers should use language interpreters) and Equity (focused on interacting with members of the LGBTQIA2S+/Queer community per directive 640.38).

Important to compliance, the Supervisors In-Service training is expected to (1) expand the 2021 Critical Incident Management class to include practice scenarios and critical incident command and (2) expand supervisors' knowledge of how to conduct a use of force investigation for After Action reports and how to conduct investigations of community complaints. Training on critical incident command is a direct result of PPB's needs assessment on demonstrations, as well as earlier critiques by COCL and DOJ.

Also important to compliance, PPB's 2022 Training Plan includes a separate training on Crowd Management. Sworn members, Sergeants, Lieutenants, and other command-level personnel will all have roles to play in the Crowd Management Incident Command training. This follows directly from PPB's needs assessment on demonstrations and FEMA training programs. However, crowd control training for specialty units was not included, nor did PPB provide COCL or DOJ with a policy or SOP for the unit they say is responsible for this work, the Mobile Field Force (MFF).

In sum, while the details for some trainings have yet to be finalized (and may depend on decisions outside the PPB), PPB's 2022 Training Plan is responsive to essential findings from PPB's needs assessment on crowd management. However, COCL remains uncertain as to whether the standardized FEMA-based incident command training, which is fairly time consuming,[8] will be fully responsive to the specific crowd control problems faced by the PPB in 2020. For example, given that RRT has not been reconstituted, what specialty units will be

---

[8] For example, the intermediate class (ICS-300) requires 21 hours of training and the advanced class (ICS-400) requires 15 hours. The introductory lessons require another 12.5 hours, delivered via self-paced online training.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

responding and how will they be trained?[9] Will the training cover responses to different forms of protesters' resistance and the officers' decision to use specific weapons? The external assessment may be able to address these concerns. Also, COCL will need to review any policies that drive the lesson plans for any specialty unit (e.g. MFF) or command structure that will be used to respond to large demonstrations in the future.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To achieve substantial compliance, hire an independent organization to complete a Critical Incident Assessment of crowd control during the 2020 protests, including implications for PPB training</li><li>Explain how the FEMA training on Incident Command is responsive to PPB's crowd control issues. Clarify which PPB specialty units will be responding to demonstrations</li><li>In preparation for the next protest, provide training plans for any specialty unit deployment and any weapons that will be allowed, based on undated policies</li><li>Seek to release the Annual Training Plan earlier so that others have more time to review it</li></ul> |
| **Assessment Based On** | <ul><li>Critical review of two PPB reports – *2021 Training Needs Assessment: Law Enforcement Response to Mass Demonstrations* and the *2022 Annual Training Plan*</li></ul> |

**Evaluate Training**

| |
|---|
| **Settlement Agreement Paragraph** |
| 80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; |

---

[9] The PPB reports that MMF will respond for now, but that decision is still under discussion.

student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Assessed the methods of evaluation, content, and the presence of a complete evaluation system with feedback loops |

### Compliance Assessment

PPB's training evaluation system continues to rely on multiple methods of data collection, analysis and reporting. The Training Division manages to administer in-class quizzes/surveys, anonymous post-class evaluation surveys, knowledge tests, some scenario skills tests, and classroom observations. We have reviewed these instruments and methods at various times and have provided PPB with feedback from a scientific, research perspective. Overall, we are satisfied with the methods and measures employed by PPB in the fourth quarter.

During the fourth quarter, the Training Division continued to analyze evaluation data from the Supervisors In-Service, general In-Service for PPB members, Advanced Academy training for recruits, Crowd Control Training, Enhanced Crisis Intervention Team (ECIT) training, and multiple online training programs. Specific reports were generated to evaluate specific trainings in 2021, which we review here. Also, we evaluate the knowledge tests provided to us for ECIT and In-Service trainings. Overall, we continue to be impressed by the work of the Training analyst.

*In-Service Training*. The report, *Evaluation of General In-Service Training for Tenured Officers* (prepared in the fourth quarter and released in January, 2022) is very comprehensive, evaluating the eight major classes delivered earlier in 2021,[10] and providing recommended improvements. The knowledge tests and surveys suggest that most students found these classes well executed and a good use of their time. Students were also able to demonstrate

---

[10] These classes were: Conducted Electronic Weapons (CEWs), Control Tactics, Firearms, Legal Updates, Patrol Procedures (Emergency Entry), Patrol Procedures Scenarios (Procedural Justice, Crisis Intervention, Emergency Entry), Police Vehicle Operations, and VirTra Simulator.

their knowledge of the subject matter on the knowledge tests. For each class, the Training Division also identifies areas where additional training or changes in training methods could be helpful. In some cases, they were able to monitor and report changes in survey responses over time, showing for example, an increase in officers' confidence in their ability to deploy CEWs between 2017 and 2021. We encourage the Training Division to incorporate many of these recommendations where feasible.

The knowledge tests for the ECIT and In-Service classes covered many of the topics that appear in the curricula, including PPB policies on mental health and use of force. However, some of these surveys would be quite difficult to answer (for example, for a single question, students must select the 5 correct responses out of 8 possibilities; In other cases, each response option for a single question includes three different actions). The surveys could be structured in a way that might be more valid and consume less class time.

Whether the knowledge gained from training translates into behavior remains uncertain. In prior years, COCL has recommended that behavior be measured in two settings, followed by feedback: (1) during in-person skills training and (2) on the job. Currently, some skills are tested before students leave the training academy (e.g. firearms qualification, where 98.1 percent passed), but most skills are not evaluated in this setting. For procedural justice, we are pleased that PPB has at least attempted to measure these skills at the group level (e.g. groups of 12 officers responded to a domestic disturbance during the In-Service Patrol Procedures Scenario[11]). In the future, we encourage the PPB to also include testing at the individual level to improve performance, as it has done once in the past.

 A big challenge for the Training Division in the future is to develop outcomes metrics to capture "*the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs.*" (Par. 80). This on-the-job outcome objective also fits within the Kirkpatrick Model of Training Evaluation endorsed by the Training Division. Although PPB's In-service evaluation report mentions "Related On-the-Job Outcomes," it only makes reference to ongoing supervisory channels, such as after action reviews of Force Data Collection Reports (FDCRs) by supervisors and investigations of officer-involved shootings to see if they are out of policy. Also, no statistical analysis of trends on these metrics is provided. In the future, through BWC data, contact surveys, and police reports (e.g. longitudinal data on

---

[11] We credit the Training Division with preliminary measurement of group performance on procedural justice dimensions, with candid assessments, e.g., 25 or 45 groups (12 officers each) have room for improvement in procedural justice - specifically, 33% of the groups could improve on voice, 42% on neutrality, 13% on respect, and 34% on trust/empathy.

**Exhibit A**

use of force, misconduct, complaints), PPB should explore ways to capture changes in decision making and behaviors <u>on the job</u> that can be attributed to training.[12] We also encourage PPB to work with local university researchers to conduct more scientific evaluations of training, such as randomized control trials.[13] We continue to recommend that PPB reinstitute contact surveys for community members who have had a recent police contact, to measure the extent of procedural justice exhibited by officers, especially in response to mental health calls.

*Online Training*. This quarter PPB provided a detailed report on the online training program, where students evaluated more than a dozen classes on several dimensions (e.g. well organized, good use of my time, worked well in the online format, and enough dedicated time to complete the trainings). Not surprisingly, officers showed a preference for practical and highly interactive training (e.g. using police cars to box in other vehicles or providing first aid to injured persons), and gave the lowest ratings to classes on procedural justice when interacting with the public and mindfulness skills to reduce stress. Whether ratings are due to the instructor's delivery, content, or perceived importance to their job cannot be discerned from these types of data.[14] Clearly, officers want more interactive capacity and more examples in the online trainings, something we continue to stress.

PPB's online training report covers not only the findings, but seeks to be responsive to officers' concerns. PPB has made a good faith effort to improve online training, but acknowledges that there is significant room for improvement. PPB will need to continue the discussion of what topics are best covered online or in the classroom. One persistent issue is officers' claim that they do not have enough dedicated time to complete this series of online trainings. In June, for example, 63% of respondents assigned to Patrol felt they did not have enough dedicated time and some asked for overtime to complete the online trainings. PPB is trying to address this issue. We agree that the Training Division should not be pushing out too many videos over a short period of time. However, we appreciate officers' concern that they

---

[12] The PPB has informed COCL that it does not have the resources to fully implement the Kirkpatrick model and perform analyses on on-the-job performance beyond what it is currently doing.

[13] Randomized control trials (RCTs) or strong quasi-experimental designs are the only scientific methods that allow for confident inferences about the effectiveness of training programs. Control groups are essential. Sometimes, administrators and their attorneys are nervous about RCTs, but once they have a more complete understanding, these concerns can be alleviated.

[14] This underscores the importance of not relying entirely on officer's assessments of training. As important as these surveys are, sometimes what officers need the most is what they want the least, e.g. uncomfortable conversations about equity and bias-free policing.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

should not receive a knowledge test that covers multiple online trainings spread out over time. Knowledge tests should be short and linked to specific trainings.

Previously we also recommended that online surveys be added to PPB's equity classes. In response, the City's Office of Equity and Human Rights has hired an analyst to perform this function. Furthermore, in response to COCL's recommendation that PPB take action to improve the response rates for their online surveys, PPB has shared the survey results with PPB members in a very readable report to encourage future participation.

While we are pleased with the work of the Training Division's analyst, we continue to recommend the hiring of more civilian analysts and information technology staff for the Training Division. These functions are essential to achieve evidence-based training, including cutting-edge online pedagogy, within a true learning organization that values quick feedback loops.

| | |
|---|---|
| **COCL Recommendations** | ● Hire more civilian analysts and information technology staff for the Training Division<br>● Consider redesigning knowledge tests to simplify the format and make them easier for students to complete<br>● Work with local university researchers to conduct more scientific evaluations of training on-the-job outcomes, including contact surveys to measure the impact of training on police-community interactions and procedural justice<br>● The PPB's Training Division and administration should evaluate and prioritize the recommendations produced by the training analysts |
| **Assessment Based On** | ● COCL review of training evaluation tools, quality of data, and systems of reporting and feedback |

**Document Training Delivered and Received**

| |
|---|
| **Settlement Agreement Paragraph**<br><br>81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, |

attendance records, and other training material in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Requested and reviewed LMS records for the fourth quarter; requested and observed electronic inquiries of LMS files |

**Compliance Assessment**

The Training Division continues to use the Cornerstone Learning Management System (LMS) to record officer training. LMS attendance records were updated in the fourth quarter to include all in-person and online In-service trainings noted earlier, as well as the firearms range qualifications, legal updates, directives, and other online training videos and notices. Records of external and discipline-specific trainings continue to be maintained.

By reviewing LMS training hours, the Training Division is able to ensure that PPB members remain in compliance with Oregon state standards and have received the training required by PPB. LMS is used to ensure that PPB employees who are not on leave are completing their required training and that these records are reviewed by supervisors. The review and compliance process is as follows: PPB employees are given 30 days to complete training and sent email reminders 14 days, 7 days, and 1 day before the due date, and 1 day past the due date. Their RU manager is sent emails regarding training delinquencies at 1, 5, and 21 days past the due date.

When PPB members fail to complete online training in this time period, the Training Division continues to send non-compliance memos to the Chief's office. In the fourth quarter, only 41 such memos were sent to the Chief's office for review from 11 classes. If the absence is justified (e.g. long medical leave), the Training Division is notified and the LMS records are updated. If the absence does not appear to be justified, the employee's supervisor or unit manager is notified and the training must be completed immediately under supervision. Thus, COCL is satisfied that very few PPB employees missed very few required trainings (out of thousands of possible misses) and that systems are in place to remedy the problem for those who were absent.

| COCL Recommendations | ● No recommendations at this time |
| --- | --- |

48

| Assessment Based On | ● Review of LMS updates for Q4 2021 |
|---|---|

---

**Settlement Agreement Paragraph**

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Semi-Annual Training Reports |

**Compliance Assessment**

PPB's Semi-Annual Training Reports for the third and fourth quarters of 2021 were delivered to the Deputy and Assistant Chiefs on January 21, 2022. The internal report lists 462 classes/groups attended by sworn members and the external report lists 173 classes/groups attended by sworn members between July 1, 2021 and December 31, 2021. Some of the external classes were attended by only one or two individuals, which is standard practice when special skills are needed or when instructors are reviewing new classes for possible adoption by the PPB.

However, we are concerned that the Training Division may not be aware of all specialty unit trainings, as required by directive 1500.00, and therefore, this semi-annual report could be incomplete. COCL will not pass judgment in this quarter and will await additional information in 2022.

| COCL Recommendations | ● Ensure that the semi-annual training report includes all specialty unit trainings |
|---|---|
| Assessment Based On | ● Delivery and content of Semi-Annual Training Reports |

**Trainer Qualifications**

| | |
|---|---|
| **Settlement Agreement Paragraph**<br><br>83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed "Work History Review Sheet" for Q4 hires and ensured that PPB is following SOP 1-19 standards. |
| **Compliance Assessment**<br><br>During the fourth quarter, two officers were transferred into new positions within the Training Division, thus activating the review process pursuant to SOP #1-19. COCL has reviewed the Work History Review Sheets and finds no evidence of civil judgments, discipline, or mistreatment of people with mental illness as defined in Par. 83. These officers are now functioning as Lead Instructors for ABLE and Patrol Procedures. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | • COCL review of "Work History Review Sheet" and SOP 1-19 standards |

**Deliver Appropriate and High-Quality Training**

---

**Settlement Agreement Paragraph**

84. (COCL Summary) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. PPB is expected to develop and implement a high-quality system of training that is consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention. In addition to all sworn personnel, paragraph 84 requires supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observed Supervisor In-Service training and ABLE training during Q4. |

---

**Compliance Assessment**

During the fourth quarter, PPB provided two important trainings required by paragraph 84 – Supervisor Training and peer intervention training for all officers. COCL has observed both of these trainings and will provide a description and assessment of each here. In addition, we will provide an overview of the online trainings delivered by PPB during the fourth quarter. PPB did not return to Substantial Compliance during the fourth quarter because they have yet to provide crowd control training that incorporates changes to the use of force policy (directive 1010.00), incorporates both internal and external assessments of training needs, and provides scenarios or exercises to practice appropriate crowd control skills. These trainings cannot be delivered until the policies on use of force and crowd control have been revised and approved. Many revisions have been made, but the review process is still ongoing.

**Supervisor In-service Training**

---

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

As COCL has noted on many occasions, supervisor training is critically important, not only because these individuals are expected to provide leadership and manage the entire organization, but in crowd control settings in particular, they are expected to make sound strategic decisions, supervise their teams, and later ensure that any force events are properly documented and reviewed for compliance with PPB policy.

Between November 16th and December 17th, PPB provided Supervisor In-service training in 8 sessions. According to the training records reviewed by COCL, 115 supervisors received this training.[15] Here we provide an overview of the 8-hour training provided for supervisors in the fourth quarter.

*Procedural Justice for Supervisors*

The first session of the day was a 1.5 hour session on procedural justice. The goals of the session were to describe the supervisory role in procedural justice and the impact of bias on perceptions of police legitimacy. The Lieutenant was a very experienced instructor and comfortable in this role. The session began with a robust discussion of what procedural justice meant to the students. Some responses included being fair, reasonable, consistent, and trustworthy. The instructor defined procedural justice as how people perceive the fairness of what we do and as a set of interpersonal skills and emotional intelligence that can be learned.

The session proceeded with breakout groups that discussed different case studies. The groups were asked to come up with solutions for how they could support the officer in the case study with their procedural justice skills. The groups then presented their case study and solutions to the other students, which led to class discussion of each scenario and possible solutions. The instructor helped steer the group to any answers that were not already suggested. All but one of the case studies focused on internal procedural justice. For example, an officer disengaging from the job, a captain angered by a recent policy change, and an officer who has an increasingly short temper. There was little discussion about external procedural justice and how procedural justice can be used to build trust with the community. (We acknowledge that external procedural justice has been given more attention in previous classes and that it was not intended as the focal point in this class). Here, procedural justice in relation to the community was only discussed as a way to build legitimacy with the

---

[15] The estimated 8 supervisors who did not attend will be required to complete a make-up session.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

community. The need to "mend fences" after isolated incidents that negatively affect the community was emphasized, and the obstacles to building legitimacy were acknowledged.

The transactional nature of procedural justice was discussed in terms of how building trust can help community members be more understanding when officers use deadly force. This discussion occurred using a PowerPoint slide of young black people sitting on a hood of a police car having a conversation with officers. This led into a discussion of how biases can impact procedural justice and legitimacy. Four types of biases were discussed: negativity bias in which one bad encounter can undo roughly seven good encounters, availability bias in which people overestimate the danger of highly salient negative events, loss aversion where people fear losses more than they look forward to gains and framing, which involved how an event is presented can impact perceptions of that event. This section of the training focused on how to take the blame of bad perceptions off the police and put it onto the media and community. Importantly, the focus was on how procedural justice can make up for bad events instead of how procedural justice can be used to prevent bad outcomes. Additionally, there was no mention of how procedural justice was used or how it could have been used during any specific cases in Portland like the 2020 protests.

### *UDAR*

Next was a one-hour session on updates and new aspects of the Uniform Daily Assignment Roster (UDAR) system for timekeeping. UDAR allows supervisors to track employees' schedules, including overtime and leave time, and keep accurate records of hours worked. The instructor took a few suggestions from the crowd for future improvements. The instructor also took time to show how to use the dashboard feature and all the types of information that can be gleaned from it such as how much overtime a specific officer works in relation to other officers.

### *Reasonable Suspicion*

This one-hour session focused on reasonable suspicion concerning an officer who may be under the influence of drugs or alcohol and the responsibilities of the supervisor when this occurs. The sergeant was a very dynamic and engaging instructor, and this session focused on the change to Directive 316.00. Under the change, reasonable suspicion requires supervisors to take control of situations. The session acknowledged that this is a difficult situation in which it is vital for supervisors to know the procedural details and the location of the required documents. The instructor made it very clear that the goal of this policy is to take care of officers and not "get" them.

There were two hypothetical scenarios that were discussed and the steps a supervisor is required to take once reasonable suspicion is present. The steps were presented as observe, confirm, document, notify, test, transport (the employee), and what happens next. For one scenario, reasonable suspicion was present, so the instructor walked through the steps that needed to be taken, but for the other scenario, reasonable suspicion was not present. Overall, it was clear the supervisors had heard this information before, but paid close attention and were very engaged, as demonstrated by taking notes and asking questions.

### Wellness

The fourth session of the morning was a one-hour session on officer wellness and how wellness can affect job performance. After a class discussion of wellness, the instructor emphasized that it involves not only physical health, but also mental, emotional, social, and financial health. The class used their phones to complete a personal wellness assessment which involved rating themselves on a scale of 1-10 in specific wellness dimensions and overall wellness. The instructor encouraged students to reassess their scores in six months.

There was an engaged group discussion regarding the effects of members not thriving in their personal lives and as leaders, particularly how their supervisory wellness can affect officers. Supervisors were encouraged to observe and evaluate the wellness of their subordinates. Four recommendations for how supervisors can support their officers' wellness were given: provide emotional support, structural support, model health behavior, and partner with other managers (This is consistent with the principles of internal procedural justice). It was noted that wellness culture appears to be better among supervisors than line officers, and the class discussed how they can implement wellness options for their officers and themselves. Overall, the instructor and the group were engaged in discussion. Although mental health counseling was only briefly mentioned, other trainings by PPB have given attention to this important service and PPB has a peer support program.

