**SCOTT ERIK ASPHAUG, OSB #833674**
United States Attorney
**RENATA A. GOWIE, OSB #175273**
Civil Division Chief
**JARED D. HAGER, WSB #38961**
Assistant United States Attorney
U.S. Attorney's Office for the District of Oregon
1000 SW Third Ave., Suite 600
Portland, Oregon 97204-2936
Phone:  503.727.1120
Email:  jared.hager@usdoj.gov

**KRISTEN CLARKE**
Assistant Attorney General
Civil Rights Division
**STEVEN H. ROSENBAUM**
Chief
**LAURA L. COWALL**
Deputy Chief
**R. JONAS GEISSLER**
Trial Attorney
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C.  20530
Phone:  202.514.6255
Fax:  202.514.4883
     Attorneys for Plaintiff United States

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:12-cv-02265-SI |
| Plaintiff, | PLAINTIFF'S NOTICE OF SIXTH PERIODIC COMPLIANCE ASSESSMENT REPORT |
| v. | |
| **THE CITY OF PORTLAND**, | |
| Defendant. | |

Page 1     Plaintiff's Notice of Sixth Periodic Compliance Assessment Report

Plaintiff United States of America (United States) submits this Notice of Sixth Periodic Compliance Assessment Report in advance of the Status Conference set for July 27, 2022. The Report, attached as Exhibit 1, focuses on Defendant the City of Portland's (City) compliance activity from January 10, 2021, to March 31, 2022, as relevant to seven sections of the Amended Settlement Agreement (Agreement)—Use of Force (Section III, ¶¶ 66–77); Training (Section IV, ¶¶ 78–87); Community-Based Mental Health Services (Section V, ¶¶ 88–90); Crisis Intervention (Section VI, ¶¶ 91–115); Employee Information System (EIS) (Section VII, ¶¶ 116–120); Accountability (Section VIII, ¶¶ 121–140); and Community Engagement and Creation of Portland Committee on Community Engaged Policing (PCCEP) (Section IX, ¶¶ 141–152). ECF 276-1, Am. Settlement Agreement.[1]

We assess the City's compliance using the following color-coded rating levels:

- Green: substantial compliance with an ongoing obligation. This level indicates that the City has implemented the provision as required by the Agreement, and must continue implementing the provision to remain in substantial compliance.

- Yellow: partial compliance with an ongoing obligation. This level indicates that the City has made progress with implementation, but has specific concerns it must address to reach substantial compliance.

- Red: noncompliance. This level indicates that we have identified barriers to the City implementing a provision that the Parties must address by devising an appropriate remedy or modifying the Agreement to accomplish the same result as that intended by the provision in noncompliance.

---

[1] On April 29, 2022, this Court approved the operative version of the Agreement after the United States and City (collectively, the Parties) agreed to add a new section with additional remedies (Section XI, ¶¶ 186–195) to resolve a notice of noncompliance. ECF 290, Order; ECF 276, Mot. to Amend Agreement. This Court previously entered the Agreement as a court order. ECF 99, Order (approving the original Agreement); ECF 262, Order (approving amendments to the Agreement).

**Page 2    Plaintiff's Notice of Sixth Periodic Compliance Assessment Report**

The City has earned mixed results in recent years. In 2019-2020, the Department of Justice (DOJ) found that as of January 10, 2020, the City had achieved substantial compliance with all paragraphs of the Agreement. ECF 212, DOJ Interim Compliance Assessment Report, at 2; ECF 195, DOJ 4th Periodic Compliance Assessment Report, at 2. However, in 2021, we reported that the City did not meet the standard for terminating the Agreement because the City did not maintain substantial compliance with 11 paragraphs among four sections, owing largely to the Portland Police Bureau (PPB)'s response to the 2020 demonstrations for racial justice and police accountability. ECF 236, DOJ 5th Periodic Compliance Assessment Report, at 2. On April 2, 2021, after the Parties could not informally resolve the compliance concerns, DOJ issued a notice of noncompliance.[2] ECF 286-1, DOJ Notice.

