**United States v. City of Portland**

**DOJ's Sixth Periodic Compliance Assessment Report**

| | |
|---|---|
| III. USE OF FORCE | **Partial Compliance** |
| IV. TRAINING | **Partial Compliance** |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | **Substantial Compliance** |
| VI. CRISIS INTERVENTION | **Partial Compliance** |
| A. Addictions and Behavioral Health Unit and Advisory Committee | **Partial Compliance** |
| B. Continuation of Crisis Intervention (C-I) Program | **Substantial Compliance** |
| C. Establishing "Memphis Model" Crisis Intervention Team | **Substantial Compliance** |
| D. Mobile Crisis Prevention Team | **Substantial Compliance** |
| E. Service Coordination Team | **Substantial Compliance** |
| F. Bureau of Emergency Communications | **Substantial Compliance** |
| VII. EMPLOYEE INFORMATION SYSTEM | **Partial Compliance** |
| VIII. OFFICER ACCOUNTABILITY | **Partial Compliance** |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING | **Partial Compliance** |

## III.    USE OF FORCE

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness:  (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied.  PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible. In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons, including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function.  To achieve these outcomes, PPB shall implement the requirements set out below.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Section III because PPB has not fully implemented the requirements.

The City and the United States agreed to additional remedies laid out in new Section XI, ECF 275-1, to resolve a notice of noncompliance based on our Fifth Periodic Compliance Assessment Report covering January 20, 2020, to January 10, 2021, ECF 236-1, and a letter critiquing the Police Review Boards, ECF 286-3.  Implementing Section XI will address, in part, the specific actions we recommended for Section III in our prior report.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 3.[1]  The new Section XI, however, does not alter the City's ongoing obligations to comply with the Agreement.  Accordingly, we assess the City's compliance with

---

[1] We said that the City should:

(a) Complete the City's planned comprehensive master after action review of crowd-control events from May 29 to November 15, 2020, including a critical assessment of supervisory force investigations and command reviews of Force Data Collection Reports (FDCRs) and After Action Reports (AARs);

(b) Identify force events that require administrative investigation, but have not yet had investigations opened, including, where appropriate, referral for investigation consistent with Section VIII-Accountability;

(c) Develop and implement a method to investigate uses of force in chaotic crowd-control events;

(d) Implement additional crowd-control training for both Rapid Response Team (RRT) and Mobile Field Force (MFF), including analysis of need for additional members of these and supporting groups in order to [] handle crowd control without overreliance on a small group of individuals; and

(e) Fully implement approved force use and reporting policies going forward.

Not all of these topics are covered within Section XI.  But, Section XI should facilitate compliance with all of these topics.

Section III during the period covering January 2021 to March 2022, when the City completed its production of information in response to our force-related requests.

## A.    Use of Force Policy

66. PPB shall maintain the following principles in its existing use of force policies:

a. PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and

b. PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. PPB shall add to its use of force policy and procedures the following use of force principles:

a. Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b. In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

c. The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d. Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

| Status | Partial Compliance |
|--------|---------------------|

The City remains in partial compliance with Paragraphs 66 and 67 because PPB has not consistently verified performance of the policies governing force.  Four areas of particular concern are:  (1) PPB produced a master after action report (MAAR) during this compliance period that validated out-of-policy conduct from the 2020 protests; (2) PPB's administrative investigations excused out-of-policy conduct by the Rapid Response Team (RRT) because they trained themselves incorrectly; (3) PPB failed to enforce its policies to address collateral misconduct, to address faulty Police Review Board (PRB) analysis, or to properly and timely apply policy in a couple of Level 1 force events (i.e., officer-involved shootings); and (4) PPB did not properly apply policy to problematic uses of canine and crowd control force during this compliance period.  We are hopeful that a revised force policy, properly applied, will address many of these concerns.

PPB reports it is complying with these paragraphs.  PPB 2022 Q1 Update Report, at 1–4, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf.  But PPB does not assess its implementation of the approved force policy.  *See id.* (reporting from 2017 onward that the relevant "principles remain in effect and are at the core of the force policy," in reference to PPB training on approved Directive 1010.00 – Use of Force).  To achieve substantial compliance, PPB must implement its approved force policy consistently and fully.  Paragraph 153 (requiring PPB to "implement" "all provisions of this Agreement"); *see* Paragraph 33 (defining "implement" or "implementation" as the "development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and

verified performance of that policy or procedure in actual practice through the regular use of audit tools"). Accordingly, we share the Compliance Officer's assessment that PPB is in partial compliance with these paragraphs. ECF 291-1, COCL Q4 2021 Report, at 24–25.

Since August 19, 2017, PPB Directive 1010.00 has governed when officers may use force and when officers must attempt to de-escalate encounters, and the requirements to report and investigate uses of force. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 4. In January 2020, PPB promulgated a revised force policy with approval from the Compliance Officer and DOJ. *See* Dir. 1010.00 – Use of Force, available at [www.portlandoregon.gov/police/article/751998](www.portlandoregon.gov/police/article/751998). Many FDCRs and associated AARs generated during this compliance period appear to show PPB's adherence to much of the approved policy. Several of the FDCRs and AARs for uses of force against persons in a perceived mental health crisis note de-escalation efforts, issuance of warnings, and use of low levels of force. However, PPB did not consistently or verifiably implement the required policies in several important ways, including with respect to some force events during this period and older force events whose review by the City stretched into this period.

**PPB Management Review of the Response to 2020 Crowd Control Events:** During the rating period, we evaluated two aspects of PPB's use of force and review of force from the 2020 crowd control events. First, we reviewed PPB management's master after action report of 2020 events, which the City completed during this compliance period. Second, we considered administrative investigations of 2020 actions that are still working through the City's systems.

**Master After Action Report (MAAR):** On March 29, 2021, PPB emailed us three documents that it described as a Master After Action Report for the 2020 crowd control events. The City added a fourth document on April 12, 2021. On May 5, 2021, we provided the City with detailed comments. ECF 286-2, MAAR Letter. We explained that the MAAR was not sufficiently comprehensive and lacked critical self-assessment. ECF 286-2, MAAR Letter, at 1. The MAAR also did not sufficiently address violations of either the force policy, Directive 1010.00, Procedure Par. 13.4.10, or the crowd control policy, Directive 635.10, Procedure Par. 13.1.1.

**Administrative Investigations:** In this compliance assessment period, the City has either begun or continued numerous administrative investigations of alleged officer misconduct stemming from PPB's response to the 2020 crowd control events. Our review of those administrative investigations indicate that PPB inconsistently enforces Directive 1010.00 (and the constitutional requirement) that all force must be objectively reasonable. PPB also failed to consistently enforce the policy requirement to de-escalate. PPB must demonstrate consistent and verified performance of the force policy requirements to re-achieve substantial compliance.

In force reviews covered by these investigations, PPB officers and executives repeatedly noted that PPB's Rapid Response Team (RRT) members were trained that they need not follow Directive 1010.00, because they were authorized to use greater force under Directive 635.10. We found substantial evidence that RRT members were in fact instructed to follow Directive 1010.00:

1. The very first procedure within the crowd control directive clearly states the supremacy of the force directive: "Directive 1010.00, Use of Force, governs all uses of force, including in crowd management and crowd control situations." *See* Dir. 635.10 – Crowd Management/Crowd Control, Procedure Par. 1, available at [www.portlandoregon.gov/police/article/649358](www.portlandoregon.gov/police/article/649358).

2. All PPB members previously received in-service training on Directive 1010.00, which the Compliance Officer and DOJ approved. The training made clear that all force is

subject to Directive 1010.00, which, among other things, forbids unconstitutional uses of force. Thus, all members—RRT and non RRT—received notice during in-service training that all force must comply with the force policy.

3. Some RRT training materials specifically list Directive 1010.00 as applicable during crowd control events. Thus, it appears that RRT properly trained RRT members to use force consistent with Directive 1010.00.

4. In September 2019, the City produced to us RRT training materials for a planned Fall 2019 RRT training.[2] We reviewed these on a short timeframe. We stated, among many other things: "Both the lesson and the demonstrations must refer to and incorporate the approved use-of-force policy and the crowd-control policy. The lesson plan should set forth this performance standard. This lesson plan implicates 1010.00 and 1010.10 for reporting requirements." PPB revised the lesson plans in response and incorporated Directive 1010.00. Thus, the comprehensive RRT training shortly before the 2020 crowd control events reflected the requirements of Directive 1010.00.

**Collateral Misconduct:** PPB has not consistently enforced the force policy in two types of collateral misconduct. First, the investigation of some uses of force in an event uncovered misconduct in other uses of force around the same event. PPB declined to pursue enforcement of the force policy with respect to these discovered collateral misconduct issues. Second, the investigation of these and some other force allegations revealed that supervisors and executives sometimes did not appropriately apply Directive 1010.00 in the command chain reviews of the underlying uses of force. But for these reviews, PPB did not pursue the enforcement of the force policy to the chain of command as required. *See* Dir. 1010.00, Procedure Par. 13.7.

A September 28, 2020 force interaction that PPB reviewed during this compliance period is emblematic of both of these issues. A protestor was in a park holding a register-to-vote sign. A Sergeant directed officers to take the sign under the theory that it *could* be used as a weapon. The protestor was not using or threatening to use the sign as a weapon. The order led to a cascading, domino effect of out-of-policy force: the grabbing of the protestor to seize the sign, a chemical restraint on the protestor, a late knee strike after the protestor was detained by other officers, and the same Sergeant's push of a bystander attempting to video record the interaction. The bystander reportedly resisted by grabbing the Sergeant's hand and as a result was sprayed with chemical restraint. The City posted three videos of the interaction on its own website as part of a consideration of a $100,000 settlement to the protestor based on this interaction. *See* City Council hearing Dec. 22, 2021, available at www.youtube.com/watch?v=aXKE2u24WKg&t=6106s (1:26:48 to 1:58:11). In June 2021, we reviewed the case file as part of an administrative investigation. PPB sustained a force policy violation against only the officer who used the knee strike and only for that strike. We raised with PPB the collateral misconduct of the other officers and the Sergeant. PPB "saw no misconduct."

PPB asserted that a City Attorney advice memo permitted them to seize anything that could be a weapon—omitting from their consideration whether such item is actually being used as a weapon or threatened to be used as a weapon. PPB did not include this memo in the force review file provided to us. Instead, during this compliance period, the City stuck to the justification of

---

[2] This production did not include the RRT slides containing the "Prayer of the Alt Right." We discuss the slides in Section IV of this report.

forcefully taking the sign.  A July 29, 2021 memo provided to us conveyed a direction from the then Deputy Chief that all officers involved in the interaction receive a debrief covering three topics:

1. More clearly articulating, in non-hypothetical terms, how the pole meets the definition of a "weapon" under the City Code.

2. Whether, in hindsight, the decision to take the pole tended to make the overall situation better or worse.

3. Reinforcing [the Officers'] attempt at de-escalation by explaining the need to take the pole and not the sign to [the subject], and their calm demeanor in a fairly hostile crowd.

Memo from CAPT Chris Gjovik, July 29, 2021.  After PPB failed to ensure compliance with its force policies, the City paid $100,000 to settle one of the claims arising from this incident.  *See* Maxine Bernstein, "City of Portland set to pay $100K to settle suit filed by man arrested after refusing to relinquish sign during protest," Oregonian, Dec. 20, 2021, available at www.oregonlive.com/crime/2021/12/city-of-portland-set-to-pay-100k-to-settle-suit-filed-by-man-arrested-after-refusing-to-relinquish-sign-during-protest.html.

**Police Review Board (PRB) Observations:**  Though the Parties agreed to remedies to resolve concerns we raised about PRB operations in a letter dated March 23, 2021, ECF 286-3, we have identified new concerns and are working with the City to address ongoing concerns with PPB's accountability process.  On December 14, 2021, in connection with our data request for this assessment period, we asked the City for any documents demonstrating substantive response to the action items raised in the PRB letter.  We have not yet received a substantive response and continue to evaluate PRB meetings to ascertain if our concerns have been addressed.

Our observations of more recent PRBs and review of case materials since March 23, 2021 indicate ongoing issues, including management justifying force based on the actions of a crowd rather than individuals; inadequate enforcement of the requirement to attempt to de-escalate encounters before and during force applications; and interference by officer's representatives during administrative interviews, in some cases substantively changing the outcomes of those interviews.

**Level 1 Uses of Force:**  In some of the Level 1 force events we reviewed during this compliance period, PPB did not enforce the requirements of Directive 1010.00.  In one instance, PPB did not investigate the policy prohibition on a member placing themselves "in a location that is clearly vulnerable to vehicular attack" when that was a central element of the incident.  Dir. 1010.00, Procedure Sec. 8.5.3.  In another, PPB's assessment failed to adequately investigate and enforce the fundamental requirements for de-escalation and using only the force reasonably necessary.  Dir. 1010.00, Procedure Sec. 1.

Also, there was a substantial delay in PPB's process to assess Level 1 uses of force.  We asked the City to explain why the City has not completed PRBs as of December 14, 2021 (the date of a large data request we sent to the City) for six separate Level 1 uses of force, including fatal shootings.  For all six, PPB responded, "Date of completion to be determined."  Only one was still awaiting a grand jury transcript.  This provides insufficient information to identify gaps in meeting the 180-day deadline as required by Paragraph 123 ("If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them").  Delays in Level 1 reviews may hinder PPB's ability to address any policy or tactical issues in a timely fashion, leaving involved members

in a state of limbo, i.e., not knowing if they will be subject to discipline or not. Delays also deprive PPB of notice of immediate training needs to correct tactical issues as quickly as possible.

**Canine Issues:** Two separate canine force events show that PPB has a find-and-bite practice. The preferred professional standard is find-and-bark. A find-and-bite practice fails to ensure force "is no greater than necessary to accomplish a lawful objective," in violation of Section III.

In the first case (21-122336), a management review substantively changed the facts as reported in the canine officer's FDCR. In that incident, the canine handler reported that he sent the canine over a fence "on a search and take," meaning "search and bite," whereupon the canine landed on the subject and immediately bit him. The handler wrote that he could not see the subject who was hiding under a tarp, yelling that the dog was biting him. The interaction caused a serious injury, which triggered a notification to PPB's Professional Standards Division. In that notice, the PPB supervisor added a causal justification inconsistent with the reported facts: "The dog eventually located the suspect hiding under a tarp in a backyard and *bit the suspect **when** the suspect refused to surrender*." May 7, 2021 email "Fw: K9 Bite Force Notification PPB #21-122336 – Allegation of Officer criminal misconduct" (emphasis added). A force policy is not implemented when there is insufficient justification for a find-and-bite practice, and the supervisor who should serve as a check on the reasonableness of force application instead changes the justification. The subject alleged that he raised his hands in surrender when he heard the handler warn of the use of canine, but the involved officer reported not hearing a response from the subject. In response to the subject's statement, the supervisor reported a need for body-worn camera recordings:

> This type of allegation could be immediately proven or disproved if the Police Bureau had Body Worn Camera technology and made officers deploy with the technology. Because officers do not have access to Body Worn Camera technology, audio and/or video of force deployments is rare and often incomplete when a residential / commercial surveillance camera films police force contacts. Because of this, investigating supervisors at the scene and IAD personnel have to spend additional time investigating these types of allegations. For these reasons, I would recommend that the Police Bureau explore the purchase and use of a Body Worn Camera system in the future.

We agree. New Paragraph 194 is designed to remedy this concern.

In the second canine case (21-40950), PPB attempted to arrest a burglary subject barricaded in a utility room. After breaking the door, the handler gave the canine a "bite command and then deployed him into the utility room," i.e., another example of find-and-bite practice. Even after the two officers grabbed the subject to pull him out, the handler reported that he deliberately left the canine "on bite." While the other officers were pulling the subject out, one officer "could feel the tugs from the K9 which was biting at [the subject's] lower legs," i.e., the dog and the officers were in a tug of war with the subject's body. This resulted in serious injury requiring hospital treatment. PPB did not provide us with the harness-mounted video recording of the interaction, though reports indicate it exists. In any event, the continued use of a canine bite after seizure indicates greater force than necessary contrary to the requirements of this Agreement. However, PPB found the use of force within policy.

7

PPB did provide photos of the significant injuries in both of these canine cases.[3]

**Recent Crowd Control Responses:**  We reviewed several of PPB's crowd control response AARs and FDCRs for this compliance period.  We saw one example of PPB successfully implementing force use and reporting policies.  Some others showed deficiencies, including similar issues to those we identified in PPB's response to 2020 crowd control events.

In the reporting of Case 21-96526, from an April 11, 2021 event, the supervisor responded to the scene and completed interviews of officers and asked the crowd what happened.  The officer who used force was able to articulate an objectively reasonable basis for deploying a 40mm round against a subject who punched an officer in the face.  The FDCR still lacked a timed and dated signature,[4] but the AAR reportedly was done within 72 hours.  And, the chain of command corrected the level of force categorization in its review.

In contrast to this success, some other crowd control reports in which force was used were not as successful.  As with the AARs and FDCRs for other force events, the City did not provide to DOJ the videos and photos with the AARs and FDCRs for crowd-control events even though some reports indicate that videos and photos exist.

A publicly available video of a crowd control situation on June 24, 2021 (Case 21-681074) showed issues with PPB's response.[5]  As our consultant observed in viewing the video, the PPB response led to a "melee."  In response to taunting and shouting, one PPB member first smacked at and then grabbed at a protestor's hand, pushed him back with a baton, stepping out of the skirmish line.  To be clear, the protestor was not justified in his actions.  PPB's skirmish line broke.  When the skirmish line broke, there were three deployments of aerosol restraint captured on video (and a fourth reported), at least one of which was a larger broadcast spray specifically prohibited by the rules of engagement set that night according to the AAR.  In the AAR, the supervisor failed to reconcile the officer's version of events with the depiction in videos.

---

[3] In most other force cases, the City did not provide photos and videos referenced in FDCRs and AARs.  On March 11, 2022, the City deemed their production to DOJ complete.  PPB has the burden to maintain and provide all records necessary to demonstrate compliance with the Agreement.  Paragraph 174.  This includes complete use-of-force records.  The City's incomplete production of PPB force documents failed to demonstrate compliance.

[4] New Paragraph 188 provides that the City "shall revise Force Data Collection Report (FDCR) and After Action Report (AAR) forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing.  In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and AAR forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review."  This provision was not in effect when the crowd control incident occurred, but the operative policy also required timely reporting.  PPB did not capture the date of initial submission and subsequent edits in the forms.

[5] The City also provided a video attached to a referral to an outside law enforcement agency—not the AAR or FDCR—which corroborated the publicly available video.  Grace Morgan on Twitter: "A bystander caught the moment PPB assaulted and maced peaceful protesters on scene - this video is very intense, warning. Credit @running_50 https://t.co/TiMmIRSKAG" / Twitter (available at twitter.com/gravemorgan/status/1408313568299130880).

Cases 21-102375 and 21-102058, both relate to a crowd control event on April 16, 2021, i.e., the crowd that gathered at Lents Park following an officer-involved shooting there earlier in the day. While most of the force used in this interaction appeared objectively reasonable based on the reporting, a significant use of force that night did not comply with the Settlement. A Sergeant in that incident deployed what PPB euphemistically calls an "RBDD," a Rubber Ball Distraction Device. In fact, this is a pellet grenade. The Sergeant observed a subject kicking a smoke grenade toward them. The Sergeant threw an RBDD toward the subject. "The munition successfully went off behind the [subject] in an area *not likely* to cause anyone else to be struck by the payload." While helpful to report the intent not to hit others, the description of *likeliness* does not comport with the numerous other descriptions of a crowd of 100-200 people gathered. In review, none of the chain of command sought clarity on this or questioned the inconsistency between the large number of people and the proximity to the subject. Also, this use and reporting of an RBDD do not comport with PPB's own training on RBDDs. PPB's training (not provided to us until this year) shows that their RBDD devices have a 50-foot blast radius over a 360-degree range, i.e., in every direction. The training also instructs never to throw within 5-6 feet of a person and the training illustrates grievous injuries from misfired grenades. PPB did not address any of the factors in its chain-of-command review. This indiscriminate use of force does not evidence compliance with the force provisions of this Agreement or PPB's force policies, which require assessment of *individual* threat and resistance and *individual* justification of each *independent* application of force. *See* Dir. 1010, Procedure, Pars. 5.1.1, 5.1.3, and 5.4.1.

Since the 2020 protests, Oregon state law changed to forbid nearly all kinetic impact munitions (e.g., pellets, 40mm foam rounds, and FN303 bismuth rounds) in crowd control. Oregon H.B. 2928, "Relating to the use of tools by law enforcement agencies; and declaring an emergency," effective July 19, 2021, available at olis.oregonlegislature.gov/liz/2021R1/Measures/Overview/HB2928; *see also* Oregon H.B. 4008, "Relating to public safety; and declaring an emergency," effective March 23, 2022, available at olis.oregonlegislature.gov/liz/2022R1/Measures/Overview/HB4008. During the course of policy review meetings to discuss changes to Directive 1010.00, a Deputy Chief advised that PPB currently is not using pellet grenades, has no personnel to train and certify officers for their use, and does not intend to use pellet grenades. State law would not permit indiscriminate use of impact munitions in response to crowds. Throughout the policy discussion process, PPB did not articulate a use for pellet grenades that would adhere to this Agreement and PPB policy to use force only where there is legal justification and, even then, only as necessary. We are open to discussion should the City identify an appropriate use for these devices that can be governed by compliant policy. In absence of an approved use, we asked whether PPB would decommission all pellet grenades. PPB has yet to do so.

In Case 21-680063 from a crowd control incident on January 20, 2021, PPB's production excluded one Sergeant's AAR. A produced AAR contained boilerplate statements for "Time Discrepancies" and "Observation Discrepancies" without reconciling discrepancies as required by policy. The AAR also included the same boilerplate reason for not conducting interviews that we found throughout 2020 crowd control response AARs: "As this was an active riot, interviews were not conducted at the location of force. I was also not present in the area of many of the instances. Suspect was interviewed later by detectives." Also, a Lieutenant involved in that interaction submitted their FDCR for review by a subordinate Sergeant. And, though the Commander near the top of the review noted seeing a video of interaction, the prior supervisors in the chain did not. The City did not provide us the video. This incident represented a repetition of the same type of force management issues that we identified in our review of 2020 crowd control response.

**Flash-Bang Grenades:**  In our collaborative review of Directive 1010.00 with PPA and the City, discussed below, we learned that PPB has not been reporting deployments of flash-bang grenades as uses of force unless an injury or complaint of injury resulted.  Use of the flash-bang grenades like any other force tool must be governed by Directive 1010.00 and meet the constitutional standard for use of force.  *See Boyd* v. *Benton Cty.*, 374 F.3d 773, 779 (9th Cir. 2004) (assessing the use of a flash bang grenade under the Fourth Amendment's objective reasonableness test).  PPB has now agreed to amend its force reporting directives to include use of flash-bang grenades *within* structures.  The Parties have not resolved this issue, however.  In our view, any use in close proximity to a person, even outside, falls within this Agreement's definition of force and must be reported.

**Still Pending Policy Revisions:**  Also contributing to our finding that the City is only in partial compliance with Paragraphs 66 and 67 is the needed, but still unresolved revision to Directive 1010.00.  In our prior report, we found that the City attempted to change its force policy first by a press release and then by a subsequent "*nunc pro tunc*" order.  We found this insufficient to provide adequate direction to officers.  During this compliance period, we have worked with the City Attorney's Office, PPB, PPA, PPCOA, and the Compliance Officer, to review PPB's proposed revisions to the force policy.  PPB has made substantial course corrections in this process, and we anticipate that a new suite of force policies—with accompanying SOPs for specialty units and munitions—will better address the need for clear direction that we identified in our prior compliance assessment report.  Until then, PPB is providing officers with conflicting guidance.  Officers must always abide by Directive 1010.00.  But, now, officers also must follow interim orders, guidance on new state laws, and applicable temporary restraining orders not yet incorporated into policy.  Accordingly, until the inconsistencies and irregularities of these multiple documents coalesce into final, approved policies, the City cannot re-achieve substantial compliance.

