**J. ASHLEE ALBIES, OSB #051846**
E-mail: ashlee@albiesstark.com
ALBIES & STARK, LLC
1 S.W. Columbia Street, Suite 1850
Portland, Oregon  97204
Phone:   (503) 308.4770
Fax:      (503) 427.9292

*Attorney for Amicus AMA Coalition for Justice and Police Reform*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:12-cv-02265-SI |
| Plaintiff, | |
| | **JULY 2022 STATUS REPORT OF THE ALBINA MINISTERIAL ALLIANCE COALITION FOR JUSTICE AND POLICE REFORM** |
| v. | |
| CITY OF PORTLAND, | |
| Defendant. | |

The Albina Ministerial Alliance Coalition for Justice and Police Reform ("AMA Coalition") hereby submits its status report for the upcoming July 27, 2022 Status Conference.

## I.    APPRECIATION FOR THE WORK DONE AND THOSE WHO HAVE DONE IT

The AMA Coalition appreciates the work of the many community members, advocates, and City and Federal employees and officials who continue to work on this case and drive forward the goal of police accountability.  The City remains in substantial compliance with many of the terms of the Agreement, which demonstrates commitment and continued engagement in these areas.  In addition, the AMA Coalition welcomes the addition of the ABLE training curriculum and is encouraged by its addition to PPB's framework.

II.     **AMAC RESPONSE TO PLAINTIFF DEPARTMENT OF JUSTICE'S SIXTH COMPLIANCE REPORT**

In the United States Department of Justice ("DOJ")'s Fifth Periodic Compliance Assessment Report, it found the City out of compliance with several terms of the Agreement: Section III - Use of Force; Section IV - Training; Section VIII - Officer Accountability; and Section IX - Community Engagement. Dkt. 236-1.  This lack of compliance stemmed largely from the PPB's response to the 2020 Racial Justice protests, where PPB members used force over 6,000 times against protestors, including indiscriminate uses of force such as tear gas and flash bangs.  In the DOJ's Sixth Periodic Compliance Report, the City has yet to repair these deficiencies, and has now fallen out of compliance with Section VI - Crisis Intervention for the Behavioral Health Unit and Advisory Committee, as well as Section VII – Employee Information System. See Dkt. 292-1.

A.     **Review of 2020 Racial Justice Protest Response**

In response to DOJ's concerns about the PPB response to the 2020 protests, in March of 2021, the PPB provided the DOJ a self-assessment of its response, titled the Master After Action Report ("MAAR")."  The MAAR was provided to the DOJ in two parts, the first on March 29 and the second on April 12 of 2021.  The DOJ found the MAAR insufficiently comprehensive, that it lacked critical self-assessment, and that it validated out-of-policy conduct from the 2020 protests. Dkt. 292-1, p. 3.

The PPB also provided the DOJ an audit of its crowd control response to the protests in December of 2021, over a year after the conclusion of the 2020 protests, but, as the DOJ found, it too was woefully insufficient.  The audit did not take into account COCL's input, nor did it comply with the Agreement's requirements. *Id.* at 21-23.  Moreover, it was completed and posted late; lacked credibility by finding PPB at 96% compliance rate, which is impossible given

the City's admissions about deficiencies stemming from the protests; did not qualitatively assess

PPB's use of force or its reporting requirements; and validated the blanket use of sound truck

warnings without specific inquiry. *Id.*   The AMA Coalition agrees with the DOJ's concise

assessment that "PPB designed the 2020 crowd control audit to validate its responses and

overlook numerous reporting deficiencies rather than critically assess the force that was used and

the reporting processes that failed, and attempt to learn from the experience." *Id.* at 22.  This

remains deeply concerning, as it captures the ongoing pattern of lack of accountability stemming

from the protests.

As part of the remedies of Section XI, the City externalized a comprehensive critical

assessment of the 2020 protest response, contracting with an outside entity, Independent Monitor

LLC, to conduct this review.  But that review is not expected to be completed until January of

2023, two and a half years after the 2020 protests began.  While the AMA Coalition welcomes

this external review, it notes that this publicly funded assessment was only required because the

City failed to do the work itself by refusing to engage in meaningful self-reflection on its use of

force.  Despite feedback to the contrary from the DOJ, the COCL, Courts, and the public, PPB

continues to insist that when it comes to its 2020 protest response, "99% of the time we did it

well." *Id.* at 31.  To be credible as a learning agency, it must take seriously the task of

recognizing and acknowledging that it can and should do better.  Without doing so, the City and

PPB will not make progress towards resolution of this case, nor will it become a viable public

safety organization.

