**Juan C. Chavez**, OSB #136428
Email: jchavez@ojrc.info
**Franz Bruggemeier**, OSB # 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

Attorneys for *Amicus Curiae* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>    vs.<br><br>CITY OF PORTLAND,<br><br>Defendant. | Case No. 3:12-cv-02265-SI<br><br><br>*AMICUS CURIAE* MENTAL HEALTH ALLIANCE'S JULY 2022 STATUS HEARING BRIEFING |

## I. INTRODUCTION

*Amicus curiae* Mental Health Alliance ("MHA") provides this briefing for the following purposes:

1. General commentary on the Use of Force assessments in Plaintiff United States' *Notice of Sixth Periodic Compliance Assessment Report*, Dkt. 292 and 292-1.

2. Express concern about implementation of Paragraphs 191 and 194 from the recently adopted Section XI.

3. Provide updates about:

a. Portland Committee on Community-Engaged Policing (PCCEP)

b. Use of force data discussed in MHA's previous filing, Dkt. 284 and 285.

c. Police Accountability Commission (PAC)

d. Behavioral Health Unit Advisory Committee (BHUAC)

4. Express need for additional amendments to settlement agreement.

## II. PROCEDURAL AND SUBSTANTIVE FACTS

When the parties last convened for a status hearing on August 24, 2021, Dkt. 249, the City of Portland had been in non-compliance with the parties' settlement agreement following their unchecked excessive use of force in the Summer of 2020.

The parties to this case convened over the Fall of 2021 to discuss new remedies and provisions for the settlement agreement. The parties largely agreed on the slate of provisions, but MHA had reservations about two provisions: Paragraphs 191 (civilian trainer) and 194 (Body-worn cameras). The Court granted the amendments to the settlement agreement on April 29, 2022.

The United States has once again found the City in non-compliance with the settlement agreement. Dkt. 292.

## III. DISCUSSION

### A. The City Has Not Complied with the Settlement Agreement

The Mental Health Alliance agrees that the City has "backslid," as the Plaintiff notes on page 3 of their Sixth Periodic Compliance Report. Dkt. 292. As much as MHA wishes there to be cause for optimism that the City's police bureau will change its ways because of the Plaintiff's settlement agreement, we can only currently place our optimism in programs tangentially-related to the settlement agreement like Portland Street Response and the future police accountability

board for which the community volunteers of the Police Accountability Commission are developing the rules and procedures. The public—especially the people with mental illness whose voice MHA hopes to uplift in this matter—demands progress, not backsliding. While MHA could and will commend progress when it's made, it is hard to call something progress when we are locked in a loop. We keep returning to the same place, to report the same conclusions, to report a new death of one of our community members. As we will discuss below, MHA believes that only with more provisions with outcome-based metrics, can the City of Portland truly put its pattern and practice of excessive force behind it. But for now, we join the Plaintiff in highlighting the City's backslide.

The Plaintiff's report is replete with examples of the City's police bureau being presented with obvious, clear examples of training and directives that drove excessive force outcomes, but the City still insists that the training is justified and lawful. For instance, "PPB officers and executives repeatedly noted that PPB's Rapid Response Team (RRT) members were trained that they need not follow Directive 1010.00, because they were authorized to use *greater force* under Directive 635.10." Dkt. 292-1, p. 4 (emphasis added). As the Plaintiff notes, Directive 635.10 does no such thing, and yet the Defendant trains its officers to believe it does.

Even when the Bureau does acknowledge the issues with its training and directives, that is not reflected in disciplinary outcomes:

> "[T]he City failed to identify misconduct in several cases and did not hold any supervisors responsible for their conduct. In the accountability process we continued to see PPB members from line officers to deputy chiefs conflate the actions of the crowd generally with the individual justification required for each separate application of force. When the City reaches a sustained finding, it does not necessarily impose the applicable discipline. Seven times during this compliance period, the City voluntarily resolved grievances of imposed discipline by agreeing that the 'discipline be

rescinded' and 'that all references of this matter be removed from [the Grievant's] personnel file.'"

