**Statement by Jason Renaud**
**US DOJ v City of Portland Status Conference**
Mental Health Alliance
July 27, 2022

I am Jason Renaud. I am here representing the consensus of the 22 active members and four organizations of the Mental Health Alliance.

The law is a clumsy tool to make public policy. But in the absence of good public policy, and with police officers continuing to use excessive force, harming and killing people with mental illness, we end up here, year after year, expecting something different.

At our last hearing, the Mental Health Alliance presented data analysis suggesting that the frequency of use of force on people with mental illness has not been reduced in recent years, and that the severity of force, when used, arguably, has *increased* since 2017. That analysis, by Dr. Jonathan Brown, used police data from force reports and police dispatches to get an independent, citizen-focused and community-based understanding of what's going on. We will be verifying, expanding, and sharing this analysis over the next year with the City and with the Court, in the peer-reviewed scientific literature, with other racial and social justice advocates, and with other cities under consent decrees.

It's easy to begin jumping from one point to another here. But members of the Mental Health Alliance carry the simple fact that people with mental illness continue to be harmed by Portland's police at a level disproportionate to the general public and in a way that continues to show that EITHER, 1) there remains a pattern and practice of using excessive force against persons with mental illness OR 2) that social forces like COVID, houselessness, addiction, and a dysfunctional psychiatric treatment system put police in a position to use force to solve problems that force only makes worse, OR 3) Both.

We think it's time for a change of strategy. It's time to finally take seriously that the primary way to reduce harm by police to people with mental illness is to reduce their contact – in terms of frequency, length, and intensity. Reducing contact requires a new strategy - and new remedies.

The settlement agreement has over a hundred and ninety-five items - and some are brand new - that nominally intend to change the behavior of the police and nominally intend to reduce the pattern and practice of harming people with mental illness. Note, I say "nominally," because we remain confused how these remedies have much, if anything, to do with people with mental illness.

One item we've raised before, which might have helped, and could – with amendment – still help is Item 89 - referring to the development of a Walk In / Drop Off center. Once the Agreement was signed, the parties identified Item 89 as aspirational - which means in non-legal language they weren't going to do it. Then when Legacy opened the Unity Center, the parties claimed Unity would serve as Item 89 - though the city had nothing to do with the development

of Unity and doesn't contribute to its current operations. Unity is not a walk in / drop off center. In its promotional materials, in its hiring documents, in its state certification, and recently in civil court, it describes itself as a Psychiatric Emergency Hospital.

I had a chat about this with one of our friends who recently spent two months locked up at Unity. Our friend was confused about how a hospital could be misunderstood as a Walk In / Drop Off center. "That's ridiculous," she said, "haven't they been in Unity?"

Meanwhile, Multnomah County is preparing to open a walk in / drop off center downtown this Fall. Members of the Alliance have been watching this deliberate progress for a few years now. I asked the senior County administrator of the new Behavioral Health Resource Center - has the city made a contribution to construction or are there plans with the city to contribute to the operations? No. There has been no discussion, and there are no plans. That would have been a helpful remedy. That would have been an example of how the city was reducing force against people with mental illness.

After speaking to that senior administrator, I went a little further and I asked all the Multnomah County Commissioners what they would do if there were a partnership between the city and the county to reduce use of force. They sent us a letter, which we have shared with the court.

**First**, the County looks to increase medical sobering services so they wouldn't have shut down Portland's acute drug and alcohol detoxification center - which was a walk-in drop / drop-off center paid for through the PPB budget for 40+ years. Does the court know over 24,000 people were admitted to Portland's emergency rooms for acute detoxification in the past year? During COVID? That's where addicts have go because the city no longer has an acute detox.

**Second**, additional investments in crisis response and peer support services are an immediate benefit - and the county is ready and willing to partner with the city on developing these resources and services. They've been doing crisis outreach for decades.

**Third**, our community could use an additional walk in / drop off center paired with transitional housing out in East Portland. And this prospective remedy is now the easiest - the city could model theirs after the county's, or simply pay the county to build and operate another.

To us, the city has failed to meet the obligations of the agreement - in Section VI. And while there is necessary work being done by other agencies, the city is not a party. As the County Commissioners stated in their letter, much work remains to be done.

The settlement agreement anticipates its initial failure and need for revision: "To fully achieve these goals, this Agreement requires the City and PPB to further revise or, where needed, adopt new policies, training, supervision, and practices in the following areas: the use of force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement."

Our recommendation to the court - and to the parties – is to revise the Settlement Agreement with new remedies specifically designed to reduce the contact between the police and people with mental illness. These new remedies don't necessarily have to be complex, or costly, or take a long time - the low hanging fruit has not been picked. The Mental Health Alliance can bring local and national experts to advise the parties and the court of effective resources and services to make this change.

To us, after ten years, the work of this case has not really started. A lot of other things have gone on in the name of reducing force against people with mental illness - but we have not been protected by the settlement agreement.

###

Attached

MultCo Letter
BHECN data from April 2022