# COMPLIANCE OFFICER AND COMMUNITY LIAISON

# *Quarterly Report: Quarter 1 Updates and Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**January 1, 2022 to March 31, 2022**

**September 8, 2022**



**Exhibit A**

# TABLE OF CONTENTS

TABLE OF CONTENTS    **1**

INTRODUCTION    **2**

REPORT CARD    **13**

III. USE OF FORCE    **29**

IV: TRAINING    **46**

V. COMMUNITY-BASED MENTAL HEALTH SERVICES    **87**

VI. CRISIS INTERVENTION    **92**

VII. EMPLOYEE INFORMATION SYSTEM    **126**

VIII. OFFICER ACCOUNTABILITY    **132**

IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING    **157**

XI. ADDITIONAL REMEDIES    **178**

LIST OF ABBREVIATIONS    **183**

LIST OF PERSONNEL    **186**

APPENDIX A    **187**

# INTRODUCTION

This is the Compliance Officer/Community Liaison's (COCL) first quarter report for 2022, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered April 29, 2022. This report covers the three-month period from January 1, 2022, to March 31, 2022.

The COCL continues to evaluate whether the systems required by the Settlement Agreement have been sustained or restored to ensure constitutional policing in Portland. For the first quarter of 2022, most systems remained intact, but some have not been repaired and thus are unable to produce the desired outcomes. As we have noted in previous reports, to a large extent this can be attributed to the City not yet introducing new remedies for the systems that were adversely affected (e.g., Critical Incident Assessment of crowd control in 2020). For others, such as community engagement, additional setbacks have occurred.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

# <u>EXECUTIVE SUMMARY</u>

In this first quarter of 2022, the Portland Police Bureau (PPB) and the City of Portland remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. However, they were found to be in Partial Compliance for 23 paragraphs – six more than the fourth quarter of 2021.  The paragraph-by-paragraph ratings can be found in the Report Card that follows this narrative summary.

### <u>III. USE OF FORCE</u>

During the first quarter of 2022, there are several elements of Section III where the PPB remains in Substantial Compliance due to previously established processes. These include Conducted Electronic Weapons (CEWs) (Par. 68), sergeant staffing (Par. 71), and the After Action Report (Par. 72). But, nine of the twelve paragraphs for Section III remain out of Substantial Compliance. As the COCL has previously reported, the failure to return to Substantial Compliance with many of the paragraphs is due, in large part, to the PPB having not completed a comprehensive Critical Incident Assessment of the PPB's response to the 2020 protests. During the first quarter of 2022, the PPB solicited proposals from vendors and a vendor should be selected during the second quarter. Until this assessment is completed, the PPB cannot return to Substantial Compliance with Pars. 66, 67, 69, 70, 73, 74, 75, & 77.

In addition to needing a comprehensive Critical Incident Assessment, Section III remains out of Substantial Compliance due to issues found during our review of a sample of force cases. For instance, it remains unclear to the COCL how the PPB decides when it is most appropriate to address a problem with supervisor counseling or when it is most appropriate to refer the case for formal investigation (Pars. 66-67). The COCL also found repetitive language in FDCR's which raises a concern about ensuring officers are independently writing their FDCR (Par. 69). These issues should have been identified by supervisors during the AAR and/or audit process.

As with previous quarters, the PPB remains out of Substantial Compliance based on the audit process used by the Force Inspector (Pars. 74-77). There continue to be instances in which an issue is identified but is not forwarded by the Force Inspector to the Training Division for review. The Force Inspector also continued to forward the entire force applications report to RU managers instead of identifying the specific officers who demonstrate a need for more in-depth review. Similarly, the force statistics reported by PPB do not include a discussion of potential reasons or implications for the findings. For instance, the quarterly force report stays silent on the fact that Central Precinct saw a 35% increase in the number of force events and that 22% of force events bureau wide involved persons in a perceived mental health crisis, which is a 10% increase from Q4 2021. The PPB has substantial opportunity to use the data they

3

**Exhibit A**

report to identify areas of improvement based on force trends but remain limited in the analyses conducted.

## IV: TRAINING

The PPB has remained in Substantial Compliance with seven of the 10 paragraphs in Section IV. PPB continues to maintain a robust system of data collection and analysis to evaluate their training programs and fulfill its obligation to seek community input through the Training Advisory Committee. However, the PPB remains in partial compliance on two key paragraphs in Training: Par. 79 and Par. 84 as described below.

### *Training Needs Assessment and Training Plan: Par. 79*

During the first quarter of 2022, the Training Division continued crafting its next annual training needs assessment and its crowd management needs assessment for training in 2023 by gathering additional information from a variety of sources. However, the PPB remains in Partial Compliance for Paragraph 79 because the City has yet to outsource and complete an independent Critical Incident Assessment of force applications and crowd control during the 2020 protests, which will have clear implications for PPB's training needs. On a positive note, the City was able to solicit proposals from vendors during the first quarter to perform this work.

The PPB's 2022 Training Plan included a separate training on Crowd Management, but specialty units were not covered.  PPB now informs COCL that it has no plans to use specialty units to respond to protests, so no specialty training is needed.

### *Training Content and Delivery: Par. 84*

During the first quarter of 2022 the PPB provided one major training required by Paragraph 84 – In-Service training for all officers. The COCL observed this training and herein provides a description and assessment. Overall, the COCL team was satisfied with both the substance and delivery of this training, although we offered some recommendations.  To increase public safety and strengthen public trust in the PPB, the COCL continues to recommend that the PPB do everything possible to provide innovative and intensive training on de-escalation and procedural justice, with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" (Par. 84), including crowd control settings.

Better crowd control training is needed, as recommended by the COCL and the DOJ in the past. But first, such training must be linked to sound policy. To achieve Substantial Compliance, the PPB must refine existing policies to clarify the roles and responsibilities of street-level incident command, the use of specific weapons, protestors' actions that do and do not justify the use of force, and other issues. When these changes have been incorporated into the PPB's force-related directives (910.00, 1010.00, and 1015.00) and crowd control directive (635.10), and

4

**Exhibit A**

have been approved by the DOJ, then they can be integrated into crowd control training.  The policy review process was not completed in the first quarter of 2022.

### Online Training

The PPB continues to offer a range of online trainings. In the first quarter, COCL highlighted the PPB's equity training, which focused on interacting with members of the LGBTQIA2S+/ Queer community. With new leadership now for PPB's Learning Management System (LMS), which manages online training, we hope that the PPB will continue to explore more sophisticated videos and work collaboratively with in-person instructors to ensure that virtual and in-class instruction are linked in a complementary fashion.

### Specialty Unit Training

For specialty unit training, the community was outraged by the offensive RRT training slides from 2018, and clearly expressed their feelings throughout the first quarter of 2022. During this time period, the COCL requested, but did not receive, any updates on the investigation. Looking beyond the question of "who is responsible for these PowerPoint slides?" the COCL's primary concern is that the Training Division is rigorously following an internal process for obtaining, reviewing and approving training plans in advance. This quarter we report on the actions taken by the PPB to prevent this from happening again, but a more robust system of oversight would be beneficial for accountability, transparency, and training quality.

### Training Outcome Assessment

This quarter the COCL included an Outcome Assessment of specific PPB training, looking at whether it was well received by the students and whether the students learned anything from it. Our assessment focuses on training where the PPB has collected sufficient data in 2021 to allow for such a review, namely, the Supervisor's In-Service training in 2021.  Overall, the COCL is satisfied that the PPB has taken a systematic approach to collecting data that is useful for evaluating the process and impact of this program. The findings indicate that the training was well received by PPB's supervisors and ended with students demonstrating the level of knowledge needed to pass in each subject. Specific recommendations were provided by students and the COCL to improve these classes. We look forward to the PPB's Training Division adopting new on-the-job outcome measures in the future to evaluate training effectiveness, as well as more sophisticated evaluation designs that allow for stronger cause-and-effect inferences.

Finally, we note that organizational reform is most likely to occur when policy, training, and individual performance evaluations are modified to reflect best practices in policing and are linked to one another. When the PPB measures what matters to the community, this

information can be used for training and for feedback to individual officers. Thus, the COCL will continue to provide recommendations for improvement in each of these areas.

## V.  COMMUNITY-BASED MENTAL HEALTH SERVICES

Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. In the first quarter of 2022, the PPB and the City remained in substantial compliance for all paragraphs in Section V. The City and PPB both continued to participate in the broader community-based mental health service response system through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

During the first quarter, BOEC maintained Portland Street Response (PSR) dispatch protocols and training for telecommunicators, both of which were previously reviewed by the BHUAC. The PSR program started in 2021 and serves as a non-law enforcement response option to certain mental health and behavioral health crises. The PSR program has expanded beyond the pilot phase and is now operating city-wide. In general, PSR seems to be capable of providing some relief in response to mental health calls but is currently restricted in the call types they can respond to. Furthermore, while training during the initial stages of the PSR program has been adequate, a PSU evaluation recommended that BOEC and PPB adopt a formal training program for PSR that builds upon the information they have collected during the pilot program. In response, the PPB has provided evidence that such training will occur in the third quarter of 2022.  As PSR expands citywide, it is important that PPB and the City continue to advertise and promote this option.

Also, as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Related to this, PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crises. Additionally, PPB continues to participate in the Transportation Workgroup.

## VI. CRISIS INTERVENTION

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

As we have done in the past, we evaluated PPB and the City's system of mental health response in two ways: (1) Primary Response, including Enhanced Crisis Intervention Team (ECIT) officers and Portland Street Response; and (2) Secondary Response, including Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT). We also evaluated the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC). We then assess PPB's response to such calls when received. Finally, we examined what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. During the first quarter of 2022, the PPB and the City fell out of compliance with Section VI as a result of lapses with paragraphs related to the BHUAC (see Par. 95, Par. 96, Par. 98).

During this quarter, BOEC maintained their policies and training for telecommunicators on dispatching officers to calls involving a mental health component. They continued to use seven call characteristics to determine whether a specialized ECIT officer should be dispatched. However, there still remains a need to adopt official policies and training for PSR. Although BOEC did not make progress on this in first quarter of 2022, they have plans to work with PSR and BHUAC in the second and third quarters of 2022 to develop official policies.

For their part, the PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). PPB also continued to provide training to new officers as well as current officers through annual In-service training. Additionally, PPB maintained their specialized response approach through the use of ECIT officers. Our report reviews the data collected by PPB on ECIT in the first quarter.

The PPB has maintained the use of the BHRT to assist individuals who represent an escalating risk of harm. While the settlement agreement only requires three teams for each precinct, PPB has plans to return to five BHRTs in the near future. As part of this, PPB posted a job announcement for one of the additional BHRT officer during this quarter. The PPB has also maintained the Service Coordination Team (SCT) to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. For both of these programs, we provide ongoing operational statistics, including statistics related to decision-making and outcomes. In the first quarter of 2022 Portland State University completed a report on the 2018 and 2019 cohorts of the SCT and a brief summary of the findings are provided in our report.

Finally, the BHUAC continued to meet during the fourth quarter of 2021, utilizing the expertise of individuals at PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer

7

**Exhibit A**

Engagement, Disability Rights Oregon, the Public Defender's Office, CareOregon, AMR, Central City Concern, and the Unity Center for Behavioral Health. During the quarter, the advisory committee discussed topics related to PSR, the mental health suite of directives, and opening the meetings to the public. In regard to the Partial Compliance issued for paragraph 95, the COCL found that the operation of the BHUAC to have fallen out of Substantial Compliance due to the lack of action taken towards the COCL's TA statement that called upon the BHUAC to review critical incidents. Additionally, the BHUAC did not review the refresher Crisis Intervention training that was provided as part of the In-service training (Par. 98). Furthermore, an important function of the BHUAC is to spend their meetings time in a productive manner so they can offer recommendation and feedback on policies, systems, and protocols.  While this occurred in some respect through reviewing PPB policies, other meeting time was taken up by issues that were not related to PPB response to persons with mental illness.  As a result, we urge PPB and the City to re-evaluate and better utilize the BHUAC so that its advisory function can be maximized.

## VII.  EMPLOYEE INFORMATION SYSTEM

For the first quarter of 2022, the PPB remained in Substantial Compliance with a portion of Section VII (Pars. 118 – 120), as the current Employee Information System (EIS) thresholds to identify potentially problematic trends meet the requirements of the Settlement Agreement. Additionally, the PPB has promoted and trained a second EIS administrator and is, therefore, in Substantial Compliance with Par. 120. However, the PPB continues to only meet Partial Compliance for Pars. 116 and 117 due to the process by which officers with outlying use of force statistics are identified and documented in EIS. Instead of proactively identifying "at-risk employees, supervisors [or] teams" the Force Inspector forwarded force application reports to RU Managers for review. Consequently, there was a lack of documentation of the decision-making process in EIS. The PPB informed the COCL that changes were made to this process during the second quarter of 2022 to achieve Substantial Compliance and we will report on these changes in our next report.

We also maintain our position from prior reports that PPB should seek to ensure that the EIS is "more effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116). Initial discussion regarding an EIS evaluation occurred in the first quarter, but no significant progress was made. The COCL has previously provided the PPB and the DOJ with a draft methodology and data analysis plan and are awaiting further discussion with PPB. We will continue to provide updates of this process in our future reports.

## VIII. OFFICER ACCOUNTABILITY

During the first quarter of 2022, PPB did not return to Substantial Compliance with Section VIII. We note several paragraphs within Section VIII where PPB and the City have maintained Substantial Compliance, including paragraphs related to Officer-Involved Shooting (OIS) investigation procedures, Independent Police Review (IPR) documentation/notification requirements, and Citizen Review Committee (CRC) operations. Furthermore, the City and the Police Review Board (PPB) maintained Substantial Compliance for all paragraphs related to timely investigations.

However, for other paragraphs, we find persistent issues that continue to prevent the City from gaining Substantial Compliance (Par. 128, 129 and 131).  For instance, we found that hindrances to a meaningful, independent investigation by IPR remained, including the tenuous position that IPR finds itself in given the forthcoming civilian-led accountability system. There continues to be a backlog of 45,000 - 50,000 documents in the Records Division that IPR indicates may impact their investigations. The PPB and the City have inform the COCL that the slow pace of the City's hiring process has hindered the ability to reduce the backlog. Thus, the PPB has taken proactive steps to reduce the hiring process timeline by partnering with another law enforcement agency to speed up the process of candidate background checks.

Additionally, we no longer find compliance with the requirements of Par. 129, requiring all allegations of excessive use of force to receive a full and complete investigation unless determined by IPR that the allegation has no basis in fact.  During this quarter, we noted several allegations of excessive force which were administratively closed.  We also note that in some instances, we found the decisions understandable though still a violation of the Settlement Agreement.  In these instances, we suggest that City may consider requesting an amendment to the Settlement Agreement allowing for potential additional revisions to IPR's SOP regarding this paragraph.

Finally, the City and PPB remain out of compliance with the requirements of Par. 131 which holds expectations for the Police Review Board (PRB).  During this quarter, we did not observe the same deficiencies in PRB operations that we had seen in prior quarters.  However, both PRB cases we reviewed this quarter were fairly unambiguous in the reasonableness of the officers' force.  As a result, we will need to see PRBs of similar quality in the coming quarters to be confident that their operation has indeed improved.

## IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

The PPB has continued to engage the community through a wide range of formal and informal advisory groups as well as through public events. However, PCCEP suffered during the first

9

**Exhibit A**

quarter, due largely to problems with City support. Although subcommittee chairs continued to hold meetings and the full PCCEP continued to meet, both the PCCEP's project manager and project assistant left their positions in the first quarter. With unclear leadership, tensions among members increased. Although City support appeared to be headed in a positive direction by the end of the quarter, with plans for hiring staff and managing PCCEP meetings underway, considerable work remained to be done and membership problems continued. Hence, the City was kept in Partial Compliance for Paragraph 144 and was lowered to Partial Compliance for Pars. 142 and 143.

The PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions (Par. 148), although the COCL has grown increasingly concerned about procedures and data related to traffic stops and searches. The PPB continued to produce credible quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. However, over the past two years, the COCL has repeatedly highlighted racial disparities in traffic stops and searches. To address these concerns, the PPB introduced the new Stops Data Collection app at the start of 2021 to collect additional data about stops, and provided some preliminary training to officers, but the full program has yet to be implemented with high integrity.

Thus, to remain in compliance with Par.148, the COCL expects that the PPB will introduce a revised protocol and directives on police stops and consent searches (focused on the distribution of consent search cards and recording of such behavior as required by state law), as well as training on these changes. This will allow the community to know that the PPB is making a good faith effort to modify its behavior on the streets related to "community concerns regarding discriminatory policing." (Par. 148). Again, we encourage the PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns, especially since reports by PPB and other groups have found that the problem of disparate treatment of African Americans reaches beyond traffic stops to the use of force and arrest rates.

Finally, to truly engage the broader Portland community (beyond advisory groups) and give voice to the thousands of residents who have lived experience interacting with the PPB officers, we strongly encourage the City to introduce and institutionalize a contact survey to measure the level of procedural justice and public satisfaction with police services. Local researchers could be helpful to develop and manage this type of community engagement program and the COCL is willing to provide technical assistance upfront. By measuring what matters to the public (e.g., whether they are treated respectfully, fairly, and given a voice) and using this data to evaluate officer performance, we can expect that organizational behavior and police culture will change in the desired direction. Similarly, we recommend partnering with a local university

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

to survey PPB employees to give officers a voice and better understand their needs and concerns.

## XI. ADDITIONAL REMEDIES

The parties have reached agreement on a set of remedies to achieve full compliance with the terms of the Settlement Agreement.[1] Consequently, they have agreed to add a new section to the Settlement Agreement - Section XI - that contains eight new Paragraphs (188 to 195). In February of 2022, the Portland City Council voted unanimously to amend the Settlement Agreement to include the new remedies. The Federal court Fairness Hearing on this amendment was held in April of 2022, at which time the federal Judge approved the amendment.

In the first quarter of 2022 the City continued its groundwork on three key remedies contained in Section XI:

Paragraph 191 — Civilian Leadership in Training: The City Council funded a "Police Education Director" to oversee educational aspects of the Training Division. The job opening was posted and the selection committee began to review applicants. Although a good pool of applicants was obtained, the COCL expected to see more community involvement in the recruitment and selection process, as recommended by the Training Advisory Committee.

Paragraph 194 — Body-Worn Cameras: The City and PPB have continued the foundational work to implement a body-worn camera (BWC) policy and program. In the first quarter of 2022 PPB released a Request for Proposal (RFP) to solicit BWC vendors capable of supplying Portland with the equipment necessary for a BWC program. Additionally, the PPB started a process to gather subject-matter experts to assist in the scoring process.  The City solicited assistance from the COCL to gather community input for a BWC policy. Thus, the COCL, in partnership with the PCCEP and other advisory groups, hosted a community forum of over 100 community members and community survey to seek community input on the desired elements of PPB's body-worn

---

[1] These meetings included the Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

camera policy and practices. The survey was completed by over 2,000 respondents. The results from these community engagement events are summarized in this report.

<u>Paragraph 195 — Community Police Oversight Board</u>: The City, with voter support on a 2020 ballot measure, agreed to create "...a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline." (Par. 195). In 2021 the City Council created a Police Accountability Commission (PAC), composed of 20 community members, with a mission to develop the new oversight board. The PAC held 13 public meetings to discuss a framework for community engagement, bylaws and internal processes, equity trainings, and a timeline for the PAC to complete the mission.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

# REPORT CARD

This report includes a "Report Card" that provides a separate assessment of each paragraph in the Agreement. We have returned to this format because it gives the City additional clarity about what is needed to achieve Substantial Compliance. All paragraphs are reviewed and evaluated using the following standards:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

In this first quarter of 2022, the Portland Police Bureau (PPB) and the City of Portland remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. However, they were found to be in Partial Compliance for the following paragraphs regarding Use of Force (Pars. 66, 67, 69, 70, 73, 74, 75, 76, 77), Training (Pars. 78, 79, 84), Crisis Intervention (Pars. 95, 96), Employee Information System (Pars. 116, 117), Officer Accountability (Pars. 128, 129, 131), and Community Engagement (Pars. 142, 143, 144). Compared to the fourth quarter of 2021, the first quarter of 2022 includes additional Partial Compliance Assessments for Crisis Intervention (Pars. 95, 96, 98), Officer Accountability (129), and Community Engagement (Par. 142, 143). The table below summarizes the compliance status and recommendations for all paragraphs reviewed by the COCL.

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **III. USE OF FORCE** | | |
| Par. 66 | Partial Compliance | <ul><li>To achieve Substantial Compliance, conduct a Critical Incident Assessment</li><li>To achieve Substantial Compliance, revise Directive 1010.00 as necessary</li><li>Provide a working definition, or set of criteria, for when incidents require formal review instead of supervisor counseling</li></ul> |

| | | |
|---|---|---|
| | Partial Compliance (yellow) | • Re-assess officer characterizations of de-escalation |
| Par. 67 | Partial Compliance | • To achieve Substantial Compliance, conduct a Critical Incident Assessment<br>• To achieve Substantial Compliance, revise Directive 1010.00 as necessary<br>• Provide a working definition, or set of criteria, for when incidents require formal review instead of supervisor counseling<br>• Re-assess officer characterizations of de-escalation |
| Par. 68 | Substantial Compliance | • Revise policies as necessary to account for reasonable lethal-force exceptions |
| Par. 69 | Partial Compliance | • To achieve Substantial Compliance, conduct a Critical Incident Assessment<br>• To achieve Substantial Compliance, revise Directive 0910.00 as necessary<br>• Re-emphasize the importance of reliably completing the FDCR |
| Par. 70 | Partial Compliance | • To achieve Substantial Compliance, conduct a Critical Incident Assessment<br>• To achieve Substantial Compliance, revise Directive 1010.00 as necessary<br>• Create EIS entries for supervisors who did not identify the violation of policies on profanity and did not forward the allegation of excessive force to EIS |
| Par. 71 | Substantial Compliance | • Continue monitoring and reporting ratio of officers to sergeants |
| Par. 72 | Substantial Compliance | • Continue regular reviews of AAR form |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Par. 73 | Partial Compliance | • To achieve Substantial Compliance, ensure that chain-of-command supervisors are held accountable for inadequate reports and analysis<br>• To achieve Substantial Compliance, conduct a Critical Incident Assessment<br>• To achieve Substantial Compliance, revise Directive 1010.00 as necessary<br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
|---|---|---|
| Par. 74 | Partial Compliance | • To achieve Substantial Compliance, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>• To achieve Substantial Compliance, ensure completed process for each issue identified by the Force Inspector |
| Par. 75 | Partial Compliance | • To achieve Substantial Compliance, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>• To achieve Substantial Compliance, ensure completed process for each issue identified by the Force Inspector |
| Par. 76 | Partial Compliance | • To achieve Substantial Compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere<br>• To achieve Substantial Compliance, enhance follow-up processes<br>• To achieve Substantial Compliance, resume practice of the Force Inspector identifying potentially problematic officers |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Par. 77 | Partial Compliance | <ul><li>To achieve Substantial Compliance, ensure identified trends are forwarded to Policy and Training personnel as necessary</li><li>To achieve Substantial Compliance, ensure completed process for each issue identified by the Force Inspector</li></ul> |
|---|---|---|
| **IV. TRAINING** | | |
| Par. 78 | Partial Compliance | <ul><li>To achieve Substantial Compliance, PPB must substantially comply with all paragraphs within Section IV</li></ul> |
| Par. 79 | Partial Compliance | <ul><li>To achieve Substantial Compliance, hire an independent organization to complete a Critical Incident Assessment of crowd control during the 2020 protests, including implications for PPB training</li><li>If any PPB specialty units will be deployed for demonstrations, provide training plans based on updated policies</li><li>Include training with robust scenarios and feedback loops to strengthen interpersonal communication skills</li><li>Seek to release the Annual Training Plan earlier in the year so that others have more time to review it</li></ul> |
| Par. 80 | Substantial Compliance | <ul><li>Add post-class evaluation surveys to the Equity training</li><li>Require that students complete post-class evaluation surveys to increase response rates and the validity of the results</li><li>Hire more civilian analysts and information technology staff for the Training Division</li><li>Work with local university researchers to conduct more scientific evaluations of</li></ul> |

| | | |
|---|---|---|
| | | training on-the-job outcomes, including contact surveys to measure the impact of training on police-community interactions and procedural justice |
| Par. 81 | Substantial Compliance | • Provide a semi-annual analysis of non-compliance rates for training completion and actions taken by PPB when officers do not complete the required trainings on time |
| Par. 82 | Substantial Compliance | • Ensure that the semi-annual training report includes all specialty unit trainings<br>• As part of the semi-annual training report, consider adding the non-compliance results requested by COCL for Par. 81 |
| Par. 83 | Substantial Compliance | • No recommendations at this time |
| Par. 84 | Partial Compliance | • To achieve Substantial Compliance, incorporate findings from PPB's Needs Assessment on demonstrations as well as the findings from the future external Critical Incident Assessment on demonstrations.<br>• To achieve Substantial Compliance, develop and deliver training with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" (Par. 84) including crowd control settings. This should include opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest. |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

|  |  | • To achieve Substantial Compliance, refine existing policy to clarify the roles and responsibilities of street-level incident command, and incorporate recent changes to PPB's force-related directives into training (910.00, 1010.00, and 1015.00).<br>• To achieve Substantial Compliance, strengthen your system to review and approve all specialty unit trainings to avoid inappropriate or harmful training and regain public trust<br>• Continue to develop scenarios that allow officers to practice their de-escalation and procedural justice skills<br>• Continue to support the development of S.O.P online training that allows for interactivity<br>• Avoid overloading PPB members with too much online training during any one month, and keep them up to date on changes in the law<br>• Provide refresher training on First Amendment rights and bias-free policing that can address any PPB bias against peaceful protestors |
| Par. 85 | Substantial Compliance | • To remain in Substantial Compliance, PPB must submit a Training Division audit plan by the end of the third quarter of 2022, with timelines for completing the next audit and the report |
| Par. 86 | Substantial Compliance | • No recommendations at this time |
| Par. 87 | Substantial Compliance | • No recommendations at this time |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

**V. COMMUNITY-BASED MENTAL HEALTH SERVICES**

| Par. 88 | Substantial Compliance | • No recommendations at this time |
|---|---|---|
| Par. 89 | Substantial Compliance | • We suggest the PPB provide updated information to the Transportation Workgroup and assess how they will handle absences when information is expected of them |
| Par. 90 | Substantial Compliance | • No recommendations at this time |

