# Status Report before Judge Simon regarding
# The Portland Settlement Agreement Case No. 3:12-cv-02265-SI

## Statement by
## Dr. Dennis P. Rosenbaum, Ph.D. and Dr. Thomas E. Christoff, Ph.D.
## Compliance Officer and Community Liaison (COCL)
## November 9, 2022

**OPENING COMMENTS**

Your Honor, thank you for this opportunity to report our findings as the Compliance Officer and Community Liaison (or COCL as we are called). Today, most systems used by the Portland Police Bureau to guarantee constitutional policing have remained intact, but some systems were compromised during the 2020 protests and continue to exhibit problems. Unfortunately, the long absence of an independent critical assessment of what went wrong during the protests, as recommended by the COCL nearly two years ago, has delayed the City's recovery. Also, beyond the use of force, setbacks have since occurred in the City's systems of accountability and community engagement.

We have now completed our compliance and outcome assessments for the second quarter of 2022, so we can give you a brief summary of progress and setbacks for the first half of the year, and make a few comments on more recent developments. However, your Honor, in the interest of time, we refer you to our full report because we cannot adequately cover all of the current compliance problems or success stories in a few minutes. Here we will touch on a few highlights.

You will hear people say that "nothing has improved since the Settlement Agreement was implemented eight years ago." We understand their frustration, but we don't share that view. We have documented the changes that occurred during this timeframe – system changes that aren't always visible in the community -- but we are also very clear about the work that remains to be done. The COCL is about hard facts and we use rigorous methods to make these decisions. The reality is that many people in the City have worked very hard to change the policies and training within the Police Bureau to comply with the terms of this Settlement Agreement, but clearly, more work is needed to change the organization and culture that are responsible for the quality of policing on the streets of Portland every day. We will discuss additional changes that we believe would make an impact.

In our quarterly reports we include a Report Card that summaries our compliance assessment for each paragraph in the Settlement Agreement under our purview, and what specific changes are needed to move from Partial Compliance to Substantial Compliance.

Our latest Report Card for the second quarter of 2022 shows that the City had not returned to Substantial Compliance on 24 paragraphs in Sections III through IX. Specifically, this included 9 paragraphs in Use of Force, 2 paragraphs in Training, 3 in Crisis Intervention, 2 in Employee Information System, 5 in Officer Accountability, and 3 in Community Engagement. In addition, after evaluating the new Section XI for the first time, we found the City has yet to achieve Substantial Compliance for 7 of the 8 paragraphs involving new remedies.

### III. USE OF FORCE

For Section III, we note that while the Police Bureau continues to substantially comply with some paragraphs, critical <u>persistent</u> issues continue to exist which prevent Substantial Compliance with the section as a whole. At times, the issues pertain to nuanced concepts such as failure to provide consistent and accurate descriptions of de-escalation. We have repeatedly identified examples where de-escalation is being incorrectly described by officers, but we have seen no recent attempts by the Police Bureau to remedy our concerns. For instance, in the past, the Bureau's Force Inspector provided a clarifying document which we believe had improved officers' descriptions of de-escalation and we have suggested to the Bureau that they should consider updating and re-issuing that guidance though, to-date, they have chosen not to do so.

Other issues preventing Substantial Compliance, however, are not nuanced issues, but rather reflect a wholesale failure to respond to our recommendations. For instance, we have recommended the Force Inspector resume the process of identifying officers who represent the <u>highest</u> levels of potentially problematic behavior based on statistically heightened uses of force. This has not yet occurred despite it being the Police Bureau's practice in the past.

Finally, it remains unclear to us how the Bureau determines when deficiencies by an officer or supervisor in the force reporting process warrant formal accountability measures rather than informal supervisory counseling. While we agree that many minor oversights can best be handled through an Employee Information System (EIS) entry, we continue to see examples of non-minor reporting violations that are not adequately handled. In all, your Honor, the current deficiencies point to concerns with the Police Bureau's overall management of use of force and we will continue to work with the Bureau to resolve these issues in the near future.

## IV: TRAINING

For Training, Section IV, the Police Bureau was found to be in Substantial Compliance with eight of the 10 paragraphs. They continue to maintain a robust system of data collection and analysis to evaluate their training programs and fulfill their obligation to seek community input through the Training Advisory Committee. However, we continue to recommend that the Training Division introduce outcomes metrics to capture (and I quote from Par. 80), "the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs." We will provide additional technical assistance in this area in the months ahead.

The Police Bureau has moved to Substantial Compliance for its Training Plan and Needs Assessment (Par. 79). The Training Division continues to do an excellent job of gathering information for its 2022 annual training needs assessment and refining its training plans for In-Service, Supervisors In-Service, Enhanced Crisis Intervention Team, and Advanced Academy. This includes the training needs and plans associated with crowd management. Because a new remedy was approved in the second quarter, requiring an external Critical Incident Assessment of force used during the 2020 protests, we have moved this obligation from Par. 79 to Par. 189 under Section XI.

