**Juan C. Chavez**, OSB #136428
Email: jchavez@ojrc.info
**Franz Bruggemeier**, OSB # 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270

Attorneys for *Amicus Curiae* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>CITY OF PORTLAND,<br><br>　　　　Defendant. | Case No. 3:12-cv-02265-SI<br><br>*AMICUS CURIAE* MENTAL HEALTH ALLIANCE'S NOVEMBER 2022 STATUS REPORT |

**NOVEMBER 2022 STATUS REPORT**

On July 22, 2022, after hearing few updates on Defendant City of Portland's efforts to regain compliance with the Settlement Agreement they entered into with Plaintiff United States, the Court concluded the hearing by stating that "[it] will want to get a more fulsome update of exactly where things are when we meet again." Aug. 2022 Hr. Trans. 106:5-6. It is now over three months later, and the parties are returning to Court to report nothing new.

It dismays the Mental Health Alliance ("MHA") that this is Defendant's chosen course. The public, the Court, and Plaintiff all deserve answers on the status of the City's body worn

camera policy, an update to the biased training slide investigation, and on its other new obligations under Section XI. By once again coming to Court empty handed, Defendant has shown its contempt not only for the Court, but for the public—many of whom set aside time in their busy lives to come to these hearings to learn about what is happening in this case and provide testimony.

Despite their dismay, MHA intends to present to the Court short summary responses to some of the matters addressed by Plaintiff in its status report, and to provide an update on Dr. Jonathan Brown's study of PPB's use of force patterns. MHA would have presented on other subjects, such as the status of the body worn camera policy or the hiring of a new civilian training dean, had there been any fulsome updates on the topic, but there has been none.

### A. Training Slide Investigation.

Plaintiff United States wrote in its brief that it has concerns about the investigation and Police Review Board process regarding the training slide. Dkt. 307, pp. 2-3. The City has been performing this investigation for over a year now, having learned about the slide deck in September 2021 after it was disclosed in another civil lawsuit.[1] Plaintiff also states that it hopes that the City corrects those concerns. *Id.* at p. 3. The City states in its brief that the PRB process has already concluded, and the process moves on—presumably to the Chief and the Police Commissioner, Mayor Wheeler. Dkt. 310, p. 2.

Reading this, MHA and the public could reasonably draw the conclusion that the City has not addressed Plaintiff's concerns, and that the City intends to not discipline whichever officer's conduct resulted in this training slides being created and taught.

---

[1] Maxine Bernstein, *Portland police training on protests ends with slide showing mock prayer for 'dirty hippy,' prompts investigation*, The Oregonian (Jan. 14, 2022), available at https://www.oregonlive.com/crime/2022/01/portland-police-training-on-protests-ends-with-slide-showing-mock-prayer-for-dirty-hippie-prompts-investigation.html

### B. PCCEP.

At least one MHA member has attended every PCCEP meeting. MHA members have recently observed that the City appears to have taken tight control of the PCCEP. It has implemented changes that have reduced the ability of the PCCEP members to direct the actions of the committee and have reduced community involvement.

For example, the City has presented newly written bylaws and a slate of subcommittees for the PCCEP to accept. PCCEP members have expressed negative feedback about those changes, and the changes have left committee members feeling frustrated and controlled. Additionally, while the City continuously states that PCCEP has its full contingency of 13 members, two of the members appointed several months ago have never attended a single meeting or participated in any way. That exacerbates the problems about quorums and failures to change the quorum rules that AMAC's status report has described to this Court. Also, the changes to the online format of the meetings do not allow for community members to participate as freely as they were able to in the past. Community members are now given a few minutes at the end of the meetings, and only if there is time, to share their thoughts. Another change is that community members can no longer use the Chat function during the meetings to participate. These changes have resulted in both committee and community members feeling discounted and less engaged in the committee. MHA is concerned that the City is implementing similar changes to other community advisory boards to reduce their independence and participation. This erosion of community engagement furthers our belief that the City does not wish to meet its obligations for community engagement both as a public body and as a Defendant who signed a settlement agreement ten years ago.

PCCEP's recent experience with near collapse speaks to this, demanding that MHA draw the Court's attention again to comments and conduct by the City at a PCCEP meeting. This incident raises concerns about the City's ability to operate in good faith in this case, not just in the context of the PCCEP but in all other contexts as well. During a March 30, 2022 meeting of the PCCEP convened by the Defendant to discuss "pausing" the activities of the PCCEP (a pause that was neither contemplated by the Defendant's legal obligations under this case nor approved by the Plaintiff or the MHA, though we cannot speak for the other *amici*), the Mayor's "Director of Strategic Innovations" Sam Adams made comments suggesting that the City did not believe it had a continuing obligation to comply with the settlement agreement.

