# COMPLIANCE OFFICER AND COMMUNITY LIAISON

# *Quarterly Report: Quarter 2 Updates and Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**April 1, 2022 to June 30, 2022**

**November 30, 2022**



**Exhibit A**

# **TABLE OF CONTENTS**

**TABLE OF CONTENTS**                                                                                          **1**

**INTRODUCTION**                                                                                              **2**

**EXECUTIVE SUMMARY**                                                                                         **3**

**REPORT CARD**                                                                                               **13**

**III. USE OF FORCE**                                                                                         **33**

**IV: TRAINING**                                                                                              **59**

**V. COMMUNITY-BASED MENTAL HEALTH SERVICES**                                                                 **99**

**VI. CRISIS INTERVENTION**                                                                                   **104**

**VII. EMPLOYEE INFORMATION SYSTEM**                                                                          **141**

**VIII. OFFICER ACCOUNTABILITY**                                                                              **148**

**IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY
ENGAGED POLICING**                                                                                           **173**

**XI. ADDITIONAL REMEDIES**                                                                                   **199**

**LIST OF ABBREVIATIONS**                                                                                     **219**

**LIST OF PERSONNEL**                                                                                         **222**

**Exhibit A**

# INTRODUCTION

This is the Compliance Officer/Community Liaison's (COCL) second quarter report for 2022, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered April 29, 2022. This report covers the three-month period from April 1, 2022, to June 30, 2022.

The COCL continues to evaluate whether the systems required by the Settlement Agreement have been sustained or restored to ensure constitutional policing in Portland. For the second quarter of 2022, most systems remained intact, but some were not repaired and thus are unable to produce the desired outcomes. As we have noted in previous reports, to a large extent, this can be attributed to the City not yet introducing new remedies for the systems that were adversely affected (e.g., Critical Incident Assessment of crowd control in 2020). For others, such as community engagement, the setbacks were not completely corrected.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# EXECUTIVE SUMMARY

In this second quarter of 2022, the Portland Police Bureau (PPB) and the City of Portland remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. However, they were found to be in Partial Compliance for 24 paragraphs of the original paragraphs. The paragraph-by-paragraph ratings, including the new Section XI, can be found in the Report Card that follows this narrative summary.

## III. USE OF FORCE

During the second quarter of 2022, there are several elements of Section III where the PPB remains in Substantial Compliance due to previously established processes. These include Conducted Electronic Weapons (CEWs) (Par. 68), sergeant staffing (Par. 71), and the After Action Report (Par. 72). But nine of the twelve paragraphs for Section III remain out of Substantial Compliance. There were no changes to compliance ratings in this section from the first quarter to the second quarter of 2022.

Primarily, Section III remains out of Substantial Compliance due to persistent issues identified in our review of force cases that we have found in prior quarters and which were again found during this quarter. For instance, it continues to remain unclear to the COCL how the PPB decides when it is most appropriate to address a problem with supervisor counseling or when it is most appropriate to refer the case for formal investigation (Pars. 73-75; 77). The COCL also continues to find inconsistent language in FDCR's regarding "de-escalation" which raises a concern about the reliability and validity of force report data (Pars. 67, 69, 74, 75, 77).

As with previous quarters, the PPB remains out of Substantial Compliance based on the audit process used by the Force Inspector (Pars. 74-77). There continue to be instances in which an issue is identified but is not forwarded by the Force Inspector to the Training Division for review. The Force Inspector also continued to forward the entire force applications report to RU managers instead of identifying the specific officers who demonstrate a need for more in-depth review. Similarly, the force statistics reported by PPB do not include a discussion of potential reasons or implications for the findings. The PPB has substantial opportunities to use the data they report to identify areas of improvement based on force trends, but the analyses conducted remain limited.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**IV: TRAINING**

Compliance ratings for Training have not changed from the first to second quarter, except for Par. 79. The PPB was found to be in Substantial Compliance with eight of the 10 paragraphs in Section IV. PPB continues to maintain a robust system of data collection and analysis to evaluate their training programs and fulfill its obligation to seek community input through the Training Advisory Committee. For the future, COCL continues to recommend that the Training Division introduce outcomes metrics to capture "the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs." (Par. 80).

The PPB remains in Partial Compliance for the delivery of training (Par. 84) but has moved to Substantial Compliance for its Training Plan and Needs Assessment (Par. 79). These assessments are summarized below.

*Training Needs Assessment and Training Plan: Par. 79*

 During the second quarter of 2022, the Training Division continued to gather information for its 2022 annual training needs assessment and refine its 2022 training plans for In-Service, Supervisors In-Service, Enhanced Crisis Intervention Team, and Advanced Academy.

The Training Division also continued to gather outside information on training needs associated with crowd management, including safety and injury risks, applicable laws, and research on protesting groups that engage in violence. Input from police personnel in the Training Division was also sought. The COCL values this preparatory work on crowd management and believes that it is an excellent investment of time and resources, especially considering our expressed concerns about PPB's response to the protests. However, because COCL is now conducting a separate compliance review of the <u>external</u> Critical Incident Assessment of force used during the 2020 protests (Par. 189), we have removed this obligation from Par. 79. The Training Division, when judged on its own work now (especially its needs assessment), has achieved Substantial Compliance with Par. 79. During the second quarter, the City hired an outside entity to perform the work required in Par. 189 and COCL will evaluate that process separately.

As PPB begins to identify the training implications for these internal and external assessments of crowd management, the COCL continues to encourage PPB to give particular attention to developing and strengthening specific skills through role playing scenarios and feedback debriefings. PPB has responded by initiating a deeper dive into procedural justice skills.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

*Training Content and Delivery: Par. 84*

During the second quarter of 2022 the COCL was able to observe and evaluate one major training – the two-week Sergeants Academy for new sergeants. In addition, our report provides an overview of the online training delivered by the PPB during the second quarter. The PPB did not return to Substantial Compliance during the second quarter for Par. 84 because they have yet to provide crowd control training that: (1) incorporates changes to polices related to use of force and crowd control, (2) incorporates both internal and external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills. The policy review process was still underway at the end of the second quarter.

Overall, COCL was satisfied with the curriculum content for the Sergeants Academy training, as it covered a range of topics important for new supervisors. COCL's main concern with these classes was the over-reliance on "static," word-based PowerPoint slides. PPB's instruction could benefit from a Problem-Based Learning approach, where students are able to apply the knowledge and policy to real world situations via classroom scenarios and exercises.

Also, we continue to emphasize the need for evidence-based training in areas such as de-escalation and procedural justice where research has identified effective training methods. Our hope is that future evidence-based training can draw upon local data from body-worn camera footage and contact surveys to clearly illustrate to officers where specific improvements in performance are needed when interacting with the public.

*Online Training*. During the second quarter, the PPB continued to provide a range of online classes and educational material using their Learning Management System (LMS). The PPB's Equity and Inclusion Office (EIO) continued to offer Equity training through the Learning Management System (LMS). COCL reviewed the PPB's equity training, which continued the series on interacting with members of the LGBTQIA2S+/ Queer community. The EIO released the final two videos in this series, which received positive reviews from COCL. We encourage PPB to continue down the path of exploring more sophisticated videos and working collaboratively with in-person instructors to ensure that virtual and in-class instruction are linked in a complementary fashion.

*Crowd Management and Specialty Unit Training*. In terms of crowd management, the City and PPB have sought to provide additional training over the past year in response to criticism from both COCL and DOJ, as well as a lawsuit where such training is required as a remedy. The emphasis has been on providing legal updates around the use of force. A comprehensive approach to crowd management has yet to be implemented and will require that PPB incorporate findings from internal and external needs assessments.

5

**Exhibit A**

The external assessment of crowd control -- which should have clear implications for training -- started in the second quarter. The City was able to hire a company to perform this work, but the assessment will not be completed in 2022. However, PPB plans to conduct some crowd control training with all PPB members beginning in January of 2023. Also, the Sergeants Academy this quarter included some training on the use of the Mobile Field Force (MFF) from a supervisor's perspective, and PPB plans to use MFF for crowd management. In-service training will be needed for all officers when PPB's force directives have been finalized and PPB has decided how best to manage demonstrations. Until these changes have been made, the PPB will remain in Partial Compliance for Pars. 78 and 84.

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

Paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system, within which PPB and the City are partners and not necessarily drivers of the system. In the second quarter of 2022, the PPB and the City remained in Substantial Compliance for all paragraphs in Section V. The City and PPB both continued to participate in the broader community-based mental health service response system through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

During the second quarter, BOEC maintained Portland Street Response (PSR) dispatch protocols and training for telecommunicators, both of which were previously reviewed by the BHUAC. The PSR program started in 2021 and serves as a non-law enforcement response to certain mental health and behavioral health crises. The PSR program has expanded beyond the pilot phase and is now operating city-wide though we found there are some potential limitations in the programs ability to respond to all calls that fit their dispatch criteria (Par. 90). While training during the initial stages of the PSR program has been adequate, a PSU evaluation recommended that BOEC and PPB adopt a formal training program for PSR that builds upon the information they have collected during the pilot program. In response, the PPB has provided evidence that such training will occur in the third quarter of 2022. As PSR expands citywide, it is important that PPB and the City continue to advertise and promote this option.

Also, as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity

6

**Exhibit A**

Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Furthermore, PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crises. Additionally, PPB continues to participate in the Transportation Workgroup.

## VI. CRISIS INTERVENTION

As we have done in the past, we evaluated PPB and the City's system of mental health response in two ways: (1) Primary Response, including Enhanced Crisis Intervention Team (ECIT) officers and Portland Street Response; and (2) Secondary Response, including Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT). We also evaluated the steps taken once a call involving a person in mental health crisis is received by the Bureau of Emergency Communication (BOEC). We then assess PPB's response to such calls when received. Finally, we examined what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. During the first quarter of 2022, the PPB and the City fell out of compliance with Section VI as a result of lapses with paragraphs related to the BHUAC(see Par. 95, Par. 96, Par. 98). In the second quarter, these issues persisted in part though meaningful steps were taken towards remedying other concerns.

During this quarter, BOEC maintained their policies and training for telecommunicators on dispatching officers to calls involving a mental health component. They continued to use seven call characteristics to determine whether a specialized ECIT officer should be dispatched. However, there remains a need to adopt official policies and training for PSR. Although BOEC did not make progress on this in first quarter of 2022, they worked with PSR on SOPs in the second quarter and presented them to the BHUAC in the third quarter of 2022. Our third quarter report will provide more details about this update.

For their part, the PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). PPB also continued to provide training to new officers as well as current officers through annual In-service training. Additionally, PPB maintained their specialized response approach through the use of ECIT officers.

The PPB has maintained the use of the BHRT to assist individuals who represent an escalating risk of harm. While the Settlement Agreement only requires three teams for each precinct, PPB

7

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

had made plans to return to five BHRTs over time. In fact, PPB reinstated a fourth BHRT and started conducting interviews for a fifth BHRT in the second quarter. The PPB has also maintained the Service Coordination Team (SCT) to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. For both of these programs, we provide ongoing operational statistics, including statistics related to decision-making and outcomes. Additionally, included in our report is an outcome assessment looking at data on BHRT outcomes over the past two years. We provide descriptive statistics on individuals who are referred and accepted to the caseload. Outcome analysis confirms that there is a significant reduction in arrests/custodies after BHRT intervention.

Finally, the BHUAC continued to meet during the second quarter of 2022, utilizing the expertise of individuals at PPB, BOEC, the City, the Mental Health Association of Oregon, Cascadia Behavioral Health, Multnomah County Sheriff's Office, the Oregon Health Authority, Multnomah County Health and Addiction Services, the Multnomah County Office of Consumer Engagement, Disability Rights Oregon, the Public Defender's Office, CareOregon, AMR, Central City Concern, and the Unity Center for Behavioral Health. During the quarter, the advisory committee discussed topics related to the Sergeants Academy ECIT training, ECIT in-service training, and hiring clinicians for the BHRT. However, we continued to find concerns with the operation of the committee as one meeting was largely unproductive and another meeting did not have a quorum, issues that we have commented on in prior report as well. Although we report on progress in terms of responding to COCL's prior TA Statement, these operational limitations will still need to be resolved.

## VII. EMPLOYEE INFORMATION SYSTEM

For the second quarter of 2022, the PPB remained in Substantial Compliance with a portion of Section VII (Pars. 118 – 120), as the current Employee Information System (EIS) thresholds to identify potentially problematic trends meet the requirements of the Settlement Agreement. However, the PPB continues to achieve only Partial Compliance for Pars. 116 and 117 due to the process by which officers with outlying use of force statistics are identified and documented in EIS. Instead of proactively identifying "at-risk employees, supervisors [or] teams," the Force Inspector continues to only forward force application reports to RU Managers for review. Consequently, there was a lack of documentation of the decision-making process in EIS. For the second quarter of 2022, the Force Inspector did request feedback from the RU Managers about

**Exhibit A**

outlying officers, but the responses were minimal and not responsive to the COCL's broader concerns.

We also maintain our position from prior reports that PPB should seek to ensure that the EIS is "more effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116). Initial discussion of a possible EIS evaluation occurred in the first and second quarter, but further progress has been limited. The COCL has previously provided the PPB and the DOJ with a draft methodology and data analysis plan and we are awaiting further discussion with PPB. We will continue to provide updates of this process in our future reports.

## VIII. OFFICER ACCOUNTABILITY

During the second quarter of 2022, PPB did not return to Substantial Compliance with Section VIII. We note several paragraphs within this Section where PPB and the City have maintained Substantial Compliance, including paragraphs related to Officer-Involved Shooting (OIS) investigation procedures, Independent Police Review (IPR) documentation/notification requirements, and Citizen Review Committee (CRC) operations. Furthermore, the City and the Police Review Board (PPB) maintained Substantial Compliance for all paragraphs related to timely investigations. Additionally, given two quarters of PRB meetings which we found to conform to the letter and intent of Par. 131, we find PPB has returned to Substantial Compliance with that paragraph.

However, for other paragraphs, we find persistent issues that continue to prevent the City from gaining Substantial Compliance (Pars. 126, 128, 129, 169). For instance, while we have found that the IPR's concerns with future attrition have been largely ameliorated, there remains an issue with a Records Division backlog of 45,000 - 50,000 documents. We note that PPB is currently taking steps to resolve this backlog though we will need to see evidence that it being reduced before we can find Substantial Compliance again. Additionally, we continue to find that while some administrative closures of excessive force might be reasonable, they remain a technical violation of the Settlement Agreement (Par. 129). We have also found PPB to no longer be in Substantial Compliance with the requirements of Par. 126. This is due to prior guidance from the COCL team that policy and protocol changes would be necessary to allow for situations where an officer is mentally incapacitated after an OIS event. As it has been nine months since we provided that guidance and no changes to policy have occurred, we now find PPB to be in Partial Compliance. Finally, we include an assessment of Par. 169 in this report,

9

**Exhibit A**

finding Partial Compliance based on our review of a sample of force events as well as other instances where there was a failure to initiate accountability processes.

## IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

In the second quarter of 2022, PCCEP began to function as a legitimate body for community engagement again, despite facing numerous challenges over the past several quarters, including the loss of all staff members and low membership. However, the City's level of support for PCCEP was insufficient to return to Substantial Compliance. We do expect improvement in the third quarter, as the City has taken steps to hire an administrative assistant and analyst who are scheduled to begin work in July of 2022. Nevertheless, we remind the City that at the close of the second quarter, they have not formally responded to three recommendations made by PCCEP in the third quarter of 2021, nor have the minutes from most PCCEP meetings in 2022 been posted.

COCL is satisfied that the PPB has continued to engage the community through a wide range of formal and informal advisory groups as well as through public events. However, racial disparities in traffic stops and consent searches remain a problem that requires further action.

Both PPB and PCCEP have sought to achieve a greater public presence on the internet as they engage Portland's diverse communities, but both have been stifled by the City's new website. Hopefully, the technical support for public safety programs on the City's website can be given a higher priority in the future. Hence, the City remains in Partial Compliance for Paragraphs 142, 143 and 144.

The PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions (Par. 148), although to remain in compliance with Par.148, the PPB will need to introduce a revised directive on police stops and consent searches (focused on the distribution of consent search cards and recording of such behavior as required by state law), as well as training on these changes. We have learned that the directive will be completed in the third quarter and with additional training, PPB will be able to adequately address "community concerns regarding discriminatory policing." (Par. 148). Again, we encourage the PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns.

Finally, to truly engage the broader Portland community (beyond advisory groups) and give voice to the thousands of residents who have lived experience interacting with the PPB officers,

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

we continue to encourage the City to introduce and institutionalize a contact survey to measure the level of procedural justice and public satisfaction with police services. Local researchers could be helpful to develop and manage this type of community engagement program, with technical assistance from COCL. This could provide the foundation for tangible efforts to improve police legitimacy and public trust.


## XI. ADDITIONAL REMEDIES

The parties have reached agreement on a set of remedies to achieve full compliance with the terms of the Settlement Agreement.[1] Consequently, they have agreed to add a new section to the Settlement Agreement - Section XI - that contains eight new Paragraphs (188 to 195). In February of 2022, the Portland City Council voted unanimously to amend the Settlement Agreement to include the new remedies. The Federal court Fairness Hearing on this amendment was held in April of 2022, at which time the federal Judge approved the amendment.

Because the final approval of this amendment occurred in the second quarter of 2022, COCL will now provide, for the first time, a compliance assessment for the remedies found in Paragraphs 188 to 195. At this point, we are primarily documenting the activities undertaken to lay the groundwork for these remedies. The City and community leaders have made noticeable progress on some key remedies, including Body-worn Cameras (Par. 194) and the Community Police Oversight Board (Par. 195), although full implementation is far down the road. Other remedies have been slow to get started (e.g., the Critical Assessment of Crowd Control, Par. 189), and one got off to a bad start and needed to reboot (I.e., Civilian Dean of Training, Par. 191). In this report COCL will provide a summary of progress on these new remedies.

---

[1] These meetings included the Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

**Exhibit A**

The introduction of these remedies has allowed COCL to re-consider our compliance assessments for other paragraphs. For example, COCL had linked compliance for some paragraphs in the original Settlement Agreement with compliance ratings on new remedies (e.g. the training needs assessment in Par. 79 linked to the independent crowd management assessment in Par. 189). We have decided that some of these original paragraphs should be treated separately. The result is that PPB is given credit for progress on some paragraphs without consideration of the new remedies. Remember, the new remedies were negotiated as a pathway to achieve complete compliance with the Settlement Agreement. Even though COCL has upgraded the compliance assessment for a couple of paragraphs in the original agreement, the City is still responsible for achieving Substantial Compliance with the terms of the new remedies.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# REPORT CARD

This report includes a "Report Card" that provides a separate assessment of each paragraph in the Agreement. This format gives the City clarity about what is needed to achieve Substantial Compliance. All paragraphs are reviewed and evaluated using the following standards:

- **Substantial Compliance**: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- **Partial Compliance**: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- **Non-Compliance but Initial Steps Taken**: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

In the second quarter of 2022, the Portland Police Bureau (PPB) and the City of Portland remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. However, they were found to be in Partial Compliance for the following paragraphs regarding Use of Force (Pars. 66, 67, 69, 70, 73, 74, 75, 76, 77), Training (Pars. 78, 84), Crisis Intervention (Pars. 95, 96, 98), Employee Information System (Pars. 116, 117), Officer Accountability (Pars. 126, 128, 129, 134, 169), Community Engagement (Pars. 142, 143, 144). Compared to the first quarter of 2022, the second quarter of 2022 includes a change to Partial Compliance Assessment for Pars. 126 and 134 (Accountability) and a change to Substantial Compliance for Par. 97 (Crisis Intervention) and Par. 131 (Accountability).

This is the first time that COCL has assessed compliance with the new Section XI, "Additional Remedies." Here we found that the City was in Substantial Compliance with one paragraph (Par. 190) and Partial Compliance with seven paragraphs (Pars. 188, 189, 191, 192, 193, 194, 195).

The table below summarizes the compliance status and recommendations for all paragraphs reviewed by the COCL.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **III. USE OF FORCE** | | |
| Par. 66 | Partial Compliance | • To achieve Substantial Compliance, review case and take remedial action<br>• Reassess officer characterizations of de-escalation |
| Par. 67 | Partial Compliance | • To achieve Substantial Compliance, review case and take remedial action<br>• Reassess officer characterizations of de-escalation |
| Par. 68 | Substantial Compliance | • Discuss event with COCL team members |
| Par. 69 | Partial Compliance | • To achieve Substantial Compliance, review case and take remedial action |
| Par. 70 | Partial Compliance | • To achieve Substantial Compliance, review case and take remedial action<br>• Create EIS entries for supervisors who did not adequately assess AARs |
| Par. 71 | Substantial Compliance | • Continue monitoring and reporting ratio of officers to sergeants |
| Par. 72 | Substantial Compliance | • Continue regular reviews of AAR form |
| Par. 73 | Partial Compliance | • To achieve Substantial Compliance, ensure that chain-of-command supervisors are held accountable for inadequate reports and analysis |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 74 | Partial Compliance | • To achieve Substantial Compliance for Par. 74, 75, and 77, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>• To achieve Substantial Compliance for Par. 74, 75, and 77, ensure completed process for each issue identified by the Force Inspector<br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 75 | Partial Compliance | • To achieve Substantial Compliance for Par. 74, 75, and 77, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>• To achieve Substantial Compliance for Par. 74, 75, and 77, ensure completed process for each issue identified by the Force Inspector<br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 76 | Partial Compliance | • To achieve Substantial Compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • To achieve Substantial Compliance, enhance follow-up processes<br>• To achieve Substantial Compliance, resume the practice of the Force Inspector identifying potentially problematic officers |
| Par. 77 | Partial Compliance | • To achieve Substantial Compliance for Par. 74, 75, and 77, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>• To achieve Substantial Compliance for Par. 74, 75, and 77, ensure completed process for each issue identified by the Force Inspector<br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| **IV. TRAINING** | | |
| Par. 78 | Partial Compliance | • To achieve Substantial Compliance, PPB must substantially comply with all paragraphs within Section IV |
| Par. 79 | Substantial Compliance | • If PPB decides to deploy any specialty units for demonstrations, they should update their training plan to reflect that decision<br>• Include training with robust scenarios and feedback loops to strengthen interpersonal communication skills |
| Par. 80 | Substantial Compliance | • Return all Training Analysts to their original job requirements within the Training Division |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | to ensure the best needs assessment, training plan, and knowledge about training's effectiveness <br>• Expand your work with local university researchers to conduct more scientific evaluations of on-the-job outcomes, with RCT designs, including contact surveys to measure the impact of training on police-community interactions and procedural justice |
| Par. 81 | Substantial Compliance | • Establish a system of review to ensure that LMS captures all external trainings and trainings of specialty units <br>• Provide a periodic analysis of non-compliance rates for training completion and actions taken by the PPB when officers do not complete the required trainings on time <br>• Ensure that the few individuals with multiple unexcused absences from training are coached or disciplined appropriately |
| Par. 82 | Substantial Compliance | • Ensure that the semi-annual training report includes all specialty unit trainings |
| Par. 83 | Substantial Compliance | • No recommendations at this time |
| Par. 84 | Partial Compliance | • To achieve Substantial Compliance, Crowd Control and Management training should be updated based on the PPB's Needs Assessment on mass demonstrations <br>• To achieve Substantial Compliance, develop and deliver training with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | (Par. 84) including crowd control settings. This should include opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest.<br>• To achieve Substantial Compliance, incorporate recent changes to the PPB's force-related Directives into training (910.00, 1010.00, and 1015.00)<br>• To achieve Substantial Compliance, strengthen the PPB's system to review and approve all specialty unit trainings to avoid inappropriate or harmful training and regain public trust. Enforce Directive 1500.00 and S.O.P. #1-21. This should include a complete investigation of RRT training in 2018.<br>• Continue to support the development of sophisticated online training that allows for interactivity and is linked to subsequent in-person skills development<br>• Provide refresher training on first amendment rights and bias-free policing that can address any PPB bias against peaceful protestors |
| Par. 85 | Substantial Compliance | • To remain in Substantial Compliance, the PPB should produce a Training Division Audit report by the end of the fourth quarter of 2022<br>• We recommend that the audit evaluate record keeping on specialty classes and outside trainings<br>• We recommend that the audit give attention to the delivery of in-service training for |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | officers and supervisors, with particular attention to equity classes |
| Par. 86 | Substantial Compliance | • The Force Inspector should work with the TAC to find a better way to deliver the use of force presentations, including the coverage of inequities. |
| Par. 87 | Substantial Compliance | • No recommendations at this time |
| **V. COMMUNITY-BASED MENTAL HEALTH SERVICES** | | |
| Par. 88 | Substantial Compliance | • No recommendations at this time |
| Par. 89 | Substantial Compliance | • No recommendations at this time |
| Par. 90 | Substantial Compliance | • No recommendations at this time |
| **VI. CRISIS INTERVENTION** | | |
| Par. 91 | Substantial Compliance | • Continue to update the COCL and the DOJ on changes to personnel when applicable |
| Par. 92 | Substantial Compliance | • The BHU should work in closer coordination with the Force Inspector when force trends relate to persons in mental health crisis<br>• Continue to collect and review data on mental health services, and use this information to update services as needed |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 93 | Substantial Compliance | • The BHU should work in closer coordination with the Force Inspector when force trends relate to persons in mental health crisis<br>• Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 94 | Substantial Compliance | • Continue to encourage regular attendance<br>• Continue discussions around bringing in new members |
| Par. 95 | Partial Compliance | • To return to Substantial Compliance, resolve the issues surrounding quorum and meeting efficiency.<br>• To return to Substantial Compliance, continue to engage the COCL and the DOJ in conversation regarding the content of the COCL's TA Statement |
| Par. 96 | Partial Compliance | • To return to Substantial Compliance, resolve the issues surrounding quorum and meeting efficiency.<br>• To return to Substantial Compliance, continue to engage the COCL and the DOJ in conversation regarding the content of the COCL's TA Statement |
| Par. 97 | Substantial Compliance | • No recommendations at this time |
| Par. 98 | Partial Compliance | • To return to Substantial Compliance with Par. 98, allow BHUAC to review the training before the next In-service training |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|-----------|------------------|----------------------|
| Par. 99 | Substantial Compliance | • No recommendations at this time |
| Par. 100 | Substantial Compliance | • Continue utilizing existing data to assess demand for ECIT services |
| Par. 101 | Substantial Compliance | • Re-engage the BHUAC regarding ECIT participation criteria |
| Par. 102 | Substantial Compliance | • Continue to seek out recommendations from the BHUAC on ECIT training |
| Par. 103 | Substantial Compliance | • No recommendations at this time |
| Par. 104 | Substantial Compliance | • Continue to highlight all aspects of BHU's work |
| Par. 105 | Substantial Compliance | • No recommendations at this time |
| Par. 106 | Substantial Compliance | • No recommendations at this time |
| Par. 107 | Substantial Compliance | • No recommendations at this time |
| Par. 108 | Substantial Compliance | • No recommendations at this time |
| Par. 109 | Substantial Compliance | • No recommendations at this time |
| Par. 110 | Substantial Compliance | • Continue to collect data and create reports on mental health services |
| Par. 111 | Substantial Compliance | • No recommendations at this time |
| Par. 112 | Substantial Compliance | • No recommendations at this time |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 113 | Substantial Compliance | • Create BOEC PSR policy |
| Par. 114 | Substantial Compliance | • Develop focused training for PSR |
| Par. 115 | Substantial Compliance | • Consider current PSR issues and their implications for policy and training |
| | **VII. EMPLOYEE INFORMATION SYSTEM** | |
| Par. 116 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br>• To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur<br>• Continue contributing to the development of the EIS evaluation |
| Par. 117 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br>• To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur<br>• Continue contributing to the development of the EIS evaluation |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 118 | Substantial Compliance | • No recommendations at this time |
| Par. 119 | Substantial Compliance | • No recommendations at this time |
| Par. 120 | Substantial Compliance | • No recommendations at this time |
| **VIII. OFFICER ACCOUNTABILITY** | | |
| Par. 121 | Substantial Compliance | • Continue ensuring cases are closed within 180 days |
| Par. 122 | Substantial Compliance | • No recommendations at this time |
| Par. 123 | Substantial Compliance | • Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| Par. 124 | Substantial Compliance | • No recommendations at this time |
| Par. 125 | Substantial Compliance | • No recommendations at this time |
| Par. 126 | Partial Compliance | • To achieve Substantial Compliance, revise Directive 1010.10 to allow for the potential for witness officers being incapacitated for mental health reasons<br>• Provide criteria for detectives to make such a determination |
| Par. 127 | Substantial Compliance | • No recommendations at this time |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 128 | Partial Compliance | • To achieve Substantial Compliance, the PPB should resolve the records backlog in the Records Division |
| Par. 129 | Partial Compliance | • To return to Substantial Compliance, re-emphasize the responsibilities of on-scene supervisors and provide documentation of efforts to COCL<br>• Consider requesting an amendment to Settlement Agreement allowing for potential additional revisions to IPR's SOP regarding Par. 129 |
| Par. 130 | Substantial Compliance | • Complete an investigation of the allegation of retaliation |
| Par. 131 | Substantial Compliance | • No recommendations at this time |
| Par. 132 | Substantial Compliance | • No recommendations at this time |
| Par. 133 | Substantial Compliance | • No recommendations at this time |
| Par. 134 | Partial Compliance | • To return to Substantial Compliance, resolve staffing issues through the Community Safety Division<br>• To return to Substantial Compliance, evaluate functional concerns and resolve them |
| Par. 135 | Substantial Compliance | • No recommendations at this time |
| Par. 136 | Substantial Compliance | • No recommendations at this time |
| Par. 137 | Substantial Compliance | • No recommendations at this time |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 138 | Substantial Compliance | • Discuss with COCL the City's plan to ensure complainants can easily track cases online |
| Par. 139 | Substantial Compliance | • Discuss with COCL the City's plan to ensure complainants can easily track cases online |
| Par. 140 | Substantial Compliance | • Discuss with COCL the City's plan to ensure complainants can easily track cases online |
| Par. 169 | Partial Compliance | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found |
| **IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING** | | |
| Par. 141 | Substantial Compliance | • No recommendations at this time |
| Par. 142 | Partial Compliance | • To achieve Substantial Compliance with Par. 142, the City should respond to PCCEP's 2021 third quarter recommendations |
| Par. 143 | Partial Compliance | • To achieve Substantial Compliance with Par. 143, the City should:<br>  ○ Create a work plan, as promised, that outlines a strategy and timeline to identify and recruit sufficient PCCEP members to maintain a full body<br>  ○ Restore the PCCEP to near-full membership and ensure that it |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | represents a "reasonably broad spectrum of the community" |
| Par. 144 | Partial Compliance | • To achieve Substantial Compliance, provide adequate staffing dedicated to supporting PCCEP<br>• To achieve Substantial Compliance, post minutes of the PCCEP meetings within 10 business days after a PCCEP meeting, in accordance with the Amended PCCEP Plan |
| Par. 145 | Substantial Compliance | • Seek to improve access to police and City services for individuals with Limited English Proficiency (LEP) through updated policy, training, and dedicated personnel. Make LEP training a priority<br>• PPB should hire a dedicated, full-time LEP manager to oversee the implementation of LEP services and respond to emerging issues and concerns<br>• Encourage officers to use the Community Engagement App to document all community events and identify community members who might be overlooked with the current set of events<br>• Invest in a one-stop website where community and PPB members can learn about various advisory groups and community engagement events<br>• Continue to invest in community-driven equity training for all officers<br>• Continue to invest in new versions of the Community Police Academy to institutionalize |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | community engagement and serve as a model for other agencies |
| Par. 146 | Substantial Compliance | • Seek to improve access to police and City services for individuals with Limited English Proficiency (LEP) through updated policy, training, and dedicated personnel. Make LEP training a priority<br>• PPB should hire a dedicated, full-time LEP manager to oversee the implementation of LEP services and respond to emerging issues and concerns<br>• Incentivize officers to use the Community Engagement App to document all community events and identify community members who are being missed with the current set of events<br>• Invest in a one-stop website where community and PPB members can learn about various advisory groups and community engagement events<br>• Continue to invest in community-driven equity training for all officers<br>• Continue to invest in new versions of the Community Police Academy to institutionalize community engagement and serve as a model for other agencies |
| Par. 147 | Substantial Compliance | • Provide refresher training on bias-free, impartial policing<br>• Continue the dialogue with community members around racial disparities in traffic stops and searches |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 148 | Substantial Compliance | • To remain in Substantial Compliance for Par. 148, the PPB will need to do the following:<br>  ○ Revise Directive 650.00 ("Search, Seizures, and Inventories") to incorporate the revised protocol on stops and consent searches (completed in Q3)<br>  ○ Develop and implement training on Directive 650.00<br>  ○ Distribute the consent search cards to those stopped<br>  ○ Show that records are being kept consistent with the new Oregon law to improve the measurement of discriminatory policing<br>• We recommend that PPB revise directive 860.10 ("Traffic Citations and Arrests") to ensure discretionary stops for minor vehicle violations (e.g., one taillight out) are limited and do not reflect bias<br>• We recommend that PPB provide refresher training on bias-free, impartial policing<br>• Continue the dialogue with community members around racial disparities in traffic stops and searches |
| Par. 149 | Substantial Compliance | • As part of everyday policing, introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with special populations |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • Implement anonymous internal surveys of the PPB employees to measure police-community interactions, internal procedural justice, wellness, police culture, and employee satisfaction<br>• Acquire and use software to analyze body worn camera data<br>• As a learning organization, introduce programs, polices, and training curricula that are responsive to these new databases |
| Par. 150 | Substantial Compliance | • No recommendations at this time |
| Par. 151 | Substantial Compliance | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training. |
| Par. 152 | Substantial Compliance | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training. |
| **XI. ADDITIONAL REMEDIES** | | |
| Par. 188 | Partial Compliance | • To achieve Substantial Compliance, ensure Office365 is fully launched and implemented. |
| Par. 189 | Partial Compliance | ∉ To achieve Substantial Compliance, the outside entity must collect and analyze data consistent with the Scope of Work, and |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | prepare a report that critically assesses the City's response to the 2020 demonstrations<br>∉ To achieve Substantial Compliance, the City must use this report to prepare a training needs assessment<br>∉ To achieve Substantial Compliance, the outside entity must prepare a follow-up report that reviews the City's response to their original report, including the City's training needs assessment<br>∉ Keep COCL informed of the work planned and completed by the outside entity<br>∉ Provide COCL with the outside entity's reports and the City's training needs assessment |
| Par. 190 | Substantial Compliance | • To remain in Substantial Compliance, the City must continue to provide a separate line time for PPB training-related overtime expenses. |
| Par. 191 | Partial Compliance | • To achieve Substantial Compliance, as the City and PPB prepare to reinitiate the hiring process, they should build in more opportunities for community involvement in the process<br>• To achieve Substantial Compliance, the City and PPB should look for individuals who understand policing but also understand best practices in teaching and evaluation. |
| Par. 192 | Partial Compliance | • To achieve Substantial Compliance, complete a thorough and accurate investigation of the command personnel associated with the 2020 crowd control |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | • To achieve Substantial Compliance, hold accountable the investigated command personnel members who were found to have violated PPB policies (including this Agreement) as described in Par. 192. |
| Par. 193 | Partial Compliance | • To achieve substantial compliance, hold the required precinct meetings to discuss PPB's 2021 Annual Report no later than September 20, 2022. |
| Par. 194 | Partial Compliance | ∉ To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement" (Par. 194). This means that (1) once bargaining has been completed and (2) the BWC policy has been finalized, the City will need to (3) introduce adequate training, and (4) complete a successful pilot test, followed by (5) full-scale implementation of BWCs for PPB officers<br>∉ During the bargaining process, we encourage the City to incorporate the recommendations from the community, the COCL and the DOJ<br>∉ The PPB should seek to acquire software for analyzing BWC data and identifying patterns in police-community interactions that can be used for training and coaching.<br>∉ The PPB should inquire about Axon's MY90 contact survey or other survey software and determine whether it can be linked to the BWC program |

