**Status Report before Judge Simon regarding**

**The Portland Settlement Agreement Case No. 3:12-cv-02265-SI**


**Statement by**

**Dr. Dennis P. Rosenbaum, Ph.D. and Dr. Thomas E. Christoff, Ph.D.**

**Compliance Officer and Community Liaison (COCL)**

**February 28, 2023**


**OPENING COMMENTS**

Your Honor, thank you for this opportunity to report our findings as the Compliance Officer and Community Liaison (or COCL as we are called). Dr. Rosenbaum could not be here today, so I will be representing the COCL.

We have now completed our compliance and outcome assessments for the third quarter of 2022 and have collected additional information from the fourth quarter, so we can give you a brief summary of progress and setbacks during this period.

Overall, your Honor, we continue to find that most systems used by the Portland Police Bureau to guarantee constitutional policing remained intact throughout the third quarter, and thus, the City remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. Equally important, they were able to move from Partial to Substantial Compliance for seven paragraphs. However, they remain in Partial Compliance for 16 of the original paragraphs and six of the new remedies, as described in our Q3 report.


**III. USE OF FORCE**

For Section III, several paragraphs returned to Substantial Compliance in our most recent report based on our review of a sample of use of force events. However, some issues continue to remain. For instance, at the last status hearing, we discussed the need for PPB to re-issue guidance on what does and does not constitute de-escalation. We have now made this a condition on ongoing Substantial Compliance with several paragraphs within Section III. Additionally, in our Q3 report, we provided concrete examples of how the Force Inspector might identify officers using force at higher rates than other similarly-situated officers. Although we

have seen some improvement of this occurring during the present quarter, we will be working with PPB and the Force Inspector to better refine the process, consistent with when we had previously found Substantial Compliance for those paragraphs.  Finally, we are still awaiting an operational distinction between when a deficiency can be handled through informal means (e.g., supervisor counseling) and when formal accountability mechanisms should be initiated (e.g., a supervisory investigation).  These issues will need to be addressed before PPB can return to Substantial Compliance with Section III.


**IV: TRAINING**

For Training, Section IV, the Police Bureau continues to be in Substantial Compliance with eight of the 10 paragraphs. They continue to maintain a robust system of data collection and analysis for their training programs. Also, COCL has been satisfied, overall, with the content and delivery of various training classes we observed in 2022, including the coverage of the legal requirements around crowd control. However, by the end of 2022, the Police Bureau had not achieved Substantial Compliance for Par. 84 because they had yet to provide crowd control training that does three things: (1) incorporates the latest changes to polices related to use of force and crowd control, (2) incorporates both internal and external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills.

Your Honor, the In-service Training that COCL and DOJ will be observing over the next two days will meet some of these requirements, as we will describe in future reports. However, Substantial Compliance will require additional training since the external assessment was not complete at the time of this In-service training. Also, COCL may have additional recommendations and requirements based on our observations of the training but will be able to say for sure once we've conducted our observation.

COCL's overall assessment of online training remains positive. However, we believe that some training would be more appropriate for an in-person format, including those that require in-class discussions (e.g., difficult conversations around bias-free policing or police responses to the LGBTQIA2S+/ Queer community) and those that require in-class practice of skills (e.g., de-escalation and procedural justice). From our perspective, the PPB has yet to adequately integrate these sensitive topics into in-person training, as recommended by the Equity and Inclusion Office (EIO), nor have they given sufficient attention to the interpersonal skills needed to achieve de-escalation and procedurally just outcomes during interactions with the public.

Finally, we have recommended that PPB revisit its Annual Performance Evaluation system and provide new training to supervisors who complete these evaluations. After reviewing the performance evaluation data for our most recent report, we found that not a single patrol officer

received a "Needs Improvement" rating on any of the 62 metrics used on their annual performance evaluation. Naturally, this raises concern about whether supervisors are taking a critical eye to the performance of officers under their command and is a potential cultural concern if officers are not being informed of areas where they could improve.

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES and VI. CRISIS INTERVENTION

We continue to find that the Police Bureau and the City have largely remained in Substantial Compliance with Section V (Community-Based Mental Health Services) and Section VI (Crisis Intervention). For Section V, we continue to find the Bureau and City have maintained their roles in multiple committees and workgroups designed to address important issues in city, county, and state approaches to providing comprehensive mental health services. We also continue to recognize the benefit of having a non-police response to low-level calls involving persons in mental health crisis. In our most recent report, we also provided an update on the issue of PSR's limited resources, hearing from City staff how the PSR queue may be closed at times during the day due to no available PSR responder. This also appears to be impacting PPB's officers' views of how reliable a PSR response might be on any given call. However, we are confident that the City is taking these issues seriously and is in the process of taking remedial steps, including by attempting to expand PSR funding avenues and forging closer relationships with PPB as part an overall City approach to mental health response.

