**Mary Austad**

| | |
|---|---|
| **From:** | Portland Copwatch <copwatch@portlandcopwatch.org> |
| **Sent:** | Thursday, February 23, 2023 4:04 PM |
| **To:** | Rosenbaum-COCL, Dennis; Jonas Geissler; Jared Hager |
| **Cc:** | Mary Austad; PortlandCityCouncilwheeler@portlandcopwatch.org; Commissioner Dan Ryan; Commissioner Carmen Rubio; Commissioner Mingus Mapps; Rene Gonzalez; PCCEPinfo@portlandoregon.gov; News Media |
| **Subject:** | Analysis: Cops Get Unearned Passing Grades in More Areas of Settlement Agreement- February 2023 |

CAUTION - EXTERNAL:

Note: this analysis can also be found online at
https://portlandcopwatch.org/COCLanalysisPCW0223.html

To:  Compliance Officer/Community Liaison
    US Department of Justice
cc: Hon. Judge Michael Simon
    City of Portland
    Portland Committee on Community Engaged Policing
    AMA Coalition for Justice and Police Reform
     and other community organizations
    News media

COPS GET UNEARNED PASSING GRADES IN MORE AREAS OF SETTLEMENT AGREEMENT
an analysis by Portland Copwatch, February 23, 2023

The Compliance Officer/Community Liaison (COCL), which assesses Portland
progress in following the remedies laid out in the 2012 US Department of
Justice (DOJ) Settlement Agreement, posted a new draft Report in
January, covering Q3 2022.*-1 As usual, Portland Copwatch doesn't
necessarily agree with all of the ratings. The most egregious this time
is the finding that the Behavioral Health Unit Advisory Committee
(BHUAC) is in compliance for reviewing use of force and deadly force
against people in mental health crisis (paragraphs 95 & 96), even though
the first presentation of data and summary reports to the Committee
isn't taking place until March 2023, well past the end of the September
30 end date of the reporting period. The COCL also gave "Substantial
Compliance" to paragraphs about use of force (66, 67 & 69), another one
about the BHUAC around officer training (98), and one about the
volunteer membership and staffing of the Portland Committee on Community
Engaged Policing (PCCEP-- paragraphs 143 & 144). In addition, two of the
recent remedies agreed upon to fix problems after the crackdown on the
2020 racial justice uprisings led the City to fall out of compliance
became rated as "Substantial" (188 fixing a report form & 193 about the
Bureau's annual report).*-2 This leaves either 21 (by our count) or 22
(by COCL's) paragraphs still in "Partial Compliance."*-3 To their
credit, the COCL continues to urge the PPB to use its own data showing
racial disparities to figure out ways to reduce those disparities.

However, as usual PCW finds that many of the conclusions still go too easy on a Bureau that doesn't properly hold officers accountable, continues to lose trust with the community, and generally seems not to care whether they fully comply.

An outside report by the Independent Monitor LLC consulting group covering the 2020 protests was due out in January. As of February 20, that report still does not exist, meaning the Bureau will not be able to comply with a number of remedies. While that group's report is late, they didn't get stared on it until mid-2022 because the PPB did two of their own inadequate reports before that, running down the clock. Looking at the number of officers who resigned or retired since 2020, it's likely that most of those responsible for the violence are long gone, so even if the Independent Police Review (IPR) finds supervisors who encouraged such behavior at fault (per Paragraph 192), the main hope is that systems will be fixed to prevent such problems moving forward. Other aspects being held up without the independent report are: creating new policies, updating training and tracking of officers' behavior.

