**Juan C. Chavez**, OSB #136428
Email: jchavez@ojrc.info
**Franz Bruggemeier**, OSB # 163533
Email: fbruggemeier@ojrc.info
**Amanda Lamb**, OSB #222284
Email: alamb@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270

      Attorneys for *Amicus Curiae* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>CITY OF PORTLAND,<br><br>      Defendant. | Case No. 3:12-cv-02265-SI<br><br>*AMICUS CURIAE* MENTAL HEALTH ALLIANCE'S FEBRURARY 2023 STATUS REPORT |

**NOVEMBER 2022 STATUS REPORT**

*Amicus Curiae* Mental Health Alliance ("MHA") provide this Status Report for the scheduled status hearing on February 28, 2023, at 9:00 am. Members of MHA and their counsel will present testimony within their allotted 10 minutes in support of their statements here.

This status report is supported by the declaration of their counsel, Juan C. Chavez, and includes Exhibits 1 and 2.

///

## I. INTRODUCTION

MHA joins the Albina Ministerial Alliance Coalition ("AMAC") in their concerns regarding the trajectory of the settlement agreement and the much needed involvement of the community in the decisions made in this case largely behind closed doors. Because we align with AMAC on many of these points, we will largely not readdress them here. MHA would like to direct the Court's attention to a few key matters. As ever, MHA seeks to center the voices of persons with mental illness who both appear before the Court and those who cannot.

The last time the parties returned to Court in this matter, the Court made two observations MHA would like to highlight:

> "[T]ransparency, in my opinion, is an important part of the solution to this problem, and I think that sooner rather than later, and I really, frankly, was expecting it would be by now, that we would have some greater transparency on how did those offensive slides get in there and what's being done to remedy that problem."

Nov. 9, 2022 Hrg. Trans. 11:24-12:4.

> "I am assuming that everybody is acting in good faith here. But at some point, if this continues too long, I'm going to ask and invite the United States to file some type of motion, because there is a possibility that both sides to the collective bargaining negotiations may find it in their interest to move more slowly than either the United States, as plaintiff, or the Court, as supervisor of the settlement, thinks is appropriate."

Nov. 9, 2022 Hrg. Trans. 42:1-8.

The parties have spent the better part of the last year waiting for progress on the items from Section XI. While the Defendant City of Portland have two scant updates on the above, MHA cannot say that the updates bring us further towards transparency or compliance.

In our effort to provide helpful information to the Court, MHA needs the transparency that the Court also called for last hearing. Without that transparency, MHA is without enough

information to be a vigorous friend of the court. As here, MHA wishes it could better inform the Court of its opinions regarding the investigation into the RRT slide, but it cannot because the release of the findings letter—signed January 6, 2023—came less than a week prior to our status conference.

Less than a month before the hearing, and less than a week before in regard to the training slide, the City has provided some new information, but little beyond that. Similarly, while mediation between the parties continues often behind closed doors, the public cannot be heard except by the *amici*. But MHA is often left to wonder, as is the public, whether the City and Defendant-Intervenor Portland Police Association understand and value the role of the public in this process. The public has not been involved in conversations weighing the different policy options explored during mediation.. Additionally, the conversations has not been focused on how to reduce or end the pattern and practice of violence against persons in a mental health crisis.

Because of the consistent delays, lack of transparency, and lack of a role for the public to play in important policy decisions, we believe it is necessary for the Court to act directly. For the community and for the *amici*, opportunities to be included and heard feel like an afterthought to the media cycle and optics of this proceeding. That is not a dynamic that brings us closer to a conclusion in this case. MHA proposes that we break this pattern by bringing the Court's power to bear.

MHA believe that the Court should order Plaintiff United States to *enforce* its settlement agreement against the City, particularly in regards to Paragraph 169 which relates to discipline of officers, and Paragraph 194 which relates to body-worn cameras. As stated in the Settlement Agreement, "The Parties anticipate that the City will have substantially complied with all

provisions of the Agreement by October 12, 2017." Dkt. 276-1, ¶ 175(a). We are 1,964 days overdue.

