**JONATHAN BETZ BROWN, MPP, PhD**

E-mail: jonabrown@gmail.com
2559 NW Overton Street
Portland OR 97210
Phone: 503 473 4796

## Testimony and New Data on Use of Force

Submitted February 28, 2023, to the United States District Court, for the District of Oregon, Portland Division, regarding United States of America v. City of Portland

Case No. 3:12-cv-02265-SI

## SUMMARY

After a steady three-year increase, the rate of use of force by Portland Police Officers on persons likely to be experiencing a severe mental illness crisis has begun to decrease. The volume of 911 dispatches for probable mental crises has also started to decrease.

Both decreases began in mid-2021. Their combined effects on decreased counts of use of force are additive, and the effect is large. Reported incidents of use of force are roughly 35% of their peak in April 2021.

The drop in use of force that I report demands further study. There are many competing explanations. Effective future action depends on knowing which are true. To learn more about the causes of the drop in mental-crisis force-incidents, I have begun working with three masters-level students from the Vrije University of Amsterdam to conduct interviews and perform additional data analyses. The student-interns will arrive in late March to begin a month of interviews in Portland.

Of course, the impetus for the present Settlement was unconstitutional *lethal* force against persons with mental illness, not the day-to-day *sub-lethal* force that I have studied. And Portland's volume of officer-involved shootings has not diminished. 2022 was a record high year for police-involved shootings, most of which continue to involve mentally impaired decedents. It remains uncertain whether reductions in *sub-lethal* force will cause eventual reductions in *lethal* force. Causes, and therefore the remedies for avoidable lethal force, may be different. In addition to studying sub-lethal force in Portland, the University of Amsterdam students and I will test whether decreases in sub-lethal force cause fewer instances of lethal police force, by combining Portland data with data from other West Coast cities to obtain a sufficient sample size.

However, the Portland City Attorney recently declared that no member of the Mental Health Alliance is permitted to speak to any City employee without the approval, oversight, and possible participation by the City Attorney. I ask that the Court require the City to

facilitate our interviews and provide necessary datasets in a timely and constructive manner, while the student-interns are still in Portland.

I urge the parties and the court to divert more effort and resources to the study of real outcomes and causes. This might be accomplished through the new Court Monitor or by creating a semi-independent non-governmental "observatory" that could combine and analyze data from many governmental and private entities, including body-worn camera data, and manage surveys like the police interaction feedback survey that outgoing COCL leader, Dennis Rosenbaum, has proposed.

## RESEARCH METHODS

In the great majority of PPB force-incidents, two or more officers participate in the application of force. Therefore, to observe the constitutionality and effect on citizens of official use of force, it is best to study total *incidents* of force, not just individual officers' reports of their own behavior.

In addition, to detect changing patterns of force, it helps to study *rates* of incidents of force, not just counts of incidents. Rates and ratios are calculated by dividing data about force-incidents by a denominator that adjusts for changes in the volume of opportunities to use force. PPB does not share its datasets on all encounters, which would be most helpful, but they do post data on 911 dispatches. Dispatches trigger the large majority of use-of-force incidents. Therefore, the work described in this testimony focuses on ratios of incidents to dispatches.

To calculate rates for circumscribed civilian groups, such as the severely mentally ill, I looked (in the sub-lethal force dataset) for those dispatches in which particular groups were concentrated. I discovered that each impairment group (mental, alcohol, and drug) clusters into a small group of dispatch types—types that with one exception do not overlap. In every case, I used a consistent formula to associate impairments with dispatch types. Anyone can view the entirety of the work I did, from the original uploaded PPB datasets, through every step of data wrangling, through the program that created every word and figure in this document, by following this link: https://posit.cloud/content/5165743. Interested persons should contact me for help identifying the relevant datasets and programs.

## RESULTS

### POLICE DISPATCHES

I begin by describing the changing volumes of police dispatches, because dispatch volumes affect and show the importance of calculating rates, which I report subsequently.

**Police Dispatch Volume Varies Dramatically by Season. Overall Dispatch Volume Has Been Declining Since 2019.**

As Figure 1 shows, police dispatches in Portland vary dramatically by time of year, historically peaking in July and August. In 2020, amid the COVID-19 lock-down and citizens' efforts to protect police-officers and other workers from exposure to the virus, calls to 911 dropped precipitously, by about 4000 calls per month. 911-calls regained half of this lost volume in 2021. But in 2022 calls declined again, down to 4000 fewer calls per month than 2019. The summer peak did not materialize.