### Critical Incident Management

This was the most requested training topic among PPB sergeants. In the past, critical incident training was almost identical for officers and supervisors, and now, training is more specific to the supervisory role, i.e., the sergeant as the Incident Commander (IC). The session emphasized that supervisors should prioritize supervision, not tactical performance, and what

supervisors should think about when to respond to incidents. The sergeant instructor asked numerous questions and kept the class engaged.

The 3.5 hour session focused on incident command for patrol supervisors. The training goal was to provide specific guidelines for ICs. The instructor engaged the group in a discussion of what factors call for a supervisor to respond to an incident scene, and what is required for an officer to become an IC. However, when reviewing the lesson plans for this class, DOJ and COCL noted that the PPB does not have a policy for street-level incident command, and the instructor of this class also noted this fact. Thus, the instructors are forced to rely upon their own experiences and knowledge rather than PPB guidelines.

The 4 Cs (Containment plan, Custody plan, Communication plan, and Contingency plan), with which everyone was expected to be familiar, was briefly discussed. The acronym PAID (Prioritize, Assign, Intent, Define) was discussed in detail as it provides guidelines for the IC. Prioritization requires the IC to decide which of the 4Cs is the top priority based on the incident facts. Assignment requires the IC to assign other officers explicitly by name to specific tasks so the IC can focus on incident supervision, as the only way to be in charge of everything is to be in charge of nothing. Intent requires the IC to provide subordinates with sufficient detail so that the overall goal is clear, and they understand how to accomplish their tasks. Definition includes defining the event and the desired outcome.

The session then moved into a discussion of how supervisors play a role in de-escalation and that it may sometimes be necessary for a supervisor to de-escalate another officer. Supervisors need to ensure their officers have the tools, resources, and training needed to de-escalate. There was a discussion about how one goal of de-escalation is to decrease the risk to which officers are exposed. Additionally, almost all of the example scenarios used in this session involved potential suicide. There were no examples of how to de-escalate potential use of force situations with individuals who are upset but not having a mental health crisis or with crowd control settings.

The instructor played the audio of a mental health incident in which he was involved. The instructor stopped the audio periodically to point out the 4Cs and PAID when they occurred. The audio was used as a learning tool in that the instructor provided a detailed assessment of officer actions during the incident.

The instructor also discussed the value of post-incident debriefing, emphasizing that debriefing is not personal, and that actions are criticized only to improve future performance. Supervisors are still required to deal with personnel performance problems, but the debrief was not the appropriate forum for such feedback.

_Knowledge Test and Survey_

55

**Exhibit A**

The training concluded with an emailed survey and test, which the officers completed on their phones. The instructor encouraged the class to be candid when completing the survey, in that they play a key role in training development.

*Overall Assessment of Supervisor In-Service Training*
During the supervisor training sessions, the students were attentive, and there was very little cross talk or phone checking. The students were engaged, appeared to speak freely, and participated in robust discussions and some debates. The instructors demonstrated engagement by asking questions and leading discussions, and covered some important supervisory topics.

However, COCL, using two different observers on two different days, identified a few limitations of the training, so we offer more technical assistance on this subject. First, the procedural justice training paid little attention to external procedural justice, i.e., how supervisors could help to improve officers' interactions with the public. We acknowledge that the PPB has covered this topic in previous trainings, but additional and more intensive coverage would be beneficial in the future. Second, the Critical Incident Management training is not based on any PPB policy, so revisions to relevant policies should be a priority Third, this training included an extensive list of supervisory roles in incident command (e.g., 4 types of plans and 4 guiding principles) as well as supervisory roles in de-escalation, but provided no time or opportunity to engage in scenarios so that supervisors could practice these skills. Fourth, the Critical Incident Management training examples were exclusively about potential suicide and included no examples of how to de-escalate potential use of force situations with aroused individuals, crowds, or demonstrations.


**ABLE Peer Intervention Training for all PPB Members**


In-service peer intervention training, required by Par. 84, encourages officers to intervene when their peers are engaging in, or about to engage in, harmful actions, such as the use of force against passively resistant protesters. After the approval of directive 305.00 on peer intervention in the third quarter, PPB introduced the 8-hour ABLE training ("Active Bystandership for Law Enforcement"), developed by Georgetown University's Law Center.[16]

---

[16] https://www.law.georgetown.edu/cics/able/

PPB's *2022 Annual Training Plan* describes the ABLE program in this way:

*"This program focuses on awareness of the importance of active bystandership and provides early intervention strategies for situations that may lead to officer, community member, and/or agency harm. This program utilizes leadership, ethics, and wellness principles for increasing understanding for the need of peer intervention as well as how to successfully address these challenging situations."*

The ABLE training was delivered in 35 sessions between September 9th and December 15th of 2021. According to the training records reviewed by COCL, 734 PPB members received the ABLE training.[17] The training sessions were led by PPB members who were trained and certified through ABLE's "train-the-trainer" process. The sessions were delivered via Zoom. For our review COCL observed one of the 35 ABLE sessions that occurred in Q4 2021.

The 8-hour training was broken down into six one-hour blocks, with an hour set aside for lunch between the fourth and fifth blocks, and 15-minute breaks between the remaining one-hour blocks. The training combined lecture components, case study reviews, small and large group discussions, video reviews of interventions, and role-plays that gave officers the opportunity to apply the skills they learn throughout the training.

The first hour focused on clarifying the purpose of ABLE and why it is being implemented by the Bureau. Trainers stressed that ABLE is not a "tattle-tale" policy and does not require that officers report more or new types of incidents that they are not currently required to report by existing PPB policy, but rather that the goal is to decrease the number of reportable offenses by intervening at the earliest moment possible to prevent a fellow officer from engaging in misconduct and causing harm (either to themselves/their professional reputations or to community members). The trainers also shared that the goals of the ABLE training are to reduce harm and give officers the tools that they need to (1) conduct interventions when necessary and (2) be prepared to receive interventions and feedback from their colleagues. The trainers went on to discuss that the addition of ABLE training is not meant to diminish the work that officers do to keep each other safe in the field but the skills gained from the training are meant to ensure that everyone in the Bureau is on the same page as it relates to intervening in situations that could result in harm to the officer or members of the public. This block included three case studies on incidents in which there were no interventions conducted and the officers in the case studies end up causing harm (which they stress can be other than physical harm)/engaging in misconduct. The section also

---

[17] The estimated 50 members who did not attend will be required to complete a make-up session.

introduces the Three Pillars of ABLE which are to (1) reduce mistakes, (2) prevent misconduct, and (3) promote health and wellness.

The second hour focused on the third of the Three Pillars of ABLE – promote health and wellness. This time was spent discussing primary versus secondary trauma, the types of issues within the profession of law enforcement that can lead to poor mental health, and the types of negative outcomes that can be avoided if officers seek to reduce mistakes and prevent misconduct as they carry out their duties. Within this block officers went into their small groups for the first time to discuss situations that they have been in where they intervened and situations where they could have intervened but did not. The section concluded with a discussion of active bystandership compared to passive bystandership which included a discussion of two social experiments that focused on the actions and reactions of bystanders in different situations and what percentage of people intervened in each experiment.

The third hour continued the discussion of social experiments with a focus on the Milgram experiment and the Ervin Staub experiment.[18] Once again, they discussed the rates at which people intervened in each of the experiments and under what circumstances. The entire class discussed what could be a motivating factor for PPB members to intervene to prevent harm and in their small groups they discussed factors that could motivate someone not to intervene. They came back to the large group where they discussed who could be harmed when officers fail to intervene and what specific harms could occur.

The fourth hour of the training was focused on teaching the officers when and how to intervene. The block began by showing a video from the Seattle protests during which an officer intervened with a colleague to remove their knee from the neck of a protester and a second video out of Nebraska where an officer intervened with their colleague who was getting agitated with a member of the community during a traffic stop. They then discussed the three steps of ABLE – Notice, Decide, and Act – with a deeper dive on the Notice and Decide steps. The trainers emphasized that intervening early is best and the longer you wait to intervene, the fewer the options available to conduct the intervention. This block closed by reminding officers that they have a duty to intervene if "unnecessary harm is being inflicted."

---

[18] These are classic social psychology experiments. The purpose of the Milgram experiment was to test how far people would go in obeying orders if the orders involved harming another person. The purpose of the Ervin Staub experiment was to test for the bystander effect; specifically examining whether action, or inaction by other bystanders would encourage the individual being studied to intervene.

58

Hour five was spent discussing the last step of ABLE, as presented in the previous block – Act. The block began with small group discussions where the officers were asked to share their perspectives on what would make an intervention successful on themselves, if they needed one, and what should happen in the conversation that takes place after a successful intervention. The small groups also discussed factors to consider, such as existing relationships, when initiating an intervention. After the small group discussion, the class went over how the likelihood of preventing harm decreases the longer one waits to intervene and the tactical options that officers can employ to intervene. Following those discussions, they viewed a training video from the Washington Criminal Justice Training Commission that showed two officers conducting peer interventions for each other. This block concluded with the officers going back into their small groups to role-play two scenarios. The goal of the role-play scenarios was to give officers a chance to practice the skills that they learned during the training while following the three steps of ABLE – Notice, Decide, and Act. The scenarios were done in pairs, and in each pair, one officer intervened and the other received the intervention. After each role-play the officers debriefed the scenarios within their small groups and then rejoined the larger group to discuss the tactics used by the officers playing the role of intervenors, and what the officer receiving the intervention felt the intervenor did well. The first scenario was two officers who did not know each other well, but had been working together, when one noticed a change in the other's demeanor and appearance. The second scenario involved an officer becoming agitated with protesters during a demonstration.

The sixth block began by discussing the intervention model that is used by airlines called PACT (Probe, Alert, Challenge, and Take action). The class walked through a scenario, related to the airline industry, to demonstrate the PACT model. At the end of that discussion the trainers connected the PACT model back to their work in policing. Following the discussion of the PACT model the trainers discussed what officers should do after an event, both in the case that an intervention occurred and in the case that an intervention was not attempted. After this discussion the officers went back to their small groups to participate in two more role-play scenarios. Following each of these scenarios the small groups debriefed and then returned to the larger group to discuss the tactics used and what was done well. The first role-play was a new officer intervening with their Field Training Officer (FTO) who has a habit of unsafe driving practices. The second scenario was about a sergeant interacting poorly with a person experiencing a mental health crisis. This scenario was different from the other three as the officers were not assigned particular roles but instead, they worked through the PACT model together in their small groups. After these final two role-plays the class revisited the case studies from the first block and discussed potential intervention strategies at different stages of the incidents to prevent harm. The penultimate task was checking in to see if the

officers' opinions on peer intervention and active bystandership had changed over the course of the training. Finally, at the end of the training the trainers shared the commitments being made by PPB as it relates to ABLE training such as ensuring that all sworn members receive the training by December 15, 2021.

Assessment of the ABLE Training

Overall, the ABLE training was well executed by the PPB trainers. The national Lead Training Instructor for the ABLE program, who observed the delivery of ABLE training in Portland, and who has trained instructors in more than 180 agencies across the country, said that PPB instructors "did an outstanding job" and suggested that PPB is a model for other agencies to follow.

As stated earlier, the training was delivered via Zoom which can create some barriers, particularly as it comes to the most interactive portions of the class. However, given this barrier, the role-plays were mostly well-done and the trainers did well in engaging quieter participants in the full group discussions.

**In-service: Online Training**

In the fourth quarter, PPB continued to provide a range of online classes and educational material using their Learning Management System (LMS). With different postings each month, a total of 17 items were delivered virtually to PPB members during the quarter. This included videos, Tips and Techniques, and Legal Updates. Three directives were covered: foot pursuits (630.15), Drug, Alcohol and Tobacco-free Workplace (316.00), and bystander intervention (Directive 305.00). The City Attorney's Office fell behind on providing officers with legal updates, so during the fourth quarter, they posted updates for a nine month period, ranging from November of 2020 to July of 2021. We will discuss the Language Access training and language app further under Par. 146 because of the community engagement component.

As noted in our last quarterly report, in 2021, PPB's Equity and Inclusion Office (EIO) began developing and posting a series of online equity trainings for all PPB personnel (we reviewed and summarized several videos produced in our Q1, Q2, and Q3 reports). The following covers the online and in-person training activities completed in Q4 related to equity as well as foundational work to expand equity trainings in the first quarter of 2022.

_Online Equity Trainings_

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

During the fourth quarter, there were no new equity trainings posted online. EIO continued foundational work to produce the next sequence of equity trainings which focus on interacting with the LGBTQIA2S+ community. The first videos in this training set are scheduled to be available before the end of the first quarter of 2022. COCL will cover the trainings (if released as scheduled) in the 2022 Q1 report.

*Other Equity Training Related Activities*

In October DOJ, in collaboration with members of the community, presented a training to about 40 sworn and non-sworn members of PPB titled "Engaging and Building Relationships with Transgender Communities." Currently, PPB does not plan to expand this training to the rest of PPB staff due to time constraints created by other in-person training obligations. COCL recommends that PPB review their training requirements to determine if there could be space created to expand this training to the rest of the Bureau.

EIO also spent Q4 preparing for the Advanced Academy, reviewing training lesson plans for an equity lens, and obtaining funding for the "train the trainer" process for the REPAIR (Redefining Policing to Affirm and Instill Human Rights) program with the intent to determine if PPB would be interested in implementing the program within the Bureau.[19] EIO has also been involved in work that brings together equity trainers across City departments to share best practices, broaden feedback loops, and de-silo information, with the goal of standardizing equity training across the City.

Finally, as we noted previously, PPB posted an online video called the "Stops App Update Training," explaining how officers use the app to report various information about stops, including the legal reasons for the stop. We are still waiting for PPB to update this online training after it finalizes a policy that covers consent searches and makes available cards in five different languages explaining the driver's (and passenger's) right to decline a consent search. COCL will continue to report on this because the traffic stops data collection will not be complete without it.

*Overall Assessment of Online Training*
The Training Division continues to provide a wide range of online trainings and educational materials of varying quality. Given that virtual training will continue to grow in a post-pandemic world with declining budgets, we continue to stress the importance of doing it well.

---

[19] https://www.civilandhumanrights.org/repair-course-for-law-enforcement/

Unfortunately, PPB has suffered from a vacancy in the LMS Administrator position through most of the third quarter and fourth quarters of 2021. However, the position was filled by mid December. Hopefully, PPB can find the right balance of virtual trainings that include asynchronous videos, interactive videos (with "click through" questions and quizzes), and live interactions with instructors. Some training topics require in-class discussions (e.g., "difficult conversations" around bias-free policing) and some require in-class practice of skills (e.g., de-escalation and procedural justice).

In 2022, with new personnel in the Training Division, COCL will revisit the issues around online training, including balancing online and in-person training, combining online and in-person formats to allow officers to practice the skills promoted online, and providing student with enough dedicated time to complete the online classes and ensure that each class is taken seriously.

**Simulator Training**

Finally, in terms of skills practice, we continue to be hopeful that PPB will make progress in using the VirTra 3-D simulator (used in the 2021 In-service training) or a similar program to identify or develop scenarios that allow officers to practice their procedural justice and other interpersonal communication skills. No new VirTra training was delivered in the fourth quarter, but we will continue to monitor progress with this technology. Apparently, the Training Division is disappointed in this technology because of serious reliability problems, although COCL believes that this type of virtual methodology could help the PPB achieve Substantial compliance with the requirement for role-playing scenarios and interactive exercises (Par. 84.a.i), as well as the requirement for integrated de-escalation techniques (Par. 84.a.ii) to prevent or reduce the use of force.

**Specialty Unit Training**

Paragraph 84 requires that PPB "develop and deliver a high-quality system of training that is consistent with PPB's policies as well as federal and state laws…" According to the PPB's directive 1500.00, the Training Division is expected to ensure that "All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of all individuals whom they encounter, including those individuals who have or are perceived to have mental illness, and employ strategies to build community partnerships to effectively increase public trust and safety." The PowerPoint slides used for training the Rapid Response Team (RRT) in the past do not meet these standards. This is an ongoing investigation, so COCL will only discuss this training as it relates to compliance with the training requirements of the Settlement Agreement.

This 2018 RRT training did not come to the attention of COCL until January of 2022. In the past, COCL has focused its attention on PPB's core training classes for all sworn members and classes relevant to the Settlement Agreement, namely: In-service for all officers, In-service for all command and supervisory personnel, Advanced Academy training for all new recruits, and Enhanced Crisis Intervention Team (ECIT) training for responding to mental health incidents. The training requirements of the Settlement Agreement focus largely on patrol officers and supervisors in general, not specialty units.[20] Only after PPB's problematic response to the 2020 protests did COCl turn its attention to a non-mental health specialty unit - the Rapid Response Team (RRT) – because of its central role in crowd control and demonstrations. In fact, COCL was very critical of the court-ordered RRT training provided by the City Attorney's office in March of 2021 (See COCL's 2021 Q1 report)[21].

COCL began to report on the deficiencies in RRT training in 2021, but we had no idea of the existence of disturbing training material from 2018, including one slide showing a "Prayer of the Alt Knight'' meme, suggesting that police violence against protestors is somehow justified.[22] Other problems in the slide deck were apparent.

COCL was shocked by this offensive training material, but at this point, we are primarily concerned about the PPB's internal process for reviewing and approving training curricula and materials for specialty units. The Training Division is required to review and approve all training material used to train PPB personnel, per directive 1500.00 and SOP 1021, but PPB apparently did not enforce this directive.

specialty units can be a special challenge for law enforcement agencies. Some are critically important, but all too often, they have their own systems of training and supervision that can lead to problems because of insufficient oversight by management. The public may not realize that PPB has many specialty units including: Air Support unit, Canine unit, Crisis Negotiation Team (CNT), Explosive Disposal unit, Narcotics and Organized Crime unit, Special Emergency Reaction Team (SERT), Forensic Evidence unit, Traffic unit, the new Focused Intervention Team (FIT) for gun violence, and several behavioral health units - Behavioral Health Response Teams (BHRT), Service Coordination Teams (SCT), and Enhanced Crisis

---

[20] Although the use of force requirements would apply to all officers.

[21] This RRT training was in response to an order from Chief Judge Hernández regarding the violations of a temporary restraining order against using less-lethal weapons for crowd control without proper training and without "active aggression."

[22] Whether or not PPB officers were familiar with this meme is uncertain, but the content on the PowerPoint slide is clear. For a history of this meme, see https://knowyourmeme.com/memes/events/prayer-of-the-alt-knight

Intervention Team (ECIT). The Training Division offers training for many of these specialty units, but they also allow them to receive outside training, where there can be less oversight. In any event, the Training Division is required to have a system in place to review and approve all training. COCL will check to ensure that such management systems are in place. We also recommend that the Inspector General's audit of the Training Division (Par. 85) cover these management practices.

**Training Summary and Conclusions**

During the fourth quarter, PPB provided two important trainings required by paragraph 84 – Supervisor Training and peer intervention training (ABLE) for all officers. COCL observed both of these trainings and overall was satisfied with both substance and delivery. The attention to officer wellness and internal procedural justice throughout these trainings is critically important as a starting point, but the whole picture will require more attention to police-community interactions and a more outward facing approach to training. Along these lines, we also encourage the Training Division to continue refresher training on First Amendment rights and bias-free policing that can address any lingering PPB bias or interactions with protesters.

PPB continues to offer a range of online trainings, and with new leadership at LMS, we hope that PPB can continue to explore more sophisticated videos and avoid pushing too much content each month. Also, officers should be kept abreast of new laws that may affect their ability to execute their law enforcement functions.