The City lost more progress last year. In this Report, we find that the City is not in substantial compliance with 30 paragraphs among six sections. Our findings are mostly consistent with the Compliance Officer's findings from the fourth quarter of 2021 and first quarter of 2022. *See* ECF 291-1, COCL Q4 2021 Report (rating partial compliance for 17 paragraphs among five sections); COCL Q1 2022 Report (draft) (rating partial compliance for 23 paragraphs among six sections).

Despite the City's recent further backsliding, we have considerable cause for optimism going forward. First, in the last year, the City maintained or re-achieved substantial compliance with 57 paragraphs. That is a noteworthy accomplishment. Substantial compliance is not a given, but reflects hard work and consistent performance over time. Second, the City made tremendous commitments to resolve DOJ's notice of noncompliance, agreeing to eight new remedies (Section XI, ¶¶ 188–195), including a civilian leader for PPB's Training Division, body-worn cameras (BWCs) for officers, and

---

[2] The notice of noncompliance resulted in the Parties, Portland Police Association (PPA), Albina Ministerial Alliance for Justice and Police Reform (AMAC), and Mental Health Alliance (MHA) participating in several mediation sessions that United States Magistrate Judge Stacie Beckerman facilitated between September and December 2021. *See* ECF 256, 263, 266, 267, 268, 272.

Page 3     Plaintiff's Notice of Sixth Periodic Compliance Assessment Report

a new structure for civilian oversight and police accountability. ECF 283, City Mem. We are now monitoring the City's compliance with Section XI and will report our assessment next year. Third, the City continues to build on its innovative approach to crisis triage by enhancing first responder options available to 911 operators. We commend the City for expanding Portland Street Response (PSR) based on reliable data showing positive outcomes for community members and the public safety system.[3] Indeed, the City has invested significant resources to create new unarmed public safety support specialist positions, fund more Behavioral Health Response Teams (BHRTs), and re-constitute a specialty unit to abate gun violence subject to enhanced community oversight. PPB also provided all officers with new Active Bystandership for Law Enforcement (ABLE) training, which reflects a best practice. We appreciate the City's efforts to comply with the Agreement while undertaking reforms that go beyond its minimum requirements. Fourth, the City and Defendant-Intervenor PPA negotiated a four-year contract with massive support from elected officials and rank-and-file officers. The contract provides officers various financial incentives, allows PSR to expand, and includes a Corrective Action Guide (CAG) to ensure more transparent and consistent accountability for misconduct.[4]

---

[3] In the 2021 fall budget, the City substantially increased PSR's funding to $2.98 million based on initial data analysis. *See* Greg Townley & Emily Leickly, *Portland Street Response: Six-Month Evaluation*, PSU Homelessness Research & Action Collaborative, Oct. 2021, available at www.portland.gov/sites/default/files/2021/psu-portland-street-response-six-month-evaluation-final.pdf. In March 2022, PSR expanded again; it now has 20 full-time staff and covers all 145 square miles of the city of Portland. *See* PSR, News Article, Mar. 27, 2022, available at www.portland.gov/streetresponse/news/2022/3/27/portland-street-response-expands-service-citywide. Recent analysis confirms that PSR continues to achieve good outcomes. *See* Greg Townley & Emily Leickly, *Portland Street Response: Year One Evaluation*, PSU Homelessness Research & Action Collaborative, Apr. 2022, available at www.portland.gov/streetresponse/portland-state-evaluation.

[4] The PPA contract did not resolve BWC issues, which remain subject to bargaining. If the City does not complete bargaining by August 29, 2022, the Court may hold periodic status conferences every 60 days to receive an update on the procedural status of bargaining related to BWCs. ECF 276-1, Am. Settlement Agreement, ¶ 184(c).

But serious compliance concerns remain and new ones surfaced during this reporting period. The City must correct course to resolve these issues, as spelled out in more detail in the Report. The Parties have discussed the issues and, in some cases, the City has already taken meaningful steps to remedy our concerns. The City should be able to resolve many issues within 6 to 12 months.