## 1.    Electronic Control Weapons

68. PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapon System to include the following principles:

   a. Prohibition against the use of ECWs for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force;

   b. Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their ECW;

   c. Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following ECW use;

   d. Only one ECW at a time may be used on a subject, intentionally, except where lethal force would be permitted;

   e. After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each ECW cycle in their use of force reports;

   f. Officers shall make every reasonable effort to attempt handcuffing during and between each ECW cycle. Officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant use;

g. ECWs shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of use of force; and

h. Officers receive annual ECW in service training including proficiency and policy changes, if any.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 68.

Our review of reported ECW use showed that the force appeared justified, and officers provided sufficient warning prior to using the ECW or articulated why a warning was not possible. PPB also utilized its ambulance service, AMR, or Portland Fire Bureau members to remove probes unless the subject removed the probes themselves. Supervisors reported responding to the scene of ECW use. The Compliance Officer's review of force events similarly finds that officers used ECWs in conformance with Paragraph 68. ECF 274-1, COCL Q2 2021 Report, at 13, 20.

Implemented policy and training also continue to support substantial compliance. We previously reported that PPB's revised Directive 1010.00 incorporates all of Paragraph 68's mandates. ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report, at 8. PPB is currently in the process of revising this directive and returning to a format in which PPB will govern less lethal weapons in a policy separate from its general force directive. We do not object to the shift in format provided that the requirements of Paragraph 68 and the current Directive 1010.00 remain in policy and the revised directive is subject to the Paragraph 166 approval process.

Moreover, we again assessed PPB's in-service training for ECWs. We reviewed and approved PPB's ECW training materials before in-service training. PPB's in-service training provided annual recertification and effectively addressed the policy requirements for using ECWs. Additionally, in reviewing force reports related to crowd control in the compliance period we continue to find that PPB maintained its prohibition on using ECWs for crowd control purposes. This prohibition exceeds the requirements of Paragraph 68.

Accordingly, we continue to agree with the Compliance Officer that PPB's written reports demonstrate the City is meeting the obligations in this paragraph. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 13–14; ECF 291-1, COCL Q4 2021 Report, at 25–26. However, we have reservations about the evidence based on the lack of photos attached to the sample of written reports of ECW use that we reviewed. Directive 1010.10, Section 6.4.4.4.1 requires that, if possible, officers take photos when they use an ECW to capture "the areas of probe strikes, whether probes penetrated the person's skin, left visible marks or only penetrated the person's clothing, before and after probe removal, as well as any marks, or lack of marks, left by drive stun." Even where FDCRs or AARs indicated that PPB's evidence system had photos, photos were not included in the City's production. In the future, PPB's implementation of a body-worn camera program that provides appropriate access to video recordings should address this issue.

## 2.    Use of Force Reporting Policy and Use of Force Report

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that:

a. All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

b. All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

c. In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for purposes of paragraphs 70, and 72-77 of this Agreement.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Paragraph 69 because PPB has not consistently verified performance of the policies governing timely and thorough force reports. Four areas of particular concern are: (1) untimely FDCRs; (2) lack of full and candid accounts; (3) officer incapacitation in Level 1 force cases; and (4) reporting when force is used by an outside law enforcement agency.

**Untimely FDCRs:** All officers involved in a use of force must timely complete use of force reports. Paragraph 69(a). PPB's approved force policy requires that officers complete an FDCR by the end of the shift in which the officer used force, except for Level 1 uses of force like shootings. Dir. 1010.00, Procedure Par. 11.1.4. We reviewed numerous FDCRs that did not capture the time and date when the form is completed. New Paragraph 188 requires the City to address this issue. In the interim, the City has not demonstrated compliance with the timeliness requirements of this paragraph; reports that we reviewed did not include a narrative entry in the open text boxes of the existing form to indicate when the FDCR was complete or revised. Accordingly, the City did not present evidence of compliance with Paragraph 69(a).

**Some FDCRs Lack Full and Candid Accounts:** Most of the FDCRs that we reviewed for this compliance assessment period appeared to provide more or less fulsome accounts to supervisors. However, FDCRs from some crowd control events were not complete or candid because they did not accurately or fully describe the force. In Case 21-34006, two witness officer reports were identical copies, not individual "candid" accounts as required. Paragraph 69(b). Additionally, during this compliance period, we observed several FDCRs from 2020 go through the administrative investigation process, which provided less than candid accounts about the conduct of involved officers or collateral uses of force.

**Officer Incapacitation:** Two of ten officer-involved-shooting incidents that occurred during this compliance assessment period raise questions about the City's compliance with Paragraph 69(c) and Directive 1010.10 – Deadly Force and In-Custody Death Reporting and Investigation Procedures, available at www.portlandoregon.gov/police/article/656780.[6]

On July 20, 2021, a PPB member used lethal-level force in shooting a subject who was in a convenience store (Case 21-199178). The store clerk had called 911 when the subject ate food without paying and sat down on the floor refusing to leave. Two PPB officers responded. The subject broke a wine bottle on the floor. Armed with the neck of the bottle, the subject approached the officers. One officer shot his firearm. The other twice deployed a Taser. The witness officer (who deployed the Taser but did not fire his gun) refused to provide a witness statement at the time of the incident, citing through his attorney the stress of the incident and off-duty stresses. The witness officer also should have completed the FDCR for the Taser use before the end of shift.

---

[6] These events also implicate the City's compliance with Paragraph 125.

We asked the City to explain the lack of a timely statement from the witness officer.  The City excused the witness officer by reading Directive 1010.10 to give PPB discretion to direct (or not direct) the witness officer to provide a statement.  Specifically, the City relied on the "subject to" language:

> 2.1.2.4.  Witness officer(s) shall also be subject to on-scene interviews to discuss the incident with detectives.  They shall provide a full and candid account of the use of force event.

The City interprets "subject to" as optional, not mandatory.  We disagree.  Even if the City were correct, and policy permitted the witness officer not to give a full and candid account of the deadly force event while on scene, two other concerns arise.  First, the City's response indicates that PPB members discussed the policy requirement for a witness officer interview while on scene.  But the City's response omits the fact that the IPR Director was on scene and objected to forgoing the witness officer interview.  Second, the detective's report from the night of the shooting records that the witness officer refused through his attorney to submit to an interview, but nonetheless agreed to "a brief walkthrough."  We do not know the extent of the discussion on the walkthrough, though, because the detective's report does not report any information gained from the walkthrough.

The second officer-involved shooting occurred on December 24, 2021, when a PPB member used lethal-level force when a stolen pickup truck rammed the officer (2020-B-0066).  The involved officer suffered serious injuries that amounted to physical incapacitation at that time and for some time later.  However, the documentation provided to us failed to identify the justification for the length of the delay in conducting the interview.  PPB did not interview the involved officer until February 10, 2021—a length that limited the utility of the officer's statement as the passage of time clouds recollection .  Directive 1010.10 contemplates incapacitation of the involved officer:

> 2.2.5.1.  The PSD Captain or designee shall ensure that the involved member(s) provides a compelled statement as soon as practicable, but no later than within 48 hours of the event, unless the member is physically incapacitated and unable to provide a statement.

The file provided to DOJ contained an email which was supposed to have an attached letter from the officer's attorney, but did not.  Accordingly, it is unclear why the physical incapacitation to provide a statement lasted for such an extensive period of time.

These two events show the need for PPB to both adhere to existing Directive 1010.10, which is incorporated into the Agreement, and clarify what evidence is necessary to document incapacitation.

**Force Used in Coordination with an Outside Law Enforcement Agency:**  An officer-involved shooting with an outside law enforcement agency also implicated the City's compliance with this paragraph.  PPB must adhere to this Agreement and its force policies, whether acting on its own or in concert with another agency.

On January 26, 2022, a PPB officer deployed a 40mm round in an incident in which a deputy from a different jurisdiction used deadly force.  *See* Ryan Haas, *et al.*, "Clackamas County sheriff's deputy shoots and kills man after traffic pursuit into Portland," Jan. 27, 2022, available at www.opb.org/article/2022/01/27/clackamas-county-sheriffs-office-shoots-and-kills-person-after-traffic-pursuit-into-portland/.  On January 29, 2022, we asked the City to produce the AAR for the 40mm use within 72 hours, as required by PPB policy.  PPB acknowledged that although a PPB officer did not use deadly force, "this incident was considered a category 1 force event."  Email from CMDR J. Bell to J. Geissler, Feb. 2, 2022.  As of the release of this report, that investigation is still ongoing.  This incident illustrates the need to timely categorize a use of force and promptly apply the appropriate PPB directive.  In a Level 1 force event, PPB must comply with all

requirements of Directive 1010.10, e.g., call outs to the scene, communication restriction orders, walk throughs, public safety statements, etc. If PPB did not treat this as a Level 1 use of force, then PPB should have completed the AAR within 72 hours and met the other on-scene investigatory and review requirements of Directive 1010.00.

In sum, we agree with the Compliance Officer's assessment that the City is in partial compliance with this paragraph. ECF 291-1, COCL Q4 2021 Report, at 26–27.

### 3.  Use of Force Supervisory Investigations and Reports

70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

a. Complete After Action Reports within 72 hours of the force event;

b. Immediately notify his or her shift supervisor and PSD regarding all officers['] Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement;

c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

d. Interview officers individually and not in groups.

| Status | **Partial Compliance** |
|--------|------------------------|

The City remains in partial compliance with Paragraph 70 because PPB has not yet consistently verified performance of the policies governing timely and thorough AARs.

PPB's self-assessment analyzes only the notice requirements of Paragraph 70(b), not the 72-hour requirement of Paragraph 70(a), the medical attention requirement of Paragraph 70(c), or the interview requirements of Paragraph 70(d). PPB 2022 Q1 Update Report, at 10–14, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. Thus, we agree with the Compliance Officer that PPB is in partial compliance with this paragraph. ECF 291-1, COCL Q4 2021 Report, at 27–28.

**Paragraph 70(a):** AAR forms do not indicate date, time, or amendment to the AARs and, therefore, leave uncertain whether and when initial drafts were complete. Also, the AARs we reviewed do not include photographic or video evidence, even when the AAR indicated such information exists. For example, in a serious use of force, the AAR was initially missing. When it was eventually produced, the AAR did not explain why PPB did not secure a video of the event from a civilian witness who reported recording the event. If PPB did secure the video, it neither recorded that in the AAR nor produced it. Based on our review of AARs, it appears that the City is not consistently applying the requirement for supervisors to "ensure that the administrative review includes collecting any physical or photographic/video evidence that may assist other reviewers in the chain of command in understanding the scene and event." Dir. 1010.00, Procedure Par. 12.4.9.

**Paragraph 70(b):**  Overall, PPB's referrals to PSD had mixed results, thus not reaching substantial compliance.  In Case 21-122336, the PPB supervisor's notice to PSD added a causal justification inconsistent with the reported facts of a canine bite.  PPB cannot be said to comply with the notification to PSD in that instance, when the notification minimized the interaction, and the supervisor who should serve as a check on the reasonableness of using force instead supplemented the officer's justification.  As discussed above, the PPB supervisor added a causal justification for force not found in the officer's reported facts, "[The Canine] bit the suspect when the suspect refused to surrender."  May 7, 2021 email "Fw:  K9 Bite Force Notification PPB #21-122336 – Allegation of Officer criminal misconduct."  As another example, PPB reported to their Detective Division possible criminal conduct in member(s)' use of force.  PPB indicated that it would open an administrative investigation of the allegation, but would let that process determine whether to investigate criminally.  Commendably, PPB executives noted that should the administration process lead to a criminal investigation, PPB would "look to have an outside agency take that piece."  AC J. Resch email Dec. 1, 2021.  However, even though a neighbor reportedly recorded the underlying interaction, the PPB file did not include any video.

**Paragraph 70(c):**  We could not fully assess whether PPB adequately secured medical care because in many cases the City did not produce photographs of injuries.  However, based on PPB's written reports that we reviewed, it appears that officers are continuing to secure medical care for the subjects injured during encounters with PPB.

**Paragraph 70(d):**  PPB's AAR form includes checkboxes for a supervisor to affirm individual interviews.  Though the AAR form should ensure this requirement is met, it did not always do so. For example, in a force event from 2020 that was reviewed this compliance period, the supervisor checked the box for all officers, but a later review showed that the supervisor had not interviewed any of the officers.  As we discuss with respect to Paragraph 72, PPB knew of a systemic failure to interview officers for AARs, but did not revise the checklist to ensure the adequacy of investigation as required by Paragraph 70(d).

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 71.

We agree with the Compliance Officer's assessment that PPB is maintaining adequate patrol supervision staffing.  ECF 291-1, COCL Q4 2021 Report, at 29.  However, we note a potential concern regarding training for officers designated as acting supervisors.  The use of acting supervisors was prevalent in a number of force events that we have reviewed.  Pursuant to Paragraph 158, we will monitor this concern by requesting an analysis of the extent to which PPB relies on acting supervisors and whether such personnel receive adequate training to perform the role.

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities.  PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 72 because PPB has not ensured the adequacy of the supervisor investigation checklist.

In 2020, the supervisory checklist proved to be inadequate.  PPB policy designates the AAR form as the checklist to ensure supervisors carry out their force investigation responsibilities.  Dir. 1010.00, Procedure Par. 13.2.  We previously found this sufficient.  *See* ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report, at 13–14; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 14.  However, we also advised that the checklist did not always result in critical analysis of force or demonstrate that supervisors conducted fulsome investigations of force used during crowd-control events.  *Id.*  We now know that the City knew the checklist was not and could not be followed in some circumstances.  The insufficiency of the checklist is evident in the Force Inspector's July 9, 2020 training—not shared with DOJ until January 14, 2022—that highlighted AARs not adequately assessing the number of rounds used, justification for each round, whether supervisors showed up on the scene, and whether photo or video evidence existed.  Still, PPB did not revise the checklist during this compliance period.  Accordingly, we disagree with the Compliance Officer's assessment that PPB is in substantial compliance with this paragraph.  *See* ECF 291-1, COCL Q4 2021 Report, at 29–30.

PPB is currently exploring revisions to Directive 1010.00.  The Parties are discussing the policies governing use of force and force reporting with the PPA and Compliance Officer, and the public will be able to provide input through the Universal Review Process.  We anticipate addressing revisions to the AAR form in this process, and the City being able to demonstrate an adequate review and revision of the checklist when the policies are approved pursuant to Paragraph 166.

73. PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

a. EIS tracks all Directive 940.00 comments, findings and corrections;

b. All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

c. All supervisors in the chain of command are accountable for inadequate reports and analysis;

d. A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations. Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

e. When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

f. Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

g. The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor.

| Status | Partial Compliance |
|---|---|

The City remains in partial compliance with Paragraph 73 for four reasons:  (1) PPB is not ensuring the EIS is effective; (2) PPB prepared an inadequate crowd control audit of force during the 2020 protests; (3) PPB has not consistently taken appropriate corrective action in response to sustained policy violations; and (4) PPB did not timely resolve policy, training, tactical, and other concerns arising from the use of force during crowd control events.

We agree with the Compliance Officer's assessment of PPB's failure to meet the requirements of this paragraph.  ECF 291-1, COCL Q4 2021 Report, at 30–31.  We also agree that PPB must clarify the issues that may be addressed in EIS entries (73(a)) and distinguish those issues from the misconduct that requires investigation and potential discipline (73(b)).  ECF 291-1, COCL Q4 2021 Report, at 31–32.

PPB's self-assessment covers quarterly audit reports, but omits the crowd control force audit for 2020, when the lion's share of force occurred.  PPB 2021 Q4 Update Report, at 24, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf.  PPB did not complete the crowd control audit until December 15, 2021, and it still does not track the requirements of Paragraph 73.

**73(a):**  On December 15, 2021, PPB produced its audit of crowd control response to the 2020 protests.  As discussed below, the audit's design is inadequate because it does not incorporate the Compliance Officer's input and its content is inadequate because it does not assess what is required by Paragraphs 74 to 77.  The audit also did not generate data necessary to show that EIS tracks all AAR comments, findings, and corrections.

**73(b)-(d):**  We reviewed numerous AARs that either worked their way through PPB or originated in this compliance period.  We have not yet seen a concerted effort to hold accountable supervisors in the chain of command for inadequate reports and analysis, including PPB managers who repeatedly justified uses of force against a person based on actions of others.  PPB also did not take steps to hold accountable any shift or precinct commander who permitted deficient investigations.  Paragraph 74(d).  As an example, we identified for the City a PPB supervisor's faulty analysis of the *Graham* and policy standards.  ECF 286-3, PRB Letter, Mar. 23, 2021.  But the City took no steps to hold the supervisor accountable, a continuing failure to comply with this paragraph.  Indeed, another senior supervisor who we identified to the City as conducting objectively deficient investigations received a significant promotion.  Our concerns were a basis for our notice of noncompliance, which the City resolved by agreeing to Section XI – Addendum of Additional Remedies.  New Paragraph 192 addresses these issues by requiring the City to identify and hold accountable the high-level supervisors—ranked Lieutenant or above—who:  (a) trained officers to believe they could use force against individuals during crowd control events without meeting the requirements of PPB's general force policy; (b) served as incident commanders and directed or authorized any officer to use force in violation of PPB policy, or who failed to ensure that FDCRs and AARs were completed as required by policy; and (c) the Commanders and above who failed to

timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020.

**73(e):**  PPB has infrequently sustained uses of force as not complying with policy—even when we identified out-of-policy force for PPB.  But, applying Paragraph 73(e)'s requirement specifically to the uses of force PPB has sustained during this compliance period, we assess PPB as only partially compliant.  In this assessment period, PPB frequently misapplied the current discipline guide during the accountability process, PPB did not apply policies to hold officers accountable as it should, and the City voluntarily expunged the records of officers who were appropriately disciplined. Accordingly, the City has not imposed "appropriate corrective action" required by Paragraph 73(e).

**73(f):**  As we described above, supervisors repeatedly asserted that RRT members were trained— incorrectly—to apply PPB's crowd control policy over the requirements of Directive 1010.00. We find this justification inadequate.   Training cannot necessarily trump unambiguous policy requirements.  Regardless, if PPB supervisors believe RRT was mis-trained, they have a continuing obligation to take corrective action, to notify the Inspector, who must work with the Chief to "ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns."  Paragraph 73(f).  None of that happened.  *See infra* Section IV.  We repeatedly encouraged PPB to train RRT—before RRT members resigned en masse following one member's criminal indictment.  Critical policy concerns took more than a year to resolve.  Training, tactical and other concerns will be part of the City's implementation of new Paragraph 189.

## B.    Compliance Audits Related to Use of Force

74. In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports to ensure that:

a. With respect to use of force generally:

i. reports describe the mental health information available to officers and the role of that information in their decision making;

ii. officers do not use force against people who engage in passive resistance that does not impede a lawful objective;

iii. when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

iv. officers call in specialty units in accordance with procedure;

v. officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

vi. officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

b. With respect to ECW usages:

i. ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits. Discrepancies within the audit should be appropriately investigated and addressed;

ii. officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

18

iii. officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

iv. officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing so is reasonably calculated to prevent the use of a higher level of force.

c. With respect to use of force reporting, the reports:

i. are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

ii. include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

iii. include a decision point description of the force decision making;

iv. include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

v. include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

vi. include the reason for the initial police presence;

vii. include a description of the level of resistance encountered by each officer that led to each separate use of force and, if applicable, injury;

viii. include a description of why de-escalation techniques were not used or whether they were effective;

ix. include whether the individual was known by the officer to be mentally ill or in mental health crisis;

x. include a general description of force an officer observes another officer apply; and

xi. demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement.

75. In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

a. Complete a Supervisor's After Action Report within 72 hours of notification;

b. Review all use of force reports to ensure they include the information required by this Agreement and PPB policy;

c. Evaluate the weight of the evidence;

d. Use a "decision-point" approach to analyze each use of force;

e. Determine whether the officer's actions appear consistent with PPB policy, this Agreement, and best practices;

f. Determine whether there was legal justification for the original stop and/or detention;

g. Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;

h. Determine whether additional training or counseling is warranted;

i. Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

j. Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

k. Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

l. Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

a. Determine if significant trends exist;

b. Determine if there is variation in force practice away from PPB policy in any unit;

c. Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate;

d. Identify and correct deficiencies revealed by the analysis; and

e. Document the Inspector's findings in an annual public report.

77. In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that all supervisors in the chain of command:

a. Review Directive 940.00 findings using a preponderance of the evidence standard;

b. Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

c. Modify findings as appropriate and document modifications;

d. Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

e. Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

f. Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer; and

g. Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

| Status | Partial Compliance |
|---|---|

The City is no longer in substantial compliance with Paragraphs 74 to 77 because PPB did not consult with the Compliance Officer on its audit of force used during crowd control and produced an audit that does not comply with this Agreement.

PPB continues to self-report compliance with these paragraphs, but does so based on its quarterly audit reports, not the significant audit of uses of force during crowd control events in 2020—when most force was used. PPB 2022 Q1 Update Report, at 25–42, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. PPB designed the crowd control audit without consulting the Compliance Officer, did not complete it until December 15, 2021, and did not include every element required by Paragraphs 74 to 77. We therefore agree with the Compliance Officer's assessment that PPB has not met the requirements of these paragraphs. ECF 291-1, COCL Q4 2021 Report, at 32–37.

**PPB's 2020 Crowd Control Audit:** We previously stated that "the lack of prompt supervisory force investigations of crowd-control events is likely to deprive the upcoming force inspector's audit of necessary data. We will assess the sufficiency of that audit in a future compliance assessment report." ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 17. PPB eventually presented a 2020 crowd control force audit that does not comply with this Agreement. PPB did not conduct a self-critical assessment, propose corrective action recommendations, or provide the necessary data for the EIS or for group-level comparisons between units. PPB, "2020 Crowd Control Audit Results," undated, available at www.portlandoregon.gov/police/article/799620 (hereinafter 2020 Crowd Control Audit Results). PPB designed and performed the audit without consulting with the Compliance Officer, in violation of this Agreement. Paragraphs 74–77.

PPB routinely audits force used during crowd control events at year's end, rather than as part of its quarterly audits. On January 19, 2021, we asked PPB for its force audit for crowd control in 2020. PPB did not have one. PPB eventually produced its 2020 crowd control force audit to the Compliance Officer and DOJ on December 15, 2021—more than a year after PPB determined the 2020 protests finally ended on November 16 2020. On December 14, 2021, we asked PPB to explain the delay in writing. In January 2022, PPB cited the volume of force being reviewed and lack of personnel to perform the audit. Yet this Agreement requires that the City provide, "necessary support and resources to enable PPB to fulfill its obligations under this Agreement." Paragraph 7. PPB also asserted a laudable position given the lack of resources:

> Expediency should not be the priority when auditing our Crowd Control Events. The Force Inspectors Office and Audit Team want to complete as thorough and accurate an audit of our events as possible, especially given the intense scrutiny given to Crowd Control and our desire to be as transparent as possible.

PPB's delayed audit did not meet those worthy goals for at least five reasons.

First, PPB did not post the audit until after May 6, 2022, when DOJ specifically asked the City to do so. This Agreement requires "All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations. Audits and reports shall be posted on PPB's website." Paragraph 155.