### B.    Training and Officer Accountability

The Sixth Compliance Report finds significant deficiencies with the PPB's training

process and accountability mechanisms: concerns about quality and timeliness of administrative

investigations; open questions about the Police Review Board ("PRB"); inadequacies of After-Action Reports, Supervisor Investigations and follow up investigations; concerns about Deadly Force response and reviews; failure to ensure effective use of the Employee Information System; inadequacies of PPB's self-audit of the 2020 protests; failure to correct training deficiencies to RRT and Mobile Field Force; failure of the training division to conduct a needs assessment for its annual training plan to conduct an audit and maintain certain records; failure to consistently apply policies uniformly or hold officers accountable; timeliness of investigations; allowing subversion of Communication Restriction Orders; and inconsistent implementation of discipline. Such deficiencies represent significant backsliding on key areas of the Agreement.

Before getting into specifics below, the AMA Coalition continues to believe that training should involve significant participation, in design and delivery, from impacted community members and those with lived experience.

### 1.  Disconnect between Policy, Training, and Practice

The AMA Coalition remains gravely concerned that a disconnect between PPB policy, training, and practice persists.  The DOJ found PPB's own administrative investigations into the 2020 protests excused out-of-policy conduct by the Rapid Response Team ("RRT") because RRT trained themselves incorrectly, that PPB failed to enforce policies to address collateral misconduct; failed to address faulty Police Review Board ("PRB") analysis, or to properly and timely apply policy in some deadly force events. Dkt. 292-1, 3.  Moreover, the DOJ notes that PPB did not properly apply policy to problematic uses of force as well and inconsistently enforced Directive 1010 (which governs use of force), the constitutional limitations on use of force, and its de-escalation policy. *Id.* at 3-4.  Concerningly, the DOJ found that PPB officers and executives "repeatedly noted that RRT members were trained that they need not follow Directive

1010.00, because they were authorized to use greater force under Directive 635," which governs crowd control. *Id.* at 4, 25.

However, when DOJ reviewed the relevant policy and training, it found the policy is clear that 1010 applies to crowd control situations, and RRT members *had* been trained that Directive 1010 applies to all uses of force. *Id.* at 4-5.  A RRT Lieutenant and an Assistant Chief justified using force circumventing Directive 1010, the latter disagreeing with Judge Hernandez's finding of contempt for an officer's use of force during the protests. *Id.* at 25-26.  This begs the question then, how can PPB members, officers and executives alike, have gotten this wrong?  It also makes clear that the accountability mechanisms PPB has in place to identify, address, and correct these issues has again failed.  The AMA Coalition also notes that the City has not yet addressed the poor training to RRT and its impact on the organization. *Id.* at 27.

The Agreement's new Section XI, Paragraph 192 requires the City to investigate and hold PPB supervisors accountable for training RRT members to use force against individuals during crowd control events without those members meeting the requirements of Directive 1010, for directing or authorizing this use of force, or failing to ensure after action reports were completed, and to hold accountable PPB commanders who failed to address these systemic issues.  That investigation is apparently underway, and the AMA Coalition looks forward to the results of this investigation.

### 2.  *Deadly force incidents do not follow expected protocol*

Deadly force cases have perhaps the most widespread impact on PPB members and the community.  It is therefore critical that reviews of such incidents are conducted carefully, thoroughly, and consistent with policy.  The AMA Coalition was dismayed to learn the City interprets the requirement of a timely statement from-witness officers to be "optional," rather

than mandatory, *id.* at. 13, given the history of community distress and heightened distrust in the wake of deadly shooting cases.  In that same vein, the AMA Coalition has concerns that a statement from an involved officer in deadly force case was obtained 48 *days* after the incident. *Id.*  While it appears the officer was incapacitated for a period of time stemming from injuries related to the incident, it is unclear whether that incapacitation was for this entire time. *Id.* Again, the AMA Coalition's interest is in not having additional backsliding on the gains made throughout this case, which included elimination of the 48-*hour* rule.

### 3.  Accountability deficiencies remain unaddressed

In a jarring finding, the AMA Coalition was startled to learn that <u>seven</u> times during the compliance period, the City voluntarily agreed to rescind discipline and to remove all references of the matter from the officers' personnel files as part of voluntarily resolution of grievances. *Id.* at 58.  These disciplinary actions were levied after what we presume was a DOJ-approved investigation.  This reversal does not engender trust in the accountability system.

The AMA Coalition remains concerned that collateral misconduct learned or identified during existing administrative investigations is left unaddressed, and that the reviews of force continue to focus in on *articulation* of the justification of force, rather than an analysis of whether the force was actually justified. *Id.* at 5-6.  Further, the AMA Coalition shares the DOJ's concerns about PPA representatives interfering with use of force investigations. *Id.* at 60.  This is completely unacceptable, and the City has been on notice of these concerns since 2020 but has yet to remedy it. *Id.*

Moreover, the DOJ notes that it identified concerns with the Police Review Board ("PRB") in March of 2021, and again in December of 2021, but has yet to receive a substantive response from the City on these latter concerns, seven months after the DOJ requested additional

information. *Id.* at 6.  In addition, the PPB has inadequately investigated deadly force incidents, did not enforce supposedly required de-escalation tactics, and has substantially delayed the PRB processes. *Id.*  These concerns support the AMA Coalition's longstanding position that a special prosecutor with independent investigation capacity should be appointed in officer-involved deadly force cases.