Dkt. 292-1, p. 58.

The Bureau continues to solidify the view amongst its ranks that the public, courts, and DOJ have all been wrong to criticize its tactics and actions during the 2020 Movement for Black lives. In a self-audit, "PPB gave itself an overall compliance rate of 96%. Even ignoring force policy requirements and assessing only the reporting requirements of crowd control policy, as PPB designed its audit to do, a 96% compliance rate is inconsistent with the City's acknowledgement that it did not complete timely AARs or conduct full interviews and investigations of force during the 2020 protests." Dkt. 292-1, p. 22. Despite the City repeatedly returning to this Court to relay that it understands that "mistakes were made," it tells its own officers and the public a different story. That failure to admit any fault or wrongdoing is again illustrated by the following: "The procedural justice class instructed by a Captain of training expressed the management view: 'Again, 99% of the time we did [crowd control] well.'" Dkt. 292-1, p. 31.

Even when ordered to comply with a federal court order, such as the contempt order by Judge Hernández in *Don't Shoot Portland v. City of Portland*, 503 F. Supp. 3d 1022, 1034 (D. Or. 2020), the City failed to purge its old ways: "[T]he March 24, 2021 legal instruction [from the City Attorney's office] acknowledged a conflict with training in the statements: 'I'm just giving you legal advice but you should probably rely upon your training. I don't want to give you conflicting advice from your training.'" Dkt. 292-1, p. 27.

Furthermore, from MHA's observation, the definition of "Mental Illness" in the Settlement Agreement at ¶ 43 has not been consistently applied in relevant documents (e.g., training directives) which defines it as including "individuals with dual diagnosis of mental

illness and another condition, such as drug and/or alcohol addiction." Publicly available information indicates police are over-using substance abuse to dismiss mental illness, resulting in excessive force and possibly under-reporting of police-mental illness/mental health crisis interactions.

The cumulative story here is that the City has a deep, unshakeable accountability and excessive force problem. There can be no question that this affects people with mental illness who regularly come into contact with the Bureau's officers. Unlike with protests, those interactions are rarely documented by independent sources. The City's non-compliance with its Force Data Collection Report and After Action Report requirements cast heavy doubts on the reliability of use of force reporting in those interactions. Unfortunately, very much like the protest context, accountability is also non-existent for officers who kill or hurt people in mental health crises.

**B. The City's Withdrawal of its Offer of Employment for the Civilian Training Dean Position After a Background Check of the Candidate Highlights Lack of Involvement of Community Members and Issues with Hiring from Within Police Ranks for a Role Meant to Change Policing Culture.**

As MHA told the Court in its Memorandum regarding adoption of Section XI, the civilian "dean" of police training does hold promise in concept as written. Our caution stemmed from two learned experiences by the people who hold those roles in Los Angeles and New Orleans: 1) The role of training dean could just result in continued deference to the Bureau on matters of training and discipline if the dean is not vested with the authority to develop and direct the training and ensure that the training is working; and 2) The need for a competent and resolved outsider who can change the culture of the Bureau without succumbing to it. Our city's recent experience with having offered the Training Dean position to a candidate who is currently

an officer and trainer with the Los Angeles Police Department and then rescinding that job offer demonstrates why our caution and the caution of the community matters.

The Court heard from Commissioner Hardesty during our April 2022 fairness hearing that the City had stacked the majority of the hiring committee for the "civilian" dean with officers from the Portland Police Bureau. We heard that the hiring committee had already selected three finalists for the position, all of whom are or were previously police officers.