**VI. CRISIS INTERVENTION**

| Par. 91 | Substantial Compliance | • Continue to update the COCL and the DOJ on changes to personnel when applicable |
|---|---|---|
| Par. 92 | Substantial Compliance | • The BHU should work in closer coordination with the Force Inspector when force trends relate to persons in mental health crisis<br>• Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 93 | Substantial Compliance | • The BHU should work in closer coordination with the Force Inspector when force trends relate to persons in mental health crisis<br>• Continue to collect and review data on mental health services, and use this information to update services as needed |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Par. 94 | Substantial Compliance | • Continue to encourage regular attendance |
|---|---|---|
| Par. 95 | Partial Compliance | • To return to Substantial Compliance, ensure BHUAC meetings meet the purpose of the committee<br>• To return to Substantial Compliance, re-engage the COCL and the DOJ in conversation regarding the content of the COCL's TA Statement<br>• To return to Substantial Compliance, ensure the BHUAC reviews all PPB training |
| Par. 96 | Partial Compliance | • To return to Substantial Compliance, ensure BHUAC meetings meet the purpose of the committee<br>• To return to Substantial Compliance, re-engage the COCL and the DOJ in conversation regarding the content of the COCL's TA Statement<br>• Emphasize documenting formal recommendations and the PPB's response |
| Par. 97 | Partial Compliance | • To return to Substantial Compliance, allow BHUAC to review the training before the next In-service training |
| Par. 98 | Partial Compliance | • To return to Substantial Compliance, allow BHUAC to review the training before the next In-service training |
| Par. 99 | Substantial Compliance | • Continue to monitor and identify potential reasons for the difference in transporting to the hospital |
| Par. 100 | Substantial Compliance | • Continue utilizing existing data to assess demand for ECIT services |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Par. 101 | Substantial Compliance | • Re-engage the BHUAC regarding ECIT participation criteria |
|---|---|---|
| Par. 102 | Substantial Compliance | • Continue to seek out recommendations from the BHUAC on ECIT training |
| Par. 103 | Substantial Compliance | • No recommendations at this time |
| Par. 104 | Substantial Compliance | • Continue to highlight all aspects of BHU's work |
| Par. 105 | Substantial Compliance | • No recommendations at this time |
| Par. 106 | Substantial Compliance | • No recommendations at this time |
| Par. 107 | Substantial Compliance | • No recommendations at this time |
| Par. 108 | Substantial Compliance | • No recommendations at this time |
| Par. 109 | Substantial Compliance | • No recommendations at this time |
| Par. 110 | Substantial Compliance | • Continue to collect data and create reports on mental health services |
| Par. 111 | Substantial Compliance | • No recommendations at this time |
| Par. 112 | Substantial Compliance | • No recommendations at this time |
| Par. 113 | Substantial Compliance | • Create BOEC PSR policy |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Par. 114 | Substantial Compliance | • Develop focused training for PSR |
|---|---|---|
| Par. 115 | Substantial Compliance | • Utilize quality assurance audits to inform PSR policies and training |
| **VII. EMPLOYEE INFORMATION SYSTEM** | | |
| Par. 116 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br>• Continue contributing to the development of the EIS evaluation |
| Par. 117 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br>• Continue contributing to the development of the EIS evaluation |
| Par. 118 | Substantial Compliance | • No recommendations at this time |
| Par. 119 | Substantial Compliance | • No recommendations at this time |
| Par. 120 | Substantial Compliance | • No recommendations at this time |
| **VIII. OFFICER ACCOUNTABILITY** | | |
| Par. 121 | Substantial Compliance | • Take steps to return the percentage of overdue cases back to an acceptable level. |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Par. 122 | Substantial Compliance | • No recommendations at this time |
|---|---|---|
| Par. 123 | Substantial Compliance | • Ensure that investigators utilize the "Recommended action plan for reducing delays of this nature" section consistently to outline future action plans<br>• Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| Par. 124 | Substantial Compliance | • No recommendations at this time |
| Par. 125 | Substantial Compliance | • No recommendations at this time |
| Par. 126 | Substantial Compliance | • No recommendations at this time |
| Par. 127 | Substantial Compliance | • No recommendations at this time |
| Par. 128 | Partial Compliance | • To achieve Substantial Compliance, continue hiring efforts for Records Division and provide COCL updates<br>• Show continued progress with Police Accountability Commission |
| Par. 129 | Partial Compliance | • To return to substantial compliance, re-emphasize the responsibilities to PPB and IPR and provide documentation of efforts to COCL<br>• Consider requesting an amendment to Settlement Agreement allowing for potential additional revisions to IPR's SOP regarding Par. 129 |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Par. 130 | Substantial Compliance | • Complete an investigation of the allegation of retaliation |
|---|---|---|
| Par. 131 | Partial Compliance | • To achieve Substantial Compliance, the PRB should continue to operate in a thoughtful and unbiased manner<br>• To achieve Substantial Compliance, provide additional training to ensure PRB members correctly distinguish exonerating from mitigating factors |
| Par. 132 | Substantial Compliance | • No recommendations at this time |
| Par. 133 | Substantial Compliance | • No recommendations at this time |
| Par. 134 | Substantial Compliance | • No recommendations at this time |
| Par. 135 | Substantial Compliance | • No recommendations at this time |
| Par. 136 | Substantial Compliance | • No recommendations at this time |
| Par. 137 | Substantial Compliance | • No recommendations at this time |
| Par. 138 | Substantial Compliance | • No recommendations at this time |
| Par. 139 | Substantial Compliance | • No recommendations at this time |
| Par. 140 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| | | |
|---|---|---|
| **IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING** | | |
| Par. 141 | Substantial Compliance | • No recommendations at this time |
| Par. 142 | Partial Compliance | • To achieve Substantial Compliance, the City should respond to PCCEP's 2021 third quarter recommendations |
| Par. 143 | Partial Compliance | • To achieve Substantial Compliance, the City should create a work plan, as promised, that outlines a strategy and timeline to identify and recruit sufficient PCCEP members to maintain a full body |
| Par. 144 | Partial Compliance | • To achieve Substantial Compliance, provide adequate staffing dedicated to supporting PCCEP<br>• To achieve Substantial Compliance, post minutes of the PCCEP meetings within 10 business days after a PCCEP meeting, in accordance with the Amended PCCEP Plan |
| Par. 145 | Substantial Compliance | • No recommendations at this time |
| Par. 146 | Substantial Compliance | • Seek to improve access to police and City services for individuals with Limited English Proficiency (LEP) through updated policy, training, and dedicated personnel |
| Par. 147 | Substantial Compliance | • The PPB should continue its dialogue with community members around racial disparities and pay particular attention to disparities in the Central district for both Blacks/African Americans and Hispanic/Latinos |

**Exhibit A**

| | | |
|---|---|---|
| | | • Prepare for additional training on stops and searches<br>• Consider refresher training on bias-free, impartial policing |
| Par. 148 | Substantial Compliance | • To remain in Substantial Compliance for Par. 148 in 2022 the PPB will need to do the following:<br>• Prepare a revised protocol for police stops and consent searches<br>• Revise Directive 650.00 ("Search, Seizures, and Inventories") to incorporate the revised protocol on stops and consent searches<br>• Revise directive 860.10 ("Traffic Citations and Arrests") to ensure discretionary stops for minor vehicle violations (e.g., one taillight out) are limited and do not reflect bias<br>• To remain in Substantial Compliance with Par. 148 in 2023, the PPB will need to do the following:<br>• Develop and implement training on the revised traffic stop/search protocol and relevant directives<br>• Distribute the consent search cards to those stopped<br>• Show that records are being kept consistent with the new Oregon law<br>• Consider refresher training on bias-free, impartial policing<br>• Continue the dialogue with community members around racial disparities in traffic stops and searches |

26

**Exhibit A**

| | | |
|---|---|---|
| Par. 149 | Substantial Compliance | • As part of everyday policing, introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with special populations<br>• Implement anonymous internal surveys of the PPB employees to measure internal procedural justice, wellness, police culture, and employee satisfaction<br>• Acquire and use software to analyze body worn camera data<br>• As a learning organization, introduce programs, polices, and training curricula that are responsive to these new databases |
| Par. 150 | Substantial Compliance | • The PPB should continue to complete a draft of its Annual Report in a timely manner, so it can receive feedback from PCCEP and make revisions as needed<br>• The PPB should present the Annual Report to the City Council after receiving feedback from the community at Precinct meetings and/or public comments should be allowed after the PPB's presentation to the City Council |
| Par. 151 | Substantial Compliance | • No recommendations at this time |
| Par. 152 | Substantial Compliance | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training. |

**Exhibit A**

**Remedies for Non-Compliance**

After five mediation meetings, the City and DOJ reached agreement on a set of remedies to achieve compliance with the terms of the Settlement Agreement[2]. On January 10, 2022, the DOJ and the City filed their final "Joint Status Report" in the U.S. District Court (ECF 275), summarizing the mediation results and the specific remedies on which the parties agreed in principle. Essentially, the parties have agreed to add a new section to the Settlement Agreement - Section XI - that contains eight new paragraphs 188 to 195 (See Appendix A for the list of remedies). The City Council approved these remedies in February of 2022. A formal joint motion to amend the Agreement was filed with the Court on February 25, 2022 (ECF 276), and a fairness hearing was held on April 29, 2022 to determine whether Section XI is "fair, adequate, and reasonable." The Amendments were adopted by Court Order the same day (ECf

Although not yet adopted in the first quarter of 2022, the City continued to lay the groundwork for these remedies. Therefore, the COCL will continue to assess all relevant paragraphs of the Settlement Agreement but will give increased attention to these remedies as they are critical for achieving Substantial Compliance. In preparation, we have added Section XI to the current report ("Additional Remedies") and have provided a brief summary of three critical remedies where work is underway, namely, hiring a civilian to lead the Training Division (Par. 191), introducing body-worn cameras for PPB officers (Par. 194) and creating a Community Police Oversight Board (Par. 195). Now approved by the Court, the work of the COCL will expand in the second quarter as we begin to conduct a formal compliance review for all paragraphs within Section XI.

---

[2] These meetings included the Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

# III. USE OF FORCE

## A. Use of Force Policy

---

### Settlement Agreement Paragraph

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. COCL Summary: Paragraph 67 establishes that the PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the individual, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| Compliance Label | Par. 66 Partial Compliance |
| --- | --- |
| | Par. 67 Partial Compliance |
| Methodology | Review force case sample |

### Compliance Assessment

As part of our regular review of PPB force events, we evaluated 20 cases which represent a cross-section of PPB's use of force, including force from different Categories, from different Precincts, involving the use of a CEW, against persons in mental health crisis, and protest force events. While we did not find any use of force incidents that would constitute non-compliance with Pars. 66 and 67, we did find a few issues that should have been raised during the AAR and/or audit process.

---

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

For instance, when certain mistakes are made by officers or supervisors, it remains unclear to the COCL how PPB decides whether to address the problem with supervisor counseling or refer the case for a more formal investigation. This issue was found in two cases we reviewed. In the first case, the AAR review noted "The officers' warnings were fairly general likely [do] not meet the standard of a warning based on our training." In the second case, the chain-of-command review noted that after a CEW use, the sergeant "did not take pictures or have pictures taken of the cartridges or torso of the subject after the probe was removed. I attribute this to not being many incidents involving a taser on [the sergeant's shift]." In both cases, the officers/sergeant were given counseling, though we also note that both issues (warning and post-CEW responsibilities) have been the subject of extensive training over the years. We again request that PPB provide a working definition, or set of criteria, for when incidents require formal review instead of supervisor counseling.

We also have minor concerns with the way de-escalation is described in some cases. For instance, we observed several FDCRs and AARs that included "numerical superiority" as the de-escalation tactic used. To be clear, numerical superiority can be considered a de-escalation tactic, in situations where a subject, realizing they are outnumbered and without options, may voluntarily surrender.  Alternatively, this might also escalate the situation and therefore, simply having more officers at a call does not automatically equate to de-escalation, a fact also recognized by PPB's Directive 1010.00 which considers "ensuring there are an <u>appropriate number of members</u> on scene" (emphasis added). Numerical superiority should be considered as a de-escalation tactic only when it is a tactical decision made by an officer based on the perceived likelihood of de-escalating the situation.  However, in reading the case files, it appeared the officers reported numerical superiority as a characteristic of the event rather than a tactical decision by any officer.  Accordingly, we suggest PPB re-assess the ways that officers have been characterizing their use of de-escalation.

We do not believe these issues are of sufficient concern to change our compliance rating -- we bring them up as technical assistance to help PPB improve force events and their review. However, as it relates to Pars. 66 and 67, we continue to find PPB out of compliance until a comprehensive Critical Incident Assessment of the 2020 protests is conducted. This assessment will be used to resolve the deficiencies of the 2020 protest response by PPB and safeguard against similar deficiencies occurring should PPB face similar protests with similar use of force events. As a follow-up to prior reports, we note that the revisions to Directive 1010.00 (Use of Force) were not completed in the first quarter though significant progress was made. Ultimately, these revisions will remedy many of the issues we had identified, even prior to a more comprehensive assessment. We will provide an update in our next report.

| **COCL Recommendations** | • To achieve Substantial Compliance, conduct a Critical Incident Assessment<br>• To achieve Substantial Compliance, revise Directive 1010.00 as necessary<br>• Provide a working definition, or set of criteria, for when incidents require formal review instead of supervisor counseling<br>• Re-assess officer characterizations of de-escalation |
|---|---|
| **Assessment Based On** | • Lack of Critical Incident Assessment<br>• COCL review of force sample |

## 1. Electronic Control Weapons

| **Settlement Agreement Paragraph** |
|---|
| 68. COCL Summary: The PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement). |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review force case sample |
| **Compliance Assessment** | |

31

Based on our review of PPB force events, we find that PPB officers continue to use CEWs in accordance with the Settlement Agreement (Par. 68). Previously, Directive 1010.00 included a section directing officers on when they may and may not employ a CEW and the requirements of officers before, during, and after the use of a CEW. As part of the ongoing revisions to Directive 1010.00, guidelines regarding the use of CEW will be separated out and placed in a new Less Lethal Weapons directive (Directive 1015.00). Directive 1015.00 will include the language previously found in 1010.00. For instance, Directive 1015.00 requires independent justification for each individual CEW cycle, the provision of a verbal warning before deploying when safe, and paramedics to be tasked with removing CEW probes.

In our review of five CEW applications during the first quarter of 2022, we found that all events containing the use of a CEW adhered to the requirements of Par. 68. However, we note one potential issue with Directive 1010.00 as it relates to CEW use. In one case, the circumstances at one point were such that officers would have had justification to use lethal force. In that instance, the subject had struck another person with an ax and was within reach of the ax when officers were prepared to enter in order to get the injured person medical attention. To avoid lethal force, however, a sergeant ordered two officers to use two CEWs simultaneously if the opportunity presented itself, and to "hold [the subject] under power" until an arrest could be made. The use of two simultaneous CEWs is, by policy, allowed in situations where lethal force would be authorized. Additionally, given the time needed to get the individual in custody and the overall facts of the situation, we find it reasonable that the individual be held under CEW power for more than a single application. However, the policy as currently written does not have a lethal-force exception for holding a person under CEW power for more than a single application and we suggest PPB revise their policies as necessary to account for reasonable lethal-force exceptions.

| **COCL Recommendations** | • Revise policies as necessary to account for reasonable lethal-force exceptions |
|---|---|
| **Assessment Based On** | • COCL review of CEW cases |

**2. Use of Force Reporting Policy and Use of Force Report**

<div style="border">

**Settlement Agreement Paragraph**

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors; (c) In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for the purposes of paragraphs 70, and 72-77 of this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review force case sample |

**Compliance Assessment**

As noted above, as part of our regular review of PPB force events, we evaluated 20 cases which represent a cross-section of PPB use of force. We do not find any force reports that would constitute non-compliance with Par. 69, but we did find several issues that should have been raised during the AAR and/or audit process.

As one example, we identified one event where two different officers' FDCR appeared to be near-carbon copies of each other in some sections, raising concerns as to the independent reporting of the officers and whether a "full and candid account" was provided to supervisors (Par. 69b). The repetitive language may also impact the ability of the reports to "facilitate a thorough review of the incident in question by supervisory members" (Directive 1010.00, section 11.1.4) if the reports do not capture the individual experiences of each officer. We do not believe officers were attempting to cover up anything. Rather, we mention this as a reminder that all reports must be written from the individual officer's perception and that using stock or repetitive language can be counterproductive to the force investigation process.

Other instances where improvement in reporting could occur have been discussed in our assessment of Pars. 66 and 67, including accurate descriptions of de-escalation and force warnings. We also found several instances where officers described other force options they

</div>

considered, but where those other force options would likely have been found excessive, raising the question as to why they were even considered. For instance, in one event, a person was resisting handcuffing and the officer's FDCR stated "I considered pepper spraying [NAME] but did not want to risk spraying other officers." Based on the facts of the event as described by the officer, pepper spraying an individual would not have been objectively reasonable and it is therefore unclear why pepper spray was even considered.

In the past, we have noted that not all force events can reasonably contain de-escalation and officers should feel free to state that. In the instances we reviewed for this quarter, not all force events would require officers to consider other (potentially excessive) force options and officers should feel free to state that. We note that some officers did so, to their credit, but we would expect that all officers understand this.

Finally, as it relates to drafting "timely use of force reports," PPB's current operation continues to have officers email FDCRs to supervisors, who are then required to verify that the reports were submitted by the end of the officer's shift.  This is also a point of review by the force audit team.  However, due to the current process, we are unable to independently verify the timeliness of FDCRs using the documents provided by PPB, an issue we have raised previously (for instance, see our 2020 Q3 report).  We were pleased to see it addressed through the remedies that have since been agreed upon by the Parties and we will provide an update on this remedy in our next report.

We also note that, as part of the ongoing revisions to Directive 1010.00, guidelines regarding force reporting will be separated out and placed in a new Use of Force Reporting, Review, and Investigation directive (Directive 0910.00). Directive 0910.00 will include the language previously found in 1010.00. Additionally, in accordance with Par. 188 in Section XI of the Settlement Agreement PPB is required to revise the Force Data Collection Report (FDCR) and After Action Report forms to capture when forms are edited and completed. During the first quarter of 2022 the FDCR was updated.

Finally, as with prior quarters, we continue to find PPB and the City out of compliance for Par. 69 until a comprehensive Critical Incident Assessment of the 2020 protests is conducted to resolve the deficiencies of the 2020 protest response by PPB and safeguard against similar deficiencies occurring should PPB face similar protests with similar use of force events.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, conduct a Critical Incident Assessment<br>• To achieve Substantial Compliance, revise Directive 0910.00 as necessary |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| | • Re-emphasize the importance of reliably completing the FDCR |
|---|---|
| **Assessment Based On** | • Lack of Critical Incident Assessment<br>• COCL review of force sample |

### 3. Use of Force Supervisory Investigations and Reports

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement).</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Partial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>Review force case sample</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">As noted above, as part of our regular review of PPB force events, we evaluated 20 cases which represent a cross-section of PPB use of force. Overall, we find that the After Action Reviews (AARs) we evaluated for this quarter were consistent with the letter and intent of Par. 70. However, we refer to our assessment of prior paragraphs within this section of our report, particularly as it relates to officers' attempts at de-escalation, force warnings, CEW use, and overall force reporting. Although we do not find any of these issues sufficient to negate compliance with the requirements of Par. 70, we do feel that the AAR process should have led supervisors to identify these issues on their own. Additionally, we identified one case wherein the subject on-scene complained of excessive force but which was not forwarded to IA by</td></tr>
</table>

anyone within the chain-of-command. We discuss this incident in terms of its implications for Par. 129 (see Section VIII).

Additionally, we found one case where an officer on-scene used disrespectful profanity towards the individual. The profanity was unnecessary and ultimately resulted in a substantiated Supervisory Investigation finding against the officer. However, the profanity was not identified by the reviewing chain-of-command and no EIS entries were found for the chain-of-command's oversight. We credit a team member on the force audit team for correctly identifying the issue, raising the issue with the Force Inspector, and forwarding the issue on to IA. However, the responsibility should (and does) fall on the chain-of-command to identify the policy violation, a responsibility that wasn't fulfilled by any of the supervisors in this event.

As part of the ongoing revisions to Directive 1010.00, guidelines regarding force review and investigation will be separated out and placed in a new Use of Force Reporting, Review, and Investigation directive (Directive 0910.00). Directive 0910.00 will include the language previously found in 1010.00.

We also continue to find the PPB and the City out of compliance for Par. 70 until a comprehensive Critical Incident Assessment of the 2020 protests is conducted to resolve the deficiencies of the 2020 protest response by PPB and safeguard against similar deficiencies occurring should the PPB face similar protests with similar use of force events.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance, conduct a Critical Incident Assessment</li><li>To achieve Substantial Compliance, revise Directive 1010.00 as necessary</li><li>Create EIS entries for supervisors who did not identify the violation of policies on profanity and did not forward the allegation of excessive force to EIS</li></ul> |
| **Assessment Based On** | <ul><li>Lack of Critical Incident Assessment</li><li>COCL review of force sample</li></ul> |

**Settlement Agreement Paragraph**

| | |
|---|---|
| 71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review rate of officers to supervisors |
| **Compliance Assessment** | |
| The PPB has maintained an adequate patrol-supervision staffing level in accordance with Par. 71. As noted in prior reports, the rate of officers to sergeants is a better metric than the raw number of sergeants. In the first quarter of 2022, the PPB reported a staffing ratio of 5.4 officers for every sergeant (including Acting Sergeants) across the three precincts. The PPB currently is operating six sergeants under their authorized amount (66 sergeants for 72 authorized positions). However, the ratio continues to be reasonable and consistent with prior years and we therefore find that the PPB has maintained compliance with Par. 71. | |
| **COCL Recommendations** | • Continue monitoring and reporting ratio of officers to sergeants |
| **Assessment Based On** | • COCL review of ratio of officers to sergeants |

| |
|---|
| **Settlement Agreement Paragraph** |
| 72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually. |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Methodology | Review current AAR form; Review upcoming web form |
|---|---|

**Compliance Assessment**

Presently, the After Action Report (AAR) form contains the checklist and therefore we find the PPB has remained in Substantial Compliance with the requirements of Par. 72. The Central Precinct SharePoint-based AAR pilot project that was discussed in the last report concluded in the first quarter of 2022. Currently, the Force Inspector and Audit Team are in the process of working with the Training Division to update training materials before the SharePoint-based AAR form is implemented across the Bureau. This new form should allow for a more streamlined process of documenting crowd control events through updated dropdown menus, access to previous drafts, and automatic email notifications. While we wait for the findings of the Critical Incident Assessment, we note that the current changes should address several of the issues we have raised in the past (see, for instance, our 2020 fourth quarter report) and we credit the PPB with undertaking this process. We look forward to reviewing if and how the new form improves the AAR process and suggest the PPB conduct a follow-up review after a large protest event to ensure that supervisors found the updated form beneficial.

| **COCL Recommendations** | • Continue regular reviews of AAR form |
|---|---|
| **Assessment Based On** | • COCL review of AAR form |

**Settlement Agreement Paragraph**

73. COCL Summary: Paragraph 73 directs the PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review force case sample |

**Compliance Assessment**

As noted earlier, we reviewed 20 cases which represent a cross-section of the PPB use of force, including force from different Categories, from different Precincts, involving the use of a CEW, against persons in mental health crisis, and protest force events. In general, we find that most AARs we reviewed for this quarter were consistent with the letter and intent of Par. 73.

However, we note that the issues discussed above in our assessment of prior paragraphs also apply to this paragraph as they were not identified during the chain-of-command reviews and therefore "supervisors in the chain of command [were] not held accountable for inadequate reports and analysis through corrective action" (Par. 73c). This includes our prior discussion of the PPB needing to operationally define the difference between mistakes that can be addressed by supervisor counseling and those that require a more formal review, an issue we have previously discussed in the context of this paragraph as well.

As in prior quarters, we continue to find the PPB and the City out of compliance for Par. 73 until a comprehensive Critical Incident Assessment of the 2020 protests is conducted to resolve the deficiencies of the 2020 protest response by the PPB and safeguard against similar deficiencies occurring should the PPB face similar protests with similar use of force events.

As part of the revisions to Directive 1010.00, guidelines regarding force review and investigation will be separated out and placed in a new Use of Force Reporting, Review, and Investigation directive (Directive 0910.00). Directive 0910.00 will include the language previously found in 1010.00.

| **COCL Recommendations** | • To achieve Substantial Compliance, ensure that chain-of-command supervisors are held accountable for inadequate reports and analysis<br>• To achieve Substantial Compliance, conduct a Critical Incident Assessment<br>• To achieve Substantial Compliance, revise Directive 1010.00 as necessary |
|---|---|

| | |
|---|---|
| | • To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| **Assessment Based On** | • Lack of Critical Incident Assessment<br>• COCL review of force sample<br>• Lack of clarity in conduct that requires formal review |

## B. Compliance Audits Related to Use of Force

**Settlement Agreement Paragraph**

74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any

training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement.)

| Compliance Label | Par. 74 Partial Compliance |
| | Par. 75 Partial Compliance |
| | Par. 77 Partial Compliance |
| Methodology | Review Quarterly Force Audit Report; Review Force Inspector Memos; Review Force Inspector Phase II Spreadsheet |

### Compliance Assessment

Compared with the fourth quarter of 2021, officers' reporting accuracy decreased across all categories (mental health and injuries, force and resistance, de-escalation and decision point analysis, witness, and CEW). As with prior PPB reports, it was noted that for Sergeants EIS "continues to generate a high number of deficiencies".

In addition to ensuring reporting compliance, the Force Inspector reviews force events to find broader issues related to policy, training, equipment, or personnel concerns. In the first quarter of 2022, we saw evidence that the Force Inspector was sending these issues to the appropriate

personnel (i.e., RU Managers) using a standardized feedback form. Previously the COCL has noted a lack of documented follow-up to verify that responsive actions were taken, but in the first quarter of 2022 it appears all feedback forms were resolved with confirmation from the RU Manager that an entry was placed in EIS.

However, there remain some instances where issues were not forwarded on for training or policy review. For instance, the Inspector's report to each RU Manager continued to find that "there is a need for attention to Command Review of reporting requirements and the necessary corrective action." We note that this same "need for attention" was found in the supporting documents for the third quarter and fourth quarter of 2021 (though with slightly different language). While PPB has indicated this has been addressed during the RU Manager reviews, these reviews have not prevented the same issue from being identified multiple times by the Force Inspector. We have repeatedly stated in prior reports that this issue should also be forwarded to the policy team and training division. While the issue was once again forwarded to each RU Manager, the Force Inspector again did not appear to send it for training review, despite it being identified for the third quarter in a row. Additionally, we found one instance where the RU identified a need for updated resources from the Training Division, but there was no evidence that this concern was forwarded to the Training Division. We have noted similar circumstances in prior reports. PPB needs to ensure that all feedback loops are closed and that all recommendations for organizational improvement are acted upon by the Force Inspector.

In order to return to Substantial Compliance with the requirements of these paragraphs, there must be a completed process for each issue that the Force Inspector identifies. In instances where there are potential policy or training implications, the relevant teams must be informed. For other implications, the loop must be closed and associated documentation returned to the Force Inspector.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>• To achieve Substantial Compliance, ensure completed process for each issue identified by the Force Inspector |
| **Assessment Based On** | • Review of Force Audit Report<br>• Review of Feedback forms |

**Settlement Agreement Paragraph**

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Quarterly Force Reports |

**Compliance Assessment**

For each of the subsections of Par. 76, the PPB possesses a tool or process to achieve Substantial Compliance. For instance, in addressing subsection (a), the PPB continues to produce quarterly and annual force reports including several important data points and comparisons to prior quarters. Subsection (a) is also addressed, in part, through the Phase II review wherein the Force Inspector identifies organizational trends. For subsections (b) and (c), the Force Inspector reviews the findings of a comparative analysis of each officer, unit, and group (as defined by common days off), identifying differences and discussing the analysis with each patrol RU Manager. For subsection (d), the Force Inspector either provides a memo to the RU Manager or creates a manual EIS alert (see also Par. 117). Finally, for subsection (e), the Force Inspector memorializes findings of the reviews in annual reports, including the Annual Force Summary Report and Annual Force Audit Summary Report.

These processes often provide important information regarding use of force trends. For instance, the first quarter Force Analysis Summary Report indicates that the number of force cases increased by 11% from the first quarter of 2021 and that 22% of subjects who experienced force used against them were in a perceived mental health crisis. Additionally, the fourth quarter of 2021 saw a decrease in use of force for each precinct compared to the third quarter. However, for the first quarter of 2022, Central Precinct saw a 35% increase in the number of cases involving force (57 events in the fourth quarter and 77 events in the first quarter), while North and East Precinct remained fairly consistent with the prior quarter.

Additionally, the quarterly comparative analysis prepared by the Inspector provides an immensely important and detailed comparison of several organizational levels, including by officer, assignment, unit, RU Manager, and days off. This document allows RU Managers to see which of their officers are using force at comparatively higher rates.

However, the PPB's execution of each process continues to suffer from limitations. For instance, while the Force Inspector can identify officers using more force from the comparative analysis (76c), no specific officers were identified for more in-depth review by the RU Manager. Instead, the Force Inspector has maintained the practice of simply forwarding the force audit results to the RU manager for their review. We have previously noted that this is against the spirit of such reviews and that as a result, there is no evidence as to the decision-making process for these outlying officers, thus no evidence as to how these officers were evaluated or assessed as part of the EIS process (see also Par. 117). The PPB reports that this practice has changed in the second quarter of 2022, but it remained deficient for this quarter.

Furthermore, we have previously noted our concern that PPB reports force statistics but does not discuss the potential implications or require review by RU Managers. For instance, as noted above, Central Precinct saw a 35% increase in the number of force events between quarters. There is no discussion in the quarterly force report as to potential reasons for this and we have no evidence that this increase was forwarded on for RU Manager review. Similarly, the report is silent on the fact that 22% of force events involved persons in mental health crisis despite this representing a 10% increase. Quarter to quarter changes in use of force statistics do not make a trend and such increases may be due to understandable reasons.  However, it is the responsibility of the Force Inspector to make that determination.  At present, the reports do not include any commentary on the statistics or, where appropriate, recommended remedial actions.  While increases quarter-over-quarter may be understandable, the public will not be able to know this unless PPB includes a narrative in their report.

As we have said in the past, conducting statistical analyses on force trends means little when it is done simply as a matter of routine and specific actions are not taken as a result. The analyses done by the Force Inspector and force analysts offer substantial opportunity for the PPB to reduce use of force by addressing emerging trends. However, we have not seen sufficient action from the PPB when the data indicate potential areas of improvement. We therefore find PPB continues to only be in partial compliance with the requirements of this paragraph.

Finally, in past reports, the COCL has provided example analyses of potential trends and details that the PPB could look at with their use of force data (see Appendix B of the fourth quarter 2021 report). While COCL did not repeat these analyses this quarter, a separate analysis was conducted on behalf of the Mental Health Alliance (MHA) and shared with both the COCL and the PPB during the second quarter of 2022. Given questions about the methodological

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

decisions in the MHA assessment, the PPB and the MHA researcher met to discuss the methodology and the implications of the evaluation. The COCL was originally given the impression that we would be part of this meeting, but the meeting occurred without us. We will therefore need to follow-up with both PPB and the MHA researcher before providing comments on the assessment.

| **COCL Recommendations** | • To achieve Substantial Compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere<br>• To achieve Substantial Compliance, enhance follow-up processes<br>• To achieve Substantial Compliance, resume practice of the Force Inspector identifying potentially problematic officers |
|---|---|
| **Assessment Based On** | • COCL review of quarterly Force Data Summary Reports<br>• COCL review of spreadsheet comparing force rates across individuals, shift, days off, and assignment |

# IV: TRAINING

**Overview of Training Systems**

The COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which the PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

**Overview of Methods**

The COCL continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL also continues to observe training (either in-person or online), observe TAC meetings, and conduct interviews with the PPB, TAC members and others as needed. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness.

**Assessment of Compliance**

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below. | |
| **Compliance Label** | Partial Compliance |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Methodology | This is a summative judgment that is contingent upon satisfying all paragraphs in Section IV |
|---|---|

**Compliance Assessment**

The PPB has achieved only Partial Compliance with Paragraph 78 because Substantial Compliance requires the PPB to "implement the requirements below." Thus, because this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, Training.

We will continue to focus on the primary training for all officers and supervisors: In-Service Training, Supervisor In-Service, Advanced Academy (for new officers), and special mental health trainings for ECIT, as these are the trainings most central to the Settlement Agreement. However, given the problems that occurred with the PPB's crowd management during the 2020 protests, the COCL added this subject to our training evaluation agenda beginning in 2021.