Overall, COCL has been satisfied with the content and delivery of training that we have observed thus far in 2022, including In-service training for all officers, the Sergeants Academy for new supervisors, ECIT training for responding to mental health crises, and specialty unit training. However, the Police Bureau has not returned to Substantial Compliance for Par. 84 because they have yet to provide crowd control training that does three things: (1) incorporates changes to polices related to use of force and crowd control, (2) incorporates both internal and external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills. The policy review process is still underway, but nearing completion, although some additional changes may be needed <u>after</u> the external assessment has been completed, which did not start until the third quarter of 2022. Over the past year, the City and Police Bureau should be credited with developing additional crowd control training in response to criticism from the COCL, DOJ, the public and the courts. However, a more comprehensive approach to crowd management is needed.

Also, the COCL continues to emphasize the need for evidence-based training in areas such as de-escalation and procedural justice where research has identified effective training methods. This would also include more attention to a Problem-Based Learning approach, where students are able to apply the knowledge and policy to real world situations via classroom scenarios and

exercises, such as what we observed recently in the off-site training for specialty units[1]. Also, future evidence-based training with the Police Bureau should draw upon body-worn camera footage and contact surveys in Portland to clearly illustrate to officers where specific improvements in performance are needed when interacting with the public.

Finally, the Police Bureau continues to expand its range of online classes and educational material using their Learning Management System (LMS), including a well-designed series on Equity delivered by the Bureau's Equity and Inclusion Office (EIO). In the future, our expectation is that the Police Bureau will continue to strengthen the link between virtual and in-class instruction so that concepts introduced to officers virtually can be translated into practice scenarios, thus increasing the probability that such training will be expressed in on-the-job behaviors.

**V. COMMUNITY-BASED MENTAL HEALTH SERVICES and VI. CRISIS INTERVENTION**

We continue to find that the Police Bureau and the City have largely remained in Substantial Compliance with Section V (Community-Based Mental Health Services) and Section VI (Crisis Intervention). For Section V, we continue to find the Bureau and City have maintained their roles in multiple committees and workgroups designed to address important issues in city, county, and state approaches to providing comprehensive mental health services. As your Honor knows, the City has recently expanded Portland Street Response (PSR) citywide and initial evaluations by Portland State University has shown positive results. However, we are also aware that limited PSR resources have impacted their ability to respond to all calls meeting their response criteria and this is something that we have begun to further explore. Also related to PSR, we are aware that BOEC is still in the process of creating policies and training though in the third quarter. They have presented PSR SOPs to the BHUAC and will we summarize these efforts in our next report.

For Section VI, we continue to find that the Enhanced Crisis Intervention Team, Behavioral Health Response Team, and Service Coordination Team are acting in accordance with the requirements of the Settlement Agreement. For instance, in our most recent report, we provided an analysis of BHRT data, indicating a significant reduction in arrests and custodies after BHRT intervention compared to prior to BHRT intervention.

However, the City and the Police Bureau remain out of Substantial Compliance with Section VI due to issues with the operation of the Behavioral Health Unit Advisory Committee (BHUAC). As a follow-up to a Technical Assistance Statement we prepared last year, the City, the Police Bureau, DOJ, and COCL engaged in a collaborative process to introduce use of force summary

---

[1] This training occurred in the 3rd quarter and involved the Bureau's Special Emergency Reaction Team (SERT) and Crisis Negotiation Team (CNT).

statistics to the BHUAC, allowing them to better contextualize the policy and training recommendations they make. Additionally, the BHUAC's recent review of the Bureau's training has largely addressed concerns which, in part, contributed to us finding them out of compliance in the past year. However, before returning to Substantial Compliance, we will need to see that the BHUAC consistently has sufficient membership for a quorum as well as holds consistently productive meetings. Although we credit the work of the BHUAC in framing and developing the Bureau's and the City's mental health response overall, the operational limitations must be addressed.

**VII. EMPLOYEE INFORMATION SYSTEM**

The Police Bureau remains out of Substantial Compliance with Section VII (Employee Information System) for two primary reasons, the first of which is similar to the concerns already discussed in the context of Section III regarding the management of the EIS system. For instance, when officers, supervisors, and teams demonstrate a significantly heightened prevalence of use of force, they do not regularly receive an EIS alert and, consequently, are not provided any type of intervention to address potential underlying causes. Furthermore, we have repeatedly stated in past reports that the Police Bureau now has sufficient data to evaluate whether their EIS approach is effective. We have provided the Bureau with technical assistance as to a potential methodology for conducting such an evaluation, though we continue to wait for their feedback on that plan. As you now, Par. 116 requires the Police Bureau to enhance its EIS to "more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion." Without a fulsome evaluation, we cannot say at the moment whether the Bureau's system is effective at all, and therefore, cannot determine whether the enhancements required by the Settlement Agreement have made the system more effective.