When asked if the pause would put the City out of compliance with Section 9 of the settlement agreement, Mr. Adams stated "I think we're already out of compliance." Later in that meeting, KC Lewis (a member of the Mental Health Alliance) asked for clarification, stating "is the City's position that you are no longer bound by any of the terms of the settlement agreement because you're already out of compliance with it?"

Mr. Adams began to respond to the question, but was interrupted by Robert Taylor, counsel for the Defendant, who stated "we are bound by the settlement agreement, whether we are in substantial compliance, or out of substantial compliance, or if we fall into non-compliance, we are bound by that settlement agreement." He went on to acknowledge that the staffing issues that have kept the PCCEP from running smoothly have been a long-running issue.

It is troubling that Mr. Adams (representing the Mayor's office) seems to be under the belief that the Defendants' falling out of compliance with the Settlement Agreement essentially creates a free-for-all in which the City can act as they please in contravention of the terms of the agreement. The gulf in understanding between the City Attorney's office, who represent the City

in this settlement agreement, and the Mayor's (and police commissioner's) office, who are actually responsible for implementing the terms of the agreement, is troubling. This is particularly disappointing coming from Mr. Adams, who prior to his current role in Mayor Wheeler's office was originally responsible for approving this settlement agreement on the Defendant's side.

It is difficult not to wonder if the City has taken a similar attitude towards compliance in other areas of this agreement, compounding our worries about City's refusal to provide an update on the training slide investigation that are at issue in this status conference. A watchful eye and a heavy hand on the part of the court may be necessary to make sure that the Defendants understand the legal obligations they are under.

**C. Court Monitor.**

MHA has previously expressed its support for a Court Monitor being appointed in this case. After consideration, MHA wishes to emphasize the conditions in which it believes that a Court Monitor would be appropriate for this case.

If adequately funded and fully empowered to access data, a Court Monitor could bring a more independent and thoughtful outside expert assessment to the case. However, MHA believes that any Court Monitor must be under the administrative control of the Court and the public—not the City Attorney's office. In addition, at least initially, the Monitor must "own" and control the staff and activities that sustain community engagement.

To allow sustained, meaningful engagement with the community, MHA also believes that the Court Monitor should live, work, and/or worship in Portland—the Court Monitor must be connected to and part of the Portland community. Because the constitutional basis for the creation of the settlement agreement was a pattern and practice of unwarranted use of force

against the mentally ill, any Court Monitor should have professional or personal experience with mental illness. If a suitable Monitor does not have this experience, the Court could work with *amici* to identify Portland-area subject-matter experts to join the Monitor's team.

With news of the present COCL's retirement from the case, the need for an independent monitor for this case grows even more apparent, and, under the right conditions, could be a great benefit to this case and to the community of Portland.

### D.  Use of Force Data Updates.

MHA member Dr. Jonathan Brown has continued his statistical analysis of PPB's use of force data. In April 2022, Dr. Brown summarized to the Court his initial findings that the degree of force used by PPB officers on persons likely to be mentally ill has increased steadily in the past four years when officers use force to detain them. Over the same period, since 2017, the probability that force is used during dispatches that include higher proportions of people who are likely mentally ill did not decrease.

Now, Dr. Brown has additional findings to share:

- Despite a steady decline in police dispatches overall, force-incidents during a mental crisis have not declined, even though force incidents have declined for all other groups.

- This failure to decrease is unique to mental-crisis force-incidents.

- During mental-crisis force-incidents, as he reported in April 2022, the intensity or level of police use-of-force increased steadily since 2017.

- There is a general shift toward higher-impact uses of force in all force-incidents for all groups, although the increase is greatest among incidents involving mental health crises.

- The proportion of persons in mental health-crisis reporting a residential address has dropped substantially.

Dr. Brown will continue to develop his data and analysis for the Court's review.

## CONCLUSION

MHA does agree that more frequent hearings in this case would be a benefit to the parties and community, providing more accountability, more clarity, and more direction from the Court. We appreciate having more opportunities to come before the Court to present testimony. We also appreciate the time and effort by Plaintiff to find time to return to the Court by at least February 2023. But the City cannot be rewarded with four more months for successfully hiding the ball before these hearings. If the City ever meets its obligations to report to the Court an update on its body worn camera policy, or the status of its investigation into the training slide, we request that the Court convenes an expedited hearing on these matters and allow for public testimony.

DATED November 8, 2022.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Of Attorneys for *Amicus Curiae*
Mental Health Alliance

/s/ *Franz H. Bruggemeier*
Franz H. Bruggemeier, OSB #163533
Of Attorneys for *Amicus Curiae*
Mental Health Alliance