31

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|-----------|-----------------|---------------------|
| Par. 195 | Partial Compliance | ∉ To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a Community Police Oversight Board (CPOB) as defined in Par. 195 and compliant with collective bargaining obligations<br>∉ To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases. |

32

# III. USE OF FORCE

**A. Use of Force Policy**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. <u>COCL Summary</u>: Paragraph 67 establishes that the PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the individual, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| **Compliance Label** | Par. 66 Partial Compliance |
|---|---|
| | Par. 67 Partial Compliance |
| **Methodology** | Review force case sample |

| | |
|---|---|
| **Compliance Assessment** | |

As part of our regular review of PPB force events, we evaluated 20 cases which represent a cross-section of PPB's use of force, including force from different Categories, from different Precincts, involving the use of a CEW, against persons in mental health crisis, and protest force events. Overall, we found that most applications of force by PPB officers followed the core

principles that should guide force decisions. However, we found one case where the applications of force did not demonstrate sufficient force avoidance skills. Additionally, within this case, there appeared to be the opportunity for de-escalation of force that was not taken advantage of and applications of force that were not thoroughly reviewed. For instance, one officer in this case controlled the subject's head with their knee and, rather than evaluate the force used on this sensitive target area, the reviewing sergeant appeared only to justify it. In another example within that same case, an officer appeared to have an opportunity to open the subject's car door in order to get them into custody, though did not do so, thereby prolonging the force event. These issues (and others) were not identified in the chain-of-command review, which we discuss more in our assessment of Pars. 70 and 73.

As with prior quarters, we also continue to have concerns on how the term "de-escalation" is used by PPB members. For instance, in the case described above, the use of spike strips and the tactical positioning of a patrol car to box in the subject were considered de-escalation tactics, despite the fact that the officer stated the reason for the actions were to prevent the subject's escape. As such, we reiterate our position that PPB should reassess the ways in which officers have been using the term "de-escalation" and take corrective action as needed. Should we continue to see the term loosely used repeatedly, re-training throughout the entire organization may become a necessary component of ongoing compliance.

| **COCL Recommendations** | • To achieve Substantial Compliance, review case and take remedial action<br>• Reassess officer characterizations of de-escalation |
|---|---|
| **Assessment Based On** | • COCL review of force sample |

### 1. Electronic Control Weapons

| **Settlement Agreement Paragraph** |
|---|
| 68. COCL Summary: The PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; |

officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review force case sample |

**Compliance Assessment**

Based on our review of PPB force events, we find that PPB officers continue to use CEWs in accordance with the Settlement Agreement (Par. 68). For this quarter, we reviewed a total of two force events involving an officer's use of a CEW. In one event, there were a total of five applications of CEW though we found each to be reasonable under the totality of the circumstance. Although we found each application to be reasonable, we also suggest PPB review this event to determine what other options might have been available to potentially avoid a higher number of CEW applications. For instance, the event involved a person armed with both a knife and a needle who presented a threat of serious bodily harm to themselves. and, during at least one CEW cycle, there appeared to be the opportunity to disarm the subject, thereby reducing the need for additional cycles. However, while we look forward to discussing this event with PPB to provide more fulsome technical assistance, we do not believe our concern reflects a violation of the Settlement Agreement. As such, we continue to find PPB to be in Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • Discuss event with COCL team members |
|---|---|
| Assessment Based On | • COCL review of CEW cases |

## 2. Use of Force Reporting Policy and Use of Force Report

### Settlement Agreement Paragraph

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors; (c) In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for the purposes of paragraphs 70, and 72-77 of this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review force case sample |

### Compliance Assessment

As noted in our assessment of Pars. 66 and 67, our review of 20 PPB force events, found only a single use of force where the FDCRs and AAR would be considered below standards. For all other use of force events, we found reports to be comprehensive and, where minor deficiencies were present, they were regularly identified and resolved by the chain of command. As noted above though, where repeated inconsistencies are found in use of force reporting (e.g., inconsistency in the use of the term "de-escalation"), it is incumbent upon PPB to recognize those issues and engage in corrective action through remedial training. We look forward to discussing this further with PPB in the context of the specific cases we reviewed. This will also help to improve the reliability and validity of PPB data to ensure that all officers have a common understanding of the data collection points.

| COCL Recommendations | • To achieve Substantial Compliance, review case and take remedial action |
|---|---|

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| **Assessment Based On** | • COCL review of force cases |
|---|---|

### 3. Use of Force Supervisory Investigations and Reports

**Settlement Agreement Paragraph**

70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement).

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review of force cases |

**Compliance Assessment**

As noted above, as part of our regular review of PPB force events, we evaluated 20 cases which represent a cross-section of PPB use of force. Overall, we find that the After-Action Reviews (AARs) we evaluated for this quarter were consistent with the letter and intent of Par. 70. Specifically, we remain impressed with the supervisors' attention to detail and correcting report-writing deficiencies in a timely manner.

However, some AARs were less comprehensive. For instance, in the case described above in prior paragraphs, the Acting Lt. appeared focused on a generalized justification for actions taken, the crime problem in general and other generalizations rather than a focus on the incident, tactics, policy and risk analysis. Furthermore, as discussed in our review of Pars. 74,

75, and 77 (below), the Force Inspector identified that one case was inappropriately reviewed as a Category III event rather than the correct review level of Category II. Given that these issues occurred in a relatively small number of cases, they don't appear to represent a larger trend. However, this conclusion does not remove PPB's responsibility to correct the behavior and we therefore recommend PPB take corrective action as necessary upon re-reviewing these events.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, review cases and take remedial action<br>• Create EIS entries for supervisors who did not adequately assess AARs |
| **Assessment Based On** | • COCL review of force cases |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review rate of officers to supervisors |
| **Compliance Assessment** | |

The PPB has maintained an adequate patrol-supervision staffing level in accordance with Par. 71. As noted in prior reports, the rate of officers to sergeants is a better metric than the raw number of sergeants. In the second quarter of 2022, the PPB reported a staffing ratio of 5.9 officers for every sergeant (including Acting Sergeants) across the three precincts. The PPB

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

currently is operating ten sergeants under their authorized amount (62 sergeants for 72 authorized positions). However, as shown in Figure 3-1, we see the highest ratio of officers to sergeants when compared to recent years. While we still maintain that the ratios are reasonable across all three precincts (and therefore continue to find Substantial Compliance with this paragraph), PPB should continue to monitor these ratios to ensure they don't become so high that sergeants are unable to manage the number of officers under their supervision.



| COCL Recommendations | • Continue monitoring and reporting ratio of officers to sergeants |
|---|---|
| Assessment Based On | • COCL review of ratio of officers to sergeants |

---

**Settlement Agreement Paragraph**

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

**Exhibit A**

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review current AAR form; Review upcoming web form |

**Compliance Assessment**

Presently, the After-Action Report (AAR) form contains the checklist and therefore we find the PPB has remained in Substantial Compliance with the requirements of Par. 72. Although we assess PPB's use of the AAR form as the "investigation checklist" to be in compliance with this paragraph, we refer the reader to our assessment of Par. 70 for commentary on the adequacy of the investigations themselves.

After piloting the new SharePoint web-based AAR form at the Central Precinct, the form is scheduled to go live Bureau-wide in the third quarter of 2022. In addition to updating the form, the Force Inspector and Audit Team worked with the Training Division to update training materials and initiated training for the Bureau-wide implementation of the new system. In the third quarter, the COCL reviewed and provided comments on the Supervisor In-service training materials, including the web-based AAR form. We continue to look forward to seeing if and how the new form improves the AAR process after being utilized Bureau wide. Additionally, while we wait for the findings of the Critical Incident Assessment, we note that the current changes should address several of the issues we have raised in the past and will help the PPB achieve Substantial Compliance with Par. 188.

| COCL Recommendations | • Continue regular reviews of AAR form |
|---|---|
| Assessment Based On | • COCL review of AAR form |

**Exhibit A**

**Settlement Agreement Paragraph**

73. COCL Summary: Paragraph 73 directs the PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review force case sample |

**Compliance Assessment**

As noted earlier, we reviewed 20 cases which represent a cross-section of the PPB use of force, including force from different Categories, from different Precincts, involving the use of a CEW, against persons in mental health crisis, and protest force events. In general, we find that most AARs we reviewed for this quarter were consistent with the letter and intent of Par. 73, although our critiques discussed in prior paragraphs also apply to this paragraph. Specifically, the problems identified by COCL were not identified during the chain-of-command reviews and therefore "supervisors in the chain of command [were] not held accountable for inadequate reports and analysis through corrective action" (Par. 73c). This includes our prior discussion of the PPB needing to operationally define the difference between mistakes that can be addressed by supervisor counseling and those that require a more formal review, an issue we have previously discussed in the context of this paragraph as well.

| COCL Recommendations | • To achieve Substantial Compliance, ensure that chain-of-command supervisors are held accountable for inadequate reports and analysis |
|---|---|

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| | • To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| **Assessment Based On** | • COCL review of force cases<br>• Lack of clarity in conduct that requires formal review |

## B. Compliance Audits Related to Use of Force

<div style="border:1px solid">

### Settlement Agreement Paragraph

74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine

</div>

**Exhibit A**

whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement.)

| Compliance Label | Par. 74 Partial Compliance |
| --- | --- |
| | Par. 75 Partial Compliance |
| | Par. 77 Partial Compliance |
| Methodology | Review Quarterly Force Audit Report; Review Force Inspector Memos; Review Force Inspector Phase II Spreadsheet |

### Compliance Assessment

On a quarterly basis, PPB conducts the audits of force events required by Pars. 74, 75, and 77. Compared with the first quarter of 2022, officers' reporting accuracy increased across all

categories during the second quarter (mental health and injuries, force and resistance, de-escalation and decision point analysis, witness, and CEW). As with prior PPB reports, it was noted that, for Sergeants, EIS "continues to generate the second highest number of deficiencies" though given the overall 99.2% accuracy, this equated to only 8 deficiencies in this category. The highest number of deficiencies for Sergeants continues to be completion and reporting of corrective action, with 10 total deficiencies in this category. For Command level review, the categories with the largest deficiencies are completeness of AARs with 41 deficiencies and notification of misconduct with 36 deficiencies.

In addition to ensuring reporting compliance, the Force Inspector reviews force events to find broader issues related to policy, training, equipment, or personnel concerns. In the second quarter of 2022, we saw evidence that the Force Inspector was sending these issues to the appropriate personnel (i.e., RU Managers) using a standardized feedback form and all feedback forms were resolved with confirmation from the RU Manager that an entry was placed in EIS.

However, there remain some instances where issues were not forwarded on for training, policy review, or some other division. For instance, the Inspector's report to each RU Manager continued to find that "there is a need for attention to Command Review of reporting requirements and the necessary corrective action." We note that this same "need for attention" has been found in the supporting documents since the third quarter of 2021 (though at times with slightly different language). While PPB has indicated this problem is being addressed during the RU Manager reviews, such reviews still have not resolved the issue. Even though we have repeatedly stated in prior reports that this issue should also be forwarded to the Training Division, it does not appear PPB is willing to do so, as this is now the fourth quarter in a row this "need" has been identified but not properly addressed.

As another example of issues not being forwarded to the proper personnel, the Acting Captain in one Precinct noted that a "systemic issue" with the Records Division prevented CEW download reports for three force events from being available prior to the Inspector's review. In speaking with PPB on this statement, we were informed that the Records Division does not transcribe CEW download reports though is supposed to attach the reports to the AAR for the sergeant's review. However, the sergeant still has the obligation to send the download reports to the Inspector with the AAR. This is another example of the long-standing concern we have expressed regarding whether significant deficiencies should be referred for formal accountability reviews (e.g., supervisory investigations) or should be handled though informal counseling. We also found another case during this quarter which similarly raises this concern.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

In this case, the Inspector's audit demonstrated that a use of force was originally reviewed as a Category 3 despite it being a Category 2 use of force. This issue was not caught by any person in the chain –of command and, although EIS entries were created for the sergeant and lieutenant, no further action was taken. While the evidence shows it was quickly resolved once identified by the Inspector, the fact that no one within the chain –of command correctly categorized the use of force is concerning given the importance of force reviews to the Settlement Agreement. We again request that PPB provide us with better protocol or guidelines for responding to different deficiencies in reporting, so that we are better able to review these types of incidents in the future.

In order to return to Substantial Compliance with the requirements of these paragraphs, there must be a completed process for each issue that the Force Inspector identifies, including the ongoing need for Command review of reporting requirements. In instances where there are potential policy or training implications, the relevant teams must be informed. And where the Inspector identifies deficiencies that go above a minor oversight, proper correction should be implemented.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance for Par. 74, 75, and 77, ensure identified trends are forwarded to Policy and Training personnel as necessary<br>• To achieve Substantial Compliance for Par. 74, 75, and 77, ensure completed process for each issue identified by the Force Inspector<br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| **Assessment Based On** | • Review of Force Audit Report<br>• Review of Feedback forms |

**Exhibit A**

**Settlement Agreement Paragraph**

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Reviewed Quarterly Force Reports |

**Compliance Assessment**

For each of the subsections of Par. 76, the PPB possesses a tool or process to achieve Substantial Compliance. For instance, in addressing subsection (a), the PPB continues to produce quarterly and annual force reports including several important data points and comparisons to prior quarters. Subsection (a) is also addressed, in part, through the Phase II review wherein the Force Inspector identifies organizational trends. For subsections (b) and (c), the Force Inspector reviews the findings of a comparative analysis of each officer, unit, and group (as defined by common days off), identifying differences and discussing the analysis with each patrol RU Manager. For subsection (d), the Force Inspector either provides a memo to the RU Manager or creates a manual EIS alert (see also Par. 117). Finally, for subsection (e), the Force Inspector memorializes findings of the reviews in annual reports, including the Annual Force Summary Report and Annual Force Audit Summary Report.

These processes often provide important information regarding use of force trends. For instance, the second quarter Force Analysis Summary Report indicates that the number of force cases decreased by 3% from the first quarter of 2022 and that 16% of subjects who experienced force used against them were in a perceived mental health crisis. Additionally, the PPB reports the Central Precinct saw a 25% decrease in the number of cases involving force but stays silent on the fact that this comes after a 35% increase in the first quarter. While this

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

decrease puts them back in line with the fourth quarter of 2021 this points to the COCL's concern about the PPB reporting force statistics but not discussing the overall statistical trends. Certainly, a single quarter of data does not indicate a trend and we do not intend to imply that PPB should provide single-quarter commentary. However, as these are public facing documents, PPB should provide more robust discussion about changes over time even if the changes are due to seasonality, changes in the number of arrests, or there is no readily available explanation.

As we have said in the past, conducting statistical analyses on force trends means little when it is done simply as a matter of routine and specific actions are not taken as a result. The analyses done by the Force Inspector and force analysts offer substantial opportunity for the PPB to reduce use of force by addressing emerging trends. However, we have not seen sufficient action from the PPB when the data indicate potential areas of improvement. We therefore find PPB continues to only be in Partial Compliance with the requirements of this paragraph.

Additionally, the quarterly comparative analysis prepared by the Inspector provides an immensely important and detailed comparison of several organizational levels, including by officer, assignment, unit, RU Manager, and days off. This document allows RU Managers to see which of their officers are using force at comparatively higher rates. In previous reports, the COCL has raised concern over the process by which the Force Inspector identifies "at-risk employees, supervisors, [or] teams." These concerns have not been alleviated and we will need to schedule a meeting in the coming months to resolve this issue given the impact on these paragraphs as well as with Pars. 116-117 (see our assessment of those paragraphs for a more fulsome explanation of the concerns).

Also, during the second quarter of 2022, an analysis of the PPB's use of force was conducted on behalf of the Mental Health Alliance (MHA) and shared with both the COCL and the PPB. Given questions about the methodological decisions in the MHA assessment, the PPB and the MHA researcher met to discuss the methodology and the implications of the evaluation. The COCL was originally given the impression that we would be part of this meeting, but the meeting occurred without us. During a follow-up meeting with PPB, we were provided an update and we received information on an independent analysis of force data conducted by PPB. We provide additional information on the analysis in our outcome assessment located at the end of this section.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere<br>• To achieve Substantial Compliance, enhance follow-up processes<br>• To achieve Substantial Compliance, resume the practice of the Force Inspector identifying potentially problematic officers |
| **Assessment Based On** | • COCL review of quarterly Force Data Summary Reports<br>• COCL review of spreadsheet comparing force rates across individuals, shift, days off, and assignment |

**Use of Force Outcome Assessment**

Here we provide an assessment based on an analysis of the PPB's use of force data that is made publicly available on their website every quarter. This outcome assessment is provided in part to comply with Par. 170 to assess the creation of sustainable systems as outcomes. This assessment is not intended to replicate or replace the analyses done by the PPB. Rather, COCL seeks to offer a different perspective, encourage the PPB to include a narrative aspect to their report, and ask that they address emerging trends. The COCL provided a similar analysis in our fourth quarter of 2021 report and plan to continue providing a similar analysis every six months.

*Force Frequency:* As seen in Figure 3.2 the raw number of individuals who were the recipients of PPB force has been decreasing over the past year. Although there has been some fluctuation in the data, the fourth quarter of 2021 saw the second lowest number of force recipients over the past few years. Also decreasing is the force-to-custody rate as indicated by the black line in Figure 3.2. The reductions in the raw number of individuals experiencing force against them and reductions in the force-to-custody rate are positive, though it's not clear what the exact cause of these reductions are. PPB should explore the reasons for the reductions in order to, if possible, replicate or maintain them. In the meantime, we provide a further breakdown of these force events, specifically trends in the application of force against persons who were perceived to be in a mental health crisis.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**



*Mental Health:* Since the Settlement Agreement gives considerable attention to PPB's use of force against those who are perceived to be experiencing a mental health crisis, this analysis provides a deeper look into those events. Figure 3.3 compares the total number of force recipients with the number of force recipients believed to be in a mental health crisis. Across the whole dataset, on average, those in a perceived mental health crisis make up 17% of the individuals the PPB uses force on. The first quarter of 2022 was above average at 22%, but the second quarter was in line with the average at 16%. However, as displayed by the black trendline, the number of individuals in a perceived mental health crisis as a proportion of all force recipients has been increasing over time. PPB should evaluate the potential reasons for this increase and, where it is within their control, take appropriate action.

As part of their discussion with the Mental Health Association (MHA), the PPB noticed this increase too, and examined several potential explanatory variables including the presence of a weapon, the number of officers on-scene, increases in baseline population data, whether the event contained a police-officer hold (POH), and several other avenues of exploration. Overall,

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

the PPB found several potential explanations, including the fact that the number of armed persons has been increasing at a greater rate for persons in mental health crisis when compared to persons not in crisis. In the data, being armed may include a blunt object, a firearm (or replica firearm), implying a firearm, a knife/edged weapon, biohazard threat (i.e., possessing a needle, spitting, or other bodily fluids), or some other weapon. In conducting additional data analysis on individuals who were considered armed and actually using or presenting the weapon, they were most often armed with a knife or something representing a biohazard threat (approximately 60% of cases).

We have urged the PPB to share their full analysis and findings with members of the BHUAC as well as PCCEP to collaboratively discuss potential steps the PPB could take should any actions be considered within the control of PPB. However, they should be commended for conducting a responsive analysis and we look forward to discussing this issue with them more.

**Figure 3.3**



Another data point to consider is how many individuals are repeatedly involved in force events in a single quarter. Figure 3.4 compares the number of force events per individual in a quarter for those who were not experiencing a mental health crisis with those who were perceived to be in a mental health crisis. On average, across the whole dataset, those who were perceived to be in a mental health crisis experienced force used against them 2.3 times per quarter,

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

whereas those who were not in a mental health crisis experienced force used against them 2.1 times per quarter. This is a small difference overall, but over time, it has become a larger difference (see Figure 3.4). Specifically for the second quarter of 2022, those who were perceived to be in a mental health crisis experienced an average of 2.8 uses of force events in the quarter, while those who were not believed to be in a mental health crisis experienced force an average of 2.1 times during the quarter. The reasons for this increasing difference are not clear and this again is an area that PPB should further explore in order to identify potential reasons and remediate.

**Figure 3.4**



Looking at the use of force events involving those who were perceived to be in a mental health crisis, the most common incident types were behavioral health, welfare check, disturbance, assist, and unwanted person. As shown in Figure 3.5, since at least 2018, behavioral health incidents are the most common type of incident that involves a use of force incident with a person perceived to be in a mental health crisis.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**



In Figure 3.6, we show that the proportion of force events in which the person was unarmed has been decreasing for the past several years, both for persons in mental health crisis and those not. Put another way, when PPB has used force, it has increasingly been used on persons who are armed. For instance, on average across the entire dataset, those in a perceived mental health crisis were unarmed 58% of the time force was used against them, meaning they were armed 42% of the time. However, analysis conducted by both the COCL and PPB has shown that the proportion of force in which persons in mental health crisis were armed has been increasing. For instance, in 2018, persons in mental health crisis were armed 37% of the time, while in 2021, they were armed 43% of the time. Furthermore, the second quarter of 2022 saw the lowest percentage of unarmed subjects perceived to be in a mental health crisis across the dataset (32%) meaning 68% of the time, the person in mental health crisis was armed. This is similar when compared to all persons (regardless of the presence of a mental health crisis) at the time of force, who were unarmed 69% of the time in 2018 but 63% in 2021.

This is not only a matter of proportion but of raw numbers as well. Although further exploration would be necessary to account for de-policing (i.e., officers not being proactive in enforcing the law or engaging the community), the data appear to indicate that PPB is decreasing the frequency with which they are using force against the unarmed. In 2018, the

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

PPB used force against 648 unarmed individuals in total. In 2021, there had been a 27% reduction in this number for unarmed individuals whereas the number of armed individuals remained relatively the same (see Table 3.1). Therefore, the data appear to indicate that PPB isn't using less force on the number of armed individuals but instead using it less on unarmed individuals.

**Figure 3.6**



**Table 3.1**

| Year | Total Armed | Total Unarmed | Grand Total |
|------|-------------|---------------|-------------|
| 2018 | 285 | 648 | 933 |
| 2019 | 252 | 551 | 803 |
| 2020 | 228 | 425 | 653 |
| 2021 | 277 | 476 | 753 |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

*Force Category:* As shown in Figure 3.7, the most frequent category of force used by the PPB is category IV which is the lowest level of force. Category IV was the most frequent level of force used -- 48.4% of all force events in the second quarter of 2022. This is consistent with the average over the last year and a half (47.9%). Figure 3.8 breaks down the category of force used against those who were believed to be in a mental health crisis. In the second quarter of 2022, PPB most often used the lowest level of force with those believed to be in a mental health crisis (71%) compared to all individuals (48%). Additionally, 2022 saw a large decrease in the proportion of category II uses of force for those believed to be in a mental health crisis compared to all of 2021. In 2021, category II force was used in 20% of events, but in 2022 it has been used in only 6% of events.

**Figure 3.7**



54

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**



**Figure 3.8**

*CEW Use:* Since 2018, there have been a total of 7,486events in which the PPB used force against an individual. During that time the PPB used a CEW 389 times in 260 events (at least one application) which is 3.5% of the total force events. Given the total number of force events in the dataset, PPB officers appear to use CEWs infrequently. Although, as displayed in Figure 3.9, the number of CEW applications per officer per quarter has been increasing over the previous two years for events where the individual is believed to be experiencing a mental health crisis. Additionally, on average, officers deploy CEWs 1.4 times in a quarter (Figure 3.10). This rate is the same across the dataset when comparing perceived mental health and non-mental health applications of CEW.



**Figure 3.9**

**CEW Use by Applications & Number of Officers**

**Figure 3.10**

**Rate of CEW Applications per Officer**

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

*Race:* While the COCL has not previously provided a breakdown of the use of force by race of the recipient, this analysis has been encouraged by community members concerned about racial disparities in police treatment. Figures 3.11 and 3.12 provide a breakdown of the race of force recipients by those who were perceived to be in a mental health crisis and those who were not. We begin by noting that, according to Census data, whites make up 69% of the total population, while Black/African Americans make up 6% of the population. In the second quarter of 2022 whites were 65% and Black/African Americans were 24% of the force recipients who were believed to be in a mental health crisis. For those in the non-mental health crisis category, whites were 62% and Black/African Americans were 20% of the force recipients. These numbers are fairly consistent across the whole dataset except for Black/African Americans who were not perceived to be experiencing a mental health crisis, the average across the dataset is 30%, which is significantly higher than this quarter. This indicates that at least for events in which there is no perceived mental health crisis racial disparities have been decreasing over the past year.

**Figure 3.11**



COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**



COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# IV: TRAINING

## Overview of Training Systems

The COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which the PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

## Overview of Methods

The COCL continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL also continues to observe training (either in-person or online), observe TAC meetings, and conduct interviews with the PPB, TAC members and others as needed. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness.

## Assessment of Compliance

<div style="border:1px solid black; padding:10px;">

### Settlement Agreement Paragraph

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.

</div>

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | This is a summative judgment that is contingent upon satisfying all paragraphs in Section IV |

**Compliance Assessment**

The PPB has achieved only Partial Compliance with Paragraph 78 because Substantial Compliance requires the PPB to "implement the requirements below." Since this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, Training.

We will continue to focus on the primary training for all officers and supervisors, and special mental health trainings for ECIT, as these are the trainings most central to the Settlement Agreement. However, given the problems that occurred with the PPB's crowd management during the 2020 protests, the COCL added this subject to our training evaluation agenda beginning in 2021.

We will continue to evaluate training progress in terms of the fidelity of implementation and whether these trainings are likely to achieve the desired outcomes listed in Par. 78.

| COCL Recommendations | • To achieve Substantial Compliance, the PPB must substantially comply with all paragraphs within Section IV |
| --- | --- |
| Assessment Based On | • Summative and contingent upon satisfying all paragraphs of Section IV, based on the methods identified for each |

**Assess Training Needs**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interviewed PPB staff and reviewed internal training documents.<br><br>When available, the COCL will assess the quality of the independent Critical Incident Assessment of 2020 crowd control, with particular attention to training needs around crowd management and use of force. |

**Compliance Assessment**

As we reported in the fourth quarter, the Training Division completed its *2022 Annual Training Plan*. It also prepared its own report in December – 2*021 Training Needs Assessment: Law Enforcement Response to Mass Demonstrations*. The COCL provided a detailed assessment of these documents in our fourth quarterly report.

During the second quarter of 2022, the Training Division continued to gather information for its 2022 annual training needs assessment and its crowd management needs assessment. The Training Division continued to refine its 2022 training plans for In-Service, Supervisors In-Service, Enhanced Crisis Intervention Team, and Advanced Academy. Furthermore, the Training Division Analyst provided Training managers with needs assessment findings

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

throughout the year, so this is an ongoing process. This work involved gathering additional information from a variety of sources, including audit reports on use of force, complaint findings, changes in Oregon and Federal law, changes in the PPB directives, trends in hazards and officer safety issues, and research on best practices and trends. The Training Division continued to seek input from the community (via TAC, PCCEP, and CAG), PPB members (via training surveys), the PPB's Force Audit Team, the PPB's Equity & Inclusion Office, the City Attorney's Office, the Independent Police Review (IPR), and other stakeholders. Thus, the PPB continues to employ the methods and data sources identified in Paragraph 79.

As expected, the needs assessment report was not updated during this period. The PPB provided a revised Training Plan in March with an Addendum providing details about a planned training for new sergeants (Sergeants Academy). After feedback from the COCL and the DOJ, this three-week training began in the second quarter and is reviewed by COCL in this report (Par. 84).

The Training Division gathered additional outside information on training needs associated with crowd management, including safety and injury risks, applicable laws, and research on protesting groups that engage in violence. Internally, the Training Analyst held meetings with the Incident Management Team, the Crowd Management Incident Commander team, the Training Division management, the Specialized Resource Division management, and the Lead Instructors to discuss training priorities and issues.