For Section VI, we continue to find that the Enhanced Crisis Intervention Team, Behavioral Health Response Team, and Service Coordination Team are acting in accordance with the requirements of the Settlement Agreement. In our most recent report, we also found improved operations of the BHUAC, including conducting outreach to increase membership, emphasizing providing formal recommendations, and a comprehensive review of crisis response training. Additionally, in March of this year, the BHUAC will receive a presentation from the Force Inspector, reviewing summary statistics of non-lethal force events and hearing essential facts of lethal force events that occurred in the prior year. We will provide our observations of this presentation in our 2023 Q1 report.

## VII. EMPLOYEE INFORMATION SYSTEM

The Police Bureau remains out of Substantial Compliance with Section VII (Employee Information System) as the issue of identifying outlying officers, supervisors, and teams has not yet been resolved. As noted before, we have provided some concrete examples for PPB with respect to identifying issues of concern and will need to work with PPB moving forward to ensure that this

process is in-line with the expectations of the Settlement Agreement.  Additionally, efforts to conduct a comprehensive evaluation of the EIS to ensure that it "more effectively identif[ies] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion" continue, though at a slower pace than we would hope.  We are meeting with PPB representatives this week to re-engage on this assessment though it is becoming increasingly likely that this evaluation will not be completed prior to the next COCL or Court Monitor being appointed.  However, we will continue to work with PPB in the coming months to set the stage for such an assessment.


**VIII. OFFICER ACCOUNTABILITY**

For Section VIII (Officer Accountability), we continue to find that Police Bureau and the City are not in Substantial Compliance for several paragraphs, though they are in Substantial Compliance for several others.  For paragraphs out of Substantial Compliance, many are the same paragraphs that we had found out of compliance for similar reasons in prior reports: a backlog in the Records Division continues have potential implications for the availability of documents during an administrative investigation; Directive 1010.10 still requires revision to account for the requirements of Par. 126; IPR has yet to revise their SOPs as it relates to Par. 129 (though we are aware that this effort is underway); and there are still deficiencies in the overall management of the accountability system.  This also has impacted the City's ability to comply with the broader requirements of Par. 169.  We will continue to work with the Police Bureau and the City on these issues and have set aside time this week to address some of them.


**IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)**

Section IX focuses on the Police Bureau's Community Engagement efforts and the role of the Portland Committee on Community-Engaged Policing (PCCEP).  Your Honor, as we told you in November, the first half of 2022 was very difficult for PCCEP, but things began to improve in the third and fourth quarters. Excellent support staff were hired by the City, new PCCEP members were onboarded, and the PCCEP redefined itself with new subcommittees. However, when we interviewed the members individually, they reported feeling ineffective at accomplishing many of their authorized duties and responsibilities, including community engagement. Despite their frustrations, these volunteers have remained committed to their work and hope to see improvement in the near future.

Section IX also requires the Police Bureau to demonstrate a sound community engagement plan. The Police Bureau has continued to engage the community through a range of advisory groups. However, we strongly encourage the City to introduce and institutionalize an <u>independent contact survey</u> as a way to give voice to the thousands of community members who have lived experience interacting with Portland Police officers. Thus, in a separate technical assistance report, published on February 2nd, Dr. Rosenbaum laid out a plan for this Contact Survey Program, and described how it can be used to measure the level of procedural justice and public satisfaction with police services. If used properly for coaching, training, and performance evaluation, this contact survey program should have a profound impact on police-community interactions, give voice to the community, and ultimately strengthen public trust in the Portland Police Bureau. Whether such a program is required by the Settlement Agreement is a matter of legal discussion though the report does identify several relevant sections of the Settlement Agreement that the survey can act as a measuring stick for. Our hope is that the City will develop and implement this program on its own rather than have it imposed by COCL or DOJ though that decision will be left to the Parties.

## XI. ADDITIONAL REMEDIES

The COCL continues to monitor the preliminary work associated with eight new remedies found in Section XI.  The City has achieved Substantial Compliance with two of the eight remedies (Pars. 190 and 193).  Of the remaining remedies, COCL believes that three are likely to have the largest impact on police reform. First, Par. 191 requires the hiring of a Civilian Dean to rethink the delivery and evaluation of police training. That hiring process was restarted in a much improved fashion and is nearing completion.  Second, Par. 194 requires the implementation of Body-worn Cameras (Par. 194), which should promote civility during interactions and provide critical recordings needed to improve procedural justice on the streets of Portland.  Unfortunately, the bargaining process has delayed implementation, including finalization of the BWC policy. When the BWC program is finally implemented, we recommend that the City conduct an audit of officer's usage patterns to ensure policy compliance. Third, and finally, Par. 195 requires the creation of a Community Police Oversight Board. The 20-member Police Accountability Commission assigned to this task has been working very hard, but progress has been slowed by the need for background research on best practices. Also, the complexity of the operational problems they face, including the investigation of use of force cases and the administration of police discipline, dictates a considerable investment of time to develop methods that are efficient, effective, and equitable.  Meanwhile, the functions of the Independent Police Review (IPR) cannot be compromised – new and ongoing complaints must be properly addressed in a

timely manner. Thus, COCL will be keeping an eye on current police accountability during this transition period.

Thank you, Your Honor.