Four officers used deadly force in the quarter, with three occurring in a period of four days. Two resulted in civilians' deaths, yet the COCL's focus is only on whether the Bureau followed its protocols to investigate the incidents, not whether they may have involved people in crisis or violations of civil rights. The COCL has adamantly refused to do an analysis of deadly force cases, claiming the sample size is too small. But by the end of 2022, the PPB had shot or shot at 17 people in the course of two years, so there should be plenty to consider in their Q4 Report.*-4 The Report makes no mention of the fact that the PPB decided to stop sharing the names of officers involved in shootings after the first two took place, despite their policy requiring release within 24 hours. This decision was widely criticized by community members and the media, and was not resolved until December. At the February 2 Town Hall presenting the Report, the COCL confessed to not having any knowledge of this issue, making a strong argument that whether there is a new COCL or a Court Monitor, they need to have stronger local ties to Portland,

At that same Town Hall, the COCL stated that they still did not know the status of the investigation into biased training slides, an investigation which supposedly began in September of 2021. In other words, it was incomplete for over 365 days in the period covered by the Report,. Another 115 days passed before the Q3 Report was released. All investigations are supposed to be completed in 180 days (paragraph 121), but this one case took over 480. On February 22, six days before the next federal court hearing on the Agreement before Judge Michael Simon, the City announced that one officer had been disciplined.

As the City and DOJ are about to present to Judge Simon on progress made since the last hearing on November 9. Media also reported that the City and the Portland Police Association (PPA) are heading into arbitration over the policies on Body Worn Cameras, one of Simon's high areas of interest. That, the slow progress on the training slides investigation,

and the facts contradicting the highly-touted return of the Portland Committee on Community Engaged Policing (PCCEP) to its full 13-person membership may push Simon to try forcing changes to be made as he implied in November. Three of the new PCCEP members resigned within five months of being appointed, a fourth member's term ended in December, and Council only filled two of four empty seats at a hearing on February 15.

The finding that the BHUAC is in compliance before remedies have been enacted is similar to how other paragraphs (including 66 & 67) were prematurely praised, and is similar to giving a student an "A" just for handing in their homework without checking the substance.

In this analysis, paragraph numbers generally appear in (parentheses) and Report page numbers in [brackets].

----------

COPS FLOP: PLACES THE COCL FOUND INADEQUATE ACTION

Some major issues were raised in the Report, including the following:

--The online training on equity led the COCL to discover problematic thinking among some officers around racial bias, ableism and white supremacist ideology (84) [p. 77].

--In reviewing the Bureau's annual performance evaluations of officers, which the COCL argues can help improve how things play out on the streets, no officers received a rating of "needs improvement" in 2133 data points reviewed [pp. 5, 81 & 91-92]. Each officer's report includes 62 areas of review. The COCL suggests a culture change so that supervisors will feel comfortable using that rating to provide constructive feedback. Bonus fact: One area of review is whether the officer follows the law. Apparently, whether or not officers know policy is the lowest rated data point, coming in at 2.08 on a scale of 1-3 [p. 233].

--Even though there's an entire section on Community Engagement which includes an elaborate plan to help the PPB gain trust with the public (146), the Bureau has not been prioritizing such interactions [pp. 9 &196]

--After years working on cards about the right to refuse to consent to a search, they are finally available. But the training on searches failed to alert officers to the cards' availability in five languages (84) [p. 73].

--Neither the PPB nor the COCL seems to know why the North Precinct's 10 PM-2 AM shift was only able to provide Enhanced Crisis Intervention Team (ECIT) officers 39% of the time, compared to the overall response rate of 68% (100) [pp. 112-113].

THAT'S NEWS TO US

Portland Copwatch tries to follow all things related to police
accountability in this City. However, sometimes information is either
buried or not shared with the public at all. Here are some newsworthy
items in the Report:

--The PPB is putting some uses of force that result in community members
going to the hospital in a lower category than required because they are
not clear-- after 10 years under the Agreement, mind you-- whether
"treatment" means the person was admitted into the hospital (70) [p.
35]. PCW has addressed this issue in comments on the Bureau's policies
but did not realize the faulty reporting was ongoing.

--The Report reveals that internal reviews of After Action Reports led
to five cases being sent to Internal Affairs for possible use of force
violations, one sent to policy, two sent to training, and four to
commanders (74, 75 & 77) [p. 42]. So, maybe sometimes the PPB can take
steps toward accountability.

--In this quarter, two officers used force seven times and one used
force eight times. The COCL notes this is 1.8% of officers who used
force, but 7.4% of force reports made (76) [p. 45].