## II. DISCUSSION

### A. Court Intervention

The purpose of this settlement agreement and the primary concern of MHA is to end the pattern and practice of violence against people experiencing mental health crises. The City has had ample opportunity to both hold individual officers accountable and work to improve the policy, training, and accountability systems to change police culture and ultimately achieve the stated goals of this settlement. And yet we saw PPB's violent response to protestors in 2020 and continued use of excessive and deadly force against people in crisis, with only narrowly targeted changes to address the individual behavior of a few without enough attention toward the system as a whole. And now we see continued delays in investigations, implementing body-worn cameras, and hiring a training dean. Instead, where does the community find the Bureau's energy being spent? In lobbying on behalf of private firms like ShotSpotter,[1] and advocating for a new airplane.[2] Meanwhile, as our prior briefing illustrates, the City's police continue to trend towards ever increasing violence against our community. Dkt. 319, pp. 6-7.

The Court can *sua sponte* demand that the United States show cause why their settlement agreement has not been enforced. *See Exh.* 1, *United States v. Miami-Dade County, et. al.*, Case 1:13-cv-21570-BB, Dkt. 246 p. 4 (S.D. Fl. 2022) (ordering the United States to show cause as to "why, despite Defendants' well-documented and repeated failures to comply with the Consent

---

[1] Jonathan Levinson, *Gunshot detection company investigated for possible violations of Portland lobbying laws*, Oregon Public Broadcasting (Feb. 17, 2023), available https://www.opb.org/article/2023/02/17/portland-oregon-shot-spotter-shotspotter-gunshot-detection-technology-police/
[2] John Ross Ferrara, *City Council approves PPB spending $1.5 million on new patrol plane*, KOIN 6 News (Feb. 1, 2023), available at https://www.koin.com/news/portland/city-council-approves-ppb-spending-1-5-million-on-new-patrol-plane/

Agreement and Settlement Agreement, the United States has failed to seek enforcement of either Agreement.") We ask that the Court do so here in this case.

**B. Updates**

    1. Training Slide Investigation.

The City of Portland has agreed to "apply policies uniformly and hold officers accountable for complying with PPB policy and procedure." *Id.* at ¶ 169. Additionally, the City "shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means." *Id.* at ¶ 121.

In its briefing to the Court back in November 2022, the United States stated that it has concerns about the investigation and Police Review Board process regarding the training slide. Dkt. 307, pp. 2-3. We still do not know the nature of the United States' concern. While the City ultimately imposed discipline on a single officer for one single slide, better transparency would allow the public and the *amici* assess the City's commitment to ¶ 169 of the settlement agreement.

As the Training Slide investigation and countless others before it demonstrate, the City's primary concern appears to be avoiding litigation, either from the community or by PPA, not in creating or upholding a true accountability system. While some City employees undoubtedly invested an immense amount of personal labor, finances, and time into conducting this investigation, the outcome will do little to change the parts of the system and police culture that allow the pattern and practice to persist. Imposing low-level discipline on only select individuals several years after the harm does little to interrogate the system that allowed them to not only

operate within that system, but perpetuate the unconstitutional activities by training other officers.

Nevertheless, it *is* a positive development that the City determined who likely put the offensive "Prayer of the Alt Knight" into an Rapid Response Team ("RRT") training deck, and decided to discipline him. However, several issues remain unanswered:

- The investigation into the other offensive and legally incorrect slides have either not been investigated or completed.

- Sgt. McDaniel has been sued three times because of his personal involvement in alleged excessive force at protests. Why did this not trigger further scrutiny of his trainings? *See, e.g.*, Settlement Agreement, Dkt. 262-1, ¶ 83 ("PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force"); and *see* ¶ 81 (PPB shall track and report training materials, including lesson plans and training delivered, and supervisors shall at least semi-annually review that database for the officers under his/her command).

- Commander Dobson confronted Sgt. McDaniel about the slide after he presented it to RRT trainees. Why did Commander Dobson not inform the Training Division, Internal Affairs, or other superiors?

- Only Commander Dobson and Sgt. McDaniel recalled seeing the offensive slide prior to the investigation. How is that plausible?

- When confronted by the Training Division head after initiation of the investigation, Sgt. McDaniel denied being involved with the slide's inclusion.

      Evidence strongly suggested otherwise. How can Sgt. McDaniel remain a police officer despite having credibility issues?