Figure 1. Total Police Dispatches by Month
Portland Police Bureau, Q1 2018 - Q4 2022

Includes all Bureau of Emergency Communication Dispatches.
Excludes traffic stops and officer-initiated encounters.

**Dispatches for Mental Illness Crises Dropped Less than Other Dispatches after COVID Started, but then Dropped More in 2021 and 2022.**

Figure 2 shows monthly counts of the dispatches that account for most use-of-force incidents involving a severe mental illness crisis. Unlike other dispatches, summer mental crisis dispatches peaked at pre-COVID levels in 2021. COVID-related losses of mental health services may have triggered this. The use-of-force data also show that homelessness increased about 50 percent among mental crisis subjects, but not drug abuse impairment did not appreciably increase (data not shown).

Starting in the Fall of 2021, mental crisis dispatches dropped well below pre-COVID levels. Portland's Bureau of Emergency Communication (BOEC) received about 1000 fewer mental crisis calls per month in 2022 than they got in 2019. The expected summer peak was also modest in 2022.



Figure 2. Mental Crisis-Concentrated Police Dispatch
Portland Police Bureau, Q1 2018 - Q4 2022

Number of highly mental crisis-associated BOEC dispatches.
Highly mental crisis-associated dispatch categories are:
Behavioral Health, Welfare Check, Assist, Juvenile and School Problem.

## RATES OF USE OF FORCE FOR MENTAL CRISES

### After Mid-2021, Mental Crisis RATES of Use of Force Began to Drop

Figure 3 displays Portland's monthly mental-crisis rates of use of force through 2022.

Based on data through June 2021, I previously reported to the Court that no statistically significant lessening in the rate of use of force during mental health crisis could be seen.

Now, with 18 months more data, a period of decreasing probability of use of force per mental-crisis dispatch clearly has begun. The decrease started in mid-2021, just as mental-crisis calls to 911 began to drop.



Reported force incidents mental crisis-associated BOEC dispatches.
Mental crisis-associated dispatch types are:
Behavioral Health, Welfare Check, Assist, Juvenile and School Problem.

With the benefit of longer hindsight, force-rates per mental-crisis dispatch now show three distinct "eras":

> (1) Jan-June 2018: following an initial dramatic increase in force reports in 2017 (data not shown), when PPB required many more kinds of force to be reported, the volume of force-reports (FDCRs) dropped rapidly, for unknown reasons.
>
> (2) July 2018-June 2021: over these three years, an approximate doubling in mental-crisis rates of force occurred. Meanwhile, force rates in nearly all *other* subgroups and discharge-types declined (data not shown).
>
> (3) July 2021-Dec 2022: a dramatic new decline in rates of mental-crisis use of force began.

## COMPARISON TO RATES OF USE OF FORCE IN OTHER GROUPS

Figures 4-6 show rates of use of force in other dispatch-groups: no impairment (Figure 4), drug impairment (Figure 5), and alcohol impairment (Figure 6). For clarity, these figures omit the first six months of 2018, when officers were adjusting to the new force-reporting system.

For dispatch-types in which **few subjects were impaired,** force-rates on show no seasonal variation and a steady 4.5-year increase. An isolated jump in August 2021 may have something to do with the Black Lives Matter demonstrations that occurred during that summer, despite PPB's work to exclude demonstration-related incidents from its posted use of force dataset.



Figure 4. Non-Impaired Force Rate
Portland Police Bureau, Q3 2018 - Q4 2022

Rate of policing incidents involving significant force that occurred during BOEC dispatch-types in which any impairment is rarely reported. Non-impaired dispatch categories are Suspicious, Stolen Vehicle, Theft, Robbery, Assault, Restraining Order Violation, Burglary, Animal Problem, and Alarm.

Force-rates during **drug-impairment** dispatches grew steadily until February 2021, when Measure 110 went into effect, decriminalizing personal possession of most formerly illegal drugs. See Figure 5, below. After January 2021, the data show that a jagged but definite decline in drug-related force began. Presumably, this decline evolved as officers attempted fewer arrests per drug-related 911 request, and as prosecutors accepted fewer cases because of Measure 110.