The PPB remains in Substantial Compliance for all paragraphs in Section IV (Training), with the exception of Par. 78, 79. and 84. Because PPB's response to demonstrations remains a central problem in the City's efforts to achieve Substantial Compliance with the Settlement Agreement, PPB's Training Division must continue to take remedial action. We acknowledge that the Training Division has completed a comprehensive review of training needs related to crowd management and that the City has taken action in the fourth quarter to outsource an independent Critical Incident Assessment of crowd control that would have implications for future training (See remedies in Appendix A). However, PPB will remain in Partial Compliance on Pars. 79 and 84 until the required recommendations listed below have been implemented.

| | |
|---|---|
| **COCL Recommendations** | • To achieve substantial compliance, incorporate findings from PPB's Needs Assessment on demonstrations as well as the findings from the future external Critical Incident Assessment on demonstrations.<br>• To achieve substantial compliance, develop and deliver training with "*role playing scenarios and interactive exercises* |

|  | *that illustrate proper use of force decision making*" (Par. 84) including crowd control settings. This should include opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest.<br>● To achieve substantial compliance, refine existing policy to clarify the roles and responsibilities of street-level incident command, and incorporate recent changes to PPB's force directive 1010.00 into training.<br>● To achieve substantial compliance, strengthen your system to review and approve all specialty unit trainings to avoid inappropriate or harmful training and regain public trust. Enforce directive 1500.00 and SOP 1-21.<br>● Continue to explore the use of the VirTra 3-D simulator or other methods to identify or develop scenarios that allow officers to practice their de-escalation and procedural justice skills<br>● Continue to support the development of sophisticated <u>online</u> training that allows for interactivity<br>● Avoid overloading PPB members with too much online training during any one month, and keep them up to date on changes in the law<br>● Provide refresher training on first amendment rights and bias-free policing that can address any PPB bias against peaceful protestors |
|---|---|
| **<u>Assessment Based On</u>** | ● COCL's observation/assessment of training content, delivery, and consistency with adult-learning principles and best practices<br>● Future content assessment: Whether PPB can provide training on crowd control and force reporting that is based on a comprehensive assessment of problems that occurred during the 2020 protests and includes the requirements of Par. 84 |

**<u>Audit the Training Program</u>**

**Settlement Agreement Paragraph**

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | When the next audit is complete, COCL will review the audit report for accuracy and completeness |

**Compliance Assessment**

COCL continues to recommend that PPB undertake another audit in the near future because of changes that have occurred since the last formal audit in 2018 and because of the bigger changes that are planned, including the hiring of a civilian head of PPB's Training Division. Also, the problems associated with the RRT training suggest that the process of reviewing training materials for all units deserves attention, as well as classes that reinforce a healthy view of the community. As technical assistance, COCL recommends that, once the civilian dean of Training is hired, one future audit should include a management perspective and comment on the organizational structure and staffing issues.

At this point, COCL can confirm that the Training Division has continued to perform the functions identified in Par. 85, as reported throughout Section IV (Training) of this COCL report. In terms of the requirement in 85(g) (which is not discussed elsewhere in Section IV), for the one DOJ-related directive enacted in the fourth quarter, 94% of relevant PPB employees acknowledged having received it and read it within the 30-day timeframe.

As we noted last quarter, the Office of the Inspector General (OIG), who is responsible for these audits, has only three analysts who have been extremely busy conducting an analysis of force incidents stemming from the 2020 demonstrations. These staffing issues have delayed OIG's ability to perform this audit of PPB's training. In the fourth quarter, OIG was able to make contingent job offers for three new positions. However, background checks and training of these new employees will not likely conclude until the summer of 2022. COCL is sensitive to these constraints, but to remain in Substantial Compliance, PPB will need to produce an audit plan by the end of the third quarter of 2022 that can be reviewed and approved by DOJ and COCL.

| **COCL Recommendations** | ● To remain in substantial compliance, PPB must submit a Training Division audit plan by the end of the third quarter of 2022, with timelines for completing the next audit and the report. The plan should address directive 1500. |
|---|---|
| **Assessment Based On** | ●  COCL will document the date the audit plan is received and will review the audit plan based on identified needs of the Training Division, auditing standards, and the timeline for completion of the audit |

**Analyze and Report Force Data**

| **Settlement Agreement Paragraph** |
|---|
| 86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed and observed Inspector's presentation to Training Advisory Council (TAC)<br><br>Reviewed TAC reports and recommendations |

**Compliance Assessment**

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). Protest-related force statistics are included at the end of the quarterly reports and on PPB's Open Data Portal, which lists the number and types of crowd control force incidents. We credit the PPB for continuing to gather and report force data, and therefore, continue to find them in compliance with Par. 86, but as previously noted, the PPB must find ways to improve the quality of data on force used in crowd control settings.

PPB's third quarter force report was completed on November 15, 2021 but could not be presented until the first quarter of 2022 because TAC's only meeting during the quarter was held on November 10, 2021. However, at the TAC meeting in November, the Force Inspector reported a pattern of increased force applications during the first half of 2021.

In terms of community engagement, the TAC and the PPB Training Division continue to have a productive relationship. During the fourth quarter, several TAC members observed the "dry run" for ABLE training and the In-Service training and were able to make suggestions and recommendations. The Chief's office continues to respond in a timely manner to any formal recommendations from TAC.

| COCL Recommendations | ● No recommendations at this time |
|---|---|
| Assessment Based On | ● COCL review of PPB's quarterly force reports and inclusion of trends<br>● COCL observations of Inspector's presentation to TAC<br>● PPB's responsiveness to TAC's recommendations |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| **Settlement Agreement Paragraph** |
|---|
| 87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief. |

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review PPB website regarding TAC<br><br>Review TAC agendas and minutes<br><br>Observe TAC meetings |

| **Compliance Assessment** |
|---|
| One TAC meeting was held in the fourth quarter (November 10, 2021) and it was open to the public as required by Paragraph 87. COCL continues to observe these Zoom meetings and the public has been allowed to listen and make comments. PPB continues to use a public email distribution list to send reminders of the meetings to the public. PPB also continues to post the TAC meeting agendas and minutes on PPB's website.[23] |

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Assessment Based On** | ● COCL review of information available on PPB website<br>● COCL observation of TAC meetings and review of TAC minutes |

---

[23] http://www.portlandoregon.gov/police/61449

# V. COMMUNITY-BASED MENTAL HEALTH SERVICES

### Settlement Agreement Paragraph

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Monitor the City and PPB continuing to work with community partners |

### Compliance Assessment

This paragraph is assessed based on the City and PPB's continuing relationship with community partners. As this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section.

| | |
|---|---|
| **COCL Recommendations** | ● No recommendations at this time |
| **Assessment Based On** | ● N/A – Summative paragraph |

**Settlement Agreement Paragraph**

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review status of Unity Center; Review minutes from Unity Transportation Workgroup |

**Compliance Assessment**

COCL continues to acknowledge that the focus of Par. 89 is on the Community Care Organizations and the expectation that they establish one or more drop-off center(s). The Settlement Agreement does not hold any authority over these organizations, but our assessment remains focused on PPB's activities and reasonable expectations regarding their involvement with the drop-off/walk-in center(s).

Related to the focus of Par. 89, The Unity Center remains the drop off center for individuals experiencing behavioral health needs. The facility has been operating in this capacity since it opened in May 2017. PPB has two policies related to this paragraph, including Directive 850.21 (Peace Officer Custody (Civil)) and 850.25 (Police Response to Mental Health Facilities). These directives provide the protocol for officers to contact AMR for ambulance transport to the Unity Center. These directives have remained the same throughout 2021. During the fourth quarter of 2021, the mental health suite of directives went through the review process. PPB will work on addressing any issues and look for feedback on the directives. Future COCL reports will address any changes that result from this review as well as the role that the BHUAC played in the policy revision process.

Since the opening of the Unity Center, a Transportation Workgroup has met regularly in quarterly meetings to discuss the operation of the Center. This workgroup includes members of Unity, PPB, Multnomah County and Legacy ED Health. The group met for their quarterly meeting on November 18, 2021. Topics of discussion during this quarter included several points raised about PPB response, including an ongoing concern involving the reluctance of PPB officers to lock up their weapons when they arrive at Unity. It was pointed out that PPB officers have other facilities in which they are willing to lock up their weapons. The group also talked

about the need to issue a reminder that PPB officers should leave their business card when dropping off individuals at the center. Another concern brought up is that Unity is unable to get copies of the detailed officer reports. For each of these issues, PPB will be exploring possible solutions and will update the Workgroup during the next quarterly meeting.

Based on PPB and the City's participation in the process to date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph. We will continue to monitor how PPB revises the suite of directives related to mental health response as well as the updates provided to the Transportation Workgroup based on their comments in this quarter.

| COCL Recommendations | ● No recommendations at this time |
|---|---|
| Assessment Based On | ● COCL review of Unity Transportation Workgroup minutes |

**Settlement Agreement Paragraph**

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU") [Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Community Outreach Meeting minutes; Review PSU evaluation on PSR |

**Compliance Assessment**

As with the above paragraph, Par. 90 holds expectations of CCOs to create subcommittees for PPB to serve on, with a list of initial goals to be accomplished. However, CCO's are not under the authority of the Settlement Agreement and we therefore only evaluate PPB on what can reasonably be expected of the agency given the lack of opportunity from CCOs.

During the fourth quarter, minutes and a resource list were provided for meetings with Legacy Community Outreach. At these meetings, presentations were made regarding community resources such as housing support and legal support.

Of note as it pertains to Par. 90 and to the Community Mental Health Section at large is the introduction of the Portland Street Response (PSR) as a mental health triage option. PSR is a new first-response program that takes non-emergency calls. This initiative aims to remove police presence, when possible, by dispatching a specialized team consisting of firefighter paramedics, licensed mental health therapists, community health workers, and peer specialists. For BOEC to dispatch a call to PSR, the individual must not have a known weapon or be displaying threatening behavior. They can be dispatched for any of the following criteria:

1. A person experiencing a possible mental health crisis, intoxication and/or drug affected. This person must be outside or inside of a publicly accessible space

2. A person who is outside and down, not checked

3. A person outside and yelling

4. A person who needs a referral for services but does not have access to a phone

Portland State University completed a six-month evaluation of the program and the full report can be found online.[24] The report uses data collected from call and response outcomes, surveys and interviews with community members and stakeholders, as well as observational data from meetings and ride alongs. The report showcases generally encouraging outcomes, as well as offering some recommendations for continued success.

During the six month evaluation period from February 2021 to August 2021, there was 4.6% reduction in total calls that traditionally would have been responded to by PPB. The majority of these calls were dispatched by BOEC (87%) while the other 13% were from PSR self-dispatch. The majority of PSR calls (88%) did not require a co-response from another unit. Of the 46 calls that did require a co-response, 27 of these calls were PSR requesting assistance,

---

[24] For the full report: https://www.pdx.edu/homelessness/sites/g/files/znldhr1791/files/2021-10/PSU%20Portland%20Street%20Response%20Six-Month%20Evaluation_final%20for%20website.pdf

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

while 13 calls involved other units requesting assistance from PSR. PPB requested PSR in 10 of these calls.

When PSR responded to the call, the most common outcome (28.4% of all calls) was a field evaluation of the client with no further treatment needed. Furthermore, no calls resulted in an arrest of the individual when a PPB co-responded to the call (N=27). This finding, along with the fact that there was 4.6% reduction in calls that would have previously been responded to by PPB, suggests that PSR is seeing initial success in reducing overall criminal justice involvement. The table below lists all outcomes for the 383 calls during the six-month evaluation period. In 383 total calls for service, PSR referred 28 clients for follow-up care by the community health workers (though it is not clear whether some of these clients received multiple referrals).

### Table of PSR Client Outcomes[25]

| Outcome | Number of calls | Percent of all calls |
|---|---|---|
| Client evaluated, no treatment required | 95 | 24.8% |
| Cancelled (no client found) | 94 | 24.5% |
| Client refused evaluation/treatment | 62 | 16.2% |
| Assist | 31 | 8.1% |
| Cancelled (prior to arrival on scene) | 23 | 6% |
| Client treated by PSR and released (per protocol) | 21 | 5.5% |
| Cancelled (no client contact) | 19 | 5% |
| Client treated by PSR, transferred care to ambulance | 14 | 3.7% |
| Client treated by PSR, refused transport | 5 | 1.3% |
| Client evaluated, refused treatment and transport | 3 | 0.8% |
| Standby- no service or support provided | 3 | 0.8% |
| Unknown outcome | 13 | 3.4% |

PSU followed up their evaluation with some recommendations. Some of these recommendations are pertinent to PPB and the Settlement Agreement as they entail the implementation of policies that would affect the operation of BOEC and PPB. For instance, PSR is planning on going city wide, and thus all police precincts, not just the East precinct, will

[25] Figure found in PSU report: Townley, G., & Leickly, E. (2021). Portland Street Response: Six-Month Evaluation. Portland State University Homelessness Research & Action Collaborative.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

see a change in their response to certain calls. PSU recommends that PSR expand their call criteria, which they find to be too limiting. At this point in time, PSR cannot respond to calls inside residences, including shelters. Furthermore, they cannot respond if a person is suicidal, in traffic, threatening violence, or if a weapon is present. PSR is limited in the calls they can take due to collective bargaining agreements between the City and the Portland Police Association (PPA). PSU recommended that PPA make an agreement with PSR that would lift restrictions around responding to calls in residences as well as calls involving suicide. COCL recommends additional collaboration between PPB, BOEC and Portland Fire and Response (PF&R) as well as other relevant entities to develop clear protocols and policies around the type of calls being dispatched to PSR.

Another recommendation by PSU is to continue to train and support dispatchers. They recommend the introduction of a direct line and designated position to deal with PSR calls. Additionally, there needs to be continued training on when to dispatch PSR as compared with ECIT (or some other referral). As BOEC becomes more familiar with these call types and gains more experience, this experience should be used to help update and refresh training.

Furthermore, PSU recommends that more awareness and education needs to be provided to other first responders so they better understand the role of PSR. In interviews conducted by PSU, the researchers found that PPB expressed ambivalent levels of support for the program and a lack of understanding regarding the purpose as well as the process of when to call them (though we note PSU's sample size was very small, N=8). PSR has made attempts at increasing awareness by providing information during PPB roll calls, a collaborative approach we believe to be essential.

| COCL Recommendations | ● Make changes to PSR as necessary in accordance with the findings of PSU |
|---|---|
| Assessment Based On | ● PPB involvement with Behavioral Health Collaborative Team<br>● PPB involvement with Legacy ED Community Outreach |

# VI. CRISIS INTERVENTION

## A. Addictions and Behavioral Health Unit and Advisory Committee

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.<br><br>*[As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures].* | |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHU Unit Structure |

| |
|---|
| **Compliance Assessment** |
| In terms of personnel and BHU's general oversight, the BHU continues to conform to the requirements of Par. 91, as evidenced by the BHU unit structure and our observations of the BHU coordinating ECIT, BHRT, and SCT operations. While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, ECIT data collection, etc.), ECIT officers directly report to their precinct level chain of command. This command structure conforms to the Memphis Model. There have been no major changes to the structure of the unit and PPB is expected to provide updates on personnel changes. Therefore, PPB remains in substantial compliance. |

| | |
|---|---|
| **COCL Recommendations** | ● Continue to update COCL and DOJ on changes to personnel when applicable |
| **Assessment Based On** | ● COCL review of unit structures and personnel |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

### Settlement Agreement Paragraph

92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Compliance Label | 92. Substantial Compliance |
| | 93. Substantial Compliance |
| Methodology | Review BHCT, BHRT, and SCT coordination team meeting agendas and minutes; Review ECIT, BHRT, and SCT outcome measures |

### Compliance Assessment

PPB utilizes a number of work groups to collaborate on ways to "decrease law enforcement interactions [and] mitigate the potential uses of force in law enforcement interactions with consumers of mental health services." For instance, the Behavioral Health Coordination Team (BHCT) meets on a bi-weekly basis to discuss current and potential BHRT clients. The BHCT is composed of a number of community partners including representatives from Multnomah County, Cascadia, and Federal/State law enforcement. PPB provided us with meeting minutes and agendas indicating that a core group of partners attends consistently, with other partners attending as needed.

The discussions during these meetings are designed to problem-solve and create strategies to reduce future criminal justice contacts for individuals that have frequent contact but have been difficult to engage in ongoing services. BHU personnel indicate that information on individuals discussed is only shared if it is subject to lawful disclosure. BHU personnel indicate the BHCT has been a particularly valuable collaborative strategy.

The Service Coordination Team also conducts weekly meetings to discuss potential clients and make determinations about eligibility for SCT Services. Meetings include community partners and representatives from various entities in Multnomah County. The meetings also review

current SCT clients in order to "facilitate continuation of care" for clients . We believe these meetings meet the spirit of Par. 92.

The collection of data through the Mental Health Template (MHT) continued during the fourth quarter of 2021. The data produced is utilized to identify individuals and locations with repeat calls for service and to develop response strategies.

Relevant outcome measures are collected for BHRT and SCT and PPB provides COCL with quarterly reports summarizing these data. All together, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, BHCC (Behavioral Health Call Center), BOEC, and BHUAC. We have met with the Lieutenant who oversees BHU on multiple occasions and are confident that all aspects of BHU (ECIT, BHRT, and SCT) are operating as a comprehensive system rather than individual programs. Thus, we find that PPB remains in substantial compliance with the paragraph requirements of 92 and 93.

| COCL Recommendations | • Continue to collect and review data on mental health services, and use this information to update services as needed |
|---|---|
| Assessment Based On | • BHCT, BHRT, and SCT coordination meeting agendas and minutes<br>• ECIT, BHRT, and SCT outcome measures |

**Settlement Agreement Paragraph**

94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHUAC roster of members; Review BHUAC minutes; Observe BHUAC meetings |

**Compliance Assessment**

In the fourth quarter of 2021 the Behavioral Health Unit Advisory Committee (BHUAC) continued to regularly meet, holding meetings on October 27th and December 1st. The minutes of these meetings have been documented. While the October meeting minutes are posted publicly online,[26] the December minutes have yet to be posted. Membership requirements of the BHUAC as outlined in paragraph 94 continue to be met, with a current roster of 15 voting members, representing a variety of entities involved in the mental health response systems. Beyond the roster requirements, voting members are expected to attend, and there needs to be at least 8 voting members present for quorum. Of the 11 total meetings in 2021, 6 members missed 4 or more meetings. In the fourth quarter meeting attendance remained consistent, with 3 voting members absent at the October meeting and the December meeting. With a total of 12 voting members at each meeting in the fourth quarter, meeting quorum was not an issue. Both the first and the second quarter of 2021 had meetings in which quorum was not met, and the third quarter had two meetings in which quorum was just met. Thus, the BHUAC saw an improvement in attendance during the fourth quarter and we hope that regular attendance is maintained. During meetings, members have robust discussions that bring forward unique issues pertaining to their work. The collaboration across entities allows for more nuanced and well-informed problem solving. As of this report, the membership of BHUAC continues to conform to the representation envisioned in Par. 94 and we therefore continue to find PPB in substantial compliance.

| | |
|---|---|
| **COCL Recommendations** | ● Emphasize regular attendance to make maintain quorum being met |
| **Assessment Based On** | ● BHUAC roster<br>● BHUAC minutes<br>● Observations of BHUAC meetings |

**Settlement Agreement Paragraph**

---

[26] https://www.portland.gov/sites/default/files/2022/10.27.2021-bhuac-minutes_approved.pdf

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHUAC minutes; Observe BHUAC meetings |

### Compliance Assessment

Paragraph 95 envisions that the BHUAC committee members will assist "the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services." While COCL does not wish to downplay the assistance that BHUAC has provided, we believe that the BHUAC is not being utilized to the fullest extent. This is elaborated on in the Technical Assistance (TA) statement that can be found in Appendix C of the report. Of concern to COCL were two main issues: BHUAC review of training and review of critical incidents. The October 27, 2021 meeting of the BHUAC included a presentation by the Crisis Intervention Team Coordinator who provided a summary of the upcoming November 2021 ECIT certification class. While the presentation and following conversation with the committee members was a positive interaction, COCL expressed concerns about the lack of formal review by the BHUAC. For instance, in previous years, the training division had provided the BHUAC with the slides and full content of the training. This information was provided with enough lead time for the BHUAC to make recommendations that could actually impact how the training would unfold. However, this did not occur during the review of the November 2021 CIT training, nor did there appear to be any indication that the concerns, comments, and suggestions raised by BHUAC members were being tracked. COCL recommends that PPB return to the prior practice of providing the full content of the ECIT training to BHUAC for formal review, as well as inviting at least one member of the BHUAC to observe the training in person.