Our executive summary of the Report by section follows. At the status conference scheduled for July 27, 2022, we anticipate presenting an overview of our compliance findings and answering any questions the Court may have.

**Force (Section III)**: The City continues to face significant compliance challenges related to reporting force, investigating force reports, and evaluating whether force and force investigations comply with policy. (Pars. 66–67, 69–70, 72–73). We are confident these challenges will be resolved when PPB adopts revised force policies and the City implements the new Section XI remedies, including BWCs. Separately, on December 15, 2021, PPB produced to us its internal audit of force used during the 2020 protests. The audit was deficient in two significant ways: (1) not consulting with the Compliance Officer on scope and content; and (2) omitting parts required by the Agreement. (Pars. 74–77). The audit was a missed opportunity that negatively impacts other compliance areas. (Pars. 79, 117).

**Training (Section IV)**: Training reflects the City's recent uneven performance. Positive developments include PPB providing ABLE training and the City funding a civilian to lead the Training Division. Conversely, the City and PPB belatedly discovered training materials used by the Rapid Response Team (RRT) without the Training Division's knowledge, review, or approval, in violation of Directive 1500.00. The materials contain varying degrees of offensive content, incorrect guidance, and false or misleading information related to PPB's crowd management policies and practices. The RRT training fails to comply with the Agreement, and negatively impacts compliance with other provisions about assessing training needs, preparing training plans, and conducting training

audits. (Pars. 78–79, 81, 84–86). Moreover, the process by which the City provided the RRT materials to DOJ and the Compliance Officer continues a concerning pattern of untimely and incomplete production of information in this case. *See* ECF 286-2, DOJ Letter, at 2–3.

**Community-Based Mental Health Services (Section V)**: The City remains in substantial compliance with this section. In 2021, the City significantly expanded capacity for the Bureau of Emergency Communications (BOEC) to divert 911 calls from PPB to qualified mental health providers as first responders by: (1) funding a 10% increase in BOEC staffing to 131 call takers and dispatchers; and (2) launching and then expanding PSR to respond to certain non-emergency calls involving a person experiencing homelessness, a mental health crisis, or intoxication. (Par. 90).

**Crisis Intervention (Section VI)**: The City's multifaceted approach to crisis intervention mostly remains in substantial compliance with the Agreement. PPB's crisis intervention training and the Behavioral Health Unit's (BHU) structure and operations continue to meet requirements. (Pars. 91–93, 97–112). BOEC continues to provide training, perform operations, and conduct quality assurance as required. (Pars. 113–115). However, PPB has not adequately enabled the BHU Advisory Committee (BHUAC) to perform its mission of decreasing the potential for violent encounters between officers and those who may have a mental illness or be experiencing a mental health crisis. (Par. 95). The BHUAC can and should look at past violent encounters to inform recommendations for reducing future violent encounters. Given recent data indicating increased rate and severity of force against those in crisis, the impending rollout of BWCs, and legitimate community concerns about the BHUAC's ability to reduce potential violence without reviewing real events, we agree with the Compliance Officer that the City must do more to empower the BHUAC to fulfill its obligations under this Agreement. *See* ECF 291-1, COCL Q4 2021 Report, at 81–82, 155–59, 164–67.

**EIS (Section VII)**: The City did not maintain substantial compliance with the EIS provisions for three reasons: (1) EIS data is incomplete and inaccessible; (2) reduced staffing has impacted the

EIS team's ability to ensure supervisors conduct meaningful officer reviews; and (3) PPB needs "to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion." (Pars. 116–117). The Compliance Office offered its technical assistance, which the City has not yet accepted.

**Accountability (Section VIII)**: The City continues to struggle with its obligation to ensure PPB applies policies uniformly and holds officers accountable for complying with training and procedure. (Pars. 137, 169). In this compliance period, the City did not adequately implement Police Review Board (PRB) procedures, identify and investigate collateral misconduct, or enable the Independent Police Review (IPR) to conduct meaningful investigations by, for example, timely disclosing and resolving a backlog of processing PPB records, totaling tens of thousands of documents, some of which are needed for investigations. (Pars. 129, 131). The City also did not meet timelines for completing IPR investigations and resolving Citizen Review Committee (CRC) appeals. (Pars. 121, 123). In addition, the City did not consistently ensure compliance with Directive 1010.10 as it relates to communication restriction orders and obtaining officer interviews in deadly force events. (Pars. 125–126).