Second, the audit findings lack credibility. PPB gave itself an overall compliance rate of 96%. Even ignoring force policy requirements and assessing only the reporting requirements of crowd control policy,[7] as PPB designed its audit to do, a 96% compliance rate is inconsistent with the City's acknowledgement that it did not complete timely AARs or conduct full interviews and investigations of force during the 2020 protests. *See* Dir. 635.10, Procedure Par. 13.1.1 (requiring that the Incident Commander "Write an After Action in accordance with Directive(s) 905.00, Non-Force After Action Reporting, or 1010.00, Use of Force, if force was used"); *see also* Dir. 635.10, Par. 13.3.4 (requiring the supervisor to "write an after action of any force used by the squad in accordance with Directive 1010.00, Use of Force, during the incident").

Third, the audit did not qualitatively assess PPB's force. The audit consisted mainly of checkboxes regarding the reporting requirements of Directive 635.10. This Agreement requires that audits make qualitative assessments to ensure force is not used against people who passively resist (Paragraph 74(a)(ii)) and the least amount of appropriate force possible is used (Paragraph 74(a)(vi)). Questions 23–25 of Survey Tool 3 are the only qualitative questions about the force used. *See* 2020 Crowd Control Audit Results, at 23. Those questions do not independently assess whether force complied with training, policy, law, or this Agreement. Rather the questions merely ask whether *the AARs found* that the force was compliant. The net effect of this framing is to validate AAR findings without scrutinizing the actual findings.

The audit fails to qualitatively assess the force reporting requirements of Paragraph 74(b), the characteristics of supervisory review required by Paragraph 75, the trend analysis and corrective action required by Paragraph 76, or the adequacy of chain-of-command reviews required by Paragraph 77. Had the audit done so, it could address the concerns we identified last year, including the conflation of active and passive resistance, the reliance on sound truck warnings, the lack of connection with incident action plans, and the lack of witness interviews. We laid out a roadmap to identify these issues, and thereby improve outcomes, in our prior compliance assessment report. Instead PPB's audit asked a simple, binary question about chain-of-command review: "Does command agree with the sergeant's findings?" 2020 Crowd Control Audit Results, at 23.

Fourth, the audit sought to validate the specific overreliance on a sound truck that the Compliance Officer and DOJ agreed was not necessarily compliant. PPB devoted seven of 35 questions in its "Survey 2" tool to sound truck warnings. 2020 Crowd Control Audit Results, at 14–16. None of the questions asked about the specific issue the Compliance Officer and DOJ identified, i.e., did PPB identify whether the warning was effective for the specific force event. *Compare* ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 9 (stating "LRAD announcements may be valid warnings to the crowd generally, but as one reviewer aptly recognized in an AAR, members should not assume that subjects heard the LRAD. *See* AAR package 0625-0626").

PPB designed the 2020 crowd control audit to validate its responses and overlook numerous reporting deficiencies rather than critically assess the force that was used and the reporting processes that failed, and attempt to learn from the experience.

**Reporting and Correcting Deficiencies:** PPB has not produced an annual audit report as required by Paragraph 76(e) for this compliance period or the prior. *See* PPB, "Force Audit

---

[7] To be clear, the requirements of Directive 1010.00 apply. However, even if that policy did not apply, PPB did not always comply with prohibitions of Directive 635.10. For example, paragraph 10.4 of the policy prohibits bringing a motor vehicle into contact with protestors, but at least one officer did just that: www.youtube.com/watch?v=ZTJPBN_u8O8.

Reports," available at www.portlandoregon.gov/police/72521. PPB provided a spreadsheet of Force Inspector recommendations it has tracked since January 10, 2021. Though helpful, the tracking tool appears incomplete. The list is extremely short and does not appear to address any trend issues. When we found PPB in substantial compliance with the Agreement on January 10, 2020, the available data for Q3 2019 showed a force-to-custody rate of 3.3% (for non-crowd-control-related force events). PPB, "Use of Force Summary," available at public.tableau.com/app/profile/portlandpolicebureau/viz/ForceAuditReport/Summary. Since then, PPB has used force more frequently, including at a current rate of 5.4% of custodies based on Q4 2021 data, and at a rate as high as 7% in Q2 2021. *Id.* This is a significant trend that should have been identified and addressed. Also, the spreadsheet does not include a specific training issue identified by a PPB supervisor in Case 21-175074. This was an ECW use that raised the issue of the need for additional training on rearming a Taser before a second deployment.

**Audit Is Inconsistent with the Force Inspector's Training Slide:** On January 14, 2022, the City's legal counsel first disclosed to us a training provided by PPB's Force Inspector—the same person responsible for the audits—that is dated July 9, 2020.[8] This training contained a number of admissions that evidence a failure to collect adequate data for the audits that followed. "There are several of these FDCR's (sic) that make an auditor cringe when it comes to reporting force . . .. Terms like deploying 30-50 rounds is problematic usage of our weapon systems. We need to have a count of our munitions and justification for each round we are deploying." The same training acknowledged that baton usage reporting was inconsistent and included no reporting on some reports. The Force Inspector's statements indicate that PPB knew of problems that should have been addressed in its December 15, 2021 audit of crowd control uses of force. Yet, PPB asserted a 96% success rate in that crowd control audit. The audit is inconsistent with the Force Inspector's training. Accordingly, PPB's largest and most consequential audit of this compliance period does not evidence substantial compliance with Paragraphs 74–77.

## IV.    TRAINING

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Paragraph 78 because PPB has not fully implemented the requirements of Section IV.

We share the Compliance Officer's assessment that PPB is in partial compliance with this paragraph. *See* ECF 291-1, COCL Q4 2021 Report, at 38–39.

**Training Accomplishments:** In this compliance period, PPB's training achieved two new significant positive developments: (1) Active Bystandership for Law Enforcement (ABLE) Training and (2) the City's allocation of funds to create a civilian training dean position. The training dean is intended to bring consistent and professional leadership and better incorporate all aspects of adult

---

[8] PPB is obliged to provide DOJ all force-related training materials pursuant to Paragraph 166.

learning techniques into the Training Division.  ABLE Training has been a long-term goal that finally came to fruition in this compliance assessment period.

PPB based its ABLE Training on course material from the Georgetown University Law Center's Center for Innovations in Community Safety, available at www.law.georgetown.edu/cics/able/. PPB added its own ABLE policy references to these materials.  All class participants were required to affirm in PPB's learning management system (LMS) that they read this new policy before taking the class.  We observed a recording of the training delivered via Zoom.  In contrast to other PPB training delivered by Zoom, the ABLE class instructor required participants to keep their cameras on and remain engaged.  The class included break-out sessions in small groups.  We witnessed in these a good example of personal intervention and strong affirmation by the ABLE facilitator.

Another accomplishment, though not a new development, was Taser and firearms training that effectively incorporated PPB's force use and reporting polices.

**Offensive RRT Training Materials:**  As the City has already acknowledged to the Court, the City did not disclose to the Compliance Officer or DOJ RRT training material until this compliance period.[9]  Had those materials been disclosed previously, we likely would not have found the City in compliance with Section IV, or likely other sections, absent remediation.

Paragraph 166 requires that "PPB shall send new or revised policies, procedures, protocols, and training curricula regarding use of force, interactions with persons in mental health crisis and systems of accountability to DOJ as they are promulgated, with a copy to the COCL."  This standing, court-ordered requirement obviates any need for a specific request.  In addition, we frequently make specific requests in our meetings or in writing.  One such set of requests centered on RRT.  In early 2019, we orally requested the specific dates and details of the Spring RRT training, which was listed in the 2019 Training Plan, so that we could review the materials and observe the training.  RRT apparently executed that training without informing PPB's Compliance Coordinator with sufficient time to permit our review or observation.  The Training Division should have had these materials as required by PPB Directive 1500.00 – Training, and as specifically identified in the October 2017 Training Division audit report at page 12 "85d-e-1 The Audit Team recommends that the Training Division maintain training records and course materials for specialty trainings (e[.]g. SERT, EDU, RRT, etc.)," available at www.portlandoregon.gov/police/article/666053.

We then focused on the planned Fall 2019 RRT training, also listed in the 2019 Training Plan. PPB's Compliance Coordinator memorialized our request in a June 12, 2019 email to an RRT Lieutenant, forwarded to us on June 13, 2019, when the Compliance Coordinator disclosed that PPB canceled the planned off-site training.  PPB did not amend the 2019 Training Plan.  On July 10, 2019, the Compliance Coordinator followed up with some information, but no course materials.

Though the Parties continued discussing RRT in our meetings, we provided PPB a written reminder of our request for RRT lesson plans in a September 12, 2019 email.  On Friday evening, September 13, 2019, PPB produced limited lesson plans.  We reviewed them over the weekend.  On Monday morning, September 16, we asked by email for any other RRT training materials that existed.  On September 20, 2019, we returned extensive written comments on the RRT lesson plans, including that the RRT training needed to comport with the Agreement's force and training provisions.  Both

---

[9] The City released the RRT training slides to DOJ, the Compliance Officer, and the media in January 2022.  They are available on the City's website:  www.documentcloud.org/documents/21180085-protests_riots_powerpoint_reduced_size_final.

in that email and in the comments to the attached lesson plans, we requested the slides and videos that RRT would use.  Ultimately, PPB produced certain lesson plans and three sets of slides.  But, PPB did *not* produce the problematic RRT slides until January 14, 2022.

**Training's Effect on Accountability:**  PPB has repeatedly asserted that RRT training instructed members that they could use force based on PPB's Directive 635.10, without following the requirements of Directive 1010.00.[10]  However, in our September 2019 emails and the written comments to the provided lesson plans, we stressed the need for the crowd control training to follow Directive 1010.00, and to stress de-escalation.  We stated, among other things:  "Both the lesson and the demonstrations must refer to and incorporate the approved use-of-force policy and the crowd-control policy.  The lesson plan should set forth this performance standard.  This lesson plan [also] implicates 1010.00 and 1010.10 for reporting requirements."

The City agrees that Directive 635.10 does not supplant Directive 1010.00.  However, the point is not yet permeating into PPB as it should.  Only recently, the written record of an accountability case showed that the *same* RRT Lieutenant to whom we wrote in September 2019 about the applicability of Directive 1010.00, served as an internal subject matter expert to justify use of force circumventing Directive 1010.00.  And an Assistant Chief disagreed with a contempt finding and instead stated that an officer's actions were consistent with training.  The City must ensure that all PPB members understand that the general use-of-force policy applies in crowd control situations.

**The Previously Undisclosed RRT Training Materials:**  The City is currently investigating at least one aspect of the RRT training, a slide depicting the "Prayer of the Alt Right":



---

[10] On its face, the crowd control directive makes clear the preeminence of the force directive: "1. Directive 1010.00, Use of Force, governs all uses of force, including in crowd management and crowd control situations."  Directive 635.10, Procedure 1.

We await the outcome of that investigation to better understand the facts and context of the presentation during training. We will likely have more to say about the slides and their effect on PPB after the close of the investigation. We note, however, an additional issue that the City advised us is not part of its current investigation: improper characterization of legal justification for force.

The RRT training materials incorrectly portray the legal justification for force. The slides picture a person standing with a sign as "active resistance":



Chief Judge Marco Hernández found in *Don't Shoot Portland* v. *Portland*, that the City was in contempt for violating its own force directive during the 2020 protests for precisely this sort of inappropriate justification. A specific issue was whether PPB was authorized to use impact rounds on persons slow walking while holding a banner and refusing to let go of the banner. The judge found: "At most, the record shows that the individual who was refusing to let go of their sign was engaged in passive resistance." *Don't Shoot Portland* v. *Portland*, 503 F. Supp. 3d 1022, 1034 (D. Or. 2020).

Similar to this slide, a separate set of late-disclosed RRT training slides cited a case overruled by the Ninth Circuit Court of Appeals, *Headwaters Forest Def.* v. *Cty. of Humboldt*, 1998 U.S. Dist. LEXIS 16953 (N.D. Cal. Oct. 26, 1998), which overstated the justification for use of chemical restraint. Those same slides also cited cases from other judicial districts and another state, which are not binding legal authority in Oregon. This training did not comply with Paragraph 78.

**Effects of RRT Training:** PPB assigned grenadiers to be the "linebacker" for crowd control response, whether by RRT or MFF. Grenadiers routinely used less lethal munitions in crowd control responses both during this compliance period and before. Training materials for grenadiers were important for our compliance assessment report. On March 29, 2021, PPB's Compliance Coordinator responded to our request for PPB grenadier certification lesson plans. PPB responded that "they do not consider this a 'training' per se so there is no 'lesson plan.'" Email from M. Buckley to J. Geissler, March 29, 2021. In fact, after the City produced RRT training materials in response to our December 14, 2021 request, we found that there had already been a FN303 qualification training from 2018 and 2019, with materials not previously shared with DOJ.

Before the planned 2021 grenadier classes, we advised PPB about these specific qualification classes:

1. Qualification presupposes qualifying to use a weapon system in conformance with law and policy. For example, PPB routinely provides firearms instruction at in-service which provides law and policy guidance applicable to later firearms qualification. Also, PPB provides CEW training on law and policy as part of annual in-service that includes qualification on use of CEW. Here, PPB presents qualification independent of law or policy guidance on use of FN303 launchers, 40mm launchers, and hand-held riot control agents. This is insufficient. PPB should, at a minimum, provide a lesson plan on the law and policy guidance for use of these weapons to accompany the qualification—including the dos and don'ts of use. DOJ would like to review the lesson plan in advance.

2. We note that the FN303 qualification potentially contradicts the training from the City Attorney in response to Judge Hernández' sanction order. Specifically, the FN303 qualification requires firing two rounds in repeated sets. However, the March 24, 2021 legal training instructed that, to comply with the order, officers must pause in between FN rounds rather than fire volleys. The FN303 qualification is silent on this pause. At this time, we do not opine on the proper tactical application of the FN303 launchers. Rather we just note the potential contradiction. Indeed, the March 24, 2021 legal instruction acknowledged a conflict with training in the statements: "I'm just giving you legal advice but you should probably rely upon your training. I don't want to give you conflicting advice from your training." PPB should clarify how it expects grenadiers to behave before further confusing the topic.

Email from J. Geissler to M. Buckley, April 2, 2021. Without producing course materials, PPB conducted an "FN303 Armorers class" on April 10, 2021, and merely removed "qualification" from the class title, but otherwise went forward with the class on using the weapon.

**Remediating the RRT Training:** Throughout this rating period, the City did not remedy the poor training to RRT and its overall effect on the organization. As we said in our March 21, 2021, and April 2, 2021 emails to PPB: "We want PPB to train its RRT members—as well as all Mobile Field Force participants—as expeditiously as possible to address the issues that we identified in our compliance assessment report. However, PPB must do so in a fashion consistent with the Settlement Agreement, approved PPB policies, and the Constitution."

PPB has not provided this training. The 2021 Training Plan identified needed RRT training. After RRT resigned, PPB did not reconstitute the team. PPB did not train Mobile Field Force participants on all of the issues we identified. PPB also did not revise its Bureau-wide training plan in light of RRT's non-availability. In the absence of effective remedial training, the offensive RRT slides impose an unmitigated impact on the organization as a whole.

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Status | Partial Compliance |
|---|---|

The City is no longer in substantial compliance with Paragraph 79 because the Training Division did not conduct a needs assessment for PPB's annual training plan

We agree with the Compliance Officer's assessment that PPB is in partial compliance pending a critical assessment of its 2020 protest response.  ECF 291-1, COCL Q4 2021 Report, at 39–40.

PPB has not prepared a fulsome needs assessment on which to base a training plan.  We acknowledge that new Paragraph 189 requires the City to contract with an outside entity to assess PPB's 2020 crowd control response to inform a future needs assessment and training plan.  In this compliance assessment period, though, there was no critical assessment.  Instead, as discussed in Section III, above, the City validated its response to 2020 crowd control events in its master after action report without critical assessment, thus failing to inform its need for training.  *See* ECF 286-2, MAAR Letter, at 2–3.  PPB's audit of the force used during 2020 crowd control events was not completed until December 15, 2021.  In all events, the audit did not meet the requirements of Paragraph 73.  Thus, in this compliance assessment period, PPB's needs assessment and training plans were not informed as required by Paragraph 79.

Additionally, PPB has not fully implemented its training plans for 2021 and 2022, or updated them for changed circumstances.  For instance, PPB planned to complete RRT training in April 2021.  *See* 2021 Training Plan, at 17, available at www.portlandoregon.gov/police/article/798653.  This was an important step for remedying compliance concerns arising from crowd control responses.  PPB provided COCL and DOJ certain lesson plans and material for this planned training—much of which was not even developed until we requested their production.  We reviewed and critiqued the material.  PPB did not correct the material, but delayed the training.  Then RRT members resigned.  PPB did not revise the training plan after this change.

Lastly, training plans cannot be viewed as compliant with Paragraph 79 when the Training Division did not even know of all of the trainings given throughout the Division.  The City recently admitted that PPB has not complied with the requirement of Directive 1500.00, which requires that all specialized unit trainings be approved by the Training Division.  *See* email from CAPT C. Gjovik Jan. 10, 2022.  To re-achieve substantial compliance, the Training Division must inform annual training plan revisions with a fulsome needs assessment that considers all inputs required by this paragraph, and any crowd control analysis prepared by the outside entity pursuant to Paragraph 189.

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum.  These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs.  This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 80.

We agree with the Compliance Officer's assessment that the Training Division's class survey data continues to demonstrate compliance with this paragraph.  ECF 236-1, DOJ 5th Periodic

Compliance Assessment Report, at 21–22; ECF 291-1, COCL Q4 2021 Report, at 44–48. However, we have concerns that the Training Division has not consistently approved trainings for specialty units. The City has not assured us that it is enforcing Directive 1500.00, the policy that requires all PPB trainings to be approved by the Training Division. To prevent a reduced compliance rating, PPB should collect data from specialty unit trainings, then review and analyze the data for future training effectiveness.

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Status | Partial Compliance |
|--------|-------------------|

The City is no longer in substantial compliance with Paragraph 81 because PPB is not ensuring that supervisors review the LMS database at least semi-annually, as required.

The Compliance Officer found PPB in substantial compliance with this obligation based on its analysis of data contained in the Training Division's Learning Management System (LMS). ECF 291-1, COCL Q4 2021 Report, at 48–50. We agree with the Compliance Officer's assessment of LMS. However, during this reporting period, we learned from the LMS administrator that supervisors review LMS records annually as part of the performance evaluation cycle, not semi-annually as Paragraph 81 requires. To re-achieve substantial compliance, PPB must ensure that supervisors conduct semi-annual evaluations of subordinate officers.

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 82.

We continue to agree with the Compliance Officer that PPB is reporting training as required. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 22; ECF 291-1, COCL Q4 2021 Report, at 50.

PPB prepares semi-annual reports that catalog internal and external trainings. We share the Compliance Officer's concern that PPB may not be tracking specialty unit training given the City's admitted nonenforcement of Directive 1500.00's requirement that the Training Division review and approve all training. Our concern is somewhat mitigated by reviewing LMS records for individual officers, which show attendance at many specialty unit trainings. This indicates that LMS is centrally tracking specialty trainings, even if the Training Division is not reviewing and approving them as required.

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding

years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Status | Substantial Compliance |
|--------|------------------------|
| The City remains in substantial compliance with Paragraph 83. | |

The City remains in substantial compliance with Paragraph 83.

We share the Compliance Officer's view that PPB's consistent performance of this obligation over time establishes compliance with the paragraph. *See* ECF 291-1, COCL Q4 2021 Report, at 51.

We have concerns, however, that PPB has transferred a sworn member to an administrative role in the Training Division, characterizing them as not being an instructor, even though PPB previously applied Paragraph 83's requirement and PPB's procedure for checking disciplinary history to a similar transfer. PPB's Compliance Coordinator did not report this new transfer on their quarterly report. Other transfers complied with SOP 1-19 based on a review of the records provided indicating PPB checked the record of each for such discipline. We will continue to monitor whether PPB adequately ensures that all members assigned to work in the Training Division are vetted for a history of using excessive force, consistent with PPB's SOP 1-19.

84. All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

    a. With respect to patrol officers, PPB shall:

        i. increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

        ii. emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

        iii. continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

        iv. continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

        v. describe situations in which a force event could lead to potential civil or criminal liability; and

        vi. continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-center communication, such as the term "mentals," in all work-related settings and communications, as well as when interacting with the public.

    b. With respect to supervisors, provide additional training on how to:

        i. conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3;

ii. evaluate officer performance as part of PPB's annual performance evaluation system; and

iii. foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Paragraph 84 because PPB's Training Division has not corrected identified gaps in training or adequately addressed compliance concerns.

We agree with the Compliance Officer's extensive analysis of the City's compliance and what PPB must do to re-achieve substantial compliance with this paragraph. ECF 291-1, COCL Q4 2021 Report, at 52–66.

**PPB Executives Mainly Validated Actions in 2020:** On September 22, 2021, we observed a bureau-wide in-service training. The training was designed to focus on PPB's crowd control response and identify issues from 2020. Among other things, this training included an introduction by way of a video from Chief Lovell and a short in-person presentation from an Assistant Chief speaking to PPB's 2020 crowd control response. The organizational critique from the Assistant Chief was limited to acknowledging error in classifying the 2020 protests as "one event." Officers in attendance were not satisfied. One asked if there would be a PPB statement given that the City and public "blamed" PPB for either engaging or not engaging crowds in 2020. The Assistant Chief promised that the PPB public information officer was planning a media event to discuss how PPB responds to crowd control and follow-up investigations. A search of PPB's news releases since this training does not show such a media event occurred. PPB appeared largely unwilling to acknowledge in this training shortcomings with its crowd control response or lack of leadership messaging internally and externally. Indeed, the procedural justice class instructed by a Captain of training expressed the management view: "Again, 99% of the time we did it well."

**Inconsistent Interactive Exercises:** Some portions of PPB's classroom presentations included interactive exercises as required by Paragraph 84(a). These included asking classes to respond to videos showing other law enforcement agencies' interactions. Unfortunately, for one video, one legal instructor characterized an action as passive resistance, while another instructor in a later session characterized the same action as more than passive. And for another video, one legal instructor characterized the resistance shown as physical resistance while the other instructor in the later session did not. Thus, different classes received different instruction in these instances. Also, a separate part of the in-service training including a video of instruction from a PPB commander. This contained useful information, but was not interactive. It would have benefited from exercises like learning to fill in PPB's incident action plan forms or AAR requirements.

**Wellness Exercise Showed Strains in Relationship with Public:** The same in-service training included a wellness class that involved a class exercise consistent with Paragraph 84(a)(i)'s requirement to instruct on ethical decision making and peer intervention. Officers broke into groups of 3-4 people to talk about the work-related and personal challenges of policing in Portland in 2020. Officers spoke to being ostracized in their places of worship or their children's schools whether or not the officers were part of PPB's crowd control response. Officers called out PPB's managers for not "owning poor training, policy, and direction." This cathartic session spoke to the officer wellness programs that the Training Advisory Council and PCCEP have supported for PPB.

**Medical Aid Training Continues to Save Lives:** Paragraph 84(a)(iii) refers to medical care for subjects injured during a force event. However, PPB has effectively trained officers to provide care

to all injured people regardless of who or what caused the injury. The training has saved lives in the field. For example, in March 2022, PPB officers used a first aid kit to save the life of a gunshot victim. PPB, "Portland Officers Save Life of Gunshot Victim (Photo)," Mar. 9, 2022, available at www.portlandoregon.gov/police/news/search.cfm?id=412209&mode=read.

**Legal Training Addressed Difficult Truths:** An Assistant City Attorney routinely provides a legal-updates training to PPB. In the September 2021 in-service training, this training addressed difficult questions from students about justifications for uses of force in response to crowd control events. Students acknowledged that they had "a chip on their shoulder," and asserted that review of a use of force in a crowd control incident would "ignore *Graham* [v. *Connor*]," and that PPB was "applying 20/20 hindsight." In response, as the instructor aptly analogized that even if a criminal suspect is having a bad day, they are still guilty if they commit a crime; the conditions of the situation go to mitigation in the penalty phase, but not the guilt or innocence of the act. So, too, the instructor pointed out an officer's lack of sleep will not make a use of force reasonable. These were tense exchanges and the message was not always well received. But the instruction was accurate.