Finally, the AMA Coalition agrees with the DOJ that the PPB should be investigating allegations that it missed in an initial investigation. *Id*. at 59.  Failure to do so misses important learning opportunities for course correction.

**4.** *Incidents that result in substantial or high-profile settlements should be examined*

Settlement Agreement paragraph 133 applies certain repercussions where an officer's use of force results in civil liability, such as reevaluating the officer's participation in specialty units, tracking in EIS, reopening an IA investigation, or initiating an IA investigation if one had not been conducted with a rebuttable presumption that the force used violates PPB policy, and examining why an IA investigation reached a different outcome then the civil trial. *Id.* at 70-71. While the City is in substantial compliance with this paragraph, as there were no civil liability findings last year, consistent with the DOJ's recommendation, the AMA Coalition strongly urges the City to apply these systems for holding supervisors accountable, tracking deficiencies from the Force Inspector, and informing the training needs assessment. *Id.*

**C.    Community Engagement**

Community distrust of PPB and the City remains.  PPB and the City must show they are capable and willing to respond to community demands to change the culture of policing, and to continue to expand investments in diversity and transparency.  As the AMA Coalition has stated many times, if community members do not see themselves as important members of the City and

treated with respect, then it is unlikely that communities trust the City.

The AMA Coalition remains supportive of the Portland Committee on Community Engaged Policing ("PCCEP") and appreciates the PCCEP's community engagement.  While PCCEP has made progress since the last hearing, *see* Dkt. 292-1, 75-84, there is still high turnover, inconsistent quorums at the meetings, and lack of capacity and resources to meet the requirements of some paragraphs of the Agreement.  The AMA Coalition remains committed to continue to work in collaboration with the PCCEP and continues to attend PCCEP meetings and send the meeting announcements to its large email list but maintains that a community organizer for outreach and engagement is necessary to PCCEP's success.

As the DOJ notes, the City has failed to fill vacant PCCEP seats and has not adequately staffed, supervised administrative staff, and supported PCCEP. Dkt. 292-1, 77.-78.

Because of the consistently high turnover, and great deal of work the PCCEP is expected to engage with, the AMA Coalition believes that City Council should authorize PCCEP to set its own quorum at a number that will allow them to take action instead of waiting to have full or near full participation from all members.  Historically, PCCEP has struggled to maintain steady numbers at its meetings, and such an allowance would grant the entity further flexibility.

### D.    Bias Based Policing

Again, the PPB's own data continues to reflect disparate policing of Black people and people of color in its stops, searches, and arrests, with an increase in percentage of traffic stops and searches of Black people in 2021. *See* PPB Strategic Services Division, Stop Data Collection 2021 Annual Report (July 1, 2022) ("PPB 2021 Stop Data Report"), at 11, 19[1].  The AMA

---

[1] Available at https://www.portland.gov/sites/default/files/2022/2021_stops_data_annual_report.pdf (last visited 7/25/22)

Coalition remains concerned about the disproportionate stop, search, arrest, and use of force against Black community members.

In late June of 2021, PPB implemented two protocols to address its racial disparities in traffic stops: officers de-prioritized making traffic stops for the enforcement of low-level traffic infractions, and officers began following new consent search protocols to inform residents of their Fourth Amendment Rights. These protocols are not enshrined in PPB policy.

A year later, while traffic and pedestrian stops are significantly down, the disproportionate rations of stops, searches, and arrests of Black people and people of color remains. *Id.; see also* Catalina Gaitan, *See which drivers Portland police are more likely to stop,* The Oregonian (7/24/22)[2]. "Black drivers were significantly more likely to be asked to consent to a search than other drivers and were less likely to deny consent than White drivers." PPB 2021 Stop Data Report, at 4. And "Hispanic or Latino drivers were significantly more likely to receive a citation than other drivers, regardless of the stop reason." *Id.* at 5.

In addition, PPB recently concluded that a PPB member's membership with the Oath Keepers in 2018 did not violate any PPB policies, despite the fact the Oath Keepers are an extremist right-wing radical anti-government militia group, and were instrumental in organizing the January 6, 2021 insurrectionary attack on the U.S. Capitol seeking to overturn the 2020 election. *See* Jonathan Levison, *Portland police investigation clears officer who joined Oath Keepers militia,* OPB (7/14/22)[3].