The hiring process included 18 applicants and involved sworn and professional staff members, Chief's Office, staff from elected officials, community members, and another law enforcement civilian dean from a major city. The Bureau developed interview questions with input from the Portland Committee on Community-Engaged Policing (PCCEP) and PPB's Coalition of Advisory Groups, which has representatives from: the Training Advisory Committee; Slavic Advisory Committee; Muslim Advisory Committee; Behavioral Health Advisory Committee; African-American Advisory Committee; Latino Advisory Committee; Alliance of Safer Communities Advisory Committee; and the Asian Pacific Islander Advisory Committee. These committees, however, are all hand selected by the police chief or the police commissioner. That is not community engagement in any substantive and honest sense.

The Mental Health Alliance had reached out to the City and PPB and offered to be a part of the screening and hiring process for the dean position but were turned away. If MHA had been part of the process, we would have objected to a career officer—regardless of who the person is or their academic credentials—being the first civilian head of training. The purpose of a civilian being the head of training was to gain—at a high and powerful level—a non-police person to push back against how things have always been done within PPB and in policing, to bring research and experience outside of police departments, and to change and transform the PPB into

a police agency that would no longer need the guidance and enforcement of the Settlement Agreement to try to force the City to engage in constitutional policing. That purpose is undermined when the City and PPB select a career police officer for that position.

Additionally, the proposed hire also had a background that did not engender confidence in the community that their police force would be receiving training that corrects past biases and sufficiently changes the culture within PPB. The community had just recently learned that the riot police from the Bureau, in addition to the Multnomah County Sheriffs, Salem Police Department, and Oregon State Police, received training from a PowerPoint presentation that contained slides containing politically-biased and legally incorrect content. Dtk. 292-1, pp. 25-26. When news of the City's new hire was announced, it did not take long for community activists to find that the person offered the training dean position appeared to have affinities for extreme right-wing thinkers and organizations, including a group the Southern Poverty Law Center notes has explicit ties to alt-right white supremacists.[1] Those connections are concerning, especially given that the police training slides expressed ideas from right-wing extremists that encouraged police to use violence violent against people who believe in police reform and reduction in the amount of violence police use. The City has not disclosed the exact reason why the offer had been rescinded, but vaguely cites "that as a result of the background check, the city withdrew the conditional offer of employment."[2] The proposed training dean also expressed his

---

[1] Zane Sparling, *Portland yanks job offer for police training chief, citing problems in background check*, The Oregonian (Jul. 20, 2022), available at https://www.oregonlive.com/crime/2022/07/portland-yanks-job-offer-for-police-training-chief-citing-problems-in-background-check.html; *and* Brendan Joel Kelley, *Turning Point USA's blooming romance with the alt-right*, Southern Poverty Law Center (Feb. 16, 2018), available at https://www.splcenter.org/hatewatch/2018/02/16/turning-point-usas-blooming-romance-alt-right.

[2] *Supra* Sparling, fn. 1.

belief on his podcast that he has a "dislike for police reform and ideas surrounding implicit bias training."[3]

Given the ease that these connections to far right groups and hostile views to police reform and implicit bias training were found leads MHA to two troubling conclusions: 1) The hiring committee knew about these views and connections and did not care; or 2) The hiring committee did not challenge the applicants to explain their views on these issues. Having community members and advocacy groups like AMAC and MHA on the hiring committee could have prevented these lapses and prevented the need for a completely new hiring process. Substantive community involvement might have resulted in support for the candidate if the right questions had been asked during the hiring process and convincing answers received. Some members of the MHA reviewed the candidate's podcasts and doctoral dissertation in detail and felt that the candidate might perform well despite his non-civilian background, and others within the group disagreed. Active community participation in vetting, interacting with, and posing questions to the candidate might have resolved the question. But neither *amici* or the larger community were not at the table. Neither were members of AMAC. The Bureau needs to understand that the remedies from Section XI are meant to cure and correct past misconduct, not provide more opportunity to maintain the status quo and declare mission accomplished. The public demands better. Although we are disappointed in the amount of time and money that has already been spent to get to the point of starting over, we hope that the City heeds these calls, and MHA would gladly assist the City in their search for a new training dean.