We will continue to evaluate training progress in terms of the fidelity of implementation and whether these trainings are likely to achieve the desired outcomes listed in Par. 78.

| COCL Recommendations | • To achieve Substantial Compliance, the PPB must substantially comply with all paragraphs within Section IV |
|---|---|
| Assessment Based On | • Summative and contingent upon satisfying all paragraphs of Section IV, based on the methods identified for each |

47

**Assess Training Needs**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | The COCL reviewed and assessed PPB's updated *2022 Annual Training Plan;* When available, the COCL will assess the quality of the independent Critical Incident Assessment of 2020 crowd control, with particular attention to training needs around crowd management and use of force. |

**Compliance Assessment**

As we reported in the fourth quarter, the Training Division completed its *2022 Annual Training Plan*. It also prepared its own report in December – 2*021 Training Needs Assessment: Law Enforcement Response to Mass Demonstrations*. The COCL provided a detailed assessment of these documents in our fourth quarterly report.

During the first quarter of 2022, the Training Division continued crafting its next annual training needs assessment and its crowd management needs assessment for 2023 training. This work involved gathering additional information from a variety of sources, including audit reports on use of force, complaint findings, changes in Oregon and Federal law, changes in the PPB directives, trends in hazards and officer safety issues, and research on best practices and trends. The Training Division continued to seek input from the community (via TAC, PCCEP, and CAG), PPB members (via training surveys), the PPB's Force Audit Team, the PPB's Equity & Inclusion Office, the City Attorney's Office, the Independent Police Review (IPR), and

other stakeholders. Thus, the PPB continues to employ the methods and data sources identified in Paragraph 79.

The needs assessment report was not updated during this period, nor was it expected. However, the PPB did provide a revised Training Plan in March with an Addendum providing details about a planned training for new sergeants (Sergeants Academy). After feedback from the COCL and the DOJ, this three-week training will begin in the second quarter.

The Training Division continues to gather information on training needs associated with crowd management, but we remind the PPB that this process cannot be finished until an external assessment has been completed. Thus, the PPB remains in Partial Compliance for Paragraph 79 because the City has yet to outsource and complete an independent Critical Incident Assessment of force applications and crowd control during the 2020 protests. On a positive note, the City was able to solicit proposals from vendors during the first quarter to perform this work and a vendor will be selected in the second quarter.

As we noted in our fourth quarter report, the PPB's crowd control needs assessment included an extensive list of training recommendations, but they were not prioritized and resources to implement them were not identified.[3] This refinement may have to wait until the external assessment of the protests is complete and the revised directives on force and crowd control have been promulgated. Also, the PPB's 2022 Training Plan included a separate training on Crowd Management, but specialty units were not covered in this training.  PPB now informs COCL that it has no plans to use specialty units to respond to protests, so no specialty training is needed.  Historically, RRT and SERT were used in protests, and in 2021, grenadiers were trained and equipped to use grenadier equipment and munitions (such as FN303 launchers). In any event, COCL wonders whether future crowd control training for all officers will cover responses to different forms of protesters' resistance and the officers' decision to use specific weapons? The external assessment, as well as revisions to the PPB's directives, should be able to address these training concerns.

When the PPB begins to refine the training implications for these internal and external assessments of crowd management, the COCL will continue to encourage PPB to give

---

[3] The responsibility for reviewing and prioritizing training recommendations lies with management, not the research analyst(s) who wrote this report.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

particular attention to developing and strengthening specific skills through role playing scenarios and feedback debriefings.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, hire an independent organization to complete a Critical Incident Assessment of crowd control during the 2020 protests, including implications for PPB training<br>• If any PPB specialty units will be deployed for demonstrations, provide training plans based on updated policies<br>• Include training with robust scenarios and feedback loops to strengthen interpersonal communication skills |
| **Assessment Based On** | • Review of the PPB's internal training documents and interviews with the PPB personnel |

**Evaluate Training**

| **Settlement Agreement Paragraph** |
|---|
| 80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor. |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Assessed the methods of evaluation, content, and the presence of a complete evaluation system with feedback loops |

### Compliance Assessment

The PPB's training evaluation system continues to rely on multiple methods of data collection, analysis and reporting. The Training Division manages to administer in-class quizzes/surveys, anonymous post-class evaluation surveys, knowledge tests, some scenario skills tests, and classroom observations. We continue to review these instruments and methods and provide the PPB with feedback from a scientific, research perspective. Overall, we continue to be satisfied with the methods and measures employed by the PPB in the first quarter of 2022, although we continue to offer recommendations for improvement.

During the first quarter, the Training Division continued to evaluate various trainings, including 2021 Supervisors In-Service, 2021 Crowd Control, 2022-1 Advanced Academy for recruits, In-Service and Advanced Academy training for program managers and lead instructors, and multiple online training programs. Specific reports were generated to evaluate specific trainings in 2021.

The COCL continues to be satisfied overall with the work of the PPB's Training evaluation team, given the limited staffing available for these sizeable evaluation tasks. In this first quarter report, the COCL comments on three trainings where evaluation results are available – the 2021-1 Advanced Academy training, the 2021 Supervisors In-Service and the Online training program. The Supervisors In-Service Training has been selected for inclusion in COCL's Outcome Assessment, so our comments on this particular training can be found at the end of the Training section (Section IV).

### Advanced Academy Training

The Training Division invested considerable time collecting and analyzing survey data and knowledge test data from the 29 recruits who were enrolled in the 2021-1 Advanced Academy training. The COCL was able to locate and review 66 internal reports containing results from the surveys and exams administered each day of the 11-week training program. At this time, we did not receive a summary report, so we will not provide a detailed outcome

**Exhibit A**

assessment. Nevertheless, we will make observations about evaluation methods, and comment on the findings from a couple of classes that are either new to the Advanced Academy curriculum or important to the Settlement Agreement.

In terms of evaluation methods, students were provided with a reasonably good set of survey questions to evaluate their classes and instructors, and overall, the feedback from students was very positive. Also, the exams were mostly valid in our opinion, although a few exams may have been too easy, where the average score was 99%. Adding a few more difficult questions in the future would provide a more accurate picture of knowledge acquisition. Also, we noted that all 29 recruit officers took the exams (knowledge tests), but many of the feedback surveys were completed by less than half of the students. The COCL continues to maintain that class surveys, like exams, should not be optional, unless they are part of a larger external research project that requires informed consent. When only a nonrandom subset of students provides feedback, the Training Division is left with uncertainty about whether the survey results represent an accurate picture of the quality of instruction and class content.

In terms of training delivery, there were some problems reported which were likely reflected in the evaluation results. The 2021-1 Advanced Academy training was different from past Academies because of staffing problems. A decline in the number of lead instructors and satellite instructors (from the Precincts) caused the Training Division to change the size and number of training blocks. Unfortunately, this mixture of times, along with a shortage of satellite instructors and lead instructors, resulted in some frustration among recruits who had to wait extended periods while other groups finished scenarios. Also, scenario sessions were not always delivered with the same number of qualified staff.

*Community Engagement:* This is the second Advanced Academy that included training on Community Engagement in this way, where students traveled to the original neighborhood of Vanport (to hear from someone who lived there) and to the First Baptist Church on Vancouver Avenue (to hear from a panel of community members). Overall ratings were positive, although some did not like to hear criticism of the police coming from community members as part of their training. Nevertheless, the field experience appeared to receive higher ratings than the classroom experience at the Training Division. The Zoom format for the Immigrant Refuge Community Organization, while helping students better understand cultural constrains on victims, received the lowest ratings, with students preferring an in-person dialogue.  However, in-person training is very difficult to achieve for community members who would need to repeat their instruction for many weeks and have other commitments.  Finally, a PPB observer noted that the Vanport experience could have been

enhanced with a historian who could help students link the Vanport experience to the Black community in Portland today.

*Crisis Intervention:* The Advanced Academy 2021-1 Crisis Intervention Training (CIT) was evaluated with good questions and was very well received by the new officers, who gave positive ratings overall. However, the CIT-specific scenarios were sometimes compromised because of staff shortages. These important scenarios require specialized roles, so satellite instructors are not typically qualified to perform these functions. Finally, some students felt that portions of this CIT training were redundant with the DPSST's Basic Academy and the Advanced Academy CIT. The COCL, however, is less concerned with redundancy, which can strengthen knowledge and skill if done properly.

## Online Training

The Training Division has continued to evaluate its online programs. There was a gap in this evaluation program between July and November because the small team of analysts did not have enough bandwidth, but the evaluations have resumed. Hence, the PPB prepared a report in the first quarter that summarizes the survey results from two online trainings: (1) 2012 Language Access: Utilizing Bilingual Bureau Members (November 2021) and (2) Directive 640:38, Interacting with Members of the LGBTQIA2S+ / Queer Community – Chief's Message (February 2022). The content of these classes is described under Paragraph 84 of this report.

The survey results continue to show positive results overall, although the Queer Community video received less favorable reviews from the officers, perhaps because of content and delivery. For example, some students felt the content was controversial or sensitive, and therefore, would be best served by an in-person discussion. Also, some students wanted to hear the voice of the queer community and their lived experience, not just the voices of senior administrators within the PPB.

In terms of evaluation methods, we have previously expressed our concern about low response rates for the feedback surveys. The Language Access survey, completed in November 2021, received only a 7.5% response rate – similar to several online surveys conducted earlier in 2021. However, the Queer Community survey, completed in February 2022, received a 21.5% rate. Hopefully, this improvement will continue, as the PPB has taken steps to enhance response rates in 2022, but we maintain that non-voluntary surveys will solve this problem.

Prior to January 2022, the PPB administered only one survey per training month, and the survey may have to cover three separate online trainings completed at various times during

**Exhibit A**

the month. This can affect response rates, as well as the reliability and validity of the findings (i.e., asking students to recall a training they had three or four weeks earlier can be difficult, especially if they have been exposed to additional trainings since then). In 2022, the PPB improved the methodology, providing one online survey for each training, including an automated reminder one week after the initial invitation.

Clearly, there are still many challenges ahead for the PPB when it comes to online training, including more interactivity, more dedicated time to complete surveys, optimal pedagogical methods for sensitive topics, and others. The PPB has made a good faith effort to begin addressing these concerns by making shorter videos, inserting start/stop and rewind buttons, and adding some interactive components. But staffing limitations will continue to affect the PPB's ability to make a full transition to online education in terms of content, delivery, and evaluation.

We have a few concerns about the presentation of the survey results in this particular report. First, some of the tables have redundant content, and therefore can be confusing (e.g., showing results for the PPB members with and without dedicated time to complete online training – one or the other is sufficient). Second, the listing of individual open-ended comments is unusual, and arguably gives too much attention to one person's views (i.e., individuals are not representative of the whole class). Typically, researchers will summarize open-ended comments by <u>identifying themes</u> and then give examples of each theme. However, we acknowledge that the PPB, in this internal report, is seeking to be responsive to concerns at the individual level (e.g., the PPB has selectively embedded responses to individual comments in the report). This level of responsiveness is a nice idea (designed to help improve survey response rates in the future by providing feedback to respondents), but perhaps these comments by individuals and the PPB's responses should be included as an appendix to avoid clouding the survey results overall.

Previously, we noted the absence of any surveys for equity training. We can now report that the equity training includes surveys to evaluate these classes. Finally, we continue to recommend the hiring of more civilian analysts and information technology staff to improve the PPB's ability to deliver and evaluate the effectiveness of innovative online training methods. We also recommend that CIT staffing remain a top priority in the Training Division.

**<u>On-the-Job Outcomes</u>**

Finally, we continue to recommend that the Training Division introduce outcomes metrics to capture "the extent to which program graduates are applying the knowledge and skills

acquired in training to their jobs." (Par. 80). This on-the-job outcome objective also fits within the Kirkpatrick Model of Training Evaluation endorsed by the Training Division.

We again credit the PPB Training evaluation team for beginning to consider "Related On-the-Job Outcomes" in their 2021 In-Service and 2021 Supervisors In-Service evaluation reports. They mention possible analysis of data regarding use of force and use of firearms (officer involved shootings) as captured in the PPB's Force Data Collection Report (FDCR), supervisor After Action reports, and follow-up investigations – data that could be used to determine whether the officer's actions were within policy and reflect good decision making (for example, did the officer do anything to precipitate the use of force? Were de-escalation tactics employed?). Also, data found in General Offense Reports and Mental Health Templates, and supervisor reports can determine, to some extent, whether the reporting is complete and accurate, and the officer decisions were reasonable when interacting with someone who maybe having a mental health crisis. However, the Training Division admits that, at present, these data are not currently being compiled and analyzed to measure the effectiveness of training. In addition to these police reports, we encourage the PPB to look at complaint data.

We acknowledge that on-the-job outcome evaluations would be labor intensive and time consuming. But under the new civilian leadership in the Training Division and if additional evaluation/research staff can be hired, PPB should be able to perform analyses on certain datasets. This will also require some prioritization and selection of specific outcome metrics. In terms of on-the-job metrics, we repeat our strong recommendation that the PPB introduce community contact surveys to measure the extent of procedural justice exhibited by officers, especially in response to mental health calls, but in response to other calls as well. This will give voice to the community and produce rich data for training. Finally, to increase the strength of their training evaluations, the PPB should work with local university researchers to introduce randomized control trials (RCTs) and strong quasi-experimental designs.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>Require students to complete post-class evaluation surveys to increase response rates and increase the validity of the survey results</li><li>Hire more civilian analysts and information technology staff for the Training Division</li><li>Work with local university researchers to conduct more scientific evaluations of on-the-job outcomes, including</li></ul> |

| | |
|---|---|
| | contact surveys to measure the impact of training on police-community interactions and procedural justice<br>• Ensure that the Training Division has enough CIT instructors to effectively facilitate all CIT scenarios |
| **Assessment Based On** | • COCL review of training evaluation tools, quality of data, and systems of reporting and feedback |

**Document Training Delivered and Received**

| |
|---|
| **Settlement Agreement Paragraph**<br><br>81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually. |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Requested and reviewed LMS records for the first quarter; Requested and observed electronic inquiries of LMS files |

| |
|---|
| **Compliance Assessment**<br><br>The Training Division continues to use the Cornerstone Learning Management System (LMS) to record officer training. LMS attendance records were updated in the first quarter to include all in-person and online In-service trainings noted earlier, as well as the other online training videos and notices. Records of external and discipline-specific trainings continue to be maintained. During our site visit in March, we looked at the LMS master list of trainings. |

We selected some supervisors and officers at random and then confirmed that their attendance at required trainings had been recorded in LMS.[4]

By reviewing LMS training hours, the Training Division is able to ensure that the PPB members remain in compliance with Oregon state standards and have received the training required by the PPB. LMS is used to ensure that the PPB employees who are not on leave are completing their required training and that these records are reviewed by supervisors. The review and compliance process is as follows: the PPB employees are given 30 days to complete training and sent email reminders 14 days, seven days, and one day before the due date, and one day past the due date. Their RU manager is sent emails regarding training delinquencies at one, five, and 21 days past the due date.

When the PPB members fail to complete online training in this time period, the Training Division continues to send non-compliance memos to the Chief's office. Focusing on sworn PPB members, in the first quarter, six such memos (covering six classes) were sent to the Chief's office for review during the first quarter of 2022. The COCL found that, in total, only 17 officers missed the training. If the absence is justified (e.g., long medical leave), the Training Division is notified and the LMS records are updated. If the absence does not appear to be justified, the system is designed to work this way: the employee's supervisor or unit manager is notified, and the training must be completed immediately under supervision.

In the first quarter of 2022, the COCL requested documentation of this review system for all cases in 2021 and for data on the rate of non-compliance.  In response, the PPB conducted a preliminary analysis of compliance rates, looking at all 46 non-compliance memos that were issued in 2021 for sworn personnel (the COCL has reviewed them as well). Given that the PPB employed at least 774 officers (the current workforce) who needed training in 2021, there were 35,604 opportunities for the PPB officers to miss training throughout the year. However, only 160 trainings were missed, thus producing a compliance rate of 99.5%. Also, about half of these missed trainings were due to a few individuals on extended leave, retiring, or resigning. Thus, the PPB does not have a serious problem with officers missing training (about 0.22% of the time). However, for the cases that cannot be easily explained away, the

---

[4] Although supervisors only review their employees annually as part of their performance evaluation, not semi-annually, neither DOJ nor COCL has viewed this as a non-compliance issue in the past. For COCL, the continuous review of training records by LMS and the chain of command was sufficient for compliance with Par. 81.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

PPB found no evidence of EIS entries or discipline. Thus, the COCL recommends that the Chief's Office or the Training Division give more attention to the few cases where officers are not responding to the training requirements.

| **COCL Recommendations** | • Provide a periodic analysis of non-compliance rates for training completion and actions taken by the PPB when officers do not complete the required trainings on time |
|---|---|
| **Assessment Based On** | • Review of LMS updates for the first quarter of 2022<br>• Review of all non-compliance memos issued in 2021 |

| **Settlement Agreement Paragraph** |
|---|
| 82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Semi-Annual Training Reports |

**Compliance Assessment**

The PPB's Semi-Annual Training Reports for the third and fourth quarters of 2021 were delivered to the Deputy and Assistant Chiefs on January 21, 2022, and therefore the PPB remains in Substantial Compliance for Par. 82. The internal report lists 462 classes/groups attended by sworn members and the external report lists 173 classes/groups attended by sworn members between July 1, 2021 and December 31, 2021.

Given the ongoing investigation of RRT training, the COCL will wait to see whether the PPB's Semi-Annual Training reports for 2022 contain all specialty unit trainings.

| COCL Recommendations | • Ensure that the semi-annual training report includes all specialty unit trainings<br>• As part of the semi-annual training report, consider adding the non-compliance results requested by COCL for Par. 81 |
|---|---|
| Assessment Based On | • Delivery and content of Semi-Annual Training Reports |

**Trainer Qualifications**

| **Settlement Agreement Paragraph** |
|---|
| 83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed "Work History Review Sheet" for first quarter hires and ensured that PPB is following S.O.P. #1-19 standards. |

| **Compliance Assessment** |
|---|
| During the first quarter, one officer was selected to be a Lead Instructor at the Training Division, thus activating the review process pursuant to S.O.P. #1-19. The COCL has reviewed the Work History Review Sheet of this individual and finds no evidence of civil judgments, discipline, or mistreatment of people with mental illness as defined in Par. 83. |

| COCL Recommendations | ● No recommendations at this time |
|---|---|
| Assessment Based On | ● COCL review of "Work History Review Sheet" and S.O.P. #1-19 standards |

**Deliver Appropriate and High-Quality Training**

| **Settlement Agreement Paragraph** |
|---|
| 84. (COCL Summary) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. PPB is expected to develop and implement a high-quality system of training that is consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention. In addition to all sworn personnel, paragraph 84 requires supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions. |

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observed Supervisor In-Service training and reviewed LGBTQIA2S+ trainings made available through the LMS during the first quarter. |

| **Compliance Assessment** |
|---|
| During the first quarter of 2022 the PPB provided one major training required by Paragraph 84 – In-Service training for all officers. The COCL observed this training and herein provides a |

description and assessment. In addition, we provide an overview of the online training delivered by the PPB during the first quarter. Finally, we offer an Outcome Assessment of relevant PPB training.

The PPB did not return to Substantial Compliance during the first quarter because they have yet to provide crowd control training that incorporates changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and crowd control (Directive 635.10), incorporates both internal and external assessments of training needs, and provides scenarios or exercises to practice appropriate crowd control skills. These trainings cannot be delivered until the policies on use of force and crowd control have been revised and approved. This review process was still underway at the end of the first quarter.

The reality is that an external assessment of crowd control will not be completed in 2022. Thus, we acknowledge and accept PPB's plans to conduct some crowd control training with all PPB members in January of 2023, with lesson plans that are developed in 2022.  No doubt, some follow-up training will be needed after the PPB receives the results of the external assessment but waiting could further compromise the PPB's preparedness for the summer of 2023.

In the meantime, the PPB continues to develop and deliver other essential training classes. During the first quarter, the PPB was able to complete lesson plans, PowerPoints, and other material for a new Sergeants Academy. The COCL and the DOJ reviewed and critiqued these documents during the first and second quarters, and the training will begin in the second quarter. Thus, the COCL will include a description of this three-week training in our second quarter report.

**Officer In-Service Training**

The COCL observed the Officer In-Service Training in January of 2022. This training started with three hours at the firing range, which we did not observe because we have observed it many times previously and were informed that the training was essentially unchanged.

*Legal Updates:* The next session was one hour of legal updates presented by the City Attorney's Office. The instructor went over three categories where case law updates have been made. For each category, the officers participated by answering clicker questions on which way they thought the court ruled in the cases discussed.

The first category focused on extension of the stop and specifically the Arreola-Botella case. This 2019 Oregon Supreme Court case eliminated the "unavoidable lull" and requires that all inquiries made during a traffic stop must be related to the reason for the stop or justified on

other grounds. This case effectively changes pretext traffic stops.[5] Three Oregon state court cases involving extension of the stop were discussed (State v. Hallam, State v. Taylor, and State v. Soto-Navarro) with attention to why the courts ruled the way they did.

The second category discussed was the officer safety exception. Under this exception an officer must have subjective reasonable suspicion that the person poses an immediate threat of serious injury and the officer's concern and response must be objectively reasonable under the totality of the circumstances. State v. Bailey was then discussed, with the instructor noting that just because someone has a gun does not automatically justify a warrantless search due to officer safety. State v. Payne was also discussed in which the officer safety exception could be applied.

The final topic covered was search and seizure. The instructor presented five cases in which the officers in the room had to decide if search or seizure was justified or not. These cases were State v. Goldberg, State v. Hollins, State v. Lebanno, State v. McCarthy, and Caniglia v. Strom. These cases covered important settings and topics, including land, automobiles, and the community caretaking standard.

After each case was discussed, the instructor asked the officers to determine which way they thought a court ruled on a circumstance similar to the case presented. The officers used clickers to submit their answers anonymously. In some cases, almost all of the officers answered correctly but in other cases more than half were wrong. The instructor then facilitated a robust discussion of why the officers answered the way they did. This format seemed to provide a safe space for officers to express their opinions on how certain laws are enforced in practice. The instructor was able to effectively use their position as a lawyer to help explain why courts have ruled the way they have and what that means for the day-to-day practices of the officers. The only concern from this session was the number of officers who answered incorrectly. Granted, some officers were exposed to new and complex legal issues for the first time. However, this knowledge deficiency underscores the importance of

---

[5] A pretext traffic stop is when an officer pulls over a driver for a minor traffic or equipment violation (e.g. failure to signal, broken taillight), and then uses the stop to investigate a more serious crime (e.g. illegal drugs, DUI). Considerable discretion is involved.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

frequent training on new case law and possibly a more accessible format for officers to review this information.

*Patrol Procedure Principles:* The next session was an hour and a half classroom presentation on patrol procedures. To start the session a video was shown of a person describing the many uses for a "framing square" used by construction workers. Drawing on this analogy, the message communicated was that patrol tools are very applicable in many different situations just like the framing square. The presenter then discussed the reason police have procedures and principles for patrol. The old principles can still be used (i.e., have a leader, have a plan, be adaptable, don't assume, correct mistakes, and communicate), but the new ones presented here were updated and more concise.

The four new principles are: Know your role and own it, Communicate effectively, Prioritize and execute, and Gain an advantage. Several videos were shown to help officers understand how these principles can be applied to their work. For the "Know your role and own it" principle, officers were given the example of air force members getting a plane ready, where each person has a specific job to get the plane off the ground and each is equally important. Similarly, all police officer roles are important and necessary to have an effective police agency. To illustrate the "Communicate effectively" principle and how it differs from simply communication, officers viewed a video of the Fort Worth Police Department responding to a domestic disturbance. To illustrate the "Prioritize and execute" principle, officers viewed a video of King County Sheriff's Office and the Seattle Police Department stopping a person in a car that ended with shots being fired. The presenter and officers discussed how priorities of the different officers shifted throughout the stop and what they did correctly. Finally, for the "Gain an advantage" principle, they discussed how tactical advantages can also be disadvantages including cover, concealment, lighting, numerical superiority, distance, element of surprise, movement, and information. A few videos were played involving shots being fired at an officer to demonstrate how tactical advantages can become disadvantages.

The only discussion of de-escalation was toward the end of the session when reviewing the "Gain an advantage" principle. They discussed how de-escalation gives officers an advantage because it is a deliberate attempt to prevent or reduce the amount of force necessary to resolve the confrontation. The PPB has been encouraged in the past to place a strong emphasis on de-escalation in training. Once again, this training did not achieve this goal. While the brief discussion on de-escalation in this training was a promising start, it should be expanded significantly and not focus exclusively on how it benefits the officer.

Finally, this session ended with a 12-minute video by the PPB's Training Division on critical incident response and the four Cs. This video provided little new information, as it served primarily as a summary of the material just discussed in the session.  The officers seemed to

enjoy this video and the other videos in this session. The videos showing other police officers seemed to be the most intriguing to those in attendance and encouraged the most discussion. However, the videos and this In-service training involved very little in the way of problem-based learning, where officers are engaged in critical thinking and problem solving.[6]

Unfortunately, all videos of police officers involved shots fired. There were no circumstances shown or discussed that involved any other situations. While incidents involving shots fired are important, they represent a very small portion of the calls for service received by PPB officers.  Attention to "low frequency – high risk" incidents can save lives, but attention to other incidents can save people from preventable uses of force and save everyone from reviewing and possibly investigating these actions. Training should also cover more common police-public encounters and illustrate how the four principles can be applied in lower risk settings that may escalate if not handled properly. The introduction of body worn cameras will provide many opportunities for PPB trainings to incorporate more videos covering a wider array of settings.

*Scenario:* The last session of the day was a real-life scenario played out by the officers. The purpose of this scenario was to allow the officers an opportunity to implement the four principles they had learned earlier that day. The scenario involved a man in a car with a gun who was parked outside his sister's house. He needed his money from her to pay off his gambling debts, but she was not home so he was unable to obtain the money. He fired one shot up into the air out of frustration while he was in communication with officers. The officers were expected to communicate with him and de-escalate the situation without anyone being injured. Some played active roles, while others played more of an observer role. If the scenario had taken place with two smaller groups, all officers could have been given the opportunity to play an active role. The group debriefed the scenario with the trainer and talked through what everyone did and why. The instructor helped facilitate a group discussion of how each of the four principles were applied.

---

[6] For the reader interested in problem-based learning in policing, see Stephen Lettic's dissertation (2015): https://www.proquest.com/openview/fe8cdd3926801413f32b418e6462de07/1?pq-origsite=gscholar&cbl=18750

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

Although the scenario did give officers a chance to talk to the man by phone, the debrief lacked any discussion of de-escalation or procedural justice. Not every officer spoke during the debrief. The majority of the debrief was devoted to reviewing what happened and who did things correctly. There was little constructive criticism given. As this was a training scenario, the goal should be to find ways to improve officers' performance, no matter how small. The scenario seemed to play out in a way that worked out well for the officers and the community member, with the man surrendering. There was no discussion in the debrief of what actions the officers could have taken if the man was having a mental health crisis or was more hostile towards the officers or other community members. In the future, PPB should consider training their role player in crisis to vary their level of cooperation with the officers, depending on how they are being treated by the officers on the scene.

**In-service: Online Training**

In the first quarter, the PPB continued to provide a range of online classes and educational material using their Learning Management System (LMS). A total of 14 items were delivered virtually to PPB members during the quarter. This included videos, Tips and Techniques, and Legal Updates. Three Directives were covered: Wellness Program (500.00), Interacting with Members of the LGBTQIA2S+ Community (640.38), and Vehicle Disposition and Impoundment (630.60). The City Attorney's Office continued to be behind on providing officers with legal updates, so during the first quarter, they posted six updates accounting for a five-month period, ranging from August of 2021 to December of 2021.

As noted in our last quarterly report, the PPB's Equity and Inclusion Office (EIO) began developing the next sequence of equity trainings focused on interacting with historically marginalized groups. In the first quarter, EIO released the first two training videos in the sequence to the LMS. The COCL's review here covers the online training activities completed in the first quarter related to equity as well as foundational work to expand equity training in the second quarter of 2022.

**Online Equity Trainings**

In the first quarter of 2022 the Equity and Inclusion Office (EIO) launched its next sequence of trainings focused on historically marginalized groups. In this sequence, the first set of online trainings is centered on interacting with the LGBTQIA2S+ community and is required for all PPB members. There are currently four planned trainings on this topic, and they are based on, and an accompaniment to, PPB directive 0640.38 - "Interacting with Members of the LGBTQIA2S+/Queer Community." During the first quarter, EIO released two trainings on the

LMS that are described below. The final two videos are scheduled to be released in the second quarter of 2022. COCL will review the remaining videos when they are released.

*Video 1 - Chief's Message video:* The introduction video is about six-minutes long and it includes perspectives from members of the command staff, including the Chief of Police, on the importance of the policy and the PPB's commitment to applying the policy to all interactions with members of the LGBTQIA2S+/ Queer community, internal and external to the PPB. The video goes on to preview the topics that will be covered in upcoming videos in the sequence and closes with EIO staff stating that they are available to the PPB members if they have questions, comments, or concerns related to the content of the upcoming videos.