**VIII. OFFICER ACCOUNTABILITY**

For Section VIII (Officer Accountability), we continue to find that Police Bureau and the City are not in Substantial Compliance for several paragraphs, though they are in Substantial Compliance for several others. For instance, we continue to find compliance with paragraphs related to timely investigations, the Independent Police Review's (IPR's) documentations and notification requirements, and a majority of paragraphs dealing with investigation procedures after a lethal force event. For other paragraphs, however, we have found ongoing and new challenges to compliance. For instance, while we have found that the IPR's concerns with future attrition have been largely ameliorated, there remains an issue with the Police Bureau's Records Division backlog of 45,000 - 50,000 documents. We note that the Bureau is currently taking steps to resolve this backlog, though we will need to see evidence that it being reduced before we can find them in Substantial Compliance again. Additionally, we continue to find that

while some administrative closures of excessive force might be reasonable, they remain a technical violation of the Settlement Agreement (Par. 129). We have recently discussed this with the Parties and understand IPR is in the process of refining their SOPs to address this. We have recently found the operation of the Citizen Review Committee (CRC) to no longer be in Substantial Compliance due to concerns with resources and public in-fighting. Finally, we have recently begun including an assessment of Par. 169 in our reports, finding Partial Compliance based on our review of a sample of force events as well as other instances where there was a failure to initiate accountability processes. Similar to our findings with use of force and EIS, we believe this relates to deficiencies in the overall <u>management</u> of the accountability system and we will continue to work with the Police Bureau and the City to ensure a fair, consistent, and predictable system moving forward.

## IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

Section IX focuses on the Police Bureau's Community Engagement efforts and the role of the Portland Committee on Community-Engaged Policing (PCCEP). Your Honor, 2022 has been a very difficult year for PCCEP members. In the first and second quarters, they worked without the support of regular staff members and without the replacement of members who had left, and with restrictions on their ability to hold subcommittee meetings. And several of their recommendations to the City from 2021 were not answered.

In the third and fourth quarters, the City's support has improved -- staff have been hired, new PCCEP members have been onboarded, and the PCCEP has redefined itself with new subcommittees. There are still challenges ahead, such as finding the right balance between too little and too much City support, with complaints at both ends.

Section IX also requires the Police Bureau to demonstrate a sound community engagement plan. COCL is satisfied that the Police Bureau has continued to engage the community through a wide range of formal and informal advisory groups as well as through public events. Also, their analysts do a fine job of posting data about the Bureau's performance. However, racial disparities in traffic stops and consent searches remain a problem that requires further action. So COCL has emphasized that the Police Bureau will need to introduce a revised directive on police stops and consent searches, including attention to the distribution of consent search cards to educate the public about their rights). These changes will require additional training of officers.

We should note that both the Police Bureau and PCCEP have sought a greater public presence on the internet as they seek to engage Portland's diverse communities, but both have been stifled by the City's management of its new website, which has resulted in long delays in the

posting of materials such as minutes from PCCEP meetings. Hopefully, the technical support for public safety programs on the City's website can be given a higher priority in the future. Hence, the City remains in Partial Compliance for Paragraphs 142, 143 and 144.

Finally, to truly engage the broader Portland community (beyond advisory groups) and give voice to the thousands of residents who have lived experience interacting with Portland Police officers, we continue to encourage the City to introduce and institutionalize an independent contact survey to measure the level of procedural justice and public satisfaction with police services. If used properly for coaching and training, this data system could have a profound impact on police-community interactions, ultimately enhancing police legitimacy and public trust in the Portland Police Bureau.

### XI. ADDITIONAL REMEDIES

Finally, as you know well your Honor, the parties have reached agreement on a set of eight new remedies to achieve full compliance with the terms of the Settlement Agreement. Because approval of this amendment by the City and this Court did not occur until the second quarter of 2022, COCL's assessment of compliance began only recently.

We have documented the activities undertaken to lay the groundwork for these remedies. The City, Police Bureau, and community leaders have made noticeable progress on some key remedies, such as Body-worn Cameras (Par. 194) and the Community Police Oversight Board (Par. 195), although full implementation of these interventions is far down the road. For example, body-worn cameras will require new policy (currently being bargained), new training, a pilot test of the equipment and procedures, full-scale implementation, and eventually, an audit of officers' usage patterns. And the work of the Police Accountability Commission (PAC) – the group assigned the job of developing the new civilian oversight board -- is enormous, as they must first learn about the complexities of use of force investigations, the administration of police discipline, and best practices elsewhere. Other remedies have been slow to get started (such as the Critical Assessment of Crowd Control, Par. 189), and one remedy -- the Civilian Dean of Training (Par. 191) got off to a bad start and needed to reboot. COCL will continue to report on the implementation of these new remedies, including any challenges that must be overcome down the road to achieve Substantial Compliance.

Thank you, Your Honor.