The COCL values this preparatory work on crowd management and believes that it is an excellent investment of time and resources, especially considering our expressed concerns about PPB's response to the protests. However, because COCL is now conducting a separate compliance review of the external Critical Incident Assessment of force used during the 2020 protests (Par. 189), we have removed this obligation from Par. 79. The Training Division, when judged on its own work now (especially its needs assessment), has achieved Substantial Compliance with Par. 79. During the second quarter, the City hired a vendor to perform the work required in Par. 189 and COCL will evaluate that process separately.

The PPB's 2022 Training Plan included a separate training on Crowd Management, but specialty units were not covered in this training. Last quarter PPB informed us that it has no plans to use specialty units to respond to protests, so no specialty training is needed. Since the end of RRT, PPB's plan has been to activate a Mobile Field Force (MFF) from officers within each precinct to respond to mass demonstrations. The plan is for all PPB officers to receive some crowd control training during the 2023 In-service.

Previously, COCL recommended that PPB "Explain how the FEMA training on Incident Command is responsive to PPB's crowd control issues. Clarify which PPB specialty units will be responding to demonstrations…and provide training plans for any specialty unit deployment and any weapons that will be allowed, based on updated policies." The Training Division reports that they will address the role of FEMA training in this year's report when they evaluate crowd management. PPB has initiated internal discussions of the role of its officers and specialty units in crowd management and will provide training plans. At present, PPB is trying to identify instructors who can attend national best practices training for crowd management topics, including riot control agents, special impact weapons, crowd control, baton use, and other topics.

As PPB begins to identify the training implications for these internal assessments of crowd management, the COCL continues to encourage PPB to give particular attention to developing and strengthening specific skills through role playing scenarios and feedback debriefings. In response to COCL's recommendations, PPB has begun to assess training needs through the lens of procedural justice, including reviews of complaint data, community survey findings, previous In-Service scenarios training results, and research reports. The In-Service Management team, Procedural Justice Lead Instructor and Training Analyst have met to discuss this information and how it affects future training plans.

Finally, COCL previously recommended that PPB "Seek to release the Annual Training Plan earlier so that others have more time to review it." In response, PPB has moved up the due date to December 1st.

| | |
|---|---|
| **COCL Recommendations** | • If PPB decides to deploy any specialty units for demonstrations, they should update their training plan to reflect that decision<br>• Include training with robust scenarios and feedback loops to strengthen interpersonal communication skills |
| **Assessment Based On** | • Review of the PPB's internal training documents and interviews with the PPB personnel |

**Exhibit A**

**Evaluate Training**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interviewed PPB staff and reviewed internal training documents<br><br>Assessed the methods of evaluation, content, and the presence of a complete evaluation system with feedback loops |

**Compliance Assessment**

The PPB's training evaluation system continues to rely on multiple methods of data collection, analysis and reporting. The Training Division administers in-class quizzes/surveys, anonymous post-class evaluation surveys, knowledge tests, some scenario skills tests, and classroom observations. We continue to review these instruments and methods and provide the PPB with feedback from a scientific research perspective. Overall, we continue to be satisfied with the methods and measures employed by the PPB in the second quarter of 2022, although we continue to offer recommendations for improvement.

During the second quarter, the Training Division continued to evaluate various trainings, with particular attention given to the In-Service training for all officers, Advanced Academy training for new recruits, Enhanced Crisis Intervention Team (ECIT) training, and Online

training. The primary focus of the Training Division was on data collection and analysis, with the production of several internal preliminary reports.

The COCL continues to be satisfied overall with the work of the PPB's Training evaluation team, given the limited staffing available for these sizeable evaluation tasks. More details about the evaluation results will appear in COCL's third quarter report when the findings become available.

In our first quarter report, we made several recommendations to improve the evaluation of training programs, and the Training Division has responded to these suggestions in a favorable manner. First, we asked the Training Analysts to "consider redesigning knowledge tests to simplify the format and make them easier for students to complete." (Some of the multiple-choice questions were confusing and unnecessarily difficult). The Training Division has since refined the knowledge tests and reported to the COCL that student concerns and complaints about the exams have "declined substantially." Second, we encouraged the Training Division to "work with local university researchers to conduct more scientific evaluations of training on-the-job outcomes, including contact surveys to measure the impact of training on police-community interactions and procedural justice." (See On-the-job outcomes below for more details). Finally, the COCL recommended that PPB's Training Division and the PPB administration "evaluate and prioritize the recommendations produced by the Training Analysts." We can now report that the Training Analysts are coordinating with PPB's Policy Team and their Online Training Team to share specific evaluation results and discuss how they can be integrated into policy and training.

COCL has also recommended that PPB ensure adequate staffing of Analysts to perform research and evaluation functions. The Training Division has had three Analyst positions for some time, but in recent years, two of the three have been tasked with work other than data analysis (e.g., curriculum development). We hope to see them return to their original job functions soon.


**Training Evaluation Focal Points**

During the second quarter, the Training Division invested considerable time collecting and analyzing survey data and knowledge test data for three primary clusters: the Advanced Academy training, Online Training, and Enhanced Crisis Intervention Team training. The Advanced Academy data are extensive, involving daily surveys for 48 days. Overall, COCL is

**Exhibit A**

satisfied with the content of the exams and quizzes for all three types of training in the second quarter, which cover a wide variety of topics. COCL is also generally satisfied with the surveys designed to obtain feedback from the trainees. The Online Training survey does a nice job of seeking input on ways to improve online training, since this methodology is still in the early stages of development. However, one question asked, "Are you currently working a patrol or non-patrol assignment? (Optional)" COCL disagrees with the decision to make this question optional because this will make the sample of survey respondents less representative of the larger PPB population. There is no risk of individuals being identified when answering this general question.

The Training Division produced some preliminary findings from these surveys and exams, which the Analysts have used to debrief the Training Division's lead instructors. The results continue to be positive overall. When these results are finalized, COCL will review them as part of our Training Outcome Assessment in the third quarter.

**On-the-Job Outcomes**

COCL continues to recommend that the Training Division introduce outcomes metrics to capture "the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs." (Par. 80). This on-the-job outcome objective also fits within the Kirkpatrick Model of Training Evaluation which provides the framework for the Training Divisions' approach to evaluation.

The COCL is pleased that the Training Division Analysts are beginning to move in this direction as time allows. Previously, we noted that they were considering many different outcome measures, ranging from use of force to response to mental health calls, but had yet to compile or analyze these data for training evaluation purposes. This quarter, we can report that the Analysts are beginning to explore various outcome measures in greater detail. They are working with the BHU analyst, for example, to gather on-the-job outcomes associated with mental health calls. Also, with assistance from university researchers, they are beginning to look at outcome data in a longitudinal framework to see whether the trends show improvement or decline. This includes plans to look at existing data from contact surveys to evaluate changes over time in procedural justice during police-community contacts. In the future, we can expect that the Training Division will report on these trends, either as part of their In-Service evaluation reports or as a separate report.

**Exhibit A**

This work is encouraging and represents a good start. However, while trend analysis may help to determine whether PPB is moving in the right direction overall, it will not allow anyone to say, with confidence, that the changes are due to specific training. That is only possible with stronger evaluation designs, that include pretest-posttest changes and control groups. In this regard, PPB is currently drawing on more external research expertise and is working with universities and other organizations to strengthen its evaluation capacity. For example, the Wellness Program is being assessed with a pretest-posttest control group design that will allow for stronger causal about whether officers show improvement due to this particular training.

In the past, COCL has recommended that PPB go further to introduce the strongest evaluation design, the Randomized Control Trial (RCT), where officers are randomly assigned to receive the new training or remain in the control group for a short period of time. PPB has considered an RCT for training but was concerned about training delays that may result. Based on years of experience with program evaluation and RCTs, COCL can reassure the PPB that this would be a good investment. Perhaps the new civilian Director of Training can promote this type of evidence-based practice within the PPB.

| | |
|---|---|
| **COCL Recommendations** | • Return all Training Analysts to their original job within the Training Division to ensure the best needs assessment, training plan, and knowledge about training's effectiveness<br>• Expand your work with local university researchers to conduct more scientific evaluations of on-the-job outcomes, with RCT designs, including contact surveys to measure the impact of training on police-community interactions and procedural justice |
| **Assessment Based On** | • COCL review of training evaluation tools, quality of data, and systems of reporting and feedback |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Document Training Delivered and Received**

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong><br><br>81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Substantial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>Requested and reviewed LMS records for the second quarter; Requested and observed electronic inquiries of LMS files</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong><br><br>The Training Division continues to use the Cornerstone Learning Management System (LMS) to record officer training. LMS attendance records were updated in the second quarter to include all in-person and online In-service trainings noted earlier, as well as the other online training videos and notices. Eight online classes were included (See Par. 84), as well as records of completion for range qualifications and instructor-led training. Records of external trainings continue to be maintained for any training that is reported to the Training Division. We ask that PPB establish a system of review to ensure that LMS captures all external trainings and trainings of specialty units. The next Training Audit (Par. 85) should be able to assess this capacity.<br><br>During our site visit, we looked at the LMS master list of trainings. We randomly selected supervisors and officers and then confirmed that their attendance at required trainings had been recorded in LMS. We also checked officers' records for some specialty trainings. We confirmed attendance at the CNT crisis training in August. The Rilea training for SERT in September was not yet recorded, but the training had just ended, so we expect that it to be included in the third quarter.</td></tr>
</table>

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

By reviewing LMS training hours, the Training Division is able to ensure that the PPB members remain in compliance with Oregon state standards and have received the training required by the PPB. LMS is used to ensure that the PPB employees who are not on leave are completing their required training and that these records are reviewed by supervisors.

The review and compliance process is as follows: the PPB employees are given 30 days to complete training and are sent email reminders 14 days, seven days, and one day before the due date, and one day past the due date. Their RU manager is sent emails regarding training delinquencies at one, five, and 21 days past the due date.

When the PPB members fail to complete online training in this time period, the Training Division continues to send non-compliance memos to the Chief's office. Focusing on sworn PPB members, five such memos (covering five classes) were sent to the Chief's office for review during the second quarter of 2022. The COCL found that, in total, only 5 officers missed the training. If the absence is justified (e.g., long medical leave), the Training Division is notified and the LMS records are updated. In the case that the absence does not appear to be justified, then the employee's supervisor or unit manager is notified, and the training must be completed immediately under supervision. PPB has given more attention to these few cases in 2022.

Thus, COCL finds that PPB has remained in Substantial Compliance with Par. 81. The DOJ did not agree with this assessment, pointing out that supervisors are not required to perform semi-annual reviews. Although supervisors only review their employees annually as part of their performance evaluation, not semi-annually, neither DOJ nor COCL has viewed this as a non-compliance issue in the past. Annual performance evaluations are a standard practice in the field. For COCL, the continuous review of training records by LMS and the chain of command was sufficient for compliance with Par. 81.

| **COCL Recommendations** | <ul><li>Establish a system of review to ensure that LMS captures all external trainings and trainings of specialty units</li><li>Provide a periodic analysis of non-compliance rates for training completion and actions taken by the PPB when officers do not complete the required trainings on time</li><li>Ensure that the few individuals with multiple unexcused absences from training are coached or disciplined appropriately</li></ul> |
| --- | --- |

**Exhibit A**

| | |
|---|---|
| **Settlement Agreement Paragraph** ||
| 82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Semi-Annual Training Reports |
| **Compliance Assessment** ||
| The PPB's Semi-Annual Training Reports for the first and second quarters of 2022 will be delivered to the Deputy and Assistant Chief in the third quarter. In the meantime, the PPB remains in Substantial Compliance for Par. 82. We have recommended that the Semi-Annual Training Report include both internal and external trainings, including specialty unit trainings, as well as a summary of non-compliance results. ||
| **COCL Recommendations** | • Ensure that the semi-annual training report includes all external and specialty unit trainings |
| **Assessment Based On** | • Delivery and content of Semi-Annual Training Reports |

70

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Trainer Qualifications**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed "Work History Review Sheet" for second quarter hires and ensured that PPB is following S.O.P. #1-19 standards. |
| **Compliance Assessment** | |
| During the second quarter, one officer and one sergeant were assigned to the Training Division to assist with training pertaining to crowd control and public order, thus activating the review process pursuant to S.O.P. #1-19. The COCL reviewed the Work History Review Sheet for these individual and finds no evidence of civil judgments, discipline, or mistreatment of people with mental illness as defined in Par. 83. | |
| **COCL Recommendations** | ● No recommendations at this time |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | ● COCL review of "Work History Review Sheet" and S.O.P. #1-19 standards |

### Deliver Appropriate and High-Quality Training

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 84. (COCL Summary) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. PPB is expected to develop and implement a high-quality system of training that is consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention. In addition to all sworn personnel, paragraph 84 requires supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions. | |
| **Compliance Label** | <mark>Partial Compliance</mark> |
| **Methodology** | Observed Sergeants Academy Training and reviewed Equity and online trainings made available through the LMS during the second quarter

Interviewed PPB personnel |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Compliance Assessment**

During the second quarter of 2022 the COCL was able to observe and evaluate one major training for supervisors – the two-week Sergeants Academy for new sergeants. In addition, we provide an overview of the online training delivered by the PPB during the second quarter. The PPB did not return to Substantial Compliance during the second quarter because they have yet to provide crowd control training that (1) incorporates changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and crowd control (Directive 635.10), (2) incorporates both internal and external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills. These trainings cannot be delivered until the policies on use of force and crowd control have been revised and approved. This review process was still underway at the end of the second quarter.

The external assessment of crowd control was initiated in the third quarter, and thus, will not be completed in 2022. However, PPB plans to conduct some crowd control training with all PPB members in January of 2023. Also, the Sergeants Academy training (see review below) includes some coverage of crowd management.

In addition to the Sergeants Academy, the PPB continues to develop and deliver other essential training classes. During the second quarter, the PPB provided 10 sessions of its In-Service training for all officers (which COCL observed and evaluated in the first quarter).

**Sergeants Academy Training**

The PPB held their 2022 Sergeants Academy training in June. It occurred over 2 weeks and covered a range of training topics for new sergeants including Leadership in Policing, Performance Reviews, EIS, Procedural Justice, Community Engagement, and Critical Incident Management. The COCL was able to observe several days of this training and here we provide a summary and assessment of these classes. Most of the classes we observed were one hour in length. A few more intensive topics were covered in 1.5 or two-hour sessions.

Overall, the Sergeants Academy training covered important topics for new supervisors. COCL's main concern with many of these classes is the reliance on a "static" PowerPoint method of delivery. The PowerPoints reviewed by the COCL for the Sergeants Academy, as well as trainings observed in the past, consist of almost entirely of very wordy slides without

**Exhibit A**

photos or graphics. In general, this is not considered a strong pedagogical tool for keeping the students' attention.

Also, many of the classes include topics that would benefit from a Problem Based Learning approach, so students would be able to apply the knowledge and policy to real world situations. For example, when learning crowd control methods, trainees need to engage with classroom scenarios and exercises. The PPB should have ample videos of events from the 2020 protests to allow for Problem Based Learning on crowd management. The COCL continues to recommend creating more engaging PowerPoints and involving more classroom scenarios.

Below we give the reader an overview of the classes included in the Sergeants Academy:

*Performance Management/Tableau:* This session reviewed the overtime dashboard and budget and fiscal data. This information can be accessed by officers through their email on the private website. Sergeants were informed that this software gives them the ability to share information from their phone with the public. A few examples were shown in order to increase accessibility. A review of CAD call statistics was also discussed. COCL's main concern was the absence of clarity about the purpose of this training and why it was necessary. Students should be given clear direction about what they should be doing with this information in their new role as sergeant.

*Uniform Daily Assignment Roster (UDAR):* The UDAR is the program used to keep track of an officer's working hours, overtime hours, and leave taken. The sergeants should have already received some training on UDAR, as it was covered in previous in-service trainings. As supervisors, they are now responsible for approving overtime and time off for their officers. COCL's main concern lies with access to the system (and not with the material presented) because the instructor and students noted that the system is difficult to access and not very user friendly.

*FMLA/Officer Injuries:* This session covered the process needed for officers when they sustain an injury. Officers must complete a Disability in the Line of Duty report, and supervisors must complete an After Action Review. The session was interactive and the presenter provided multiple examples.

*Community Engagement:* This class focused on providing an overview of the Community Engagement Strategic Plan developed by the Office of Community Engagement which includes how to create sustainable and meaningful relationships between the community and

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

the police. Community engagement can be viewed by sergeants as a trust-building tool. Sergeants play an important role in facilitating community engagement through *public involvement, communications, access, and training*. Examples given of ***public involvement*** are ride-alongs and community site visits. In terms of ***communications***, sergeants can refer community members to its advisory councils or other city resources. They can also refer them to IPR if they would like to register a complaint. The PPB Language Line App was given as an example of ways to ensure ***access*** to PPB services for all communities. ***Trainings*** such as PPB-led workshops such as WomenStrength and BHU De-Escalation were mentioned as ways to increase knowledge and skills in diverse communities. PPB's Community Active Shooter Preparedness was also mentioned, but this type of training must be handled carefully to avoid increasing fear among community members. In sum, these four categories -- *public involvement, communications, access, and training* -- are a part of the PPB's community engagement strategic plan that was developed with input from PCCEP. This class was well delivered.

*Mental Health Related Information:* This class discussed the role of ECIT teams, the role of sergeants during a critical incident that involves mental health and when to fill out the Mental Health Template. The purpose of this session was to go over the Mental Health Audit Tool in order to prevent and correct errors related to mental health information. An ECIT communication team should have a primary communicator, a coach, and an intelligence gatherer. Sergeants are required to acknowledge or respond to all calls when an officer is dispatched to a mental health facility. During calls where there is a mental health nexus, sergeants are expected to manage dispatch and use of ECIT members while coordinating with BOEC. Sergeants are also required to ensure their officers are following the appropriate reporting requirements after responding to a call involving a perceived mental health crisis. This class was well delivered.

*Report Review & Approval:* This session focused on the reports officers must review in their new role as sergeants. Sergeants must ensure their officers are writing their reports completely and free of deficiencies. If sergeants notice an error in the report it needs to be corrected as soon as possible. Sergeants will be held accountable if reports they approve are missing reporting requirements. The COCL feels this lesson could be expanded to include Problem-based learning methods and examples of potentially biased reporting involving protected classes.

**Exhibit A**

*SERT Activations:* The purpose of this class was to describe the role of sergeants after a critical incident, including how to activate a Special Emergency Reaction Team (SERT). There is a separate class for handling critical incidents. There were a few examples, personal experiences, and concerns that were discussed. Including a discussion on possible scenarios of "suicide by cop."

*EIS:* This one-hour session was delivered by one of the Employee Information System (EIS) Administrators for the purpose of reviewing the responsibilities and role of sergeants with EIS. The presenter reviewed Directive 345.00 and the EIS handbook which includes step by step instructions for EIS use by Sergeants. The presenter acknowledged EIS is not an exciting topic to discuss and the current system has a few shortcomings, but this is what they have to work with for the foreseeable future. The presenter repeatedly mentioned that the purpose of EIS is to compare officers to their peers in order to intervene early. This was one of multiple concerns the COCL raised after reviewing the lesson plan and PowerPoint. The concept of "comparing officers to each other" is not the sole intent of EIS and could be problematic in the way it pits officers against each other. The presenter also made clear his dislike of the terms "intervention" and "coaching" that are used in EIS due to the negative connotations associated with them. Instead, the presenter recommended using terms such as "opportunity" rather than "intervention" to keep EIS language neutral.

One message repeatedly emphasized is that EIS is not inherently bad and should not be viewed as such. The presenter asked the sergeants to raise their hand if they have been subject to an alert as a way to demonstrate that getting an alert does not mean someone is doing a bad job. Alerts are neutral and based in fact and they allow for conversations and check-ins to occur. Additionally, EIS provides a way to reward officers and reinforce good behavior.

A portion of this training was spent discussing the differences between the Performance Discussion Tracker (PDT) and EIS, although PDT is part of EIS. The presenter emphasized that sergeants need to be cautious about using PDT entries as a crutch or equal response to a positive EIS entry, since EIS holds more weight for evaluating personnel than does PDT. The presenter also noted that in the past, commendations put into PDT were entered into EIS by the staff, but this is backlogged 2-3 years since there was a shortage of EIS staff.

A new pilot was scheduled in the East precinct for traumatic alerts. In the pilot, Employee Assistant Program (EAP) members, rather than sergeants, were expected to have a confidential conversation with the officer when a traumatic alert goes off. The idea here is

**Exhibit A**

that the officer is more likely to talk to a peer officer under EAP confidentiality. The presenter was very supportive of EAP referrals as an intervention. However, COCL has learned that the East precinct declined to introduce the pilot program.

*Complaint Process and Supervisor Investigations:* This one-and-a-half-hour session focused on what happens when a complaint is filed with the PPB and was presented by a Lieutenant from Internal Affairs (IA). First, the presenter went over two legal cases, Garrity vs New Jersey and Weingarten. Garrity vs New Jersey ensures that officers cannot be compelled to testify against themselves in an investigation by their employer. Weingarten guarantees the right to have a union member present during any investigative interview the employee believes may result in discipline. The instructor emphasized the importance of officers knowing and reviewing the PPB policies, especially the use of force policy, before they go into an interview with Internal Affairs (IA) since IA can only make findings based on violations of policies.

A complicated infographic was shown to demonstrate the complaint process. IA is required to investigate all use of force complaints as they are the lead investigators for officer-involved shootings, use of deadly force, and in custody deaths. If there is a complaint with a criminal allegation involved, then IA does not interview the officer until after the criminal investigation is completed. The Independent Police Review (IPR) provides the intake for the majority of citizen complaints and conducts independent investigations of cases involving crowd control, disparate treatment, vulnerable persons, sworn members ranked captain or above, and cases of significant public interest. Both IA and IPR investigations result in a recommended finding, which then goes for management review and then to Police Review Board (PRB) and/or Citizen Review Committee (CRC). For each stage of the complaint process there are deadlines, but the whole process must be completed within 180 days.

Investigation findings rely on a preponderance of evidence, which indicates that it is more likely than not the allegation is true. A complaint can result in a finding of administrative closure which occurs in situations for things such as no misconduct, an unidentifiable employee, or the case was previously investigated. The instructor made a point to emphasize the fact that even though the public thinks the PPB likes to "sweep things under the rug" every complaint gets investigated even if it results in a finding of administrative closure. A full investigation can result in findings of *sustained,* in which the preponderance of evidence proves a violation of policy or procedure, *not sustained* in which the evidence was insufficient to prove a violation of policy or procedure, *exonerated* in which the evidence proves the

member's conduct was lawful and within policy, or *unfounded* in which the evidence proves the allegation was false or devoid of fact.

Supervisor Investigations (SI) were discussed because it is the responsibility of the sergeant to conduct SIs. The goal of SIs is to improve service and handle lower-level complaints in a timely manner. SIs are for complaints which, if found to be substantiated, would not result in more than command counseling. A complaint can also go before the Police Review Board (PRB), which is called upon for a controverted finding, sustained 2.02 violations, sustained force violations, officer involved shootings, and in custody deaths. The presenter strongly advocated for officers serving on PRB since there are frequently complaints about the internal disciplinary process and PRB gives officers a say in the process.

*Organizational Justice:* This was the first time this training was offered for new sergeants. The COCL commends the PPB for implementing a much-needed training on procedural justice and for incorporating COCL comments into the lesson plan. The one-hour session began with a discussion of what organizational justice is and why it is necessary. Insufficient organizational justice can lead to outcomes such as low morale, poor job satisfaction, low productivity, and high turnover of employees[2]. Organizational justice occurs when officers feel respected, feel some control over their work environment, are defended against unjust treatment, and have opportunities for growth. Sergeants play a key role in creating a sense of organizational justice.

There was a discussion as to how relationships can be a major cause of perceived injustice. Research has shown that even if the outcome was fair, a person can still feel it was unjust if they believe someone was rude or unfair to them during the process. Interpersonal interactions can build respect and increase organizational justice. The audience provided suggestions on how they as sergeants can increase respect among their officers. Suggestions included getting coffee with officers, being honest, showing up to calls even when not

---

[2] Research by the Compliance Officer in more than 70 large cities shows that low levels of organizational justice also result in a lack of willingness to follow rules and to support the leadership of the organization, which makes reform difficult.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

required, and asking officers what they're interested in. Sergeants are also able to encourage officers to utilize their allotted wellness time each week and make sure busy districts are adequately staffed. Because sergeants have the most impact on the day-to-day morale of officers and because they are the future command staff, having them understand organizational justice is essential.

This session ended with two scenarios that were discussed in small groups, with trainees given the opportunity to consider how they might handle these problems. One scenario involved an internal problem, and one involved a community member. The small group discussions provided an opportunity for the new sergeants to consider ways of handling these problems in a procedurally just manner. These group exercises are a good start, although the performance of individual sergeants in these settings remains unknown.

*After Action Reports (AARs):* After Actions Reports were covered in a three-hour session. Sergeants are the first member of the leadership team to be involved in AARs, therefore it is essential they understand what does and what does not require an AAR. Sergeants must act both as an investigator and an evaluator. Sergeants are factfinders, not advocates. The goals of AARs are summarized by 5 Ws and the instances in which an AAR is required were briefly discussed, as it seemed most in the class were already aware of this information.

The session spent a significant amount of time going over the process of writing an AAR. The sergeant who goes to the scene should be writing the AAR. In cases where the person was believed to be completely lucid but there is a mental health flag from years ago, the mental health box should not be checked on the new AAR. For the force report section, a strong emphasis was placed on providing details to help those reading the report understand why the force was considered necessary. A few general tips from the presenter included: writing AARs after debriefs; a sergeant's input is important; AARs are meant to be read in conjunction with the police report; and that the current master AAR form has some quirks. The session ended with a discussion of three scenarios and for each, which forms would need to be filled out. A scenario was given by the presenter and the sergeants were asked to review the Force Data Collection Report (FDCR) for accuracy. Lastly, the class walked through filling out a master After Action report together. The majority, if not all, of the sergeants had previously filled out an AAR, as most have been serving as acting sergeants prior to this training.

The trainees raised multiple questions about the best way to fill out FDCRs, noting that different supervisors have different requirements when filling out FDCRs. Because

supervisors' preferences on how to fill out FDCRs comes down to personalities, which are hard to navigate, the instructor's advice is to follow Directive 1010.00 on use of force. Similar concerns were also raised by the sergeants when filling out AARs, as they tend to follow the preferences of their supervisors. COCL and DOJ have expressed concern about the content of FDCRs and AARs in the past. Hopefully, these concerns will be addressed by the new SharePoint version of the form and the pilot test. We look forward to the results.

### Other Sessions within the Sergeants Academy

There were several classes that COCL did not observe in-person, but for most, we provided feedback to the PPB on their lesson plans prior to the start of training. These classes are briefly summarized below based on our review of the lesson plans.

*Annual Performance Evaluation:* This class is intended to help sergeants learn how to evaluate their officer's performance over the last year and how to give feedback. Sergeants must learn how to review their officer's behavior through annual performance evaluations, EIS entries, and daily interactions. COCL will continue to recommend that the feedback provided to officers via the annual performance evaluation is meaningful and provides room for improvement. This evaluation should be a key mechanism for improving both individual and organizational performance.

*Crowd Management and Control:* The purpose of this class is to inform sergeants of skills to manage demonstrations and protests. The session started with an overview of definitions regarding crowd management and control such as civil disobedience, passive resistance, and riot. The PPB Directive 635.10 is the policy regarding crowd management and control and was discussed.[3] An overview of the Mobile Field Force was given and then the class was tasked with demonstrating how to run a Mobile Field Force squad.

---

[3] This class should also cover directive 1010.00 on Use of Force, which also applies in crowd control settings.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

*Portland Police Association Collective Bargaining Agreement (PPA):* The purpose of this session was to inform all new sergeants of how to supervise officers in a way that complies with the Collective Bargaining Agreements (CBAs) and state labor organization laws. Sergeants need to understand employee rights when they are addressing an officer's performance.

*Leadership in Policing:* The purpose of the class is to orient the officers to their new role as a sergeant and how it fits within the structure of the PPB. The class was asked to discuss why they became police officers and see how their own personal values align with the values of the PPB. Unfortunately, COCL has learned that the Leadership training position at the Training Division has been removed due to staff shortages.

*Motivating and Empowering Your Team:* This session is intended to provide sergeants with the resources needed to motivate and empower officers and become an influential leader. A sergeant has three roles to fill: supervision, management, and leadership. Examples of practical actions sergeants can take through roll calls, phone calls, big calls, and bad calls were discussed. This session should be directly linked to the session on organizational justice.

*Sergeant Response to Officer Involved Shooting (OIS):* This class was a scenario in which sergeants respond to the scene of an OIS and accomplish the duties as found in Directive 1010.10. Each scenario was to include four officers (one role playing the suspect who was shot and killed). The scenario was followed by a debrief.

**In-service: Online Training**

In the second quarter, the PPB continued to provide online classes and educational material using their Learning Management System (LMS). A total of seven items were delivered virtually to PPB members during the quarter. This included training videos, legal updates, the amended Settlement Agreement, and a Bureau directive (0320.00 Reporting of Potential Exculpatory and Impeachable Information). The City Attorney's Office posted a legal update for October 2021, but none for the current year. In addition to offerings made available through the LMS, some PPB members, depending on their rank, were required to take the Incident Command System (ICS) training provided by the Federal Emergency Management

**Exhibit A**

Agency (FEMA) and the US Department of Homeland Security[4]. The ICS is part of the National Incident Management System (NIMS) and the training seeks to prepare agencies to respond to, and recover from, large and small-scale incidents. This training is federally mandated and due to be completed by the end of September 2022.

As noted in our last quarterly report, the PPB's Equity and Inclusion Office (EIO) began posting equity training videos focused on interacting with members of the LGBTQIA2S+ community. This quarter EIO released the final two videos in this series. The COCL's review here covers the online training activities completed in the second quarter related to equity as other activities undertaken by EIO to expand equity offerings going forward.

**Online Equity Trainings**

In the second quarter of 2022 the Equity and Inclusion Office (EIO) continued its next sequence of online trainings focused on interacting with the LGBTQIA2S+ community. During Q2 the final two online training videos were made available to PPB members through the LMS. As with the videos in Q1, these videos are based on, and an accompaniment to, PPB directive 0640.38 - "Interacting with Members of the LGBTQIA2S+/Queer Community." For a description of video one and video two, please refer to COCL's Q1 2022 report. The final two videos of the series are described below.

*Video 3 – Pronouns:* This video, which clocks in at just over eight-minutes, covers three terms/topics related to gender identity and seeks to prepare officers to ask people that they are interacting with "how would you prefer to be addressed?" Each term is introduced by displaying and speaking the definition as it appears within the policy followed by a community member sharing their perspectives on the terms. In addition to community members and EIO staff, the video features a trainer from Los Angeles Police Department (LAPD) who (1) is a member of the LGBTQIA2S+ community and (2) focuses on what they

---

[4] https://training.fema.gov/nims/

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

term "tactical communication" which involves expanding knowledge on how to interact with communities that law enforcement officers may not regularly interact with.

The first term the video covers is gender expression. During the discussion portion, community members and the LAPD trainer share their preferred pronouns and discuss the importance of gender expression and share examples of how they express their gender identity. The next term covered is non-binary. The discussion on this term is focused on one of the presenters' experiences as a non-binary person, what that means to them, and sharing additional terms, including some culturally specific ones, that some non-binary folks may use. The final term covered is misgendering. For this discussion community members and the trainer share their experiences with being misgendered and how it has impacted them. The next portion of the video presents a set of outdated terms that should not be used to refer to a person who is transgender and outlines that the appropriate terms to use (when referring to someone) are "transgender" or "trans" and highlights that the person may simply prefer to be referred to as male or female without the qualifier of "trans" or "transgender." At the close of the video EIO staff offers some final thoughts:

- The way a person presents by their dress, haircut, and looks may not accurately reflect their gender identity

- It is always appropriate to use the person's name or ask how they would like to be addressed

- Pronouns can change over time and the correct pronoun to use is the one the person tells you to use

- When discussing interacting with the LGBTQIA2S+ community that includes the internal community of PPB as well.