--Police now categorize a person having a needle or spitting at them as
being "armed." This description was previously used 5% of the time, but
is now up to 12%. The concept is quite bizarre since most humans carry
spit with them at all times (76) [p. 46]. A table shows
"Needle/Spit/Bodily Fluid" was used six times in 2020, 13 times in 2021
and 13 times in the first nine months of 2022 [p. 47].

--The increase in force used against people in mental health crisis is
up from one in 20 to one in eight, a 250% increase (76) [p. 46].

--Even though there were eight deadly force incidents in 2021 and two in
the first six months of 2022, the Police Review Board, which is supposed
to look at both out-of-policy cases that lead to discipline and deadly
force cases, never met between July and September (131) [p. 154].

--The COCL says that the City's Discipline Guide is not used in a
consistent manner. Additionally, cases opened under the old Guide are
having those provisions applied to them. They threaten to take Paragraph
137 out of compliance unless the Bureau updates the policy on the Guide
[p. 159].

--Six members of the PCCEP responded to questions from the COCL about
the group's effectiveness. The majority indicated they don't feel PCCEP
is fulfilling its duties. One person said the PPB was told to stop
coming to meetings while PCCEP was getting new members. They
characterized the relationship with the Mayor and the Bureau as poor,
saying there was some perception that "former" PCCEP members were
"anti-police." Three of those interviewed had been on since before 2022,
three were new [pp. 186-188]. Portland Copwatch would add that this

4

analysis pointed to the availability of the Zoom chat function as an improvement to PCCEP meetings, but the trade off is there's hardly any time for verbal public input anymore.

--The PCCEP members also recommended doing a new survey of the community about their perceptions of police [p. 189], which is called for in paragraph 146 but the City conducted two and then stopped years ago.

--The City did not get a Bureau of Justice grant to pay for Body Worn Cameras for the police [p. 211]. For the BWC program, the PPB has apparently hired four people (three in records people and one in IT, with two more records positions open), even though they don't have the cameras yet. Also, in a footnote the COCL says they now rescind their recommendation to use Axon's community survey connected to body cams as it should be independent of the PPB; this is consistent with concerns brought up by PCW.

--When officers are trained about force now, the PPB does not teach any specific rules, but only talks about the federal court ruling known as the "Graham Standard" (84) [p. 63]. They tell officers they have to explain their reasons for using force and the type of force. They also have cut down the types of resistance officers can describe to just two: active and passive. To their credit, the Bureau is teaching cops that when there is a question about being objective, it means according to case law, not other cops.

--Scenarios taught in PPB training this quarter included officers asking questions to a man loudly knocking on a door, and it turning out he lived there, as well as an officer being pinned down by a person with a hammer (84) [pp. 64-65]. The latter scenario almost always ended with shots being fired.

--The relatively new Active Bystander for Law Enforcement (ABLE) training asks what stops an officer from intervening when others appear to be violating law or policy (84) [pp. 65-66]. In training videos, officers (from other jurisdictions, we believe) say the wish they had intervened. Strangely, there are different ABLE reporting requirements for officers who are part of a collective bargaining unit and those who are not [p. 76].

--A training video on managing public spaces, i.e. doing camp sweeps, or as termed by the City, "cleanups," says officers are supposed to stay until the sweep is done. However, a City employee _or contractor_ can send them away (84) [pp, 74-75]. Officers attending sweeps are supposed to identify people-- but if the "cleanup" is to address sanitary issues, there is no reason for police to do that unless police are fishing for warrants. The COCL notes that the training doesn't instruct officers to issue a receipt for property that is seized.

--After years of concern about officers not removing their weapons before entering the Unity Center on mental health calls, the Bureau now claims the times that happened were "isolated incidents" and now

officers are required to remove their firearms (89) [p. 97].

--The PPB's Behavioral Health Unit says their Behavioral Health response Team is looking into obtaining a Crisis Response Dog (95) [p. 105].

--Some officers went to a training about the rise of white supremacist movements. For some reason, though, these were officers on the Behavioral Health Response Team (109) [p. 122]. One can argue that white supremacy is a form of mental illness, but it still seems this should be part of the Bureau's anti-bias training for all cops. Unless of course the training is to teach them how to be a better white supremacist.