- There should be effective internal procedures in place to approve training slides, which would prevent inaccurate or offensive trainings from being delivered. There are also terms in the Settlement Agreement that should have prevented the creation and use of violent, offensive, and incorrect training materials. *See, e.g.*, Settlement Agreement, Dkt. 262-1, ¶¶ 81 (training materials must be reviewed by supervisors); 82 (training materials must be delivered to U.S. DOJ); 83 (must create policies to prevent trainers who have a history of using excessive force); 85 (Inspector and COCL must audit PPB to ensure that maintain accurate records of trainings delivered, including substance and attendance, are kept"). Were all of those obligations met and followed in this case? They do not appear to have been. Why did they fail to prevent the training from being delivered? Was anyone investigated or disciplined for the failure of process? What changes are being made to ensure adequate controls are in place that will be prevent inaccurate or offensive and legally incorrect trainings in the future?

Officers from four departments—Portland Police Bureau, Multnomah County Sheriff's Office, City of Salem, and Oregon Police—participated in this RRT training. If some of them had come forward with their concerns about the slide, then their protestations are not documented. Is there a code of silence? Were concerns brought but not documented? Or most troubling, do these officers agree with or are they not offended by calls for unconstitutional violence against police accountability protesters?

We are hopeful that the ongoing investigation into the matter will answer these and other questions.

2. Court Monitor.

The City and PPA have spent the last year delaying the implementation of the City's new body-worn camera policy per its obligation under Section XI of the settlement agreement. Dkt. 276-1, ¶ 194. By most reports, including the City's current Status Update to the Court, Dkt. 341 at 2, the impasse came to fore on the issue of pre-review of footage prior to report writing.[3] If PPA are successful at arbitration and succeed in having a body-worn camera policy contrary to the stated expectations of the Plaintiff United States and the needs for the tool as a remedy for non-compliance with the Settlement Agreement, we will then spend the following months unsure whether the United States will enforce the agreement or how PPA will delay its implementation further.

MHA has previously expressed its support for a Court Monitor being appointed in this case. In prior briefing, MHA detailed some of their expectations for such a position. The parties are presently locked in mediation, as each participant has told the Court in their briefings. Like AMAC, MHA has not participated in all sessions of mediation between the parties and cannot advise the Court on the provisions being negotiated.

Without breaking confidences, MHA simply wants there to be an avenue for the public to truly be engaged with the monitoring of the Police Bureau, that any changes are changes to add a monitor and not hidden revisions to the Agreement itself, and that such a monitor be committed to staying in Portland until the pattern and practice of harm ceases.

---

[3] Sophie Peele, *In Portland's Impasse Over Body-Worn Cameras, Sticking Point Remains Pre-Review by Cops*, Willamette Week (Feb. 17, 2023), available at https://www.wweek.com/news/courts/2023/02/17/in-portlands-impasse-over-body-worn-cameras-sticking-point-remains-pre-review-by-cops/,

3. Body-Worn Camera.

As we have written in previous briefs, Dkt. 284 p. 11-12, as a corrective remedy, a prospective body worn camera policy stemming from the City's previous non-compliance needs to be built upon principles of transparency and accountability—not as a surveillance tool supplanting an officer's constitutional duty to be able to articulate and justify their actions. Pre-review would be contrary to the purpose of ¶ 194.

A survey of other similarly-sized jurisdictions show that approximately half forbid pre-review of the camera footage prior to use of deadly force report writing, while the other half does. *Ex.* 2. Approximately 10% of the cities—specifically Atlanta, El Paso, and Tucson—surveyed prohibit pre-review prior to all force reports being written. *Id.* While there are prudential and constitutional purposes for prohibiting pre-review, MHA emphasizes that body-worn cameras are meant to be a remedial tool in this case and are part of the Settlement Agreement because of that, not as a force augmentation tool. As we will likely not see resolution on this paragraph in the coming year, and that resolution could very well likely create a conflict between the parties, it is all the more imperative for the Court to compel Plaintiff to action on this point. The constitutional rights of the public should not be bargainable. The parties signed an agreement concurrent with this point. They should be wary to stray from that principle.

## CONCLUSION

MHA never makes these points lightly or without the conviction that they are necessary to save the lives of vulnerable people. MHA hopes to be heard by the Court.

DATED February 27, 2022.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Of Attorneys for *Amicus Curiae*
Mental Health Alliance