Figure 5. Drug-Impaired Force Rate

Portland Police Bureau, Q3 2018 - Q4 2022

Policing incidents involving significant force that occurred during drug-impaired BOEC dispatch-types.
Drug-impaired dispatch categories are Welfare Check and Unwanted Person.

Force-rates during **alcohol impairment dispatches**–traffic accidents, DUII, and domestic violence incidents–show a generally unchanging pattern, except for an upward blip in Winter 2021-22, which might be random variation. See Figure 6, below.

Figure 6. Alcohol-Impaired Force Rate

Portland Police Bureau, Force Data Collection Reports and Dispa

Policing incidents involving significant force that occurred during alcohol-impaired BOEC dispatch-types.
Alcohol-impaired dispatch-types are Disturbance, Collision, DUII, and Domestic Violence



## DISCUSSION

The recent drop in mental crisis force-rates is remarkable for several reasons.

First, in absolute terms it is a *large* reduction. As shown below in Figure 7, from the peak in mid-2021 to the end of 2022, uses of force during mental crisis dispatches have dropped from more than 20 per month to perhaps 6 or 7 per month. This is a roughly three-fold decrease. The combined effects of fewer dispatches and less use of force per dispatch are additive.



Figure 7. Mental Crisis Force Incidents
Portland Police Bureau, Q3 2018 - Q4 2022

Number of incidents involving significant force that occurred during mental crisis-associated BOEC dispatch-types: Behavioral Health, Welfare Check, Assist, Juvenile and School Problem.

Second, all else being equal, the decrease in mental-crisis dispatch volume might easily have caused an *increased* rate of use of force *per dispatch*, but apparently it did not. For example, an increase would have occurred if it was the less difficult calls to 911 that Portlanders stopped making, leaving a more dangerous "casemix" for PPB to deal with.

Third, to the best of my knowledge, this sudden, dramatic change is unexpected, and its *causes are as yet unknown*. The Settlement Agreement was not modified in mid-2021. Nothing in the hundreds of requirements in the Settlement Agreement that I know of directly produced the change in rate. Nothing in the reports that I recall from the COCL or the PPB Inspector General has yet described it. No publicly described supervisory action or published change in PPB policy explains it.

Perhaps…individual police officers have come to recognize the futility of trying to help mentally ill Portlanders by forcing them into emergency rooms that do not want them, cannot fully help them, and cannot transfer them because inpatient mental health facilities are full. The fact that officers are now sending an increasing proportion mental-crisis force

recipients to jail might be a sign of this awareness (data not shown). Criminal prosecution is now said to be the only way to gain admission to inpatient mental care in Oregon.

Perhaps…persons with severe mental illnesses and their families have simply come to understand, especially after PPB behavior during the Black Lives Matter demonstrations of 2021, that inviting the police into mental breakdown situations is too dangerous. Perhaps, in severe situations, they are turning instead to hotlines such as Multnomah County's Behavioral Health Call Center (503-988-4888), which through Cascadia Behavioral Healthcare provides 24/7 mobile intervention teams.

Perhaps…BOEC's 911 operators have simply started to refer more calls to non-police responders, and to Portland Street Response, which coincidentally began its roll-out in mid-2021.

Perhaps…officers have simply stopped reporting uses of force on the mentally ill.

Many more "perhapses" could be listed. Which are supported by the evidence? The parties and the public need to know. The evidence deserves more study and I would urge the parties and the court to divert more effort and resources to the study of real outcomes and causes. This might be accomplished through the new Court Monitor or by creating a broader non-governmental "observatory" that could combine and analyze data from many governmental and private entities, including body-worn camera data, and manage surveys like the police interaction feedback survey that outgoing COCL leader, Dennis Rosenbaum, has proposed. As I believe my own work demonstrates, (1) an unbiased independent eye can add real value and (2) police data alone are not sufficient to understand how, why, and how responsibly police use force.

I, myself, have begun working with three masters-level students from the Vrije University of Amsterdam to conduct interviews and perform additional data analyses. The student-interns will arrive in late March to begin a month of interviews in Portland.

In this connection, I must inform the Court that the Portland City Attorney recently prohibited me from contacting any City employee without the prior approval, monitoring, and possibly participation of a Deputy City Attorney. I hope that the City will facilitate our interviews and provide necessary datasets while the student-interns are still in Portland.