COCL's TA statement also raised concerns about the lack of involvement of the BHUAC in reviewing critical incidents when they involved persons in mental health crises. BHUAC has stated it is beyond their scope to review such incidents despite paragraph 95 stating that BHUAC is expected to provide recommendations "regarding police contact with persons who

may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent outcomes." Thus, COCL believes that PPB would benefit from having BHUAC involved in the review of such incidents.

Since issuing our TA Statement, COCL and PPB have further discussed these issues. As for a more in-depth review of training by the BHUAC, the PPB agrees with our findings and has committed to providing more advanced information on the training, including the relevant training material. Furthermore, a discussion involving COCL, PPB and DOJ occurred in the first quarter of 2022 regarding BHUAC reviewing critical incidents. We will provide additional information in our next report and look forward to continuing the conversations with PPB.

As PPB has committed to making changes in accordance with our TA Statement, we continue to find that PPB has maintained substantial compliance with the requirements of Par. 95. However, future compliance will be predicated on PPB demonstrating their commitment by providing training material to BHUAC and continuing conversations with COCL and DOJ regarding the review of critical incidents.

| **COCL Recommendations** | <ul><li>To remain in substantial compliance, ensure BHUAC has timely and complete access to future training presentation material</li><li>Continue to engage COCL in conversation regarding the content of COCL's TA Statement</li></ul> |
|---|---|
| **Assessment Based On** | <ul><li>Review of BHUAC minutes and agendas</li><li>Observation of BHUAC meetings</li></ul> |

| **Settlement Agreement Paragraph** | |
|---|---|
| 96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC recommendations found in BHUAC minutes |

**Compliance Assessment**

In accordance with paragraph 96, the BHUAC continues to provide COCL with a report of their votes and recommendations for the implementation of the BHU and BOEC. In October of 2021, they had no formal recommendations to submit. Following the December 2021 meeting, the BHUAC voted to tailor the language of four SOP's to reflect the current command structure, changing "Community Services Division" to "Specialized Resources Division."

Over the years, the number of recommendations that the BHUAC has offered has varied. For instance, as systems became more entrenched and established within the BHU and BOEC, it is important to recognize that recommendations may not need to be as extensive as in the BHU's formative years. However, as new members have joined the BHUAC, fresh perspectives have often stimulated discussion to prompt recommendations. As it relates to compliance with this paragraph, we continue to witness partners engaging in thoughtful conversations and making recommendations as necessary, and therefore find PPB to have maintained compliance with Par. 96 (though see also Par. 95).

| **COCL Recommendations** | ● Emphasize documenting formal recommendations |
|---|---|
| **Assessment Based On** | ● BHUAC status reports and recommendations<br>● PPB responses to BHUAC recommendations |

**B. Continuation of C-I Program**

| **Settlement Agreement Paragraph** |
|---|
| 97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Advanced Academy C-I Training material |

**Compliance Assessment**

PPB continues to emphasize crisis response as a core competency in their training. All officers are required to receive a minimum of 40 hours of crisis intervention training prior to graduating from the Advanced Academy. PPB did not begin any new Advanced Academies in the fourth quarter of 2021. The next Advanced Academy will be held in the first quarter of 2022 and COCL will provide an update in our next report. As PPB continues to emphasize and hold the 40 hour requirement of Crisis Intervention training for all officers, we find them in substantial compliance with paragraph 97.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Assessment Based On** | ● Prior review of Advanced Academy CI Training materials |

<br>

| **Settlement Agreement Paragraph** |
|---|
| 98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of PPB in-service training |

| **Compliance Assessment** |
|---|
| PPB continues to require that all members receive 40 hours of crisis intervention training split between the State Academy and PPB's Advanced Academy training.

In 2021, the annual In-service training did include a Crisis Intervention refresher training piece presented in a scenario. This occurred earlier in the year during the second quarter of 2021. The 2022 In-service training is also planning a refresher training that includes a scenario with a person in crisis. In upcoming reports, COCL will provide their assessment of this refresher training. This will include whether BHUAC was able to review and provide recommendations prior to the implementation of the training. |

| COCL Recommendations | • Allow BHUAC to review the training before the next In-service training |
|---|---|
| Assessment Based On | • PPB In-service training |

### C. Establishing "Memphis Model" Crisis Intervention Team

<table>
<tr><td colspan="2" align="center"><b>Settlement Agreement Paragraph</b></td></tr>
<tr><td colspan="2">99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]").</td></tr>
<tr><td><b>Compliance Label</b></td><td>Substantial Compliance</td></tr>
<tr><td><b>Methodology</b></td><td>Review BHU/ECIT data; Interview PPB Personnel; Review Mental Health Template data; Review BOEC data</td></tr>
<tr><td colspan="2" align="center"><b>Compliance Assessment</b></td></tr>
<tr><td colspan="2">

PPB continues to operate under a modified "Memphis Model" of crisis intervention. In this specialized response system, a select group of officers receive an additional 40 hours of training to become Enhanced Crisis Intervention Team (ECIT) officers. In the fourth quarter of 2021, a new class of 29 ECIT officers were trained and certified. This brought the total roster up to 128 operational ECIT PPB members.

PPB continues their practice of providing semi-annual reports evaluating the ECIT program. In November 2021, PPB released their second report for the year and it covered the time periods from April 1, 2021 to September 30, 2021. The previous report was covered in COCL's 2021 Q2 report and at that time we highlighted a few data points on ECIT response. For instance, in the previous reporting period, when looking at non-ECIT calls, there was no difference between ECIT and non-ECIT officers in the decision to transport to a mental health hospital. This finding stuck out because for all five previous reporting periods, ECIT officers were significantly more likely to transport the individual to a hospital than non-ECIT officers. In the most recent reporting period, this difference between the two groups returned. While the gap is smaller between the two groups, over the years, there has been an overall increase in the probability for each group to transport to hospital (See the table below for details).

</td></tr>
</table>

There is also a noteworthy difference between the groups in the decision to transport to jail. In the reporting period of Q2 and Q3 of 2020 there was a significant difference found for the first time, with ECIT officers being more likely to transport to jail. The following period saw no difference, but in the most recent reporting period, there was once again a significant difference found, with ECIT officer being more likely to transport to jail. The probability of transport to jail for ECIT officers on scene was 8.2% compared to 5.6% for non-ECIT officers. PPB should continue to monitor this difference to see if it persists and, if so, identify potential reasons.

### Odds Ratios from Logistic Regression
### Presence of ECIT-Trained Officer On Scene of Non-ECIT Calls on Call Outcome

|  | Transportation to Jail | Transportation to Hospital (Mental Health)/Unity Center | Use of Force |
|---|---|---|---|
| 04/01/18 - 09/30/18 N=2,703 | No Difference | More Likely (1.924) | Not enough cases (35) |
| 10/01/18 - 03/31/19 N=2,108 | No Difference | More Likely*** (1.898) | Not enough cases (24) |
| 04/01/19 - 09/30/19 N=2,178 | No Difference | More Likely** (1.433) | Not enough cases (47) |
| 10/01/19 – 03/31/20 N=1,780 | No Difference | More Likely** (1.464) | Not enough cases (30) |
| 04/01/20 - 09/30/20 N=1,603 | More Likely** (1.715) | More Likely** (1.401) | Not enough cases (39) |
| 10/01/20 – 03/31/21 N=1,497 | No Difference | No Difference | Not enough cases (31) |
| 04/01/21 - 09/30/21 N=1,762 | More Likely* (1.503) | More Likely** (1.384) | Not enough cases (66) |

Notes: Logistic Regression Models controlled for the following: (1) Precinct - Central, (2) Priority Level - High 1-3, (3) Presence of Weapon, (4) Subject Injury, (5) Mental Health Professional Involvement, (6) Warrant or PV Detainer, and (7) Directors Hold. Directors Hold with high standard error is excluded from the models.
*p<.05
**p < .01
***p < .001 [27]

---

[27] Figure provided by PPB

| COCL Recommendations | ● Continue monitoring ECIT data for trends |
|---|---|
| Compliance Rating Based On | ● ECIT roster<br>● PPB's Semi-Annual Mental Health Crisis Response Report |

| **Settlement Agreement Paragraph** | |
|---|---|
| 100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review ECIT Roster; Interview PPB personnel |

**Compliance Assessment**

PPB continues to follow the practice of accepting volunteer officers for ECIT certification. In the fourth quarter of 2021, PPB conducted their first ECIT certification training since 2019. This updated the roster of operational ECIT officers from 100 to 128. This increase in ECIT officers is welcomed by COCL and might help to address the demand for ECIT services in Portland. Data from 2020 and 2021 found the response rate of ECIT officers to calls requesting an ECIT officer hovering between 69% and 71% (consistent with the latest PPB report which indicates a 71% response rate for the most recent six-month study period). This percentage represents a slight decrease from March of 2018 when the response rate was 75%.

The response rate of ECIT officers to ECIT calls represents a good indicator of the "demand for ECIT services" as outlined in paragraph 100. With the increase in operational ECIT officers in Q4, PPB will be in a better position to meet the demand for ECIT services. Future compliance reports will continue to look at the data provided by PPB in their semi-annual reports to assess response rates. PPB continues the practice of accepting volunteers for assignment to ECIT as well as collecting data to assess the demand of ECIT services. Thus, we find them to be in substantial compliance with paragraph 100.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| COCL Recommendations | ● Continue utilizing existing data to assess demand for ECIT services |
|---|---|
| Compliance Rating Based On | ● Mental Health Template data<br>● ECIT roster<br>● PPB's Semi-Annual Mental Health Crisis Response Report |

**Settlement Agreement Paragraph**

101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT].

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review evaluation documents for potential ECIT officers |

**Compliance Assessment**

In the fourth quarter of 2021, PPB trained a new class of ECIT officers. COCL reviewed the documents related to the 38 potential ECIT officers who applied for the training. In accordance with paragraph 101, a request was submitted to IA to review the files of each applicant. This review looked into whether any applicant had an IA disciplinary history that would be detrimental to the ECIT unit, or had a sustained use of force or mistreatment complaint involving a person with a mental illness within the last three years. All of the 38 applicants were cleared at this stage. Furthermore, PPB continued the practice of sending out a supervisor questionnaire (which utilizes questions in-line with BHUAC recommendations) as a part of their pre-training evaluation.

COCL suggests that PPB continue to seek advice from the BHUAC to help define other potential criteria for qualification, selection, and ongoing participation of officers in the ECIT. While the BHUAC did play an initial role in providing recommendations for criteria and that was implemented in the use of supervisor questionnaires by PPB, their involvement has been limited in recent years. As it had been two years since PPB had recruited a new class of ECIT officers, it is important to continue to analyze and update selection criteria as needed. Seeking

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| | |
|---|---|
| advice from the BHUAC can help PPB make any necessary updates to their criteria for qualification, selection, and ongoing participation of officers in the ECIT. | |
| **COCL Recommendations** | ● Re-engage the BHUAC regarding ECIT participation criteria |
| **Compliance Rating Based On** | ● PPB ECIT evaluation documents |

---

**Settlement Agreement Paragraph**

102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review ECIT training documents |

**Compliance Assessment**

As previously discussed, COCL issued a TA statement in the fourth quarter on the operation of the BHUAC. Pertinent to paragraph 102 is the concern over how the BHUAC is being utilized to develop training for ECIT members. While we refer the reader to Appendix C and our assessment of Par. 95 for further detail, we note that PPB has committed to ensuring greater review for future trainings.

However, in our review of the course materials, we found the lesson plans and PPTs to be sufficient as evidenced by a minimal number of comments (none of which were tied to maintaining compliance). The contents of the training included:

- An overview of the purpose and protocols of ECIT
- Review of Directive 850.20: Police Response to Mental Health Crisis; Directive 850.21: Peace Officer Custody (Civil); Directive 850.22: Police Response to Mental Health Director's Holds and Elopement; Directive 850.25: Police Response to Mental Health Facilities
- Review of the data on ECIT calls and responses
- Information on mental illness symptoms and how to assess risk

- Review of the National Association for Mental Illness (NAMI) and how to use it as a resource
- Information on the Peer Recovery Movement
- Techniques for dealing with individuals in different types of crisis (e.g., suicide or psychosis)
- Review of response strategies for de-escalation
- Information on trauma informed care and how to implement it
- A forum on community resources and connecting individuals to resources
- A panel consisting of people with lived experiences
- A review of a case study
- Site visits to various Mental Health Facilities
- Participation in five scenarios to practice communication skills and procedural justice

We continue to appreciate PPB's dedication to their ECIT model and commend their efforts to provide thorough training. Nonetheless, we urge PPB to continue to analyze and update their materials for ECIT training on an ongoing basis and receive the full benefit of the BHUAC's review.

| **COCL Recommendations** | - Seek out recommendations from the BHUAC on ECIT training |
|---|---|
| **Compliance Rating Based On** | - ECIT training material<br>- Observation of BHUAC meeting |

| **Settlement Agreement Paragraph** | |
|---|---|
| 103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB policy |
| **Compliance Assessment** | |

89

**Exhibit A**

In accordance with Par. 103 (and the Memphis model of mental health crisis response), ECIT members retain their normal duties until dispatched for use as ECIT. BOEC personnel have received training on the criteria for dispatching an ECIT to a call. Additionally, PPB's Directive 850.20 includes the requirement for officers to consider calling in specialized units (including ECIT) as necessary. As such, we find PPB has maintained compliance with Par. 103.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● PPB policy |

| **Settlement Agreement Paragraph** |
|---|
| 104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review PPB public awareness efforts; Review BHU website; Review BHUAC minutes |

| **Compliance Assessment** |
|---|

PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe that PPB has made a serious effort to highlight the work of the BHU in its entirety, not only the ECIT.

For instance, iIn the fourth quarter of 2021, various members of PPB's BHU attended the monthly PCCEP Behavioral Health Subcommittee meetings. Furthermore, the BHU continued its efforts in outreach by attending conferences and providing presentations of their work. In addition, external recognition of the BHU has come in the form of media coverage as well as recognition by the Department of Justice during the first quarter of 2022 (which we will discuss in greater detail in our next report).

Based on this and our previous review of PPB outreach efforts, we believe PPB has substantially complied with the requirements of Par. 104. PPB should continue to highlight all aspects of BHU's work.

| **COCL Recommendations** | ● Continue to highlight all aspects of BHU's work |
|---|---|
| **Compliance Rating Based On** | ● Public awareness and education documents |

---

**Settlement Agreement Paragraph**

105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Mental Health Template data; Interview PPB personnel |

**Compliance Assessment**

In accordance with this paragraph PPB must collect data on mental health calls and the BHU is required to report on the data collected. In the fourth quarter of 2021, PPB continued to use the Mental Health Template (MHT) as the method for collecting the data points required in Par. 105. PPB's quality assurance plan for ECIT-related data and outcomes includes analysts auditing associated data on a monthly basis.

The BHU provided COCL with a quarterly report describing MHT data for Q4 in 2021. In the fourth quarter, PPB received 400 MHTs on 388 calls that reported an ECIT officer on scene (a single call may result in more than one MHT being completed). ECIT officers authored 277 (69%) of the MHTs. For the 388 calls, the most common technique used was de-escalation (47%). A total of 20 calls (5% of the total) reported a use of force. For the disposition of the 388 calls, the most common clearance type was a report written with no arrest (84% of calls),

| | |
|---|---|
| followed by about 5% of calls being cleared by arrest. Thus PPB remains in substantial compliance with Par. 105 because of the nature and extent of data collected and analyzed on ECIT dispatches. | |
| **COCL Recommendations** | ● No recommendations at this time |
| **Compliance Rating Based On** | ● Mental Health Template data |

## D. Mobile Crisis Prevention Team

| |
|---|
| **Settlement Agreement Paragraph** |
| 106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct. |
| 107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer. |

| | |
|---|---|
| **Compliance Label** | 106. Substantial Compliance |
| | 107. Substantial Compliance |
| **Methodology** | Review BHU Unit Structure; Review of BHUAC meeting, Interview PPB Personnel |

| |
|---|
| **Compliance Assessment** |
| PPB continues to have a BHRT car in each precinct composed of one officer and one qualified mental health professional. For the officer, the BHRT is considered their full-time assignment. While the Settlement Agreement only requires that PPB has three total teams (for each precinct), PPB was previously able to have five teams, with the additional two teams addressing Houselessness and Follow Up. When PPB faced budget cuts and staffing shortages in 2021, it was unable to fill these two additional teams after one PPB member retired and another was transferred to fill needs elsewhere. In recent updates, PPB was able to secure funding from the |

city to hire back these two additional teams. As of writing this report, the additional teams have not been restored, but PPB is actively trying to make this happen. With regards to the PPB's requirements of paragraphs 106 and 107, they continue to be in substantial compliance.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● BHU Unit Structure |

### Settlement Agreement Paragraph

108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review evaluation documents for potential ECIT officers |

### Compliance Assessment

All BHRT officers are ECIT certified and are held to the same eligibility standards as ECIT officers. In addition, SOP #43 covers the ongoing participation of officers involved with BHRT. The BHU Sergeants and the Lieutenant monitor all current BHRT members through the Employee Information System (EIS) and PSD to ensure qualifications are maintained. Therefore, we find PPB to remain in substantial compliance with paragraph 108.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● PPB policy |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| **Settlement Agreement Paragraph** | |
|---|---|
| 109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review reported trainings for BHRT members |
| **Compliance Assessment** | |
| The BHU continues to promote supplemental training for supervisors and BHRT members. In the fourth quarter 2021, no supplemental training programs were attended, but throughout the whole year, many different trainings were completed. A variety of training topics were covered, including crisis intervention, motivational interviewing, stress management strategies, wellness restoration, and hostage negotiation, among others. We therefore find PPB to remain in substantial compliance with paragraph 109. | |
| **COCL Recommendations** | ● No recommendations at this time |
| **Compliance Rating Based On** | ● PPB quarterly report identifying supplemental BHRT training |

| **Settlement Agreement Paragraph** | |
|---|---|
| 110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Mental Health Template summary data; Review BERS summary data |
| **Compliance Assessment** | |

PPB has continued the practice of collecting data through the Mental Health Template (MHT). When an officer has an encounter with a mental health component they will complete the MHT and this information is used to address mental health service needs. If an individual is a subject of three Mental Health Templates (MHTs) in a 30-day period, they will be referred to the Behavioral Health Unit Electronic Referral System (BERS) (if a referral had not already been made). Once an individual is referred, a team will look at specific criteria including: a demonstration of escalating behavior, frequent contacts with PPB, considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. If the individual is deemed an appropriate candidate for additional intervention, the Behavioral Health Unit Coordination Team (BHUCT) (which is composed of law enforcement, court, service provider, and hospital provider personnel, among other relevant stakeholders) will discuss a plan of action.