**Community Engagement and Creation of PCCEP (Section IX)**: The City re-achieved substantial compliance with its obligations to prepare and present PPB's Annual Report. (Par. 150). However, citywide staffing challenges negatively impacted compliance in several areas, including the PCCEP and EIS. In particular, the City did not promptly hire replacement staff or appoint new PCCEP members to fill vacancies, substantially increasing burdens on the PCCEP and its volunteer members. (Pars. 143–144). The City also did not provide appropriate supervision, consistent support, or necessary data for the PCCEP to accomplish the objectives laid out in the Agreement and the PCCEP Plan. (Par. 151). The City has a framework to get the PCCEP back on track and we are confident the City can re-achieve substantial compliance with Section IX by the end of the year.

**Addendum of Additional Remedies (Section XI)**: These remedies were added to the Agreement on April 29, 2022. ECF 290, Order. We will assess the City's performance and issue a compliance rating in next year's report.

Finally, although not separately addressed in this Report, we have concerns with the City's performance of some of its obligations in Section X – Agreement Implementation and Enforcement.[5] Most significantly, the untimely discovery and even later production of RRT training materials continue a pattern of the City not timely providing complete information to DOJ and the Compliance Officer, as required by Paragraphs 156, 162–164, 166, and 174.[6] The City's obligation to collect and maintain accurate data is essential for proper audits, the outcome assessments required by Paragraph 170, and demonstrating implementation sufficient to achieve substantial compliance as required by Paragraphs 153 and 175.[7]

The City cannot meet its burden to show compliance without providing complete and accurate data. We will carefully assess the City's compliance with the applicable terms of Section X and continue to report our findings next year.

\*   \*   \*

---

[5] We have at times separately assessed the City's compliance with applicable paragraphs of Section X. *See, e.g.*, ECF 105-1, DOJ 1st Periodic Compliance Assessment Report, at 86–93; ECF 124-1, DOJ 2nd Periodic Compliance Assessment Report, at 125–132. We have always assessed compliance with Paragraph 169 as part of Section VIII – Accountability. *E.g.*, ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 50–52.

[6] The City also did not disclose a PPB armorer's class, as required by Paragraph 162. We have recently had to spend significant time working with the City to ensure DOJ has direct access to City employees and information, consistent with Paragraphs 164 and 165.

[7] The City also did not post all PPB audits on its website, as required by Paragraph 155. And throughout 2021, the City had posted the original version of the Agreement (ECF 4-1), and had not provided the then current, amended version (ECF 262-1) to PPB officers to read and acknowledge, as required by Paragraph 187.

In sum, we saw the City backslide on compliance, but we are hopeful that the City will correct course. Yet we remain mindful of the Court's direction to consider whether now a Court-appointed monitor may be appropriate "at least to protect the progress that has been made and prevent further slippage." ECF 249, Hr'g Tr. at 196 (Aug. 24, 2021). The Parties continue to discuss a Court-appointed Monitor and remain open to exploring ways to improve the City's progress toward re-achieving substantial compliance. We will keep the Court apprised of developments.

DATED: June 30, 2022.

FOR THE UNITED STATES:

| | |
|---|---|
| SCOTT ERIK ASPHAUG<br>United States Attorney<br>District of Oregon | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
| RENATA A. GOWIE<br>Civil Division Chief | STEVEN H. ROSENBAUM<br>Special Litigation Section Chief |
| /s/ Jared D. Hager<br>JARED D. HAGER<br>Assistant U.S. Attorney | /s/ Laura L. Cowall<br>LAURA L. COWALL<br>Deputy Chief |
| | /s/ R. Jonas Geissler<br>R. JONAS GEISSLER<br>Trial Attorney |

Page 9    Plaintiff's Notice of Sixth Periodic Compliance Assessment Report