**Force Inspector Failed to Resolve Lingering Force Issues:** In contrast, the Force Inspector's instruction validated behavior and did not answer challenging questions from the class. The Inspector validated use of LRAD for warnings, instructed that "guidance" with a baton is not force without defining "guidance," a term not defined in policy. The Inspector characterized as "best practice" the counting of 40mm rounds used; this is short of the force reporting policy requirement that officers justify each round in their reports. PPB instructed a later class of students to address with the Force Inspector the issue of which Sergeant should review force reports for a crowd control event. However, the Force Inspector's class never addressed that issue. Accordingly, training did not clarify the question of who is responsible for force reviews in crowd control events.

**Supervisory In-Service:** We reviewed and obtained from PPB significant changes to lesson plans for the December 2021 supervisory in-service. We rely upon the Compliance Officer's observation of that training. Based on our review of the lesson plans and extensive discussions with PPB about them, we agree with the Compliance Officer that the critical incident management lesson plan crystalized an issue: PPB does not, but should, have a clear policy guiding incident management.

**ABLE Training:** As we described above, the ABLE Training was a highlight of training during this compliance assessment period. Specifically, ABLE's subject matter spoke directly to Paragraph 83(a)(i)'s requirement for training officers on the importance and impact of ethical decision making and peer intervention.

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

   a. Conducts a comprehensive needs assessment annually;

   b. Creates a Training Strategic Plan annually;

   c. Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training;

   d. Maintains accurate records of Training delivered, including substance and attendance;

   e. Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ;

   f. Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and

g. Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 85 because PPB has not conducted an up-to-date audit of training or maintained certain accurate training records required by this Agreement.

Despite recommending another training audit, the Compliance Officer found PPB in substantial compliance with this paragraph based on the Training Division's efforts and staffing shortages in the Office of the Inspector General.  ECF 291-1, COCL Q4 2021 Report, at 67–68.  We appreciate the challenges around staffing, but they do not excuse the need for a training audit.

PPB last released an audit of training in 2018.  Four years later, that audit is out of date.  Moreover, PPB did not adopt some of the audit's findings, including its recommendation "that the Training Division maintain training records and course materials for specialty trainings" such as "SERT, EDU, RRT, etc."  Indeed, the City recently reported it had not been ensuring that PPB members comply with Directive 1500.00.  Specifically, the City had not enforced the policy that requires the Training Division to review and approve all specialty unit trainings.

The City has also continued to train officers incorrectly on the initial version of this Agreement from 2014, ECF 4-1, and not the revised versions from either 2018, ECF 171, or 2021, ECF 262-1.  For the pendency of this case, the City must ensure that all PPB officers read, understand, and sign the terms of the current version of this Agreement.  Paragraph 187 ("All PPB officers and persons related to the implementation of this Agreement shall sign a statement indicating that they have read and understand this Agreement within 90 days of the effective date of this Agreement.  Such statement shall be retained by PPB").  To re-achieve substantial compliance with this paragraph, PPB must also conduct another training audit.

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council.  The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented.  The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies.  The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 86 because PPB's audit of crowd control force from 2020 does not comply with this Agreement.

The Compliance Officer found substantial compliance based on the Inspector's quarterly force audits, despite concluding that PPB "must find ways to improve the quality of data on force used in crowd control settings."  ECF 291-1, COCL Q4 2021 Report, at 69.  We acknowledge the

Inspector has produced many compliant quarterly reports. However, in this reporting period, we identified significant concerns that downgrade compliance.

First, PPB did not complete an audit of force used in response to crowd control events in 2020 until December 15, 2021—more than a year after PPB marked the end of the 2020 protests. Training Advisory Council (TAC) minutes do not reflect that the Inspector presented this audit to TAC since its production. Even if the Inspector had done so, the audit does not track the requirements of Paragraph 73, which implicates the City's compliance with this paragraph's requirement to identify use-of-force patterns and trends to the Chief, Training Division, and the TAC. Thus, the audit did not produce the data necessary for TAC to assess use-of-force patterns and trends or make meaningful recommendations.

Second, the audit did not identify patterns or trends in crowd control uses of force, though a prior, previously undisclosed training by the Inspector from July 9, 2020 acknowledged problems in the justification and reporting of uses of force. The City did not provide the Inspector's July 9, 2020 training to us until January 14, 2022, and apparently has not provided the information contained in that training to TAC. Some relevant training slides include "problematic use of force patterns and training deficiencies" that the Inspector should have shared with TAC:



After Action Training – 7/9/20
- Case numbers, reporting and cohesion of reports.
  - Missing FDCR's – this is probably the most important issue that has arisen out the last 6 weeks. We have received several AAR's referencing FDCR's that are missing. One example from a stack of them.
    - Case #20-6805XX – missing two reports upon initial receipt by the CHO. One of those missing FDCR's has been located under a different case number, however that FDCR references a foot pursuit of which no report has been located to this point.
    - Others AAR's have been submitted with the FDCR's still in the Sergeant's email inboxes.
    - The reason for this training is go over the process and expectations so this doesn't get through the Sergeant/Lieutenant/Commander review without being addressed or corrected.

Descriptions cont'd

This example is one that is problematic, in reality I am not sure of the solution. There are several of these FDCR's that make an auditor cringe when it comes to reporting force. The officers actions, while most likely justified do not fit into the reporting processes we have. I have talked to Lt Niiya, Capt Dobson, MaryClaire and Chief Resch about how to make this fit into our format and the only way it would is for each of the 30-50 rounds to be in a drop down box. Terms like deploying 30-50 rounds is problematic usage of our weapon systems. We need to have a count of our munitions and justification for each round we are deploying.

Photos / Video / Witnesses
- Similar to EIS, this has also been a challenge. Submitting photos / video is not always an option, documentation as to why they were not taken should be in all the AAR's. If the person was taken into custody, a Field Arrest Team should snap a photo for the supervisor.
- Similar to both EIS/Photos witnesses statements pose a challenge. If the supervisor did not respond out into the field, that should be written into the AAR.

Summary of Audit
- Missing Reports
  - Both squads have missing reports, resulting in approximately 30 total deficiencies each
- Missing FDCRs where force described in narratives
  - RRT Delta – missing FDCR for DPSST 51XXX
  - RRT Charlie – missing 3 FDCRs for DPSST 57XXX
- Force reporting lacks detail for force users and witnesses
  - DPSST 52XXX and 50XXX did not provide an estimate of the number of force applications used
  - DPSST 52XXX and 52XXX described several other officers using force, but unable to tell from narrative who officers are or what force was used
- Missing EIS entries
  - Missing entries for DPSSTs 51XXX and 51XXX, resulting in 10 total deficiencies

Finally, the Inspector's presentations to the Training Advisory Council typically include data showing force applications against persons in actual or perceived mental health crisis. But the Inspector's March 9, 2022 presentation excluded the 2021 Q4 data.

To re-achieve substantial compliance, the Inspector must complete all substantial regular force audits in accord with the terms of this Agreement.

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Status | Substantial Compliance |
|---|---|
| The City remains in substantial compliance with Paragraph 87. | |
| We continue to agree with the Compliance Officer that TAC meetings are appropriately open to the public. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 27–28; ECF 291-1, COCL Q4 2021 Report, at 70. | |

## V.    COMMUNITY-BASED MENTAL HEALTH SERVICES

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders.

| Status | Substantial Compliance |
|---|---|
| The City remains in substantial compliance with Paragraph 88. | |
| PPB continues to engage with the City's partners to bridge gaps in Oregon's statewide mental health infrastructure. PPB's Behavioral Health Unit (BHU) is collaborating with state and county entities, area CCOs, community-based mental health service providers, the PCCEP, and other stakeholders. *See* PPB BHU, available at www.portland.gov/police/divisions/behavioral-health-unit. | |
| The BHU Advisory Committee (BHUAC), the Service Coordination Team (SCT), and the Behavioral Health Response Team (BHRT) maintain positive relationships with NGOs and governmental organizations, including the Behavioral Health Coordination Team, the Unity Center Advisory Council, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group. The SCT continues to partner successfully with Central City Concern to connect BHRT clients with essential resources, such as housing via the Supportive Transition & Stabilization Program. ECF 291-1, COCL Q4 2021 Report, at 99–100; *see* BHU Newsletter, Jan. 2016, available at www.portlandoregon.gov/police/article/561475 (announcing program). The BHU publicizes its efforts by alerts to an email list anyone can join, *see* PPB Flash Alerts, available at flashalert.net/id/portlandpolice/150918, and in semi-regular public newsletters available on the City's external website, *see* BHU Newsletters, available at www.portlandoregon.gov/police/63093. | |

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 89.

PPB continues to work with the Unity Center (Unity) and its Transportation Subcommittee to facilitate transfer of individuals by ambulance to Unity and local hospital emergency rooms. PPB policy provides for such transfer and transport. Dir. 630.45 – Emergency Medical Custody Transports, available at www.portlandoregon.gov/police/article/526144; Dir. 850.20 – Police Response to Mental Health Crisis, available at www.portlandoregon.gov/police/article/778534. In addition, the City provided material financial support to assist Unity's establishment.

Unity meets the expectation that local CCOs establish one or more walk-in/drop-off centers for individuals with addiction and/or behavioral health service needs. In practice, Unity is not merely a way station for later arrest. In response to community member concerns and the Court's questions, we have reported the number of people served by Unity and arrested at Unity since it began operating on January 31, 2017. ECF 191, DOJ Status Report, at 3–4; ECF 195-1, DOJ Fourth Periodic Compliance Assessment Report, at 31; ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 29. Between December 1, 2020 and November 30, 2021, there were 7 arrests at Unity, of which 2 were current patients, 4 were discharged patients, and 1 was not a patient. Over that period, Unity provided care to people across 10,653 encounters, yielding an arrest rate of about 1 in every 1,520 encounters. This is an improvement. Between January 31, 2017 and November 30, 2020, there were 74 arrests at Unity, of which 11 were current patients, 53 were discharged patients, and 10 were not patients. Over that period, Unity provided care to people across 42,856 encounters, yielding an arrest rate of about 1 in every 580 encounters.[11]

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit (ABHU), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications (BOEC) and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include:

a. Increased sharing of information, subject to lawful disclosure, between agencies and organizations including BOEC, Multnomah County, and health care providers to create an information exchange among first responders and providers to better serve those suffering from mental illness;

b. Creation of rapid-access clinics so those in crisis have access to timely medication management appointments;

---

[11] Unity voluntarily provided statistical information for DOJ to respond to the Court's inquiry and provide updates in periodic compliance assessment reports. Unity is not a party to this litigation, however, and DOJ has not rigorously evaluated and does not opine on the quality of Unity's services.

c. Enhancing access to primary care providers to shift low-to moderate acuity patients to primary care programs creating more capacity for acute patients in existing outpatient crisis mental health systems;

d. Expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders;

e. Addressing issues of unmet needs identified by Safer PDX and its community partners;

f. Expanding and strengthening networks of Peer-Mediated services to:

    i. develop a referral guide delineating these services and locations and assist with accessing information;

    ii. better educate the community of the viability of these services as alternative first engagement sites/programs for those having difficulty engaging with "professional driven" services;

    iii. expand peer services connected to peer supports in the community for inpatient psychiatric units (including Emergency Departments) and in the community;

    iv. add peer guides to work alongside Emergency Department guides for those patients with behavioral health issues entering the Emergency Department; and

    v. evaluate opportunities to expand use of peers to coordinate with PPB ABHU (as described herein) and function as a link with impacted individuals; and

g. pursue tele-psychiatry (a provision of mental health care by video conferencing) as a way for first responders to take advantage of existing IT infrastructure to provide direct care or provider evaluation supporting the provision of appropriate services to an individual in crisis.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 90.

In 2021, the City significantly expanded BOEC's capacity to divert 911 calls from PPB to qualified civilian mental health providers as first responders in two ways. First, the City approved funding for BOEC to hire 13 additional full-time employees (FTE), a more than 10% increase that brings their FTE total to 131 call takers and dispatchers. Second, the City launched and then expanded the Portland Street Response (PSR) program for certain non-emergency calls involving a person experiencing homelessness, a mental health crisis, or intoxication. *See generally* PSR, available at www.portland.gov/streetresponse. PSR is coordinated by Portland Fire & Rescue and dispatched as first responders by BOEC. The PSR founding team consisted of a firefighter paramedic, licensed mental health crisis therapist, and two community health workers. PSR now also employs community health medical professionals and peer support specialists.

The PSR pilot program began in February 2021, and included one team working weekdays from 10:00 a.m. to 6:00 p.m., in the Lents neighborhood of Southeast Portland, an area covering about four square miles. In April 2021, PSR's geographic scope expanded to 13 square miles. In November 2021, PSR added an additional team to work nights and weekends, and expanded again to cover all 36 square miles of PPB's East Precinct. PSR, News Article, Nov. 3, 2021, available at www.portland.gov/streetresponse/news/2021/11/3/portland-street-response-night-shift-launches-nov-4-psr-offers.

As a consequence of the City's collective bargaining agreement with the PPA, PSR currently responds to calls for service that meet limited criteria.  BOEC will dispatch PSR if:

1. The call is about (a) a person who is possibly experiencing a mental health crisis, intoxicated, and/or drug affected if the person is either outside or inside a publicly accessible space, such as a business, store, or public lobby; (b) a person who is outside and down, not checked; (c) a person who is outside and yelling; or (d) a person who needs a referral for services but lacks access to a phone; and

2. The person (a) has no known access to weapons; (b) is not displaying physically combative or threatening behavior; (c) is not suicidal; and (d) is not inside a private residence.

PSR, FAQs, available at www.portland.gov/streetresponse/psr-faq.

Early data analysis indicated that PSR is successfully diverting calls for service from armed police response to qualified healthcare providers.  Greg Townley & Emily Leickly, *Portland Street Response: Six-Month Evaluation*, PSU Homelessness Research & Action Collaborative, Oct. 2021, available at www.portland.gov/sites/default/files/2021/psu-portland-street-response-six-month-evaluation-final.pdf.  More recent analysis confirms that PSR continues to achieve positive outcomes.  Greg Townley & Emily Leickly, *Portland Street Response: Year One Evaluation*, PSU Homelessness Research & Action Collaborative, Apr. 2022, available at www.portland.gov/streetresponse/portland-state-evaluation

In 2021, the City increased PSR's funding to $2.98 million.  In March 2022, PSR expanded again; it now has 20 full-time staff and covers all 145 square miles of Portland.  PSR, News Article, Mar. 27, 2022, available at www.portland.gov/streetresponse/news/2022/3/27/portland-street-response-expands-service-citywide.

## VI.    CRISIS INTERVENTION

The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises.  The PPB will add new capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis as required by this Agreement.  Despite the critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force.

## A.    Addictions and Behavioral Health Unit and Advisory Committee

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit (ABHU) within the PPB.  PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU.  ABHU shall oversee and coordinate PPB's Crisis Intervention Team (C-I Team), Mobile Crisis Prevention Team (MCPT), and Service Coordination Team (SCT), as set forth in this Agreement.

| Status | Substantial Compliance |
|---|---|
| The City remains in substantial compliance with Paragraph 91. | |

PPB established and has maintained the units, the staffing, and the command structure required by this Agreement, though PPB uses different names for most of the units.  The entities referenced in this Agreement equate with the following PPB entities:

- Addictions and Behavioral Health Unit = Behavioral Health Unit (BHU).

The BHU is part of PPB's Community Services Division and coordinates its crisis response units.  PPB BHU, available at www.portland.gov/police/divisions/behavioral-health-unit.  Lieutenant Chris Burley currently manages the BHU, having replaced Lieutenant Casey Hettman in early 2022.

- Crisis Intervention Team = Enhanced Crisis Intervention Team (ECIT).

ECIT officers volunteer to receive specialized training and act as primary responders to calls for service that involve both a mental health crisis and a heightened risk of harm.  *See generally* PPB Training Division, *2018 ECIT Evaluation Report*, Feb. 2019, available at www.portlandoregon.gov/police/article/759082.

- Mobile Crisis Prevention Team = Behavioral Health Response Team (BHRT).

BHRT units pair a PPB patrol officer with a qualified mental health professional from Cascadia's Project Respond to follow-up with people who have had frequent contact with police while in crisis with the goal to reduce the frequency and risk of future contacts.  *See generally* BHRT, available at www.portlandoregon.gov/police/article/458966;  Project  Respond,  available  at www.cascadiabhc.org/services/crisis-intervention/#_ProjectRespond.  PPB recently advised that it is exploring alternatives to Project Respond clinicians.

- Service Coordination Team = Service Coordination Team (SCT).

The SCT coordinates treatment and other wrap-around services to reduce recidivism by frequent drug and property crime offenders.

92. ABHU will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor.  PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 92.

The BHU continues to use and share data as required in three primary ways:  (1) weekly reports to the Multnomah County Behavioral Health Call Center from the BHU Electronic Referral System (BERS), which monitors individuals referred for BHRT follow-up; (2) Behavioral Health Coordination Team meetings to reach individuals with frequent police contact; and (3) regular meetings between SCT and service system partners to coordinate services.  The BHU shares data collected by ECIT officers, BHRT units, and the SCT with the BHUAC for their consideration.  We continue to agree with the Compliance Officer that these efforts substantially comply with this paragraph.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 33–34; ECF 273-1, COCL Q1 2021 Report, at 41–44; ECF 274-1, COCL Q2 2021 Report, at 44–47; ECF 278-2, COCL Q3 2021 Report, at 43–46; ECF 291-1, COCL Q4 2021 Report, at 78–79.

The City is also decreasing police contacts and mitigating potential force with PSR.  Recent analysis indicates that PSR is getting good results for consumers and the City's first responder system.  Greg

Townley & Emily Leickly, *Portland Street Response: Year One Evaluation*, PSU Homelessness Research & Action Collaborative, Apr. 2022, available at www.portland.gov/streetresponse/portland-state-evaluation.

93. ABHU shall track outcome data generated through the C-I Team, MCPT, and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 93.

PPB officers continue to regularly collect outcome data from qualifying mental health encounters, which PPB data analysts continue to analyze. However, for the past several quarters, PPB has not clearly identified how the BHU has used this data to develop new response strategies for repeat calls for service; identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral health crisis event; or identify officers' performance warranting commendation or correction.

In 2021, the Compliance Officer was satisfied with the BHU's use of the various outcome data based on the data itself and meetings with the BHU Lieutenant. ECF 273-1, COCL Q1 2021 Report, at 44; ECF 291-1, COCL Q4 2021 Report, at 78–79. For now, we lack reason to disagree though we have concerns about whether the BHU is using the outcome data as required. We will continue to monitor the City's compliance with its ongoing obligation to ensure the BHU capitalizes on the large amount of data to improve.

94. Within 90 days of the Effective Date, PPB shall also establish an ABHU Advisory Committee. The ABHU Advisory Committee shall include representation from: PPB command leadership, CIT, MCPT, and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 94.

The BHUAC has met regularly since 2013. *See* BHUAC, available at www.portland.gov/police/bhu-advisory. Membership currently includes the required representatives. BHUAC Roster, available at www.portland.gov/police/bhu-advisory/bhuac-members. We observe meetings periodically, as does the Compliance Officer.

The BHUAC has met remotely via Zoom for the last two-plus years due to the COVID-19 pandemic. BHUAC meetings are not open to the public or recorded, but the BHUAC prepares minutes, which are reviewed and approved, then posted on PPB's website along with other publicly available reports. BHUAC Minutes, available at www.portlandoregon.gov/police/68755; BHUAC Monthly Reports, available at www.portlandoregon.gov/police/70713; BHUAC Status Reports,

available at www.portlandoregon.gov/police/69679; BHUAC Additional Reports, available at www.portlandoregon.gov/police/70726.

Some community members have maintained that the BHUAC should open its meetings to the public or, alternatively, some part of its meetings, as the Court has suggested. ECF 175, Hr'g Tr. at 157:25–158:3 (Apr. 19, 2018). The City Attorney's Office continues to opine that Oregon law does not require open meetings in this context, and that the BHUAC can decide for itself whether to hold open, partially open, or closed meetings. The BHUAC has repeatedly declined to open its meetings to the public, doing so again in early 2022. However, the BHUAC has taken other steps to involve the community, including through an engagement plan it formally adopted in May 2020. BHUAC Reports, May 2020, available at www.portland.gov/sites/default/files/2022/05-bhuac_may-2020_report.approved.pdf; BHUAC Community Engagement Plan, available at www.portlandoregon.gov/pccep/article/761723. BHUAC members remain willing to speak with individual community members upon request and do so often. For the last eighteen months, the BHUAC has held quarterly community engagement meetings that are open to the public. *See* BHUAC Meetings, available at www.portland.gov/police/bhu-advisory/events/2022/4/7/bhuac-community-engagement-meeting. In addition, many BHUAC members and BHU officers regularly attend and present information to the PCCEP's Behavioral Health Subcommittee.

This Agreement does not expressly require or prohibit the BHUAC from holding open or partially open meetings. *Compare* Paragraph 87 (requiring that Training Advisory Council meetings be open to the public). Accordingly, we do not view the City's compliance with Paragraph 94, or any other term of this Agreement, to turn on how the BHUAC exercises its discretion to allow the public to observe all or part of its meetings.

95. The ABHU Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of C-I Team, MCPT, SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The ABHU Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The ABHU Advisory Committee shall report its recommendations to the ABHU Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Status | Partial Compliance |
|---|---|

The City is no longer in substantial compliance with Paragraph 95 because the City and PPB are not receiving guidance from the BHUAC regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, to reduce the potential for violent encounters.

Between 2014 and 2020, the BHUAC helped the City and PPB develop the BHU and the City's crisis triage approach, including by recommending new and revised general policies, procedures, and training about police contact with those in crisis. These basic efforts had initial positive effects on PPB's contacts with the subject population, reflected in a relatively low and stable incidence of violent encounters. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 38–39; ECF 238-1, COCL Q4 2020 Report, at 15. Some of this work continued in 2021. For example, the BHUAC approved BOEC's plan to train staff and implement the new ProQA Triage system, including protocols for triaging medical calls with a suicide nexus. It is too early to tell whether and

to what extent the protocols impact the potential for violent encounters between police and those who may be mentally ill or experiencing a mental health crisis.

However, recent data indicate that PPB officers have had a greater frequency of violent encounters with those in crisis. *See* ECF 278-1, COCL Q3 2021 Report, at 21–22; ECF 291-1, COCL Q4 2021 Report, at 155, 157, 159. The BHUAC has not examined these encounters to evaluate whether recommendations may be appropriate to address the changed circumstances. In fact, at a community engagement meeting held on Zoom in October 2021,[12] the BHUAC advised that it could not discuss actual encounters between PPB officers and persons who may be mentally ill or experiencing a mental health crisis. The BHUAC indicated its belief that reviewing officer-involved shootings and other violent encounters fell outside the scope of the BHUAC's operation. We disagree.