/ / /

---

[2] Available at https://www.msn.com/en-us/news/us/see-which-drivers-portland-police-are-more-likely-to-stop/ar-AAZUBQ6 (last visited 7/25/22).
3Available at https://www.opb.org/article/2022/07/14/portland-police-investigation-clears-officer-who-joined-oath-keepers-militia/?fbclid=IwAR3pgV1Zmea6hmVNjWFIZ0jn9cpAHCcOk6zJf5Mqh3MIfiwZrUwr2_NszME (last visited 7/24/22)

The stop data, coupled with the training slide deck released earlier this year by the PPB (described at Dkt. 292-1, at 25), and the above Oath Keeper story demonstrate the PPB and City have lost substantial ground with the community on showing it lacks bias.

### E. Mental Health

The AMAC supports the Mental Health Association (MHA)'s repeated concerns that the City has failed to address mental health crises in a nonviolent manner and PPB has therefore continued to use excessive force against people with mental health conditions or perceived mental health conditions.  The DOJ and COCL have both reported increased use of force against people in crisis, but the City has not offered an explanation for this trend. While the AMAC supports and appreciates the increased support for Portland Street Response and the Public Safety Support Specialists, designed to reduce violent interactions between PPB and people with mental health conditions by reducing contact with armed officers who are not equipped to safely manage mental health crises.

In addition, the AMA Coalition supports additional community engagement with the Behavioral Health Unit Advisory Committee ("BHUAC"), and believes, as does the MHA and DOJ, that it should be reviewing critical incidents as part of its role.

The AMA Coalition defers to the Mental Health Alliance for further information and assessment of PPB's interactions with people in crisis and the City's attempts at providing training and resources to reduce incidents of violence.

### III.    SECTION IX REMEDIES

Though it has been just a few months since the Court's approval of Section XI of the Agreement, the City has been moving forward with implementation.  As noted above, the

external review of PPB's response to the 2020 protests is underway, with a report expected in January of 2023.

### 1. Body Worn Cameras

The City has contracted with AXON, formerly TASER International, for a pilot program. The AMA Coalition believes a third-party Oregon company subject to Oregon law, who is not the manufacturer, nor any law enforcement entity should store the footage, to ensure access/storage and prevent tampering.

Despite stressing repeatedly the importance of community engagement, neither the AMA Coalition nor the MHA were consulted or engaged for this process. The City and the Portland Police Association remain in the bargaining process over this critical issue. The AMA Coalition maintains its position that if body cameras are used by PPB, certain parameters must be met, as drafted and adopted by the AMA Coalition in 2015 and reiterated in Dkt. 288, at 3. Critically, the AMA Coalition strenuously opposes any BWC policy that allows officers to review footage before writing their reports. Body worn cameras are a tool for accountability and should be treated as such. The AMA Coalition strongly urges the PPA and the City to agree to policies that are consistent with the AMA Coalition's stated principles.

### 2. Hiring of Civilian Training debacle

Last week the City announced it had hired a civilian training director, only to rescind the offer days later, after it was uncovered how hostile the proposed hire was to police reform. See https://www.portlandoregon.gov/police/news/read.cfm?id=432409. Despite having 18 qualified applicants, the City is restarting the process. As the MHA notes, despite having representatives from various City Advisory committees to give input into the hiring process, these committees are all selected by either the police chief or the police commissioner. As Commissioner

Hardesty noted at the recent Fairness Hearing, the selection committee was police-heavy, and all three finalists were current or former police officers. This process has not been injected with community engagement. For that reason, the AMA Coalition and MHA should participate in the hiring panel for the next round.

## IV.    COURT MONITOR

The AMA Coalition continues to believe that a court monitor may be appropriate in this case. Given the daylight at times between the COCL's assessment and the DOJ's assessment on the City's compliance, it may be the time to move towards a court monitor.

## V.    CONCLUSION

The AMA Coalition is concerned by the PPB's backsliding on many of the requirements of the Agreement. Moreover, the City's response to the DOJ's Sixth Periodic Report reflects a defensiveness that will continue to interfere with a culture change that all have agreed is needed. The AMA Coalition will continue to support transformative change within the bureau that will lead to the safety of all community members.

In conclusion, the AMA Coalition remains committed to bringing a community voice to this very important process. Consistent with the AMA Coalition's collaborative agreement with the DOJ and City, the AMA Coalition agrees to advocate for the implementation of the Settlement Agreement and PCCEP reforms that the AMA Coalition supports and will oppose any attempts to weaken or dilute the Settlement Agreement and PCCEP reforms that it supports.

DATED: July 25, 2022

Respectfully submitted,

*/s/ J. Ashlee Albies*
J. Ashlee Albies, OSB # 051846
ashlee@albiesstark.com