///

---

[3] Joelle Jones, *City of Portland withdraws offer to hire new PPB training dean*, KOIN 6 News (Jul. 20, 2022), available at https://www.koin.com/local/multnomah-county/city-of-portland-withdraws-offer-to-hire-new-ppb-training-dean/.

**C. MHA Remains Concerned About How the City Will Implement a Body Worn Camera Policy under Paragraph 194 of Section XI.**

According to the City, it has chosen Axon as a vendor for its body worn camera (BWC) program. Dkt. 295, p. 6. The policies for that program, however, have not yet been determined. MHA has concerns that the services that can be provided by Axon might impose limitations on or otherwise negatively affect the City's BWC policies that are necessary for the BWC program to increase accountability and transparency, as it should as a remedy under the Settlement Agreement. In addition, MHA is also concerned about the selection of Axon by the City without engagement with the public, MHA, or AMAC. The City repeatedly states that it wants to end the Settlement Agreement to return oversight and direction of PPB to the community, but its community engagement is consistently lacking.

MHA continues to be concerned about the process of forming the BWC policies through the City's bargaining with PPA and length of time it is taking to create those policies. We remain concerned about the policies that will ultimately be adopted through that process. While we wait for that outcome, MHA will remind the City and PPA that the BWC policy is a remedy under the Settlement Agreement to achieve accountability and transparency. As such, the policies should reflect that; Plaintiff, AMAC, and MHA have provided clear guidance about what policies are necessary, baseline operational policies for the BWC to meet the requirements to fulfill its role as a remedy under Section XI of the Settlement Agreement, including no pre-report review and the ability of the public to have access to the BWC data.

**D. Updates on Other Issues**

<u>1. Portland Committee on Community-Engaged Policing ("PCCEP")</u>

As MHA noted in our briefing for the August 2021 status hearing, PCCEP had adopted no meaningful qualitative and quantitative metrics to assess their success. We also noted that

"[m]embers of the PCCEP seem lost as how to go about encouraging more participation by the community and, to date, we have seen little effort on their part or on the part of their staff, to accomplish this. Therefore, we have not seen PCCEP 'engaging' the community in conversation about the police." Dkt. 247, p. 13. MHA opposed full adoption of the PCCEP amendment at the time of the August 2021 hearing, and took no position on the Plaintiff's motion to adopt the PCCEP amendment when motioned upon. Dkt. 261, fn. 1. The Court adopted the amendment on September 23, 2021. Matters have since worsened.

PCCEP nearly collapsed in total in April 2022, owing to low membership and inadequate staffing, both issues that MHA has raised in the past.[4] The Mayor's office believed that it could unilaterally shut down PCCEP for two months because "the city is already out of compliance with the 2014 settlement."[5] The City later reversed this course, but not without significant pushback from both PCCEP and the community it's meant to serve.

As MHA has maintained all along, we hold the members of PCCEP in high regard and are grateful for their labor and the heart that they put into this often thankless and unnoticed work. But they have been let down repeatedly is the City. It is not lost on MHA or the public that PCCEP's priority amongst City-run projects sank to the bottom as soon as the Court granted the PCCEP amendment. It became another checked box for the City to tout then forget. The City must now work to raise its esteem and prove to this Court and the public that it is meaningfully committed to community engagement.

---

[4] Sophie Peel, *Mayor's Office Wants to Suspend Police Policy Advisory Group for Two Months Because of Insufficient Staffing and Low Membership*, Willamette Week (Mar. 30, 2022), available at https://www.wweek.com/news/city/2022/03/30/mayors-office-wants-to-suspend-police-policy-advisory-group-for-two-months-because-of-insufficient-staffing-and-low-membership/.

[5] *Id.*

To that end, MHA has had productive discussions with the City regarding changes to the PCCEP charter. We were able to negotiate with the City to reserve seats on PCCEP for people with mental illnesses or lived experience with mental illness. That does give us optimism that the City, with appropriate guidance and assistance, can resolve some of the issues involved with PCCEP. But more must be done.