*Video 2 – LGBTQIA2S+ Vocabulary:* The second video in the LGBTQIA2S+ sequence is a little under eight-minutes long and focuses on defining four of the fourteen terms within the policy. The four terms that are covered in the video are LGBTQIA2S+ (sharing what each letter and symbol represent), Queer, Gender Identity, and Transgender. The definitions are stated, as defined in policy, by EIO staff and then further contemplated by a member of the LGBTQIA2S+/ Queer community. The community members discuss the significance of the terms, and the importance of understanding the terms and using them correctly. To wrap up the video, a member of the EIO staff states that the goal of learning about the terminology is to "respond with humility and empathy when a person shares their identity." Staff goes on to highlight the key points of the training which is that understanding and appropriately using the terminology can be beneficial in building relationships, creating safety in the community, and shedding light on context of a crime where the PPB members may be called to respond. Additionally, staff shares that the training also applies to how the PPB members interact with those internal to the Bureau. It is also made clear that the PPB members should not assume anyone's gender identity and should ask people how they would prefer to be addressed. The video concludes by stating that terminology can change and that members should respond by accepting corrections from those they interact with and letting members know they can reach out to EIO with any concerns or questions.

The two LMS videos released in the first quarter are a good start to covering this complex and important topic. As PPB moves forward with producing more LMS videos to accompany their policy for interacting with members of the LGBTQIA2S+/ Queer community, the COCL encourages the PPB to focus on how to apply what PPB members are learning to their work out in the field. For instance, how should officers write up reports if a community member's information is different than what is on their government issued identification and how should searches and detentions be managed for transgender community members? The COCL will review the next videos in this training sequence in upcoming quarterly reports. For

**Exhibit A**

a review of the current video trainings from the students' perspective, see the COCL's summary under Par. 80 above.

*Other Equity Training Related Activities:* In the first quarter, EIO continued the work of reviewing all existing trainings and lesson plans for an equity lens. Additionally, EIO continues to seek out supplemental training for the PPB members and will send 25 bureau members to attend the "training of trainers" program for the REPAIR[7] course, which was discussed in COCL's previous quarterly report. EIO also continued working with other equity trainers across City departments to de-silo information, share best practices, and broaden feedback loops.

*Overall Assessment of Online Training:* The Training Division continues to provide a wide range of online trainings and educational materials. As noted earlier, some critical feedback is described under Par. 80 above. Fortunately, the LMS Administrator position – vacant for several months in 2021 -- was filled in December and this individual was learning the system during the first quarter. We feel the PPB is engaging in a good faith effort to find the right balance of virtual trainings that include asynchronous videos, interactive videos (with "click through" questions and quizzes), and live interactions with instructors. We continue to maintain that some training topics require in-class discussions (e.g., difficult conversations around bias-free policing or responses to the LGBTQIA2S+/ Queer community) and some require in-class practice of skills (e.g., de-escalation and procedural justice).

With new personnel in the Training Division, the COCL will revisit the issues around online training, including balancing online and in-person training, combining online and in-person formats to allow officers to practice the skills promoted online, and ensuring that students complete the feedback surveys so that training can be continually improved.

## Simulator Training

In past reports, the COCL has commented that the VirTra 3-D simulator (used in PPB's 2021 In-service training) could be a useful vehicle to practice specific interpersonal communication skills needed by the PPB officers. We pointed out that this type of virtual methodology could

---

[7] https://www.civilandhumanrights.org/repair-course-for-law-enforcement/

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

help the PPB achieve Substantial Compliance with the requirement for role-playing scenarios and interactive exercises (Par. 84.a.i), as well as the requirement for integrated de-escalation techniques (Par. 84.a.ii) to prevent or reduce the use of force. However, the PPB has discontinued use of the VirTra 3-D simulator because of continued reliability problems. The Training Division has devoted considerable personnel time trying to keep the system running, but it is not cost-effective. We accept their decision, although we continue to believe that similar technology will likely play an increasingly vital role in future training programs nationwide. In the absence of such virtual training, the PPB will need to provide real-life scenarios for officers to practice de-escalation, procedural justice, and other communication skills.

**Specialty Unit Training**

As the COCL has noted in the past, the PPB has dozens of specialty units that serve important functions, but in some cases, they have their own systems of training and supervision that can lead to problems because of insufficient oversight by management. COCL has maintained an interest in specialty units that are potentially important to the Settlement Agreement's focus on constitutional policing and use of force. This quarter we discuss specialty training related to the former RRT and the new Focused Intervention Team (FIT). Other relevant specialty units involving behavioral health -- the Behavioral Health Response Teams (BHRT), Service Coordination Teams (SCT), and Enhanced Crisis Intervention Team (ECIT) -- are covered elsewhere in our review.

The COCL will continue to focus its attention on the PPB's core training classes for all sworn members and classes relevant to the Settlement Agreement, namely: In-service for all officers, In-service for all command and supervisory personnel, Advanced Academy training for all new recruits, and Enhanced Crisis Intervention Team (ECIT) training for responding to mental health incidents. However, after the PPB's problematic response to the 2020 protests, COCL turned its attention to a non-mental health specialty unit - the Rapid Response Team (RRT) – because of its central role in crowd control and demonstrations (e.g., see the COCL's first quarter 2021 critique of the court-ordered RRT training provided in March of 2021).

*Rapid Response Team (RRT) 2018 Training Investigation:* The 2018 training of the PPB's Rapid Response Team (RRT) was the main controversy surrounding the PPB's training in the first quarter of 2022. In January, the City revealed to the COCL the existence of the disturbing and offensive training material from 2018, including one slide showing a "Prayer of the Alt Knight" meme, suggesting that protestors are "dirty hippies" and that police violence against them is

justified.8 This has caused an uproar in Portland, and has resulted in many inquiries and demands from the community during the first quarter of 2022. The RRT was disbanded in 2021.  Certainly, this prior training was inconsistent with the requirement that all aspects of PPB training shall "... employ strategies to build community partnerships to effectively increase public trust and safety." (Par. 78).

The Mayor's Office learned about this slide at the end of September 2021 and immediately asked the PPB's Internal Affairs Division to open an investigation into this training material to determine its origin and delivery. In January of 2022, both the COCL and the DOJ asked the City Attorney's Office (CAO) to keep them informed of this investigation and the CAO has agreed to these requests. However, the COCL did not receive any updates on the investigation during the first quarter and we have since renewed our request. At the close of the first quarter, the RRT investigation had been operational for six months.

Going forward, the COCL's primary concern is that the Training Division is rigorously following an internal process for reviewing and approving training curricula and materials for specialty units. Indeed, the Training Division is required to review and approve all training material used to train the PPB personnel, per Directive 1500.00 and S.O.P #1-21[9], but the PPB did not enforce these regulations.

In response to this RRT incident, the PPB has taken at least two actions. First, the PPB's Training Division Captain released an internal memo in January of 2022 to all RU managers reminding them that external training plans must be reviewed and approved in advance by the Training Division, citing Directive 1500.00: "Precincts/divisions intending to conduct training shall submit a training plan through their RU Manager to the Training Division not less than sixty (60) days prior to the first day of the training." (Section 13.1.3). Second, the Training Division has included all planned training for Specialty units in its revised 2022 Annual Training Plan. The COCL will continue to monitor both the review process and the investigation. Again, we recommend that the next audit of the Training Division by the Inspector General (Par. 85) covers these management practices.

---

[8]For a history of this meme, see https://knowyourmeme.com/memes/events/prayer-of-the-alt-knight

[9]https://www.portlandoregon.gov/police/article/680811

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

*Focused Intervention Team (FIT) Training:* The PPB's Gun Violence Reduction Team (GVRT) was disbanded in July of 2020, after concerns about racial disparities in their traffic stops.  But after more than 1200 confirmed shootings in 2021, the City launched a new gun violence team on January 19, 2022, called the Focused Intervention Team (FIT). With the rise in violent crime, the City decided to move quickly and provide a week-long training for FIT members from January 6-15, 2022. This meant that neither the COCL nor the DOJ was given the opportunity to review the lesson plans, nor was the City Attorney's Office. The COCL also did not have sufficient advance notice to observe the training.

To avoid the problems associated with the prior gun team, when the FIT was officially created by the City Council in 2021, they also created a Community Oversight Group (COG) that was to be involved in selecting the members of the FIT, defining their function, and assisting in training. The COG has served in this capacity.  The City gave the impression that the FIT would give more attention to shooting scenes and apprehending suspects rather than traffic stops, although the PPB has informed us that FIT will make traffic stops that are intelligence driven. Indeed, the lesson plans appear to give considerable attention to traffic stops and searches.[10] Hopefully, the training for FIT seeks to avoid high-discretionary pretext stops that have contributed historically to racial disparities evident in GVRT statistics. We are pleased to see that the FIT training does include a class on Equity.

**Crowd Control and Management: Recommendations**

Given the centrality of crowd control issues for achieving compliance with the Settlement Agreement, the COCL feels compelled to make a few comments about Training issues and related subjects. In terms of Training, we credit the CAO and PPB for introducing crowd control training through different In-service venues over the past year. However, to a large extent, this training has been limited to legal updates around the use of force (which the COCL has covered in prior reports). Also, crowd control training and training for incident commanders has been delayed until policy and S.O.P. issues have been resolved. Most

---

[10] However, to our knowledge, the training did not include gun crime investigation

importantly, we remind the reader that a comprehensive approach to crowd management has yet to be implemented and will require that PPB incorporate findings from PPB's Needs Assessment on demonstrations as well as the findings from the future external Critical Incident Assessment on demonstrations.

In terms of larger issues about crowd management and PPB's ability to achieve compliance with the terms of the Settlement Agreement, improvements to training are certainly important, along with other reforms. No doubt, individual officers should be held accountable for force applications that are outside of policy or are inconsistent with training. Furthermore, PPB personnel higher in the chain of command should be held accountable for the proper review and response to problematic force incidents during protests (and other force applications), as we have underscored repeatedly in our COCL reports.

However, as experts in organizational behavior, we give less attention than other critics to seeking accountability for incident commanders or supervisors for the decisions they made during the protests and more attention to the organizational culture and socialization process in law enforcement agencies that resulted in para-military operations. No doubt, the demonstrations were unprecedented in intensity, chaos, and duration, and as a result caught PPB off guard. This reality is something that occurred in dozens of other cities, as evidenced by the national conferences held in 2021 to discuss these events. However, we need to ask why these agencies responded as they did?

After the protests, we learned that PPB's force policies and training on crowd control were inadequate and both COCL and DOJ have provided extensive feedback to PPB over the past year regarding the use of specialty units, de-escalation methods, types of resistance that would/would not justify the use of force, preparing Force reports and After Action reports, and other topics.  So clearly, organizational reform is more likely to occur when policy, training, and individual performance evaluations are modified to reflect best practices in policing and enhance police legitimacy.  Use of force is only justified under extreme circumstances and disrespectful interactions are never justified. Along these lines, the Portland community is clearly asking for a police force that respects individual rights, is compassionate toward those who are suffering, practices procedural justice (giving voice, respect, fairness), engages in thoughtful problem solving as needed, and uses force only as a last resort after de-escalation has been skillfully attempted.

Thus, the COCL will continue to provide recommendations for improving training, policy, and performance evaluations as they relate to crowd management and organizational behavior in general.  These components should all be interconnected, with policy guiding training, and

training guiding performance reviews.  The PPB's annual performance evaluations should be data-driven and serve as an important mechanism for changing the organizational culture.

For crowd control, in addition to the internal and external assessments of the 2020 protests, we recommend that the PPB and the City pay attention to two recent reports: First, in April of 2022, the Independent Police Review (IPR) released a report with six recommendations titled, *Lessons Learned: City's response to protests exposed vulnerabilities in Portland's police accountability system*.[11] Second, after hundreds of George Floyd protests nationwide, the Police Executive Research Forum (PERF) collected extensive data from dozens of cities and police chiefs, and prepared a report in February of 2022 titled, *Rethinking the Police Response to Mass Demonstrations: 9 Recommendations.*[12] The PERF report provides a national context, so Portland should understand that the PPB was not the only law enforcement agency whose response to protests was challenging and problematic. In this report PERF provides important recommendations – consistent with the COCL's emphasis on communication, community engagement, and de-escalation -- and therefore, we have encouraged the PPB management to take them seriously.

Finally, we recommend that the community and the PPB read the recent report by the OIR Group on PPB's culture.[13]  Although their survey of 277 officers is not a good methodology for measuring race bias (and does not find any),[14] the OIR Group does a good job of examining the PPB from a number of different angles and offers a range of solid recommendations to improve the organization.

---

[11] https://www.portland.gov/ipr/news/2022/4/12/lessons-learned-citys-response-protests-exposed-vulnerabilities-portlands-police

[12] https://www.policeforum.org/assets/ResponseMassDemonstrations.pdf

[13] https://www.portland.gov/sites/default/files/council-documents/2022/Portland%20OIR%20Group%20-%20Portland%20Culture%20Project%20-%20Final%20Report_0.pdf

[14] As a psychologist and survey researcher, the Compliance Officer can say with confidence that direct questions about prejudice or racism will not reveal valid results. Because people are defensive and want to project a positive image of themselves and their profession, they are generally incapable of providing an accurate account of their internal attitudes on subjects that have strong political and socially desirable responses. Also, we know from research that bias is often unconscious – something we are not aware of (and thus, it is called "implicit bias").

**Training Outcome Assessment**

In the context of this Settlement Agreement, the COCL's outcome assessment looks at both the creation of sustainable systems as outcomes (per Par. 170), such as the PPB's training evaluation program (Par. 80) and the achievement of specific programmatic outcomes, such as training effects. To a large extent, we include the review of systems under our Compliance reviews each quarter. Here, our outcome assessment focuses on whether the training programs that were introduced were well received by the students and whether the students learned anything from the training. As a cautionary note, the available data are only suggestive rather than definitive when it comes to estimating training effects. The PPB would need to introduce "control groups" to make stronger causal inferences about training effectiveness. We have considerable expertise in program evaluation that allows us to make these recommendations.

Here we draw upon data collected as part of the PPB's Training Evaluation program. With limited resources, the PPB analysts have managed to collect a wide range of survey and test data from students across many of their training programs. This data is not available every quarter, so we will report on them periodically. This quarter, we will focus on recent data associated with the 2021 Supervisors In-Service training that occurred during the fourth quarter of 2021 and released in the first quarter of 2022 after the survey and test data were complied, analyzed, and reported.

The COCL has also encouraged the PPB to collect on-the-job outcome measures that might be influenced by training, and the PPB has made a commitment to do so. In the Supervisor evaluation report, the PPB has begun to identify possible ways to conduct this type of outcome assessment, but this is a long-term project that is only in its infancy. There are many possibilities in this realm, including complaint data, use of force data, data on public perceptions of the police, and someday, body-worn camera data. When the PPB's analyses become available, we will report on them. Furthermore, we will continue to recommend new data on public perceptions of police encounters. The contact surveys we have recommended (sometimes called "customer satisfaction" surveys) can be very useful for giving the community a voice, shaping officers' behavior on the job, and monitoring change over time. Behaviors that are <u>measured</u> (and for which officers are therefore accountable) are much more likely to change than behaviors that are <u>not measured</u>.

To evaluate the Supervisors In-service training, the PPB's Training Evaluation team used multiple methods, but the centerpiece of this work are knowledge tests and feedback

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

surveys.[15] The knowledge tests were administered at the conclusion of this one-day training (what we call a "post-test only" evaluation design) to determine whether officers had acquired the basic knowledge articulated in the Learning/Performance Objectives for the class. Whether students had this knowledge prior to entering the class is unknown (without a pretest or other control group), but at least the PPB can ensure that students possessed this knowledge prior to leaving the classroom.

The feedback survey gave students the opportunity to evaluate the quality of the instruction and their perceptions of what they learned, as well as make recommendations for current and future trainings. We also credit the PPB with using this data to provide regular feedback reports to training managers to improve future training. The COCL has reviewed these internal reports and finds them useful.

Below we provide a summary of the findings from the knowledge tests and feedback surveys connected to the 2021 Supervisors In-Service Training.

_Knowledge Tests:_ In terms of the knowledge tests, we reviewed the results from each of the five classes that comprised the Supervisors In-service training. The knowledge checks were not extensive (two or three questions for each class), but they covered some key topics. We have complied Table 1.1 so the reader can see that the vast majority of students were able to answer the questions correctly and thus receive full credit for those questions. Some students struggled a little with test questions for some of these classes, but given the limited number of test questions, these results are very positive. In the past, the COCL has provided the PPB with feedback on how to improve test questions, so we will not repeat that technical assistance here. But overall, we are satisfied with the PPB's efforts to assess student's knowledge on these topics.

[15] PPB's evaluations are based on Kirkpatrick's model of training evaluation, which has been popular for many decades. See Kirkpatrick, W. K., & Kirkpatrick, J. D. (2016). _Kirkpatrick's Four Levels of Training Evaluation_. United States: ATD Press. This model has some limitations, but we have endorsed it in the past.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

**Table 1.1: Knowledge Test Results for Supervisory In-Service Classes[16]**

| Class | Number of Test Questions | Percent that Received Full Credit for the Questions |
|---|---|---|
| Procedural Justice | 3 | 97-99% |
| UDAR | 2 | 89-95% |
| Reasonable Suspicion | 2 | 87-90% |
| Leadership and Wellness | 2 | 83-100% |
| Critical Incident Management | 2 | 91-100% |

*Feedback Surveys:* On the feedback survey, the PPB provided students with a range of questions, seeking their evaluation of each class and its impact on them, as well as future training needs for supervisors. Overall, the Supervisor In-service training received higher ratings in 2021 than in 2020 (66% vs 40% "generally satisfied" or "very satisfied"), probably because the 2020 training was online, while the 2021 training was in-person.

As shown in Table 1.2, roughly nine out of 10 students felt the instructors for these five classes in 2021 were "organized and well prepared." However, they were not as pleased with the content as judged by whether the class was "good use of my training time." The Procedural Justice class received the lowest ratings, with only 50% reporting it was a good

---

[16] Compiled by COCL from tabular data found in 2021 Supervisors In-Service Training: Evaluation of In-Service Training for Supervisors. Portland Police Bureau Training Division, April 2022.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

use of their time.[17] Students who gave lower ratings were also more inclined to feel that this class did not help them generate new ideas or strategies to improve procedural justice. While some of these lower ratings may be due to the de-valuation of the procedural justice model within the PPB culture, these ratings may also reflect some boredom with the current approach to teaching this topic every year. As the COCL has noted many times, live interactive scenarios would help to reveal the benefits of procedural justice during interactions with subordinates or with members of the public and could provide constructive feedback on interpersonal communication skills.

**Table 1.2: Student Feedback for Supervisory In-Service Classes**[18]

(% of Students who Agree or Strongly Agree)

---

[17] The report did not include responses to the question on overall satisfaction with the Procedural Justice training or compare it to other classes on this dimension.

[18] Compiled by COCL from tabular data found in 2021 Supervisors In-Service Training: Evaluation of In-Service Training for Supervisors. Portland Police Bureau Training Division, April 2022.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Class | The Trainer(s) were Organized and Well Prepared | The Class was a Good Use of My Training Time |
|---|---|---|
| Procedural Justice | 88.7% | 50.0% |
| UDAR | 88.8% | 62.9% |
| Reasonable Suspicion | 95.3% | 77.9% |
| Leadership and Wellness | 90.8% | 70.9% |
| Critical Incident Management | 88.5% | 79.3% |

*Recommendations:* As part of the Feedback surveys, supervisors provided a range of comments and recommendations regarding current and future training and the Bureau overall, especially for classes on Procedural Justice and Critical Incident Management. Here we list some examples:

Procedural Justice and Legitimacy: Address the barriers to improving external procedural justice (e.g., PPB staffing and leadership communication with the public); get to know community members and businesses in the neighborhoods (e.g., bicycle and foot patrols); discuss the underlying reasons for public distrust of the PPB; integrate procedural justice training into other training topics; have a candid discussion of accountability issues.

UDAR: Make the UDAR system more user friendly.

Reasonable Suspicion: No substantive comments.

Leadership and Wellness: No substantive comments.

Critical Incident Management: Integrate Incident Command System principles into this training; incorporate more case studies, critical incident management scenarios for supervisors, and tactical debrief examples.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

*Conclusions*. The COCL is satisfied that the PPB has taken a systematic approach to collecting data that is useful for evaluating the process and impact of its primary training programs. Again, the PPB has created respectable training and evaluations systems, which are outcomes as defined by Paragraph 170. On-the-job outcomes have yet to be fully assessed, but in their evaluation report on the 2021 Supervisor In-Service Training, the PPB has outlined its plan for collecting such data. We look forward to additional details in the future as the PPB increases its commitment to evidence-based training.

**Training Summary and Conclusions**

During the first quarter, the PPB provided one important training required by Paragraph 84 – In-Service training for all officers. The COCL observed this training and overall was satisfied with both the substance and delivery, although we offered some recommendations. Essentially, officers learned about four new principles for patrol procedures and were involved in one group scenario, along with legal updates and firearms practice.

To minimize the use of force in crowd management and crisis intervention settings, to increase safety for both officers and the community, and to strengthen public trust in the police, COCL continues to recommend that the PPB do everything possible to provide innovative training on de-escalation and procedural justice and reward such actions daily. Unfortunately, the In-Service training this quarter fell short of achieving these goals. The de-escalation coverage should be expanded significantly and reach beyond citing the benefits to officer. We appreciate the need to restore morale with the ranks, and it should be retained, but PPB also needs an outward facing approach to training that covers the benefits to the community. Also, annual performance evaluations by supervisors should be revisited to ensure that interpersonal communication is incentivized.

While the PPB has adopted some evidence-based training, we hope that this approach is given even greater attention by the new civilian leader to be hired in the Training Division. For example, although rigorous evaluations of police training are rare, randomized control trials continue to validate the effectiveness of training on procedural justice and de-escalation. We are pleased to report that the de-escalation training introduced by the PPB last year, called Integrating Communications, Assessment, and Tactics (ICAT), has been shown recently to reduce use of force incidents, community injuries, and officer injuries in one large

police department (Engel, et al., 2022).[19] Furthermore, intensive procedural justice training has been shown to yield more procedurally just actions by the police in high-crime locations, i.e., more respectful treatment of community members, fewer arrests, fewer perceptions of police harassment and violence, and actual reductions in crime (Weisburd, et al., 2022).[20] However, this type of procedural justice training requires a substantial commitment of time – this one lasted for five days!

This new research is consistent with prior rigorous evaluations showing that procedural justice training can change on-the-job behavior, as reflected in higher performance ratings given by mentors (Antrobus, et al., 2019), reduced reliance on arrest and use of force (Wheller, et al., 2013), and increased public satisfaction with the police (Mazerolle, et al., 2012).[21] Thus, the PPB should continue to pursue new methods of training and evaluation related to procedural justice and de-escalation so that these interpersonal skills become a natural response for the PPB officers. This will require a larger commitment of time and more attention to role playing scenarios. Finally, evidence-based training should draw upon local data from body-worn camera footage and contact surveys to clearly illustrate to officers where specific improvements in performance are needed.

---

[19] Engel, R. S., Corsaro, N., Isaza, G. T., & McManus, H. D. (2022). "Assessing the impact of de-escalation training on police behavior: Reducing police use of force in the Louisville, KY Metro Police Department." *Criminology & Public Policy*, 21: 199-233.

[20] Weisburd, D., Telep, C.W., Vovak, H., Zastrow, T., Braga, A. A., & Turchan, B. (2022). "Reforming the police through procedural justice training: A multicity randomized trial at crime hot spots." *PSNA*, 119 (14): https://doi.org/10.1073/pnas.2118780119.

[21] Antrobus, E., Thompson, I., and Ariel, B. (2019). Procedural justice training for police recruits: Results of a randomized controlled trial. *Journal of Experimental Criminology 15*(1), 29–53.

Mazerolle, L., Bennett, S., Antrobus, E., and Eggins, E. (2012). Procedural justice, routine encounters and citizen perceptions of police: Main findings from the Queensland Community Engagement Trial (QCET). *Journal of Experimental Criminology 8*(4), 343–367.

Wheller, L., Quinton, P., Fildes, A., and Mills, A. (2013). *The Greater Manchester Police Procedural Justice Training Experiment*. Coventry, UK: College of Policing. Available: https://library.college.police.uk/docs/college-of-policing/Technical-Report.pdf

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

The PPB continues to offer a range of online trainings, and with new leadership for LMS, we hope that the PPB will continue to explore more sophisticated videos and work collaboratively with in-person instructors to ensure that virtual and in-class instruction are linked in a complementary fashion. Also, officers should be kept abreast of new laws that may affect their ability to execute their law enforcement functions.

For specialty unit training, the community has been outraged by the offensive RRT training slides from 2018 and is awaiting the investigative findings. Looking forward, COCL's primary concern is that  the Training Division is rigorously following an internal process for obtaining, reviewing and approving training plans in advance. Herein we have reported on the actions taken by the PPB to date, but a more robust system of oversight would be helpful.

In terms of our Outcome Assessment for Training, the COCL is satisfied that the PPB has taken a systematic approach to collecting data that is useful for evaluating the process and impact of its primary training programs. The Supervisors' In-Service training in 2021 was well received by supervisors and ended with officers demonstrating the level of knowledge needed to pass in each subject. Specific recommendations were provided by students and the COCL to improve these classes. We look forward to the PPB's Training Division adopting additional on-the-job outcome measures in the future to evaluate training effectiveness, as well as more sophisticated evaluation designs that allow for stronger cause-and-effect inferences. We realize that evaluating the impact of training on the job is no easy task, but we encourage PPB to continue on this pathway.

The PPB remains in Substantial Compliance for all paragraphs in Section IV (Training), except for Par. 78, 79, and 84. Because the PPB's response to demonstrations remains a central problem in the City's efforts to achieve Substantial Compliance with the Settlement Agreement, the PPB's Training Division must continue to take remedial action. We acknowledge that the City continues to move forward with efforts to outsource an independent Critical Incident Assessment of crowd control that would have implications for future training (See remedies in Section XI). However, the PPB will remain in Partial Compliance on Pars. 79 and 84 until the required recommendations listed below have been implemented.

| **COCL Recommendations** | • To achieve Substantial Compliance, Crowd Control and Management training should be updated based on the PPB's Needs Assessment on demonstrations and future recommendations from the external Critical Incident Assessment |
|---|---|

|  | • To achieve Substantial Compliance, develop and deliver training with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" (Par. 84) including crowd control settings. This should include opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest. In the absence of 3-D virtual training, these will need to be real-life practice scenarios.<br>• To achieve Substantial Compliance, refine existing policy to clarify the roles and responsibilities of street-level incident command, and incorporate recent changes to the PPB's force-related Directives into training (910.00, 1010.00, and 1015.00).<br>• To achieve Substantial Compliance, strengthen the PPB's system to review and approve all specialty unit trainings to avoid inappropriate or harmful training and regain public trust. Enforce Directive 1500.00 and S.O.P. #1-21.<br>• Provide the COCL and the DOJ with lesson plans for specialty units involved in street enforcement and crowd control prior to training<br>• Continue to support the development of sophisticated online training that allows for interactivity<br>• Work to develop more two-step training programs where online videos are followed by in-person skills development<br>• Avoid overloading the PPB members with too much online training during any one month, and keep them up to date on changes in the law<br>• Provide refresher training on first amendment rights and bias-free policing that can address any PPB bias against peaceful protestors |
| **Assessment Based On** | • COCL's observation/assessment of training content, delivery, and consistency with adult-learning principles and best practices<br>• Future content assessment: Whether the PPB can provide training on crowd control and force reporting that is based |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| | on a comprehensive assessment of problems that occurred during the 2020 protests and includes the requirements of Par. 84 |
| --- | --- |

## Audit the Training Program

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | When the next audit is complete, the COCL will review the audit report for accuracy and completeness |

| **Compliance Assessment** |
| --- |
| The PPB should undertake another audit because of changes that have occurred since the last formal audit in 2018 and because of the bigger changes that are planned, including the hiring of a civilian head of the PPB's Training Division. Also, the problems associated with the RRT training suggest that the process of reviewing training materials for all units deserves attention, as well as classes that reinforce a healthy view of the community. The COCL continues to recommend that one future audit should include a management perspective |

**Exhibit A**

and comment on the organizational structure and staffing issues to assist the new civilian dean.

At this point, the COCL can confirm that the Training Division has continued to perform the functions identified in Par. 85, as reported throughout Section IV (Training) of this COCL report. In terms of the requirement in Par. 85(g) (which is not discussed elsewhere in Section IV), no directives relevant to the Settlement Agreement were enacted in the first quarter, and therefore, no compliance report was needed to demonstrate that the PPB employees had read them.

As we noted in previous quarterly reports, the Office of the Inspector General (OIG) did not have the staffing bandwidth in 2021 to begin the next audit. However, during the first quarter of 2022, the OIG was able to hire two new analysts who are being trained. To remain in Substantial Compliance, the PPB will need to produce an audit plan by the end of the third quarter of 2022 that can be reviewed and approved by the DOJ and the COCL.

| **COCL Recommendations** | • To remain in Substantial Compliance, the PPB must submit a Training Division audit plan by the end of the third quarter of 2022, with timelines for completing the next audit and the report. The plan should address Directive 1500. |
| --- | --- |
| **Assessment Based On** | • COCL will review the audit plan based on identified needs of the Training Division, auditing standards, and the timeline for completion of the audit |

**Analyze and Report Force Data**

| **Settlement Agreement Paragraph** |
| --- |
| 86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training |

deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed and observed Inspector's presentation to Training Advisory Council (TAC); Reviewed TAC reports and recommendations |

### Compliance Assessment

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). Protest-related force statistics are included at the end of the quarterly reports and on the PPB's Open Data Portal, which lists the number and types of crowd control force incidents. Thus, the COCL continues to find the PPB in compliance with Par. 86, but as previously noted, the PPB must find ways to improve the quality of data on force used during crowd control.