The video closes with the EIO staff member sharing contact information for EIO and encouraging people to reach out if they have questions, comments, or concerns.

*Video 4 – Policy Scenarios:* The final video in the sequence is just over three-minutes long and focuses on how the policy, and all the information learned over the course of the preceding videos, should be applied in report writing. A member of PPB's policy development team discussed where a person's preferred name, gender identity, and preferred pronouns should be recorded within a report and the importance of ensuring that the information is included.

To close out the video, EIO staff acknowledges that some interactions will not go smoothly and that the trainings do not cover every scenario that could possibly arise in the field. They close the video by inviting PPB members to reach out to EIO if they have any questions, comments, or concerns.

The two equity training videos released this quarter conclude the series on interacting with members of the LGBTQIA2S+ community. Clearly, there was a great deal of care taken in producing these training videos. The inclusion of community members who are part of the LGBTQIA2S+ community allowed for a grounded and accessible series of videos. While the videos are well done and offer some valuable information, there are still limitations to how effective the videos can be on their own. This series set a good foundation for more education on interacting with the LGBTQIA2S+ community but for deeper understanding COCL continues to encourage PPB to develop an in-person component to allow for dialogue and deeper engagement with the subject matter. COCL commends EIO for addressing how the accompanying LGBTQIA2S+ policy should be applied in police work, specifically as it relates to acknowledging and including people's preferred names and chosen pronouns when writing reports.

*Other Equity Training Related Activities:* In the second quarter, EIO continued to work on providing more training opportunities to sworn, and non-sworn, PPB members. To this end, EIO offered a community engagement 101 course for new recruits who went through the Advanced Academy in Q2. The 40-hour, in-person, course includes a racial equity course, walkabouts, and chances to connect community members and specialty officers, and conversations on how to police in communities that may have a distrust of officers.

Additionally, PPB received funding from the Collaborative Reform Initiative Technical Assistance Center (CRI-TAC)[5] for 20 additional PPB members to receive the REPAIR[6] course, which has been discussed in COCL's previous quarterly reports. The PPB members were able

---

[5] https://cops.usdoj.gov/collaborativereform

[6] https://www.civilandhumanrights.org/repair-course-for-law-enforcement/

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

to choose from either the two-week or six-week program and those who selected the six-week program were then able to attend the "train the trainer" program. EIO also continued working with other equity trainers and analysts from other public safety related City departments to de-silo information and begin to standardize approaches to interactions with community members that touch on equity issues. Moving forward, EIO will be taking some time to focus on providing in-person trainings to PPB members. They are not currently planning for the next series of equity related LMS trainings, but EIO plans to consider the next phase of LMS equity trainings in the upcoming quarters.

*Overall Assessment of Online Training:* The Training Division continues to provide a wide range of online trainings and educational materials. As noted earlier, some critical feedback is described under Par. 80 above. We feel the PPB is engaging in a good faith effort to find the right balance of virtual trainings that include asynchronous videos, interactive videos (with "click through" questions and quizzes), and live interactions with instructors. The COCL and PPB agree that some training topics require in-class discussions (e.g., difficult conversations around bias-free policing or responses to the LGBTQIA2S+/ Queer community) and some require in-class practice of skills (e.g., de-escalation and procedural justice).

With new personnel in the Training Division, including a new LMS Administrator, the COCL will revisit the issues around online training, including balancing online and in-person training, combining online and in-person formats to allow officers to practice the skills promoted online, and ensuring that students complete the feedback surveys so that training can be continually improved.

**Specialty Unit Training**

As the COCL has noted in the past, the PPB has dozens of specialty units that serve important functions, but in some cases, they have their own systems of training and supervision that can lead to problems because of insufficient oversight by management. COCL has maintained an interest in specialty units that are potentially important to the Settlement Agreement's focus on constitutional policing and use of force. The COCL will continue to focus its attention on the PPB's core training classes for all sworn members and classes relevant to the Settlement Agreement, as well as Enhanced Crisis Intervention Team (ECIT) training for responding to mental health incidents. However, after the PPB's problematic response to the 2020 protests, COCL turned its attention to the Rapid Response Team (RRT) – because of its

central role in crowd control and demonstrations (e.g., see the COCL's first quarter 2021 critique of the court ordered RRT training provided in March of 2021).

First, in terms of ECIT, there was no training during the second quarter, except for a 30-minute scenario within the In-Service training that PPB is counting as a "mental health refresher training." (And COCL reviewed this In-Service training in the first quarter).[7] The main training for ECIT officers will occur in the fall.

The 2018 training of the PPB's Rapid Response Team (RRT) was the main controversy surrounding the PPB's training in the first quarter of 2022. In January, the City revealed to the COCL the existence of disturbing and offensive training material, and as a result, both the COCL and the DOJ asked the City Attorney's Office (CAO) to keep them informed of this investigation. COCL did not receive any updates on the investigation during the first quarter and by the end of the second quarter, we were informed that the investigation was still ongoing. Apparently, the investigators were challenged to locate all the command personnel associated with the RRT, as some were no longer employed by the PPB. Also, the first draft report was sent back to the authors with a request to gather additional investigative information. Recently COCL was informed that the investigation was completed late in the third quarter and will be reviewed by PRB in the fourth quarter.

_Crowd Management Training in General:_ To be fair, the City and PPB have sought to provide additional crowd management training over the past year in response to criticism from both COCL and DOJ, as well as a lawsuit where such training is required as a remedy.[8] We have reported on these trainings in the past, including training on use of force in crowd control settings for all officers and for new officers.

Since the RRT was disbanded, the PPB has not decided whether another specialty unit will be used in protest events. In the meantime, the Mobile Field Force (MFF) from each precinct will respond to demonstrations.

---

[7] The primary focus of the 8.5-hour In-Service training in the first and second quarters was firearms (4 hours).

[8] Don't Shoot Portland v. Portland, 503 F Supp. 3d 1022, 1034 (D. Or. 2022)

86

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

In addition, PPB seeks to hold quarterly training on "Critical Incident Command" for its Special Emergency Reaction Team (SERT) and Crisis Negotiation Team (CNT), covering directive 720.00 and related policies. According to PPB's Training, the CIC trainings "are for those that provide on-call command response to all SERT and CNT activations, high-risk warrants or any other event designated by the Chief of Police or designee." In the third quarter of 2022, COCL was invited to provide feedback to PPB on the lesson plans for this training, and we did so. But to be clear, these groups are not involved in crowd management during protests. The primary focus of this training will be on Critical Incident Commander's role[9] and the specialty group's role during <u>individual</u> crises (including mental health), not <u>group</u> events. Thus, we will wait to see how PPB will train its officers in general and MFF in particular to manage public demonstrations.

More generally, our main concern about the training of specialty groups is about oversight and approval. The Training Division is required to review and approve <u>all</u> training material used to train PPB personnel, per Directive 1500.00 and S.O.P #1-21[10], but the PPB did not enforce these regulations with the 2018 RRT training. However, as we noted in our first quarter report, the PPB has taken steps to correct this problem. First, the PPB's Training Division Captain released an internal memo in January of 2022 to all RU managers reminding them that external training plans must be reviewed and approved in advance by the Training Division, citing Directive 1500.00. Second, the Training Division has included all planned training for Specialty units in its revised 2022 Annual Training Plan. The COCL will continue to monitor both the review process and the investigation.

Because good crowd management is essential for achieving compliance with the Settlement Agreement, the COCL will continue to address this issue and make recommendations. Although PPB has introduced some crowd management training through different In-service

---

[9] For PPB, Critical Incident Commander (CIC) is different from the Crowd Management Incident Commander (CMIC).

[10] https://www.portlandoregon.gov/police/article/680811

**Exhibit A**

venues over the past year, the emphasis has been on providing legal updates around the use of force (which the COCL has covered in prior reports). Even in this domain, more clarity is needed so that officers fully understand that PPB's general use of force policy (Directive 1010) applies to crowd control events. Thus, a comprehensive approach to crowd management has yet to be implemented and will require that PPB incorporate findings from PPB's Needs Assessment on demonstrations as well as the findings from the future external Critical Incident Assessment on demonstrations. The City has hired an organization to conduct the external critical incident assessment and their work will begin in the third quarter.

As we have noted previously, COCL provided extensive feedback to PPB over the past year regarding the use of specialty units, de-escalation methods, types of resistance that would/would not justify the use of force, preparing Force and After Action reports, and other topics. Organizational reform is more likely to occur when policy, training, and individual performance evaluations are modified to reflect best practices in policing and enhance police legitimacy. The COCL will continue to provide recommendations for improving training, policy, and performance evaluations as they relate to crowd management and organizational behavior in general. In the future, COCL will give additional attention to PPB's annual performance evaluations by supervisors, which can serve as an important mechanism for changing the organizational culture and street-level behavior.

For crowd control, in addition to the internal and external assessments of the 2020 protests, we continue to recommend that the PPB and the City give serious attention to recent reports by the Independent Police Review (IPR, April, 2022) *Lessons Learned: City's response to protests exposed vulnerabilities in Portland's police accountability system*[11] and by, the Police Executive Research Forum (PERF, February, 2022) *Rethinking the Police Response to Mass*

---

[11] https://www.portland.gov/ipr/news/2022/4/12/lessons-learned-citys-response-protests-exposed-vulnerabilities-portlands-police

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

*Demonstrations: 9 Recommendations.[12]* The PERF report provides important recommendations – consistent with the COCL's emphasis on communication, community engagement, and de-escalation.

**Training Summary and Conclusions**

During the second quarter, the PPB provided one important training required by Paragraph 84 – training for new supervisors. The COCL observed the Sergeants Academy and overall, we were satisfied with the curriculum content. It covered a range of important topics, including Leadership in Policing, Performance Reviews, EIS, Procedural Justice, Community Engagement, Crowd Management and Control, and preparing After Action Reviews of force incidents. COCL's main concern with many of these classes is the reliance on static, wordy PowerPoint slides, which is not the best way to engage students. Many of the classes included topics that would benefit from a Problem Based Learning approach, so students would be able to apply the knowledge and policy to real world situations. The COCL continues to recommend creating more engaging PowerPoints and involving more classroom scenarios.

Last quarter COCL emphasized the need for evidence-based training in areas such as de-escalation and procedural justice where research has identified effective training methods. This would apply to instructional techniques as well, so we hope that the new civilian leader to be hired in the Training Division can give attention to these issues. Eventually, our hope is that evidence-based training can draw upon local data from body-worn camera footage and contact surveys to clearly illustrate to officers where specific improvements in performance are needed when interacting with the public.

In the second quarter, the PPB continued to provide a range of online classes and educational material using their Learning Management System (LMS). A total of seven topics were delivered virtually to PPB members during the quarter. In addition to offerings made available

---

[12] https://www.policeforum.org/assets/ResponseMassDemonstrations.pdf

**Exhibit A**

through the LMS, some PPB members, depending on their rank, were required to take the Incident Command System (ICS) training provided by the Federal Emergency Management Agency (FEMA) and the US Department of Homeland Security.

As noted in our last quarterly report, the PPB's Equity and Inclusion Office (EIO) began posting equity training videos focused on interacting with members of the LGBTQIA2S+ community. This quarter EIO released the final two videos in this series, which received positive reviews from COCL.

We feel the PPB is engaging in a good faith effort to find the right balance of virtual trainings that include asynchronous videos, interactive videos (with "click through" questions and quizzes), and live interactions with instructors. Based on our experience, some training topics require in-class discussions (e.g., difficult conversations around bias-free policing or responses to the LGBTQIA2S+/ Queer community) and some require in-class practice of skills (e.g., de-escalation and procedural justice). Hopefully, PPB can continue to pursue the best balance.

In terms of crowd management, the City and PPB have provided additional training over the past year in response to criticism from both COCL and DOJ, as well as a lawsuit where such training is required as a remedy.[13] The emphasis has been on providing legal updates around the use of force. A comprehensive approach to crowd management has yet to be implemented and will require that PPB incorporate findings from internal and external needs assessments.

Furthermore, since the RRT was disbanded, the PPB has not decided whether to engage another specialty unit in protest events or what that unit might look like. For now, the Mobile Field Force (MFF) will respond to demonstrations. The Sergeants Academy included some training on the use of MFF from a supervisor's perspective, and new In-service training for all officers will be implemented in 2023 after PPB's force directives have been finalized.

---

[13] Don't Shoot Portland v. Portland, 503 F Supp. 3d 1022, 1034 (D. Or. 2022)

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

For specialty unit training, we are also awaiting the investigative findings from the 2018 problematic RRT training (See Par. 193). Looking forward, however, COCL's primary concern is that the Training Division is rigorously following an internal process for obtaining, reviewing and approving training plans prior to the start of training. A fail-proof system of oversight must be in place.

Finally, we look forward to the PPB's Training Division adopting additional on-the-job outcome measures in the future to evaluate training effectiveness, as well as more sophisticated evaluation designs. The findings will allow PPB to identify effective and ineffective training programs and adjust accordingly.

The PPB remains in Substantial Compliance for all paragraphs in Section IV (Training), except for Par. 78 and 84. The City has made progress on outsourcing the independent Critical Incident Assessment of crowd control that would have implications for future training (See Par. 189). However, the PPB will remain in Partial Compliance until the required recommendations listed below have been implemented.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, Crowd Control and Management training should be updated based on the PPB's Needs Assessment on mass demonstrations<br>• To achieve Substantial Compliance, develop and deliver training with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" (Par. 84) including crowd control settings. This should include opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest.<br>• To achieve Substantial Compliance, incorporate recent changes to the PPB's force-related Directives into training (910.00, 1010.00, and 1015.00)<br>• To achieve Substantial Compliance, strengthen the PPB's system to review and approve all specialty unit trainings to avoid inappropriate or harmful training and regain public trust. Enforce Directive 1500.00 and S.O.P. #1-21. This |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| | should include a complete investigation of RRT training in 2018.<br>• Continue to support the development of sophisticated online training that allows for interactivity and is linked to subsequent in-person skills development<br>• Provide refresher training on first amendment rights and bias-free policing that can address any PPB bias against peaceful protestors |
| **Assessment Based On** | • COCL's observation/assessment of training content, delivery, and consistency with adult-learning principles and best practices<br>• Processes described by PPB personnel<br>• Future content assessment: Whether the PPB can provide training on crowd control and force reporting that is based on a comprehensive assessment of problems that occurred during the 2020 protests and includes the requirements of Par. 84 |

**Audit the Training Program**

---

**Settlement Agreement Paragraph**

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a

---

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | When the audit plan is available, COCL will review the methodology for coverage and validity. Later, COCL will then review the audit report for accuracy and completeness. |

### Compliance Assessment

COCL has consistently recommended that PPB undertake another audit because of changes that have occurred since the last formal audit in 2018 and because of the bigger changes that are planned, including the hiring of a civilian head of the PPB's Training Division. Also, the problems associated with the RRT training suggest that the process of reviewing training materials for all units deserves attention, as well as classes that reinforce a healthy view of the community. The PPB's Office of the Inspector General (OIG) is planning to conduct another audit and is planning to complete the audit plan/methodology in the third quarter.

At this point, the COCL can confirm that the Training Division has continued to perform the functions identified in Par. 85, as reported throughout Section IV (Training) of this COCL report. In terms of the requirement in Par. 85(g), one directive relevant to the Settlement Agreement (Directive 320.00, "Portland Police Bureau Reporting of Potential Exculpatory or Impeachment Information") was enacted in the first quarter. In terms of compliance, PPB reports that 98% of the PPB employees who are required to read this directive acknowledged doing so within the 30-day time period set by PPB. OIG, who needed the staffing bandwidth to conduct a full audit of the Training Division, was able to hire two analysts during the first quarter and a third one during the second quarter, bringing the total audit team to six members. Hence, OIG is prepared to move forward with the Training audit.

We recognize that DOJ has found the PPB in Partial Compliance on Par. 85 for not conducting a follow up audit by this time. The COCL has been slightly more lenient because of staffing issues, but primarily because the Settlement Agreement does not specify the interval for

conducting follow up audits, and because PPB has, de facto, performed certain highly visible functions required by the audit, such as the annual Needs Assessment and Training Plan (See Par. 79). But COCL has insisted on deadlines for the next audit plan and audit completion. We can now report that the PPB produced an audit plan in the second quarter, and it has been reviewed by the COCL. The audit itself is expected to be completed by the end of the year.

The COCL has suggested to PPB that the new audit give some attention to training classes for all officers and for supervisors rather than focus on training for new recruits (as it did in 2018), and address Directive 1500, which requires all training plans be approved by the Training Division. Also, we continue to emphasize the need to evaluate the organizational structure and resources within the Training Division to ensure that the new civilian Dean has the freedom and support to introduce real change without unnecessary administrative or bureaucratic barriers. Also, classes that give attention to equity and bias should be given special attention, including how they are evaluated, since these classes are important for changing police culture and ensuring constitutional policing.

| | |
|---|---|
| **COCL Recommendations** | • To remain in Substantial Compliance, the PPB should produce a Training Division Audit report by the end of the fourth quarter of 2022.<br>• We recommend that the audit evaluate record keeping on specialty classes and outside trainings.<br>• We recommend that the audit give attention to the delivery of in-service training for officers and supervisors, with particular attention to equity classes. |
| **Assessment Based On** | • COCL will review the audit plan based on identified needs of the Training Division, auditing standards, and the timeline for completion of the audit. |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Analyze and Report Force Data**

---

**Settlement Agreement Paragraph**

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed Training Advisory Council (TAC) meeting agenda and minutes; Reviewed TAC reports and recommendations |

**Compliance Assessment**

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). Protest-related force statistics are included at the end of the quarterly reports and on the PPB's Open Data Portal, which lists the number and types of crowd control force incidents. Thus, the COCL continues to find the PPB in compliance with Par. 86, but as previously noted, the PPB must find ways to improve the quality of data on force used during crowd control.

TAC held one public meeting during the second quarter of 2022 on May 11, 2022, at which the new chair of TAC was elected. While there was no presentation of force data by the Force Inspector at the TAC meeting this quarter, the meeting took place before the publication of the Q1 Force Application Report. This data was presented at the third quarter meeting held in July.

95

**Exhibit A**

In terms of community engagement, the TAC and the PPB Training Division continue to have a productive relationship. At the May 11th, 2022 meeting the PPB provided an update of the process of hiring the new Dean of Training and an update on the Training Division's work. The Chief's office continues to respond in a timely manner to any formal recommendations from TAC. We therefore find the PPB remains in compliance with Par. 86.

At the meeting this quarter a new chair was elected and the COCL was given the opportunity to interview them. Here we summarize some of the points expressed by the new chair. It should be noted that this summary represents the chair's viewpoint and is not a formal stance of TAC and no vote has been taken on this matter. The new chair indicated they intend to keep TAC moving in the same direction as they have been under the previous chair. One thing the chair would like to do is formalize a few administrative things such as ensuring onboarding resources are in a central place and utilizing a recommendation tracker to document recommendations current and historical. Another goal is to help create and support useful task forces.

One administrative barrier for the TAC is the inability to directly update their website. The current practice for updating the website requires submitting requests to the City and this can have a long turnaround. This barrier could potentially impact the ability to enhance the relationship with the community by limiting communication and transparency. When it comes to working directly with the PPB and Training Division staff, the chair confirmed the COCL's observations of a good working relationship between TAC and the PPB, emphasizing good communication and responsiveness. The chair indicated that they are satisfied with both the time it takes for PPB to respond to their recommendations, as well as with the content of PPB's responses.

Regarding the quarterly reports and presentations on use of force, the chair shared the sentiment that some members do not find them very useful or productive. One of the reasons cited is the amount of meeting time these presentations require relative to actionable findings. The TAC only meets six times a year and spends a substantial amount of time listening to the use of force presentations. The TAC does not have the ability to do much with the use of force information presented to them within a single meeting. The TAC is interested in working with the Force Inspector to come up with an approach to sharing data that would be more valuable. The TAC members have also repeatedly raised concerns with the way PPB discusses racial disparities in rates of custody and use of force and believe that PPB can do a better job of highlighting inequity and structural factors that lead to such

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

disparities. Overall, the chair believes the TAC is interested in working with the Force Inspector to develop a more effective and efficient way of presenting use of force data.

The COCL recognizes the DOJ found the PPB in Partial Compliance for this paragraph, maintaining that PPB's audit of crowd control force from 2020 does not comply with the Settlement Agreement. The COCL has also raised concerns about the crowd control audit and as such, kept Section III in Partial Compliance. The DOJ report also indicates issues with the data the Force Inspector presents to the TAC. The COCL would encourage the Force Inspector to work with the TAC to create a better system of presenting use of force data, but at this time the PPB remains in Substantial Compliance with Par. 86. The COCL continues to maintain that the current system of force reporting and the relationship between the TAC and PPB meets the basic standards articulated in Par. 86.

| **COCL Recommendations** | • The Force Inspector should work with the TAC to find a better way to deliver the use of force presentations, including the coverage of inequities. |
|---|---|
| **Assessment Based On** | • COCL review of PPB's quarterly force reports and inclusion of trends<br>• PPB's responsiveness to TAC's recommendations |

| **Settlement Agreement Paragraph** |
|---|
| 87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief. |

| **Compliance Label** | Substantial Compliance |
|---|---|

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Methodology | Review of PPB website regarding TAC; Review TAC agendas and minutes; Observe TAC meetings |
|---|---|

**Compliance Assessment**

The TAC meeting held in the second quarter of 2022 (May 11th) was open to the public as required by Paragraph 87. The COCL continues to observe these Zoom meetings and the public has been allowed to listen and make comments. The PPB continues to use a public email distribution list to send reminders of the meetings to the public. The PPB also continues to post the TAC meeting agendas and minutes on the PPB's website.[14]

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | • COCL review of information available on PPB website<br>• COCL observation of TAC meetings and review of TAC minutes |

---

[14] https://www.portland.gov/police/tac/events/past

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# V. COMMUNITY-BASED MENTAL HEALTH SERVICES

### Settlement Agreement Paragraph

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Monitor the City and PPB continuing to work with community partners |

### Compliance Assessment

This paragraph is assessed based on the City and the PPB's continuing relationship with community partners. As this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section. Since all other paragraphs within this section remain in Substantial Compliance, so too does Par. 88.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | • N/A – Summative paragraph |

---

### Settlement Agreement Paragraph

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review status of Unity Center; Review minutes from Unity Transportation Workgroup |

### Compliance Assessment

The COCL continues to acknowledge that the focus of Par. 89 is on the Community Care Organizations and the expectation that they establish one or more drop-off center(s). The Settlement Agreement does not hold any authority over these organizations, but our assessment remains focused on the City's activities and reasonable expectations regarding their involvement with the drop-off/walk-in center(s).

Related to the focus of Par. 89, The Unity Center remains the drop off center for individuals experiencing behavioral health needs. The facility has been operating in this capacity since it opened in May 2017. The PPB has two policies related to this paragraph, including Directive

850.21 (Peace Officer Custody (Civil)) and 850.25 (Police Response to Mental Health Facilities). These directives provide the protocol for officers to contact AMR for ambulance transport to the Unity Center. These directives have remained the same throughout 2021 though are currently in the review process with the entire suite of directives related to mental health response. In the third quarter of 2022, the COCL team was provided the opportunity to review these directives and we will therefore provide an update in our next report.

Since the opening of the Unity Center, a Transportation Workgroup has met regularly in quarterly meetings to discuss the operation of the Center. This workgroup includes members of Unity, the PPB, AMR, Multnomah County and Legacy ED Health. The group met for their quarterly meeting on May 26, 2022. At the fourth quarter meeting in 2021, discussion was raised about the PPB response, including an ongoing concern involving the reluctance of the PPB officers to lock up their weapons when they arrive at Unity. Another concern brought up was that Unity is unable to get copies of the detailed officer reports. The PPB was able to address both points at the second quarter meeting. It was confirmed that the process for PPB officers is to lock up their weapons before entering Unity and reasoned that if an officer is not following that protocol, they might be new and unaware of the process. The representative for PPB asked Unity to contact her with the officer's information if there is any issue with this moving forward, so PPB can remedy the situation and make sure that all officers are following the proper procedure. Additionally, the group discussed the possibility of PPB sharing, with Unity, a detailed police report concerning the individual being brought in. There are some privacy concerns around this, and it requires more discussion and planning on how to efficiently deliver such information. In the meantime, PPB officers are asked to make sure they leave their card or contact information so that Unity staff can follow up with them if needed. We will provide updates to this issue in future reports once more information is available.

The group also reviewed transportation data, which indicated that Unity had been able to cut their divert times by almost half in the last couple of months (divert times means when the hospital decides to close themselves off from new admissions due to being at capacity, being short-staffed, or any other reason). Other partners provided updates and the agencies acknowledged a re-grouping effort to co-manage the growing substance abuse issue in Portland. The Unity Transportation working group is fulfilling its function and providing a space for partners to increase collaboration and problem solving.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

Based on the PPB and the City's ongoing participation in the process to date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph.

| **COCL Recommendations** | • No Recommendations at this time |
|---|---|
| **Assessment Based On** | • COCL review of Unity Transportation Workgroup minutes |

---

**Settlement Agreement Paragraph**

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU") [Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators to divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Community Outreach Meeting minutes; Review PSU evaluation on PSR |

**Compliance Assessment**

As with the above paragraph, Par. 90 holds expectations of CCOs to create subcommittees for PPB to serve on, with a list of initial goals to be accomplished. However, CCO's are not under the authority of the Settlement Agreement, and we therefore only evaluate the City on what can reasonably be expected of the agency given the lack of opportunity from CCOs.

During the second quarter of 2022, Legacy Community Outreach met twice, and minutes and a resource list were provided for those meetings. At the May 2022 meeting, presentations were made regarding community resources such as The Victim Rights Law Center, Transition Support Services provided by Multnomah County Corrections and C-TEC which aims to provide youth services such as employment training and opportunities. The June 2022 meeting focused on state resources and provided information on Supplemental Nutrition Assistance Program (SNAP) benefits, Temporary Assistance for Needy Families (TANF) and the Job Opportunity and Basic Skills (JOBS) program. Additionally, the local organization Maybelle Center for Community gave a presentation detailing their services. The PPB's Service Coordination Team manager attended both meetings.

Additionally, this quarter, as it relates to "expanded options for BOEC operators to divert calls to civilian mental health services" (Par. 90), we reviewed a lesson plan discussing the functional similarities and differences between Portland Street Response (PSR), Project Respond, and ECIT officers. The in-service training will be given starting the third quarter and is responsive to recommendations from the analysis of PSR conducted by Portland State University (PSU). Finally, although we provide more detail in our assessment of Par. 115, there appear to be limitations in PSR's ability to respond to all calls which fit the program's dispatch criteria which we will need to follow up with in future reports.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | • PPB involvement with Behavioral Health Collaborative Team <br> • PPB involvement with Legacy ED Community Outreach <br> • PSU's evaluation of PSR |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# VI. CRISIS INTERVENTION

## A. Addictions and Behavioral Health Unit and Advisory Committee

### Settlement Agreement Paragraph

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*[As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures].*

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHU Unit Structure |

### Compliance Assessment

In terms of personnel and BHU's general oversight, the BHU continues to conform to the requirements of Par. 91, as evidenced by the BHU unit structure and our observations of the BHU coordinating ECIT, BHRT, and SCT operations. While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, ECIT data collection, etc.), ECIT officers directly report to their precinct level chain of command. This command structure conforms to the Memphis Model. There have been no major changes to the structure of the unit and PPB is expected to provide updates on personnel changes.

In the second quarter of 2022, PPB provided the COCL with the updated organization chart for the Specialized Resources Division, which houses the BHU. In the first quarter, PPB shared plans that they would be assigning a new BHU Sergeant to the unit and, in the second quarter, they confirmed that a new sergeant was put in place. The new sergeant also brings prior experience as a former BHRT officer. Additionally during the second quarter, the PPB continued planning for making the switch to having all BHRT clinicians being in-house (as opposed to contracting with Cascadia). While an additional BHRT team was added in the second quarter (see Par. 106), moving forward, all BHRT mental health professionals will need to re-apply to be a city employee. The BHU also released a position announcement and began interviewing for a BHRT officer in the second quarter and they expect the position to be filled by the third quarter. PPB continues to be transparent and provide documentation on updates within the unit organization and we therefore find that PPB remains in Substantial Compliance with this paragraph.

| | |
|---|---|
| **COCL Recommendations** | • Continue to update the COCL and the DOJ on changes to personnel when applicable |
| **Assessment Based On** | • COCL review of unit structures and personnel |

**Settlement Agreement Paragraph**

92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate

| | response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction. |
|---|---|
| **Compliance Label** | 92. Substantial Compliance |
| | 93. Substantial Compliance |
| **Methodology** | Review BHUCT, BHRT, and SCT coordination team meeting agendas and minutes; Review ECIT, BHRT, and SCT outcome measures |

### Compliance Assessment

The PPB continues to utilize a number of work groups to collaborate on ways to "decrease law enforcement interactions [and] mitigate the potential uses of force in law enforcement interactions with consumers of mental health services" (Par. 92). BHU staff meet weekly to discuss the BHRT caseload and the Behavioral Health Unit Coordination Team (BHUCT) meets on a bi-weekly basis to discuss current and potential BHRT clients. The BHUCT is composed of several community partners including representatives from Multnomah County, Cascadia, and Federal/State law enforcement. PPB provided us with meeting minutes and agendas indicating that a core group of partners attends consistently, with other partners attending as needed.

The discussions during these meetings are designed to problem-solve and create strategies to reduce future criminal justice contacts for individuals that have frequent contact but have been difficult to engage in ongoing services. BHU personnel indicate that information on individuals discussed is only shared if it is subject to lawful disclosure. BHU personnel indicate the BHUCT has been a particularly valuable collaborative strategy.

The Service Coordination Team also conducts weekly meetings to discuss potential clients and make determinations about eligibility for SCT Services. Meetings include community partners and representatives from various entities in Multnomah County. The meetings also review current SCT clients in order to "facilitate continuation of care" for clients. We believe these meetings meet the spirit of Par. 92.

**Exhibit A**

The PPB continues to provide the COCL with the documentation for all meetings occurring within the BHU, including minutes from each SCT, BHU, and BHUCT meeting. Additionally, the PPB provided the COCL with copies of the BHRT fliers that are used to communicate with partners about individuals they are trying to connect with services. This information is also supplemented through data collected on the Mental Health Template (MHT) by identifying individuals and locations with repeat calls for service and developing response strategies.

Relevant outcome measures are collected for BHRT and SCT and the PPB provides the COCL with quarterly reports summarizing these data. Altogether, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, BHCC (Behavioral Health Call Center), BOEC, and BHUAC. Thus, we find that the PPB remains in Substantial Compliance with the paragraph requirements of 92 and 93.

However, we maintain our suggestion that the BHU work in closer coordination with the Force Inspector when force trends relate to persons in mental health crisis (see, for instance, our assessment of Par. 76). We have made this suggestion several times, and we have yet to see evidence of greater collaboration between the BHU and Inspector. We note that this is not a condition for substantial compliance and is rather technical assistance for enhanced operation within the Bureau.

| | |
|---|---|
| **COCL Recommendations** | • The BHU should work in closer coordination with the Force Inspector when force trends relate to persons in mental health crisis<br>• Continue to collect and review data on mental health services, and use this information to update services as needed |
| **Assessment Based On** | • BHCT, BHRT, and SCT coordination meeting agendas and minutes<br>• ECIT, BHRT, and SCT outcome measures |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

### Settlement Agreement Paragraph

94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC roster of members; Review BHUAC minutes; Observe BHUAC meetings |

### Compliance Assessment

In the second quarter of 2022, the Behavioral Health Unit Advisory Committee (BHUAC) continued to regularly meet, holding meetings on April 27, May 25, and June 14. The minutes of these meetings have been documented and shared with COCL and are found on the PPB's website.