--Emergency call takers did not dispatch Enhanced Crisis Intervention Team officers to 5170 calls. Of 249 that were audited, 17 qualified (about 7%), which the COCL says is typical (Paragraph \115) [p. 131]. This implies that over 300 calls were not properly routed. Calls to Portland Street Response were down by 22% this quarter because they don't always have enough personnel to respond. Incidentally, there is no indication of why Public Safety Support Specialists can't be sent on some of these calls-- and no mention of the PSSS program at all in the entire Report.

--In this quarter, 13 cases about officers were sent for criminal investigations (122) [p. 144]. There were four shootings involving six officers, so what were the other cases and what kinds of misconduct / crimes are being investigated?

--Along those lines, the PPB issued a total of 24 communications restriction orders for the four deadly force incidents in Q3 (125) [p. 147]. With only six involved officers, it would be good to know who else received those orders.*-5

--IPR added a button on their home page so it is easier for complainants to access complaint status updates (138-140) [p. 161]. Notably, PCW called attention to the lack of such a link in an earlier analysis.

--There is a plan in place to keep the Independent Police Review running until the new oversight system is in effect (195) [pp. 12 & 216]. IPR is to maintain operations until the new board is in place to ensure continuity. Non represented IPR employees can get new position in the City or with the Auditor, represented employees will negotiate their future.

--The Report claims that all officers affirmed that they read the Settlement Agreement after it was amended in April, 2022 (81) [p. 58].

--In an attachment (Appendix B) reviewing the ECIT training done in Q3, the officers' responses to various aspects are telling. The officers gave low ratings for a consumer panel discussion, with 90% liking it compared to 93-100% for others. For instance, "Threat assessment" got 100%, but trauma informed care only received 85%. A unit on the killing by Washington County Sheriff's Deputies of Lukus Glenn in 2006 got 91%

6

for use of time but only 78% for teaching something new. Scenarios presented included a woman in an alcove with a knife, which got the lowest ratings (72%). Force options on a man with paranoia at a homeless shelter got 97%. One of the scenarios will be revised or dropped due to feedback, but it doesn't say which one [pp. 224-228].


(continued in next email)
CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

## Mary Austad

| | |
|---|---|
| **From:** | Portland Copwatch <copwatch@portlandcopwatch.org> |
| **Sent:** | Thursday, February 23, 2023 4:05 PM |
| **To:** | Rosenbaum-COCL, Dennis; Jonas Geissler; Jared Hager |
| **Cc:** | Mary Austad; Mayor Ted Wheeler; Commissioner Dan Ryan; Commissioner Carmen Rubio; Commissioner Mingus Mapps; Rene Gonzalez; PCCEPinfo@portlandoregon.gov |
| **Subject:** | (2) Analysis: Cops Get Unearned Passing Grades in More Areas of Settlement Agreement- February 2023 |

CAUTION - EXTERNAL:

(continued from previous email)

STILL TO DO

The PPB and the City have been given more than adequate time to complete tasks to bring themselves back into compliance with the Agreement. Some examples of items left undone:

--Despite repeated requests from the COCL, the Bureau has not clearly defined which cases get resolved by supervisor counseling and which ones go to full investigation (73) [p. 39].

--The 911 operators have not been able to create an official policy for dispatching Portland Street Response as a non-police alternative for mental health calls (113), mostly because there are still discussions going on with the Portland Police Association about what calls PSR is allowed to take [pp. 7 & 129].

--The Bureau's Force Inspector continues to send all information about officer use of force to supervisors (116 & 117), instead of narrowing the list down to those officers whose force use stands out among their peers [pp. 8 &136]

--Though it's not clear of the substance, the Independent Police Review is supposed to fix a Standard Operating Procedure around the mandatory investigations of use of force complaints (129); in the past the COCL has said they want to help the IPR legitimately dismiss more cases [pp. 8 & 151].