PPB has continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the fourth quarter of 2021, a total of 220 referrals were processed by the BHU. Of the 220 referrals, 103 (47%) were assigned to the BHRT caseload. This assignment rate represents an increase from the previous quarter (41%) and a return to the historical acceptance rates which have generally been between 45% and 55%.

In the fourth quarter of 2021, 94 individuals transitioned to inactive status with BHRT. Of those individuals, 34 (36%) had been previously assigned to the BHRT caseload in a different quarter and continued into 2021 Q4.

As shown in the figure below, this quarter saw that the most common reason for a referral to be assigned was for Escalating Behavior (41%), closely followed by Frequent Contacts (36%).



Figure 1: Assigned Cases Reason for Referral, 2021 Q4
N=103

[28]

---

[28] Figure provided by PPB

When looking at the outcomes of referrals for inactive cases in Q3, the most common outcome was Coordinated Services (33%), closely followed by Concern Mitigated (19%).



Figure 2: Inactive Cases Outcome of Referral, 2021 Q4
N=94

[29]

PPB's current practice of collecting data through the MHT and using that data to inform service needs fulfills the requirements outlined in Par. 110.

| **COCL Recommendations** | ● Continue to collect data and create reports on mental health services |
|---|---|
| **Compliance Rating Based On** | ● Mental Health Template data<br>● BERS referral data |

<br>

| **Settlement Agreement Paragraph** |
|---|
| 111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process. |

| Compliance Label | Substantial Compliance |
|---|---|

---

[29] Figure provided by PPB

| Methodology | Review Directives 850.20, 850.21, 850.22, and 850.25; Interview PPB personnel |
|---|---|

| **Compliance Assessment** |
|---|
| PPB continues to operate under the Directives 850.20, 850.21, 850.22, and 850.25, which dictate the procedures for AMR to provide transportation for a person in a mental health crisis. PPB continues to collaborate with AMR to work together when issues arise in the transportation of an individual dealing with a mental health crisis (see our assessment of Par. 89). PPB also has a designated liaison Sergeant at each precinct to respond, in real time, to any transportation issues. As PPB continues to uphold these procedures, we find them to remain in substantial compliance with paragraph 111. |

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|

| **Compliance Rating Based On** | ● Directives 850.20, 850.21, 850.22, and 850.25<br>● PPB interviews |
|---|---|

## E. Service Coordination Team

| **Settlement Agreement Paragraph** |
|---|
| 112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review SCT outcome measures; Review SCT Referrals Report |

| **Compliance Assessment** |
|---|
| PPB continues to facilitate the provision of services to individuals who experience drug-addiction, mental illness, and are chronically involved in criminal behavior. The SCT coordinates access to housing, medical, counseling, and addiction/mental health services. Members of the SCT are proactive in seeking out collaborations with other stakeholders in the State of Oregon. |

PPB also continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people served by the SCT. As we noted in prior reports, the number of referrals significantly decreased between the first and second quarters of 2020 and began to increase slightly in the final quarter of 2020 and continued to increase in 2021 before returning to historical averages. For the fourth quarter of 2021, the number of referrals was 259, as shown in the table below. While this number is a decrease from the previous quarter (307), it is consistent with the typical number of referrals before 2020. Of the referrals for the fourth quarter, the SCT accepted 54%, with the other 46% did not meet the assignment criteria. The primary reasons for not meeting criteria was the lack of recent crimes (25%) and lack of criminal history (23%).

| SCT Referrals, 2021 Q4 | | |
|---|---|---|
| | N | % of Total |
| Number of Referrals | 259 | - |
| Number of Individuals Referred* | 255 | - |
| Number of Referrals That Met Assignment Criteria | 140 | 54% |
| Number of Referrals That Did Not Meet Assignment Criteria | 119 | 46% |
| Reason for Not Meeting Assignment Criteria | N | % of Not Meeting Assignment Criteria |
| Lacks recent crimes | 30 | 25% |
| Lacks criminal history | 27 | 23% |
| Unable to Locate | 17 | 14% |
| Higher level of care | 17 | 14% |
| Aggression | 8 | 7% |
| Sex Offender | 6 | 5% |
| Crimes outside Portland | 5 | 4% |
| Arson | 4 | 3% |
| Other | 4 | 3% |
| Connected to services | 1 | 1% |

[30]

Additionally, The Supportive Transitions and Stabilization (STS) Program is an expansion of the SCT operation and is run by the Central City Concern's Housing Rapid Response. It is intended to address the needs of those with mental illness and co-occurring disorders who temporarily require a more extensive level of care by creating a direct housing resource. In the fourth quarter of 2021, 19 individuals were referred, 14 of the referrals were accepted, and a total of 7 new participants were served, as shown in the table below.

---

[30] Figure provided by PPB

| STS Referrals, 2021 Q4 | |
|---|---|
| Number of Referrals | 19 |
| Number of Individuals Referred | 19 |
| Average Age of Individuals Referred | 42.4 yrs |
| Number of Referrals Accepted (Met Criteria)* | 14 |
| Number of Referrals Declined | 4 |
| Number of new participants served during Quarter | 7 |
| Number of participants who successfully completed | 1 |
| Participants terminated for cause/non-compliance | 4 |
| Participants who voluntarily withdrew from program | 0 |
| Average Length of Stay (days)  of those who exited during Quarter | 138.8 |
| Bed utilization rate | 51% |

[31]

As a part of their continued operations the SCT program manager conducts outreach to several agencies to help spread information about the program as well as to provide participants with additional services. In the fourth quarter, they continued this practice, meeting with various entities and services.

In the past Portland State University has held a Capstone project that would conduct an assessment on the outcomes of the SCT. Due to the impacts of the COVID pandemic, the class was canceled in 2020 and 2021. Nonetheless, the SCT program manager worked with the PSU professor to conduct a review. This review will be finalized in the next quarter, and COCL will provide an update on SCT outcomes in future reports.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● SCT process<br>● SCT outcome measures |

---

[31] Figure provided by PPB

**F. BOEC**

<table>
<tr><td colspan="2" align="center">**Settlement Agreement Paragraph**

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to [Behavioral Health Call Center - BHCC], and adding new or revised policies and protocols to assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals.</td></tr>
<tr><td>**Compliance Label**</td><td>Substantial Compliance</td></tr>
<tr><td>**Methodology**</td><td>Interview BOEC personnel; Review BOEC protocols</td></tr>
<tr><td colspan="2">

**Compliance Assessment**

BOEC has completed and maintained the policies and procedures prescribed within Par. 113. BOEC's Mental Health and ECIT dispatch Protocol SOP identifies seven call characteristics where an ECIT dispatch officer will be dispatched. These characteristics include when there is a mental health component and: (1) a weapon is present; (2) the subject is violent; (3) the call is at a mental health facility; (4) the caller is threatening suicide and has the means to carry it out; (5) at the request of a community member; (6) at the request of another officer; (7) or when the subject represents an escalating risk of harm to self or others.

BOEC's has maintained their policy criteria for ECIT dispatch, which partially satisfies the requirement for crisis triage. In addition, BOEC has updated criteria for forwarding calls to the Behavioral Health Call Center (BHCC). BOEC also has triage protocol in place for PSR, though due to continued negotiations between the City and PPA, BOEC does not presently have an official policy for PSR. In total, the triage protocols for mental health calls satisfies Par. 113 and BOEC remains in substantial compliance, though as with prior reports, we note that policies should be in place prior to PSR expanding citywide so as to make PSR consistent with other triage options (including dispatching ECIT). We will provide updates as necessary in our next report.</td></tr>
<tr><td>**COCL Recommendations**</td><td>● Create BOEC PSR policy</td></tr>
<tr><td>**Compliance Rating Based On**</td><td>● BOEC protocols for ECIT dispatch<br>● BOEC protocols for BHCC referral</td></tr>
</table>

| | ● BOEC protocols for PSR dispatch |
|---|---|

| **Settlement Agreement Paragraph** | |
|---|---|
| 114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interview BOEC personnel |

| **Compliance Assessment** |
|---|
| BOEC staff continue to receive training in crisis triage. CIT training for dispatchers is provided periodically to ensure all staff have this training. In the third quarter of 2021, BOEC provided in-service training for all staff and provided refreshers on ECIT dispatch protocols, PSR dispatch protocols, referring calls to the BHCC, and other topics. Additionally, CIT training for new telecommunicators is scheduled to be delivered in the second quarter of 2022 and we will provide an update in future reports. In the fourth quarter, no new training was implemented. With the addition of Portland Street Response, BOEC has a new element within their crisis triage to consider when implementing future trainings. However, BOEC has not developed a focused training on PSR yet, as no official policies have been adopted. The Fall 2021 in-service training included a guest speaker from PSR and there was time devoted to understanding the differences for when ECIT should be dispatched versus PSR; however this is not consistent with the type of focused training we have seen for ECIT. BOEC informs us they plan to develop one in the near future. |

| **COCL Recommendations** | ● Develop focused training for PSR |
|---|---|
| **Compliance Rating Based On** | ● Prior observation of BOEC training<br>● Interview with BOEC personnel |

**Settlement Agreement Paragraph**

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of BOEC data; Interview with BOEC personnel |

**Compliance Assessment**

COCL reviewed data related to the operation of BOEC, not only in the context of PPB's crisis response but also in the context of other triage options, including transferring calls to the BHCC and dispatching PSR to calls that meet the necessary criteria. Within the fourth quarter of 2021, BOEC audited a total of 344 calls with a mental health component but that did not receive an ECIT dispatch. In 17 of those calls (4.9%) BOEC's audit later found that sufficient information existed at the time of the call to warrant it being dispatched as ECIT. BOEC also assessed accuracy for calls transferred to the BHCC, with 8 out of 152 calls being kicked back to BOEC for ECIT dispatch (we note this may not indicate fault with the telecommunicators decision since BHCC operators may learn additional information warranting emergency response). Finally, BOEC dispatched a total of 325 calls to PSR during the fourth quarter. BOEC continues to collect data and audit their own calls to ensure call takers are following the Crisis Triage policies and procedures. As PSR expands city wide, BOEC should utilize this data collection and auditing to help inform future policies and training. BOEC shows a continued dedication to auditing the quality of their call taking and dispatch and we therefore find them in compliance with Par. 115.

| **COCL Recommendations** | ● Utilize quality assurance audits to inform PSR policies and training |
|---|---|
| **Compliance Rating Based On** | ● Review of BOEC data<br>● Interview with BOEC personnel |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

# VII. EMPLOYEE INFORMATION SYSTEM

### Settlement Agreement Paragraph

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| Compliance Label | 116. Partial Compliance |
| | 117. Partial Compliance |
| Methodology | Interview EIS/PPB personnel; Review PPB EIS analysis |

### Compliance Assessment

The PPB continued to use the Employee Information System (EIS) as their primary system for identifying potentially problematic members and "design[ing] assistance strategies to address specific issues affecting the employee" (Par. 116). As for PPB's current procedure of evaluating subsections (a) and (b) of Par. 116, PPB reports increases in compliance with supervisory reviews. As shown in the figure below, for subsection (a) (supervisors performing semi-annual reviews), compliance was at approximately 98% for the fourth quarter of 2021. PPB indicates that despite the staffing shortages of the Bureau, for subsection (b), compliance rates for supervisors' reviews of new officers under their command increased to approximately 90% in Q4, which was a 6% increase from Q3. For subsection (c) there was a 96.8% compliance rate for "opportunities for compliance" inspected by the PSD EIS team, which is a combination of the subsection (a) and subsection (b) reviews.

**Figure 7.1:** Compliance with Reviews Directive 345.00 Reviews (Figure provided by PPB)



However, the events of 2020 revealed holes in PPB operations which led to the EIS data, particularly officers' applications of force data, number of FDCRs data, and accountability data, to be incomplete. This was due to officers not comprehensively completing FDCRs during the protests and the resulting accountability shortcomings when force was not sufficiently reported. As a result, PPB needs to acknowledge and fix those holes, the full extent of which can only be known through a comprehensive external Critical Incident Assessment of the protests. However, the reasons for Partial Compliance with Pars. 116 and 117 are primarily due to other factors related to the EIS process itself and unknown outcomes.

Specifically, in the past, the Inspector's notifications to supervisors concerning officers with outlying use of force statistics had included language that could have biased the reviewing supervisor. However, in the fourth quarter the Force Inspector did not proactively identify any "at-risk employees, supervisors [or] teams", instead forwarding the results document to the RU Manager for their review. As a result, there was a lack of documentation as to the decision-making process for outliers since no officers, units, or groups received an EIS entry as a result of the Inspector's analysis.

Relatedly, although PPB has a process to identify officers who show elevated metrics of review, including complaints, time off, and force rates in a quarter (see Par. 76), alerts generated as a result do not appear to be reviewed in accordance with SOPs #44 and #47. These SOPs require

an extensive review of the officer's overall performance; however, interviews with PPB personnel indicate that, at times, only the events triggering the alert are reviewed.

Finally, we maintain our position from prior reports that PPB should seek to ensure that the EIS is "more effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116). Although no discussions regarding this evaluation were held in the fourth quarter of 2021, initial meetings occurred in the first quarter of 2022 and COCL began discussing the evaluation process. We will provide updates in our next report.

| | |
|---|---|
| **COCL Recommendations** | ● To achieve substantial compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br>● Continue contributing to the development of the EIS evaluation. |
| **Compliance Rating Based On** | ● EIS and threshold review process |

---

| **Settlement Agreement Paragraph** | |
|---|---|

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period.

| **Compliance Label** | 118. Substantial Compliance |
|---|---|
| | 119. Substantial Compliance |
| **Methodology** | Interview EIS/PPB personnel; Reviewed EIS program data |
| **Compliance Assessment** | |

The thresholds PPB are required to maintain for Par. 118 continue to be used to flag officers for case management reviews. PPB continues to collate data from a variety of sources, including force events, traumatic incidents (captured in Regional Justice Information Network (RegJIN)), complaints, and commendations (captured in Administrative Investigations Management (AIM)). This data is then used to identify potentially problematic behavior with the predetermined thresholds identified by these paragraphs.

In the fourth quarter of 2021, EIS Administrators reviewed a total of 383 alerts and sent 207 (54%) on for RU Manager review (see Figure 7.1). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts closed in the fourth quarter of 2021 (which may also include cases opened in prior quarters), there were 215 alerts sent to the RU Manager and for 181 (84.2%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the fourth quarter of 2021, a substantial majority (75.3%) resulted in some type of intervention for the officer. The information provided by PPB indicates that most of the interventions involved a debriefing though three involved an EAP referral.

**Figure 7.2:** EIS Alerts and Alerts Sent to RU Manager (Figure provided by PPB)



**EIS Alerts and Interventions**

| | 2020 Q4 | 2021 Q1 | 2021 Q2 | 2021 Q3 | 2021 Q4 |
|---|---|---|---|---|---|
| **Alerts Sent to RU** | 277 | 237 | 209 | 263 | 215 |
| **Alerts Sent to Supervisor (Percent of Alerts Sent to RU)** | 80 (28.8%) | 142 (59.9%) | 137 (65.6%) | 210 (79.8%) | 181 (84.2%) |
| **Interventions (Percent of Alerts Sent to RU)** | 70 (25.3%) | 106 (44.7%) | 100 (50.7%) | 160 (60.8%) | 162 (75.3%) |
| **Interventions (Percent of Alerts Sent to Supervisor)** | 70 (87.5%) | 106 (74.6%) | 100 (73%) | 160 (76.2%) | 162 (89.5%) |

Regarding Par. 119, of the 383 alerts created in Q4, 227 were force related, and of those, 11 (or 4.8%) included at least one threshold break for three or more uses of force in the preceding 30 days. Of the 227 force-related alerts, 54 were sent to the RU managers for review.

**Figure 7.3:** Breakdown of Alerts Sent to RU (Figure provided by PPB)

| Count of SentToRU | | | |
|---|---|---|---|
| Alert Type | No | Yes | Grand Total |
| Complaints | 3 | 32 | 35 |
| Force | 173 | 54 | 227 |
| Precinct Alert | | 3 | 3 |
| Traumatic Incident | | 118 | 118 |
| **Grand Total** | **176** | **207** | **383** |

COCL has decided that the straight-forward requirements of Pars. 118 and 119 have been met. We continue to require that the City conduct an Independent Critical Assessment of the 2020 protests to achieve Substantial Compliance with Sections III and IV as the reasons stated there, but the functioning of EIS as required by these two paragraphs are currently being met.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● Lack of Critical Incident Assessment<br>● Current EIS thresholds |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

| **Settlement Agreement Paragraph** |  |
|---|---|
| 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed. |  |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed Directive 345.00; Reviewed EIS Program |

| **Compliance Assessment** |  |
|---|---|
| Paragraph 120 requires that PPB "identify and train a second EIS administrator." In our last report, we noted that the Bureau had eliminated the PSD Lieutenant position which included the responsibilities of the second EIS administrator. This remains the same for the fourth quarter of 2021, with the Force Inspector acting as the second EIS administrator on an interim basis. While PPB acknowledges this is not a long-term solution, they note that the Force Inspector received the necessary training to act as the second administrator. As we have previously reported, this training is conducted via a comprehensive operations manual— including SOPs for the handling of EIS alerts, entries, and responses—in accordance with Par. 120. We therefore find that PPB has maintained compliance with Par. 120 though continue to recommend they continue seeking to implement a longer-term solution. |  |
| **COCL Recommendations** | ● Determine a long-term solution for responsibilities of second EIS administrator |
| **Compliance Rating Based On** | ● Previous training of EIS Administrators |

# VIII. OFFICER ACCOUNTABILITY

### A. Investigation Timeframe

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, including appeals, if any, to CRC. Appeals to CRC shall be resolved within 21 days. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review IPR Quarterly Data Analysis; Review Administrative Investigation Management (AIM) System data |
| **Compliance Assessment** | |
| On a quarterly basis, the IPR provides summary statistics for all full administrative investigations which are closed within 180 days of their initiation date. Using the quarter that the cases were opened as reference, the IPR statistics show sustained improvement in achieving the 180-day timeline for administrative investigations. For instance, the IPR statistics demonstrate that of the 19 cases that were opened in the second quarter of 2021 (the last quarter for which 180 days could have passed for this report) and which have since closed, only a single case exceeded the 180-day timeline (5%). Furthermore, while separate data provided by IPR to COCL indicate that five additional cases from the second quarter currently remain open, this still results in a 75% true compliance rate for cases that should have been completed by the end of the fourth quarter (later conversations with IPR indicated that now three of the 19 remain open). Additionally, the quarterly statistics indicate that 14 cases from the third quarter of 2021 have already been completed within 180 days and only 8 remain open. While we will still need to determine whether those 8 were closed within 180 days (which we will do in our next report as they would need to be closed in the first quarter of 2022 to be within 180-days), we find the improvements in timelines to have been sustained and therefore find the City and PPB to have returned to substantial compliance with the requirements of Par. 121. | |
| **COCL Recommendations** | ● No recommendations at this time |

| **Compliance Rating Based On** | ● IPR data indicating adherence to 180-day timeline |
| --- | --- |

| **Settlement Agreement Paragraph** |
| --- |
| 122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Criminal-IA Concurrent Investigation Audit Reports; Review Directive 0330.00 |

| **Compliance Assessment** |
| --- |
| In the fourth quarter of 2021, PPB continued to provide documentation indicating when Internal Affairs investigations began compared with when criminal investigations began. For all 9 cases in the quarter, the investigations began within a couple days of each other and therefore met the criteria for "concurrent." As a result of the documentation provided by PPB, we maintain that PPB has maintained compliance with Par. 122. |

| **COCL Recommendations** | ● No recommendations at this time |
| --- | --- |
| **Compliance Rating Based On** | ● Criminal-IA Concurrent Investigation Audit reports |

| **Settlement Agreement Paragraph** |
| --- |
| 123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them. |

110

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Administrative Investigations Report |

**Compliance Assessment**

During the fourth quarter of 2021, the PPB provided an Administrative Investigations Report which noted that, although stages of investigation went over their allotted time, no cases closed during the quarter exceeded the overall 180-day timeline. This is the result of PPB's process wherein days are subtracted from back-end processes if front-end processes go over their allotted time. As a result of PPB providing the Administrative Investigations Report, we find the PPB has maintained compliance with the requirements of Par. 123.