Between November 2021 and January 2022, we joined the Compliance Officer in meeting multiple times with the BHU Lieutenant and PPB's Compliance Coordinator to discuss whether the BHUAC can and should inform its recommendations to reduce violent encounters by reviewing actual encounters. PPB agreed to explore workable solutions and propose alternatives. On December 10, 2021, the Compliance Officer issued a technical assistance letter on the issue, providing additional guidance about the importance of looking at past encounters if the BHUAC is to achieve its goal of decreasing the potential for future violent encounters. ECF 291-1, COCL Q4 2021 Report, at 81–82, 164–67. We agree. As the City takes steps to implement the adoption of body-worn cameras for PPB officers, the BHUAC should get accustomed to looking at actual police interactions to inform its recommendations for policy, practice, and training. In addition, the BHUAC should consider new ways to reduce violent encounters between police and those in crisis given the recent trends in officer use of force against those in crisis. ECF 278-1, COCL Q3 2021 Report, at 21–22; ECF 291-1, COCL Q4 2021 Report, at 155, 157, 159. The Compliance Officer notes that BHUAC's review and assessment of PPB's past encounters can provide an additional safeguard against future unconstitutional force or justifiable but avoidable serious force events, particularly as to force that gives rise to community concerns about officers' decision-making. ECF 291-1, COCL Q4 2021 Report, at 166–67.

In March 2022, a new Lieutenant was assigned to lead the BHU. At the April 2022 BHUAC community engagement meeting, the BHUAC advised that it was waiting for advice from DOJ and the Compliance Officer before deciding how to respond to the October 2021 community request that the BHUAC look at actual encounters to inform policy, procedure, and training recommendations. This was news to us. It is unclear what, if any, information PPB provided to the BHUAC about the various meetings and guidance DOJ and the Compliance Officer provided to PPB between November and February 2022. The Compliance Officer provided additional technical assistance on May 10, 2022. When we proposed a meeting to discuss the issue with the new BHU Lieutenant and PPB Compliance Coordinator on May 19, PPB did not respond. However, counsel for the City responded that PPB would determine its own course of action, giving as much weight to our advice as they deem fit.

More than eight months have passed since the issue was first raised. PPB still has not provided a written proposal that would enable the BHUAC to look at past violent encounters between officers and those who may be mentally ill or experiencing a mental health crisis, to inform

---

[12] Portions of the meeting and related commentary can be streamed online. *See* Flying Focus Media, available at flyingfocus.org/AdvisePolice_streamingpage.html.

recommendations to reduce the potential for future violent encounters.  Neither the City nor PPB has provided a written explanation of why such a proposal is impermissible or unwarranted.  In the context of recent force data, the impending rollout of body-worn cameras, and legitimate community concerns about the BHUAC's ability to reduce the potential for violent encounters without reviewing real events, the City must do more to empower the BHUAC to fulfill its obligations under this Agreement.

96. Within 240 days of the Effective Date of this Agreement, the ABHU Advisory Committee will provide status reports on the implementation of the ABHU and BOEC Crisis Triage, and identify recommendations for improvement, if necessary.  PPB will utilize the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 96.

The BHUAC continues to monitor implementation of the BHU and BOEC crisis triage approach, and provide required status reports.  The BHUAC has appropriately interfaced with PSR representatives.  As the City creates additional crisis triage options that BOEC can dispatch to the scene of a crisis event, the BHUAC should have open lines to communicate and stay informed with how each aspect of the City's approach to crisis triage impacts the outcomes for people with actual or perceived mental illness.

As the Compliance Officer notes, the BHUAC has not recently made many formal recommendations to systems, policies, and staffing, despite new members joining the Committee. ECF 291-1, COCL Q4 2021 Report, at 83.  The Committee's members have relevant professional expertise across the spectrum of the criminal justice and mental health service systems and include those with lived experience at the intersection of mental illness and police encounters.  We will continue to monitor the BHUAC's effectiveness as an advisory group to improve the City's approach to crisis triage.

## B.    Continuation of C-I Program

97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City.  PPB shall continue to train all officers on C-I.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 97.

PPB continues to treat crisis intervention as a core competency skill for all sworn police officers, providing all officers with 40 hours of crisis intervention training.  In 2021, PPB provided crisis intervention training as part of the Advanced Academy for new recruits and as part of in-service training for all officers.  ECF 274-1, COCL Q2 2021 Report, at 42.  We continue to share the Compliance Officer's view that PPB's crisis intervention training substantially complies with this paragraph.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 37; ECF 291-1, COCL Q4 2021 Report, at 84.

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call response duties.  Additionally, PPB

shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with ABHU Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| Status | Substantial Compliance |
|---|---|
| The City remains in substantial compliance with Paragraph 98. | |

PPB developed its crisis intervention training in consultation with the BHUAC. PPB also incorporated a crisis intervention scenario in its 2021 annual in-service training. DOJ, its experts, and the Compliance Officer regularly review PPB lesson plans and observe training. The BHUAC has an opportunity to review training materials, though it has not recently made any formal recommendations. We continue to agree with the Compliance Officer that PPB's crisis intervention training meets the requirements of this paragraph. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 33–34; ECF 291-1, COCL Q4 2021 Report, at 84–85.

C.    Establishing "Memphis Model" Crisis Intervention Team

99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").

| Status | Substantial Compliance |
|---|---|
| The City remains in substantial compliance with Paragraph 99. | |

The core features of the Memphis Model are law enforcement partnerships with advocacy groups and mental health service providers; local ownership; a volunteer group of specially trained officers comprising around 25% of the patrol division; and protocols and training for 911 call dispatchers to ensure the specially trained officers act as the primary responding officers to certain pre-identified calls involving a mental health crisis. University of Memphis, *Crisis Intervention Team Core Elements*, available at www.cit.memphis.edu/information_files/CoreElements.pdf.

The City has adopted the core features of the Memphis Model. PPB has a volunteer group of ECIT officers who receive an additional 40 hours of crisis intervention training on top of the 40 hours that all patrol officers receive. By the end of 2021, PPB had 128 certified ECIT patrol officers, representing about 34 percent of PPB's patrol force. The BHU oversees the ECIT program, though ECIT officers retain their normal patrol duties and chain of command. The BHU has established meaningful partnerships with advocacy groups and mental health service providers. These features of the BHU are consistent with the Memphis Model.

The City diverges from the Memphis Model by triaging mental health-related calls and directly dispatching ECIT officers only to calls that pose a relatively greater risk of harm. BOEC will dispatch ECIT officers to a call that involves both a mental health crisis and one of seven other factors:

1.  The subject is violent toward others (physically combative, threatening violence, assaulting);

2.  The subject has a weapon;

3.  The subject is threatening or attempting suicide;

4. The call is at a mental health facility;

5. Upon request of the caller;

6. Upon request of a responding officer; or

7. The subject's behavior indicates an escalating risk of harm of self or others.

For mental health-related calls that lack one of these seven factors, BOEC dispatches any nearby available patrol officer, of which about 34 percent are ECIT certified and 66 percent are not. This triage approach to dispatch modifies the Memphis Model.

The City has legitimate reasons for its approach. First, all patrol officers are trained in crisis intervention and dispatching all patrol officers to lower risk calls provides practical experience. Second, the City's ECIT program incorporates the informed view of the BHUAC and builds off a foundation of community support. PPB and BOEC have implemented quality assurance measures to identify issues, refine training, and enhance the City's response to crisis calls. Third, the City adopted this approach for important local historical reasons, including the 1992 officer-involved shooting death of Nathan Thomas and the 2006 in-custody death of James Chasse. Those tragic outcomes led to community demands for all officers to be trained to identify the signs and symptoms of crisis, de-escalate encounters, and safely resolve calls. Thus, to the extent the City's variation on the Memphis Model arises from local concerns and partnerships with local mental health advocacy groups and service providers, it substantially complies with this paragraph's requirements.

PPB's directives relating to mental health crisis intervention, including Directive 850.20, codify the City's Memphis Model approach. Dir. 850.20 – Police Response to Mental Health Crisis, available at www.portlandoregon.gov/police/article/778534. PPB policy emphasizes de-escalation and disengagement, when appropriate, and transporting people by ambulance to a hospital rather than by police cruiser to jail.

The City has demonstrated the effectiveness of the current ECIT dispatch criteria. Since April 2018, the City has provided six-month data reports seven times. Outcomes remain generally positive and reflect a crisis intervention approach that complies substantially with this Agreement. Most of the data sets continue to show that both ECIT and non-ECIT officers are getting people to the hospital by ambulance rather than taking them to jail. Force also remains low as an overall percentage of calls, though recent data indicates that officers are using force more frequently against those experiencing a mental health crisis, including Level 1, Level 2, and Level 3 force, which is likely to result in injury. ECF 278-1, COCL Q3 2021 Report, at 21–22; ECF 291-1, COCL Q4 2021 Report, at 155, 157, 159. The two most recent data sets cover from October 1, 2020, to October 1, 2021. During this period, PPB reported 149 uses of force over 22,194 service encounters involving a mental health component, which is about seven-tenths of one percent, or about 1 in every 148 encounters. Most of this was Category 4 force (84 cases), the lowest level of force, defined as not reasonably likely to result in physical injury. Category 2 force (20 cases) and Category 3 force (45 cases), which includes the use of ECWs or Tasers, collectively was used in less than one-third of one percent of encounters.[13]

_____

[13] This is consistent with aggregate data from the Mental Health Template. For the 30-month period from April 1, 2018 to September 30, 2020, PPB officers responded to more than 54,000 calls involving a mental health component. Force was used in less than 1 percent of the calls. Most often (256 cases),

> In sum, though the City's triage approach varies slightly from the Memphis Model, we continue to find the variance justified based on local needs with input from community partners and appropriate outcome assessments.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 37–39.

100. PPB's C-I Team shall be comprised of officers who volunteer for assignment to the C-I Team. The number of C-I Team members will be driven by the demand for C-I Team services, with an initial goal of 60-80 volunteer, qualified officers.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 100.

PPB continues to exceed the initial goal of 60–80 volunteer ECIT members.  As of January 2022, 167 sworn members had active ECIT certification, of which 128 are operational patrol officers. Data from 2021 showed that ECIT officers arrive at between 69 and 71 percent of calls to which BOEC directly dispatches them, which is consistent with expectations based on prior data showing about a 70 percent arrival rate.  *Compare* ECF 291-1, COCL Q4 2021 Report, at 87, *with* ECF 226-1, COCL Q2 2020 Report, at 27.  As the Compliance Officer has noted, when an ECIT officer does not arrive on scene, the predominant reason is that another officer arrived first and called off the ECIT officer after resolving the situation.  ECF 226-1, COCL Q2 2020 Report, at 27.

101. No officers may participate in C-I Team if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of C-I Team service, or during C-I Team service.  PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the C-I Team.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 101.

PPB has adopted standard operating procedures that appropriately define criteria for qualification, selection, and ongoing participation as an ECIT officer.  The BHU Lieutenant applies the rules by monitoring EIS alerts for ECIT officers, reviewing BHU data analyses, and interfacing with the Professional Standards Division.  ECF 278-1, COCL Q3 2021 Report, at 42; ECF 291-1, COCL Q4 Report, at 88–89.  In 2021, 29 new officers passed the required ECIT screening and selection process.

102. PPB shall specially train each C-I Team member before such member may be utilized for C-I Team operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for C-I Team members consistent with the Memphis Model.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 102.

---

this was Category 4 force, the lowest level, defined as not reasonably likely to result in physical injury. Category 2 and 3 force, was used in just one-fourth of one percent of encounters (144 cases).

PPB's ECIT training is consistent with the Memphis Model. ECIT officers receive specialized training, consisting of 40 hours of enhanced crisis intervention training beyond the 40 hours of introductory crisis training that all officers receive. The BHU developed the ECIT training in collaboration with the Training Division. The BHUAC has discussed the training and can make formal training recommendations, but recently it has not done so.

The training appropriately emphasizes de-escalation and communication skills, and teaches officers how to recognize the signs and symptoms of a mental health crisis. More details and some evaluations from older ECIT trainings are available online. 2014 ECIT Training Evaluation, available at www.portlandoregon.gov/police/article/557965; 2015 ECIT Training Evaluation, available at www.portlandoregon.gov/police/article/635138; 2018 ECIT Report, available at www.portlandoregon.gov/police/article/686016; 2018 ECIT Training Evaluation, available at www.portlandoregon.gov/police/article/756181.

In November 2021, PPB certified 29 new ECIT officers after they completed advanced training, which included sessions led by local mental health professionals, peer support specialists, and mental health consumers, as well as BHU staff. DOJ, its expert consultants, and the Compliance Officer have consistently found the ECIT training to be sound in form and content. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 41; ECF 274-1, COCL Q3 Report, at 42. However, we agree with the Compliance Officer that PPB should update its ECIT training materials more regularly, draw on the various experiences of BHUAC members, and use examples of successes and those that could have been improved upon for training purposes. ECF 291-1, COCL Q4 Report, at 89–90 & app. C. Learning from one's own successes and failures has focused, personalized benefits. As an organization, PPB will better convey its mission and values by incorporating self-examination into all aspects of training and operations.

103. C-I Team members will retain their normal duties until dispatched for use as a C-I Team. BOEC or PPB may dispatch C-I Team members to the scene of a crisis event.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 103.

ECIT officers retain their normal duties until BOEC sends them to a call that meets ECIT-dispatch criteria. BOEC operators dispatch ECIT officers to the scene of a call that involves a mental health crisis and one of seven "plus-factors," i.e., criteria the City uses as a proxy for relative risk of harm. BOEC protocols and training emphasize that dispatchers should err on the side of sending ECIT officers to a call that arguably meets one of the seven dispatch criteria, such as presenting an escalating risk of harm.

BOEC's dispatch criteria include calls where either the 911 caller or a PPB officer asks for an ECIT officer. In addition, PPB policy empowers officers to request an ECIT officer to respond to help resolve a mental health crisis call. Dir. 850.20 – Police Response to Mental Health Crisis, Paragraph 4.1, available at www.portlandoregon.gov/police/article/778534.

104. PPB will highlight the work of the C-I Team to increase awareness of the effectiveness of its work.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 104.

PPB and the BHU highlight the work of ECIT officers in newsletters and meeting minutes, through press releases and flash alert e-mails, and on social media.  *See* BHU Newsletters, available at www.portland.gov/police/divisions/behavioral-health-unit#toc-bhu-newsletter; BHUAC Meeting Minutes, available at www.portland.gov/police/bhu-advisory/documents; PPB Flash Alerts, available at www.flashalert.net/id/portlandpolice; PPB Social Networking, available at www.portlandoregon.gov/police/50422.  In addition, PPB posts useful information about the BHU components and links to mental health resources on its website.  PPB BHU, available at www.portland.gov/police/divisions/behavioral-health-unit.

ECIT officers have achieved outcomes that merit commendation.  They have saved dozens of lives, from averting suicide attempts, *see, e.g.,* BHU Newsletter, Q2-Q3 2021, at 2–3, available at www.portlandoregon.gov/police/article/798152, to deescalating encounters with people who were armed and in apparent crisis, *see* BHU Newsletter, Spring-Fall 2020, at 4, available at www.portlandoregon.gov/police/article/779284.  On March 17, 2022, an ECIT officer received the 2020-2021 Attorney General's Award for Distinguished Service in Community Policing for compassionately resolving a tense situation with a community member experiencing an extended period of psychosis.  DOJ, Press Release, available at www.justice.gov/ag/class-2020-2021; USAO Press Release, available at www.justice.gov/usao-or/pr/portland-police-bureau-officer-receive-attorney-generals-award-distinguished-service.

105. For each crisis event to which a C-I Team is dispatched, the C-I Team member shall gather data that ABHU shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include:

    a. Date, time, and location of the incident;

    b. Subject's name, age, gender, and address;

    c. Whether the subject was armed, and the type of weapon;

    d. Whether the subject is a U.S. military veteran;

    e. Complainant's name and address;

    f. Name and DPSST number of the officer on the scene;

    g. Whether a supervisor responded to the scene;

    h. Techniques or equipment used;

    i. Any injuries to officers, subject, or others;

    j. Disposition;

    k. Whether a mental health professional responded to the scene;

    l. Whether a mental health professional contacted the subject as a result of the call; and

    m. A brief narrative of the event (if not included in any other document).

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 105.

PPB directs officers to collect the required data. Dir. 850.20 – Police Response to Mental Health Crisis, Paragraph 1.2, available at www.portlandoregon.gov/police/article/778534. The Training Division has effectively reinforced the importance of data collection. The BHU uses the data to aggregate outcomes, evaluate trends, and report out as authorized by law. We share the Compliance Officer's assessment that the Mental Health Template reliably collects data to facilitate organizational improvement. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 42–43; ECF 291-1, COCL Q4 2021 Report, at 92–93.

### D.    Mobile Crisis Prevention Team

106. PPB currently has an MCPT comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand MCPT to provide one MCPT car per PPB precinct.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 106.

PPB currently has the minimum required BHRT units. A BHRT unit consists of one ECIT officer and one qualified mental health professional from Cascadia's Project Respond. *See* Project Respond, available at www.cascadiabhc.org/services/crisis-intervention/#_ProjectRespond.

In 2020, after expanding to five BHRT units, the City cut two units due to budgetary cuts and staffing issues. However, as part of the 2021 Fall Budget Monitoring Process, the City re-allocated funds to increase the BHRT back to five units. PPB is exploring how to fill those positions and has advised that it may shift from qualified mental health professional contractors to using City employees. We will monitor any change in the BHRT framework to ensure compliance with this Agreement.

107. Each MCPT car shall be staffed by one sworn PPB officer and one qualified mental health professional. MCPT shall be the fulltime assignment of each such officer.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 107.

PPB continues to staff BHRT units as required. More information about the BHRT is available at www.portland.gov/police/divisions/behavioral-health-unit#toc-behavioral-health-response-team.

108. No officers may participate in MCPT if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of MCPT service, or during MCPT service. PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the MCPT.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 108.

With the advice of the BHUAC, PPB adopted standard operating procedures that appropriately define criteria for qualification, selection, and ongoing participation as a BHRT officer.  The BHU Lieutenant and Sergeants ensure these requirements are enforced by monitoring EIS for alerts and interfacing with the Professional Standards Division.

109. PPB shall specially train each MCPT member before such member may be utilized for MCPT operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for MCPT members.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 109.

All BHRT officers receive ECIT training and relevant supplemental crisis intervention trainings on a case-by-case basis.  In 2021, BHRT members attended classes on health equity, motivational interviewing, stress management, hostage negotiation, behavioral therapy, and personality disorders.

110. MCPT shall utilize C-I Team data to proactively address mental health service, in part, by connecting service recipients with service providers.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 110.

The Mental Health Template has now captured more than four years of reliable data, covering tens of thousands of calls for service that involve a mental health component.  BHU analysts use this data to evaluate trends, identify repeat contacts, and track referrals.  BHRT units continue to use this data to connect frequent police contacts to service providers, as required.  We continue to agree with the Compliance Officer that the BHRT's efforts are achieving successful outcomes for service recipients.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 44; COCL Q3 2021 Report, at 43–44; ECF 291-1, COCL Q4 2021 Report, at 95–97.

111. Within 180 days of the Effective Date, PPB, with the advice of the ABHU Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies.  These policies and procedures shall clearly describe the roles and responsibilities of these entities and of MCPT officers in the process.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 111.

PPB promulgated the required policies in 2017, after obtaining necessary approvals.  Dir. 850.21 – Peace Officer Custody (Civil), available at www.portlandoregon.gov/police/article/778533; Dir. 850.22 – Police Response to Mental Health Director Holds and Elopement, available at www.portlandoregon.gov/police/article/778532; Dir. 850.25 – Police Response to Mental Health

Facilities, available at www.portlandoregon.gov/police/article/778531.  In 2019, PPB promulgated Directive 850.20, which directs officers to seek a non-criminal resolution for a person with a mental illness or in a mental health crisis, including by referral to a community-based mental health service provider or by requesting an ambulance to transport the person to an appropriate facility for voluntary care.  Dir. 850.20 – Police Response to Mental Health Crisis, Paragraph 3, available at www.portlandoregon.gov/police/article/778534.

## E.    Service Coordination Team

112. The Service Coordination Team (SCT), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 112.

The SCT continues to serve its designated population, connecting individuals to providers of supportive housing, addiction and mental health treatment services, and medical care.

The Compliance Officer has previously shown that the SCT reduces arrests and increases employment and housing.  ECF 182-2, COCL Q1 2018 Report, at 26, 45–50.  In addition, since 2003, Portland State University has released annual reports about the SCT.  *See, e.g.*, PSU Capstone Class, *Study of the Service Coordination Team and its influence on chronic offenders*, 2018, available at capstone.unst.pdx.edu/sites/default/files/2018%20Capstone%20final%20report%20%28final%20draft%29.pdf.  In 2019, PSU found that the SCT program reduces police contacts with enormous value for the community.  *See* PSU Capstone Class, *Study of the Service Coordination Team and its influence on chronic offenders*, 2018, on file with DOJ at 24, (concluding that every "dollar the program spends has a corresponding $20.61 in avoided cost for the community").  The 2020 and 2021 classes were canceled due to COVID-19; however, the SCT has advised that a 2022 report will be released.

We continue to share the Compliance Officer's assessment that the SCT effectively facilitates the provision of services to individuals who interact with PPB and who also have a criminal record, addictions, and highly acute mental or physical health service needs.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 47; ECF 291-1, COCL Q4 2021 Report, at 98–100.

## F.    BOEC

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the ABHU Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB ABHU or directly to NGOs or community-based mental health professionals.

| Status | Substantial compliance |
|---|---|

The City remains in substantial compliance with Paragraph 113.

The City's Bureau of Emergency Communications (BOEC) is responsible for 911 emergency call operations.  BOEC, available at www.portland.gov/911.

In early 2014, with the advice of the BHUAC, BOEC enacted protocols to triage calls with a mental health nexus. In 2021, BOEC added new protocols to assign calls to PSR, which consists of teams that include a mental health professional. PSR, Frequently Asked Questions, available at www.portland.gov/streetresponse/psr-faq. Currently, BOEC will dispatch PSR if:

1. The call is about (a) a person who is possibly experiencing a mental health crisis, intoxicated, and/or drug affected if the person is either outside or inside a publicly accessible space, such as a business, store, or public lobby; (b) a person who is outside and down, not checked; (c) a person who is outside and yelling; or (d) a person who needs a referral for services but lacks access to a phone; and

2. The person (a) has no known access to weapons; (b) is not displaying physically combative or threatening behavior; (c) is not suicidal; and (d) is not inside a private residence.

PSR, FAQs, available at www.portland.gov/streetresponse/psr-faq. However, a caller can also simply ask 911 to dispatch a PSR team, even anonymously. *See* PSR, Flyer, available at www.portland.gov/sites/default/files/2022/PSR_Flyer_English.pdf.

The BHUAC has continued to advise BOEC on training, quality assurance for call takers and dispatchers, and protocols for triaging calls among ECIT and non-ECIT officers, PSR, and the Behavioral Health Call Center (BHCC).[14] The BHCC operates 24/7 and, for more than 20 years, has been a reliable resource for community members. Multnomah County, Behavioral Health Crisis Intervention, available at www.multco.us/behavioral-health/mental-health-crisis-intervention; Multnomah County, *Honoring 20 years of Behavioral Health Call Center services*, Jan. 19, 2022, available at www.multco.us/multnomah-county/news/honoring-20-years-behavioral-health-call-center-services. The system for transferring calls to the BHCC is functioning as intended.

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the ABHU Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 114.

In 2016, in coordination with PPB and the BHUAC, BOEC designed a 16-hour crisis intervention training program that, at the time, was widely recognized as a model for ECIT dispatch programs. *See* ECF 124-1, DOJ 2nd Periodic Compliance Assessment Report, at 84; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 48-49. In the second half of 2021, after a two-year hiatus caused by the COVID-19 pandemic, BOEC reinstated its in-service training, including refresher lessons on ECIT dispatch, PSR dispatch, and BHCC call referrals. As a stopgap, BOEC used email reminders and posted flyers about crisis triage principles, which we found sufficient to sustain substantial compliance. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 46–47.

As the Compliance Officer notes in each quarterly report for 2021, BOEC has not developed a PSR-focused training as it had for ECIT dispatch. ECF 273-1, COCL Q1 2021 Report, at 38–39;

---

[14] The BHCC was formerly called the Multnomah County Crisis Line, but changed its name in 2021.