2. Use of Force Data

At the April 2022 fairness hearing, MHA member Dr. Jonathan Brown summarized to the Court his initial findings that the degree of force used by PPB officers on persons likely to be mentally ill has increased steadily in the past four years, when officers use force to detain them. Over the same period, since 2017, the probability that force is used during dispatches that include higher proportions of people who are likely mentally ill did not decrease. *See Dec. of Chavez*, Exhibit 1 – Testimony of Dr. Jonathan Brown. Since relaying his early findings, Dr. Brown again reached out to PPB's Office of the Inspector General to discuss his methods. PPB staff have responded with helpful information and made useful comments and criticisms that Dr. Brown has found productive. He hopes that PPB will be able to provide him with some additional electronic data that will help him address its criticisms. He is presently working on a full scientific paper to present, verify, and expand his work, a draft of which he hopes the City will be able to review before submission. Dr. Brown will provide updated findings to the Court as soon as he can.

3. Police Accountability Commission ("PAC")

As MHA noted in its April 2022 Fairness Hearing briefing, MHA has concerns that the City will not meet its obligation under this provision nor the voter's demand. MHA additionally believes that, for the board to be created effectively and timely, the City must provide sufficient

staff and resources to the Police Accountability Commission. For example, the PAC must be sufficiently supported to allow it to be actively engaged with a wide community of concerned citizens and to review and understand comparable police accountability agencies, so that it can create a future board that is largely independent of political influence and capable of holding police officers administratively accountable for actions which are out of city policy. The PAC faces similar problems as those faced by PCCEP—the City has not properly supported the PAC with staff and resources to set up the body for success—but the stakes are even higher for the City's failures in supporting the creation of the new police accountability board.

Now, in July 2022, MHA still sees glacial progress in getting an accountability body created. Only recently, and a year after the PAC commissioners were appointed, has the City hired proper staff for the PAC. Eighteen months have passed since the voters overwhelmingly passed Measure 26-217, and work on a new accountability board has not really begun. The City inexplicably did not convene PAC for close to a year, and PAC has spent more than 30 weeks preparing to work—but it has yet to set pen to paper to create a governance for a future Police Accountability Board.

### 4. Behavioral Health Unit Advisory Committee (BHUAC)

As MHA noted in our August 2021 status hearing briefing, the BHUAC "has failed to allow community engagement." Dkt. 247, p. 15. That issue continues. Now, the Plaintiff has found that the "City is no longer in substantial compliance with Paragraph 95 because the City and PPB are not receiving guidance from the BHUAC regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, to reduce the potential for violent encounters." Dkt. 292-1, p. 41. In fact, the BHUAC has not examined recent examples of

increased violent encounters with persons with mental illness, and whether "recommendations may be appropriate to address the changed circumstances." *Id.* at p. 42.

Eight months have passed since the BHUAC received direction from the Plaintiff and the Compliance Officer to remedy these issues. *Id.* The City has not developed a plan to fix BHUAC.

The BHU could be strengthened through input by people in the community who are not represented by any member of the BHUAC by opening their meetings to the public. By not allowing inclusion, the BHUAC does not add to community trust and resiliency. Had these meetings been opened, MHA believes that oversight and transparency would have prevented BHUAC from ignoring its mandate to review these violent encounters so that it can properly fulfil its requirement under Paragraph 95 to "analyze and recommend appropriate changes to policies, procedures, and training regarding police contact with persons who may be [or may be perceived to be] mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters." We again request that the BHUAC open its meetings and join the Plaintiff in demanding a plan to review these encounters, as the COCL report for the fourth quarter of 2021 clearly explains is required by the Settlement Agreement—despite the City and members of PPB and BHUAC believing otherwise, *see* Dkt. 291-1, p. 166—especially ahead of the adoption of body worn cameras.