TAC held two public meetings during the first quarter of 2022. The Force Inspector presented the third quarter force report at the January 12, 2022 meeting and the fourth quarter force report at the March 9, 2022 meeting, showing changes over time as well. In both TAC meetings this quarter, TAC members expressed an interest in seeing the Force Inspector provide more demographic breakdowns of the data. The presentations did include a breakdown of custodies and use of force by gender and race/ethnicity.

In terms of community engagement, the TAC and the PPB Training Division continue to have a productive relationship. During the first quarter, several TAC members observed the "dry run" for In-Service training and were able to make suggestions and recommendations. Additionally, TAC was able to make recommendations on what PPB should look for in the new dean of training position. The Chief's office continues to respond in a timely manner to any formal recommendations from TAC.

| COCL Recommendations | • No recommendations at this time |
|---|---|

| Assessment Based On | • COCL review of PPB's quarterly force reports and inclusion of trends<br>• COCL observations of Inspector's presentation to TAC PPB's responsiveness to TAC's recommendations |
| --- | --- |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of PPB website regarding TAC; Review TAC agendas and minutes; Observe TAC meetings |

| **Compliance Assessment** |
| --- |
| Two TAC meetings were held in the first quarter of 2022 (January 12 and March 9) and were open to the public as required by Paragraph 87. The COCL continues to observe these Zoom meetings and the public has been allowed to listen and make comments. The PPB continues to use a public email distribution list to send reminders of the meetings to the public. The PPB also continues to post the TAC meeting agendas and minutes on the PPB's website.[22] Minutes for the March 9 meeting are currently being transcribed. |

---

[22] https://www.portland.gov/police/tac/events/past

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | • COCL review of information available on PPB website<br>• COCL observation of TAC meetings and review of TAC minutes |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

# V. COMMUNITY-BASED MENTAL HEALTH SERVICES

### Settlement Agreement Paragraph

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Monitor the City and PPB continuing to work with community partners |

### Compliance Assessment

This paragraph is assessed based on the City and the PPB's continuing relationship with community partners. As this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |

| Assessment Based On | • N/A – Summative paragraph |
|---|---|

**Settlement Agreement Paragraph**

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review status of Unity Center; Review minutes from Unity Transportation Workgroup |

**Compliance Assessment**

The COCL continues to acknowledge that the focus of Par. 89 is on the Community Care Organizations and the expectation that they establish one or more drop-off center(s). The Settlement Agreement does not hold any authority over these organizations, but our assessment remains focused on the City's activities and reasonable expectations regarding their involvement with the drop-off/walk-in center(s).

Related to the focus of Par. 89, The Unity Center remains the drop off center for individuals experiencing behavioral health needs. The facility has been operating in this capacity since it opened in May 2017. The PPB has two policies related to this paragraph, including Directive 850.21 (Peace Officer Custody (Civil)) and 850.25 (Police Response to Mental Health Facilities). These directives provide the protocol for officers to contact AMR for ambulance transport to the Unity Center. These directives have remained the same throughout 2021 though are currently in the review process with the entire suite of directives related to mental health response.

Since the opening of the Unity Center, a Transportation Workgroup has met regularly in quarterly meetings to discuss the operation of the Center. This workgroup includes members of

Unity, the PPB, AMR, Multnomah County and Legacy ED Health. The group met for their quarterly meeting on February 23, 2022. At the previous quarterly meeting, discussion was raised about the PPB response, including an ongoing concern involving the reluctance of the PPB officers to lock up their weapons when they arrive at Unity. Another concern brought up was that Unity is unable to get copies of the detailed officer reports. For each of these issues, the PPB planned to bring responses to the 2022 first quarter meeting. Unfortunately, the PPB representative was unable to attend and thus this agenda item was moved to the second quarter meeting. While the COCL understands that scheduling conflicts can occur, the PPB still could have provided an update via email or other forms of communication and then answered any follow-up questions at the next meeting. Due to the nature of the meetings only being quarterly, delaying providing any information for three months may hinder progress in resolving these concerns.

Other discussion points presented at the meeting included the development of a smaller workgroup to look into diversion data, with an update on the progress of this group to be provided at the second quarter meeting. The group also reviewed transportation data, as well as discussed staffing issues being experienced by all partners. The Unity Transportation working group is fulfilling its function and providing a space for partners to increase collaboration and problem solving.

Based on the PPB and the City's ongoing participation in the process to date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph. However, we suggest the PPB provide updated information to the Transportation Workgroup and assess how they will handle absences when information is expected of them.

| **COCL Recommendations** | • We suggest the PPB provide updated information to the Transportation Workgroup and assess how they will handle absences when information is expected of them |
|---|---|
| **Assessment Based On** | • COCL review of Unity Transportation Workgroup minutes |

---

### Settlement Agreement Paragraph

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU")

[Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Community Outreach Meeting minutes; Review PSU evaluation on PSR |

**Compliance Assessment**

As with the above paragraph, Par. 90 holds expectations of CCOs to create subcommittees for PPB to serve on, with a list of initial goals to be accomplished. However, CCO's are not under the authority of the Settlement Agreement, and we therefore only evaluate the City on what can reasonably be expected of the agency given the lack of opportunity from CCOs.

During the first quarter of 2022, minutes and a resource list were provided for monthly meetings with Legacy Community Outreach. At these meetings, presentations were made regarding community resources such as support for senior citizens, housing support, legal support, and treatment for behavioral health and substance abuse. The SCT manager attended each monthly meeting.

In the COCL's last report for 2021 we shared a summary of the Portland State University's (PSU) evaluation of the Portland Street Response (PSR) pilot program. At that time, we encouraged PPB to consider and implement the recommendations PSU provided. Since that report, we have learned that PPB will be providing an in-service training video later this year describing the roles and responsibilities of both PSR and Project Response.  We were provided a lesson plan for the training though note the lesson plan was developed in the second quarter of 2022 and will therefore provide an update in our next report.

**Exhibit A**

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | • PPB involvement with Behavioral Health Collaborative Team<br>• PPB involvement with Legacy ED Community Outreach<br>• PSU evaluation |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

# VI. CRISIS INTERVENTION

## A. Addictions and Behavioral Health Unit and Advisory Committee

### Settlement Agreement Paragraph

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*[As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures].*

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHU Unit Structure |

### Compliance Assessment

In terms of personnel and BHU's general oversight, the BHU continues to conform to the requirements of Par. 91, as evidenced by the BHU unit structure and our observations of the BHU coordinating ECIT, BHRT, and SCT operations. While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, ECIT data collection, etc.), ECIT officers directly report to their precinct level chain of command. This command structure conforms to the Memphis Model. There have been no major changes to the structure of the unit and PPB is expected to provide updates on personnel changes. In the first quarter of 2022, PPB provided the COCL with the updated organization chart for the Specialized Resources Division, which houses the BHU, as well as a memo that provides updates on promotions, new hires, and movement within the Bureau. PPB also provided the COCL with the job announcements hiring for two positions within the BHU, a new sergeant and an officer to join BHRT. PPB expects

these positions to be filled by the second quarter of 2022. Additionally, PPB is working with Cascadia to determine how they will go about adding two more BHRT's. PPB continues to be transparent and provide documentation on updates within the unit organization and we therefore find that PPB remains in Substantial Compliance with this paragraph.

| COCL Recommendations | • Continue to update the COCL and theDOJ on changes to personnel when applicable |
|---|---|
| **Assessment Based On** | • COCL review of unit structures and personnel |

| **Settlement Agreement Paragraph** |
|---|
| 92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction. |

| **Compliance Label** | 92. Substantial Compliance |
|---|---|
| | 93. Substantial Compliance |
| **Methodology** | Review BHUCT, BHRT, and SCT coordination team meeting agendas and minutes; Review ECIT, BHRT, and SCT outcome measures |

**Compliance Assessment**

The PPB utilizes a number of work groups to collaborate on ways to "decrease law enforcement interactions [and] mitigate the potential uses of force in law enforcement interactions with consumers of mental health services." BHU staff meet weekly to discuss the BHRT caseload and the Behavioral Health Unit Coordination Team (BHUCT) meets on a bi-weekly basis to discuss current and potential BHRT clients. The BHUCT is composed of a number of community partners including representatives from Multnomah County, Cascadia, and Federal/State law enforcement. PPB provided us with meeting minutes and agendas indicating that a core group of partners attends consistently, with other partners attending as needed.

The discussions during these meetings are designed to problem-solve and create strategies to reduce future criminal justice contacts for individuals that have frequent contact but have been difficult to engage in ongoing services. BHU personnel indicate that information on individuals discussed is only shared if it is subject to lawful disclosure. BHU personnel indicate the BHCT has been a particularly valuable collaborative strategy.

The Service Coordination Team also conducts weekly meetings to discuss potential clients and make determinations about eligibility for SCT Services. Meetings include community partners and representatives from various entities in Multnomah County. The meetings also review current SCT clients in order to "facilitate continuation of care" for clients. We believe these meetings meet the spirit of Par. 92.

The PPB has provided the COCL with the documentation for all meetings occurring within the BHU, including minutes from each SCT, BHU, and BHUCT meeting. Additionally, the PPB provided the COCL with copies of the BHRT fliers that are used to communicate with partners about individuals they are trying to connect with services. This information is also supplemented through data collected on the Mental Health Template (MHT) by identifying individuals and locations with repeat calls for service and developing response strategies.

Relevant outcome measures are collected for BHRT and SCT and the PPB provides the COCL with quarterly reports summarizing these data. All together, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, BHCC (Behavioral Health Call Center), BOEC, and BHUAC. Thus, we find that the PPB remains in Substantial Compliance with the paragraph requirements of 92 and 93. However, we suggest the BHU work in closer coordination with the Force Inspector when force trends relate to persons in mental health crisis (see, for instance, our assessment of Par. 76), a suggestion we have made in prior reports.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| COCL Recommendations | • The BHU should work in closer coordination with the Force Inspector when force trends relate to persons in mental health crisis<br>• Continue to collect and review data on mental health services, and use this information to update services as needed |
|---|---|
| Assessment Based On | • BHCT, BHRT, and SCT coordination meeting agendas and minutes<br>• ECIT, BHRT, and SCT outcome measures |

---

### Settlement Agreement Paragraph

94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHUAC roster of members; Review BHUAC minutes; Observe BHUAC meetings |

### Compliance Assessment

In the first quarter of 2022, the Behavioral Health Unit Advisory Committee (BHUAC) continued to regularly meet, holding meetings on January 26, February 23, and March 23. The minutes of these meetings have been documented and shared with COCL and are found on the PPB's website.

Membership requirements of the BHUAC as outlined in Paragraph 94 continue to be met, with a current roster of 15 voting members, representing a variety of entities involved in the mental health response systems. Beyond the roster requirements, voting members are expected to attend, and there needs to be at least eight voting members present for quorum. For each of the three meetings held in the first quarter, a quorum was met. Although quorum was met there does appear to be regular absence from some members which limits the possibility of a truly collaborative council. The BHUAC is a voluntary commitment, and the COCL understands that there will be absences. Nonetheless, we recommend that the PPB continue to encourage regular attendance, and for those that can't attend regularly, seek out another member from the organization that would be more available. As of this report, the membership of BHUAC continues to conform to the representation envisioned in Par. 94 and we therefore continue to find PPB in Substantial Compliance.

| **COCL Recommendations** | • Continue to encourage regular attendance |
|---|---|
| **Assessment Based On** | • BHUAC roster<br>• BHUAC minutes<br>• Observations of BHUAC meetings |

---

| **Settlement Agreement Paragraph** |
|---|
| 95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board. |

| **Compliance Label** | Partial Compliance |
|---|---|

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| **Methodology** | Review BHUAC minutes; Observe BHUAC meetings |
|---|---|

**Compliance Assessment**

Paragraph 95 envisions that the BHUAC committee members will assist "the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services." The BHUAC continued to hold monthly meetings in the first quarter of 2022. At the January meeting, Portland Street Response gave a presentation to the committee. This led to a fruitful discussion in which committee members were able to ask questions and learn more about the operation and expansion of PSR as it pertains to the wider crisis system. It was also brought up that BHUAC members may be able to review PSR policies and operations, but no immediate plans have been made for this. The PSR discussion did highlight that there were still gaps in the integration and collaboration with other entities in the wider crisis system. PSR stressed that they are hoping that continuing to build partnerships will help to alleviate these gaps. It is the COCL's hope that continued discussion between partners will help with this integration. In addition, the BHUAC also spent time reviewing the mental health suite of directives and provided feedback based on their experiences.

As a follow-up to our prior TA Statement, we note there has been relative inaction on the part of PPB and the BHUAC to review street encounters by the PPB, including critical use of force incidents. During the first quarter, we held a single meeting with the PPB representatives on our TA Statement. Since, then, no follow-up meeting has been held and, while a number of factors contributed to the lack of follow-up meeting, none of them were so significant that ongoing discussions would have been prevented.  We also note that BHUAC could have continued their own conversations related to this but did not even though the committee has had sufficient time to do so. For instance, in each of the three meetings during the first quarter, BHUAC members discussed the issue of making BHUAC meetings open to the public, despite having had multiple votes on the issue over the years and the issue having been fairly decided. In fact, the entire March meeting was solely devoted to this topic and some BHUAC members expressed frustration over the continued discussion.

Finally, although required by the Settlement Agreement, the BHUAC did not review PPB's most recent in-service training scenario related to mental health response, another missed opportunity though one that should have achieved prior to the first quarter (see also our assessment of Par. 98).

Given the combination of these issues, we find that Par. 95 is no longer in substantial compliance. To return to substantial compliance, we recommend the PPB and the BHUAC re-

engage with the COCL and the DOJ regarding critical incident reviews and ensure that future meetings re-focus on the purpose and intent of the BHUAC, which is to provide meaningful guidance to the PPB. We also recommend PPB ensure that the BHUAC reviews all PPB training in the future.

| **COCL Recommendations** | • To return to Substantial Compliance, ensure BHUAC meetings meet the purpose of the committee<br>• To return to Substantial Compliance, re-engage the COCL and the DOJ in conversation regarding the content of the COCL's TA Statement<br>• To return to Substantial Compliance, ensure the BHUAC reviews all PPB training |
|---|---|
| **Assessment Based On** | • Review of BHUAC minutes and agendas<br>• Observation of BHUAC meetings |

| **Settlement Agreement Paragraph** |
|---|
| 96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review BHUAC recommendations found in BHUAC minutes |

| **Compliance Assessment** |
|---|
| In accordance with Paragraph 96, the BHUAC continues to provide the COCL with a report of their votes and recommendations for the implementation of the BHU and BOEC. In the first |

quarter of 2022, the BHUAC submitted recommendations on the Mental Health Suite of Directives. Some members recommended slight language changes to the policies as written. Another member recommended that a policy regarding the need to intervene be more flexible. As written, the directive states that officers on the scene must wait until a Sergeant is there before intervening, but members suggested that if a mental health professional and an ECIT are present, then a risk assessment could be made to determine if it is appropriate to intervene before the arrival of a Sergeant. Another recommendation was to include more specific language about system integration with mental health facilities.

However, as with our assessment of Par. 95, we no longer find the overall operation of the BHUAC to be in compliance with the Settlement Agreement. As it relates to Paragraph 96, the BHUAC made recommendations throughout the quarter related to mental health directives; however, opportunities for other contributions were not realized and BHUAC meeting time was spent discussing an already settled matter or reviewing, amending, and approving minutes from prior meetings. Additionally, no further discussion between the PPB, BHUAC, the DOJ, or the COCL occurred regarding the review of critical incidents, an area that is potentially ripe for BHUAC recommendations. Furthermore, the BHUAC did not review the PPB's in-service training scenario and therefore could not provide recommendations.

Finally as it relates to Paragraph 96, it would be further helpful if the PPB participated in a feedback loop with BHUAC recommendations. It is presently uncertain how the PPB is using these recommendations and we suggest the Bureau report back to the BHUAC why or why not they will be utilizing a recommendation.

| | |
|---|---|
| **COCL Recommendations** | • To return to Substantial Compliance, ensure BHUAC meetings meet the purpose of the committee<br>• To return to Substantial Compliance, re-engage the COCL and the DOJ in conversation regarding the content of the COCL's TA Statement<br>• Emphasize documenting formal recommendations and the PPB's response |
| **Assessment Based On** | • BHUAC status reports and recommendations<br>• PPB responses to BHUAC recommendations |

**B. Continuation of C-I Program**

---

**Settlement Agreement Paragraph**

97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| Compliance Label | 97. Substantial Compliance |
| --- | --- |
| | 98. Partial Compliance |
| Methodology | Review of the PPB in-service training |

---

**Compliance Assessment**

The PPB continues to emphasize crisis response as a core competency in their training. For instance, all officers are required to receive a minimum of 40 hours of crisis intervention training prior to graduating from the Advanced Academy. In the first quarter of 2022, the PPB began a new Advanced Academy in February and provided 19 hours of Crisis Intervention training to recruits, with additional hours to be provided in the second quarter as well. This complements the 28 hours of C-I training that all recruits get in the statewide DPSST Basic Academy.

Additionally in the first quarter of 2022, the in-service training for patrol procedures included a crisis intervention refresher training. This training involved a 30-minute scenario in which officers had to walk through dealing with a person in crisis. For the completion of this training, members received a 30-minute mental health training credit for DPSST continuing certification requirement. For a review of this scenario, see Par. 84 in the training section of this report. The COCL has concerns with how impactful this scenario was in helping to advance approaches to

calls with a mental health component. The debriefing provided little constructive criticism for the students.

As it pertains to Par. 98, the BHUAC was not consulted to review this refresher training. As BHUAC review is required by Par. 98, we can no longer find the PPB in substantial compliance with the requirements of this paragraph. To return to substantial compliance, we encourage the PPB to resume utilizing the BHUAC as a resource when designing C-I refresher training for in-service.

| **COCL Recommendations** | • To return to Substantial Compliance, allow BHUAC to review the training before the next In-service training |
|---|---|
| **Assessment Based On** | • PPB In-service training |

## C. Establishing "Memphis Model" Crisis Intervention Team

| **Settlement Agreement Paragraph** |
|---|
| 99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]"). |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review BHU/ECIT data; Interview PPB Personnel; Review Mental Health Template data; Review BOEC data |

| **Compliance Assessment** |
|---|
| The PPB continues to operate under a modified "Memphis Model" of crisis intervention. In this specialized response system, a select group of officers receive an additional 40 hours of training to become Enhanced Crisis Intervention Team (ECIT) officers. In the first quarter of 2022, the |

PPB had a roster of 127 operational ECIT officers with a total of 165 sworn ECIT certified members.

Additionally, the BHU continued to hold ECIT advisory meetings. During the first quarter, ECIT members from all precincts discussed topics related to ECIT in-service, Project Respond, and BHU referrals. For instance, the minutes from the meeting noted "multiple officers and sergeants indicated that feedback as to whether or not a person is assigned and possibly what is being or has been done with a person." Using this input, the PPB has now begun the process of providing feedback in such situations, thereby closing the loop on this recommendation.

The PPB also continued their practice of providing semi-annual reports evaluating the ECIT program during this quarter. In June 2022, PPB released their first report for the year, covering the time period from October 1, 2021 to March 31, 2022. The data in the report indicate that non-ECIT calls have a 50% greater likelihood of the person being transported to the hospital when an ECIT officer is on-scene. This is the highest odds-ratio in the past three years and, although it represents only a single reporting period, the PPB should monitor and identify potential reasons.

Alternatively, the data for this report indicated no difference between calls involving an ECIT officer and calls not involving an ECIT officer as it relates to transporting the person to jail (i.e., arrest). Two of the last four assessments have found no difference, as well as each assessment done prior to April 2020.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

**Figure 1 (provided by PPB)**

**Odds Ratios from Logistic Regression**
**Presence of ECIT-Trained Officer On Scene of Non-ECIT Calls on Call Outcome**

|  | Transportation to Jail | Transportation to Hospital (Mental Health)/Unity Center | Use of Force |
|---|---|---|---|
| 04/01/18 - 09/30/18 N=2,703 | No Difference | More Likely*** (1.924) | Not enough cases (35) |
| 10/01/18 - 03/31/19 N=2,108 | No Difference | More Likely*** (1.898) | Not enough cases (24) |
| 04/01/19 - 09/30/19 N=2,178 | No Difference | More Likely** (1.433) | Not enough cases (47) |
| 10/01/19 – 03/31/20 N=1,780 | No Difference | More Likely** (1.464) | Not enough cases (30) |
| 04/01/20 - 09/30/20 N=1,603 | More Likely** (1.715) | More Likely** (1.401) | Not enough cases (39) |
| 10/01/20 – 03/31/21 N=1,497 | No Difference | No Difference | Not enough cases (31) |
| 04/01/21 - 09/30/21 N=1,762 | More Likely* (1.503) | More Likely** (1.384) | Not enough cases (66) |
| 10/01/21 – 03/31/22 N=1,422 | No Difference | More Likely*** (1.503) | Not enough cases (37) |

Notes: Logistic Regression Models controlled for the following: (1) Precinct - Central, (2) Priority Level - High 1-3, (3) Presence of Weapon, (4) Subject Injury, (5) Mental Health Professional Involvement, (6) Warrant or PV Detainer, and (7) Directors Hold. Directors Hold with high standard error is excluded from the models.
*$p < .05$
**$p < .01$
***$p < .001$

| COCL Recommendations | • Continue to monitor and identify potential reasons for the difference in transporting to the hospital |
|---|---|
| Compliance Rating Based On | • ECIT roster<br>• PPB's Semi-Annual Mental Health Crisis Response Report |

**Settlement Agreement Paragraph**

100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review ECIT Roster; Interview PPB personnel |

**Compliance Assessment**

The PPB continues to follow the practice of accepting volunteer officers for ECIT certification. In the first quarter of 2022, the PPB had 127 active operational ECIT members who are available to respond to calls.

The semi-annual assessment of ECIT also provides important metrics for evaluating whether the number of ECIT officers is being "driven by the demand for [ECIT] services". For instance, data from the semi-annual report found the response rate of ECIT officers to calls requesting an ECIT officer to be 70%. This is consistent with previous reporting periods, with a range of response rates between 69% to 71%. We will need to see whether the increase in ECIT officers during the fourth quarter of 2021 impacts the response rate but also note that for most instances where there was no ECIT response, it was rarely a result of no ECIT officers being available (only 6% of such instances). Instead, the primary reason was that the officer was called off by a supervisor or the call was cleared before an ECIT officer could arrive (63% of all incidents).

As the PPB continues to train new cadres of ECIT officers and the data indicate that the number of ECIT officers is commensurate with the demand for services, we continue to find the PPB in compliance with the requirements of Par. 99.



Figure 2: ECIT Calls for Service (provided by PPB)

*Approximately 9% of the calls reviewed actually had an ECIT officer present (e.g., related/duplicate call with ECIT officer on scene and ECIT officer on scene per reporting other than CAD).

| COCL Recommendations | • Continue utilizing existing data to assess demand for ECIT services |
|---|---|
| Compliance Rating Based On | • Mental Health Template data<br>• ECIT roster<br>• PPB's Semi-Annual Mental Health Crisis Response Report |

**Settlement Agreement Paragraph**

101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT].

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review evaluation documents for potential ECIT officers |

**Compliance Assessment**

In the first quarter of 2022, the PPB did not recruit any new ECIT applicants, and no changes were made to the qualifications. The PPB last taught a new training class for ECIT in the fourth quarter of 2021. COCL's previous report analyzed the roster and determined that the PPB followed the qualifications outlined in Paragraph 101. The COCL continues to suggest that the PPB seek input from the BHUAC for any updates to the qualifications that might benefit the program and to do so before delivering future ECIT training classes. At this point, we find the PPB to be in compliance with the requirements outlined in Paragraph 101.

| COCL Recommendations | • Re-engage the BHUAC regarding ECIT participation criteria |
| --- | --- |
| Compliance Rating Based On | • PPB ECIT evaluation documents |

**Settlement Agreement Paragraph**

102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review PPB supplemental documents |

**Compliance Assessment**

No new ECIT members were added to the roster in the first quarter of 2022. Nonetheless, some members of the BHU and ECIT did participate in training related events. Members are encouraged to engage in ongoing trainings, and one member attended a specialized training entitled "Advanced De-escalation and Escalation Prevention Training (ADEPT) for CIT Professionals". The CIT Coordinator assisted the Training Division with both in-service and Advanced Academy training. At these trainings, the coordinator helped to teach, facilitate, and debrief students about C-I topics. In addition, a BHRT officer taught a class to Advanced Academy students regarding considerations when dealing with houseless populations.

We continue to appreciate the PPB's dedication to their ECIT model and commend their efforts to provide thorough training. We recommend the PPB continue to analyze and update their materials for ECIT training on an ongoing basis and to utilize outside perspectives, such as those from the BHUAC to help inform training content.

| COCL Recommendations | • Continue to seek out recommendations from the BHUAC on ECIT training |
|---|---|
| Compliance Rating Based On | • PPB supplemental documents<br>• Observation of BHUAC meeting |

**Settlement Agreement Paragraph**

103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB policy |

**Compliance Assessment**

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

In accordance with Par. 103 (and the Memphis model of mental health crisis response), ECIT members retain their normal duties until dispatched for use as ECIT. BOEC personnel have received training on the criteria for dispatching an ECIT to a call. Additionally, the PPB's Directive 850.20 includes the requirement for officers to consider calling in specialized units (including ECIT) as necessary. As such, we find PPB has maintained compliance with Par. 103.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • PPB policy |

| **Settlement Agreement Paragraph** | |
|---|---|
| 104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB public awareness efforts; Review BHU website; Review BHUAC minutes |

**Compliance Assessment**

The PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe that the PPB has made a serious effort to highlight the work of the BHU in its entirety, not only the ECIT.

For instance, in the first quarter of 2022, the BHU Newsletter discussed training coordination between the BHU and Project Respond, highlighted the development of Portland Street Response, introduced the new BHU Lieutenant, and discussed therapy dogs utilized by the Unit.

Furthermore, the BHU continued its efforts in outreach by attending conferences and providing presentations of their work. In addition, external recognition of the BHU has come in the form of media coverage as well as recognition by the Department of Justice during the first quarter of 2022. A PPB ECIT officer received the Attorney General's Award for Distinguished Service in Community Policing. The officer was able to connect an individual with resources that dramatically improved the individual's life. That individual followed up with the officer a year later to thank the officer for how they handled the situation. This award was given to only 18 officers nationwide and is a great accomplishment that should be recognized.

Based on this and our previous review of the PPB outreach efforts, we believe the PPB has substantially complied with the requirements of Par. 104. The PPB should continue to highlight all aspects of BHU's work.

| **COCL Recommendations** | • Continue to highlight all aspects of BHU's work |
|---|---|
| **Compliance Rating Based On** | • Public awareness and education documents |

| **Settlement Agreement Paragraph** | |
|---|---|
| 105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Mental Health Template data; Interview PPB personnel |

**Compliance Assessment**

In accordance with this paragraph the PPB must collect data on mental health calls and the BHU is required to report on the data collected. In the first quarter of 2022, the PPB continued to use the Mental Health Template (MHT) as the method for collecting the data points required in Par. 105. The PPB's quality assurance plan for ECIT-related data and outcomes includes analysts auditing associated data on a monthly basis.

The BHU provided COCL with a quarterly report describing MHT data for the first quarter of 2022. In the fourth quarter, the PPB received 492 MHTs on 475 calls that reported an ECIT officer on scene (a single call may result in more than one MHT being completed). ECIT officers authored 348 (71%) of the MHTs. For the 475 calls, the most common technique used was de-escalation (42%). A total of 27 calls (6% of the total) reported a use of force. For the disposition of the 475 calls, the most common clearance type was report completed (85% of calls), followed by about 5% of calls being cleared by arrest (physical). Due to the nature and extent of data collected and analyzed on ECIT dispatches the PPB remains in Substantial Compliance with Par. 105

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Mental Health Template data |

**D. Mobile Crisis Prevention Team**

**Settlement Agreement Paragraph**

106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.

107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer.

| Compliance Label | 106. Substantial Compliance |
|---|---|
| | 107. Substantial Compliance |
| Methodology | Review BHU Unit Structure; Review of BHUAC meeting, Interview PPB Personnel |

**Compliance Assessment**

The PPB continues to have a BHRT car in each precinct composed of one officer and one qualified mental health professional. For the officer, the BHRT is considered their full-time assignment. During this quarter, the PPB and City planned to move towards having the qualified mental health professional in each BHRT car be a City employee.  In speaking with a PPB representative about this, we were informed that the proposed change was to ensure equitable compensation between BHRT professionals and PSR professionals as they are both qualified mental health professionals responding to persons with mental illness.  As the qualifications needed to act on the BHRT, the functions of the BHRT, and the BHRT personnel will all remain the same after the switch, we do not believe this would constitute a violation of the Settlement Agreement.