Membership requirements of the BHUAC as outlined in Paragraph 94 continue to be met, with a current roster of 15 voting members, representing a variety of entities involved in the mental health response systems. Beyond the roster requirements, voting members are expected to attend, and there needs to be at least eight voting members present for quorum. For two of the three meetings held in the second quarter, a quorum was met. At the June meeting, only seven voting members were in attendance, not meeting quorum. In the past, we have noted quorum being an issue and, although quorum was met at two of the meetings, we continue to suggest PPB encourage regular attendance from the volunteer committee meetings. We do note that at the June meeting, members began a discussion around bringing in new members and talked about other organizations they could look into. As additional information comes in on this effort, we will provide updates in future reports. However, for this report given the

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

quorum met for two of the meetings, we continue to find PPB in Substantial Compliance with this paragraph.

| **COCL Recommendations** | <ul><li>Continue to encourage regular attendance</li><li>Continue discussions around bringing in new members</li></ul> |
| --- | --- |
| **Assessment Based On** | <ul><li>BHUAC roster</li><li>BHUAC minutes</li><li>Observations of BHUAC meetings</li></ul> |

---

### Settlement Agreement Paragraph

95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| **Compliance Label** | Partial Compliance |
| --- | --- |
| **Methodology** | Review BHUAC minutes; Observe BHUAC meetings |

### Compliance Assessment

Paragraph 95 envisions that the BHUAC committee members will assist "the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of

community-based mental health services." The BHUAC continued to hold monthly meetings in the second quarter of 2022. The meeting agendas included topics such as directive review and a review of upcoming trainings including the Sergeants Academy ECIT lesson plan and the upcoming ECIT In-service. For both of these training presentations, BHUAC members were provided with the contents a week before the meeting and then were able to provide feedback after a presentation by PPB staff.

However, some persistent concerns with the operation of the BHUAC remained, including lost opportunities for providing guidance to PPB and the City and having a quorum of members during meetings. For instance, the May meeting was entirely spent going over prior meetings' minutes, leading to disagreements and rendering the meeting largely unproductive. The meeting was supposed to contain a review of BHU SOPs though this did not occur due to there being insufficient time left. Additionally, as noted above, one meeting did not have a quorum of BHUAC members and, although this was the meeting that contained robust discussion of the PPB trainings, recommendations could not be voted on (though some changes to training were ultimately made as a result of the positive discussion that occurred).

To be clear, our observations of the April and June BHUAC meetings revealed meaningful conversations that we believe ultimately were beneficial to the PPB and City. For instance, even without a quorum, the BHUAC discussion of PPB trainings resulted in improvements to the trainings. Therefore, our remarks regarding issues of quorum and meeting efficiency are not designed to criticize the BHUAC members themselves, who have continued to demonstrate a commitment to improving mental health response in Portland through engaged discussions. However, the formal operation of the committee overall has experienced shortcomings which will need to be resolved in order to return to Substantial Compliance.

As a follow-up to our prior technical assistance (TA) statement, significant progress was made regarding the issue of BHUAC reviewing information about real-world uses of force against persons in mental health crisis. This included a fruitful meeting with the relevant parties as well as PPB providing COCL and DOJ a proposal for incorporating such information in BHUAC meetings. However, the bulk of this progress occurred in the third quarter, and we will therefore provide an update in our next report. Additionally, as noted above, the PPB provided greater opportunity for the BHUAC to review the Bureau's training on encounters with persons in mental health crisis and, during the meeting, the committee engaged in thoughtful discussion and provided informal suggestions to the PPB. As a result, there has been significant progress in resolving both of the issues we identified in our TA statement.

Given the outstanding concerns with BHUAC's formal operation as well as the need to completely resolve the issue of reviewing information on use of force by PPB officer officers when interacting with persons in mental health crisis, we continue to find that Par. 95 is only in Partial Compliance. Although we have seen improvements in some areas (for instance, the recent review of PPB training), these other areas will still require resolution to return to Substantial Compliance.

| **COCL Recommendations** | • To return to Substantial Compliance, resolve the issues surrounding quorum and meeting efficiency.<br>• To return to Substantial Compliance, continue to engage the COCL and the DOJ in conversation regarding the content of the COCL's TA Statement |
|---|---|
| **Assessment Based On** | • Review of BHUAC minutes and agendas<br>• Observation of BHUAC meetings |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review BHUAC recommendations found in BHUAC minutes |

**Compliance Assessment**

In accordance with Paragraph 96, the BHUAC continues to provide the COCL with a report of their votes and recommendations for the implementation of the BHU and BOEC. In the second quarter of 2022, the BHUAC viewed a presentation by the Directives team and were provided with an upcoming schedule for reviewing directives and SOP's. The committee was also informed that they could send recommendations to the Directives Team at any time, even if the directive isn't up for review. As such, recommendations will be held for the next review period. The BHUAC also reviewed the Sergeants Academy ECIT training lesson plans and provided some suggestions for edits. The PPB updated the training slides based on the suggestions made during the meeting. The BHUAC also reviewed the ECIT In-service training slides, which covered targeted violence, threat assessment and motivational interviewing. The feedback from the group was positive. At the June meeting, the BHUAC also reviewed a presentation about the formation of the new Clinician position that will be hired through the City of Portland to serve on the BHRT. The committee had informal recommendations such as looking at other cities that have similar positions and updating some of the language in job position description. Members also discussed some of the challenges that might arise due to changes in the clinicians being city employees and not employees of Cascadia.

During the second quarter, the BHUAC made one recommendation, namely, that "the BHUAC shall not be responsible for gathering comments made during the quarterly BHUAC engagement meeting as this does not fall under the scope of work for the BHUAC. It was agreed upon that if the public would like to give feedback on directives the BHUAC would point them to the existing resources to provide." However, as noted in our assessment of Par. 95, we found that there were lost opportunities for the BHUAC to make additional formal recommendations, including in one meeting without a quorum (thereby prohibiting formal recommendations) and another meeting that focused primarily on passing minutes. While we note that informal recommendations were provided during the discussion of PPB trainings, the lost opportunities for formal recommendations drive our position that Par. 96 still be considered in Partial Compliance. Furthermore, while there has been considerable progress towards resolving the issues we identified in our prior TA Statement, these conversations will still need to continue in order to reach a final resolution regarding BHUAC reviewing real-information regarding officers use of force against persons in mental health crisis.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • To return to Substantial Compliance, resolve the issues surrounding quorum and meeting efficiency.<br>• To return to Substantial Compliance, continue to engage the COCL and the DOJ in conversation regarding the content of the COCL's TA Statement |
| **Assessment Based On** | • BHUAC status reports and recommendations<br>• PPB responses to BHUAC recommendations |

**B. Continuation of C-I Program**

| **Settlement Agreement Paragraph** |
|---|
| 97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.<br><br>98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers. |

| | |
|---|---|
| **Compliance Label** | 97. Substantial Compliance |
| | 98. Partial Compliance |
| **Methodology** | Review of the PPB in-service training |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Compliance Assessment**

The PPB continues to emphasize crisis response as a core competency in their training. For instance, all officers are required to receive a minimum of 40 hours of crisis intervention training prior to graduating from the Advanced Academy. In the first quarter of 2022, the PPB began a new Advanced Academy in February and provided 19 hours of Crisis Intervention training to recruits, with additional hours to be provided in the second quarter as well. In the second quarter, PPB Advanced Academy provided 6.5 additional hours of Crisis Intervention Training. This complements the 28 hours of C-I training that all recruits get in the statewide DPSST Basic Academy. The Advanced Academy concluded in May, with all new recruits completing 25.5 hours of C-I training. Combined with the 28 hours they previously received in the state academy, new PPB recruit finished their training with 53.5 hours of C-I training, exceeding the necessary 40 hours of required C-I training.

However, as noted in our prior report for Par. 98, the BHUAC was not asked to review the in-service scenario involving persons in mental health crisis. As this review is required by Par. 98, we must still find PPB in only partial compliance with the requirements of this paragraph. To return to substantial compliance, we encourage the PPB to resume utilizing the BHUAC as a resource when designing C-I refresher training for in-service. Additionally, we note that such efforts need not wait for PPB to develop the training for BHUAC review. Rather, trainings could be developed in coordination with BHUAC, bringing them in at the ground level as opposed to the committee reviewing the final product.

| **COCL Recommendations** | • To return to Substantial Compliance with Par. 98, allow BHUAC to review the training before the next In-service training |
|---|---|
| **Assessment Based On** | • PPB In-service training |

## C. Establishing "Memphis Model" Crisis Intervention Team

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]"). | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHU/ECIT data; Interview PPB Personnel; Review Mental Health Template data; Review BOEC data |

**Compliance Assessment**

The PPB continues to operate under a modified "Memphis Model" of crisis intervention. In this specialized response system, a select group of officers receive an additional 40 hours of training to become Enhanced Crisis Intervention Team (ECIT) officers. As part of ECIT operations, PPB has Directive 850.20 (Police Response to Mental Health Crisis) though this directive was being revised in the third quarter. Along with the revisions, the PPB is planning a training that will distinguish between the roles and responsibilities of ECIT, Portland Street Response, and Project Respond. As the majority of this occurred in the third quarter, we will provide updates in our next report.

In the second quarter of 2022, PPB decided to review the composition of the ECIT roster. The core function of ECIT is responding to calls with a mental health component, yet a number of those on the roster were inactive and it no longer made sense to involve them in trainings. These inactive members included sergeants not working in a uniform capacity, detectives, and members with a rank higher than sergeant. Thus, PPB decided to "honorably de-certify" these individuals and re-align the roster to be closer to the true function of ECIT. This left PPB with 144 total members active in the ECIT program.

Additionally, the BHU continued to hold ECIT advisory meetings. During the second quarter, ECIT members from all precincts discussed topics related to ECIT in-service, Portland Street Response, and the ECIT roster. For instance, the minutes from the meeting noted that officers

**Exhibit A**

feel that PSR needs hold authority and that PSR could benefit from training on PPB's force policy, so they better understand situations in which force is in policy. The minutes also noted that ECIT officers would appreciate more ECIT officers being added to the roster as they feel that they are currently working over capacity responding to calls. The officers also discussed that there are some issues with calls getting labeled as ECIT when they just have a mental health component and don't meet the full criteria for ECIT. This issue stems from dispatch as well as other officers calling in ECIT when it is unnecessary. At the meeting PPB discussed sending out reminders to officers about the proper protocol for calling in ECIT.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • ECIT roster<br>• PPB's Semi-Annual Mental Health Crisis Response Report |

| **Settlement Agreement Paragraph** |
|---|
| 100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review ECIT Roster; Interview PPB personnel |

| **Compliance Assessment** |
|---|
| The PPB continues to follow the practice of accepting volunteer officers for ECIT certification. In the second quarter of 2022, the PPB had 144 total ECIT members, which also includes the |

reduction in number from the de-certification process described in our assessment of Par. 99. Based on this as well as the semi-annual assessment conducted by PPB that we reported on in our last report (showing a 70% response rate), we continue to find that the number of ECIT officers is commensurate with the demand for services and therefore PPB has maintained compliance with the requirements of Par. 99.

| **COCL Recommendations** | • Continue utilizing existing data to assess demand for ECIT services |
|---|---|
| **Compliance Rating Based On** | • Mental Health Template data<br>• ECIT roster<br>• PPB's Semi-Annual Mental Health Crisis Response Report |

| **Settlement Agreement Paragraph** | |
|---|---|
| 101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT]. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review evaluation documents for potential ECIT officers |
| **Compliance Assessment** | |
| In the second quarter of 2022, the PPB did not recruit any new ECIT applicants, and no changes were made to the qualifications. The PPB last taught a new training class for ECIT in the fourth quarter of 2021. COCL's previous report analyzed the roster and determined that the PPB | |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

followed the qualifications outlined in Paragraph 101. The COCL continues to suggest that the PPB seek input from the BHUAC for any updates to the qualifications that might benefit the program and to do so before delivering future ECIT training classes. At this point, we find the PPB to be in compliance with the requirements outlined in Paragraph 101.

| COCL Recommendations | • Re-engage the BHUAC regarding ECIT participation criteria |
|---|---|
| **Compliance Rating Based On** | • PPB ECIT evaluation documents |

| | **Settlement Agreement Paragraph** |
|---|---|
| | 102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model. |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB supplemental documents |
| | **Compliance Assessment** |
| | No new ECIT members were added to the roster in the second quarter of 2022. Nonetheless, some members of the BHU and ECIT did participate in training related events. Members are encouraged to engage in ongoing trainings, and some ECIT officers attended supplemental trainings covering topics such as Stress and Trauma Disorders, Hostage Negotiation, and Psychiatric Emergencies. Additionally, three officers attended a 2-day Group Crisis Intervention course. |

**Exhibit A**

We continue to appreciate the PPB's dedication to their ECIT model and commend their efforts to provide thorough training. We recommend the PPB continue to analyze and update their materials for ECIT training on an ongoing basis and to utilize outside perspectives, such as those from the BHUAC to help inform training content.

| **COCL Recommendations** | • Continue to seek out recommendations from the BHUAC on ECIT training |
|---|---|
| **Compliance Rating Based On** | • PPB supplemental documents<br>• Observation of BHUAC meeting |

| **Settlement Agreement Paragraph** | |
|---|---|
| 103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB policy |

| **Compliance Assessment** |
|---|
| In accordance with Par. 103 (and the Memphis model of mental health crisis response), ECIT members retain their normal duties until dispatched for use as ECIT. BOEC personnel have received training on the criteria for dispatching an ECIT to a call. Additionally, the PPB's Directive 850.20 includes the requirement for officers to consider calling in specialized units (including ECIT) as necessary. During the third quarter, Directive 850.20 was being revised and we will provide updates in our next report. Overall, we find PPB has maintained compliance with Par. 103. |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • PPB policy |

| **Settlement Agreement Paragraph** | |
|---|---|
| 104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB public awareness efforts; Review BHU website; Review BHUAC minutes |

**Compliance Assessment**

The PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe that the PPB has made a serious effort to highlight the work of the BHU in its entirety, not only the ECIT.

For instance, in the second quarter of 2022, the BHU Newsletter discussed the BHU's participation in the Joint Threat Assessment Training and introduced the new sergeant and BHU clinicians. The newsletter also highlighted a success story that involved the BHU working with a family to help reach a mother suffering from bipolar disorder. Furthermore, the BHU continues its efforts of outreach by attending conferences and providing presentations of their work. During the third quarter of 2022, we observed a BHU presentation at the CIT

International Conference and will discuss our perceptions of the presentation in our next report. Based on this and our previous review of the PPB outreach efforts, we believe the PPB has substantially complied with the requirements of Par. 104. The PPB should continue to highlight all aspects of BHU's work.

| COCL Recommendations | • Continue to highlight all aspects of BHU's work |
|---|---|
| Compliance Rating Based On | • Public awareness and education documents |

### Settlement Agreement Paragraph

105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Mental Health Template data; Interview PPB personnel |

### Compliance Assessment

In accordance with this paragraph the PPB must collect data on mental health calls and the BHU is required to report on the data collected. In the second quarter of 2022, the PPB continued to use the Mental Health Template (MHT) as the method for collecting the data

points required in Par. 105. The PPB's quality assurance plan for ECIT-related data and outcomes includes analysts auditing associated data on a monthly basis.

The BHU provided COCL with a quarterly report describing MHT data for the second quarter of 2022. In the second quarter, the PPB received 423 MHTs on 411 calls that reported an ECIT officer on scene (a single call may result in more than one MHT being completed). ECIT officers authored 288 (68%) of the MHTs. For the 475 calls, the most common technique used was de-escalation (43%). A total of 28 calls (7% of the total) reported a use of force. For the disposition of the 475 calls, the most common clearance type was report completed (81% of calls), followed by about 8% of calls being cleared by arrest (physical). Due to the nature and extent of data collected and analyzed on ECIT dispatches the PPB remains in Substantial Compliance with Par. 105

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • Mental Health Template data |


**D. Mobile Crisis Prevention Team**

| **Settlement Agreement Paragraph** |
|---|
| 106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.<br><br>107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer. |

| Compliance Label | 106. Substantial Compliance |
|---|---|

| | 107. Substantial Compliance |
|---|---|
| **Methodology** | Review BHU Unit Structure; Review of BHUAC meeting, Interview PPB Personnel |

| **Compliance Assessment** |
|---|
| The PPB continues to have a BHRT car in each precinct composed of one officer and one qualified mental health professional. For the officer, the BHRT is considered their full-time assignment. As an update to prior reports, the PPB continued in their efforts to expand the number of BHRT teams back to five. In the second quarter of 2022, the PPB hired another officer and clinician, bringing the count to four total BHRT teams. Additionally, the PPB began interviews to hire for the fifth BHRT officer and they expect that role to be filled in the third quarter and we provide updates on this process in our next report. As a result of their efforts we continue to find PPB is in Substantial Compliance with the requirements of Pars. 106 and 107. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • BHU Unit Structure |

| **Settlement Agreement Paragraph** |
|---|
| 108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] |

Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review evaluation documents for potential ECIT officers |

**Compliance Assessment**

All BHRT officers are ECIT certified and are held to the same eligibility standards as ECIT officers. In addition, S.O.P. #43 covers the ongoing participation of officers involved with BHRT. The BHU Sergeants and the Lieutenant monitor all current BHRT members through the Employee Information System (EIS) and PSD to ensure qualifications are maintained. For the new BHRT officer hired during this quarter, they were subjected to this entire process as they were already ECIT certified and were not flagged by PSD as being subjected to discipline for force against persons with mental illness. Therefore, we find the PPB to remain in Substantial Compliance with Paragraph 108.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • PPB policy |

**Settlement Agreement Paragraph**

109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review reported trainings for BHRT members |

| **Compliance Assessment** |
|---|
| The BHU continues to promote supplemental training for supervisors and BHRT members. In the second quarter of 2022, members took part in both external supplemental training and internal training. Internally, a BHU clinician led a training for all BHU staff members on trauma informed care. In addition, some members of the BHU attended external trainings about threat assessment and hostage negotiation. It appears that the BHU has continued to forge a culture in which ongoing learning and training is promoted and encouraged. We therefore find the PPB to remain in Substantial Compliance with Paragraph 109. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • PPB quarterly report identifying supplemental BHRT training |

| **Settlement Agreement Paragraph** |
|---|
| 110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers. |

| Compliance Label | Substantial Compliance |
|---|---|

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Methodology | Review Mental Health Template summary data; Review BERS summary data |
|---|---|

**Compliance Assessment**

The PPB has continued the practice of collecting data through the Mental Health Template (MHT). When an officer has an encounter with a mental health component, they will complete the MHT and this information is used to address mental health service needs. If an individual is a subject of three Mental Health Templates (MHTs) in a 30-day period, they will be referred to the Behavioral Health Unit Electronic Referral System (BERS) (if a referral had not already been made).

Once an individual is referred, a team will look at specific criteria including: a demonstration of escalating behavior, frequent contacts with the PPB, considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. If the individual is deemed an appropriate candidate for additional intervention, the Behavioral Health Unit Coordination Team (BHUCT) (which is composed of law enforcement, court, service provider, and hospital provider personnel, among other relevant stakeholders) will discuss a plan of action.

The PPB has continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the second quarter of 2022, a total of 213 referrals were processed by the BHU. Of the 213 referrals, 111 (52%) were assigned to the BHRT caseload. This assignment rate represents an increase from the previous two quarters (47% and 50%, respectively). Historically, acceptance rates have generally been between 45% and 55%.

In the first quarter of 2022, 89 individuals transitioned to inactive status with BHRT. Of those individuals, 27 (30%) had been previously assigned to the BHRT caseload in a different quarter and continued into the second quarter of 2022.

As shown in the figure below, this quarter saw that the most common reason for a referral to be assigned was for Risk to Others (33%), closely followed by Frequent Contacts (32%).

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**



Figure 6.1: Assigned Cases Reason for Referral (provided by PPB)

When looking at the outcomes of referrals for inactive cases in the second quarter of 2022, the most common outcome was Concern Mitigated (24%), closely followed by Systems Coordination (21%) and Coordinated Services (20%),



Figure 6.2: Inactive Cases Outcome of Referral (provided by PPB)

The PPB's current practice of collecting data through the MHT, meeting weekly to share information and using data to inform service needs fulfills the requirements outlined in Par. 110.

As part of our regular ongoing outcome assessments, we provide an in-depth evaluation of the Behavioral Health Response Team (BHRT). For this evaluation, we were provided a dataset that included all BHRT referrals between 7/1/2019 through 6/30/2022, a three-year period which allows for sufficient post-intervention analysis. The dataset contained 2,903 referrals on a total of 2,039 individuals (some individuals were referred more than once). The vast majority (76.5%, N=1,560) of individuals received only a single BHRT referral during the three years, though others were referred two (13.8%, N=281) or three (5.1%, N=104) times. Less common were

individuals who were referred more than three times which accounted for only 4.6% of the dataset, though three people were referred to the BHRT 10 or more times in the three-year period.

The majority of the referrals were for individuals who were white (69.6%), male (61.4%), and in the age range of 30-49 (50.5%). The second most common race was Black/African American, making up 16.9% of the referrals. The second most common age group for referrals was persons over 50 (25.8%), followed by those 18 to 29 years of age (20.8%). Of the 2,903 referrals, 35% were made by ECIT officers, while the other 65% came from non-ECIT officers. There were also individual officer differences in the number of referrals made, as 12.8% of referrals came from only 8 officers. It is very likely that some of these officers worked within the BHU, wherein a primary responsibility is reviewing PPB interactions and making referrals through BERS. There were also Precinct differences in the number of referrals, with 44.2% coming from Central Precinct (which houses the BHU), 26.8% coming from East Precinct, and 25.3% coming from North Precinct.

After the referral is made, the case is evaluated to determine whether they meet certain criteria to receive BHRT intervention (see below for the reasons for acceptance). Of the 2,903 referrals, 46.4% were accepted and assigned to the BHRT. Similar to those who get referred, the majority of the individuals accepted to the BHRT were white (71.4%), male (64.2%), and in the age range of 30-49 (54.6%). No sizeable race/ethnicity differences were apparent when comparing referral to acceptance decisions.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | Referred to BHRT | Accepted by BHRT |
|---|---|---|
| **Race/Ethnicity** | | |
| *White* | 69.6% | 71.4% |
| *Black/African American* | 16.9% | 16.6% |
| *Hispanic* | 4.5% | 3.8% |
| *Asian* | 3.7% | 4.1% |
| *Other/Unknown* | 5.3% | 4.1% |
| **Gender** | | |
| *Male* | 61.4% | 64.2% |
| *Female* | 38.6% | 35.8% |
| **Age Group** | | |
| *Under 18 Years Old* | 2.9% | 1.8% |
| *18-29 Years Old* | 20.8% | 19.2% |
| *30-49 Years Old* | 50.5% | 54.6% |
| *Over 50 Years Old* | 25.8% | 24.4% |

For those who do not get accepted for BHRT service, the most common reasons for declination were "Infrequent Police Contact" (38.1%), "Received or Engaged in Services" (28%), "Other"

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

(14.6%), and "Low Safety Concern" (7.8%). Very few referrals were declined for capacity or workload issues (1.2% combined).



COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

We examined categories of eligibility (reasons for acceptance) for those who are accepted for BHRT services. The most common categories were "Escalating Behavior" (39.3%), "Frequent Contacts" (34.9%), "Risk to Others" (15.7%), and "Risk to Self" (7.0%).



Upon selection of an individual, the BHRT attempts to coordinate provision of services which occurs for approximately 22.7% of individuals who receive BHRT intervention. Other common outcomes were "Concern Mitigated" (20.5%), "Systems Coordination" (19.1%), "Unable to Locate" (10.7%), "Refused Assistance" (9.3%), "Jail" (8.3%), and "Civil Commitment" (6.1%). These frequencies are in-line with evaluation done in prior reports.

As a follow-up to our prior assessment of BHRT (see COCL report dated June 17, 2018) we also assessed the long-term outcomes associated with BHRT intervention. Given the focus of BHRT on reducing contact with the criminal justice system, we sought to determine whether more recent data continues to indicate a reduction in arrests/custodies after intervention. For this analysis, we only included individuals who were inactivated prior to 7/1/2021 so as to have a

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

full year of post-intervention arrest/custody data. This led to a total of 268 individuals that were assigned for BHRT intervention, who were inactivated prior to 7/1/21, and who had at least one arrest either before or after BHRT intervention.

Consistent with our prior analysis (as well as analyses PPB recently presented at the annual CIT International Conference), there is a significant reduction in arrests/custodies after BHRT intervention. Individuals within the dataset had a mean of 3.52 arrests/custodies in the year prior to BHRT and, in the year following BHRT intervention, had a mean of 1.73 arrest/custodies. This mean difference of 1.79 arrests/custodies is significant (t(268)=6.24, p=.000) and indicates a substantial reduction in these types of contact with the police. Additionally, significant reductions were found for each category of crime found within the dataset (crimes against persons, crimes against property, and crimes against society). For instance, "crimes against society" showed a mean reduction of 1.91 arrests/custodies post BHRT intervention (t(45)=3.28, p<.01). For "crimes against property", there was a mean reduction of .66 arrests/custodies post intervention (t(268)=4.33, p=.000). And for "crimes against persons", there was a mean reduction of .60 arrests/custodies post intervention (t(35)=2.04, p<.05). Although we cannot say for certain that these actions are due solely to BHRT intervention (other factors may be involved), we continue to find that the results of the analysis suggest a positive impact of the BHRT.

| | |
|---|---|
| **COCL Recommendations** | • Continue to collect data and create reports on mental health services |
| **Compliance Rating Based On** | • Mental Health Template data<br>• BERS referral data |

**Settlement Agreement Paragraph**

111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of

individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Directives 850.20, 850.21, 850.22, and 850.25; Interview PPB personnel |

**Compliance Assessment**

The PPB continues to operate under the Directives 850.20, 850.21, 850.22, and 850.25, which dictate the procedures for AMR to provide transportation for a person in a mental health crisis. These directives were also reviewed by the BHUAC during the first quarter of 2022. Furthermore, the PPB continues to collaborate with AMR when issues arise in the transportation of an individual dealing with a mental health crisis (see our assessment of Par. 89). The PPB also has a designated liaison Sergeant at each precinct to respond, in real time, to any transportation issues. As PPB continues to uphold these procedures, we find them to remain in Substantial Compliance with Paragraph 111.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • Directives 850.20, 850.21, 850.22, and 850.25<br>• PPB interviews |

**E. Service Coordination Team**

<div>

**Settlement Agreement Paragraph**

112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review SCT outcome measures; Review SCT Referrals Report |

**Compliance Assessment**

The PPB continues to facilitate the provision of services to individuals who experience drug-addiction, mental illness, and are chronically involved in criminal behavior. The SCT coordinates access to housing, medical, counseling, and addiction/mental health services. Members of the SCT are proactive in seeking out collaborations with other stakeholders in the State of Oregon.

The PPB also continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people served by the SCT. For the second quarter of 2022, the number of referrals was 318, as shown in Table 6.1. This is an increase from the previous quarter (255), suggesting that the number of referrals is returning to pre-pandemic levels. Additionally, of the referrals for the second quarter, the SCT accepted 64%, while the other 36% did not meet the assignment criteria. The primary reasons for not meeting criteria was the lack of recent crimes (30%) and lack of criminal history (30%).

</div>

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Table 6.1 : SCT Referrals (provided by PPB)**

| SCT Referrals, 2022 Q2 | N | % of Total |
|---|---|---|
| Number of Referrals | 318 | - |
| Number of Individuals Referred* | 316 | - |
| Number of Referrals That Met Assignment Criteria | 203 | 64% |
| Number of Referrals That Did Not Meet Assignment Criteria | 115 | 36% |
| Reason for Not Meeting Assignment Criteria | N | % of Not Meeting Assignment Criteria |
| Lacks criminal history | 35 | 30% |
| Lacks recent crimes | 35 | 30% |
| Higher level of care | 10 | 9% |
| Sex Offender | 9 | 8% |
| Unable to Locate | 9 | 8% |
| Other | 8 | 7% |
| Aggression | 3 | 3% |
| Arson | 3 | 3% |
| Conflict of interest | 1 | 1% |
| Crimes outside Portland | 1 | 1% |
| Lacks addiction history | 1 | 1% |

Additionally, The Supportive Transitions and Stabilization (STS) Program is an expansion of the SCT operation and is run by the Central City Concern's Housing Rapid Response. It is intended to address the needs of those with mental illness and co-occurring disorders who temporarily require a more extensive level of care by creating a direct housing resource. As shown in Table 6.2, in the second quarter of 2022, 22 individuals were referred, 21 of the referrals were accepted, and a total of eight new participants were served, as shown in the table below. Furthermore, PPB anticipates that restoring the fifth BHRT team will continue to raise referrals and we will continue to provide updates on these trends.

**Table 6.2: STS Referrals (provided by PPB)**

| STS Referrals, 2022 Q2 | |
|---|---|
| Number of Referrals* | 22 |
| Number of Individuals Referred | 21 |
| Average Age of Individuals Referred | 35.5 yrs |
| Number of Referrals Accepted (Met Criteria) | 16 |
| Number of Referrals Declined | 6 |
| Number of new participants served during Quarter | 8 |
| Number of participants who successfully completed | 0 |
| Participants terminated for cause/non-compliance | 3 |
| Participants who voluntarily withdrew from program | 2 |
| Average Length of Stay (days)  of those who exited during Quarter | 102.0 |
| Bed utilization rate | 66% |

As a part of their continued operations the SCT program manager conducts outreach to several agencies to help spread information about the program as well as to provide participants with additional services. In the second quarter, they continued this practice, meeting with various entities and services. Our first quarter report also provided a summary of the findings from Portland State University's evaluation of the SCT, which continues to show positive outcomes from this initiative.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • SCT process<br>• SCT outcome measures |

**F. BOEC**

---

### Settlement Agreement Paragraph

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to [Behavioral Health Call Center - BHCC], and adding new or revised policies and protocols to assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interview BOEC personnel; Review BOEC protocols |

### Compliance Assessment

BOEC has completed and maintained the policies and procedures prescribed within Par. 113. BOEC's Mental Health and ECIT dispatch Protocol S.O.P. identifies seven call characteristics where an ECIT dispatch officer will be dispatched. These characteristics include when there is a mental health component and: (1) a weapon is present; (2) the person is violent; (3) the call is at a mental health facility; (4) the caller is threatening suicide and has the means to carry it out; (5) at the request of a community member; (6) at the request of another officer; (7) or when the person represents an escalating risk of harm to self or others.

BOEC's has maintained their policy criteria for ECIT dispatch, which partially satisfies the requirement for crisis triage. In addition, BOEC has updated criteria for forwarding calls to the Behavioral Health Call Center (BHCC). BOEC also has triage protocol in place for PSR, though due to continued negotiations between the City and PPA, BOEC does not presently have an official policy for PSR. Although BOEC has not been able to adopt official policies yet, during the second quarter they worked on the PSR SOP. This SOP was reviewed by BHUAC in the third quarter and will be addressed in COCL's upcoming Q3 report. In total, the triage protocols for mental health calls satisfies Par. 113 and BOEC remains in Substantial Compliance.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • BOEC protocols for ECIT dispatch<br>• BOEC protocols for BHCC referral<br>• BOEC protocols for PSR dispatch |

| **Settlement Agreement Paragraph** | |
|---|---|
| 114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interview BOEC personnel |

**Compliance Assessment**

BOEC staff continue to receive training in crisis triage and during the second quarter, BOEC provided in-service training to telecommunicators over 11 training sessions. Additionally during the second quarter, BOEC staff members delivered training to dispatchers at the Department of Public Safety Standards and Training (DPSST), but this training was for dispatchers statewide. Due to staffing issues at BOEC, none of BOEC employees were able to attend this training. Finally, BOEC is currently in the process of hiring more employees and, as with prior cohorts, is planning on sending will be sending them to CIT Training for Dispatchers in upcoming quarters.