--After an officer who witnessed a police shooting refused to get interviewed in 2021 by claiming they were traumatized, the COCL said the Bureau has to fix their policy to accommodate such incapacitation (126), which currently is limited to physical injuries [pp. 8 & 148].

--Though IPR is back up to a reasonable amount of staff now that they are independent of the Auditor's office, because the Bureau's Records Division still has a backlog of 45,000-50,000 records to process,

Paragraph 128 is still in Partial compliance [p. 150].

--Though it had been a full year at the time of the reporting period
(and is now nearly 1.5 years later), the Mayor and Bureau have not
responded to recommendations made by PCCEP in Q3 2021 (142) [p. 9]. The
City has also not finalized either the PCCEP plan nor the city code that
would make PCCEP a permanent institution, blaming all of these problems
on turnover in the Mayor's office [pp. 171-172].

SUPPOSEDLY FIXED OR FIXED ITEMS

As noted above, PCW is not sure that all of the paragraphs now found in
"Substantial Compliance" fully fix the problems they were meant to
solve. However, some fixes are potentially simple and real.

Dubious ones include:

--Three paragraphs about use of force policies (66, 67 & 69) were found
in compliance despite the COCL noting that officers don't seem to be
clear on what is or is not a form of de-escalation [p. 30]. The COCL
even threatens to remove the Substantial label if they don't fix this
issue by June 2023. So, why up the ratings at all?

--The finding for the PPB to be in compliance on auditing its training
has been Substantial for a while, because the Agreement doesn't say how
often the audits have to be done (85). However, the COCL is only giving
the PPB until the end of 2022 to complete a new one [p. 84].

--Regarding the BHUAC talking about force and deadly force, the
Inspector General is supposed to present to them with force data and
"essential facts" of lethal force cases on an annual basis. The BHUAC
had comments and questions, and agreed to the proposal at their October
meeting. COCL conditioned their "Substantial" rating on what happens in
March, which again raises the question of why it's not still in Partial
compliance (95) [pp. 105-106]. Similarly, the BHUAC is supposed to
comment on 911 policies and the COCL found them in full compliance on
Paragraph 96... unless they fail to do so by March as well [p. 106-107].

--Paragraphs 150 and 193 about the presentation of the Annual Report are
both given clearance [pp. 11, 184 & 208]. The PPB "checked the box" by
giving a draft to the PCCEP in late May, presenting at their meeting in
late June, holding meetings in each Precinct in July, and having Council
vote to approve the Annual Report on August 31, prior to the Sept. 20
deadline in the new remedy. However, the public wasn't properly informed
when PCCEP received the draft, the Precinct events happened with little
prior notice, and the Chief did not tell Council any of the feedback
they heard at those events. As noted in our previous comments, the PCCEP
meeting about the Annual Report wasn't publicized until the day before
it occurred.

--PCCEP's membership was, for the first time in a year, up to its full
13 members, satisfying Paragraph 143 [pp. 24 &171-172]. However, as

noted above, one member retired and three quit within a few months and PCCEP is still down by two people.

--The newly hired staff for PCCEP has picked up the pace of posting minutes and videos online, which pulled Paragraph 144 up to "Substantial Compliance." However, even the COCL notes that the notes are hard to find on the website [p. 173]. Moreover, staff drew up changes to the PCCEP's bylaws and other documents without their input, created agendas for them while denying them the ability to choose their own leadership, and often fails to give adequate notice for meetings.

Ones which appear to be adequate are:

--The PPB added fields to two forms on reporting Force to include the dates that each officer working on it has completed their writing/reviewing (188) [pp. 10 & 200].

--The BHUAC gave input into the Crisis Intervention Training this year because the PPB (finally) gave them the plan far enough in advance, bringing Paragraph 98 into compliance [p. 108-109].


GLIMMERS OF HOPE

There are some issues that the COCL has focused on that either show improvement by the Bureau or by the consultants themselves. Examples include:

--A footnote on page 44 talks about how use of force against crowds and officer involved shootings [sic] are not included on the Bureau's website. The COCL writes "Particularly given that PPB has had 17 OIS event in the past two years, the highest 2-year total since at least 2010, the reader should interpret our analysis with this in mind" (76).