However, while none of the cases exceeded 180-days, we note that certain stages did and we suggest PPB also implement an action plan in these instances (even if the overall case is completed on-time). For instance, one case during the fourth quarter noted that a stage being overdue appeared to be due to "confusion over the case being reassigned after the FMLA period." (Family Medical Leave Act). Another case noted that the investigation stage went over the timelines as a result of the case being "returned to the investigator multiple times for additional investigation." In other instances, IA resources appeared to impact stage-timelines as stages went overdue to allow staff to work on "active cases and priority matters." Although PPB notes that these issues are discussed informally, such discussions were not reflected in the supporting documents provided to us, leaving the record unclear as to how the issues have been resolved. So as to better reflect a learning organization, PPB should memorialize such discussions for future management.

| COCL Recommendations | ● Maintain self-improvement loop for stages even if case does exceed timelines |
|---|---|
| Compliance Rating Based On | ● Administrative Investigations Report |

**B. On Scene Public Safety Statements and Interviews**

**Settlement Agreement Paragraph**

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Directive 1010.10 |

**Compliance Assessment**

During the fourth quarter of 2021, PPB maintained their protocols for compelled statements to PSD and all officers have been advised on the protocol. As a result, we find PPB has maintained compliance with Par. 124.

| COCL Recommendations | ● No recommendations at this time |
|---|---|
| Compliance Rating Based On | ● Current PPB policy |

**Settlement Agreement Paragraph**

125. Separation of all witnesses and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed CROs for 2021 Q4 OIS events |

| **Compliance Assessment** |
|---|
| During the fourth quarter of 2021, there were two OIS events. In both of these instances, PPB provided COCL with copies of the CROs provided to witnesses and involved officers. A review of the CROs indicate they were all provided in a reasonable timeframe. We therefore find that PPB has maintained substantial compliance with the requirements of Par. 125. |

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● CROs for 2021 Q4 OIS events |

| **Settlement Agreement Paragraph** |
|---|
| 126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Officer Involved Shooting case file excerpts |

| **Compliance Assessment** |
|---|
| During the fourth quarter of 2021, the PPB provided us with documentation demonstrating that at each of the two OIS events in this quarter, a witness officer provided an on-scene walk-through and briefing to the Detectives Division. Such on-scene walk-throughs and briefings provide preliminary information for detectives to begin their investigation and the member is then interviewed in more depth by detectives afterwards. Based on the documentation reviewed, we find PPB has maintained compliance with Par. 126. |

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|

**Exhibit A**

| Compliance Rating Based On | ● OIS case file excerpts |
|---|---|

| **Settlement Agreement Paragraph** ||
|---|---|
| 127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Officer Involved Shooting case files excerpts |
| **Compliance Assessment** ||
| During the fourth quarter of 2021, PPB provided us with documents indicating that all involved officers in lethal force were requested to provide a voluntary on-scene walk-through and interview. As has been the case in prior lethal force events, each involved member declined citing Constitutional protections. As a result of the PPB requests, we continue to find PPB has substantially complied with the requirements of Par. 127. ||
| **COCL Recommendations** | ● No recommendations at this time |
| **Compliance Rating Based On** | ● OIS case file excerpts |

## C. Conduct of IA Investigations

| **Settlement Agreement Paragraph** |
|---|
| 128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort |

consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Police Accountability Commission agendas |

**Compliance Assessment**

During the fourth quarter of 2021, both the IPR and IA maintained their respective administrative investigations using the system we have previously found compliant with Par. 128. However, the forthcoming civilian-led accountability system (that will eventually replace IPR) places IPR in a tenuous position. IPR continues to inform us that any attrition from their current personnel during this transition period could have detrimental effects on their ability to conduct meaningful independent investigations when they determine such investigations are necessary. In response to our prior recommendations related to this issue, we were provided an accountability system transition plan during the first quarter of 2022 and we will provide updates in our next report. As noted in Section XI of this report, the Police Accountability Commission (who is responsible for designing the new Community Police Oversight Board) held meetings in December. We will provide updates on the transition as it affects Par. 128 and other aspects of Section VIII, Accountability.

During the fourth quarter of 2021, we were also informed of a 45,000-50,000 document Records Division backlog that led IPR to not have a key document as part of their investigation for one case (IPR ultimately received this document from the alleged officer in the case after IPR realized they did not have it). While PPB and the City inform us that the vast majority of documents in the backlog are likely inconsequential to administrative investigations, we have yet to receive an update as to the current size of the backlog, the impact of the backlog, or City efforts to reduce the backlog. Upon receiving an update, we will provide additional information in future reports.

| | |
|---|---|
| **COCL Recommendations** | • To achieve substantial compliance, provide accountability system transition plan<br>• To achieve substantial compliance, provide COCL an update on Records Division Backlog<br>• Show continued progress with Police Accountability Commission |

| **Compliance Rating Based On** | ● Lack of an accountability system transition plan<br>● Ongoing Records Division Backlog<br>● Police Accountability Commission meetings |
| --- | --- |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review administrative closure justifications for allegations of excessive force |

| **Compliance Assessment** | |
| --- | --- |
| During the fourth quarter of 2021, there were four allegations of excessive force which were administratively closed by IPR. In three of these, there was a complete absence of corroborating evidence to predicate the investigation. However, in one of the cases, the use of force was not in dispute – FDCRs and an AAR existed for the event and a supervisor documented the claimed excessive force and injury. In providing COCL a summary of the event, IPR noted that the "evidence shows that officers did not use inappropriate force on CO or violate a PPB directive." Based on this justification from IPR, the officer should have been exonerated. In further speaking with IPR, we were informed that the allegation could have alternatively been framed as an allegation of Control (as opposed to an allegation of Force) since the evidence in the record indicated the complaint was about the use of handcuffs (the complainant had pre-existing injuries to his/her arm). However, as the complainant had used the term excessive force, it was framed as a Force complaint. While we find the City and IPR to be in substantial compliance with the requirements of Par. 129 since this was only a single case, we recommend the City re-open the case to (1) determine whether it better fits the definition of Control per IPR's definitions and the statements of the complainant and (2) make an appropriate finding after a full investigation if retained as a Force allegation. | |
| **COCL Recommendations** | ● Re-open allegation, determine whether it better fits the definition of Control per IPR's definitions and Statements of the |

| | |
|---|---|
| | complainant, and perform a full investigation (with corresponding finding) if retained as a Force allegation |
| **Compliance Rating Based On** | ● Administrative closure of allegations of excessive force |

---

### Settlement Agreement Paragraph

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Directive 310.20 |

### Compliance Assessment

During the fourth quarter of 2021, PPB maintained Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited) which contains the requirements of Par. 130 (see Policy #2 within the Directive). No allegations of harassment occurred in the fourth quarter of 2021. We find PPB has maintained compliance with the requirements of Par. 130 at this point in time.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● Directive 310.20 |

---

### Settlement Agreement Paragraph

131. COCL Summary. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131

refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, and the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Directive 336.00; Review City Code 3.20.140; Observe PRBs |

**Compliance Assessment**

While PPB maintains Directive 336.00 and the City maintains City Code 3.20.140 which outline the operations of the PRB, COCL continues to find that the operation of PRB is inconsistent with the requirements of Par. 131, specifically subsection (c) which requires all participating PRB members to "make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts." During the fourth quarter of 2021, COCL observed PRBs where we continued to see confusion around the Graham standard and active aggression. There was also some tendency to use mitigating factors to justify the use of force rather than as a consideration for the extent of discipline. Whereas at times the City Attorney provided clarification, the continuation of these issues is a cause for concern and they must be resolved.

Additionally, during one PRB, we noted some PRB members including the fact that the officer's assignment could be impacted by a sustained finding of excessive force. This is problematic as PRB members should not be predicating their decisions to any degree on impacts to the officers assignment. As this would not justify misconduct nor would it be considered a mitigating factor, PRB members should avoid considering the officer's current/future assignment in their deliberations.

| **COCL Recommendations** | • To achieve substantial compliance, resolve the ongoing issues of PRB operation through better training and clarification<br>• To achieve substantial compliance, ensure PRB members are clear that assignment is not an exonerating or mitigating factor |
|---|---|
| **Compliance Rating Based On** | • Observation of PRBs |

**Settlement Agreement Paragraph**

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB Directive 336.00 |

**Compliance Assessment**

During the fourth quarter of 2021, PPB maintained Directive 336.00 (Police Review Board) which memorializes the authority of PRB to send a case back for additional investigation. There were no such instances during this quarter. As Par. 132 has adequately been placed into policy, we find PPB has maintained substantial compliance with the requirements of this paragraph.

| COCL Recommendations | ● No recommendations at this time |
|---|---|
| Compliance Rating Based On | ● PPB Directive 336.00 |

**Settlement Agreement Paragraph**

133. COCL Summary: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Substantial Compliance |
|---|---|

119

| Methodology | Review SOP #32 and #42 |
|---|---|

| | |
|---|---|
| | **Compliance Assessment**<br><br>During the fourth quarter of 2021, the PPB maintained SOP #32 (Civil Liability and Tort Claims) and SOP #42 (Evaluation of Members Fitness to Participate in All Current and Prospective Specialized Units when the Use of Force Results in a Finding of Liability in a Civil Trial). The combination of these two SOPs contains the requirements of Par. 133. There were no findings of liability during the fourth quarter. As a result of PPB possessing these SOPs, we find they have maintained compliance with the requirements of Par. 133. |
| **COCL Recommendations** | ● No recommendations at this time |
| **Compliance Rating Based On** | ● SOP #42<br>● SOP #32 |

## D. CRC Appeals

| | |
|---|---|
| | **Settlement Agreement Paragraph**<br><br>134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level. |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review City Code 3.21.080; Review CRC minutes |
| | **Compliance Assessment**<br><br>The CRC continues to include 11 community members who are representative of the community at large. A review of the minutes for the meeting the CRC had in the fourth quarter, as well as prior recordings and in-person observations of the CRC, leads us to believe they |

| | |
|---|---|
| remain neutral, unbiased, and capable of making objective decisions. We therefore find the City has maintained compliance with the requirements of Par. 134. | |
| **COCL Recommendations** | ● No recommendations at this time |
| **Compliance Rating Based On** | ● City Code 3.21.080<br>● CRC minutes |

| | |
|---|---|
| **Settlement Agreement Paragraph**<br><br>135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence. 136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized. | |
| **Compliance Label** | 135. Substantial Compliance |
| | 136. Substantial Compliance |
| **Methodology** | Review PSF-5.03; Review CRC minutes |

**Compliance Assessment**

The City maintains PSF-5.03 which memorializes the CRC's authority as related to Pars. 135 and 136. A review of the minutes for the one CRC meeting in the fourth quarter of 2021 indicate that no request for additional information was made in the quarter. However, the CRC meeting did contain a follow-up from a prior request for additional information. In that follow-up, the IPR Director indicated the requested additional information was addressed in other related complaints (as there were several related cases). As the CRC retains the authority to request

121

| | additional investigation and we have seen evidence of this process play out, we find the City has maintained substantial compliance with this paragraph. |
|---|---|
| **COCL Recommendations** | ● No recommendations at this time |
| **Compliance Rating Based On** | ● Charter Code and Policy Code PSF-5.03<br>● CRC minutes |

**E. Discipline**

| **Settlement Agreement Paragraph** | |
|---|---|
| 137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Directive 338.00 and corresponding matrix guide; Review Corrective Action Recommendation documents; |

**Compliance Assessment**

In the fourth quarter of 2021, the PPB maintained Directive 338.00 (Discipline Guide) as well as the matrix guide that is easy to read and facilitates reasonably predictable and consistent discipline. Additionally, the guide allows for the integration of mitigating and aggravating factors and provides examples of each. We reviewed four Corrective Action Recommendation documents provided by PPB for the fourth quarter. In each, the RU Manager provided a summary of the case, the mitigating and aggravating factors, and their rationale for their discipline recommendation. Additionally, we reviewed the actual discipline imposed for each case and found it to also be consistent with the range of discipline allowed in the guide. As such, we believe PPB has maintained substantial compliance with Par. 137. At present, the discipline guide is being revised and we will therefore provide an update in our next report.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● Corrective Action Recommendations |

### F. Communication with Complainant and Transparency

| **Settlement Agreement Paragraph** |
|---|
| 138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that complainant can file and track his or her own complaint of officer misconduct. 139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own compliant to the extent permitted by law. |
| 140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law. |

| **Compliance Label** | 138. Substantial Compliance |
|---|---|
| | 139. Substantial Compliance |
| | 140. Substantial Compliance |
| **Methodology** | Review IPR website; Review IPR policy; Review findings letters; Interview IPR personnel |

| **Compliance Assessment** |
|---|
| We continue to see evidence of IPR conforming with Pars. 138, 139, and 140. IPR has maintained many different avenues for submitting a complaint. When an individual submits a complaint online, they receive a unique tracking number and can request a status update with |

that number. If they submit through another avenue, such as mail, telephone, or walk in, the IPR employee will submit the complaint through their online system to generate a tracking number which will be given to the complainant. IPR and the city will share requested documents with complainants as is appropriate in line with Oregon Public Records Request laws. From a protocol and operation standpoint, IPR has systems in place to ensure that they are complying with the requirements of Pars. 138 and 139.

IPR shared with COCL their records for complaints they handled in 2021. In the fourth quarter, IPR closed out a total of 51 cases. Each case had been tracked internally to make sure all steps of the protocol were followed. COCL personally reviewed a 10% sample of these cases to ensure that all communication requirements were met. In each of the cases reviewed, IPR was able to show that soon after the complaint was filed, the complainant received an initial contact letter in writing. After the cases were closed, the complainant received a letter documenting the closure of the complaint. For most of the cases, these letters went out in email form. However, in one of the complaints (filed on behalf of a houseless person), IPR wrote a letter, made attempts to locate the individual, and provided a copy of the letter at the office, in case the individual was able to come in to receive it. The contents of each initial contact letter contain the tracking number, the complaint classification, and the assignment. The contents of the closure letter contained the outcome of the investigation, whether any corrective action was taken, and any additional action the complainant may take. Having reviewed the IPR website and meeting with IPR to review their protocols and records, COCL finds that the city to be in substantial compliance with Pars. 138, 139, and 140.

| **COCL Recommendations** | ● No Recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● IPR policy<br>● Complaint tracking webpage<br>● Finding and closure letters to complainant<br>● Interview of IPR personnel |

# IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

| **Settlement Agreement Paragraph** |
|---|
| 141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with the DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement. |
| 142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement. |
| 143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland. |

| | |
|---|---|
| **Compliance Label** | 141. Substantial Compliance |
| | 142. Substantial Compliance |
| | 143. Substantial Compliance |
| **Methodology** | Observation of PCCEP meetings<br>Review of minutes, reports, and recommendations<br>Interviews with City staff and PCCEP |

**Compliance Assessment**

Per Pars. 141 and 142, PCCEP has continued to function as a legitimate body for community engagement, supporting multiple subcommittees that have sought input from community members, government officials, and community leaders and have generated ideas to improve police-community relations.

In the fourth quarter of 2021, PCCEP continued monthly general meetings and subcommittee meetings via Zoom. Highlights of PCCEP's work as a full committee in the fourth quarter include adopting a letter to the police chief to acknowledge the late Chief Charles Moose's "courage, endurance, dedication to community-engaged policing," reviewing PCCEP's past recommendation on body worn cameras, discussing and adopting a proposal for developing a PCCEP strategic plan and a new leadership structure for PCCEP's steering committee (discussed below), co-hosting a town hall on COCL's Q2 report, and hosting a discussion of the City's fall budget process as it relates to public safety (Portland Street Response, PPB, and other bureaus).

PCCEP did not adopt any recommendations in the fourth quarter. Three recommendations that PCCEP adopted in the third quarter are still pending a response from the City: A recommendation regarding data transparency (specifically, public release of all FDCRs)—developed jointly with the Citizen Review Committee and the Training Advisory Council and approved at the July PCCEP meeting; recommendations related to codification of PCCEP approved at the August PCCEP meeting; and elevating the recommendations of the Citizen Review Committee regarding 2020 protests at the September PCCEP meeting. Per the Amended PCCEP Plan, "*The City shall provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days.*" At the close of the fourth quarter, the City had not formally responded to these recommendations. These delays continue to be attributed to turnover and changes in staffing within the Mayor's Office.

PCCEP's subcommittees focus on Youth, Behavioral Health, Racial Equity, and Settlement Agreement and Policy. In addition, a PCCEP steering committee meets monthly. In the fourth quarter, the Behavioral Health Subcommittee heard a presentation on Portland Street Response's pilot project and expansion, and discussed comments on PPB's Wellness Program Directive. The Youth Subcommittee discussed outreach goals, developing a committee work plan, and planning a youth forum to discuss racial justice and police. The Racial Equity Subcommittee heard a presentation on PPB's Stops Data, and considered recommendations related to the data. The Settlement Agreement and Policy Subcommittee hosted COCL's quarterly town hall on the Q2 2021 report, and heard updates from DOJ and the City on the

Settlement Agreement mediation. The Steering Committee continued to set agendas for the full PCCEP meetings, and also reshaped PCCEP's leadership structure, with the Steering Committee membership now composed of the chairs of other PCCEP Subcommittees.

While PCCEP members remain very active and should be credited for their contributions, given the level of attrition, we are concerned about whether PCCEP still represents a "reasonably broad spectrum of the community," as required by Paragraph 143. Granted, there is still diverse gender and racial representation present among the seven PCCEP members still seated at the end of the fourth quarter, but many seats are vacant. COCL is concerned with the attrition of PCCEP members, and lack of urgency on the part of the City to identify and recruit new PCCEP members to maintain a full 13-member body. No new members have been appointed since August of 2021. Attrition and lack of re-appointment of new members was a major factor in the dissolution of PCCEP's preceding body, the Community Oversight Advisory Board. COCL will be watching this issue closely in the first quarter of 2022. In this quarter, COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

| **COCL Recommendations** | <ul><li>To remain in substantial compliance, the City should create a work plan, as promised, that outlines a strategy and timeline to identify and recruit sufficient PCCEP members to maintain a full body</li><li>To remain in substantial compliance, the City should respond to PCCEP's third quarter recommendations</li></ul> |
|---|---|
| **Compliance Rating Based On** | <ul><li>Content of PCCEP meetings</li><li>Substance of reports and recommendations</li><li>Level of community engagement</li></ul> |

| **Settlement Agreement Paragraph** | |
|---|---|
| 144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan. | |
| **Compliance Label** | Partial Compliance |

| Methodology | Observation of PCCEP meetings<br>Review of minutes, reports, and recommendations<br>Interviews with City staff and PCCEP |
|---|---|

**Compliance Assessment**

During the fourth quarter, the City was supportive of the PCCEP in some ways (e.g. someone from the City Attorney's Office and the PPB attended PCCEP meetings to answer questions). However, the City remains in Partial Compliance with Par. 144 because the staffing problems identified by COCL in each quarter of 2021 have not been addressed, and continue to have adverse effects.