ECF 274-1, COCL Q2 2021 Report, at 41–42; ECF 278-2, COCL Q3 2021 Report, at 41; ECF 291-1, COCL Q4 2021 Report, at 102. BOEC has advised that it is developing a PSR-focused training to deliver in 2022. We will continue to monitor the City's compliance with its ongoing obligation to ensure BOEC dispatchers are sufficiently trained to effectuate the City's approach to crisis triage.

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 115.

The City's crisis triage approach became fully operational in 2019, when it was codified in policy, governed by established protocols, and implemented by appropriately trained staff. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 49. The City continues to invest substantially in improving its first responder services, most notably by developing the PSR pilot program, rolling it out, evaluating its impact, and expanding based on reliable data. *See* PSR News, March 27, 2022, available at www.portland.gov/streetresponse/news/2022/3/27/portland-street-response-expands-service-citywide; *see also* PSR, Data Dashboard, available at www.portland.gov/streetresponse/data-dashboard.

BOEC continues to appropriately transfer calls to the BHCC, send ECIT officers to calls meeting the dispatch criteria, and audit calls to ensure proper dispatch decisions are made or corrective action can be taken. As the City modifies its approach to crisis triage, BOEC must continue to provide its personnel with comprehensive and high-quality training, in coordination with the BHUAC, to ensure success. This includes the PSR program, which is part of Portland Fire & Rescue. *See generally* PSR, available at www.portland.gov/streetresponse.

PPB continues to operationalize its piece of the City's crisis triage approach through basic crisis intervention training for all patrol officers, ECIT officers, BHRT units, and the SCT. Though there are indications that officers are using force more frequently in calls with a mental health nexus, PPB has systems in place and community partners, including the BHUAC, to help understand and abate these trends before they become normalized.

## VII.    EMPLOYEE INFORMATION SYSTEM

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall:

a. Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;

b. Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and

c. Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| Status | Partial Compliance |
|--------|-------------------|

The City is no longer in substantial compliance with Paragraphs 116 and 117 because PPB has not fully implemented the relevant policies. *See generally* Dir. 345.00 – Employee Information System, available at www.portlandoregon.gov/police/article/731768; Dir. 215.00 – Member Performance Evaluations, available at www.portlandoregon.gov/police/article/759103.

We agree with the Compliance Officer's well-formed analysis of the City's partial compliance with these paragraphs. ECF 291-1, COCL Q4 2021 Report, at 104–06. Other factors relevant to our assessment relate to data, staffing, and risk management.

**Incomplete and Inaccessible EIS Data:** We share the Compliance Officer's concern that PPB's failure to record all uses of force in 2020 continues to deprive the EIS system of necessary data during this compliance assessment period. The Force Inspector's July 9, 2020 training, which the City produced to us on January 14, 2022, admits that many supervisors lack access to the EIS, in violation of this Agreement:



## EIS entries

- This has been a challenge as a large portion of the supervisors do not have access to the individual officers EIS. While this is relatively minor in comparison to the previous topics, I put it in this presentation anyway as it is required by policy. Directive 345.00.
- 3.1.3. The entry shall include, at a minimum:
- 3.1.3.1. The case number of the incident,
- 3.1.3.2. The nature of the incident and, if applicable, the type of force used,
- 3.1.3.3. Whether the incident was within policy,
- 3.1.3.4. Any positive performance, and
- 3.1.3.5. Any training deficiencies, policy deficiencies, or poor tactical decisions identified as well as any non-disciplinary corrective action taken to remedy them.

Sending an email to Sgt Spiegel in PSD with an entry to be put into EIS if you do not have access to an officer's EIS is acceptable. Or having it entered by another supervisor on your behalf is also a standard practice. There has been no suspension of the requirement of completing an entry that I am aware of.

"After Action Training – 7/9/20," Slide 12. Thus, the performance data tracker entries for that period are incomplete. It follows that supervisors could not accurately check the EIS entries of officers who transferred to their command during this compliance assessment period.

**Reduced Staffing Impacting EIS Operations:** In addition to incomplete EIS data that moves the City into partial compliance with Paragraphs 116 and 117, insufficient staffing may have a future effect on compliance. In the third quarter of 2021, PPB eliminated the EIS Lieutenant position "[d]ue to budget and staffing issues." PPB 2021 Q3 Update Report, at 281–82, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. PPB divided the workload among the assigned EIS Sergeant and civilian EIS administrator. *Id.* The reduced staffing negatively impacted the EIS Team, in particular their ability to timely ensure that supervisors review their subordinates' EIS data. *Id.* PPB's on-time percentages for EIS reviews of transfers decreased from 90.3% in the fourth quarter of 2021 to 87.9% in the first quarter of 2022.

PPB 2022 Q1 Update Report, at 282–83, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. PPB attributes the increased untimeliness to lacking two EIS administrators. *Id.*

**Effective Identification of At-Risk Employees:** This Agreement requires an EIS system that is intended to be predictive. PPB's EIS should identify at-risk officers based on certain thresholds or outlier metrics, then offer those officers intervention before career-ending behavior and other bad outcomes happen to the officer or the public. To that end, the Compliance Officer has endeavored to assist PPB in assessing the efficacy of current EIS thresholds. This effort should meet PPB's business purposes, i.e., PPB invests significant person hours and software expense in a system; the system should produce a useful result.

A review of a sample of EIS records for officers who ultimately became subject to criticism for poor outcomes shows that PPB repeatedly declined any interventions. The EIS also shows no interventions following the City's settlement of significant civil claims based on PPB uses of force. We believe the inefficacy of the current EIS system requires the PPB to explore enhancements, as required by Paragraph 116. We agree with the Compliance Officer, who made a similar assessment on May 11, 2022, and offered the City assistance.

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews:

    a. Any officer who has used force in 20% of his or her arrests in the past six months; and

    b. Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.

| Status | Substantial Compliance – Continued Technical Assistance |
|---|---|

The City remains in substantial compliance with Paragraphs 118 and 119.

PPB reports that it sends roughly half of the alerts generated by EIS to responsible unit (RU) managers each quarter. *See* ECF 291-1, COCL Q4 Report, at 107. The specific thresholds required by this Agreement remain in place. Dir. 345.00 – Employee Information System, creates the following thresholds for review:

- Shift Force Ratio: a sworn member's force ratio is greater than or equal to three times their shift's average ratio in the preceding six months;

- Force Ratio: a sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six months;

- Force Count: a sworn member uses force three or more times in the preceding 30 days;

- Criminal Complaint: a member receives a complaint with an allegation of criminal misconduct;

- Complaint in Same Category: a member receives two or more complaints with at least one allegation in each complaint being in the same category (such as two complaints that both have conduct allegations) for events in the preceding six months;

- Complaint Count: a member receives three or more complaints for events in the preceding six months;

- Traumatic Incidents: a member experiences three or more traumatic incidents in the preceding 30 days; and

- Commendations: a member receives two or more commendations for events in the preceding six months.

PPB data indicate an all-time low percentage of alerts closed with interventions in the fourth quarter of 2020, 28.9%, but a steady increase in 2021, to a high of 75.3%. ECF 291-1, COCL Q4 Report, at 108. By the first quarter of 2022, interventions fell to 51.8% of alerts. *Id.* Still, we agree with the Compliance Officer that PPB policy and implementation data currently support a substantial compliance assessment. ECF 291-1, COCL Q4 2021 Report, at 106–08.

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 120.

In 2021, PPB used the Force Inspector as a second EIS administrator in an interim capacity. The Compliance Officer, PPB, and DOJ agree that this is not a long-term solution. ECF 291-1, COCL Q4 Report, at 109. PPB should implement a durable solution going forward.

In January 2022, PPB was short two EIS staff. PPB 2022 Q1 Update Report, at 282, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. However, we agree with the Compliance Officer's most recent assessment that PPB is meeting its obligation to identify and train a second EIS administrator, as required by this paragraph. ECF 291-1, COCL Q4 2021 Report, at 109.

## VIII.   OFFICER ACCOUNTABILITY

PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.

169 PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Paragraph 169 because PPB does not consistently apply policies uniformly or hold officers accountable for complying with policy and procedure.

The Compliance Officer has not assessed the City's compliance with this paragraph.[15] We find the City is in partial compliance with its obligations to hold officers accountable for complying with PPB policies through investigative findings that are supported by a preponderance of the evidence, documented in writing, and resolved in a fair and expeditious manner.

New Section XI includes a requirement that the City initiate certain accountability investigations. ECF 275-1, Am. Settlement Agreement, ¶ 192. New Paragraph 192 provides:

> Within 60 days of the date this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement.

This new remedy resolves certain compliance concerns that we raised last year. The City retains an ongoing obligation to comply with Paragraph 169. Accordingly, though we give a frank assessment of the City's compliance since January 10, 2021, we expect that the Settlement will enable the City to address our concerns.

---

[15] The Compliance Officer has assessed Section VIII, but not Paragraph 169 because it is part of Section X – Agreement Implementation and Enforcement. Several paragraphs in Section X impose obligations on the City and PPB with which their compliance can and should be assessed. We assess compliance with Paragraph 169 because it relates directly to the subject matter of Section VIII – Officer Accountability.

**Fundamental Issue of Accountability:**  The City's accountability investigations take around a year to reach a finding.  In this compliance assessment period, January 10, 2021, to March 31, 2022, DOJ—as well as the Court and public—should have seen efforts to fully and fairly investigate allegations arising from PPB's 6,600-plus reported uses of force in response to the protests in 2020.  To be clear, there are a couple of examples from investigations of 2020 crowd control allegations in which PPB ultimately sustained an allegation and the Chief followed the approved discipline guide.  And there are examples of PPB correctly finding that no misconduct occurred or that insufficient evidence led to a not-sustained finding.  However, the City failed to identify misconduct in several cases and did not hold any supervisors responsible for their conduct.  In the accountability process we continued to see PPB members from line officers to deputy chiefs conflate the actions of the crowd generally with the individual justification required for each separate application of force.  When the City reaches a sustained finding, it does not necessarily impose the applicable discipline.  Seven times during this compliance period, the City voluntarily resolved grievances of imposed discipline by agreeing that the "discipline be rescinded" and "that all references of this matter be removed from [the Grievant's] personnel file."

**Collateral Misconduct:**  In this compliance assessment period, there were a number of instances of failure to identify collateral misconduct, i.e., potential violations of PPB directives that are uncovered during the primary investigation of another directive or part of the directive that was the original focus of the investigation.  The issue repeatedly arose in written files that underlay a Police Review Board (PRB).  This issue continued even after we notified the City of our concern that PPB was excluding from its investigations applicable administrative charges and did not identify collateral misconduct.  *See* ECF 286-3, PRB Letter, Mar. 23, 2021, at 7–8.  In the PRB process, all members must assert that they have read the entire PRB file.  The files are often 1,000-2,000 pages, sometimes more, and include video and audio recordings and photographs.  It is not surprising with this large amount of data that not all aspects of a force event are covered in a PRB dealing with specific allegations against specific officers.  But, the professionals in IA and IPR who put together the investigative material in these files are responsible for identifying potential collateral misconduct of other officers that becomes apparent in the investigation of the incident.  And, certainly, the IA and IPR investigators and the chains of command who review the PRB files and underlying reports should be able to make sure that the directives are properly applied to the accused officers.  We found gaps in both of these areas:  identifying potential misconduct of others officers and correctly applying directives to the accused officers.

As described above, the FDCRs and AARs for September 30, 2020 were the subject of a PRB in this compliance assessment period.  *See* 21-C-0187.  Though IA and IPR spent months with this case, neither raised allegations about other officers' separate uses of three pellet grenades that night.  These indiscriminate uses of force could not meet the requirement of the Agreement or PPB policy requiring individual justification for force.  And their use—thrown directly at people—was contrary to PPB's own training.  Yet, the City did not identify or address this potential collateral misconduct that was part of the administrative review in this compliance period.[16]

**Double Jeopardy Issue:**  In prior assessments of accountability investigations, we have critiqued the failure to address all allegations raised, or which should have been raised, in the review of a

---

[16] The administrative investigation file also contained the training records for a different officer than the subject officer and training records that predated the subject officer's tenure.  IA and IPR failed to note or correct this in their review of the file.

critical force incident.  In such assessments, we have told the City that it should remedy this deficiency by completing investigations of the allegations that PPB did not investigate from the critical force incident.  ECF 236-1, DOJ Fifth Periodic Compliance Assessment Report, at 52 (citing City Attorney Memo of July 29, 2020 admitting that "PPB did not investigate whether [the supervisor] satisfactorily performed his duties in terms of operational planning and supervision," but asserting double jeopardy and untimeliness would bar administrative review).  In response to our critiques, the City has asserted, based on its interpretation of relevant labor law, that double jeopardy—the legal concept of prosecuting the same person twice for the same offense—attaches to the entire event for the involved officers.  Setting aside whether an officer could validly assert a double jeopardy defense to a wholly different administrative charge than previously considered, the City is required by this Agreement to identify and investigate all allegations in critical force incidents.  The City has not done so.

In this compliance assessment period, for example, the City reviewed a May 22, 2021 officer involved shooting that involved a pursuit of the subject following the shooting.  *See* 2021-B-0019.  The investigative file showed that IA never cited or applied PPB's pursuit policy, yet PPB still found the actions of a supervisor within policy for that pursuit.  The record did not show that the supervisor had completed an AAR for the pursuit as required by policy.  *See* Dir. 630.05 – Vehicle Interventions and Pursuits, Pars. 9.1.10, 9.1.10.1.  This omission from investigation, again, arguably and unnecessarily created a double jeopardy issue.

The City created another such double jeopardy situation in a review of a different shooting in this compliance period.  *See* 2020-B-0066.  One of the central issues of this December 24, 2020 incident is the position of the officer's vehicle directly in front of a large, stolen pickup truck.  In that instance, the officer pulled their police vehicle in front of the truck, with the officer's door opening directly in front of the heavy truck's bumper.  The subject rammed and injured the officer, who fired their handgun.  The administrative investigation did not cite or address the operative provisions of Directive 1010.00 for the positioning of the vehicle:

> 8.5.3. Members are prohibited from intentionally positioning themselves in the path of a moving vehicle or in a location that is clearly vulnerable to vehicular attack.

> 8.5.8. Members shall not use poor tactics or positioning as justification for shooting at or from a moving vehicle.

To the credit of the training analysis of that incident, the Training Division did cite these provisions.  Even equipped with that analysis, though, both IA and the chain of command still omitted all consideration of those provisions from the administrative investigation.  While the subject officer's horrific injuries may serve as mitigation when considering a consequence of violating policy, the injuries do not suspend the Agreement's requirement to apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.  Not only does the omission of these policy provisions give rise to a double jeopardy defense to a later attempt to enforce them, but PPB's reluctance to address the fundamental issue of the position of the police vehicle fails to address the risk that was involved in the interaction.  When PPB does not enforce a policy designed to protect officers, PPB's systems do not prevent repetition of poor outcomes in the future.

In another example, PPB initiated an accountability investigation during this compliance period based on a tort claim that asserted, among other things, a First Amendment claim against an officer.  *See* 2021-C-0187.  Yet, the administrative investigation did not include this separate allegation.  Similarly, an administrative investigation in this compliance period did not include a First Amendment allegation against the involved officer, even though the complaint stemmed from an

application for a temporary restraining order that alleged a First Amendment violation.  *See* 2020-B-0075.

**Interfering with Administrative Investigative Interviews:**  We previously identified to the City a problem with officers' representatives interfering with administrative interviews, coaching responses, answering for officers, or changing the direction of questioning.  This continued to be a problem in this compliance assessment period.  It was commonplace in many of the most consequential force events that such interference occurred in the administrative interviews.  *See, e.g.,* 2020-C-0269; 2020-B-0066; 2020-B-0066.  This issue continued in this compliance assessment period even though we gave notice to the City of the issue:

> The collective bargaining agreement between the Portland Police Association and the City does not permit a union representative to participate in an interview. *See* Labor Agreement between the Portland Police Association and the City of Portland, November 11, 2016 to June 30, 2020, Sec. 61.2.2.3, available at  www.ppavigil.org/wp-content/uploads/2017/04/PPA-CBANov-16-June-20-searchable.pdf ("The officer may have an Association representative present to witness the interview provided the representative does not participate in the interview").[17]  Thus, PPB permitted a violation of its collective bargaining agreement to interfere with its accountability process.

ECF 286-3, PRB Letter, Mar. 23, 2021, at 6.  We saw no data or outcomes to show PPB corrected this known issue.

**Transition Period for Accountability:**  As we stated in our prior compliance assessment report, the City's charter amendment potentially will establish a board for PPB oversight that, among other things, may displace IPR's role, but it is unclear when and in what shape this reorganization would occur.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 52.  Paragraph 195(b) of Section XI adopts the City's charter amendment as an additional accountability remedy and puts a timeframe on the City to give effect to the will of the voters.

During this compliance assessment period, before the Court approved Section XI, the City Auditor withdrew consent to oversee IPR.  This led to an interim step, in part anticipated by Paragraph 195(a).  The City established IPR as a standalone office, outside of the Auditor's purview.  This was a reasonable solution for the interim.  However, the expected creation of the oversight board has led to insecurity in the longevity of job positions within IPR.  In turn, this has led to attrition from the IPR ranks.  The lack of assurance of ultimate career positions will continue to prove a challenge.  The City must maintain a sufficient complement of qualified IPR investigators and managers to ensure timely and adequate investigations during this period of transition.

## A.    Investigation Timeframe

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means.  For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC.  Appeals to CRC shall be resolved within 90 days.

---

[17] The City extended this contract for one year.  Rebecca Ellis, "Portland Extends Contract With Police Union For 1 Year," OPB, July 1, 2020, available at www.opb.org/news/article/portland-police-contract-extendnegotiations-street-response/.

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Status | Partial Compliance |
|---|---|

The City remains in partial compliance with Paragraphs 121 and 123 because the required timelines continue to be unmet.

The Compliance Officer concluded that the City is in substantial compliance with these paragraphs, but did not analyze whether CRC appeals are being resolved within 90 days, as required. ECF 291-1, COCL Q4 2021 Report, at 109–11. We have not seen sufficient evidence of compliance.

**PPB Self-Reporting:** PPB issues a quarterly self-report, which concludes that the City complies with these paragraphs. *See* PPB 2022 Q1 Update Report, at 309–10, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. In the last six quarters, PPB reported the below levels of compliance with the 180-day timeline, excluding days tolled pursuant to Paragraph 122. PPB's self-reported statistics count only cases that are closed each quarter; so an overdue case counts against only the quarter in which it is closed.

2020 Q4:  1 of 56 administrative investigations closed in this quarter exceeded 180 days.

2021 Q1:  6 of 43 administrative investigations closed in this quarter exceeded 180 days.

2021 Q2:  7 of 55 administrative investigations closed in this quarter exceeded 180 days.

2021 Q3:  5 of 42 administrative investigations closed in this quarter exceeded 180 days.

2021 Q4:  0 of 31 administrative investigations closed in this quarter exceeded 180 days.

2022 Q1:  3 of 32 administrative investigations closed in this quarter exceeded 180 days.

According to PPB, 22 of 259 cases, or 8.5% are late. PPB does not coordinate its reporting with IPR, but excludes IPR independent administrative investigations of alleged policy violations. Accordingly, PPB's self-assessment does not reflect all administrative investigations.

**IPR Self-Reporting:** IPR reported the following data from its "All Investigations" count:

2020 Q4:  8 of 33 administrative investigations closed in this quarter exceeded 180 days.

2021 Q1:  5 of 29 administrative investigations closed in this quarter exceeded 180 days.

2021 Q2:  1 of 19 administrative investigations closed in this quarter exceeded 180 days.

2021 Q3:  5 of 21 administrative investigations closed in this quarter exceeded 180 days.

2021 Q4:  4 of 14 administrative investigations closed in this quarter exceeded 180 days.

According to IPR's self-reporting, 23 of 116 cases, or 19.8% are late. This rate of untimeliness falls short of substantial compliance.

**Review of Underlying Investigative Files:** Some of the lengthy administrative investigations we reviewed lacked clear or justifiable reasons for delay:

- 2020-C-0043 closed during this compliance period with findings approved 439 days after receipt of the tort claim that initiated the investigation.

- Case 2020-C-0267 began September 16, 2020, and became IPR independent investigation assigned January 4, 2021. The investigation was due March 15, 2021. On its weekly report, "Age of All IPR Intakes as of April 19, 2021," IPR reported the investigation as overdue—the 180 days had already elapsed. But, on the next weekly report, "Age of All IPR Intakes as of April 26, 2021," IPR only then began reporting the tolling of the administrative investigation during the pendency of a criminal investigation. On the same report, however, IPR created a new "assigned date" of April 21, 2021. As of the "Age of All IPR Intakes as of May 23, 2022" IPR report, the case is reported overdue, again, with a total case age of 614 days.

- A spot check of the October 4, 2021 weekly report from IPR and IA showed four of seven IPR investigations were far beyond the 180-day deadline, and only one was tolled for criminal investigation according to PPB's quarterly reports:

  1. 2020-C-0117: 483 days total case age (concurrent criminal listed in Q2 2020)

  2. 2020-C-0137: 481 days total case age (not listed as concurrent criminal)

  3. 2020-C-0207: 454 days total case age (not listed as concurrent criminal)

  4. 2020-C-0220: 421 days total case age (not listed as concurrent criminal)

**PPB Reviews of Level 1 Uses of Force:** The City presented no reasons why outstanding administrative investigations of Level 1 uses of force, e.g., officer-involved shootings, have lasted far beyond 180-day deadline in this compliance period. According to the IPR Director's Report, Feb. 2, 2022, available at www.portland.gov/sites/default/files/2022/directors-report-2-2-22.pdf, the following officer-involved shooting and in-custody death cases remained open past 180 days:

| Incident Date | Case Number | Subject |
|---|---|---|
| 12-24-20 | 20-B-66 | Dahlen |
| 6-24-21 | 21-B-23 | Townsend |
| 3-31-21 | 21-B-15 | Tran |
| 4-16-21 | 21-B-16 | Delgado |
| 5-22-21 | 21-B-19 | Carr |
| 7-20-21 | 21-B-26 | Merritt |
| 8-27-21 | 21-B-30 | Tadros |
| 9-12-21 | 21-B-32 | Boinay |

For the shooting on May 22, 2021, the grand jury returned a no true bill on June 15, 2021, but PPB did not present the investigation to the PRB until March 30, 2022. The administrative file did not include reasons for this inordinate period of time to resolve the case.

**CRC Timelines:** CRC appeals must be resolved within 90 days. Few appeals comply. For example, in Case 2020-C-0043, the City received a request for a CRC appeal on November 19, 2020, and did

not hear the appeal until June 2, 2021. CRC, Meeting Minutes, June 2, 2021, available at efiles.portlandoregon.gov/Record/14680254/File/Document. That means 195 days elapsed from the request for appeal to the appeal hearing. Even with some of that time attributable to a request of the appellee's counsel, this length of time is excessive.

The City did not present data to demonstrate that it resolves CRC appeals within 90 days, as required. IPR tracks CRC timeframes in the City's AIM database. However, IPR reports that CRC timelines are based on the opening and closing of the window of time within which a complainant or officer may request appeal. The relevant dates are when an appeal is requested and when it is resolved by the Chief's approval or rejection of CRC's recommended findings. The City must show that CRC appeals are resolved within 90 days to comply with Paragraph 121.

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 122 because the City continues to allow appropriate tolling and apply approved procedures for concurrent criminal and administrative investigations, subject to tolling. ECF 212, DOJ Interim Compliance Assessment Report, at 10; ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 53–54; PPB SOP 39 – Criminal Internal Investigations, effective Dec. 5, 2018; PPB SOP 6 – Criminal Case Review, effective June 5, 2017.