**E. The Need for a Section XII: The Road Ahead**

Portland police officers continue to harm and kill people with mental illness. At our last hearing, MHA presented data analysis suggesting that the frequency of use of force on people with mental illness has not been reduced in recent years, and that the severity of force, when used, appears to have *increased* since 2017. It seems like more must be done. Primarily, MHA

believes that the best way to reduce harm by police against people with mental illness is to reduce their contact, including reductions in the frequency, length, and intensity of contact. The current terms of the Settlement Agreement are not reducing those contacts—to do so requires something more.

One way of reducing those contacts under the current Settlement Agreement, as we have raised before, could be Paragraph 89, which refers to the development of a Walk In/Drop Off center. Although the parties have identified Paragraph 89 as aspirational, Portland needs something to provide that service to reduce the unnecessary contacts that result in PPB using force on people with mental illness. As we have stated before, Unity Center does not fill that role. It provides another important, but very different, service of a Psychiatric Emergency Hospital, which is how it describes itself.

Multnomah County, however, is preparing to open a walk in / drop off center downtown this Fall. *See* Multnomah County Commissioners' Letter, Ex 1, Declaration of Juan C. Chavez. According to a County administrator of the new Behavioral Health Resource Center, the City has not made any contribution to its construction nor are there any plans or discussions about the City contributing to its operation.

We asked all of the Multnomah County Commissioners what services would be helpful if there were a partnership between the City and the County to develop them and reduce use of force against people with mental illness. In the Commissioners' letter, they identify three areas in which they would like to expand services if they had additional funds: increased medical sobering services; additional investments in crisis response and peer support services; and the need for additional behavior centers, particularly in East Portland, that would include a walk in/drop off center.

Page 14 -- *AMICUS CURIAE* MENTAL HEALTH ALLIANCE'S JULY 2022 STATUS HEARING BRIEFING

Portland needs medical sobering services. For 40 years, a walk in/drop off drug and alcohol detoxification center was paid for through the PPB budget. Now, thousands of people each year must use hospital emergency rooms for that purpose. Crisis response and peer support is needed, and the County is willing to work with the City to develop those resources. The City should fulfil its obligation under the Settlement Agreement and create, or work with the County to create, these needed resources to provide for the people of Portland while also reducing contacts between PPB and people with mental illness. The City must do more to actually achieve a reduction in the amount of force used on people with mental illness by PPB. If the parties believe that providing those needed services is not currently in the Settlement Agreement, they have the duty to amend the Agreement to include new remedies specifically designed to reduce that contact. MHA can bring in local and national experts to advise the Parties and the Court on these needs.

**F. Court Monitor**

MHA renews its support for a Court Monitor. We add, however, a reminder that the Court and parties should be skeptical of any court monitor picked or determined solely by the City without sufficient consultation with the Parties and amici in this case and from the community. The civilian training dean hiring process serves as a timely reminder of that concern. Moreover, we have heard from others around the country that ensuring that the Parties and amici all have a positive and open communication with the Court Monitor is critical for the success of the Settlement Agreement. Having the amici and all Parties involved in the selection of a Court Monitor can be the deciding factor of whether the addition of a Court Monitor will aid or hinder the achievement of the Settlement Agreement's purpose of reducing the use of force against people with mental illness.

## CONCLUSION

We request that the Court continue to monitor progress of the implementation of the

Settlement Agreement, and, when the time comes, to adopt further remedies to cure its

deficiencies so that PPB and the City can truly move past the need to have the federal

government ensuring that PPB reduces the use of force against people with mental illness and

use only the force allowed under the Constitution.

DATED July 25, 2022.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Of Attorneys for *Amicus Curiae*
Mental Health Alliance

/s/ *Franz H. Bruggemeier*
Franz H. Bruggemeier, OSB #163533
Of Attorneys for *Amicus Curiae*
Mental Health Alliance