While the Settlement Agreement only requires that the PPB has three total teams (for each precinct), the PPB was previously able to have five teams, with the additional two teams addressing Houselessness and Follow Up. When the PPB faced budget cuts and staffing shortages in 2021, they did not fill these two additional teams after one PPB member retired and another was transferred to fill needs elsewhere. In recent updates, the PPB was able to secure funding from the city to hire back these two additional teams. In the first quarter of 2022, the PPB posted a job announcement to hire one additional BHRT officer. They are also working with Cascadia to determine how to fill the clinician role. The PPB aims to have hired a new BHRT officer by the second quarter of 2022. With regards to the PPB's requirements of Paragraphs 106 and 107, they continue to be in Substantial Compliance.

| COCL Recommendations | • No recommendations at this time |
|---|---|

| Compliance Rating Based On | • BHU Unit Structure |
|---|---|

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT]. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review evaluation documents for potential ECIT officers |
| **Compliance Assessment** | |
| All BHRT officers are ECIT certified and are held to the same eligibility standards as ECIT officers. In addition, S.O.P. #43 covers the ongoing participation of officers involved with BHRT. The BHU Sergeants and the Lieutenant monitor all current BHRT members through the Employee Information System (EIS) and PSD to ensure qualifications are maintained. Therefore, we find the PPB to remain in Substantial Compliance with Paragraph 108. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Compliance Rating Based On** | • PPB policy |

112

| **Settlement Agreement Paragraph** |
| --- |
| 109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members. |

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review reported trainings for BHRT members |

| **Compliance Assessment** |
| --- |
| The BHU continues to promote supplemental training for supervisors and BHRT members. In the first quarter of 2022, members took part in both external supplemental training and internal training. Internally, two BHRT officers hosted a training for the BHU to discuss different crisis communication styles. In addition, some members of the BHU attended external trainings about community issues, such as drug production and extremism. It appears that the BHU has continued to forge a culture in which ongoing learning and training is promoted and encouraged. We therefore find the PPB to remain in Substantial Compliance with Paragraph 109. |

| COCL Recommendations | • No recommendations at this time |
| --- | --- |
| Compliance Rating Based On | • PPB quarterly report identifying supplemental BHRT training |

| **Settlement Agreement Paragraph** |
| --- |
| 110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers. |

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review Mental Health Template summary data; Review BERS summary data |

**Compliance Assessment**

The PPB has continued the practice of collecting data through the Mental Health Template (MHT). When an officer has an encounter with a mental health component, they will complete the MHT and this information is used to address mental health service needs. If an individual is a subject of three Mental Health Templates (MHTs) in a 30-day period, they will be referred to the Behavioral Health Unit Electronic Referral System (BERS) (if a referral had not already been made).

Once an individual is referred, a team will look at specific criteria including: a demonstration of escalating behavior, frequent contacts with the PPB, considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. If the individual is deemed an appropriate candidate for additional intervention, the Behavioral Health Unit Coordination Team (BHUCT) (which is composed of law enforcement, court, service provider, and hospital provider personnel, among other relevant stakeholders) will discuss a plan of action.

The PPB has continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the first quarter of 2022, a total of 240 referrals were processed by the BHU. Of the 240 referrals, 119 (50%) were assigned to the BHRT caseload. This assignment rate represents an increase from the previous quarter (47%). Historically, acceptance rates have generally been between 45% and 55%.

In the first quarter of 2022, 122 individuals transitioned to inactive status with BHRT. Of those individuals, 37 (30%) had been previously assigned to the BHRT caseload in a different quarter and continued into the fourth quarter of 2021.

As shown in the figure below, this quarter saw that the most common reason for a referral to be assigned was for Escalating Behavior (46%), closely followed by Frequent Contacts (33%).

**Figure 3: Assigned Cases Reason for Referral (provided by PPB)**

**Exhibit A**



When looking at the outcomes of referrals for inactive cases in the first quarter of 2021, the most common outcome was Coordinated Services (31%), closely followed by Systems Coordination (19%).

**Figure 3.1: Inactive Cases Outcome of Referral (provided by PPB)**



The PPB's current practice of collecting data through the MHT, meeting weekly to share information and using data to inform service needs fulfills the requirements outlined in Par. 110.

| | |
|---|---|
| **COCL Recommendations** | • Continue to collect data and create reports on mental health services |
| **Compliance Rating Based On** | • Mental Health Template data<br>• BERS referral data |

| **Settlement Agreement Paragraph** |
|---|
| 111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of |

individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Directives 850.20, 850.21, 850.22, and 850.25; Interview PPB personnel |

**Compliance Assessment**

The PPB continues to operate under the Directives 850.20, 850.21, 850.22, and 850.25, which dictate the procedures for AMR to provide transportation for a person in a mental health crisis. These directives were also reviewed by the BHUAC during the first quarter of 2022. Furthermore, the PPB continues to collaborate with AMR when issues arise in the transportation of an individual dealing with a mental health crisis (see our assessment of Par. 89). The PPB also has a designated liaison Sergeant at each precinct to respond, in real time, to any transportation issues. As PPB continues to uphold these procedures, we find them to remain in Substantial Compliance with Paragraph 111.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Directives 850.20, 850.21, 850.22, and 850.25<br>• PPB interviews |

**E. Service Coordination Team**

| **Settlement Agreement Paragraph** |
|---|

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review SCT outcome measures; Review SCT Referrals Report |

### Compliance Assessment

The PPB continues to facilitate the provision of services to individuals who experience drug-addiction, mental illness, and are chronically involved in criminal behavior. The SCT coordinates access to housing, medical, counseling, and addiction/mental health services. Members of the SCT are proactive in seeking out collaborations with other stakeholders in the State of Oregon.

The PPB also continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people served by the SCT. As we noted in prior reports, the number of referrals significantly decreased between the first and second quarters of 2020 and began to increase slightly in the final quarter of 2020 and continued to increase in 2021 before returning to historical averages. For the first quarter of 2022, the number of referrals was 255, as shown in the table below. Of the referrals for the first quarter, the SCT accepted 61%, while the other 39% did not meet the assignment criteria. The primary reasons for not meeting criteria was the lack of recent crimes (27%) and lack of criminal history (24%).

**Table 2.1: SCT Referrals (provided by PPB)**

| SCT Referrals, 2022 Q1 | N | % of Total |
|---|---|---|
| Number of Referrals | 255 | - |
| Number of Individuals Referred* | 250 | - |
| Number of Referrals That Met Assignment Criteria | 155 | 61% |
| Number of Referrals That Did Not Meet Assignment Criteria | 100 | 39% |
| Reason for Not Meeting Assignment Criteria | N | % of Not Meeting Assignment Criteria |
| Lacks recent crimes | 27 | 27% |
| Lacks criminal history | 24 | 24% |
| Cannot locate in system | 16 | 16% |
| Higher level of care | 12 | 12% |
| Aggression | 8 | 8% |
| Other | 4 | 4% |
| Crimes outside Portland | 4 | 4% |
| Sex Offender | 3 | 3% |
| Arson | 2 | 2% |

Additionally, The Supportive Transitions and Stabilization (STS) Program is an expansion of the SCT operation and is run by the Central City Concern's Housing Rapid Response. It is intended to address the needs of those with mental illness and co-occurring disorders who temporarily require a more extensive level of care by creating a direct housing resource. In the first quarter of 2022, 22 individuals were referred, 15 of the referrals were accepted, and a total of eight new participants were served, as shown in the table below.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

**Table 2.2: STS Referrals (provided by PPB)**

| STS Referrals, 2022 Q1 | |
|---|---|
| Number of Referrals | 22 |
| Number of Individuals Referred | 22 |
| Average Age of Individuals Referred (one individual did not have a DOB) | 45.3 yrs |
| Number of Referrals Accepted (Met Criteria)* | 15 |
| Number of Referrals Declined | 7 |
| Number of new participants served during Quarter | 8 |
| Number of participants who successfully completed | 3 |
| Participants terminated for cause/non-compliance | 5 |
| Participants who voluntarily withdrew from program | 0 |
| Average Length of Stay (days) of those who exited during Quarter | 116.5 |
| Bed utilization rate | 53% |

As a part of their continued operations the SCT program manager conducts outreach to several agencies to help spread information about the program as well as to provide participants with additional services. In the first quarter, they continued this practice, meeting with various entities and services.

In the past Portland State University has held a Capstone project that would conduct an assessment on the outcomes of the SCT. Due to the impacts of the COVID pandemic, the class was canceled in 2020 and 2021. Nonetheless, the SCT program manager and the BHU Data Analyst worked with the PSU professor to conduct an independent review and the report was released in the first quarter. Below is a brief summary of the report that covers both the 2018 and 2019 cohorts for SCT.

- 2018 Cohort Summary:
    - o In 2018, there were 103 total participants in the program with 16.5% (17) of them completing the program in its entirety. For those that did exit before completion, the average length of stay in the program was 104 days, suggesting that many were still able to access resources and benefit from the program, even if they didn't complete. In addition, only 12.6% (13) of the participants failed to engage at all with the program. This engagement rate of 87.4% exceeded the previous high engagement rate of 71.9%.
    - o Outcomes: When looking at pre and post arrests and police contacts for all participants, both averages reduced by 41%. Those who completed the program

saw the greatest reduction with a 97% reduction in arrests and a 71% decrease in police contact.

- 2019 Cohort Summary:
  - o In 2019, there were 118 total participants with 25.4% completing (30) the program in its entirety. For those who did not complete, the average length of stay was 74 days. The engagement rate for 2019 was 73.7%, a decrease from the historic high rate the year before.
  - o Outcomes: When looking at pre and post arrests and police contacts for all participants, arrests were reduced by 58% and police contact was reduced by 52%. Those who completed the program saw the greatest reduction with an 82% reduction in arrests and a 78% decrease in police contact.
- Comparison with other cohorts 2015, 2016, 2017
  - o A comparison of the data with the SCT cohorts from 2015-2017, shows that there has been a steady decrease in post program arrests throughout the year.
  - o The completion rate was the lowest in 2018, but performance measures were seemingly more positive, with a slightly higher average length of stay in the program than all years beside 2016 and an increase in non-recidivating participants.
  - o The researcher points out that SCT needs to balance a desire to increase engagement rate with measuring a participant's willingness to participate. There is a ceiling to engagement rate.
  - o The table below highlights all key performance measures:

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

**Table 2.3: SCT Key Performance Measures**

| COHORT | 2015 N = 139 | 2016 N = 127 | 2017 N = 139 | 2018 N = 103 | 2019 N = 118 |
|---|---|---|---|---|---|
| Average Length of Stay (days) | 146.1 | 158.8 | 133.9 | 147.14 | 137.16 |
| Engagement Rate | 64% | 69% | 71.6% | 87.4% | 73.7% |
| Completion Rate | 31.5% | 27.4% | 29.73% | 18.88% | 34.5% |
| No-arrests Post-Program | 39.3% | 54.6% | 38.74% | 65.5% | 67.8% |

[23]

- Cost-Benefit Analysis:
  - 2018: The researcher conducted a Cost-Benefit Analysis by comparing the money spent for participants in the program against what it would cost for each participant to move through the system. This analysis shows that the program Is saving the community money. In 2018, the avoided cost to the community was $16,393,998.13. For every dollar spent in the program, there is a corresponding $20.58 in avoided cost for the community.
  - 2019: In 2019, the avoided cost to the community was $18,880,718.93. For every dollar spent in the program, there is a corresponding $22.33 in avoided cost for the community.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

---

[23] Trapp, Donald (2021) "Study of the Service Coordination Team and its Influence on Chronic Offenders" Portland State University

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Compliance Rating Based On | • SCT process<br>• SCT outcome measures |
|---|---|

**F. BOEC**

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to [Behavioral Health Call Center - BHCC], and adding new or revised policies and protocols to assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals.</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Substantial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>Interview BOEC personnel; Review BOEC protocols</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">BOEC has completed and maintained the policies and procedures prescribed within Par. 113. BOEC's Mental Health and ECIT dispatch Protocol S.O.P. identifies seven call characteristics where an ECIT dispatch officer will be dispatched. These characteristics include when there is a mental health component and: (1) a weapon is present; (2) the person is violent; (3) the call is at a mental health facility; (4) the caller is threatening suicide and has the means to carry it out; (5) at the request of a community member; (6) at the request of another officer; (7) or when the person represents an escalating risk of harm to self or others.

BOEC's has maintained their policy criteria for ECIT dispatch, which partially satisfies the requirement for crisis triage. In addition, BOEC has updated criteria for forwarding calls to the Behavioral Health Call Center (BHCC). BOEC also has triage protocol in place for PSR, though due to continued negotiations between the City and PPA, BOEC does not presently have an official policy for PSR. While, BOEC has not been able to adopt official policies yet, they have plans to meet with PSR and the BHUAC in the second and third quarter of 2022 to finalize these protocols.  In total, the triage protocols for mental health calls satisfies Par. 113 and BOEC remains in Substantial Compliance, though as with prior reports, we note that policies should</td></tr>
</table>

| | |
|---|---|
| be in place prior to PSR expanding citywide so as to make PSR consistent with other triage options (including dispatching ECIT). We will provide updates as necessary in our next report. | |
| **COCL Recommendations** | • Create BOEC PSR policy |
| **Compliance Rating Based On** | • BOEC protocols for ECIT dispatch<br>• BOEC protocols for BHCC referral<br>• BOEC protocols for PSR dispatch |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interview BOEC personnel |
| **Compliance Assessment** | |

BOEC staff continue to receive training in crisis triage. CIT training for dispatchers is provided periodically to ensure all staff have this training.   CIT training for new telecommunicators is scheduled to be delivered in the second quarter of 2022 and we will provide an update in future reports.

With the addition of Portland Street Response, BOEC has a new element within their crisis triage to consider when implementing future trainings. However, BOEC has not developed a focused training on PSR yet, as no official policies have been adopted. In the first quarter, no new training was implemented, but updated protocols were sent to dispatchers three weeks prior to city wide expansion of PSR. The Fall 2021 in-service training included a guest speaker from PSR and there was time devoted to understanding the differences for when ECIT should

| | |
|---|---|
| be dispatched versus PSR; however this is not consistent with the type of focused training we have seen for ECIT. BOEC informs us they plan to develop one in the near future. | |
| **COCL Recommendations** | • Develop focused training for PSR |
| **Compliance Rating Based On** | • Prior observation of BOEC training<br>• Interview with BOEC personnel |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of BOEC data; Interview with BOEC personnel |
| **Compliance Assessment** | |

COCL reviewed data related to the operation of BOEC, not only in the context of PPB's crisis response but also in the context of other triage options, including transferring calls to the BHCC and dispatching PSR to calls that meet the necessary criteria. For instance, in the semi-annual evaluation of mental health calls, BOEC audited a total of 679 calls with a mental health component but that did not receive an ECIT dispatch. In 35 of those calls (5.2%) BOEC's audit later found that sufficient information existed at the time of the call to warrant it being dispatched as ECIT. BOEC also assessed accuracy for calls transferred to the BHCC, with 16 out of 145 calls being kicked back to BOEC for ECIT dispatch (we note this may not indicate fault with the telecommunicators decision since BHCC operators may learn additional information warranting emergency response). Finally, BOEC dispatched a total of 647 calls to PSR during the first quarter. BOEC continues to collect data and audit their own calls to ensure call takers are

following the Crisis Triage policies and procedures. As PSR expands city wide, BOEC should utilize this data collection and auditing to help inform future policies and training. BOEC shows a continued dedication to auditing the quality of their call taking and dispatch and we therefore find them in compliance with Par. 115.

| **COCL Recommendations** | • Utilize quality assurance audits to inform PSR policies and training |
|---|---|
| **Compliance Rating Based On** | • Review of BOEC data<br>• Interview with BOEC personnel |

# VII. EMPLOYEE INFORMATION SYSTEM

### Settlement Agreement Paragraph

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| Compliance Label | 116. Partial Compliance |
| --- | --- |
| | 117. Partial Compliance |
| Methodology | Interview EIS/PPB personnel; Review PPB EIS analysis |

### Compliance Assessment

The PPB continued to use the Employee Information System (EIS) as their primary system for identifying at-risk members and potentially problematic trends and "design[ing] assistance strategies to address specific issues affecting the employee" (Par. 116). As for the PPB's current procedure of evaluating subsections (a) and (b) of Par. 116, the PPB reports rates of compliance with supervisory reviews that are consistent with prior quarters. As shown in the figure below, for subsection (a) (supervisors performing annual reviews), compliance was at approximately 98% for the first quarter of 2022. For subsection (b), compliance rates for supervisors' reviews of new officers under their command was approximately 88% in the first

quarter, which was a 2% decrease from the fourth quarter of 2021. We also note that nine of the 16 late reviews that occurred in the quarter were from January when EIS was short-staffed. The PPB notes this "likely contributed to late reminder emails to RU managers which would explain the unusually high rate of tardiness in January." However, the responsibility of conducting reviews is with the RU managers, not with EIS staff in sending reminder emails. We therefore carry concern that some supervisors may only conduct the reviews upon prompting rather than as a routine part of their job. We therefore suggest the PPB remind supervisors of their responsibilities, regardless of whether or not a reminder email is sent out. Finally, for subsection (c) there was a 93.9% compliance rate for "opportunities for compliance" inspected by the PSD EIS team, which is a combination of the subsection (a) and subsection (b) reviews.

**Figure 4: Compliance with Reviews Directive 345.00 Reviews (provided by PPB)**



In addition to these reviews, we maintain concern with the process by which the Force Inspector identifies "at-risk employees, supervisors, [or] teams." Specifically, the Force Inspector continues to send only the Force Application spreadsheet to RU Managers rather than proactively identifying "at-risk employees, supervisors [or] teams" for additional discussion. As a result, there continues to be a lack of documentation as to the decision-making process for outliers since we received no evidence that any officers, units, or groups were further reviewed based on the Inspector's analysis. While the PPB informs us this process changed in the second quarter, it remained deficient for the first quarter.

Finally, we maintain our position from prior reports that the PPB should seek to ensure that the EIS is "more effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116). Initial discussions regarding this

evaluation began in the first quarter of 2022 and, although not occurring in the first quarter, we have provided the PPB and the DOJ with a draft methodology and data analysis plan. We will continue to provide updates of this process in our future reports.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br>• Continue contributing to the development of the EIS evaluation |
| **Compliance Rating Based On** | • EIS and threshold review process |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period.

| Compliance Label | 118. Substantial Compliance |
|---|---|
| | 119. Substantial Compliance |
| Methodology | Interview EIS/PPB personnel; Reviewed EIS program data |
| **Compliance Assessment** | |

128

The thresholds the PPB are required to maintain for Par. 118 continue to be used to flag officers for supervisory reviews. The PPB continues to collate data from a variety of sources, including force events, traumatic incidents (captured in Regional Justice Information Network (RegJIN)), complaints, and commendations (captured in Administrative Investigations Management (AIM)). This data is then used to identify potentially problematic behavior with the predetermined thresholds identified by these paragraphs.

In the first quarter of 2022, EIS Administrators reviewed a total of 322 alerts and sent 175 (54%) on for RU Manager review (see Figure 5). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts closed in the first quarter of 2022 (which may also include cases opened in prior quarters), there were 170 alerts sent to the RU Manager and for 112 (65.9%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the first quarter of 2022, 51.8% resulted in some type of intervention for the officer. This is a significant decrease from the fourth quarter of 2021 (75.3%) though is similar to other previous quarters. The information provided by the PPB indicates that most of the interventions involved a debriefing though two involved an EAP referral which is consistent with the fourth quarter of 2021.

**Figure 5: EIS Alerts and Alerts Sent to RU Manager (provided by PPB)**



| Table 3: EIS Alerts and Interventions | | | | | |
|---|---|---|---|---|---|
| | **2021 Q1** | **2021 Q2** | **2021 Q3** | **2021 Q4** | **2022 Q1** |
| **Alerts Closed by RU** | 237 | 209 | 263 | 215 | 170 |
| **Alerts Sent to Supervisor (Percent of Alerts Sent to RU)** | 142 (59.9%) | 137 (65.6%) | 210 (79.8%) | 181 (84.2%) | 112 (65.9%) |
| **Interventions (Percent of Alerts Sent to RU)** | 106 (44.7%) | 100 (50.7%) | 160 (60.8%) | 162 (75.3%) | 88 (51.8%) |
| **Interventions (Percent of Alerts Sent to Supervisor)** | 106 (74.6%) | 100 (73.0%) | 160 (76.2%) | 162 (89.5%) | 88 (78.6%) |

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Compliance Rating Based On** | • Lack of Critical Incident Assessment<br><br>• Current EIS thresholds |

| **Settlement Agreement Paragraph** | |
|---|---|
| 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed Directive 345.00; Reviewed EIS Program |

**Compliance Assessment**

Paragraph 120 requires that the PPB "identify and train a second EIS administrator." During the third quarter of 2021 the Bureau eliminated the PSD Lieutenant position which included the responsibilities of the second EIS administrator. In the third and fourth quarters of 2021 the

Force Inspector acted as the second EIS administrator on an interim basis. A newly promoted Lieutenant joined the EIS team and was trained under the primary EIS Administrator during the first quarter of 2022. As we have previously reported, this training is conducted via a comprehensive operation manual—including S.O.P.s for the handling of EIS alerts, entries, and responses—in accordance with Par. 120. We therefore find that the PPB has maintained compliance with Par. 120.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Previous training of EIS Administrators<br>• Appointment of second EIS Administrator |

# VIII. OFFICER ACCOUNTABILITY

**A. Investigation Timeframe**

---

**Settlement Agreement Paragraph**

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review IPR Quarterly Data Analysis; Review Administrative Investigation Management (AIM) System data |

**Compliance Assessment**

On a quarterly basis, the IPR provides summary statistics for all full administrative investigations which are closed within 180 days of their initiation date. Using the quarter that the cases were opened as reference, the IPR statistics show that of the 21 cases that were opened in the third quarter of 2021 (the last quarter for which 180 days could have passed for this report), 5 cases exceeded the 180-day timeline (24%). In the previous report it was reported there were 5 cases from the second quarter and three cases from the third quarter that were still open at the end of the fourth quarter. These cases, while exceeding the 180-day timeline, were closed in the first quarter of 2022. Additionally, the quarterly statistics indicate that 10 cases from the fourth quarter of 2021 have already been completed within 180 days and only eight remain open. We find that timelines have generally been sustained and therefore find the City and the PPB to have returned to Substantial Compliance with the requirements of Par. 121. However, we note that the percent of cases completed within 180 days decreased from the last report of 84% to 76% for this report. While a single quarter may be an aberration, the increase in overdue cases needs to be addressed in order for PPB and the City to maintain substantial compliance with Par. 121.

| COCL Recommendations | • Take steps to return the percentage of overdue cases back to an acceptable level. |
|---|---|
| **Compliance Rating Based On** | • IPR data indicating adherence to 180-day timeline |

| **Settlement Agreement Paragraph** |
|---|
| 122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate. |

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review Criminal-IA Concurrent Investigation Audit Reports; Review Directive 0330.00 |

| **Compliance Assessment** |
|---|
| In the first quarter of 2022, the PPB continued to provide documentation indicating when Internal Affairs investigations began compared with when criminal investigations began. For all five cases in the quarter, both the Internal Affairs investigation and the criminal investigation began on the same day and therefore met the criteria for "concurrent." As a result of the documentation provided by the PPB, we maintain that PPB has maintained compliance with Par. 122. |

| COCL Recommendations | • No recommendations at this time |
|---|---|

| **Compliance Rating Based On** | • Criminal-IA Concurrent Investigation Audit reports |
|---|---|

| **Settlement Agreement Paragraph** | |
|---|---|
| 123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Administrative Investigations Report |

**Compliance Assessment**

During the first quarter of 2022, the PPB closed 32 administrative investigations. The PPB provided the COCL with an Administrative Investigations report which noted that three cases exceeded the 180-day timeline. For each of these three cases the PPB provided clear explanations of why stages of the investigation exceeded the allotted time. Some of the reasons for the cases concluding beyond that 180-day timeline were; extensive time spent in the intake process at IPR, an investigator being directed to interview the involved officer (the officer had been interviewed by an investigator for another case stemming from the same complaint and, rather conduct their own interview, the investigator in the overdue case reviewed the interview from the other investigation), and extended leaves for witness and involved members.

There were 29 cases where certain stages of the investigation went over their allotted time, but the overall investigation concluded under 180-days. This is the result of the PPB's process wherein days are subtracted from back-end processes if front-end processes go over their allotted time. As a result of the PPB providing the Administrative Investigations report, we find the PPB has maintained compliance with the requirements of Par. 123. As the COCL suggested in previous reports, the PPB has included spaces to contemplate action plans for all cases, inclusive of those that do not exceed the overall 180-day timeline but are delayed in specific stages, to ensure that similar delays will not occur in the future. However, investigators do not

use this space in a consistent manner. Some investigators use the space to summarize the reasons for delays in the investigation while others include some proposed solutions to the causes of the delays in the case. Although not a major issue, the PPB should ensure that IA investigators use this space consistently to outline action plans to ensure that similar delays do not occur in the future.

| **COCL Recommendations** | • Ensure that investigators utilize the "Recommended action plan for reducing delays of this nature" section consistently to outline future action plans<br>• Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| --- | --- |
| **Compliance Rating Based On** | • Administrative Investigations Report |

### B. On Scene Public Safety Statements and Interviews

| **Settlement Agreement Paragraph** |
| --- |
| 124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Directive 1010.10 |
| **Compliance Assessment** | |

During the first quarter of 2022, the PPB maintained their protocols for compelled statements to PSD and all officers have been advised on the protocol. As a result, we find the PPB has maintained compliance with Par. 124.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● Current PPB policy |

| **Settlement Agreement Paragraph** | |
|---|---|
| 125. Separation of all witnesses and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed CROs for 2022 FIRST QUARTER OIS events |
| **Compliance Assessment** | |
| During the first quarter of 2022, there was one OIS event. The PPB provided the COCL with copies of the CROs provided to witnesses and involved officers. A review of the CROs indicates they were all provided in a reasonable timeframe. We therefore find that the PPB has maintained Substantial Compliance with the requirements of Par. 125. | |

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • CROs for 2022 first quarter OIS events |

| **Settlement Agreement Paragraph** | |
|---|---|
| 126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Officer Involved Shooting case file excerpts |
| **Compliance Assessment** | |
| During the first quarter of 2022, the PPB provided us with documentation demonstrating that in the OIS event this quarter, a witness officer provided an on-scene walk-through and briefing to the Detectives Division. Such on-scene walk-throughs and briefings provide preliminary information for detectives to begin their investigation and the member is then interviewed in more depth by detectives afterwards. Based on the documentation reviewed, we find PPB has maintained compliance with Par. 126. | |
| **COCL Recommendations** | • No recommendations at this time |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Compliance Rating Based On | • OIS case file excerpts |
|---|---|

| **Settlement Agreement Paragraph** |
|---|
| 127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Officer Involved Shooting case files excerpts |

| **Compliance Assessment** |
|---|
| During the first quarter of 2022, the PPB provided us with documents indicating that all officers involved in a lethal force event were requested to provide a voluntary on-scene walk-through and interview. As has been the case in prior lethal force events, each involved member declined citing constitutional protections. As a result of the PPB requests, we continue to find the PPB has substantially complied with the requirements of Par. 127. |

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • OIS case file excerpts |

**C. Conduct of IA Investigations**

---

**Settlement Agreement Paragraph**

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Police Accountability Commission agendas |

**Compliance Assessment**

During the first quarter of 2022, both the IPR and IA maintained their respective administrative investigations using the system we have previously found compliant with Par. 128. However, the forthcoming civilian-led accountability system (that will eventually replace IPR) continues to place IPR in a tenuous position. IPR continues to inform us that attrition from their current personnel during this transition period has the potential for detrimental effects on their ability to conduct meaningful independent investigations when they determine such investigations are necessary.

In response to our prior recommendations related to this issue, we were provided an accountability system transition plan during the first quarter of 2022. The transition plan that was shared with the COCL outlines a contingency plan to allow IPR staff to transition into the Auditor's Office (at the Auditors discretion and with assistance from the Bureau of Human Resources) once the new Community Police Oversight Board is operational. However, the transition plan does not address the concerns around independent investigations as outlined in Par. 128.

As noted in Section XI of this report, the Police Accountability Commission (who is responsible for designing the new Community Police Oversight Board) held meetings throughout the first quarter. During those meetings the Police Accountability Commission (PAC) completed their first of six work phases which is "Convening and Organizational." This phase included developing their values and goals, agenda and scope, bylaws, and community engagement

framework. In the first quarter there were no discussions on the specific characteristics of the Board that will ensure meaningful independent investigation as outlined in Par. 128. However, the PAC may address the investigative jurisdiction issue in their third phase "Establishing Powers and Duties." We will provide updates on the transition as it affects Par. 128 and other aspects of Section VIII, Accountability.

During the fourth quarter of 2021, we reported on an approximate 45,000-50,000 document Records Division backlog. As an update to this issue, we have been informed that the slow pace of the City's hiring process has hindered PPB's ability to reduce the backlog, though the City reports one person has been hired and another 20 are currently in background. Additionally, the PPB has taken proactive attempts to reduce the time involved in the hiring process, including partnering with another law enforcement agency to help in the background check process. We were also informed that although the backlog remains, it did not significantly increase despite staff medical leave due to COVID and an influx in priority processes. Although the City maintains that only a single IPR investigation was directly impacted by the backlog, the backlog still requires resolution and we look forward to future updates from the City related to this matter.

| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance, continue hiring efforts for Records Division and provide COCL updates</li><li>Show continued progress with Police Accountability Commission</li></ul> |
|---|---|
| **Compliance Rating Based On** | <ul><li>Accountability system transition plan</li><li>Ongoing Records Division Backlog</li><li>Police Accountability Commission meetings</li></ul> |

| **Settlement Agreement Paragraph** |
|---|
| 129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact. |

| **Compliance Label** | Partial Compliance |
|---|---|

| Methodology | Review administrative closure justifications for allegations of excessive force |
|---|---|

### Compliance Assessment

In the first quarter of 2022, there were three allegations of excessive force that were administratively closed by IPR. Two allegations were closed due to a lack of collaboration from the complainants and one allegation was closed due to a lack of jurisdictional authority. In the first case, the allegation was automatically submitted for investigation based on claims made by the "complainant" during an interaction where they stated that they were harmed in the process of the PPB members making an arrest. Investigators reached out to the complainant multiple times via phone and USPS mail and received no response. In the second case the complainant submitted a tort claim and did not follow up with investigators attempts to schedule an intake interview. The claim referred to the existence of video evidence on social media (which could not be located). IPR tried to cross reference video evidence they had access to with the dates listed in the complaint and could not find any that fit the description of the alleged incident in the tort claim. The final allegation was made in the same tort claim as referenced above. In this case the allegation is about an incident in which the PPB members were not present but federal law enforcement officers were. Like the above-mentioned allegation there was reference to publicly available social media videos which could not be located by IPR investigators. At any rate, IPR would not be able to open an administrative investigation into the actions of federal law enforcement officers.