With the addition of Portland Street Response, BOEC has a new element within their crisis triage to consider when implementing future trainings. However, BOEC has not developed a focused training on PSR yet, as no official policies have been adopted. In the second quarter, no

new training was implemented, but regular updates were provided to dispatchers and call takers as the program rolled out. We will continue to provide updates in future quarters though note that a focus training will need to be developed for PSR once official policies have been adopted.

| **COCL Recommendations** | • Develop focused training for PSR |
|---|---|
| **Compliance Rating Based On** | • Prior observation of BOEC training<br>• Interview with BOEC personnel |

| **Settlement Agreement Paragraph** | |
|---|---|
| 115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of BOEC data; Interview with BOEC personnel |

**Compliance Assessment**

COCL reviewed data related to the operation of BOEC, not only in the context of PPB's crisis response but also in the context of other triage options, including transferring calls to the BHCC and dispatching PSR to calls that meet the necessary criteria. For instance, in the second quarter evaluation of mental health calls, BOEC reported setting up 4,483 calls with a mental health component that did not receive an ECIT dispatch. BOEC audited a total of 345 of these calls. In 17 of those calls (4.9%) BOEC's audit later found that sufficient information existed at the time of the call to warrant it being dispatched as ECIT. This rate is consistent with prior

**Exhibit A**

reporting periods. BOEC also assessed accuracy for calls transferred to the BHCC, with 10 out of 257 calls being kicked back to BOEC for ECIT dispatch (we note this may not indicate fault with the telecommunicators decision since BHCC operators may learn additional information warranting emergency response). Finally, BOEC dispatched a total of 2,415 calls to PSR during the second quarter.

We also reviewed the integral role that BOEC has played with respect to the city-wide expansion of PSR. In the second quarter, BOEC set up 2,415 calls for PSR, which was nearly four times as many calls as Q1. BOEC has successfully navigated this expansion by working with PSR as they get off the ground though there have been some setbacks as PSR has been unable to respond to the significant increase in call volume and has worked with Portland Fire's Community Health Assess and Treat team (CHAT) to help with call volume. Additionally, BOEC has faced challenges setting up calls for service for PSR at times due to staffing shortages or when PSR was in trainings or meetings. In those instances, BOEC would set up the calls to be responded to by PPB. We will need to look into these issues further and will provide an update in our next report though we suggest BOEC consider these issues and their implications for policy and training.

| **COCL Recommendations** | • Consider current PSR issues and their implications for policy and training |
|---|---|
| **Compliance Rating Based On** | • Review of BOEC data<br>• Interview with BOEC personnel |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# VII. EMPLOYEE INFORMATION SYSTEM

### Settlement Agreement Paragraph

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| Compliance Label | 116. Partial Compliance |
| | 117. Partial Compliance |
| Methodology | Interview EIS/PPB personnel; Review PPB EIS analysis |

### Compliance Assessment

The PPB continued to use the Employee Information System (EIS) as their primary system for identifying at-risk members and potentially problematic trends and "design[ing] assistance strategies to address specific issues affecting the employee" (Par. 116). As for the PPB's current procedure of evaluating subsections (a) and (b) of Par. 116, the PPB reports rates of compliance with supervisory reviews that are consistent with prior quarters. As shown in the figure below, for subsection (a) (supervisors performing annual reviews), compliance was at approximately 99% for the second quarter of 2022. However, for subsection (b) which requires

"new-to-command" reviews, compliance rates were 89% in the second quarter. This is now the fourth quarter in a row that compliance rates have been 90% or lower whereas in the year prior, new-to-command reviews had been near 95%. The majority of these deficiencies (80%) came from North Precinct where only 8 out of the 16 reviews (50%) were completed on time. Despite this, PPB provided no evidence that the North Precinct commander or other supervisors received corrective action. Finally, for subsection (c) (which looks at all opportunities for Par. 116 compliance), there was a 95.4% compliance rate though this too is largely impacted by North Precinct's new-to-command review failures.

**Figure 7.1: Compliance with Reviews Directive 345.00 Reviews (provided by PPB)**



In previous reports, we have raised concern over the process by which the Force Inspector identifies "at-risk employees, supervisors, [or] teams." Previously, the Force Inspector sent only the Force Application spreadsheet to RU Managers rather than proactively identifying "at-risk employees, supervisors [or] teams" for additional discussion. As a result, there was a lack of documentation as to the decision-making process for outliers since we received no evidence that any officers, units, or groups were further reviewed based on the Inspector's analysis. For the second quarter of 2022, the Force Inspector did not rectify this issue by identifying specific

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

officers and, although the Force Inspector did request additional feedback information from RU Managers, it was extremely minimal and isn't responsive to our broader concerns. For instance, the Force Inspector provided the Force Applications Spreadsheet and instructed the RU Manager that for all members being two or more standard deviations above the mean, the RU Manager should "document discussions with the members deemed to require intervention in their EIS/PDT, and list the remaining members in the precinct alert with the reasons they do not require additional intervention." For two precincts, the RU Manager did not provide an individualized response and the one RU Manager who did only did so upon prompting and only listed the names saying "I do not have any concerns with the deviations."

Overall, there appears to be a misunderstanding of what the spreadsheet is designed to accomplish. This is most apparent from one RU Manager whose response stated, "Nearly all the officers that were highlighted for using Cat 4 levels of force and nearly all work in the Downtown core or the force was from a significant event." However, "working in the Downtown core" is irrelevant since the officers are being compared to their peers in similar assignments. They are not being compared to officers assigned to other areas and therefore should not be summarily dismissed in this way. Furthermore, the current approach does not rely on the expertise of the Force Inspector to focus on those who might <u>truly</u> be problematic. For instance, in East Precinct, the RU Manager indicated reviewing 72 members, though many of these are likely not an issue and are only highlighted due to low relative arrests or some other explanatory factor. Therefore, it is not surprising that the RU Manager would give a blanket statement that there were no concerns as it is unreasonable that they would provide the in-depth review that should be expected with each of the 72 individuals. We maintain our position that it is the responsibility of the Force Inspector to review the spreadsheet, filter out those who, based on the benchmark data, would not be a cause for concern and only forward on those members who would be. This was PPB's practice in the past and they will need to return to this practice to return to Substantial Compliance.

Finally, we maintain our position from prior reports that the PPB should seek to ensure that the EIS is "more effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" (Par. 116). The COCL provided the PPB and the DOJ with a draft methodology and data analysis plan during the second quarter of 2022. Discussions regarding the analysis plan were held during the third quarter and we will provide updates as this process progresses in our future reports.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br>• To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur<br>• Continue contributing to the development of the EIS evaluation |
| **Compliance Rating Based On** | • EIS and threshold review process |

| **Settlement Agreement Paragraph** | |
|---|---|
| 118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.<br><br>119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period. | |
| **Compliance Label** | 118. Substantial Compliance |
| | 119. Substantial Compliance |
| **Methodology** | Interview EIS/PPB personnel; Reviewed EIS program data |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Compliance Assessment**

The thresholds the PPB are required to maintain for Par. 118 continue to be used to flag officers for supervisory reviews. The PPB continues to collate data from a variety of sources, including force events, traumatic incidents (captured in Regional Justice Information Network (RegJIN)), complaints, and commendations (captured in Administrative Investigations Management (AIM)). This data is then used to identify potentially problematic behavior with the predetermined thresholds identified by these paragraphs.

In the second quarter of 2022, EIS Administrators reviewed a total of 320 alerts and sent 158 (49.4%) on for RU Manager review (see Figure 7.2). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts closed in the second quarter of 2022 (which may also include cases opened in prior quarters), there were 174 alerts sent to the RU Manager and for 126 (72.4%) of those instances, the alert was sent on for further supervisor review. Additionally, of alerts sent to the officer's supervisor during the second quarter of 2022, 54% resulted in some type of intervention for the officer. The information provided by the PPB indicates that most of the interventions involved a debriefing though five involved an EAP referral and one involved a monitoring plan which is consistent with prior quarters. Of the 320 alerts that were created in the second quarter of 2022, 177 (55.3%) were force related. Of the force-related alerts 13% included a threshold break for three of more uses of force over the prior 30 days.

As discussed in our assessment of Par. 116, we will need to conduct a comprehensive review to determine the relative effectiveness of EIS interventions, both from empirical data analyses as well as through conversations with key stakeholders in the EIS process.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

## Figure 7.2: EIS Alerts and Alerts Sent to RU Manager (provided by PPB)



### Table 3: EIS Alerts and Interventions

|                                                             | 2021 Q2         | 2021 Q3         | 2021 Q4         | 2022 Q1         | 2022 Q2         |
| ----------------------------------------------------------- | --------------- | --------------- | --------------- | --------------- | --------------- |
| **Alerts Closed by RU**                                     | 209             | 263             | 215             | 170             | 174             |
| **Alerts Sent to Supervisor (Percent of Alerts Sent to RU)** | 137 (65.6%)     | 210 (79.8%)     | 181 (84.2%)     | 112 (65.9%)     | 126 (72.4%)     |
| **Interventions (Percent of Alerts Sent to RU)**            | 100 (50.7%)     | 160 (60.8%)     | 162 (75.3%)     | 88 (51.8%)      | 94 (54.0%)      |
| **Interventions (Percent of Alerts Sent to Supervisor)**    | 100 (73.0%)     | 160 (76.2%)     | 162 (89.5%)     | 88 (78.6%)      | 94 (74.6%)      |

| **COCL Recommendations**       | ● No recommendations at this time              |
| ------------------------------ | ---------------------------------------------- |
| **Compliance Rating Based On** | ● Current EIS thresholds and associated data   |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| **Settlement Agreement Paragraph** |
|---|
| 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Reviewed Directive 345.00; Reviewed EIS Program |

| **Compliance Assessment** |
|---|
| Paragraph 120 requires that the PPB "identify and train a second EIS administrator." During the second quarter of 2022 the PPB maintained the second EIS administrator that was trained and joined the team in the first quarter of 2022. We therefore find that the PPB has maintained compliance with Par. 120. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Maintenance of second EIS Administrator |

# VIII. OFFICER ACCOUNTABILITY

## A. Investigation Timeframe

### Settlement Agreement Paragraph

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review IPR Quarterly Data Analysis; Review Administrative Investigation Management (AIM) System data |

### Compliance Assessment

On a quarterly basis, the IPR provides summary statistics for all full administrative investigations which are closed within 180 days of their initiation date. Using the quarter that the cases were opened as reference, the IPR statistics show that of the 18 cases that were opened in the fourth quarter of 2021 (the last quarter for which 180 days could have passed for this report), only 2 cases exceeded the 180-day timeline (11%). Additionally, the quarterly statistics indicate that 10 cases from the first quarter of 2022 have already been completed within 180 days while eleven remain open (though still within 180 day timeframe). We find that timelines have generally been sustained and therefore find the City and the PPB continue to maintain Substantial Compliance with the requirements of Par. 121. In the last report we noted that the percentage of cases completed within 180 days decreased from 84% to 76%. It was reassuring to see this percentage increase to 89% and note that this is the highest on-time completion rate in almost two years

In their report, the DOJ found the City and PPB to be in Partial Compliance with Par. 121, in part due to a lack of evidence that appeals to the CRC are resolved within 90-days. However, in looking at the data, we note that CRC appeals are relatively rare (only three in the past two and a half years) and therefore quantitative patterns are difficult to determine. Two of the three cases which went to CRC went over the 90-day deadline though in speaking with IPR about these cases, we were informed that one of the cases was sent back for additional investigation and was part of a series of complaints by the same individual. For the other case, scheduling conflicts on the part of the appellant's attorney, including having to reschedule the original CRC hearing, impacted the ability to complete the CRC phase in 90 days. Given these issues, we do not find that the missed 90-day window for these two cases constitute a breach of this paragraph though will continue to review CRC process to ensure that cases do not exceed the timeline unnecessarily.

| **COCL Recommendations** | • Continue ensuring cases are closed within 180 days |
|---|---|
| **Compliance Rating Based On** | • IPR data indicating adherence to 180-day timeline |

| **Settlement Agreement Paragraph** |
|---|
| 122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate. |

| **Compliance Label** | Substantial Compliance |
|---|---|

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Methodology | Review Criminal-IA Concurrent Investigation Audit Reports; Review Directive 0330.00 |
|---|---|

| **Compliance Assessment** |
|---|
| In the second quarter of 2022, the PPB continued to provide documentation indicating when Internal Affairs investigations began compared to when criminal investigations began. This quarter there were seven cases that required both a criminal investigation and an Internal Affairs investigation. For all seven cases, both the Internal Affairs investigation and the criminal investigation began on the same day and therefore met the criteria for "concurrent." As a result of the documentation provided by the PPB, we maintain that PPB has maintained compliance with Par. 122. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

| **Compliance Rating Based On** | • Criminal-IA Concurrent Investigation Audit reports |
|---|---|

| **Settlement Agreement Paragraph** |
|---|
| 123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Administrative Investigations Report |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Compliance Assessment**

During the second quarter of 2022, the PPB closed 22 administrative investigations. The PPB provided the COCL with an Administrative Investigations Report which noted that two cases exceeded the 180-day timeline. For both cases the PPB provided clear explanations of why stages of the investigation exceeded the allotted time. Some of the reasons for the cases concluding beyond that 180-day timeline were: miscommunication between an IA admin, IA supervisor, and IA investigator regarding the availability of grand jury transcripts, staff turnover impacting the training analysis stages, and scheduling issues. For each issue, a recommendation was made for remediation.

There were five additional cases where the investigation went beyond the 180-timeline but, when tolled without the criminal investigation, the administrative investigation concluded under 180-days. Additionally, there were incidents where individual stages went over their allotted time but in which the overall timeline did not exceed 180 days. For these, IA personnel also provided a reason for the stage-delay and suggestions for remediation.

The Department of Justice assigned a "Partial Compliance" rating to PPB for Par. 123 while COCL has asserted that PPB has been in Substantial Compliance with this section. The DOJ found partial compliance particularly due to OIS events going beyond 180 days without PPB providing an analysis and justification for the delay. However, the DOJ cited open cases in their report, two of which were closed in the second quarter of 2022 and were therefore included in our assessment for this report. As noted above, we found the analysis process consistent with prior standards of compliance given the identification of issues and the recommendations of the IA captain. We will continue to evaluate the reasonableness of the review process for other OIS events going forward though continue to find Substantial Compliance for this paragraph based on PPB's current efforts.

| | |
|---|---|
| **COCL Recommendations** | • Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| **Compliance Rating Based On** | • Administrative Investigations Report |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**B. On Scene Public Safety Statements and Interviews**

<table>
<tr><td colspan="2" align="center">

**Settlement Agreement Paragraph**

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.
</td></tr>
<tr><td>

**Compliance Label**</td><td>Substantial Compliance</td></tr>
<tr><td>

**Methodology**</td><td>Review Directive 1010.10</td></tr>
<tr><td colspan="2" align="center">

**Compliance Assessment**

During the second quarter of 2022, the PPB maintained their protocols for compelled statements to PSD and all officers have been advised on the protocol. As a result, we find the PPB has maintained compliance with Par. 124.
</td></tr>
<tr><td>

**COCL Recommendations**</td><td>

● No recommendations at this time</td></tr>
<tr><td>

**Compliance Rating Based On**</td><td>

● Current PPB policy</td></tr>
</table>

<table>
<tr><td align="center">

**Settlement Agreement Paragraph**

125. Separation of all witnesses and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any
</td></tr>
</table>

**Exhibit A**

lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed CROs for 2022 Second Quarter OIS events |

**Compliance Assessment**

During the second quarter of 2022, there was one OIS event. The PPB provided the COCL with copies of 10 CROs, including CROs for both witness and involved officers. However, we were informed that several PPB members were originally considered to be witness officers though were later determined not to be. As this OIS is still under an active investigation, we will have to wait to review the full casefile to determine the appropriateness of this decision. As such, we continue to find that the PPB has maintained Substantial Compliance with the requirements of Par. 125 though will follow-up in our next report regarding PPB's decision.

The Department of Justice assigned a rating of Partial Compliance to Par. 125, arguing some CROs in prior OIS events were not effective regardless of whether they were issued in a reasonable amount of time. As support for this, the DOJ refers to an OIS wherein the subject was still at-large, and a responding officer shared visual evidence from a witness's phone in an email to the entire department in order to help apprehend the suspect. We have reviewed this email and found that it contained two still photos of a vehicle that had recently struck and injured a PPB officer. In reviewing the email, we did not see any indication that the officer was attempting to undermine the CRO and the email did not contain any text. As such, we continue to find PPB to be in Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • No recommendations at this time |
|---|---|

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| **Compliance Rating Based On** | • CROs for 2022 second quarter OIS events |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review Officer Involved Shooting case file excerpts |

**Compliance Assessment**

During the second quarter of 2022 there was one OIS event though, for this report, we were not provided evidence that any officer was required to give an on-scene briefing. In speaking with PPB, we were informed that several PPB members were originally considered to be witness officers though were later determined not to be. As with Par. 125, we will have to wait to review the full casefile to determine the appropriateness of this determination.

The DOJ assigned PPB a Partial Compliance rating for Par. 126 as they had found PPB did not "properly implement the requirements of Directive 1010.10 in multiple cases" during their reporting period. In this report, we ultimately agree with the compliance finding of DOJ though for different reasons than they cited. DOJ noted two cases: the first involved a witness officer that claimed mental incapacitation for not providing an immediate interview whereas the second case included an involved officer who was physically incapacitated. Since this second case related to an involved officer, Par. 126 is not implicated, and we therefore will only comment on the first case.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

As we noted in our 2021 Q3 report, the witness officer in that case was experiencing trauma to such an extent that it was "not something the detectives had seen before." DOJ critiqued the Bureau for not properly documenting the reasons and we agree the Bureau could have done better. However, our bigger point on this issue is that PPB possessed "no protocol for assessing when the officers' actions or statements should lead detectives to consider the officer 'injured' in the context of the officer's mental health." (COCL 2021 Q3 report). To date, there remains no protocol for conducting such an assessment despite our report being released three quarters ago. Because nine months have passed and PPB has yet to develop a protocol, we find that they are no longer in substantial compliance. To return to Substantial Compliance, the PPB will need to update Directive 1010.10 to allow for the potential for witness officers being incapacitated for mental health reasons as well as provide COCL with criteria for making such a determination.

| **COCL Recommendations** | • To achieve Substantial Compliance, revise Directive 1010.10 to allow for the potential for witness officers being incapacitated for mental health reasons<br>• Provide criteria for detectives to make such a determination |
| --- | --- |
| **Compliance Rating Based On** | • OIS case file excerpts |

| **Settlement Agreement Paragraph** |
| --- |
| 127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |

| Methodology | Review Officer Involved Shooting case files excerpts |
|---|---|

| **Compliance Assessment** |
|---|
| During the second quarter of 2022, the PPB provided us with documents indicating that both officers involved in the sole lethal force event were requested to provide a voluntary on-scene walk-through and interview. As has been the case in prior lethal force events, both involved members initially declined. However, for one of the involved officers, it appears they later reversed their decision and provided on-scene clarifying statements (though it's unclear as to whether a formal walk-through occurred). Regardless, as a result of the PPB requests, we continue to find the PPB has substantially complied with the requirements of Par. 127. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

| **Compliance Rating Based On** | • OIS case file excerpts |
|---|---|

**C. Conduct of IA Investigations**

| **Settlement Agreement Paragraph** |
|---|
| 128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary. |

| **Compliance Label** | Partial Compliance |
|---|---|

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Methodology | Review Police Accountability Commission agendas |
|---|---|

**Compliance Assessment**

During the second quarter of 2022, both the IPR and IA maintained their respective administrative investigations using the system we have previously found compliant with Par. 128. As recently as the first quarter, COCL reported that the transition from the current accountability system to the new civilian-led accountability system had put IPR in a tenuous position, particularly as it relates to maintaining staff during the transition period, which would directly impact the organization's efficacy. However, in the second quarter, IPR staff reported less uncertainty based on several developments. For instance, the transition from the Auditor's office has been completed and there is a tentative collective bargaining agreement on the table (see Par. 195(a) for more detail). As part of this, the City appears prepared to provide IPR personnel bonuses for remaining with IPR and the IPR staff indicate it is likely the bargaining agreement will be finalized sometime in the fourth quarter. Although the IPR personnel indicated that only 11 of 16 positions within the organization are filled (they are presently unable to hire additional personnel), those remaining with the office were said to be feeling more confident and secure in their current positions. Therefore, COCL is less concerned with new attrition and IPR informs us that they can operate with the current staffing levels.

In prior reports, we have discussed the approximate 45,000-50,000 document Records Division backlog. As an update to this issue, we have been informed that the backlog continues to exist and that while the Records Division has continued to bring new personnel on, there has been no impact on the backlog yet. We maintain that the backlog requires resolution prior to returning to Substantial Compliance and we look forward to future updates from the City related to this matter.

| COCL Recommendations | • To achieve Substantial Compliance, the PPB should resolve the records backlog in the Records Division |
|---|---|

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Compliance Rating Based On | • Accountability system transition plan<br>• Ongoing Records Division Backlog<br>• Police Accountability Commission meetings |
|---|---|

---

**Settlement Agreement Paragraph**

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review administrative closure justifications for allegations of excessive force |

**Compliance Assessment**

In the second quarter of 2022, a data spreadsheet provided by IPR indicated that there were five administrative complaints containing allegations of excessive use of force that were administratively closed by IPR. However, during discussions with IPR and a review of allegation data shared with the COCL team, it became clear that one of the cases was incorrectly categorized as force. The allegation dataset shared with COCL stated that the case included excessive force allegations and even specified the force was applied by hands/feet/knees. After speaking with representatives from IPR and reviewing all the intake documents it appears there was no use of force involved in this case. This incorrect categorization should be reviewed by IPR to ensure data reliability for other events and, while representing only a single case that we have found, may justify further exploration in how data is entered, verified, and maintained.

The remaining four allegations of excessive force administratively closed in Q2 were related to officer conduct during the 2020 protests. Three allegations were administratively closed citing a "lack of investigative merit." In each of those cases the complainants, and their legal

**Exhibit A**

representation, were contacted by IPR for an intake interview however, neither the complainants nor their legal representation responded to schedule an intake interview. Additionally, the claims could not be substantiated by FDCRs related to the protests or the existence of other evidence (e.g., recordings of the protests publicly available on social media). The remaining allegation was administratively closed after it was determined at the intake phase that there was no misconduct. The complaint came to IPR through a tort claim where the complainant stated that they were forcibly removed from their vehicle and arrested. IPR reached out to the complainant and was directed by the complainant to reach out to their legal representation to schedule an intake interview. IPR did not receive a response from the complainant's representation. In this case there are multiple reports from involved, witness, and arresting officers that indicated that there was no force used in the interactions with complainant. Without an interview with the complainant, and based on the numerous reports from PPB members, IPR administratively closed the complaint.

For at least some of these, the decisions made to administratively close the excessive force are understandable. Additionally, we note the investigative steps that IPR takes even prior to such closures, including attempts by investigators to contact the complainants and their legal representatives, cross-referencing publicly available videos that could match the incident as described in the complaints, and making attempts to identify officers by referencing FDCRs. However, in some of these instances, administrative closure continues to constitute a technical violation of the Settlement Agreement, even if understandable. Therefore, consistent with our prior reports, we recommend the City consider requesting an amendment to Settlement Agreement allowing for potential additional revisions to IPR's SOP regarding Par. 129.

Additionally, as a follow-up to an incident we reported on last quarter wherein a supervisor did not forward on an allegation of excessive force for a full investigation, we were informed by PPB that they have recently opened an investigation though this occurred in the third quarter. We will therefore provide an update in future reports. Furthermore, given that we have identified similar deficiencies in prior quarters, we again recommend PPB re-emphasize the responsibilities of on-scene supervisors to forward allegations of excessive force on for a complete investigation.

| **COCL Recommendations** | • To return to Substantial Compliance, re-emphasize the responsibilities of on-scene supervisors and provide documentation of efforts to COCL |
| --- | --- |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | • Consider requesting an amendment to Settlement Agreement allowing for potential additional revisions to IPR's SOP regarding Par. 129 |
|---|---|
| **Compliance Rating Based On** | • Administrative closure of allegations of excessive force |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Directive 310.20 |
| **Compliance Assessment** | |
| During the second quarter of 2022 the PPB maintained Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited) which contains the requirements of Par. 130 (see Policy #2 within the Directive). There was one complaint with three allegations of harassment/retaliation made in the second quarter of 2022 and, since the case has not yet closed, we will need to follow-up with PPB regarding these allegations to ensure compliance with this paragraph. For this report that, PPB remains in Substantial Compliance with Par. 130 because they have maintained their directive and we see evidence that the PPB is willing to investigate potential violations of the directive. | |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| **COCL Recommendations** | • Complete an investigation of the allegation of retaliation |
|---|---|
| **Compliance Rating Based On** | • Directive 310.20 |

---

| **Settlement Agreement Paragraph** |
|---|
| 131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case, and stipulated discipline. (For details and exact language, see the Settlement Agreement). |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Directive 336.00; Review City Code 3.20.140; Observe PRBs |

| **Compliance Assessment** |
|---|
| The PPB's Directive 336.00 and the City's Code 3.20.140 have been maintained, which outline the operations of the PRB. However, in 2021 the COCL found that the operation of the PRB was inconsistent with the requirements of Par. 131, specifically subsection (c) which requires all participating PRB members to "make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts." During the first quarter of 2022, COCL observed two PRBs and did not see the same confusion around the Graham |

standard and active aggression. Similarly, during the second quarter, COCL observed four PRBs and did not see the same issues concerning the Graham standard that were presented in 2021.

In the four cases reviewed by the PRB, their analysis was based on the reasonable standard (Graham v. Connor) that also included thoughtful discussion about mitigating factor and/or de-escalation tactics officers deployed during the incidents. The results of the board reviews were clear, concise, and thoughtful determinations that upheld the precedent set in the first quarter. This was witnessed in a May board hearing in which the findings were sustained, even though members agreed that while officers were facing great pressure and stress it was not cause for the force used against a protest medic.

In sum, the PRB meetings we observed and summarizing documents reviewed this quarter did not reveal any issues around mitigating factors or active aggressions. Of the three cases when the officer's actions were found to be in-policy there was a clear threat and active aggression towards the officers, and no voting members appeared to have any confusion or doubt surrounding the officer's perception of events. These cases continue to suggest that the PRB is capable of engaging in thoughtful and unbiased recommendations. Therefore, the City has returned to Substantial Compliance for Par. 131. The COCL will continue to observe and review PRBs to ensure the compliance rating remains appropriate.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Observation of PRBs and PRB documents |

**Settlement Agreement Paragraph**

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must

make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB Directive 336.00 |

**Compliance Assessment**

During the second quarter of 2022, the PPB maintained Directive 336.00 (Police Review Board) which memorializes the authority of PRB to send a case back for additional investigation. There were no such instances during this quarter. As Par. 132 has adequately been placed into policy, we find PPB has maintained Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • PPB Directive 336.00 |

**Settlement Agreement Paragraph**

133. COCL Summary: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review S.O.P. #32 and #42 |

| **Compliance Assessment** |
|---|
| During the second quarter of 2022, the PPB maintained S.O.P. #32 (Civil Liability and Tort Claims) and S.O.P. #42 (Evaluation of Members Fitness to Participate in All Current and Prospective Specialized Units when the Use of Force Results in a Finding of Liability in a Civil Trial). The combination of these two S.O.P.s contains the requirements of Par. 133. There were no findings of liability during the second quarter. As a result of PPB possessing these S.O.P.s, we find they have maintained compliance with the requirements of Par. 133. |

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Compliance Rating Based On | • S.O.P. #32 and #42 |

**D. CRC Appeals**

| **Settlement Agreement Paragraph** |
|---|
| 134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level. |

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Review City Code 3.21.080 Review CRC meeting; communication with City staff |

<table>
<tr><td colspan="2" align="center"><strong><u>Compliance Assessment</u></strong></td></tr>
</table>

The CRC continues to include 11 community members who are representative of the community at large. However, during the second quarter, the CRC met one time, although they had scheduled a total of eight meetings, including subcommittee meetings. Additionally, due to staffing issues, they did not post any minutes from the Q2 meeting. This inability to be public-facing presents a challenge for the CRC to fulfill its charge, though we hope that future plans to be supported by staff from the Community Safety Division will resolve some of these challenges. Additionally, the CRC has continued to suffer from functionality issues, including continued in-fighting within the public eye. No appeals occurred in the second quarter of 2022 but we have concerns regarding the CRC's operability going forward. Due to these issues, we find the City in Partial Compliance with Par. 134 and will continue to monitor the committee's operation going forward.

| <u>COCL Recommendations</u> | ∉ To return to Substantial Compliance, resolve staffing issues through the Community Safety Division<br>∉ To return to Substantial Compliance, evaluate functional concerns and resolve them |
| --- | --- |
| <u>Compliance Rating Based On</u> | ∉ City Code 3.21.080<br>∉ Review of CRC Minutes and inter-committee emails |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Settlement Agreement Paragraph**

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e., PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Compliance Label | 135. Substantial Compliance |
| | 136. Substantial Compliance |
| **Methodology** | Review PSF-5.03; Review of CRC meeting recording |

**Compliance Assessment**

The City maintains PSF-5.03 which memorializes the CRC's authority as related to Pars. 135 and 136. Our review of the CRC meeting recording indicates that the CRC retains the authority to request an additional investigation and we have seen evidence of this process play out in prior quarters. Therefore, we find the City has maintained Substantial Compliance with this paragraph.

| COCL Recommendations | • No recommendations at this time |

| | |
|---|---|
| **Compliance Rating Based On** | • Charter Code and Policy Code PSF-5.03<br>• Meeting recording |

## E. Discipline

<table>
<tr><td colspan="2" align="center"><b>Settlement Agreement Paragraph</b></td></tr>
<tr><td colspan="2">137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.</td></tr>
<tr><td><b>Compliance Label</b></td><td>Substantial Compliance</td></tr>
<tr><td><b>Methodology</b></td><td>Review Directive 338.00 and corresponding matrix guide; Review Corrective Action Recommendation documents; Review of Department of Justice Letter</td></tr>
<tr><td colspan="2" align="center"><b>Compliance Assessment</b></td></tr>
<tr><td colspan="2">In the second quarter of 2022, the PPB maintained Directive 338.00 (Discipline Guide) as well as the matrix guide that is easy to read and facilitates reasonably predictable and consistent discipline. Additionally, the guide allows for the integration of mitigating and aggravating factors and provides examples of each. We reviewed two Corrective Action Recommendation documents provided by the PPB for the second quarter of 2022. In each, the RU Manager provided a summary of the case, the mitigating or aggravating factors, and their rationale for their discipline recommendation. However, for one case, the supervisor noted that due to the seriousness of the officer's actions, they did not find any mitigating factors. Considering the</td></tr>
</table>

**Exhibit A**

admitted seriousness of the allegations, it would have been appropriate to also discuss the aggravating factors.

As in the past, we have some concerns with the consistency of the accountability system based on our review of cases. However, these concerns related more to the failure of PPB and the City to initiate full investigations (see Par. 129), conduct impartial and consistent PRBs (see Par. 131), or make findings consistent with the facts (see newly addressed Par. 169) rather than the execution of the disciplinary guide specified in this paragraph. In their report, DOJ noted that these failures did impact Par. 137 and thereby found the PPB and the City to be only in Partial Compliance as PPB did not "consistently apply policies uniformly or hold officers accountable for complying with policy and procedures" (DOJ Sixth Periodic Compliance Assessment Report, assessment of Par. 169). As stated in our last report, we agree that these failures impact the "legitimacy of the accountability system as a whole" (COCL 2022 Q1 report), though maintain our position that they should be addressed in their corresponding paragraphs. As such, we continue to find Substantial Compliance for this paragraph. While we do not disagree with DOJ's conclusions regarding the accountability system, we refer the reader to other paragraphs to see how we have reached similar conclusions.