--The COCL pays particular attention to the fact that one officer whose force applications per arrest were at 65% compared to 21% for other people on that officer's shift. Their criticism of the PPB for not examining the reasons for this is so strong they even underlined the text (116 & 117) [pp. 135-137]. The higher rates were dismissed as unimportant because, for instance, an officer may have been the "cover officer" in a two-person car... even though other officers performing the same function did not have those high rates. Commanders and Captains reviewed nine officers for disproportionate force use, but looked at whether each act of violence was in policy rather than why they used so much of it. The Force Inspector did not identify outliers. The COCL says the Bureau can find a way to figure out why this is happening without necessarily laying the blame on the outlier officers.

--As noted since 2020, the COCL has continued to discuss the racial disparities in traffic stops. In the Q3 report they say Black and Latino drivers were stopped more frequently compared to Q1 & Q2. Black people make up 6% of the population but the percentages of stops were 19%, 17%,

3

and 20%. Latinos are 10% of the population and made up 12%, 11%, and 13% of stops (148) [pp. 178-179]. Though PCW would say those fluctuations aren't significant, the disparities pointed to are. The COCL goes on to say that there have been more stops of Black drivers for non-moving violations, which they call pretext stops, as well as an increase in searches [p. 180]. Black drivers are less likely to refuse to consent to a search. Latinos received more citations in Q3 regardless of the reason for the stop. The COCL suggests they may pull compliance on this paragraph if steps are not taken to address the disparities, which have been clear for five years (well, 23 years, actually, but ok).

--Regarding the collecting of data on whether training is effective (80), the COCL notes that turnover in the Training Division is problematic [p. 55]. PCW has noted that there have been five Captains in five years.

--Training on workplace harassment included racism as an issue (84) [p. 66].

--It is so rare that a misconduct case goes all the way to a jury and results in a civil penalty that PCW thinks there was only one time the COCL has ever reported on investigations prompted by such findings. The COCL notes that the Bureau did lose a case in Q4 and promises to report on it next time (133) [p. 156].

--The training about consenting to searches says that such consent must be "clear, specific, unequivocal, voluntary and obtained without coercion" (84) [p. 72].

--At the same time PCW has started to see the Training Advisory Council begin to ask questions about PPB use of force data, the COCL urges the Bureau to make their quarterly reports to the TAC more "useful" (86) [p. 85].

--The COCL asks again for the Bureau to create one web page where information about all advisory groups to the PPB can be found, an issue that predates the COCL being hired in 2014 (145) [p. 176].

--In the discussion of the PPB's Community Engagement, the Report points out that it is important for officers to attend meetings where they may feel uncomfortable instead of only "fun" events like summer festivals [p. 190]. They note that "of course" the police want to manage their public image.

MISSTEPS STILL HAPPEN

There are other points of analysis by the COCL that Portland Copwatch finds troubling, even, dare we say, bogus. Here are some:

--Though the PPB's Q3 Use of Force Report shows that only 0.38% of calls

4

for service result in force being used,*-6 the COCL doesn't comment on
the fact that 5% of calls involving mental health crisis resulted in
force (105) [p. 115].

--The Report claims there was community input into the Bureau's annual
training plan through the Training Advisory Council (79) [p. 51]. PCW
attends most every TAC meeting and did not see any proposed
recommendations specific to the training plan, nor was the public
attending the meetings invited to give input. Moreover, the Report says
the assessment of the PPB's crowd training included looking at
complaints and responses to demonstrations, input from the community
(again, not sure in what form), listening to the Portland Business
Alliance and the Portland Police Association, and looking at "literature
on local protesting and extremist groups" [pp. 51-52]. This is what the
COCL calls "doing their homework."

--Regarding the training plan, rather than go into great detail as the
COCL does in many other areas of the Report, they tell the reader to
read the document themselves [p. 52].

--The COCL says that officers missed one or more classes in 24
instances, though that could be few officers missing multiple classes
(81) [p. 59]. Why don't they know?