Historically, we note that record keeping and timely posting improved significantly in the second quarter, and that improvement continued into the third quarter, with videos posted to PCCEP's YouTube channel within days of the meeting's date. However, several PCCEP meeting records were posted to another YouTube channel (not linked to PCCEP's webpage), which was also an issue in the third quarter; COCL has provided technical assistance, urging PCCEP staff to ensure everyone has access to PCCEP's YouTube channel for posting, and suggesting all recording be consolidated on PCCEP's YouTube channel, for ease of public access.

Written meeting minutes continue to be difficult to locate on PCCEP's website; one set of minutes was posted for the December full PCCEP meeting, along with lengthy—and difficult to navigate—transcripts of the other two full meetings in the fourth quarter. No subcommittee minutes were posted.

We recommend that the City continue to show improvement in the timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. For the fourth quarter, the City's level of support for PCCEP was insufficient to return to Substantial Compliance for Par. 144.

| **COCL Recommendations** | ● To achieve substantial compliance, provide adequate staffing so that the minutes to PCCEP meetings are posted within 10 business days after a PCCEP meeting, in accordance with the Amended PCCEP Plan |
|---|---|
| **Compliance Rating Based On** | ● Review of PCCEP website and YouTube channel |

**Exhibit A**

**Portland Police Bureau's Role in Public Engagement and Outreach**

*System Overview*

As described in Paragraph 145, PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns.

*The Community Engagement Plan*

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan. 146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan. | |
| **Compliance Label** | 145. Substantial Compliance |
| | 146. Substantial Compliance |
| **Methodology** | Monitor progress on the implementation of the Community Engagement Plan<br>Interview City personnel and advisory groups members about community engagement and support |
| **Compliance Assessment** | |
| PPB has continued its systems of community engagement, both with the PCCEP and other advisors. COCL continues to use the Community Engagement Plan (CEP) as a framework for assessing PPB's progress on community engagement under the Settlement Agreement. The Plan's four components are: Public involvement, Communications, Access, and Training. | |

129

**Public Involvement.** The CEP specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

In the fourth quarter, PPB worked with specific advisory groups, including its "Community and Culturally Specific Councils" and its "Operational Councils."[32] The Coalition of Advisory Groups (CAG) held bi-weekly meetings with the Chief's office during this period, and the following advisory groups continued to meet: Alliance for Safer Communities, Asian Pacfic Islander American Advisory Council, Latino Advisory Council, Muslim Advisory Council, and the Slavic Advisory Council. They continue to work closely with the PPB on everything from hate crime to body-worn cameras while advocating for their communities. COCL has suggested PPB advisory groups provide periodic summaries of their meetings for the benefit of the public, although they are not required to do so. Some have created their own Facebook page and some have minutes of their meetings posted on the PPB website. PPB's Operational Councils, such as the Behavioral Health Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council, continued to meet regularly and post their meeting results on the PPB website.

**Communication.** The CEP specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. In the fourth quarter, PPB continued to use social media to communicate with the public and used other mechanisms such as press releases, emails, brochures, and presentations to reach the public. Although minutes or summaries of advisory meetings are not consistently posted, we commend the PPB for generating a monthly list of "Community Engagement Events" that have occurred, including the type and number of events, the number of community and police attendees, and the names of any organizations involved.[33]

**Access.** The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

---

[32] See PPB website for details: https://www.portlandoregon.gov/police/30379

[33] Fourth quarter events: October (20 events with 733 community attendees), November (19 events with 613 community attendees), December (7 events with 172 community attendees).

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

We continue to report that PPB's language access plan, directive, and training were not developed in this quarter because PPB is still waiting for the City to implement a city-wide process of recruiting bilingual employees as interpreters. However, as described below, PPB has worked with community members to develop videos to educate all PPB members on how to respond appropriately to individuals needing language access services.

Training. The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

PPB continues to take actions consistent with these goals. PPB members previously received some basic training in how to use the LanguageLine software ("Insight" app) to communicate with anyone who has limited English proficiency (LEP). During the fourth quarter, the Office of Community Engagement, in collaboration with the Training Division and members of the LEP community, created two training videos for officers on Language and Cultural Awareness. This training also instructed officers in how to use PPB's bilingual members when needed.

Last quarter, COCL encouraged the City to request data from LanguageLine on how often PPB officers are using the Insight app and for what languages to help assess supply and demand for such language services. The City has done so, and the data from 938 calls indicates that Spanish is, by far, the most requested translation, comprising 69% of all calls involving LEP individuals (followed by Vietnamese at 7%, Russian and Somali around 4%, Cantonese and Mandarin around 3%, Arabic at 2% and 17 other languages under 2%). This information should help PPB assess the demand for specific PPB interpreters, given that LanguageLine is intended only as a support system when interpreters are not available.

In terms of history and culture, the Equity and Inclusion Office continued to work on new equity trainings, as summarized in Par. 84.

Noteworthy for the fourth quarter is restarting of the Community Police Academy by the Office of Community Engagement and the Training Division, after a 2 year hiatus. Various City departments and advisory groups participated, and PPB is pursuing a more educational approach that extends beyond the traditional approach of having community members exposed to police work.

In sum, during the fourth quarter PPB continued to implement its Community Engagement Plan by maintaining partnerships with community organizations and advisory councils and seeking their help with various forms of cultural awareness and LEP services training for PPB members. Thus, PPB remains in substantial compliance for Pars. 145 and 146.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Reviews of reports<br>• Feedback from City and advisory groups<br>• Implementation of the Community Engagement Plan |

*Data Collection, Analysis, and Reporting*

PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par. 147-150).

---

**Settlement Agreement Paragraph**

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| Compliance Label | 147. Substantial Compliance |
|---|---|
| | 148. Substantial Compliance |

**Compliance Assessment**

PPB remains in Substantial Compliance with Par. 147 because they have reported demographic data pertinent to each precinct and posted them on their website.[34] PPB should not be expected to provide new demographic data until the American Community Survey by the Census Bureau has released new information.[35] For the public and research community, the PPB continued to provide a wide range of data, maps, and high-quality interactive dashboards on its website.[36]

PPB remains in Substantial Compliance with Par. 148 because they continue to collect, analyze, and report demographic data from individuals who are stopped by PPB using its Stops Data Collection app. In terms of data analysis and reporting requirements, PPB's Strategic Service Division continued to produce the quarterly Stops Data Collection reports and share them with PCCEP and the public. The 2021 fourth quarter report was released on January 24, 2022 and is discussed in the present report.[37] The tables below provide the traffic stops rates for Black/African Americans and Hispanic/Latino drivers for each quarter of 2021, broken down by precinct. These tables do not show the total number of traffic stops, where the pattern of decline has reversed in the fourth quarter: 4,871 (Q1), 3,537 (Q2), 2,285 (Q3), and 3,301 (Q4). However, the number of individuals stopped who were perceived by PPB to have a mental health issue remained steady at around 1% of the total traffic stops.

The fourth quarter data for 2021 continues to show racial disparities in traffic stops.[38] As shown in Table 9.1, Black/African American drivers make up only 5.8% of Portland's population but 16.3% of the traffic stops citywide. Although Central and East precincts showed some decline in the rate of stops for Black/African American drivers in the fourth quarter, the rates remained high in all districts. Black/African Americans are stopped at a rate 4 times higher than their population numbers in the Central precinct, 3 times higher in the East precinct, and 2 times higher in the North precinct. The rate of stops among non-traffic officers remains higher than traffic officers (16.9% vs. 13.4%), although the difference between these two groups has shrunk.

---

[34] https://www.portlandoregon.gov/Police/article/780347

[35] The 2016-2020 American Community Survey 5-year data products will be available at data.census.gov starting March 17, 2022.

[36] https://www.portlandoregon.gov/police/71673

[37] PPB's Stops Data Collection Report for Q4 2021: https://www.portlandoregon.gov/police/article/798734

[38] We continue to focus on traffic stops (not pedestrian stops) since they account for 99% of all stops in Portland.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

Traffic stops involving Hispanic/Latino drivers do not show such large disparities. As shown in Table 9.2, Hispanic/Latinos make up 9.7% of the population and 11.3% of all stops in the fourth quarter. Quarter by quarter, the rate of traffic stops remained fairly stable for the Hispanic/Latino population during 2021. Only the Central precinct continued to show any racial disparity when compared to the population estimates (6.2% of the total population vs. 10.2% of the stops). There were few differences between Traffic and non-traffic officers when stopping the Hispanic/Latino population.

Again, we encourage PPB and the community to continue monitoring these enforcement actions, discuss any concerning patterns, and explore solutions.

COCL has previously noted that PPB has begun to collect additional data to better understand the racial disparities that are present in stops and searches, including information on consent searches. PPB is still planning to: (1) distribute cards in five major languages that explain the desire to conduct a search and the community member's right to refuse; (2) change their search policy or SOP to reflect these changes; and (3) train officers in how to document the search process in the field. In the fourth quarter, PPB held off on policy revisions and training because Oregon state legislators have not yet finalized a bill on consent searches that is currently under review.

| | |
|---|---|
| **COCL Recommendations** | • PPB should continue its dialogue with community members around racial disparities and pay particular attention to disparities in the Central district for both Blacks/African Americans and Hispanic/Latinos<br>• Prepare for additional training on stops and searches<br>• Consider refresher training on bias-free, impartial policing |
| **Compliance Rating Based On** | • COCL review of PPB Precinct demographic reports<br>• COCL review of PPB Stops Data Collection reports |

**TABLE 9.1 Traffic Stops by Precinct and Division: Black/African American Drivers**

| Precinct | Percentage of Population that is Black/African American[39] | Percentage of Stops with Black/African American Drivers[40] | | | |
|---|---|---|---|---|---|
| | | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 |
| Central | **2.9%** | 15.9% | 14.4% | 13.6% | 11.9% |
| East | **5.6%** | 20.2% | 20.4% | 20.6% | 18.3% |
| North | **8.8%** | 20.2% | 18.1% | 12.8% | 19.7% |
| Traffic Officers | NA | 12.8% | 12.8% | 9.7% | 13.4% |
| Non-Traffic Officers | NA | 21.5% | 20.6% | 19.9% | 16.9% |
| Citywide | **5.8%** | 18.9% | 18.3% | 17.7% | 16.3% |

---

[39] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB report at https://www.portlandoregon.gov/Police/article/780457

[40] Source: PPB's 2021 Stops Data Collection reports at https://www.portlandoregon.gov/police/article/783756, https://www.portlandoregon.gov/police/article/785651, https://www.portlandoregon.gov/police/article/797190

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

**TABLE 9.2 Traffic Stops by Precinct and Division: Hispanic/Latino Drivers**

| Precinct | Percentage of Population that Hispanic / Latino[41] | Percentage of Stops with Hispanic/Latino Drivers[42] | | | |
|---|---|---|---|---|---|
| | | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 |
| Central | **6.2%** | 9.9% | 11.4% | 11.2% | 10.2% |
| East | **12.0%** | 11.2% | 11.1% | 11.9% | 12.5% |
| North | **10.2%** | 13.5% | 10.8% | 11.9% | 8.6% |
| Traffic Officers | NA | 12.1% | 13.1% | 9.9% | 12.4% |
| Non-Traffic Officers | NA | 10.9% | 10.6% | 12.4% | 11.0% |
| Citywide | **9.7%** | 11.2% | 11.3% | 11.8% | 11.3% |

---

[41] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB report at https://www.portlandoregon.gov/Police/article/780347

[42] Source: PPB's 2021 Stops Data Collection reports at https://www.portlandoregon.gov/police/article/783756, https://www.portlandoregon.gov/police/article/785651, https://www.portlandoregon.gov/police/article/797190

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

**Settlement Agreement Paragraph**

149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review metrics requirement |

**Compliance Assessment**

The City has completed the requirement to develop a set of metrics to evaluate community engagement, and therefore remains in Substantial Compliance.

As technical assistance, COCL continues to encourage the City and PPB to gather more specific outcome data relevant to police-community interactions. which can be used to track and enhance organizational performance. To measure the quality of police-community interactions for all encounters, body-worn camera data will be helpful if the City can acquire innovative software that is able to scan for problematic patterns in audio and video data and generate reports for supervisory review. Also, we continue to recommend that PPB reintroduce contact surveys to give the community a voice as the City seeks to determine the level of procedural justice exhibited by PPB officers during police-community interactions. These two data sets provide a foundation for an evidence-based, data-driven police organization, including supervisor coaching and feedback based on performance metrics. We encourage the PPB to incorporate these outcome measures as part of the remedies being pursued in Section XI.

| | |
|---|---|
| **COCL Recommendations** | • Implement a contact survey to measure the level of procedural justice in police-public interactions<br>• Implement internal surveys of PPB members to measure organizational justice, employee satisfaction, wellness, and police culture<br>• Acquire and use software to analyze body worn camera data |
| **Compliance Rating Based On** | • The development of a list of metrics that captures multiple dimensions of community engagement |

| **Settlement Agreement Paragraph** |
| --- |
| 150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters. |

| | |
| --- | --- |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed PPB's Annual Report; Interviewed PPB and PCCEP |

| **Compliance Assessment** |
| --- |
| PPB remains in Substantial Compliance because no additional work under Paragraph 150 was required during the fourth quarter of 2021. In the third quarter, PPB successfully completed the remaining tasks surrounding their 2020 Annual report, as described in COCL's last report.<br><br>Although not required by the Settlement Agreement, we remind the PPB that community members have asked that the City Council presentation of the Annual report by the Chief be delayed until the PPB has received feedback on the report from each of the precincts. Alternatively, we encourage the City Council to allow for public comment after PPB's presentation. |

| | |
| --- | --- |
| **COCL Recommendations** | ● PPB should present the Annual Report to the City Council after receiving feedback from the community at Precinct meetings |
| **Compliance Rating Based On** | ● Review of the content and presentation of PPB's Annual Report |

## Summary of PPB's Community Engagement

PPB maintained its systems of community engagement as it continues to implement its Community Engagement Plan. The Office of Community Engagement continued to partner with

diverse communities through existing and new advisory councils. PPB's Operational Councils (such as the Behavioral Health Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council) meet regularly and have current postings on the PPB website. PPB's diverse advisory groups (Community and Culturally Specific Councils) continue to meet with PPB and the communities they represent and have improved their efforts to keep the public informed about their work.

PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. PPB continued to produce quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. The traffic stop data for all four quarters of 2021 were examined for racial disparities in stops when compared to population estimates. Although improvements were noted, Black/African Americans are stopped at a rate 4 times higher than their population numbers in the Central precinct, 3 times higher in the East precinct, and 2 times higher in the North precinct. Traffic stops involving Hispanic/Latino drivers do not show real disparities, with the exception of the Central precinct. To address these concerns, PPB introduced the new Stops Data Collection app at the start of year to collect additional data about stops, and provided some preliminary training to officers, but the full program, with consent search cards in five languages, has yet to be implemented.

Again, we encourage PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns.

| **Settlement Agreement Paragraph** | | |
|---|---|---|
| 151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.<br>152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law. | | |
| **Compliance Label** | 151. Substantial Compliance | |
| | 152. Substantial Compliance | |
| **Compliance Assessment** | | |

PCCEP met as needed to accomplish their objectives as set forth in the PCCEP Plan.

At least one representative of the City Attorney's Office attends PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings law. While no new members joined PCCEP in Q4, previously the City has trained new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all City advisory boards. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● Regularity and content of PCCEP meetings<br>● Provision of City's legal advice and training for PCCEP |

**Overall Assessment of Section IX**

PPB has continued to engage the community through a wide range of formal and informal advisory groups as well as through public events. The PCCEP continued to struggle during the fourth quarter, due largely to problems with City support. Although subcommittee chairs continued to hold meetings and the full PCCEP continued to meet, the PCCEP members need more consistent support from the City to ensure that PCCEP is able to maintain full membership and function as a legitimate body of community engagement. Hence, the City remains in Partial Compliance for Paragraph 144.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

# XI. ADDITIONAL REMEDIES

As we noted in the introduction, the parties have reached agreement on a set of remedies to achieve compliance with the terms of the Settlement Agreement.[43] Consequently, they have agreed to add a new section to the Settlement Agreement - Section XI - that contains eight new paragraphs 188 to 195 (See Appendix A for details). Although the fairness hearing will not occur until April of 2022, the City Council has voted to approve these remedies, and the City has begun work on Section XI. Although COCL will wait until the Court has approved this agreement before conducting a full-scale compliance assessment, in the current report we offer a preliminary look at three remedies where groundwork is underway.

This section XI will not be presented in the format used throughout this report because COCL is not offering a compliance assessment at this time. We are simply keeping the public informed of activities underway regarding Paragraphs 191, 194, and 195.

## Paragraph 191: Civilian Leadership in Training

Paragraph 191 requires that "*Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division.*" Indeed, in November of 2021 the City Council funded a new position, called "Police Education Director" by the City's Bureau of Human Resources). To create a job description, PPB has reached out to other cities with similar positions, such as Los Angeles and Baltimore. The job has been posted and the search process is underway. Community participation to date has included a recommendations report by the Training Advisory Council (TAC) in January of 2022 and a commitment by the City to include one member of TAC on the selection committee. COCL will provide an update in our next quarterly report.

## Paragraph 194: Body-Worn Cameras

Paragraph 194 states that "*Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy- review-and-approval provisions of this Agreement.*" The City is progressing

---

[43] These meetings included the Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

towards the implementation of a body-worn camera (BWC) policy and program. In previous reports COCL recommended that the City introduce BWCs to ensure greater transparency and improved evidence collection during police-public interactions. Moreover, research has shown that BWCs can reduce the number of complaints and uses of force by the police.[44]

The City requested that DOJ set principles to govern a BWC policy, and in response, DOJ released a letter to the City on November 15, 2021, addressing key issues, including deployment, notice, activation/deactivation/buffering, authorized users, preview, control of videos, and accountability. DOJ additionally stated that public input should drive a BWC policy and be collected expeditiously before the PPB drafts and adopts such a policy.

To comply with guidance from DOJ, the City solicited assistance from COCL to gather community input for a BWC policy. Starting in November, COCL began to engage with city stakeholders including the City Attorney's Office (CAO), PPB, and the Portland Committee on Community-Engaged Policing (PCCEP) to discuss the potential format of the community forum, who to include, and how to stage questions to community. During the conversations with city partners, COCL determined that engagement with the community would require a heavier partnership with PCCEP to ensure the forum would reach disproportionately impacted communities in Portland. COCL capitalized on the conversations with city partners to gather contact information for community-based organization leaders and other related community stakeholders to invite to the forum. Planning efforts for a community driven BWC forum continued into the new year.

**Paragraph 195: Community Police Oversight Board**

This remedy is based on a ballot measure "that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline." (Par. 195).