Though we rate this provision in substantial compliance, we have some concern about PPB tolling administrative investigations for multiple months while waiting for an outside agency to complete criminal investigations. Paragraph 122 allows only for "appropriate tolling." The professional standard in many large law enforcement agencies requires that the agency conducting the administrative investigation make periodic contact with the prosecutor to ensure that any tolling is appropriate. Accused officers should receive reasonably expedient processing of complaints. Otherwise, an officer must work under the pallor of an unresolved accusation, which can hold up transfers or promotions. Likewise, complainants should receive reasonably expedient resolution to their complaints. Accordingly, we sought information about the lengthy delays following presentations at a February 1, 2022 IA/IPR meeting. Specifically, we asked who was the point of contact for PPB to communicate with state and local prosecutors concerning open criminal investigations of PPB officers. PPB reported being mere passive receivers of information. It does not appear that PPB tracks the progress of criminal investigations, which could potentially result in excessive tolling. PPB should institute a tracking practice.

## B.    On Scene Public Safety Statements and Interviews

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 124.

We continue to agree with the Compliance Officer that PPB's protocol for compelled statements complies with the requirements of this paragraph. ECF 291-1, COCL Q4 2021 Report, at 112–13; ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 54. We previously credited PPB's enactment and application of Directive 1010.10 – Deadly Force and In-Custody Death Reporting and Investigation Procedures; SOP 7 – Deadly Force; In-Custody Death Investigations; and SOP 30 – Concurrent Administrative/Criminal Investigations. ECF 212, DOJ Interim Compliance Assessment Report, at 10–11. PPB continues to implement these policies and procedures.

125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witnesses and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 125 because in this compliance period, PPB repeated a past practice that undermines CROs.

The Compliance Officer found substantial compliance based on PPB providing CROs that were issued within reasonable timeframes, without assessing whether the CROs were effective. ECF 291-1, COCL Q4 2021 Report at 113–14. We reviewed several Level 1 force investigations. While CROs timely issued in most cases, PPB allowed some CROs to be undermined.

For example, on December 24, 2021, a PPB member used deadly force when a stolen pickup truck rammed the officer (2020-B-0066). The file provided for that event showed repetition of a prior issue that undercut the CROs. On the night of the incident, PPB compromised the CRO requirement by emailing "AllPPBUsers" a video of the interaction, while the scene was still active. In a prior compliance assessment report, we raised concerns about a similar action compromising CROs:

> In our 2015 report card, we admonished the former Assistant Chief for permitting officers to view surveillance videos before providing their statements. We found that permitting the officers to view the video served as an "indirect communication between the officers regarding the facts of the event," in violation of Paragraph 125.

> Even after that admonishment, PPB showed the FLIR[18] video from the May 2016 incident at roll call within days of the incident and before PPB rescinded CROs. Auditor interview, August 17, 2016. Though this may have been innocuous in this case, generally the sharing of videos between officers may serve to subvert the effectiveness of the CROs.

ECF 124-1, DOJ 2nd Periodic Compliance Assessment Report, at 102–03.

---

[18] Forward Looking Infrared, a thermographic camera typically attached to an aircraft.

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Status | Partial Compliance |
|---|---|

The City is no longer in substantial compliance with Paragraph 126 because PPB did not properly implement the requirements of Directive 1010.10 in multiple cases this reporting period.

The Compliance Officer found substantial compliance based on identifying only one instance of noncompliance during 2021. ECF 278-1, COCL Q3 2021 Report, at 61–62; ECF 291-1, COCL Q4 2021 Report, at 114.   As described in the assessment of Paragraph 69, two of ten officer-involved-shooting events that occurred during this compliance period did not comply with this paragraph.

First, on July 20, 2021, a PPB member used lethal-level force in shooting a subject who was in a convenience store (Case 21-199178).  The store clerk had called 911 when the subject ate food without paying and sat down on the floor refusing to leave.  Two PPB officers responded.  The subject broke a wine bottle on the floor.  Armed with the neck of the bottle, the subject approached the officers.  One officer shot their firearm.  The other twice deployed a Taser.  The witness officer (who deployed the Taser but did not fire his gun) refused to provide a witness statement at the scene, citing through their attorney the stress of the incident and off-duty stresses.  The witness officer also should have completed the FDCR for the Taser use before the end of shift.

We asked the City to explain the lack of a timely statement from the witness officer.  The City excused the witness officer by reading the approved directive to allow discretion to the agency in directing the witness officer to provide a statement.  Specifically, the City cited Directive 1010.10 – Use of Force:

> 2.1.2.4. Witness member(s) shall also be subject to on-scene interviews to discuss the incident with detectives.  They shall provide a full and candid account of the use of force event.

The City interprets "subject to" as optional not mandatory.  We disagree with that reading, but take the City's interpretation at face value.  We are more troubled, however, by two items in the City's response.  One, the City described in its response a discussion between PPB members at the scene regarding this issue and the witness officer's interview.  However, the City's response omits from this description that the IPR Director was at the scene and objected to forgoing the witness officer interview.  Two, the detective's report from the night of the shooting records that the witness officer refused through his attorney to submit to an interview, but also records that the witness officer nonetheless agreed to "a brief walkthrough."  It is unclear how one can be incapacitated for an interview, but not incapacitated to conduct a walkthrough.  We cannot know the extent of the discussion on the walkthrough, however, because the detective's report ends at this agreement and does not report any content of the walkthrough.

Second, on December 24, 2021, a PPB member used lethal-level force when a stolen pickup truck rammed the officer (2020-B-0066).  The involved officer suffered serious injuries that no officer should ever be subject to in the course of doing their job.  The injury amounted to physical incapacitation at that time and for some time later.  However, the documentation provided to us failed to identify the justification for the length of the delay in the interview.  PPB did not interview

the involved officer until February 10, 2021—a length that limited the utility of the officer's statement and clouds recollection by the passage of time.  Certainly, Directive 1010.10 envisions incapacitation of the involved officer:

> 2.2.5.1.  The PSD Captain or designee shall ensure that the involved member(s) provides a compelled statement as soon as practicable, but no later than within 48 hours of the event, unless the member is physically incapacitated and unable to provide a statement.

The file provided to DOJ contained an email which was supposed to have an attached letter from the officer's attorney, but did not.  Accordingly, it is unclear why the physical incapacitation to provide a statement lasted for such an extensive period of time.

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 127.

We continue to agree with the Compliance Officer that PPB is adhering to the requirements of this paragraph on-scene at lethal force and in-custody death events.  ECF 291-1, COCL Q4 2021 Report, at 115.  For example, in case 2021-B-0019 concerning the May 22, 2021 officer-involved shooting, on-scene detectives asked the involved officer for an on-scene briefing and an interview.  The involved officer declined.  *See also* 2020-B-0066 (same).

## C.    Conduct of IA Investigations

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA.  Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Status | Partial Compliance |
|---|---|

The City is no longer in substantial compliance with Paragraph 128 because PPB's records backlog and other structural challenges have materially impacted IPR's ability to conduct meaningful independent investigations, as required by this Agreement.

We agree with the Compliance Officer's assessment of partial compliance.  *See* ECF 291-1, COCL Q4 2021 Report, at 115–16; ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 55–56.  Two concerns are most prevalent.

**Record Backlog:**  We agree with the Compliance Officer that the City's backlog in producing records affected IPR's ability to conduct meaningful investigations:

> During the fourth quarter of 2021, we were also informed of a 45,000-50,000 document Records Division backlog that led IPR to not have a key document as part of their investigation for one case (IPR ultimately received this document from the alleged officer in the case after IPR realized they did not have it). While PPB and the City inform us that

the vast majority of documents in the backlog are likely inconsequential to administrative investigations, we have yet to receive an update as to the current size of the backlog, the impact of the backlog, or City efforts to reduce the backlog. Upon receiving an update, we will provide additional information in future reports.

ECF 291-1, COCL Q4 2021 Report, at 115.

**Meaningful Independent Investigation:** IPR has a crucial role as the outside civilian oversight agency to shed light on potential misconduct, conduct credible investigations, reach reliable conclusions, and earn public and organizational trust in the accountability process. But the City did not ensure that IPR initiated investigations of managers who approved inappropriate crowd control force or collateral misconduct in the more than 6,000 reported uses of force during the 2020 protests.[19] The City and the United States agreed to resolve this and several other accountability concerns with new Section XI. New Paragraph 192 specifically affirms that Directive 330 – Internal Affairs, Complaint Intake, and Processing, and this Agreement require PPB to investigate *any* sworn member whose misconduct is discovered in any setting. We understand that IPR is now spearheading implementation of Paragraph 192's requirements for certain supervisory investigations stemming from the 2020 crowd control force incidents. Going forward, the City should also ensure IPR is able to affirmatively assert itself and investigate known misapplications of policies, failures in reporting and reviewing force, and general mismanagement of force.

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Status | **Partial Compliance** |
|--------|------------------------|

The City is no longer in substantial compliance with Paragraph 129 because the City did not investigate all allegations of excessive force.

This Agreement does not allow PPB to administratively close investigations of excessive force allegations without a full investigation. IPR may do so, but only when its intake investigation shows by clear and convincing evidence that the allegation has no basis in fact. PPB did not administratively close any reported allegations of excessive force from the fourth quarter of 2020 through the first quarter of 2022. *See* PPB 2022 Q1 Update Report, at 340–41, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf; *see also* IPR SOP, Sec. 2.3, revised Jan. 10, 2020 (clarifying that clear and convincing evidence is needed to administratively close a force allegation).

However, in several administrative investigations, the City did not identify collateral misconduct or correctly apply parts of PPB's force policy. IPR also did not administratively investigate known management issues in PPB's response to the 2020 protests. New Paragraph 192 codifies a remedy designed to address the last issue, and we understand IPR is spearheading implementation now.

---

[19] IPR's protocols provide that IPR will prioritize: "Allegations involve a member of the rank of Captain or higher;" and "Allegations arising from a crowd control event, demonstration, or other constitutionally protected speech event." PSF-5.02 - Independent Police Review - Administrative Investigations, available at www.portland.gov/sites/default/files/2020-06/psf-5.02-ipr-administrative-investigations-draft-2-698939.pdf.

> Also, we agree with COCL's assessment that IPR should not have closed the investigation of a complaint alleging excessive force when there was not clear and convincing evidence to IPR that the allegation had no basis in fact.  ECF 291-1, COCL Q4 2021 Report, at 116.

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 130.

We agree with the Compliance Officer's assessment that the City continues to adequately prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.  ECF 291-1, COCL Q4 2021 Report, at 118; ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 3 (citing Dir. 310.20 – Discrimination, Harassment, and Retaliation Prohibited, effective May 15, 2020, available at www.portlandoregon.gov/police/article/760883).

The Compliance Officer found no allegations of retaliation and has not reported on the City's compliance with this paragraph since January 10, 2021.  However, the CRC considered an appeal that included a retaliation claim, indicating continued enforcement of the directive.  ECF 238-1, COCL Q4 2020 Report, at 10, 52.  We also assessed an investigation of a retaliation allegation and found it sufficient to demonstrate PPB's implementation of the policy.

131. The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below:

a. Currently, seven voting members of the PRB review use of force incidents, including two citizen members. When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members.

b. The CRC slot on the PRB in use of force cases will rotate among the CRC membership so that different CRC members participate on the PRB. Within 60 days of the Effective Date, the Auditor shall develop a membership rotation protocol.

c. All members participating in the PRB must maintain confidentiality and be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions and "just cause" requirements set forth in Portland City Charter, City rules, and labor agreements.

d. Cases in which the member elects, with the concurrence of the Chief and the Police Commissioner, to accept the investigative findings and recommended discipline. This option will only be available to a member following implementation of code language which shall require at a minimum a full investigation of the alleged misconduct, issuance of the investigative findings, and concurrence with the findings by the Independent Police Review, the Professional Standards Division and the member's Branch Chief.  The scope of cases eligible for stipulated discipline shall be identified in the authorizing code, and cases involving alleged used of excessive force, cases involving alleged discrimination, disparate treatment or retaliation, reviews of officer

involved shootings and in-custody deaths, and cases in which the Chief or the Police Commissioner does not agree to accept the member's proposed stipulation to findings and recommended discipline shall not be eligible for stipulated findings and recommended discipline.

e. All community members and CRC members must meet the following qualifications to participate on the PRB:

i. Pass a background check performed by the Bureau.

ii. Participate in Bureau training to become familiar with police training and policies, including the PRB process.

iii. Sign a confidentiality agreement.

iv. Participate in ride-alongs to maintain sufficient knowledge of police patrol procedures.

f. Current city code provides that the City Auditor and the Chief have authority to recommend to City Council the removal of citizen members from the PRB pool. Likewise, the City Auditor or Chief shall have authority to recommend to City Council removal of a CRC member from serving on the PRB. The Chief or the City Auditor may recommend that City Council remove a community member or member of the CRC from the pool for the following reasons:

i. Failure to attend training;

ii. Failure to read Case Files;

iii. Objective demonstration of disrespectful or unprofessional conduct;

iv. Repeated unavailability for service when requested;

v. Breach of confidentiality;

vi. Objective demonstration of bias for or against the police; or

vii. Objective demonstration of conflict of interest.

g. Removal from participation in the PRB shall not affect CRC membership.

h. Like current PRB citizen members, CRC members serving on the PRB may serve in that capacity for no more than three (3) years.

i. A CRC member who participates in a PRB review shall recuse himself/herself during any later appeal of the same allegation(s) to the CRC.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 131 because PPB did not properly implement the required PRB procedures during this compliance period.

We agree with the Compliance Officer's assessment that the PRB's operation has been inadequate to meet the requirements of this Agreement. ECF 291-1, COCL Q4 2021 Report, at 118–19. The Compliance Officer reported that it:

observed PRBs where we continued to see confusion around the *Graham* standard and active aggression. There was also some tendency to use mitigating factors to justify the use of force rather than as a consideration for the extent of discipline. Whereas at times

the City Attorney provided clarification, the continuation of these issues is a cause for concern and they must be resolved.

ECF 291-1, COCL Q4 2021 Report, at 119.

We remotely observed several PRBs in 2021 and 2022. We will not quote the internal deliberations of the PRBs. However, our observations lead us to the conclude that the City is not in substantial compliance with Paragraph 131(c), which requires: "All members participating in the PRB must . . . be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions." We continue to see PRB members fail to apply the explicit requirements of PPB policy and instead assert justifications for force based on the actions of people other than the subject of the officer's force. PPB policy requires force be assessed based on totality of the circumstances and specifically must consider the subject's threat of harm or flight, severity of offense, and level of resistance. Dir. 1010.00, Procedure Par 5.

In addition, the City did not adequately train CRC members to participate on the PRB, as required. Paragraph 131(e). Instead of finding an acceptable adaptation for training during the COVID-19 pandemic, the City suspended the ride along and civilian academy requirements. CRC, Meeting Minutes, June 2, 2021 available at efiles.portlandoregon.gov/Record/14680254/File/Document.

We previously concluded that PPB properly incorporated Paragraph 131's requirements in Directive 336.00 – Police Review Board, and Directive 337.00 – Police Review Board Personnel Selection. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 58. The policies establish partial compliance, but the City must fully implement the policies to re-achieve substantial compliance.

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 132.

We continue to agree with the Compliance Officer that the City has empowered the PRB to send an issue back for further factual development. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 58; ECF 291-1, COCL Q4 2021 Report, at 120.

PPB has incorporated Paragraph 132's requirements in Directive 336.00. We did not observe a PRB exercise this authority during this compliance period. But we have seen PPB reopen an investigation after a PRB due to an investigative error and conduct a second PRB for the same allegation. This process took longer than 10 days, but did not violate the timeline imposed by this paragraph because the PRB did not vote to return the file to the investigative entity.

133. If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall: (1) enter that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial finding creating a rebuttable presumption that the force used also violated PPB

policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the IA investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 133.

We continue to agree with the Compliance Officer that PPB is properly implementing SOPs 32 and 42, which incorporate the requirements this paragraph.  ECF 291-1, COCL Q4 2021 Report, at 120–21.

PPB had no civil liability findings during this compliance period.  However, the City settled several long-pending claims regarding specific uses of force that PPB previously found within policy, including:

1. Quanice Hayes, Feb. 9, 2017, for $2,095,081. www.opb.org/article/2021/02/23/police-shooting-quanice-hayes-settlement/;

2. Terrell Johnson, May 10, 2017, for $600,000. www.opb.org/article/2021/07/21/portland-city-council-approves-600000-dollar-settlement-in-police-killing-of-terrell-johnson/; and

3. Aaron Cantu, Aug. 4, 2018, for $125,000.  www.oregonlive.com/crime/2021/11/city-poised-to-pay-125000-to-settle-excessive-force-claim-against-portland-police-from-august-2018-protest.html.

Paragraph 133 does not apply to settlements.  However, for substantial or high-profile settlements, the City should consider whether to apply their systems for holding supervisors responsible for properly reviewing these uses of force, consistent with Section VIII, tracking deficiencies from the Force Inspector, consistent with Section III, and informing the training needs assessment, consistent with Section IV.

## D.    CRC Appeals

134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 134.

We continue to agree with the Compliance Officer that the CRC's membership is properly composed and the CRC operates pursuant to allowable rules.  ECF 291-1, COCL Q4 2021 Report, at 121–22.

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraphs 135 and 136.

We agree with the Compliance Officer's assessment that the City has memorialized CRC's authority to conduct appeals in city code. ECF 291-1, COCL Q4 2021 Report at 122–23. We previously reported that the CRC's governing regulations incorporate the requirements of these paragraphs. ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report, at 71; 195-1, DOJ 4th Periodic Compliance Assessment Report, at 66.

The results of an appeal during this compliance assessment period demonstrate the City's implementation of CRC's codified authority. On June 2, 2021, we observed the CRC conduct an appeal hearing in Case 2020-C-0043. The minutes of the hearing are available online at: efiles.portlandoregon.gov/Record/14680254/File/Document.

On February 12, 2020, the City received a tort claim notice that raised the allegations at issue in this investigation. PPB initially approved findings on October 6, 2020. *See* approval by AC M. Leasure. The complainant requested an appeal on November 19, 2020. Originally, the appeal hearing was set for January 6, 2021, but an unexplained delay occurred. *See* Email from D. Nguyen November 24, 2020. We have not seen minutes from the January 2021 CRC meeting, which would typically be posted on the City's website. *See generally* CRC, 2021 Minutes, available at efiles.portlandoregon.gov/Record/14680248/. The hearing was rescheduled for February 3, 2021, but delayed again without an explanation noted in the file. *See* Email from D. Nguyen January 4, 2021. A hearing was rescheduled for March 3, 2021, but IPR postponed based on the request of the appellant's attorney. *See* Email from D. Nguyen March 1, 2021. A hearing was reset a fourth time for April 7, 2021, but IPR again postponed this hearing. *See* Email from D. Nguyen April 5, 2021. On April 26, 2021, PPB approved final findings without explanation on the resubmission of findings for approval. *See* approval by AC J. Resch. In all, 439 day passed from receipt of the allegations to approved findings—far more than the 180-day deadline set by this Agreement. Paragraph 121.

This CRC appeal concerned allegations arising from the August 17, 2019 arrest of an individual during PPB's response to a crowd control event. We reviewed the underlying file, including aerial and street-level video, which showed a large crowd that included protestors who attacked a construction worker and an audio report of a protestor attacking a driver with an aerosol restraint. Most of the videos do not show the interaction at issue in the specific timeframe of the allegation. But one television news video showed the arrest and cuffing.

In a writing from PPB to IPR dated July 13, 2021, PPB accepted CRC's recommendations for Officer B regarding allegation five, inappropriate use of force under Directive 1010.00 (changing the finding

from unfounded to not sustained with a debriefing), and allegation seven, inaccurate reporting under Directive 900.00 (changing from unfounded to a sustained finding).  PPB also accepted CRC's recommendation for Officer C regarding allegation six, inappropriate use of force under Directive 1010.00 (from unfounded to not sustained with a debrief).  Likewise, PPB accepted CRC's recommendation for Officer A regarding allegation four, inappropriate use of force under Directive 1010.00 (from unfounded to not sustained with a debrief).  Our review of the Chief's reasoning in changing the administrative finding regarding an officer's reporting obligations from unfounded to sustained showed strong reasoning and sound judgement.  The Chief cited specific facts in the investigative record that supported the ultimate finding.

On one hand, this case file shows the success of the CRC process.  CRC reviewed the case file and relied on credible news video to find that the administrative investigation outcome for allegation seven was unreasonable because it was not supported by the evidence.  On the other hand, the appeal showed gaps in the underlying administrative investigation.  IPR and PPB had this news video on April 13, 2020, but did not use it to inform findings prior to the CRC review.  *See* Email from M. Rinta to C. Kestell, April 13, 2020 (linking to kptv.com video).  The attorney for the complainant reshared the same video on July 1, 2020, with a description of the interaction.  *See* Email from M. Rinta to C. Kestell, July 1, 2020 (linking to the same kptv.com video).  The chronological list from the IPR investigator does not list the email from the complainant's attorney on April 13, "(No response received as of case submission)," and reports not using the evidence offered by the attorney on July 1:  "Email rec'd from attorney Rinta with some links to evidence (none used in amended report)."  *See* Chronological Record UPR 2020-C-0043 (emphasis added).

## E.    Discipline

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| Status | Partial Compliance |
| --- | --- |

The City is no longer in substantial compliance with Paragraph 137 because PPB did not consistently implement the provisions of the discipline guide.

The Compliance Officer found substantial compliance with this paragraph based primarily on the existence of the discipline guide and its proper application in four cases.  ECF 291-1, COCL Q4 2021 Report, at 123–24.  Though PPB maintained the discipline guide and policy, in this compliance assessment period we repeatedly observed fundamental misapplications of the guide in PRBs.  PRB members frequently conflated findings and mitigation.  PRB members departed from the discipline guide, assigning allegations to lower levels than specified in the guide.  PPB also departed from the guide and mitigated downward a sustained finding for an egregious violation of the force directives by a supervisor.  Moreover, the City produced a record of voluntary grievance resolutions that caused prior discipline to be expunged, in departure from the prior findings and the guide.  *See* discussion of Paragraph 169 above.

To the City's credit, the City provided us informal notice that it was negotiating with PPA to replace the existing discipline guide a Corrective Action Guide (CAG).  This Agreement requires that the City provide DOJ notice "if any term of this Agreement becomes subject to collective bargaining,"

and "keep DOJ apprised of the status of the resulting negotiations." Paragraph 186. On February 22, 2022, we conditionally approved the negotiated CAG on the following terms:

> [W]e now conditionally approve the CAG, subject to the City timely revising Directive 338.00 to include, among other things: (a) an acknowledgement of the binding nature of the CAG on the positions of the City or the PPA in any arbitration, and (b) consistent criteria to guide when Education Based Alternatives could be applied, including a workable expectation of what those alternatives may be. Any such revision to Directive 338.00 is subject to the process set forth in Paragraph 166 and the public comment process that PPB utilizes for all revised directives. This public comment process should include the ability for the Portland Committee on Community-Engaged Policing and any other advisory groups to provide feedback on the directive.

> Additionally, to meet the requirements of Agreement Paragraph 137, the City must implement the CAG with fidelity to its representations to us and the other requirements of the Agreement. To be clear, merely having a policy on the books does not amount to substantial compliance. Rather, the Agreement requires implementation, meaning "verified performance of that policy or procedure in actual practice." Agreement Par. 33.

To re-achieve substantial compliance the City must implement the applicable discipline guide with fidelity to its requirements.

## F.    Communication with Complainant and Transparency

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraphs 138, 139, and 140.