We also found one case where the AAR investigation revealed an allegation of excessive force by the subject on-scene. In this incident, the chain-of-command did not forward the case on to IA for a full investigation. This continues a trend we have previously identified.

In both situations (on-scene allegation and IPR administrative closing), the decisions made constitute a violation of the Settlement Agreement, even if they were understandable. From the descriptions of these cases, it is highly likely that they all would result in a finding of Exonerated. Additionally, as a matter of process, the decisions by IPR to administratively close an allegation of excessive force allows them to re-open the case if additional information is discovered later; a liberty they would not have if they conducted a full investigation with findings. However, the language of the Settlement Agreement is fairly clear – there must be clear and convincing evidence that the allegation has no basis in fact.

Given prior examples of allegations of excessive force not receiving a full and complete investigation, coupled with the current quarter's instances, we must find that the PPB and the

141

**Exhibit A**

City are no longer in substantial compliance with the requirements of Par. 129. We therefore recommend the City and PPB re-emphasize their responsibilities under Par. 129 to supervisors and IPR and provide documentation of their efforts to the COCL.  Finally, as it relates to Par. 129, IPR had, in the past, revised their SOP to allow for administrative closure in situations where there was an inability to contact the complainant (though, per COCL's recommendation, this could not be the sole reason) (see IPR SOP, Sections 2.3.III.B and 2.3.III.C).  In this same vein, the City may consider requesting an amendment to Settlement Agreement allowing for potential additional revisions to IPR's SOP regarding Par. 129, particularly given the double-jeopardy concern raised by IPR.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To return to substantial compliance, re-emphasize the responsibilities to PPB and IPR and provide documentation of efforts to COCL</li><li>Consider requesting an amendment to Settlement Agreement allowing for potential additional revisions to IPR's SOP regarding Par. 129</li></ul> |
| **Compliance Rating Based On** | <ul><li>Administrative closure of allegations of excessive force</li></ul> |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Directive 310.20 |
| **Compliance Assessment** | |

During the first quarter of 2022 the PPB maintained Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited) which contains the requirements of Par. 130 (see Policy #2 within the Directive). In our review of 20 accountability cases, we saw no evidence of retaliation. However, there was one allegations of harassment/retaliation made in the first quarter of 2022 and, since it has not yet closed, we will need to follow-up with PPB regarding this allegation to ensure compliance with this paragraph. As the PPB has maintained their directive and we see evidence that the PPB is willing to investigate potential violations of the directive, we find the PPB has maintained compliance with the requirements of Par. 130.

| COCL Recommendations | • Complete an investigation of the allegation of retaliation |
|---|---|
| Compliance Rating Based On | • Directive 310.20 |

| **Settlement Agreement Paragraph** | |
|---|---|
| 131. COCL Summary. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case, and stipulated discipline. (For details and exact language, see the Settlement Agreement). | |
| Compliance Label | Partial Compliance |
| Methodology | Review Directive 336.00; Review City Code 3.20.140; Observe PRBs |
| **Compliance Assessment** | |

143

The PPB's Directive 336.00 and the City's Code 3.20.140 have been maintained, which outline the operations of the PRB. However, in 2021 the COCL found that the operation of the PRB was inconsistent with the requirements of Par. 131, specifically subsection (c) which requires all participating PRB members to "make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts." During the first quarter of 2022, COCL observed two PRBs but we did not see the same confusion around the Graham standard and active aggression.

For both cases, Internal Affairs gave a thorough presentation describing the situation. The Training Division also gave a presentation breaking down the incidents to determine if the officer was acting reasonably in each scenario given their training.  For one of the cases, there was a recommendation for additional training regarding box-in procedures and communication. The Training Division followed this up by sending out a video in the LMS to all the PPB staff which highlighted proper instructions, communications and times in which officers can do a box-in to a car. The video also noted that "Planning, Coordination, and Communication are keys to a successful box in."  Additionally, another case was forwarded to the Training Division to use as an example of positive community interaction.

In sum, the PRB meetings we observed this quarter did not reveal any issues around mitigating factors or active aggressions. Both cases were events in which there was a clear threat and active aggression towards the officers, and no voting members appeared to have any confusion or doubt surrounding the officer's perception of events. Neither PRB resulted in discipline, but both produced future training recommendations. These two cases suggest that the PRB is capable of engaging in thoughtful and unbiased recommendations but should not be considered a trend given our prior observations and given that these cases were unambiguous in our opinion. Therefore, the City will remain in Partial Compliance until we are confident that the same outcome can be replicated when the circumstances are different and after the additional training has been provided.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, the PRB should continue to operate in a thoughtful and unbiased manner<br>• To achieve Substantial Compliance, provide additional training to ensure PRB members correctly distinguish exonerating from mitigating factors |
| **Compliance Rating Based On** | • Observation of PRBs |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

**Settlement Agreement Paragraph**

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB Directive 336.00 |

**Compliance Assessment**

During the first quarter of 2022, the PPB maintained Directive 336.00 (Police Review Board) which memorializes the authority of PRB to send a case back for additional investigation. There were no such instances during this quarter. As Par. 132 has adequately been placed into policy, we find PPB has maintained Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • PPB Directive 336.00 |

**Settlement Agreement Paragraph**

133. COCL Summary: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation

if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review S.O.P. #32 and #42 |

| **Compliance Assessment** |
|---|
| During the first quarter of 2022, the PPB maintained S.O.P. #32 (Civil Liability and Tort Claims) and S.O.P. #42 (Evaluation of Members Fitness to Participate in All Current and Prospective Specialized Units when the Use of Force Results in a Finding of Liability in a Civil Trial). The combination of these two S.O.P.s contains the requirements of Par. 133. There were no findings of liability during the fourth quarter. As a result of PPB possessing these S.O.P.s, we find they have maintained compliance with the requirements of Par. 133. |

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • S.O.P. #32 and #42 |

## D. CRC Appeals

| **Settlement Agreement Paragraph** |
|---|
| 134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level. |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review City Code 3.21.080; Review CRC minutes |

**Compliance Assessment**

The CRC continues to include 11 community members who are representative of the community at large. A review of the minutes for the meetings the CRC had in the first quarter, as well as prior recordings and in-person observations of the CRC, leads us to believe they remain neutral, unbiased, and capable of making objective decisions. We therefore find the City has maintained compliance with the requirements of Par. 134.

| **COCL Recommendations** | ● No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | ● City Code 3.21.080<br>● CRC minutes |

**Settlement Agreement Paragraph**

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

**Exhibit A**

| Compliance Label | 135. Substantial Compliance |
| --- | --- |
| | 136. Substantial Compliance |
| Methodology | Review PSF-5.03; Review CRC minutes |

| **Compliance Assessment** |
| --- |
| The City maintains PSF-5.03 which memorializes the CRC's authority as related to Pars. 135 and 136. A review of the minutes for the three CRC meetings in the first quarter of 2022 indicates a planned appeal that was subsequently postponed to a later CRC meeting due to additional evidence in the investigation. As the CRC retains the authority to request additional investigation and we have seen evidence of this process play out, we find the City has maintained Substantial Compliance with this paragraph. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Compliance Rating Based On** | • Charter Code and Policy Code PSF-5.03<br>• CRC minutes |

**E. Discipline**

| **Settlement Agreement Paragraph** |
| --- |
| 137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Directive 338.00 and corresponding matrix guide; Review Corrective Action Recommendation documents; Review of Department of Justice Letter |

**Compliance Assessment**

In the first quarter of 2022, the PPB maintained Directive 338.00 (Discipline Guide) as well as the matrix guide that is easy to read and facilitates reasonably predictable and consistent discipline. Additionally, the guide allows for the integration of mitigating and aggravating factors and provides examples of each. We reviewed two Corrective Action Recommendation documents provided by the PPB for the first quarter. In each, the RU Manager provided a summary of the case, the mitigating and aggravating factors, and their rationale for their discipline recommendation. Additionally, we reviewed the actual discipline imposed for each case and found it to also be consistent with the range of discipline allowed in the guide.

However, we note that in our review of accountability cases, we identified one case where the final findings were inconsistent with the facts of the event and therefore the member did not receive appropriate discipline. Furthermore, we identified cases that should have been forwarded on for a full investigation but were not (see Par. 129). While we discuss these cases in the context of other paragraphs, they also undermine the predictability and consistency required by Par. 137. As the PPB has maintained a discipline guide, we find they have maintained Substantial Compliance with Par. 137. However, these other issues must be resolved to restore legitimacy to the accountability system as a whole.

COCL will further review the approved Corrective Action Guide (CAG) and revised Directive 338.00 in future quarterly reports.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Corrective Action Recommendations |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

**F. Communication with Complainant and Transparency**

<div style="border:1px solid">

**Settlement Agreement Paragraph**

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Compliance Label | 138. Substantial Compliance |
| --- | --- |
| | 139. Substantial Compliance |
| | 140. Substantial Compliance |
| **Methodology** | Review IPR website; Review IPR policy; Review findings letters |

**Compliance Assessment**

We continue to see evidence of IPR conforming with Pars. 138, 139, and 140. IPR has maintained many different avenues for submitting a complaint. When an individual submits a complaint online, they receive a unique tracking number and can request a status update with that number. If they submit through another avenue, such as mail, telephone, or walk in, the IPR employee will submit the complaint through their online system to generate a tracking number which will be given to the complainant. IPR and the city will share requested documents with complainants as is appropriate in line with Oregon Public Records Request

</div>

laws. From a protocol and operation standpoint, IPR has systems in place to ensure that they are complying with the requirements of Pars. 138 and 139.

As with previous quarters, IPR shared their records for complaints with the COCL. For the first quarter of 2022, IPR closed out a total of nine investigations which consisted of 26 allegations. Six of these investigations were related to allegations from the 2020 George Floyd protests and had been opened since 2020. Of the 26 complaints, nine resulted in a sustained finding, nine not sustained, and eight exonerated. See below for more detailed data analysis as we provide an outcome assessment based on the allegation data provided by IPR from January 1, 2020 – March 31, 2022.

The COCL personally reviewed a 10% sample of these cases to ensure that all communication requirements were met. In each of the cases reviewed, IPR was able to show that soon after the complaint was filed, the complainant received an initial contact letter in writing. After the cases were closed, the complainant received a letter documenting the closure of the complaint. For most of the cases, these letters went out in email form. However, in one of the complaints (filed on behalf of a houseless person), IPR wrote a letter, made attempts to locate the individual, and provided a copy of the letter at the office, in case the individual was able to come in to receive it. The contents of each initial contact letter contain the tracking number, the complaint classification, and the assignment. The contents of the closure letter contained the outcome of the investigation, whether any corrective action was taken, and any additional action the complainant may take. Having reviewed the IPR website and meeting with IPR to review their protocols and records, the COCL finds that the city to be in Substantial Compliance with Pars. 138, 139, and 140.

**Accountability Outcome Assessment**

While the COCL reports on outcomes as they relate to the compliance with each paragraph of the Settlement Agreement, we also are using this section to look at outcomes from the perspective of a sustainable system (see Par. 170). Using the data from IPR we have conducted an analysis on officer accountability. The dataset includes all complaints received from January 1, 2020 through March 31, 2022.

*Allegation Types:* Since January 1, 2020 there have been a total of 1,480 allegations against Portland Police Officers. There can be multiple allegations per investigation. The 1,480 allegations are connected to 685 investigations with each investigation having an average of 2.2 allegations. Figure 7.4 displays a breakdown of the different types of allegations received. Conduct, procedure, and force allegations are the most common type of allegations with 29.0%, 26.1%, and 25.7% respectively. Figure 6.1 shows the top four allegation types over time.

There are clear spikes in the number of allegations during the second and third quarters of 2020 which were when the George Floyd Protests occurred and for which we are awaiting the Critical Incident Assessment to be conducted.  The number of allegations dropped through 2021 though we also note slight increases in the number of force and procedure allegations during the first quarter of 2022 compared to 2021.

**Table 4.1: Allegation Type**

| Allegation Type | Number of Allegations (%) |
|---|---|
| Conduct | 429 (29.0%) |
| Procedure | 386 (26.1%) |
| Force | 381 (25.7%) |
| Courtesy | 175 (11.8%) |
| Disparate Treatment | 48 (3.2%) |
| Control | 27 (1.8%) |
| Policy Issue | 12 (0.8%) |
| Blank | 22 (1.5%) |
| **Grand Total** | **1480** |



**Figure 6.1: Allegation Types Over Time**

Of the 1,480 total allegations, 208 (14.1%) were bureau-initiated allegations and 1,272 (85.9%) were citizen initiated. Of the bureau-initiated allegations, 61.5% were for conduct allegations and 29.7% were for procedure allegations. There were two force allegations initiated by the bureau. The largest categories of citizen-initiated allegations were for force allegations (29.8%), procedure (25.8%), and conduct (23.7%).



**Figure 6.2: Allegation Initiation**

*Officer Breakdown:* There were 439 unique officers who were the subject of an administrative investigation between January 1, 2020 and March 31, 2022. There were 195 investigations where the employee not identified, listed as unidentified, or listed as PPB.  There were two officers who were the subject of 10 or more investigations and 22 who were the subject of an administrative investigation between five and nine times. For cases where the employee was identified, approximately 2/3 (66.5%) received a single allegation.  Overall, the average number of allegations per officer per complaint since January 1, 2020 has been 1.6 (Figure 6.3). The first quarter of 2022 had the highest number of allegations per officer since the third quarter of 2020 which included the George Floyd protests. The average number of allegations per officer per complaint has been increasing over the past three quarters, a trend we recommend the PPB take a closer look.

**Figure 6.3: Average Number of Allegations per Officer**



*Findings:* 1,352 allegations have been closed since January 1, 2020. An allegation can take multiple different routes to being closed. One way, and the most common (34.6%), is an administrative closure. Administrative closure occurs for instances when no misconduct was found, the allegation was previously investigated, or the officer is unidentifiable.

If an allegation proceeds to a full investigation, there are four possible results: sustained, not sustained, unfounded, and exonerate. A sustained finding occurs when the preponderance of evidence proves a violation of policy or procedure. Not sustained occurs when the evidence is insufficient to prove a violation of policy or procedure. Exonerated occurs when the preponderance of evidence proves the member's conduct was lawful and within policy. Unfounded occurs when the preponderance of evidence proves the allegation was false or devoid of fact or there was not a credible basis for a possible violation of policy or procedure. Of investigation findings, the most common finding for an allegation is exonerate (13.4%) (see Figure 6.4).

Instead of a full investigation, an allegation can be referred for a Supervisor Investigation (SI) in which the officer's supervisor reviews the allegation with the officer. In SIs there are two possible findings: unsubstantiated and substantiated. A substantiated finding cannot result in disciplinary action. Of the 138 allegations that were referred for an SI, 33 (23.9%) resulted in a substantiated finding (see Figure 6.5).







| COCL Recommendations | • No Recommendations at this time |
|---|---|
| Compliance Rating Based On | • IPR policy<br>• Complaint tracking webpage<br>• Finding and closure letters to complainant<br>• Interview of IPR personnel |

# IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

**Settlement Agreement Paragraph**

141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with the DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement.

142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.

143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.

| Compliance Label | 141. Substantial Compliance |
| --- | --- |
|  | 142. Partial Compliance |
|  | 143. Partial Compliance |

| Methodology | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |
|---|---|

**Compliance Assessment**

In the first quarter of 2022 PCCEP endeavored to function as a legitimate body for community engagement but faced numerous challenges (see also Par. 144). PCCEP's multiple subcommittees met with varied frequency in the first quarter, and the group sought input from community members to improve police-community relations.

However, as one PCCEP member told the Mayor during their March 30 meeting, "PCCEP is in a crisis right now." Membership dwindled to a bare quorum by the end of the first quarter, with seven members, and both full-time City support staff left their positions in the first quarter. Members disagreed as to whether a recent shift in how PCCEP's steering committee is structured was effective.

In late March, the Mayor's newly-hired Director of Community Safety and Director of Strategic Innovations met with PCCEP members and floated the idea of a 60-day break from PCCEP meetings, to "allow for the hiring of new staff and for all involved to consider what is working well for [PCCEP] and what can be improved upon." The Mayor's Office also announced a plan to transfer administration of PCCEP from the City's Office of Equity and Human Rights (OEHR) to the Community Safety Division (CSD).

The Mayor attended a follow up meeting with PCCEP members on March 30, to gather feedback on the proposed 60-day break, noting it could be an opportunity for PCCEP to "take a breather" and put plans in place to strengthen PCCEP. He noted it was PCCEP's call as to whether the group took a break. Most members were concerned at the risk of PCCEP losing remaining momentum with a break.

The COCL sent a survey to the PCCEP members remaining at the end of the first quarter; three of seven responded. Responses were mixed as to whether PCCEP had been able to fulfil its authorized duties during the first quarter.

In the first quarter of 2022, PCCEP continued monthly general meetings and subcommittee meetings via Zoom. Highlights of PCCEP's work as a full committee in the first quarter included co-hosting a January forum on body worn cameras, with COCL; the forum's video has been viewed an additional 618 times since it first streamed on January 23. PCCEP also worked on a letter to the Mayor, Chief of Police, and City Attorney, regarding offensive police training slides that came to light in late 2021—part of a recommendation from PCCEP's Racial Equity

Subcommittee. PCCEP also heard an update on the PPB's Equity Plan and co-hosted a Town Hall with the COCL on the 2021 third quarter report.

Three recommendations that PCCEP adopted in the third quarter are still pending a response from the City: A recommendation regarding data transparency (specifically, public release of all FDCRs)—developed jointly with the Citizen Review Committee and the Training Advisory Council and approved at the July PCCEP meeting; recommendations related to codification of PCCEP approved at the August PCCEP meeting; and elevating the recommendations of the Citizen Review Committee regarding 2020 protests at the September PCCEP meeting. Per the Amended PCCEP Plan, "The City shall provide thorough and timely responses to PCCEP recommendations and requests for information and shall endeavor to do so within 60 days." At the close of the first quarter, the City had not formally responded to these recommendations, and only the codification recommendation was posted to the recommendation section of PCCEP's updated website. These delays continue to be attributed to turnover and changes in staffing within the Mayor's Office. Thus, the COCL has lowered the compliance rating on Par. 142 to Partial Compliance, as PCCEP's ability to function effectively has been compromised by the City's lack of responsiveness to PCCEP's recommendations over the past two quarters.

While the remaining PCCEP members are very engaged, given the level of attrition in the fourth and first quarters, we remain concerned about whether PCCEP still represents a "reasonably broad spectrum of the community," as required by Paragraph 143. There is still diverse gender and racial representation present among the eight PCCEP members seated at the start of the first quarter, but many seats are vacant—PCCEP is down to seven members by the end of the first quarter. Thus, the COCL has lowered the compliance rating on Par. 143 to Partial Compliance.

By the end of the first quarter, the COCL remained very concerned with the attrition of PCCEP members, and lack of urgency on the part of the City to identify and recruit new PCCEP members to maintain a full 13-member body. No new members have been appointed since August of 2021. Attrition and lack of re-appointment of new members was a major factor in the dissolution of PCCEP's preceding body, the Community Oversight Advisory Board. The COCL will be watching this issue closely in the second quarter of 2022.

In this quarter, the COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

| **COCL Recommendations** | ● To achieve Substantial Compliance with Par. 142, the City should respond to PCCEP's 2021 third quarter recommendations |
|---|---|

|  | • To achieve Substantial Compliance with Par. 143, the City should create a work plan, as promised, that outlines a strategy and timeline to identify and recruit sufficient PCCEP members to maintain a full body |
|---|---|
| **Compliance Rating Based On** | • Content of PCCEP meetings<br>• Survey of PCCEP members<br>• Interview with City staff<br>• Substance of reports and recommendations<br>• Level of community engagement |

| **Settlement Agreement Paragraph** |
|---|
| 144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

| **Compliance Assessment** |
|---|

The City's support of PCCEP was in a major transition throughout the first quarter of 2022. PCCEP's project manager and project assistant left their positions in the first quarter, and other staff in the City's Office of Equity and Human Rights (OEHR), the Mayor's Office, the City Attorney's Office, and the Community Safety Division (CSD) stepped in with varying capacities to support PCCEP.

Interviews with City staff who worked closely with PCCEP indicate that supervisory roles and staff responsibilities were often unclear within the bureau structure at OEHR, and staff transitions in the Mayor's Office reduced that office's capacity to be responsive to staff working on PCCEP issues. PCCEP staff noted that the PPB staff were responsive and attentive to PCCEP's

needs. Staff interviewed by the COCL also noted tensions with individual PCCEP members that made supporting the body stressful at times and created morale issues.

During the first quarter, the City was supportive of the PCCEP in some ways (e.g., City staff continued to host and attend meetings), and by the end of the quarter the City's support appears to be moving in a positive direction—toward hiring new staff dedicated to PCCEP, and outlining a plan to more effectively support the body. The Mayor's Office hired a new Director of Community Safety in February. Part of her duties are liaising to PCCEP, and she quickly took on a more hands-on management approach with the group. Staff in the City Attorney's office are working closely with the Mayor's Office to re-build support structures for PCCEP.

City staff transitioned PCCEP's website to the City's new online format during the first quarter, migrating past agendas, minutes, and other documents, and organizing them in a more accessible way. However, posting of meeting minutes continues to falter in 2022; there are none posted for the three full PCCEP meetings in the first quarter or any of the subcommittee meetings. Most meeting agendas are organized in the section of the website designated for agendas and minutes. Videos of meetings have generally been posted in a timely manner, and the link to PCCEP's YouTube channel is accessible from PCCEP's home page.

For the first quarter, the City's level of support for PCCEP was insufficient to return to Substantial Compliance for Par. 144. Staffing problems identified by the COCL in each quarter of 2021 have not been fully addressed and continue to have adverse effects. One PCCEP member surveyed by the COCL believes the lack of total support from the City "has damaged our integrity in the community," a sentiment echoed by staff.

We continue to recommend that the City show improvement in the timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. In addition, we recommend the City hire new staff support for PCCEP and adequately train and support the new staff in their role. The additional capacity in the Mayor's Office, Community Safety Division, and City Attorney's office and their roles with PCCEP are promising; the COCL will be closely watching how they support PCCEP during the second quarter.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, provide adequate staffing dedicated to supporting PCCEP<br>• To achieve Substantial Compliance, post minutes of PCCEP meetings within 10 business days after a PCCEP meeting, in accordance with the Amended PCCEP Plan |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| | |
|---|---|
| **Compliance Rating Based On** | • Review of PCCEP website and YouTube channel<br>• Survey of PCCEP members<br>• Interviews with staff |

**Portland Police Bureau's Role in Public Engagement and Outreach**

*System Overview*

Under the Settlement Agreement, the PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns.

*The Community Engagement Plan*

| **Settlement Agreement Paragraph** |
|---|
| 145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan. |
| 146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan. |

| **Compliance Label** | 145. Substantial Compliance |
|---|---|
| | 146. Substantial Compliance |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| Methodology | Monitor progress on the implementation of the Community Engagement Plan; Interview City personnel and advisory groups members about community engagement and support |
|---|---|

**Compliance Assessment**

The PPB has continued its systems of community engagement, both with the PCCEP and its many community advisory groups. The COCL continues to use the Community Engagement Plan (CEP) as a framework for assessing PPB's progress on community engagement under the Settlement Agreement. The Plan's four components are: Public involvement, Communications, Access, and Training. Each is summarized below.

*Public Involvement:* The CEP specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

In the first quarter of 2022, the PPB worked with specific advisory groups, including its "Community and Culturally Specific Councils" and its "Operational Councils."[24] The following PPB advisory groups continued to meet monthly: Asian Pacific Islander American Advisory Council (APIA), Latino Advisory Council (LAC), Muslim Advisory Council (MAC), and the Slavic Advisory Council (SAC). They continue to work closely with the PPB and the community on a range of topics. This quarter, attention was given to hate crime (APIA and MAC)),[25] human trafficking (SAC), consent searches (LAC), PPB's role in the FBI's Joint Terrorism Task Force (MAC)[26], and the PPB's Community Police Academy (SAC), allowing community members to

---

[24] See PPB website for details: https://www.portlandoregon.gov/police/30379

[25] On February 9, 2022, the Multnomah County District Attorney announced a Bias Crimes data dashboard, and the DA received input from APIA and MAC. The dashboard can be viewed at: https://www.mcda.us/index.php/bias-crimes-dashboard

[26] PPB's Criminal Intelligence Unit provided an update on PPB's new JTTF Annual report. https://www.portland.gov/sites/default/files/council-documents/2022/2022-ppb-report-to-city-council-on-jttf_0.pdf

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

become more familiar with police work. In January, these groups also worked with COCL to promote a Community Forum on Body-Worn Cameras and distribute a survey on this topic to their members. The Chief's Office is always well represented at these meetings and the PPB's liaison continues to do an excellent job of coordinating with these advisory groups. Finally, representatives of these PPB advisory groups continue to meet as part of the Coalition of Advisory Groups (CAG) to enhance collaboration and mutual support. The COCL has recommended greater public awareness of these advisory groups, and that has improved, as these groups are beginning to create their own social media pages and post their minutes on PPB's website.

PPB's Operational Councils, such as the Behavioral Health Unit Advisory Committee (BHUAC), the Equity Advisory Council (EAC), and the Training Advisory Council (TAC), continued to meet regularly and post their meeting results on the PPB website. The TAC has consistently provided the PPB with feedback on existing and planned training programs. They have produced various advisory reports with training recommendations, including a report in January on plans to hire a civilian Dean of Training (Par. 191).

*Communication:* The CEP specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. In the first quarter, the PPB continued to use social media to communicate with the public and used other mechanisms such as press releases, emails, brochures, and presentations to reach the public. The PPB continues to prepare a monthly list of "Community Engagement Events" that have occurred, including the type and number of events, the number of community and police attendees, and the names of any organizations involved. Events in the first quarter of 2022 include the following: January (14 events with 587 community and 60 PPB attendees), February (nine events with 1,085 community and 21 PPB attendees), March (11 events with 717 community and 33 PPB attendees).

*Access:* The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all the PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

We have reported many times that the PPB's language access plan, directive, and training were not developed because the PPB is still waiting for the City to implement a city-wide process of recruiting bilingual employees as interpreters. However, several facts are noteworthy: First, the City Council passed Resolution No. 37525 on December 16, 2020, authorizing a "Language Pay Differential policy to compensate qualified multilingual City employees who use their language

skills to assist the community." (Human Resources).[27] Second, the Office of Equity and Human Rights has established a process for employees to apply for this program.[28]

The COCL would like to remind the PPB that (1) Census data suggest that nearly one-in-five people in Portland age five and over speak a language other than English at home; (2) community members have complained about language barriers and inconsistent use of language services by PPB officers and (3) In 2021, IPR prepared a report on this problem and made a number of sound recommendations to improve the PPB's response to persons with limited English proficiency.[29]

We acknowledge that the PPB has, in the past, worked with community members to develop videos to educate all the PPB members on how to respond appropriately to individuals needing language access services; that the PPB (at the COCL's request) used LanguageLine data to assess the supply and demand for specific language services;[30] and that the PPB has worked with community members to translate search cards into the five most used languages. But a more systematic approach to responding to LEP individuals is needed with good policy and training, as suggested under Par. 84 for consent searches.

Apparently, the PPB was told initially that sworn officers were not eligible for the City's Language Pay Differential program, which created some delays. The PPB does have a LEP policy 640.36 ("Communication with Hearing Impaired and Limited English Proficient Persons")[31] but does not have any dedicated staff to work on the LEP issue, unlike other large police departments. Because of the growth in xenophobia and hate crime directed at immigrants (whether they be Asian Pacific Islanders, Muslims, Latinos, or other communities), we encourage the City and the PPB to work harder to improve police services to LEP communities

---

[27] https://www.portland.gov/bhr/employee-relations/language-pay-differential-overview

[28] https://www.portlandoregon.gov/oehr/81684

[29] https://www.portland.gov/ipr/news/2021/2/11/portland-police-needs-ensure-language-services-are-equitable-and-consistent

[30] For example, Spanish is, by far, the most requested translation, comprising 69% of all calls involving LEP individuals.

[31] https://www.portlandoregon.gov/police/article/533213

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

and strengthen their access to language services. When community members with limited English proficiency can communicate clearly with the police, public safety is improved for all parties.

*Training:* The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

The PPB continues to take actions consistent with these goals. As described under Par. 84, PPB's Equity and Inclusion Office (EIO) began developing the next sequence of equity trainings focused on interacting with historically marginalized groups. In the first quarter, EIO released the first two training videos in this sequence focused on the PPB's interactions with the LGBTQIA2S+ community.