Finally, in the first quarter of 2022, the DOJ approved an updated Corrective Action Guide (CAG) after it had been approved by Portland City Council as part of labor negotiations. However, we saw no evidence that the new CAG had been implemented during the second quarter. Directive 338.00 (Disciplinary Guide) posted to PPB's website continues to reference the prior discipline matrix as did the Corrective Action Recommendations memorandums we reviewed for this quarter. Going forward, we will continue to provide updates regarding the CAG and any policy changes and training associated with it.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Corrective Action Recommendations |

**F. Communication with Complainant and Transparency**

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.</td></tr>
<tr><td colspan="2">139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.</td></tr>
<tr><td colspan="2">140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>138. Substantial Compliance</td></tr>
<tr><td></td><td>139. Substantial Compliance</td></tr>
<tr><td></td><td>140. Substantial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>Review IPR website; Review IPR policy; Review findings letters</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">We continue to see evidence of IPR conforming with Pars. 138, 139, and 140. IPR has maintained many different avenues for submitting a complaint. When an individual submits a complaint online, they receive a unique tracking number and can request a status update with that number. If they submit through another avenue, such as mail, telephone, or walk in, the IPR employee will submit the complaint through their online system to generate a tracking</td></tr>
</table>

169

**Exhibit A**

number which will be given to the complainant. IPR and the City will share requested documents with complainants in line with Oregon Public Records Request laws. From a protocol and operation standpoint, IPR has systems in place to ensure that they are complying with the requirements of Pars. 138 and 139.

As with previous quarters, we reviewed a random sample of case files and, as related to these paragraphs, were able to locate consistent documentation sent to complainants regarding the status of their cases, including when the cases were opened, when findings had been made, and when the cases were closed. As such, the COCL finds that the city to be in Substantial Compliance with Pars. 138, 139, and 140.

As for the requirements of Par. 138 for complainants to be able to track their complaint online, we note that the City has recently revised the website template for the IPR (as well as other City agencies such as the PPB). The new template is difficult to navigate and the location of the case-tracking tab is, while still existing, not immediately apparent. In order to get to the status request template, individuals must first click on the File a Complaint or Commendation tab, which then takes you to the old website template, at which point you have to click on the broader Submit a Complaint tab, and then click on the IPR Complaint Status Request Form (for the reader, the direct link is https://www.portlandoregon.gov/ipr/42860). In conversations with IPR, they readily admit that it is confusing though also stated that they have received at least one status request form from a community member after the switch to the new template. Because there remains an ability for community members to request their case status, we continue to find Substantial Compliance with Par. 138, at least for the moment. However, the City will need to take steps to ensure that the new website template can allow for easy tracking of case status and we look forward to discussing this issue in greater detail.

| **COCL Recommendations** | • Discuss with COCL the City's plan to ensure complainants can easily track cases online |
|---|---|
| **Compliance Rating Based On** | • IPR policy<br>• Complaint tracking webpage<br>• Finding and closure letters to complainant<br>• Interview of IPR personnel |

| **Settlement Agreement Paragraph** |  |
| --- | --- |
| 169. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure. |  |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review sample of accountability cases; Review use of force events; Review EIS entries; Review force audit; Interviews with PPB and City personnel |

**Compliance Assessment**

The COCL team has, historically, not assessed compliance with the requirements of Par. 169 as it is housed within Section X (Agreement Implementation and Enforcement). However, in their most recent report, DOJ argued that, given the direct relationship to the subject matter of Section VIII (Officer Accountability), Par. 169 "can and should be assessed." We agree and will continue to incorporate Par. 169 into future reports.

As demonstrated in our assessment of other paragraphs, the accountability system operating within PPB and the City has demonstrable strengths though also critical deficiencies which undermine PPB's ability to "apply policies uniformly and hold officers accountable for complying with PPB policy and procedure." These include instances where there were failures to initiate administrative investigations, failures to adequately investigate an allegation of misconduct, and failures to impose consistent discipline.

At times, this was also reflected in the sample of cases we reviewed for this quarter. Although we found most them to be reasonable in their processes and conclusions, others suffered from deficiencies. For instance, in one case we reviewed, the allegations initially raised were investigated thoroughly and fairly. However, in the course of the investigation, other (albeit more minor) violations of policy appeared to be admitted to by the officer though no corrective action was taken as a result (in their report, the DOJ uses the term "collateral misconduct" for this). In another case, investigators took the statements of the alleged officer as fact without taking additional steps to verify the information. Given some concerning facts of the case, the lack of attention to validating the statements of the officer leaves significant lingering doubts. Of all the cases we reviewed for the quarter, this case

171

**Exhibit A**

contained the most serious deficiencies and we look forward to speaking with PPB about it more.

Based on our review of cases for this quarter as well as other deficiencies described above, we find that the PPB and City are only in Partial Compliance with the requirements of Par. 169. To achieve Substantial Compliance with this paragraph, the PPB and City will need to demonstrate a consistent and fair accountability system. This includes not only by implementing the requirements of other paragraphs within Section VIII but also by incorporating an expanded approach to conducting objective investigations and holding officers accountable when policy violations (no matter how minor) are discovered.

| COCL Recommendations | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found |
|---|---|
| Compliance Rating Based On | • Sample of accountability cases<br>• Sample of use of force events<br>• Interviews with PPB and City personnel |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

| Settlement Agreement Paragraph |
|---|
| 141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with the DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement. |
| 142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement. |
| 143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland. |

| Compliance Label | 141. Substantial Compliance |
|---|---|
| | 142. Partial Compliance |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | 143. Partial Compliance |
|---|---|
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

**Compliance Assessment**

In the second quarter of 2022, PCCEP began returning to functionality as a legitimate body for community engagement, after facing numerous challenges over the past several quarters, culminating in a member telling the Mayor during their March 30 meeting, "PCCEP is in a crisis right now."

Going into the second quarter, PCCEP membership had dwindled to seven members (out of 13 seats), and both full-time City support staff had left their positions in the first quarter. Subcommittee work was paused, and subcommittees did not meet during the second quarter. The City had begun transferring administration of PCCEP from the City's Office of Equity and Human Rights (OEHR) to the Community Safety Division (CSD).

By the end of the second quarter, a PCCEP administrative assistant and analyst had been hired (with a start date in the third quarter), and the City was in final interviews for a supervisor for the PCCEP staff team. The City also put out a request for proposals from facilitators for PCCEP meetings. Two additional PCCEP members were appointed in mid-June, and another's term expired, but this individual was not reappointed—bringing the roster to eight members.

Highlights of PCCEP's work as a full committee in the second quarter included participating in the April 29 fairness hearing, reviewing PPB's 2021 Annual Report, and co-hosting a Town Hall with the COCL on the 2021 fourth quarter report. PCCEP also hosted a Youth Speak Out Event in April. PCCEP members also participated in ridealongs with PPB officers.

PCCEP also discussed a "Proposal for PCCEP Plan Revisions," drafted by the City and shared in April. Proposed changes include removing a requirement that the Mayor consult with the PCCEP chair and Council before removing a PCCEP member and changing the threshold for removal from "no longer fit to serve on the committee due to misconduct" to "no longer fit to serve on the committee." The Proposal maintains a 60-day timeline for the City to "provide thorough and timely responses to PCCEP recommendations and requests for information," and adds a provision that "if the City is unable to do so, the City will provide reasoning for delay."

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

The Proposal also adds a provision for an annual report "on the recommendations made by PCCEP, and the City's response to and implementation of those recommendations." The current Amended PCCEP Plan says, "The City will also provide staff support and funding for community organizing/outreach," while the Proposal notes "City staff will also support PCCEP's community organizing and outreach." The Proposal extends the timeline for posting meeting minutes from 10 business days to 30 days. PCCEP discussed the Proposal during the second quarter and provided feedback to the City.

In the second quarter of 2022, PCCEP continued monthly general meetings via Zoom, with members of the community in attendance.

Three recommendations that PCCEP adopted in the third quarter of 2021 are still pending a response from the City: A recommendation regarding data transparency (specifically, public release of all FDCRs)—developed jointly with the Citizen Review Committee and the Training Advisory Council and approved at the July PCCEP meeting; recommendations related to codification of PCCEP approved at the August PCCEP meeting; and elevating the recommendations of the Citizen Review Committee regarding 2020 protests at the September PCCEP meeting.

Per the Amended PCCEP Plan, "The City shall provide thorough and timely responses to PCCEP recommendations and requests for information and shall endeavor to do so within 60 days." At the close of the second quarter, the City had not formally responded to these recommendations, and only the codification recommendation was posted to the recommendation section of PCCEP's updated website. At the June PCCEP meeting, City staff noted that codification would be brought to the City Council along with the updated PCCEP Plan.

These delays have been to be attributed to turnover and changes in staffing within the Mayor's Office. In the first quarter, the COCL had lowered the compliance rating on Par. 142 to Partial Compliance, as PCCEP's ability to function effectively has been compromised by the City's lack of responsiveness to PCCEP's recommendations over the past three quarters. The City remains in Partial Compliance until the recommendations are resolved.

At the end of the first quarter, the COCL was very concerned with the attrition of PCCEP members, and lack of urgency on the part of the City to identify and recruit new PCCEP members to maintain a full 13-member body. While two new members were appointed in the second quarter, and remaining PCCEP members are very engaged, we remain concerned about whether PCCEP still represents a "reasonably broad spectrum of the community," as required

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

by Paragraph 143, with many seats still vacant. Another member of PCCEP was interested in continuing her service on the committee, but the Mayor's office advised that her term had ended, and she would not be re-appointed (a second PCCEP member was re-appointed to a new term during this quarter); this member was upset about the decision, and felt she wasn't given notice or an opportunity to be heard regarding her desire to continue serving. However, the City maintains that they did communicate with her and provided an explanation for the decision. In part, this situation was exacerbated by incomplete records of appointment dates, and inconsistent term dates for PCCEP members—an issue City staff are working to resolve by aligning PCCEP term start and end dates. The COCL is maintaining the compliance rating on Par. 143 of Partial Compliance pending confirmation of additional PCCEP members.

In this quarter, the COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

| **COCL Recommendations** | ∉ To achieve Substantial Compliance with Par. 142, the City should respond to PCCEP's 2021 third quarter recommendations |
|---|---|
| | ∉ To achieve Substantial Compliance with Par. 143, the City should: |
| | ○ Fulfill the workplan that outlines a strategy and timeline to identify and recruit sufficient PCCEP members to maintain a full body |
| | ○ Restore the PCCEP to near-full membership and ensure that it represents a "reasonably broad spectrum of the community" |
| **Compliance Rating Based On** | • Content of PCCEP meetings |
| | • Interview with City staff |
| | • Substance of reports and recommendations |
| | • Level of community engagement |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Settlement Agreement Paragraph**

144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

**Compliance Assessment**

During the first quarter, the City was supportive of the PCCEP in some ways (e.g., City staff continued to host and attend meetings), and by the end of the quarter the City's support appeared to be moving in a positive direction—toward hiring new staff dedicated to PCCEP and outlining a plan to more effectively support the body.

City staff transitioned PCCEP's website to the City's new online format during the first quarter, migrating past agendas, minutes, and other documents, and organizing them in a more accessible way. However, posting of meeting minutes continues to falter into the second quarter of 2022; there are none posted for the full PCCEP meetings in the first or second quarter, or any of the subcommittee meetings from the first quarter. Two 2022 meeting agendas are organized in the section of the website designated for agendas and minutes, but others are embedded in the event listing for the meeting. Videos of meetings have generally been posted in a timely manner, and the link to PCCEP's YouTube channel is accessible from PCCEP's home page.

For the second quarter, the City's level of support for PCCEP was insufficient to return to Substantial Compliance for Par. 144, though the announced hiring of an administrative assistant and analyst scheduled to start in July of 2022 should position the City to rectify these issues in the third quarter.

We continue to recommend that the City show improvement in the timely posting of information about PCCEP's work so that the public is kept informed about these community

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | engagement opportunities and productions. In addition, we recommend the City adequately train and support the new staff in their role. |
|---|---|
| **COCL Recommendations** | ∉ To achieve Substantial Compliance, provide adequate staffing dedicated to supporting PCCEP<br>∉ To achieve Substantial Compliance, post minutes of PCCEP meetings within 10 business days after a PCCEP meeting, in accordance with the Amended PCCEP Plan |
| **Compliance Rating Based On** | • Review of PCCEP website and YouTube channel<br>• Interviews with staff |

**Portland Police Bureau's Role in Public Engagement and Outreach**

*System Overview*

Under the Settlement Agreement, the PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns.

*The Community Engagement Plan*

| **Settlement Agreement Paragraph** |
|---|
| 145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan. |
| 146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where |

those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.

| Compliance Label | 145. Substantial Compliance |
| | 146. Substantial Compliance |
| Methodology | Monitor progress on the implementation of the Community Engagement Plan; Interview City personnel and advisory groups members about community engagement and support |

**Compliance Assessment**

The PPB has continued its systems of community engagement, both with the PCCEP and its many community advisory groups. The COCL continues to use the Community Engagement Plan (CEP) as a framework for assessing PPB's progress on community engagement under the Settlement Agreement. The Plan's four components are: Public involvement, Communications, Access, and Training. Each is summarized below.

*Public Involvement:* The CEP specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

In May of 2022, the Chief created the position of Community Engagement Lead within the Office of Community Engagement (OCE) to further enhance PPB's efforts to build relationships with diverse communities in Portland. From COCL's perspective, the officer promoted to this position is very qualified and will oversee the work of OCE to enhance PPB's Community Engagement Plan and work with partners both inside and outside the PPB.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

During the second quarter, the PPB continued to work with its advisory groups, including its "Community and Culturally Specific Councils" and its "Operational Councils."[15] Most of PPB's advisory groups continued to meet monthly[16]: Asian Pacific Islander American Advisory Council (APIA), Latino Advisory Council (LAC), and Muslim Advisory Council (MAC). They continued to work closely with the PPB and the community on a range of topics. The APIA and the MAC gave particular attention to the growing problem of hate crime, while the LAC invited PPB to speak about "Active Shooter Preparedness" and PPB's new Consent Search Card. The Chief's Office is always well represented at these meetings and the PPB's liaison continues to do an excellent job of coordinating with these advisory groups.

Representatives of these PPB advisory groups continue to meet as part of the Coalition of Advisory Groups (CAG) to enhance collaboration and mutual support. During the second quarter, the CAG held their monthly meetings with the Chief's office. They also developed a working relationship with two City Commissioners to discuss community safety issues and relevant programs. The CAG also hosted the PPA Union President to explain union activities and hosted a PPB Commander to explain PPB's response to the protests of 2020 and the "lessons learned."

The COCL continues to recommend greater public awareness of these advisory groups. Unfortunately, the City's new website is very disappointing in this regard. The latest minutes from meetings of some advisory groups are 2016 and 2019, while four other groups have no meetings posted. Furthermore, PPB employees who are seeking greater public awareness of their community outreach efforts report that the process of getting information posted is extremely slow. Apparently, the City's transition to a new web platform has been a bigger challenge than anyone expected. COCL has also been disappointed with PPB's new website when seeking to find specific information.

---

[15] See PPB website for details: https://www.portlandoregon.gov/police/30379

[16] The Slavic Advisory Council did not meet, but PPB maintained communication with them as they worked on safety planning and other services for Ukrainian refugees.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

On a positive note, the CAG is working with the Office of Community Engagement to design a website that will give the public greater access to the work of the CAG and other groups. COCL has learned that PPB and community leaders are also considering a one-stop website where community and PPB members can learn about various advisory groups and community engagement events. We strongly endorse this vision. We hope that the PPB, PCCEP, and CAG can work together to improve public safety in Portland. True community policing is about the co-production of public safety, with all voices heard and respected.

PPB's Operational Councils, such as the Behavioral Health Unit Advisory Committee (BHUAC), the Equity Advisory Council (EAC), and the Training Advisory Council (TAC), continued to meet regularly and post their meeting results on the PPB website. The TAC has consistently provided the PPB with feedback on existing and planned training programs.

*Communication:* The CEP specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. In the second quarter, the PPB continued to use social media to communicate with the public and used other mechanisms such as press releases, emails, brochures, and presentations to reach the public. Using an App developed by an analyst at PPB, the Bureau continues to prepare a monthly list of "Community Engagement Events" that have occurred, including the type and number of events, the number of community and police attendees, and the names of any organizations involved. Events in the second quarter of 2022 included the following: April (19 events with 3006 community and 55 PPB attendees), May (15 events with 2,677 community and 57 PPB attendees), and June (27 events with 2,928 community and 123 PPB attendees). However, over time, PPB officers are less likely in 2022 to use the App to document community events. COCL will review community engagement data in the third quarter as part of our Outcome Assessment.

*Access:* The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all the PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

We have reported many times that the PPB's language access plan, directive, and training were not developed for a variety of reasons discussed in our prior reports. This year the Community Engagement Lead has taken on the role of temporary language manager to facilitate access to services for individuals who interact with PPB officers but have limited English proficiency (LEP).

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

Anecdotally, we are learning that more PPB officers are getting tested and certified as language interpreters and are receiving compensation as a qualified multilingual City employee via the Office of Equity and Human Rights.[17] However, COCL has consistently recommended a more systematic approach to responding to LEP individuals is needed with good directives and training, as suggested under Par. 84 for consent searches. PPB has yet to develop a LEP directive, including coverage of consent searches. Also, we recommend that PPB hire a full-time LEP manager so that the Community Engagement Lead has the time to perform a wide range of community engagement functions. Because English is a second language for one-in-five people in Portland ages five and older, PPB needs to take this problem very seriously if it cares about positive community engagement. Also, the increase in xenophobia and hate crimes directed at immigrants means these individuals, often with limited English proficiency, will need additional police services.

We acknowledge that the PPB has, in the past, worked with community members to develop many videos to educate all the PPB members on how to respond appropriately to individuals needing language access services and that the PPB has worked with community members to translate search cards into the five most used languages. But a more comprehensive and systematic approach is needed for responding to LEP individuals and those who are deaf/hard of hearing. Also, when community members with limited English proficiency can communicate clearly with the police, public safety is improved for all parties.

*Training:* The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

The PPB continues to take actions consistent with these goals. As described under Par. 84, PPB's Equity and Inclusion Office (EIO) continued its sequence of equity trainings focused on interacting with historically marginalized groups. In the second quarter, EIO released two more

---

[17] https://www.portlandoregon.gov/oehr/81684

**Exhibit A**

training videos in this sequence focused on the PPB's interactions with the LGBTQIA2S+ community.

Another positive observation is the continued development and enhancement of PPB's Community Police Academy (CPA). This training, developed by the OCE and Training Division, allows community members to become more familiar with police work in Portland so they can provide more informed feedback. The second CPA occurred in May, and PPB is planning to hold three more. This training content is unusually transparent and culturally responsive for a police agency, covering policy, firearms, tactical decision making, and other topics. During this 10-hour session, which includes classroom presentations and five scenarios, one officer is partnered with one community member. One of the CPAs will be reserved for new PCCEP members. The OCE Community Lead is working with national experts to develop an innovative, unprecedented CPA that involves a cohort of CAP graduates with whom the PPB will continue to engage. Under this model, PPB is seeking continuous input on training and policy. Existing advisory groups are expected to have a role in this process.

In sum, during the second quarter of 2022 the PPB continued to implement its Community Engagement Plan by maintaining partnerships with community organizations and advisory councils and seeking their help with various forms of cultural awareness training for the PPB members. Thus, the PPB remains in Substantial Compliance for Pars. 145 and 146, but the COCL expects that PPB will give a higher priority to LEP services and continue to invest in the Community Police Academy.

| | |
|---|---|
| **COCL Recommendations** | • Seek to improve access to police and City services for individuals with Limited English Proficiency (LEP) through updated policy, training, and dedicated personnel. Make LEP training a priority<br>• PPB should hire a dedicated, full-time LEP manager to oversee the implementation of LEP services and respond to emerging issues and concerns<br>• Encourage officers to use the Community Engagement App to document all community events and identify groups that might be overlooked with the current set of events |

| | |
|---|---|
| | • Invest in a one-stop website where community and PPB members can learn about various advisory groups and community engagement events<br>• Continue to invest in community-driven equity training for all officers<br>• Continue to invest in new versions of the Community Police Academy to institutionalize community engagement and serve as a national model |
| **Compliance Rating Based On** | • Reviews of City and the PPB reports<br>• Feedback from the City, the PPB, and advisory groups<br>• Implementation of the Community Engagement Plan |

*Data Collection, Analysis, and Reporting*

The PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par. 147-150).

---

**Settlement Agreement Paragraph**

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

---

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Compliance Label | 147. Substantial Compliance |
|---|---|
|  | 148. Substantial Compliance |

**Compliance Assessment**

The PPB remains in Substantial Compliance with Par. 147 because they have compiled and reported demographic data pertinent to each precinct and posted them on their website,[18] and they have provided new demographic data based on the latest information from the Census Bureau's American Community Survey. The PPB also prepared a handout and delivered it to the Precinct Commanders. In addition, PCCEP was informed last quarter that new demographic data have been posted on the PPB's website. For the public and research community, the PPB continues to provide a wide range of data, maps, and high-quality interactive dashboards on its website.[19]

For now, the PPB remains in Substantial Compliance with Par. 148 as they continue to collect, analyze, and report demographic data from individuals who are stopped by the PPB using its Stops Data Collection app. In terms of data analysis and reporting requirements, the PPB's Strategic Service Division continued to produce the quarterly and annual Stops Data Collection reports and share them with PCCEP and the public. For this report, COCL will summarize PPB's quarterly reports from the first and second quarters of 2022, as well as PPB's 2021 annual report that was released on July 1, 2022. Before doing that, COCL wants to commend the PPB analysts for the quality of their work. The statistical analysis and presentation of stops data are of high quality and superior to what we have observed in other police agencies. The Strategic Services Division seems committed to transparency with the community and a willingness to address areas of concern.

---

[18] https://www.portlandoregon.gov/Police/article/780347
[19] https://www.portlandoregon.gov/police/71673

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

COCL will continue to focus on data pertaining to racial disparities in police traffic stops. As shown in Table 9-1, the first quarter of 2022 reveals an increase in the rate of stopping Black/African American drivers (19.2%), but that rate declined to 16.7% in the second quarter. For Hispanic/Latino drivers, the rate remained fairly stable at 11.7% (see Table 9-2). However, using population statistics, these rates show racial disparities, as Black/African Americans make up only 5.8% of the Portland population, and Hispanic/Latinos make up only 9.7% of the population.[20] In 2022, the rate of stops for Black/African American drivers remained relatively high in all three Precincts among Non-Traffic officers, while the rate for Hispanic/Latino drivers remained slightly higher than expected in the Central Precinct.

[20] Regarding concerns about racial profiling, the PPB cautions against relying exclusively on demographic data from the U.S. Census (used here), which could be misleading, as other people visit or work in these communities. Also, traffic stops are not entirely determined by the discretion of PPB officers, but also reflect where they are assigned and the jobs they are assigned to do. Some communities, including low income and Black/African American communities, experience higher levels of serious crime and more traffic accidents, resulting in more PPB officers working in these areas. Thus, PPB uses "benchmarking" to evaluate racial bias rather than rely exclusively on demographics. For the Traffic officers, PPB uses Injury Collision Statistics and for Non-Traffic officers, uses Crime Victimization Rates.  When such benchmarks are used as the denominator, PPB concludes that in 2021, only the Native Hawaiian drivers were overrepresented in stops by Traffic officers, and no groups were overrepresented in stops by Non-Traffic officers. Whether bias or policy (i.e., deployment of more officers to hot spots) drives the observed disparities, they still need to be addressed.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**TABLE 9.1 Traffic Stops by Precinct and Division: Black/African American Drivers**

| Precinct | Percentage of Population that is Black/African American[21] | Percentage of Stops with Black/African American Drivers | | | | | |
|---|---|---|---|---|---|---|---|
| | | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 |
| Central | **2.9%** | 15.9% | 14.4% | 13.6% | 11.9% | 13.9% | 11.8% |
| East | **5.6%** | 20.2% | 20.4% | 20.6% | 18.3% | 20.9% | 18.5% |
| North | **8.8%** | 20.2% | 18.1% | 12.8% | 19.7% | 24.3% | 21.6% |
| Traffic Officers | NA | 12.8% | 12.8% | 9.7% | 13.4% | 12.3% | 11.7% |
| Non-Traffic Officers | NA | 21.5% | 20.6% | 19.9% | 16.9% | 20.2% | 29.2% |
| Citywide | **5.8%** | 18.9% | 18.3% | 17.7% | 16.3% | 19.0% | 16.7% |

---

[21] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB reports at: https://www.portland.gov/police/open-data/stops-data

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | | Percentage of Stops with Hispanic/Latino Drivers | | | | | |
|---|---|---|---|---|---|---|---|
| **Precinct** | **Percentage of Population that Hispanic/ Latino[22]** | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 |
| Central | **6.2%** | 9.9% | 11.4% | 11.2% | 10.2% | 9.7% | 11.2% |
| East | **12.0%** | 11.2% | 11.1% | 11.9% | 12.5% | 12.2% | 11.7% |
| North | **10.2%** | 13.5% | 10.8% | 11.9% | 8.6% | 11.7% | 12.1% |
| Traffic Officers | NA | 12.1% | 13.1% | 9.9% | 12.4% | 12.1% | 13.6% |
| Non-Traffic Officers | NA | 10.9% | 10.6% | 12.4% | 11.0% | 11.6% | 10.7% |
| Citywide | **9.7%** | 11.2% | 11.3% | 11.8% | 11.3% | 11.7% | 11.7% |

**TABLE 9.2 Traffic Stops by Precinct and Division: Hispanic/Latino Drivers**

---

[22] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB reports at: https://www.portland.gov/police/open-data/stops-data

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

*Annual Stops Data Report*

PPB released its *2021 Stops Data Collection Annual Report* on July 1st, so we will provide a quick summary here. PPB officers made 44% fewer driver stops in 2021 than in 2020, although stops in the East Precinct continue to rise. The PPB posits that the reduction is due to fewer officers on the street (staffing shortage), especially the Traffic Division (where stops declined dramatically (3,725 in 2021 vs. 13,640 in 2020), and not a policy decision to make fewer stops.

In 2020, PPB analysts found that Black/African American drivers were stopped at a higher rate for "Non-Moving Violations, "which are often called "investigatory" or "pretext" stops that indicate racial bias. As a result of these patterns, COCL has argued in past reports that PPB should give less attention to lower-level infractions and non-moving violations that may contribute to racial disparities in stops. Beginning in June of 2021, the Chief directed PPB officers to "focus on safety violations and enforcement in high crash corridors." The good news is that traffic stops for such minor violations declined in 2021, although more than one-third of the stops were still for minor moving and non-moving violations (e.g., missing or expired license plates is, malfunctioning equipment).[23] Furthermore, PPB also reports, using benchmarks, that in 2021 "no perceived racial/ethnic groups were stopped at a significantly higher rate for Non-Moving Violations... when compared to White subjects." However, given the perceived ambiguity in the Chief's decision, the authors of PPB's annual report are recommending that PPB publish a "specific list of violations that are no longer eligible for stops." A few examples could be helpful for policy and training, but COCL cautions against eliminating an officer's discretion.

Consent searches continued to decline in 2021 to less than 3% of all drivers stopped (the lowest rate on record). However, even using benchmarks, Black/African American drivers were significantly more likely than other drivers to be asked to consent to a search and were less

---

[23] Keep in mind that the Chief's guidance did not happen until June, so some portion of these minor violations likely occurred in 2021 prior to his guidance.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

likely to deny consent than White drivers. COCL commends the PPB authors of this annual report for making the following candid and evidence-based statement:

"*These search requests are often not viewed as "voluntary" because of the power differential between law enforcement officials and searched subjects, and therefore the entire doctrine of consent search skews in favor of criminal justice systems at the expense of community members (research cited). This is especially true for Black / African American individuals who receive advice at a young age to comply with officer requests to avoid negative interactions with police (research cited). Given the deep-seated and long-standing issues around systemic and institutional racism in our country, the Portland Police Bureau recognizes that the disparities exhibited in the data are unlikely to improve without direct and concerted actions.*" (p. 20).

This recommendation in PPB's 2021 annual report only reaffirms their recommendation from the 2020 annual report. After highlighting persistent racial disparities over the past five years of data collection, the 2020 annual report concludes, "*The long-term nature of these disparate search rates indicates they are unlikely to change unless the Bureau actively works to reduce these search disparities through adjustments to policy and practice*." (p. 19).

Following COCL's recommendations, the authors of PPB's annual stops report encouraged PPB to finalize Directive 650.00 ("Search, Seizures, and Inventories"), which requires officers to inform community members of their right to deny a consent search and produce an audio recording of this process. PPB has already produced cards that must be distributed to community members describing their right to refuse a search in the five most common languages used in Portland. The new directive became effective August 1, 2022, but officers will need additional training on this directive. Directive 650.00 is very similar to a new State of Oregon law, SB 1510, that will be effective January 1, 2023, so training on both the directive and state law is essential to ensure that officers' actions on the street regarding consent searches is consistent with the law and policy. This training should also revisit the issue of bias in stop outcomes and bias in general when making decisions to stop or search individuals. For example, the 2021 data show that, while warnings are the most common stop disposition, Hispanic/Latino drivers were significantly more likely to receive a citation than other drivers, regardless of the reason for the stop.

Since 2020, COCL has been strongly recommending these actions, so we are pleased to see progress on their search policy, which required input from multiple perspectives. However, as we noted in our last report, if the PPB is unable to develop training on consent searches and

**Exhibit A**

Directive 650.00 in the near future, the COCL will have to find them out of compliance for Par. 148, since these actions impact the PPB's ability to collect important data that will "contribute to the analysis of community concerns regarding discriminatory policing," (Par. 148). The quality of this data should improve significantly if officers are given more guidance about stops and searches, and the rights of all community members are clearly expressed in their own language. The Directive requires officers to document the reason for the search on their Stops app ("mask"), which will give PPB analysts additional data and insights regarding search disparities.

Although COCL has chosen to focus on racial disparities in traffic stops and searches, we again stress that the problem runs deeper. As we noted last quarter, reports by the PPB itself, by TAC, and other groups (e.g., FiveThirtyEight) have found that unequal treatment of Black/African Americans by the PPB reaches far beyond traffic stops, revealing racial disparities in the rates of arrest and use of force. We credit PPB's research team for their work and look forward to additional training that will address their concerns and improve the measurement of "discriminatory policing" (Par. 148).

| | |
|---|---|
| **COCL Recommendations** | • To remain in Substantial Compliance for Par. 148, the PPB will need to do the following:<br>   o Revise Directive 650.00 ("Search, Seizures, and Inventories") to incorporate the revised protocol on stops and consent searches (completed in Q3)<br>   o Develop and implement training on Directive 650.00<br>   o Distribute the consent search cards to those stopped<br>   o Show that records are being kept consistent with the new Oregon law to improve the measurement of discriminatory policing<br>• We recommend that PPB revise directive 860.10 ("Traffic Citations and Arrests") to ensure discretionary stops for minor vehicle violations (e.g., one taillight out) are limited and do not reflect bias<br><br>• We recommend that PPB provide refresher training on bias-free, impartial policing |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| | • Continue the dialogue with community members around racial disparities in traffic stops and searches |
| **Compliance Rating Based On** | • COCL review of the PPB Precinct demographic reports<br><br>• COCL review of the PPB Stops Data Collection reports<br><br>• COCL review of the PPB directives |

<br>

| | |
|---|---|
| **Settlement Agreement Paragraph**<br><br>149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review metrics requirement |

**Compliance Assessment**

The City has completed the requirement to develop a set of metrics to evaluate community engagement, and therefore remains in Substantial Compliance. These metrics are used by the PPB to guide their Community Engagement Plan.