--There seems to be no argument about the PPB using the term
"de-escalation" to mean two things. They now refer to "pro-active" and
"reactive" de-escalation, with the first use to prevent the "need" to
use force and the other is lowering the force already being used [pp.
63-64]. The COCL seems to think it's ok to consider numerical
superiority a form of de-escalation, even though it has the potential to
escalate and really fits the definition of intimidation (84).

--There is also a loophole to when officers can use force against people
who are passively resisting-- if such resistance "impedes a lawful
objective" (84) [p. 64]. How could the police possibly abuse this
loophole?

--Officers who are supposedly getting extra skills to de-escalate were
given training on "Targeted violence and threat assessment" (84) [p.
66]. Why prepare them to anticipate threats, wouldn't a more neutral
term be "safety assessment"? The same analysis talks about mitigating
the risk of violence, but they don't say whether that's by the police or
the community member [p. 67].

--While it's impressive that training for the Special Emergency Reaction
Team*-7 includes emphasis on the sanctity of life, they also include a
scenario where they fire their weapons (84) [pp. 71-72].

--The Report says that the public can listen to Training Advisory
Council meetings and make comments (87) [p. 88], but ignores that fact
that they do not allow input prior to their taking votes.

--The COCL continues to shrug off that lack of committing crimes (28%) and not having a criminal history (21%) are two of the biggest reasons people can't get treatment and housing through the Service Coordination Team (112) [p. 116].

--The Report indicates that the most frequent misconduct allegations are about improper conduct (29%), procedure (26%) and force (25%). Data show that overall only 18% of allegations were sustained (found out of policy), 41% were "exonerated" (found in policy), and 21% were thought to be "unfounded" (the incident did not occur as described). Another 20% had insufficient evidence to make any of the other findings. Although this information is in a section referred to as an outcomes analysis, the COCL does not cross-reference what kinds of allegations resulted in which findings. They also provide information that when low level complaints are investigated by supervisors, 76% are not substantiated while 24% are, a slightly higher rate [pp. 164 & 168-169].

--The PPB is commended for doing outreach for the Precinct meetings regarding their Annual Report (150). But in a footnote on page 185, the COCL admits they have no evidence of East Precinct's outreach, that North Precinct only reached out to four large organizations, and that Central Precinct sent out 77 emails, which we assume doesn't mean one a day for 77 days but rather one email to 77 recipients.

--The COCL describes the PPB's Office of Community Engagement as "aggressively" working to meet its goals, perhaps not the best term to use regarding people who carry guns,, Tasers, batons, pepper spray and other weapons [p. 190].

--After the finalist to become the new civilian "dean" of PPB training was rejected due to something that turned up in a background check (likely anti-community social media posts that activists discovered), the Bureau began a new search in Q3. Despite community concerns, the COCL says they are ok with that person being a former officer (like the rejected candidate) so long as they have educational training skills (191) [p. 205].

--A special attachment about the performance evaluations reveals that they refer to officer-community interactions as "customer service" [p. 231]. PCW repeatedly says that people are not going into a "police store" to buy something; the police are public servants with the authority to use violence to enforce state policy.


SEEKING CLARITY

In several places in the Report, there is a suggestion that certain information is available, but no links are given as evidence. For instance:

--The Training Division is supposedly tracking all recommendations they receive [p. 86]. However, PCW could only find a link to all

recommendations made by the Training Advisory Council, which does not immediately indicate the substance and status of those recommendations < https://portland.gov/police/tac/ppbtacrecs>.

--The Report says that the TAC agreed to post its meetings on YouTube at its September meeting [p. 87], which implies that the November and January meetings are online. PCW could not find either of them.

--The Enhanced Crisis Intervention Team did not show up for 48 out of 1302 calls (4%) for reasons listed as "other," but no examples are given (100) [p. 112].

--A footnote on p. 190 says that the Muslim Advisory Council helped quell a protest by getting PPB to provide more information on an "incident that occurred in their community." It would probably be helpful to the broader community to have more context for this development.