On November 3, 2020, Portland voters passed Ballot Measure 26-217 to create this civilian oversight board for the Portland Police Bureau (PPB). The oversight board will act as an independent body that has the authority to:

- Investigate all deaths in custody and uses of deadly force
- Investigate all complaints of force that result in injury, discrimination against a protected class, violations of federal or state constitutional rights

---

[44] https://bwctta.com/impact-bwcs-citizen-complaints-directory-outcomes

- Investigate other complaints or incidents of misconduct as they see fit or mandated by City Code
- Subpoena, gather, and compel documents and all evidence, including the ability to compel statements from witnesses and officers
- Compel sworn members of the PPB and supervisors to participate in investigations.
- Make policy recommendations to the PPB and City Council, and
- Impose discipline, including termination.[45]

To establish the community oversight board, in July of 2021 the City Council created a Police Accountability Commission (PAC), composed of 20 community members, with the directive of developing the new oversight board for the Portland Police. In the fourth quarter of 2021 the PAC launched the first series of meetings consisting of a private meet-and-greet followed by two public commission meetings.[46] The first public commission meeting was held on December 9, 2021, from 7:30-9:00 pm with an agenda that included training about public meetings and records from a Senior Deputy City Attorney, review of community standards, roles and responsibilities, and proposed work plans.[47] The last public commission meeting of the quarter was held on December 18, 2021, from 1:00-3:00 pm with an agenda that included discussion on the organization phase structure that focused on potential by-laws and who they should engage from the community.[48] Plans were made to create two PAC sub-committees - one on bylaws and internal processes and one on community engagement. In summary, during the fourth quarter the PAC was launched and spent considerable time building relationships among members and beginning the work needed to establish an organizational structure, values, mission, and bylaws. The work of the sub-committees and the work of the full PAC is expected to accelerate in 2022 and COCL will observe this activity.

---

[45] https://www.portland.gov/sites/default/files/2021/portland-ballot-measure-26-217-11-03-2020.pdf
[46] https://www.portland.gov/police-accountability/events/meetings?f%5B0%5D=year%3A2021
[47] https://www.portland.gov/police-accountability/events/2021/12/9/police-accountability-commission-meeting
[48] https://www.portland.gov/police-accountability/events/2021/12/18/police-accountability-commission-meeting

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**BHRT:** Behavioral Health Response Team

BHCC: Behavioral Health Call Center

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CAG:** Coalition of Advisory Groups

**CCO:** Coordinated Care Organization

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COCL:** Compliance Officer and Community Liaison

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DOJ:** Department of Justice

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FMLA**: Family and Medical Leave Act

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**PAC**: Police Accountability Commission

**PCCEP:** Portland Committee on Community Engaged-Policing

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PS3:** Public Safety Support Specialist

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SOP:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**UDAR**: Uniform Daily Assignment Roster

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

**YSD:** Youth Services Division

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

# <u>LIST OF PERSONNEL</u>

Chief of Police: Chuck Lovell

Deputy Chief of Police: Michael Frome

Assistant Chief of Operations: Brian Ossenkop

Assistant Chief of Services: Michael Leasure

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Jeff Bell

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Chris Lindsay

Behavioral Health Unit (BHU): Casey Hettman

EIS Supervisor: Ron Mason

EIS Administrator: Dan Spiegel

Training Captain: Christopher Gjovic

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

# APPENDIX A

## Proposed Section XI of Settlement Agreement

## Filed by the DOJ on 11/8/2022 as Document 269-1

XI.    ADDENDUM OF ADDITIONAL REMEDIES

On April 2, 2021, the United States issued a notice of noncompliance pursuant to Paragraph 178. The purpose of this Addendum is to ensure that the City, by and through its officials, agents, employees, and bureaus, takes actions to resolve the concerns expressed by the United States in the noncompliance notice. Specifically, the United States found that the City failed to implement the following provisions of this Agreement: Section III – Use of Force, Paragraphs 66, 67, 69, 70, and 73; Section IV – Training, Paragraphs 78 and 84; Section VIII – Officer Accountability, Paragraphs 121, 123, and 169; and Section IX – Community Engagement and Creation of Portland Committee on Community Engaged Policing, Paragraph 150. The City does not admit that the allegations of noncompliance are true.

188.    The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review.

189.    Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

190.    Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement.

191.    Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold.

192.    Within 60 days of the date this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph.

193.    In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement.

194.    Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a.    The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

b.    Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy. The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c.    If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs. The City will provide a final procedural status update upon the completion of the collective bargaining process.

d.    The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

195.    In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to City Council for final approval.

a.      Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b.      Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement. Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board. Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work. For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c.      The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

# APPENDIX B

# COCL Technical Assistance and Outcome

# Measurement for PPB's Use of Force Data

*Force Frequency*

**FIGURE 3.1**



COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

**FIGURE 3.2**



 In previous reports, we noted that the number of individuals on whom PPB used force, excluding crowd control uses of force, was steadily increasing since 2020 Q3, with a low of 142 to a high of 205 in 2021 Q2. As indicated by the orange line in **FIGURE 3.1**, the force-to-custody rate had shown a consistent increase since the first quarter of 2020 up. Since 2021 Q2, there has been a 21% decline in the number of individuals who experienced force by PPB (from 205 to 161) and a 16% decline from Q3. The fourth quarter of 2021 recorded the lowest number of individuals PPB used force on in 5 quarters (since 2020 Q3). As indicated by the orange line in **FIGURE 3.1**, the force-to-custody rate has shown a consistent increase since the first quarter of 2020. Additionally, while still higher than quarters before 2020, there was a decrease in the force-to-custody rate for Q4 compared to the third quarter of 2021., though the rate is still higher than quarters prior to 2020.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

*Proportion of Individuals in Mental Health Crisis*

**FIGURE 3.3**



The number of individuals who were perceived by PPB officers to be experiencing a mental health crisis when they used force decreased from 36 to 26 from Q3 to Q4 of 2021 (a 28% decrease). However, as a proportion, persons perceived to be in a mental health crisis represented 16% of individuals who experienced a use of force event in the fourth quarter of 2021 **(see FIGURE 3.3)**, which is consistent across all force data since 2017, i.e., during this timeframe, persons perceived to be in a mental health crisis represent 17% of the individuals who have force used against them. However, the data indicates an overall increasing trend in the proportion of persons perceived to be in a mental health crisis, moving from a low of 8% in the fourth quarter of 2018 to a high of 24% in the second quarter of 2021. We continue to suggest that the Force Inspector consult BHU as necessary to determine potential reasons for this increase as well as determine ways to reverse the overall trend as necessary.

*Applications per Person per Event*



FIGURE 3.4

A single force event can contain multiple applications of force and it is therefore important to not only look at the raw number of events but also how many times officers are using force within a single event (i.e., the number of applications). Since 2017, outside of crowd control contexts, an officer has used only a single application of force 61% of the time, two applications 20% of the time, and three applications of force 11% of the time. Therefore, over 90% of force events contained three or fewer applications of force, most of which are Category IV force events (see next section). Since 2017, the average applications per officer per event has been increasing slightly (see trend line in **FIGURE 3.4**) though we note that the trend is not statistically significant.

*Persons Experience Multiple Force Events*

**Figure 3.5**



Every quarter the force dataset includes instances where the same individual is involved in multiple use of force events. The second quarter of 2021 saw the highest force events per individual believed to be in a mental health crisis (3.46, see **FIGURE 3.5**), which is the same quarter that saw the highest proportion of individuals believed to be in a mental health crisis where force was used against them (24.4%, see **FIGURE 3.3**). Across the whole dataset, on average, a person believed to be in a mental health crisis experienced use of force against them 2.17 times in the same quarter. In comparison to those who were not in a mental health crisis, a person, on average, experienced force used against them 2.01 times in the same quarter (see **FIGURE 3.5**). As seen by the trendlines in **FIGURE 3.5**, the number of times a person experiences force used against them in one quarter, regardless of their perceived mental health status, has been increasing over time although the difference has become smaller. COCL recommends this trend continue to be monitored to ensure there is not an increase and that the numbers stay fairly consistent regardless of perceived mental health status. As with the above, the force team should consult with the BHU to identify potential reasons and potential resolutions to these outcomes.

*Force Categories*

When looking at overall force categories, a majority of force applications are in Category IV, the lowest level of force. Category IV has been the highest force used in approximately 50% of events from the fourth quarter of 2018 to the present. Additionally, Category III is the highest use of force in approximately 40% of force events, with Category II making up the remaining approximate 10%. As seen in **FIGURE 3.6**, over the past three years use of force events in Category IV have been decreasing while Category III force events have been increasing. In the fourth quarter of 2021 there was only a 4% difference in instances in which Category IV was the highest use of force used (47%) and where Category III was the highest use of force used (43%). Additionally, this quarter saw the lowest proportion of Category II events (10%) since Q1 of 2019.

**FIGURE 3.6**



COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

**FIGURE 3.7**



When looking at whether the same trends can be seen for persons perceived to be in a mental health crisis, we see a wider gap between Category IV and Category III levels. For persons perceived to be in a mental health crisis over the whole dataset, Category IV force (the lowest level of force) was the most frequent category of force used (approximately 65% of events), whereas Category III events represent 20% of the events. The more serious Category II use of force was applied in approximately 16% of mental health crisis events compared with approximately 11% for persons not in mental health crisis. Therefore, the data is clear that when PPB officers use force against persons they perceived to be in a mental health crisis, they most often do so using the lowest category of force, more so than with persons not in mental health crisis. This may be due to a number of factors, including the emphasis on mental health crisis response over the course of the Settlement Agreement. However, we suggest the PPB examine this phenomenon more closely in coordination with the BHU in order to see whether it is possible to further widen the divide between Category IV and other force categories. We also recommend that they look at injuries, which have been shown to be higher in other cities for individuals with mental illness (see citation above).

*Subject Resistance*

When looking at the level of resistance shown by the subject in events where force was used, the large majority were active resistance regardless of whether they were perceived to be in a

**Exhibit A**

mental health crisis or not. **Table 3.1** shows a breakdown of the level of resistance shown by the subject in use of force events over the entire dataset. However, force was used in a higher percentage of events where the subject showed passive resistance for those not in a mental health crisis (6.3%) compared to those believed to be in a mental health crisis (1%). It should be noted that the events where force was used on a subject displaying passive resistance while in a mental health crisis all occurred before 2020, suggesting that PPB has not used force against persons in mental health crisis who are passively resisting since then.

**Table 3.1**

| Subject Resistance | No Mental Health Crisis | Mental Health Crisis |
|---|---|---|
| **Active Resistance** | 71.8%<br>(4,381) | 77.8%<br>(1,167) |
| **Active Aggression** | 21.4%<br>(1,306) | 20.7%<br>(311) |
| **Passive Resistance** | 6.3%<br>(382) | 1%<br>(13) |
| **Deadly Resistance** | 0.3%<br>(17) | 0.5%<br>(8) |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

*Armed Subjects*



FIGURE 3.8

Comparing events where force was used in which the subject was unarmed provides differing results depending on whether the individual was perceived to be experiencing a mental health crisis or not (see **FIGURE 3.8**). When looking at the trend over time, the proportion of force events involving unarmed persons not perceived to be in mental health crisis has been declining, a decline not seen in the proportion of force events involving unarmed persons in mental health crisis.

*Use of CEW*

In reviewing the data, PPB officers appear to use CEW's sparingly given the overall force numbers across the dataset. For instance, in the entire dataset, there were a total of 7,506 events wherein an officer used force on an individual. Of these, the PPB officer used a CEW (at least one application) in 395 of these events or 5.3% of events. Additionally, there was little difference in CEW usage in cases where the individual was perceived to be suffering from a mental health crisis (CEW used in 4.6%) versus cases where they were not (CEW used in 5.2%).

Furthermore, in 12 of the 70 events the person in mental health crisis was unarmed, indicating that for the majority of those events (82.9%), officers are not using CEW against unarmed individuals. In all, the data indicate that PPB officers use CEWs infrequently.

**Figure 3.9** displays the rate of CEW applications per officer in events where the person was believed to be in a mental health crisis and when the person was not. The average rate of CEW applications per officer against those believed to be in a mental health crisis over the whole dataset is slightly lower (1.2) than in events where the person was not in a mental health crisis (1.5). There were two quarters in 2019 in which no officer used a CEW against a person believed to be experiencing a mental health crisis. Yet the rate of CEW applications per officer in cases of mental health crisis is higher than for those not in a mental health crisis in the majority of quarters for 2020 though, given the low raw numbers, the difference does appear negligible.

**TABLE 3.2**

| Force Events | No Mental Health Crisis | Mental Health Crisis |
|---|---|---|
| **Force Events with CEW** | 325 (5.2%) | 70 (4.6%) |
| **Force Events with No CEW** | 5,883 (94.8%) | 1,448 (95.4%) |

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

**Figure 3.9**



COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

## APPENDIX C

# Technical Assistance Statement

# Behavioral Health Unit Advisory Committee (BHUAC)

## Office of the Compliance Officer and Community Liaison (COCL)

## Rosenbaum & Associates, LLP December 10, 2021

In response to emergent concerns related to the operation of the Behavioral Health Unit Advisory Committee (BHUAC) based on COCL observations of BHUAC meetings (including an open meeting with community members) and conversations with PPB members, the COCL team provides the following Technical Assistance for the PPB and BHUAC to remain in compliance with the Settlement Agreement. In particular, Par. 95 requires the BHUAC to "*analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters.*"

To be clear from the onset of this technical assistance, we note that preliminary conversations with PPB and the BHU Lt. regarding the below concerns have been fruitful and have demonstrated a willingness to be responsive. As of this date, the COCL has held two separate meetings with PPB, the City, the BHUAC Chair, and the Department of Justice (DOJ) wherein we have raised our concerns, received feedback, and agreed in principle to responsive changes in BHUAC operation. We provide this technical assistance in order to memorialize the conversations to-date and identify clear expectations regarding resolution.

*BHUAC Review of Training*

During the October 27, 2021 meeting, the BHUAC discussed an upcoming ECIT training to be completed in November 2021. Prior to the October BHUAC meeting, the committee was provided a summary of the ECIT training, though at no point was the Committee provided lesson plans or PowerPoint (PPT) slide decks. In phone calls with PPB prior to the October meeting, we raised this as a concern and suggested the BHUAC be provided the lesson plans or presentation materials prior to meeting. In response, we were informed that would not occur despite that being the process for prior reviews of the ECIT training.

During the October BHUAC meeting, no presentation materials were provided to the Committee. Instead, the department relied on a Zoom discussion wherein a member of the Training Division orally reviewed the summary document and took questions from the Committee. We note that the Committee raised several valid comments and questions which received responses from the Training Division member. However, some comments related to ways that the training could be enhanced. While these comments were identified as something that could be incorporated into future trainings, we have no evidence that they were documented for future consideration (i.e., a tracking system similar to other processes implemented as a result of the Settlement Agreement).

Although the BHUAC as a committee has reviewed lesson plans and training materials for prior iterations of the ECIT training, this does not support the present decision to prevent the Committee from reviewing the lesson plans and training material for the November ECIT training (and future trainings). There are two primary reasons why ongoing review is critical. First, the BHUAC has undergone personnel changes since the ECIT training was last reviewed. Although the types of organizations involved has remained a constant, the individual persons have changed, bringing with it new lived experiences and new perspectives. By disallowing these individuals to provide their own unique contributions through the direct review of the training, the PPB is restricting the full contribution of current members. Second, ongoing review is needed because of the ever-evolving nature of crisis response. Improved understanding of mental illness, as well as the development and refinement of tools for interacting with persons in mental health crisis, are ongoing and therefore require ongoing subject matter review.

In order to resolve this issue, we recommend the PPB revert to prior practices, including BHUAC review of lesson plans as well as affording the BHUAC an opportunity to observe trainings in-person. In order to facilitate this, we recommend PPB ensure that training materials for all future mental health-related trainings are provided to BHUAC with sufficient time for the Committee to review the lesson plans and PPTs, meet, make recommendations, and see those recommendations incorporated prior to the delivery of training. For recommendations which the Bureau is unable to incorporate immediately, we recommend the PPB develop a system for ensuring subsequent trainings will incorporate the BHUAC's input. For recommendations which

164

**Exhibit A**

the Bureau disagrees with, we recommend the BHUAC be provided written feedback in accordance with other community advisory committees (e.g., PCCEP). Finally, we recommend the PPB reserve at least one spot for BHUAC members to observe the training so they can report back to the broader group[49].

*BHUAC Review of Critical Incidents*

During the October 27, 2021 open meeting with community members, members of the PPB and BHUAC indicated that reviewing officer-involved shootings and other critical incidents fell "outside the scope" of the BHUAC's operation. However, Par. 95 is clear that the BHUAC is expected to provide recommendations "*regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent outcomes.*" Having the benefit of BHUAC review and assessment of PPB's policy, training, equipment, and operations provides an additional safeguard against potential future unconstitutional force, particularly when reviewing critical incidents that lead to community concerns with officers' decision-making.

Presently, the PPB uses the Police Review Board (PRB) process to identify potential implications for policy, training, equipment, and operations. While we have documented our concerns with the PRB operation in recent reports (as has DOJ), the PRB process does not act as a substitute for BHUAC review as there is no requirement for mental health subject matter experts to be on the PRB when an event involves a person in mental health crisis. As part of the PRB process, the Training Division also conducts a thorough review and, in doing so, PPB states that the mental health expert within the Division is consulted. Although, we believe the Training Division's mental health expert is well-qualified and has positively contributed to the entirety of PPB's current model, the well-rounded expertise of the BHUAC would be a valuable supplement and would allow for a more robust review.

We note that the BHUAC does, in fact, discuss quantitative outcomes of officer encounters. Regularly, the BHUAC has received presentations from the BHU regarding ECIT, BHRT, and SCT statistics. Additionally, the BHUAC has received several updates about positive interactions between persons in mental health crisis and PPB officers. Such qualitative reports supplement the quantitative assessments, providing a more fulsome picture of PPB operations. However, without a focused review of events involving negative outcomes (regardless of whether the officer violated policy), the picture being provided to BHUAC is not complete. We further note

---

[49] As some trainings, namely the ECIT training, are 40-hours total, we suggest observation of training days be done on a rotating basis so as to not overburden any one BHUAC member.

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**

that this is consistent with the sentiments captured in the BHUAC's February 28, 2018 minutes which states "[BHUAC *members wanted to know how all the new directives, policies and training are working out in the community*."[50] We believe that a review of critical incidents, coupled with the positive examples heard by the BHUAC and the statistical presentations from PPB, will allow members to be confident in PPB's ability to safely resolve incidents involving a mental health crisis.

In order to resolve this issue, the COCL, PPB, and DOJ have had recent discussions about how such a review might occur. Although no finalized plan has been presented, we credit the PPB with coming to the table and providing potential solutions. We look forward to seeing a new protocol to address these issues and recommend that PPB discuss their plan with BHUAC before anything is finalized.

*Conclusion*

The COCL team continues to appreciate the expertise and insight that members of the BHUAC bring to the table as part of their role as a PPB advisory committee. However, by limiting the BHUAC's ability to meaningfully contribute to the Bureau's policies, training, and operations for responding to persons in mental health crises, the PPB is also limiting its own ability to act as a learning organization. To resolve this, we recommend the PPB ensure BHUAC members have meaningful opportunities to review training as well as review real-world interactions between police and persons living with mental illness in order to provide evidence-based suggestions to the Bureau. To date, these issues have not caused the COCL to find the City out of Substantial Compliance with the Settlement Agreement. However, without responsive action by the Bureau, such deficiencies may impact COCL's future compliance ratings. We look forward to discussing our concerns with the PPB should further information be necessary.

---

[50] https://www.portlandoregon.gov/police/article/680811

COCL Quarterly Report: Quarter 4 Updates & Analysis, October 1, 2021 to December 31, 2021

**Exhibit A**