We continue to share the Compliance Officer's assessment that the City continues to provide the required communication and transparency for complainants. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 60–61; ECF 291-1, COCL Q4 2021 Report, at 123–24. IPR's website continues to allow complainants to check the status of their complaints by entering their complaint number or the complainant's identifying information. IPR, Complaint Status Request Form, available at www.portlandoregon.gov/ipr/64452 (this form is still active, though it is now listed on the inactive IPR website, as is the current IPR complaint form).

## IX.    COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED-POLICING

There is significant community and City interest in improving PPB's community relationships. The community is a critical resource. Soliciting community input regarding PPB's performance, while also enhancing PPB's current community outreach efforts, will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety.

141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Portland Committee on Community Engaged-Policing (PCCEP), within 90 days of the Effective Date of the relevant amendments to this Agreement.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 141.

On August 24, 2017, the City established the PCCEP to work with the Mayor/Police Commissioner, PPB, and the City's diverse constituencies to achieve equitable policing and meaningful community engagement with PPB. ECF 169-4, Ordinance. The Ordinance set forth a plan for the PCCEP's work. ECF 169-9, PCCEP Plan. On September 26, 2018, the City confirmed the PCCEP's inaugural members after a lengthy recruitment, selection, and orientation process designed to ensure equity and inclusion. ECF 200, Decl. of Nicole Grant, ¶¶ 3-7 & Exs. 1–3. PCCEP has operated since then. *See* PCCEP, available at www.portland.gov/pccep/about-us.

After receiving public input, including from members of the amici groups, AMAC and MHA, the PCCEP decided to organize itself into five standing subcommittees that would do the work of developing recommendations alongside interested members of the community and subject matter experts from the City: (1) Steering, www.portland.gov/pccep/subcommittees/steering-committee; (2) Settlement Agreement and Policy, www.portland.gov/pccep/subcommittees/settlement-agreement-and-policy; (3) Racial Equity, www.portland.gov/pccep/subcommittees/racial-equity; (4) Behavioral Health, www.portland.gov/pccep/subcommittees/behavioral-health; and (5) Youth, www.portland.gov/pccep/subcommittees/youth. At times, the PCCEP has also created ad hoc committees, such as to explore a Truth and Reconciliation Commission, *see* YouTube, PCCEP Videos, available at www.youtube.com/watch?v=kxRoNrHX3YQ, and to help the City reimagine Core Patrol Services, *see* PCCEP Library, available at www.portland.gov/pccep/library/cps.

For three years, the City ensured that the PCCEP had sufficient staff and volunteer community members to operate consistently as required by this Agreement. However, since the fall of 2021, the PCCEP lost two staff members and six volunteer Committee members. Beginning in November 2021, the City has not ensured the PCCEP has sufficient members to perform the functions outlined in this Agreement and the Amended PCCEP Plan, as required by Paragraphs 143 and 151. Since December 2021, the City has not ensured the PCCEP has adequate staff support, as required by Paragraph 144. As of April 2022, the City still had not appointed any replacement members or hired staff to fill vacancies.

The City is aware of the deficiencies and is working to resolve them. New personnel within the Mayor's Office and City Attorney's Office have developed a plan to appoint new PCCEP members, hire staff support, and revise the Amended PCCEP Plan. We will monitor the City's implementation of this plan to ensure the City returns to substantial compliance with its PCCEP-related obligations.

142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns.  The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement.  Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 142.

In 2018, the City authorized the PCCEP to perform the five tasks listed here.  ECF 169-9, PCCEP Plan.  However, by the end of 2021, the City was not providing support sufficient to enable the PCCEP to discharge these tasks in practice.  In particular, the City did not fill vacancies on the Committee or hire replacement staff, resulting in downgraded compliance ratings for Paragraphs 143, 144, and 151.

The PCCEP is generally independent and self-directed, and usually can set its own agenda with community input.  The PCCEP and its subcommittees have, to varying degrees, performed the five authorized tasks, with input from the community and the City.  For example, the PCCEP regularly formulates, discusses, and votes on recommendations after taking public comment.  The City adopted several of the PCCEP's recommendations from 2021  However, as of April 2022, the City has not responded to any PCCEP recommendations made after August 2021.  *See* ECF 278-1, COCL Q3 2021 Report, at 63; ECF 291-1, COCL Q4 2021 Report, at 127–28; PCCEP Recommendations, available at www.portland.gov/pccep/pccep-recommendations.  The City should approve, reject, or modify a PCCEP recommendation within 60 days, or explain why it needs more time to consider the issue.  *See* ECF 215-1, Am. PCCEP Plan.

The PCCEP contributed to the creation of PPB's Community Engagement Plan, which the City formally adopted on October 2, 2019, after a public hearing that included testimony from the PCCEP, PPB, and community members.  City Council Resolution 37452, available at efiles.portlandoregon.gov/Record/13297449.  In 2021, the PCCEP did not specifically contribute to the implementation of PPB's Community Engagement Plan.  However, as described in the Compliance Officer's most recent quarterly reports, PPB continues to take appropriate steps to implement the plan.  ECF 278-1, COCL Q3 2021 Report, at 66–67; ECF 291-1, COCL Q4 2021 Report, at 130–32.

The PCCEP is also authorized to assess the City's compliance with this Agreement, which it does regularly through the Settlement Agreement and Policy subcommittee by taking reports from the City, Compliance Officer, and DOJ.  The PCCEP has also presented its views about compliance to the Court.  *E.g.*, ECF No. 249, Hr'g Tr. 126:10–143:14 (Aug. 24, 2021).  In 2021, the PCCEP considered implementation of this Agreement at several public meetings, including by hosting town hall events with the Compliance Officer (February 23, July 27, and October 14 and 26) and soliciting DOJ's presentations on compliance assessment and mediation (March 23 and November 16).  *See* PCCEP, Meeting Agendas and Minutes, available at www.portland.gov/pccep/subcommittees;

YouTube, PCCEP Videos, available at www.youtube.com/channel/UC0W1oX39iMCY-0O-qeqLTxg.

The City has amended the PCCEP Plan twice, complying with the requirements both times. *See* Council Resolution 37470, Dec. 18, 2019, available at efiles.portlandoregon.gov/Record/13438255; Council Ordinance 27284, Sept. 5, 2018, available at efiles.portlandoregon.gov/Record/12278614. The two amendments improved on the PCCEP's operations, including by ensuring seats for youth members and creating a more flexible on-boarding process. The City is in the process of amending the Plan a third time, consulting with relevant stakeholders in accord with the required process. The City is also considering codifying the PCCEP to ensure its continuity as a body through changes in City leadership. To the extent any such codification materially modifies the Amended PCCEP Plan and occurs during the pendency of this Agreement, the City must continue to comply with this paragraph by consulting with the AMAC and the PPA, and by obtaining DOJ's review and approval.

143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.

| Status | Partial Compliance |
|--------|--------------------|

The City is not substantially complying with Paragraph 143 because it has not provided the PCCEP with adequate membership.

As of April 2022, the 13-member Committee had six vacancies and seven members. *See* PCCEP Member Bios, available at www.portland.gov/pccep/about-us/member-bios. The six open seats have been unfilled for four months or longer despite some members reporting that they recruited applicants on the City's behalf, who applied but did not receive prompt response from the City. The current PCCEP Plan vests the Mayor's Office with authority to nominate members and the City Council with authority to approve their appointments. No other entities can discharge this essential obligation. *See* ECF 215-1, Am. PCCEP Plan.

The City must take immediate corrective action to fill open seats and take steps to ensure that future vacancies are timely filled.

144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.

| Status | Partial Compliance |
|--------|--------------------|

The City is not substantially complying with Paragraph 144 because it is not providing sufficient administrative support for the PCCEP to perform the duties and responsibilities set out in this Agreement and the Amended PCCEP Plan.

The PCCEP Project Director left City employment in December 2021. The PCCEP Project Assistant left City employment in March 2022. PCCEP staff supervisors in the Office of Equity and Human Rights (OEHR) varied throughout 2021. In an interview with the longest serving supervisor, we learned that the supervisor could not account for the daily and weekly tasks of PCCEP staff. Indeed, the supervisor had not even read the PCCEP Plan. Supervision and engagement from the Mayor's Office also waned in 2021 due to frequent turnover. The PCCEP had at least four different points of contact within the Mayor's Office, which caused confusion and

delayed responsiveness, and negatively impacted the ability of PCCEP members and staff to maintain productive relationships with City leadership.

The turnover within the Mayor's Office and the PCCEP also impacted performance, particularly as to notifying the public of meetings, posting minutes, and responding to recommendations. *See* COCL Q3 2021 Report, at 11–12, 64–66; ECF 291-1, COCL Q4 2021 Report, at 127–28. The City has offered to provide contract facilitation services, which the PCCEP has accepted at times. Most of the time, the PCCEP has chosen to self-facilitate, which PCCEP members have done well.

During the pandemic, the City provided a Zoom account to enable the PCCEP to hold meetings remotely. Meetings have been recorded and are posted online. *See* YouTube, PCCEP Videos, available at [www.youtube.com/channel/UC0W1oX39iMCY-0O-qeqLTxg](www.youtube.com/channel/UC0W1oX39iMCY-0O-qeqLTxg). The City hosts a dedicated website for PCCEP, which contains links to documents that memorialize the PCCEP's work. *See* PCCEP, available at [www.portland.gov/pccep](www.portland.gov/pccep). City staff have generally been responsive to community ideas about what should be linked on the PCCEP website; they can be contacted at [PCCEPInfo@portlandoregon.gov](PCCEPInfo@portlandoregon.gov).

The City has advised that it will move the PCCEP from OEHR to the Community Safety Division (CSD), which provides staffing, supervision, and related administrative support for other volunteer groups that provide public safety-related advice to the City, including the Police Accountability Commission. *See* Community Safety Division, available at [www.portland.gov/community-safety](www.portland.gov/community-safety); Police Accountability Commission, available at [www.portland.gov/police-accountability](www.portland.gov/police-accountability).

The City must provide adequate staffing and supervision to enable the PCCEP to perform its mission. The PCCEP will also benefit from a stable Mayor's Office liaison with sufficient authority and access to City leaders. We will monitor the PCCEP's transition from OEHR to CSD to evaluate whether and to what extent the restructuring impacts the City's compliance with this Agreement.

145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 145.

PPB has consistently worked with City resources knowledgeable about public outreach processes, community partners, and the PCCEP to improve its efforts to engage with the community. PPB regularly engages the public through faith-based meetings, training and educational workshops, neighborhood meetings, advisory councils and boards, cultural events, sporting activities, charitable giving, immigrant outreach, media events, and its flash alert system for email communication. *See generally* PPB, Community, available at [www.portlandoregon.gov/police/30379](www.portlandoregon.gov/police/30379); *see also* Flash Alerts, available at [flashalert.net/id/portlandpolice](flashalert.net/id/portlandpolice). PPB command staff and members of its Office of Community Engagement have attended each of the PCCEP's monthly meetings and most of its subcommittee meetings.

We continue to agree with the Compliance Officer that PPB's efforts substantially comply with this paragraph. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 65–66; *see also* ECF 273-1, COCL Q1 2021 Report, at 59–63; ECF 274-1, COCL Q2 2021 Report, at 62–64; ECF 278-1, COCL Q3 2021 Report, at 66–69; ECF 291-1, COCL Q4 2021 Report, at 130–32.

146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 146.

In 2018, the City contracted with DHM Research, a professional survey research organization that the City had engaged for similar surveys in 2013, 2015, and 2016. *See* DHM Research, available at www.dhmresearch.com.  In 2019, DHM conducted another reliable, comprehensive, and representative survey of the Portland community, as required by this paragraph. In February 2019, DHM prepared a report and analysis.  DHM Research, *City of Portland Community Policing – Mail Survey*, February 2019, available at www.portlandoregon.gov/pccep/article/734466.  On July 23, 2019, DHM presented its findings at the PCCEP's monthly meeting. YouTube, PCCEP Videos, available at www.youtube.com/watch?v=N3N6666BHek.

In 2019, with the PCCEP's input, the City adopted PPB's five-year Community Engagement Plan, which identifies goals in the areas of public involvement, communication, access, and training. *See* PPB, Community Engagement Plan, available at www.portlandoregon.gov/pccep/article/741550. The Plan is designed to evolve over time, with continued input from the PCCEP.  PPB has established a productive working relationship with the PCCEP sufficient to enable an ongoing collaboration.  PCCEP has periodically engaged with PPB to understand how the Community Engagement Plan is being implemented and whether it should be modified or supplemented.  As PPB enters the third year of the five-year Plan, it should continue to seek input from its City and community partners to evaluate and improve upon the initial iteration.

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts.  The data shall also be provided to PCCEP to inform its work.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 147.  However, we have concerns that the City is not ensuring PCCEP has the data necessary to inform its work.

PPB collects the demographic data required by this paragraph from the U.S. Census Bureau's American Community Survey. *See generally* U.S. Census Bureau, available at www.census.gov.  PPB routinely posts this data on their website. *E.g.*, PPB Strategic Services Division, *PPB Precinct Demographics*, December 2020, available at www.portlandoregon.gov/Police/article/780347.  The data is thus available to the PCCEP, even if difficult to find on the PPB website.  However, the City did not provide evidence that it provided the data to the PCCEP or when it did.

In 2019, the Compliance Officer detailed how PPB precinct commanders use demographic data to tailor outreach and policing programs.  ECF 196-1, COCL Q4 2019 Report, at 45.  We have not seen evidence indicating whether and how precinct commanders have used more recent

demographic data. We also have not seen evidence that the PCCEP has used precinct demographic data to inform its work. The PCCEP has not provided input to precinct commanders on how to develop or tailor outreach and policing programs to precinct residents, or even considered whether to provide such input.

The City has authorized the PCCEP to review, evaluate, and recommend improvements to PPB's Community Engagement Plan and to advise on strategies to improve community relations. In performing this work, the PCCEP should consider relevant precinct demographic data to inform its analysis and recommendations.

Thus, while we share the Compliance Officer's assessment that the City is substantially complying with its obligations, *see* ECF 278-1, COCL Q3 2021 Report, at 67–68; ECF 291-1, COCL Q4 2021 Report, at 134, we are concerned that the PCCEP has not been considering whether to provide any input to precinct commanders about how to develop and tailor outreach and policing programs to precinct residents.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 148.

PPB requires officers to collect the demographic data required by this paragraph. PPB reports this data quarterly, typically on February 15, May 15, August 15, and November 15 of each year. Data through the first quarter of 2022 has been publicly reported and is available on PPB's website. PPB, Stops Data Collection Quarterly Reports, available at www.portlandoregon.gov/police/67433. PPB publishes a yearly report with greater analyses of the stops data. As of April 2022, annual data through 2020 has been reported and is available on PPB's website. PPB, Stops Data Collection Annual Reports, available at www.portlandoregon.gov/police/72040.

The PCCEP has received this data and presentations from PPB personnel knowledgeable about the topic. The Racial Equity subcommittee has devoted several meetings to the issue of discriminatory policing, particularly as to the contexts of stops and training. PPB's Equity and Inclusion Office continues to provide substantial support to the PCCEP and the City's goal of racial equity. *See generally* PPB Equity and Inclusion Office, available at www.portland.gov/police/divisions/equity-and-inclusion-office; PPB Racial Equity Plan – Phase 3, 2021–2022, available at www.portland.gov/sites/default/files/2022/racial-equity-plan-2021-2022-signed.pdf.

PPB's Open Data Portal is another significant ongoing effort to enhance data collection and public reporting. The Portal publicly catalogs a broad array of PPB-related information, including lethal force events, general use-of-force statistics, reports of bias-related crimes, and general crime statistics. *See* PPB, Open Data, available at www.portland.gov/police/open-data. The searchable database is updated regularly with new data relevant to community concerns.

149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 149.

In 2019, the Compliance Officer, PPB, and DOJ jointly developed a list of metrics to evaluate community engagement and outreach, which was revised after the PCCEP reviewed and recommended modifications. The five metrics are:

**1. Survey data detailing public trust and confidence in PPB.** PPB is expected to continue to engage with diverse community members in a manner that is fair (unbiased), respectful, and helpful. Public perceptions of the PPB and the performance of its officers are considered important metrics, as they affect public trust and confidence in the police. These can be measured through community and/or contact surveys.

**2. Communication with the public.** The PPB is expected to maintain and continue to establish conduits of information to encourage the bi-directional flow of information between the community and the PPB. These can be measured through the presence, quality, and quantity of information available on PPB's website and social media outlets.

**3. Collective engagement with the community through boards, commissions, committees, and other stakeholder forums/groups/meetings.** PPB is expected to continue to participate in a wide range of public events and groups for purposes of accountability, transparency, and public education. This participation could be measured through the presence, quality, and quantity of PPB participation in these collective events. PPB is expected to report on strategies used to engage with communities that have historically been difficult to reach, including but not limited to, people with mental illness and houseless individuals.

**4. Regular reporting to the community on PPB activities.** In the interest of transparency and public education, PPB is expected to continue to report regularly to the community regarding its activities and events in the realm of community engagement (including #3 above). These can be measured through the presence, quality, and quantity of information contained in PPB's reports, website and social media outlets. PPB reports should note situations in which Bureau members engage with the community in an official capacity, but out of their patrol uniform. In addition, reports should note significant changes year over year, including number and type of contacts, to allow for historical comparison.

**5. Integrating best practices from police departments across the country and around the world.** PPB is expected to report on efforts made to identify learnings from other departments and integrate those learnings into the Bureau's community engagement work. This metric includes, but is not limited to, attendance at conferences outside of Portland, training by personnel from outside of Portland, and changes to policies and practices inspired by learnings from other jurisdictions.

PPB's Community Engagement Plan addresses these metrics, and PPB evaluates its progress implementing the Plan through the Office of Community Engagement. PPB Community, available at www.portlandoregon.gov/police/30379. The PCCEP is tasked with holding PPB accountable

> to its community engagement strategies, and PPB has pledged to continue working with the PCCEP to evaluate the Plan in action and modify it as needed.
>
> We share the Compliance Officer's view that the City should consider reintroducing contact surveys to give voice to the community members most directly affected by police encounters and to measure PPB's efforts to incorporate procedural justice into policy and practice.  ECF 278-1, COCL Q3 2021 Report, at 71–72; ECF 291-1, COCL Q4 2021 Report, at 138.  However, at this time, we agree with the Compliance Officer's assessment that the City remains in substantial compliance with this paragraph.

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing, in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| Status | Substantial Compliance |
|---|---|

The City is in substantial compliance with Paragraph 150.

PPB corrected course in 2021.  After failing to release its 2017 and 2019 Annual Reports before December of 2018 and 2020, PPB was unable to hold the requisite precinct meetings those years.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 69–70.  As a result, DOJ issued a notice of noncompliance, which the City resolved, in part, by agreeing in new Paragraph 193 to release PPB's Annual Report by September 20 of each year this Agreement is in effect.

In 2021, PPB provided a draft of its 2020 Annual Report to the PCCEP for review and comment at its June monthly meeting.  PPB, 2020 Annual Report (draft), available at www.portlandoregon.gov/pccep/article/784276; PCCEP, Meeting Minutes, June 22, 2021, available at www.portland.gov/pccep/subcommittees#toc-2021. PPB responded to the PCCEP's feedback, releasing the final version on August 3, 2021.  *See* PPB, 2020 Annual Report, available at www.portlandoregon.gov/police/article/785376.

The timely release of the 2020 Annual Report allowed PPB to present it to the public and City Council, as required.  On August 17, 18, and 19, Chief Lovell and the respective Central, North, and East precinct commanders held recorded meetings on Zoom with interested community members.  *See* YouTube, PPB Videos, available at www.youtube.com/playlist?list=PLLaHQOlhmiRqsVE0b-bt3lgzGuPXTsSLY.  The meetings broached challenges and successes, and were generally well received.  On August 18, 2021, Chief Lovell presented the Report to City Council, which accepted it without further public comment. City Council, Agenda and Video, available at www.portland.gov/council/agenda/2021/8/18#toc-wednesday-august-18-2021-9-30-am- (remarks run from about 30:00 to 1:01:30); City Council, Report 626-2021, available at www.portland.gov/council/documents/report/accepted/626-2021.

151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory

requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

| Status | Partial Compliance |
| --- | --- |

The City is not substantially complying with Paragraph 151 because it hindered the PCCEP's ability to meet as needed to accomplish the objectives set forth in the Amended PCCEP Plan.

For three years beginning in November 2018, the PCCEP consistently held monthly public meetings and five subcommittee meetings even as one or two seats remained vacant. In November 2021, the situation became unsustainable as vacancies doubled from two to four as members rotated off the Committee after serving their terms. By January 2022, vacancies tripled to six open seats. The impact was magnified by the PCCEP Project Director leaving City employment for another job in December 2021, with the PCCEP Project Assistant leaving City employment in March 2022. As of April 2022, the PCCEP continued to have six open seats and the City had not hired a new Project Director or Assistant. As a result of the understaffing, the Mayor's Office proposed (but ultimately declined) a 60-day hiatus for PCCEP. However, the City canceled PCCEP subcommittee meetings in April, May, and June 2022 due to lack of staffing. PCCEP members had scheduled meetings, prepared topics, and were available to meet to accomplish the objectives set forth in the Amended PCCEP Plan, but were unable to do so because of the City's inability to provide necessary logistical support.

The Amended PCCEP Plan lays out many tasks for the PCCEP to complete at quarterly or annual intervals. Many of those tasks were not completed in 2021, and some may become moot in 2022 as the City transitions the PCCEP away from OEHR. For example, the OEHR Director has not regularly attended PCCEP meetings or met with PCCEP members. Despite commendable efforts by staff to support the PCCEP members, DOJ and the Compliance Officer conducted multiple interviews in the second half of 2021, which revealed significant supervisory failures within OEHR that left staff feeling unsupported and overwhelmed. The failures were magnified by turnover within the Mayor's Office, which prevented the PCCEP, its staff, and its members from having consistent and reliable access to City leadership.

Despite the challenges, members and staff worked hard to advance the mission, as detailed in the Compliance Officer's quarterly reports. ECF 273-1, COCL Q1 2021 Report, at 12–13, 56–57; ECF 274-1, COCL Q2 2021 Report, at 11–12, 60–62; ECF 278-1, COCL Q3 2021 Report, at 11–12, 63–65; ECF 291-1, COCL Q4 2021 Report, at 126–28. In 2021, the PCCEP addressed governance issues, received presentations from subject matter experts in behavioral health and policing, heard public comment, made statements on issues of public concern, and developed, discussed, and voted on recommendations to improve police-community interactions. The PCCEP hosted town hall meetings to discuss the Compliance Officer's quarterly reports, DOJ's periodic compliance assessment report, and the Parties' efforts to mediate a resolution to DOJ's notice of noncompliance, and produced quarterly reports. PCCEP Reports, available at www.portland.gov/pccep/library/pccep-reports. The PCCEP also formed ad hoc committees to explore the formation of a truth and reconciliation commission and to reimagine core patrol services. PCCEP Core Patrol Services, available at www.portland.gov/pccep/library/cps.

The PCCEP's substantial efforts to accomplish its objectives are commendable given the City not providing logistical support for subcommittee meetings, not appointing replacement members, inadequately supervising support staff, and not hiring replacement staff. The City must enable the

| PCCEP to meet as needed to accomplish the objectives set forth in the Amended PCCEP Plan to re-achieve substantial compliance. |
| --- |

152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

| Status | Substantial Compliance |
| --- | --- |
| The City remains in substantial compliance with Paragraph 152.<br><br>The City Attorney's Office provides PCCEP members with live training, access to recorded training materials, and written materials on the requirements of local law. At least one City lawyer attends each PCCEP meeting, and sometimes several attend. City lawyers generally provide timely responses to specific questions from PCCEP members. | |