As we noted in our last report, the PPB Office of Community Engagement and the Training Division have restarted the PPB's Community Police Academy after a two-year hiatus. This allows community members to become more familiar with police work in Portland so they can provide more informed feedback. In sum, during the first quarter of 2022 the PPB continued to implement its Community Engagement Plan by maintaining partnerships with community organizations and advisory councils and seeking their help with various forms of cultural awareness training for the PPB members. Thus, the PPB remains in Substantial Compliance for Pars. 145 and 146, but the COCL expects great progress on the PPB's response to the LEP community.

| **COCL Recommendations** | • Seek to improve access to police and City services for individuals with Limited English Proficiency (LEP) through updated policy, training, and dedicated personnel |
|---|---|
| **Compliance Rating Based On** | • Reviews of City and the PPB reports<br>• Feedback from the City, the PPB, and advisory groups<br>• Implementation of the Community Engagement Plan |

*Data Collection, Analysis, and Reporting*

The PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par. 147-150).

**Exhibit A**

**Settlement Agreement Paragraph**

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| **Compliance Label** | 147. Substantial Compliance |
| --- | --- |
| | 148. Substantial Compliance |

**Compliance Assessment**

The PPB remains in Substantial Compliance with Par. 147 because they have compiled and reported demographic data pertinent to each precinct and posted them on their website.[32] In March of 2022, the PPB provided new demographic data based on the latest information from the Census Bureau's American Community Survey, covering the period from 2016-2020. The PPB prepared a handout and delivered it to the Precinct Commanders. In addition, PCCEP has been informed that new demographic data have been posted on the PPB's website and they can provide feedback to Precinct Commanders if needed. In a separate document, the PPB provided a comparison of two time periods – 2011-2015 vs. 2016-2020. The Black/African American and Hispanic/Latino populations showed some growth in the Central and East

---

[32] https://www.portlandoregon.gov/Police/article/780347

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

Precincts but declined somewhat in the North Precinct. For the public and research community, the PPB continues to provide a wide range of data, maps, and high-quality interactive dashboards on its website.[33]

For now, the PPB remains in Substantial Compliance with Par. 148 as they continue to collect, analyze, and report demographic data from individuals who are stopped by the PPB using its Stops Data Collection app, but future compliance may be in jeopardy if PPB is unable to implement policy and protocols as described below. In terms of data analysis and reporting requirements, the PPB's Strategic Service Division continued to produce the quarterly Stops Data Collection reports and share them with PCCEP and the public. The PPB's 2021 fourth quarter report was released in January 2022 but was discussed in our last (fourth quarter) report.[34] As we pointed out, the fourth quarter data for 2021 continued to show racial disparities in traffic stops, which we began reporting in the second quarterly report for 2020.

COCL began reporting on the PPB's racial disparities in traffic stops in the second quarter report for 2020. In the fourth quarter of 2020, COCL noted that citywide the annual stops data for 2020 revealed that not only was the rate of stops higher for Black/African American drivers, but the rate of consent searches was also higher, as well as the rate of arrests after stops. As we noted, in the East Precinct, Black/African American drivers were five times more likely to be searched when stopped by a PPB officer than drivers in other precincts.[35] The PPB's *Stops Data 2020 Annual Report*[36] describes the persistence of this search pattern:

- "Black / African American drivers were searched at a higher-than-expected rate for the fourth time in the last five years. They were more likely to be asked to consent to a search than other drivers and were less likely to deny consent than White drivers." (p. 4).

---

[33] https://www.portlandoregon.gov/police/71673

[34] PPB's Stops Data Collection Report for FOURTH QUARTER 2021: https://www.portlandoregon.gov/police/article/798734

[35] Certainly, the original Gun Violence Reduction Team, which did most of its work in the East Precinct, contributed to these statistics, and was dissolved in June of 2020.

[36] https://www.portlandoregon.gov/police/article/785420

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

- The authors were candid in their assessment: "The long-term nature of these disparate search rates indicates they are unlikely to change unless the Bureau actively works to reduce these search disparities through adjustments to policy and practice." (p. 19).

To address this problem, the PPB has promised for some time to update its consent search protocol so that individuals' constitutional rights are protected. This protocol would require officers to distribute cards informing community members of their right to refuse a consent search if they are asked for one. In our first quarter report of 2021, one year ago, we stated the following:

> "In fourth quarter 2020 COCL expressed the hope that PPB's new Stops Data Collection App and related protocols (i.e., distributing cards about the subject's rights, recording the transaction on their phone) would help address the racial disparity problem in 2021 by requiring officers to think about the reason for the stop and search. PPB introduced the new app ("mask") in January, but failed to change the policy, distribute the explanatory cards to those stopped, or provide additional training to officers on this new protocol. We are surprised by PPB's lack of action to update their protocol regarding police stops and searches…"

Unfortunately, one year later, the PPB has yet to implement these actions, although the COCL has commented on this delay each quarter. During this period, we were patient and did not view this as a compliance issue, but given the lack of action, the COCL is prepared to change its assessment. We give the PPB credit for finalizing the content of the search cards in five different languages (with the help of its advisory groups), which took nearly a year. The next steps are to make relevant policy revisions and train officers on the consent search protocol. The PPB has attributed their delay to the Oregon state legislators not finalizing a bill on stops and consent searches, but Senate Bill 1510 has now passed and went into effect March 23, 2022[37]. Thus, the PPB has an open road to complete these tasks. If the PPB is unable to develop policy and training in 2022, the COCL will have to find them out of compliance for Par. 148, since these actions impact the PPB's ability to collect important data that will "contribute to the analysis of community concerns regarding discriminatory policing," (Par. 148).

---

[37] https://legiscan.com/OR/bill/SB1510/2022

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

We want to stress that both stops and searches are very serious matters. There are real dangers involved, especially for people of color, and nearly all drivers are fearful and embarrassed by these encounters. Yet these patterns of racial bias in police decision making continue locally and nationally. For example, a large-scale study by Baumgartner and his colleagues (2017) in more than a dozen states found that Blacks were twice as likely to be stopped and four times as likely to be searched as whites.[38] We also know that contraband or illegal weapons are rarely found as a result of searches, and when they are, people of color are often less likely involved than whites, contrary to racial stereotypes. Also, there is little evidence that traffic stops are an effective tool for combating violent crime, as believed by many law enforcement agencies.

After research findings[39] and lawsuits, some cities, like Oakland and Philadelphia, are changing their policies to reduce the number of high discretionary, pretext stops.[40] Hopefully, Portland can continue down this path with a revised policy and new training on the consent search protocol. Recently, the PPB has been successful at reducing the total number of stops citywide. The next goal should be to reduce the racial disparity rates for stops and searches.

COCL has chosen to focus on racial disparities in traffic stops, but to be clear, the problem runs deeper. Reports by the PPB itself, by TAC, and other groups (e.g. FiveThirtyEight) have found that unequal treatment of Black/African Americans by the PPB reaches far beyond traffic stops, revealing racial disparities in the rates of arrest and use of force. We credit PPB's research team for their work but expect that PPB and the City will act more aggressively to address these concerns.

---

[38] Baumgartner, F.R., Christiani, L., Epp, D. A., Roach, K, & Shoub, K. (2017). Racial Disparities in Traffic Stop Outcomes. https://fbaum.unc.edu/articles/RacialDisparitiesInTrafficStops.pdf

[39] See work by Jennifer Eberhardt and her colleagues at Stanford University, https://searchworks.stanford.edu/view/by412gh2838

[40] For example, see Philadelphia's new "Driving Equality Bill" https://phlcouncil.com/councilmember-thomas-driving-equality-law-to-go-into-effect-march-3rd/

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | - To remain in Substantial Compliance for Par. 148 in 2022 the PPB will need to do the following:<br>  - Prepare a revised protocol for police stops and consent searches<br>  - Revise Directive 650.00 ("Search, Seizures, and Inventories") to incorporate the revised protocol on stops and consent searches<br>  - Revise directive 860.10 ("Traffic Citations and Arrests") to ensure discretionary stops for minor vehicle violations (e.g., one taillight out) are limited and do not reflect bias<br><br>- To remain in Substantial Compliance with Par. 148 in 2023, the PPB will need to do the following:<br>  - Develop and implement training on the revised traffic stop/search protocol and relevant directives<br>  - Distribute the consent search cards to those stopped<br>  - Show that records are being kept consistent with the new Oregon law<br><br>- Consider refresher training on bias-free, impartial policing<br><br>- Continue the dialogue with community members around racial disparities in traffic stops and searches |
| **Compliance Rating Based On** | - COCL review of the PPB Precinct demographic reports<br><br>- COCL review of the PPB Stops Data Collection reports<br><br>- COCL review of the PPB directives |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

**Settlement Agreement Paragraph**

149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review metrics requirement |

**Compliance Assessment**

The City has completed the requirement to develop a set of metrics to evaluate community engagement, and therefore remains in Substantial Compliance. These metrics are used by the PPB to guide their Community Engagement Plan.

As technical assistance, the COCL continues to encourage the City and the PPB to gather more specific outcome data relevant to police-community interactions. which can be used to track and enhance organizational performance. We encourage PCCEP to weigh in on the merits of specific methods proposed by the COCL below.

First, to measure the quality of police-community interactions for all encounters, body-worn camera data will be helpful if the City can acquire innovative software that is able to scan for problematic patterns in audio and video data and generate reports for supervisory review (See Par. 194 below).

Second, we continue to recommend that the PPB reintroduce contact surveys to give the community a voice as the PPB seeks to determine the level of procedural justice exhibited by the PPB officers during police-community interactions. The PPB officers can distribute business cards after each encounter that contain a unique QR code so that community members can

rate the officer's performance. One small town in Virginia is already doing this[41], and Portland could be the first large city to introduce a similar program.

Third, we encourage the PPB to conduct routine online surveys of the PPB sworn and civilian employees to measure the level of organizational justice, wellness, police culture, and overall satisfaction with their jobs. These findings can be used to develop programs and supervisory trainings designed to improve morale and organizational performance.

These three data sets can provide a foundation for an evidence-based, data-driven police organization, including supervisor coaching and feedback based on performance metrics. We encourage the PPB to incorporate these outcome measures as part of the remedies being pursued in Section XI.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>As part of everyday policing, introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with special populations</li><li>Implement anonymous internal surveys of the PPB employees to measure internal procedural justice, wellness, police culture, and employee satisfaction</li><li>Acquire and use software to analyze body worn camera data</li><li>As a learning organization, introduce programs, polices, and training curricula that are responsive to these new databases</li></ul> |
| **Compliance Rating Based On** | <ul><li>The development of metrics that captures multiple dimensions of community engagement</li></ul> |

---

[41] In this small Va. town, citizens review police like Uber drivers - The Washington Post

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed the PPB's Annual Report; Interviewed the PPB and PCCEP |

| | |
|---|---|
| **Compliance Assessment** | |
| The PPB remains in Substantial Compliance for the first quarter of 2022. During this period, the PPB was working on the 2021 Annual Report by collecting information from all divisions and units within the PPB. A draft of the Annual Report is expected to be ready for review by PCCEP in the second quarter, thus avoiding the late production that occurred in previous years, but that will be determined in our next report. | |
| For the 2020 Annual Report, the PPB was able to achieve the requirement of holding three precinct meetings and covering the appropriate material required by Par. 150. For the 2021 Annual Report, we remind the PPB that community members have asked the PPB to wait until they have received feedback on their annual report from each of the precincts before making a presentation to the City Council. At a minimum, the City Council could allow for public comment after the PPB's presentation on the report. | |

| | |
|---|---|
| **COCL Recommendations** | • The PPB should continue to complete a draft of its Annual Report in a timely manner, so it can receive feedback from PCCEP and make revisions as needed<br>• The PPB should present its Annual Report to the City Council _after_ receiving feedback from the community at Precinct |

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

| | meetings and/or public comments should be allowed after the PPB's presentation to the City Council |
|---|---|
| **Compliance Rating Based On** | • Review of progress on the content and presentation of the PPB's Annual Report |

### Summary of PPB's Community Engagement

The PPB maintained its systems of community engagement as it continues to implement its Community Engagement Plan. The Office of Community Engagement continued to partner with diverse communities through existing and new advisory councils. The PPB's Operational Councils (such as the Behavioral Health Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council) meet regularly and have current postings on the PPB website. The PPB's diverse advisory groups (Community and Culturally Specific Councils) continue to meet with the PPB and the communities they represent and have improved their efforts to keep the public informed about their work.

The PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions, although the COCL has grown increasingly concerned about procedures and data related to traffic stops and searches. The PPB continued to produce credible quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. Over the past two years, the COCL has consistently noted racial disparities in traffic stops and searches. To address these concerns, the PPB introduced the new Stops Data Collection app at the start of 2021 to collect additional data about stops, and provided some preliminary training to officers, but the full program has yet to be implemented with high integrity.

Thus, to remain in compliance with Par.148, the COCL expects that the PPB will introduce a revised protocol and directives on police stops and consent searches (focused on the distribution of consent search cards and recording of such behavior as required by state law), as well as training on these changes. This will allow the community to know that the PPB is making a good faith effort to modify its behavior on the streets related to "community concerns regarding discriminatory policing." (Par. 148). Again, we encourage the PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns.

Finally, to truly engage the broader Portland community (beyond advisory groups) and give voice to the thousands of residents who have lived experience interacting with the PPB officers, we strongly encourage the City to introduce a contact survey to measure the level of

procedural justice and public satisfaction with police services. Local researchers could be helpful to develop this type of community engagement program and the COCL could provide technical assistance. By measuring what matters to the public (e.g., whether they are treated respectfully, fairly, and given a voice) and using these data to evaluate officer performance, organizational behavior and police culture will inevitably change.

---

**Settlement Agreement Paragraph**

151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

| **Compliance Label** | 151. Substantial Compliance |
| | 152. Substantial Compliance |

**Compliance Assessment**

PCCEP met as needed to accomplish their objectives as set forth in the PCCEP Plan. At least one representative of the City Attorney's Office attends PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings law.

While no new members joined PCCEP in the first quarter, previously the City has trained new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all City advisory boards. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

However, in meetings with the Mayor in late March, one PCCEP member noted "we weren't all given the same information when we onboarded." For example, not all current PCCEP

members have been able to participate in a ride-along as part of their onboarding, during COVID. The City will remain in Substantial Compliance for Par. 152 because it has provided training regarding "City and State law" but it should standardize the training received for all PCCEP members.

| | |
|---|---|
| **COCL Recommendations** | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training. |
| **Compliance Rating Based On** | • Regularity and content of PCCEP meetings<br>• Provision of City's legal advice and training for PCCEP |

**Overall Assessment of Section IX**

The PPB has continued to engage the community through a wide range of formal and informal advisory groups as well as through public events. However, PCCEP suffered during the first quarter, due largely to problems with City support. Although subcommittee chairs continued to hold meetings and the full PCCEP continued to meet, both the PCCEP's project manager and project assistant left their positions in the first quarter. With unclear leadership, tensions among members increased. Although City support appeared to be headed in a positive direction by the end of the quarter, with plans for hiring staff and managing PCCEP meetings underway, considerable work remained to be done and membership problems continued. Hence, the City was kept in Partial Compliance for Paragraph 144 and was lowered to Partial Compliance for Pars. 142 and 143.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

# XI. ADDITIONAL REMEDIES

The parties reached an agreement on a set of remedies to achieve full compliance with the Settlement Agreement. Those remedies – collectively captured in Section XI as an amendment of this Agreement – were approved by the Portland City Council on February 9, 2022, and by the federal judge at the Fairness Hearing on April 29, 2022. As this final approval occurred in the second quarter of 2022, Section XI will not be presented in the format used throughout this report because the COCL is not offering a compliance assessment at this time. We are simply keeping the public informed of preliminary groundwork by the City and PPB on three key remedies found in Paragraphs 191, 194, and 195.

**Paragraph 191: Civilian Leadership in Training**

Paragraph 191 requires that "Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division." As shared in our previous report, City Council funded the "Police Education Director" position. In the first quarter the job opening was posted online, and the search process began. The position posting was closed on February 7, 2022, and the Bureau of Human Resources (BHR) determined that 18 applicants met the minimum requirements for the position. The selection committee, which consisted of eight PPB members from EIO, the Training Division, BHR, and members representing the various ranks within PPB, met and scored each applicant against a rubric to determine who would move forward in the process. Representatives from the Mayor's office and City Council also reviewed all applications. Together the two groups narrowed the pool to six candidates to move forward in the hiring process. Community participation to date has included a recommendations report by the Training Advisory Council (TAC) in January of 2022. In the next phase of the selection process the candidates will go through panel interviews and, ultimately, the Chief of Police will determine who will be offered the position. In our next quarterly report, we will provide an update on the interview process and the final decision made by the Chief.

The COCL expected to see more community involvement in the recruitment and selection process. The TAC report recommended not only that TAC serve on the selection committee, but that input be sought from other community representatives, including PCCEP, CRC, BHUAC, PEAC, and the PPB's community and culturally specific advisory councils. In addition, TAC recommended that the person selected should have several qualifications and emphasized that the Dean should have authority to "fully pursue and implement long-term training goals."

178

**Exhibit A**

**Paragraph 194: Body-Worn Cameras**

Paragraph 194 states that "Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy- review-and-approval provisions of this Agreement." The City is continuing to progress towards the implementation of a body-worn camera (BWC) policy and program. In the first quarter of 2022 PPB released a Request for Proposal (RFP) to solicit BWC vendors capable of supplying Portland with the equipment necessary for a BWC program. Additionally, the PPB started a process to gather subject-matter experts to assist in the scoring process, which is expected to continue into November 2022.

The City requested that the DOJ set principles to govern a BWC policy, and in response, the DOJ released a letter to the City on November 15, 2021, addressing key issues, including deployment, notice, activation/deactivation/buffering, authorized users, preview, control of videos, and accountability. The DOJ additionally stated that public input should drive a BWC policy and be collected expeditiously before the PPB drafts and adopts such a policy.

To comply with guidance from the DOJ, the City solicited assistance from the COCL to gather community input for a BWC policy. The COCL decided that a community forum and community survey would be the best ways to seek community input. During the conversations with city partners, the COCL decided that engagement with the community would benefit from a partnership with PCCEP to ensure that the forum would reach disproportionately impacted communities in Portland. The COCL worked with city partners to gather contact information for community-based organization leaders and other community stakeholders whom we could invite to the forum and seek their assistance in distributing the survey.

On Sunday, January 23, 2022, COCL partnered with the Portland Committee on Community-Engaged Policing (PCCEP) to host a community forum and engage with community and city stakeholders. Key city stakeholders from the City Attorney's Office (CAO), the DOJ, the PPB, and Portland Police Association (PPA) led a panel discussion to address questions and concerns posed from community members. Moreover, the forum allowed the COCL to acquire feedback from community to help shape the coming BWC pilot program and resulting policy. At the height of the three-hour meeting, over 100 community members were in attendance including members from PPB advisory councils, community-based organizations, and government stakeholders. During the forum, the COCL heard discussions on the following topics:

- Whether the community is included in further discussions about BWCs
- Whether officers should have the discretion to decide when to activate their body-worn cameras
- Whether officers should review the BWC footage before writing their reports of critical incidents or after they have written an initial report

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

- What entity should be responsible for storing the BWC footage, who should have access to the footage, and when.

In addition to the community forum, the COCL distributed an online survey to community members to ensure all of Portland's communities had an opportunity to provide feedback about PPB's BWC policy. The survey was offered in five languages – English, Spanish, Russian, Chinese, and Vietnamese – to ensure the COCL was able to obtain feedback from communities with limited English proficiency (These translations were provided by the City). The survey URL link was directly sent to more than 28 advocacy groups, social service agencies, government agencies, Portland City Council, and City advisory groups to help spread word to the wider Portland community. The survey went live on January 14 and remained open for two weeks with a very good response. After gathering and cleaning the data received from the survey, the final sample of respondents was 2,110, with approximately 22% of them self-reported as non-white and multi-racial. The survey questions sought community feedback on BWC activation, privacy concerns, pre-review, training review, and access to footage.

The COCL prepared a technical assistance report, summarizing the results of the online survey and the community forum, on February 12, 2022[42]. Community feedback collected during the forum was summarized in the body of the report, however, the COCL attached all comments to the appendix of the report to ensure the community was not censored or filtered by the COCL. The feedback obtained by the COCL supplemented and updated the PPB community engagement efforts in previous years.

As Portland introduces BWCs, the COCL has encouraged the PPB to begin thinking about ways to fully utilize this new database to evaluate the quality of police services during day-to-day interactions with the public and to improve organizational performance. Public trust in the PPB is heavily influenced by the quality of these interactions. Thus, in our next report, we will propose several ways that the PPB can use BWC data to make significant changes in officers' supervision and training.

---

[42] A copy of COCL's report on Body-Worn Cameras can be found at:
https://www.portlandcocl.com/reports/2022/2/18/body-worn-cameras-technical-assistance-report

**Paragraph 195: Community Police Oversight Board**

This remedy is based on a ballot measure "that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline." (Par. 195).

On November 3, 2020, Portland voters passed Ballot Measure 26-217 to create this civilian oversight board for the Portland Police Bureau (PPB). The oversight board will act as an independent body that has the authority to:

- Investigate all deaths in custody and uses of deadly force
- Investigate all complaints of force that result in injury, discrimination against a protected class, violations of federal or state constitutional rights
- Investigate other complaints or incidents of misconduct as they see fit or mandated by City Code
- Subpoena, gather, and compel documents and all evidence, including the ability to compel statements from witnesses and officers
- Compel sworn members of the PPB and supervisors to participate in investigations.
- Make policy recommendations to the PPB and City Council, and
- Impose discipline, including termination.[43]

To establish the community oversight board, in July of 2021 the City Council created a Police Accountability Commission (PAC), composed of 20 community members, with the directive of developing the new oversight board for the Portland Police. In the fourth quarter of 2021 the PAC launched the first series of meetings consisting of a private meet-and-greet followed by two public commission meetings.[44] In the first quarter of 2022, the PAC held one private meet-and-greet to continue building relationships between members and ensure increased collaboration based on shared values and goals. The PAC held 13 public meetings to discuss a framework for community engagement, bylaws and internal processes, equity trainings, and a timeline for the PAC to complete the mission. As we noted previously, the PAC was successful in creating two sub-committees: Bylaws and Internal Processes and Community Engagement

---

[43] https://www.portland.gov/sites/default/files/2021/portland-ballot-measure-26-217-11-03-2020.pdf
[44] https://www.portland.gov/police-accountability/events/meetings?f%5B0%5D=year%3A2021

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

Framework. COCL members were present during both the full PAC meetings and sub-committee meetings and will continue to monitor progress.

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**BHRT:** Behavioral Health Response Team

**BHCC:** Behavioral Health Call Center

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CAG:** Coalition of Advisory Groups

**CEW:** Conducted Electric Weapons

**CCO:** Coordinated Care Organization

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COCL:** Compliance Officer and Community Liaison

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DOJ:** Department of Justice

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

183

**Exhibit A**

**FED:** Forensic Evidence Division

**FMLA**: Family and Medical Leave Act

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**LMS:** Learning Management System

**PAC**: Police Accountability Commission

**PCCEP:** Portland Committee on Community Engaged-Policing

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PS3:** Public Safety Support Specialist

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**S.O.P.:** Standard Operating Procedure

**SSD:** Strategic Services Division

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**UDAR**: Uniform Daily Assignment Roster

**YSD:** Youth Services Division

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

## <u>LIST OF PERSONNEL</u>

Chief of Police: Chuck Lovell

Deputy Chief of Police: Michael Frome

Assistant Chief of Operations: Brian Ossenkop

Assistant Chief of Services: Michael Leasure

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Jeff Bell

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Peter Helzer

Behavioral Health Unit (BHU): Casey Hettman

EIS Supervisor: Matthew Engen

EIS Administrator: Dan Spiegel

Training Captain: Christopher Gjovic

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

## APPENDIX A

**Proposed Section XI of Settlement Agreement
Filed by the DOJ on 1/10/2022 as Document 275-1**

**(see attached)**

COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2022 to March 31, 2022

**Exhibit A**

## XI.    ADDENDUM OF ADDITIONAL REMEDIES

On April 2, 2021, the United States issued a notice of noncompliance pursuant to Paragraph 178.  The purpose of this Addendum is to ensure that the City, by and through its officials, agents, employees, and bureaus, takes actions to resolve the concerns expressed by the United States in the noncompliance notice.  Specifically, the United States found that the City failed to implement the following provisions of this Agreement:  Section III – Use of Force, Paragraphs 66, 67, 69, 70, and 73; Section IV – Training, Paragraphs 78 and 84; Section VIII – Officer Accountability, Paragraphs 121, 123, and 169; and Section IX – Community Engagement and Creation of Portland Committee on Community Engaged Policing, Paragraph 150.  The City does not admit that the allegations of noncompliance are true.

188.    The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing.  In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review.

189.    Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report.  The City will use the report to prepare a training needs assessment.  The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party.  If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable

PROPOSED SECTION XI

**Exhibit A**

modification of the Scope of Work or extension of deadlines, which the United States shall not

unreasonably decline.

190.    Before November 25, 2021, the City shall provide in the budget a separate line item

for overtime costs to conduct necessary training for PPB officers.  The City shall include a similar

line item in subsequent budgets for the duration of this Agreement.

191.    Before November 25, 2021, the City shall budget for a qualified civilian in PPB to

direct all educational aspects of PPB's Training Division alongside the Captain of the Training

Division, who will direct administrative aspects of PPB's Training Division.  The respective roles

and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this

Agreement, provided that the Parties may agree to modify those roles and will not unreasonably

withhold such agreement.  Once funding is provided, the City shall post the position within 90 days.

Once the position is posted, the City shall make a job offer to a suitable candidate and complete any

required background screenings within 150 days.  If the City demonstrates to the United States that

no suitable candidate applied for or accepted the position, or that the City is otherwise making

significant progress toward meeting the deadlines in this Paragraph, the City may request a

reasonable extension of time to fill the position, which the United States shall not unreasonably

withhold.

192.    Within 60 days of the date this paragraph is entered as an order of the Court, the

City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and

above who trained Rapid Response Team members to believe that they could use force against

individuals during crowd control events without meeting the requirements of PPB Directive

1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above

who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who

failed to ensure that FDCRs and After Action Reports arising from the crowd control events

PROPOSED SECTION XI

**Exhibit A**

starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020.  Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph.  The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement.

193.    In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement.

194.    Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a.    The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

PROPOSED SECTION XI

**Exhibit A**

b.    Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy.  The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c.    If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs.  The City will provide a final procedural status update upon the completion of the collective bargaining process.

d.    The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement.  If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

195.    In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to

PROPOSED SECTION XI

**Exhibit A**

replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to City Council for final approval.

a.    Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b.    Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight

PROPOSED SECTION XI

**Exhibit A**

Board and effective police accountability, consistent with the requirements of this Agreement.  Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board.  Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work.  For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c.    The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

PROPOSED SECTION XI

**Exhibit A**

DATED: January __, 2022.

Respectfully submitted,

| | |
|---|---|
| FOR THE UNITED STATES: | |
| SCOTT ERIK ASPHAUG<br>United States Attorney<br>District of Oregon | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
| RENATA A. GOWIE<br>Civil Division Chief | STEVEN H. ROSENBAUM<br>Special Litigation Section Chief |
| _/s/ Jared D. Hager_<br>JARED D. HAGER<br>Assistant U.S. Attorney | _/s/ Laura L. Cowall_<br>LAURA L. COWALL<br>Deputy Chief |
| | _/s/ R. Jonas Geissler_<br>R. JONAS GEISSLER<br>Trial Attorney |

| | |
|---|---|
| FOR THE CITY OF PORTLAND: | |
| _/s/ Robert Taylor_<br>ROBERT TAYLOR<br>City Attorney | _/s/ Heidi Brown_<br>HEIDI BROWN<br>Chief Deputy City Attorney |

PROPOSED SECTION XI

**Exhibit A**

**Attachment 1 to Proposed Section XI regarding Paragraph 191**

YELLOW = Academic Director
BLUE = Captain
GREEN = Both

| Academic Director | SHARED | Captain |
|---|---|---|
| • Lesson plan final approval<br>• Forecasting/scheduling of the yearly training calendar<br>• Needs assessment and surveys (analyst supervision)<br>• Instructor development/training<br>• FTEP and recruit officers training<br>• Ensure training adheres to policy<br>• Procedural Justice program<br>• Patrol Procedures Patrol Vehicle, Operations, Control Tactics, Firearms program training<br>• Community academy training<br>• Advanced academy<br>• Supervisor in-service<br>• Inservice<br>• Outside training approval<br>• Approval of PPB training provided outside the Training Division<br>• Learning Management System<br>• Video Production unit<br>• PS3 training<br>• Able Program<br>• CIT/ECIT training<br>• Satellite instructor schools training<br>• Return to work training for members who have been on extended leave | • Instructor Selection<br>• DPSST coordination<br>• FTEP and recruit officers<br>• Budget<br>• Wellness programs<br>• Patrol Procedures Patrol Vehicle, Operations, Control Tactics, Firearms program<br>• Sworn and non-sworn performance evaluations<br>• Community academy<br>• Leadership program<br>• Officer involved shooting reviews<br>• Satellite instructor schools<br>• Training Advisory Council (TAC)<br>• PRB advisory member | • FTEP and recruit officer assignments<br>• EAP<br>• Armory and equipment management<br>• Facility use management (internal and external users)<br>• Patrol Procedures Patrol Vehicle, Operations, Control Tactics, Firearms program assignments<br>• Community academy assignments<br>• Cadet program coordination<br>• Satellite instructor school assignments |

**Exhibit A**