As technical assistance, the COCL continues to encourage the City and the PPB to gather more specific outcome data relevant to police-community interactions - data which can be used to track and enhance organizational performance. We will continue to recommend that the City measure the quality of police-community interactions for all encounters using data from community contact surveys, body-worn cameras, and officer surveys. COCL will continue to provide technical assistance on these topics and encourage the City to work in partnership with local universities to establish and maintain these metrics. These datasets can provide a

**Exhibit A**

foundation for an evidence-based, data-driven police organization, including supervisor coaching and feedback to officers based on performance metrics. We encourage the PPB to incorporate these outcome measures as part of the remedies being pursued in Section XI.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>As part of everyday policing, introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with special populations</li><li>Implement routine, anonymous internal surveys of the PPB employees to measure police-community interactions, internal procedural justice, wellness, police culture, and employee satisfaction</li><li>Acquire and use software to analyze body worn camera data</li><li>As a learning organization, introduce programs, polices, and training curricula that are responsive to these new databases</li></ul> |
| **Compliance Rating Based On** | <ul><li>The development of metrics that capture multiple dimensions of community engagement</li></ul> |

---

**Settlement Agreement Paragraph**

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed the PPB's Annual Report; Interviewed PPB and City staff involved with PCCEP |

**Compliance Assessment**

The PPB remains in Substantial Compliance for the second quarter of 2022. A draft of PPB's 2021 Annual Report was completed in May, and thus PPB was responsive to concerns about late production that occurred in previous years. Also, COCL has reviewed the draft and found that the content complies with the requirements of Paragraph 150.[24] The report covers problem solving and community policing as it reviews the work of all branches of the PPB, as well as PPB's community engagement efforts. Both accomplishments and challenges are covered, including crime statistics, force statistics, and the impact of budget deficits on police services.

As required by Par. 150, the draft was shared with the PCCEP on May 27, giving PCCEP members time to review it before their June meeting. The draft was also posted on the PCCEP website. The 2021 Annual Report was discussed at the June PCCEP meeting and PPB received some feedback. Written comments from PCCEP were also allowed for one week. The draft report was revised by PPB staff in preparation for three Precinct meetings scheduled in July. COCL will report on those meetings in our next report.

Previously, COCL has reminded PPB that community members have asked them to wait until they have received feedback on their annual report from each of the precincts before making a

---

[24] The Annual Report can be found at: https://www.portland.gov/sites/default/files/2022/ar_2021_final.pdf

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

presentation to the City Council. In the second quarter, we are pleased to report that the PPB has agreed to this recommendation, and it was later approved by the City Council.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Compliance Rating Based On** | • Review of progress on the content and presentation of the PPB's Annual Report |

**Summary of PPB's Community Engagement**

The PPB maintained its systems of community engagement as it continues to implement its Community Engagement Plan. The Office of Community Engagement continued to partner with diverse communities through existing and new advisory councils. The PPB's Operational Councils (such as the Behavioral Health Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council) meet regularly and have current postings on the PPB website. The PPB's diverse advisory groups (Community and Culturally Specific Councils), as well as the CAG, continue to meet with the PPB leadership, City Commissioners, and the communities they represent, and they are making a good-faith effort to keep the public informed about their work. However, the City's technology personnel have struggled to help PPB and its advisory groups achieve this mission. Minutes of meetings and other public-facing documents are not being posted in a timely manner. The City's transition to a new web platform has been a bigger challenge than anyone expected, and community engagement efforts have suffered as a result.

The PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. The PPB continued to produce exceptional quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. However, over the past few years, the COCL has consistently noted racial disparities in traffic stops and searches. On a positive note, traffic stops for such minor violations have declined, whether it is due to the Chief directing officers to focus on safety violations instead of minor violations, or to major reductions in the number of Traffic officers. Also, consent searches continued to decline in 2021, yet Black/African American drivers were

195

**Exhibit A**

still more likely than other drivers to be asked to consent to a search. PPB has begun to take this problem seriously, but it has taken several years to reach this point.

Thus, to remain in compliance with Par.148, the COCL expects that the PPB will introduce a revised protocol and directives on police stops and consent searches (focused on the distribution of consent search cards and recording of such behavior as required by state law), as well as training on these changes. PPB is making progress on these tasks, but more work remains, as PPB admits. Once implemented, the PPB will be able to show that it has made a good faith effort to improve the actions of its officers on the streets related to "community concerns regarding discriminatory policing." (Par. 148). The quality of stops data collection will be improved with clear policy and training, as will the fairness of police decisions. Again, we encourage the PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns.

Finally, to truly engage the broader Portland community (beyond advisory groups) and give voice to the thousands of residents who have lived experience interacting with the PPB officers, we continue to encourage the City to introduce a contact survey to measure the level of procedural justice and public satisfaction with police services. By measuring what matters to the public (e.g., whether they are treated respectfully, fairly, and given a voice) and using these data to evaluate officer performance at the individual level, organizational behavior and police culture are much more likely to change in the direction of building community trust.

---

**Settlement Agreement Paragraph**

151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

| Compliance Label | 151. Substantial Compliance |
|---|---|

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | 152. Substantial Compliance |
|---|---|

**Compliance Assessment**

PCCEP met as needed to accomplish their objectives as set forth in the PCCEP Plan. At least one representative of the City Attorney's Office attends PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings law.

While no new members joined PCCEP in the first quarter, previously the City has trained new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all City advisory boards. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

However, in meetings with the Mayor in late March, one PCCEP member noted "we weren't all given the same information when we onboarded." For example, not all current PCCEP members have been able to participate in a ride-along as part of their onboarding, during COVID. The City will remain in Substantial Compliance for Par. 152 because it has provided training regarding "City and State law" but it should standardize the training received for all PCCEP members.

| **COCL Recommendations** | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training. |
|---|---|
| **Compliance Rating Based On** | • Regularity and content of PCCEP meetings<br>• Provision of City's legal advice and training for PCCEP |

**Overall Assessment of Section IX**

In the second quarter of 2022, PCCEP began to function as a legitimate body for community engagement again, despite facing numerous challenges over the past several quarters,

197

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

including the loss of all staff members and low membership. During this time, the City's level of support for PCCEP was insufficient to return to Substantial Compliance. However, we expect improvement in the third quarter, as the City took steps to hire an administrative assistant and analyst who are scheduled to begin work in July of 2022. Nevertheless, we remind the City that at the close of the second quarter, the City has not formally responded to three recommendations made by PCCEP in the third quarter of 2021, nor have minutes from most PCCEP meetings in 2022 been posted.

COCL is satisfied that the PPB has continued to engage the community through a wide range of formal and informal advisory groups as well as through public events. However, racial disparities in traffic stops and consent searches remain a problem that requires further action.

Both PPB and PCCEP have sought to achieve a more public presence on the internet as they engage Portland's diverse communities, but both have been stifled by the City's new website. Hopefully, the technical support for public safety programs on the City's website can be given a higher priority in the future. Hiring a website manager would be a good first step.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# XI. ADDITIONAL REMEDIES

After five mediation meetings, the City and DOJ reached agreement on a set of remedies to achieve compliance with the terms of the Settlement Agreement[25]. On January 10, 2022, the DOJ and the City filed their final "Joint Status Report" in the U.S. District Court (ECF 275), summarizing the mediation results and the specific remedies on which the parties agreed in principle. Essentially, the parties have agreed to add a new section to the Settlement Agreement - Section XI - that contains eight new paragraphs 188 to 195.

These remedies were approved by the Portland City Council on February 9, 2022, and by the federal judge at the Fairness Hearing on April 29, 2022. Because the final approval of this amendment occurred in the second quarter of 2022, COCL will now provide a compliance assessment for the remedies found in Paragraphs 188 to 195.

| Settlement Agreement Paragraph | |
|---|---|
| 188. The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review of AAR and FDCR forms |

---

[25] These meetings included the Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Compliance Assessment**

In the second quarter of 2022 the PPB added a space to the FDCR form for officers to fill in the date and time of completion. The PPB is currently in the process of launching a SharePoint web-based AAR form which is scheduled to go live bureau-wide in the third quarter of 2022. This new form should allow for a more streamlined process of documenting crowd control events through updated dropdown menus, access to previous drafts, and automatic email notifications. The COCL looks forward to reviewing the news forms and seeing how they help improve the review process. Once the implementation process of Office365 is completed and the new forms are able to capture when they are edited and completed the PPB will be able to achieve substantial compliance with Par. 188.

| COCL Recommendations | ∉ To achieve Substantial Compliance, ensure Office365 is fully launched and implemented. |
|---|---|
| Compliance Rating Based On | ∉ Including date and time on FDCR and AAR forms<br>∉ Implementation process of Office365 |

**Settlement Agreement Paragraph**

189. Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| Compliance Label | **Partial Compliance** |
|---|---|
| **Methodology** | Interviews with PPB officials and review of documents |

### Compliance Assessment

The elements of Paragraph 189 constitute themes that run throughout COCL's reports since we first began assessing PPB's response to the 2020 protests. Because this is the first quarter where COCL can assess compliance for this paragraph, we take this opportunity to express our appreciation that the Parties jointly agreed to address these issues in a systematic fashion. This remedy is something COCL recommended after PPB's original After Action report failed to give a candid and self-critical assessment of mistakes made by PPB in response to the protesters.[26]

In performing our assessment of compliance for the second quarter, we primarily rely on interviews with PPB officials as well as documents that were given to us after they were publicly released. Aside from this information, the COCL team finds it difficult to fully report the progress of this paragraph since we were not kept informed of efforts to comply with it. For example, COCL was not invited to review the Scope of Work (SOW) to determine whether our original concerns, or those of DOJ, were being addressed. Additionally, we were not notified of any progress being made to hire an outside vendor to conduct the assessment.

Based on our recent discussions with PPB and City personnel, as well as the documentation we have seen, we can report that, during the second quarter of 2022, a group was hired to perform this assessment, and that representatives from this group made their first site visit to Portland in June to seek input from City officials, PPB employees, and community members. Given this information, we find the City and PPB to be in Partial Compliance with

---

[26] See, for instance, https://www.oregonlive.com/portland/2021/05/city-hired-consultants-blast-portland-police-analysis-of-bureaus-handling-of-mass-protests-as-tone-deaf.html

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

this paragraph. In order to reach Substantial Compliance, we will need to review the final report of the group, ensure that it meets the Scope of Work, and that PPB adequately uses it to develop a training needs assessment. As part of this, we would suggest that PPB and the City provide the COCL with progress updates so, if we identify any concerns that might impact the potential for Substantial Compliance, they can be addressed as soon as possible.

| | |
|---|---|
| **COCL Recommendations** | ∉ To achieve Substantial Compliance, the outside entity must collect and analyze data consistent with the Scope of Work, and prepare a report that critically assesses the City's response to the 2020 demonstrations<br><br>∉ To achieve Substantial Compliance, the City must use this report to prepare a training needs assessment<br><br>∉ To achieve Substantial Compliance, the outside entity must prepare a follow-up report that reviews the City's response to their original report, including the City's training needs assessment<br><br>∉ Keep COCL informed of the work planned and completed by the outside entity<br><br>∉ Provide COCL with the outside entity's reports and the City's training needs assessment |
| **Compliance Rating Based On** | ∉ Evaluation of progress used to hire an outside entity<br><br>∉ Evaluation of the products planned and delivered by the outside entity |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 190. Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interviews with City officials and review of budget documents |

**Compliance Assessment**

To conduct necessary training, the PPB included these overtime costs in its FY2022-23 budget proposal. Subsequently, the City Council included a separate line time for these overtime costs in the City's budget. Hence, the COCL finds that the City has achieved Substantial Compliance with the requirements of Par. 190. If the budget line item is removed in the next budget, the City will be assigned Non-Compliance.

| **COCL Recommendations** | ∉ To remain in Substantial Compliance, the City must continue to provide a separate line time for PPB training-related overtime expenses. |
|---|---|
| **Compliance Rating Based On** | ∉ Review of budget documents and amount of overtime funding included in the budget. |

**Settlement Agreement Paragraph**

191. Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold.

| **Compliance Label** | Partial Compliance |
|---|---|

**Exhibit A**

| Methodology | Tracking the hiring process for the Police Education Director |
|---|---|

**Compliance Assessment**

On December 17th, 2021, the City Council voted to fund the Police Education Director position. This person is expected to ensure high quality training for PPB officers, both in-person and online, that is consistent with adult-learning principles and evidence-based best practices. This individual will also ensure that outside training is reviewed and approved in advance and will have several other responsibilities.

As discussed in our Q1 report, the City made progress on filling the Police Education Director (also referred to as the civilian training dean or the police academic dean) position to lead PPB's Training Division. At the end of Q1, PPB, representatives from the Mayor's Office and City Council had reviewed the applications of the 18 candidates who met the minimum requirements for the position and had selected six candidates to participate in interviews. However, prior to the beginning of the interview process, two of the candidates withdrew from the process.

The interview process began during Q2 and consisted of two rounds. The first round consisted of two panel interviews. There were nine panelists representing the Training Advisory Committee (TAC), the Mayor's Office, Council Offices, PPB's Training Division, PPB's Equity and Inclusion Office, and rank and file members of PPB/the Portland Police Association. Each panel consisted of four to five panelists who asked each candidate eight questions, some of which were sourced from the PPB advisory councils. At the conclusion of the first round of interviews the scores for each candidate from the two panel interviews were combined to determine which candidates would move forward to the final interview. The panels indicated that three candidates should advance to the final interview. However, one of the three candidates selected to move forward withdrew from the process prior to the final interview. Only two candidates participated in final interviews.

The final interviews were conducted by the Chief of Police, a member of the community selected by the Chief, a Deputy Chief within PPB, and an individual who holds a position comparable to the Police Education Director in another jurisdiction. Near the end of Q2 the Chief determined which candidate would receive a conditional offer of employment to fill the Police Education Director position.

In the third quarter, the position was offered to a candidate and subsequently withdrawn. The offer of employment was rescinded based on "information" shared with the City shortly after it became public knowledge that the employment offer had been made. While this all occurred during the third quarter, we would be remiss to not contemplate this situation for this report given the high expectations that many people have for the Police Education Director and the City's plans to restart the hiring process for this position.

In previous reports we stated that we had hoped to see more community involvement in the process. As the City begins the hiring process anew, we see many opportunities to make worthwhile adjustments to the process, specifically by including more community voices in meaningful ways. COCL offers the following as examples of steps PPB could take to increase community involvement going forward:

- PPB could more broadly solicit the community for potential interview questions
  - In the previous process, PPB reached out to groups that comprise their advisory councils – which was a good first step but there is an opportunity to receive broader input.
- PPB could build time into the process for a community forum with the finalists where community members can hear from the finalist directly and ask their own questions.
  - This has been done in other jurisdictions with hiring for highly visible police oversight related positions.

Overall, prior to the unexpected recission of the offer of employment, the City and PPB had made good strides in fulfilling Par. 191. However, they have now missed the 150-day timeline and have been forced to reboot the search process. Hence, the City remains in Partial Compliance for Par. 191

In August of 2022, COCL provided PPB with a series of comments and recommendations on the revised hiring process. We will provide more information in our third quarter report. At this point, we will simply say that the Training Dean will need staff support (which the City has provided in the budget) and the independence to develop and implement new training without interference. We acknowledge that the Dean will function within the PPB bureaucracy and report to a Deputy Chief, but this individual is expected to have a significant role in determining the direction of training at PPB.

Regarding the public's concern about any candidate's background, COCL does not have a problem with someone who has served as a police officer in the past (that experience can be very helpful), but the individual hired should have experience with research and educational

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | methods that reach far beyond the experience of being a police officer (the civilian who serves in a similar role in the Baltimore Police Department is an excellent example). |
|---|---|
| **COCL Recommendations** | ∉ To achieve Substantial Compliance, as the City and PPB prepare to reinitiate the hiring process, they should build in more opportunities for community involvement in the process<br>∉ To achieve Substantial Compliance, the City and PPB should look for individuals who understand policing but also understand best practices in teaching and evaluation. |
| **Compliance Rating Based On** | ∉ The City publicly posted the Police Education Director position on 01/10/2022 which falls within the 90-day timeline from funding to posting[27]<br>∉ At the end of Q2 PPB was on track to make a conditional offer for the position which exceeded the 150-day timeline |

---

**Settlement Agreement Paragraph**

192. Within 60 days of the date this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of

---

[27] On December 15, 2021, the City Council voted to fund the Police Education Director position. The position was on the City's career page on January 10, 2022. https://www.portland.gov/council/agenda/2021/12/15

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interviewed PPB, CAO, and IPR personnel |

### Compliance Assessment

The IPR is currently in the process of conducting a series of investigations required by Par. 192. Presently, the IPR considers there to be four primary investigative areas: (1) providing deficient and contradictory training to RRT members; (2) directing or authorizing force in violation of 1010.00; (3) deficient FDCR and AAR reports, and; (4) command staff and above who did not correct misunderstandings and misapplications of PPB policy with regards to crowd control events. As such, IPR has opened four case numbers currently for the purpose of formalizing the investigation, but with the understanding that as individual PPB members are identified, subsequent case numbers will then be opened.

At present, the IPR is currently in the process of gathering information to assess the underlying assumptions of Par. 192 and identify the PPB members who should be the subject of the investigation. Additionally, the IPR is attempting to work with the Parties to determine the scope of the investigation. For instance, subsection (c) of Par. 192 is broad in nature and will have significant overlap with the Critical Incident Assessment required by Par. 189.

Therefore, the IPR will need to ensure that they are not unnecessarily duplicating efforts while also maintaining an independent investigation of PPB's response to the protests. Given these efforts, we find that the City is in Partial Compliance with the requirements of this paragraph.

Although we will continue to monitor the progress of each of these investigations, we feel it necessary to make some initial comments on the language and intent of Par. 192. For instance, several of this paragraph's subsections begin with an <u>assumption</u>, including the assumption that particular PPB members trained RRT members "to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00," as well as the assumption that particular PPB members directed or authorized others to use force without meeting the requirements of 1010.00. While we are not prepared to say that such assumptions are entirely speculative, they are assumptions nonetheless and IPR will need to provide compelling evidence that the underlying assumptions are true before they can move on to holding individual PPB members accountable. For instance, it is possible that no training specifically instructed RRT members to incorrectly ignore aspects of directive 1010.00, but rather there existed a cultural understanding that such actions would be allowed (relating more to subsection (c) of this paragraph). In such an event, the underlying assumption would be negated. As such, we will prioritize reviewing IPR's efforts in addressing the assumptions as the first phase of monitoring the implementation of Par. 192 and, if proven to be true, assess the investigation against identified PPB members.

Second, we will need to ensure that IPR conducts a fair and impartial investigation. However, given the language of Par. 192 (including the underlying assumptions) as well as the overall nature of the investigations, there is a possibility that investigators may feel pressured to reach certain conclusions (e.g., to identify and hold accountable several PPB members as responsible for the observed outcomes). If true, this may undercut the entire goal of the accountability system being fair and consistent. The investigations required by Par. 192 are still in their initial information-gathering phases and therefore we have no evidence that they are not being conducted fairly or impartially. However, this will also be a focus of the COCL team, and we will provide updates going forward.

| | |
|---|---|
| **COCL Recommendations** | ∉ To achieve Substantial Compliance, complete a thorough and accurate investigation of the command personnel associated with the 2020 crowd control and the training they provided |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| | ∉ To achieve Substantial Compliance, hold accountable the investigated command personnel members as appropriate who are found to have violated PPB policies in the manner described in Par. 192. |
| **Compliance Rating Based On** | ∉ Discussions with City personnel |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

193. In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | • Interviewed PPB personnel regarding progress on their 2021 Annual Report and plans for dissemination<br>• Reviewed PPB's 2021 Annual Report |

| | |
|---|---|
| **Compliance Assessment** | |

The COCL found PPB to be in Substantial Compliance with Par. 150. In addition, the PPB is on track to achieve Substantial Compliance with the added requirements of Par. 193. As noted earlier, a draft of PPB's 2021 Annual Report was completed in May of 2022 and revised in June based on feedback from PCCEP.

PPB has posted the final version of the report and is expecting to present the relevant content at Precinct meetings scheduled for July 13, 20, and 21. Thus, PPB will remain in Partial Compliance until they are able to achieve this goal, and thus meet the required deadline of September 20, 2022.

| | |
|---|---|
| **COCL Recommendations** | ∉ To achieve substantial compliance, hold the required precinct meetings to discuss PPB's 2021 Annual Report no later than September 20, 2022. |
| **Compliance Rating Based On** | ∉ Date the PPB final report was completed<br>∉ Date the PPB final report was presented at three precinct meeting |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**Settlement Agreement Paragraph**

194. Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a. The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

b. Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy. The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c. If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs. The City will provide a final procedural status update upon the completion of the collective bargaining process.

d. The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review of June BWC Status Report |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | Communication with PPB personnel |
|---|---|

### **Compliance Assessment**

The City is continuing to progress towards the implementation of a body-worn camera (BWC) policy and program. In the first quarter of 2022 PPB released a Request for Proposal (RFP) to solicit BWC vendors capable of supplying Portland with the equipment necessary for a BWC program. Additionally, the PPB started a process to gather subject-matter experts to assist in the scoring process, which is expected to continue into November 2022. This process is ongoing and will continue as negotiations with the Portland Police Association (PPA) and Portland Police Commanding Officers Association (PPCOA) continue the bargaining process, which includes the creation of a BWC program and policy.

The City requested that the DOJ set principles to govern a BWC policy, and in response, the DOJ released a letter to the City on November 15, 2021, addressing key issues, including deployment, notice, activation/deactivation/buffering, authorized users, preview, control of videos, and accountability. The DOJ additionally stated that public input should drive a BWC policy and be collected expeditiously before the PPB drafts and adopts such a policy. As discussed in COCL's first quarter report, part of the public input process was a public forum and community survey, facilitated by COCL, that brought together PPB, city stakeholders, community groups, PCCEP members, and the public to discuss questions and concerns.

As reported in federal court on April 29, 2022, the COCL underscored two findings from the community forum and survey regarding access to the BWC recordings. First, the community wants open access to the recordings for PPB supervisors, trainers, and auditors, as well as the general public. Second, in deadly force incidents, most survey respondents felt that PPB officers should not review the camera footage until after they have written their force report (called the "preview" issue). We maintain that this viewpoint is consistent with the Supreme Court's "Graham standard," which prohibits 20/20 hindsight, meaning that we should evaluate the use of force based on what the officer knew at the time, not what they learned later.

In the second quarter of 2022, the PPB underwent a series of next steps for the BWC program implementation including demonstrations from the top vendors; scoring of those vendors; vendor selection; grant application submission; and contract negotiations. The two remaining vendors demonstrated their products in May and were scored to determine which one will move on to the pilot program. This scoring process resulted in the selection of Axon, which is

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

heavily utilized by police departments of various sizes throughout the US. If Axon proves to be a successful selection, they will transition into full implementation at the completion of the pilot program. Axon also has a contact survey program (MY90) that can be linked to BWC data. COCL encourages PPB to inquire about this survey and have it modified to meet local needs.

The next step completed in the second quarter was a grant submission to the Bureau of Justice Assistance for the Body-Worn Camera Policy and Implementation Program. This grant assists and funds law enforcement agencies that seek to obtain BWCs for the purpose of establishing or expanding a BWC program in their respective departments. The PPB submitted a grant package to the BJA on May 25, 2022 and anticipates a decision by October 22, 2022.

Whether this grant proposal is funded or not, we hope that the PPB and the City will use this opportunity to exploit the rich data that will be produced from BWCs. COCL has recommended that the City look ahead strategically. If the City partners with researchers who have the right software, the BWC data can be used to identify specific types of interpersonal communication that lead to the escalation of conflict and the use of force, so that such encounters can be prevented or minimized in the future. Also, disparities in police treatment can be examined across various constitutionally protected classes. COCL has also recommended that first-line supervisors be trained to use BWC data for coaching and feedback to individual officers under their supervision. But these initiatives are down the road. PPB must first develop a sound BWC policy, basic training and a pilot program.

As mentioned previously, the PPB continued bargaining with the Portland Police Association (PPA). Additionally, discussions with the City Attorney's Office and the city procurement department began for the pilot contract and will continue for a couple of months until the details are worked out between the departments. However, the pilot program cannot commence until a BWC policy is finalized, which is contingent upon a successful bargaining process. Hopefully, the negotiations can be completed so the BWC pilot program can move ahead as scheduled for October 2022. If the City and the PPA cannot reach agreement, they will need arbitration to remove the impasse, which could add another six to nine months to the process.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | ⌐ To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement" (Par. 194). This means that the City will need to:<br>    ○ Complete the bargaining process<br>    ○ Finalize the BWC policy<br>    ○ Develop and implement BWC training<br>    ○ Complete a successful pilot test in the field<br>    ○ Achieve full-scale implementation of BWCs for PPB officers<br>⌐ During the bargaining process, we encourage the City to incorporate the recommendations from the community, the COCL and the DOJ<br>⌐ The PPB should seek to acquire software for analyzing BWC data and identifying patterns in police-community interactions that can be used for training and coaching.<br>⌐ The PPB should inquire about Axon's MY90 contact survey or other survey software and determine whether it can be linked to the BWC program |
| **Compliance Rating Based On** | ⌐ Progress made in bargaining, policy development, and hiring a qualified BWC vendor |

**Settlement Agreement Paragraph**

195. In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to City Council for final approval.

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

a. Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b. Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement. Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board. Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work. For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c. The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

| Compliance Label | Partial Compliance |
|---|---|

**Exhibit A**

| Methodology | Observation of Police Accountability Commission (PAC) meetings |
| | Review of PAC's Quarterly Report, April-June 2022 |

**Compliance Assessment**

The City is currently in Partial Compliance with the requirements of Par. 195, but considerable work remains to be done. On November 3, 2020, Portland voters passed Ballot Measure 26-217 to create this Community Police Oversight Board (CPOB) that would provide an entirely new police accountability system. The CPOB, which would replace IPR and even replace the Chief of Police for disciplinary decisions, will act as an independent body that has the authority to:

- Investigate all deaths in custody and uses of deadly force
- Investigate all complaints of force that result in injury, discrimination against a protected class, violations of federal or state constitutional rights
- Investigate other complaints or incidents of misconduct as they see fit or mandated by City Code
- Subpoena, gather, and compel documents and all evidence, including the ability to compel statements from witnesses and officers
- Compel sworn members of the PPB and supervisors to participate in investigations.
- Make policy recommendations to the PPB and City Council, and
- Impose discipline, including termination.[28]

To establish the community oversight board, in July of 2021 the City Council created a Police Accountability Commission (PAC), composed of 20 community members, with the directive of developing the new oversight board for the Portland Police. Following the fourth quarter of 2021 and first quarter of 2022, COCL members were present during both the full PAC meetings and sub-committee meetings. During the second quarter of 2022, PAC entered its

---

[28] https://www.portland.gov/sites/default/files/2021/portland-ballot-measure-26-217-11-03-2020.pdf

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

Fact-Finding Phase of work, as detailed in their quarterly report to Portland City Council. PAC's Fact-Finding phase focuses on gaining an understanding of the issues that PAC is aiming to fix and the ways they can learn from other jurisdictions, affected communities, and subject matter experts. This phase is expected to end in the third quarter of 2022.

Throughout the second quarter, the commission held 10 full PAC meetings, three sub-committee meetings, and one private community-building session. Speakers from the City Council, Mayor's Office, PPB, IPR, and the CRC gave presentations during these meetings. During an April work session meeting, the Commission discussed ways to better engage with the community and the barriers they face to community engagement. Another meeting of note, held in May, involved a discussion with the Mayor about his participation and limitations to the processes involved in officer discipline and termination. Related, later in June, the Chief of Police and Deputy Chief of Police presented to the Commission about the disciplinary process and the involvement of the chain of command. Currently, the meetings and space held by the PAC continue to show progress, however measured, toward fulling the requirements of this remedy.

The PAC has suggested that they face structural challenges through the quorum standard that was established for their body – 11 of 20 present to meet quorum. A letter was drafted to the City Council expressing their concern about the quorum requirement, asking the City Council to identify PAC alternates and lower the quorum to only a majority of active members. The end of the second quarter saw a final and approved letter transmitted to Portland City Council. The COCL remains cautiously optimistic and vigilant as the PAC requests a revision to quorum standards and will further monitor this issue in the next quarterly report. To date, the PAC has not experienced any quorum problems and they have been quick to replace members. As stated previously, COCL members will continue to attend PAC meetings and monitor any progress and changes to practices.

In response to Par 195(a), plans have been submitted to DOJ "for an orderly transition to the Community Police Oversight Board." Effective June 30, 2022, IPR was removed from the city Auditor's office by amending Portland City Code (PCC) 3.21. The plan to remove IPR was submitted in January of this year. IPR is now recognized as an agency independent of the City Council and other city bureaus. Under this amendment to the PCC, IPR can request services, assistance, and advice from any City department, officer, administrative agency, or bureau in the performance of its duties. To ensure continuity of resources to IPR, the City Council will fund IPR at the amount necessary to maintain operations until IPR transitions to the new Community Police Oversight Board. Similarly, non-represented IPR employees will be allowed

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

to transfer to an equivalent (or suitable) position offered by the City Council, or to the Auditor's office if offered. For represented IPR employees, the City will negotiate with the AFSCME to discuss the alternatives available to ensure the retention of represented employees.

The work of the PAC should eventually lead them to submit a proposal to the City Council that will include "changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board." (Par. 195 (b)). Clearly, there is much work to be done before such a proposal is ready to be submitted. Finally, the City will need to ensure that the proposed changes to the City code "comply with any collective bargaining obligations" (Par. 195(c)). The COCL will closely monitor the implementation of the amendment in the months ahead.

The PAC has worked hard to provide a process and framework for this remedy and the Committee is supported by competent and committed City staff. There is also a transition plan in place to sustain IPR until the new Board is functional. Therefore, COCL provides an initial rating of Partial Compliance for Par. 195.

| | |
|---|---|
| **COCL Recommendations** | ∉ To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a Community Police Oversight Board (CPOB) as defined in Par. 195 and compliant with collective bargaining obligations<br><br>∉ To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases. |
| **Compliance Rating Based On** | ∉ Progress achieved by PAC toward developing the CPOB.<br>∉ Implementation and functioning of the CPOB. |

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**BHRT:** Behavioral Health Response Team

**BHCC:** Behavioral Health Call Center

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CAG:** Coalition of Advisory Groups

**CEW:** Conducted Electric Weapons

**CCO:** Coordinated Care Organization

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COCL:** Compliance Officer and Community Liaison

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DOJ:** Department of Justice

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

219

**Exhibit A**

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FMLA**: Family and Medical Leave Act

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IPR:** Independent Police Review

**JOBS**: Job Opportunity and Basic Skills (JOBS)

**LMS:** Learning Management System

**PAC**: Police Accountability Commission

**PCCEP:** Portland Committee on Community Engaged-Policing

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PS3:** Public Safety Support Specialist

**RU:** Responsibility Unit

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

**SCT:** Service Coordination Team

**SNAP**: Supplemental Nutrition Assistance Program

**S.O.P.:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TANF**: Temporary Assistance for Needy Families

**TOD:** Tactical Operations Division

**UDAR**: Uniform Daily Assignment Roster

**YSD:** Youth Services Division

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**

# LIST OF PERSONNEL

Chief of Police: Chuck Lovell

Deputy Chief of Police: Michael Frome

Assistant Chief of Operations: Brian Ossenkop

Assistant Chief of Services: Michael Leasure

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Jeff Bell

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Peter Helzer

Behavioral Health Unit (BHU): Casey Hettman

EIS Supervisor: Matthew Engen

EIS Administrator: Dan Spiegel

Training Captain: Christopher Gjovic

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

COCL Quarterly Report: Quarter 2 Updates & Analysis, April 1, 2022 to June 30, 2022

**Exhibit A**