CONCLUSION

It is hard to tell whether there will be any channels for the community to learn some of the "inside baseball" information that the COCL has been reporting on if and when an Independent Monitor is picked to take over compliance reviews. Regardless, for the time being these Reports continue to be informative, even when some obvious shortcomings by the City and PPB are being ignored. PCW also continues to think there could be a lot less repetition in each Report, so they would not keep clocking in at 200+ pages. The COCL's website gives an estimated release date of April 11 for the next quarterly report, and with Dr. Rosenbaum retiring at the end of June, that will be the last from this particular COCL team as it is currently organized.

PCW continues to urge the City to take on the proposed reforms with enthusiasm and grace, if they want to gain the trust of the public and create a Police Bureau that meets or exceeds constitutional standards. The fact that two major issue raised by the Judge in November were magically "resolved" in the two weeks prior to the new hearing show that the City is still dragging its feet.


---------

Footnotes

*1- Find the Report at https://tinyurl.com/COCLQ32022

*2- Though the COCL says this makes a total of seven paragraphs moving into compliance (p. 3), it is actually eight, or ten including the two new remedy paragraphs.

*3- On page 3, the COCL says the City is in Partial compliance on 16

original remedies and six new ones, or 22. But
COCL only lists these 21 paragraphs as being only in Partial
Compliance-- Force (6): 70, 73, 74, 75, 76, 77; Training (2): 78, 84.
Employee Information System (2): 116, 117; Accountability (5): 126, 128,
129, 134, 169. Community Engagement (1): 142; New remedies (5): 189,
191, 192, 194, 195.

*4- A footnote on p. 44 indicates the COCL is aware this is the highest
rate of shootings since "at least 2010."

*5- It says the following numbers of communications restrictions were
issued on these dates, PCW has added the numbers of involved officers in
parentheses: 7/24/22 3 (1), 7/26/22 2 (1), 7/27/22 9 (1), 8/16/22 10
(3).

*6-
https://portland.gov/police/documents/force-data-summary-report-2022-q3/download

*7- PCW still urges the PPB to change the name of SERT to the Special
Emergency RESPONSE Team, so they're not always reacting.

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or
clicking on links.

## Mary Austad

| | |
|---|---|
| **From:** | Portland Copwatch <copwatch@portlandcopwatch.org> |
| **Sent:** | Friday, February 24, 2023 3:10 PM |
| **To:** | Mary Austad |
| **Subject:** | Re: 3:12-cv-02265-SI United States of America v. City of Portland |

CAUTION - EXTERNAL:

Ms Austad
Thank you for sharing this information.

I haven't heard 100% how each member of PCW who wants to speak is going
to appear, but am assuming for now we'll all be calling in remotely.

Please sign up these four people in a block:

Dan Handelman, Marc Poris, Barbara Bochinski, Philip Chachka

If the order is going to change I will let you know.

I also hope to submit a full testimony to the court (to help Mr.
Apodaca) once we have it finalized, but we weren't able to get that done
by today.

If you would like to enter the following into the record so the Judge
has some idea what we'll be addressing, please do.

Portland Copwatch plans to address at least these topics in its
testimony on Tuesday, February 28 at the status conference:

--The training slides investigation and the inadequate resolution
announced 6 days before the court hearing.

--Body cameras and the announcement 11 days before the court hearing
that a decision will be left to an arbitrator, meaning there is no
obvious avenue for public input.

--The again-delayed report on the 2020 protests, which is now supposed
to be released in April rather than January.

--Ongoing racial bias despite years of attention, and a refutation to
the PPB's claims about people skewing the data by driving into Portland
from surrounding areas.

--The failure to keep a full roster of members at the Portland Committee
on Community Engaged Policing.

--Various issues raised in the latest Quarterly Report by the Compliance

Officer including the preliminary judgment about the Behavioral Health Unit Advisory Committee.

--The COCL's lack of knowledge about the PPB failing to release names of officers involved in deadly force and how that relates to the idea of an independent court monitor.

--The need for the City to align the deadline for the Police Accountability Commission with the Court's order entered April 29, 2022, which gave 18 months from that date to finish the Commission's work.

--Impediments to the City coming into full compliance as observed by Portland Copwatch and others in the community.

--dan handelman
portland copwatch